

**JUDGE BERMAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 3042

| | |
|---|---|
| Rio Tinto plc, | |
| Plaintiff, | Civil Action No. |
| v. | COMPLAINT |
| Vale, S.A., Benjamin Steinmetz, BSG Resources Limited, BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSGR Guinea Ltd. BVI, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR Guinea, Frederic Cilins, Michael Noy, Avraham Lev Ran, Mamadie Touré, and Mahmoud Thiam, | JURY TRIAL DEMANDED |
| Defendants. | |

RECEIVED
APR 30 2014
U.S.D.C. S.D. N.Y.
CASHIERS

For its Complaint, Plaintiff Rio Tinto plc ("Rio Tinto") alleges as follows:

## I.   **INTRODUCTION**

1.     This is a case about the theft of Rio Tinto's valuable mining rights by the Defendants through a scheme in violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), hatched and substantially executed in the United States.  The U.S.-based enterprise's ultimate target was Rio Tinto's mining concession in the Simandou region of southeast Guinea.  Simandou is one of the most valuable iron ore deposits in the world, estimated to be worth billions of dollars.  At the time Defendants devised their fraudulent scheme, Rio Tinto had spent eleven years and hundreds of million of dollars developing mining operations at Simandou and expected it to yield substantial profits into the future.

2.     At the heart of the RICO scheme was Defendant Vale, S.A. ("Vale"), an international mining company whose American Depository Receipts (ADRs) are among the most-heavily traded on the New York Stock Exchange.  Beginning in August 2008, Vale entered into discussions with

Rio Tinto to purchase some of the Simandou asset. The Rio Tinto-Vale negotiations began in person with two meetings in New York in November 2008, during which Rio Tinto provided Vale with highly confidential and proprietary information regarding Simandou. Rio Tinto provided this information in good faith pursuant to a confidentiality agreement that required Vale to treat the information with discretion and solely for the intended purpose – to determine whether Rio Tinto and Vale could agree to terms on Rio Tinto's interest in Simandou.

3.      Rio Tinto's proprietary information showed Vale both the extraordinary value of the Simandou concession and how to develop it. As Vale quickly surmised, gaining control of the Simandou deposit would strengthen Vale's position in the world's high-grade iron ore market, since the only other comparable source is Vale's own Carajas Iron Ore Mine in Brazil.

4.      Defendant Vale saw a golden opportunity to not only obtain that control, but to do so on the cheap, when Vale learned from Rio Tinto that Defendants Steinmetz and BSG Resources Limited (collectively with its named subsidiaries and affiliates, "BSGR") were attempting to interfere with and steal Rio Tinto's rights to the Simandou concession. Given BSGR's reputation for corruption and bribery—well known among those active in the mining industry, including Vale— Vale was on notice that Steinmetz's and BSGR's efforts to misappropriate Rio Tinto's rights included bribing various Guinean officials.

5.      For Steinmetz and BSGR, bribing officials was particularly necessary to acquire Simandou because they lacked any track record in iron ore mining. But bribery alone would not be sufficient for Steinmetz and BSGR to successfully exploit Simandou. Steinmetz and BSGR needed a partner with significant iron ore mining experience both to provide it with the technical know-how and resources needed to develop the mine, and to lend it credibility with the Guinean officials.

6.     Steinmetz and BSGR found that partner in Vale.   Indeed, upon learning of Steinmetz's and BSGR's efforts during the New York meetings, Vale – secretly and unbeknownst to Rio Tinto – entered into a conspiracy with Steinmetz and BSGR to misappropriate Rio Tinto's Simandou rights.   The RICO enterprise was then born, and began conducting a pattern of racketeering activity in the United States and elsewhere.

7.     While BSGR and Steinmetz pursued their illegal bribery campaign in Guinea, Vale's role in the scheme was to continue to obtain Rio Tinto's highly confidential and proprietary information under false pretenses, and pass that information on to Steinmetz and BSGR in order to facilitate their efforts to induce officials in the Guinean Government to rescind Rio Tinto's rights.

8.     Thus, Defendant Vale feigned continued interest in pursuing a deal with Rio Tinto so that it could extract more of Rio Tinto's highly confidential business and technical information.  This was accomplished through a number of additional meetings in New York City between December 2008 and February 2009, and through continuous access to a U.S.-based data room containing Rio Tinto's confidential documents from December 2008 through June 2009.  The information included, but was not limited to, geological and technical information, product characteristics, suitable mining methods and drilling operations, processing and logistics including the viability of different transportation options, and the status of efforts to bring the mine into production.

9.     As Vale acquired Rio Tinto's confidential information in the United States, it secretly shared it with Steinmetz and BSGR to support their bid to misappropriate Rio Tinto's Simandou mining rights.  The scheme quickly bore fruit when certain officials in the Guinean Government announced in December 2008 that the Government had rescinded half of Rio Tinto's Simandou interest and intended to assign that interest to BSGR.  The Government's announcement came shortly after a secret meeting earlier in December (at the same time that Vale executives were

3

meeting with Rio Tinto in New York) between Guinean officials responsible for deciding mining rights and representatives of both Vale and BSGR.

10.      Vale's double dealing in furtherance of its conspiracy with BSGR and Steinmetz, however, did not stop there.  Seven months after Steinmetz and BSGR unlawfully induced the Guinean Government to rescind Rio Tinto's Simandou rights, Vale continued to fraudulently conceal its association with Steinmetz and BSGR, and continued to misappropriate confidential information about Simandou mining operations from Rio Tinto.

11.      The Simandou negotiations between Rio Tinto and Vale ended in June 2009.  Having successfully, and illegally, obtained a substantial portion of Rio Tinto's Simandou concession, the co-conspirators resolved to formalize their relationship and further conceal the illicit nature of their dealings.  Vale purchased a majority interest in BSGR's Guinean subsidiary for $2.5 billion, the first $500 million of which was paid to BSGR in April 2010.  Two months after that payment, in June 2010, BSGR paid a $200 million bribe to the Guinean Minister of Mines, Defendant Mahmoud Thiam (a U.S. citizen), as payment for his assistance to Defendants in unlawfully securing Rio Tinto's Simandou rights.

12.      The Vale-BSGR deal provided a façade of legitimacy to the conspiracy, thereby helping to further conceal it.  Indeed, the enterprise's fraudulent scheme remained concealed for nearly three more years.  From 2010 to 2013, Defendants and their co-conspirators utilized the confidential information and technical know-how they had misappropriated from Rio Tinto to develop and exploit Simandou for their joint benefit.  They drilled exactly where Rio Tinto's confidential information showed them to drill, and they developed and implemented a railroad and port plan identical to the one they stole from Rio Tinto.

13.      The walls finally came crashing down on Defendants in January 2013, as the U.S. and

4

Guinean Governments opened parallel criminal investigations into how Steinmetz and BSGR obtained their interest in Simandou. In a desperate attempt to avoid detection, the enterprise sent Defendant Frederic Cilins, an agent and/or employee of Steinmetz and BSGR, to the United States to conceal and/or destroy evidence of the enterprise's illegal activity related to Simandou. In April 2013, U.S. federal authorities arrested Cilins in Florida and charged him with obstruction of a grand jury investigation, destruction of evidence, and witness tampering. In March 2014, Cilins entered a guilty plea to one count of obstruction. Today at least six different countries – the United States, the United Kingdom, France, Guinea, Switzerland, and Guernsey – are investigating Steinmetz, BSGR, and other Defendants for their role in the theft of Rio Tinto's Simandou mining rights. On April 9, 2014, a technical committee tasked with reviewing the Government of Guinea's mining contracts announced its finding that Steinmetz and BSGR won the mining rights to Blocks 1 and 2 of Simandou through bribery and corruption. On or around April 17, the Government of Guinea announced that it approved the recommendations of the technical committee, meaning that BSGR and Vale will be stripped of their rights to Blocks 1 and 2 of Simandou.

14.    The highly confidential and proprietary information misappropriated from Rio Tinto in the United States and provided to Steinmetz and BSGR was critical to the success of the RICO enterprise. It was widely known that Steinmetz and BSGR primarily operated in the diamond market and did not have the resources, history, or technical background to develop Simandou's massive untapped iron ore reserves, which would require skill, expertise, financing and equipment that Steinmetz and BSGR wholly lacked. By partnering with Vale, however, Steinmetz and BSGR gained everything they needed. With its access to Rio Tinto's confidential geological, technical, and logistical data at the meetings in New York and from a data room, Vale armed Steinmetz and BSGR with the fruits of Rio Tinto's years, and hundreds of millions of dollars of research and development,

to persuade officials in the Guinean Government to accept their bribes and go along with their illegal scheme.

15.     The Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, §1961 *et seq.*, with predicate acts including, but not limited to, mail and wire fraud, money laundering, obstruction of justice, witness tampering, and violations of the Travel Act. In addition, the conduct of Defendants constitutes common law fraud and civil conspiracy to commit fraud, as well as aiding and abetting a fraud. As a result, Defendants' conduct entitles Rio Tinto to damages and other relief.

## II.     THE PARTIES

### A.     The Plaintiff

16.     Rio Tinto plc is a United Kingdom corporation, whose principal place of business is at 2 Eastbourne Terrace, London, W2 6LG, United Kingdom 020 7781-2000. Rio Tinto plc trades ADRs on the New York Stock Exchange.

### B.     The Defendants

17.     Vale S.A. is a Brazilian corporation with its principal place of business at Avenida Graça Aranha, No. 26, 20030-900 Rio de Janeiro, RJ, Brazil. Vale trades ADRs on the New York Stock Exchange. It also transacts business in the United States, including New York, through a sales office located at 2 Park 80 Plz W, Saddle Brook, New Jersey 07663 and a wholly owned subsidiary located in Wyckoff, New Jersey. It also owns a 50% interest in California Steel Industries, located at 1400 San Bernardino Avenue, Fontana, California 92335.

