UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>Plaintiff,<br><br>v.<br><br>Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam,<br><br>Defendants. | Civil Action No. 14-cv-3042 (RMB)<br><br>AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

For its Complaint, Plaintiff Rio Tinto plc ("Rio Tinto") alleges as follows:

## I.   <u>INTRODUCTION</u>

1.      This is a case about the theft of Rio Tinto's valuable mining rights by the Defendants through a scheme in violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), hatched and substantially executed in the United States.  The U.S.-based enterprise's ultimate target was Rio Tinto's mining concession in the Simandou region of southeast Guinea.  Simandou is one of the most valuable iron ore deposits in the world, estimated to be worth billions of dollars.  At the time Defendants devised their fraudulent scheme, Rio Tinto had spent eleven years and hundreds of millions of dollars developing mining operations at Simandou and expected it to yield substantial profits into the future.

2.      At the heart of the RICO scheme were Defendant Vale S.A. ("Vale"), an international mining company whose American Depository Receipts (ADRs) are among the most-heavily traded on the New York Stock Exchange; Defendant Mahmoud Thiam, a U.S. citizen and the former

Guinean Minister of Mines who served as the go-between for key members of the enterprise, received more than one hundred million dollars in bribes, portions of which he doled out to a broad array of government officials to further the interests of the conspiracy, and misused his authority and power to ensure the success of the conspiracy; Defendants Benjamin (Beny) Steinmetz and his company BSG Resources (collectively with its named subsidiaries and affiliates, "BSGR") that paid the bribes; Defendant Frederic Cilins, who – acting on behalf of the conspiracy – covered up the scheme through a series of illegal acts in the United States and now has pled guilty to obstruction of justice charges in connection with an investigation into Simandou being conducted by the United States Attorneys' Office for the Southern District of New York; and Defendant Mamadie Touré, a resident of the United States, who received some of the bribes.

3.      In 2008, Vale made the strategic decision to gain control of some or all of Simandou at any cost.  To that end, Vale devised and pursued a two-front attack on Rio Tinto's mining concession at Simandou, which consisted of Blocks 1, 2, 3, and 4 (the "Simandou Concession"): overtures to the Government of Guinea, and ultimately entering into a RICO conspiracy with the other defendants to steal it.

4.      A key part of Vale's strategy was to dupe Rio Tinto into revealing its confidential and proprietary information about the Simandou Concession that it had spent many years and hundreds of millions of dollars developing.  To accomplish this, beginning in 2008, Vale entered into discussions with Rio Tinto to purchase the Simandou Concession while actively concealing from Rio Tinto the material facts that (1) it was also in discussions with the Government of Guinea for some or all of Rio Tinto's Simandou Concession, and (2) it was evaluating and considering Defendants Steinmetz and BSGR as possible partners to pursue Rio Tinto's Simandou Concession. Vale's material omissions and misrepresentations fraudulently induced Rio Tinto to enter into the

negotiations and sign a confidentiality agreement with Vale.  As part of these negotiations, Rio Tinto provided Vale with its highly confidential and proprietary information regarding Simandou.  Rio Tinto justifiably relied upon Vale's material omissions and misrepresentations, in that had it known that Vale was in discussions with the Government of Guinea for the  Simandou Concession or that Vale was considering and evaluating Defendants Steinmetz and BSGR as potential partners, it never would have entered into negotiations, signed the confidentiality agreement, or provided its confidential and proprietary information to Vale.  Vale misrepresented that it was acting in good faith because it knew all negotiations regarding the Simandou Concession would have ceased had Vale disclosed to Rio Tinto its material omissions and misrepresentations.

5.     The Rio Tinto-Vale negotiations began in person with two key meetings in New York in November 2008, during which Vale learned important details about both the extraordinary value of the Simandou Concession and how to develop it.  As Vale quickly confirmed, gaining control of the Simandou deposit would advance its strategy of strengthening Vale's position in  the world's high-grade iron ore market.

6.     Defendant Vale saw a golden opportunity to not only obtain that control, but to do so on the cheap, after learning details about Defendants Steinmetz's and BSGR's attempts to interfere with and steal Rio Tinto's rights to the Simandou Concession.  Given BSGR's reputation for corruption and bribery – well known among those active in the mining industry, including Vale – Vale was on notice that Steinmetz's and BSGR's efforts to misappropriate Rio Tinto's rights included bribing various Guinean officials.

7.     Indeed, Vale itself had first-hand experience with BSGR's methods and tactics for acquiring mining rights at Simandou.  In 2005-2006, Vale applied for a mining permit for a concession called Simandou North ("North"), which was adjacent to, but separate and apart from,

Rio Tinto's Simandou Concession at issue in this litigation. Despite being entitled to the concession under Guinean law, Vale's application was denied in favor of BSGR – a company that had no iron ore mining experience but did have an agent, Defendant Frederic Cilins, providing bribes in the form of gifts and payments to the then-Guinean President's fourth wife, Defendant Mamadie Touré. Vale learned a valuable lesson from this run in with Defendants Steinmetz and BSGR. This lesson would be recalled as Vale developed its plan to get Rio Tinto's Simandou Concession.

8.      Defendants Steinmetz and BSGR shared Vale's desire for Rio Tinto's Simandou Concession. For Steinmetz and BSGR, bribing officials was particularly necessary to acquire Simandou because they lacked any track record in iron ore mining. But bribery alone would not be sufficient for Steinmetz and BSGR to successfully exploit Simandou. Steinmetz and BSGR wanted a partner with significant iron ore mining experience both to provide them with technical know-how and resources needed to develop the mine, and to lend them credibility with the Guinean officials. Steinmetz and BSGR found that partner in Vale.

9.      Before Vale's meetings with Rio Tinto in New York, Vale knew of Steinmetz and BSGR's desires for Rio Tinto's Simandou Concession. During the meetings in New York, however, Vale confirmed and learned the details of how Steinmetz and BSGR were targeting Rio Tinto's Simandou Concession. Indeed, upon confirming Steinmetz's and BSGR's efforts during the New York meetings, Vale – secretly and unbeknownst to Rio Tinto – entered into a conspiracy with Steinmetz and BSGR to misappropriate Rio Tinto's rights to the Simandou Concession. The RICO enterprise was then born, and began conducting a pattern of racketeering activity in the United States and elsewhere.

10.      It was widely known that Steinmetz and BSGR primarily operated in the diamond market and did not have the resources, history, or technical background to develop Simandou's

massive untapped iron ore reserves, which would require skill, expertise, and financing that Steinmetz and BSGR wholly lacked.  By partnering with Vale, however, Steinmetz and BSGR gained everything they needed.  Given Vale's experience mining iron ore and its access to Rio Tinto's confidential geological, technical, and logistical data at the meetings in New York and from a data room, Vale armed Steinmetz and BSGR with the fruits of Rio Tinto's years, and hundreds of millions of dollars of research and development, to persuade officials in the Guinean Government to accept their bribes and go along with their illegal scheme.

11.     Thus, in furtherance of the conspiracy, Defendant Vale feigned continued interest in pursuing a deal with Rio Tinto.  This was accomplished through a number of additional meetings in New York City between December 2008 and February 2009, and through continuous access to a U.S.-based data room containing Rio Tinto's confidential documents from December 2008 through June 2009.  The information included, but was not limited to, geological and technical information, product characteristics, suitable mining methods and drilling operations, processing and logistics including the viability of different transportation options, and the status of efforts to bring the mine into production.

12.     The Defendants' conspiracy quickly began to bear fruit when officials in the Guinean Government announced in December 2008 that the Government had rescinded half of Rio Tinto's Simandou Concession (Blocks 1 and 2) and intended to assign that interest to BSGR.  The Government's announcement came shortly after a secret meeting earlier in December (at the same time that Vale executives were meeting with Rio Tinto in New York) between Guinean officials responsible for deciding mining rights and representatives of both Vale and BSGR.

13.     After this important first success, the conspiracy continued and drew upon the resources and power of Defendant Mahmoud Thiam, a U.S. citizen serving as the Guinean Minister

of Mines at the time.  In furtherance of the conspiracy, Defendants Steinmetz and BSGR began

paying substantial bribes to Defendant Thiam to confirm their interests in Simandou Blocks 1 and 2.

And beginning in January of 2009 and continuing through June 2009, Defendants Vale, Steinmetz,

BSGR, and Thiam met and communicated on multiple occasions in furtherance of their conspiracy.

Defendants concealed all of this from Rio Tinto during the entire time that Vale was negotiating with

Rio Tinto.  The result of Defendants' scheme was a June 2009 official statement from Thiam, on

behalf of the Government of Guinea, that confirmed the mining rights for Simandou Blocks 1 and 2,

previously held by Rio Tinto, were now BSGR and Steinmetz's.

14.     The Simandou negotiations between Rio Tinto and Vale ended in June 2009.  Having

successfully, and illegally, obtained half of Rio Tinto's Simandou Concession, the co-conspirators

resolved to formalize their relationship and further conceal the illicit nature of their dealings.  Vale

purchased a majority interest in BSGR's Guinean subsidiary for $2.5 billion, the first $500 million

of which was paid to BSGR in April 2010.  Two months after that payment, in June 2010, BSGR

paid another installment of its approximately $100 million bribe to Defendant Thiam (a U.S. citizen).

Thiam kept portions of this as payment for his  role in the conspiracy, and doled out the rest in

furtherance of the conspiracy to steal Rio Tinto's Simandou rights.

15.     The Vale-BSGR deal provided a façade of legitimacy to the conspiracy, thereby

helping to further conceal it.  Indeed, the enterprise's fraudulent scheme continued and remained

concealed for nearly three more years.  From 2010 to 2013, Defendants and their co-conspirators

utilized the confidential information and technical know-how they had misappropriated from Rio

Tinto to develop and exploit Simandou for their joint benefit.  They drilled exactly where Rio

Tinto's confidential information showed them to drill, and they developed and implemented a

railroad and port plan identical to the one they stole from Rio Tinto.  Meanwhile, Defendants and

6

their co-conspirators continued to commit crimes in the United States and elsewhere in an effort to destroy evidence of the enterprise and silence a key witness, Defendant Touré.

16.     The walls finally came crashing down on Defendants in January 2013, as the U.S. and Guinean Governments opened parallel criminal investigations into how Steinmetz and BSGR obtained their interest in Simandou.  In a desperate attempt to avoid detection, the enterprise sent Defendant Frederic Cilins, an agent and/or employee of Steinmetz and BSGR, to the United States to conceal and/or destroy evidence of the enterprise's illegal activity related to Simandou.  In April 2013, U.S. federal authorities arrested Cilins in Florida and charged him with obstruction of a grand jury investigation, destruction of evidence, and witness tampering.  In March 2014, Cilins entered a guilty plea to one count of obstruction.  Today at least six different countries – the United States, the United Kingdom, France, Guinea, Switzerland, and Guernsey – are investigating Steinmetz, BSGR, and other Defendants for their role in the theft of Rio Tinto's Simandou mining rights.  On April 9, 2014, a technical committee tasked with reviewing the Government of Guinea's mining contracts announced its finding that Steinmetz and BSGR won the mining rights to Blocks 1 and 2 of Simandou through bribery and corruption.  As a result, the Government of Guinea revoked the rights of BSGR and Vale to Blocks 1 and 2 of Simandou.

17.     The Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, §1961 *et seq.*, with predicate acts including, but not limited to, mail and wire fraud, money laundering, obstruction of justice, witness tampering, and violations of the Travel Act. In addition, the conduct of Defendants constitutes common law fraud, fraud in the inducement, and civil conspiracy to commit fraud, as well as aiding and abetting a fraud.  As a result, Defendants' conduct entitles Rio Tinto to damages and other relief.

## II.   THE PARTIES

### A.   The Plaintiff

18.     Rio Tinto plc is a multinational corporation headquartered in the United Kingdom, whose principal place of business is at 2 Eastbourne Terrace, London, W2 6LG, United Kingdom 020 7781-2000.  Rio Tinto plc trades ADRs on the New York Stock Exchange, and has a subsidiary of which maintains an office at 28 West 44th Street, Level 16, New York, NY 10036.  Rio Tinto plc also has billions of dollars of assets in the United States, earns billions of dollars in annual revenue from operations in the United States, and employs thousands of individuals in the United States.

### B.   The Defendants

19.     Vale S.A. is a Brazilian corporation with its principal place of business at Avenida Graça Aranha, No. 26, 20030-900 Rio de Janeiro, RJ, Brazil.  Vale trades ADRs on the New York Stock Exchange.  It also transacts business in the United States, including New York, through a sales office located at 2 Park 80 Plz W, Saddle Brook, New Jersey 07663 and a wholly owned subsidiary located in Wyckoff, New Jersey.  It also owns a 50% interest in California Steel Industries, located at 1400 San Bernardino Avenue, Fontana, California 92335.

