# EXHIBIT A

# Confidentiality Deed

**Rio Tinto Limited**

**Rio Tinto plc**

**Companhia Vale do Rio Doce**

1

**Table of Contents**

| | | | |
|---|---|---|---|
| **1.** | **Definitions and interpretation** | | **1** |
| | 1.1 | Definitions | 1 |
| | 1.2 | Interpretation | 6 |
| **2.** | **Joint and Several Obligations** | | **7** |
| **3.** | **Provision of Confidential Information** | | **7** |
| **4.** | **Confidentiality** | | **7** |
| | 4.1 | Recipient's covenants | 7 |
| | 4.2 | Disclosure to Permitted Persons | 8 |
| | 4.3 | Advisers, Debt Financiers and Consultants | 8 |
| | 4.4 | Notice to Discloser | 8 |
| | 4.5 | Other exceptions | 9 |
| | 4.6 | Form of disclosure | 10 |
| | 4.7 | No further use of Confidential Information | 10 |
| **5.** | **Prohibited Activities** | | **10** |
| | 5.1 | Share Acquisitions | 10 |
| | 5.2 | Permitted Activities | 11 |
| | 5.3 | No-talk restriction | 13 |
| | 5.4 | Withdrawal Notice | 13 |
| **6.** | **Disclaimer** | | **14** |
| | 6.1 | Discloser not liable | 14 |
| | 6.2 | Disclaimer | 14 |
| | 6.3 | Proprietary rights | 15 |
| **7.** | **Return, destruction and deletion** | | **15** |
| | 7.1 | Recipient's obligations | 15 |
| | 7.2 | Effect of return, destruction or deletion | 15 |
| | 7.3 | Permitted Retention | 16 |
| **8.** | **Related Entities** | | **16** |
| **9.** | **Remedies** | | **16** |
| **10.** | **Acknowledgements** | | **16** |
| | 10.1 | No liability for early termination of discussions | 16 |
| | 10.2 | No legal obligations until formal agreement is executed | 16 |
| | 10.3 | Insider trading | 17 |
| **11.** | **Duration** | | **17** |
| **12.** | **Legal Professional Privilege** | | **17** |
| **13.** | **Notices** | | **17** |
| **14.** | **Entire agreement** | | **18** |
| **15.** | **Amendment** | | **18** |

Page (i)

i

| | | |
|---|---|---|
| 16. | **Assignment** | **18** |
| 17. | **No waiver** | **18** |
| 18. | **Further assurances** | **18** |
| 19. | **Costs and stamp duty** | **19** |
| 20. | **Governing law and jurisdiction** | **19** |
| 21. | **No Third Party Rights** | **19** |
| 22. | **Appointment of Process Agent** | **19** |
| 23. | **Counterparts** | **20** |
| **Schedule 1** | | **21** |
| | A. Vale | 21 |
| | B. Rio Tinto | 21 |
| **Schedule 2** | | **24** |
| | Rights to Acquire Shares | 24 |
| **Schedule 3** | | **25** |
| | Identified Subsidiaries of Rio Tinto | 25 |
| | Executed and delivered as a deed. | 26 |

| **Date** | 2 September 2008 |
|---|---|

**Parties**

1. **Rio Tinto Limited** (ACN 004 458 404) and **Rio Tinto plc**, a company incorporated in England with registered number 719885; and

2. **Companhia Vale do Rio Doce**, a corporation incorporated in accordance with the laws of the Federative Republic of Brazil, with head-office at Avenida Graça Aranha 26, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the Brazilian Taxpayer's Registry under No. 33.592.510/0001-54.  (**Vale**).

**Recitals**

A   Rio Tinto and Vale each possess certain valuable information that they wish to remain secret and confidential.

B   Each of Rio Tinto and Vale has requested that the other disclose the information to it for the Permitted Purpose.

C   Rio Tinto and Vale may each, at their discretion, supply information to the other on the terms of this Deed.

**It is agreed** as follows.

## 1.   Definitions and interpretation

### 1.1   Definitions

The following definitions apply unless the context requires otherwise.

*Adviser* means, in relation to a party, its legal, financial or accounting advisers who hold a specific mandate in respect of the Proposed Transaction, solely in their capacity as advisers to such party.

*ASX* means ASX Limited (ABN 98 008 624 691).

*Australian Listing Rules* means the Listing Rules of the Australian Securities Exchange.

*Authorised Persons* means, in relation to an entity, those persons listed in sub-Clauses (a), (b) and (c) of the definition of No-talk Related Persons.

*BHPB* means BHP Billiton Limited (ACN 004 028 077) and BHP Billiton plc (registered number 3196209) (each a *BHPB Entity*).

*BOVESPA* means the São Paulo Stock Exchange.

*Brazilian Corporations Law* means Brazilian Federal Law No. 6404/76, as amended from time to time.

*Code* means the City Code on Takeovers and Mergers as from time to time amended and interpreted by the UK Panel on Takeovers and Mergers.

*Confidential Information* means information disclosed or made available in connection with the Proposed Transaction which relates to the Discloser, a member of the Discloser Group or a business or asset of the Discloser or member of the Discloser Group that has been provided to the Recipient by the Discloser or its Related Persons and whether the information is in oral, visual or written form or in any other form) and any Derived Information from such information, and includes:

(a)    all commercial, financial, legal and technical information and know-how which is disclosed or made available in connection with the Proposed Transaction to the Recipient by or on behalf of the Discloser or which is otherwise acquired by the Recipient directly or indirectly from the Discloser, whether so disclosed or acquired before or after the execution of this Deed;

(b)    the contents of any agreements between the parties or any Related Entity of a party relating to or as a result of the Permitted Purpose;

(c)    the fact of execution and the contents of this Deed and any other instruments entered into or to be entered into in connection with this Deed;

(d)    the fact that discussions may have already occurred between the parties or their Related Entities and their respective Advisers, Debt Financiers or Consultants in respect of the Permitted Purpose, that further such discussions may occur in the future or that a party (or its Related Entities) may or has withdrawn from such discussions;

(e)    the existence and contents of any meetings, discussions and negotiations between the parties and their Related Entities in relation to the Permitted Purpose; and

(f)    the fact that the Discloser has disclosed or may disclose information to the Recipient pursuant to this Deed.

