# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rio Tinto plc,

             Plaintiff,

    -against-

Vale, S.A., Benjamin Steinmetz, BSG
Resources Limited, BSG Resources (Guinea)
Ltd. aka BSG Resources Guinée Ltd, BSGR
Guinea Ltd. BVI, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR Guinea, Frederic Cilins,
Michael Noy, Avraham Lev Ran, Mamadie
Touré, and Mahmoud Thiam,

           Defendants.

14 Civ. 3042 (RMB)

---

## DECLARATION OF
## LORD COLLINS OF MAPESBURY
### July 29, 2014

---

**I**    **Introduction**

1.    For the purposes of this report I have been supplied by Cleary Gottlieb Steen and Hamilton
LLP ("Cleary Gottlieb") on behalf of Vale, S.A., formerly known as Companhia Vale do
Rio Doce, and referred to hereinafter as "Vale," with a copy of a Confidentiality Deed
dated September 2, 2008 between Rio Tinto Limited, Rio Tinto plc and Vale and entities
related to them (the "Confidentiality Deed").

2.    I have also been supplied with a copy of a complaint in proceedings brought in the United
States District Court for the Southern District of New York by Rio Tinto plc against Vale

1

and others dated April 30, 2014.  The complaint alleges that Vale obtained confidential information from Rio Tinto pursuant to the Confidentiality Deed and misappropriated that information for purposes not permitted by the Confidentiality Deed, and makes various tortious and statutory claims in connection with its receipt and use of the information.

3.    Clauses 20 and 22 of the Confidentiality Deed provide as follows:

**20. Governing law and jurisdiction**

(a)      This Deed shall be governed by and construed in accordance with English law.

(b)      Each of the parties agrees that the courts of England are to have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that accordingly any proceedings arising out of or in connection with this Deed shall be brought in such courts.  In connection with any disputes which may arise out of or in connection with this Deed, each of the parties irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.

(c)      Notwithstanding the provisions of sub-Clause (b) of this Clause 20, the parties recognise that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed (including in relation to the obligations set out in sub-Clause 5 (Share Acquisitions)), not least where injunctions are required.  Where this is the case, each of the parties agrees irrevocably and unconditionally to submit to the non-exclusive jurisdiction of the Central Courts (*Foro Central*) of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

...

**22. Appointment of Process Agent**

(a)      Vale hereby irrevocably appoints Law Debenture Corporate Services Limited located at Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent to accept service of process in England in any legal action or proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by Rio Tinto. Vale agrees to inform Rio Tinto in writing of any change of address of such process agent within 14 days of such change.  If such process agent ceases to be able to act as such or to have an address in England, Vale irrevocably agrees to appoint a new process agent in England reasonably acceptable to Rio Tinto and to deliver to Rio Tinto within 14 days a copy of a written acceptance of appointment by the process agent. Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

(b)      Rio Tinto Limited hereby irrevocably appoints Rio Tinto Plc as its agent to accept service of process in England in any legal action or proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by Rio Tinto Limited, Rio Tinto Limited agrees to inform Vale in writing of

2

any change of address of such process agent within 14 days of such change. If such process agent ceases to be able to act as such or to have an address in England, Rio Tinto Limited irrevocably agrees to appoint a new process agent in England reasonably acceptable to Vale and to deliver to Vale within 14 days a copy of a written acceptance of appointment by the process agent. Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

4. I have been asked to give an opinion on whether sub-clause 20(b) of the Confidentiality Deed constitutes an exclusive forum selection clause or a non-exclusive forum selection clause. In England these are usually referred to as exclusive or non-exclusive jurisdiction clauses and I will use that terminology. The difference between the two is that an exclusive jurisdiction clause confers jurisdiction on the courts of a particular country to the exclusion of the jurisdiction of the courts of other countries, whereas a non-exclusive jurisdiction clause confers jurisdiction on the courts of a particular country without prejudice to the right to bring proceedings in other courts. To put it differently, an exclusive jurisdiction is a promise not to sue in other courts.

5. As I shall develop below (paragraphs 57-58), it is plain as a preliminary matter that these proceedings fall within the category in sub-clause 20(b) of "any disputes which may arise out of or in connection with this Deed," which is broad enough to cover not only contractual claims but also tortious, equitable and statutory claims arising out of the relationship between the parties. The question then arises whether sub-clause 20(b) is an exclusive or non-exclusive jurisdiction clause.

6. For reasons which will be explained below, the question presented to me is one of contractual construction. But in order to put the discussion into context, I will mention at the outset some features of clauses 20 and 22. First, sub-clause 20(a) provides that the Deed is to be governed by and construed in accordance with English law. The effect of this provision is that under English law, the English court would have a discretionary long-arm jurisdiction over Vale even if sub-clause 20(b) (and sub-clause 22(a)) had not been included.

7.  Second, sub-clause 20(b) provides that the English courts are to have non-exclusive jurisdiction, but it also goes on to say that "accordingly any proceedings ... *shall* be brought in such courts" (emphasis added).

8.  Third, sub-clause 20(c) provides for the non-exclusive jurisdiction of the Brazilian courts, "notwithstanding the provisions of sub-Clause (b)".

9.  Fourth, the effect of the provision in sub-clause 22(a) for consent to service of proceedings in London is that the English court would have had jurisdiction irrespective of the provisions of sub-clause 20(a) and sub-clause 20(b).

10. Subject to my understanding that the role of an expert on foreign law in the federal court (as it is in the English court) is to give evidence on the content of that law, and not to apply it to the facts of the case, it may be helpful to the court if I were to express my own view on whether sub-clause 20(b) is an exclusive or non-exclusive jurisdiction clause, and I propose to do so, subject to that qualification. For the reasons given below, in my opinion an English court ought to conclude both on linguistic grounds and on the basis of commercial common sense that, although there appears to have been careless drafting, sub-clause 20(b) is (subject to the carve-out for Brazil in sub-clause 20(c)) a submission to the exclusive jurisdiction of the English court, despite the use of the expression "non-exclusive".

11. Exhibit LC2 to this opinion contains copies of the legal authorities to which I refer. Some of them are very long and in those cases the exhibit contains the relevant portions only, and I have satisfied myself that nothing else in the report affects what is said in the extracts.

12. This opinion is given exclusively for use in these proceedings in the US District Court for the Southern District of New York.

