# 'EXHIBIT C

# EXHIBIT LC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>                    Plaintiff,<br><br>        -against-<br><br>Vale, S.A., Benjamin Steinmetz, BSG Resources Limited, BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSGR Guinea Ltd. BVI, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR Guinea, Frederic Cilins, Michael Noy, Avraham Lev Ran, Mamadie Touré, and Mahmoud Thiam,<br><br>                    Defendants. | 14 Civ. 3042 (RMB) |

## Exhibits to the Declaration of Lord Collins of Mapesbury

**A. United Kingdom authorities**

1.    *Actavis Group HF v Eli Lilly & Co* [2012] EWHC 3316 (Pat) (extract)

2.    *Actavis Group HF v Eli Lilly & Co* [2013] EWCA Civ 517, [2013] RPC 985 (extract)

3.    *Antaios Compania Naviera SA v Salenia Rederierna AB* [1985] AC 191 (extract)

4.    *A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep 183

5.    *Austrian Lloyd Steamship Co v Gresham Life Assurance Society* [1903] 1 KB 249

6.    *Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8, [2002] 1·AC 251 (extract)

7.    *Bank of New York Mellon v GV Films* [2009] EWHC 2338 (Comm), [2010] 1 Lloyd's Rep 365

8.    *BNP Paribas SA v Anchorage Capital Europe LLP* [2013] EWHC 3073 (Comm)

9.    *British Aerospace Plc v Dee Howard Co.* [1993] 1 Lloyd's Rep 368

10.   *Caresse Navigation Ltd v Office National de l'Electricite (The Channel Ranger)* [2013] EWHC 3081 (Comm), [2013] 2 CLC 480

11.   *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101 (extract)

12.    *Charter Reinsurance Co Ltd v Fagan* [1997] AC 313 (extract)

13.    *Continental Bank v Aeakos Cia Naviera SA* [1994] 1 WLR 588

14.    *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767 (extract)

15.    *East v Pantiles (Plant Hire) Ltd* [1982] 2 EGLR 111

16.    *Evans Marshall & Co Ltd v Bertola SA* [1973] 1 WLR 349 (extract)

17.    *Fiona Trust and Holding Corp v Privalov* [2007] UKHL 40, [2007] Bus LR 1719 (extract)

18.    *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 (extract)

19.    *McGowan v Summit at Lloyd's,* 2002 SC 638

20.    *Montgomery, Jones & Co v Liebenthal & Co* [1898] 1 QB 487

21.    *Ocarina Marine Ltd v Marcard Stein & Co* [1994] 2 Lloyd's Rep 524 (extract)

22.    *Pathé Screen Entertainment Ltd v Handmade Films (Distributors) Ltd,* 1989, transcript  (extract)

23.    *Prenn v Simmonds* [1971] 1 WLR 1381 (extract)

24.    *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900 (extract)

25.    *Royal Bank of Scotland v Highland Financial Partners LP* [2012] EWHC 1278 (Comm), [2012] CLC 109 (extract)

26.    *Royal Bank of Scotland v Highland Financial Partners LP* [2013] EWCA Civ 328, [2013] 1 CLC 596 (extract)

27.    *S&W Berisford plc v New Hampshire Insurance Co* [1990] 2 QB 631

28.    *Sabah Shipyard (Pakistan) Ltd v Republic of Pakistan* [2002] EWCA Civ 1643, [2003] 2 Lloyd's Rep 571

29.    *Schuler AG v Wickman Tools Ltd* [1974] AC 235 (extract)

30.    *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Athena) (No. 2)* [2006] EWHC 2530 (Comm), [2007] 1 Lloyd's Rep 280 (extract)

31.    *Sebastian Holdings Inc v Deutsche Bank AG*  [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep 106 (extract)

32.    *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corp* [2000] 1 Lloyd's Rep 670

33.    *Sirius International Insurance Co v FAI General Insurance Ltd* [2004] UKHL 54 [2004] 1 WLR 3251 (extract)

34.   *Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588

35.   *Standard Bank Plc v Agrinvest International Inc* [2007] EWHC 295 (Comm), [2008] 1 Lloyd's Rep 532

36.   *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG* [2014] EWCA Civ 1010

37.   *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 1 CLC 934 (extract)

38.   *YM Mars Tankers Ltd v Shield Petroleum Co (Nigeria) Ltd* [2012] EWHC 2652 (Comm)

**B. United States authorities**

39.   *Castellano v State of New York*, 374 NE 2d 618 (1978)

40.   *Longo v FlightSafety Intern, Inc,* 2014 WL 880410 (EDNY 2014)

41.   *Shawmut Bank Connecticut, NA v Connecticut Limousine Service, Inc*, 670 A 2d 880 (Conn App Ct 1996)

**C. Academic authorities**

42.   Briggs & Rees, *Civil Jurisdiction and Judgments* (5th ed. 2009), para. 4.45

43.   Dicey, Morris & Collins, *The Conflict of Laws* (15th ed. 2012), paras. 11-131, 12-105

Status: **☐** Positive or Neutral Judicial Treatment

## Actavis Group HF v Eli Lilly and Company

## Medis EHF v Eli Lilly and Company

Case Nos: HC12E02962, HC12A03340

High Court of Justice Chancery Division Patents Court

27 November 2012

**[2012] EWHC 3316 (Pat)**

**2012 WL 5894516**

Before: The Hon Mr Justice Arnold

Date: 27 November 2012

Hearing dates: 14–15 November 2012

### Representation

Richard Meade QC and Thomas Raphael (instructed by Bird & Bird LLP ) for the Claimants.

Stephen Phillips QC and Thomas Mitcheson (instructed by Hogan Lovells International LLP ) for the Defendant.

### Approved Judgment

Mr Justice Arnold:

### Introduction

1 Pemetrexed is a cancer treatment which has been marketed by the Defendant ("Lilly") or its subsidiaries under the brand name Alimta since 2004. It was protected by a basic patent that has been extended by Supplementary Protection Certificates ("the SPCs") which will expire in December 2015. Lilly also owns European Patent No. 1 313 508 ("the Patent"), which will not expire until June 2021, for the use of pemetrexed disodium in combination with vitamin B12 or a pharmaceutical derivative thereof. The Claimants (whom I will refer to as "Actavis" save when it is necessary to distinguish between them) contend that dealings in pemetrexed *dipotassium* will not infringe the Patent. Lilly disputes this. Actavis would like a resolution of this issue in good time for them to enter the market on expiry of the SPCs. Furthermore, Actavis would like the issue to be determined with respect to the French, German, Italian, Spanish and United Kingdom designations of the Patent, which cover the major pharmaceutical markets in Europe, in a single trial. Accordingly, Actavis have commenced these proceedings seeking declarations of non-infringement of each of those designations of the Patent. Actavis do not challenge the validity of the Patent in these proceedings. By the applications which are now before the Court, Lilly seeks declarations that this Court does not have, alternatively should not exercise, jurisdiction in respect of the French, German, Italian and Spanish designations of the Patent. Lilly does not contest the Court's jurisdiction with regard to the UK designation.

### Background

*The parties*

2 The Actavis group of companies is a well-known multinational supplier of generic pharmaceuticals. The Actavis group presently has its headquarters in Switzerland, having moved there from Iceland in 2009. Watson Pharmaceuticals is currently in the process of acquiring the Actavis group, and as a result certain changes have recently been made to the corporate structure of the Actavis group, but for the purposes of the present applications these can be ignored. The ultimate holding company of the Actavis group is Actavis Equity S.àr.l, a company incorporated in Luxembourg. The parent operating company is a company which in July 2012 was called Actavis Group hf ("Actavis Group"), a company incorporated in Iceland. Actavis Group has a considerable number of subsidiaries incorporated in different countries which are responsible for selling the group's products. These include Actavis France, Actavis Deutschland GmbH & Co KG ("Actavis Deutschland"), Actavis Italy SpA, Actavis Spain SA and Actavis UK Ltd. Actavis Group PTC ehf ("Actavis PTC"), a company incorporated in Iceland, is another subsidiary of Actavis Group. Actavis PTC has a number of subsidiaries, including Actavis hf and Medis ehf ("Medis"), both companies incorporated in Iceland; but these do not include the national sales subsidiaries for France, Germany, Italy, Spain or the UK.

3 Lilly is incorporated in the State of Indiana, United States of America. Lilly has a considerable number of subsidiaries, including Eli Lilly and Company Ltd ("Lilly UK"), which is incorporated in England.

*The Patent*

4 The Patent has an earliest claimed priority date of 30 June 2000, a filing date of 15 June 2001 and a date of grant of 18 April 2007. The specification is entitled "Combination containing an antifolate and methylmalonic acid lowering agent". The representative identified on the first page of the specification is as follows:

"Burnside, Ivan John et al

Eli Lilly and Company Limited

European Patent Operations

Lilly Research Centre

Erl Wood Manor

Sunninghill [sic] Road

Windlesham, Surrey GU20 6PH (GB)"

5 The only independent claims are claim 1 and 12, which are as follows:

"1. Use of pemetrexed disodium in the manufacture of a medicament for use in combination therapy for inhibiting tumor growth in mammals wherein said medicament is to be administered in combination with vitamin B12 or a pharmaceutical derivative thereof, said pharmaceutical derivative of vitamin B12 being hydroxocobalamin, cyano-10-chlorocobalamin, aquocobalamin perchlorate, aquo-10-chlorocobalamin perchlorate, azidocobalamin, chlorocobalamin or cobalamin.

12. A product containing pemetrexed disodium, vitamin B 12 or a pharmaceutical derivative thereof said pharmaceutical derivative of vitamin B12 being hydroxocobalamin, cyano-10-chlorocobalamin, aquocobalamin perchlorate, aquo-10-chlorocobalamin perchlorate, azidocobalamin, chlorocobalamin or cobalamin, and, optionally, a folic binding protein binding agent selected from the group consisting of folic acid, (6R)-5-methyl-5,6,7,8-tetrahydrofolic acid and (6R)-5-formyl-5,6,7,8-tetrahydrofolic acid, or a physiologically available salt or ester thereof, as a combined preparation for the simultaneous, separate or sequential use in inhibiting tumor growth."

*The pre-action correspondence*

6 On 12 July 2012 Actavis' solicitors Bird & Bird wrote to Lilly at "C/O Ivan J. Burnside, Lilly Research Centre, Erl Wood Manor, Windlesham, Surrey GU20 6PH". This is Lilly's address for service registered with the Intellectual Property Office in respect of the UK designation of the Patent pursuant to rule 103 of the Patents Rules 2007 . It may be noted that the addresses for service in respect of the French, German, Italian and Spanish designations are the addresses of local patent attorneys in the respective jurisdictions.

7 Given the importance of the terms of this letter to the issues on the present application, it is necessary to set out almost all of it:

"*EP 1 313 508 ("the Patent")*

We represent Actavis Group PTC ehf and its relevant national subsidiaries ("Actavis").

You are registered as the proprietor of European Patent (UK) No. 1 313 508 B1 entitled *"Combination containing an antifolate and methylmalonic acid lowering agent"* that is currently valid until 15 June 2021.

The purpose of this letter is to put you on notice that Actavis wishes at the expiry of SPC/GB05/011 to launch a pemetrexed product for use in the manufacture of a medicament for use in combination therapy for inhibiting tumour growth in mammals in the United Kingdom. At the same time (i.e. upon expiry of the equivalent SPCs) Actavis similarly wishes to launch such a product in other jurisdictions, including but not limited to Germany, France, Italy and Spain.

Actavis is aware of the Patent. We should be grateful if you would treat this letter as relating to the national designations of EP 1 313 508 B1 in Germany (DE60127970 (T2)), France (EP 1 313 508 B1), Italy (ES2284660 (T3)), and the United Kingdom, Actavis has no wish to engage in litigation with you about the Patent but will do so if necessary. The purpose of this letter is to attempt to avoid such litigation.

