# 'EXHIBIT C

# ''Rc t v'KKKqh'Z KK

1 K. B.        KING'S BENCH DIVISION.        249.

C. A.
1902
Nov. 17.
1903
Jan. 19.

[IN THE COURT OF APPEAL.]

## AUSTRIAN LLOYD STEAMSHIP COMPANY v. GRESHAM LIFE ASSURANCE SOCIETY, LIMITED.

*Arbitration—Staying proceedings—Submission—Agreement to refer Disputes to Foreign Court—Arbitration Act, 1889 (52 & 53 Vict. c. 49), ss. 4, 27.*

A policy of life insurance was effected by a foreigner with an English insurance company, which had a branch office at Budapest. The policy, which was in the French language, provided that the premiums and insurance money should be payable at Budapest, and contained a condition, of which the English translation was as follows: "For all disputes which may arise out of the contract of insurance, all the parties interested expressly agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction in such matters":—

*Held,* that the above-mentioned condition constituted a "submission" within the meaning of s. 4 of the Arbitration Act, 1889.

APPEAL against an order of Darling J. at chambers refusing to stay proceedings in an action upon a policy of life insurance.

The plaintiffs sued as assignees of the policy, which had been effected by one Rabl, a native of Trieste, since deceased, who had been the chief cashier of the plaintiffs at Constantinople, upon his own life with the defendants, who were an English insurance company, having a branch office at Budapest in Hungary. The policy, which was in the French language, bore an English stamp, was sealed with the defendants' English seal, and was dated "Londres." It was made subject to certain general conditions in print annexed thereto. By these conditions the premiums and insurance money were made payable at Budapest. The 24th condition, which was one of a group of conditions headed "Domicile," was as follows: "24. Pour toutes contestations qui pourraient surgir du contrat d'assurance toutes les parties intéressées se soumettent de convention expresse à la jurisdiction des tribunaux compétents de Budapest."

The defendants applied at chambers for an order to stay proceedings in the action under the 4th section of the Arbitration Act, 1889, but the learned judge refused the application. The defendants appealed.

C. A.
1903

AUSTRIAN
LLOYD
STEAMSHIP
COMPANY
v.
GRESHAM
LIFE
ASSURANCE
SOCIETY.

Upon the appeal coming on for argument on November 17, 1902, the Court of Appeal were desirous of information on the question whether the terms of the 24th condition had any special or technical meaning in the French language in connection with the subject-matter; it was therefore arranged that some expert agreed upon by the parties should make a translation of it, and the further hearing of the appeal was adjourned for that purpose. The parties agreed that Mr. Thomas Barclay, who was an advocate in France, should make the translation of the condition, which he accordingly did as follows: "Residence for purposes of jurisdiction." ". . . "24. For all disputes which may arise out of the contract of insurance, all the parties interested expressly agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction in such matters."

The appeal again came on for argument on January 19.

*Haldane, K.C.*, and *G. H. Devonshire*, for the defendants. Clause 24 of the conditions of insurance amounts to an agreement by both parties to the contract that any dispute under it shall be determined by the Court having jurisdiction in such matters at Budapest. Such an agreement is a submission to arbitration within the meaning of s. 4 of the Arbitration Act, 1889. It is clear that the meaning of "submission" in that section is not confined to an "arbitration" in the strict technical sense of the term, but includes every case in which the parties have constituted a tribunal for themselves. It was held in *Law* v. *Garrett* (1) that an agreement to submit all disputes to a foreign Court was within the 11th section of the Common Law Procedure Act, 1854. It is submitted that, having regard to the terms of the contract and all the circumstances of the case, the law of Hungary must be taken to have been intended by the parties to govern this contract: *Hamlyn* v. *Talisker Distillery*. (2) That being so, the object of condition 24 clearly was that the Hungarian Courts which administer that law should have exclusive jurisdiction over all questions which might arise under the contract of assurance.

(1) (1878) 8 Ch. D. 26.          (2) [1894] A. C. 202.

*J. A. Hamilton*, K.C., and *Leck*, for the plaintiffs. Condition 24 is not a "submission" within the meaning of the Arbitration Act, 1889. It only means that, if, in the case of a dispute, either party elects to invoke the jurisdiction of the Court at Budapest, the other party shall not be at liberty to object to its jurisdiction. Agreeing to submit to the jurisdiction of a Court, if invoked by the other party, is not equivalent to agreeing to refer a dispute to the arbitration of that Court. The defendants are an English company, domiciled in England, which carries on insurance business and invites people to insure at Budapest. The object of the condition plainly is to hold out as an attraction, in order to induce persons to insure with the defendants in Hungary, that they will not have to resort to the English Courts to enforce their policies. It is therefore made a term of the contract that, for the purposes of its enforcement, the defendants shall be regarded as having a conventional domicil in Budapest. But the condition does not provide that the Courts of Budapest shall have exclusive jurisdiction over all disputes arising under the policy. In order that s. 4 of the Arbitration Act, 1889, may apply, there must be an agreement that some person or persons, or body, shall have exclusive jurisdiction over any dispute arising under the contract. The Court have a discretion under the section. If the construction of the condition is not absolutely clear, the Court ought not, as a matter of discretion, to stay proceedings in the action.

[They cited *Montgomery, Jones & Co.* v. *Liebenthal & Co.* (1)]

*Haldane*, K.C., for the defendants, was not called on to reply.

ROMER L.J. This is a simple point; and, though I can understand that different persons might take different views of it, I must say that to my mind the meaning of condition 24 is that contended for by the defendants. The question is this: Does the condition merely mean that, if one of the parties to the contract is sued by the other in the Court of Budapest, he will not take any objection to its jurisdiction; or, does it mean that the parties mutually agree that, if any

(1) [1898] 1 Q. B. 487.

C. A.
1903

AUSTRIAN
LLOYD
STEAMSHIP
COMPANY
v.
GRESHAM
LIFE
ASSURANCE
SOCIETY.

252.    KING'S BENCH DIVISION.    [1903]

C. A.
1903

AUSTRIAN
LLOYD
STEAMSHIP
COMPANY
*v.*
GRESHAM
LIFE
ASSURANCE
SOCIETY.

Romer L.J.

dispute arises under the contract, it shall be determined by the Court in Budapest? Having regard to the nature of the contract and its language, I am of opinion that the latter construction is the correct one. It is not as if the insurance company only had agreed that they would submit to the jurisdiction of the Court at Budapest: both parties mutually agree to submit to that jurisdiction in respect of any dispute which may arise under the contract. If there had been an agreement by the parties in similar terms to submit to the decision of a particular individual, I think there could have been no doubt that it would have amounted to an agreement to submit any dispute under the contract to the arbitration of that person. In this case, instead of nominating a particular individual as arbitrator, the parties agree to submit any dispute arising under the contract to the Courts at Budapest. I think the appeal should be allowed.

MATHEW L.J. I am of the same opinion. It seems to me that the plain meaning of the language of the condition is, not merely that, in the event of a dispute arising under the contract, either party shall have an option of suing in the Court at Budapest having jurisdiction in such matters, but that both parties shall be bound to refer such a dispute to that Court. It is suggested, as a reason why we should give to the condition the meaning contended for by the plaintiffs, that the object of inserting it was that it might operate as an attraction to persons to insure at Budapest with the defendants. I do not, however, see why, in considering the object of the condition, we should look only to the position of the assured. It might often be of great importance to the insurance company, in case of a dispute arising under a policy of insurance effected at Budapest, that they should not have to bring witnesses from thence to distant places. But, whatever the object of inserting the condition may have been, I think that the effect of it is clearly what I have stated.

*Appeal allowed.*

Solicitors for plaintiffs: *Stokes & Stokes.*
Solicitors for defendants: *Devonshire, Monkland & Co.*

E. L.

A

House of Lords

## Bank of Credit and Commerce International SA *v* Ali and others

## [2001] UKHL/8

B  2001  Jan 16, 17, 18;          Lord Bingham of Cornhill, Lord Browne-Wilkinson,
        March 1                    Lord Nicholls of Birkenhead, Lord Hoffmann
                                                        and Lord Clyde

*Employment — Contract of employment — Implied term — Redundant employees
entering into agreement settling all claims arising from employment — Employer
subsequently found to have conducted business illegally and dishonestly —*
C  *Employees claiming stigma damages for breach of implied term of trust and
confidence and misrepresentation — Whether claims barred by agreement*

In 1990 the defendant employees were made compulsorily redundant by the
plaintiff bank. In consideration of a payment by the bank, they signed an agreement
by which they accepted the terms set out "in full and final settlement of all or any
claims . . . of whatsoever nature that exist or may exist" against the bank. In 1991
D  the bank went into insolvent liquidation, and wide publicity was given to the corrupt
and dishonest manner in which its business had been conducted. In the course of the
liquidation the liquidators sought to recover loans made to the employees, who
counterclaimed damages for misrepresentation and breach of their employment
contracts as a result of which, they alleged, they were at a disadvantage on the labour
market. The bank contended that the agreements signed by the employees were
binding compromise agreements precluding their claims. The judge so held, but the
E  Court of Appeal allowed an appeal by the employees.
On appeal by the bank—
*Held*, dismissing the appeal (Lord Hoffmann dissenting), that there were no
special rules of interpretation applicable to a general release, which was to be
construed in the same way as any other contract, the question being the intention of
the parties ascertained objectively in the context of the circumstances in which the
release had been entered into; that when the employees' agreements had been entered
F  into neither party could realistically have supposed that a claim for damages in
respect of disadvantage on the labour market was a possibility; and that, accordingly,
the parties could not be held to have intended the releases to apply to such claims
( post, paras 8–9, 10, 19, 21, 26, 29, 35, 78–79, 85, 86).
Dicta of Lord Hoffmann in *Investors Compensation Scheme Ltd v West
Bromwich Building Society* [1998] 1 WLR 896, 912–913, HL(E) applied.
Decision of the Court of Appeal [2000] ICR 1410 affirmed.
G
The following cases are referred to in their Lordships' opinions:
*Arrale v Costain Civil Engineering Ltd* [1976] 1 Lloyd's Rep 98, CA
*Bank of Credit and Commerce International SA v Ali (No 2)* [2000] ICR 1354
*Bell v Lever Bros Ltd* [1932] AC 161, HL(E)
*Cloutte v Storey* [1911] 1 Ch 18, CA
H  *Cole v Gibson* (1750) 1 Ves Sen 503
*Ecclesiastical Comrs for England v North Eastern Railway Co* (1877) 4 Ch D 845
*Grant v John Grant & Sons Pty Ltd* (1954) 91 CLR 112
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
        1 WLR 896; [1998] 1 All ER 98, HL(E)
*Lindo v Lindo* (1839) 1 Beav 496

A    business should be concealed from the general body of employees, including Mr Naeem; (iv) [the bank] must be taken to have known that Mr Naeem did not have that knowledge at the relevant time—it was [the bank's] intention to conceal the dishonest and corrupt nature of its business from the general body of its employees and there is no reason to think that it had not achieved that objective; (v) without that knowledge Mr Naeem could not have appreciated that there had been a breach of the

B    implied term on which the stigma claim is founded; and (vi) the possibility that [the bank]—a bank authorised by the Bank of England under the Banking Act 1987 to carry on banking business in London—would be carrying on a dishonest and corrupt business was so remote that Mr Naeem could not have been expected to appreciate that it might exist, or that [the bank] might be in breach of its obligation not to abuse the

C    trust and confidence which he was entitled to place in it as his employer."

    7   Lightman J [1999] ICR 1068 and a majority of the Court of Appeal (Chadwick and Buxton LJJ) [2000] ICR 1410 held that the general language of the release was sufficiently comprehensive to embrace the claims which Mr Naeem sought to pursue. Since all the claims known to the parties were identified and met in full, the broad language of the release must (they held)

D    be taken to refer to other claims, not at that stage known or identified. Sir Richard Scott V-C took a different view. He held in paragraph 34 of his judgment, at p 1422, that the appeal should be allowed:

    "on the ground that the COT-3 agreement, properly construed on the assumed facts and in the context of the parties' knowledge at the time it was signed, does not bar Mr Naeem's 'stigma' claim."

