# 'EXHIBIT C

# ''Rc t v'KX'qh'Z K

| PART 4 | BAe v. Dee Howard | [Q.B. (Com. Ct.) |
|---|---|---|

It may be that Marc Rich is entitled to restrain Petrolsea from disclosing such documents. In that event, having particular regard to the fact that Marc Rich is once more in control of the conduct of the arbitration, it may be appropriate for the arbitrators to decline to order disclosure. These are not, however, questions which are open to me on this appeal.

It is unfortunate that the arbitration has been delayed by over six months while a point of law has been canvassed which is unlikely to be determinative even of the extent of discovery that Petrolsea is obliged to give.

I observed at the outset that this appeal was without precedent. I hope that it will not become one.

---

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Nov. 30 and Dec. 1, 1992

---

## BRITISH AEROSPACE PLC
v.
## DEE HOWARD CO.

Before Mr. Justice WALLER

**Practice — Application to set aside — Stay of proceedings — Jurisdiction clause — Parties entered into Technical Assistance Agreement — Clause provided for agreement to be subject to English law and disputes to be referred to English Court — Whether clause an exclusive jurisdiction clause — Whether American Courts more appropriate forum — Whether action should be stayed and writ set aside.**

British Aerospace (BAe) and the Dee Howard Co., (DHC) entered into an agreement known as the Technical Assistance Agreement (TAA) whereby BAe agreed to provide DHC with assistance and information in connection with a re-engining programme which DHC was undertaking. The TAA provided inter alia:

1.6 This agreement shall be governed by and be construed and take effect according to English law and the parties hereto agree that the courts of law in England shall have jurisdiction to entertain any action in respect hereof and that in the event of such proceedings being commenced each party shall forthwith notify to the other an address in England for the service of documents.

DHC was a company incorporated in and carrying on business in Texas U.S.A. BAe was an English company carrying on business in England.

In November/December 1991, DHC suspended further work on the re-engining programme claiming that BAe had totally failed to carry out its obligations under the TAA.

On Dec. 3, DHC commenced proceedings in the Texas State Court. Those proceedings were served on BAe in England and on Feb. 3 1992 BAe removed the proceedings to the Federal Court.

On Feb. 10, BAe applied to dismiss the Texas proceedings for improper venue relying on cl. 1.6 of the TAA and on Apr. 15, BAe applied to dismiss the Texas proceedings additionally on the ground of forum non conveniens.

On Apr. 29, BAe commenced proceedings in the English Court against DHC. BAe also joined DHC's parent company Alenia S.p.A. alleging that that company had induced breaches of the TAA by DHC.

On June 15, 1992 DHC issued two summons, a summons to set aside the leave to serve DHC out of the jurisdiction and a summons for a stay of the proceedings against Alenia on the bases that proceedings were pending in the Texas Court and that that Court was the appropriate forum for the action.

[1993] Vol. 1      LLOYD'S LAW REPORTS      369

Q.B. (Com. Ct.)]                                      BAe v. Dee Howard

DHC submitted, that cl. 1.6 was not an exclusive jurisdiction clause; that Texas was the more appropriate forum; that the plaintiffs had to establish that there was some personal or juridical advantage that would be available to them only in the English action and that it was of such importance that it would cause injustice to deprive them of it and the plaintiffs had not so established any personal or juridical advantage; and that their lawyers had built up a degree of expertise in other litigation in the U.S.A. and it would be a terrible waste of that investment if that expertise was not used in litigation against BAe (the *Cambridgeshire* factor).

——*Held*, by Q.B. (Com. Ct.) (WALLER, J.), that (1) whether cl. 1.6 was exclusive was a question of construction; the words "any action" were capable of meaning "all actions"; the parties had expressly agreed English law and there would have been no need to expressly agree that the English Court should have jurisdiction for the English Court to have non-exclusive jurisdiction unless the parties were seeking to add something i.e. that England should have exclusive jurisdiction (*see* p. 373, col. 1; p. 374, col. 1);

——*Sohio Supply Co. v. Gatoil (U.S.A.) Inc.*, [1989] 1 Lloyd's Rep. 588, considered.

(2) the language in the clause was transitive in the sense of submitting disputes to the English Court as opposed to the parties simply submitting themselves to the jurisdiction of the English Court; there was no real purpose in submitting disputes to the jurisdiction of the English Court as well as choosing English law unless the intention was to make England exclusive; and the provision in cl. 1.6 relating to providing an address for service related to an English address (*see* p. 375, col. 1);

——*Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd.*, July 11, 1989 unreported, considered.

(3) there was clear mutuality in that each party might wish to sue the other and the use of the word "shall" was apposite to create the language of obligation; the clause under English law was an exclusive jurisdiction clause (*see* p. 375, col. 2);

——*S. W. Berisford Plc v. New Hampshire Insurance Co.*, [1990] 1 Lloyd's Rep. 454, considered.

(4) even if not an exclusive jurisdiction clause, this was a clause which the parties had freely negotiated agreeing not to object to the English Court's jurisdiction; it simply should not be open to DHC to start arguing about the relative merits of fighting an action in Texas as compared with fighting an action in London where the factors relied on would have been imminently foreseeable at the time they entered into the contract; and to rely before the English Court on the fact that they had commenced proceedings in Texas and that there would be two sets of proceedings unless the English action was stayed was impermissible; the inconvenience for witnesses, the location of documents, the timing of a trial and all such like matters were aspects which DHC were precluded from raising and commencing an action in Texas could not give them a factor

on which they could rely unless the action had continued without protest from BAe (*see* p. 376, cols. 1 and 2);

(5) as to the *Cambridgeshire* factor, the Court was not persuaded that the expertise undoubtedly achieved by the lawyers for DHC in other actions should be a factor which override the contractual bargain of DHC that they would not object to the jurisdiction of the English Court (*see* p. 377, col. 2);

(6) even if the burden were on BAe to establish that this was a proper case for service out of the jurisdiction and that the forum conveniens were London, the plaintiffs had discharged the burden and the summons would be dismissed (*see* p. 378, col. 1).

——*The Spiliada*, [1987] 1 Lloyd's Rep. 1, considered.

The following cases were referred to in the judgment.

*Abidin Daver*, The (H.L.) [1984] 1 Lloyd's Rep. 339; [1984] A.C. 398;

Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd., (C.A.) [1903] 1 K.B. 249;

Canon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd., July 11, 1989 unreported;

S. & W. Berisford Plc. v. New Hampshire Insurance Co., [1990] 1 Lloyd's Rep. 454; [1990] 2 All E.R. 321;

Sohio Supply Co. v. Gatoil (U.S.A.) Inc (C.A.) [1989] 1 Lloyd's Rep. 588;

*Spiliada*, The [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460;

Standard Steamship Owners Protection and Indemnity Association (Bermuda) Ltd. v. Gann, [1992] 2 Lloyd's Rep. 528.

These were summons by the defendants the Dee Howard Co. and Alenia S.p.A., that the leave given to the plaintiffs British Aerospace plc, be set aside and that the action brought by the plaintiffs against the defendants be stayed on the bases that proceedings were pending in the Texan Court and that that Court was the more appropriate forum.

Mr. Christopher Clarke, Q.C. and Mr. W. Wood (instructed by Messrs. Freshfields) for the plaintiffs; Mr. Christopher Carr, Q.C. and Mr. John McCaughran (instructed by Messrs. Baker Mckenzie) for the defendants.

The further facts are stated in the judgment of Mr. Justice Waller.

Judgment was delivered in open Court.

Thursday Dec. 10, 1992

### JUDGMENT

Mr. Justice WALLER: I have thought it right to give judgment in this matter in open Court because this application seems to me to be an example of what has become an unfortunate fashion in O. 12 applications in relation to which the spirit and the letter of the Commercial Court Practice Directions are not being adhered to. It has also given rise to arguments as to the proper approach to a clause agreeing to the English Court's jurisdiction and the extent to which it should be open to a party so agreeing to raise points as to forum conveniens.

*Introduction*

British Aerospace (BAe) and the Dee Howard Co. (DHC) in January, 1986 entered into an agreement known as the Technical Assistance Agreement (the TAA). Under the TAA, BAe agreed to provide DHC with assistance and information in connection with a re-engining programme which DHC was undertaking. BAe is an English company carrying on business in England. DHC is a company incorporated and carrying on business in Texas, U.S.A. It was a term of the TAA, cl. 1.6 as follows:

This agreement shall be governed by and be construed and take effect according to English law and the parties hereto agree that the courts of law in England shall have jurisdiction to entertain any action in respect hereof and that in the event of such proceedings being commenced each party shall forthwith notify to the other an address in England for the service of documents.

In November/December, 1991 DHC suspended further work on the re-engining programme claiming that BAe had totally failed to carry out its obligations under the TAA. DHC on Dec. 3, 1991 commenced proceedings in the Texas State Court. Those proceedings were served on BAe in England or brought to BAe's notice on dates as to which there may be some dispute. BAe removed the proceedings (as, provided it complied with the timescale for doing so, it was entitled to do) to the Federal Court on Feb. 3, 1992. On Feb. 10, BAe applied to dismiss the Texas proceedings for improper venue relying on cl. 1.6 of the TAA. On Apr. 15, 1992 BAe applied to dismiss the Texas proceedings additionally on the ground

of forum non conveniens and on Apr. 29, 1992 they commenced the proceedings with which this application is concerned. They chose it is right to say to apply for leave to serve out pursuant to O. 11, r. 1(*d*)(i), (ii) and (iv). They might have chosen to commence the proceedings by issuing a writ, and in reliance on cl. 1.6, have tried to get DHC to nominate an address in London for service of documents and tried to serve without leave under O. 10, r. 3. They did not however do so.

Into those proceedings BAe also joined DHC's parent company Alenia S.p.A. (Alenia), alleging that that company had induced breaches of the TAA by DHC. Alenia being an Italian entity was served without leave under the 1968 Convention in reliance on art. 5 on the basis, which is not challenged, that in part the harmful event i.e. the damage to BAe, would have been suffered in England.

On June 15, 1992 DHC issued the two summonses that are before me, a summons to set aside the leave to serve DHC out of the jurisdiction, and a summons for a stay of the proceedings against Alenia on the bases that proceedings were pending in the Court of the District Court in San Antonio and that that Court was the appropriate forum for the action.

Having regard to the clause in the contract and even given that it were arguable that the clause is not an exclusive jurisdiction clause, one might be forgiven for thinking that there ought to be some limit to the points that ought to be available for suggesting that England was not the appropriate forum. Even if that were an unfair assumption, it would not have been difficult to predict the type of arguments that would have been deployed and one would have thought that it should have been possible to deploy them relatively shortly and relatively inexpensively. I was however faced by 12 lever arch files and the prediction that the hearing, I assume on the basis that I had read some of the material, would last two to three days. To be fair, very little of the material was actually referred to, but that being so one has to question the necessity for it being there at all. The hearing also lasted only just over a day and a half, but even that was I suspect longer than necessary.

Part of the argument in the case sought to compare the likely trial date in the Commercial Court in London with the likely trial date in Texas. Indeed, one submission of Mr. Carr, Q.C. was to the effect that it would point up the difficulties that the Commercial Court is in in relation to Judge power, if in a public judgment leave to serve out was refused on the grounds of the likely trial date in the Commercial Court.

LLOYD'S LAW REPORTS

Q.B. (Com. Ct.)] BAe v. Dee Howard [WALLER, J.

There is indeed some shortage of Judge power at present in the Commercial Court but whatever the Judge power, resources would be finite. Furthermore the resources of other jurisdictions must be finite also. If litigants are entitled to take up extensive periods of Court time arguing whether Court A or Court B should have jurisdiction to try their dispute, it is not surprising to find that there are significant delays in getting the cases actually tried.

I must and do recognize that parties do take the fights as to jurisdiction seriously, and I also recognize that one of the features of the Commercial Court which is important is that Judges do hear the interlocutory applications. Both those factors do however I believe lead to representatives leaving absolutely no stone unturned. The result is that there is every argument covered more than once in the affidavits, substantial skeleton arguments and then oral argument as well. There is in fact a practice direction which was I suspect overlooked in this case, and which may not be as generally appreciated by practitioners as it should be. It lays down *maximum* times for which summonses ought to be listed *unless* consent is obtained from the Judge in charge of the Commercial List or a Judge nominated by him. Four hours is the maximum, for as the direction puts it "summons for setting aside etc". (see par. 6.3 of Guide to Commercial Court Practice and Practice Direction of Mr. Justice Hirst dated Oct. 23, 1987 set out on p. 32 of the Guide). Perhaps it is not as clear as it should be that those words cover stay applications as well, or a situation where there are two summonses. The application before me included a stay application as well as an application to set aside service and it is possible that it is for that reason that the listing office itself did not insist on the procedure being followed. But the important thing is that the direction is laying down maxima, and the spirit of the direction requires summonses such as those before me to be approached with those maxima in mind. Practitioners have a responsibility to cut down on the material placed before the Court, so as to achieve shorter and less expensive hearings than are all too often indulged in at the moment. Even if Lord Templeman's approach in *The Spiliada*, [1987] 1 Lloyd's Rep. 1 at p. 3; [1987] A.C. 460 at p. 465) cannot be achieved in many cases, it is much more that approach for which the parties should aim, those proceedings will only add to the enormous, and in my view unnecessary, expense that the litigants are being put to, will continue unabated.

