# EXHIBIT C

588

Neill L.J.        Reg. v. Merseyside Coroner, Ex p. Carr (D.C.)        [1994]

In coroners' courts, however, it has been the practice to empanel a jury in    A
excess of the minimum number who are required to return a verdict.
Accordingly, I see no reason in principle why the discharge of a juror
necessarily requires the coroner to start the proceedings again with a
freshly empanelled jury. It is, however, unnecessary to reach a final
decision on this matter.

I would grant the application for judicial review and invite argument      B
as to the precise form of order.

MANTELL J.   I agree and have nothing to add.

*Certiorari to quash coroner's decision
of 9 April 1992.*
*Declaration that proceedings before*      C
*jury empanelled on 26 February 1991*
*were a nullity.*
*Fresh inquest to be held before different*
*coroner and a new jury.*
*No order for costs.*

Solicitors: *Jack Thornley, Ashton under Lyne; Deputy City Solicitor,*      D
*Liverpool City Council, Liverpool.*

[Reported by ALISON SYLVESTER, Barrister]

E

[COURT OF APPEAL]

F

*CONTINENTAL BANK N.A. v. AEAKOS COMPANIA
NAVIERA S.A. AND OTHERS

1993 Nov. 9, 10        Sir Stephen Brown P., Steyn and Kennedy L.JJ.

*Practice—Stay of proceedings—Jurisdiction under European Convention—*
*Loan agreement requiring borrowers to submit to jurisdiction of*
*English courts—Whether English courts having exclusive jurisdiction*      G
*over disputes concerning agreement—Whether injunction available*
*to restrain borrowers' action in Greek court against lender—Civil*
*Jurisdiction and Judgments Act 1982 (c. 27), Sch. 1, arts. 17, 21,*
*22*

The plaintiff American bank granted a loan facility to the
Greek defendants under an agreement which provided that each      H
defendant "irrevocably submits to the jurisdiction of the English
courts . . . but the bank reserves the right to proceed under this
agreement in the court of any other country claiming or having
jurisdiction in respect thereof." The defendants commenced an
action in a Greek court claiming damages against the bank on
the ground of a wrong exercise of rights under the loan agreement.
The bank issued a writ in England claiming an injunction to
restrain the defendants from continuing the Greek proceedings in

The Weekly Law Reports 22 April 1994

589

1 W.L.R.                    Continental Bank v. Aeakos S.A. (C.A.)

A    breach of the jurisdiction agreement. The judge refused the
defendants' application to strike out the English action, or to stay
it under article 21 or 22 of the Brussels Convention on Jurisdiction
and the Enforcement of Judgments in Civil and Commercial
Matters, as set out in Schedule 1 to the Civil Jurisdiction and
Judgments Act 1982[1] and he granted the injunction as sought.
    On the defendants' appeal:—
    *Held,* dismissing the appeal, that the jurisdiction agreement on
B    its true construction obliged the defendants to submit disputes
concerning the loan agreement to the English courts; that by
virtue of article 17 of the Brussels Convention the English courts
had exclusive jurisdiction over any such dispute and, therefore,
the question of a stay under article 21 or 22 of the Convention
did not arise; and that, on the facts, the judge properly exercised
his discretion in granting the injunction as being the only effective
C    remedy for the defendants' breach of contract (post, pp. 596E–G,
597H–598A).
    Decision of Gatehouse J. affirmed.

The following cases are referred to in the judgment of the court:

*Anonima Petroli Italiana S.P.A. v. West of England Shipowners Mutual
    Insurance Association (London) Ltd.* (unreported), 9 April 1990, Saville J.
*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191;
D    [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
*Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488; [1988]
    3 W.L.R. 867; [1988] 2 All E.R. 577, C.A.
*Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.* [1903]
    1 K.B. 249
*British Aerospace Plc. v. Dee Howard Co.* [1993] 1 Lloyd's Rep. 368
E   *Cannon Screen Entertainment v. Handmade Films* (unreported), 20 July 1989,
    Hobhouse J.
*Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A.* [1983] 2
    Lloyd's Rep. 171, C.A.
*Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Insurance
    Co. Ltd.* [1993] Q.B. 701; [1993] 3 W.L.R. 42; [1993] 3 All E.R. 897, C.A.
F   *I.P. Metal Ltd. v. Ruote O.Z. S.p.A.* [1993] 2 Lloyd's Rep. 60
*Kloeckner & Co. A.G. v. Gatoil Overseas Inc.* [1990] 1 Lloyd's Rep. 177
*Kurz v. Stella Musical Veranstaltungs G.m.b.H.* [1992] Ch. 196; [1991]
    3 W.L.R. 1046; [1992] 1 All E.R. 630
*Société Nationale Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871;
    [1987] 3 W.L.R. 59; [1987] 3 All E.R. 510, P.C.
*Sohio Supply Co. v. Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588, C.A.

G    The following additional cases were cited in argument:

*Barclays Bank Plc. v. Homan* (1993) B.C.L.C. 680, C.A.
*Berisford (S. & W.) Plc. v. New Hampshire Insurance Co.* [1990] 2 Q.B. 631;
    [1990] 3 W.L.R. 688
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3 W.L.R.
    413; [1984] 3 All E.R. 39, H.L.(E.)
H   *Bushby v. Munday* (1821) 5 Madd. 297
*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991;
    [1981] 1 All E.R. 143, H.L.(E.)
*Man (E.D. & F.) (Sugar) Ltd. v. Yani Haryanto (No. 2)* [1991] 1 Lloyd's
    Rep. 429, C.A.

---

[1] Civil Jurisdiction and Judgments Act 1982, Sch. 1, art. 17: see post, p. 595A–C.
  Art. 21: see post, p. 595C–D.
  Art. 22: see post, p. 595D–F.

The Weekly Law Reports 22 April 1994

590

Continental Bank v. Aeakos S.A. (C.A.)                    [1994]

*Overseas Union Insurance Ltd. v. New Hampshire Insurance Co.* (Case    A
    C 351/89) [1992] Q.B. 434; [1992] 2 W.L.R. 586; [1992] 2 All E.R. 138,
    E.C.J.
*Owens Bank Ltd. v. Bracco* [1992] 2 A.C. 443; [1992] 2 W.L.R. 621; [1992]
    2 All E.R. 193, H.L.(E.)
*South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien"*
    *N.V.* [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487, H.L.(E.)

APPEAL from Gatehouse J.                                                B
    By a loan agreement dated 20 May 1981 the plaintiff, Continental
Bank N.A., an American bank, granted a loan facility to the first to
fifteenth defendants, one-ship companies managed by Aegis Shipping Co.
Ltd. of Athens. Georgios Papalios, Nicolaos Papalios and Theodora
Papalios, respectively the sixteenth to eighteenth defendants, were the
guarantors of the loan. The agreement contained a clause stating that the   C
borrowers submitted irrevocably to the jurisdiction of the English court.
The defendants commenced an action in the Multi-membered First
Instance Court, Athens claiming damages against the bank on the ground
that the bank had exercised rights under the loan agreement contrary to
article 919 of the Greek Civil Code. By a summons dated 1 June 1991 the
bank sought an injunction requiring the defendants to take no further
steps in the Greek proceedings. By a summons of 23 July 1991 the          D
defendants sought an order that the bank's writ and points of claim be
struck out or that the action be stayed under articles 21 or 22 of the
Brussels Convention. Gatehouse J. granted final injunctions restraining
the defendants from taking any further steps in the Greek proceedings.
    By a notice of appeal dated 26 September 1991 the defendants appealed
on the grounds, inter alia, that (1) the judge was wrong in holding that it   E
was a breach of their agreements with the plaintiff for the defendants to
launch proceedings in the Athens court; (2) the judge was wrong to grant
the injunctions and to refuse the relief sought by the defendants; (3) the
judge erred in not giving any or any sufficient weight to the fact that
the Greek court, which was a Community Court, was already seised of
the matter and would, unless the injunctions were issued, decide for itself
whether it had jurisdiction to hear the Greek proceedings; and (4) that to   F
issue the injunctions was to interfere, albeit indirectly, with the workings
of another Community court.
    The facts are stated in the judgment.

    *Barbara Dohmann Q.C.* and *T. A. G. Beazley* for the defendants.
    *Christopher Clarke Q.C.* and *Mark Hapgood* for the bank.           G

    STEYN L.J. delivered the following judgment of the court.  The central
question is whether Continental Bank N.A. is entitled, by virtue of an
exclusive jurisdiction agreement, to an injunction restraining a group of
borrowers and guarantors from bringing legal proceedings against the
bank in Greece.
    Continental Bank N.A. is an American bank. The bank had a branch   H
in Greece. The first to fifteenth defendants are one-ship companies
registered in Panama and Liberia. They are managed as a group by Aegis
Shipping Co. Ltd. of Athens. By a loan agreement dated 20 May 1981 as
subsequently amended the bank, through its Athens branch, granted to
the first to fifteenth defendants a secured floating interest rate loan facility
of U.S.$56m. As security each borrower granted to the bank as assignment
of freights and other earnings, and a mortgage over the vessel owned by

The Weekly Law Reports 22 April 1994

591

1 W.L.R.                  Continental Bank v. Aeakos S.A. (C.A.)

A   it. The bank also obtained guarantees, dated 3 June 1981, from three
individual members of the Papalios family who were beneficially interested
in the corporate borrowers. The guarantors are the sixteenth to eighteenth
defendants. $29·8m. of the facility was used to pay off the previous
mortgagee, the Bank of America, which had a mortgage over six of the
vessels, and the balance was used to refinance the purchase of vessels by
nine other companies.

B     The borrowers defaulted within a year of the grant of the loan facility.
The last quarterly instalment was paid in December 1981. As early as
mid-1981 there had been a downturn in the shipping cycle. By 1984 freight
rates and the price of vessels had dropped markedly. The shipping cycle
had entered a phase of recession. The borrowers were substantially in
arrears. On 24 December 1984 the bank and the defendants entered into a
C   rescheduling agreement. Pursuant to this agreement the bank agreed to
waive certain amounts of interest, to reschedule repayment of outstanding
principal and to limit the liabilities of the guarantors. It is the bank's case
that conditions precedent of the rescheduling agreement were never
fulfilled, and that it therefore never became effective. But, the bank argues,
this issue is unimportant because the borrowers failed to repay the second
and subsequent rescheduled payments of principal, and therefore, if the
D   rescheduling agreement became effective, the bank became restored to its
original rights. The bank contends that it is owed the sum of $32,855,311
and interest.

    On 4 October 1991 the bank issued a writ in an English action against
the defendants. But on 20 November 1990 the defendants had commenced
an action against the bank in the Multi-membered First Instance Court of
E   Athens. The borrowers claimed damages against the bank totalling about
$63m. and a declaration that the guarantors had been released. The cause
of action was based on article 919 of the Greek Civil Code, which
provides:

      "Whoever intentionally in a manner which violates the commands
      of morality, causes damages to another is bound to make reparation
      to the other for any damage this caused."

F   The thrust of the defendants' claim is that the bank exercised its rights
under the loan agreement contrary to business morality. The judgment
under appeal records that the defendants "expressly disavowed any
reliance on any breach of contract on the part of the bank."
Miss Dohmann, appearing on behalf of the defendants, told us that the
true position is more complex. She said the claim was principally in tort
G   but it had contractual aspects. So be it.

    In March 1991, in Chicago, the complaint in the Greek proceedings
was served on the bank. The bank's response was to issue a writ in an
English action on 7 April 1991. In the English action the bank sought an
injunction to restrain the defendants from continuing the Greek
proceedings in breach of various jurisdiction agreements which, in the
bank's submission, conferred exclusive jurisdiction on the English courts
H   to try the relevant disputes. Clause 21 of the loan agreement provides:

      "21.01 This agreement shall be governed by and construed in
      accordance with English law.

      "21.02 Each of the borrowers . . . hereby irrevocably submits to
      the jurisdiction of the English courts and hereby irrevocably nominates
      Messrs. Aegis (London) Ltd., of 197, Knightsbridge, London, S.W.7,
      England, to receive service of proceedings in such courts on its behalf

592

Continental Bank v. Aeakos S.A. (C.A.)         [1994]

A

but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof."

The jurisdiction agreements contained in the amending agreements, the rescheduling agreement and the guarantees are in somewhat different terms. It is, however, agreed that it is only necessary for us to consider the interpretation and effect of clause 21.02.

