# 'EXHIBIT C

# ''Rct v'XK'qh'ZKK

The Weekly Law Reports, March 23, 1973

361

**1 W.L.R.**          Evans Marshall & Co. v. Bertola S.A. (Q.B.D.)          Kerr J.

A  cient grounds there is a discretion to disregard such a clause whether it is an exclusive jurisdiction clause or not.

This distinction is borne out by the decisions in the Divisional Court and the Court of Appeal in *Hoerter (trading as C. F. Mumm)* v. *Hanover Caoutchouc, Gutta Percha, and Telegraph Works* (1893) 10 T.L.R. 22; 10 T.L.R. 103. It was also mentioned recently by the Court of Appeal in *Mackender* v. *Feldia A.G.* [1967] 2 Q.B. 590, 598, 599 by Lord Denning
B  M.R. and at p. 604 by Diplock L.J.

The same distinction is made in an unreported decision of the Court of Appeal to which I was referred, *YTC Universal Ltd.* v. *Trans Europa Compania de Aviacion, S.A.* decided on October 7, 1968; Bar Library Transcript No. 366. Widgery L.J. there said that the burden of proving that a clause was an exclusive jurisdiction clause rests on the defendant who
C  relies on it. That case, and the *Hoerter* case, also show or suggest that the question whether or not a foreign jurisdiction clause is of an exclusive nature is a question to be decided according to the foreign law.

I find it difficult to apply this distinction, at any rate to the present case. In *Hoerter's* case, 10 T.L.R. 103, 104 it was said in the Court of Appeal by Lord Esher M.R. that the effect by the foreign law of a foreign jurisdiction clause should be dealt with on an application by the defendant to
D  discharge the service of the writ upon him, or at the trial. But in the present case we have reached the former stage at this moment in so far as the writ claiming relief by injunction is concerned. Further, I cannot see, with great respect, how this point can ever be dealt with at the trial, because an erroneous order giving leave to serve out of the jurisdiction under Ord. 11 cannot then be made the subject matter of a defence.

E  I think that the distinction between "exclusive" and other foreign jurisdiction clauses has two consequences. First, if the parties have expressly provided for the exclusive jurisdiction of a foreign court, or if it is clearly shown that this is how the foreign court would regard the clause, or if they have expressly renounced other applicable jurisdictions—then in all these cases the courts will require still stronger grounds for allowing proceedings to be brought here or to be continued here, notwithstanding
F  the clause, than in cases of "non-exclusive" foreign jurisdiction clauses.

Secondly, it is possible that in the case of a non-exclusive jurisdiction clause the court will not stay proceedings served on a defendant within his own ordinary jurisdiction, that is to say in the country where he resides or carries on business. For instance, if Bertola had in this case sued Evans Marshall in the English courts, and the true analysis is that the
G  present clause 15 is not an exclusive jurisdiction clause, then it may be that the English courts would in that event have been willing to allow the action to proceed. But this is not a point which it is necessary to decide here.

However, since some distinction clearly exists between so-called exclusive and other foreign jurisdiction clauses I must seek to apply this distinction here. The evidence of Mr. Valls on behalf of the plaintiffs is that the matter is governed by article 57 of the Spanish Law of Civil Procedure,
H  and he says that this contains two requirements. First, parties must clearly and conclusively renounce their own jurisdiction; and, secondly, they must in effect submit expressly and clearly to the particular court which they have chosen. Mr. Valls says that, since the first requirement is here not present in clause 15, that clause is of no effect at all under Spanish law.

For the defendants, Señores de Burgos and Rivero, two experienced Spanish lawyers, disagree with Mr. Valls and regard the clause as an exclusive jurisdiction clause.

362

Kerr J.      Evans Marshall & Co. v. Bertola S.A. (Q.B.D.)      [1973]

Having considered this evidence I have reached the following conclu- A
sions on the material before me, which is, of course, inevitably somewhat
limited. If the question is: would the Barcelona court accept jurisdiction
under Spanish law, although it is not the jurisdiction of either party, or
would it alternatively treat the clause as wholly void, then I prefer the
evidence of Señor de Burgos and Señor Rivero that the Barcelona court
would accept the submission to its jurisdiction. On the other hand, if the
question is: does Spanish law treat Barcelona as the court of exclusive B
jurisdiction, so that, for instance, the plaintiffs could not in the present
case sue Bertola in Jerez but only in Barcelona, then my answer is that I
do not know. Although this is stated by Señor de Burgos in his affidavit
to be the effect of the clause, I consider that this has not been sufficiently
explored in the evidence to enable me to accept it as being necessarily
correct as a matter of Spanish law.
    But if the choice lies between the conclusion that this clause has no C
effect whatsoever in Spanish law, or that it is indeed an exclusive jurisdic-
tion clause, then I prefer the latter view. I therefore prefer to proceed on
the basis that this is likely in Spanish law to be regarded as an exclusive
jurisdiction clause.
    The third point of law is that the effect of foreign jurisdiction clauses
has come before the courts in two different contexts. First, it has come D
before the courts in applications for leave to serve defendants out of the
jurisdiction under Ord. 11. Secondly, it has come before the courts in
applications for staying actions brought in England against defendants
who have been served here. It is clear that in both cases the courts have
a discretion to disregard such clauses; in the first case by virtue of Ord. 11
itself, and in the second case by virtue of their inherent jurisdiction.   E
    I should for the sake of completeness mention the other cases which
were cited on the effect of such clauses. These were The Athenee (1922)
11 Ll.L.R. 6; The Vestris (1932) 43 Ll.L.R. 86; The Fehmarn [1958] 1
W.L.R. 159; Unterweser Reederei.G.m.b.H. v. Zapata Off-Shore Co. (The
Chaparral) [1968] 2 Lloyd's Rep. 158; and finally The Eleftheria [1970]
P. 94 in which Brandon J. reviewed most of the authorities.   F
    For the purpose of this distinction between what one may call Ord. 11
cases and stay cases I accept, as was recognised by counsel for the plain-
tiffs, that in Ord. 11 cases there is a heavier burden on the plaintiff who
wants to bring the defendant within the jurisdiction than in cases of appli-
cations for staying actions properly instituted here. To bring a defendant
before the English courts in the face of a foreign jurisdiction clause to my
mind clearly goes further than merely allowing an action against a defen- G
dant properly served here to proceed. I therefore take also this distinction
into consideration.
    Finally, there is the question of the scope of the court's discretion.
Proceeding as I do on the basis that this may be, or may amount to, an
exclusive jurisdiction clause by Spanish law and that the court is dealing
with applications under Ord. 11, I apply the most stringent tests which H
one can find laid down in the authorities. In Mackender v. Feldia A.G.
[1967] 2 Q.B. 590, 604, Diplock L.J. said:

    "Where parties have agreed to submit all their disputes under a
    contract to the exclusive jurisdiction of a foreign court, I myself
    should require very strong reasons to induce me to permit one of them
    to go back on his word."

**\*1720 Fili Shipping Co Ltd and others v Premium Nafta Products Ltd and others**

· **On appeal from Fiona Trust and Holding Corpn and others v Privalov and others**

House of Lords

17 October 2007

**[2007] UKHL 40**

**[2007] Bus. L.R. 1719**

Lord Hoffmann , Lord Hope of Craighead , Lord Scott of Foscote , Lord Walker of Gestingthorpe and Lord Brown of Eaton-under-Heywood

2007 July 30, 31; Oct 17

*Arbitration—Arbitrator—Jurisdiction—Owners bringing tort proceedings against charterers and purporting to rescind charterparties for bribery—Owners seeking court declaration as to validity of rescission—Charterers seeking determination of issue by arbitrator pursuant to arbitration clause—Whether arbitration clause impeached by allegations of bribery— Arbitration Act 1996 (c 23), ss 7, 9, 72(1)*

Eight companies within a Russian group of companies entered into charterparties as owners with three chartering companies. Each of the charterparties contained a clause providing for "any dispute arising under this charter" to be decided in England and conferred on either party the right to elect to have any such dispute referred to arbitration. The owners, among others, brought proceedings against the charterers for the torts of conspiracy, bribery and breach of fiduciary duty, claiming, inter alia, that each of the eight charterparties had been induced by bribery and, having purported to rescind the charters, sought a declaration from the court as to the validity of that act. The charterers sought to have the issue determined under the arbitration clause and appointed an arbitrator. On the owners' application under section 72(1) of the Arbitration Act 1996 [1] to restrain the arbitral proceedings and on the charterers' application under section 9 of the Act that the court proceedings be stayed, the judge held that the question whether the charterparties were void for bribery fell outside the scope of the arbitration clause and refused the charterers' application for a stay. On appeal by the charterers, the Court of Appeal held that the dispute did fall within the arbitration clause, which survived notwithstanding any illegality of the main contract since section 7 of the 1996 Act required an arbitration clause to be treated as a distinct agreement.

On the owners' appeal—

*Held* , dismissing the appeal, that the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, were likely to have intended any dispute arising out of the relationship into which they had entered or purported to enter to be decided by the same tribunal unless the language made it clear that certain questions were intended to be excluded from the arbitration; that where it was claimed that in any event the arbitration clause had been impeached by the illegality of the contract in which it was contained, the effect of the principle of \*1721 separability in section 7 was that the agreement to go to arbitration could be challenged only on grounds relating directly to that agreement; and that, accordingly, since the language of the arbitration clause contained nothing to exclude disputes about the validity of the contract on grounds of fraud, and there were no grounds of challenge specific to the validity of the arbitration clause, the claims that the charter contracts had been induced by bribery fell to be determined by arbitration (post, paras 13–19, 22, 26, 27, 31, 32, 35, 36–38).

Decision of the *Court of Appeal [2007] EWCA Civ 20; [2007] Bus LR 686; [2007] 1 All ER (Comm) 891; [2007] 2 Lloyd's Rep 267 affirmed.*

The following cases are referred to in their Lordships' opinions:

11 With that background, I turn to the question of construction. Your Lordships were referred to a number of cases in which various forms of words in arbitration clauses have been considered. Some of them draw a distinction between disputes "arising under" and "arising out of" the contract. In *Heyman v Darwins Ltd [1942] AC 356* , 399 Lord Porter said that the former had a narrower meaning than the latter but in *Union of India v E B Aaby's Rederi A/S [1975] AC 797* Viscount Dilhorne, at p 814, and Lord Salmon, at p 817, said that they could not see the difference between them. Nevertheless, in *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63* , 67, Evans J said that there was a broad distinction between clauses which referred "only those disputes which may arise regarding the rights and obligations which are created by the contract itself" and those which "show an intention to refer some wider class or classes of disputes." The former may be said to arise "under" the contract while the latter would arise "in relation to" or "in connection with" the contract. In *Fillite (Runcorn) Ltd v Aqua-Lift (1989) 26 Con LR 66* , 76 Slade LJ said that the phrase "under a contract" was not wide enough to include disputes which did not concern obligations created by or incorporated in the contract. Nourse LJ gave a judgment to the same effect. The court does not seem to have been referred to *Mackender v Feldia AG [1967] 2 QB 590* , in which a court which included Lord Denning MR and Diplock LJ decided that a clause in an insurance policy submitting disputes "arising thereunder" to a foreign jurisdiction was wide enough to cover the question of whether the contract could be avoided for non-disclosure.

12 I do not propose to analyse these and other such cases any further because in my opinion the distinctions which they make reflect no credit upon English commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions "arising under this charter" in clause 41(b) and "arisen out of this charter" in clause 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion expressed by Longmore LJ in the Court of Appeal [2007] Bus LR 687 , para 17, that the time has come to draw a line under the authorities to date and make a fresh start. I think that a fresh start is justified by the developments which have occurred in this branch of the law in recent years and in particular by the adoption of the principle of separability by Parliament in section 7 of the 1996 Act. That section was obviously intended to enable the courts to give effect to the reasonable commercial expectations of the parties about the questions which they intended to be decided by arbitration. But section 7 will not achieve its purpose if the *\*1726* courts adopt an approach to construction which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

13 In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: "if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so."

14 This appears to be the approach adopted in Germany: see the *Decision of 27 February 1970 of the* Federal Supreme Court of the Federal Republic of Germany (Bundesgerichtshof) (1970) 6 Arbitration International 79 , 85:

> "There is every reason to presume that reasonable parties will wish to have the
> relationships created by their contract and the claims arising therefrom, irrespective of
> whether their contract is effective or not, decided by the same tribunal and not by two
> different tribunals."

