# 'EXHIBIT C

# 'Rct v'XKK'qh'Z'K'K

524         LLOYD'S LAW REPORTS         [1994] Vol. 2

PART 5]         Ocarina Marine v. Marcard Stein         [Q.B. (Com. Ct.)

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

May 13, 1994

OCARINA MARINE LTD. AND OTHERS
v.
MARCARD STEIN & CO.

Before Mr. Justice RIX

Practice — Writ — Application to set aside — Jurisdiction — Loan agreement, assignment of earnings and deed of charges entered into between German bank and Liberian shipowners — Documents contained English jurisdiction clause — Whether English Court had jurisdiction to hear action against German bank — Whether writ should be set aside — Civil Jurisdiction and Judgments Act, 1982, arts. 2, 5(1), 17.

The four plaintiffs were Liberian shipowning (or ex-shipowning) companies and the defendant was a German bank operating out of Hamburg and domiciled in Germany.

The first three plaintiffs entered into loan agreements with the defendant in October 1991, all in essentially identical form under which the defendant provided the respective plaintiffs with loan facilities to be applied to finance the purchase of three separate vessels. It was an obligation and a condition precedent to the effectiveness of the loan agreements that the plaintiffs would execute and provide to the defendants, inter alia, assignments of earnings of the relevant vessels, deeds of charges on the retention accounts in which the vessel's earnings would be placed and deeds of pledge of shares in the plaintiff companies. Each loan agreement, assignment and charge contained clauses in slightly different language providing for English jurisdiction.

By May 1992 financial difficulties led to a series of meetings in Hamburg and London culminating on May 16, 1992. The plaintiffs alleged that a restructuring was then agreed, and that this agreement although reached orally was to be documented in exactly the same way as the earlier loan agreements and that it was also expressly agreed that English law and jurisdiction would apply.

The plaintiffs alleged that at a further meeting in Cologne on May 26, 1992 the defendant stated that it was unwilling to provide the further finance agreed upon, in the absence of additional security over and above the vessels themselves. The plaintiffs accepted that statement as a repudiation or renunciation of the oral agreement of May 16, 1992.

At a further meeting held in London on May 29, 1992 the plaintiffs alleged that the parties agreed a further restructuring, i.e. a complete unwinding of the loan facilities provided by the defendant to those four plaintiffs and two other shipowning companies whereby all the vessels were sold to the defendant at prices intended to discharge all possible outstanding liabilities to the defendant under the various loan and security agreements.

The plaintiffs identified the following claims against the defendant: (i) a claim by the first three plaintiffs pursuant to the loan agreements to be reimbursed the sums outstanding in their retention accounts or damages for breach of those agreements on the basis that all liabilities under these agreements had been discharged; (ii) the identical claim pursuant to the assignments and charges; (iii) a claim for the return of various share certificates lodged with the defendant pursuant to the pledges or damages for breach of the loan agreements on the same basis that all liabilities had been discharged; (iv) a claim for damages for breach of the oral agreement of May 16, 1992; (v) a claim for damages for breach of the agreement of May 29, 1992 on the basis that the defendant had failed to credit the plaintiffs with the agreed proceeds of the sale of the vessels or to treat the plaintiffs' obligations under their loan and security agreements as discharged.

The defendant applied to set aside the service of the writ and for a declaration that the Court had no jurisdiction over the defendant in respect of the subject matter of the plaintiffs' claims.

The plaintiffs had to show that their claims fell within the exceptions to art. 2 of the Brussels Convention. They argued that the five claims all arose out of or in connection with the loan agreements and they sought to rely on art. 17 in that the relevant documentation all contained agreements in writing to submit disputes to the English Court. Alternatively they relied upon art. 17 of the Convention in respect of claim (iv) on the ground that the May 16, 1992 restructuring would be documented into a contract in writing containing an English jurisdiction clause. Alternatively, they relied upon art. 5(1) of the Convention in respect of claim (iv) on the ground that the principal obligation under the May 16, 1992 restructuring was to be performed in London.

The defendants sought to rely on their general business conditions which by cl. 26 contained a German jurisdiction clause.

————Held, by Q.B. (Com. Ct.) (RIX, J.), that (i) the jurisdiction agreements contained in the loan documentation had to be construed as requiring the first three plaintiffs not only to submit to English jurisdiction but also to submit their disputes to the jurisdiction of the English Courts; as such they were incompatible with cl. 26 of the general business conditions and had to be taken as varying or even excluding that clause (see p. 529, col. 1);

(2) when one considered the three jurisdiction clauses together with their wide language as to the scope of disputes covered by the agreements as to jurisdiction, it was even harder to imagine that the parties to these agreements intended that small differences in wording were to make a critical differ-

ence as to where the plaintiffs were required to bring suit (*see* p. 530, col. 1);

———— *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505 applied.

(3) the plaintiffs were bound to submit disputes arising out of or in connection with the loan documentation to the English Courts and art. 17 of the Convention applied to such disputes in derogation from art. 2; it was common ground that claims (i), (ii) and (iii) were claims or disputes within such written jurisdiction clauses; and the first three plaintiffs had jurisdiction under art. 17 of the Convention to bring claims (i), (ii) and (iii) in England (*see* p. 531, cols. 1 and 2);

(4) claims (iv) and (v) arose out of or in connection with a wholly different restructuring agreement which it was alleged was repudiated; and the agreement embraced six vessels and not merely three and the fourth plaintiff was co-plaintiff in respect of such claims while being absent from the first series of claims based on the October, 1991 documentation, (*see* p. 532, col. 1);

(5) claim (v) as currently presented and claim (iv) were not within the scope of the jurisdiction agreements of the October 1991 loan documentation (*see* p. 532, col. 1);

(6) the plaintiffs' reliance on art. 17 of the Convention in respect of claim (iv) on the ground of an express oral agreement for English jurisdiction to be documented in writing which had failed as part of the defendant's repudiation of the restructuring agreement of May 16, 1992 could not be sustained in circumstances where consent between the parties had not been confirmed in accordance with the formal requirement of art. 17 (*see* p. 532, col. 1);

(7) the plaintiffs' reliance on art. 5(1) of the Convention to sustain their claim in England for damages for repudiation of the alleged agreement of May 16, 1992 failed; the place of performance of the obligation to provide finance was Hamburg (*see* p. 533, cols. 1 and 2);

(8) there was jurisdiction in England under the Convention in respect of claims (i), (ii) and (iii) by reason of art. 17; but not in respect of claims (iv) and (v) (*see* p. 533, col. 2);

(9) in the circumstances the writ ought not to have been issued without leave nor served out of the jurisdiction on the defendant; the various paragraphs in the writ would be struck out and the points of claim struck out as a whole; leave would be given to the plaintiffs to serve a new points of claim in proper form (*see* p. 533, col. 2; p. 534, col. 1).

The following cases were referred to in the judgment:

Alghussein Establishment v. Eton College, (H.L.) [1988] 1 W.L.R. 587;

Berghoefer G.m.b.H. & Co. K.G. v. A.S.A. S.A., [1986] 1 C.M.L.R. 13;

Continental Bank N.A. v. Aeakos Compania Naviera S.A., (C.A.) [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588;

Galeries Segoura Sprl v. Firma Rahim Benakdarian, [1977] 1 C.M.L.R. 361;

Owens Bank Ltd. v. Fulvio Bracco (E.C.J.) (C. 129–92) [1994] 2 W.L.R. 759;

Partenreederei Ms Tilly Russ v. Haven & Vervoebedrif Nova N.V., [1985] 1 Q.B. 931;

Richardson v. Richardson, [1927] P. 228;

Union Transport Plc. v. Continental Lines S.A., (H.L.) [1992] 1 Lloyd's Rep. 229; [1992] 1 W.L.R. 15.

———————

This was an application under R.S.C., O. 12, r. 8 for an order setting aside service of the writ in these proceedings and for a declaration that the Court had no jurisdiction over the defendant, Marcard Stein & Co., a German bank, in respect of the subject matter of the claims brought by the Liberian plaintiffs, Ocarina Marine Ltd., Damaris Maritime Co. Ltd., Verena Shipping Ltd. and Fantasia Marine Inc.

Mr. John Lockey (instructed by Messrs. Watson, Farley & Williams) for the defendant bank; Mr. Alistair Schaff (instructed by Messrs. Ince & Co.) for the plaintiffs.

The further facts are stated in the judgment of Mr. Justice Rix.

JUDGMENT

Mr. Justice Rix: This is an application under R.S.C., O. 12, r. 8 for an order setting aside service of the writ in these proceedings and for a declaration that the Court has no jurisdiction over the defendant in respect of the subject matter of the plaintiffs' claims. The application raises issues under arts. 5(1) and 17 of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters as enacted by the Civil Jurisdiction and Judgments Act, 1982.

The four plaintiffs are Liberian shipowning (or ex-shipowning) companies. The defendant is a German bank operating out of Hamburg and domiciled for the purposes of the Convention in Germany. The proceedings are concerned with civil and commercial matters. In the circumstances it is common ground that under art. 2 of the Convention the defendant must be sued in the Courts of Germany, unless the plaintiffs can bring themselves within any of the exceptions laid down by the Convention. The exceptions upon which they rely are those contained in art. 5(1) and art. 17. Article 5(1) provides:

| Rix, J.] | Ocarina Marine v. Marcard Stein | [Q.B. (Com. Ct.) |
|---|---|---|

A person domiciled in a Contracting State may, in another Contracting State, be sued —

1. In matters relating to a contract, in the courts for the place of performance of the obligation in question . . .

Article 17 provides:

If the parties, one or more of whom is domiciled in a Contracting State, have agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction. Such an agreement conferring jurisdiction shall be either — (a) in writing or evidenced in writing . . .

If an agreement conferring jurisdiction was concluded for the benefit of only one of the parties, that party shall retain the right to bring proceedings in any other court which has jurisdiction by virtue of this Convention.

Before turning to the claims set out in the writ and points of claim it may be convenient if I first deal in narrative form with the background to the plaintiffs' complaints. The first three plaintiffs, Ocarina, Damaris and Verena entered into loan agreements with the defendant in October, 1991, all in essentially identical form, under which the defendant provided the respective plaintiffs with loan facilities to be applied to finance the purchase of three separate vessels. It was an obligation under and a condition precedent to the effectiveness of the loan agreements that these plaintiffs would execute and provide to the defendant inter alia assignments of earnings of the relevant vessels (the "assignments"), deeds of charge upon the retention accounts in which the vessels' earnings would be placed (the "charges") and deeds of pledge of shares in the plaintiff companies (the "pledges"). The loan agreements called for the opening of loan accounts and retention accounts with the defendant. The retention accounts would be credited with the earnings of each vessel and debited with repayments and interest payments on appropriate dates. Each loan agreement provided for English law and jurisdiction, the latter in the following terms:

*25. Jurisdiction*

(A) The Borrower hereby irrevocably agrees for the benefit of the Bank that the courts of England shall have jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes which may arise out of or in connection with this Agreement and for such purposes irrevocably submits to the jurisdiction of such courts . . .

(D) The submission to the jurisdiction of the Courts referred to in Sub-Clause (A) shall not (and shall not be construed so as to) limit the right of the Bank to take proceedings against the Borrower in any other court of competent jurisdiction nor shall the taking of proceedings in any one or more jurisdiction preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

The assignments contain the following clause concerning "Assignment of Earnings":

The Owner as beneficial owner hereby assigns to the Lender all its right, title and interest in and to the Earnings and all and any proceeds thereof provided that upon payment to the Lender of all monies due and to become due from the Owner under or pursuant to the Loan Agreement and the Security documents therein referred to and when the Owner shall be under no further actual or contingent liability under the Loan Agreement or the Security Documents therein referred to, the Lender will, at the request and cost of the Owner, reassign without recourse or warranty as to the subject matter of such assignment, the Earnings to the Owner or to whomever the Lender shall reasonably believe to be entitled thereto.

