# 'EXHIBIT C

631

**2 Q.B.**                         Reg. v. Gibson (C.A.)

A
                              *Appeals dismissed.*
                              *Application for certificate under sec-*
                              *tion 33(2) of the Criminal Appeal*
                              *Act 1968 refused.*

    *Solicitors: Stephens Innocent. Crown Prosecution Service, Head-*
*quarters.*

B
                                                        L. N. W.

C

    S. & W. BERISFORD PLC. AND ANOTHER v. NEW HAMPSHIRE
                        INSURANCE CO.

    1989   Sept. 25, 26, 29;                          Hobhouse J.
           Nov. 27
D
    *Practice—Stay   of   proceedings—Jurisdiction   under   European*
        *Convention—Contract made in England between American insurer*
        *and English company for benefit of American subsidiary—*
        *Contract   containing   English   jurisdiction   clause—Proceedings*
        *commenced in England—Effective parties domiciled in United*
        *States—Application for stay on grounds of forum non conveniens—*
E       *Whether jurisdiction clause imposing obligation to sue in English*
        *courts—Whether jurisdiction convention of European Communities*
        *applicable—Whether power under convention to stay proceedings—*
        *Civil Jurisdiction and Judgments Act 1982 (c. 27), s. 49, Sch. 1,*
        *arts. 2, 8[1]*

         The first plaintiffs, a United Kingdom company, were the
    parent company of the second plaintiffs, an American company
F   based in New York. The first plaintiffs insured all their
    subsidiaries, including the second plaintiffs, with the London
    office of the defendants, an American insurance company
    domiciled in New Hampshire. The policies, which included a
    group permanent cargo contract and a fidelity guarantee policy,
    were governed by English law, the cargo contract bearing the
    words "this insurance is subject to English jurisdiction." The
    plaintiffs claimed that between June 1986 and May 1988 items
G   worth U.S.$54m. had been stolen from the premises of the
    second plaintiffs in New York. The defendants did not accept
    that losses on that scale had taken place and refused to meet
    claims which the plaintiffs made under the guarantee policy.
    The plaintiffs commenced actions in the High Court, claiming
    the moneys which they alleged were due under both policies.
    The defendants applied by summons to stay the actions under
    section 49 of the Civil Jurisdiction and Judgments Act 1982 on
H   the grounds that they should have been brought in New York.

    [1] Civil Jurisdiction and Judgments Act 1982, s. 49: see post, p. 643F–G.
    Sch. 1, art. 2: see post, p. 639A–B.
    Art. 8: see post, p. 639C–D.

632

Berisford Plc. v. New Hampshire Insurance                                [1990]

On the defendants' applications:—

*Held* (1) that the words "this insurance is subject to English jurisdiction" were inapt to create an obligation on either party, which would require clear words, and to construe them as requiring the assured to sue only in England was to go beyond their natural meaning; that, having regard to the legal and commercial relationships created by the contract and to the words actually used, the clause was to be construed as a declaration that the parties' rights under the policy were capable of enforcement in the English courts; and that, accordingly, the clause did not amount to an exclusive jurisdiction clause (post, pp. 627G—638B).

(2) Dismissing the applications, that the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 was not restricted in its application to cases where at least one party to the litigation was actually domiciled in a contracting state; that, applying the Convention, the defendant was deemed, by article 8, to be domiciled in the United Kingdom by virtue of having a branch, agency or other establishment in London, and since the parties had not agreed that the courts of any other contracting state should have jurisdiction, article 2 required that the defendant should be sued in the United Kingdom; that to stay the proceedings on the ground of forum non conveniens would be inconsistent with the Convention; and that, accordingly, the court had no jurisdiction under section 49 of the Civil Jurisdiction and Judgments Act 1982 to accede to the defendants' application (post, pp. 640D–E, 642C–E, 643D–E, 645C–E).

*Held*, further, that even if the court had a discretion to grant a stay, the defendants had not established that New York was clearly a more appropriate forum (post, p. 648C–D).

The following cases are referred to in the judgment:

*Aratra Potato Co. Ltd. v. Egyptian Navigation Co.* [1981] 2 Lloyd's Rep. 119, C.A.

*Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd.* (unreported), 11 July 1989, Hobhouse J.

*Gerling Konzern Speziale Kreditversicherungs-A.G. v. Amministrazione del Tesoro dello Stato* (Case 201/82) [1983] E.C.R. 2503, E.C.J.

*Overseas Union Insurance Ltd. v. New Hampshire Ltd.*, The Times, 27 September 1988

*Roneleigh Ltd. v. MII Exports Inc.* [1989] 1 W.L.R. 619, C.A.

*Sohio Supply Co. v. Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588, C.A.

*Spillada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460; [1986] 3 W.L.R. 972; [1986] 3 All E.R. 843, H.L.(E.)

SUMMONSES

By two writs dated 3 April 1989 the plaintiffs, S. & W. Berisford Plc. and N.G.I. International Precious Metals Inc., commenced proceedings against the defendants, the New Hampshire Insurance Co., for breach of contract in failing to meet claims under two insurance policies arising out of thefts of items worth U.S.$54m. from the second plaintiffs' premises in New York. The defendants applied by summons for all further proceedings in the actions to be stayed pursuant to section 49(3) of the Supreme Court Act 1981 and the inherent jurisdiction of the

A

B

C

D

E

F

G

H

2 Q.B.                    Berisford Plc. v. New Hampshire Insurance

A court on the ground that the appropriate forum for the trial of the action in the interests of all the parties and for the ends of justice was the courts of the state of New York and not the High Court in London.

The matter was heard in chambers and judgment was given in open court.

The facts are stated in the judgment.

B *Sydney Kentridge Q.C.* and *Julian Flaux* for the plaintiffs.
*Stephen Tomlinson Q.C.* and *Jonathan Gaisman* for the defendants.

*Cur. adv. vult.*

27 November.   The following judgment was handed down.

C
HOBHOUSE J.   By two writs dated 3 April 1989 the plaintiffs commenced proceedings against the defendants in this court. The defendants are the New Hampshire Insurance Co. which, as its name implies, is a New Hampshire corporation incorporated under the laws of that state in the United States of America. It carries on business in among other places the cities of New York and London. In this city it
D has an office in Fenchurch Street, London E.C.3. It could therefore properly be served at that office within the jurisdiction of this court. No objection is taken to the service of the proceedings. But the defendants have now applied by summons for both the actions to be stayed on the ground that the proceedings ought to be taking place in the courts of New York and not in this court.

E The first plaintiffs are incorporated in the United Kingdom and are the parent company of the second plaintiffs who are incorporated under the laws of the state of New York and carry on business there. The first plaintiffs are the principal company in a large world wide group of companies and they carry on business as, among other things, dealers and traders of commodities of all kinds on a world wide basis. The
F second plaintiffs carry on business in New York as manufacturers and sellers of gold jewellery and watches.

The actions are brought under two insurance policies which were taken out by the first plaintiffs on the London market through London brokers with the London office of the defendants. The first plaintiffs took out these policies not only on their own behalf but on behalf of and for the benefit of their subsidiaries including the second plaintiffs.
G The alleged losses that are the subject matter of the claims in the actions are alleged to have been suffered by the second plaintiffs. For the purposes of the defendants' applications to stay these actions no point is taken by the plaintiffs based on the fact that the actions include the first plaintiffs as well as the second plaintiffs. It cannot be suggested that the first plaintiffs were improperly joined as they were the direct and original parties to the relevant contracts the subject matter of the
H actions; but for the purposes of considering any question of stay of the actions their presence does not affect the questions which have to be considered as they are not substantial parties and are not claiming any relief on their own behalf.

634
Hobhouse J.          Berisford Plc. v. New Hampshire Insurance          [1990]

A

The factual allegation upon which the plaintiffs base their claim in both the actions is that between June 1986 and May 1988 there were stolen from the second plaintiffs some U.S.$54m. worth of gold, gold products, diamonds, coloured stones, watch movements and other materials or work in progress. It is said that this value of goods was stolen from their premises at 155, The Avenue of the Americas in New York. The second plaintiffs occupy three floors in this building on two of which the manufacturing work is done and the materials and work in progress are stored. The second plaintiffs say that they have been the victims of systematic thefts by some of their employees who belong to the so-called "Russian Mafia." The plaintiffs have some evidence to support their allegations but only extending to a very small proportion of the total value that they allege has been lost. Some prosecutions are pending in New York and other states but the defendants question that losses of the scale alleged have ever taken place. They point out that the alleged losses are quite out of proportion to the turnover of the second plaintiffs and submit that their allegations are frankly incredible. The defendants say that the discrepancies merely arise from inadequate and inaccurate record keeping and auditing processes.

B

C

The claims in the action are made under two classes of insurance policy. The defendants have indicated that they will also be raising defences to the plaintiffs' claims on the basis of various provisions of the relevant policies and on the basis of an alleged oral agreement with the brokers concerned with the main policy (Sedgwick Cargo Ltd.). The main policy is a group permanent cargo contract which insures the first plaintiffs and their subsidiaries and/or associated companies and covers "goods and/or merchandise and/or produce and/or materials of every description and/or machinery and/or all other interests incidental to the assured's business . . . ." It has potentially a world wide application and by an appendix specifically covers the second plaintiffs. The contract incorporates the Institute cargo clauses (A); it thus covers all risks of loss of and/or damage to the subject matter insured. In view of this incorporation the policy is required to be on the M.A.R. form, which is a form used by the Institute of London Underwriters as a "companies marine policy" and bears expressly on its face the words: "This insurance is subject to English jurisdiction."

D

E

F

The other action relates to a claim under an independent contract of insurance, the fidelity guarantee policy, which insures against fidelity risks subject to an aggregate £1m. limit of indemnity. This policy has no jurisdiction clause.

G

It is not in dispute that the relevant contracts were all made in London as part of the business carried on in London by the defendants' London office. It is accepted that they are governed by English law. It is further accepted that it is sensible that the action on the fidelity contract should be tried in the same courts as the action on the cargo contracts. The fidelity contracts would on any view only give a very limited recovery. Therefore the issues raised by the defendants' summonses were argued and examined by reference to the claims on the cargo contracts and it was accepted that the fate of the defendants' applications must stand or fall by reference to the cargo contracts. If the defendants

H

2 Q.B.                Berisford Plc. v. New Hampshire Insurance               Hobhouse J.

A    do not succeed in obtaining a stay of the action on the cargo contracts
     then they should not succeed in getting a stay of the fidelity action; on
     the other hand if they do succeed then the fidelity action should be
     stayed as well. Accordingly in this judgment I will discuss the issues and
     arguments raised by the defendants' summonses solely by reference to
     the main action based upon the cargo policy.

B        The defendants' summons asks that, pursuant to section 49(3) of the
     Supreme Court Act 1981 and the inherent jurisdiction of the court, all
     further proceedings in the action be stayed on the grounds that the
     appropriate forum for the trial of the action in the interests of all the
     parties and for the ends of justice is not the High Court in London but
     rather the courts of New York, United States of America. It is essentially
     a forum non conveniens application. Various issues have been raised on
C    this summons. First it was in issue whether the jurisdiction clause in the
     policy was an exclusive jurisdiction clause or merely a permissive one,
     and flowing from this issue whether there were any grounds for staying
     the action even if it was an exclusive jurisdiction clause. Secondly,
     assuming that there was no exclusive jurisdiction clause, various issues
     arose under the Convention on Jurisdiction and the Enforcement of
     Judgments in Civil and Commercial Matters 1968 as enacted by the Civil
D    Jurisdiction and Judgments Act 1982 and set out in Schedule 1 thereto.
     Thus there was first the question whether, where both the relevant
     parties to the litigation are domiciled in a country which is not a
     Convention country, the provisions of the Convention have any
     application. Then, if this point were resolved against the defendants,
     there was the further question whether the exercise of a power to stay
E    the action on grounds of forum non conveniens would be inconsistent
     with the provisions of the Convention: see section 49 of the Act. Then
     finally, if there were a power to stay on grounds of forum non
     conveniens, whether it should be exercised in the circumstances of this
     case.

         In the course of presenting their submissions, and in the affidavits
     upon which they relied, both the plaintiffs and the defendants made
F    exaggerated allegations of fact. The plaintiffs alleged that the defendants
     were merely trying to harass the plaintiffs by oppressive, time consuming,
     and unduly expensive proceedings in New York in which the right to
     discovery would be abused. The defendants, in contrast, alleged that the
     plaintiffs' motives in bringing proceedings in England were simply to
     avoid any proper investigation of their claims and to obstruct the
     defendants in the conduct of their defence. Both these allegations must
G    be unequivocally rejected. I do not accept that the courts of New York
     would be incapable, on the application of the present plaintiffs, of
     preventing an abuse of their pre-trial discovery procedures if any were
     to occur or be threatened. If these actions are to be tried in New York,
     there would be no reason to suppose that the relevant procedures would
     not be equitably and justly regulated by the courts of New York, albeit
H    that the procedures would be somewhat different from those in this
     country. Similarly, the plaintiffs cannot be criticised in any way for
     commencing their proceedings in the courts of this country. They have
     an express right to do so under the principal contract upon which they

636

Hobhouse J.        Berisford Plc. v. New Hampshire Insurance                [1990]

are suing. They likewise have a clear right under the procedural laws of   A
this country because of the undisputed and relevant presence of the
defendants in this country. Further it is not the case that the powers of
discovery and investigation that can be invoked under English procedural
law are in any way inadequate to enable justice to be done between the
parties in a case such as the present. It is not for this court to tell the
defendants how to take advantage of those powers nor to tell them of
the relevant inter-relationship of the procedural powers that exist in this   B
country and in the United States. Those are matters upon which the
defendants will no doubt seek and receive appropriate advice. The
allegations and counter-allegations that have been made are regrettable
and owe more to the apparent antagonism between the parties than to
the realities of litigation either in New York or this country.

