# 'EXHIBIT C

## ''Rc t v'KZ 'qh'Z K K

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

4–10; 18 October 2006

---

SEA TRADE MARITIME CORPORATION

v

HELLENIC MUTUAL WAR RISKS ASSOCIATION (BERMUDA) LTD

(THE "ATHENA") (No 2)

[2006] EWHC 2530 (Comm)

Before Mr Justice LANGLEY

**Arbitration — Jurisdiction and error of law — P&I Association Rules — Arbitration clause contained in Rules — Whether arbitration clause incorporated into contract of insurance — Relevance of knowledge of brokers — Whether agreement contained exclusive jurisdiction clause — Arbitration Act 1996, sections 67 and 69.**

In December 1992 the claimant (Sea Trade), through agents and brokers, applied to enter their vessel *Athena* with the defendant Association for the purpose of obtaining war risk insurance. On 4 December 1992 the Association's agents offered insurance "in accordance with the rules and bye-laws of the Association". The offer was accepted by Sea Trade on 11 December and *Athena* was entered into the Association from 10 December 1992.

On 10 December 1992 Sea Trade completed an Application for Membership of the Association in respect of *Athena*. The Application stated that Sea Trade applied to become a member of the Association "in accordance with the Bye-Laws and the Rules for such Association with which I/we agree to conform". A Certificate of Entry was supplied to Sea Trade's brokers referring to "the Rules of the Association for the time being in force".

In January 1993 the Association wrote a letter to Sea Trade enclosing the "Rates and Terms" for the current policy year and stating that the "Rates and Terms" should be read in conjunction with the current Rules of the Association which could be obtained from the Association's managers or agents at specified addresses. Sea Trade's brokers issued cover notes confirming that insurance had been effected with the Association. One cover note was for the period from 10 to 31 December 1992 and the cover note for the 1993 year. The cover was for war risks "on terms and conditions" as attached. The attachment included "Conditions: Conditions as Rules to cover War, etc . . . "

Thereafter the insurance was renewed annually as from 1 January of each year. Pursuant to a request from Sea Trade's brokers a Certificate of Entry dated 27 September 1996 was supplied by the Association's agents. In December 1996 the renewal for 1997 was confirmed by the Association's agents in a fax stating

that renewal would be "in accordance with . . . terms of entry and the Association's current rules on values as expiry". On 14 January 1997 Sea Trade's brokers sent to Sea Trade's agents a "confirmation of insurance" recording that renewal had been effected for 1997 "subject to the general conditions attached". The general conditions attached included "CONDITIONS: Conditions as Rules to cover War, etc. Subject to Conditions as per Club Certificate".

In May 1997 Sea Trade presented a war risks claim to the Association in respect of damage to *Athena* from an explosion said to have been caused by Tamil Tigers when the vessel was at Trincomalee. The claim was presented on the basis that there was no right to recover under the insurance because Sri Lanka had been declared an "Additional Premium Area" (APA) and Sea Trade had failed to give proper notice of the fact that it was going to Sri Lanka as required by Rule 25.1 of the Rules of the Association. The Association was asked to exercise the discretion provided for by Rule 25.3 to make payment notwithstanding the want of notice.

The Association decided, in the exercise of its discretion, to make a payment of up to US$3.4 million. However, Sea Trade claimed a further US$3.5 million and brought proceedings against the Association in Greece to recover the additional amount. Sea Trade also brought proceedings in New York.

The Association sought a stay of the New York proceedings in favour of arbitration in London relying on Rule 44 of the Rules, which provided:

> 44.1 The Association and each Owner hereby submits to the jurisdiction of the High Court of Justice of England in respect of any dispute or difference between the Owner and the Association arising out of or in connection with these Rules or out of or in connection with any contract between the Owner and the Association.

> 44.2 Save for any claim by the Association in respect of the sums which the Association may consider to be due to it from an Owner either the Association or the Owner may, by giving written notice of the election to the other, elect to have such dispute or difference referred to arbitration in London subject to the provisions of Rules 44.2.1 to 44.2.7.

> . . .

> 44.2.7 The submission to arbitration and all proceedings therein shall be subject to the English Arbitration Act 1996 and to any statutory modification thereof.

A stay of the New York proceedings was granted on 13 March 2003.

In the London arbitration Sea Trade contended *inter alia* that Rule 44 had not been incorporated into the insurance contract because it had not been specifically referred to and because Sea Trade was unaware of it; alternatively, if Rule 44.1 had been incorporated into the contract it was not an exclusive jurisdiction clause in favour of the English courts.

The arbitrators held that Rule 44 was incorporated into the insurance, and that Rule 44.1 did constitute an exclusive jurisdiction clause.

Sea Trade appealed. On the issue of incorporation, it submitted that, in the absence of special circumstances, arbitration clauses were not incorporated into a contract unless specifically referred to in the primary contractual documentation. The Association contended that the general rule was that standard terms, including arbitration clauses, could be incorporated by the use of general words, and it was only in "two-contract cases" (for example where a bill of lading incorporated terms by reference to a charterparty) that the stricter rule applied.

————*Held*, by QBD (Comm Ct) (LANGLEY J) that:

(1) Rule 44 was incorporated into the insurance contract.

(a) The general rule was that standard terms, including arbitration clauses, could be incorporated by the use of general words. Exceptionally, a stricter rule was applied in two-contract cases for reasons of commercial certainty, and in such cases there had to be an express reference to arbitration (*see* paras 65 and 81);

————*Thomas (TW & Co) Ltd v Portsea Steamship Co Ltd* [1912] AC 1, *Wyndham Rather Ltd v Eagle Star* (1925) 21 Ll L Rep 214, *Heyman v Darwins Ltd* (1942) 72 Ll L Rep 65; [1942] AC 356, *Modern Buildings Wales Ltd v Limmer & Trinidad Co Ltd* [1975] 2 Lloyd's Rep 318, *Bremer Vulkan Schiffbau Und Maschinenfabrik v South India Shipping Corporation Ltd* [1981] 1 Lloyd's Rep 253; [1981] AC 909, *Tracomin SA v Sudan Oil Seeds Co* [1983] 1 Lloyd's Rep 560; [1983] 1 WLR 662, *The St Raphael* [1985] 1 Lloyd's Rep 403, *Pine Top Insurance Co Ltd v Unione Italiano Anglo Saxon Reinsurance Co Ltd* [1987] 1 Lloyd's Rep 476, *The Federal Bulker* [1989] 1 Lloyd's Rep 103, *Aughton Ltd v MF Kent Services Ltd* (1992) 57 BLR 1; (1991) 31 Con LR 60, *Giffen (Electrical Contractors) Ltd v Drake & Scull* (1993) 37 Con LR 84, *Roche Products v Freeman Process Systems Ltd* (1997) 80 BLR 102, *Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership* (1998) 65 Con LR 11 considered; *Ben Barrett v Henry Boot* [1995] CILL 1026 not followed.

(b) The contract was to be found in the exchanges in December 1992 and the Application for Membership. On the true construction of the contract Rule 44 was incorporated (*see* paras 82, 83 and 85).

(c) Even if Rule 44 had not been incorporated, Sea Trade was, or was to have been taken to have been, aware of the arbitration provisions in Rule 44.2, and would have been bound by them. Sea Trade's brokers had copies of the Association's Rules at the time the insurance was first agreed and by the time of the renewal agreement for 1997. Accordingly Sea Trade was bound by its brokers' knowledge (*see* paras 87, 90, 92 and 96);

————*El Ajou v Dollar Land Holdings* [1994] 2 All ER 685 applied.

(2) Rule 44.1 was a non-exclusive jurisdiction clause (*see* para 106);

————*Pathé Screen Entertainment v Handmade Films* [2005] Lloyd's Rep IR 32 followed.

————

The following cases were referred to in the judgment:

*Axa Re v Ace Global Markets Ltd* [2006] Lloyd's Rep IR 683;

*Ben Barrett v Henry Boot* [1995] CILL 1026;

*Bremer Vulkan Schiffbau Und Maschinenfabrik v South India Shipping Corporation Ltd* (HL) [1981] 1 Lloyd's Rep 253; [1981] AC 909;

*British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368;

*Continental Bank v Aeakos Compania Naviera SA* (CA) [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588;

*El Ajou v Dollar Land Holdings plc* (CA) [1994] 2 All ER 685;

*Excomm Ltd v Ahmed Abdul-Qawi Bamaodah (The St Raphael)* (CA) [1985] 1 Lloyd's Rep 403;

*Federal Bulk Carriers Inc v C Itoh & Co Ltd (The Federal Bulker)* (CA) [1989] 1 Lloyd's Rep 103;

*Giffen (Electrical Contractors) Ltd v Drake & Scull* (CA) (1993) 37 Con LR 84;

*Heyman v Darwins Ltd* (HL) (1942) 72 Ll L Rep 65; [1942] AC 356;

*Maspons Y Hermano v Mildred* (HL) (1883) 8 App Cas 874;

*Modern Buildings Wales Ltd v Limmer & Trinidad Co Ltd* (CA) [1975] 2 Lloyd's Rep 318; [1975] 2 All ER 549;

*Pathé Screen Entertainment v Handmade Films (Distributors) Ltd*, 11 July 1989; [2005] Lloyd's Rep IR 32;

*Pine Top Insurance Co Ltd v Unione Italiano Anglo Saxon Reinsurance Co Ltd* [1987] 1 Lloyd's Rep 476;

*Roché Products v Freeman Process Systems Ltd* (1997) 80 BLR 102;

*Sabah Shipyard (Pakistan) Ltd v Islamic Republic of Pakistan* (CA) [2003] 2 Lloyd's Rep 571;

*Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership* (1998) 65 Con LR 11;

*Sinochem International Oil (London) Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670;

*Thomas (T W & Co) Ltd v Portsea Steamship Co Ltd* (HL) [1912] AC 1;

*Tracomin SA v Sudan Oil Seeds Co Ltd* [1983] 1 Lloyd's Rep 560; [1983] 1 WLR 662;

*Wyndham Rather Ltd v Eagle, Star & British Dominions Insurance Company Ltd* (CA) (1925) 21 Ll L Rep 214.

---

This was an appeal by the claimant shipowners Sea Trade Maritime Corporation from the decision of arbitrators determining (1) that a standard jurisdiction and arbitration clause in the defendant's Rules was incorporated into the insurance contract with the defendant, and (2) that the jurisdiction clause was exclusive.

Timothy Brenton QC and David Bailey, instructed by Fox Williams LLP, for the claimant; Stephen Moriarty QC and Derrick Dale, instructed by Richards Butler, for the defendant.

The further facts are stated in the judgment of Langley J.

Judgment was reserved.

Wednesday, 18 October 2006

---

**JUDGMENT**

**Mr Justice LANGLEY:**

*Introduction*

*The claim form*

1. The claimant ("Sea Trade") was incorporated in July 1992 in Liberia, and is the owner of the vessel *Athena*. Sea Trade issued the arbitration claim form before the court on 29 July 2005. The respondent ("the Association") is a mutual insurance company incorporated in Bermuda, which provides war risks insurance for ships beneficially owned or controlled by a majority of Greek interests.

2. The claim form sought relief under each of sections 67, 68 and 69 of the Arbitration Act 1996, in respect of an interim award ("the award") dated 1 July 2005 by which certain preliminary issues were determined by Sir Christopher Staughton, Jonathan Hirst QC and George Henderson in an arbitration in which the Association was claimant and Sea Trade was respondent.

3. The relief sought in the claim form under section 67 of the 1996 Act is that the award be set aside for want of substantive jurisdiction; the relief sought under section 68 ("serious irregularity") was the setting aside of certain paragraphs of the award on the basis that the questions determined in those paragraphs were not within the scope of the preliminary issues ordered to be heard; the relief sought under section 69 was permission to appeal

on a number of "questions of law" (some going to jurisdiction and some not) relating to the Rules of the Association and in particular the Rules relating to jurisdiction and arbitration (Rule 44) and additional premium areas (Rules 15 and 25). The questions of law, so far as material, were:

> 5.1. The question of whether Rule 44 was incorporated into the insurance; in particular the question of whether general words of incorporation are sufficient to incorporate an arbitration agreement . . .

> 5.2. The proper construction of Rule 44 . . . specifically whether:

> (1) Rule 44.1 is a non-exclusive jurisdiction clause; and

> (2) The right to elect to arbitrate under Rule 44.2 can be lost by delay and/or applies only to proceedings commenced in the English High Court, not in other competent courts.

> 5.3. The question of whether the claimant is precluded from relying on a breach of Greek law . . .

> 5.4. The question of whether Rules 15.3 and 25.3 were incorporated into the contract; in particular, the questions of whether they are terms which are properly characterised as unusual, onerous and out of conformity with market practice and whether the test in *Interfoto Picture Library v Stiletto Visual Programmes Ltd* [1989] 1 QB 433 applies and was satisfied . . .

*The November 2005 order*

4. The major issues to which this judgment relates are those arising and still pursued under section 67 relating to the jurisdiction of the arbitral tribunal. They are the subject of an order made by Morison J on 25 November 2005, for trial of certain preliminary issues as follows:

> (1) What law governs the claimant's insurance with the defendant?

> (2) On the assumption that English law applies, was Rule 44 incorporated into the claimant's insurance with the defendant?

> (3) On the assumption that English law applies, does Rule 44.2, on its proper construction, apply to the facts of this case?

> (4) On the assumption that English law applies, as a matter of English law, would the alleged breaches of Greek law relied upon by the claimant have the effect of rendering the claimant's insurance, and/or the arbitration clause in it, void?

> (5) On the assumption that English law applies, would the alleged breaches of New York law relied upon by the claimant have the effect of

[2007] Vol 1      LLOYD'S LAW REPORTS      283

| QBD (Comm Ct) | The "Athena" (No 2) | [Langley J |

rendering the claimant's insurance, and/or the arbitration clause in it, void?

5. By the same order, Morison J ordered that, in effect, insofar as the application for permission to appeal under section 69 raised the same issues they should be heard at the same time. He also ordered that the remaining issues and the application under section 68 should be dealt with either on paper or at another hearing or stayed, the details of which are, as will appear, no longer material.

6. The parties have agreed that the present hearing should also address the only extant issue arising from Sea Trade's application under section 69. That is the question whether, if the arbitral tribunal did have jurisdiction, it was wrong in law to conclude that, on its proper construction, Rule 44 constituted an exclusive jurisdiction clause in favour of the English courts. The significance of this issue is limited. It is no longer relied upon as the basis for an argument going to jurisdiction. If the Rule does provide for exclusive jurisdiction, Sea Trade was in breach of contract in commencing proceedings (as it did) in Greece and New York. That may give rise to claims by the Association for costs otherwise not recoverable (now put forward in the total sum of about US$500,000). I shall refer to this issue as "the exclusive jurisdiction issue" and address it after the issues which do go to the jurisdiction of the arbitral tribunal.

### Rule 44

7. So far as material, as from 1 January 1997, Rule 44 provided:

> 44.1 The Association and each Owner hereby submits to the jurisdiction of the High Court of Justice of England in respect of any dispute or difference between the Owner and the Association arising out of or in connection with these Rules or out of or in connection with any contract between the Owner and the Association.
>
> 44.2 Save for any claim by the Association in respect of the sums which the Association may consider to be due to it from an Owner either the Association or the Owner may, by giving written notice of the election to the other, elect to have such dispute or difference referred to arbitration in London subject to the provisions of Rules 44.2.1 to 44.2.7.
>
> . . .
>
> 44.2.7 The submission to arbitration and all proceedings therein shall be subject to the English Arbitration Act 1996 and to any statutory modification thereof.

8. The provisions of Rule 44.2.1 are not material.

9. Previous versions of the Rules, applicable from 1 January in 1988 and 1994, had also contained arbitral provisions but in different terms.

### Other Rules

10. Rule 46 provided that the Rules were subject to English law.

11. Rule 11 of the 1988 and 1997 Rules provided that:

> Subject as otherwise provided in these Rules the insurance by the Association of a ship entered in the Association shall commence at the time and date specified in the Certificate of Entry and shall continue until 2400 hours GMT on 31 December next ensuing, and thereafter from Policy Year to Policy Year, unless it terminates, ceases or is cancelled in accordance with these Rules.

12. Rule 12 of the 1988 and 1997 Rules provided that:

> 12.1 Any alteration of these Rules shall be binding upon the Owner and take effect as from the commencement of the Policy Year following that in which such alteration is adopted.
>
> 12.2 Changes in the terms and conditions of insurance (otherwise than by alteration of the Rules) may be made by the Managers by notice given to the Owner not later than 1200 hours GMT on 14 December in any Policy Year and shall take effect as from the commencement of the next following Policy Year.

### The factual background

13. The management of *Athena* was delegated by Sea Trade to a Greek company, Natalca Shipping Co SA ("Natalca"). Natalca appointed sub-agents, a New York corporation, Trans-Ocean Steamship Agency Inc ("Trans-Ocean"). At all material times, the President of Trans-Ocean was Mr Theo Vatis; the Operations Manager, with responsibility for insurance, was Ms Elizabeth Mulcahy. Mr George Peters was appointed Attorney-in-Fact of Sea Trade. He shared office space at the same address as Trans-Ocean. Each signed a witness statement which was before the arbitral tribunal and each has signed supplementary statements for the present proceedings. Mr Peters, alone, gave oral evidence.

14. The Association is managed by Thomas Miller (Bermuda) Ltd who delegate underwriting and claims handling to Thomas Miller (Isle of Man) Ltd ("Miller IOM"). Edward Gould, the underwriting manager of Miller IOM, gave oral evidence in the arbitration and to the court.

