# 'EXHIBIT C

# '''Rct v'Z 'qh'Z KK

The Weekly Law Reports   17 December 2004

3251

[2004] 1 WLR   Sirius Insurance Co v FAI General Insurance (HL(E))

A     House of Lords

*Sirius International Insurance Co (Publ) *v* FAI General Insurance Ltd and others

[2004] UKHL 54

B   2004  Nov 8, 9;          Lord Bingham of Cornhill, Lord Nicholls of Birkenhead,
          Dec 2                 Lord Steyn, Lord Walker of Gestingthorpe
                                    and Lord Brown of Eaton-under-Heywood

Banking — Letter of credit — Condition for draw-down — Letter of credit subject to
    express negative covenant not to draw down unless conditions satisfied —
    Whether entitlement to draw down — Whether conditions satisfied

C
        The defendant wished to reinsure the liabilities of a Lloyd's syndicate. Since the
    syndicate had concerns about the defendant's solvency the claimant agreed to
    reinsure the liabilities of the syndicate and retrocede it to the defendant. Under the
    agreement, in the event of any claim under the reinsurances, the claimant would be
    liable to the syndicate and the defendant would be correspondingly liable to the
    claimant. It was a term of the agreement that the defendant provide the claimant
D   with a letter of credit for US$5m. The letter of credit was subject to an express
    negative covenant, contained in an agreed side letter, that the claimant would neither
    pay a claim by the syndicate nor draw down without the defendant's consent. When
    the syndicate made a claim the defendant disputed the coverage provided by the
    reinsurances and retrocessions and arbitration proceedings were commenced in the
    claimant's name on behalf of the syndicate. Those proceedings were compromised
    by a Tomlin order by which the defendant agreed it was indebted to the claimant in
    the sum of US$22·5m. It was also agreed that the letter of credit be drawn down and
E   held in an escrow account and that the positions of the parties in respect of the
    proceeds of that account were unaffected by the settlement. On the claimant's
    application for the determination of preliminary issues the judge held that, while the
    principle of autonomy which applied to letters of credit was a of vital importance,
    there was no reason why the law should not give effect to an express agreement that a
    party would not draw down a letter of credit unless certain conditions were met, that
    by acknowledging its indebtedness to the claimant the defendant effectively agreed
F   that the claimant should pay the syndicate's claims, that the conditions limiting the
    drawing down of the letter of credit were therefore satisfied and that the proceeds of
    the escrow account belonged to the claimant as it would have been entitled to draw
    down. The Court of Appeal held that the literal meaning of the words of the Tomlin
    order did not express an agreement by the defendant that the claimant should pay the
    syndicate's claim and that, consequently, the underlying agreement had not been
    fulfilled and the defendant was entitled to the proceeds of the escrow account.
G       On appeal by the claimant—
        *Held*, allowing the appeal, that it was unnecessary for the House to resolve any
    issues regarding the so-called autonomy principle applicable to letters of credit issued
    by banks, and the appeal turned on the basis of the correct contextual interpretation
    of non-standard documents; that although leave to appeal would not ordinarily have
    been granted in such a case, the House was seized with the issue and it fell to be
    resolved; that the Tomlin order had to be construed objectively as a commercial
H   instrument; that the question which had to be asked was what would a reasonable
    person, circumstanced as the actual parties were, have understood the parties to have
    meant by the use of specific language; that the answer to that question was to be
    gathered from the text under consideration and its relevant contextual scene; that
    there had been a shift from literal methods of interpretation towards a more
    commercial approach; that, generally speaking, literalism should be resisted; and that

3252
Sirius Insurance Co v FAI General Insurance (HL(E))   [2004] 1 WLR

(per Lord Nicholls of Birkenhead, Lord Steyn and Lord Walker of Gestingthorpe) the   **A**
Court of Appeal's interpretation of the Tomlin order had been uncommercial and
literalistic, and the judge's interpretation had been correct (post, paras 1–3, 18–19,
25, 27–28, 39–40).

  *Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191, HL(E),
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749,
HL(E) and *Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896, HL(E) applied.   **B**
  Decision of the Court of Appeal [2003] EWCA Civ 470; [2003] 1 WLR 2214;
[2004] 1 All ER 308 reversed.

The following cases are referred to in the opinions of their Lordships:

*Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191; [1984] 3 WLR
  592; [1984] 3 All ER 229, HL(E)
*Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC   **C**
  251; [2001] 2 WLR 735; [2001] 1 All ER 961, HL(E)
*Bolivinter Oil SA v Chase Manhattan Bank NA (Practice Note)* [1984] 1 WLR 392;
  [1984] 1 All ER 351; [1984] 1 Lloyd's Rep 251, CA
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
  1 WLR 896; [1998] 1 All ER 98, HL(E)
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749;
  [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)   **D**
*On Demand Information plc v Michael Gerson (Finance) plc* [2002] UKHL 13;
  [2003] 1 AC 368; [2002] 2 WLR 919; [2002] 2 All ER 949, HL(E)

The following additional cases were cited in argument:

*Boral Formwork & Scaffolding Pty Ltd v Action Makers Ltd* [2003] NSWSC 713
*Czarnikow-Rionda Sugar Trading Inc v Standard Bank London Ltd* [1999] 2 Lloyd's   **E**
  Rep 187
*Deutsche Rückversicherung AG v Walbrook Insurance Co Ltd* [1995] 1 WLR 1017;
  [1994] 4 All ER 181; sub nom *Group Josi Re (formerly Groupe Josi Réassurance
  SA) v Walbrook Insurance Co Ltd* [1996] 1 WLR 1152; [1996] 1 All ER 791, CA
*Fletcher Construction Australia Ltd v Varnsdorf Pty Ltd* [1998] 3 VR 812
*GKN Contractors Ltd v Lloyds Bank plc* [1985] 30 BLR 48, CA
*Harbottle (R D) (Mercantile) Ltd v National Westminster Bank Ltd* [1978] QB 146;   **F**
  [1977] 3 WLR 752; [1977] 2 All ER 862
*Liverpool City Council v Irwin* [1977] AC 239; [1976] 2 WLR 562; [1976] 2 All
  ER 39, HL(E)
*Owen (Edward) Engineering Ltd v Barclays Bank International Ltd* [1978] QB 159;
  [1977] 3 WLR 764; [1978] 1 All ER 976; [1978] 1 Lloyd's Rep 166, CA
*Shamsher Jute Mills Ltd v Sethia (London) Ltd* [1987] 1 Lloyd's Rep 388
*Standard Trust Co v The Bank of Nova Scotia* (2001) 201 Nfld & PEIR 8
*United City Merchants (Investments) Ltd v Royal Bank of Canada* [1983] 1 AC 168;   **G**
  [1982] 2 WLR 1039; [1982] 2 All ER 720; [1982] 2 Lloyd's Rep 1, HL(E)
*Urquhart Lindsay and Co v Eastern Bank Ltd* [1922] 1 KB 318

APPEAL from the Court of Appeal
  This was an appeal by the claimant, Sirius International Insurance Co
(Publ), with leave of the House given on 8 July 2003, from a decision of the
Court of Appeal (May, Carnwath LJJ and Wall J) dated 4 April 2003, in   **H**
favour of the defendants, FAI General Insurance Ltd and its liquidators
(Anthony McMahon, Thomas Riddell and John Wardrop), which reversed a
decision of Jacob J dated 23 July 2002, in determining a preliminary issue, to
the effect that the proceeds of a letter of credit which had been paid into an

A  escrow account pursuant to a Tomlin order, dated 6 April 2001, belonged to
the claimant.
   The facts are stated in the opinion of Lord Steyn.

   *Geoffrey Vos QC* and *Peter Arden* for the claimant.
   *Gabriel Moss QC* and *Philip Marshall QC* for the defendant.

B  Their Lordships took time for consideration.

   2 December. **LORD BINGHAM OF CORNHILL**
   1   My Lords, left to myself, I should have accepted the interpretation put
by the defendant on the Tomlin order agreed between the parties on 6 April
2001. But no issue of principle on the construction of contracts divides the
parties. The Tomlin order is expressed in terms which are one-off. If the
C  claimant's argument on construction is accepted no point of law of general
public importance arises. I must acknowledge that the judge adopted the
construction favoured by a majority of my noble and learned friends. My
own reasons for favouring a different construction differ from those of the
Court of Appeal. This being so, no purpose is served by expounding the
interpretation which I myself would have put on the Tomlin order, and I am
D  content to accept that favoured by the majority. I would accordingly agree
that the appeal should be allowed.

   **LORD NICHOLLS OF BIRKENHEAD**
   2   My Lords, I have had the advantage of reading in draft the speeches of
my noble and learned friends, Lord Steyn and Lord Walker of
E  Gestingthorpe. For the reasons they give, with which I agree, I would allow
this appeal.

   **LORD STEYN**
   3   My Lords, when leave to appeal was granted by an Appeal
Committee, it may have appeared that important issues regarding the so-
called autonomy principle applicable to letters of credit issued by banks
F  would have to be resolved. Certainly that was the main thrust of the
petition. In the result it has turned out to be unnecessary to examine the
arguments about the autonomy principle. Instead it has become clear that
the appeal should be decided on the basis of the correct contextual
interpretation of two related documents. Those two documents are a side
letter to a letter of credit, agreed between the party setting up the letter of
credit and the beneficiary, and a schedule to a Tomlin order settling a dispute
G  that had arisen between the parties. These two documents are not in
standard form. The interpretation of these documents is, like the
construction of all texts, a matter of law but it does not involve a question of
general public importance. The House would not ordinarily have given
leave to appeal in such a one-off case. But the House is now seized with it,
and the issue must be resolved.

H
   *The commercial context*

   4   Sirius International Insurance Co (Publ) is a company incorporated
under the laws of Sweden. It carries on business as an insurer and reinsurer.
FAI General Insurance Ltd is a company incorporated under the laws of

3254
Sirius Insurance Co v FAI General Insurance (HL(E))                    [2004] 1 WLR
Lord Steyn

New South Wales. It also carries on business as an insurer and reinsurer. It    A
is part of the insolvent HIH insurance group.  FAI is in provisional
liquidation in Australia and in England.  The second to fourth defendants
are FAI's English provisional liquidators, who were appointed as such by an
order made by Hart J on 23 March 2001.

  5   In early 1997 a syndicate at Lloyd's, Agnew, wished to reinsure its
liabilities on its onshore energy account.  FAI offered to act as reinsurer but
Agnew required an "A" rated reinsurer.   FAI was not "A" rated.    B
Accordingly, Agnew required the policy to be fronted by an acceptably rated
reinsurer.  Sirius was an "A" rated reinsurer.  By its letter dated 15 October
1997, Sirius agreed to "front" the reinsurance by writing the policy for
Agnew, and then retroceding it "back to back" to FAI.  For fronting the
reinsurance Sirius received an annual fee of US$65,000.

  6   Sirius duly wrote the reinsurance for Agnew for two periods:    C
1 December 1996 to 31 December 1997 and 31 December 1997 to
31 December 1998 and FAI duly wrote the retrocessions for Sirius for
the same periods.  The premiums for the two years were respectively US$2m
and US$1.6m.  These sums went to FAI.  To summarise: Agnew was the
insurer; Sirius was the fronting reinsurer, and FAI was the retrocessionaire.

  7   By undertaking to act as fronting reinsurer Sirius assumed the risk, in    D
the event of the insolvency or default of FAI, of having nevertheless to pay
Agnew.  The fact that the FAI was not an "A" rated insurance company
underlined the fact of the risk.  Not surprisingly, Sirius required security.
Sirius insisted on a letter of credit from a bank.   A side letter, dated
3 September 1999, which was negotiated between Sirius and FAI, provided:

      "We [Sirius] therefore undertake that we will not agree or pay any    E
    claim presented to Sirius by [Agnew] without FAI's prior agreement in
    writing, nor will we draw down under [the letter of credit], unless
    (1) FAI has agreed that Sirius should pay a claim but has not put Sirius in
    funds to do so, notwithstanding the simultaneous settlements clause in
    our retrocession contract (see below) or (2) [Agnew] obtains a judgment
    or binding arbitration award against Sirius which Sirius is obliged to pay."

Paragraph 3 of the side letter also recorded that    F

      "FAI has already agreed to a simultaneous settlements clause which
    provides that FAI shall pay their share of any loss under the retrocession
    simultaneously with Sirius' payment to Agnew".

Thereafter, FAI (by now acting by its parent HIH) produced a draft letter of
credit.  The terms of the letter of credit, which incorporated the ICC Uniform    G
Customs and Practice for Documentary Credits (1993 Revision), were
approved by Sirius.  On 24 January 2000, Westpac Banking Corpn, an
Australian bank, produced an irrevocable standby letter of credit for US$5m
in the terms agreed by the parties.  Westpac was not aware of the terms of the
side letter.

*The dispute*    H

  8   By this time, Agnew had claimed against Sirius under the
reinsurances, and a dispute had developed as to whether the reinsurances
written by Sirius and, consequent upon that, the retrocessions written by
FAI, should respond to the claims.  On 23 March 2000, Lambert Fenchurch

A   Ltd (Agnew's brokers), Agnew and Sirius entered into a funding agreement whereby, inter alia, Lambert Fenchurch agreed to fund Agnew in respect of its paid losses due under the reinsurances and Sirius agreed to permit Lambert Fenchurch to commence proceedings on its behalf to enforce Sirius' rights under the retrocessions. Prior to the funding agreement, Sirius had suggested an ad hoc arbitration between Agnew and FAI. FAI refused to engage in such an arbitration. In May 2000, Sirius started arbitration B  proceedings against FAI claiming to be entitled to payment by FAI under the retrocessions which issue necessarily involved the question whether Sirius was liable to Agnew. On 15 March 2001, provisional liquidators were appointed in Australia over FAI. On 23 March 2001, provisional liquidators were appointed in England by Hart J. This had the effect, under section 130(2) of the Insolvency Act 1986, of automatically staying the C  arbitration proceedings.

