# EXHIBIT C

## UBS AG & Anor v HSH Nordbank AG.

[2009] EWCA Civ 585

Court of Appeal (Civil Division).
Ward LJ, Lord Collins of Mapesbury and Toulson LJ.
Judgment delivered 18 June 2009.

> *Jurisdiction clause – Conflict of laws – Banking – Negative declaration – Collateralised debt obligations – Defendant sued claimant in New York alleging misselling and mismanagement of securities – Parties had entered into different agreements for different aspects of overall relationship with different terms as to jurisdiction – Dealer's confirmation relating to notes used to pay for other notes contained English jurisdiction clause – Parties did not intend jurisdiction clause contained in dealer's confirmation would govern every dispute relating to inducement of making such investment – Standard form bond issue jurisdiction clause in dealer's confirmation did not apply to claims that transaction as a whole induced by misrepresentation – Council Regulation 44/2001, art. 23.*

This was an appeal by an investment bank, UBS, from a decision that the English court did not have jurisdiction in respect of its claims for negative declarations.

The respondent, HSH, was a commercial bank incorporated in Germany. HSH had assumed the assets, rights and obligations of another German bank, LB Kiel. The transactions in issue took place in 2002/2003 between UBS and LB Kiel.

HSH had brought proceedings against UBS in New York claiming that UBS made fraudulent and negligent misrepresentations and non-disclosures thereby inducing LB Kiel to invest in certain loan notes (the NS4 notes) in a transaction governed by New York law.

UBS brought proceedings in England for declarations of non-liability relying on an exclusive English jurisdiction clause in dealer's confirmation relating to the notes (the Kiel MTN notes) which HSH had used to pay for the NS4 notes.

The judge held that that English jurisdiction clause was insufficiently wide to cover the dispute set out in the New York complaint. All matters relating to the NS4 notes were subject to the laws of New York and all the relevant agreements contained submissions to the jurisdiction of the New York courts, except one which was silent as to jurisdiction and hence effectively agreed that action could be brought in any court of competent jurisdiction. That agreement would not entitle UBS to sue HSH, a German domiciled company, in England. The result was that the English court did not have jurisdiction under art. 23 of Regulation 44/2001.

A

UBS appealed arguing that the Kiel MTN notes were central to the transaction. The dealer's confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court. It should be given a generous interpretation. Also particular weight should be given to the fact that the dealer's confirmation jurisdiction clause, in favour of the English courts,

B

was an exclusive jurisdiction clause. The other jurisdiction clauses in the other contracts comprising the transaction were each non-exclusive New York clauses. In so far as the parties were to be taken to have been addressing the question of how any overlap between different jurisdiction clauses was to be resolved, that was the clearest indication that they envisaged that if a matter fell within the

C

wording they had agreed in the dealer's confirmation jurisdiction clause, then it would take precedence over any other clause which might also apply.

*Held*, dismissing the appeal:

D

Sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seemed plain that the result for which UBS contended would be a wholly uncommercial result and one that sensible business people could not have intended. It was fanciful to suppose, as UBS contended, that the dealer's confirmation jurisdiction

E

clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash. The dispute had nothing to do with the Kiel MTN notes, which were no more than the consideration for the NS4 notes. The parties could not be taken objectively to have intended that the jurisdiction clause contained in the dealer's confirmation, i.e. the method of

F

payment for the investment, would govern every dispute relating to inducement of making such investment. The same allegations would be made if Kiel LB had paid for its investment in cash instead of notes. Whether a jurisdiction clause applied to a dispute was a question of construction. Where there were numerous jurisdiction agreements which might overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should

G

be the subject of inconsistent jurisdiction clauses. The jurisdiction clause in the dealer's confirmation was a 'boiler plate' bond issue jurisdiction clause, and was primarily intended to deal with technical banking disputes. Where the parties had entered into a complex transaction it was the jurisdiction clauses in the agreements which were at the commercial centre of the transaction which

H

the parties must have intended to apply to such claims as were made in the New York complaint and reflected in the draft particulars of claim in England. The standard form bond issue jurisdiction clause in the dealer's confirmation did not apply to claims that the transaction as a whole, and in particular the purchase of the NS4 notes, was induced by misrepresentation.

A   'investment in a multiple tranche synthetic Collateralised Debt Obligation'. The
declarations which were sought were:

(i) that the Principal Agreements and the terms contained therein, as well as all other
written agreements and/or written notifications and/or documents entered into and/or
executed by the parties pursuant to or related to or in connection with the Transaction
B   (the 'Related Documents') were and had been at all material times valid, binding and
enforceable;

(ii) that HSH was not entitled to rescind any of the Principal Agreements or any of
the Related Documents (which is no longer relevant since the claim for rescission has
C   been dropped);

(iii) that HSH was not induced to enter into the Transaction by the alleged
misrepresentations and/or non-disclosures;

D   (iv) that the obligations of the parties in relation to the Transaction were (and had at
all material times been) governed by, and are limited to, the terms of the Principal
Agreements and/or the Related Documents and, save as expressly set out in those
Agreements and/or the Related Documents, UBS had assumed no obligation, duty or
other responsibility, whether of a fiduciary or other nature, to HSH;

E   (v) alternatively, that any such duty, obligation or responsibility undertaken by UBS
had been lawfully performed and discharged;

(vi) that UBS had not been unjustly enriched as alleged and/or had not converted any
of HSH's funds and/or HSH's investment as alleged;

F   (vii) that UBS had materially complied with and/or discharged each and all of its
relevant obligations arising out of or in connection with the Principal Agreements
and the Related Documents and accordingly UBS had not caused and/or was not
liable to HSH in respect of any loss or damage arising out of or in connection with
those Agreements and the Related Documents (whether in contract, tort, statute or
G   otherwise) which may have been suffered or incurred by HSH in connection with the
Transaction.

82. Are these claims within the Dealer's Confirmation jurisdiction clause? I accept
UBS's submission that the proper approach to the construction of clauses agreeing
H   jurisdiction is to construe them widely and generously: *Donohue v Armco Inc* [2001]
UKHL 64; [2002] CLC 440 at [14]. I also accept that in the usual case the words
'arising out of' or 'in connection with' apply to claims arising from pre-inception
matters such as misrepresentation: *Fiona Trust & Holding Corp v Privalov* [2007]
EWCA Civ 20; [2007] 1 CLC 144 (affd sub nom *Premium Nafta Products Ltd v Fili
Shipping Co Ltd* [2007] UKHL 40; [2007] 2 CLC 553, *Deutsche Bank AG v Asia*

*Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091; [2008] 2     A
CLC 520, *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488.

83. But the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487; [2008] 2 CLC 864 at [93], whether a dispute     B
falls within one or more related agreements depends on the intention of the parties as revealed by the agreements.

84. Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my     C
judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended.     D

85. It is fanciful to suppose (as UBS contends) that the Dealer's Confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash.     E

86. The Dealer's Confirmation is expressed to be issued pursuant to LB Kiel's US$20 billion Global Medium Term Note Programme and simply confirms the issue of the US$500 Kiel MTN Notes to UBS as one of the dealers on HSH's bond programme. UBS immediately transferred them to NS4. NS4 kept the Kiel MTN Notes as an investment or 'collateral' to create income in order to fund payments     F
under the NS4 Notes.

87. I accept HSH's argument that the Kiel MTN Notes are simple AAA-rated bonds that HSH issued pursuant to a pre-existing bond programme. HSH used these Notes (rather than cash) to pay for the NS4 Notes. This dispute has nothing to do with the Kiel MTN Notes, which were no more than the consideration for the NS4     G
Notes. The parties cannot be taken objectively to have intended that the jurisdiction clause contained in the Dealer's Confirmation (i.e. the method of payment for the investment) would govern every dispute relating to inducement of making such investment.

88. There is no dispute about the issue, sale or performance of the Kiel MTN     H
Notes. Their holder, NS4, is not a party to any of the proceedings. None of the parties to the proceedings advances any claim under the Kiel MTN Notes against any other party. None of the parties suggests there has been any breach of the Kiel MTN Notes, or any misrepresentation in relation to them. The Kiel MTN Notes are supported by a German state guarantee and are virtually equivalent to cash. The misrepresentation



IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

**[2012] EWHC 2652 (Comm)**

No. 2012 Folio 188

The Rolls Building

Monday, 27th February 2012

Before:

MRS. JUSTICE GLOSTER DBE

B E T W E E N :

YM MARS TANKERS LIMITED                    Claimant

- and -

SHIELD PETROLEUM CO. (NIGERIA) LIMITED     Defendant

_____

*Transcribed by BEVERLEY F. NUNNERY & CO*
*Official Shorthand Writers and Tape Transcribers*
*Quality House, Quality Court, Chancery Lane, London WC2A 1HP*
**Tel: 020 7831 5627   Fax: 020 7831 7737**
*info@beverleynunnery.com*

_____

MR. M. COLLETT (instructed by Jackson Parton) appeared on behalf of the Claimant.

MISS V. SELVARATNAM QC (instructed by Ince & Co.) appeared on behalf of the Defendant.

_____

# J U D G M E N T

(Approved)

MRS. JUSTICE GLOSTER:

1.  This is an application by the first defendant, Shield Petroleum Co. (Nigeria) Limited ("Shield"), for an order staying paragraphs 1(1) and 1(2) of an order which I made without notice on 3rd February 2012 ("the 3rd February Order") on the application of the Claimant, YM Mars Tankers Limited, ("Owners"). The 3rd February Order required Shield:  1) immediately to take such steps as were necessary to release MV YM Saturn ("the Vessel") from arrest in Nigeria, and to secure the discontinuance of all proceedings in suit No. FHCLCS1552 2011 in the Federal High Court in Lagos, or elsewhere in Nigeria; and 2) not to take any further steps in such proceedings other than such steps as were necessary to secure such release.  I also made an order 3) restraining Shield, from commencing or continuing any proceedings in respect of the claims for damages arising from the carriage and delivery of a cargo of PMS gasoline under a bill of lading dated 8 September 2011 from Offshore Cotonou in Benin ("the Bill of Lading"), otherwise than before the English High Court under the terms of the Bill of Lading.

2.  Miss Selvaratnam QC, who appears on behalf of Shield, which is a cargo receiver, invites the court to stay those paragraphs of the order pending what she suggests should be an expedited hearing of: (i) a Part 11 application, yet to be issued by Shield, to challenge the jurisdiction of this court to entertain the action; and (ii) the effective inter partes hearing of Shield's application to discharge the 3rd February Order.  Miss Selvaratnam suggests that such an application could be heard - with an estimate of one day - on Friday 16th March 2012.  She argues that, in the meantime, the court should stay paragraphs 1(1) and (2) of the 3rd February Order in order to hold the ring.  Because this is an urgent matter, the court could indeed make available a one day hearing, excluding reading time, on Friday, 16th March.

3.  The claimant, YM Mars Tankers Limited, ("Owners"), are the owners of the Vessel.  By a time Charterparty on an amended Shelltime 4 form, evidenced by a recap dated 4th September 2011, ("the Head Charterparty") Owners chartered the Vessel to Fleet Trade & Transport Inc ("Fleet"), a company incorporated in the Marshall Islands, for a period of "min 1 month plus 1 month CHOPT which to be advised 15 days in advance".

