# EXHIBIT C

40 Conn.App. 268
Appellate Court of Connecticut.

SHAWMUT BANK CONNECTICUT, N.A.
v.
CONNECTICUT LIMOUSINE SERVICE, INC.

No. 13812.  |  Argued Oct. 23,
1995.  |  Decided Feb. 6, 1996.  |
Certification Denied April 1, 1996.

Following default on loan obligations secured by pledge of stock, pledgee bank filed action to wind up business and affairs of pledgor corporation. The Superior Court in the Judicial District of Ansonia-Milford, Rush, J., ordered corporation to wind up its business and affairs, and corporation appealed. The Appellate Court, Lavery, J., held that: (1) inconsistent clauses in pledge could be reconciled only by construing agreement to mean that transfer of voting power took place only upon listed "event of default;" (2) trial court's construction of pledge agreement was not a reformation, as would require specific request for equitable relief; (3) testimony of attorney who prepared pledge agreement was probative on proper construction of two inconsistent clauses in agreement, and admission of testimony did not violate parol evidence rule; (4) computer generated records were properly admitted as business records; and (5) remedies provided in pledge agreement were not exclusive.

Affirmed.

**881  *269 Petition to wind up the business and affairs of the defendant, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the court, *Rush, J.;* judgment ordering the defendant to wind up its business and affairs, from which the defendant appealed to this court. *Affirmed.*

**Attorneys and Law Firms**

Rodger C. Boe, Hartford, with whom, on the brief, was Donald D. Philips, for appellant (defendant).

Howard L. Siegel, Hartford, with whom was Margaret M. Pinkham, Boston, MA, for appellee (plaintiff).

Before LAVERY, SPEAR and FRANCIS X. HENNESSY, JJ.

**Opinion**

LAVERY, Judge.

The defendant, Connecticut Limousine Service, Inc., appeals from the judgment of the trial court ordering it to wind up its business and affairs pursuant to General Statutes § 33-382(a).[1] The defendant claims that the trial court improperly (1) interpreted a pledge agreement between the parties to entitle the plaintiff, Shawmut Bank Connecticut, N.A.,[2] to the voting power of pledged **882 shares of stock, (2) corrected a scrivener's error when no claim for reformation was brought, (3) allowed parol evidence pertaining to the preparation of the pledge agreement, (4) admitted exhibits over the defendant's objection, and (5) found *270 that the plaintiff was not limited to the remedies expressly provided in the pledge agreement. We affirm the judgment of the trial court.

[1]  General Statutes § 33-382(a) provides in pertinent part: "The superior court for the judicial district where the principal office of a corporation is located, or any judge thereof, shall wind up the business and affairs of such corporation on petition of the following persons in the following cases: (1) In a proceeding by a holder or holders of shares having voting power sufficient under the circumstances to dissolve the corporation pursuant to the certificate of incorporation...."

[2]  Shawmut Bank Connecticut, N.A., was formerly known as Connecticut National Bank, Connecticut National Bank originally entered into the pledge agreement with Connecticut Limousine Group, Inc., and Connecticut Limousine Service, Inc.

The trial court found the following facts. On September 19, 1986, the parties executed a pledge agreement under which the defendant pledged 1000 shares of its stock to the plaintiff as collateral security for certain loan obligations. On August 28, 1992, the parties amended the pledge agreement as part of a comprehensive loan restructuring agreement involving an aggregate indebtedness in excess of $8 million. The pledge agreement, as amended, provides that the defendant pledge the 1000 shares of its stock as security for the August 28, 1992 loan obligations.

Pursuant to the August 28, 1992 loan agreement, the defendant was required to make monthly payments of $105,150 to the plaintiff. The defendant has not made these monthly payments since September, 1993. In November,

670 A.2d 880

1993, the plaintiff declared the loans to be in default and, thereafter, sought to enforce its rights under the pledge agreement to exercise all voting rights of the pledged stock. In December, 1993, the plaintiff filed this action to wind up the business and affairs of the defendant pursuant to § 33-382(a).

The pledge agreement contains the following provisions relating to the voting power of the pledged stock. Section 1(B) of the pledge agreement states that the defendant retains all voting powers pertaining to the pledged stock "[u]nless and until an event of default specified in section 4 ... shall occur." [3] Pursuant to § 1(C) of the pledge agreement, the plaintiff shall have **\*271** the sole and exclusive right to exercise all voting privileges in the event of any default. [4] Section 4 of the pledge agreement provides that the defendant will not "issue shares or classes of its stock ... or redeem any shares of its stock." Section 5 of the pledge agreement, entitled "Defaults," provides a list of actions constituting an "event of default," including a default on payment obligations under the August 28, 1992 loan agreement. [5]

[3]   Section 1(B) of the pledge agreement provides in pertinent part: "Unless and until an event of default specified in section 4 hereof (any event so continuing being hereinafter called a 'default') shall occur: (1) pledgor shall be entitled to exercise all voting and/or consensual powers pertaining to the pledged stock or any part thereof...."

[4]   Section 1(C) of the pledge agreement provides in pertinent part: "If any default shall have occurred and while the same is continuing: (1) the bank or its nominee or nominees shall have the sole and exclusive right to exercise all voting and consensual powers pertaining to the pledged stock or any part thereof...."

[5]   Section 5 of the pledge agreement provides in pertinent part: "The following will constitute 'events of default' hereunder, namely ... (C) default by pledgor for five days in the payment of any amount owing under the agreement or the loan when due."

The trial court held that the reference in § 1(B) of the pledge agreement to "an event of default in section 4" was a clerical or typographical error, and that § 5, rather than § 4, of the pledge agreement identifies events of default. Applying that construction to the pledge agreement, the trial court found that when the defendant defaulted on its payment obligations under the loan agreement, the plaintiff was entitled to exercise all voting privileges pertaining to the pledged stock. The trial court concluded that the plaintiff was entitled to the relief

sought under § 33-382(a) because it held the right to vote all of the authorized, issued and outstanding shares of the defendant's stock.

I

The defendant claims that the trial court improperly concluded that a payment default entitled the plaintiff to the exclusive voting power of the pledged shares. The defendant relies on § 1(B) of the pledge agreement, which states that the defendant is entitled to the voting powers pertaining to the pledged stock until a default **\*272** specified in § 4 of the pledge agreement. We find that the trial court properly concluded that the reference to § 4 in § 1(B) of the pledge agreement was a scrivener's error.

**\*\*883** **[1]**  **[2]**   The general rules of contract construction apply when construing a pledge agreement. When interpreting a contract, we construe the contract as a whole and all relevant provisions are considered when determining the intent of the parties. *White v. Kampner*, 229 Conn. 465, 473, 641 A.2d 1381 (1994). "The rules of construction 'dictate giving effect to all the provisions of a contract, construing it as a whole and reconciling its clauses.... Where two clauses which are apparently inconsistent may be reconciled by a reasonable construction, that construction must be given, because it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions.' " *Dainty Rubbish Service, Inc. v. Beacon Hill Assn., Inc.,* 32 Conn.App. 530, 534, 630 A.2d 115 (1993), quoting *Dugan v. Grzybowski,* 165 Conn. 173, 179, 332 A.2d 97 (1973).

**[3]**   In this case, the written pledge agreement contains inconsistent clauses relating to the voting power of the pledged stock. As written, § 1(B) of the pledge agreement allows the defendant to exercise voting rights until it either issues further shares of its outstanding stock or redeems any shares of stock. Section 1(C) provides, however, that the plaintiff is entitled to exercise voting rights if the defendant, inter alia, defaults on its payment obligations under the loan agreement. We find that these clauses are inconsistent and can be reconciled only by construing the pledge agreement to mean that a transfer of voting power takes place only upon an "event of default" listed in § 5.

