# EXHIBIT D
# Part II of V

# EXHIBIT LC3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>        Plaintiff,<br><br>    -against-<br><br>Vale, S.A., Benjamin Steinmetz, BSG<br>Resources Limited, BSG Resources (Guinea)<br>Ltd. aka BSG Resources Guinée Ltd, BSGR<br>Guinea Ltd. BVI, BSG Resources Guinée<br>SARL aka BSG Resources (Guinea) SARL<br>aka<br>VBG-Vale BSGR Guinea, Frederic Cilins,<br>Michael Noy, Avraham Lev Ran, Mamadie<br>Touré, and Mahmoud Thiam,<br><br>        Defendants. | 14 Civ. 3042 (RMB) |

**Appendix 3 to the Declaration of Lord Collins of Mapesbury**

**Legal Authorities**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>          Plaintiff,<br><br>   -against-<br><br>Vale, S.A., Benjamin Steinmetz, BSG<br>Resources Limited, BSG Resources<br>(Guinea)<br>Ltd. aka BSG Resources Guinée Ltd,<br>BSGR<br>Guinea Ltd. BVI, BSG Resources Guinée<br>SARL aka BSG Resources (Guinea)<br>SARL aka VBG-Vale BSGR Guinea,<br>Frederic Cilins, Michael Noy, Avraham<br>Lev Ran, Mamadie Touré, and Mahmoud<br>Thiam,<br><br>          Defendants. | 14 Civ. 3042 (RMB) |

### <u>Appendix 3 to the Declaration of Lord Collins of Mapesbury</u>

**A United Kingdom authorities**

1. *AstraZeneca UK Ltd v Albemarle International Corp* [2010] EWHC 1028 (Comm), [2010] 2 Lloyd's Rep 61 (extract)

2. *Deutsche Bank AG v Asia Pacific Broadband Wireless* [2008] EWCA Civ 1091, [2008] 2 Lloyd's Rep 619

3. *Fiona Trust and Holding Corp v Privalov* [2007] UKHL 40, [2007] Bus LR 1719

4. *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance* [1993] QB 701 (extract)

5. *Heyman v Darwins Ltd* [1942] AC 356 (extract)

6. *Lesotho Highlands Development Authority v Impregilo SpA* [2005] UKHL 43, [2006] 1 AC 221 (extract)

7. *Mackender v Feldia* [1967] 1 QB 590

8. *Paal Wilson & Co. A/s v. Partenreederei Hannah Blumenthal* [1983] 1 AC 854 (extract)

9. *Sulamérica Cia Nacional de Seguros SA v Enesa Engelharia SA* [2012] EWCA Civ 638, [2013] 1 WLR 102 (extract)

**B     United States authorities**

10. *Person v Google Inc*, 456 F Supp 2d 488 (SDNY 2006)

11. *Plastic Suppliers, Inc v Cenveo*, 2011 WL 196887 (NDNY 2011)

12. *Scherk v Alberto-Culver Co*, 417 US 506 (1974)

**C     Academic authority**

13. Dicey, Morris and Collins, *Conflict of Laws*, 15th ed, 2012, paras 12-109 - 12-113

A   **AstraZeneca UK Ltd v Albemarle International Corp & Anor.**
[2010] EWHC 1028 (Comm)

Queen's Bench Division (Commercial Court).
Hamblen J.

B   Judgment delivered 12 May 2010.

> *Conflict of laws – Service out of jurisdiction – Contract – Duress – Conspiracy*
> *– Stay of proceedings – Defendant US manufacturer agreed in 2005 to supply*
> *chemical to claimant UK drug company to make active ingredient of anaesthetic*
> *– Defendant given right of first refusal to supply active ingredient under mutually*
> C   *acceptable terms and conditions – Parties could not agree terms and defendant*
> *sued in US – Proceedings dismissed as in breach of English jurisdiction clause in*
> *2005 agreement but appeal pending – Claimant sued for breach of contract, duress*
> *and conspiracy – Claimant entered into new 2008 supply agreement allegedly as*
> *a result of defendant wrongfully starving it of supplies – Claim that chemical*
> D   *supplied under 2008 agreement should have been supplied under 2005 agreement*
> *– English court had jurisdiction over contract claims by virtue of jurisdiction*
> *clause – Court had jurisdiction over duress claim as claim for restitution arising*
> *out of acts committed within jurisdiction – Court had jurisdiction over conspiracy*
> *claim on basis of damage suffered or acts committed within jurisdiction – Duress*
> E   *and conspiracy claims should be stayed as matter of discretion in light of South*
> *Carolina exclusive jurisdiction clause in 2008 agreement – No stay of contract*
> *claims under 2005 agreement – Council Regulation 44/2001, art. 23 – Civil*
> *Procedure Rules, Pt. 6, Practice Direction 6B, para. 3.1(6), (7), (9), (16).*

F   **This was an application by the defendants (AIC and AC) for an order that
the court had no jurisdiction to try the proceedings, alternatively for a stay of
proceedings pending the resolution of issues by the courts of the United States.**

**The claimant (AZ) was an English company which manufactured prescription
drugs. AC was incorporated in Virginia and manufactured chemicals. AIC was
also incorporated in Virginia and was AC's international trading subsidiary.**

G

**In 2005 AIC and AZ entered into an agreement subject to English law and
jurisdiction for the supply of Di-isopropyl-phenol ('DIP'), which AZ used
at its plant in Macclesfield to distil into propofol, the active ingredient of an
anaesthetic sold by AZ, 'Diprivan'. AZ was obliged to purchase at least 80% of**

H   **its DIP from AIC (clause C5), its only supplier. The contract price for the DIP
was US\$88.09 per kg at the outset, but later increased to US\$98 per kg under the
terms of the agreement.**

**The 2005 agreement provided that in the event that AZ reformulated or
otherwise changed the Diprivan brand to substitute propofol for DIP, it would**

so notify the defendants and give them the first opportunity and right of first
refusal to supply propofol to AZ under mutually acceptable terms and conditions
(clause H).

A

In 2007 AZ sought proposals from the defendants and third parties for the
supply of propofol, in place of DIP. AZ sought to agree terms with the defendants.
Meanwhile, AZ contended that the defendants had ceased to supply AZ with DIP
in accordance with AZ's purchase orders under the 2005 agreement. The parties
could not agree terms and in February 2008 AC and AIC issued proceedings
('the 2008 action') in South Carolina, claiming damages against AZ for alleged
breach of clause H of the 2005 agreement.

B

In June 2008 AC and AZ entered a further agreement for the sale of DIP ('the
2008 agreement'). The 2008 agreement provided for the defendants to supply
9,253 kg of DIP to AZ at their list price of US$1,200 per kg. That agreement was
subject to the laws of South Carolina.

C

AZ's case was that it had been forced to enter into the 2008 agreement under
duress as a result of the defendants wrongfully starving it of DIP supplies.
AZ contended that the DIP it purchased under the 2008 agreement was DIP
which it had been entitled to receive at a fraction of the price under the 2005
agreement.

D

The defendants' US proceedings had been dismissed, for infringement of
the English jurisdiction clause in the 2005 agreement. However, an appeal was
pending.

E

AZ issued proceedings in England claiming damages against AIC for breach
of the 2005 agreement; claiming against AC in economic duress for restitution
of the sums paid under the 2008 agreement or damages, and claiming damages
against both AIC and AC for conspiring to injure AZ by unlawful means.

F

AC then brought US proceedings against AZ for declarations that AC had
performed the 2008 agreement, owed nothing to AZ under or in relation to
the 2008 agreement, and that claims between AC and AZ related to the 2008
agreement had to be brought in the courts of South Carolina.

G

The defendants' case on jurisdiction was that AZ's claims for economic duress
and conspiracy were governed by the law of South Carolina, were subject to
the South Carolina jurisdiction clause and should be litigated in the existing
proceedings in South Carolina. Further, the question whether the provisions
of the 2008 agreement precluded AZ from suing in England in reliance on the
jurisdiction clause in the 2005 agreement was already in issue in the South
Carolina proceedings and the English court should accordingly await the
outcome of those proceedings.

