# EXHIBIT D
# Part III of V

A                                    House of Lords

## Fili Shipping Co Ltd and others *v* Premium Nafta Products Ltd and others

## [On appeal from Fiona Trust and Holding Corpn and others *v* Privalov and others]

B

### [2007] UKHL 40

| | |
|---|---|
| 2007  July 30, 31;<br>Oct 17 | Lord Hoffmann, Lord Hope of Craighead,<br>Lord Scott of Foscote, Lord Walker of Gestingthorpe<br>and Lord Brown of Eaton-under-Heywood |

C

*Arbitration — Arbitrator — Jurisdiction — Owners bringing tort proceedings against charterers and purporting to rescind charterparties for bribery — Owners seeking court declaration as to validity of rescission — Charterers seeking determination of issue by arbitrator pursuant to arbitration clause — Whether arbitration clause impeached by allegations of bribery — Arbitration Act 1996 (c 23), ss 7, 9, 72(1)*

D
    Eight companies within a Russian group of companies entered into charterparties as owners with three chartering companies. Each of the charterparties contained a clause providing for "any dispute arising under this charter" to be decided in England and conferred on either party the right to elect to have any such dispute referred to arbitration. The owners, among others, brought proceedings against the charterers for the torts of conspiracy, bribery and breach of fiduciary duty, claiming, inter alia, that each of the eight charterparties had been induced by bribery and, having
E    purported to rescind the charters, sought a declaration from the court as to the validity of that act. The charterers sought to have the issue determined under the arbitration clause and appointed an arbitrator. On the owners' application under section 72(1) of the Arbitration Act 1996[1] to restrain the arbitral proceedings and on the charterers' application under section 9 of the Act that the court proceedings be stayed, the judge held that the question whether the charterparties were void for bribery fell outside the scope of the arbitration clause and refused the charterers'
F    application for a stay. On appeal by the charterers, the Court of Appeal held that the dispute did fall within the arbitration clause, which survived notwithstanding any illegality of the main contract since section 7 of the 1996 Act required an arbitration clause to be treated as a distinct agreement.
    On the owners' appeal—
    *Held*, dismissing the appeal, that the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, were likely to
G    have intended any dispute arising out of the relationship into which they had entered or purported to enter to be decided by the same tribunal unless the language made it clear that certain questions were intended to be excluded from the arbitration; that where it was claimed that in any event the arbitration clause had been impeached by the illegality of the contract in which it was contained, the effect of the principle of

H    [1] Arbitration Act 1996, s 7: see post, para 9.
    S 9: "(1) A party to an arbitration agreement against whom legal proceedings are brought . . . in respect of a matter which under the agreement is to be referred to arbitration may . . . apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter . . ."
    S 72(1): "A person alleged to be a party to arbitral proceedings but who takes no part in the proceedings may question—(a) whether there is a valid arbitration agreement . . . by proceedings in the court for a declaration or injunction or other appropriate relief."

separability in section 7 was that the agreement to go to arbitration could be    *A*
challenged only on grounds relating directly to that agreement; and that, accordingly,
since the language of the arbitration clause contained nothing to exclude disputes
about the validity of the contract on grounds of fraud, and there were no grounds of
challenge specific to the validity of the arbitration clause, the claims that the charter
contracts had been induced by bribery fell to be determined by arbitration (post,
paras 13–19, 22, 26, 27, 31, 32, 35, 36–38).

Decision of the Court of Appeal [2007] EWCA Civ 20; [2007] Bus LR 686;    *B*
[2007] 1 All ER (Comm) 891; [2007] 2 Lloyd's Rep 267 affirmed.

The following cases are referred to in their Lordships' opinions:

*A T & T Technologies Inc v Communication Workers of America* (1986) 475 US 643;
   106 S Ct 1415

*Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488; [1988] 3 WLR
   867; [1988] 2 All ER 577; [1988] 2 Lloyd's Rep 73, CA    *C*

*Comandate Marine Corpn v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192

*Decision of 27 February 1970* (1970) 6 Arbitration International 79

*Fillite (Runcorn) Ltd v Aqua-Lift* (1989) 26 Con LR 66, CA

*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd*
   [1992] 1 Lloyd's Rep 81; [1993] QB 701; [1993] 3 WLR 42; [1993] 3 All ER 897;
   [1993] 1 Lloyd's Rep 455, CA

*Heyman v Darwins Ltd* [1942] AC 356; [1942] 1 All ER 337, HL(E)    *D*

*Mackender v Feldia AG* [1967] 2 QB 590; [1967] 2 WLR 119; [1966] 3 All ER 847;
   [1966] 2 Lloyd's Rep 449, CA

*Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988]
   2 Lloyd's Rep 63

*Prima Paint Corpn v Flood & Conklin Manufacturing Co* (1967) 388 US 395; 87 S Ct
   1801

*Threlkeld & Co (David L) Inc v Metallgesellschaft Ltd (London)* (1991) 923 F 2d    *E*
   245

*Union of India v E B Aaby's Rederi A/S (The Evje)* [1975] AC 797; [1974] 3 WLR
   269; [1974] 2 All ER 874; [1974] 2 Lloyd's Rep 57, HL(E)

The following additional cases were cited in argument:

*A B Norrkopings Trikafabrik v A B Per Persson* (1936) NJA 521

*Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's    *F*
   Rep 87, CA

*Albon (trading as NA Carriage Co) v Naza Motor Trading Sdn Bhd* [2007]
   EWHC 9 (Ch); [2007] Bus LR D87; [2007] 1 WLR 2489; [2007] 2 All ER 719;
   [2007] 1 All ER (Comm) 795; [2007] 1 Lloyd's Rep 297

*Antonis P Lemos, The* [1985] AC 711; [1985] 2 WLR 468; [1985] 1 All ER 695;
   [1985] 1 Lloyd's Rep 283, HL(E)

*BTR Engineering (Australia) Ltd v Dana Corpn* [2000] VSC 246    *G*

*Buckeye Check Cashing Inc v Cardegna* (2006) 546 US 440; 126 S Ct 1204

*Cancanon v Smith Barney, Harris, Upham & Co* (1986) 805 F 2d 998

*Capital Trust Investments Ltd v Radio Design TJ AB* [2002] EWCA Civ 135; [2002]
   2 All ER 159; [2002] 1 All ER (Comm) 514, CA

*Carnoustie Universal SA v International Transport Workers Federation* [2002]
   EWHC 1624 (Comm); [2002] 2 All ER (Comm) 657

