# EXHIBIT D
# Part IV of V

H. L. (E.)      whereby he was liable to be placed at a disadvantage as
1942        compared with others.  The section is, I think, dealing with
LONDON      the terms of a man's employment, not with the decisions
PASSENGER   which the employer may take from time to time in individual
TRANSPORT   cases.  In coming to a decision to refuse representation he is
BOARD       merely relying on the general law that there is no obligation
v.          on an employer to let his employee be represented on a matter
MOSCROP.    of discipline, and reliance on the general law is not, in my
Lord Porter.  view, the imposition of a condition.  (2.) I think, as indeed I
            believe all your Lordships think, that it is unfortunate that so
            great a change between the remedy asked and that given by the
            Court of Appeal should have been made without the appro-
            priate amendment in the pleadings.  These, however, are minor
            matters, and for the reasons which I have given I would allow
            the appeal.

    Solicitors for appellants :    *Solicitor to London Passenger
Transport Board.*
    Solicitors for respondent :  *Cole & Matthews.*

                                                        F. C.

[HOUSE OF LORDS.]

H. L. (E.)*  HEYMAN AND ANOTHER  .   .   .   .   .  APPELLANTS ;
1941                             AND
Oct. 28, 30,  DARWINS, LIMITED  .   .   .   .   .  RESPONDENTS.
31 ;
Nov. 4, 6.
1942        *Arbitration—Contract—Repudiation—Any dispute arising " in respect*
Feb. 20.              *" of this agreement "—Scope of arbitration clause.*

            When an arbitration clause in a contract provides without any
        qualification that any difference or dispute which may arise " in
        " respect of " or " with regard to " or " under the contract " shall
        be referred to arbitration, and the parties are at one in asserting
        that they entered into a binding contract, the clause will apply
        even if the dispute involves an assertion by one party that cir-
        cumstances have arisen, whether before or after the contract has
        been partly performed, which have the effect of discharging one
        or both parties from all subsequent liability under the contract,
        such as repudiation of the contract by one party accepted by the
        other, or frustration of the contract.  *Secus,* generally, if the point

        * *Present :* VISCOUNT SIMON L.C., LORD RUSSELL OF KILLOWEN,
    LORD MACMILLAN, LORD WRIGHT and LORD PORTER.

Case 1:14-cv-03042-RMB-AJP   Document 84-18   Filed 09/03/14   Page 3 of 31

in dispute is whether the contract containing the clause was ever entered into at all or was void ab initio, for example, because the making of it was illegal.

Observations of Lord Loreburn L.C. and Lord Shaw in *Johannesburg Municipal Council* v. *D. Stewart & Co.* (1902), *Ld.*, 1909 S. C. (H. L.) 53, at pp. 54, 56 ; and of Viscount Haldane L.C. in *Jureidini* v. *National British and Irish Millers Insurance Co., Ld.* [1915] A. C. 499, at p. 505, not adopted. Decision of the Judicial Committee of the Privy Council in *Hirji Mulji* v. *Cheong Yue Steamship Co., Ld.* [1926] A. C. 497, questioned.

An arbitration clause in a contract provided that " if any " dispute shall arise between the parties hereto in respect of this " agreement or any of the provisions herein contained or anything " arising hereout the same shall be referred for arbitration in " accordance with the provisions of the Arbitration Act, 1889." A dispute having arisen between the parties, the appellants commenced an action against the respondents claiming (*a*) a declaration that the respondents had " repudiated and/or evinced " an intention not to perform " the contract and (*b*) damages. The respondents, who admitted the existence of the contract and denied that they had repudiated it, applied to have the action stayed in order that it might be dealt with under the arbitration clause :—

*Held*, that the dispute fell within the terms of the arbitration clause and that the action ought to be stayed.

APPEAL from the Court of Appeal.

The facts were stated by Viscount Simon L.C. as follows :

By a written contract dated February 19, 1938, the respondents, manufacturers of steel in Sheffield, as principals appointed the appellants, whose business address was in New York, to be sole selling agents of their tool steels in a wide area of territories including the western hemisphere (excluding U.S.A. and Argentine), Australia, New Zealand and India. The appellants were to sell in the name of the respondents, the respondents fixing f.o.b. prices and the appellants charging the purchaser with such excess price over f.o.b. prices as they could obtain. Any excess price over the f.o.b. price was for the credit of the appellants and the respondents were to account to the appellants in respect of such excess price after the respondents had received payment in full from the purchaser. The duration of the agreement was to be for three years from April 1, 1938, as a minimum. The agreement contained an arbitration clause in the following terms : "If any dispute shall arise between the parties hereto "in respect of this agreement or any of the provisions herein "contained or anything arising hereout the same shall be "referred for arbitration in accordance with the provisions of

Case 1:14-cv-03042-RMB-AJP   Document 84-18   Filed 09/03/14   Page 4 of 31

Repudiation, then, in the sense of a refusal by one of the
parties to a contract to perform his obligations thereunder,
does not of itself abrogate the contract. The contract is not
rescinded. It obviously cannot be rescinded by the action of
one of the parties alone. But, even if the so-called repudia-
tion is acquiesced in or accepted by the other party, that does
not end the contract. The wronged party has still his right
of action for damages under the contract which has been broken,
and the contract provides the measure of those damages. It
is inaccurate to speak in such cases of repudiation of the
contract. The contract stands, but one of the parties has
declined to fulfil his part of it. There has been what is called
a total breach or a breach going to the root of the contract
and this relieves the other party of any further obligation to
perform what he for his part has undertaken. Now, in this
state of matters, why should it be said that the arbitration
clause, if the contract contains one, is no longer operative or
effective ? A partial breach leaves the arbitration clause
effective. Why should a total breach abrogate it ? The
repudiation being not of the contract but of obligations under-
taken by one of the parties, why should it imply a repudiation
of the arbitration clause so that it can no longer be invoked
for the settlement of disputes arising in consequence of the
repudiation ? I do not think that this is the result of what is
termed repudiation. Suppose the injured party prefers to
have his claim of damages for the other party's total breach
assessed by arbitration, can he not invoke and enforce the
arbitration clause for that purpose ? Can he be effectually
met by a plea on the part of the wrongdoer that the wrong-
doer has repudiated the contract and with it the arbitration
clause which is consequently no longer operative ? I do not
think that this result follows even if the injured party acquiesces
in the total breach—accepts the repudiation, as it is put—
and contents himself with his claim of damages. I think he
is entitled to insist on having his damages assessed by
arbitration notwithstanding the other party's repudiation.

I venture to think that not enough attention has been
directed to the true nature and function of an arbitration
clause in a contract. It is quite distinct from the other clauses.
The other clauses set out the obligations which the parties
undertake towards each other hinc inde, but the arbitration
clause does not impose on one of the parties an obligation in
favour of the other. It embodies the agreement of both

H. L. (E.)

1942

HEYMAN
v.
DARWINS,
LD.

Lord Macmillan.

Case 1:14-cv-03042-RMB-AJP   Document 84-18   Filed 09/03/14   Page 5 of 31

H. L. (E.)

1942

HEYMAN
v.
DARWINS,
LD.

Lord Macmillan.

parties that, if any dispute arises with regard to the obligations which the one party has undertaken to the other, such dispute shall be settled by a tribunal of their own constitution. And there is this very material difference, that whereas in an ordinary contract the obligations of the parties to each other cannot in general be specifically enforced and breach of them results only in damages, the arbitration clause can be specifically enforced by the machinery of the Arbitration Acts. The appropriate remedy for breach of the agreement to arbitrate is not damages, but its enforcement. Moreover, there is the further significant difference that the courts in England have a discretionary power of dispensation as regards arbitration clauses which they do not possess as regards the other clauses of contracts.

I am, accordingly, of opinion that what is commonly called repudiation or total breach of a contract, whether acquiesced in by the other party or not, does not abrogate the contract, though it may relieve the injured party of the duty of further fulfilling the obligations which he has by the contract undertaken to the repudiating party. The contract is not put out of existence, though all further performance of the obligations undertaken by each party in favour of the other may cease. It survives for the purpose of measuring the claims arising out of the breach, and the arbitration clause survives for determining the mode of their settlement. The purposes of the contract have failed, but the arbitration clause is not one of the purposes of the contract.

