# EXHIBIT D
# Part V of V

456 F.Supp.2d 488
United States District Court,
S.D. New York.

Carl E. PERSON, Plaintiff,
v.
GOOGLE INC., Defendant.

No. 06 Civ. 4683(RPP). | Oct. 11, 2006.

**Synopsis**
**Background:** Advertiser, who sought to purchase ads on
Internet search engine, brought antitrust action against search
engine provider for its allegedly discriminatory pricing
scheme. Provider moved to dismiss for improper venue on
grounds that forum selection clause in advertising contract
required claim to be brought in California.

**Holdings:** The District Court, Robert P. Patterson, Jr., J., held
that:

[1] forum selection clause was enforceable, but

[2] transfer to Northern District of California was warranted.

Motion granted.

**Attorneys and Law Firms**

**\*490** Carl E. Person, New York City, Pro se.

Jonathan M. Jacobson, Meredith E. Kotler, Sara Ciarelli,
Wilson Sonsini Goodrich & Rosati, New York City, for
Defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

By motion dated July 27, 2006, Defendant, Google INC.
("Google"), moved to dismiss the Complaint pursuant to
Rules 12(b)(3) and 12(b)(6) of the Federal Rules of Civil
Procedure ("Fed. R. Civ.P.") all counts of Plaintiff, Carl E.
Person's ("Person"), Complaint for violation of Sections 1 and
2 of the Sherman Antitrust Act, the Donnelly Act, Sections

349(a) and 350 of New York's General Business Law, and
Section 16720 of the California Cartwright Act.

For the reasons that follow, Defendant's motion to dismiss for
improper venue is granted.

### BACKGROUND

**A. Procedural Posture**
Plaintiff filed a Complaint with the Court on June 19, 2006.
He filed a Motion for Preliminary Injunction on June 27,
2006. Defendant filed a Notice of Motion to Dismiss on
July 27, 2006. Plaintiff filed his Reply, along with a Cross–
Motion for Leave to Amend Complaint and Alternative
Cross–Motion to Transfer to California on August 3, 2006.
Defendant filed a Reply to Plaintiff's Cross–Motion on
August 31, 2006. Arguments on Defendant's Motion to
Dismiss were heard on September 13, 2006. Plaintiff moved
to amend his Complaint again on September 14, 2006.
His Motion to File an Amended Complaint was denied on
September 20, 2006.

**\*491** Count One of the Complaint charges Google with
monopolization or attempted monopolization, along with a
conspiracy to monopolize under Section 2 of the Sherman Act
(15 U.S.C. § 2). Count Two charges a conspiracy to fix prices
and restrain trade in violation of Section 1 of the Sherman Act
(15 U.S.C. § 1). Count Three alleges a conspiracy to restrain
trade in violation of New York's Donnelly Act (New York
General Business Law § 340). Counts Four and Five allege
deceptive acts and false advertising in violation of Sections
349(a) and 350 of the General Business Law of the State of
New York. Count Six alleges a conspiracy in violation of the
California Cartwright Act Section 16720.

**B. Parties**
Plaintiff, Person, is a 70–year–old attorney and
businessperson who lives in New York. He is running
for Attorney General in the November 2006 election.
(Pl.Compl.¶ 7.) Defendant is a Delaware Corporation with its
principal place of business in California, and with a place of
business in New York. (Id. ¶¶ 4, 9, 10.)

**C. Statement of Facts**
Google's internet search technology offers the world's largest
online index of websites and to anyone with an internet
connection, free of charge. Google derives its primary

revenue from businesses that advertise their products and services on its website. (*Id.* ¶ 11.) Thousands of advertisers pay Google to advertise their websites on its search page. (*Id.*) Google's AdWords program is used by businesses to promote their products and services with targeted advertising. (*Id.*) Ads appear either to the right of or above a searcher's displayed results on Google's main website; these ads are designated "sponsored." (*Id.* ¶ 23.) The ads are linked to certain keywords chosen by the advertisers. When a Google user searches for a particular term, only the ads linked to that term will appear in the sponsored section. (Pl.'s Mem. in Opp'n. to Def.'s Mot. to Dismiss at 20.) Advertisers are charged each time a user clicks the link that is displayed along with their advertisement. (*Id.*)

In August 2005, Google created its quality score analysis, which automatically evaluates whether or not to publish, and at what price to publish ads for businesses wishing to make use of a particular keyword. (Pl.Compl.¶ 31.) The quality score is based on a number of factors, including "ad text and click through rate (CTR) on Google, relevance of ... ad text, historical keyword performance on Google, the quality of [the business' ads] landing page and other relevancy factors," in particular the "content and layout of the page linked from [the proposed ad]." (*Id.*)

Plaintiff claims that Google uses these factors engages in order to maintain its monopoly over "keyword targeted internet advertising." (*Id.* ¶ 12.) Plaintiff is running for New York Attorney General in the November 2006 election and believes that, through advertising on Google, he can build a voter list of more than 100,000 New York residents. (Decl. of Carl E. Person ¶ 3, August 2, 2006.) He alleges that he has been thwarted in this quest by Defendant's discriminatory pricing scheme. (*Id.* ¶ 16.) He charges that there is a hidden set of rules and software instructions that deny Plaintiff and other small business users the ability to find and use any keywords at the advertised minimum prices. He alleges that these prices are reserved for high volume advertisers such as eBay! and other alleged co-conspirators. (*Id.* ¶ 25.) Plaintiff recently sought to take advantage of Google's offered minimum price-per-click by using \*492 keywords that no other advertiser was bidding on. He found 25 English words that when used in a search returned no advertisements. (*Id.* ¶ 54.) Plaintiff then immediately tried to bid on these words as keywords, but was advised by AdWords that these words were not available for keyword use. (*Id.* ¶ 55–6.) He alleges that this is due to a specific effort by Google to keep him from advertising on its website. (*Id.* ¶ 58.)

Plaintiff alleges that even though Defendant uses software to regulate the content and relevancy of the ads that are linked to particular keywords, the software is designed to overcharge its smaller customers (Plaintiff included), and reduce costs for high-volume advertisers. (Pl.Compl.¶ 18.) Plaintiff contends that Defendant uses its "quality score" to weed out advertisers that it believes will not be profitable to them. (Pl.Opp'n.Mem.7.) He claims that this subjective judgment directly contradicts Defendant's claim that the bidding process for keywords by advertisers is an "auction," in which bidders receive placement on Google's search page in relation to the price they bid, not the quality or relevance of their landing page. (*Id.* at 6.)

The Complaint further alleges that Defendant has conspired with its large-volume advertisers: eBay, Schwab & Co., John Hancock Life Insurance Co., Lexus, Honda, Travelocity, Orbitz, Priceline, Expedia, Circuit City, Amazon PriceGrabber, AOLShopping, Toshiba Direct, and Best Buy, among others, to "reduce not eliminate the profitable use of AdWords by the Plaintiff and other small businesses" (Pl.Compl.¶¶ 35–40), and that Defendant is able to do this without repercussion because its major competitors, Yahoo! and MSN, are "poor, undesirable substitutes." (*Id.* ¶ 30A.)

Defendant asserts that as a condition of using the AdWords program, all users, including Plaintiff, enter into a contract with a forum selection clause, and should be held to that contract. (Def.Mem.4.) Plaintiff does not dispute that he entered into such a contract. (Pl.Opp'n.Mem.4.) Because Defendant's motion to dismiss for improper venue is granted, the other grounds of its Motion to Dismiss will not be addressed.

## DISCUSSION

### A. Jurisdiction

The Court has original jurisdiction over the claims arising out of the Sherman Act. *See* 13 U.S.C. § 1337 ("The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."). The Court has jurisdiction over the state claims because there is diversity of citizenship between the parties, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

**B.** *Standard of Review*

A threshold issue for a motion to dismiss based on a forum selection clause is whether the motion should be considered under Rule 12(b)(3) or Rule 12(b)(6). The Second Circuit has produced no definitive ruling on the issue. *See New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 28 (2d Cir.1997) ("[N]o consensus [has] developed as to the proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause."). Here, the issue will be considered under Fed. Civ. P. Rule 12(b)(3) because that is how it was framed by the parties. *See J.B. Harris, Inc. v. Razei Bar Industries, Inc.,* 37 F.Supp.2d 186, 189 (E.D.N.Y.1998) ("The Court does not decide whether this issue might more properly have been raised by way of *493 Rule 12(b)(6), as the issue is squarely framed by Defendant under Rule 12(b)(3) and Plaintiff does not argue that this is an improper procedural mechanism.").

[1] [2] Upon a motion to dismiss under Rule 12(b)(3) the Plaintiff has the burden of pleading venue. However, "the Court accepts facts alleged in the complaint as true and draws all reasonable inferences in [plaintiff's] favor." *Caremark Therapeutic Servs. v. Leavitt,* 405 F.Supp.2d 454, 457 (S.D.N.Y.2005).

**C.** *Forum Selection Clause*

Defendant moves to dismiss based on a forum selection clause contained in a contract signed by all users of AdWords. (Def.Repl.Mem.1.) Initially, Defendant produced a copy of the current agreement. (*See* Decl. of Sarah Ciarelli Ex. A, July 27, 2006.) Plaintiff, however, objected that the 2006 agreement is not the same as the one he signed when he became an AdWords customer in 2003. (Pl.Opp'n.Mem.4.) In response, Defendant produced a copy of the contract users were asked to sign in 2003. Both contracts contain a forum selection clause stating that disputes or claims arising out of the contract are to be adjudicated in Santa Clara County, California.

Although Plaintiff now contends that the 2003 contract exhibited by Defendant may not be an exact replica of the one he signed, (he did not produce a copy of the contract he allegedly signed and did not allege that he would be able to do so if given the opportunity.) (*See* Transcript of Sept. 13, 2006 Hearing ("09/13 Tr.") 17–8 (THE COURT: "If you want more time to respond to the reply papers ... I would ... consider allowing you ... more time to file a surreply." MR. PERSON:

"Your Honor, I don't have any additional information than what I'm saying.").)

Furthermore, the only difference he claims between the contract Defendant's exhibit and the one he allegedly signed is that there were boxes on the latter for him to acknowledge his consent. (*Id.*) Plaintiff does not dispute that he signed an agreement in November, 2003. (*See id.* ("I went ahead and assented to whatever it was they gave me. I don't know what it was, but I did assent to it.").) Nor does he allege that the agreement he signed was different, in substance, from the 2003 contract exhibited by Defendant; he argues only that Defendant's proffered contract is not a copy of the specific agreement he signed. (*Id.* at 18.) However, prior to using AdWords, every customer must click on a box acknowledging that they agree to the terms and conditions of Defendant's contract. (Decl. of David DiNucci ¶ 5, August 31, 2006.) Thus, Plaintiff's very existence as an AdWords customer is evidence that he agreed to the 2003 form contract proffered by Defendant. Even given the generous factual standard applied on a Rule 12(b)(3) motion, without more from Plaintiff, it appears that the contract Plaintiff signed did indeed contain the forum selection clause appearing in the 2003 contract proffered by Defendant.

The mere existence of a contract with a forum selection clause is not the end of an inquiry into proper venue; these clauses must be examined for accuracy and fairness. Forum selection clauses were once uniformly rejected by the federal courts. They are now, however, uniformly upheld. As the Second Circuit has stated, aversion to such clauses is "simply a vestigial remainder of an outmoded doctrine." *Bense v. Interstate Battery Sys. of Am., Inc.,* 683 F.2d 718, 721 (2d Cir.1982).

[3] Forum selection clause language must, however, be mandatory to be enforced. *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distrib.,* *494 *Inc.,* 22 F.3d 51 (2d Cir.1994). In *Boutari,* the Second Circuit overturned a dismissal based on a forum selection clause giving the courts of Greece jurisdiction because that contract could be read to permit, rather than insist on, Greece as a venue. *Id.* at 53. However, the court made clear that where, as here, "mandatory venue language is employed, the clause will be enforced." *Id.* The contract from 2003, at issue here, states that "[any] dispute or claim arising out of or in connection with this Agreement *shall* be adjudicated in Santa Clara County, California." (DiNucci Decl. Ex. B Sec. 15 (emphasis

added).) Thus, it is clear that the venue clause at issue in this case was meant to be mandatory rather than permissive.

**[4]**   According to the Supreme Court, mandatory forum selection clauses "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Second Circuit has made clear that reasonableness will be presumed unless the plaintiff can make a strong showing otherwise. This "presumption of validity" regarding a forum selection clause can only be overcome:

> (1) if [the clause's] incorporation into the agreement was the result of fraud or overreaching ...; (2) if the complaining party "will for all practical purposes be deprived of his day in court," due to the grave inconvenience or unfairness of the selected forum ...; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy ...; or (4) if the clauses contravene a strong public policy of the forum state.

*Roby v. Corporation of Lloyds*, 996 F.2d 1353, 1363 (2d Cir.1993) (quoting *M/S Bremen*, 407 U.S. at 18, 92 S.Ct. 1907).

### 1. Fraud or Overreaching

**[5]   [6]**   Plaintiff's sole claim of contractual fraud is his allegation of false advertising by Defendant. (Pl.Compl.¶¶ 152–58.) He claims that calling the process by which AdWords' customers obtain keywords an "auction" is misleading because it fails to acknowledge the subjective component of Defendant's selection of ads. (Pl.Opp'n.Mem.20.) In other words, Plaintiff claims he was seduced into doing business with defendant based on a false claim of an auction process, characterized by objective awards based solely on bidding price. *Id.* Even if Plaintiff could make out a colorable claim of false advertising, which he cannot,[1] the fraudulent actions capable of overcoming the presumption of validity for a forum selection clause must be directly related to that clause, not the contract more generally. *See A.I. Credit Corp. v. Liebman*, 791 F.Supp. 427, 430 (S.D.N.Y.1992)("A party may not, however, avoid the effect of a forum selection clause by merely alleging fraud or coercion in the inducement of the contract at issue. Rather, the party must show that 'the inclusion of that clause in the contract was the product of fraud or coercion.' ") (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)(emphasis in

the original)). Plaintiff does not claim that the inclusion of the forum selection clause in the AdWords agreement was the product of fraud. He **\*495** has not met that ground for rejecting the forum selection clause.

**1**   Defendant produced a printout from its AdWords website, which made quite clear that the bidding process for keywords was not a typical auction, and that the awarding of keywords was based on an examination of the relevance of the chosen word to the advertiser's website, the advertiser's click through rate, and several other factors. (*See* Ciarelli Decl. at Ex. B.) Thus, it does not appear that Plaintiff was misled, by the suggestion that he was entering a typical auction, into doing business with Defendant.

