**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

September 17, 2014

Hon. Richard M. Berman
United States District Judge, Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 12D
New York, New York 10007

Re:     ***Rio Tinto v. Vale et al*, Civil Action No. 14-cv-3042 (RMB) (S.D.N.Y.)**

Dear Judge Berman:

        This letter is respectfully submitted on behalf of Rio Tinto plc in opposition to the joint

motion to dismiss the Amended Complaint pursuant to *forum non conveniens* filed by Vale S.A.,

Benjamin Steinmetz, BSG Resources Limited, VBG–Vale BSGR Limited aka BSG Resources

(Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG

Resources (Guinea) SARL aka VBG-Vale BSGR, and Mahmoud Thiam (the "Moving

Defendants").  As detailed below, the Moving Defendants' motion should be denied because (1)

the jurisdictional clause upon which Vale relies is non-exclusive and permits Rio Tinto to sue

Vale in this Court, and (2) the *forum non conveniens* factors strongly favor suit in this Court.

<u>**ARGUMENT**</u>

**I.      THE JURISDICTIONAL CLAUSE IS NON-EXCLUSIVE**

        Clause 20 of the Deed, on which the Moving Defendants rely for the first of their two

proposed grounds for dismissal, does four things.  *First*, it provides that the Deed is governed by

English law.  Ex. A ("Deed"), cl. 20(a).  *Second*, it confers **non-exclusive** jurisdiction on English

courts to hear disputes arising out of or in connection with the Deed.  *Id.*, cl. 20(b).  *Third*, it

indicates that if one party elects to file a proceeding in an English court, the responding party

agrees to submit to the English court's non-exclusive jurisdiction and to waive any objection

based on venue or *forum non conveniens* grounds.  *Id.*  *Finally*, notwithstanding the parties'

agreement to waive any argument that England is not a convenient forum, Clause 20 sets forth one exception. It provides that in some cases, a defendant may apply for English proceedings to be stayed or dismissed on the grounds that Brazil is the more appropriate forum. *Id.*, cl. 20(c). In those instances where the English court concludes that Brazil is indeed the better forum, the parties agree to the ***non-exclusive*** jurisdiction of the courts in Rio de Janeiro. *Id.*

While Clause 20 specifies what happens *if* a party chooses to bring a dispute in England, it does not dictate that a party may *only* bring disputes in England (or Brazil) to the exclusion of other forums. To the contrary, the clause states – not once, but twice – that the jurisdiction conferred by the Deed is "non-exclusive." The parties remain free to bring a proceeding in any other location, subject to the risk that the defendant will challenge the suit on jurisdictional or *forum non conveniens* grounds. The Deed thus sets up England as an advantageous jurisdiction, but not as the exclusive one. Clause 20 therefore permits Rio Tinto to sue Vale in this Court.

The repeated use of "non-exclusive" is fatal to any contention that England is the only available forum for the present dispute. Vale nevertheless asks this Court to ignore the plain and unambiguous language in the contract, in favor of an interpretation foreclosed by the text and requiring this Court to assume that Rio Tinto and Vale – two sophisticated entities represented by counsel – did not mean what they said. Indeed, Vale's English law expert, Lord Collins of Mapesbury, attempts to explain away the Deed's repeated use of the term "non-exclusive" by assuming it must have been a *mistake*. But absent this alleged drafting error, Lord Collins concedes – as he must – that the use of "non-exclusive" is determinative.

There is no justification, however, for rewriting the contract between Rio Tinto and Vale. As Rio Tinto's English law expert, Lord Leonard Hoffmann (cited by Lord Collins multiple times and author of what Lord Collins calls "the most influential, and most cited, modern

opinion in this area" (Collins Decl. ¶ 31)) explains in the declaration attached as Exhibit B, the Deed can be read in a logical and straightforward manner that harmonizes each element of Clause 20, without any need to assume that the parties erred in drafting the agreement.

A.     **"Non-Exclusive" Means** *Non-Exclusive*

The question of whether Clause 20 is mandatory or permissive is governed by the law selected in the Deed, *i.e.* English law. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 217-18 (2d Cir. 2014); Deed, cl. 20(a). As Vale's expert, Lord Collins, correctly notes, the starting point for interpreting a contractual provision under English law "is the natural and ordinary meaning of the words of the contract, and in the vast majority of cases that is the ending point also." Collins Decl. ¶ 21. In this case, Clause 20 unambiguously states that the courts of England have non-exclusive jurisdiction. Specifically, Clause 20 provides as follows:

**20. Governing law and jurisdiction**

(a)     This Deed shall be governed by and construed in accordance with English law.

(b)     Each of the parties agrees that the courts of England are to have ***non-exclusive jurisdiction*** to settle any disputes which may arise out of or in connection with this Deed and that accordingly any proceedings arising out of or in connection with this Deed shall be brought in such courts. In connection with any disputes which may arise out of or in connection with this Deed, each of the parties irrevocably submits to the jurisdiction of such courts and waives any objections to proceedings in any such court on the grounds of venue or on the ground that the proceedings have been brought in an inconvenient forum.

(c)     Notwithstanding the provisions of sub-Clause (b) of this Clause 20, the parties recognize that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed (including in relation to the obligations set out in sub-Clause 5 (Share Acquisitions), not least where injunctions are required. Where this is the case, each of the parties agrees irrevocably and unconditionally to submit to the ***non-exclusive jurisdiction*** of the Central Courts (Foro Central) of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

Deed, cl. 20 (emphasis added).

The natural and ordinary meaning of the term "non-exclusive jurisdiction" is neither

controversial nor ambiguous under English law.  It is "a well known technical term which denotes submission to the jurisdiction of the courts in question without prejudice to the right to bring proceedings in any other court willing to take jurisdiction."  Ex. B ("Hoffmann Decl.") ¶ 7. In other words, a non-exclusive jurisdiction clause is permissive, rather than mandatory.  Vale's expert, Lord Collins, agrees.  As he states, "[t]he difference between a non-exclusive jurisdiction clause and an exclusive jurisdiction clause is that an exclusive jurisdiction clause requires proceedings to be brought in the chosen court, and a non-exclusive jurisdiction clause gives or confirms *an option* for proceedings to be brought in the nominated court."  Collins Decl. ¶ 37 (emphasis added).  Lord Collins repeatedly admits that the use of "non-exclusive" is normally determinative of whether a jurisdictional clause is mandatory or permissive:

- "…I acknowledge that the ordinary meaning of the an express reference to the non-exclusive character of jurisdiction would normally be determinative."  *Id.* ¶ 59.

