# EXHIBIT B

# EXHIBIT B

**Rio Tinto plc v Vale SA and others**

**Declaration of Lord Hoffmann**

1.      I was from 1995 to 2009 a member of the Appellate Committee of the House of Lords, which then exercised the final appellate jurisdiction for the United Kingdom that since 2009 has been vested in the Supreme Court.  I am currently a non-permanent member of the Court of Final Appeal for Hong Kong, which remains a common law jurisdiction.  Previous to my appointment to the House of Lords I was from 1985 a member of the High Court and then the Court of Appeal of England and Wales, and before that Queen's Counsel at the bar of England and Wales. I now practice as an arbitrator and am visiting professor in the University of Oxford.

2.      In August 2008 Rio Tinto plc ("Rio Tinto") entered into negotiations with Vale SA ("Vale") with a view to Vale purchasing, among other assets, Rio Tinto's interest in the iron deposits at Simandou, Guinea. On 2 September 2008 Rio Tinto and Vale executed a Confidentiality Deed in contemplation of their disclosure to each other of confidential information for the "Permitted Purpose" of assessing whether or not to pursue the proposed transaction.  By clause 20(a), the Deed was expressed to be "governed by and construed in accordance with English law."  Thereafter Rio Tinto disclosed to Vale confidential technical, commercial and political information about Simandou.

3.      In an Amended Complaint filed in the US District Court for the Southern District of New York, Rio Tinto alleges that in November 2008 it informed Vale in confidence that one Benjamin Steinmetz ("Steinmetz") and his company BSG Resources Ltd ("BSGR") were trying to bribe Guinea government officials to revoke Rio Tinto's rights in the Simandou deposits and grant them to BSGR instead. Upon obtaining this information, Vale decided to join forces with Steinmetz and BSGR. It pretended to be continuing to negotiate with Rio Tinto until June 2009 and thereby obtained access to its confidential information.  But it used this information to support its bid, in partnership with BSGR, to supplant Rio Tinto and obtain a mining concession in its place.

4. The Amended Complaint alleges a number of causes of action, the first being violation of the Racketeer Influence and Corrupt Organisations Act 18 USC § 1962 ("RICO"). Various criminal acts are said to be part of a criminal enterprise, in violation of RICO, which obtained Rio Tinto's confidential information in order to deprive it of the Simandou concession. There are also counts of conspiracy to violate RICO, fraud, conspiracy to commit fraud, aiding and abetting fraud and (added by amendment) fraudulent concealment of Vale's true intentions for the purpose of inducing Rio Tinto to disclose the confidential information. Besides Vale, Steinmetz and BSGR, the defendants include five individuals who are alleged to have been parties to the RICO enterprise and the associated conspiracies.

5. By letter dated 3 September 2014 the law firm of Cleary Gottlieb Steen & Hamilton have applied to the court on behalf of all the defendants to dismiss the proceedings on the grounds of *forum non conveniens* on the ground that England is the convenient forum. One of the grounds for this motion, and an independent ground on behalf of Vale, is that the jurisdiction clause in the Confidentiality Deed requires Rio Tinto to bring any such proceedings against Vale in England.

6. Clause 20 of the Confidentiality Deed is entitled "Governing law and jurisdiction". The jurisdiction provisions are contained in sub-clauses (b) and (c) of clause 20:

> **20. Governing law and jurisdiction**
>
> (a) This Deed shall be governed by and construed in accordance with English law.
>
> (b) Each of the parties agrees that the courts of England are to have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that accordingly any proceedings arising out of or in connection with this Deed shall be brought in such courts. In connection with any disputes which may arise out of or in connection with this Deed, each of the parties irrevocably submits to the jurisdiction of such courts and waives any objections to proceedings in any such court on the grounds of venue or on the ground that the proceedings have been brought in an inconvenient forum.

