# EXHIBIT 10

Case 1:14-cv-03042-RMB-AJP   Document 88-12   Filed 09/17/14   Page 2 of 4

# HOUSE OF LORDS

Oct. 15, 16, 17; Dec. 13, 2001

---

DONOHUE
v.
ARMCO INC. AND OTHERS

[2001] UKHL 64

Before Lord BINGHAM of CORNHILL, Lord MACKAY of CLASHFERN, Lord NICHOLLS of BIRKENHEAD, Lord HOBHOUSE of WOODBOROUGH and Lord SCOTT of FOSCOTE

Practice — Anti-suit injunction — Joinder of potential co-claimants — Application to set aside service of proceedings — Defendants sold insurance group to management buy-out — Negotiations conducted with claimant — Defendant alleged it had been victim of fraud — Defendant brought proceedings in New York — Claimant alleged New York proceedings vexatious and oppressive and in breach of exclusive English jurisdiction clause — Whether anti-suit injunction should be granted — Whether exclusive English jurisdiction clause applicable — Whether potential co-claimants should be joined in English proceedings for anti-suit injunction — Whether service out of jurisdiction should be set aside.

The defendants were all companies in the Armco group which was a U.S. based conglomerate. Armco owned via two subsidiaries a group of three insurance companies known as British National Insurance Group (BNIG). The assets of the insurance group were owned by the third defendants Armco Financial Services International Ltd. (AFSIL) and Armco Financial Services Europe Ltd. (AFSEL) which had since been dissolved. The insurance group went into run-off in 1984.

In the late 1980s Armco decided to sell off the insurance group and from 1990 Armco investigated selling the group to Armco managers in a management buy-out (MBO). In early 1991 negotiations began with two managers, the claimant Mr. Donohue and Mr. Atkins. On the Armco side the negotiations were conducted by two executives Mr. Rossi and Mr. Stinson.

Armco alleged that it had been the victim of a scheme to defraud the Armco group that was devised by Mr. Donohue, Mr. Rossi and Mr. Stinson in late 1990 or early 1991 and which Mr. Atkins joined in about April, 1991. Armco's allegation was that the secret plan of the group of four was that Armco would be fraudulently induced to inject an extra large sum into the insurance group totalling U.S. $42.5 m. Armco said that the plan of the group of four was then to buy the insurance group through a Jersey company they owned called Wingfield; as a part of this plan, Armco alleged that the conspirators fraudulently induced Armco to agree to exclusive English jurisdictions clauses in three key contracts for the sale of the shares of the insurance group companies to Wingfield.

Armco also contended that as part of the secret plan the group of four fraudulently induced Armco to agree to debt collection contracts with a Nevis company owned by them called NPV (Nevis).

Armco further alleged that the group of four had fraudulently obtained funds from two trust funds set up to give financial protection to the fifth defendants Northwestern International Insurance Co. (NNIC) against claims by policyholders insured by the predecessor of NNIC, Bellafonte Insurance Co. (Bellafonte).

On Aug. 5, 1998 Armco brought proceedings in New York to recover the damages that the group claimed to have suffered as a result of the alleged fraud. Armco also claimed punitive and triple damages under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (c) (The RICO statute).

Mr. Donohue, Mr. Rossi and Mr. Stinson denied the conspiracy. They contended that the New York proceedings brought by Armco were vexatious and oppressive. Mr. Donohue and Channel Island Service Holdings Ltd. (CISHL), a company incorporated by Armco to effect the sale and transfer of the shares in BNIG, and Wingfield Ltd. argued that the New York proceedings were in breach of the exclusive English jurisdiction clauses (EJCs) contained in one of the transfer agreements and sale and purchase agreements.

Mr. Donohue applied for an anti-suit injunction to prevent the defendants from suing him in any forum other than England.

Mr. Rossi, Mr. Stinson, CISHL, Wingfield, International Run-off Services Inc., (IROS) a company owned by Mr. Stinson and alleged by Armco to have been used to receive commission fraudulently obtained from the fourth defendant, Armco Pacific Ltd. (APL) through the debt collection agreement made between APL and NPV (Nevis), and International Trustee and Receivership Ltd. (ITRL), a company owned by Mr. Rossi, applied to be joined as co-claimants in the proceedings for an anti-suit injunction.

