# EXHIBIT 11

### COURT OF APPEAL

1–2 April, 18 June 2009

———

UBS AG
v
HSH NORDBANK AG

[2009] EWCA Civ 585

Before Lord Justice WARD,
Lord COLLINS OF MAPESBURY and
Lord Justice TOULSON

**Conflict of laws — Jurisdiction — Defendant domiciled in an EU member state — Whether exclusive jurisdiction agreement covered the dispute — Council Regulation (EC) 44/2001, article 23.**

UBS, a Swiss bank, entered into a transaction with Landesbank Schleswig-Holstein (LB Kiel, the predecessor in title of HSH), a company domiciled in Germany. LB Kiel wanted to obtain exposure to certain credit products. A Cayman Islands company, North Street Referenced Linked Notes, 2002-4 Ltd (NS4), was set up by UBS. NS4 was to issue US dollar notes in three categories, one of which comprised US$500 million of floating rate notes of classes A to D (Class A to D NS4 Notes). They were to be issued to and purchased by UBS so that UBS could sell them to LB Kiel as part of the transaction.

On 23 January 2002 UBS and LB Kiel signed a Letter Agreement, which superseded prior discussions. This stated that LB Kiel and UBS had confirmed the purchase and sale of the Class A to D NS4 Notes subject to acceptable documentation. The Letter Agreement was governed by New York law but was silent as to jurisdiction. On 5 March 2002 the parties entered into the Reference Pool Side Agreement (RPSA), which was subject to New York law and contained a non-exclusive New York jurisdiction clause. On 5 March 2002 LB Kiel issued to UBS US$500 million of medium-term notes (the Kiel Notes); the principal amount of each note with accrued interest was to become payable to a noteholder on any business day at the noteholder's option subject to written notice being given five business days in advance. The detailed arrangements for these notes, and certain other matters, were the subject of two documents, a Pricing Supplement and a Dealer's Confirmation: the documents were governed by English law and English exclusive jurisdiction, and amounted to an initial purchase agreement for the Kiel Notes. The exclusive jurisdiction clause in the Dealer's Confirmation provided that:

> [T]he parties hereby irrevocably agree that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and the parties accordingly submit to the exclusive jurisdiction of the English courts for any suit, action or proceedings arising out of or in connection with this Agreement . . .

> Each of [LB Kiel and LB Finance] hereby irrevocably waives any objection which it may have to the laying of the venue of any Proceedings in the courts of England and any claim that any such Proceedings have been brought in an inconvenient forum . . .

Immediately upon issue by LB Kiel to UBS the Kiel Notes were transferred by UBS to NS4 in exchange for the issue by NS4 to UBS of the Class A to D NS4 Notes. At the same time UBS sold to LB Kiel the Class A to D NS4 Notes in exchange for the issue to UBS of the Kiel Notes in accordance with the Letter Agreement. Pursuant to this sale the Class A to D NS4 Notes, upon issue by NS4 to UBS on 5 March 2002, were immediately transferred by UBS to LB Kiel: this arrangement was subject to New York law but did not involve any express term as to jurisdiction.

Disputes arose between the parties. On 25 February 2008 UBS issued a claim form against HSH seeking declarations of non-liability, and on the same date HSH began proceedings in the Supreme Court of the State of New York identifying eight causes of action, including that UBS in selling the Class A to D NS4 Notes to LB Kiel made various misrepresentations to LB Kiel, some fraudulently, and that UBS breached the contract for the sale of the Class A to D NS4 Notes to LB Kiel, by failing to deliver notes with the characteristics promised. HSH applied to the English court for an order that the court had no jurisdiction to try UBS's claim. UBS relied upon the English exclusive jurisdiction clauses in the Dealer's Confirmation and the Kiel Notes as the basis for the jurisdiction of the English court over HSH under article 23 of the Brussels Regulation, Council Regulation (EC) No 44/2001.