18.     Benjamin "Beny" Steinmetz is an Israeli citizen who conducts and transacts business and personal affairs in New York. He maintains a residence or business address at 580 Fifth Avenue, Apartment 417, New York, New York and at 781 Fifth Avenue, Apartment 791, New York, New York. On information and belief, Steinmetz is now a subject in a federal criminal investigation

in the United States related to Simandou.

19.     BSG Resources Limited is a privately-held corporation with its head office in Guernsey, Channel Islands. It is wholly-owned by The Beny Steinmetz Group, which is a privately owned holding company that largely focuses on the selling and buying of diamonds. BSG Resources Limited is an agent of Steinmetz. On information and belief, BSG Resources Limited, like Steinmetz, also is a subject in a federal criminal investigation in the United States related to Simandou.

20.     BSG Resources (Guinea) Limited, also known as BSG Resources Guinée Limited ("BSGR Guinea"), is a wholly-owned subsidiary of BSG Resources Limited that is also registered in Guernsey. On information and belief, BSGR Guinea also is a subject in a federal criminal investigation in the United States related to Simandou. Upon information and belief, after entering into a joint venture with Vale, BSGR Guinea changed its corporate name to VBG Guernsey.

21.     BSGR Guinea Ltd BVI ("BSGR Guinea BVI") is a corporate affiliate of BSG Resources Limited incorporated in the British Virgin Islands. From March 2006 until March 2008, Pentler Holdings ("Pentler") owned a 17.65 percent equity stake in BSGR Guinea BVI. In March 2008, BSG Resources Limited reacquired BSGR Guinea BVI from Pentler. On information and belief, BSGR Guinea BVI also is a subject in a federal criminal investigation in the United States related to Simandou.

22.     BSG Resources Guinée SARL, also known as BSGR Resources (Guinea) SARL, is a corporate affiliate of BSG Resources Limited that BSG Resources Limited registered in Guinea to hold the titles and agreements from which BSG Resources Limited would benefit. After entering into a joint venture with Vale, BSGR Guinée SARL changed its corporate name to VBG-Vale BSGR Guinea. VBG-Vale BSGR Guinea was created for purposes of holding the rights to develop Blocks

1 and 2 of Simandou.

23.     BSG Resources Limited, BSGR Guinea, BSGR Guinea BVI, and VBG-Vale BSGR Guinea are collectively referred to herein as "BSGR."

24.     Frederic Francois Marcel Cilins, a/k/a Frederic Cilins, is a citizen of France and is an agent and/or employee of Steinmetz and BSGR.  On March 10, 2014, Cilins entered a guilty plea in the Southern District of New York in Case No. 13-Cr.-315-WHP to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, related to the ongoing U.S. criminal investigation related to Simandou.  Cilins is currently in prison and awaiting sentencing in the United States.

25.     Mamadie Touré is a citizen of Guinea but lives in the United States, and is a resident of the state of Florida.  Touré was the fourth wife of former Guinean President General Lansana Conté.  She is a cooperating witness in the United States' criminal investigation into Simandou.

26.     Mahmoud Thiam is a U.S. citizen that maintains a residence and transacts business in New York City.  He was the Guinean Minister of Mines, Energy and Hydraulics from January 2009 until 2011.

27.     Avraham Lev Ran is an agent and/or high-level employee of BSGR (or one of its affiliates or subsidiaries), and, on information and belief, is connected to the criminal conduct of Defendant Cilins.  Lev Ran was affiliated with Pentler, which owned a 17.65 percent equity stake in BSGR Guinea BVI from March 2006 until March 2008.  In 2010, Lev Ran twice wired money from an account in Israel to an account in Florida that belonged to Defendant Touré.  Through various limited liability corporations, Lev Ran also co-owns several properties in Florida with Cilins and Michael Noy.

28.     Michael Noy is an agent and employee of BSGR, and is Cilins' superior within

8

BSGR. On information and belief, Defendant Noy is connected to the criminal conduct of Cilins.

Noy was affiliated with Pentler. Through various limited liability corporations, Noy co-owns several

properties in Florida with Cilins and Lev Ran.

## III.    JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over Rio Tinto's claims under 28 U.S.C. §

1331 and 18 U.S.C. §§ 1964, 1965.

30.    This Court also has supplemental jurisdiction over Rio Tinto's state law claims

pursuant to 28 U.S.C. § 1367.

31.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965

because a substantial number of the events giving rise to this action occurred in this district.

32.    This Court has personal jurisdiction over Vale pursuant to 18 U.S.C. § 1965(a) and

CPLR 302(a)(2) because Vale committed tortious acts within the state. Alternatively, the exercise of

jurisdiction over Vale is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires

application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in

which all of the Defendants could otherwise be tried together.

33.    This Court has personal jurisdiction over BSGR pursuant to 18 U.S.C. § 1965(a) and

CPLR 302(a)(2) because BSGR has committed tortious acts within the state. This Court also has

personal jurisdiction over BSGR based on the acts of its co-conspirators and agents within the state.

Alternatively, the exercise of jurisdiction over BSGR is proper in this district pursuant to 18 U.S.C.

§1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b)

because there is no district in which all of the Defendants could otherwise be tried together.

34.    This Court has personal jurisdiction over Defendant Steinmetz pursuant to 18 U.S.C.

§ 1965(a) and CPLR 302(a)(3) because he committed tortious acts within the state which caused an

injury to persons within the state and he regularly does or solicits business, and/or engages in other

9

persistent conduct, and/or derives substantial revenue from goods used or consumed and/or services rendered in the state. This Court also has personal jurisdiction over Defendant Steinmetz based on the acts of his co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over Steinmetz is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

35.     Exercise of jurisdiction over Defendant Cilins is reasonable and proper under 18 U.S.C. § 1965(a) because Cilins has committed various crimes in this district (and elsewhere). This Court also has personal jurisdiction over Defendant Cilins based on the acts of his co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over Cilins is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

36.     Exercise of jurisdiction over Defendant Mahmoud Thiam is reasonable and proper under 18 U.S.C. §1965(a) because Thiam is a resident of the State of New York and because he conducts extensive business activities in New York. This Court also has personal jurisdiction over Defendant Thiam because he has committed various crimes in this district (and elsewhere) and based on the acts of his co-conspirators and agents within the state.

37.     Mamadie Touré is a resident of the United States. Exercise of jurisdiction over Defendant Touré is reasonable and proper under 18 U.S.C. § 1965(a) because Touré has committed various crimes in this district (and elsewhere). This Court also has personal jurisdiction over Defendant Touré based on the acts of her co-conspirators and agents within the state. Alternatively, for Rio Tinto's claims for violations of 18 U.S.C. § 1962, the exercise of jurisdiction over Touré is

proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together.

38.     This Court has personal jurisdiction over Defendants Lev Ran and Noy based on the acts of their co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over Lev Ran and Noy is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

## IV.   FACTUAL ALLEGATIONS

Rio Tinto alleges the following upon information and belief:

### A.   Rio Tinto Held A Valid Mining Concession For Simandou

39.     On February 25, 1997, the Guinean Ministry of Natural Resources and Energy awarded four exploration permits to Rio Tinto for iron ore mining at Simandou in southeast Guinea. Simandou is one of the largest iron ore deposits in the world. According to studies, Blocks 3 and 4 alone are capable of sustaining a 100 million ton per annum run-rate. If one adds in production from Blocks 1 and 2, the production rate could double. These deposits are considered high grade iron ore deposits, containing ore grades of 60 to 68 percent Fe. The effect that these kinds of deposits could have on the iron ore and steel markets has led to the Simandou deposits being described as "world-class deposits" and "the biggest and best iron ore layers." Indeed, the only other source of iron ore meeting this quality standard is Vale's Carajas Iron Ore Mine in Brazil.

40.     After being awarded these permits, Rio Tinto spent the next nine years exploring and developing Simandou. On March 30, 2006, the then-President of Guinea, Lansana Conté, granted Rio Tinto a mining concession for Simandou (the "Concession"). The President's signature and subsequent publication of the Concession gave it the force of law in Guinea. The Concession

11

granted Rio Tinto an area of 738 km (squared) of Simandou for 25 years.

41.     After receiving the Concession, Rio Tinto continued – as it had over the previous nine years – to meet its obligations by investing its resources, time, and finances into the exploration and development of the iron ore mining operations at Simandou.   Indeed, at all times during its development, Rio Tinto met its legal obligations to explore and evaluate the potential for mining iron ore at Simandou.

42.     Rio Tinto's initial exploration and development of the mine had taken nine years and was extremely expensive in part due to the historic scope of the project, the difficult terrain, and the absence of basic infrastructure, such as roads and railways, necessary to develop the mine.   All parties knew and understood that exploration and development would be a lengthy process given these challenges.

43.     As of August 2008, two years after receiving the Concession, Rio Tinto had doubled its drilling capacity at the Simandou site, drilling more than 218,000 meters of core samples, and developing and constructing various infrastructure projects.   As of August 2008, Rio Tinto had invested hundreds of millions of dollars in developing Simandou.

**B.      Defendants Steinmetz and BSGR Lay the Groundwork for the RICO Enterprise**

44.     Defendants Steinmetz and BSGR had their sights on the potential riches of the Simandou deposit since at least 2005, when BSGR sent its agent, Defendant Cilins, to Guinea to start laying the groundwork for an acquisition of the Simandou concession.

45.     Over the course of the next six months, Cilins stayed at the Novotel, a hotel popular with mining executives.   By developing contacts in the Novotel's business center and surreptitiously obtaining copies of all incoming and outgoing faxes, Cilins learned details about Rio Tinto's efforts to explore and develop the Simandou mine.