20.     Benjamin "Beny" Steinmetz is an Israeli citizen who conducts and transacts business and personal affairs in New York.  He maintains a business address at 580 Fifth Avenue, Apartment 417, New York, New York and, at the time of the allegations alleged herein, maintained a residence at 781 Fifth Avenue, Apartment 701, New York, New York.  On information and belief, Steinmetz is now a subject in a federal criminal investigation in the United States being run by the Department of Justice and the United States Attorneys' Office for the Southern District of New York related to Simandou.

21.    **The "BSGR" Entities**

(a)    BSG Resources Limited is a privately-held corporation with its head office in Guernsey, Channel Islands.  It is wholly-owned by The Beny Steinmetz Group, which is a privately owned holding company that largely focuses on the selling and buying of diamonds. BSG Resources Limited is an agent of Steinmetz.  On information and belief, BSG Resources Limited, like Steinmetz, also is a subject in a federal criminal investigation in the United States related to Simandou.

(b)    VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd ("VBG-Vale BSGR Guernsey"), is a wholly-owned subsidiary of BSG Resources Limited that is also registered in Guernsey.  Upon information and belief, after entering into a joint venture with Vale, this entity changed its corporate name to VBG–Vale BSGR Limited.  On information and belief, VBG-Vale BSGR Guernsey also is a subject in a federal criminal investigation in the United States related to Simandou.

(c)    BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR Guinea ("VBG-Vale BSGR Guinea"), is a corporate affiliate of BSG Resources Limited that BSG Resources Limited registered in Guinea to hold the titles and agreements from which BSG Resources Limited would benefit.  After entering into a joint venture with Vale, this entity changed its corporate name to VBG-Vale BSGR Guinea.  VBG-Vale BSGR Guinea was created for purposes of holding the rights to develop Blocks 1 and 2 of Simandou.

(d)    BSGR is notorious for its complex and secret corporate structure.  This lack of transparency is not coincidental; it is purposefully aimed at avoiding legal obligations across the globe.  Underscoring the opaque nature of BSGR, BSGR itself refers to the different

BSGR entities related to Guinea interchangeably.  For example, in a press release on its website dated May 9, 2013 titled "Response to BSGR Guinea press speculation", BSG Resources Limited refers to itself as "BSGR" or "the Group" through the release, and does not clearly discern between the different entities.[1]  Despite the existence of VBG Guernsey and VBG-Vale BSGR Guinea, the press release vaguely claims that "BSGR" was awarded permits by the Government of Guinea, and that "BSGR" achieved "considerable success" in Guinea.  There is no distinguishing between BSG Resources Limited, VBG Guernsey, and VBG-Vale BSGR Guinea.  Given that these entities are referred to interchangeably by its own corporate parent, Rio Tinto has no choice but to do the same.  Absent discovery, it is near impossible to attribute specific acts to specific entities given the limited disclosure BSGR makes to the public regarding its corporate affiliates.  Accordingly, BSGR Resources Limited, VBG Guernsey, and VBG-Vale BSGR Guinea are collectively referred to herein as "BSGR."

        22.    Frederic Francois Marcel Cilins, a/k/a Frederic Cilins, is a citizen of France and is an agent and/or employee of Steinmetz and BSGR.  On March 10, 2014, Cilins entered a guilty plea in the Southern District of New York in Case No. 13-Cr.-315-WHP to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, related to the ongoing U.S. criminal investigation related to Simandou.  On July 29, 2014, Cilins was sentenced to 24 months imprisonment and three years of supervised release.  Cilins is a known affiliate of BSGR.  According to BSGR's own website, "[l]acking a permanent presence in Guinea, BSGR sought to

---

[1]  *See* "Response to BSGR Guinea press speculation" May 9, 2013, *available at* http://www.bsgresources.com/bsgr-guinea/bsgr-guinea-press-releases/response-to-bsgr-guinea-press-speculation-2/; *see also* "BSGR Guinea History", available at http://www.bsgresources.com/bsgr-guinea/bsgr-guinea-history/ (referring generally to "BSGR in Guinea" as opposed to names of corporate affiliates).

work with Michael Noy, Avraham Lev Ran and *Frederic Cilins*, who had extensive business operations in Guinea."[2]

23.     Mamadie Touré is a citizen of Guinea but lives in the United States, and is a resident of the state of Florida.  Touré was the fourth wife of former Guinean President General Lansana Conté.  She is a cooperating witness in the ongoing criminal investigation into Simandou being conducted by the United States Attorneys' Office for the Southern District of New York and the U.S. Department of Justice.

24.     Mahmoud Thiam is a U.S. citizen that maintains a residence and transacts business in New York City.  He was the Guinean Minister of Mines, Energy and Hydraulics from January 2009 until 2011.

### C.     Unnamed Co-conspirators Employed By or Affiliated with Steinmetz and BSGR

25.     Avraham Lev Ran is an agent and/or high-level employee of BSGR (or one of its affiliates or subsidiaries), and, on information and belief, is connected to the criminal conduct of Defendant Cilins.   According to BSGR's website, "[l]acking a permanent presence in Guinea, BSGR sought to work with Michael Noy, *Avraham Lev Ran* and Frederic Cilins, who had extensive business operations in Guinea."[3]  Lev Ran was affiliated with Pentler Holdings ("Pentler"), which owned a 17.65 percent equity stake in BSGR Guinea BVI (an entity that has since been dissolved) from March 2006 until March 2008, and operates on behalf of BSGR.  In 2010, Lev Ran on behalf of BSGR and/or Steinmetz, and in furtherance of the conspiracy, twice wired money from an account in Israel to an account in Florida that belonged to Defendant Touré.  Through various

---

[2]  *Id.* (emphasis added).

[3]  *Id.* (emphasis added).

limited liability corporations, Lev Ran also co-owns several properties in Florida with Cilins and Michael Noy.

26.     Michael Noy is an agent and employee of BSGR, and is Cilins' superior within BSGR.  According to BSGR's website, "[l]acking a permanent presence in Guinea, BSGR sought to work with *Michael Noy*, Avraham Lev Ran and Frederic Cilins, who had extensive business operations in Guinea."[4]  On information and belief, Defendant Noy is connected to the criminal conduct of Cilins.  Noy was affiliated with Pentler.  Through various limited liability corporations, Noy co-owns several properties in Florida with Cilins and Lev Ran.

## III.     <u>JURISDICTION AND VENUE</u>

27.     This Court has subject matter jurisdiction over Rio Tinto's claims under 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964, 1965.

28.     This Court also has supplemental jurisdiction over Rio Tinto's state law claims pursuant to 28 U.S.C. § 1367.

29.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965 because a substantial number of the events giving rise to this action occurred in this district.

30.     This Court has personal jurisdiction over Vale pursuant to 18 U.S.C. § 1965(a) and CPLR 302(a)(2) because Vale committed tortious acts within the state.  Alternatively, the exercise of jurisdiction over Vale is proper in this district pursuant to 18 U.S.C. §1965(b).  Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

31.     This Court has personal jurisdiction over BSGR pursuant to 18 U.S.C. § 1965(a) and CPLR 302(a)(2) because BSGR directed its employees and/or agents to enter the United States and

---

[4]  *Id.* (emphasis added).

commit tortious acts within the state. This Court also has personal jurisdiction over BSGR based on the acts of its co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over BSGR is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

32.    This Court has personal jurisdiction over Defendant Steinmetz, who directed Cilins and other co-conspirators to enter the United States and commit crimes in New York and elsewhere. The Court also has personal jurisdiction pursuant to 18 U.S.C. § 1965(a) and CPLR 302(a)(3) because he committed tortious acts within the state which caused an injury to persons within the state and he regularly does or solicits business, and/or engages in other persistent conduct, and/or derives substantial revenue from goods used or consumed and/or services rendered in the state. This Court also has personal jurisdiction over Defendant Steinmetz based on the acts of his co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over Steinmetz is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

33.    Exercise of jurisdiction over Defendant Cilins is reasonable and proper under 18 U.S.C. § 1965(a) because Cilins has committed various crimes in this district (and elsewhere). This Court also has personal jurisdiction over Defendant Cilins based on the acts of his co-conspirators and agents within the state. Alternatively, the exercise of jurisdiction over Cilins is proper in this district pursuant to 18 U.S.C. §1965(b). Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the Defendants could otherwise be tried together.

34.     Exercise of jurisdiction over Defendant Mahmoud Thiam is reasonable and proper under 18 U.S.C. §1965(a) because Thiam is a resident of the State of New York and because he conducts extensive business activities in New York.  This Court also has personal jurisdiction over Defendant Thiam because he has committed various crimes in this district (and elsewhere) and based on the acts of his co-conspirators and agents within the state.  Moreover, property purchased by Defendant Thiam and located in the State of New York was purchased using proceeds of corrupt payments received by Defendant Thiam during his tenure as Minister of Mines in Guinea.

35.     Mamadie Touré is a resident of the United States.  Exercise of jurisdiction over Defendant Touré is reasonable and proper under 18 U.S.C. § 1965(a) because Touré has committed various crimes in this district (and elsewhere).  This Court also has personal jurisdiction over Defendant Touré based on the acts of her co-conspirators and agents within the state.  Alternatively, for Rio Tinto's claims for violations of 18 U.S.C. § 1962, the exercise of jurisdiction over Touré is proper in this district pursuant to 18 U.S.C. §1965(b).  Justice requires application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together.

## IV.    FACTUAL ALLEGATIONS

Rio Tinto alleges the following upon information and belief:

### A.     Rio Tinto Held A Valid Mining Concession For Simandou

36.     On February 25, 1997, the Guinean Ministry of Natural Resources and Energy awarded four exploration permits to Rio Tinto for iron ore mining at Simandou in southeast Guinea. Simandou is one of the largest iron ore deposits in the world.  According to studies, Blocks 3 and 4 alone are capable of sustaining a 100 million ton per annum run-rate.  If one adds in production from Blocks 1 and 2, the production rate could double.  These deposits are considered high grade iron ore deposits, containing ore grades of 60 to 68 percent Fe.  The effect that these kinds of deposits could

have on the iron ore and steel markets has led to the Simandou deposits being described as "world-class deposits" and "the biggest and best iron ore layers."

37. After being awarded these permits, Rio Tinto spent the next nine years exploring and developing Simandou. On March 30, 2006, the then-President of Guinea, Lansana Conté, granted Rio Tinto the Simandou Concession. The President's signature and subsequent publication of the Simandou Concession gave it the force of law in Guinea. The Simandou Concession granted Rio Tinto an area of 738 km (squared) of Simandou for 25 years.

38. After receiving the Simandou Concession, Rio Tinto continued – as it had over the previous nine years – to meet its obligations by investing its resources, time, and finances into the exploration and development of the iron ore mining operations at Simandou. Indeed, at all times during its development, Rio Tinto met its legal obligations to explore and evaluate the potential for mining iron ore at Simandou.

39. Rio Tinto's initial exploration and development of the mine had taken nine years and was extremely expensive in part due to the historic scope of the project, the difficult terrain, and the absence of basic infrastructure, such as roads and railways, necessary to develop the mine. All parties knew and understood that exploration and development would be a lengthy process given these challenges.

40. As of August 2008, two years after receiving the Simandou Concession, Rio Tinto had doubled its drilling capacity at the Simandou site, drilling more than 218,000 meters of core samples, and developing and constructing various infrastructure projects. As of August 2008, Rio Tinto had invested hundreds of millions of dollars in developing the Simandou Concession.

**B.** **Defendants Steinmetz and BSGR Lay the Groundwork for the RICO Enterprise**

41.     Defendants Steinmetz and BSGR had their sights on the potential riches of the Simandou deposit as early as 2005.  Around that same time, BSGR sent its agent, Defendant Cilins, to Guinea to start laying the groundwork for an acquisition of the Simandou concession.

42.     Dispatched to Conakry, Cilins stayed at the Novotel, a hotel popular with mining executives.  By developing contacts in the Novotel's business center and surreptitiously obtaining copies of all incoming and outgoing faxes, Cilins learned details about Rio Tinto's efforts to explore and develop the Simandou Concession.

43.     Sensing an opportunity to induce the Conté regime to illegally rescind Rio Tinto's mining rights and award them to BSGR, Cilins began distributing gifts to various contacts in Guinea. He soon learned, however, that the only person who mattered in the country was President Conté, and that the way to Conté was through his four wives – particularly through his fourth and youngest wife, Defendant Mamadie Touré.