*Consultant* means a person who holds a specific mandate in respect of the Proposed Transaction to provide corporate or advisory services to a party, solely in such person's capacity as a consultant to such party.

*Corporations Act* means the Australian *Corporations Act 2001* (Cth).

*Debt Financier* means a person who is, or is intended to be, engaged to provide, directly or indirectly, or is a bona fide possible source of debt financing or other financial assistance to a party in respect of the Proposed Transaction, solely in such person's capacity as a debt financier to such party.

*Deed* means this Confidentiality Deed.

*Derived Information* means all notes, memos, reports, calculations, conclusions or summaries or other material derived or produced partly or wholly from any of the Confidential Information and any or all computer records (including data, copies, models, reproductions and recordings) derived or produced partly or wholly from any of the Confidential Information.

Page 2

2

*Discloser* means:

(i)    Rio Tinto in relation to Confidential Information which relates to Rio Tinto, a member of the Rio Tinto Group or a business or assets of Rio Tinto or a member of the Rio Tinto Group; and

(ii)    Vale in relation to Confidential Information which relates to Vale, a member of the Vale Group or a business or assets of Vale or a member of the Vale Group.

*Discloser Group* means the Discloser and each Related Entity of such Discloser.

*Disclosing Party Shares* means:

(a)    any shares in the capital of the Discloser;

(b)    securities convertible into shares of the Discloser (including any option over or relating to shares in issue or not or shares held by the counterparty or not); or

(c)    any legal, equitable or economic interest in those shares or securities (including any derivative instrument or other financial product affording an economic exposure to movement in the price of any such shares or securities).

*FSMA* means the UK *Financial Services and Markets Act 2000*.

*Government Agency* means any governmental, semi-governmental, administrative, fiscal, judicial or quasi-judicial body, department, commission, authority, tribunal, agency or entity.

*Group* means the Rio Tinto Group and/or the Vale Group, as the context requires.

*Identified Subsidiary* means in respect of each party, those corporations identified in Schedule 3 to this Deed.

*London Stock Exchange* means the London Stock Exchange plc.

*Longstop Date* means the earlier of:

(a)    the last date on which BHPB is entitled to revise the BHPB Offer pursuant to the Code; and

(b)    the date falling nine (9) months after the date of this Deed.

*No-talk Related Persons* means, in relation to a party:

(a)    the directors of such party and the executive officers of such party;

(b)    such party's Advisers, Debt Financiers and Consultants, acting on behalf of such party or its Related Entities; and

(c)    the officers, employees, agents, contractors and partners of such party and of the Related Entities of such party together with their directors (but only to the extent that any such person is a Secondary Recipient).

*party* means a party to this Deed.

*Permitted Person* means, in respect of a party, the Related Entities of such party, the directors, officers and employees of such party and of the Related Entities of such party and the Advisers of

such party and any other person expressly agreed in writing between the parties (whether in accordance with sub-Clause 4.2(c) or otherwise).

*Permitted Purpose* means conducting an assessment of whether or not the parties will pursue the Proposed Transaction and taking action in furtherance of the Proposed Transaction.

*Proposal for Rio Tinto* means any proposed or possible transaction or arrangement pursuant to which, if ultimately completed, a person (or a group of persons) would:

(a)      directly or indirectly acquire an interest in, voting power in, a relevant interest in or become the holder of:

         (i)      any Rio Tinto Shares; or

         (ii)      the whole or a substantial part or a material part of the business or property (or of a business group or division) of Rio Tinto or of any member of the Rio Tinto Group; or

         (iii)      otherwise than in the ordinary course of operations (including, without limitation, in connection with metals or other commodity trading transactions), assets with a value of US$10,000,000 or more of either Rio Tinto or any member of the Rio Tinto Group,

including by way of takeover bid, scheme of arrangement, capital reduction, sale of assets, sale, purchase or issue of any Rio Tinto Shares, joint venture or any arrangement which gives an economic interest or economic exposure to the business, property or assets of Rio Tinto;

(b)      acquire control of either of Rio Tinto plc or Rio Tinto Limited; or

(c)      otherwise acquire or merge with either of Rio Tinto plc or Rio Tinto Limited (including by a reverse takeover bid, reverse scheme of arrangement or dual listed companies structure),

provided that this definition of Proposal for Rio Tinto shall not include any proposed or possible transaction or arrangement pursuant to which, if ultimately completed, would result in a person directly or indirectly acquiring an interest in, voting power in, a relevant interest in or become the holder of, any shares or other interest held by a person other than Rio Tinto or a Related Entity of Rio Tinto in an entity in which Rio Tinto or a Related Entity of Rio Tinto owns, directly or indirectly, an interest in, voting power in, a relevant interest in or is the holder of any shares or other interest.

*Proposed Transaction* means a transaction between the parties under which Vale (and/or a Related Entity of Vale) will become the owner of a material or substantial interest (whether legal, beneficial or otherwise) in shares, assets and/or the business of the Rio Tinto Group.

*Recipient* means where the Discloser is Rio Tinto, Vale and, where the Discloser is Vale, Rio Tinto.

*Related Entity* means:

(a)      in relation to Rio Tinto Limited, any entity which is related to it within the meaning of section 50 of the Corporations Act, and also includes Rio Tinto plc and all Related Entities of Rio Tinto plc; and

Page 4

(b)    in relation to Rio Tinto plc, its subsidiaries and subsidiary undertakings (as such are defined under the UK Companies Act 1985, as amended), and also Rio Tinto Limited and all Related Entities of Rio Tinto Limited; and

(c)    in relation to Vale, means (i) its subsidiaries and (ii) Valepar S.A. to the extent that Valepar S.A. is a Secondary Recipient. For the purposes of this definition, a company is a **"subsidiary"** of another company if that company, directly or indirectly, through one or more subsidiaries:

    (i)    holds a majority of the voting rights in it;

    (ii)    is a member or shareholder of it and has the right to appoint or remove a majority of its board of directors or equivalent managing body;

    (iii)    is a member or shareholder of it and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in it; or

    (iv)    has the right to exercise a dominant influence over it, for example by having the power to give, or by actually giving, directions with respect to its operating and financial policies, with which its directors and/or management are obliged to comply.