## II   Qualifications

13. A full curriculum vitae is in Exhibit LC1 to this opinion. I received my legal education at Cambridge University (BA (Law), 1963, First Class with Distinction; LLB (International Law), 1964, First Class) and Columbia Law School (LLM 1965). I was from 1971 to 2000 a partner in Herbert Smith, a leading firm of solicitors in the City of London, including

4

several years as head of its litigation and arbitration department. In 1997 I was one of the first two solicitors to be appointed as a Queen's Counsel.

14.   Between 1997 and 2000 I served as a deputy High Court Judge in the Chancery Division. In 2000 I was appointed to be a judge of the Chancery Division (as Mr Justice Lawrence Collins), and subsequently of the Commercial Court.

15.   In 2007 I was appointed to be a member of the Court of Appeal (as Lord Justice Lawrence Collins).

16.   In April 2009 I was appointed a Lord of Appeal in Ordinary (as Lord Collins of Mapesbury), i.e. a member of the appellate committee of the House of Lords, then the highest court in the United Kingdom, the functions of which were taken over by the Supreme Court of the United Kingdom on its inauguration in October 2009, and of which I became a member until I reached the compulsory age of retirement in 2011.

17.   I am now a Professor of Law at University College London, I serve as a non-permanent judge of the Hong Kong Court of Final Appeal, and I continue to sit as an Acting Justice of the UK Supreme Court. I also sit as an arbitrator in international arbitrations. I have been a visiting professor at Columbia University Law School (2012, 2013) and New York University Law School (2012 and 2014), and have been appointed an adjunct professor at New York University Law School for 5 years from 2015.

18.   Since 1987 I have been the general editor of Dicey and Morris (now Dicey, Morris and Collins) on the Conflict of Laws ("Dicey"), the leading work in that field in the British Commonwealth, the most recent edition (the 15th edition) of which was published in October 2012. In 1994 I was awarded the degree of Doctor of Laws by Cambridge University for distinction by original contribution to the science or study of law. I am an elected Fellow of the British Academy, and an elected member of the Institut de droit international. I am also a member of the American Law Institute.

19.   My particular expertise in the area on which I have been asked to give this opinion includes these matters: (1) while I was in practice I handled one of the early modern decisions on the distinction between exclusive and non-exclusive jurisdiction clauses

*(Evans Marshall & Co Ltd v Bertola SA* [1973] 1 WLR 349) and during the 1970s and 1980s I acted for what was then a major New York bank on its syndicated Eurodollar loan agreements all of which required consideration of the use of jurisdiction clauses; (2) I was the author of some of the earliest academic writing in this area, e.g. (1971) 20 ICLQ 550; (3) as indicated above, I have been the general editor of Dicey since 1987, and from the 10th edition in 1980 until the 12th edition in 1993 I was responsible for the chapter which included the section on jurisdiction clauses; (4) as a judge I decided cases on jurisdiction clauses in the Chancery Division: *BAS Capital Funding v Medfinco* [2003] EWHC 1798 (Ch), [2004] 1 Lloyd's Rep 652; *Bank of Tokyo-Mitsubishi v Baskan Gida* [2004] EWHC 945 (Ch), [2004] 2 Lloyd's Rep 395; and in the Court of Appeal: *Satyam Computer Services v Upaid Systems* [2008] EWCA Civ 487, [2008] 2 CLC 864; *UBS AG v HSH Nordbank* [2009] EWCA Civ 585, [2009] 2 Lloyd's Rep 272.

## III   Rules of interpretation in English law

20.   For reasons which appear below, the fundamental question which I have asked is a question of contractual construction.

*Natural and ordinary meaning rule*

21.   The starting point is the natural and ordinary meaning of the words of the contract, and in the vast majority of cases that is the ending point also: "the enquiry will start, and usually finish, by asking what is the ordinary meaning of the words used": *Charter Reinsurance Co Ltd v Fagan* [1997] AC 313, 384[1], per Lord Mustill.

22.   The ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant: *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, at para 14.[2]

*Excluded matters*

---

[1] LC2/12.
[2] LC2/24.

23.   There are three areas which are excluded from the scope of the exercise of contractual interpretation. The first is the subjective intention of the parties. That is because the object is to give effect to the intention of the parties objectively established, and not their subjective intentions: *Prenn v Simmonds* [1971] 1 WLR 1381, at 1385[3]; *Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8, [2002] 1 AC 281, at para 8[4]; *Sirius International Insurance Co v FAI General Insurance Ltd* [2004] UKHL 54, [2004] 1 WLR 3251, at para 18[5].

24.   The second excluded matter is evidence of conduct subsequent to the contract: *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235, at 261.[6]

25.   The third excluded matter is evidence of the pre-contractual negotiations. It has been established since the 19th century that pre-contractual negotiations are not admissible evidence in the construction of contracts. The principle was re-affirmed in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384-1385;[7] *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235, at 261;[8] *Investors Compensation Scheme Ltd. v West Bromwich Building Society* [1998] 1 WLR. 896, 912-913;[9] and, most recently, in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101.[10] In the latter case Lord Hoffmann emphasised that the rule excluded evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It did not exclude the use of such evidence for other purposes: for example, to establish that a fact which might be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These were not exceptions to the rule, and operated outside it: para 42.

*Departure from literal meaning*

---

[3] LC2/23.
[4] LC2/6.
[5] LC2/33.
[6] LC2/29. I express no view on whether under conflict of laws rules applicable in New York, questions of admissibility of evidence (such as subsequent conduct or pre-contractual negotiations) to interpret contracts are procedural questions governed by New York law, or substantive questions governed by English law.
[7] LC2/23.
[8] LC2/29.
[9] LC2/18.
[10] LC2/11.

7

26.  Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract: *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, at 912-913[11].

27.  A literal interpretation divorced from context or from the surrounding circumstances will not be adopted. In *Prenn v Simmonds, ante*, the House of Lords adopted the approach of Cardozo J in the New York Court of Appeals (who in turn had cited English textbook authority).

28.  Lord Wilberforce there said (at 1383-1385):[12]

> "... The time has long passed when agreements ... were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. There is no need to appeal here to any modern, anti-literal, tendencies, for Lord Blackburn's well-known judgment in *River Wear Commissioners v. Adamson* (1877) 2 App Cas 743, 763 provides ample warrant for a liberal approach. We must, as he said, inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. ...
>
> ...
>
> I may refer to one other case, to dispel the idea that English law is left behind in some island of literal interpretation. In *Utica City National Bank v. Gunn* (1918) 118 N.E. 607 the New York Court of Appeals followed precisely the English line. Cardozo J. in his judgment refers, at p. 608, to 'the genesis and aim of the transaction' citing *Stephen's Digest of the Law of Evidence* and *Wigmore on Evidence*. Surrounding circumstances may, he says, 'stamp upon a contract a popular or looser meaning' than the strict legal meaning, certainly when to follow the latter would make the transaction futile. 'It is easier to give a new shade of meaning to a word than to give no meaning to a whole transaction.' ..."