On this basis and in accordance with section 71 of the Patents Act 1977 and/or the inherent jurisdiction of the Court, our client hereby seeks a written acknowledgement from the proprietor of the Patent that each of the proposed acts alone set out below would not constitute an infringement of the Patent:

1. Actavis imports, keeps, offers for disposal and disposes of medicaments in the United Kingdom containing pemetrexed dipotassium for use in combination therapy for inhibiting tumour growth in mammals wherein said medicament is to be administered in combination with vitamin B12 or a pharmaceutical derivative thereof, said pharmaceutical derivative of vitamin B12 being hydroxocobalamin, cyano-10-chlorocobalamin, aquocobalamin perchlorate, aquo-10-chlorocobalamin perchlorate, azidocobalamin, chlorocobalamin, or cobalamin.

2. Actavis imports, keeps, offers for disposal or disposes of medicaments in the United Kingdom containing pemetrexed dipotassium for use in combination therapy for inhibiting tumour growth in mammals wherein said medicament is to be administered in combination with vitamin B12 or a pharmaceutical derivative thereof, said pharmaceutical derivative of vitamin B12 being hydroxocobalamin, cyano-10-chlorocobalamin, aquocobalamin perchlorate, aquo-10-chlorocobalamin perchlorate, azidocobalamin, chlorocobalamin or cobalamin and a folic binding protein binding agent selected from folic acis, (6R)-5-methly-5,6,7,8-tetrahydrofolic acid and (6R)-5-forinyl-5,6,7,8-tetrahydrofolic acid of a physiologically available salt or ester thereof.

We consider that the answer to the proposed acts should be the same across Europe in relation to the acts specified in the national provisions equivalent to section 60 of the Patents Act . Accordingly, we assume that if you are prepared to provide the declarations sought in accordance with section 71 of the Patents Act that you will also be willing to provide such an acknowledgement that such acts in each and all of the jurisdictions where the Patent is in force or where the national patents specified above are registered would not infringe such patents. We should be grateful if you would also provide us with such a written acknowledgement.

For the avoidance of doubt and given other relevant constraints, Actavis is not planning

an imminent launch of such a product...."

8 It is worth emphasising for the benefit of readers unfamiliar with the procedure under section 71 of the Patents Act 1977 that, as is clear from the letter when read as a whole, numbered paragraphs 1 and 2, although expressed in the present tense, described acts which Bird & Bird's clients proposed to do at some point in the future.

9 On 26 July 2012 Lilly's solicitors Hogan Lovells wrote to Bird & Bird seeking further information about the proposed acts. On the same day Bird & Bird replied providing some, but not all, of the information requested. The letter was headed in the same manner as the letter dated 12 July 2012, and it referred a number of times to "our client". Bird & Bird's letter concluded:

"We consider that your client is, and has been since 12 July 2012, in possession of all the facts that it needs in order to provide the written acknowledgements sought by our client. If the acknowledgments have not been provided to us by 4:00 pm on Tuesday 31 July 2012, our client intends to serve proceedings on your client seeking appropriate declarations from the Court. We should be grateful if you would inform us by return whether or not you are instructed to accept service of such proceedings."

10 On 31 July 2012 Hogan Lovells replied to Bird & Bird's letter dated 26 July 2012. This letter stated:

"We confirm that we are instructed to accept service on behalf of our client."

*The First Claim*

11 In the meantime, this Court issued the Claim Form in claim number HC12E02962 ("the First Claim"), with Particulars of Claim attached, at the request of Bird & Bird on 27 July 2012. The Claimant in the First Claim is Actavis Group and the Defendant is Lilly. The claim is for (1) a declaration pursuant to section 71 of the 1977 Act that dealings in pemetrexed dipotassium in the UK as proposed in Bird & Bird's letter dated 12 July 2012 would not infringe any claim of the UK designation of the Patent and (2) a declaration pursuant to the Court's inherent jurisdiction that dealings in pemetrexed dipotassium in France, Germany, Italy and Spain as proposed in Bird & Bird's letter dated 12 July 2012 would not infringe any claim of the corresponding designations of the Patent. As noted above, there is no challenge to the validity of the Patent.

12 On 1 August 2012 Bird & Bird wrote to Hogan Lovells enclosing "by way of service" the Claim Form, Particulars of Claim and Response Pack in the First Claim. These documents referred to the UK designation of the Patent as "the Patent" and the other four designations as "the Related Patents". The letter went on to say:

"In your letter of 31 July 2012, you confirmed that you were instructed to accept service on behalf of your client (Eli Lilly & Company). As you are aware, the proprietor of the Patent is Eli Lilly & Company. You will also be aware that the proprietor of the Related Patents is the same Eli Lilly & Company. Accordingly, upon receipt by you of this letter and the enclosures Eli Lilly & Company has been served in relation to the action as a whole and that [sic] there is no requirement for our client to go to the time and expense of serving these same proceedings on the addresses for service for the Related Patents."

13 On 15 August 2012 Hogan Lovells filed an acknowledgement of service on behalf of Lilly indicating an intention to contest jurisdiction.

14 On 23 August 2012 Hogan Lovells wrote to Bird & Bird disputing that Bird & Bird's letter dated 1 August 2012 constituted valid service of the Claim Form in the First Claim for two reasons. First, "this firm was not instructed to accept service of a claim by Actavis Group". Secondly, "in any event, [the confirmation given in the letter dated 31 July 2012] was only in respect of appropriate declarations of non-infringement, which would not include declarations in relation to

the foreign designations of EP508". The letter went on to say that Lilly would also contend that this Court did not have, or should not exercise, jurisdiction over the claims for declarations in respect of the non-UK designations of the Patent; but that Lilly accepted that this Court had and should exercise jurisdiction over the claim in respect of the UK designation.

15 On 29 August 2012 Lilly duly filed an application contesting the Court's jurisdiction in respect of the claims in respect of the non-UK designations.

16 On 11 October 2012 Bird & Bird wrote to Lilly "C/O Ivan J. Burnside, Lilly Research Centre, Erl Wood Manor, Windlesham, Surrey GU20 6PH" enclosing "by way of service" the Claim Form, Particulars of Claim and Response Pack in the First Claim without prejudice to their client's contention that the First Claim had already been served.

*The Second Claim*

17 Also on 29 August 2012, this Court issued the Claim Form in claim number HC12A03340 ("the Second Claim"), with Particulars of Claim attached, at the request of Bird & Bird. The Claimant in the Second Claim is Medis and the Defendant is Lilly. Apart from the identity of the Claimant, the Second Claim is identical to the First Claim.

18 On the same day Bird & Bird wrote to both Hogan Lovells and to Lilly "C/O Ivan J. Burnside, Lilly Research Centre, Erl Wood Manor, Windlesham, Surrey GU20 6PH" enclosing "by way of service" the Claim Form, Particulars of Claim and Response Pack in the Second Claim.

19 On 4 September 2012 Hogan Lovells wrote to Bird & Bird disputing that Bird & Bird's letter dated 29 August 2012 constituted valid service of the Claim Form in the Second Claim so far as it related to the non-UK designations of the Patent. The letter went on to reiterate Lilly's contention that this Court did not have, or should not exercise, jurisdiction over the claims for declarations in respect of the non-UK designations of the Patent.

20 On 26 September 2012 Lilly duly filed an application contesting the Court's jurisdiction in respect of the claims in respect of the non-UK designations.

*The German proceedings*

21 On 30 July 2012 Lilly issued proceedings against Actavis PTC and Actavis Deutschland in the Düsseldorf Landgericht (Düsseldorf Regional Court) for threatened infringement of the German designation of the Patent, relying upon Bird & Bird's letter dated 12 July 2012. These proceedings were served on 9 August 2012. Actavis PTC and Actavis Deutschland have challenged the jurisdiction of the Düsseldorf Regional Court on the ground of *lis alibi pendens* . As I understand it, the Düsseldorf Regional Court has yet to rule upon that challenge. The trial of the German proceedings (if not dismissed or stayed on jurisdictional grounds) is scheduled for March 2014.

*France, Italy and Spain*

22 To date, Lilly has not commenced proceedings for threatened infringement of the Patent in France, Italy or Spain.

*European Patent Office opposition*

23 The grant of the Patent was opposed before the European Patent Office by Teva Pharmaceutical Industries Ltd ("Teva"). The opposition was rejected by the Opposition Division at a hearing on 18 November 2010 for reasons given in writing on 27 December 2010. On 3 March 2011 Teva appealed to the Technical Board of Appeal (appeal T 542/11). On 30 October 2012 Actavis Deutschland filed a notice of intervention in the appeal relying upon the German proceedings as providing the basis for its intervention. (In effect, therefore, the Actavis group has voluntarily bifurcated the infringement and validity aspects of its case with respect to the Patent.) There is no application by Lilly to stay these proceedings pending the determination of the appeal.

**Matters not in dispute**

24 It is convenient before turning to the issues to set out a number of matters which are not in dispute.

25 First, Actavis do not suggest that they can found jurisdiction under either Article 2 or Article 5 of Council Regulation 44/2001/EC of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("the Brussels I Regulation"). Given that Lilly is not domiciled in an EU Member State, it follows that the jurisdiction of this Court is a matter for national law, in accordance with Article 4 of the Brussels I Regulation . (The same is true with regard to the Brussels and Lugano Conventions.)

26 Secondly, Actavis have not sought, and therefore have not obtained, permission to serve either the First Claim or the Second Claim on Lilly out of the jurisdiction. Nor have Actavis suggested that they would be able to obtain permission to serve Lilly out of the jurisdiction on any of the grounds specified in CPR Practice Direction 6B paragraph 3.1.

27 Thirdly, if the Claim Form in the First Claim has been validly served on Lilly, the issue of the Claim Form on 27 July 2012 seized the English court of that claim for the purposes of *lis pendens* under Article 30(1) of the Brussels I Regulation . Actavis contend that it follows that, if this Court has jurisdiction over the claim in respect of the German designation of the Patent, this Court is the first seized of that claim, rather than the Düsseldorf Regional Court.

28 Fourthly, Lilly does not dispute that the claims raised in the First and Second Claims with regard to the non-UK designations of the Court are justiciable before this Court (i.e. that this Court has subject matter jurisdiction). In the light of the decision of the *Supreme Court in Lucasfilm Ltd v Ainsworth [2011] UKSC 39, [2012] 1 AC 208* , Lilly has not sought to argue that such claims are not justiciable before this Court by virtue of the Moçambique rule ( *British South Africa Co v Cia de Moçambique [1893] AC 602* ) even though they concern patents rather than copyrights. I shall return to this point below.

29 Fifthly, as noted above, Actavis have not challenged the validity of the Patent in either the First or Second Claim. Furthermore, Actavis have undertaken not to challenge validity, or to contend that the Patent is invalid, in these proceedings either by way of claim or by way of defence to any counterclaim for infringement if this Court accepts jurisdiction over the First and/or Second Claims. In these circumstances counsel for Lilly accepted that this Court was not required to decline jurisdiction by virtue of Article 22(4) of the Brussels I Regulation , which confers exclusive jurisdiction over challenges to the validity of registered intellectual property rights on the courts of the States where they are registered: see Case C-4/03 Gesellschaft für Antriebstechnik mbH & Co KG v Lamellen und Kupplungsbau Beteilungs KG [2006] ECR I-6523 at [16]. He nevertheless sought to rely upon Article 22(4) as part of Lilly's argument on *forum non conveniens* , as I shall explain below.

30 Sixthly, it is common ground that the law applicable to the question of whether this Court has power to grant declarations as to whether Actavis' proposed acts would infringe each of the non-UK designations of the Patent is English law as the *lex fori* , since this is a question of procedure or remedy. Furthermore, Lilly does not dispute that under English law, if Actavis can demonstrate that they have a "real commercial reason" for seeking declaratory relief, then the Court can grant such declarations pursuant to its inherent jurisdiction: see *Nokia Corp v InterDigital Corp [2006] EWCA Civ 1618, [2007] FSR 23* . For the avoidance of doubt, Lilly has not conceded that Actavis do have a real commercial reason.

31 Seventhly, it is common ground that, by virtue of Article 8(1) of European Parliament and Council Regulation 864/2007/EC of 31 July 2007 on the law applicable to non-contractual regulations ("the Rome II Regulation"), the law applicable to the question of whether Actavis' proposed acts would infringe each non-UK designation of the Patent is the substantive patent law of that country. Accordingly, unless Lilly chooses not to raise any issue as to foreign law (in which case this Court will assume that the foreign laws are no different to English law) or the parties agree that the questions of whether Actavis' proposed acts would infringe each of the designations of the Patent should all be tried by reference to another law, then this Court will be required to apply French law to determine whether there would be infringement of the French designation, German law to determine whether there would be infringement of the German designation and so on.