E    Mr Naeem's appeal against Lightman J's dismissal of his claim was allowed, since all members of the Court of Appeal held that it would in all the circumstances be unconscionable for the bank to rely on the release in order to bar Mr Naeem's claim.

    8   I consider first the proper construction of this release. In construing this provision, as any other contractual provision, the object of the court is

F    to give effect to what the contracting parties intended. To ascertain the intention of the parties the court reads the terms of the contract as a whole, giving the words used their natural and ordinary meaning in the context of the agreement, the parties' relationship and all the relevant facts surrounding the transaction so far as known to the parties. To ascertain the parties' intentions the court does not of course inquire into the parties'

G    subjective states of mind but makes an objective judgment based on the materials already identified. The general principles summarised by Lord Hoffmann in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912–913 apply in a case such as this.

    9   A party may, at any rate in a compromise agreement supported by valuable consideration, agree to release claims or rights of which he is unaware and of which he could not be aware, even claims which could not

H    on the facts known to the parties have been imagined, if appropriate language is used to make plain that that is his intention. This proposition was asserted by Lord Keeper Henley in *Salkeld v Vernon* (1758) 1 Eden 64, in a passage quoted in paragraph 11 below. It was endorsed by the High Court of Australia in *Grant v John Grant & Sons Pty Ltd* (1954) 91 CLR

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

15 September 2009

BANK OF NEW YORK MELLON

v

GV FILMS

[2009] EWHC 2338 (Comm)

Before Mr Justice FIELD

Jurisdiction — Agreement contained jurisdiction clause — Provision that one party irrevocably submit to the jurisdiction waiving objections — Whether exclusive — Anti-suit injunction.

In 2006 GV Films, an Indian company, made two bond issues: (i) an issue of US$4.5 million, 2.25 per cent convertible bonds; and (ii) the issue of €9 million zero coupon convertible bonds. The bank was trustee in relation to both bond issues under two trust deeds with GV Films. Both deeds were governed by English law and contained jurisdiction clauses, although the issues related to the Dollar Bond Trust Deed clause:

The Courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Trust Deed or the Bonds and accordingly any legal action or proceedings arising out of or in connection with this Trust Deed or the Bonds ("Proceedings") may be brought in such courts. The Company irrevocably submits to the jurisdiction of such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of the Trustee and each of the Bondholders and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction.

At the end of 2007 GV Films took steps to implement a scheme to demerge into three companies: GV Films Ltd, GV Studio City Ltd and GV New Media Technology Ltd. By an order dated 29 November 2007 the High Court of Madras directed that a meeting of equity shareholders be held on 24 January 2008 to consider the proposed scheme. GV Films was of the view that the consent of the bond holders was unnecessary, and lawyers acting for the bond holders intervened: proceedings were brought in the High Court of Madras, opposing the demerger. The scheme of arrangement petitions were dismissed on 4 December 2008, and the decision was under appeal.

In 2009 the bank gave notice of events of default to GV Films and required the defaults to be remedied. On 16 March 2009, GV Films brought proceedings in the Madras High Court against the bank and the bond holders, seeking a declaration that the notices from the bank were premature, invalid and unenforceable and an injunction restraining the bank from taking any steps pursuant to those notices. On 29 May 2009 the bank brought the present proceedings to recover accelerated payments by reason of three alleged events of default.

GV Films sought a stay of the proceedings, and the bank sought an anti-suit injunction to prevent GV Films from participating in the Indian proceedings.

——Held, by QBD (Comm Ct) (FIELD J) that the application for a stay would be refused and that an anti-suit injunction would be granted.

(1) The true construction of the clause was that it was an exclusive jurisdiction clause so far as concerned GV Films. The words: "The courts of England are to have jurisdiction to settle any dispute which may arise out of or in connection with this Trust Deed . . ." taken together with the express liberty conferred on the trustee but not conferred on the company, to bring proceedings in any other court of competent jurisdiction, clearly showed that the intention of the parties was that the courts of England were to be the exclusive jurisdiction so far as proceedings brought by GV Films were concerned (see para 14);

——Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588, followed; Crédit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd [1999] 1 Lloyd's Rep 767; [1999] 1 All ER (Comm) 237, applied; Sabah Shipyard (Pakistan) Ltd v Republic of Pakistan [2003] 2 Lloyd's Rep 571, Sumport Shipping Ltd v Tryg Baltica International (UK) Ltd [2003] 1 Lloyd's Rep 138, considered.

(2) A stay would be refused. Where there was an exclusive jurisdiction clause and a party thereto sought a stay of proceedings within the jurisdiction nominated by the clause, such an application would only succeed if that party could show strong reasons why the clause should not be enforced against them (see para 16);

——Donohue v Armco Inc [2002] 1 Lloyd's Rep 425, applied.

(3) Where a party had expressly agreed not to rely on convenience arguments in resisting the jurisdiction of the nominated court, that was a matter of very considerable significance, and especially strong grounds would be required before the exclusive jurisdiction clause could be departed from on grounds founded on convenience. The fact that the bank freely participated in the demerger proceedings before the Madras High Court and had not objected to the jurisdiction of the Indian court in the proceedings brought by GV Films for negative relief in Madras did not come anywhere near to constituting a reason why the clause should not be enforced: the bank's participation in the former was in conformity with the jurisdiction clause; and the bank's participation in the negative declaratory relief proceedings was under protest and jurisdiction was in issue (see paras 18, 20 and 21);

——Shashoua v Sharma [2009] 2 Lloyd's Rep 376, distinguished.

(4) The bank's application for an anti-suit injunction succeeded. In the absence of strong reasons, it was plain as a matter of principle that the court's discretion should be exercised in favour of an injunction that

| | | |
|---|---|---|
| FIELD J] | Bank of New York Mellon v GV Films | [QBD (Comm Ct) |

enforced the contractual rights constituted by the exclusive jurisdiction clause (*see* para 23);

——*Donohue, v Armco Inc* [2002] 1 Lloyd's Rep 425, applied.

The following cases were referred to in the judgment:

*Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd*, 11 July 1989, unreported;

*Continental Bank NA v Aeakos Compania Naviera SA* (CA) [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588;

*Crédit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767; [1999] 1 All ER (Comm) 237;

*Donohue v Armco Inc* (HL) [2002] 1 Lloyd's Rep 425;

*Sabah Shipyard (Pakistan) Ltd v Republic of Pakistan* (CA) [2003] 2 Lloyd's Rep 571;

*Shashoua v Sharma* [2009] 2 Lloyd's Rep 376;

*Sunport Shipping Ltd v Tryg Baltica International (UK) Ltd* (CA) [2003] 1 Lloyd's Rep 138.

This was the hearing of two applications: by GV Films seeking a stay of the proceedings on the basis that there were proceedings before the High Court of Madras in India; and by the bank for an anti-suit injunction to restrain GV Films from pursuing the Indian proceedings.

Stephen Phillips QC and William Edwards, instructed by Lovells LLP, for the claimant; Jeffrey Gruder QC, instructed by Howard Kennedy, for the defendant.

The further facts are stated in the judgment of Field J.

Tuesday, 15 September 2009

## JUDGMENT

**Mr Justice FIELD:**

1. There are two applications before the court:

(i) an application by the defendant ("GV Films") dated 10 July 2009 seeking a stay of these proceedings, essentially on the basis that there are proceedings before the High Court of Madras in India; and

(ii) an application by the claimant, ("the bank") for an anti-suit injunction dated 14 August 2009 to restrain those Indian proceedings on the basis that they are brought in breach of an exclusive jurisdiction clause, or are vexatious and oppressive.

2. The bank is a US bank with a London branch. GV Films is an Indian company incorporated and based in Chennai. In 2006 GV Films made two bond issues:

(i) an issue of US$4.5 million, 2.25 per cent convertible bonds ("the Dollar Bonds"); and

(ii) the issue of €9 million zero coupon convertible bonds ("the Eurobonds"). The bank is trustee in relation to both bond issues under two trust deeds with GV Films.

In relation to the Dollar Bonds the trust deed is dated 20 April 2006 ("the Dollar Bonds Trust Deed"). In relation to the Eurobonds the trust deed is dated 23 October 2006 ("Eurobonds Trust Deed").

3. Both trust deeds contained identical jurisdiction clauses. The case has been fought out on the wording of the jurisdiction clause in the Dollar Bonds Trust Deed. Under clause 25.1 the deed is governed by English law. Clause 25.2 provides:

The Courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Trust Deed or the Bonds and accordingly any legal action or proceedings arising out of or in connection with this Trust Deed or the Bonds ("Proceedings") may be brought in such courts. The Company irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of the Trustee and each of the Bondholders and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction.

Condition 19 of the Dollar Bond Terms provides:

(a) these conditions, the agency agreement, the Trust Deed and the Bonds are governed by and shall be construed in accordance with English law. The company has in the Trust Deed irrevocably agreed for the benefit of the trustee and the Bondholders that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with these conditions, the Trust Deed or the Bonds, and that accordingly any legal action or Proceedings arising therefrom or in connection therewith may be

brought by the Bondholders in the courts of England.

(b) the company has in the Trust Deed irrevocably and unconditionally waived and agreed not to raise any objection which may have now or subsequently to the laying of the venue of any Proceedings in the courts of England and any claim that any Proceedings had been brought in an inconvenient form and, further, it irrevocably and unconditionally agreed that a judgment in any Proceedings brought in the courts of England shall be conclusive and binding upon the company and may be enforced in the courts of any other jurisdiction.

(c) Nothing in these conditions shall limit any rights to take proceedings against the company in any other court of competent jurisdiction, nor shall the taking of proceedings in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

4. At the end of 2007 GV Films took steps to implement a scheme to demerge into three companies: GV Films Ltd, GV Studio City Ltd and GV New Media Technology Ltd. By an order dated 29 November 2007 the High Court of Madras directed that a meeting of equity shareholders be held on 24 January 2008 to consider the proposed scheme. GV Films was of the view that consent of the bond holders was unnecessary. At the end of January 2008 the bond holders contended that the demerger scheme required their permission pursuant to condition 7.1 of the Eurobond Terms and condition 12 of the Dollar Bond Terms. This was not accepted by GV films. By 5 May 2008 GV Films had been served with notice by two Indian law firms in Chennai acting on behalf of the Dollar Bond holders and the Eurobond holders objecting to the demerger scheme. Lawyers acting for both sets of bond holders intervened to oppose the proposed scheme. Both the Dollar and the Eurobond holders were represented by counsel before the High Court of Madras who put forward arguments in opposition to the demerger.

5. The scheme of arrangement petitions were heard by Venkataraman J who, by a judgment dated 4 December 2008, refused to sanction the proposed scheme of arrangement and dismissed the petitions. By an appeal notice dated 3 April 2009, GV Films has appealed that decision although the appeal has not yet been heard.

6. By letters dated 23 February 2009 and 5 March 2008, the bank gave notice to GV Films of alleged events of default under the bonds and required them to be remedied to the extent that they were capable of remedy. On 16 March 2009 GV Films brought proceedings in the Madras High Court against the bank and the Euro and Dollar Bond holders, seeking a declaration that the notices from the bank dated 23 May and 5 March 2009 were premature, invalid and unenforceable and an injunction restraining the bank from taking any steps pursuant to those notices.

7. On 1 April 2009 Mr Balasubramaniam of BVS Legal appeared on behalf of the bank when the court was moved for an injunction by counsel for GV Films and asked for time to file a reply. At this point no proceedings had been served on the bank or the bond holders. GV Films allege that Mr Balasubramaniam made no objection as to the jurisdiction of the court.