That brings me to this case which it seems to me really is worse than any I have had experience of so far, because it is a case in which DHC negotiated and agreed the cl. 1.6 that I have set out. Can it really be right that having agreed that clause, DHC can then come and argue before the English Court the inconveniences of being brought here — witnesses having to travel to London, more expensive to litigate in London, location of documents, speed of trial in England as compared with Texas etc. It would seem to me that whether or not this clause is an exclusive jurisdiction clause it is strange if those points in any event were open to them. Much of the material before the Court goes to those points, and if the material had had to be limited to some exceptional factor that now existed which could not have been foreseen at the time this agreement was entered into, the material would have been minimal and the argument correspondingly shorter. However I am in one sense getting ahead of myself and I should turn to deal with the arguments of DHC.

*DHC's submissions*

(i) They submit first of all that cl. 1.6 was not an exclusive jurisdiction clause. They accept that if it was then it would have been a breach of that clause to commence the proceedings in Texas, and that in that event this Court would dismiss their summons to set aside service. That they also accept, would carry with it the dismissal of Alenia's summons, who I should stress are represented by the same Counsel and solicitors.

(ii) On the basis that they are right in that submission they submit then that the approach of the Court to DHC's application should be that BAe sought and obtained leave under O. 11 and that thus it is the principles set out in Lord Goff's speech in *The Spiliada*, [1987] 1 Lloyd's Rep. 1 at p. 12, col. 1; [1987] A.C. 460 at p. 478F onwards which are applicable, and not those relating to an application for a stay where the proceedings have been commenced as of right from p. 10, col. 1; p. 475C.

(iii) They further submit that where there is a case pending in another jurisdiction, Texas, which is an appropriate forum for the resolution of the dispute between the parties, then if the defendant in the foreign suit institutes proceedings in England, those proceedings will only not be stayed if the plaintiff establishes objectively by cogent evidence that there is some personal or juridical advantage that would be available to him only in the English action that it is of such importance that it would cause injustice to

**LLOYD'S LAW REPORTS**

WALLER, J.] BAe v. Dee Howard [Q.B. (Com. Ct.)

deprive him of it. The words come from the speech of Lord Diplock in *The Abidin Daver*, [1984] 1 Lloyd's Rep. 339 at p. 334, col. 1; [1984] A.C. 398 at pp. 411-412. They submit that BAe have not so established any personal or juridical advantage.

(iv) In any event they say that their lawyers have built up a degree of expertise in other litigation in the U.S.A. and that it would be a terrible waste of that investment if that expertise was not used in the litigation against BAe. This is what is termed the *Cambridgeshire* factor.

(v) They further rely on disadvantages to them in — location of witnesses, location of documentation, legal costs and timing of trial.

*BAe's submissions*

(i) They submit that cl. 1.6 is an exclusive jurisdiction clause.

(ii) In the alternative they submit that this at the very least is a clause by virtue of which DHC agree not to dispute the jurisdiction of the English Court. For that reason, and in addition, because the clause in fact provided a machinery for commencing proceedings without leave under O. 11, the approach cannot be more beneficial to DHC than the approach of Lord Goff in the service as of right cases and is in fact less beneficial.

(iii) They submit that the Court's approach should really be very little different from that in an exclusive jurisdiction clause case in that DHC should not be entitled to rely on factors other than something which would not have been foreseeable when they agreed to the clause.

(iv) They say that Lord Diplock in *The Abidin Daver* did not have in mind a case with a clause relating to jurisdiction, nor circumstances in which the proceedings in the foreign jurisdiction are at a preliminary stage, and indeed where jurisdiction in the foreign Court is the subject of challenge in that jurisdiction. They rely on the sentence in the speech of Lord Templeman in that case (at p. 353, col. 1; p. 425H) —

There is ample scope for a litigant to choose the exercise of English jurisdiction of which Sir John Donaldson M.R. is justly proud, notwithstanding that proceedings have already been instituted under a foreign jurisdiction, provided that the events which happen prior to the hearing of an application for a stay of the English proceedings do not demonstrate that the foreign forum is to be preferred on the grounds of convenience and expense. An ugly rush to get one action decided ahead of the other is not to be replaced by an ugly rush to issue proceedings in one country before the issue of proceedings in another.

(v) They say that at this juncture the Texas proceedings having been issued close on the events that have given rise to the dispute between the parties, and Texas jurisdiction having been challenged immediately, this Court should give little if any weight to the existence of those proceedings because otherwise it supports the idea of an "ugly rush to issue proceedings" deprecated by Lord Templeman.

(vi) They say the *Cambridgeshire* factor did not arise in any proceedings to which they were a party, and in any event the factors giving rise to the *Cambridgeshire* factors in this case are nothing like the factors relied on in *The Spiliada* itself. In any event, such factors as there are cannot be sufficient to allow DHC to be released from its bargain not to resist the jurisdiction of the English Court.

It is right to say that Mr. Carr, Q.C. in his reply emphasized another possibility open to the Court, which was in effect to suspend its ruling to await the decision of the Texas Court, by setting the writ aside and staying the proceedings on condition that the Texas Court decided the jurisdiction question in favour of DHC. In that way, he submitted, there could be no risk of double litigation because if the Texas Court ruled against his clients there would then be only one case in London, but if they ruled in his favour there would be only one case in Texas. In a case of this kind where it is an English law contract I would certainly think that it could not be right to force BAe to have the construction of cl. 1.6 i.e. whether the clause is exclusive or otherwise, decided by the Texas Court. Furthermore if the meaning of the clause is that DHC will not oppose the jurisdiction of the English Court, it would again seem wrong unless there were the exceptional circumstances not foreseeable when the contract was made to release DHC from its bargain. In any event, where jurisdiction battles are being fought on both sides of the Atlantic, I would think that it is fairer to both parties and probably more helpful to each of the Courts involved for each Court to take a view in the circumstances that exist including the present position in the litigation in the other's Court. Thus I can say at the outset that I would not think it right to accede to the submission that I should make some form of order dependent on the view that the Court in Texas takes. I believe that Court would feel likewise and neither means any disrespect to the other.

Q.B. (Com. Ct.)]      BAe v. Dee Howard      [WALLER, J.

### Is cl. 1.6 exclusive?

This is of course a question of construction, and I must have regard to the particular clause that I am dealing with. However, certain authorities were cited to which it is useful to refer. First in point of time is *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.*, [1903] 1 K.B. 249. This case is important both to the exclusive jurisdiction aspect and as to the possible alternative meaning of the clause. The clause with which the case was concerned read as follows —

For all disputes which may arise out of the contract of insurance, all the parties interested expressly agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction in such matters.

The argument for the insurers was that the clause was inserted so that insureds could feel comforted by the fact that they could sue in Budapest if they so desired, but the clause should not be construed as exclusive so as to prevent an action being brought in England. Lord Justice Romer said:

This is a simple point; and, though I can understand that different persons might take different views of it, I must say that to my mind the meaning of the clause is that contended for by the defendants. The question is this: Does the condition merely mean that if one of the parties to the contract is sued by the other in the court of Budapest, he will not take any objection to its jurisdiction; or, does it mean that the parties mutually agree that, if any dispute arises under the contract, it shall be determined by the court in Budapest? Having regard to the nature of the contract and its language, I am of the opinion that the latter construction is the right one.

Lord Justice Mathew was of the same opinion albeit he used slightly different language.

For present purposes it is important to note that the word exclusive does not appear, and by providing that *all* disputes were submitted to Budapest that was enough to enable the words to be construed in the transitive sense (to use the words of Mr. Justice Hobhouse in a case to which I shall later refer), and to imply the negative so as to place an obligation on the insurers not to sue other than in Budapest.

More recently, in *Sohio Supply Company v. Gatoil (U.S.A.) Inc.*, [1989] 1 Lloyd's Rep. 588 the Court of Appeal considered the approach to the construction of a jurisdiction clause and in particular as to whether the clause was exclusive. The clause under consideration in that case was by virtue of amendments agreed:

This agreement should be governed by the laws of England, under the jurisdiction of the English court without recourse to arbitration.

In his judgment at p. 591 Lord Justice Staughton recites a passage from Dicey & Morris on Conflict of Laws and in particular a footnote where it is submitted that the question is whether on its true construction a clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word exclusive is used. In that case, Counsel did not dissent from that footnote and indeed adopted it as did Lord Justice Staughton himself. He then said:

It is I think part of the matrix background or surrounding circumstances, which ever term one chooses to use, that this was a contract made between sophisticated businessmen who specifically chose their words as to English jurisdiction for the purpose of this contract.

I have to say the same is true in relation to the contract with which I am concerned. Lord Justice Staughton continued:

It is not a consumer contract printed on a form or anything like that. To my mind it is manifest that these businessmen intended that clause to apply to all disputes that should arise between them.

Again I pause to say it will be noted that the word "all" was not expressly used in the clause under consideration in that case and indeed the language of the clause in that case was not as clear as the language in the instant case where the words "any action" are certainly capable of meaning "all actions". Lord Justice Staughton then continues:

I can think of no reason at all why they should choose to go to the trouble of saying that the English Court should have non-exclusive jurisdiction. I can think of every reason why they should choose that some Court, in this case the English Court, should have exclusive jurisdiction. Then both sides would know where all cases were to be tried. It may be that in some other types of case such as a policy of insurance, there is a reason for providing for non-exclusive jurisdiction. I can see none here. I am not sure that I can detect what precisely the reason was for choosing England. The parties had chosen English law; it may be that they thought that the best place for English law to be applied was in English Courts; it may be that they even thought that English Courts were a good thing on their own right — I do not know.

LLOYD'S LAW REPORTS [1993] Vol. 1

WALLER, J.]                    BAe v. Dee Howard                    [Q.B. (Com. Ct.)

All that Lord Justice Staughton says in that passage applies with equal force in the instant case save that there was a clear reason why, in the instant case, English law might be chosen, and it is a clear case in which it must have been fully debated as to whether English law and English jurisdiction was the appropriate law and jurisdiction.

There is only one matter that I would add in relation to the clause in the instant contract and it may be implicit in what Lord Justice Staughton said in *Sohio*. In the instant case the parties have expressly agreed English law and there would be no need to expressly agree that the English Court should have jurisdiction for the English Court to have non-exclusive jurisdiction. The English Court would in any event have such jurisdiction and by expressly agreeing to English jurisdiction they must be seeking to add something i.e. that England should have exclusive jurisdiction.

Since the Court of Appeal decision there have been two decisions of Mr. Justice Hobhouse, the first *Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd.* (July 11, 1989, Q.B.D. unreported) and *S. & W. Berisford Plc v. New Hampshire Insurance Co.*, [1990] 1 Lloyd's Rep. 454; [1990] 2 All E.R. 321.

In the *Cannon Screen* case, Mr. Justice Hobhouse was considering two clauses, but it is sufficient to cite only one which was in the following terms:

This agreement shall be construed and interpreted pursuant to laws of England and the parties hereby consent and submit to the jurisdiction of the Courts of England in connection with any dispute arising hereunder. The parties further agree that process in any such action may be served upon either of them by registered or certified mail at the address of first above given or such other address as the party being served may from time to time have specified to the other party by previous written notice.

The application before him was for an injunction to restrain Californian proceedings. He referred to both the above Court of Appeal decisions and decided that the clause was not exclusive and stated his reasons as follows:

In my judgment the wording of these clauses is clear. The clause in the model and conforming agreements starts by specifically referring to the fact that the agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. If therefore expressly

contemplates the relevance of other entities than those actually named in the agreement. It then uses words which are words of submission not reference: "The parties hereby submit to the jurisdiction". In the output agreement the equivalent phrase is "the parties hereby consent and submit to the jurisdiction". The addition of the word "consent" reinforces the same conclusion. The phrase in the *Austrian Lloyd* case was "agree to submit" but in that case it was construed in a transitive sense as an agreement to submit disputes to a particular court in the same way as one can agree to submit disputes to the decision of an arbitrator. The clauses which I have to construe do not lend themselves to a transitive construction; the sense is that the parties submit themselves to the jurisdiction of the court not that the parties submit disputes. In the *Austrian Lloyd* case it was open to the court to construe the words as if they read "agree to submit all such disputes". I do not consider that it would be appropriate to make such an inferential insertion in these clauses. Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English Courts and not there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used. It is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.

However, he also in fact in that case granted an injunction and one of the important considerations he had in mind was the jurisdiction clause, and he said this about it:

There is on any view an agreement between Cannon UK and the Defendants to submit to the jurisdiction of the English courts. Therefore it cannot be said that as regards the matters to which that cause relates it is an arrogation of jurisdiction by the English courts to decide whether those matters should be tried. Those parties have agreed to submit to English jurisdiction; <u>they cannot object to its accepting that jurisdiction</u>. (My underlining.)

This passage is obviously of relevance to consideration of the question that might arise if cl. 1.6 was non-exclusive.