B

By a summons dated 3 June 1991 the bank sought a permanent injunction against the defendants to restrain them from taking further steps in the Greek proceedings, or, alternatively, the bank sought an interim injunction to the same effect until trial or further order. The defendants took out a cross-summons dated 23 July 1991. The defendants sought an order that the bank's writ and points of claim be struck out under R.S.C., Ord. 18, r. 19 or under the court's inherent jurisdiction, or that the action be stayed under article 21 or 22 of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters signed at Brussels on 27 September 1968. On 30 July 1991 the rival summonses came before Gatehouse J. for hearing. Broadly speaking there were three issues before the judge. (1) Were the defendants in breach of contract by suing in Greece? (2) If so, do articles 21 and 22 of the Brussels Convention require the English court to stay the proceedings? (3) If not, ought the English court nevertheless as a matter of discretion under English law to stay the English proceedings or, in any event, to refuse to grant an injunction? In a reserved judgment, given on 23 August 1991, the judge decided all three issues in favour of the bank and granted final injunctions restraining the defendants from taking any further steps in the Greek proceedings. On this appeal the issues can conveniently be considered under the three broad headings which we have identified.

C

D

E

*The alleged breach of the jurisdiction agreements*

Miss Dohmann challenges the judge's construction of clause 21.02 on two fronts. First, she submits, the Greek proceedings fall outside the scope of clause 21.02. Secondly, she submits that even if the Greek proceedings fall within the scope of clause 21.02, it is not an exclusive jurisdiction clause. If either submission is right, the appeal must succeed.

F

Is clause 21.02 wide enough to cover the Greek proceedings? It is common ground that not only the loan agreement, as amended, but also the separate jurisdiction agreements are governed by English law. And the construction of clause 21.02 is, of course, a question of law. Clause 21.02 is undoubtedly elliptical. It simply provides that the borrowers and guarantors submit "to the jurisdiction of the English courts . . ." In our judgment the clause should be read in a transitive sense: see *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.* [1903] 1 K.B. 249. It contemplates the submission of disputes to the English courts. The correctness of this construction is reinforced by the fact that the clause contemplates service of proceedings. But what disputes does it cover? The answer is not to be found in the niceties of the language of clause 21.02. It is to be found in a common sense view of the purpose of the clause. We are emboldened to adopt this approach by the observation of Lord Diplock in *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191, 201E:

G

H

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense."

The Weekly Law Reports 22 April 1994

593

1 W.L.R.              Continental Bank v. Aeakos S.A. (C.A.)

A    The only sensible construction of clause 21.02 is that it is a submission of disputes in connection with the loan facility to the jurisdiction of the English courts.

. Prima facie, therefore, clause 21.02 covers the Greek proceedings. But Miss Dohmann submits that the clause cannot be construed as extending to a claim in tort. It seems to us to be useful on this point to consider the approach adopted nowadays in the closely analogous field of arbitration clauses. In *Empresa Exportadora de Azucar v. Industria Azucarera Nacional*

B    *S.A.* [1983] 2 Lloyd's Rep. 171 the arbitration clause covered "any dispute arising out of this contract." The question was whether it covered only contractual claims or also a claim in conversion. In giving the judgment of the court Ackner L.J. concluded, at p. 183:

C         "the contractual and tortious disputes were so closely knitted together on the facts, that the agreement to arbitrate on one can properly be construed as covering the other."

Moreover, if Miss Dohmann is right, it would mean that a claim for damages for a negligent misrepresentation inducing the contract (a tort) would be outside clause 21.02, but a claim seeking rescission of the contract on the ground of the same misrepresentation (a contractual

D    claim) would be covered by it. If the defendants' contention is accepted, it follows that the two claims might have to be tried in different jurisdictions. That would be a forensic nightmare. Again, in the field of the construction of arbitration clauses the modern approach provides helpful guidance. In *Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488, 517, Bingham L.J. said: "I would be very slow to attribute to reasonable parties

E    an intention that there should in any foreseeable eventuality be two sets of proceedings." In the same case Balcombe L.J. adopted a similar approach. He said, at p. 503:

         "(1) It may be presumed that the parties intended to refer all the disputes arising out of this particular transaction to arbitration. (2) It may also be presumed that the parties intended that all disputes should be determined finally by the same tribunal."

F    In *Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd.* [1993] Q.B. 701, Hoffmann L.J. adopted the same approach and vividly described it as "the presumption in favour of one-stop adjudication." We are in respectful agreement with these observations, and there is no conceivable reason why the same approach should not

G    apply to the construction of jurisdiction agreements.
     The complaint in the Greek proceedings makes clear that the thrust of the defendants' case is that the bank performed the loan agreement in a manner which was contrary to business morality. The issue in the Greek proceedings is inextricably interwoven with the contractual rights and duties of the parties. In our judgment the judge rightly concluded that all disputes in connection with the loan facility are covered by the jurisdiction

H    clause, and so construed clause 21.02 is apt to cover the disputes in the Greek proceedings.
     Does clause 21.02 contain an exclusive jurisdiction clause? Clause 21.02 does not expressly make clear that the jurisdiction agreement is an exclusive one. *Dicey & Morris, The Conflict of Laws*, 12th ed. (1993), vol. 1, p. 422, submits that the question is simply whether on its true construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used. In *Sohio*

594

Continental Bank v. Aeakos S.A. (C.A.)                                    [1994]

*Supply Co. v. Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588, 591, the      A
Court of Appeal approved this submission as contained in *Dicey & Morris*,
11th ed. (1987). In our judgment it would be a surrender to formalism to
require a jurisdiction clause to provide in express terms that the chosen
court is to be the exclusive forum.

   We have already explained why we interpret clause 21.02 in a transitive
sense as involving an agreement by the defendants to submit disputes in      B
connection with the loan facility to the jurisdiction of the English courts.
That does not necessarily mean that clause 21.02 is an exclusive jurisdiction
agreement. Mr. Clarke submits that where there is an agreement to submit
disputes to the jurisdiction of a particular country, the parties are taken
to have intended the chosen court's jurisdiction to be exclusive unless
there are unusual or particular circumstances which indicate otherwise. He
finds some comfort in *Austrian Lloyd Steamship Co. v. Gresham Life*          C
*Assurance Society Ltd.* [1903] 1 K.B. 249, 251–252; *Sohio Supply Co. v.*
*Gatoil (U.S.A.) Inc.* and *British Aerospace Plc. v. Dee Howard Co.* [1993]
1 Lloyd's Rep. 368. See, however, *Cannon Screen Entertainment v.*
*Handmade Films* (unreported), 20 July 1989. We find it unnecessary to
explore this line of authority or to express any view on Mr. Clarke's
submission. We say that because clause 21.02 (the only jurisdiction          D
agreement that we are asked to consider) does not contain a submission
to English jurisdiction simpliciter. We regard the concluding words as
significant: "but the bank reserves the right to proceed under this
agreement in the courts of any other country claiming or having
jurisdiction in respect thereof." The juxtaposition of a submission by the
defendants to the jurisdiction of the English courts and the option reserved
in favour of the bank to sue elsewhere brings into play the expressio unius   E
exclusio alterius canon of construction. It suggests that a similar option in
favour of the defendants was deliberately omitted. In our judgment the
language of clause 21.02 evinces a clear intention that the defendants, but
not the bank, would be obliged to submit disputes in connection with the
loan facility to the English courts.

   In view of this conclusion it is unnecessary to consider an alternative
argument which the bank was ready to advance. It is right, however, that     F
we should identify it. Relying on the judgment of Hoffmann J. in *Kurz v.*
*Stella Musical Veranstaltungs G.m.b.H.* [1992] Ch. 196, 203D–H, the bank's
case was that, if clause 21.02 was not an exclusive jurisdiction clause,
article 17 of the Brussels Convention nevertheless applied to it. Eminent
writers are in disagreement on the correctness of the decision in the *Kurz*
case: see *Cheshire and North, Private International Law*, 12th ed. (1992),
pp. 316–317; *Dicey & Morris, The Conflict of Laws*, 12th ed., vol. 1, p. 431   G
and Richard Fentiman "Jurisdiction—When Non-Exclusive Means
Exclusive" [1992] C.L.J. 234. Since we heard no argument on the point we
express no view on it.

*The impact of the Brussels Convention*                                      H

   The defendants submit that the provisions of article 21 or article 22 of
the Convention required the judge to refuse to grant an injunction and to
stay the English action. That submission is based on the undoubted fact
that the proceedings in Greece were commenced before the proceedings in
England. Given that we have concluded that an exclusive jurisdiction
agreement obliged the defendants to sue in England, and that the
defendants acted in breach of that agreement, it is necessary to consider

1 W.L.R.                    Continental Bank v. Aeakos S.A. (C.A.)

A   the interaction of article 17 and articles 21 and 22. Article 17, so far as is
material, provides:

> "If the parties, one or more of whom is domiciled in a contracting
> state, have agreed that a court or the courts of a contracting state are
> to have jurisdiction to settle any disputes which have arisen or which
> may arise in connection with a particular legal relationship, that court
> or those courts shall have exclusive jurisdiction. . . . Where such an
> B   agreement is concluded by parties, none of whom is domiciled in a
> contracting state, the courts of other contracting states shall have no
> jurisdiction over their disputes unless the court or courts have declined
> jurisdiction. If an agreement conferring jurisdiction was concluded for
> the benefit of only one of the parties, that party shall retain the right
> to bring proceedings in any other court which has jurisdiction by
> C   virtue of this Convention."

Article 21 provides:

> "Where proceedings involving the same cause of action and
> between the same parties are brought in the court of different
> contracting states, any court other than the court first seised shall of
> D   its own motion decline jurisdiction in favour of that court. A court
> which would be required to decline jurisdiction may stay its
> proceedings if the jurisdiction of the other court is contested."

Article 22 provides:

> "Where related actions are brought in the courts of different
> contracting states, any court other than the court first seised may,
> E   while the actions are pending at first instance, stay its proceedings. A
> court other than the court first seised may also, on the application of
> one of the parties, decline jurisdiction if the law of that court permits
> the consolidation of related actions and the court first seised has
> jurisdiction over both actions. For the purposes of this article, actions
> are deemed to be related where they are so closely connected that it
> is expedient to hear and determine them together to avoid the risk of
> F   irreconcilable judgments resulting from separate proceedings."

Miss Dohmann submits that the Athens court was "the court first seised"
within the meaning of article 21 and article 22. She further submits "the
same cause of action" is involved in the Greek and English proceedings.
Accordingly, she submits, the judge was obliged under article 21 to stay
the English action. Alternatively, she submits that one is dealing with
G   "related actions" and the judge had a discretion to be exercised in
accordance with article 22, as interpreted in the jurisprudence governing
it, and that he was wrong not to stay the English action.

The judge dealt with this point in commendably succinct terms. He
said:

> "The defendants rely on articles 21 and/or 22. But in my judgment,
> H   the defendants' action in the Athens court and the plaintiff's action
> in this court do not involve the same causes of action for the purposes
> of article 21, as interpreted in *Gubisch Maschinenfabrik K.G. v.*
> *Palumbo* (Case 144/86) [1987] E.C.R. 4861. Nor are they "related
> actions" for the purposes of article 22. The actions are totally
> different, as appears from the respective pleadings and it is not
> enough that one issue—jurisdiction—could arise in both actions. In
> any case, the provisions of article 17 are conclusive. The corporate

596

Continental Bank v. Aeakos S.A. (C.A.)                    [1994]

A

defendants are all domiciled in Liberia or Panama; it may be arguable that they are also domiciled in Greece, where they are all managed. The individual defendants are either domiciled in Greece or England—there is a dispute as to this, but their domicile is undoubtedly one or the other, so it is immaterial which is correct. The bank, it is admitted, is domiciled in Illinois. So either the opening sentence of article 17 applies, or alternatively the third sentence. Clause 21.02 thus confirms the exclusive jurisdiction of the English courts for any action brought by the defendants against the plaintiff bank. The Brussels Convention, therefore, does not alter the position and the bank is entitled to the injunction it seeks."

B

We do not propose to consider whether articles 21 or 22 would be applicable if there was no exlusive jurisdiction clause. The fact is that there is an exclusive jurisdiction agreement. And it is common ground that article 17 applies to it.

C

In construing the Brussels Convention it is important to put aside pre-conceptions based on traditional English rules. The Convention is a radical new regime governing the international legal relationships of the contracting states. It is intended to eliminate obstacles to the functioning of the common market and to further the evolution of a vast single market: Jenard Report (Official Journal 1979 No. C. 59, p. 19). The genesis of the Convention is the jurisprudence of the civil law rather than the common law. Since the original states were all civil law countries, and the United Kingdom played no role in the drafting of the Convention, this is hardly surprising. Traditionally, English courts assert a discretion to enjoin a party by injunction from pursuing foreign legal proceedings in breach of an exclusive jurisdiction clause. The idea that a national court has discretion in the exercise of its jurisdiction does not generally exist in civilian systems: Schlosser Report (Official Journal 1979 No. C. 59, p. 97, para. 76).