15 If one adopts this approach, the language of clause 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

16 The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

17 The principle of separability enacted in section 7 means that the invalidity or rescission of the main contract does not necessarily entail the invalidity or rescission of the arbitration agreement. The

896

[1998]

[HOUSE OF LORDS]                                                      A

\*INVESTORS COMPENSATION SCHEME LTD. .        . APPELLANTS

AND

WEST BROMWICH BUILDING SOCIETY .     .    . RESPONDENTS

AND                                                          B

SAME                                                 APPELLANTS

AND

HOPKIN & SONS (A FIRM) AND OTHERS  .     .    . RESPONDENTS

1997 April 21, 22, 23;        Lord Goff of Chieveley, Lord Lloyd of Berwick,
      June 19                         Lord Hoffmann, Lord Hope of Craighead     C
                                              and Lord Clyde

*Financial Services—Compensation—Statutory scheme—Investors' rights
assigned to scheme—Whether right of rescission chose in action—
Whether misuse of language or syntax to be taken into account in
construing assignment—Whether assignment valid*

On the advice of independent financial advisers, investors     D
entered into home income plans under which they took out
mortgages on their homes with certain building societies to secure
advances which were then invested in equity-linked bonds. They
suffered heavy losses as a result of a fall in equities and rise in
interest rates. The financial advisers having become insolvent, the
investors lodged claims for compensation with the Investors
Compensation Scheme Ltd., the body established pursuant to     E
section 54 of the Financial Services Act 1986[1] to provide a
compensation fund for persons with unsatisfied claims against
persons authorised to carry on investment business. The scheme's
claim form required the investor to assign to the scheme all rights
arising out of the transaction against the financial advisers and
anyone else, subject to a reservation of certain rights against the
building society which provided the mortgage. Section 3(b) of the     F
form excepted from the assignment the benefits of any claim
(whether sounding in rescission for undue influence or otherwise)
that the investor might have against the building society in which
he claimed an abatement of sums he would otherwise have to pay
the building society in respect of the mortgage loan or interest on
that loan. The scheme declined to compensate investors for
moneys which they had given away or spent on themselves, or
professional fees or damages for illness, anxiety and stress and the
decision not to do so was upheld by the House of Lords. The     G
scheme then brought proceedings against various building societies
and firms of solicitors for compensation for breach of statutory
duty under the Act of 1986 and damages for breach of duty at
common law, claiming to sue as assignee of the investors. The
question arose whether section 3(b) meant there had not been a
valid assignment of investors' rights against the building society.
The judge decided as a preliminary issue that section 3(b) had
only reserved to the investor the right to an adjustment of the     H
mortgage debt in the event of rescission as part of a mutual
restoration of benefits but that the purported assignment, being
an assignment of part of the remedy attaching to a chose in
action, was void. The Court of Appeal held that the words of
section 3(b) could not bear the judge's construction.

---

[1] Financial Services Act 1986, s. 54: see post, pp. 907G–908B.

The Weekly Law Reports 22 May 1998

897

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

On appeal by the scheme to the House of Lords:—

*Held*, allowing the appeal (Lord Lloyd of Berwick dissenting), that in construing contractual documents the aim was to find the meaning which the document would convey to a reasonable person having all the background knowledge reasonably available to the parties, including anything which would have affected the way a reasonable man would have understood it, but excluding previous negotiations and declarations of subjective intent; that the meaning which a document would convey to a reasonable man was what the parties using its words against the relevant background would reasonably have been supposed to mean and included the possibility of ambiguity and even misuse of words or syntax; that the court was not obliged to ascribe to the parties an intention which plainly they could not have had, and in choosing between competing unnatural meanings was entitled to decide that the parties must have made mistakes of meaning or syntax; that a claim to rescission could be made only by the owner of the mortgaged property and was not a separately assignable chose in action but was simply part of the process of rescission; and that in reserving to the investor any claim to abatement of the mortgage debt consequent on rescission section 3(b) was not cutting down the scope of the chose in action assigned to the scheme but was merely intended to make clear that the investor would not be accountable to the scheme for any abatement of the debt as a result of an action for rescission of the mortgage; that the claim form was effective to assign to the scheme the whole of the investors' claim to compensation and damages, although they retained the right to claim rescission of their mortgages on such terms as the court might consider just; and that, accordingly, the scheme could maintain the actions against the building societies and the solicitors (post, pp. 898H, 912H–913E, 914B–E, 916D–917A, 918A–G).

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordship's opinions:

*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191; [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)

*Barclays Bank Plc. v. O'Brien* [1994] 1 A.C. 180; [1993] 3 W.L.R. 786; [1993] 4 All E.R. 417, H.L.(E.)

*Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313; [1996] 2 W.L.R. 726; [1996] 3 All E.R. 46, H.L.(E.)

*Investors Compensation Scheme Ltd. v. Cheltenham and Gloucester Building Society* (unreported), 1 November 1995, Evans-Lombe J.

*Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749; [1997] 2 W.L.R. 945; [1997] 3 All E.R. 352, H.L.(E.)

*Porter v. National Union of Journalists* [1980] I.R.L.R. 404, H.L.(E.)

*Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)

*Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989; [1976] 3 All E.R. 570, H.L.(E.)

*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C. 261; [1995] 3 W.L.R. 289; [1995] 3 All E.R. 605, H.L.(E.)

*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973] 2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)

*Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)

The following additional cases were cited in argument:

*Archer v. Brown* [1985] Q.B. 401; [1984] 3 W.L.R. 350; [1984] 2 All E.R. 267

*Barings Plc. v. Coopers & Lybrand,* The Times, 6 December 1996; Court of Appeal (Civil Division) Transcript No. 1557 of 1996, C.A.

*Béchervaise v. Lewis* (1872) L.R. 7 C.P. 372

*Bristol and West Building Society v. May May & Merrimans* [1998] 1 W.L.R. 336; [1997] 3 All E.R. 206

A

Secondly, the parenthesis seemed very strange against the background of the law. If it was exhaustive, why was "sounding in rescission for undue influence" singled out? What about rescission on other grounds, or claims for breach of statutory or common law duty? It was rather like providing in a lease of a flat that the tenant should not keep "any pets (whether neutered Persian cats or otherwise)." Something seemed to have gone wrong.

B

Considerations of this kind led the judge to conclude in the *Cheltenham and Gloucester* case that the wider construction of "any claim" and "abatement" led to a "ridiculous commercial result which the parties to the claim forms were quite unlikely to have intended" and that it was clear that "the drafting of the second paragraph of section 3(b) was mistaken." He therefore concluded that the meaning intended by the parties was that the investor should retain any claim for an abatement of his debt which arose out of a claim for rescission, whether for undue influence or otherwise. This could be fitted easily into the scheme of the law because the old equitable remedy of rescission included, as part of the restitutio in integrum, an accounting for benefits and indemnity against liabilities which could result in an abatement of the mortgage debt. Such a remedy was quite separate from a common law action for misrepresentation or breach of statutory duty. But the judge seems to have had some misgivings about his interpretation: he said that was doing violence to the natural meaning of the words and altering the drafting of the paragraph in a way "more appropriate to rectification than the process of construction." In the present case, however, the judge adhered to his construction and gave some additional reasons.

C

D

In the Court of Appeal, Leggatt L.J. said, on the authority of *Through the Looking-Glass*, that the judge's interpretation was "not an available meaning of the words." "Any claim (whether sounding in rescission for undue influence or otherwise)" could not mean "Any claim sounding in rescission (whether for undue influence or otherwise)" and that was that. He was unimpressed by the alleged commercial nonsense of the alternative construction.

E

My Lords, I will say at once that I prefer the approach of the judge. But I think I should preface my explanation of my reasons with some general remarks about the principles by which contractual documents are nowadays construed. I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989, is always sufficiently appreciated. The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of "legal" interpretation has been discarded. The principles may be summarised as follows.

F

G

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

H

(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the

The Weekly Law Reports 29 May 1998

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          Lord Hoffmann

exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749.

(5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191, 201:

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense."

If one applies these principles, it seems to me that the judge must be right and, as we are dealing with one badly drafted clause which is happily no longer in use, there is little advantage in my repeating his reasons at greater length. The only remark of his which I would respectfully question is when he said that he was "doing violence" to the natural meaning of the words. This is an over-energetic way to describe the process of interpretation. Many people, including politicians, celebrities and Mrs. Malaprop, mangle meanings and syntax but nevertheless communicate tolerably clearly what they are using the words to mean. If anyone is doing violence to natural meanings, it is they rather than their listeners.

I shall, however, make four points supplemental to those of the judge. First, the claim form was obviously intended to be read by lawyers and the explanatory note by laymen. It is the terms of the claim form which govern the legal relationship between the parties. But in construing the form, I think that one should start with the assumption that a layman who read the explanatory note and did not venture into the claim form itself was being given an accurate account of the effect of the transaction. It is therefore significant that paragraph 4 of the note says categorically and without qualification that the investor gives up all his rights against anyone else and transfers them to I.C.S. If the effect of the claim form was that the investor retained his claim against the building society,

638

2002

A

McGOWAN v SUMMIT AT LLOYDS

No 56
12 June 2002

Extra Division
Sheriff court

BRIAN McGOWAN, Pursuer (Respondent) – *Hofford*
SUMMIT AT LLOYDS, Defenders (Appellants) – *Love*

B

*Contract – Construction – Contract conferring exclusive jurisdiction on the English
courts – Whether jurisdiction of the Scottish courts excluded – Civil Jurisdiction and
Judgments Act 1982 (cap 27) Sched 4 art 5* [1]

*International law – Jurisdiction – Contract conferring exclusive jurisdiction on the
English courts – Whether jurisdiction of the Scottish courts excluded – Civil Jurisdiction
and Judgments Act 1982 (cap 27) Sched 4 art 17*

C

*Process – citation of authorities – cases reported in Session Cases and official English Law
Reports to be cited from that source*

Schedule 4 to the Civil Jurisdiction and Judgments Act 1982 governs jurisdiction
as between the Scottish and English courts, and art 17 of that schedule
provides that if the parties have agreed that the courts of a particular part of
the United Kingdom are to have jurisdiction, those courts shall have
jurisdiction.

D

A bus operator sought indemnification under an insurance policy in respect
of the destruction of buses by fire. The insurance company pled no jurisdiction,
on the basis that the policy contained a clause conferring exclusive jurisdiction
on the courts of England. The contract provided that it was governed by the
laws of England. The sheriff repelled the plea, and the insurers appealed to
the Court of Session. The defenders argued that a jurisdiction clause fell to be
construed in the same way as any other contract. The pursuers argued that
there was a presumption against the exclusion of the jurisdiction of the
Scottish courts, which could be overcome only by an express term or necessary
implication.

E

*Held* that (1) the question whether the jurisdiction arising under a jurisdiction
agreement is exclusive or non exclusive depends on the law governing the
agreement and not upon art 17 of Sched 4 (p 644B–C); (2) there being no
averments of English law, the court could only proceed on the basis that the
relevant English law was the same as Scots law (p 644E–F); (3) the court could
not draw any conclusions from the citation of English decisions in argument
as to what English law might be, and any apparent difference from Scots law
was something to be taken into account in assessing any persuasive authority
the decision might possess in enabling the court to determine the position
under Scots law (p 644G); (4) there was no general rule of law that a
contractual clause will only be construed as conferring an exclusive jurisdiction
on a foreign court if it does so expressly (p 658H–I); (5) the same canons of
construction are to be applied in relation to a jurisdiction clause as any other
mutual contract provision, and the words construed in accordance with their
natural meaning in the light of the circumstances in which the contract was
made (p 659B); (6) factors which may point towards exclusive jurisdiction
were that the clause has been agreed and was in favour of both parties; factors
which point against were that the clause was in a printed form issued by one
party, and imposed an obligation falling substantially on the other (p 659G–
H); and (7) on a proper construction of the clause in issue, the English courts
did not have exclusive jurisdiction (p 660F); and appeal *refused*.

*Scotmotors (Plant Hire) Ltd v Dundee Petrosea Ltd* 1980 SC 351 *explained.*

*Observed* that when a case has been reported in Session Cases or an English
case in the Law Reports published by the Incorporated Council for Law

F

G

H

I

[1] The relevant statutory provisions are sufficiently set forth in the rubric, *supra*
and the opinion of the court, *infra* — Ed.

Reporting for England and Wales, it should be cited from that source; on occasion reports from other series are appropriately cited, for example, House of Lords decisions in private reports (p 660G–661E)

BRIAN McGOWAN raised an action against Summit at Lloyds in the sheriff court at Paisley. The defenders' plea of no jurisdiction was repelled by the sheriff. The defenders appealed to the Court of Session.

*Cases referred to:*
*Austrian Lloyd Steamship Company v Gresham Life Assurance Society Ltd* [1903] 1 KB 249
*Berisford S & W plc v New Hampshire Insurance Co* [1990] 2 QB 631
*Blaikie v Aberdeen Railway Company* (1852) 1 Paters 119
*Bremen, The v Zapata Off-shore Co* (1972) 407 US 1
*British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368
*British Steel Corporation v Allivane International Ltd* 1989 SLT (Sh Ct) 57
*Calder v Mackay* 1860 22 D 743
*Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd* unreported 11 July 1989
*Compagnie Commercial Andre S A v Artibell Shipping Co Ltd* 1999 SLT 1051
*Continental Bank N A v Aeakos Compania Naviera S A* [1994] 1 WLR 588
*Duke of Buccleuch v Inland Revenue Commissioners* [1967] AC 506
*Eldersie Steamship Co Ltd v Burrell & Son* (1895) 22 R 389
*Estasis Salotti v RUWA* [1976] ECR 1831
*Evans Marshall & Co Ltd v Bertola S A* [1973] 1 WLR 349
*Hoerter v Hanover* (1893) 10 TLR 22 and 103
*Jenic Properties Ltd v Andy Thornton Architectural Antiques* 1992 SLT (Sh Ct) 5
*Kurz v Stella Musical GmbH* [1992] Ch 196
*Lamb v Lord Advocate* 1976 SC 110
*McCarthy v Abowall (Trading) Ltd* 1992 SLT (Sh Ct) 65
*McConnell & Reid v Smith* 1911 SC 635
*McCutcheon v David McBrayne Ltd* 1964 SC (HL) 28
*Meeth v Glacetal* [1978] ECR 2133
*Morrison v Panic Link Ltd* 1993 SC 631
*Racecourse Betting Control Board v Secretary for Air* [1944] Ch 114
*Scotmotors (Plant Hire) Ltd v Dundee Petrosea Ltd* 1980 SC 351
*Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670
*Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588

*Textbooks referred to:*
Cheshire & North, *Private International Law* (13th ed) pp 239–240
Dicey & Morris, *The Conflict of Laws* (13th ed) para 12–107

The cause called before an Extra Division, comprising Lord Marnoch, Lady Cosgrove and Lord Reed for a hearing on the summar roll.