The assignments also provide for English law and jurisdiction, the latter in the following terms:

*11. Jurisdiction*

(A) For the benefit of the Lender, the parties hereto irrevocably agree that the Courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceedings (together in this Clause referred to as "Proceedings") arising out of or in connection with this Agreement may be brought in such Courts . . .

(D) Nothing contained in this Clause shall limit the right of the Lender to take proceedings against the Owner in any other Court of competent jurisdiction; nor shall the taking of proceedings in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

The charges contain the following clause:

8.1 This Agreement shall be governed by and construed in accordance with English Law and the parties irrevocably agree for the exclusive benefit of the lenders that the courts of England are to have jurisdiction to

It will be observed that these five claims fall into essentially two parts. The first, second and third are claims made by the first three plaintiffs by reference to the written agreements entered into in October, 1991. The fourth and fifth claims, however, arise out of the oral agreements of May, 1992, and the fourth plaintiff is alleged to be party to them. It is not clear exactly on what basis the fourth plaintiff is included as a claimant at any rate in respect of the agreement of May 16, 1992: possibly by way of novation on the basis of a company to be nominated. There is also a claim for an account by all four plaintiffs.

The writ does not cover the identical ground in quite the same way. There is no express mention of the assignments or charges, although there are claims for reimbursement of the retained earnings—

. . . under the additional Loan Agreement and/or as varied or otherwise.

There is a separate claim for breach of an oral loan agreement between the fourth plaintiff and the defendant made on or after May 16, 1992 in respect of which it is said that the defendant has failed to remit monies properly owing to the fourth plaintiff. This claim does not appear to have been advanced in the points of claim.

In these circumstances Mr. Schaff, on behalf of the plaintiffs, accepts the burden of showing that the plaintiffs' claims fall within the exceptions to art. 2 of the Convention. He seeks first of all to support the claims in respect of the written loan documentation of October, 1991, relying on art. 17 of the Convention, the relevant terms of which I have already set out. He submits that the three claims concerned all "arise out of or in connection with" the relevant contracts, and that these contracts all contain agreements in writing by the parties to submit such disputes to the English Courts.

On behalf of the defendant Mr. Lockey contends otherwise. He points out that in October, 1991 and again in May, 1992 the plaintiffs opened accounts with the defendant pursuant to application forms which stated that:

All business with the bank shall be governed by your General Business Conditions . . .

and that the conditions contain a German jurisdiction clause in the following form:

26.(1) The premises of the bank's office keeping the account are the place of performance for both parties, provided the customer is a businessman who does not fall under the definition of Section 4 of the German Commercial Code (Handelsgesetzbuch)

or if the customer is a public-law body corporate or a state-operated special fund or if his residence is outside the Federal Republic of Germany. All legal relationships between the customer and the bank are subject to the law prevailing at the place of performance, even in the event of a lawsuit being conducted abroad.

(2) If the customer is a businessman who does not fall under the definition of Section 4 of the German Commercial Code (Handelsgesetzbuch) or if the customer is a public-law body corporate or a state-operated special fund, the bank can be sued only in the court having jurisdiction at the place of performance.

It is not in dispute that the plaintiffs are, other things being equal, customers to whom those provisions apply. Mr. Lockey next points out that the wording of cl. 25(A) of the loan agreements only states that the—

. . . Borrower agrees . . . and for such purposes irrevocably submits to . . .

the jurisdiction of the English Courts. That agreement, he says, does not embrace the defendant, who is free to sue in Germany, as is confirmed by cl. 25(D). The jurisdiction clause should therefore be read as a unilateral one, only binding on the plaintiffs. As for the defendant bank, the only agreement as to where it is to be sued is to be found in the last sentence of cl. 26(2) of the general business conditions, which states that it can be sued:

. . . only in the court having jurisdiction at the place of performance . . .

and that place of performance is defined in the opening words of cl. 26(1) of those conditions as being Hamburg:

The premises of the bank's office keeping the account are the place of performance for both parties.

As for the assignments and the charges, although the language of their jurisdiction clauses differs from that of cl. 25(A) of the loan agreements in referring to "parties":

. . . the parties hereto irrevocably agree that the Courts of England are to have jurisdiction . . .

those agreements must be regarded as only ancillary to the primary loan agreements, and have to be construed against the background of cl. 26 of the general business conditions. So construed, cl. 11(A) of the assignments and cl. 8.1 of the charges have to be read as though "parties" mean the plaintiffs. In any event the plaintiffs' applications to open fresh accounts in May, 1992, thereby renewing their allegiance to

the terms of the general business conditions, override any contrary agreement to be found in the loan agreements or elsewhere. Mr. Lockey further submits that any jurisdiction clause seeking to provide for a jurisdiction other than the one mandated under art. 2 of the Convention must be clear and precise and be construed restrictively, relying on *Owens Bank Ltd. v. Fulvio Bracco*, [1994] 2 W.L.R. 759 (C. 129–92, judgment of the European Court of Justice delivered Jan. 20, 1994).

I approach the construction of these clauses applying English canons of construction, as I am required to do. The loan agreements, the assignments and the charges are all governed by English law, and, although the general business conditions are governed by German law, the evidence I have received as to their construction under German law informs me that they can be expressly varied and leaves for my decision the extent, if any, to which the jurisdiction clauses in the loan documentation of October, 1991 affect cl. 26 of the general business conditions, and the extent, if any, to which the applications of May, 1992 affect the jurisdiction clauses in the loan documentation. In applying canons of English construction to the relevant clauses, I think I am entitled to bear in mind, and I do, that the formal requirements of art. 17 of the Convention have been interpreted to mean that consent has to be clearly and precisely shown, and that any jurisdiction agreed for the purpose of art. 17 may be a derogation from the general rule contained in art. 2. In the case of genuine ambiguity or uncertainty as to the correct construction of such a jurisdiction clause I therefore consider that the English Court should resolve such ambiguity or uncertainty in favour of a construction which leaves the underlying jurisdiction required by art. 2 untouched. Nevertheless, in my judgment the jurisdiction agreements contained in the loan documentation have to be construed as requiring the first three plaintiffs not only to submit to English jurisdiction themselves but also to submit their disputes to the jurisdiction of the English Courts. As such they are incompatible with cl. 26 of the general business conditions, and have to be taken as varying or even excluding that clause.

My reasons are as follows. Clause 25(A) begins with an agreement by the "Borrower" (that is to say by the first three plaintiffs) that the Courts of England:

. . . shall have jurisdiction to hear and determine any suit.

Prima facie "any suit" means what it says and embraces any suit whether brought by or against the borrower. There is no express language to say that the Courts of England are not to have jurisdiction to hear and determine any suit brought by the borrower. Any such limitation therefore would have to be implicit, in circumstances where the limitation could have been easily written in: "to hear and determine any suit brought against but not by the Borrower". The clause then proceeds to state that the borrower agrees that the Courts of England shall have jurisdiction "to settle any disputes". Disputes, unlike suits, are not brought by one party against the other: they are the result of differences between two parties. Again the qualification sought by the defendant is not express, but would have to be introduced by implication. This time the implication is technically more difficult. To distinguish between disputes which are to be determined in England and those which are not within that agreement could not for this purpose be achieved by any qualification as to the nature of the dispute in question, but has to depend, so the defendant's argument would have to go, upon who is the initiating litigant. It follows, therefore, that at the time when a dispute occurred, the parties would not know whether it was to be litigated in England or not. Moreover, "any disputes" would have to mean something along the lines of "any disputes in which the Borrower emerged as defendant". It seems to me that this is an impossible implication. Then again, cl. 25(D) preserves the defendant bank's right to sue the borrower in any other Court of competent jurisdiction. Thus cl. 25 as a whole says that the bank may sue the borrower in England or elsewhere where jurisdiction can be properly founded but apparently, on the defendant's argument, says nothing whatsoever about where the borrower may sue the bank. This seems to me to be improbable: possible, of course, should a clause expressly state that it is dealing with the question of jurisdiction unilaterally; but in the absence of such express guidance, improbable. It is made none the less improbable by the express agreement upon English proper law in cl. 27. Although it is perfectly possible to divorce law and jurisdiction, and this not infrequently occurs, it is not a construction which one would expect to find in a contract which provides for both English law and jurisdiction — absent express language, such as is found in cl. 25(D). As for the words "for the benefit of the Bank", Mr. Lockey submitted that they mean "at the election of the Bank"; but in my view they amount to words of art signifying that this jurisdiction agreement is of a kind, permitted by art. 17 (where the

words, however, are "for the benefit of only one of the parties"), which allows one of the parties to bring proceedings "in any other court which has jurisdiction by virtue of this Convention".

It seems to me that the construction of cl. 25(A) which I favour is confirmed by the analogous clauses in the assignments and charges. Clause 11(A) of the former begins:

> For the benefit of the Lender, the parties hereto agree that the Courts of England are to have jurisdiction to settle any disputes . . .

In this clause there can be no doubt that the agreement for English jurisdiction is mutual, albeit there is still a reservation in cl. 11(D) to permit the defendant bank to sue in any other Court of competent jurisdiction. The opening words "for the benefit of the Lender" in this context cannot possibly mean "at the election of the Lender", and Mr. Lockey's submission that the word "parties" means the borrower is equally impossible. The same remarks can be addressed to the language of cl. 8.1 of the charges:

> . . . the parties irrevocably agree for the exclusive benefit of the Lender that the courts of England are to have jurisdiction to settle any disputes . . .

When one considers the three jurisdiction clauses together, with their wide language as to the scope of disputes covered by the agreement as to jurisdiction ("arise out of or in connection with"), it is even harder to imagine that the parties to these agreements intended that small differences in wording were to make a critical difference as to where the plaintiffs were required to bring suit. Otherwise the same dispute which under the loan agreements would "arise out of or in connection with" such agreements and, upon the defendant's argument, would have to be litigated in Germany, could equally "arise out of or in connection with" the assignments and charges and have to be litigated in England, although in both cases the claimant was a plaintiff.

The construction of cl. 25(A) which I favour is in my judgment also confirmed by authority. In *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588 an American bank granted a loan facility to a Greek shipowner at the former's Athens branch. The loan agreement was governed by English law and contained a jurisdiction clause as follows:

> Each of the borrowers . . . hereby irrevocably submits to the jurisdiction of the Eng-

lish court and hereby irrevocably nominates [A] . . . to receive service of proceedings in such Courts on its behalf but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof.

The borrowers were the first to commence proceedings against the bank — in Greece: in response to service of those proceedings upon it, the bank sought an injunction in England to restrain the borrowers from continuing the Greek proceedings in breach of the jurisdiction agreement. Subsequently the bank commenced a separate action in England against the borrowers on the merits. The Court of Appeal held that the jurisdiction clause was an agreement binding the borrowers to commence proceedings in England.

Lord Justice Steyn delivered the judgment of the Court. At p. 508, col. 1; pp. 592G–593A he said:

> Clause 21.02 is undoubtedly elliptical. It simply provides that the borrowers and guarantors submit "to the jurisdiction of the English courts . . . " In our judgment the clause should be read in a transitive sense: see *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.*, [1903] 1 K.B. 249. It contemplates the submission of disputes to the English Courts.