                                                                              C

*The jurisdiction clause*

      The relevant words appear on the face of the policy form. They are:
"This insurance is subject to English jurisdiction." These words have to
be construed as part of a contract made in England and governed by
English law. Further, they appear on a printed document, on the same
page as the signature and stamp which binds the defendants, which is   D
headed "The Institute of London Underwriters companies marine
policy." The contract is a policy of insurance of which the primary
function is to state the rights of the assured against the underwriters and
the obligations of the underwriters. The contemplation of the form must
be a contract made in London, almost certainly by an insurance company
with a place of business in London. The defendants were such a
company and they had an Institute of London Underwriters reference   E
number. To construe the relevant words as being intended to permit
English jurisdiction would appear implausible, although such a
construction would become more plausible if one were to consider that
the parties had in mind article 17 of the Convention of 1968 to which I
will refer later. But taking the contract at its face value, there is no need
for the parties to provide that English jurisdiction be permitted; such   F
jurisdiction already exists. The alternative constructions are either that,
on the one hand, it is simply a declaratory provision and, on the other
hand, it is a provision for exclusive jurisdiction.

      An exclusive jurisdiction clause is one which imposes a contractual
obligation on one or more parties to litigate in the stated jurisdiction.
The present clause if creating an obligation would create a mutual
obligation. (It is of course possible for such clauses to impose such an   G
obligation on only one of the contracting parties.)

      The correct approach to the construction of jurisdiction clauses was
recently considered by the Court of Appeal in *Sohio Supply Co. v.
Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588. The relevant contract
was a contract for the sale of Brent crude f.o.b. Sullom Voe and neither
party was English. The parties negotiated various amendments to the
form on which they contracted. The outcome was that it was to be   H
treated as including the words: "Governing law: This agreement shall be
governed by the laws of England under the jurisdiction of the English
court without recourse to arbitration." The question was whether this

2 Q.B.    Berisford Plc. v. New Hampshire Insurance    Hobhouse J.

A    wording amounted to an exclusive jurisdiction clause. The Court of
Appeal approved a statement in *Dicey & Morris, The Conflict of Laws*,
11th ed. (1987), p. 404:

> "the question is whether on its true construction the clause *obliges*
> the parties to resort to the relevant jurisdiction irrespective of
> whether the word 'exclusive' is used."

B    In the context of that particular contract, the court held that that clause
did impose such an obligation. In the course of his judgment Staughton
L.J. included the following observations, at pp. 591–592:

> "The question is one of the construction of this contract and nothing
> more. It is, I think, part of the matrix background, or surrounding
> circumstances, whichever term one chooses to use, that this was a
C    contract made between sophisticated businessmen who specifically
> chose their words as to English jurisdiction for the purpose of this
> contract. It is not a consumer contract on a printed form, or
> anything like that. To my mind, it is manifest that these business
> men intended that clause to apply to all disputes that should arise
> between them. I can think of no reason at all why they should
D    choose to go to the trouble of saying that the English courts should
> have non-exclusive jurisdiction. I can think of every reason why
> they should choose that some court, in this case the English court,
> should have exclusive jurisdiction. Then, both sides would know
> where all cases were to be tried. It may be that in some other types
> of case, such as a policy of insurance, there is a reason for providing
> for non-exclusive jurisdiction. I can see none here."

E    It is to be noted that Staughton L.J. was inclined to put insurance
contracts into a different category where a permissive clause could make
commercial sense. However, the same canons of constructions are to be
applied in relation to this type of clause as any other mutual contractual
provision. It is a matter of construing the words used in accordance with
their natural meaning and in the light of the surrounding circumstances
F    in which the contract was made: see, for example, *Cannon Screen
Entertainment Ltd. v. Handmade Films (Distributors) Ltd.* (unreported),
11 July 1989.
      In the present case, in my judgment, the words used are inapt to
create any obligation. If an obligation was intended it could easily have
been so stated in clear words. The provision appears in the underwriter's
G    printed form of policy which is issued to the assured. The mutuality of
the clause must in practice be very limited. Under English law where a
contract has been placed through brokers it will be very rare indeed that
an underwriter will ever have to start an action against an assured. The
primary relevance of the clause must be to actions to be brought by the
assured against the underwriter. To construe this wording as requiring
the assured to sue only in England is to go beyond the natural meaning
H    of the words actually used. Further, to construe the words as declaratory
is not to deprive them of significance. It is a statement to the assured,
who may be foreign, that the rights that he has under the policy are
capable of enforcement in the English courts. Such is an apt interpretation

having regard to the legal and commercial relationships created by the    A
document and having regard to the words actually used. Such a clause,
even though creating no obligation to sue only in England is a contractual
acknowledgement of the jurisdiction of the English courts and a
contractual agreement to the invocation of that jurisdiction.

Therefore I conclude that this clause is not an exclusive jurisdiction
clause. As I pointed out in *Cannon Screen Entertainment Ltd. v.
Handmade Films (Distributors) Ltd.* such a conclusion does not mean    B
that the clause ceases to be relevant in relation to an application such as
that which is being made by the defendants on this summons. If the
contract says that the assured is entitled to sue the underwriter in the
English courts, then it requires a strong case for the courts of this
country to say that that right shall not be recognised and that he must
sue elsewhere. Further, it will be necessary to revert to the significance    C
of this clause in relation to article 17 of the Convention.

In the light of this decision the question whether the court has any
discretion to stay proceedings where they are brought in this country not
only in accordance with the procedural laws of this country but also in
accordance with an exclusive jurisdiction clause to which both parties
have agreed, can be taken very shortly. I am not satisfied that there is
any jurisdiction, or discretion, to stay such an action on the grounds of    D
forum non conveniens.

I was invited to apply the principles restated by the Court of Appeal
in *Aratra Potato Co. Ltd. v. Egyptian Navigation Co.* [1981] 2 Lloyd's
Rep. 119. This argument was mistaken. That case was concerned with a
different question—whether a foreign exclusive jurisdiction clause
purporting to exclude the jurisdiction of the English courts should be    E
given effect to by staying English proceedings. Where the effect of the
clause is to exclude the jurisdiction of the English courts, the clause will
only be given effect to if the English courts in the exercise of their
discretion think it appropriate to do so. The *Aratra Potato Co.* case was
concerned to define the criteria applicable to that exercise. Where a
plaintiff is able to serve a defendant within the jurisdiction so that he
does not need the leave of the court to start the proceedings and where    F
the plaintiff further has the benefit of a contractual agreement by the
defendant that the English courts should have exclusive jurisdiction, it is
difficult to see how there could be any discretion to stay the English
proceedings on the ground of forum non conveniens in favour of foreign
proceedings in breach of the parties' agreement. Neither counsel could
refer me to any case where such a power had been recognised, let alone    G
exercised. If a plaintiff's action were vexatious or an abuse of process of
the court then it might be stayed on those, very different, grounds. The
defendants at one stage of their argument before me suggested that the
present actions brought by the plaintiffs were vexatious or an abuse of
process of the court but, as will be clear from what I have already said,
there was no basis for any such suggestion.

*The Convention on Jurisdiction and the Enforcement of Judgments in    H
Civil and Commercial Matters 1968*

Before discussing the issues arising under the Convention, it is
necessary to refer to some of the provisions of the Convention. Article 2

2 Q.B.          Berisford Plc. v. New Hampshire Insurance          Hobhouse J.

A    lays down the general rule: "Subject to the provisions of this Convention, persons domiciled in a contracting state shall, whatever their nationality, be sued in the courts of that state." Section 3 of Part II of the Convention is headed: "Jurisdiction in matters relating to insurance." Article 7 states: "In matters relating to insurance, jurisdiction shall be determined by this section, without prejudice to the provisions of articles 4 and 5(5)." Article 8 provides:

B    "An insurer domiciled in a contracting state may be sued: (1) in the courts of the state where he is domiciled, or (2) in another contracting state, in the courts for the place where the policy-holder is domiciled, or (3) if he is a co-insurer, in the courts of a contracting state in which proceedings are brought against the leading insurer. An insurer who is not domiciled in a contracting

C    state but has a branch, agency or other establishment in one of the contracting states shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that state."

It is not in dispute that the defendants have a "branch, agency or other establishment" in England and that the relevant dispute in the present

D    case arises "out of the operations of that branch, agency or establishment." Therefore under article 8, if it applies, the defendants are deemed to be domiciled in England and the Convention provides that they may be sued here.

Article 12 states that: "The provisions of this section may be departed from only by an agreement on jurisdiction" which satisfies any one of five criteria. It is arguable that two of the criteria are capable of

E    applying to the present case:

"(3) which is concluded between a policy-holder and an insurer, both of whom are . . . domiciled . . . in the same contracting state, and which has the effect of conferring jurisdiction on the courts of that state . . . (4) which is concluded with a policy-holder who is not domiciled in a contracting state . . . ."

F    If one treats the first plaintiffs as the policy-holder, paragraph 3 could apply; if one treats the second plaintiffs as the policy-holder paragraph 4 could apply.

Section 6 of the Convention is headed: "Prorogation of jurisdiction" and includes only two articles. Article 17 provides:

G    "If the parties, one or more of whom is domiciled in a contracting state, have agreed that a court or the courts of a contracting state are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction. . . . Where such an agreement is concluded by parties, none of whom is domiciled in a contracting state, the courts of other contracting

H    states shall have no jurisdiction over their disputes unless the court or courts chosen have declined jurisdiction."

The defendants are not as such domiciled in England; their place of business here in London does not suffice to amount to domicile under

640

Hobhouse J.            Berisford Plc. v. New Hampshire Insurance            [1990]

the principles of private international law apart from the provisions of   A
the Convention. The defendants are not domiciled in any other
contracting state. They are actually domiciled in New Hampshire. The
defendants' domicile in this country only arises, if at all, from article 8.
If the defendants are not to be treated as domiciled in England then
article 4 would apply:

> "If the defendant is not domiciled in a contracting state, the   B
> jurisdiction of the courts of each contracting state shall, subject to
> the provisions of article 16, be determined by the law of that state."

Article 16 is in Section 5 and makes provision for certain courts to have
exclusive jurisdiction in respect of certain subject matters regardless of
domicile. The present case is not concerned with any of those reserved
matters.                                                                   C

On the face of it the Convention provides more than sufficient
justification for this court to exercise the jurisdiction which is being
invoked by the plaintiffs in the present action. The defendants, however,
submit that the Convention has no application or relevance because
neither the second plaintiffs, the effective plaintiff, nor the defendants
are in fact domiciled in England or in any other convention country.
The defendants submit that it is only if either or both of the parties to   D
the litigation are domiciled in a convention country that the Convention
has any application. The defendants' submission must be rejected.

The purpose and scheme of the Convention have been discussed in
many authoritative sources. These sources are those contemplated by
section 3 of the Act. They include the commentaries of M. Jenard and
Professor Schlosser, Official Journal 1979 No. C.59, and also include the   E
many decisions that have now been given by the European Court of
Justice on the meaning and intention of the Convention. These
authorities demonstrate that the Convention is not to be limited in the
way contended for by the defendants before me. The primary purpose
of the Convention, as stated in its preamble, is:

> "to implement the provisions of article 220 of [the] Treaty by virtue   F
> of which they undertook to secure the simplification of formalities
> governing the reciprocal recognition and enforcement of judgments
> of courts or tribunals; . . ."

It is also:

> "To determine the international jurisdiction of their courts, to
> facilitate recognition and to introduce an expeditious procedure for   G
> securing the enforcement of judgments, authentic instruments and
> court settlements; . . ."

It is part of this objective and scheme that there should be an agreement
between the contracting states as to the jurisdiction which their respective
courts shall exercise. If the judgments of those courts are to be
recognised and enforceable in any Convention country it is necessary to   H
know by what criteria the validity of the exercise of jurisdiction by the
court giving the judgment or making the order is to be tested. The
Convention harmonises those criteria. Questions of the enforcement or

A   recognition of judgments or orders may arise where neither of the parties to the original litigation was actually domiciled in any contracting state. To limit the Convention in the way contended for by the defendants would be inconsistent with achieving the primary objective of the Convention.

A further purpose of the Convention has been recognised. It is to avoid conflicts of jurisdiction and inconsistent decisions between different

B   courts in different contracting states. This objective is an aspect of the primary objective but it also has a validity of its own as a matter of regulating and co-ordinating the jurisdictions of the courts of the contracting states inter se. Here again the contention of the defendants runs counter to the objective and purpose of the Convention. There will be a risk that the same question will be being determined as between

C   effectively the same parties at the same time in the courts of more than one contracting state. The clear intent of the Convention is that this should not occur. If the defendants are right it can occur.

Section 8 of the Convention deals with lis pendens and related actions and the point raised by the defendants' contention has been considered in relation to article 21 by Hirst J. in *Overseas Union Insurance Ltd. v. New Hampshire Insurance Ltd.*, The Times, 27

D   September 1988. Hirst J., having among other things considered the commentators, concluded that on a proper construction of the Convention, article 1 applies equally to domiciled and non-domiciled defendants. I respectfully agree with his conclusion. It is under appeal to the Court of Appeal and I am informed that the Court of Appeal has referred the matter to the European Court of Justice. The procedure being followed in that case, however, does not relieve me from having

E   to give my own decision on the much clearer question raised by the present case.