15. In December 1992 Trans-Ocean applied, on behalf of Sea Trade, to enter *Athena* with the Association for the purpose of obtaining war risk

LANGLEY J]                      The "Athena" (No 2)                  [QBD (Comm Ct)

insurance for the vessel. Brokers were involved. There remains an issue as to the party, if any, for which the brokers were acting, at least in respect of some of their activities, but it was Sea Trade who instructed Alexander & Alexander in New York ("A&A") to procure the insurance. A&A passed on the instruction to their associate Alexander Howden Marine & Energy (AH) in London who made the direct approach to Miller IOM. The broker at AH who placed the insurance (Michael Wright) gave evidence to the arbitral tribunal and to the court at the instance of the Association. That evidence was to the expected effect that he regarded himself as acting for A&A and the assured, Sea Trade, and not for the Association. Mr Wright was familiar with the Association's procedures and Rules. He had worked with Mr Gould for the Thomas Miller Group in London from 1983 to 1988 in the war risks team.

16. *Athena* was entered into the Association, and so insured against war risks, from 10 December 1992. Thereafter the insurance was renewed annually as from 1 January of each year.

17. In 1994 A&A were replaced as brokers by Johnson & Higgins ("J&H"). The individual at A&A who had handled Sea Trade's business had moved to J&H. J&H used their London office to communicate with the Association. Mr Vatis signed an open letter, dated 11 July 1994, on Trans-Ocean notepaper which included the statements that:

This confirms that as of July 11, 1994 we have appointed Johnson & Higgins of California as our exclusive Insurance Broker with respect to our Hull & Machinery, etc Marine Insurance program . . .

Johnson & Higgins . . . is hereby authorised to negotiate directly with any interested companies as respect changes in existing insurance policies and in closing, changing, increasing or cancelling insurance Johnson & Higgins . . . is hereby authorised to negotiate directly with any interested companies as respect changes in existing insurance policies and in closing, changing, increasing or cancelling insurance . . .

This letter also constitutes your authority to furnish Johnson & Higgins of California's representatives with all information which they may request, as it pertains to our insurance contracts . . .

18. The open letter was sent to Mr Gould at the Association by fax on 12 July 1994. The fax confirmed the change of "broker-of-record" and asked Mr Gould to provide the writer "with copies of any/all documentation on this account issued by the Club for the current year". Mr Gould replied by telex dated 14 July that the Association's files were "being marked accordingly" and stating "as you

know from previous dealings we do not issue annual documentation such as certificates of entry as they remain valid throughout vessel's entry in the Association but we shall revert on the matter of documentation". Mr Peters said he was not aware of Mr Vatis's letter before the loss.

19. In May 1997 Trans-Ocean presented a war risks claim to the Association on behalf of Sea Trade in respect of damage to *Athena* from an explosion said to have been caused by Tamil Tigers when the vessel was at Trincomalee, Sri Lanka.

20. The claim was expressly presented on the basis that there was no right to recover under the insurance because Sri Lanka had been declared an "Additional Premium Area" (APA) and Sea Trade had failed to give proper notice of the fact that it was going to Sri Lanka as required by Rule 25.1 of the Rules of the Association. The Association was asked to exercise the discretion provided for by Rule 25.3 to make payment notwithstanding the want of notice.

21. The Association decided, in the exercise of its discretion, to make a payment of up to US$3.4 million. This decision was made in September 1997 and confirmed in December and again in September 1999. This sum has been paid.

22. Following payment, Sea Trade brought proceedings against the Association in Greece claiming payment in full (a further US$3.5 million) and damages. Sea Trade also brought proceedings in New York.

23. The Association sought a stay of the New York proceedings in favour of arbitration in London relying on Rule 44 of the Rules. A stay was granted on 13 March 2003. Appeals by Sea Trade against the stay were dismissed.

24. Before the arbitrators, Sea Trade contended that the tribunal had no jurisdiction on a number of grounds, including that Rule 44 was not incorporated into the contract of insurance because it was "onerous and unusual"; because Sea Trade was unaware of the Rule; because the Rule had not been expressly referred to; and because the insurance, and so the arbitration clause, was void for breaches of Greek and/or New York law.

25. It was in this context that the arbitral tribunal ordered the preliminary issues to be heard which were the subject of the award. They were heard in May and June 2005. The award found in favour of the Association on all the issues raised by the present claim form.

*The other applications*

26. Sea Trade's applications under section 69 for permission to appeal, which were to be considered on paper pursuant to the November 2005 order,

LLOYD'S LAW REPORTS

QBD (Comm Ct)] The "Athena" (No 2) [LANGLEY J

were refused by me by an order dated 17 February 2006. Sea Trade's applications under sections 68 and 69, which were to be determined at another hearing, were dismissed by Christopher Clarke J by an order dated 24 February 2006.

*The preliminary issues*

27. The issues ordered to be tried at the present hearing are set out in para 4. But only one of them has survived to a hearing and so judgment. I should, however, summarise the position as it developed before the hearing began.

*Issue (1): Governing law*

28. Rule 46 provided that:

These Rules and any contract of insurance between the Association and an Owner shall be governed by and construed in accordance with English Law.

29. Sea Trade contended that the Rule had not been incorporated into the contract of insurance. The arbitral tribunal held that it had been. On 14 June 2006 Sea Trade's solicitors wrote stating that Sea Trade no longer intended to pursue this issue. It is, therefore, now not in issue that the insurance is, as a matter of English conflict of law principles, governed by English law.

*Issue (2): Incorporation of Rule 44*

30. Sea Trade contended that, if the contract of insurance was governed by English law, Rule 44.2 was not incorporated into it because Sea Trade was unaware of its terms and such references as may have been made to it were insufficient to achieve incorporation. Sea Trade also contended that it was not incorporated because it was "onerous and unusual", not in conformity with market practice and because insufficient attempts had been made to bring it to Sea Trade's attention. The arbitral tribunal decided that the Rule was incorporated into the contract: paras 22 to 34 of the award. On 14 June 2006 Sea Trade's solicitors wrote stating that Sea Trade no longer sought to contend that Rule 44.2 was not incorporated in the contract of insurance because it was "onerous and unusual". It is now contended only that it was not incorporated because it was not specifically referred to and because Sea Trade was unaware of it. This gives rise to the only surviving issues relating to the jurisdiction of the arbitral tribunal. I shall refer to the issues as "the incorporation issue", "the construction issue", and "the knowledge issue" as it remains the Association's case that even if general words of incorporation do not suffice to incorporate an arbitration clause, or that the words used did not do so,

on the facts of this case Sea Trade would still be bound by Rule 44.2.

*Issue (3): Rule 44.2 and the facts*

31. Sea Trade contended that the arbitration clause did not apply because it had commenced proceedings in Greece and New York. Sea Trade abandoned this contention on 27 September 2006.

*Issues (4) and (5): Breaches of Greek and New York law*

32. Sea Trade abandoned its case on these issues on 21 September 2006.

*The facts*

33. On 2 December 1992 Mr Wright of AH faxed Mr Gould:

Please seek principal's agreement to enter [*Athena*] with effect from time and date of delivery to owners currently expected 4 December 1992.

Details as follows:

Owning Co: Sea Trade . . .

34. Miller IOM telexed their response on 4 December that, subject to confirmation of Greek beneficial ownership of *Athena*:

. . . we are authorised by our principals . . . to offer insurance by the Association to Sea Trade . . . (the shipowners) in respect of *Athena* . . . in accordance with the rules and bye-laws of the Association and on the following basis . . . If the shipowner wishes to accept this offer please telex the acceptance to us . . . within three working days . . . by completing the acceptance section at the foot of this telex . . . On receipt of the acceptance or after the delivery date, whichever is the later, we will issue a certificate of entry in evidence of this Association's insurance of the shipowner for the ship concerned . . .

35. On 11 December Mr Wright sent a further fax to Mr Gould:

Please note [*Athena*] delivered to owners 1145 GMT 10 December 1992. Further your telex offer of insurance dated 4 December is acceptable. Please proceed.

36. On 12 January 1993 Miller IOM wrote to AH in respect of *Athena*:

Further to the offer of Insurance made by Thos R Miller & Son (Bermuda) and acceptance by the Member, on behalf of our principals please find attached to this letter a copy of the Rates and Terms for the current Policy Year which should be read in conjunction with the current Rules of the Association.

37. The "Rates and Terms" enclosed was a four-page document which, on the second page contained an "NB" stating:

> It is the Association's practice only to alter the Rules as and when it is necessary to strengthen or clarify the cover, and the Members are reminded that the Association's 1988 Rules will continue in full force and effect for 1993. Any Member who requires copies of the 1988 Rules should contact the Managers, their Agents or their consultants at the following addresses . . .

38. Three addresses were set out with telephone, fax and telex numbers also given for each.

39. Thus, as is beyond argument, and not in issue, the original contract of insurance and the 1993 renewal made express reference to it being "in accordance with" the Rules and, if required, it was spelt out how a copy of the Rules could be obtained. In fact, Mr Wright was familiar with and had copies of the Rules and the evidence is that a copy was probably not requested by or supplied to him at the time for that reason. He also said, and I accept, that he was aware the Rules provided for arbitration of disputes. Mr Brenton QC, for Sea Trade, submitted that a proper reading of the 4 December telex was that the Rules were referred to simply as the basis for Miller IOM's authority to make the offer of insurance and not as relevant to the scope of the insurance. That submission in my judgment defies the language used and, in the context of the addressee being Mr Wright, verges on the absurd.

40. On 10 December 1992 Mr Peters (as "Attorney in Fact") had completed an Application for Membership of the Association in respect of *Athena*. The Application was sent to Miller IOM. The Application named Sea Trade c/o Natalca as owners, was addressed to the managers of the Association, and stated:

> I/we hereby apply to become (a) Member(s) of the above-named Association and authorise you to enter my/our name (s) in the Register of Members of such Association. I/we also request you to enter (ATHENA) for insurance in such Association to the extent specified in accordance with the Bye-Laws and the Rules of such Association with which I/we agree to conform.

41. An attorney signing such a form, without being aware of the Rules to which he was agreeing that his principal would conform, would be acting at least unwisely; unless, of course, he was content to rely on others who had or could be expected to have the relevant knowledge. I did not find Mr Peters' attempts to explain this in evidence satisfactory. He said he had no reason to think the Rules would contain anything material to the cover. He also said "we" asked for the Rules, meaning by

"we" himself as attorney, Trans-Ocean and the brokers. But the only evidence of such a request comes much later in 1996 after the change of broker. At 10 December 1992 Mr Peters could have had no idea from the documents he says were available to him of any terms of the cover. The one thing he did say he had read was a brochure of the Association extolling its virtues as offering much wider cover than was available in the commercial market. In the same paragraph of the brochure which he probably read in which that laudatory statement was made it was also stated that:

> The cover is set out in the Association's Rule Book. The extent and width of the Club cover is not always fully understood and for ease of understanding the main aspects are given below . . .

42. Mr Peters said, and I accept, that the Application for Membership form would probably have been provided to him by Trans-Ocean. Someone at Trans-Ocean must either have been familiar with it and retained blank copies or must have obtained it from A&A of whom the same can be said. The form was, Mr Gould said, in fact no longer used by the Association. Nonetheless, I accept Mr Wright's evidence that on receiving it he would have passed it on to Mr Gould, probably on 22 December. I also accept Mr Gould's evidence that upon receipt he would have seen that it was kept on the file.

43. The documents include an unexecuted copy of a Certificate of Entry relating to *Athena*. The Certificate provides:

> The insurance provided by this policy (including the risks insured and the rights and liabilities of the Assured and the Association thereunder) shall, save only as may be otherwise set out herein, be as specified in this policy . . . and the Rules of the Association for the time being in force and shall continue until the insured ship is sold, lost or withdrawn, or the insurance is otherwise terminated or suspended in accordance with the terms, exclusions and warranties contained in those Rules, all of which are incorporated in this policy.

44. It was Mr Gould's evidence that it was standard practice for the original Certificate to be sent (together with a debit note and a summary of debits/credits for the broker) to the broker. The documents would be generated at Miller IOM by computer and would be sent without a covering letter. The only "copy" would be on the computer. Mr Wright said it was the practice at AH to pass on to A&A all formal documents such as a certificate of entry upon receipt. Mr Brenton cross-examined both witnesses on the basis that the practice may not have been followed with a membership starting so late in a year and because of the absence of any

record and the mistake made by A&A (see para 46 below). I am satisfied, however, that the practice was followed. Mr Gould and Mr Wright were plainly honest witnesses and their evidence was straightforward and compelling. The 4 December telex (para 34) says that a certificate of entry will be issued "in evidence of this insurance". The existence of the unsigned copy of the Certificate of Entry supports them. I find, therefore, that the Certificate was not only sent to AH but also to A&A; both brokers would in any event, on the evidence, have been familiar with the Association's practices and rules. Through no fault of their own, A&A's documents have been destroyed and so are unavailable.

45. A&A in New York issued two cover notes dated 6 January 1993, confirming that insurance had been effected with the Association for the assured "Sea Trade . . . owner and/or Trans-Ocean . . . as managers" of *Athena* for war risks on "terms and conditions" as attached. One cover note was for the period from 10 to 31 December 1992 and the other for the 1993 year. The attachment stated:

Conditions: Conditions as Rules to cover War, etc . . .

Warranted Trading Worldwide subject to current exclusions (As Attached)

Subject to Conditions as Club Certificate.

46. It would, again, be a matter of real criticism if writers or readers of these cover notes were not aware of the "conditions" of the cover for which their principals were paying. In fact, the War Risk Trading Warranties attachment stated that the absence of prior advice of a voyage to an APA would not affect the cover. That was not correct. The Rules current at the time (the 1988 issue) by Rule 25 provided that prior notice was required for cover to remain effective. It seems that was also the case prior to 1988.

47. Mr Brenton submitted that it was "perfectly apparent" from this error that A&A did not have or receive a copy of the Rules or at least had no idea what they provided. I do not agree. There is and was no evidence from A&A. The more likely explanation is that A&A had misunderstood the Rule or used an inappropriate standard letter. As will also be seen, long before the loss, J&H were aware of the true terms of Rule 25 and made Trans-Ocean aware of them also: para 58 below.

48. Mr Peters said that he believed that these cover notes alone, which were supplied to him by Ms Mulcahy, were the "policy" and that they contained all the material terms of the cover. He also said, remarkably and unconvincingly, that he had read all the references to "conditions" as no more than a reference to the terms applicable to

APAs. Whatever Mr Peters' belief, Mr Brenton's case was that the contract of insurance was to be found in the December 1992 exchanges between AH and the Association. Of course in either case the Rules were expressly referred to as such. Nonetheless, Mr Brenton submits that even if general words do or can suffice to incorporate an arbitration clause, the words used in the December exchanges fail, as a matter of construction, to do so. It is this submission that I refer to as "the construction issue" in para 30 albeit, as will be seen, in my judgment, the incorporation issue also turns on construction.

49. The war risks insurance of *Athena* was renewed with the Association annually up to and including 1997, the year of the loss. It is both parties' case that the cover was "continuous" from year to year, in accordance with Rule 11 of the Association's Rules. J&H replaced A&A in 1994: see paras 17 and 18.

50. In May 1996 J&H New York sought from J&H London a cover note or Certificate of Entry for "Trans-Ocean Steamship War Risk". J&H London, on 29 May, asked Miller IOM for six copies of "your most recent rule book". They were duly supplied and J&H London sent the six copies to J&H New York to "share . . . since I understand Trans-Ocean are also keen to have a copy". Yet both Mr Vatis and Ms Mulcahy say Trans-Ocean had no copy of the Rules prior to the loss. In June 1996 J&H New York repeated the request for a cover note and Certificate of Entry. J&H London apologised for the lack of a cover note adding:

we were informed by the (Association) that they do not issue certificates at each renewal, they believe that entry into the club is continuous . . . I have not seen the original certs on these accounts and I wonder if you might forward copies of same to me.

51. J&H New York asked J&H London to obtain "the most recent certificate" commenting that they would have thought "that there would be new certs issued since J&H has replaced A&A/Howden as the broker of record". The concern was to verify to mortgagees of *Athena* that war risk cover was in place. J&H New York continued to chase J&H London for certificates in August. Mr Brenton submitted that these requests were made for J&H's own purposes and not as brokers for Trans-Ocean/Sea Trade. That is simply not so as their terms demonstrate.

52. A signed copy of the Certificate of Entry for *Athena* dated 27 September 1996 was completed by Miller IOM and supplied to J&H. The copy in the court papers was disclosed by J&H New York. The certificate contains the same reference to the Rules as the certificate supplied to AH at the outset of the

insurance (para 43). Mr Brenton submitted that there was "evidence" from J&H that J&H did not in fact receive any Certificates of Entry before the loss. He relied for that submission on an internal J&H memorandum, dated 14 November 1997, which was written in response to a request from Ms Mulcahy for "a chronology of events". The memorandum does state that "to date we have never received *Athena* Certificate of Entry . . . from . . . (the) Association". But the chronological context of the statement makes the "date" uncertain and, granted that J&H undoubtedly seeking the certificate (para 51) and that the Association undoubtedly prepared one and sent it to J&H London after which the requests ceased, as they also did for the Rules, I unhesitatingly conclude that both the certificate and the Rules were supplied to J&H New York, and supplied prior to the renewal for 1997. Mr Peters said he did not receive any certificate (or the Rules) before the loss, albeit he was sure J&H would have given him a copy had they received one.

53. The renewal for 1997 was effected, on Trans-Ocean's instructions, by J&H. J&H New York asked J&H London on 18 December 1996 to confirm renewal with the Association and the next day J&H London faxed Mr Gould accordingly. Mr Gould confirmed the renewal by fax on 24 December.