*The Tomlin order*

    9  Sirius applied to court for a lifting of the automatic stay on the arbitration, which was by then about to come to a lengthy substantive hearing. By that time the provisional liquidators were running FAI. The D  application to lift the automatic stay on the arbitration were compromised between Sirius and the provisional liquidators of FAI by a Tomlin order dated 6 April 2001. The material terms of the Tomlin order were as follows:

     "1 FAI General Insurance Co Ltd ('FAI') is indebted to the applicant [Sirius] in the sum of US$22,500,000 and the applicant shall be entitled to prove in the liquidation or scheme of arrangement of FAI in the said sum E  of US$22,500,000. 2 [Sirius] shall draw down on Westpac Banking Corporation's Irrevocable Standby Letter of Credit No 772 dated 3 February 2000 ('the LOC'). 3 [Sirius] shall pay the proceeds of the LOC ('the proceeds') into an escrow account to be held together with accrued interest thereon by Reynolds Porter Chamberlain pending the resolution of the parties' claims (if any) in respect of the LOC. 4 For the F  avoidance of doubt, the position and all arguments of the applicant and the respondents in respect of the LOC are preserved in respect of the proceeds notwithstanding the terms of this schedule. 5 Save for the parties' rights with respect to the LOC and the agreements associated to the LOC, the terms herein shall be in full and final settlement of all claims raised by either party in the arbitration proceedings."

G  On about 12 June 2001, the letter of credit was drawn down in accordance with its terms and the proceeds were placed in escrow pursuant to the Tomlin order.

*The proceedings*

    10  On 31 July 2001, Reynolds Porter Chamberlain, on behalf of Sirius, demanded payment of the sums held in escrow. The demand was not H  acceded to and these proceedings were commenced by Sirius by application dated 19 September 2001. On 27 May 2002, Mr Registrar Baister directed that certain questions be determined as preliminary issues: namely (a) what were the conditions upon which Sirius could draw down the letter of credit and (b) whether those conditions were satisfied.

3256
Sirius Insurance Co v FAI General Insurance (HL(E))                    [2004] 1 WLR
Lord Steyn

A  11   On 23 July 2002, Jacob J [2003] 1 WLR 87 decided that the first condition of the side letter had been satisfied by the terms of paragraph 1 of the Tomlin order and gave directions for the future conduct of the application and also gave FAI permission to appeal. In respect of the first condition of the side letter Jacob J observed, at p 94, para 26:

B  "[Counsel for FAI] submitted that FAI had never agreed that Sirius should pay a claim. [Counsel for Sirius] says that FAI in effect did so by clause 1 of the Tomlin schedule. By that clause FAI acknowledged an indebtedness of US$22·5m to Sirius. Everyone knew that there was a back-to-back arrangement in place, that the US$22·5m would inure for Agnew's benefit. So in substance, submitted [counsel for Sirius], FAI agreed to payment by Sirius. They knew exactly who was really getting the benefit of clause 1 of the settlement agreement. I think that is right. No one ever thought that the right to the US$22·5m was really that of Sirius. The commercial substance is that FAI had agreed that Sirius should pay a claim."

C

12   On 4 April 2003, the Court of Appeal reversed the decision of the judge. The Court of Appeal [2003] 1 WLR 2214 held that the first condition of the side letter had not been satisfied and decided that FAI was entitled to the proceeds of the letter of credit. On the point of interpretation May LJ concluded, at pp 2222–2223, para 21:

D

"[Counsel for Sirius] accepted that the second condition of the 3 September 1999 agreement was not and is not fulfilled. He accepted that the first condition was not fulfilled before the Tomlin order. He accepted that the literal words of paragraph 1 do not express an agreement by FAI that Sirius should pay Agnew's claim. Creative construction or implication is required to interpret it as doing so. He accepted, I think, that an award in contested arbitration proceedings would not have fulfilled the first condition. But the Tomlin order, he said, embodied an agreement not an award, and the agreement that Sirius should be entitled to prove in FAI's liquidation or administration for US$22·5m necessarily carried with it an agreement by FAI that Sirius should pay Agnew's claim. I do not think so."

E

F

Carnwath LJ agreed, at p 2227, para 34, and Wall J came to the same conclusion, at p 2228, para 39. The Court of Appeal held that FAI were entitled to the proceeds of the letter of credit in the escrow account. The effect was Sirius became an unsecured creditor in the insolvency of FAI.

13   Sirius now appeals to the House of Lords.

G

*The issues*

14   The statement of issues agreed between the parties reads as follows:

"(1) Whether paragraph 1 of the Tomlin order, on its true construction, constituted an agreement by FAI that [Sirius] should pay Agnew and thereby satisfied the first of the conditions for draw down set out in the agreement. (2) Whether, having regard to paragraphs 4 and 5 of the Tomlin order, any of the provisions of that order can be construed as taking away FAI's argument that it was entitled to the proceeds of the letter of credit as a result of non-compliance with the conditions of draw

H

3257

[2004] 1 WLR                    Sirius Insurance Co v FAI General Insurance (HL(E))
                                                                    Lord Steyn

A   down in the agreement. (3) Whether, in the event that [Sirius] could not
    establish that the agreed conditions for draw down were satisfied, it
    follows that draw down in breach of the agreement gave rise to an
    entitlement on the part of FAI to the proceeds of the letter of credit, as
    opposed to a claim in damages. This question raises the following issues:
    (a) Whether the effect of the autonomy principle, which is applicable to
B   letters of credit and all other documentary credits, is such as to give
    [Sirius] the right to the proceeds, leaving FAI with its claim in damages; or
    (b) Whether, in the circumstances of this case, FAI is entitled to the
    proceeds."

    *The point of construction*

C       15   The principal question is whether the first condition of the side letter
    was satisfied by the terms of paragraph 1 of the Tomlin order.
        16   The judge ended his trenchant judgment by saying, at p 94, para 28:

        "I reach this conclusion without regret. The truth is that FAI got the
        benefit of Sirius fronting the deal. The price of that was the provision
        of the letter of credit. The letter of credit was properly drawn down. It was
D       there to meet just the eventualities that happened."

    This was a reference to the merits of the underlying dispute. In the
    construction of commercial documents a hard-headed approach is
    necessary. The merits of the underlying dispute, predating the Tomlin order,
    were as such entirely irrelevant to the determination of the question of
    construction. But the matrix of the Tomlin order may cast light on its
E   meaning.
        17   Turning now to the two documents to be considered, the meaning of
    the first condition of the side letter is not in doubt. It stipulates as a pre-
    condition for draw down under the letter of credit that: "FAI has agreed that
    Sirius should pay [to Agnew] a claim but has not put Sirius in funds to do so,
    notwithstanding the simultaneous settlements clause . . ." (Words in square
    brackets inserted). No dispute about the meaning of this precondition
F   emerged during the oral hearing of the appeal. The critical question is
    whether the terms of paragraph 1 of the Tomlin order satisfied this
    condition.
        18   The settlement contained in the Tomlin order must be construed as a
    commercial instrument. The aim of the inquiry is not to probe the real
    intentions of the parties but to ascertain the contextual meaning of the
    relevant contractual language. The inquiry is objective: the question is what
G   a reasonable person, circumstanced as the actual parties were, would have
    understood the parties to have meant by the use of specific language. The
    answer to that question is to be gathered from the text under consideration
    and its relevant contextual scene.
        19   There has been a shift from literal methods of interpretation towards
    a more commercial approach. In *Antaios Compania Naviera SA v Salen*
H   *Rederierna AB* [1985] AC 191, 201, Lord Diplock, in an opinion concurred
    in by his fellow Law Lords, observed: "if detailed semantic and syntactical
    analysis of a word in a commercial contract is going to lead to a conclusion
    that flouts business common sense, it must be made to yield to business
    common sense." In *Mannai Investment Co Ltd v Eagle Star Life Assurance*

3258
Sirius Insurance Co v FAI General Insurance (HL(E))           [2004] 1 WLR
Lord Steyn

*Co Ltd* [1997] AC 749, 771, I explained the rationale of this approach as     A
follows:

> "In determining the meaning of the language of a commercial
> contract . . . the law . . . generally favours a commercially sensible
> construction.   The reason for this approach is that a commercial
> construction is more likely to give effect to the intention of the parties.
> Words are therefore interpreted in the way in which a reasonable     B
> commercial person would construe them.   And the standard of the
> reasonable commercial person is hostile to technical interpretations and
> undue emphasis on niceties of language."

The tendency should therefore generally speaking be against literalism.
What is literalism? It will depend on the context. But an example is given in     C
*The Works of William Paley* (1838 ed), vol III, p 60. The moral philosophy
of Paley influenced thinking on contract in the 19th century. The example is
as follows: the tyrant Temures promised the garrison of Sebastia that no
blood would be shed if they surrendered to him. They surrendered. He shed
no blood. He buried them all alive. This is literalism. If possible it should be
resisted in the interpretative process.   This approach was affirmed by the
decisions of the House in *Mannai Investment Co Ltd v Eagle Star Life*     D
*Assurance Co Ltd* [1997] AC 749, 775E–G, per Lord Hoffmann and in
*Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896, 913D–E, per Lord Hoffmann.

   20   From the surrounding circumstances preceding the making of the
Tomlin order, and the text of the Tomlin order, it can be inferred that the
parties had two major immediate objectives.   First, they desired to
compromise an arbitration that would have been long and costly.   This     E
objective was achieved by paragraph 5 of the Tomlin order.  Secondly, the
letter of credit had been extended but was due to expire on 15 November
2001.  Both parties wanted to obtain a draw down of the letter of credit on
terms which left open the issue of the entitlement of the proceeds of the draw
down. Paragraph 2 of the Tomlin order provided for the draw down.

   21   That brings me directly to the effect of paragraph 1 of the Tomlin     F
order read in context of the remainder of the paragraphs of the schedule to
it.  At first glance there are countervailing indications.  Counsel for Sirius
emphasised the unqualified acknowledgement of indebtedness in a specific
sum in paragraph 1. While literally paragraph 1 recorded the indebtedness
of FAI to Sirius, counsel for Sirius argued that by reason of the back-to-back
fronting arrangement, and the simultaneous settlement clause referred to in
the side letter itself, paragraph 1 necessarily meant that FAI acknowledged     G
the indebtedness of Sirius to Agnew in the same sum.  At the very least, he
argued, it meant that FAI accepted that the insured events had occurred and
that liability in the sum of $22·5m had been incurred under the matching
reinsurances and retrocessions. As against this counsel for FAI relied heavily
on the words in paragraph 4 that *"all* arguments of [Sirius] and [FAI] are
preserved in respect of the proceeds notwithstanding the terms of this
schedule".  His primary argument was that paragraph 1 must be read as     H
entirely subordinate to paragraph 4.  He submitted that the very fact that it
was agreed that the proceeds would be paid into an escrow account, rather
than be paid over to Sirius, supported this argument.

*The Weekly Law Reports   17 December 2004*

3259

[2004] 1 WLR                    Sirius Insurance Co v FAI General Insurance (HL(E))
                                                                    Lord Steyn

A     22   If this argument of FAI is accepted, it follows inexorably that by
virtue of the terms of the settlement in the Tomlin order Sirius abandoned
the chance of ever fulfilling either condition of the side letter. That must be
so since the arbitration proceedings were compromised. In his judgment the
judge trenchantly commented on such an outcome, at p 93, paras 21–22:

B       "If one follows the logic of [the] argument through, its effect is that the
letter of credit was agreed at the time to be unenforceable. It might as
well have been torn up by the agreement . . . This is such a bizarre
conclusion that it cannot be right."

On this point May LJ came to the same conclusion. He said, at p 2222,
para 19:

C       "In my judgment, the judge was correct to reject FAI's extreme
submissions based on paragraphs 4 and 5 of the schedule to the Tomlin
order. The short point is that paragraphs 4 and 5 cannot, in my view, be
read as leaving open for future contention that which paragraph
1 compromised. Paragraph 1 compromised the arbitration proceedings.
It did not purport to determine questions arising out of the letter of credit.
Available arguments as to the letter of credit were preserved, but the
D   indebtedness of FAI to Sirius under the retrocessions was determined."

Carnwath LJ agreed with the judgment of May LJ and in a separate
judgment Wall J took the same view. In my view the outcome contemplated
by the argument of counsel for FAI is so extraordinary as to be commercially
implausible.
  23   I would accept the argument of counsel for Sirius and reject the
E   argument of counsel for FAI. It does not follow from this conclusion that the
reservation of rights under paragraph 4, and the payment of the proceeds
into the escrow account, is to be given no meaning. These features of the
settlement were intended to enable the English provisional liquidators to
decide whether, and if so, in what manner, they might wish to challenge
Sirius' right to the proceeds of the letter of credit. One must bear in mind
that the provisional liquidators took office only 13 days before the Tomlin
F   order and probably knew very little about the background. The reservation
of rights would, for example, have entitled them to rely, for example, on
dishonesty in the underlying transaction if that could be established. Only in
such an attenuated sense were rights reserved. Given this reservation of
rights, the arrangement to pay the proceeds into an escrow account was not
surprising.
G     24   For all these reasons I would reject the primary argument of counsel
for FAI.
  25   That leaves the reasoning of the Court of Appeal to the effect "that
the literal words of paragraph 1 do not express an agreement by FAI that
Sirius should pay Agnew's claim": p 2223, para 21, per May LJ and p 2228,
para 39, per Wall J. It is indeed true that literally paragraph 1 did not so
provide. But it is also clear that the words of paragraph 1 necessarily meant
H   that FAI agreed that, under the back to back reinsurances, and the
simultaneous settlements procedure, that Sirius should pay Agnew. If it
were necessary I would reach this conclusion on the basis of a constructional
implication. I do not, however, think that it is necessary to resort to an
implication. In my view the judge was right to conclude that on a correct

3260
Sirius Insurance Co v FAI General Insurance (HL(E))                    [2004] 1 WLR
Lord Steyn

interpretation of paragraph 1 of the Tomlin order the first condition of the    A
side letter was satisfied.  With due respect to the members of the Court of
Appeal their interpretation was uncommercial and literalistic.