4.  The Head Charterparty expressly provided, amongst other terms, as follows:

    "B/Ls Cls

    'In case that an original Bill of Lading is not available at discharging port on the Vessel's arrival and/or the Vessel is ordered to discharge at a port other than the port specified in the original Bill of Lading. Owner will accept Head Charterers' LOI by email/fax as per Owner's P and I Club wording without bank guarantee signed by

Charterers authorised officer only. The original LOI to be sent to Owner's office at the earliest. ... Issued LOI to be counter signed by Charts and countersigned by Receivers o'wise Vessel will not discharge.

...

- In case Bs/L are issued to the order of a bank then Chrs' LOI to be countersigned by an authorised officer of the bank / or a direct e-mail message from the Bank towards the Owners verifying and consenting that the Bank do not have objection and unconditionally permits the specific cargo B/L ... date ... Ex M.... to be discharged according to Chrs instructions

All bills of lading to be issued under the CP and relating to loading and/or discharge in West Africa to be subject to Hague or Hague Visby Rules and English Law / Jurisdiction.

...

- LAW AND LITIGATION CLAUSE: any dispute arising out of or in connection with this charter, involving amounts in excess of US$ 50,000 (United States Dollars Fifty Thousand) shall be subject to the jurisdiction of the English High Court. Any dispute arising out of or in connection with this charter involving amounts up to and including US$ 100,000 (United States Dollars Fifty Thousand) shall be referred to arbitration by a single arbitrator in London in accordance with the provisions of the London Maritime Arbitrators Association (LMAA) Small Claims Procedure. OR ALTERNATIVELY, PROVIDED BOTH PARTIES MUTUALLY AGREE THEN PARTIES CAN PROCEED TO ASDEM

LONDON WITH COSTS 50/50 OR LOOSING PART. NO APPEAL TO SUCH ORDER

...

- Ows not to discharge in case there is an outstanding hire or AWRI from Charts to Ows.

English Law – G/A Arbitration London.

...

Lien

26.   Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter: …

…

Construction

42.   The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof."

5.   By a time Charterparty on an amended Shelltime 4 form dated 4th September 2011 ("the Sub-Charterparty"), Fleet chartered the Vessel to the second defendant, Sopetro Marine Limited ("Sopetro"), for a period of "minimum one (1) month plus one (1) month in Charterers' option to be advised 15 days in advance". The Sub-Charterparty was on substantially back-to-back terms with the Head Charterparty, albeit that the daily rate of hire was $15,000 per day rather than $14,500.

6.   By the Bill of Lading, Owners acknowledged the shipment on board the Vessel of goods said to be 13,255.106 metric tons (vac) of PMS gasoline, ("the Gasoline"), at offshore Cotonou for carriage to Apapa Sea Port, Lagos, Nigeria. The Bill of Lading was in the Congenbill 1994 form and expressly provided, amongst other terms, as follows:

"[Page 2]

Shipper

NIMEX PETROLEUM LTD

Consignee

TO THE ORDER OF ING BELGIUM,

BRUSSELS, GENEVA BRANCH

…

FREIGHT PAYABLE AS PER CHARTER PARTY dated

…

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

FREIGHT PAYABLE AS PER CHARTER PARTY

...

[Page 1]

Conditions of Carriage

(1)    All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated."

7.    As I said, I granted the injunction on a without notice basis on Friday 3rd February 2012.  On that occasion, Mr. Nicholas Parton, a partner in Jackson Parton, the solicitors' firm acting for Owners, appeared before me as an advocate.

8.    For the purposes of the hearing before me today it does not appear to be in dispute that:

i)    Fleet failed to pay hire and other sums when due under the Head Charterparty;

ii)    Fleet failed to tender to Owners an LOI for delivery of goods without presentation of the bill of lading conforming with the requirements of the Head Charterparty, namely, that the LOI was duly countersigned in the terms required.  The LOI which was dated 13th September 2011, and presented by Fleet, was not countersigned by the bank to whose order the bill was consigned, ING, and ING withdrew any consent to discharge.

iii)    Owners then lawfully exercised the lien over the cargo given to them by clause 26 of the Head Charterparty, and also the additional clause:

"The Owners not to discharge in case there is outstanding hire or AWRI from charterers to the Owners", (as also set out above).

On 18th November 2011, Owners obtained an order from the Nigerian court placing a lien on the Gasoline on board the Vessel to secure Owners' claim for unpaid charter hire pending the provision of an acceptable bank guarantee to secure Owners' claim.

iv)    On 8th December 2011, Shield and Sopetro each provided letters of undertaking to Owners in similar terms promising, amongst other things, not to arrest the Vessel.  The letter of undertaking given by Shield was in the following terms:  it referred to the Vessel, the voyage, the cargo, and the Bill of Lading;  it was addressed to Owners, and also MAS Shipping & Transportation Trading Inc, Owners' managers.  It recited as follows:

"In consideration of your agreement to discharge and deliver the cargo in accordance with our agreement, we confirm on our own

behalf and on behalf of any person asserting rights under the above Bill of Lading, or otherwise, claiming to have an interest in the cargo that no claim will be brought against yourselves, the Vessel, the Master of the Vessel, other agents of yourselves or the Vessel, or their respective insurers, arising out of the aforesaid Bill of Lading, or in connection with the voyage of the Vessel, for any reason whatsoever, including but not limited to any delay in discharge and/or delivery of the cargo.  This agreement shall be covered by English law and shall be subject to the non-exclusive jurisdiction of the English court."

And it was purportedly signed on behalf of Shield.

v)    By 12th December 2011, Shield had remitted $1.556 million in two tranches to Owners in respect of the hire and other sums outstanding and unpaid by Fleet.

vi)   It was only on 20th December 2011, however, that the master of the Vessel confirmed that he had received the original endorsed Bill of Lading.  That fact is not in dispute.

vii)  The Vessel discharged between 21st and 23rd December.

viii) It was then, contrary to the undertaking which apparently had been given in Shield's letter of undertaking, arrested in Nigeria at the suit of Shield on 23rd December.  Shield also advanced a substantial claim against Owners in the Nigerian proceedings to the effect that it was entitled to substantial damages for delay in the discharge of the cargo.  The claims are made variously in US dollars and in Nigerian naira, and they appear to total in excess of $13 million.

ix)   Subsequently, on 20th January 2012, the Lagos court of first instance ordered the release of the Vessel following an application by Owners based on what was alleged by Owners to be Shield's failure to make full and frank disclosure to the Nigerian court.  That application to set aside the arrest of the Vessel was made on 3rd January 2012, there having been delay caused by a general strike in Lagos.  The grounds of Owners' application were that Shield had misled the court in two material respects:  first, that Shield had failed to mention to the court that there was a charterer in the contractual chain which had failed to pay hire to Owners; and, secondly, that Shield and sub-charterers, Sopetro, had given the letters of undertaking to Owners.  That application was made to the Nigerian court subject to an express reservation of rights to argue that the Lagos court had no jurisdiction.

x)    On 20 January 2012, the Nigerian court found in favour of Owners' application on the ground of non-disclosure, and ordered the release of the Vessel.

xi)    However, subsequently, an appeal was lodged by Shield, according to Owners, on the sole ground that the application to release was filed late, due apparently to the general strike.

9.    According to Miss Selvaratnam, however, Shield's appeal to the Nigerian Court of Appeal will raise wider issues than simply the time point; she said that Shield will contend that there was no material, or indeed any, non disclosure, in its original application for an arrest; that moreover there was no obligation upon Shield to disclose the existence of the letter of undertaking on the application for the arrest; and that, in any event, the letter of undertaking was given as a result of illegitimate economic duress; and that the person who signed it, a Mr. Mills, was only the chief operating officer and lacked authority to give the letter of undertaking on behalf of Shield.

10.    As I have said, the Nigerian court ordered the release of the Vessel on 20th January. However, because Shield has lodged an appeal in the Nigerian court, the Vessel remains under arrest, and remained under arrest at the time the earlier without notice application was made to me.

11.    It was not in dispute before me that, whilst the Vessel remains under arrest, Owners continue to suffer loss and damage. These were summarised in paragraph 27 of Mr. Parton's affidavit in support of the original without notice application. These include losses at $14,500 a day (the Head Charterparty rate); since the date of the arrest to the date of Mr. Parton's first witness statement of 2nd February, the total was $609,000; in addition substantial sums were owed in respect of the hire outstanding at the date of arrest, bunkers, agency expenses and freshwater costs. It is likely that there will be an additional claim for the loss of a fixture dated 19th December 2011 from Lagos to Antwerp. It was in those circumstances that Mr. Parton deposed that damages were not an adequate remedy for Owners in respect of what Owners asserted was a breach of the jurisdiction agreement as set out in the Head Charterparty, and (according to Owners) incorporated in the Bill of Lading.

12.    At the without notice hearing, I granted the injunction against a cross-undertaking in damages from Owners, which is a one ship company. I am told today that the Vessel is worth in the region of $25 million. Pending any application for the discharge of the injunction, I required Owners to lodge by way of security the sum of £35,000. That was effectively provided by a letter from Jackson Parton, Owners' solicitors, confirming that such sum was being held to the order of Jackson Parton's client account to the order of this action. The quantum was fixed by reference to the likely costs of any application to this court by Shield to

vary or discharge the 3rd February order, and/or to seek fortification of Owners' cross-undertaking in damages.

13.  Pursuant to a further order made by me on 17th February, Sopetro was added to the claim form as second defendant by amendment on 22nd February.   Shield acknowledged service on 23rd February by Ince & Co, although it was clear that Ince & Co. had in fact been acting on behalf of Shield for some time prior to 23rd December.

14.  The grounds on which this application is made to stay paragraphs 1(1) and 1(2) of the 3rd February Order pending the hearing of Shield's Part 11 application, and what Miss Selvaratnam contends should be the effective *inter partes* hearing of an application to discharge the 3rd February Order, are basically fourfold.  First, as set out in Mr. Jonathan Lux's two witness statements served on behalf of Shield (Mr. Lux being a partner in Ince & Co), Shield contends that it has a good arguable claim against Owners for amounts in excess of $13 million, plus interest and costs, and, that unless satisfactory security for those claims is provided, it is highly likely that those claims will go unsatisfied if the Vessel is released from arrest.  Shield contends that Owners are a one ship company with no evidence of assets apart from the Vessel.  Shield's second ground is that the Bill of Lading did not on its true construction incorporate the jurisdiction of the English High Court.  The third ground is that the letter of undertaking was extracted from Shield by the exercise of illegitimate pressure by Owners, and the fourth ground is that the letter of undertaking was not legally binding or duly authorised by Shield for want of compliance with formalities under Nigerian corporate law.

15.  In support of these grounds, Miss Selvaratnam submitted that on the evidence it was now clear that the Nigerian Court of Appeal has fixed 2nd April 2012 as the date for hearing of Shield's appeal against the discharge of the arrest and that, if Shield were to be prevented from appearing at the hearing by the anti-suit injunction, there would be a very real risk that its appeal will be dismissed and the Vessel released from arrest.  It was on that basis that she asked the court to:

i)   give directions for the expedited hearing of Shield's Part 11 jurisdictional challenge and the effective hearing of Shield's discharge application so that it was determined in good time prior to 2nd April 2012; and

ii)  pending that hearing, grant a stay of paragraphs 1(1) and (2) of the order.