The defendant's construction of the pledge agreement would make § 5 of the pledge agreement meaningless by transferring voting power only if the **\*273** defendant issued further

670 A.2d 880

shares of stock or redeemed shares. "Parties do not ordinarily insert meaningless provisions in their agreements and, therefore, if it is reasonably possible to do so, every provision must be given effect." *Dainty Rubbish Service, Inc. v. Beacon Hill Assn., Inc.,* supra, 32 Conn.App. at 534, 630 A.2d 115. We agree with the trial court that the pledge agreement must be construed to mean that voting power is transferred upon an event of default listed in § 5.

## II

**[4]**  **[5]**  The defendant claims that the trial court's construction of the pledge agreement constitutes a reformation of the contract when such relief was not requested by the plaintiff. We recognize that before reformation can be granted by the court, equitable relief must specifically be requested by the plaintiff. Practice Book § 139;[6] *Prudent Projects v. Travelers Ins. Co.,* 3 Conn.App. 429, 431, 489 A.2d 396 (1985); 1 Restatement (Second), Contracts § 155 (1981). We conclude, however, that the trial court's construction of the pledge agreement was not a reformation.

6    Practice Book § 139 provides: "A party seeking equitable relief shall specifically demand it as such, unless the nature of the demand itself indicates that the relief sought is equitable relief."

**[6]**  **[7]**  An action for reformation rests on the equitable theory that the instrument sought to be reformed does not express the intention of the parties because it was executed as the result of mutual mistake or unilateral mistake coupled with fraud or inequitable conduct on the part of the other party. *Greenwich Contracting Co. v. Bonwit Construction Co.,* 156 Conn. 123, 126, 239 A.2d 519 (1968). "In many instances, words used by the parties in their writing are not particularly suitable to express their meaning, but they are nevertheless capable of being interpreted, even without an actual physical reformation of the contract.... In such a case no *274 equity power is required." D. Dobbs, Law of Remedies (2d Ed.1993) § 11.6(3). If the word in question appears to be an error, the trial court may, by looking at the contract as a whole, interpret the word so it is more logically suited to the agreement. See *Roth v. Phillips Petroleum Co.,* 739 S.W.2d 598, 600 (Mo.App.1987).

We agree with the trial court that the pledge agreement is capable of being interpreted by looking at the writing as a whole and reconciling inconsistent provisions. The trial court found that the pledge agreement contained inconsistent language and interpreted the agreement accordingly. The trial court did not reform the agreement by use of **884 equitable powers. We conclude that the plaintiff was not required to request equitable relief and that the trial court properly construed the pledge agreement.

## III

The defendant also claims that the trial court improperly allowed parol evidence concerning the drafting of the pledge agreement. Specifically, the defendant claims that the trial court improperly allowed into evidence the testimony of Melvin Ditman, an attorney who prepared the pledge agreement. Ditman testified that the reference in § 1(B) of the pledge agreement to § 4 was incorrect, and that the reference should have been to § 5. We agree with the trial court's decision that Ditman's testimony did not violate the parol evidence rule.

**[8]**  **[9]**  **[10]**  **[11]**  The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Giorgio v. Nukem, Inc.,* 31 Conn.App. 169, 173-74, 624 A.2d 896 (1993); see also 2 Restatement (Second) Contracts § 213 (1981). The rule does not forbid the presentation of parol evidence, but prohibits the use of such evidence to vary or contradict the terms of the contract. *275 *TIE Communications, Inc. v. Kopp,* 218 Conn. 281, 288, 589 A.2d 329 (1991). When a court is faced with an issue of the construction of a contract containing inconsistent clauses, the parol evidence rule does not apply. All relevant evidence is admissible on the issue of contract interpretation, and "[a]ny determination of the meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, *preliminary negotiations and statements made therein,* usages of trade, and the course of dealing between the parties." (Emphasis added.) 2 Restatement (Second), Contracts § 212, comment (b) (1981). "The only limitation is that 'the asserted meaning must be one to which the language of the writing read in context, is reasonably susceptible in the light of all of the evidence introduced.' " J. Calamari & J. Perillo, Contracts (3d Ed.1987) § 3-15, quoting 2 Restatement (Second), Contracts § 215 comment (b) (1981). The operative question becomes whether parol evidence is offered to contradict the writing or to aid in its interpretation. *Bead Chain Mfg. Co. v. Saxton Products, Inc.,* 183 Conn. 266, 273, 439 A.2d 314 (1981).

**[12]** In this case, the trial court was faced with an issue of contract interpretation. Ditman's testimony was probative on the proper construction of two inconsistent clauses in the pledge agreement. We find that the testimony was not offered to contradict the writing, but to determine which of the references to events of default found in the two transfer of voting power provisions should be given effect. We conclude that the trial court properly allowed Ditman's testimony into evidence to aid in the court's construction of the pledge agreement.

### IV

**[13]** The defendant's next claim is that the trial court improperly admitted several trial exhibits into evidence without a proper foundation for their admission as business **\*276** records pursuant to General Statutes § 52-180. [7] At trial, the plaintiff offered computer printouts relating to the amounts due and owing on the various loans secured by the pledge agreement under the business records exception to the hearsay rule. Paul Balboni, a loan officer with the plaintiff, testified that he was personally familiar with the plaintiff's loan relationship with the defendant and that the bank maintained computer records with regard to these loans. The defendant objected on the ground that the plaintiff failed to authenticate the records with testimony by a witness with working acquaintance with the methods by which such records are made.

[7] General Statutes § 52-180(a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

**\*\*885** "Section 52-180 should be liberally construed, and review is limited to determining whether the trial court abused its discretion in admitting a document under that section." *State v. Lawler*, 30 Conn.App. 827, 832, 622 A.2d 1040 (1993). In *American Oil Co. v. Valenti*, 179 Conn. 349, 426 A.2d 305 (1979), our Supreme Court found that a witness must have personal experience with record keeping procedures in order to be competent to testify that computer generated records were made in the ordinary course of business. "What is crucial is not the witness' job description but rather his knowledgeability about the basic elements that afford reliability to computer printouts.... The witness must be a person who is familiar with computerized records not only as a user but also as someone with some working acquaintance with the methods by which such records are made." (Citation omitted.) *Id.,* at 360-61, 426 A.2d 305.

In this case, Balboni testified that he was familiar with the procedures by which the bank enters data into **\*277** the computer system, outlined those procedures and stated that he and other bank officers found the procedures reliable. We conclude that the trial court did not abuse its discretion by admitting the computer generated records based on Balboni's testimony.

### V

**[14]** The defendant's final claim is that the trial court improperly concluded that the plaintiff was not limited to the remedies provided in the pledge agreement. The defendant refers to § 2 of the pledge agreement, which sets forth three remedies available to the plaintiff in the event of a default. [8] The defendant claims that the plaintiff is not entitled to maintain an action under § 33-382(a), but is limited to (1) the rights available under the Uniform Commercial Code, (2) the right to apply cash held as collateral toward payment of the loan, or (3) the right to sell the pledged stock. The trial court found that the remedies set forth in § 2 were not intended to exclude all other remedies. We agree.

[8] Section 2 of the pledge agreement, entitled "Remedies," provides in pertinent part: "If any default shall have occurred and be continuing, in addition to any rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in Connecticut, the bank may, without being required to give any notice except as hereinafter provided (i) apply the cash, if any, then held by it as collateral hereunder to the payment of the note ... and (ii) if there shall be no such cash or the cash so applied shall be insufficient to pay in full all such obligations, sell the pledged stock...."

**[15]** **[16]** **[17]** Parties to a contract may agree on the remedies available in the event of a breach of contract. If the language of the agreement discloses that the parties intended to limit the remedies to those stated, the agreement will be enforced and the party will be limited to the exclusive

remedies outlined in the agreement. See *Coastal Computer Corp. v. Team Management Systems, Inc.,* 624 So.2d 352, 353 (Fla.App.1993); **\*278** *Middleton v. Klingler,* 410 N.W.2d 184, 186 (S.D.1987). A contract will not be construed to limit remedial rights unless there is a clear intention that the enumerated remedies are exclusive. See *In re Hale Desk Co.,* 97 F.2d 372, 373 (2d Cir.1938); 17A Am.Jur.2d 762-63, Contracts § 748 (1991); see also *Gaynor Electric Co. v. Hollander,* 29 Conn.App. 865, 871-72, 618 A.2d 532 (1993) (holding that under General Statutes § 42a-2-719 parties may limit remedy for breach if limitation clearly expressed).