H

A

*Held*, staying the duress and conspiracy claims but not the contract claim:

1. AZ had much the better of the argument that the 2008 agreement did not supersede the 2005 agreement and thus that there was a subsisting agreement conferring jurisdiction on the English courts. The 2005 agreement was not a relevant prior agreement under the 2008 agreement and the latter did not deprive AZ of any already accrued cause of action for damages or remove its right to rely on the jurisdiction agreement. In the circumstances AZ had established that the English court had jurisdiction over its contract claims pursuant to art. 23 of Regulation 44/2001. AZ had shown that England was clearly the appropriate forum for the trial of its breach of contract claims. The defendants had not established the requisite rare and compelling circumstances for a stay of those claims on case management grounds.

B

C

2. In relation to duress the fact that the restitution sought by AZ was in the context of a voidable contract did not mean that AZ was not seeking restitution within para. 3.1(16) of Practice Direction B supplementing CPR Part 6. The alleged suborning of AZ's will occurred in England where AZ was based and, on AZ's case, was directly brought about by the failure to make required deliveries of DIP in England. AZ had established a serious issue to be tried and that the English court had jurisdiction over the duress claim. Similarly in relation to the conspiracy claim AZ had demonstrated that significant damage was sustained within the jurisdiction within para. 3.1(9)(a), namely non-delivery of the outstanding orders and the additional cost of purchasing DIP from AC at US\$1,200 per kg rather than at US\$98 per kg. The non-delivery of DIP to Macclesfield was also a substantial and efficacious 'act committed within the jurisdiction' and so AZ also came within the second limb of the tort gateway in para. (9)(b). AZ had shown to the requisite standard that its claim came within the relevant gateway and that there was a serious issue to be tried. Therefore the English court had jurisdiction over the conspiracy claim.

D

E

F

3. AZ's claims in duress and conspiracy were within the exclusive South Carolina jurisdiction clause in the 2008 agreement. Even if the conspiracy claim was not covered by the clause, its very close connection to the duress claim meant that it should sensibly be tried before the same court. The South Carolina courts would apply the doctrine of separability to the jurisdiction clause. The duress claim did not specifically impeach the jurisdiction agreement. Therefore the defendants could rely on the South Carolina court exclusive jurisdiction clause in respect of the claims in duress and conspiracy. (Premium Nafta Products v Fili Shipping [2007] UKHL 40; [2007] 2 CLC 553 applied.)

G

H

4. AZ had not made out sufficiently strong reasons for not giving effect to the South Carolina court jurisdiction clause. Although there was an overlap between the contract and the duress/conspiracy claims, they were nevertheless distinct

claims. The contract claims raised relatively narrow issues which, subject to the supersession point, essentially depended on the construction of the 2005 agreement. If the contractual claims were split from the duress/conspiracy claims there would not be parallel proceedings on the same claims/issues, or the risk of directly inconsistent decisions. Nor was it a case in which other parties' interests were involved. Further, it was possible that the resolution of the contractual issues would mean that the duress and conspiracy claims need never be determined.

5. Thus the English court had jurisdiction over all three of AZ's claims. However, as a matter of discretion the duress and conspiracy claims should be stayed in the light of the South Carolina court exclusive jurisdiction clause in the 2008 agreement. Both jurisdiction agreements should be respected, with the consequence that the contract claims should proceed in England and the duress and conspiracy claims (if pursued) should proceed before the South Carolina courts. No stay should be ordered in respect of the contract claims under the 2005 agreement which should be allowed to proceed in England regardless of the defendants' appeal in the 2008 action.

The following cases were referred to in the judgment:

*Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi ve Pazarlarma AS* [2004] 2 Ll Rep 395.
*Canada Trust v Stolzenberg (No. 2)* [1998] CLC 23; [1998] 1 WLR 547 (CA); [2001] CLC 118; [2002] 1 AC 1 (HL).
*Carvill America Inc v Camperdown UK Ltd* [2005] 1 CLC 845.
*Cherney v Deripaska* [2008] EWHC 1530 (Comm); [2009] EWCA Civ 849.
*De Molestina v Ponton* [2001] CLC 1412.
*Derksen v Pillar* (unreported, 17 December 2002).
*Deutsche Bank v Asia Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091; [2008] 2 CLC 520.
*Donohue v Armco Inc* [2002] CLC 440.
*El Nasharty v J Sainsbury plc* [2007] EWHC 2618 (Comm); [2008] 1 Ll Rep 360.
*Johnson & Building Environmental Services In v Key Equipment Finance* (2006) 627 SE 2d 740 (SC).
*Konkola Copper Mines v Coromin Ltd* [2006] EWCA Civ 5; [2006] 1 CLC 1.
*Kuwait Oil Tanker Co SAK v Al-Bader (No. 3)* [2000] 2 All ER (Comm) 271.
*Mackender v Feldia AG* [1967] 2 QB 590.
*Premium Nafta Products Ltd v Fili Shipping Ltd* [2007] UKHL 40; [2007] 2 CLC 553.
*Reichhold Norway ASA v Goldman Sachs International* [2000] CLC 11; [2000] 1 WLR 173.
*Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 438.
*Sharab v Al Saud* [2009] 2 Ll Rep 160.

A

(2) The above proposition is consistent with South Carolina's 'general disfavoring of forum selection clauses'.

(3) A forum selection clause ought not logically to operate so as to prevent suit in South Carolina based on acts preceding the execution of the agreement.

B

(4) '... the forum selection clause in the present case is narrowly tailored to encompass all events related to the lease whereas [*Forrest v Verizon Communications*] involved a clause that related to all claims arising between the parties.'

C
90. AZ argue that this decision involves at least implicit rejection of the separability doctrine in relation to disputes based on acts prior to the agreement itself, consistently with South Carolina's policy of disfavouring forum selection clauses.

D
91. However, as Professor Lacy points out, the doctrine of separability was not specifically in issue in the *Johnson* case. Further, the essential holding or ratio of the case turned on the 'narrowly tailored' clause in issue. That clause conferred jurisdiction on the New York Court 'with respect to any provision of the lease'. That was regarded as being 'narrowly tailored to certain activities between the parties'. In contrast the jurisdiction clause in the 2008 Agreement is not limited in scope in this way, but is expressed in general and wide terms which are clearly capable of covering pre-agreement acts.

E

F
92. Professor Lacy also points out that South Carolina's alleged policy of not favouring forum selection clauses only applies to intra-state forum selection clauses which provide for an action to be maintained in a venue which the South Carolina courts would otherwise regard as being inappropriate. It does not apply to clauses conferring jurisdiction on the South Carolina courts.

G
93. Further, Professor Crystal accepts that the South Carolina courts apply the separability doctrine to arbitration clauses. As Professor Lacy points out, arbitration clauses are a subset of forum selection clauses and the same reasoning should apply. This has been recognised by virtually all state courts which have considered this issue.

94. For the reasons given by Professor Lacy I am satisfied that Albemarle have much the better of the argument on this issue.

H
95. If so, the next issue is whether, notwithstanding the application of the separability doctrine, the duress claim impeaches the jurisdiction agreement.