*Chimimport plc v G d'Alesio SAS* [1994] 2 Lloyd's Rep 366    *H*

*Credit Suisse First Boston (Europe) Ltd v Seagate Trading Co Ltd* [1999] 1 All ER
   (Comm) 261; [1999] 1 Lloyd's Rep 784

*Deweer v Belgium* (1980) 2 EHRR 439

*El Nasharty v J Sainsbury plc* [2003] EWHC 2195 (Comm); [2004] 1 All ER (Comm)
   728; [2004] 1 Lloyd's Rep 309

A  *Ethiopian Oilseeds and Pulses Export Corpn v Rio del Mar Foods Inc* [1990]
        1 Lloyd's Rep 86
    *Law Debenture Trust Corpn plc v Elektrim Finance BV* [2005] EWHC 1412 (Ch);
        [2005] 2 All ER 476; [2005] 2 Lloyd's Rep 755
    *Paper Products Pty Ltd v Tomlinsons (Rochdale) Ltd* (1993) 43 FCR 439
    *Philippines, Republic of v Westinghouse Electric Corpn* (1989) 714 F Supp 1362
    *Stretford v Football Association Ltd* [2007] EWCA Civ 238; [2007] Bus LR 1052;
B        [2007] 2 All ER (Comm) 1; [2007] 2 Lloyd's Rep 31, CA
    *Three Valleys Municipal Water District v E F Hutton & Co Inc* (1991) 925 F 2d 1136
    *Walter Rau Neusser Oel und Fett AG v Cross Pacific Trading Ltd* [2005] FCA 1102

    **APPEAL** from the Court of Appeal
        This was an appeal, by leave of the House of Lords (Lord Hoffmann,
    Lord Walker of Gestingthorpe and Lord Neuberger of Abbotsbury), by the
C   14th and the 21st to 27th claimants, Fili Shipping Co Ltd, Glefi Shipping
    VII Co Ltd, Progress Shipping Co, Universal Navigation Co Ltd, Glefi
    Shipping XXIX Co Ltd, Glefi Shipping XXVIII Co Ltd, Integrity Maritime
    Inc and Valloy Shipping Corpn ("the owners") against the decision of
    the Court of Appeal (Tuckey, Arden and Longmore LJJ) whereby, in
    proceedings brought by Fiona Trust and Holding Corpn and 28 other
D   claimants, including the owners, claiming damages for conspiracy, bribery
    and breach of fiduciary duty against Yuri Privalov and 21 other defendants
    and as part of which proceedings the owners having sought a declaration
    that they had validly rescinded charterparties entered into between
    themselves and the twentieth to twenty-second defendants, Premium
    NAFTA Products Ltd, Remmy Commercial Corpn and Henriot Finance Ltd
    ("the charterers") as having been procured by bribery, and the charterers in
E   response having sought a determination of that issue under an arbitration
    clause in each of the charters, the Court of Appeal reversed the decision
    of Morison J [2006] EWHC 2583 (Comm); [2007] 1 All ER (Comm) 81
    restraining the arbitral proceedings pending the trial of the court action.
        The facts are stated in the opinion of Lord Hoffmann.

F   *Christopher Butcher QC* and *Philip Jones QC* for the owners.
    *Nicholas Hamblen QC* and *Vernon Flynn* for the charterers.

    Their Lordships took time for consideration.

    17 October. **LORD HOFFMANN**
        1   My Lords, this appeal concerns the scope and effect of arbitration
G   clauses in eight charterparties in Shelltime 4 form made between eight
    companies forming part of the Sovcomflot group of companies (which is
    owned by the Russian state) and eight charterers. It is alleged by the owners
    that the charters were procured by the bribery of senior officers of the
    Sovcomflot group by a Mr Nikitin, who controlled or was associated with
    the charterer companies. It is unnecessary to set out the details of these
    allegations because it is not disputed that the owners have an arguable case.
H   They have purported to rescind the charters on this ground and the question
    is whether the issue of whether they were entitled to do so should be
    determined by arbitration or by a court. The owners have commenced court
    proceedings for a declaration that the charters have been validly rescinded
    and the charterers have applied for a stay under section 9 of the Arbitration

Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the A
Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] Bus LR 686
allowed the appeal and granted it.

2   The case has been argued on the basis that there are two issues: first,
whether, as a matter of construction, the arbitration clause is apt to cover
the question of whether the contract was procured by bribery and
secondly, whether it is possible for a party to be bound by submission to
arbitration when he alleges that, but for the bribery, he would never have    B
entered into the contract containing the arbitration clause. It seems to me,
however, that for the reasons I shall explain, these questions are very
closely connected.

3   I start by setting out the arbitration clause in the Shelltime 4 form:

"41(a) This charter shall be construed and the relations between the    C
parties determined in accordance with the laws of England.
"(b) Any dispute arising under this charter shall be decided by the
English courts to whose jurisdiction the parties hereby agree.
"(c) Notwithstanding the foregoing, but without prejudice to any
party's right to arrest or maintain the arrest of any maritime property,
either party may, by giving written notice of election to the other party,
elect to have any such dispute referred . . . to arbitration in London, one    D
arbitrator to be nominated by owners and the other by charterers, and in
case the arbitrators shall not agree to the decision of an umpire, whose
decision shall be final and binding upon both parties. Arbitration shall
take place in London in accordance with the London Maritime
Association of Arbitrators, in accordance with the provisions of the
Arbitration Act 1950, or any statutory modification or re-enactment
thereof for the time being in force. (i) A party shall lose its right to make    E
such an election only if: (a) it receives from the other party a written
notice of dispute which—(1) states expressly that a dispute has arisen out
of this charter; (2) specifies the nature of the dispute; and (3) refers
expressly to this clause 41(c); and (b) it fails to give notice of election to
have the dispute referred to arbitration not later than 30 days from the
date of receipt of such notice of dispute . . ."                                 F

4   It will be observed that clause 41(b) is a jurisdiction clause in respect
of "any dispute arising under this charter" which is then incorporated by
reference (by the words "any such dispute") in the arbitration clause in 41(c).
So the first question is whether clause 41(b) refers the question of whether
the charters were procured by bribery to the jurisdiction of the English court.
If it does, then a party may elect under clause 41(c) to have that question    G
referred to arbitration. But I shall for the sake of convenience discuss the
clause as if it was a simple arbitration clause. The owners say that for two
reasons it does not apply. The first is that, as a matter of construction, the
question is not a dispute arising under the charter. The second is that the
jurisdiction and arbitration clause is liable to be rescinded and therefore not
binding upon them.