There still remains the difficulty raised by the dicta of Lord Shaw and Lord Haldane which I have quoted. It is said to be wrong to allow a party to a contract who has refused to perform his obligations under it at the same time to insist on the observance of a clause of arbitration embodied in the contract. The doctrine of approbate and reprobate is said to forbid this. I appreciate the apparent dilemma, but with the greatest respect I venture to think it is based on a misapprehension. The key is to be found in the distinction which I have endeavoured to draw between the arbitration clause in a contract and the executive obligations undertaken by each party to the other. I can see nothing shocking or repugnant to law in one business man saying to another that he regrets he finds himself unable to go on with his deliveries under a contract between them and at the same time asking the other to join with him in a reference under an

A                                  House of Lords

## Lesotho Highlands Development Authority *v* Impregilo SpA and others

### [2005] UKHL 43

B   2005  May 9, 10;                      Lord Steyn, Lord Hoffmann,
         June 30                    Lord Phillips of Worth Matravers MR,
                          Lord Scott of Foscote and Lord Rodger of Earlsferry

*Arbitration — Award — "Serious irregularity" — Contract stipulating currency of account and applicable law — Tribunal making award in different currency — Pre-award interest ordered by reference to procedural law of arbitration rather* C  *than applicable law of contract — Whether errors of law — Whether excess of power — Arbitration Act 1996 (c 23), ss 48(4), 49(3), 68*

In 1991 the employer, a public authority in the Kingdom of Lesotho, engaged the contractors, a consortium of seven companies from England, Italy, Germany, France and South Africa, to construct a dam in Lesotho. The law of the contract was stated to be that of the Kingdom of Lesotho and the currency of account was to be Maloti, D  with provision for payments to be converted into the contractors' currencies at the exchange rates applicable on a specified date, namely 42 days before the closing date for submission of tenders. The contract provided for disputes to be referred to arbitration under the International Chamber of Commerce ("ICC") Rules of Conciliation and Arbitration 1987 and excluded any appeal on points of law under section 69 of the Arbitration Act 1996. The project was successfully completed but a dispute arose in respect of claims by the contractors for reimbursement of increased E  costs. The employers rejected the claims and they were referred to ICC arbitration in London. The arbitrators decided that sums totalling 18.9m Maloti should have been paid by the employer. However, between the date when the payments should have been made and the date of the award the value of the Maloti had fallen heavily and the arbitrators, in purported reliance on the power under section 48(4) of the 1996 Act[1] to make an award "in any currency", ordered payment in the contractors' own currencies converted from Maloti at the rate prescribed in the contract, which pre-F  dated the Maloti's collapse. The arbitrators also held that they were entitled under section 49(3) of the Act to award interest from when the sums had been due to the date of the award. The employers, believing that the provision in the contract for payments to be made in Maloti precluded the use of section 48(4) and that the choice of Lesotho law as the substantive law of the contract precluded the award of pre-award interest under section 49(3), sought an order from the judge quashing or remitting the decision as being a serious irregularity causing them substantial injustice within section 68 of the Act, namely an excess of power under G  section 68(2)(b). The judge held that the arbitrators had exceeded their powers by expressing the award in currencies other than those stipulated in the contract and by awarding interest in circumstances not permitted under Lesotho law. The Court of Appeal upheld the judge's decision.
    On appeal by the contractors—
    *Held*, allowing the appeal, that a decision by arbitrators that amounted to no more than an error of law involved no excess of power under section 68(2)(b) of the H  1996 Act; that (Lord Phillips of Worth Matravers MR dissenting) the tribunal's decision as to the currency of the award could have amounted to no more than an erroneous exercise of the power available to arbitrators under section 48(4) and

    [1] Arbitration Act 1996, ss 48(4), 49(3): see post, para 2.
    S 68: see post, para 28.

therefore an error of law rather than an excess of power within section 68(2)(b); that    A
the arbitrators' award of interest could not be impugned since the employer had not
established the pre-condition of substantial injustice necessary for a complaint under
section 68 and since, in any event, the arbitrators' power under section 49(3) to
award interest had not been expressly excluded by the parties and, even if exercised
erroneously, would have been no more than an error of law outside section 68(2)(b);
and that, accordingly, the arbitrators' award would stand (post, paras 23–24, 32–33,
35–36, 39, 42–43, 55–56).    B
    Decision of the Court of Appeal [2003] EWCA Civ 1159; [2004] 1 All ER
(Comm) 97 reversed.

The following cases are referred to in their Lordships' opinions:

*Anisminic Ltd v Foreign Compensation Commission* [1969] 2 AC 147; [1969] 2 WLR
   163; [1969] 1 All ER 208, HL(E)
*Attorney General of the Republic of Ghana v Texaco Overseas Tankships Ltd (The*    C
   *Texaco Melbourne)* [1994] 1 Lloyd's Rep 473, HL(E)
*Bank Mellat v GAA Development and Construction Co* [1988] 2 Lloyd's Rep 44
*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd*
   [1993] QB 701; [1993] 3 WLR 42; [1993] 3 All ER 897, CA
*Jugoslavenska Oceanska Plovidba v Castle Investment Co Inc* [1974] QB 292;
   [1973] 3 WLR 847; [1973] 3 All ER 498, CA
*K/S A/S Bill Biakh v Hyundai Corpn* [1988] 1 Lloyd's Rep 187    D
*Miliangos v George Frank (Textiles) Ltd* [1976] AC 443; [1975] 3 WLR 758; [1975]
   3 All ER 801, HL(E)
*Parsons & Whittemore Overseas Co Inc v Société Générale de l'Industrie du Papier
   (RAKTA)* (1974) 508 F 2d 969
*Patel v Patel* [2000] QB 551; [1999] 3 WLR 322, CA
*Seabridge Shipping AB v AC Orssleff's Eftf's A/S* [1999] 2 Lloyd's Rep 685
*Services Europe Atlantique Sud (SEAS) v Stockholms Rederiaktiebolag Svea (The*    E
   *Despina R)* [1979] AC 685; [1978] 3 WLR 804; [1979] 1 All ER 421, HL(E)
*United Railways of Havana and Regla Warehouses Ltd, In re* [1961] AC 1007;
   [1960] 2 WLR 969; [1960] 2 All ER 332, HL(E)

The following additional cases were cited in argument:

*Alan (WJ) & Co Ltd v El Nasr Export & Import Co* [1972] 2 QB 189; [1972] 2 WLR
   800; [1972] 2 All ER 127, CA    F
*Chandris v Isbrandtsen-Moller Co Inc* [1951] 1 KB 240; [1950] 1 All ER 768
*Checkpoint Ltd v Strathclyde Pension Fund* [2003] EWCA Civ 84; The Times, 12
   February 2003, CA
*Midland International Trade Services Ltd v Al-Sudairy* (unreported) 11 April 1990,
   Hobhouse J
*President of India v La Pintada Cia Navigacion SA* [1985] AC 104; [1984] 3 WLR
   10; [1984] 2 All ER 773, HL(E)    G

**APPEAL** from the Court of Appeal
    This was an appeal, by leave of the House of Lords (Lord Bingham of
Cornhill, Lord Hope of Craighead and Lord Brown of Eaton-under-
Heywood), by the contractors, Impregilo SpA, Hochtief AG, Bouygues SA,
Kier International Ltd, Stirling International Civil Engineering Ltd, Concor
Holdings (Pty) Ltd and Group Five Construction (Pty) Ltd, from the order of    H
the Court of Appeal (Brooke and Latham LJJ and Holman J) dismissing their
appeal from the decision of Morison J [2003] 1 All ER (Comm) 22 to allow
an application by the employer, the Lesotho Highlands Development
Authority, to set aside or remit to an arbitral tribunal (John Uff QC, John

Act made by the Departmental Advisory Committee, published in    A
Arbitration International, vol 13, at p 275.)

"As this has been the actual achievement of the Act, it would in my
view be a retrograde step if when a point arose reference had to be made
to pre-Act cases.   Reference to such cases should only generally be
necessary in cases where the Act does not cover a point—as, for example,
in relation to confidentiality or where for some other reason it is necessary    B
to refer to the earlier cases.   A court should, in general, comply with the
guidance given by the Court of Appeal and rely on the language of the
Act.   International users of London arbitration should, in my view, be
able to rely on the clear "user-friendly language" of the Act and should
not have to be put to the trouble or expense of having regard to the pre-
1996 Act law on issues where the provisions of the Act set out the law. If    C
international users of London arbitration are not able to act in that
knowledge, then one of the main objectives of the reform will have been
defeated."

The reference to an earlier decision of the Court of Appeal is to *Patel v Patel*
[2000] QB 551. I would respectfully endorse the observation in *Seabridge*.

                                                                                   D

### XIII. *The seat of the arbitration*

20   The Act is engaged where the "seat" of the arbitration is in England
and Wales or Northern Ireland: section 2(1).   This is a reference to "the
juridical seat" of the arbitration designated, inter alia, by the parties to the
arbitration agreement: section 2.   The determination of the juridical seat of
the arbitration as England (as was done in the present case) is the gateway to    E
the powers of the tribunal spelled out in many provisions of the Act.   In
setting out the powers of a tribunal the 1996 Act often uses the permissive
expression "the parties are free to agree".   Subject agreements to the
contrary, the relevant powers in the present case are section 48(4) (currency)
and section 49(3) (pre-award interest.)

                                                                                   F

### XIV. *The independence of the arbitration agreement*

21   It is part of the very alphabet of arbitration law, as explained in
*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance
Co Ltd* [1993] QB 701, 724–725, per Hoffmann LJ (now Lord Hoffmann)
and spelled out in section 7 of the Act, that the arbitration agreement is a
distinct and separable agreement from the underlying or principal contract.    G
It is in the arbitration agreement, read with the curial law, in this case the
Arbitration Act 1996, that the powers of the tribunal are to be found and
not in the underlying contract.   In the present case one is dealing with an
ICC arbitration agreement.   In such a case the terms of reference which
under article 18 of the ICC rules are invariably settled may, of course,
amend or supplement the terms of the arbitration agreement.   The terms of    H
reference too are a source of the powers of the arbitrator.   This is the
context in which the terms of reference in the present case expressly
provided for the dispute to be settled in accordance with the provisions of
the 1996 Act.

590                    QUEEN'S BENCH DIVISION          [1967]

*C. A.*
1967

Reg.
*v.*
Cleghorn

LORD PARKER
C.J.

Thompson, it became necessary for much more to be done; the   A
defendant himself had to be recalled, counsel had to take further
instructions, in fact two further defence witnesses were called who
otherwise would not have been called, and the trial took on a
completely different aspect.