### 2. Deprivation of Plaintiff's Day in Court

**[7]**   Plaintiff claims that dismissing this case for improper venue will deprive him of his right to a meaningful hearing because he is running for Attorney General of New York in November 2006 and needs to compile a voter list in advance of his election bid. (Person Decl. ¶¶ 3–6.) He alleges that he brought this case in New York because it is where he lives, and is a more convenient forum. While Plaintiff's urgency is understandable, it does not rise to the level of deprivation meriting a refusal to honor a forum selection clause. *See Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 11 (2d Cir.1995) (Plaintiff's allegations of inconvenience of Greece as forum did not "deprive [plaintiff] her day in court within the traditional meaning of the ... phrase."); *Olsen v. Muskegon Piston Ring Co.*, 117 F.2d 163, 165 (6th Cir.1941) ("[T]he right to a day in court means not the actual presentation of the case, but the right to be duly cited to appear and to be afforded an opportunity to be heard.").

Plaintiff does not assert that he was unable to initiate this suit in California. He claims only that New York is a more convenient forum and that there is urgency to his Complaint. However, as stated in his Complaint, Plaintiff has been a customer of AdWords since 2003, and Defendant has been using its allegedly discriminatory pricing scheme since at least December 2005. (Pl.Compl.¶ 8, 32.) Plaintiff did not bring this suit until June 2006. In view of his failure to act promptly, he cannot now allege that it would be this court's dismissal for improper venue that denied him his urgent remedy.[2] Furthermore, he is seeking damages as well as injunctive relief. (*Id.* ¶ 97–8.) His damages claim will remain viable even after the election has taken place.

2   A definitive ruling on Defendant's 12(b)(6) motion
    would similarly fail to meet Plaintiff's time table given
    the multiple claims he has asserted and his desire to
    amend his complaint for a second time. (*See* Letter of
    September 18, 2006 (requesting leave to file a second
    amendment).)

### 3. *Fundamental Fairness*

**[8]   [9]**   Plaintiff alleges that he assented to the agreement,
only because it was a prerequisite to becoming an AdWords
user. Unlike the contracts at issue in *Bremen,* and *Roby,*
the AdWords contract is not the product of an arms-length
negotiation. Instead it is an agreement that was drawn
up entirely by Defendant, and signed by every AdWords
customer. Plaintiff alleges that the agreement is a "contract
of adhesion." (*See* 09/13 Tr. 25 ("THE COURT: You're arguing
it's a contract of adhesion." MR. PERSON: "I'm sorry, yes,
adhesion, a contract of adhesion.").) Such contracts require
a more "refined" scrutiny for fairness. *See Carnival Cruise
Lines, Inc. v. Shute,* 499 U.S. 585, 593, 111 S.Ct. 1522, 113
L.Ed.2d 622 (1991) ("In evaluating the reasonableness of the
forum clause at issue in this case, we must refine the analysis
of The Bremen to account for the realities of form passage
contracts.").

According to the Second Circuit, "[t]ypical contracts of
adhesion are standard-form contracts offered by large,
economically powerful corporations to unrepresented,
uneducated, and needy individuals on a take-it-or-leave-it
basis, with no opportunity to change the contract's terms."
*Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d
Cir.1997). It should be noted at the outset that Plaintiff does
not match **\*496** the picture of a victim of a contract of
adhesion painted by the Second Circuit. He cannot claim
to be "unrepresented, uneducated and needy" since he is an
experienced lawyer, who, as is clear from his complaint and
supporting memorandum, is highly intelligent and should
be well able to understand the terms of a form contract.
Google, on the other hand, is certainly a large, economically
powerful company. Moreover, as mentioned earlier, in order
to do business of any kind with AdWords, a user must
sign an agreement drafted entirely by Defendant. Thus, it
is appropriate in this dispute to treat this contract as one
of adhesion, and scrutinize it more carefully to ensure the
fairness of the forum choice.

As Judge Baer noted in *Caremark,* "[a]ny review of a
forum selection clause for 'fundamental fairness' must begin
with the seminal case of *Carnival Cruise Lines, Inc.*" 385

F.Supp. at 198. In *Carnival,* the Supreme Court dealt with
a forum selection clause included on a passenger ticket
for a commercial cruise. The Court disapproved of the
language in the lower court opinion, which stated that
a "nonnegotiated forum-selection clause in a form ticket
contract is never enforceable simply because it is not the
subject of bargaining," *id.* at 593, 111 S.Ct. 1522. The Court
ruled that the terms of the forum selection clause were
"subject to judicial scrutiny for fundamental fairness." *Id.* at
595, 111 S.Ct. 1522. Among the factors the Court considered
were (i) whether or not Carnival Cruise was forum shopping
when it selected Florida as a venue; (ii) whether or not the
passenger's assent to the contract was the product of "fraud or
overreaching" and; (iii) whether the passengers had notice of
the forum selection clause. *See id.*

#### a. *Forum Shopping*

Plaintiff contends that Defendant selected the forum because
they believe it will give them an edge in antitrust litigation
—that they are, in essence, forum shopping. (*See* Pl. Opp'n.
Mem. at 4 ("Google ... effectively select[s] its judge in
antitrust cases.").) Plaintiff, however, presents no reason to
believe that federal judges in California have any reason to
be prejudiced in favor of Defendants. He only asserts that
Google's headquarters are located in the area. The fact that
Defendant is located in California suggests another, highly
plausible, reason why it would include a forum selection
clause—in order to locate the myriad suits inevitably brought
against a such a sizeable company in a single, convenient
forum. *See Carnival Cruise,* 499 U.S. at 595, 111 S.Ct. 1522
(forum shopping claim belied by the fact that "Petitioner has
its principal place of business in Florida.").

Furthermore, Plaintiff has requested a transfer to the Northern
District of California should the motion to dismiss for
improper venue be granted. (Pl. Opp'n. Mem. at 25.).
Apparently, he has not reached the conclusion that the courts
in California will decide in favor of Defendant if he wishes to
pursue his complaint there.

#### b. *Fraud or Overreaching*

As indicated above, Plaintiff has made no claim of fraud or
overreaching in obtaining his assent to the forum selection
clause.

#### c. *Notice*

**Person v. Google Inc., 456 F.Supp.2d 488 (2006)**

2006-2 Trade Cases P 75,448

Finally, there is no indication that Plaintiff did not have notice that the forum for suits against Defendant were to be brought in Santa Clara County. In order to do business with AdWords, Plaintiff had to assent to the terms of its contract. (*See* DiNucci Decl. ¶ 5 ("Before an advertiser's account will be activated, the advertiser **\*497** [must agree to] the AdWords agreement.").) By clicking on a link, a user is taken to the agreement before assenting to its terms. *Id.* In *Carnival*, passengers were not notified of the terms of the agreement until they had their ticket in hand since the agreement was the ticket. *See* 499 U.S. at 587, 111 S.Ct. 1522 ("The face of each ticket, at its left-hand lower corner, contained [the forum selection clause]."). Here, Plaintiff had more notice than the *Carnival* plaintiffs did since he had an opportunity to view and reject Defendant's terms before spending any money with AdWords.

Scrutiny of the contract between Plaintiff and Defendant does not uphold Plaintiff's allegations of unfairness.

**4. *Against Public Policy of Forum***

[10] The Supreme Court has said that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Bremen,* 407 U.S. at 18, 92 S.Ct. 1907. It is clear, from Second Circuit precedent, however, that far from being against public policy in this Court's jurisdiction, forum selection clauses are considered "presumptively valid." *Roby,* 996 F.2d at 1363. Thus, the fourth factor of the test for reasonableness is also resolved in Defendant's favor.

**5. *Conflict with Anti–Trust Laws***

[11] Finally, Plaintiff claims that allowing Defendant to contractually designate a forum for antitrust claims, such as this one, will "emasculate the federal statutes providing antitrust plaintiffs with a greater choice of venue than provided to plaintiffs in other types of cases." (Pl.Opp'n.Mem.4–5.) However, the Second Circuit has addressed this point directly and decided to the contrary in *Bense,* 683 F.2d 718. There, the plaintiff argued that the "congressional purpose underlying the broad venue provision of [federal antitrust laws] was to promote vigorous private enforcement of the antitrust laws, and he contend[ed] that

this precludes enforcement of contractual forum-selection clauses." *Id.* at 720. The Second Circuit was not persuaded by this argument, noting in particular that "[the plaintiff] ... [has] made no showing that his antitrust action could not be prosecuted as vigorously in Texas as in Vermont, nor has he demonstrated that the Congressional purpose would be subverted by enforcement of forum-selection clauses." *Id.*

Similarly, here, Plaintiff has made no showing that a federal court in California would be less likely to give credence to his claims than a court in New York, nor has he shown that the forum selection clause at issue in this case tends to subvert the purpose of federal antitrust enforcement.

**D. *Plaintiffs' Cross Motion to Transfer***

[12] In his reply to Defendant's Motion to Dismiss, Plaintiff cross motions the Court to transfer his Complaint to the Northern District of California, pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). (Pl.Opp'n.Mem.25.) Defendant contends that Plaintiff's method of raising this issue was not proper. (*See* Def. Repl. Mem. 3 n. 1. (Claim presented without "any formal motion papers ... evidence nor argument in support of ... motion."))

Even if Defendant's allegation is true, it is immaterial. Courts dismissing for improper venue can transfer a complaint without motion from either party "in the interest of justice." 28 U.S.C. § 1406(a). The Second Circuit has stated that "[c]ourts enjoy considerable discretion when deciding whether to transfer a case in the interests of justice." *Daniel v.* **\*498** *American Bd. of Emergency Medicine,* 428 F.3d 408, 435 (2d Cir.2005). However, a court should not "waste judicial resources by transferring a case that is clearly doomed." *Id.* at 436 (quoting *Phillips v. Seiter,* 173 F.3d 609, 610 (7th Cir.1999)). Though it does appear that Plaintiff's claims will be difficult to sustain, it does not appear that they are "clearly doomed." Thus, the dispute is hereby transferred to the Northern District of California at San Jose, which is in Santa Clara County, the forum selected by the contract.

IT IS SO ORDERED.

**Parallel Citations**

2006-2 Trade Cases P 75,448

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## LIST OF SURAL(BARBADOS) LIMITED/GORTT
## WITNESSES AND PERSONS OF INTEREST

| NAME | ORGANIZATION | Position |
|---|---|---|
| Awong, Keith | The National Gas Company of Trinidad and Tobago Limited Orinoco Drive, Point Lisas Industrial Estate, Couva | Chairman, former member of Alutrint Board of Directors and now deceased |
| Bernard, Adrian | Alutrint | Manager, Finance & Administration of Alutrint |
| Butler, Renda | Sural Barbados Limited | Member of Alutrint board, Managing Director of Alutrint until October 2008 |
| Enill, Conrad | Ministry of Energy and Energy Industries International Waterfront Tower C, Level 25 No. 1 Wrightson Road Port of Spain | The Minister |
| Julien, Kenneth S | Natural Gas Export Task Force | Chairman of National Energy Corporation; Chairman of Natural Gas Export Task force; member of Standing Committee on Energy until May 2010 |
| Julien, Philip | | Former CEO of Alutrint Limited |
| Lewis, Alison | Ministry of Finance | Former Permanent Secretary at Ministry of Finance and Board member of Alutrint Limited |
| Manning, Patrick | | Former Prime Minister until May 2010 |
| Mayers, Leroy | Ministry of Energy | Former Permanent Secretary at Ministry of Energy & Energy Affairs |

| NAME | ORGANIZATION | Position |
|---|---|---|
| | | and Board Member of Alutrint Limited |
| Murray, Colleen | Alutrint | Former Corporate Secretary of Alutrint Limited |
| Palmieri, Marco Antonio | Votorantim Metais Ltd Parca Ramos de Azevedo 254-6 Aandar 01037-912 Sao Paulo Brazil | Head of Business Development for Votorantim in the period 2008-2010 |
| Preziosi, Alexander | Viso Rodriguez Cottin, Medina Ramirez & Associates Caracas, Venezuela | Board Member of Alutrint replaced Renda Butler in late 2011; Counsel for Sural in Venezuela |
| Ramlogan, Anand | Ministry of the Attorney General in Trinidad | Senator and present Attorney General of Government of Trinidad and Tobago from May 2010 |
| Riviere, Alfredo | Indirect owner of Sural (Barbados) Limited as CEO of Quantex Financial Ltd c/o Sural C.A. | Sural (Barbados) Limited Claimant, CEO of Sural Group; member of Board of Alutrint Limited |
| Santos, Sergio | Votorantim | |
| Silva, Joao Bosco | Votorantim Metals | CEO |
| Singh, Stephen | Johnson, Camacho & Singh 10 Sweet Briar Road, 1st floor St. Clair Trinidad, West Indies | Sural's counsel in Trinidad |

Westlaw.uk

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

**H**
Motions, Pleadings and Filings

Judges, Attorneys and Experts

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
PLASTIC SUPPLIERS, INC., Plaintiff,
v.
CENVEO, INC., Defendant.

Civ. Action No. 3:10–CV–0512 (TJM/DEP).
Jan. 20, 2011.

Archer & Greiner, P.C., Christopher Gibson, Esq.,
John R. Powers, III., Mark J. Obertstaedt, Esq., of
Counsel, Haddonfield, NJ, Hinman, Howard Law
Firm, Leslie Prechtl Guy, Esq., Dawn J. Lanouette,
Esq., of counsel, Binghamton, NY, for Plaintiff.

King & Ballow, Richard S. Busch, Esq., of Counsel,
Nashville, TN, Harris, Beach, PLLC, Mark B.
Wheeler, Esq., Russell E. Maines, Esq., of Counsel,
Ithaca, NY, for Defendant.

*DECISION AND ORDER*
DAVID E. PEEBLES, United States Magistrate
Judge.
*1 Plaintiff Plastic Suppliers Inc. ("PSI") has
commenced this action against defendant Cenveo,
Inc. ("Cenveo"), alleging breach of contact and
asserting diversity of jurisdiction as a basis for this
court's jurisdiction, pursuant to 28 U.S.C. § 1332.
PSI maintains that Cenveo entered into a contract to
purchase polystyrene and polyactic films from the
plaintiff for use in windowed mailing envelopes, but
has since wrongfully repudiated the agreement.

Neither the parties nor the operative facts giv-
ing rise to plaintiff's claims has any material con-
nection with this district.[FN1] Yet, PSI brought suit
here based on a forum selection provision within the
contract at issue, in which both parties agreed that
any claim related to the agreement must be brought
in a state or federal court located in New York, and
its assessment that the action can be litigated effi-
ciently and economically in this district.

> FN1. Cenveo does operate a plant in
> Conklin, New York, and thus within this
> district. The facility, however, does not
> manufacture product related to this suit,
> nor does it have any other connection with
> the parties' dispute.