- "the use of the expression 'non-exclusive' would normally be a conclusive pointer against the exclusivity of the clause."  *Id.*

Since the meaning of "non-exclusive jurisdiction" is not only clear, but indeed agreed to by both sides' experts, the Court's analysis of this contractual provision should end there.

## B.  Vale's Argument Improperly Assumes The Parties Made A Mistake

Lord Collins nevertheless opines that, in this case, the term "non-exclusive" is not dispositive.  In fact, he supposes it has the opposite of its plain meaning.  And he arrives at that conclusion not by offering an interpretation that attempts to give effect to the clause as actually executed by the parties, but instead by dismissing the use of the highly-specific term "non-exclusive" (twice) as the result of "careless drafting."  Collins Decl. ¶ 10; *see also id.* at ¶ 62 (opining that "non-exclusive" was left in as a "result of careless drafting"); ¶ 64 (explaining that

Lord Collins concluded that the expression "non-exclusive" must "hav[e] been inserted, or left in, in error."); ¶ 94 (opining that "the expression 'non-exclusive' was, as a result of careless drafting, inserted or left in sub-clause 20(b) in error . . .").

Notably, Vale's motion to dismiss fails to even mention that its expert's entire analysis is premised on the idea that "non-exclusive" was a mistake.[1]  It is of course no surprise that Vale would want to bury this aspect of its expert's analysis because it is fatal to their view of the clause under English law.  Indeed, Lord Collins himself admits that he is "not aware of any reported decision in which this principle [that something has "gone wrong" with the language of the contract] has been applied to a question of the exclusivity of a jurisdiction clause."  Collins Decl. ¶ 87.  And Lord Hoffmann describes the Collins Declaration as "a truly heroic feat of interpretation, a thing unattempted yet in any judicial decision."  Hoffmann Decl. ¶ 8.  He explains that while "[t]here are cases in which 'jurisdiction', *tout simple*, has been interpreted in context to mean exclusive jurisdiction," there are "none, so far as I am aware, in which the draftsmen of an important contract negotiated between well-advised multinational corporations has said 'non-exclusive' but has been held to have meant 'exclusive'." *Id.*

In trying to show that the intention of the parties was something different than what they actually said – specifically, that Clause 20 is "a submission to the exclusive jurisdiction of the English court, despite the use of the expression 'non-exclusive'", Collins Decl. ¶ 95 – Lord Collins points to three things:  (1) the clause's use of the word "shall"; (2) the relationship between the Deed's sub-clauses; and (3) commercial common sense.  Not one of these purported

---

[1]  Vale not only conceals this aspect of its expert's opinion, it actually goes further and *contradicts* it.  In its Motion, Vale argues that the parties actually intended to use the term "non-exclusive" to indicate that England and Brazil are non-exclusive as to each other, while being exclusive as to all other forums.  Mot. at 5.  This reading runs directly counter to Lord Collins's conclusion that the parties did not intend to use the word "non-exclusive" at all.  Collins Decl. ¶¶ 10, 62, 64, 94.

bases supports Vale's unprecedented claim that "non-exclusive" actually means "exclusive."[2]

### 1.     Vale's Reliance On The Word "Shall" Is Misplaced

After noting that the parties agree to the non-exclusive jurisdiction of the English courts, Clause 20(b) of the Deed provides that "accordingly any proceeding arising out of or in connection with this Deed shall be brought in such courts."  Deed, cl. 20(b).  Vale wrongly seizes upon this language and asserts that "the use of 'shall' is mandatory," and "signals an obligation to submit disputes *only* to English courts."  Mot. at 4.  As Vale's expert notes, however, a "literal interpretation divorced from context or from the surrounding circumstances will not be adopted."  Collins Decl. ¶ 27.  A non-contextual interpretation of "shall" is particularly dangerous, since under English law "the word is notoriously ambiguous."  Hoffmann Decl. ¶ 20.  As Lord Hoffmann explains,

> Thornton's *Legislative Drafting*, the leading English work on the subject, says that ["shall"] is "one of the most ambiguous terms in legislative drafting".  "It may be temporal and denote future time" or it may be "modal denoting obligation".  Its use in UK legislative drafting has been virtually prohibited, provoking an elegiac editorial in the Statute Law Review ("*In Honour of the Moribund 'Shall'*" (2014) 35 Statute Law Review v-vi).  There are numerous cases in which "shall" has been read "not to impose an absolute and imperative duty to do or omit the act prescribed" (per Starke J in *R v Davis* (1947) 75 CLR 409).

*Id.*  Because of the ambiguity surrounding the term "shall," it is "an inherently weak indicator" for determining the intentions of the parties.  *Id.*[3]

---

[2]     Lord Collins acknowledges that English law precludes him from considering either the parties' subjective intention or their pre-contractual negotiations.  *See* Collins Decl. ¶¶ 23, 25.

[3]  U.S. courts agree with their English counterparts that the term "shall" must be viewed in context.  *See, e.g.*, *RLS Assocs. LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 710 (2d Cir. 2004) ("To understand the intended meaning of a contractual provision and particularly to appreciate whether it was intended to create a mandatory obligation, as opposed to a discretionary option, a court must read the relevant terms of a provision in full and in context, rather than simply assume that the selection of a particular word was intended to denote the significance lawyers normally intend by its use.")*; id.* at 710 n.2 (citing *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 557 (2002) ("[W]hile the word 'shall' is primarily mandatory in effect, and 'may' is primarily permissive in effect, courts, in endeavoring to arrive at the meaning of written language ... will construe 'may' and ' shall' as permissive or mandatory in accordance with the subject matter and context.")).  Not surprisingly, none of (footnote continued)

Adopting Vale's interpretation of "shall" produces an absurd contradiction:  The parties agree that the courts in England are to have **non-exclusive** jurisdiction to settle disputes "and that accordingly" English courts are to have **exclusive** jurisdiction.  This would be "not merely a case of the parties saying one thing in one place and something different in another.  It would be subscribing to a contradiction of Alice in Wonderland proportions."  Hoffmann Decl. ¶ 21.