> (c) Notwithstanding the provisions of sub-Clause (b) of this Clause 20, the parties recognize that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed (including in relation to the obligations set out in sub-Clause 5 (Share Acquisitions), not least where injunctions are required. Where this is the case, each of the parties agrees irrevocably and unconditionally to submit to the non-exclusive jurisdiction of the Central Courts (Foro Central) of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

7. The jurisdiction conferred by these two clauses upon the courts of England and Brazil respectively is expressed to be non-exclusive, a well known technical term which denotes submission to the jurisdiction of the courts in question without prejudice to the right to bring proceedings in any other court willing to take jurisdiction. It is therefore an unpromising start for an argument that Rio Tinto is obliged to sue in England (or Brazil).

8. I have however had the privilege of reading two Declarations in support of the motion to stay these proceedings by Lord Collins of Mapesbury, in which he expresses the view that the word "non-exclusive" should be understood to mean "exclusive". This is a truly heroic feat of interpretation, a thing unattempted yet in any judicial decision. There are cases in which "jurisdiction", *tout simple*, has been interpreted in context to mean exclusive jurisdiction, but none, so far as I am aware, in which the draftsmen of an important contract negotiated between well-advised multinational corporations has said "non-exclusive" but has been held to have meant "exclusive".

9. I agree with what Lord Collins says about the principles applied in English law to the construction of documents. (I am the author of the opinions cited by Lord Collins in paragraphs 31, 35 and 57 of his report). Where we part company is in the application of those principles to the facts of this case. I shall first state my own opinion and then offer my comments on that of Lord Collins.

10. Clauses conferring non-exclusive jurisdiction upon English courts are fairly common in international commerce. The use of such a clause has two consequences. First, it is a ground upon which an English court will, as a matter of domestic law, exercise "long-arm" jurisdiction to allow proceedings against a

defendant outside the jurisdiction.[1] Secondly, it makes it "difficult, if not impossible" for a defendant served with proceedings in an English court to argue that England is not a *forum conveniens*.[2] The first consequence is not of great significance in this case because (as Lord Collins points out) an English court would also be able to take jurisdiction on at least two other grounds: first, that the contract is governed by English law[3] and secondly that the provisions of the contract for appointing agents to receive service enable both parties to be served within the jurisdiction.[4] But the second consequence requires more attention.

11. In *Mercury Communications Ltd v Communication Telesystems International* Moore-Bick J stated the attitude of the English courts as follows:[5]

> "Although a non-exclusive English jurisdiction clause leaves the parties free to bring proceedings elsewhere without thereby committing any breach of contract, it has generally been regarded as a powerful factor in favour of allowing proceedings brought in this country to continue. There are, it seems to me, two reasons why that should be so. In the first place… a clause of that kind involves a contract by each party to submit to the jurisdiction of the English courts if the other chooses to bring proceedings in this country. Although neither party binds itself to bring any action here, each of them does agree to submit to the jurisdiction if an action is brought against it. Secondly, as part and parcel of agreeing to submit to the jurisdiction each party must be taken to have recognised that this country would be an appropriate forum for the trial of the action."

12. More recently, Gloster J has summarized the effect of an English non-exclusive jurisdiction clause when a party sues in an English court as follows:[6]

> (i)   The fact that the parties have freely negotiated a contract providing for the non-exclusive jurisdiction of the English courts and English law, creates a strong prima facie case that the English jurisdiction is the correct one. In such circumstances it is appropriate to approach the matter as

---

[1] Civil Procedure Rules, Practice Direction 6B, paragraph 3.1 (6)(d); Brussels Convention, Article 23.
[2] See Langley J in *Sea Trade Maritime Corporation v Hellenic Mutual War Risks Association (Bermuda) Ltd ("The Athena No 2)")* [2007] 1 Lloyd's Rep 280 at paragraph 103.
[3] Civil Procedure Rules, Practice Direction 6B, paragraph 3.1 (6)(c).
[4] See Confidentiality Deed, Clause 22, Appointment of Process Agent
[5] [1999] 2 All ER (Comm) 33, at p. 6.
[6] *Amtec International Ltd v Biotec USA Inc* [2006] EWHC 47 (Comm), paragraph 7.

though the claimant has founded jurisdiction here as of right, even though the clause is non-exclusive; see e.g. per Hobhouse J in *S & W Berisford Plc v New Hampshire Insurance Co.* [1990] 1 Lloyd's Rep. 454, at 463; per Waller J in *British Aerospace Plc v Dee Howard Co* [1993] 1 Lloyd's Rep. 368; per Moore-Bick J in *Mercury Communications Ltd v Communication Telesystems International* [1999] 2 AER 33 at page 41.