The fourth and fifth defendants (APL and NNIC) applied to set aside the proceedings against them and to discharge the leave given to serve these proceedings on them outside the jurisdiction on the ground that agreement to accept service was conditional.

The issues for decisions were (1) whether the claimants and potential co-claimants (PCC) should be granted an anti-suit injunction and if so what its scope should be; (2) whether the PCC should be joined to the anti-suit injunction proceedings; (3) whether leave to serve the proceedings on the fourth and fifth defendants should be set aside.

———*Held,* by Q.B. (Com. Ct.) (AIKENS, J.), that (1) service on APL and NNIC should be set aside;

(2) the PCCs should not be joined as claimants in the English action;

(3) an injunction restraining proceedings in New York should not be granted to Mr. Donohue.

Mr. Donohue appealed.

Case 1:14-cv-03042-RMB-AJP Document 88-12 Filed 09/17/14 Page 3 of 4

scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English Court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum. I use the word "ordinarily" to recognize that where an exercise of discretion is called for there can be no absolute or inflexible rule governing that exercise, and also that a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct. But the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it. Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case. In the course of his judgment in *The Eleftheria*, [1969] 1 Lloyd's Rep. 237 at p. 242; [1970] P. 94 at pp. 99–100, Mr. Justice Brandon helpfully listed some of the matters which might properly be regarded by the Court when exercising its discretion and his judgment has been repeatedly cited and applied. Mr. Justice Brandon did not intend his list to be comprehensive, but mentioned a number of matters, including the law governing the contract, which may in some cases be material. (I am mindful that the principles governing the grant of injunctions and stays are not the same: see *Aérospatiale* at p. 896. Considerations of comity arise in the one case but not in the other. These differences need not, however, be explored in this case.)

25. Where the dispute is between two contracting parties, A and B, and A sues B in a non-contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in their contract, and the interests of other parties are not involved, effect will in all probability be given to the clause. That was the result in *Mackender v. Feldia A.G.*, [1966] 2 Lloyd's Rep. 449; [1967] 2 Q.B. 590; *Unterweser Reederei G.m.b.H. v. Zapata Off-Shore Co. (The Chaparral)*, [1968] 2 Lloyd's Rep. 158; *The Eleftheria*, [1969] 1 Lloyd's Rep. 237; [1970] P. 94; *DSV Silo- und Verwaltungsgesellschaft m.b.H. v. Owners of the Sennar and 13 Other Ships (The Sennar (No. 2))*, [1985] 1 Lloyd's Rep. 521; [1985] 1 W.L.R. 490; *British Aerospace Plc. v. Dee Howard Co.* [1993] 1 Lloyd's Rep. 368; *Continental Bank N.A. v. Aeakos Compania Naviera S.A. and Others*, [1994] 1 Lloyd's Rep. 505; [1994] 1 W.L.R. 588; *Aggeliki Charis Compania Maritima S.A. v. Pagnan S.p.A. (The Angelic Grace)*, [1995] 1 Lloyd's Rep. 87; and *Akai Pty. Ltd. v. People's Insurance Co. Ltd.*, [1998] 1 Lloyd's Rep. 90. A similar approach has been followed by Courts in the United States, Canada, Australia and New Zealand: see, for example, *M/S Bremen v. Zapata Off-Shore Co.*, (1972) 407 U.S. 1; *Volkswagen Canada Inc. v. Auto Haus Frohlich Ltd.*, [1986] 1 W.W.R. 380; *FAI General Insurance Co. Ltd. v. Ocean Marine Mutual Protection and Indemnity Association*, (1997) 41 N.S.W.L.R. 559; and *Kidd v. van Heeren*, [1998] 1 N.Z.L.R. 324.

26. *Cargo lately laden on board Fehmarn (Owners) v. Fehmarn (Owners) (The Fehmarn)*, [1957] 1 Lloyd's Rep. 511; [1958] 1 W.L.R. 159 shows that this is not an invariable result. This was one of the earlier cases in the modern series. The Russian exclusive jurisdiction clause was a condition in a bill of lading, no doubt part of a standard form, and certainly not the subject of negotiation between the parties to the eventual dispute. That was between English owners of the bill and German owners of the vessel. The dispute was held to have a much closer connection with England than with Russia, and it was thought that the German owners did not object to the dispute being decided in England if they could avoid giving security. On those grounds, the Judge having declined to stay the proceedings in England, the Court of Appeal upheld his decision.