Walker J, [2008] 2 Lloyd's Rep 500, held that the relevant jurisdiction was in the Dealer's Confirmation rather the Kiel Notes, because UBS held the Kiel Notes for no more than an instant. Walker J held that the jurisdiction clause did not cover the dispute set out in the New York complaint. This was a case in which the parties had entered into different agreements for different aspects of an overall relationship, with different terms as to jurisdiction. In the present case the parties had made agreements in circumstances which were markedly different from the normal expectation that the parties intended any dispute arising out of their relationship to be determined by the same tribunal. When considering the jurisdiction clauses found in the RPSA, the Kiel Notes, and the Kiel Notes Initial Purchase Agreement (IPA), a person having the relevant background knowledge would at once have seen that there was scope for the clauses to clash. In order to limit that scope, and to ensure that the clauses had meaning, such a person would be driven to the conclusion that each such clause focused upon matters directly relating to the contract in which it was found. On that basis, all matters relating to the Class A to D NS4 Notes, including the Indenture, the Letter Agreement and the RPSA were subject to the laws of New York. All those agreements contained submissions to the jurisdiction of the courts of New York, save for the Letter Agreement which was silent as to jurisdiction and hence effectively agreed that action could be brought in any court of competent jurisdiction. The Letter Agreement did not entitle UBS to sue HSH, a German domiciled company, in England. The focus had to be on the cause

(iv) that the obligations of the parties in relation to the transaction were (and had at all material times been) governed by, and are limited to, the terms of the Principal Agreements and/or the Related Documents and, save as expressly set out in those agreements and/or the Related Documents, UBS had assumed no obligation, duty or other responsibility, whether of a fiduciary or other nature, to HSH;

(v) alternatively, that any such duty, obligation or responsibility undertaken by UBS had been lawfully performed and discharged;

(vi) that UBS had not been unjustly enriched as alleged and/or had not converted any of HSH's funds and/or HSH's investment as alleged;

(vii) that UBS had materially complied with and/or discharged each and all of its relevant obligations arising out of or in connection with the Principal Agreements and the Related Documents and accordingly UBS had not caused and/or was not liable to HSH in respect of any loss or damage arising out of or in connection with those agreements and the Related Documents (whether in contract, tort, statute or otherwise) which may have been suffered or incurred by HSH in connection with the transaction.

82. Are these claims within the Dealer's Confirmation jurisdiction clause? I accept UBS's submission that the proper approach to the construction of clauses agreeing jurisdiction is to construe them widely and generously: *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 at para 14. I also accept that in the usual case the words "arising out of" or "in connection with" apply to claims arising from pre-inception matters such as misrepresentation: *Fiona Trust & Holding Corporation v Privalov* [2007] 2 Lloyd's Rep 267 (affirmed *sub nom Premium Nafta Products Ltd v Fili Shipping Co Ltd* [2008] 1 Lloyd's Rep 254); *Deutsche Bank AG v Asia Pacific Broadband Wireless Communications Inc* [2008] 2 Lloyd's Rep 619; *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488.

83. But the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 All ER (Comm) 465, at para 93, whether a dispute falls within one or more related agreements depends on the intention of the parties as revealed by the agreements.

84. Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended.

85. It is fanciful to suppose (as UBS contends) that the Dealer's Confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash.

86. The Dealer's Confirmation is expressed to be issued pursuant to LB Kiel's US$20 billion Global Medium-Term Note Programme and simply confirms the issue of the US$500 Kiel MTN Notes to UBS as one of the dealers on HSH's bond programme. UBS immediately transferred them to NS4. NS4 kept the Kiel MTN Notes as an investment or "collateral" to create income in order to fund payments under the NS4 Notes.

87. I accept HSH's argument that the Kiel MTN Notes are simple AAA-rated bonds that HSH issued pursuant to a pre-existing bond programme. HSH used these notes (rather than cash) to pay for the NS4 Notes. This dispute has nothing to do with the Kiel MTN Notes, which were no more than the consideration for the NS4 Notes. The parties cannot be taken objectively to have intended that the jurisdiction clause contained in the Dealer's Confirmation (ie the method of payment for the investment) would govern every dispute relating to inducement of making such investment.

88. There is no dispute about the issue, sale or performance of the Kiel MTN Notes. Their holder, NS4, is not a party to any of the proceedings. None of the parties to the proceedings advances any claim under the Kiel MTN Notes against any other party. None of the parties suggests there has been any breach of the Kiel MTN Notes, or any misrepresentation in relation to them. The Kiel MTN Notes are supported by a German state guarantee and are virtually equivalent to cash. The misrepresentation claims were made about the Reference Pool, not about the Kiel MTN Notes. The same allegations would be made if Kiel LB had paid for its investment in cash instead of notes.

89. The New York complaint alleges (*inter alia*) that: (a) UBS induced HSH to purchase the NS4 Notes by misrepresentations concerning, among other things, the credit quality of the Reference Pool to which payments under the NS4 Notes were linked; and (b) UBS failed to operate a Commitments Committee, as required by the RPSA, so as to select Reference Pool assets with stable or