46.     Sensing an opportunity to induce the Conté regime to illegally rescind Rio Tinto's

mining rights and award them to BSGR, Cilins began distributing gifts to various contacts in Guinea. He soon learned, however, that the only person who mattered in the country was President Conté, and that the way to Conté was through his four wives – particularly through his fourth and youngest wife, Defendant Mamadie Touré.

47.    To gain access to Defendant Touré, Cilins hired her brother, Ibrahima Soury Touré, to help promote BSGR's interests in Guinea.  After Cilins established a relationship with Defendant Touré, Cilins and several BSGR associates secured a meeting with President Conté.  At this meeting, BSGR gave General Conté a watch that was inlaid with Steinmetz diamonds.  At another meeting, BSGR presented the Minister of Mines with a model of a Formula 1 race car that was similarly encrusted with Steinmetz diamonds.

48.    These meetings paid dividends.  In December 2005, a helicopter was observed landing on Rio Tinto's Simandou Mining Concession area.  The helicopter belonged to President Conté and the passenger was a South African geologist from BSGR.

49.    During the next several years, a series of contracts were executed between various high-level BSGR employees and Defendant Touré.  These contracts evidence that prior to the formation of the RICO enterprise in the United States, Defendants Steinmetz, BSGR, Lev Ran, Noy, Cilins, and Touré already were actively engaging in bribery and corruption in an effort to gain control of the Simandou concession.

50.    These corrupt efforts escalated in 2008, when BSGR – through its Director of Operations for BSGR Guinea – entered into a "Commission Contract" with Defendant Touré.  The contract stated that Touré would help BSGR obtain Blocks 1 and 2 of Rio Tinto's Simandou concession in exchange for a $2 million commission to Touré.  Another $2 million would go to "people of good will" that helped BSGR obtain Blocks 1 and 2 of Simandou.

51.     A "Protocole D'Accord" dated February 28, 2008 between a company called Matinda (belonging to Defendant Touré) and BSGR Guinea further committed to giving 5% of the shares of Blocks 1 and 2 of Simandou to Matinda as payment for Touré's assistance in rescinding Rio Tinto's lawful mining rights.

52.     BSGR – including through its corporate affiliate Pentler – continued to pay these bribes to Defendant Touré for years.  For example, a July 2010 agreement required Pentler to pay Touré (through Matinda) $3.1 million for her part in acquiring the Simandou concession.  Similarly, an August 3, 2010 contract between Pentler and Touré promised Touré an additional $5 million, payable in two parts.  The contract also required Touré to conceal her relationship with Pentler.

53.     For BSGR, bribery of this sort was particularly necessary to acquire Simandou because it lacked any track record in iron ore mining.  But bribery alone would not be sufficient for BSGR to successfully exploit Simandou without a partner with significant iron ore mining experience.  BSGR would soon find that partner in Vale.

**C.     Vale and Rio Tinto Begin Negotiations Over Simandou**

54.     In August 2008, representatives of Vale and Rio Tinto broached the prospect of Vale's potential acquisition of three Rio Tinto assets, including an interest in Simandou.

55.     As part of these negotiations, Rio Tinto and Vale entered into a Confidentiality Deed dated September 2, 2008 (the "Confidentiality Deed").  The Confidentiality Deed stated that both parties would hold "Confidential Information in strict confidence."  The Confidentiality Deed further stated that neither party would "make any use of the Confidential Information or any part of it except" to "conduct an assessment of whether or not the parties would pursue" a transaction under which Vale would acquire an interest in Rio Tinto's assets.

56.     During the discussions over Simandou, Vale requested that Rio Tinto provide confidential information related to Rio Tinto's development of Simandou.  The requested documents

14

included highly confidential and proprietary information related to the geology of the mine, such as detailed drill data and results, infrastructure, ore composition and various transportation options for economically transporting the resource to market.

57.     The information requested by Vale, which Rio Tinto ultimately provided, was confidential and proprietary and known only to a small number of Rio Tinto's employees. It was the result of more than eleven years and hundreds of millions of dollars of research and development of the Simandou project by Rio Tinto.

58.     After signing the Confidentiality Deed, Rio Tinto and Vale began a series of key meetings in New York related to Vale's potential acquisition of Simandou.

1.     **November 19, 2008 Meeting in New York City**

59.     On November 19, 2008, Vale met with Rio Tinto in New York City at the headquarters of Vale's legal counsel, a Manhattan law firm. In attendance at this meeting for Vale were 20 executives, two Manhattan attorneys who would represent Vale throughout the negotiations, and a New York-based Vice President at Deutsche Bank.

60.     At this meeting, Rio Tinto and Vale discussed an offer Vale had made on November 14, 2008 to purchase the Simandou asset. Vale clarified that its valuation was based on publicly available information, and that it was a bid for the entire project at Simandou – Blocks 1, 2, 3 and 4. Rio Tinto informed Vale that the assets at Simandou were worth much more than the amount of Vale's offer, explaining that the quality of the significant reserves of iron ore at Simandou placed it in the same class as Vale's Carajas Iron Ore Mine in Brazil.

61.     To accommodate Vale's request that due diligence regarding Rio Tinto's assets proceed promptly, Rio Tinto offered to immediately implement a due diligence process, which would include a confidential presentation about the Simandou Project by Rio Tinto's management and the establishment of a data room (the "Data Room").

62.     At no time during the November 19, 2008 meeting did Vale disclose, or did Rio Tinto suspect, that Vale would use the New York meetings and its access to the Data Room to misappropriate Rio Tinto's confidential information as part of a conspiracy with Steinmetz and BSGR to sabotage Rio Tinto's business operations at Simandou.

2.     **November 24, 2008 Meeting in New York City**

63.     On November 24, 2008, Vale again met with Rio Tinto at the New York offices of Vale's attorneys. In attendance at this meeting were executives from Vale and two New York City-based attorneys.

64.     At the November 24 meeting, Rio Tinto opened the Data Room so that Vale could begin its due diligence. As promised, the Data Room contained documents reflecting highly confidential information pertaining to Simandou. To protect Rio Tinto's confidential trade secrets and other proprietary information contained in the Data Room, Rio Tinto required Vale to execute an access agreement (the "Data Room Access Agreement") prior to viewing any of the documents in the Data Room.

65.     Intralinks was the Data Room host and service provider. All documents in the Data Room were stored on, and accessed from, Intralinks' servers in the United States.

66.     More than sixty individuals from Vale, five attorneys from a New York-based law firm representing Vale, and twelve employees of a New York-based accounting firm also representing Vale had access to the Data Room. All five of the attorneys from the New York-based law firm were themselves based in and reviewed the confidential documents in the Data Room from New York City. And at least some, if not all, of the twelve accounting-firm employees reviewed the confidential documents in the Data Room from New York City.

67.     Through documents made available in the Data Room and Rio Tinto's presentation on November 24, 2008 in New York, Rio Tinto briefed Vale on three confidential topics pertaining

to the Simandou asset.

a.  **Geological Data**

68.     Rio Tinto gave a presentation on the geological data and information it had developed over eleven years of exploration work at Simandou.  This presentation disclosed confidential information to Vale, including but not limited to:  geological data acquisition; geological modeling and mapping; precise coordinates for the top mining targets; and Rio Tinto's estimates of the total resource potential for Simandou.

69.     Of particular note, the Data Room contained Rio Tinto's exploration data, the industry term for vitally important information gathered from taking a series of increasingly-concentrated core samples within a defined grid.  These core samples reveal the substance and quality of minerals lying underground, the depth at which these minerals can be found, and the qualities of the materials above the minerals, such as the density of rock and moisture-content of soil.

70.     None of the foregoing information was publicly known and Rio Tinto would not have shared such information with Vale had it known that Vale would subsequently use such information to conspire with Steinmetz and BSGR to unlawfully deprive Rio Tinto of part of its Concession.

b.  **Rail Transport and Port Plans**

71.     In addition to the geological presentation, Rio Tinto gave a presentation at the November 24, 2008 meeting highlighting various aspects of the Simandou project, including rail transport and port options.

72.     The railway plans for transporting mined ore from Simandou to a port on the coast were a particularly important aspect of the necessary infrastructure development.  The Guinean Government wanted to develop a railway through Guinea, from the Simandou mine to a port in Conakry.  Rio Tinto had spent several years and millions of dollars of work investigating the costs

and benefits of various rail transport options before coming to the ultimate conclusion that a commercial railway through Guinea would face significant economic challenges, largely due to the extremely difficult and mountainous terrain.  Instead, Rio Tinto's extensive work had shown that a railway through Liberia was a far more viable option for transporting mined ore from Simandou.

73.     Also in the course of studying the option of a railway through Liberia, Rio Tinto identified a previously unknown Liberian port, south of the main port at Buchanan, as the ideal port location for transporting the Simandou ore to market.  This "new port" at Didia was largely undeveloped in terms of infrastructure, but Rio Tinto's studies had shown that it had an ideal depth for ship berthing that would require little to no dredging and could be easily altered to accommodate the buildings, infrastructure, homes, and hospitals all required to support a mining operation the size and scope of Simandou.  A port at Buchanan was the more obvious choice, so Rio Tinto's identification of Didia as the better option was highly proprietary and confidential.

74.     Rio Tinto's presentations to Vale and further information in the Data Room synthesized several years and millions of dollars of work investigating the costs and benefits of various rail transportation and port options.  Vale's theft of this information armed Steinmetz and BSGR with the studies, analyses, and hard evidence needed to convince the Guinean Government to agree to a railway through Liberia.