44.      To gain access to Defendant Touré, Cilins hired her brother, Ibrahima Soury Touré, to help promote BSGR's interests in Guinea.  After Cilins established a relationship with Defendant Touré, Cilins and several BSGR associates secured a meeting with President Conté.  At this meeting, BSGR gave General Conté a watch that was inlaid with Steinmetz diamonds.  At another meeting, BSGR presented the Minister of Mines with a model of a Formula 1 race car that was similarly encrusted with Steinmetz diamonds.

45.     These meetings paid dividends.  In December 2005, a helicopter was observed landing on Rio Tinto's Simandou Mining Concession area.  The helicopter belonged to President Conté and the passenger was a South African geologist from BSGR.

46.     And in February 2006, BSGR made further inroads in Guinea when it entered into a Memorandum of Understanding with the Guinean Government for a mining project known as Zogota, which was located adjacent to, and south of Rio Tinto's Simandou Concession.

47.     In 2005-2006, Vale applied for a mining permit for a concession previously defined as "North," (*see* Paragraph 7), which was adjacent to, but separate and apart from, Rio Tinto's Simandou Concession at issue in this litigation.   Despite being entitled to the concession under Guinean law, Vale's application was denied in favor of BSGR – a company that had no iron ore mining experience but did have an agent, Defendant Frederic Cilins, providing bribes in the form of gifts and payments to the then-Guinean President's fourth wife, Defendant Mamadie Touré.  Indeed, the North concession that the Government of Guinea gave BSGR covered the *precise* coordinates that Vale was entitled to.  This North episode taught Vale an important lesson about BSGR's ability to get things done in Guinea.  As detailed herein, Vale would recall that lesson when it entered into the conspiracy to steal Rio Tinto's Simandou Concession.

48.     BSGR's and Steinmetz's bribery continued.  During the next several years, a series of contracts were executed between various high-level BSGR employees and Defendant Touré.  These contracts evidence that prior to the formation of the RICO enterprise in the United States, Defendants Steinmetz, BSGR (including through the acts of unnamed co-conspirators Lev Ran and Noy), Cilins, and Touré already were actively engaging in bribery and corruption in an effort to gain control of the Simandou Concession.

49.     These corrupt efforts escalated in 2008, when BSGR – through its Director of Operations for BSGR Guinea – entered into a "Commission Contract" with Defendant Touré.  The contract stated that Touré would help BSGR obtain Blocks 1 and 2 of Rio Tinto's Simandou

concession in exchange for a $2 million commission to Touré. Another $2 million would go to "people of good will" that helped BSGR obtain Blocks 1 and 2 of Simandou.

50.     A "Protocole D'Accord" dated February 28, 2008 between a company called Matinda (belonging to Defendant Touré) and BSGR Guinea further committed to giving 5% of the shares of Blocks 1 and 2 of Simandou to Matinda as payment for Touré's assistance in rescinding Rio Tinto's lawful mining rights.

51.     BSGR – including through its corporate affiliate Pentler – continued to pay these bribes to Defendant Touré for years, including payments totaling almost $2 million in 2009 alone. Touré would later travel to the United States and purchase a home in Florida with that money. Touré also signed a July 2010 agreement required Pentler to pay Touré (through Matinda) $3.1 million for her part in acquiring the Simandou Concession. Similarly, an August 3, 2010 contract between Pentler and Touré promised Touré an additional $5 million, payable in two parts. The contract also required Touré to conceal her relationship with Pentler.

52.     For BSGR, bribery of this sort was particularly necessary to acquire the Simandou Concession because it lacked any track record in iron ore mining. But bribery alone would not be sufficient for BSGR to successfully exploit Simandou. BSGR needed a partner with significant iron ore mining experience and the resources to develop Simandou. BSGR would find that partner in Vale.

### C.     Vale Targets Rio Tinto's Simandou Concession

53.     In 2008, Vale made the strategic decision to gain control of Simandou at any cost. To that end, Vale devised and pursued a two-front attack on Rio Tinto's Simandou Concession: overtures to the Government of Guinea, and ultimately entering into a RICO conspiracy with the other defendants to steal it. As part of its overtures to the Government of Guinea, Vale met and communicated with the Government of Guinea throughout 2008 regarding Rio Tinto's Simandou

Concession.  At these meetings, Vale expressed its interest in attaining Rio Tinto's Simandou Concession, touting its resources, experience, and proven capability in mining iron ore.

54.     Another key part of Vale's strategy was to dupe Rio Tinto into revealing its confidential and proprietary information about Simandou that it had spent many years and hundreds of millions of dollars developing.  To accomplish this, beginning in 2008, Vale entered into discussions with Rio Tinto to purchase the Simandou Concession while actively concealing from Rio Tinto the material facts that (1) it was also in discussions with the Government of Guinea for Rio Tinto's Simandou Concession, and (2) it was evaluating and considering Defendants Steinmetz and BSGR as possible partners to pursue Rio Tinto's Simandou Concession.

55.     Vale's material omissions and misrepresentations fraudulently induced Rio Tinto to enter into the negotiations and sign a Confidentiality Deed dated September 2, 2008 (the "Confidentiality Deed") with Vale.  Despite its assurances it was negotiating in good faith with Rio Tinto, Vale concealed that it had met and communicated with the Government of Guinea on numerous occasions regarding Rio Tinto's Simandou Concession.

56.     As part of the Rio Tinto-Vale negotiations, Rio Tinto provided Vale with its highly confidential and proprietary information regarding the Simandou Concession.  Rio Tinto justifiably relied upon Vale's material omissions and misrepresentations, in that had it known that Vale was in discussions with the Government of Guinea for the Simandou Concession or that Vale was considering and evaluating Defendants Steinmetz and BSGR as potential partners, it never would have entered into negotiations, signed the confidentiality agreement, or provided its confidential and proprietary information to Vale.  Vale misrepresented that it was acting in good faith because it knew all negotiations regarding the Simandou Concession would have ceased had Vale disclosed to Rio Tinto its material omissions and misrepresentations.

57.     The information requested by Vale, which Rio Tinto ultimately provided, was confidential and proprietary and known only to a small number of Rio Tinto's employees.  It was the result of more than eleven years and hundreds of millions of dollars of research and development of the Simandou project by Rio Tinto.

58.     The negotiations between Rio Tinto and Vale occurred over a period of months, and involved a series of key meetings in New York City at the headquarters of Vale's legal counsel, Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb").

1.     **November 19, 2008 Meeting in New York City**

59.     On November 19, 2008, Vale met with Rio Tinto in the New York City offices of Clearly Gottlieb.  In attendance at this meeting for Vale were at least Leonardo Harris, Pedro Rodrigues, and Eduardo Ledsham.  Also in attendance on behalf of Vale were Jeffrey S. Lewis and Juan G. Giraldez, two New York City-based attorneys at Cleary Gottlieb who would represent Vale throughout the negotiations, and David Cheney, a New York City-based Vice President at Deutsche Bank.  Rio Tinto was represented at the November 19, 2008 meeting by three executives: Tim Lane, Peter Cunningham, and Kerryl Bradshaw.  Also in attendance on behalf of Rio Tinto were Colm Donlon, a Managing Director at Morgan Stanley, and at least 10 attorneys from the Australia-based law firm of Allens Arthur Robinson ("Allens Arthur").

60.     At this meeting, Rio Tinto and Vale discussed an offer Vale had made on November 14, 2008 to purchase the Simandou Concession asset.  Vale clarified that its valuation was based on publicly available information, and that it was a bid for all of Rio Tinto's Simandou Concession – Blocks 1, 2, 3 and 4.  Rio Tinto informed Vale that the assets at Simandou were worth much more than the amount of Vale's offer, explaining that the quality of the significant reserves of iron ore at Simandou placed it in the same class as Vale's Carajas Iron Ore Mine in Brazil.

61.     To accommodate Vale's request that due diligence regarding Rio Tinto's assets proceed promptly, Rio Tinto offered to immediately implement a due diligence process, which would include a confidential presentation about the Simandou Project by Rio Tinto's management and the establishment of a data room (the "Data Room").

62.     At no time during the November 19, 2008 meeting did Vale disclose, or did Rio Tinto suspect, that Vale would use the New York meetings and its access to the Data Room as part of the RICO conspiracy.

2.     **November 24, 2008 Meeting in New York City**

63.     On November 24, 2008, Vale again met with Rio Tinto at the New York offices of Cleary Gottlieb.  In attendance at this meeting from Vale were the following executives: Lucio Cavalli; Edson Ribeiro; Mauro Moraes; Keith Martin; Eduardo Ledsham; Pedro Rodrigues; and Leonardo Harris (dialed in via telephone).  Also in attendance, on behalf of Vale, were Jeffrey S. Lewis and Juan G. Giraldez, two New York City-based attorneys at Cleary Gottlieb.  Rio Tinto was represented at this meeting by the following executives: Tim Lane; Michael Harris; Marius Verwoerd; Peter Cunningham; and David Smith (dialed in via telephone) as well as attorneys from Allens Arthur.

64.     At the November 24 meeting, Rio Tinto opened the Data Room so that Vale could begin its due diligence.  As promised, the Data Room contained documents reflecting highly confidential information pertaining to the Simandou Concession.  To protect Rio Tinto's confidential trade secrets and other proprietary information contained in the Data Room, Rio Tinto required Vale to execute an access agreement (the "Data Room Access Agreement") prior to viewing any of the documents in the Data Room.

65.     Intralinks was the Data Room host and service provider.  All documents in the Data Room were stored on, and accessed from, Intralinks' servers in the United States.

66.     More than sixty individuals from Vale, five attorneys from a New York-based law firm representing Vale, and twelve employees of a New York-based accounting firm also representing Vale had access to the Data Room.  All five of the attorneys from the New York-based law firm were themselves based in and reviewed the confidential documents in the Data Room from New York City.  And at least some, if not all, of the twelve accounting-firm employees reviewed the confidential documents in the Data Room from New York City.

67.     Through documents made available in the Data Room over the course of seven months of negotiations between Rio Tinto and Vale, and Rio Tinto's presentation on November 24, 2008 in New York, Rio Tinto briefed Vale on at least three confidential topics pertaining to the Simandou Concession, among other things.

a.     **Geological Data**

68.     Rio Tinto gave a presentation on the geological data and information it had developed over eleven years of exploration work at Simandou.  This presentation disclosed confidential information to Vale, including but not limited to:  geological data acquisition; geological modeling and mapping; precise coordinates for the top mining targets; and Rio Tinto's estimates of the total resource potential for the Simandou Concession.

69.     Of particular note, the Data Room contained Rio Tinto's exploration data, the industry term for vitally important information gathered from taking a series of increasingly-concentrated core samples within a defined grid.  These core samples reveal the substance and quality of minerals lying underground, the depth at which these minerals can be found, and the qualities of the materials above the minerals, such as the density of rock and moisture-content of soil.

70.     None of the foregoing information was publicly known and Rio Tinto would not have shared such information with Vale had it known that Vale was in discussions with the Guinean Government or that Vale had entered into a conspiracy with the other Defendants to steal Rio Tinto's Simandou Concession.

b.     **Rail Transport and Port Plans**

71.     In addition to the geological presentation, Rio Tinto gave a presentation at the November 24, 2008 meeting highlighting various aspects of the Simandou Concession, including rail transport and port options.

72.     The railway plans for transporting mined ore from Simandou to a port on the coast were a particularly important aspect of the necessary infrastructure development.  The Guinean Government wanted to develop a railway through Guinea, from the Simandou mine to a port in Conakry.  Rio Tinto had spent several years and millions of dollars of work investigating the costs and benefits of various rail transport options before coming to the ultimate conclusion that a commercial railway through Guinea would face significant economic challenges, largely due to the extremely difficult and mountainous terrain.  Instead, Rio Tinto's extensive work had shown that a railway through Liberia was a far more viable option for transporting mined ore from Simandou.

73.     Also in the course of studying the option of a railway through Liberia, Rio Tinto identified a previously unknown Liberian port, south of the main port at Buchanan, as the ideal port location for transporting the Simandou ore to market.  This "new port" at Didia was largely undeveloped in terms of infrastructure, but Rio Tinto's studies had shown that it had an ideal depth for ship berthing that would require little to no dredging and could be easily altered to accommodate the buildings, infrastructure, homes, and hospitals all required to support a mining operation the size and scope of Simandou.  A port at Buchanan was the more obvious choice, so Rio Tinto's identification of Didia as the better option was highly proprietary and confidential.

74.     Rio Tinto's presentations to Vale and further information in the Data Room synthesized several years and millions of dollars of work investigating the costs and benefits of various rail transportation and port options.  Vale's theft of this information armed Steinmetz and BSGR with the studies, analyses, and hard evidence needed to convince the Guinean Government to agree to a railway through Liberia.