*Related Person* means, in relation to an entity, the Related Entities of the entity and officers, directors, employees, agents, contractors, partners of the entity and of Related Entities of the entity, and the entity's Advisers, Debt Financiers or Consultants.

*relevant interest* means relevant interest as defined in the Corporations Act.

*Restricted Period* means the period commencing on the date of this Deed and ending on the earliest to occur of:

(a)    the date that BHPB announces that the pre-conditional offers that it announced on 6 February 2008 (as may be subsequently amended or supplemented) (the *BHPB Offer*) will not be made or, if made, have lapsed or been withdrawn;

(b)    the date the BHPB Offer becomes wholly unconditional;

(c)    the date on which a Rio Tinto Sale Event (as defined below) occurs or, if earlier, the date of a public announcement of the execution of a definitive agreement providing for a Rio Tinto Sale Event;

(d)    the Longstop Date;

(e)    45 days following the later of (i) the date of delivery by Vale of a Withdrawal Notice and (ii) the Target Date; and

(f)    the date of delivery by Rio Tinto of a Withdrawal Notice.

*Request* has the meaning set out in Clause 5.4(a).

*Rio Tinto* means Rio Tinto plc and Rio Tinto Limited provided, in the event that either or both of Rio Tinto plc and Rio Tinto Limited demerge a portion of its or their business and/or insert a parent company by scheme of arrangement or otherwise, Rio Tinto shall include such demerged entities and/or parent company.

5

*Rio Tinto Group* means Rio Tinto and each of their Related Entities.

*Rio Tinto Sale Event* has the meaning set out in Clause 5.2(a)(ii)(A).

*Rio Tinto Shares* means:

(a)     any shares in the capital of Rio Tinto plc or Rio Tinto Limited; or

(b)     securities convertible into shares of either of them (including any option over or relating to shares on issue or not or shares held by the counterparty or not); or

(c)     any legal, equitable or economic interest in those shares or securities (including any derivative instrument or other financial product affording an economic exposure to movement in the price of such shares or securities).

*Secondary Recipient* means a person to whom the Recipient discloses, or gives access to, Confidential Information in accordance with Clause 4.2.

*Securities Laws* means any law or rule which prohibits any person in possession of information about a company from dealing in securities of that company or from communicating that information to any other person (including the Corporations Act, the Australian Listing Rules, the rules and regulations of BOVESPA, FSMA, the Brazilian Corporations Law, the United States securities laws and regulations, the UK Listing Rules or the rules and regulations of the London Stock Exchange, Euronext and the New York Stock Exchange).

*senior executive representative* means chief executive officer or chief financial officer.

*Target Date* means 15 December 2008.

*UK Listing Rules* means any of the Listing Rules, Disclosure & Transparency Rules or Prospectus Rules made by the Financial Services Authority in exercise of its functions as competent authority pursuant to Part VI of FSMA.

*Vale Group* means Vale and each of its Related Entities.

*voting power* means voting power as defined in section 610 of the Corporations Act.

**1.2     Interpretation**

Headings are for convenience only and do not affect interpretation. The following rules apply unless the context requires otherwise.

(a)     The singular includes the plural and conversely.

(b)     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(c)     A reference to a person, corporation, trust, partnership, unincorporated body or other entity includes any of the foregoing.

(d)     A reference to a Clause, sub-Clause or Schedule is a reference to a clause, sub-clause of, or schedule to, this Deed.

6

Page 6

(e)   A reference to an agreement or document (including a reference to this Deed) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Deed or that other agreement or document.

(f)   A reference to a party to this Deed or another agreement or document includes the party's successors and permitted substitutes or assigns.

(g)   A reference to conduct includes, without limitation, an omission, statement and undertaking, whether or not in writing.

(h)   Nothing in this Deed is to be interpreted against a party solely on the ground that the party put forward this Deed or any part of it.

## 2.   Joint and Several Obligations

Rio Tinto plc and Rio Tinto Limited shall be jointly and severally liable for all obligations of Rio Tinto hereunder.

## 3.   Provision of Confidential Information

Either party may provide to the other certain Confidential Information for the Permitted Purpose, on the terms and conditions in this Deed.  However, nothing in this Deed requires either party to make any Confidential Information available to the other.  The making of any Confidential Information available to the Recipient is at the absolute discretion of the Discloser.

## 4.   Confidentiality

### 4.1   Recipient's covenants

Subject to Clauses 4.2 and 4.5, each Recipient undertakes and covenants with the Discloser that it will:

(a)   hold the Confidential Information in strict confidence, keep the Confidential Information secret, protect and preserve the confidential nature and secrecy of the Confidential Information, and not disclose any of the Confidential Information to any person (or allow or assist any person to observe or have access to any Confidential Information) other than in accordance with this Deed;

(b)   establish and maintain effective security measures to safeguard all Confidential Information from unauthorised access, use, reproduction or disclosure and use the same degree of care as it uses to protect its own confidential information or which a prudent person would use to protect that person's confidential information (whichever standard is higher);

(c)   not make any use of the Confidential Information or any part of it except for the Permitted Purpose;

(d)   not directly or indirectly (without the prior written consent of the Discloser) make any enquiries of or discuss with any officer, employee, former officer or employee (unless any such person is currently an officer or employee of the Recipient), financier, customer,

Page 7

supplier, consultant, landlord, tenant, creditor, co-venturer or alliance partner of any member of the Discloser Group any matters in connection with the Proposed Transaction; and

(e)     promptly do anything reasonably required by the Discloser to prevent or restrain a continuing breach or reasonably anticipated breach of this Deed or any continuing infringement or reasonably anticipated infringement of the Discloser's rights arising out of this Deed by any person, whether by court proceedings or otherwise.