*Commercial common sense*

---

[11] LC2/18.
[12] LC2/23.

29.  Consequently in *Antaios Compania Naviera SA v Salen Rederierna A.B.* [1985] AC 191, at 201,[13] Lord Diplock took the opportunity of re-stating that:

> "If detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business common sense."

30.  More recent decisions of the House of Lords and its successor the UK Supreme Court in the same sense are *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, at para 16[14]; *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 W.L.R. 2900, at para 21 ("If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other")[15].

*The modern approach*

31.  In what has become the most influential, and most cited, modern opinion in this area, Lord Hoffmann said in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, at 912-913:[16]

> "... I should preface my explanation of my reasons with some general remarks about the principles by which contractual documents are nowadays construed. I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989, is always sufficiently appreciated. The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of "legal" interpretation has been discarded. The principles may be summarised as follows.
>
> (1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

---

[13] LC2/3.
[14] LC2/11.
[15] LC2/24.
[16] LC2/18.

(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

...

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749.

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. ..."

*Effect of mistake: rectification*

32.   Where by mistake a document does not reflect the intention of the parties, it may be rectified by the court if the party seeking rectification shows that: (1) the parties had a common continuing intention, whether or not amounting to an agreement, in respect of a particular matter in the instrument to be rectified; (2) there was an outward expression of accord; (3) the intention continued at the time of the execution of the instrument sought to be rectified; (4) by mistake, the instrument did not reflect that common intention: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, at para 48.[17]

*Interpretation to avoid effect of something having "gone wrong" with the language*

---

[17] LC2/11.

10

33. Where a mistake is obvious, for example because the literal meaning of the words would be absurd and it is clear what is meant, rectification is not necessary; the matter will be dealt with as one of construction: *East v Pantiles Plant Hire Ltd* [1982] EGLR 111, 112.[18] My understanding is that a similar approach can be found in the United States: *Shawmut Bank Connecticut, NA v Connecticut Limousine Service, Inc*, 670 A 2d 880, 883 (Conn App Ct 1996)[19] ("If the word in question appears to be an error, the trial court may, by looking at the contract as a whole, interpret the word so it is more logically suited to the agreement"); *Castellano v State of New York*, 374 NE 2d 618, 620 (NY Court of Appeals, 1978)[20] ("...what was requested was an interpretation rather than what might be characterized as a reformation. To carry out the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear").

34. As appears above, in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896[21] Lord Hoffmann recognised that if it appears from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Consequently, the background and purpose of the transaction may show that something "has gone wrong" with the language of the contract and that a literal interpretation may be avoided to ensure that the intentions of the parties may be effectuated without it being necessary to resort to rectification of the contract.

35. *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101[22] was such a case. The House of Lords held that, although a court would not easily accept that linguistic mistakes had been made in formal documents, if the context and background drove a court to conclude that something had gone wrong with the language of a contract the law did not require it to attribute to the parties an intention which a reasonable person would not have understood them to have had; that where it was clear both that there was a mistake on the

---

[18] LC2/15.
[19] LC2/41.
[20] LC2/39.

[21] LC2/18.
[22] LC2/11.

face of the document and what correction ought to be made in order to cure it, in that it was clear what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties by using the language in the contract to have meant, the court was entitled to correct the mistake as a matter of construction.

36.   The facts of the case (in which my dissenting opinion in the Court of Appeal on the meaning of the document was upheld by the House of Lords) are complex and do not need to be spelled out here. Lord Hoffmann said (at paras 15-16):

> "It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out. On the other hand, Lawrence Collins LJ thought it had. It is, I am afraid, not unusual that an interpretation which does not strike one person as sufficiently irrational to justify a conclusion that there has been a linguistic mistake will seem commercially absurd to another: compare the *Kirin-Amgen* case [2005] All ER 667, 684–685. Such a division of opinion occurred in the *Investors Compensation Scheme* case itself [1998] 1 WLR 896. The subtleties of language are such that no judicial guidelines or statements of principle can prevent it from sometimes happening. It is fortunately rare because most draftsmen of formal documents think about what they are saying and use language with care. But this appears to be an exceptional case in which the drafting was careless and no one noticed.
>
> I agree with the dissenting opinion of Lawrence Collins LJ because I think that to interpret the definition of ARP in accordance with ordinary rules of syntax makes no commercial sense. ..."

## IV   Exclusive and non-exclusive jurisdiction clauses

*A question of interpretation*

37.   The difference between a non-exclusive jurisdiction clause and an exclusive jurisdiction clause is that an exclusive jurisdiction clause requires proceedings to be brought in the chosen court, and a non-exclusive jurisdiction clause gives or confirms an option for proceedings to be brought in the nominated court: *Austrian Lloyd Steamship Co v Gresham Life Assurance Society* [1903] 1 KB 249, 252[23]; *Evans Marshall & Co Ltd v Bertola SA*

---

[23] LC2/5.

12

[1973] 1 WLR 349, at 360-362[24], per Kerr J; and many other cases, e.g. *S&W Berisford plc v New Hampshire Insurance Co* [1990] 2 QB 631, 636[25].

38. The question is one of construction of the agreement and the word "exclusive" does not have to be used: *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767, at 776[26] ("the courts of England are to have jurisdiction to settle any disputes..."); and see, e.g. *Austrian Lloyd Steamship Co v Gresham Life Assurance Society* [1903] 1 KB 249[27] ("For all disputes...all the parties interested expressly submit to the jurisdiction of the Courts of Budapest"); *Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588, at 591[28] ("under the jurisdiction of the English Court without recourse to arbitration"); *Continental Bank v Aeakos Cia Naviera SA* [1994] 1 WLR 588, at 594[29] ("Each of the borrowers...hereby irrevocably submits to the jurisdiction of the English courts..."); *Royal Bank of Scotland v Highland Financial Partners LP* [2012] EWHC 1278 (Comm), [2012] CLC 109, at para 137[30], ("The Issuer irrevocably agrees that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes"), affd on this aspect [2013] EWCA Civ 328, at para 175[31].