32 Eighthly, it is common ground that, since France, Germany, Italy, Spain and the United

Kingdom are all Contracting States to the European Patent Convention , each of those countries is obliged to give effect in its national substantive patent law to Article 69 EPC and the Protocol on the Interpretation of Article 69 . As is well known, in theory this should mean that each country's courts adopt the same approach to determining the scope of protection of a patent; but in practice there appear to be differences between the jurisprudence of the different countries, particularly with regard to equivalents. The extent of these differences, and the extent to which such differences are responsible for different outcomes when the same European patent is litigated in different countries (as opposed to other factors, such as different evidence, different procedures and the fact that even within one country courts often disagree with each other on questions of patent interpretation) are much debated. I shall return to this point below.

33 Ninthly, it is common ground that, since France, Germany, Italy, Spain and the UK all signed the Agreement relating to Community Patents to which the Community Patent Convention as revised in 1989 was annexed, each of those countries has implemented Articles 25 and 26 CPC in its national laws even though the CPC never came into force. In the United Kingdom Articles 25 and 26 CPC are implemented by section 60 of the 1977 Act. Lilly has adduced no evidence that there is any difference between the provisions of section 60 and the corresponding provisions of French, German, Italian and Spanish law that is material to the question of whether Actavis' proposed acts would infringe the relevant designations of the Patent. While there has been no corresponding harmonisation of national laws on accessory liability, Lilly has not adduced any evidence that there is any difference between the relevant national laws that is material to the question of whether Actavis' proposed acts would infringe the relevant designations of the Patent.

34 Tenthly, Actavis have not suggested that this Court is prevented by the Brussels I Regulation from granting a stay of the First and Second Claims so far as they relate to the non-UK designations of the Patent on *forum non conveniens* grounds (compare cases such as *Case C-281/02 Owusu v Jackson [2005] ECR I-1383* ).

**The issues**

35 The issues arising on Lilly's applications are as follows:

  i) Was service of the First Claim validly effected:

  a) under the consent for service contained in Hogan Lovells' letter dated 31 July 2012,

  b) under CPR r. 63.14 , and/or

  c) under CPR r. 6.9 ?

  ii) Was service of the Second Claim validly effected under the consent for service? (The issues under CPR rr. 63.14 and 6.9 are identical for the Second Claim.)

  iii) If the consent for service covers the First (or Second) Claim, was it also a consent to jurisdiction?

  iv) If service has been validly effected, but there has been no consent to jurisdiction, should the Court decline to exercise its jurisdiction on the ground of *forum non conveniens* ?

**Was service of the First Claim validly effected under the consent for service?**

*The law*

36 Although the consent for service is not strictly a contract, it is common ground that it should be interpreted in accordance with the principles of contractual interpretation stated by Lord Hoffmann in *Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896* at 912–913. As Lord Hoffmann summarised it in the later cases of *Bank of Credit and Commerce International SA v Ali [2001] UKHL 8, [2002] 1 AC 251* at [37] and *Chartbrook Ltd v Persimmon Homes Ltd [2009] UKHL 38, [2009] 1 AC 1011* at [14], the correct approach is to ask what a reasonable person having all the background knowledge which would have been available to the parties at the time would have understood them to be using the language of the contract to mean.

37 The fourth principle stated by Lord Hoffmann in Investors Compensation Scheme re-states his earlier observation in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd [1997] AC 749* at 775:

"The meaning of words, as they would appear in a dictionary, and the effect of their syntactical arrangement, as it would appear in a grammar, is part of the material which we use to understand a speaker's utterance. But it is only a part; another part is our knowledge of the background against which the utterance was made. It is that background which enables us, not only to choose the intended meaning when a word has more than one dictionary meaning but also, in the ways I have explained, to understand a speaker's meaning, often without ambiguity, when he has used the wrong words."

38 The fifth principle was stated by Lord Hoffman at 913 as follows:

"The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had."

39 In Chartbrook Lord Hoffmann acknowledged at [15] that "it clearly requires a strong case to persuade the court that something must have gone wrong with the language".

*Assessment*

40 As noted above, Lilly disputes that the letter dated 31 July 2012 gave consent to service of the First Claim for two reasons. Before I turn to consider those reasons, it is worth noting that Lilly has not suggested that the scope of Hogan Lovells' actual authority to consent to service is relevant to the enquiry.

Did the consent extend to a claim by Actavis Group?

41 Lilly contends that it only consented to service of a claim by the companies identified in Bird & Bird's letter dated 12 July 2012, namely "Actavis Group PTC ehf and its relevant national subsidiaries". As is common ground, however, Actavis Group is neither Actavis PTC nor a subsidiary of Actavis PTC. Actavis contend that the reasonable person having all the background knowledge available to the parties as at 31 July 2012 would have understood Bird & Bird's letter dated 26 July 2012 to have requested, and Hogan Lovells' letter dated 31 July 2012 to have given, consent to service of proceedings by the parent operating company of the Actavis group and its relevant national subsidiaries regardless of their precise identities.

42 In assessing these rival contentions, the starting point is to identify the background knowledge available to the parties as at 31 July 2012. Since it is Lilly that was being asked to consent to service, it is the knowledge available to Lilly which matters. I do not understand it to be disputed that Lilly knew that the Actavis group is a multinational supplier of generic pharmaceuticals and that companies in the group are frequent litigants in patent disputes before this Court. The

evidence in support of Lilly's application in the First Claim includes a print-out of a D&B Global Reference Solution search showing the structure of the Actavis group carried out by Hogan Lovells on 2 August 2012. It is not disputed that a search on 31 July 2012 would have yielded the same result, and accordingly this information was available to Lilly at that date. The search shows that (i) Actavis Group is (ignoring what appears to be a holding company) the parent company of the group, (ii) Actavis Group has a large number of national subsidiaries (including in Germany, Italy and the UK), (iii) Actavis PTC is a subsidiary of Actavis Group (and not vice-versa) and (iv) Actavis PTC only has active subsidiaries in Iceland (one of which is Medis).

43 It should be noted that Actavis has included in its evidence on these applications a confidential document showing the actual structure of the Actavis group as at July 2012. This shows that the structure shown by the D&B search is in fact inaccurate and incomplete. For example, it includes Actavis Group's French and Spanish subsidiaries, whereas the D&B search does not. As counsel for Lilly accepted, however, this information shown in the confidential document was not available to Lilly as at 31 July 2012.

44 Lilly has sought to rely upon the fact that 33 out of 34 marketing authorisations granted by the Medicines and Healthcare Regulatory Agency to the Actavis group this year were granted to Actavis PTC. I am unconvinced that this information was background knowledge which was available to the parties as at 31 July 2012, since it only emerged in Lilly's reply evidence. Although I accept that the information was in the public domain, that indicates that, even when challenging this Court's jurisdiction, Lilly and its lawyers did not initially think that it was relevant to search for that information. Even if it was background knowledge available to the parties as at 31 July 2012, however, I do not regard it as significant. This is because, once a marketing authorisation has been granted to one company in a group, it can be relied on by other companies in the group (including a parent and a subsidiary).

45 The next thing to consider is whether and to what extent the reasonable person would have understood the precise identity of the prospective claimants to be important to the consent which was given. There are three aspects to this enquiry.

46 The first is the information which was provided in Bird & Bird's letter dated 12 July 2012. This stated that Bird & Bird acted for "Actavis Group PTC ehf and its relevant national subsidiaries". It is common ground that "relevant" would have been understood to mean "relevant to the designations of the Patent mentioned below", but the letter did not identify the "relevant national subsidiaries" in question. If the identity of the intended claimants was a matter of concern to Lilly, one would have expected Hogan Lovells to ask for further information about this before consenting to service. It did not do so.

47 The second aspect is the substantive claim. In some cases, the identity of the prospective claimant will be important to the prospective defendant, and hence to the interpretation of any consent to service, because it is relevant to the substantive claim: see, for example, Firstdale Ltd v Quinton [2004] EWHC 1926 (Comm). In the present case, the claims are claims for declarations pursuant to the Court's inherent jurisdiction that proposed acts would not infringe the non-UK designations of the Patent. In my judgment the identity of the person who proposes to do the acts is irrelevant to that question. The identity of the claimant may be relevant to the question of whether the claimant has a real commercial reason for seeking declaratory relief, but in my view it is manifest that the Actavis group does have a real commercial reason. I cannot see that it really matters for that purpose precisely which company or companies in the group brings the claim. (I should make it clear, however, that in saying this I am not intending to prejudge any arguments about the *res judicata* effect of any declarations which Actavis may obtain.)

48 The third aspect is procedural. In some cases, the identity of the prospective claimant will be important to the prospective defendant because it is relevant to procedural questions such as disclosure, compellability of witnesses and security for costs. In the present case Lilly does not suggest that the precise identity of the claimant(s) affects any of these questions. It is unlikely that any company in the Actavis group will have any disclosable documents and it is unlikely that any company in the Actavis group will have any compellable witness, since the primary — and probably the only — issue in the First and Second Claims will be the construction of claims 1 and 12 of the Patent. Lilly has not sought security for costs, and in any event it has not suggested that it would make any difference to such an application whether the claimant was Actavis Group or Actavis PTC.

49 Counsel for Lilly argued that the words "Actavis Group PTC ehf and its relevant national subsidiaries" were perfectly clear, that there was nothing to suggest that anything had gone wrong with the language and that they should therefore be given their natural and ordinary meaning.

50 Counsel for Actavis argued that the reasonable person equipped with the background knowledge would realise that Bird & Bird or their clients (in fact it was their clients) must have made a mistake in referring to Actavis PTC rather than Actavis Group, since Actavis PTC did not appear to be the parent operating company of the Actavis group and did not have any relevant national subsidiaries. He drew an analogy with the tenant's letters in Mannai , which said "12 January 1995" when the tenant meant 13 January 1995.

51 Counsel for Actavis also argued that the reasonable person would conclude that, when Hogan Lovells stated on 31 July 2012 that Lilly consented to service, Lilly was not concerned as to the precise identity of the prospective claimant. In this connection he drew an analogy with the case of Front Carriers Ltd v Atlantic and Orient Shipping Corp [2007] EWHC 421 (Comm), [2007] 2 Lloyds Rep 131 , in which Langley J held that the communications between the parties showed that the defendant had intended to contract with the disponent owner of the vessel. The defendant did not care who that was provided it was a member of the claimant's group. Accordingly, a contract had been formed between the claimant and the defendant, even though the draft contract referred to another company with a similar name.

52 I prefer the arguments of counsel for Actavis. Accordingly, I conclude that Lilly consented to the service of proceedings by the parent operating company of the Actavis group and its relevant national subsidiaries and that Actavis Group is covered by that consent.

### Did the consent extend to a claim in respect of the non-UK designations of the Patent?

53 Lilly contends that it only consented to service of a claim in respect of the UK designation. Actavis contend that Lilly also consented to service of claims in respect of the French, German, Italian and Spanish designations.

54 Counsel for Actavis argued that Bird & Bird's letter dated 12 July 2012 made it crystal clear in the second and third paragraphs that it was concerned with the position in France, Germany, Italy and Spain as well as the UK and that it sought both "a written acknowledgement" in relation to the UK and "a written acknowledgement" in relation to the other jurisdictions. He further argued that Bird & Bird's letter dated 26 July 2012 had clearly stated that if "the acknowledgements [plural]", which must mean all the acknowledgements sought in the 12 July letter, were not provided, Actavis intended to serve proceedings seeking "appropriate declarations [plural]", which must mean declarations in respect of the matters not acknowledged, from "the Court" [singular]", which could only mean this Court. It then asked whether Hogan Lovells were instructed to accept service of "such proceedings", which could only mean proceedings in this Court seeking those declarations.