8. On 25 May 2009 Peter Beck and Partners, the sole holder of the Eurobonds, instructed the bank to accelerate the Eurobond. The following day Metage Capital Ltd, the sole holders of the Dollar Bonds, wrote to the bank instructing them to accelerate payment of the Dollar Bonds. In accordance with those instructions on 26 May 2009 the bank wrote to GV Films contending that there had been events of default under both sets of bonds, and contending that payment of the bonds had been accelerated. On 29 May 2009 the bank brought proceedings in this court to recover the claimed accelerated payments and served particulars of claim on 5 June 2009.

9. There are three alleged events of default relied on by the bank in the proceedings brought in this court. The first contends that there was a failure by GV Films pursuant to clause 9.6 of the Dollar and Eurobonds to supply documentation and circulars to the bank and the bond holders relating to the intended scheme of demerger; the second relates to non-payment of legal fees incurred by the bank in respect of the demerger proceedings in the Madras High Court; the third relies on condition 11(f) of the Dollar Bond terms and 11.1.4 of the Eurobond terms, and involves an allegation in the particulars of claim that the demerger petition brought by GV Films in the Madras High Court amounted to an event of default pursuant to these provisions since it:

    ... would (had it been sanctioned) have involved the devolution of the rights and liabilities of GV Films in respect of the entire business of GV Films on two new companies. The trustee will refer to:

      (i) the proposed scheme of arrangement, and

      (ii) the judgment of Mrs Justice Venkataraman dated 4 December 2008 as showing what was proposed by GV Films.

10. At the centre of both applications before the court is the question whether the jurisdiction clause is an exclusive jurisdiction clause so far as GV Films is concerned. The bank relies on *Continental*

*Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR 588 and *Crédit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 All ER (Comm) 237, and contends that properly construed the jurisdiction clause is an exclusive jurisdiction clause requiring GV Films to sue only in England in respect of matters arising out of the bonds. The jurisdiction clause construed in *Crédit Suisse* was to all intents and purposes identical to the jurisdiction clause in this case. It is set out in the judgment of Rix J at page 244 beginning between G and H. At page 248 of the report under the heading "Clause 5.2 an exclusive or non-exclusive jurisdiction clause", Rix J summarises the arguments of the parties. The claimant in that case relied on the judgment of the Court of Appeal in *Continental Bank* where the relevant clauses were:

21.01 This agreement shall be governed by and construed in accordance with English law.

21.02 Each of the borrowers . . . hereby irrevocably submits to the jurisdiction of the English courts and hereby irrevocably nominate Messrs Aegis (London) Ltd of 197 Knightsbridge, London SW7, England, to receive service of proceedings in such courts on its behalf, but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof.

The essential reasoning of the Court of Appeal in the *Continental* case is cited by Rix J at page 249:

We have already explained why we interpret clause 21.02 in a transitive sense as involving an agreement by the defendants to submit disputes in connection with the loan facility to the jurisdiction of the English courts. That does not necessarily mean that clause 21.02 is an exclusive jurisdiction agreement. Mr Christopher Clarke QC submits that where there is an agreement to submit disputes to the jurisdiction of a particular country, the parties are taken to have intended the chosen court's jurisdiction to be exclusive unless there are unusual or particular circumstances which indicate otherwise . . . We find it unnecessary to explore this line of authority or to express any view on Mr Clarke's submission. We say that because clause 21.02 (the only jurisdiction agreement that we are asked to consider) does not contain a submission to English jurisdiction simpliciter. We regard the concluding words as significant: " . . . but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof". The juxtaposition a submission by the appellants to the jurisdiction of the English courts and the option reserved in favour of the Bank to sue elsewhere brings into play the *expressio unius exclusio alterius* canon of construction. It suggests that a similar option in favour of the appellants was deliberately omitted. In our judgment the language of clause 21.02 evinces a clear intention that the appellants, but not the bank, would be obliged to submit disputes in connection with the loan facility to the English courts.

Having noted the arguments advanced by the defendant, Rix J continued at page 249J:

The word "exclusive" was missing in *Continental Bank* as well and did not affect the issue. The word "may" reflects the possibility that CS Europe may at its option bring proceedings against MLC outside England. The "taking of proceedings" in the context of the final sentence can in my judgment only apply to the taking of proceedings by CS Europe; the presence of different law or jurisdiction clauses in other agreements merely serves to highlight the express wording of this clause; although the presence of an exclusive clause binding on MLC in the Purchase Agreements alone may seem odd, or at any rate incoherent, I do not feel, in the light of *Continental Bank* and its reasoning which lays stress on the Bank's unilateral option, to hold otherwise than that MLC is bound by its contract to bring proceedings arising out of or in connection with the purchase of agreements exclusively in the courts of England.

11. Mr Gruder QC for GV Films contends that I ought not to adopt the reasoning of Rix J in *Credit Suisse*. He points out that nowhere is the word "exclusive" used in the jurisdiction clause, and lays emphasis on the word "may" in contra-distinction to the possibility of the use of the word "shall". He contends that the irrevocable submission which is provided for in the second sentence of the clause applies to the previous sentence, and is governed by the previous sentence. He also relied on *Sabah Shipyard (Pakistan) Ltd v Republic of Pakistan* [2003] 2 Lloyd's Rep 571. That case concerned provisions contained in a guarantee. Clause 2.6 of the guarantee provided as follows:

2.6 Sovereign Immunity

The Guarantor hereby irrevocably and unconditionally agrees that the execution, delivery, and performance by it of this Guarantee constitute private and commercial acts.

The Guarantor hereby irrevocably and unconditionally agrees that:

(i) should. any proceedings be brought against the Guarantor or its assets, other than its military aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under

the 1978 Immunity Act of the United Kingdom or the 1976 Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets") in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guarantee, no claim of immunity from such proceedings will be claimed by or on behalf of the Guarantor on behalf of itself or any of its assets (other than the Protected Assets);

(ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and

(iii) consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of its use or intended use.

Clause 1.9.1 in the guarantee provided, under the heading: "Submission to Jurisdiction":

Each party hereby consents to the jurisdiction of the Courts of England for any action filed by the other Party under this Agreement to resolve any dispute between the Parties and maybe [sic] enforced in England except with respect to the Protected Assets, as defined in the Implementation Agreement of the Guarantor.

12. The leading judgment was given by Waller LJ. In para 32 he cites a passage from the unreported judgment of Hobhouse J in Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd. The clause there construed provided:

This agreement shall be construed and interpreted pursuant to laws of England and the parties hereby consent and submit to the jurisdiction of the Courts of England in connection with any dispute arising hereunder. The parties further agree that process in any such action may be served upon either of them by registered or certified mail at the address of first above given or such other address as the party being served may from time to time have specified to the other party by previous written notice.

In the course of his judgment Hobhouse J said:

Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have

used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English Courts and not that there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used. It is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.

Waller LJ went on (in para 34):

In my view clause 1.9.1 does not lend itself to a transitive construction, and when taken with clause 2.6, it seems to me that it is not an exclusive clause in the sense of making it a breach of contract for either party to commence proceedings in a jurisdiction other than England.

13. Mr Gruder QC contended that the essential elements found in the jurisdiction clause in the bond terms and the trust deeds were present in the Sabah provisions. He accordingly submitted that I should not feel bound by the decision of Rix J, or indeed by Continental Bank, but instead should adopt the approach of Waller LJ in Sabah. Mr Phillips for the bank argued that I was bound by the decision in Continental Bank. The hallmark of that case, he argued, was the close juxtaposition in one and the same clause of the acceptance that the courts of England should have jurisdiction with the liberty given to only one of the parties to bring proceedings elsewhere, thereby engaging the expressio unius exclusio alterius rule of construction noted by Steyn LJ in Continental Bank. Mr Phillips also relied on Sunport Shipping Ltd v Tryg Baltica International (UK) Ltd [2003] 1 Lloyd's Rep 138, where, at para 28 Clarke LJ said:

To my mind, that principle . . . [reading words of a condition in the light of existing English decisions] . . . is essentially a principle of construction. Thus the court is trying to ascertain the intention of the parties in using the expression deployed in the contract. Where a contract has been professionally drawn, as in the case of the Institute Clauses, the draftsman is certain to have in mind decisions of the courts on earlier editions of the clause. Such decisions are part of the context or background circumstances against which the particular contract falls to be construed. If the draftsman chooses to adopt the same words as previously construed by the courts, it seems to me to be likely that, other things being equal, he intends that the words should continue to have the same meaning.

14. Quite apart from authority, I would hold that the true construction of clause 25.2 in the Dollar Bonds Trust Deed is that it is an exclusive jurisdiction clause so far as concerns the company. The

clause has to be construed as a whole, and part of the relevant background are the similar provisions contained in the Dollar Bonds Terms. In my judgment the words:

> The courts of England are to have jurisdiction to settle any dispute which may arise out of or in connection with this Trust Deed . . .

taken together with the express liberty conferred on the trustee but not conferred on the company, to bring proceedings in any other court of competent jurisdiction, clearly show that the intention of the parties was that the courts of England are to be the exclusive jurisdiction so far as proceedings brought by GV Films are concerned. But the matter does not stop there, for I accept the submission of Mr Phillips that this question of construction has effectively been decided by the Court of Appeal in *Continental Bank*. I also, with respect, find the reasoning of Rix J in *Crédit Suisse* entirely persuasive. The *Sabah* case involved different wording. There, rather than providing that "the courts of England *are* to have jurisdiction" (emphasis supplied), the clause provided "each party hereby consents to the jurisdiction to the courts of England", and further, and more significantly, the reference to the bringing of proceedings in any jurisdiction was not contained in the selfsame jurisdiction clause but was contained in the quite separate clause, clause 2.16, that was concerned with exceptions to the doctrine of sovereign immunity.

15. For these reasons I find that clause 25.2 is an exclusive jurisdiction clause so far as concerns GV Films.

16. Where there is an exclusive jurisdiction clause and a party thereto seeks a stay of proceedings within the jurisdiction nominated by the clause, such an application will only succeed if that party can show strong reasons why the clause should not be enforced against them. In *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 Lord Bingham said:

> 24. If contracting parties agree to give a particular Court exclusive jurisdiction to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English Court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum. I use the word "ordinarily" to recognise that where an exercise

of discretion is called for there can be no absolute or inflexible rule governing that exercise, and also that a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct. But the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it. Whether a party can show strong reasons, sufficient to displace the other party's *prima facie* entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case. In the course of his judgment in *The Eleftheria* [1969] 1 Lloyd's Rep 237 at p 242; [1970] P 94, at pp 99–100, Brandon J helpfully listed some of the matters which might properly be regarded by the court when exercising its discretion, and his judgment has been repeatedly cited and applied. Brandon J did not intend his list to be comprehensive, but mentioned a number of matters, including the law governing the contract, which may in some cases be material. (I am mindful that the principles governing the grant of injunctions and stays are not the same: see *Aérospatiale* at p 896. Considerations of comity arise in the one case but not in the other. These differences need not, however, be explored in this case).

> 25. Where the dispute is between two contracting parties, A and B, and A sues B in a non-contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in their contract, and the interests of other parties are not involved, effect will in all probability be given to the clause . . .

17. Mr Gruder contended that it was irrelevant that his clients had expressly waived the right to advance contentions based on convenience for resisting the reach of the jurisdiction clause. In his submission, the approach was that formulated by Lord Bingham, and it was not open to the bank to contend that there was a special rule where there was waiver of convenience-based arguments that only such matters as were not in the contemplation of the parties at the time the clause was concluded could be prayed in aid as constituting strong reasons for disapplying the jurisdiction clause.