LLOYD'S LAW REPORTS

BAe v. Dee Howard

In my view, in the instant case, there are three distinctions from the clauses being considered by Mr. Justice Hobhouse. First the language in the clause before me is transitive in the sense of submitting disputes to the English Court as opposed to the parties simply submitting themselves to the jurisdiction of the English Court. Second, albeit this factor was present in the clause Mr. Justice Hobhouse was considering, no reference was made to it, there is no real purpose as I see it in submitting disputes to the jurisdiction of the English Court as well as choosing English law unless the intention is to make England exclusive. Third, the provision relating to providing an address for service relates in cl. 1.6 to an English address; that limitation does not appear to be the situation in the *Cannon Screen* case.

In the *Berisford* case he was being asked to construe the provision of a contract which simply stated "subject to English jurisdiction". He considered the question of construction of that clause at p. 457, col. 1 to p. 458, col. 2; p. 325H to p. 327G. He took the view that the words he was construing in that case were inapt to create any obligation. He put the matter in this way.

. . . If an obligation was intended it could easily have been so stated in clear words. The provision appears in the underwriters printed form of policy which is issued to the assured. The mutuality of the clause must in practice be very limited. Under English law where a contract has been placed through the brokers it would be very rare indeed that an underwriter will ever have to start an action against an assured. The primary relevance of the clause must be to actions to be brought by the assured against the underwriter. To construe this wording as requiring the assured to sue only in England is to go beyond the natural meaning of the words actually used. Further, to construe the words as declaratory is not to deprive them of significance. It is a statement to the assured, who may be foreign, that the rights that he has under the policy are capable of enforcement in English Courts. Such is an apt interpretation having regard to the legal and commercial relationship created by the document and having regard to the words actually used. Such a clause, even though creating no obligation to sue only in England is a contractual acknowledgment of the jurisdiction of the English Courts and a contractual agreement to the invocation of that jurisdiction.

Therefore I conclude that this clause is not an exclusive jurisdiction clause. As I pointed out in *Cannon Screen Entertainment Ltd. v. Handmade Films*, such a conclusion does not mean that the clause ceases to be relevant in relation to an application such as that which is being made by the defendants on this summons. If the contract says that the assured is entitled to sue the underwriter in the English Court, then it requires a strong case for the Courts of this country to say that that right should not be recognised and that he must sue elsewhere.

I have cited again the whole of the passage because it is relevant to what the situation should be if the clause was non-exclusive. But in my view Mr. Justice Hobhouse was dealing with a very different situation and laid great emphasis on the lack of mutuality of the obligation. In the case with which I am concerned, there is clear mutuality in that each party may wish to sue the other and the use of the word "shall", is apposite to create the language of obligation. Furthermore, in my judgment the words in cl. 1.6 "any action" clearly do mean *all* actions. Thus in my view this clause under English law is an exclusive jurisdiction clause.

*What if the clause were non exclusive?*

I have already cited passages in the two judgments of Mr. Justice Hobhouse relevant to this aspect. I should perhaps add that in the *Berisford* case when considering forum conveniens and his discretion, Mr. Justice Hobhouse also said:

. . . the fact that the parties have agreed in their contract that the English court shall have jurisdiction (albeit a non-exclusive jurisdiction) creates a strong prima facie case that that jurisdiction is an appropriate one; it should in principle be a jurisdiction to which neither party to the contract can object as inappropriate; they have both implicitly agreed that it is appropriate.

In a further case cited to me of *Standard Steamship Owners Protection & Indemnity Association (Bermuda Ltd.) v. Gann*, [1992] 2 Lloyd's Rep. 528, Mr. Justice Hirst (as he then was) also dealt with a situation in which there was a non exclusive jurisdiction clause in favour of England. He was also dealing with a case in which there had been leave given to serve out of the jurisdiction. When dealing with forum non conveniens and the arguments on p. 533 he said:

Mr. Bueno Q.C. relying on *The Spiliada* submits that the burden of proof is on the plaintiff to satisfy the court that England is clearly and distinctly the appropriate forum for the trial of this action. Were it not for the

LLOYD'S LAW REPORTS  [1993] Vol. 1

| WALLER, J.] | BAe v. Dee Howard | [Q.B. (Com. Ct.) |

submission by the defendants to English jurisdiction, this would plainly be correct, but in view of that clause, the authorities plainly establish in my judgment that the Court will give effect to that submission, although still retaining a discretion to grant a stay if the defendants can show strong reasons against holding the parties to their bargain (*The Chapparal*, [1968] 2 Lloyd's Rep. 158 and *The El Amria* [1991] 2 Lloyd's Rep. 199).

Those statements of principle give some support to what I believe to be the correct view to take of the clause with which this case is concerned. But I would suggest, particularly in a case where the clause has actually been freely negotiated and forms an express term of a detailed agreement, the matter should in fact go further. In *Gann*, Mr. Justice Hirst considered such questions as (i) that there was another action in San Diego the mirror of the English action where jurisdiction was being challenged; (ii) the question of centre of gravity and whether that were England or San Diego; (iii) the convenience in relation to the bringing of witnesses to one place or the other; (iv) whether or not English law was an important factor; and (v) the distinction there may be between the Rules as to discovery and the question of the benefit of jury trial in the U.S.

In *Berisford*, Mr. Justice Hobhouse also considered certain equivalent factors.

I am dealing here with a clause which the parties have freely negotiated. It is not a standard term incorporated by reference as in Mr. Justice Hirst's case or a term similar to that placed in standard form on the front of an insurance document as in the *Berisford* case. I remind myself of the language used by Lord Justice Romer in the *Austrian Lloyd* case where he says:

> Does the condition merely mean that, if one of the parties to the contract is sued by the other in the court of Budapest, he will not take any object to its jurisdiction?

I also remind myself of the language used by Mr. Justice Hobhouse in the *Cannon Screen* case:

> Those parties have agreed to submit to English jurisdiction; they cannot object to its accepting that jurisdiction.

It seems to me on the language of the clause that I am considering here, it simply should not be open to DHC to start arguing about the relative merits of fighting an action in Texas as compared with fighting an action in London, where the factors relied on would have been eminently foreseeable at the time that they entered into the contract. Furthermore, to rely before the English Court on the factor that they have commenced proceedings in Texas and therefore that there will be two sets of proceedings unless the English Court stops the English action, should as I see it simply be impermissible, at least where jurisdiction in those proceedings has been immediately challenged. If the clause means what I suggest it means then that they are not entitled to resist the English jurisdiction if an action is commenced in England, it is DHC who have brought upon themselves the risk of two sets of proceedings if as is likely to happen, BAe commence proceedings in England. Surely they must point to some factor which they could not have foreseen on which they can rely for displacing the bargain which they made i.e. that they would not object to the jurisdiction of the English Court.

Adopting that approach it seems to me that the inconvenience for witnesses, the location of documents, the timing of a trial, and all such like matters, are aspects which they are simply precluded from raising. Furthermore, commencing an action in Texas, albeit that may not be a breach of the clause, cannot give them a factor on which they can rely, unless of course that action has continued without protest from BAe. One can well imagine that if BAe had taken part in the proceedings in Texas without protest and if the proceedings had reached the stage at which enormous expenditure had been incurred by both sides and the matter was accordingly nearly ready for trial in Texas, that such factors would obviously lead the English Court to exercise its discretion in favour of setting aside service of proceedings. That is very far from being the situation in relation to the Texas proceedings so far commenced.

In relation to the only other factor which it seems to me could be said to be one not foreseeable when the contract was entered into, the *Cambridgeshire* factor, I am not persuaded that the expertise undoubtedly achieved by the lawyers for DHC in other actions should be a factor which overrides the contractual bargain of DHC that they would not object to the jurisdiction of the English Court.

It is thus clear to me that the proper approach to a case of the sort that I am considering is to consider it as equivalent to proceedings commenced as of right, to apply the passage in Lord Goff's judgment in *The Spiliada* dealing with such actions, but to add the consideration which he did not have in mind as pointed out by Mr. Justice Hobhouse in *Berisford*, that there is a clause under which DHC had agreed not to object to the jurisdiction. That being the proper

approach, and additionally, it being (as in my judgment it is) right only to consider the matters which would not have been foreseeable when that bargain was struck, I would dismiss both summonses of the defendants.

*What if an approach as per Lord Goff on O. 11 in The Spiliada were the correct one?*

In case I have gone too far in my approach to the clause in this case, I should add that I have examined the various matters relied on by DHC and can say that even if the onus had been on BAe to establish that this was a proper case for service out of the jurisdiction and to establish that London was the forum conveniens, I would have been satisfied that they had done so. Mr. Carr, Q.C. for DHC, in his submissions put the factors in relation to witnesses, time for trial, location of documents and matters of that sort as neutral. He relied on (a) the fact that there was litigation in Texas and (b) on the *Cambridgeshire* factors as those which demonstrated that the plaintiffs had failed to discharge the burden upon them.

Mr. Clarke, Q.C. for the plaintiffs, submitted that the fact that proceedings had been commenced in Texas was of very little importance in that jurisdiction was challenged there from the outset and was still being challenged. He submitted that the most significant factor was that the action concerned what was the precise extent and scope of BAe's obligation. He suggested that in order to answer that question the Court needed to determine the true construction and effect as a matter of English law of the relevant clauses of the TAA. The clauses particularly which will give rise to difficulty are cll. 1.4 and 9.1, 9.2, 9.3 and 14.2. These are clauses of limitation and all sorts of problems will arise on their construction and as to how the facts should be applied in relation to those clauses. He submitted that if the case were to be tried in Texas the opinions of the English lawyers would be vast because they would have to deal with the different factual situations which could arise and the different possible constructions of the clauses under English law by reference to different factual situations.

As I see it, it is likely to be inconvenient to attempt to try this action in effect as a two stage process with a Judge having to be provided with evidence of what English law is in order to fit the different factual situations that could arise with different submissions on English law.

Mr. Clarke, Q.C. also submits that the factual focus is also on what BAe did. There is no real dispute that over 95 per cent. of the work was done in England by people who worked in England and who then and now reside in England. The centre of gravity of the action, he submits, is clearly England, and that any point as to witnesses and convenience of getting them before a Court, favours BAe. On this last aspect he also stressed that BAe faced very serious charges in the United States action. If serious charges are made it clearly is important that those persons against whom those charges are made are able to give live evidence. It is clearly more convenient for senior personnel to give that evidence in London than it is in Texas. The last point is not the most critical factor in my view, but I do think the centre of gravity is England and that on balance, on witnesses, BAe do have a stronger point than DHC.

Finally the plaintiffs in Texas, (DHC) have a constitutional right to jury trial. It is said by Mr. Carr, Q.C. that this is a factor to which I can have no regard because it means that I am entering into considerations of the fairness or otherwise of the trials in a foreign jurisdiction as compared with English jurisdiction. All that I can say is that it does appear that in many cases the fact there is to be a jury trial in the United States has been a factor taken into account by the English Courts. I believe it to be a legitimate factor to take into account that this action does not seem to me to be suitable for Jury trial, but, I can also make it clear that even without that factor I would have ruled the same way.

As regards the *Cambridgeshire* factors relied on by DHC, it is submitted by Mr. Clarke, Q.C. that the Court is not concerned with factors similar to those relied on in *The Spiliada* where lawyers and scientists were engaged on enquiry at the frontiers of human knowledge. In any event he submits on behalf of BAe that it cannot be right to displace England as the forum if it would otherwise be the appropriate forum, just because DHC has advisers used in two different cases to which BAe are not parties which assists them in conducting their case on behalf of DHC. In any event the expertise is almost certainly exportable, and will in fact in any event have to be developed by English lawyers for the purpose of taking depositions. In my view, BAe are correct in their submissions on this aspect. If England were otherwise the appropriate forum, which in my view it is, it would not be right to displace England by reference to the factors which arise in this case and, as it seems to me, it is likely that the expertise developed would have to be exported for the purpose of English lawyers taking depositions in the case.

**480**                                              [2013] 2 CLC

**Caresse Navigation Ltd v Office National de l'Electricite & Ors**   A
**(Channel Ranger).**
[2013] EWHC 3081 (Comm)

Queen's Bench Division (Commercial Court).
Males J.                                                             B
Judgment delivered 14 October 2013.

> *Shipping – Arbitration – Bill of lading – Jurisdiction clause – Alleged*
> *contamination of coal cargo – Charter on Americanised Welsh Coal Charter*
> *form 1979 providing for English law and jurisdiction – Effect of bill of lading*   C
> *incorporating charterparty law and arbitration clause – Shipowner seeking*
> *declaration of non-liability – Cargo insurers commenced proceedings in*
> *Morocco – Cargo receiver and insurers challenging English jurisdiction – Good*
> *arguable case that bill of lading governed by English law – Incorporating words*
> *of bill of lading demonstrated intention to incorporate charterparty dispute*
> *resolution clause – Bill of lading construed as containing English jurisdiction*   D
> *clause from charter – Serious issue to be tried on merits – England clearly*
> *appropriate forum – Risk of less favourable legal regime in Morocco decisive –*
> *Defendants' jurisdiction challenge dismissed.*

    This was an application by the defendant cargo receiver and insurers   E
challenging the jurisdiction of the English court.