D

E

Article 17 follows the civilian approach. Article 17 has mandatory effect. When article 17 applies it follows that the jurisdiction agreement prorogates (confers) jurisdiction on the courts of the contracting state chosen by the parties, and that the jurisdiction agreement deprives the courts of other contracting states of jurisdiction. Indeed, it is the duty of the courts of other contracting states of their own motion to consider whether article 17 applies and to decline jurisdiction if it does: Schlosser Report (Official Journal 1979 No. C. 59, p. 81, para. 22). There is no discretionary power *in the Convention itself* to override the conclusive effect of an exclusive jurisdiction agreement which conforms with the requirements of article 17. It follows that if article 17 applies its provisions take precedence over the provisions of articles 21 and 22.

F

G

The structure and logic of the Convention convincingly points to this conclusion. The reasons supporting this conclusion are, however, not formalistic. The consequences that would flow from the adoption of the submission of Miss Dohmann are startling. Article 21 provides that there shall be a mandatory stay of proceedings in favour of the court first seised, if courts of different contracting states are seised of proceedings involving "the same cause of action." If Miss Dohmann's submission is correct, it follows that a party will be able to override an exclusive jurisdiction agreement which is governed by article 17, by pre-emptively suing in the courts of another contracting state. The courts of the latter state which ex hypothesi have been deprived of jurisdiction would then be

H

The Weekly Law Reports 22 April 1994

597

1 W.L.R.                    Continental Bank v. Aeakos S.A. (C.A.)

A    "the court first seised." The chosen court of the parties would then be
     obliged to decline jurisdiction or, if the jurisdiction of the other court is
     contested, to stay its proceedings. In this way a party who is in breach of
     the contract will be able to set at naught an exclusive jurisdiction
     agreement which is the product of the free will of the parties. The principle
     of the autonomy of the parties, enshrined in article 17, cannot countenance
     such a conclusion.

B         In coming to the same conclusion in *Kloeckner & Co. A.G. v. Gatoil
     Overseas Inc.* [1990] 1 Lloyd's Rep. 175, 195–196, Hirst J. pointed to the
     additional policy factor that in the Convention system the best placed
     court to decide questions of exclusive jurisdiction is the court chosen by
     the parties in their jurisdiction agreement. It is not altogether surprising
     that in *Anonima Petroli Italiana S.p.A. v. West of England Shipowners
C    Mutual Insurance Association (London) Ltd.* (unreported), 9 April 1990,
     Saville J. described an argument similar to the one addressed to us on
     behalf of the defendants as entailing "ludicrous" consequences. With due
     deference to the careful arguments of Miss Dohmann, we find ourselves
     in agreement with Saville J. See, also *I.P. Metal Ltd. v. Ruote O.Z. S.p.A.*
     [1993] 2 Lloyd's Rep. 60. The critical point is that there is nothing in the
     Convention which is inconsistent with a power vesting in the English court
D    to grant an injunction the objective of which is to secure enforcement of
     an exclusive jurisdiction agreement.

          For all these reasons we conclude that, since article 17 applies, the
     question of a stay under articles 21 and 22 of the Convention does not
     arise.

E    *The exercise of discretion under English Law*
          On the supposition that articles 21 and 22 of the Convention are
     inapplicable, the defendants seek to invoke the inherent power of the
     court to stay the English proceedings. They argue that the judge should
     have granted a stay until the Greek court had decided whether or not it
     had jurisdiction. In any event, the defendants submit, even if a stay was
     inappropriate, the judge ought not to have granted an injunction. They
F    draw attention to the fact that, although a stay involves the regulation of
     English legal proceedings, an injunction restraining foreign legal
     proceedings involves indirect interference in the procedure of a foreign
     court. Accordingly, the defendants submit, a court invited to grant such
     an injunction ought to proceed with great caution and ought to grant such
     an injunction only if the ends of justice require it: see *Société Nationale
G    Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871, 891F–897A.
     Miss Dohmann emphasised that the Greek court is the court first seised
     with the substantive action. She said that it would be wrong for the
     English court to decide that the Greek court does not have jurisdiction.
     The question whether the Greek court has jurisdiction ought to be left to
     the Greek court. The English court ought to trust the Greek court. The
     injunction will operate as an indirect interference with the workings of a
H    Community court. Such an injunction should only be granted if the
     pursuit of the remedy in the foreign court would be vexatious and
     oppressive. That test is not satisfied. For these reasons, Miss Dohmann
     submitted, the judge erred in not staying the English action, but, in any
     event, she said, he plainly erred in exercising his discretion in favour of
     the granting of an injunction.

          It is necessary to bear in mind that the proper construction of the
     jurisdiction agreements is governed by English law. And, as a matter of

598

Continental Bank v. Acakos S.A. (C.A.)                                    [1994]

A English law, the jurisdiction agreements apply to the subject matter of the Greek proceedings, and are exclusive jurisdiction agreements. It follows that the English courts have exclusive jurisdiction. And by virtue of article 17 the Greek courts have been deprived of jurisdiction.

But Miss Dohmann submits that the English courts ought to defer to the Greek courts on the interpretation and effect of the exclusive jurisdiction agreement. She argues that we can safely leave it to the Greek courts to decide the article 17 issue on its merits. That is not how we
B understand the expert evidence on Greek law filed in this case. Mr. Soufias, the bank's Greek lawyer, appears to say that the Greek court will assume jurisdiction. Mr. Stephanakis, the defendants' Greek lawyer, says that the Greek court will not consider a jurisdictional issue because the bank co-operated at an early stage in asking for an adjournment. He says that in Greece that will be regarded as a submission to jurisdiction. It does not
C appear that the Greek court will consider the impact on its jurisdiction of the exclusive jurisdiction agreement and article 17 of the Convention. But we do not rest our judgment on this point.

Under the Greek rules of civil procedure a defendant is obliged to file a defence on the merits at the same time as an objection to jurisdiction. The bank cannot therefore in practice challenge the jurisdiction of the
D Greek court without filing a detailed defence on the merits to the defendants' complaint, which runs to 38 pages, and the bank will in addition have to lodge at the same time all supporting documentary evidence. Legal fees will apparently amount to about $120,000. And, in addition, the bank would have to serve expert evidence from an English lawyer on the effect of clause 21.02. Again, we do not rest our judgment on this point.
E In our view the decisive matter is that the bank applied for the injunction to restrain the defendants' clear breach of contract. In the circumstances, a claim for damages for breach of contract would be a relatively ineffective remedy. An injunction is the only effective remedy for the defendants' breach of contract. If the injunction is set aside, the defendants will persist in their breach of contract, and the bank's legal
F rights as enshrined in the jurisdiction agreements will prove to be valueless. Given the total absence of special countervailing factors, this is the paradigm case for the grant of an exclusive jurisdiction agreement. In our judgment the continuance of the Greek proceedings amounts to vexatious and oppressive conduct on the part of the defendants. The judge exercised his discretion properly.

G
*Conclusion*

It follows that we would reject the submissions of the defendants under all three headings. It is right to add, however, that in relation to the link between articles 17 and 21 of the Convention, the defendants applied for an order referring an appropriate question to the European Court of Justice. It is true that, except for first instance decisions, there is apparently
H no authority directly in point. The more obvious the answer to a question the less authority there sometimes is on it. We entertain no doubt about the answer to the proposed question. We would reject the application.

Somewhat tentatively, the defendants also asked for an order that the following two questions be referred to the European Court of Justice: (a) whether the Greek proceedings and the English proceedings involve "the same cause of action" for the purposes of article 21 of the Convention

A   and (b) whether the Greek proceedings and the English proceedings are
"related actions" for the purposes of article 22 of the Convention. In our
judgment there are no relevant questions of "interpretation" of the
Convention which arise in the present case. In our judgment no reference
is necessary. We would also reject the application in both parts.
    We would dismiss the appeal.

B
                                    *Appeal dismissed with costs.
                                    Leave to appeal refused.*

   *Solicitors: Constant & Constant; Norton Rose.*

                                                    M. B. D.

C

D

                    [QUEEN'S BENCH DIVISION]

        *PRACTICE DIRECTION (ADMIRALTY: ASSESSORS'
                        REMUNERATION)

E   *Admiralty—Practice—Nautical and other assessors—Remuneration and
        expenses—Payment—R.S.C., Ord. 74*

    1. This practice direction is issued by direction of Lord Taylor of
Gosforth C.J. and Sir Thomas Bingham M.R.
    2. In the absence of special directions given in a particular case the
F   remuneration payable to Trinity Masters and nautical and other assessors
summoned to assist the Court of Appeal, the Admiralty Court on the trial
of an action, or a Divisional Court of the Queen's Bench Division hearing
an appeal under R.S.C., Ord. 74 shall be:

|  |  |
|---|---|
| (i) For each day of the hearing (except where (ii) or (iii) applies). | £300 |
| (ii) For a day on which the hearing finishes before the midday adjournment. | £150 |
| (iii) For a day on which the hearing commences after midday adjournment, the assessor not having attended, or having been engaged in another case, before such an adjournment. | £150 |
| (iv) For attending the court on a day on which the case is not heard. | £40 per hour |
| (v) For consultation with the court on a day on which the case is not heard. | £150 |
| (vi) For attending to hear reserved judgment (including any consultation with the court on the same day). | £75 |
| (vii) If notice of attendance is countermanded less than two days before the hearing. | £150 |

[1999] Vol. 1      LLOYD'S LAW REPORTS      767

Q.B. (Com. Ct.)]      Credit Suisse v. MLC      PART 9

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Dec. 21, 1998

CREDIT SUISSE FIRST BOSTON (EUROPE) LTD.

v.

MLC (BERMUDA) LTD.
(formerly MLC EMERGING MARKETS LTD.)

Before Mr. Justice RIX

Practice — Jurisdiction clause — Anti-suit injunction — Purchase of Russian bonds from plaintiffs — Purchase agreement contained English jurisdiction clause — Dispute between plaintiffs and defendants — Defendants commenced proceedings in America — Whether clause an exclusive jurisdiction clause — Scope of clause — Whether clause restrained defendants from bringing proceedings in America — Whether anti-suit injunction should be granted — Whether English action should be stayed.

The defendant (MLC) was a hedge fund and operated through its investment manager (MLC Group). MLC purchased some Russian bonds from the plaintiff (CS Europe), an English company. The deals were made on the telephone in New York between MLC and Credit Suisse First Boston Corporation (CS US) which operated as CS Europe's agent.

There were two series of bonds. On Mar. 12, 1998 MLC purchased U.S.$3 m. Tatneft Credit Linked Notes due Aug. 18, 1998 series EM399 (the Tatneft notes) which were issued by Credit Suisse First Boston, a Swiss Company (CS Switzerland). The second series of bonds was an issue of Russian Federation GKO Credit & Convertibility Linked Notes series EM438 due Oct. 16, 1998 (the GKO notes). The underlying security in this case was expressed in Russian roubles so that the purchase of such notes involved a currency risk which as part of the overall purchase was hedged by a forward contract written with CS Switzerland. On May 5, 1998 MLC brought U.S.$20 m. nominal of the GKO notes.

The Tatneft notes Purchase Agreement was dated Mar. 12, 1998 and provided inter alia:

    5.1 This Agreement shall be governed by and construed in accordance with English Law.

    5.2 The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and accordingly any legal action or proceedings arising out of or in connection with this Agreement (Proceedings) may be brought in such courts. The Purchaser irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts . . . This submission is made for the benefit of the Seller and shall not limit the right of the Seller to take proceedings in any other court of competent jurisdiction . . .

The GKO notes Purchase Agreement dated May 6, 1998 was in materially identical form and contained an identical English law and jurisdiction clause, cl. 5. Both Purchase Agreements were signed in London on behalf of CS Europe and sent out to MLC Group in New York for signature on behalf of MLC.

The purchase of the notes was financed by means of repurchase transactions (repos) by which CS Europe agreed to repurchase the notes (first leg) and then after a defined interval to sell them back again to MLC at a price which reflected the first leg repurchase price plus a financing charge (second leg). The effect of these transactions was that MLC obtained credit for their purchases (82 per cent. on the Tatneft notes and 90 per cent. on the GKO notes), but CS Europe retained the security of title to the notes itself. The repurchase transactions were governed by the Global Master Repurchase Agreement (GMRA) which was dated Apr. 6, 1998. The parties to it were CS Europe and MLC and it was countersigned by CS US "solely in his capacity as agent".

Clause 17 of the GMRA provided inter alia:

    This Agreement shall be governed by and construed in accordance with the laws of England, Buyer and Seller hereby irrevocably submit for all purposes of or in connection with this Agreement . . . to the jurisdiction of the Courts of England . . . Nothing in this paragraph shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.

The GMRA contained provisions for margin maintenance and events of default.

There was also a Customer Agreement between MLC and CS US dated May 16, 1997. Under this agreement MLC would purchase equities, securities and other financial instruments from CS US and its affiliates or deliver such financial instruments bought elsewhere to CS US and CS US would in return maintain MLC's accounts and provide MLC with financing and financial information. The equity in the accounts was to secure all of MLC's indebtedness to CS US and any of the Credit Suisse affiliates. The Customer Agreement contained a New York law clause but no jurisdiction clause.