At advising, on 12 June 2002, the opinion of the court was delivered by Lord Reed.

OPINION OF THE COURT — [1] The pursuer is a bus operator. According to his pleadings, a number of his buses were destroyed in a fire in January 2000. He brought the present action in the sheriff court at Paisley against the defenders, seeking indemnification for his losses under a policy of insurance. The defenders pleaded *in limine* that the court had no jurisdiction, on the basis that the policy contained a clause conferring exclusive jurisdiction on the courts of England. That plea was repelled by the sheriff, and the present appeal has been brought against his decision.

[2] The pursuer's case proceeds upon the basis that the sheriff court has

A    jurisdiction under art 5 of sched 4 to the Civil Jurisdiction and Judgments Act
     1982. Before considering that provision in particular, however, it may be
     helpful to place it in the context of the overall purpose and scheme of the 1982
     Act.

     [3] The 1982 Act radically altered the law of the United Kingdom, and that of
     Scotland in particular, in relation to the jurisdiction of courts and tribunals and
B    the recognition and enforcement of external judgments. Its primary purpose
     was to give the force of law within the United Kingdom to the Brussels
     Convention of 1968 and related instruments. The 1968 Convention in turn had
     as its primary object to facilitate the reciprocal recognition and enforcement of
     judgments within the European Community. That objective was to be achieved
     *inter alia* by harmonising the rules of jurisdiction within the Community. The
     1982 Act however went further than giving effect to the 1968 Convention. In
C    particular, a potential difficulty arose from the fact that the Convention
     assigned jurisdiction to the courts of contracting states, one of which was the
     United Kingdom: the Convention did not (in general) address the issue
     whether the courts of England and Wales, Scotland or Northern Ireland were
     to have jurisdiction. To solve this problem, the 1982 Act adopted a modified
     version of the scheme of jurisdiction set out in the 1968 Convention as the basis
D    of a new set of rules for the allocation of jurisdiction among the courts of the
     different parts of the United Kingdom, in cases where the courts of the United
     Kingdom were entitled to assume jurisdiction under the 1968 Convention.
     Further, in relation to Scotland, the 1982 Act introduced a new set of rules of
     jurisdiction applicable when the rules of the 1968 Convention, or those of the
     scheme for the allocation of jurisdiction within the United Kingdom, did not
E    fall to be applied. This new set of rules was itself largely based upon the rules
     of the 1968 Convention.

     [4] At the risk of over-simplification, the scheme of the 1982 Act can be
     summarised as follows. Part I of the Act gives effect to the 1968 Convention,
     which is set out in sched 1. Part II of the Act gives effect to the intra-United
     Kingdom scheme, the rules of which are set out in sched 4. Part III of the Act
F    gives effect to the new Scottish rules of jurisdiction, which are set out in sched
     8. It is Part II of the Act, and the scheme contained in sched 4, which are
     relevant to the present case. Because these proceedings were begun before 1
     March 2002 they are unaffected by the Civil Jurisdiction and Judgments Order
     2001, by virtue of the transitional provisions contained in art 6.

     [5] Schedule 4 is given effect by sec 16 of the Act, which provides *inter alia*
G    that sched 4 is to have effect for determining, for each part of the United
     Kingdom, whether the courts of law of that part, or any particular court of law
     in that part, have or has jurisdiction in proceedings falling within the scope of
     the section. The section applies to proceedings where the subject-matter falls
     within the scope of the 1968 Convention and the defendant or defender is
     domiciled in the United Kingdom or the proceedings are of a kind mentioned
H    in art 16 of the 1968 Convention. In the present case, the subject-matter falls
     within the scope of the 1968 Convention and the defender is domiciled in the
     United Kingdom (in England). Schedule 4 is therefore applicable. It contains a
     modified version of Title II of the 1968 Convention.

     [6] In sched 4, the general principle laid down by art 2 is that, subject to the
     provisions of Title II, persons domiciled in a part of the United Kingdom are to
I    be sued in the courts of that part. Subject to the provisions of Title II, the

defenders, being domiciled in England, are therefore to be sued in the English courts. Article 3 permits persons domiciled in a part of the United Kingdom to be sued in the courts of another part of the United Kingdom, but only by virtue of the rules set out in secs 2, 4, 5 and 6 of Title II. Section 2 is headed 'Special jurisdiction' and contains *inter alia* art 5, on which the pursuer relies in the present case. Article 5 begins: 'A person domiciled in a **part of the United Kingdom** may, in another **part of the United Kingdom**, be sued: (1) in matters relating to a contract, in the courts for the place of performance of the obligation in question...'. (the words printed in heavy type are those resulting from modifications of Title II of the 1968 Convention by way of addition or substitution: sec 16(2)(b)).The pursuer's case that art 5 confers jurisdiction over the present proceedings on the sheriff court at Paisley proceeds on the basis that the place of performance of the defenders' obligation to indemnify him at his home address, which is within the sheriffdom of North Strathclyde.

[7] Schedule 4 also contains provisions concerned with exclusive jurisdiction and with prorogation of jurisdiction. Section 5 is headed 'Exclusive jurisdiction', and contains art 16. That article provides that, in certain specified proceedings, particular courts 'shall have exclusive jurisdiction, regardless of domicile'. An example is proceedings which have as their object the dissolution of a company: the courts of the part of the United Kingdom in which the company has its seat have exclusive jurisdiction. Section 6 is headed 'Prorogation of jurisdiction', and contains *inter alia* art 17. The first paragraph of that article is in the following terms: 'If the parties...have agreed that a court or the courts of a part of the United Kingdom are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, and, apart from this Schedule, the agreement would be effective to confer jurisdiction under the law of that part, that court or those courts shall have... jurisdiction...'. (the dots indicate modifications of Title II of the 1968 Convention by way of omission: sec 16(2)(a)).

[8] Article 17 of sched 4 has been considered on a number of occasions in the sheriff court, and conflicting opinions have been expressed as to its effect. One view is that where sched 4 is applicable, art 17 has the effect that a jurisdiction clause in a contract cannot create an exclusive jurisdiction, even if the clause purports to do so: any jurisdiction referred to in the clause must be concurrent with that of any other court which would have jurisdiction apart from the clause. Before this court, parties were agreed that this approach was mistaken. In view of the divergence of opinions expressed in the reported cases, however, we asked to be addressed on the point, with a view to offering guidance to lower courts. As this issue is logically anterior to the question of interpretation of the particular clause with which the present case is concerned, we shall begin by considering the effect of art 17.

[9] Article 17 of sched 4 does not expressly stipulate that the jurisdiction to which it refers is necessarily non-exclusive: it merely provides that the court whose jurisdiction has been prorogated 'shall have...jurisdiction'. The argument that it prevents an exclusive jurisdiction from being created by agreement depends upon a comparison of art 17 of sched 4 with other provisions. In particular, art 17 of sched 4 is a modified version of art 17 of the 1968 Convention, which (as we have mentioned) appears in sched 1 to the Act. In the 1968 Convention, art 17 begins as follows:'1. If the parties, one or more of whom is domiciled in a Contracting State, have agreed that a court or the

A   courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.' The modified version of art 17 which appears in sched 4 omits the word 'exclusive'.

[10] The effect of the word 'exclusive' in art 17 of the 1968 Convention is a less straightforward question than it might seem at first sight. It appears,
B   from a series of decisions of the European Court of Justice, that jurisdiction under art 17 is 'exclusive' in the sense that it operates to the exclusion of any jurisdiction which might otherwise arise under arts 2 to 6 of the 1968 Convention (see eg *Estasis Salotti v RUWA; Meeth v Glacetal*). Differing views have been expressed on the effect, under art 17, of a non-exclusive jurisdiction clause, ie a clause providing for jurisdiction to be possessed by a particular court in addition to
C   any other jurisdiction which might otherwise exist. One view is that such a clause comes within art 17 and can be given effect in accordance with its terms (see eg *Kurz v Stella Musical GmbH*; Dicey & Morris, *The Conflict of Laws*, 13th ed, para 12-107). Another view is that such a clause falls outside the scope of art 17, and is therefore ineffective in circumstances where jurisdiction is governed by the 1968 Convention (see eg Cheshire & North, *Private*
D   *International Law*, 13th ed, pp 239-240). We were not addressed on this controversy, and it is unnecessary for us to express any opinion upon it.

[11] The difference in terminology between art 17 of sched 4 and art 17 of the 1968 Convention itself is clearly intentional. Parliament must have intended the effect of the modified version of art 17, in sched 4, to be different from the effect which it considered the original art 17 to have, or at least potentially to have. That conclusion is fortified by a comparison between sched 4 and sched
E   8, which concerns jurisdiction in Scotland (subject *inter alia* to sched 4: see sec 20(1)) and enacts another modified version of the 1968 Convention. Rule 5(1) of sched 8, which is based on art 17 of the 1968 Convention, provides: 'If the parties have agreed that a court is to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court shall have exclusive jurisdiction.'

F   [12] In *British Steel Corporation v Allivane International Ltd*, the sheriff proceeded on the basis that the original art 17, by reason of the word 'exclusive', prevented jurisdiction from arising under the earlier provisions of the Convention in a case where there was a jurisdiction agreement; and that Parliament, by omitting the word 'exclusive' from the modified version in sched 4, must therefore have intended that an agreement on the jurisdiction of
G   the courts of one part of the United Kingdom (whether expressed to be exclusive or not) should not prevent proceedings from being brought in any other part of the United Kingdom whose courts had jurisdiction under the earlier provisions of sched 4. The sheriff put the matter in this way (at p 59): 'Where the question involves the allocation of jurisdiction within the United Kingdom, the agreed prorogation of the courts of one constituent part is not
H   exclusive. This is so even where the agreement expressly provides to the contrary. The mandatory character of articles 2 and 3 of schedule 4 overrides contractual stipulations to a different effect...In my opinion Parliament deliberately declined to invest the prorogated jurisdiction described in the first paragraph of article 17 of Schedule 4 to the Act with an exclusive complexion. That must mean that that jurisdiction is concurrent with the domiciliary
I   jurisdiction prescribed in article 2.' The approach taken in *British Steel* was not

A

followed in *Jenic Properties Ltd v Andy Thornton Architectural Antiques* or in *McCarthy v Abowall (Trading) Ltd*, but those decisions contain no detailed analysis of the issues, and it is possible, as the editors of Dicey & Morris observe (at p 440), that the reasoning of the *British Steel* decision may not have been understood.

B

[13] We were not addressed on any materials extrinsic to the 1982 Act which might assist in determining what Parliament's intention may have been when it enacted art 17 of sched 4, and in particular in determining why the word 'exclusive' was omitted. The issue is not made any easier by the fact that the effect of art 17 of the 1968 Convention, and in particular its application to non-exclusive jurisdiction agreements, is itself a matter of difficulty and controversy. We are, however, aware that the application of art 17 of the Convention to non-exclusive jurisdiction agreements has long been a matter of uncertainty. One possible view, at the time the 1982 Act was enacted, was that art 17 had no application to such agreements, because of the presence in art 17 of the term 'exclusive', and that such agreements were therefore ineffective in circumstances where jurisdiction was governed by art 17. The alternative view — that such an agreement could be given effect under art 17 in accordance with its terms — did not receive any judicial support in the United Kingdom, so far as we are aware, until the decision in *Kurz* in 1991, long after the enactment of the 1982 Act. In these circumstances, it would be understandable if Parliament had omitted the word 'exclusive' from art 17 of sched 4 so as to ensure that non-exclusive jurisdiction agreements should continue to have effect in the allocation of jurisdiction as between the courts of the United Kingdom. In other words, by omitting the word 'exclusive', Parliament may have intended to imply that the jurisdiction conferred by art 17 of sched 4 need not be exclusive, and therefore that that provision extended to non-exclusive as well as to exclusive jurisdiction agreements. If that were Parliament's intention, then it would be incorrect to infer, as the sheriff did in *British Steel*, that Parliament must have intended that the jurisdiction conferred by art 17 must necessarily be non-exclusive of jurisdiction arising under the earlier articles.