At p. 509, col. 1; p. 594B–E Lord Justice Steyn continued:

> We have already explained why we interpret cl. 21.02 in a transitive sense as involving an agreement by the defendants to submit disputes in connection with the loan facility to the jurisdiction of the English Courts. That does not necessarily mean that cl. 21.02 is an exclusive jurisdiction agreement. Mr. Clarke submits that where there is an agreement to submit disputes to the jurisdiction of a particular country, the parties are taken to have intended the chosen Court's jurisdiction to be exclusive unless there are unusual or particular circumstances which indicate otherwise. He finds some comfort in *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.*, [1903] 1 K.B. 249 at pp. 251–252; *Sohio Supply Co. v. Gatoil (U.S.A.) Inc.*, [1989] 1 Lloyd's Rep. 588 and *British Aerospace Plc. v. Dee Howard Co.*, [1993] 1 Lloyd's Rep. 368. See, however, *Cannon Screen Entertainment v. Handmade Films* (unreported) July 20, 1989. We find it unnecessary to explore this line of authority or to express any view on Mr. Clarke's sub-

mission. We say that because cl. 21.02 (the only jurisdiction agreement that we were asked to consider) does not contain a submission to English jurisdiction simpliciter. We regard the concluding words as significant:

but the bank reserves the right to proceed under this agreement in the courts of any other country claiming or having jurisdiction in respect thereof.

The juxtaposition of a submission by the defendants to the jurisdiction of the English Courts and the option reserved in favour of the bank to sue elsewhere brings into play the expressio unius exclusio alterius canon of construction. It suggests that a similar option in favour of the defendants was deliberately omitted. In our judgment cl. 21.02 evinces a clear intention that the defendants, but not the bank, would be obliged to submit disputes in connection with the loan facility to the English Courts.

I reject the submission that the construction of the jurisdiction clauses in the loan documentation is affected by cl. 26 of the general banking conditions. Such conditions were intended to cover the defendant's general banking business, but must be considered to be ousted by the tailor-made provisions relating to the loan documentation. It is clear that the provision for German law in cl. 26(1) of the conditions and the provision for English law in the loan documentation cannot exist side by side: the latter ousts the former. As for the suggestion that a half-way house position may prevail, whereby German law is supplanted by English law as the proper law of the agreements, but the provision for suit against the defendant only in the Courts having jurisdiction at the place of performance survives, this seems to me to be unrealistic. It would involve defining the place of performance under an English law contract with the assistance of a proviso which only makes sense if German law is the proper law:

. . . provided the customer is a businessman who does not fall under the definition of Section 4 of the German Commercial Code . . .

It follows that the plaintiffs are bound to submit disputes arising out of or in connection with the loan agreements, the assignments and the charges to the English Courts, and art. 17 of the Convention applies to such disputes in derogation from art. 2. It is common ground that at any rate claims (i), (ii) and (iii) identified above are claims or disputes within such written jurisdiction clauses. Claim (iii) (par. 16 of the points

of claim) presents a slight complication in that the pledges under which the relevant share certificates have been lodged are not in evidence before me. However, the claim is said to be advanced pursuant to the loan agreements, and the defendant has addressed no separate argument to me to the effect that, if I find that art. 25 of the loan agreements amounts to an agreement for English jurisdiction, I should nevertheless find that claim (iii) lies outside the scope of such agreement. I therefore hold that the first three plaintiffs have jurisdiction under art. 17 of the Convention to bring claims (i), (ii) and (iii) in England.

I therefore turn to consider the position relating to claims (iv) and (v) arising out of the alleged May, 1992 restructuring. The plaintiffs rely here again upon art. 17. They say that such claims are also claims or disputes which "arise out of or in connection with" the loan agreements. I do not agree. They are claims which arise out of or in connection with a wholly different restructuring agreement which it is alleged was repudiated. Such agreement embraced six vessels and not merely three, and the fourth plaintiff is co-plaintiff in respect of such claims while being absent from the first series of claims based upon the October, 1991 documentation.

Having said that, and despite the fact that neither Mr. Schaff nor Mr. Lockey drew a distinction between claim (iv) and claim (v) but were both prepared to deal with the latter in the same breath as the former, I believe that there is a distinction to be made between them. Claim (iv) is concerned with an entirely new restructuring, and also a new beginning. The claim is for damages for repudiation of that agreement in the as yet unspecified amount of profits which it is speculated would have been obtained by developing a line with the six vessels concerned. Claim (v) grows out of and reverses that new beginning, and in this sense it belongs together with claim (iv); it too embraces four (potentially six) claimants, rather than merely the original three. However, in another sense, the alleged agreement out of which claim (v) has arisen looks back to the loan documentation of October, 1991 and was designed, so it is said, to discharge all of the first three plaintiffs' obligations under those original arrangements. In that sense, and confining the impact of the May 29, 1992 agreement to the first three plaintiffs, I can visualise the possibility that certain aspects of that agreement are inextricably bound up with the subject matter of claims (i), (ii) and (iii). Now, I do not know exactly what is the nature of the dispute between the parties with

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

Royal Courts of Justice

Tuesday, 11th July, 1989

Before:

Mr. Justice Hobhouse

PATHE SCREEN ENTERTAINMENT LIMITED
AND OTHERS

-v-

HANDMADE FILMS (DISTRIBUTORS) LTD.
AND ANOTHER

(Transcribed by Harry Counsell & Co., 61, Carey Street, London,
WC2A 2JG.  Telephone 01-242-9346)

Miss ROSS CRAIL (instructed by Messrs. Wright, Webb & Syrett)

appeared on behalf of the Plaintiffs.

MR. S. BOYD, Q.C.  (instructed by Messrs. Frere Cholmeley)

appeared on behalf of the Defendants.

J U D G M E N T
(Handed down)

1

I am concerned with a summons which was issued on the
24th April 1989 and, so far as is now material asks for
interlocutory relief in the following terms:

"That the first Defendant by itself servants agents or
otherwise howsoever be restrained until after judgment
in this action or further order from continuing the
complaint filed by the first Defendant against Cannon
Screen Entertainment Limited, The Cannon Group Inc,
and Yoram Globus on 10th February 1989 in Superior
Court of the State of California for the County of
Los Angeles under Case No C 714017."

THE AGREEMENTS:

On the 1st April 1984 a written agreement was made between
the predecessor of Cannon UK and the Second Defendants.
This agreement was made in London and included a clause in
the following terms:

"This agreement shall be construed and interpreted
pursuant to laws of England and the parties hereby
consent and submit to the jurisdiction of the Courts
of England in connection with any dispute arising
hereunder.  The parties further agree that process in
any such action may be served upon either of them by
registered or certified mail at the address of first
above given or such other address as the party being
served may from time to time have specified to the
other party by previous written notice."

3

THE JURISDICTION CLAUSE:

The construction of a contract depends upon the words used by the parties construed in their context in the contract and in the light of the surrounding circumstances to the making of the contract.  Broadly, jurisdiction clauses which are mutual may be of three types.  First there can be a clause which specifically provides that a certain court is to have exclusive jurisdiction.  Second there can be a clause, like an arbitration clause, by which the parties agree to refer to a particular court the determination of certain disputes.  Thirdly, the parties can simply agree that a certain court will have jurisdiction over them or to submit to the jurisdiction of that court.  In the first two categories to attempt to litigate a relevant dispute before some other forum is a breach of the clause although under English law, the remedies for such breach may be limited and discretionary; this is because under English law no agreement, apart from some statutory provision can oust the jurisdiction of the court.  The function of the third category is to confer jurisdiction and avoid disputes about jurisdiction; it can accordingly confer useful and valuable rights.

The clauses which I have to construe do not use the word 'exclusive'.  But if the context and the remainder of the words the parties have used demonstrate that their intention was that the jurisdiction should be exclusive then the clause can nevertheless be put into, and enforced as a clause in, the first category.

I have been referred to two cases in which Courts were

32

prepared to treat a jurisdiction clause as exclusive even
though that word was not used.  The first is <u>Austrian Lloyd
v Gresham Life Assurance</u>, 1903 1KB 249 (Court of Appeal).
The contract concerned was a life insurance policy taken
out by a native of Trieste who worked in Constantinople
with the branch office at Budapest of an English Insurance
Company.  The policy was in the French language, bore an
English stamp, was sealed with the Defendants English seal
and was dated Londres".  The translation of the relevant
clause read:

>"Residence for purpose of jurisdiction.  24.  For all
>disputes which may arise out of the contract of
>insurance all the parties interested expressly agree
>to submit to the jurisdiction of the Courts of
>Budapest having jurisdiction in such matters."

At page 251 of the report Lord Justice Romer posed the
question:.

>"Does the condition merely mean that, if one of the
>parties to the contract is sued by the other in the
>Court of Budapest, he will not take any objection to
>its jurisdiction; or, does it mean that parties
>mutually agree that, if any dispute arise under the
>contract, it shall be determined by the Court in
>Budapest?".

He answered the question: "Having regard to the nature of
the contract and its language, I am of opinion that the
latter construction is the correct one."  He considered the
object of the contract and likened the clause to an
agreement to submit any dispute under the contract to the

33

arbitration of some individual.  The other member of the
court, Lord Justice Matthew, expressed himself similarly.
He considered that the plain meaning of the language used
by the parties was that "both parties shall be bound to
refer such a dispute to that court".  The view of the Court
of Appeal was therefore that that clause came within the
second category which I have identified.

The other authority is more recent; it was decided by
the Court of Appeal on the 14th July of last year, Sohio
Supply v Gatoil USA Inc 1989 1 Lloyds 588.  There the
contract was for the sale of 600,000 barrels of Brent crude
FOB Sullom Voe.  The sellers were a Delaware company
carrying on business in Ohio and the buyers, also a
Delaware company, carried on business in Texas but were
believed to be controlled from Geneva.  The contract
incorporated BP standard terms which included a specific
clause - "Governing Law: This agreement shall be governed
by the laws of England.  Under the jurisdiction of the
English Court without recourse to arbitration."  The
question before the Court of Appeal was whether this was an
exclusive jurisdiction clause.  A statement in Dicey and
Morris was approved by the Court: "Some authorities suggest
that the clause must provide in terms that the jurisdiction
of the chosen Court be exclusive - [Hoerter v Hanover
1893, 10 TLR 103, and 2 Canadian cases] - But it is
submitted that the question is whether on its true
construction the clause obliges the parties to resort to
the relevant jurisdiction irrespective of whether the word
exclusive is used".  The Court of Appeal therefore

34

considered it as a question of the construction of the
contract and nothing more, such question to be considered
against the matrix background or surrounding circumstances,
in which the contract was made. The Court of Appeal
considered that having regard to such surrounding
circumstances there was good commercial reason why the
parties should have agreed an exclusive jurisdiction
clause. They rejected as irrelevant arguments based upon
the way in which the clause had been negotiated (Prenn v
Simmonds 1971 1 WLR 1381). They concluded that the true
construction of the contract was that it provided for
exclusive not merely permissive jurisdiction. Before
leaving this authority it is convenient to note that one of
the factors which they took into account in exercising the
discretion which they then had to exercise was expressed in
these terms: "Furthermore, it is inherently undesirable
that there should be concurrent proceedings in different
jurisdictions about the same subject matter.... of course
it is sometimes unavoidable.... but it is certainly a
factor to be taken into account."

Turning now to the contract which I have to construe,
I must of course construe it in accordance with English law
and take into account neither more nor less than the
materials which are considered by English law to be
relevant to the construction of a written commercial
contract. The fact that the clauses in question do not
include the word 'exclusive' does not of itself provide the
answer. However, in view of the fact that if the parties
had wished to provide for exclusive jurisdiction there was

35

a simple and clear wording which they could have adopted to achieve that result, there is no warrant for construing a jurisdiction clause as an exclusive jurisdiction clause unless that can clearly be seen to be the intention of the parties.