It is true that the Convention also has as one of its objects the regulation of the exercise of procedural rights by persons who are nationals of or domiciled in contracting states and the protection of persons domiciled in a contracting state from being sued in other

F   contracting states. But it is clear that these objectives are not the only objectives of the Convention nor are they the primary objectives of the Convention as a whole. The overall objective remains as I have stated and that objective is, in part, fulfilled by laying down detailed rules which have regard to, among other things, the desirability of a party being sued only in the courts of the state in which it is domiciled.

G   But perhaps the most conclusive evidence against the argument of the defendants is the text of the Convention itself. It is comprehensive in its drafting. It does in many places contemplate that either one or both of the parties to litigation may not be domiciled in a contracting state. Article 4 expressly legislates for the situation where the intended defendant is not domiciled in any contracting state. Article 2 clearly applies to actions brought by persons who are not domiciled in any

H   contracting state. Article 8 expressly applies to an insurer who is not actually domiciled in a contracting state but is deemed to be so domiciled. Article 12(4) expressly applies to a policy-holder who is not domiciled in a contracting state. Article 16 provides for certain courts to

642
Hobhouse J.          Berisford Plc. v. New Hampshire Insurance          [1990]

have an exclusive jurisdiction regardless of the domicile of either party    A
and therefore can and must apply even where neither party is domiciled
in a contracting state. These illustrations can be multiplied many times
and as will be appreciated they include illustrations which are directly
relevant to the present case: see also Professor Schlosser's commentary,
Official Journal 1979 No. C.59, p. 112, para. 136. Neither in the
Convention itself, nor for that matter in the Act of 1982, is there to be    B
found expressly or implicitly the restriction that the defendants seek to
impose upon the application and scope of the Convention. The
defendants' contention under this head must be rejected.

   If then the Convention in principle applies to this litigation and the
present parties, the next question is what is its effect. The primary
provision is the deeming provision in article 8. The starting point
therefore is that the defendants are to be treated as if they were          C
domiciled in the United Kingdom. Prima facie, therefore, under article 2
the defendants should be sued in this court. But article 8 itself permits
them to be sued not only in this court but, in the alternative, in another
contracting state if that is where the policy-holder is domiciled or a
leading insurer is being sued in respect of the same risk. Neither of
those alternatives apply here. Therefore the net result of article 8 and    D
article 2 is that the defendants shall in respect of the present matter be
sued in the courts in London.

   Under these circumstances articles 12 and 17 are strictly speaking of
only academic relevance. The jurisdiction clause in the policy does not
seek to depart from the effect of articles 2 and 8. However articles 12
and 17 do show that there is no objection under the Convention to the        E
parties' having agreed that the English courts should have jurisdiction
and, further, that the English courts should in principle give effect to the
clause in the same way as if it conferred an exclusive jurisdiction: see
also M. Jenard's commentary, Official Journal 1979 No. C.59, at p. 37.
This last consideration would be conclusive as between courts in any of
the contracting states; it may be that it adds little when the court being
"excluded" is a court which is not in any of the contracting states.        F

   Professor Schlosser, Official Journal 1979 No. C.59, p. 124, para. 176
points out that there is nothing in the Convention to stop a court
declining jurisdiction if that jurisdiction arises solely from a jurisdiction
clause between parties who otherwise are not subject to the jurisdiction
of that court and where the jurisdiction of the courts of any other
contracting state is not involved. In such circumstances the court has a    G
right to exercise a discretion whether it will act upon the jurisdiction
clause and it can apply its own principles of procedural law (including
where relevant the principle of forum non conveniens). He says, at
para. 177:

      "proceedings can be brought before a court within the Community       H
      by parties who, although both domiciled outside the Community,
      have agreed that that court should have jurisdiction. There is no
      reason for the Convention to include rules on the conditions under
      which the court stipulated by such parties must accept jurisdiction."

A   Further the Convention does not preclude the courts of a contracting
state from applying principles such as those stated in the *Aratra Potato
Co.* case [1981] 2 Lloyd's Rep. 119 where its jurisdiction is being sought
to be excluded in favour of a non-contracting state. Professor Schlosser
says, at para. 176:

B   "If a court within the Community is applied to despite such an
agreement, its decision on the validity of the agreement depriving it
of jurisdiction must be taken in accordance with its own lex fori."

However the general import of article 17 is that jurisdiction clauses
should be given effect to even though they may not be expressed in
exclusive terms. Lest this intent be thought to be too sweeping it should
be remembered that article 17 itself incorporates various qualifications
C   and safeguards, including, in relation to insurance, the provisions of
article 15 to which I have referred earlier. The defendants' submission
that article 17 can have no relevance in relation to insurance matters is
shown to be unsound by this express cross-reference: see also *Gerling
Konzern Speziale Kreditversicherungs-A.G. v. Amministrazione del
Tesoro dello Stato* (Case 201/82) [1983] E.C.R. 2503.

D   It follows that in my judgment, on the correct construction of the
Convention as applied to the present case, the provisions of the Con-
vention are in effect mandatory. As a matter of construction, the
English court is required to accept jurisdiction over the claim that the
plaintiffs are making against the defendants in this action.

One of the main ways that the defendants put their argument in
support of the right of the English court nevertheless to stay the
E   proceedings on the grounds of forum non conveniens was to contrast the
use of the word "shall" in article 2 with the use of the word "may" in
article 8. This argument in my judgment involves a misconstruction of
the Convention. The jurisdiction is mandatory although under article 8
there are two other options which in this case do not arise.

The defendants' application before me has ultimately to rely upon
section 49 of the Act which provides:

F   "Nothing in this Act shall prevent any court in the United Kingdom
from staying, sisting, striking out or dismissing any proceedings
before it, on the ground of forum non conveniens or otherwise,
where to do so is not inconsistent with the 1968 Convention."

The defendants have to satisfy me that for this court to stay the present
G   action on the grounds of forum non conveniens would not be inconsistent
with the Convention.

As I have already indicated, I consider that in relation to the present
case, having regard to its subject matter and parties, and to the
application of article 8 in conjunction with article 2, the defendants'
application is inconsistent with the provisions of the Convention.
However, the matter can be approached more broadly as a matter of
H   principle and the overall intention of the Convention.

As already indicated the Convention includes article 4 and gives the
courts wide powers to apply their own procedural law and principles of
private international law in relation to actions brought against intended

644

Hobhouse J.          Beresford Plc. v. New Hampshire Insurance          [1990]

defendants who are not domiciled in any contracting state. In the United     A
Kingdom such defendants might be sued either because they are
amenable to service in this country by reason of having a place of
business in this country or because they may be sued and served under
R.S.C., Ord. 10 and Ord. 11. In any such case, provided there is not
any other provision of the Convention which governs the situation, the
powers saved by section 49 of the Act of 1982 may be exercised. (The
example of a jurisdiction clause, as already discussed, provides a further     B
example.) There will be no inconsistency with the Convention. So the
fact that in the present case, as in any other case where the Convention
makes express provision for a Convention country to have jurisdiction,
there is an inconsistency and, accordingly, no right to invoke section 49,
does not mean that in a large number of the cases coming before the
court there may not be scope for exercising one or more of the powers     C
referred to in section 49. There is no need to construe the Convention
and the Act of Parliament which under English municipal law gives it its
effect as requiring the introduction of alien considerations into the
interpretation and implementation of the Convention.

     This point exposes a fundamental difficulty in the defendants'
argument before me. They had to recognise that there was nothing in
the Convention which contemplated any application of a remedy of stay     D
on the grounds of forum non conveniens. There are express provisions
in section 8 of the Convention dealing with lis pendens and related
actions, but there is no provision which so much as hints at the exercise
of the power invoked by the defendants. The defendants met this point
by explaining that under the legal systems of most of the contracting
states the concept of lis alibi pendens in unknown. Jurisdiction is either     E
accepted or refused and there is no concept of discretionary jurisdiction.

     The question of discretionary jurisdiction is discussed by Professor
Schlosser, Official Journal 1979 No. C.59, pp. 97–99, paras. 76 et seq.:

     "The idea that a national court has discretion in the exercise of its
     jurisdiction either territorially or as regards the subject matter of a
     dispute does not generally exist in continental legal systems. Even     F
     where, in the rules relating to jurisdiction, tests of an exceptionally
     flexible nature are laid down, no room is left for the exercise of any
     discretionary latitude. . . . 78. According to the views of the
     delegations from the continental member states of the Community
     such possibilities are not open to the courts of those states when,
     under the 1968 Convention, they have jurisdiction and are asked to
     adjudicate. . . . Where the courts of several states have jurisdiction,     G
     the plaintiff has deliberately been given a right of choice, which
     should not be weakened by application of the doctrine of forum
     conveniens. The plaintiff may have chosen another apparently
     'inappropriate' court from among the competent courts in order to
     obtain a judgment in the state in which he also wishes to enforce it.
     . . . The practical reasons in favour of the doctrine of forum
     conveniens will lose considerably in significance as soon as the 1968     H
     Convention becomes applicable in the United Kingdom and Ireland.
     The implementing legislation will necessitate not inconsiderable
     changes in the laws of those states, both in respect of the definition

2 Q.B.                    Berisford Plc. v. New Hampshire Insurance                    Hobhouse J.

A    of the concept of domicile (see paragraph 73) and on account of the
     abolition of jurisdictional competence based merely on service of a
     writ within the area of the court (see paragraph 86). To correct
     rules of jurisdiction in a particular case by means of the concept of
     forum conveniens will then be largely unnecessary. After considering
     these arguments the United Kingdom and Irish delegations did not
     press for a formal adjustment of the 1968 Convention on this
B    point."

     See also *Cheshire and North's Private International Law*, 11th ed. (1987),
     p. 326.
         The defendants' acceptance of this situation is fatal to their case. It is
     clear that the Convention is designed (subject to article 4) to achieve
     uniformity and to "harmonise" the relevant procedural and jurisdictional
C    rules of the courts of the contracting states. The Convention leaves no
     room for the application of any discretionary jurisdiction by the courts
     of this country; the availability of such a discretion would destroy the
     framework of the Convention and create lack of uniformity in the
     interpretation and implementation of the Convention. This argument of
     the defendants must therefore also be rejected. It follows that their
D    applications must fail. This court does not have the discretion they invite
     it to exercise.

     *Forum non conveniens—the discretion*
         In view of my decision that I do not have a discretion to stay these
     actions on the ground of forum non conveniens, I will take this
E    remaining topic shortly. It is agreed that the discretion with regard to
     the fidelity action should be exercised in the same way as in relation to
     the main cargo contract action. So here again I will refer only to the
     cargo contract action.
         This basis upon which the discretion is invoked is the principle of
     forum non conveniens or, to use the expression preferred by Lord Goff
     of Chieveley in *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987]
F    A.C. 460, 474, 477, the principle that litigation should take place in the
     most "appropriate" forum:

         "In my opinion, the burden resting on the defendant is not just to
         show that England is not the natural or appropriate forum for the
         trial, but to establish that there is another available forum which is
         clearly or distinctly more appropriate than the English forum. . . .
G        the question is whether there exists some other forum which is
         clearly more appropriate for the trial of the action . . ."

     In evaluating the appropriateness of the forum in the present case I
     consider that weight must be given to two particular factors which did
     not have to be discussed in the *Spiliada* case. First, the Convention is,
     and is intended to be, a codified scheme to make provision for cases to
H    be tried in appropriate fora; if, contrary to my decision in this case, the
     Convention does leave room for a relevant discretion, there nevertheless
     must be some very weighty factor to displace the jurisdiction provided
     for by the Convention and considered by the Convention to be the

                                                         2 Q.B. 1990-25

appropriate jurisdiction. Secondly, as pointed out in *Cannon Screen*   A
*Entertainment Ltd. v. Handmade Films (Distributors) Ltd.*, 11 July 1989,
the fact that the parties have agreed in their contract that the English
courts shall have jurisdiction (albeit a non-exclusive jurisdiction) creates
a strong prima facie case that that jurisdiction is an appropriate one; it
should in principle be a jurisdiction to which neither party to the
contract can object as inappropriate; they have both implicitly agreed
that it is appropriate.                                                    B

    There are factors which support the contention of the defendants
that the courts of New York are a convenient forum for the trial of
these actions. The underlying factual question to be investigated is what
was the extent of the actual losses suffered by the second plaintiffs.
Were they real losses? What was the extent of the goods stolen and
what was their value? It may also be relevant what were the precautions   C
taken by the second plaintiffs to guard against such losses and comply
with the warranties in the policies. The factual investigation of these
matters is already under way in New York and will have to be followed
up in New York. There are pending prosecutions and criminal
investigations in various states of the U.S.A. Documentary and oral
evidence will have to be obtained from the U.S.A. Both the second
plaintiffs and the defendants are amenable to the jurisdiction of the     D
courts of New York and it is convenient to them. These are powerful
factors to be put in the scale and were there no other factors might be
decisive in favour of the courts of New York.