54. The 24 December fax read:

WE ACKNOWLEDGE RECEIPT OF YOUR FAXES D.D. 19.12.96. ON BEHALF OF OUR PRINCIPALS PLEASED TO CONFIRM THAT THE ENTRIES OF ALL VESSELS OF GROTON PACIFIC FLEET WILL BE RENEWED IN THIS ASSOCIATION FOR A FURTHER PERIOD OF 12 MONTHS FROM 1.1.97. IN ACCORDANCE WITH THEIR RESPECTIVE TERMS OF ENTRY AND THE ASSOCIATION'S CURRENT RULES ON VALUES AS EXPIRY. WE CONFIRM THAT WE WILL ONLY RENEW THE ENTRY OF "ATHENA" ON TRANSOCEAN FLEET ON A REVISED VALUE OF USD 12.0M. PLEASE CONFIRM ACTUAL DATE OF SALE OF MARQUESA IN ORDER THAT WE CAN ADJUST OUR RECORDS.

WISHING YOU A MERRY CHRISTMAS.

55. The faxes referred to related to the Groton Pacific fleet (which is not relevant) and a fax in which J&H had confirmed that other vessels managed by Trans-Ocean (including *Marquesa*) were to be sold, and so would not be renewed, so that *Athena* alone should be renewed but without the existing increased value cover.

56. Mr Brenton made the submission that the reference in the 24 December fax to terms of entry and current rules was applicable only to the Groton fleet and not to *Athena*. Mr Moriarty QC, for the Association, described the submission in strongly dismissive terms. I agree with Mr Moriarty. It is fanciful to suggest that the fax was stating that the renewal of the cover for *Athena* was other than on the applicable terms of entry and current Rules or was to be contrasted with the Groton fleet renewal, let alone that J&H would have so read it.

57. On 14 January 1997 J&H New York sent Trans-Ocean a "confirmation of insurance" in respect of *Athena*. The confirmation recorded that

in accordance with your instructions we have arranged Marine insurance on the VESSEL "ATHENA" ATTACHING 1 JANUARY 1997 EXPIRING 31 DECEMBER 1997, INCLUSIVE In the amounts and subject to the general conditions as attached . . .

The general conditions attached included:

CONDITIONS: Conditions as Rules to cover War, etc.

Subject to Conditions as per Club Certificate.

58. This confirmation also included a page entitled "Additional Premium Areas" which listed the current APAs (including Sri Lanka) and spelt out that "the Rules provide that the Owner of an Entered Ship shall give written notice to the Association before the Entered Ship enters an Additional Premium Area, and specifies the consequences that follow if this condition is not complied with". A "confirmation of insurance" in the same terms had also been supplied by J&H New York to Trans-Ocean on 29 January 1996 for the calendar year 1996.

59. Earlier, on 4 December 1996, J&H New York had sent to Trans-Ocean (addressed to Ms Mulcahy) "for your information and file" "two sets of circulars" from the Association referring to a Special General Meeting of the Association "regarding Amendments to the Rules". The circulars referred expressly to Rule 44.

60. The circulars included a "Notice of Meeting" from the Association dated 15 November. It was addressed "to the Members". Mr Gould said, and I accept, that it would have been sent to J&H as brokers for Sea Trade/Trans-Ocean. The documents suggest that there was some confusion between J&H's offices in London, New York and San Francisco which probably accounts for the delay in the documents being sent on to Trans-Ocean. The circulars also included an "Explanatory Note" relating to the proposed amendments to the Rules. Rule 44 was one of the three Rules to be amended. The amendment was to alter the wording set out in para 7 of this judgment. The note did indeed explain the reason for the proposed amendment. It was followed by the resolutions to be put to the

meeting which set out the terms of the proposed changes, including the wording I have quoted which became part of Rule 44 with effect from 1 January 1997. It was Ms Mulcahy's written evidence in the arbitration that she had no recollection of seeing this letter. She does not say it was not received. Mr Peters did not remember it either. Mr Brenton accepted that Rule 12.1 was incorporated in the contracts of insurance (like Rule 11) and so, that if, contrary to his submissions, general references to the Rules did suffice to incorporate an arbitration clause, the amendments to it would also be binding.

61. There are, as I have said, unsurprisingly on the evidence as I have sought to summarise it, issues as to whether or not Sea Trade did in fact know of the Rules and the effect of Rule 44 (the knowledge issue, as I have called it), but I propose first to consider the legal principles to be applied where it is sought to incorporate an arbitration clause in a contract.

*The incorporation issue*
*The law*

62. The difference between the submissions can be summarised shortly. Mr Brenton submits that absent special circumstances or express reference to an arbitration clause in what I will call the primary contractual documents, an arbitration clause cannot be incorporated into the contract by reference to what I will call a secondary document in which the clause is contained. The submission is founded on authorities in which the secondary document is a contract to which at least one party is different from the parties to the contract in question (a "two-contract case"). Those authorities address issues of incorporation in particular in reinsurance contracts by reference to the terms of the underlying insurance, in construction contracts by reference in sub-contracts to main contracts, and in bills of lading by reference to charterparties. Mr Moriarty submits that (whatever the position in a two-contract case) the law permits the use of general words to incorporate by reference standard terms to be found in another document, including incorporation of arbitration clauses in that document, in what I will call "a single contract" case.

63. *The Federal Bulker* [1989] 1 Lloyd's Rep 103 was a two-contract case in which the issue was whether a clause in a charterparty requiring bills of lading to provide for arbitration "of all disputes arising out of this contract" was incorporated in bills which themselves provided only that "all terms . . . as per charterparty . . . to be considered as fully incorporated herein as if fully written".

64. The Court of Appeal held that the arbitration clause in the charterparty was not incorporated in

the bills. In the course of his judgment, at page 105 col 2, Bingham LJ said:

Generally speaking, the English law of contract has taken a benevolent view of the use of general words to incorporate by reference standard terms to be found elsewhere. But in the present field a different, and stricter, rule has developed, especially where the incorporation of arbitration clauses is concerned. The reason no doubt is that a bill of lading is a negotiable commercial instrument and may come into the hands of a foreign party with no knowledge and no ready means of knowledge of the terms of the charterparty. The cases show that a strict test of incorporation having, for better or worse, been laid down, the Courts have in general defended this rule with some tenacity in the interests of commercial certainty. If commercial parties do not like the English rule, they can meet the difficulty by spelling out the arbitration provision in the bill of lading and not relying on general words to achieve incorporation.

The importance of certainty in this field was emphasised by Lord Denning MR in *The Anne-field* . . . by Sir John Donaldson MR in *The Varenna* . . . and by Lord Justice Oliver in the same case . . . This is indeed a field in which it is perhaps preferable that the law should be clear, certain and well understood than that it should be perfect. Like others, I doubt whether the line drawn by the authorities is drawn where a modern commercial lawyer would be inclined to draw it. But it would, I think, be a source of mischief if we were to do anything other than try to give effect to settled authority as best we can.

65. In my judgment, this dictum expresses both the principle and (with some reluctance) the justification for an exception to it. In principle, English law accepts incorporation of standard terms by the use of general words and, I would add, particularly so when the terms are readily available and the question arises in the context of dealings between established players in a well-known market. The principle, as the dictum makes clear, does not distinguish between a term which is an arbitration clause and one which addresses other issues. In contrast, and for the very reason that it concerns other parties, a "stricter rule" is applied in charterparty/bills of lading cases. The reason given is that the other party may have no knowledge nor ready means of knowledge of the relevant terms. Further, as the authorities illustrate, the terms of an arbitration clause may require adjustment if they are to be made to apply to the parties to a different contract. The language of Bingham LJ would not encourage any extension of the stricter rule, a sentiment with which I would respectfully agree.

66. I can see little or no reason for a rule which incorporates some but not all of the terms of a referenced document, provided, at least, that as a matter of construction the incorporated terms can readily apply to the relevant contract without violence to the principles on which contracts are to be construed. Indeed, I think the authorities justify an approach to the issue as one of construction, albeit certain recognised principles of construction have been established by authority in two-contract cases. Terms that are incorporated, as the law stands, are just as (if not more) likely to be unknown to the parties as an arbitration clause. This case is a case in point. On their evidence, Sea Trade and Trans-Ocean were wholly unaware of any of the terms of the insurance although it is not in dispute that a contract of insurance was made in late 1992. Yet they accept that all the other terms in the Rules were incorporated in that contract, or perhaps all other terms "germane to the insurance" (hardly a recipe for certainty) but not the arbitration clause. I can see little logic in that. Mr Brenton submits that logic requires the stricter rule to be applied in all cases. But it is that rule, if any, which I think to be illogical. In the case of a single contract, the ordinary rules of construction work perfectly well. Those rules, of course, include rules which justify a different approach to "unusual" or "onerous" terms sought to be incorporated and are subject to statutory modification in consumer contracts, but such considerations are of no relevance in this case.

67. It is, nonetheless, Mr Brenton's primary submission that the principles enunciated by the House of Lords in *Thomas (T W & Co) Ltd v Portsea Steamship Co Ltd* [1912] AC 1, the decision in which the House endorsed the "stricter rule" and which the Court of Appeal applied in *The Federal Bulker*, amplified by the decisions of the House in *Heyman v Darwins Ltd* (1942) 72 Ll L Rep 65; [1942] AC 356 and *Bremer Vulkan Schiffbau Und Maschinenfabrik v South India Shipping Corporation Ltd* [1981] 1 Lloyd's Rep 253; [1981] AC 909, establish, absent special circumstances, that the true rule is that arbitration clauses are not to be incorporated in any contract unless specifically referred to in the primary contractual documentation. He submits that the rationale of the decision in *Thomas v Portsea* applies to a single contract case as much as it does to a two-contract case and the principle to be derived from the other decisions, that an arbitration clause "constitutes a self-contained contract collateral or ancillary to" the contract in which it is to be found, dictate that such clauses are special and subject to special principles in any contract in which it is sought to incorporate them.

68. In my judgment, this submission is hopeless. It would involve the exception swallowing the rule. It is contrary to authority binding upon me. It puts a weight on *Thomas v Portsea* which it cannot begin to bear.

69. As to authority, there are four decisions which cannot be reconciled with Mr Brenton's submission. He submitted that they were wrongly decided, because *Thomas v Portsea* was not cited and the law had not developed so as to apply the same approach in other two contract cases. In *Modern Buildings Wales Ltd v Limmer & Trinidad Co Ltd* [1975] 2 Lloyd's Rep 318; [1975] 2 All ER 549, the Court of Appeal decided that general words of incorporation ("in full accordance with the appropriate form for nominated sub-contractors") were sufficient to incorporate the arbitration clause in what the court held to be "the appropriate form" into the contract between the head contractor and the sub-contractor. *Heyman v Darwins* was cited to the court. Submissions that the arbitration clause was not incorporated were given short shrift by Buckley LJ [1975] 2 Lloyd's Rep 323 col 2; [1975] 2 All ER 555h, and Ormrod LJ [1975] 2 Lloyd's Rep 324 col 2; [1975] 2 All ER 557e.

70. In *Tracomin SA v Sudan Oil Seeds Co* [1983] 1 Lloyd's Rep 560 at 562 col 2; [1983] 1 WLR 662 at 664H Staughton J said (albeit the point was conceded) that an arbitration clause would be incorporated by reference in a contract of sale in the same manner as any other clause. In *The St Raphael* [1985] 1 Lloyd's Rep 403 the Court of Appeal decided the same: see in particular Lloyd LJ at page 409 col 2. The fact that the party denying incorporation was unaware that the document referred to contained an arbitration clause was "irrelevant". In *Wyndham Rather Ltd v Eagle Star & British Dominions Insurance Company Ltd* (1925) 21 Ll L Rep 214 an insurance slip stated that it was "subject to the proposal form". The proposal form stated that it was subject to "the usual conditions" of the insurers' policy. Those conditions contained an arbitration clause. The Court of Appeal held that the contract of insurance contained in the slip included a submission to arbitration. In none of these cases, it is true, was *Thomas v Portsea* cited. But that is no surprise. No one thought it relevant. Nor do I.

71. The leading text books on the law of arbitration also state the distinction upon which the Association relies.

72. The reasoning of the members of the House of Lords in *Thomas v Portsea* was short but varied. The fact that bills of lading were negotiable was relied upon by Lords Atkinson and Robson. The need for certainty in the law (the Court of Appeal had decided the issue in 1889) was relied upon by

LLOYD'S LAW REPORTS

QBD (Comm Ct)] The "Athena" (No 2) [LANGLEY J

Lord Loreburn LC. The fact that the language of the arbitration clause was inapposite to claims under the bills or would require manipulation to apply in that context was relied upon by Lords Loreburn, Gorrell and Robson. The "language problem" is one which would only exceptionally arise in a single contract case. Rule 44 is drafted, as one would expect, so as to apply to the Association and owners. Mr Brenton submitted that the question whether general words were sufficient to incorporate an arbitration clause was one of law logically to be addressed without reference to questions whether or not if they were sufficient the clause potentially incorporated was apposite. Their Lordships would not agree. Lord Gorrell said in terms that the question was one of construction. So, too, did the Court of Appeal in *Giffen (Electrical Contractors) Ltd v Drake & Scull* (1993) 37 Con LR 84 at page 90 *per* Sir Thomas Bingham MR.

73. Other reasons for the decision in *Thomas v Portsea* were that (Lord Gorrell) an arbitration clause if incorporated would oust the jurisdiction of the court and so "very clear language" would be required to have that effect and that, Mr Brenton submits, albeit I am not sure with justification, such clauses are "independent" or "separate" or "ancillary" or "personal" a feature which undoubtedly finds expression later in *Heyman v Darwins* and *Bremer Vulkan*, albeit in a different context.

74. I see no reason why "ouster of jurisdiction" should give rise to anything more than a point of construction. The independent nature of an arbitration clause also, to my mind, has much greater relevance when the clause is to be found in a two-contract case. In the case of a single contract the anterior question is whether any of the referenced terms are incorporated, with the illogicality, in my judgment, of picking and choosing between them. The arbitration clause may take on its independent or personal character once it is incorporated but in a single contract case I see no reason why that potential characteristic should determine whether or not it is incorporated.

75. The final reason to be found in the authorities as justification for a different approach to arbitration clauses is to be found in the judgment of Sir John Megaw in *Aughton Ltd v MF Kent Services Ltd* (1991) 31 Con L R 60 at page 87. Mr Brenton placed considerable reliance on this judgment albeit the only other member of the court, Ralph Gibson LJ disagreed with Sir John Megaw on the issue of relevance to this case. Sir John relied upon the fact that statute required (as it did following the Arbitration Act 1950) that an arbitration agreement should be in writing. The object of that requirement was said to be "to ensure that one is not to be deprived of his right to have a dispute decided by a court of law, unless he has consciously and deliberately

agreed that it should be so". So expressed the point is not different in substance from the "ouster of jurisdiction" point. However, *The St Raphael* is authority that in a single contract case an arbitration clause is binding on a party unaware of it. I also think Mr Moriarty is right that the statutory requirement for writing is aimed more at the need for precision as to what is agreed to be referred to arbitration and the constitution of the tribunal and procedure to be followed by it.

76. I have been referred to a considerable number of authorities but none which I think cast doubt on the principle and exception and the reasoning to which I have referred. Mr Brenton rightly referred to section 6(2) of the 1996 Act which provides that:

the reference in an agreement to a written form of arbitration clause or to a document containing an arbitration clause constitutes an arbitration clause if the reference is such as to make that clause part of the agreement.

77. The Act was deliberately drafted so as not to address just what "reference" would make an arbitration clause "part of the agreement". It follows, as Mr Brenton submitted, that it did not seek to change the law. But not, as he also submitted, that the Act provides a uniform test for all cases in which the question arises: if the law differentiated between circumstances in the way Bingham LJ expressed before the Act, then the Act did nothing to alter that.

78. The authorities relied upon by Mr Brenton are, with one exception, two-contract cases in which it was sought to incorporate an arbitration clause in one contract into the material contract where the issue was whether or not there was an agreement to arbitrate in that contract. *Aughton* was a case where the first contract was a building sub-contract between P and K and the material contract a sub-sub-contract between K and A. Ralph Gibson LJ favoured incorporation even by general words; Sir John Megaw did not. *Pine Top Insurance Co Ltd v Unione Italiano Anglo Saxon Reinsurance Co Ltd* [1987] 1 Lloyd's Rep 476 was a case in which the first contract was a contract of insurance and the material contracts were contracts of reinsurance and retrocession. Several other authorities were cited in the same context.

79. The only authority to which Mr Brenton referred in which general words had been held to be insufficient to incorporate an arbitration clause in a single contract case is the decision of HHJ John Lloyd QC in *Ben Barrett v Henry Boot* [1995] CILL 1026. The judge followed the judgment of Sir John Megaw in *Aughton* and applied it in a single contract case concerning a construction sub-contract. But that decision has not been followed in two

LANGLEY J]                       The "Athena" (No 2)                    [QBD (Comm Ct)

subsequent construction cases: *Roche Products v Freeman Process Systems Ltd* [1996] 80 BLR 102, a decision of HHJ Hicks QC, and *Secretary of State for Foreign and Commonwealth Affairs v Percy Thomas Partnership* (1998) 65 Con LR 11, a decision of HHJ Peter Bowsher QC. I would in particular and with respect refer to the judgment of HHJ Hicks QC which addresses the issue in terms with which I agree.

80. I would add that I also think Mr Moriarty is right in his submission that in a number of two-contract cases there has been an underlying assumption that an arbitration clause in the referenced contract was itself incorporated into that contract by general words. There are also numerous first instance decisions in which the distinction between single and two-contract cases has been applied or assumed to be the law.