26   Given this conclusion it is common ground that all remaining issues
fall away.

27   For these reasons, as well as the reasons given by my noble and
learned friend, Lord Walker of Gestingthorpe, I would allow the appeal
against the order of the Court of Appeal and restore the order of Jacob J.    B

**LORD WALKER OF GESTINGTHORPE**

28   My Lords, I have had the advantage of reading in draft the speech of
my noble and learned friend, Lord Steyn.  I agree with it, and for the reasons
which he gives I would allow this appeal.  But because of the differences of
opinion between your Lordships on the first issue, the issue of construction,    C
I wish to add a few observations in my own words.

29   The House has to construe two contractual documents which
interact on each other.  One is a letter dated 3 September 1999 written by
Ms Monica Cramer Manhem, a senior vice-president of the principal
company in the group which includes the appellant, Sirius.  The letter is part
of an exchange of correspondence between reinsurance executives, and none
of the correspondence appears to have been drafted by lawyers.  The other    D
document is the schedule to a Tomlin order made on 6 April 2001.  The
order was made on what had originally been an application to lift a stay of
arbitration proceedings between Sirius and the first respondent, FAI.  It had
the effect of bringing the arbitration proceedings to an abrupt end.  What
further effect it had is a matter of acute controversy, on which Jacob J and
the Court of Appeal reached different conclusions.    E

30   The Tomlin order was drafted by competent and experienced
lawyers (the House was not told its exact provenance, but both sides had
solicitors and counsel of high standing).  But it seems to have been produced
under severe time constraints, and at a time when (because of the recent
appointment of provisional liquidators with solicitors and counsel who were
new to the matter) one side at least was by no means well informed about the
tangled history of these reinsurances.  Sirius (and the brokers, Lambert    F
Fenchurch, who were in substance conducting the arbitration in the name of
Sirius) had much more opportunity to become acquainted with the
complexities of the position but for them too FAI's dramatic plunge into
insolvency was a new factor calling for specialised advice.

31   When a commercial dispute arises it is sometimes convenient to both
sides to reach a limited agreement involving some immediate action, but to    G
leave other issues unresolved, to be compromised or litigated at some future
time.  In the present case it is reasonably clear—whatever other difficulties
there are about the construction and effect of the schedule to the Tomlin
order—that both sides wanted to achieve two immediate objectives.  One
was to put an end to the arbitration proceedings, in which a long and
expensive hearing was due to start very soon.  The other was to obtain draw-
down on the letter of credit (which had been extended but was to expire on    H
15 November 2001) while leaving open the issue of entitlement to the
proceeds of the draw-down.

32   When parties are under severe time pressure, and one or both of
them have inadequate information, such a limited agreement may be all that

3261

[2004] 1 WLR                    Sirius Insurance Co v FAI General Insurance (HL(E))
                                              Lord Walker of Gestingthorpe

A   the parties can achieve. But in such difficult circumstances they may have to
    accept that the immediate action on which they do agree inevitably alters the
    context of the issues which remain unresolved. For instance, a consent order
    for sale of equipment subject to a finance lease may raise the question
    whether relief from forfeiture, which the lessee was seeking from the court,
    is still available (see the decision of this House in *On Demand Information
    plc v Michael Gerson (Finance) plc* [2003] 1 AC 368, especially in the speech
B   of Lord Millett, at p 381, paras 36–39).
        33   So in this case the two important points on which the parties did
    agree inevitably had an effect on the issues which were not resolved.
    Paragraphs 1 and 5 of the schedule had the effect of putting a final end to the
    arbitration. It was no longer possible for Sirius to obtain declaratory relief
    (sought, in addition to a money award, in the arbitration) to the effect that
C   Sirius was bound to pay Agnew and FAI was bound to pay Sirius. Moreover,
    paragraphs 2 and 3 of the schedule had the effect that Westpac, the issuer of
    the letter of credit, dropped out of the picture. The escrow account was a
    sort of substitute for the letter of credit but it was of a different kind, as the
    element of "the great and fundamentally important separation" (the
    expression used by Sir John Donaldson MR in *Bolivinter Oil SA v Chase
    Manhattan Bank (Practice Note)* [1984] 1 Lloyd's Rep 251, 256) between
D   banker and re-insurers was no longer there. The deceptively simple
    language of para 4 of the schedule must in my view be approached with these
    points in mind.
        34   The terms in the schedule, and paragraph 4 in particular, must also
    be viewed, like any other contractual document, in their commercial
    context. In this House there was not much common ground between
E   counsel as to how the commercial context of the Tomlin order should be
    characterised. The courts below saw much more of the extensive
    documentary evidence than has been placed before your Lordships. But the
    limited evidence before the House discloses some uncontroversial facts
    which may be material. (a) The order of Mr Registrar Baister made on
    27 May 2002 (that is, more than a year after the Tomlin order) shows that
    there was still no agreement as to what the basic contractual documents
F   were. Between August 1999 and January 2000 there had been a lengthy
    exchange of correspondence (identified in the affidavit dated 18 September
    2001 of Mr Timothy Brown of Reynolds Porter Chamberlain and the
    witness statement dated 2 November 2001 of Ms Kathryn Carr of Ince &
    Co) from which the effective contractual terms had to be identified and
    extracted. (b) In an affidavit made on 5 April 2001 (that is, the day before
G   the Tomlin order) Mr Timothy Bull of Reynolds Porter Chamberlain
    deposed (in relation to the letter of 3 September 1999) to his belief that: "The
    agreement does not say so however the intention is that FAI's written
    agreement would not be unreasonably withheld." Whether or not this was
    admissible or cogent on the issue of construction of the letter, it appears to
    have been the only clear instance of an argument about the letter of credit
    put forward openly before the making of the Tomlin order. (c) There is
H   mention (in a letter dated 31 July 2001 from Reynolds Porter Chamberlain
    to Freshfields Bruckhaus Deringer, and also in an affidavit of Mr Timothy
    Brown of Reynolds Porter Chamberlain sworn on 18 September 2001) of a
    suggestion put forward on behalf of the provisional liquidators that (in the
    words of the letter) "the security given by the LOC must be 'downgraded' as

3262
Sirius Insurance Co v FAI General Insurance (HL(E))                    [2004] 1 WLR
Lord Walker of Gestingthorpe

a result of FAI's insolvency to security for any distribution in the estate of      A
FAI". This suggestion was evidently put forward after the appointment of
the provisional liquidators but before the Tomlin order. (d) However, it
does not seem to have been a considered view, since on 7 August 2001
Freshfields (for the provisional liquidators) stated that their clients had still
not had an opportunity to acquaint themselves with the facts and take a view
as to the merits of Sirius's claim. In order to do so they would need (among
other things) to contact Ince & Co (who had acted for FAI at the time).      B
Freshfields' state of knowledge on 6 April 2001 must have been even more
deficient. (e) In her witness statement of 2 November 2001 Ms Carr put
forward further arguments (based on allegations of champerty and
misrepresentation) on behalf of the provisional liquidators but there is no
suggestion that these arguments were live at the date of the Tomlin order.

35    Against that background I turn to paragraph 4 of the schedule to the      C
Tomlin order:

    "For the avoidance of doubt, the position and all arguments of [Sirius]
    and [FAI and the provisional liquidators] in respect of the LOC are
    preserved in respect of the proceeds notwithstanding the terms of this
    schedule."

Meticulous verbal analysis of this paragraph is not appropriate, at any rate      D
not to the exclusion of common sense, or its commercial context.
Nevertheless I make three short verbal points. First, the words "For the
avoidance of doubt", although sometimes loosely used, suggest that the
paragraph is going to spell out what is fairly obvious (or at any rate
unsurprising) rather than subverting the other provisions of the schedule.
Second, the reference to arguments being "preserved" cannot in the      E
circumstances sensibly restrict the parties to arguments which had already
been articulated and advanced (compare the mirror-image issue of the
release of unknown claims considered by this House in *Bank of Credit and
Commerce International SA v Ali* [2002] 1 AC 251); at the time when the
Tomlin order was made there seems to have been doubt even as to the
identity of the relevant contractual documents. Any arguments, whether or
not already canvassed, could be put forward (the parenthesis " (if any)" in      F
paragraph 3 is consistent with that). Third, the repetition of "in respect of"
("the arguments . . . in respect of the LOC are preserved in respect of the
proceeds") is not careless drafting but serves to emphasise the intended
parallel between the letter of credit before draw-down and the proceeds after
draw-down.

36    Then there are the most controversial words in paragraph 4,      G
"notwithstanding the terms of this schedule". Plainly they are intended to
have some sort of overriding effect: in particular, since the issues left
unresolved centre on the letter of credit, to require entitlement to the letter of
credit to be determined as if there had been no draw-down.      That
hypothetical approach may give rise to more difficulties than the parties had
fully thought through, but it is consistent with their commercial objectives.

37    Does the schedule intend the hypothesis to be stretched further, so as      H
to require the apparently unqualified acknowledgement in paragraph 1 of
FAI's liability to be disregarded in determining entitlement to the proceeds of
the letter of credit? The judge thought that that would be an extraordinary
result. He said, at p 93, paras 21–22:

3263
[2004] 1 WLR                Sirius Insurance Co v FAI General Insurance (HL(E))
                                    Lord Walker of Gestingthorpe

A       "If one follows the logic of [the] argument through, its effect is that the
        letter of credit was agreed at the time to be unenforceable. It might as
        well have been torn up by the agreement . . .  This is such a bizarre
        conclusion that it cannot be right."

        38  In the Court of Appeal May LJ took the same view.  He said,
        at p 2222, para 19:

B       "In my judgement, the judge was correct to reject FAI's extreme
        submissions based on paragraphs 4 and 5 of the schedule to the Tomlin
        order.  The short point is that paragraphs 4 and 5 cannot, in my view, be
        read as leaving open for future contention that which paragraph
        1 compromised.  Paragraph 1 compromised the arbitration proceedings.
        It did not purport to determine questions arising out of the letter of credit.
C       Available arguments as to the letter of credit were preserved, but the
        indebtedness of FIA to Sirius under the retrocessions was determined."

        Carnwath LJ agreed with May LJ; and Wall J expressed similar views.
        39  The ground on which the Court of Appeal disagreed with the judge
        was not as to a far-reaching counterfactual hypothesis introduced by
        paragraph 4, but as to the proper meaning of paragraph 1, construed in its
D       commercial context.  On that point, for all the reasons given by Lord Steyn,
        I respectfully prefer the reasoning of the judge to that of the Court of Appeal.
        As the judge said, at p 94, para 26: "The commercial substance is that
        FAI had agreed that Sirius should pay a claim." For these reasons I would
        allow the appeal.

        LORD BROWN OF EATON-UNDER-HEYWOOD
E       40  My Lords, I find myself in precisely the same position as my noble
        and learned friend, Lord Bingham of Cornhill.  I too was inclined to the
        construction of the Tomlin order contended for by the defendants.  For the
        reasons given by Lord Bingham, however, I too am content to agree that
        the appeal should be allowed.

                                                        Appeal allowed.
F
        Solicitors: Reynolds Porter Chamberlain; Ince & Co.

                                                                B L S

G                              ————

H

Appeal Board, having considered the evidence relating to *Ionian Pioneer*, held that the sellers had failed to exclude the shippers of goods on that vessel from the category of potentially relevant shippers. This question of fact was essentially one for the board and the board did not, as Mr. Tugendhat suggested, erroneously reverse the burden of proof when making their finding.

I agree and I prefer to rest my judgment on this one short ground.

I would dismiss the appeal and affirm the Judge's order.

**Lord Justice MANN:** I agree.

**Lord DONALDSON of LYMINGTON M.R.:** I also agree.

[*Order: Appeal dismissed with costs. Leave to appeal to the House of Lords refused.*]

---

### COURT OF APPEAL

July 14, 1988

SOHIO SUPPLY CO.
v.
GATOIL (USA) INC.

Before Lord Justice STAUGHTON
and SIR DENYS BUCKLEY

Sale of goods (f.o.b.) — Letter of credit — Buyers required to open letter of credit 10 days prior to estimated loading date — Meaning — Whether buyers in breach — Proceedings commenced by buyers in Texas — Whether applications to stay or set aside proceedings should be granted — Whether buyers should be restrained from proceeding in the Texan Court.

By a contract concluded at the end of January 1986 the sellers agreed to sell to the buyers 600,000 barrels of Brent crude oil f.o.b. Sullom Voe. The contract provided inter alia.

Three days Load Declaration:

Seller(s) shall declare by 1700 hours (London time) a 3-day load range no later than the 15th day prior to the 1st of the said load range. In the event that the 15th day prior to the first day of the said three days load range falls on a Saturday, Sunday, or London Bank Holiday, such declaration to buyer shall be given by 1700 hours (London time) on the last preceding business day.

Letter of Credit:

Buyer shall post an irrevocable documentary Letter of Credit 10 days prior to estimated load date in a form and with a bank acceptable to Sohio. All bank charges will be for Buyer's account.

The contract was to be governed by English law.

On Mar. 5, 1986 the sellers declared their three-day range as Mar. 22–24. The sellers took the view that the letter of credit should have been opened 10 days prior to the first day of the three-day load range which was Mar. 12. No letter of credit was opened and on Mar. 13 the sellers treated the buyers' conduct as being in breach of condition and terminated the contract.

On Mar. 17 the buyers gave instructions to their Texas solicitors to commence proceedings in Texas. At the same time the plaintiffs instructed English solicitors. They commenced proceedings in England and on Mar. 24, 1986 the sellers were given leave to issue a writ for service out of jurisdiction. The buyers commenced proceedings in Texas on Mar. 25 and on Mar. 27 the sellers issued their writ in England and in due course it was served.

The buyers applied (1) to set aside the leave given for service out of the jurisdiction; (2) for a stay of the English proceedings on the ground that England was not the appropriate forum and (3) to

C.A.]            Sohio v. Gatoil            [STAUGHTON, L.J.

dismiss the English action for want of prosecution. The sellers applied for an injunction to restrain the buyers from proceeding in the Texan Court.

———— *Held*, by PHILLIPS, J., that the buyers applications would be dismissed; the sellers were entitled to an injunction.

The buyers appealed.