16.  Miss Selvaratnam submitted that, in accordance with authority, the court had to be satisfied before making an interim anti-suit injunction that the claimant was entitled to final relief.  That is because the effect of an anti-suit injunction restraining Shield from pursuing its appeal to the Nigerian court against the release of the Vessel, would effectively be final.  Miss Selvaratnam quoted paragraphs 13.27 to 13.29 from *The Anti-Suit Injunction* by *Raphael*.  She also quoted paragraph 13.32, where the author of *Raphael* states that:

> "On the other hand, if the question of breach of contract cannot properly be resolved in advance of trial (for example where the injunction respondent contends that an alleged exclusive forum clause was not in fact agreed, or that it can be 'impeached' for some reason), it will be insufficient for the applicant to show merely that there is a serious issue to be tried as to the validity of the clause, or that his case is arguable. Instead, the current approach appears to be that in order to justify the application of the *Angelic Grace* principles the applicant will have to show to a 'high degree of probability' that there is a valid and binding exclusive form clause. Conversely, it will not be sufficient for an injunction respondent merely to *allege* that a *prima facie* valid exclusive forum clause is invalid or not binding in order to displace the application of the *Angelic Grace* principles; he will have to produce 'credible' evidence to 'impeach' the clause which is enough to displace the 'high probability' that the clause will be enforced at trial. If the respondent's attempt at impeachment fails, then the *Angelic Grace* principles will be applied on the basis that the court is sufficiently satisfied that the clause is binding."

17.   I also refer to paragraph 13.31 of the same textbook:

> "Under the principles developed in *The Angelic Grace*, where the injunction defendant is in breach of contract, an anti-suit injunction should be granted unless there are good reasons not to do so. At the interim stage this poses the question of what level of proof of a breach of contract is required.
>
> Where the question of whether the injunction respondent is in breach of contract can be satisfactorily resolved at the interim hearing (for example where there is a straightforward dispute about the construction of the exclusive forum clause), the courts will usually require the injunction applicant actual to convince the court, for the purposes of the interim hearing, that the foreign proceedings were indeed in breach of contract, in order to justify the application of the *Angelic Grace* principles at the interim stage. If this can be shown, then the interim injunction will be granted unless the injunction respondent can show at the interim hearing that there are 'strong reasons' not to do so."

18.   Accordingly, I have to decide whether I accede to Shield's application for a further hearing on Friday 16th March and grant a stay of the relevant paragraphs of the 3rd February Order in the meantime, or whether, as Mr. Collett, counsel acting for Owners, submits that I should, I rule on the discharge application made by Shield here and now. Of course, any order that I make today would not,

theoretically at any rate, prevent the defendant from pursuing a Part 11 jurisdiction application, or, indeed, a discharge application on fuller or further evidence, although, for obvious reasons, it might be somewhat of a disincentive if I were to rule on the discharge application adversely to Shield today.

19.   The underlying financial considerations are as follows.   Miss Selvaratnam submits that the evidence shows that Shield is not in any way trying to act in an un-commercial fashion. Shield, by Ince & Co., have offered to release the Vessel against the production by Owners of a Club letter of undertaking which would respond to an appropriate jurisdiction. However, it appears clear that the cost of a Club letter of undertaking would be in the region of 1% of the total value of Shield's claim, or at least that was what I was told by Miss Selvaratnam initially. Thus, Owners would be looking at a cost of something in the region of $130,000, which would have to be paid upfront.  Subsequently, Miss Selvaratnam told me on instructions that it was a matter of discretion for the Club whether or not it would charge as much as 1%, given that the undertaking would only be required, at least in the first instance, pending the discharge application.  It would, of course, if Shield were successful on that application, have to continue thereafter for perhaps an indeterminate time, or at least pending the hearing of Shield's appeal to the Nigerian Court.  Miss Selvaratnam submits that, unless security is provided by Owners, Shield's claim for $13 million will, in effect, remain unpaid if the Vessel is released.  Mr. Collett submits that the same goes for Owners' continuing damages, in that Owners will be effectively wholly unsecured for their ongoing losses pending the resolution of the dispute.

20.   It is against that background that I have to decide, effectively, whether to determine the discharge application here and now on the evidence currently before me or adjourn it for another two weeks and stay paragraphs 1(1) and 1(2) of the 3rd February order in the meantime.  I have concluded that it is appropriate that I should decide today whether the 3rd February Order should be discharged. Miss Selvaratnam argues that it may be that there would be additional evidence that Shield would wish to provide for a discharge hearing in two weeks time. However, given the time that has elapsed since the date of my order, and, in particular, the fact that these parties have been in dispute since September, and proceedings have already been under way in the Nigerian courts for some time, it is surprising, to say the least, that, if indeed there is additional evidence, that evidence relating to Shield's allegations of economic duress and want of authority was not before me today.  Ince & Co, as I have said, have been acting in this matter since well before the original arrest of the Vessel. If Shield had wanted to put forward additional evidence before me, whether to support their cargo claims, their arguments in relation to the non-incorporation of the Charterparty terms into the Bill of Lading, their allegations about duress or want of authority, they have had every opportunity to do so.

21. In those circumstances, it seems to me that I should grasp the nettle and decide today whether or not the injunction should be discharged. This will not preclude any further application by Shield to discharge the injunction on the basis of further evidence, but it seems to me that I have to deal with the application on the evidence as it stands today rather than simply staying the order for a further two weeks. I am not clear to what extent, if at all, the court would be better informed at that date in relation to the evidential basis for Shield's discharge application, and Miss Selvaratnam did not explain why. To stay the order would expose Owners to the continuing risk of non-recovery of their ongoing losses, or require them to pay upfront $130,000 for a Club undertaking to secure the release of the Vessel with only speculative chances of recovery of that sum. It would also require Owners to incur the costs of engaging with the Nigerian appeal process - also potentially irrecoverable as there is no evidence to suggest that Shield (although apparently a member of a large international group) would be amenable to execution in this jurisdiction, or, indeed, has assets in Nigeria that would be available to satisfy any adverse costs liability.

22. I therefore turn to consider whether I should discharge the 3rd February Order in order to permit Shield to pursue its appeal to the Nigerian Court against the release of the Vessel from arrest.

23. In my judgment, the grounds put forward to support Shield's discharge application are extremely weak. First, as Mr. Collett submitted, the claims that have been put forward by Shield to support its claims for $13 million in relation to the alleged delay in discharge of the cargo from the Vessel are not impressive. I would not describe them as good or arguable.

24. Shield was not a party to the Head Charterparty and had no right to demand delivery of the cargo without presentation of the Bill of Lading. On what appears to be the agreed chronology of this matter, the original endorsed Bill of Lading was not presented to the master until 20th December 2012. That being so, it is difficult to see how, so far as Owners are concerned, there can be any arguable claim for late delivery of the cargo. It may be that Shield has a claim against Fleet in respect of that sum, but it is difficult to see how any claim for late delivery can be made against Owners in circumstances where discharge took place on 21st December, the very day after presentation of the endorsed Bill of Lading.

25. In the circumstances Owners were clearly entitled to exercise a lien over the cargo for the outstanding sums due under the Head Charterparty, and indeed this very fact appears to have been confirmed by the order of the Nigerian court dated 18th November 2011. Shield's Statement of Claim in the Nigerian proceedings suggests that payments by Sopetro/Shield to Fleet were payments under the Head Charterparty to Owners (although Mr. Lux rightly made no such suggestion). Moreover, the fact that Shield may have paid outstanding sums to Fleet, or that

Sopetro paid sums to Fleet was irrelevant.  Payments under the Sub-Charterparty or to Fleet did not on any basis, or could not on any basis, have excused or prevented Fleet from being in breach of its payment obligations under the Head Charterparty, which entitled Owners to exercise their lien over the cargo prior to 20th December 2012.   Furthermore, the direct payments made by Shield to Owners were voluntary payments in order to release the lien.  Accordingly, I regard Shield's claims against Owners in the sum of $13 million as flimsy.  They do not support Miss Selvaratnam's argument that the effect of the anti-suit injunction would be wrongly to deprive Shield of security for a good arguable claim.

26.     For the purposes of the second ground, I have to consider the issue whether or not the clause in the Head Charterparty (the clause referred to by its heading as "the Law and Litigation Clause") was incorporated, or became a term of the Bill of Lading.

27.     The thrust of Miss Selvaratnam's argument was that the Law and Litigation Clause in the Charterparty, cannot have been incorporated in the terms of the Bill of Lading because Condition (1) of the Bill of Lading refers to "the Law and Arbitration clause" of the Head Charterparty, and the Head Charterparty itself in its heading refers to a "Law and Litigation Clause".  She submits, therefore, that the Bill of Lading incorporation provision is inconsistent with the terms of the clause in the Head Charterparty and therefore the latter clause cannot be incorporated into the Bill of Lading.  She submits that the reference to "the Law and Arbitration Clause" in Clause (1) of the Bill of Lading demonstrates a clear intention on the part of the parties to the Bill of Lading that they intended to arbitrate their disputes, in the same way as if they were parties merely to the arbitration clause appearing in the Charterparty.  In this context she relies on the *Delos* [2001] 1 Lloyd's Rep 703, a decision of Mr. Justice Langley, in particular at paragraph 12:

> "12.   ...  The Congen bills plainly referred to 'the Law and Arbitration clause' as a clause (or term) to be incorporated in the bills.  *The Rena K* and *The Nerano* are, I think, clear authority that in such a case the parties to the bills intended to arbitrate and to do so as if they were the parties to the arbitration clause appearing in the charter-party: see per Lord Justice Saville at [1966] 1 Lloyd's Rep p4.  If it were otherwise, the words would serve no purpose."

28.     She further submits that clauses in a Charterparty which are inconsistent with the express provisions of a bill of lading will not be incorporated.  She says that, applying those principles to the facts of the present case, it is clear that it was the intention of the parties to the contract, contained in or evidenced by the Bill of Lading, that their disputes would be subject to arbitration, and that it would fly in

the face of the intention of the parties to the Bill of Lading to require them to litigate their disputes. She submits that to impose an obligation on Shield to litigate its disputes in the English court would involve an impermissible degree of verbal manipulation of the bill and would be manifestly inconsistent with the terms of the bill.

29.    Therefore, she submits, the jurisdictional basis on which Owners obtained their anti-suit injunction is fundamentally flawed because the application was wrongly premised upon incorporation of an exclusive jurisdictional clause requiring Shield to litigate disputes arising in relation to the Bill of Lading before the English court. She submits that the arbitration clause in the Head Charterparty does not apply to claims that are in excess of $100,000; and that since the claim brought by Shield in the Nigerian proceedings are for in excess of $13 million, the arbitration provisions in the Charterparty are therefore inapplicable. She therefore submits it follows that Shield was entitled to bring the present claims before the Nigerian court; Shield is a Nigerian company; the cargo was destined for a Nigerian discharge port; and the Vessel is currently under arrest in Nigeria. She submitted that for all those reasons the Nigerian courts were plainly competent and appropriate for the resolution of the present dispute and therefore it was wrong for this court to grant an anti-suit injunction.

30.    Contrary to Miss Selvaratnam's helpful arguments, I cannot agree with her submissions under this head. As Mr. Collett submitted, the question is whether the term "Law and Arbitration Clause" in the Bill of Lading is apt to apply to the "Law and Litigation Clause" in the Head Charterparty. In other words, is the Bill of Lading referring to and incorporating the entirety of the "Law and Litigation Clause" or merely part of it? In my judgment, on the true construction of the Bill of Lading, the whole of the clause is incorporated. I have little doubt that the printed clause 41 of the Shelltime form, which the "Law and Litigation Clause" replaced, would also have been incorporated by the reference to a "Law and Arbitration Clause" because it provides for High Court jurisdiction with a right to elect for London arbitration.