In this case, the pledge agreement contains no language indicating that the parties intended the remedies contained in § 2 to be the exclusive remedies available to the plaintiff in the event of a default. We agree with the trial court that the remedies in the pledge agreement are not exclusive and that the plaintiff was entitled to maintain an action under General Statutes § 33-382(a).

The judgment is affirmed.

In this opinion the other judges concurred.

**Parallel Citations**

670 A.2d 880

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# CIVIL JURISDICTION AND JUDGMENTS

## FIFTH EDITION

BY

### ADRIAN BRIGGS

*Professor of Private International Law, Oxford University*
*Fellow and Tutor in Law, St Edmund Hall, Oxford*
*Barrister, Blackstone Chambers, Temple*

EDITED BY

### PETER REES, QC

*Partner, International Dispute Resolution Group,*
*Debevoise & Plimpton LLP*

## informa

LONDON
2009

to arbitrate was not caused by the alleged bribery: it, or something very like it, would still have bound the shipowners, no matter who the vessels had been chartered to, and whether or not there would have been bribery. It is the way of the business done on the terms of the Shelltime 4 form.[1]

### Nature of the choice of court agreement: breach by bringing the objected-to proceedings

4.45 An agreement may oblige the claimant to sue in the foreign court; but if, on its proper construction, it merely obliged the defendant to submit to the jurisdiction of the foreign court if the claimant took steps to invoke its jurisdiction, there is, on the face of it, no breach of the contract if the claimant institutes proceedings in England: he will have done nothing which he promised not to do.[2] The issue is sometimes reformulated so as to enquire whether the agreement was one which conferred exclusive or non-exclusive jurisdiction on the chosen foreign court. If one accepts that this is the right question to ask, it is clear that the question is to be answered by reference to the law which governs the agreement,[3] and is not for English law as *lex fori*, even if English courts were formerly occasionally encouraged to construe the agreement as if it involved no more than a simple question of English domestic law.[4] Notwithstanding the analysis which will be set out below, there is a powerful view that the dichotomy of exclusive and non-exclusive jurisdiction agreements is simple and clear and well-known, and in many cases, the question whether the agreement on jurisdiction was exclusive or non-exclusive may be all that needs to be asked in order to answer the questions which arise.[5]

Where the agreement is to be construed according to English law, there has been a noticeable judicial tendency[6] to resolve any ambiguity in the construction of the parties' agreement in favour of seeing it as one giving exclusive jurisdiction to the nominated court. It is unnecessary that the agreement actually contain the word "exclusive" in order to have this effect,[7] but if the nominated court would have had jurisdiction in any event, without reference to the agreement, a court may wish to attribute some further effect to the

---

1  *Cf.*, for this pattern of reasoning in a judgment of Lord Hoffmann in another context, but which appears to be strikingly relevant to the issues, *South Australia Asset Management Corp v. York Montague Ltd* [1996] UKHL 10, [1997] AC 191 (investor would still have invested in (other, similar) property if not lied to by surveyor, and would therefore still have sustained the losses resulting from the fall in the market. That component of the loss was not, therefore, caused by the surveyor's wrongdoing).

2  A contractual promise not to challenge the jurisdiction of the English courts was construed as an agreement for the exclusive jurisdiction of the English courts in *General Motors Corp v. Royal & Sun Alliance Insurance plc* [2007] EWHC 2206 (Comm), [2008] Lloyd's Rep IR 311.

3  *Huerter v. Hanover Telegraph Works* (1893) 10 TLR 103; *Nova (Jersey) Knit Ltd v. Kammgarn Spinnerei GmbH* [1977] 1 WLR 713; *Evans Marshall & Co v. Bertola SA* [1973] 1 WLR 349, 361; *Ocarina Marine v. Mar and Stein & Co* [1994] 2 Lloyd's Rep 524; *FAI General Insurance Co Ltd v. Marine Mutual Protection and Indemnity Assn* (1996) 41 NSWLR 117. See also Fawcett [2001] LMCLQ 234.

4  *Cf. The Cap Blanco* [1913] P 130.

5  *See*, for example, *Ace Insurance Ltd v. Moose Enterprise Pty Ltd* [2009] NSWSC 724, [11]–[33].

6  But there will still be some proceedings which will fall outside the material scope of the agreement on jurisdiction: for an illustration, see *AWB Geneva SA v. North America Steamships Ltd* [2007] EWCA Civ 739, [2007] 2 Lloyd's Rep 315 (no breach of jurisdiction clause for trustee in bankruptcy to bring proceedings in the insolvency to obtain a determination of rights under a contract. But as the Canadian court may be assisted by the decision of the English court on the meaning of the clause, the action in England would be allowed to continue for that purpose).

7  *Continental Bank NA v. Aeakos SA* [1994] 1 WLR 588.

agreement, which will tend to lead in turn to its being seen as exclusive.[1] On some occasions the nominated court may not necessarily have had jurisdiction, so that it would have been commercially sensible to give that court non-exclusive jurisdiction, but the courts have still chosen to interpret the agreement as providing for exclusive jurisdiction in the nominated court: this approach is not, it seems, really reliable.[2]

A strictly grammatical[3] approach has been occasionally resorted to, but as a tool for throwing light on what the parties, who may well not have been English and will not have been grammarians, actually intended, it would seem to have little to commend it. According to this, it is evidently necessary to ask whether the parties agreed to submit themselves to the jurisdiction of a court, or agreed to submit disputes to the jurisdiction of a court. But the difference between "the parties submit" and "the parties submit their disputes" will elude most minds.[5] It is true that the former suggests that the verb is reflexive, and that the parties submit themselves, and that the latter is transitive in that the parties submit something, disputes, to the court; and it is wholly obscure what the point of that observation might be. The idea that parties submit themselves to the jurisdiction of a court for something *other* than the resolution of a dispute is surreal. If one were to ask what the parties meant when they agreed to submit, the answer will be that they agreed to submit to trial. It is improbable, and the more so where the drafting is done by those not expert users of the English language, that the parties appreciated that there could be a difference between the two forms, and even more improbable that they predicted the consequences which followed from the difference. Most graduates of English universities would be hard put to it to see and explain the distinction; it is beyond all reason to proceed on the basis that non-native speakers of English must have done do.

It must also be observed that there is no reason in principle why an exclusive, rather than a non-exclusive, construction should be taken to be reflect the rational intention of parties. Parties who enter into a contractual relationship which might result in litigation several years afterwards may take the view that they wish to determine and be sure about the law which will be applied by the court which has ultimately to resolve any dispute between them, but may also wish not to commit themselves to a particular court, to the exclusion of all other courts, for that litigation. The wisdom of being free to sue where the

1. *Sohio Supply Co v. Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588 (held exclusive); *Cannon Screen Entertainment Ltd v. Handmade Films (Distributors) Ltd* (11 July 1989: held non-exclusive); *S & W Berisford plc v. New Hampshire Insurance Co* [1990] 1 Lloyd's Rep 454 (held non-exclusive); *Continental Bank NA v. Aeakos* [1994] 1 WLR 588 (held exclusive); *British Aerospace plc v. Dee Howard Co* [1993] 1 Lloyd's Rep 368 (held exclusive); *A/S D/S Svendborg v. Wansa* [1997] 2 Lloyd's Rep 183 (held exclusive); *Sinochem International Oil (London) Co Ltd v. Mobil Sales and Supply Corp* [2000] 1 Lloyd's Rep 670 (held exclusive); *Arg Insurance Ltd v. Moose Enterprise Pty Ltd* [2009] NSWSC 724 (held exclusive).
2. *British Aerospace,* where the defendant would not have been subject to the jurisdiction of the English court. This was approved in *Ace Insurance Ltd v. Moose Enterprise Pty Ltd* [2009] NSWSC 724, though the case also suggests at [33] that in the event of ambiguity, the clause will be construed as non-exclusive, on the basis that it is so easy to draft it exclusively, a failure to do so is significant: *sed quaere.*
3. Though at times it seems almost eccentric.
4. See the cases cited above; and also *McGowan v. Summit at Lloyd's* 2002 SLT 1258. This is not to deny the principle that parties reduce their agreement to written form, where there is great value in regarding the written form as the sum and substance of the agreement. The issue is not where the agreement is to be found, but what that written form tells us about the parties intended; *cf. Chartbrook Ltd v. Persimmon Homes Ltd* [2009] UKHL 38, [2009] 3 WLR 267.
5. *Sea Trade Maritime Corp v. Hellenic Mutual War Risks Association (Bermuda) Ltd* [2006] EWHC 2530 (Comm), [2007] 1 Lloyd's Rep 280, at [98].