96. On this issue it was common ground that guidance is to found in the English law authorities.

97. In the leading case of *Premium Nafta Products v Fili Shipping* [2007] UKHL          A
40; [2007] 2 CLC 553, Lord Hoffmann explained the principle as follows:

> '17. The principle of separability enacted in section 7 [of the *Arbitration Act*
> 1996] means that the invalidity or rescission of the main contract does not
> necessarily entail the invalidity or rescission of the arbitration agreement.          B
> The arbitration agreement must be treated as a "distinct agreement" and can
> be void or voidable only on grounds which relate directly to the arbitration
> agreement. Of course there may be cases in which the ground upon which the
> main agreement is invalid is identical with the ground upon which the arbitration
> agreement is invalid. For example, if the main agreement and the arbitration
> agreement are contained in the same document and one of the parties claims that          C
> he never agreed to anything in the document and that his signature was forged,
> that will be an attack on the validity of the arbitration agreement. But the ground
> of attack is not that the main agreement was invalid. It is that the signature to
> the arbitration agreement, as a "distinct agreement", was forged. Similarly, if a
> party alleges that someone who purported to sign as agent on his behalf had no
> authority whatever to conclude any agreement on his behalf, that is an attack on          D
> both the main agreement and the arbitration agreement.
>
> 18. On the other hand, if (as in this case) the allegation is that the agent
> exceeded his authority by entering into a main agreement in terms which were
> not authorized or for improper reasons, that is not necessarily an attack on the          E
> arbitration agreement. It would have to be shown that whatever the terms of the
> main agreement or the reasons for which the agent concluded it, he would have
> had no authority to enter into an arbitration agreement. Even if the allegation
> is that there was no concluded agreement (for example, that terms of the main
> agreement remained to be agreed) that is not necessarily an attack on the
> arbitration agreement. If the arbitration clause has been agreed, the parties will          F
> be presumed to have intended the question of whether there was a concluded
> main agreement to be decided by arbitration.
>
> 19. In the present case, it is alleged that the main agreement was in uncommercial
> terms which, together with other surrounding circumstances, give rise to the          G
> inference that an agent acting for the owners was bribed to consent to it. But
> that does not show that he was bribed to enter into the arbitration agreement.
> It would have been remarkable for him to enter into any charter without an
> arbitration agreement, whatever its other terms had been. Mr Butcher QC, who
> appeared for the owners, said that but for the bribery, the owners would not
> have entered into any charter with the charterers and therefore would not have          H
> entered into an arbitration agreement. But that is in my opinion exactly the kind
> of argument which section 7 was intended to prevent. It amounts to saying that
> because the main agreement and the arbitration agreement were bound up with
> each other, the invalidity of the main agreement should result in the invalidity
> of the arbitration agreement. The one should fall with the other because they

A    would never have been separately concluded. But section 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the arbitration agreement and is not merely a consequence of the invalidity of the main agreement.'

B    98. In *El Nasharty v J Sainsbury plc* [2007] EWHC 2618 (Comm); [2008] 1 Ll Rep 360, Tomlinson J applied the above principle in a case relating specifically to duress, again in the context of an arbitration clause. He stated as follows:

C    '25. ... as Sir Anthony Clarke MR pointed out at paragraph 52 of the judgment of the Court of Appeal, if there is duress or undue influence or mistake which invalidates the arbitration agreement there will be no waiver of relevant rights under Article 6. The relevant duress must however impeach the validity of the arbitration agreement itself, not just the wider agreement of which it forms part. An attack on the validity of the wider contract may of necessity impeach the arbitration clause too, but it may not, as pointed out by the Court of Appeal in

D    *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] QB 701.

26. As Longmore LJ pointed out in *Fiona Trust* at page 697 Steyn J at first instance in the *Harbour* case [1992] 1 Ll Rep 81 at page 91 had already said, in

E    relation to fraud and duress:

"Once it became accepted that the arbitration clause is a separate agreement, ancillary to the contract, the logical impediment to referring an issue of the invalidity of the contract to arbitration disappears. Provided that the arbitration clause itself is not directly impeached (e.g. by a *non est factum* plea), the

F    arbitration agreement is as a matter of principled legal theory capable of surviving the invalidity of contract."

Fraud is an imprecise term which takes its colour from the context. Duress however in English law leads usually to voidability rather than initial invalidity, and no doubt the same is true of most cases usually characterised as fraud. The

G    significance of what Hoffmann LJ added in the Court of Appeal on appeal from Steyn J in the *Harbour* case at pages 723/4 of the report lay in his point that even in cases of initial invalidity of the wider agreement it does not follow that the issue which invalidates the main contract invalidates the separate arbitration agreement. The question must always be asked whether the issue extends to the

H    validity of the arbitration agreement itself.

27. Mr Warwick submitted that an allegation that the main agreement was entered into under the influence of duress must necessarily impeach the arbitration agreement because it is an allegation that the Claimant's will was coerced, vitiating his apparent consent to the main agreement and everything

in it. The case should he submitted be regarded as analogous to one of mistake     A
or *non est factum* affecting the main agreement where arguably an arbitration
agreement could not be relied upon. ... Even if this was wrong, *Fiona Trust*
was he pointed out concerned with bribery, not duress, as to which different
considerations apply and in any event, suggested Mr Warwick, the duress in
this case plainly affected the arbitration clause. In this regard he relied upon the     B
following passage in the Claimant's second Witness Statement, at paragraph
18:

"I would not have entered into any part of the April 2001 Agreement (and that
includes the arbitration clause) had I not been obligated to do so by the duress
the subject matter of my claim."     C

28. Mr Warwick advanced his thoughtful argument only five days before the
House of Lords gave judgment on appeal from the *Fiona Trust* decision ... His
main argument cannot survive their Lordships' speeches. ... Lord Hoffmann
said: [see para. 97 above]     D

...

29. Specifically as to the position on this spectrum at which allegations of duress
will usually fall, I would draw attention, as did Longmore LJ in the *Fiona Trust*
case at page 699, to what is said by the learned editors of Dicey & Morris,     E
*Conflict of Laws*, 14th Edition [2006] at paragraph 12-099:

"The Supreme Court of the United States has also held that a challenge to the
existence of the jurisdiction agreement based on fraud or duress must be based
on facts specific to the clause, and cannot be sustained on the basis of a challenge
on like grounds to the validity of the contract containing it. It is submitted that     F
there are excellent reasons of policy to support such an approach, for the parties,
when they nominated a court with jurisdiction to settle their disputes, may well
have expected this court to have and exercise jurisdiction if the dispute were to
concern the very validity of the contract."

G

The decision of the Supreme Court of the United States to which reference is
there made is *Scherk v Alberto-Culver Co* 417 US 506 (1974). That was a case
where a contract between a German seller and a US buyer for the purchase of
various business and associated intellectual property was said to have been
induced by fraudulent misrepresentation concerning the trademark rights     H
transferred. The sales contract, which was negotiated in the United States,
England and Germany, signed in Austria and closed in Switzerland, contained an
ICC arbitration clause providing for arbitration in Paris. At page 519, footnote
14 the majority opinion of the court noted:

A

"In *The Bremen* we noted that forum-selection clauses 'should be given full effect' when 'a freely negotiated private international agreement [is] unaffected by fraud ...' ... This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the

B

contract was the product of fraud or coercion."

30. Accordingly what is needed in the present case if the Claimant is successfully to impugn the enforceability of the arbitration clause is reliance on some facts "specific to the arbitration agreement" – see per Lord Hope. In my judgment

C

the allegations put forward by the Claimant in this case are simply, again in the words of Lord Hope, "parasitical to a challenge to the validity of the main contract" and thus "will not do". Like the argument of Mr Butcher QC in *Fiona Trust*, Mr Warwick's argument is, in the words of Lord Hoffmann, "exactly the kind of argument which section 7 was intended to prevent".'

D

99. AZ contend that the South Carolina jurisdiction clause in the 2008 Agreement is specifically impeached on the grounds of economic duress: see Particulars of Claim, paragraphs 57 and 57.2. In particular:

(1) AZ were entitled to receive the DIP, which they contend they were forced by

E

economic duress to purchase from AC, under an agreement with AIC and AC (the 2005 Agreement) which was subject to English law and jurisdiction.

(2) Those English law and jurisdiction provisions had been both very long-standing (going back before the 2005 Agreement to 1994) and uncontentious.