5   Both of these defences raise the same fundamental question about the    H
attitude of the courts to arbitration. Arbitration is consensual. It depends
upon the intention of the parties as expressed in their agreement. Only the
agreement can tell you what kind of disputes they intended to submit to
arbitration. But the meaning which parties intended to express by the words

A   which they used will be affected by the commercial background and the
    reader's understanding of the purpose for which the agreement was made.
    Businessmen in particular are assumed to have entered into agreements to
    achieve some rational commercial purpose and an understanding of this
    purpose will influence the way in which one interprets their language.

        6   In approaching the question of construction, it is therefore necessary
B   to inquire into the purpose of the arbitration clause. As to this, I think there
    can be no doubt. The parties have entered into a relationship, an agreement
    or what is alleged to be an agreement or what appears on its face to be an
    agreement, which may give rise to disputes. They want those disputes
    decided by a tribunal which they have chosen, commonly on the grounds of
    such matters as its neutrality, expertise and privacy, the availability of legal
    services at the seat of the arbitration and the unobtrusive efficiency of its
C   supervisory law. Particularly in the case of international contracts, they
    want a quick and efficient adjudication and do not want to take the risks of
    delay and, in too many cases, partiality, in proceedings before a national
    jurisdiction.

        7   If one accepts that this is the purpose of an arbitration clause, its
    construction must be influenced by whether the parties, as rational
D   businessmen, were likely to have intended that only some of the questions
    arising out of their relationship were to be submitted to arbitration and
    others were to be decided by national courts. Could they have intended that
    the question of whether the contract was repudiated should be decided by
    arbitration but the question of whether it was induced by misrepresentation
    should be decided by a court? If, as appears to be generally accepted, there is
    no rational basis upon which businessmen would be likely to wish to have
E   questions of the validity or enforceability of the contract decided by one
    tribunal and questions about its performance decided by another, one would
    need to find very clear language before deciding that they must have had
    such an intention.

        8   A proper approach to construction therefore requires the court to give
    effect, so far as the language used by the parties will permit, to the
F   commercial purpose of the arbitration clause. But the same policy of giving
    effect to the commercial purpose also drives the approach of the courts (and
    the legislature) to the second question raised in this appeal, namely, whether
    there is any conceptual reason why parties who have agreed to submit the
    question of the validity of the contract to arbitration should not be allowed
    to do so.

        9   There was for some time a view that arbitrators could never have
G   jurisdiction to decide whether a contract was valid. If the contract was
    invalid, so was the arbitration clause. In *Overseas Union Insurance Ltd v
    AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63,
    66 Evans J said that this rule "owes as much to logic as it does to authority".
    But the logic of the proposition was denied by the Court of Appeal in
    *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance
H   Co Ltd* [1993] QB 701 and the question was put beyond doubt by section 7
    of the Arbitration Act 1996:

        "Unless otherwise agreed by the parties, an arbitration agreement
    which forms or was intended to form part of another agreement (whether
    or not in writing) shall not be regarded as invalid, non-existent or

ineffective because that other agreement is invalid, or did not come into   A
existence or has become ineffective, and it shall for that purpose be
treated as a distinct agreement."

10   This section shows a recognition by Parliament that, for the reasons
I have given in discussing the approach to construction, businessmen
frequently do want the question of whether their contract was valid, or came
into existence, or has become ineffective, submitted to arbitration and that   B
the law should not place conceptual obstacles in their way.

11   With that background, I turn to the question of construction. Your
Lordships were referred to a number of cases in which various forms of
words in arbitration clauses have been considered. Some of them draw a
distinction between disputes "arising under" and "arising out of" the
agreement. In *Heyman v Darwins Ltd* [1942] AC 356, 399 Lord Porter said   C
that the former had a narrower meaning than the latter but in *Union of India
v E B Aaby's Rederi A/S* [1975] AC 797 Viscount Dilhorne, at p 814, and
Lord Salmon, at p 817, said that they could not see the difference between
them.   Nevertheless, in *Overseas Union Insurance Ltd v AA Mutual
International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63, 67, Evans J said
that there was a broad distinction between clauses which referred "only
those disputes which may arise regarding the rights and obligations which   D
are created by the contract itself" and those which "show an intention to
refer some wider class or classes of disputes." The former may be said to
arise "under" the contract while the latter would arise "in relation to" or "in
connection with" the contract. In *Fillite (Runcorn) Ltd v Aqua-Lift* (1989)
26 Con LR 66, 76 Slade LJ said that the phrase "under a contract" was not
wide enough to include disputes which did not concern obligations created   E
by or incorporated in the contract. Nourse LJ gave a judgment to the same
effect. The court does not seem to have been referred to *Mackender v Feldia
AG* [1967] 2 QB 590, in which a court which included Lord Denning MR
and Diplock LJ decided that a clause in an insurance policy submitting
disputes "arising thereunder" to a foreign jurisdiction was wide enough to
cover the question of whether the contract could be avoided for non-
disclosure.   F

12   I do not propose to analyse these and other such cases any further
because in my opinion the distinctions which they make reflect no credit
upon English commercial law. It may be a great disappointment to the
judges who explained so carefully the effects of the various linguistic
nuances if they could learn that the draftsman of so widely used a standard
form as Shelltime 4 obviously regarded the expressions "arising under   G
this charter" in clause 41(b) and "arisen out of this charter" in
clause 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion
expressed by Longmore LJ in the Court of Appeal [2007] Bus LR 687,
para 17, that the time has come to draw a line under the authorities to date
and make a fresh start. I think that a fresh start is justified by the
developments which have occurred in this branch of the law in recent years
and in particular by the adoption of the principle of separability by   H
Parliament in section 7 of the 1996 Act. That section was obviously
intended to enable the courts to give effect to the reasonable commercial
expectations of the parties about the questions which they intended to be
decided by arbitration. But section 7 will not achieve its purpose if the

1725
**[2007] Bus LR**                                 Fiona Trust and Holding Corpn v Privalov (HL(E))
                                                                          Lord Hoffmann

A    courts adopt an approach to construction which is likely in many cases to
     defeat those expectations. The approach to construction therefore needs to
     be re-examined.

        13   In my opinion the construction of an arbitration clause should start
     from the assumption that the parties, as rational businessmen, are likely to
     have intended any dispute arising out of the relationship into which they
     have entered or purported to enter to be decided by the same tribunal. The
B    clause should be construed in accordance with this presumption unless the
     language makes it clear that certain questions were intended to be excluded
     from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17:
     "if any businessman did want to exclude disputes about the validity of a
     contract, it would be comparatively easy to say so."