While recognising that this rule of practice is only a general
rule, and that there may be occasions to depart from it, this   B
court can see no ground in the present case for so departing.
Accordingly, the court has come to the conclusion, though it con-
fesses with some reluctance, that this is a case in which the
conviction must be quashed. So far therefore as this case is
concerned at any rate, the prisoner is discharged.

C

*Appeal allowed.*
*Conviction quashed.*

Solicitors: *Lincolns*; *Director of Public Prosecutions.*

D

[COURT OF APPEAL]

*C. A.*
1966
*Oct.* 17, 18

LORD
DENNING
M.R.,
DIPLOCK
and
RUSSELL
L.JJ.

MACKENDER AND OTHERS
*v.*
FELDIA A. G. AND OTHERS

E

[1966 M. No. 1584]

*Practice—Writ—Service out of jurisdiction—Contract—Contract made*
*within jurisdiction—Insurance policy with foreign jurisdiction*
*clause—Proceedings on policy in Belgium—Writ claiming policy*      F
*void issued in England—Whether leave should be granted to*
*serve writ outside jurisdiction—R.S.C., Ord. 11, r. 1 (f).*

*Insurance—Non-disclosure—Effect—Alleged failure to disclose prac-*
*tice of smuggling in foreign country—Policy with foreign juris-*
*diction clause—Whether contract void ab initio—Whether clause*
*binding.*

*Law Reform—Whether necessary—Conflict of laws—Jurisdiction of*      G
*English courts on contracts subject to foreign jurisdiction by*
*agreement.*

By a contract made in London in 1964, the plaintiffs, Lloyd's
underwriters, issued a jewellers' block insurance policy covering
the defendants, who were diamond merchants incorporated
respectively in three different European countries, against loss or

**2 Q.B.**          QUEEN'S BENCH DIVISION          **591**

C. A.

1966

Mackender
*v.*
Feldia A. G.

**A**  damage to their stock anywhere in the world. The policy contained a foreign jurisdiction clause providing that it should be governed exclusively by Belgian law and that any disputes thereunder should be " exclusively subject to Belgian jurisdiction."

In January, 1965, a loss of diamonds and pearls occurred in Naples. The defendants made a claim on the plaintiffs for £48,266, the loss. After investigations and negotiations, the plaintiffs rejected the claim, alleging that the defendants had made a practice of smuggling diamonds into Italy, that it was contrary to English policy to insure goods which were intended to be smuggled into a friendly foreign country and that the defendants had been guilty of non-disclosure of this practice. The defendants started proceedings in Belgium claiming payment of their loss of £48,266. Wanting the dispute to be tried in England, the plaintiffs issued a writ in England asking that the policy be declared void for illegality and voidable for non-disclosure, and that it be rescinded or annulled. The plaintiffs applied under R.S.C., Ord. 11, r. 1 (1) (*f*),[1] for leave to serve the writ on the defendants out of the jurisdiction.

On appeal by the defendants against the grant of leave to serve the writ out of the jurisdiction:—

*Held,* allowing the appeal, that as non-disclosure only made the contract void from the moment of avoidance and illegality only made it unenforceable, the dispute remained within the foreign jurisdiction clause and as the plaintiffs had agreed to that clause the discretion of the court should not be exercised to give leave to serve the writ out of the jurisdiction.

*Per* Diplock L.J. The jurisdiction which the High Court claims over defendants who are neither present nor ordinarily resident in this country, when it grants leave under R.S.C., Ord. 11, is a claim which conflicts with the general principles of comity between civilised nations, and it is one which should be exercised with caution (post, p. 599D–F). The prima facie rule of English conflict of laws is that the proper law of a contract is that system of law which the parties have agreed shall regulate the legally enforceable rights and duties to which their agreement gives rise. Here the parties expressly agreed that the proper law of the policy should be Belgian law (post, p. 602A–B).

Decision of McNair J. reversed.

APPEAL from McNair J.

**G**  The plaintiffs, Leslie Stanley Mackender, Clarence Roy Hill and Anthony Stewart Clifford White, claimed by writ dated

---

[1] R.S.C., Ord. 11, r. 1: "(1) . . . service of a writ, or notice of a writ, out of the jurisdiction is permissible with the leave of the court in the following cases, that is to say . . . (*f*) if the action begun by the writ is brought against a defendant  . . . to enforce, rescind, dissolve, annul or otherwise affect a contract, or to recover damages or obtain other relief in respect of the breach of a contract, being (in either case) a contract which—(i) was made within the jurisdiction. . . ."

C. A.
1966
———
Mackender
v.
Feldia A. G.
———

April 29, 1966, against the defendants, Feldia A.G. and Ch. Brach-   A
feld and Sons S.A. and Diamil S.R.L., (1) a declaration (a) that
the purported contract of insurance contained in Lloyd's Policy
No. 159541 dated June 22, 1964, was void for illegality and/or
(b) that the plaintiffs were entitled to avoid the contract on the
ground of non-disclosure of a material fact or facts; (2) rescission
or annulment of the said contract and/or delivery up or cancella-   B
tion of the said contract; (3) further or other relief. The plaintiffs
claimed on behalf of themselves and all other underwriters sub-
scribing the said policy. On May 2, 1966, Roskill J. granted the
plaintiffs leave ex parte to serve the writ out of the jurisdiction.
On July 28, 1966, McNair J., after hearing the defendants,
affirmed the decision of Roskill J. The defendants appealed from   C
the order of McNair J. and sought an order that the order of
Roskill J., the writ of summons issued pursuant thereto, the
service of the notice and all subsequent proceedings be set aside,
or, alternatively, an order that all further proceedings be stayed.

The grounds of appeal were, inter alia, that: the matters in
issue fell within the scope of the contractual provision conferring   D
sole jurisdiction on the Belgian courts; the judge erred in assuming
that the Belgian courts might not have jurisdiction to determine
the issues in the action; the judge erred in holding that no undue
inconvenience would result from allowing the action to continue,
notwithstanding that proceedings under the policy were already
in progress in Belgium; the plaintiffs should not be permitted to   E
invoke the jurisdiction of the English court for the purpose of claim-
ing a negative form of relief founded on considerations of English
public policy, when an action claiming a positive form of
relief was being prosecuted in the court of a foreign friendly state
to which the parties had agreed to refer their disputes; the   F
discretion conferred by R.S.C., Ord. 11, should be exercised with
caution and in all the circumstances leave under Ord. 11 should
not have been granted; (alternatively) the parties had expressly
agreed to submit disputes arising under the policy to the jurisdic-
tion of the Belgian court and no sufficient reason had been
shown why effect should not be given to that agreement.   G

The facts are stated in the judgment of Lord Denning M.R.

*Robin Dunn Q.C.* and *M. J. Mustill* for the defendants. This
contract if it is illegal at all is only illegal because it is contrary to
English public policy. The facts of this case are not contrary
to English public policy. A breach of the revenue laws of another

C. A.

1966

Mackender
v.
Feldia A. G.

A    country is not illegal by the laws of this country.  In any case the
contract was not void at its outset but was merely unenforceable in
this country.  What better forum is there to decide the issue than
the forum provided by the contract, the Belgian courts?

The power under R.S.C., Ord. 11, to give leave to serve outside
the jurisdiction should be exercised with great caution.  It is
B    unpopular abroad: see *per* Scott L.J. in *George Munro Ltd.* v.
*American Cyanamid & Chemical Corporation* [2] and *per* Winn J. in
*Cordova Land Co. Ltd.* v. *Victor Brothers Ltd.* [3]  Where the parties
have by their contract agreed to submit all disputes to a foreign
court, that is a strong reason for refusing leave to serve outside the
jurisdiction.

C    The invalidity which is alleged here falls to be determined by
Belgian law: see Cheshire & Fifoot Law of Contract, 5th ed. (1960),
p. 302.  The acts alleged as amounting to illegality are merely a
breach of another country's revenue laws and do not amount to
illegality: see Dicey's Conflict of Laws, 7th ed. (1958), p. 162.

The question of non-disclosure is essentially one for the Belgian
D    court.  Rescission even in English law is not an appropriate remedy
where the claim is based on non-disclosure.  Rescission involves
restitutio in integrum.  Non-disclosure gives the right to repudi-
ate.  Rescission is an equitable remedy putting the parties back in
their original position: see Halsbury's Laws of England, 3rd ed.,
Vol. 22 (1958), p. 192.  If you take away the claim for rescission
E    here, you leave a claim for a bare declaration of non-liability.

*R. A. MacCrindle Q.C.* and *Anthony Lloyd* for the plaintiffs.
The writ claims two forms of relief with one thing in common:
they both attack an apparent contract ab extra.  They attack it for
faults which the plaintiffs say prevent an unimpeachable contract
from coming into existence.  If an insurer hears of the non-
F    disclosure of a material fact he is entitled in English law to avoid
the contract ab initio: see Arnould on Marine Insurance, 15th ed.
(1961), Vol. 2 (British Shipping Laws, Vol. 10), para. 551, p. 522.
Here the insurers have elected to treat the contract as void both
by letter and by writ.  If they are right in doing this there is no
contract and there was no contract when the Belgian proceedings
G    were started.  So the relations between the parties are no longer
governed by the contract at all.

The plaintiffs seek to rely on a pre-contractual state of affairs
which entitles the insurers to say " there is no contract."  If they

---

[2] [1944] K.B. 432, 437; 60 T.L.R.      [3] [1966] 1 W.L.R. 793, 796.
265, 266; [1944] 1 All E.R. 386, 388,
C.A.