Currently pending before the court is Cenveo's
motion requesting that the action be transferred to
the Southern District of New York, pursuant to 28
U.S.C. § 1404(a). Consideration of the factors in-
forming the analysis of whether a transfer of the
action is appropriate under that section weighs in
favor of granting the motion, though not apprecia-
bly. Nonetheless, because Cenveo has consented to
have the action brought here, and the Southern
District of New York also has little, if any, mean-
ingful connection with the action, I find no basis to
disturb plaintiff's choice of forum, and will therefore
deny the pending motion.

*I. BACKGROUND*
PSI is a New Jersey corporation with head-
quarters in Columbus, Ohio. The plaintiff is one of
only three domestic manufacturers of polystyrene
films for use in mailing envelopes. Plaintiff has a
number of manufacturing facilities throughout the
United States; none of those, however, is located in
New York, although it does operate a manufacturing
plant in relatively-nearby Mount Laurel, New Jer-
sey.[FN2]

> FN2. Defendant calculates the distance
> from that plant to New York City to be
> slightly over eighty miles. *See* Christ Decl.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

(Dkt. No. 30–2) ¶¶ 10–11.

Defendant Cenveo is a Colorado corporation with principal corporate offices located in Stamford, Connecticut, and is one of only four major domestic envelope manufacturers that purchase polystyrene and polyacetic acid envelope films in the United States. Like PSI, Cenveo similarly operates several manufacturing plants, including one located in Jersey City, New Jersey. [FN3]

> FN3. Cenveo's Jersey City facility is located approximately seven miles from the Southern District of New York's Manhattan courthouse. Christ Decl. (Dkt. No. 30–2) ¶ 13.

In or about the summer of 2009 Cenveo began purchasing plastic window films from PSI. Prior to that time defendant acquired the bulk of its plastic window films from DOW Chemical, Inc., one of plaintiff's competitors. Following negotiations, the parties ultimately entered into a contract in or about November of 2009 under which Cenveo agreed to purchase eighty percent of its film requirements from plaintiff through 2010, and ninety-eight percent thereafter for the remaining life of the contract, which was to expire on December 31, 2012. Included within the contract was a provision granting an option to Gould Paper Corporation ("Gould") to purchase products from PSI on behalf of Cenveo.

*2 The November 2009 supply agreement was later superseded by another executed in February 2010 and containing terms identical to those of its predecessor. Under both contracts the parties reached the following agreement with regard to both jurisdiction and the applicable law to govern any disputes arising under them:

> Section 10. *Governing Law; Jurisdiction.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law rules of such state. Any controversy or claim arising out of or relating to this Agreement shall be brought

exclusively in the state or federal courts located in the State of New York, the jurisdiction of which the parties hereto irrevocably consent to.[FN4]

> FN4. Although neither party makes reference to it, attached to the Supply Agreement as Exhibit A is a document entitled "Supplier Standard Terms", Dkt. No. 1–2, containing a section which provides, in pertinent part, that "[t]he validity, performance, construction and effect of this Invoice shall be governed by the law of the State of New Jersey. Any dispute arising out of or related to the Products of this Invoice shall be resolved exclusively in the sate [sic] or federal courts of New Jersey, the exclusive jurisdiction of which Buyer irrevocably consents to for this purpose...."

At some point during the course of performance under the terms of these two agreements a dispute arose between the parties concerning the quality of plaintiff's product. According to the plaintiff, Cenveo has disavowed the contract and turned to a competitor to supply its envelope film, and with the exception of small purchases of a type of film not available from other suppliers, Cenveo has not placed any orders under the agreements since April of 2010.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 30, 2010. Since that time issue has been joined, a conference has been conducted by the court in connection with the action pursuant to Rule 16 of the Federal Rules of Civil Procedure, and a Uniform Pretrial Scheduling Order ("UPSO") has been issued governing the progression of the case.[FN5] Dkt. No. 27.

> FN5. Under the terms of the court's UPSO discovery must be completed by June 24, 2011, and dispositive motions are to be filed by July 29, 2011. *See* Dkt. No. 27. The UPSO also establishes a deadline for mediation, as well as a jury trial date of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

December 5, 2011. *Id.*

On November 9, 2010, defendant Cenveo filed a motion seeking a transfer of the action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). That motion, which is now fully briefed, was argued before me on January 7, 2011, at which time decision in connection with the motion was reserved. [FN6]

> FN6. Since a venue transfer is regarded as a non-dispositive matter, it is considered as falling within the scope of my jurisdiction as a magistrate judge under 28 U.S.C. § 636(b)(1)(A). *See White Mop Wringer Co. of Canada Ltd. v. BT Capital Partners, Inc.,* No. 95–CV–565, 1997 WL 222380, at *1 (N.D.N.Y. Apr. 29, 1997) (Pooler, J .); *Pemrick v. Stracher,* No. 90–CV–849, 1992 WL 697636, at *1 (N.D.N.Y. Mar. 27, 1992) (McAvoy, C.J.); *see also Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.,* No. CV 99–2491, 2000 WL 33155640 (E.D.N.Y. Sept. 15, 2000) (decision of magistrate judge ordering a venue transfer under section 1404(a)); *Tenen v. Winter,* 15 F.Supp.2d 270 (W.D.N.Y.1998) (decision by district judge affirming the order of a magistrate judge denying a motion for a change of venue).

## III. *DISCUSSION*

The statutory provision under which defendants' venue transfer motion is brought allows that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). As the latter portion of that provision implies, as a threshold matter in order to transfer a case under section 1404(a) the court must find that the proposed transferee court has the ability to exercise personal jurisdiction over the defendants, and additionally that venue is appropriate in that forum. *Oriska Ins. Co. v. Brown & Brown of Texas,*

*Inc.,* No. 02–CV–578, 2005 WL 894912, at *4 (N.D.N.Y. Apr. 8, 2005) (Hurd, J.) (citations omitted); *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y.1991) (citations omitted).

In this instance, the language of the governing forum selection clause makes clear that the parties have agreed to submit to personal jurisdiction anywhere in New York. *Rescuecom Corp. v. Chumley,* 522 F.Supp.2d 429, 443 (N.D.N.Y.2007) (the use of the words "exclusive jurisdiction" have been specifically recognized as including consents to jurisdiction) (citation omitted). It also seems clear that venue would be appropriate in the Southern District, since the forum selection clause does not specify venue, but instead generally provides for an action to be brought in New York.

*3 Having found that the proposed transferee court is an appropriate forum for adjudication of this claim, the court must next determine whether a transfer to that jurisdiction is warranted. Motions for transfer under section 1404(a) are addressed to the sound discretion of the court, and are informed by overarching notions of convenience and fairness. *Linzer v. EMI Blackwood Music, Inc.,* 904 F.Supp. 207, 216 (S.D.N.Y.1995) (citations omitted). The burden of demonstrating the desirability of a transfer lies with the moving party; in considering such a motion, a court should not disturb a plaintiff's choice of forum unless the defendant makes a "clear and convincing" showing that the balance of convenience weighs strongly in favor of defendant's choice of venue. [FN7] *Id.* at 216–17 (citations omitted); *see also Excelsior College v. Frye,* 306 F.Supp.2d 226, 231 (N.D.N.Y.2004).

> FN7. Although an important consideration, it should be noted that plaintiff's choice of forum is far less outcome determinative in the analysis under section 1404(a) than it was under the doctrine of *forum non-conveniens. See Meteoro Amusement Corp. v. Six Flags,* 267 F.Supp. 263, 279 (N.D.N.Y.2003) (McCurn, J.) (citing, *inter*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

*alia, Pelligrino v. Stratton Corp.,* 679
F.Supp. 1164, 1167 (N.D.N.Y.1988)).

The factors generally identified by the courts as
relevant when addressing a section 1404(a) transfer
motion include 1) the place where the operative
facts occurred; 2) convenience of the parties; 3) the
convenience of witnesses; 4) the relative ease of
access to sources of proof; 5) the availability of
process to compel attendance of unwilling wit-
nesses; 6) the plaintiff's choice of forum; 7) the
forum's familiarity with the governing law; and 8)
trial efficiency and the interests of justice.[FN8] *Via-
com,* 774 F.Supp. at 867–68 (citations omitted); *see
Excelsior College,* 306 F.Supp.2d at 231.

> FN8. Some cases also cite the relative
> means of the parties as an additional con-
> sideration. *Indymac Mortgage Holdings,
> Inc. v. Reyad,* 167 F.Supp.2d 222, 239–40
> (D.Conn.2001). Although courts can con-
> sider the relative means of parties, this
> factor is not entitled to great weight where
> plaintiff and defendant are both corpora-
> tions." *Toy Biz, Inc. v. Centuri Corp.,* 990
> F.Supp. 328, 331 (S.D.N.Y 1998). Addi-
> tionally, "[a] party arguing for or against a
> transfer because of inadequate means must
> offer documentation to show that transfer
> (or lack thereof) would be unduly bur-
> densome to his finances." *Federman As-
> socs. v. Paradigm Medical Indus., Inc.,* No.
> 96 Civ. 8545(BSJ), 1997 WL 811539, at *4
> (S.D.N.Y. Apr. 8, 1997) (citations omit-
> ted); *see also Orb Factory, Ltd. v. Design
> Science Toys, Ltd.,* 6 F.Supp.2d 203, 210
> (S.D.N.Y.1998) ("[W]here proof of such
> disparity is not adequately provided, or
> does not exist, this is not a significant fac-
> tor to be considered.") (citation omitted).
> Here, there is no argument made concern-
> ing the relative means of the parties.

The core determination to be made under sec-
tion 1404(a) involves identifying the center of
gravity of the litigation; a key component of that

inquiry is focused upon the convenience of wit-
nesses. *Viacom,* 774 F.Supp. at 868 (citations
omitted). Courts routinely transfer cases when the
principal events occurred, and accordingly the key
witnesses are located, in another district. *Id.* (citing
*Computer Horizons Corp. v. Knauer,* 483 F.Supp.
1272 (S.D.N.Y.1980)). Where the operative facts of
the case have little connection with the district
where the suit is pending, the importance of the
plaintiff's forum choice as a factor is considerably
lessened. *Id.*

Consideration of the relevant section 1404(a)
factors weighs somewhat, though not markedly, in
favor of the Southern District. The parties' submis-
sions provide little information concerning the locus
of the operative facts in this case, although it appears
clear that few, if any, occurred in the Northern Dis-
trict of New York. While there apparently were
some business discussions held between the parties
in New York City, the record does not disclose
where the contract was actually negotiated and ex-
ecuted. Convenience of the parties does not appear
to be a strong consideration since although the
Southern District of New York is slightly more
proximate to Stamford, Connecticut, where Cenveo
has its headquarters and some of its potential wit-
nesses are located, it does not appear that the
Northern District of New York would be materially
less convenient for them. Party and witness con-
venience does not appear to be a consideration for
the plaintiff, which has not identified any of its
witnesses located in either district now under con-
sideration.[FN9]

> FN9. Acknowledging that courts are re-
> luctant to transfer venue where it would
> merely shift the inconvenience from one
> party to the other, *Wagner v. New York
> Marriott Marquis,* 502 F.Supp.2d 312, 316
> (N . D.N.Y.2007), defendant asserts that
> plaintiff cannot argue that its witnesses
> would be inconvenienced by the transfer.

*4 Turning to convenience of the witnesses, it is
said that this is "probably the single-most important

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
**(Cite as: 2011 WL 196887 (N.D.N.Y.))**

factor in the analysis of whether transfer should be granted." *In re Bennett Funding Group, Inc.,* 259 B.R. 243, 249 (N.D.N.Y.2001) (citation omitted). "While the convenience of party witnesses is a factor to be considered, the convenience of non-party witnesses is the more important factor." *Aquatic Amusement Assocs., Ltd. v. Walt Disney World Co.,* 734 F.Supp. 54, 57 (N.D.N.Y.1990) (citation omitted). In weighing the convenience of witnesses, courts should consider both the number of witnesses located in a given venue and the relative salience of their prospective testimony. *See Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.,* 415 F.Supp.2d 370, 373 (S.D.N.Y.2006) (stating "the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide") (internal quotation marks and citation omitted).

In this case, the key Cenveo witnesses all appear to be located in Connecticut, and thus closer to the Southern District of New York than to this district. It also appears that many of the quality issues leading to Cenveo's repudiation of the contract were experienced at Cenveo's Jersey City plant, and it is therefore presumably more convenient for witnesses from that facility to travel to the Southern District of New York for trial. There is also some potential involvement of non-party witnesses in the action, including principally those from Gould, located in New York City. Convenience of non-party witnesses is thus a factor which weighs in favor of transfer.[FN10]

> **FN10.** It is doubtful, however, that if the case remains in this district and Gould witnesses are deposed and/or called for trial they will suffer significant inconvenience. In terms of deposition, the governing rules provide that as a non-party no Gould witness can be forced to appear for deposition involuntarily more than one hundred miles from where he or she resides, is employed or regularly transacts business in person. *See* Fed.R.Civ.P. 45(c)(3)(A) (ii).

For much the same reason as was previously

discussed, ease of access to sources of proof does not appear to heavily favor either of the districts under consideration in this case. The availability of process to compel attendance of unwilling witnesses, including notably those from Gould, does not appear to be a determining factor since under Rule 45 a witness from New York City can be subpoenaed for a trial in the Northern District of New York. *See* Fed.R.Civ.P. 45(b)(2)(C) and 45(c)(3)(A)(ii). Similarly, familiarity with governing legal principles does not appear to play a role in the section 1404 calculus, since judges in both districts are presumably familiar with and equally capable of applying New York law concerning contracts.

In terms of trial efficiency, in opposing Cenveo's motion plaintiff has argued that the Southern District of New York is a congested court, citing older cases, some of which characterize "the Southern District of New York [as] the busiest judicial district in the nation." *Kanbar v. U.S. Healthcare, Inc.,* 715 F.Supp. 602, 606 (S.D.N.Y.1989); *see also Coker v. Bank of America,* 984 F.Supp. 757, 768 (S.D.N.Y.1997). It also attaches to its opposition papers statistics indicating that there are 26,245 cases pending in the Southern District in 2009, and only 2,577 pending in the Northern District. Analysis of publically available data, however, reflects that there is no material difference in terms of court congestion and disposition times between the two districts, particularly when considering the length of time from filing to trial.[FN11]

> **FN11.** According to statistics maintained by the Administrative Office of the United States Courts, for the twelve month period ending September 30, 2009 the average time from filing to trial in a civil case was 31 months in this district, as opposed to 31.4 in the Southern District of New York.