When read as a whole, as it must be, Clause 20 establishes that the parties did not intend to make England the sole available forum to the exclusion of all other forums.  It is clear from the text that the parties were preoccupied with ensuring England would be an available jurisdiction, free from *forum non conveniens* objections with the sole exception pertaining to Brazilian courts.  *See* Hoffmann Decl. ¶¶ 13-22; *see also* Deed, cl. 20(b), (c).  This is the only reading that gives effect to, and harmonizes, all of the sub-parts of Clause 20 – including the use of the term "shall."  As Lord Hoffmann explains,

> In this context, the word "shall" has temporal significance.  "Shall" is the parties' expression that they foresee there will be instances where a party elects in the future (temporal) to bring claims in the courts of England to take advantage of the mandatory acceptance of English jurisdiction if suit is filed there.  There is no doubt that the idea could have been better expressed, but that is in my view the best way not to convict the parties of having subscribed to an absurd contradiction.

Hoffmann Decl. ¶ 22.

Thus, the parties' use of the term "shall" does not support the conclusion that use of "non-exclusive" in Clause 20 was in error.

### 2.   Sub-Clauses (b) and (c) Show That Clause 20 Is Non-Mandatory

Vale next argues that "[t]here would be no need to specify that Clause 20(c) applied 'notwithstanding' Clause 20(b) if Clause 20(b) itself left it open for the parties to commence

---

the U.S. cases Vale relies upon in support of its interpretation (*see* Mot. at 4) involve a forum selection clause containing the phrase "non-exclusive."

litigation in Brazil."   Mot at. 5.   According to Vale, "Clause 20(c) would be superfluous if Clause 20(b) did not otherwise require the parties to submit all disputes in connection with the Deed to the courts of England."   *Id.*

Vale's reading of sub-clauses (b) and (c) is untenable in two respects.   First, it requires the Court to assume that the parties' repeated use of the word "non-exclusive" was a mistake. Second, giving effect to the term "non-exclusive" does not render Clause 20(c) superfluous.   The plain purpose of Section 20(b) is to ensure that proceedings brought in England are generally exempt from *forum non conveniens* objections, and Clause 20(c) carves out a single exception to that general rule.   *See* Hoffmann Decl. ¶¶ 13-22.   When that purpose is accounted for, both sub-clauses (b) and (c) can be given effect and work together in harmony without any need to assume that the parties engaged in "careless drafting."   Sub-clause (b) provides that *forum non conveniens* is generally not available when a case is brought in England, and (c) sets forth the one exception when it can be used.

Indeed, it is Vale's tortured reading, which assumes a mistake, that leads to internal inconsistency.   As noted above, if Clause 20 is construed to designate England as the exclusive jurisdiction for disputes, it would be "pointless and irrelevant" for the parties to waive *forum non conveniens* objections in England, as they do in Clause 20(b).   *See* Hoffmann Decl. ¶ 18.

Further, if Clause 20 were intended to make England the exclusive forum with the single exception of Brazil, as Vale suggests, it would have a glaring deficiency – the provision offers no definition as to when a party may sue in Brazil.   *See* Deed, cl. 20(c).   "This would be remarkable if (c) was intended to create an exceptional right to sue in Brazil in such indistinct terms." Hoffmann Decl. ¶ 18.   This omission makes complete sense, on the other hand, if the parties intended sub-clause (c) to be an exception to the general prohibition against arguing that England

8

is an inconvenient forum, and to apply when a proceeding has first been commenced in England. This leaves it to the English court to decide whether Brazil is a more appropriate forum when *forum non conveniens* factors are assessed under English law.

Additionally, while sub-clause (b) provides a waiver for *non conveniens* arguments in England, sub-clause (c) contains no similar waiver for Brazil.  Vale offers no explanation for why, under their reading, only one of their two purportedly exclusive jurisdictions gets the benefit of this waiver.  However, this dichotomy is easily explainable under Rio Tinto's reading where the parties have agreed that suits brought in England get the benefit of the waiver of *forum non conveniens* arguments, with the exception that in some instances a defendant can argue that Brazil is the proper forum.  This framework only applies where a party elects to file in the non-exclusive jurisdiction of England in the first instance.  If a party chooses instead to file in Brazil, then that suit – like a suit filed in the United States or any other jurisdiction – remains susceptible to traditional *forum non conveniens* objections.  *See* Hoffmann Decl. ¶¶ 13-22.

### 3.    A Non-Exclusive Jurisdiction Clause Makes Commercial Sense

Finally, Lord Collins argues that the parties' use of "non-exclusive" must have been mistaken because a permissive jurisdiction clause makes no commercial sense.  He offers three arguments:  (1) it makes no commercial sense that the parties agreed that every court in the world is an available forum; (2) since the agreement is governed by English law (sub-clause 20(a)) and provides for service of process in England (sub-clause 22(a)), disputes should be centered in England; and (3) if sub-clause 20(b) is construed as non-exclusive, "it has achieved very little."  Collins Decl. ¶¶ 69-71.  Each of these arguments fails.

Contrary to Lord Collins's supposition, it would violate commercial sense (and indeed common sense) for the parties to lock themselves into a single jurisdiction to raise disputes,

when circumstances might dictate that another jurisdiction is a more convenient or appropriate forum. Rio Tinto's reading of the Deed, by contrast, gives the parties the best of both worlds. On the one hand, they get a degree of certainty, since Clause 20 ensures that England is an available forum. At the same time, the parties retain the flexibility to file in a different jurisdiction if another forum is better suited to hear the dispute. Even then, the parties are protected from being dragged into an inappropriate or inconvenient forum, because every jurisdiction other than England remains susceptible to a *forum non conveniens* challenge.