(ii) Although, in the exercise of its discretion, the court is entitled to have regard to all the circumstances of the case, the general rule is that the parties will be held to their contractual choice of English jurisdiction unless there are overwhelming, or at least very strong, reasons for departing from this rule; see e.g. *British Aerospace Plc supra* ; *Mercury Communications supra at* page 41; per Aikens J in *Marubeni Hong Kong & South China Ltd v Mongolian Government* [2002] 2 AER (Comm) 873 at 891(b) – (f); per Lawrence Collins J in *Bas Capital Funding Corporation and others v Medfinco Ltd and Others* [2004] 1 Lloyd's Rep 652 at paragraphs 192-195; per Gross J in *Import Export Metro Ltd v Compania Sud Americana de Vapores SA* [2003] 1 Lloyd's Rep 405.

(iii) Such overwhelming or very strong reasons do not include factors of convenience that were foreseeable at the time that the contract was entered into (save in exceptional circumstances involving the interests of justice); and it is not appropriate to embark upon a standard *Spiliada* balancing exercise. The defendant has to point to some factor which it could not have foreseen at the time the contract was concluded. Even if there is an unforeseeable factor or a party can point to some other reason which, in the interests of justice, points to another forum, this does not automatically lead to the conclusion that the court should exercise its discretion to release a party from its contractual bargain; see cases cited *supra…*"

13. It is a general principle in the construction of documents to try to give effect to the purpose for which the parties appear to have intended to achieve; in the common phrase, to give their language a "purposive construction". This purpose may be best ascertained from what the parties themselves have said. If one reads the whole of subclauses (b) and (c), they show a considerable preoccupation with the question of whether a party could avoid English jurisdiction on the grounds of *forum non conveniens* and, save in the case of Brazil, a determination to prevent it from doing so.

14.     So, for example, sub-clause (b) follows the conferral of non-exclusive jurisdiction by not only a provision that each party "submit to the jurisdiction of [the English] courts" but also that it "waives any objections to proceedings in any such court on the grounds of venue or on the ground that the proceedings have been brought in an inconvenient forum".  These provisions appear to be an attempt to slam shut the door which Langley J left slightly ajar in saying that a non-exclusive jurisdiction clause made it "difficult, if not impossible" to argue that an English court was not an appropriate forum.  This second sentence of sub-clause (b) is entirely consistent with the conferment of non-exclusive jurisdiction to have been no mistake and to have been intended to exclude so far as possible any argument that England was not a *forum conveniens*.

15.     The concern of the parties with the question of a convenient forum is carried over into sub-clause (c), which creates the exception in favour of Brazil. It says that the parties "recognise that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed". It then provides that "where this is the case", i.e. if the Brazilian courts *are* the appropriate forum, the parties agree to the non-exclusive jurisdiction of the courts in Rio de Janeiro.

16.     It is important to note the way in which subclauses (b) and (c) relate to each other.  The second sentence of sub-clause (b) shows that what the parties intended to achieve was one of the recognized effects of a non-exclusive jurisdiction clause, namely that if proceedings were commenced in England, the other party should have to submit to that jurisdiction and in particular should not be entitled to argue that the English court was not a *forum conveniens*.  Sub-clause (c) opens with the words "Notwithstanding the provisions of sub-Clause (b) of this Clause 20…"  That indicates that sub-clause (c) will permit something that would have been prohibited by sub-clause (b).  On the face of it, what is prohibited by sub-clause (b) is not the bringing of proceedings in Brazil.  The fact that English jurisdiction is said to be non-exclusive makes that permissible.  What is prohibited by sub-clause (b) is objecting to proceedings commenced in England on the ground that it is not a *forum conveniens*.  And it is this which sub-clause (c) exceptionally allows.  Sub-clause (c) says that the parties recognize that

in some cases Brazil may be the appropriate forum. In such a case, a defendant may properly apply for English proceedings to be stayed on the grounds that Brazil is the appropriate forum, "notwithstanding" the prohibition on objecting to proceedings in England on the basis of *forum non conveniens in sub-clause (b)*.