27. The authorities show that the English Court may well decline to grant an injunction or a stay, as the case may be, where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions. These decisions are instructive. In *Evans Marshall and Co. Ltd. v. Bertola S.A. and Another*, [1973] 1 Lloyd's Rep. 453; [1973] 1 W.L.R. 349 there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the Court in Barcelona. Mr. Justice Kerr at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (p. 462; pp. 363–364). The Court of Appeal took a similar view (pp. 473, 479; pp. 377, 385). Lord Justice Sachs — thought separate trials particularly inappropriate where a conspiracy claim was in issue (p. 473; p. 377). In *Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria)*, [1981] 2 Lloyd's Rep. 119 the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the Courts of Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and Harbour

| 434 | LLOYD'S LAW REPORTS | [2002] Vol. 1 |
|---|---|---|
| Lord BINGHAM] | **Donohue v. Armco** | [H.L. |

Co., which was not bound by the clause. The Court of Appeal upheld the Judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Lord Justice Brandon said, at p. 128:

> I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries. See as to this *Halifax Overseas Freighters Ltd. v. Rasno Export (The Pine Hill)*, [1958] 2 Lloyd's Rep. 146 and *Taunton-Collins v. Cromie*, [1964] 1 W.L.R. 633.

*Citi-March Ltd. v. Neptune Orient Lines Ltd.*, [1997] 1 Lloyd's Rep. 72; [1996] 1 W.L.R. 1367 also involved third party interests and raised the possibility of inconsistent decisions. Mr. Justice Colman regarded separate trials in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp. 77–78; pp. 1375–1376. *Mahavir Minerals Ltd. v. Cho Yang Shipping Co. Ltd. (The M C Pearl)*, [1997] 1 Lloyd's Rep. 566 again involved third parties and raised the possibility of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the Courts of Seoul, Mr. Justice Rix refused to stay proceedings in England. He regarded the case as on all fours with *Citi-March* (see p. 575) and at p. 569 observed:

> ... It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost ...

A similar approach is discernible in *Bouygues Offshore S.A. v. Caspian Shipping Co.*, [1998] 2 Lloyd's Rep. 461, in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Lord Justice Evans as "near-conclusive" (p. 467), an injunction to restrain proceedings in South Africa was refused. In par. 27 of his judgment (at p. 466) Lord Justice Evans said:

> In my judgment, two questions arise, one a matter of principle. First, should the Court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is "yes". Mr. Justice Clarke did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognized in other authorities ...

Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p. 470) —

> ... this is the only way in which to minimize, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions.

28. Not all cases can be so neatly categorized. In *Crédit Suisse First Boston (Europe) Ltd. v. MLC (Bermuda) Ltd.*, [1999] 1 Lloyd's Rep. 767, Mr. Justice Rix dealt with a case in which there were four potential parties and three different agreements (or classes of agreement) but only two of the parties were bound by an English exclusive jurisdiction clause under one of the agreements. There were proceedings by C against A (the two parties to the clause) in England and proceedings by A against C, B and D in New York alleging statutory breaches relating to the agreement containing the clause and also under an agreement not containing an exclusive jurisdiction clause, and including other claims such as a claim for conversion. The Judge gave leave, on their application, for B and D to be joined to C's action against A in England (p. 775). A's application to stay the proceedings by C in England was not pursued, but if it had been it would have failed (p. 781). On an application by C, B and D for an injunction to restrain A suing them in New York, the Judge granted an injunction but only to restrain the prosecution of claims covered by the exclusive jurisdiction clause (p. 782). The Judge was confronted in this case with a difficult procedural and jurisdictional tangle which permitted no wholly satisfactory solution. It was however important to his decision that he did not judge it possible to make an order which would ensure trial of all proceedings arising out of all the agreements in one forum. At p. 781 he said (interpolating schematic