75.     The information on the rail transport and port options was not publicly known and Rio Tinto would not have shared such information with Vale had it known that Vale would misuse that information in its scheme with Steinmetz and BSGR to steal Blocks 1 and 2 of Rio Tinto's Concession.

c.     **Steinmetz's and BSGR's Advances on Rio Tinto's Concession**

76.     At the November 24, 2008 meeting, Rio Tinto also provided Vale with a confidential briefing about the status of its Concession and the attempts of Steinmetz and BSGR to

18

misappropriate it.

77.    Rio Tinto disclosed to Vale that on July 28, 2008, Guinea had issued a decree purporting to change Rio Tinto's property rights to those of an exploration permit holder.  Rio Tinto explained that an exploration permit holder still held valid and enforceable rights to the mine, and that Rio Tinto viewed this purported change to its Concession as an illegitimate sham not in accordance with Guinean mining law.  Rio Tinto further explained to Vale that it believed, based on statements and correspondence from Guinean officials, that the purported change to its Concession would ultimately be of no significance.  Indeed, Vale acknowledged that the purported change was of no significance when it continued negotiations with Rio Tinto and made an offer for Rio Tinto's Concession.

78.    Those active in the Guinean mining industry, including Vale, a sophisticated, worldwide mining company, were well aware of allegations of BSGR's reputation for corruption and bribery since it began conducting business in the country.  What Vale did not know until it was informed by Rio Tinto at the November 24, 2008 meeting in New York was that BSGR was now specifically targeting Rio Tinto's Simandou concession.

79.    Rio Tinto specifically disclosed that on July 17, 2007 and August 5, 2008, BSGR Guinea (a company affiliated with Steinmetz and BSGR) had registered a request with the Guinean Ministry of Mines for exploration permits to Simandou Blocks 1, 2, and 3 – the very blocks Rio Tinto had been developing since 1997.  Rio Tinto told Vale that BSGR sought the permit despite the fact that Rio Tinto held a legal mining concession to Blocks 1, 2, 3, and 4 that carried the force of law.

80.    Rio Tinto also informed Vale that BSGR Guinea had obtained written assurances from the Minister of Mines on November 3, 2008 that the Government would withdraw Rio Tinto's

19

Concession. This correspondence was not public knowledge and while Rio Tinto was not a recipient of the correspondence, Rio Tinto learned of it through its contacts in Guinea.

81.     Vale further learned from Rio Tinto that on November 6, 2008, BSGR Guinea had registered an additional request with the Ministry of Mines for an extension of their research and exploration permits to Blocks 1 and 2 of Rio Tinto's Concession.

82.     Given the allegations of BSGR's reputation for corruption and bribery, Vale was on notice, based on the information provided by Rio Tinto during the November 24, 2008 meeting, that Steinmetz's and BSGR's efforts to misappropriate Rio Tinto's concession included bribery and other acts of political corruption.

83.     As of the November 24, 2008 meeting, the information about BSGR's advances towards Rio Tinto's Concession was not publicly known. Rio Tinto would not have shared such information with Vale had it known that Vale would secretly join forces with BSGR to form an enterprise, defraud Rio Tinto, and steal the rights to Blocks 1 and 2 of Rio Tinto's Concession.

**D.     Rio Tinto Takes Vale to Simandou**

84.     On December 10, 2008, Rio Tinto gave Vale a confidential tour of the Simandou site, at which time Rio Tinto continued discussing the technical aspects of the deposits, the drilling performed to date, and the mining logistics.

85.     During the site visit, Rio Tinto gave a detailed tour of its potential mining operations at Captain Hook, a site located in North Simandou Blocks 1 and 2 and discussed at the November 24, 2008 meeting. It is notable that during this time, Vale expressed particular interest in Rio Tinto's plans and strategy for developing Blocks 1 and 2 (the very blocks that the RICO enterprise ultimately stole from Rio Tinto). Unaware of Vale's sinister design, Rio Tinto provided highly confidential information responsive to Vale's inquiries.

20

E. **The RICO Enterprise is Born**

86.     Upon learning the full extent of the value of the Simandou asset, the technical information necessary to develop that asset, and Steinmetz's and BSGR's efforts to induce government officials to hand over Rio Tinto's Concession, Vale began working with Steinmetz and BSGR to acquire Rio Tinto's interest in the coveted Simandou iron ore deposits.  Upon information and belief, a meeting between Vale and BSGR occurred in December 2008.

87.     During its discussions with Steinmetz and BSGR, Vale improperly divulged the confidential information it had obtained from Rio Tinto at the November 24, 2008 meeting and from the Data Room regarding the technical and geological information necessary for any development at Simandou.

88.     Upon learning of Vale's interest and its source of confidential inside information, Steinmetz, BSGR, and Vale formed an agreement to work together – in conjunction with the other Defendants and co-conspirators – to steal Rio Tinto's mining rights at Simandou, and the U.S.-based illegal enterprise was born.

89.     Defendants agreed that Vale would continue to misrepresent to Rio Tinto that it was interested in Rio Tinto's mining rights.  This allowed the enterprise, through Vale, to gain access to highly confidential information from Rio Tinto, which the Defendants then used for their own development of Simandou.  Meanwhile, Steinmetz and BSGR continued lobbying and bribing key Guinean Government officials—a fact which Vale knew or should have known—including by making illegal promises and payments.  This would prove to be a mutually beneficial partnership.

90.     Indeed, without Vale's support, Steinmetz's and BSGR's plan to steal Simandou from Rio Tinto would not have been successful.  It was widely known that Steinmetz and BSGR primarily operated in the diamond market and did not have the resources, history, or technical background to develop Simandou's massive untapped iron ore reserves, which would require skill, expertise,

financing and equipment that Steinmetz and BSGR wholly lacked.  Because Vale had these in abundance, it was the perfect partner for the fraudulent scheme to steal Rio Tinto's rights.  By gaining access to Rio Tinto's confidential geological, technical, and logistical data at the meetings in New York and from the Data Room, Defendants armed themselves with the fruits of Rio Tinto's years and hundreds of millions of dollars of research and development to persuade the Guinean Government to accept their bribes and go along with their illegal scheme by revoking Rio Tinto's Simandou rights and assigning those rights to BSGR.

F.     **The Enterprise Lobbies the Guinean Government and Achieves an Early Success**

91.     In December 2008, Vale and BSGR met with the Guinean Government to propose a potential Vale–BSGR joint venture to develop Simandou Blocks 1 and 2.  At this meeting, Vale and BSGR proposed the possibility of assisting with or financing a railway through Liberia – the very railway concept that Rio Tinto originated after years of analysis and Vale stole during the confidential negotiations in New York.

92.     Steinmetz's and BSGR's use of the confidential information Vale acquired from Rio Tinto quickly proved effective.  On December 9, 2008, the Guinean Government sent a letter to Rio Tinto indicating that it was rescinding Rio Tinto's rights to Blocks 1 and 2.  On December 11, 2008, it was publicly announced that the Guinean Government was awarding exploration licenses for those same blocks to BSGR Guinea.

93.     This turn of events was surprising, to say the least, to everyone except the co-conspirators.  Not only is it highly irregular in the mining industry to award a mining concession to lands with proven reserves to an entity that took no part in the exploration of those reserves, but the last communication Rio Tinto received regarding its Concession was a September 19, 2008 letter reassuring Rio Tinto of the Guinean Government's "firm wish to carry out the partnership with" Rio

22

Tinto. Also, the awarding of Blocks 1 and 2 to BSGR Guinea was of particular concern since Blocks 1 and 2 contained the valuable Captain Hook area of Rio Tinto's Concession.

### G.   The Enterprise Continues to Defraud Rio Tinto in Order to Steal its Confidential Information

94.   Although the Guinean Government awarded BSGR Guinea exploration licenses to Blocks 1 and 2, the Minister of Mines and the President of Guinea still needed to affirm the validity of and ratify the licenses. To achieve confirmation of BSGR Guinea's licenses, BSGR and Steinmetz needed Vale to continue its ruse of negotiating with Rio Tinto in order to maintain access to Rio Tinto's confidential information.

95.   Continuing the ploy, Vale met with Rio Tinto at the New York offices of Vale's attorneys on December 21-22, 2008, January 15-16 and 28-29, 2009 and February 4, 2009. At these meetings, Rio Tinto provided more confidential information about Simandou in the belief that Vale was negotiating in good faith about a possible deal for some of Rio Tinto's Simandou rights. Additionally, Vale continued to have access to Rio Tinto's confidential information through the Data Room.

96.   In a letter dated January 29, 2009 (the "Letter of Intent"), Vale told Rio Tinto that "[b]ased on the information [Rio Tinto] has provided [Vale] with respect to Simandou . . . We propose to enter into discussions regarding the terms of a joint venture, partnership, or investment agreement regarding Simandou . . ." The Letter of Intent had an Annex which set forth various milestones for the negotiations regarding Simandou, and contemplated continued meetings between Vale and Rio Tinto.

97.   Through the Letter of Intent and throughout the meetings in December 2008 and January and February 2009, Vale feigned an interest in negotiating a deal with Rio Tinto, the entire time gathering Rio Tinto's confidential information as part of the enterprise's scheme to acquire Rio

23

Tinto's Concession.

**H.     The Vale-Rio Tinto Negotiations End**

98.     Vale and Rio Tinto ended their negotiations about a possible Vale acquisition of some of Rio Tinto's Simandou rights towards the end of June 2009.  Accordingly, after seven months of unfettered access by dozens of Vale personnel and representatives, the Data Room was closed.  Vale personnel continued to access information about Simandou right up until the time the negotiations with Rio Tinto ceased.

**I.     Defendants and the Guinean Government Meet During the Time Rio Tinto is Negotiating With Vale**

99.     Despite Vale's representations, Defendants and officials of the Guinean Government continued to meet during the time Vale was actively negotiating with Rio Tinto.  On March 1, 2009, while Vale was still negotiating with Rio Tinto over Simandou, Mark Struik (who was then BSGR's Chief Operating Officer and currently is the CEO of its Mining and Metals Division) and a representative of Vale met in Dakar, Senegal.  Upon information and belief, Struik told the Vale representative that BSGR would be able to finance initial survey and sampling costs, but would need help with the railway and exporting the iron ore.