75.      The information on the rail transport and port options was not publicly known and Rio Tinto would not have shared such information with Vale had it known that Vale was in discussions  with the Guinean Government or that Vale had entered into a conspiracy with the other Defendants to steal Rio Tinto's Simandou Concession.

c.     **Steinmetz's and BSGR's Advances on Rio Tinto's Simandou Concession**

76.     At the November 24, 2008 meeting, Rio Tinto also provided Vale with a confidential briefing about the status of its Simandou Concession and the attempts of Steinmetz and BSGR to steal it.  This information provided Vale important details on Steinmetz's and BSGR's attack on Rio Tinto's Simandou Concession.

77.     Rio Tinto disclosed to Vale that on July 28, 2008, Guinea had issued a decree purporting to change Rio Tinto's property rights to those of an exploration permit holder.  Rio Tinto explained that an exploration permit holder still held valid and enforceable rights to the mine, and that Rio Tinto viewed this purported change to its Simandou Concession as an illegitimate sham not in accordance with Guinean mining law.  Rio Tinto further explained to Vale that it believed, based on statements and correspondence from Guinean officials, that the purported change to its Simandou Concession would ultimately be of no significance.  Indeed, Vale acknowledged that the purported change was of no significance when it continued negotiations with Rio Tinto regarding its Simandou Concession.

78.     Those active in the Guinean mining industry, including Vale, a sophisticated, global mining company who had itself lost mining rights to BSGR at North, were well aware of allegations of BSGR's reputation for corruption and bribery since it began conducting business in the country. At the November 24, 2008 meeting in New York, Rio Tinto discussed and confirmed for Vale that BSGR was now specifically targeting Rio Tinto's Simandou Concession.

79.     Rio Tinto specifically disclosed that on July 17, 2007 and August 5, 2008, BSGR Guinea (a company affiliated with Steinmetz and BSGR) had registered a request with the Guinean Ministry of Mines for exploration permits to Blocks 1, 2, and 3 of Simandou – the very blocks Rio Tinto had been developing since 1997. Rio Tinto told Vale that BSGR sought the permit despite the fact that Rio Tinto's Simandou Concession consisted of all four blocks – *i.e.*, Blocks 1, 2, 3, and 4 – and carried the force of law.

80.     Rio Tinto also informed Vale that BSGR Guinea had obtained written assurances from the Minister of Mines on November 3, 2008 that the Government would withdraw Rio Tinto's Simandou Concession. This correspondence was not public knowledge and while Rio Tinto was not a recipient of the correspondence, Rio Tinto learned of it through its contacts in Guinea.

81.     Vale further learned from Rio Tinto that on November 6, 2008, BSGR Guinea had registered an additional request with the Ministry of Mines for an extension of their research and exploration permits to Blocks 1 and 2 of the Simandou Concession.

82.     Given the allegations of BSGR's reputation for corruption and bribery, Vale's own prior experience with BSGR in Guinea at North, and information provided by Rio Tinto during the November 24, 2008 meeting, Vale was on notice that Steinmetz's and BSGR's efforts to misappropriate Rio Tinto's Simandou Concession included bribery and other acts of political corruption.

83.     Rio Tinto would not have shared such information with Vale had it known that Vale would secretly join forces with BSGR to form an enterprise, defraud Rio Tinto, and steal the rights to Blocks 1 and 2 of the Simandou Concession.

**D.     Rio Tinto Takes Vale to Simandou**

84.     On December 10, 2008, Rio Tinto gave Vale a confidential tour of the Simandou site, at which time Rio Tinto continued discussing the technical aspects of the deposits, the drilling performed to date, and the mining logistics.

85.     During the site visit, Rio Tinto gave a detailed tour of its potential mining operations at Captain Hook, a site located in Simandou Blocks 1 and 2 and discussed at the November 24, 2008 meeting.  It is notable that during this time, Vale expressed particular interest in Rio Tinto's plans and strategy for developing Blocks 1 and 2 (the very blocks that the RICO enterprise ultimately stole from Rio Tinto).   Unaware of Vale's sinister design, Rio Tinto provided highly confidential information responsive to Vale's inquiries.

**E.     The RICO Enterprise is Born**

86.     Upon learning during the meetings in New York the full extent of the value of the Simandou Concession, the technical information necessary to develop that asset, and the details about Steinmetz's and BSGR's efforts to induce government officials to hand over Rio Tinto's Simandou Concession, Vale resolved to work with Steinmetz, BSGR, and the other defendants to acquire Rio Tinto's Simandou Concession.  Upon information and belief, a meeting between Vale and BSGR occurred in December 2008.

87.     During its discussions with Steinmetz and BSGR, Vale improperly divulged the confidential information it had obtained from Rio Tinto at the November 24, 2008 meeting and from the Data Room regarding the technical and geological information necessary for any development at Simandou.  Upon learning of Vale's interest and its source of confidential inside information,

Steinmetz, BSGR, and Vale formed an agreement to work together – in conjunction with the other Defendants and co-conspirators – to steal Rio Tinto's mining rights at Simandou, and the U.S.-based illegal enterprise was born.

88.     This would prove to be a mutually beneficial partnership.  Steinmetz and BSGR were the perfect partner for Vale because Vale knew that Steinmetz and BSGR had access to the right Guinean officials and were paying bribes to steal Rio Tinto's Simandou Concession.

89.     And without Vale's support, Steinmetz's and BSGR's plan to steal Simandou from Rio Tinto would not have been successful.  It was widely known that Steinmetz and BSGR primarily operated in the diamond market and did not have the resources, history, or technical background to develop Simandou's massive untapped iron ore reserves, which would require skill, expertise, and financing that Steinmetz and BSGR wholly lacked.  Because Vale had these in abundance, it was the perfect partner for the fraudulent scheme to steal Rio Tinto's rights.  With Vale's access to Rio Tinto's confidential geological, technical, and logistical data at the meetings in New York and from the Data Room, the Defendants armed themselves with the fruits of Rio Tinto's years and hundreds of millions of dollars of research and development to persuade the Guinean Government to accept their bribes and go along with their illegal scheme by revoking Rio Tinto's Simandou rights, assigning those rights to BSGR.

90.     So Defendants agreed that Vale would continue its ruse of negotiating in good faith with Rio Tinto, never once disclosing its scheme with Steinmetz and BSGR to steal Rio Tinto's Simandou Concession.  By doing so, Vale confirmed one of its critical roles in the scheme: through Vale, the enterprise gained access to highly confidential information from Rio Tinto, which the Defendants then used for their own development of Simandou.  Meanwhile, Steinmetz and BSGR

continued lobbying and bribing key Guinean Government officials—a fact which Vale knew or should have known—including by making illegal promises and payments.

       **F.**     **The Enterprise Lobbies the Guinean Government and Achieves an Early Success**

      91.     In December 2008, Vale and BSGR met with the Guinean Government to propose a potential Vale–BSGR joint venture to develop Simandou Blocks 1 and 2. At this meeting, Vale and BSGR proposed the possibility of assisting with or financing a railway through Liberia – the very railway concept that Rio Tinto originated after years of analysis and Vale stole during the confidential negotiations.

      92.     On December 9, 2008, the Guinean Government sent a letter to Rio Tinto indicating that it was rescinding Rio Tinto's rights to Simandou's Blocks 1 and 2. On December 11, 2008, it was publicly announced that the Guinean Government was awarding exploration licenses for those same blocks to BSGR Guinea.

      93.     This turn of events was surprising, to say the least, to everyone except the co-conspirators. Not only is it highly irregular in the mining industry to award a mining concession to lands with proven reserves to an entity that took no part in the exploration of those reserves, but the last communication Rio Tinto received regarding its Simandou Concession was a September 19, 2008 letter reassuring Rio Tinto of the Guinean Government's "firm wish to carry out the partnership with" Rio Tinto.

      94.     Rio Tinto did not accept that its rights to Blocks 1 and 2 were actually rescinded. Instead, Rio Tinto made every effort to convince the Government of Guinea that the rescission was invalid and inconsistent with Guinean law. As discussed in more detail below, Rio Tinto's efforts on this front were consistently stymied by the enterprise, particularly Defendant Thiam who, as the Minister of Mines, was vested with the power to review and award mining permits in Guinea.

G.     **The Enterprise Continues to Defraud and Intimidate Rio Tinto to Ensure the Award to BSGR is Finalized**

95.     Although the Guinean Government awarded BSGR Guinea exploration licenses to Blocks 1 and 2, the Minister of Mines and the President of Guinea still needed to affirm the validity of and ratify the licenses.  To actually achieve confirmation of BSGR Guinea's licenses, the conspiracy still had more work to do.

96.     Continuing the ploy, Vale met with Rio Tinto at the New York offices of Cleary Gottlieb on December 21-22, 2008, January 15-16 and 28-29, 2009 and February 4, 2009.  At these meetings, Rio Tinto provided more confidential information about Simandou in the mistaken belief that Vale was negotiating in good faith about a possible deal for some of Rio Tinto's Simandou rights.  Additionally, Vale continued to demand ongoing and unfettered access to Rio Tinto's confidential information.

97.     At the same time, Defendant Mahmoud Thiam, who was receiving bribes from Steinmetz and BSGR, used his power and authority as the Minister of Mines to advance the conspiracy by ensuring that the award of Simandou Blocks 1 and 2 would be finalized.  In his position, Defendant Thiam was perfectly positioned not only to serve as the go-between for key members of the enterprise, but also to receive and distribute bribes to an array of government officials, all the while thwarting Rio Tinto's efforts to contest the award of Blocks 1 and 2 to his co-conspirator, BSGR.

98.     In an attempt to legitimize the award of Blocks 1 and 2 to BSGR, Defendant Thiam as the Minister of Mines sent Rio Tinto a letter on February 29, 2009 purporting to officially rescind Rio Tinto's rights to Blocks 1 and 2.

99.     That letter was followed several months later, on May 28, 2009, when Defendant Thiam sent another letter to Rio Tinto demanding that Rio Tinto remove its equipment from Blocks 1 and 2, claiming Rio Tinto's equipment was located within the territory covered by BSGR's permit.

100.     Just one month later, Defendant Thiam sent another letter to Rio Tinto on June 26, 2009.  In this letter, Defendant Thiam chastised Rio Tinto for questioning the validity of BSGR's rights to Blocks 1 and 2, and maintained that the decision "complies with Guinean laws in the mining exploitation Code [sic] and with international best practices."  Thiam went on to tell Rio Tinto that because of its actions, its rights to Blocks 3 and 4 remained "fragile."  Thiam's statements not only fraudulently concealed the illicit activity of the RICO enterprise, but also threatened Rio Tinto such that it had to back down in order to protect its remaining rights to Blocks 3 and 4. Thiam's June 29, 2009 letter on behalf of the Guinean Government made the initial December 2008 award of Simandou Blocks 1 and 2 to BSGR official until the Guinean Government recently revoked BSGR and Vale's rights to Simandou Blocks 1 and 2.

101.     Throughout this time, Defendant Thiam (a U.S. citizen now living in New York) received bribes and payments from Defendants Steinmetz and BSGR on behalf of the enterprise and in return for Thiam's assistance in furthering the Defendants' conspiracy to steal Simandou from Rio Tinto.

### H.     Defendants Meet During the Time Rio Tinto is Negotiating With Vale

102.     The conspiracy's meetings and communications with the Guinean Government regarding the theft of Rio Tinto's Simandou Concession continued while Vale was actively negotiating with Rio Tinto.  At the end of January 2009, Vale met again with BSGR in Conakry to discuss the progress of the conspiracy to steal Rio Tinto's Simandou Concession.  This was followed by another meeting on March 1, 2009 when  Mark Struik (who was then BSGR's Chief Operating Officer and currently is the CEO of its Mining and Metals Division) and a representative of Vale met

in Dakar, Senegal to discuss the conspiracy.  Upon information and belief, Struik and the Vale representative discussed how the costs for the conspiracy would be divided up, specifically that BSGR would be able to finance initial survey and sampling costs, but would need help with the railway and exporting the iron ore.

103.    Between March 19, 2009 and March 25, 2009, there were several meetings between Vale and BSGR in Guinea to discuss the details of their business relationship.  Upon information and belief, Steinmetz attended some of these meetings.  One of the meetings between Vale and BSGR also included then-President Moussa Dadis Camara and the Minister of Mines, Defendant Thiam.

104.     In mid-April 2009, Defendant Thiam travelled in interstate commerce to Paris, where he met with top Vale and BSGR officials in Paris at a diplomatic mission and the Raphael Hotel. And on June 25, 2009, President Camara met with country representatives from both Vale and BSGR.  This meeting included dinner at the official residence of Defendant Thiam.