### 4.2    Disclosure to Permitted Persons

Subject to compliance with Clause 4.3, each Recipient may disclose or allow access to Confidential Information to its Permitted Persons if:

(a)     the disclosure or access is necessary for the Permitted Purpose, and is only made or allowed to that extent;

(b)     before disclosure is made or access allowed to the Confidential Information, the Permitted Person is informed of the confidentiality obligations contained in this Deed; and

(c)     in respect of Consultants and Debt Financiers only, the Discloser has given its express written consent to the disclosure of (or access to) Confidential Information to (or by) that Consultant or Debt Financier.

Each Recipient shall procure that its Permitted Persons to whom Confidential Information is to be made available pursuant to this Clause 4.2 comply with the obligations in this Deed regarding such Confidential Information. In the event of a breach by a Permitted Person, that breach will be deemed to be a breach of this Deed by the relevant Recipient, and the Discloser will be entitled to all remedies available to them under this Deed or at law or in equity as if the breach of Clause 4.1 by the Permitted Person was a breach by the relevant Recipient. A Discloser may require by written notice at any time that a Recipient deny access to Confidential Information to any of its Permitted Persons and may at any time require by written notice that a Recipient procure compliance by its Permitted Persons with the provisions of Clause 7 as if references therein to the Recipient were references to the relevant Permitted Person.

### 4.3    Advisers, Debt Financiers and Consultants

Each party represents and warrants to the other party that it has at the date of this Deed retained in relation to the Proposed Transaction only those Advisers and approached in relation to the Proposed Transaction only those Debt Financiers and Consultants named in Schedule 1A, in the case of Vale, and Schedule 1B, in the case of Rio Tinto. Each party undertakes promptly to notify the other party in writing any changes or additions to those Advisers, Debt Financiers or Consultants and, in the event of any addition of a Debt Financier or Consultant by either party, shall not disclose any Confidential Information to such additional Debt Financier or Consultant without the prior written consent of the other party having been obtained in accordance with sub-Clause 4.2(c) of this Deed.

### 4.4    Notice to Discloser

Each Recipient shall maintain and shall procure that each of its Permitted Persons maintains an up-to-date list of each Permitted Person to whom the Recipient has granted access to Confidential

Page 8

Information in accordance with Clause 4.2 and shall, on request, provide a copy of that list to the relevant Discloser.

**4.5     Other exceptions**

(a)     This Deed does not prevent a Recipient from using or disclosing Confidential Information:

    (i)     which was already in the possession of the Recipient at the time it was first disclosed to the Recipient by the Discloser, or the Discloser's Advisers, Debt Financiers or Consultants on behalf of the Discloser having been obtained by lawful means;

    (ii)     which is or becomes generally available to the public otherwise than by disclosure in breach of the terms of this Deed;

    (iii)     which becomes available to the Recipient from a third person which at the time of use or disclosure the Recipient believes to be legally entitled to possess the information and to provide it to the Recipient;

    (iv)     which is derived by the Recipient independently of and without reference to any Confidential Information;

    (v)     where such disclosure or use is required by law or by any court of competent jurisdiction, by the Australian Listing Rules, the UK Listing Rules or the rules and regulations of the London Stock Exchange, the New York Stock Exchange, BOVESPA (or any other stock exchange on which the shares of a member of the Recipient's Group are listed or quoted), the Code, the Corporations Act, the Brazilian Corporations Law, the Brazilian Securities Commission (*Comissao de Valores Mobiliários  CVM*), in particular the disclosure obligations provided for in CVM ruling 358/2002, the United States securities laws and the rules and regulations of the United States Securities and Exchange Commission or any enquiry or investigation by any court of competent jurisdiction, governmental, official or regulatory body which is lawfully entitled to require any such disclosure;

    (vi)     where such disclosure or use is approved in writing by the Discloser.

(b)     Prior to any disclosure or use under sub-Clause 4.5(a)(v), the Recipient must in addition to complying with Clause 4.6:

    (i)     provide the Discloser with sufficient notice to enable them to seek a protective order or other remedy unless earlier disclosure is required by law in which case the Recipient must provide the Discloser with as much notice prior to disclosure as is lawful and reasonably practicable;

    (ii)     if and to the extent lawful and reasonably practicable, provide the Discloser with all assistance and co-operation which the Discloser considers reasonably necessary to prevent or minimise such disclosure; and

    (iii)     if and to the extent lawful and reasonably practicable, consult with the Discloser as to the content and timing of and the approach in relation to any proposed

Page 9

communication having regard, in particular, to the intention not to prejudice the interests of the Discloser.

### 4.6 Form of disclosure

To the extent possible without Rio Tinto or Vale breaching applicable laws or regulations, or the rules of any stock exchange on which the shares of any member of its Group are listed, neither Rio Tinto nor Vale may disclose Confidential Information under Clause 4.5 by means of a public announcement, stock exchange release, public document or otherwise, without first obtaining the other's consent to the form of that announcement, release or other disclosure, which consent must not be unreasonably withheld or delayed.

### 4.7 No further use of Confidential Information

Each Recipient must (and must ensure that each of its Secondary Recipients does), as promptly as is reasonably practicable following written demand by the Discloser, cease to use or make any further disclosure of any Confidential Information, including use or disclosure for the Permitted Purpose.

## 5. Prohibited Activities

### 5.1 Share Acquisitions

Without prejudice to any obligations which it may have at law, under other provisions of this Deed, under the Code or otherwise, each party agrees that it shall not, and shall procure that the members of its Group and anyone acting on its or their behalf in respect of a Prohibited Activity (together, the *Restricted Parties*) shall not, directly or indirectly, alone or with others, for a period of one year from the date of this Deed without the prior consent in writing of a director or officer of the other party, engage in any Prohibited Activity.