*Applicable principles*

39. The same principles of construction are to be used as regards any contractual provision: *S&W Berisford plc v New Hampshire Insurance Co* [1990] 2 QB 631, 637[32]; *McGowan v Summit at Lloyd's*, 2002 SC 638, at para 51[33].

40. A broad and purposive construction must be followed: *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep 106, at para 39[34] (a case involving the scope of a jurisdiction clause).

---

[24] LC2/16.
[25] LC2/27.
[26] LC2/14.
[27] LC2/5.
[28] LC2/34.
[29] LC2/13.
[30] LC2/25.
[31] LC2/26.
[32] LC2/27.
[33] LC2/19.

13

41.  A number of non-exhaustive factors have been considered by the courts in determining whether a jurisdiction agreement is exclusive or non-exclusive, although not every point has been considered to be relevant in every case.

*Relevance of English law as governing law*

42.  First, the majority of cases which have considered the relevance of a choice of English to govern the substantive aspects of the contract have treated that choice (which, as in the present case, very often accompanies the choice of English jurisdiction) as the substantive law of the contract to be of great significance: e.g. *A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep 183, at 186.[35] The tendency (but not an invariable one) is to conclude that if the parties have chosen English law as the governing law of the contract, then it is unlikely that they would be agreeing to courts other than English courts deciding their disputes.

43.  In *Ocarina Marine Ltd v Marcard Stein & Co* [1994] 2 Lloyd's Rep 524 at 529[36], Rix J said: "Although it is perfectly possible to divorce law and jurisdiction, and this not infrequently occurs, it is not a construction which one would expect to find in a contract which provides for both English law and jurisdiction;" see also *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corp (No.2)* [2000] 1 Lloyd's Rep 670 at para 33[37] (Hong Kong law and jurisdiction); *Standard Bank Plc v Agrinvest International Inc* [2007] EWHC 295 (Comm), [2008] 1 Lloyd's Rep 532, at para 21[38] (where parties had agreed that the contract would be governed by English law and had submitted to the jurisdiction of the English court, it was difficult to think of a reason why they would have agreed to non-exclusive jurisdiction). But there are several cases which give the choice of English law as the governing law less weight: e.g. *McGowan v Summit at Lloyds*, 2002 SC 638 (Court of Session, Inner House – the Scottish equivalent of the English Court of Appeal) at para 49[39], relying especially on *S&W Berisford plc v New Hampshire Insurance*

---

[34] LC2/31.
[35] LC2/4.
[36] LC2/21.
[37] LC2/32.
[38] LC2/35.
[39] LC2/19.

*Co* [1990] 2 QB 631, 636[40]; and *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Athena)* [2006] EWHC 2530 (Comm), [2007] 1 Lloyd's Rep 280, at para 103[41].

44.   There is emphasis on English law as the governing law for two reasons, the first of which predominates in the authorities. The first reason is that there is often little commercial sense in providing for disputes potentially to be resolved in a court which will only apply English law as foreign law.

45.   The second reason is that there may be little commercial sense in providing for non-exclusive English jurisdiction when, for reasons to be explained below, the English court will have jurisdiction irrespective of the non-exclusive jurisdiction clause: *British Aerospace Plc v Dee Howard Co.* [1993] 1 Lloyd's Rep 368 at 375[42] ("parties hereto agree that the courts of law in England shall have jurisdiction to entertain any action in respect hereof": held exclusive because English court would have jurisdiction in any event and parties must have been seeking to add something); contrast *S&W Berisford plc v New Hampshire Insurance Co* [1990] 2 QB 631, 636[43] (insurance contract "subject to English jurisdiction": held non-exclusive and declaratory of the English court's jurisdiction).

46.   Secondly, in some cases the court has treated the question whether the obligation to submit disputes to a particular court is mutual, but this is of little weight. That is because a jurisdiction agreement can impose an obligation on only one party, and frequently does so, especially in financial instruments, where the bank, or other financial institution, will stipulate that actions against it must be brought exclusively in its home state, while it is free to pursue the counterparty wherever it can find assets: see, e.g. *Continental Bank v Aeakos Cia Naviera SA* [1994] 1 WLR 588, at 594[44] ("Each of the borrowers...hereby irrevocably submits to the jurisdiction of the English courts...but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having

---

[40] LC2/27.
[41] LC2/30.
[42] LC2/9.
[43] LC2/27.
[44] LC2/13.

jurisdiction in respect thereof"); *Ocarina Marine Ltd v Marcard Stein & Co* [1994] 2 Lloyd's Rep 524[45] ("Borrower hereby irrevocably agrees for the benefit of the Bank that the courts of England shall have jurisdiction" without prejudice to the bank's right to proceed elsewhere); *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767[46] ("Purchaser irrevocably submits to the jurisdiction of [English] courts" without limiting right of Seller to proceed in any other court); *Bank of New York Mellon v GV Films* [2009] EWHC 2338 (Comm), [2010] 1 Lloyd's Rep 365[47] ("Company irrevocably submits to the jurisdiction of such courts" but submission is for the benefit of the trustee and each of the bondholders and shall not limit their right to take proceedings in any other court of competent jurisdiction); *Royal Bank of Scotland v Highland Financial Partners LP* [2012] EWHC 1278 (Comm), [2012] CLC 109, at para 137[48], ("The Issuer irrevocably agrees that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes" without limiting the right of the bank to take proceedings in any other court of competent jurisdiction), affd on this aspect [2013] EWCA Civ 328, at para 175[49].

47.   Consequently, whether the clause is mutual may be a factor in determining whether it is exclusive (e.g. *Austrian Lloyd Steamship Co v Gresham Life Assurance Society* [1903] 1 KB 249, 252[50]; *Sinochem v Mobil Sales* [2000] 1 Lloyd's Rep 670, at para 33[51]) but it is not determinative.

*Linguistic techniques: "irrevocably"/transitive-intransitive*

48.   Thirdly, some largely linguistic techniques have been used as factors. Thus it has been said that the word "irrevocably" is suggestive of obligation rather than option: *Standard Bank Plc v Agrinvest International Inc*, above, at para 22[52] and *Royal Bank of Scotland v*

---

[45] LC2/21.
[46] LC2/14.
[47] LC2/7.
[48] LC2/25.
[49] LC2/26.
[50] LC2/5.
[51] LC2/32.
[52] LC2/35.