55 Counsel for Lilly argued that the correspondence had to be read against the background that claims for declarations of non-infringement of foreign designations of patents were almost unprecedented. While I accept that that is so, it seems to me that the importance of that factor is considerably tempered by the impact of the Supreme Court's decision in Lucasfilm on 27 July 2011 . As any experienced intellectual property solicitor, such as those representing Lilly, would have known, that decision made it much easier for parties to argue that the claims concerning infringement and non-infringement of foreign patents were justiciable in this Court. Thus it was only a matter of time before a case such as this one presented itself.

56 Counsel for Lilly also sought to rely upon the fact that Lilly had instructed Hogan Lovells to issue proceedings in Germany prior to 26 July 2012, and those proceedings were issued on 30 July 2012. As he accepted in the course of argument, however, those facts do not form part of the relevant background knowledge, since Actavis only became aware of the German proceedings on 9 August 2012.

57 Counsel for Lilly went on to dispute counsel for Actavis' reading of the correspondence. He fastened on the word "declarations" in the second sentence of the paragraph following numbered paragraph 2 in the 12 July letter. He argued that the word "declarations" in the 26 July letter referred back to those declarations, that is to say, declarations under the 1977 Act in respect of

# ACTAVIS GROUP HF v ELI LILLY & CO
# AND
# MEDIS EHF v ELI LILLY & CO

COURT OF APPEAL

Longmore, Lloyd and Kitchin L.JJ.: 22 April and 21 May 2013

[2013] EWCA Civ 517, [2013] R.P.C. 37

H1 *European Patent – Declaration of non-infringement – Jurisdiction – Foreign designations – Service – Whether service of proceedings accepted – Construction of pre-action correspondence – Whether service effected at a place of business in the UK – Whether service at place of business in the UK effective in relation to proceedings concerning foreign designations – Appeal to Court of Appeal*

H2     Civil Procedure Rules, rr.6.9, 63.14

The claimants in both actions were suppliers of generic pharmaceuticals. They were both members of the Actavis group of companies. They sought declarations (pursuant to s.71 of the Patents Act 1977 and in the inherent jurisdiction of the court) that a product which they proposed to market did not infringe the UK, French, German, Italian or Spanish designations of European Patent No. 1,313,508 ("the Patent") the claims of which were directed to the use of a compound called pemetrexed in the form of its disodium salt. The validity of the Patent was not in issue. Pemetrexed was the active ingredient of a cancer treatment marketed by the defendant ("Lilly") under the name Alimta and which was the subject of a supplementary protection certificate ("SPC") due to expire in December 2015. However the Patent was not due to expire until 2021. Lilly was the proprietor of both the SPC and the Patent.

H3     The product the claimants proposed to market included pemetrexed dipotassium and would compete with Alimta. They accepted that they could not market it until after the expiry of the SPC. However, they contended that the issue of infringement was a short one, that it needed to be resolved before the expiry of the SPC and that it would be far more convenient to determine the matter in relation to all five national designations of the Patent at a single trial. Lilly challenged the court's jurisdiction to determine the issues arising in relation to the foreign designations and also contended that there had been no proper service of the proceedings upon it.

H4     As to jurisdiction, Lilly contended that the court should decline to hear the claims in respect of the foreign designations on grounds of *forum non conveniens*. In particular, it did not accept that the claimants' proposed product would not infringe and contended that the determination of that issue would involve consideration of the relevant laws of construction and contributory infringement applying in relation to each designation. Although the UK was the appropriate jurisdiction to determine infringement in relation to the UK designation, the issue of infringement in relation to the others would more conveniently be dealt with in each of the respective territories.

986                          ACTAVIS GROUP HF V ELI LILLY & CO

H5      This was not a case in which the court was required to decline jurisdiction under
art.22(4) of Council Regulation 44/2001/EC ("Brussels I") as the claimants had
undertaken not to challenge the validity of the Patent or to contend that it was
invalid in the present proceedings if the court accepted jurisdiction. Further, Lilly
did not contend that infringement of the foreign designations was not justiciable
before the Patents Court. However many of the same factors which led the Court of
Appeal to conclude that foreign copyright claims were not justiciable in *LucasFilm
Ltd v Ainsworth*[1] were relied upon by Lilly as supporting its contention that
jurisdiction should be declined on *forum non conveniens* grounds.

H6      As to service, the following issues arose, namely (i) whether Lilly had (acting by its
solicitors) agreed to accept service of the proceedings in the first action, (ii) whether
service in either action had been properly effected on Lilly under CPR r.6.9 at a place
of business in the jurisdiction, and (iii) whether service had been properly effected in
either action under CPR r.63.14 on the basis that the claims concerned the UK
designation of the Patent.

H7      As to (i), this involved construing the relevant letter before action and subsequent
open correspondence. Lilly contended that, properly construed, its solicitors had
agreed to accept service of proceedings brought by Actavis PTC and its relevant
national subsidiaries, not proceedings brought by the claimant, Actavis Group. Even
if (which was denied) service had been accepted, this did not extend to the acceptance
of service of proceedings in respect of the foreign designations. As to (ii), service had
been effected at the Lilly Research Centre at Windlesham. This was the research and
development centre of Eli Lilly and Company Ltd ("Lilly UK"), the home of the
European Patent Operations Department, and human health regional sales and
marketing activities were carried on there. It was also Lilly's address for service
registered with the UK Intellectual Property Office ("IPO") in respect of the UK
designation of the Patent pursuant to Patents Rules 2007, r.103. The argument in
relation to (iii) turned upon whether the foreign designations "related to" the
registered right because they were designations of the same patent and identically
worded.

H8      At first instance, Arnold J. dismissed Lilly's applications.[2] He held that there had
been consent to service of the proceedings in the first action, that this included
proceedings in relation to the foreign designations as well as the UK designation
and that the proceedings had been validly served on Lilly at Windlesham in
accordance with CPR r.6.9, but not CPR r.63.14. Having consented to jurisdiction,
Lilly could not now contest jurisdiction on *forum non conveniens* grounds. As to
the second action, he held that any consent to the service of proceedings had been
withdrawn before service had been effected and that the proceedings had been
validly served upon Lilly at Windlesham in accordance with CPR r.6.9, but not
under CPR r.63.14. Had there been no consent to the service of proceedings in
the first action, the proceedings would not have been stayed on grounds of
*forum non conveniens* as Lilly had not shown that the courts of France, Germany,
Italy and Spain were the appropriate fora. The reasons given by the Supreme
Court in *LucasFilm Ltd v Ainsworth*[3] when overturning the decision of the

---

[1] [2009] EWCA Civ 503, [2010] F.S.R. 10, CA, overturned on appeal to the Supreme Court: see [2011] UKSC 39, [2011] F.S.R. 41, SC.
[2] [2012] EWHC 3316 (Pat).
[3] [2011] UKSC 39, [2011] F.S.R. 41, SC.

Court of Appeal and determining that the foreign copyright issues raised in that case were justiciable were equally relevant to the operation of the *forum non conveniens* doctrine. Further, it had not been suggested that any of the courts of the other designated states would both have and exercise jurisdiction to hear them all together. The choice was between determining all five claims together or having five claims tried separately in different national courts. Arnold J. rejected arguments based upon differences in national approach and the relative speed of proceedings.

H9     Lilly appealed. On the appeal in relation to the first action, the Court of Appeal formed the view that it unnecessary to go further than to decide whether there had been an agreement to accept services of the proceedings. The parties agreed that this disposed of the appeal in the first action and that the second action was redundant in the circumstances. Nonetheless they asked the court to express its conclusion on the other issues in relation to service (but not *forum conveniens*) on the basis that there was now a third action also on foot in which those issues may be determinative. The Court of Appeal duly did so.

H10     **Held,** dismissing the appeal in the first action

*Agreement to accept service*

H11     (1) The judge had been right to conclude that Lilly had consented to service of proceedings brought by the parent operating company of the Actavis group and its relevant national subsidiaries, and that the claimant in the first action was covered by that consent. Even if the reasonable person in the shoes of Lilly and its solicitors did not know of the Actavis group structure, that person would have thought the letter before action had been written on behalf of the trading subsidiaries which would sell the proposed product and their parent company and would have understood the letter from Lilly's solicitors as agreeing to accept service of proceedings brought by those companies. If they did know of the Actavis group structure, they would have realised that those acting for the claimant in the first action had made a mistake in the letter before action and must have intended to refer to the Actavis group company which did indeed have the relevant trading subsidiaries, that is to say, Actavis Group. ([41]–[43])

H12     (2) The judge had been right to conclude that the first claim was validly served under that consent for service. Lilly's submissions were based upon a wholly artificial reading of the correspondence. Actavis Group was therefore entitled to have all of its claims determined in this jurisdiction. It was the company which, through its various national subsidiaries, wished to market a product in competition with Alimta. ([53])

*Place of business in the UK*

H13     (3) (Obiter) The patent department and regulatory activities carried on at Windlesham were, at least in significant part, Lilly's own business. In dealing as they did with Lilly's own patents, the relevant personnel were prosecuting, managing and defending patents on Lilly's behalf and maintaining vital protection for Lilly's global pharmaceutical business. So also the regulatory activities were carried out for Lilly and in Lilly's name. Service had accordingly been validly effected upon Lilly therein accordance with CPR r.6.9. ([73]–[75])

988                      ACTAVIS GROUP HF v ELI LILLY & CO

*CPR 63.14*

H14     (4) (Obiter) The judge had been right to reject the argument that service had been
properly effected in relation to the foreign designations. Foreign designations of a UK
patent were not patents under the 1977 Act and CPR 63.14 did not provide a means of
service in relation to them. Nor was the position any different if the claim form also
included a claim in respect of the UK designation. In such a case the claim form was
to be regarded as including separate claims in respect of each designation and CPR
r.63.14 only provided a means for its service in so far as it related to the UK
designation. Were the position otherwise, the provisions of CPR r.63 could be
circumvented by convoying claims in respect of foreign patents with a claim in
respect of a corresponding UK patent. That would be an absurd result and one
which could not have been intended. ([81], [82])

H15     **Cases referred to in the judgment:**
       *Adams v Cape Industries Plc* [1990] Ch 433, [1990] 2 WLR 657, CA
       *Aktieselskabet Dampskib "Hercules" v Grand Trunk Pacific Railway Company*
       [1912] KB 222, CA
       *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, SC
       *South India Shipping Corporation Ltd v The Export-Import Bank of Korea* [1985] 1
       WLR 585, [1985] 2 All ER 219, CA

H16     *Stephen Phillips Q.C.* and *Roger Wyand Q.C.*, instructed by *Hogan Lovells
       International LLP*, appeared for the defendant/appellant.
       *Richard Meade Q.C.* and *Thomas Raphael*, instructed by *Bird & Bird LLP*, appeared
       for the claimants/respondents.

       **Kitchin L.J.:**

       **Introduction**

1       This is an appeal from the decision of Arnold J. dated 27 November 2012 and his
consequential order in a dispute about jurisdiction in two related patent actions. The
claimants, Actavis Group hf ("Actavis Group") in the first action, and Medis ehf
("Medis") in the second, are both companies in the Actavis group of companies, a
well known supplier of generic pharmaceuticals. I will refer to the claimants
collectively as "Actavis".
2       The defendant, Eli Lilly & Company ("Lilly"), is incorporated in the State of
Indiana, USA and is a major research-based pharmaceutical company. It has
operating subsidiaries in many countries, including Eli Lilly & Company Ltd
("Lilly UK") which is incorporated in England.
3       One of Lilly's important products is a cancer treatment called Alimta which
contains as its active ingredient a compound called pemetrexed. Alimta was
covered by a basic patent which has now reached the end of its term but
the protection it afforded to Alimta has been extended by Supplementary
Protection Certificates (SPCs) which will expire in December 2015. Lilly also
owns European Patent No 1 313 508 ("the Patent") which has designations in
the UK, France, Germany, Italy and Spain and which will not expire until 2021.
Its claims are, however, directed to the use of pemetrexed in the form of its
disodium salt.

Published by Oxford University Press for the Intellectual Property Office

just in the UK but also in Germany, France, Italy and Spain. These are all territories in which Lilly has a designation of the Patent which would threaten the proposed launch. So Actavis, in an attempt to avoid litigation, was seeking an acknowledgement that the product and the proposed sales activities of the trading subsidiaries would not infringe those foreign designations. The subsidiaries must therefore be the Actavis trading subsidiaries in each of the territories to which reference is made. It necessarily follows too that the relevant Actavis parent company is the parent of those subsidiaries.