18. In my judgment, where a party has expressly agreed not to rely on convenience arguments in resisting the jurisdiction of the nominated court, that is a matter of very considerable significance, and in such a case especially strong grounds will be required before the exclusive jurisdiction clause can be departed from on grounds based on convenience. The strong reasons relied on by Mr Gruder are essentially three. First, he says that the bank freely participated in the demerger proceedings

FIELD J]                    Bank of New York Mellon v GV Films                    [QBD (Comm Ct)

England. In the case before me, however, the bank and the bond holders have a clear liberty to take proceedings in any foreign court. Further and in any event, on the evidence before me, although there is some dispute as to what might have happened on 3 September 2009, it is plain that there was no positive submission to the jurisdiction by the bond holders of the bank; and the appearance on 1 April was before there had been any service effected on the bank or on the bond holders. It is also plain that when the appearance was filed it was filed under protest. For these reasons, I see no justification for ordering a mini-trial of the allegations that the bank and the bond holders submitted to the jurisdiction.

23. My conclusion therefore is that there are no strong or sufficient reasons for not enforcing the exclusive jurisdiction clause against GV Films. It follows that GV Films' application for a stay must fail. It equally follows that the bank's application for an anti-suit injunction must succeed. In the absence of strong reasons, consistent with the approach of Lord Bingham in *Donohue*, it is plain as a matter of principle that the court's discretion should be exercised in favour of an injunction that enforces the contractual rights constituted by the exclusive jurisdiction clause. Accordingly, I shall grant the anti-suit injunction sought subject to any necessary debate with counsel as to its precise wording.

# BNP Paribas S.A. v Anchorage Capital Europe LLP, Anchorage Capital Group LLC, ACMO S.A.R.L., AIO III S.A.R.L.

Case No: 2013 Folio 235

High Court of Justice Queen's Bench Division Commercial Court

11 October 2013

## [2013] EWHC 3073 (Comm)

## 2013 WL 5336632

Before: The Honourable Mr Justice Males

Date: 11/10/2013

Hearing dates: 25th & 26th September 2013

## Representation

Mr Bankim Thanki QC and Mr Patrick Goodall (instructed by Cleary Gottlieb Steen & Hamilton LLP ) for the Claimant.

Mr Paul Greenwood (instructed by Stewarts Law LLP ) for the Defendants.

## Approved Judgment

Mr Justice Males:

## Introduction

1 This case is a dispute between a bank and a hedge fund about whether a handful of instant message communications resulted in a binding contract or contracts and, if so, between which parties and on what terms. But the issue presently for decision is whether these issues should be determined in London or New York (or possibly Luxembourg). As is often the case in commercial disputes, particularly in cases where tens of millions of dollars are at stake and it is thought that where the case is fought may well determine the eventual outcome, the parties and their lawyers have left no stone unturned in seeking respectively to establish or to challenge the jurisdiction of the English court over this dispute.

2 There are two applications to be determined. The first is a challenge by the second to fourth defendants (but not the first defendant, an English LLP) to the jurisdiction of the English court. Those defendants contend that the English court has no jurisdiction over them, or alternatively that any jurisdiction which it may have should not be exercised. The second is an application by the claimant to restrain the second defendant from pursuing proceedings which it has commenced in New York which (as is common ground) raise essentially the same issues as those arising in this action.

## The parties

3 The claimant, BNP Paribas SA ("BNPP"), is a French public limited company (société anonyme) with its headquarters in Paris. It operates globally, providing banking and financial services across 78 countries. However, this dispute concerns the corporate and investment banking activities of the Financial Credits Trading Desk of its registered London branch and has no connection with Paris (where the Desk has no traders). BNPP engages in banking and

specialised financial trading business in London, including the buying and selling of high yield distressed debt securities.

4 The Anchorage group is an investment management group with its principal centre of operations in New York. It provides investment management and trading services, operating through a structure of affiliated companies that provide investment management services or act as portfolio holding companies (ie funds) incorporated across a number of jurisdictions. Its legal, compliance, tax and accountancy functions are located centrally in New York, with the same individuals performing those functions for all group entities.

5 Four entities within the Anchorage group are defendants to this action. The first defendant, Anchorage Capital Europe LLP ("Anchorage London"), is an English LLP with an office in London. It provides investment management services to funds within the group. It was granted authorisation by the FSA (now the FCA) to act as an investment management business on 22 December 2009. The second defendant, Anchorage Capital Group LLC ("Anchorage New York"), is a Delaware company with its headquarters in New York which acts as an investment manager and adviser to the funds within the group. It is registered with the U.S. Securities and Exchange Commission as an investment adviser. The third and fourth defendants, respectively ACMO Sàrl ("ACMO") and AIO III Sàrl ("AIO"), both Luxembourg companies, are two of the investment funds within the group. I shall refer to "Anchorage" when there is no need to distinguish between the different defendants and to the second to fourth defendants together as "the overseas defendants".

## The AIB Notes

6 This action is concerned with subordinated private placement notes issued by Anglo Irish Bank ("AIB") with a face value of US $95 million ("the Notes"). The Notes were issued pursuant to a Note Purchase Agreement dated 28 September 2005 . Under the Note Purchase Agreement , AIB issued a principal amount of US $165 million Subordinated Notes, Series A, due 29 September 2015 (the "A Notes") and US $35 million Subordinated Notes, Series B, due 29 September 2017 (the "B Notes"). The Notes the subject of this action are A Notes. They are not listed on any exchange and are physically certificated.

7 AIB is a bank incorporated in the Republic of Ireland, which was nationalised by the Irish Government in 2009. On 1 July 2011 it was merged with the Irish Nationwide Building Society, which had also been nationalised, to form the Irish Bank Resolution Corporation Limited ("IBRC"). On 7 February 2013, it was announced that IBRC would be liquidated, rendering the Notes virtually worthless.

## The rival cases

8 It is BNPP's case that two binding English law contracts were concluded. The first is said to have been concluded on Friday 7 December 2012, when BNPP sold Notes with a face value of US $50 million. I shall refer to this as "the Friday trade" or "the Friday contract". The second was on the following Monday, 10 December 2012, when BNPP says that a contract for the sale of Notes with a face value of a further US $45 million was concluded ("the Monday trade" or "the Monday contract"). BNPP's primary case is that the Friday contract was concluded with Anchorage New York, while the Monday contract was concluded with Anchorage London, although it says also that both Anchorage companies were acting as agents for undisclosed principals, namely ACMO and AIO, the funds to which it is said that Anchorage had decided to allocate the Notes. However, BNPP has yet to plead its case in detail and Mr Bankim Thanki QC for BNPP reserved the right to plead the case in alternative ways as there is scope for more than one analysis of which Anchorage entity was BNPP's counterparty.

9 In contrast, Anchorage's case in very brief summary is that no binding contract was concluded on either day because material terms remained to be agreed; that the parties' dealings were governed by New York law and that any agreement reached at that stage was what is known as a "Type II preliminary agreement" under New York law whereby the parties' only obligation is to negotiate final terms in good faith; that as a result of the parties' subsequent conduct they either concluded a binding contract on 14 February 2013 for the first time or varied any existing contract, in either case so as to provide expressly for New York law and for BNPP to give certain

representations, of which BNPP is in breach; or if no such binding contract was then concluded, that is because BNPP was in breach of its obligation to negotiate in good faith. However, if (contrary to Anchorage's case), binding commitments for the purchase of the Notes were undertaken as a result of the parties' dealings on 7 and 10 December, it says that there was a single contract concluded on 7 December 2012 between BNPP and Anchorage New York, to which the other defendants were not parties.

## The trades

10 The circumstances in which these issues (and the related issue of where they should be determined) arise were as follows.

11 In October 2012, a New York investment firm called Fir Tree Partners ("Fir Tree") approached Jonathan Lett, a trader with BNPP in London, with a view to seeing whether it wished to purchase the Notes. BNPP was interested, and explored with a number of market participants, including Matt Hartnett of Anchorage London, the possibility of an on-sale. Although Anchorage's evidence suggested that BNPP's role was merely as a broker to conclude a prospective contract between Fir Tree and Anchorage, before me Anchorage's counsel Mr Paul Greenwood expressly accepted that BNPP was acting as a principal in purchasing the Notes from Fir Tree and was likewise acting as a principal in any contract concluded with any Anchorage entity for the onward sale of the Notes. It was at all times made clear to Anchorage that BNPP was purchasing the Notes from Fir Tree, and that its ability to sell to Anchorage was dependent on lining up a purchase of the Notes from Fir Tree with a sale to Anchorage, on which no doubt BNPP would make its own turn.

12 Anchorage was interested in purchasing the Notes and carried out due diligence upon them. BNPP was aware that Anchorage was doing this, and there was some discussion about the Notes between analysts employed by the respective parties. Although Anchorage (not surprisingly) did not share with BNPP the results of its due diligence, this was a prospective sale of Irish distressed debt. BNPP would reasonably have concluded, therefore, that Anchorage would identify the major risk associated with the Notes as being a default brought about by the conduct of the Irish government, as in fact it did.

13 Although the initial contact had been with Matt Hartnett of Anchorage London, negotiations were taken up by Anchorage's New York office. On 5 December 2012 Scott Goodwin of Anchorage New York provided Anchorage's initial offer, saying in an e-mail of that date that "we are good for 60mm face on this at 65" — or in other words, offering to buy Notes with a face value of US $60 million at a price of 65 cents on the dollar.

14 Further negotiations took place over the next two days, not only on the price, but also on the quantity of Notes to be sold. By 18:26 London time on Friday 7 December 2012 Mr Goodwin's proposal was that Anchorage would "buy 50mm right now … and then we have an option to buy the remaining 45mm until noon US time on Monday barring any news." By this stage, the proposed price had been negotiated down to 62.5 cents. He also indicated that "I'm going to need u to mark this for us every month", or in other words, to provide a valuation of the illiquid Notes each month up to their maturity date so that Anchorage could ensure that they were correctly valued in its books for internal accounting and reporting purposes, which BNPP agreed to do.

15 At 20:36 London time the following exchange took place between Mr Goodwin and Mr Lett via Bloomberg Instant Message, which BNPP contends resulted in a binding contract for the purchase by Anchorage New York of US $50 million of Notes, at a price of 62.5 cents on the dollar:

> "20:36:45 JONATHAN LETT, BNP PARIBAS Says Scott – pls can you confirm that Anchorage will buy USD50m BBG001MFY449 @ 62½ plus USD25m Ireland 5yr at 215bps. You have the exclusive on the balance until noon Monday at the same level subject to news from the seller.
>
> 20:36:59 SCOTT GOODWIN, ANCHORAGE GROUP GR Says done thank you
>
> 20:37:17 JONATHAN LETT, BNP PARIBAS Says this is done – thanks for the trade"

16 This was followed at 21:50 London time (by which time trading had ceased in London and those working at BNPP in London had gone home) by a voice confirmation recording this trade which was sent to Mr Goodwin by a credit sales representative at BNP Paribas Securities Corp, an affiliate of BNPP in New York. This described the customer as "Scott Goodwin @ Anchorage" and set out the terms of the trade, including the quantity, price, accrued interest and settlement date. Mr Goodwin replied with the subject line "VCON TRADE CONFIRMED".

17 Two aspects of these exchanges call for explanation. First, as indicated in the Bloomberg messages set out above, in addition to purchasing Notes with a face value of US $50 million, at the same time Anchorage also purchased "USD25m Ireland 5yr at 215bps". This was a credit default swap providing protection against a specified credit event involving the Republic of Ireland and required payment by Anchorage of an upfront fee of almost US $1.3 million. It represented a partial hedge against the risk of default on the Notes. Second, the parties had also been discussing the sale and purchase of further Notes with a face value of US $45 million. These were referred to as being subject to an "option" in Mr Goodwin's message at 18:26 and were what was referred to as "the balance" in Mr Lett's message at 20:36, on which Anchorage was to have "the exclusive". However, this was "subject to news from the seller", that is to say from Fir Tree, which reflected the fact that (as both parties understood) BNPP did not own these Notes and would only be in a position to sell them if it was able to purchase them from Fir Tree once Anchorage had made up its mind that it wanted them.