    The claimant shipowner, a Marshall Islands company, chartered its vessel
on an amended NYPE form to U-Sea Bulk A/S for one time charter trip with
a cargo of coal in bulk. U-Sea concluded that charter in order to perform one
of three shipments which it had agreed to perform under a voyage charter        F
contract with Glencore International AG. The voyage charter between U-Sea
and Glencore was in the form of an e-mail fixture recap, which set out the main
terms agreed and concluded 'otherwise as per' a previous charter which was
attached 'logically amended as per main terms agreed'. The previous charter
was on the Americanised Welsh Coal Charter ('Amwelsh') form 1979 providing   G
for English law and exclusive jurisdiction.

    The vessel loaded a cargo of coal at Rotterdam for carriage to Morocco. The
bill of lading on the Congenbill 1994 form incorporated the terms and conditions
of the charterparty 'including the law and arbitration clause'. At the discharge
port a 'hot spot' was detected in the cargo in one of the holds. The hot spot was   H
doused with water as an emergency measure. There was a dispute as to what
the dousing consisted of. The receivers said that, even though fresh water was
available, there was dousing by salt water in holds 2, 4 and 5 which caused
contamination of the cargo and rendered it unusable for their purposes.

A     The claimant issued proceedings seeking a declaration of non-liability. Permission was granted to serve the receivers out of the jurisdiction in Morocco on the basis that the bill of lading contract was governed by English law and contained a term conferring jurisdiction on the English court. The cargo insurers were subsequently joined as defendants.

B     The main issue on the defendants' application concerned the effect of the incorporation into the bill of lading of the 'law and arbitration clause' of the charterparty when the dispute resolution clause in the charterparty provided, not for English law and arbitration, but for English law and court jurisdiction.

C     *Held*, dismissing the defendants' challenge to the jurisdiction:

      1. The parties had made a choice, for the purposes of the Rome I Regulation (Regulation (EC) 593/2008), art. 3(1), of English law to govern the bill of lading contract. Whatever the effect of the words 'and arbitration' in the bill of lading clauses, the express references to the governing law of the charterparty amounted to an irrefutable case that the parties to the bill of lading intended their contract
D     to be governed by the same law as was applicable to the charterparty, at any rate provided that the law so chosen was usual and proper for the trade. Since the Amwelsh form was a commonly used charter form for the carriage of coal, there was nothing surprising or unusual about the choice of English law, which was
E     what the printed form provided. Therefore, for the purpose of passing through the jurisdictional gateway, the owners had a good arguable case that the bill of lading was a contract governed by English law. (The Njegos [1936] P 90 and The San Nicholas [1976] 1 Ll Rep 8 applied.)

      2. The parties plainly contemplated the incorporation of at least one kind of
F     ancillary clause. Whether specific words which were accepted to be effective to incorporate at least one kind of ancillary clause (an arbitration clause) could properly be read as extending also to another kind of ancillary clause was a matter of interpretation. The only clause in the charterparty to which the parties could have intended their words to refer was the law and jurisdiction clause. It
G     seemed a more natural construction of the bill of lading to read it as referring to that clause, rather than as referring to an arbitration clause in the charterparty, if any. It was clear that something had gone wrong with the language, and it was clear what a reasonable person would have understood the parties to have meant. That conclusion did not run counter to the need for clarity and certainty, bearing in mind that the bill might come into the hands of other parties who were
H     not aware of the terms of the charterparty. (TW Thomas & Co Ltd v Portsea Steamship Co Ltd [1912] AC 1 and YM Mars Tankers Ltd v Shield Petroleum (Nigeria) Ltd [2012] EWHC 2652 (Comm) considered.)

      3. The conclusion of a charterparty by means of a fixture recap together with the incorporation of terms from some earlier charter by means of wording such

Case 1:14-cv-03042-RMB-AJP   Document 84-6   Filed 09/03/14   Page 14 of 38

as 'otherwise as per proforma … logically amended' was very common. The parties to a charter concluded in that way intended to incorporate the dispute resolution clause of the earlier charter thus identified. Accordingly the bill of lading contained a term requiring any dispute to be submitted to the exclusive jurisdiction of the English court. (Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi AS v Sometal SAL [2010] EWHC 29 (Comm); [2012] 1 CLC 448 considered.)

4. There was a serious issue to be tried on the merits of the owners' claim.

5. If the bill of lading was governed by English law and provided for the exclusive jurisdiction of the English court, that would in itself be sufficient to show that England was the appropriate forum. On the assumption that the jurisdiction clause did not apply and that the only gateway available to the owners was that the bill of lading was a contract governed by English law, that choice of English law was capable of being a factor of significant and even decisive weight, particularly if the foreign court's application of a different law would or might lead to a different result, as that would be to deprive the claimant of the benefit of its bargain. There was a real risk that forcing the owners to proceed in Morocco where Moroccan law and the Hamburg Rules would be applied would have the effect of depriving the owners of the benefit of their bargain. That risk of a less favourable legal regime in Morocco was a decisive factor. Accordingly, even if the jurisdiction clause did not apply, England was clearly the appropriate forum. (Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry (The Lucky Lady) [2013] EWHC 328 (Comm); [2013] 2 CLC 461 and VTB Capital Plc v Nutritek International Corp [2013] UKSC 5; [2013] 1 CLC 153 considered.)

6. Since the claim was for a negative declaration, the claimant had also to show that there was 'a solid practical benefit' in proceedings in England. There was such a benefit, namely that a declaration might assist the owners to resist enforcement in a third country, and might enable the owners to obtain an anti-suit injunction. (Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry (The Lucky Lady) [2013] EWHC 328 (Comm); [2013] 2 CLC 461 applied.)

The following cases were referred to in the judgment:

AK Investment CJSC v Kyrgyz Mobil Tel Ltd [2011] UKPC 7; [2011] 1 CLC 205; [2012] 1 WLR 1804.
Aries Tanker Corp v Total Transport Ltd (The Aries) [1977] 1 WLR 185.
Chartbrook Ltd v Persimmon Homes Ltd [2009] UKHL 38; [2009] 1 AC 1101.
Delos, The [2001] 1 Ll Rep 703.
Federal Bulk Carriers Inc v C Itoh & Co Ltd (The Federal Bulker) [1989] 1 Ll Rep 103.
Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi AS v Sometal SAL [2010] EWHC 29 (Comm); [2012] 1 CLC 448.

A    *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12; [2003] 1 CLC 921; [2004] 1 AC 715.
*Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry (The Lucky Lady)* [2013] EWHC 328 (Comm); [2013] 2 CLC 461.
*Njegos, The* [1936] P 90.

B    *Pacific Molasses Co and United Molasses Trading Co v Entre Rios Compania Naviera SA (The San Nicholas)* [1976] 1 Ll Rep 8.
*Siboti K/S v BP France SA* [2003] EWHC 1278 (Comm); [2004] 1 CLC 1.
*TW Thomas & Co Ltd v Portsea Steamship Co Ltd* [1912] AC 1.
*VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5; [2013] 1 CLC 153.
*YM Mars Tankers Ltd v Shield Petroleum (Nigeria) Ltd* [2012] EWHC 2652

C    (Comm).


Henry Byam-Cook (instructed by Holman Fenwick Willan LLP) for the claimant.

Tom Whitehead (instructed by Hill Dickinson LLP) for the defendants.

D                           JUDGMENT

**Males J:  Introduction**

1. The main issue raised by this application concerns the effect of the incorporation

E    into a bill of lading of the 'Law and Arbitration clause' of an identified charterparty when the dispute resolution clause in that charterparty provides, not for English law and arbitration, but for English law and court jurisdiction. Two main questions arise: (i) should the clause be read as providing for the jurisdiction of this court and (ii) is there in any event an effective choice of English law as the law applicable to the bill of lading?

F

2. These questions arise on a challenge by the defendants to the jurisdiction of this court pursuant to CPR 11, permission to serve the first defendant (the receiver of the cargo) out of the jurisdiction in Morocco having been given by Hamblen J, the jurisdictional gateways relied on by the claimant shipowners being that the bill of

G    lading contract (i) is governed by English law and (ii) contains a term to the effect that the court shall have jurisdiction. Subsequent orders made by Blair J and HHJ Mackie QC joined the second to sixth defendants (the insurers of the cargo) to the action and extended the time for service.

H    3. There was also listed before me an application by the claimant owners for an anti-suit injunction to restrain the further pursuit of proceedings commenced by the defendant insurers in Morocco, but the claimant agreed at the hearing that this should be deferred until after I had determined whether the English court has jurisdiction and, if so, on what basis. The defendants made clear that, at this stage, they intend to play no part in responding to that application, lest it be said that by doing so they have submitted to the jurisdiction of this court.

A

### The parties

4. The claimant, a Marshall Islands company, was and still is the owner of the vessel 'CHANNEL RANGER' and was the contractual carrier of the cargo on the subject voyage under the relevant bill of lading. The first defendant, a Moroccan state electricity generating company, was the receiver of the cargo. The second to sixth defendants were the insurers of the cargo. Under Moroccan law, whatever rights of suit under the bill of lading have passed to the receiver can be exercised by the cargo insurers, so that they can now bring a claim under the bill of lading in respect of cargo damage in their own name. It transpires that the third defendant is in fact the same company as the second defendant. Accordingly, the claimant accepts that the third defendant need no longer be named as a defendant to the proceedings.

B

C

### Background

5. By a contract on an amended NYPE form dated 23 March 2011 the claimant chartered the vessel to U-Sea Bulk A/S for one time charter trip with a cargo of 'coal in bulk'. It appears that U-Sea concluded this charter in order to perform one of three shipments which it had agreed to perform under a voyage charter contract with Glencore International AG dated 6 January 2011 ('the voyage charter').

D

6. The voyage charter between U-Sea and Glencore was in the form of an e-mail fixture recap (as is not uncommon, it seems that no formal charterparty was ever drawn up), which set out the main terms agreed and concluded:

E

'otherwise as per proforma C/P Glencore/Eitzen latest C/P dated 14 January 2009 (see attached) logically amended as per main terms agreed.'

F

7. The Glencore/Eitzen charter dated 14 January 2009 was an attachment to this e-mail. It was on the Americanised Welsh Coal Charter ('Amwelsh') form 1979. Clause 5 of this printed form provided:

'This Charter Party shall be governed by English law, and any dispute arising out of or in connection with this Charter shall be submitted to the exclusive jurisdiction of the High Court of Justice of England and Wales.'

G

8. The vessel arrived at Rotterdam on 1 April 2011 and loaded 39,001.503 mt of cargo between 4 and 6 April 2011. Shipment of the cargo on board the vessel was acknowledged by a bill of lading dated 6 April 2011, signed on behalf of the master by the local agents and stating that the cargo was 'shipped in apparent good order and condition'. The bill named Glencore as the shipper and was consigned to the order of the first defendant. It was therefore a negotiable bill, which took effect as a contract between the claimant shipowners and Glencore. The port of discharge was Nador in Morocco.

H

A

    9. The bill of lading was on the well-known 'Congenbill 1994' form which states on its face that it is 'to be used with charter-parties'. The form includes a box on the front in which the printed words 'Freight payable as per CHARTER-PARTY dated ...' appear, while on the reverse clause 1 of the conditions of carriage provides that:

B

    'All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.'

    10. Clause 2 of the printed terms, a General Paramount clause, provides for the Hague or Hague-Visby Rules (in this case, the latter) to apply to the bill of lading

C

contract.

    11. In the present case, the box on the front of the form referring to payment of freight was completed by the insertion of the date of the voyage charter, 6 January 2011. Further, the central box on the front of the form also included the typed clause:

D

    'Freight payable as per Charter Party. All terms, conditions, liberties and exemptions including the law and arbitration clause, are herewith incorporated.'

    12. The vessel sailed from Rotterdam on 6 April 2011. It is the owners' case, and so far at any rate has not been disputed by the defendants, that at no time prior to loading or during loading itself did Glencore, the shipper, or its appointed agent

E

provide any information to the master regarding the characteristics of the cargo and the recommended safe handling procedures for its loading and transportation. In particular, no warning was given to the master that the cargo to be carried was liable to self-heat.

F

    13. The vessel arrived at Nador on 11 April 2011 after a voyage of only five days and berthed on 12 April 2011, at which time the temperature of the cargo was noted to have increased. According to the owners, the following days were characterised by delays in the commencement and progress of discharge, the effect of which was that the self-heating of the cargo in three of the vessel's five holds worsened, with a small

G

hot spot being found in hold 2 on the evening of 15 April 2011. This had increased in size by the following day.

    14. By this stage, the owners had instructed a surveyor, Dr Daniel Sheard of Brookes Bell, to attend on board the vessel to monitor the situation and provide expert assistance to the master. U-Sea had also instructed its own expert, Mr Graham

H

Charlton, from Burgoynes. Due to the elevated temperatures in hold 2 and the risk of flammable gas evolution, the master, Dr Sheard, Mr Charlton and a representative from the harbour master considered that the hotspot in hold 2 should be doused with water as an emergency measure to preserve the safety of the vessel, the rest of the cargo and those on board.