On Aug. 17, 1998 CS Europe made a margin call in respect of the Tatneft notes which MLC failed to pay. On Aug. 18 MLC became liable to repurchase the Tatneft notes but failed to pay the repurchase price of U.S.$1,665,969.16. By reason of MLC's default, MLC became liable to pay a further U.S.$6,058,882.28 in respect of the GKO notes. On Sept. 25 CS US at CS Europe's request liquidated assets belonging to MLC which realized U.S.$4,490,625.71 which was then transferred to CS Europe.

On Sept. 25, 1998 CS Europe commenced proceedings in the English Court for the balance claimed to be due and served a writ on MLC in accordance with the provisions of GMRA.

On Oct. 6 MLC acknowledged service of these proceedings and indicated its intention to defend them. On Oct. 22 CS Europe served its points of claim on MLC.

On Oct. 26 MLC commenced proceedings in the Federal District for the Southern District of New York against CS Europe, CS US and CS Switzerland, and on

LLOYD'S LAW REPORTS [1999] Vol. 1

Credit Suisse v. MLC [Q.B. (Com. Ct.)

Nov. 3 issued a demand for a jury trial in the New York proceedings.

CS Europe applied for an anti-suit injunction contending that the Purchase Agreement contained an English jurisdiction clause which was an agreement for exclusive jurisdiction in England. CS Europe also applied to join CS US and CS Switzerland as parties to the action and further applied to amend the writ to include inter alia claims for declaration of non-liability.

MLC applied for a stay of the English proceedings in favour of New York,

———Held, by Q.B. (Com. Ct.) (Rix, J.), that (1) there would be jurisdiction under R.S.C., O. 11, r. 1(1)(d)(iii) and (iv) so far as any claim by CS US under GMRA was concerned since that contained an English law and jurisdiction clause, and that the claims for declarations of non-liability were similarly within those sub-rules as being claims to "otherwise affect" contracts that contained English law and jurisdiction clauses; moreover the concept of sub-r. (c) (necessary or proper party) applied to additional plaintiffs in the context of O. 15, r. 6 (joinder of parties); there appeared to be sufficient cause for all three CS entities to be entitled to join in the proceedings and leave to amend would be granted (see p. 775, col. 2);

(2) in cl. 5.2 the word "may" reflected the possibility that CS Europe may at its option bring proceedings against MLC outside England; the "taking of proceedings" in the context of the final sentence could only apply to the taking of proceedings by CS Europe; the presence of different law and jurisdiction clauses in other agreements merely served to highlight the express wording of this clause; although the presence of an exclusive clause binding on MLC in the Purchase Agreements alone might seem odd or at any rate incoherent, MLC was bound by its contract to bring proceedings "arising out of or in connection with" the Purchase Agreements exclusively in the Courts of England (see p. 776, col. 2);

———Continental Bank N.A. v. Aeakos Compania Naviera S.A., [1994] 1 Lloyd's Rep. 505, applied.

(3) the Court was reluctant to hold that those of MLC's claims in its New York complaint which referred to the GMRA were claims which arose out of or in connection with the Purchase Agreements and did not arise out of or in connection with the GMRA; if they arose out of or in connection with both the Purchase Agreements and the GMRA then where the jurisdiction clauses were in conflict, there was no reason why the GMRA clause should not prevail either on the basis that MLC should be able to exercise the broader rights or on the basis that the scope in the context which was closer to the claim and which was more specifically involved in the claim should prevail over the clause which was only more distantly or collaterally involved (see p. 777, cols. 1 and 2);

(4) it was far-fetched to regard "any disputes" in cl. 5.2 as covering disputes between MLC and any one other than MLC's contract partner under the Purchase Agreements, namely CS Europe; cl. 5.2 was part of a bilateral agreement between a seller and a buyer and the disputes to which such an agreement might give rise were prima facie bilateral disputes; there was nothing in

the language of cl. 5.2 to suggest that it was intended to have an ambit beyond the parties to the Purchase Agreements themselves; while it was true that the agreements mentioned CS affiliates there was nothing in the express language of cl. 5.2 to suggest that the clause was intended to bind MLC as to where it was entitled to sue such affiliates (see p. 777, col. 2; p. 778, col. 1);

(5) CS US was always known to be acting as an agent or broker on behalf of CS Europe, rather than for itself; in the case of the Tatneft notes Purchase Agreement the signature was for CS Europe simpliciter and the agreement was on CS Europe's letter-head; in the case of the GKO notes Purchase Agreement, although the document was on CS US' letter-head and was signed by CS US the signature was "acting as agent for" CS Europe and the text of the agreement made clear that CS Europe was the seller and CS US merely its agent; and the submission that an agent may always sue on the contract which it made for its principal would be rejected in that the exceptional situation in which an agent made itself liable concurrently with or to the exclusion of the principal did not apply (see p. 778, col. 1);

(6) par. 2(g)(ii) of the GMRA's Supplementary Terms and Conditions provided inter alia that CS US "shall otherwise have no liability" in respect of this agreement or such transaction except for its gross negligence or wilful misconduct in performing its duties as a facilitating agent; it was clear that CS US was not intended to have a complete immunity and there was no reason why MLC's complaints against CS US in the New York proceeding were not complaints relating to the latter's duties as CS Europe's facilitating agent in connection with the Tatneft and GKO transactions (see p. 778, col. 2);

(7) neither CS Europe nor the other two CS entities had the right to insist on exclusive jurisdiction in England so far as claims against CS US and CS Switzerland were concerned; and only some of MLC's New York claims fell within cl. 5.2 (see p. 778, col. 2);

(8) whether cl. 5.2 was enforced or not it could not be assumed that all litigation between MLC and the CS entities was carried forward in one jurisdiction unless the injunction was extended to all the claims against all three CS entities in New York since cl. 5.2 did not bind CS US and CS Switzerland; and unless such injunction was granted, the complaint in New York would continue in any event and the continuation of the English proceedings was inevitable too (see p. 781, col. 1);

———British Aerospace Plc. v. Dee Howard & Co., [1993] 1 Lloyd's Rep. 368, applied.

(9) claims against CS US and CS Switzerland would not be enjoined because however undesirable it was in principle to have parallel litigation in two jurisdictions, it seemed that the duplication of litigation did not in itself make it in the interests of justice to injunct the New York proceedings in so far as the claims against CS US and CS Switzerland were concerned; the claims against CS US were made either under Federal statute law or New York common law or under the Customer Agreement; to the extent that such claims were free-standing of any contract between MLC and CS US no

[1999] Vol. 1      LLOYD'S LAW REPORTS      769

Q.B. (Com. Ct.)]      Credit Suisse v. MLC      [Rix, J.

jurisdiction clause applied and it could not be said that New York was an inappropriate forum; it was not in the interests of justice to injunct MLC from pursuing its New York claims against CS US and CS Switzerland (see p. 781, cols. 1 and 2);

(10) similarly MLC's claims made against CS Europe under or in connection with the GMRA itself would not be injuncted; MLC's right to sue CS Europe under the GMRA in New York was expressly reserved to MLC by cl. 17 of the GMRA; and the New York Court would be in a better position to analyse the complaint for the purpose of identifying the relevant or more relevant jurisdiction clause; it could not be said that it was in the interests of justice that they must all be tried together in England with such claims as were within cl. 5.2 (see p. 781, col. 2; p. 782, col. 1);

(11) even though New York was one possible forum in which the whole gamut of the litigation could be conducted and where apart from the force of cl. 5.2, the only real impediment to that jurisdiction would be the need for English law to be brought by evidence before the New York jury, London was another jurisdiction in which the whole litigation could be conducted and where the action would proceed in any event; the only party which would have to be brought here was MLC; MLC had agreed to litigate in England; for the purposes of the Purchase Agreements it had not only submitted to the jurisdiction of the English Courts and had waived any objections on the ground of venue or inconvenience but it had agreed to litigate exclusively in England; for the purposes of the GMRA it similarly "irrevocably submitted for all purposes of and in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England"; and it could not be heard to say that England was an inappropriate jurisdiction so far as disputes relating to the GMRA were concerned (see p. 782, cols. 1 and 2);

(12) London was a feasible and wholly appropriate forum for the litigation as a whole and there was ultimately no good reason why MLC should not be injuncted from pursuing its New York its claims arising out of or in connection with the Purchase Agreements (see p. 782, col. 2);

(13) MLC's application for a stay would be dismissed (see p. 783, col. 1);

(14) those claims which it was common ground fell within the Purchase Agreements would be injuncted; those parts of the New York complaint which dealt with "the initial investment in the Linked Notes" were within the injunction but not those parts of those counts which dealt with MLC's "ongoing decisions regarding holding and/or hedging them", nor the other counts save to the extent that those other counts themselves depended, if they did, on the injuncted claims (see p. 782, col. 2; p. 783, col. 1).

The following cases were referred to in the judgment:

Airbus Industrie GIE v. Patel, (H.L.) [1998] 1 Lloyd's Rep. 631; [1998] 2 W.L.R. 686;

Akai Pty. Ltd. v. People's Insurance Co. Ltd., [1998] 1 Lloyd's Rep. 90;

Alexander (Philip) Securities and Futures Ltd. v. Bamburger, (C.A.) [1996] C.L.C. 1757;

Angelic Grace, The, (C.A.) [1995] 1 Lloyd's Rep. 87;

Bouygues Offshore S.A. v. Caspian Shipping Co. (No. 2), [1997] 2 Lloyd's Rep. 485;

Bouygues Offshore S.A. v. Caspian Shipping Co., (C.A.) [1998] 2 Lloyd's Rep. 461;

British Aerospace Plc. v. Dee Howard Co., [1993] 1 Lloyd's Rep. 368;

Continental Bank N.A. v. Aeakos Compania Naviera S.A., (C.A.) [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588;

El Amria, The, (C.A.) [1981] 2 Lloyd's Rep. 119;

Ocarina Marine Ltd. v. Marcard Stein & Co., [1994] 2 Lloyd's Rep. 524;

Snelling v. John G. Snelling Ltd., [1973] Q.B. 87;

Société Nationale Industrielle Aerospatiale v. Lee Kui Jak, (P.C.) [1987] A.C. 871.

This was an application by the plaintiffs Credit Suisse First Boston (Europe) Ltd. for an anti-suit injunction against the pursuit by the defendants MLC (Bermuda) Ltd. (formerly MLC Emerging Markets Ltd.) of its proceedings in New York claims having arisen between the parties in connection with the agreements relating to the purchase of Russian Bonds.

Mr. Iain Milligan, Q.C. and Mr. Christopher Butcher (instructed by Messrs. Allen & Overy) for the plaintiffs; Mr. Richard Salter, Q.C. and Mr. Jonathan Nash (instructed by Messrs. Richards Butler) for the defendants.

The further facts are stated in the judgment of Mr. Justice Rix.

Judgment was released for publication.

## JUDGMENT

Mr. Justice RIX:

*Introduction*

The defendant, MLC (Bermuda) Ltd. ("MLC"), is a hedge fund. As its name suggests, it is a Bermudan company, but it operates through its investment manager, MLC International Investment Group ("MLC Group"), which has offices in New York (and Dallas). This litigation arises out of MLC's purchase of some Russian bonds from the plaintiff, Credit Suisse First Boston (Europe) Ltd., an English company ("CS Europe"). The actual

Rix, J.]                          Credit Suisse v. MLC                          [Q.B. (Com. Ct.)

deals were made on the telephone in New York, between Mr. Amit Agarwala and Mr. Marc Tishfield of MLC Group and Mr. Aaron Tighe of Credit Suisse First Boston Corporation, a Massachusetts corporation with offices in New York which operates as CS Europe's agent ("CS US").

There were two series of bonds. On Mar. 12, 1998 MLC purchased U.S.$3 m. nominal Tatneft Credit Linked Notes due Aug. 18, 1998 series EM399 (the "Tatneft notes"). The Tatneft notes were issued by a third Credit Suisse company, Credit Suisse First Boston, a Swiss company ("CS Switzerland"). The value of the Tatneft notes was linked to the performance of the underlying obligation of a Russian oil company, O. A. Tatneft. The second series of bonds was an issue of Russian Federation GKO Credit & Convertibility Linked Notes series EM438, due Oct. 16, 1998 (the "GKO notes"). The underlying security in this case was expressed in Russian roubles, so that purchase of such notes involved a currency risk which as part of the overall purchase was hedged by a forward contract written with CS Switzerland. The rationale was that if the rouble declined in value, the currency contract appreciated: ultimately, however, there was a credit risk on a Russian bank. On May 5, 1998 MLC bought U.S.$20 m. nominal of the GKO notes.