C

D

E

F

[14] The alternative view is that Parliament omitted 'exclusive' from art 17 of sched 4 because it did not intend that if it should be possible for parties, by agreement, to confer jurisdiction on the courts of one part of the United Kingdom to the exclusion of jurisdiction which would otherwise be possessed by the courts of another part of the United Kingdom. We are not persuaded that this is what Parliament intended. It would mean, in the first place, that an agreement to confer exclusive jurisdiction would have to be treated as if it were an agreement to confer non-exclusive jurisdiction, contrary to the intention of the parties (cf the observation of the European Court of Justice in *Meeth v Glacetal* at p 2141, that 'article 17 is based on a recognition of the independent will of the parties to a contract in deciding which courts are to have jurisdiction to settle disputes falling within the scope of the Convention'). This rule would in addition apply only to agreements governed by sched 4: a clause conferring exclusive jurisdiction on the Scottish courts, for example, would be effective if the case fell within sched 1 or sched 8, but not if it fell within sched 4. It is not apparent to us what rationale there might be for such an approach. Finally, we note that sec 49 of the 1982 Act (as amended) provides: 'Nothing in this Act shall prevent any court in the United Kingdom from staying, sisting, striking out or dismissing any proceedings before it, on the ground of *forum non*

G

H

I

644                    McGowan v Summit at Lloyds                    2002

A  *conveniens* or otherwise, where to do so is not inconsistent with the 1968
Convention or, as the case may be, the Lugano Convention.' In a case falling
within the scope of sched 4, it would not be inconsistent with the 1968
Convention for the Scottish courts to dismiss an action on the ground that the
parties had agreed that the English courts should have exclusive jurisdiction.
That being so, and given the terms of sec 49, it appears to us that art 17 of
B  sched 4 should not be interpreted as requiring the Scottish courts to accept
jurisdiction in the face of an agreement conferring exclusive jurisdiction on the
English courts.
[15] For these reasons, we conclude that the question whether the jurisdiction
arising under a jurisdiction agreement is exclusive or non-exclusive depends
upon the law governing the agreement (specifically, the law governing the
C  relevant clause), and not upon art 17 of sched 4.
[16] In the present case, the contract provides that 'this Document shall be
governed by the laws of England'. Given such a provision, Scottish private
international law regards English law as the law governing the effect of the
jurisdiction condition. The Scottish courts cannot take judicial notice of foreign
law; and they cannot therefore apply any foreign system of law (including
D  English law) unless it has been established as a fact. In the absence of any proof
of foreign law, the Scottish courts proceed on the basis that foreign law
coincides with Scots law. In the present case, there is no suggestion in the
pleadings that the relevant English law differs in any way from Scots law, and
no attempt has been made before us to establish English law as a fact. In these
circumstances, this court can only proceed on the basis that the relevant
English law is the same as Scots law.
E  [17] The Scottish courts are accustomed to have regard to decisions of the
English courts for their persuasive value; and reference to a number of English
decisions was made during the discussion before us. We were, however,
invited by counsel for the pursuer to disregard the English decisions, on the
basis that English law in respect of the construction of jurisdiction clauses is
different from Scots law. This might be thought to be a paradoxical submission:
F  the court is directed by Scottish private international law to apply English law
in construing the contract, but it has to disregard English law if it differs from
Scots law. As this point gave rise to some confusion in the discussion before us,
we should perhaps make it clear that there is no paradox. This court is not
qualified to express any opinion as to English law, for the reasons already
explained, unless it has been established by competent means as a fact. The
G  court cannot draw any conclusions, merely from the citation of English
authorities in argument, as to what English law may be. To the extent that an
English decision appears to proceed upon principles which are not those of
Scots law, then that is something to be taken into account in assessing any
persuasive authority it might possess in enabling this court to determine the
position under Scots law.
H  [18] Approaching the question of construction of the jurisdiction clause as
one of Scots law, counsel made differing submissions as to the relevant
principles. Counsel for the defenders submitted that a jurisdiction clause fell to
be construed in the same way as any other clause in a contract. Counsel for the
pursuer, on the other hand, submitted that there was a special rule in Scots law
governing the construction of jurisdiction clauses. According to this rule, there
I  was a presumption in law against the exclusion of the jurisdiction of the

Scottish courts, which could be overcome only by an express term or, possibly, by necessary implication. The authority for this special rule was said to be the opinion of the Second Division, delivered by Lord Justice-Clerk Wheatley, in *Scotmotors (Plant Hire) Ltd v Dundee Petrosea Ltd.*

[19] The parties to the *Scotmotors* case were two Scottish companies, operating from the docks in Dundee. They entered into an agreement, to be performed wholly in Scotland, which essentially concerned the hire of cranes for use by the pursuers in the Dundee docks. The pursuers subsequently brought proceedings against the defenders in Dundee sheriff court on the ground that the cranes were defective. The defenders then pled that the Scottish courts had no jurisdiction, on the basis that the contract included a clause in the following terms: 'Proper Law. This agreement shall be governed and construed in accordance with the Laws of England, and the parties hereto submit to the jurisdiction of the English courts.' The sheriff sustained the plea to jurisdiction, but his decision was reversed by the Second Division.

[20] It is not altogether easy to discern the *ratio decidendi* of the decision of the Inner House; and it is necessary to analyse the opinion of the Lord Justice-Clerk in some detail. After narrating the background circumstances, the Lord Justice-Clerk continued: 'This point turns on whether the condition headed 'Proper Law' ousts the jurisdiction of the Scottish Courts. It has been stated, albeit in relation to arbitration cases, that the jurisdiction of the Courts cannot be ousted unless the provision therefor has been "expressly specified" or "distinctly expressed" cf Lord Justice-Clerk Inglis in *Calder v Mackay* at p 744 and Lord Dundas in *McConnell & Reid v Smith* at p 638. We see no reason for a different standard being applied to the agreement here.'

[21] A number of observations can be made about this paragraph. First, in our opinion it is not accurate to say that an exclusive jurisdiction clause 'ousts' the jurisdiction of the courts. Courts possess jurisdiction by the operation of law. One of the powers which jurisdiction confers is the power to decide whether or not to exercise that jurisdiction in the sense of allowing a case to proceed. That power is recognised, for example, by sec 49 of the 1982 Act. A jurisdiction clause is relevant to the exercise of that power (and may, in circumstances governed by article 17 of the 1968 Convention, be decisive), but it cannot and does not oust the jurisdiction from which that power is derived. In *Elderslie Steamship Co Ltd v Burrell & Son,* for example, the court declined to exercise jurisdiction in circumstances where one party to a contract had exercised an option to decide that proceedings must be brought in England, but the court regarded itself as continuing to possess jurisdiction (see eg per Lord Young at p 391 and per Lord Rutherfurd Clark at p 394). As Burger CJ observed, delivering the opinion of the majority of the United States Supreme Court in *The Bremen v Zapata Off-shore Co* at p 12: 'The argument that such clauses are improper because they tend to "oust" a court of jurisdiction is hardly more than a vestigial legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals. No one seriously contends in this case that the forum-selection clause "ousted" the District Court of jurisdiction over Zapata's action. The threshold question is whether that court should have exercised its jurisdiction to do more

A    than give effect to the legitimate expectations of the parties, manifested in their *freely negotiated agreement, by specifically enforcing the forum clause."*

[22] Secondly, the analogy drawn by the Lord Justice-Clerk between an agreement on jurisdiction and an arbitration clause appears to us to be untenable, at least at the present day. The analogy may have been derived from the English authorities which were cited to the court, and in particular the case

B    of *Austrian Lloyd Steamship Company v Gresham Life Assurance Society Ltd.* At the time of that decision (as is evident from the report), the power of the English courts to stay proceedings which were in breach of a foreign jurisdiction agreement was thought to be derived from the discretion conferred on them by arbitration legislation. In other words, the English courts at that time treated agreements on jurisdiction as analogous to arbitration clauses so as to be able

C    to give effect to them. Later English decisions, which were not cited to the court in *Scotmotors*, departed from that approach. In *Racecourse Betting Control Board v Secretary for Air*, for example, MacKinnon LJ said (at p 126): 'It is, I think, rather unfortunate that the power and duty of the court to stay the action was said to be under s. 4 of the Arbitration Act 1889. In truth, that power and duty arose under a wider general principle, namely, that the court makes people abide by their contracts, and, therefore, will restrain a plaintiff from bringing an action

D    which he is doing in breach of his agreement with the defendant that any dispute between them shall be otherwise determined... it would have been, I think, more logical to say, not that the plaintiff could be restrained under s. 4 of the Act, but that he could be restrained under the principle of which that section is a particular example.' It appears now to be settled that the English courts' jurisdiction to grant a stay is inherent; and a submission to a foreign

E    court is no longer treated as equivalent to a submission to arbitration (see eg *Evans Marshall & Co Ltd v Bertola SA* at p 360 per Kerr J, as he then was). Any support formerly derived from English law for the proposition that an agreement on jurisdiction and an arbitration clause fell to be treated similarly thus no longer exists. On analysis, there are, of course, significant differences. In particular, under the latter, the parties waive their right to have their rights

F    and obligations determined by a court. Under the former, they merely agree to restrict that right to a particular court. That is a difference which, albeit thought unimportant in 1980, can no longer be brushed aside. We say that because the treatment of foreign courts as equivalent to arbitrations, rather than as equivalent to Scottish courts, is difficult to reconcile with the ratification and implementation of international conventions on jurisdiction and the mutual

G    recognition of judgments. Indeed, now that the 1968 Convention has been implemented by the 1982 Act, it seems to us that that approach can simply no longer be treated as a principle of Scottish private international law.

[23] For the foregoing reasons it is, we think, arguable that the decision in *Scotmotors* need no longer be regarded as authoritative or binding on this court. However, it is unnecessary to go that length because on close analysis we do not

H    consider that, read overall, the Lord Justice-Clerk's opinion involves the application of any distinct principle or rule of law to the construction of clauses such as that with which we are here concerned. Before embarking on that analysis, it is, however, perhaps worth noting that even the cases concerning arbitration clauses to which the Lord Justice-Clerk referred are far from conclusive.

[24] *Calder v Mackay* was an application to the supervisory jurisdiction of the

I    court, for judicial review (as it would now be called) of a decree-arbitral which

was said to be *ultra vires* in so far as it not only valued work carried out under    A
a building contract but in addition ordered the employer to pay the sum at
which the work was valued. The issue before the court in that case was
whether or not the *vires* of the decision-maker extended to making an order for
payment. The passage in the opinion of Lord Justice-Clerk Inglis, to which
Lord Justice-Clerk Wheatley referred, is in the following terms: 'Now, one    B
ground on which I hold this decree bad in law is, that it is *ultra fines*
*compromissi* - that is to say, that it is an unlawful attempt to extend the subject-
matter of the submission. That subject-matter, according to my view, is a
valuation of work, and nothing else; and whenever the arbiters went beyond
that, they assumed an office not conferred on them. I should have thought this
clear in principle, but we have lately had abundant opportunities of seeing
practical illustrations of this principle, as in the case of *Blaikie v Aberdeen*    C
*Railway Company*, in which there were as general words of reference as were
ever put in a submission. That case was appealed, and the judgment was
sustained in so far as it held that the construction of the contract was within the
power of the arbiters. But the House of Lords were of opinion that the award of
the arbiter was bad, in so far as it assessed damages, and for this reason,
because an arbiter cannot be allowed to oust the jurisdiction of the courts of
law, nor can parties be considered as intending to do so, except to the extent    D
which they have expressly specified.'

[25] The phrase 'expressly specified' thus comes from Lord Justice-Clerk
Inglis's gloss on the decision of the House of Lords in *Blaikie v Aberdeen Railway*
*Company*. When one reads the speeches of their Lordships in the latter case,
however, it seems clear that only ordinary principles of construction were
employed. Lord St Leonards LC said this (at p 121): 'Now, my Lords, that [viz    E
the construction of the arbiter's powers] is a mere question of construction, and
not depending upon any rule of law...My noble and learned friend and myself
have both agreed that the arbiter has exceeded his power as regards the
assessing of the damages, and therefore that part of the interlocutor which
affirms his proceeding in that respect, will be reversed...' The other speech was
delivered by Lord Brougham, who said (at pp 121-122): 'My Lords, on the    F
other point, namely , with respect to the assessment of damages, we are
entirely agreed...I entirely agree with my noble and learned friend, that our
course here would not be difficult if it was a mere question of law; but we
consider this to be a question on the construction of an instrument, which is to
a certain extent a question of law, in as much as these questions are for the
court, not for the jury; nevertheless, it is in the nature of a question of fact so    G
far, that it is for the purpose of discovering what the intentions of the parties
are, that you undertake the examination of that instrument; and, therefore, on
that ground it is that we have come to this opinion.' In so far as it goes,
therefore, the decision of the House of Lords seems to give little, if any,
support to the view that an arbitration clause should be construed according to
a different principle from any other contractual provision.    H

[26] The other authority cited by Lord Justice-Clerk Wheatley, *McConnell &*
*Reid v Smith*, was a 'ticket' case in the same line of authority as the better
known case of *McCutcheon v David McBrayne Ltd*. It was concerned with the
question whether an arbitration clause included in certain standard conditions,
to which a general reference was made in sale notes, had been sufficiently
brought to the notice of the purchaser so as to be incorporated into the contract.    I

A   It was in that rather special context that Lord Dundas observed 'It is an
important matter, and one that must be distinctly expressed, that a man should
abandon his normal remedies at law.' The other members of the court, Lord
Justice-Clerk MacDonald and Lord Ardwall, found it unnecessary to employ
similar language, and it is by no means clear that even Lord Dundas intended
his remarks to be applicable generally.

B   [27] The authorities cited by Lord Justice-Clerk Wheatley thus provide, in our
opinion, a less than firm foundation for the proposition that special rules of
construction apply even to arbitration clauses. That of course would not matter if
the *ratio* of *Scotmotors* was otherwise clear that such rules should be applied to
jurisdiction clauses. But, as stated above, we do not believe that to be the case.