Before me both parties sought to rely upon the surrounding circumstances and the structure of the agreements. Thus it was said by the Defendants that it would be nonsense to have an exclusive jurisdiction clause because these contracts were capable of being performed worldwide and questions under them in particular questions about possible infringements of copyright, might arise in any country and need to be enforced locally. I was not impressed by this argument. The parties to the various contracts can appropriately be restrained by proceedings in the English Courts and the contract provides that the original parties should continue to be liable notwithstanding assignments. An exclusive jurisdiction clause might well assist in frustrating spoiling tactics by a contract breaker. Persons who are not parties to the contract would not be bound by nor entitled to rely upon the clause whatever its form.

The Plaintiffs' argument was not much more impressive. They argued that since the original parties to the contracts and indeed the notice addresses were English a permissive jurisdiction clause could not have any relevant content and that it therefore, in order to give it some worthwhile commercial effect, should be construed as an exclusive jurisdiction clause. This argument was

36

misconceived on the terms of the contracts themselves.  The
parties to the conforming agreements would not necessarily
be the same as those to the output agreement and there was
a provision for the substitution of other group companies
as parties to the contract, or the assignment of the
contracts, or the performance of the contracts through
other companies.  It is easy to contemplate a situation
where the jurisdiction clauses could perform a useful
function in the enforcement of the rights under the
contract or the resolution of disputes under the contract
even if they are construed permissively.  Further it is a
mistaken argument to say that every part of a commercial
agreement of this character must be given effect and may
not be surplusage.  It is common place that in commercial
transactions, particularly where they use standard terms,
contracts may to some extent contain surplusage.  If the
wording of the clause is clear then the fact that it adds
nothing to the remainder of the agreement is no
justification for giving it a meaning other than that which
it naturally bears.

In my judgment the wording of these clauses is clear.
The clause in the model and conforming agreements starts by
specifically referring to the fact that the agreement shall
be binding upon and inure to the benefit of the parties and
their respective successors and permitted assigns.  It
therefore expressly contemplates the relevance of other
entities than those actually named in the agreement.  It
then uses words which are words of submission not
reference: "The parties hereby submit to the jurisdiction".

37

In the output agreement the equivalent phrase is "the parties hereby consent and submit to the jurisdiction". The addition of the word 'consent' reinforces the same conclusion. The phrase in the Austrian Lloyd case was "agree to submit" but in that case it was construed in a transitive sense as an agreement to submit disputes to a particular court in the same way as one can agree to submit disputes to the decision of an arbitrator. The clauses which I have to construe do not lend themselves to a transitive construction; the sense is that the parties submit themselves to the jurisdiction of the court not that the parties submit disputes. In the Austrian Lloyd case it was open to the court to construe the words as if they read "agree to submit all such disputes". I do not consider that it would be appropriate to make such an inferential insertion in these clauses. Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English Courts and not that there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used. It is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.

The Plaintiffs' claim for relief based upon the

38

A

allegation that these contracts contained exclusive jurisdiction clauses and that it was a breach of contract for the Defendants to commence the proceedings in the Californian Courts therefore fails.  The Plaintiffs if they are to succeed in obtaining the relief for which they ask on this summons will have to succeed under the second

B

and/or third of Lord Brandon's headings.  This conclusion of course does not exhaust the relevance of the jurisdiction clauses.  As will be apparent I consider them

C

to be of primary importance in evaluating the justice and propriety of granting an injunction to stay the Californian proceedings under the second and/or third heads.

D

E

F

G

H

39

The Weekly Law Reports, August 27, 1971

1381

I W.L.R.                    In re Ward decd. (Ch.D.)              Plowman J.

A    So, far from *In re Ivory* being an authority against the view which I take in this matter, in my judgment it impliedly supports that view.

I was also referred to *Concha v. Concha* (1886) 11 App.Cas. 541 in the House of Lords which again, I think, affords support for the view which I take because it was decided there by the House of Lords that the statement of the deceased's domicile which is to be found in probates and letters of administration, as indeed it is in the present case, is not conclusive B  in rem.

For those reasons, in my judgment question 1 of the originating summons falls to be answered in the terms of paragraph (b) of that question, and I will so declare.

I will make an order under question 2 (b) that

C    "the plaintiffs may (without being under any liability by so doing) refrain from bringing such proceedings as aforesaid unless the defendants provide to the plaintiffs security,"

and so on.

*Order accordingly.*

Solicitors: *Winston & Co.; Fairchild, Greig & Co.*

D

T. C. C. B.

E               [HOUSE OF LORDS]

\* PRENN  .   .   .   .   .   .   .   . APPELLANT

                       AND

SIMMONDS .   .   .   .   .   .   .   . RESPONDENT

F  1971  June 8, 9, 10, 14, 15;    Lord Reid, Lord Donovan, Lord Wilberforce,
          July 20                 Lord Pearson and Lord Diplock

*Contract—Agreement in writing—Construction—Option to buy shares at named price if "profits" available for dividend of company over relevant period reached named sum—Whether "profits" referred to those of company alone or to "consolidated profits" of company and its subsidiaries—Whether evidence of prior negotiations between parties receivable as an aid to construction of agreement*

The respondent brought an action against the appellant in which he claimed that under the terms of an agreement under seal dated July 6, 1960, he was entitled to acquire from the appellant for a consideration of £6,600 a four per cent. interest in the ordinary capital of R.T.T., a company controlled H  by the appellant. That interest was at the date of trial worth some £200,000. The appellant disputed the claim on the ground that a necessary condition prescribed by the agreement had not been satisfied because less than £300,000 profits available for dividend on the ordinary stock of the company over the relevant period had been earned. The dispute between the parties related to whether the "profits" in question meant (a) the separate profits of R.T.T. alone in which case the amount over the period fell short of the target figure by less

1382

Prenn v. Simmonds (H.L.(E.))                    [1971]

than £10,000, or (b) the consolidated profits of the group con-    A
sisting of R.T.T. and subsidiaries in which case the amount
was largely exceeded.

    Pennycuick J. rejected the respondent's construction that
" profits " meant consolidated profits but ordered rectification
of the agreement. On appeal, the Court of Appeal dismissed
the appeal finding in favour of the respondent on the question
of construction.

    The appellant appealed to the House of Lords. On the    B
hearing of the appeal it was contended, inter alia, on behalf
of the respondent that it was permissible to look at prior
negotiations between the parties as an aid in the construction
of a written document:—

    Held, (1) that in construing a written agreement evidence
of negotiations or of the parties' intentions ought not to be
received by the court, and that evidence should be restricted
to evidence of the factual background known to the parties    C
at or before the date of the contract, including evidence of the
" genesis " and objectively the " aim " of the transaction.

    Hvalfangerselskapet Polaris Aktieselskap v. Unilever Ltd.
(1933) 39 Com.Cas. 1, H.L.(E.) considered.

    (2) That albeit the wider principle of construction con-
tended for failed, the word " profits " in the context of the
agreement meant " consolidated profits," and that, accordingly,
the appeal must be dismissed.    D

    Decision of the Court of Appeal affirmed.

The following cases are referred to in Lord Wilberforce's opinion:

Crane v. Hegeman-Harris Co., Inc. [1939] 1 All E.R. 662; post, p. 1390.
Hvalfangerselskapet Polaris Aktieselskap v. Unilever Ltd. (1933) 39 Com.
    Cas. 1, H.L.(E.).
MacDonald v. Longbottom (1859) 1 E. & B. 977.    E
River Wear Commissioners v. Adamson (1877) 2 App.Cas. 743, H.L.(E.).
Utica City National Bank v. Gunn (1918) 118 N.E. 607.

The following additional cases were cited in argument:

Bank of New Zealand v. Simpson [1900] A.C. 182, P.C.
Birch v. Depeyster (1816) 4 Camp. 385.
Edwards v. Saunton Hotel Co. Ltd. [1943] 1 All E.R. 176.    F
Holdsworth (Harold) & Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R.
    352; [1955] 1 All E.R. 725, H.L.(Sc.).
Shore v. Wilson (1842) 9 Cl. & Fin. 355, H.L.(E.).
Suisse Atlantique Société D'Armement Maritime S.A. v. N.V. Rotter-
    damsche Kolen Centrale [1967] 1 A.C. 361; [1966] 2 W.L.R. 944;
    [1966] 2 All E.R. 61, H.L.(E.).

                                                       G

APPEAL from the Court of Appeal.

    This was an appeal by leave of the House of Lords by the appellant,
Daniel Dan Prenn, who was the defendant in the action, from the order
of the Court of Appeal (Lord Denning M.R., Widgery and Cross L.JJ.)
dated January 28, 1970, dismissing an appeal by the appellant from an
order dated February 25, 1969, whereby Pennycuick J. in an action by the
respondent, John Charles Simmonds, as plaintiff (1) ordered rectification    H
of a deed dated July 6, 1960, executed by the appellant and the respondent
for the acquisition by the respondent of certain shares in Controls &
Communications Ltd. (formerly called Radio & Television Trust Ltd.);
(2) ordered specific performance of the deed as so rectified and (3) ordered
that the appellant should pay nine-tenths of the respondent's costs of such
action.

**1 W.L.R.**              Prenn v. Simmonds (H.L.(E.) )              Lord Wilberforce

A   the relevant surrounding circumstances may be different. And at this stage
there is no consensus of the parties to appeal to. It may be said that
previous documents may be looked at to explain the aims of the parties.
In a limited sense this is true: the commercial, or business object, of the
transaction, objectively ascertained, may be a surrounding fact. Cardozo J.
thought so in the *Utica Bank* case. And if it can be shown that one inter-
pretation completely frustrates that object, to the extent of rendering
B   the contract futile, that may be a strong argument for an alternative inter-
pretation, if that can reasonably be found. But beyond that it may be
difficult to go: it may be a matter of degree, or of judgment, how far one
interpretation, or another, gives effect to a common intention: the parties,
indeed, may be pursuing that intention with differing emphasis, and hoping
to achieve it to an extent which may differ, and in different ways. The
C   words used may, and often do, represent a formula which means different
things to each side, yet may be accepted because that is the only way to
get "agreement" and in the hope that disputes will not arise. The only
course then can be to try to ascertain the "natural" meaning. Far more,
and indeed totally, dangerous is it to admit evidence of one party's objective
—even if this is known to the other party. However strongly pursued this
may be, the other party may only be willing to give it partial recognition,
D   and in a world of give and take, men often have to be satisfied with less
than they want. So, again, it would be a matter of speculation how far
the common intention was that the particular objective should be realised.
In the present case, Lord Denning M.R. seems to have taken into account
Dr. Simmonds' anxiety (as testified by a witness) to protect himself against
unilateral decisions by Mr. Prenn: and an argument pressed on us was
E   that, if Mr. Prenn's interpretation (i.e. that only the holding company's
profits were relevant) was correct, Dr. Simmonds would, in this matter on
which he felt so anxious, in some respect at least, be completely in Mr.
Prenn's hands, for Mr. Prenn could decide just how much, or how little, of
the subsidiaries' profits were to be passed to the holding company. I cannot
see how any of this can be admissible, because, I repeat, I cannot see how
it is helpful. Given the fact of Dr. Simmonds' anxiety, the whole question
F   is how far does the agreement meet it: how can we know, except by
interpreting the agreement, how far Mr. Prenn was willing to meet him
or how far Dr. Simmonds decided to take what he could get? Even the
argument that Mr. Prenn's interpretation would put Dr. Simmonds in his
hands, though apparently attractive, I find to be dangerous: a man in
Dr. Simmonds' position—a professional man—entering into relations with
the source of finance and benefits to come, might decide, in his own interest,
G   that if he could not get all the protection he wanted, the risk of partial
protection was one to accept; that Mr. Prenn had to be trusted to act
fairly. To say that the clause had this result is not to say that it was futile
or frustratory: it is to say that a better clause could, with hindsight, in
Dr. Simmonds' interest have been drawn. But the court cannot construct
such a clause out of the material given.