    But there are other factors; they arise out of the defences which the
defendants seek to raise. The most important of these is that, in relation
to the cargo contract, the defendants seek to say that there was a        E
collateral agreement entered into by the underwriter in their London
office with the representative of the brokers, Sedgwicks, that the
relevant risks should not be covered by the cargo contracts. The defendants have
alleged in one of the affidavits placed before me:

      "Whatever may be the true construction of the group cargo contracts
      in this respect, I am informed by Mr. David S. French, the          F
      defendants' underwriter who agreed to the inclusion of the second
      plaintiffs in the group cargo contracts, that it was expressly agreed
      and understood between him and the plaintiff's broker, Mr. Tony
      Jarvis of Sedgwick Cargo Ltd., that employees' dishonesty was to
      be excluded. Mr. Jarvis and Mr. French, in the latter's recollection,
      agreed that it was not necessary specifically to include an exclusion
      in relation to employees' dishonesty as the coverage under the      G
      policy was subject to [various excepions]."

This allegation is intended to provide a total defence to the claim of the
plaintiffs in the main action and to confine them to the very limited
recovery available upon the fidelity policy the subject matter of the
subsidiary action. This important dispute relates to matters which
happened in London and are governed by English law and upon which        H
oral evidence will have to be heard. Further, as soon as the defendants
make this allegation (as they say they will) in their defence in the main
action, the plaintiffs will need to join Sedgwicks as additional defendants

647

**2 Q.B.**          Berisford Plc. v. New Hampshire Insurance          Hobhouse J.

A    in order to make an alternative claim against them. Sedgwicks are subject to the jurisdiction of this court and are not, on the evidence before me, subject to the jurisdiction of the courts of New York within the accepted principles of private international law, although no doubt there would be scope in any proceedings against the defendants in New York to apply for Sedgwicks, nevertheless, to be joined in those proceedings. If such an attempt were made it would be questionable

B    whether it would confer any rights on the plaintiffs against Sedgwicks and in any event the indication is that it would give rise to a keenly contested jurisdictional dispute before the courts of New York. It is the defendants who have chosen to raise this defence and it creates a serious and substantial juridical disadvantage for the plaintiffs should they not be allowed to continue the present proceedings in London. No adequate

C    reason has been shown why the plaintiffs should be deprived of the juridical advantage they enjoy in London.

There are further factors which support the view that London is an appropriate forum. The defendants propose to take defences arising upon the wording of the insurance contracts. These are primarily legal points of construction but they will need to be decided having regard to English law and to the practices and conventions of the London

D    insurance market with which this court is familiar. Further, the collateral agreement defence to which I have referred in the previous paragraph also raises questions of mixed fact and law which are again particularly appropriate to be tried in this court. It is of course not impossible to try such questions in the courts of a foreign country but that involves a transformation of the nature of the trial and transforms questions of law into questions of fact. The distinction between law and fact is further

E    relevant to the exercise of any right of appeal. It is clear from the way that the defendants have presented their case before me that these questions of law or of mixed law and fact are substantial and have a direct relevance to the outcome of the litigation.

As regards procedural considerations, I have already indicated that I do not consider that the procedural rights to discovery are decisive, or

F    indeed significant, as between litigation in New York and litigation in London. It is however the case that the costs incurred will in any event be very substantial and, indeed, may even be higher under the procedures of the courts of New York. In any case where the costs are going to involve very substantial sums of money, as must be the case in relation to the present matters, the question of the recoverability of such

G    costs is not an irrelevant factor: see *Roneleigh Ltd. v. MII Exports Inc.* [1989] 1 W.L.R. 619. If a stay were otherwise to be ordered consideration would have to be given to imposing terms which would not deprive the plaintiffs of the legitimate juridical advantage which they possess before the courts of this country of having the right to recover costs from the defendants if the plaintiffs succeed in the action. The defendants naively suggested that this was not a juridical advantage because if the plaintiffs

H    were to lose they would have to pay the defendants costs in this country. The plaintiffs are of course bringing the present actions because they expect to succeed and they wish to invoke the remedies available to them under English law and before the English courts. The courts of

648
Hobhouse J.          Berisford Plc. v. New Hampshire Insurance          [1990]

New York do not provide them with any remedy by which they can   A
recover the costs of enforcing what they say are their rights under these
policies. It is not for the defendants to deprive the plaintiffs of the rights
to recover costs.

Accordingly, if there were to be a stay, it should only be a stay on
terms and, if satisfactory terms could not be worked out which would
protect the plaintiffs' position on costs, then the stay would have to be   B
refused. Until the final stage of the hearing before me, there was a
further point concerning the risk that there would be a jury trial if these
matters were to be tried in New York. However the defendants have
avoided that not insignificant point by offering an undertaking that if
there were to be a trial in New York they would agree that it should be
by judge alone.

Balancing these various factors the one against the other, the   C
defendants have not satisfied me overall that the courts of New York are
clearly more appropriate than this court for the trial of these actions. If
it were necessary for me to exercise my discretion I would exercise it in
favour of the plaintiffs and not the defendants.

But for the reasons already given, the defendants' applications in
both actions fail and must be dismissed.

                                                              D

                                        *Applications dismissed.*

   *Solicitors: Hill Taylor Dickinson; Clifford Chance.*

          [Reported by Miss BARBARA SCULLY, Barrister-at-Law]

                                                              E

[2003] Vol. 2     LLOYD'S LAW REPORTS     571

C.A.]     Sabah v. GOP     PART 8

# COURT OF APPEAL

Oct. 16, 17; Nov. 14, 2002

SABAH SHIPYARD (PAKISTAN) LTD.
v.
ISLAMIC REPUBLIC OF PAKISTAN AND
ANOTHER

[2002] EWCA Civ 1643

Before Lord Justice PILL, Lord Justice WALLER
and Sir MARTIN NOURSE

**Practice** — Jurisdiction — Jurisdiction clause — Anti-suit injunction — Dispute under contracts relating to barge mounted electric generation facility at Karachi — Collateral guarantee gave jurisdiction to English Courts — Whether defendants in waiving sovereign immunity consented to English Court having jurisdiction to grant anti-suit injunction — Proper construction of jurisdiction clause — Defendant obtained injunction restraining claimants from commencing proceedings in England — Whether injunction restraining defendants from continuing proceedings in Pakistan should be granted.

Sabah, the claimant was a company incorporated in Pakistan for the sole purpose of entering into certain agreements with the first defendants (GOP) and the second defendants, the Karachi Electrics Supply Corporation Ltd. (KESC) a state owned company. Those agreements related to the design, construction, operation and maintenance of a barge-mounted electric generation facility at Karachi. Various agreements were signed in 1996 including the Implementation Agreement (the IA) between Sabah and the GOP and the Power Purchase Agreement (PPA) between Sabah and KESC. GOP also entered into a guarantee dated May 5, 1996 in favour of Sabah. Clause 1.9.1 of the guarantee provided inter alia:

    Each Party consents to the jurisdiction of the Courts of England for any action filed by the other Party under this agreement to resolve any dispute between the Parties and may be enforced in England . . .

    Disputes arose in relation to the reasons why the project was delayed. KESC drew down on certain letters of credit provided by Sabah pursuant to the PPA on the basis that the delay was due to Sabah being in breach of contract. Sabah asserted that the delay was due to force majeure, that KESC should have granted an extension of time and thus that KESC had acted wrongfully and in breach of contract.

    On Dec. 7, 1998 Sabah commenced arbitrations against the GOP under the IA and against KESC under the PPA. The arbitration under the PPA took place in Singapore and the arbitrator made an award in Sabah's favour in the sum of U.S.$6.84 m. together with interest and costs.

    Sabah demanded payment from KESC. KESC denied liability. Sabah claimed under the guarantee against GOP.

    GOP asserted that (1) GOP was not bound by the findings in the arbitration between KESC and Sabah; (2) Sabah had in any event not established the liability of KESC who were challenging the award; (3) because the IA had terminated, the PPA had ceased to exist and (a) the demand was premature because the legality of the basis on which the PPA had been terminated was still subject to arbitration and (b) was not maintainable for failure of consideration; (4) no demand could be made until the award was a rule of Court; (5) the demand had not been made in accordance with the guarantee.

    On Oct. 31, 2001 the GOP issued proceedings in the Court of the Senior Civil Judge Islamabad claiming declarations that the award had been obtained by fraud and that the demand was based on an award not binding on the GOP, that the guarantee was invalid due to the failure of consideration and that Sabah should be permanently restrained by injunction from making any demand under the guarantee.

    The GOP also applied ex parte on injunction pending trial of the action restraining Sabah from making any demand whatsoever under the guarantee which had the effect of preventing Sabah from commencing proceedings in England despite cl. 1.9.1 of the guarantee.

    On Dec. 11, 2001 Sabah applied to the English Courts submitting that the injunction granted by the Courts of Pakistan had expired on Nov. 15, 2001 and had not been renewed. They applied for an injunction restraining the GOP from continuing the proceedings in the Court of the Senior Judge, Islamabad.

————*Held*, by Q.B. (Com. Ct.) (DAVID STEEL, J.), that (1) the GOP had by the guarantee waived sovereign immunity including consenting to the granting of an injunction;

    (2) this was a case where an injunction restraining proceedings should be granted;

    (3) the parties had identified a neutral forum in which they were content that their dispute should be determined, that forum being the same as the governing law of contract and a forum which was deemed convenient and appropriate;

    (4) the proceedings in Pakistan were vexatious and oppressive.

    The GOP appealed, the issues for decision being (i) whether under the guarantee, the GOP in waiving sovereign immunity consented to this Court having jurisdiction to grant the injunction which the Judge granted; (2) the proper construction of the jurisdiction clause; and (3) whether the circumstances were such that if the Court had jurisdiction to grant an injunction it should do so in particular in the context of the GOP having obtained an injunction with the effect of restraining Sabah commencing proceedings in England.

————*Held*, by C.A. (PILL and WALLER, L.JJ. and Sir MARTIN NOURSE), that (1) the Judge was right in his conclusions on the sovereign immunity issue (*see* pars. 25, 27, 49 and 51);

    (2) cl. 1.9.1 did not lend itself to a transitive construction and when taken with cl. 2.6, it was not an exclusive clause in the sense of making it a breach of

LLOYD'S LAW REPORTS [2003] Vol. 2

Sabah v. GOP [C.A.

contract for either party to commence proceedings in a jurisdiction other than England (*see* pars. 34 and 53);

(3) the GOP agreed to submit to the jurisdiction of the English Court; furthermore it appointed agents for the purpose of service in England and it agreed to waive any objection that any action brought in England was being brought in an inconvenient forum; it could not have been the intention of the parties that if proceedings were commenced in England, parallel proceedings could be pursued elsewhere unless there was some special reason for doing so; it could not have been contemplated that convenience could count as a reason for pursuing proceedings in a country other than England (*see* par. 36);

(4) where England had been chosen as a neutral jurisdiction by an entity, Sabah a Pakistan company with Malaysian shareholders, and the state of Pakistan, it could not have been contemplated that parallel proceedings would be pursued in the Courts of Pakistan simply on the basis that that forum was a convenient forum; it was clearly a breach of contract to seek to prevent Sabah commencing proceedings in the agreed jurisdiction; if Sabah had already commenced proceedings in England before commencement of the proceedings in Pakistan, it would in the context of this particular clause clearly have been vexatious for those proceedings in Pakistan to have been commenced if the only basis for bringing the same was on the ground of forum convenience; and if proceedings were commenced in Pakistan simply to frustrate the jurisdiction clause such conduct would be contrary to the spirit of the jurisdiction clause and vexatious (*see* pars. 36 and 37);

(5) if proceedings had been commenced in England before the GOP commenced their proceedings in Pakistan, then the commencement of such proceedings would be vexatious and oppressive unless the GOP could show some exceptional reason why parallel proceedings were justified; the GOP could not show any exceptional reasons (*see* par. 42);

(6) the proceedings were commenced, it was plain as a pre-emptive strike and in the hope of preventing Sabah starting proceedings in the country to which both parties had agreed; the only basis for suggesting that the proceedings should be allowed to continue was that Pakistan was a convenient forum; it simply could not have been contemplated that if proceedings were commenced in the forum each had agreed as convenient parallel proceedings would still take place in Pakistan (*see* pars. 42 and 52);

(7) parallel proceedings in England and Pakistan simply on the basis that both were convenient was contrary to the spirit of the jurisdiction clause agreed; the seeking of the injunction to prevent proceedings in England tried to deal with that obvious point but the seeking of the injunction was impermissible and once it disappeared it was clear that parallel proceedings should not be entitled to continue (*see* pars. 43 and 52);

(8) the submission that this Court should still leave the question of a stay of the Pakistan proceedings to the Pakistan Court would be rejected; a stay would have been resisted and since this Court was the Court chosen by the parties as having jurisdiction, and a Court which

had concluded that the conduct of the GOP was vexatious and contrary to the spirit of the jurisdiction clause agreed, this Court would be failing in its duty if it did not give effect to that view by granting an injunction (*see* pars. 44 and 52);

(9) the Judge was right to grant an injunction and right to refuse the GOP's application to stay the English proceedings; the appeal would be dismissed (*see* pars. 46, 47, 48, and 53).