*Conclusion*

81. In my judgment, and in agreement with the arbitral tribunal, the Association is right and Sea Trade is wrong. General words of incorporation may serve to incorporate an arbitration clause save in the exceptional two-contract cases to which I have referred in which some express reference to arbitration or perhaps provision of the relevant clause is also required.

*The construction issue*

82. The first question is, of course, to determine where the relevant contract is to be found. The parties are agreed that at the least it is to be found in the exchanges in December 1992 quoted at paras 33 to 35.

83. Whilst I do not think it affects my conclusion on this issue, and I would deprecate an over-analytical approach to what I think by 1997 had clearly been agreed, I also think that Mr Moriarty is right that the Application for Membership (para 40) is a contractual document or itself a contract. It is true that at the time the Association itself did not require completion of such a document, but it purports to record an agreement to conform with the Rules, is consistent with the other documents and with all the documentation that followed over the years of the insurance. It forms part of a single transaction confirmed thereafter.

84. Mr Brenton acknowledges the incorporation of Rules 11 and 12. Rule 11 refers to the Certificate of Entry. There were alterations to the Rules from time to time. The insured value changed. So did the premium chargeable. The 1997 renewal (paras 53 to 56) was also expressly agreed to be made "in accordance with" the terms of entry and the current rules. The confirmation note sent to Trans-Ocean brought that expressly to their attention (para 57).

85. Mr Brenton's submission was that words such as "terms" and "conditions" had been held not to refer to arbitration clauses, and that such general words would not in any event suffice to incorporate an arbitration clause. Seen in the context of all the exchanges over the years of cover, the supply of the Rules, the supply of the Certificates of Entry (paras 44 and 52), the frequent and explicit references to the Rules and the knowledge of the brokers involved, I think this is a hopeless submission. It is not in issue that the words were sufficient to incorporate the other Rules. The references to "Conditions as Rules" were quite general. It is (rightly) no longer suggested that Rule 44 was either unusual or onerous. Those cases on which Mr Brenton relies are two-contract cases. In a single contract case it is, in my judgment, wrong to seek to describe some Rules as conditions or terms but others as somehow something else. The words of the original contract alone (para 34) were that the insurance was offered "in accordance with the rules" of the Association. That refers to all the rules not some of them; so, too, do the subsequent documents.

86. In effect, I think Mr Brenton's submission is no better or worse than his submissions on the incorporation issue.

*The knowledge issue*

87. The question whether or not Sea Trade was, or is to be taken to have been, aware of the arbitration provisions in Rule 44.2 and would be bound by them, even if general words did not suffice in law to incorporate them in the contract of insurance, is academic in view of my conclusions on the incorporation and construction issues.

88. The issue has given rise to detailed submissions of some intricacy which, as they are case specific, are unlikely to prove of interest to anyone but the parties. In the context that they are also academic, I hope I will be forgiven if I address them as succinctly as I think appropriate.

89. Mr Brenton's basic submission was that whether or not (and he submitted not) Sea Trade had notice or knowledge of the arbitration clause that was not the same as making a contract or agreement to be bound by it. I agree. But, I think, it makes no commercial sense in a single contract case to deny the existence of an agreement for arbitration if, for example, a party agrees in one document or written exchange to be bound by terms to be found in another document and, at the time of that agreement, he knows that the second document contains an arbitration clause and/or has a copy of the second document and can see the position for himself. Nor do I think it sensible that the law should draw a radical distinction between a case in

[2007] Vol 1 LLOYD'S LAW REPORTS 293

QBD (Comm Ct)] The "Athena" (No 2) [LANGLEY J

which A sends to B an offer on, say, stated terms "and otherwise on the terms of our enclosed Rules" or a case in which the Rules are supplied at a separate time but before the contract relied upon and purporting to incorporate the Rules is made.

90. I have found as a fact that Sea Trade's brokers, A&A (paras 44 and 47), AH (para 39) and J&H (paras 50 and 52), each had copies of the Rules at the time the insurance was first agreed and at least (in the case of J&H) by the time of the renewal agreement for 1997. I, like, but perhaps more strongly than, the arbitral tribunal, have considerable reservations as to the denials by Mr Peters and Trans-Ocean that they had the Rules. Trans-Ocean ought at the least to have been aware before the 1997 agreement for renewal not only of the existence of an arbitration clause but of the specific terms of the clause put forward for approval: para 59. I am also satisfied that Mr Wright was specifically aware of the arbitration clause in the Rules at the time the insurance was agreed in 1992: para 39.

91. It was in this context that the question arose whether or not the knowledge of A&A, AH and J&H was to be attributed to Sea Trade or their admitted agents, Trans-Ocean. There is no dispute that the brokers were the agents for Sea Trade to obtain and agree war risks insurance. I have found that J&H's requests for the Rules and the certificate of entry were also made as agents for Sea Trade: para 51.

92. As a matter of English law it is trite that the brokers were the agents of Sea Trade. Nor is the question one of attribution. If a principal employs an agent to enter into a transaction to the terms of which the agent's knowledge is material, even though that knowledge was obtained outwith the agency, the principal is bound by the contract concluded by his agent including, if it be material, terms of the contract to which the agent has or is held to have agreed as a result of his knowledge: see *El Ajou v Dollar Land Holdings* [1994] 2 All ER 685 *per* Hoffmann LJ at 702c–h and the cases cited there. Indeed I think it would make a mockery of the law if, as Mr Brenton submitted, a broker had to acquire afresh knowledge of the Rules on each occasion a new client instructed him to obtain war risks insurance from the Association.

93. Sea Trade contends, however, that it is New York law which governs the relationship of Sea Trade and the brokers. Sea Trade rely on expert evidence of New York law which, Mr Brenton submits, is to the effect that in receiving the policy or policy terms a broker is the agent of the insurer not the insured.

94. In my judgment this contention is wrong for at least two reasons. First, New York law does not govern the relationship. The rights and liabilities of the principal as regards the other contracting party are generally governed by the law of the contract concluded between that party and the agent: *Maspons v Mildred* (1883) 8 App Cas 874; *Dicey & Morris on The Conflict of Laws*, 14th Edition, volume 2, Rule 228. I see no reason in this case to depart from this general rule.

95. Second, the expert evidence of New York law is to the effect that a broker is generally regarded as the agent of the insured but may, if the facts so establish, be considered the agent of the insurer. On the facts of this case it is, I think, entirely clear that both A&A (and AH) and J&H acted throughout for Sea Trade and not for the Association. That is as would generally be expected (both in the UK and New York) and is wholly consistent with the documents and, of course, the evidence of Mr Wright. The terms of J&H's instructions could hardly have been wider (para 17). The requests for the Rules and the terms on which they were supplied (para 49) and the terms and purpose for which the Certificate of Entry was requested demonstrate, as I have said, that J&H were acting for Sea Trade and Trans-Ocean in seeking and receiving the documents.

96. Had this question been material, I would also have decided it in favour of the Association.

*The exclusive jurisdiction issue*

97. Clauses 44.1 and 44.2 are quoted in para 7.

*Authority*

98. I have also been referred to a number of authorities on this issue. They are not all easy to reconcile. The language of "transitive" and "intransitive" does not leap to every mind. But one of the, if not the, most often cited cases and judgments is the decision of Hobhouse J given in July 1989 in *Pathé Screen Entertainment v Handmade Films (Distributors) Ltd*, 11 July 1989, which has recently been fully reported as an attachment to the judgment of Morison J in *Tonicstar Ltd v American Home Insurance Co* [2005] Lloyd's Rep IR 32.

99. The issue in *Pathé Screen* concerned wording which read:

The parties hereby [consent and] submit to the jurisdiction of the Court of England in connection with any dispute arising hereunder.

100. The bracketed words "and consent" appeared in one clause but not another, but Hobhouse J's judgment applies regardless. In the course of his judgment, Hobhouse J said:

The construction of a contract depends upon the words used by the parties construed in their

LLOYD'S LAW REPORTS [2007] Vol 1

| Langley J] | The "Athena" (No 2) | [QBD (Comm Ct) |

context in the contract and in the light of the surrounding circumstances to the making of the contract. Broadly, jurisdiction clauses which are mutual may be of three types. First there can be a clause which specifically provides that a certain court is to have exclusive jurisdiction. Second there can be a clause, like an arbitration clause, by which the parties agree to refer to a particular court the determination of certain disputes. Thirdly, the parties can simply agree that a certain court will have jurisdiction over them or to submit to the jurisdiction of that court. In the first two categories to attempt to litigate a relevant dispute before some other forum is a breach of the clause although under English law, the remedies for such breach may be limited and discretionary; this is because under English law no agreement, apart from some statutory provision can oust the jurisdiction of the court. The function of the third category is to confer jurisdiction and avoid disputes about jurisdiction; it can accordingly confer useful and valuable rights.

The clauses which I have to construe do not use the word "exclusive". But if the context and the remainder of the words the parties have used demonstrate that their intention was that the jurisdiction should be exclusive then the clause can nevertheless be put into, and enforced as a clause in, the first category.

I have been referred to two cases in which Courts were prepared to treat a jurisdiction clause as exclusive even though that word was not used. The first is *Austrian Lloyd v Gresham Life Assurance* [1903] 1 KB 249 (Court of Appeal). The contract concerned was a life insurance policy . . . The translation of the relevant clause read:

"Residence for purpose of jurisdiction. 24. For all disputes which may arise out of the contract of insurance all the parties interested expressly agree to submit to the jurisdiction of the Courts of Budapest having jurisdiction in such matters."

At page 251 of the Report Lord Justice Romer posed the question:

"Does the condition merely mean that, if one of the parties to the contract is sued by the other in the Court of Budapest, he will not take any objection to its jurisdiction; or, does it mean that parties mutually agree that, if any dispute arises under the contract, it shall be determined by the Court of Budapest?"

He answered the question: "Having regard to the nature of the contract and its language, I am of opinion that the latter construction is the correct one." He considered the object of the contract

and likened the clause to an agreement to submit any dispute under the contract to the arbitration of some individual. The other member of the court, Lord Justice Matthew, expressed himself similarly. He considered that the plain meaning of the language used by the parties was that "both parties shall be bound to refer such a dispute to that court". The view of the Court of Appeal was therefore that the clause came within the second category which I have identified.

The other authority is more recent; it was decided by the Court of Appeal on 14 July of last year, *Sohio Supply v Gatoil USA Inc* [1989] 1 Lloyd's Rep 588. There the contract was for the sale of 600,000 barrels of Brent crude . . . The contract incorporated BP standard terms which included a specific clause — "Governing Law: This agreement shall be governed by the laws of England. Under the jurisdiction of the English court without recourse to arbitration." The question before the Court of Appeal was whether this was an exclusive jurisdiction clause. A statement in *Dicey and Morris* was approved by the court: "Some authorities suggest that the clause must provide in terms that the jurisdiction of the chosen court be exclusive . . . But it is submitted that the question is whether on its true construction the clause obliges the parties to resort to the relevant jurisdiction irrespective of whether the word exclusive is used." The Court of Appeal therefore considered it as a question of the construction of the contract and nothing more, such question to be considered against the matrix background or surrounding circumstances, in which the contract was made. The Court of Appeal considered that having regard to such surrounding circumstances there was good commercial reason why the parties should have agreed an exclusive jurisdiction clause . . . They concluded that the true construction of the contract was that it provided an exclusive not merely permissive jurisdiction . . .

Turning now to the contract which I have to construe, I must of course construe it in accordance with English law and take into account neither more nor less than the materials which are considered by English law to be relevant to the construction of a written commercial contract. The fact that the clauses in question do not include the word "exclusive" does not if itself provide the answer. However, in view of the fact that if the parties had wished to provide for exclusive jurisdiction there was a simple and clear wording which they could have adopted to achieve that result, there is no warrant for construing a jurisdiction clause as an exclusive jurisdiction clause unless that can clearly be seen to be the intention of the parties . . .

LLOYD'S LAW REPORTS

QBD (Comm Ct)] The "Athena" (No 2) [LANGLEY J

In my judgment the wording of these clauses is clear. The clause in the model and conforming agreements starts by specifically referring to the fact that the agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. It therefore expressly contemplates the relevance of other entities than those actually named in the agreement. It then uses words which are words of submission not reference: "The parties hereby submit to the jurisdiction." The addition of the word "consent" reinforces the same conclusion. The phrase in the *Austrian Lloyd* case was "agree to submit" but in that case it was construed in a transitive sense as an agreement to submit disputes to a particular court in the same way as one can agree to submit disputes to an arbitrator. The clauses which I have to construe do not lend themselves to a transitive construction; the sense is that the parties submit themselves to the jurisdiction of the court not that the parties submit disputes. In the *Austrian Lloyd* case it was open to the court to construe the words as if they read "to agree to submit all such disputes". I do not consider that it would be appropriate to make such an inferential insertion in these clauses. Words are an accurate tool and relatively small differences in wording will produce different contractual effects. In these clauses the parties have used neither the word exclusive nor a sentence construction which is transitive. They have used words which are apt to demonstrate an intention to agree to submit to the jurisdiction of the English Courts and not that there should be a contractual obligation not to have any recourse to any other court. This is the natural meaning of the words used, it is consistent with the surrounding circumstances and the general matrix of the contracts and in accord with the general context in which these clauses appear in the contracts.

101. I have quoted from this judgment at length not only because it addresses the wording used in the Court of Appeal cases referred to, but because, it is agreed, the wording of Rule 44.1 is to the same substantial and grammatical effect as the wording addressed by Hobhouse J. Unless, therefore, there is some valid distinction to be drawn, or I decline to follow the decision, Rule 44.1 would not be an exclusive jurisdiction clause and the arbitral tribunal would have reached an erroneous conclusion. As Mr Bailey, who argued this part of the case on behalf of Sea Trade, put it the question is whether the parties submit to the jurisdiction or all disputes are submitted to the jurisdiction.

102. Mr Moriarty did not submit that Hobhouse J was wrong. He was right not to do so; at least to a court of first instance. The decision has since been frequently referred to substantially without criti-

cism. It was applied by the Court of Appeal in *Sabah Shipyard (Pakistan) Ltd v Islamic Republic of Pakistan* [2003] 2 Lloyd's Rep 571, see *per* Waller LJ at paras 30–34. Mr Moriarty sought to distinguish the decision, pointing out (with some justification, I think) that the analysis of the *Austrian Lloyd* case opened the way to "inferential insertion" in respect of wording not easy to distinguish in substance from the wording before Hobhouse J and this court. The particular wordings in later cases in which jurisdiction clauses were held to be exclusive such as *British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368, *Continental Bank v Aeakos Compania Naviera SA* [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588 and *Sinochem International Oil (London) Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670 are much more readily distinguishable.

103. In the *British Aerospace* case, at page 375, Waller J distinguished Hobhouse J's decision (described as the *Cannon Screen* case) on two grounds specific to the wording, but also because of the presence of an English choice of law clause, albeit such a clause was also present in the contract construed in *Pathé Screen* itself. Waller J considered the choice of law clause material because "there is no real purpose as I see it in submitting disputes to the jurisdiction of the English court as well as choosing English law unless the intention is to make England exclusive". Rix J in *Sinochem* made the same point at page 676. But, as Mr Bailey submitted, even a non-exclusive jurisdiction clause does have a purpose. It makes it difficult, if not impossible, to argue that the chosen forum is not an appropriate one for the resolution of the dispute. In *Axa Re v Ace Global Markets Ltd* Lloyd's Rep IR 683, Gloster J, like Hobhouse J, held that an English jurisdiction clause was non-exclusive notwithstanding that the contract also contained an English choice of law clause.

104. Although both parties sought to pray in aid "the obvious commercial sense" of their respective constructions neither in my judgment demonstrated any compelling contextual arguments to that end.

105. Mr Moriarty's major submission was that the arbitration provisions in Rule 44.2 justified the court reaching an opposite conclusion to Hobhouse J. I do not think they do. The fact that there is (save for claims by the Association) a mutual elective arbitration clause for arbitration in London cannot, I think, affect the proper construction of Rule 44.1; and, indeed, as Mr Bailey submitted, if it did there is no good reason for giving more emphasis to London than to the fact the Rule is elective or optional.

| LANGLEY J] | The "Athena" (No 2) | [QBD (Comm Ct) |

*Conclusion*

106. In my judgment no good reason has been shown for this court departing from the conclusion reached by Hobhouse J on wording agreed to be substantially the same as Rule 44.1. If, therefore, the issue had been heard by me, I would have decided it differently from the arbitral tribunal.

*Permission*

107. Sea Trade need permission to appeal on this issue. The tribunal addressed it in peremptory terms in para 40 of the award. Sea Trade submit the decision was both "open to serious doubt" and, if necessary, "obviously wrong". Mr Bailey submitted the "lower" test was appropriate because the issue was not a "one-off" issue but involved the construction of a standard form of contract applicable (as I have held) to all members of the Association which is itself a leading provider of war risks insurance covering some 80 per cent of the Greek fleet. I accept that submission. I therefore grant leave and determine the question as I have stated.

*Conclusions*

108. In my judgment, the answers to the five issues ordered to be the subject of this determination (para 4) are:

(i) Issue (1) English law applies.

(ii) Issue (2) Yes: Rule 44 was incorporated in the insurance of Sea Trade by the Association.

(iii) Issue (3) Yes: Rule 44 does apply on the facts of the case.

(iv) Issue (4) No: Breaches of Greek law (if any) are irrelevant.

(v) Issue (5) No: Breaches of New York law (if any) are irrelevant.

109. Sea Trade is granted permission to appeal on the question whether Rule 44.1 is an exclusive English jurisdiction clause and in my judgment it is not.

110. I will hear the parties on the appropriate form of order and any outstanding issues when this judgment is handed down.