———— *Held*, by C.A. (STAUGHTON, L.J. and Sir DENYS BUCKLEY) that (1) the sellers had a good arguable case that the letter of credit should have been opened 10 days before the first day of the three-day load range and the application to set aside the service would be refused (*see* p. 591, col. 2);

(2) in granting the injunction the learned Judge took into account the delay and the fact that it had caused no real prejudice to the buyers and the learned Judge's exercise of his discretion on this point should not be interfered with; further the Texan action was an action for a negative declaration commenced by the buyers when they were apprehensive that proceeding's might be commenced against them in England and such proceedings ought not to be encouraged; and it was inherently undesirable that there should be concurrent proceedings in different jurisdiction about the same subject matter; the buyers' appeal would be dismissed (*see* p. 592, col. 2; p. 593, col. 1).

———

The following cases were referred to in the judgment of Lord Justice Staughton:

E. I. Du Pont de Nemours & Co. Inc. v. I. C. Agnew, (C.A.) [1987] 2 Lloyd's Rep. 585;

Hoerter v. Hanover, (1893) 10 T.L.R. 103;

*Lisboa*, The (C.A.) [1980] 2 Lloyd's Rep. 546;

Prenn v. Simmonds, (H.L.) [1971] 1 W.L.R. 1381;

Saipem S.p.A. v. Dredging V02 B.V., (C.A.) [1988] 2 Lloyd's Rep. 361;

Spiliada Maritime Corporation v. Cansulex Ltd., (H.L.) [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460.

———

This was an appeal by the defendant buyers, Gatoil (USA) Inc. from the decision of Mr. Justice Phillips dismissing their applications to stay or set aside the proceedings brought by the plaintiffs Sohio Supply Co. against the defendants in respect of a contract for the sale of Brent Crude Oil.

Mr. A. G. S. Pollock, Q.C. and Mr. Julian Flaux (instructed by Messrs. Stephenson Harwood) for the defendants; Mr. Stephen Tomlinson, Q.C. (instructed by Messrs. Norton Rose Botterell & Roche) for the plaintiff.

The further facts are stated in the judgment of Lord Justice Staughton.

## JUDGMENT

**Lord Justice STAUGHTON:** In this appeal and application the appellants and applicants are Gatoil (USA) Inc.; they are the defendants in an English action and were the buyers of a quantity of Brent crude oil. The respondents are the Sohio Supply Co., plaintiffs in the English action and sellers of the Brent crude oil. The problem arises from a contract concluded at the end of January, 1986 for the sale of 600,000 barrels of Brent crude oil f.o.b. Sullom Voe. I must refer to some of the terms of that contract in a moment.

The sellers, Sohio, are a company registered in Delaware; they carry on business in Ohio. The buyers, Gatoil, are likewise registered in Delaware; they carry on business in Texas and they are, we are told, very probably controlled from Geneva.

The contract came about as follows. On Jan. 28, 1986 Sohio sent a telex to Gatoil proposing the purchase of the 600,000 barrels. The shipment period was Mar. 1 to 31, 1986. There were a number of other terms in that proposal; one read:

Three days Load Declaration:

Seller(s) shall declare by 1700 hours (London time) a 3-day load range no later than the 15th day prior to the 1st of the said load range. In the event that the 15th day prior to the first day of the said three days load range falls on a Saturday, Sunday, or London Bank Holiday, such declaration to buyer shall be given by 1700 hours (London time) on the last preceding business day.

There was another important term:

Letter of Credit:

Buyer shall post an irrevocable documentary Letter of Credit 10 days prior to estimated load date in a form and with a bank acceptable to Sohio. All bank charges will be for Buyer's account.

Then there was another term proposed:

Governing Law.

This agreement shall be governed by the Laws of England.

That is followed by:

Other terms and conditions.

BP's "Standard Terms and Conditions for the Purchase and Sale of Crude Oil FOB Port of Loading" are hereby incorporated by reference and shall prevail unless superseded by the terms contained herein.

To that there was a reply from Gatoil on the next day, Jan. 29, 1986:

**LLOYD'S LAW REPORTS** [1989] Vol. 1

STAUGHTON, L.J.] Sohio v. Gatoil [C.A.

We are in receipt of your telex dated 28th January 1986 outlining the terms and conditions governing above referenced transaction and we are in agreement with said terms and conditions except with the following modification.

Then in par. 5 they said:

Under "Governing Law" please insert "Under the jurisdiction of the English courts without recourse to arbitration" after "port of loading".

The reference to "after port of loading" is a little misleading, as those words had occurred somewhat higher up in the original proposal from Sohio.

The mention of arbitration is explained by the fact that the BP conditions contain a term providing for arbitration in England.

On Jan. 31, 1986 Sohio replied by telex as follows:

In response to your 1/29/86 telex modification of our original contract telex. We confirm our agreement to your changes as worded.

So there a contract was concluded which contained the term that it should be governed by English law and also the term—

. . . Under the jurisdiction of the English Court without recourse to arbitration.

It should be said that the BP conditions do make some provision as to the nomination by a buyer in a f.o.b. contract of his ship, and the giving of an estimate as to when that ship will arrive; but that provision was drafted with reference to quite different circumstances, and afforded no effective term as to nomination or estimation of arrival date appropriate to the contract in this case.

The facts are that on Mar. 6, 1986 the sellers declared their three-day range as Mar. 22 to 24. Ten days before Mar. 22 is Mar 12. March 12 came and went without the buyers opening any letter of credit. It would seem that the market price of Brent crude oil had fallen considerably. On Mar. 13 the sellers took the view that the buyers were in breach of condition and treated the contract as at an end. It is agreed that the term as to provision of a letter of credit was a condition which had to be strictly complied with.

The question is what it meant when it said that the letter of credit was to be provided "ten days prior to estimated loading date". The sellers say that it meant 10 days prior to the first day of the three-day load range. The buyers say that it did not mean that; either it meant the last day of the three-day load range, which is the last day on which the buyers could properly estimate that the ship would arrive; or it meant that date, if any, upon which the buyers should estimate the ship to arrive.

So the contract was purportedly terminated on Mar. 13 1986. There followed a most unusual flurry of litigation. We are told that on Mar. 17 the buyers gave instructions to their Texas solicitors to commence proceedings in Texas. Presumably those proceedings were to be for a declaration that they were not liable, because the buyers had lost nothing by being released from this unprofitable contract. At the same time the sellers instructed English solicitors. Those solicitors decided to commence proceedings in England. They telephoned another English solicitor on Mar. 21 because they knew that he commonly acted for Gatoil and they wished, as a matter of courtesy, to discover whether he had instructions to accept service of proceedings. The other English solicitor said that, although he commonly did act for Gatoil, he did not have any such instructions. The suggestion is that he promptly telephoned Gatoil, or sent them some message, warning them that English proceedings were imminent. That has not been denied, but it is to be observed that the buyers had already given instructions for their proceedings in Texas.

On Mar. 24, 1986 Mr. Justice Bingham gave the sellers leave to issue a writ for service out of jurisdiction. On the following day, Mar. 25, the buyers commenced their proceedings in Texas. Two days later, on Mar. 27, the sellers issued their writ in England and in due course it was served.

There was then a somewhat sterile wrangle as to whether the sellers' solicitors had to provide a copy of the affidavit which they put before Mr. Justice Bingham, and its exhibits. On May 9, 1986 the buyers issued and served a summons under O.12, r. 8 to set aside the English proceedings. The sellers correspondingly, on May 19, 1986, served a plea in abatement in the Texas proceedings. That, we are told, is a plea which could only succeed if there had been another action started before the Texas action. Both sides made submissions to the Texan Court; the sellers also filed a plea in answer to the merits, subject to their plea in abatement. On July 3, 1986 the Texan Court dismissed the application made by the plea in abatement.

There followed a period of some six months in which the buyers, through their Texan and English solicitors, were pressing the sellers to agree to abandon the English proceedings and to accept that there would be proceedings in

C.A.]                     Sohio v. Gatoil                     [STAUGHTON, L.J.

Texas only. The sellers' solicitors were extremely dilatory in obtaining instructions in answer to that suggestion. Eventually, on Jan. 6, 1987, they just said that they were unable to accept it.

Then there was a short period of without prejudice negotiations, ending in February, 1987. Next, the buyers' Texan lawyers set about taking statements from potential witnesses.

Then in June two things happened; it is open to argument, but quite immaterial, which happened first. On the one hand the sellers' solicitors in England gave notice of intention to proceed and mentioned that they would be issuing a summons for an injunction restraining the Texas proceedings. On the other hand, the buyers' Texan lawyers gave notice of their intention to apply to the Texan Court for an order for depositions. Thus it was that there came before Mr. Justice Phillips four applications. The first, by the buyers, was to set aside the leave given by Mr. Justice Bingham for service out of the jurisdiction. The second, also by the buyers, was for a stay of the English proceedings on the ground that England was not the appropriate forum. The third, also by the buyers, was to dismiss the English action for want of prosecution. The fourth application, by the sellers, was to restrain the buyers from proceeding in the Texan Court.

On Oct. 9, 1987 Mr. Justice Phillips dismissed the buyers' three applications and granted the sellers' application for an injunction. The buyers now apply for leave to appeal in respect of Mr. Justice Phillips' dismissal of their three applications; they also appeal, but do not need leave, against the grant of an injunction to the sellers.

I deal firstly with the application for leave to appeal against the refusal to set aside service out of the jurisdiction. The argument here turns on whether the sellers have a good arguable case. They say, firstly, that the contract means what they say it means, and that the letter of credit had to be opened 10 days before the first day of the three-day range. If there were any doubt about that, or if they were otherwise to be wrong, they say that according to the custom of the trade that is the accepted meaning of the contract.

Mr. Pollock, for the buyers, has said that the question of what the contract means is a very short point and he has urged us, although this is only an application to set aside service, not to consider whether the sellers have a good arguable case, but to decide the point. If the sellers are wrong about it, this Court should say so and

set aside the service. Asked whether this Court should equally decide the point if we were in favour of the sellers' contention, Mr. Pollock showed rather less enthusiasm, because there may still be an argument as to course of dealing in his clients' favour.

As a matter of construction, I have no doubt that the sellers show a good arguable case on that point; I do not think it would be right for me to say more than that. That makes it unnecessary to consider whether the affidavit which they produced sufficiently displays a good arguable case on the point of custom. All too often parties allege a custom, and when it comes to trial they merely produce witnesses to say what they think the contract means, who are then faced with other witnesses on the other side who think that the contract means something different. I say nothing about that point because there is no need to do so.

So I would agree with the Judge in dismissing the application to set aside leave to serve out of the jurisdiction.

Mr. Pollock has not pursued his applications for leave to appeal against the Judge's refusal of a stay on the ground that England is not a convenient forum, and against his refusal to dismiss the action for want of prosecution. So that leaves only his appeal against the injunction.

It seems to me that one should first decide whether the clause in the contract was one which provided that the English Courts should have exclusive jurisdiction, or merely provided that they should have non-exclusive jurisdiction.

In Dicey and Morris on Conflict of Laws, p. 404, there is this footnote 93:

Some authorities suggest that the clause must provide in terms that the jurisdiction of the chosen court be exclusive . . .

and then there is a reference to *Hoerter v. Hanover*, (1893) 10 T.L.R. 103, to two Canadian cases and to certain other authorities, and the footnote continues:

. . . but it is submitted that the question is whether on its true construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used.

Mr. Pollock does not dissent from that footnote; indeed, he adopts it.

The question is one of the construction of this contract and nothing more. It is, I think, part of the matrix background, or surrounding circumstances, whichever term one chooses to use, that this was a contract made between sophisticated business men who specifically chose their

STAUGHTON, L.J.]                     Sohio v. Gatoil                              [C.A.

words as to English jurisdiction for the purpose of this contract. It is not a consumer contract on a printed form, or anything like that. To my mind, it is manifest that these business men intended that clause to apply to all disputes that should arise between them. I can think of no reason at all why they should choose to go to the trouble of saying that the English Courts should have non-exclusive jurisdiction. I can think of every reason why they should choose that some Court, in this case the English Court, should have exclusive jurisdiction. Then, both sides would know where all cases were to be tried. It may be that in some other types of case, such as a policy of insurance, there is a reason for providing for non-exclusive jurisdiction. I can see none here. I am not sure that I can detect what precisely the reason was for choosing England. The parties had chosen English law; it may be that they thought that the best place for English law to be applied was an English Court; it may be that they even thought that English Courts were a good thing in their own right — I do not know. It may be that they wanted to join the 28 per cent. of cases in the Commercial Court where both sides came from overseas; or it may be that they just wanted to choose a neutral forum. But in my judgment, that was their choice.

I should say that the Judge below took into account that this term as to jurisdiction in the English Court was to replace the arbitration clause in the BP terms. I think Mr. Pollock is right in submitting that the Judge was wrong to take that into account. He referred us to the case of *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381, in which Lord Wilberforce explained, at pp. 1383 to 1385 why it was wrong to take negotiations into account; specifically, he said that one should not refer either to the negotiations or to the subjective intention of the parties in construing a contract. As I have said, I think Mr. Pollock is very probably right about that, but I would reach the same conclusion as that of the Judge without reference to that point.

Granted that there is an exclusive jurisdiction clause, should the sellers have had an injunction restraining the proceedings in Texas? There is not much authority directly in point; in fact, the only case to which we have been referred which is directly to the point is *The Lisboa*, [1980] 2 Lloyd's Rep. 546. In that case the Court of Appeal was faced with the problem of a ship which had been arrested in Italy for the purpose of obtaining security, whilst the bills of lading contained an exclusive English jurisdiction clause. All three members of the Court

held that even where foreign proceedings were a breach of an exclusive English jurisdiction clause, the Court still had a discretion; the discretion to order an injunction should still be exercised with great caution. Lord Justice Dunn went on to say that an injunction should not be granted unless the foreign proceedings were vexatious or oppressive; but it seems to me that the continuance of foreign proceedings in breach of contract where the contract provides for exclusive English jurisdiction may well in itself be vexatious and oppressive in any given case. The Court of Appeal in that case allowed the arrest in Italy to stand, because it was for security only.