31.    In my judgment, the "Law and Arbitration Clause" referred to in the Bill of Lading clearly should be, and would be, construed as a reference to the "Law and Litigation Clause" in the Head Charterparty. It would be un-commercial to suggest that, simply because the "Law and Litigation Clause" in the Head Charterparty provides that arbitration should be limited to disputes below a certain level, that somehow meant that only the arbitration provision should be carved out for the purposes of the Bill of Lading. The High Court provisions are all part of the same clause and scheme. It is absurd to suggest that once claims exceed a certain threshold, no jurisdictional provisions are incorporated. Accordingly, I take the view that Owners have satisfied me that the Nigerian proceedings were in breach of the incorporated mandatory provisions that disputes above $50,000 should be subject to the jurisdiction of the English court.

But, on any basis, in my judgement, there is a high degree of probability that there is a valid and binding exclusive jurisdiction clause. I record that it was not argued by Miss Selvaratnam that the clause was a non-exclusive jurisdiction clause. The dictum of Langley J was not in point, so far as the issue which I had to decide was concerned.

32. I conclude that the reference includes, and clearly includes the reference to the jurisdiction of the English High Court in respect of disputes in excess of $50,000.

33. The further basis for the injunction, and the third ground put forward by Shield, is based on the letter of undertaking given by Shield. As I have already said, this purported to be an agreement by Shield not only that there would be no claim by Shield in respect of late discharge and delivery of the cargo from the Vessel but also that the agreement should be governed by English law and should be subject to the non exclusive jurisdiction of the English court. On its face, therefore, it is not simply a jurisdiction agreement, albeit a non exclusive one, but it is also a binding agreement not to bring <u>any</u> claim against Owners under the Bill of Lading, or in connection with any delay in the discharge or delivery of the cargo. If indeed that is a contractually binding agreement on Shield, it is clear that by proceeding with the arrest and appeal in the Nigerian courts, it is in direct breach of the obligations which it assumed in the letter of undertaking .

34. I therefore have to consider whether at this stage there is any evidence before the court to support the two arguments put forward by Miss Selvaratnam to the effect that the letter of undertaking cannot be relied upon by Owners. Her first argument was that the letter of undertaking was given as a result of economic duress. There is nothing in the evidence before me that goes anywhere near to supporting such an allegation. Miss Selvaratnam referred me to a letter in which reference was made to the point. This was a letter written on behalf of Sopetro, which refers to the pressure which Sopetro was allegedly under to supply the cargo to sub-buyers, and also the fact that Sopetro had no other alternative other than to submit to Owners' demands. However, that is not evidence on behalf of Shield, and it seems to me that, even if it were, it did not amount to illegitimate pressure imposed on it by Owners.

35. As I have already mentioned, it is not disputed by Shield that Fleet had failed to pay hire and other sums when due, and therefore that Owners were entitled to exercise a lien over the cargo, as indeed they did. As I have already mentioned, there was no presentation of an endorsed Bill of Lading until 20th December. Moreover, the letters of undertaking were provided <u>before</u> such time as Shield voluntarily settled the outstanding hire and other sums. Accordingly, as Mr. Collett submitted, refusal to discharge after the second payment on 12th December could not have been duress which procured the letters of undertaking because they had already been given by that date. Mr. Collett also submitted that there had been no attempt to set aside the letter of undertaking, which even if it

had been obtained by duress, was not void but merely voidable; and that, accordingly, until such time as attempts were made to avoid the letter of undertaking it stood. I do not rely on that point. It may be technically right, but no doubt it could be argued to the contrary that this application or other conduct on Shield's part is, in effect, an attempt to avoid the letter of undertaking.

36. Accordingly, I am not satisfied that there is any evidence before me today that the letter of undertaking was extracted from Shield by the exercise of illegitimate pressure by Owners. There were real and genuine commercial reasons which necessitate the adoption of a particular course by both Shield (no doubt under commercial pressure to fulfil its contracts with sub-purchaser) and Owners to ensure the release of Owners' lien over the goods.

37. The fourth ground put forward on behalf of Shield to justify the discharge of the order is that the Shield letter of undertaking was signed by a Mr. Jeff Mills, who, as chief operating officer, had no authority to sign Shield's letter of undertaking on its behalf. Again, this is a somewhat surprising assertion being made at a very late stage. In paragraph 1 of Mr. Mills' affidavit in support of Shield's application to the Nigerian court to arrest the Vessel on 23rd December 2011, Mr. Mills recited:

> "I am the plaintiff/applicant's chief operating officer, managing its day to day business and affairs, and by virtue of my office I am conversant with the facts of this case and the facts I depose to herein."

38. In his first witness statement Mr. Lux says as follows in relation to the claim, that the LOU was not legally binding on Shield. He says:

> "I am advised by [his Nigerian counterpart] that the LOU is not legally binding on Shield in any event because it was not signed by two directors, or by a director and a company secretary, as required under the Nigeria Companies and Allied Matters Act 1990. The lawyer has told me that the person who signed the LOU on behalf of Shield, Mr. Mills, was neither a director nor the company secretary of Shield at the time of signing, although he was subsequently appointed a director of the company in February 2012."

Then he exhibits the particulars of the directors of Shield at the date the LOU was signed.

Mr. Lux goes on to say:

> "I am also advised that there was no board resolution authorising Mr. Mills to sign the LOU. On that basis there are issues which need to be considered in the light of the Overseas Company Execution of

> Documents and Registration of Charges Regulations 2000, because by reason of their effect there is a question of whether or not the LOU is binding as a matter of English law. This will also be the subject of further evidence and argument at the hearing of the Part 11 application."

39. Again, I received no argument or evidence to support those bald statements, which could very easily have been done if they were seriously being relied upon. I was, however, provided by Mr. Collett with an extract from the Nigerian Companies and Allied Matters Act 1990. Sections 65 and 66 provide, in so far as is here material, that:

> "Section 65
>
> Acts of a managing director, while carrying on in the usual way the business of the company, shall be treated as the act of the company itself.
>
> …
>
> Section 66
>
> Except as provided in Section 65 … the acts of any officer or agent of the company shall not be deemed to be the acts of the company unless,
>
> (a)    the company, acting through its members in a general meeting, board of directors, or managing director shall have expressly or implied [sic] authorised such officer or agent to act in the matter; or
>
> (b)    the company, … shall have represented the officer or agent as having its authority to act in the matter."

40. Nowhere in the evidence is it suggested that Mr. Mills, as chief operating officer, was not authorised by Shield, nor was any evidential basis provided to support the assertion of want of authority. Such authority was not required to be given in a board meeting. On the evidence before me it would appear that, even if Mr. Mills was not the managing director, even if he was not actually a director at the time, he was certainly represented by the company as having its authority to act in the matter having been placed in the "office", to use Mr. Mills' own words, of chief operating officer and managing its day to day business. If indeed I were to be persuaded to discharge this injunction on the basis that the letter of undertaking had not been authorised by Shield, it was incumbent upon it to provide far more cogent evidence to support this very late allegation of want of authority.

41.   In conclusion it seems to me that the justice of this case will be met if I maintain the injunctions made in the 3rd February Order and require Owners' holding company to support Owners' cross undertaking in damages.   I have asked Mr. Collett whether the holding company, Yildirim Holdings AS, which according to the website material in evidence appears to be a company of substance, would be prepared to support Owner's cross undertaking in damages, and, for the purposes of enforcement of that undertaking, submitting to this jurisdiction.   Mr. Collett has confirmed that the holding company would be prepared to stand behind the cross undertaking in damages given by Owners and submit to the jurisdiction for that purpose.   Owners are also prepared to undertake not to dispose of the Vessel pending further order of this court.   The reality, therefore, is that Shield is more than adequately secured for what, at least at this stage of the game, appears to be an extremely weak claim for late delivery, or late discharge, of the cargo on board the Vessel.   In contrast, if I were to discharge the injunction, Owners would have no security, either for their losses to date, nor for the contingent repayment of the approximate $130,000 cost of a Club undertaking, nor for the potential costs of engaging in the Nigerian appeal process.

42.   I am satisfied, in those circumstances, that irrespective of whether a further application is made to discharge the injunction on the basis of further evidence, or a Part 11 application is proceeded with, despite the decision that I have reached in this judgment as to the incorporation of the jurisdiction clause, it is not appropriate to discharge, or vary, or stay, the effect of the 3rd February Order pending the hearing of any such Part 11 application or further discharge application.

---

Westlaw.uk

374 N.E.2d 618                                                                Page 1

43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724

**(Cite as: 43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724)**

**H**

Court of Appeals of New York.

Anthony A. CASTELLANO et al., Appellants,

v.

STATE of New York et al., Respondents.

(Claim No. 54477.)

Feb. 14, 1978.

The Court of Claims, Dorothea E. Donaldson, J. made award for appropriation of portions of parcels, and appeals were taken. The Supreme Court, Appellate Division, 52 A.D.2d 1014, 383 N.Y.S.2d 712, reversed so much of the judgment as provided for interest on award and remitted matter, and landlords appealed from judgment of Court of Claims entered following remittal. On the Court of Appeals' motion, tenant was joined to appeal. The Court of Appeals held that: (1) where landlords made at least prima facie case for their entitlement to award by showing that use of word "Lessor" in part of clause of lease was grammatically inconsistent with rest of lease, and what was requested was interpretation rather than what might be characterized as a reformation, question of interpretation was properly within Court of Claims' jurisdiction and case was not capable of proper resolution because of failure to explore fully how such interpretation might have affected allocation of damages, and (2) where State failed to appeal from judgment in favor of tenant, court could not interfere with nor disturb that judgment even if State was required to pay twice for the same damage.

Judgment appealed from and order of the Appellate Division reversed and case remitted.

Breitel, C. J., filed a dissenting opinion in which Jasen and Fuchsberg, JJ., joined.

West Headnotes

**[1] Eminent Domain 148 ☞157**

148 Eminent Domain
  148II Compensation
    148II(D) Persons Entitled and Payment

148k157 k. Apportionment. Most Cited Cases

Court of Claims has jurisdiction and indeed obligation to make award in compliance with terms of agreement between landlord and tenant and, in so doing, may exclude one of the parties from part or all of award to which it might otherwise be entitled.

**[2] Eminent Domain 148 ☞158**

148 Eminent Domain
  148II Compensation
    148II(D) Persons Entitled and Payment

148k158 k. Determination of Conflicting Claims. Most Cited Cases

Where landlords made at least prima facie case for their entitlement to eminent domain award by showing that use of word "Lessor" in part of clause of lease was grammatically inconsistent with rest of lease, and what was requested was interpretation rather than what might be characterized as a reformation, question was one of interpretation properly within the jurisdiction of the Court of Claims and thus case was not capable of proper resolution because of failure from the outset to explore fully how interpretation of lease might affect allocation of damages between landlords and tenant for appropriation of portion of property.

**[3] Contracts 95 ☞157**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k151 Language of Instrument

95k157 k. Mistakes in Writing, Grammar, or Spelling. Most Cited Cases

To carry out intention of contract, words may be transposed, rejected, or supplied to make its meaning more clear.