assets of the defendant may be found would tend against the exclusive construction of the choice of court agreement which is ambiguous on the point. It may therefore be that a jurisdiction clause which allows, but does not require, litigation to take place in a particular court is a perfectly sensible provision. There should, on this view, no presumption one way or the other, any more than there should be an analysis of verbal moods in order to work out what commercial parties actually intended.

If it is held that the agreement is in substance non-exclusive, it may be supposed that the application for a stay of proceedings[1] will be determined by *Spiliada* principles, though with appreciable differences: the foreign court will be assumed[2] to be available as a forum, and the agreement may, almost by itself, identify the nominated court as being more appropriate than England. If it is coupled with a choice of the law of that forum, the case for a stay under *Spiliada* may be almost as strong as if the agreement had conferred exclusive jurisdiction on the nominated court.[3] If the claimant has the nerve to allege that deficiencies in the process of that court will mean that it will be unjust for him to be held to his contract and sent to that chosen court, he should expect to receive distinctly unsympathetic treatment.[4]

It ought to be said that it is not necessary to accept that the party to an agreement for the resolution of disputes commits an actionable breach of contract by bringing proceedings contrary to that agreement. The English judicial approach has generally been to see the wrongful behaviour in terms of a breach of contract. The breach of contract has been basis for ordering a stay of English proceedings brought in circumstances where the parties agreed not to do so, and for the ordering of an injunction to restrain the party who, contrary to the agreement, brings proceedings before the courts of a foreign country, and for awarding damages to the party who suffers pecuniary loss when the other brings proceedings otherwise than in accordance with his agreement.

However, much the same set of outcomes may be obtained if the conduct of the party in question is seen as wrongful in some other way. Such wrongfulness could be expressed

---

1. The same will be true, *mutatis mutandis*, if an anti-suit injunction is sought, on which see further below, para 5.44.

2. Though the contrary may be shown.

3. *Standard Steamship Owners' P & I Association (Bermuda) Ltd* v. *Gann* [1992] 2 Lloyd's Rep 528. In *ED & F Man (Sugar) Ltd* v. *Kvaerner Gibraltar Ltd* [1996] 2 Lloyd's Rep 206 it was said that a choice of Gibraltar as having non-exclusive jurisdiction, especially when coupled with an express choice of Gibraltar law, made Gibraltar at least a more appropriate forum than England. The judge seems to have been prepared to go so far as to see such a combined clause as being as powerful a reason to stay proceedings as would be an exclusive jurisdiction clause for Gibraltar. In *BP plc* v. *Aon Ltd* [2005] EWHC 2554 (Comm), [2006] 1 Lloyd's Rep 549 it was held that there was no breach involved in applying to serve out where there was a non-exclusive jurisdiction agreement for Illinois, for there were at the date of the application no proceedings pending in the Illinois court; but that in all the circumstances it was not possible to show that England was clearly the more appropriate forum for the trial of the issues. See also *Winnetka Trading Corp* v. *Julius Baer International Ltd* [2008] EWHC 3146 (Ch), where the narrowing of the distinction between exclusive and non-exclusive jurisdiction clauses is noted (non-exclusive jurisdiction for Guernsey; stay of English proceedings).

4. *Cf. British Aerospace plc* v. *Dee Howard Corp* [1993] 1 Lloyd's Rep 368 (but which involved a choice of court for England). To the same broad effect, *Mercury Communications Ltd* v. *Communication Telesystems International* [1997] 2 All ER (Comm) 33; *JP Morgan Securities Asia Pte Ltd* v. *Malaysian Newsprint Industries Sdn Bhd* [2001] 2 Lloyd's Rep 41; *Import Export Metro Ltd* v. *Compania Sud Americana de Vapores SA* [2003] EWHC 11 (Comm); [2003] 1 Lloyd's Rep 405; *Antec Ltd* v. *Biosafety USA Inc* [2006] EWHC 47 (Comm); *HIT Entertainment Ltd* v. *Gaffney International Licensing Pty Ltd* [2007] EWHC 1282 (Ch); *Middle Eastern Oil LLC* v. *National Bank of Abu Dhabi* [2008] EWHC 2895 (Comm), [2009] 1 Lloyd's Rep 251. The courts in Singapore have taken a similar view: *The Asian Plutus* [1990] 2 Mal LJ 449.

in terms of inequitable or unconscionable conduct, perhaps as vexation or oppression; or as a wrong which is in the nature of a tort. These are all versions of an actionable and/or restrainable civil wrong; and if there is any unease about the relentless nature of a contractual analysis, may have certain presentational advantages. It is not clear that the differences are much more than preferences, but the relief considered in this Chapter, and in Chapter 5 may be almost as easy to justify if the conduct of the party who departs from an agreement on choice of court is understood as wrongful in a way which is not contractual in nature.[1]

### Breach of a non-exclusive agreement for choice of court

**4.46** Though it takes a moment to appreciate the point, it is entirely possible that a non-exclusive jurisdiction agreement can be broken by the bringing of proceedings in England. It all depends on the careful and full construction of the clause in question, and on the nature of the conduct said to amount to a breach.

In *Sabah Shipyard (Pakistan) Ltd* v. *Islamic Republic of Pakistan*[2] proceedings were brought in Pakistan in order to seek to frustrate proceedings which had been brought in England. The parties had agreed to the non-exclusive jurisdiction of the English courts. As the claimant had instituted proceedings in England, it was held to be a breach of the particular contract for the defendant to institute proceedings in Pakistan which were designed to frustrate the English proceedings;[3] and to this extent the decision is entirely orthodox. But the court was prepared to go so far as to indicate that pre-emptive proceedings in Pakistan would have been open to the same objection. It may have been right to see the agreement on jurisdiction as initially non-exclusive, but one which became exclusive, and binding in that sense, once it had been invoked by the claimant summoning the defendant before the English courts;[4] and if that were its true construction, the granting of an injunction to enforce the agreement is right in principle. If, by contrast, the jurisdiction clause in question is construed as allowing for[5] parallel proceedings, as a non-exclusive jurisdiction clause may be taken to do,[6] or if it makes it express that the parties contemplated the possibility that parallel proceedings might be brought,[7] it can hardly be

---

1. For the working out of some of the implications of this, see Tham [2004] LMCLQ 46. For an illustration of the points, see *Ace Insurance Ltd* v. *Moose Enterprise Pty Ltd* [2009] NSWSC 724.
2. [2002] EWCA Civ 1643; [2003] 2 Lloyd's Rep 571. See also *BP plc* v. *Aon Ltd* [2005] EWHC 2544 (Comm), [2006] 1 Lloyd's Rep 549 (no breach as no proceedings pending in foreign chosen court).
3. Which it would if the *lis pendens* made it more difficult, or impossible, for the claimant to seise the nominated court with jurisdiction, or if the court wrongly seised had issued an anti-suit injunction at the behest of the contract-breaker.
4. In other words, if the true construction of the agreement was that, whenever the claimant issued proceedings in London, the defendant would abandon any proceedings overseas and thenceforward defend or counterclaim only in London, such a clause would be breached by the bringing of, and refusal to discontinue, foreign proceedings. Everything will turn on a precise analysis of the structure of the jurisdiction agreement. See also *Noble Power Investments Ltd* v. *Nissei Stomach Tokyo Co Ltd* [2008] HKCA 255, [2008] 5 HKLRD 631.
5. Or, maybe more properly, not raising any objection to the issue of whether the proceedings will be allowed to run in parallel is not one over which the parties have sole control.
6. *Deutsche Bank AG* v. *Highland Crusader Offshore Partners LP* [2009] EWCA Civ 725.
7. As it did in *Royal Bank of Canada* v. *Cooperatieve Centrale Raiffeisen Boerenleenbank* [2003] EWCA Civ 7; [2004] 1 Lloyd's Rep 471 and *Deutsche Bank AG* v. *Highland Crusader Offshore Partners LP* [2009] EWCA Civ 725.