F

(3) AC's exploitation of the fact that AIC had illegitimately withheld DIP from AZ included insisting not only on the oppressive commercial terms of the 2008 Agreement but also on the incorporation of their own Terms and Conditions. Thus (adding underlining for emphasis):

G

(a) On 14 April 2008 Brian Carter of Albemarle provided AZ with their proposed Sales Agreement (including the General Conditions of Sale), warning 'Any proposed changes to this agreement may delay shipments'.

(b) On 17 April 2008 John Steitz of Albemarle wrote: 'As I mentioned last week, it is our desire to Supply DIP. However, *it would be based on terms and conditions as*

H

*prescribed by Brian Carter*.'

(c) On 18 April 2008 Marc Jones of AZ protested: '*AZ cannot sign up to the terms and conditions set out by Brian* for DIP supply as they are completely unreasonable and our governance processes will not allow me to do it.'

A

(d) On 21 April 2008, Mr Steitz responded that unless mediation resulted in DIP and Propofol commercial agreements being entered into '*any sales of DIP from Albemarle to AZ will be made according to the terms and conditions previously offered*. I reiterate please contact Brian Carter as he will be coordinating this for Albemarle. On the subject of governance, I do not believe that I can help provide any solution.'

B

(e) On 16 May 2008, Mr Carter repeated Albemarle's position:

'As Albemarle has advised you several times in the past, we have no desire to disrupt your operations. Moreover, as we have also consistently advised you in the past, we will continue to sell DIP to AstraZeneca at list price, pre-paid with order and *subject to our Conditions of Sale*.'

C

(f) On 22 May 2008, Mr Jones responded disputing the assertion that Albemarle did not intend to disrupt AZ's operations and stating that '*the price offered and the conditions attached* to such purchase are deliberately calculated to put us in a position where we cannot accept your offer'. He suggested a lower price, payment via an escrow account, and an agreement by AZ not to claim the difference in price.

D

(g) None of those proposed amendments was accepted by Albemarle.

(4) Thus, relying on AZ's inability to resist, AC drove through not just the commercial bargain but also their own desired ancillary terms, including the law and jurisdiction provisions, which were plainly disadvantageous to AZ, as compared to those which previous applied to the supply of DIP by AIC.

E

100. In these circumstances, AZ contend that the duress case is specifically directed against the imposition of the South Carolina jurisdiction provision. The duress case is one which involves both the impeachment of the 2008 Agreement as a whole *and* of its South Carolina law and jurisdiction clause and it should not be enforced.

F

101. Albemarle submit that paragraph 57 of the Particulars of Claim makes clear that the allegation of economic duress is directed at the 2008 Agreement as a whole, rather than the jurisdiction clause in particular:

G

'AstraZeneca contends that its consent to each term of the Second Agreement was procured by economic duress'.

102. They point out that this is confirmed by Mr Gosling at paragraphs 40 and 42 of his first witness statement:

H

'... as a direct consequence of the economic duress placed on the Claimant, it was forced to enter into the Second Agreement ...'

A

'In the circumstances, the exclusive jurisdiction clause was clearly part of the overall deal which was being demanded of the Claimant in return for sale of further DIP.'

103. Further, Albemarle stress that:

B

(1) The evidence is that the jurisdiction clause in the 2008 Agreement is a typical clause which was incorporated by reference into the agreement. This removes the duress objection still further from the jurisdiction clause. AZ have to argue that by duress Albemarle impelled AZ to enter into an agreement, one term of which incorporated by reference terms and conditions, which in turn contained the jurisdiction clause.

C

(2) AZ did not at any stage object to the jurisdiction clause in the 2008 Agreement, whereas it did object to the price. Thus, AZ's letter of 22 May 2008 proposed various changes to the draft of the 2008 Agreement, including that:

D

(a) payment should be made into an escrow account;

(b) the price should be amended to US$250 per kg; and

(c) AZ should be entitled expressly to reserve any claims which it might have against Albemarle, save that it would accept a more limited waiver of its claims for the difference between the 2005 Agreement price and US$250 (a point which AZ ultimately conceded);

E

but AZ did not seek to change the terms of the governing law and jurisdiction provision in the draft contract.

F

104. I consider that Albemarle have much the better of the argument on this issue for the reasons given by them. In particular, although AZ can point to duress relating to the acceptance of their standard terms as opposed to their commercial terms, they cannot point to duress relating specifically to the jurisdiction clause as opposed to Albemarle's standard terms generally. Albemarle never specifically insisted on the jurisdiction clause, nor did AZ ever raise any specific objection to it. There are no facts alleged which are specific to the jurisdiction agreement itself.

G

105. I am therefore satisfied to the requisite standard that Albemarle can rely on the South Carolina court exclusive jurisdiction clause in respect of the claims in duress and conspiracy.

H

106. AZ nevertheless submit that this is one of those exceptional cases where the jurisdiction clause should not be enforced. Notwithstanding the South Carolina court exclusive jurisdiction clause the English court does have a discretion to allow the duress and conspiracy claims to be brought here. However, given the parties'

**520**

## Deutsche Bank AG & Ors v Asia Pacific Broadband Wireless Communications Inc & Anor.

[2008] EWCA Civ 1091

Court of Appeal (Civil Division).
Laws, Keene and Longmore L JJ.
Judgment delivered 13 October 2008.

> *Conflict of laws – Jurisdiction agreement – Loan facility agreement entered into by Taiwanese borrowers containing exclusive English jurisdiction clause – Proceedings brought under agreement relying on jurisdiction clause – Borrowers alleged that agreement entered into without authority – Claimant lenders sought to amend to put forward alternative claims in restitution and misrepresentation if agreement unauthorised – Separability of jurisdiction agreement – Whether consensus clearly and precisely demonstrated in relation to jurisdiction agreement – External indicia of consensus in place – Good arguable case that contractual claim and alternative claims subject to jurisdiction agreement so that English court had jurisdiction – No rule that jurisdiction clauses not to apply if plausibly alleged that underlying contract vitiated by mistake, misrepresentation, illegality, lack of authority or lack of capacity – Council Regulation 44/2001, art. 23.*

This was an appeal by the claimants against a decision of Flaux J ([2008] EWHC 918 (Comm)) refusing permission to amend to plead certain alternative claims on the ground that the court had no jurisdiction to determine the new claims.

The claimant lenders made available a credit facility of some US$210 million to the first defendant, a telecommunications company in Taiwan which operated a mobile phone network. The second defendant, which was the parent company of the first, guaranteed the loan and became a co-obligor under the credit agreement. At the time the agreement was made, both defendants were companies in the Rebar Group controlled by the Wang family. In December 2006 members of the family were indicted for fraud in Taiwan. From February 2007 both defendant companies had been under new management.

The defendants had defaulted under the credit agreement. The claimants issued proceedings relying on an exclusive English jurisdiction clause in the credit agreement.

The defendants' case was that the transaction involving the credit agreement was entered into by the Wang family as part of a large scale fraud perpetrated by them upon the defendant companies, including the extraction of large sums of money which the credit facility transaction was designed to conceal. It was

A  said that the credit agreement was void because the members of the family who executed the documents did not have the companies' authority to do so, there being no effective board resolution authorising the transaction or the transaction not being in the best interests of the companies, to the claimants' knowledge.

B  The claimants sought to amend to raise claims in restitution and misrepresentation if (as the defendants alleged but the claimants denied) the credit agreement was void. The judge held that the English court did not have jurisdiction in respect of those new claims, because the claimants had not been able to establish real consent to the jurisdiction clause because the defendants were plausibly asserting that the agreement had been signed without authority.

C  The defendants submitted that real consent to the jurisdiction clause as required by art. 23 of Council Regulation 44/2001 could not be clearly and precisely demonstrated where the defendants' whole case was that the credit agreement was unauthorised and part of a wide scale fraud on the companies.