        14   This appears to be the approach adopted in Germany: see the
C    *Decision of 27 February 1970 of the Federal Supreme Court of the
     Federal Republic of Germany (Bundesgerichtshof)* (1970) 6 Arbitration
     International 79, 85:

        "There is every reason to presume that reasonable parties will wish to
        have the relationships created by their contract and the claims arising
        therefrom, irrespective of whether their contract is effective or not,
D       decided by the same tribunal and not by two different tribunals."

        15   If one adopts this approach, the language of clause 41 of Shelltime
     4 contains nothing to exclude disputes about the validity of the contract,
     whether on the grounds that it was procured by fraud, bribery,
     misrepresentation or anything else. In my opinion it therefore applies to the
     present dispute.

E       16   The next question is whether, in view of the allegation of bribery, the
     clause is binding upon the owners. They say that if they are right about
     the bribery, they were entitled to rescind the whole contract, including the
     arbitration clause. The arbitrator therefore has no jurisdiction and the
     dispute should be decided by the court.

        17   The principle of separability enacted in section 7 means that the
     invalidity or rescission of the main contract does not necessarily entail
F    the invalidity or rescission of the arbitration agreement. The arbitration
     agreement must be treated as a "distinct agreement" and can be void
     or voidable only on grounds which relate directly to the arbitration
     agreement. Of course there may be cases in which the ground upon which
     the main agreement is invalid is identical with the ground upon which the
     arbitration agreement is invalid. For example, if the main agreement and
     the arbitration agreement are contained in the same document and one of
G    the parties claims that he never agreed to anything in the document and
     that his signature was forged, that will be an attack on the validity of the
     arbitration agreement. But the ground of attack is not that the main
     agreement was invalid. It is that the signature to the arbitration agreement,
     as a "distinct agreement", was forged. Similarly, if a party alleges that
     someone who purported to sign as agent on his behalf had no authority
H    whatever to conclude any agreement on his behalf, that is an attack on
     both the main agreement and the arbitration agreement.

        18   On the other hand, if (as in this case) the allegation is that the agent
     exceeded his authority by entering into a main agreement in terms which
     were not authorised or for improper reasons, that is not necessarily an

attack on the arbitration agreement.   It would have to be shown that   A
whatever the terms of the main agreement or the reasons for which the
agent concluded it, he would have had no authority to enter into an
arbitration agreement.  Even if the allegation is that there was no concluded
agreement (for example, that terms of the main agreement remained to be
agreed) that is not necessarily an attack on the arbitration agreement.  If the
arbitration clause has been agreed, the parties will be presumed to have     B
intended the question of whether there was a concluded main agreement to
be decided by arbitration.

   19   In the present case, it is alleged that the main agreement was in
uncommercial terms which, together with other surrounding circumstances,
give rise to the inference that an agent acting for the owners was bribed to
consent to it.  But that does not show that he was bribed to enter into the
arbitration agreement.  It would have been remarkable for him to enter into   C
any charter without an arbitration agreement, whatever its other terms had
been.  Mr Butcher, who appeared for the owners, said that but for the
bribery, the owners would not have entered into any charter with the
charterers and therefore would not have entered into an arbitration
agreement.  But that is in my opinion exactly the kind of argument which
section 7 was intended to prevent.  It amounts to saying that because the   D
main agreement and the arbitration agreement were bound up with each
other, the invalidity of the main agreement should result in the invalidity of
the arbitration agreement.  The one should fall with the other because they
would never have been separately concluded.  But section 7 in my opinion
means that they must be treated as having been separately concluded and the
arbitration agreement can be invalidated only on a ground which relates to
the arbitration agreement and is not merely a consequence of the invalidity   E
of the main agreement.

   20   Mr Butcher submitted that the approach to construction and
separability adopted by the Court of Appeal infringed the owners' right of
access to a court for the resolution of their civil disputes, contrary to
article 6 of the Convention for the Protection of Human Rights and
Fundamental Freedoms.  I do not think there is anything in this point.  The   F
European Convention was not intended to destroy arbitration.  Arbitration
is based upon agreement and the parties can by agreement waive the right to
a court.  If it appears upon a fair construction of the charter that they have
agreed to the arbitration of a particular dispute, there is no infringement of
their Convention right.

   21   For these reasons, which are substantially the same as those given by
Longmore LJ in the Court of Appeal, I would hold that the charterers are   G
entitled to a stay of the proceedings to rescind the charters and dismiss the
appeal.

## LORD HOPE OF CRAIGHEAD

   22   My Lords, I have had the advantage of reading in draft the speech of
my noble and learned friend Lord Hoffmann.  I entirely agree with it, and for
the reasons he gives I too would dismiss the appeal.  I wish to add only a few   H
brief comments.

   23   There are, as Lord Hoffmann has said, two issues in this appeal.  The
first is an issue of construction: whether the appellant owners' claims that
the charterparties have been validly rescinded are disputes which arise

A   under, or out of, the charterparties within the meaning of clause 41. The second is an issue of separability: whether, assuming that the owners have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in clause 41 have been rescinded as well. The owners submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are

B   directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are said to have been uncommercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of

C   these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

     24  On the first issue, the owners say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes

D   as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to have informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to

E   this argument. One is to be found in the wording of clause 41 itself. The other is to be found by considering whether its consequences make sense in the international commercial context within which these standard forms are designed to operate.

     25  As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they

F   enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every

G   business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

     26  Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the

H   kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide

charterers and shipowners with legal certainty at the negotiation stage as to   A
what they are agreeing to. But there is no conflict between that proposition
and the guidance which Longmore LJ gave in paras 17–19 of the Court of
Appeal's judgment about the interpretation of jurisdiction and arbitration
clauses in international commercial contracts. The proposition that any
jurisdiction or arbitration clause in an international commercial contract
should be liberally construed promotes legal certainty. It serves to underline
  B
the golden rule that if the parties wish to have issues as to the validity of
their contract decided by one tribunal and issues as to its meaning or
performance decided by another, they must say so expressly. Otherwise
they will be taken to have agreed on a single tribunal for the resolution of all
such disputes.