C. A.
1966

Mackender
v.
Feldia A. G.

are right, English law considers the position on the footing that **A** there is no contract. Like fraud, non-disclosure in insurance matters renders the contract voidable, an "apparent contract" is rendered voidable: see *per* Lord Porter in *Heyman* v. *Darwins Ltd.*[4] The law appears to be that if there is any hint of fraud the premium is not recoverable.

The second form of relief claimed is that this apparent contract **B** was of no effect because it was from the inception an illegal contract. In principle it would be a strange thing if a venture involving smuggling goods into a friendly country contrary to its law could be insured against in English law. If the underwriters are correct it will not be open to the defendants to insist that they can rely on certain clauses in the contract such as the foreign jurisdiction **C** clause.

The first question is to classify the problem, whether in tort or contract. English courts will apply English standards to do this. Is this a case where there is a true consensus amounting to a contract? Take a mistake making a contract void; suppose this contract contains a Belgian jurisdiction clause: that would be **D** precisely this position. To say "this policy is governed by Belgian law" assumes that there is a policy; but the plaintiffs say that there is no contract, no collateral clause. The court is being asked to annul this contract; if the court does so, there is no contract.

The law with which this transaction has the closest connection **E** is English law. Cheshire's Private International Law, 7th ed. (1965), p. 203, refers to the "putative proper law," i.e., the law which would be the proper law in the objective sense assuming the contract had been effectively created; and if this is correct, English law applies. Suppose a foreign seller makes an offer to an English potential buyer, open for seven days, knowing that by Panamanian **F** law an offer which is not refused in seven days is deemed to be accepted and inserts a clause "subject to Panamanian law," and the English buyer knows nothing of this and does not accept in seven days: could the foreigner sue in a Panamanian court and say there is no contract? The parties are not free to choose what law governs "the valid creation of a contract": Cheshire's Private **G** International Law, 7th ed., p. 203. "The formation of a contract is governed by that law which would be the proper law of the contract if the contract was validly concluded": Dicey's Conflict of Laws, 7th ed., p. 766, rule 160. Here the parties have been completely

4 [1942] A.C. 356, 392; 58 T.L.R. 169; [1942] 1 All E.R. 337, H.L.

**2 Q.B.**          QUEEN'S BENCH DIVISION          595

C. A.
1966
Mackender
v.
Feldia A. G.

**A**  silent as to what law decides whether there is a contract. The parties ex hypothesi would not have agreed to the clause in the contract dealing with the effect of Belgian law, but for the existence of the fact which vitiated the contract.

  The court must look at the apparent contract and then determine whether an apparent contract of that type, i.e., insurance, has been **B**  created by English law. Unless the parties have agreed in the apparent terms of this contract there is no contractual agreement; it is a nullity. Although the plaintiffs were entitled to treat it as a valid contract, they have elected not to do so. As a result of the letters they wrote and the writ, there is no policy. The passage cited from Arnould shows that the effect of the election is that **C**  there is no contract, the contract is avoided ab initio. There was a defective consent to the contract, because the mind of one party did not go with it because of the non-disclosure of a material fact.

  There are a number of other matters which militate against setting aside service of the writ. If the court does set aside service, **D**  suppose the underwriters took no part in the Belgian proceedings, or protested to the jurisdiction, and a judgment was entered in a Belgian court for the amount claimed: it could not be sued on here, but could only be enforced by registration as a foreign judgment. It would be open to the underwriters here to apply to set aside the registration of the foreign judgment on the grounds that the Belgian court had no jurisdiction and of illegality. The **E**  matter would then have to be litigated here. The underwriters do not want the case tried in Belgium, because England is the only country where the issue, the defence of English public policy, can be tried. As to the effect of the Foreign Judgments (Reciprocal Enforcement) Act, 1933, see Cheshire on Private International Law, 7th ed., p. 542 onwards. It **F**  is almost inconceivable that the underwriters could rely on English public policy in the Belgian courts. So if service of the writ were set aside, the matter could well be relitigated. Virtually all the evidence would come from England. All the surrounding circumstances support the desirability of an English forum. The **G**  plaintiffs got their blow in first.

  As to illegality, this is an " all risks " policy. The courts have held collateral contracts to be tainted.

  [RUSSELL L.J. Would Lloyd's be entitled to repudiate a policy on a car because it was sometimes used for poaching?]

  If the car is used for an illegal purpose, yes. A smuggler is engaged in a criminal activity for which he can be caught and

596                    QUEEN'S BENCH DIVISION                    [1967]

punished. The underwriters attach considerable importance to the    A
issue of illegality and if the case were dealt with by the Belgian
courts, the question of illegality would very likely be raised if any
Belgian judgment were enforced here under the Act of 1933. The
Belgian court is at present awaiting the result of these proceedings.

*Dunn Q.C.* in reply. As to the Foreign Judgments (Reciprocal
Enforcement) Act, 1933, the Belgian proceedings should be allowed    B
to go on and if the underwriters subsequently want to take the point
of illegality, then let them. To hold that conduct of the kind
alleged here would be contrary to public policy, would be extend-
ing public policy unduly. As to non-disclosure, this is not a non
est factum case: if it were, the argument might have relevance.
Non-disclosure is different from fraud and misrepresentation.    C
Reliance is placed on the way in which the effect of non-disclosure
is put in Halsbury's Laws of England, 3rd ed., Vol. 22 (1958), p.
192. The contract must be looked at to see under what law it falls
to be considered.

LORD DENNING M.R. We are here concerned with a Lloyd's    D
jewellers' block policy. In 1964 underwriters at Lloyd's issued
a policy covering three European companies who deal in diamonds
and precious stones. One company is incorporated in Switzerland,
another in Belgium and the third in Italy. I will call them the
diamond merchants. The policy covered the diamond merchants
against loss or damage to their stock of jewellery and precious    E
stones. It was a time policy for one year from April 16, 1964, to
April 15, 1965. It covered their goods anywhere in the world.
The total sum insured was £450,000. The premium was £4,675.
The policy contained a foreign jurisdiction clause in these terms:

"Notwithstanding that this policy has been effected in    F
London, England, this policy shall be governed exclusively
by Belgian law and any disputes arising thereunder shall be
exclusively subject to Belgian jurisdiction, it being agreed
that all summonses, notices or processes requiring to be
served upon the underwriters for the purposes of such juris-
diction shall be deemed to be properly served if addressed
to them and delivered to them care of Lloyd's agent at    G
Antwerp."

In January 1965 a loss occurred in Naples. Mr. Myer was
the representative in Italy of the diamond merchants. He was in
Naples on business, carrying nearly the whole of his stock with
him, diamonds and pearls worth nearly £50,000. All were in a
small brief-case which he carried but he had it tied to his wrist

C. A.

1966

Mackender
v.
Feldia A. G.

LORD
DENNING
M.R.

**A**  with a steel chain. He was talking to a friend outside a shop when he was jostled. The brief-case was snatched from him. The steel chain was broken or cut. All the diamonds and pearls were gone. The diamond merchants made a claim on Lloyd's underwriters for the loss. The precise figure was £48,266. The underwriters engaged assessors to look into the claim. As the

**B**  result of the investigation they discovered, so they said, that the diamond merchants made a practice of smuggling diamonds into Italy. They employed couriers to evade the Italian customs. It is said that Mr. Myer may be prosecuted in Italy for illegally importing diamonds.

**C**       After considerable negotiation, Lloyd's underwriters rejected the claim. They say that it is contrary to English policy to insure goods which are intended to be smuggled into a friendly foreign country. They also say that the diamond merchants were guilty of non-disclosure and that they failed to disclose that it was in the course of their business to smuggle goods into a friendly

**D**  foreign country. Lloyd's underwriters say that if they had known of this fact, they would not have undertaken the insurance.

Where is the dispute to be tried? Lloyd's underwriters would like it tried in England. They have issued a writ in the English courts asking that the policy be declared void for illegality and voidable for non-disclosure, and that it be rescinded or annulled.

**E**  They applied for leave to serve this writ out of the jurisdiction on the diamond merchants. Roskill J. granted leave ex parte. McNair J., after hearing the diamond merchants, affirmed the decision. Now the diamond merchants appeal to this court. They point out that the policy contains the foreign jurisdiction clause and they ask that this dispute be decided in Belgium.

**F**  The diamond merchants have themselves filed proceedings in the Belgian court claiming payment of this £48,266 on account of the loss. They appear to have obtained leave from the Belgian courts to serve proceedings on Lloyd's underwriters and those proceedings are being carried on in Belgium. The question we have to decide is whether the English proceedings should now

**G**  be continued.

The rules of court are wide enough to cover the case for service out of the jurisdiction. R.S.C., Ord. 11, r. 1 (f), says that it is permissible if an action is brought to annul or otherwise affect a contract "made within the jurisdiction." This contract was undoubtedly made within the jurisdiction. The negotiations between the underwriters and the brokers were here in London,

598                          QUEEN'S BENCH DIVISION                    **[1967]**

C. A.          the slip signed here, and the policy issued out of and signed at    A
1966           Lloyd's policy signing office.