**\*5** As can be seen, this district has no connection with the parties and operative facts in this case, and consideration of the relevant factors weighs

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

slightly in favor of a transfer to the Southern District of New York. In this case, however, the question of whether the action should be transferred is complicated by the existence of a forum selection provision under which the parties have consented to jurisdiction in the state and federal courts of New York. "The presence of a [valid and enforceable] forum-selection clause ... [in a case] will be a significant factor that figures centrally in the district court's calculus [when deciding a motion to transfer venue under 28 U.S.C. § 1404(a) ]." *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 2244. This is because, as the Supreme Court has explained, "[t]he flexible and individualized analysis Congress prescribed in § 1404(a) ... encompasses consideration of the parties' private expression of their venue preferences." *Id.* at 29–30, 108 S.Ct. at 2244. The practical effect of the presence of a valid forum selection clause is to "put[ ] a greater burden on the party seeking to transfer the case." *Elite Parfums, Ltd., v. Rivera,* 872 F.Supp. 1269, 1272 (S.D.N.Y.1995); *see also A.I. Int'l Corp. Holdings, Inc. v. Surgicare, Inc.,* No. 03 Civ. 2481, 2003 WL 22705128, at *3–4 (S.D.N.Y. Nov. 17, 2003) (citing *Elite Parfums)* (requiring more than "[m]ere inconvenience and expenses of traveling" where forum selection clause is present on motion to transfer venue; requiring presence of "exceptional circumstances").

"Forum selection clauses are presumptively enforceable, and will be enforced unless the party seeking to avoid the designated forum shows: (1) fraud or coercion in the incorporation of the clause, (2) denial of the complaining party's day in court, due to the grave inconvenience of the selected forum or the fundamental unfairness of the chosen law, or (3) frustration of a strong public policy of the forum." *Rich Corp. v. M/V "Ming Plenty",* No. 01 CIV 6268, 2002 WL 109576, at * 2 (S.D.N.Y. Jan. 25, 2002) (citation omitted).

In its reply, defendant seems to suggest that because it asserts the contract as a whole is unenforceable, the forum selection clause is likewise unenforceable and should be given no weight in the court's consideration of this motion. This argument, however, is contrary to the law. *A.I. Credit Corp. v. Liebman,* 791 F.Supp. 427, 430 (S.D.N.Y.1992) (quoting *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913 (1972)) ("A party may not, however, avoid the effect of a forum selection clause merely by alleging fraud or coercion in the inducement of the contract at issue. Rather, the party must show that *'the inclusion of that clause in the contract was the product of fraud or coercion.' "*) (emphasis in original).

Indisputably, a forum selection clause agreed to by the parties should be given significant weight when deciding a motion to transfer such as that now before the court. *Elite Parfums, Ltd.,* 872 F.Supp. at 1272 (quoting *Stewart Org., Inc.,* 487 U.S. at 29, 108 S.Ct. at 2243). The circumstances now before the court, however, present a close case. As has been noted, the case has no tangible connection with this district. To be sure, "[t]here is no requirement that there ... be a substantial nexus between the chosen forum and the claim for the choice of forum to receive deference; rather there must be some material relation." *Race Safe Sys., Inc. v. Indy Racing League,* 251 F.Supp.2d 1106, 1111 (N.D.N.Y.2003) (internal quotation marks and citation omitted). However, such deference should not be strictly applied in a case "where none of the operative facts of the action occur in the forum selected by the plaintiff." *Wagner v. New York Marriott Marquis,* 502 F.Supp.2d 312, 317 (N.D.N.Y.2007) (quoting *Fitzgerald v. Central Gulf Steamship Corp.,* 292 F.Supp. 847, 849 (E.D.Pa.1968)) (internal quotation marks omitted). Similarly, a plaintiff's choice of forum will be accorded less weight when it is not the plaintiff's home. *Abovekeeper, Inc. v. Recording Industry Ass'n of Amer., Inc.,* 166 F.Supp.2d 655, 660 (N.D.N.Y), *aff'd sub nom. BuddyUSA, Inc. v. Recording Industry Ass'n of Amer., Inc.,* 21 Fed. App'x 52 (2d Cir.2001).

*6 In the end, the court must examine where the interests of justice lie, particularly in a case such as this bearing little or no tangible connection to the forum selected. The interests of justice, while un-

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

deniably somewhat intangible in nature, "has been deemed the most important factor." *The Research Foundation of State of Univ. of New York v. Luminex,* No. 1:07–CV–1260, 2008 WL 4822276, at *8 (N.D.N.Y. Nov. 3, 2008) (Treece, M.J.) (quoting *Race Safe Systems, Inc. v. Indy Racing League,* 251 F.Supp.2d at 1111). Where the interests of justice weigh so heavily in favor of transfer a plaintiff's form selection, which is consistent with an agreed upon forum selection provision, may be overridden and a transfer ordered. *ZPC 2000, Inc. v. SCA Group, Inc.,* 86 F. Supp .2d 274, 278 (S.D.N.Y.2000). In this instance, however, the interests of justice do not heavily favor either forum now under consideration; neither has any meaningful connection with this action. Given this circumstance, and since plaintiff has properly invoked an agreed-upon forum selection clause, and the defendant has consented to submit to the jurisdiction of any state or federal court in New York, I find no basis to interfere with the parties' agreement and plaintiff's choice of venue.

## IV. *SUMMARY AND CONCLUSION*

Undeniably, neither the plaintiff, the defendant, nor the operative facts in this case has any tangible connection with the Northern District of New York. Plaintiff nonetheless commenced this action here pursuant to a forum selection provision under which both parties agreed to submit to the jurisdiction of any state or federal court within New York for purposes of addressing any disputes under their agreement. Defendant now seeks to transfer the case to another district bearing only slightly more of a connection to the parties and the operative facts, arguing that the interests of justice warrant a transfer notwithstanding the parties' agreement. Because I find that the interests of justice do not weigh so heavily in favor of transfer as to effectively override the parties' forum selection provision and plaintiff's choice of venue, I conclude that transfer of the matter to the Southern District of New York would be inappropriate. It is therefore hereby

ORDERED, that defendant's motion to transfer this case pursuant to pursuant to 28 U.S.C. § 1404(a)

to the Southern District of New York (Dkt. No. 30) is DENIED; and it is further

ORDERED, that a telephone conference will be held in this action on February 1, 2011 at 4:00 p.m.; plaintiff's counsel is directed to make arrangements for placement of the call.

N.D.N.Y.,2011.
Plastic Suppliers, Inc. v. Cenveo, Inc.
Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 2012 WL 6093544 (Trial Motion, Memorandum or Affidavit) Trial Brief of Plaintiff Plastic Suppliers, Inc. (Jan. 13, 2012) Original Image of this Document (PDF)
• 2012 WL 6093550 (Jury Instructions) Defendant Cenveo, Inc.'s Proposed Jury Instructions (Jan. 13, 2012) Original Image of this Document (PDF)
• 2012 WL 6093535 (Trial Motion, Memorandum or Affidavit) Complaint (Jan. 10, 2012) Original Image of this Document (PDF)
• 2012 WL 6093533 (Trial Motion, Memorandum or Affidavit) Motion in Limine No. 3 Defendant Cenveo, Inc.'s Motion in Limine to Exclude Testimony or Evidence Regarding the Relative Sizes of Cenveo, Inc. And Plastic Suppliers, Inc. (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093536 (Trial Motion, Memorandum or Affidavit) Motion in Limine No. 2 Defendant Cenveo, Incs Motion in Limine to Exclude Testimony or Evidence Regarding An Alleged Conspiracy Between Cenveo Employee Alx Greene and Plastic Suppliers Former Employee Robert Stephens and Any Reated Text Messages, Emails, or Other Similar Communications (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093537 (Trial Motion, Memorandum or Affidavit) Motion in Limine No. 4 Defendant Cenveo, Inc.'s Motion in Limine to Exclude Testimony or Evidence Regarding Plastic Suppliers, Inc.' Abandoned Damages Claims Related to Interest Payments, Closing Plants, and Laying Off Workers

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 196887 (N.D.N.Y.)
(Cite as: 2011 WL 196887 (N.D.N.Y.))

(Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093546 (Trial Motion, Memorandum or Affidavit) Complaint (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093551 (Trial Motion, Memorandum or Affidavit) Motion in Limine No. 5 Defendant Cenveo, Inc.'s Motion in Limine to Exclude Testimony or Evidence Regarding Any Alleged Resistance from Cenveo, Inc. In the Transition from Dow Plastic Window Film to Plastic Suppliers, Inc. Plastic Window Film (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093552 (Trial Motion, Memorandum or Affidavit) Motion in Limine No.7 Defendant Cenveo, Inc.'s Motion in Limine to Exclude Testimony or Evidence Regarding Alleged Damages Plastic Suppliers, Inc. Failed to Mitigate (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093563 (Trial Motion, Memorandum or Affidavit) Motion in Limine No.1 Defendant Cenveo, Inc.'s Motion in Limine to Exclude Testimony or Evidence Regarding Any Alleged Bad Faith Reasons for Cenveo's Alleged Breach of the Supply Agreement, Including Obtaining a Lower Price from Interfilm Holdings, Inc. (Jan. 3, 2012) Original Image of this Document (PDF)
• 2012 WL 6093542 (Trial Motion, Memorandum or Affidavit) Motion in Limine No. 9 Defendant Cenveo, Inc.'s Motion in Limine for a Declaration as a Matter of Law that Plastic Suppliers, Inc. Had a Continuing Duty to Mitigate its Alleged Lost Profit Damages and Failed to Do So By Unreasonably Rejecting a Purchase Order Cenveo, Inc. Placed for its 2012 Demand for Plastic Window Film Pursuant to the Terms of the Supply Agreement, Thereby Reducing its Alleged Lost Profit Damages (Jan. 2012) Original Image of this Document (PDF)
• 2011 WL 5838410 (Expert Report or Affidavit) Declaration of Charles J. Lancelot, Ph.D. (Oct. 11, 2011) Original Image of this Document with Appendix (PDF)
• 2011 WL 10795882 (Trial Motion, Memorandum or Affidavit) Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 75) (Aug. 30, 2011) Original Image of this Document (PDF)

• 3:10cv00512 (Docket) (Apr. 30, 2010)

Judges, Attorneys and Experts(Back to top)

Judges | Attorneys | Experts

Judges

• Peebles, Hon. David E.
United States District Court, Northern New York
Syracuse, New York 13261
Litigation History Report | Judicial Motion Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

Attorneys

Attorneys for Defendant
• Busch, Richard S.
Nashville, Tennessee 37201
Litigation History Report | Profiler

• Maines, Russell E.
Ithaca, New York 14850
Litigation History Report | Profiler

• Wheeler, Mark B.
Ithaca, New York 14850
Litigation History Report | Profiler

Attorneys for Plaintiff
• Gibson, Christopher R.
Haddonfield, New Jersey 08033
Litigation History Report | Profiler

• Guy, Leslie Prechtl
Binghamton, New York 13902-5250

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

94 S.Ct. 2449
Supreme Court of the United States

Fritz SCHERK, Petitioner,

v.

ALBERTO-CULVER COMPANY.

No. 73—781.   |   Argued April 29,
1974.   |   Decided June 17, 1974.
|   Rehearing Denied, Oct. 15, 1974.

See 419 U.S. 885, 95 S.Ct. 157.

Action was brought by American company, purchaser of
European business entities, against German citizen, as seller
of the business entities, to recover damages and other
relief based on claim that purchaser had been defrauded
in violation of the Securities Exchange Act in connection
with representations concerning trademarks which were
transferred as part of sale. The seller sought to stay
proceedings while parties arbitrated dispute before the
International Chamber of Commerce tribunal as provided by
contract as the means of settling any and all controversies
arising under agreement or for breach thereof. The United
States District Court for the Northern District of Illinois,
Eastern Division, entered order refusing to stay arbitration
and the seller appealed. The United States Court of Appeals
for the Seventh Circuit, 484 F.2d 611, affirmed, and certiorari
was granted. The United States Supreme Court, Mr. Justice
Stewart, held that in the context of the international agreement
which the purchase and sale of business represented the
arbitration clause would be enforced.

Reversed and remanded.

Mr. Justice Douglas filed a dissenting opinion and Mr.
Justice Brennan, Mr. Justice White and Mr. Justice Marshall
concurred.

**2450 *506 Syllabus[*]

[*]   The syllabus constitutes no part of the opinion of the
Court but has been prepared by the Reporter of Decisions
for the convenience of the reader. See United States v.
Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26
S.Ct. 282, 287, 50 L.Ed. 499.

Respondent, an American manufacturer based in Illinois,
in order to expand its overseas operations, purchased
from petitioner, a German citizen, three enterprises owned
by him and organized under the laws of Germany and
Liechtenstein, together with all trademark rights of these
enterprises. The sales contract, which was negotiated in the
United States, England, and Germany, signed in Austria,
and closed in Switzerland, contained express warranties
by petitioner that the trademarks were unencumbered and
a clause providing that 'any controversy or claim (that)
shall arise out of this agreement or the breach thereof'
would be referred to arbitration before the International
Chamber of Commerce in Paris, France, and that Illinois
laws would govern the agreement and its interpretation and
performance. Subsequently, after allegedly discovering that
the trademarks were subject to substantial encumbrances,
**2451 respondent offered to rescind the contract, but when
petitioner refused, respondent brought suit in District Court
or damages and other relief, contending that petitioner's
fraudulent representations concerning the trademark rights
violated s 10(b) of the Securities Exchange Act of 1934
and Rule 10b—5 promulgated thereunder. Petitioner moved
to dismiss the action or alternatively to stay the action
pending arbitration, but the District Court denied the motion
to dismiss and, as sought by respondent, preliminarily
enjoined petitioner from proceeding with arbitration, holding,
in reliance on Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98
L.Ed. 168, that the arbitration clause was unenforceable. The
Court of Appeals affirmed. Held: The arbitration clause is to
be respected and enforced by federal courts in accord with the
explicit provisions of the United States Arbitration Act that
an arbitration agreement, such as is here involved, 'shall be
valid, irrevocable, and enforceable, save upon such grounds
as exist at law or in equity for the revocation of any contract.'
9 U.S.C. ss 1, 2. Wilko v. Swan, supra, distinguished. Pp.
2452—2458.

(a) Since uncertainty will almost inevitably exist with
respect to any contract, such as the one in question here,
with substantial *507 contacts in two or more countries,
each with its own substantive laws and conflict-of-laws
rules, a contractual provision specifying in advance the
forum for litigating disputes and the law to be applied
is an almost indispensable precondition to achieving the
orderliness and predictability essential to any international
business transaction. Such a provision obviates the danger
that a contract dispute might be submitted to a forum hostile
to the interests of one of the parties or unfamiliar with the
problem area involved. Pp. 2455—2456.

(b) In the context of an international contract, the advantages that a security buyer might possess in having a wide choice of American courts and venue in which to litigate his claims of violations of the securities laws, become chimerical, since an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the buyer's choice. Pp. 2456—2457.

(c) An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute, and the invalidation of the arbitration clause in this case would not only allow respondent to repudiate its solemn promise but would, as well, reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts.' The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513. P. 2457.