Lord Collins's second claim, that the parties' choice of English law requires exclusive jurisdiction in England, is equally unpersuasive. Indeed, "[t]he Brazilian exception sits a little awkwardly with this argument."[4] Hoffmann Decl. ¶ 27. Additionally, Lord Collins acknowledges "that there is no clear line of authority which says that a choice of English law must be accompanied by exclusive English jurisdiction." Collins Decl. ¶¶ 42-45. "It is a factor to be taken into account in deciding whether the simple use of the word 'jurisdiction' means exclusive or non-exclusive jurisdiction, with mixed results. *But no judge has ever used it to conclude that non-exclusive meant exclusive.*" Hoffmann Decl. ¶ 27 (emphasis added). Lord Collins' reliance on the appointment of an English process agent in sub-clause 22(a) is also misplaced. Service of process in England is entirely consistent with England being one forum (even an advantageous forum), but not an exclusive forum. *See* Hoffmann Decl. ¶ 28.

Lord Collins also errs in asserting that, if read to be non-exclusive, sub-clause 20(b) "has achieved very little." Collins Decl. ¶ 71. This assertion rests on a mistaken belief that the only possible purpose for 20(b) is to confer exclusive jurisdiction on English courts. But as Lord Hoffmann demonstrates, the language chosen by the parties shows that they intended sub-clause

---

[4] Moreover, "[t]here are many common law jurisdictions (not least New York) which would have less difficulty with English commercial law than the courts of Brazil." Hoffmann Decl. ¶ 27.

20(b) to serve a different function – namely to permit proceedings filed in England to benefit from the waiver of *forum non conveniens* objections, with one exception – that is entirely consistent with the language ("non-exclusive") that the sophisticated parties in this case actually used in their agreement.  *See* Hoffmann Decl. ¶ 24.

*****

The Court is left with a clear choice.  Vale asks the Court to assume that the parties did not mean what they said when they twice used the term "non-exclusive jurisdiction" in the Deed – a term that is commonly understood in English law to be permissive, not mandatory – and to take the unprecedented step of holding that an explicitly non-exclusive jurisdictional clause is in fact exclusive.  By contrast, Rio Tinto asks the Court to read the entire clause in context, and conclude that while it inartfully includes the "notoriously ambiguous" term "shall," it means exactly what it says.  Rio Tinto's approach is the correct one.

### C.    Even if Clause 20 Were Exclusive, Rio Tinto's Claims Do Not "Arise Out Of" or in Connection With" The Deed

Because the jurisdiction clause is non-exclusive, it does not apply and this Court need not even consider whether Rio Tinto's claims "arise out of or are in connection with" the Deed. Nevertheless, it is clear that they do not.  Whether the claims arise out of or in connection with the Deed is governed by English law.  *Martinez*, 740 F.3d at 217-18.  Under English law, the question is whether the contract, construed against the background known to both parties at the time of contracting, should objectively be regarded as having been intended to cover the wide-ranging criminal conspiracy alleged in the Amended Complaint.  Hoffmann Decl. ¶36.  The answer here must be no.  At the time of executing the Deed, Rio Tinto did not know, nor could it have known, that Vale was but one player in an elaborate conspiracy to steal Rio Tinto's mining rights at Simandou.  It also cannot be that Vale, which repeatedly availed itself of New York to

11

advance the conspiracy, should now be able to in effect secure immunity by relying upon a jurisdiction clause in the Deed that was used to advance the enterprise.  Hoffmann Decl. ¶ 38.

Vale's expert counters this English law analysis by relying on *Fiona Trust and Holding Corp v Privalov* [2007] Bus LR 1719, another decision authored by Lord Hoffmann.  *Fiona Trust* stands for the unremarkable proposition that English courts broadly construe arbitration clauses, and start from the assumption that the parties, as rational business people, are likely to have intended any dispute arising out of their relationship to be decided by the same tribunal. Collins Decl. ¶ 57, Collins Sept. 3 Decl. ¶ 5.  But Lord Hoffmann has explained that his decision in *Fiona Trust* does not dictate the outcome here.  That is because where, as here, other parties also become involved in the dispute, another powerful consideration comes into play:  whether the parties, as rational business people, are likely to have intended that the same issues should be decided by different tribunals, with the possibility of inconsistent decisions.  Hoffmann Decl. ¶ 33.  And where, as here, "the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant disputes," English courts consistently refuse to enforce even exclusive jurisdiction clauses.  *Id.* ¶ 34.  In other words, Vale's reading would lead to an unfavored result under English law:  parallel proceedings in England against Vale and in this Court against the other Moving Defendants, with the possibility of inconsistent results.

Because English law applies, the litany of U.S. cases that Vale cites in support of its argument are of no avail.  Nevertheless, the outcome is no different under U.S. law.  Unlike the U.S. cases Vale cites, none of Rio Tinto's claims depends upon the existence of the Deed; each could be brought in the absence of the Deed.  None of Vale's duties not to defraud Rio Tinto or enter into a conspiracy to steal Rio Tinto's mining rights stem from the Deed.  In fact, the Deed

covers only information; it does not deal with, let alone mention, the mining rights that are at issue in this litigation.  And nothing in the Deed governs the numerous illicit acts the Complaint alleges Vale undertook in furtherance of the conspiracy, including, among other things, (1) helping to induce officials in the Guinean government to rescind Rio Tinto's rights in Blocks 1 and 2 of Simandou, Am. Compl. ¶¶ 91-92; (2) supporting Steinmetz's and BSGR's efforts to bribe Guinean officials, *id.* ¶¶ 89-90; (3) meeting with BSGR and Guinean mining officials about taking Simandou while in the midst of negotiations with Rio Tinto, *id.* ¶¶ 103-04; and (4) forming a public joint venture with BSGR in an attempt to conceal and legitimize the conspiracy, *id.* ¶¶ 107-10.  Nor does the Deed govern any of the other illicit acts undertaken by Vale's co-conspirators, for which Vale also is liable.  The actions of Vale's co-conspirators are also attributed to Vale.  *See Tedesco v. Mishkin*, 689 F. Supp. 1327, 1333 (S.D.N.Y. 1987).  Vale's argument boils down to the untenable proposition that the Deed immunizes it from its decision to enter into a conspiracy to steal Rio Tinto's mining rights with a number of co-conspirators (none of whom are a party to the Deed) that spanned several years and includes numerous acts which the Deed in no way contemplated.  This is not the law.  *See Armco Inc. v. N. Atl. Ins. Co.*, 68 F. Supp. 2d 330, 339 (S.D.N.Y. 1999) (holding that "a large scale scheme to defraud that included numerous pre-contract activities" that predated and produced the contract did not fall within contract's forum selection clause).[5]