17.     The scheme of the two subclauses is thus perfectly simple. Both are primarily concerned with proceedings in England and whether a party can object to them on grounds of forum non conveniens. Sub-clause (b) says that it may not and sub-clause (c) creates an exception in favour of Brazil in which it can.

18.     The language of subclauses (b) and (c) is in my opinion quite inconsistent with (b) conferring exclusive jurisdiction but (c) creating an exception in which a party is allowed to sue in Brazil. First, if (b) confers exclusive jurisdiction, its second sentence is pointless and irrelevant. If the parties have agreed to the English courts having exclusive jurisdiction, it does not matter whether it is an appropriate forum or not. They have contracted not to sue anywhere else. Secondly, it is noticeable that (c) does not define the circumstances in which the Brazilian courts "may be the appropriate forum". It gives an example, but no definition. This would be remarkable if (c) was intended to create an exceptional right to sue in Brazil in such indistinct terms. Whether a jurisdiction is "appropriate" or not is often a finely balanced decision. A party that considers that Brazil is an appropriate forum and starts proceedings there may find that an English court disagrees and holds him liable in damages for breach of the promise to sue only in England.[7] On the other hand, if (as I think) both sub-clauses are concerned with the question of whether a party can object to proceedings which have been commenced in England, the clause makes perfectly good sense. Sub-clause (b) prohibits a party generally from objecting on grounds of *forum non conveniens* but sub-clause (c) allows him to do so if he considers that Brazil is the appropriate forum. Non-exclusive jurisdiction is conferred on the courts of both countries and the English court is free to decide which is the appropriate forum. The contract does not have to define the circumstances in which Brazil would be an appropriate forum because the English court will

---

[7] *Union Discount Co Ltd v Zoller* [2002] 1 WLR 1517, 1527.

decide this on the basis of normal *forum non conveniens* doctrine, neither country having been given a contractual preference.

19.     The language and scheme of sub-clauses (b) and (c), both containing references to an "inconvenient" or "appropriate" forum demonstrate that the parties were concerned with objections to jurisdiction on grounds of *forum non conveniens*. Their primary purpose was to ensure so far as possible that an English court would not stay proceedings on grounds of *forum non conveniens* except where the competing forum was Brazil. To achieve this purpose, it was appropriate to designate both courts as having non-exclusive jurisdiction. It would have been quite inappropriate for the English court to have exclusive jurisdiction as Lord Collins suggests because in that case the whole question of *forum conveniens* would have been irrelevant except in the case of the Brazil exception, where its imprecision in delimiting the boundary of English jurisdiction would have given rise to considerable uncertainty for the parties.

20.     The only language in sub-clauses (b) or (c) which suggests an imperative obligation to sue in England is the use of the word "shall" in sub-clause (b). If one disregards the context in which it is used, it could be so construed. However, the word is notoriously ambiguous. Thornton's *Legislative Drafting*, the leading English work on the subject, says that it is "one of the most ambiguous terms in legislative drafting". "It may be temporal and denote future time" or it may be "modal denoting obligation". Its use in UK legislative drafting has been virtually prohibited, provoking an elegiac editorial in the Statute Law Review *("In Honour of the Moribund 'Shall'"* (2014) 35 Statute Law Review v-vi). There are numerous cases in which "shall" has been read "not to impose an absolute and imperative duty to do or omit the act prescribed" (per Starke J in *R v Davis* (1947) 75 CLR 409, 418).[8] It is therefore an inherently weak indicator compared with the way in which, as I have indicated above, the intentions of the parties may be gathered from the way in which the totality of subclauses (b) and (c) are expressed.