100.     Between March 19, 2009 and March 25, 2009, there were several meetings between Vale and BSGR in Guinea to discuss the details of their business relationship.  Upon information and belief, Steinmetz attended some of these meetings.  One of the meetings between Vale and BSGR also included then-President Moussa Dadis Camara and the Minister of Mines, Defendant Thiam.

101.     And on June 25, 2009, President Camara met with country representatives from both Vale and BSGR.  This meeting included dinner at the official residence of Defendant Thiam.

24

### J.     Vale and BSGR Seek to "Legitimize" Their Illicit Partnership

102.     In December 2009, Vale and BSGR met again to discuss the details of their conspiracy for exploiting Rio Tinto's stolen data to develop Simandou.  The meetings continued in January 2010 (in Brazil) and February 2010 (in Conakry and at Simandou).

103.     On information and belief, Vale and BSGR resolved during these meetings to formalize their relationship, in order to give the appearance of legitimacy and thereby conceal the illicit nature of their dealings.  On April 30, 2010, Vale publicly announced that it had been negotiating a joint venture with BSGR for Blocks 1 and 2.  Vale acquired a majority stake in BSGR Guinea for $2.5 billion, with a $500 million down payment made at the time of the transaction.  This majority stake permitted Vale to take the lead in developing Blocks 1 and 2.

104.     Notwithstanding their efforts to "legitimize" their unlawful association, the terms of the deal Vale signed with BSGR are indicative of the tortious and illegal acts that underlie their acquisition of Simandou Blocks 1 and 2.  For example, Vale's transfer of the balance of payment, some $2 billion, is conditioned on BSGR's fulfillment of certain critical objectives, one of which is the resolution of any legal claims or uncertainties surrounding BSGR's acquisition of Blocks 1 and 2.  This is a clear reference to the theft of the blocks from Rio Tinto and reflects Vale's concern that its scheme with BSGR will be uncovered.  Vale is well aware that it engaged in an elaborate fraud with Steinmetz and BSGR at Rio Tinto's expense, and the conditionality it has placed on payment of the final $2 billion to BSGR is insurance against revelation of the fraud.  To date, Vale still has not paid the $2 billion to BSGR.

105.     On April 30, 2010, Vale and BSGR also announced the creation of a railway through Liberia and a port at Didia – the very railway and port options Vale stole after Rio Tinto had spent years and millions of dollars researching and developing them.

**K.    The Enterprise, Through Defendant Thiam, Threatens the Remainder of Rio Tinto's Concession**

106.    In June 2010, the Minister-Secretary General of the Guinean Government informed Rio Tinto that, in 2011, the Government "might" demand the retrocession of Block 3.   On information and belief, this threat was made to intimidate Rio Tinto from pursuing its legal rights against the Guinean Government and Defendants for the theft of Rio Tinto's rights to Blocks 1 and 2, and to sabotage the remainder of Rio Tinto's Concession.

107.    On June 8, 2010, Defendant Thiam (who was still the Minister of Mines), appeared on the CNBC television program "Closing Bell."  During this interview at the New York Stock Exchange in New York City, Defendant Thiam spoke in favor of the joint venture between BSGR and Vale.

108.    At some point between June 6 and June 12, 2010, Defendant Thiam met with Defendant Steinmetz in Paris, France.  On information and belief, Steinmetz paid Thiam a $200 million bribe for facilitating the signing and announcement of BSGR's exploration license over Rio Tinto's Simandou Blocks 1 and 2 in February 2009.  On information and belief, this bribe was paid as part of the enterprise's continuing scheme to steal and exploit Rio Tinto's rights to Blocks 1 and 2 and to sabotage Rio Tinto's remaining operations at the Simandou site.  Later in 2011, Thiam bought an apartment in Manhattan for $1.5 million and an estate in Duchess County, New York for $3.75 million. Thiam paid for both properties with cash.

109.    On October 4, 2010, Minister Thiam publicly stated that Rio Tinto had until February 2011 to formally waive its rights to Blocks 1 and 2.  Thiam further stated that if Rio Tinto did not waive its rights to Blocks 1 and 2, it risked losing its rights to Blocks 3 and 4.  On information and belief, this threat was made to intimidate Rio Tinto from pursuing its legal rights against the Guinean Government and Defendants for the theft of Rio Tinto's rights to Blocks 1 and 2, and to sabotage

26

Rio Tinto's remaining operations at the Simandou site. Such threats continued throughout January and February 2011.

**L.    The RICO Conspiracy Continues Through 2013, as the Enterprise Attempts To Conceal its Illegal Conduct, Obstruct the U.S. Criminal Investigation, and Avoid Prosecution**

110.    From 2010 to 2013, Defendants continued to utilize the confidential information and technical know-how they had misappropriated from Rio Tinto to develop and exploit Simandou for Vale and BSGR's joint benefit. For example, when Vale and BSGR wanted to publicly document the quality and amount of iron ore in Blocks 1 and 2 they simply went back and drilled right where Rio Tinto originally had, using the coordinates and locations of the drill holes Rio Tinto confidentially provided Vale during the meetings in New York and in the Data Room. Rather than spending millions of dollars and years of exploration drilling hundreds of holes – many of which might not be fruitful – Defendants simply used the roadmap they stole from Rio Tinto.

111.    Likewise, Defendants utilized and implemented Rio Tinto's Liberian railway and Didia port plans as part of their development plan for Simandou Blocks 1 and 2. This information and other information Rio Tinto provided to Vale during its confidential negotiations in New York took years and millions of dollars for Rio Tinto to develop – but Defendants got it all for free through their RICO conspiracy.

112.    Defendants' successful concealment of their illegal and tortious activities ended in January 2013 when the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation ("FBI") began conducting a federal criminal investigation regarding potential violations of the Foreign Corrupt Practices Act ("FCPA") and anti-money laundering statutes relating to, among other things, the laundering into and through the United States of potential bribe payments to Guinean officials for the purpose of obtaining Rio Tinto's rights to Simandou (the "Grand Jury Investigation"). A parallel investigation was opened at or around the

same time by the Guinean Government.

113.    In connection with the Grand Jury Investigation, the United States government is working with a cooperating witness (referred to in the filings as "CW") that was previously married to a certain Guinean Official.  The cooperating witness is Defendant Touré.

114.    The United States Government filed a criminal complaint against Defendant Cilins on April 15, 2013 (the "Cilins Complaint").  The Cilins Complaint alleges numerous illegal acts by Cilins in the United States.  Upon information and belief, Cilins committed these crimes in his capacity as a member of the RICO enterprise in an effort to conceal the criminal activity of BSGR, Steinmetz, Vale, and others.

115.    Beginning in March 2013, Defendant Cilins contacted Defendant Touré by telephone and through in-person meetings and offered her substantial sums of money, in an effort to induce Touré to deliver to him, for destruction, documents including contracts evidencing bribe payments from BSGR to Touré.  Upon information and belief, some of these telephone conversations occurred while Touré was in New York City.  The interactions between Cilins and Touré were monitored and recorded by FBI agents, and are summarized below.

116.    On March 15 and 16, 2013, Touré and Cilins spoke by telephone and discussed an in-person meeting and Touré asked Cilins whether she should bring "the documents" to the meeting. These documents included contracts evidencing bribe payments from BSGR to Touré.

117.    On March 20, 2013, Touré called Cilins and asked him whether a person identified in the Cilins Complaint as "CC-1" agreed to the sum of money that Touré requested.  Upon information and belief, CC-1 is Defendant Steinmetz.  Cilins responded, "of course."

118.    On March 25, 2013, Cilins and Touré met at the airport in Jacksonville, Florida.  At the meeting, Cilins told Touré that after he was able to destroy the papers, Touré would be paid.

Touré asked Cilins what she should do if the United States Government ever approached her, and Cilins told her that if that ever happened, she should destroy the documents.

119.    On April 11, 2013, Cilins and Touré met again at the same airport. Touré told Cilins that she had been approached by FBI agents investigating bribe payments and mining contracts in Guinea. Touré also reported to Cilins that she had told the FBI agents that she did not have any relevant documents. Cilins responded that all of the documents needed to be destroyed very urgently. At the same meeting, Cilins also said or did the following:

(a)    Cilins told Touré that she should issue a statement denying that she had anything to do with the matter. Cilins also suggested that Touré might want to deny that she was ever married to a certain Guinean Official. Cilins was referring to Lansana Conté, Touré's deceased husband and former President of Guinea.

(b)    Cilins indicated that he and Touré needed to burn the documents at issue.

(c)    Cilins told Touré that he was asked to be present in person to witness the documents being burned in order to guarantee that nothing was left behind. Upon information and belief, Defendant Steinmetz instructed Cilins to witness the documents being burned.

(d)    Cilins broached the topic of payment with Touré during the meeting. Cilins told Touré that she would be paid $1 million divided into two payments (regardless of the outcome of the investigation into BSGR's rights to Simandou). Cilins also told Touré she would receive an additional $5 million if the Guinean Government's investigation concluded that BSGR's rights to Simandou were valid.

(e)    Cilins presented to Touré a document he referred to as an "attestation" (the "Attestation") that contained a number of false statements. At the instruction of Cilins, Touré signed and dated the Attestation.

120.     Cilins and Touré had a second meeting on April 11, 2013 at the same location. At the meeting, Touré told Cilins that she was concerned about lying to the FBI, and that she wanted money immediately. Cilins responded that he would try to get $50,000 to give Touré, but that he would need permission from a senior BSGR operative to do so.