### I.    The Vale-Rio Tinto Negotiations End

105.    Vale and Rio Tinto ended their negotiations about a possible Vale acquisition of some of Rio Tinto's Simandou Concession towards the end of June 2009.  Accordingly, after seven months of unfettered access by dozens of Vale personnel and representatives, the Data Room was closed.

106.    Vale personnel continued to access information about Simandou right up until the time the negotiations with Rio Tinto ceased.  For example, on June 3, 8, and 27, 2009, Bruno Perrotta of Vale accessed Simandou-related documents in the Data Room, including documents related to geology and mining  documents.  On June 3, 2009, Jose Andre de Casto Alves accessed metallurgy and geology reports related to the Simandou Concession, and on June 16, he accessed documents related to the railway option.  He returned to the Data Room on June 18, 2009, and

accessed the Data Room and looked at documents related to Rio Tinto's plan for the railroad and port.

**J.      Vale and BSGR Seek to "Legitimize" Their Illicit Partnership**

107.     In December 2009, Vale and BSGR met again to discuss the details of their conspiracy to steal Rio Tinto's Simandou Concession.  The meetings continued in January 2010 (in Brazil) and February 2010 (in Conakry and at Simandou).  On information and belief, Vale and BSGR resolved during these meetings to formalize their relationship, in order to give the appearance of legitimacy and thereby conceal the illicit nature of their dealings.

108.     On April 30, 2010, Vale publicly announced that it had negotiated a joint venture with BSGR for Simandou Blocks 1 and 2.  With this announcement, Vale confirmed that it had acquired a majority stake in BSGR Guinea for $2.5 billion, with a $500 million down payment made at the time of the transaction.  This majority stake permitted Vale to take the lead in developing Simandou Blocks 1 and 2.

109.     In any event, notwithstanding their efforts to "legitimize" their unlawful association, the terms of the deal Vale signed with BSGR are indicative of the tortious and illegal acts that underlie their acquisition of Simandou Blocks 1 and 2.  For example, Vale's transfer of the balance of payment, some $2 billion, is conditioned on BSGR's fulfillment of certain critical objectives, one of which is the resolution of any legal claims or uncertainties surrounding BSGR's acquisition of Blocks 1 and 2.  This is a clear reference to the theft of the blocks from Rio Tinto and reflects Vale's concern that its scheme with BSGR will be uncovered.  Vale is well aware that it engaged in an elaborate fraud with Steinmetz and BSGR at Rio Tinto's expense, and the conditionality it has placed on payment of the final $2 billion to BSGR is insurance against revelation of the fraud.  To date, Vale still has not paid the $2 billion to BSGR.

110.     On April 30, 2010, Vale and BSGR also announced the creation of a railway through Liberia and a port at Didia – the very railway and port options Vale stole after Rio Tinto had spent years and millions of dollars researching and developing them.

> **K.     The Enterprise, Through Defendant Thiam, Continues to Cover up the Scheme and Threaten the Remainder of Rio Tinto's Simandou Concession**

111.     Defendants Steinmetz and BSGR paid Defendant Thiam, then Minister of Mines for Guinea, to bolster the legitimacy of BSGR's title to Simandou Blocks 1 and 2 and put an end to any attempts to question the legality of BSGR's rights.   To carry out his end of the bargain, Thiam repeatedly disseminated false information to benefit BSGR and Vale, and disparage Rio Tinto.

112.     In May 2010, Thiam dismissed the suggestion of a Guinean opposition leader that the rights of BSGR and Vale to Blocks 1 and 2 were invalid.  He emailed a statement to a Bloomberg reporter stating, "There is no opposition – the Vale-BSGR deal is between two private companies; BSGR has a legal title and decided on a joint venture with Vale."  Thiam's statements – aimed to conceal the invalidity of BSGR's title to Simandou Blocks 1 and 2 and ensure the BSGR - Vale deal stayed intact – were false.

113.     In June 2010, the Minister-Secretary General of the Guinean Government informed Rio Tinto that, in 2011, the Government "might" demand the retrocession of Block 3.   On information and belief, this threat was made to intimidate Rio Tinto from pursuing its legal rights against the Guinean Government and Defendants for the theft of Rio Tinto's rights to Blocks 1 and 2, and to sabotage the remainder of Rio Tinto's Concession.

114.     On June 8, 2010, Defendant Thiam, appeared on the CNBC television program "Closing Bell."   During this interview at the New York Stock Exchange in New York City, Defendant Thiam praised BSGR and spoke in favor of the joint venture between BSGR and Vale: "Thanks [to] a very aggressive junior company, BSGR, that came and developed that permit to the

point where it made it attractive to a big player like Vale, now with that combination of the entrepreneurial spirit on one side and Vale's might as a dominant iron-ore producer in the world, the country now has a chance within three and a half years to export its very first ton of iron-ore. But beyond that, that mine alone will, in time, catapult the country into the number three iron-ore exporter in the world, from zero. So to us, it is crucial."

115.    At some point between mid-May and mid-June 2010, Defendant Thiam met with Defendant Steinmetz in Paris, France. At this time, on information and belief, Thiam received another installment of a bribe that eventually totaled as much as $100 million. Portions of this approximately $100 million Thiam kept for himself for his role in the conspiracy, and the rest of which he doled out to various Guinean officials in furtherance of the conspiracy. Later in 2011, Thiam bought an estate in Duchess County, New York for $3.75 million. Thiam paid for the property with cash.

116.    On October 4, 2010, Minister Thiam publicly stated that Rio Tinto had until February 2011 to formally waive its rights to Blocks 1 and 2. Thiam further stated that if Rio Tinto did not waive its rights to Blocks 1 and 2, it risked losing its rights to Blocks 3 and 4.

117.    In September 2010, various media outlets covered Thiam's ongoing threats against Rio Tinto and its rights to Simandou. In support of his actions, he e-mailed statements to reporters, including one at Bloomberg, which claimed that Rio Tinto had failed to provide documentation to the Government of Guinea.

118.    On information and belief, Defendant Thiam's threats were made to intimidate Rio Tinto from pursuing its legal rights against the Guinean Government and Defendants for the theft of Rio Tinto's rights to Blocks 1 and 2 so that the activities of the RICO enterprise would remain

concealed and undiscovered, and to sabotage Rio Tinto's remaining operations at the Simandou site. Such threats continued throughout January and February 2011.

**L.**   **The RICO Conspiracy Continues Through 2013, as the Enterprise Continues to Conceal its Illegal Conduct, Obstruct the U.S. Criminal Investigation, and Avoid Prosecution**

119.    From 2010 to 2013, Defendants continued to reap the benefits of their scheme.  For example, when Vale and BSGR wanted to publicly document the quality and amount of iron ore in Blocks 1 and 2 they simply went back and drilled right where Rio Tinto originally had, using the coordinates and locations of the drill holes Rio Tinto confidentially provided Vale during the meetings in New York and in the Data Room.  Rather than spending millions of dollars and years of exploration drilling hundreds of holes – many of which might not be fruitful – Defendants simply used the roadmap they stole from Rio Tinto.

120.    Likewise, Defendants utilized and implemented Rio Tinto's Liberian railway and Didia port plans as part of their development plan for Simandou Blocks 1 and 2.  This information and other information Rio Tinto provided to Vale during its confidential negotiations in New York took years and millions of dollars for Rio Tinto to develop –  but Defendants got it all for free through their RICO conspiracy.

121.    Defendants' successful concealment of their illegal and tortious activities ended in January 2013 when the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation ("FBI") began conducting a federal criminal investigation regarding potential violations of the Foreign Corrupt Practices Act ("FCPA") and anti-money laundering statutes relating to, among other things, the laundering into and through the United States of potential bribe payments to Guinean officials for the purpose of obtaining Rio Tinto's rights to Simandou (the "Grand Jury Investigation").  A parallel investigation was opened at or around the same time by the Guinean Government.

122.    In connection with the Grand Jury Investigation, the United States government is working with a cooperating witness (referred to in the filings as "CW") that was previously married to the Former President of Guinea, Lansana Conté.  The cooperating witness is Defendant Touré.

123.    The United States Government filed a criminal complaint against Defendant Cilins on April 15, 2013 (the "Cilins Complaint").  The Cilins Complaint alleges numerous illegal acts by Cilins in the United States.  Upon information and belief, Cilins committed these crimes in his capacity as a member of the RICO enterprise in an effort to conceal the criminal activity of BSGR, Steinmetz, Vale, and others.

124.    In March 2013, Defendant Cilins contacted Defendant Touré by telephone and through in-person meetings and offered her substantial sums of money, in an effort to induce Touré to deliver to him, for destruction, documents including contracts evidencing bribe payments from BSGR to Touré.  Upon information and belief, some of these telephone conversations occurred while Touré was in New York City.  The interactions between Cilins and Touré were monitored and recorded by FBI agents, and are summarized below.

125.    On March 15 and 16, 2013, Touré and Cilins spoke by telephone and discussed an in-person meeting and Touré asked Cilins whether she should bring "the documents" to the meeting. These documents included contracts evidencing bribe payments from BSGR to Touré.

126.    On March 20, 2013, Touré called Cilins and asked him whether a person identified in the Cilins Complaint as "CC-1" agreed to the sum of money that Touré requested.  Upon information and belief, CC-1 is Defendant Steinmetz.  Cilins responded, "of course."

127.    On March 25, 2013, Cilins and Touré met at the airport in Jacksonville, Florida.  At the meeting, Cilins told Touré that after he was able to destroy the papers, Touré would be paid $300,000 immediately, and would receive an unspecified amount of money later.  Touré asked Cilins

what she should do if the United States Government approached her, and Cilins told her that if that happened, she should destroy the documents.

128.     On April 11, 2013, Cilins and Touré met again at the same airport.  Touré told Cilins that she had been approached by FBI agents investigating bribe payments and mining contracts in Guinea.  Touré also reported to Cilins that she had told the FBI agents that she did not have any relevant documents.  Cilins responded that all of the documents needed to be destroyed very urgently.  At the same meeting, Cilins also said or did the following:

(a)     Cilins told Touré that she should issue a statement denying that she had anything to do with the matter.  Cilins also suggested that Touré might want to deny that she was ever married to a certain Guinean Official.  Cilins was referring to Lansana Conté, Touré's deceased husband and former President of Guinea.

(b)     Cilins indicated that he and Touré needed to burn the documents at issue.

(c)     Cilins told Touré that he was asked to be present in person to witness the documents being burned in order to guarantee that nothing was left behind.  Upon information and belief, Defendant Steinmetz instructed Cilins to witness the documents being burned.

(d)     Cilins broached the topic of payment with Touré during the meeting.  Cilins told Touré that she would be paid $1 million divided into two payments (regardless of the outcome of the investigation into BSGR's rights to Blocks 1 and 2).  Cilins also told Touré she would receive an additional $5 million if the Guinean Government's  investigation concluded that BSGR's rights to Blocks 1 and 2 were valid.

(e)     Cilins presented to Touré a document he referred to as an "attestation" (the "Attestation") that contained a number of false statements.  At the instruction of Cilins, Touré signed and dated the Attestation.

129.    Cilins and Touré had a second meeting on April 11, 2013 at the same location.  At the meeting, Touré told Cilins that she was concerned about lying to the FBI, and that she wanted money immediately.  Cilins responded that he would try to get $50,000 to give Touré, but that he would need permission from a senior BSGR operative to do so.

130.    On April 14, 2013, Touré and Cilins met again at the same location.  After the meeting concluded, Cilins was arrested.  At the time of his arrest, he possessed envelopes from Wells Fargo Bank containing approximately $20,000 in United States currency.

131.    On March 10, 2014, Cilins entered a guilty plea to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510.  During his allocution, Cilins admitted to offering a government witness money to persuade her to leave the United States to avoid speaking with the FBI.  As explained above, that government witness is Mamadie Touré.  Cilins also admitted that he offered Touré $20,000, and promised to give her more money at a later date once she was in Africa.  On July 29, 2014, Judge William H. Pauley, III sentenced Cilins to 24 months of imprisonment and three years of supervised release.  In sentencing Mr. Cilins, Judge Pauley observed that "Mr. Cilins sought to obstruct a major criminal investigation into an alleged long-running bribery scheme to obtain billions of dollars of Guinea's mineral wealth.  The subjects of that investigation are allegedly wealthy international businessmen, including Mr. Cilins, who had the resources and sophistication to attempt to thwart the investigators."[5]  Judge Pauley continued: "The obstructive conduct here, as the government points out in its submission, was particularly sophisticated and involved *several trips to the United States* and Guinea, the preparation of

---

[5]  Transcript of Sentencing, *U.S. v. Cilins*, 13 Cr. 315 (S.D.N.Y. July 29, 2014), Dkt. No. 73 at 13:14-20.

fraudulent documents, and efforts to suborn perjury.  It's the kind of criminal conduct that screams for general deterrence."[6]

### M.    Additional Criminal Acts Committed by the Enterprise in the United States to Conceal its Illegal Scheme

132.    In addition to the Cilins Complaint, the Government has filed other documents in Case No. 13-Cr.-315-WHP that detail the enterprise's U.S.-based criminal activity.