For the purposes of this Clause 5, each of the following is a *Prohibited Activity*:

(a) acquiring or seeking to acquire an interest in the shares of the other party or any Identified Subsidiary including rights to acquire, rights to subscribe for, options in respect of, and derivatives referenced to, such shares, other than the acquisition of shares pursuant to any right to acquire such shares (contractual or otherwise) of a member of the Rio Tinto Group or the Vale Group (as the case may be) held by Rio Tinto or Vale existing on the date of this Deed and listed in Schedule 2 to this Deed; or

(b) entering into any agreement or arrangement (conditionally or otherwise and whether legally binding or not) with any person in relation to the acquisition of such an interest; or

(c) communicating with any shareholder of the other party with the purpose or effect of encouraging such shareholder to:

    (i) oppose the board of directors' business strategy or management of the business;

    (ii) request (publicly or otherwise) that the board of directors of the other party takes a particular course of action, or otherwise seek to influence the position of the board of directors of the other party, in relation to any proposal, possible offer or offer

Page 10

for all or any part of the voting share capital of the other party announced by it or any other person; or

(d)   making a general offer for all or any part of the share capital of the other party or an Identified Subsidiary of such party; or

(e)   announcing, or taking any action which under the Code, the Corporations Act, Brazilian Corporations Law or otherwise would require the announcement of, any proposals for any takeover, merger, consolidation or share exchange or similar transaction involving the securities of the other party or an Identified Subsidiary of such party (whether on a conditional basis or otherwise); or

(f)   taking any step which can reasonably be expected to give rise to any obligation under the Code, the Corporations Act, Brazilian Corporations Law or equivalent requirements in any jurisdiction to make any offer for all or any part of the share capital of the other party or an Identified Subsidiary of such party; or

(g)   assisting or advising any person in relation to, any of the foregoing.

Notwithstanding the foregoing provisions of this Clause 5.1, sub-Clauses 5.1(b) and 5.1(g) shall not be construed as restricting a Restricted Party from acquiring, seeking to acquire, or entering into any agreement or arrangement to acquire the assets of the other party (other than shares of an Identified Subsidiary of such other party) or any other person or entity; provided that the acquiring Restricted Party does not acquire, seek to acquire or agree to acquire the share capital of such other party or one of its Identified Subsidiaries. For the avoidance of doubt, the obligations of Vale under Clause 5.3 shall apply until the expiration of the Restricted Period.

Notwithstanding anything to the contrary in this Deed, pension plans and pension funds of the parties and of any member of their respective Groups, which are independently managed by unaffiliated third parties that are not Secondary Recipients, shall not be Restricted Parties for purposes of this Clause 5.1 and shall not be a member of the Vale Group for purposes of Clause 5.3.

## 5.2   Permitted Activities

Nothing in Clauses 5.1 or 5.3 (without prejudice to any other obligations or restrictions) shall prevent any Restricted Party from engaging in any Prohibited Activity with respect to (i) Rio Tinto plc or Rio Tinto Limited, or (ii) an Identified Subsidiary of Rio Tinto:

(a)   in the case of Rio Tinto plc and Rio Tinto Limited only:

(i)   if any person (other than the persons who are so restricted by Clause 5.1):

(A)   shall have become interested (as defined in the Code) in shares carrying more than 29.9 per cent of the votes ordinarily exercisable at general meetings of Rio Tinto plc; or

(B)   shall have acquired a relevant interest in shares which results in that person or any other person having voting power in more than 20 per cent. of the votes ordinarily exercisable at general meeting of Rio Tinto Limited; or

11

Page 11

(C)    shall have become interested (as defined in the Code) in shares carrying more than 29.9 per cent of the votes ordinarily exercisable by shareholders of Rio Tinto plc and Rio Tinto Limited on a Joint Decision (as defined in the Articles of Association of Rio Tinto plc); or

(D)    (I) has satisfied or announced satisfaction of or waived, to the extent permitted by the Takeover Panel, the preconditions to an offer for all the shares of Rio Tinto plc and Rio Tinto Limited announced on 6 February 2008 and (II) such offer has not lapsed; or

(E)    other than the offer existing on the date of this Deed as referred to in sub-Clause (D) above, has announced a *bona fide* general offer (howsoever structured and whether or not subject to pre-conditions) for shares of Rio Tinto plc or Rio Tinto Limited or has announced a firm intention to make such an offer (whether or not subject to pre-conditions) which could result in such person becoming interested in shares carrying a majority of the votes ordinarily exercisable at general meetings of Rio Tinto plc or Rio Tinto Limited and such offer (I) is or will be made in accordance with Article 64(B)(xii)(i) or (j) of the Articles of Association of Rio Tinto plc and Rule 145.B.(x)(i) or (j) of the Constitution of Rio Tinto Limited and (II) has not lapsed; or

(ii)    on the occurrence of:

(A)    the sale of all or substantially all of Rio Tinto's assets, other than in connection with an internal restructuring transaction primarily involving Rio Tinto, one or more of its subsidiaries and/or any holding company formed for the purpose of such transaction wholly owned by persons who were shareholders of Rio Tinto immediately prior to such transaction (such a sale, a *Rio Tinto Sale Event*); or

(B)    the public announcement of the execution of a definitive agreement providing for (I) any of the events contemplated in the foregoing sub-Clauses 5.2(a)(i) or (II) a Rio Tinto Sale Event; and

(b)    in the case of an Identified Subsidiary of Rio Tinto only:

if any person (other than the persons who are so restricted) has announced a *bona fide* general offer (howsoever structured and whether or not subject to any pre-conditions) for shares of such Identified Subsidiary of Rio Tinto or has announced a firm intention to make such an offer (whether or not subject to pre-conditions) which could result in such person becoming interested in shares carrying a majority of the votes ordinarily exercisable at general meetings of such Identified Subsidiary of Rio Tinto and such offer (i) is or will be made in accordance with the provisions of the Code or the rules of any other applicable jurisdiction relating to tender offers and (ii) has not lapsed.

To the extent the circumstances set forth in sub-Clauses 5.2(a)(i)(D)(I), 5.2(a)(i)(E)(I) or 5.2(b)(i) that resulted in the lifting of the prohibition on Prohibited Activities no longer subsist as a result of such party's offer having lapsed, the prohibition on Prohibited

Page 12

12

Activities set forth in Clause 5.1 shall be reinstated; provided, that (i) any actions taken during the period when such prohibitions were lifted shall not constitute a violation of Clause 5.1; (ii) the Restricted Party may comply with its obligations pursuant to any agreement or arrangement entered into or any legal obligation resulting from any action or step taken during the period when such prohibition was lifted; and (iii) the Restricted Party may continue to carry out any *bona fide* general offer (howsoever structured and whether or not subject to preconditions) announced during the period when the prohibition was lifted.