*Highland Financial Partners LP* [2013] EWCA Civ 328 at para 175[53]; and cf *Sinochem v Mobil Sales* [2000] 1 Lloyd's Rep 670, at para 33[54]. It has been held that a reference to settlement of disputes (as opposed to a reference to suits) may make a difference. In *Ocarina Marine Ltd v Marcard Stein & Co* [1994] 2 Lloyd's Rep 524[55] the court emphasised that the clause in question provided that the Borrower irrevocably agreed that the English courts were to have jurisdiction to "settle any disputes". It was held that this was an exclusive jurisdiction clause which bound the Borrower not to sue abroad: "Disputes, unlike suits, are not brought by one party against another; they are the result of differences between two parties" (at 529).

49.   What has been described by a leading commentator (Professor Adrian Briggs in Briggs and Rees, *Civil Jurisdiction and Judgments*, 5th ed 2009, para 4.45[56]) as a "strictly grammatical" or "almost eccentric" approach has been used by asking whether the agreement can be construed in a transitive sense, i.e. to submit disputes to a tribunal, as opposed to an intransitive sense, i.e. the parties submitting to the jurisdiction. This distinction derives from the decision of Hobhouse J in *Pathé Screen Entertainment Ltd v Handmade Films (Distributors) Ltd*, 1989, unreported[57], and has been applied many times: *British Aerospace Plc v Dee Howard Co.* [1993] 1 Lloyd's Rep 368 at 375[58]; *Continental Bank v Aeakos Cia Naviera SA* [1994] 1 WLR 588, at 592 and 594[59]; *Sabah Shipyard (Pakistan) Ltd v Republic of Pakistan* [2002] EWCA Civ 1643, [2003] 2 Lloyd's Rep 571, at paras 30-35[60]; *McGowan v Summit at Lloyd's*, 2002 SC 638, at para 44[61]; *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corp (No.2)* [2000] 1 Lloyd's Rep 670 at para 32[62]; *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Athena)* [2006] EWHC 2530 (Comm), [2007] 1 Lloyd's Rep 280, at

---

[53] LC2/26.
[54] LC2/32.
[55] LC2/21.
[56] LC2/42.
[57] LC2/22.
[58] LC2/9.
[59] LC2/13.
[60] LC2/28.
[61] LC2/19.
[62] LC2/32.

para 101[63]; *Standard Bank Plc v Agrinvest International Inc* [2007] EWHC 295 (Ch), at para 21[64]; *Royal Bank of Scotland Plc v Highland Financial Partners LP* [2012] EWHC 1278 (Comm) at para 135[65] (affd on this aspect [2013] EWCA Civ 328[66]).

50.   But many clauses in which the language was not transitive have been interpreted to be exclusive and therefore inferentially transitive: see *Continental Bank NA v Aeakos Cia Naviera SA* [1994] 1 WLR 588, 592[67] (borrowers and guarantor submit "to the jurisdiction of the English courts..." to be read in a transitive sense); applied in *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 784, at 776[68] (English court to have jurisdiction to settle any disputes/purchaser irrevocably submits to jurisdiction of English courts/submission for benefit of seller who may take proceedings in any other court); and Dicey says (15th ed 2012) that this rule of construction "would appear to have practically nothing to recommend it" (para 12-105[69]). As Professor Briggs, the editor of this passage, says in his book on *Civil Jurisdiction and Judgments*, above (at para 4.45[70]): "the idea that parties submit themselves to the jurisdiction of a court for something *other* than the resolution of a dispute is surreal.   Most graduates of English universities would be hard put to it to see and explain the distinction; it is beyond all reason to proceed on the basis that non-native speakers of English must have done so."

51.   In *BNP Paribas SA v Anchorage Capital Europe LLP* [2013] EWHC 3073 (Comm)[71] the jurisdiction clause was "This Agreement shall be governed by, and construed in accordance with, English Law and you irrevocably submit to the jurisdiction of the English courts in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement." Males J referred to the criticism of the distinction between transitive and intransitive, and said (at para 87) that:

---

[63] LC2/30.
[64] LC2/35.
[65] LC2/25.
[66] LC2/26.
[67] LC2/13.
[68] LC2/14.
[69] LC2/43.
[70] LC2/42.
[71] LC2/8.

"the distinction in the present case between submitting to the jurisdiction in respect of certain matters (intransitive and therefore, so the argument goes, non-exclusive) and submitting disputes in respect of certain matters to the jurisdiction of the court (transitive, and therefore exclusive) is so elusive that it escapes me altogether."

52. He concluded (at para 88):

"In the end all of these factors are only signposts which may sometimes assist in determining the intention of the parties, while the terms 'exclusive' and 'non-exclusive' themselves are merely convenient labels. In agreement with *Dicey* at para 12-105 ('the true question is whether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used'), I prefer to ask the question whether the commencement and pursuit of the foreign proceedings in question are things which a party has promised not to do."

*Article 23 of the Brussels I Regulation*

53. Article 23(1) of the Brussels I Regulation[72] provides:

"If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise.

Such an agreement conferring jurisdiction shall be either: (a) in writing or evidenced in writing; or (b) in a form which accords with practices which the parties have established between themselves; or (c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned."

54. Article 23 provides a presumption that the jurisdiction is to be exclusive unless the parties have agreed otherwise. Article 23 applies where at least one of the parties is domiciled in a

---

[72] Council Regulation (EC) 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters. This will be replaced by Article 25 of the recast Brussels I Regulation (Regulation (EU) 1215/2012), which applies to proceedings instituted on or after January 10, 2015. The new Article 25 is in this respect the same as the existing Article 23.

Brussels I Regulation State. It is primarily directed to allocation of jurisdiction between the EU States which are parties to the Brussels I Regulation, but it applies on its face to a case such as this where one of the parties is domiciled in a non-Regulation State such as Brazil.

55.   I do not consider that the presumption of exclusivity in Article 23 assists in this case. Here the sole question is whether the parties have provided otherwise by the use of the expression "non-exclusive" in sub-clause 20(b).

**V     Conclusions**

56.   Subject to the point I make above that the function of an expert on foreign law is not to give evidence on the construction of an agreement, my conclusions are these.

57.   In my opinion, these proceedings fall within the category in sub-clause 20(b) of "any disputes which may arise out of or in connection with this Deed." The modern law is now to be found in the decision of the House of Lords in *Fiona Trust and Holding Corp v Privalov* [2007] UKHL 40, [2007] Bus LR 1719[73] which swept away technical distinctions between different types of wording such as disputes "arising under" or "arising out of" or "in connection with" or "in relation to." Instead the court was to start from the assumption that the parties, as rational business people, are likely to have intended any dispute arising out of their relationship to be decided by the same tribunal. Accordingly, a clause such as sub-clause 20(b) submitting "any disputes which may arise out of or in connection with this Deed" will cover not only contractual claims but also tortious, equitable and statutory claims.