40      This analysis presents a difficulty because Actavis PTC is not in fact the parent of those subsidiaries. So what would the reasonable person have understood the letter as a whole to mean? Would he have understood the letter to have been written on behalf of Actavis PTC and its subsidiaries, irrespective of the nature of their businesses? Or would he have understood the letter to have been written on behalf of the trading subsidiaries which would sell the proposed product and their parent? I think the answer is tolerably clear and driven by business common sense.

41      If (as Lilly urges, but I do not, for the reasons I have given, accept) the reasonable person in the shoes of Lilly and Hogan Lovells did not know of the Actavis group structure, he would have thought the letter had been written on behalf of the trading subsidiaries which would sell the proposed product, and also their parent, whatever its name might be. So also he would have understood Hogan Lovells were, by their letter of 31 July 2012, agreeing to accept service of proceedings brought by those companies.

42      If, on the other hand, the reasonable person in the shoes of Lilly and Hogan Lovells did know of the Actavis group structure, he would have realised that Bird & Bird or their clients had made a mistake in calling the group company "Actavis PTC" because this company did not have trading subsidiaries in each of the relevant territories. He would also have understood that Bird & Bird must have intended to refer to the Actavis group company which did indeed have the relevant trading subsidiaries, that is to say, Actavis Group. Furthermore, he would again have understood Hogan Lovells were, by their letter of 31 July 2012, agreeing to accept service of proceedings brought by those companies.

43      It follows that I believe the judge was right to conclude that Lilly consented to service of proceedings brought by the parent operating company of the Actavis group and its relevant national subsidiaries, and that Actavis Group is covered by that consent.

*Did Lilly agree to accept service of proceedings in respect of the foreign designations?*

44      Lilly argues that Bird & Bird's letter of 12 July 2012 sought acknowledgments and declarations in accordance with s.71 of the 1977 Act or under the inherent jurisdiction of the Court that particular acts in the UK would not constitute infringement. Accordingly, it says, these acknowledgments and declarations must relate to the UK designation. The letter then continues with regard to the different national provisions across Europe:

> "Accordingly, we assume that if you are prepared to provide the declarations sought in accordance with section 71 of the Patents Act that you will also be willing to provide such an acknowledgement that such acts in each and all of the jurisdictions where the Patent is in force or where the national patents specified

above are registered would not infringe such patents. We should be grateful if you would also provide us with such a written acknowledgement."

45      Lilly draws attention to the contrast between the request for "declarations" in respect of the UK designation and mere "acknowledgments" sought in respect of the foreign designations. Nowhere, Lilly continues, does the letter suggest that proceedings would be brought in England in respect of the foreign designations. The reasonable person would therefore have concluded that Bird & Bird were seeking acknowledgements and declarations in respect of non-infringement of the UK designation and, if those could be given, for acknowledgements in respect of the foreign designations. If, however, the acknowledgments could not be given, Actavis PTC was threatening to launch proceedings in this jurisdiction for declarations of non-infringement of the UK designation, and in other jurisdictions for relief in respect of the foreign designations.

46      As for the letter from Bird & Bird of 26 July 2012, Lilly submits that the nature of the "appropriate declarations" to which it refers was not explained. But reference back to the letter of 12 July shows that the declarations referred to must be those relating to the UK, these being the two enumerated declarations set out in the fifth paragraph and, indeed, the only declarations referred to anywhere in that letter.

47      Lilly then refers to Hogan Lovell's agreement in their letter of 31 July 2012 that they were instructed to accept service on behalf of their client and says this could only have extended to proceedings whose ambit had been set out clearly and precisely.

48      Finally, Lilly points to the letter of 1 August 2012 from Bird & Bird which purported to effect service on Hogan Lovells and the statement it contains that because Lilly was also the proprietor of the foreign designations, there was no requirement for the proceedings to be served on the addresses for service of those designations in their respective territories. Lilly continues there would have been no requirement to do this had Bird & Bird understood that consent had been provided by Hogan Lovells in the manner for which Actavis contend.

49      In my judgment Lilly's submissions are based upon a wholly artificial reading of the correspondence. The letter of 12 July 2012 says in terms that it relates to the national designations of the Patent in Germany, France, Italy, Spain and the UK. It then seeks a written acknowledgement pursuant to s.71 of the 1977 Act or under the inherent jurisdiction of the English courts that the acts specified in the two enumerated sub-paragraphs would not infringe the UK designation. Turning to the foreign designations, it says that they (that is to say Bird & Bird) assume that if Lilly is prepared to provide the declarations sought in respect of the UK designation it will also be willing to provide acknowledgements that such acts would not infringe the foreign designations. The letter continues: "We require the written acknowledgements within 14 days of today's date". This plainly refers to the acknowledgements requested in respect of both the UK and foreign designations.

50      On 26 July 2012, Bird & Bird wrote again stating that if the acknowledgments were not provided by 4.00pm on 31 July 2012, they intended to serve proceedings seeking appropriate declarations from "the Court". It would have been clear to any reasonable person that this meant proceedings in England seeking declarations from the English court in respect of the subject matter of both sets of acknowledgements which had been requested, namely in respect of both the UK and foreign designations. The letter concluded with the request that Hogan Lovells inform them whether they were instructed to accept service of such proceedings.

51      The response from Hogan Lovells on 31 July confirmed that they were instructed to accept service on behalf of Lilly. This would have come as no surprise to a reasonable person because, as the judge himself observed, it is clear that the English court has jurisdiction to entertain claims for infringement of foreign intellectual property rights provided validity is not in issue and there is a basis for exercising jurisdiction over the defendant.

52      Finally, I see nothing in the letter from Bird & Bird of 1 August 2012 which bears on this. The letter simply records that, consent for service having been given, there would be no need to serve proceedings on addresses for service of the foreign designations.

53      It follows that the judge was right to conclude as he did that the first claim was validly served under the consent for service. It also follows that the appeal in relation to the first action must be dismissed. Actavis Group is therefore entitled to have all of its claims determined in this jurisdiction. It is the company which, through its various national subsidiaries, wishes to market a product in competition with Alimta. Accordingly, as all parties accepted, the second action becomes redundant.

**Issue (ii): was service validly effected under CPR 6.9?**

54      CPR 6.9(2) permits service of proceedings on an overseas corporation at "any place in the jurisdiction where the corporation carries on its activities; or at any place of business of the company within the jurisdiction". As the judge explained, this provision is the successor to a series of earlier provisions going back to RSC Order IX r.8, and although the CPR constitute a new procedural code, it was common ground that in this area the earlier authorities remain relevant and persuasive.

55      There was no dispute as to the relevant general principles established by those authorities. A place of business needs to be fixed and definite, and the activity must have been carried on there for a sufficient time for it to be characterised as a business. However, it is not necessary to establish that a substantial part of the business of the corporation is carried on from the place in question, and a corporation may have a place of business even if the activities carried on there are incidental to the main objects of the corporation: *South India Shipping Corporation Ltd v Export-Import Bank of Korea* [1985] 1 WLR 585 (CA), [1985] 2 All ER 219. So, for example, in *Aktieselskabet Dampskib "Hercules" v Grand Trunk Pacific Railway Company* [1912] KB 222, the defendant was incorporated in Canada for the purpose of constructing and working a railway there, its main office being in Montreal. Four directors resident in London formed a committee to make contracts on behalf of the company for the purpose of raising loan capital. This constituted the carrying on of business in this country.

56      As the editors of Dicey, Morris and Collins, The Conflict of Laws (15 edn), say at 11-119, the Companies Act 2006 makes provision for the service of documents on a foreign corporation whose particulars are registered, and this does, as a practical matter, deal with the majority of cases. A real problem is only likely to arise in a case such as this where the corporation's business is said to be carried on by a representative or agent. In *Adams v Cape Industries Plc* [1990] 1 Ch 433, [1990] 2 WLR 657, this court explained that in such a case the question whether the representative has been carrying on the business of the foreign corporation or merely his own business will necessitate an investigation of the functions the representative has been performing and all aspects of the relationship between

191

United Malayan Banking Corpn. v. Pemungut Hasil Tanah (P.C.)

A    incidents of the tenure of land, and among these incidents is the right, in appropriate circumstances, to the grant of relief against forfeiture. The National Land Code is a complete and comprehensive code of law governing the tenure of land in Malaysia and the incidents of it, as well as other important matters affecting land there, and there is no room for the importation of any rules of English law in that field except in so far as the Code itself may expressly provide for this.

B    For these reasons their Lordships will advise His Majesty the Yang di-Pertuan Agong that the appeals should be dismissed with costs.

*Solicitors: Philip Conway Thomas & Co.; Turner Kenneth Brown; Stephenson Harwood.*

C                                                        S. S.

D

E

[HOUSE OF LORDS]

ANTAIOS COMPANIA NAVIERA S.A.   .   .   .    APPELLANTS

AND

F    SALEN REDERIERNA A.B..   .   .   .   .    RESPONDENTS

1984   July 2; 26                 Lord Diplock, Lord Keith of Kinkel, Lord Scarman, Lord Roskill and Lord Brandon of Oakbrook

G   *Arbitration—Appeal—Award—Charterparty—Withdrawal of vessel— Whether owners only entitled to withdraw on a repudiatory breach—Whether reasonable time expired before withdrawal— Grounds for granting leave to appeal—Arbitration Act 1979 (c.42), s.1(3)(b) (6A) (as amended by Supreme Court Act 1981 (c.54), s.148(2))*
*Ships' Names—Antaios*

H      The charterers chartered a vessel from the shipowners on 3 November 1978 on a three-year time charter in the N.Y.P.E. form. The charterparty contained a London arbitration clause and disputes which had arisen between the parties were referred to arbitration. One of the main issues in the arbitration was

193

1 A.C.                    Antaios Compania S.A. v. Salen A.B. (H.L.(E.))

A    S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1
     W.L.R. 166 considered.
         Per curiam (i) Unless judges are prepared to be vigilant in
     the exercise of the discretions conferred upon them by sections
     1 and 2 of the Arbitration Act 1979, they will allow the
     intention of Parliament to promote speedy finality in arbitral
     awards to be frustrated (post, p. 199D–E). Accordingly (a) leave
     to appeal to the High Court from an arbitrator's award under
B    section 1(3)(b) should only be given, even in a case turning on
     the construction of a standard term, where the judge considers
     that a strong prima facie case has been made out that the
     arbitrator had been wrong in his construction, and that applied
     even though there might be dicta in other reported cases
     suggesting that there might be two schools of thought among
     commercial judges upon the term's construction; if there were
     conflicting decisions the judge should give leave (post, pp. 203G–
C    204A); (b) leave to appeal from a decision to grant or refuse
     leave to appeal to the High Court from an arbitral award should
     only be granted under section 1(6A) where the decision called
     for some amplification, elucidation or adaptation to changing
     practices of existing guidelines (post, p. 205D–E).
         (ii) On the hearing of applications under section 1(3)(b) for
     leave to appeal to the High Court against arbitral awards a
D    judge ought not normally to give reasons for a grant or refusal
     of leave and should follow a practice similar to that adopted by
     the House of Lords when dealing with petitions for leave to
     appeal (post, pp. 205H–206A).
         Decision of the Court of Appeal [1983] 1 W.L.R. 1362;
     [1983] 3 All E.R. 777 affirmed on different grounds.

E    The following cases are referred to in their Lordships' opinions:

     Associated Provincial Picture Houses Ltd. v. Wednesbury Corporation [1948]
         1 K.B. 223; [1947] 2 All E.R. 680, C.A.
     B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1 W.L.R.
         166; [1982] 1 All E.R. 616
     Edwards v. Bairstow [1956] A.C. 14; [1955] 3 W.L.R. 410; [1955] 3 All
         E.R. 48, H.L.(E.)
F    Mardorf Peach & Co. Ltd. v. Attica Sea Carriers Corporation of Liberia
         (The Laconia) [1977] A.C. 850; [1977] 2 W.L.R. 286; [1977] 1 All E.R.
         545, H.L.(E.)
     Miramar Maritime Corporation v. Holborn Oil Trading Ltd. [1984] A.C.
         676; [1984] 3 W.L.R. 1; [1984] 2 All E.R. 326, H.L.(E.)
     Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema) [1980] 2 Lloyd's
         Rep. 83; [1980] Q.B. 547; [1980] 3 W.L.R. 326; [1980] 3 All E.R. 117,
G        C.A.; [1982] A.C. 724; [1981] 3 W.L.R. 292; [1981] 2 All E.R. 1030,
         H.L.(E.)