18 Shortly after noon London time on the following Monday, 10 December 2012, David Bodenstein of BNPP contacted Mr Hartnett of Anchorage London by Bloomberg Instant Message to see whether Anchorage did want these further Notes, as BNPP was also discussing a possible sale of them to others and wanted "to make sure that I give you guys a last look". Mr Bodenstein offered to call Mr Goodwin in New York, but Mr Hartnett responded that "either of us is fine". Mr Hartnett indicated that he thought that Anchorage did want to buy the remaining Notes, but was "just figuring out what funds to put it in". Later in the day he confirmed that Anchorage did want to buy, in response to which Mr Bodenstein indicated, after checking with Fir Tree, that BNPP was in a position to sell. The following exchange then took place via Bloomberg Instant Message:

"16:05:45 DAVID BODENSTEIN: 45mm

16:05:49 MATT HARTNETT: done?

16:06:22 DAVID BODENSTEIN: @62.5 we sell

16:06:44 MATT HARTNETT: perfect

16:06:49 MATT HARTNETT: thx again for the trade

16:06:58 DAVID BODENSTEIN: ANGIR

We sell $45mm 09/15 to Anchorage at 62½."

19 BNPP's case is that this exchange resulted in a further binding contract, for the purchase by Anchorage London of US $45m of Notes, again at 62.5 cents on the dollar.

## Subsequent events

20 On 11 December 2012, Melissa Griffiths of Anchorage sent an email to BNPP which referred to the "BNP sale to Anchorage" and advised that she would be responsible at Anchorage for settling the purchase. Her email referred to two distinct trades, on 7 and 10 December respectively. She indicated that the US $50 million of Notes traded on the Friday were to be allocated to ACMO, while the US $45 million of Notes traded on the Monday were to be split, with US $29 million allocated to ACMO and US $16 million to AIO. This was the first occasion on which BNPP was told of this allocation although it had been told, shortly before the Monday trade, that Anchorage was "just figuring out what funds to put it in".

21 The trades could not be settled immediately, because the physical Notes had (it transpired) been destroyed by flood damage resulting from Hurricane Sandy in October 2012. In order for

the trades to be settled, it was necessary for Fir Tree to get the Notes re-issued. They would then have to be re-registered and physically transferred from Fir Tree to BNPP, and then from BNPP to Anchorage. Although it appears that Anchorage was not told the detail of what would be required, it was told on 12 December 2012 that it would take some time and perhaps as much as four weeks to re-register the Notes. In the event it appears to have taken longer than this.

22 On 14 December 2012 Ms Griffiths sent a further e-mail attaching what was described as a "sample draft trade acknowledgement". This acknowledgment was a draft contract between BNPP and ACMO relating to the Friday trade (although with an indication that, once finalised, a similar contract could be prepared for the Notes to be allocated to ACMO and AIO as a result of the Monday trade) which was stated to be subject to New York law and contained (among other things) a proposed representation and warranty by BNPP that there were no defaults pursuant to the Notes either at the date of the contract or the Settlement Date (the date when rights to the Notes were to be transferred to ACMO and BNPP would be paid). BNPP responded that it would pass the draft onto its Compliance/Legal department and reply in due course, but in the event it never did so.

23 On 11 January 2013 Max Lipkin of Anchorage asked BNPP for a confirmation that "we hold this position at 12/31" (ie by the 31 December 2012 year end), the stated purpose of the request being "to get our administrator comfortable" that the Notes were held by Anchorage. In response BNPP confirmed that "the below trades are agreed, and still awaiting settlement". The "below trades" referred to were the Friday trade, allocated in its entirety to ACMO, and the Monday trade, split between ACMO and AIO as Anchorage had requested.

24 On 16 January 2013, in a conversation between Mr Lett of BNPP and Vladimir Bermant, an analyst at Anchorage London, the latter agreed with the former's observation that "this was an excellent trade for you guys", the point being that the value of the Notes had risen substantially since the trades had been agreed.

25 On 18 January 2013, Eric Sacks, the Chief Financial Officer of Anchorage New York, requested BNPP to confirm to Anchorage's auditors, Ernst & Young, the purchase of the Notes by ACMO and AIO.

26 On 7 February 2013, however, the position changed dramatically. AIB (in the form of IBRC) was placed into special liquidation in Ireland by emergency legislation passed in an overnight session of the Dáil. The effect of this liquidation was to render the Notes worthless or virtually so.

27 Also on 7 February 2013, Fir Tree tendered physical Notes to BNPP. BNPP was therefore in a position to settle the trades with Anchorage, and attempted to contact Anchorage to arrange settlement. Anchorage did not respond. Accordingly BNPP re-registered the Notes in ACMO and AIO's names and confirmed that the physical Notes would be delivered upon payment. The total sum demanded was US $59.375 million. Payment was requested at an account in New York. It is this conduct which is said by Anchorage to amount to acceptance of the terms proposed in Ms Griffiths' draft trade acknowledgment of 14 December 2012, thus resulting in a concluded or varied contract or contracts containing representations by BNPP and expressly subject to New York law.

28 Having demanded payment for the Notes on 15 February 2013, BNPP issued these proceedings on 19 February 2013, initially against the overseas defendants only. On 11 March 2013 Anchorage New York commenced an action against BNPP in New York seeking declarations that Anchorage New York was not obliged to purchase the Notes (i) because what I have called the Friday and the Monday trades did not create any binding contract as the parties had not reached agreement on all the material terms or on formal documentation necessary to consummate the contemplated transaction, and (ii) because BNPP's delay in tendering the Notes prior to IBRC's liquidation had the effect of frustrating any contract which had been concluded. Anchorage New York also sought damages for breach by BNPP of a duty to negotiate in good faith said to arise under New York law.

29 BNPP was not aware of those proceedings until after 12 March 2013, on which date the claim form in the English proceedings was re-issued on amendment, the amendment being to join Anchorage London as a defendant.

30 In order to avoid the time and expense involved in serving these proceedings on the various overseas defendants out of the jurisdiction, the parties reached a sensible agreement whereby

Anchorage's solicitors would accept service while reserving the right to challenge the jurisdiction of this court. Although at an earlier stage there was some disagreement as to the effect of this agreement, by the time of the hearing before me it was common ground that this service agreement had no effect on the right of the overseas defendants to challenge jurisdiction and that the burden remained on BNPP to justify the exercise of jurisdiction just as it would have done if BNPP had been required to serve the overseas defendants in the United States and Luxembourg respectively.

### The parties' prior dealings and the jurisdiction clause

31 This was not the first occasion on which BNPP and Anchorage had dealt together. Although there may be some dispute as to the extent of those dealings, there have been at least a number of prior contracts between BNPP's London branch and Anchorage entities, as well as other transactions in which BNPP's branches in other jurisdictions had dealt with Anchorage.

32 Like many large financial institutions, BNPP's London branch trades on standard terms of business. BNPP has sent Anchorage several versions of these terms over the years. These terms, headed "London Terms of Business for Professional Clients or Eligible Counterparties" and to which I shall refer as BNPP's London terms, are stated by clause 2.1 to apply

"where either BNP Paribas London Branch or BNP Paribas UK Limited (or any other UK Affiliate of BNP Paribas from time to time) is the contractual counterparty for any transaction you enter into with us, or where the business relationship between you and us is conducted through either entity."

33 Clause 34 of the terms applicable at the time of the Friday and Monday trades (and at all previous material times) provided for English law and jurisdiction in the following terms:

"This Agreement shall be governed by, and construed in accordance with, English Law and you irrevocably submit to the jurisdiction of the English courts in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement."

34 On 27 February 2008 BNPP informed Anchorage's central compliance manager that Anchorage New York had been classified as an eligible counterparty for the purpose of the Markets in Financial Instruments Directive (2004/39/EC) and its implementing regulations and sent him a MIFID pack (a pack of paperwork sent by BNPP to clients for the purposes of complying with this directive), requesting consent to this classification. This was given on 4 March 2008. At that stage BNPP's London terms were not sent, but they were sent in August 2008 as part of a MIFID pack sent to Anchorage New York and another Anchorage entity, Anchorage Capital Partners LP. In response Anchorage's compliance officer confirmed that the consent to classification as an eligible counterparty given earlier by Anchorage New York was also valid for this further entity. There was no objection to the BNPP London terms.

35 BNPP's London terms were also sent to Ms Griffiths and Sara Tin (both of Anchorage New York) in connection with a transaction involving Anchorage Capital Master Offshore Ltd, a Cayman Islands company within the Anchorage group, in July 2011. In response to that, Kathryn Pruess, who was (and who in her email was described as) Anchorage New York's Associate General Counsel, responded by email on 28 July 2011:

"We have reviewed and are comfortable with these terms".

### BNPP's case on jurisdiction

36 In summary, BNPP's case for jurisdiction over each defendant is as follows.

*Anchorage London.*

37 No question of jurisdiction arises. Anchorage London is an English LLP which was served here, and which does not challenge the court's jurisdiction over it.

*Anchorage New York.*

38 BNPP seeks to found jurisdiction over Anchorage New York for its claim under the Friday contract (and if necessary the Monday contract, although BNPP's primary case is that the Monday contract was concluded with Anchorage London) by any of the following routes:

> 38.1 first, pursuant to Article 23 of the Brussels Regulation (because Anchorage New York accepted an English jurisdiction clause in BNPP's London terms);

> 38.2 second, pursuant to <u>CPR</u> PD6B para 3.1(6)(a) because the contract was made within the jurisdiction;

> 38.3 third, pursuant to <u>CPR</u> PD6B para 3.1(6)(c), because the contract was governed by English law, either because of the express choice of English law in BNPP's London terms or as a result of applying Article 4 of the Rome I Regulation;

> 38.4 fourth, pursuant to <u>CPR</u> PD6B para 3.1(6)(d), because the contract contains a term (again, in BNPP's London terms) to the effect that the English court shall have jurisdiction;

> 38.5 fifth, pursuant to <u>CPR</u> PD6B para 3.1(7) because a breach of the contract was committed within the jurisdiction; and

> 38.6 sixth, pursuant to <u>CPR</u> PD6B para 3.1(3), because Anchorage New York is a necessary or proper party to the claims made against Anchorage London, ACMO and/or AIO.

*ACMO and AIO.*

39 BNPP seeks to found jurisdiction over ACMO and AIO under the following provisions of the Brussels Regulation:

> 39.1 Article 23, because they are bound by the English jurisdiction clause in BNPP's London terms;

> 39.2 Article 5(1)(a), because the place of performance of the obligation in question under the contracts is England;

> 39.3 in relation to the Monday contract, Article 5(5), because the dispute arises out of the operations of ACMO and AIO's agent, Anchorage London, situated in England; and

> 39.4 Article 6(1), because the claim against ACMO and AIO is so closely connected to the claim against Anchorage London, which is sued in the court of its place of domicile, that it is expedient to hear and determine them together.

## Jurisdiction — the tests to be applied

*Under the Brussels I Regulation*

40 Where jurisdiction is founded under the Brussels Regulation, it is for the claimant to show a good arguable case that jurisdiction is available under the Regulation. This means that, on the material available at this preliminary stage, the claimant must have "much the better of the argument" ( <u>*Canada Trust Co v Stolzenberg (No 2) [1998] 1 WLR 547)*</u> . There has been detailed analysis in many cases of what is meant by this formulation, including such issues as what if anything is added by the word "much", but as the question of jurisdiction in this case does not depend upon such precise nuances, I need not rehearse those cases or enter into that debate.

*Under CPR PD6B*

41 By contrast, where jurisdiction is sought to be established under the provisions of CPR PD6B, a three-stage test applies.

41.1 First, the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits. This is the same test as for summary judgment, namely whether there is a real (as opposed to fanciful) prospect of success.