Case 1:14-cv-03042-RMB-AJP   Document 84-6   Filed 09/03/14   Page 18 of 38

**486**                          Channel Ranger                    [2013] 2 CLC
                                    *(Males J)*

15. There is a dispute as to what this dousing consisted of. The owners say that there was dousing of the hot spot in hold 2, initially with fresh water but then, because there was not a sufficient supply of fresh water, with salt water for a period of no more than about seven minutes; and that on the following day there was further dousing, this time with fresh water only. The receivers, however, say that the use of salt water was more extensive and that, even though fresh water was available, there was dousing by salt water in holds 2, 4 and 5 which caused contamination of the cargo and rendered it unusable for their purposes, namely use in industrial boilers for the production of electricity.

16. Discharge operations were interrupted on 18 April 2011, when the vessel was arrested by the receivers. That arrest was lifted on 20 April 2011 in exchange for a P & I Club letter of undertaking. Cargo operations resumed on 21 April 2011 and discharge was completed on 23 April 2011. The vessel sailed from the port on 24 April 2011.

17. The P & I Club letter of undertaking was substituted by a bank guarantee dated 29 April 2011 from Banque Marocaine du Commerce Exterieur given on behalf of the club in favour of the first and second defendants. It states that it was issued to secure payment of any sums payable by the owners in respect of 'the alleged damage to the cargo of coal discharged from the said vessel on arrival at Nador on 11.04.2011, caused by combustion and fire-extinguishing water' and is for a maximum sum of 9,500,000 Moroccan Dirhams (equivalent to about US$1,181,000).

18. The defendants rely on a survey report from TEXA, local surveyors who attended on board the vessel during certain periods of the discharge operation, but who may not have been present on board when the crew doused the cargo at the discharge port. There is an issue about this. Nonetheless, the surveyor concludes:

'7,266.243 mt of steam coal imported by the ONE, damaged by contamination following its dousing by seawater in the holds of the vessel. This dousing was undertaken by the employees of the shipowner, while the ship was berthed, even though freshwater was immediately available. There was thus damage to the actual coal by the sodium chloride contained in seawater'.

**The proceedings**

19. The claim form in this action seeking a declaration of non-liability was issued on 8 June 2011. The first defendant has been aware of the English proceedings since 21 June 2011, but there were delays in serving the proceedings on the defendants in Morocco. Service was eventually effected on the insurer defendants on dates in February 2013 and on the first defendant on 6 May 2013.

20. A month after service upon them, on 28 March 2013, the insurer defendants (exercising their right under Moroccan law to sue in their own names) commenced

© DSP Publishing Ltd                                    [2013] 2 CLC 480

A   proceedings in the Commercial Court in Casablanca against (i) the master, in his
    capacity as representative of the owners, and (ii) the port operating company. The
    claim against the owners is made pursuant to the Hamburg Rules (which apply in
    Morocco) and relies simply on the fact that the cargo was damaged on outturn. The
    basis on which it is sought to hold the port operating company responsible is not
    explained. Apparently there is no difficulty as a matter of Moroccan law in serving
B   the claim on the owners by service on their port agents but (more than six months
    after commencement of the proceedings) such service had not been effected as at the
    date of the hearing before me.

    21. By an application dated 22 May 2013 the defendants challenge the jurisdiction
C   of this court. On 13 August 2013 the claimant owners issued an application for an
    anti-suit injunction to restrain pursuit of the Moroccan proceedings on the ground that
    this constitutes a breach of the exclusive jurisdiction clause in the charter party which
    (they say) was incorporated into the bill of lading.

**The tests for jurisdiction**
D
    22. Save in one respect the proper approach to the questions whether the court has
    and/or should exercise jurisdiction was not in dispute.

    23. The court has a discretionary power under CPR 6.36 and 6.37 to grant
E   permission to serve a claim form out of the jurisdiction if the following conditions
    are met, on all of which the burden lies upon the claimant:

    (i) the claimant has a good arguable case that the claim comes within one or more of
    the jurisdictional gateways set out in CPR PD 6B para 3.1;

F
    (ii) the claim has a reasonable prospect of success on the merits; and

    (iii) the court is satisfied that England and Wales is the proper place in which to bring
    the claim.

G   24. The standard of a good arguable case is less stringent than proof on the
    balance of probabilities but is higher than the test of serious issue to be tried. It
    involves considering the relative strengths of the arguments in the light of the material
    available, bearing in mind the limitations of the interlocutory process. For this reason,
    it is often glossed by saying that the claimant must show that it has much the better,
    or at any rate the better, of the argument.
H
    25. The standard in relation to the second condition is akin to the standard on a
    summary judgment application under CPR 24. It is therefore a relatively low hurdle
    for a claimant, who must have a real as opposed to a fanciful prospect of success. The
    cases are replete with warnings against attempting to conduct anything in the nature
    of a mini trial on the merits.

A

26. As for the third condition, it must be shown that England is clearly the appropriate forum for the resolution of the claims.

27. The point on which the parties disagree is whether or to what extent it is legitimate on an *inter partes* hearing to take account of events occurring after the initial grant of permission to serve out. This point arises because the defendants contend that the existence of the Moroccan proceedings is an important factor on the question of appropriate forum. The claimant owners say that where permission to serve out has been granted on a without notice basis and that permission is subsequently challenged by the defendant, the proper approach is for the court to exercise its discretion afresh on the basis of all the evidence now before it, but that it cannot take into account events which have only occurred since the grant of permission. The logic of this position is that the question whether the original permission ought to have been granted cannot be affected by matters only occurring thereafter: *Briggs & Rees, Civil Jurisdiction and Judgments*, (5th Edn, 2009) para 5.28. They accept, however, that such subsequent events may be taken into account, once it is established that the court has jurisdiction, on an application by the defendants that such jurisdiction should not be exercised on *forum non conveniens* grounds, but contend that on such an application it would be the defendants who would bear the burden. As I shall explain, this case does not depend on whether or at what stage of the argument I am permitted to take account of the existence of the Moroccan proceedings, or on the burden of proof, and I therefore need not determine this question.

B

C

D

E

**Jurisdictional gateways**

28. The claimant shipowners invoke two of the jurisdictional gateways in para 3.1(6) of CPR PD 6B. These are, first that the bill of lading is a contract 'governed by English law', and second that the bill 'contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract'. These depend, in both cases, on the effect of the incorporation of the charterparty into the bill of lading. As already noted, in order to pass through these gateways, a claimant is only required to show that it has a good arguable case. Mr Henry Byam-Cook for the claimant shipowners urged me to apply that test and to go no further. Mr Tom Whitehead for the defendants, however, urged me to decide one way or the other whether the bill of lading does contain a term conferring jurisdiction on the English court and not merely whether there is a good arguable case to this effect. He suggested that it would be critical to the exercise of discretion to know by which (if either) of the jurisdictional gateways relied on the owners had succeeded in establishing jurisdiction (as no separate consideration of appropriate forum will arise if there is an exclusive jurisdiction clause) and also cited [81] of the judgment of the Privy Council given by Lord Collins of Mapesbury in *Altimo Holdings & Investment Ltd v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2011] 1 CLC 205; [2012] 1 WLR 1804:

F

G

H

A
'A question of law can arise on an application in connection with service out of the jurisdiction, and, if the question of law goes to the existence of jurisdiction, the court will normally decide it, rather than treating it as a question of whether there is a good arguable case: *EF Hutton & Co (London) v Mofarrij* [1989] 1 WLR 488, 495; *Chellaram v Chellaram (No 2)* [2002] 3 All ER 17, para 136.'

B
29. The question whether the bill of lading contains a term providing for English court jurisdiction is a question of law. Neither party suggested that there are additional facts relevant to that question which are not currently in evidence. It has been fully argued and, as well as affecting the issue of jurisdiction, will in due course be relevant to (and potentially determinative of) the owners' application for an anti-suit injunction.

C
Moreover, the question would not arise for decision at any trial (since, *ex hypothesi*, by the stage of a trial the court would have decided to exercise jurisdiction). For these reasons I accept Mr Whitehead's submission that the point should be decided now.

**Governing law**

D
30. I begin, however, with the question of the governing law of the bill of lading. The governing law of a contract must be determined in accordance with the provisions of the Rome I Regulation (Regulation (EC) 593/2008), which provides in Article 3(1) that:

E
'A contract shall be governed by the law chosen by the parties. The choice shall be made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case. By their choice the parties can select the law applicable to the whole or part only of the contract.'

F
31. Mr Byam-Cook submitted that whatever the effect of the words 'and arbitration' in the typed clause on the face of the bill of lading and in clause 1 of the printed term on the reverse, these clauses constitute a clear choice of English law as the law to govern the bill of lading contact. In particular, he submitted that:

G
(i) Although different considerations may apply with regard to the incorporation of jurisdiction or arbitration clauses, general words of incorporation are sufficient to incorporate a charterparty governing law provision into a bill of lading: *The Njegos* [1936] P 90 and *The San Nicholas* [1976] 1 Ll Rep 8. In such circumstances, a degree of verbal manipulation of the incorporated clause is allowed: *Aikens, Bills of Lading* (2006) para 7.91 and 7.99.

H
(ii) In any event, the bill contains two express and specific references to the proper law clause in the voyage charter, which are more than sufficient to incorporate that choice of law into the bill of lading.

(iii) This amounts to an express choice of English law for the purposes of the Rome I Regulation: *Aikens, Bills of Lading* para 14.10.

A

32. Mr Whitehead submitted that the bill contained no express choice of English law and that in accordance with Article 5(1) of the Rome I Regulation, which deals with contracts of carriage, the governing law is the law of Morocco as the agreed place of delivery. Article 5(1), however, applies only 'to the extent that the law applicable to a contract for the carriage of goods has not been chosen in accordance with Article 3'. The question for decision, therefore, is whether there was such a choice. Mr Whitehead submitted that there was not, because (i) a consignee is entitled to know with precision from the face of the bill of lading what law if any has been chosen, (ii) the terms of the voyage charter were not known to the receivers until after the dispute arose, and (iii) the parties to the bill of lading did not contract with knowledge of the choice of law clause in the charterparty.

B

C

33. In my judgment it is important to remember that the bill of lading is a contract concluded between the owners and the shipper of the cargo, in this case Glencore. The consignee, although named in the bill, is not a party to the contract although it may become a holder of the bill and, by that means, may acquire rights of suit against the owners. On the other hand, it may not – for example, if for whatever reason it declines to take up and pay for the shipping documents when they are tendered under its purchase contract. In determining whether the parties to the contract have chosen a governing law for the purpose of Article 3, what matters is the choice if any made by the original parties to the contract. In construing the bill of lading in order to ascertain whether they have made such a choice, it is relevant to take account of the fact that the bill is negotiable and may come into the hands of parties who have no means of knowledge of the terms of any charterparty referred to, but the question remains a question of construction of the contract between the original parties thereto.

D

E

34. I accept Mr Byam-Cook's submission that general words of incorporation are sufficient to incorporate a proper law clause, or at any rate that there is at least a good arguable case that this is so. It was so held in *The San Nicholas* [1976] 1 Ll Rep 8, where Lord Denning MR said (omitting citations, in a judgment with which Roskill and Ormrod L JJ agreed):

F

'The only remaining question is whether the incorporation includes the clause saying that the contract "shall be governed by the laws of England". It is settled that an arbitration clause is not incorporated ... But the clause which defines the proper law of the contract is incorporated ... So this bill of lading is governed by the laws of England. At any rate, there is a good arguable case that the contract sued upon is expressly or impliedly governed by English law.'

G

H

35. One of the cases cited by Lord Denning was *The Njegos* [1936] P 90, where the charterparty was held to be governed by English law principally because it provided for arbitration in London. It was held that general words of incorporation were not sufficient to incorporate the charterparty arbitration clause into the bill of lading, but that the incorporation of charterparty terms which (in part because of the arbitration

A   clause) were themselves governed by English law nevertheless demonstrated a choice
    of English law to govern the bill of lading contract.

    36. In addition, in the present case, whatever the effect of the words 'and
    arbitration' in the bill of lading clauses, in my judgment the express references to the
    governing law of the charterparty amount to an irrefutable case that the parties to the
B   bill of lading intended their contract to be governed by the same law as was applicable
    to the charterparty, at any rate provided that the law so chosen was usual and proper
    for the trade. Since the Amwelsh form is a commonly used charter form for the
    carriage of coal, there was nothing surprising or unusual about the choice of English
    law, which is what the printed form provides, and no reason why this common form of
C   bill of lading should not be transferred to a consignee who (upon becoming a holder
    of the bill) would succeed to the rights contained therein, which rights were subject
    to English law.

    37. I conclude, therefore, that for the purpose of passing through this jurisdictional
    gateway the owners have a good arguable case that the bill of lading is a contract
D   governed by English law. I would go further and say that when it comes to the
    exercise of discretion (considered below), that discretion will fall to be exercised
    on the basis that the owners have an extremely strong case that the bill of lading is
    subject to an express choice of English law.