The troubles of the Russian economy which ultimately burst on the international financial scene in August, 1998 are well known. Although there is a degree of dispute about the residual value of the notes, it would seem that their value may have shrunk to nothing. MLC managed to sell U.S.$13 m. nominal of the GKO notes at a loss in two tranches before the final melt-down, but on Aug. 17 they were told that the Tatneft notes had zero value, and it was at about the same time that the Russian government announced a moratorium on the repayment of foreign debt, following a calamitous decline in the value of the rouble. It was, I think, that moratorium which has led to the ineffectiveness of the hedge.

The purchase of the notes was financed by means of repurchase transactions ("repos"). These were transactions by which CS Europe agreed to repurchase the notes (first leg) and then after a defined interval to sell them back again to MLC at a price which reflected the first leg repurchase price plus a financing charge (second leg). The effect of these transactions was that MLC obtained credit for their purchases (82 per cent. on the Tatneft notes and 90 per cent. on the GKO notes), but CS Europe retained the security of title to the notes itself.

On Aug. 17, 1998 CS Europe made a margin call in respect of the Tatneft notes which MLC failed to pay. On Aug. 18 MLC became liable to repurchase

the Tatneft notes, but failed to pay the repurchase price of U.S.$1,665,969.16. By reason of MLC's default, MLC became liable to pay a further U.S.$6,058,882.28 in respect of the GKO notes. On Sept. 25 CS US, at CS Europe's request, liquidated assets belonging to MLC which realized U.S.$4,490,625.71 which was then transferred to CS Europe. On the same day CS Europe commenced these proceedings for the balance claimed to be due by serving the writ on MLC's process agents in London in accordance with the provisions of the agreement which controlled the repo transactions, namely the Global Master Repurchase Agreement (the "GMRA") dated Apr. 6, 1998.

On Oct. 8 MLC acknowledged service of these proceedings and indicated its intention to defend them. On Oct. 22 CS Europe served its points of claim on MLC.

Then on Oct. 26 MLC commenced proceedings in the Federal District Court for the Southern District of New York. It did so not only against CS Europe, but also against CS US and CS Switzerland. On Nov. 3 MLC issued a demand for a jury trial in the New York proceedings, which I understand cannot be opposed. By consent, activity in the New York proceedings has been temporarily stayed pending the determination of an application by CS Europe to the English Court for an anti-suit injunction against MLC's pursuit of its proceedings in New York. MLC has responded by requesting a stay of the English proceedings in favour of New York.

The basis of CS Europe's application for an anti-suit injunction is an English jurisdiction clause, said to be an agreement for exclusive jurisdiction in England, which is contained in the Purchase Agreements for the two series of notes.

With that brief introduction to the overall structure of the dispute before me, I must now refer to the various agreements governing the relationships of the parties.

*The contractual regime*

The contractual regime between MLC and the three Credit Suisse companies, CS Europe, CS US and CS Switzerland, is a relatively complex one. The first contract in point of time is the Customer Agreement dated May 16, 1997 made between MLC and CS US.

*The Customer Agreement*

The function of the Customer Agreement was that it reflected MLC's appointment of CS US (as representative of the Credit Suisse group as a whole) as its "prime broker". The gist of it was that MLC would purchase equities, securities and other

financial instruments from CS US and its affiliates or deliver such financial instruments bought elsewhere to CS US, and CS US would in return maintain MLC's accounts (the "customer accounts") and provide MLC with financing and financial information. The equity in the accounts was to secure all of MLC's indebtedness to CS US and any of the Credit Suisse affiliates. The Customer Agreement contained a New York law clause, but no jurisdiction clause. It was pursuant to the Customer Agreement that on Sept. 25, 1998 CS US, at CS Europe's request, exercised rights to liquidate MLC's assets held in its accounts at CS US following MLC's alleged default under the Customer Agreement in failing to put up further margin in respect of the Tatneft notes. Thus on that day CS US wrote to MLC as follows:

We are writing to inform you that as a result of the occurrence of an Event of Default under Section 7 of the Customer Agreement dated May 16, 1997 (the "Agreement") between [CS US] and [MLC], in accordance with Sections 3 and 8 of the Agreement we have liquidated and closed your accounts. The proceeds of such accounts (the "Proceeds") will be applied as a credit against any Obligations-(as defined in the Agreement) of MLC to [CS US, CS Europe] and any other CSFBC Party (as defined in the Agreement).

The Customer Agreement provided inter alia as follows:

*1. Applicable Rules and Regulations; Other Agreements.*

This Agreement and all Transactions executed in connection herewith hereby incorporate and shall be subject to the constitution, by-laws, rules, regulations, customs, usages, rulings and interpretations, as amended, of the exchange or market (and its clearinghouse, if any) where the Transactions are executed by CSFBC or its agents and of the National Association of Securities Dealers, Inc., the Securities and Exchange Commission and the Board of Governors of the Federal Reserve system, in all cases where applicable. Provisions contained in and remedies provided by this Agreement which are additional to and more or less expansive than any provisions contained in or remedies provided by any other agreement with Customer (including, without limitation, provisions or remedies that cover the same subject matter) shall not be deemed to be in conflict with each other, and all such provisions and remedies shall be applicable and available.

*19. Single Agreement.*

[CS US] and Customer acknowledge that they have entered into this Agreement and will enter into Transactions in consideration of and in reliance upon the understanding that all such Transactions constitute a single business and contractual relationship and have been made in consideration of each other . . .

*22. Governing Law.*

This Agreement and its enforcement shall be governed by the laws of the State of New York (without giving effect to the conflict of law principles thereof). The parties acknowledge that this Agreement is a "securities contract" within the meaning of the Bankruptcy Code (11 U.S.C. Section 74(7)).

*The Global Master Repurchase Agreement ("GMRA")*

The GMRA is the agreement which, as its name suggests, was intended to provide the framework in accordance with which repo transactions could be carried out to finance MLC's investments. The parties to it are CS Europe and MLC. It is also countersigned by CS US "solely in its capacity as agent". The current GMRA is dated Apr. 6, 1998 and supersedes the original such agreement which was executed in July, 1997. It applies to so-called "transactions" which under cl. 1 are defined as ones in which:

. . . one party . . . agrees to sell to the other . . . "Securities" . . . against the payment of the purchase price by Buyer to Seller, with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain or on demand against the payment of the purchase price by Seller to Buyer.

The GMRA contains provisions for margin maintenance and events of default. A representations clause (cl. 9) provides that in the absence of written agreement to the contrary neither party relies on any advice of the other, that each party has and will make its own decisions based on its own judgment, and that it understands and is willing to assume the risk of each transaction. Clause 15 states that the GMRA:

. . . shall supersede any existing agreements between the parties containing general terms and conditions for Transactions.

Clause 17 (headed "Governing Law") provides for English law and jurisdiction as follows:

This Agreement shall be governed by and construed in accordance with the laws of England. Buyer and Seller hereby irrevocably submit for all purposes of or in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England.

. . .

LLOYD'S LAW REPORTS [1999] Vol. 1

RIX, J.] Credit Suisse v. MLC (Q.B. (Com. Ct.)

Nothing in this paragraph shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.

It is therefore common ground that the GMRA contains a *non-exclusive* English jurisdiction clause.

Annex 1, Part 1 to the GMRA contains a series of "Supplemental Terms or Conditions". Paragraph 2(g) provides that if CS US acts as "facilitating agent" with respect to any Transaction, the confirmation of that Transaction shall so state and the following terms shall apply, viz. —

(i) [CS US], as a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC"), will arrange such Transaction, as facilitating agent for each of Buyer and Seller. As facilitating agent, [CS US] will be responsible for (I) effecting and settling such Transaction, on behalf of [CS Europe], (II) issuing all required confirmations and statements to Buyer and Seller in compliance with Rule 15c3–1 under the Securities Exchange Act of 1934 (the "Exchange Act"), (III) maintaining books and records relating to such Transaction as required . . . under the Exchange Act, and (IV) if requested by Buyer or Seller, receiving, delivering and safeguarding such party's funds and securities in connection with such Transaction in compliance with . . . the Exchange Act . . .

(ii) [CS US] is participating in such Transaction solely as facilitating agent for Buyer and Seller. [CS US] shall have no responsibility or personal liability to Buyer or Seller arising from any failure by Buyer or Seller to perform any obligations hereunder, or to monitor or enforce compliance by Buyer or Seller with any obligation hereunder, including, without limitation, any obligation to maintain margin. Each of Buyer and Seller agrees to proceed solely against the other to collect or recover any securities or monies owing to it in connection with or as a result of such Transaction or otherwise hereunder. [CS US] shall otherwise have no liability in respect of this Agreement or such Transaction except for its gross negligence or wilful misconduct, or its failure to comply with applicable U.S. securities laws and regulations, in performing its duties as facilitating agent hereunder.

CS Europe and CS US rely before me on par. 2(g)(ii) just cited as a promise by MLC to both or either that MLC will not sue CS US in connection with or as a result of any repo transaction entered into through CS US. Thus, although the GMRA taken by itself does not enable CS US to say that it cannot be sued outside England, it points to this par. 2(g)(ii) as a general prohibition on MLC bringing suit against it anywhere.

MLC takes issue with the substance and effectiveness of this submission for reasons which I will elaborate below.

*The Purchase Agreements*

The actual purchase of the notes was effected in the following way.

The Tatneft notes were purchased on the telephone on Mar. 12, 1998. That was in advance of the issue date of the notes of Mar. 24. As stated above, the deal was done in New York between CS Europe and MLC through the agency of CS US acting by Mr. Tighe and with Mr. Agarwala of MLC's associate company, MLC Group, acting for MLC. It would seem upon the present evidence, but the matter is not entirely clear to me, that at that stage there was nothing that passed or had passed in writing between the parties to describe the notes being purchased. MLC alleges before me and in the New York proceedings that certain representations were made by Mr. Tighe to Mr. Agarwala, such as that CS Europe would make a market in the Tatneft notes, viz. that there was an assurance of liquidity, and that the notes were part of an issue of U.S.$40 m. The parties respectively support and deny the making of such representations in evidence before me: for present purposes I can treat such allegations and denials as merely that, but recognizing that they are seriously made and supported by evidence.

On the following day, Mar. 13, 1998, paperwork was passed from CS Europe in London to MLC Group in New York. The paperwork consisted of a document headed "Final Terms and Conditions" of the Tatneft notes as well as the document which set out the terms of purchase itself (the "Purchase Agreement") and which was dated Mar. 12, 1998.

The Tatneft notes Purchase Agreement referred to the accompanying document as the "summary terms and conditions in final form" of the notes but also to an "Information Memorandum" which was to be dated the date of issue of the notes and was to come forward prior to the settlement date of Mar. 24, 1998.

The Purchase Agreement contained standard printed representations by MLC as purchaser, which were expressed also as warranties and agreements. These were to the effect that MLC was a sophisticated institutional investor with knowledge and experience in financial and business matters and expertise in assessing credit risk, that it was relying exclusively on its own sources of information and credit analysis, that neither CS Europe nor any affiliate had made any representation as to the credit quality of the notes, that in certain circumstances the hedging provision amount could be substantially less than par and might be zero, that

[1999] Vol. 1     LLOYD'S LAW REPORTS     773

Q.B. (Com. Ct.)     Credit Suisse v. MLC     [Rix, J.

based on its own independent review and professional advice it had determined that the notes were a fit, proper and suitable investment for it notwithstanding the clear and substantial risks inherent in them, that it had not relied on CS Europe or any affiliate in so determining, that neither CS Europe nor any affiliate had acted as its financial advisor or fiduciary, and that it could not sell the notes without their issuer's prior written consent. MLC similarly gave to CS Europe an indemnity against any loss, liability, claim or action that CS Europe might incur or which might be made against it arising out of any breach by CS Europe of any of such representations, warranties or agreements.

Of particular relevance to the present applications is cl. 5 headed "Governing Law and Jurisdiction". It provided as follows:

5.1 This Agreement shall be governed by and construed in accordance with English Law.

5.2 The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and accordingly any legal action or proceedings arising out of or in connection with this Agreement ("Proceedings") may be brought in such courts. The Purchaser irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient form. This submission is made for the benefit of the Seller and shall not limit the right of the Seller to take proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) if and to the extent permitted by applicable law.

This clause, 5.2, is the jurisdiction clause relied on by CS Europe in the present proceedings as an exclusive jurisdiction clause so far as MLC is concerned.

The GKO notes Purchase Agreement, dated May 6, 1998, was in materially identical form, mutatis mutandis. It referred to a trade date of May 5 and a settlement date of May 12. It also contained in its cl. 5 an identical English law and jurisdiction clause. The actual trade was done in New York between Mr. Tighe of CS US and on this occasion Mr. Tishfield of MLC Group. MLC alleges in respect of this trade that Mr. Tighe told Mr. Tishfield that CS Europe would again make a market in these notes and that the currency hedge included in the purchase would protect MLC

against any devaluation of the rouble without exposure to the Russian banking system.