[28] Read in isolation, the paragraph from *Scotmotors* which we have quoted
C   might be interpreted as setting up a rule of law that a jurisdiction clause will
not exclude the jurisdiction of the Scottish courts unless such an exclusion has
been 'expressly specified' or 'distinctly expressed'. The remainder of the
opinion, however, does not support that interpretation. After the paragraph
already quoted, Lord Justice-Clerk Wheatley continued: 'In construing the
meaning and effect of the condition, we start by noting that both parties are
companies with their registered office in Scotland and the contracts had to be
D   carried out in Scotland. In that situation the normal forum for an action for
breach of contract would be a Scottish Court. The condition, however,
provided that the agreement would be governed and construed in accordance
with the laws of England. That in itself provides no obstacle to a Scottish Court
entertaining such an action, since our procedure provides for English law
being proved as a matter of fact in Scottish Courts. The condition, however,
E   goes on to provide that "the parties hereto submit to the jurisdiction of the
English Courts." The respondents argued that this, read in conjunction with
the earlier part of the condition, clearly indicated that the parties were agreeing
that all disputes arising out of the contracts would come within the exclusive
jurisdiction of the English Courts. Reliance was placed on the case of *Austrian
Lloyd Steamship Company v Gresham Life Assurance Society* in support of this
F   argument. In that case the condition was in these terms: 'For all disputes which
may arise out of the contract of insurance, all the parties interested expressly
agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction
in such matters.' The facts were that a life assurance policy was effected by a
foreigner with an English insurance company which had an office in Budapest.
The policy was in French language and provided that the premiums and insurance
G   money should be payable at Budapest. The Court of Appeal,
overturning the decision of a single judge, ordered a stay of proceedings, on
the basis that the condition attached to the contract of insurance, properly
construed, meant that the parties had agreed that all disputes arising under the
contract should be determined by the Court in Budapest. Romer LJ took the
view that this is what the condition provided for, and rejected the contention
H   that it simply meant that the parties would not take any objection to the
jurisdiction of the Budapest Court. Matthew LJ said that the condition meant
that both parties were bound to refer such a dispute to that court. We note that
there were features in that case which distinguish it from the instant case. The
person effecting the policy was a foreigner, the insurance company, although
an English one, had an office in Budapest, and the premiums and insurance
I   money were to be paid in Budapest, whereas in this case the parties were both

companies incorporated and operating in Scotland, the contracts were to be    A
carried out in Scotland, and no reference was made to disputes in the
condition. The respondents maintained, however, that this last point had no
significance since a proper reading of the condition necessarily implied that it
related to all disputes arising out of the contract.'

[29] The first point we note about this paragraph is that it is inconsistent with    B
the view that the court had, in the preceding paragraph, laid down a rule of law
that an exclusive jurisdiction could only be conferred 'expressly'. The condition
with which the court was concerned and which has been quoted above did not,
in terms, confer exclusive jurisdiction. Nonetheless, the court embarked upon the
task of 'construing the meaning and effect of the condition'; and they began that
task by examining the circumstances surrounding the contract – what Lord
Wilberforce described in other cases as the 'matrix of fact'.    C

[30] The second point to note is the emphasis laid by the court upon the fact
that the 'normal forum' was the Scottish courts. In this connection, it is again
important to bear in mind that this case pre-dated the 1982 Act. At that time
jurisdiction, under Scots law, was governed by the common law. In an
ordinary action *in personam*, such as an action of damages for breach of
contract, the court's jurisdiction generally depended on the defender's being
present or resident in Scotland, or (in the case of a company) registered in    D
Scotland. On the facts of *Scotmotors*, all these grounds of jurisdiction pointed to
Scotland: the facts of the case had no connection whatsoever with England,
apart from the reference to England in the jurisdiction condition.

[31] The third point we note is that the court distinguished the decision of the
Court of Appeal in the *Austrian Lloyd* case on its facts. The *Austrian Lloyd* case
is discussed below, but it is sufficient at this point to note that the Court of    E
Appeal did not apply any special rule of construction to the jurisdiction
condition with which it was concerned.

[32] Returning to *Scotmotors*, the final relevant paragraph of the Lord Justice-
Clerk's opinion is in the following terms: 'As we have already noted, the normal
forum for an action arising out of these contracts was the Scottish Courts which
could deal with the law agreed to in the condition. In considering whether that    F
jurisdiction has been ousted on the ground that the condition meant that the
parties had agreed that all disputes arising out of the contract had not only to be
governed and construed by English law but that the English Courts would have
exclusive jurisdiction to entertain such disputes, we have to determine whether
the wording of the condition was so expressly specified or distinctly expressed
as to produce that effect. On the face of it, the wording does not do so. In our    G
view the proper meaning and effect of the second part of the condition is that the
parties agree to submit to the jurisdiction of the English Courts if an action is
raised there. It does not provide that the parties agree that all disputes must be
submitted to the jurisdiction of the English Courts. Nor does it mean that the
parties agree to abandon their right to resort to the otherwise obvious
jurisdiction of Scottish Courts. Had it been intended to give exclusive jurisdiction
to the English Courts, that could easily have been clearly specified. We are not    H
dissuaded from that view by the opinions expressed by the judges in *Austrian
Lloyd Steamship Company*, because the circumstances there were clearly different,
and these different circumstances seem to have weighed with the judges in
reaching their decision. The view which we have taken accords with the view
expressed by Baron Pollock in *Hoerter* at p. 23.'    I

A
[33] In this paragraph the Lord Justice-Clerk again emphasised the status of the Scottish courts as the 'normal forum' or 'obvious jurisdiction' to which all the facts of the case pointed. The decision in *Austrian Lloyd* was again distinguished on its facts rather than because of any divergence in principle; and support was found in the earlier English decision in the *Hoerter* case.

B
[34] In our opinion, the *Scotmotors* decision does not vouch the proposition that a clause conferring an exclusive jurisdiction must do so in express terms. Nor does it support an approach which confines the construction of a jurisdiction clause to the precise words used: otherwise, the court need not have examined the surrounding circumstances. Moreover, the references to the earlier English cases, and the distinguishing of *Austrian Lloyd* on its facts, are inimical to the suggestion that there was a special rule of construction in Scots law which applied generally to jurisdiction clauses. Instead the emphasis placed by the

C
court upon the factors connecting the case to Scotland as the 'normal forum' suggests to us that all the court was really doing was to emphasise that, where Scotland was the 'normal forum', its jurisdiction would not be held to be excluded unless that was the clear meaning of the words used. If that is indeed the *ratio* of the case, however, then it need not be regarded as laying down any special rule of law for the construction of jurisdiction agreements, but should be

D
understood simply as a decision on the facts of the case as to how the meaning of the contract fell properly to be ascertained.

[35] In support of his submission as to the rule of law supposedly laid down in *Scotmotors*, counsel for the pursuer also referred to the decision of the Extra Division in *Morrison v Panic Link Ltd*. This case concerned a franchise agreement relating to courier services, entered into between the franchiser, an English

E
company operating from Leicestershire, and the franchisee, an individual living in Aberdeen. The franchisee began proceedings in the Court of Session, seeking damages for breach of contract. The action was brought after the 1982 Act had come into force, although no reference was made to this by the Lord Ordinary or by the Extra Division. It is apparent from the Session Papers that jurisdiction was based on art 5 of sched 4, ie it was contended that Scotland was the place of performance of the obligation in question. The franchiser pled that the court had

F
no jurisdiction, on the basis of a clause in the franchise agreement which provided: '9.25 Proper law and jurisdiction 9.25.1 This agreement shall be governed by English law in every particular including formation and interpretation and shall be decreed to have been made in England. 9.25.2 Any proceedings arising out of or in connection with this agreement may be brought

G
in any court of competent jurisdiction in England. 9.25.3 The submission by the parties to such jurisdiction shall not limit the right of the franchiser to commence any proceedings arising out of this agreement in any other jurisdiction it may consider appropriate.' That plea was repelled by the Lord Ordinary, and a reclaiming motion against that interlocutor was refused.

H
[36] Lord Murray's opinion, in giving the reasoning of the court, made no reference to any authority but focused on the terms of clause 9.25.2, and in particular the use of the word 'may': 'As counsel himself recognised, the use of the word "may" in cl 2 of sec 9.25 of the contract, though not fatal to his argument, does mean that the context in which it is used must indicate clearly and unambiguously that it is intended to convey an exclusive obligation. While we accept that there is a necessary interrelationship between cll 2 and 3, we are

I
not persuaded that cl. 3 is necessary in order to interpret the terms of cl 2 even

although cl 2 is necessary for the interpretation of cl 3.' It appears from that
passage that counsel made a concession (not otherwise recorded in the
opinion), which may explain the absence of any reference to authority. In any
event, in so far as the decision proceeded on a concession, its significance, if
any, is greatly reduced.

[37] The only other Scottish case to which we were referred in this context
was *Compagnie Commercial Andre SA v Artibell Shipping Co Ltd* in which the
Lord Ordinary referred (at p 1063) to 'the need for clarity and distinct
expression if jurisdiction which the Scottish courts would otherwise have to is to
be excluded by an agreement to prorogate the jurisdiction of a foreign court
(*Morrison v Panic Link Ltd* at p 234J-L; *Scotmotors* at p 354)'. The citation from
*Morrison* in fact refers to counsel's argument, but in any event we do not regard
this decision as innovating in any way upon *Scotmotors*.

[38] We were also referred to a number of English decisions concerned with
the construction of jurisdiction clauses, some of which have already been
mentioned. Before embarking upon a discussion of these cases, it is relevant to
note that the English cases have considered the effect of jurisdiction clauses in
a number of different contexts. First, the issue has come before the English
courts in the context of applications for leave to serve defendants out of the
jurisdiction. That is a procedure under which the English courts exercise a
more extensive jurisdiction than Scottish courts have traditionally claimed,
exercising jurisdiction over defendants who are neither present nor ordinarily
resident in England. *Hoerter*, for example, was a case of that kind; and its facts
were far removed from those in which, to use Lord Wheatley's expression,
England might be regarded from a Scottish perspective as the 'normal forum'.
That context had no Scottish equivalent prior to the 1982 Act. Secondly, the
issue has arisen in the context of applications for staying actions brought in
England against defendants served there. Thirdly, the issue has arisen in the
context of applications for injunctions to prevent proceedings from being taken
in other jurisdictions.

[39] We begin by considering the *Hoerter* case. The first point we note is that
the Lord Justice-Clerk referred to the decision of the Divisional Court, reported
at (1893) 10 TLR 22. That decision was however appealed to the Court of
Appeal, whose decision is reported at p 103 of the same volume. The case
concerned a claim by an English company for commission on sales, principally
in England, of the goods of a German company which had no place of business
in England. The question was whether the plaintiffs should be allowed to
serve their writ out of the jurisdiction. Under English law (unlike Scots
common law), such service was normally permitted where the claim arose out
of a contract which was due to be performed in England. In opposing leave,
the defendants relied on a clause in these terms: 'In case of disputes, the firm of
Mumm [the plaintiffs] submit to the laws in force in Hanover, and jurisdiction.'
In the Divisional Court, the latter part of that clause was interpreted as
meaning that the parties would not object to the jurisdiction of Hanover, rather
than as conferring an exclusive jurisdiction on Hanover. Pollock B observed
that if it had been intended to give the court in Hanover exclusive jurisdiction,
it might have been so provided in express terms. That observation appears to
have attracted the court's attention in *Scotmotors*. The decision was affirmed by
the Court of Appeal, but on different grounds, and without any view being
expressed as to the construction of the clause. Lord Esher MR is reported as

A   saying (at p. 104): 'The clause was in a German contract, and it must be
construed according to German law. Was the judge at that stage of the
proceedings to try the question whether that was its effect? Was he to examine
the German law and hear evidence on the point? That was not the time to
discuss the contract...It was impossible to say that the clause was clear,
because two judges in the Divisional Court differed from [the judge in
B   chambers]. That being so, the right course was to allow the service of the notice
of the writ to stand, and to leave the question to be argued upon a subsequent
application of the defendants, or to be disposed of at the trial.' In the
circumstances, we do not consider that any assistance can be derived from the
decision of the Divisional Court in that case.

[40] We next consider the *Austrian Lloyd* case. This case concerned a life
C   assurance policy taken out by a native of Trieste with an English insurance
company which had a branch in Budapest. The premiums and insurance
money were payable in Budapest. The policy (which was in French) contained
a clause in these terms (as translated): 'For all disputes which may arise out of
the contract of insurance, all the parties interested expressly agree to submit to
the jurisdiction of the Courts of Budapest having jurisdiction in such matters.'
Romer LJ posed the question for determination in this form (at pp 251-252):
D   'Does the condition merely mean that, if one of the parties to the contract is
sued by the other in the Court of Budapest, he will not take any objection to its
jurisdiction; or, does it mean that the parties mutually agree that, if any dispute
arises under the contract, it shall be determined by the Court in Budapest?
Having regard to the nature of the contract and its language, I am of opinion
that the latter construction is the correct one. It is not as if the insurance
E   company only had agreed that they would submit to the jurisdiction of the
Court at Budapest: both parties mutually agree to submit to that jurisdiction in
respect of any dispute which may arise under the contract. If there had been an
agreement by the parties in similar terms to submit to the decision of a
particular individual, I think there could have been no doubt that it would
have amounted to an agreement to submit any dispute under the contract to
F   the arbitration of that person. In this case, instead of nominating a particular
individual as arbitrator, the parties agree to submit any dispute arising under
the contract to the Courts at Budapest.' Matthew LJ delivered a concurring
judgment, in the course of which he said (at p 252): 'It seems to me that the
plain meaning of the language of the condition is, not merely that, in the event
of a dispute arising under the contract, either party shall have an option of
G   suing in the Court at Budapest having jurisdiction in such matters, but that
both parties shall be bound to refer such a dispute to that Court.' The clause
did not include the word 'exclusive'. The meaning attributed to the clause was
not one which, in our opinion, could readily be described as 'expressly
specified' or 'distinctly expressed', and there is no trace of such a test in the
court's reasoning. The court appears to have approached the question in the
H   ordinary way, as one of construction of language in the context of the
surrounding circumstances. The question was whether, properly construed,
the clause obliged the parties to resort to the specified jurisdiction.