H       In my opinion, then, evidence of negotiations, or of the parties' inten-
tions, and a fortiori of Dr. Simmonds' intentions, ought not to be received,
and evidence should be restricted to evidence of the factual background
known to the parties at or before the date of the contract, including
evidence of the "genesis" and objectively the "aim" of the transaction.

       As to the circumstances, and the object of the parties, there is no contro-
versy in the present case. The agreement itself, on its face, almost supplies
enough, without the necessity to supplement it by outside evidence. But

Supreme Court                                                                          *A*

## *Rainy Sky SA v Kookmin Bank*

[2011] UKSC 50

2011  July 27;                     Lord Phillips of Worth Matravers PSC, Lord Mance,
    Nov 2                          Lord Kerr of Tonaghmore, Lord Clarke of          *B*
                                        Stone-cum-Ebony, Lord Wilson JJSC

*Contract — Construction — Performance bond — Advance payment bonds issued in*
*respect of shipbuilding contracts — Shipbuilder experiencing financial difficulty*
*and subjected to debt work-out procedure — Claimant buyers demanding*
*repayment of instalments already paid to shipbuilder under terms of contracts —*
*Shipbuilder refusing to repay instalments — Buyers claiming repayment under*
*bonds — Whether bonds covering sums to which buyers claiming entitlement to*    *C*
*repayment — Whether considerations of commercial common sense relevant in*
*construing contractual terms*

    A shipbuilder entered into six contracts to build and sell a vessel to each of the
first six claimants.  The purchase price of each vessel was payable in five equal
instalments at specified times with the final instalment being paid on delivery.  It was
a term of the contract that as a condition precedent to the payment of the first    *D*
instalment the shipbuilder would give the buyers refund guarantees relating to the
instalments.  In accordance with that term the defendant bank issued each claimant
with advance payment bonds.  After the six claimants had paid the first instalment
and the first claimant had paid the second instalment, the shipbuilder experienced
financial difficulties and became the subject of a debt work-out procedure.  The
shipbuilder refused to refund the instalments paid.  The first six claimants together
with the seventh claimant who was the assignee of the benefit of the bonds, brought    *E*
proceedings against the bank claiming repayment under paragraph 3 of the bonds of
the instalments paid to the shipbuilder, and issued an application for Part 24
summary judgment.  The bank refused to pay on the grounds that paragraph 3 had to
be read with paragraph 2 and on its true construction paragraph 3 did not cover the
refunds which the six claimants sought, but covered pre-delivery instalments prior to
the termination of the contract or a total loss of the vessel.  The defendant issued a
counter application for Part 24 summary judgment.  The judge in the Commercial    *F*
Court held that the construction of paragraph 3 of the bonds contended for by the
bank would have an uncommercial result and gave summary judgment for the
claimants.  The bank appealed but conceded that the two different interpretations
of paragraph 3 advanced by the bank and by the claimants were both arguable.
The Court of Appeal held, by a majority, that the construction contended for by the
bank would not produce an absurd or irrational result and that it was not sufficient to
say that no credible commercial reason had been advanced for the limited scope of    *G*
the bonds as that would put the court in danger of substituting its own judgment of
the commerciality of the transaction for that of the parties.  Accordingly, the Court
of Appeal allowed the appeal and gave summary judgment for the bank.
    On appeal by the claimants—
    *Held*, allowing the appeal, that the ultimate aim of interpreting a provision in a
contract, especially a commercial contract, was to determine what the parties meant    *H*
by the language used, and that involved ascertaining what a reasonable person would
have understood the parties to have meant; that the relevant reasonable person for
that purpose was one who had all the background knowledge which would
reasonably have been available to the parties in the situation in which they were at
the time of the contract; that where the parties had used unambiguous language the
court had to apply it, but it was not necessary to conclude that unless the most

[2011] 1 WLR                           Rainy Sky SA v Kookmin Bank (SC(E))

A   natural meaning of the words produced a result so extreme as to suggest that it was
    unintended, the court had to give effect to that meaning; that the court had to have
    regard to all the relevant surrounding circumstances and if there were two possible
    constructions the court was entitled to prefer the construction which was consistent
    with business common sense and to reject the other; that it was not necessary to
    conclude that a particular construction would have an absurd or irrational result
    before having regard to the commercial purpose of the agreement; that since the two
B   possible interpretations of paragraph 3 contended for by the claimants and by the
    bank were both arguable, it was appropriate for the court to have regard to
    considerations of commercial common sense in resolving the question as to what a
    reasonable person would have understood the parties to have meant; that an
    appellate court was also entitled to take account of the fact that an experienced judge
    of the Commercial Court had concluded that the bank's construction would have
    an uncommercial result; that of the two arguable constructions of paragraph 3 the
    claimants' construction was to be preferred because it was consistent with the
C   commercial purpose of the bonds in a way that the bank's construction was not; and
    that, accordingly, the judge's order would be restored (post, paras 14, 20, 21, 23, 29,
    30, 40–47).
         Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995]
    EGLR 97, CA, Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2) [2001]
    2 All ER (Comm) 299, CA and Barclays Bank plc v HHY Luxembourg SARL
    [2011] 1 BCLC 336, CA considered.
D        Decision of the Court of Appeal [2010] EWCA Civ 582; [2011] 1 All ER (Comm)
    18 reversed.

    The following cases are referred to in the judgment of Lord Clarke of Stone-cum-
    Ebony JSC:

    Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191; [1984]
E        3 WLR 592; [1984] 3 All ER 229, HL(E)
    Barclays Bank plc v HHY Luxembourg SARL [2010] EWCA Civ 1248; [2011]
         1 BCLC 336, CA
    Chartbrook Ltd v Persimmon Homes Ltd (Chartbrook Ltd Part 20 defendants)
         [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200,
         HL(E)
    Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995]
         1 EGLR 97, CA
F   Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2) [2001] EWCA Civ 1047;
         [2001] 2 All ER (Comm) 299; [2001] CLC 1103, CA
    Golden Key Ltd, In re [2009] EWCA Civ 636, CA
    Homburg Houtimport BV v Agrosin Private Ltd (The Starsin) [2003] UKHL 12;
         [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)
    International Fina Services AG v Katrina Shipping Ltd (The Fina Samco) [1995]
         2 Lloyd's Rep 344, CA
G   Investors Compensation Scheme Ltd v West Bromwich Building Society [1998]
         1 WLR 896; [1998] 1 All ER 98, HL(E)
    Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd [1997] AC 749;
         [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
    Pink Floyd Music Ltd v EMI Records Ltd (Practice Note) [2010] EWCA Civ 1429;
         [2011] 1 WLR 770, CA
    Prenn v Simmonds [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)
H   Sigma Finance Corpn, In re [2009] UKSC 2; [2010] 1 All ER 571, SC(E)
    Society of Lloyd's v Robinson [1999] 1 WLR 756; [1999] 1 All ER (Comm) 545
    Wickman Machine Tool Sales Ltd v L Schuler AG [1974] AC 235; [1973] 2 WLR
         683; [1973] 2 All ER 39, HL(E)

    No additional cases were cited in argument.

QB                                                                    **109**

A   **Royal Bank of Scotland plc v Highland Financial Partners LP &
    Ors.**
    [2012] EWHC 1278 (Comm)

    Queen's Bench Division (Commercial Court).
B   Burton J.
    Judgment delivered 25 May 2012.

C   *Anti-suit injunction – Collateralised debt obligation – Concealment –
    Defendant borrowers' CDO transaction never closed because of market
    collapse – Realisation by claimant bank of acquired loans – Claimant entitled
    to recover outstanding balance of advances but giving credit for value of loans
    – Separate decisions on liability and quantum – Claimant concealed fact that
    some loans previously transferred from trading book to banking book to take
    advantage of accounting treatment – Defendants commencing proceedings in
    Texas for fraudulent misrepresentation – Whether proceedings in breach of
D   exclusive English jurisdiction clause – Whether Texan proceedings vexatious
    and oppressive – Whether claimant disentitled to injunctive relief because of
    unclean hands – Whether liability judgment should be set aside as obtained
    by fraud.*

E       These were applications by the claimant bank (RBS) for permanent anti-suit
    injunctive relief and by the first to third defendants to set aside judgment in
    favour of RBS on the ground that it was obtained by fraud.

        The issues arose out of a series of agreements involving the advancing by
    RBS of some €240 million in respect of a proposed collateralised debt obligation
F   (CDO) transaction called Highlander V. Highlander V involved the Highland
    companies borrowing from RBS via a special purpose vehicle to acquire a
    portfolio or warehouse of loans and to issue securities to the market using the
    loans as collateral. The transaction was a casualty of the market collapse of
    2008–9, and there never was a closing date, no securities were ever issued, and
G   RBS sought repayment from the Highland defendants of the balance outstanding
    after realising the acquired loans.

        RBS obtained summary judgment on its claim (see [2010] EWHC 194
    (Comm)), with quantum to be assessed. That decision was upheld on appeal:
    [2010] EWCA Civ 809.
H
        At the quantum hearing the defendants took issue with the method by which
    RBS had realised the acquired loans, namely an informal quasi-auction known
    as 'bids wanted in competition' (BWIC). The court held ([2010] EWHC 3119
    (Comm)) that, before the opening of the BWIC, RBS had already decided to
    retain 36 of the loans and had transferred them from its trading book to its

A   banking book in order to take advantage of the favourable accounting treatment permitted by IAS/39. In the circumstances RBS was in breach of its contractual obligations and of its equitable obligations as mortgagee.

B   The result of RBS's failure to comply with its obligation to disclose that it had already decided to acquire the 36 loans was to reduce its recovery from £35m to €21m.

C   The fact that, in order to take advantage of IAS/39, the 36 loans had been transferred by RBS from its trading book onto its banking book before the BWIC, and that they were thus not for sale to third parties in the BWIC, was referred to in this hearing as the suppressed fact.

The second defendant Highland company and Scott Law, as assignee of the other Highland defendants, then commenced Texan proceedings against RBS, alleging misrepresentation and fraud in relation to the 36 loans.

D   RBS sought an anti-suit injunction to restrain the Texan proceedings, on the basis that, if the Highland defendants and assignee were entitled to bring the proceedings at all, they were in breach of exclusive English jurisdiction clauses in doing so in Texas; and in any event the matters sought to be litigated in Texas were res judicata, or the litigation was vexatious or an abuse of process because those matters had been, or ought to have been, litigated in the English E   proceedings. There were jurisdiction clauses in a number of the agreements which governed the CDO, but RBS placed principal reliance on that in the First Loss Deposit Facility Deed.

The Highland defendants and Scott Law argued that the jurisdiction clauses F   did not prevent the Texan proceedings and/or there were strong reasons not to grant injunctive relief, and that RBS was not entitled to injunctive relief by virtue of the equitable doctrine of 'unclean hands'. Further the Highland defendants and Scott Law sought to set aside the liability judgment on the ground that it was obtained by fraud.