The following cases were referred to in the judgment of Lord Justice Walter:

A Co. v. Republic of X, [1990] 2 Lloyd's Rep. 521;

Airbus Industrie GIE v. Patel, (H.L.) [1999] 1 A.C. 19;

Alcom v. The Republic of Columbia, (H.L.) [1984] 1 A.C. 580;

Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd., [1903] 1 K.B. 249;

BAe v. Dee Howard Co. [1993] 1 Lloyd's Rep. 368;

Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd., July 11, 1989 unreported;

Castanho v. Brown & Root (U.K.) Ltd., (H.L.) [1981] A.C. 557;

Continental Bank N.A. v. Aeakos Compania Naviera S.A., [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588;

Donohue v. Armco Inc. and others, (H.L.) [2002] 1 Lloyd's Rep. 425;

Ex parte Kitchen, (1881) 17 Ch. D. 668;

Glencore International A.G. v. Exeter Shipping and others, Apr. 18, 2002 unreported;

Société National Industrielle Aerospatiale v. Lee Kui Jak, (P.C.) [1987] A.C. 781;

Spiliada Maritime Corporation v. Consulex Ltd., (H.L.) [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460;

Turner v. Grovit and others, [2002] 1 W.L.R. 107.

This was an appeal by the defendants the Islamic Republic of Pakistan and Karachi Electrics Supply Corporation Ltd. from the judgment of Mr. Justice David Steel given in favour of the claimants Sabah Shipyard (Pakistan) Ltd. continuing the injunction granted to the claimant restraining the appellant state from continuing with proceedings commenced by them on Oct. 31, 2001 in the Court of the Senior Judge, Islamabad.

[2003] Vol. 2                    LLOYD'S LAW REPORTS                                        573

C.A.]                                          Sabah v. GOP                                      [Waller, L.J.

Mr. Timothy Young, Q.C. (instructed by Messrs. Amhurst Brown Colombotti) for the defendant; Mr. Timothy Saloman, Q.C. and Mr Simon Picken (instructed by Messrs. DLA) for the claimant.

The further facts are stated in the judgment of Lord Justice Waller.

Judgment was reserved.

Thursday, Nov. 14, 2002

---

### JUDGMENT

**Lord Justice WALLER:**

*Introduction*

1. This is an appeal from a judgment of Mr. Justice David Steel given on Feb. 6, 2002. He continued an injunction granted by him without notice on Dec. 11, 2001, restraining the appellant state (The Islamic Republic of Pakistan referred to hereafter by the initials GOP) from continuing with proceedings commenced by them on Oct. 31, 2001 in the Court of the Senior Judge, Islamabad. He also ruled against the GOP's application to stay the English proceedings. The Judge gave limited permission to appeal on "the State Immunity Issue", but this Court on Apr. 24, 2002 gave permission to appeal on all aspects. The essential issues which arise on the appeal relate to (1) whether under a guarantee given in favour of Sabah Shipyard (Pakistan) Ltd. (Sabah), the GOP, in waiving sovereign immunity consented to this Court having jurisdiction to grant the injunction which the Judge granted; (2) the *proper construction of the jurisdiction clause* of the same guarantee (cl. 1.9.1) under which:

. . .

Each Party consents to the jurisdiction of the Courts of England for any action filed by the other Party under this Agreement to resolve any dispute between the Parties and may be enforced in England except with respect to the Protected Assets, as defined in the Implementation Agreement of the Guarantor.

and (3) whether the circumstances are such that if the Court has jurisdiction to grant an injunction it should do so, in particular in the context of the GOP having obtained an injunction with the effect of restraining Sabah commencing proceedings in England, (although there is a dispute as to whether the same was actually in force when Mr. Justice David Steel granted the injunction).

*The facts*

2. Sabah is a limited company incorporated in Pakistan. It was incorporated by its Malaysian parent for the sole purpose of entering into certain agreements with the GOP and a state owned corporation, the second defendant, the Karachi Electrics Supply Corporation Ltd. (KESC). Those agreements related to the design, construction, operation and maintenance of a barge-mounted electric generation facility at Karachi. Various agreements were signed in 1996 including the Implementation Agreement (the IA) between Sabah and the GOP, and the Power Purchase Agreement (the PPA) between Sabah and KESC. In accordance with the terms of the IA, art. 22, GOP also entered into a guarantee dated May 5, 1996, in favour of Sabah. Clause 1 of the guarantee provided as follows:

1.1 *Guarantee*

In consideration of the Company having entered into the Power Purchase Agreement with KESC and the Fuel Supply Agreement with the Fuel Supplier, the Guarantor hereby irrevocably and unconditionally guarantees and promises to pay the Company any and every sum of money KESC and the Fuel Supplier are obligated to pay to the Company under or pursuant to the Power Purchase Agreement and the Fuel Supply Agreement that KESC or the Fuel Supplier has failed to pay when due in accordance with the terms of those agreements, which obligation of the GOP shall include monetary damages arising out of any failure by KESC or the Fuel Supplier to perform its obligations under the Power Purchase Agreement or the Fuel Supply Agreement, respectively, to the extent that any failure to perform such obligations gives rise to monetary damages.

3. Disputes arose in relation to the reasons why the project was delayed. KESC drew down on certain letters of credit provided by Sabah pursuant to the PPA on the basis that the delay was due to Sabah being in breach of contract. Sabah asserted that the delay was due to force majeure, that KESC should have granted an extension of time and thus that KESC had acted wrongfully and in breach of contract. On Dec. 7, 1998 Sabah commenced arbitrations against the GOP under the IA, and against KESC under the PPA. The arbitration under the

PPA took place in Singapore, and the arbitrator, Sir David Tompkins, Q.C., made an award in Sabah's favour in the sum of U.S.$6.84m. together with interest and costs.

4. Sabah demanded payment from KESC by letter dated June 27, 2001. KESC responded by fax of July 7, 2001 denying liability. By letter dated Sept. 7, 2001, Sabah made a demand under the guarantee on the GOP. The GOP responded by letter dated Sept. 11, 2001 asserting (1) that the GOP was not bound by the findings in the arbitration as between KESC and Sabah; (2) that Sabah had in any event not established the liability of KESC, who were challenging the award [KESC have challenged the award in the Sindh High Court in Karachi]; (3) that because the IA had terminated, the PPA had ceased to exist, and (a) the demand was premature because the legality of the basis on which the PPA had been terminated was still subject to arbitration, and (b) was not maintainable for failure of consideration; (4) no demand could be made until the award was made a rule of Court; (5) the demand had not been made in accordance with the guarantee.

5. On Oct. 31, 2001 the GOP issued proceedings in the Court of the Senior Civil Judge, Islamabad, describing the proceedings as "Suit for a declaration & permanent injunction". The pleading asserted the points set out in the letter of Sept. 11 but also asserted that the award had been obtained by fraud, and claimed a declaration to that effect in addition to declarations that the demand was based on an award not binding on the GOP, that the guarantee was invalid due to failure of consideration, and that Sabah should be "permanently restrained by injunction from making any demand under the guarantee."

6. Also on Oct. 31, 2001, the GOP applied ex parte for an injunction pending trial of the action restraining Sabah from making any demand whatsoever under the guarantee. It is common ground that the form of words had the effect, and was intended to have the effect, of preventing Sabah commencing proceedings in England despite cl. 1.9.1 of the guarantee. On the documents that this Court has, there is no indication that cl. 1.9.1 was drawn to the attention of the Islamabad Court. The application simply asserted the strength of the GOP's case. The guarantee was appended as a document, but it seems most unlikely that cl. 1.9.1 was drawn to the attention of the Court in any detail because there is no mention of the clause in the record of argument and decision (p. 197/198), and whether or not that clause is exclusive, it seems to provide a complete answer to any assertion that Sabah should be subjected to an injunction which has the effect of preventing them commencing proceedings in England.

7. Mr. Gruder, Q.C., who appeared for the GOP before Mr. Justice David Steel, told the Judge on instructions that the Judge in Islamabad "was specifically told about these matters" (see judgment p. 24 line 29). It is difficult to accept that the Judge in Islamabad fully appreciated the effect of cl. 1.9.1, because if he had, I cannot think he would have granted an interim injunction ex parte in the terms he did i.e. "until the next date of hearing defendant is hereby restrained to demand/recover any amount from the plaintiff on the basis of guarantee."

8. The history of the proceedings thereafter was that on Nov. 5, representatives of the GOP appeared again before the Judge. The documents for one reason or another had not been served on Sabah, and an order was made for re-service "for 15th November". On Nov. 15, Counsel for both sides appeared and Counsel for Sabah asked for time to file a written statement and counter affidavit, and the case was adjourned until Dec. 13, 2001. There is a dispute as to whether the injunction granted ex parte continued after that date. Those acting for the GOP say that their representative checked with the Judge that the injunction continued and assert that the Judge said "that continues." They assert further that as a matter of Pakistan law the injunction would continue automatically. Those representing Sabah say that the injunction does not continue automatically and that, although Mr. Naqvee representing the GOP made an oral request for the injunction to continue, since the Judge did not respond to that request they believed the injunction was not continuing.

9. Mr. Justice David Steel did not feel it necessary to resolve either the issue as to whether under Pakistan law the injunction automatically continued, or as to what precisely transpired before the Judge in Islamabad on Nov. 15. He accepted that Mr. Talibuddin "was firmly of the view that the order needed to be renewed at the hearing of 5th November, and that it had not been by reference to the express terms of the order". He also accepted that he "did not appreciate that Mr. Naqvee thought otherwise, given his request for a extension on 15th November". He accepted he was unaware of any different view "because it was not expressed or because it was not heard."

10. In any event Sabah made their application to the English Court on Dec. 11, 2001. They set out in the supporting affidavit what they suggested had happened in the Courts in Pakistan asserting that the GOP had obtained an ex parte injunction "until the next hearing date"; that that injunction had expired on Nov. 15, 2001, and had not been renewed. They applied without notice because of a fear that if they gave notice to the GOP, the GOP would attempt to obtain a further injunction. An

injunction was granted by Mr. Justice David Steel, and directions given for a return date when the matter could be argued with the GOP represented.

11. The Court in Islamabad was due to hear the application inter partes in the proceedings in that Court on Dec. 13, 2001, but on being informed of the injunction granted by the English Court, postponed that hearing until after the date of the on notice hearing in England. I note in passing, as did the Judge, that the record of what occurred on Dec. 13 in the Islamabad Court does not read as if the view was being taken that the proceedings and application for an injunction in England were in contumacious breach of an injunction issued in the Pakistan Courts.

12. On the on notice hearing in England, Mr. Justice David Steel held that the GOP had by the guarantee waived sovereign immunity including consenting to the granting of an injunction; and that this was a case where an injunction restraining proceedings should be granted. It was not argued before him that cl. 1.9.1 was an exclusive jurisdiction clause in the sense that the GOP had been in breach of contract in commencing proceedings in Pakistan, but it was suggested that cl. 1.9.1 was more than a bare agreement to accord jurisdiction to England on a non-exclusive basis "because it not only affords machinery for service of process in England, see 1.9.2, but also contains a waiver of any objection to English jurisdiction on forum non-conveniens grounds, 1.9.3" (see judgment p. 19). The view of Mr. Justice David Steel was thus that —

　　. . . whilst the burden would be on [Sabah] to establish that the proceedings commenced in Pakistan are vexatious or oppressive, . . . it is a burden lightened by the fact that the parties have identified a neutral forum in which they are content that their dispute should be determined, that forum being the same as the governing law of the contract and a forum which is deemed convenient and appropriate.

13. Mr. Justice David Steel held that the proceedings in Pakistan were vexatious and oppressive. He examined the reasons why the proceedings had been commenced in Pakistan at all, and his conclusion ultimately he put in the following terms:

　　The claimants, I conclude, have fully made good their case that the proceedings in Pakistan are oppressive and vexatious. The defendants have no legitimate interest in invoking Pakistan jurisdiction. It is, as I see it, a transparent device to seek to avoid liability under the guarantee by reference to defences which have little merit and that, in any event, are governed by English law. Furthermore they are being advanced in an inconvenient jurisdiction, and certainly not a neutral one, all in the context of an agreement in clause 1.9.3 not to object to English jurisdiction on the grounds of inconvenience.

14. In reaching the above conclusion he found that the reason given for invoking the jurisdiction of the Pakistan Court, i.e. that it was a convenient forum, was not a legitimate reason having regard to the terms of the guarantee. He in any event found that it was "impossible to discern any genuine aspects of convenience justifying the invocation of Pakistani jurisdiction, even if it was open to the [GOP] to pray in aid aspects of convenience," reaching this conclusion by reference to his view (1) that the issues raised by the GOP were issues of law and construction which were unlikely to need witnesses; (2) that the issues of construction were at first blush only just arguable; (3) that the allegation that the award had been obtained by fraud had effectively been withdrawn and replaced by a complaint of procedural unfairness; (4) that the complaint was in any event difficult to argue, but even if there was merit in it, it would be for a Singapore Court to adjudicate upon, Singapore having jurisdiction over the arbitration; (5) that the GOP's assertion that the claimants could not rely on the award, but would need to establish the case they had established in the arbitration with KESC was misconceived. He distinguished *ex parte Kitchin*, (1881) 17 Ch. Div. 668 on the basis that there was no special agreement in that case whereas there was in the instant case.

15. Mr. Justice David Steel as I have said, did not feel it necessary to decide whether the injunction was actually in force in Pakistan, and indeed he added —

　　. . . that even if Mr. Talibuddin should have appreciated it was arguable that the injunction remained in force, it would have been of limited significance to the application to this court. First, because the need to go ex parte would have been fully justified given the argument that no injunction was in force but that it could be readily reinstated. Second, the whole thrust of the application was that the invocation of Pakistan jurisdiction to obtain an injunction was vexatious and oppressive, and thus the arguable existence of the outcome of such an oppressive and vexatious proceedings would have been of limited materiality to the exercise of discretion (see judgment p. 42).