106 LLOYD'S LAW REPORTS [2011] Vol 1

Part 2 Sebastian Holdings v Deutsche Bank [CA

## COURT OF APPEAL

28–29 April; 20 August 2010

SEBASTIAN HOLDINGS INC
v
DEUTSCHE BANK AG

[2010] EWCA Civ 998

Before Lord Justice Mummery,
Lord Justice Thomas and
Lord Justice Pitchford

**Conflict of laws — Stay of proceedings — Actions between the parties in both New York and England — Whether English claims governed by exclusive jurisdiction clauses — Whether proceedings could be stayed on the basis of *forum non conveniens*.**

Between 2006 and 2008 the parties entered into a series of agreements under which the appellant, Sebastian, traded in the financial markets through the respondent bank.

The first agreement, in May 2006, was a Master Agreement on the 1992 International Swap Dealers Association standard form for trading in equities (the Equities ISDA Master Agreement) and provided a framework under which the parties could enter into over-the-counter derivative contracts. The agreement was subject to the exclusive jurisdiction of the English courts.

In November 2006 the parties entered into three further agreements: the FX Prime Brokerage Agreement setting out the framework for foreign exchange and related trading, which was subject to the exclusive jurisdiction of the New York courts; the FX Agent Master Agreement, to be used for offsetting transactions, which was subject to the non-exclusive jurisdiction of the English courts; and the Pledge and Pledgeholder Agreement, which was governed by Swiss law but the bank as pledgee was entitled to bring an action against Sebastian as pledgor before a competent court at its place of residence.

In January 2008 four further agreements were made: an Equities Prime Brokerage Agreement, for trading in equities, which was subject to the exclusive jurisdiction of the English courts; a Listed F&O Agreement under which the bank agreed to provide services for listed futures, options and other derivative transactions and which was subject to the exclusive jurisdiction of the English courts; an Overseas Securities Lender's Agreement between Sebastian and the bank for lending and borrowing securities, subject to London arbitration; and a Master Netting Agreement, which provided for the ability to terminate the Equities ISDA Master Agreement, the Equities Prime Brokerage Agreement and the Listed F&O Agreement, and which was subject to the exclusive jurisdiction of the English courts.

The trading ended in October 2008, when losses of US$750 million were made by Sebastian. In November 2008 Sebastian commenced proceedings in New York under the FX Prime Brokerage Agreement to recover its losses. In January 2009 the bank brought proceedings in England under the FX Agent Master Agreement and the Master Netting Agreement to recover US$250 million which it alleged Sebastian should have paid. Sebastian argued that the claims did not arise under those agreements so that the English jurisdiction clauses did not apply. Sebastian contended that the parties must have intended that claims would be brought in the forum from which the claim had its cause or origin, and in the present case the centre of gravity of the claim was under the FX Prime Brokerage Agreement. Sebastian argued in the alternative that, even if that was wrong, New York was the most convenient forum and that the English proceedings should be stayed. Walker J held on 14 August 2008 that the bank was entitled to bring its claim under the two agreements, and on 1 December 2009 Burton J refused to stay the proceedings.

Sebastian appealed against the decision of Walker J. Sebastian also sought permission to appeal against the judgment of Burton J.

————*Held*, by CA (Mummery, Thomas and Pitchford LJJ) that the appeal against the decision of Walker J would be dismissed, and that permission would be granted to appeal against the decision of Burton J but the appeal would be dismissed.

(1) The bank was entitled to bring its claims in the English courts (*see* para 55).

(a) In construing a jurisdiction clause, a broad and purposive construction was to be followed (*see* para 39);

————*Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425, *Fiona Trust & Holding Corporation v Privalov* [2007] 2 Lloyd's Rep 267 affirmed, *Premium Nafta Products v Fili Shipping* [2008] 1 Lloyd's Rep 254, applied.

(b) Where the parties had entered into a complex series of agreements, it was necessary to construe each one by taking account of the overall scheme and to read sentences and phrases in the context of that overall scheme (*see* para 40);

————*Re Sigma Finance Corporation* [2009] UKSC 2, applied.

(c) It was generally to be assumed that, just as parties to a single agreement did not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements did not generally intend a dispute to be litigated in two different tribunals, although the task of the court in determining whether a dispute fell within the jurisdiction clauses of one or more related agreements depended upon the intention of the parties as revealed by the agreements (*see* paras 41 and 42);

————*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, applied; *Credit Suisse First Boston (Europe) Ltd v MLC Bermuda Ltd* [1999] 1 Lloyd's Rep 767, *UBS AG v HSH Nordbank AG* [2009] 2 Lloyd's Rep 272, considered.

CA]                            Sebastian Holdings v Deutsche Bank                    [THOMAS LJ

(d) The parties plainly intended the bank to be able to bring a claim under an agreement under which a debt was due in the jurisdiction provided for in that agreement. It was impossible to see how it could be said that the bank and Sebastian were to be taken to have agreed that the bank would analyse its claim and ascertain under which agreement the cause or origins of the debts arose before issuing its proceedings. Rational businessmen entering into agreements relating to different aspects of trading in the financial markets would understand that the bank would wish to be entitled to bring proceedings to enforce payment of debts under each agreement which gave rise to the specific debt. Businessmen agreeing to different jurisdiction clauses in a series of related contracts could not have been taken to have intended that the entitlement to bring that claim in the chosen forum in respect of one contract should depend on whether a defence had been raised prior to the bringing of the claim and that the defence to that claim might place the centre of gravity of the dispute as being related to a different contract with a different jurisdiction clause. Not only would it give rise to a complete lack of certainty, but could seriously prejudice an institution such as a bank bringing a claim if there was a limitation period about to expire or there was otherwise a need to bring a claim urgently (*see* paras 58, 63 and 65);

———*Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* [2004] 1 Lloyd's Rep 471, *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm), applied.

(2) The English proceedings would not be stayed. The judge had applied the correct principles and the Court of Appeal would not interfere. Parties would be held to their contractual choice of English jurisdiction, unless there were overwhelming, or at least very strong, reasons for departing from the rule. The fact that the New York courts had jurisdiction did not take the matter any further (*see* paras 74, 78 and 80);

———*Import Export Metro Ltd v Compania Sud Americana de Vapores SA* [2003] 1 Lloyd's Rep 405, *Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm), applied; *Spiliada Maritime Corporation v Cansulex Ltd (The Spiliada)* [1987] 1 Lloyd's Rep 1; [1987] AC 460, referred to.

The following cases were referred to in the judgment:

*Ace Insurance SA NV v Zurich Insurance Co* (CA) [2001] EWCA Civ 173; [2001] 1 Lloyd's Rep 618;

*Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm);

*British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368;

*Choudhary v Bhatter* (CA) [2009] EWCA Civ 1176;

*Credit Suisse First Boston (Europe) Ltd v MLC Bermuda Ltd* [1999] 1 Lloyd's Rep 767;

*Donohue v Armco Inc* (HL) [2001] UKHL 64; [2002] 1 Lloyd's Rep 425;

*Fiona Trust & Holding Corporation v Privalov* (CA) [2007] EWCA Civ 20; [2007] 2 Lloyd's Rep 267; (HL) [2007] UKHL 40; [2008] 1 Lloyd's Rep 254;

*Goshawk Dedicated Ltd v Life Receivables Ireland Ltd* [2009] IESC 7;

*Import Export Metro Ltd v Compania Sud Americana de Vapores SA* [2003] EWHC 11 (Comm); [2003] 1 Lloyd's Rep 405;

*Owusu v Jackson* (ECJ) [2005] 1 Lloyd's Rep 452; [2005] ECR I-1383;

*Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* (CA) [2004] EWCA Civ 7; [2004] 1 Lloyd's Rep 471;

*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm); (CA) [2008] EWCA Civ 487;

*Sigma Finance Corporation, Re* (SC) [2009] UKSC 2;

*Spiliada Maritime Corporation v Cansulex Ltd (The Spiliada)* (HL) [1987] 1 Lloyd's Rep 1; [1987] AC 460;

*UBS AG v HSH Nordbank AG* (CA) [2009] EWCA Civ 585; [2009] 2 Lloyd's Rep 272.

This was an appeal by Sebastian Holdings Ltd against the ruling of Walker J, dated 14 August 2008, holding that England was the most appropriate forum for the hearing of the dispute between the parties, and an application for permission to appeal against the judgment of Burton J, dated 1 December 2009, refusing to stay the English proceedings.

Timothy Lord QC and Jasbir Dhillon, instructed by Travers Smith Solicitors LLP, for Sebastian Holdings Ltd; David Foxton QC and Sonia Tolaney, instructed by Freshfields Bruckhaus Deringer LLP, for Deutsche Bank AG.

The further facts are found in the judgment of Thomas LJ.

Friday, 20 August 2010

———

JUDGMENT

Lord Justice THOMAS:

*Introduction*

1. The principal issue in this appeal is the construction of jurisdiction clauses in a series of

(v) The agreements between the parties plainly contemplated that different jurisdiction clauses would apply to claims under the different agreements; in those circumstances multiplicity of proceedings was inevitable.

(vi) The court should not re-write the agreements by making one jurisdiction clause override the other with the effect of allocating all disputes to the court it considered best suited to deal with the dispute.

### (ii) The decision of Walker J

37. Walker J rejected the argument put forward by Sebastian. A short summary cannot do justice to the careful and detailed analysis of the clauses and the decision in *UBS*, as set out at paras 45 to 48 and 63 to 80 of his judgment.

(i) The court had to begin by considering the development of the overall contractual relationship. In May 2006 the parties agreed by use of the ISDA clause as analysed in *Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* [2004] 1 Lloyd's Rep 471 that if one party brought proceedings in the English courts, then the other was obliged to submit, but either party could bring proceedings in other courts and the bringing of proceedings in one would not preclude the bringing of proceedings in another.

(ii) As regards the position at the end of November 2006, the use of the ISDA form and the specific choice of English jurisdiction in the FX Agent Master Agreement showed that the parties contemplated the same as regards that agreement; as to the FX Prime Brokerage Agreement, there was again consistency, as it contained a non-exclusive New York jurisdiction clause:

"70. ... The general approach to a non-exclusive jurisdiction clause would be that in the ordinary course the parties cannot have contemplated that if proceedings were commenced in the forum each had agreed as convenient parallel proceedings would still take place in another forum. However it seems to me clear that the overall relationship between the parties departed from that course in May 2006, and in relation to [the FX Agent Master Agreement] continued to depart from that course in November 2006. It is in my view impossible to read into [the FX Prime Brokerage Agreement] a ban on proceedings elsewhere once a New York claim was under way. It follows that the jurisdiction clause in [the FX Prime Brokerage Agreement] was not inconsistent with those in [the Equities ISDA Master Agreement of May 2006] and [the FX Agent Master Agreement]."

(iii) After referring to the Swiss Pledge Agreement at paras 71 to 73 with its provision for Swiss jurisdiction, he concluded as regards the position in November 2006:

"74. Thus it seems to me as a matter of contractual entitlement to sue in a particular jurisdiction, the position in November 2006 was that any Proceedings could be begun in England if relating to [the FX Agent Master Agreement] or [the Equities ISDA Master Agreement], and it would not matter so far as contractual entitlement was concerned that the claim also fell within the [FX Prime Brokerage Agreement] jurisdiction clause ... No contractual primacy was afforded to any one jurisdiction clause."

(iv) The position did not change as a result of the agreements in January 2008. The exclusive English jurisdiction clauses in the Master Netting Agreement and the Equities Prime Brokerage Agreement, although on the bank's standard form, could not be seen as being concerned with technical banking disputes, as they were at the heart of the agreements for the extension of trading in equities. It was impossible to contend that businessmen would have agreed that the obligation as to where to sue for debts arising under those agreements would give way to the jurisdiction clause in the earlier agreement.

(v) The bank was correct in accepting that, although it could not bring a claim in London in relation to the operation of the FX Prime Brokerage Agreement, issues arising under it might become part of the proceedings if Sebastian chose to raise such issues by way of defence.

(vi) The service of process provisions relied on by the bank could not provide a different result to that achieved by a construction of the jurisdiction clauses.

38. It was contended by Mr Tim Lord QC on the appeal that the judge had fallen into error by not applying the general principle set out by Lord Collins in *UBS*; he had failed to give effect to the fact that the centre of gravity of the claims and the dispute related to FX trading governed by the FX Prime Brokerage Agreement and thus subject to New York jurisdiction.

### (iii) The applicable principles

39. It is clear that in construing a jurisdiction clause, a broad and purposive construction must be followed: *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425; *Fiona Trust & Holding Corporation v Privalov* [2007] 2 Lloyd's Rep 267 affirmed in *sub nom Premium Nafta Products v Fili Shipping* [2008] 1 Lloyd's Rep 254 where Lord Hoffmann observed at para 7:

"If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention."

40. The Supreme Court emphasised in *Re Sigma Finance Corporation* [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme.

41. It is generally to be assumed on these principles that just as parties to a single agreement do not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements do not generally intend a dispute to be litigated in two different tribunals.

42. However, where there are multiple related agreements, the task of the court in determining whether a dispute falls within the jurisdiction clauses of one or more related agreements, depends upon the intention of the parties as revealed by the agreements against these general principles: see Collins LJ in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487 at para 93 and *UBS* at para 83.

43. The considerations have been examined in particular by Rix J in *Credit Suisse v MLC* and by Lord Collins in *UBS*. It is necessary to refer to these in a little more detail. In the first of these cases, *Credit Suisse*, MLC, a hedge fund, had purchased bonds from Credit Suisse under two agreements made in March and May 1998 with exclusive English jurisdiction clauses. The parties had in April 1998 entered into a third agreement with the object of financing the purchase — the Global Master Repurchase Agreement (GMRA); this was governed by a non-exclusive English jurisdiction clause which expressly acknowledged the right of each party to bring proceedings in a court of competent jurisdiction. When the hedge fund defaulted under the GMRA, Credit Suisse sued in England under the GMRA; it sought an anti-suit injunction restraining the hedge fund from pursuing proceedings (including claims for violations of US securities laws) the hedge fund had brought against Credit Suisse and two of its associated companies in New York. Credit Suisse asserted that there was a breach of the exclusive jurisdiction clauses in the purchase agreements, as the whole of the hedge fund's claims fell within the English jurisdiction clauses in

those agreements. The hedge fund contended that there were significant aspects of the New York proceedings that did not relate to the purchase agreements. Rix J referred to the dispute being, on the one hand, one single narrative arising out of the purchase, but on the other:

"where different agreements are entered into for different aspects of an overall relationship, and those different agreements contain different terms as to jurisdiction, it would seem to be applying too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette" (page 777).

44. Although he considered that the centre of gravity of the hedge fund's complaints was focused on the purchases, he was reluctant to hold that the complaints in New York which related to the GMRA arose out of the purchase agreements. He continued:

"If they arise out of or in connection with both the Purchase Agreements and the GMRA, then, where the jurisdiction clauses are in conflict, I do not see why the GMRA clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by [Credit Suisse], [the hedge fund] should be entitled to exercise the broader rights; or on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved."

45. For those two reasons, he decided that the hedge fund's claims in New York were preferably to be viewed as claims under the GMRA rather than under the purchase agreement. If he was wrong about the claims being claims under the GMRA, then the New York court was better placed to analyse the complaint in the proceedings to decide whether claims in the complaint should be stayed in favour of English jurisdiction. He therefore refused to grant an injunction to Credit Suisse restraining the hedge fund continuing in New York with its claims under the GMRA, undesirable though it was in principle to have claims in two jurisdictions.

46. Before turning to *UBS*, it is convenient to note Lord Collins' comment at para 94 of his judgment in *UBS*:

"The essence of Rix J's first reason is that under the *contra proferentem* principle, the intention must be taken to have been that, where a dispute fell within the wording of both jurisdiction agreements, it was the GMRA which was to be taken as the agreed position. The second reason, which he must have meant as a matter of construction, was that the parties must be taken to have intended that, where a dispute fell within both sets of agreements, it should be governed by

### QUEEN'S BENCH DIVISION
### (COMMERCIAL COURT)

Apr. 4, 2000

SINOCHEM INTERNATIONAL OIL
(LONDON) CO. LTD.

v.

MOBIL SALES AND SUPPLY CORPORATION
AND SINOCHEM INTERNATIONAL OIL CO.
LTD. (THIRD PARTY)

Before Mr. Justice RIX

*Sale of goods (f.o.b.) — Jurisdiction clauses — Stay of action — Sellers sold quantity of crude oil to buyers — Price remained outstanding — Buyers entitled to set off sums allegedly due under contracts between buyers' affiliates and sellers' affiliates — Contracts contained Hong Kong and English law and jurisdiction clauses — Whether Hong Kong clause an exclusive jurisdiction clause — Whether Hong Kong more convenient forum — Whether English proceedings should be stayed — Whether third party notice could be served on sellers' affiliates.*

On Oct. 29, 1998 the claimant seller (Sinochem London) sold a quantity of crude oil to the defendant buyer (Mobil Delaware) on f.o.b. terms. Clause 18 of the sale contract (the English contract) provided inter alia:

*Non-Performance*

All payments under this agreement shall be made without set-off or counterclaim and will not be subject to any conditions except as provided in the following:

Notwithstanding any other provisions of this or any other contract between the parties or their affiliates, in the event any party ("the non-performance party") shall (I) default in the payment . . . the other party ("the performing party") shall have the right . . . to set-off, counterclaim or withhold payment in respect of any default by the non-performing party or any affiliate of the non-performing party under this agreement or any other agreement between the parties or their affiliates . . .