The most important point argued by Mr. Pollock on the subject of discretion was delay. I have already mentioned that there was considerable delay on the part of the sellers in this case. The Texas proceedings were started against them early in 1986; yet it was not until July, 1987 that they took out their summons for an injunction restraining those proceedings. At first sight that would appear to be very late indeed; but a curious feature of this case is that all the buyers sought in the Texas proceedings was a declaration of non-liability. Between July, 1986 when the plea in abatement was dismissed, and June, 1987, when the sellers gave notice of intention to proceed in England and the buyers gave notice that they wanted depositions of witnesses, neither side did anything in the Texas proceedings. All that Gatoil did was take statements from witnesses, which they acknowledge would be equally useful if there were to be proceedings in this country.

In those circumstances the first task for us is to look at how the Judge below exercised his discretion on this point. He said:

As far as the Texan proceedings are concerned, Mr. Pollock is right in saying that an injunction should normally be sought promptly. Had the Buyers progressed those proceedings with vigour, so that they would suffer real prejudice if they were now stopped, it might well be inappropriate to grant the injunction. As it is, I consider that the proper course must be to grant the injunction that the Sellers seek, so that this dispute can be determined in the forum which is not merely the appropriate forum, but the forum agreed upon by the parties.

The Judge took the delay into account; he also took into account, as he was entitled to do, that it had caused no real prejudice to the buyers. Mr. Pollock in effect admits that to be true, because he said in explaining why he was not pursuing his application for dismissal for

want of prosecution, that the expenditure on the Texas proceedings would be turned to good use wherever the case proceeds. In my judgment we should not interfere with the Judge's exercise of his discretion on that point.

We have been reminded by Mr. Tomlinson of what Lord Templeman said in *Spiliada Maritime Corporation v. Cansulex*, [1987] 1 Lloyd's Rep. 1 at p. 3; [1987] 1 A.C. 460 at p. 465, to the effect that the Judges of the Commercial Court should be allowed to determine these applications for choice between rival fora, and that appeals should be rare; of course, that was not in the context of an exclusive jurisdiction clause.

In addition, I would myself have added reasons to those which the Judge gave. First, the Texan action is an action for a negative declaration, commenced by the buyers when, as is quite plain, they were apprehensive that proceedings might be commenced against them in England. I would not do anything to encourage that sort of proceeding. Another Division of this Court in the case of *Saipem S.p.a. v. Dredging VO2 B.V.*, [1988] 2 Lloyd's Rep. 361 was equally discouraging about applications for negative declarations. Furthermore, it is inherently undesirable that there should be concurrent proceedings in different jurisdictions, about the same subject matter: See art. 21 of the Convention in the Schedule to the Civil Jurisdiction and Judgments Act, 1982, and also the judgment of Lord Justice Bingham in *E.I. Du Pont de Nemours & Company v. I.C. Agnew*, [1987] 2 Lloyd's Rep. 585, particularly at p. 589. Of course, it is sometimes unavoidable; it was unavoidable in that case, but it is certainly a factor to be taken into account.

Accordingly, I would dismiss the buyers' appeal against the injunction, and refuse their applications for leave to appeal against the other orders of Mr. Justice Phillips.

**Sir DENYS BUCKLEY:** I agree.

*[Order: Buyers' appeal against grant of injunction dismissed with costs; applications for leave to appeal dismissed with costs.]*

## QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Jan. 30, 31, Feb. 1,2,3, 7 and 8, 1989

THE "EGLANTINE", "CREDO" AND "INEZ"

Before Mr. Justice SHEEN

**Collision — Overtaking vessels — Collision in Dover Strait — Second defendants' vessel proceeding in wrong direction in traffic lane — Collision between plaintiffs' and first defendants' vessels — Navigation of vessels — Liability for collision.**

On Aug. 17, 1984 at 11 42 G.M.T. there was a collision between the plaintiffs' vessel *Eglantine* and the defendants' vessel *Credo*. The collision occurred in dense fog in the Dover Straits in a position distant about six miles and bearing about 346 deg. from Cap. Gris-Nez. In the events which led up to the collision the second defendants' vessel *Inez* was involved.

*Eglantine* was a single screw motor bulk carrier of 18,737 g.r.t. She was powered by a diesel engine which developed 10,500 b.h.p. driving a variable pitch propeller. On the day of the collision she was bound from Rouen to Ventspils, Russia laden with a cargo of 24,005 tonnes of grain.

*Credo* was a single screw motor vessel of 65,052 g.r.t. She was driven by a diesel engine which developed 23,900 shaft horse power and was engaged in a ballast voyage from Lisbon to Mongstad.

*Inez* was a twin screw motorized tank barge of 1799.85 g.r.t. She was powered by two diesel engines developing 1320 b.h.p. and was engaged in a voyage from Antwerp to Calais with a cargo of fuel oil. She had unintentionally passed Calais when she encountered the other two vessels.

*Eglantine* was proceeding into the Dover Strait at a speed of about 13½ knots on a course of 020 deg. About half an hour before the collision *Eglantine* passed Cap Gris-Nez at a distance of about 4 miles or a little less. At that time *Credo* was about 2½ miles astern proceeding into the Dover Strait on a course of 039 deg. at a speed of at least 16 knots. *Credo* passed Cap Gris-Nez about 10 minutes after *Eglantine*. At that time *Credo* was on the port quarter of *Eglantine* and overhauling *Eglantine*. *Credo* crossed to the starboard quarter of *Eglantine* and those vessels were then on a diverging course.

When those on board *Eglantine* and *Credo* first became aware of *Inez* the latter vessel was proceeding, in breach of r. 10 of the International Regulations for Preventing Collisions at Sea, 1972, in a south-westerly direction down that lane of the traffic separation scheme reserved for ships proceeding in a north-westerly direction.

At first it appeared that *Inez* would pass down the starboard side of *Eglantine* but in due course she was seen to alter her course to starboard. The

532                       LLOYD'S LAW REPORTS                 [2008] Vol 1

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

5; 9 November 2007

———

STANDARD BANK PLC AND ANOTHER

v

AGRINVEST INTERNATIONAL INC AND OTHERS

[2007] EWHC 2595 (Comm)

Before Mr Justice Teare

**Practice — Anti-suit injunction — Declaratory relief — Option contract — Sale agreement — Whether sale agreement contained exclusive jurisdiction clause.**

The first claimant was a London bank (the bank). The second claimant was the bank's ultimate parent. The first defendant (Agrinvest) was a company incorporated in Arizona. The second defendant (Mr Chawafaty) was Agrinvest's principal director. The third defendant (Cairo Phoenix) was a trading name used by Mr Chawafaty.

Agrinvest traded in emerging market debt. In May 2000 the bank granted Agrinvest an option to purchase US$24.213 million of promissory notes issued by the Government of Kenya. The option was exercisable until 31 July 2000 but was later extended until 14 August 2000. The option fee was US$2 million.

At the same time Agrinvest entered into a forward sale facility with the bank. The terms of the facility were set out in a Master Sale Agreement (the MSA) dated 12 May 2000. The MSA applied to a sale by Agrinvest to the bank of bonds issued by an Egyptian healthcare company, Lakah, and global depositary receipts (GDRs) representing shares in Lakah. Agrinvest obtained just under US$10 million in respect of the sale, and agreed to buy the bonds and GDRs back from the bank for forward settlement in November 2000.

The MSA provided for English law and jurisdiction. Clause 19 provided:

19.1 This Agreement and all Trade Confirmations shall be governed by and construed in accordance with the laws of England.

19.2 Each party hereto irrevocably submits to the jurisdiction of the courts in England for the purpose of any action, suit or proceeding relating to this Agreement or any Trade Confirmation and irrevocably agrees that all claims in respect of any such action, suit or proceeding may be heard and determined in any such court.

The share price of Lakah shares, and therefore GDRs, suddenly fell in June 2000. In consequence the forward settlement date was extended from time to time, ultimately to 10 September 2004. Agrinvest did not exercise its option to purchase the promissory notes issued by the Government of Kenya.

In January 2002 Agrinvest gave the bank charges over land in Mississippi. In February 2002 it provided three promissory notes in the sum of US$5.36 million, but after 2003 no further payments were made. Agrinvest failed to repurchase the securities, and its three promissory notes were dishonoured when presented for payment.

In July 2007 the bank commenced proceedings against Agrinvest under Part 7 of the Civil Procedure Rules to recover claims of almost US$6 million plus interest arising out of the MSA and the associated agreements.

Meanwhile, in September 2005, the bank had issued notices of a trustees' sale of the land in respect of which charges had been given in favour of the bank. Agrinvest obtained an order from the Chancery Court of Harrison County, Mississippi restraining the bank from foreclosing. The bank applied to discharge the order. In February 2006 Agrinvest issued a motion in the Mississippi court to amend its complaint against the bank to set out the grounds on which it said that it was not liable to the bank for any monetary claim, and that the bank was liable to it for alleged breaches of contract in relation to the sale of Lakah bonds and GDRs. No steps were taken to have the motion heard.

In or about April 2007, Mr Chawafaty and Cairo Phoenix brought a claim against the bank and the second claimant, and others, in Egypt for the sum of US$15.8 million plus interest. The Egyptian claimants alleged they were unable to exercise the option to purchase the Kenyan Government promissory notes because the bank wrongfully caused the price of GDRs to fall and/or because the bank acted wrongfully in connection with the sale of GDRs. The claims were said to arise out of the option contract and out of the transaction governed by the MSA. The Egyptian claimants also alleged that Egyptian law applied to the MSA.

On 26 July 2006 the bank and the second claimant commenced the present proceedings against the defendants under Part 8 of the Civil Procedure Rules for an injunction restraining both the Mississippi proceedings and the Egyptian proceedings, and for declarations of non-liability, including a declaration that the bank was not in breach of the option agreement.

On 31 August 2007 David Steel J granted the claimants an interim anti-suit injunction. The defendants did not appear at that hearing. The matter was listed for a final hearing on 5 November 2007. The defendants again did not appear.

The claimants submitted (1) that they were entitled to an anti-suit injunction against Agrinvest on the basis that clause 19 of the MSA was an exclusive jurisdiction agreement, (2) that they were entitled to injunctions against Mr Chawafaty and Cairo Phoenix on the basis that the Egyptian proceedings were unconscionable, vexatious and oppressive insofar as they related to the claimants' Part 7 claims under the MSA, (3) that they were entitled to a declaration of non-liability in relation to the alleged breach of the option agreement, and to injunctions against Mr Chawafaty and Cairo Phoenix on the basis that the Egyptian proceedings were unconscionable, vexatious and oppressive insofar as they related to the claimants' claim for that declaration of non-liability, and (4) that they were entitled to various other declarations of non-liability.

————*Held* by QBD (Comm Ct) (Teare J) that:

(1) Clause 19 of the MSA was an exclusive jurisdiction agreement. Agrinvest had not shown any good reason why it should not be held to its agreement. Accordingly, an anti-suit injunction would be granted to restrain Agrinvest from prosecuting its claims against the bank relating to the MSA either in Mississippi or in Egypt (*see* para 23);

————*Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670, *Sohio v Gatoil* [1989] 1 Lloyd's Rep 588, and *Lobb Partnership v Aintree Racecourse Co Ltd* [2000] CLC 431 considered; *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 applied.

(2) An anti-suit injunction would also be granted (a) restraining Agrinvest from prosecuting its claims relating to the MSA against the second claimant in Egypt, and (b) restraining Mr Chawafaty and Cairo Phoenix from prosecuting their claims relating to the MSA against the bank in Egypt. The Egyptian proceedings were calculated to subvert or frustrate the English Part 7 proceedings. They were unconscionable or vexatious or oppressive because Mr Chawafaty and Cairo Phoenix had no contractual claim against the bank and none of the Egyptian claimants had a contractual claim against the second claimant. In addition the Egyptian claimants alleged that the MSA was governed by Egyptian law, which was contrary to clause 19.1 of the MSA and was significant because, were claims for breach of contract arising out of the fall in value of Lakah bonds and GDRs in June 2000 or out of the sale of GDRs between December 2000 and February 2001 now to be brought in England, they would be time-barred. The reliance on Egyptian law was thus a further reason why the Egyptian proceedings were unconscionable or vexatious and oppressive (*see* paras 26 and 27);

————*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 and *Turner v Grovit* [2002] 1 WLR 107 applied; *Trafigura Beheer BV v Kookmin Bank Co* [2005] EWHC 2350 (Comm), and *Trafigura Beheer BV v Kookmin Bank Co (No 2)* [2007] 1 Lloyd's Rep 669 considered.

(3) In circumstances where Agrinvest had not exercised its option to purchase the Kenyan Government promissory notes, the bank could not be liable for refusing to implement the option agreement and an appropriate declaration of non-liability would be made in the Part 8 proceedings. An anti-suit injunction would be granted in order to protect that declaration of non-liability (*see* paras 29 and 30);

————*Trafigura Beheer BV v Kookmin Bank Co (No 2)* [2007] 1 Lloyd's Rep 669 considered.

(4) Further declarations of non-liability would also be made as sought by the claimants, subject to certain corrections (*see* para 37).

The following cases were referred to in the judgment:

*Austrian Lloyd Steamship Co v Gresham Life Assurance Society Ltd* (CA) [1903] 1 KB 249;

*British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368;

*Continental Bank NA v Aeakos Compania Naviera SA* (CA) [1994] 1 Lloyd's Rep 505;

*Lobb Partnership v Aintree Racecourse Co Ltd* [2000] BLR 65; [2000] CLC 431;

*S&W Berisford plc v New Hampshire Insurance Co* [1990] 1 Lloyd's Rep 454;

*Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670;

*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* (PC) [1987] AC 871;

*Sohio Supply Co v Gatoil (USA) Inc* (CA) [1989] 1 Lloyd's Rep 588;

*Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co Ltd* (CA) [2005] 1 Lloyd's Rep 67;

*Trafigura Beheer BV v Kookmin Bank Co* [2005] EWHC 2350 (Comm);

*Trafigura Beheer BV v Kookmin Bank Co (No 2)* [2007] 1 Lloyd's Rep 669;

*Turner v Grovit* (HL) [2002] 1 WLR 107.

————

This was the trial of the action brought by the claimants Standard Bank plc and its ultimate parent against the defendants Agrinvest International Inc, Charles Chawafaty and Cairo Phoenix Foreign Trade Centre for declarations of non-liability and anti-suit injunctions restraining the defendants from continuing proceedings brought by them in the United States and in Egypt.