**[4] Eminent Domain 148 ☞158**

148 Eminent Domain
  148II Compensation
    148II(D) Persons Entitled and Payment

148k158 k. Determination of Conflicting Claims. Most Cited Cases

Where State had failed to appeal from judgment on tenant's claim in connection with State's appropriation of portion of parcel, Court of Appeals could not interfere with or disturb that judgment even if state was required to pay twice for same damage to landlords, which were being allowed to attempt to show under lease that they were entitled to entire award.

**[5] Eminent Domain 148 ⟿158**

148 Eminent Domain
   148II Compensation
      148II(D) Persons Entitled and Payment
         148k158 k. Determination of Conflicting Claims. Most Cited Cases
To avoid procedural difficulties in appropriation cases, separate claims resulting from appropriation should be consolidated and, if consolidation is not ordered, to avoid potential duplication of liability, state should appeal from all judgments relating to claims with respect to the same property.

**\*910 \*\*\*725 \*\*619** Morton N. Wekstein, Bronxville, for appellants.

L. Victor Vaccaro, New York City, for Yonkers Realty Associates, respondent.

Louis J. Lefkowitz, Atty. Gen. (Vernon Stuart and Ruth Kessler Toch, Albany, of counsel), for State of New York, respondent.

OPINION OF THE COURT
PER CURIAM.

In June, 1970, pursuant to sections 30 and 349-c of the Highway Law, the State appropriated a portion of two adjacent parcels in the City of Yonkers in Westchester County. Parcel I was owned in fee by claimants Castellano and leased to Yonkers Realty Associates. The latter owned Parcel II. A building housing an S. Klein Department Store straddled the two parcels. Following the taking: claimants Castellano filed a claim as fee owners of Parcel I (Claim No. 54477); and Yonkers Realty filed two claims, one as lessee of

Parcel I (Claim No. 54102) and the other as fee owner of Parcel II (Claim No. 54106). This appeal concerns a dispute between the Castellanos, as fee owners, and Yonkers Realty, as lessee, with respect to amounts awarded for Parcel I.

The Court of Claims denied the State's motion for consolidation of the three claims, but ordered that its motion for a joint trial be granted. Based on a taking of 19,103 square feet in Parcel I and permanent and temporary easements, the court found that Parcel I suffered direct and consequential damages amounting to $180,034. In considering how this sum should be apportioned between the owner and lessee, the court rejected the landlords' argument that correction of an alleged typographical error in clause (d) of paragraph 12 of the land lease established that the landlords were entitled to the entire proceeds of the award, concluding that the proof presented was insufficient and further that the court lacked jurisdiction to reform the lease. Instead, the court awarded the Castellanos $16,675, representing their reversionary interest\*\*\*726 as fee owners and the present worth of the rental loss, and awarded the balance of the damages, approximately $164,000, to lessee Yonkers Realty. These awards were embodied in separate judgments.

Cross appeals were taken to the Appellate Division, which \*911 found no error in amount of damages determined or in the result reached in allocating said amount. That court held, however, that the Court of Claims improperly rejected the State's attempt to introduce partial payment agreements into evidence solely for the purpose of proving that there should be a suspension of interest on the amounts stated in said agreements as of 30 days after the State sent closing papers to the claimants pursuant to the agreements. Hence, it modified by reversing so much of the judgments as provided for interest on the awards and remitted the matter for a determination of the question of interest.

The fee owners, the Castellanos, appealed pursuant to CPLR 5601 (subd. (d)) from the judgment of the Court of Claims entered following the remittal by the Appellate Division. On this court's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 N.E.2d 618                                                                                                        Page 3
43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724
**(Cite as: 43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724)**

own motion, Yonkers Realty Associates was joined in this appeal pursuant to CPLR 1003.

[1][2] There should be a reversal. It is a fundamental principle that the Court of Claims has jurisdiction, and indeed an obligation, to make an award in compliance with the terms of an agreement between a **620 landlord and a tenant and that in so doing it may exclude one of the parties from part or all of an award to which it might otherwise be entitled (see Traendly v. State of New York, 51 A.D.2d 489, 382 N.Y.S.2d 365, affd. 43 N.Y.2d 804, 402 N.Y.S.2d 394, 373 N.E.2d 289; Cooney Bros. v. State of New York, 24 N.Y.2d 387, 300 N.Y.S.2d 830, 248 N.E.2d 585; Matter of City of New York (Allen St.), 256 N.Y. 236, 176 N.E. 377). In the instant matter, the owners made at least a prima facie case for their entitlement to the award by showing that the use of the word "Lessor" in a part of clause (d) of paragraph 12 of the lease was grammatically inconsistent with the rest of the lease. Further proof was offered, but it is unnecessary to detail it here. The point is that from the outset the case was not capable of proper resolution because of the failure to explore fully how this interpretation of clause (d) of paragraph 12 might affect the allocation of damages.

[3] It was asserted that a reformation of the lease was sought and that the Court of Claims lacked jurisdiction for such an undertaking. The fact is, however, that what was requested was an interpretation rather than what might be characterized as a reformation. To carry out the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear ( Bintz v. City of Hornell, 268 App.Div. 742, 747, 53 N.Y.S.2d 803, 807; Potthoff v. Safety Armorite Conduit Co., 143 App.Div. 161, 163, 127 N.Y.S. 994, 995; see, also, *912Long Is. R. R. Co. v. Northville Inds. Co., 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 930, 362 N.E.2d 558, 563; Castelli v. Burns, 156 App.Div. 200, 140 N.Y.S. 1057). This was a question of interpretation properly within the jurisdiction of the Court of Claims.

At trial, proof was offered to show what was intended in clause (d) of paragraph 12 of the lease, but the trial court's resolution of this issue was impeded because it assumed that the relief sought was reformation and that the court lacked jurisdiction to grant this remedy. If the court had been of the view that it could substitute one word for another in order to make clear the meaning of the lease, the proof offered may have furnished additional support for the interpretation urged by the Castellanos. To focus on this issue, the case should be remitted for further proceedings so that such proof may be considered in the context of a trial at which the court recognizes that it may determine that the parties intended to use the word "Lessee" in the relevant portion of clause (d) of paragraph 12. The court may thus explore all that may be offered to show what is the proper interpretation***727 of clause (d) of paragraph 12 and how it might relate to the other provisions of the lease. When examining the condemnation clauses, however, the court should be mindful that there may be a distinction between how the award should be judicially allocated and the manner in which the parties have agreed to apply it (see Traendly v. State of New York, 43 N.Y.2d 804, 402 N.Y.S.2d 394, 373 N.E.2d 289, supra ).

[4][5] In conclusion, by remitting, this court does not open up or touch upon the judgment in favor of the claim made by Yonkers Realty (Claim No. 54102). Since the State has failed to appeal from the judgment on that claim, this court may not interfere with or disturb that judgment, even if the State is required to pay twice for the same damage. In future cases, to avoid procedural difficulties, ordinarily claims of this sort should be consolidated and, if consolidation is not ordered, to avoid a potential duplication of liability, the State should appeal from all judgments relating to claims in respect to the same property.

Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be reversed, without costs, and the case remitted to the Court of Claims for further proceedings in accordance with this opinion with respect to the allocation of damages to claimants-appellants for the property in question.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 N.E.2d 618                                                                                                Page 4
43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724
**(Cite as: 43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724)**

BREITEL, Chief Judge (dissenting).

I dissent and vote to *913 affirm. The trial court's conclusion that it lacked power to reform the lease, even if erroneous, does **621 not require remittal because the court also concluded, correctly, that, aside from any absence of power, there was insufficient proof to support the lessors' contention that the lease contained a typographical error. By implication, inferable from its memorandum, the Appellate Division reached the same conclusion with respect to the insufficiency of the proof. Since the trial court's apportionment of damages, affirmed by the Appellate Division, was in accordance with the terms of the lease, there should be an affirmance.

Determinative of the allocation of the award in eminent domain are, of course, the terms of the lease from the Castellanos, as lessors, to Yonkers, the current lessee (see Matter of City of New York (Allen St.), 256 N.Y. 236, 242-243, 176 N.E. 377, 379). Paragraph 12 of the lease deals with the respective rights of the parties in the event of a taking in eminent domain. Clauses (a) and (b) of paragraph 12 refer to the effect on the lease itself of a total or partial taking. It is the next two clauses, (c) and (d), dealing with apportionment of condemnation awards, that are of concern in this litigation.

Clause (c) of paragraph 12 defines the lessee's right to compensation in eminent domain: "(c) It is expressly understood and agreed that no part of any award, however, shall belong to the Lessee except that part of any award relating to the value of the building or buildings taken and Lessee's interest in leasehold if any award is made therefor, less depreciation. No such depreciation shall be deemed to take place during the first two years of this lease. Thereafter, such depreciation shall be conclusively presumed to be at the rate of one (1%) per cent per year and the Lessee's award shall be reduced accordingly. Subject to the foregoing provisions it is expressly agreed that the Lessee shall be entitled to any award made for the building or buildings, and for the Lessee's interest in the leasehold, if any is awarded by the Court." Thus, the lessee is entitled to recover for the value of its leasehold, that

is, the capitalized excess of market rental value over the rent reserved, and for the value of the buildings. The language dealing with depreciation provides an adjustment for valuing the buildings, but would have no economic or legal application to valuing the leasehold. A leasehold does not depreciate in the sense that term is normally used; a leasehold's value may decline but the declination *914 is a function of capitalizing the excess ***728 of the market rent over the reserved rent for the balance of the lease period.

Clause (d) allocates the remainder of any condemnation award to the lessors: "(d) Awards for the value of the land and the value of the buildings and improvements as of the end of the term herein, and the Lessors' interest in and to the value of its leasehold, if any is awarded, are hereby assigned to the Lessors and they are given complete authority to collect the same." One must note that the reference in clause (d) to the lessors' right to the award for the land, the buildings, and improvements is limited to what they would have received, in the words of the clause, "as of the end of the term" of the lease. On the other hand, the lessee is entitled under clause (c) to the value of its "interest in leasehold"; namely, as stated earlier, the capitalized excess of market rental value over the rent reserved. The lessors are, therefore, entitled to the value of the reversion in the land, building, and improvements, and the value of their interest in the lease, which is limited to the capitalized value of the rent reserved. Thus, clauses (c) and (d), taken together, account for all the value in the property.

The difficulty, if there be difficulty, arises from a single grammatical error in clause (d). The lessors, a group of three brothers, are granted their interest "in and to the value of its leasehold", rather than their leasehold. On this mistake, the lessors' entire case is based. They contend that the linguistic inconsistency resulted not from a grammatical slip, but from a typographical error substituting "lessors" for "lessee". In other words, they interpret the clause to grant to the lessors "the lessee's interest in and to the value of its leasehold."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*\*622** As principal support for this position, plaintiffs note that nowhere else in the lease was this grammatical error repeated. This absence of repetition of error has little probative force certainly no more than would a failure to repeat the alleged typographical error.

Aside from the lack of evidence presented, plaintiffs argument is intrinsically unpersuasive. First, the occasion for the grammatical error involved is easily understood. One need only think of the landlord as a single entity rather than three brothers to see how the error could have been committed. In fact, the very same grammatical error appears in the Court of Claims opinion, referring to the Castellanos' rental loss as "its rental loss." Second, and more important, the change suggested by plaintiffs is not in harmony with the other terms of **\*915** the lease. Were plaintiffs' contention accepted, clause (c) would award the value of the lessee's interest in the leasehold to the lessee, and clause (d) would award that same interest to the lessor.