# DICEY, MORRIS AND COLLINS
## ON
# THE CONFLICT OF LAWS

### FIFTEENTH EDITION

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY
P.C., LL.D., LL.M., F.B.A.

WITH

SPECIALIST EDITORS

VOLUME 1

SWEET & MAXWELL        THOMSON REUTERS

RULE 32     *Jurisdiction and Foreign Judgments*

**11–130**     Submission has been inferred when the defendant applied to strike out part of the claim.[365] It has also been inferred when the defendant filed affidavits and appeared through counsel to argue the merits[366] on the claimant's application for an injunction; or when the defendant consented *inter partes* to the continuance of a freezing injunction without reserving his right to contest the jurisdiction;[367] or when he sought to set aside a committal order and gave an undertaking and submitted evidence;[368] when he moved to set aside a default judgment and at the same time applied for an order that the plaintiff deliver a statement of claim;[369] and when he applied for an order for security for costs.[370] The clear trend of the modern authorities is that the defendant will not be regarded as having submitted by making an application in the proceedings, provided that he has specifically reserved his objection to the jurisdiction.[371]

**11–131**     Submission may also be inferred from the terms of a contract. At common law, the mere agreement of the parties that the court was to have jurisdiction to determine disputes arising out of a contract between them was insufficient by itself to give the court jurisdiction, because the defendant could not be legally served with process if he was out of England.[372] But if one party to the contract nominated an agent resident in England to accept service of process on his behalf, he was deemed to submit to the jurisdiction, and service could be effected on the agent in accordance with the contract.[373] This rule of the common law is confirmed by CPR, r.6.11,[374] which gives effect to the

---

[365] *The Messiniaki Tolmi* [1984] 1 Lloyd's Rep. 266 (CA).

[366] *Boyle v Sacker* (1888) 39 Ch.D. 249 (CA). But not merely where the purpose was to seek to have a freezing injunction discharged: *Obikoga v Silvernorth Ltd, The Times*, July 6, 1983.

[367] *Esal Ltd v Pujara* [1989] 2 Lloyd's Rep. 479 (CA), distinguishing *Obikoga v Silvernorth Ltd, The Times*, July 6, 1983. cf. *The Xing Su Hai* [1995] 2 Lloyd's Rep. 15 (compliance with disclosure order not a submission when made subject to reservation as to jurisdiction). A party who appears to challenge a freezing injunction obtained without notice does not thereby waive his right to contest jurisdiction unless as part of those proceedings he agrees to an order regulating his position until the trial of the action: *SMAY Investments Ltd v Sachdev* [2003] EWHC 474 (Ch.), [2003] 1 W.L.R. 1973.

[368] *Marketmaker Technology Ltd v CMC Group Plc* [2008] EWHC 1556 (QB).

[369] *Fry v Moore* (1889) 23 Q.B.D. 395 (CA). cf. *Ngcobo v Thor Chemical Holdings Ltd, The Times*, November 10, 1995 (CA) (service of defence after leave to appeal given from judge's refusal to stay: appeal struck out); *Williams v Society of Lloyd's* [1994] 1 V.R. 274 (request for particulars not a submission).

[370] *Lhoneux Limon Co v Hong Kong Banking Corporation* (1886) 33 Ch.D. 446. But the position will be different if he makes it clear that the application is without prejudice to the objection to the jurisdiction and if the application is limited to the costs of the challenge to the jurisdiction: see *Hewden Stuart Heavy Cranes Ltd v Leo Gottwald*, unreported, 1992 (CA) (a case on what is now Art.24, Brussels I Regulation, below, paras 11R–397 *et seq.*); cf. *Catalyst Research Corp v Medtronic Inc* (1982) 131 D.L.R. (3d) 767 (Fed CA).

[371] *Williams & Glyn's Bank v Astro Dinamico*, above; *Esal Ltd v Pujara*, above; *Catalyst Research Corp v Medtronic Inc*, above.

[372] See *British Wagon Co v Gray* [1896] 1 Q.B. 35 (CA). The actual decision would now be different because of CPR, PD6B, para.3.1(6)(d)): see Rule 39(1).

[373] *Tharsis Sulphur Co v Société des Métaux* (1889) 58 L.J.Q.B. 435; *Montgomery Jones Co v Liebenthal Co* [1898] 1 Q.B. 487 (CA); *Reversionary Interest Society Ltd v Locking* [1928] W.N. 227.

[374] Previously RSC, Ord.10, r.3.

424

principle that the parties to a contract may agree that the court shall have jurisdiction to determine any dispute between them, and also provides machinery for serving the process in the manner laid down in the contract.[375] But there is an important distinction between the case where the mode of serving the process specified in the contract involves service in England, and the case where it involves service abroad. In the former case, service may be effected as of right without special leave. But in the latter case permission must be obtained for the service of process out of England, unless of course the defendant submits to the jurisdiction in some other way; but permission will normally be granted under CPR, PD6B, para.3.1(6)(d), i.e. Rule 34(4), and under any other clause of Rule 34 which may be applicable.[376]

In *Employers' Liability Assurance Corporation v Sedgwick, Collins Co*,[377] three members of the House of Lords suggested that an overseas company which files the name and address of a person authorised to accept service[378] thereby submits to the jurisdiction of the English courts. But to say that a corporation which, under the threat of a heavy fine, files with the Registrar of Companies the name of a person authorised to accept service of process on its behalf thereby submits to the jurisdiction seems even more artificial than saying that a corporation which establishes a place of business in England is deemed to be present in England. For this reason the jurisdiction of the court over foreign corporations is discussed in connection with Rule 31[379] and not in connection with Rule 32. There is perhaps more justification for saying that a foreign partnership which carries on business in England thereby submits to the jurisdiction[380] since in this case no question of a penalty arises. But for reasons of convenience this case also is discussed in connection with Rule 31[381] in order that all the cases on carrying on business in England may be considered together.  **11–132**

The principle of submission can give the court jurisdiction only to the extent of removing objections thereto which are purely personal to the party submitting, as, for example, that he has not been duly served with process.[382] Submission cannot give the court jurisdiction to entertain proceedings which in itself lies beyond the competence or authority of the court. Thus, even as regards defendants who are not domiciled in a Member State or a Convention State, submission cannot confer jurisdiction on the English court where the  **11–133**

---

[375] An ad hoc agreement, not expressly contemplated by CPR, r.6.11, will also be effective: *Kenneth Allison Ltd v Limehouse Co* [1992] 2 A.C. 105.

[376] See below, Rule 39(1) and, e.g. *The Chaparral* [1968] 2 Lloyd's Rep. 158 (CA); *The Vikfrost* [1980] 1 Lloyd's Rep. 560 (CA).

[377] [1927] A.C. 95, 104, 107, 114–115.

[378] See above, para.11–113.

[379] See above, paras 11–114 *et seq*. But *cf. Mitsui & Co Ltd v Nexen Petroleum UK Ltd* [2005] EWHC 625 (Ch.), [2005] 3 All E.R. 511.

[380] *Hobbs v Australian Press Association* [1933] 1 K.B. 1, 18 (CA).

[381] See above, para.11–112.