D  *Held*, allowing the claimants' appeal and the proposed amendments:

1. If a claimant wished to rely on a jurisdiction clause pursuant to art. 23, he had to demonstrate clearly and precisely that the clause was the subject of a consensus between the parties. If that was in dispute the claimant had to show

E  that on the available material the requirements of form in art. 23(1) were met and that the clause was the subject of consensus. The formal requirements of art. 23 were met in this case inasmuch as the agreement confirming jurisdiction was itself in writing and contained in a written agreement. That agreement had been signed or sealed by all the parties. In those circumstances it was clear that consensus was reached on the clause. Therefore, the formal requirements

F  of art. 23 were met subject to the argument that the Taiwanese signatories had no authority to conclude the credit agreement. (Bols Distilleries BV v Superior Yacht Services Ltd [2007] 1 CLC 308; [2007] 1 WLR 12 distinguished.)

2. A jurisdiction clause, like an arbitration clause, was a separable agreement

G  from the agreement as a whole. It followed that disputes about the validity of the contract had to be resolved pursuant to the terms of the clause, as the clause in this case provided. It was only if the jurisdiction clause was itself under some specific attack that a question could arise whether it was right to invoke the jurisdiction clause. (Mackender v Feldia [1967] 2 QB 590, Fiona Trust v Privalov [2007] 2 CLC 553 and Benincasa v Dentalkit Srl [1997] ECR I-3767

H  considered.)

3. The judge's conclusion was one that the doctrine of separability was designed to avoid. In the present case an agreement was undoubtedly concluded and the question was whether it was an authorised agreement. By virtue of the separability principle there could be little doubt that the English court had

**522**    Deutsche Bank v APBW    [2008] 2 CLC

jurisdiction to determine that question; once that conclusion was reached it also    A
had to have jurisdiction to determine the consequences of any such decision. The
European authorities did not lay down any requirement that such clauses were
not to apply if there was a plausible allegation that the contract, in which such a
clause was contained, was vitiated by mistake, misrepresentation, illegality, lack
of authority or lack of capacity. (Estasis Salotti di Colzani Aimo et Gianmario    B
Colzani v RUWA Polstereimaschinen GmbH (Case 24/76) [1976] ECR 1831,
Coreck Maritime GmbH v Handelsveem BV [2001] CLC 550; [2000] ECR I-
9337, and Mainschiffahrts Genossenschaft eG (MSG) v Les Gravieres Rhenanes
Sarl (Case C-106/96) [1997] ECR I-911 considered.)

    **4. The primary claim fell within the jurisdiction clause which was itself within**    C
**art. 23 of the Regulation. It followed that, both as a matter of construction of the**
**clause and as a matter of European law, the alternative claims also came within**
**the terms of art. 23 and that the English court had jurisdiction to resolve those**
**claims or, at the very least, that there was a good arguable case to that effect.**

The following cases were referred to in the judgment:    D

*Benincasa v Dentalkit Srl* (Case C-269/95) [1997] ECR I-3767.
*Bols Distilleries BV v Superior Yacht Services Ltd* [2007] 1 CLC 308; [2007] 1
WLR 12.
*Canada Trust Co v Stolzenberg (No. 2)* [1998] CLC 23; [1998] 1 WLR 547.    E
*Caterpillar Financial Services Corp v SNC Passion* [2004] 2 Ll Rep 99.
*Coreck Maritime GmbH v Handelsveem BV* (Case C-387/98) [2001] CLC 550;
[2000] ECR I-9337.
*Effer SpA v Kantner* (Case 38/81) [1982] ECR 825.
*Estasis Salotti di Colzani Aimo et Gianmario Colzani v RUWA Polstereimaschinen
GmbH* (Case 24/76) [1976] ECR 1831.    F
*Fiona Trust & Holding Corp v Privalov* [2007] 2 CLC 553.
*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd*
[1993] 1 QB 701.
*Kleinwort Benson Ltd v Glasgow City Council* [1997] CLC 1609; [1999] 1 AC
153.    G
*Knorr-Bremse Systems v Haldex Brake Products GmbH* [2008] EWHC 156 (Pat).
*Mackender v Feldia AG* [1967] 2 QB 590.
*Mainschiffahrts Genossenschaft eG (MSG) v Les Gravieres Rhenanes Sarl* (Case
C-106/96) [1997] ECR I-911.

Stephen Moriarty QC, Derrick Dale and Louise Merrett (instructed by Allen &    H
Overy LLP) for the appellant.

    Christopher Butcher QC and Adrian Briggs (instructed by Davis & Co) for the
respondent.

A

## JUDGMENT

### Longmore LJ: Facts

B

1. The issue in this appeal is whether an exclusive jurisdiction clause, which covers any dispute as to the existence or validity of the contract, covers not merely claims advanced on the basis that the contract is a valid and subsisting contract but also alternative claims advanced on the basis (asserted by the defendant but denied by the claimant) that the contract is of no effect.

C

2. The claims in the present case are primarily for repayment of monies advanced by various lenders (the claimants being those lenders or their successors in title and otherwise known as 'the Finance Parties') under a Credit Agreement dated 31 March 2006. Under that agreement the claimants made available a credit facility of some US$210 million to the first defendant ('APBW'), a telecommunications company in Taiwan which operated a mobile phone network. The loan was ostensibly to finance the purchase by APBW of equipment from another Taiwanese company, Huawei. The second defendant, which is the parent company of APBW, guaranteed the loan and became a co-obligor with APBW under the Credit Agreement. At the time the Agreement was made, both defendants were companies in the Rebar Group controlled by the Wang family. Mr Wang Ling-Tai was the Chairman of APBW. In December 2006 he and other members of his family were indicted for fraud in Taiwan. From February 2007 both defendant companies have been under new management.

D

E

3. Clause 34 of the Credit Agreement provided that the Agreement was governed by English law. Clause 35 was an exclusive jurisdiction clause in the following terms:

F

'35. ENFORCEMENT

35.1 Jurisdiction

(a) The English courts have exclusive jurisdiction to settle any dispute in connection with any Finance Document.

G

(b) The English courts are the most appropriate and convenient courts to settle any such dispute in connection with any Finance Document. Each Obligor agrees not to argue to the contrary and waives objection to those courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document.

H

(c) This clause is for the benefit of the Finance Parties only. To the extent allowed by law, a Finance Party may take:

(i) proceedings in any other court; and

**524**          **Deutsche Bank v APBW**                    **[2008] 2 CLC**
                      *(Longmore LJ)*

A

(ii) concurrent proceedings in any number of jurisdictions.

(d) References in this Clause to a dispute in connection with a Finance Document
includes any dispute as to the existence, validity or termination of that Finance
Document.'

B

This is as wide a jurisdiction clause as is readily conceivable.

4. The credit facility was duly provided to APBW, which then made withdrawals
under it and paid interest due on sums so withdrawn until about December 2006. No
further payments of interest after that date were made and on 9 March 2007 the first
claimant, Deutsche Bank AG, as Facility Agent on its own behalf and on behalf of
the other lenders, declared various events of default and made formal demand for
sums outstanding against both defendants. After various monies had been paid out of
escrow accounts, the sums outstanding were equivalent to some US$175 million. The
defendants did not pay any part of the sums outstanding and on 30 April 2007 the
present proceedings were begun in the Commercial Court in London. The Claim Form
(supported by a statement of truth signed by the claimants' solicitors) stated that the
Court had jurisdiction on the basis that the defendants were parties to an agreement
conferring jurisdiction to which Article 23 of the Judgments Regulation 44/2001
applied. That was, of course, a reference to Clause 35 of the Credit Agreement.

5. The Claim Form was served on the defendants pursuant to Clause 35.2 of the
Credit Agreement by service on Law Debenture Corporate Services Limited, being
the agent for service within the jurisdiction appointed by the defendants. At that stage
no objection was raised as to the jurisdiction of the English Courts. It is perhaps
difficult to see how there could have been any such objection.