    27   The overall purpose of clause 41 is identified in the two opening
paragraphs. These are the choice of law and jurisdiction clauses. There is no   C
sign here—leaving aside the question of arbitration for a moment—that
the parties intended that the disputes which were to be determined in
accordance with the laws of England and be decided by the English courts
were not to include disputes about the charter's validity. The simplicity of
the wording is a plain indication to the contrary. The arbitration clause
which follows is to be read in that context. It indicates to the reader that   D
he need not trouble himself with fussy distinctions as to what the words
"arising under" and "arising out of" may mean. Taken overall, the wording
indicates that arbitration may be chosen as a one-stop method of
adjudication for the determination of all disputes. Disputes about validity,
after all, are no less appropriate for determination by an arbitrator than any
other kind of dispute that may arise. So I do not think that there is anything
  E
in the owners' point that it must be assumed that when the charters were
entered into one party was entirely ignorant that they were induced by
bribery. The purpose of the clause is to provide for the determination of
disputes of all kinds, whether or not they were foreseen at the time when the
contract was entered into.

    28   Then there are consequences that would follow, if the owners are
right. It is not just that the parties would be deprived of the benefit of having   F
all their disputes decided in one forum. The jurisdiction clause does not say
where disputes about the validity of the contract are to be determined, if this
is not to be in the forum which is expressly mentioned. The default position
is that such claims would have to be brought in the jurisdiction where their
opponents were incorporated, wherever and however unreliable that might
be, while claims for breach of contract have to be brought in England. But
  G
why, it may be asked, would any sensible businessmen have wished to agree
to this? As Bingham LJ said in *Ashville Investments Ltd v Elmer Contractors
Ltd* [1989] QB 488, 517, one should be slow to attribute to reasonable
parties an intention that there should in any foreseeable eventuality be two
sets of proceedings. If the parties have confidence in their chosen jurisdiction
for one purpose, why should they not have confidence in it for the other?
Why, having chosen their jurisdiction for one purpose, should they leave the   H
question which court is to have jurisdiction for the other purpose unspoken,
with all the risks that this may give rise to? For them, everything is to be
gained by avoiding litigation in two different jurisdictions. The same
approach applies to the arbitration clause.

A     29   The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

B     30   The Bundesgerichtshof's decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is

C effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

D     31   In *A T & T Technologies Inc v Communications Workers of America* (1986) 475 US 643, 650 the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In *David L Threlkeld & Co Inc v Metallgesellschaft Ltd (London)* (1991) 923 F 2d 245 (2d Cir) the court observed that federal arbitration policy required that any doubts concerning

E the scope of arbitral issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In *Comandate Marine Corpn v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places,

F particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

    32   It is in the light of these observations that the issue of severability should be viewed also. Section 7 of the Arbitration Act 1996 reproduces in

G English law the principle that was laid down by section 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying

H substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in *Prima Paint Corpn v Flood & Conklin Manufacturing Co* (1967) 388 US 395, 404 is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts.

The statutory language, it said, did not permit the court to consider claims   *A*
of fraud in the inducement of the contract generally. It could consider only
issues relating to the making and performance of the agreement to arbitrate.
*Dicey, Morris & Collins, The Conflict of Laws*, 14th ed (2006), vol 1,
para 12-099, acknowledge that there are excellent reasons of policy to
support this approach.

33   The owners' case is that, as there was no real consent to the   *B*
charterparties because they were induced by bribery, there was no real
consent to the arbitration clauses. They submit that a line does not have to
be drawn between matters which might impeach the arbitration clause and
those which affect the main contract. What is needed is an analysis of
whether the matters that affect the main contract are also matters which
affect the validity of the arbitration clause. As the respondent charterers
point out, this is a causation argument. The owners say that no substantive   *C*
distinction can be drawn between various situations where the complaint is
made that there was no real consent to the transaction. It would be contrary
to the policy of the law, which is to deter bribery, that acts of the person
who is alleged to have been bribed should deprive the innocent party of
access to a court for determination of the issue whether the contract was
induced by bribery.   *D*

34   But, as Longmore LJ said in para 21 of the Court of Appeal's
judgment, this case is different from a dispute as to whether there was ever a
contract at all. As everyone knows, an arbitral award possesses no binding
force except that which is derived from the joint mandate of the contracting
parties. Everything depends on their contract, and if there was no contract
to go to arbitration at all an arbitrator's award can have no validity. So,   *E*
where the arbitration agreement is set out in the same document as the main
contract, the issue whether there was an agreement at all may indeed affect
all parts of it. Issues as to whether the entire agreement was procured by
impersonation or by forgery, for example, are unlikely to be severable from
the arbitration clause.

35   That is not this case, however. The owners' argument was not that
there was no contract at all, but that they were entitled to rescind the   *F*
contract including the arbitration agreement because the contract was
induced by bribery. Allegations of that kind, if sound, may affect the
validity of the main agreement. But they do not undermine the validity
of the arbitration agreement as a distinct agreement. The doctrine of
separability requires direct impeachment of the arbitration agreement
before it can be set aside. This is an exacting test. The argument must be   *G*
based on facts which are specific to the arbitration agreement. Allegations
that are parasitical to a challenge to the validity to the main agreement will
not do. That being the situation in this case, the agreement to go to
arbitration must be given effect.

## LORD SCOTT OF FOSCOTE

36   My Lords, I have had the advantage of reading in advance the   *H*
opinion of my noble and learned friend Lord Hoffmann and find myself in
complete agreement with the conclusion he has reached and his reasons for
that conclusion. I cannot improve upon those reasons and shall not try to do
so. I, too, would dismiss this appeal.

A  **LORD WALKER OF GESTINGTHORPE**

37   My Lords, I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it. It gives full effect to the legislative purpose of section 7 of the Arbitration Act 1996. It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant. For these reasons I, too, would dismiss this

B  appeal.

**LORD BROWN OF EATON-UNDER-HEYWOOD**

38   My Lords, for the reasons given in the speeches prepared by my noble and learned friends Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.

C                                        *Appeal dismissed with costs in House.*

*Solicitors: Ince & Co; Lax & Co.*

                                                                      C T B

D

E

F

G

H

Q.B.