Mackender          But although there is jurisdiction to give leave, it is a matter
Feldia A. G.   of discretion as to whether it should be granted. Mr. Dunn for the
v.             diamond merchants says that, in view of the foreign jurisdiction
LORD           clause, the court should not give leave. But Mr. MacCrindle for
DENNING        the underwriters says that the foreign jurisdiction clause ought    B
M.R.           not to be given such importance in this case. He says that the
               foreign jurisdiction clause only applies where a contract has been
               truly created and formed. Here he says that owing to the non-
               disclosure, there was no true contract—no real consent by the
               underwriters—and that, on this basis, the contract itself falls down,
               including even the foreign jurisdiction clause.                      C

                   I can well see that if the issue was whether there ever had
               been any contract at all, as, for instance, if there was a plea of
               non est factum, then the foreign jurisdiction clause might not
               apply at all. But here there was a contract, and when it was
               made, it contained the foreign jurisdiction clause. Even if there
               was non-disclosure, nevertheless non-disclosure does not auto-      D
               matically avoid the contract. It only makes it voidable. It gives
               the insurers a right to elect. They can either avoid the contract
               or affirm it. If they avoid it, it is avoided in this sense, that the
               insurers are no longer bound by it. They can repudiate the
               contract and refuse to pay on it. But things already done are not
               undone. The contract is not avoided from the beginning but only    E
               from the moment of avoidance. In particular, the foreign jurisdic-
               tion clause is not abrogated. A dispute as to non-disclosure
               is "a dispute arising under" the policy and remains within the
               clause: just as does a dispute as to whether one side or other was
               entitled to repudiate the contract: see *Heyman* v. *Darwins Ltd.*[1]

                   It seems to me that Mr. MacCrindle's argument (to the effect    F
               that non-disclosure strikes out the whole contract) is not well
               founded. The foreign jurisdiction clause is a positive agreement
               by the underwriters that the policy is governed exclusively by
               Belgian law. Any dispute under it is to be exclusively subject to
               Belgian jurisdiction. That clause still stands and is a strong
               ground why discretion should be exercised against leave to serve   G
               out of the jurisdiction.

                   As to illegality, I would only say this: the underwriters were
               clearly innocent. The diamond merchants may have had an
               unlawful intention to smuggle goods into a friendly foreign

                   [1] [1942] A.C. 356; 58 T.L.R. 169; [1942] 1 All E.R. 337, H.L.

**2 Q.B.**          QUEEN'S BENCH DIVISION          599

A   country. But their illegality would not affect the formation of
the contract. It would only make it unenforceable. It would
mean that they could not recover on the policy. This dispute
again comes within the foreign jurisdiction clause.

It all comes to this: the English courts have discretion
whether or not to give leave to serve this writ out of the jurisdic-
B   tion. Seeing that the underwriters have agreed to a foreign
jurisdiction clause which gives exclusive jurisdiction to the Belgian
courts, I think we should allow these disputes to be decided in the
courts of Belgium. We should not give leave to serve this writ
out of the jurisdiction.

C   I would therefore allow the appeal.

DIPLOCK L.J.: The contract which is the subject-matter of
these proceedings was undoubtedly made in England. The slip
was initialled in London and the policy signed on behalf of
underwriters by the manager of Lloyd's policy signing office there.
D   The English High Court accordingly had power to give leave
to serve the writ upon the defendants outside the jurisdiction,
and unless service is set aside and the action stayed, it will have
jurisdiction to hear and to determine it. But leave to serve a
writ outside the jurisdiction is always discretionary. The jurisdic-
tion which the High Court claims over defendants who are neither
E   present nor ordinarily resident in this country, when it grants
leave under R.S.C., Ord. 11, is wider than any corresponding
jurisdiction which it recognises as possessed by a foreign court
over defendants who are not present or ordinarily resident in
the foreign state. And because it is a claim which conflicts with
the general principles of comity between civilised nations, it is
F   one which should be exercised with caution. I cannot do better
than echo the words of Scott L.J. in *George Monro Ltd.* v.
*American Cyanamid & Chemical Corporation*[2]:

> "Service out of the jurisdiction at the instance of our
> courts is necessarily prima facie an interference with the
> exclusive jurisdiction of the sovereignty of the foreign country
> where service is to be effected. I have known many continen-
G   > tal lawyers of different nations in the past criticise very
> strongly our law about service out of the jurisdiction. As a
> matter of international comity it seems to me important to
> make sure that no such service shall be allowed unless it is
> clearly within both the letter and the spirit of R.S.C., Ord. 11."

[2] [1944] K.B. 432, 437; 60 T.L.R. 265, 266; [1944] 1 All E.R. 386, 388,
C.A.

C. A.
1966

Mackender
v.
Feldia A. G.

LORD
DENNING
M.R.

600                        QUEEN'S BENCH DIVISION                    [1967]

C. A.
1966
───────
Mackender
v.
Feldia A. G.
Diplock L.J.
───

The application for leave to serve a writ outside the jurisdic-     A
tion under R.S.C., Ord. 11, is made ex parte. On that application,
which in the present case came before Roskill J., the only question
on which he had to satisfy himself was whether the subject-matter
of the action prima facie falls within the ambit of R.S.C., Ord. 11.
If it does and leave is granted, the question whether the court
in its discretion should allow the action to proceed falls for       B
decision when the defendant has entered a conditional appearance
and applies to have service set aside and the proceedings stayed.
The application in this case came before McNair J. and it is his
exercise of his discretion in refusing the application which this
court is asked to review.

The defendants' case is simple. It needs no subtlety of exposi-     C
tion.

> "You underwriters," they say, "in order to get this
> business, agreed with us, who carry on business in civil law
> countries, that the policy should be governed by Belgian law
> upon which we can readily obtain advice from our own lawyers
> at home, and, what is more important, you undertook to         D
> accept the exclusive jurisdiction of the Belgian courts, with
> which our lawyers at home are familiar, to hear and deter-
> mine any disputes arising under it. All we ask is that you
> should keep your word."

The plaintiffs' answer is that the foreign jurisdiction clause does
not apply to the particular disputes which they seek to have de-
termined in this action in the English court. They claim that       E
the policy either was void for illegality in English law or was
voidable for non-disclosure by the assured of material facts, and
they have elected to avoid it. Disputes of these kinds, they con-
tend, are not disputes arising under the contract but are disputes
as to whether there is a contract at all.

I will deal first with illegality in isolation from non-disclosure.   F
The policy was a jewellers' block policy insuring the stock-in-trade
of the defendants against all risks, with certain exceptions. It is
alleged by the underwriters that the defendants in the course of
their business habitually traded in uncustomed goods, that is to
say, they smuggled them across the frontier into Italy in contra-   G
vention of the Italian revenue law. It is relevant to note that one
of the excepted perils under the policy is "confiscation or requisi-
tion or destruction of or damage to property by or under the order
of any government or public or local authority." The insurance is
not one of indemnity against the consequences of smuggling. How
then is the claim that the policy was void for illegality put? It is

**2 Q.B.**          QUEEN'S BENCH DIVISION                              601

A   said that the adventure insured was "tainted" with illegality, not
under Belgian law but under English law. This is a picturesque
metaphor which invites analysis. English courts will not enforce an
agreement, whatever be its proper law, if it is contrary to English
law, whether statute law or common law; nor will they enforce it
even though it is not contrary to English law if it is void for
B   illegality under the proper law of the contract. Furthermore, sub-
ject to one exception, the English courts will not enforce perform-
ance or give damages for non-performance of an act required to
be done under a contract, whatever be the proper law of the
contract, if the act would be illegal in the country in which it is
required to be performed. The exception, the precise scope of
C   which is unsettled and need not be determined in the present
case, is where the illegality is a breach of a revenue or fiscal law of
a foreign state.

But unenforceability and voidness are not the same concept.
To analyse the difference it is convenient to distinguish between
an "agreement," which requires no more than a consensus ad
D   idem between the parties, and a "contract," which is an agree-
ment plus something more. Where an agreement is wholly unen-
forceable because it is contrary to English law, it may, if the
proper law of the agreement is itself English law, accurately be
said to be void as a contract, that is, not to be a contract at all.
For a contract is a species of agreement which gives rise to legally
E   enforceable rights and duties; and an agreement which is contrary
to English law, if that is also its proper law, gives rise to none. But
if an agreement, though contrary to English law, e.g., a marriage
brokage contract, is not illegal by its proper law, it cannot properly
be said to be void and thus not a contract at all. It does give rise
to rights and duties which are legally enforceable elsewhere than
F   in England. It is a contract, but one which is unenforceable in the
English courts. A fortiori a contract which is not illegal by its
proper law, but requires for its performance an act to be done
which would be illegal under the law of the country where the act is
required to be done, is not void. It is a contract which is, in a
particular respect only, unenforceable in the English courts. This
G   is to be contrasted with an agreement which under its foreign
proper law is illegal and incapable of giving rise to legally enforce-
able rights and liabilities under that law. Since the foreign proper
law must be looked to for the legal affects of the agreement, such
an agreement may properly be said to be void, i.e., not to be a
contract at all.

C. A.
1966

Mackender
v.
Feldia A. G.

Diplock L.J.

C. A.
1966
——
Mackender
v.
Feldia A. G.
Diplock L.J.
——

.  The proper law of the agreement is thus crucial to the question    A
whether an agreement, which would be illegal under English law,
is void as a contract. The prima facie rule of English conflict of
laws—more liberal in this respect than many Continental systems
—is that the proper law of a contract is that system of law which
the parties themselves have agreed shall regulate the legally        B
enforceable rights and duties to which their agreement gives rise.
In the present case the parties have expressly agreed that the
proper law of the policy shall be Belgian law. That they have so
agreed must be treated as accepted, so far as the claim that the
policy is void for illegality considered in isolation is concerned.
What is in dispute in this claim is whether their undoubted agree-   C
ment, embodied in the policy, which includes their choice of
Belgian as its proper law, does give rise to any legally enforceable
rights and duties under Belgian law. That in my view is a dispute
arising under the agreement, i.e., policy. And that dispute, accord-
ing to the terms of the policy, must be decided according to Belgian
law. The Belgian courts are not only a convenient forum for its     D
resolution: they are the forum to which both parties agreed to
submit. It is immaterial whether the English courts would enforce
the contract at all or any particular claim under it. No one is
asking them to do so.