484 F.2d 611, reversed and remanded.

**Attorneys and Law Firms**

Robert F. Hanley, Evanston, Ill., for petitioner.

Gerald Aksen for the American Arbitration Association, as amicus curiae, by special leave of Court.

Francis J. Higgins, Chicago, Ill., for respondent.

**Opinion**

*508 Mr. Justice STEWART delivered the opinion of the Court.

Alberto-Culver Co., the respondent, is an American company incorporated in Delaware with its principal office in Illinois. It manufactures and distributes toiletries and hair products in this country and abroad. During the 1960's Alberto-Culver decided to expand its overseas operations, and as part of this program it approached the petitioner Fritz Scherk, a German citizen residing at the time of trial in Switzerland. Scherk was the owner of three interrelated business entities, organized under the laws of Germany and Liechtenstein, that were engaged in the manufacture of toiletries and the licensing of trademarks for such toiletries. An initial contact with Scherk was made by a representative of Alberto-Culver in Germany in June **2452 1967, and negotiations followed at further meetings in both Europe and the United

States during 1967 and 1968. In February 1969 a contract was signed in Vienna, Austria, which provided for the transfer of the ownership of Scherk's enterprises to Alberto-Culver, along with all rights held by these enterprises to trademarks in cosmetic goods. The contract contained a number of express warranties whereby Scherk guaranteed the sole and unencumbered ownership of these trademarks. In addition, the contract contained an arbitration clause providing that 'any controversy or claim (that) shall arise out of this agreement or the breach thereof' would be referred to arbitration before the International Chamber of Commerce in Paris, France, and that '(t)he laws of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance.'[1]

[1]   The arbitration clause relating to the transfer of one of Scherk's business entities, similar to the clauses covering the other two, reads in its entirety as follows:
'The parties agree that if any controversy or claim shall arise out of this agreement or the breach thereof and either party shall request that the matter shall be settled by arbitration, the matter shall be settled exclusively by arbitration in accordance with the rules then obtaining of the International Chamber of Commerce, Paris, France, by a single arbitrator, if the parties shall agree upon one, or by one arbitrator appointed by each party and a third arbitrator appointed by the other arbitrators. In case of any failure of a party to make an appointment referred to above within four weeks after notice of the controversy, such appointment shall be made by said Chamber. All arbitration proceedings shall be held in Paris, France, and each party agrees to comply in all respects with any award made in any such proceeding and to the entry of a judgment in any jurisdiction upon any award rendered in such proceeding. The laws of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance.'

*509 The closing of the transaction took place in Geneva, Switzerland, in June 1969. Nearly one year later Alberto-Culver allegedly discovered that the trademark rights purchased under the contract were subject to substantial encumbrances that threatened to give others superior rights to the trademarks and to restrict or preclude Alberto-Culver's use of them. Alberto-Culver thereupon tendered back to Scherk the property that had been transferred to it and offered to rescind the contract. Upon Scherk's refusal, Alberto-Culver commenced this action for damages and other relief in a Federal District Court in Illinois, contending that Scherk's fraudulent representations concerning the status of the trademark rights constituted violations of s 10(b) of the

**Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

Securities Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. s 78j(b), and Rule 10b—5 promulgated thereunder, 17 CFR s 240.10b—5.

In response, Scherk filed a motion to dismiss the action for want of personal and subject-matter jurisdiction as well as on the basis of forum non conveniens, or, alternatively, to stay the action pending arbitration in Paris pursuant to the agreement of the parties. Alberto- *510 Culver, in turn, opposed this motion and sought a preliminary injunction restraining the prosecution of arbitration proceedings.[2] On December 2, 1971, the District Court denied Scherk's motion to dismiss and, on January 14, 1972, it granted a preliminary order enjoining Scherk from proceeding with arbitration. In taking these actions the court relied entirely on this Court's decision in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168, which held that an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933, in view of the language of s 14 of that Act, barring '(a)ny condition, stipulation, or provision binding any person acquiring any security to **2453 waive compliance with any provision of this subchapter . . ..' 48 Stat. 84, 15 U.S.C. s 77n.[3] The Court of Appeals for the Seventh Circuit, with one judge dissenting, affirmed, upon what it considered the controlling authority of the Wilko decision. 484 F.2d 611. Because of the importance of the question presented we granted Scherk's petition for a writ of certiorari. 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108.

[2]   Scherk had taken steps to initiate arbitration in Paris in early 1971. He did not, however, file a formal request for arbitration with the International Chamber of Commerce until November 9, 1971, almost five months after the filing of Alberto-Culver's complaint in the Illinois federal court.

[3]   The memorandum opinion of the District Court is unreported.

## I

[1]   The United States Arbitration Act, now 9 U.S.C. s 1 et seq., reversing centuries of judicial hostility to arbitration agreements,[4] was designed to allow parties to avoid *511 'the costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts . . ..' H.R.Rep.No.96, 68th Cong., 1st Sess., 1, 2 (1924); see also S.Rep.No.536, 68th Cong., 1st Sess. (1924). Accordingly the Act provides that an arbitration agreement

such as is here involved 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. s 2.[5] The Act also provides in s 3 for a stay of proceedings in a case where a court is satisfied that the issue before it is arbitrable under the agreement, and s 4 of the Act directs a federal court to order parties to proceed to arbitration if there has been a 'failure, neglect, or refusal' of any party to honor an agreement to arbitrate.

[4]   English courts traditionally considered irrevocable arbitration agreements as 'ousting' the courts of jurisdiction, and refused to enforce such agreements for this reason. This view was adopted by American courts as part of the common law up to the time of the adoption of the Arbitration Act. See H.R.Rep.No. 96, 68th Cong., 1st Sess., 1, 2 (1924); Sturges & Murphy, Some Confusing Matters Relating to Arbitration under the United States Arbitration Act, 17 Law & Contemp.Prob. 580.

[5]   Section 2 of the Arbitration Act renders 'valid, irrevocable, and enforceable' written arbitration provisions 'in any maritime transaction or a contract evidencing a transaction involving commerce . . .,' as those terms are defined in s 1. In Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199, this Court held that the stay provisions of s 3 apply only to the two kinds of contracts specified in ss 1 and 2. Since the transaction in this case constituted 'commerce . . . with foreign nations,' 9 U.S.C. s 1, the Act clearly covers this agreement.

In Wilko v. Swan, supra, this Court acknowledged that the Act reflects a legislative recognition of the 'desirability of arbitration as an alternative to the complications of litigation,' 346 U.S., at 431, 74 S.Ct., at 185, but nonetheless declined to apply the Act's provisions. That case involved an agreement between Anthony Wilko and Hayden, Stone & Co., a large brokerage firm, under which Wilko agreed to purchase on margin a number of shares of a corporation's common stock. Wilko alleged that his purchase of the stock was induced by false representations *512 on the part of the defendant concerning the value of the shares, and he brought suit for damages under s 12(2) of the Securities Act of 1933, 15 U.S.C. s 77l. The defendant responded that Wilko had agreed to submit all controversies arising out of the purchase to arbitration, and that this agreement, contained in a written margin contract between the parties, should be given full effect under the Arbitration Act.

**Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

The Court found that '(t)wo policies, not easily reconcilable, are involved in this case.' 346 U.S., at 438, 74 S.Ct., at 188. On the one hand, the Arbitration Act stressed 'the need for avoiding the delay and expense of litigation,' id., at 431, 74 S.Ct., at 185, and directed that such agreements be 'valid, irrevocable, and enforceable' in federal courts. On the other hand, the Securities Act of 1933 was '(d)esigned to protect investors' and to require 'issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale,' by creating 'a special right to recover for **2454 misrepresentation . . ..' 346 U.S., at 431, 74 S.Ct., at 184 (footnote omitted). In particular, the Court noted that s 14 of the Securities Act, 15 U.S.C. s 77n, provides:

> 'Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.'

The Court ruled that an agreement to arbitrate 'is a 'stipulation,' and (that) the right to select the judicial forum is the kind of 'provision' that cannot be waived under s 14 of the Securities Act.'[6] 346 U.S., at 434—435, 74 S.Ct., at 186. *513 Thus, Wilko's advance agreement to arbitrate any disputes subsequently arising out of his contract to purchase the securities was unenforceable under the terms of s 14 of the Securities Act of 1933.

6   The arbitration agreement involved in Wilko was contained in a standard form margin contract. But see the dissenting opinion of Mr. Justice Frankfurter, 346 U.S. 427, 439, 440, 74 S.Ct. 182, 189, concluding that the record did not show that 'the plaintiff (Wilko) in opening an account had no choice but to accept the arbitration stipulation . . ..' The petitioner here would limit the decision in Wilko to situations where the parties exhibit a disparity of bargaining power, and contends that, since the negotiations leading to the present contract took place over a number of years and involved the participation on both sides of knowledgeable and sophisticated business and legal experts, the Wilko decision should not apply. See also the dissenting opinion of Judge Stevens of the Court of Appeals in this case, 484 F.2d 611, 615. Because of our disposition in this case on other grounds, we need not consider this contention.

Alberto-Culver, relying on this precedent, contends that the District Court and Court of Appeals were correct in holding that its agreement to arbitrate disputes arising under the contract with Scherk is similarly unenforceable in view of its contentions that Scherk's conduct constituted violations of the Securities Exchange Act of 1934 and rules promulgated thereunder. For the reasons that follow, we reject this contention and hold that the provisions of the Arbitration Act cannot be ignored in this case.

[2]   At the outset, a colorable argument could be made that even the semantic reasoning of the Wilko opinion does not control the case before us. Wilko concerned a suit brought under s 12(2) of the Securities Act of 1933, which provides a defrauded purchaser with the 'special right' of a private remedy for civil liability, 346 U.S., at 431, 74 S.Ct., at 184. There is no statutory counterpart of s 12(2) in the Securities Exchange Act of 1934, and neither s 10(b) of that Act nor Rule 10b—5 speaks of a private remedy to redress violations of the kind alleged here. While federal case law has established that s 10(b) and Rule 10b—5 create an implied private cause of action, see *514 6 L. Loss, Securities Regulation 3869 —3873 (1969) and cases cited therein; cf. J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1556, 12 L.Ed.2d 423, the Act itself does not establish the 'special right' that the Court in Wilko found significant. Furthermore, while both the Securities Act of 1933 and the Securities Exchange Act of 1934 contain sections barring waiver of compliance with any 'provision' of the respective Acts,[7] certain of the 'provisions' of the 1933 Act that the Court held could not be waived by Wilko's agreement to arbitrate find no counterpart in the 1934 Act. In particular, **2455 the Court in Wilko noted that the jurisdictional provision of the 1933 Act, 15 U.S.C. s 77v, allowed a plaintiff to bring suit 'in any court of competent jurisdiction—federal or state—and removal from a state court is prohibited.' 346 U.S., at 431, 74 S.Ct., at 184. The analogous provision of the 1934 Act, by contrast, provides for suit only in the federal district courts that have 'exclusive jurisdiction,' 15 U.S.C. s 78aa, thus significantly restricting the plaintiff's choice of forum.[8]

7   Section 14 of the Securities Act of 1933, 15 U.S.C. s 77n, provides as follows:
    'Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.'
    Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. s 78cc(a), provides:

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)
94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

'Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.' While the two sections are not identical, the variations in their wording seem irrelevant to the issue presented in this case.

8    We do not reach, or imply any opinion as to, the question whether the acquisition of Scherk's businesses was a security transaction within the meaning of s 10(b) of the Securities Exchange Act of 1934, and Rule 10b—5. Although this important question was considered by the District Court and the Court of Appeals, and although the dissenting opinion, post, p. 2458, seems to consider it controlling, the petitioner did not assign the adverse ruling on the question as error and it was not briefed or argued in this Court.

*515 [3]    Accepting the premise, however, that the operative portions of the language of the 1933 Act relied upon in Wilko are contained in the Securities Exchange Act of 1934, the respondent's reliance on Wilko in this case ignores the significant and, we find, crucial differences between the agreement involved in Wilko and the one signed by the parties here. Alberto-Culver's contract to purchase the business entities belonging to Scherk was a truly international agreement. Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein. The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

Such a contract involves considerations and policies significantly different from those found controlling in Wilko. In Wilko, quite apart from the arbitration provision, there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement. The parties, the negotiations, and the subject matter of the contract were all *516 situated in this country, and no credible claim could have been entertained that any international conflict-

of-laws problems would arise. In this case, by contrast, in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract. 9

9    Together with his motion for a stay pending arbitration, Scherk moved that the complaint be dismissed because the federal securities laws do not apply to this international transaction, cf. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (CA2 1972). Since only the order granting the injunction was appealed, this contention was not considered by the Court of Appeals and is not before this Court.

Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of **2456 the parties or unfamiliar with the problem area involved. 10

10    See Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1051 (1961). For example, while the arbitration agreement involved here provided that the controversies arising out of the agreement be resolved under '(t)he laws of the State of Illinois,' supra, n. 1, a determination of the existence and extent of fraud concerning the trademarks would necessarily involve an understanding of foreign law on that subject.

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite *517 unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages. In the present case, for example, it is not inconceivable that if Scherk had anticipated that Alberto-Culver would be able in this country to enjoin resort to arbitration he might have sought an order in France or some other country enjoining Alberto-Culver from proceeding with its litigation in the United States. Whatever recognition the courts of this country might ultimately have granted to the order of the foreign court, the dicey atmosphere

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)
94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements. [11]

[11] The dissenting opinion argues that our conclusion that Wilko is inapplicable to the situation presented in this case will vitiate the force of that decision because parties to transactions with many more direct contacts with this country than in the present case will nonetheless be able to invoke the 'talisman' of having an 'international contract.' Post, at 2461. Concededly, situations may arise where the contacts with foreign countries are so insignificant or attenuated that the holding in Wilko would meaningfully apply. Judicial response to such situations can and should await future litigation in concrete cases. This case, however, provides no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere. The only contact between the United States and the transaction involved here is the fact that Alberto-Culver is an American corporation and the occurrence of some—but by no means the greater part—of the pre-contract negotiations in this country. To determine that 'American standards of fairness,' post, at 2461, must nonetheless govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries.

The exception to the clear provisions of the Arbitration Act carved out by Wilko is simply inapposite to a case such as the one before us. In Wilko the Court reasoned *518 that '(w)hen the security buyer, prior to any violation of the Securities Act, waives his right to sue in courts, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him . . . .' 346 U.S., at 435, 74 S.Ct., at 187. In the context of an international contract, however, these advantages become chimerical since, as indicated above, an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice. [12]

[12] The dissenting opinion raises the specter that our holding today will leave American investors at the mercy of multinational corporations with 'vast operations around the world . . . .' Post, at 2464. Our decision, of course, has no bearing on the scope of the substantive provisions of the federal securities laws for the simple reason that the question is not presented in this case. See n. 8, supra.