---

[5]  Vale's accusation that Rio Tinto "blatantly change[d] its statement of the facts" is baseless for two reasons.  First, the Court ordered that Rio Tinto had two weeks to amend its complaint.  The entire purpose of the Court's pre-motion letter method is to allow plaintiffs an opportunity to rectify any alleged deficiencies before a formal motion to dismiss.  *See Streit v. Bushnell,* 424 F. Supp. 2d 633, 640 n. 4 (S.D.N.Y. 2006) ("It would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or by the Court, only to have the case dismissed because the conforming change in some way may conflict with an allegation in the earlier pleadings.").  Second, many of the facts underlying the amended pleading, including those supporting the fraudulent inducement claim, were discovered as part of Rio Tinto's ongoing investigation after filing the original complaint. *See* Alan Mansfield, 1 Bus. & Commercial Litig. Fed. Courts § 7:69 (3d ed.) ("An amended complaint may be used . . . to add newly discovered factual allegations to the earlier complaint . . . .").

## II.     DISMISSAL FOR *FORUM NON CONVENIENS* IS NOT WARRANTED

The Moving Defendants' second argument that this Court should take the extraordinary step of declining jurisdiction on *forum non conveniens* grounds is equally unpersuasive.  The Supreme Court has long held that a "plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 502, 508 (1947).  Dismissal is appropriate only upon a "clear showing" both that there is an adequate alternative forum and "that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience."  *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002); *see Am. Stock Exch., LLC v. Towergate Consultants Ltd.*, 03-cv-856 (RMB), 2003 WL 21692814, at *3 (S.D.N.Y. July 21, 2003) (Berman, J.) (mere inconvenience is insufficient).   The Moving Defendants have not and cannot meet that high burden.

The *forum non conveniens* inquiry proceeds from the premise, established in *Gulf Oil*, that a plaintiff's choice of forum is entitled to deference.  *See Gross v. British Broad.*, 386 F.3d 224, 230 (2d Cir. 2004) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001) (*en banc*)).   As a threshold matter, the defendant must demonstrate that there is an adequate alternative forum for adjudication of the plaintiff's claims against all defendants. *Gilbert*, 330 U.S. at 506-07.  Only if there is such an alternative forum may the court proceed to weigh the private and public interests implicated by the choice of forum.  *Gross*, 386 F.3d at 230. And even if the defendant has demonstrated the adequacy of an alternative forum, it carries a heavy burden to demonstrate that dismissal is appropriate based on the balance of interests.  "A balance of the relevant interests must weigh heavily in favor of dismissal to justify invocation of *forum non conveniens*."  14D Charles Alan Wright, Arthur R. Miller, et al., Federal Practice & Procedure §3828 (4th ed. 2014).

The Moving Defendants cannot demonstrate that England is an adequate forum because

Defendants Touré and Cilins have not consented to English jurisdiction and appear to be beyond the reach of English courts.   That alone dooms their motion.   Moreover, Rio Tinto's selection of this forum is entitled to deference, and the balance of relevant interests strongly favor Rio Tinto's selection, including that (1) three of the key named defendants, who were all actively involved in the RICO conspiracy, reside in the United States, including Defendant Mahmoud Thiam who lives in New York City; (2) the U.S. Attorney for the Southern District of New York is conducting a parallel investigation of the very conduct at issue in this case, which will require the production of relevant evidence *in New York*, whether or not Rio Tinto's case proceeds in this forum; and (3) Vale and its co-conspirators committed numerous acts in furtherance of the conspiracy in the United States, and New York in particular.

### A.    England Is Not An Adequate Alternative Forum Because Some Defendants Are Not Amenable To Process In England

The *forum non conveniens* doctrine allows dismissal only where the court determines that "an alternative forum is available, because application of the doctrine 'presupposes at least two forums *in which the defendant is amenable to process*.'"   *Murray v. British Broad. Corp.,* 81 F.3d 287, 292 (2d Cir. 1996) (quoting *Gulf Oil,* 330 U.S. at 506–07 (emphasis added)).   The Moving Defendants fail to meet their burden to show that England is an adequate forum.   Two crucial Defendants residing in the United States have not consented to jurisdiction in an English court; and, in any event, a bald assertion in a legal brief, signed only by Vale's counsel, is inadequate to establish that even the Moving Defendants consent to jurisdiction in an English court.

### 1.    English Courts Would Not Have Jurisdiction Over Touré And Cilins

In a transparent attempt to obfuscate the fact that they do not speak for *all defendants*, the Moving Defendants define themselves simply as the "Defendants."   Mot. at 1.   But two key

defendants—Mamadie Touré and Frederic Cilins—have not joined the Motion.    Defendants Touré and Cilins both reside in the United States (Touré in Florida and Cilins in federal prison in Pennsylvania), and neither has consented or is otherwise subject to the jurisdiction of the English courts.  These facts are fatal to the Motion under binding Second Circuit precedent.

"[I]n order to grant a motion to dismiss for *forum non conveniens*, a court must satisfy itself that the litigation may be conducted elsewhere against *all defendants*."  *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 73 (2d Cir. 1998) (emphasis added); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 426 (S.D.N.Y. 1998) ("[T]he requirement that a defendant be subject to the jurisdiction of the alternative forum 'refers to all defendants.'" (quoting *Madanes v. Madanes*, 981 F. Supp. 241, 265-66 (S.D.N.Y. 1997))); *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667 (NRB), 2006 WL 3247363, at *5 (S.D.N.Y. Nov. 8, 2006) ("*All defendants*, including the non-German [defendants], have represented to this Court that they would consent to the jurisdiction of the German courts") (emphasis added).[6]

This Court's decision in *Herald*, cited by the Moving Defendants, does not suggest otherwise.  *See* Mot. at 18 n.20 (citing *In re Herald, Primeo & Thema Sec. Litig.*, No. 09-civ-289, 2011 WL 5928952, at *13 (S.D.N.Y. Nov. 29, 2011) (Berman, J.)).  *Herald* does not stand for the proposition that the adequacy of the forum turns solely on whether Defendants "who ha[ve] entered an appearance" are amenable to process.  *Herald*, 2011 WL 5928952, at *13.  In *Herald*, this Court rendered its decision on the motions to dismiss nearly three years after the