21.     It is worth observing the precise way in which the word is used. The parties agree that the courts in England are to have non-exclusive jurisdiction

---

[8] See also cases cited under the word "Shall" in Stroud's Judicial Dictionary of Words and Phrases (8th edn 2012), Volume 3 at pp. 2710-2714.

"and that accordingly any proceedings...shall be brought in such courts". The use of the word "accordingly" is important here. It is said to be a *conclusion* which they have agreed to be the consequence of their agreement that the English courts are to have non-exclusive jurisdiction. If "shall" is construed to mean that the English courts are to have exclusive jurisdiction, this would be not merely a case of the parties saying one thing in one place and something different in another. It would be subscribing to a contradiction of Alice in Wonderland proportions. The answer lies, I would suggest, in considering the use of the ambiguous word "shall" in the context of what the parties were trying to achieve in the jurisdiction clause as a whole.

22. Read as a whole, the clause shows a preoccupation with making it in general mandatory for a party to submit to the English jurisdiction when proceedings have been commenced against him in England. I think it is this concentration upon the duty of a defendant to accept litigation in England that has caused the parties to say that proceedings "shall be brought in such courts". In this context, the word "shall" has a temporal significance. "Shall" is the parties' expression that they foresee instances where a party elects in the future (temporal) to bring claims in the courts of England to take advantage of the mandatory acceptance of English jurisdiction if suit is filed there. There is no doubt that the idea could have been better expressed, but that is in my view the best way not to convict the parties of having subscribed to an absurd contradiction.

23. It is true that there are cases in which the courts have been driven to say that "something must have gone wrong with the language" and to conclude that the parties intended a meaning at odds with the conventional meaning of the words or syntax they have used. The principles are set out in paragraph 31 of Lord Collins's Declaration. I would however emphasise principle (5): "we do not easily accept that people have made linguistic mistakes, particularly in formal documents". It is only when the conventional meaning of the language does not reflect what was "plainly" the intention of the parties that the court is justified in departing from the normal meaning of the words.

24.     In this case, however, the question in this case is not whether something has gone wrong but what has gone wrong? Have the parties made the astonishing mistake of using a well known technical term in a diametrically opposite sense, or have they used the word "shall" in an awkward and ambiguous sense? Much will depend upon what the context shows to be the commercial result intended by the parties. That is what is meant by the frequently used expression "purposive construction." In my view the commercial result intended by the parties appears clearly enough from the rest of the language they used in the two sub-clauses. They did not want a party to be able to object to proceedings in England except on the ground that Brazil would be the appropriate forum. That purpose is best attained by giving "non-exclusive" its ordinary meaning.

25.     I shall now discuss the contrary view of Lord Collins. He starts with two points on the language of the clause. First, he refers to the use of the word "shall". That is a point I have already dealt with. Secondly, he says that if the jurisdiction conferred upon the English courts were non-exclusive, the opening words of sub-clause (c), creating an exception to the provisions of sub-clause (b), would be redundant. A party would be able to sue in Brazil simply because the English jurisdiction was non-exclusive. But I think in saying this, Lord Collins misunderstands the purpose of sub-clause (c). He assumes that it is to allow the Brazilian courts to take jurisdiction. But this is wrong. It seems to me that in trying to discover the purpose of a provision, it is helpful to examine precisely the language which the parties have used. Lord Collins does not attempt to do so. He makes no reference to the second sentence of sub-clause (b), which indicates the purpose of designating England as having jurisdiction, or the references to "inconvenient forum" in the second sentence of sub-clause (b). This language makes it clear that the principal purpose sub-clause (b) is to exclude objections to the jurisdiction of the English court on grounds of *forum non conveniens*. Once this point is appreciated, it becomes equally clear why the exception in (c) was needed; not to confer jurisdiction on a Brazilian court but to allow a party to apply to stay proceedings in England on the ground that Brazil was the appropriate forum.

26.     Lord Collins then advances three propositions of "commercial common sense" as to why the parties must have meant exclusive when they said non-exclusive.  The first is that it would make no sense to agree that their disputes could be litigated in any court in the world willing to take jurisdiction.  This is a general condemnation of non-exclusive jurisdiction clauses, which happen to be extremely common, and are used to achieve the tangible benefits summarised in paragraphs 11 and 12 above.