121.     On April 14, 2013, Touré and Cilins met again at the same location. After the meeting concluded, Cilins was arrested. At the time of his arrest, he possessed envelopes from Wells Fargo Bank containing approximately $20,000 in United States currency.

122.     On March 10, 2014, Cilins entered a guilty plea to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510. During his allocution, Cilins admitted to offering a government witness money to persuade her to leave the United States to avoid speaking with the FBI. As explained above, that government witness is Mamadie Touré. Cilins also admitted that he offered Touré $20,000, and promised to give her more money at a later date once she was in Africa. Cilins is still in prison and is awaiting his sentencing, which is currently scheduled for June 27, 2014.

**M.     Additional Criminal Acts Committed by the Enterprise in the United States to Conceal its Illegal Scheme**

123.     In addition to the Cilins Complaint, the Government has filed other documents in Case No. 13-Cr.-315-WHP that detail the enterprise's U.S.-based criminal activity.

124.     The Government's Memorandum in Support of Detention Pending Trial states that "Cilins made clear during these meetings [with Touré] that he was not working alone." Indeed, the Government's June 6, 2013 filing quotes from the English translation of Cilins' conversation with Touré, in which he told her of his visit with an individual identified by the Government as "CC-1." As explained above, on information and belief, CC-1 is Defendant Steinmetz. Cilins told Touré: "Listen – 'He [Steinmetz] told me, 'That's good, *but I want you to go see – but I want you to destroy*

these documents.' 'He told me, 'Okay, you go – since you want – *I want you to tell me, 'I saw that the documents [noise] were destroyed; it's over, there are no more documents.'*" (emphasis added). Thus, Cilins traveled to the United States at the instruction of Steinmetz to bribe Touré to destroy certain documents (including contracts evidencing bribe payments from BSGR to Touré).

125.   The Government's filings also indicate that Defendants Noy and Lev Ran are directly connected to the criminal conduct of Cilins.  BSGR has admitted that Defendants Noy and Lev Ran were affiliated with BSGR.

126.   According to the Government's filings, Noy, who was considered Cilins' superior within BSGR, spoke to Cilins on April 11, 2013 during Cilins' first meeting with Touré.  During the phone call, Cilins gave the phone to Touré and she and Noy spoke.

127.   Later in the day on April 11, Cilins called Noy again to tell Noy that Touré signed the sham Attestation and that Touré had been approached by the FBI.  While Noy asked Cilins for more details, Cilins responded that he was hesitant to discuss details over the phone.

128.   After the second April 11, 2013 meeting, Cilins called Noy again.  He told Noy that he had to return on Saturday because "not everything is here."  Noy asked follow-up questions regarding the status of where the documents were, and Cilins assured him that he would get the remainder of the documents on Saturday.  These phone calls establish Defendant Noy's participation in the conspiracy and enterprise, and that he knew about and was involved in Cilins' efforts to destroy the contracts evidencing bribe payments from BSGR to Touré.

129.   The Government's filings also allege that Defendants Lev Ran and Cilins transferred significant sums of money to Defendant Touré from and/or to bank accounts in the United States. The dates of the payments conveniently follow the execution of the July and August 2010 contracts between Pentler and Touré described above in Paragraph 52:

(a)     Lev Ran transferred $149,970 on July 21, 2010 and $99,970 on August 5, 2010 from an account in Israel to an account in Florida that belonged to Touré; and

(b)     Cilins issued checks from Wells Fargo Bank, payable to Touré, in the amounts of $100,000 and $50,000, on July 27, 2010 and August 5, 2010, respectively.

### N.    The Investigation of Steinmetz and BSGR Continues

130.    The Government's investigation of Defendants Steinmetz, BSGR, and other Defendants continues to this day.  Indeed, upon information and belief, the United States Department of Justice ("DOJ") sent Defendant Steinmetz a letter in January 2014 informing him that he is the subject of a federal criminal investigation involving allegations of bribery related to Simandou. Additionally, the Government of Guinea recently concluded a three-year inquiry into how Steinmetz and BSGR won the mining rights to Blocks 1 and 2 of Simandou.  The technical committee tasked with the Guinean investigation concluded that Steinmetz and BSGR obtained the rights to Simandou through a bribery scheme involving Mamadie Touré.  On or around April 17, the Government of Guinea announced that it approved the recommendations of the technical committee, meaning that BSGR and Vale will be stripped of their rights to Blocks 1 and 2 of Simandou.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Violations of RICO, 18 U.S.C. § 1962
#### (Against All Defendants)

131.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

132.    At all relevant times, Defendants Steinmetz, Cilins, Touré, Noy, Lev Ran and Thiam are each a "person" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

133.    At all relevant times, Defendants Vale and BSGR, including their officers, directors, and employees, are "persons" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

134.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The RICO Enterprise

135.    Defendants Steinmetz, Vale, BSGR, Cilins, Touré, Noy, Lev Ran, and Thiam, together with (1) BSGR's employees, officers, directors, and agents; (2) other BSGR-owned entities; and (2) Vale's business groups, subsidiaries, affiliates, officers, directors, and employees, form an association-in-fact for the common and continuing purpose described herein and constitute an ongoing criminal enterprise.  Through a pattern of fraud, bribery, lies, and corruption, the members of the enterprise engaged in a common scheme to obtain Rio Tinto's highly confidential information under false pretenses and to use that information to wrest half of the Simandou concession from Rio Tinto (hereinafter, the "RICO Enterprise").

136.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

137.    This association-in-fact constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and/or its activities affected, interstate and/or foreign commerce.

138.    The participants in this association-in-fact directly or indirectly benefited from access to Rio Tinto's confidential information by, among other things: (1) making use of the stolen information to fraudulently obtain Rio Tinto's rights in Simandou Blocks 1 and 2; (2) benefiting from Rio Tinto's confidential information in developing mining operations at Simandou; and (3) retaining their interest in Simandou for a number of years by fraudulently concealing their own involvement in the scheme.

139.    The RICO Enterprise's repeated, continuous, and flagrant violations of federal

criminal law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.* Their racketeering activities, both individually and collectively, pose a serious threat of continuing criminal conduct into the foreseeable future.

140.    The RICO Enterprise's common purpose came into existence in 2008, when BSGR, Steinmetz, and Vale met to discuss the proprietary information Vale learned from Rio Tinto and conspired to obtain further confidential information through false pretenses, in a bid to wrongfully acquire Rio Tinto's rights to Simandou, to retain those rights for themselves, and fraudulently conceal all illegal actions taken to obtain those rights. These efforts continue today.

141.    Defendants BSGR, Steinmetz, and Vale are central and controlling figures in the RICO Enterprise, and have been responsible for oversight of the scheme to defraud Rio Tinto, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise. Actions taken by the RICO Enterprise in furtherance of the scheme include, but are not limited to (1) feigning interest in purchasing Rio Tinto's rights to Simandou in order to fraudulently obtain confidential information, so that Defendants could utilize that information to misappropriate the rights to Simandou; (2) paying bribes to Defendant Thiam and Defendant Touré in exchange for assistance in Defendants' attempt to fraudulently obtain the rights to Blocks 1 and 2; and (3) attempting to convince Touré to destroy evidence of the criminal scheme in order to fraudulently conceal the RICO Enterprise's activities and to prevent the United States and Guinean Governments from uncovering documentary evidence of Defendants' crimes.

142.    The RICO Enterprise was predominately domestic in nature, as demonstrated by the following facts:

- the enterprise was conceived and orchestrated in the United States after Vale attended the November 24, 2008 meeting in New York City and learned of both the

extraordinary value of Rio Tinto's Concession and Steinmetz's and BSGR's efforts to misappropriate it;

- the fraud upon Rio Tinto was carried out in the United States, as Vale attended numerous meetings in New York in December 2008 and January and February 2009, as part of the scheme to obtain Rio Tinto's confidential information regarding Simandou by false pretenses, for the purpose of sharing that information with Steinmetz and BSGR;

- Vale further misappropriated Rio Tinto's confidential information through the U.S.-based Data Room;

- both Rio Tinto (the victim of the RICO Enterprise's fraudulent scheme) and Vale (one of the perpetrators) trade ADRs on the New York Stock Exchange;

- bribe payments made by the RICO Enterprise in furtherance of its illegal bid to steal Rio Tinto's Simandou rights went through U.S. banks, including payments issued from Defendant Cilins' Wells Fargo bank account in the United States and payments made into Defendant Touré's bank account in Florida;

- the RICO Enterprise made unlawful bribe payments to and through Defendant Thiam, himself a U.S. Citizen;

- Defendants Thiam and Touré sought refuge in the United States with their ill-gotten gains; each purchased property here using the proceeds of bribe payments from the RICO Enterprise; and

- Defendant Cilins, at the instruction of Defendant Steinmetz, traveled to the United States for the purpose of obstructing the U.S. and Guinean investigations and further concealing the RICO Enterprise's criminal actions.  On March 10, 2014, Cilins

pleaded guilty to one count of obstruction of a criminal investigation in the Southern District of New York.

### The Pattern of Racketeering Activity

143.    The RICO Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

144.    The actions undertaken by the RICO Enterprise from at least November 2008 to the present were inherently unlawful, they were its regular way of operating, and the nature of those acts clearly implies a threat of continued criminal activity.

145.    The RICO Enterprise engaged in a pattern of racketeering, including, but not limited to: (1) mail and wire fraud; (2) money laundering; (3) violations of the Travel Act; (4) obstruction of a criminal investigation; and (5) witness tampering.

### Predicate Acts:  Mail and Wire Fraud, Violations of 18 U.S.C. §§ 1341, 1343

146.    The RICO Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

147.    The RICO Enterprise, through the Defendants, engaged in a criminal scheme to defraud Rio Tinto, bribe Guinean officials, and illegally obtain rights to Simandou.  The ultimate objective of the Defendants' scheme or artifice was to defraud Rio Tinto and convince Guinean Government officials through bribery to hand over the rights to Simandou to the Defendants.