133.    Prior to Cilins' sentencing, the Government made additional filings providing additional detail, including that in April and May 2012, Cilins tried to persuade Defendant Touré to sign a declaration falsely stating that she had no relationship with BSGR.  Cilins and Touré exchanged several versions of a declaration between April 27, 2012 and May 5, 2012, but Touré never signed it.  On May 8, 2012, Defendant Cilins was in Guinea and he met with two people who know Defendant Touré.  That meeting was recorded.  During the meeting, one of the people called Touré on the phone.  During the call, Cilins told Touré to "make your decision.  It's your decision." He also told her he was leaving Guinea, but that he would "report, on, on our discussions. . . I, you know, I'm not playing around."  Upon information and belief, Cilins was referring to Touré's decision as to whether she would agree to sign a false declaration to assist BSGR in its efforts to conceal its illegal conduct.

134.    On November 26, 2012, Cilins signed a declaration falsely claiming, among other things, that he never knew that BSGR paid Touré.  Cilins intended that his declaration be used during the proceedings conducted by the Government of Guinea.

135.    The Government's Memorandum in Support of Detention Pending Trial states that "Cilins made clear during these meetings [with Touré] that he was not working alone."  Indeed, the Government's June 6, 2013 filing quotes from the English translation of Cilins' conversation with

---

[6]  *Id.* at 13:21-14:1 (emphasis added).

Touré, in which he told her of his visit with an individual identified by the Government as "CC-1." As explained above, on information and belief, CC-1 is Defendant Steinmetz.  Cilins told Touré: "Listen – 'He [Steinmetz] told me, 'That's good, *but I want you to go see – but I want you to destroy these documents.*' 'He told me, 'Okay, you go – since you want – *I want you to tell me, 'I saw that the documents [noise] were destroyed; it's over, there are no more documents.*'" (emphasis added). Thus, Cilins traveled to the United States at the instruction of Steinmetz to bribe Touré to destroy certain documents (including contracts evidencing bribe payments from BSGR to Touré).

136.    The Government's filings also indicate that BSGR's employees and/or agents,  Noy and Lev Ran, are directly connected to the criminal conduct of Cilins.  BSGR has admitted that co-conspirators Noy and Lev Ran worked for or were affiliated with BSGR.[7]

137.    According to the Government's filings, Noy, who was considered Cilins' superior within BSGR, spoke to Cilins on April 11, 2013 during Cilins' first U.S. meeting with Touré. During the phone call, Cilins gave the phone to Touré and she and Noy spoke.

138.    Later in the day on April 11, Cilins called Noy again from the U.S. to tell Noy that Touré signed the sham Attestation and that Touré had been approached by the FBI.  While Noy asked Cilins for more details, Cilins responded that he was hesitant to discuss details over the phone.

139.    After the second April 11, 2013 meeting, Cilins called Noy again.  He told Noy that he had to return to the United States on Saturday because "not everything is here."  Noy asked follow-up questions regarding the status of where the documents were, and Cilins assured him that he would get the remainder of the documents on Saturday.  These phone calls establish BSGR and Steinmetz's participation in the conspiracy and enterprise through Cilins and Noy, and that co-

---

[7]    See "Response to BSGR Guinea Press Speculation" dated May 9, 2013, *available at* http://www.bsgresources.com/bsgr-guinea/bsgr-guinea-press-releases/response-to-bsgr-guinea-press-speculation-2/.

conspirator Noy knew about and was involved in Cilins' efforts to destroy the contracts evidencing bribe payments from BSGR to Touré.

140.    The Government's filings also allege that Defendant Cilins and Steinmetz and BSGR, through co-conspirator Lev Ran, and possibly others, transferred significant sums of money to Defendant Touré from and/or to bank accounts in the United States.  The dates of the payments conveniently follow the execution of the July and August 2010 contracts between Pentler and Touré described above in Paragraph 51:

(a)    Lev Ran transferred $149,970 on July 21, 2010 and $99,970 on August 5, 2010 from an account in Israel to an account in Florida that belonged to Touré; and

(b)    Cilins issued checks from Wells Fargo Bank, payable to Touré, in the amounts of $100,000 and $50,000, on July 27, 2010 and August 5, 2010, respectively.

(c)    According to the Government, other owners of Pentler, directly or indirectly, also made the following additional payments to Touré: (1) an October 2011 wire payment of $500,000; (2) a January 2012 wire payment of $250,000; (3) a January 2012 wire payment of $150,000 and (4) a May 2012 wire payment of $936,451.02.

141.    In total, the payments from Cilins, Lev Ran, and others to Touré from 2010 through May 2012 – all made at the behest of Steinmetz and/or BSGR – totaled $2,136,391.02.

## N.    **Defendants' Wrongfully Concealed Their Activity**

142.    Defendants wrongfully and fraudulently concealed material facts relating to their unlawful conduct against Rio Tinto, including by acting individually and/or collectively as part of the racketeering conspiracy alleged herein.  Defendants' unlawful conduct was carried out secretly and to avoid detection, and their acts and communications in furtherance of their conspiracy were purposefully and inherently secret and self-concealing.

143.    As a result of such wrongful concealment and the secret nature of Defendants'
illegal activity, Rio Tinto did not know of or discover, and could not have known or discovered
in the exercise of reasonable diligence, the unlawful conduct and resulting injury alleged herein
that underlies the RICO claims and the other wrongs alleged herein until after the criminal
proceedings against various Defendants, as set forth further below, were publicly disclosed
beginning in April 2013.

144.    Defendants further wrongfully concealed the material facts relating to their
unlawful conduct and resulting injury by the following acts:

(a)    Vale's continued negotiations with Rio Tinto during the first half of 2009,
despite its discussions with Steinmetz and BSGR to develop a joint venture;

(b)    BSGR's continued public statements dismissing the veracity of the bribery
allegations despite compelling evidence,  for example its September 28, 2012 press release
characterizing the allegations as "baseless and merely constitute a crude smear campaign;"[8]

(c)    Repeated false statements by Thiam, as a representative of the
Government of Guinea, regarding the legitimacy and validity of the Vale-BSGR joint venture;

(d)    a false affidavit dated November 26, 2012 submitted by Defendant Cilins
to the Government of Guinea concerning material facts relating to the unlawful conduct of
himself, Steinmetz, BSGR, and Touré; and

(e)    the repeated efforts of Defendant Cilins, acting at the behest of Defendants
Steinmetz and BSGR, to obstruct the investigations of the U.S. and Guinean Governments by

---

[8]   BSGR to Resist Smear Campaign to Undermine Position in Guinea, September 28, 2012,
*available at* http://www.bsgresources.com/bsgr-guinea/bsgr-guinea-press-releases/bsgr-to-resist-
smear-campaign-to-undermine-position-in-guinea-2/.

attempting to convince Defendant Touré to sign a false declaration and destroy material evidence.

145.     The acts described in Paragraph 144 (a) – (e) above were undertaken in furtherance of the racketeering conspiracy alleged herein.  By virtue of these actions and, upon information and belief, other similar actions with the knowledge of Defendants, Defendants affirmatively prevented Plaintiffs from discovering the nature of their claims and the injury resulting from the RICO violations and other wrongs alleged herein.

146.     In April 30, 2010, Rio Tinto was genuinely shocked that Vale and BSGR were doing business together.  Upon learning of Vale's involvement with Blocks 1 and 2 of Simandou, Rio Tinto exercised due diligence in pursuing discovery of the claims asserted herein. Rio Tinto conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou.  But Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise.

147.     Indeed, Rio Tinto's inability to discover evidence of the RICO enterprise was a consequence of the foregoing obstruction and other fraudulent and criminal conduct.  Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until after the criminal proceedings involving Cilins became public in April 2013.

148.     Thus, at the time the Government of Guinea officially rescinded Rio Tinto's rights to Blocks 1 and 2 in 2009, Rio Tinto did not know of, and could not reasonably have discovered, the facts underlying the RICO violations and the resulting RICO injury asserted herein.

### O.   The Investigation of Steinmetz and BSGR Continues to this Day

149.     Various government investigations of Defendants Steinmetz, BSGR, and other Defendants, including one by the United States Attorneys' Office for the Southern District of New York and the U.S. Department of Justice,  continue to this day.  Indeed, upon information and belief, the United States Department of Justice ("DOJ") sent Defendant Steinmetz a letter in January 2014 informing him that he is the subject of a federal criminal investigation involving allegations of bribery related to Simandou.  Additionally, the Government of Guinea recently concluded a three-year inquiry into how Steinmetz and BSGR won the mining rights to Blocks 1 and 2 of Simandou. The technical committee tasked with the Guinean investigation concluded that Steinmetz and BSGR obtained the rights to Blocks 1 and 2 of Simandou through a bribery scheme involving Defendant Touré.   On or around April 17, the Government of Guinea announced that it approved the recommendations of the technical committee, meaning that BSGR and Vale have been stripped of their rights to Blocks 1 and 2 of Simandou.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of RICO, 18 U.S.C. § 1962
### (Against All Defendants)

150.     Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

151.     At all relevant times, Defendants Steinmetz, Cilins, Touré, and Thiam are each a "person" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

152.     At all relevant times, Defendants Vale and BSGR, including their officers, directors, and employees, are "persons" within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

153.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The RICO Enterprise

154.    Defendants Steinmetz, Vale, BSGR, Cilins, Touré, and Thiam, together with (1) BSGR's employees, officers, directors, and agents; (2) other BSGR-owned entities; and (2) Vale's business groups, subsidiaries, affiliates, officers, directors, and employees, form an association-in-fact for the common and continuing purpose described herein and constitute an ongoing criminal enterprise.  Through a pattern of fraud, bribery, lies, and corruption, the members of the enterprise engaged in a common scheme to obtain Rio Tinto's highly confidential information under false pretenses and to use that information to wrest half of the Simandou Concession from Rio Tinto (hereinafter, the "RICO Enterprise").

155.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

156.    This association-in-fact constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and/or its activities affected, interstate and/or foreign commerce.

157.    The participants in this association-in-fact directly or indirectly benefited from access to Rio Tinto's confidential information by, among other things: (1) making use of the stolen information to fraudulently obtain Rio Tinto's rights in Simandou Blocks 1 and 2; (2) benefiting from Rio Tinto's confidential information in developing mining operations at those blocks; and (3) retaining their interest in Blocks 1 and 2 of Simandou for a number of years by fraudulently concealing their own involvement in the scheme.

158.    The RICO Enterprise's repeated, continuous, and flagrant violations of federal criminal law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*  Their racketeering activities, both individually and collectively, pose a serious threat of continuing criminal conduct into the foreseeable future.

159.    The RICO Enterprise's common purpose came into existence in 2008, when BSGR, Steinmetz, and Vale met to discuss the proprietary information Vale learned from Rio Tinto and conspired to obtain further confidential information through false pretenses, in a bid to wrongfully acquire Rio Tinto's Simandou Concession, to retain those rights for themselves, and fraudulently conceal all illegal actions taken to obtain those rights.  These efforts continue today.

160.    Defendants BSGR, Steinmetz, and Vale are central and controlling figures in the RICO Enterprise, and have been responsible for oversight of the scheme to defraud Rio Tinto, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise.  Actions taken by the RICO Enterprise in furtherance of the scheme include, but are not limited to (1) feigning interest in purchasing Rio Tinto's rights to some or all of the Simandou Concession in order to fraudulently obtain confidential information, so that Defendants could utilize that information to misappropriate Rio Tinto's Simandou Concession; (2) paying bribes to Defendant Thiam and Defendant Touré in exchange for assistance in Defendants' attempt to fraudulently obtain the rights to Blocks 1 and 2; and (3) attempting to convince Touré to destroy evidence of the criminal scheme in order to fraudulently conceal the RICO Enterprise's activities and to prevent the United States and Guinean Governments from uncovering documentary evidence of Defendants' crimes.