**5.3      No-talk restriction**

(a)      During the Restricted Period, Vale will procure that:

   (i)      neither it nor any of its Related Persons, acting on behalf of any member of the Vale Group, agrees a Proposal for Rio Tinto with any other person;

   (ii)      neither it nor any of its No-talk Related Persons solicits, invites, facilitates, encourages, initiates any enquiries, negotiations or discussions, or communicates any intention to do any of these things, negotiates or enters into, continues or participates in negotiations or discussions with any other person regarding a Proposal for Rio Tinto (any such action, a *Solicitation Action*);

   (iii)      neither it nor its No-talk Related Persons take any action to authorise any Related Person of Vale to take a Solicitation Action; and

   (iv)      if any of its No-talk Related Persons become aware of any Related Person of Vale taking any Solicitation Action, such person will take such action as is necessary to ensure the cessation of such Solicitation Action by such Related Person,

even if:

      (A)      the relevant person's Proposal for Rio Tinto was not directly or indirectly solicited, initiated, facilitated or encouraged by Vale or any of its Related Persons; or

      (B)      the relevant person has publicly announced their Proposal for Rio Tinto.

(b)      The provisions of sub-Clause 5.3(a) shall not apply to any asset, business, business group or division, or property (or a substantial part or any material part of a business or property, or of a business group or division) with respect to which Rio Tinto or a Related Person has entered into a written agreement and such agreement has not terminated with one or more persons or entities (other than members of the Rio Tinto Group) for the sale or transfer thereof.

(c)      Nothing in sub-Clause 5.3(a) restricts or prohibits Vale from entering into discussions with Authorised Persons of Rio Tinto in connection with the acquisition of any assets of the Rio Tinto Group.

**5.4      Withdrawal Notice**

(a)      Either party may request (a *Request*) (and the other party shall reasonably comply with such request), at any time during the term of this Deed that the parties have a meeting to discuss the progress of discussions or negotiations regarding the Proposed Transaction (a

Page 13

*Review Meeting*). A Review Meeting shall include a senior executive representative from each party.

(b) The parties shall use their reasonable endeavours to hold the Review Meeting in person. If, after the tenth calendar day following the date of a Request, a Review Meeting has not taken place, the Review Meeting may be held by teleconference.

(c) Either party may serve a notice (a *Withdrawal Notice*) on the other party withdrawing from any negotiations in relation to the Proposed Transaction at any time following (i) a Review Meeting or (ii) the fourteenth calendar day following the date on which either party requests a Review Meeting if such Review Meeting has not occurred prior to such date.

(d) The service of a Withdrawal Notice in accordance with the provisions of this Clause 5.4 shall not prejudice the continued application and effect of the terms of this Deed, which shall continue in full force and effect in accordance with their terms.

## 6. Disclaimer

### 6.1 Discloser not liable

(a) Each Recipient acknowledges that, in considering whether to enter into a formal arrangement resulting from the Permitted Purpose, except as may be expressly specified in a definitive agreement for such arrangement, it is relying and will rely on its own independent assessment and not on the Confidential Information.

(b) Each Recipient, for itself and on behalf of all Related Persons who are Secondary Recipients, acknowledges that the Discloser and its Related Persons do not, except as may be expressly specified in another written agreement:

    (i) make any representation or give any warranty as to the accuracy or completeness of any of the Confidential Information;

    (ii) accept any responsibility for any inaccuracy or misleading information in, or for any omission from, the Confidential Information;

    (iii) accept any responsibility for any interpretation, opinion or conclusion that any person may form as a result of examining the Confidential Information; and

    (iv) accept any responsibility or obligation to update any of the Confidential Information or otherwise inform the Recipient of any matter arising or coming to the notice of the Discloser or any of its Related Persons which may affect or qualify any Confidential Information.

### 6.2 Disclaimer

Subject to any further agreement between the parties, each Recipient covenants and agrees that to the maximum extent permitted by law, no liability for any loss or damage (whether foreseeable or not and whether caused by negligence or otherwise) suffered by any person is accepted by the Discloser or its Related Persons by reason of or in connection with the provision or use of the

14

Confidential Information or by the purported reliance on the Confidential Information by the Recipient hereunder.

**6.3   Proprietary rights**

(a)   Each Recipient acknowledges that the Confidential Information constitutes valuable and proprietary information of the Discloser.

(b)   The Discloser reserves all rights in the Confidential Information and no rights or obligations other than those expressly contained in this Deed are granted or to be implied from this Deed. In particular, no licence is granted directly or indirectly under any patent, invention, discovery, copyright or other intellectual property right now or in the future held, made, obtained or licensable by the Discloser.

(c)   The Recipient acknowledges that the Confidential Information and all intellectual property rights in the Confidential Information (including copyright, design and patent rights) are the exclusive property of and will remain the exclusive property of the Discloser or its Related Entities (as applicable).

## 7.   Return, destruction and deletion

**7.1   Recipient's obligations**

(a)   Each Recipient must, as promptly as possible, return to the Discloser (or, at the Discloser's option, destroy) all copies of Confidential Information held by the Recipient or which is under its control (or the control of one or more of its Secondary Recipients), and provide to the Discloser, if requested in writing, certificates from a duly authorised senior officer of the Recipient that to the personal knowledge of that senior officer all such records have been delivered, erased or destroyed (as applicable), in the following circumstances:

(i)   if ordered by a court; or

(ii)   on demand by the Discloser.

(b)   Without limiting sub-Clause 7.1(a), where the Discloser opts to require return or destruction under sub-Clause 7.1(a), the Discloser may also require that the Recipient, so far as it is reasonably practicable to do so, delete entirely and permanently all of the Confidential Information from every computer disk or electronic storage facility of any type owned, within the control of or used by the Recipient or any of its Related Entities or any Secondary Recipient, provided that in the case of an electronic storage facility that is an archive, if deletion would affect the integrity of the archive system, the information may be retained provided that it is not accessed.