58.   *Fiona Trust and Holding Corp v Privalov* was a case of an arbitration clause, but the same principle has been applied in many cases to jurisdiction clauses, including a decision of the Court of Appeal in which I gave the leading opinion: *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 1 CLC 934,[74] in which I accepted that the proper approach to the construction of clauses agreeing jurisdiction was to construe them widely and generously. In the most recent case, decided earlier this month, the Court of Appeal again accepted that

---

[73] LC2/17.

[74] LC2/37.

the decision in *Fiona Trust* applies to jurisdiction clauses, and held that a submission to the exclusive jurisdiction of the English courts applied to tortious claims: *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG* [2014] EWCA Civ 1010, paras 8 and 12.[75] This view of English law has been accepted in several cases in New York, of which the most recent is *Longo v FlightSafety Intern, Inc,* 2014 WL 880410 (EDNY 2014).[76]

59.   Turning to the question whether sub-clause 20(b), the jurisdiction clause in the Confidentiality Deed, is exclusive or non-exclusive, I acknowledge that the ordinary meaning of an express reference to the non-exclusive character of jurisdiction would normally be determinative.

60.   In my view, however, in the particular circumstances of this matter, an English court ought to come to the conclusion that, notwithstanding the use of the expression "non-exclusive" in sub-clause 20(b), the parties have agreed that, subject to the provision in sub-clause 20(c) that the courts of Brazil are to have non-exclusive jurisdiction, the English courts are to have exclusive jurisdiction over any disputes.

61.   My reasons fall into two categories. The first category consists of linguistic analysis. The second category consists of considerations of commercial common sense and the intention which should be imputed to the parties.

*Linguistic considerations*

62.   I acknowledge, of course, as I have already said, that the use of the expression "non-exclusive" would normally be a conclusive pointer against the exclusivity of the clause. But there are two powerful pointers suggesting that the expression has been inserted in, or left in, the Confidentiality Deed as a result of careless drafting, when the actual intention as revealed by the language of the Deed in context was that all proceedings were to be brought in England, except as provided by the non-exclusive submission to the Brazilian courts envisaged by sub-clause 20(c).

---

[75] LC2/36.
[76] LC2/40.

63. The first pointer is the mandatory nature of the provision in sub-clause 20(b) that "any proceedings arising out of or in connection with this Deed *shall be brought in such courts*" (emphasis added). That provision makes no sense if the clause is to be construed as non-exclusive.

64. Consequently, sub-clause 20(b) will only make sense if its literal meaning is departed from in one of two ways. The first way is to give priority to the expression "non-exclusive." This can only be done by construing the words "shall be brought" as "may be brought". The second way is to give priority to the words "shall be brought." This can only be done by treating the expression "non-exclusive" as having been inserted, or left in, in error.

65. The second pointer is that the opening words of sub-clause 20(c) ("Notwithstanding the provisions of sub-Clause (b) of this Clause 20") are wholly redundant if sub-clause 20(b) is a non-exclusive jurisdiction clause. That is because, if the jurisdiction of the English court is non-exclusive, then the jurisdiction of the Brazilian court is not properly expressed as being "notwithstanding" the non-exclusive jurisdiction of the English court. If sub-clause 20(b) is a non-exclusive jurisdiction clause, it was not necessary to insert those words, any more than it would have been necessary to open sub- clause 20(b) with words such as "notwithstanding the provisions of sub-clause (c) of this clause".

66. There are two other linguistic matters to which I do not attach importance. The first is the fact that the jurisdiction is expressed in intransitive terms ("each of the parties irrevocably submits to the jurisdiction of such courts"). I have dealt above with the point that, although used in some decisions as a pointer towards non-exclusivity, it has been much criticised and should have no weight. The second is the use of the word "irrevocably" in that phrase. Although it has been relied on as a pointer to exclusivity, I do not consider it to be of any weight. In this context it is simply a "boiler-plate" expression of no significance.

*Commercial considerations*

67. I have already emphasised that in English law the interpretation of a provision in a commercial contract involves ascertaining what a reasonable person would have understood the parties to have meant.

22

68. Commercial common sense supports the view that the words "any proceedings arising out of or in connection with this Deed shall be brought" in such courts (i.e. "the courts of England") have priority. There are three reasons why I consider it to be consistent with commercial common sense for sub-clause 20(b) to be construed as an exclusive jurisdiction agreement in the light of those words, notwithstanding the use of the phrase "non-exclusive."

69. First, it makes no commercial sense for the parties to have agreed that every court in the world which would take jurisdiction might exercise it over the parties. I am informed by Cleary Gottlieb that the RTZ group has principal subsidiaries which might be Related Entities (as defined) in the following countries: Australia, Brazil, Canada, Guinea, Madagascar, Mongolia, Mozambique, Namibia, South Africa and the United States; and that the Vale group has such subsidiaries in these countries: Australia, Austria, Brazil, Canada, Indonesia, Mozambique, New Caledonia, Oman, Peru, Singapore and Switzerland. It is simply unrealistic that companies of this degree of commercial sophistication would have agreed to so uncommercial a result that the courts of at least 16 countries in the world, additional to the specifically selected fora in England and Brazil, potentially have jurisdiction over disputes arising out of the Confidentiality Deed by virtue of the Related Entities provision. There will be many other countries which may take jurisdiction by virtue of other bases of jurisdiction such as (as is claimed in this case) the place of commission of alleged tortious acts. No sensible commercial persons would have agreed to such a result.

70. Second, the agreement is governed by English law and it makes commercial sense for disputes to be centred in England, subject to the expressly negotiated provision for jurisdiction of the Brazilian courts, where the main contracting parties are English and Brazilian.

71. Third, if sub-clause 20(b) is construed as non-exclusive it has achieved very little. That is because without sub-clause 20(b) the English court would have jurisdiction in any event.

72. To develop that point it is necessary to explain that the jurisdiction of the English court over a defendant which is not domiciled within the European Union depends on whether

the defendant can be served with the process of the English court. If the defendant can be served within England, then the English court has jurisdiction as of right. If the defendant cannot be served within England, the English court will have jurisdiction (of a discretionary nature) if the case comes within the long-arm provisions of English law.