     The following additional cases were cited in argument:

     Allen v. Robles [1969] 1 W.L.R. 1193; [1969] 3 All E.R. 154, C.A.
     Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry
         of Food and Agriculture [1982] 1 All E.R. 578
H    Evans v. Bartlam [1937] A.C. 473; [1937] 2 All E.R. 646, H.L.(E.)
     Halfdan Greig & Co. A/S v. Sterling Coal and Navigation Corporation (The
         Lysland) [1973] Q.B. 843; [1973] 2 W.L.R. 904; [1973] 2 All E.R.
         1073, C.A.

1 A.C.        Antaios Compania S.A. v. Salen A.B. (H.L.(E.))        Lord Diplock

A     to the whole purpose of the N.Y.P.E. time charter form. The owners relied on what they said was 'the literal meaning of the words in the clause.' We would say that if necessary, in a situation such as this, a purposive construction should be given to the clause so as not to defeat the commercial purpose of the contract."

B     This passage in the award anticipates the approach to questions of construction of commercial documents that was voiced by this House in the very recent case, *Miramar Maritime Corporation v. Holborn Oil Trading Ltd.* [1984] A.C. 676, which dealt with a bill of lading issued under a charterparty in Exxonvoy 1969 form. There, after referring to various situations which might arise if the construction for which the shipowners in that case contended were correct, I added, at p. 682, in a speech concurred in by my fellow Law Lords:

C     "There must be ascribed to the words a meaning that would make good commercial sense if the Exxonvoy bill of lading were issued in *any* of these situations, and not some meaning that imposed upon a transferee to whom the bill of lading for goods afloat was negotiated, a financial liability of unknown extent that no business man in his senses would be willing to incur."

D     While deprecating the extension of the use of the expression "purposive construction" from the interpretation of statutes to the interpretation of private contracts, I agree with the passage I have cited from the arbitrators' award and I take this opportunity of re-stating that if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense.

E     Leave to appeal to the High Court from the arbitrators' award was refused by Staughton J. In giving reasons for his refusal, as is apparently his habit, he regarded the award as raising two questions: that which I have numbered (1) which he regarded as a question of construction and thus of law; and that which I have numbered (2), viz., whether a reasonable time had expired before the notice of withdrawal was given, which he regarded as one of fact for the arbitrators. The arbitrators'

F     decision that a reasonable time had already expired before notice of withdrawal was given, even on the assumption that the breaches relied upon by the shipowners although not classifiable in law as being repudiatory, nevertheless had entitled the shipowners when they learnt of them to give notice of withdrawal provided it were prompt, had the

G     result that whichever way question (1) was decided it could not substantially affect the rights of any parties to the arbitration, and leave to appeal upon that point of law was therefore barred by section 1(4) of the Act of 1979.

Staughton J., however, indicated that but for the "reasonable time" point he would have been strongly minded to give leave to appeal on the construction of the N.Y.P.E. withdrawal clause since this was in a

H     standard form which is widely used and conflicting judicial dicta are to be found as to the meaning which the arbitrators had ascribed to the expression "any other breach of this charter party" appearing in the clause. Staughton J., however, noted in his reasons for refusing leave

[1997] Vol. 2    LLOYD'S LAW REPORTS    183

## COURT OF APPEAL

Mar. 19, 20, 21; Apr. 16, 1997

———

A/S D/S SVENDBORG AND ANOTHER

v.

WANSA
(Trading as MELBORNE ENTERPRISES)
ESTONIAN SHIPPING CO. LTD.

v.

WANSA

(Trading as D. & M. IMPEX)

Before Lord Justice STAUGHTON, Lord Justice
WAITE and Lord Justice ALDOUS

Practice — Mareva injunctions — Anti-suit injunctions — Forum non conveniens — Contract for carriage of goods by sea — Exclusive jurisdiction clause — Claims for fraudulent misrepresentation or deceit and shortage — Actions commenced in Sierra Leone — Whether anti-suit and Mareva injunctions should be granted — Whether England more appropriate forum — Whether judgment in default should be set aside.

There were three actions before the Court. In action 1996 Folio 54 (the *Melborne Enterprises* action) the plaintiffs were A/S D/S Svendborg and D/S A/F 1912 A/S trading as Maersk Line and Mr. Mohamed K. Wansa was the only defendant trading as Melborne Enterprises.

In action 1996 Folio 55 (the *Estonian Shipping* action) the plaintiffs were Estonian Shipping Co. Ltd. and Mr. Wansa was again named as the only defendant.

The third action was 1987 S No. 4032A Folio 377. It was between the plaintiffs in the *Melborne Enterprises* action and Mr. Wansa was the seventh defendant (the *Hadson Taylor* action).

### Melborne Enterprises

On or about Feb. 1, 1992 a container laden with bales of textiles was loaded on board *Esther Schulte* at Banjul in the Gambia for carriage to Freetown in Sierra Leone. The container was carried under a bill of lading dated Feb. 1, 1992. Maersk Line were the contractual carriers although the carriage was sub-contracted to St. Gerard Shipping Co. Ltd. (St. Gerard) and Hanseatic Shipping Co. Ltd. (Hanseatic).

The contract was governed by the Hague Rules, and the bill of lading was subject to English law and jurisdiction.

The defendant who bought the goods from the shippers contended that when the container was unstuffed in Freetown there was a shortage of 82 bales of textiles and that such shortage was caused by theft from the container while it was in the custody and

control of the plaintiffs for which the plaintiffs were responsible.

On May 11, 1993 the defendant issued a writ in Sierra Leone against the plaintiffs, St. Gerard and Hanseatic. On June 4, 1994 the plaintiffs submitted to the jurisdiction of the Sierra Leone Court. The action still proceeds.

The plaintiffs submitted that the Court should grant an injunction restraining the continuation of the proceedings and they applied for a *Mareva* injunction in support of their claims for fraudulent misrepresentation or deceit and for breach of contract. They further claimed a declaration that they were not liable to the defendant and injunctions both restraining the defendant from continuing his action in Sierra Leone and directing him to discontinue it.

The plaintiffs further argued that they were entitled to have all the claims arising out of the bill of lading determined in England.

### Estonian Shipping

This action arose out of two shipments of cement consigned to the government of Sierra Leone by the Japanese government. The cement was shipped on board the plaintiffs' vessels *Parila* and *Paldiski*. In each case the bill of lading named D. & M. Impex as the notify party and each bill contained a jurisdiction clause the effect of which was that disputes under the bill of lading were to be decided in Estonia and the contracts were governed by Estonian law.

The defendant contended that there were shortages and on Oct. 10, 1994 issued a writ against the plaintiffs in Sierra Leone claiming damages. The plaintiffs submitted to the jurisdiction of the Sierra Leone Court and that action was still proceeding.

The plaintiffs relied on the breach of jurisdiction clause and argued for the same relief as in the *Melborne Enterprises* action.

### The Hadson Taylor action

On May 1, 1987 Hadson Taylor & Co. (Hadson Taylor) issued a writ in personam against the plaintiffs and others alleging delayed delivery and breach of a contract of carriage contained in or evidenced by a bill of lading.

In July, 1987 the plaintiffs issued a writ naming seven defendants of which Hadson Taylor were the fifth defendants and the defendant was the seventh defendant.

On July 1, 1987 Mr. Justice Saville gave leave to the plaintiffs to serve the writ out of the jurisdiction on the first to sixth defendants and granted injunctions restraining either the issue or the continuation of proceedings in Sierra Leone as appropriate.

On July 10 Mr. Justice Staughton gave leave to serve on the seventh defendant as a necessary or proper party to the claims by the plaintiff and an injunction was granted against the defendant restraining him from procuring or inducing breaches of contract by the first to sixth defendants or continuing proceedings in Sierra Leone. A concurrent writ was issued against

LLOYD'S LAW REPORTS

the defendant which claimed injunctive relief and damages for breach of contract.

Hadson Taylor did not heed the injunction. The plaintiffs applied for a stay in Sierra Leone but their action was dismissed.

The plaintiffs submitted that the defendant was in contempt of the English Court by procuring Hadson Taylor to proceed in Sierra Leone.

The defendant did not acknowledge service of the writ and on Nov. 18, 1993 the plaintiffs obtained judgment against the defendant for damages to be assessed.

The defendant applied for the judgment to be set aside and the proceedings stayed and for the *Mareva* injunctions and anti-suit injunctions to be discharged.

————*Held*, by Q.B. (Com. Ct.) (CLARKE, J.) that

A. as to the *Mareva* injunctions — *Melborne Enterprises* and *Estonian Shipping* actions: (1) the plaintiffs had to show that they had a good arguable case that they were entitled to damages from the defendant and there must be a real risk that in the absence of an injunction any judgment obtained would go unsatisfied;

(2) it was not seriously suggested that the plaintiffs did not satisfy these tests in the case of either the *Melborne Enterprises* or the *Estonian Shipping* claims; the plaintiffs had satisfied both tests on the evidence and had shown on the facts that they had a good arguable case that they were entitled to damages for breach of the exclusive jurisdiction clauses and/or damages for deceit; if no *Mareva* injunction was granted there was a real risk that the plaintiffs would not be able to enforce any judgment; and it was not appropriate to discharge the *Mareva* injunctions.

B. Forum — *Melborne Enterprises* (1) the Court should not be reluctant to grant an injunction merely on the ground that proceedings were on foot in Sierra Leone; the Court should not be reluctant to grant an injunction on the ground that to do so might be thought to be an interference with the exercise of a jurisdiction by a Court of competent jurisdiction elsewhere; it would not be such an interference but merely the enforcement of a contractual promise;

(2) where there was an exclusive jurisdiction clause the basic principles were that the parties should be kept to their bargain unless there was good reason to the contrary; where there was an English exclusive jurisdiction clause an injunction would ordinarily be granted where the application was made promptly; the longer the delay before the application was made the more likely it was that there would be good reason to refuse it; equally voluntary submission to the jurisdiction of the foreign Court would very often amount to such good reason, especially where the proceedings have progressed for any period of time a fortiori where an application for a stay of the foreign proceedings had been made and failed;

(3) there was no doubt that the plaintiffs submitted to the jurisdiction of the High Court in Sierra Leone on June 4, 1994; there was considerable force in the submission that in those circumstances and having regard to the lapse of time since then no injunction should be granted; in ordinary circumstances it would

almost certainly succeed but there were circumstances and evidence in this case which together with other evidence that the defendant had regularly boasted that he could in effect manipulate the legal system in Sierra Leone amounted to sufficient evidence of vexation and oppression to lead to the conclusion that justice required that the determination of the plaintiffs' allegations of fraud should be decided in England which was the agreed jurisdiction for the defendants' contractual claims;

(4) in all the circumstances the plaintiffs should be permitted to proceed with their claims for damages for both deceit and breach of contract in England and that the defendant should be restrained from continuing with his *Melborne Enterprises* action in Sierra Leone.

C. Forum — *Estonian Shipping*: the plaintiffs wished to bring proceedings on a similar basis to those in the *Melborne Enterprises* case; in those circumstances the right course was to maintain the injunction and allow all the plaintiffs' claims to proceed in England where the question whether the defendant had presented fraudulent claims in these actions could be determined together in one set of proceedings; on the footing that the English Court would determine those questions in the *Melborne Enterprises* action it was not seriously suggested that the *Estonian Shipping* action should be determined in Estonia.