41.2 Second, the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more of the jurisdictional gateways set out in CPR PD6B. Again, this means that the claimant must have much the better argument on this point.

41.3 Third, the claimant must satisfy the court that in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.

## Article 23 of the Brussels Regulation

42 As will have been observed, although there are various routes by which BNPP seeks to found jurisdiction against the different overseas defendants, in the case of all of them BNPP relies on the jurisdiction clause in its London terms of business as a clause falling within Article 23 of the Brussels Regulation.

43 It is common ground that jurisdiction can only be established against ACMO and AIO pursuant to the terms of the Brussels Regulation as they are companies domiciled in an EU member state. Anchorage New York is not so domiciled and contends that it is not subject to the Regulation. However, it is well established that the Regulation is part of English law and that jurisdiction may be established under Article 23 by reason of a jurisdiction clause fulfilling the requirements of that Article between an English domiciled claimant and a defendant domiciled outside the EU: Antec International Ltd v Biosafety USA Inc [2006] EWHC 47 (Comm); Thomas Cook Tour Operations Ltd v Kaya Turistic Tesisleri Otelcilik [2009] EWHC 720 (QB).

44 Under Article 23(1), a jurisdiction agreement is effective if it is: (a) in writing or evidenced in writing; (b) in a form which accords with practices which the parties have established between themselves; or (c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned. The purpose of these requirements is to ensure that there is consensus between the parties to the jurisdiction clause, and to this end for the purposes of Article 23(1)(a) it is the agreement to the jurisdiction clause (and not merely the clause itself) which must be in writing: *Estasis Salotti di Colzani Aimo e Gianmario Colzani v RUWA Polstereimaschinen GmbH (Case 24/76) [1976] ECR 1831* ; and *Galeries Segoura v Rahim Bonakdarian (Case 25/76) [1976] ECR 1851* .

45 In the present case the jurisdiction clause applies, by its own terms, when a contract is concluded with BNPP's London branch. In order to establish jurisdiction under Article 23 it is therefore necessary for BNPP to show a good arguable case that it did conclude a binding contract with the defendant which it is sought to bring before the court and that the defendant agreed to the jurisdiction clause. I consider these questions in turn. However, although the question whether the Friday and/or the Monday trade resulted in a binding contract or contracts for the sale of the Notes and, if so, with whom and on what terms, seems likely to be determinative of liability in this action, at this stage I am concerned only with the question of jurisdiction, applying the test of good arguable case. It is unnecessary and would not be appropriate to attempt finally to determine these matters.

*Was there a binding contract or contracts for the sale of the Notes?*

46 I summarised the relevant principles (which are well established) for determining whether a contract has been concluded in Air Studios (Lyndhurst) Ltd v Lombard North Central Plc [2012]

EWHC 3162 (QB), [2013] 1 Lloyd's Rep 63 at [5] to [9] and need not repeat that summary here. It is clear, applying those principles, that BNPP has a good arguable case, at any rate if English law applies, that the Friday and the Monday trades were intended to result in immediately binding contracts for the sale and purchase of the Notes at the agreed price and were not subject to later negotiation of detailed contractual terms. My reasons for this conclusion are as follows.

47 First, on both occasions the traders used the language of binding contract ("done", "thanks for the trade"), with no suggestion that either the Friday or the Monday trade was subject to further negotiation of detailed terms and conditions. Nor was there any such suggestion in Mr Goodwin's unqualified approval of the voice confirmation on the Friday evening. Second, the US $25m credit default swap purchased on the Friday demonstrated an intention by Anchorage to hedge the Notes purchased under the Friday trade, which only made sense if a binding contract to purchase those Notes had been concluded. Third, the background against which the trades were negotiated on both the Friday and the Monday was one in which it was known that BNPP would need to align its purchase from Fir Tree with its sale to Anchorage, that the price at which Fir Tree was willing to sell was liable to change, and that BNPP was also known to be negotiating with other prospective buyers who were interested in purchasing the Notes. In such circumstances it was essential to strike a deal which would be immediately binding on both parties. Fourth, even Ms Griffiths' e-mail of 14 December 2012 attaching the draft trade acknowledgment did not suggest that agreement on these terms was necessary before the parties would be contractually bound. Fifth, in numerous ways between the conclusion of the trades and the liquidation of AIB on 7 February 2013, the parties' dealings with each other set out above suggested a mutual understanding that the trades had resulted in binding contracts.

48 There was some debate about whether, if the Friday and the Monday trades resulted in binding agreements, there was (as Anchorage contended) a single contract concluded on Friday for the sale and purchase of Notes with a face value of US $50 million together with a binding option for the purchase of further Notes with a face value of US $45 million or (as BNPP contended) two separate contracts. Again, it is unnecessary and would not be appropriate to reach a final conclusion on this question, and ultimately I doubt if it makes much difference, at any rate so far as the question of jurisdiction is concerned. The question of one contract or two depends in part on whether the provision in the Friday trade that "You have the exclusive on the balance until noon Monday at the same level subject to news from the seller" created a legally binding option unilaterally exercisable by Anchorage. BNPP contends that the subject ("news from the seller") was too vague to give rise to a binding obligation and that the "exclusive" was merely a moral rather than a legal commitment undertaken by BNPP. However, even if this was a legally binding option, its exercise was clearly dependent on BNPP being able to conclude a purchase with Fir Tree on the Monday at the same price as the purchase it was concluding on the Friday. Thus the option could not be exercised by a unilateral notice without more and a process of negotiation or at any rate investigation would be required before the parties could know whether it had been exercised successfully. The judgment of Hoffmann J in *Spiro v Glencrown Properties Ltd [1991] Ch 537* demonstrates that an option is not strictly speaking either a conditional contract or an irrevocable offer, although there are some ways in which it resembles each of them, and that how it is to be characterised depends upon the context. In my judgment, for the purposes of a dispute about jurisdiction in the circumstances of this case, the Monday trade is best regarded as a distinct contract, which is in fact how the parties treated it. I consider that BNPP has at any rate a good arguable case to this effect.

*With whom were the contracts made?*

49 Identification of the Anchorage entity or entities which concluded the contracts is more complex. It may well be that no real thought was given to this by the traders who concluded them. They may well have regarded the substance of the matter as a deal between BNPP and Anchorage, in which identification of the particular purchaser was no more than an unimportant detail which could be sorted out when the paperwork was written up. From the viewpoint of traders who knew and trusted each other and who had often dealt with each other in the past, that would not be surprising. Nevertheless, as there can in law be no contract without a contracting party or parties, it is necessary to analyse the parties' dealings in order to identify the parties to the contracts. However, in circumstances where there was an evident intention to be bound, the law should seek to give effect to the commercial parties' intentions and it would be wrong to approach this issue in an unduly technical way.

50 As already indicated, BNPP's primary case is that the Friday contract was concluded by Anchorage New York acting as an agent for ACMO as an undisclosed principal, and that the Monday contract was concluded by Anchorage London acting as an agent for ACMO and AIO as its undisclosed principals. On that basis BNPP contends that it is entitled to sue both the agent and the principal (see the summary of the law on undisclosed principals by Lord Lloyd of Berwick in *Siu Yin Kwan v. Eastern Insurance Co Ltd [1994] 2 AC 199* at 207). Anchorage, however, contend that if any binding contract was concluded, it was concluded with Anchorage New York; that no decision was made until after the conclusion of the trades about the fund or funds to which the Notes would be allocated; and that there can be no question of an agent acting for an undisclosed principal whose identity has not been determined at the time of conclusion of the contract. The result, according to Anchorage, is that there is no arguable case against Anchorage London (which therefore cannot be used as an "anchor" defendant for the purpose of founding jurisdiction against the overseas defendants) and no basis on which jurisdiction can be established against ACMO or AIO as there is no good arguable case that they were parties to any contract. Anchorage accepts that there is a serious issue to be tried against Anchorage New York, but contends that Anchorage New York did not agree to the jurisdiction clause in BNPP's London terms and that BNPP is unable to found jurisdiction against it by means of any of the gateways in CPR 6PD.

51 In response BNPP invites me to infer, contrary to Anchorage's evidence, that decisions to allocate the funds to ACMO and AIO had been made before the conclusion of the trades. It contends that Anchorage New York and Anchorage London must have intended to contract on behalf of one or more of the funds rather than on their own behalf, that a decision about allocation must have been made before concluding the trades as Anchorage would need to know where the money to pay for the Notes was to come from, and that the fact that decisions appear already to have been made very shortly after conclusion of the trades is an indication that they had in fact been made beforehand. In the alternative it contends that there is no conceptual difficulty with holding a party liable as an undisclosed principal notwithstanding that its identity has not been determined at the time of concluding that contract, provided that at the time of contracting the agent intends to contract for one of a range of principals and is authorised to do so, at any rate in circumstances such as the present where the identity of a contracting party within a group of companies is a matter of no significance to the counterparty.

52 I must bear in mind that at this stage the question is only whether there is a good arguable case and that I am not deciding these issues. It seems to me that the question whether a decision on allocation had been made before the trades were concluded is a factual question which may be determined either way, and which may have a significant bearing as a matter of law on the identity of the contracting Anchorage party, even though it would appear to be a point of little commercial significance. There is force in the points made by BNPP suggesting that the decision had already been made, but Anchorage's evidence that no decision had been made is unequivocal and cannot at this stage be regarded as wrong.

53 If a decision had been made to allocate the Notes to ACMO and AIO respectively, there would appear to be a compelling case that ACMO and AIO were BNPP's only contractual counterparties, on the basis that there was an understanding from the parties' prior dealings that Anchorage New York and Anchorage London were not purchasing the Notes on their own behalf, but were acting as agents on behalf of funds within the group, and that BNPP was content to deal with whichever fund was determined by Anchorage. If that is so, ACMO and AIO would be liable on the contracts, although Anchorage New York and Anchorage London, whose role was known to be merely that of agents, would probably not be.

54 On the other hand, if no decision on allocation had been made when the trades were concluded, it seems to me that there is at least a good arguable case that Anchorage New York incurred personal liability on the Friday contract and that whichever of Anchorage New York and Anchorage London is to be regarded as having concluded the Monday contract likewise incurred personal liability on that contract, at any rate if Anchorage is correct in its submission that there can be no question of agency on behalf of a principal who has not yet been identified, a point which (as it seems to me) should not be determined at this stage but is best left for decision once the full facts are established. As to which of these two entities is to be regarded as having concluded the Monday contract, I accept BNPP's submission that as the contract was in fact concluded as a result of dealings with personnel at Anchorage London, there is a good arguable case that it is that company which should be regarded as having done so. While there is an

argument that the option given on the Friday (whether or not legally binding) was given to Anchorage New York as the party with whom the Friday trade had been concluded, so that the exercise of this option on Monday must also have been by Anchorage New York, it is also possible (and in the end seems more plausible) to regard the option as being given on the Friday to whichever Anchorage company would wish to purchase the further Notes.

55 It seems to me that there is also a good arguable case that even if the contracts were not initially concluded with ACMO and AIO because their identity had not yet been determined, the post-contractual exchanges in which BNPP confirmed the purchases (including confirmation of the allocation to ACMO and AIO) had the effect that these funds undertook liability under the contracts, although it would be debatable whether such liability was intended to be instead of or in addition to that of Anchorage New York and Anchorage London who had initially concluded the contracts. However, the parties' submissions did not analyse the position in this way and I do not rest my judgment on this way of viewing the matter.

56 At trial, and when deciding against which if any of the defendants to enter judgment on either contract, final decisions will need to be made about these matters. At this stage, when the issue is one of jurisdiction and the test is that of good arguable case, I consider that there is a sufficient case against each of the overseas defendants to satisfy that test. I conclude, therefore, that there is a good arguable case that (i) Anchorage New York is liable on the Friday contract, either as principal or as agent, (ii) ACMO is liable on the Friday contract as principal, (iii) (if, contrary to BNPP's primary case but as contended by Anchorage, the Monday contract is to be regarded as having been concluded by Anchorage New York) Anchorage New York is also liable on the Monday contract, either as principal or as an agent, and (iv) ACMO and AIO are liable on the Monday contract as principals, each for their respective allocation.