E
    **The jurisdiction clause**

    38. For over a century special rules have applied to the incorporation of charterparty
    arbitration clauses into bills of lading. As Bingham LJ observed in *The Federal Bulker*
    [1989] 1 Ll Rep 103, these rules were developed because of the negotiable nature of
F   bills of lading which means that they may come into the hands of a foreign party with
    no knowledge or ready means of knowledge of the charterparty terms, and they have
    been defended by the courts with some tenacity in view of the interests of commercial
    certainty. A valuable summary was given by Gross J in *Siboti K/S v BP France SA*
    [2003] EWHC 1278 (Comm); [2004] 1 CLC 1 at [24], in a judgment which also held
G   that these rules apply equally to jurisdiction clauses as to arbitration clauses. As there
    was no dispute before me about these rules, it is sufficient for present purposes to say
    that general words of incorporation (however wide, and whether or not including the
    word 'whatsoever') will not be effective to incorporate an arbitration (or jurisdiction)
    clause because such clauses are 'ancillary' to the main contract to which they relate,
    but that specific reference to an arbitration (or jurisdiction) clause will be effective;
H   and that, providing there is such a specific reference demonstrating an intention to
    arbitrate, it does not matter that the wording of the charterparty arbitration clause may
    require some degree of verbal manipulation in order to make it applicable to the bill
    of lading (for example, because it refers to disputes between owners and charterers):
    see e.g. *The Delos* [2001] 1 Ll Rep 703.

A

39. Applying these rules, it was common ground before me that if the charterparty had contained an arbitration clause (which I would qualify by saying, an arbitration clause usual in the trade) that would have been effectively incorporated into the bill of lading. But of course it did not. The bill of lading incorporated the charterparty 'law and arbitration' clause, but the charterparty provided for English law and jurisdiction, rather than for English law and arbitration.

B

40. In those circumstances Mr Byam-Cook for the owners submitted that the specific incorporating words of the bill of lading (which included typed words on the face of the bill to which it was important to give meaning and effect: see *The Starsin* [2003] UKHL 12; [2003] 1 CLC 921; [2004] 1 AC 715) demonstrated an intention to incorporate the charterparty dispute resolution clause, and could only refer to clause 5 of the charterparty providing for English law and court jurisdiction. He submitted that where as here the bill of lading contained specific words of incorporation, there was no need to give those words a strict construction, and that if it was clear that the parties had made a mistake (by referring to 'arbitration' when they clearly meant 'jurisdiction'), the bill of lading contract could be read in accordance with what a reasonable person would have understood them to have meant (see *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] 1 AC 1101).

C

D

41. Mr Whitehead for the receiver and insurers, however, submitted that the rules about incorporation give effect to the need for clarity and certainty, that arbitration is (and is well understood to be) different from litigation in court for a variety of important reasons (privacy, flexible procedures, parties' choice of tribunal which may include members with special expertise, ease of enforcement of awards, etc), that there is no reason to suppose that the parties made a mistake in referring to arbitration, and that effect would be given to the words of incorporation by construing them to mean that the charterparty arbitration clause 'if any' would be incorporated.

E

F

42. I accept that there is a need for clarity and certainty in this area, and that arbitration and litigation are (or at least can be) very different. Indeed parties sometimes choose to arbitrate precisely because they do not want their disputes to go to court. I accept also Mr Whitehead's submission that the typed words in the central box on the face of the bill ('Freight payable as per Charter Party. All terms, conditions, liberties and exemptions including the law and arbitration clause, are herewith incorporated') appear to add nothing to the meaning of printed clause 1 on the reverse, when read together with the lower box dealing with payment of freight in which the date of the charterparty has been inserted. Even if that typed repetition adds a degree of emphasis, and notwithstanding the greater weight attaching to typed clauses than to standard printed conditions, I would be reluctant to conclude that these words make a critical difference in the present case.

G

H

43. Nevertheless, on balance I accept Mr Byam-Cook's submissions. It seems to me that the question here is essentially one of construction rather than incorporation.

A   Thus, although it can be posed by asking whether the jurisdiction clause in the charterparty is incorporated into the bill of lading, the real question is what the parties should reasonably be understood to have meant by the words 'law and arbitration clause' which plainly contemplate the incorporation of at least one kind of ancillary clause. That is a question to be answered objectively, having regard to the background circumstances, which include the fact that the charterparty does not contain an
B   arbitration clause, but does contain a law and jurisdiction clause. Special rules, to the effect that ancillary clauses will not be incorporated unless specific words are used, are of comparatively little weight in deciding whether specific words which are accepted to be effective to incorporate at least one kind of ancillary clause (an arbitration clause) can properly be read as extending also to another kind of ancillary
C   clause.

44. It is clear, as Mr Byam-Cook submitted, that the only clause in the charterparty to which the parties could have intended their words to refer is the law and jurisdiction clause. There is no other candidate. That being so, it seems to me to be a more natural construction of the bill of lading to read it as referring to that clause, rather than to
D   read it as referring to an arbitration clause in the charterparty 'if any'. I can see no basis for adding the words 'if any' into the bill of lading when the original parties to that contract either knew or must be taken to have known that the charterparty contained no such clause. That would render the specific incorporating words empty of content.

E   45. Accordingly, I accept Mr Byam-Cook's submission that the principle stated by Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 at [25] applies here:

F       'What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language, and that it should be clear what a reasonable person would have understood the parties to have meant. In my opinion, both of these requirements are satisfied.'

G   46. Does this conclusion run counter to the need for clarity and certainty, particularly bearing in mind that the bill may come into the hands of other parties (such as the receiver in this case) who are not aware of the terms of the charterparty? In my judgment it does not.

H   47. It is true that without reference to the charterparty, a consignee taking up and paying for the bill of lading cannot know in what forum any claim for breach of the bill of lading contact must be brought. But that would be true even if the charterparty provided for arbitration (in which case Mr Whitehead accepted that the consignee would be bound to arbitrate). The consignee could assume that the arbitration clause was one which was usual in the trade (if it was not, the consignee would not be bound

A

by it), but it could not know without seeing the charterparty whether any arbitration was to be held in London or in some other city, whether the tribunal was to be a sole arbitrator or three arbitrators, and so on. In all these respects the consignee would be bound by whatever the original parties to the bill of lading had agreed by their incorporation of the charterparty arbitration clause. Indeed, the consignee would not necessarily know what governing law applied to the bill of lading contract.

B

48. None of this offends against the need for clarity and certainty. On the contrary, the consignee would know from the specific words of incorporation that the incorporation of charterparty terms was not confined to terms which were 'germane to the shipment, carriage and delivery of the goods' (to use the phrase found in the authorities going back to *Thomas & Co Ltd v Portsea Steamship Co Ltd* [1912] AC 1) but extended to at least some ancillary clauses concerned with choice of law and dispute resolution. That being so, I conclude that the consignee is equally bound by a clause in the charterparty which can be identified as the clause which the parties to the bill of lading contract clearly had in mind when referring to the charterparty 'law and arbitration clause', at any rate provided that (as here) the clause in question is one which was usual in the trade.

C

D

49. I am reinforced in this conclusion by the decision of Gloster J in *YM Mars Tankers Ltd v Shield Petroleum (Nigeria) Ltd* [2012] EWHC 2652 (Comm). That was a case involving a Congenbill form including the standard wording incorporating 'the Law and Arbitration Clause' of the charterparty, but the charterparty in question included a clause, headed 'Law and Litigation', which provided for disputes involving an amount in excess of US $50,000 to be subject to the jurisdiction of the English court, while disputes involving lesser amounts were to go to arbitration in accordance with the LMAA Small Claims Procedure. The cargo receiver argued that the bill did not on its true construction provide for the jurisdiction of the English court over a claim for an amount in excess of US $50,000. Gloster J rejected this argument. She said at [30] that:

E

F

'In my judgment, the "Law and Arbitration Clause" referred to in the Bill of Lading clearly should be, and would be, construed as a reference to the "Law and Litigation Clause" in the Head Charterparty. It would be uncommercial to suggest that, simply because the "Law and Litigation Clause" in the Head Charterparty provides that arbitration should be limited to disputes below a certain level, that somehow meant that only the arbitration provision should be carved out for the purpose of the Bill of Lading. The High Court provisions are all part of the same clause and scheme. It is absurd to suggest that once claims exceed a certain threshold, no jurisdictional provisions are incorporated.'

G

H

50. While this case is not on all fours, because the 'Law and Litigation' clause did at least contain some provision for arbitration, it demonstrates that the question for decision is a question of construction of the bill of lading and that at least in some circumstances a reference to 'arbitration' in the bill of lading may properly be read

A   as providing for court jurisdiction – indeed, it goes further by saying that in some circumstances any other conclusion would be 'uncommercial' and 'absurd'.

51. I should mention one further argument. Mr Whitehead submitted that because the charterparty in this case takes the form of a fixture recap into which the terms of a previous charterparty between Glencore and Eitzen (a third party) were incorporated,

B   this is what was described by Christopher Clarke J in *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi AS v Sometal SAL* [2010] EWHC 29 (Comm); [2012] 1 CLC 448 as a 'two contract' case. He submitted that the jurisdiction clause in the Glencore/ Eitzen charterparty was not even incorporated into the charter party dated 6 January 2011 between U-Sea and Glencore, and therefore could not have been incorporated

C   into the bill of lading by a reference to that charterparty, however specific. That, said Mr Whitehead, was because the recap did not contain specific words of incorporation, but only the general words 'otherwise as per proforma C/P Glencore/Eitzen … logically amended'.

D   52. Referring to the situation where parties make a contract incorporating terms agreed between one of them and a third party, Christopher Clarke J observed at [49] that:

'There is a particular need to be clear that the parties intended to incorporate the arbitration clause when the incorporation relied on is the incorporation of the terms of a contract made between different parties, even if one of them is a

E   party to the contract in suit. In such a case it may not be evident that the parties intended not only to incorporate the substance of provisions of the other contract, but also provisions as to the resolution of disputes between different parties, particularly if a degree of verbal manipulation is needed for the incorporated arbitration clause to work. These considerations do not, however, apply to a

F   single contract case.'

53. I would respectfully agree that there is a need for clarity and that, depending on the circumstances, it may not be evident in such a case that the parties intend to incorporate a dispute resolution clause. Conversely, it may be evident that they

G   do. The conclusion of a charterparty by means of a fixture recap together with the incorporation of terms from some earlier charter by means of wording such as 'otherwise as per proforma … logically amended' is very common. In my judgment the parties to a charter concluded in this way do intend to incorporate the dispute resolution clause of the earlier charter thus identified. If, as generally happens, their contract is subsequently set out in a formal signed charterparty drawn up by the

H   brokers, it will include that dispute resolution clause, but even if that does not happen (as is also common and as appears to be the present case) they still intend that clause to apply to disputes between them. The alternative would mean that their charter contains no dispute resolution clause at all, either for arbitration or for a specified court jurisdiction, which (if not unprecedented) would at least be extremely unusual. I have no doubt that the dispute resolution clause in the Glencore/Eitzen charterparty

did form part of the charterparty between U-Sea and Glencore, which charterparty      A
was in turn incorporated into the bill of lading. I suspect that, if a dispute were to
arise between U-Sea and Glencore, those parties would be amazed to be told that the
jurisdiction clause did not apply.

54. Accordingly I conclude that the bill of lading contained a term requiring any      B
dispute to be submitted to the exclusive jurisdiction of the English court.

### Reasonable prospect of success

55. Mr Whitehead submitted that even if the owners passed through one or both         C
of the jurisdictional gateways, nevertheless service should be set aside because their
claim has no real prospect of success. He submitted that the owners have failed
to explain what difference if any the shipper's failure to tell the master about the
characteristics of the cargo would have made and that it was incumbent on the
owners to set out their case as to why they exercised due diligence to make the vessel  D
seaworthy under Article III rule 1 of the Hague-Visby Rules and why they would be
entitled to rely on any of the excepted perils in Article IV rule 2.

56. I have no doubt that there is a serious issue to be tried on the merits. Even
leaving on one side the potential limitation issue referred to below, it is obvious
from the evidence that the owners' case is that they were not responsible for the      E
heating of the cargo – or, to break the issues down, that the vessel was not in any
way unseaworthy, that the statement in the bill of lading that the cargo was shipped
in 'apparent' good order and condition gives rise to no *prima facie* case against
them, that they are entitled to rely (for example) on various excepted perils, as well
as on Article IV rule 6 which deals with the shipment of inflammable or dangerous     F
cargoes, that the dousing of the cargo was entirely appropriate and in any event that it
caused little or no salt water contamination. This case raises issues which can only be
determined at trial. There are also issues, raised by the defendants, as to whether the
master cared for the cargo properly during the voyage. If both parties were English, so
that no question of jurisdiction arose, it is inconceivable that this would be regarded
as a case for summary judgment.                                                        G

### Appropriate forum

57. Mr Whitehead accepted that if the bill of lading was governed by English         H
law and contained a term requiring any dispute to be submitted to the exclusive
jurisdiction of the English court, that would in itself be sufficient to show that
England is the appropriate forum. As that is what I have held, it would be possible to
say at this point that the defendants' challenge to the jurisdiction must be dismissed.
However, as the point was argued, I will go on to deal with the issue of appropriate
forum on the assumption that the jurisdiction clause does not apply and that the only

A     gateway available to the owners is that the bill of lading is a contract governed by
      English law.