Both Purchase Agreements were signed in London on behalf of CS Europe and sent out to MLC Group in New York for signature on behalf of MLC.

*The repurchase transactions*

On Mar. 16, 1998 a repo transaction was made in respect of the Tatneft notes purchase. The "repo start date" was Mar. 24, i.e. the purchase settlement date, and the "repo end date" was three months later on June 24. That is to say that on Mar. 24 CS Europe repurchased the Tatneft notes from MLC (the first leg) and on June 24 the position was again reversed by a further sale back to MLC (the second leg). On June 24 a further repo transaction was entered into, and so on.

Similar repo transactions were entered into in relation to the GKO notes, commencing with May 13, 1998.

These transactions were all expressed to supplement and form part of and be subject to the GMRA.

*The Conditions of the Notes*

Ultimately, the Conditions of the Notes were set out in the Information Memoranda issued in the case of the Tatneft notes on Mar. 24, 1998 and in respect of the GKO notes on May 12, 1998, in both cases after the respective deal dates.

The issuer of both series of notes was expressed to be CS Switzerland acting through its Nassau branch, while CS Europe was described as "calculation agent" and "paying agent" and also as "arranger" in respect of the notes' issue.

The Information Memoranda contained warnings:

No person is authorised to give any information or to make any representation not contained in this Information Memorandum . . .

Any prospective purchaser of any Notes should ensure that it understands the nature of the Notes and the extent of its exposure to risk and that it considers the suitability of the Notes as an investment in the light of its own circumstances and financial condition, as a professional investor. The Notes differ from an ordinary debt security in that the Redemption Amount which a holder may receive on redemption of a Note will depend, inter alia, on various economic and political factors in Russia and on whether a Regulatory Change Event occurs during the Valuation Period . . .

A passage in the Information Memoranda headed "Investment Considerations" stated that "No secondary market is expected to develop in respect of the Notes" and that CS Switzerland, CS Europe and any CS affiliate may have existing business relationships with Tatneft or Russia.

Condition 12 of the Conditions of the Notes contained a "Governing Law" clause as follows:

The Agency Agreement and the Notes are governed by, and shall be construed in accordance with, English law.

The Issuer irrevocably and unconditionally agrees for benefit of the Noteholders that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with the Agency Agreement or the Notes and that accordingly any suit, action or proceedings (together referred to as "Proceedings") arising out of or in connection therewith may be brought in the courts of England.

The Issuer irrevocably and unconditionally waives and agrees not to raise any objection which it may have now or subsequently to the laying of the venue of any Proceedings in the courts of England and any claim that any Proceedings have been brought in an inconvenient forum and have further irrevocably and unconditionally agreed that a judgment in any Proceedings brought in the courts of England shall be conclusive and binding upon the Issuer and may be enforced in the courts of any other jurisdiction. Nothing in this Condition shall limit any right to take Proceedings against the Issuer in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.

It is common ground that this jurisdiction clause, like the jurisdiction clause in the GMRA, does not provide for exclusive jurisdiction in England.

*The English proceedings*

On Sept. 25, 1998 CS Europe commenced these proceedings by issuing a writ against MLC. The writ claims "U.S.$1,665,969.16 and/or other sums due" under and/or damages for breach of the GMRA. The relief is limited to that due under the GMRA. Service was effected on MLC within the jurisdiction under express provisions in the GMRA for such service.

On Oct. 22, 1998 CS Europe served its points of claim. These claim U.S.$1,665,969.16 as being the repurchase price of the Tatneft notes due from MLC under the last of the Tatneft repo transactions, and an additional U.S.$6,058,882.28 as being the similar sum due under the last of the GKO repo transactions. Against these sums CS Europe gives

credit for U.S.$4,490,625.71 being the sum transferred to CS Europe by CS US as a result of the liquidation of MLC's accounts with CS US under the Customer Agreement. Thus, interest apart, the net amount claimed in principal is U.S.$3,234,225.73.

There is no claim under the Purchase Agreements, which have been performed.

*The New York complaint*

On Oct. 24, 1998 MLC commenced its action in New York and served a complaint against CS Europe, CS US and CS Switzerland. The causes of action asserted arise under federal U.S. securities laws and/or the common law and statutes of the state of New York. MLC alleges inter alia violations of the Securities Exchange Act, 1934 (the "1934 Act") based on misrepresentation and non-disclosure both in connection with the initial sale of the notes and subsequently in connection with the after-sale relationship at a time when the repo transactions were in effect; common law fraud and negligent misrepresentation in connection with the initial sales and the subsequent relationship; and conversion of MLC's assets by reason of CS US's liquidation of MLC's accounts. Factually, these causes of actions and the remedies claimed in respect of them depend on allegations as to what was said over the telephone by Mr. Tighe to Mr. Agarwala or Mr. Tishfield, either prior to and at the time of dealing, or subsequently. It is said that during the after-sale period, as a result of Mr. Tighe's then misrepresentations or non-disclosures, MLC forbore from taking action which it would or could otherwise have taken.

MLC asserts that there is both subject matter and personal jurisdiction over the three CS entities in New York. It relies on the policy of the 1934 Act to achieve fair dealing in the U.S. securities industry, on the presence of CS US and CS Switzerland in the U.S.A., and on the fact that the transactions in question were entered into in New York through CS Europe's New York agent, CS US. Much of that is in dispute, but is a matter for the New York Court. What, however, CS Europe puts at the forefront of its objection to New York jurisdiction is the jurisdiction clause, cl. 5, in the Purchase Agreements. It is on that basis, as well as on par. 2(g)(ii) of the GMRA's Supplemental Terms and Conditions, that CS Europe asks the London Court to injunct MLC from continuing its proceedings in New York. CS Europe points out that at the forefront of MLC's New York complaint is the allegation that misrepresentation or non-disclosure occurred in the initial sale of the notes.

[1999] Vol. 1       LLOYD'S LAW REPORTS       775

Q.B. (Com. Ct.)]       Credit Suisse v. MLC       [Rix, J.

*The amendments in the London action*

In the light of MLC's proceedings in New York, and because MLC has initiated its New York action against CS US and CS Switzerland as well as against CS Europe, CS Europe and its two affiliates riposte by seeking to amend the writ and points of claim in the London action. First, there is an application to join CS US and CS Switzerland as parties to the action as second and third plaintiffs respectively. Secondly, the relief sought in the writ is to be substantially amended so as to include eight new paragraphs: these seek a declaration that the Purchase Agreements are valid and binding upon MLC; a declaration that by cl. 5.2 of the Purchase Agreements MLC was and is obliged to refer the issues raised in the New York proceedings for determination exclusively by the English Court; an injunction to restrain MLC from pursuing the New York proceedings or from pursuing the same or substantially the same issues elsewhere than in England; damages for breach of cl. 5.2; an indemnity under the Purchase Agreements; a declaration that CS Europe and/or CS US were entitled to liquidate MLC's accounts with CS US pursuant to the Customer Agreement; a declaration that neither CS US nor CS Switzerland has any liability to MLC in respect of any of these transactions; and damages for breach of par. 2(g)(ii). These new claims are then reflected in the amended points of claim, which indicate that CS US as well as CS Europe are claimants to damages for breach of cl. 5.2 and/or par. 2(g)(ii).

The draft amendments to the writ need the leave of the Court. Logically the first question is whether I should give leave to amend and to add the new parties.

*Leave to amend*

Only the joinder of CS US and CS Switzerland is objected to by MLC. It is accepted that there is power to join them under the wide terms of R.S.C., O. 15, r. 6(2)(b)(ii), but it is submitted that as a matter of principle leave should not be given where CS US and CS Switzerland would not have been entitled to issue and serve new proceedings out of the jurisdiction on MLC.

On behalf of MLC Mr. Richard Salter, Q.C. has taken a broad brush and has not sought to investigate in detail each claim which the draft amended points of claim ascribes to CS US or CS Switzerland respectively. His broad submission, however, is that neither CS US's claims under the GMRA nor both new parties' claims for declarations of non-liability are within the letter or the spirit of R.S.C., O. 11 (by analogy).

In my view, however, Mr. Iain Milligan, Q.C., who appears for the CS plaintiffs, is correct to

submit that there would be jurisdiction under O. 11, r. 1(1)(d)(iii) and (iv) so far as any claim by CS US under the GMRA is concerned, since that contains an English law and jurisdiction clause, and that the claims for declarations of non-liability are similarly within those sub-rules as being claims to "otherwise affect" contracts that contain English law and jurisdiction clauses, viz. the GMRA and the Notes. Moreover, the concept of sub-r. (c) ("necessary or proper party"), also relied on by Mr. Milligan, applies with peculiar force to additional plaintiffs in the context of O. 15, r. 6. It is true that it is difficult to see what liability is asserted against CS Switzerland as issuer of the Notes, but that has not prevented CS Switzerland from being sued in New York: in the circumstances there seems to me to be sufficient cause for all three CS entities to be entitled to join in the English proceedings, and I give leave to amend in accordance with the CS plaintiffs' summons.

*Clause 5.2: an exclusive or non-exclusive jurisdiction clause?*

It is convenient to go next to the question of the construction of cl. 5.2 and the issue whether it does or does not impose on MLC an exclusive regime for jurisdiction in England: for this is the linchpin of the CS plaintiffs' applications. I will consider below the further question of the scope of the clause in relation to the issues raised in the New York proceedings.

Mr. Milligan submits that cl. 5.2 is essentially no different from the jurisdiction clause considered in *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588 and therefore must likewise be regarded as an exclusive jurisdiction clause so far as claims brought by MLC are concerned. He accepts that CS Europe would be entitled under the last sentence of the clause to bring proceedings against MLC elsewhere than in England, but submits that this unilateral licence merely emphasizes, as in *Continental Bank v. Aeakos*, the exclusive nature of the clause so far as concerns MLC.

It will be recalled that the clause in *Continental Bank v. Aeakos* provided:

> Each of the borrowers . . . hereby irrevocably submits to the jurisdiction of the English courts . . . but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction thereof.

Lord Justice Steyn in giving the judgment of the Court of Appeal, said at p. 509, col. 1; p. 594 —

> We have already explained why we interpret cl. 21.02 in a transitive sense as involving an agreement by the defendants to submit disputes

in connection with the loan facility to the juris-diction of the English Courts. That does not necessarily mean that cl. 21.02 is an exclusive jurisdiction agreement. Mr. Clarke submits that where there is an agreement to submit disputes to the jurisdiction of a particular country, the parties are taken to have intended the chosen Court's jurisdiction to be exclusive unless there are unusual or particular circumstances which indi-cate otherwise . . . We find it unnecessary to explore this line of authority or to express any view on Mr. Clarke's submission. We say that because cl. 21.02 (the only jurisdiction agree-ment that we are asked to consider) does not contain a submission to English jurisdiction sim-pliciter. We regard the concluding words as significant: "but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction thereof." The juxtaposition of a submission by the defendants to the jurisdiction of the English Courts and the option reserved in favour of the bank to sue elsewhere brings into play the expressio unius exclusio alterius canon of con-struction. It suggests that a similar option in favour of the defendants was deliberately omit-ted. In our judgment the language of cl. 21.02 evinces a clear intention that the defendants, not the bank, would be obliged to submit disputes in connection with the loan facility to the English Courts.

Mr. Salter, however, emphasizes the absence from cl. 5.2 of the word "exclusive", the presence of the word "may" (not "shall") in the first sentence, and submits that the final phrase of the clause, that beginning with the words "nor shall the taking of Proceedings", can apply to the proceed-ings of both parties and not merely to those of CS Europe. He also submits that in *Continental Bank v. Aeakos* the Court of Appeal was construing the parties' principal agreement, whereas in this case the Purchase Agreements take place in the context and against the background of the Consumer Agreement and the GMRA the former of which provides for New York law and no agreed jurisdic-tion and the later of which provides for what is accepted to be a non-exclusive jurisdiction agree-ment. Moreover, given the importance of the role of CS US and the actual deal-making being carried out in New York, an exclusive clause depriving MLC of the right to bring proceedings in New York should be regarded as unusual and not one that the parties and in particular MLC should lightly be thought of as making. For all these reasons, Mr. Salter concludes, *Continental Bank v. Aeakos* should be distinguished.

I do not agree. The word "exclusive" was missing in *Continental Bank* as well and did not affect the issue. The word "may" reflects the possibility that CS Europe may at its option bring proceedings against MLC outside England. The "taking of proceedings" in the context of the final sentence can in my judgment only apply to the taking of proceedings by CS Europe. The presence of different law or jurisdiction clauses in other agreements merely serves to highlight the express wording of this clause. Although the presence of an exclusive clause binding on MLC in the Purchase Agreements alone may seem odd, or at any rate incoherent, I do not feel able in the light of *Continental Bank v. Aeakos* and its reasoning, which lays stress on the bank's reluctant option, to hold otherwise than that MLC is bound by its contract to bring proceedings "arising out of or in connection with" the Purchase Agreements exclu-sively in the Courts of England.