[41] The remaining English cases which were cited to us are more recent. The
first case which appears to us to be of assistance is *Sohio Supply Co v Gatoil
(USA) Inc*. That case concerned a contract for the sale of crude oil, entered into
I   between two companies neither of which was English. The parties negotiated

various amendments to the form on which they contracted. The outcome was
that it included the words: 'Governing law: This agreement shall be governed
by the laws of England under the jurisdiction of the English Court without
recourse to arbitration.' In the Court of Appeal, Staughton LJ, with whom
Buckley LJ agreed, said this about the clause (at pp 591-592): 'In Dicey and
Morris on *Conflict of Laws*, p 404, there is this footnote 93: "Some authorities
suggest that the clause must provide in terms that the jurisdiction of the chosen
court be exclusive…" and then there is a reference to *Hoerter v Hanover*, to two
Canadian cases and to certain other authorities, and the footnote continues: "…
but it is submitted that the question is whether on its true construction the
clause obliges the parties to resort to the relevant jurisdiction, irrespective of
whether the word 'exclusive' is used." … The question is one of the
construction of this contract and nothing more. It is, I think, part of the matrix
background, or surrounding circumstances, whichever term one chooses to
use, that this was a contract made between sophisticated businessmen who
specifically chose their words as to English jurisdiction for the purpose of this
contract. It is not a consumer contract on a printed form, or anything like that.
To my mind, it is manifest that these businessmen intended that clause to
apply to all disputes that should arise between them. I can think of no reason
at all why they should go to the trouble of saying that the English courts
should have non-exclusive jurisdiction. I can think of every reason why they
should choose that some court, in this case the English court, should have
exclusive jurisdiction. Then, both sides would know where all cases were to be
tried. It may be that in some other types of case, such as a policy of insurance,
there is a reason for providing for non-exclusive jurisdiction. I can see none
here. I am not sure that I can detect what precisely the reason was for choosing
England. The parties had chosen English law; it may be that they thought that
the best place for English law to be applied was an English Court; it may be
that they even thought that English Courts were a good thing in their own
right - I do not know. It may be that they wanted to join the 28 per cent of cases
in the Commercial Court where both sides came from overseas; or it may be
that they just wanted to choose a neutral forum.' In this passage, the court
rejected any general proposition that the choice of an exclusive jurisdiction
must be expressly specified, regarding the matter simply as one of construction
of the contract unencumbered by special rules of construction. In construing
the contract in question, the court had regard to its commercial context; to the
fact that the jurisdiction clause had been specifically agreed; to the fact that
English jurisdiction had been chosen although neither party had any relevant
connection to England; to the existence of several reasons why an exclusive
English jurisdiction might have been selected (including, in the context of
international trade, the desirability of a neutral forum); and to the absence of
any rationale for selecting a non-exclusive English jurisdiction. The passage
implies that a consumer contract on a printed form might fall to be treated
differently; and the court observed that, in the context of an insurance policy,
there might be a reason for providing for non-exclusive jurisdiction.

[42] The next case we wish to consider, and the one which we have found of
greatest assistance, is *S & W Berisford plc v New Hampshire Insurance Co*. This
case concerned two insurance policies taken out by a British company with the
London office of an American insurance company. The British company took
out the policies not only on their own behalf but also on behalf of and for the

A    benefit of their subsidiaries, which included a company incorporated in New
     York. The policies were governed by English law. One of the policies was a
     cargo contract and was on a form used by the Institute of London
     Underwriters. It included the clause: 'This insurance is subject to English
     jurisdiction.' In considering that clause, Hobhouse J (as he then was) said this
     (at pp 636-637): 'These words have to be construed as part of a contract made
B    in England and governed by English law. Further, they appear on a printed
     document, on the same page as the signature and stamp which binds the
     defendants, which is headed "The Institute of London Underwriters companies
     marine policy." The contract is a policy of insurance of which the primary
     function is to state the rights of the assured against the underwriters and the
     obligations of the underwriters. The contemplation of the form must be a
C    contract made in London, almost certainly by an insurance company with a
     place of business in London. The defendants were such a company and they
     had an Institute of London Underwriters reference number. To construe the
     relevant words as being intended to permit English jurisdiction would appear
     implausible, although such a construction would become more plausible if one
     were to consider that the parties had in mind article 17 of the Convention of
D    1968 to which I will refer later. But taking the contract at its face value, there
     is no need for the parties to provide that English jurisdiction be permitted; such
     jurisdiction already exists. The alternative constructions are either that, on the
     one hand, it is simply a declaratory provision and, on the other hand, it is a
     provision for exclusive jurisdiction. An exclusive jurisdiction clause is one
     which imposes a contractual obligation on one or more parties to litigate in the
     stated jurisdiction. The present clause if creating an obligation would create a
E    mutual obligation. (It is of course possible for such clauses to impose such an
     obligation on only one of the contracting parties.)' After referring to the
     judgment of Staughton LJ in *Sohio*, Hobhouse J continued (at pp 637–638): 'It is
     to be noted that Staughton LJ was inclined to put insurance contracts into a
     different category where a permissive clause could make commercial sense.
     However, the same canons of construction are to be applied in relation to this
F    type of clause as any other mutual contractual provision. It is a matter of
     construing the words used in accordance with their natural meaning and in the
     light of the surrounding circumstances in which the contract was made: see, for
     example, *Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd*. In
     the present case, in my judgment, the words used are inapt to create any
     obligation. If an obligation was intended it could easily have been so stated in
     clear words. The provision appears in the underwriter's printed form of policy
G    which is issued to the assured. The mutuality of the clause must in practice be
     very limited. Under English law where a contract has been placed through
     brokers it will be very rare indeed that an underwriter will ever have to start
     an action against an assured. The primary relevance of the clause must be to
     actions to be brought by the assured against the underwriter. To construe this
H    wording as requiring the assured to sue only in England is to go beyond the
     natural meaning of the words actually used. Further, to construe the words as
     declaratory is not to deprive them of significance. It is a statement to the
     assured, who may be foreign, that the rights that he has under the policy are
     capable of enforcement in the English courts. Such is an apt interpretation
     having regard to the legal and commercial relationships created by the
I    document and having regard to the words actually used. Such a clause, even

though creating no obligation to sue only in England is a contractual
acknowledgement of the jurisdiction of the English courts and a contractual
agreement to the invocation of that jurisdiction. Therefore I conclude that this
clause is not an exclusive jurisdiction clause. As I pointed out in *Cannon Screen
Entertainment Ltd v Handmade Films (Distributors) Ltd* such a conclusion does not
mean that the clause ceases to be relevant in relation to an application such as
that which is being made by the defendants on this summons. If the contract
says that the assured is entitled to sue the underwriter in the English courts,
then it requires a strong case for the courts of this country to say that that right
shall not be recognised and that he must sue elsewhere. Further, it will be
necessary to revert to the significance of this clause in relation to article 17 of
the Convention.'

[43] A number of points can be taken from the passages which we have quoted.
First, the court proceeded, as in *Sohio*, on the basis that a jurisdiction clause is to
be construed in the same way as any other mutual contractual provision: the
words used are to be construed in accordance with their natural meaning and in
the light of the surrounding circumstances in which the contract was made.
Secondly, the court had regard to a number of factors in considering the
alternative constructions. The factors which pointed away from construing the
clause as a provision for exclusive jurisdiction were (i) that such a provision
would, in the context of the insurance policy in question, impose an obligation
which would in practice be likely to fall only on the insured; (ii) that the putative
obligation was not clearly stated; (iii) that the contract was on a printed form
issued by the insurer to the insured; and (iv) that the alternative construction,
even in a situation in which the English courts had jurisdiction in any event
(the underwriters being English and the contract being governed by English
law), had legal and commercial significance. In relation to the last factor, the
court had in mind (a) the general legal and commercial significance of an
acknowledgement issued to the insured (who might be foreign) that the contract
was enforceable in the English courts, and (b) the more particular significance of
such an acknowledgement in private international law, notably (1) in the context
of an application for a stay of proceedings (or, in Scotland, sisting or dismissal)
under sec 49 of the 1982 Act, for example on the ground of *forum non conveniens*,
and (2) in relation to art 17 of the 1968 Convention (which Hobhouse J
considered to be applicable to non-exclusive jurisdiction clauses: p 642).

[44] The *Cannon Screen* case, to which reference was made in *Berisford*, was a
slightly earlier decision of Hobhouse J. It too is of assistance in identifying how
clauses of the present kind ought to be interpreted. Although it is unreported,
the central passages of the judgment are quoted in *British Aerospace plc v Dee
Howard Co* at p 374. In *Cannon Screen*, the court had to consider two clauses in
similar terms. One was as follows: 'This agreement shall be construed and
interpreted pursuant to laws of England and the parties hereby consent and
submit to the jurisdiction of the Courts of England in connection with any
dispute arising hereunder.' We note that that clause is in similar terms to the
one considered in *Scotmotors* (the words 'in connection with any dispute
arising hereunder' do not appear in the *Scotmotors* clause, but are implicit).
Hobhouse J decided that the clauses were not exclusive, and distinguished the
*Austrian Lloyd* case ('for all dispute…the parties interested expressly agree to
submit to the jurisdiction of the Courts of Budapest'). He stated his reasons as
follows: 'In my judgment the wording of these clauses is clear. The clause in

A    the model and conforming agreements starts by specifically referring to the fact that the agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. It therefore expressly contemplates the relevance of other entities than those actually named in the agreement. It then uses words which are words of submission not reference: "The parties hereby submit to the jurisdiction". In the output agreement the equivalent phrase is "the parties hereby consent and submit to the jurisdiction." The addition of the word "consent" reinforces the same conclusion. The phrase in the *Austrian Lloyd* case was "agree to submit" but in that case it was construed in a transitive sense as an agreement to submit disputes to a particular court in the same way as one can agree to submit disputes to the decision of an arbitrator. The clauses which I have to construe do not lend themselves to a transitive construction; the sense is that the parties submit themselves to the jurisdiction of the court not that the parties submit disputes. In the *Austrian Lloyd* case it was open to the court to construe the words as if they read "agree to submit all such disputes". I do not consider that it would be appropriate to make such an inferential insertion in these clauses. Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English Courts and not there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used. It is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.' This passage is helpful, in our opinion, in emphasising the importance of paying close attention to the words actually used. The conclusion reached did not depend on any artificial presumption or rule of construction, but upon a careful examination of the clause within its factual matrix. In particular, so far as the language is concerned, Hobhouse J identified the issue as being whether the sense of the clause was that the parties agreed to submit their disputes to the chosen jurisdiction, or that they agreed to submit to that jurisdiction if it were to be invoked in connection with any dispute: in other words, whether 'submit' was being used in a transitive or intransitive sense.

[45] Although Hobhouse J decided that the clause was non-exclusive, he granted an injunction in that case to restrain Californian proceedings; and one of the important considerations he had in mind, in doing so, was the jurisdiction clause: 'There is on any view an agreement between Cannon UK and the Defendants to submit to the jurisdiction of the English courts. Therefore it cannot be said that as regards the matters to which that clause relates it is an arrogation of jurisdiction by the English courts to decide where those matters should be tried. Those parties have agreed to submit to English jurisdiction; they cannot object to its accepting that jurisdiction.' This illustrates the point made by Hobhouse J in *Berisford*: even a clause which is merely declaratory of a jurisdiction which already exists can nonetheless be of legal significance.

[46] We were next referred to the *British Aerospace* case itself. The clause in that case provided: 'This agreement shall be governed by and be construed and take effect according to English law and the parties hereto agree that the courts of law in England shall have jurisdiction to entertain any action in respect

A

hereof and that in the event of such proceedings being commenced each party shall forthwith notify to the other an address in England for the service of documents.' The clause appeared in a contract between an English company and an American company and had been specifically agreed. Waller J (as he then was) considered the factual matrix to be similar to that in *Sohio*, ie a deliberate choice of English jurisdiction in a sophisticated commercial transaction, which the parties had freely negotiated, expressed in a situation in which the English courts would have jurisdiction in any event (by virtue of the contract being governed by English law), and in circumstances where either party might wish to sue the other. In these circumstances, and bearing in mind also the provision for an English address for service, Waller J distinguished *Cannon Screen* and *Berisford,* and construed the clause as intended to confer an exclusive jurisdiction, rather than as being merely declaratory.

B

C

[47] Counsel also cited to us the decision of the Court of Appeal in *Continental Bank NA v Aeakos Compania Naviera SA.* That case concerned a loan agreement between an American bank and Greek shipping companies which contained the following clause: '21.01 This agreement shall be governed by and construed in accordance with English law.21.02 Each of the borrowers…hereby irrevocably submits to the jurisdiction of the English courts and hereby irrevocably nominates Messrs Aegis (London) Ltd, of 197, Knightsbridge, London, SW7, England, to receive service of proceedings in such courts on its behalf but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof.' In construing the clause, Steyn LJ (as he then was), delivering the judgment of the court, said (at p 592): 'In our judgment the clause should be read in a transitive sense: see *Austrian Lloyd Steamship Co v Gresham Life Assurance Society Ltd.* It contemplates the submission of disputes to the English courts. The correctness of this construction is reinforced by the fact that the clause contemplates service of proceedings.' Steyn LJ added (at p 594) that the fact that the clause was construed in a transitive sense did not necessarily mean that it was an exclusive jurisdiction clause. The juxtaposition of a submission to the jurisdiction of the English courts and the option reserved in favour of the bank to sue elsewhere however brought into play the *expressio unius exclusio alterius* canon of construction. In holding that this clause conferred an exclusive jurisdiction on the English courts, Steyn LJ observed (at p 594): 'In our judgment it would be a surrender to formalism to require a jurisdiction clause to provide in express terms that the chosen court is to be the exclusive forum.' We respectfully agree with that observation.