G   *Held*, refusing the defendants' application to set aside the liability judgment and RBS's application for injunctive relief:

1. The liability judgment should not be set aside on grounds of fraud. Despite the fraudulent concealment, the outcome would not have changed. Ordinarily where it was sought to set aside a judgment obtained by fraud, what would H   happen on a retrial was uncertain, or at any rate unknown, and it might well be difficult, if not impossible, to consider what the decision might be if the matter were re-tried with honest evidence. But in this case, the case had been tried with all the evidence, including the previously suppressed fact. It would be pointless to set aside the judgment, since, if the case were retried, the same result would

A   follow, so far as liability and quantum was concerned. By reference to the facts and disclosure at the quantum trial, which had not materially changed as a result of considerable further disclosure, the result in the quantum judgment was correct and reflected the true position, including the previously suppressed fact. Even if there had been dishonest concealment, the judgment on liability should not be set aside. In any event the court was not persuaded that there had

B   been dishonest concealment at the stage of the summary judgment application, although there had been later.

2. The jurisdiction clause in the First Loss Deed was to be construed as an exclusive English jurisdiction clause so far as the defendants were concerned.

C   If RBS was entitled to enforce the exclusive jurisdiction clause against the Highland defendants, then it was also entitled to do so as against Scott Law claiming under them. The claims made in the Texan proceedings fell within the exclusive jurisdiction clause contained in the deed; the claims in tort, relating to the circumstances of the extension and termination of the CDO were all claims 'in connection with' the deed, as part of an interlocking package of agreements.

D   RBS was entitled to rely upon the exclusive jurisdiction clause to restrain proceedings not only against itself, but also against two employees, who had been joined in the Texan proceedings as personal defendants; to restrain the Texan proceedings, not only against RBS, but also against the employees, fell within the ambit of the exclusive jurisdiction clause and/or was a proper consequence of it.

E   Given the applicability of the exclusive jurisdiction clause, questions of comity did not arise.

3. In the circumstances strong reasons were required if the English court was not to grant an anti-suit injunction. 'Unclean hands' was a well-established concept applicable by way of a defence to any claim for equitable relief. The

F   question therefore was whether there had been sufficiently serious improper conduct by RBS, having an immediate and necessary relation to the equitable relief sued for, namely the injunctive relief to restrain the Texa proceedings. RBS's main witness had deliberately concealed the suppressed fact until at or immediately before the quantum trial. He had also lied on this application. There

G   had therefore been improper conduct up to and including this hearing and it was serious. That misconduct had an immediate and necessary relation to the equity sued for. Although there might be some hardship to RBS, the findings as to unclean hands were strong reasons why the court should not grant an injunction enforcing the exclusive jurisdiction clause in favour of RBS.

H

The following cases were referred to in the judgment:

*ACP Capital Ltd v IFR Capital plc* [2008] 2 Ll Rep 655.
*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Ll Rep 87.

QB                           RBS v Highland Financial Partners                    **175**
                                      *(Burton J)*

A    questions (e.g. as to the precise circumstances of Phase 2), but I am entirely satisfied
     that, by reference to the facts and disclosure that were in the event before me at the
     Quantum Trial (which have not materially changed as a result of the considerable
     further disclosure now before me) the result in the Quantum Judgment is correct and
     reflects the true position, including the previously Suppressed Fact. I am satisfied
B    therefore that the judgment should not be set aside and that, if it were, judgment to
     the same effect would be given.

     129. Even if there were dishonest concealment therefore, I do not conclude that
     the judgment on liability should be set aside. However, I am not persuaded in any
     event that there was at the stage of the Part 24 application dishonest concealment by
C    Mr Griffiths. Although the Suppressed Fact had not at that stage been revealed to
     Herbert Smith, I am not persuaded to the relevant standard of proof that Mr Griffiths,
     knowing or believing, and being advised, that information relating to quantum did
     not need to be disclosed, was dishonestly concealing a matter which he knew ought
     to have been revealed. Clearly he ought to have told the true position to Herbert
     Smith and left them to decide what to disclose, but I do not conclude that he was
D    deliberately and dishonestly concealing the information at *that* stage, albeit that I do
     so conclude in respect of the periods which followed and leading up to the trial on
     quantum. However my conclusion in this regard is not in the event determinative,
     because of the conclusion I have reached above that the judgment on liability should
     not be set aside.

E
     **VII The Anti-Suit Injunction**

     130. The following issues arise:

F    (i) Is there a relevant jurisdiction clause?

     (ii) If so, does it provide for the exclusive jurisdiction of the English courts for any
     claim by Highland against RBS?

G    (iii) Does it apply to Scott Law as assignee?

     (iv) What is the ambit of such clause?

     (v) Does it prevent claims against Hall and Griffiths?

H    (vi) What is the impact of comity on such clause, if any?

     (vii) If there is no exclusive jurisdiction clause, can the Texas proceedings be said
     to be vexatious and/or an abuse as brought by Highland and/or Scott Law against (i)
     RBS (ii) Hall and Griffiths?

**176**       RBS v Highland Financial Partners       [2012] 2 CLC
                    *(Burton J)*

(viii) Are there 'strong reasons' not to enforce such a clause at the suit of RBS and/       A
or is the doctrine of 'unclean hands' an answer to RBS's claim for injunctive relief?

*(i) Jurisdiction Clauses*

131. There are jurisdiction clauses in a number of the Agreements which governed       B
the CDO, but only four of them are relied upon by RBS, those set out in (ii), (v), (vi)
and (vii) below, though RBS places principal reliance on the First Loss Deed (in (v)):

(i) The Mandate Letter of 5 April 2007 contained in its original form, and as amended/
restated on 25 March 2008, (at Clause 10) what is conceded to be a non-exclusive       C
English jurisdiction clause, together with an English law provision.

(ii) The ISD, also of 5 April 2007, to which RBS, the Issuer, the Interim Servicer and
the Second and Third Defendants were the (relevant) parties contained the following
material clauses:

   **'22.1** *Jurisdiction*       D

  The Issuer irrevocably agrees that the courts of England shall have jurisdiction
  to hear and determine any suit, action or proceedings, and to settle any
  disputes, which may arise out of or in connection with this deed (respectively
  "Proceedings" and "Disputes") and, for such purposes, irrevocably submits to       E
  the jurisdiction of such courts. The Issuer irrevocably waives any objection
  which it might now or hereafter have to the courts of England being nominated
  as the forum to hear and determine any Proceedings and to settle any Disputes
  and agrees not to claim that any such court is not a convenient or appropriate
  forum.       F

  *22.2 Non Exclusive Jurisdiction*

  The submission to the jurisdiction of the courts referred to in this clause 22
  (Jurisdiction) is for the benefit of [RBS] and shall not (and shall not be construed
  so as to) limit the right of [RBS] to take Proceedings against the Issuer in any       G
  other court of competent jurisdiction nor shall the taking of Proceedings in
  any one or more jurisdictions preclude the taking of Proceedings in any other
  jurisdiction (whether concurrently or not) to the extent permitted by applicable.

  *22.3 Process Agent Appointment*       H

  The Issuer hereby appoints TMF Management (UK) Limited ... to receive
  service of process on its behalf as its authorised agent for service of process in
  England ...'

Again there was a provision (by Clause 21) for English law to govern it.

A

(iii) The Funding Agreement (also of 5 April 2007), to which only the Issuer and RBS were (relevant) parties, contained, in Clause 16, an English law clause, and then the three subclauses dealing with jurisdiction identical to those in the ISD.

B

(iv) The Debenture, also of 5 April 2007, between RBS and the Issuer contains, by Clause 20, an English law clause and, by Clause 21, an exclusive jurisdiction clause (expressed to be for the benefit of RBS only).

(v) The First Loss Deed, of 31 October 2007, to which the Interim Servicer and the First, Second and Third Defendants and RBS were the only parties, provides, by

C

Clause 12, an English law clause, and then by Clause 13 as follows:

'13.1 *Jurisdiction*

D

The Parties irrevocably agree that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this deed (respectively "Proceedings" and "Disputes") and, for such purposes, irrevocably submits to the jurisdiction of such courts. The Parties irrevocably waive any objection which each may now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and to settle any Disputes

E

and each Party agrees not to claim that any such court is not a convenient or appropriate forum.

13.2 *Non Exclusive Jurisdiction*

F

The submission to the jurisdiction of the courts referred to in this clause 13 (Jurisdiction) is for the benefit of [RBS] and shall not (and shall not be construed so as to) limit the right of [RBS] to take Proceedings against another Party in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) to the extent permitted by applicable

G

law.'

(vi) The 31 October [2007] Amendment Deed, to which the Issuer, the Interim Servicer, the Second and Third Defendants and RBS were the only relevant parties, contains the following provisions of relevance:

H

'2.3 Save as varied by this Amendment Deed, the [ISD] and the [Funding Agreement] shall each remain in full force and effect upon the terms and conditions set out therein respectively.

...

**178**          RBS v Highland Financial Partners          [2012] 2 CLC
                           (*Burton* J)

3.1 Each Party acknowledges and agrees with the other Party that this deed    A
together with any other documents referred to in this Amendment Deed
constitutes the entire and only agreement between the Parties.

3.2 If any of the provisions of this Amendment Deed are inconsistent with or
in conflict with any of the provisions of the [ISD] or [Funding Agreement]    B
then, to the extent of any such inconsistency or conflict, the provisions of this
Amendment Deed shall prevail as between the Parties.

4. PROVISIONS OF THE [ISD] APPLICABLE

The provisions of clauses 15 (Limited Recourse), 16 (No Petition), 18 (Notices),   C
19 (Counterparts), 21 (Governing Law) and 22 (Jurisdiction) of the [ISD] shall
apply, mutatis mutandis, to this Amendment Deed as if they were set out herein
and references to [ISD] were replaced by references to "this Amendment Deed".'

(vii) The Second Loss Deed (being the further Amendment Deed of 1 April 2008),   D
to which RBS, the Issuer, the Interim Servicer and the First, Second and Third
Defendants were all parties, effected an amendment to all of the ISD, the Funding
Agreement and the First Loss Deed, and contained identical provisions to those in the
First Amendment Deed, which I have set out above, save to make express reference
additionally to the First Loss Deed as also being amended.

                                                                                E
132. Mr Nicholls' case is that the clause in the First Loss Deed is plainly (and
sufficiently) an exclusive jurisdiction clause, binding upon the Defendants (and Scott
Law as assignee), and such as to entitle him to an injunction. If it be necessary he
also relies upon the ISD, as amended by the two subsequent Amendment Deeds. He
recognises, as was forcefully pointed out by the Defendants, that the clause in the
ISD plainly only applied to the Issuer. However he submits that this is overtaken by    F
the Amendment Deeds:

(i) The First Amendment Deed amends the provisions of the ISD, as there appears.
It is not simply that the provisions of the jurisdiction clause, expressly referred to in
Clause 4, apply 'as if set out herein', but that there is then additionally the usage of the
words 'mutatis mutandis', which Mr Nicholls submits makes plain that the provisions   G
are thus to apply to all of the parties to the ISD and the Funding Agreement who are
now parties to the Amendment Deed which amends them, and not just to the Issuer.

(ii) The second Amendment Deed (the Second Loss Deed) makes the position even
clearer, Mr Nicholls submits, as, in addition to amending the ISD and the Funding    H
Agreement (and the First Amendment Deed), it now also amends the FLD, to which
the First Defendant was a party, such that, the Issuer, the Servicer and all the Highland
Defendants are now parties and, he submits, governed *mutatis mutandis* by the
provisions of the jurisdiction clause, as it states.