16. As already indicated Mr. Justice David Steel gave only limited permission to appeal confined to the state immunity point, but this Court granted full permission to appeal on Apr. 24, 2002, Lord Justice Clarke delivering the judgment with which Lord Justice Pill and Lord Justice Chadwick agreed. One

WALLER, L.J.]                    Sabah v. GOP                          [C.A.

basis for granting permission was the relevance of the existence of the injunction in Pakistan to the exercise of the Court's discretion here.

17. Further material has been placed before us in relation to the proceedings in Pakistan. That Court has suo motu ordered the lawyers for Sabah to show cause as to why they should not be committed for contempt. It is however still contended by Sabah and those representing Sabah that the injunction was not in place when proceedings were commenced in England. The matter has not been finally resolved. Neither side at the hearing before us was anxious for this Court to become embroiled in that issue, and unless it was necessary for the decision on the appeal it must be right to leave that question to the Courts in Pakistan. For reasons which will become clear, I can say now that in my view it is not necessary for the decision on this appeal to resolve that question. It is right to emphasize that I did not understand Mr. Young, Q.C. to press any argument that those representing Sabah appreciated that there was an injunction in place in Pakistan when they commenced proceedings in England. No attempt was made to argue that the finding of the Judge, that there was genuine belief as to the position (as set out in the affidavits supporting the application for relief in this country) was wrong.

*Sovereign immunity*

18. Clause 2.6 of the guarantee provides as follows:

2.6 *Sovereign Immunity*

The Guarantor hereby irrevocably and unconditionally agrees that the execution, delivery, and performance by it of this Guarantee constitute private and commercial acts.

The Guarantor hereby irrevocably and unconditionally agrees that: (i) should any proceedings be brought against the Guarantor or its assets, other than its military aircraft, naval vessels and other defense related assets or assets protected by the diplomatic and consular privileges under the 1978 Immunity Act of the United Kingdom or the 1976 Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets") in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guarantee, no claim of immunity from such proceedings will be claimed by or on behalf of the Guarantor on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) consents generally in respect of the enforcement of any judgment

against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of its use or intended use).

19. The GOP is a state. The relevant Sections of the State Immunity Act, 1978 provide as follows —

13. . . . Immunity from jurisdiction

1. — (1) A State is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act.

. . .

Exceptions from immunity

2. — (1) A State is not immune as respects proceedings in respect of which it has submitted to the jurisdiction of the courts of the United Kingdom.

(2) A State may submit after the dispute giving rise to the proceedings has arisen or by a prior written agreement; but a provision in any agreement that it is to be governed by the law of the United Kingdom is not to be regarded as a submission

. . .

3. — (1) A State is not immune as respects proceedings relating to — (a) a commercial transaction entered into by the State

. . .

13. — (1) No penalty by way of committal or fine shall be imposed in respect of any failure or refusal by or on behalf of a State to disclose or produce any document or other information for the purposes of proceedings to which it is a party.

(2) Subject to subsections (3) and (4) below —

(a) relief shall not be given against a State by way of injunction or order for specific performance or for the recovery of land or other property; and

(b) the property of a State shall not be subject to any process for the enforcement of a judgment or arbitration award or, in an action in rem, for its arrest, detention or sale.

Subsection (2) above does not prevent the giving of any relief or the issue of any process with the written consent of the State concerned; and any such consent (which may be contained in a prior agreement) may be expressed so as to apply to a limited extent or generally; but a

provision merely submitting to the jurisdiction of the courts is not to be regarded as a consent for the purposes of this subsection.

. . ;

14. — (1) The immunities and privileges conferred by this Part of this Act apply to any foreign or commonwealth State other than the United Kingdom, and references to a State include references to —

(a) the sovereign or other head of that State in his public capacity;

(b) the government of that State; and

(c) any department of that government.

20. The argument of Mr. Saloman, Q.C. in summary was (1) cl. 2.6 as a whole appeared to be intended to be a comprehensive waiver placing the GOP in the same position as any private individual save in relation to "protected assets"; (2) support for that view was supplied by the fact that it would be odd for a state to waive immunity from suit in a particular jurisdiction, but preserve for itself the right in effect to resist enforcement of that very right; (3) cl. 2.6 was constructed so as to deal first with commencement of proceedings by 2.6(i); second, with the proceedings themselves by 2.6(ii); and third, with the enforcement of any judgment by 2.6(iii). The language of 2.6(ii) was very wide and by waiving "any right of immunity" "in connection with any proceedings," the GOP was consenting to the granting of any relief against it (save in relation to its protected assets) in connection with the proceedings e.g. an interim injunction for *Mareva* relief or for an anti suit injunction. In the alternative (4) if (as the GOP argued) because the word "consents" appeared in cl. 2.6(iii), and not in 2.6(ii), it was only to 2.6(iii) to which the Court could look so far as "procedural privileges" were concerned, that clause should be construed so as to amount to a consent to relief including injunctive relief even prior to final judgment.

21. The argument of Mr. Young for the GOP was that the language of 2.6 followed the language of s. 13 of the State Immunity Act. That clause accordingly, he submitted, used the word waive when it was concerned with waiver of sovereign immunity, and "consent" when it was concerned with privileges retained by a state. It was only in cl. 2.6(iii) that the word "consent" appeared. Thus it was, he suggested, from cl. 2.6(iii) and that clause alone that any consent to the granting of an anti-suit injunction had to be spelt out. But he submitted that cl. 2.6(iii) was governed by the words at the commencement of the clause "enforcement of any judgment";. So until final judgment, he submitted, there was no room for spelling out any consent to relief by way of injunction. Thus his submission was that there was no consent to the granting of any

injunction during the currency of any proceedings. He accepted that once judgment had been granted the word "relief" included injunction, i.e. a *Mareva* injunction to aid enforcement of a judgment.

22. Mr. Young's submission has certain rather odd consequences. It would seem that whereas he would accept that the Court could grant a *Mareva* injunction to aid enforcement of a final judgment, it could not grant a *Mareva* during the currency of the proceedings. It would also seem that although he would accept that a final injunction might be granted to aid enforcement of a final judgment, an interim injunction to hold the status quo pending decision could not be granted. It further has the consequence that, as Mr. Saloman submitted, although the GOP has waived immunity in relation to suit brought in England, and however vexatiously the GOP may behave in commencing proceedings elsewhere, the GOP cannot be compelled to comply with its obligation.

23. My starting point accordingly is that it would be very strange if cl. 2.6 as a whole were not to be construed so as to include a consent by the GOP to have an interim injunction granted against it. Mr. Young's submissions do not involve looking at cl. 2.6 as a whole at all. He concentrates on cl. 2.6(iii) suggesting that because of the use of the word "consents", that must be the only provision which relates to consent (the word used in s. 13(3)), but then seeks to confine the clause to matters after final judgment, because of the words "generally in respect of the enforcement of any judgment" at the beginning of the clause. However, such a construction makes no commercial sense, and assumes that a draftsman had the State Immunity Act in front of him and was seeking to achieve a very odd result — consent to relief including an injunction to assist the enforcement of final judgment, but no consent to maintaining the status quo pending judgment.

24. Mr. Young's submission also gives very little meaning to cl. 2.6(ii).

25. The Judge preferred the primary submission of Sabah which relied on cl. 2.6(ii) as providing the relevant consent. I think the Judge was right in the construction he chose. Furthermore, it seems to me that support for the approach adopted is obtained from the decision quoted by the Judge, of Mr. Justice Saville (as he then was) in *A Company v. Republic of X*, [1990] 2 Lloyd's Rep. 521. The clauses under consideration were different, but Mr. Justice Saville rejected an argument that in some way a restrictive operation should be adopted to clauses dealing with waiver of immunity since one of the parties is a state; where the case concerns an ordinary commercial transaction, there is no good reason why the clause in question should not be

WALLER, L.J.]                          Sabah v. GOP                               [C.A.

construed in accordance with the ordinary principles of construction for commercial contracts "giving the words used, if capable of bearing them, a construction which accords with commercial common sense."

26. He furthermore suggested that the argument run in that case as in this that drew a distinction between immunities and privileges was a "highly legalistic argument that cannot be accepted." He pointed out that privileges can be described as immunities and indeed had been not only by Mr. Wood in his work entitled "The Law and Practice of International Finance", but indeed by Lord Diplock in the House of Lords in *Alcom v. The Republic of Columbia*, [1984] 1 A.C. 580 at p. 600G.

27. I would thus uphold the Judge on the state immunity aspect for the reasons he gave in reliance on cl. 2.6(ii).

*Exclusive or non-exclusive*

28. I shall set out cl. 1.9 in its entirety.

1.9 *Submission to Jurisdiction; Service of Process*

1.9.1 *Submission to Jurisdiction*

Each party hereby consents to the jurisdiction of the Courts of England for any action filed by the other Party under this Agreement to resolve any dispute between the Parties and maybe [sic] enforced in England except with respect to the Protected Assets, as defined in the Implementation Agreement of the Guarantor.

1.9.2 *Appointment of Agent for Service of Process*

With respect to any proceedings referred to in Section 1.9.1:

(a) The Guarantor appoints, the Commercial Officer, or in his absence, another diplomatic agent of its Diplomatic Mission at such Contracting Party, and, in all cases, the Commercial Counsellor of the Islamic Republic of Pakistan in London (or, in his absence, a responsible officer in the High Commission), whose address is presently 35/36 Lowndes Square, London SW1 9JN, England, to receive for and on its behalf service of process in any such proceeding;

(b) The Company appoints Clyde & Co., whose address is presently 21 Eastcheap, London EC3M 1JP, England, to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(c) Each Party shall maintain in London a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent;

(d) Each Party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgment based thereon.

1.9.3 *Waiver of Defence of Inconvenient Forum*

Each Party waives any objection that it may now or hereafter have to the venue of any action or proceeding brought as consented to in this Section 1.9, and specifically waives any objection that any such action or proceeding was brought in any inconvenient forum and agrees not to plead or claim the same. Each Party agrees that service of process in any such action or proceeding may be effected in the manner set forth in this Section 1.9 or in any other manner permitted by applicable law.

29. Clause 2.6 set out above is also relevant in that it appears to contemplate the bringing of proceedings in "any jurisdiction" at least as against the GOP.

30. The first question is whether cl. 1.9.1 is an exclusive jurisdiction clause so as to make it a breach of contract for either party to bring proceedings in any other Court but that of England. Mr. Saloman, it would seem, did not press the argument before the Judge that the clause was exclusive in that sense. He sought before us however to suggest that it was exclusive in that sense and relied on *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.*, [1903] 1 K.B. 249. That case was concerned with a clause in the following terms:

For all disputes which may arise out of the contract of insurance, all the parties interested expressly agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction in such matters.

31. Lord Justice Romer in his judgment in the Court of Appeal said:

This is a simple point; and, though I can understand that different persons might take different views of it, I must say that to my mind the meaning of condition 24 is that contended for by the defendants. The question is this: Does the condition merely mean that, if one of the parties to the contract is sued by the other in the Court of Budapest, he will not take any objection to its jurisdiction; or, does it mean that the parties mutually agree that, if any dispute arises under the contract, it shall be determined by the Court in Budapest? Having regard to the nature of the contract and its language, I am of opinion that the latter construction is the correct one. It is not as

if the insurance company only had agreed that they would submit to the jurisdiction of the Court at Budapest: both parties mutually agree to submit to that jurisdiction in respect of any dispute which may arise under the contract. If there had been an agreement by the parties in similar terms to submit to the decision of a particular individual, I think there could have been no doubt that it would have amounted to an agreement to submit any dispute under the contract to the arbitration of that person. In this case, instead of nominating a particular individual as arbitrator, the parties agree to submit any dispute arising under the contract to the Courts at Budapest. I think the appeal should be allowed.

32. We were also referred in this context by both Counsel to *BAe v. Dee Howard Co.*, [1993] 1 Lloyd's Rep. 368; and *Continental Bank NA. v. Aeakos Compania Naveria S.A.*, [1994] 1 W.L.R. 588.

● In *BAe* I cited a passage from the transcript of a judgment of Mr. Justice Hobhouse (as he then was) in *Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd.*, (July 11, 1989 Q.B.D. unreported). The clause with which he was dealing was in the following terms:

This agreement shall be construed and interpreted pursuant to laws of England and the parties hereby consent and submit to the jurisdiction of the Courts of England in connection with any dispute arising hereunder. The parties further agree that process in any such action may be served upon either of them by registered or certified mail at the address of first above given or such other address as the party being served may from time to time have specified to the other party by previous written notice.

33. His view was that that clause was not exclusive and his reasons involved consideration of the *Austrian Lloyd* case, and were in the following terms:

In my judgment the wording of these clauses is clear. The clause in the model and conforming agreements starts by specifically referring to the fact that the agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. It therefore expressly contemplates the relevance of other entities than those actually named in the agreement. It then uses words which are words of submission not reference: "The parties hereby submit to the jurisdiction." In the output agreement the equivalent phrase is "the parties hereby consent and submit to the jurisdiction." The addition of the word "consent" reinforces the same conclusion. The phrase in the *Austrian Lloyd* case was "agree to submit" but in that case

it was construed in a transitive sense as an agreement to submit disputes to a particular court in the same way as one can agree to submit disputes to the decision of the arbitrator. The clauses which I have to construe do not lend themselves to a transitive construction; the sense is that the parties submit themselves to the jurisdiction of the court not that the parties submit disputes. In the *Austrian Lloyd* case it was open to the court to construe the words as if they read "agree to submit all such disputes." I do not consider that it would be appropriate to make such an inferential insertion in these clauses. Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English courts and not there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used. It is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.