The price remained outstanding. The buyer admitted the contract and the sum due but claimed to set off sums allegedly due under three contracts for the sale of low sulphur fuel oil made between Mobil Oil Hong Kong Ltd. (Mobil H.K.) as seller and Sinochem International Oil Co. Ltd. (Sinochem Beijing) as buyers (the Hong Kong contract).

The seller applied for summary judgment under Part 24 of the Civil Procedure Rules and related relief.

It was accepted that Mobil H.K. was an affiliate of the buyer and Sinochem Beijing was an affiliate of the seller for the purpose of cl. 18.

The buyer argued that the purpose of the clause was to allow set-off of an affiliate's liability, and the correct way to construe the provisions was to treat the word "party" in the clause as including "affiliate" and this construction accorded with the purpose of the clause.

On Mar. 24, 1999 Mobil Delaware took an assignment of Mobil H.K.'s rights under the Hong Kong contract and on Mar. 26, 1999 issued a third party notice against Sinochem Beijing.

On May 7, 1999 Mobil Delaware obtained permission to serve that third party notice out of the jurisdiction on Sinochem Beijing on the ground that the latter was a necessary or proper party to the existing proceedings.

———*Held*, by LONGMORE, J., that Mobil Delaware was entitled to summary judgment; the set off clause i.e. cl. 18 did not reach the cross-claim under the Hong Kong contract.

Mobil Delaware appealed.

———*Held*, by C.A. (THORPE and MANCE, L.JJ., KENNEDY, L.J. dissenting) that Mobil Delaware was entitled to set off any indebtedness of Sinochem Beijing under the Hong Kong contract.

On Oct. 12 Sinochem Beijing issued its application under R.S.C., O. 12, r. 8 to challenge the jurisdiction of the Court and to discharge service of the third party notice on it.

The Hong Kong contract contained a Hong Kong law and jurisdiction clause and the English contract contained an English law and jurisdiction clause.

The issues for decision were (1) whether the Hong Kong jurisdiction clause was an exclusive jurisdiction clause; (2) whether England or Hong Kong was the more convenient forum; (3) whether the English proceedings should be stayed; (4) whether leave to serve out against Sinochem Beijing should be permitted.

———*Held*, by Q.B. (Com. Ct.) (Rix, J.), that (1) the Hong Kong contract not only provided for Hong Kong law but stated that the Hong Kong Courts "are to have jurisdiction to settle any disputes" between the parties and that the parties "submit to the jurisdiction of those courts"; this was a clause which contained a transitive obligation to submit disputes to the Courts of Hong Kong; it had all the indicia of such a clause; it was mutual, it referred to "any disputes" and the language "are to have jurisdiction" was the language of obligation and not option; the Hong Kong clause like the London clause was an exclusive jurisdiction clause (*see* p. 676, col. 2: p. 677, col. 1);

(2) it was not disputed that if the issues in the case encompassed a claim that Mobil H.K. had conspired with Chinese receivers to smuggle contraband oil products into China under the misdescription of low sulphur oil such a case could be more conveniently dealt with in Hong Kong (*see* p. 677, col. 1);

(3) on the facts and the evidence it could not be said that Mobil H.K. had clearly shown that the convenient forum for the determination of the issues which arose or might arise between it and Sinochem Beijing was England rather than Hong Kong (*see* p. 677, col. 2);

(4) the English Court could if it saw it as appropriate stay these proceedings pending the litigation in Hong Kong of the issues under the Hong Kong contract (*see* p. 678, col. 2);

Q.B. (Com. Ct.)]      Sinochem v. Mobil Sales      [Rix, J.

————*In re Harrods (Buenos Aires) Ltd.*, [1992] Ch. 72, applied.

(5) to stay the English proceedings would not be the right course to take; it was Sinochem London which commenced the proceedings in this jurisdiction; it did not seem that the matters raised by Sinochem Beijing went beyond matters of convenience; the mere possibility of the multiplicity proceedings was not a strong reason why in the interests of justice Sinochem London should be relieved of its bargain to litigate disputes under the English contract in England (*see* p. 679, cols. 1 and 2; p. 680, col. 1);

(6) the parties to the English contract had agreed to litigate in England and had done so in the light of the Hong Kong contract and its outcome; cl. 18 of the English contract stated that it operated "notwithstanding any other provisions of this or any other contract between the parties or their affiliates"; thus not only was the English contract made later than and against the background of the Hong Kong contract but this provision in it was expressed as taking precedence; so that the Court was unwilling to stay the English proceedings (*see* p. 680, col. 1);

(7) leave to serve out against Sinochem Beijing should be permitted; once the Court of Appeal had decided that Mobil Delaware was entitled to resist these proceedings by invoking Mobil H.K.'s claim, and the Court had decided that the potential issues which might arise under the Hong Kong contract did not necessitate the staying of these proceedings, the interests of justice required that all the parties involved in such issues should be present in the proceedings in England (*see* p. 680, col. 2);

(8) Mobil Delaware had shown strong cause for departing from the Hong Kong clause, even if and to the extent that it must be regarded as binding on it; and permission to serve the third party claim on Sinochem Beijing would be upheld; Sinochem Beijing's challenge to the jurisdiction would be rejected (*see* p. 680, col. 2; p. 681, cols. 1 and 2).

———

The following cases were referred to in the judgment:

Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd., [1903] 1 K.B. 249;

Berisford (S&W) Plc v. New Hampshire Insurance Co., [1990] 1 Lloyd's Rep. 454;

British Aerospace plc v. Dee Howard Co., [1993] 1 Lloyd's Rep. 369;

Bua International Ltd. v. Hai Hing Shipping Co. Ltd. (The *Hai Hing*), [2000] 1 Lloyd's Rep. 300;

Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd., July 11, 1989, unreported;

Citi-March Ltd. v. Neptune Orient Lines Ltd., [1997] 1 Lloyd's Rep. 72;

*Eleftheria*, The [1969] 1 Lloyd's Rep. 237; [1970] P. 94;

Evans Marshall & Co. Ltd. v. Bertola S.A., (C.A.) [1973] 1 Lloyd's Rep. 435; [1973] 1 W.L.R. 349;

Haji-Ioannou v. Frangos, (C.A.) [1999] 2 Lloyd's Rep. 337;

Harrods (Buenos Aires) Ltd., In re (C.A.) [1992] Ch. 72;

Lindsay (W.N.) & Co. Ltd. v. European Grain Shipping Agency Ltd., [1963] 1 Lloyd's Rep. 437;

*MC Pearl*, The [1997] 1 Lloyd's Rep. 566;

Sarrio S.A. v. Kuwait Investment Authority, (H.L.) [1998] 1 Lloyd's Rep. 129; [1999] 1 A.C. 32; (C.A.) [1997] 1 Lloyd's Rep. 113;

Sinochem International Oil (London) Co. Ltd. v. Mobil Sales & Supply Corporation, [1999] 2 Lloyd's Rep. 769;

Soho Supply Co. v. Gatoil (U.S.A.) Inc., [1989] 1 Lloyd's Rep. 589;

Spiliada Maritime Corporation v. Cansulex Ltd., (H.L.) [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460;

Toepfer (Alfred C.) v. Continental Grain Co., [1974] 1 Lloyd's Rep. 1;

*Xin Yang*, The [1996] 2 Lloyd's Rep. 217.

———

This was a challenge to the Court's jurisdiction by the third party Sinochem International Oil Co. Ltd. (Sinochem Beijing) and an application to discharge the third party notice served on it by the defendants Mobil Sales and Supply Corporation (Mobil Delaware) in the action between the claimants Sinochem International Oil (London) Co. Ltd. (Sinochem London) and Mobil Delaware the Court of Appeal in earlier proceedings ([2000] 1 Lloyd's Rep. 339) having held that Mobil Delaware was entitled to set off any indebtedness of Sinochem Beijing (an affiliate of Sinochem London) to Mobil Oil Hong Kong Ltd. (Mobil H.K.) (an affiliate of Mobil Delaware) against its liability for the price otherwise due to Sinochem London.

Mr. Charles Hollander, Q.C. (instructed by Messrs. Norton Rose) for the defendants; Mr. Steven Berry (instructed by Messrs. Holman Fenwick & Willan) for the third party.

The further facts are stated in the judgment of Mr. Justice Rix.

Judgment was given in Chambers but has been released for publication.

## JUDGMENT

Mr. Justice RIX: 1. In this unusual case there is a conflict between two different jurisdiction

672                     LLOYD'S LAW REPORTS                     [2000] Vol. 1

Rix, J.]                     Sinochem v. Mobil Sales                     [Q.B. (Com. Ct.)

clauses, one pointing to England and the other to Hong Kong. How is the conflict to be resolved?

2. The question arises in the following context. The Hong Kong subsidiary of a major U.S. oil company contracted with a leading state trading company of the People's Republic of China ("China") to sell fuel oil on C.F.R. (cost and freight) terms to Huangpu in China. On arrival in China, the oil was confiscated by the Chinese authorities on the ground that it was being smuggled into China under a misdescription: a legitimate cargo of low sulphur fuel oil was masquerading as an illegitimate cargo of gasoil. Although there was some part payment of the price of the cargo, by far the greater part of the price went unpaid. That contract (there were in fact three associated contracts) contained a Hong Kong law and jurisdiction clause. I shall refer to that contract as the Hong Kong contract.

3. Some time later under an unrelated contract the English subsidiary of the Chinese state trading company sold another cargo of oil to a U.S. subsidiary of the U.S. oil major. The contract was unrelated — but it contained an unusual set-off clause which permitted set-off of claims by any affiliates of the buyer and seller respectively. Mindful of the unpaid price owed to its Hong Kong affiliate, the U.S. subsidiary of the oil major made only such part payment to the English subsidiary of the Chinese state enterprise as would recoup the outstanding debt under the Hong Kong contract. This later contract contained an English law and jurisdiction clause. I shall refer to this contract as the English contract.

4. The English subsidiary of the Chinese state enterprise sued its U.S. buyer in England for the balance of the price. After initial success in obtaining summary judgment, it failed in the Court of Appeal on the ground that the set-off clause did indeed permit set-off of the Hong Kong affiliate's claim against the Chinese state enterprise. It follows that the issue in the English claim is solely whether the Chinese buyer under the Hong Kong contract was excused from payment under that contract.

5. The clash of jurisdiction clauses now arises because of the U.S. subsidiary's desire to introduce that Chinese buyer under the Hong Kong contract into the English proceedings by way of third party (or in C.P.R. terms Part 20) notice. To do that permission is needed under R.S.C., O. 11, r. 1(1).

6. It is recognized that the essential dispute in the English proceedings arises under the Hong Kong contract. But there is disagreement as to the consequences of that fact. In theory there are three possibilities. One is that permission to serve out against the Chinese state enterprise should be

refused because of the Hong Kong jurisdiction clause and because Hong Kong is in any event the appropriate forum. The second is that permission should be granted because the issue under the Hong Kong contract in any event has to be litigated in England and it is desirable to have all parties present in the same forum. The third is that because the appropriate forum is in Hong Kong, the English Court should not only refuse permission to serve out, but should stay the English action pending resolution of the Hong Kong contract issues in Hong Kong: in that way not only could the issues be debated in the appropriate forum, but the risk of multiplicity of proceedings could be avoided.

7. Each of these alternatives was canvassed in the submissions of Counsel. Which is the correct solution?

*The Hong Kong contract*

8. The Hong Kong contract was made between Mobil Oil Hong Kong Ltd. ("Mobil H.K.") and Sinochem International Oil Co. Ltd. of Beijing ("Sinochem Beijing"). There were in fact three contracts, dated Feb. 25, Feb. 27 and Mar. 3, 1998, for a total of 500,000 barrels of Low Sulfur Fuel Oil and 100,000 barrels of L.S.F.O. The Low Sulfur Fuel Oil and the L.S.F.O. had different specifications. For instance, the Low Sulfur Fuel Oil was to have a maximum viscosity of 100 cst at 122F, whereas the L.S.F.O. was to have a maximum of 0.9 per cent. sulphur and a maximum viscosity of 5.5 cst. The price of the Low Sulfur Fuel Oil was U.S.$16.40 per barrel and the price of the L.S.F.O. was U.S.$12.95 per barrel. Delivery terms were "C.F.R. Huangpu or a mutually agreeable anchorage" and the contract contemplated lighterage at the master's option. Title and risk of loss were to pass at the load port. Insurance was for the buyer. The quality and quantity were to be determined at the load port under a clause which read as follows:

> Quality and quantity shall be determined at the loadport and witnessed by an internationally recognized independent inspector appointed by the Seller and acceptable to the buyer . . . The determination by the inspector shall be final and binding . . .

The law and jurisdiction clause stated:

> This contract shall be governed by and construed in accordance with the laws of Hong Kong. The parties hereto irrevocably agree that the courts of Hong Kong are to have jurisdiction to settle any disputes which may arise out of or in connection with this contract and submit to the jurisdiction of those courts.

9. The cargo was loaded on to *Sea Falcon* at Long Beach in California and two bills of lading

dated Mar. 10, 1998 were issued, one for the Low Sulfur Fuel Oil, and one for the L.S.F.O.: together the two parcels amounted to some 90,000 tonnes. The bills were made out to the order of Sinochem Beijing.

10. *Sea Falcon* gave a notice of readiness at Huangpu on Apr. 3, 1998. There is some uncertainty as to where the vessel was at that time. Some documents suggest that she was at the port itself. But there is also evidence that she was some 50 miles away off the island of Lantau. Huangpu is a port on the Pearl River on the mainland of China: Lantau is close to Hong Kong. Discharging began on Apr. 3 or 4 into barges. On Apr. 4 Chinese customs officials boarded the vessel. On Apr. 5, when she had discharged about 31,000 tonnes, she shifted to Huangpu's inner anchorage and there discharged the balance of her cargo. On Apr. 6 customs and marine police were on board and a video was taken. Officials continued to visit the vessel, and a T.V. crew was also on board. Throughout discharge three representatives of Mobil Hong Kong were on the vessel. On Apr. 11 discharge was completed and the vessel departed on the next day.

11. Mobil H.K. appears to have faxed the shipping documents to Sinochem Beijing on Mar. 14 and to have couriered them to Sinochem Beijing on Apr. 14. Those documents contained certificates of analysis describing all the cargo as "Low Sulfur Fuel Oil" and certifying its analysis in accordance with the various tests stated in the specifications. No point has been taken before me that those certificates are not in contractual form.

12. Invoices dated Apr. 27, 1998 from Mobil H.K. to Sinochem Beijing for the price of the two parcels, described in each case as Low Sulfur Fuel Oil, appear in evidence before me, but Sinochem Beijing says that these invoices, like the shipping documents, never arrived. The invoices state that payment was due by June 10, 1998, which I think represents a slight extension over and above the contractual term of payment "within 60 days after NOR day".

13. On June 12, 17 and 19, 1998 Mobil H.K. received three payments on account in respect of the Hong Kong contract, totalling U.S.$1,600,000. These payments were made by companies described as Shanghai Weifou International Trading Co. Ltd. and Bincon Ltd. On each occasion the payment was preceded by advice from Sinochem Beijing that an application for telegraphic transfer had been made. The payments were credited by Mobil H.K. to Sinochem Beijing's account. That left a sum outstanding under the Hong Kong contract of U.S.$7,790,482.50.

14. On June 26, 1998, however, the situation changed with the following fax from Sinochem Beijing to Mobil H.K.:

Concerning the above/mentioned deal, we requested you to supply Low Sulfur Fuel Oil. However, the cargo has been detained by the Chinese authorities ever since it arrived in Huangpu on April 3, 1998 and is firmly believed to be gasoil in terms of specification and to be involved in smuggling business. Unless you clarify the quality and nature of the cargo directly with our end user either Guangdong Chemicals Imp and Exp Corp or Zhongshan Fuxing Refinery, both in written form and by sending special personnels, we will proceed by filing our case to defend the reputation of our company and we hold you totally responsible for this and any loss occurred.

15. On June 30 the Huangpu Customs faxed directly to Mobil H.K., to state that inspection had revealed that the cargo specification did not comply with that declared by the receiver. Mobil H.K. was invited to attend a meeting with all relevant information. A meeting ensued to which Mobil H.K. brought the relevant shipping documentation.

16. On July 24, 1998 an article appeared in the Shenzhen Special Administrative Region newspaper concerning *Sea Falcon* and her cargo. It reported that two barges had been stopped by the coast guard in early April on an allegation of smuggling. A seaman from one of these barges is said to have claimed that *Sea Falcon* had transferred nearly 50,000 tonnes of oil product to "tens of tankers" in the previous days off Lantau Island. On Apr. 6 the authorities had intervened in *Sea Falcon's* discharge. The suggestion was that the cargo had been a finished oil product, gasoil, and that this shipment was one of a number making use of forged permits to obtain customs clearance with the intention of evading tax.

17. Subsequently, but on a presently unknown date, an article appeared in *Lloyd's List* describing China's efforts to clamp down on gasoil smuggling into south China. It was explained that Beijing was trying to protect mainland refineries which were finding it impossible to sell their mounting inventories because China's support for crude oil had kept domestic raw material costs artificially higher than plummeting international prices. Reference was made to *Sea Falcon* in these terms:

More recently . . . Sea Falcon was detained by Chinese authorities on suspicion of disguising a shipment of gas-oil as fuel oil. The 90,000 tonne shipment was the largest to date and the scale of such an operation has attracted the attention of the central government . . .

RIX, J.]          Sinochem v. Mobil Sales          [Q.B. (Com. Ct.)

The incident once again occurred in waters close to Hong Kong, with the ship and 40,000 tonnes of cargo seized in Huangpu Port, where the ship had shifted after unloading the other half of the cargo at Guishan Island, about 40 km southwest of Hong Kong. The consignee for the Sea Falcon's cargo was a Chinese oil-producing factory.