Graham Dunning QC and Brian Dye, instructed by Stephenson Harwood, for the claimants; the defendants were not represented.

The further facts are stated in the judgment of Teare J.

Judgment was reserved.

Friday, 9 November 2007

————

## JUDGMENT

**Mr Justice TEARE:**

1. In this Part 8 claim the claimants seek a permanent anti-suit injunction against the defendants and also certain declarations of non-liability.

| Teare J] | Standard Bank plc v Agrinvest International Inc | [QBD (Comm Ct) |
|---|---|---|

The defendants were not represented at the hearing.

*The background to the applications*

2. I can summarise the background from the detailed account of it given in the written evidence of Richard Gwynne, a partner in Stephenson Harwood, the solicitors acting for the claimants. The first claimant, Standard Bank plc, is a London bank (the bank). The second claimant, Standard Bank Group Ltd, is the bank's ultimate parent. The first defendant, Agrinvest International Inc (Agrinvest), is a company incorporated in Arizona. Its principal director, Mr Charles Chawafaty, is the second defendant (Mr Chawafaty). It appears that the third defendant, Cairo Phoenix Foreign Trade Centre (Cairo Phoenix), is a trading name used by Mr Chawafaty.

3. Agrinvest is a trader in emerging market debt. In May 2000 the bank granted Agrinvest an option (contained in or evidenced by a facsimile dated 3 May 2000 and signed in London by Mr Chawafaty on behalf of Agrinvest on 12 May 2000) to purchase US$24.213 million of promissory notes issued by the Government of Kenya. The option was exercisable until 31 July 2000 but was later extended until 14 August 2000. An option fee of US$2 million was payable by 8 May 2000.

4. There was no express choice of law (or of jurisdiction). If the option contract is to be regarded as a bilateral contract then it is the bank's performance of its obligation to deliver the promissory notes upon the exercise of the option which is characteristic of the option to purchase contract (by analogy with a sale contract). If the option contract is to be regarded as a unilateral contract then, again, it is the bank's performance of that same obligation which is characteristic of the option to purchase contract. In either case, since the bank's place of business is in London, English law is the applicable law; see the Contracts (Applicable Law) Act 1990, article 4 of the Rome Convention and *Dicey, Morris and Collins on the Conflict of Laws*, 14th Edition, para 32-116.

5. At the same time Agrinvest entered into a forward sale facility with the bank. The terms of the facility were set out in a draft term sheet, later superseded (save in respect of certain interest obligations) by a Master Sale Agreement ("the MSA") dated 12 May 2000. The MSA applied to a sale by Agrinvest to the bank of bonds issued by an Egyptian healthcare company, Lakah, and global depositary receipts representing shares in Lakah ("GDRs"). Agrinvest obtained just under US$10 million in respect of the sale and agreed to buy the bonds and GDRs back from the bank for forward settlement in November 2000.

6. The MSA provided for English law and jurisdiction. Clause 19 provided as follows:

19.1 This Agreement and all Trade Confirmations shall be governed by and construed in accordance with the laws of England.

19.2 Each party hereto irrevocably submits to the jurisdiction of the courts in England for the purpose of any action, suit or proceeding relating to this Agreement or any Trade Confirmation and irrevocably agrees that all claims in respect of any such action, suit or proceeding shall be heard and determined in any such court.

7. Agrinvest used US$2 million of the proceeds of the sale of the bonds and GDRs to pay the option fee. However, the share price of Lakah shares (and therefore of GDRs) suddenly fell in early June 2000. In consequence the forward settlement date was extended from time to time, ultimately to 10 September 2004. Also, Agrinvest did not exercise its option to purchase the promissory notes issued by the Government of Kenya.

8. Between 2000 and 2003 Agrinvest made certain payments to reduce the amount it would have to pay to repurchase the bonds and GDRs. In addition extra GDRs were provided and these, or the original GDRs or both, were sold to reduce Agrinvest's liability between December 2000 and February 2001. Agrinvest also gave the bank charges over land in Mississippi in January 2002 and provided three promissory notes in the sum of US$5.36 million in February 2002. But after 2003 no further payments were made. Agrinvest failed to repurchase the securities and its three promissory notes were dishonoured when presented for payment.

9. The current position is therefore that the bank has monetary claims against Agrinvest of almost US$6 million plus interest arising out of the MSA as amended and the associated agreements. These claims have been advanced in proceedings issued in this court. In February 2006 claim form 2006 Folio 59 was issued. Although a default judgment was entered the bank later agreed to have it set aside, essentially because the claim form should have been served out of the jurisdiction and it had not been. Due to the passage of time the claim form could no longer be served out of the jurisdiction and so a fresh Part 7 claim form was issued, 2007 Folio 1180, in July 2007. Permission to serve this claim out of the jurisdiction in Arizona was granted by Christopher Clarke J on 24 July 2007.

*Mississippi*

10. Meanwhile, in September 2005, the bank had issued notices of a trustees' sale of the land in respect of which charges had been given in favour of the bank. This was a non-judicial process and did

LLOYD'S LAW REPORTS

not involve an application to the court for judicial foreclosure. However, the land had been affected by Hurricane Katrina and Agrinvest obtained an order from the Chancery Court of Harrison County, Mississippi, restraining the bank from foreclosing. The bank applied to discharge the order (whilst being careful not to submit its monetary claims to the Mississippi court). Agrinvest then, in February 2006, issued a motion in the Mississippi court to amend its complaint against the bank to set out the grounds on which it said that it was not liable to the bank for any monetary claim and that the bank was liable to it for alleged breaches of contract in relation to the sale of Lakah bonds and GDRs. Agrinvest alleged "unfair trading" in GDRs and that the bonds had been sold at a "concocted" and "artificial" price. However, no steps have been taken to have this motion heard.

*Egypt*

11. On 1 May 2007 the bank received a document in Arabic described as a "subpoena" purportedly by way of service. When translated it appeared to be notice of a substantive claim brought against the bank and the second claimant (and others) in the Court of First Instance of South Giza for the sum of US$15.8 million plus interest. The Egyptian claimants appear to be not only Agrinvest but also Cairo Phoenix and Mr Chawafaty. The Egyptian claimants appear to be alleging that they were unable to exercise the option to purchase the Kenyan Government promissory notes because the bank wrongfully caused the price of GDRs to fall and/or because the bank acted wrongfully in connection with the sale of GDRs. As a result the Egyptian claimants have sustained loss. It may also be alleged, though the matter is far from clear, that the bank "refused to implement" the option contract. Although there is a lack of clarity as to the detail of these claims there is little doubt that the claims are said to arise out of the option contract and out of the transaction governed by the MSA. That is because extensive reference is made to contractual obligations. It is further to be observed that the document assumes that Egyptian law applies because extensive reference is made to that law.

*The Part 8 claim*

12. The bank and the second claimant decided to obtain an injunction restraining both the Mississippi proceedings (save in relation to legitimate Katrina relief protection) and the Egyptian proceedings. They also sought declarations of non-liability. These are the proceedings with which I am concerned. They were issued on 26 July 2007 and on that day Christopher Clarke J granted permission that they be served out of the jurisdiction.

13. The application of the bank and second claimant for an interim anti-suit injunction was heard before David Steel J on 31 August 2007. The defendants did not appear at that hearing. Steel J was satisfied that the proceedings had been properly served on the defendants and he granted interim relief. On 15 October 2007 Andrew Smith J ordered that the claim for final relief be heard on 5 November 2007 because a hearing was due to take place in Egypt on 10 November (now postponed until 13 November 2007). Agrinvest and Mr Chawafaty have acknowledged service but have not filed any evidence or appeared at the hearing before me.

14. Agrinvest has however sent a "Memorandum" which is to constitute its "response". It alleges that Mr Gwynne had failed to disclose certain documents, seeks to cast doubt on the bank's substantive monetary claims, alleges that the funding of the option agreement to purchase the Kenyan Government promissory notes was dependent upon the sale of the Lakah bonds and GDRs, states that the bank owes monies to Agrinvest and not vice versa and, finally, that the anti-suit injunction is abusive because it "thwarts other competent and prevailing forums and laws".

15. Two of the documents which were said not to have been disclosed have been provided by Mr Davis of Stephenson Harwood. I am told that the first document is an annex to the MSA and that it does not appear to change any part of the legal analysis affecting the Part 8 proceedings. I am also told that the second document does not appear to be relevant to the Part 8 claim but in any event contains an English law and jurisdiction clause. The third document could not be found. Mr Chawafaty was asked to supply a copy and he has provided an extract from a document which contains a clause providing for English law and jurisdiction. This also does not appear to change any part of the legal analysis affecting the Part 8 claim. In circumstances where the documents do not appear to affect the Part 8 claim the bank cannot fairly be criticised for not putting them before the court. In any event Agrinvest had the opportunity to provide them to the court at the inter-parties hearing before David Steel J had it been thought that they were relevant. So far as the other points in the memorandum are concerned they do not appear to advance the issues raised by the Part 8 claim. Whilst the memorandum asserts that this court has "abused its discretion to protect its jurisdiction" there is no coherent explanation as to why the grant of an anti-suit injunction is or would be an abuse.

*Anti-suit relief*

16. The first basis on which an anti-suit injunction is sought is that clause 19 of the MSA is an

LLOYD'S LAW REPORTS [2008] Vol 1

Teare J] Standard Bank plc v Agrinvest International Inc [QBD (Comm Ct)

exclusive jurisdiction agreement; that is, it imposes an obligation upon the parties to submit disputes to the English court. It is well established that:

If contracting parties agree to give a particular court exclusive jurisdiction to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English Court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum . . . Whether a party can show strong reasons, sufficient to displace the other party's *prima facie* entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case (per Lord Bingham in *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 at para 24).

17. This is not a case where the EC Judgments Regulation applies and so it is not necessary to consider how the above principle applies, if at all, in such cases; cf *Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co Ltd* [2005] 1 Lloyd's Rep 67.

18. Thus it is necessary to decide whether clause 19 of the MSA is an exclusive jurisdiction agreement. I have already set out its terms.

19. The manner in which jurisdiction clauses have been construed has a long history; see *Austrian Lloyd Steamship Co v Gresham Life Assurance Society Ltd* [1903] 1 KB 249, *Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588, *S&W Berisford plc v New Hampshire Insurance Co* [1990] 1 Lloyd's Rep 454, *Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 Lloyd's Rep 505, *British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368 and *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corporation* [2000] 1 Lloyd's Rep 670.

20. In the last mentioned case Rix J summarised the essential question at para 32 as follows:

The test which has been developed for distinguishing an exclusive from a non-exclusive jurisdiction clause is whether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used: *Dicey and Morris* 13th Edition, 2000 at para 12-078. Or to put the issue in another way: is the obligation contained in the clause the intransitive one to submit to a jurisdiction if it is chosen by the other contracting party, or is it the transitive one to submit all disputes to the chosen jurisdiction?

21. The natural meaning of the first limb of clause 19.2 is that it imposes an intransitive obligation to submit to the jurisdiction of the English courts. However, the second limb of clause 19.2 lends itself to a transitive construction, namely, a mutual obligation to submit all disputes relating to the MSA to the English courts. Moreover, in the context of parties who had chosen that the MSA would be governed by English law and had submitted to the jurisdiction of the English courts it is difficult to think of a reason why they would have agreed to the English court having non-exclusive jurisdiction (cf *Sohio v Gatoil* [1989] 1 Lloyd's Rep 588 per Staughton LJ at page 591 col 2 to page 592 col 2).

22. It might be suggested that the use in the second limb of the word "may" rather than "shall" is indicative of the language of option than of obligation. However, this seems an unlikely intention having regard to the context and the use of the word "irrevocably" which is suggestive of obligation rather than of option. I consider that the proper construction of the second limb of clause 19.2 is that once one party has decided that a dispute was to be referred to the English court the other party is bound (because he irrevocably agreed) to submit that dispute to the English court. The suggestion that, despite the context and the use of the word "irrevocably", a party was intended to be free to submit disputes relating to the MSA to a court other than the English court in circumstances where the other party insisted upon the English court is unlikely to have been the parties' intention; cf the discussion in *Lobb Partnership v Aintree Racecourse Co Ltd* [2000] CLC 431 at pages 434 and 435 per Colman J. In the present case the bank decided to have the dispute decided in England by commencing proceedings in England.

23. For these reasons I consider that clause 19.2 contains an exclusive jurisdiction clause. Agrinvest has not shown any good reason (either in its memorandum or otherwise) why it should not be held to its agreement. It follows that this is a proper case in which to exercise the court's discretion to grant an injunction restraining Agrinvest from prosecuting its claims against the bank relating to the MSA either in Mississippi or in Egypt.

24. The injunction is sought not only against Agrinvest but also against Mr Chawafaty and Cairo Phoenix because they appear to be claimants in the Egyptian proceedings. Since they are not parties to the MSA such injunction can only be granted on the basis that the proceedings in Egypt are, for some other reason, unconscionable or vexatious and

[2008] Vol 1

LLOYD'S LAW REPORTS

537

QBD (Comm Ct)]

Standard Bank plc v Agrinvest International Inc

[TEARE J

oppressive. Further, the second claimant, the parent company of the bank, seeks an anti-suit injunction because it is a defendant to the Egyptian proceedings. Since the second claimant is not a party to the MSA it too must establish that the proceedings in Egypt are, for some other reason, unconscionable or vexatious and oppressive.

25. The relevant principles for the grant of an anti-suit injunction are set out in *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 and *Turner v Grovit* [2002] 1 WLR 107. They have been summarised by Cooke J in *Trafigura Beheer BV v Kookmin Bank Co* [2005] EWHC 2350 (Comm) at para 42 (and adopted by Field J in his decision in the same case [2007] 1 Lloyd's Rep 669 at para 44) as follows:

> (i) The court will grant an injunction where the pursuit of the foreign proceedings is "unconscionable", as is made clear by the House of Lords in *Turner v Grovit* [2002] 1 WLR 107 at paras 22–29, per Lord Hobhouse. The injunction is a personal remedy for the wrongful conduct of another party — a fault based remedial concept, in respect of conduct which the court may describe as "vexatious" or "oppressive", but deriving from "the basic principle of justice".