It is true that grammatical construction is often a "reliable signpost" in discovering the intention of the parties. But it is also true that "(a)t times the language of a contract, read as a whole * * * may disclose an intention which would be thwarted by a strict grammatical construction. We refuse to follow a signpost when it appears that it points in the wrong direction." ( Wirth & Hamid Fair Booking v. Wirth, 265 N.Y. 214, 219, 192 N.E. 297, 299 (Lehman, J.).) In this case, the lessors' grammatical argument places undue emphasis on a single phrase, rather than reading that phrase as it must be read, in the context of the writing as a whole (see Empire Props. Corp. v. Manufacturers Trust Co., 288 N.Y. 242, 248, 43 N.E.2d 25, 28).

Thus, the trial court made no error in finding plaintiffs' proof insufficient to support the contention of typographical error. It matters not that the court also concluded, independently, and erroneously, that it lacked power to correct such an error. That error does not affect the finding on sufficiency of proof. The trial court had a full record before it, without exclusion of any material

proof proffered by plaintiffs. The proof consisted almost exclusively of opinions elicited or sought to be elicited on cross-examination of the witnesses for **\*\*\*729** Yonkers and a lawyer witness for the Castellanos who gave his opinion as an expert with respect to the existing language of the condemnation clause. There is no reason to believe that a new trial would produce any additional evidence on this point. In the absence of the exclusion of other admissible evidence offered, and there was none, a pure question of law is presented which can be and should be resolved by this court.

What remains is to consider the Court of Claims' distribution of the condemnation award in light of the lease terms. The lessors, the Castellanos, were awarded the value of their reversionary interest, together with "the present worth of its rental loss" (meaning "their" rental loss) under the lease. This is precisely the amount to which they were entitled under clause (d) of paragraph 12 of the lease, as developed above. Hence the court's apportionment of the award was correct.

Moreover, substantial economic justice, a factor important and, arguably, determinative of the grammatical error, supports the result reached by the Court of Claims. The significant**\*916** economic cause of the controversy is, of course, the large increase in the value of the property since the lease was first made in 1958. The land value of the entire Castellano parcel, before the taking, as found by the trial court, was about 2.5 million dollars. Yet, the rent reserved under the Castellano lease at the time of the taking was only $30,000 per year. Hence, the lease terms had become quite unfavorable to the Castellanos. Of course, the courts are and should be powerless to correct an intentional bargain which turns out to be unfavorable for one side, as it might have turned out for the other side.

Once the value of Yonkers' leasehold interest is subtracted, the Castellanos' fee interest in property subject to a 102-year lease, with 90 years of the term remaining, is not very valuable. An award for more **\*\*623** than loss of the rent reserved under the lease and the reversion interest

374 N.E.2d 618                                                   Page 6
43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724
**(Cite as: 43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d 724)**

would significantly overcompensate the Castel-
lanos.

In summary, the award was apportioned as
the lease provides explicitly; the apportionment is
in accord with the economic sense of the transac-
tion; and there is no ambiguity in the lease requir-
ing construction or interpretation beyond the ob-
vious change from a singular to a plural possess-
ive adjective. Most important, the trial revealed
no proof or offer of proof by the lessors to estab-
lish their unlikely contention. The issue gave no
trouble to the courts below and it is strange that it
gives trouble to this court.

Accordingly, the judgment appealed from
and the order of the Appellate Division brought
up for review should be affirmed.

GABRIELLI,    JONES,    WACHTLER    and
COOKE, JJ., concur in Per Curiam opinion.
BREITEL, C. J., dissents and votes to affirm in a
separate opinion in which JASEN and FUCHS-
BERG, JJ., concur.
Judgment appealed from and order of the Ap-
pellate Division brought up for review reversed,
without costs, and the case remitted to the Court
of Claims for further proceedings in accordance
with the opinion herein.

N.Y. 1978.
Castellano v. State
43 N.Y.2d 909, 374 N.E.2d 618, 403 N.Y.S.2d
724

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.UK

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

Motions, Pleadings and Filings

Judges and Attorneys

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Captain Gina M. LONGO, Plaintiff,
v.
FLIGHTSAFETY INTERNATIONAL, INC.,
Warren Linham, Tracey Clough, Paul Hewett,
and Kim Knight, Defendants.

No. 12–cv–2413 (WFK)(LB).
Signed March 5, 2014.
Filed March 6, 2014.

**Background:** Former employee brought action against former employer and individual employees, alleging sexual harassment, retaliation, and breach of contract. Defendants moved to dismiss.

**Holdings:** The District Court, William F. Kuntz II, J., held that:
(1) of the United Kingdom applied to determine whether forum selection clause was enforceable;
(2) under United Kingdom law, forum selection clause was enforceable; and
(3) enforcement of forum selection clause was not unjust or unreasonable.

Motion granted.

West Headnotes

**[1] Contracts 95 ⬅127(4)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k127 Ousting Jurisdiction or Limiting Powers of Court
                95k127(4) k. Agreement as to Place of Bringing Suit; Forum Selection Clauses. Most Cited Cases

**Federal Courts 170B ⬅2973**

170B Federal Courts
    170BXIV Forum Non Conveniens
        170Bk2973 k. Parties' Choice of Forum; Forum-Shopping. Most Cited Cases
        Generally, the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens.

**[2] Contracts 95 ⬅141(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k141 Evidence
                95k141(1) k. Presumptions and Burden of Proof. Most Cited Cases
        The burden is on a plaintiff, who opted to bring a suit in a forum other than the one required by a forum-selection clause, to make a strong showing in order to overcome the presumption of enforceability of the clause.

**[3] Contracts 95 ⬅127(4)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k127 Ousting Jurisdiction or Limiting Powers of Court
                95k127(4) k. Agreement as to Place of Bringing Suit; Forum Selection Clauses. Most Cited Cases
        There is generally a strong presumption in favor of upholding the enforceability of forum-selection clauses.

**[4] Contracts 95 ⬅141(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k141 Evidence
                95k141(1) k. Presumptions and Burden of Proof. Most Cited Cases

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

Because a plaintiff risks losing its chosen forum by enforcement of a forum-selection clause, the plaintiff is entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had the opportunity to be heard.

**[5] Contracts 95 ⚲127(4)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k127 Ousting Jurisdiction or Limiting Powers of Court
            95k127(4) k. Agreement as to Place of Bringing Suit; Forum Selection Clauses. Most Cited Cases

**Contracts 95 ⚲206**

95 Contracts
   95II Construction and Operation
      95II(C) Subject-Matter
         95k206 k. Legal Remedies and Proceedings. Most Cited Cases

In order to prevail on a motion seeking enforcement of a forum-selection clause, the movant must demonstrate: (1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; (3) the claims and parties involved in the suit are subject to the forum selection clause; and (4) if the movant satisfies these elements, the burden shifts to the party opposing enforcement to rebut the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.

**[6] Contracts 95 ⚲206**

95 Contracts
   95II Construction and Operation
      95II(C) Subject-Matter
         95k206 k. Legal Remedies and Proceedings. Most Cited Cases

Law of the United Kingdom applied to determine whether forum selection clause in em-

ployment contract between employee who was U.K. resident and employer headquartered in New York applied to employee's claims of sexual harassment, retaliation, and breach of contract; contract contained choice of law clause selecting U.K. law and parties did not dispute validity of contract.

**[7] Federal Courts 170B ⚲2973**

170B Federal Courts
   170BXIV Forum Non Conveniens
      170Bk2973 k. Parties' Choice of Forum; Forum-Shopping. Most Cited Cases

Under United Kingdom law, forum selection clause in employment contract between employee who was U.K. resident and employer headquartered in New York, which selected U.K. as forum for disputes, was enforceable, as required to dismiss under doctrine of forum non conveniens employee's action brought in the United States, alleging sexual harassment, retaliation, and breach of contract; parties agreed in the contract to be subject to U.K. law and jurisdiction of U.K. courts, employee alleged sexual harassment in violation of non-discrimination policies laid out in contract's "Equal Opportunities" provision, and there was no language excluding sexual harassment claims.

**[8] Contracts 95 ⚲127(4)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k127 Ousting Jurisdiction or Limiting Powers of Court
            95k127(4) k. Agreement as to Place of Bringing Suit; Forum Selection Clauses. Most Cited Cases

In all but the most unusual cases, the interest of justice is served by holding parties to their bargain by enforcing forum-selection clauses.

**[9] Federal Courts 170B ⚲2973**

170B Federal Courts
   170BXIV Forum Non Conveniens
      170Bk2973 k. Parties' Choice of Forum;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

Forum-Shopping. Most Cited Cases

Enforcement of forum selection clause in employment contract between employee who was United Kingdom resident and employer headquartered in New York, which selected U.K. as forum for disputes, was not unjust or unreasonable, as required to dismiss under doctrine of forum non conveniens employee's action brought in the United States, alleging sexual harassment, retaliation, and breach of contract; employee admitted existence of contractual relationship in asserting breach of contract claim, and U.K. law required existence of contractual relationship in order to bring employment discrimination claim.

Andrew James Schatkin, Law Office of Andrew J. Schatkin, Jericho, NY, for Plaintiff.

James Raymond Williams, Alexander Wilde Leonard, Ravindra Kumar Shaw, Samantha K. Abeysekera, Jackson Lewis LLP, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*
WILLIAM F. KUNTZ II, District Judge.

**\*1** Gina M. Longo ("Plaintiff") brings this action for damages and injunctive relief against her former employer, FlightSafety International, Inc. ("FlightSafety"), and individual employees of FlightSafety, Warren Linham ("Linham"), Tracey Clough ("Clough"), Paul Hewett ("Hewett"), and Kim Knight ("Knight"). Plaintiff brings claims based upon sexual harassment, hostile work environment, retaliation, and breach of contract. Defendants move to dismiss the complaint in its entirety pursuant to the doctrine of *forum non conveniens* and under other various theories arising under Rule 12(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this Court dismisses Plaintiff's action in its entirety based on the application and enforcement of the employment contract's forum-selection clause via the doctrine of *forum non conveniens.*

**I. BACKGROUND**

Plaintiff alleges a lengthy set of facts, which the Court views in the light most favorable to Plaintiff for purposes of this motion. At all times relevant to the action Plaintiff was a resident of the United Kingdom and concurrently a citizen of the United States. (Dkt. No. 8, First Amended Complaint ("FAC"), ¶ 3 (Oct. 12, 2012)). FlightSafety International, Inc. ("FlightSafety") is a domestic corporation incorporated in the state of New York. (FAC ¶ 4.) FlightSafety employed Linham, Clough, Hewett, and Knight in managerial positions. (FAC ¶¶ 5–8.) In her first amended complaint, Plaintiff states she "was offered a contract of employment," (FAC ¶ 11), which contained the terms and conditions of her employment, (FAC ¶ 10; Aff. of Tracey Clough ("Clough Aff."), Ex. A, B.) The employment contract included a forum-selection clause and a choice-of-law clause that reads: "The Conditions of Employment—UK shall be interpreted and enforced in accordance with the laws of the United Kingdom, and the parties submit to the exclusive jurisdiction of the English courts." (Clough Aff., Ex. B. at 1.)