[382] For the purposes of amendment of statements of case to add new claims, a foreign defendant who submits should be treated as a party who only came into the proceedings by virtue of service out of the jurisdiction. Accordingly, a new claim can only be added if it is such that, independently of the original claim, permission would be granted to serve out of the jurisdiction: *Beecham Group Ltd v Norton Healthcare Ltd* [1997] F.S.R. 81.

another, but requires a clear and specific reference to be made to it in the second contract.[499] However, more recently, the view that general words will not incorporate a jurisdiction agreement has been questioned, some decisions preferring instead to say that the question is one of construction of the words of the second contract, and that this is should not be prejudiced by any presumption against the effect of general words.[500] One possible reconciliation of the cases is that where the incorporation is from another (first) contract to which the parties to the second contract had also been party, general words will be likely to be sufficient, but that where the jurisdiction clause is to be taken from a contract to which they were not, such as in the context of charterparties and bills of lading, the test for incorporation will be stricter, and general words will be less likely to suffice.[501]

Where the Brussels I Regulation or the Lugano Convention is applicable to the jurisdiction agreement, it is not clear whether the question of incorporation is answered by sole reference to the rules governing formality, or is, or is also, regulated as a matter of substantive law by the *lex contractus* of the agreement into which it is alleged the term was incorporated.[502] But if the second contract contains words which satisfy the "clear and specific" requirement of the common law, it is unlikely that the result will be different.[503]

**Exclusive, non-exclusive, and hybrid jurisdiction clauses.** It is a question   12–105
of interpretation, governed by the law applicable to the contract, or more accurately, the law governing the jurisdiction agreement,[504] whether a jurisdiction clause is exclusive or non-exclusive, i.e. whether it requires proceedings to be brought in a particular forum, or simply records the parties' agreement, or the absence of objection, to the jurisdiction of courts of a particular country without requiring proceedings to be brought there.[505] The question may be relevant to the question whether the English court should exercise jurisdiction, though it will certainly be important if an application is made for an injunction to restrain a party who, as it is contended, has brought foreign proceedings in breach of an exclusive jurisdiction clause. Some authorities suggest that the clause must provide in terms that the jurisdiction

---

[499] For the effect of deletion of a jurisdiction agreement in the course of negotiation, see *Brotherton v Aseguradora Colseguros SA (No.1)* [2002] Lloyd's Rep. I.R. 848.

[500] *Axa Re v Ace Global Markets Ltd* [2006] EWHC 216 (Comm.), [2006] Lloyd's Rep. I.R. 683; *Sea Trade Maritime Corp v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Athena) (No.2)* [2006] EWHC 2530 (Comm.), [2007] 1 Lloyd's Rep. 280.

[501] *Habas Sinai ve Tibbi Gazlar Isthisal Endustri AS v Sometal SRL* [2010] EWHC 29 (Comm.), [2010] Bus. L.R. 880 (distinguished *Stellar Shipping Co LLC v Hudson Shipping Lines* [2010] EWHC 2985 (Comm.)).

[502] See para.12–128, below.

[503] *Prifti v Musini SA de Seguros y Reaseguros* [2003] EWHC 2797 (Comm.), [2004] Lloyd's Rep. I.R. 528 (a case on Art.23 of the Brussels I Regulation); *Merkel International Insurance Co Ltd v La Republica Compania Argentina de Seguros Generales SA* [2004] EWHC 1826 (Comm.), [2005] 1 Lloyd's Rep. I.R. 90; *Nestorway Ltd v Ambaflex BV* [2006] IEHC 235, [2007] I.L.Pr. 633.

[504] *cf. Mackender v Feldia AG* [1967] 2 Q.B. 590, 598, per Lord Denning M.R., and the cases on arbitration clauses, see below, paras 16–011 *et seq.*

[505] See *Evans Marshall & Co Ltd v Bertola SA* [1973] 1 W.L.R. 349, 361–362. *cf. Commercial Bank of the Near East Plc v A* [1989] 2 Lloyd's Rep. 319; *Green v Australian Industrial Investment Ltd* (1989) 90 A.L.R. 500. See also Kahn-Freund (1977) 26 I.C.L.Q. 825, 828–829.

of the chosen court be exclusive,[506] but the true question is whether on its proper construction the clause *obliges* the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used.[507] Where the agreement is governed by English law, and in the absence of explanation to the contrary, the court may conclude that if the nominated court would have had jurisdiction by right in the absence of the agreement, the agreement would be idle unless it conferred *exclusive* jurisdiction on the nominated court.[508] But the parties may have provided for jurisdiction without realising that this principle of interpretation exists, and it is submitted that the point should not be pressed too far. Surprisingly, perhaps, this and similar questions of construction have not tended to rely on the application of more general contractual principles, such as the rule that ambiguity in contractual wording is resolved by construction *contra proferentem*,[509] though there appears to be no reason why such an approach should be applicable here as it is elsewhere in the law of contract.[510] By contrast, an occasionally-used rule of construction,[511] that a clause is exclusive if transitive in form (i.e. the parties submit disputes), but non-exclusive if intransitive (i.e. the parties submit (themselves), would appear to have practically nothing to recommend it.[512]

[506] *Hoerter v Hanover, etc. Works* (1893) 10 T.L.R. 103 (CA); *Westcott v Alsco Products of Canada Ltd* (1960) 26 D.L.R. 281 (Nfld CA); *Harrington v Industrial Sales Ltd* [1973] 2 W.W.R. 330, affirmed [1973] 5 W.W.R. 577 (Sask CA); *Khalij Commercial Bank Ltd v Woods* (1985) 17 D.L.R. (4th) 358 (Ont); *Contractors Ltd v MTE Control Gear Ltd* [1964] S.A.S.R. 47. *cf. Compagnie Commerciale André SA v Artibell Shipping Co Ltd*, 1999 S.C.L.R. 349.

[507] This sentence was treated as correctly stating the law in *Sohio Supply Co v Gatoil (USA) Inc* [1989] 1 Lloyd's Rep. 588, 591 (CA); *British Aerospace Plc v Dee Howard Co* [1993] 1 Lloyd's Rep. 368; *Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 W.L.R. 588 (CA). See also *Ocarina Marine v Macard Stein & Co* [1994] 2 Lloyd's Rep. 524; *FAI General Insurance Co Ltd v Marine Mutual Protection and Indemnity Assn* (1996) 41 N.S.W.L.R. 117; *Middle Eastern Oil LLC v National Bank of Abu Dhabi* [2008] EWHC 2895 (Comm.), [2009] 1 Lloyd's Rep. 251; *Bank of New York Mellon v GV Films Ltd* [2009] EWHC 2338 (Comm.), [2010] 1 Lloyd's Rep. 365; *General Motors Corp v Royal & Sun Alliance Insurance Plc* [2007] EWHC 2206 (Comm.), [2007] 2 C.L.C. 507. See also *Breitenbücher v Wittke* [2008] CSOH 145 (persons affected by jurisdiction clause to be determined by governing law).

[508] *Sohio Supply Co v Gatoil USA Inc*, above; *A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep. 368, 373 (CA); *British Aerospace Plc v Dee Howard Corp* [1993] 1 Lloyd's Rep. 368; *FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity Assn*, above; *Ace Insurance Ltd v Moose Enterprise Pty Ltd* [2009] NSWSC 724. But for the view that the question is one of construction by close attention to the words actually used, unaided by any such presumption, see *McGowan v Summit at Lloyd's*, 2002 S.L.T. 1258 (IH). On service of suit clauses, see *Ace Insurance SA-NV v Zürich Insurance Co* [2001] EWCA Civ 173, [2001] 1 Lloyd's Rep. 618 (CA). Whether the agreement also applies to applications for provisional or protective relief is also a matter of construction: *Bankgesellschaft Berlin AG v First International Shipping Corp Ltd* [2001] C.P. Rep. 62.

[509] *cf. Noble v Carnival Corp* (2006) 80 O.R. (3d) 392. The possibility of construction *contra proferentem* was raised, but did not need to be relied on, in *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep. 106.