6. After several extensions of time, the defence was served on 14 September 2007.
It is a lengthy document but in essence it contends that the Credit Agreement is void
because the members of the Wang family who were the Chairmen of the defendant
companies and who signed the Credit Agreement and other documents on behalf of
the companies did not have the authority of the companies to enter into the Credit
Agreement on their behalf. In particular it is said

(i) there was no or no effective board resolution of the first defendant to authorise the
transaction contemplated and/or evidenced by the various agreements;

(ii) alternatively, if there was an effective board resolution, the agreements were not
authorised because they were not in the best interests of the defendants.

It is also said that the loan was entered into in order to conceal (or assist in concealing)
misappropriations of about US$800 million of company money made by members of
the Wang family.

A

    7. The essence of the defendants' case is, therefore, that the transaction involving the Credit Agreement was entered into by the Wang family as part of a large scale fraud perpetrated by them upon the defendant companies, including the extraction of large sums of money which the credit facility transaction was designed to conceal. It is said that the supposed board resolutions of the defendant companies were created by the Wang family entirely for their own interest and in reality board meetings were not held, the family having had complete disregard for the principles of corporate governance. Furthermore, it is the defendants' case that Deutsche Bank knew or ought to have known (i) of the bad reputation of the Wang family in Taiwan and (ii) that this transaction was not in the best interests of the defendant companies and apparently, not therefore enforceable.

B

C

    8. The claimants served a detailed and lengthy reply which raised two alternative claims for the first time. At a Case Management Conference on 14 November 2007, Flaux J ordered that the claimants should serve any proposed amendment to the Claim Form and Particulars of Claim to raise these alternative claims by 19 November 2007 and that, by 3 December 2007, the defendants through their solicitors should indicate whether the amendments were accepted or whether the defendants disputed the Court's jurisdiction in relation to the alternative claims. On 13 December 2007, the defendants' solicitors wrote indicating that jurisdiction was indeed disputed. That gave rise to a contested application for permission to amend to plead the alternative claims which Flaux J in due course refused on the grounds that the court had no jurisdiction to determine them, [2008] EWHC 918 (Comm). Hence this appeal.

D

E

    9. The two alternative claims set out in the draft amended particulars of claim are:

F

(i) The contention that if the Credit Agreement is void (as the defendants allege but the claimants deny) the monies paid out pursuant to it were paid under a mistake of fact and/or law and/or for a consideration which wholly failed. Accordingly, the claimants claim repayment of the money lent together with interest on the basis that the defendants would be unjustly enriched if they retained the amounts drawn down under the Credit Agreement. This claim can be categorised as a restitutionary claim.

G

(ii) The contention that if (as the defendants contend) the Credit Agreement is void because there was no board meeting of the first defendant authorising Mr Wang as its chairman to enter the Credit Agreement, then Mr Wang made misrepresentations to the claimants that such a meeting had taken place, misrepresentations for which the first defendant is said to be liable to the claimants.

H

    10. It will be seen that both the restitution claim and the misrepresentation claim are true alternatives to the primary claim in contract already before the court. These alternative claims only arise if the defendants establish that the Credit Agreement is void for want of authority on one or other of the grounds alleged in the defence.

Unless the defendants' case succeeds on one or other basis, the alternative claims are unnecessary because, on that hypothesis, the claimants will succeed on their primary claim in contract.

11. It is now common ground between the parties that the new claims fall within the terms of the exclusive jurisdiction clause contained in the Credit Agreement. What is in dispute is whether the English Court has jurisdiction to try them.

**Background to Submissions**

12. It is accepted by both parties that, because the first claimant is domiciled in a Member State of the European Union, the right to rely on the jurisdiction clause depends on the terms of Article 23(1) of the Judgments Regulation ('the Regulation') which provides as follows:

'If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. Such an agreement conferring jurisdiction shall be either:

(a) in writing or evidenced in writing;

(b) in a form which accords with the practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of this type involved in the particular trade or commerce concerned.'

13. Article 23 forms part of Section 7 of Chapter II of the Regulation, dealing with Jurisdiction. The general provisions in Section 1 of Chapter II include the general rule of jurisdiction that a defendant shall be sued in the courts of his domicile. Article 3 then provides that a defendant domiciled in a Member State may be sued elsewhere only by virtue of the rules set out in Sections 2–7 of the Chapter. Section 2 deals with Special Jurisdiction (such as under Article 5) and Sections 3–6 with jurisdiction under various types of contract. Section 7 is headed 'Prorogation of Jurisdiction' and in Article 23 deals with consensual agreements relating to jurisdiction. These provisions are relevant, as a matter of English law, because the claimant bank is itself incorporated and domiciled in a Member State and is thus subject to the Regulation.

14. In the present case, unless jurisdiction in respect of the alternative claims can be founded upon the jurisdiction clause, the English court has no jurisdiction over

A   the defendants in respect of those claims. Although the claimants pursued a case of
    waiver by the defendants of any objection to the jurisdiction of the English Courts, the
    judge held that that alternative basis for jurisdiction was hopeless. I would agree with
    the Judge that the mere submission to the jurisdiction in relation to the primary claim
    cannot constitute a submission in relation to the alternative claims. In the present case,
    jurisdiction is either to be derived from the jurisdiction clause or not at all.

B

    15. In *Estasis Salotti di Colzani Aimo et Gianmario Colzani v RUWA
    Polstereimaschinen GmbH* (Case 24/76) [1976] ECR 1831, 1841 the European Court
    of Justice said in relation to Article 17 which was the predecessor of Article 23:

C       'In view of the consequences that such an option may have on the position of
        parties to the action, the requirements set out in article 17 governing the validity
        of clauses conferring jurisdiction must be strictly construed.

        By making such validity subject to the existence of an "agreement" between the
        parties, article 17 imposes on the court before which the matter is brought the
D       duty of examining, first, whether the clause conferring jurisdiction upon it was
        in fact the subject of a consensus between the parties, which must be clearly and
        precisely demonstrated.

        The purpose of the formal requirements imposed by Article 17 is to ensure that
E       the consensus between the parties is in fact established.'

    It was therefore held that a jurisdiction clause contained in general conditions on the
    reverse of the contractual document, on which the parties' signatures appeared, was
    not the subject of consensus in the absence of a reference on the front of the document
    to the fact that there were general conditions on the back.
F

    16. Since the question whether the court has jurisdiction always arises on an
    interlocutory basis before trial, it is recognised that it is possible that a trial may
    falsify the basis on which jurisdiction has been assumed. For that reason it has been
    held in England that any fact and matter on which the assumption of jurisdiction by
G   the court depends has to be shown to exist by reference to the test of a 'good arguable
    case'. This test was used and explained by Waller LJ in *Canada Trust v Stolzenberg*
    [1998] CLC 23, 28-9; [1998] 1 WLR 547, 555 and approved in connection with
    Article 23 by Lord Rodger of Earlsferry, delivering the advice of the Privy Council
    in *Bols Distilleries v Superior Yacht Services* [2007] 1 CLC 308; [2007] 1 WLR 12
    at paragraph 28:
H
        'Their Lordships would respectfully join … in endorsing the approach in the
        judgment of Waller LJ. Despite the submissions of counsel for the defendants
        to the contrary, it appears to the Board that, if the standard of "a good arguable
        case" is properly understood and applied, there is no risk that the effectiveness
        of the Regulation will be impaired. The rule is that the court must be satisfied,

or as satisfied as it can be having regard to the limitations which an interlocutory A
process imposes, that factors exist which allow the court to take jurisdiction.
In practice, what amounts to a "good arguable case" depends on what requires
to be shown in any particular situation in order to establish jurisdiction. In the
present case, as the law of the Court of Justice emphasises, in order to establish
that the usual rule in article 2(1) is ousted by article 23(1), the claimants must B
demonstrate "clearly and precisely" that the clause conferring jurisdiction on the
court was in fact the subject of consensus between the parties. So, applying the
"good arguable case" standard, the claimants must show that they have a much
better argument than the defendants that, on the material available at present,
the requirements of form in article 23(1) are met and that it can be established,
clearly and precisely, that the clause conferring jurisdiction on the court was the C
subject of consensus between the parties.'