A

[COURT OF APPEAL]

## HARBOUR ASSURANCE CO. (U.K.) LTD. v. KANSA GENERAL INTERNATIONAL INSURANCE CO. LTD. AND OTHERS

1993   Jan. 25, 26; 28          Ralph Gibson, Leggatt and Hoffmann L.JJ.

B  *Arbitration—Arbitrator—Jurisdiction—Dispute   under   reinsurance*
*contracts—Allegation of illegality—Whether illegality dispute*
*covered by arbitration clause—Whether arbitration clause*
*severable—Whether defendants entitled to stay of action*

The plaintiffs agreed to reinsure the defendants in respect of
risks for the years 1980, 1981 and 1982. The agreement contained
an arbitration clause which provided that all disputes arising
C thereunder should be submitted to arbitration. The plaintiffs
claimed that the defendants were not registered or approved to
effect or carry on insurance or reinsurance business in Great
Britain under the Insurance Companies Acts 1974 and 1981 and
that the agreement was therefore void for illegality and sought a
declaration to that effect. The defendants applied for an order
that the action should be stayed pursuant to section 1 of the
Arbitration Act 1975. The judge held that the issue of initial
D illegality was not within the jurisdiction of an arbitrator and
dismissed the application.
On appeal by the defendants:—
*Held,* allowing the appeal, that an arbitration clause contained
in a written contract was a collateral agreement which fell to be
construed according to its terms and the wishes of the parties;
that the question of initial illegality of a contract, not directly
E impeaching the arbitration clause, was capable of being within
the jurisdiction of an arbitrator; that whether a particular form
of illegality rendered void both the arbitration clause and the
contract depended upon the nature of the illegality; that the
illegality pleaded had not affected the validity of the arbitration
clause which, as a matter of construction, was wide enough to
cover the issue, and the question of initial illegality was,
therefore, a dispute arising out of the agreement; and that,
F accordingly, a stay of the action would be granted (post,
pp. 709E–F, 711D–F, 713D–E, 714D–F, 715D–G, 716G–717A,
719C–D, G, 724A–E, 725F–H, 726A–D).
*Heyman   v.   Darwins   Ltd.* [1942]   A.C.   356,   H.L.(E.)
considered.
*David Taylor & Son Ltd. v. Barnett Trading Co.* [1953]
1 W.L.R. 562, C.A. distinguished.
G Decision of Steyn J. [1992] 1 Lloyd's Rep. 81 reversed.

The following cases are referred to in the judgments:

*Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488; [1988]
3 W.L.R. 867; [1988] 2 All E.R. 577, C.A.
*Bremer Vulkan Schiffbau und Maschinenfabrik v: South India Shipping*
*Corporation Ltd.* [1981] A.C. 909; [1981] 2 W.L.R. 141; [1981] 1 All
H E.R. 289, H.L.(E.)
*Dalmia Dairy Industries Ltd. v. National Bank of Pakistan* [1978] 2 Lloyd's
Rep. 223, C.A.
*Decision of 27 February 1970* (1990) Arbitration International, vol. 6, No. 1,
p. 79

702

*Fillite (Runcorn) Ltd. v. Aqua-Lift (a firm)* (1989) 45 B.L.R. 27, C.A.          A
*Heyman v. Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E.)
*Hirji Mulji v. Cheong Yue Steamship Co. Ltd.* [1926] A.C. 497, P.C.
*India (Union of) v. E. B. Aaby's Rederi A/S* [1975] A.C. 797; [1974]
        3 W.L.R. 269; [1974] 2 All E.R. 874, H.L.(E.)
*Langton v. Hughes* (1813) 1 M. & S. 593
*Lee (Joe) Ltd. v. Lord Dalmeny* [1927] 1 Ch. 300
*Mackender v. Feldia A.G.* [1967] 2 Q.B. 590; [1967] 2 W.L.R. 119; [1966]          B
        3 All E.R. 847, C.A.
*Mahmoud and Ispahani, In re* [1921] 2 K.B. 716, C.A.
*Paal Wilson & Co. A/S v. Partenreederei Hannah Blumenthal* [1983] 1 A.C.
        854; [1982] 3 W.L.R. 1149; [1983] 1 All E.R. 34, H.L.(E.)
*Phoenix General Insurance Co. of Greece S.A. v. Halvanon Insurance Co.
        Ltd.* [1988] Q.B. 216; [1987] 2 W.L.R. 512; [1987] 2 All E.R. 152, C.A.
*Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)
*Prima Paint Corporation v. Flood & Conklin Manufacturing Co.* (1967) 388          C
        U.S. 395
*Prodexport State Co. for Foreign Trade v. E. D. & F. Man Ltd.* [1973] Q.B.
        389; [1972] 3 W.L.R. 845; [1973] 1 All E.R. 355
*Smith, Coney & Barrett v. Becker, Gray & Co.* [1916] 2 Ch. 86, C.A.
*Sojuznefteexport v. Joc Oil Ltd.* (unreported), 7 July 1989; (1990) Yearbook
        of Commercial Arbitration 384
*Taylor (David) & Son Ltd. v. Barnett Trading Co.* [1953] 1 W.L.R. 562;          D
        [1953] 1 All E.R. 843, C.A.


The following additional cases were cited in argument:

*Antonis P. Lemos, The* [1985] A.C. 711; [1985] 2 W.L.R. 468; [1985] 1 All
        E.R. 695, H.L.(E.)
*Craig v. National Indemnity Co.* (unreported), 25 July 1980, Lloyd J.          E
*Deutsche Schachtbau-und Tiefbohrgesellschaft m.b.H. v. R'As al-Khaimah
        National Oil Co.* [1990] 1 A.C. 295; [1987] 3 W.L.R. 1023; [1987] 2 All
        E.R. 769, C.A.
*Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A.* [1983]
        2 Lloyd's Rep. 171, C.A.
*Gibraltar (Government of) v. Kenney* [1956] 2 Q.B. 410; [1956] 3 W.L.R.
        466; [1956] 3 All E.R. 22
*Kruse v. Questier & Co. Ltd.* [1953] 1 Q.B. 669; [1953] 2 W.L.R. 850; [1953]          F
        1 All E.R. 954
*Sykes v. Fine Fare Ltd.* [1967] 1 Lloyd's Rep. 53, C.A.
*Willcock v. Pickfords Removals Ltd.* [1979] 1 Lloyd's Rep. 244, C.A.


INTERLOCUTORY APPEAL from Steyn J.

The plaintiffs, Harbour Assurance Co. (U.K.) Ltd., claimed, inter          G
alia, a declaration that certain insurance policies made by way of
obligatory quota share retrocession, taking effect for the years 1980 to
1984, entered into with the six defendants, Kansa General International
Insurance Co. Ltd., Tapiola International Insurance Co. Ltd., Keskinai-
nen Vakuutusyhtio Autoilijat (a body corporate), Tyovaen Keskinainen
Vakuutusyhtio Turva (a body corporate), Keskinainen Vakuutusyhtio
Varma (a body corporate) and Finnish Industrial and General Insurance          H
Co. Ltd., were void for illegality on the grounds, inter alia, that the
defendants were not registered or approved to effect or carry on
insurance or reinsurance business in Great Britain under the Insurance

722

merely disentitle the defendants from enforcing its obligations. It would  A
not make the agreement void.