   A claim that a contract is void for illegality does not raise any
issue as to whether or not the parties in fact agreed to the terms   E
of the policy, including those in the foreign jurisdiction clause. It
concedes that they did, but asserts that their agreement gave rise
to no legally enforceable rights or duties. It thus raises no dispute
about the consensus ad idem of the parties as to the exclusive
jurisdiction of the Belgian courts. But the alternative claim of the
underwriters to avoid the contract for non-disclosure of a material   F
fact, it has been ably argued on their behalf, does raise the
question as to whether there was a contract at all, and thus the
question whether there was any agreement that Belgian law should
be the proper law of the contract. This question, it is argued, is to
be determined not by Belgian law but by a putative objective
proper law, a concept which I find confusing, but which is said    G
in this case to be English law. Furthermore, it is contended that
such a question, by whatever law it is to be determined, is not a
dispute arising under the policy within the meaning of the foreign
jurisdiction clause.

   This argument, I think, is misconceived. It is based upon an
imprecise use of the phrase " avoid the contract." Where acts

A   done in England, in this case the oral negotiations between the
assured's broker and the underwriters, the initialling of the slip
and the signing of the policy, are alleged not to have resulted in
an agreement at all (i.e., where there is a plea of non est factum)
and the question is whether there was any real consensus ad idem,
it may well be that this question has to be determined by English
B   law and not by the law which would have been agreed by them as
the proper law of the contract if they had reached an agreement.
But that is not the position when underwriters seek to repudiate
a contract upon discovering that material facts were not disclosed
to them by their assured before the policy was entered into.

C       Where English law is the proper law of a contract of insurance
and so regulates the legally enforceable rights and duties of the
parties arising under their agreement, among the incidents or
legal characteristics in English law of a contract of insurance
(which distinguishes it from most other contracts) is the right of
the insurer, if he discovers that some material fact has not been
D   disclosed to him by the assured during the negotiations for the
contract, to elect either to continue to perform the contract and to
require its continued performance by the assured, or to repudiate
the contract, that is to say, to treat it as at an end so far as
concerns any future performance. If he elects to repudiate the
contract, consequential rights and duties as respects acts already
E   done under the contract, such as premiums already paid or claims
already met, are other incidents or legal characteristics of the
contract under English law. Any disputed claim by an insurer to
exercise all or any of these rights which arise upon discovering
that there has been non-disclosure of a material fact is in my view
clearly a dispute under the contract and falls within the foreign
F   jurisdiction clause.
        The fallacy in the argument to the contrary is that when what
is said to be a "voidable" contract is said to be "avoided," that
does not mean that the contract never existed but that it ceases
to exist from the moment of avoidance, and that upon its ceasing
there may then arise consequential rights in respect of things done
G   in performance of it while it did exist which may have the effect
of undoing those things as far as practicable. It is sometimes
sought to assimilate the concept of avoidance of a voidable contract
to the concept of non est factum which prevents a contract ever
coming into existence at all. It is argued that innocent misrepre-
sentation or, in the case of contracts of insurance, non-disclosure
of material facts vitiates consent and makes the apparent consent of

C. A.
1966

Mackender
v.
Feldia A. G.
DIPLOCK L.J.

C. A.
1966
Mackender
v.
Feldia A. G.
Diplock L.J.

the party misled, no consent at all. But this is specious. What is     A
really meant is that the party did in fact consent but would not
have done so if he had known then what he knows now. Fraud
may raise other considerations into which it is not necessary to ·
go.

Whether one of the legal incidents or characteristics of the
contract of insurance in the present case is that the underwriters     B
are entitled to repudiate for the non-disclosure of the particular
facts which they alleged have not been disclosed must be de-
termined by the proper law of the policy, which is Belgian law
and not English law. So here again the Belgian courts, to which
the parties have expressly agreed to submit this kind of dispute,
is a forum conveniens.                                                 C

Finally, is this a case where we should interfere with the exer-
cise of his discretion by McNair J.? I agree with my Lord that it
is. The judge sets out three reasons which influenced him in
exercising his discretion to allow the English action to proceed.
The first reason was that in his view neither of the disputes were   D
disputes which fell within the foreign jurisdiction clause. I have
already indicated that in my view he was mistaken in law in so
holding. The second reason was his view upon the evidence
before him at that time that the Belgian courts would not have
jurisdiction to determine the disputes which the underwriters
desired to raise in the English action. Further evidence has been    E
filed to show that in that respect he was mistaken upon the facts
as to Belgian law. The third reason, as I understand it, was that
he took the view that there would be no inconvenience in having
two sets of proceedings because in point of fact the proceedings
in England and the proceedings in Belgium could not deal with the
same issues. That was founded upon the view that the Belgian     F
courts had no jurisdiction to entertain the dispute which the
underwriters desired to raise.

I think, therefore, that the judge exercised his discretion upon
a wrong view of English law and a wrong view of the facts as to
Belgian law. That entitles us in this court to exercise our discre-
tion de novo unfettered by the way in which the judge exercised   G
his. Where parties have agreed to submit all their disputes under
a contract to the exclusive jurisdiction of a foreign court, I myself
should require very strong reasons to induce me to permit one of
them to go back on his word. The assureds are a Belgian parent
company and its Italian and Swiss subsidiaries. As I have said,
I do not doubt that one of the inducements to the assureds to

**2 Q.B.**              QUEEN'S BENCH DIVISION                    605

C. A.
1966
Mackender
v.
Feldia A. G.
DIPLOCK L.J.

A    enter into this contract at all was the undertaking that any dis-
     putes would be settled in Belgium either by arbitration or by the
     courts of the parent company's own country with whose language
     they are familiar and which apply a law upon which they can
     readily obtain advice from the parent company's own lawyers in
     their own land.

B        It is said, on the other hand, that the oral evidence which is
     required to raise the defences which the underwriters desire to
     raise is evidence which can most conveniently be given in England
     because it consists primarily of negotiations between the under-
     writers and the brokers who were based in London. I am not
     impressed by this ground for disregarding the express agreement
C    of the parties. Antwerp is not very far away. Brokers and under-
     writers can go there to give their evidence if this is necessary under
     Belgian procedure.

         The second ground put forward is that if the action in this
     country is stayed, the underwriters will not be able to raise before
D    the Belgian courts a defence on which they wish to rely that the
     agreement, even if legal under Belgian law, was illegal under Eng-
     lish law. But if the underwriters think that that defence is one which
     is worth persisting in, either as a matter of law or as a matter of
     business, they will have an opportunity of doing so under section
     4 (1) (a) (v) of the Foreign Judgments (Reciprocal Enforcement)
E    Act, 1933, if judgment on the assureds' claim is given against them
     in the Belgian courts and attempts are made to enforce it in this
     country. I have already indicated the nature of the facts which are
     said to give rise to this defence. Whether on further reflection the
     underwriters will wish to take it, I do not know.

F        RUSSELL L.J.: I agree that service of the notice of the writ
     should be set aside. Here the parties undoubtedly entered into a
     contract, and so far as non-disclosure is concerned, the question for
     judicial decision is whether under the law governing the contract
     one party can say that there was non-disclosure such as to confer
     upon that party the right to elect to treat this contract as not bind-
G    ing upon him, and, if so, upon what terms. The parties have in
     terms agreed that the law governing the contract is Belgian law.
     I see no reason why in such a case there is need to search for some
     other law. To do so would seem to introduce a wholly unneces-
     sary complication into the affair. The case does not involve either
     non est factum or fraud or even innocent misrepresentation and I
     say nothing as to such cases. So far as illegality and English

C. A.
1966
──────
Mackender
v.
Feldia A. G.
────

A  policy are concerned, I add nothing to what has been already said. I am not impressed by the suggestion which was made that the arguments are in any way capable of being raised in these courts against registration of a foreign judgment if obtained by the insurers and that therefore they might as well be allowed to be raised now in this action. I am content to wait and see.

B

> *Appeal allowed with costs. Order for service and service itself set aside.*
>
> *Leave to appeal to House of Lords refused.*

C

Solicitors: *Ince & Co.; Waltons, Bright & Co.*

A. H. B.

D

1966
*Nov.* 1
──────
LORD PARKER
C.J.
WINN L.J.
and
WIDGERY J.
────

## GREEN v. MINISTER OF HOUSING AND LOCAL GOVERNMENT

*Evidence—Fresh evidence—Minister's decision—Statutory appeal to High Court—Right of appeal on point of law—Minister's dismissal of appeal in view of inspector's finding of fact—Fresh evidence casting doubt on finding of fact—Power of court to receive—R.S.C. (Rev. 1965) (S.I. 1965 No. 1776), Ords. 55, 94—Town and Country Planning Act, 1962 (10 & 11 Eliz. 2, c. 38), s. 180 (1).*[1]

*Town Planning—Appeal from Minister—Fresh evidence—Appeal on point of law—Dismissal by Minister of appeal against enforcement notice—Minister's decision based on inspector's finding of fact—Fresh evidence casting doubt on inspector's finding of fact—Jurisdiction of court to receive—R.S.C. (Rev. 1965), Ords. 55, 94—Town and Country Planning Act, 1962, s. 180 (1).*

E

F

    The appellant appealed to the Minister of Housing and Local Government against an enforcement notice, dated March 30, 1965, served on him alleging development of certain land by

G

[Reported by GRAHAM GARNER, ESQ., Barrister-at-Law.]