Two Terms ago in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, we rejected the doctrine that a forum-selection clause of a contract, although voluntarily adopted by the parties, will not be respected in a suit brought in the United States "unless the selected state would provide a more convenient forum than the state in which suit is brought." **2457 Id., at 7, 92 S.Ct., at 1912. Rather, we concluded that a 'forum clause should control absent a strong showing that it should be set aside.' Id., at 15, 92 S.Ct., at 1916. We noted that 'much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place (where personal or in rem jurisdiction might be established). The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting.' Id., at 13—14, 92 S.Ct., at 1915.

*519 [4] [5] An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. [13] The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.' Id., at 9, 92 S.Ct., at 1912. [14]

[13] Under some circumstances, the designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction. In this case, however, '(t)he laws of the State of Illinois' were explicitly made applicable by the arbitration agreement. See n. 1, supra.

[14] In The Bremen we noted that forum-selection clauses 'should be given full effect' when 'a freely negotiated private international agreement (is) unaffected by fraud . . . .' 407 U.S., at 13, 12, 92 S.Ct., at 1915, 1914. This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion. Cf.

**Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270.

Although we do not decide the question, presumably the type of fraud alleged here could be raised, under Art. V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, see n. 15, infra, in challenging the enforcement of whatever arbitral award is produced through arbitration. Article V(2)(b) of the Convention provides that a country may refuse recognition and enforcement of an award if 'recognition or enforcement of the award would be contrary to the public policy of that country.'

For all these reasons we hold that the agreement of the parties in this case to arbitrate any dispute arising out of their international commercial transaction is to be *520 respected and enforced by the federal courts in accord with the explicit provisions of the Arbitration Act. [15]

[15] Our conclusion today is confirmed by international developments and domestic legislation in the area of commercial arbitration subsequent to the Wilko decision. On June 10, 1958, a special conference of the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. In 1970 the United States acceded to the treaty, (1970) 3 U.S.T. 2517, T.I.A.S. No. 6997, and Congress passed Chapter 2 of the United States Arbitration Act, 9 U.S.C. s 201 et seq., in order to implement the Convention. Section 1 of the new chapter, 9 U.S.C. s 201, provides unequivocally that the Convention 'shall be enforced in United States courts in accordance with this chapter.'

The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, S. Exec. Doc. E, 90th Cong., 2d Sess. (1968); Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049 (1961). Article II(1) of the Convention provides: 'Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.'

In their discussion of this Article, the delegates to the Convention voiced frequent concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements. See G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24—28 (1958).

Without reaching the issue of whether the Convention, apart from the considerations expressed in this opinion, would require of its own force that the agreement to arbitrate be enforced in the present case, we think that this country's adoption and ratification of the Convention and the passage of Chapter 2 of the United States Arbitration Act provide strongly persuasive evidence of congressional policy consistent with the decision we reach today.

**2458 Accordingly, the judgment of the Court of Appeals is *521 reversed and the case is remanded to that court with directions to remand to the District Court for further proceedings consistent with this opinion.

It is so ordered.

Reversed and remanded.

Mr. Justice DOUGLAS, with whom Mr. Justice BRENNAN, Mr. Justice WHITE, and Mr. Justice MARSHALL concur, dissenting.

Respondent (Alberto-Culver) is a publicly held corporation whose stock is traded on the New York Stock Exchange and is a Delaware corporation, with its principal place of business in Illinois. Petitioner (Scherk) owned a business in Germany, Firma Ludwig Scherk, dealing with cosmetics and toiletries. Scherk owned various trademarks and all outstanding securities of a Liechtenstein corporation (SEV) and of a German corporation, Lodeva. Scherk also owned various trademarks which were licensed to manufacturers and distributors in Europe and in this country. SEV collected the royalties on those licenses.

Alberto undertook to purchase from Scherk the entire establishment—the trademarks and the stock of the two corporations; and later, alleging it had been defrauded, brought this suit in the United States District Court in Illinois to rescind the agreement and to obtain damages.

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

**\*522** The only defense material at this stage of the proceeding is a provision of the contract providing that if any controversy or claim arises under the agreement the parties agree it will be settled 'exclusively' by arbitration under the rules of the International Chamber of Commerce, Paris, France.

The basic dispute between the parties concerned allegations that the trademarks which were basic assets in the transaction were encumbered and that their purchase was induced through serious instances of fraudulent representations and omissions by Scherk and his agents within the jurisdiction of the United States. If a question of trademarks were the only one involved, the principle of The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, would be controlling.

We have here, however, questions under the Securities Exchange Act of 1934, which in s 3(a)(10) defines 'security' as including any 'note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . . .' 15 U.S.C. s 78c(a)(10). We held in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564, as respects s 3(a)(10):

'(R)emedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of security in s 3(a)(10) **2459 necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should **\*523** be on economic reality.' Id., at 336, 88 S.Ct., at 553. (Footnote omitted.)

Section 10(b) of the 1934 Act makes it unlawful for any person by use of agencies of interstate commerce or the mails '(t)o use or employ, in connection with the purchase or sale of any security,' whether or not registered on a national securities exchange, 'any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.' 15 U.S.C. s 78i(b).

Alberto-Culver, as noted, is not a private person but a corporation with publicly held stock listed on the New York Stock Exchange. If it is to be believed, if in other words the allegations made are proved, the American company has been

defrauded by the issuance of 'securities' (promissory notes) for assets which are worthless or of a much lower value than represented. Rule 10b—518 of the Securities and Exchange Commission states:

'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

'(a) To employ any device, scheme, or artifice to defraud,

'(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

'(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

'in connection with the purchase or sale of any security.' 17 CFR s 240.10b—-5.

**\*524** Section 29(a) of the Act provides:

'Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.' 15 U.S.C. s 78cc(a).

And s 29(b) adds that '(e)very contract' made in violation of the Act 'shall be void.'[1] No exception is made for contracts which have an international character.

[1]   Section 29(b) reads: 'Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation

of any such provision, rule, or regulation . . ..' 15 U.S.C. s 78cc(b).

The Securities Act of 1933, 48 Stat. 84, 15 U.S.C. s 77n, has a like provision in its s 14:

> 'Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.'

In Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168, a customer brought suit against a brokerage house alleging fraud in the sale of stock. A motion was made to stay the trial until arbitration occurred under the United States Arbitration Act, 9 U.S.C. s 3, as provided in the customer's contract. The *525 Court held that an agreement for arbitration **2460 was a 'stipulation' within the meaning of s 14 which sought to 'waive' compliance with the Securities Act. We accordingly held that the courts, not the arbitration tribunals, had jurisdiction over suits under that Act. The arbitration agency, we held, was bound by other statutes which were not necessarily consistent with the 1933 Act. We said:

'As the protective provisions of the Securities Act require the exercise of judicial direction to fairly assure their effectiveness, it seems to us that Congress must have intended s 14 . . . to apply to waiver of judicial trial and review.' 346 U.S., at 437, 74 S.Ct., at 188.

Wilko was held by the Court of Appeals to control this case —and properly so.

The Court does not consider the question whether a 'security' is involved in this case, saying it was not raised by petitioner. A respondent, however, has the right to urge any argument to support the judgment in his favor (save possibly questions of venue, see Peoria R. Co. v. United States, 263 U.S. 528, 536, 44 S.Ct. 194, 197, 68 L.Ed. 427.United States v. American Railway Express Co., 265 U.S. 425, 435—436, and n. 11, 44 S.Ct. 560, 563—564, 68 L.Ed. 1087), even those not passed upon by the court below and also contentions rejected below. Langnes v. Green, 282 U.S. 531, 535—539, 51 S.Ct. 243, 244 —246, 75 L.Ed. 520;Welling v. General Industries Co., 330 U.S. 545, 547 n. 5, 67 S.Ct. 883, 884, 91 L.Ed. 1088. The Court of Appeals held that 'securities' within the meaning of the 1934 Act were involved here, 484 F.2d 611, 615. The brief of the respondent is based on the premise that 'securities' are

involved here; and petitioner has not questioned that ruling of the Court of Appeals.

It could perhaps be argued that Wilko does not govern because it involved a little customer pitted against a big brokerage house, while we deal here with sophisticated buyers and sellers: Scherk, a powerful German operator, *526 and Alberto-Culver, an American business surrounded and protected by lawyers and experts. But that would miss the point of the problem. The Act does not speak in terms of 'sophisticated' as opposed to 'unsophisticated' people dealing in securities. The rules when the giants play are the same as when the pygmies enter the market.

If there are victims here, they are not Alberto-Culver the corporation, but the thousands of investors who are the security holders in Alberto-Culver. If there is fraud and the promissory notes are excessive, the impact is on the equity in Alberto-Culver.

Moreover, the securities market these days is not made up of a host of small people scrambling to get in and out of stocks or other securities. The markets are overshadowed by huge institutional traders.[2] The so-called 'off-shore funds,' of which Scherk is a member, present perplexing problems under both the 1933 and 1934 Acts.[3] The tendency of American investors to invest indirectly as through mutual funds[4] may change the character of the regulation but not its need.

[2] See Institutional Investor Study Report of the SEC, H.R.Doc.No. 92—64 (1971), particularly Vol. 4.

[3] Id., Vol. 1, p. XVI; Vol. 3, p. 879 et seq.

[4] Id., Vol. 1, p. XIX; Vol. 2, p. 215 et seq.

There has been much support for arbitration of disputes; and it may be the superior way of settling some disagreements. If A and B were quarreling over a trade-mark and there was an arbitration clause in the contract, the policy of Congress in implementing the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as it did in 9 U.S.C. s 201 et seq., would prevail. But the Act does not substitute an arbiter for the settlement of disputes under *527 the 1933 and **2461 1934 Acts. Art. II(3) of the Convention says:

'The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration,

unless it finds that the said agreement is null and void, inoperative or incapable of being performed.'[2] (1970) 3 U.S.T. 2517, 2519, T.I.A.S. No. 6997.

[5]    The Convention also permits that arbitral awards not be recognized and enforced when a court in the country where enforcement is sought finds that '(t)he recognition or enforcement of the award would be contrary to the public policy of that country.' Art. V(2)(b); (1970) 3 U.S.T. 2517, 2520, T.I.A.S. No. 6997. It also provides that recognition of an award may be refused when the arbitration agreement 'is not valid under the law to which the parties have subjected it,' in this case the laws of Illinois. Art. V(1)(a). See n. 10, infra.

But s 29(a) of the 1934 Act makes agreements to arbitrate liabilities under s 10 of the Act 'void' and 'inoperative.' Congress has specified a precise way whereby big and small investors will be protected and the rules under which the Alberto-Culvers of this Nation shall operate. They or their lawyers cannot waive those statutory conditions, for our corporate giants are not principalities of power but guardians of a host of wards unable to care for themselves. It is these wards that the 1934 Act tries to protect.[6] Not a word in the Convention governing *528 awards adopts the standards which Congress has passed to protect the investors under the 1934 Act. It is peculiarly appropriate that we adhere to Wilko—more so even than when Wilko was decided. Huge foreign investments are being made in our companies. It is important that American standards of fairness in security dealings govern the destinies of American investors until Congress changes these standards.

[6]    Requirements promulgated under the 1934 Act require disclosure to security holders of corporate action which may affect them. Extensive annual reports must be filed with the SEC including, inter alia, financial figures, changes in the conduct of business, the acquisition or disposition of assets, increases or decreases in outstanding securities, and even the importance to the business of trademarks held. See 17 CFR ss 240.13a—1, 249.310; 3 CCH Fed.Sec.L.Rep. 31,101 et seq. (Form 10 —K). The Commission has proposed that corporations furnish a copy of annual reports filed with it to any security holder who is solicited for a proxy and requests the report. 39 Fed.Reg. 3836. Current reports must be filed with the SEC by an issuer of securities when substantial events occur, as when the rights evidenced by any class of securities are materially altered by the issuance of another class of securities or when an issuer has acquired a significant amount of assets other than in the ordinary course of business. See 17 CFR ss 240.13a —11, 249.308; 3 CCH Fed.Sec.L.Rep. 31,001 et seq. (Form 8—K).

The Commission, recognizing that the Form 10--K reports filed annually with it might be excessively abstruse for security holders, see 39 Fed.Reg. 3835, has proposed that the annual reports distributed to security holders in connection with annual meetings and solicitation of proxies provide substantially greater amounts of meaningful information than required presentedly. These annual reports would include a description of the business of the issuer, a summary of operations, explanation of changes in revenues and expenses, information on the liquidity position and the working capital requirements of the issuer, and identification of management and performance on the market of the issuer's securities. See 39 id., at 3834—3838.

The Court finds it unnecessary to consider Scherk's argument that this case is distinguishable from Wilko in that Wilko involved parties of unequal bargaining strength. Ante, at 2454, n. 6. Instead, the Court rests its conclusion on the fact that this was an 'international' agreement, with an American corporation investing in the stock and property of foreign businesses, and speaks favorably of the certainty which inheres when parties *529 specify an arbitral forum for resolution of differences in 'any contract touching two or more countries.'

This invocation of the 'international contract' talisman might be applied to a **2462 situation where, for example, an interest in a foreign company or mutual fund was sold to an utterly unsophisticated American citizen, with material fraudulent misrepresentations made in this country. The arbitration clause could appear in the fine print of a form contract, and still be sufficient to preclude recourse to our courts, forcing the defrauded citizen to arbitration in Paris to vindicate his rights.[7]

[7]    The Court concedes, ante, at 2456 n. 11, that there may be situations where foreign contacts were 'so insignificant or attenuated' that Wilko would apply and an American court would not enforce an arbitration agreement in an international contract. The recognition that 'international' contracts may in fact involve significant direct contacts with this country is realistic and salutary. But the Court by its concession undermines somewhat its reliance on its admonition—itself supported only by speculation—that '(a) contractual provision specifying in advance the forum in which disputes shall be litigated . . . is . . . an almost indispensable precondition

to achievement of the orderliness and predictability essential to any international business transaction.' Uncertainty and a 'dicey atmosphere,' supposedly destructive of international contracts, may persist for many contracts. The parties to an international contract may not in fact be bound by a 'solemn agreement' to arbitrate, for an American court could find, at a much later date, sufficient contacts with this country to require the application of Wilko.

It has been recognized that the 1934 Act, including the protections of Rule 10b-5, applies when foreign defendants have defrauded American investors, particularly when, as alleged here,[8] they have profited by firtue *530 of proscribed conduct within our boundaries. This is true even when the defendant is organized under the laws of a foreign country, is conducting much of its activity outside the United States, and is therefore governed largely by foreign law.[9] The language of s 29 of the 1934 Act does not immunize such international transactions, and the United Nations Convention provides that a forum court in which a suit is brought need not enforce an agreement to arbitrate which is 'void' and 'inoperative' as contrary to its public policy.[10] When a *531 foreign corporation **2463 undertakes fraudulent action which subjects it to the jurisdiction of our federal securities laws, nothing justifies the conclusion that only a diluted version of those laws protects American investors.