---

[6]   *See also Lans v. Adduci Mastriana & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 290 (D.D.C. 2011) ("The defendants have failed to establish that Sweden is available as an alternative forum as to *all* defendants" and noting defendants conspicuously ignored certain of the named defendants in its motions) (emphasis in original); *AloStar Bank of Commerce v. GLS Florida Prop. 2, LLC*, 11-cv-406-RS-GRJ, 2012 WL 4986964, at *3 (N.D. Fla. Oct. 17, 2012) (denying *forum non conveniens* where court concluded that "it is clear that not all parties have consented."); *McTurtrie v. Iolab Corp.*, Civ. A. Nos. 94-3683 to 94-3688, 1995 WL 133338, at *1 (E.D. La. Mar. 24, 1995) ("However, dismissal predicated on *forum non conveniens* requires that *all* defendants consent or be subject to the alternative forum's jurisdiction") (emphasis in original).

complaint was filed.  The Court's analysis was focused on two defendants that had entered appearances, but had refused to consent to the jurisdiction of the proposed alternative forum (Ireland).  The Court concluded that these non-consenting defendants posed no impediment to dismissal on *forum non conveniens* grounds—but only because the Court concluded that those defendants should be dismissed from the case entirely, on grounds unrelated to the *forum non conveniens* analysis.  *Id.*  The Court also dismissed claims against the non-appearing defendants for insufficient service of process, lack of personal jurisdiction, and alternatively for failure to prosecute under Federal Rules of Civil Procedure 12(b)(5), (2), and 41(b).  *Id.* at *3 & n.7.  Here, by contrast, Defendants Cilins and Touré both were properly served with both the Complaint, and Touré with the Amended Complaint.  *See* Dkt. Nos. 37, 46, 85.[7]  Also in stark contrast to *Herald*, this case was filed fewer than five months ago, has proceeded on a comparatively fast track, and Rio Tinto has every intention of prosecuting its claims against these two crucial defendants, who have neither consented to nor are otherwise amenable to process in England.

### 2.    Vale's Counsel's Representation Is Not Sufficient To Establish That The Moving Defendants Consent to Jurisdiction in England

The Motion states that "all [of the Moving Defendants] consent to the jurisdiction of the courts of England in regard to this matter."  Mot. at 18.  But nowhere in the voluminous filing of the Moving Defendants is there a sworn statement by a single Moving Defendant stipulating to the jurisdiction of the courts of England.  In fact, none of the Moving Defendants other than Vale even signed the brief with this statement in it.  Vale's counsel's statements in a letter brief to the Court would therefore be insufficient to establish adequacy of England as an alternative forum,

---

[7]  Defendant Cilins soon will be served with the Amended Complaint at his new prison in Pennsylvania (he was until very recently jailed in New York), where he currently is serving time for obstructing the United States' investigation into many of the misdeeds alleged in this case.

even if the brief purported to represent the position of *all* of the defendants (which it does not).[8]

Because only Defendant Vale has formally consented to the jurisdiction of the English courts, and because the United States is the only place where Rio Tinto can pursue its litigation against *all* Defendants, England is not an adequate alternative forum, and the Motion should be denied.[9]

### B.    Rio Tinto's Decision To Avail Itself Of U.S. Courts Is Entitled To Deference

Even if England were an adequate alternative forum, the Moving Defendants cannot meet their heavy burden to make a "clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience." *DiRienzo*, 294 F.3d at 30.  The Second Circuit has identified two related inquiries that a court must undertake in determining whether dismissal in favor of an adequate alternative forum is warranted.  First, the court must give due consideration to the Supreme Court's admonition that a plaintiff's choice of forum should rarely be disturbed.  *Gilbert*, 330 U.S. at 508.  Moreover, the Second Circuit has explained that the weight given to this factor varies, such that "[t]he more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."  *Iragorri*, 274 F.3d at 71–72; *see also Bigio v. Coca-Cola*, 448 F.3d 176, 179 (2d Cir.

---

[8]    *See, e.g.*, *Niv v. Hilton Hotels Corp.*, 710 F. Supp. 2d 328, 336 (S.D.N.Y. 2008) ("defendants submitted stipulations asserting that they are amenable to service in Egypt."); *Esfahani v. Citibank, N.A.*, 587 F. Supp. 841, 843 n.2 (S.D.N.Y. 1984) (discussing affidavit submitted by Citibank in support of its *forum non conveniens* motion stating, *inter alia*, that it would consent to jurisdiction in France).

[9]    As Rio Tinto pled in its Amended Complaint, "BSGR is notorious for its complex and secret corporate structure. This lack of transparency is not coincidental; it is purposefully aimed at avoiding legal obligations across the globe." Am. Compl. ¶ 21(d).  Accordingly, any dismissal should be conditioned upon a sworn submission by each Defendant agreeing to (1) submitting to jurisdiction in England, (2) waiving any statute of limitations defense, and (3) agreeing to satisfy any judgment rendered by an English court.  *See Do Rosario Vega v. World Meteorological Org.*, 486 F. Supp. 2d 297, 308 (S.D.N.Y. 2007) (indicating that Court would entertain imposing as a condition of dismissal that defendants consent to (1) accepting service of process in Switzerland, (2) waiving any statutes of limitations defenses, and (3) satisfying any judgment rendered by a Swiss court); *Madanes*, 981 F. Supp. at 266 ("Given the ramifications of this dispute, the Court concludes that it would be improper to dismiss the case absent a proffer by all of the Defendants that they would be willing to consent to the jurisdiction of the Argentine court, as well as agree to satisfy any judgment reached by that court.").

2006) (reversing dismissal on *forum non conveniens* grounds and explaining that "the more that a plaintiff, *even a foreign plaintiff*, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given to that choice.") (quoting *Iragorri*, emphasis added).