27.     Secondly, he says that (apart from the Brazilian exception) it makes no sense to allow an agreement governed by English law to be adjudicated upon other than by English judges.  The Brazilian exception sits a little awkwardly with this argument.  There are many common law jurisdictions (not least New York) which would have less difficulty with English commercial law than the courts of Brazil.  And in paragraphs 42-45 Lord Collins acknowledges that there is no clear line of authority which says that a choice of English law must be accompanied by exclusive English jurisdiction.  It is a factor to be taken into account in deciding whether the simple use of the word "jurisdiction" means exclusive or non-exclusive jurisdiction, with mixed results. But no judge has ever used it to conclude that non-exclusive meant exclusive.

28.     Finally, Lord Collins says that non-exclusive jurisdiction would have been contrary to commercial common sense  because "it has achieved very little."  But the force of this argument is weakened by the failure of Lord Collins to analyse what the parties actually said in the two sub-clauses in order to discover what they wanted to achieve.  Lord Collins mistakenly assumes that the purpose of sub-clause 20(b) was to confer jurisdiction on the English court and points out, correctly, that for various reasons it was for this purpose redundant. He acknowledges that the exercise of this jurisdiction over Vale under sub-clauses 20(a) and 22(a) would be subject to objection on grounds of *forum non conveniens*, but says that it is very unlikely that such an objection would have succeeded.  He impliedly accepts (although he does not expressly say) that a non-exclusive jurisdiction clause would reduce or eliminate the chance of such an objection succeeding, but says it is "uncommercial" to imagine that the parties stipulated

for a non-exclusive submission to jurisdiction "for such a theoretical and limited gain".

29. Lord Collins, as an acknowledged expert on the conflict of laws, may be right in saying that there would have been little chance of an English court staying proceedings on grounds of *forum non conveniens*. He might have advised the parties not to get over-excited about the matter. If they had accepted his advice, it is hard to say what they would have done. They might have gone for an exclusive jurisdiction clause or they might have deleted the jurisdiction clause altogether, relying on the other grounds upon which an English court would assume jurisdiction. It is unclear how, in such a case, they would have fitted in the Brazilian exception, which expressly contemplates the possibility of a successful application for a *forum non conveniens* stay. However, in construing the contract the court is concerned with the purpose which the parties or their lawyers actually had and not with what they might have done if they had been better advised. Transaction lawyers are cautious folk and they obviously took the question of appropriate forum seriously.

30. I therefore think that Lord Collins is wrong and that the true meaning of sub-clause (b) is that the English courts have non-exclusive jurisdiction. It follows that the forum selection clause in the Confidentiality Deed permits claims like those in this case to be brought outside England and Brazil, including in the United States District Court for the Southern District of New York.

31. If the Court considers that Lord Collins is right about the exclusivity of the English jurisdiction, the question then arises as to whether the proposed proceedings in New York fall within the scope of the jurisdiction clause, that is, whether they "arise out of or in connection with this Deed" within the meaning of sub-clause (b). Lord Collins deals with this matter in paragraphs 57 and 58 of his first Declaration and, specifically in relation to the claim of pre-contractual conspiracy introduced by amendment, in his second Declaration.

32. In paragraph 57 Lord Collins refers in particular to my opinion in *Fiona Trust and Holding Corp v Privalov* [2007] Bus LR 1719, in which I said that the

scope of an arbitration (or jurisdiction) clause should be given a broad construction, covering any dispute arising out of the relationship between the parties which was contemplated by the agreement. The basis for this approach to construction was that "the parties, as rational business people, are likely to have intended any dispute arising out of their relationship to be decided by the same tribunal."

33. This is a powerful consideration and in the case of a dispute between the parties to the arbitration or jurisdiction agreement, will usually carry the day. However, when other parties also become involved in the dispute, another powerful consideration comes into play, namely whether the parties, as rational business people, are likely to have intended that the same issues should be decided by different tribunals, with the possibility of inconsistent decisions.