148.    In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier and/or (2) by means of wire communications

in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

      (a)    Vale made false representations to Rio Tinto regarding its interest to purchase Simandou (despite the fact that Vale had secretly agreed with Steinmetz and BSGR to steal Rio Tinto's rights) through the mail and wires, including the January 29, 2009 Letter of Intent from Vale to Rio Tinto described above in Paragraph 96.

      (b)    Cilins issued two checks to Defendant Touré from his Wells Fargo bank account in the United States: the first on July 27, 2010 in the amount of $100,000 and the second on August 5, 2010 in the amount of $50,000. Upon information and belief, the checks were sent through U.S. mail. These funds constituted bribery payments for Touré's assistance in the illegal scheme.

      (c)    Vale's participation by phone in the February 4, 2009 meeting in New York, during which Vale continued to falsely express an interest in purchasing Rio Tinto's rights to Simandou;

      (d)    Vale's repeated access to the Data Room to obtain Rio Tinto's confidential and proprietary information, as described above in Paragraphs 61 through 75;

      (e)    Numerous phone calls between Cilins and Touré on March 15, 16, and 20, 2013, during which they discussed plans to destroy documentary evidence;

      (f)    Three April 11, 2013 telephone communications between Cilins and Noy (at the behest of BSGR and Steinmetz) regarding plans to convince Touré to destroy evidence of criminal activity and sign the false Attestation; and

      (g)    Funds *transferred* by BSGR's employee/agent, Lev Ran, and *accepted* by Defendant Touré, including a July 21, 2010 transfer of $149,970 and an August 5, 2010 transfer of

$99,970. These funds constituted bribery payments from the RICO Enterprise for Touré's assistance in the illegal scheme, and were transferred from Lev Ran's Israeli bank account to Touré's bank account in Florida.

149. Accordingly, Defendants Cilins, Noy, Lev Ran, Touré, BSGR, Steinmetz, Vale and other members of the RICO Enterprise committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

150. The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Rio Tinto into sharing confidential information, to obtain the rights to Simandou, and later to fraudulently conceal evidence of criminal conduct. The scheme was successful because Defendants were able to obtain Simandou Blocks 1 and 2, and fraudulently concealed their illegal activities for a number of years.

151. Rio Tinto reasonably relied on the Defendants' false and misleading statements. Further, the Defendants' acts have caused Rio Tinto substantial damages.

***Predicate Acts: Travel Act, Violations of 18 U.S.C. § 1952***

152. The Enterprise's pattern of racketeering included several violations of the Travel Act, 18 U.S.C. § 1952.

*Travel Act Violation: Destruction, Alteration, and Falsification of Records in a Federal Investigation in Violation of 18 U.S.C. § 1519*

153. Defendant Cilins, at the instruction of Defendants Steinmetz, BSGR, and Noy, traveled to the United States (including New York and Florida) with intent to carry out unlawful activity.

154. At the instruction of Steinmetz, BSGR and Noy, Cilins travelled to Florida to meet with Defendant Touré. During these meetings, Cilins not only violated 18 U.S.C. § 1512 and 18 U.S.C. § 1510 (as described below), but Cilins also violated 18 U.S.C. § 1519 in his attempts to

38

destroy, alter, and falsify records in a federal investigation.  Cilins then willfully, knowingly, and with the intent to impede, obstruct, and influence the investigation of the DOJ, altered, destroyed, mutilated, concealed, covered up, falsified, and made false entries in records, documents, and tangible objects.  Further, Cilins directed Touré to destroy certain documents (including the contracts evidencing bribe payments from BSGR to Touré) that were the subject of the Grand Jury Proceeding.

*Travel Act Violation:  Illegal Payments to Foreign Officials in Violation of 15 U.S.C. § 78dd*

155.  Defendants also violated 15 U.S.C. § 78dd in that, having devised or intended to devise a scheme or artifice to defraud Rio Tinto and steal the rights to Simandou, the RICO Enterprise bribed and otherwise improperly influenced one or more senior officials of the former Government of Guinea.  Indeed, the arrest of Cilins was in connection with an ongoing U.S. federal investigation into, among other illegal activity, violations of the FCPA through bribes to officials of the former Government of Guinea for the purpose of obtaining rights to Blocks 1 and 2 of Simandou.

156.  Defendants Steinmetz, BSGR, and Cilins, and others acting at their instruction, made illegal payments to, and improperly influenced, one or more senior officials in Guinea, including Defendant Thiam, himself a U.S. citizen and a domestic concern within the meaning of 15 U.S.C. § 78dd-2(a).  In light of the information provided to Vale by Rio Tinto during the November 24, 2008 meeting, and given the allegations of BSGR's reputation for bribery and corruption—which were well known in the mining industry—Vale knew or should have known of Steinmetz's and BSGR's corrupt activities.

157.  At some point between June 6 and June 12, 2010, Thiam met with Steinmetz in Paris, France.  On information and belief, during this period Steinmetz paid Thiam a $200 million bribe for facilitating the signing of BSGR's exploration license over Rio Tinto's Simandou Blocks 1 and 2.

On information and belief, this bribe was paid as part of the enterprise's continuing scheme to steal Rio Tinto's rights to Blocks 1 and 2 and to sabotage Rio Tinto's remaining operations at the Simandou site.

158.     Upon information and belief, members of the RICO Enterprise made use of the mails, wires, and other means of interstate commerce corruptly in order to offer and promise to pay bribes and other payments to one or more senior officials of the Guinean Government, including but not limited to Defendant Thiam, in order to conceal their scheme to defraud Rio Tinto and illegally obtain the rights to Simandou.

159.     Improper payments were made to foreign officials within the meaning of 15 U.S.C. § 78dd-2(a)(1) and §78dd-1(a)(1) in order to (1) influence Defendant Thiam and other officials of the Guinean Government to agree to fraudulent and illegal transactions revoking Rio Tinto's rights to Blocks 1 and 2 of Simandou, in violation of their duties as government officials; and (2) secure an improper business advantage for Defendants.

160.     Rio Tinto has been damaged as a direct and proximate cause of Defendants' illegal payments to one or more senior officials of the former Government of Guinea.

161.     Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to bribe Guinean government officials, thereby depriving Rio Tinto of its Simandou rights.  To further this goal, the RICO Enterprise violated the FCPA, by attempting to and successfully bribing Guinean officials in order to obtain the rights to Blocks 1 and 2 of Simandou.

### *Predicate Act:  Obstruction of a Criminal Investigation, Violations of 18 U.S.C. § 1510*

162.     The RICO Enterprise's pattern of racketeering included obstruction of a criminal investigation in violation of 18 U.S.C. § 1510.

163.     Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to

cover up the Enterprise's activities in connection with its bribery of Guinean officials and its defrauding of Rio Tinto.

164. At the direction of Steinmetz, BSGR and Noy, and for the benefit of the other Defendants, these schemes were furthered by Defendant Cilins, who in this district and elsewhere, willfully and knowingly endeavored by means of bribery to obstruct, delay, and prevent the communication of information relating to a violation of criminal statutes of the United States by Touré to a criminal investigator. Further, Cilins offered money to Touré in exchange for her agreement to provide Cilins, for destruction, documents that the FBI was seeking in connection with an investigation (including contracts evidencing bribe payments from BSGR to Touré). Cilins also offered money to Touré in exchange for her agreement to sign the false Attestation relating to matters under investigation by FBI agents.

165. On March 10, 2014, Cilins pleaded guilty to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510.

166. Thus, Defendants Cilins, Noy, Steinmetz and BSGR violated 18 U.S.C. § 1510 in furtherance of the RICO Enterprise's scheme.

### Predicate Act:  Tampering with a Witness, Victim, or an Informant, Violations of 18 U.S.C. § 1512

167. The RICO Enterprise's pattern of racketeering included tampering with a witness, victim or an informant in violation of 18 U.S.C. § 1512.

168. Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to cover up its activities in connection with its bribery of Guinean officials and its defrauding of Rio Tinto.

169. At the direction of Steinmetz, BSGR, and Noy, and for the benefit of the other Defendants, these schemes were furthered by Defendant Cilins, who willfully, knowingly, and

corruptly did obstruct, influence, and impede official proceedings and attempt to do so. Specifically Cilins directed Touré to make false statements to FBI agents regarding the commission of federal offenses.

170.    Cilins did also knowingly use intimidation, threaten, and corruptly persuade a person, and attempt to do so, and engage in misleading conduct towards another person with intent to cause and induce a person to alter, destroy, mutilate, and conceal an object with intent to impair the object's integrity and availability for use in an official proceeding. Specifically, Cilins offered to pay Touré money in exchange for her agreement to provide to Cilins, for destruction, documents that were to be produced in the Grand Jury Proceeding.

171.    Thus, Cilins, Noy, Steinmetz, and BSGR violated 18 U.S.C. § 1512 in furtherance of the RICO Enterprise's scheme.

### Predicate Act: Money Laundering, Violations of 18 U.S.C. § 1956

172.    The RICO Enterprise's pattern of racketeering included money laundering in violation of 18 U.S.C. § 1956.

173.    Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to bribe Guinean government officials, thereby depriving Rio Tinto of its Simandou rights. To further this goal, the RICO Enterprise committed and/or conspired to commit money laundering pursuant to 18 U.S.C. § 1956. Indeed, it is public knowledge that the arrest of Cilins was in connection with an ongoing criminal investigation in connection with, among other illegal activity, money laundering violations relating to bribes paid to officials of the former Government of Guinea for the purpose of obtaining rights to Blocks 1 and 2.