161.    The RICO Enterprise was predominately domestic in nature, as demonstrated by the following facts:

- the enterprise was conceived and orchestrated in the United States after Vale attended the November 24, 2008 meeting in New York City and learned of both the extraordinary value of Rio Tinto's Simandou Concession and Steinmetz's and BSGR's efforts to misappropriate it;

- the fraud upon Rio Tinto was carried out in the United States, as Vale attended numerous meetings in New York in December 2008 and January and February 2009, as part of the scheme to obtain Rio Tinto's confidential information regarding Simandou by false pretenses, for the purpose of sharing that information with Steinmetz and BSGR;

- Vale further misappropriated Rio Tinto's confidential information through the U.S.-based Data Room;

- both Rio Tinto (the victim of the RICO Enterprise's fraudulent scheme) and Vale (one of the perpetrators) trade ADRs on the New York Stock Exchange;

- bribe payments made by the RICO Enterprise in furtherance of its illegal bid to steal Rio Tinto's Simandou rights went through U.S. banks, including payments issued from Defendant Cilins' Wells Fargo bank account in the United States and payments made into Defendant Touré's bank account in Florida;

- the RICO Enterprise made unlawful bribe payments to and through Defendant Thiam, himself a U.S. Citizen;

- Defendants Thiam and Touré sought refuge in the United States with their ill-gotten gains; each purchased property here using the proceeds of bribe payments from the RICO Enterprise; and

- Defendant Cilins, at the instruction of Defendant Steinmetz, traveled to the United States for the purpose of obstructing the U.S. and Guinean investigations and further concealing the RICO Enterprise's criminal actions.  Cilins later pleaded guilty to one count of obstruction of a criminal investigation in the Southern District of New York, and was sentenced to 24 months in jail.

### *The Pattern of Racketeering Activity*

162.    The RICO Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

163.    The actions undertaken by the RICO Enterprise from at least November 2008 to the present were inherently unlawful, they were its regular way of operating, and the nature of those acts clearly implies a threat of continued criminal activity.

164.    The RICO Enterprise engaged in a pattern of racketeering, including, but not limited to: (1) mail and wire fraud; (2) money laundering; (3) violations of the Travel Act; (4) obstruction of a criminal investigation; and (5) witness tampering.

### *Predicate Acts:  Mail and Wire Fraud, Violations of 18 U.S.C. §§ 1341, 1343*

165.    The RICO Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

166.    The RICO Enterprise, through the Defendants, engaged in a criminal scheme to defraud Rio Tinto, bribe Guinean officials, and illegally obtain rights to Blocks 1 and 2 of Simandou. The ultimate objective of the Defendants' scheme or artifice was to defraud Rio Tinto and convince Guinean Government officials through bribery to hand over the rights to Blocks 1 and 2 of Simandou to the Defendants.

167.    In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier and/or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, but not limited to, the following:

(a)    Vale made false representations to Rio Tinto regarding its interest to purchase Simandou (despite the fact that Vale had secretly agreed with Steinmetz and BSGR to steal Rio Tinto's rights) through the mail and wires, including a January 29, 2009 Letter of Intent from Vale to Rio Tinto.

(b)    Cilins used a telephone on May 8, 2012 to speak with Defendant Touré in order to continue his efforts to convince Defendant Touré to sign a false document declaring that she had no relationship with BSGR.

(c)    Cilins issued two checks to Defendant Touré from his Wells Fargo bank account in the United States:  the first on July 27, 2010 in the amount of $100,000 and the second on August 5, 2010 in the amount of $50,000.  Upon information and belief, the checks were sent through U.S. mail.  These funds constituted bribery payments for Touré's assistance in the illegal scheme.

(d)    Vale's participation by phone in the February 4, 2009 meeting in New York, during which Vale continued to falsely express an interest in purchasing some or all of Rio Tinto's rights to Simandou;

(e)    Vale's repeated access to the Data Room to obtain Rio Tinto's confidential and proprietary information, as described above in Paragraphs 66-67, 69, and 106;

(f)      Numerous phone calls between Cilins and Touré, including calls in the United States, on March 15, 16, and 20, 2013, during which they discussed plans to destroy documentary evidence;

(g)      Three April 11, 2013 telephone communications between Cilins and Noy (at the behest of BSGR and Steinmetz) regarding plans to convince Touré to destroy evidence of criminal activity and sign the false Attestation;

(h)      Funds *transferred* by BSGR's employee/agent, Lev Ran, and *accepted* by Defendant Touré, including a July 21, 2010 transfer of $149,970 and an August 5, 2010 transfer of $99,970.  These funds constituted bribery payments from the RICO Enterprise for Touré's assistance in the illegal scheme, and were transferred from Lev Ran's Israeli bank account to Touré's bank account in Florida;

(i)      As part of his illicit arrangement with Steinmetz and BSGR, Thiam e-mailed false statements to various media outlets, including Bloomberg, to disseminate false information about the validity of BSGR's title, the legitimacy of the Vale-BSGR joint venture, and generally conceal the activity of the RICO enterprise;

(j)      Thiam appeared on "Closing Bell," a CNBC television program in June 2010 in order to promote the enterprise's fraudulent scheme and disseminate false information about the joint venture between Vale and BSGR; and

(k)      BSGR's website postings incorporating false and misleading statements regarding the Simandou concession.[9]

---

[9]   *See, e.g.*, "BSGR to Resist Smear Campaign to Undermine Position in Guinea," September 28, 2012, *available at*, http://www.bsgresources.com/bsgr-guinea/bsgr-guinea-press-releases/bsgr-to-resist-smear-campaign-to-undermine-position-in-guinea-2/

168.     Accordingly, Defendants Cilins, Touré, BSGR (including through co-conspirators Noy and Lev Ran), Steinmetz, Vale and other members of the RICO Enterprise committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

169.     The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Rio Tinto into sharing confidential information, to obtain the rights to Simandou, and later to fraudulently conceal evidence of criminal conduct.  The scheme was successful because Defendants were able to obtain Blocks 1 and 2 of Simandou, and fraudulently concealed their illegal activities for a number of years.

170.     Rio Tinto reasonably relied on the Defendants' false and misleading statements. Further, the Defendants' acts have caused Rio Tinto substantial damages.

### Predicate Acts:  Travel Act, Violations of 18 U.S.C. § 1952

171.     The Enterprise's pattern of racketeering included several violations of the Travel Act, 18 U.S.C. § 1952.

### Travel Act Violation:  Destruction, Alteration, and Falsification of Records in a Federal Investigation in Violation of 18 U.S.C. § 1519

172.     Defendant Cilins, at the instruction of Defendants Steinmetz, BSGR, and Noy, traveled to the United States (including New York and Florida) with intent to carry out unlawful activity.

173.     At the instruction of Steinmetz, BSGR and co-conspirators Noy, Cilins travelled to Florida to meet with Defendant Touré.  During these meetings, Cilins not only violated 18 U.S.C. § 1512 and 18 U.S.C. § 1510 (as described below), but Cilins also violated 18 U.S.C. § 1519 in his attempts to destroy, alter, and falsify records in a federal investigation.  Cilins then willfully, knowingly, and with the intent to impede, obstruct, and influence the investigation of the DOJ, altered, destroyed, mutilated, concealed, covered up, falsified, and made false entries in records,

documents, and tangible objects.  Further, Cilins directed Touré to destroy certain documents (including the contracts evidencing bribe payments from BSGR to Touré) that were the subject of the Grand Jury Proceeding.

*Travel Act Violation:  Illegal Payments to Foreign Officials in Violation of 15 U.S.C. § 78dd*

174.    Defendants also violated 15 U.S.C. § 78dd in that, having devised or intended to devise a scheme or artifice to defraud Rio Tinto and steal the rights to Blocks 1 and 2 of Simandou, the RICO Enterprise bribed and otherwise improperly influenced one or more senior officials of the former Government of Guinea.   Indeed, the arrest of Cilins was in connection with an ongoing U.S. federal investigation into, among other illegal activity, violations of the FCPA through bribes to officials of the former Government of Guinea for the purpose of obtaining rights to Blocks 1 and 2 of Simandou.

175.    Defendants Steinmetz, BSGR, and Cilins, and others acting at their instruction, made illegal payments to, and improperly influenced, one or more senior officials in Guinea, including Defendant Thiam, himself a U.S. citizen and a domestic concern within the meaning of 15 U.S.C. § 78dd-2(a).  In light of the information known by Vale regarding BSGR and Steinmetz's bribery and efforts to steal Blocks 1 and 2 of Simandou, and given the allegations of BSGR's reputation for bribery and corruption—which were well known in the mining industry—Vale knew of Steinmetz's and BSGR's corrupt activities.

176.    At some point between June 6 and June 12, 2010, Thiam met with Steinmetz in Paris, France.  On information and belief, during this period Steinmetz paid Thiam a bribe, which was part of over $100 million in bribe payments that Thiam received for facilitating the signing of BSGR's exploration license over Rio Tinto's Simandou Blocks 1 and 2.  Thiam retained portions of these bribes and distributed portions to other officials that had assisted with the RICO Enterprise's

scheme. On information and belief, this bribe was paid as part of the enterprise's continuing scheme to steal Rio Tinto's rights to Blocks 1 and 2 and to sabotage Rio Tinto's remaining operations at the Simandou site.

177.    Upon information and belief, members of the RICO Enterprise made use of the mails, wires, and other means of interstate commerce corruptly in order to offer and promise to pay bribes and other payments to one or more senior officials of the Guinean Government, including but not limited to Defendant Thiam, in order to conceal their scheme to defraud Rio Tinto and illegally obtain the rights to some or all of Rio Tinto's Simandou Concession.

178.    Improper payments were made to foreign officials within the meaning of 15 U.S.C. § 78dd-2(a)(1) and §78dd-1(a)(1) in order to (1) influence Defendant Thiam and other officials of the Guinean Government to agree to fraudulent and illegal transactions revoking Rio Tinto's rights to Blocks 1 and 2 of Simandou, in violation of their duties as government officials; and (2) secure an improper business advantage for Defendants.

179.    Rio Tinto has been damaged as a direct and proximate cause of Defendants' illegal payments to one or more senior officials of the former Government of Guinea.

180.    Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to bribe Guinean government officials, thereby depriving Rio Tinto of its Simandou rights. To further this goal, the RICO Enterprise violated the FCPA, by attempting to and successfully bribing Guinean officials in order to obtain the rights to Blocks 1 and 2 of Simandou.

***Predicate Act:  Obstruction of a Criminal Investigation, Violations of 18 U.S.C. § 1510***

181.    The RICO Enterprise's pattern of racketeering included obstruction of a criminal investigation in violation of 18 U.S.C. § 1510.

182.    Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to cover up the Enterprise's activities in connection with its bribery of Guinean officials and its defrauding of Rio Tinto.

183.    At the direction of Steinmetz, BSGR and co-conspirator Noy, and for the benefit of the other Defendants, these schemes were furthered by Defendant Cilins, who in this district and elsewhere, willfully and knowingly endeavored by means of bribery to obstruct, delay, and prevent the communication of information relating to a violation of criminal statutes of the United States by Touré to a criminal investigator.  Further, Cilins offered money to Touré in exchange for her agreement to provide Cilins, for destruction, documents that the FBI was seeking in connection with an investigation (including contracts evidencing bribe payments from BSGR to Touré).  Cilins also offered money to Touré in exchange for her agreement to sign the false Attestation relating to matters under investigation by FBI agents.

184.    On March 10, 2014, Cilins pleaded guilty to one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510.

185.    Thus, Defendants Cilins, Steinmetz and BSGR violated 18 U.S.C. § 1510 in furtherance of the RICO Enterprise's scheme.

### Predicate Act:  Tampering with a Witness, Victim, or an Informant, Violations of 18 U.S.C. § 1512

186.    The RICO Enterprise's pattern of racketeering included tampering with a witness, victim or an informant in violation of 18 U.S.C. § 1512.

187.    Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to cover up its activities in connection with its bribery of Guinean officials and its defrauding of Rio Tinto.

188.    At the direction of Steinmetz, BSGR, and co-conspirator Noy, and for the benefit of the other Defendants, these schemes were furthered by Defendant Cilins, who willfully, knowingly, and corruptly did obstruct, influence, and impede official proceedings and attempt to do so. Specifically Cilins directed Touré to make false statements to FBI agents regarding the commission of federal offenses.

189.    Cilins did also knowingly use intimidation, threaten, and corruptly persuade a person, and attempt to do so, and engage in misleading conduct towards another person with intent to cause and induce a person to alter, destroy, mutilate, and conceal an object with intent to impair the object's integrity and availability for use in an official proceeding.  Specifically, Cilins offered to pay Touré money in exchange for her agreement to provide to Cilins, for destruction, documents that were to be produced in the Grand Jury Proceeding.