**7.2   Effect of return, destruction or deletion**

The return, destruction or deletion of the documents and other materials referred to in Clause 7.1 does not release the Recipient or its Secondary Recipient from their obligations under this Deed.

Page 15

**7.3    Permitted Retention**

Notwithstanding anything to the contrary herein, either party and its Secondary Recipients may retain any Confidential Information relating to the other party as may be required by law or contained or referred to in board minutes or in documents referred to therein.

## 8.    Related Entities

Each party is entering into this Deed both on its own behalf and on behalf of any of its Related Entities who have an interest in any of the Confidential Information and may enforce this Deed on behalf of any such Related Entities.

## 9.    Remedies

Each Recipient acknowledges that any unauthorised use or disclosure of the Confidential Information or any part of it in breach of this Deed, and any other breach of the terms of this Deed, will cause material damage to the Discloser and that damages may be inadequate compensation for any such breach. Consequently, each Discloser has the right, in addition to any other remedies available at law or in equity, to seek injunctive relief against the relevant Recipient and its Secondary Recipient in respect of any breach or threatened breach of this Deed by that Recipient or any of its Secondary Recipients.

## 10.    Acknowledgements

**10.1    No liability for early termination of discussions**

Subject to any further agreement between the parties, each party acknowledges that the others have the right at any time without notice to terminate any negotiations in relation to the Proposed Transaction without being liable to satisfy the costs of the others or their Related Persons however incurred.

**10.2    No legal obligations until formal agreement is executed**

(a)    Except in relation to the matters set out in this Deed, the parties agree that no legal obligations will be created, implied or inferred (including without limitation by such things as parol evidence, extended negotiations, 'handshakes', oral understandings or courses of conduct) arising out of the Permitted Purpose until a formal agreement has been executed by all parties to this Deed.

(b)    Without limiting the foregoing, this Deed and the exchange of Confidential Information or participation in discussions in connection with the Permitted Purpose:

(i)    does not oblige a party to negotiate or endeavour to reach agreement with any other person;

(ii)    does not impose any duty on a party with respect to any discussions or negotiations regarding the subject matter of the Permitted Purpose; and

16

Page 16

      (iii)    is not intended to constitute or evidence any agreement, arrangement, understanding or proposal by or between the parties relating to the Permitted Purpose.

**10.3   Insider trading**

(a)    Each Recipient acknowledges that as a result of its receipt of the Confidential Information it may be (or be taken to be) in possession of material non-public or price sensitive information in relation to Disclosing Party Shares.

(b)    Each Recipient acknowledges that it is aware of and agrees to comply with (and that it will procure that its Secondary Recipients will have been advised of and will comply with) Securities Laws in relation to Disclosing Party Shares.

## 11.   Duration

(a)    Subject to sub-Clause (b) below, the confidentiality obligations set out in Clauses 4 and 7 of this Deed shall continue in full force and effect until the fifth anniversary of the date hereof.

(b)    The parties' obligations of confidentiality in relation to the information described in sub-Clauses (b), (c), (d), (e) and (f) of the definition of Confidential Information, or Derived Information in relation to such information, shall continue for 20 years from the date hereof.

(c)    Subject to sub-Clauses 11(a) and 11(b) and, the parties' obligations in respect of the provisions of this Deed shall not be subject to termination pursuant to this Clause 11 and shall continue in full force and effect until terminated in accordance with their terms.

## 12.   Legal Professional Privilege

Each Recipient acknowledges that the Discloser does not waive any legal professional privilege that they may have in respect of any Confidential Information because of any act done under this Deed.

## 13.   Notices

Any notice, demand, consent or other communication (a *Notice*) given or made under this Deed:

(a)    must be in writing;

(b)    must either be delivered to the intended recipient by prepaid post (if posted to an address in another country, by registered airmail) or by hand or fax to the address or fax number below or the address or fax number last notified by the intended recipient to the sender:

    (i)    to Rio Tinto:        5 Aldermanbury Square
                              London
                              EC2V 7HR
                              Attention: Company Secretary

Page 17

|  | Fax No: +44 20 7781 1835 |
|---|---|
| (ii)    to Vale: | Avenida Graça Aranha 26 |
|  | 6th floor |
|  | 20030-900 – Rio de Janeiro – RJ |
|  | **Brazil** |
|  | Attention: Pedro José Rodrigues (New Business Development Director) |
|  | Fax No: +55-21-3814 6581 |

(c)     will be taken to be duly given or made, when delivered;

but if the result of the foregoing is that a Notice would be taken to be given or made on a day which is not a business day in the place to which the Notice is sent or is later than 4.00 pm (local time) it will be taken to have been duly given or made at the commencement of business on the next business day in that place.

## 14. Entire agreement

This Deed contains the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings between the parties in connection with it.

## 15. Amendment

No amendment or variation of this Deed is valid or binding on a party unless made in writing executed by all parties.

## 16. Assignment

The rights and obligations of each party under this Deed are personal. They cannot be assigned, encumbered or otherwise dealt with and neither party may attempt, or purport, to do so without the prior written consent of the other party.

## 17. No waiver

No failure to exercise nor any delay in exercising any right, power or remedy by a party operates as a waiver. A single or partial exercise of any right, power or remedy does not preclude any other or further exercise of that or any other right, power or remedy. A waiver is not valid or binding on the party granting that waiver unless made in writing.

## 18. Further assurances

Each party agrees to do all things and execute all deeds, instruments, transfers or other documents as may be necessary or desirable to give full effect to the provisions of this Deed.

Page 18

18

## 19.   Costs and stamp duty

Each party must bear its own costs arising out of the negotiation, preparation and execution of this Deed. All stamp duty (including fines, penalties and interest) that may be payable on or in connection with this Deed must be borne equally by the parties.

## 20.   Governing law and jurisdiction

(a)   This Deed shall be governed by and construed in accordance with English law.

(b)   Each of the parties agrees that the courts of England are to have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that accordingly any proceedings arising out of or in connection with this Deed shall be brought in such courts. In connection with any disputes which may arise out of or in connection with this Deed, each of the parties irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.