73.   The effect of the Deed is that, even without sub-clause 20(b), the English court would have jurisdiction (a) as of right by virtue of the service provisions in sub-clause 22(a); (b) as a matter of discretion by virtue of the choice of English law in sub-clause 20(a).

*Jurisdiction as of right: Clause 22*

74.   Clause 22 is headed "Appointment of Process Agent", and provides in sub-clause 22(a) that Vale irrevocably appoints Law Debenture Corporate Services Ltd (who are the leading company providing this service for foreign companies) as its agent to accept service of process in England in any legal action or proceedings arising out of the Deed.

75.   The effect of this provision is that the English court will have jurisdiction over any such claim if service is effected through that method. That is because under English law, in cases where the defendant is domiciled in a state outside the European Union such as Brazil, and to which for this purpose the Brussels I Regulation does not apply, jurisdiction depends on service, and if service is effected in England, the court has jurisdiction as of right.

76.   The rule at common law was that if one party to the contract nominated an agent resident in England to accept service of process on his behalf, he was deemed to submit to the jurisdiction, and service could be effected on the agent in accordance with the contract: *Montgomery Jones Co v Liebenthal Co* [1898] 1 Q.B. 487 (CA);[77] Dicey, para 11-131.[78]

77.   This rule of the common law is confirmed by the Civil Procedure Rules, CPR, r. 6.11, which provides:

---

[77] LC2/20.
[78] LC2/43.

> "Service of the claim form by contractually agreed method
>
> (1) Where—
>
> (a) a contract contains a term providing that, in the event of a claim being started in relation to the contract, the claim form may be served by a method or at a place specified in the contract; and
>
> (b) a claim solely in respect of that contract is started,
>
> the claim form may, subject to paragraph (2), be served on the defendant by the method or at the place specified in the contract.
>
> (2) Where in accordance with the contract the claim form is to be served out of the jurisdiction, it may be served—
>
> (a) if permission to serve it out of the jurisdiction has been granted under rule 6.36;
> …"

78.    Under this provision jurisdiction is conferred as of right (subject to right of the defendant to apply to have the proceedings stayed if the defendant can show that England is not the forum conveniens).

*Long-arm jurisdiction: sub-clause 20(a)*

79.    If sub-clause 22(a) were not in the agreement, the English court would have jurisdiction by virtue of the express choice of English law in sub-clause 20(a), over a Brazilian company, as authorised by the long-arm provisions of the Civil Procedure Rules.

80.    Part 6 of the Civil Procedure Rules, and Practice Direction 6B, para 3.1, set out the cases in which the court may exercise discretionary jurisdiction over persons abroad in countries such as Brazil (there are separate rules for defendants domiciled in States outside the United Kingdom to which the Brussels I Regulation applies).

81.    One of the cases in which permission to serve proceedings outside the jurisdiction may be granted is where a claim is made in respect of a contract governed by English law: Practice Direction 6B, para 3.1(6)(c).

82.    A defendant may seek to challenge the exercise of jurisdiction, in which case some further questions may arise. These include (a) whether the claim fell within one of the gateways which give the court legal power to authorise service (but no issue on this point will arise if

the claim is made in respect of a contract expressly governed by English law); (b) whether there is a serious issue to be tried on the merits of the claim.

83.   The fact that a contract is governed by English law is only one of the relevant factors in the exercise of the discretion. If the dispute does not turn on English law and England is not the place with the most significant connecting factors with the dispute and the issues, then the English court may find that it is not the appropriate forum.

*The consequence*

84.   The consequence of the service provision in sub-clause 22(a) is that a submission to non-exclusive jurisdiction of the English court by Vale would have been wholly unnecessary. Even if sub-clause 22(a) had not been included, the consequence of sub-clause 20(a), providing for the contract to be governed by English law, would have been that the English court would in any event have been entitled to exercise long-arm jurisdiction over Vale if RTZ had shown that England were the forum conveniens. It would be unusual if the English court were to refuse jurisdiction in such a case, although it is theoretically possible. It is uncommercial to imagine that commercial parties to a transaction governed by English law should be regarded as having stipulated for a non-exclusive submission to jurisdiction (rather than an exclusive submission) for such a theoretical and limited gain.

85.   In cases where the contract was governed by English law, the court has in effect asked itself why the parties should go to the trouble of providing for non-exclusive jurisdiction when the court already has jurisdiction by virtue of English law as the governing law: *Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588, at 592;[79] *A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep 183, at 186.[80]

*Where "something has gone wrong" with the language*

86.   I have already mentioned that in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896[81] Lord Hoffmann said the background and purpose of

---

[79] LC2/34.
[80] LC2/4.
[81] LC2/18.

the transaction may show that something "has gone wrong" with the language of the contract and that a literal interpretation may be avoided to ensure that the intentions of the parties may be effectuated without it being necessary to resort to rectification of the contract. In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 110[82] at para 15 he said that required a strong case to persuade the court that something must have gone wrong with the language.

87.  I am not aware of any reported decision in which this principle has been applied to a question of the exclusivity of a jurisdiction clause.

88.  But there are three analogous cases in the jurisdictional field. The first is *Actavis Group HF v Eli Lilly & Co* [2012] EWHC 3316 (Pat).[83] In that case Actavis' solicitors wrote to Lilly's solicitors to say that they represented Actavis Group PTC ehf[84] and its relevant national subsidiaries. Subsequently Lilly's solicitors said that they were instructed to accept service on behalf of Lilly. The question was whether that consent to jurisdiction extended to a claim by Actavis Group hf, the parent operating company, which was neither Actavis Group PTC nor a subsidiary of Actavis Group PTC. It was decided that, notwithstanding the apparently clear wording referring to companies that did not include the parent operating company, it did so extend.

89.  After citing *Chartbrook Ltd v Persimmon Homes Ltd*, above, Arnold J held that Lilly had consented to the service of proceedings by the parent operating company of the Actavis group and its relevant national subsidiaries and that Actavis Group hf was covered by that consent. The Court of Appeal affirmed the decision: [2013] EWCA Civ 517, [2013] R.P.C. 37.[85] Kitchin LJ said (at paras 40 and 42):

> "... So what would the reasonable person have understood the letter as a whole to mean? ...I think the answer is tolerably clear and driven by business common sense.
>
> ...

---

[82] LC2/11.
[83] LC2/1.
[84] Ehf and hf are forms of Icelandic corporation.
[85] LC2/2.