D. (1) it would not be right to discharge either the *Mareva* injunction or the anti-suit injunctions;

(2) the amount of the injunction in both cases was very large; the amount included alleged future costs and liabilities in Sierra Leone; subject to further argument the right course was for the Court to grant not just an injunction in the present form but a mandatory injunction directing the defendant to discontinue the proceedings in Sierra Leone; once the Sierra Leone proceedings had been discontinued the amounts which were subject to the *Mareva* injunction could be reduced to exclude all future costs and potential liability in Sierra Leone; that would have the advantage in the interest of all parties and the ends of justice that there would only be one set of proceedings in the future which would avoid the risk of competing judgments and would have the further advantage of reducing the amount of the *Mareva* injunction;

E. As to the *Hadson Taylor* action, if there was to be a trial in the *Melborne Enterprises* and *Estonian Shipping* actions there should be a trial in the *Hadson Taylor* action; judgment should be set aside and the liability of the defendant determined on its merits;

(2) as to quantum the Court was not persuaded that the plaintiffs had a good arguable case on the evidence available at present that the defendant was responsible for the continuation of the *Hadson Taylor* proceedings in Sierra Leone; there must on any view be a radical reduction in the amount of the *Mareva* injunction.

F. Directions should be given for the future conduct and early determination of all these actions.

The defendant Mr. Wansa appealed in the *Melborne* and *Estonian* actions.

————*Held*, by C.A. (STAUGHTON, WAITE and ALDOUS, L.JJ.) that (1) in the *Melborne* case the clause in the bill of lading did confer exclusive jurisdiction on

C.A.]            Svendborg v. Wansa             [STAUGHTON, L.J.

the English Courts; there was no reason why business-men should go to the trouble of saying that the English Courts should have non-exclusive jurisdiction; and the parties in the second part of the clause were plainly saying that English law was to be mandatory if the American Carriage of Goods by Sea Act did not apply so that they must have intended English jurisdiction likewise to be mandatory in that event (see p. 186, col. 1);

(2) in the *Estonian* case it would be assumed that the shipowners were in breach of contract in commencing proceedings against Mr. Wansa in England; but that did not mean that the *Estonian* action should be stayed; the English Courts did not regard themselves as bound in all circumstances to comply with a private contract which sought to deprive them of jurisdiction (see p. 186, col. 2);

(3) the learned Judge regarded the plaintiffs' solici-tor's evidence as sufficient reason for his order restrain-ing Mr. Wansa from dealing with his assets, and from continuing the proceedings in Sierra Leone and for refusing an order staying the English actions; all that was within the Judge's discretion and there could be no proper criticism of the way he exercised it; the carefully considered conclusion of the Judge ought not to be interfered with (see p. 189, col. 2);

(4) if Mr. Wansa discontinued the Sierra Leone proceedings there would be a case for reducing the amount of the prior restraint injunctions; the appeals would be dismissed (see p. 190, col. 1).

The following cases were referred to in the judgment of Lord Justice Staughton:

*El Amria*, The (C.A.) [1981] 2 Lloyd's Rep. 119;
Sohio Supply Co. v. Gatoil (U.S.A.) Inc., [1989] 1 Lloyd's Rep. 588.

These were appeals by the defendant Mr. Mohamed Kamal Wansa from the decision of Mr. Justice Clarke ([1996] 2 Lloyd's Rep. 559) refusing to discharge the *Mareva* and anti-suit injunctions granted to the plaintiffs A/S D/S Svendborg and D/S A/F 1912 A/S (trading as Maersk Line) and Estonian Shipping Co. Ltd. restraining the defen-dant from continuing proceedings in Sierra Leone against the plaintiff.

Mr. Kenneth Rokison, Q.C. and Mr. Vernon Flynn (instructed by Messrs. Ince & Co.) for the defendant appellant; Mr. Michael Thomas, Q.C. and Mr. Graham Dunning (instructed by Messrs. Stephenson Harwood) for the plaintiff respondents.

The further facts are stated in the judgment of Lord Justice Staughton.

## JUDGMENT

Lord Justice STAUGHTON: These proceed-ings are brought by two shipowning concerns against Mr. Mohamed Kamal Wansa. In the first action the plaintiffs are Maersk Line, which is the trading name of two Danish companies, and the defendant is Mr. Wansa trading as Maersk Enter-prises. That I will call the *Melborne* action. In the second, called the *Estonian* action, the plaintiffs are Estonian Shipping Co. Ltd. and the defendant is Mr. Wansa trading as D. & M. Impex. Mr. Wansa is now the appellant in both appeals, and the shipowners are the respondents.

On Jan. 12, 1996 Mr. Justice Clarke made prior restraint orders against Mr. Wansa in respect of his assets up to a total of U.S.\$671,581 in the *Melborne* action and U.S.\$1,271,723 in the *Estonian* action. He also granted injunctions order-ing Mr. Wansa not to continue proceedings which he had commenced against both shipowners in Sierra Leone. There was a third action with which the Judge was also concerned, but that does not feature before us (see [1996] 2 Lloyd's Rep. 559).

Mr. Wansa was in England on Jan. 12, 1996, and was personally served with the writs and the orders of Mr. Justice Clarke in all three actions. An application was made in February on his behalf to Mr. Justice Clarke for an order that the English proceedings be set aside or stayed and the injunc-tions and prior restraint orders also set aside. The application was refused in both cases; and Mr. Wansa appeals to this Court against those orders.

*The primary facts*

*(i) The Melborne case*

In February, 1992 a container loaded with bales of textiles was loaded on *Esther Schulte* at Banjul in the Gambia for carriage to Freetown in Sierra Leone. Maersk Line were the contractual carriers; their bill of lading contained this clause:

Wherever the Carriage of Goods by Sea Act 1936 (COGSA) of the United States of America applies . . . this contract is to be governed by United States law and the United States Federal Court Southern District of New York is to have exclusive jurisdiction to hear all disputes here-under. In all other cases, this Bill of Lading is subject to English law and jurisdiction.

Mr. Wansa claims to have bought the goods from the shippers, and that there was a shortage of 82 bales of textiles when the container was opened at Freetown. The shortage is disputed. On May 11, 1993 Mr. Wansa issued a writ against Maersk Line and others claiming damages in the sum of

LLOYD'S LAW REPORTS [1997] Vol. 2

STAUGHTON, L.J.] Svendborg v. Wansa [C.A.

U.S.$111,529.95, together with interest at 36 per cent. per annum.

*(ii) The Estonian case*

In March and April, 1993 cement in bags was shipped at Tallin for carriage to Freetown on board *Parila* and *Paldiski*, both vessels owned by Estonian Shipping Co. Ltd. The bills of lading each contained this clause:

3. Jurisdiction

Any dispute arising under this Bill of Lading shall be decided in the country where the carrier has his principal place of business, and the law of such country shall apply except as provided elsewhere herein.

Claims for shortage and damage were presented on behalf of the government of Sierra Leone to Sun Alliance, insurers of the cargo for the voyage. Those claims were settled for £8161.02 in one case and U.S.$2587.46 in the other. Subrogation forms were executed by the Crown Agents on behalf of the government of Sierra Leone, which presumably were designed to transfer the government's rights against the carrier (if any) to the insurers; and Sun Alliance presented claims under the bills of lading to the shipowners.

Then what appeared to be a different version of the same claim was made by Mr. Wansa. He issued a writ against Estonian Shipping Co. Ltd. in Sierra Leone. The claim was for 24,714 bags lost or damaged on *Parila* (two-fifths of the cargo) and 23,941 bags (nearly the same proportion) on *Paldiski*. The claim was based on an alleged market value of U.S.$7.10 per bag, as opposed to the U.S.$4.10 per bag for which the cargo was insured, and amounted to U.S.$348,479.44. It is disputed.

*The jurisdiction clauses*

In the *Melborne* case, there is an issue as to whether the clause in the bill of lading conferred exclusive jurisdiction on the English Courts, and whether the commencement of an action in Sierra Leone was a breach of contract. It can be argued that the express mention of exclusive jurisdiction in the first part of the clause excludes any implication that the second part provides for exclusive jurisdiction. On the other hand it can be argued that the author wished to provide for exclusive jurisdiction throughout, and did not think it necessary to repeat the word "exclusive" in the second part. It was conceded for the Court below that it was "at least strongly arguable" that the clause conferred exclusive jurisdiction on the English Courts.

Mr. Rokison, for Mr. Wansa, urged us to decide the point, and not to be content with what is

strongly arguable. I am prepared to accept the invitation, although that does not help Mr. Rokison. I conclude that the clause does confer exclusive jurisdiction on the English Courts. My reasons are in substance, first those which I stated in *Sohio Supply Co. v. Gatoil (U.S.A.) Inc.*, [1989] 1 Lloyd's Rep. 588 at pp. 591–592, and in particular that I could think of no reason why businessmen should choose to go to the trouble of saying that the English Courts should have non-exclusive jurisdiction. My second reason is that the parties in the second part of the clause were plainly saying that English *law* was to be mandatory if the American Carriage of Goods by Sea Act did not apply; it seems to me that they must have intended English *jurisdiction* likewise to be mandatory in that event.

The Estonian bills of lading do not provide for English jurisdiction; in effect they say that any dispute arising under them shall be decided in the Courts of Estonia. It follows that there was a breach of contract by Mr. Wansa in commencing proceedings in Sierra Leone. But he contends that the shipowners are also in breach, because they have started an action in England. Against that it is argued for the shipowners that their English action is not a dispute "under the bill of lading". I do not find that argument at all plausible, in view of the wide meaning that has been given to such words, for example in arbitration cases. So I am prepared to assume that the shipowners were in breach of contract, by commencing proceedings against Mr. Wansa in England. But that does not mean that we are obliged to stay the *Estonian* action. The English Courts, like those of many other countries, do not regard themselves as bound in all circumstances to comply with a private contract which seeks to deprive them of jurisdiction: see for example *The El Amria*, [1981] 2 Lloyd's Rep. 119.

*The Sierra Leone proceedings:*

*(i) The Melborne case*

A full history of these proceedings is set out in the judgment of Mr. Justice Clarke, [1996] 2 Lloyd's Rep. 559 at pp. 570–571. What follows is an abridged version.

The writ, as I have said, was issued in Sierra Leone on May 11, 1993. On June 24, Maersk Line entered an appearance under protest, and on July 5 they issued a notice of motion seeking a stay in reliance on the English jurisdiction clause. There was an exchange of affidavits, in which Mr. Wansa's shortage claim was disputed by Mr. Ghirardani, an English solicitor acting for Maersk Line. He did not assert at that stage that there was a history of fraudulent cargo claims being made in Sierra Leone. Indeed he did not, as Mr. Rokison pointed

out on several occasions, say in terms that the claim in question was fraudulent.

On Apr. 25, 1994 Mr. Justice Ademosu, directing himself in accordance with *The El Amria*, refused a stay. On May 3 Maersk Line filed a notice of motion seeking leave to appeal and a stay of the action. This, it seems, was not served. On May 11 the lawyer acting for Mr. Wansa searched the registry for a defence; none had been filed, and he entered judgment for the resale value of the goods damaged or short delivered, to be assessed, and interest on that amount at the rate of 36 per cent. per annum.

Some further attempts by Maersk Line to obtain leave to appeal and a stay followed. Then at the beginning of June or thereabouts they changed their legal advisers in Sierra Leone. What happened next was described by Mr. Justice Clarke as follows:

Once Mr. Macauley came on the scene no further attempts were made to seek leave to appeal from the Judge's refusal of a stay of the action. Instead the plaintiffs filed a notice of motion dated June 4, in which they sought to set aside the judgment on the grounds, inter alia, that the defendant was not entitled to sign judgment for 36 per cent. per annum interest, and that the plaintiffs had a defence on the merits. An affidavit was sworn in support, exhibiting a draft proposed defence. Paragraph 8 of the affidavit includes the statement that the plaintiffs —

... have advised themselves to apply for leave to defend the claim on the merits.

The reason given for not serving a defence earlier was that a challenge to the jurisdiction was being made.

Nothing more was heard of the application for leave to appeal, and the only reasonable inference is that at that time it was decided to seek to defend the claim on the merits.

Once again Maersk Line did not seek to rely on any history of fraudulent cargo claims, or assert in plain terms that the claim in question was fraudulent. It would of course have been open to them, if they obtained leave to defend, to call evidence showing that the alleged short delivery was fictitious; but like Mr. Justice Clarke I am surprised that they did not say so in an affidavit at this stage. There may have been a tactical reason for such reticence.