57 It is true that some of these conclusions appear to be mutually exclusive. For example, if Anchorage New York is liable on the Friday contract as a principal, it may be that ACMO could not also be so liable. In such circumstances, if the test of good arguable case means that the claimant must have much the better of the argument on the point, is there any inconsistency in concluding that there is a good arguable case against both defendants? In my judgment there is not. The test of good arguable case is sufficiently flexible to allow for a conclusion that there is a good arguable case that each of two defendants is liable on a contract, even if ultimately only one of them can be. In circumstances where the contractual analysis is not straightforward and depends at least to some extent on facts which are exclusively within the knowledge of the defendants, a rigid application of the test of good arguable case is clearly not appropriate.

## The requirements of Article 23

58 On the basis that there is a good arguable case against each of the overseas defendants that it is liable on one or both of the contracts, it remains to consider whether the requirements of Article 23 of the Brussels Regulation are satisfied. The jurisdiction clause in BNPP's London terms is in writing. As already noted, Anchorage expressly indicated its agreement to that clause (among others) in writing by means of Kathryn Pruess' email of 28 July 2011 which, over a signature reading "Associate General Counsel, Anchorage Capital Group LLC" (ie Anchorage New York) said "we have reviewed and are comfortable with these terms". That satisfied the requirement of agreement to the clause in writing – but agreement by whom?

59 The issue is whether, in expressing that agreement, Ms Pruess should properly be understood as expressing agreement on behalf of the Anchorage group as a whole or only on behalf of the particular Cayman Islands entity, Anchorage Capital Master Offshore Ltd, which was to be the counterparty in the particular transaction then under consideration. The context in which this issue must be determined is that BNPP was dealing with an investment management company based in New York which managed a number of funds in a number of jurisdictions including offshore jurisdictions, and that BNPP would not necessarily be told at the time of concluding a trade the identity of the Anchorage fund to which the asset in question would be allocated (indeed, on Anchorage's case, that decision might not yet have been made). BNPP would simply deal with Anchorage New York (or London) without needing to inquire on whose behalf the individuals in the New York (or London) office were acting. In the past, moreover, BNPP had been told that consent to classification as an eligible counterparty given by one Anchorage company was also valid for another entity within the group.

60 In these circumstances, it seems to me to be clear (and at any rate that BNPP has much the better of the argument) that the confirmation given by Ms Pruess is properly to be understood as given on behalf of the Anchorage group as a whole. It would make no sense to read her e-mail as saying that the particular Cayman Islands entity was comfortable with BNPP's London terms including the jurisdiction clause, but that other Anchorage entities were not. Indeed, the absurdity of such a reading can be illustrated by supposing that Anchorage had decided to allocate some of the Notes purchased in the present case to its Cayman Islands fund. It would be a strange outcome if that fund was bound by the jurisdiction clause but other funds to which the remaining Notes were allocated were not. The agreement of an agent to a jurisdiction agreement will bind the principal for the purposes of Article 23 and accordingly Ms Pruess's agreement in her capacity as Associate General Counsel of Anchorage New York was effective to bind ACMO and AIO (see Standard Steamship Owners' Protection & Indemnity Association (Bermuda) Limited v GIE Vision Bail [2004] EWHC 2919 (Comm), [2005] 1 All ER (Comm) 618 at [51]-[55]).

61 Accordingly I am satisfied that BNPP has the better (or, if different, much the better) of the argument that the court has jurisdiction over each of the overseas defendants under Article 23(1) of the Brussels Regulation – unless, that is, the position at the time of concluding the contract was changed by a subsequent variation whereby the parties agreed to New York law (as to which, see further below).

## Applicable law

62 My conclusions so far have been reached as a result of applying English law. In my judgment that is the applicable law governing these issues, either because of the parties' express choice of English law in BNPP's London terms, or because English law applies pursuant to Article 4(1)(a) of the Rome I Regulation whereby, in the absence of a choice of law made by the parties, a contract for the sale of goods is governed by the law of the country of the seller's habitual residence. The effect of Article 19(2) is that, as the contracts were concluded by BNPP's London branch, London is treated as the place of its habitual residence.

63 Anchorage contends that the choice of English law in clause 34 of BNPP's London terms applies only to matters dealt with in those terms and does not apply to "Transactions" concluded pursuant to those terms. I reject that distinction as unrealistic. It represents the kind of semantic approach to such clauses which English law has firmly left behind. Anchorage contends also that there was a choice of New York law for the purpose of Article 3 of the Rome I Regulation, so that Article 4 does not apply, but I can see no basis in the evidence for any such contention. Certainly the matters relied on, which essentially amount to no more than an assertion that it would have been sensible and desirable to agree to apply the law of New York, together with the reference to New York law in Ms Griffiths' draft trade acknowledgment, cannot constitute such a choice.

64 As to Article 4 of the Rome I Regulation, Mr Greenwood for Anchorage accepted that if there was no express choice of law in BNPP's London terms and there was otherwise no choice of law by the parties, Article 4 would apply to the sale of the Notes and would have the effect that English law is the applicable law, unless the primary rule in Article 4(1)(a) can be displaced as a result of Article 4(3). This provides that "where it is clear from all the circumstances of the case that the contract is manifestly more closely connected with a country other than that indicated" by Article 4(1), "the law of that other country shall apply". Anchorage contends that this is such a case and that it is clear that the contracts are manifestly more closely connected with New York than they are with London. I do not agree. Article 4(3) deliberately places a high hurdle in the way of a party seeking to displace the primary rule. The most that can be said in Anchorage's favour is that there are factors pointing in both directions. This comes nowhere near satisfying the test of "clear that the contract is manifestly more closely connected" with New York than with London.

65 Accordingly it is appropriate in my judgment to have approached the questions so far considered as a matter of English law. This means that it is unnecessary for present purposes to consider whether, if New York law applies, the Friday or Monday trades amounted to no more than a "Type II preliminary agreement" giving rise to an obligation to negotiate in good faith, a matter which in any event is in dispute between the parties and on which it would be difficult to reach any conclusions at this stage.

## Anchorage's variation theory

66 Anchorage's primary case is that the Friday and the Monday trades did not result in concluded contracts because there were terms which remained to be agreed. I have dealt with that argument above. Alternatively, however, it contends that the draft trade acknowledgment sent to BNPP by Ms Griffiths on 14 December 2012 (which provided for New York law to apply) was accepted by BNPP's sending of the Notes, re-issued in the names of ACMO and AIO, to Anchorage New York together with a demand for payment on 14 February 2013. It contends, therefore, that any contract already concluded on 7 or 10 December 2012 was varied by conduct, not only to provide for New York law, but also to include the representations and warranties to be given by BNPP set out in the draft acknowledgement.

67 I would accept that, if such a variation occurred, its effect would probably have been that the law and jurisdiction clause in BNPP's London terms would no longer apply to this transaction even though Ms Griffiths' draft trade acknowledgment did not expressly refer to jurisdiction as distinct from governing law. The consequence would be that BNPP would no longer be able to rely on Article 23 of the Brussels Regulation. However, I regard the argument that BNPP's conduct on 14 February 2013 was an acceptance of the terms proposed by Ms Griffiths as hopeless. Whether that conduct should be regarded as constituting such an acceptance is a question to be determined objectively. As it is put in *Chitty on Contracts* (31st ed, 2012), vol 1, para. 2-030:

> "conduct will amount to acceptance only if it is clear that the offeree did the act of alleged acceptance with the intention (ascertained in accordance with the objective principle) of accepting the offer."

68 No sensible person could have considered that BNPP's conduct on 14 February 2013 was intended to be an acceptance of Ms Griffiths' draft. There had been no reference to her draft for some weeks and it had simply dropped from view. There was no reason to suppose that by causing the Notes to be re-issued in the names of ACMO and AIO BNPP was intending to accept the terms of her draft. On the contrary it had been told on many occasions that these were the funds to which the Notes should be allocated. Moreover, and fatally to Anchorage's argument, Ms Griffiths' draft included a proposed warranty by BNPP that on the Settlement Date there was no default on the Notes, but by 14 February 2013 it was known that there was such a default as a result of the liquidation of AIB a week earlier. BNPP would have had to be mad to give such a warranty on 14 February and Anchorage cannot reasonably have thought that it was doing so.

### Conclusion on Article 23

69 The conclusions reached so far mean that BNPP succeeds in establishing jurisdiction against all three of the overseas defendants and that those defendants' application challenging the exercise of jurisdiction over them must be dismissed. That being so, I can deal very briefly with the other routes by which if necessary BNPP would seek to establish jurisdiction.

### Jurisdiction over Anchorage New York under CPR PD6B

70 In my judgment BNPP would if necessary succeed in showing a good arguable case against Anchorage New York under each of the "gateways" set out above on which it relies.

71 Whether the Friday contract was made within the jurisdiction depends on whether Mr Lett's message of 20:36:45 was an offer accepted by Mr Goodwin's response "done thank you". If so, the acceptance was received by Mr Lett in London and the contract, concluded by instantaneous means, was made in London where the acceptance was received: *Entores v Miles Far East Corp [1955] 2 QB 327* . Anchorage accepts this analysis, but submits that Mr Lett's first message was not an offer to sell but an invitation to Mr Goodwin to make an offer in those terms, so that it was his message ("done thank you") which constituted the offer and Mr Lett's response ("this is done – thanks for the trade") received in New York which constituted the acceptance. It would be unfortunate if the important question of jurisdiction should depend on such niceties, but for what it is worth I consider that BNPP has much the better of the argument on this point. There is no doubt that the Monday contract was made in England, so that if (contrary to BNPP's primary case) that was a contract concluded with Anchorage New York, jurisdiction would also be

established in respect of the Monday contract under this gateway.

72 For the reasons already given, both contracts were governed by English law and contained a term to the effect that the English court should have jurisdiction.

73 Whether a breach of the contracts was committed within the jurisdiction depends on where Anchorage's obligation to pay for the Notes had to be performed. In general, as Anchorage accepted, it is the duty of a debtor to seek out and pay his creditor at the creditor's residence or ordinary place of business. However, Anchorage contends that this rule does not apply for two reasons. The first is that as BNPP was incorporated in France, albeit with a branch in London, payment could be made either in France or in England. I do not accept this. In accordance with the reasoning in the Northern Irish case of *ICS Computing Ltd v Capital One Services Inc [2002] NIQB 2, [2002] NI 76* I would hold (and in any event there is a good arguable case) that the obligation to pay arises at the creditor's place of business and that in a case where the creditor has more than one place of business, the relevant place of business is the place through which the parties' dealings have taken place. Indeed ICS Computing Ltd was a case where there had been dealings through the plaintiff's offices in both England and Northern Ireland, but what mattered was that the office in Northern Ireland was "the main centre of activity" in these dealings. Anchorage's second argument is that when BNPP demanded payment on 14 February 2013, the demand was for payment at a bank account in New York. That is so, but (as Mr Greenwood accepted) such a demand cannot constitute a unilateral variation of the contractual obligation to pay in London. However, Mr Greenwood contends that, as a matter of construction, Anchorage New York was under an obligation to pay at such place as might reasonably be demanded by BNPP, and that what BNPP demanded, perfectly reasonably, was payment in New York. I do not accept that the contracts are to be construed in this way. It is not what they say and there is no need to imply a term that BNPP should be free to demand payment elsewhere than in London. To do so would introduce unnecessary uncertainty as there might be scope for dispute about where it was reasonable to demand payment. BNPP's demand was merely an acceptance by BNPP that if payment was made in accordance with the demand, that would discharge Anchorage's obligation.