      58. On that basis, Mr Byam-Cook submitted that the parties' express choice of
      English law is entitled to substantial weight, in particular in circumstances where
      it is common ground that the Moroccan court would apply its own law, including
B     the Hamburg Rules instead of the contractually agreed Hague-Visby regime. He
      submitted also that much of the evidence would be to do with events at the load port of
      Rotterdam or on the voyage and that the owners' evidence, including evidence about
      events at the discharge port, would come from outside Morocco, with documents in
      English, English speaking witnesses and with experts from England who had attended
C     at the discharge port.

      59. Mr Whitehead, on the other hand, made three main points: first, that upholding
      English jurisdiction would involve a multiplicity of proceedings in view of the claim
      made by the insurers in Morocco, which also involved the port authority which had
      provided the stevedores; second, that the fact that the Moroccan court would apply
D     Moroccan law is of no significance because it has not been shown that Moroccan
      law is relevantly different from English law, notwithstanding that the Hamburg
      Rules would apply; and third, that neither the events to be considered at trial nor the
      witnesses on either side have any connection with England, whereas to a very large
      extent they do with Morocco.

E
      60. While there have been cases in which multiplicity of proceedings has been
      a decisive factor against English jurisdiction, I regard the existence of proceedings
      in Morocco in this case as being of no weight (and therefore need not consider
      further the issue about the extent to which I am permitted to take those proceedings
      into account). They were commenced only after the defendants were served with
F     the present proceedings, and well after the receiver at any rate was aware of these
      proceedings. If this court was the appropriate forum at the time when permission was
      granted for service out of the jurisdiction, at which time the Moroccan proceedings
      did not exist, I do not see how the defendants' own decision to bring proceedings in
      Morocco (*ex hypothesi* not the appropriate forum in the absence of those proceedings)
G     can alter this assessment. If the existence of proceedings in two different jurisdictions
      is a problem for the defendants, they have the remedy in their own hands, namely to
      discontinue the proceedings in Morocco and contest the merits here. This view might
      require some reassessment if the insurers' claim against the port authority had been
      explained, if for example there were valid claims against the port authority which
      needed to be brought in Morocco and could not conveniently be brought here, but
H     in the absence of any such explanation the claim against the port authority has every
      appearance of being a makeweight, adding nothing of real substance to the claim
      against the owners and tacked onto the Moroccan proceedings in order to assist the
      defendants' challenge to the jurisdiction here.

61. As for the significance of the express choice of English law, such a choice is   A
capable of being a factor of significant and even decisive weight, particularly if the
foreign court's application of a different law would or might lead to a different result
as that would be to deprive the claimant of the benefit of its bargain: *Navig8 Pte
Ltd v Al-Riyadh Co for Vegetable Oil Industry (The Lucky Lady)* [2013] EWHC 328
(Comm); [2013] 2 CLC 461 at [28], where Andrew Smith J reviewed the applicable
authorities, including the comments of Lord Mance in *VTB Capital plc v Nutritek*   B
*International Corp* [2013] UKSC 5; [2013] 1 CLC 153 at [46]. I do not overlook
that the receiver did not choose English law as it was not an original party to the bill
of lading contract, but for this purpose it stands in the shoes of the shipper who did.

62. In my judgment there is a real risk that forcing the owners to proceed in   C
Morocco where Moroccan law and the Hamburg Rules would be applied would have
the effect of depriving the owners of the benefit of their bargain. Mr Whitehead was
able to point out that Article 13 of the Hamburg Rules is in substantially the same
terms as Article IV rule 6 of the Hague-Visby Rules on which the owners rely, but
to extrapolate from this to a conclusion that there is no relevant difference between
English and Moroccan law so far as this claim is concerned is in my view not   D
justified. Quite apart from the fact that at this early stage it is difficult to foresee the
way in which the litigation may develop and the precise nature of the issues which
may arise, there are myriad differences between the Hague-Visby and the Hamburg
Rules, the latter being much more favourable to cargo interests (see the summary at
Appendix VI of *Scrutton on Charterparties* (22nd edn, 2011). In my judgment this   E
risk of a less favourable legal regime in Morocco is a decisive factor.

63. I reach this conclusion leaving on one side the possibility that in England
the owners may have a complete answer to any claim against them, and thus a
straightforward basis on which they would be entitled to seek a declaration of non-
liability, by reason of Article III rule 6 of the Hague-Visby Rules. That would arise   F
because no claim was brought against them within 12 months of final discharge, so
that it is at least arguable that any such claim thereupon ceased to exist: *The Aries*
[1977] 1 WLR 185. However, although he drew this point to my attention after the
hearing, this did not form part of Mr Byam-Cook's argument at the hearing and I did
not hear Mr Whitehead upon it. I will, therefore, say no more about it than that if it is   G
a valid point, it would provide a further reason why justice would require that these
proceedings take place in a forum which will apply the parties' chosen law.

64. Finally on the question of appropriate forum, I would accept that such matters
as the convenience of witnesses and the availability of evidence point more to
Morocco than they do to England. But for the reasons I have given, such weight as   H
these factors may have is less than that arising from the need to litigate in a forum
which would apply English law as the law expressly chosen.

65. Accordingly, even if the jurisdiction clause does not apply, England is clearly
the appropriate forum for this case.

A

**Practical benefit**

66. Since the claim here is for a negative declaration, the claimant must also
show that there is 'a solid practical benefit' in proceedings here: see *The Lucky Lady*
[2013] 2 CLC 461 at [31]. I am satisfied that there is such a benefit, essentially for
B   the same reasons as given by Andrew Smith J in that case at [34] to [38], that is to
say (in outline) that a declaration may assist the owners to resist enforcement in a
third country (to which I would add that in this case it may also assist them to obtain
the release of the security given by Banque Marocaine on behalf of their P & I Club),
and that proceedings here may enable the owners to seek an anti-suit injunction (an
C   application which they have indeed made, but with which I have not yet dealt).


**Full and frank disclosure**

67. Mr Whitehead's final argument was that there was a failure of full and frank
D   disclosure in the application for permission to serve out of the jurisdiction because
the evidence in support of that application did not deal sufficiently with the points
which might be made by the defendants on the merits of the claim, did not expressly
draw attention to the argument that the jurisdiction clause in the charter party was not
incorporated because the bill of lading referred to 'arbitration', and did not grapple
E   sufficiently with the question of appropriate forum. In addition it was said that in
later applications to extend the time for service and to join the insurers as defendants,
the owners failed to explain the issues raised by the TEXA report which, although
exhibited, was not dealt with in any detail.

68. In my judgment there is nothing in these points. I do not read the owners'
F   witness statements as suggesting any more on the merits than that there was a serious
issue to be tried on which they have a real prospect of success; the argument about the
jurisdiction clause was obvious from what was said even if not spelt out; the question
of appropriate forum did not arise for separate consideration if the owners were right
(as I have held that they were) about the jurisdiction clause; and the TEXA report
G   merely confirmed that issues would arise on the merits of the claim. In my judgment
it cannot be said that the court was misled in any way or that an unfair picture was
presented to it.


**Conclusion**

H

69. Save that the name of the third defendant can be removed from the heading
of these proceedings, the defendants' challenge to the jurisdiction of this court is
dismissed. The bill of lading provides for exclusive English jurisdiction and there is
(at least) a good arguable case that it is governed by English law. There is a serious
issue to be tried on the merits. Even if the bill contains no English jurisdiction clause,

**Channel Ranger**
(*Males* J)

A

this court is clearly the appropriate forum and the proceedings serve a practical purpose. There was no failure of full and frank disclosure by the owners when seeking permission to serve out.

70. I will deal with the claimant owners' application for an anti-suit injunction following the hand down of this judgment.

B

*(Order accordingly)*

———————

C

D

E

F

G

H

A                          House of Lords

## Chartbrook Ltd and another *v* Persimmon Homes Ltd and another

### [2009] UKHL 38

B   2009   March 31;                    Lord Hope of Craighead, Lord Hoffmann,
           April 1, 2;          Lord Rodger of Earlsferry, Lord Walker of Gestingthorpe,
           July 1                          Baroness Hale of Richmond

*Contract — Construction — Pre-contract negotiations — Parties disputing amounts*
C   *due under component of price of contract — Disputed component defined in*
    *contract — Whether ordinary rules of construction applying — Whether*
    *evidence of parties' negotiations admissible as aid to construction where disputed*
    *term defined in contract — Whether rectification to be granted*

The claimant company was the owner of development land and the defendants
were developers. They entered into a contract whereby the defendants agreed to
obtain planning permission for the claimant's land and then, pursuant to a licence
from the claimant, to enter into possession, construct a mixed residential and
commercial development, and sell the properties on long leases. The claimants
D   agreed to grant the leases at the direction of the defendants, who would receive the
proceeds for their own account and pay the claimant an agreed price for the land.
Planning permission was granted and the development was built. A dispute arose
between the parties regarding a term of the contract which provided for an
"additional residential payment", which was a term defined in the contract.
The dispute related to the calculation of the amount payable under that term.
The defendants calculated the sum due as £897,051 whereas the claimants claimed to
E   be entitled to £4,484,862. The claimants brought proceedings against the defendants
for the unpaid balance of the additional residential payment which they claimed to be
owed. In support of their construction of the term of the contract the defendants
sought to rely on documents which were part of the pre-contractual negotiations.
Alternatively the defendants counterclaimed for rectification of the contract to
accord with what they claimed to be the parties' common agreement. The judge held
that the claimants' construction was the correct one and that evidence of the
F   pre-contractual negotiations was not admissible, particularly when an express
definition was contained within the contract. Accordingly, he gave judgment for the
claimants and dismissed the counterclaim. The Court of Appeal, by a majority,
upheld the judge's decision.

On appeal by the defendants—
*Held*, allowing the appeal, (1) that, although a court would not easily accept
that linguistic mistakes had been made in formal documents, if the context and
G   background drove a court to conclude that something had gone wrong with the
language of a contract the law did not require it to attribute to the parties an intention
which a reasonable person would not have understood them to have had; that where
it was clear both that there was a mistake on the face of the document and what
correction ought to be made in order to cure it, in that it was clear what a reasonable
person having all the background knowledge which would have been available to the
parties would have understood the parties by using the language in the contract to
H   have meant, the court was entitled to correct the mistake as a matter of construction;
that both those requirements were satisfied in the present case; that the definition of
"additional residential payment" in the contract was ambiguous and obviously
defective as a piece of drafting; that there was always a commercial context
to a contract negotiated between businessmen, and to interpret the definition in
accordance with the ordinary rules of syntax made no commercial sense; and that,

A

accordingly, taking into consideration the background and context but not the pre-contractual negotiations and applying the established principles of construction, the claimants' construction could not be upheld, and the construction put forward by the defendants was more appropriate (post, paras 1, 14–25, 68, 84–88, 91, 95–98).

Dicta of Brightman LJ in *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61, CA and of Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, para 50, CA approved.

B

*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, HL(E) applied.

But (2) that, although it would not be inconsistent with the English objective theory of contractual interpretation to admit evidence of previous communications between parties as part of the background which might throw light on what they meant by the language used and there were no conceptual limits to what could properly be regarded as background, the rule which had been in existence for many years was that pre-contractual negotiations should be excluded as inadmissible simply because they were usually irrelevant to the question which the court had to decide, namely, what the parties could reasonably be taken to have meant by the language which they had finally adopted to express their agreement; that, even in a case where background might be relevant, a departure from that exclusionary rule would create uncertainty of outcome in disputes over interpretation and add to the cost of advice, litigation or arbitration; that unlike surrounding circumstances, which were by definition objective and uncontroversial facts, statements in the course of pre-contractual negotiations were subjective and could, if oral, be disputed, and it was not often easy to distinguish between statements which reflected the aspirations of a party and those which embodied a provisional consensus which might help in the interpretation of the contract eventually concluded; that it could not confidently be said that the exclusionary rule was impeding the proper development of the law or had led to results which were unjust or contrary to public policy, so as to entitle the House of Lords to depart from the authorities establishing it; that the availability of the remedies of rectification and estoppel by convention were safeguards which would in most cases prevent the rule from causing any injustice, but those two remedies would have to be pleaded and clearly established; that, although the rule excluded evidence of what had been said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant, it did not exclude the use of such evidence for other purposes, such as to establish that a fact which might be relevant as background was known to the parties, or to support a claim for rectification or estoppel, which were not exceptions to the rule but operated outside it; and that, accordingly, there were no grounds for departing from the exclusionary rule and the evidence of the pre-contractual negotiations was not admissible in support of the construction of the contract (post, paras 1–4, 33–38, 41–47, 69, 70, 97, 101).

C

D

E

F

*A & J Inglis v John Buttery & Co* (1878) 3 App Cas 552, HL(Sc) and *Prenn v Simmonds* [1971] 1 WLR 1381, HL(E) followed.

*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd (The Karen Oltmann)* [1976] 2 Lloyd's Rep 708 disapproved.