*How much of the subject matter of the New York action is in breach of MLC's promise to bring proceedings exclusively in England?*

The question then arises as to the scope of cl. 5.2 and of the extent to which the New York complaint raises claims or issues within the reach of that clause.

It is common ground that to some extent at any rate the complaint is concerned with the matters within cl. 5.2, i.e. in so far as MLC claims damages for fraudulent or negligent misrepresentation or non-disclosure either under the 1934 Act or at common law in connection with the original sales of the notes. In my view this is in itself an important part of the New York action.

Mr. Salter submits, nevertheless, that in all other respects the complaint does not impinge on MLC's obligations under cl. 5.2. Thus the second important area of MLC's complaint concerns alleged mis-representations and non-disclosures or lack of fair dealing *subsequent* to the initial purchases: it is said that but for such failures in CS Europe's responsi-bilities MLC would have been able to extricate itself from its purchases, or would have suffered less loss, or would have taken steps to hedge its exposure. These allegations relate to the period of the repo transactions, rather than to the original Purchase Agreements. The third important area of the complaint relates to the liquidation of MLC's accounts. Thus, it is said, MLC's claims in respect of these second and third aspects of its complaint do not arise out of or in connection with the Purchase Agreements, but out of or in connection with the repo transactions, the GMRA and the Customer Agreement. Indeed, Mr. Salter submits that these second and third areas represent the real centre of gravity of MLC's complaint, and that the complaint could if necessary be reformulated so as entirely to

Status: ☒ Positive or Neutral Judicial Treatment

## Mary Elizabeth East v Pantiles (Plant Hire) Limited

In the Supreme Court of Judicature

Court of Appeal

On Appeal from the High Court of Justice

Chancery Division

1 January 1982

**1982 WL 221024**

Lord Justice Lawton Lord Justice Brightman Lord Justice Oliver

Tuesday, 15th December, 1981

**Representation**

> MR. P. SHERIDAN, Q.C. and MR. D. L. CROFT (instructed by Messrs. Wilkinson & Durham, Leatherhead, Surrey) appeared on behalf of the Appellant.

> MR. A. L. PRICE, Q.C. and MR. T. O. SEYMOUR (instructed by Messrs. Rowe & Maw) appeared on behalf of the Respondent.

**JUDGMENT (Revised)**

LORD JUSTICE LAWTON:

I shall ask Lord Justice Brightman to deliver the first judgment in this matter.

LORD JUSTICE BRIGHTMAN:

The facts in this appeal are fully set out in the judgment of Mr. Justice Nourse from whom this appeal lies. I intend only to repeat the facts so far as necessary to make my judgment intelligible.

The question at issue is whether the landlord served a rent review notice in time. The notice had to be posted two quarters in advance of the review date. The review date was 1st August 1979. The 1st August was also the commencement date of each year of the tenancy. If the 1st August 1979 was also the commencement date of the first quarter of the 1979/80 year of the tenancy no problem arises. The two quarters immediately prior to the review date would be the quarters running from 1st February to 30th April 1979 and 1st May to 31st July 1979, as I see it. The notice was posted on 26th January 1979; but, if, on the wording of the lease, it has to be said that the quarter starting on the 1st May ran to the 13th August and so straddled the review date, then the two complete quarters prior to the review date would be the quarters running from 1st November 1978 to 31st January 1979 and the 1st February to 30th April 1979. The notice would then be out of time.

With that brief introduction to the sort of problem that we have, I turn to the documents. There are, in fact, two leases separated by four years. The second lease, which is of an adjoining property, is worded in the same manner as the first lease *mutatis mutandis* and the same point arises. It is, at this stage, only necessary to refer to the first lease. That was executed on 2nd October 1972. It demised the premises from 1st August 1972 for the term of 21 years. Clause 1(1) specified the amount of the rent and the manner of payment. I must read it:

> "For the first seven years of the said Lease the sum of £4500 per annum by equal quarterly payments in advance on the 14th day of August the 1st day of November the first day of

February and the first day of May in each year the first payment to be made on the 1st day of August 1972".

As it stands, that subclause seems to me to be unambiguous, although somewhat eccentric. The rent is £4,500. It is to be paid by equal quarterly payments, so each quarterly payment is to be £1,125. Each payment is to be made in advance. The first £1,125 is expressed to be payable on 1st August 1972. That was then a past date, but it does not seem to me that anything turns on it. Thereafter, the sum of £1,125 is to be paid on the first day of every November, February and May but, in the case of every August, on the 14th of that month instead of the first.

The rent review clause is clause 5. I need not read the whole of it. The introductory words said that the rent shall be reviewed at the end of the 7th and 14th year of the term. That means that the reviewed rent is to be operative as from the end of those years, that is to say, as from 1st August 1979 and 1st August 1986. The reviewed rent thereafter payable is to be either the rent reserved by clause 1 subclause 1 of the lease or the open market rental value of the demised premises at the review date, whichever shall be the greater. The open market rental value is defined by subclause 1, which I need not read. The review date is defined by subclause 2 and means the expiration of the 7th or 14th year of the term, either 1st August 1979 or 1st August 1986. There is no dispute about that.

Subclause 3 provides how the open market rental value is to be determined. It is to be:

> "such annual sum as shall be (a) specified in a notice in writing signed by or on behalf of the lessor and posted by recorded delivery post in a prepaid envelope addressed to the tenant at the demised premises at any time before the beginning of a clear period of two quarters of a year (commencing on one of the usual quarter days hereinbefore mentioned) immediately preceding the review date (and such notice shall be conclusively deemed to have been received by the tenant in due course of post) or (b) agreed between the parties before the expiration of three months immediately after the date of posting of such notice as aforesaid in substitution for the said sum or (c) determined at the election of the tenant (to be made by counter-notice in writing served by the tenantupon the lessor not later than the expiration of the said three months) by an independent surveyor appointed for that purpose by the parties…"

The only other provision that I need refer to is clause 6, which says that time in relation to clause 3 shall be of the essence of the contract.

It follows that the landlord cannot get her increased rent unless she serves notice under subclause 3(a) in time and that means posting it "before the beginning of a clear period of two quarters of a year commencing on one of the usual quarter days hereinbefore mentioned" preceding" 1st August 1979.

Now, as I have already indicated, the landlord's letter was posted on 26th January 1979, that is to say, five days before the beginning, of the quarter commencing 1st February. The next quarter day commenced on 1st May. The question that arises is whether the two quarters so commencing were a clear period of two quarters of a year preceding 1st August 1979; or is the second of such quarters disqualified, as it were, from counting because it did not precede the 1st August 1979 since it straddled that date? The landlord argues that the 14th August in clause 1 subclause 1 is an obvious clerical error for 1st August. She so argues not because she is concerned about being out of her money for 14 days once a year but because it will set at rest the argument by the tenant that the quarter beginning on 1st May straddled the review date and ended on 13th August.

It is clear on the authorities that a mistake in a written instrument can, in certain limited circumstances, be corrected as a matter of construction without obtaining a decree in an action for rectification. Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction' is made as a matter of construction. If they are not satisfied then either the claimant must pursue an action for rectification or he must leave it to a court of construction to reach what answer it can on the basis that the uncorrected wording represents the manner in which the parties decided to express their intention. In Snell's Principles of Equity 27th Edition page 611 the principle of rectification by construction is said to apply only to obvious clerical blunders or grammatical mistakes. I agree with that approach. Perhaps it might be summarised by saying that the principle applies where a reader with sufficient experience of the sort

of document in issue would inevitably say to himself, "Of course X is a mistake for Y" .

I need only refer to one authority which was decided in 1854. It was Wilson v. Wilson Vol. 5 House of Lords Cases at page 40. That was a case where articles of agreement for a separation had been signed as the prelude to a deed of separation. The articles contained a non molestation clause by the husband. They also contained a stipulation that, if the husband performed the obligations binding on him under the articles, he should be indemnified against all the present debts and liabilities of the husband by the joint and several covenant of the wife's trustees. Of course, as drawn the stipulation did not make sense. Clearly the debts and the existing liabilities of the wife were to be the subject matter of the indemnity afforded to the husband, not his own indebtedness. So, when the separation deed came to be settled by the master, he approved a draft which contained a covenant by the wife's trustees to indemnify the husband not against his own debts but against the debts of the wife. The husband appeared in person when the matter came before the House of Lords and sought to have the deed framed in the precise terms of the articles. His claim was rejected and Lord St. Leonards said this:

> "If you find a clear mistake, and it admits of no other construction, a Court of Law, as well as a Court of Equity, without impugning any doctrine about correcting those things which can only be shown by parol evidence to be mistakes – without, I say, going into those cases at all, both Courts of Law and of Equity may correct an obvious mistake on the face of an instrument without the slightest difficulty."

In the instant case the learned judge accepted the argument on behalf of the landlord and he expressed himself as satisfied that there had been an obvious clerical blunder in the framing of subclause 1 of clause 1, and he said he was certain that the real intention of the parties was to insert 1st August throughout the subclause. He expressed himself as reaching that conclusion because he saw an inherent conflict between the provision, that instalments generally should be paid on 14th August and the provision that the first payment of all should be made on 1st August. In addition, he could see no reason and none had been suggested to him why the 14th August should ever have been chosen. The argument before us on behalf of the landlord has ranged a little wider and three points have been suggested for seeing an ambiguity in subclause 1 so obvious and so clear as to the nature of the mistake that we ought to strike out 14th August as a matter of construction and substitute 1st August.

Point 1 is this. If August 14th remains in subclause 1 then it is not accurate to express all the quarterly payments as made in advance. The August payment will, so it is said, to the extent of 14 days be made in arrear, treating the quarter itself as running from 1st August. To my mind, that is a criticism of the wording of subclause 1 of very small dimensions and hardly enough to conjure up, to my mind, any appreciable ambiguity.

Point 2 is this. The two quarters advance notice of rent review are to be the period of two quarters immediately preceding the review date. If the two quarters have to be those commencing on 1st November 1978 and ending 30th April 1979 then they will not represent a period immediately preceding the review date, but a period separated from it by three months. This interval inconsistent with the words "immediately preceding" would be avoided if one changed 14th August to 1st August in subclause 1 of clause 1.

Point 3 concerns subclause 4 of clause 3 of the lease. It is possible that the arbitrator would make his determination between the 1st and 14th August. In those circumstances it is said that problems will arise on the construction of the clause. I agree that, if one leaves the 14th August as the rent payment date in subclause 1 of clause 1, then subclause 4 of the rent review clause does not fit very easily with subclause 1.

Although I take these points, I do not think that they amount to very much and they certainly do not persuade me of the existence of a clear mistake in subclause 1 of clause 1 of the lease. In my view, there is no sufficient reason to alter 14th August to 1st August in subclause 1. I have no idea why the landlord was apparently content to receive the August instalment of rent 14 days later than she was entitled to receive the other instalments of rent, but I cannot see any justification for making a change. I can see two positive objections to a change. In the first place, the wording of the lease is identical with the wording of the counterpart lease, but the counterpart lease is not a facsimile of the lease itself. The lease and the counterpart are different productions in different formats, so that anything like a copying mistake is ruled out. Secondly, clause 4 subclause 1 of the lease is a forfeiture clause

which takes effect if the rent is unpaid for 21 days after becoming payable. In my view, the tenant ought to be able to rely on the integrity of the dates for the payment of rent which the landlord has seen fit to specify in subclause 1 of clause 1, and not be at risk of incurring an inadvertent forfeiture as might other-wise have happened if 14th August in subclause 1 really meant 1st August. In the light of the forfeiture clause I would be very hesitant to change as a matter of construction the specified rental dates.

With all respect to the learned judge I cannot find any sufficient justification for changing 14th August to 1st August.

Having reached that conclusion I must now seek to solve how the rent review clause operates against the uncorrected wording of the rent payment clause. At the risk of prolixity I think I must refer once more to the precise wording of subclause 3 of the rent review clause. The annual sum is to be such as may be specified in a notice which is to be posted "at any time before the beginning of a clear period of two quarters of a year (commencing on one of the usual quarter days hereinbefore mentioned) immediately preceding the review date" . I start by rejecting the word "usual" . It adds nothing to the subclause and I think is in fact meaningless. What one therefore has to identify are the "two quarters immediately preceding the review date" .

There are two arguments which have been addressed to us by the tenant's counsel on this aspect. The first argument, as I have already indicated, is that there is a quarter current on the review date which, therefore, has to be left out of account because it had not then ended, namely, a quarter beginning on 1st May and ending on 13th August. I feel no difficulty in rejecting that argument. In order to identify the two quarters of the year to which the rent review clause refers, one has to divide the year of the lease into quarters. The term of the lease started on 1st August 1972. It therefore follows that the first quarter of the lease started on that day. It could not possibly start on any other day in the absence of some express provision in the lease. The next quarter, therefore, started on 1st November 1972, the third quarter on 1st February 1973 and the final quarter of the first year on 1st May 1973. And so it went on. Each quarter of each subsequent year must have started on the first day of each of these months. The 14th August is not indicative of the date upon which a quarter commences. It is indicative of the date upon which rent has to be paid for the quarter commencing on 1st August and ending on 31st October. In the result the rent review notice was properly served because it was posted before the beginning of a clear period of two quarters of a year immediately preceding the review date.