D

E

F

G

[48] The most recent case cited to us was *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corporation.* So far as relevant to the issue with which we are concerned, this case concerned a contract for the sale of oil made between the Hong Kong subsidiary of a US oil company and a state trading company of the People's Republic of China. The contract contained the following clause: 'This contract shall be governed by and construed in accordance with the laws of Hong Kong. The parties hereto irrevocably agree that the courts of Hong Kong are to have jurisdiction to settle any disputes which may arise out of or in connection with this contract and submit to the jurisdiction of those courts.' In construing the clause, Rix J (as he then was) said this (at p 676): '32. The test which has been developed for distinguishing an exclusive from a non-exclusive jurisdiction clause is whether on its proper

H

I

A   construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used: Dicey and Morris, 13th ed 2000 at par 12-078. Or to put the issue in another way: is the obligation contained in the clause the intransitive one to submit to a jurisdiction if it is chosen by the other contracting party, or is it the transitive one to submit all disputes to the chosen jurisdiction? See *Austrian Lloyd Steamship Co v Gresham*

B   *Life Assurance Society Ltd, Sohio Supply Co v. Gatoil (USA) Inc, British Aerospace plc v Dee Howard Co, cf Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd* and *S & W Berisford Plc v New Hampshire Insurance Co*. 33.In the present case the clause in the Hong Kong contract not only provides for Hong Kong law, but states that the Hong Kong Courts "are to have jurisdiction to settle any disputes" between the parties and that the parties "submit to the jurisdiction of those courts". In my judgment, this is a clause which contains

C   a transitive obligation to submit disputes to the Courts of Hong Kong. It has all the indicia of such a clause. It is mutual, it refers to "any disputes" ie all disputes, and the language "are to have jurisdiction", pace Mr Hollander who contrasts the word "shall" in the opening line of the clause, is the language of obligation and not option. Moreover, although a choice of law clause may well exist without any jurisdiction clause to accompany it,

D   nevertheless, as Mr Justice Waller remarked in *British Aerospace v Dee Howard* at p 375, there is not much point in choosing a specific law to accompany a jurisdiction clause unless the intention is to make the Courts where such law operates exclusive. Mr Berry did not stress the unusual presence of the word "irrevocably", and so I do not do so either, but it strikes me that if anything this word underlines the transitive commitment.'

E   [49] This passage was strongly founded upon by counsel, and we should make some observations about it. The statement that 'there is not much point in choosing a specific law to accompany a jurisdiction clause unless the intention is to make the courts where such law operates exclusive' appears to us to go somewhat further than the earlier authorities. The judgments of Hobhouse J in *Cannon Screen* and *Berisford*, for example, made it clear that there can, in certain

F   circumstances, be a rational purpose in providing expressly for the non-exclusive jurisdiction of the courts whose law governs the contract. We also observe that although, as a matter of common sense, there might be thought to be something to be said for the view that a choice of law is in itself a strong pointer towards the construction of a jurisdiction clause as conferring exclusive jurisdiction (where the jurisdiction is one which applies the chosen system of law), that is

G   not the approach which has been followed in either the Scottish or the English cases which were cited to us.

[50] In the light of this discussion of the relevant authorities, both in Scotland and in England, it appears to us that the following conclusions can be reached. First, as to the interpretation of the Scottish authorities, we are satisfied that *Scotmotors*, even if still to be regarded as authoritative, did not lay down any general rule of law that a contractual clause will only be

H   construed as conferring an exclusive jurisdiction on a foreign court if it does so expressly. The court appears to have considered that, where the circumstances of the case disclosed no connection to any jurisdiction apart from Scotland, the parties' contract would not be construed as excluding the jurisdiction of the Scottish courts unless that was its clear meaning. That

I   proposition is not however a rule of law, properly speaking, but rather a

description of factual circumstances which would lead the court to construe
the contract in a particular manner.

[51] The only general principle of interpretation to be extracted from the
authorities, in our view, is that which was stated by Hobhouse J in *Berisford* (at
p 637): '[T]he same canons of construction are to be applied in relation to this
type of clause as any other mutual contractual provision. It is a matter of
construing the words used in accordance with their natural meaning and in the
light of the surrounding circumstances in which the contract was made.' There
is however nothing new about that principle in Scots law.

[52] All the cases cited are, we think, simply illustrations of an application of
that principle, albeit a comparison between them demonstrates the obvious
importance of the actual words used. As Hobhouse J observed in *Cannon Screen*:
'Words are an accurate tool and relatively small differences in wording will
produce different contractual effects.' Such a comparison also demonstrates the
importance of reading the contract as a whole: for example, a provision for an
address for service only within the chosen jurisdiction, or the conferring of an
option on only one party to bring proceedings elsewhere, may be important.
The surrounding circumstances may also colour the interpretation to be placed
upon the words used; and it is possible to identify, in the cases which we have
cited, particular circumstances which have been regarded as tending to point
towards, or away from, the conferring of an exclusive jurisdiction. For example,
the fact that a clause selecting a jurisdiction has been specifically agreed, and
that the clause is apt to be invoked by either party to the contract, are factors
which, *ceteris paribus*, may tend to point towards agreement on an exclusive
jurisdiction. On the other hand, the fact that the clause appears in a printed
form issued by one party to the other, and the considerations that exclusivity
will in practice impose an obligation falling substantially on the party to whom
such a form has been issued, and that the clause has (or could have, to other
persons to whom such a form might be issued) a commercial or legal significance
even if construed as only declaratory, are factors which *ceteris paribus* may tend
to point away from agreement on an exclusive jurisdiction. This of course is
not intended as an exhaustive list, nor does it purport to lay down any rule of
law.

[53] We can turn now to the construction of the particular clause with which this
case is concerned. It is in the following terms: 'JURISDICTION CLAUSE This
Document shall be governed by the Laws of England whose Courts shall have
jurisdiction in any dispute arising hereunder.' Considering in the first place the
ordinary meaning of the words used, the clause plainly means that the English
courts are to have jurisdiction; but it does not appear to us to carry any implication,
on its face, that that jurisdiction is to be exclusive. We note that similar words were
construed in the opposite sense in *British Aerospace* ('the courts of law in England
shall have jurisdiction to entertain any action...'), but that construction was
influenced by a provision concerning addresses for service and also by the
surrounding circumstances. Again, in *Sinochem* similar words ('the courts of Hong
Kong are to have jurisdiction to settle any disputes') were construed as conferring
an exclusive jurisdiction, but in that case the clause separately provided for the
parties to submit to the jurisdiction of the Hong Kong courts, and in addition the
surrounding circumstances resembled those in *Sohio* and *British Aerospace*.

[54] Considering next the context in which the clause appears, the contract is
a printed booklet bearing on its cover the words 'Motor Fleet Insurance Policy'.

660        McGowan v Summit at Lloyds        2002

A     It is headed: 'SUMMIT MOTOR FLEET DOCUMENT (Subscribed by Lloyd's Underwriters Only)' The opening paragraphs of the document state *inter alia* that 'the Underwriters will indemnify the Insured', and that 'Summit Motor Services Limited is empowered to sign this Document on behalf of the Underwriters'. The document applies in respect of vehicles registered in the United Kingdom, but covers accidents occurring abroad as well as within the

B     United Kingdom. The insurance covers awards made by foreign courts, subject to certain conditions. There is an arbitration clause in the following terms: 'If any difference shall arise as to the amount to be paid under this Document (liability being otherwise admitted) such difference shall be referred to an arbitrator to be appointed by the parties in accordance with the statutory provisions in force at the time. Where any difference is by this condition to be referred to arbitration the making of an award shall be a condition precedent to

C     any right of action against the Underwriters.' The contract bears to have been signed at Summit House, Waterloo Lane, Chelmsford, Essex, by a director of Summit Motor Services Limited (the defenders in the present action) under the authority of the underwriters.

[55] The observations made by Hobhouse J in *Berisford* appear to us to be applicable to this contract. The jurisdiction clause cannot plausibly be construed

D     as being intended to permit English jurisdiction, since such jurisdiction plainly exists already. It must therefore be either a declaratory provision or a provision for exclusive jurisdiction. The latter construction goes beyond the natural meaning of the words used (and does not sit easily with the arbitration clause, although the implications of the latter were not discussed before us). The clause appears in a printed form of policy which is issued to the insured. The primary

E     relevance of the clause must be to actions to be brought by the insured against the underwriters or the defenders. In that situation, the words used are not apt to impose an obligation on the insured to bring proceedings only in the English courts. The alternative construction does not deprive the words used of significance, for the reasons which Hobhouse J explained in *Berisford* at pp 637–638. In particular, a declaratory provision could be relevant where art 17 of the

F     1968 Convention applied.

[56] For all the above reasons, we reject the submission that only the English courts have jurisdiction to deal with the subject-matter of the present action, and we therefore refuse the appeal.

[57] Finally, in the light of the submissions in this case (and other cases), it is appropriate that we should add some observations about the citation of

G     judgments to the court. Where a case has been reported in Session Cases it should be cited from that source. Similarly, where an English case has been reported in the Law Reports published by the Incorporated Council of Law Reporting for England and Wales it should be cited from that source. The publishers of other series of reports perform a valuable service by reporting a wider range of cases, and often doing so more quickly. Where, however, a case has been reported in Session Cases or in the Law Reports, it is that report

H     which is most authoritative and, in general, most useful to the court. The report is authoritative, because the text will have been revised by the court. The textual differences can be of importance (see eg *Duke of Buccleuch v Inland Revenue Commissioners* per Lord Reid at p 526; *Lamb v Lord Advocate* at p 113). Even minor differences may not be altogether without significance. In the present

I     case, for example, *Berisford* was cited to us as reported in Lloyd's Law Reports.

In that version of the text, Hobhouse J referred to *Pathe Screen Entertainment v. Handmade Films*. It was not immediately apparent that that was a reference to the decision cited and quoted in *British Aerospace* under the name of *Cannon Screen*. In the version of the *Berisford* judgment reported in the Law Reports, on the other hand, Hobhouse J referred to *Cannon Screen*.

[58] There are occasions on which reports in other series are appropriately cited. For example, the House of Lords decisions in Scottish appeals were not reported in Session Cases until 1850, and even thereafter they continued for some time to be reported more fully in private reports. Thus the report of *Blaikie v Aberdeen Railway Company* at (1852) 15 D 20, to which the reader of *Calder v Mackay* is directed, does not contain the speeches, but merely summarises the conclusions reached. The speeches which we have cited are however reported by Paterson, whose report (a revised version of the report in the *Scottish Jurist*) is cited as (1852) 1 Paters. 119.

[59] A second reason for citing Session Cases or the Law Reports in preference to other series of reports is that the former may include a summary of the argument presented to the court. Sadly, the practice of reporting the argument appears to have died out in Session Cases, but it continues in the Law Reports. Where it is available, such a summary can be of great assistance to the court in putting the earlier decision in context and in assessing the weight to be attached to it.

[60] A third reason for citing Session Cases is that such a citation enables the court to consult the Session Papers relevant to the case in question. The Session Papers are a valuable resource, but in order to consult them the court has to know that the case in question was reported in Session Cases, and the number of the case in that year's reports.

THE COURT refused the appeal.

*H B M Sayers — The Anderson Partnership*

A

B

C

D

E

F

G

H

I

Case 1:14-cv-03042-RMB-AJP   Document 84-8   Filed 09/03/14   Page 34 of 41

[IN THE COURT OF APPEAL.]

MONTGOMERY, JONES & CO. *v.* LIEBENTHAL & CO.

*Practice—Service of Writ—Defendant Domiciled or Ordinarily Resident in Scotland—Agreement that Writ may be Served upon Agent in England—Order IX., rr. 1, 2.*

> An agreement by a person domiciled or ordinarily resident in Scotland, that a writ for breach of contract may be served by leaving it with an agent in England, appointed by him to accept service, is valid, and service upon the agent is good service on the defendant.
>
> *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux*, (1889) 58 L. J. (Q.B.) 435 ; 60 L. T. 924, approved.

APPEAL from the refusal of Phillimore J. at chambers to set aside the service of the writ of summons.

The defendants, who were corn merchants residing and carrying on business at Leith, in Scotland, agreed by a contract in writing to sell to the plaintiffs, who were corn merchants carrying on business at Liverpool, a cargo of wheat. The contract, which was made at Leith and was headed " London Corn Trade Association," contained the following clauses : " Buyer and seller agree that for the purpose of proceedings either legal or by arbitration this contract shall be deemed to have been made in England and to be performed there . . . . and the Courts of England or arbitrators appointed in England, as the case may be, shall, except for the purpose of enforcing any award made in pursuance of the arbitration clause hereof, have exclusive jurisdiction over all disputes which may arise under this contract. Such disputes shall be settled according to the law of England whatever the domicil, residence, or place of business of the parties to this contract may be or become . . . . Any party to this contract residing or carrying on business either in Scotland or Ireland shall for the purposes of such proceedings be considered as ordinarily resident or carrying on business at the office of the London Corn Trade Association, and being a party residing or carrying on business in Scotland shall be held to have prorogated jurisdiction as against himself

Case 1:14-cv-03042-RMB-AJP   Document 84-8   Filed 09/03/14   Page 35 of 41

to the English Courts . . . . The service of proceedings . . . . upon a party residing or carrying on business in Scotland or Ireland, by leaving the same at the office of the London Corn Trade Association, together with the posting of a copy of such proceedings to the address in Scotland or Ireland, shall be deemed good service, any rule of law or equity to the contrary notwithstanding." The contract also contained a stipulation that all disputes arising thereunder should be referred to two arbitrators, who should have power to appoint a third, the award of any two arbitrators to be conclusive and binding upon the parties, subject to the right of either party, if dissatisfied with the award, to appeal to the Committee of Appeal of the London Corn Trade Association, whose decision should be final.