A

133. The Defendants submit that the meaning of *mutatis mutandis* cannot be stretched so as to add additional parties into the jurisdiction clause, particularly given that the jurisdiction clause in the ISD specifically related only to the Issuer when it could have been applied to the Second and Third Defendants, who were parties to that Agreement. Mr Dunning suggests that it may be that the jurisdiction clause in the ISD was inserted in relation to the Issuer because it was considered that there might be some doubt about there being jurisdiction against the Issuer, a Dutch Company, unlike the American companies, given the possible impact on jurisdiction of the European element.

B

134. I am not persuaded that the mutatis mutandis provisions of the Amendment Deeds can be stretched so as to subject any other parties than the Issuer to the jurisdiction provision in the ISD. I agree that such clause can only be relied upon by RBS as against the Issuer, now in liquidation.

C

*(ii) Exclusive Jurisdiction*

D

135. There is no doubt about the governing law of the First Loss Deed being English. There are two arguments raised by the Defendants, which intertwine. The first is as to whether Clause 22.1 of the First Loss Deed is exclusive (as far as concerned the Defendants), and the second is whether it is, as described by Steyn LJ in *Continental Bank v Aeakos SA* [1994] 1 WLR 588 at 594, merely *transitive*, in the sense of involving an agreement by the Defendants to submit the disputes to the jurisdiction of the English courts, but not necessarily exclusively so.

E

136. Mr Nicholls relies strongly on the contrast between Clause 22.1 and Clause 22.2. If Clause 22.2 provides in terms that the jurisdiction of the English courts provided for in Clause 22 is non-exclusive so far as RBS is concerned, it ought to follow that it is exclusive, in the absence of such exemption, so far as concerns the Defendants (similarly so, though, as I have found, only as between RBS and the Issuer, in the identical provision in the ISD). The Defendants however point to the use of the words exclusive jurisdiction in the Debenture, such as to make it plain that, experienced lawyers being involved in the drafting of these agreements – see what was said about careful drafting of clauses in a series of contracts with the assistance of lawyers in *ACP Capital Ltd v IFR Capital plc* [2008] 2 Ll Rep 655 at paragraph 24 per Beatson J – if no such wording is used, then its absence is significant. Since the jurisdiction is not provided to be exclusive, it must be non-exclusive, and simply transitive.

F

G

H

137. It is plain however that whether a clause provides for exclusive jurisdiction or not is a question of construction, and that the express word exclusive does not need to be used. I referred in *Starlight Shipping Co v Allianz Marine (The Alexandros T)* [2012] 1 CLC 100, at paragraphs 20 to 23, to passages in *Briggs & Rees: Civil Jurisdiction and Judgments* (5th Ed) at 4.45 and *Dicey, Morris and Collins: The Conflict of Laws* (14th edn) at 12·092 and to *Sohio Supply Co v Gatoil (USA) Inc*

[1989] 1 Ll Rep 588 (CA) and *Svendborg v Wansa* [1997] CLC 985, upon which Mr          A
Nicholls relied; and I cited Steyn LJ in *Continental Bank* where he said 'it would be
a surrender to formalism to require a jurisdiction clause to provide in express terms
that the chosen Court is to be the exclusive forum' (at 594a).

138. In particular Mr Nicholls relied upon the decision of Field J in *Bank of New*          B
*York Mellon v GV Films* [2010] 1 Ll Rep 365, where he reached a conclusion that
a clause, in similar terms to that in Clause 22.1 (and where there was, like here, an
express liberty to the other party (alone) to bring proceedings in any other court of
competent jurisdiction), 'clearly show[ed] that the intention of the parties was that the
courts of England are to be the exclusive jurisdiction so far as proceedings brought
by [the one party] are concerned' (at paragraph 14). This is a far more analogous case          C
than *The Fesco Angara* [2010] 2 CLC 448, upon which the Defendants relied, and one
entirely consistent with the authorities set out in *The Alexandros T*, to which I have
referred above. I have reached the same conclusion as did Field J.

*(iii) Assignment*          D

139. Scott Law accepts that, if the Texas Proceedings can be restrained as being
vexatious and/or an abuse at the instance of RBS as against the Highland Defendants,
then, since they are assignees of some of the Highland Defendants, they too can be
restrained on that basis. They did not however accept that they could be restrained
by way of reliance upon the contractual provisions of the jurisdiction clause, since          E
they have not become bound by them. It may be that this is not any longer materially
in issue before me, because the heat appeared to go out of the argument once it was
agreed between the parties that all issues of damages or compensation arising out of
alleged breach of the jurisdiction clause would be adjourned over to another occasion
(see paragraph 30 above). The Defendants placed reliance upon the decision of the
Court of Appeal in *Through Transport Mutual Insurance Association (Eurasia) Ltd*          F
*v New India Assurance Co Ltd* [2004] 2 CLC 1189, in which an anti-suit injunction,
which had been granted by Moore-Bick J at first instance, was discharged by the
Court of Appeal, where an arbitration clause was unsuccessfully relied upon against
a party said to be a statutory assignee of the contract containing the clause, although
an effective remedy was given on a different basis). *Through Transport* has been          G
criticised both in *Dicey* (at 16-092, particularly note 37) and in *Raphael: The Anti-*
*Suit Injunction* at 10.14–10.17. In particular it is pointed out by Mr Nicholls (and
by *Raphael*) that earlier authority, in particular the Court of Appeal decision in *The*
*Jay Bola* [1997] CLC 993, was not cited in *Through Transport*, and is apparently
inconsistent with it.          H

140. In *The Jay Bola* at 1000-1 Hobhouse LJ stated:

'These authorities confirm that the rights which the insurance company has
acquired are rights which are subject to the arbitration clause. The insurance
company has the right to refer the claim to arbitration, obtain if it can an

A     award in its favour from the arbitrators, and enforce the obligation of the time charterers to pay that award. Likewise, the insurance company is not entitled to assert its claim inconsistently with the terms of that contract. One of the terms of the contract is that, in the event of dispute, the claim must be referred to arbitration. The insurance company is not entitled to enforce its right without also recognizing the obligation to arbitrate.'

B

Aikens J in *Youell v Kara Mara Shipping Co Ltd* [2000] CLC 1058 reached a similar conclusion, and Colman J in *The Front Comor* [2005] 1 CLC 347 at paragraphs 59–72, distinguished *Through Transport*, hinting, as *Raphael* suggests, that it might have been decided *per incuriam*, when he concluded that a subrogated insurer was not entitled to ignore an arbitration clause binding upon the insured, such that its rights against the debtor were to be viewed as subject to the clause. Scott V-C in *The Jay Bola* was entirely satisfied that 'an action brought to prevent a contractual assignee from suing on the contract otherwise than in accordance with an arbitration clause contained in the contract is ... an action brought to enforce the contract', by reference to the provisions of the then jurisdictional gateway.

C

D

    141. RBS sought permission to amend its pleadings to claim in the alternative a right in equity to restrain Scott Law from pursuing claims otherwise than in accordance with the exclusive jurisdiction clause, and compensation for breach of that equitable right. At the end of the day Mr Dunning seemed to accept the argument that he was unable to rely upon *Through Transport*, and limited himself to submitting that there could be no remedy by way of damages or compensation. In any event, I am entirely satisfied that if RBS is entitled to enforce the exclusive jurisdiction clause against the Highland Defendants, then it is also entitled to do so as against Scott Law claiming under them, and by reference to their alleged rights against RBS, if they otherwise fall within the exclusive jurisdiction clause. As agreed, I reserve the question of damages or compensation.

E

F

*(iv) The Ambit of the Clause*

    142. The material question is whether the claims made in the Texas Proceedings fall within the exclusive jurisdiction clause contained in the First Loss Deed. There are, as summarised in paragraph 27 above, two claims in those proceedings, contained in three counts, the first relating to the extension of the CDO and the second to its termination, both said to be based upon alleged fraudulent misrepresentations and/ or fraudulent concealment of information. Damages are claimed for fraud, and compensation for unjust enrichment. RBS contends that both claims fall within the jurisdiction clause in the First Loss Deed, as being *proceedings* or *disputes* which 'arise out of or in connection with' the First Loss Deed. The Defendants submit that the claims, both because they are claims in tort, and because they are alleged not to relate to the First Loss Deed, but only possibly to the Mandate or to the ISD or to the First Amendment Deed, do not fall within the clause.

G

H

**182**    RBS v Highland Financial Partners    [2012] 2 CLC
*(Burton J)*

143. The first and most significant question, as I am satisfied, is the interrelationship    A
of the agreements relating to the CDO, so that the agreements are intertwined and
they each contribute to the working out of the CDO. I stated, in paragraph 2 of my
Liability Judgment, and have set out in paragraph 3 above, my conclusion that:

> 'There is no dispute between the parties that the various Agreements, which    B
> originally established, and subsequently amended, the relationship between the
> parties, interlock and, although they were entered into over a period of time, and
> between the Claimant and differing members of the Highland Group and/or the
> [Issuer], they must be read and construed together.'

Again, in paragraph 4 of the Liability Judgment, I referred to 'a further package of    C
agreements'. No point was taken at the time, or on appeal, that my description of what
was common ground between the parties was not correct. Indeed the Court of Appeal,
in the judgment of Thomas LJ, set out the same:

> '3. It was common ground that the three agreements, which were subsequently    D
> varied in October 2007 and March and April should be read and construed
> together ...

> 4. ... Therefore two amending agreements were made by agreements dated 31
> October 2007 ... [the First Loss Deed and the First Amendment Deed] ...

> 11. ... as the agreements were part of an overall scheme, I have approached the    E
> construction of the agreements in accordance with the principles set out ...'

144. In any event, the relevant wording within this exclusion clause is 'in
connection with', and the jurisdiction in that regard has been transformed by (and    F
indeed even before) *Fiona Trust v Privalov* [2007] 2 CLC 553; [2007] 4 All ER
951 (HL) ('*Fiona Trust HL*'). The position both in that regard and in relation to
interconnected agreements is succinctly stated by Lord Collins in *UBS v HSH
Nordbank* [2009] 1 CLC 934 at paragraphs 82–83:

> '82. Are these claims within the dealer's confirmation jurisdiction clause? I    G
> accept UBS's submission that the proper approach to the construction of clauses
> agreeing jurisdiction is to construe them widely and generally: see *Donohue
> v Armco Inc* ... at [14]. I also accept that in the usual case the words "arising
> out of" or "in connection with" apply to claims arising from pre-inception
> matters such as misrepresentation: see *Fiona Trust* [HL] ... *Deutsche Bank AG
> v Asia Pacific Broadband Wireless Communications Inc* [2008] 2 CLC 520 and    H
> *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488.

> 83. But the essential task is to construe the jurisdiction agreement in the light of
> the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v
> Upaid Systems Ltd* ... [2008] 2 All ER (Comm) 465 at [93], whether a dispute

A  falls within one or more related agreements depends on the intention of the parties as revealed by the agreements.'

145. The position has been reiterated in a number of authorities since *Fiona Trust HL*, including *Cinnamon European Structured Credit Master Fund v Banco*
B  *Commercial Portugues SA* [2009] EWHC 3381 (Ch) per Sir William Blackburne at paragrpah 39 and *Maple Leaf Macro Volatility Master Fund v Rouvroy* [2009] 2 All ER (Comm) 287 per Andrew Smith J at paragraph 199, and in particular, in a passage which was not doubted in the Court of Appeal [2008] EWCA Civ 1091; [2008] 2 CLC 520, per Flaux J in the Commercial Court in *Deutsche Bank AG v Asia Pacific* [2008] 2 Ll Rep 177 at paragraph 45, where he said:
C

  'Both alternative claims would be claims "in connection with" the credit agreement, even on the law as it stood before *Fiona Trust*. The claim in misrepresentation is clearly in connection with the credit agreement, a point so obvious that it was not even argued in *Donohue v Armco Inc* ... per Lord
D  Bingham of Cornhill at para 14. To like effect is the judgment of Peter Gibson LJ in *DSM Anti-Infectives BV v SmithKline Beecham* [2004] EWCA Civ 1199 at para 33.'