34. In my view cl. 1.9.1 does not lend itself to a transitive construction, and when taken with cl. 2.6, it seems to me that it is not an exclusive clause in the sense of making it a breach of contract for either party to commence proceedings in a jurisdiction other than England.

35. However, it is not without interest that in the *Cannon Screen* case Mr. Justice Hobhouse did in fact grant an injunction to restrain the proceedings in California. In *BAe* I quoted Mr. Justice Hobhouse as saying:

There is on any view an agreement between Cannon U.K. and the Defendants to submit to the jurisdiction of the English courts. Therefore it cannot be said that as regards the matters to which that cause relates it is an arrogation of jurisdiction by the English courts to decide where those matters should be tried. Those parties have agreed to submit to English jurisdiction; *they cannot object to its accepting that jurisdiction.* (My emphasis).

36. In the instant case, on any view, the GOP agreed to submit to the jurisdiction of the English Court. Furthermore, it appointed agents for the purpose of service in England, and it agreed to waive any objection that any action brought in England was being brought in an inconvenient forum. It seems to me that it cannot have been the intention of the parties that if proceedings were

WALLER, L.J.]                          Sabah v. GOP                                      [C.A.

commenced in England, parallel proceedings could be pursued elsewhere unless there was some exceptional reason for doing so. It certainly cannot have been contemplated that convenience could count as a reason for pursuing proceedings in a country other than England. In particular, where England has been chosen as a neutral jurisdiction by an entity, Sabah a Pakistan company with Malaysian shareholders, and the state of Pakistan, it cannot have been contemplated that parallel proceedings would be pursued in the Courts of Pakistan simply on the basis that that forum is a convenient forum.

37. It was thus in my view clearly a breach of contract to seek to prevent Sabah commencing proceedings in the agreed jurisdiction. Furthermore, if Sabah had already commenced proceedings in England before commencement of the proceedings in Pakistan, it would in the context of this particular clause clearly have been vexatious for those proceedings in Pakistan to have been commenced if the only basis for bringing the same was on the ground of forum conveniens. It also seems to me that if proceedings were commenced in Pakistan simply to attempt to frustrate the jurisdiction clause, such conduct would be contrary to the spirit of the jurisdiction clause and vexatious.

*Is this a case for an injunction?*

38. The proper approach of the English Court has been considered recently in two cases in the House of Lords, *Donohue v. Armco Inc. and others*, [2002] 1 Lloyd's Rep. 425, and *Turner v. Grovit and Others*, [2002] 1 W.L.R. 107, and, following those decisions, in the Court of Appeal in *Glencore International A.G. v. Exeter Shipping and Others* Apr. 18, 2002. In *Turner v. Grovit* Lord Hobhouse said this at p. 118:

25. An order restraining proceedings in some other forum is the obverse of an order for the stay of proceedings before the forum itself. If there are proceedings before an English court which it is unconscionable for a party to pursue, such proceedings will be stayed. This follows the same basic logic as the grant of a restraining order where the unconscionable conduct lies in the pursuit of proceedings elsewhere. The difference between the two situations does not materially alter the nature of the unconscionable conduct being relied upon by the applicant but does importantly affect the grant of the remedy. As Lord Goff put it in *Airbus Industrie GIE v. Patel*, [1999] 1 A.C. 119 at p. 133, "[the power to stay] depends on its voluntary adoption by the state in question and [the power to make a restraining order] is inhibited by respect for comity". Under English law, a person has no right not to be sued in a particular forum,

domestic or foreign, unless there is some specific factor which gives him that right. A contractual arbitration or exclusive jurisdiction clause will provide such a ground for seeking to invoke the right to enforce the clause. The applicant does not have to show that the contractual forum is more appropriate than any other: the parties' contractual agreement does that for him. Similarly, where as in the present case there has been clearly unconscionable conduct on the part of the party sought to be restrained, this conduct is a sufficiently strong element to support the affected party's application for an order to restrain such conduct. This, as well, is not based upon the complaint that the action has been brought in an inappropriate forum — the doctrine of forum non conveniens. But, where the conduct relates to the prosecution of proceedings abroad, the question whether or not the foreign forum was an appropriate forum in which to sue is bound to have an evidential importance in the evaluation of the conduct complained of and to affect importantly the decision whether or not to grant the remedy of a restraining order. By contrast, there are cases where the only unconscionable conduct alleged is the fact that the party sought to be restrained has commenced proceedings in an inappropriate forum. This is a weak complaint and is easily overridden by other factors or considerations: see for example *Castanho v. Brown & Root (U.K.) Ltd.*, [1981] A.C. 557, *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460 and *Société Nationale Industrielle Aérospatiale v. Lee Kui Jak*, [1987] A.C. 871. Most of the criticism of the use of "anti-suit" injunctions (i.e. restraining orders) relates to their use in this field. These criticisms are recognised and for reasons of comity an English Court will be reluctant to take upon itself the decision whether the foreign forum is an appropriate one (*Airbus Industrie GIE v. Patel*, [1999] A.C. 119) and it will not do so where the foreign country is a Brussels Convention country (p. 132).

26. The making of a restraining order does not depend upon denying, or pre-empting, the jurisdiction of the foreign court. One of the errors made by the Deputy Judge in the present case was to treat the case as if it were about the jurisdiction of the Madrid court. Jurisdiction is a different concept. For the foreign court, its jurisdiction and whether to exercise that jurisdiction falls to be decided by the foreign court itself in accordance with its own laws (including Conventions to which the foreign country may be a party). The jurisdiction which the foreign court chooses to assume may thus include an extra-territorial (or exorbitant) jurisdiction which is not

[2003] Vol. 2 LLOYD'S LAW REPORTS 581

C.A.] Sabah v. GOP [WALLER, L.J.

internationally recognized. International recognition of the jurisdiction assumed by the foreign court only becomes critical at the stage of the enforcement of the judgments and decisions of the foreign court by the courts of another country. Restraining orders come into the picture at an earlier stage and involve not a decision upon the jurisdiction of the foreign court but an assessment of the conduct of the relevant party in invoking that jurisdiction. English law makes these distinctions. Indeed, the typical situation in which a restraining order is made is one where the foreign court has or is willing to assume jurisdiction; if this were not so, no restraining order would be necessary and none should be granted.

39. In the above passage Lord Hobhouse, in analysing the way in which someone may establish a right not to be sued in foreign proceedings, draws a distinction between the situation where there is an exclusive jurisdiction clause (which without more provides the right) and the situation in which the person has to rely on unconscionable conduct. He does not, because it was not relevant, explore the situation in which although a clause is not exclusive it provides the background against which the conduct of a party may be examined. The terms of such clauses will vary. In this instance the clause expressly deals with the forum conveniens aspect and provides for methods of service so as to enable England to be the most likely forum for resolution of disputes. England is the agreed jurisdiction to which neither party can object, and furthermore it cannot be said "that as regards the matters to which that clause relates it is an arrogation of jurisdiction by the English Courts to decide where those matters should be tried."

40. Mr. Young stressed various factors. First he stressed that the existence of a non-exclusive jurisdiction clause was not sufficient as a ground for granting an injunction. It was necessary for there to be oppression or vexation. I would accept that point but the terms of the non-exclusive clause will be relevant, and may, as the Judge put it, lighten the burden in establishing oppressive conduct. Second he stressed the fact that although injunctions are in personam foreign Courts do consider such injunctions as an interference with proceedings in that country. Again he is right, and it is for that reason that an English Court is cautious before granting such an injunction. Third he stressed that it was possible that there was an injunction in place granted by the Pakistan Court when Sabah commenced proceedings and moved for injunctive relief in England, and this Court would not wish to be seen to be aiding a contempt of an order made by a foreign and friendly Court. If there was an injunction in place that would clearly be a relevant matter and the English Court would clearly prefer not to be thought to be aiding a contemnor. But where the obtaining of the injunction was itself a breach of contract, and was seeking to prevent a party exercising its contractual right to bring proceedings in the English Court, the English court must at least allow the proceedings to be commenced in its Courts. It does not necessarily follow that the English Court should grant an injunction to prevent proceedings in the foreign Court, but again the existence of the foreign injunction should not prevent it doing so, if the very obtaining of that injunction can be seen to have abused the rights of the litigant with the contractual right to come to England. This of course in no way interferes with the right of the foreign Court to proceed in any way it sees fit to punish any contemnor.

41. Mr. Saloman stressed the following factors. First, to take steps as part of the proceedings in Pakistan to try and prevent proceedings in England was the clearest breach of contract. If the Court had been made aware of the effect of the relevant clause no injunction would have been granted, but the moving for an injunction and the claim for relief in the proceedings demonstrated the aim of the GOP was to have one set of proceedings but in Pakistan. Second, the proceedings can be seen as vexatious. There was simply no need to seek a negative declaration; if the GOP's point on not being liable under the guarantee is a good point it will be a good point in England as well as Pakistan. The only basis for suggesting that the proceedings should be allowed to be brought and continued in Pakistan, was on the basis that Pakistan provided a convenient forum. In the context of cl. 1.9.3, that could not provide a legitimate basis for Pakistan being the sole court in which proceedings could be brought, and could not indeed provide a basis on which parallel proceedings should be allowed to continue in Pakistan once English proceedings had been commenced. Third, an injunction against the making of a demand under the guarantee or claiming under it was completely unnecessary. A demand had already been made. Sabah did not have any security against which it could enforce its claim.

42. As already indicated, it seems to me that if proceedings had been commenced in England before the GOP commenced their proceedings in Pakistan, then the commencement of such proceedings in Pakistan would be vexatious and oppressive unless the GOP could show some exceptional reason why parallel proceedings were justified. The GOP could not show any exceptional reasons. They rely simply on matters of convenience all of which would have been in the contemplation of the parties when they agreed the clause that they did. To have sought an injunction to seek to prevent English proceedings being the parallel proceedings in those

Pill, L.J.]                              Sabah v. GOP                                    [C.A.

circumstances would have demonstrated even more clearly that the GOP's conduct was oppressive and vexatious. Does the fact that the GOP commenced their proceedings first change the position? In my view it does not. The proceedings were commenced, it is plain, as a pre-emptive strike, and in the hope of preventing Sabah starting proceedings in the country to which both parties had agreed. The only basis for suggesting that the proceedings should be allowed to continue is that Pakistan is a convenient forum. It simply cannot have been contemplated that if proceedings were commenced in the forum each had agreed as convenient, parallel proceedings would still take place in Pakistan.

43. Mr. Young at one stage suggested that the only matter about which Sabah had any right to complain was the seeking of the injunction. I do not accept that point. Parallel proceedings in England and Pakistan simply on the basis that both were convenient was contrary to the spirit of the jurisdiction clause agreed. The seeking of the injunction to prevent proceedings in England tried to deal with that obvious point. But the seeking of the injunction was impermissible, and once it disappears, it is clear also that parallel proceedings should not be entitled to continue.

44. Mr. Young would suggest that even if the above is right, this Court should still leave the question of a stay of the Pakistan proceedings to the Pakistan Court. He submits that comity requires that to be done. There are various answers to that suggestion in this case. First it is not absolutely clear that a stay would be granted; it seems that it would be resisted by the GOP and that points might be taken that Sabah, by requesting time to deal with the interim injunction, had taken a step in the action and were not entitled to a stay. Mr. Young assured us that Pakistan had a forum conveniens jurisdiction which could override the above, but it is not clear to me that accords with what Mr. Gruder told the Judge at first instance (see p. 6 par. 7). In any event since it seems that a stay would be resisted, and since this Court is the Court chosen by the parties as having jurisdiction, and a Court which has concluded that the conduct of the GOP is vexatious and contrary to the spirit of the jurisdiction clause agreed, this Court would be failing in its duty if it did not give effect to that view by granting an injunction. I stress that the injunction is in personam and against the GOP. It is being granted by the Court to which both parties have agreed to give effect to the bargain they made. It is not intended in any way to be an interference with the jurisdiction of the Courts in Pakistan, and above all it is not implying any criticism of those Courts.

45. I should add that Mr. Saloman sought to demonstrate that the action in Pakistan had very little prospect of success. The merits of an action

taken abroad could be a relevant factor in considering whether the action is oppressive, and the Judge expressed adverse views in this case. But it seems to me that in this case whatever the merits of the points being taken, the proceedings in Pakistan are vexatious. Since there was not extensive argument by either side on this aspect before us, and since on the view I take the action will be proceeding in England, and an application for summary judgment is being made, I think it better not to express any view.

46. For the reasons I have endeavoured to give, I think the Judge was right to grant an injunction in this case and right to refuse the GOP's application to stay the English proceedings. I would dismiss the appeal.

**Sir MARTIN NOURSE:**

47. I agree.

**Lord Justice PILL:** 48. I also agree. As to sovereign immunity, I too approach cl. 2.6 of the guarantee on the basis that what appears to be a comprehensive submission by the Government of Pakistan (save as to protected assets) was not intended to be capable of being nullified by the government commencing proceedings in another jurisdiction. Mr. Young, Q.C., for the government, relies on the provision in s. 13(2) of the State Immunity Act 1978 that the "written consent of the state" is required before relief can be given against the state by way of injunction and only in that part of cl. 2.6 dealing with the enforcement of judgments does the word consent appear. He places great reliance on the apparently careful drafting of cl. 2.6(iii). It was intended to provide for the consent required by s. 13(2) only at the stage of proceedings after judgment, it is submitted.