18. On Aug. 2, 1998 Huangpu Customs wrote again to Mobil H.K. to say that Guangdong Zhong-shan Fuxing Oil Refinery had authorized a customs declaration regarding the Sea Falcon cargo, and that because the declaration was not in accordance with law, Customs had formally instituted an investigation in June, 1998: they asked for Mobil H.K.'s co-operation as supplier of the cargo.

19. On Aug. 24 Mobil H.K. replied to Huangpu Customs, with a copy to Sinochem Beijing. Mobil H.K.'s letter referred to Sinochem Beijing as the "Purchaser" of the cargo and explained that its specification met international standards for fuel oil with reduced sulphur content and that such fuel oil had been traded for years in the international and Chinese importing markets. It referred to a rumour arising a few weeks after the cargo's discharge that the vessel had carried "mixed gas oil", but stated that the claim was totally unfounded. It went on to say that Mobil H.K. understood that the oil was still in Customs' hands and that Sinochem Beijing had complained that it had still not received payment. Customs were requested to keep the oil safe. On Sept. 28, 1998 Mobil H.K. wrote again to Huangpu Customs, enclosing further documentation regarding the cargo's specification and international fuel oil standard classification. On Oct. 27, 1998 Mobil H.K. complained that it had received no reply from the Customs. On Nov. 5 Mobil H.K. wrote again to say that it had just learned that about 40,000 tonnes of the cargo were to be auctioned on Nov. 3 at Guangdong International Auction Centre: it again asked Customs to keep the oil safe. Press reports indicate that the auction failed, and the subsequent fate of the cargo is unknown. As far as I can tell, Huangpu Customs have never replied to Mobil H.K.'s letters.

20. Sinochem Beijing's case concerning the Hong Kong contract is as follows. The contract was not with Sinochem Beijing at all, or, if it was, Sinochem Beijing was merely a nominee which had "lent its name" for a small commission, and on terms that no payment was due to Mobil H.K. from it, unless it had itself received payment from the true principal. Indeed the true principal was primarily responsible to make payment directly to Mobil H.K. Who was the true principal? It was a company known as Guo's Brother, an independent refiner based at Zhongshan in Guangdong province. Guo's Brother had imported large quantities of oil

products into China from 1996 until mid-1998 when it was effectively closed down by the Chinese authorities in the aftermath of the Sea Falcon affair. A substantial volume of such imports had been sourced through Mobil H.K., whose Mr. Johnson Ng and Mr. Frankie Chan had enjoyed a close relationship with Guo's Brother. Although Sinochem Beijing had signed the Hong Kong contract, the chain continued with Sinochem Bahamas and Guo's Brother companies based in Singapore and Hong Kong such as Wudfull Petroleum PTE Ltd. and Hong Kong Wufu Petroleum Co. Ltd. No shipping documents or invoices had been sent to Sinochem Beijing. No demand for payment had been made until Sept. 8, 1998, after it had become evident that Guo's Brother could not pay. The part payments had been by companies associated with Guo's Brother.

*The English contract*

21. The English contract was entered into between the claimant in these proceedings, Sinochem International Oil (London) Co. Ltd. ("Sinochem London") and the defendant, Mobil Sales and Supply Corporation of Delaware ("Mobil Delaware"). Sinochem London is an affiliate of Sinochem Beijing, and Mobil Delaware is an affiliate of Mobil H.K. Under this contract, Sinochem London is the seller and Mobil Delaware is the buyer. The contract was made through Mobil Delaware's Singapore office and dated Oct. 29, 1998, that is to say towards the end of the events related above. It was for the purchase of 1,000,000 barrels of crude oil f.o.b. Mena Al Bakr for shipment in November, 1998. It is common ground that (subject to any right of set-off) a total of U.S.$10,529,131.99 became due by Mobil Delaware to Sinochem London on Dec. 10, 1998. On Dec. 29, 1998 Mobil Delaware paid only U.S.$2,348,369.18, leaving a balance due of U.S.$8,180,762.18, and otherwise relying on a set-off pursuant to a special affiliate company set-off clause contained in cl. 18 of the contract. The contract also contained an English law and exclusive jurisdiction clause (cl. 14).

22. The special set-off clause, cl. 18, provided as follows:

*Non-performance*

All payments under this agreement shall be made without setoff or counterclaim and will not be subject to any conditions except as provided in the following:

Notwithstanding any other provisions of this or any other contract between the parties or their affiliates, in the event of any party ("the non-performing party") shall (I) default in the payment or performance of any obligation to the

[2000] Vol. 1     LLOYD'S LAW REPORTS     675

Q.B. (Com. Ct.)]     Sinochem v. Mobil Sales     [Rix, J.

other party under this or any other contract after two business days' notice of such failure, (II) become bankrupt or insolvent (however evidenced), or (III) be unable to pay its debts as they fall due, then in any such event, the other party ("the performing party"), shall have the right, in addition to, and not in limitation or exclusion of, any other rights which the performing party may have, (whether by agreement, operation of law or otherwise), to set off, counterclaim or withhold payment in respect of any default by the non-performing party or any affiliate of the non-performing party under this agreement or any other agreement between the parties or their affiliates, regardless in each case of the office or branch through which a party is acting, and the performing party's obligations hereunder to the non-performing party shall be deemed to be satisfied and discharged to the extent of such setoff, counterclaim or withholding.

"Affiliate" for the purposes of this agreement means a company which directly or indirectly controls, is controlled by, or is under common control with, a party hereto. For this purpose, "control" means the right to exercise more than 50% of the voting rights at a shareholders' meeting.

23. Sinochem London therefore commenced these proceedings by its writ issued on Jan. 20, 1999. On Mar. 24, 1999 Mobil Delaware took an assignment of Mobil H.K.'s rights under the Hong Kong contract pursuant to a liberty incorporated in the Hong Kong contract. On Mar. 26, 1999 Mobil Delaware issued its third party notice against Sinochem Beijing in respect of the subject matter of its set-off against Sinochem London under the Hong Kong contract. On May 7, 1999 Mobil Delaware obtained permission ex parte (pursuant to O. 11, r. 1(1)(c) and r. 4(1)(d)) to serve that third party notice out of the jurisdiction upon Sinochem Beijing on the ground that the latter was a necessary or proper party to the existing proceedings.

24. Mobil Delaware's third party notice appears to claim both as assignee of Mobil H.K.'s rights under the Hong Kong contract and also to have the issue of its entitlement to set off the outstanding price under the Hong Kong contract against Sinochem London determined not only as between Sinochem London and itself but also as between Sinochem Beijing and itself.

25. On Sept. 21, 1999 Mr. Justice Longmore gave summary judgment against Mobil Delaware for the outstanding part of the price under the English contract, holding that the special set-off clause did not reach the cross-claim under the Hong Kong contract: see *Sinochem International Oil*

*(London) Co. Ltd. v. Mobil Sales & Supply Corporation* [1999] 2 Lloyd's Rep. 769.

26. On Sept. 27 Sinochem Beijing acknowledged service, appointing Messrs. Holman Fenwick & Willan as their solicitors. Sinochem London is and was represented by different solicitors, Messrs. Watson Farley & Williams. On Oct. 12, 1999 Sinochem Beijing issued its application under R.S.C., O. 12, r. 8 to challenge this Court's jurisdiction and to discharge service of the third party notice upon it. At that stage, when summary judgment had been given against Mobil Delaware on both Sinochem London's claim and its own counterclaim, there was no reason why that application should not have succeeded. However, Mr. Justice Longmore had given permission to Mobil Delaware to appeal his judgment, and it was therefore agreed to postpone the hearing of Sinochem Beijing's jurisdictional challenge until after the Court of Appeal had given judgment.

27. On Feb. 17 the Court of Appeal reversed the judgment of Mr. Justice Longmore by a majority and declared that Mobil Delaware was entitled to set off any indebtedness of Sinochem Beijing under the Hong Kong contract. As a result, the argument on Sinochem Beijing's application has become a live and interesting one.

*The submissions*

28. On behalf of Sinochem Beijing Mr. Steven Berry submits that the only issues which remain arise in connection with or under the Hong Kong contract, albeit they have an impact upon the question of ultimate liability under the English contract. Those issues are to be determined under Hong Kong law and in the Courts of Hong Kong. What are those issues? They are essentially three. First, Sinochem Beijing has no liability under the Hong Kong contract because it did not enter into it, or did so as a nominee only and without personal liability, or is without liability unless and until it is itself paid by Guo's Brother. Secondly, Mobil H.K. misdescribed the cargo, which led to its confiscation by the Chinese authorities and thus its loss. Thirdly, Mobil H.K. may have itself been involved in a smuggling operation, which again has led to the loss of the cargo. Such misdescription or complicity in smuggling would amount to a repudiatory breach of contract. All such issues have not only been agreed to be litigated in Hong Kong, but can be appropriately litigated only there. It is only in Hong Kong that Sinochem Beijing can be confident of obtaining Mobil H.K.'s documents and calling its own witnesses, such as the seaman referred to in the

Rix, J.]                              Sinochem v. Mobil Sales                          [Q.B. (Com. Ct.)

Shenzhen newspaper report cited above. Not only would it take strong cause, which is absent, to permit the Court to ignore the exclusive Hong Kong jurisdiction clause (*The Eleftheria,* [1969] 1 Lloyd's Rep. 237; [1970] P. 94, *City-March Ltd. v. Neptune Orient Lines Ltd.,* [1997] 1 Lloyd's Rep. 72, *The MC Pearl,* [1997] 1 Lloyd's Rep. 566), but when the question is whether to give leave under R.S.C., O. 11 rather than whether to stay otherwise well found proceedings, then there is an even heavier burden to discharge upon the applicant who asks the Court not to enforce a foreign jurisdiction clause (*see* Dicey & Morris, 13th ed., 2000, at par. 12–114, *Evans Marshall & Co. Ltd. v. Bertola S.A.,* [1973] 1 Lloyd's Rep. 435; [1973] 1 W.L.R. 349 at p. 362).

29. On behalf of Mobil Delaware Mr. Charles Hollander, Q.C. submits, on the other hand, that there is no defence to the claim against Sinochem Beijing under the Hong Kong contract. As for Mr. Berry's first point, it is impossible for Sinochem Beijing to argue that, as the named buyer in the contract, it is not liable for the price. Secondly, as for the alleged misdescription, the contract made the load port certificates of quality final and binding, and in any event there is no evidence that the cargo was other than low sulphur fuel oil as specified in the contract. Thirdly, he points out that the allegation of complicity in smuggling is one which Mr. Berry is only willing to put in a hesitant and contingent way, viz. if evidence emerges to support the newspaper accounts. The alleged issues therefore amount to nothing in substance: but whether they do or do not, such issues would have to be litigated in London in any event in the present proceedings. Therefore, there is strong cause to justify not enforcing the Hong Kong jurisdiction clause, which in any event is not an exclusive jurisdiction clause. Unless all parties necessary to the overall dispute are present in one set of proceedings, all the dangers and evils of multiplicity of proceedings would be incurred.

30. Mr. Berry's riposte to that last point is to submit that the appropriate solution is to stay the English proceedings. To this end, he obtained in the course of the hearing the verbal consent of Sinochem Beijing to the stay of these proceedings, subject to the advancement of a petition, and if that were allowed, of an appeal to the House of Lords on the cl. 18 set-off point. In this connection, he submits that even though the English contract's exclusive jurisdiction clause is within art. 17 of the Brussels Convention since Sinochem London is domiciled within a Contracting State, nevertheless the Court has power to stay the proceedings: see *In re Harrods (Buenos Aires) Ltd.,* [1992] Ch. 72.

*Is the Hong Kong jurisdiction clause an exclusive jurisdiction clause?*

31. This is probably the first issue for decision, since if the Hong Kong jurisdiction clause does not provide for exclusive jurisdiction, then, although this would remain a case where Mobil Delaware would have to meet the burden of the *Spiliada* test (*Spiliada Maritime Corporation v. Cansulex Ltd.,* [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460), the particular force of an exclusive clause would have been dissipated.

32. The test which has been developed for distinguishing an exclusive from a non-exclusive jurisdiction clause is whether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used: Dicey and Morris, 13th ed. 2000 at par. 12–078. Or to put the issue in another way: is the obligation contained in the clause the intransitive one to submit to a jurisdiction if it is chosen by the other contracting party, or is it the transitive one to submit all disputes to the chosen jurisdiction? See *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.,* [1903] 1 K.B. 249, *Soho Supply Co. v. Gatoil (U.S.A.) Inc.,* [1989] 1 Lloyd's Rep. 589, *British Aerospace plc v. Dee Howard Co.,* [1993] 1 Lloyd's Rep. 369, *c.f. Cannon Screen Entertainment Ltd. v. Handmade Films (Distributors) Ltd.,* (July 11, 1989, Mr. Justice Hobhouse, unreported) and *S&W Berisford Plc v. New Hampshire Insurance Co.,* [1990] 1 Lloyd's Rep. 454.

33. In the present case the clause in the Hong Kong contract not only provides for Hong Kong law, but states that the Hong Kong Courts "are to have jurisdiction to settle any disputes" between the parties and that the parties "submit to the jurisdiction of those courts". In my judgment, this is a clause which contains a transitive obligation to submit disputes to the Courts of Hong Kong. It has all the indicia of such a clause. It is mutual, it refers to "any disputes" i.e. all disputes, and the language "are to have jurisdiction", pace Mr. Hollander who contrasts the word "shall" in the opening line of the clause, is the language of obligation and not option. Moreover, although a choice of law clause may well exist without any jurisdiction clause to accompany it, nevertheless, as Mr. Justice Waller remarked in *British Aerospace v. Dee Howard* at p. 375, there is not much point in choosing a specific law to accompany a jurisdiction clause unless the intention is to make the Courts where such law operates exclusive. Mr. Berry did not stress the unusual presence of the word "irrevocably", and so I do not do so either, but it strikes me that if anything this word underlines the transitive commitment.

34. Therefore, the starting point is that the Hong Kong contract, like the London contract, where indeed the word "exclusive" is expressly found, is an exclusive jurisdiction clause.

*Which is the more convenient forum?*

35. I shall take this issue second, even though it might be said that it comes lower down the menu of issues, for two reasons: one is that it may be said that it is for Mobil Delaware to show strong cause why the Court should not simply enforce the jurisdiction clause, and the other is that in such a context matters of convenience are, at any rate prima facie, largely if not entirely irrelevant: see *British Aerospace v. Dee Howard* at pp. 375–377.

36. It was not disputed by Mr. Hollander that if the issues in the case encompassed a claim that Mobil H.K. had conspired with Chinese receivers to smuggle contraband oil products into China under the misdescription of low sulphur fuel oil, then such a case could be more conveniently dealt with in Hong Kong. The parties to the Hong Kong contract are in Hong Kong and China, the relevant law would be local, the circumstances of the discharge took place in the waters off or near to Hong Kong, the local authorities were involved, many documents would be in Chinese and most of the witnesses would be from Hong Kong or China. In such a case, even in the absence of an exclusive or any jurisdiction clause, Mobil Delaware would experience an uphill struggle in meeting the *Spiliada* test of showing that leave to serve the third party claim out of the jurisdiction should be allowed on the basis that England was clearly the more appropriate forum.

37. Nevertheless, Mr. Hollander sought to meet those difficulties by emphasizing that Sinochem Beijing adumbrated defences were spurious. As to its first defence, that it was not a party at all to the Hong Kong contract, or that as a party, it was a nominee only and without liability, or liable only after payment to it by Guo's Brother, I would accept that there is nothing before me at present except what amounts to assertion or submission rather than evidence to indicate that Sinochem Beijing is not liable on its contract as buyer in the ordinary way. If that was the only point, it might be said that it could be litigated in England as easily as in Hong Kong.

38. As to the second point, that the cargo was misdescribed, Mr. Hollander similarly contends that the defence cannot survive the clause in the Hong Kong contract that the determination of the load port inspector as to quality was to be final and binding. This point, however, is not straightforward. A certificate as to quality may not be binding as to matters going to description (*W. N. Lindsay &*

*Co. Ltd. v. European Grain & Shipping Agency Ltd.*, [1963] 1 Lloyd's Rep. 437), although in certain circumstances where words of description are also words of quality it may be (*Alfred C. Toepfer v. Continental Grain Co.*, [1974] 1 Lloyd's Rep. 1). It cannot in my judgment be said that the defence that misdescription lies outside the certification clause is a spurious one. Once it becomes relevant to ask whether the cargo was properly described as low sulphur fuel oil, then evidence from the discharge port cannot be excluded.

39. The problem with Mr. Berry's third point is that it is by no means clear whether it properly exists or not. If it does, plainly the substance of it lies in China. Nevertheless, Mr. Berry was not able to say that the point would be taken, rather he gave the impression that that might depend on what emerged from the disclosure given by Mobil H.K. I would have thought for myself that disclosure would depend on the pleaded issues. Nevertheless, the burden on an applicant for leave under O. 11, let alone a claimant who asks a Court to disregard a foreign jurisdiction clause, is such that I do not think that the uncertainty that hangs over this issue should operate definitively against the foreign party. The material before me, unequivocal as it is and in large part a matter of hearsay, does not enable me to exclude the possibility of a defence based on Mobil H.K.'s alleged complicity in a smuggling operation. Mr. Berry fairly says that the presence of three representatives of Mobil H.K. at the discharge suggests something rather different from the standard C.F.R. contract where title and risk have passed on loading. I emphasize of course that Sinochem Beijing's allegations of smuggling are no more than that, allegations: but Mobil H.K. is not able to say that the issue will not arise.

40. In these circumstances, I cannot say that Mobil H.K. has clearly shown that the convenient forum for the determination of the issues which arise or may arise between it and Sinochem Beijing is England rather than Hong Kong.