> (ii) The court will readily grant an injunction to restrain proceedings which are brought in breach of an exclusive jurisdiction clause save in circumstances where the Brussels Regulation applies —- see *Through Transport Mutual v New India Assurance Co* [2005] 1 Lloyd's Rep 67 at para 67–68. This is an example of the wider principle that an English court will grant an injunction to prevent the pursuit of foreign proceedings which are vexatious, oppressive or unconscionable — see *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871.

> (iii) Absent an agreement to the exclusive jurisdiction of the English court, or some other special factor, a person has no right not to be sued in a particular forum. Where suit is brought in a foreign forum, the question whether or not that forum is an appropriate forum is a factor in assessing the conduct of the party suing there, for the purposes of considering whether to grant a restraining injunction, but if it is the only factor, it is easily overridden by other considerations (per Lord Hobhouse at para 25 of *Turner* (*ibid*)).

> (iv) To grant an injunction, the English court must have a sufficient legitimate interest in the foreign proceedings, which means that if there is no contractual reason to prevent suit there, there must be proceedings in this country which require protection (per Lord Hobhouse at para 27

of *Turner* (*ibid*), by reference to the House of Lords' decision in *Airbus Industries GIE v Patel* [1999] 1 AC 119.

> (v) English law attaches a high importance to international comity and the perception of the foreign court of an interference in its proceedings, albeit indirect. There must therefore be a clear need for protection of the English proceedings (per Lord Hobhouse at para 29 of *Turner* (*ibid*) if an injunction is to be granted.

> (vi) An injunction should not be granted if its effect would be to deprive the claimant in the foreign action of an advantage in that forum of which it would be unjust to deprive him (*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* (*ibid*) at p 896).

26. Thus there must be English proceedings which need to be protected. In the present case the bank has brought a Part 7 claim against Agrinvest claiming such sums as are due to the bank pursuant to the MSA as amended and associated agreements. Whilst Agrinvest might bring counterclaims arising out of the MSA against the bank, Mr Chawafaty and Cairo Phoenix cannot do so because they are not party to the MSA. Nor can they, or Agrinvest, bring counterclaims against the second claimant arising out of the MSA because the second claimant is not party to it. However, in the Egyptian proceedings, Mr Chawafaty and Cairo Phoenix seek an order that nothing is due to the bank and claim damages for breach of the MSA against not only the bank but also the second claimant. The Egyptian proceedings are thus calculated to subvert or frustrate the English proceedings. There is a clear need to protect them. The Egyptian proceedings are unconscionable or vexatious or oppressive because Mr Chawafaty and Cairo Phoenix plainly have no contractual claim against the bank and they, together with Agrinvest, plainly have no contractual claim against the second claimant. In addition Agrinvest and the other claimants implicitly allege, by referring to Egyptian law, that the MSA is governed by Egyptian law. This is contrary to clause 19.1 of the MSA and is significant because, were claims for breach of contract arising out of the fall in value of Lakah bonds and GDRs in June 2000 or out of the sale of GDRs between December 2000 and February 2001 now to be brought in England, they would be time-barred (because more than six years has elapsed since the alleged breach or breaches of contract). The reliance on Egyptian law is thus a further reason why the Egyptian proceedings are unconscionable or vexatious and oppressive.

27. For these reasons this is a proper case in which to exercise the court's discretion to grant an

TEARE J]                **Standard Bank plc v Agrinvest International Inc**                [QBD (Comm Ct)

injunction (a) restraining Agrinvest from prosecuting its claims relating to the MSA against the second claimant in Egypt, and (b) restraining Mr Chawafaty and Cairo Phoenix from prosecuting their claims relating to the MSA against the bank in Egypt.

*The option agreement*

28. In so far as the Egyptian claims include an allegation that the bank acted in breach of the option agreement by "refusing to implement" the option agreement (as they may do, though it remains unclear) the bank and the second claimant also seek an anti-suit injunction restraining such a claim. Such an injunction cannot be said to be necessary to protect the bank's monetary claims in its Part 7 proceedings because the Part 7 proceedings do not concern the option agreement. However, what is said in this context is that the anti-suit injunction is necessary to protect the Part 8 proceedings which seek a declaration of non-liability in relation to the option agreement. It is said that in circumstances where the option is never exercised the bank cannot possibly be liable for "refusing to implement" the option agreement and must be entitled to a declaration of non-liability. If such a declaration is granted then it would be unconscionable or vexatious and oppressive for Agrinvest to be permitted to seek to controvert that declaration by proceeding in Egypt. In this regard reliance is placed on the decision of Field J in *Trafigura Beheer BV v Kookmin Bank Co (No 2)* [2007] 1 Lloyd's Rep 669 at para 55).

29. Field J described the injunction which he granted as a "post-trial anti-suit injunction" (see para 1 of the judgment). I respectfully agree that the issuance of an anti-suit injunction in that case was a proper application of the principles governing anti-suit injunctions. In the present case the anti-suit injunction is sought at the same time as the declarations of non-liability but I do not consider that this makes it inappropriate to apply those same principles.

30. I accept the submission that, in circumstances where Agrinvest has not exercised its option to purchase the Kenyan Government promissory notes, the bank cannot be liable for refusing to implement the option agreement and I will make an appropriate declaration of non-liability. This is so as a matter of English law which is the applicable law of the option agreement but it is difficult to see how a different result could be reached under any other system of law. That being so it is appropriate, following the approach of Field J, to grant the anti-suit injunction in order to protect the declaration of non-liability. Of course, in so far as Agrinvest's claim in Egypt is that it was prevented from

exercising the option by reason of the bank's breach of the MSA then such claim is within the exclusive jurisdiction clause of the MSA and the bank can rely upon that clause to support the injunction it seeks.

*Further declarations of non-liability*

31. The declarations sought, as set out in the draft final order and explained in a further note from counsel, contain declarations in relation to applicable law and exclusive jurisdiction as well as declarations of non-liability. They are as follows:

(i) English law is the law applicable to the claims brought by the defendants against the claimants in the defendants' Egyptian proceedings and to the contracts in relation to which those claims are brought.

(ii) English law is the law applicable to the claims sought to be brought by the first defendant against the first claimant in the first defendant's proposed amended complaint in its Mississippi proceedings against the first claimant, as well as the law applicable to the contracts in relation to which those claims are brought.

(iii) The claims set out in the said Egyptian proceedings against each of the claimants, and the claims set out in the first defendant's proposed amended complaint in its Mississippi proceedings against the first claimant, are claims in relation to which the English court has exclusive jurisdiction.

(iv) All of the claims set out in the Egyptian proceedings and in the proposed amended Mississippi complaint against either of the claimants are time-barred as a matter of English law and for that reason neither of the claimants has any liability in respect of any of them.

(v) Further, as a matter of English law, the second claimant is not liable to any of the defendants in respect of the claims sought to be brought by any of the defendants against it in the Egyptian proceedings for the reason that it is not, and never has been, a party to any contractual relationship with any of them.

32. I accept the submission that the court should make declarations (i) and (ii) because the applicable law of the MSA is English law pursuant to clause 19.1 of the MSA and because English law is the applicable law of the option contract for the reasons explained in para 4 above.

33. So far as declaration (iii) is concerned I have already accepted the submission that the English court has exclusive jurisdiction in relation to the claims relating to the MSA. These claims would include the claim that appears to be made that as a result of a breach of the MSA Agrinvest was

[2008] Vol 1      LLOYD'S LAW REPORTS      539

QBD (Comm Ct)]      Standard Bank plc v Agrinvest International Inc      [Teare J

disabled from being able to exercise its option under the option agreement. However, in so far as those claims also include a claim for breach of the option agreement, as they might do, then I am unable to accept the submission that the English court has exclusive jurisdiction in relation to such a claim. That is because the option agreement does not contain a jurisdiction agreement. Declaration (iii) must therefore be subject to a saving in respect of a claim for breach of the option agreement.

34. The basis of declaration (iv) is, as I understand the matter, that the fall in the price of GDRs occurred in June 2000 and the sale of the GDRs took place in December 2000 to February 2001. Accordingly, any breach of the MSA by the bank must have occurred more than six years ago and any such claim must therefore be time-barred. The declaration should make this clear.

35. So far as declaration (v) is concerned I accept that the second claimant is not a party to the MSA and therefore is entitled to the declaration sought. The declaration should however make reference to the MSA and the option agreement rather than to "any contractual relationship".

36. I have already accepted that declaration (vi) is appropriate.

37. For these reasons I shall grant the remedies sought, subject to the above corrections. I shall ask counsel to draw up an amended final order.

*Costs*

38. It is appropriate that the defendants should pay the claimants' costs since the claimants have obtained the relief they sought. I have not been asked to assess the costs summarily and do not do so. I have, however, been asked to order an interim payment of costs. I have been provided with a draft schedule of costs in a sum of over £54,000. I will order an interim payment of £25,000.

Case No: A3/2012/0368, A3/2012/0369,
A3/2012/0370 & A3/2012/0801

Neutral Citation Number: [2014] EWCA Civ 1010
**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**THE HONOURABLE MR JUSTICE BURTON**
**[2011] EWHC 3381 (Comm)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18th July 2014

Before:

**THE RIGHT HONOURABLE LORD JUSTICE LONGMORE**
**THE RIGHT HONOURABLE LORD JUSTICE RIMER**
**- and –**
**THE RIGHT HONOURABLE LORD TOULSON**
- - - - - - - - - - - - - - - - - - - - -
Between :

| | |
|---|---|
| **STARLIGHT SHIPPING COMPANY** | **Appellant/ Claimant** |
| **- and -** | |
| 1)  **ALLIANZ MARINE & AVIATION VERSICHERUNGS AG** | **Respondents /Defendants** |
| 2)  **ROYAL & SUN ALLIANCE INSURANCE** | |
| 3)  **ASSICURAZIONI GERERALI SPA** | |
| 4)  **REMBRANDT INSURANCE CO LTD** | |
| 5)  **BRIT UW LTD (Sued on its own behalf and on behalf of all underwriting members of Lloyd's Syndicate 2987 for the 2006 Year of Account)** | |
| 6)  **NICHOLAS BURKINSHAW (Sued on his own behalf and on behalf of all underwriting members of Lloyd's Syndicate 2003 for the 2006 Year of Account)** | |
| 7)   **HISCOX DEDICATED CORPORATE MEMBER LTD (Sued on its own behalf and on behalf of all underwriting members of Lloyd's Syndicate 0033 for the 2006 Year of Account)** | |
| 8)  **HILL DICKINSON LLP** | |
| 9)  **HILL DICKINSON INTERNATIONAL** | |
| 10) **MICHAEL FRANCIS MALLIN** | |
| 11) **ALEXANDRA JULIA TYTHERIDGE** | |
| 12) **MARIA MOISIDOU** | |
| 13) **DANIEL MCCARTHY** | |
| 14) **DAVE VALE** | |
| 15) **MARK WATTERS** | |

16) SIMON LANGRIDGE
17) WILLIAM GRAHAM HENSMAN
18) KEITH RICHARD POTTER
19) STEPHEN BISHOP
20) RICHARD CHOWN
21) SIMON VINCENT STONEHOUSE
22) MARION SUSAN FRASER
23) DANIEL TONY DOBISZ
24) IAN JAMES HENSTRIDGE
25) BRENDAN ALLAN FLOOD
26) CHARLES TAYLOR ADJUSTING LIMITED
27) GORDON ELLIOT

-and-

| | |
|---|---|
| OVERSEAS MARINE ENTERPRISE INC | **Third Party/ Appellant** |

-and-

| | |
|---|---|
| 1) BRIT UW LTD (On its own behalf and on behalf of all underwriting members of Lloyd's Syndicate 2987 for the 2006 Year of Account<br>2) NICHOLAS BURKINSHAW (On his own behalf and on behalf of all underwriting members of Lloyd's Syndicate 2003 for the 2006 Year of Account)<br>3) HISCOX DEDICATED CORPORATE MEMBER LIMITED (On its own behalf of all underwriting members of Lloyd's Syndicate 0033 for the 2006 Year of Account | **2011 Folio 702 Respondents /Claimants** |

- and -

| | |
|---|---|
| 1)  STARLIGHT SHIPPING COMPANY<br>2)  OVERSEAS MARINE ENTERPRISES INC | **Appellants/ Defendants** |

-and-

| | |
|---|---|
| 1) BRIT UW LTD (On its own behalf of all underwriting members of Lloyd's Syndicate 2987 for the 2006 Year of Account)<br>2) NICHOLAS BURKINSHAW (On his own behalf and on behalf of all underwriting member of Lloyd's Syndicate 2003 for the 2006 Year of Account)<br>3) HISCOX DEDICATED CORPORATE MEMBER LIMITED (On its own behalf and on behalf of all underwriting members of Lloyd's Syndicate 0033 for the 2006 Year of Account) | **2011 Folio 1043 Respondents /Claimants** |

-and-

| | |
|---|---|
| 1) IMPERIAL MARINE CO<br>2) BRISTOL MARINE CO<br>3) CYCLONE MARITIME CO | **Appellants/ Defendants** |

4) SEAGARDEN SHIPPING INC
5) WAVE NAVIGATION INC

"ALEXANDROS T"

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

The **Appellants did not attend the hearing**
**Mr Mark Howard QC & Mr Tony Singla** (instructed by **Clyde & Co LLP**) for the **1st –
4th Respondents**
**Mr Steven Gee QC & Mr Tom Whitehead** (instructed by **Norton Rose Fulbright LLP**) for
the **5th - 7th Respondents**
**Mr David Bailey QC & Mr Jocelin Gale** (instructed by **Mayer Brown International LLP**)
for the **8th-12th Defendants**
Hearing date: 1st July 2014
- - - - - - - - - - - - - - - - - - - - -

# Judgment

**Lord Justice Longmore:**

1.  This is the resumption of the appeal from Burton J in the <u>Alexandros T</u> [2012] 2 All ER (Comm) 608 granting summary judgment to the Company Market Insurers ("CMI") and the Lloyd's Market Insurers ("LMI") against the shipowners and associated companies (to whom I shall refer compendiously as "the owners") for declarations, damages and indemnities in respect of the owners' proceedings in Greece seeking damages from the insurers, despite proceedings for sums due under the relevant insurance policies being settled as long ago as December 2007 and January 2008. The owners' application to stay the proceedings failed before Burton J but, on appeal, this court stayed the English proceedings pursuant to Article 27 of Council Regulation 44/2001 (EC) and expressed no view about the correctness or otherwise of Burton J's decision to grant summary judgment. The Supreme Court lifted that stay and we accordingly proceed to decide the rest of the owners' appeal.