Exhibit A to Clough's affidavit is a letter of appointment and is signed by Hewett, the Center Manager, and by Plaintiff, and dated February 11, 2008. (Clough Aff., Ex. A.) Exhibit B to Clough's affidavit is the Conditions of Employment, which was separately signed by Plaintiff on February 7, 2008. (Clough Aff., Ex. B.) The letter of appointment states that it "together with the enclosed 'Conditions of Employment Nov 07–UK' form your contract of employment. Additional items are enclosed as referenced in this letter." (Clough Aff., Ex. A.) The contract also contained an "Equal Opportunities" provision, which states in full part:

It is the Company's policy to provide employment, compensation, training, promotions and other conditions of employment without regard to race, colour, ethnic origin, nationality, national origin, religion or belief, sex, sexual orientation, marital status and/or disability unrelated to an individual's ability to perform essential job functions. It is also the Company's policy to conform to all employment standards required by law. Full details of this policy are contained in the Appendices attached and also in the Employee handbook.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

**\*2** (Clough Aff., Ex. B. at 9.) FlightSafety employed Plaintiff as a ground and flight simulator instructor for a probationary period beginning on May 7, 2008. (FAC ¶ 10.) She remained in this position at FlightSafety's UK Training Centre in Farnborough, Hampshire until she was dismissed on November 13, 2009. (FAC ¶¶ 10, 14.)

Plaintiff alleges that shortly after beginning employment, Linham began making unwelcome comments to her, which spurred her to record the alleged incidents of sexual harassment in a journal. (FAC ¶¶ 22–24.) Plaintiff claims that Linham made repeated comments about Plaintiff's physical appearance and attempted at times to make unwelcomed physical contact, including instances where Linham attempted to kiss Plaintiff on the lips. (FAC ¶¶ 31, 34–39, 71, 76–77, 150–56.) On August 17, 2009 Plaintiff was informed by letter of a proposed reduction of instructors for the Hawker 400XP, the simulator for which Plaintiff was an instructor. (FAC ¶ 43.) Plaintiff finally reported one of the alleged incidents to Knight on September 18, 2009. (FAC ¶ 79.) Knight prepared a report of Plaintiff's accusation on September 21, 2009 and delivered it to Clough. (FAC ¶ 80.)

In a September 24, 2009 meeting with Clough and Hewett, Plaintiff inquired of the possibility of going part-time or transferring to another program to avoid redundancy, but was informed no such opportunities were available. (FAC ¶ 89.) Plaintiff believes she was denied these requests as retaliation for making an official complaint of sexual harassment. (FAC ¶ 90.) Plaintiff alleges that the employment action was retaliation because it was only 10 days after her complaint, on October 1, 2009, that she learned she was made redundant.[FN1] (FAC ¶¶ 50, 90.) Plaintiff accepted voluntary redundancy, but later claimed this acceptance was made under duress and based upon misrepresentations by Flight-Safety as to the terms of her departure from the company. (FAC ¶¶ 115–16, 147.)

In the FAC, Plaintiff alleges causes of action for (1) discrimination and sexual harassment (without reference to any specific statute), (2) retaliation and hostile work environment (without reference to any specific statute), (3) breach of contract, and (4) discrimination and sexual harassment in violation of Section 296 of the New York State Executive Law. (FAC ¶¶ 157–64.) Plaintiff asserts jurisdiction is proper under 42 U.S.C. § 2000e. (FAC ¶ 2). Plaintiff seeks compensatory damages, punitive damages, award of costs and attorneys fees, and Plaintiff's reinstatement to her former position as injunctive relief. (FAC ¶ 164(a)-(e).) Defendant now moves this Court to dismiss Plaintiff's action in its entirety through enforcement of the employment contract's forum-selection clause, applying the doctrine of *forum non conveniens,* and Rule 12(b).

**II. STANDARD OF REVIEW**

[1] District courts were previously faced with uncertainty in designating a single clause of Rule 12(b) as the appropriate procedural means for determining dismissal of a case based on a valid forum-selection clause. *See TradeComet.com LLC v. Google, Inc.,* 647 F.3d 472, 475 (2d Cir.2011). The Supreme Court has recently resolved this ambiguity. In *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas, et al.,* —— U.S. ——, ——, 134 S.Ct. 568, 580, 187 L.Ed.2d 487 (2013), the Court held that generally "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine *of forum non conveniens,* " rather than Rule 12(b). But as the Second Circuit recognized, this clarification does nothing to "alter the materials on which a district court may rely in granting a motion to dismiss based on a forum selection clause." *Martinez v. Bloomberg LP,* 740 F.3d 211, 216 (2d Cir.2014). Typically, the district court relies strictly on the pleadings and affidavits. *See Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 130 (2d Cir.1987). The court is also empowered to order limited discovery if, in its discretion, discovery is necessary. *See Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 451 n. 3 (2d Cir.1975).

**\*3** [2][3][4] The burden is on the plaintiff, who opted to bring the suit in a forum other than the one required by the forum-selection clause,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
(Cite as: 2014 WL 880410 (E.D.N.Y.))

"to make a 'strong showing' in order to overcome the presumption of enforceability." *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 29 (2d Cir.1997). In addition, there is generally a strong presumption in favor of upholding the enforceability of forum-selection clauses. *See LaRoss Partners, LLC v. Contact 911 Inc.,* 874 F.Supp.2d 147, 153 (E.D.N.Y.2012) (Spatt, J.); *Bluefire Wireless, Inc. v. Cloud9 Mobile Commc'ns, Ltd.,* No. 09 Civ. 7268, 2009 WL 4907060, at *3 (S.D.N.Y. Dec.21, 2009) ("The Second Circuit has endorsed an expansive reading of the scope of forum selection clauses, in keeping with the policy favoring their use.") (citations omitted) (Baer, J.); *see also M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 9–10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993). Nonetheless, because the plaintiff risks losing its chosen forum by enforcement of the forum-selection clause, the plaintiff is "entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had the opportunity to be heard." *New Moon,* 121 F.3d at 29.

### III. DISCUSSION

Defendants move this Court to dismiss the claims levied against them by Plaintiff because, they contend, the employment agreement binds Plaintiff to bring this action in the United Kingdom. Plaintiff insists the claims can and should be brought in this district. For the reasons to follow, this Court agrees with Defendants.

### A. Applicable Law

[5] In order to prevail on a motion seeking enforcement of a forum-selection clause, the movant must demonstrate: "(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." *Altvater Gessler–J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.,* 572 F.3d 86, 89 (2d Cir.2009). If the movant satisfies these elements, the burden shifts to the party opposing enforcement to (4) rebut the presumption of enforceability by "making a suffi-

ciently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Phillips v. Audio Active, Ltd.,* 494 F.3d 378, 383–84 (2d Cir.2007) (internal quotations omitted). "The Supreme Court has construed this exception narrowly." *Roby,* 996 F.2d at 1363.

The analysis becomes more intricate, however, when the forum-selection clause is contained within a contract also containing a choice-of-law clause. The interplay between the forum-selection clause rule as given above and foreign law designated as controlling by the contracting parties creates an undeniable tension. The Second Circuit has recently relaxed this tension and reconciled the competing interests between the parties' legitimate contract expectations on the one hand, and important federal policies on the other. In *Martinez v. Bloomberg LP,* the Court of Appeals distinguished "between the *interpretation* of a forum selection clause and the *enforceability* of the clause." 740 F.3d at 217 (emphasis in original). The court determined that parts two and three of the four-part rule noted above were quintessentially interpretive questions, and therefore the body of law specified in the choice-of-law clause should be applied as to each.[FN2] *Id.* at 217–18. However, part four of this test relates directly to enforcement of the forum-selection clause, and federal courts have an important interest in ensuring that enforcement of a forum-selection clause would be neither unjust nor invalid in the first instance due to such reasons as fraud or overreaching. *See id.; see also Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 509–10 (2d Cir.1998); *Bremen,* 407 U.S. at 17, 92 S.Ct. 1907.

### B. Analysis

#### 1. Plaintiff's Claims Are Subject to the Forum–Selection Clause

*4 [6] *Martinez* bears a striking factual similarity to this case. In *Martinez,* the plaintiff was an employee working in the United Kingdom and sued his employer for discrimination based on disability. *Martinez,* 740 F.3d at 215. In this case, Plaintiff also worked in the United Kingdom and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
(Cite as: 2014 WL 880410 (E.D.N.Y.))

is now suing Defendants for discrimination, here based on a sexual harassment claim, (FAC ¶¶ 157–60, 164.) The employment contract at issue in *Martinez* contained a forum-selection clause requiring disputes arising under the agreement to be litigated in English courts. *Martinez,* 740 F.3d at 215. The contract also contained a choice-of-law clause stating that the agreement would be interpreted and construed in accordance with English law. *Id.* Almost identically, the employment contract at issue here includes a forum-selection clause designating English courts for jurisdiction and a choice-of-law clause requiring that the terms of the agreement "shall be interpreted and enforced in accordance with the laws of the United Kingdom." (Clough Aff., Ex. B. at 1). In *Martinez,* the validity of the contract was not in dispute, and Plaintiff never contested that the forum-selection clause was reasonably communicated to him or that the clause was mandatory. *Martinez,* 740 F.3d at 224. Here, Plaintiff similarly provides no legal argument that the agreement was invalid and never contests satisfaction of these first two parts of the forum-selection clause test.[FN3] It is part three of the rule—determining whether the claims and parties involved in the suit are subject to the forum-selection clause—that was the fulcrum of dispute in both *Martinez* and in this case.

The *Martinez* court made clear that determining whether claims and parties are subject to a forum-selection clause is an interpretive question where the designated body of law—there as well as here, English law—should guide analysis. *Id.* In facing facts mirroring those before this Court, the Second Circuit undertook a thorough examination of English law to answer the question of whether or not the discrimination claims there involved were subject to the forum-selection clause. *See id.* at 224–27. The court held that under English law the claims brought by the Plaintiff were indeed encompassed by the clause. *Id.* at 224.

The "*Fiona Trust* " case (*Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd.,* [2007] UKHL 40) is the controlling English decision on the subject and stands for the proposition that

"jurisdictional clauses" in international commercial contracts should be liberally construed in favor of the legitimate expectations of the contracting parties. *See Martinez,* 740 F.3d at 224. The House of Lords, the highest court of appeals for civil matters in the United Kingdom and now referred to as the U.K. Supreme Court, held courts should presume a jurisdictional clause encompasses all disputes arising out of the contractual relationship between parties "unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction." *Fili Shipping,* [2007] UKHL 40; *see also Martinez,* 740 F.3d at 224–25. Although the clause at issue in *Fiona Trust* was an arbitration clause, "the decision refers broadly to the interpretation of 'jurisdiction clauses [ ]' " and "English courts have repeatedly applied the holding in the *Fiona Trust* case to cases involving forum selection clauses." *Martinez,* 740 F.3d at 225 (citing *UBS AG v. HSH Nordbank AG* [2009] EWCA (Civ) 585 and *Skype Techs. SA v. Joltid Ltd.* [2009] EWHC 2783(Ch)).

*5 [7] The *Fiona Trust* principle of liberal construction applies to the forum-selection clause here, just as it did in *Martinez.* FlightSafety and Plaintiff agreed to be subject both to English law and to the jurisdiction of English courts in their employment contract. (Clough Aff., Ex. B at 1). Additionally, the dispute being litigated has arisen from the contract, as Plaintiff alleges sexual harassment in violation of the non-discrimination policies laid out in the agreement's "Equal Opportunities" provision. (Clough Aff., Ex. B. at 9.) Finally, there appears to be no language excluding sexual harassment claims from the province of the forum-selection clause. Therefore, application of English law demonstrates that Plaintiff's sexual harassment claims are subject to the forum-selection clause.