[510] *Ace Insurance Ltd v Moose Enterprise Pty Ltd* [2009] NSWSC 724, [33].

[511] See *Austrian Lloyd SS Co v Gresham Life Assurance Soc Ltd* [1903] 1 KB 249; *British Aerospace Ltd v Dee Howard Corp* [1993] 1 Lloyd's Rep 368; *Sabah Shipyard (Pakistan) Ltd v Islamic Republic of Pakistan* [2002] EWCA Civ 1643, [2003] 2 Lloyd's Rep 571, esp. at [30]–[35].

[512] Not least because if the parties submit, they only do so for the purpose of having disputes resolved, with the result that the distinction may be grammatical but is practically illusory. The suggestion that the parties drafting the contract, who may not have had English as their first or second language, were alert to this supposed rule is not credible.

# EXHIBIT LC2

**LORD COLLINS OF MAPESBURY, LL.D., F.B.A. (LAWRENCE COLLINS)**

| | | |
|---|---|---|
| 1960-1964 | | Downing College, Cambridge: |
| | 1963: | B.A., Law (First Class with Distinction) |
| | | George Long Prize in Jurisprudence |
| | | McNair Scholarship in International Law |
| | 1964: | LL.B., International Law (First Class) |
| | | Whewell Scholarship in International Law |

1964-65        Columbia University, New York (Ford Foundation Fellowship), LL.M. (1965)

1971-2000        Partner in Herbert Smith & Co (later Herbert Smith), solicitors

1997        Appointed Queen's Counsel (one of first 2 solicitors to be appointed)

1997-2000        Deputy High Court Judge, Chancery Division

2000-2007        High Court judge (as Mr Justice Lawrence Collins) (Chancery Division; judge of the Commercial Court, from 2006)

2000—        Bencher, Inner Temple

2007-2009        Lord Justice of Appeal, Court of Appeal (as Lord Justice Lawrence Collins)

2009        Lord of Appeal, House of Lords (as Lord Collins of Mapesbury)

2009-2011        Justice of the Supreme Court of the United Kingdom

2010—        Member, American Law Institute

2011—        Acting Justice of the Supreme Court of the United Kingdom

2011—        Non-permanent member of the Hong Kong Court of Final Appeal

2011—        Professor of Law, University College London

2012—        Arbitrator member, Essex Court Chambers, London

2013-2014        Deputy Chairman, Takeover Appeal Board

2014—        Chairman, Takeover Appeal Board

**As practitioner (1968-2000)**

Acted as counsel/arbitrator in ICC, LCIA and Cairo Centre Arbitrations

*Major cases in private and public international law and arbitration included*:

> *Evans Marshall & Co Ltd v Bertola SA* [1973] 1 WLR 349;
> *Japanese Ball-Bearings (Anti-Dumping*) [1979] ECR 1185 (ECJ);

1979:
acted for Manufacturers Hanover in Iranian asset freeze cases (1979-1980);
*BP v Libya* (1979) 53 ILR 297 (international arbitration);
*Libyan Arab Foreign Bank v Manufacturers Hanover Trust Co. (No. 1)*
[1988] 2 Lloyd's Rep 494; *(No. 2)* [1989] 1 Lloyd's Rep 608;
*Buttes Gas & Oil Co v Hammer (Nos. 2 & 3)* [1975] QB 557 (CA); [1981]
QB 223 (CA); [1982] AC 888 (HL);
*British Airways Board v Laker Airways* [1984] QB 142 (CA); [1985] AC 58
(HL);
*Deutsche Schachtbau v R'as al Khaimah National Oil Company* [1990] 1 AC
295 (CA and HL);
*Trasporti Castelletti v Hugo Trumpy SpA* [1999] ECR I-1597 (ECJ);
*R v Bow Street Magistrates Court, ex p Pinochet (No 3)* [2000] 1 AC 61
(appeared before HL as QC on behalf of Government of Chile);
1984-2000 Acted for United States Securities and Exchange Commission in
international enforcement cases

**International experience as judge in High Court, Court of Appeal, House of Lords and UK Supreme Court (2000-2011)**

*High Court and Court of Appeal*

*Opinions in international law and arbitration included*

> *Istil Group Inc v Zahoor* [2003] 2 All ER 252 (privilege and confidentiality);
> *Re Drax Holdings Ltd* [2004] 1 WLR 1049 (territorial scope of schemes of arrangement);
> *Aziz v Aziz* [2008] 2 All ER 501 (international law: dignity of States);
> *Michael Wilson & Partners Ltd v Emmott* [2008] 1 Lloyd's Rep 616 (confidentiality in international arbitration);
> *Elektrim SA v Vivendi Holdings* [2008] 2 CLC 564 (anti-suit injunctions);
> *Satyam Computer Services v Upaid Systems* [2008] 2 CLC 864 (jurisdiction clauses);
> *Kolden Holdings v Rodette* [2008] 1 Lloyd's Rep 434 (lis alibi pendens: Brussels I Regulation);
> *Iran v Barakat Galleries* [2009] QB 22 (enforcement of foreign public law)
> *Masri v Consolidated Contractors International Co SAL* [2009] QB 450 (receivership over foreign assets)
> *Masri v Consolidated Contractors International Co SAL* [2009] QB 503 (anti-suit injunctions);
> *Gomez v Gomez-Manche Vives* [2009] Ch 245 (international trusts);
> *ETI Euro Telecom International NV v Bolivia* [2009] 1 WLR 665 (provisional measures in ICSID investment arbitration and State immunity);
> *City of London v Sancheti* [2009] 1 Lloyd's Rep 117 (ICSID arbitration);
> *Youell v La Reunion Aerienne* [2009] 1 All ER (Comm) 1071 (international arbitration);
> *Novus Aviation v Onur Tasmacilit* [2009] I Lloyd's Rep 576 (forum non conveniens);
> *Hatzl v XL Insurance Co Ltd* [2010] 1 WLR 470 (CMR);
> *UBS AG v HSH Nordbank* [2009] 2 Lloyd's Rep 272 (jurisdiction clauses)

*House of Lords/UK Supreme Court*

> *Opinions in international law and arbitration included*:
>
> *Wasa International Insurance Co Ltd v Lexington Insurance Co* [2010] 1 AC 180 (cross-border re-insurance);

*R (on the application of Barclay) v Secretary of State for Justice* [2010] 1 AC 464 (constitutional law and human rights);
*Agbaje v Agbaje* [2010] 1 AC 628 (matrimonial law and conflict of laws);
*R (on the application of Smith) v Oxfordshire Assistant Deputy Coroner* [2011] 1 AC 1 (application of Human Rights Convention to British soldiers in Iraq);
*Dallah Real Estate & Tourism Holding v Pakistan* [2011] 1 AC 763 (international arbitration);
*AK Investment CJSC v Kyrgyz Mobil* [2012] 1 WLR 1804 (conflict of laws/jurisdiction);
*TMSF v Merrill Lynch Bank and Trust Co* [2012] 1 WLR 1721 (enforcement of foreign judgment; receivership/revocable trusts);
*NML Capital Ltd v Argentina* [2012] 1 AC 495 (state immunity);
*Lucasfilm v Ainsworth* [2012] 1 AC 208 (conflict of laws/copyright);
*Rubin v Eurofinance SA* [2013] 1 AC 236 (conflict of laws; international insolvency)

**Academic**

1975—        Fellow, Wolfson College, Cambridge (Director of European law research programme, 1975-1980); Emeritus Fellow, 2008; Honorary Fellow, 2010

1982—        Visiting Professor, Queen Mary College, University of London

1989          Elected Associate (1989-1993) and Member (since 1993), Institut de droit international

1994          Awarded LL.D., Cambridge University (for distinction by original contribution to the advancement of the science or study of law)

1994          Elected Fellow of the British Academy

2000—        Honorary Fellow, Downing College, Cambridge

2011—        Professor of Law, University College London

2011          Visiting Fellow, Victoria University, Wellington

2012/2013    Visiting Professor, Columbia University School of Law

2012/2014    Visiting Fellow/Visiting Professor, New York University School of Law