17. The judge cited this passage as well as some of the relevant principles set out
by Lewison J in paragraph 30 of his recent judgment in *Knorr-Bremse Systems v
Haldex Brake Products* [2008] EWHC 156 (Patents):
D

'(vi) If there has been no succession, the court seised must ascertain whether
the person against whom the jurisdiction clause is invoked actually accepted the
jurisdiction clause relied on against him;

(vii) The court must decide this question by reference to the requirements laid E
down in the first paragraph of article 23 of the Judgments Regulation, which is
also a matter of the law of the Regulation, rather than the national law applicable
to the substantive provisions of the contract;

(viii) The formal requirements of that paragraph are strict;
F

(ix) It is for the party relying on the jurisdiction clause to demonstrate clearly and
precisely that the formal requirements are met;

(x) The scope of a valid jurisdiction clause, in the sense of delimiting the disputes
that fall within it, is a question of the national law governing the contract.' G

## The Submissions

18. Mr Moriarty QC submitted that the claimants have clearly and precisely
demonstrated that clause 23 has been the subject of consensus because all the external H
indicia of consensus are in place in the present case; the contract was signed by
Mr Wang on behalf of the first defendant with the relevant corporate and personal
chops (a chop is a Taiwanese equivalent to a seal); there were similarly signed board
minutes of the first defendant approving the transaction, the presence of which was a
condition precedent to the Credit Agreement and detailed representations were made

A  in the Credit Agreement as to the authority of Mr Wang to enter the transaction. He submitted that these were all compelling factors pointing to consensus. The defendants could only challenge that analysis by resort to national law which set out the circumstances in which a contract would be void for want of authority. This was, however, precisely the dispute which the parties had agreed should be resolved by the neutral English Court. It was further agreed by implication that whatever the result of the dispute it was for the English Court to consider what the appropriate remedy would be. The amendments were made to enable the agreed court to give full and effective relief.

B

C  19. Mr Moriarty also had a number of fall back arguments if his primary argument did not find favour with the Court. He submitted that the defendants' pleaded case did not go so far as to establish that, even if Mr Wang had no authority to enter the Credit Agreement, he did not have authority to enter a jurisdiction agreement. Alternatively, he submitted that even if the court had no jurisdiction over the misrepresentation claim (because it was predicated upon the whole Credit Agreement being void, including the jurisdiction clause), the same was not true of the restitution claim. That claim might well succeed not just where the Credit Agreement was void for want of authority but where it was said not to be in the best interests of the defendants, an alternative line of defence which has nothing to do with consent to the jurisdiction clause.

D

E  20. Mr Butcher QC on behalf of the defendants submitted that the issue as to consensus between the parties of the jurisdiction clause could not be viewed in isolation from the claims and disputes in relation to which the clause was being prayed in aid. He submitted that the Court could and should make no assumption (let alone any decision) as to whether the test derived from paragraph 28 of *Bols Distilleries* would have been satisfied in relation to the primary claim in contract as that issue was not and never had been before the Court.

F

G  21. Even if the Court were inclined to look at that issue, he submitted that on the material before the Court now (including the defence and response to the request for further information) the claimants could not show that they had much the better of the argument that there was consensus to the jurisdiction clause. He emphasised the strictness of the approach of the European Court of Justice to Article 23, in circumstances where Article 23 involved a derogation from the general rule of jurisdiction. He referred to the fact that what was required was that the defendant had 'really consented to the clause' (paragraph 9 of the judgment in *Salotti* [1976] ECR 1831). He also relied upon the reference to Article 23 being recognition of the 'independent will of the parties' in paragraph 14 of the judgment in *Coreck Maritime* [2001] CLC 550; [2000] ECR I-9937. He submitted that 'real consent' or 'independent will' could not be clearly and precisely demonstrated where the defendants' whole case was that the Credit Agreement was unauthorised and part of a wide scale fraud on the companies.

H

22. Mr Butcher submitted in the alternative that, even if the claimants could      A
show a good arguable case as to the validity of the jurisdiction clause in relation
to their primary contractual claim, they could not use that to found jurisdiction for
an alternative claim which was predicated upon the whole Credit Agreement being
void. He challenged the suggestion that the defendants had not pleaded that there
was no authority to enter into the jurisdiction clause where the pleaded case was       B
that the whole transaction was unauthorised. The fact that Mr Wang might have had
authority to enter a jurisdiction agreement in a contract within the normal business
of the first defendant of the rental of mobile phones was nothing to the point. The
issue was whether the claimants could demonstrate that he had authority to enter the
particular jurisdiction clause in the Credit Agreement the purpose of which clause was
to resolve any disputes in connection with that Agreement. The claimants simply had      C
no material at all from which they could demonstrate that this jurisdiction clause was
somehow authorised.

**Discussion**

23. One starts with the proposition that if a claimant wishes to rely on a jurisdiction      D
clause pursuant to Article 23, he must demonstrate clearly and precisely that the clause
was the subject of a consensus between the parties. If that is in dispute the claimant
must show that on the available material the requirements of form in Article 23(1)
are met and that the clause was the subject of consensus. The formal requirements
of Article 23 are met in this case inasmuch as the agreement confirming jurisdiction      E
is itself in writing and contained in a written agreement. That agreement has been
signed or 'chopped' by all the parties. In those circumstances it is clear that consensus
was reached on the clause. It is not a case, such as *Bols Distilleries* was, in which,
although there was a written jurisdiction clause, there was no final agreement reached
between the parties at all. It seems to me, therefore, that the formal requirements of
Article 23 are met subject to the argument that the Taiwanese signatories had no      F
authority to conclude the Credit Agreement.

24. The next proposition is that a jurisdiction clause, like an arbitration clause, is
a separable agreement from the agreement as a whole. This is uncontroversial both
as a matter of domestic law (see *Mackender v Feldia* [1967] 2 QB 590 and *Fiona*      G
*Trust v Privalov* [2007] 2 CLC 553) and as a matter of European law (see *Benincasa*
*v Dentalkit Srl* [1997] ECR I-3767 and Briggs, *Civil Jurisdiction and Judgments* (4th
ed. 2005) para. 2 105 esp. at page 131). It follows that disputes about the validity
of the contract must, on the face of it, be resolved pursuant to the terms of the
clause and, indeed, the last sentence of the clause expressly so provides. It is only
if the jurisdiction clause is itself under some specific attack that a question can arise      H
whether it is right to invoke the jurisdiction clause. Examples of this might be fraud
or duress alleged in relation specifically to the jurisdiction clause. Another example
might be if the signatures to the agreement were alleged to be forgeries, although no
authority has so far so stated. Even in such a case someone has to decide whether the
signatures were in fact forged. It might well be thought that a mere allegation to that

A    effect could not have the effect of rendering a jurisdiction clause inapplicable.

25. The importance of this concept of separability is that it shows that it cannot be the case that *every* claim made on the basis that a contract is void or has never come into existence *must* fall outside the terms of a jurisdiction clause expressed as widely as that in the present case. If for example, a prepayment has been made pursuant to

B    a supposed building contract which is subsequently held to be void or never to have existed, the court so holding (by virtue of the exclusive jurisdiction clause) must, in my view, be able to order the return of the payment made. It would be absurd if that court had to decline all further jurisdiction and require the claimant to go, for that purpose, to the courts of the defendant's domicile. Similarly, if the English court in the

C    present case proceeds to hold that insufficient notice was given of the Board meeting at which it was resolved that the defendants should enter the Credit Agreement, and that for that reason the agreement was unauthorised and must be treated as not binding on the defendants, it would again be little short of absurd that the English court could not order the return of the capital actually borrowed if it was otherwise right to do so. If that were the case, the court agreed by the parties for the resolution

D    of their dispute could not give full and effective relief; that would be contrary to the doctrine of separability. That these propositions are uncontroversial as a matter of English law is shown by *Caterpillar Financial Services v SNC Passion* [2004] 2 Ll Rep 99, paragraph 16 where Cooke J held that a claim for the return of the principal (if the contract was invalid) was a claim in connection with the loan agreement 'since

E    without that agreement no sum would have been advanced at all'.