I mention these doubts because I think there is a real possibility that
the questions which both parties invite this court to decide are in fact
moot. Nevertheless, since the questions have been fully argued, I think
we should decide them.

Mr. Longmore's argument is extremely simple. He says that the
question raised on the pleadings is whether the retrocession agreement  B
was void ab initio. The arbitration clause formed part of the retrocession
agreement. Therefore the issue must involve the validity of the arbitration
clause itself.

Mr. Longmore calls this logic. I call it over-simplification. The flaw in
the logic, as it seems to me, lies in the ambiguity of the proposition that
the arbitration clause "formed part" of the retrocession agreement. In
one sense of course it did. It was clause 12 of a longer document which  C
also dealt with the substantive rights and duties of the parties. But parties
can include more than one agreement in a single document. They may
say in express words that two separate agreements are intended. Or the
question of whether the document amounts to one agreement or two
may have to be answered by reference to the kind of provisions it
contains. In any case, it is always essential to have regard to the reason  D
why the question is being asked. There is no single concept of "forming
part" which will provide the answer in every case. For some purposes a
clause may form part of an agreement and for other purposes it may
constitute a separate agreement. One must in each case consider the
terms and purpose of the rule which makes it necessary to ask the
question.

Mr. Longmore's argument might have appealed to Lord Sumner who,  E
in *Hirji Mulji v. Cheong Yue Steamship Co. Ltd.* [1926] A.C. 497, 505,
said:

"The arbitration clause is but part of the contract and, unless it is
couched in such terms as will except it out of the results, which
follow from frustration, generally, it will come to an end too."

But the reign of false logic came to an end with the decision of the  F
House of Lords in *Heyman v. Darwins Ltd.* [1942] A.C. 356. This case
decided that an accepted repudiation or frustration, while it might bring
the contract to an end in the sense of discharging the parties from further
performance of their primary obligations, did not affect the enforceability
of an arbitration clause. The House of Lords arrived at this decision by
looking at the purpose of the rule that accepted repudiation or frustration
discharges the parties from further obligations and asking whether the  G
arbitration clause should for this purpose be regarded as imposing an
obligation. In one sense it obviously did. In the context of the repudiation
or frustration rules, however, there was no reason to treat the obligation
to submit to arbitration as discharged, and such a conclusion would have
severely reduced the value of the clause.

In explaining why he refused to categorise an arbitration clause as a
contractual obligation for the purposes of the repudiation or frustration  H
rules, Lord Macmillan said, at pp. 373–374:

"I venture to think that not enough attention has been directed to
the true nature and function of an arbitration clause in a contract. It

723

**Q.B.**               Harbour Assurance Ltd. v. Kansa Ltd. (C.A.)        Hoffmann L.J.

A        is quite distinct from the other clauses. The other clauses set out the
         obligations which the parties undertake towards each other hinc
         inde, but the arbitration clause does not impose on one of the parties
         an obligation in favour of the other. It embodies the agreement of
         both parties that, if any dispute arises with regard to the obligations
         which the one party has undertaken to the other, such dispute shall
         be settled by a tribunal of their own constitution."

B
         Likewise Lord Wright said, at p. 377:

              "an arbitration agreement . . . is collateral to the substantial
              stipulations of the contract. It is merely procedural and ancillary, it
              is a mode of settling disputes, though the agreement to do so is itself
              subject to the discretion of the court. All this may be said of every
C             agreement to arbitrate, even though not a separate bargain, but one
              incorporated in the general contract."

         The proposition that at least for some purposes the arbitration clause
         may be treated as severable or separable or autonomous has become
         orthodox doctrine. In *Bremer Vulkan Schiffbau und Maschinenfabrik v.*
D        *South India Shipping Corporation Ltd.* [1981] A.C. 909, 980, Lord
         Diplock was able to say without further explanation:

              "The arbitration clause constitutes a self-contained contract collateral
              or ancillary to the shipbuilding agreement itself: *Heyman v. Darwins
              Ltd.* [1942] A.C. 356."

E   Lord Scarman, citing the same authority, said, at p. 998, that an
    arbitration clause in a contract was "in strict analysis, a separate contract,
    ancillary to the main contract."
         Mr. Longmore therefore accepts, as he must, that for some purposes
    the arbitration clause is treated as severable and may survive the
    termination or even the avoidance with retrospective effect of all the
    other obligations under the contract: see *Mackender v. Feldia A.G.*
F   [1967] 2 Q.B. 590. He submits, however, that the separability doctrine
    cannot apply to any rule which prevents the contract from coming into
    existence or makes it void ab initio. In particular, it does not apply to a
    statute or other rule of law which makes the contract void for illegality.
         It seems to me impossible to accept so sweeping a proposition. There
    will obviously be cases in which a claim that no contract came into
G   existence necessarily entails a denial that there was any agreement to
    arbitrate. Cases of non est factum or denial that there was a concluded
    agreement, or mistake as to the identity of the other contracting party
    suggest themselves as examples. But there is no reason why every case
    of initial invalidity should have this consequence. A curious contrary
    example is the decision of the Court of Appeal of Bermuda in
    *Sojuznefteexport v. Joc Oil Ltd.* (unreported), 7 July 1989; (1990)
H   Yearbook of Commercial Arbitration 384 in which the signatory to an
    agreement containing an arbitration clause had no authority to bind the
    plaintiff to the substantive obligations but was authorised to sign an
    arbitration agreement. The court held that the arbitration clause was

separable and binding. The decision was reached under Soviet law as the   A
proper law of the contract, but I think that the answer in English law
would have been the same.

    In every case it seems to me that the logical question is not whether
the issue goes to the validity of the contract but whether it goes to the
validity of the arbitration clause. The one may entail the other but, as
we have seen, it may not. When one comes to voidness for illegality, it   B
is particularly necessary to have regard to the purpose and policy of the
rule which invalidates the contract and to ask, as the House of Lords did
in *Heyman v. Darwins Ltd.* [1942] A.C. 356, whether the rule strikes
down the arbitration clause as well. There may be cases in which the
policy of the rule is such that it would be liable to be defeated by
allowing the issue to be determined by a tribunal chosen by the parties.
This may be especially true of contrats d'adhésion in which the arbitrator   C
is in practice the choice of the dominant party. Thus, saying that
arbitration clauses, because separable, are never affected by the illegality
of the principal contract is as much a case of false logic as saying that
they must be. As Ralph Gibson L.J. has pointed out the same is true of
allegations of fraud.