[1] Town and Country Planning Act, 1962, s. 180: "(1) Where the Minister gives a decision in proceedings on an appeal . . . against an enforcement notice, the appellant . . . on whom the enforcement notice was served . . . may, according as rules of court may provide, . . . appeal to the High Court against a decision on a point of law. . . ."

854

[1983]

A

[HOUSE OF LORDS]

PAAL WILSON & CO. A/S · · · · RESPONDENTS AND
CROSS-APPELLANTS

AND

PARTENREEDEREI HANNAH                                                    B
    BLUMENTHAL · · · · · · APPELLANTS AND
CROSS-RESPONDENTS

1981  July 6, 7                                          Staughton J.

1982  Feb. 24, 25, 26;                          Lord Denning M.R.,
      March 26                             Griffiths and Kerr L.JJ.    C

1982  Oct. 26, 27, 28;              Lord Diplock, Lord Keith of Kinkel,
      Dec. 2                        Lord Roskill, Lord Brandon of Oakbrook
                                          and Lord Brightman

*Arbitration — Injunction to restrain — Delay in prosecuting claim
    — Inordinate and inexcusable delay in prosecution of claim
    — Delay rendering satisfactory trial of issues impossible —*   D
    *Whether arbitration agreement discharged by frustration or
    abandonment*

*Ships' Names—Hannah Blumenthal*

A contract made in 1969 for the sale of a ship contained
a clause for arbitration in London. The buyers complained
of engine defects and in 1972 the buyers and sellers each   E
appointed an arbitrator but did not arrange for the appoint-
ment of a third arbitrator as required by the contract. By
their points of claim served in February 1974 the buyers
alleged that before the contract was entered into the sellers
had made representations, mainly oral, as to the ship's per-
formance and that the representations were untrue. In their
defence delivered in June 1974 the sellers denied having made
the representations and in November 1974 obtained con-   F
sents to amendments. No further steps were taken in the
arbitration for three years. Between September 1977 and
May 1978 there were communications between the parties'
solicitors relating to discovery and in November 1978 the
buyers' solicitors received the ship's log books from the sellers'
solicitors. In December 1979 the buyers' solicitors informed
the sellers' solicitors that they were shortly expecting an
expert report on the ship's log books that had been in pre-   G
paration, and their next letter on July 30, 1980, enclosed the
report and suggested that a date be fixed for the hearing of
the arbitration. In 1979 and 1980 the sellers' solicitors were
trying to trace witnesses who might be able to give evidence
at the hearing. Neither party at any stage applied to the
arbitrators for directions.

    In August 1980 the sellers issued proceedings for a declara-   H
tion that the arbitration agreement had been discharged by
repudiation, consensual rescission or frustration. Staughton J.
held that on the facts there was no agreement to abandon
the arbitration and that in the light of the decision of the
House of Lords in *Bremer Vulkan Schiffbau und Maschinen-*

855

**A.C.**          **Paal Wilson & Co. v. Partenreederei (Q.B.D.)**

A    *fabrik* v. *South India Shipping Corporation Ltd.* [1981] A.C.
909 it was not open to him to find that the buyers had repu-
diated the arbitration agreement.  He held, however, that the
agreement had been discharged by frustration.  The Court of
Appeal by a majority dismissed an appeal by the buyers on
the ground that in view of the long period of time that had
elapsed and the nature of the dispute, it would be impossible
for there to be a fair trial of the buyers' claim, and that
B    since, therefore, the arbitration if it took place would be
radically different from what the parties contemplated when
they made the agreement, the arbitration agreement had
been frustrated.  A majority of the court also concurred
with Staughton J.'s decision on repudiatory breach and
abandonment.

On appeal by the buyers, and cross-appeal by the sellers
on the question of abandonment: —

C    *Held*, (1) allowing the appeal, that an arbitration agree-
ment could not be frustrated by such delay by either or both
parties in preparing for the arbitration and bringing it to a
hearing that a satisfactory trial of the dispute was no longer
possible, because both parties had a mutual obligation to one
another to apply to the arbitral tribunal for directions to
prevent such delay, and a failure to comply with the obliga-
tion was a "default" which excluded the operation of the
D    doctrine of frustration; and that since both sellers and buyers
had been guilty of such delay in breach of their obligations,
the arbitration agreement had not been frustrated (post, pp.
910D–H, 919H—920B, B–C, 923A–B, E).

*Per curiam*.  The mutual obligation principle is part of
the ratio decidendi of *Bremer Vulkan*, and there is no reason
for departing from that decision, especially in view of the
particular need for certainty in the area of commercial law
E    (post, pp. 909C–D, 912D–E, 917D–E, 920B–C, 922G—923A, E–F).

*Bremer Vulkan Schiffbau und Maschinenfabrik* v. *South
India Shipping Corporation Ltd.* [1981] A.C. 909, H.L.(E.)
applied.

*Per Lord Diplock*.  The virtual impossibility of a satis-
factory trial by the arbitral tribunal is incapable of qualifying
as a frustrating event even if it has come about without
F    default by either party (post, p. 919E–F).

(2) Dismissing the cross-appeal, that the sellers could only
establish that the arbitration had been abandoned by apparent
inaction of the buyers in reliance on which the sellers acted
to their detriment if they could prove not only that the
buyers' conduct was such as to induce a reasonable belief that
they intended to abandon the arbitration, but also that the
sellers did in fact believe that the buyers so intended and
G    that they themselves acted accordingly; and that since the
facts disclosed acts by the sellers which were inconsistent with
such belief or reliance, no case for abandonment had been
made out (post, pp. 914A–E, 916F—917A, 920B–C, 923C–D, 924D
—925A).

Decision of the Court of Appeal, post, p. 869C; [1982] 3
W.L.R. 49; [1982] 3 All E.R. 394 reversed in part.

H    The following cases are referred to in the opinions of their Lordships in
the House of Lords:

*Aello, The* [1961] A.C. 135; [1960] 3 W.L.R. 145; [1960] 2 All E.R.
578, H.L.(E.).

A  the law of contract a novel heresy which your Lordships should, in my
view, be vigilant to reject.

Applying the orthodox concept of termination of contract by abandon-
ment, neither the trial judge nor any member of the Court of Appeal was
prepared to hold that the sellers were entitled to succeed on this ground;
and even if your Lordships yourselves felt some doubt upon this issue,
which I myself do not, I agree with my noble and learned friends that your
B  Lordships would hesitate long before upsetting the unanimous decision of
the judges in the lower courts on what, upon a proper application of the
law of contract, is essentially a question of fact.

In considering the question of abandonment, I found of great assistance
the tabulated chronology of events which the parties agreed and tendered
to your Lordships after the cases had been prepared. Your Lordships may
C  feel that such a chronology would be welcome and time-saving in many
other appeals, particularly if lodged before the start of the hearing.

My Lords, as respects the propriety of this House declining to follow its
own recent decision in *Bremer Vulkan* [1981] A.C. 909 I have nothing
to add to what is said on this topic by my noble and learned friends, Lord
Roskill, Lord Brandon of Oakbrook and Lord Brightman. Even if I had
been persuaded, as unrepentantly I have not, that of the two eminently
D  possible views in *Bremer Vulkan*, the majority of the House, speaking
through me, made the worse and not the better choice, I would nonetheless
agree with my Lords that in the interests of legal certainty we should abide
by it.

I turn finally to the question whether it is possible to escape the
consequences of the decision in *Bremer Vulkan* by resorting to the
E  doctrine of frustration of the arbitration agreement as Staughton J., ante,
p. 859A and the majority of the Court of Appeal, ante, p. 869C (Lord
Denning M.R. and Kerr L.J.) thought that they could do; and on this
aspect of the case, I think it helpful to start by analysing the legal character-
istics of an arbitration clause in a commercial contract.

The first characteristic is that which was established by this House in
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356. An arbitration clause is col-
F  lateral to the main contract in which it is incorporated and it gives rise
to collateral primary and secondary obligations of its own. Those collateral
obligations survive the termination (whether by fundamental breach, breach
of condition or frustration) of all primary obligations assumed by the parties
under the other clauses in the main contract. In saying this I do no more
than paraphrase in the nomenclature I adopted in *Photo Production Ltd.*
G  v. *Securicor Transport Ltd.* [1980] A.C. 827, what was said by Lord
Macmillan in *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 374.