[8]    The District Court for the Northern District of Illinois noted allegations that Scherk had failed to state a material fact, the omission of which would have been misleading, see 17 CFR s 240.10b—5(b), during crucial negotiations in Melrose Park, Illinois, and that communications between Alberto-Culver and Scherk's attorney concerning the validity and value of the trademarks occurred within the territorial jurisdiction of the United States. Finally, the District Court noted that the full economic impact of the alleged fraud occurred within the United States.

[9]    See, e.g., Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1334—1339 (CA2 1972); Travis v. Anthes Imperial Ltd., 473 F.2d 515, 523—528 (CA8 1973); SEC v. United Financial Group, Inc., 474 F.2d 354 (CA9 1973); Schoenbaum v. First-brook, 405 F.2d 200 (CA2 1968); Roth v. Fund of Funds, 279 F.Supp. 934 (SDNY), aff'd, 405 F.2d 421 (CA2 1968).

[10]   A summary of the conference proceedings which led to the adoption of the United Nations Convention was prepared by G. W. Haight, who served as a member of the International Chamber of Commerce delegation to

the conference. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958 (1958).

When Art. II(3) was being discussed, the Israeli delegate pointed out that while a court could, under the draft Convention as it then stood, refuse enforcement of an award which was incompatible with public policy, "the court had to refer parties to arbitration whether or not such reference was lawful or incompatible with public policy." Id., at 27. The German delegate observed that this difficulty arose from the omission in Art. II(3) "of any words which would relate the arbitral agreement to an arbitral award capable of enforcement under the convention." Ibid.

Haight continues:

'When the German proposal was put to a vote, it failed to obtain a two-thirds majority (13 to 9) and the Article was thus adopted without any words linking agreements to the awards enforceable under the Convention. Nor was this omission corrected in the Report of the Drafting Committee (L. 61), although the obligation to refer parties to arbitration was (and still is) qualified by the clause 'unless it finds that the agreement is null and void, inoperative or incapable of being performed.'

'As the applicable law is not indicated, courts may under this wording be allowed some latitude; they may find an agreement incapable of performance if it offends the law or the public policy of the forum. Apart from this limited opening, the Conference appeared unwilling to qualify the broad undertaking not only to recognize but also to give effect to arbitral agreements.' Id., at 28 (emphasis added).

Whatever 'concern' the delegates had that signatories to the Convention 'not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability,' ante, at 2457 n. 15, it would seem that they contemplated that a court may decline to enforce an agreement which offends its law or public policy.

The Court also attempts to treat this case as only a minor variation of The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513. In that case, however, the Court, per Mr. Chief Justice Burger explicitly stated:

'A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.'Id., at 15, 92 S.Ct. at 1916.

That is inescapably the case here, as s 29 of the Securities Exchange Act and Wilko v. Swan make clear. Neither s 29, nor the Convention on international arbitration, nor The Bremen justifies abandonment of a national public

**Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

policy that securities claims be heard by a judicial forum simply because some international elements are involved in a contract.

Section 29(a) of the 1934 Act provides that a stipulation binding one to waive compliance with 'any provision' of the Act shall be void, and the Act expressly provides that the federal district courts shall have 'exclusive jurisdiction' over suits brought under the Act. **\*532** 15 U.S.C. s 78aa. The Court appears to attach some significance to the fact that the specific provisions of the 1933 Act involved in Wilko are not duplicated in the 1934 Act, which is involved in this case. While Alberto-Culver would not have the right to sue in either a state or federal forum as did the plaintiff in Wilko, 346 U.S., at 431, 74 S.Ct., at 184, the Court deprives it of its right to have its Rule 10b—5 claim heard in a federal court. We spoke at length in Wilko of this problem, elucidating the undesirable effects of remitting a securities plaintiff to an arbitral, rather than a judicial, forum. Here, as in Wilko, the allegations of fraudulent misrepresentation will involve 'subjective findings on the purpose and knowledge' of the defendant, questions ill-determined by arbitrators without judicial instruction on the law. See id., at 435, 74 S.Ct., at 187. An arbitral award can be made without explication of reasons and without development of a record, so that the arbitrator's conception of our statutory requirement may be absolutely incorrect yet functionally unreviewable, even when the arbitrator seeks to apply our law. We recognized in Wilko that there is no judicial review corresponding to review of court decisions. Id., at 436—437, 74 S.Ct., at 187—188. The extensive pretrial discovery provided by the Federal Rules of Civil Procedure for actions in district court would not be available. And the wide choice of venue provided by the 1934 Act, 15 U.S.C. s 78aa, would be forfeited. See Wilko v. Swan, supra, at 431, 435, 74 S.Ct. at 186. The loss of the proper judicial forum carries with it the loss of substantial rights. [11]

[11]   The agreement in this case provided that the 'laws of the State of Illinois' are applicable. Even if the arbitration court should read this clause to require application of Rule 10b—5's standards, Alberto-Culver's victory would be Pyrrhic. The arbitral court may improperly interpret the substantive protections of the Rule, and if it does its error will not be reviewable as would the error of a federal court. And the ability of Alberto-Culver to prosecute its claim would be eviscerated by lack of discovery. These are the policy considerations which underlay Wilko and which apply to the instant case as well.

**\*533** When a defendant, as alleged here, has, through proscribed acts within our territory, brought itself within the ken of federal securities regulation, a fact **\*\*2464** not disputed here, those laws—including the controlling principles of Wilko—apply whether the defendant is foreign or American, and whether or not there are transnational elements in the dealings. Those laws are rendered a chimera when foreign corporations or funds—unlike domestic defendants—can nullify them by virtue of arbitration clauses which send defrauded American investors to the uncertainty of arbitration on foreign soil, or, if those investors cannot afford to arbitrate their claims in a far-off forum, to no remedy at all.

Moreover, the international aura which the Court gives this case is ominous. We now have many multinational corporations in vast operations around the world—Europe, Latin America, the Middle East, and Asia. [12] The investments of many American investors turn on dealings by these companies. Up to this day, it has been assumed by reason of Wilko that they were all protected by our various federal securities Acts. If these guarantees are to be removed, it should take a legislative enactment. I would enforce our laws as they stand, unless Congress makes an exception.

[12]   See Knickerbocker, Oligopolistic Reaction and Multinational Enterprise (Haw.Univ.1973); J. Vaupel & J. Curhan, The World's Multinational Enterprises (Harvard Univ.1973). See generally Senate Committee on Finance, 93d Cong., 1st Sess., Implications of Multinational Firms for World Trade and Investment and for U.S. Trade and Labor (Comm.Print 1973); Morgan, Controlling the Multinationals, Washington Post, Nov. 17, 1973, p. A15; Diebold, Precarious Path of the Multinationals, Wall Street Journal, Aug. 17, 1973, p. 6, col. 4.

**\*534** The virtue of certainty in international agreements may be important, but Congress has dictated that when there are sufficient contacts for our securities laws to apply, the policies expressed in those laws take precedence. Section 29 of the 1934 Act, which renders arbitration clauses void and inoperative, recognizes no exception for fraudulent dealings which incidentally have some international factors. The Convention makes provision for such national public policy in Art. II(3). Federal jurisdiction under the 1934 Act will attach only to some international transactions, but when it does, the protections afforded investors such as Alberto-Culver can only be full-fledged.

**Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

**Parallel Citations**

94 S.Ct. 2449, 41 L.Ed.2d 270, Fed. Sec. L. Rep. P 94,593

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Where the court finds that the agreement confers non-exclusive jurisdiction    **12–106**
on the designated court (whether England or a foreign court), it is more
difficult to argue that the institution of proceedings is a breach of contract; and
on that footing, an application for a stay of proceedings in favour of that
foreign court will be determined on the basis of *Spiliada Maritime Corp v
Cansulex Ltd.*[513] But the fact that a court was contractually chosen by the
parties will be taken as clear evidence that it is an available forum, and that,
in principle at least, it is not open to either party to object to the exercise of
its jurisdiction at least on grounds which should have been foreseeable when
the agreement was made.[514]

However, the position is sometimes more complex. It may be that, on its    **12–107**
true construction, though the court was given non-exclusive jurisdiction, the
parties agreed that if either were to invoke it, the other would submit to the
jurisdiction of the named court for the sole determination of the dispute.[515] It
would follow that proceedings taken in a foreign court would breach such a
jurisdiction agreement if they sought to prevent the other party from invoking
the jurisdiction agreement, or if they aimed to frustrate or prevent the other
party having recourse to it. The question is therefore whether the effect of
instituting proceedings in the foreign court, or doing so and refusing to appear
to defend the claim made in England, may, on a true construction of the
jurisdiction agreement, be seen as a breach of it.[516] Certainly the question of
exclusivity or non-exclusivity is a guide to the answer, but it is not always
definitive.

In sum, there is no reason why the parties may not, if so advised, make an    **12–108**
agreement for the resolution of disputes which is more complex, and better
suited to their needs, than would be provided by a plain and simple "exclusive
or non-exclusive" template.

**Scope and reach of jurisdiction clause.** In cases in which there is no    **12–109**
dispute as to the validity of a jurisdiction clause, the principal question is
likely to be to determine that the dispute in question falls within the material
scope of the clause, or the within the jurisdiction clause *ratione materiae*. As

---

[513] [1987] A.C. 460; see clause (2) of Rule 38, above. The same will apply when it is
complained that the bringing of proceedings in a foreign court is wrongful and should be
restrained see clause (4) of Rule 39, below.

[514] *S&W Berisford Plc v New Hampshire Insurance Co* [1990] 2 Q.B. 631 (disapproved on
other grounds in *Re Harrods (Buenos Aires) Ltd* [1992] Ch. 72 (CA)); *Standard Steamship
Owners Protection and Indemnity Association (Bermuda) Ltd v Gann* [1992] 2 Lloyd's Rep. 528;
*British Aerospace Plc v Dee Howard Co* [1993] 1 Lloyd's Rep. 368; *The Rothnie* [1996] 2
Lloyd's Rep. 206; *Mercury Communications Ltd v Communications Telesystems International*
[1999] 2 All E.R. (Comm.) 33; *JP Morgan Securities Asia Pte Ltd v Malaysian Newsprint
Industries Sdn Bhd* [2001] 2 Lloyd's Rep. 41 (CA); *Antec International Ltd v Biosafety USA Inc*
[2006] EWHC 47 (Comm.); *BP Plc v Aon Ltd* [2005] EWHC 2554 (Comm.), [2006] 1 Lloyd's
Rep. 549.

[515] *cf. Breams Trustees Ltd v Upstream Downstream Simulation Services Ltd* [2004] EWHC
211 (Ch.).

[516] *Sabah Shipyard (Pakistan) Ltd v Government of Pakistan* [2002] EWCA Civ 1643, [2003]
2 Lloyd's Rep. 571; *Standard Bank Plc v Agrinvest International Inc* [2007] EWHC 2595
(Comm.), [2008] 1 Lloyd's Rep. 532; *Antec International Ltd v Biosafety USA Inc* [2006] EWHC
47 (Comm.); *HIT Entertainment Ltd v Gaffney International Licensing Pty Ltd* [2007] EWHC
1282 (Ch.).

the common law regards these clauses as ordinary contractual terms, the question is one of construction and interpretation.[517] In principle, where it is a matter of dispute, the construction and interpretation of a jurisdiction clause is a matter to be referred to the law which governs the jurisdiction clause, which will usually[518] be the law governing the contract of which it forms a part, albeit a separable part. The account which follows explains the approach to construction and interpretation as this will be applied to a jurisdiction clause which is governed by English law, or which is not governed by a law demonstrated to be materially different from English law. Prior to 2007 the case law had allowed a minute examination of the comparative scope of clauses framed in terms of their being applicable to claims "arising from", or "arising under", or "arising under or in connection with" a contract, etc.[519] This was undertaken with a view to determining how each of these verbal formulae might or might not apply if a claim were brought to enforce a contract, or to assert the right to have rescinded a contract, or to allege the legal nullity of a supposed contract, as well as where the claimant formulated a claim as one in tort (for example, for fraud[520] or other misrepresentation), or for restitution,[521] or as a claim for breach of fiduciary duty, etc. In *Fiona Trust & Holding Corp v Privalov,*[522] the House of Lords decisively repudiated the authority which had held that there were material differences between claims "arising under", "arising in connection with", etc. stating that the "fussy distinctions"[523] made in those cases "reflect no credit upon English commercial law".[524] Henceforth, as a matter of English law the proper approach to such clauses was to treat the parties as rational commercial actors who would have had no reason to prescribe jurisdiction over some parts, but not over other parts, of what might be a claim which advanced alternative causes of action, some but not other parts of which were plainly contractual.[525]

---

[517] *The Sindh* [1975] 1 Lloyd's Rep. 372, 374 (CA); *The Sennar (No.2)* [1984] 2 Lloyd's Rep. 142 (CA), affd. [1985] 1 W.L.R. 490 (HL); *Youell v Kara Mara Shipping Co Ltd* [2000] 2 Lloyd's Rep. 102; *Francis Travel Marketing Pty Ltd v Virgin Atlantic Airways* (1996) 39 N.S.W.L.R. 160; *cf.* Case C–214/89 *Powell Duffryn Plc v Petereit* [1992] E.C.R. I–1745.

[518] But not always, as, for example, where the jurisdiction clause is the subject of a self-contained agreement about the resolution of disputes, such as in *A v B* [2006] EWHC 2006 (Comm.), [2007] 1 Lloyd's Rep. 237 (freestanding arbitration agreement).

[519] e.g. *Heyman v Darwins Ltd* [1942] A.C. 356 ("arising under" narrower than "arising out of"); *Fillite (Runcorn) Ltd v Aqua-Lift* (1989) 26 Con. L.R. 66 ("under a contract" did not apply to obligations not created by the contract itself).

[520] *Cavell USA Inc v Seaton Insurance Co* [2009] EWCA Civ 1363, [2009] 2 C.L.C. 991.

[521] *Mackays Stores v Topward Ltd* 2006 S.L.T. 716.

[522] [2007] UKHL 40, [2007] Bus. L.R. 1719 (also reported as *Premium Nafta Products Ltd v Fili Shipping Co Ltd*). To the same effect, see *Comandate Marine Corp v Pan Australia Shipping Pty Ltd* (2006) 157 F.C.R. 45, [2008] 1 Lloyd's Rep. 119.

[523] *Fiona Trust & Holding Corp v Privalov,* at [27].

[524] *ibid,* at [12].