Rio Tinto has legitimate and substantial reasons for bringing this suit in the United States and, specifically, in Southern District of New York.  As detailed in the Amended Complaint, Rio Tinto is a multinational company with significant assets in and ties to the United States and this District.  *See* Am. Compl. ¶18.  Moreover, conduct critical to the success of the RICO enterprise took place in the United States.  *See, e.g.*, *id.* ¶¶1–2, 9, 11, 15–16, 25, 54–83, 96, 105–06, 114, 119–33, 135–41, 160–61, 167, 172–73, 183, 188–89, 193, 208–13, 219, 229–34.  The fraud perpetrated on Rio Tinto was carried out by the Defendants in part in meetings that occurred in the United States, and Defendants then attempted to conceal their unlawful acts through obstruction in the United States.  A federal grand jury in this District is considering criminal charges for the very same conduct at issue in this case, and a member of the RICO enterprise, Defendant Cilins, has already pled guilty to obstruction of justice.  *Id.* ¶¶ 131, 149.  Thus, far from the forum shopping accusations the Moving Defendants lodge, Rio Tinto chose this forum because (1) it is a forum where it could sue all defendants (including U.S. citizen and New York resident Thiam, and U.S. residents Touré and Cilins); (2) it is a forum conducting an active criminal investigation into the acts which underlie the Amended Complaint, in response to which defendants already are or likely will be asked to produce witnesses and documents; and (3) it is a forum regularly utilized by Vale to conduct business, including its negotiations with Rio Tinto and the active trading of its American Depository Receipts (ADRs) on the New York Stock Exchange (NYSE).

In light of all this, the Moving Defendants' assertion that there are no significant ties to

New York is preposterous.  Given the Defendants' violations of United States law, including the RICO Act, the interest in having "United States courts enforce United States securities laws" is also a "valid reason" for Rio Tinto's choice of forum.  *DiRienzo*, 294 F.3d at 28.  Because Rio Tinto had ample legitimate reasons to prefer litigating in the United States, its choice to avail itself of that forum is entitled to considerable deference.

### C.      Private And Public Interests Weighs In Favor Of Rio Tinto's Chosen Forum

Taking account of the substantial deference due to Rio Tinto's chosen forum, the court must decide whether the Moving Defendants have met their heavy burden to demonstrate that the balance of private and public interests "tilts strongly in favor of the purported alternative forum." *See Cortec Corp. v. Erste Bank*, 535 F. Supp. 2d 403, 407 (S.D.N.Y. 2008) (quoting *PT United Can*, 138 F.3d at 74).  They have not made and cannot make that showing.  England is not a more convenient forum than the United States, much less a significantly more convenient forum.

### 1.      The Private Interest Weighs Heavily In Favor Of The United States

The private interests that guide a court's *forum non conveniens* analysis include: (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses, (3) the possibility to view the premises at issue, if relevant, and (4) other practical problems that make trial easy, expeditious, and inexpensive.  *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 220 (S.D.N.Y. 2011) (citing *Gilbert*, 330 U.S. at 508).

The Moving Defendants' principal argument, that documents and witnesses are scattered across the globe and are not centralized in the United States, is irrelevant to whether *England* would be a *more* convenient forum than the United States.  What matters is the *relative* ease of access to evidence.  *See Gilbert*, 330 U.S. at 508; *Am. Stock Exch., LLC v. Towergate*

*Consultants Ltd.*, 03 CIV. 856 (RMB), 2003 WL 21692814, at *5 (S.D.N.Y. July 21, 2003) (Berman, J.) ("[W]herever trial takes place, some witnesses will have to travel, so the cost of obtaining willing witnesses does not weigh in favor of dismissal."); *see also Constellation Energy*, 801 F. Supp. 2d at 220 (where sources of proof were not concentrated in either of two alternative forums, private interest factors "at most, weakly favor" one forum over another). Defendants themselves have identified ten countries in which they believe documents and witnesses may be located. Mot. at 19-20. Moreover, recent decisions recognize that "the difficulties of discovery are mitigated by instant communication and rapid transport, especially for sophisticated corporate entities such as the parties in this case, thus diminishing any supposed inconvenience that litigating the case in this forum might impose." *Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*, 725 F. Supp. 2d 438, 443 (S.D.N.Y. 2010).[10] The decisions on which Defendants rely do not aid their argument, because they are cases in which a majority of the evidence was centralized in a single location that pointed in favor of the alternative forum.[11]

The Moving Defendants also fail to mention that these documents and witnesses likely will be produced in the United States, *in this very District*, irrespective of the forum of this lawsuit. The United States has convened a grand jury in the Southern District of New York to investigate Defendants' criminal enterprise. Am. Compl. ¶¶ 121–22, 131, 149. As with any major criminal investigation, the grand jury undoubtedly will exercise its expansive subpoena

---

[10]   *See also Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 05-cv-9478 (GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) (Lynch, J.) ("[C]ourts in this Circuit have recognized that modern technologies can make the location of witnesses and evidence less important to the forum non conveniens analysis, particularly where the parties are major corporations." (citing *DiRienzo*, 294 F.3d at 30)); *British Marine PLC v. Aavanti Shipping & Chartering Ltd.*, 13-cv-839 BMC, 2014 WL 2475485, at *4 (E.D.N.Y. June 3, 2014) ("[M]odern technologies have rendered the physical location of documents less relevant to the *forum non conveniens* analysis.").

[11]   *See Niv*, 710 F. Supp. 2d at 340 (majority of evidence in Israel and Egypt); *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 767 (S.D.N.Y. 2006) ("overwhelming majority" of evidence located in England); *Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir. 1998) ("*all* the defendants and *nearly all* the documentary evidence are located in France" (emphasis in original)).

power and require the production of countless documents and witnesses in this District.  Indeed, forcing Defendants to produce this same material to a tribunal in England would exacerbate, not alleviate, their burden.  Similarly, the Moving Defendants' statement that "producing documents from [Switzerland] could involve potential criminal penalties," Mot. at 22, is irrelevant, as they do not explain why producing the documents in England would alleviate this concern.

Indeed, far from supporting dismissal, this factor weighs decisively in favor of retaining jurisdiction in Rio Tinto's chosen forum.  As explained above, Defendant Mahmoud Thiam lives in New York City.  Defendant Thiam's purported "consent" to proceed in England as a more convenient forum therefore is absurd, and a transparent attempt at forum shopping.[12]  Defendant Vale finds it convenient enough to trade its ADRs on the NYSE, and found it convenient enough to travel to New York to negotiate with Rio Tinto as part of its ruse.  Finally, Defendants Cilins and Touré are located in the United States and have not consented to jurisdiction in England.  These two defendants are among the most important witnesses in this case, a fact that weighs against dismissal.  In short, no other forum has these levels of connections and synergies with all the defendants.