34. Even in cases in which the language of the agreement clearly confers exclusive jurisdiction upon a court or arbitral tribunal, the English courts have been reluctant to enforce that agreement by a stay or anti-suit injunction if it would mean the possibility of different tribunals arriving at conflicting decisions. The attitude of the English courts was summarized by Lord Bingham in the leading case of *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425:

> 27. The authorities show that the English court may well decline to grant an injunction or a stay, as the case may be, where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions. These decisions are instructive. In *Evans Marshall and Co Ltd v Bertola SA and Another* [1973] 1 WLR 349 there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pp 363-364). The Court of Appeal took a similar view (pp 377, 385). Sachs LJ thought separate trials particularly inappropriate where a conspiracy claim was in issue (p 377). In *Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria)* [1981] 2 Lloyd's Rep 119 the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the

courts of Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at p 128:

> "I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries. See as to this *Halifax Overseas Freighters Ltd v Rasno Export (The Pine Hill)* [1958] 2 Lloyd's Rep 146 and *Taunton-Collins v Cromie* [1964] 1 WLR 633."

*Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 also involved third party interests and raised the possibility of inconsistent decisions. Colman J regarded separate trials in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp 1375-1376. *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The M C Pearl)* [1997] 1 Lloyd's Rep 566 again involved third parties and raised the possibility of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the courts of Seoul, Rix J refused to stay proceedings in England. He regarded the case as on all fours with *Citi-March* (see p 575) and at p 569 observed:

> "It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost . . ."

A similar approach is discernible in *Bouygues Offshore SA v Caspian Shipping Co* [1998] 2 Lloyd's Rep 461, in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Evans LJ as "near-conclusive" (p 467), an injunction to restrain proceedings in

>South Africa was refused. In paragraph 27 of his judgment (at p 466) Evans LJ said:
>
>>"In my judgment, two questions arise, one a matter of principle. First, should the Court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is 'yes'. Mr Justice Clarke did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognised in other authorities . . ."
>
>Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p 470)
>
>>"this is the only way in which to minimize, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions."

35.  Whether a New York court would take a similar attitude to the enforcement of an exclusive jurisdiction clause which clearly applied to the dispute is of course a matter for the New York court. However, it does seem to me that the grounds upon which an English court would refuse to enforce such a clause must also be relevant to the question of whether the parties intended the clause to apply to the dispute in question.

36.  The question is whether the contract, construed against the background known to both parties at the time, should objectively be regarded as having been intended to cover the matters alleged in the Amended Complaint within the terms of the jurisdiction clause. As Lord Collins said judicially in *UBS v HSH Nordbank* [2009] 2 Lloyd's Rep 272 at paragraph 83: "the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole."

37. The transaction as a whole, as alleged in the Amended Complaint, consisted of an elaborate criminal conspiracy, based in New York, to use corrupt means to strip Rio Tinto of its West African concession. The alleged fraudulent obtaining of information that Rio Tinto thought protected by the Confidentiality Deed formed only a part of the enterprise. A number of the persons alleged to have been party to the enterprise and conspiracy are outside the English jurisdiction and not parties to the agreement It does seem to me that to treat the parties as having agreed that all of this would fall within the description of disputes which "may arise out of or in connection with this Deed" would be allowing the tail to wag the dog. I do not think that the parties, as rational business people, would have intended at the time of the contract that such a dispute should be decided exclusively in England, with the possibility that it could not be decided there as between the other parties.

38. I think that this is underlined by the fact that the RICO claims, arising out of acts alleged to have been committed within the jurisdiction of the New York court, would not be enforceable in England. If the facts alleged in the Amended Complaint are taken to be true, it would seem to me strange that Vale, a Brazilian company, should in effect be able to secure immunity from any civil remedy under the law of New York for joining a RICO enterprise by inserting a non-New York jurisdiction clause in an agreement used for the purpose of carrying that enterprise into effect.

39. In my opinion, even if the jurisdiction conferred upon the English court under clause 20(b) was exclusive, it would not have applied to the proceedings in this case.

*[signature]*

Leonard Hoffmann

Brick Court Chambers

10 September 2014