174.    In particular, the RICO Enterprise laundered into and through the United States bribe payments to officials of the Government of Guinea for the purpose of stealing Rio Tinto's rights to

Blocks 1 and 2 of Simandou.  Among other things, the Grand Jury Proceeding discussed above

concerns "the transfer into the United States from outside the United States of payments in

furtherance of a scheme to corruptly obtain valuable mining concessions in Guinea," including

Simandou.

      (a)    Cilins issued two checks to Defendant Touré from his Wells Fargo bank

account in the United States:  the first on July 27, 2010 in the amount of $100,000 and the second on

August 5, 2010 in the amount of $50,000.  These funds constituted bribery payments for Touré's

assistance in the illegal scheme.  Upon information and belief, Touré received and deposited these

checks;

      (b)    BSGR and its affiliates and agents, including Defendants Lev Ran and Cilins,

made bribe payments to Touré's bank account in Florida; and

      (c)    At some point in June 2010, Defendant Thiam accepted a $200 million bribe

for facilitating the signing of BSGR's exploration license over Rio Tinto's Simandou Blocks 1 and

2.  On information and belief, this bribe was paid as part of the Enterprise's continuing scheme to

steal Rio Tinto's rights to Blocks 1 and 2 and to sabotage Rio Tinto's remaining operations at the

Simandou site.  Upon information and belief, in 2011, Thiam bought an apartment in Manhattan for

$1.5 million and an estate in Duchess County, New York for $3.75 million.  Thiam paid for both

properties with cash.

    175.    Thus, Defendants and other co-conspirators committed numerous violations of 18

U.S.C. § 1956.

### *Continuity of Conduct*

    176.    Defendants' violations of state and federal law as set forth herein, each of which

directly and proximately injured Rio Tinto, constituted a continuous course of conduct in the United

States beginning in 2008 and continuing today, which was intended to obtain money and rights to

Blocks 1 and 2 of Simandou through false representations, fraud, deceit, and other improper and unlawful means.  Therefore, said violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### *The RICO Enterprise Caused Injury to Rio Tinto*

177.    Rio Tinto, as the original and rightful owner of the Simandou Concession, has been injured in its business or property as a direct and proximate result of the RICO Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

178.    Rio Tinto's injuries are clear and definite and include the loss of billions of dollars in assets, as well as the lost investment of its activities in Simandou.

### *Rio Tinto's Entitlement to Treble Damages*

179.    As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, Rio Tinto has suffered substantial damages in an amount to be proven at trial.

180.    Pursuant to 18 U.S.C. § 1964(c), Rio Tinto is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

### SECOND CAUSE OF ACTION
### Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)
### (Against All Defendants)

181.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

182.    Since at least 2008, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

183.    The Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

184.    The Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count One at Paragraphs 143 through 175.

185.    As part of the conspiracy, each Defendant, at times acting through certain of its officers, agents, and representatives, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

186.    As a direct and proximate result of the Defendants' conspiracy, the racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. 1962(d), Rio Tinto has been injured in its business and property by the loss of its legitimate rights to Blocks 1 and 2 of Simandou.

187.    Pursuant to 18 U.S.C. § 1964(c), Rio Tinto is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

### THIRD CAUSE OF ACTION
#### Fraud
#### (Against All Defendants)

188.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

189.    Following the November 24, 2008 meeting, Vale combined forces with Steinmetz,

BSGR, and other Defendants in a scheme to deprive Rio Tinto of its Simandou rights through unlawful means. As part of this unlawful scheme, the Defendants agreed that Vale would misrepresent to Rio Tinto that it was interested in purchasing Rio Tinto's rights to Simandou. By feigning interest in a deal related to Simandou, Vale and its co-conspirators were able to gain access to key confidential and proprietary information from Rio Tinto, which Defendants then used for their own development of Simandou.

190.    Vale, encouraged by other Defendants, knowingly and intentionally misrepresented several material facts to Rio Tinto. Specifically, in advance of, during, and following the December 2008 and January and February 2009 New York meetings, Vale's executives misrepresented to Rio Tinto's executives their continued interest in purchasing Rio Tinto's Simandou rights. These false representations include, but are not limited to, the January 29, 2009 Letter of Intent from Vale to Rio Tinto, in which Vale stated that it was interested in consummating a deal with Rio Tinto involving Simandou, when in truth, Vale's executives were working with Steinmetz, BSGR, and others to deprive Rio Tinto of its Simandou rights through unlawful means.

191.    The foregoing misrepresentations were material because Rio Tinto would never have agreed to meet with Vale in December 2008 or January and February 2009 had Rio Tinto known that the Defendants intended to deprive Rio Tinto of its Simandou rights and to exploit those rights for their own personal gain to the detriment of Rio Tinto.

192.    Further Rio Tinto would not have shared its confidential and proprietary information with Vale had Rio Tinto known that Vale was conspiring with Steinmetz, BSGR, and others to deprive Rio Tinto of its Concession and to exploit those rights for their own personal gain to the detriment of Rio Tinto.

193.    The material misrepresentations were made with the intent to defraud Rio Tinto

because the Defendants knew or should have known that Rio Tinto would not have entered into negotiations to sell its Simandou rights had Rio Tinto known of the Defendants' plot to deprive Rio Tinto of its Simandou rights.

194.    But for Vale's fraudulent misrepresentations, Rio Tinto would not have met with Vale or shared its trade secrets, confidential ideas, or confidential investment information with Vale.

195.    Rio Tinto reasonably relied on the misrepresentations conveyed by Vale because Rio Tinto had no reason to suspect that Steinmetz, BSGR, and other Defendants were working with Vale to deprive Rio Tinto of its Concession.  Rio Tinto had every reason to believe that Vale was continuing its talks with Rio Tinto as part of a good faith effort to reach a mutually beneficial deal regarding Rio Tinto's rights to Simandou.

196.    The unlawful conduct of Vale, Steinmetz, BSGR, and the other Defendants has directly, legally, and proximately caused, and continues to cause, injuries to Rio Tinto in its business and property.  These injuries include Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Concession, and future lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

197.    Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendants from committing such unlawful conduct in the future.

**FOURTH CAUSE OF ACTION**
**Civil Conspiracy to Commit Fraud**
**(Against All Defendants)**

198.     Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

199.     As set forth above, the Defendants have committed fraud against Rio Tinto.

200.     The Defendants agreed to participate in a common scheme against Rio Tinto to unlawfully obtain Rio Tinto's Simandou rights.  In furtherance of this plan or purpose, Vale, Steinmetz, BSGR, and other Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.  Indeed, as early as December 2008, there was an overt act in furtherance of the conspiracy to defraud Rio Tinto: Vale and BSGR attended a secret meeting with Guinean officials responsible for deciding mining rights.  Further, as part of their agreement, Vale continued to meet with Rio Tinto in January 2009 and thereafter, while feigning interest in purchasing Rio Tinto's Concession.  In exchange, Steinmetz and BSGR continued to lobby key Guinean Government officials, including by making illegal promises and bribes—a fact which Vale knew or should have known.

201.     As a direct and proximate result of the conspiracy between Vale, Steinmetz, BSGR, and others, the overt acts committed in furtherance of that conspiracy, and the torts committed against Rio Tinto, Rio Tinto has been damaged in its business and property.  These injuries include Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Concession, and future lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

202.     Accordingly, Rio Tinto seeks an award of damages in compensation for, among

other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto

seeks the imposition of punitive damages sufficient to deter the Defendants from committing such

unlawful conduct in the future.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting a Fraud**
**(Against All Defendants)**

203.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint

as if fully set forth herein.

204.    The Defendants aided and abetted Vale's fraud on Rio Tinto, by knowingly

providing material assistance to those frauds.

205.    As described above, the Defendants had knowledge of Vale's fraudulent statements

to Rio Tinto, including that Vale was going to continue to meet with Rio Tinto under the guise of

Vale's interest in purchasing Rio Tinto's rights to Simandou in order to obtain unfettered access to

Rio Tinto's confidential and proprietary information regarding Simandou.

206.    As described above, Defendants Steinmetz and BSGR knowingly and substantially

assisted in Vale's fraud on Rio Tinto, including by lobbying and bribing key Guinean Government

officials, and by making illegal promises and payments.  Through the illegal bribes made by

Steinmetz and BSGR, Vale was able to utilize the information it obtained from Rio Tinto (under

false pretenses) in order to steal Rio Tinto's rights to Blocks 1 and 2 of Simandou.

207.    As a direct, proximate, and foreseeable result of the Defendants' conduct, Rio Tinto

has been damaged  in its business and property.  These injuries include Rio Tinto's loss of hundreds

of millions of dollars spent over eleven years developing Blocks 1 and 2, developing the technical

plans and infrastructure for extracting the iron ore from Blocks 1 and 2, and negotiating with the

Guinean Government over Rio Tinto's Concession, and future lost profits from Rio Tinto's inability

to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

208.   Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendants from committing such unlawful conduct in the future.

## DEMAND FOR RELIEF

WHEREFORE, Rio Tinto respectfully requests that the Court:

(a)   Award compensatory, consequential, exemplary and punitive damages to Rio Tinto in an amount to be determined at trial;

(b)   Treble damages pursuant to 18 U.S.C. § 1964(c);

(c)   Award the costs of this action, including Rio Tinto's attorneys' fees; and

(d)   Grant to Rio Tinto whatever further relief is just and proper.

## JURY TRIAL DEMAND

Rio Tinto demands trial by jury on issues so triable.

Dated:  New York, New York
        April 30, 2014

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: _____
        William A. Burck

        777 6th Street NW, 11th Floor
        Washington, DC 20001
        Telephone:  (202) 538-8000
        Facsimile:  (202) 538-8100
        williamburck@quinnemanuel.com

        *Attorneys for Plaintiff Rio Tinto plc*