190.    Thus, Cilins, Steinmetz, and BSGR violated 18 U.S.C. § 1512 in furtherance of the RICO Enterprise's scheme.

### Predicate Act: Money Laundering, Violations of 18 U.S.C. § 1956

191.    The RICO Enterprise's pattern of racketeering included money laundering in violation of 18 U.S.C. § 1956.

192.    Members of the RICO Enterprise knowingly and intentionally engaged in a scheme to bribe Guinean government officials, thereby depriving Rio Tinto of its Simandou rights.  To further this goal, the RICO Enterprise committed and/or conspired to commit money laundering pursuant to 18 U.S.C. § 1956.  Indeed, it is public knowledge that the arrest of Cilins was in connection with an ongoing criminal investigation in connection with, among other illegal activity, money laundering violations relating to bribes paid to officials of the former Government of Guinea for the purpose of obtaining rights to Blocks 1 and 2.

193.    In particular, the RICO Enterprise laundered into and through the United States bribe payments to officials of the Government of Guinea for the purpose of stealing Rio Tinto's rights to Blocks 1 and 2 of Simandou.  Among other things, the Grand Jury Proceeding discussed above concerns "the transfer into the United States from outside the United States of payments in furtherance of a scheme to corruptly obtain valuable mining concessions in Guinea," including Simandou.

(a)    Cilins issued two checks to Defendant Touré from his Wells Fargo bank account in the United States:  the first on July 27, 2010 in the amount of $100,000 and the second on August 5, 2010 in the amount of $50,000.  These funds constituted bribery payments for Touré's assistance in the illegal scheme.  Upon information and belief, Touré received and deposited these checks;

(b)    BSGR and its affiliates and agents, including Cilins and co-conspirator Lev Ran, made bribe payments to Touré's bank account in Florida; and

(c)    At some point in June 2010, Defendant Thiam one of a series of bribes for facilitating the signing of BSGR's exploration license over Rio Tinto's Simandou Blocks 1 and 2. On information and belief, this bribe  (and others that Thiam accepted and distributed, totaling approximately $100 million) was paid as part of the RICO Enterprise's continuing scheme to steal Rio Tinto's rights to Blocks 1 and 2 and to sabotage Rio Tinto's remaining operations at the Simandou site.  Upon information and belief, in 2011, an estate in Duchess County, New York for $3.75 million.  Thiam paid for both properties with cash.

194.    Thus, Defendants and other co-conspirators committed numerous violations of 18 U.S.C. § 1956.

*Continuity of Conduct*

195.    Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Rio Tinto, constituted a continuous course of conduct in the United States beginning in 2008 and continuing today, which was intended to obtain money and rights to Blocks 1 and 2 of Simandou through false representations, fraud, deceit, and other improper and unlawful means.  Therefore, said violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

*The RICO Enterprise Caused Injury to Rio Tinto*

196.    Rio Tinto, as the original and rightful owner of the Simandou Concession, has been injured in its business or property as a direct and proximate result of the RICO Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

197.    Rio Tinto's injuries are clear and definite and include the loss of billions of dollars in assets, as well as the lost investment of its activities related to developing Blocks 1 and 2 of Simandou.

*Rio Tinto's Entitlement to Treble Damages*

198.    As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, Rio Tinto has suffered substantial damages in an amount to be proven at trial.

199.    Pursuant to 18 U.S.C. § 1964(c), Rio Tinto is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## SECOND CAUSE OF ACTION
### Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)
### (Against All Defendants)

200.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

201.    Since at least 2008, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

202.    The Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

203.    The Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count One at Paragraphs 162 through 194.

204.    As part of the conspiracy, each Defendant, at times acting through certain of its officers, agents, and representatives or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

205.    As a direct and proximate result of the Defendants' conspiracy, the racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. 1962(d), Rio Tinto has been injured in its business and property by the loss of its legitimate rights to Blocks 1 and 2 of Simandou.

206.     Pursuant to 18 U.S.C. § 1964(c), Rio Tinto is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## THIRD CAUSE OF ACTION
### Fraud
**(Against All Defendants)**

207.     Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

208.     Following the November 24, 2008 meeting, Vale combined forces with Steinmetz, BSGR, and other Defendants in a scheme to deprive Rio Tinto of its Simandou Concession through unlawful means.   As part of this unlawful scheme, the Defendants agreed that Vale would misrepresent to Rio Tinto that it was interested in purchasing Rio Tinto's rights to some or all of the Simandou Concession.  By feigning interest in a deal related to the Simandou Concession, Vale and its co-conspirators were able to gain access to key confidential and proprietary information from Rio Tinto, which Defendants then used for their own development of Blocks 1 and 2 of Simandou.

209.     Vale, encouraged by other Defendants, knowingly and intentionally misrepresented several material facts to Rio Tinto.  Specifically, in advance of, during, and following the December 2008 and January and February 2009 New York meetings, Vale's executives misrepresented to Rio Tinto's executives their continued interest in purchasing Rio Tinto's Simandou Concession.  These false representations continued well into the first half of 2009, during which time Vale repeatedly stated that it was interested in consummating a deal with Rio Tinto involving the Simandou Concession, when in truth, Vale's executives were working with Steinmetz, BSGR, and others to deprive Rio Tinto of its Simandou rights through unlawful means.

210.     The foregoing misrepresentations were material because Rio Tinto would never have agreed to meet with Vale in December 2008 or January and February 2009 had Rio Tinto known that

the Defendants intended to deprive Rio Tinto of its Simandou rights and to exploit those rights for their own personal gain to the detriment of Rio Tinto.

211.    Further Rio Tinto would not have shared its confidential and proprietary information with Vale had Rio Tinto known that Vale was conspiring with Steinmetz, BSGR, and others to deprive Rio Tinto of its Simandou Concession and to exploit those rights for their own personal gain to the detriment of Rio Tinto.

212.    The material misrepresentations were made with the intent to defraud Rio Tinto because the Defendants knew or should have known that Rio Tinto would not have entered into negotiations to sell its Simandou Concession had Rio Tinto known of the Defendants' plot to deprive Rio Tinto of its Simandou Concession.

213.    But for Vale's fraudulent misrepresentations, Rio Tinto would not have met with Vale or shared its trade secrets, confidential ideas, or confidential investment information with Vale.

214.    Rio Tinto reasonably relied on the misrepresentations conveyed by Vale because Rio Tinto had no reason to suspect that Steinmetz, BSGR, and other Defendants were working with Vale to deprive Rio Tinto of its Simandou Concession.  Rio Tinto had every reason to believe that Vale was continuing its talks with Rio Tinto as part of a good faith effort to reach a mutually beneficial deal regarding Rio Tinto's Simandou Concession.

215.    The unlawful conduct of Vale, Steinmetz, BSGR, and the other Defendants has directly, legally, and proximately caused, and continues to cause, injuries to Rio Tinto in its business and property.  These injuries include Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing the Simandou Concession, including Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Simandou, including Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Simandou Concession, and future

lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

216.    Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendants from committing such unlawful conduct in the future.

**FOURTH CAUSE OF ACTION**
**Civil Conspiracy to Commit Fraud**
**(Against All Defendants)**

217.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

218.    As set forth above, the Defendants have committed fraud against Rio Tinto.

219.    The Defendants agreed to participate in a common scheme against Rio Tinto to unlawfully obtain a large portion of Rio Tinto's Simandou Concession.  In furtherance of this plan or purpose, Vale, Steinmetz, BSGR, and other Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.  Indeed, as early as December 2008, there was an overt act in furtherance of the conspiracy to defraud Rio Tinto:  Vale and BSGR attended a secret meeting with Guinean officials responsible for deciding mining rights.  Further, as part of their agreement, Vale continued to meet with Rio Tinto in January 2009 and thereafter, while feigning interest in purchasing some or all of Rio Tinto's Simandou Concession.  In exchange, Steinmetz and BSGR continued to lobby key Guinean Government officials, including by making illegal promises and bribes—a fact which Vale knew or should have known.

220.    As a direct and proximate result of the conspiracy between Vale, Steinmetz, BSGR, and others, the overt acts committed in furtherance of that conspiracy, and the torts committed against Rio Tinto, Rio Tinto has been damaged in its business and property.  These injuries include

Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing its Simandou Concession, including Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Simandou, including Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Simandou Concession, and future lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's rights to Blocks 3 and 4.

221.    Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendants from committing such unlawful conduct in the future.

<u>**FIFTH CAUSE OF ACTION**</u>
**Aiding and Abetting a Fraud**
**(Against All Defendants)**

222.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

223.    The Defendants aided and abetted Vale's fraud on Rio Tinto, by knowingly providing material assistance to those frauds.

224.    As described above, the Defendants had knowledge of Vale's fraudulent statements to Rio Tinto, including that Vale was going to continue to meet with Rio Tinto under the guise of Vale's interest in purchasing some or all of Rio Tinto's Simandou Concession in order to obtain unfettered access to Rio Tinto's confidential and proprietary information regarding the Simandou Concession.

225.    As described above, Defendants Steinmetz and BSGR knowingly and substantially assisted in Vale's fraud on Rio Tinto, including by lobbying and bribing key Guinean Government

officials, and by making illegal promises and payments.  Through the illegal bribes made by Steinmetz and BSGR, Vale was able to utilize the information it obtained from Rio Tinto (under false pretenses) in order to steal Rio Tinto's rights to Blocks 1 and 2 of Simandou.

226.    As a direct, proximate, and foreseeable result of the Defendants' conduct, Rio Tinto has been damaged  in its business and property.  These injuries include Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing its Simandou Concession, including Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Simandou, including Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Simandou Concession, and future lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

227.    Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that the Defendants stole from Rio Tinto.  Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendants from committing such unlawful conduct in the future.

### SIXTH CAUSE OF ACTION
**Fraudulent Inducement**
**(Against Defendant Vale)**

228.    Rio Tinto incorporates by reference all the preceding Paragraphs of this Complaint as if fully set forth herein.

229.    At the time that Rio Tinto and Vale entered into the Confidentiality Deed dated September 2, 2008, Vale actively and intentionally concealed from Rio Tinto the material facts that (1) it was also in discussions with the Government of Guinea for  Rio Tinto's Simandou Concession, and (2) it was evaluating and considering Defendants Steinmetz and BSGR as possible partners to pursue Rio Tinto's Simandou Concession.

230.    Vale's omissions were so incomplete as to these material facts that the incompleteness rendered the statements false.  Vale knew or should have known that these material omissions were false.

231.    Defendant Vale made these materially misleading statements and omissions for the purpose of inducing Rio Tinto to enter into the Confidentiality Deed and the negotiations.

232.    Vale's material omissions and misrepresentations did in fact fraudulently induce Rio Tinto to enter into the negotiations and sign the Confidentiality Deed.

233.    Vale's false and misleading statement of material fact, combined with the omission of material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading, constitutes fraudulent inducement.

234.    Rio Tinto justifiably relied upon Vale's material omissions and misrepresentations, in that had it known that Vale was in discussions with the Government of Guinea for Rio Tinto's Simandou Concession or that Vale was considering and evaluating Defendants Steinmetz and BSGR as potential partners, it never would have entered into negotiations, signed the confidentiality agreement, or provided its confidential and proprietary information to Vale.

235.    Because of Defendant Vale's fraudulent inducement, Plaintiffs are entitled to a rescission of the Confidentiality Deed.

236.    As a direct, proximate, and foreseeable result of Defendant Vale's conduct, Rio Tinto has been damaged  in its business and property.  These injuries include Rio Tinto's loss of hundreds of millions of dollars spent over eleven years developing its Simandou Concession, including Blocks 1 and 2, developing the technical plans and infrastructure for extracting the iron ore from Simandou, including Blocks 1 and 2, and negotiating with the Guinean Government over Rio Tinto's Simandou

Concession, and future lost profits from Rio Tinto's inability to sell the iron ore from Blocks 1 and 2 and the reduction in Rio Tinto's right to Blocks 3 and 4.

237.    Accordingly, Rio Tinto seeks an award of damages in compensation for, among other things, the amount of money that Defendant Vale stole from Rio Tinto. Further, Rio Tinto seeks the imposition of punitive damages sufficient to deter the Defendant Vale from committing such unlawful conduct in the future.

## DEMAND FOR RELIEF

WHEREFORE, Rio Tinto respectfully requests that the Court:

(a)    Award compensatory, consequential, exemplary and punitive damages to Rio Tinto in an amount to be determined at trial;

(b)    Treble damages pursuant to 18 U.S.C. § 1964(c);

(c)    Award the costs of this action, including Rio Tinto's attorneys' fees; and

(d)    Grant to Rio Tinto whatever further relief is just and proper.

## JURY TRIAL DEMAND

Rio Tinto demands trial by jury on issues so triable.

Dated: New York, New York
      August 15, 2014

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: _____
    William A. Burck
    Michael J. Lyle
    Eric C. Lyttle
    Stephen M. Hauss

    777 6th Street NW, 11th Floor
    Washington, DC 20001
    Telephone: (202) 538-8000
    Facsimile: (202) 538-8100
    williamburck@quinnemanuel.com

    *Attorneys for Plaintiff Rio Tinto plc*