(c)   Notwithstanding the provisions of sub-Clause (b) of this Clause 20, the parties recognise that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed (including in relation to the obligations set out in sub-Clause 5 (Share Acquisitions)), not least where injunctions are required. Where this is the case, each of the parties agrees irrevocably and unconditionally to submit to the non-exclusive jurisdiction of the Central Courts (*Foro Central*) of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

## 21.   No Third Party Rights

This Deed does not create any right under the Contracts (Rights of Third Parties) Act 1999 which is enforceable by any person who is not a party to it.

## 22.   Appointment of Process Agent

(a)   Vale hereby irrevocably appoints Law Debenture Corporate Services Limited located at Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent to accept service of process in England in any legal action or proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by Rio Tinto. Vale agrees to inform Rio Tinto in writing of any change of address of such process agent within 14 days of such change. If such process agent ceases to be able to act as such or to have an address in England, Vale irrevocably agrees to appoint a new process agent in England reasonably acceptable to Rio Tinto and to deliver to Rio Tinto within 14 days a copy of a written acceptance of appointment by the process agent. Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

(b)   Rio Tinto Limited hereby irrevocably appoints Rio Tinto plc as its agent to accept service of process in England in any legal action or proceedings arising out of this Deed, service

upon whom shall be deemed completed whether or not forwarded to or received by Rio Tinto Limited. Rio Tinto Limited agrees to inform Vale in writing of any change of address of such process agent within 14 days of such change. If such process agent ceases to be able to act as such or to have an address in England, Rio Tinto Limited irrevocably agrees to appoint a new process agent in England reasonably acceptable to Vale and to deliver to Vale within 14 days a copy of a written acceptance of appointment by the process agent. Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

## 23.   Counterparts

This Deed may be executed in any number of counterparts.  All counterparts will constitute one instrument.

*[Remainder of page intentionally left blank]*

Page 20

**Schedule 1**

**A.    Vale**

**1.    Advisers**

Cleary Gottlieb Steen & Hamilton LLP

**2.    Debt Financiers**

**3.    Consultants**

**B.    Rio Tinto**

**4.    Advisers**

Morgan Stanley; Credit Suisse (in its capacity as Adviser); JP Morgan; Macquarie; Rothschild;
Societe Generale (in its capacity as Adviser); Deutsche Bank (in its capacity as Adviser); RBS (in its
capacity as Adviser); ABN AMRO; Allens Arthur Robinson; Linklaters LLP; Sullivan & Cromwell;
Pinheiro Neto; PricewaterhouseCoopers; Ernst & Young; McCarthy Tetrault LLP

**5.    Debt Financiers**

The Royal Bank of Scotland plc (in its capacity as Debt Financier)

Deutsche Bank AG, London Branch (in its capacity as Debt Financier)

Credit Suisse (in its capacity as Debt Financier)

Société Générale (in its capacity as Debt Financier)

Australia and New Zealand Banking Group Limited

Banco Bilbao Vizcaya Argentaria S.A.

The Bank of Tokyo-Mitsubishi UFJ, Ltd., London Branch

Page 21

The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch

Calyon

Citibank N.A., London Branch

JPMorgan Chase Bank, N.A., London Branch

Mizuho Corporate Bank, Ltd

Sumitomo Mitsui Banking Corporation

UBS AG, London Branch

UBS AG, Stamford Branch

Intesa Sanpaolo S.p.A., London Branch

Bank of Montreal

Bank of China Limited, London Branch

Banco Santander S.A., London Branch

Commonwealth Bank of Australia

Canadian Imperial Bank of Commerce, London branch

Commerzbank AG

Commerzbank AG, London Branch

Natixis

Royal Bank of Canada

Standard Chartered Bank, London

The Toronto Dominion Bank

Toronto Dominion (Texas) LLC

Bank Austria Creditanstalt AG

WestLB AG, Toronto Branch

Westpac Banking Corporation

BNP Paribas

Morgan Stanley Bank

Scotiabank Europe Plc

TD Bank Europe Limited

Page 22

22

## 6.    Consultants

Port Jackson Partners; McKinsey and Company; Concept Economics

Page 23

23

**Schedule 2**

**Rights to Acquire Shares**

1.   **Rights of Rio Tinto**

   None

2.   **Rights of Vale**

   None

Page 24

**Schedule 3**

**Identified Subsidiaries of Rio Tinto**

(i)    Coal & Allied Industries Limited

(ii)   Energy Resources of Australia Ltd.

(iii)  Bougainville Copper Limited

(iv)   Palabora Mining Company Limited

(v)    Ivanhoe Mining

**3.    Identified Subsidiaries of Vale**

(i)    PT International Nickel Indonesa Tbk

(ii)   LOG-IN – Logística Intermodal S.A.

(iii)  Usinas Siderúrgicas de Minas Gerais S.A.

Page 25

**Executed and delivered as a deed.**

**Rio Tinto Limited (in respect of Confidentiality Deed with Companhia Vale do Rio Doce of 2 September 2008)**

Executed in accordance with section 127 of the
Corporations Act 2001 by Rio Tinto Limited:

Director Signature

GuY ELLIOTT

Print Name

Director/Secretary Signature

Philip W Mitchell

Print Name

**Rio Tinto plc (in respect of Confidentiality Deed with Companhia Vale do Rio Doce of 2 September 2008)**

Executed for and on behalf of Rio Tinto plc in
the presence of:

Signature

GuY ELLIOTT

Print Name

Signature

Philip W Mitchell

Print Name

Address:

Occupation

[Signature page of the Confidentiality Deed between Rio Tinto Limited, Rio Tinto plc, and Companhia Vale do Rio Doce]

## Companhia Vale do Rio Doce (in respect of Confidentiality Deed with Rio Tinto of 2 September 2008)

Executed for and on behalf of Companhia Vale
do Rio Doce by:

Signature                                    Signature

Fabio de Oliveira Barbosa
Chief Financial Officer

Print Name                                   Print Name

[Signature page of the Confidentiality Deed between Rio Tinto Limited, Rio Tinto plc, and Companhia Vale do Rio Doce]