> If …the reasonable person in the shoes of Lilly and Hogan Lovells did know of the Actavis group structure, he would have realised that Bird & Bird or their clients had made a mistake in calling the group company 'Actavis PTC' because this company did not have trading subsidiaries in each of the relevant territories. He would also have understood that Bird & Bird must have intended to refer to the Actavis group company which did indeed have the relevant trading subsidiaries, that is to say, Actavis Group. Furthermore, he would again have understood Hogan Lovells were, by their letter of 31 July 2012, agreeing to accept service of proceedings brought by those companies."

90. That decision confirms that the court will interpret a contract by reference to "business common sense" if a drafting error has occurred.

91. The second case is *YM Mars Tankers Ltd v Shield Petroleum (Nigeria) Ltd* [2012] EWHC 2652 (Comm).[86] The standard form bill of lading incorporated "the Law and Arbitration Clause" of the charterparty. The charterparty included a clause, headed "Law and Litigation", which provided that disputes involving an amount in excess of $50,000 were to be subject to the jurisdiction of the English court, while lesser amounts were to be subject of arbitration. It was held that, notwithstanding that the bill of lading referred to the "Law and Arbitration Clause" it also incorporated the submission to the jurisdiction of the English court for disputes involving more than $50,000. Gloster J said (at para 30):

> "In my judgment, the 'Law and Arbitration Clause' referred to in the Bill of Lading clearly should be, and would be, construed as a reference to the 'Law and Litigation Clause' in the Head Charterparty. It would be uncommercial to suggest that, simply because the 'Law and Litigation Clause' in the Head Charterparty provides that arbitration should be limited to disputes below a certain level, that somehow meant that only the arbitration provision should be carved out for the purpose of the Bill of Lading. The High Court provisions are all part of the same clause and scheme. It is absurd to suggest that once claims exceed a certain threshold, no jurisdictional provisions are incorporated."

92. That decision was applied in *Caresse Navigation Ltd v Office National de l'Electricité (The Channel Ranger)* [2013] EWHC 3081 (Comm), [2013] 2 CLC 460.[87] The bill of lading incorporated "the law and arbitration clause" of the charterparty. In fact the charterparty did not contain an arbitration clause, but an exclusive English jurisdiction clause with a

---

[86] LC2/38.
[87] LC2/10.

choice of English law. One of the questions was whether the bill of lading incorporated the jurisdiction clause notwithstanding the reference to "arbitration". It was held by Males J that it did. He said (at paras 43 et seq):

"... It seems to me that the question here is essentially one of construction rather than incorporation. Thus, although it can be posed by asking whether the jurisdiction clause in the charterparty is incorporated into the bill of lading, the real question is what the parties should reasonably be understood to have meant by the words 'law and arbitration clause' which plainly contemplate the incorporation of at least one kind of ancillary clause. That is a question to be answered objectively, having regard to the background circumstances, which include the fact that the charterparty does not contain an arbitration clause, but does contain a law and jurisdiction clause. ...

Accordingly, I accept [counsel's] submission that the principle stated by Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 at [25] applies here:

'What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language, and that it should be clear what a reasonable person would have understood the parties to have meant. In my opinion, both of these requirements are satisfied.' "

93.   In each of these cases a purely literal interpretation was rejected in favour of a commercial interpretation of what the parties must have intended. In *Actavis Group HF v Eli Lilly & Co* the defendant's consent to service was interpreted to include a company which was not actually specified indirectly or indirectly by the claimant's solicitors; and in *YM Mars Tankers Ltd v Shield Petroleum (Nigeria) Ltd* and *Caresse Navigation Ltd v Office National de l'Electricité (The Channel Ranger)* a reference in a bill of lading to the "law and arbitration clause" in a charterparty was interpreted to refer to a forum selection clause.

*Overall conclusion*

94.   It is a reasonable inference that the expression "non-exclusive" was, as a result of careless drafting, inserted or left in sub-clause 20(b) in error, perhaps because the drafter was endeavouring to convey the effect of the limited carve-out in sub-clause 20(c) on sub-clause 20(b), when in fact the effect of sub-clause 20(c) would have been rendered better by having the expression "exclusive (subject to sub-clause 20(c)) jurisdiction" in sub-

clause 20(b). [88] It was my invariable experience over 35 years of practice (which more than 10 years on the bench did nothing to dispel) that transaction lawyers (and their clients) are not very familiar with the subtleties and consequences of arbitration and jurisdiction clauses.

95.   But whatever the reason, in my opinion an English court ought to conclude both on linguistic grounds and on the basis of commercial common sense that sub-clause 20(b) is (subject to the carve-out for Brazil in sub-clause 20(c)) a submission to the exclusive jurisdiction of the English court, despite the use of the expression "non-exclusive".

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Lord Collins of Mapesbury

Executed, London, England

July 29, 2014

Declared to before me by the above-named LORD COLLINS OF OF MAPESBURY at London, England this 29th day of July 2014.

Notary Public London, England
(Edward Gardiner)
My Commission Expires with Life

---

[88] I have been shown previous drafts of the Confidentiality Deed, from which it seems that the word "non-exclusive" was carelessly or mistakenly not deleted, or not amended to "exclusive", when the word "shall" was substituted for "may" (at the same time that provision was made for the non-exclusive jurisdiction of the courts of Brazil) in a draft of May 2008. In my opinion it is doubtful whether these drafts would be admissible in English law except in an action for rectification (reformation), and I therefore do not deal with them in this opinion.

**APOSTILLE**
(Convention de La Haye du 5 octobre 1961)

| | |
|---|---|
| **1. Country:**<br>Pays/Pais | United Kingdom of Great Britain and Northern Ireland |
| **This public document**<br>Le présent acte public / El presente documento público | |
| **2. Has been signed by**<br>a été signé par<br>ha sido firmado por | Edward Gardiner |
| **3. Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public |
| **4. Bears the seal/stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public |

**Certified**
Attesté / Certificado

| | | |
|---|---|---|
| **5. at**<br>á / en | London | **6. the**<br>le / el día    30 July 2014 |
| **7. by**<br>par / por | Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs | |
| **8. Number**<br>sous no / bajo el número | K167118 | |
| **9. Seal / stamp:**<br>Sceau / timbre:<br>Sello / timbre: | | **10. Signature:**   J. Farrell<br>Signature:<br>Firma: |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK public official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country which is not party to the Hague Convention of 5th October 1961, it should be presented to the consular section of the mission representing that country.

*To verify this apostille go to www.verifyapostille.service.gov.uk*