On Oct. 17, 1994 Mr. Justice Ademosu refused to set aside the judgment on the ground that a general denial in the proposed defence was not enough. He did, however, remove the award of interest at 36 per cent. per annum, and instead ordered interest to be assessed. On Dec. 9 he granted leave to appeal but refused a stay. However a stay was granted by the Court of Appeal on Feb. 3, 1995.

*(ii) The Estonian case*

Mr. Wansa's writ was issued on Oct. 10, 1994. On Nov. 24, judgment in default of appearance was entered on his behalf. On the same day Estonian Shipping entered an appearance under protest, but on Dec. 2 they voluntarily submitted to the jurisdiction by serving a notice of motion to set aside the default judgment. On Jan. 10, 1995 Mr. Justice Gbow set aside the judgment, and gave Estonian Shipping leave to serve a defence. They did so on Jan. 19, and later joined the port authority as a third party. The trial began on June 13, 1995.

Then there was an objection to the admissibility of a survey report by Lloyd's agents. On June 20 the Judge held that it was admissible, but on July 13 he gave leave to appeal against that decision. Mr. Rokison told us that the appeal was dismissed on Nov. 30, 1995; and Mr. Thomas, for the shipowners, said that he had no reason to disagree with that.

*The English actions*

Thus far, there is much to be said for the view that the shipowners ought not to be allowed now to proceed against Mr. Wansa in England, as they did on Jan. 12, 1996. They had taken no steps here since the Sierra Leone proceedings were begun in May, 1993 and October, 1994 respectively. They had submitted to the jurisdiction of the Sierra Leone Courts in both cases, although if any question of discretion arises it can be said in their favour that they had mistakenly allowed judgment in default to be entered; there was a need to submit to the jurisdiction if it was to be set aside. While there was exclusive English jurisdiction in the *Melborne* case, the exclusive jurisdiction in the *Estonian* case was Estonian.

Mr. Thomas argued that the English actions are wider than those in Sierra Leone. In some senses this is true. They include a cause of action in deceit, a claim for a negative declaration (that they are not liable for any loss or damage to cargo), and breach of the jurisdiction clauses in the bills of lading. But in essence they cover the same ground, as it seems to me, with the possible exception of breach of the jurisdiction clauses. What is likely to be different, if the English actions proceed, is the evidence. As will shortly appear, the shipowners have substantial material which they say should be considered in an action here, and which has not been put forward in Sierra Leone.

There has been a hint, and perhaps more than a hint, in the evidence that the Courts of Sierra Leone are likely to be partial, favouring Mr. Wansa rather than the shipowners. That was expressly disclaimed by Mr. Boyd, who appeared for the shipowners before Mr. Justice Clarke, and has not been

LLOYD'S LAW REPORTS [1997] Vol. 2

STAUGHTON, L.J.]                Svendborg v. Wansa                [C.A.

renewed in this Court. There is still some criticism of the procedure in the Sierra Leone Courts; and to judge from one example of which we have evidence they may take a more leisurely course than we do in this country. It is said that their procedure is defective because discovery is wholly or partly absent. But I would not regard discovery as in all cases a necessary attribute of an enlightened jurisdiction; it is often the cause of much unnecessary expenditure, a view which Lord Woolf appears to share. What I do find alarming is that the Sierra Leone Courts entertain claims for an award of interest at 36 per cent. per annum on United States dollar claims. Mr. Rokison, in a fine attempt to defend the indefensible, tried to persuade us that there were facts which would justify such an award. I cannot agree. However, the English Courts are in no position to proclaim their innocence on this point. Until recently the Judgments Act rate (applied after judgment but not before) was 15 per cent., whether the currency of the judgment was U.S. dollars, Swiss francs or Brazilian cruzeiros. The going rate for U.S. dollars at the time was 6 per cent.

Two further arguments why the English actions should not proceed were advanced by Mr. Rokison. First it was said that the question whether the jurisdiction clauses in the bills of lading should be enforced was submitted to the Sierra Leone Court, and the shipowners were bound by the decision.

It is true that Mr. Justice Ademosu was asked to decide that question, and did decide it on Apr. 25, in the Melborne case. There was no appeal from his decision. But that episode was part of the Maersk Line's protest against the jurisdiction. I do not see that such a protest can be treated as a submission to the jurisdiction of the foreign Court to decide the issue of jurisdiction. (At one time English law took the contrary view on that point, but see now Dicey & Morris, The Conflict of Laws (12th ed.) p. 480.) The decision may well have been binding on Mr. Wansa, but not on Maersk Line.

The position on that point cannot be any different in the Estonian case, where there has been no decision of the Sierra Leone Court on the enforceability of the jurisdiction clause in the bill of lading.

It was also, I think, argued that the judgment on liability in the Melborne case gave rise to an estoppel against Maersk Line, as they had submitted to the jurisdiction of the Sierra Leone Courts. Mr. Thomas answers that point by saying that a foreign judgment can always be contested in this country on the ground that it was obtained by fraud: Dicey & Morris pp. 501, 505. Nevertheless Mr. Justice Clarke took the view in both cases that,

but for the evidence which I have yet to mention, he would not have favoured some or all of the shipowners' submissions in the English actions. Thus in the Melborne case he said:

There is no doubt that the plaintiffs submitted to the jurisdiction of the High Court in Sierra Leone on June 4, 1994. Mr. Collins submits that in those circumstances, and having regard to the lapse of time since then, no injunction should now be granted. There is considerable force in that submission. In ordinary circumstances it would almost certainly succeed. The question is, however, whether there are any circumstances in this case which lead to any other conclusion. Mr. Boyd submits that there are.

And in the Estonian case:

If the Estonian Shipping case is looked at in isolation, the defendant has a strong case for the discharge of the injunction restraining the further prosecution of the claims. The plaintiffs took no steps to obtain an injunction at the outset. On the contrary, they submitted to the jurisdiction, brought in a third party and participated in the trial on the merits. If this case stood alone I would discharge the injunction. However, it does not.

Mr. Ghirardani's evidence

Mr. Ghirardani is a solicitor, and a partner in the firm of Stephenson Harwood who act for the shipowners in these two actions. He has in the past nine years conducted an extensive investigation into cargo claims made at West African ports, particularly in Sierra Leone, Guinea and the Gambia. He has sworn lengthy affidavits in each of these cases. In the nature of things much of his evidence is hearsay, but not on that account to be rejected out of hand on an interlocutory application; and I do not doubt that he can to some extent give first hand evidence.

Mr. Ghirardani speaks of what he calls a claims industry in Sierra Leone, that is to say a continuing series of cargo claims over many years which cannot have been justified. He relates how, at first, claims were made against cargo underwriters. But these in the course of time were disputed, and were difficult and expensive to pursue in foreign Courts. It was easier to sue the shipowners in Sierra Leone, with both jurisdiction and enforcement available from the presence of their vessels. Eventually, international pressure was put on the government of Sierra Leone, and the procedure for arresting ships was changed; the prior approval of the Attorney General was required. The result was that claims were still pursued in Freetown, without security,

C.A.]                              Svendborg v. Wansa                              [STAUGHTON, L.J.

with the possibility of enforcement against a defendant's visiting ship thereafter.

The evidence produced by Mr. Ghirardani that Mr. Wansa and others have made fraudulent claims for loss and damage to cargo, in these and other cases, is impressive. Mr. Justice Clarke said in his judgment:

> Nevertheless, there is, I think force in Mr. Boyd's submission that the evidence amounts to a strong prima facie case that the defendant has advanced fraudulent claims in the Melborne Enterprises and Estonian Shipping cases. Whether he has in fact done so can only be determined at a trial.

Evidence of fraud would, as I have said, be admissible in enforcement proceedings brought in England. But is one to suppose that enforcement will take place in this country? The shipowners are exposed to such proceedings wherever their vessels (150 of them, in the case of Maersk Line) roam the seas.

The evidence of fraud could, of course, have been brought in the Sierra Leone proceedings, but it has not been. Seeing that no criticism is now made of the Sierra Leone Judges, it should require more than mere evidence that the claims are fraudulent to justify restraining proceedings in Sierra Leone and allowing the English actions to proceed. The case for taking that course depends on whether there is a real impediment to justice in Sierra Leone.

The evidence is considered at length in the judgment of Mr. Justice Clarke. The principal point, perhaps, is Mr. Ghirardani's assertion that it would not be safe for him to return to Sierra Leone for any prolonged period of time. A death threat has been made against him and against the Maersk Line's former senior representative in West Africa. It is said for Mr. Wansa that there will be no need for Mr. Ghirardani to go to Sierra Leone. But in my judgment there is very likely to be a significant amount of first-hand evidence which he can give; and in any event, as a solicitor who has masterminded the investigation he could reasonably be required to be present at the trial. I see no reason to doubt the credibility of Mr. Ghirardani's evidence at this stage, particularly when it is challenged (if at all) by Mr. Wansa whose claims are for the present considerably discredited.

It is also Mr. Ghirardani's evidence that Mr. Wansa has regularly boasted that he can in effect manipulate the legal system in Sierra Leone. That too may lack credibility, since it is accepted that there are no grounds for criticism of the Sierra Leone judiciary; but it scarcely lies in Mr. Wansa's mouth to say that his own assertions should be altogether disregarded. And the shipowners may

feel that justice is not seen to be done with such assertions from their opponent.

This evidence, from a respectable solicitor, to my mind changes the situation entirely. Mr. Justice Clarke regarded it as sufficient reason for his orders restraining Mr. Wansa from dealing with his assets, and from continuing the proceedings in Sierra Leone, and for refusing an order staying the English actions. All that was within the Judge's discretion, and it seems to me that there can be no proper criticism of the way that he exercised it. This Court should not in my judgment interfere with the carefully considered conclusion of a Judge with great experience in this field.

*The amount restrained*

In the *Melborne* action Mr. Wansa is restrained from dealing with his assets up to a total of U.S.$671,581.54, and in the *Estonian* action up to a total of U.S.$1,271,723.50. Those figures are derived from the affidavits of Mr. Ghirardani. They comprise the estimated costs of the shipowners' English and Sierra Leone lawyers to the date of the Judge's order, which are large enough in all conscience, and the damages and costs which will fall upon the shipowners if the Sierra Leone proceedings are continued (in breach of the injunctions) and result in judgment for Mr. Wansa. The "best estimate" is that, included in the latter part of the calculation, there will be interest at 36 per cent. per annum for a period of six years.

There is a good deal of doubt inherent in those calculations. We have little guidance from authority as to how we should treat, for the purposes of a prior restraint injunction, an assertion that breaches of contract (and of an order of this Court) will continue in the future for a period of six years, that in consequence a foreign Court will reach a wrong conclusion on liability, and that the damages will be grotesque. Presumably we must require a good arguable case as to what is likely to happen. Mr. Ghirardani says in his affidavit:

> The figures are the best estimates that we can provide, and are based on my and [the local lawyer's] previous experiences.

The solution adopted by Mr. Justice Clarke was to wait and see whether Mr. Wansa discontinued the Sierra Leone proceedings. If he did, and instead counterclaimed in England, the amounts covered by the prior restraint injunctions could be reduced by a very substantial amount. If not, the shipowners' claim for a restraint in the amounts claimed would be all the stronger.

The two cases came back before Mr. Justice Clarke on Mar. 21, 1996. At that time it was Mr. Wansa's case that he would not discontinue the

**LLOYD'S LAW REPORTS** [1997] Vol. 2

ALDOUS, L.J.]                    Svendborg v. Wansa                    [C.A.

Sierra Leone proceedings until there had been an appeal in the English actions.

There now has been an appeal. Once again, if Mr. Wansa discontinues the Sierra Leone proceedings there will be a case for reducing the amount of the prior restraint injunctions. I would give liberty to apply to a Judge of the Commercial Court in that event. For the present, I would dismiss both appeals. During the hearing there appeared to be some doubt as to whether the injunctions still subsisted, or had expired without renewal. Perhaps that has now been clarified.

**Lord Justice WAITE:** I agree.

**Lord Justice ALDOUS:** I also agree.

[*Order: Appeals dismissed with costs; costs be taxed with interest payable from today's date. Leave to appeal refused. Extension of time for service of points of defence granted. Order for amendment granted by consent.*]