74 Finally, I would accept that Anchorage New York is a necessary or proper party to the claims made against Anchorage London, ACMO and AIO. The issue here is not whether there is a sufficient connection between the various claims, but whether there is a sufficient case either on the merits or as a matter of jurisdiction against the "anchor" defendants to justify exercising jurisdiction over Anchorage New York. As to this, there is and can be no jurisdictional challenge by Anchorage London and, although Mr Greenwood submitted that the claim against Anchorage London is weak, there has been no application to strike it out. For the reasons given above it seems to me that there is a real issue to be tried as between BNPP and Anchorage London and that any strike-out or summary judgment application would be most unlikely to succeed. Accordingly the claim will continue against Anchorage London. Whether ACMO and AIO are also available as "anchor" defendants depends on whether BNPP is able to establish jurisdiction over them under the Brussels Regulation, which I consider further below.

75 As already indicated, in order to establish jurisdiction under CPR PD6B (and in contrast with the Brussels Regulation) BNPP must also show that there is a serious issue to be tried on the merits (which Anchorage New York does not dispute) and that England is clearly or distinctly the appropriate forum for the trial so that in all the circumstances the court ought to exercise its discretion in favour of English jurisdiction. I return to this after considering the position of the Luxembourg defendants, ACMO and AIO. The question of discretion does not arise in their case, but it seems sensible to address the exercise of discretion in Anchorage New York's case once it is known whether jurisdiction is established against the Luxembourg defendants.

## Jurisdiction over ACMO and AIO under the Brussels Regulation

76 As ACMO and AIO are domiciled in Luxembourg, jurisdiction over them can only be established by reference to the provisions of the Brussels Regulation. I have already concluded that jurisdiction can be founded under Article 23, but jurisdiction can also be founded under other Articles in addition, again applying the test of good arguable case.

77 For the same reasons as already given in relation to the place of breach as against Anchorage New York, jurisdiction can be founded under Article 5(1) on the basis that the place of

performance of the obligation in question is England. This requires a little explanation. For the purposes of the Brussels Regulation, the contracts for sale of the Notes were contracts for the sale of goods (the Notes being negotiable instruments). Thus, *prima facie* , Article 5(1)(b) would apply, such that the place of the performance of the obligation in question would be the place in a Member State where the goods were delivered or should have been delivered. However, the place of delivery of the Notes was New York, and thus there was no place in a Member State where the goods were to be delivered, with the consequence that Article 5(1)(b) does not apply in this case. In that situation, Article 5(1)(c) makes it clear that Article 5(1)(a) applies, such that a claim can be brought in the courts for the place of performance of the obligation in question. The "obligation in question" which is the basis of the action is ACMO and AIO's obligation to pay for the Notes, an obligation which was required to be performed in England as already explained.

78 In relation to the Monday contract, there is a good arguable case that both ACMO and AIO were represented by their agent, Anchorage London, who negotiated the contract. For the purposes of Article 5(5) of the Brussels Regulation, a contractual dispute is closely connected to the operation of a branch or agency if the contract was negotiated by that branch: *Anton Durbeck GmbH v Den Norske Bank ASA [2003] EWCA Civ 147, [2003] QB 1160* at [40]. Accordingly jurisdiction is also available under Article 5(5) because Anchorage London is established in England.

79 Finally, under Article 6(1) of the Brussels Regulation, a defendant may be sued in the Member State where a co-defendant is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. In this case, the claims against ACMO and AIO are closely connected with the claims against Anchorage London. Anchorage contends that Article 6(1) is not available because there is no serious issue to be tried on the merits against Anchorage London as the "anchor" defendant (see *The Xing Su Hai [1995] 2 Lloyd's Rep 15* at 22), but for the reasons already given I do not agree.

## Forum conveniens

80 Questions of *forum conveniens* do not arise if, as I have held, jurisdiction is established against all the overseas defendants under Article 23 of the Brussels Regulation. Further, such questions do not arise as against ACMO and AIO in any event. Nor do they arise if I am right to conclude that Anchorage New York has agreed to the English jurisdiction clause in BNPP's London terms, as there is no reason (let alone any strong reason) why effect should not be given to that clause (see eg Antec International Limited v. Biosafety USA Inc [2006] EWHC 47 (Comm) at [7]; and *Sebastian Holdings Inc v Deutsche Bank [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep 106* at [74] and [78]). If I am wrong about that, the question whether England is clearly or distinctly the appropriate forum for the trial arises only as against Anchorage New York and even then falls to be considered on the basis that, as I have also held, jurisdiction has been established against ACMO and AIO so that the action will proceed against them here as well as against Anchorage London, the English domiciled defendant. On that basis it seems to me to be clear that England is the appropriate forum for a trial against Anchorage New York. Quite apart from the obvious inconvenience (to put it no higher) of having a trial against Anchorage New York in New York and a trial against the other defendants here, this is a case where English law applies to the parties' dealings which on the facts of this case is a matter of real weight. By comparison the matters relied on by Anchorage as pointing towards New York are in my judgment insignificant. In particular, the inconvenience to Anchorage if witnesses are required to attend a trial in London seems to me to be greatly exaggerated. In a case where an objective assessment of the parties' dealings is required and where those dealings are almost entirely in writing, there seems to me to be relatively limited scope for relevant witness evidence.

81 If necessary, therefore, I would hold that jurisdiction is established over Anchorage New York pursuant to the provisions of CPR PD6B.

## BNPP's application for an anti-suit injunction

82 BNPP applies for an anti-suit injunction against Anchorage New York, on the basis that the New York proceedings are in breach of the jurisdiction clause in BNPP's London terms. Although

at this stage BNPP seeks an interim injunction pending trial rather than a final injunction, the question whether the New York proceedings are in breach of the jurisdiction clause is a question of the construction of the clause which has been fully argued and which the parties have invited me to decide. I propose to do so.

83 For ease of reference, I set out the terms of the clause again:

> "This Agreement shall be governed by, and construed in accordance with, English Law and you irrevocably submit to the jurisdiction of the English courts in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement."

84 BNPP's case is that this clause is an exclusive jurisdiction clause, while Anchorage contends that even if (as I have held) the clause was incorporated into the Friday and/or Monday contracts, commencement of the New York proceedings was not a breach of the clause because it merely provided for the non-exclusive jurisdiction of the English court, leaving Anchorage at liberty to sue BNPP in New York or, for that matter, in any court anywhere where it can establish jurisdiction over BNPP.

85 The question whether the jurisdiction clause is exclusive or non-exclusive is the subject of lively debate in the New York proceedings between the English law experts instructed by the parties for the purpose of BNPP's challenge there to the jurisdiction of the New York court. Lord Collins of Mapesbury, the expert instructed by BNPP, maintains that the clause provides for exclusive jurisdiction, while Professor Adrian Briggs, the expert instructed by Anchorage, maintains the opposite. It is of course hard to think of experts of greater eminence in this field. Their reports discuss such matters as the significance of the word "irrevocably", whether the verb "submit" is used transitively or intransitively and whether that makes any difference, and whether the *contra proferentem* rule has any role to play.

86 While there have no doubt been cases in which these matters have been accorded some weight in determining whether a jurisdiction clause should be regarded as exclusive or non-exclusive, the leading textbooks have not been impressed with the distinction between transitive and intransitive clauses. *Dicey, Morris & Collins on The Conflict of Laws* (15th edition 2012) comments at para 12-105 that the distinction between transitive and intransitive verbs to determine whether a clause is exclusive or non-exclusive "would appear to have practically nothing to recommend it". Professor Briggs is equally scathing:

> "The idea that parties submit themselves to the jurisdiction of a court for something *other* than a dispute is surreal. If one were to ask what the parties meant when they agreed to submit, the answer will be that they agreed to submit to trial. It is improbable … that the parties appreciated that there could be a difference between the two forms, and even more improbable that they predicted the consequences which followed from the difference. Most graduates of English universities would be hard put to it to see and explain the difference…" ( *Briggs & Rees, Civil Jurisdiction and Judgments* , 5th ed, 2009, para. 4.45; emphasis in the original).

87 I must confess that (even with the benefit of a university education) the distinction in the present case between submitting to the jurisdiction in respect of certain matters (intransitive and therefore, so the argument goes, non-exclusive) and submitting disputes in respect of certain matters to the jurisdiction of the court (transitive, and therefore exclusive) is so elusive that it escapes me altogether.

88 In the end all of these factors are only signposts which may sometimes assist in determining the intention of the parties, while the terms "exclusive" and "non-exclusive" themselves are merely convenient labels. In agreement with *Dicey* at para 12-105 ("the true question is whether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used"), I prefer to ask the question whether the commencement and pursuit of the foreign proceedings in question are things which a party has promised not to do.

89 It is clear that the jurisdiction clause in this case constitutes a promise by Anchorage to submit to the jurisdiction of the English court, but there is no equivalent promise by BNPP. BNPP is therefore free, if it wishes, to sue Anchorage elsewhere. In that sense, at least, the clause does not make England the exclusive venue for litigation between the parties and may be regarded as non-exclusive. But the clause does require Anchorage to submit to English jurisdiction, and thus gives BNPP the right to litigate in England, "in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement" if BNPP chooses to litigate here.

90 The first question, therefore, is whether Anchorage's New York proceedings are "in respect of" such a matter. In my judgment they clearly are and Anchorage does not contend otherwise. On the contrary it accepts, correctly, that the New York proceedings are in respect of "essentially the same issues" as are raised in these proceedings in England.

91 Since it is clear that BNPP wishes to exercise its right to litigate these issues in England, the next question is whether by seeking to litigate them in New York Anchorage is in breach of its promise to submit to the jurisdiction of the English court in respect of those matters. That question must be addressed with a measure of common sense. The clause provides that BNPP is entitled to litigate its claim here if it wishes to. It is entitled to require Anchorage to honour its promise to submit to the jurisdiction of the English court. By attempting to litigate in New York, Anchorage is seeking to deprive BNPP of that right or, at the least, to render it worthless. Its challenge to the jurisdiction here (contrary to its promise to submit) and its attempt to litigate in New York are two sides of the same coin. Even if, now that its jurisdictional challenge has been rejected, Anchorage does now submit to English jurisdiction as it has promised to do, what is to happen to the New York proceedings? It would make no sense, in my judgment, to construe the clause as permitting Anchorage, so long as it submits to the jurisdiction of the English court, also to bring a claim of its own in New York in respect of essentially the same matters as arise here. It cannot sensibly be supposed that the parties would have regarded such a prospect as acceptable. On the contrary they would rightly have regarded it as a procedural nightmare.

92 Accordingly I accept BNPP's submission, presented by its junior counsel Mr Patrick Goodall, that the New York proceedings are in breach of the jurisdiction clause in BNPP's London terms. With all due respect to Professor Briggs' views in his capacity as an expert in the New York proceedings, I regard this conclusion as clear.

93 The principles applicable to the grant of an anti-suit injunction to prevent a breach of a legal right not to be sued in a foreign court are well established and uncontroversial. In short, unless strong reasons to the contrary are shown, the parties should be kept to their contractual bargain. In cases not involving the courts of other member states of the European Union, if proceedings are commenced in a foreign jurisdiction in breach of contract, the English court will ordinarily exercise its discretion to restrain the foreign proceedings: *Donohue v Armco Inc [2001] UKHL 64, [2002] 1 Lloyd's Rep 425* at [24]. No reason is suggested here as to why, if the New York proceedings are in breach of the jurisdiction clause, an injunction should not be granted.

## Conclusion

94 Anchorage's challenge to the jurisdiction is dismissed. The English court has jurisdiction over all the defendants. There will be an injunction pending trial to restrain Anchorage New York from taking any step to pursue the proceedings commenced by it in New York.

Crown copyright

© 2014 Sweet & Maxwell