G

*Per curiam*. Rectification is not confined to cases where there was a concluded antecedent contract with which the final contract did not conform but is also available when there was no binding antecedent agreement but the parties had a common continuing intention in respect of a particular matter in the instrument in respect of which rectification is sought. In both cases the question is what an objective observer would have thought the intentions of the parties to be. In order to get rectification it has to be shown that the parties were in complete agreement on the terms of their contract but by an error wrote them down wrongly. If, by looking at what the parties said or wrote to each other in coming to their agreement and then comparing it with the contract they signed, it can be predicated with certainty what their contract was, and that it is by common mistake wrongly expressed in the

H

1103
[2009] 1 AC                Chartbrook Ltd v Persimmon Homes Ltd (HL(E))

A  document, the document can be rectified, but nothing less will suffice. On the facts both parties were mistaken in thinking that the definition of the construction of "additional residential payment" reflected their prior consensus, and so, had it been necessary, the defendants would have been entitled to rectification (*post*, paras 1, 59, 64–67, 71, 97, 100, 101).

Dicta of Denning LJ in *Frederick E Rose (London) Ltd v William H Pim Jnr & Co Ltd* [1953] 2 QB 450, 461, CA and of Mustill J in *Etablissements Georges et Paul*
B  *Levy v Adderley Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67, 72 approved.

Decision of the Court of Appeal [2008] EWCA Civ 183; [2008] 2 All ER (Comm) 387 reversed.

The following cases are referred to in the opinions of the Committee:

C  *Alexiou v Campbell* [2007] UKPC 11, PC
*Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577, CA
*Antaios Cia Naviera SA v Salen Rederierna AB* [1985] AC 191; [1984] 3 WLR 592; [1984] 3 All ER 229, HL(E)
*Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC 251; [2001] 2 WLR 735;[2001] ICR 1226; [2001] 1 All ER 961, HL(E)
*Bank of Scotland v Dunedin Property Investment Co Ltd* 1998 SC 657, Ct of Sess
D  *Birmingham City Council v Walker* [2007] UKHL 22; [2007] 2 AC 262; [2007] 2 WLR 1057; [2007] 3 All ER 445, HL(E)
*Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693, CA
*Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561, CA
*Butlin's Settlement Trusts, In re* [1976] Ch 251; [1976] 2 WLR 547; [1976] 2 All ER 483
*Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2004] EWHC
E  2974 (Pat); [2005] FSR 590
*Carmichael v National Power plc* [1999] 1 WLR 2042; [1999] ICR 337; [1999] 4 All ER 897, HL(E)
*Cohen (George) Sons & Co Ltd v Docks and Inland Waterways Executive* (1950) 84 Ll L Rep 97,CA
*East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61
*Etablissements Georges et Paul Levy v Adderley Navigation Co Panama SA*
F  *(The Olympic Pride)* [1980] 2 Lloyd's Rep 67
*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12; [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)
*Inglis (A & J) v John Buttery & Co* (1877) 5 R 58, Ct of Sess; (1878) 3 App Cas 552, HL(Sc)
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)
G  *Joscelyne v Nissen* [1970] 2 QB 86; [1970] 2 WLR 509; [1970] 1 All ER 1213, CA
*Jumbo King Ltd v Faithful Properties Ltd* (1999) 2 HKCFAR 279
*KPMG LLP v Network Rail Infrastructure Ltd* [2007] EWCA Civ 363; [2007] Bus LR 1336, CA
*Kirin-Amgen Inc v Hoechst Marion Roussel Ltd* [2004] UKHL 46; [2005] 1 All ER 667; , HL(E)
*Lovell & Christmas Ltd v Wall* (1911) 104 LT 85, CA
H  *Macdonald v Dextra Accessories Ltd* [2005] UKHL 47; [2005] 4 All ER 107; [2005] STC 1111, HL(E)
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749; [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
*Miliangos v George Frank (Textiles) Ltd* [1976] AC 443; [1975] 3 WLR 758; [1975] 3 All ER 801, HL(E)

313

A.C.

A
[HOUSE OF LORDS]

CHARTER REINSURANCE CO. LTD. . . . . Respondents

AND

FAGAN . . . . . . . . Appellant

B
1995   May 22, 23, 24, 25;                                    Mance J.
       June 23

1995   Sept. 12, 13, 14;                              Nourse, Staughton and
       Oct. 25                                        Simon Brown L.JJ.

1996   Feb. 21, 22, 26;                       Lord Goff of Chieveley, Lord Griffiths,
C      May 22                                  Lord Browne-Wilkinson, Lord Mustill
                                                       and Lord Hoffmann

*Insurance—Reinsurance—Excess of loss—Reinsurers' liability for ultim-
ate net loss in excess of specified amount—Ultimate net loss defined
as sum "actually paid" by insurers—Insurers in provisional
liquidation—Whether reinsurers liable in respect of claims agreed
but not paid—Whether liability of reinsurers dependent on insurers
having transferred funds to insured*

D

Under two whole account excess of loss reinsurances, the
reinsurers undertook to indemnify the insurers against "all losses
howsoever and wheresoever arising" during the period of the
reinsurance on any interest under policies and contracts of
insurance or reinsurance underwritten by the reinsured in their
E      whole account. Under a third policy, an aviation risk policy, the
reinsurer agreed to cover the liability of the insurers in respect of
the reinsured's aviation excess of loss underwritings during a
specified period. All three contracts provided that the reinsurer
was to be liable for the losses of the insurers in excess of an
ultimate net loss of a specified amount. The term "net loss" (or
in the aviation risk policy "ultimate net loss") was defined as
meaning "the sum actually paid by the reinsured in settlement of
F      losses or liability after making deductions for all recoveries, all
salvages and all claims upon other reinsurances whether collected
or not and shall include all adjustment expenses arising from the
settlement of claims . . ." The insurers, who were in provisional
liquidation, applied, pursuant to R.S.C., Ord. 14A, for determina-
tion of the question whether in order for the reinsurers to become
liable under the three excess of loss reinsurance agreements, it
was necessary for the insurers first to have made payment of the
G      relevant claim by way of transfer of funds to its insured. Mance J.
held that it was not. On appeal by the reinsurers, the Court of
Appeal (by a majority) dismissed the appeal.
On appeal by the reinsurer:—
*Held,* dismissing the appeal, that the words "actually paid" in
the context of the ultimate net loss clause did not have the
purpose of introducing a temporal precondition to recovery by
way of disbursement or other satisfaction of the precise net
H      commitment between the insurer and reinsured but were there
merely for the purpose of measurement; and that, accordingly,
the question raised by the summons should be answered in the
negative (post, pp. 381A–B, 386E–G, 390G–H, 392C–D, 395A–B).

314

Charter Reinsurance Co. Ltd. v. Fagan (H.L.(E.))      [1997]

      Dictum of Lord Reid in *Wickman Machine Tool Sales Ltd. v.*    A
*L. Schuler A.G.* [1974] A.C. 235, 251, H.L.(E.) considered.
      Decision of the Court of Appeal, *post*, pp. 353F et seq.; [1996]
1 All E.R. 406 affirmed.

The following cases are referred to in their Lordships' opinions:

*Allemannia Fire Insurance Co. of Pittsburgh v. Firemen's Insurance Co. of*
   *Baltimore* (1908) 209 U.S. 326       B
*British Dominions General Insurance Co. Ltd. v. Duder* [1915] 2 K.B. 394, C.A.
*Chippendale v. Holt* (1895) 1 Com.Cas. 197
*Eddystone Marine Insurance Co., In re; Ex parte Western Insurance Co.* [1892]
   2 Ch. 423
*Fidelity & Deposit Co. v. Pink* (1937) 302 U.S. 224
*Firma C-Trade S.A. v. Newcastle Protection and Indemnity Association (The*
   *Fanti)* [1987] 2 Lloyd's Rep. 299, Staughton J.; [1991] 2 A.C. 1; [1990]
   3 W.L.R. 78; [1990] 2 All E.R. 705, H.L.(E.)       C
*Gurney v. Grimmer* (1932) 44 Ll.L.Rep. 189, C.A.
*Insurance Co. of Africa v. Scor (U.K.) Reinsurance Co. Ltd.* [1985] 1 Lloyd's
   Rep. 312, C.A.
*Stickel v. Excess Insurance Co. of America* (1939) 23 N.E.2d 839
*Uzielli & Co. v. Boston Marine Insurance Co.* (1884) 15 Q.B.D. 11, C.A.
*Western Assurance Co. of Toronto v. Poole* [1903] 1 K.B. 376
*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973]    D
   2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)

The following additional cases were cited in argument in the House of Lords:

*Antaios Compania Naviera S.A. v. Salen Rederierna A.B. (The Antaios)* [1985]
   A.C. 191; [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
*Arbuthnott v. Fagan* (unreported), 30 July 1993; Court of Appeal (Civil
   Division) Transcript No. 1024 of 1993, C.A.       E
*Birmingham Corporation v. Barnes* [1935] A.C. 292, H.L.(E.)
*Black King Shipping Corporation v. Massie* [1985] 1 Lloyd's Rep. 437
*Glasgow Assurance Corporation v. Symondson* (1911) 16 Com.Cas. 109
*Hill v. Mercantile and General Reinsurance Co. Plc.* [1995] L.R.L.R. 160, C.A.
*Home and Overseas Insurance Co. Ltd. v. Mentor Insurance Co. (U.K.) Ltd.*
   [1990] 1 W.L.R. 153; [1989] 3 All E.R. 74; [1989] 1 Lloyd's Rep. 473,
   C.A.       F
*Kingsley v. Sterling Industrial Securities Ltd.* [1967] 2 Q.B. 747; [1966]
   2 W.L.R. 1265; [1966] 1 All E.R. 37; [1966] 2 All E.R. 414, McNair J.
   and C.A.
*Law Guarantee Trust and Accident Society Ltd., In re; Liverpool Mortgage*
   *Insurance Co.'s Case* [1914] 2 Ch. 617, C.A.
*Leader v. Duffey* (1888) 13 App.Cas. 294, H.L.(I.)
*Palm Shipping Inc. v. Kuwait Petroleum Corporation* [1988] 1 Lloyd's Rep. 500    G
*Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd.* [1982] A.C. 724; [1981] 3 W.L.R.
   292; [1981] 2 All E.R. 1030, H.L.(E.)
*Rex v. Inhabitants of St. Nicholas, Rochester* (1834) 3 L.J.M.C. 45
*Smith v. Cooke; Storey v. Cooke* [1891] A.C. 297, H.L.(E.)
*Thompson v. Reynolds* (1857) 26 L.J.Q.B. 93

The following cases, although not cited in argument, were referred to in the    H
printed cases:

*Attica Sea Carriers Corporation v. Ferrostaal Poseidon Bulk Reederei G.m.b.H.*
   [1976] 1 Lloyd's Rep. 250, C.A.
*Burnand v. Rodocanachi Sons & Co.* (1882) 7 App.Cas. 333, H.L.(E.)

A

precedent to any liability of the syndicates. The condition is that Charter shall have "actually paid" under the original policies. If this expression has a natural and ordinary meaning, effect should be given to it. The expression and the words which comprise it do have such a meaning. By no stretch of language can it be extended to cover a situation in which Charter has not made any disbursement, actual or even notional, and will never do so.

B

My Lords, to a substantial degree I accept this argument. I believe that most expressions do have a natural meaning, in the sense of their primary meaning in ordinary speech. Certainly, there are occasions where direct recourse to such a meaning is inappropriate. Thus, the word may come from a specialist vocabulary and have no significance in ordinary speech. Or it may have one meaning in common speech and another in a specialist vocabulary; and the context may show that the author of the document in which it appears intended it to be understood in the latter sense. Subject to this, however, the inquiry will start, and usually finish, by asking what is the ordinary meaning of the words used. I begin, therefore with "actually." In my opinion this word is used by way of qualification or precaution, in the sense of "really," "in truth," "not notionally" or "not prospectively." On this, I feel no doubts. The word "paid" is more slippery. Unquestionably, it is no longer confined to the delivery of cash or its equivalent. In ordinary speech it now embraces transactions which involve the crediting and debiting of accounts by electronic means, not only transfers between bank accounts by payment cards and direct debits, but also dealings with credit cards and similar instruments. Conditional payment by cheque would also be covered, at any rate outside a strictly legal context. Furthermore, I think it plain that in a document created to govern a transaction in the London insurance market payment would extend beyond remittances from debtor to creditor and would include the settlements in account with brokers which are a feature of that market. None the less, even giving "paid" an extended meaning the word would at first sight, and even without the qualifier "actually," fall well short of encompassing a situation in which the debtor had suffered no immediate financial detriment through a transfer of funds in the direction of the creditor, and would never do so.

C

D

E

F

My Lords, I have used the expression "at first sight" because I had initially thought that the meaning of the words was quite clear, and that the complexities and mysteries of this specialist market had hidden the obvious solution, and had led the courts below to abjure the simple and right answer and to force on the words a meaning which they could not possibly bear. I was not deflected from this opinion by any of the cases cited, which with few exceptions (to which I must return) seemed too remote from the present to offer any useful guidance.

G

This is, however, an occasion when a first impression and a simple answer no longer seem the best, for I recognise now that the focus of the argument is too narrow. The words must be set in the landscape of the instrument as a whole. Once this is done the shape of the policy, and the purpose of the terms which I have grouped as clause 2 become quite clear. As one would expect, four essential features of the insurance are described: the perils insured against; the measure of indemnity; the

H