There is, however, a second argument with which Mr. Sheridan has enter-tained us. It is this. Dating apparently from a decision in the 16th century, a quarter of a year in certain unspecified contexts has been read as meaning 91 days. That was so decided in an anonymous case in the 16th century to which I shall not trouble to refer and has been picked up in legal dictionaries. If one applied that computation to this lease, Mr. Sheridan has ingeniously worked out that the rent review notice was served one day late. Acknowledging the cleverness and originality of the argument I am unpersuaded by it. I fully accept that, on the wording of a particular instrument, a quarter of a year could well mean 91 days, but it seems to me extravagant to argue that it means 91 days on the true interpretation of this lease. Mr. Sheridan himself was constrained to concede that it would lead to a very odd result, because he accepted that the first year of the lease started on 1st August 1972 and, therefore, the first quarter of the lease started on that day; and he conceded that the eighth year of the lease started on 1st August 1979 and, therefore, that the first quarter of that year must have started on 1st August. So, if one takes a quarter of a year as 91 days, one can have an odd situation under which the end of the preceding quarter of a year does not coincide with the first day of the next quarter. I find myself completely lost by this submission. I do not think that one can conceivably read this lease as intending that the rent review notice is to be served at least two periods of 91 days before the review date.

In the result, the rent review notice was, in my judgment, properly served because it was posted before the beginning of a clear period of two quarters of a year immediately preceding the review date.

The position in relation to the second lease is exactly the same as that in relation to the first lease and does not need to be separately dealt with in this judgment.

I would, therefore, dismiss the appeal. I propose that the order made by the learned judge should be slightly altered. It must, I think, be varied by striking out the first two declarations which corrected the date 14th August to 1st August, and I think that the third declaration needs to be changed, so as to

*Page 5*

read

"This Court doth declare upon the true construction of the said Lease and Supplemental Lease respectively that the words 'a clear period of two quarters of a year (commencing on one of the usual quarter days hereinbefore mentioned) immediately preceding the review date…' contained in clause 5(3)(a) of the Lease and Supplemental Lease respectively refer to the quarters commencing on 1st February and 1st May 1979 and ending on 30th April and 31st July 1979."

LORD JUSTICE OLIVER:

I agree with what has fallen from my Lord, Lord Justice Brightman, on both points. There was a point in the course of the argument where I felt, though I was, of course, much too polite to voice its that Mr. Sheridan's submissions, if correct, seemed to be calculated to demonstrate the truth of that well-known aphorism of Mr. Bumble regarding the animal nature and unmarried state of the law. But, like my Lord, I have felt unable to accept those submissions and for the reasons which he has given. I agree that the appeal should be dismissed but that the order should be varied in the way that he has suggested.

LORD JUSTICE LAWTON:

I, too, agree. Eccentricity in the use of language in leases or in fixing the *days* on which rent is to be paid is by itself no reason why this court should try to re-write them so as to produce documents likely to be approved in Lincoln's Inn.

*Order: Appeal dismissed. Order varied as stated by Lord Justice Brightman in the judgment. Respondent to have three-quarters of costs of appeal.*

Crown copyright

© 2014 Sweet & Maxwell



349

1 W.L.R.          Lloyds Bank Ltd. v. Marcan (Ch.D.)          Pennycuick V.-C.

A    thought it imposed on the examiner a most embarrassing task. It seems to
me that the author of the notes to the *Supreme Court Practice* might well
reconsider what is said in that particular passage.

> *Order for possession on February 1,
> 1973.*
>
> *Defendants to pay plaintiffs' taxed
> costs not to be enforced without
> leave of court.*
>
> *Legal aid taxation of costs of first
> and second defendants.*

   Solicitors: *Cameron, Kemm, Nordon & Co.; Edgley & Co. for
Reynolds, Parry-Jones & Crawford, High Wycombe.*

T. C. C. B.

D                  [COURT OF APPEAL]

* EVANS MARSHALL & CO. LTD. *v.* BERTOLA S.A. AND ANOTHER
EVANS MARSHALL & CO. LTD. *v.* BERTOLA S.A.

[1972 E. No. 2242]
[1972 E. No. 2422]

1972 Nov. 24, 27; 30                        Kerr J.
Dec. 11, 12, 13, 14, 18, 19, 20       Sachs, Edmund Davies and
Cairns L.JJ.

*Practice—Writ—Service out of jurisdiction—Contract—Contract
made within jurisdiction—Foreign jurisdiction clause—Sub-
stance of contract in England—Whether leave should be granted
to serve writ outside jurisdiction—Special circumstances—
R.S.C., Ord. 11, r. 1*
*Injunction—Interlocutory—Contract—Breach of—Unilateral termi-
nation of contract with 14 years to run—Whether interlocutory
injunction proper*

   The plaintiffs, an English company, were wholesale wine
merchants. The first defendants, a Spanish company, were
producers and shippers of sherry wine. On September 26,
1951, they made an agreement whereby, inter alia, the plaintiffs
became the first defendants' sole agents for the sale of their
sherry in England. Clause 15 provided that " If any law
claim arises between the two parties it will be submitted to the
Barcelona Court of Justice."

   The agreement, originally for five years, was extended to
September 1986. In June 1972 control of the first defendants
passed to another Spanish company. The first defendants then
alleged that the plaintiffs' activities under the agreement were
unsatisfactory or obstructive and they purported to appoint the
second defendants as their agents in the plaintiffs' place. On
November 10 the plaintiffs issued a writ claiming, inter alia,
(a) against both defendants damages for conspiracy and injunc-
tions restraining them from selling sherry in the United
Kingdom otherwise than through the plaintiffs' agency; (b)
against the first defendants, damages for breach of the agree-

The Weekly Law Reports, March 23, 1973

350

Evans Marshall & Co. v. Bertola S.A. (Q.B.D.)     [1973]

A

ment; and (c) against the second defendants damages for
interference with contracts made by the plaintiffs in the course
of their acting under the agreement. The writ was amended
so as to take out the damages claims against the first defendants
and those damages claims were then made the subject of a
second writ issued by the plaintiffs against the first defendants.

B

The plaintiffs sought leave in accordance with the provisions
of R.S.C., Ord. 11 to serve the first defendants out of the juris-
diction. The judge gave leave, regarding the circumstances as
making up one of those exceptional cases that ought to be
heard in England, despite clause 15 (which was regarded as
an exclusive jurisdiction clause). The special circumstances
included (i) the fact that the substance of the case was exclu-
sively concerned with England in that the plaintiffs' conduct
here would come under scrutiny involving the testimony of
English witnesses; (ii) the dispute involved not only the parties
to clause 15 but also the second defendants; and (iii) indica-
tions that proceedings would be slower in Spain and admitted
of no interlocutory relief there.

C

The plaintiffs also applied for interlocutory injunctions
substantially in the terms claimed in the first writ. Those the
judge refused as he was not satisfied that the plaintiffs had a
strong prospect of obtaining permanent injunctions at the trial.
The plaintiffs appealed against that refusal and the first
defendants appealed against the orders made under R.S.C.,
Ord. 11:—

D

*Held*, (1) dismissing the first defendants' appeal, that leave
under R.S.C., Ord. 11 had been rightly given because the
situation was within the scope of that Order and embraced
exceptional circumstances (post, p. 376A–G) making it right
to allow the plaintiffs to sue in England despite clause 15 of
the agreement.

E

*The Fehmarn* [1958] 1 W.L.R. 159, C.A. and *YTC
Universal Ltd.* v. *Trans Europa Compania de Aviacion S.A.*
October 7, 1968, C.A., Bar Library Transcript No. 366
considered.

(2) Allowing the plaintiffs' appeal, that when the court was
deciding whether or not to grant an interlocutory injunction
the fact that the court was not satisfied that there was a strong
prospect of a permanent injunction being made at the trial was
a consideration which, while weighing heavily against the
making of an interlocutory order, did not preclude it; special
cases could arise in which it was proper to maintain a status
quo irrespective of whether the relief granted at trial would
include a permanent injunction; and that in the present case
damages were not an adequate remedy.

F

*Hill* v. *C. A. Parsons & Co. Ltd.* [1972] Ch. 305, C.A.,
obiter dicta of Lord Denning M.R. in *Hubbard* v. *Vosper*
[1972] 2 Q.B. 84, 96, C.A., *Warner Brothers Pictures Inc.* v.
*Nelson* [1937] 1 K.B. 209 and *Decro-Wall International S.A.*
v. *Practitioners in Marketing Ltd.* [1971] 1 W.L.R. 361, C.A.
applied.

G

*Per* Sachs L.J. The standard question in relation to the
grant of an injunction—" Are damages an adequate remedy ? "
—might in the light of recent authorities, be rewritten—" Is it
just, in all the circumstances, that a plaintiff should be con-
fined to his remedy in damages ? " (post, p. 379H).

H

The following cases are referred to in the judgments of the Court
of Appeal:

*Alfonal Ltd.* v. *Stratenport Ltd.*, May 20, 1969, C.A.; Bar Library
Transcript No. 197.

*Decro-Wall International S.A.* v. *Practitioners in Marketing Ltd.* [1971]
1 W.L.R. 361; [1971] 2 All E.R. 216, C.A.

*Doherty* v. *Allman* (1878) 3 App.Cas. 709, H.L.(I.).

360

Kerr J.        Evans Marshall & Co. v. Bertola S.A. (Q.B.D.)        [1973]

to serve Bertola out of the jurisdiction with the writ claiming a declaration **A**
and damages, and also now whether I should set aside the previous order
made ex parte serving Bertola with the writ claiming injunctions.

One starts with the fact that but for the Barcelona jurisdiction clause
both of these writs fall plainly within Ord. 11, r. 1. They fall within r. 1
(*l*) so far as the claims for injunctions are concerned; and they fall within
r. 1 (*g*) so far as the alleged breach of the agency agreement is concerned. **B**
Further, in relation to both writs Evans Marshall can prima facie rely on
the fact that Bertola is a necessary or proper party to an action brought
against I.S.I., who have been duly served within the jurisdiction.

The first issue is therefore as to the effect of the Barcelona jurisdiction
clause in these circumstances. There are four points of law which must be
mentioned in this connection.

First, there are authorities which suggest that in exercising the discretion **C**
whether or not to stay an action instituted here where the contract sued
upon is subject to a foreign jurisdiction clause, the court will take into con-
sideration whether or not the case is a proper one for an injunction. This
was said in *Law* v. *Garrett* (1878) 8 Ch.D. 26. The court there stayed an
action which was brought in England in connection with accounts arising
out of the dissolution of a Russian partnership which was carried on in **D**
Moscow. The agreement contained a clause submitting all disputes to the
Commercial Court at St. Petersburg. In the Court of Appeal the judgment
of the court contains the following passage, at p. 37:

"It is true that the plaintiff prays for an injunction, and if a case for
an injunction was made by the evidence, that would probably be a
sufficient reason for refusing to send the matter to arbitration; but no **E**
such case is made, indeed it is somewhat difficult to make out from
the pleadings or the evidence in respect of what the injunction is asked."

I should add that the reference to arbitration is a reference to the submission
of disputes to the Commercial Court of St. Petersburg since in those days,
and indeed in some modern authorities, a submission to a foreign court
was treated as equivalent to a submission to arbitration.

This judgment was followed by Eve J. in *Kirchner & Co.* v. *Gruban* **F**
[1909] 1 Ch. 413. That was a case where both the plaintiff firm and the
defendant were German nationals. The agreement between them related
to representation by the defendant of the plaintiff in England but it was
held to amount to a contract of service. Having accordingly come to the
conclusion that it was not a proper case for an injunction, Eve J. followed
*Law* v. *Garrett*, 8 Ch.D. 26 and stayed the action, holding that the claim for **G**
damages must be tried in Leipzig under a jurisdiction clause in the agree-
ment to this effect.

It follows from these two authorities that some distinction undoubtedly
exists between the discretion which the court exercises when the appropriate
remedy includes an injunction and when it does not. For the reasons
referred to below I have however come to the conclusion that on the facts **H**
of this case no such distinction should be drawn between the claims for
relief by injunction and the claims for a declaration and damages, and that
the right approach is to consider together the position under both writs
and the whole of the relief claimed by the plaintiffs.

The second point of law is that the authorities show that the courts
have drawn some distinction between so-called "exclusive" and other
foreign jurisdiction clauses, though it is also clear that if there are suffi-