Disputes arose between the parties as to the non-delivery of the wheat in accordance with the contract, and were referred to arbitration, and an award was made by the Committee of Appeal of the London Corn Trade Association in favour of the plaintiffs for 7353*l*. 3*s*. 6*d*. The plaintiffs issued a writ for service within the jurisdiction against the defendants to recover this amount, and served it by delivering a copy thereof to the secretary of the London Corn Trade Association at the office of the association in London, and they also sent a copy of the writ by post to the defendants at their address in Leith in accordance with the contract. The defendants applied to the judge at chambers to set aside the service of the writ, which was refused.

The defendants appealed.

*McCall*, Q.C., and *H. Tindal Atkinson*, for the defendants. The service in this case was bad. There are only three modes of service according to the rules : personal service under Order IX., r. 2, substituted service under Order LXVII., r. 6, and service out of the jurisdiction under Order XI. The only exception is that allowed by Order IX., r. 1, if the defendant by his solicitor undertakes in writing to accept service and enters an appearance. Service must be effected according to the rules, and no service is valid unless it is so effected. It is not competent to

Case 1:14-cv-03042-RMB-AJP   Document 84-8   Filed 09/03/14   Page 36 of 41

the parties to contract that a different mode of service shall be adopted: *British Wagon Co.* v. *Gray.* (1)   There the Court decided that an agreement, by a person resident in Scotland, that a writ for breach of contract arising within the jurisdiction might be served on him in Scotland, did not authorize the Court to direct service of the writ in Scotland, as to do so would be in contravention of Order XI., r. 1 (*e*).   In that case Lord Esher M.R. said (2) : " The Court can take no notice of such an agreement, and can only order service of the writ in the manner allowed by the rules, and not in any other manner upon which the parties may agree."

The decision in *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux* (3) is inconsistent with the case of *British Wagon Co.* v. *Gray* (1), and the dicta of Field J., that a person may appoint another as agent to accept service, went too far.   Even if that decision is good law, it does not cover this case, because here the plaintiffs are endeavouring to bring persons who are resident in Scotland within the jurisdiction of the English Courts, a proceeding which is prohibited by Order XI., r. 1 (*e*). This case also differs in another respect from the *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux* (3), because in the present agreement no person is named as the person to accept service.   The agreement would be complied with by placing a copy of the writ under the door of the office without handing it to anyone.   That cannot be considered good service, and, therefore, the agreement upon that point is futile.   Moreover, part of the service consists in sending a copy of the writ by post to the defendants in Scotland.   That amounts to service on the defendants in Scotland, which is prohibited by Order XI., r. 1 (*e*) : *Lenders* v. *Anderson.* (4)

[They also referred to *Société Industrielle des Métaux* v. *Companhia Portugueza dos Minas de Huelva.* (5)]

Secondly, the agreement does not cover the service of a writ.   Service of " proceedings " does not include the service of a writ.

C. A.
1898

MONTGOMERY
*v.*
LIEBENTHAL.

(1) [1896] 1 Q. B. 35.          (3) 58 L. J. (Q.B.) 435 ; 60 L. T. 924.
(2) [1896] 1 Q. B. at p. 36.      (4) (1883) 12 Q. B. D. 50.
(5) W. N. (1889) 32.

Case 1:14-cv-03042-RMB-AJP   Document 84-8   Filed 09/03/14   Page 37 of 41

C. A.
1898

MONTGOMERY
v.
LIEBENTHAL.

*Joseph Walton*, Q.C., and *L. Sanderson*, for the plaintiffs. There is nothing in the rules which prohibits a party from agreeing to appoint an agent to accept service for him. The plaintiffs are not applying to the Court for an order to effect service. The case of *British Wagon Co.* v. *Gray* (1) shews that the parties cannot by agreement give the Court a jurisdiction which is forbidden by the rules. Here no application to the Court is necessary, and that is the distinction between that case and the present one. In *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux* (2) it was held that a person may appoint another to accept service for him, and that service on that person will be considered good service. The true meaning of the agreement in this case is that the writ may be served by leaving it with some one at the office of the London Corn Trade Association. There was, therefore, good personal service. Again, the sending of a copy of the writ by post to the defendants in Scotland is not part of the service of the writ. It is something to be done subsequent to the service, so as to inform the defendants that service has been effected. Order XI., r. 1 (*e*), therefore, has no application.

*H. Tindal Atkinson* replied.

A. L. SMITH L.J. In my opinion this appeal fails. The defendants applied at chambers to set aside the service of the writ of summons upon them. The answer of the plaintiffs to that application is that the defendants have agreed that the writ should be served in the way in which it has been served, and that such service should be equivalent to personal service on them. The facts are these. The plaintiffs are corn merchants carrying on business in Liverpool, and the defendants are corn merchants resident and carrying on business in Scotland. The defendants agreed to sell a cargo of wheat to the plaintiffs, and the contract contains a stipulation that all disputes arising out of the contract should be referred to two arbitrators, subject to an appeal to the Committee of Appeal of the London Corn Trade Association. The contract also contains a clause that any party to it residing or carrying on business either in Scot-

(1) [1896] 1 Q. B. 35.          (2) 58 L. J. (Q.B.) 435; 60 L. T. 924.

Case 1:14-cv-03042-RMB-AJP   Document 84-8   Filed 09/03/14   Page 38 of 41

land or Ireland shall for the purpose of such proceedings be considered as ordinarily resident or carrying on business at the office of the London Corn Trade Association, and the contract goes on to provide that " service of proceedings upon a party residing or carrying on business in Scotland or Ireland, by leaving the same at the office of the London Corn Trade Association, together with the posting of a copy of such proceedings to the address in Scotland or Ireland, shall be deemed good service," i.e. good personal service. In the first place, it seems to me to be clear that the expression " service of proceedings " includes the service of a writ. That being so, the service contemplated by the contract is service at the office of the London Corn Trade Association. That does not mean, as has been suggested, that the writ may be served by merely pushing it under the door of the office or doing anything of that sort. It means that the writ must be left with some person at the office, as was done in this case. The service was therefore effected at the office in accordance with the contract. After the service had been so effected, a letter containing a copy of the writ was, in accordance with the contract, posted to the defendants in Scotland to inform them that the writ had been served. The question arises whether that agreement as to service is or is not a valid agreement. The writ, as I have said, has been served in the manner in which the parties agreed that it should be served. The defendants, nevertheless, say that there has been no effective personal service upon them, because the agreement as to service is invalid. To my mind that point is not tenable. I can see nothing in the rules to prevent the parties from agreeing to such a course of proceedings, and I can find no case in the books which shews that such an agreement as that made in this case is invalid. The case of *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux* (1) is an authority in support of the proposition that the parties can, as regards the mode of service, contract themselves out of the rules, and may appoint a person as agent to accept service, so long as they do not ask the Court to do something which it is prohibited from doing under the rules. In the present case

C. A.

1898

MONTGOMERY
*v.*
LIEBENTHAL.

A. L. Smith L.J.

(1) 58 L. J. (Q.B.) 435; 60 L. T. 924.

C. A.
1898

MONTGOMERY
*v.*
LIEBENTHAL.

A. L. Smith L.J.

no application was made to the Court for leave to serve the writ in the manner agreed upon, nor was any application necessary. The case of *British Wagon Co.* v. *Gray* (1) was relied upon by the defendants. That decision went upon Order XI., r. 1 (*e*), which deals with service out of the jurisdiction. That rule allows service of a writ out of the jurisdiction where the action is founded on any breach within the jurisdiction of any contract wherever made, which according to the terms thereof ought to be performed within the jurisdiction; but the last clause expressly prohibits the rule from being applicable in the case of a defendant who is domiciled or ordinarily resident in Scotland or Ireland. The plaintiffs in *British Wagon Co.* v. *Gray* (1) applied, and had to apply, for leave to serve the writ on the defendant, who was resident in Scotland, on the ground that he had agreed to be served in Scotland; but Mathew J. at chambers refused leave on the ground that the rule expressly forbade such an order being made by the Court, and that the existence of the agreement could make no difference; and this Court affirmed his decision upon that ground. The pith of that case is well summed up by Lopes L.J., where he says that "assuming the contract had the effect which it is contended that it had, I think it is clear that the parties had no power to contract that the Court should have a jurisdiction which is forbidden by the rules." Lord Esher M.R. said that "the Court can take no notice of such an agreement, and can only order service of the writ in the manner allowed by the rules, and not in any other manner upon which the parties may agree." With that I entirely agree; but that is not this case. There is no application to the Court in this case to do something which it is forbidden by the rules to do. This case comes within the decision in *Tharsis Sulphur Co.* v. *Société Industrielle des Métaux* (2), which I think is a right decision. The appeal must, therefore, be dismissed.

CHITTY L.J. I am of the same opinion. It is clear to me that this agreement as to service of "proceedings" extended to

(1) [1896] 1 Q. B. 35.          (2) 58 L. J. (Q.B.) 435; 60 L. T. 924.

C. A.

1898

MONTGOMERY
v.
LIEBENTHAL.

Chitty L.J.

the service of a writ of summons. That point, therefore, fails. I also think that this writ was properly served in accordance with the agreement. I cannot agree with the contention of the defendants that the effect of the agreement is that the writ might be served by merely leaving it at the office without handing it to any one there. The provision in the agreement as to leaving it at the office means that the writ must be left with an adult person at the office. It seems to me to be equivalent to an appointment of an agent to accept service. The writ was, therefore, properly served in accordance with the agreement by being left with the secretary at the office.

There remains the question, which is the main question in the case, whether the agreement as to the service is a valid agreement or not. The argument is that the service was not effected according to the rules, and is therefore void. In my opinion the distinction pointed out between this case and the case of the *British Wagon Co.* v. *Gray* (1) is a sound one. In that case the Court was dealing with Order XI., which, as has been said, contains a complete code governing service out of the jurisdiction. The Court can only allow service out of the jurisdiction in the cases there specified, and rule 1 (*e*) of that order shews at once that the Court has no jurisdiction, in the case of a contract to be performed within the jurisdiction, to allow service out of the jurisdiction on a person who is domiciled or ordinarily resident in Scotland or Ireland. So that the Court there had to deal with an express prohibition as to service out of the jurisdiction. There is no such provision applicable to this case. I do not propose to travel through the rules. I can find no rule which prohibits a person from agreeing as to the mode in which service may be effected on him, as, for instance, by the writ being left with his wife or with some other person. If the contention of the defendants is correct, a person who is ill cannot make a request that the plaintiff should hand the writ to his wife, but must endure the inconvenience of being served personally, otherwise the service will be bad as being in contravention of the rules. I cannot find that in any of the rules. This case comes within the

(1) [1896] 1 Q. B. 35.

494                QUEEN'S BENCH DIVISION.                [1898]

C. A.
1898

MONTGOMERY
v.
LIEBENTHAL.

Chitty L.J.

principle of the decision of the Divisional Court in *Tharsis
Sulphur Co.* v. *Société Industrielle des Métaux* (1), and I see no
reason for differing from the judgment of Field J. in that case.
That learned judge thought it clear upon principle that a person
might appoint another as agent to accept service for him, and
might enter into a contract that the agent should be the person
to accept service, and that service upon that agent should be
good service upon himself. That seems to me to be good
sense. This case falls within the principle there laid down,
and I can find no rule which avoids any such agreement.

COLLINS L.J.   I am of the same opinion.   If it is once con-
ceded that the parties have a right to contract themselves out
of the rules and to substitute a special mode of service for that
provided by the rules, the case is concluded.   I feel no difficulty
in principle in coming to that conclusion, and when I look at
the cases I find that the *Tharsis Sulphur Co.* v. *Société Indus-
trielle des Métaux* (1) is a clear authority in support of that
conclusion.   It is said that the decision in the *British Wagon
Co.* v. *Gray* (2) is inconsistent with that view.   I do not think
it is.   In that case the plaintiffs were obliged to come to the
Court and ask it to do something which it was forbidden by the
rules to do.   That is not the case here.   In the present case
the parties have put into operation the machinery as to service
which they themselves have provided, and now when that
machinery has been put into operation the defendants ask the
Court to treat that agreement as non-existent, and to set aside
the service.   I do not think we can do that.   There is no pro-
hibition, express or implied, in the rules against their coming
to such an arrangement.   In my opinion the defendants must
fail in their contention, and the appeal must be dismissed.

*Appeal dismissed.*

Solicitors for plaintiffs: *Burton, Yeates & Hart, for Tyrer,
Kenion, Tyrer & Simpson, Liverpool.*

Solicitors for defendants: *Murray, Hutchins, Stirling &
Murray.*

(1) 58 L. J. (Q.B.) 435; 60 L. T. 924.      (2) [1896] 1 Q. B. 35.

A. M.