146. I am likewise so satisfied. The claims in tort, relating to the circumstances of the extension and termination of the CDO are all claims 'in connection with' the First
E  Loss Deed, being part of *the interlocking package of agreements*.

*(v) Hall and Griffiths*

F  147. The next question is whether RBS is entitled to rely upon the exclusive jurisdiction clause to restrain proceedings not only against itself, but also against Messrs Hall and Griffiths, who have been joined in the Texas Proceedings as personal defendants, on the basis that they made the fraudulent misrepresentation or fraudulently concealed the facts the subject matter of the second count, i.e. relating to the termination of the CDO (they are not alleged to be involved in the first count,
G  relating to the extension of the CDO). The acts referred to are primarily Mr Hall's sending of the 6 November email and Mr Griffiths' operation of the BWIC, as to which the conclusions in my Quantum Judgment are relied on, and, at paragraph 73, by way of summary of the case, it is alleged that:

H  'RBS, by and through Hall and others at RBS, repeatedly made material misrepresentations and omissions to Plaintiffs regarding the sham liquidation sale, at the direction and approval of Griffiths and others at RBS.'

No other allegation is made as to Hall and Griffiths than as to their acting on behalf of RBS, and rendering RBS liable as a result.

**596**                                                                           [2013] 1 CLC

## Royal Bank of Scotland plc v Highland Financial Partners LP & Ors.

[2013] EWCA Civ 328

Court of Appeal (Civil Division).
Maurice Kay, Toulson and Aikens L JJ.
Judgment delivered 12 April 2013.

> *Banking – Fraud – Anti-suit injunction – Collateralised debt obligation (CDO)*
> *transaction – Bank to finance purchase of portfolio of loans – Transaction never*
> *closed by issue of securities because of financial markets crisis – Termination*
> *of transaction and liquidation of loans – Bank purchased loans and claimed*
> *against respondents for alleged shortfall – 'Bids wanted in competition' procedure*
> *adopted for sale of loans – Bidding process a sham in relation to some loans*
> *which bank had already transferred from trading book to banking book for*
> *accounting reasons – Failure to disclose true position – Bank in breach of*
> *contract and of equitable obligations as mortgagee – Bank nevertheless obtained*
> *judgment for €21 million – Respondents began proceedings in Texas alleging*
> *fraud against bank and employees – Bank applied for anti-suit injunction on*
> *basis of contractual jurisdiction clause – Respondents counterclaimed to set*
> *aside liability judgment as obtained by fraud – Liability and quantum judgments*
> *set aside – Anti-suit relief refused on basis of 'unclean hands' doctrine – Bank's*
> *misconduct sufficiently connected with claim for equitable relief.*

This was an appeal by RBS from a judgment of Burton J ([2012] 2 CLC 109)
in which he refused to grant anti-suit injunctions to prevent the respondents
from continuing proceedings in Texas, and a cross-appeal against the judge's
refusal to set aside his earlier grant of summary judgment in favour of RBS on
issues of liability.

The first, second and third respondents were associated with the Highland
group, a capital management group based in the USA. In 2006 the Highland
group planned to launch a collateralised debt obligation (CDO) with an expected
aggregate issuance size of €500 million. A special purpose vehicle would
issue loan notes secured by a portfolio of loans. RBS was engaged to finance
the acquisition of the loans and to market the notes. The arrangements were
contained in a mandate letter, a variable funding note purchase agreement and
an interim servicing deed (ISD). The issuer gave RBS security in respect of the
acquired loans in the form of a debenture.

Clause 4.2 of the ISD provided that if, by the time of the termination date, the
closing date (i.e. the issue of the notes etc) had not occurred, then the acquired
loans were to be sold in accordance with the terms of that clause. The worsening
economic climate meant that the transaction did not close as expected. The

A   mandate was twice extended and Highland gave collateral to RBS under first and second loss deeds. After the collapse of Lehman Brothers in September 2008 it became clear that the transaction would not close. RBS terminated the mandate and the ISD and sought to recover its advances.

B   RBS organised an auction of the acquired loans by a process referred to as 'bids wanted in competition' (BWIC). RBS was entitled to bid and purchased all the loans. It claimed that there remained a shortfall of about €30.5 million, and brought proceedings against the Highland companies to recover it. Burton J granted summary judgment to RBS on issues of liability (see [2010] EWHC 194 (Comm)). An appeal by Highland was dismissed ([2010] EWCA Civ 809).

C   At the subsequent quantum hearing, the dispute was about what sum should be credited to Highland as a result of the disposal exercise undertaken by RBS under clause 4.2 of the ISD. RBS asserted that all 88 acquired loans had been transferred to RBS in a manner which accorded with its duties under clause 4.2. Highland argued that the auction was a sham because RBS, without telling Highland, had already transferred 36 loans from its trading book to its banking book in order to take advantage of amended International Accounting Standard 39. Highland alleged that that was a breach of RBS's duties under clause 4.2 and as a mortgagee. Highland said that if RBS had acted as it should have done there would have been no shortfall. Burton J held ([2010] EWHC 3119 (Comm)) that RBS had transferred the 36 loans to its banking book before the BWIC auction and it had therefore failed to operate clause 4.2(a)(iii) of the ISD in accordance with its terms and failed in its duty as mortgagee. However, a proper valuation of the loans still left a shortfall and RBS was entitled to judgment in the sum of €21 million.

F   The second respondent and the fifth respondent, as assignee, then began litigation in Texas alleging fraud against RBS and two of its employees. RBS applied for an anti-suit injunction, alleging that the Texas proceedings were vexatious and oppressive. The Highland parties counterclaimed to set aside the liability judgment as having been obtained by fraud.

G   Burton J confirmed his conclusion that RBS had suppressed the fact that, in order to take advantage of IAS 39, the 36 loans had been transferred by RBS from its trading book to its banking book before the BWIC. He held that, although that fact had been deliberately concealed, that had not been the result of dishonesty. He declined to set aside the liability judgment because he was satisfied that the outcome of the quantum judgment was correct.

H   Burton J held that the first loss deed contained an exclusive jurisdiction provision which bound the Highland parties. However, the fact that RBS had 'unclean hands' was a strong reason why the court should not grant an injunction enforcing the exclusive jurisdiction clause in favour of RBS.





**598**     Royal Bank of Scotland v Highland Financial Partners     [2013] 1 CLC

A

RBS appealed against the refusal to grant an anti-suit injunction and Highland cross-appealed against the refusal to set aside the liability judgment.

*Held*, dismissing RBS's appeal and allowing Highland's cross-appeal:

1. On the judge's findings RBS did more than suppress facts. There was more than simple deliberate concealment of 'the suppressed fact'. The evidence and the findings of the judge overall led to the inevitable conclusion that at the time of the liability hearing and judgment RBS, by its employee SG, was positively misleading both Highland and the court as to what had happened in relation to the 36 loans and was doing so consciously and deliberately. Contrary to the judge's view, the failure to disclose the suppressed fact at the time of the liability hearing was dishonest. There was ample material on which to conclude that but for the deliberate, conscious and dishonest misstatement or concealment there would have been no summary judgment on liability in favour of RBS because none would have been applied for. It followed that the liability judgment had to be set aside as having been obtained by the fraud of RBS. It would be unjust to permit RBS to have the fruits of the quantum judgment, even though obtained on the full facts, if it would not have had that advantage if the full facts had been revealed when they should have been. The Court of Appeal judgment on liability and the quantum judgment had also to be set aside.

2. The misconduct of SG was attributable to RBS for the purposes of the 'unclean hands' doctrine. He was RBS's key witness in respect of the allegation of unclean hands and the allegation that the liability judgment had been obtained by fraud. The judge was entitled to conclude that there was a sufficient 'immediate and necessary' relation between the misconduct of SG and the claim by RBS for equitable relief in the form of an anti-suit injunction, such that RBS was to be denied that relief under the 'unclean hands' doctrine. However, there was a good argument that the Highland parties were bound by and in breach of an exclusive jurisdiction clause in favour of the English courts, where the remedy of multiple and punitive damages would not be available. Therefore, at least until that issue was finally decided, the Highland parties should be kept to their undertakings not to seek multiple or punitive damages against the defendants in the Texas proceedings. (Odyssey (London) Ltd v OIC Run-Off Ltd (Odyssey), Re (unreported, 13 March 2000, CA) applied.)

B

C

D

E

F

G

The following cases were referred to in the judgment:

H

*Ampthill Peerage, The* [1977] AC 547.
*Armstrong v Sheppard & Short Ltd* [1959] 2 QB 384.
*B, Re (Children)* [2009] 1 AC 11.
*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] CLC 579.
*Cuckmere Brick Co Ltd v Mutual Finance Ltd* [1971] 1 Ch 949.
*Dering v Earl of Winchelsea* (1787) 1 Cox Eq Cas 318.

© DSP Publishing Ltd

A   *Conclusion on the 'unclean hands' defence*

172. Given all these factors, I conclude that the judge was correct to hold that
the anti-suit injunction should be refused because Highland and Scott Law could
successfully rely on the defence of 'unclean hands'.

B   *Other arguments advanced by Highland and Scott Law on the anti-suit injunction*

173. I do not need to decide these points and I am not going to go into them in any
detail. I will just outline my views very briefly.

C   *The ambit of clause 13.1 of the FLD*

174. Does it extend to the claims made in the Texas proceedings concerning the
extension of the mandate and the ISD? The argument is that the claims comprised in
the three counts in the Texas proceedings are not disputes which 'arise out of' or 'in
connection with' the FLD of 31 October 2007, but relate to the mandate letter (and
D   its extension) and the ISD of 7 April 2007. The judge was correct in holding that the
contractual documents have to be read and construed together. He was also correct
in holding that the phrase 'in connection with' has been widely construed by English
courts in the context of jurisdiction and arbitration clauses. So my view is that Burton
J was correct to hold that the ambit of clause 13.1 of the FLD is wide enough to
E   embrace the three counts in the Texas proceedings.

*Is clause 13.1 of the FLD an exclusive jurisdiction clause?*

175. Mr Dunning is obviously right to argue that it would have been much clearer
if the first three lines of clause 13.1 had read '… the Parties irrevocably agree that
F   the courts of England shall have *exclusive* jurisdiction to hear and determine any suit
action or proceedings …'. However, taking the wording of clause 13.1 as a whole and
bearing in mind the contrasting phraseology of clause 13.2, I think that clause 13.1
must be construed as an exclusive jurisdiction clause. The use of the words '*shall
have* jurisdiction' and the requirement that the parties '*irrevocably* submit' to the
jurisdiction of the English courts (my emphasis) are powerful pointers. So also is the
G   wording of clause 13.2 which, in my view, gives RBS an option to bring proceedings
in other jurisdictions, in contrast to the inability of other 'Parties' to do so. I agree
with the judge's conclusion on this point.

H   *Does clause 13.1 extend to claims against SG and Mr Hall?*

176. The exclusive jurisdiction agreement is between RBS and Highland and Scott
Law is bound by it as assignee. Highland agreed that 'any' suit, action or proceedings
'in connection with' the FLD would be brought only in the English courts. The
clause does not say any suit, action or proceedings against RBS. Provided that the
suit, action or proceedings are 'in connection with' the FLD, Highland must bring