49. Reading the clause as a whole, I cannot accept that to have been the intention of the parties. cl. 2.6(ii) should be given a broad construction so as to include the consent required by s. 13(2), the word "waives", in the commercial context, being capable of conferring a consent. cl. 2.6(iii) was intended to make clear the extent of Sabah's post-judgment remedies, save as to protected assets, and does not limit the effect of cl. 2.6(ii). In my judgment, express consent to post-judgment injunctive relief does not in context have the effect of excluding consent to interim relief.

50. Mr. Young's submission that cl. 2.6(iii) was plainly and carefully drafted, and so drafted to achieve a particular purpose is weakened by the use for the second time of the expression "such proceedings" in cl. 2.6(iii). The expression "such proceedings" appears in each of the sub-pars. of cl. 2.6. It can be expected to have, in each case, the same meaning and it is the broad meaning particularized at the beginning of the clause. Had the

draftsman had in mind the specific purpose for which Mr. Young contends, I would have expected the words "in connection with proceedings in respect of the enforcement of any judgment" to be present rather than the broader expression "in connection with such proceedings".

51. For those, and the reasons given by Lord Justice Waller I would uphold the Judge on the state immunity issue.

52. As to the grant of an injunction and the refusal to stay the English proceedings, I agree with the reasoning and conclusions of Lord Justice Waller. Whatever label is attached to it, the intention and effect of cl. 1.9 is that, if proceedings were commenced in England, parallel proceedings could not, in the absence of exceptional reasons, be pursued elsewhere. Moreover, that intention is not defeated by the Government of Pakistan having commenced proceedings in Pakistan first. Once the English proceedings were commenced, cl. 1.9 operated to confer a jurisdiction on the English Courts which requires the Court, in present circumstances, to act by way of injunction to give effect to the agreement of the parties. I too stress that the Court's order is not intended in any way to be an interference with the jurisdiction of the Courts of Pakistan and does not imply any criticism of the Courts of Pakistan.

53. I agree that the appeal should be dismissed.

A.C.                     Davies v. Taylor (No. 2) (H.L.(E.) )

A  made.  He conceded that if the respondent had not been insured in respect
of his costs he could not have resisted the making of the order sought;
but that—he said—was because the respondent would have had in his
favour not simply the fact of success but also the fact of financial hardship.
I cannot accept this submission either.  As my noble and learned friend,
Lord Reid, said in *Gallie* v. *Lee* (*No.* 2) [1971] A.C. 1039, 1048, the
Act directs the court to consider all the circumstances and decide on
B  broad lines.  One circumstance—and a very important circumstance—is the
fact that the appeal has resulted in success for the unassisted litigant.  In
any given case there may be many other relevant circumstances—some
telling in favour of the unassisted party and some against him—which the
court has to take into account and weigh against each other; but I do not
think that one can deduce from the wording of the Act a hard and fast
rule such as was contended for by counsel that, even though there is nothing
C  to be said against the applicant, the fact of his success alone can never
entitle him to an order.  On the facts of this case where the legal aid
authorities have financed two wholly unsuccessful appeals, I am clearly of
opinion that it is " just and equitable " that the order asked for should
be made.  The costs of all the parties of the application should also, I
think, be paid out of the legal aid fund.

D
                                        *Order accordingly.*

   Solicitors: *Sharpe, Pritchard & Co.; The Law Society; Peacock &
Goddard.*

                                              J. A. G.

E

                        ————————

                     [HOUSE OF LORDS]

F  L. SCHULER A.G.     .     .     .     .     .     .     APPELLANTS

                             AND

   WICKMAN MACHINE TOOL SALES LTD.     .     .     RESPONDENTS

   [On appeal from WICKMAN MACHINE TOOL SALES LTD. *v.* L. SCHULER A.G.]

G  1973  Jan. 30, 31;          Lord Reid, Lord Morris of Borth-y-Gest,
       Feb. 1, 5, 6, 7, 8;          Lord Wilberforce, Lord Simon of
       April 4                    Glaisdale and Lord Kilbrandon

   *Contract—Construction—" Condition "—Long-term  agency  con-
      tract for sale of panel presses—Single subclause providing that
      it should be " condition " of agreement for agents to visit
      named motor manufacturers weekly to solicit orders—*
H    *Meaning of " condition " in context—Whether ambiguous—
      Whether single breach entitling other party to repudiate
      contract—Whether subsequent conduct of parties relevant to
      interpretation*

236

In May 1963 the appellants, German manufacturers, agreed
to give the respondents, an English company, the sole selling
rights for panel presses made by them for 4½ years.  Clause 7
(*b*) of the contract provided that " It shall be [a] condition of
this agreement that (i) [the respondents] shall send its repre-
sentatives to visit " the six largest United Kingdom motor manu-
facturers " at least once in every week " to solicit orders for
panel presses.  No other of the 20 clauses of the agreement was
described as a condition.

During the first eight months the respondents failed in
the visiting obligation on a scale which the arbitrator in the
consequential arbitration found to be a " material breach "
but the evidence showed that it was treated as remediable
under clause 11 (*a*) (i), which provided that either party could
terminate the agreement if the other committed a material
breach of its obligations and failed to remedy it within 60
days of being required to do so; and he found that those
breaches had been waived.  In the next six months there
were immaterial breaches of the obligation, some for good
reasons; but in July 1964 the appellants claimed the right to
terminate the contract under clause 11 (*a*) (i) and terminated it
in October 1964.

The respondents claimed damages for wrongful repudiation.
Not until the hearing of the dispute before the arbitrator were
the appellants' points of defence amended to found the right
to repudiate on the respondents' breach of the " express con-
dition " in clause 7 (*b*).  The arbitrator construed " condition "
in the subclause as referable to the provisions of clause 11 (*a*)
(i) and awarded in the respondents' favour; but Mocatta J. on
appeal on a case stated held that the introduction of the words
" It shall be [a] condition . . ." in one subclause gave the
appellants the right to repudiate the whole contract if the
respondents committed only one isolated breach of the visiting
obligation.  The Court of Appeal (by a majority) reversed that
decision holding, inter alia, that in construing the contract
which was ambiguous in its terms it was relevant to consider
the subsequent conduct of the parties.

The appellants appealed :—

*Held*, (1) that in general an agreement could not be
construed in the light of the subsequent actions of the parties.

*Whitworth Street Estates (Manchester) Ltd.* v. *James Miller
& Partners Ltd.* [1970] A.C. 583, H.L.(E.) applied.

*Watcham* v. *Attorney-General of East Africa Protectorate*
[1919] A.C. 533, P.C. considered.

(2) Dismissing the appeal (Lord Wilberforce dissenting),
that the word condition had acquired more than one meaning
in contracts, and in the present agreement, in relation to the
continuing visiting obligation, its meaning was equivocal; that
in the light of the rest of the contract " condition " in clause
7 (*b*) meant a contractual term breach of which if unremedied
(i.e., unrectified for the future if capable of rectification) gave
the appellants the right to terminate the contract in accordance
with clause 11; and that it was not a condition in the primary
sense of being used as a term of art such that a single breach
of it, however trivial and however long past, would, in the
absence of any waiver, entitle the innocent party to terminate
the whole contract forthwith.

*Per Lord Reid.*  The fact that a particular construction
leads to a very unreasonable result must be a relevant con-
sideration.  The more unreasonable the result the more unlikely
it is that the parties can have intended it, and if they do intend

A

B

C

D

E

F

G

H

261

A.C.        *Wickman Tools v. Schuler A.G.* (H.L.(E.))    Lord Wilberforce

A    The first qualification involves the legal question whether this agreement may be construed in the light of certain allegedly relevant subsequent actions by the parties. Consideration of such actions undoubtedly influenced the majority of the Court of Appeal to decide, as they did, in the respondent's favour: and it is suggested, with much force, that, but for this, Edmund Davies L.J. would have decided the case the other way. In my opinion, subsequent actions ought not to have been taken into account.

B    The general rule is that extrinsic evidence is not admissible for the construction of a written contract; the parties' intentions must be ascertained, on legal principles of construction, from the words they have used. It is one and the same principle which excludes evidence of statements, or actions, during negotiations, at the time of the contract, or subsequent to the contract, any of which to the lay mind might at first sight seem to be proper to receive. As to statements during negotiations this House has

C    affirmed the rule of exclusion in *Prenn* v. *Simmonds* [1971] 1 W.L.R. 1381 as to subsequent actions (unless evidencing a new agreement or as the basis of an estoppel) in *Whitworth Street Estates (Manchester) Ltd.* v. *James Miller & Partners Ltd.* [1970] A.C. 583.

There are of course exceptions. I attempt no exhaustive list of them. In the case of ancient documents, contemporaneous or subsequent action

D    may be adduced in order to explain words whose contemporary meaning may have become obscure. And evidence may be admitted of surrounding circumstances or in order to explain technical expressions or to identify the subject matter of an agreement: or (an overlapping exception), to resolve a latent ambiguity. But ambiguity in this context is not to be equated with difficulty of construction, even difficulty to a point where judicial opinion as to meaning has differed. This is, I venture to think, elementary law. On

E    this test there is certainly no ambiguity here.

The arguments used in order to induce us to depart from these settled rules and to admit evidence of subsequent conduct generally in aid of construction, were fragile. They were based first on the Privy Council judgment in *Watcham* v. *Attorney-General of East African Protectorate* [1919] A.C. 533 not, it was pointed out, cited in *Whitworth's* case. But

F    there was no negligence by counsel or incuria by their Lordships in omitting to refer to a precedent which I had thought had long been recognised to be nothing but the refuge of the desperate. Whether, in its own field, namely, that of interpretation of deeds relating to real property by reference to acts of possession, it retains any credibility in the face of powerful judicial criticism is not before us. But in relation to the interpretation of contracts or written documents generally I must deprecate its future

G    citation in English courts as an authority. It should be unnecessary to add that the well-known words of Sir Edward Sugden (later Lord St. Leonards) (*Attorney-General* v. *Drummond* (1842) 1 Dr. & War. 353, 368) ". . . tell me what you have done under *such* a deed, and I will tell you what *that deed* means" relate to ancient instruments and it is an abuse of them to cite them in other applications. Secondly, there were other

H    authorities cited, *Hillas & Co. Ltd.* v. *Arcos Ltd.* (1932) 43 Ll.L.R. 359 and *Foley* v. *Classique Coaches Ltd.* [1934] 2 K.B. 1. But, with respect, these are not in any way relevant to the present discussion, and the judgment of Lawrence J. in *Radio Pictures Ltd.* v. *Inland Revenue Commissioners*

262

Lord Wilberforce    Wickman Tools v. Schuler A.G. (H.L.(E.) )    **[1974]**

(1938) 22 T.C. 106, so far as it bears on this point was disapproved in the
Court of Appeal and in my opinion was not correct in law.    A

In my opinion, therefore, the subsequent actings relied upon should
have been left entirely out of account: in saying this I must not be taken to
agree that the particular actings relied on are of any assistance whatever
towards one or other construction of the contract.    Indeed if one were
to pursue the matter, the facts of the present case would be found to
illustrate, rather vividly, the dangers inherent in entertaining this class of    B
evidence at all.

The second legal issue which arises I would state in this way: whether
it is open to the parties to a contract, not being a contract for the sale of
goods, to use the word " condition " to introduce a term, breach of which
ipso facto entitles the other party to treat the contract at an end.

The proposition that this may be done has not been uncriticised.    It is    C
said that this is contrary to modern trends which focus interest rather upon
the nature of the breach, allowing the innocent party to rescind or repudiate
whenever the breach is fundamental, whether the clause breached is called
a condition or not: that the affixing of the label " condition " cannot
pre-empt the right of the court to estimate for itself the character of the
breach.    Alternatively it is said that the result contended for can only be
achieved if the consequences of a breach of a " condition " (sc., that the    D
other party may rescind) are spelt out in the contract.    In support of this
line of argument reliance is placed on the judgment of the Court of Appeal
in *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962]
2 Q.B. 26.

My Lords, this approach has something to commend it: it has academic
support.    The use as a promissory term of " condition " is artificial, as is    E
that of " warranty " in some contexts.    But in my opinion this use is now
too deeply embedded in English law to be uprooted by anything less than a
complete revision.    I shall not trace the development of the term through
19th-century cases, many of them decisions of Lord Blackburn, to the
present time: this has been well done by academic writers.    I would only
add that the *Hongkong Fir* case, even if it could, did not reverse the
trend.    What it did decide, and I do not think that this was anything new,    F
was that though a term (there a " seaworthiness " term) was not a " con-
dition " in the technical sense, it might still be a term, breach of which if
sufficiently serious could go to the root of the contract.    Nothing in the
judgments as I read them cast any doubt upon the meaning or effect of
" condition " where that word is technically used.

The alternative argument, in my opinion, is equally precluded by    G
authority.    It is not necessary for parties to a contract, when stipulating a
condition, to spell out the consequences of breach: these are inherent in
the (assumedly deliberate) use of the word: *Suisse Atlantique Société
d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale* [1967]
1 A.C. 361, 422, *per* Lord Upjohn.

It is upon this legal basis, as to which I venture to think that your
Lordships are agreed, that this contract must be construed.    Does clause    H
7 (*b*) amount to a " condition " or a " term "? (to call it an important
or material term adds, with all respect, nothing but some intellectual
assuagement).    My Lords, I am clear in my own mind that it is a condition,