41. That, however, is subject to one important further question, and that is whether the fact that those issues under the Hong Kong contract will have to be litigated in England in any event, because of the affiliate company set-off clause in the English contract, makes any difference to the ultimate exercise of my discretion. Mr. Berry submits that it does not, because Sinochem London's English action should be stayed pending litigation of the issues under the Hong Kong contract in Hong Kong.

42. So the next question is whether I should stay the English proceedings.

| Rix, J.] | Sinochem v. Mobil Sales | [Q.B. (Com. Ct.) |
|---|---|---|

*Should the English proceedings be stayed?*

43. It has to be said straightaway that I would not be willing to stay Sinochem London's action in the absence of Sinochem London, which is not represented on this hearing. That is because Sinochem Beijing has chosen to be represented by different solicitors and Counsel from those retained by Sinochem London. Mr. Berry's response to that difficulty was to seek to obtain Sinochem London's authority to state its position on the question of a stay to the Court. In the course of the hearing Mr. Berry was able to inform me that Sinochem London would consent to a stay, without prejudice to any petition or appeal to the House of Lords on the construction and effect of the set-off clause which has already been the subject of the judgments of Mr. Justice Longmore and the Court of Appeal. I have now received confirmation of its willingness to consent to a stay on those terms in a letter from its solicitors.

44. So that problem has been overcome. It remains the position, however, that Sinochem London has not applied for or requested a stay. It is Sinochem Beijing which is requesting a stay of Sinochem London's proceedings in order to rebut the point that the issues under the Hong Kong contract will have to be litigated in England in any event because of the set-off clause in the English contract.

45. The first point to note is of course that the English contract contains its own exclusive jurisdiction clause in favour of English law and an English forum. I will assume (the matter was not argued before me) that English law would have to make way for Hong Kong law to the extent that issues under the Hong Kong contract had to be litigated in London. The fact remains that the parties to the English contract agreed an exclusive jurisdiction in England, and did so in the light of a special set-off clause which effectively incorporated as relevant to a claim under the English contract any cross-claim arising under (inter alia) the Hong Kong contract.

46. The English contract's jurisdiction clause is an exclusive jurisdiction agreement within art. 17 of the Brussels Convention on the Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, which has been incorporated into English law by way of the Civil Jurisdiction and Judgments Act, 1982. This is because art. 17 is engaged if at least one of the parties is domiciled in a Contracting State, and that condition is met because Sinochem London is an English company.

47. So the next question is whether it is possible to stay an action over which art. 17 states that the chosen Courts, in this case the Courts of England,

"shall have exclusive jurisdiction". Mr. Berry submits, in reliance on *In re Harrods (Buenos Aires) Ltd.*, [1992] Ch. 72, that it is. In that case a company incorporated in England, but doing business exclusively in Argentina, was defendant to a petition that a minority shareholder was being unfairly prejudiced by the conduct of the company's affairs. Jurisdiction against the company in England existed under art. 2 of the Convention (art. 17 was not in play). Nevertheless, the Court of Appeal held that it had an inherent power, separate from any provision in the Convention, to stay proceedings in England in favour of the natural forum in Argentina. The basis of the decision was that the Convention was intended to regulate jurisdiction between Contracting States and that it was therefore consistent with the Convention to stay proceedings on the ground of forum non conveniens in a case in which no other Contracting State was concerned. The decision is a controversial one (see the discussion in Dicey & Morris, The Conflict of Laws, 13th ed., 2000 at pars. 12–017/9 and Briggs & Rees, Civil Jurisdiction and Judgments, 2nd ed., 1997, at pars. 2.226ff). It is nevertheless of course binding on me, but it might be said that it should not be extended from art. 2 into art. 17. On the other hand the present case of a defendant which is not domiciled in a Contracting State (Mobil Delaware) may be said to be an easier case for application of the principle in *In re Harrods (Buenos Aires) Ltd.* because of the operation or significance of art. 4 of the Convention: see *The Xin Yang*, [1996] 2 Lloyd's Rep. 217 at p. 221, *Sarrio S.A. v. Kuwait Investment Authority*, [1997] 1 Lloyd's Rep. 113 at pp. 124, 126, 129 (reversed on other grounds [1998] 1 Lloyd's Rep. 129; [1999] 1 A.C. 32), and *Haji-Ioannou v. Frangos*, [1999] 2 Lloyd's Rep. 337 at pp. 345–347.

48. Be that as it may, however, the position is that in the last of those cases Lord Bingham, C.J. said this about the decision in *In re Harrods (Buenos Aires) Ltd.* (at p. 346):

The case must be taken to have decided that where the choice is between the exercise of jurisdiction properly conferred on the English Court and the exercise of jurisdiction by a foreign Court in a non-Contracting State, the power to stay on grounds of forum non conveniens is not excluded by the Convention.

I must take it as established therefore that in the present case, the English Court can, if it sees it as appropriate, stay these proceedings pending the litigation in Hong Kong of the issues under the Hong Kong contract by the parties thereto.

49. The next question, therefore, is whether that would be an appropriate course for me to take in my discretion.

[2000] Vol. 1      LLOYD'S LAW REPORTS      679

Q.B. (Com. Ct.)]      Sinochem v. Mobil Sales      [Rix, J.

50. In my judgment, however, that would not be the right course to take in this case. In the first place, it is Sinochem London itself which has commenced these proceedings in this jurisdiction. It may have done so in the belief that there was no defence to its claim, but the fact is that it has invoked this jurisdiction, as it was bound to do, even if it now states its consent to the withdrawal of the issues which arise under the set-off clause, subject at any rate to any petition or appeal to the House of Lords.

51. Secondly, the English contract with its exclusive English jurisdiction clause postdated both the Hong Kong contract and the emergence out of it of the potential issues which Sinochem Beijing now invokes. In my view, once the hypothesis that the English contract's set-off clause embraces a cross-claim under the Hong Kong contract has to be accepted, as the Court of Appeal has now ruled, then the parties must be regarded as having intended the consequences of their special agreement. In the Court of Appeal, Lord Justice Mance (at par. 7 of his judgment) put out of his mind the possibility that the set-off clause had been inserted by Mobil Delaware with the specific intention of providing a defence by reason of a claim by Mobil H.K. against Sinochem Beijing under the Hong Kong contract: for the reason that no such submission had been made to that Court. It seems to me, however, that it is one thing to disregard such a consideration when the question is how the contract is to be construed. It is another thing, however, to disregard the necessary consequences of a decision as to the meaning of the clause. Moreover, Mr. Berry has before me submitted that it is an obvious inference that the special set-off clause was included by Mobil Delaware as part of a plan to relieve Mobil H.K. from the need to sue Sinochem Beijing in Hong Kong, or at all, under the Hong Kong contract. If that is his submission, it seems to me that I am at least entitled to regard the parties as acting with at any rate assumed knowledge of their inter-group contractual relationship and as having intended the consequences of their agreement. It follows, therefore, that I must regard the English contract as having been agreed in its form, containing as it does both its special set-off clause and its exclusive English jurisdiction clause, against the general background that a contract between affiliates such as would trigger off a right of set-off under the set-off clause might well contain its own jurisdiction clause, as well as against the specific background that at the time the English contract was entered into the potential dispute arising out of the non-payment under the Hong Kong contract had already arisen. In such circumstances, to stay an action under the English contract on the basis that it involved a dispute under an affiliates' contract

which could or even should more appropriately be litigated in another forum would be to disregard the carefully balanced agreement which the parties to the English contract had seen fit to make. There is no submission that that agreement was the product of any deception, misrepresentation or any kind of over-reaching.

52. Thirdly, there is as yet no litigation in Hong Kong and it is feasible that there never will be. Mobil Delaware, as assignee of the Hong Kong contract, says, through Mr. Hollander, that it will not commence proceedings in Hong Kong: in the light of the Court of Appeal decision it has no need to. Sinochem Beijing, through Mr. Berry, says that in that case, and subject to any reversal of the Court of Appeal in the House of Lords, it may be envisaged that it will itself commence proceedings for a declaration of non-liability in Hong Kong, but cannot guarantee that it will do so. To some extent, as I would understand Mr. Berry, the decision concerning litigation in Hong Kong might depend on what emerged in the course of disclosure from Mobil H.K. concerning the circumstances of discharge and of its complicity, as is suspected and alleged, in smuggling. I assume therefore that even if litigation was commenced by Sinochem Beijing, its progress would or might depend on what emerged in disclosure. In such circumstances, the staying of the English proceedings in favour of litigation in Hong Kong, which has not yet commenced and which may never be commenced or carried through to trial, is not a compelling or even attractive prospect. Of course, if no proceedings were to be commenced in Hong Kong, or if any such proceedings were to be discontinued, and if in the meantime these English proceedings had been stayed, Mobil Delaware would be entitled in due course to a lifting of that stay. But that would simply be a recipe for delay.

53. Fourthly, but also of fundamental importance, it is in my judgment a principle of the Court's residual discretion to stay even proceedings commenced in the consensual forum of an exclusive jurisdiction clause that the strong cause which needs to be shown if that discretion is to be exercised must go beyond matters of mere convenience and must enter into the interests of justice itself. After all, when parties agree to an exclusive forum for their disputes, they are or must be treated as being mindful both that they have chosen for themselves where such considerations of convenience take them and also that their choice may override pure matters of convenience — as where, typically, a neutral forum is chosen which has nothing whatsoever to do with their transaction or any likely dispute that may arise out of it. As Mr. Justice Waller put it, albeit speaking in the context of a non-exclusive jurisdiction clause, in *British*

Rix, J.]                        Sinochem v. Mobil Sales                   [Q.B. (Com. Ct.)

*Aerospace v. Dee Howard* at p. 376, it is necessary to point to some factor which could not have been foreseen in order to displace the bargain which has been agreed. He was there talking about matters of convenience. It is or may be different, however, where the quality of the consideration is different and goes to a matter of justice, although even in such a case it might be said that the factor in question should be regarded as having been foreseen and encompassed in the bargain struck.

54. In the present case, it does not seem to me that the matters raised by Sinochem Beijing as militating in favour of a stay of the English proceedings go beyond matters of convenience. At the end of the day, whatever happens to the English proceedings, Sinochem Beijing can, if it wishes, commence proceedings in Hong Kong. I do not see in the mere possibility of the multiplicity of proceedings, should Sinochem Beijing choose to commence new proceedings in Hong Kong, a strong reason why in the interests of justice Sinochem London should be relieved of its bargain to litigate disputes under its English contract in England. It is at this point that I am entitled to take account again of the three factors which I have already mentioned above.

55. Of course, in an important sense it is in the interests of justice that the same issue should not be litigated in more than one jurisdiction, with the attendant misfortunes of increased cost and the possibility of conflicting decisions. It is on such a ground, inter alia, that a stay is sometimes ordered. In the present case, however, the parties to the English contract have agreed to litigate in England, and have done so in the light of the Hong Kong contract and its outcome. Moreover, the English contract's special set-off clause states that it operates "Notwithstanding any other provisions of this or any other contract between the parties or their affiliates . . . " Thus, not only is the English contract made later than and against the background of the outcome of the Hong Kong contract, but this provision in it is expressed as taking precedence. Where therefore there is a tension between the English and the Hong Kong jurisdiction clauses in the two contracts, it seems to me that the tug of war has to be resolved in favour of England.

56. I am therefore unwilling to stay these English proceedings, even with Sinochem London's consent, and it follows that I have to consider Mobil Delaware's application to serve out against Sinochem Beijing on the basis that the underlying proceedings are entitled to go forward in England and will in any event inevitably involve any issues which may arise out of the Hong Kong contract.

*Should leave to serve out against Sinochem Beijing be permitted?*

57. I come finally therefore to the issue raised explicitly by Mobil Delaware's application under O. 11 and Sinochem Beijing's challenge under O. 12, r. 8: should leave to serve out against Sinochem Beijing be permitted?

58. In my judgment, it should. Once the Court of Appeal has decided that Mobil Delaware is entitled to resist these proceedings by invoking Mobil H.K.'s claim to (the balance of) the price under the Hong Kong contract, and I have decided that the potential issues which, on Sinochem Beijing's views of the matter, may arise under the Hong Kong contract do not necessitate the staying of these proceedings, it seems to me that the interests of justice require that all the parties involved in such issues should be present in the proceedings here. That will not prevent Sinochem Beijing, if it wishes, from commencing proceedings in Hong Kong: but that will be a matter for it. In the meantime, since the English contract must be litigated in England, it is only right that it should be litigated in the presence of all the parties interested in such issues.

59. I come to that conclusion the more readily when I bear in mind that Sinochem Beijing is only nominally a different party from Sinochem London, and that the latter is of course not only already a party to these proceedings but is the claimant in them. I am naturally conscious that Sinochem Beijing has a separate legal persona from Sinochem London, and is incorporated in a different and foreign jurisdiction. Nevertheless, not only are Sinochem London and Sinochem Beijing associated companies, all part of the Sinochem group of companies, but the special set-off clause contained in the English contract emphasizes just how closely the contracts of such affiliate companies are to be regarded for present purposes. In other words, I think that I am entitled to consider the two Sinochem companies as being in a very real sense, for the purposes of the dispute which arises out of the English contract, one entity.

60. Similarly, I bear in mind that the Hong Kong contract contains its own exclusive Hong Kong jurisdiction clause. Therefore, the burden of persuasion which Mobil Delaware bears is a particularly heavy one. Nevertheless, I have already given my reasons for thinking that in the present circumstances the tension between the two jurisdiction clauses must be resolved in favour of the later one, that contained in the English contract. Thus the interest in favour of finding, if possible, a single forum where all the parties can join together to litigate their disputes, in this case supports the case for service out. I am therefore persuaded that Mobil

LLOYD'S LAW REPORTS

| Q.B. (Com. Ct.)] | Sinochem v. Mobil Sales | [Rix, J. |
|---|---|---|

Delaware has shown strong cause for departing from the Hong Kong clause, even if and to the extent that it must be regarded as binding on it, and has also met the burden of persuasion for the purposes of O. 11 and the *Spiliada* test.

61. I refer to the extent that the Hong Kong clause must be regarded as binding on Mobil Delaware for these reasons. In its third party claim the tension between the two jurisdiction clauses arises in two separate contexts. First, it arises in the context of Mobil Delaware's reliance on the special set-off clause in the English contract. That enables it to invoke Mobil H.K.'s claim against Sinochem Beijing under the Hong Kong contract. It might be said that Mobil Delaware can only take that right subject to all the incidents of the Hong Kong contract including Mobil H.K.'s promise to submit all disputes to the Hong Kong Court. Nevertheless, there is no direct contract between Mobil Delaware and Sinochem London to that effect, but on the contrary they have agreed to litigate their disputes exclusively in England. To the extent, therefore, that Mobil Delaware's third party claim seeks to have the issue of the set-off under the Hong Kong contract litigated in the presence of Sinochem Beijing, it seems to me that the formal joinder of Sinochem Beijing adds little or nothing to the practical effect of litigating the Hong Kong contract dispute in England, as Mobil Delaware is entitled as a matter of right to do. Although the centrality of that dispute is in China or Hong Kong rather than in England, and the affiliates' Hong Kong contract contains its own Hong Kong jurisdiction clause, it obviously makes sense for the parties involved in that dispute to be joined in the litigation which in the light of my decision not to stay these proceedings must take place in England in any event.

62. Secondly, the tension arises in the context of Mobil Delaware's monetary claim, qua assignee of Mobil H.K., directly against Sinochem Beijing. In this context, the jurisdiction clause in the Hong Kong contract is binding on Mobil Delaware. Nevertheless, the claim appears to me in substance to add nothing to the issue or issues already put into litigation by Mobil Delaware's reliance on the set-off clause. Therefore, I see no virtue or justice in treating that matter differently.

63. Mr. Berry suggested that it would be unfair to bring Sinochem Beijing and the Hong Kong issues into the English litigation in circumstances where Mobil H.K. would not also be a party and subject to disclosure obligations. However, Mr. Hollander was able to satisfy me that it was only by an error that Mobil H.K. was not also joined as a second defendant in its third party claim. My decision in this case is made on the basis that that error will be promptly rectified. Sinochem Beijing and Sinochem London will therefore be entitled to Mobil H.K.'s disclosure.

64. Mr. Berry also suggested that Sinochem Beijing would be at a disadvantage in that it might turn out to be the case that it would only be in Hong Kong that it could succeed in deploying the witnesses, such as the seaman mentioned above, who could speak to the circumstances of *Sea Falcon's* discharge. However, Sinochem Beijing would be entitled in case of necessity to have evidence taken on commission.

*Miscellaneous matters*

65. Sinochem Beijing's application dated Oct. 12, 1999 referred to R.S.C., O. 12, r. 8. It would probably have been more correct at that time to have issued its challenge to the jurisdiction pursuant to C.P.R., Part 11: see *Bua International Ltd. v. Hai Hing Shipping Co. Ltd. (The Hai Hing)*, [2000] 1 Lloyd's Rep. 300 at pp. 304-305. But no point has been taken in that regard.

66. There was also a point in the affidavits and skeleton argument served on Sinochem Beijing's behalf that Mobil Delaware had made a misleading and defective affidavit in support of its ex parte application, in that no mention had been made of the potential disputes under the Hong Kong contract arising from allegations of smuggling gasoil and of misdescribing the cargo as low sulphur fuel oil. However, nothing was said in support of this point during oral submissions by Mr. Berry, and Mr. Hollander was not therefore called upon to deal with it in response. I therefore say nothing about it.

*Conclusion*

67. In conclusion, I uphold permission to serve the third party claim on Sinochem Beijing, and reject Sinochem Beijing's challenge to the jurisdiction.