2.  The underlying facts (including the nature of the Greek proceedings) are set out in paras 1-16 of my judgment reported at [2013] 1 All ER (Comm) 1297 supplemented, as necessary, by paras 1-20 of the judgment of Lord Clarke of Stone-Cum-Ebony JSC reported at [2014] 1 All ER (Comm) 337 and need not be repeated. But for ease of comprehension I will repeat the terms of the respective settlement agreements. In each of the agreements "the Assured" were defined as being "[OME] and Starlight … as Managers and/or Owners and/or Associated and/or Affiliated Companies for their respective rights and interests in the ship Alexandros T".

3.  The CMI settlement agreement then provided:-

    > "1. Each Underwriter agrees to pay on or before 18[th] January 2008 … their due proportions of the sum of US$16m … being 100% of their due proportions of the sum insured being 50% of the US$32m … without interest or costs.
    >
    > 2. The Assured and claimant agree to accept the EURO equivalent of each Underwriter's due proportion of US$16m … in full and final settlement of all and any claims it may have under Policy No 302/CF000220Z against the Underwriters in relation to the loss of "Alexandros T", including all claims for interest and costs (including in respect of all costs orders made to date in the proceedings) but without effect to any other insurance policy in which each Underwriter may be involved.
    >
    > 3. The Assured and claimant agree to Indemnify each Underwriter against any claim that might be brought against it by any of the Assured's or the claimant's associated companies or organisations or by any mortgagee in relation to the loss of "Alexandros T" or under Policy No 302/CF000220Z. …
    >
    > 4. Following the signing of this agreement, and in consideration of the promises herein, the claimant and the Underwriters will apply to stay the proceedings as against the Underwriters, the proceedings to be stayed for all purposes save for the purposes [of] carrying the terms agreed herein into effect, such stay to

have effect from the first obtainable date after 27th December 2007.

5. Following the due and proper payment by the Underwriters of the amount specified in paragraph 1 above, the Assured and claimant and the Underwriters agree to file a consent order dismissing the proceedings, with no order as to costs.

6. This agreement is subject to English law and to the exclusive jurisdiction of the High Court in London."

4.    The LMI settlement agreement provided in similar but not identical terms:-

"2. The underwriters … agree to pay on or before 24[th] December 2007 … the sum of US$8m … being 100% of their due proportions of the sum insured being 25% of US$32m … without interest or costs …

3. The Assured and claimant agree to accept the EURO equivalent of US$8m … in full and final settlement of all and any claims it may have under Policy No … against the Underwriters signing below in relation to the loss of "Alexandros T"…

4. The Assured and claimant agree to indemnify the underwriters signing below against any claim that might be brought against them by any of the Assured's or the claimant's associated companies or organisations or by any mortgagee in relation to the loss of "Alexandros T" or under Policy No …

5. This agreement is subject to English law and the jurisdiction of the High Court of London."

5.    The current position is that some submissions were made on the matters that remain in issue when the appeal was last before us. The owners have elected not to appear on the present occasion but to rely on their previous submissions together with certain matters raised in correspondence. CMI and LMI have both appeared by counsel and made oral submissions as have the 8th-12[th] defendants (to whom I refer as "the HD defendants").

6.    As it seems to me, the following issues remain for determination:-

1) Whether the claims in the Greek proceedings fall within the settlement and the indemnity provisions of the Settlement Agreements;

2) Whether the claims in the Greek proceedings fall within Clause 6 (the exclusive jurisdiction clause) of the CMI Settlement Agreement and Clause 5 of the LMI Settlement Agreement;

3) Whether the claims in the Greek proceedings fall within the exclusive jurisdiction clause in the original insurance policies;

4) Whether the claims for damages for breach of the settlement provisions and the jurisdiction provisions infringe EU law;

5) Whether the claims for associated declarations infringe EU law;

6) Whether the insurers are entitled to summary judgment for damages for breach of the jurisdiction provisions; and

7) Whether the indemnity provisions apply given the nature of the allegations being made in the Greek proceedings and the stage at which those proceedings have reached.

**Do the Greek claims fall within the settlement provision and the indemnity provision of the Settlement Agreements?**

7.      In one sense it could be said that the indemnity provision is somewhat wider than the settlement provision since in the settlement provision the owners agree to accept the relevant sums in full and final settlement of all and any claims the Assured and the claimant may have <u>under</u> the policy in relation to the loss of "Alexandros T", whereas in the indemnity provision the Assured and the claimant agree to indemnify underwriters against any claim that might be brought against them in relation to the loss of "Alexandros T" <u>or</u> under the policy.  The Greek claims (however much the claims may be tortious or delictual rather than contractual) are clearly brought in relation to the loss of the "Alexandros T" and thus, on any view, fall within the indemnity provision.  Do they also fall within the settlement provision?

8.      In my opinion they do so fall partly because it is the obvious intention of the parties that the settlement provision and the indemnity provision should march together and complement one another, but also because, ever since the decision of the House of Lords in <u>Fiona Trust v Privalov</u> [2007] Bus L.R. 1719, fine distinctions between words such as "under" or "in relation to" should no longer be made, at any rate when one is construing arbitration clauses.  Jurisdiction clauses are very similar to arbitration clauses (and, of course, appear in the Settlement Agreements with which this court is concerned); settlement clauses are analogous to both arbitration and jurisdiction clauses and should likewise be given a sensible commercial meaning; the words "full and final settlement" point to the intention of the parties that all claims in relation to the loss of the "Alexandros T" should be included in the settlement and the parties be able to continue their existence without being disturbed by further litigation in relation to that loss.

9.      The owners submitted that the <u>Fiona Trust</u> principle was not universal and should not apply to settlement agreements.  They relied on <u>Barclays Bank Plc v Nylon Capital LLP</u> [2011] EWCA Civ 826; [2012] Bus L.R. 542 in which <u>Fiona Trust</u> was distinguished.  But that case was about a clause requiring an expert to determine the allocation of partnership profits; any other dispute would have to be determined by the English courts in any event.  In these circumstances the rationale of <u>Fiona Trust</u> (that sensible businessmen would not want their disputes to be determined partly by

arbitration and partly by another tribunal such as the court) did not apply because the parties had expressly agreed that such a division was to occur.  As Thomas LJ (as he then was) put it (para 28):-

> "In contradistinction expert determination clauses generally presuppose that the parties intended certain types of dispute to be resolved by expert determination and other types by the court."

No such presupposition applies in the present case.

10.    It follows that the Greek proceedings fall within both the settlement provision and the indemnity provision and Burton J was right so to hold.

**Do the Greek claims fall within the (exclusive) jurisdiction clauses in the Settlement Agreements?**

11.    Once one is satisfied that the Greek claims fall within the settlement and indemnity provisions of the Settlement Agreement, it must follow that the Greek claims fall within the exclusive jurisdiction clause of the CMI Settlement Agreement and also fall within the jurisdiction clause of the LMI Settlement Agreement.  The Fiona Trust decision must apply to jurisdiction clauses just as much as arbitration clauses.  The Greek claims thus should have been brought in England.

**Do the Greek claims fall within the exclusive jurisdiction clauses in the original insurance policies issued by CMI and LMI?**

12.    Again the answer is that they do, however much the Greek claims may be tortious or delictual.  As Lord Clarke explained in para 4 of his judgment each party to the policy agreed to submit to the exclusive jurisdiction of the courts of England and Wales.  Indeed the owners proposed to amend their claim to allege that they had sustained losses beyond the measure of indemnity in the relevant policy relying on the very facts on which reliance is now placed in the Greek proceedings.  The fact that these claims are not permissible in English law and that Tomlinson J refused permission to the owners to make that amendment for the reasons given in para 6 of Lord Clarke's judgment is nothing to the point because the owners had promised to submit to the exclusive jurisdiction of the English courts and thus promised not to bring claims in other courts where such claims might (or might not) succeed.

13.    To the extent that persons other than the parties to the policies of insurance (or indeed, the settlement agreements) have brought claims in Greece those claims will not be caught by the jurisdiction clause in the policies (or the settlements).  That, of course, is why the Settlement Agreements had to contain the indemnity clause, by which the parties to the Settlement Agreements agreed to indemnify underwriters in the event that parties other than the parties to the policies (and the Settlement Agreements) initiated proceedings against underwriters in relation to the loss of the "Alexandros T".

14.    In these circumstances the underwriters have (as they were entitled to do) issued proceedings in England claiming (1) declarations that the bringing of the Greek proceedings was a breach of the release in the Settlement Agreements and (2)

damages for breach of the release in the Settlement Agreements and for breach of the jurisdiction clause in both the policies and the settlement agreements (as more fully described in para 18 of Lord Clarke's judgment).

**Do the claims for damages infringe EU law?**

15.   The owners assert that these claims for damages interfere with the jurisdiction of the Greek court to determine its own jurisdiction and, if appropriate, the merits of the owners' claims.   For this purpose they rely on Turner v Grovit [2004] 2 Lloyds Rep. 169.   This reliance is, however, misplaced because Turner v Grovit related to anti-suit injunctions and no such injunction is claimed in the present case.   The vice of anti-suit injunctions is that they render ineffective the mechanisms which the Jurisdiction and Judgments Regulation provides for dealing with lites alibi pendentes and related actions.   One of those mechanisms is provided by Article 27 which requires any court other than the court first seised to stay proceedings involving the same cause of action.   Our earlier decision did precisely that because we considered that the Greek proceedings did involve the same cause of action as the English proceedings but the Supreme Court has now held that we were wrong about that and has also refused a stay under Article 28.   There is therefore no question of any interference with the jurisdiction of the Greek court.

16.   The Greek court is free to consider the Greek claims; it will, of course, have to decide whether to recognise any judgment of the English court that the Greek claims fall within the terms of the Settlement Agreement and have therefore been released.   It will also have to decide whether to recognise any judgment awarding damages for breach of the Settlement Agreements and the jurisdiction clauses in both the settlement agreements and the insurance policies.   But that is not an interference with the jurisdiction of the Greek court but rather an acknowledgment of the Greek court's jurisdiction.   In these circumstances there is no infringement of EU law, nor is there any need for a reference to the Court of Justice of the European Union despite the owners' repetition of their request for such a reference in their new solicitors' letter of 26th June 2014.

17.   In fact the owners appear almost to recognise that this is the position since they expressly accept that the claim for an indemnity pursuant to the Settlement Agreements is not contrary to EU law (see their supplemental skeleton, para 48). That is plainly right (see also the observations of Lord Neuberger at para 132 of his judgment in the Supreme Court).   But if the claims to an indemnity do not infringe EU law, it is very hard to see why claims to damages should infringe that law.

**Do the claims for declarations infringe EU law?**

18.   The claims for declaratory relief are set out in para 18 of Lord Clarke's judgment. The CMI claim set out in sub-para. (a)(1)(i) has been abandoned but the other declarations are still being sought and the same principles and the same result must apply to these claims for declarations as to the claims for damages, namely that they do not infringe EU law.   The LMI claim set out in sub-para. (a)(2)(i) has not been abandoned but in circumstances in which the Supreme Court has not thought it right to make a reference in respect of that claim it would obviously be inappropriate for this court to do so.   The remaining claims for declarations by LMI are, like those of CMI, claims which do not infringe EU law.

**Summary Judgment for damages (to be assessed) for breach of the jurisdiction provisions?**

19.     The question whether the owners are acting in breach of the jurisdiction provisions is a question of law. It is clear to me that they are and the judge was therefore right now to give judgment for damages to be assessed pursuant to CPR Part 24. Damages were awarded in similar circumstances in Ellerman Lines Ltd v Read [1928] 2 KB 144.

20.     It is suggested by the owners that any claim for damages is premised on the assumption that the Greek claims would have failed on the merits if they had been advanced in England. But, quite apart from the fact that Tomlinson J refused permission to advance the claims in England (with the result that they have failed in England), the owners' breach of contract lies in the bringing of the claims. Whether they succeed in Greece or would have failed in England is irrelevant.

**Is it too early to invoke the indemnity provisions?**

21.     Burton J thought not and I agree. The underwriters have already incurred and are still incurring considerable expense as a result of the proceedings being wrongly brought in Greece. They should be indemnified in respect of those expenses as and when they occur. It is appropriate that a fund was established by Burton J and, to the extent that it is said he should not have made any such order, any such argument cannot be supported.

22.     Owners have submitted a new argument that the underwriters cannot take advantage of their own wrong to maintain a claim to indemnity. But it is much too late to make that argument on appeal. It should have been pleaded and explained to the trial judge what wrong the underwriters had committed. Tomlinson J's refusal of permission to amend makes it clear, in any event, that the underwriters have committed no wrong in the eye of the law of England which is the law the owners agreed would cover their disputes with the underwriters, both in the insurance policies and in the Settlement Agreements.

**The position of the HD defendants**

23.     Although we gave Mr David Bailey QC permission to address us on behalf of these defendants, it did not seem to me that these defendants had any specific point to make relevant to their own position, different from the points made by the underwriters. The owners' new solicitors in their letter of 30th June 2014 pointed out that Burton J had stayed the claims of these defendants until final determination of this appeal. The Supreme Court, however, lifted the stay in paragraph (2) of its order. In any event, it seems to me that they ought as necessary to be able to make any special point relevant to their position and to the arguments on the owners' appeal. Moreover, no prejudice can have been caused to the owners by our having listened to the points Mr Bailey sought to make, to which it is unnecessary to refer any further.

**Conclusion**

24.     For all these reasons the remainder of this appeal fails and I would uphold the orders made by Burton J.

**Lord Justice Rimer:**

25.    I agree.

**Lord Toulson:**

26.    I also agree.