Because in *Martinez* the Second Circuit made the same conclusion on nearly identical facts, there is no reason—and Plaintiff offers none—to arrive at a contrary conclusion here. The only distinguishable factor in *Martinez* is that the discrimination claim there was based on disability, whereas here the discrimination claim is based on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

sexual harassment. *Martinez,* 740 F.3d at 215; (FAC ¶¶ 157–60, 164.) This makes no effective difference in the analysis, as claims arising out of gender discrimination are plainly incorporated in the "Equal Opportunities" section of the employment agreement. (Clough Aff., Ex. B. at 9.)

After mining Plaintiff's brief for any position opposing Defendant's forum-selection clause argument, or even addressing the forum-selection rule, the only points capable of extraction seem to relate obliquely to the rule's third element. At the outset of her *forum non conveniens* argument (rather than under any forum-selection clause discussion) Plaintiff states that "[t]here is no mention of discrimination in the employment conditions." (Dk. No. 18, Plaintiff's Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opposition"), at 15 (Feb. 15, 2013)). This bare statement is unavailing, as the employment agreement included an "Equal Opportunities" section that expressly affirms the company's policy of non-discrimination. (Clough Aff., Ex. B. at 9.)

Plaintiff also attempts to distinguish the *Martinez* case by noting that "there was a clause in the [ *Martinez* ] agreement [stating] that 'any dispute arising hereunder shall be subject to the exclusive jurisdiction of the English Courts.' The clause in the instant employment conditions contains no such language concerning 'any dispute.' " (Plaintiff's Opposition at 16). Because "any dispute" was not specified in Plaintiff's forum-selection clause, so the argument seems to go, the discrimination claims at issue were not subject to that clause.

The forum-selection clause in the employment contract reads in full part: "[the agreement] shall be interpreted and enforced in accordance with the laws of the United Kingdom, and the parties submit to the exclusive jurisdiction of the English courts." (Clough Aff., Ex. B. at 1.) It is English law that must be looked to in order to determine the significance of any language included in or absent from the contract. *Martinez,* 740 F.3d at 224. Toward that end, in *Skype Technologies SA v. Joltid Ltd.,* the High Court of Justice (the trial court hearing the most important cases in the

United Kingdom) rejected an argument attempting to distinguish between clauses covering "any claim" as opposed to "any dispute" in forum-selection and choice-of-law clauses. [2009] EWHC 2783(Ch), [3] (cited in *Martinez,* 740 F.3d at 225.) As the *Martinez* court explained, the High Court of Justice "found this argument was 'based on an unduly narrow reading of the clause' and represented 'exactly the kind of fine distinction ... deplored in *Fiona Trust.*' " *Martinez,* 740 F.3d at 225. Similarly, Plaintiff's attempt to attribute meaning to the absence of "any dispute" in her employment contract is "unduly narrow" and represents an effort toward a fine distinction deplored in the governing English case law.

**\*6** Plaintiff attempts a final parry against Defendants' forum-selection clause argument by challenging the application of English law as to the third element. She states that "the argument that the plaintiff [ *sic* ] discrimination claim must be interpreted under English law is quite incorrect, since this case, in this District Court, is brought under the laws of the United States and the Federal Court [ *sic* ]. The defendants cannot maintain that a Federal Discrimination [ *sic* ] claim must be governed by English law when it is brought under American law." (Plaintiff's Opposition at 16). This seems to be Plaintiff's choice-of-law refutation, in total, again characteristically unadorned by any legal citation or authority. As explained above, the Second Circuit has made clear that determining whether claims or parties are subject to a forum-selection clause must be interpreted under the body of law specified in the agreement's choice-of-law provision, here English law. *Martinez,* 740 F.3d at 224. Therefore, application of English law, as construed and interpreted in *Martinez,* demonstrates that Plaintiff's claims are subject to the forum-selection clause.

### 2. *Plaintiff Has Not Overcome the Presumption of Enforceability*

[8] Because Defendants have satisfied the three elements required to enforce the forum-selection clause, the burden shifts to the party opposing enforcement to rebut the presumption of enforceability by "making a sufficiently strong

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Phillips,* 494 F.3d at 383–84 (internal quotations omitted). Unlike the inquiry into the scope of the forum-selection clause, this rule of enforceability arises from and is interpreted by federal law. *See Martinez,* 740 F.3d at 227. "Forum selection clauses play a crucial role in ensuring predictability in contract formation." *LaRoss Partners, LLC,* 874 F.Supp.2d at 185; *In re Refco Inc., Secs. Litig.,* No. 08 Civ. 3086, 2009 WL 5548666, at *5 (S.D.N.Y. Nov. 16, 2009) ("Both the Supreme Court and the Second Circuit have recognized that forum selection clauses have economic value and should be enforced in accordance with the expectations of the parties.") (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 594, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Bremen,* 407 U.S. at 13–15, 92 S.Ct. 1907). As the Supreme Court has stated, "[i]n all but the most unusual cases ... the 'interest of justice' is served by holding parties to their bargain" by enforcing forum-selection clauses. *Atl. Marine,* 134 S.Ct. at 568.

[9] While Plaintiff does seem to make some objection to the validity of the contract, she does not present a legitimate legal argument under either New York state common law or English law. In fact, Plaintiff effectively admits the existence of a contractual relationship between herself and FlightSafety in numerous ways. For instance, Plaintiff herself brings a breach of contract claim against Defendants—clearly implying the existence of a contractual relationship. (FAC ¶¶ 161–62.) Additionally, in her first amended complaint, Plaintiff admits she "was offered a contract of employment." (FAC ¶ 11.) Lastly, the *Martinez* court determined that under English law in order "to bring a claim for employment discrimination an employee ... 'must establish that she was employed and was dismissed from that employment, so that to that extent reliance must be placed on the contract of employment.' " *Martinez,* 740 F.3d at 226 (quoting *Hall v. Woolston Hall Leisure Ltd.,* [2000] EWCA (Civ) 170, [42], [46] ). In other words, English law requires a contractual relationship to exist as a precondition to

bringing an employment discrimination claim at all. Therefore, by raising a discrimination claim Plaintiff must rely upon the existence of an employment contract.

*7 Nonetheless, in Plaintiff's "Preliminary Statement" of her opposition to Defendants' motion to dismiss (rather than being placed under any argument heading) she makes the dubious claim that "[t]here is no mention [in the employment agreement] of a contractual relationship." (Plaintiff's Opposition at 6). Plaintiff adds that the employment contract is in actuality "not stated to be so." *Id.* Both of these claims cross the line from excusable mistake to either negligent reading of the basic evidence or willful misrepresentation to the court.

The second sentence of the employment agreement reads as follows: "This 'Letter of Appointment' together with the enclosed 'Conditions of Employment Nov 07–UK' *form your contract of employment* " (emphasis added) (Clough Aff., Ex. A.) The letter of appointment is signed by Hewett, the Center Manager, and Plaintiff, and is dated February 11, 2008. (Clough Aff., Ex. A.) The Conditions of Employment was separately signed by Plaintiff on February 7, 2008. (Clough Aff., Ex, B at 10.) Besides this latter signature, the Conditions of Employment addendum is unambiguously incorporated by reference and explicitly stated to constitute the Plaintiff's "contract of employment." (Clough Aff., Ex. A.) Unless Plaintiff challenges the authenticity of the Exhibit—which she did not—there is no justifiable reason for claiming that the document makes no mention of a contractual relationship. It quite obviously does.

In the end, Plaintiff makes no suggestion that enforcement of the forum-selection clause would be unreasonable or unjust, and neither does Plaintiff argue that the clause was legally invalid for any reason. If anything, she helps prove the existence of an employment contract by bringing a breach of contract claim herself and by raising discrimination claims conditioned on the existence of a contract. Therefore, because the forum-selection clause was reasonably communicated to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**

Plaintiff, it is mandatory, the Plaintiff and her claims are subject to it as interpreted under English law, and Plaintiff offers no rebuttal to enforcement, the forum-selection clause governs and requires Plaintiff to resolve her claims in the relevant English court.

## IV. SANCTIONS

While the plaintiff counsel's flagrant factual errors unsubstantiated by the evidence, his repeated failure to cite legal authority to support his positions, and his persistent presentation of legal contentions to this Court largely unwarranted by existing law, all but compel sanctions, this Court will not impose them at this time. The Court notes, however, that in (1) claiming that "[t]here is no mention [in the employment agreement] of a contractual relationship," (Plaintiff's Opposition at 6); (2) stating that there was no mention of discrimination in the employment contract, (Plaintiff's Opposition at 15); and (3) nakedly asserting English law doesn't apply in this case simply because it was brought in federal court, without providing any legal support for this position or reference to any of the on-point and controlling authority frequently cited in Defendants' briefs, (Plaintiff's Opposition at 16), counsel for the Plaintiff skates on ice best characterized as razor thin.

## V. CONCLUSION

**\*8** For the reasons discussed above, the Court GRANTS the Defendants' motion to dismiss on the basis of *forum non conveniens* (Dkt. No. 13), and therefore need not and does not reach Defendants' alternative theories. Plaintiff's complaint is dismissed in its entirety with prejudice. The Clerk of Court is instructed to enter judgment for Defendants and close the case.

### *SO ORDERED.*

FN1. However paragraph 103 seems to contradict this point by stating: "In [an October 2, 2009] letter, plaintiff was informed that she was to be made redundant on January 1, 2010." (FAC at ¶ 103.)

FN2. *Martinez* did not address part one of the rule, which requires that the clause

be reasonably communicated Reasonable communication of the forum-selection clause was not challenged in *Martinez*, nor is it contested here *Martinez*, 740 F.3d at 224.

FN3. As will be discussed further below, Plaintiff does make some assertions relating to the existence of the contract that amount to no more than blatant factual error. These haphazard statements can in no manner be construed as an argument challenging contract formation.

E.D.N.Y.,2014.
Longo v. FlightSafety Intern., Inc.
--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151

Motions, Pleadings and Filings (Back to top)

• 2012 WL 4864466 (Trial Pleading) complaint (May 15, 2012)
• 1:12cv02413 (Docket) (May 15, 2012)

---

Judges and Attorneys(Back to top)

Judges | Attorneys

Judges

• **Kuntz, Hon. William Francis II**
United States District Court, Eastern New York
Brooklyn, New York 11201
Litigation History Report | Judicial Motion Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

---

Attorneys

Attorneys for Defendant
• **Abeysekera, Samantha**
New York, New York 10103
Litigation History Report | Profiler

• **Leonard, Alexander W.**
New York, New York 10017
Litigation History Report | Profiler

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 880410 (E.D.N.Y.), 122 Fair Empl.Prac.Cas. (BNA) 151
**(Cite as: 2014 WL 880410 (E.D.N.Y.))**


• **Shaw, Ravindra K.**
New York, New York 10017
Litigation History Report | Profiler

• **Williams, James R.**
New York, New York 10017
Litigation History Report | Profiler

Attorneys for Plaintiff
• **Schatkin, Andrew J.**
Jericho, New York 11753
Litigation History Report | Profiler



END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.