2015—        Adjunct Professor, New York University School of Law

*Lectures on international law and arbitration*

Hague Academy of International Law courses 1991 (Provisional and Protective Measures in International Litigation) and 1998 (General Course); opening lecture for new Hague Academy building (Revolution and Restitution: Foreign States in National Courts), 2007
Graveson Memorial Lecture, King's College, London, 1995

Address to Judicial Conference of the Second Circuit, New York, 1996
FA Mann Lecture, Lincoln's Inn, London, 2001
Lionel Cohen Lecture, Hebrew University of Jerusalem, 2007
Freshfields Arbitration Lecture, London, 2009
Chancery Bar Association Lecture, London, 2010
Commercial Bar Association Lecture, London, 2010
Clarendon Law Lectures, Oxford, 2012
SMU Arbitration Lecture, Singapore, 2013

### *Other positions*

Member: Board of Editors, International and Comparative Law Quarterly (1988-2009); Editorial Committee, British Year Book of International Law (since 1991, and Chairman since 2010); Editorial Advisory Committee, Law Quarterly Review (since 1987); Editorial Board, Civil Justice Quarterly (since 2005); Advisory Editor, Supreme Court Practice (2002-2009)

Member: Advisory Council, Centre for Commercial Law Studies, Queen Mary College; Advisory Council, British Institute of International and Comparative Law, and Vice-President, 2011—; Ministry of Justice Advisory Committee on Private International Law

Member: Council of Advisors, Singapore International Arbitration Centre

Member: Dispute Resolution Expert, Panel of Recognised International Market Experts In Financial Law (PRIME)

Member: Editorial Board, Oxford International Arbitration Series

Formerly Member: Joint Working Party of the Bar and Law Society on Anglo-U.S. Judgments Convention (1980-82); Law Commission Joint Working Party on Torts in Private International Law (1982-84); Commercial Court Committee Working Party on Brussels and Lugano Conventions (1997); International Law Association, British Branch: Hon. Secretary, 1983-1988; International Law Association, Committee on International Securities Regulation, Chairman (1989-1994); Consultant to Law Commission on Torts in Private International Law (1989-90); gave evidence to House of Lords Public Bill Committee on resulting legislation, 1995; appointment by Secretary of State for Trade and Industry under Companies Act 1989, s. 84 (1990).

### Principal Publications

### Books

1.  General Editor, Dicey & Morris (now Dicey, Morris & Collins), *The Conflict of Laws*, 11th-15th eds, 1987-2012

2.  European Community Law in the United Kingdom (Butterworths, 1st ed. 1975; 2nd ed. 1980, 3rd ed. 1984; 4th ed. 1990)

3.  Essays in International Litigation and the Conflict of Laws (Oxford University Press, 1994)

### Chapters in books and articles

1.   The Effectiveness of the Restrictive Theory of Sovereign Immunity (1965) 4 Columbia Journal of Transnational law 119

2.   (with Aaron Etra) Policy, Politics, International Law and the United states Investment Guaranty Program (1966) 4 Columbia Journal of Transnational Law 240

3.   Interaction between Contract and Tort in the Conflict of Laws (1967) 16 International and Comparative Law Quarterly 103

4.   (with Wolfgang Friedmann) The Suez Crisis of 1956, in *International Law & Political Crisis*, 1968, ed. Scheinman & Wilkinson

5.   Arbitration Clauses and Forum Selecting Clauses in the Conflict of Laws: Some Recent Developments in England (1971) 2 Journal of Maritime Law and Commerce 363

6.   Forum Selection and an Anglo-American Conflict – The Sad Case of the Chaparral (1971) 20 International and Comparative Law Quarterly 550

7.   Exemption Clauses, Employment Contracts and the Conflict of Laws (1972) 21 International and Comparative Law Quarterly 320

8.   Some Aspects of Service Out of the Jurisdiction in English Law (1972) 21 International and Comparative Law Quarterly 656

9.   Choice of forum and the exercise of Judicial Discretion – the Resolution of an Anglo-American Conflict (1973) 22 International and Comparative Law Quarterly 332

10.  *Harris v. Taylor* Revived (1976) 92 Law Quarterly Review 268

11.  Contractual Obligations – The EEC Preliminary Draft Convention on Private International Law (1976) 25 International and Comparative Law Quarterly 35

12.  Some Thoughts on the Control of Abuse of Executive Discretion in International Law, in *Festschrift fur F.A. Mann*, 1977

13.  Floating Charges, Receivers & Managers and the Conflict of Laws (1978) 27 International and Comparative Law Quarterly 691

14.  Opportunities for and Obstacles to Obtaining Evidence in England for Use in Litigation in the United States (1979) 13 International Lawyer 27

15.  Arbitration and the Law Governing Contractual Relations in *Basle Symposium* ed. Klein & Vischer, 1983

16.  The law governing the agreement and procedure in international arbitration in England, in *Contemporary Problems in International Arbitration*, ed. Lew, 1986

17.  The Hague Evidence Convention and Discovery: A Serious Misunderstanding? (1986) 35 International and Comparative Law Quarterly 765

18.  Problems of Enforcement in the Multinational Securities Market: A United Kingdom Perspective (1987) 9 Univ. Pennsylvania Journal of International Business Law 487

19.  The Territorial Reach of Mareva Injunctions (1989) 105 Law Quarterly Review 262

20.  The High Court of Australia and Forum Non Conveniens: A Further Comment (1989) 105 Law Quarterly Review 364

21.  Fraudulent Conduct in International Law, in *Current Legal Problems 1989* (ed. Jowell and Rideout)

22.  Anton Piller Orders and Fundamental Rights (1990) 106 Law Quarterly Review 173

23.  Forum Non Conveniens and the Brussels Convention (1990) 106 Law Quarterly Review 535

24.  Temporary presence, exorbitant jurisdiction and the U.S. Supreme Court (1991) 107 Law Quarterly Review 10

25.  The High Court of Australia and Forum Non Conveniens: The Last Word? (1991) 107 Law Quarterly Review 102

26.  The Legacy of The Siskina (1992) 108 Law Quarterly Review 175

27.  Illogical Survivals and Astonishing Results (1992) 108 Law Quarterly Review 393

28.  Negative Declarations and the Brussels Convention (1992) 108 Law Quarterly Review 545

29.  Provisional and Protective Measures in International Litigation (1992-III) Receuil des cours, Hague Academy, vol. 234, p. 9

30.  The End of The Siskina? (1993) 109 Law Quarterly Review 342

31.  The Siskina Again: An Opportunity Missed (1996) 112 Law Quarterly Review 8

32.  Foreign Relations and the Conflict of Laws (1995-6) 6 King's College Law Journal 20

33.  Choice of Law and Choice of Jurisdiction in International Securities Transactions (2001) 5 Singapore Journal of International & Comparative Law 618

34.  Comity in Modern Private International Law, in *Reform and Development of Private International Law: Essays in Honour of Sir Peter North*, ed. Fawcett, 2002, p. 89

35.  FA Mann (1907-1991), in *Jurists Uprooted*, ed. Beatson and Zimmermann, 2004, p. 381

36.  The United States Supreme Court and the Principles of Comity: Evidence in Transnational Litigation (2006) 8 Yearbook of Private International Law 53

37.     Revolution and Restitution: Foreign States in National Courts (2007) Receuil des cours, Hague Academy, vol. 326, p. 9

38.     Reflections on Holocaust Claims in International Law (2008) 41 Israel Law Review 402

39.     Aspects of Justiciability in International Law, in *Tom Bingham and the Transformation of the Law: A Liber Amicorum*, ed. Andenas and Fairgrieve, 2009, p. 347

40.     Professor Lowenfeld and the Enforcement of Foreign Public Law (2009) 42 New York University Journal of International Law and Politics 125

41.     The Enforcement of Foreign Revenue Laws (2014) 130 Law Quarterly Review 352

July, 2014