26. The judge accepted these propositions as a matter of construction of the agreement in paragraphs 43-46 of his judgment but decided against the claimants because they had not established 'a good arguable case as to the validity of the jurisdiction clause'. By this he meant that the claimants had not been able to establish

F    that the clause was 'really agreed' because the defendants were plausibly asserting that the agreement had been signed without authority. That is, however, the very conclusion that the doctrine of separability is designed to avoid. If, of course, (on analysis) it appears, as it did in *Bols Distilleries* that no agreement was concluded because the parties were still in the realms of negotiation then one can see that there

G    was no agreement about anything (including any jurisdiction clause which might well have been agreed as part of any concluded agreement). But that is not the present case where an agreement was undoubtedly concluded but the only question is whether it was an authorised agreement. By virtue of the separability principle there can be little doubt that the English court has jurisdiction to determine that question; once that conclusion is reached it must, to my view, also have jurisdiction to determine the

H    consequences of any such decision.

27. In paragraphs 17 and 18 of *Fiona Trust* Lord Hoffmann drew a distinction between cases of 'no authority whatever' (e.g. an agreement signed by the office cleaner) and cases of 'excess of authority'.

'17. ... If a party alleges that someone who purported to sign as agent on his       A
behalf had no authority whatever to conclude any agreement on his behalf, that
is an attack on both the main agreement and the arbitration agreement.

18. On the other hand, if (as in this case) the allegation is that the agent
exceeded his authority by entering into a main agreement in terms which were
not authorised or for improper reasons, that is not necessarily an attack on the       B
arbitration agreement. It would have to be shown that whatever the terms of the
main agreement or the reasons for which the agent concluded it, he would have
had no authority to enter into an arbitration agreement.'

The present case falls more naturally within the second category than the first, since       C
there can be no doubt that, in general terms, the Chairman of a company has authority
to enter into loan agreements on the company's behalf. As a matter of English law,
therefore, there can be little doubt that the alternative claims would be covered by the
jurisdiction clause.

28. In coming to his conclusion the judge was heavily influenced by the       D
authorities of the European Court requiring 'real consent' (*Salotti* paragraph 9) and a
demonstration of 'independent will' (*Coreck Maritime* [2001] CLC 550; [2000] ECR
I-9937). He said that in the light of those authorities the European Court would not
consider the requisite consensus to be established merely by showing an agreement
signed by an agent whose authority to do so was denied. This, in my view, is to       E
read too much into these authorities. There is no indication in Article 23 itself that
jurisdiction clauses should be restricted in their ambit, as opposed to the undoubted
requirement that they be strictly proved to exist. The Article does not even require
that any such agreement must be in writing or evidenced in writing since it can be in
a form which accords with the parties' own established practices or in a form widely
known to and regularly observed by parties to contracts of the relevant type if it is       F
a contract made in international trade or commerce. In this context the relatively
broad construction given to this last possibility in *MSG v Gravieres Rhenanes* (Case
C-106/96) [1997] ECR I-911 may be noted. The most that can be said is that Article
23 is comparatively restrictive so far as concerns contracts which are not (or not
evidenced) in writing. No doubt the purpose of that comparative restriction is to       G
ensure that such clauses (if not in writing) are not relied on if there is, in fact, no true
consensus between the parties.

29. But I do not read the authorities as laying down any requirement that such
clauses are not to apply if there is a (plausible) allegation that the contracts, in which
such clause are contained, are vitiated by mistake, misrepresentation, illegality, lack       H
of authority or lack of capacity. That would be to deny the concept of separability
which is as much part of European law as English law. Separability was indeed a
doctrine in many European jurisdictions well before it was acknowledged in English
law, see *Harbour v Kansa* [1993] 1 QB 701 especially per Leggatt LJ. *Benincasa* is
a case in which jurisdiction was assumed under Article 5 by the courts of the place

A    of performance despite allegations of illegality, fraud and misrepresentation. *Effer v Kantner* [1982] ECR 825 was a similar case in which the (plausible) allegation was that there was no contract with the claimant at all but rather with a third party. It is difficult to think that a different answer would have been given by the European Court in either case if there had been a written jurisdiction clause and Article 23 (rather than Article 5) was being relied on.

B

30. *Salotti* [1976] ECR 1831 was the case in which the European Court held that the court hearing the case had to determine whether the contract conferring jurisdiction was in fact the subject of consensus 'which must be clearly and precisely demonstrated' and also held that the purpose of the Article's formal requirements

C    was to ensure that that consensus was in fact established. That is authority for the proposition that if the formal requirements are established (e.g. that the clause is in writing) that will be enough to ensure that consensus is established for the purpose of enabling the case to be determined. It is no support for a proposition that a plausible contention of lack of authority renders the clause inapplicable. The use of the phrase 'independent will of the parties' in *Coreck Maritime GmbH v Handelsveem BV* [2001]

D    CLC 550; [2000] ECR I-9337, paragraph 14 was not intended to express any different concept but was only used to support the conclusion that a jurisdiction clause in a bill of lading was an expression of that independent will (and would bind the receiver of the cargo) even though the clause did not itself identify the agreed court but merely provided that it was to be the court of the country where the carrier had his principal

E    place of business.

31. In paragraphs 31–34 of his judgment, the judge appears to contemplate that there might be sufficient consensus between the parties that the primary dispute as to authority can be resolved by the English court but not sufficient consensus that the court should determine alternative claims 'predicated upon the agreement containing

F    the jurisdiction clause being unauthorised and void'. To my mind this is a curious conclusion. To require separate consensuses for separate claims is an artificial concept which is most unlikely to accord with contracting parties' intentions and is unlikely to have commended itself to the framers of the Regulation.

G    32. Mr Butcher relied on *Kleinwort Benson Ltd v Glasgow City Council* [1997] CLC 1609; [1999] 1 AC 153 as showing that restitutionary claims are different from contractual claims for the purpose of Article 5 of the Regulation and submitted that the same position applied under Article 23. In that case the House of Lords held that a claim for return of money paid pursuant to an *ultra vires* swap contract could not be brought in England pursuant to the domestic equivalent of Article 5 of the Regulation

H    which entitled a claimant to sue 'in matters relating to a contract, in the courts for the place of performance of the obligation in question'. If there was no contract there could be no place of performance of the contractual obligation and the claim had to be brought in the defendants domicile (Scotland). That was a very different case. Here the question is whether there was a jurisdiction agreement and, if so, what claims come within that agreement. As a matter of English law there was such an agreement

**534**                          **Deutsche Bank v APBW**                    **[2008] 2 CLC**
                                      *(Laws LJ)*

and the alternative claims come within the agreement. The fact that the terms of          A
Article 23 of the Regulation have to be (and can be seen to have been) complied with
should make no difference.

## Conclusion

B

33. For my part, therefore, I would decline Mr Butcher's invitation not to make any
decision whether the primary claim falls within the jurisdiction clause. I would decide
that that claim is within the jurisdiction clause which is itself within Article 23 of the
Regulation. It must follow from this that, both as a matter of construction of the clause
and as a matter of European law, the alternative claims also come within the terms of
Article 23 and that the English court has jurisdiction to resolve those claims or, at the      C
very least, that there is a good arguable case to that effect.

34. I would allow this appeal and allow the proposed amendments accordingly.

**Keene LJ:**
                                                                                              D
35. I agree.

**Laws LJ:**

36. I also agree.                                                                             E

*(Appeal allowed)*

<hr>

F

G

H