    In deciding whether or not the rule of illegality also strikes down the
arbitration clause, it is necessary to bear in mind the powerful commercial   D
reasons for upholding arbitration clauses unless it is clear that this would
offend the policy of the illegality rule. These are, first, the desirability of
giving effect to the right of the parties to choose a tribunal to resolve
their disputes and secondly, the practical advantages of one-stop
adjudication, or in other words, the inconvenience of having one issue
resolved by the court and then, contingently on the outcome of that   E
decision, further issues decided by the arbitrator.

    As the German Federal Supreme Court (Bundesgerichtshof) said in
its landmark *Decision of 27 February 1970* (1990) Arbitration
International, vol. 6, No. 1, p. 79:

    "There is every reason to presume that reasonable parties will wish
    to have the relationships created by their contract and the claims   F
    arising therefrom, irrespective of whether their contract is effective
    or not, decided by the same tribunal and not by two different
    tribunals . . . Experience shows that as soon as a dispute of any kind
    arises from a contract, objections are very often also raised against
    its validity."

    As against these considerations, is there anything in the policy of the   G
rule which is alleged to invalidate the retrocession agreements which
requires that the arbitration clause should also be invalid? I have already
expressed my doubts as to whether the rule had any effect upon the
initial validity of the agreements at all. I shall assume, however, that one
was dealing with an insurance contract which was alleged to fall within
the scope of the implied prohibition in the Insurance Companies Act
1974. Is there anything in such a provision which would be undermined   H
by allowing the issue of whether it applied to be determined by
arbitration? Mr. Longmore submitted that as a matter of policy all
questions of illegality were better determined by the court than by

Q.B.                    Harbour Assurance Ltd. v. Kansa Ltd. (C.A.)          Hoffmann L.J.

A     arbitration. For my part, I cannot see why this should be so. In any case,
      Mr. Longmore had to concede that any such policy was not applied when
      it came to allowing arbitrators to decide whether a contract had been
      frustrated by supervening illegality. Since *Heyman v. Darwins Ltd.* [1942]
      A.C. 356 there has been no doubt that they have jurisdiction to do so.
      As for the specific statutory provisions, Kerr L.J. in *Phoenix General
      Insurance Co. of Greece S.A. v. Halvanon Insurance Co. Ltd.* [1988]
B     Q.B. 216 wrung his hands over the conclusion to which he felt obliged to
      come and said that the invalidity of the substantive agreement itself could
   '  not be justified on any sound grounds of public policy. In those
      circumstances, it seems to me unnecessary to carry the effect of the
      prohibition even further and hold that it also invalidates an agreement to
      arbitrate the question of whether it applies.
C         Mr. Longmore submitted that the rule for which he was contending,
      however illogical or inconvenient it might be, was established by authority
      binding upon this court. He relied in particular upon some remarks in
      *Heyman v. Darwins Ltd.* [1942] A.C. 356 by Viscount Simon L.C. and
      Lord Macmillan, with whose speech Lord Russell of Killowen agreed.
      Both speeches contain passages which contrast cases of accepted
      repudiation or frustration, with which the case was actually concerned,
D     with cases of initial invalidity, with which it was not concerned. It seems
      to me that this contrast was understandable because the most common
      examples of cases in which the ground of invalidity of the substantive
      obligations of the contract also necessarily entails the invalidity of the
      arbitration clause are cases of initial invalidity, such as the absence of
      consensus ad idem, non est factum, mistake as to the person and so
      forth. There was no reason for their Lordships to go into the question of
E     whether *every* ground for initial invalidity of the main contract necessarily
      entailed the invalidity of the arbitration clause and anything which
      appears to support this proposition must in my judgment have been an
      obiter dictum.
          There are passages in subsequent cases cited by Mr. Longmore which
      treat the dicta about initial invalidity of the contract in *Heyman v.*
F     *Darwins Ltd.* [1942] A.C. 356 as authority for the rule that an arbitration
      clause can never be the subject of a binding arbitration. Similar
      statements appear in textbooks. But none of these are binding authority.
      Steyn J. was however persuaded that *David Taylor & Son Ltd. v. Barnett
      Trading Co.* [1953] 1 W.L.R. 562, a decision of this court, was binding
      authority for the proposition that an arbitrator cannot have jurisdiction
G     to decide whether the contract containing the arbitration clause is void
      for illegality. In my view the case did not address this question at all.
      First, the motion to set aside the award was based upon two grounds:
      error of law on the face of the award, which the court rejected, and
      misconduct by the arbitrator in wilfully failing to have regard to the fact
      that the contract was illegal. The motion did not impugn his jurisdiction.
      Secondly, the references to jurisdiction in the judgments were statements
H     to the effect that an arbitrator did not have jurisdiction to award damages
      on an illegal contract. No one said that the arbitrator could not have
      jurisdiction to decide whether the contract was illegal in the first place.
      Thirdly, even if by some implication the case is treated as having decided

726
Hoffmann L.J.          Harbour Assurance Ltd. v. Kansa Ltd. (C.A.)          [1993]

that the arbitration clause was itself void for illegality, the case can only  A
have decided that this was the effect of the relevant statutory instruments.
It cannot have decided that every ground of illegality must necessarily
invalidate an arbitration clause in the prohibited contract.

It follows that in my judgment the illegality pleaded by the plaintiffs
does not affect the validity of the arbitration clause. This leaves the
question of whether as a matter of construction the clause is wide enough
to cover the illegality issue. In construing the contract, one is assisted by  B
the presumption in favour of one-stop adjudication to which I have
already referred. As Bingham L.J. said in *Ashville Investments Ltd. v.
Elmer Contractors Ltd.* [1989] Q.B. 488, 517:

"I would be very slow to attribute to reasonable parties an intention
that there should in any foreseeable eventuality be two sets of
proceedings."  C

In my judgment the words "all disputes or differences arising out of
this agreement" apply without difficulty to a dispute over whether the
agreement, which was admittedly concluded, gave rise to any enforceable
obligations. The presumption merely reassures one that the natural
meaning of the words produces a sensible and business-like result.

I therefore agree that the appeal should be allowed and the  D
proceedings stayed.

*Appeal allowed.*
*Leave to appeal refused.*

*Solicitors: Lovell White Durrant; Clifford Chance.*  E

[Reported by JAMES KELLY ESQ., Barrister]

F

G

H