The second characteristic of an arbitration clause is that the primary
obligations that it creates are subject to conditions subsequent. The clause
comes into operation so as to impose primary obligations upon the parties
to the contract only upon the occurrence of a combination of future events
which may or may not occur, viz., (1) the coming into existence of a dispute
H  between the parties as to their primary or secondary obligations under the
main contract; and (2) the invoking of the arbitration clause by a party to
the contract (" the claimant ") who desires to obtain the resolution of that
dispute by the procedure for which the arbitration clause provides. It

Court of Appeal                                                          A

## *Sulamérica Cia Nacional de Seguros SA and others *v* Enesa Engelharia SA and others

### [2012] EWCA Civ 638

2012  March 20;        Lord Neuberger of Abbotsbury MR, Moore-Bick, Hallett LJJ    B
       May 16

*Conflict of laws — Contract — Arbitration agreement — Insurance policy expressly governed by Brazilian law containing exclusive jurisdiction clause in favour of Brazilian courts and London arbitration clause — Insurers denying liability for claims made by insured under policy — Insurers giving notice of arbitration — Insured obtaining Brazilian injunction restraining insurers from continuing with arbitration claim — Proper law governing arbitration agreement — Whether English law — Whether insurers entitled to anti-suit injunction to restrain insured from pursuing Brazilian proceedings*

C

The insured, Brazilian companies involved in the construction of a hydroelectric generating plant in Brazil, made claims under two insurance policies. The insurers denied liability on the grounds that the losses were uninsured or excluded under the terms of the policies, or for material non-disclosure by the insured. The policies, which were in substantially the same terms, contained an express choice of Brazilian law as the governing law of the contract, an exclusive jurisdiction clause in favour of the Brazilian courts, and mediation and arbitration clauses, whereby the parties undertook that, prior to a reference to arbitration, they would seek to have any dispute resolved by mediation, and that if they failed to agree the amount due through mediation the dispute would be referred to arbitration, the seat of the arbitration being London. Either party was entitled to refer the dispute to arbitration. The insurers gave notice of arbitration without referring the dispute to mediation. The insured obtained an injunction in Brazil restraining the insurers from pursuing arbitration proceedings, whereupon the insurers applied to the English court for, and were granted, an ex parte interim injunction to restrain the insured from pursuing proceedings in Brazil. Following an inter partes hearing the judge continued the injunction, holding that the agreement to arbitrate had its closest and most real connection with English law because of the choice of London as the seat of the arbitration and that accordingly English law was the proper law of the arbitration agreement.

On the insured's appeal—

*Held,* dismissing the appeal, that whether the proper law of an arbitration agreement in a commercial contract was the governing law of the contract or the law of the seat of the arbitration was a matter of contractual interpretation and thus depended on all the terms of the particular contract read in the light of the surrounding circumstances and commercial common sense; that where an arbitration agreement formed part of a substantive contract, although the governing law might be different from that of the substantive contract, it was to be assumed that, in the absence of an indication to the contrary, the parties intended the whole of their relationship to be governed by the same system of law; that the proper law of the arbitration agreement was to be determined by a three-stage inquiry into (i) express choice, (ii) implied choice and (iii) closest and most real connection, those three stages to be considered separately and in that order; that since an express choice of law governing the substantive contract was a strong indication of the parties' intention in relation to the law of the arbitration agreement, a search for an implied choice of proper law for the arbitration agreement was likely to indicate an intention that the same law was to govern both the substantive and arbitration agreements unless other factors pointed to a different conclusion; that, although there were

D

E

F

G

H

A    powerful factors in favour of an implied choice of Brazilian law as the governing law
     of the arbitration agreement, the choice of another country as the seat of the
     arbitration imported an acceptance of the laws of that country as applying to the
     proceedings, and the choice of the law of Brazil, since it would render the arbitration
     agreement enforceable only with the consent of the insured, was inconsistent with the
     unqualified provision for arbitration in the arbitration clause and likely to render it
     ineffective; that it followed that the parties had not made an implied choice of
B    Brazilian law to govern the arbitration agreement; that an agreement to resolve
     disputes in London in accordance with English arbitral law did not have a close
     juridical connection with the system of law governing the insurance policy, the
     purpose of which was unrelated to that of dispute resolution, rather its closest and
     most real connection was with the law of the place where the arbitration was to be
     held; and that, accordingly, the arbitration agreement was governed by English law
     and the injunction restraining the insured from pursuing the Brazilian proceedings
     should continue (post, paras 11, 25–26, 29–32, 47, 48, 49, 51, 60–62).
C         *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334,
     HL(E), *Black Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG*
     [1981] 2 Lloyd's Rep 446 and *C v D* [2008] Bus LR 843, CA considered.
          Decision of Cooke J [2012] EWHC 42 (Comm); [2012] 1 Lloyd's Rep 275
     affirmed.

     The following cases are referred to in the judgments:

D    *Ace Capital Ltd v CMS Energy Corpn* [2008] EWHC 1843 (Comm); [2009] Lloyd's
          Rep IR 414
     *Black Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1981]
          2 Lloyd's Rep 446
     *C v D* [2007] EWCA Civ 1282; [2008] Bus LR 843; [2008] 1 All ER (Comm) 1001;
          [2008] 1 Lloyd's Rep 239, CA
     *Cable & Wireless plc v IBM United Kingdom Ltd* [2002] EWHC 2059 (Comm);
E         [2002] 2 All ER (Comm) 1041
     *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334;
          [1993] 2 WLR 262; [1993] 1 All ER 664; [1993] 1 Lloyd's Rep 291, HL(E)
     *Fiona Trust and Holding Corpn v Privalov* [2007] UKHL 40; [2007] Bus LR 1719;
          [2007] 4 All ER 951; [2007] 2 All ER (Comm) 1053; [2008] 1 Lloyd's Rep 254,
          HL(E)
     *Holloway v Chancery Mead Ltd* [2007] EWHC 2495 (TCC); [2008] 1 All
F         ER (Comm) 653
     *Leibinger v Stryker Trauma GmbH* [2006] EWHC 690 (Comm)
     *Sonatrach Petroleum Corpn (BVI) v Ferrell International Ltd* [2002] 1 All
          ER (Comm) 627
     *Sumitomo Heavy Industries Ltd v Oil and Natural Gas Commission* [1994] 1 Lloyd's
          Rep 45
     *XL Insurance Ltd v Owens Corning* [2001] 1 All ER (Comm) 530; [2000] 2 Lloyd's
G         Rep 500

     The following additional cases were cited in argument:

     *Abuja International Hotels Ltd v Meridien SAS* [2012] EWHC 87 (Comm); [2012]
          1 Lloyd's Rep 461
     *Deutsche Schachtbau-und Tiefbohrgesellschaft mbH v R'As as-Khaimah National
          Oil Co* [1990] 1 AC 295; [1987] 3 WLR 1023; [1987] 2 All ER 769; [1987]
H         2 Lloyd's Rep 246, CA
     *Naviera Amazonica Peruana SA v Cia Internacional de Seguros del Peru* [1988]
          1 Lloyd's Rep 116, CA
     *Svenska Petroleum Exploration AB v Government of the Republic of Lithuania
          (No 2)* [2005] EWHC 2437 (Comm); [2006] 1 All ER (Comm) 731; [2006]
          1 Lloyd's Rep 181

© 2013 The Incorporated Council of Law Reporting for England and Wales

108
Sulamérica SA v Enesa Engelharia SA (CA)                           [2013] 1 WLR
Moore-Bick LJ

arbitration would be ineffective and the injunction would have to be    A
discharged.

8    The judge held that the proper law of the arbitration agreement in this
case was English law, notwithstanding the express choice of Brazilian law as
the law governing the policies and the obvious connection of the policy to
Brazil. He considered at para 10 that the key question was the weight to be
given to the choice of London as the seat of the arbitration. He pointed out    B
that the choice of the seat of the arbitration determines the curial law and the
supervising jurisdiction of the courts of the country where the seat is located,
in this case England. That led him to the clear conclusion at para 15 that the
law with which the agreement to arbitrate had its closest and most real
connection was the law of England.

9    It was common ground before us, as it had been before the judge,
that the proper law of the arbitration agreement is to be determined in    C
accordance with the established common law rules for ascertaining the
proper law of any contract. These require the court to recognise and give
effect to the parties' choice of proper law, express or implied, failing which
it is necessary to identify the system of law with which the contract has the
closest and most real connection: see *Dicey, Morris & Collins, The Conflict
of Laws*, 14th ed (2006), para 16R-001. It was also common ground that    D
an arbitration agreement forming part of a substantive contract is
separable, in the sense that it has an existence separate from that of the
contract in which it is found.   That principle, which reflects the
presumption that the parties intended that even disputes about matters
which, if established, would undermine the intrinsic validity of the
substantive contract (such as fraudulent misrepresentation) should be    E
determined by their chosen procedure, has been given statutory recognition
by section 7 of the Arbitration Act 1996.  In *Fiona Trust and Holding
Corpn v Privalov* [2007] Bus LR 1719 the House of Lords re-emphasised
both the presumption that parties to a contract who have included an
arbitration clause intend that all questions arising out of their relationship
should be determined in accordance with their chosen procedure and the
separability of arbitration agreements which enables their intention to be    F
effective.

10    The insured's case is that the parties have impliedly chosen the law of
Brazil as the law governing the arbitration agreement.  In support of that
they rely on three principal factors: the express choice of the law of Brazil as
the law governing the policy, coupled with the agreement that the courts of
Brazil should have exclusive jurisdiction in respect of any disputes arising    G
under, out of, or in connection with the policy; the close commercial
connection between the policy and the state of Brazil (the parties, the subject
matter of the insurance and the currency of the policy all being Brazilian and
the language in which it is written being Portuguese); and the inclusion of a
provision, which is itself governed by the law of Brazil, requiring the parties
to attempt mediation as a precondition to any reference to arbitration.  Of
these, most emphasis was placed on the express choice of the law of Brazil to    H
govern the policy, but the insured also relied on the wider commercial and
legal context in which the arbitration agreement is set.  Although they
recognised that the parties had not made an express choice of proper law to
govern the arbitration agreement, they submitted that the judge had failed to