[525] *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] Q.B. 488; *AWB Geneva SA v North America Steamships Ltd* [2007] EWCA Civ 739, [2007] 1 C.L.C. 749; *Brave Bulk Transport Ltd v Spot On Shipping Ltd* [2009] EWHC 612 (QB), [2009] 2 Lloyd's Rep. 115 (applied in *Vitol SA v Capri Marine Ltd (No.2)* [2010] EWHC 458 (Comm.), [2011] 1 All E.R. (Comm.) 366); *Oceanconnect UK Ltd v Angara Maritime Ltd* [2010] EWCA Civ 1050, [2011] 1 Lloyd's Rep. 399; *Louis Dreyfus Commodities Kenya Ltd v Bolster Shipping Co Ltd* [2010] EWHC 1732 (Comm.), [2011] All E.R. (Comm.) 540.

*Forum Non Conveniens and Jurisdiction Agreements*   RULE 39

*Material scope and concurrent jurisdiction clauses.* Where a complex    12–110
financial or other commercial transaction is put in place by means of a number
of interlinked contracts, and each has its own provision for the resolution of
disputes, the point of departure will be that it is improbable that a jurisdiction
clause in one contract even if expressed in ample terms, was intended to
capture disputes more naturally seen as arising under a related contract.[526] In
some cases the court called upon to disentangle such provisions has guided
itself by seeking to identify the particular contract out of which the dispute
most naturally arises, or to locate the centre of gravity of the dispute; in others
it has preferred to ask whether the claim brought by the claimant was one
which a jurisdiction agreement permitted the claimant to bring, whatever else
may also have been permitted by other jurisdiction agreements,[527] though
these are simply two aspects of the single issue, which is one of contractual
interpretation. Even if the effect is that there will be a risk of fragmentation of
the overall process for the resolution of disputes, this is not by itself sufficient
to override the construction, and consequent giving of effect to the complex
agreements for the resolution of disputes which the parties have made.[528]

*Personal scope.* A separate aspect of the scope of a jurisdiction agreement    12–111
is the question of its scope *ratione personae*, its personal scope. In *Donohue
v Armco Inc*,[529] Lord Scott specifically considered a question which had been
raised, but not answered, in a previous case:[530] whether a dispute-resolution
agreement could be framed according to which A promised B not to bring
proceedings against C except in a designated court in such a way as gave some
form of protection to C, and what would happen if it was. It is apparent that
there are two points to consider. The first is whether, on a true construction of
the language in which the clause is expressed, it represents such a promise
made to B.[531] Those courts which have been called upon to deal with this
point have frequently had to struggle with drafting which is wordy and

---

[526] *Satyam Computer Services Ltd v Upaid Services Ltd* [2008] EWCA Civ 487, [2008] 2 All
E.R. (Comm.) 465; *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 2 Lloyd's Rep.
272. See also *ACP Capital Ltd v IFR Capital Plc* [2008] EWHC 1672 (Comm.), [2008] 2 Lloyd's
Rep. 665; *ACE Capital Ltd v CMS Energy Corp* [2008] EWHC 1843 (Comm.), [2008] 2 C.L.C.
318; *Choil Trading SA v Addax Energy SA* [2009] EWHC 2742 (Comm.); *Douglas v Glenvarigill
Co Ltd* [2009] CSOH 17, 2009 S.C.L.R. 379.
[527] *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep.
106.
[528] *BP Plc v Aon Ltd* [2005] EWHC 2554 (Comm.), [2006] 1 Lloyd's Rep. 549; *Deutsche Bank
AG v Highland Crusader Offshore LP* [2009] EWCA Civ 725, [2010] 1 W.L.R. 1023; *Morgan
Stanley & Co International Plc v China Haisheng Juice Holdings Ltd* [2009] EWHC 2409
(Comm.), [2010] 1 Lloyd's Rep. 265; *Skype Technologies SA v Joltid Ltd* [2009] EWHC 2783
(Ch.), [2011] I.L.Pr. 103; *Brave Bulk Transport Ltd v Spot On Shipping Ltd* [2009] EWHC 612
(QB), [2009] 2 Lloyd's Rep. 115; *Dubai Islamic Bank PJSC v PSI Energy Holding Co BSC*
[2011] EWHC 1019 (Comm.).
[529] [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425.
[530] *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 All E.R. (Comm.)
237. The decision pre-dated the Contracts (Rights of Third Parties) Act 1999; the court was
reluctant to interpret a contract as conferring a benefit which the common law of privity would
not then allow the third party, supposed beneficiary, to enforce.
[531] In this section the discussion is based on the assumption that the law which governs the
agreement is English law. If it is not, the corresponding provisions of whatever other law applies
to the jurisdiction agreement will apply instead.

opaque, and have come to a variety of conclusions, though as the question is one of construction, and no more, this is not surprising.[532] The second is whether such a promise gives rights to B, or to C, or to both. In principle, the answer is provided by the ordinary rules of privity of contract.[533] If the promisee, B, seeks to enforce the promise made by A, by applying for a stay or dismissal of the proceedings brought against C, there is no obvious reason why relief should be denied, unless it can be said that he has no legitimate interest in A's proceedings against C.[534] Whether C may seek relief in his own right will depend on whether the benefit of the jurisdiction agreement was one which A and B purported to confer on him: if it was, and if the contract is governed by English law, the Contracts (Rights of Third Parties) Act 1999 will, in principle at least, allow C to assert and enforce the benefit of the jurisdiction agreement. If the contract between A and B makes it clear that C is not to have this right,[535] C certainly cannot claim any contractual entitlement to apply for relief, though it has been suggested that where A has promised B not to sue C in the forum court, C, though having no contractual right to relief, may still contend that the bringing of proceedings against him in that court is vexatious or oppressive, or otherwise unconscionable, presumably on the ground that if A has made a clear statement on which reliance has been placed, it should not be open to A to proceed as if that statement had never been made, and the court's inherent power to stay proceedings, for example, on the footing that they are oppressive or vexatious, or that the court is, in the light of the promise made, a *forum non conveniens*, may still available to justify jurisdictional relief.[536]

**12–112**    *Jurisdiction clauses associated with voidable contracts.* Closely associated with the question of material scope is the issue whether a jurisdiction clause is applicable when a contract, the original making of which is not in dispute, has been rescinded, or avoided, or frustrated, or terminated.[537] Such a case

---

[532] *Morgan Stanley & Co International Plc v China Haisheng Juice Holdings Ltd* [2009] EWHC 2409 (Comm.), [2010] 1 Lloyd's Rep. 265; *Whitesea Shipping & Trading Corp v El Paso Rio Clara Ltda (The Marielle Bolten)* [2009] EWHC 2552, [2010] 1 Lloyd's Rep. 648; *Global Partners Fund Ltd v Babcock & Brown Ltd (In Liquidation)* [2010] NSWCA 196. But where the promise is only worded to apply to proceedings against A, associates of A have no rights in relation to it, and any attempt to be joined as claimants "in order to give effect to the jurisdiction clause" by obtaining an injunction for themselves will be rejected: *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425.

[533] Assuming the contract to be governed by English law. Where it is governed by a foreign law, that law will provide the answer to the question whether non-parties may take advantage of the contract, and if so, how.

[534] If, for example, the contract provides that B will indemnify C (or "hold C harmless"), a sufficient interest will be likely to be present. *cf. Gore v Van Der Lann* [1967] 2 Q.B. 31 (CA); *Beswick v Beswick* [1968] A.C. 58; *Snelling v John G Snelling Ltd* [1973] Q.B. 87; *Global Partners Fund Ltd v Babcock & Brown Ltd (In Liquidation)* [2010] NSWCA 196.

[535] For example, by expressly excluding the Contracts (Rights of Third Parties) Act 1999.

[536] *Global Partners Fund Ltd v Babcock & Brown Ltd (In Liquidation)* [2010] NSWCA 196, [73]: perhaps by analogy with the reasoning in *Norwich CC v Harvey* [1989] 1 All E.R. 1180 (CA).

[537] Quite apart from the case in which fault is found with the substantive contract, and the question is as to the effect on the jurisdiction agreement, it is clear that a jurisdiction clause can itself be repudiated, so freeing the other party from the obligation to comply with it: *Dubai Islamic Bank PJSC v PSI Energy Holding Co BSC* [2011] EWHC 1019 (Comm.).

presented itself in *Fiona Trust & Holding Corp v Privalov*,[538] in which a shipowner sought to avoid a charterparty, which contained a jurisdiction agreement, on the ground that as the substantive contract had been procured by bribery, and that once the bribery had come to light the entire contract had been rescinded, the shipowner had been freed from the constraint of the jurisdiction clause. In *Fiona Trust and Holding Co v Privalov*,[539] the House of Lords decisively rejected the contention that where a claimant had rescinded, or had purported to rescind, an admitted commercial contract the validity of which was governed by English law, the dispute-resolution clause was nullified together with everything else. This conclusion was justified by aligning the common law of jurisdiction clauses with the developed law of arbitration,[540] and adopting the idea that, at least where the matter was governed by English law,[541] a jurisdiction clause was legally separable from the substantive contract in which it was recorded, with the result that its validity was unaffected by the rescission of the substantive contract. A dispute resolution clause would only be deprived of intrinsic[542] effect if the fact or factor which was relied on to impugn the agreement was one specifically referable to or targeted at the dispute-resolution agreement itself.[543] In *Fiona Trust* itself, a contention that the charterparty had been rescinded when it had been discovered that it had been procured by bribery was held insufficient to impugn the dispute-resolution clause in the charter itself, for the allegation of bribery was not one specifically targeted at the dispute-resolution agreement.

*Jurisdiction clauses associated with "void contracts"*. It is important to observe that the context in which *Fiona Trust* re-stated the law was that there was no dispute about the original validity of the contract. It does not follow

**12–113**

---

[538] [2007] UKHL 40, [2007] Bus. L.R. 1719. To the same effect, see *Comandate Marine Corp v Pan Australia Shipping Pty Ltd* (2006) 157 F.C.R. 45, [2008] 1 Lloyd's Rep. 119. For earlier cases proposing this approach, see *FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity Association* (1997) 41 NSW.L.R. 559, [1998] Lloyd's Rep. I.R. 24; *IFR v Federal Trade SpA*, September 19, 2001; *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] Q.B. 701 (CA). For an analogous approach in French law, see *Monster Cable Products Inc v Audio Marketing Services* (Cass. civ. I, October 22, 2008) [2009] I.L.Pr. 158.

[539] To the same effect, see *Comandate Marine Corp v Pan Australia Shipping Pty Ltd* (2006) 157 F.C.R. 45, [2008] 1 Lloyd's Rep. 119.

[540] Arbitration Act 1996, s.7, though it had been widely accepted in the law of arbitration long before that.

[541] Where English law is not the law which governs the jurisdiction agreement, this approach will not apply as a rule, though it is to be supposed that it will be presumed to be consistent with the relevant foreign law unless the contrary is convincingly shown.

[542] As distinct from legal effect (such as by reason of overriding mandatory law, whether domestic or resulting from European harmonization, such as the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083): Case C–240/98 *Océano Grupo Editorial SA v Quintero* [2000] E.C.R. I–4941). Likewise, rules which require particular notice to be given in respect of onerous terms may apply to a dispute resolution clause: *Kaye v Nu Skin UK Ltd* [2009] EWHC 3509 (Ch.), [2011] 1 Lloyd's Rep. 40 (applying the rule in *J Spurling Ltd v Bradshaw* [1956] 1 W.L.R. 461 to an arbitration agreement).

[543] This will be the case where, for example, there was a misrepresentation on the very question whether a written document contained a jurisdiction clause. The question of how to proceed where the contention is that a contract never came into existence in the first place is entirely distinct from the issues examined and resolved in *Fiona Trust*, which was a case in which the original contract was not denied.

that the same approach, of detaching the jurisdiction agreement from the rescission or avoidance or termination of the substantive contract, can be justified where the contention of one of the parties is that no contract ever came into existence in the first place. This may arise (taking the examples, for convenience of illustration only, from English domestic law) where there is an allegation of failure to reach material agreement, or an absence of consideration, or mistake (including perhaps forgery[544] and *non est factum*), and perhaps some varieties of illegality.[545] The question whether the parties agreed upon the jurisdiction of a court as one of the terms of a contract must in principle be governed by the law which governs the broader issue of contractual formation.[546] As to that, the general approach of the common law has been to refer to the question to the putative proper law, or governing law, for two reasons. The first is that any question whether a contract contains a particular term is a matter for its governing law; and if that is so, the same law should also determine whether there was any agreement at all; the second is that if negotiating parties allowed themselves to come close to the point where a rationally-connected legal system might conclude that they had reached contractual agreement, each can fairly be regarded as being at risk of the court arriving at such a conclusion.

12–114    *Standard of proof.* As was explained in Chapter 11, where an English court is called on to exercise jurisdiction in circumstances in which the material jurisdictional facts are not agreed, the party who wishes to invoke the jurisdiction will be required to have the better of the argument that the facts which support its invocation of the jurisdiction are satisfied.[547] It is likely that the same principle applies in mirror image when a party challenges the exercise of jurisdiction by pointing to an agreement providing for the jurisdiction of the courts of a foreign country. If the court is required to decide who, on the material before it, has the better of the argument on the facts and matters relevant to the existence and exercise of jurisdiction, the question of who has

---

[544] See Lord Hoffmann in *Fiona Trust*, at [17]; *cf.* at [34], where Lord Hope appeared to suggest that contentions of forgery of document or signature fell under the voidable, rather than under the void, category of objection, and that they therefore did not impeach the dispute-resolution agreement.

[545] The answer will depend, in principle at least, on whether the illegality in question is said to make the contract a complete nullity, or makes it an unenforceable agreement, or affects the substantive contract but not the provision for the resolution of disputes. For an illustration of the difficulty see *Mackender v Feldia AG* [1967] 2 Q.B. 590.

[546] *Midgulf International Ltd v Groupe Chimiche Tunisien* [2010] EWCA Civ 66, [2010] 1 C.L.C. 113; *Rimpacific Navigation Inc v Daehan Shipbuilding Co Ltd* [2009] EWHC 2941 (Comm.), [2010] 2 Lloyd's Rep. 236 (a service out case). There may be rare cases in which the parties have agreed that a particular court is to have jurisdiction to determine whether the contract between them is void: *cf. UR Power GmbH v Kuok Oils & Grains Pte Ltd* [2009] EWHC 1940 (Comm.), [2009] 2 Lloyd's Rep. 495, [40] (an arbitration case).

[547] *Bols Distilleries BV v Superior Yacht Services Ltd* [2006] UKPC 45, [2007] 1 W.L.R. 12 (a case on the Brussels I Regulation, but upon which point, English procedural law is applicable). On the relationship between "the better of", "much the better of", and "clearly the better of" the argument, see *Global 5000 Ltd v Wadhawan* [2011] EWHC 853 (Comm.), [2011] 2 All E.R. (Comm.) 190 and the cases discussed therein.