In the face of all this, the Moving Defendants contend that all of the relevant witnesses are located outside the United States, and none of the Rule 26 initial disclosures identified a single U.S. witness.  Mot. at 20.  This blatantly ignores the fact that Defendants Thiam, Cilins and Toure – who are all located in the United States – will be key witnesses.  And Rio Tinto's Amended Complaint identifies a number of third-party witnesses in the United States.  Am. Compl.  ¶¶ 59, 63, 66.

---

[12]   The Second Circuit "commented in *Iragorri* that defendants as much as plaintiffs may be concerned with litigation tactics or forum shopping rather than convenience, and may move for dismissal under *forum non conveniens* to further those goals."  *Gross*, 386 F.3d 224 at 244.

The Moving Defendants' argument on this factor boils down to the assertion that travel time and expense will be lessened if the case were tried in England.  Mot. at 21.  Even assuming that were true,[13] it falls far short of showing that the United States is "genuinely inconvenient and the selected forum significantly preferable."  *Am. Stock Exch.*, 2003 WL 21692814 at *5.  In any event, "wherever trial takes place, some witnesses will have to travel, so the cost of obtaining willing witnesses does not weigh in favor of dismissal," *id.* at *5, and for those beyond the reach of the court's subpoena power, the Second Circuit has recognized that videotaped depositions obtained through letters rogatory may be an adequate substitute.  *See DiRienzo*, 294 F.3d at 30 ("While demeanor evidence is important when trying a fraud case before a jury, videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess the credibility of these Canadian witnesses." (citation removed)); *Lans*, 786 F. Supp. 2d at 296 ("[D]ue to modern technology, this Court has the capacity to have [unavailable witnesses'] testimony presented to it or a jury through close-circuit technology").  Accordingly, the private interest factor weighs in favor of Rio Tinto's chosen forum in the United States.

### 2.    The Public Interest Weighs In Favor Of Rio Tinto's Chosen Forum

The public interest factors include: (1) administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having the trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.  *Constellation Energy*, 801 F. Supp. 2d at 220–21 (citing *Gilbert,* 330 U.S. at 508).  These factors, too, weigh against

---

[13]  *But see, e.g.*, J. Mark Ramseyer & Eric B. Rasmussen, *Comparative Litigation Rates* 22, Harvard John M. Olin Ctr. For Law, Economics, and Business, Discussion Paper No. 681, 2010), *available at* http://www.law.harvard.edu/programs/olin_center/papers/pdf/Ramseyer_681.pdf (comparing costs of litigating in several jurisdictions and finding, for example, that enforcing a contract in England is relatively more expensive than in the United States).

dismissal and in favor of retaining jurisdiction in the United States.

The gravamen of the Moving Defendants' argument regarding the public interest factors appears to be that the United States and the Southern District of New York do not have a substantial interest in this litigation.  *See* Mot. at 23–24.  The Moving Defendants cannot seriously contend that the Southern District of New York does not have an interest in this matter at the same time that the U.S. Attorney's Office for the Southern District of New York and the Department of Justice are conducting a "major criminal investigation" into this matter.  Am. Compl. ¶ 132 (quoting Judge Pauley's description of the investigation).[14]  Unlike in cases such as *Herald*, 2011 WL 5928952 and *Erausquin v. Notz, Stucki Mgmt.*, 806 F. Supp. 2d 712 (S.D.N.Y. 2011) that dealt with foreign investors' suits against foreign money managers that had invested with Bernard Madoff, the "core operative facts" of this suit involve the conduct of the individuals presently under investigation in this District.  Accordingly, the benefit to the United States from being able to monitor this suit weighs heavily against dismissal.

As to the other public interest factors, the Moving Defendants again largely fail to engage in a *comparative* analysis of the interests.  First, the Moving Defendants state that the Southern District of New York is a congested center of litigation but do not provide any evidence that courts in the United Kingdom are less congested.  *See Am. Stock Exch.*, 2003 WL 21692814 at *5 ("[T]he Court has no reason to believe that the United Kingdom court is any less busy than this Court ....").  Second, the fact that there currently are no judicial vacancies in this District "makes this concern of little or no present significance."  *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 n.5 (2d Cir. 2000).  Accordingly, this provides no support for Moving Defendants' contention that England is a more a convenient forum.

---

[14]  *See also In re Air Crash Off Long Island, N.Y.*, 65 F. Supp. 2d 207, 217 (S.D.N.Y. 1999) (extensive investigation by federal and state authorities weighed heavily against dismissal); *cf. Do Rosario Veiga*, 486 F. Supp. at 307 (investigation by Swiss law enforcement weighed in favor of dismissing in favor of Swiss forum).

Similarly, the Moving Defendants claim that this Court's applying English law alongside New York law is "untenable," Mot. at 25, but they fail to explain why it would not be equally untenable to do so in an English court.  Moreover, this illusory concern is undermined by the fact that "there are few if any countries in the world whose body of law is more amenable to application in the United States than Great Britain's."  *Gross*, 386 F.3d at 234; *see also Terra Firma*, 725 F. Supp. 2d at 442 ("English law is routinely applied in this district.").

The Moving Defendants present no logical reason why an English forum would better serve the public interest than would this Court, much less demonstrate that the balance of factors "tilts strongly" in favor of England.  Both the private and public interests weigh in favor of retaining jurisdiction, and the Moving Defendants have therefore fallen far short of making a "clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience," *DiRienzo*, 294 F.3d at 30, and that litigating in England would be "significantly preferable," *Am. Stock Exch.*, 2003 WL 21692814, at *6 (citing *DiRienzo*, 294 F.3d at 33), as required by Second Circuit precedent.

## CONCLUSION

For the reasons set forth above, Rio Tinto respectfully requests that the Court deny the Moving Defendants' motion to dismiss.

Respectfully submitted,

/s/ Michael J. Lyle
Michael J. Lyle

cc:  All Counsel of Record (by ECF)