# EXHIBIT LC4
# Part I of IV

# EXHIBIT LC4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>               Plaintiff,<br><br>   -against-<br><br>Vale, S.A., Benjamin Steinmetz, BSG Resources Limited, BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSGR Guinea Ltd. BVI, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka<br>VBG-Vale BSGR Guinea, Frederic Cilins, Michael Noy, Avraham Lev Ran, Mamadie Touré, and Mahmoud Thiam,<br><br>            Defendants. | 14 Civ. 3042 (RMB) |

**Appendix 4 to the Declaration of Lord Collins of Mapesbury**

**Legal Authorities**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>          Plaintiff,<br><br>  -against-<br><br>Vale, S.A., Benjamin Steinmetz, BSG Resources Limited, BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSGR Guinea Ltd. BVI, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR Guinea, Frederic Cilins, Michael Noy, Avraham Lev Ran, Mamadie Touré, and Mahmoud Thiam,<br><br>          Defendants. | 14 Civ. 3042 (RMB) |

### Appendix 4 to the Third Declaration of Lord Collins of Mapesbury

**A   English authorities**

1. *Donohue v Armco Inc* [2001] UKHL 64, [2002] CLC 440
2. *Donohue v Armco Inc* [2000] CLC 1090 (extract)
3. *Fiona Trust and Holding Corp v Privalov* [2007] EWCA 20, [2007] Bus LR 686 (extract)
4. *National Westminster Bank v Utrecht-America Finance Co* [2001] EWCA Civ 658, [2001] CLC 1372 (extract)

**B   US authorities**

5. *Lipcon v Underwriters at Lloyd's, London,* 148 F 3d 1285 (11th Cir 1998)
6. *Richards v. Lloyd's of London,* 135 F 3d 1289 (9th Cir 1998)
7. *Roby v Corporation of Lloyd's*, 996 F 2d 1353 (2nd Cir 1993), cert den, 510 US 945 (1993)

**C   Academic authorities**

8. Briggs, *Agreements on Jurisdiction and Choice of Law* (2008), para 7.02
9. Dicey, Morris and Collins, *Conflict of Laws*, 15th ed 2012, paras 12-145 – 12-153

**440**                                                  [2002] CLC

## Donohue v Armco Inc & ors.                                A

[2001] UKHL 64
House of Lords.
Lord Bingham of Cornhill, Lord Mackay of Clashfern, Lord Nicholls of
Birkenhead, Lord Hobhouse of Woodborough, Lord Scott of Foscote.
Judgment delivered 13 December 2001.

B

*Conflict of laws – Anti-suit injunction – Service out of jurisdiction – Exclusive
jurisdiction clause – Forum non conveniens – Claimant sought to restrain US
proceedings on basis of exclusive English jurisdiction clauses – US plaintiffs
undertook not to enforce any award of multiple or punitive damages – Extent to
which claims and parties in US proceedings were within and bound by jurisdiction
clauses – Whether US defendants could be joined as claimants in English
proceedings for anti-suit injunction – Whether US proceedings vexatious – Whether
England natural forum – Whether US defendants had cause of action entitling them
to service out against US plaintiffs – Whether ends of justice best served by single
trial in New York – Whether English court should grant anti-suit injunction.*

C

This was an appeal by the plaintiffs in US proceedings from a majority decision of the
Court of Appeal ([2000] CLC 1090) granting the claimant an anti-suit injunction
restraining the US plaintiffs' proceedings in New York.

D

The plaintiffs in New York were Armco Inc and four other companies in the Armco
group ('AFSC', 'AFSIL', 'APL' and 'NNIC'). The Armco group formerly included a
group of insurance companies ('BNIG') which were in run-off. Armco agreed to sell
BNIG to its management and negotiations were conducted by 'R' and 'S', two senior and
long-serving Armco executives, both of them US citizens and residents. The prospective
buyers were the claimant 'D' and 'A', also senior and long-serving Armco executives, but    E
UK citizens resident in Singapore and England respectively. The sale of the business was
effected by incorporating a new company 'CISHL' to which the BNIG assets would be
transferred. The shares in BNIG were held by AFSIL and another Armco subsidiary
'AFSEL'. AFSC injected US$32.5m in cash and securities into CISHL. A further
US$10m was transferred from AFSEL to CISHL. In 1991 AFSIL and AFSEL executed
transfer agreements transferring all their assets in BNIG into CISHL. On the same day     F
all the shares in CISHL were sold to 'Wingfield' under a sale and purchase agreement.
After the sale BNIG was renamed 'NAIG', the leading company of the group being
'NAIC'.

The parties to the agreements on the Armco side were AFSIL, AFSEL and AFSC and
on the buyers' side CISHL, Wingfield, D and A. On the later dissolution of AFSEL,
Armco Inc succeeded to the rights and obligations of that company, and so was to be
treated as a party to one of the transfer agreements and to the sale and purchase      G
agreement. Each of the agreements contained an express stipulation that the contract was
governed by English law, made provision for service on a nominated agent of the
vendor's solicitors in England, and provided for the exclusive jurisdiction of the English
court.

In 1997, NAIC went into provisional liquidation with other group companies and a
winding-up petition was presented to the High Court. At that time Armco received      H
certain information from A, who had resigned from NAIG in 1995. On the basis of that
information, proceedings were issued in 1998 by the five Armco appellants in New York
against NAIC, D, A, R and S and their respective companies, 'ITRS' and 'IROS',
Wingfield, CISHL, and NPV Ltd (a Nevis company). The proceedings were based on
what the amended complaint described as an international fraud of immense
proportions. The Armco companies contended that a secret agreement had been made

© 2002 Sweet and Maxwell Ltd
bcom2002 case   52 Mp   440   —bcom4100

A    between D, A, R and S in New York in April 1991. Pursuant to that agreement Armco would be fraudulently induced to inject an extra-large sum into BNIG and the four would then buy BNIG through Wingfield, a Jersey company which they (or some of them) owned. Since R and S were Armco executives negotiating on behalf of their employer their conduct was a breach of the duty they owed to their employer. The plan was implemented. Much of the money injected into the group had allegedly, been siphoned off by the four for their own ends. Armco also contended that, as part of the secret plan, the

B    group of four fraudulently induced Armco (by APL) to enter into debt collection contracts with NPV, the Nevis company which they owned: those contracts were said to have been unduly favourable to NPV and to have enabled the four to take exorbitant fees for themselves. It was further alleged that the four fraudulently obtained money from two trust funds set up earlier to give financial protection to NNIC against claims by policyholders of an insurer whose business NNIC had taken over. A further complaint

C    was that, between 1991 and 1997, the four diverted funds from NAIG to themselves by means of various commission, consultancy and dividend payments. The New York proceedings also included claims under the Federal Racketeer Influenced and Corrupt Organizations Act ('RICO'), which enabled a successful plaintiff to recover triple, punitive and exemplary damages.

D    R and S and ITRS and IROS and Wingfield and CISHL moved to dismiss the New York proceedings against them on various grounds. That motion was denied. D did not take part in that proceeding, but instead applied to the English court for an anti-suit injunction to enforce the exclusive jurisdiction clauses ('EJCs') in the transfer and sale and purchase agreements. Application was also made in the action to join R and S and ITRS and IROS and Wingfield and CISHL as claimants ('the potential co-claimants' or 'PCCs'). APL and NNIC applied to set aside service upon them.

E    Aikens J [1999] CLC 1748) ordered that service on APL and NNIC be set aside. That decision was upheld by the Court of Appeal ([2000] CLC 1090). The judge further decided that the PCCs should not be joined as claimants in the English action. The majority in the Court of Appeal took a different view and held that they should be joined. The judge held that an injunction restraining proceedings in New York should not be granted to D on the basis of his finding that many of the claims in the New York proceedings did not come within the exclusive jurisdiction clauses in the agreements. The New York proceedings against D were not vexatious and oppressive. The Court of Appeal

F    granted an injunction against the first three Armco defendants (Armco Inc, AFSC and AFSIL) restraining them from commencing or continuing proceedings against any of the claimants (D, R and S, IROS, ITRS, Wingfield and CISHL) in any court other than those of England and Wales regarding any dispute arising out of the management buy-out, defined to mean the 1991 disposal of BNIG. The injunction did not apply to APL and

G    NNIC, the joinder of which companies had been disallowed, and was limited to the causes of action held to fall within the exclusive jurisdiction clauses. But the benefit of the exclusive jurisdiction clauses was extended to the four PCCs who were not party to them (R and S and their respective companies). The object of the injunction was to give effect to the exclusive jurisdiction clauses and to ensure trial in England of the issues arising out of or connected with the management buy-out between all the parties involved. The Armco companies appealed challenging the joinder of the US PCCs and offering not to enforce

H    against D, Wingfield or CISHL any multiple or punitive damages awarded in the New York proceedings.

    *Held,* allowing the appeal:

    1. CISHL was a party to the transfer agreements and Wingfield was party to the sale and purchase agreement. The agreements contained EJCs and the court had power to add those companies as claimants if it considered it desirable to do so under CPR, r. 19.2

(2). Whether it was desirable depended on whether the US PCCs should be joined and whether the grant of an anti-suit injunction to D was upheld.

2. The other PCCs were in a different position to Wingfield and CISHL since they were not party to the agreements and did not have the benefit of the EJCs. None had any cause of action that would entitle the court to give leave to serve out of the jurisdiction and thus none could bring proceedings against Armco companies in England unless those companies submitted to the jurisdiction. The judge was right that England was not the natural forum for the proceedings and that the New York proceedings against the US PCCs were not vexatious and oppressive. (Siskina v Distos Compania Naviera SA [1979] AC 210, Societe Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871 and Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd [1993] AC 334 applied.)

3. Since the PCCs could not have obtained leave to serve out, the fact that the three Armco companies were amenable to the jurisdiction by virtue of their contractual relationship with D did not enable the US PCCs to take advantage of that relationship to effect service on the solicitors nominated by those companies pursuant to the agreements. A foreign party could only be made subject to the jurisdiction to the extent that the rules permitted. The majority of the Court of Appeal was wrong to have allowed joinder of the US PCCs. (Holland v Leslie [1894] 2 QB 450, Johnson v Taylor Bros and Co Ltd [1920] AC 144 applied.)

4. The court would normally enforce D's contractual right as against the three Armco appellants to submit disputes between them within the scope of the EJCs to the English court. However the court could decline to grant an injunction where the interests of other parties not bound by the clauses or the existence of other claims meant that other proceedings would anyway take place with the risk of inconsistent decisions. In the instant case D's right against the three Armco companies had to be balanced against the fact that the five Armco plaintiffs in New York had successfully founded jurisdiction there against the US PCCs as defendants and that the two Armco companies which were not subject to the jurisdiction of the English court by virtue of the EJCs had successfully founded jurisdiction in New York against D, Wingfield and CISHL. Further, the three Armco companies had successfully founded jurisdiction in New York against D, Wingfield and CISHL in respect of claims that were not within the EJCs. That amounted to a strong reason for not giving effect to the EJCs in favour of D on the basis that the ends of justice would be best served by a single trial in New York. The Court of Appeal had erred in the exercise of its discretion and the court would exercise the discretion afresh. It would set aside the injunction on the basis of the undertaking by the Armco plaintiffs not to enforce against D, Wingfield or CISHL any multiple or punitive damages awarded in the New York proceedings.

The following cases were referred to in the speeches:

*Aggeliki Charis Compania Maritima SA v Pagnan SpA ('The Angelic Grace')* [1995] 1 Ll Rep 87.
*Airbus Industrie GIE v Patel* [1998] CLC 702; [1999] 1 AC 119.
*Akai Pty Ltd v People's Insurance Co Ltd* [1997] CLC 1508.
*Aratra Potato Co Ltd v Egyptian Navigation Co ('The El Amria')* [1981] 2 Ll Rep 119.
*Beck v Value Capital Ltd (No. 2)* [1975] 1 WLR 6; [1976] 1 WLR 572 (CA).
*Bremen M/S v Zapata Off-Shore Co* (1972) 407 US 1.
*British Aerospace plc v Dee Howard Co* [1993] 1 Ll Rep 368.
*British Airways Board v Laker Airways Ltd* [1985] AC 58.
*Castanho v Brown and Root (UK) Ltd* [1981] AC 557.
*Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334.
*Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367.
*Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR 588.

© 2002 Sweet and Maxwell Ltd
bcom2002 case   52 Mp   442   —bcom4100

Donohue v Armco Inc
(Lord Bingham)

A
*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] CLC 579.
*DSV Silo- und Verwaltungsgesellschaft mbH v Owners of the Sennar ('The Sennar') (No. 2)*
[1985] 1 WLR 490.
*Eleftheria, The* [1970] P 94.
*Evans Marshall & Co Ltd v Bertola SA* [1973] 1 WLR 349.
*FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity
Association* (1997) 41 NSWLR 559.

B
*Fehmarn, The* [1958] 1 WLR 159.
*Holland v Leslie* [1894] 2 QB 450.
*Johnson v Taylor Bros & Co Ltd* [1920] AC 144.
*Kidd v van Heeren* [1998] 1 NZLR 324.
*Mackender v Feldia AG* [1967] 2 QB 590.
*Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd ('The M C Pearl')* [1997] CLC 794.

C
*Mercedes-Benz AG v Leiduck* [1995] CLC 1090; [1996] AC 284.
*Siskina v Distos Compania Naviera SA* [1979] AC 210.
*Societe Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871.
*South Carolina Insurance Co v Assurantie Maatschappij 'De Zeven Provincien' NV* [1987]
AC 24.
*Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460.

D
*Ultisol Transport Contractors Ltd v Bouygues Offshore SA* [1998] CLC 1526.
*Unterweser Reederei GmbH v Zapata Off-Shore Co ('The Chaparral')* [1968] 2 Ll Rep 158.
*Volkswagen Canada Inc v Auto Haus Frohlich Ltd* [1986] 1 WWR 380.

Lord Grabiner QC and Daniel Toledano (instructed by Freshfields) for the appellant.

Peter Leaver QC and Robert Howe (instructed by Simmons & Simmons) for the respondent.

E

SPEECHES

**Lord Bingham of Cornhill:**

1. The issue in this appeal is whether an injunction should have been granted to restrain the prosecution of proceedings in New York and, if so, in whose favour it should have been granted.

F
2. By a summons issued on 8 March 1999 Mr Donohue, the respondent to this appeal, sought such an injunction against the five companies, all of them in the Armco group, which are named as the appellants before the House. Aikens J at first instance declined to grant an injunction: [1999] CLC 1748. His decision was reversed by a majority of the Court of Appeal (Stuart-Smith and Sedley L JJ, Brooke LJ dissenting) [2000] CLC 1090, who granted an injunction. The facts giving rise to this appeal were helpfully summarised by the judge and Stuart-Smith LJ: see at p. 1750 et seq and 1092 et seq of the respective judgments. Stuart-Smith

G
LJ also appended to his judgment, at p. 1188, an annex giving details of the companies and individuals involved in the proceedings and an explanation of the acronyms used in his judgment. Both the factual summary and the annex should be treated as incorporated in this opinion, which permits more economical reference to be made to the background history.

3. The parties fall into two camps. One camp comprises Armco Inc, the parent company of the Armco group, a conglomerate based in the US, and four other companies known by their

H
initial letters ('AFSC', 'AFSIL', 'APL' and 'NNIC'). These five companies are plaintiffs in the New York proceedings already mentioned and defendants (or potential defendants) in this English action and are named as appellants before the House. This camp also included Armco Financial Services Europe Ltd ('AFSEL'), a company which has now been dissolved.

4. The second camp comprises, first of all, Mr Donohue, a defendant in the New York proceedings and the claimant here. It also comprises a number of potential co-claimants ('PCCs'), all of them defendants in the New York proceedings: Mr Rossi and his Ohio

**444**                         Donohue v Armco Inc                    [2002] CLC
                              (Lord *Bingham*)

company known as 'ITRS'; Mr Stinson and his Ohio company known as 'IROS'; Wingfield      A
Ltd, a Jersey company; and another Jersey company known as 'CISHL'. Another defendant
was sued in New York, Mr Atkins, but he settled the claim against him.

  5.  The Armco group formerly included several insurance companies together known as the
British National Insurance Group ('BNIG'). BNIG ceased to write new business and entered
run-off status in 1984. It thus represented a liability to Armco, since claims under existing
policies had to be met, and negotiations for the sale of the business were set in train. On the      B
Armco side, the negotiations were conducted by Rossi and Stinson, two senior and long-
serving Armco executives, both of them US citizens and residents. The prospective buyers
were Mr Donohue and Mr Atkins, also senior and long-serving Armco executives, but UK
citizens resident in Singapore and England respectively.

  6.  The shares in BNIG were owned by AFSIL and AFSEL. To effect the sale of the business
Armco sold its shares in BNIG. To this end it incorporated CISHL. AFSC injected US$32.5m      C
in cash and securities into CISHL. A further US$10m was transferred from AFSEL to CISHL.
On 3 September 1991 AFSIL and AFSEL each executed an agreement (referred to as 'the
transfer agreements') transferring all their assets in BNIG into CISHL. On the same day
Wingfield acquired all the shares in CISHL under a sale and purchase agreement bearing the
same date under which Wingfield was named as the purchaser. After the sale BNIG was
renamed the North Atlantic Insurance Group ('NAIG'), the leading company of which was      D
called the North Atlantic Insurance Company Ltd ('NAIC').

  7.  Many of the facts surrounding these transactions are the subject of acute controversy
between the parties. But two points central to this appeal are not in doubt. First, the only parties
to these three agreements were (on the Armco side) AFSIL, AFSEL and AFSC and (on what
may be called the Donohue side) CISHL, Wingfield, Mr Donohue and Mr Atkins. It is now
accepted that, on the dissolution of AFSEL, Armco Inc succeeded to the rights and obligations
of that company, so it also is to be treated as a party to one of the transfer agreements and to the      E
sale and purchase agreement. But the other companies in the Armco group (APL and NNIC)
and several of the PCCs (Rossi and Stinson and their respective companies ITRS and IROS)
were not parties to any of the three agreements. Secondly, each of the three agreements
contained an express stipulation that the contract was governed by English law, made provision
for service on a nominated agent of the vendor's solicitors in England and, most importantly,
provided for the exclusive jurisdiction of the English court. In the sale and purchase agreement
it was provided that 'the parties hereby irrevocably submit themselves to the exclusive      F
jurisdiction of the English courts to settle any dispute which may arise out of or in connection
with this agreement'. The exclusive jurisdiction clause in each of the transfer agreements was
differently worded, but no point has been taken on the difference of wording.

  8.  Several years passed before, in early 1997, NAIC went into provisional liquidation with
other group companies and a winding-up petition was presented to the High Court. From about
this date, it appears that there were a series of discussions between a lawyer representing      G
Armco and Mr Atkins, who had resigned from NAIG in 1995. Mr Atkins made a series of
statements, the last of them in evidence dated September 1998. On this statement Armco
strongly rely in support of their case.

  9.  On 5 August 1998 proceedings were issued by the five Armco appellants in New York
against NAIC, Mr Donohue, Mr Atkins, all the six PCCs (Rossi and Stinson and their
respective companies, Wingfield and CISHL), and NPV Ltd (a Nevis company). The      H
proceedings were based on what the amended complaint described as 'an international fraud of
immense proportions'. The amended complaint is a substantial document, running to more
than 70 pages and including 17 specific counts. It is not easily summarised, but the broad thrust
of the Armco companies' case is clear enough. They contend that a secret agreement (recorded
in writing) was made between Donohue, Atkins, Rossi and Stinson in New York in April 1991.
Pursuant to this agreement Armco would be fraudulently induced to inject an extra-large sum

52-1-02
HL

Donohue v Armco Inc
(Lord *Bingham*)

**445**

A    into BNIG and the four would then buy BNIG, thus enriched, through Wingfield, a Jersey company which they (or some of them) owned. Since Rossi and Stinson were Armco executives negotiating on behalf of their employer their conduct was a flagrant breach of the duty they owed to their employer. The plan was implemented. Much of the money injected into the group has, it is alleged, been siphoned off by the four for their own ends. But the alleged fraud did not end there. Armco also contend that, as part of the secret plan, the group of four fraudulently induced Armco (by APL) to enter into debt collection contracts with NPV, the

B    Nevis company which they owned: these contracts are said to have been unduly favourable to NPV and to have enabled the four to take exorbitant fees for themselves. It is further alleged that the four fraudulently obtained money from two trust funds set up earlier to give financial protection to NNIC against claims by policyholders of an insurer whose business NNIC had taken over. In this way, it is said, the four fraudulently depleted the trust funds by some US$16m after the 3 September 1991 agreements. A further complaint is that, between 1991

C    and 1997, the four diverted funds from NAIG to themselves by means of various commission, consultancy and dividend payments. The New York proceedings also included claims under the Federal Racketeer Influenced and Corrupt Organizations Act 18 USC §1962(c) ('RICO'), which enables a successful plaintiff to recover triple, punitive and exemplary damages.

    10. All the PCCs (Rossi and Stinson and their respective companies, Wingfield and CISHL) moved to dismiss the New York proceedings against them on various grounds, a motion denied by Judge Schwartz sitting in the District Court of the Southern District of New York on

D    30 September 1999. Mr Donohue did not take part in that proceeding, but had instead issued the present summons applying for an injunction on 8 March 1999. Application was also made in the action to join the PCCs as claimants. APL and NNIC applied to set aside service upon them.

    11. These three applications came before Aikens J who gave his reserved judgment on

E    15 July 1999. On the third summons he ordered that service on APL and NNIC be set aside ([1999] CLC 1748, para. 68). This decision was upheld by the Court of Appeal ([2000] CLC 1090, para. 46 and 80). It has not been challenged before the House.

    12. On the second summons, the judge decided that the PCCs should not be joined as claimants in the English action (para. 50, 67). The majority in the Court of Appeal took a

F    different view and held that they should be joined (para. 52–53, 98). Brooke LJ held that there were no grounds for allowing any of the American PCCs (Rossi and Stinson and their respective companies) to be joined as claimants: para. 89–92. The propriety of joining the PCCs as claimants in this action is one of the major issues before the House.

    13. On the first summons, the judge held that an injunction restraining proceedings in New York should not be granted to Mr Donohue. In reaching that conclusion he made two important findings. The first was expressed in para. 42 and 43 of his judgment (p. 1760):

G        '42. I have decided that the claims raised in the NY proceedings based on a pre-existing conspiracy to defraud Armco are not claims that "arise out of" either the SPA [sale and purchase agreement] or the transfer agreements. They "arise out of" the [alleged] agreement to conspire against Armco to defraud it. I have also concluded that the claims concerning the collection agreement did not arise out of or in connection with the SPA or the transfer agreements. I doubt the trust fund claims come within the EJCs [exclusive jurisdiction clauses] too, but I was told that the trust fund claims may not be relevant

H        now that the NNIC/NAIC disputes have been settled subject to ratification by the court. Thus at least the issues raised in counts 1–8 and 9–12 [of the amended complaint in the New York proceedings] are not within the EJCs.

        43. This means that much of the disputes raised in the NY proceedings are outside the scope of the EJCs...'

    The second important finding was that Armco Inc had never succeeded to the rights and obligations of AFSEL under the transfer agreement and the sale and purchase agreement to

Donohue v Armco Inc                    [2002] CLC
                                    (Lord *Bingham*)

which AFSEL had been party and so had never become bound by the exclusive jurisdiction          A
clause in those agreements (para. 28). The judge accordingly approached Mr Donohue's
application by considering whether the New York proceedings against him were vexatious and
oppressive and concluded that they were not (para. 65–66). All three members of the Court of
Appeal disagreed with these two findings, although with some qualifications by Brooke LJ
concerning the first (para. 30–31, 27, 67, 97). The Court of Appeal held that these errors
vitiated the judge's exercise of discretion and so entitled the Court of Appeal to exercise its          B
discretion afresh (para. 32, 87).

   14. The Court of Appeal's conclusions on these two points have not been in issue before the
House. Armco Inc accepts that as the successor to AFSEL it is bound by the exclusive
jurisdiction clauses in the transfer agreement to which AFSEL was party and in the sale and
purchase agreement to the extent that AFSEL would itself have been bound had it not been
dissolved. Armco Inc also asserts that as the ultimate victim of the alleged conspiracy it has          C
claims independent of those derived from AFSEL, an assertion challenged by Mr Donohue and
the PCCs. On the scope of the clauses, the Armco companies accept that the clauses cover
claims based on the conspiracy which preceded the making of the agreements as well as the
misrepresentations and concealment which procured them to be made. The scope of the clauses
was not the subject of argument before the House and I do not think it appropriate to give
detailed consideration to this aspect of the case. The exclusive jurisdiction clause in the sale
and purchase agreement, quoted above, was in wide terms. The practice of the English courts is          D
to give such clauses, as between the parties to them, a generous interpretation.

   15. The Court of Appeal granted an injunction against the first three Armco defendants
(Armco Inc, AFSC and AFSIL) restraining them from commencing or continuing proceedings
against any of the claimants (Donohue, Rossi and Stinson, IROS, ITRS, Wingfield and CISHL)
in any court other than those of England and Wales regarding any dispute arising out of the
management buy-out, defined to mean the 1991 disposal of BNIG. The injunction was          E
expressed to apply in particular to the Armco companies' New York proceedings already
referred to, and to the numbered counts which were held to cover the 1991 management buy-
out. Thus the injunction did not apply to APL and NNIC, the joinder of which companies had
been disallowed, and was limited to the causes of action held to fall within the exclusive
jurisdiction clauses. But the benefit of the exclusive jurisdiction clauses was extended to the
four PCCs who were not party to them (Rossi and Stinson and their respective companies). The
object of the injunction was plainly to give effect to the exclusive jurisdiction clauses and to          F
ensure trial in England of the issues arising out of or connected with the management buy-out
between all the parties involved.

   16. The grant of an anti-suit injunction, as of any other injunction, involves an exercise of
discretion by the court. To exercise its discretion reliably and rationally, the court must have
the fullest possible knowledge and understanding of all the circumstances relevant to the
litigation and the parties to it. This is particularly true of an anti-suit injunction because, as          G
explained below, the likely effect of an injunction on proceedings in the foreign and the
domestic forum and on parties not bound by the injunction may be matters very material to the
decision whether an injunction should be granted or not. Thus although the two main issues
before the House cannot be regarded entirely independently of each other, it is preferable to
consider the issue of joinder of the PCCs before considering the grant of an anti-suit injunction
more generally.          H

## Joinder of the PCCs

   17. CISHL was party to each of the transfer agreements. Wingfield was party to the sale and
purchase agreement. All three agreements contained an English exclusive jurisdiction clause.
Both companies have been sued by Armco in New York. Both have claims falling within RSC,
O. 11, r. 1(1)(d)(iii) and (iv) (now CPR, r. 6.20(5)(c) and (d)) entitling them to seek leave to

52-4-02
**HL**        Donohue v Armco Inc       **447**
(Lord *Bingham*)

A   serve proceedings out of the jurisdiction. Under RSC, O. 15, r. 6(2)(b)(ii) (now CPR, r. 19.2(2)) the court has power to add these companies as claimants if it considers it desirable to do so. Thus if the court should consider it desirable to do so there is no jurisdictional objection to the grant of leave to add CISHL and Wingfield as claimants in Mr Donohue's action and to give leave (if it were needed) to CISHL and Wingfield to serve AFSIL and Armco Inc (as the successor to AFSEL) out of the jurisdiction. The basis of their claim is in principle the same as that of Mr Donohue, but since they seek to be added to existing proceedings they must

B   persuade the court that it is desirable to add them. The decision whether it is desirable to add them will be heavily influenced by the decision whether to join the other PCCs and whether Mr Donohue upholds his claim to the grant of an anti-suit injunction.

     18. The other four PCCs (Rossi and Stinson and their respective companies) are in a different position. None was a party to either transfer agreement or to the sale and purchase agreement and so none has the benefit of the English exclusive jurisdiction clause. It is

C   common ground that none has any cause of action which would entitle the court to give leave to serve proceedings out of the jurisdiction under RSC, O. 11, r. 1 or CPR, r. 6.20, and thus none could bring independent proceedings against any Armco company in England unless that company submitted to the jurisdiction. But these PCCs rely on the broad power of the court under RSC, O. 15, r. 6 and CPR, r. 19, which is said to be unconstrained by the rules on service out of the jurisdiction, and it is said to be desirable to add them because they have a substantial

D   cause of action entitling them to seek an anti-suit injunction. The Armco companies reply that a foreign party, even if already properly sued within the jurisdiction, may not be subjected to a claim for which leave to serve out could not be granted and further that, in the absence of any contractual right to rely on an exclusive jurisdiction clause, these PCCs have on the material before the House no cause of action entitling them to seek an anti-suit injunction. The first issue between the parties is whether these PCCs can show any cause of action which would entitle them to claim an injunction.

E   19. The jurisdiction of the English court to grant injunctions, both generally and in relation to the conduct of foreign proceedings, has been the subject of consideration by the House of Lords and the Privy Council in a series of decisions in recent years which include *Siskina (Owners of cargo lately laden on board) v Distos Compania Naviera SA* [1979] AC 210; *Castanho v Brown & Root (UK) Ltd* [1981] AC 557; *British Airways Board v Laker Airways Ltd* [1985] AC 58; *South Carolina Insurance Co v Assurantie Maatschappij 'De Zeven*

F   *Provincien' NV* [1987] AC 24; *Societe Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871; and *Airbus Industrie GIE v Patel* [1998] CLC 702; [1999] 1 AC 119. Those decisions reveal some development of principle and there has in other decisions (for example, *Mercedes-Benz AG v Leiduck* [1995] CLC 1090; [1996] AC 284) been some divergence of opinion. But certain principles governing the grant of an injunction to restrain a party from commencing or pursuing legal proceedings in a foreign jurisdiction, in cases such as the present, as between the Armco companies and these PCCs, are now beyond dispute. They were

G   identified by Lord Goff of Chieveley giving the opinion of the Judicial Committee of the Privy Council in Aerospatiale (at p. 892):

     (1) The jurisdiction is to be exercised when the ends of justice require it.

     (2) Where the court decides to grant an injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed.

H   (3) An injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy.

     (4) Since such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution.

     In *Aerospatiale* the issue was whether proceedings in Texas should be restrained in favour of Brunei, and (at p. 896) Lord Goff summarised the guiding principles:

'In the opinion of their Lordships, in a case such as the present where a remedy for a     A
particular wrong is available both in the English (or, as here, the Brunei) court and in a
foreign court, the English or Brunei court will, generally speaking, only restrain the
plaintiff from pursuing proceedings in the foreign court if such pursuit would be
vexatious or oppressive. This presupposes that, as a general rule, the English or Brunei
court must conclude that it provides the natural forum for the trial of the action; and
further, since the court is concerned with the ends of justice, that account must be taken     B
not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign
proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the court
will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in
the foreign forum of which it would be unjust to deprive him. Fortunately, however, as
the present case shows, that problem can often be overcome by appropriate undertakings
given by the defendant, or by granting an injunction upon appropriate terms; just as, in     C
cases of stay of proceedings, the parallel problem of advantages to the plaintiff in the
domestic forum which is, prima facie, inappropriate, can likewise often be solved by
granting a stay upon terms.'

20. If these principles are applied to the present case it is in my opinion plain that an anti-suit
injunction could not properly be granted in favour of these PCCs. The judge (considering the
position of Mr Donohue and all the PCCs) concluded that England was not the natural forum
for these proceedings, that the connections with England were slim and that the New York     D
proceedings were not vexatious and oppressive (para. 65–66). Stuart-Smith LJ observed that if
this were an alternative forum case he would not necessarily disagree with the judge (para. 38).
Brooke LJ considered that the convenient forum for the resolution of all disputes between
Rossi and Stinson and their former employers was clearly situated on the other side of the
Atlantic (para. 92). Judge Schwartz concluded that: 'Permitting this trial to proceed in New
York would be neither oppressive nor vexatious to defendants', and further said:     E

'This court concludes that this action, involving US plaintiffs, mostly US or non-English
defendants, and a fraudulent scheme that allegedly arose in New York, is far removed
from the facts of those cases where courts granted the extraordinary remedy of forum
non conveniens.'

The Armco companies are incorporated in Ohio, Delaware, Wisconsin and (in the case of
APL) Singapore. Rossi and Stinson and their companies have no English links. The dispute     F
between them and the Armco companies concerns the alleged breach of the fiduciary duty they
owed to their employers. It is plain that England is not the natural forum for resolution of this
dispute and that the New York proceedings by the Armco companies against these PCCs are
neither vexatious nor oppressive.

21. There is another more technical objection to the joinder of these PCCs. In stating the
third of his basic principles in *Aerospatiale*, Lord Goff made reference to 'a party who is     G
amenable to the jurisdiction of the court'. This echoed the language of Lord Diplock in his
important statement of principle in *The Siskina* [1979] AC at p. 256, which has been
understood to mean that the court may only grant an injunction where it has personal
jurisdiction over the defendant in the sense that he could be served personally or under RSC, O.
11 (other than subr. (i)): see *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd*
[1993] AC 334 at p. 342, per Lord Browne-Wilkinson. These PCCs could not, as already     H
noted, have obtained leave to serve out of the jurisdiction on any of the Armco companies in
independent proceedings. Service on APL and NNIC has been set aside. Does the amenability
of Armco Inc, AFSC and AFSIL to the jurisdiction of the English court by virtue of their
contractual relationship with Mr Donohue enable these PCCs to take advantage of that
relationship to effect service on the solicitors nominated by those companies pursuant to the
transfer and sale and purchase agreements, and thus to prosecute a claim which could not
otherwise have been prosecuted in this forum? In my opinion it does not. Since *Holland v*

© 2002 Sweet and Maxwell Ltd
bcom2002 case   52 Mp   448   —bcom4100

A    *Leslie* [1894] 2 QB 450 the view has prevailed that the court should refuse to allow an
     amendment of proceedings which would introduce a new cause of action against a foreign
     defendant in respect of which the court would have refused leave for service out of the
     jurisdiction (see, for instance, *Beck v Value Capital Ltd (No. 2)* [1975] 1 WLR 6, affirmed,
     although not on this point, [1976] 1 WLR 572). This view seems to me to accord with principle.
     The jurisdiction of the English court is territorial. A party resident abroad may be subjected to
B    the jurisdiction of the court to the extent (and only to the extent) that statute or rules made under
     statute permit. It would emasculate that salutary rule if such a party, properly served with
     notice of a claim falling within RSC, O. 11, r. 1 or CPR, r. 6.20 were then to be exposed to
     claims falling outside the relevant rule. In exercising its discretion to give leave to serve out of
     the jurisdiction the court will have regard to the substance of a claimant's complaint and not
     permit jurisdiction to be obtained by a mere device: *Johnson v Taylor Bros & Co Ltd* [1920]
     AC 144. It would be wrong in principle to allow these PCCs to use Mr Donohue's action as a
C    Trojan horse in which to enter the proceedings when they could have shown no possible ground
     for doing so in their own right.

        22.  The majority of the Court of Appeal were in my opinion wrong to allow the joinder of
     these four PCCs, and I would accordingly set aside that order and refuse joinder.

     **The grant of an injunction to Mr Donohue**

D       23.  I turn to the question whether an anti-suit injunction should be granted to Mr Donohue,
     recognising that as between him and the first three Armco appellants (Armco Inc, AFSC and
     AFSIL) there is a contractual obligation to submit any dispute which may arise out of or in
     connection with the sale and purchase agreement to the exclusive jurisdiction of the English
     court. It is plain that while some of the claims made by the Armco companies in the New York
     proceedings fall outside the scope of this clause, some claims central to the Armco companies'
E    complaint fall within it. In this situation, exercise of the broad discretion conferred on the court
     by s. 37 of the *Supreme Court Act* 1981 to grant an injunction in all cases in which it appears to
     the court to be just and convenient to do so is controlled by principles to be derived from a
     substantial line of authority here and abroad.

        24.  If contracting parties agree to give a particular court exclusive jurisdiction to rule on
     claims between those parties, and a claim falling within the scope of the agreement is made in
     proceedings in a forum other than that which the parties have agreed, the English court will
F    ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by
     restraining the prosecution of proceedings in the non-contractual forum abroad, or by such
     other procedural order as is appropriate in the circumstances) to secure compliance with the
     contractual bargain, unless the party suing in the non-contractual forum (the burden being on
     him) can show strong reasons for suing in that forum. I use the word 'ordinarily' to recognise
     that where an exercise of discretion is called for there can be no absolute or inflexible rule
     governing that exercise, and also that a party may lose his claim to equitable relief by
G    dilatoriness or other unconscionable conduct. But the general rule is clear: where parties have
     bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that
     obligation in the absence of strong reasons for departing from it. Whether a party can show
     strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the
     contractual bargain, will depend on all the facts and circumstances of the particular case. In the
     course of his judgment in *The Eleftheria* [1970] P 94, at pp. 99–100, Brandon J helpfully listed
H    some of the matters which might properly be regarded by the court when exercising its
     discretion, and his judgment has been repeatedly cited and applied. Brandon J did not intend his
     list to be comprehensive, but mentioned a number of matters, including the law governing the
     contract, which may in some cases be material. (I am mindful that the principles governing the
     grant of injunctions and stays are not the same: see *Aerospatiale* at p. 896. Considerations of
     comity arise in the one case but not in the other. These differences need not, however, be
     explored in this case.)

**450**                     Donohue v Armco Inc                    [2002] CLC
                              (Lord *Bingham*)

25.  Where the dispute is between two contracting parties, A and B, and A sues B in a non-          A
contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in
their contract, and the interests of other parties are not involved, effect will in all probability be
given to the clause. That was the result in *Mackender v Feldia AG* [1967] 2 QB 590;
*Unterweser Reederei GmbH v Zapata Off-Shore Co ('The Chaparral')* [1968] 2 Ll Rep 158;
*The Eleftheria* [1970] P 94; *DSV Silo- und Verwaltungsgesellschaft mbH v Owners of the
Sennar ('The Sennar') (No. 2)* [1985] 1 WLR 490; *British Aerospace plc v Dee Howard Co*          B
[1993] 1 Ll Rep 368; *Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR
588; *Aggeliki Charis Compania Maritima SA v Pagnan SpA ('The Angelic Grace')* [1995] 1 Ll
Rep 87; and *Akai Pty Ltd v People's Insurance Co Ltd* [1997] CLC 1508. A similar approach
has been followed by courts in the US, Canada, Australia and New Zealand: see, for example,
*M/S Bremen v Zapata Off-Shore Co* (1972) 407 US 1; *Volkswagen Canada Inc v Auto Haus
Frohlich Ltd [1986] 1 WWR* 380; *FAI General Insurance Co Ltd v Ocean Marine Mutual
Protection and Indemnity Association* (1997) 41 NSWLR 559; and *Kidd v van Heeren* [1998] 1    C
NZLR 324.

26.  *The Fehmarn (Cargo owners) v Fehmarn (Owners)* [1958] 1 WLR 159 shows that this
is not an invariable result. This was one of the earlier cases in the modern series. The Russian
exclusive jurisdiction clause was a condition in a bill of lading, no doubt part of a standard
form, and certainly not the subject of negotiation between the parties to the eventual dispute.
That was between English owners of the bill and German owners of the vessel. The dispute was    D
held to have a much closer connection with England than with Russia, and it was thought that
the German owners did not object to the dispute being decided in England if they could avoid
giving security. On those grounds, the judge having declined to stay the proceedings in
England, the Court of Appeal upheld his decision.

27.  The authorities show that the English court may well decline to grant an injunction or a
stay, as the case may be, where the interests of parties other than the parties bound by the        E
exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are
part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent
decisions. These authorities are instructive. In *Evans Marshall & Co Ltd v Bertola SA* [1973] 1
WLR 349 there was a tripartite dispute but only two of the parties were bound by a clause
conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was
impressed by the undesirability of there being two actions, one in London and the other in
Barcelona (pp. 363–364). The Court of Appeal took a similar view (pp. 377, 385). Sachs LJ      F
thought separate trials particularly inappropriate where a conspiracy claim was in issue
(p. 377). In *Aratra Potato Co Ltd v Egyptian Navigation Co ('The El Amria')* [1981] 2 Ll Rep
119 the primary dispute was between cargo interests and the owner of the vessel, both parties
being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of
Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and
Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's          G
decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon
LJ said (at p. 128):

'I agree entirely with the judge's view on that matter, but would go rather further than he
did in the passage from his judgment quoted above. By that I mean that I do not regard it
merely as convenient that the two actions, in which many of the same issues fall to be
determined, should be tried together; rather that I regard it as a potential disaster from a      H
legal point of view if they were not, because of the risk inherent in separate trials, one in
Egypt and the other in England, that the same issues might be determined differently in
the two countries. See as to this *Halifax Overseas Freighters Ltd v Rasno Export ("The
Pine Hill")* [1958] 2 Ll Rep 146 and *Taunton-Collins v Cromie* [1964] 1 WLR 633.'

*Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 also involved third party
interests and raised the possibility of inconsistent decisions. Colman J regarded separate trials

© 2002 Sweet and Maxwell Ltd
bcom2002 case   52 Mp   450   —bcom4100

A    in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp 1375–1376. *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The M C Pearl)* [1997] CLC 794 again involved third parties and raised the possibility of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the courts of Seoul, Rix J refused to stay proceedings in England. He regarded the case as on all fours with *Citi-March* (see p. 805) and at p. 798 observed:

B

> 'It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost...'

C    A similar approach is discernible in *Ultisol Transport Contractors Ltd v Bouygues Offshore SA ('The Bos 400')* [1998] CLC 1526, in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Evans LJ as 'near-conclusive' (para. 29), an injunction to restrain proceedings in South Africa was refused. In para. 27 of his judgment Evans LJ said:

D

> 'In my judgment, two questions arise, one a matter of principle. First, should the court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is "yes". Clarke J did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognised in other authorities...'

E    Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p. 1537),

> 'this is the only way in which to minimise, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions.'

F    28. Not all cases can be so neatly categorised. In *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] CLC 579 Rix J dealt with a case in which there were four potential parties and three different agreements (or classes of agreement) but only two of the parties were bound by an English exclusive jurisdiction clause under one of the agreements. There were proceedings by C against A (the two parties to the clause) in England and proceedings by A against C, B and D in New York alleging statutory breaches relating to the agreement containing the clause and also under an agreement not containing an exclusive jurisdiction clause, and including other claims such as a claim for conversion. The judge gave leave, on their application, for B and D to be joined to C's action against A in England (p. 588). A's application to stay the proceedings by C in England was not pursued, but if it had been it would have failed (p. 596). On an application by C, B and D for an injunction to restrain A suing them in New York, the judge granted an injunction but only to restrain the prosecution of claims covered by the exclusive jurisdiction clause (p 598). The judge was confronted in this case with a difficult procedural and jurisdictional tangle which permitted no wholly satisfactory solution. It was however important to his decision that he did not judge it possible to make an order which would ensure trial of all proceedings arising out of all the agreements in one forum. At p. 596 he said (interpolating schematic references for the references he made to named parties):

G

H

> '(5) An important fact in this case, as it seems to me, is that, whether I enforce [the exclusive jurisdiction clause] or not, I cannot ensure that all litigation between [A] and [B, C and D] is carried forward in one jurisdiction unless I would be prepared to extend my injunction to all the claims against [B, C and D] in New York. That is because [the

exclusive jurisdiction clause] does not bind [B and D]. That remains the case even if I      A
assume that all the claims against [C] come within [the exclusive jurisdiction clause],
but I have already stated that in my judgment that is not the case. It follows that unless I
am prepared not only to enforce [the exclusive jurisdiction clause] but also to injunct
[A's] claims against [B and D] and [A's] claims against [C] outside [the exclusive
jurisdiction clause], [A's] complaint in New York will continue in any event. On the
other hand [counsel] has not pursued [A's] application for a stay of [C's] action, but if he      B
had, it would fail for the reasons for which [counsel] cited *British Aerospace plc v Dee
Howard Co* [1993] 1 Ll Rep 368. Thus the continuation of the proceedings in England is
inevitable too.

(6) I would not, however, injunct the claims against [B and D] because, however
undesirable it is in principle to have parallel litigation in two jurisdictions, it seems to me
the duplication of litigation does not in itself make it in the interests of justice to injunct
the New York proceedings in so far as claims against [B and D] are concerned...'      C

    29. In seeking to apply this body of authority to the present case the first point to be made is
that Mr Donohue has as against the first three Armco appellants a strong prima facie right not to
be the subject elsewhere than in England of claims by those companies falling within the scope
of the clause. Some of the claims made against him by those companies in New York do fall
within the clause. This is an important and substantial, and not a formal or technical, right. At
an earlier stage of this English litigation Armco sought to impeach the exclusive jurisdiction
clauses on the ground that they had been induced by the fraud of the four conspirators. The      D
judge not only rejected the contention that Armco executives had been misled but also found
that Armco's English and US lawyers had known all about the clauses and their consequences
and that Armco had had its own good reasons for inserting English law and jurisdiction clauses
in the contracts (para. 35–40). There was no appeal against these conclusions. Thus Armco,
having agreed to these clauses to serve their own ends, are now seeking to be released from
their bargain. To permit them to do so exposes Mr Donohue to an obvious risk of injustice. This      E
risk does not derive from the venue alone: Mr Donohue might, as a UK citizen, prefer to be
sued in London rather than New York if he has to be sued anywhere, but to him, as a resident of
Singapore, New York is not in itself an obviously more inconvenient forum than London. A
more substantial objection may be founded on the perceived procedural disadvantages to him
of being sued in New York: as the evidence suggests, the cost would be greater, trial would be
by jury and costs would be very largely irrecoverable even if he were to succeed. But there are      F
always points of this kind to be made when comparing one forum with another, and the
standing, authority and expertise of the forum in which the New York proceedings are being
pursued cannot be questioned. Much more significant, from Mr Donohue's viewpoint, are the
RICO claims made against him. They could not be pursued against him in England. They
could, if established in New York, lead to the award of swingeing damages against him. On
agreement of the exclusive jurisdiction clause he could reasonably have felt confident that no      G
RICO claim arising out of or in connection with the agreements could be pursued against him
and it would represent an obvious injustice if he were now to be exposed to those claims.

    30. There is, as always, another side to the coin. All five Armco appellants have a clear
prima facie right to pursue against Rossi and Stinson and their respective companies any claim
they choose in any convenient forum where they can found jurisdiction. They have
successfully founded jurisdiction in New York. There is, as I have already concluded, no
ground upon which this court could properly seek to restrain those proceedings. It would not be
appropriate for the English courts to form any judgment, however tentative, on the merits of the      H
Armco companies' claims, beyond noting that lack of merit was not one of the grounds on
which the PCCs invited Judge Schwartz to dismiss the proceedings in New York. It must be
assumed that the claims made by the Armco companies against their former employees Rossi
and Stinson, including the RICO claims, are serious and substantial claims. There is nothing
whatever to suggest that these claims will not proceed in New York whether or not an
injunction is granted to Mr Donohue.

© 2002 Sweet and Maxwell Ltd
bcom2002 case    52 Mp   452   ---bcom4100

52-1·02
HL

**Donohue v Armco Inc**
(Lord *Bingham*)

**453**

A
   31. It must further be noted that APL and NNIC have a clear prima facie right to pursue against Mr Donohue, Wingfield and CISHL also any claim they choose in any convenient forum where they can found jurisdiction. They have successfully founded jurisdiction in New York. I have already recorded that service of the English proceedings on APL and NNIC has been set aside. There is no ground upon which the English court could properly restrain their proceedings in New York. It appears, as Stuart-Smith LJ held (para. 54(3)) that the claims of

B
APL and NNIC relate to the collection agreement and the trust fund withdrawals rather than the allegedly fraudulent management buy-out, but these claims also cannot be treated as lacking merit. They are proceeding in New York, and everything suggests that they will continue in New York whether or not the English court grants an injunction to Mr Donohue.

   32. Similarly, the first three Armco appellants have a clear prima facie right to pursue against Mr Donohue, Wingfield and CISHL any claim not covered by the exclusive jurisdiction clauses in any convenient forum where they can found jurisdiction. They have

C
successfully founded jurisdiction in New York. To the extent that the claims of these Armco companies do not arise out of or in connection with the transfer agreements and the sale and purchase agreement, they fall outside the exclusive jurisdiction clauses, and there is no ground upon which the English court could properly restrain these proceedings. Everything suggests that they will continue in New York whether or not the English court grants an injunction to Mr Donohue.

D
   33. Thus Mr Donohue's strong prima facie right to be sued here on claims made by the other parties to the exclusive jurisdiction clause so far as the claims made fall within that clause is matched by the clear prima facie right of the Armco companies to pursue in New York the claims mentioned in the last three paragraphs. The crucial question is whether, on the fact of this case, the Armco companies can show strong reasons why the court should displace Mr Donohue's clear prima facie entitlement. If strong reasons are to be found (and the need for strong reasons is underlined in this case by the potential injustice to Mr Donohue, already

E
noted, if effect is not given to the exclusive jurisdiction clauses) they must lie in the prospect, if an injunction is granted, of litigation between the Armco companies on one side and Mr Donohue and the PCCs on the other continuing partly in England and partly in New York. What weight should be given to that consideration in the circumstances of this case?

   34. I am driven to conclude that great weight should be given to it. The Armco companies contend that they were the victims of a fraudulent conspiracy perpetrated by Donohue, Atkins,

F
Rossi and Stinson. Determination of the truth or falsity of that allegation lies at the heart of the dispute concerning the transfer agreements and the sale and purchase agreement. It will of course be necessary for any court making that determination to consider any contemporary documentation and any undisputed evidence of what was said, done or known. But also, and crucially, it will be necessary for any such court to form a judgment on the honesty and motives of the four alleged conspirators. It would not seem conceivable, on the Armco case, that some of the four were guilty of the nefarious conduct alleged against them and others not. It seems to

G
me plain that in a situation of this kind the interests of justice are best served by the submission of the whole dispute to a single tribunal which is best fitted to make a reliable, comprehensive judgment on all the matters in issue. A procedure which permitted the possibility of different conclusions by different tribunals, perhaps made on different evidence, would in my view run directly counter to the interests of justice.

   35. Stuart-Smith LJ (at para. 42–44) regarded the subject matter of the collection agreement

H
complaints as 'quite different' from that involving the first three Armco appellants in relation to the transfer agreements and the sale and purchase agreement. He discounted the significance of the trust fund withdrawal claims on the ground that they had almost certainly been settled (para. 45), although it is noteworthy that the settlement agreement made with NAIC expressly preserved the right of NNIC to pursue claims against Rossi, Stinson, Donohue and Atkins, ITRS, IROS, Wingfield, NPV and CISHL in the New York proceedings. It is true that the collection agreement and the trust fund withdrawals give rise to different grounds of claim. But

**454**                         Donohue v Armco Inc                    [2002] CLC
                                    (Lord *Bingham*)

the principal actors are the same, and Armco contends, rightly or wrongly, that these were further manifestations of the plot made by the four conspirators to enrich themselves at the expense of Armco. I cannot for my part accept that the ends of justice would be well served if Armco's allegations concerning the transfer and sale and purchase agreements were determined in England and its allegations concerning the collection agreement and trust fund withdrawals were determined in separate proceedings in New York. The judgment made of the motives and honesty of the four alleged conspirators in the one context would plainly have an important bearing on the judgment made in the other.

36. In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue. In New York proceedings Mr Donohue will be entitled to claim that the sale and purchase agreement is governed by English law. And Lord Grabiner, representing Armco, has accepted that Armco's breach of contract in suing elsewhere than in the contractual forum could found a claim by Mr Donohue for any damage he has suffered as a result. The qualification is that he should be protected against liability under the RICO claims made against him because of the obvious injustice to him which such liability would in the circumstances involve. But before considering whether such a protection can and should be afforded to Mr Donohue it is necessary to address an important preliminary question.

37. The discretion whether or not to grant an injunction was in the first instance that of the judge. His exercise of discretion was entitled to be respected unless, on grounds of his error or misdirection, the Court of Appeal was entitled to exercise its discretion afresh. The Court of Appeal held, rightly, that such grounds existed, and did exercise its discretion afresh. But the exercise of discretion is not at large in this House: the Court of Appeal's exercise of discretion must in its turn be respected unless on grounds of error or misdirection the House is entitled to exercise its own discretion. Having regard to the long and closely reasoned leading judgment of Stuart-Smith LJ, I would not lightly disregard the majority's conclusion.

38. I am however persuaded that the discretionary judgment made by the Court of Appeal is fundamentally vitiated by an incorrect view of the future shape of this litigation. In his judgment, Stuart-Smith LJ considered the grant of an injunction to Mr Donohue before considering whether Rossi and Stinson and their respective companies should be joined as claimants, and this enabled Mr Donohue to contend in argument that the Court of Appeal's decision on grant of an injunction should stand despite its conclusion, incorrect as I have held it to be, on joinder. But this reading of Stuart-Smith LJ's judgment cannot in my opinion be sustained. I think it is plain, in particular from para. 42 of his judgment, that Stuart-Smith LJ contemplated that all disputes between the Armco companies and Donohue, Rossi and Stinson relating to the transfer and sale and purchase agreements would be resolved in the English forum. This enabled him to say:

'The issues in the claim of AFSC, AFSIL and the derivative claim of Armco Inc in relation to the MBO [management buy-out] are whether there was the secret agreement alleged, whether Mr Rossi and Mr Stinson were beneficially interested in Wingfield at the time, whether US$30m was an excessive sum and whether US$10m worth of AFSEL's assets were secretly and fraudulently transferred. If these allegations are made out, Mr Donohue, Mr Rossi, Mr Stinson and Wingfield will be liable...'

He was not there recognising the possibility that different conclusions might be reached in the cases of Mr Rossi and Mr Stinson on the one hand and Mr Donohue and Wingfield on the other, a very unlikely event in the case of a single composite trial but an entirely possible outcome if parallel trials relating to the management buy-out took place in both England and New York. This incorrect view was in my opinion compounded by his treatment of the collection and trust fund withdrawal claims as different and separate from the management

A    buy-out claims. For reasons already given I cannot accept this view. Had Stuart-Smith LJ reached the view which I have reached on the joinder of Rossi and Stinson and their companies, I feel sure that he would have been gravely concerned at the prospect of the same issue being determined in different tribunals, with the obvious and highly undesirable risk of inconsistent findings and decisions. For these reasons I am of the opinion that members of the House are entitled and bound to exercise their discretion afresh.

B    39. The interests of justice are in my judgment best served if an anti-suit injunction is denied to Mr Donohue but an undertaking proffered on behalf of the Armco companies (defined to include the five Armco appellants) is accepted in the following terms:

> 'The Armco companies... confirm that they undertake not to enforce against Mr Donohue, Wingfield or CISHL any multiple or punitive damages awarded in the New York proceedings whether awarded pursuant to the RICO statute or common law.

C

> For the avoidance of doubt, the above undertaking (i) shall not restrict the Armco companies from seeking to enforce any award made in the New York proceedings for damages which are not multiple or punitive; (ii) shall relate only to enforcement; and (iii) as against any defendant in the New York proceedings other than Mr Donohue, Wingfield or CISHL, shall have no effect whatsoever in respect of the Armco companies pursuing or enforcing any claim or award in the New York proceedings whether for multiple or punitive damages or otherwise.'

D    If there were any doubt about the efficacy of this proffered undertaking in relation not only to Mr Donohue but also Wingfield and CISHL, I would order the joinder of those companies. But I am satisfied that this is an unnecessary step which would serve no useful purpose. I would accordingly refuse the application of these parties to be joined as claimants in the present action. In the result, I would allow the appeal, on the undertaking just recited, and set aside the orders of the Court of Appeal joining the PCCs as claimants and granting an injunction to Mr Donohue.

E

### Lord Mackay of Clashfern:

   40. I have had the advantage of reading in draft the speech delivered by Lord Bingham of Cornhill. For the reasons he gives with which I agree, I also would allow the appeal on the terms he has proposed.

F

### Lord Nicholls of Birkenhead:

   41. I have had the advantage of reading in draft the speech of Lord Bingham of Cornhill. For the reasons he gives, and with which I agree, I too would allow this appeal.

G

### Lord Hobhouse of Woodborough:

   42. I agree that the appeal should be allowed on the terms stated in the speech of Lord Bingham of Cornhill with which I agree. This appeal has not involved any disputed question of principle but has turned upon the application of established principles to the factual complexities of international multi-party disputes as exemplified by the facts of this particular case. It is because we are exceptionally differing from the Court of Appeal on a question of discretion that I will briefly add my own reasons for doing so.

H    43. The case has two aspects. The primary aspect is whether Mr Donohue should be granted the 'anti-suit' injunction for which he has asked the court to restrain proceedings in New York or anywhere else other than in London. This ultimately turns upon the exercise of the court's discretion. The Court of Appeal were undoubtedly right to conclude (at para. 30–32) that, as the judge had made an error in holding that Armco Inc was not bound by the exclusive jurisdiction clause and had construed the clause as not having a wide enough scope to cover the disputes being raised in New York against Mr Donohue, this meant that his exercise of the

**456**                              Donohue v Armco Inc                        **[2002] CLC**
                                      (Lord *Bingham*)

A

discretion was wrongly based and the Court of Appeal were obliged to address the exercise of
the discretion afresh. By a majority, the Court of Appeal decided to grant the injunction in a
limited form, limited to the first three defendants and excluding claims in relation to the
'collection agreement' and the trust funds.

44.  The second aspect involves the subsidiary question whether Mr Rossi and Mr Stinson
and their two companies, the four of the so-called 'PCCs', should be joined as plaintiffs in
Mr Donohue's English action and, if so, likewise granted an injunction. Formally, I agree that
the question of joinder was dealt with by the majority of the Court of Appeal only after they had
decided the primary question of whether Mr Donohue should be granted an injunction and that
therefore it could be said, and the respondents so argued before this House, that the reversal of
the Court of Appeal's decision on the second aspect would not invalidate their decision on the
primary question. This however faces the respondents and the Court of Appeal with a dilemma.
A central factor in the exercise of the discretion whether or not to grant any injunction was an
assessment of what will be the position in New York and London if an injunction is granted. (If
no injunction is granted the position is simple: the proceedings in New York will continue and
there will be no proceedings, anyway at this stage, in London.) If the Court of Appeal have
arrived at their decision of the primary question without fully carrying out that assessment they
have been in error; they have left out of account a material factor. On the other hand, if they did
carry out that assessment but made an error in doing so, proceeding on the basis that the four
PCCs on would have to be sued in London and not in New York, their exercise of the discretion
is likewise open to attack. I will therefore take the joinder issue first.

45.  The London action was an action brought by Mr Donohue. It was an action based upon
the contractual right given by that clause to hold the other parties to that contract, and those
claiming through them, to their promise only to sue Mr Donohue in England. Mr Donohue was
entitled to sue and serve the first three defendants in accordance with that clause. Those
defendants as they were bound to do acknowledged service and placed solicitors on the record
to act on their behalf in the action. The four PCCs (and CISHL and Wingfield, who are not
relevant for this purpose) then applied to be joined in the action. They simply relied upon the
ground: 'The basis of the application is that England is the most appropriate forum for the
resolution of the disputes between the applicants and the defendants.' Such an application is
made by issuing and serving a summons or 'application notice' asking the court to order such
joinder. The summons/notice had to be served on the existing parties by sending the summons
to their solicitors on the record. No problem of service arises at that stage. But in order to obtain
an order (save by the consent of all parties) for their joinder the applicants have to make out a
case for their joinder. If they say, as did the four PCCs, that they should be joined because they
too wish to claim 'anti-suit' injunctions against the existing defendants, they must be able to
show that they could properly have brought proceedings against the defendants claiming that
relief. It is at this stage that their application became unsustainable. The four PCCs had no
procedural or contractual right to sue the defendants in the English jurisdiction; the English
courts had no natural jurisdiction over the defendants. The applicants could not satisfy the tests
laid down in *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460. They could not show that
London was clearly the appropriate forum (in contrast to New York) so as to justify them in
commencing proceedings against the defendants in London (*Spiliada* at p. 481). Further, by the
same token, they could not show that they had any viable claim to an anti-suit injunction
against the defendants based upon the contention that the defendants' chosen forum, New
York, was a forum non conveniens to such a degree that it was vexatious for them to have sued
the PCC parties there (*SNIAS v Lee Kui Jak* [1987] AC 871). New York was not an
inappropriate forum (cf. *Spiliada*, p. 477) nor could they show that they needed an injunction to
protect proceedings in this country: *Airbus Industrie v Patel* [1998] CLC 702; [1999] 1 AC
119. The application by these parties to be joined in the action was misconceived and should
have been refused. The majority of the Court of Appeal seem to have considered that the

B

C

D

E

F

G

H

© 2002 Sweet and Maxwell Ltd

Donohue v Armco Inc
(Lord *Bingham*)

457

A   joinder and the grant of an anti-suit injunction to them followed from their decision to grant Mr Donohue an injunction. This was not correct. The position of a party who has an exclusive English jurisdiction clause is very different from one who does not. The former has a contractual right to have the contract enforced. The latter has no such right. The former's right specifically to enforce his contract can only be displaced by strong reasons being shown by the opposite party why an injunction should not be granted. The latter has to show that justice requires that he should be granted an injunction. The Court of Appeal should have refused the

B   application of the four PCCs to be joined and should likewise have refused their application for an injunction.

   46.  The Court of Appeal clearly had in mind that some proceedings would continue in New York, including some involving Mr Donohue himself. The limitations which they included in the injunction both as regards parties and as regards subject matter demonstrate this. The

C   correct decision on the application of the four PCCs – that it should be dismissed – would have added to this prospect. The true balance between New York and London, therefore, was not that which must have been visualised by the majority of the Court of Appeal. The arguments in favour of refusing Mr Donohue the injunction for which he was applying would have been very materially strengthened.

   47.  The Court of Appeal rightly attached importance to the fact that in New York

D   Mr Donohue would be subject to 'RICO' claims and a liability in triple damages. To be protected against such a possibility was a legitimate concern of Mr Donohue to which a court should give weight in considering how to exercise its discretion. Lord Grabiner QC for the defendants recognised this and met it by offering the undertaking to which Lord Bingham has already referred. The offer of this undertaking does alter the position and indeed a court could have met the point by imposing equivalent terms upon the defendants as a condition of refusing to grant Mr Donohue an unqualified injunction. This too has changed the balance between the

E   two jurisdictions and should be taken into account.

   48.  Lord Grabiner took his argument one step further. He acknowledged that some breaches of the exclusive jurisdiction clause have taken place and will continue, if the appeal is allowed and the injunction refused, and he likewise recognised that, if this leads to Mr Donohue incurring a greater liability or being put to a greater expense (e.g. for unrecovered costs) in New York than would have been the case in London, Mr Donohue may have a claim in damages

F   against the defendants for breach of contract – breach of the exclusive jurisdiction clause. This does not appear to have been a point put to the Court of Appeal and it was only raised by Lord Grabiner in this House during his reply, no doubt as a result of his further consideration of the RICO point. I am prepared to accept this submission and proceed on the basis that, if Mr Donohue can hereafter show that he has suffered loss as a result of the breach of the clause, the ordinary remedy in damages for breach of contract would be open to him. I say no more than this since the position is complex. The litigation in New York includes parties who are not

G   parties to the jurisdiction agreement and against whom, and in relation to whom, Mr Donohue is not entitled to rely upon the clause. Further, when the issues of fact have been fully tried in New York, a situation may be established whereby Mr Donohue's right to rely upon the contract as against the defendants may be affected or situations of circuity of action may arise. That is not presently the position but Lord Grabiner's point has merit and relevance in this exceptional and finely balanced case.

H   49.  The basis on which the exercise of the discretion has to be exercised is different from that before the Court of Appeal. In part this is because of a wrong decision on the joinder question and in part because of further arguments advanced by the defendants before this House. In my judgment in this case they exceptionally suffice to justify the House in deciding that the discretion should be exercised afresh by your Lordships and against the grant of the injunction.

   50.  I therefore agree that the appeal should be allowed on the terms proposed.

**Lord Scott of Foscote:**                                                                    A

51. I have had the advantage of reading in draft the opinion of Lord Bingham of Cornhill, and gratefully adopt his recital of the relevant facts.

52. There seem to me to be two main issues that must be decided in the present case. They to some extent overlap one another. They are (i) whether the contractual exclusive jurisdiction clauses, contained in the transfer agreements dated 3 September 1991 under which AFSIL and AFSEL transferred their respective shares in BNIG to CISHL and in the sale and purchase    B agreement of the same date under which AFSIL and AFSEL transferred their shares in CISHL to Wingfield, should be enforced by injunction so as to bar proceedings in New York that fall within the scope of those clauses, properly construed; and (ii) if the answer to issue (i) is 'yes', whether an injunction should be granted in order to bar also the prosecution in New York of proceedings that are not themselves caught by the exclusive jurisdiction clauses but are closely associated with those that are.                                                           C

53. The principles to be applied in order to decide on the one hand whether an exclusive jurisdiction clause should be enforced by an injunction and on the other hand whether the commencement or continuation of foreign proceedings which are not caught by an exclusive jurisdiction clause should be barred by an injunction seem now well settled and have not been the subject of any real disagreement before your Lordships. It is accepted that a contractual exclusive jurisdiction clause ought to be enforced as between the parties to the contract unless    D there are strong reasons not to do so. Prima facie parties should be held to their contractual bargain: see *The Fehmarn* [1958] 1 WLR 159; *The Chaparral* [1968] 2 Ll Rep 158; *The El Amria* [1981] 2 Ll Rep 119; *The Sennar (No. 2)* [1985] 1 WLR 490; *The Angelic Grace* [1995] 1 Ll Rep 87. If, on the other hand, there is no contractual bargain standing in the way of the foreign proceedings, 'the… court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive': per    E Lord Goff of *Chieveley in Societe Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 at p. 896.

54. There has been some debate before your Lordships as to the order in which the two issues referred to above should be considered but it seems to me convenient to start with the exclusive jurisdiction clauses and to try and decide what part, if any, of the New York proceedings the clauses cover, who is and who is not entitled to their benefit and who is and    F who is not bound by them.

**The exclusive jurisdiction clauses**

55. In the transfer agreements, the parties to which were AFSIL and AFSEL, as transferors, and CISHL, as transferee, the exclusive jurisdiction clause said, simply, that 'each party submits to the exclusive jurisdiction of the Supreme Court of Judicature of England' (para 15.2).                                                                                  G

56. In the sale and purchase agreement the exclusive jurisdiction clause said that:

'the parties hereby irrevocably submit themselves to the exclusive jurisdiction of the English courts to settle any dispute which may arise out of or in connection with this agreement.'

57. The parties to the sale and purchase agreement, in addition to AFSIL, AFSEL and   H Wingfield, included AFSC, Mr Atkins and Mr Donohue.

58. The terms of the sale and purchase agreement clause are very wide, 'any dispute which may arise out of or in connection with this agreement', but it has not been suggested that the terms of the clauses in the transfer agreements should be given any lesser scope. So I propose to concentrate on the sale and purchase agreement clause and treat it as applicable also to any dispute arising out of or in connection with the transfer agreements.

A    59.  Armco Inc was not a party to any of these agreements but, on the dissolution of AFSEL,
the assets of AFSEL, including its assignable choses in action, became vested, as I understand
it, in Armco. It is accepted, rightly in my opinion, that, in respect of any causes of action vested
in Armco as successor of AFSEL, Armco is subject to the same contractual inhibitions under
the exclusive jurisdiction clause as AFSEL was subject to. But in respect of causes of action to
which Armco is entitled in its own right, i.e. otherwise than as successor to AFSEL, Armco is
B    not bound by the exclusive jurisdiction clause, whether or not the causes of action relate to a
dispute arising out of or in connection with one or other of the agreements.

     60.  There is a point of construction of the exclusive jurisdiction clause that it is convenient
to deal with at this point. It is accepted that the clause is not restricted to contractual claims. A
claim for damages for, for example, fraudulent misrepresentation inducing an agreement
containing an exclusive jurisdiction clause in the same form as that with which this case is
C    concerned would, as a matter of ordinary language, be a claim in tort that arose 'out of or in
connection with' the agreement. If the alleged fraudulent misrepresentation had been made by
two individuals jointly, of whom one was and the other was not a party to the agreement, the
claim would still be of the same character, although only the party to the agreement would be
entitled to the benefit of the exclusive jurisdiction clause. The commencement of the claim
against the two alleged tortfeasors elsewhere than in England would represent a breach of the
D    clause. The defendant tortfeasor who was a party to the agreement would, absent strong
reasons to the contrary, be entitled to an injunction restraining the continuance of the foreign
proceedings. He would be entitled to an injunction restraining the continuance of the
proceedings not only against himself but also against his co-defendant. The exclusive
jurisdiction clause is expressed to cover '*any dispute*' which may arise out of or in connection
with' the agreement. It is not limited to 'any claim against' the party to the agreement. To give
the clause that limited construction would very substantially reduce the protection afforded by
E    the clause to the party to the agreement. The non-party, if he remained alone as a defendant in
the foreign proceedings, would be entitled to claim from his co-tortfeasor a contribution to any
damages awarded. He could join the co-tortfeasor, the party entitled to the protection of the
exclusive jurisdiction clause, in third party proceedings for that purpose. The position would be
no different if the claim were to be commenced in the foreign court with only the tortfeasor who
was not a party to the exclusive jurisdiction clause as a defendant. He would be able, and well
advised, to commence third party proceedings against his co-tortfeasor, the party to the
F    exclusive jurisdiction clause.

     61.  In my opinion, an exclusive jurisdiction clause in the wide terms of that with which this
case is concerned is broken if any proceedings within the scope of the clause are commenced in
a foreign jurisdiction, whether or not the person entitled to the protection of the clause is joined
as defendant to the proceedings. An injunction restraining the continuance of the proceedings
would not, of course, be granted unless the party seeking the injunction, being someone entitled
G    to the benefit of the clause, had a sufficient interest in obtaining the injunction. It would, I think,
be necessary for him to show that the claim being prosecuted in the foreign jurisdiction was one
which, if it succeeded, would involve him in some consequential liability. It would certainly, in
my opinion, suffice to show that if the claim succeeded he would incur a liability as a joint
tortfeasor to contribute to the damages awarded by the foreign court.

H    62.  This point is of direct relevance in the present case. In the New York proceedings, which
I must analyse more fully in a moment, several claims are made but most of them are based
upon the allegation that Mr Donohue, Mr Atkins, Mr Rossi and Mr Stinson conspired together
fraudulently to extract in various ways substantial sums of money from the Armco group of
companies. If the allegations can be made good, the liability of the conspirators would be a
joint and several liability. There are substantial issues as to which of the claims fall within the
language of the exclusive jurisdiction clause but I think it is clear that some of them do. Of the
four alleged conspirators only Mr Donohue and Mr Atkins are contractually entitled to the

**460**                            Donohue v Armco Inc                      [2002] CLC
                                      (Lord Scott)

benefit of the exclusive jurisdiction clause. Mr Atkins has settled with Armco, so it was          A
Mr Donohue alone who commenced an action in this country for an injunction enforcing the
clause. If Mr Donohue is entitled to an injunction enforcing the clause he is entitled, in my
opinion, to an injunction that bars the continuance of the claims in question not only against
himself but also against Mr Rossi and Mr Stinson with whom he is jointly and severally liable.
If claims against Mr Donohue are within the clause, then so too are the corresponding claims
against Mr Rossi and Mr Stinson. Mr Rossi and Mr Stinson are not contractually entitled to
enforce the clause, but Mr Donohue is, in my opinion, entitled to ask the court to enforce it by          B
restraining the prosecution in New York of all claims within its scope in respect of which
Mr Donohue would be jointly and severally liable.


**The New York proceedings**                                                                        C

    63.  It is necessary to analyse with some care the nature of the claims made in the New York
proceedings in order to decide which of them are caught by the exclusive jurisdiction clause
and which are not.

    64.  The amended complaint filed in New York describes the parties and then, in para. 25–63
sets out the 'Facts'. Under the sub-heading 'The secret agreement' it is alleged that the four
individual defendants entered into a secret agreement under which Mr Rossi and Mr Stinson,          D
who owed Armco fiduciary duties as directors and were responsible on behalf of Armco for
negotiating with Mr Donohue and Mr Atkins the terms under which the latter would purchase
BNIG from Armco, became secret partners with them in that purchase. It is alleged that
pursuant to the secret agreement Mr Rossi and Mr Stinson agreed on behalf of Armco to
excessive sums being injected into CISHL whose its shares were sold to Wingfield. Recovery
of the sums is sought. This claim seems to me a fairly clear example of a 'dispute arising out of
or in connection with' the sale and purchase agreement.                                             E

    65.  The amended complaint goes on to allege that 'other aspects of the sale were similarly
tainted by the fraud' (para. 41). Reference is made, as an example, to the extraction of sums of
money from two trust funds that had been established in the United States to support insurance
liabilities of NAIC. I find it difficult to follow how this dispute could be brought within the
exclusive jurisdiction clause. The only 'connection' seems to me to be that if BNIG had not
been purchased the scheme for milking the trust funds would not have been implemented. It is a          F
causa sine qua non, a 'but for', connection and I doubt whether that is enough.

    66.  The amended complaint alleges, also, that 'as part of their secret agreement' the four
conspirators extracted funds from APL via a debt collection agreement between APL, acting
by Mr Rossi, and NPV, acting by Mr Donohue and Mr Stinson, under which NPV obtained
unjustifiably inflated rates of commission. I cannot see any basis on which the claims based on
this debt collection agreement can be regarded as falling within the exclusive jurisdiction          G
clause.

    67.  In respect of each of the claims to which I have referred the plaintiffs in the New York
proceedings claim punitive as well as compensatory damages.

    68.  In addition it is alleged that the defendants' conduct constituted racketeering, wire fraud
and mail fraud for the purpose of the 'RICO' Act (Federal Racketeer Influenced and Corrupt
Organisations Act 18 USC §1962(c)). Under the RICO Act claims triple damages are sought.          H
In so far as the RICO Act claims are based on conduct in connection with the transfer
agreements or the sale and purchase agreement, it might seem that they, too, fall within the
language of the exclusive jurisdiction clause. But it is common ground that a RICO Act claim
could not be brought in an English court. It cannot, in my opinion, be supposed that in
submitting to the exclusive jurisdiction of the English courts the parties had in mind claims
which an English court would have no jurisdiction to entertain. The contractually expressed

A    purpose of the submission to the English courts was 'to settle any dispute which may arise', etc.
     How can this language be sensibly thought apt to cover a dispute that the English courts would
     be jurisdictionally unable to settle? The choice of law provision that, in the sale and purchase
     agreement, immediately preceded the exclusive jurisdiction clause, in my opinion, underlines
     the point: 'this agreement shall be governed by and construed in accordance with' English law.
     The parties could not have intended that RICO Act claims would be governed by English law.
     English law does not recognise such claims. Nor can it be supposed that the parties, by the use
B    of a fairly commonplace choice of law provision and exclusive jurisdiction clause, were
     intending to contract out of any RICO Act liability that might be connected with the agreement.
     In my opinion, any such contractual intention would need to be clearly expressed. Accordingly,
     in my opinion, as a matter of construction of the exclusive jurisdiction clause, the RICO Act
     claims are not caught.

C        69. The amended complaint included also breach of fiduciary duty claims against Mr Rossi
     and Mr Stinson. These claims arise in part out of conduct of Mr Rossi and Mr Stinson in
     negotiating the terms of the sale by Armco of BNIG. But I do not think a claim by Armco
     against its own officers for breach of fiduciary duty represents a 'dispute' caught by the
     exclusive jurisdiction clause. 'Dispute' in the clause means, in my opinion, a dispute in respect
     of which there is, on each side, a party, or a person claiming through a party, to the agreement.
     A claim by Armco for breach of fiduciary duty by its directors is, in my opinion, no more
D    caught than would be a claim by Armco for negligence by its lawyers whether or not the
     conduct complained of related to the transfer agreements or the sale and purchase agreement.

         70. There are, in addition, other claims made in the New York proceedings but most of them
     are different formulations of the claims to which I have already referred. I think I have
     mentioned all those that bear upon the issues that arise on this appeal.

E    **Should injunctions be granted?**

         71. Virtually all the claims in the New York proceedings are based upon the alleged secret
     agreement between the four individual defendants. Some of the claims, those made against
     Mr Donohue and those relating to the allegedly excessive funds injected into CISHL, are
     within the scope of the exclusive jurisdiction clause. Others seem to me to be plainly outside
F    the scope of the clause.

         72. The Court of Appeal granted injunctions restraining the continuance of claims 'to the
     extent that the claims arise out of or are connected with the management buy-out'. The
     injuncted claims included the RICO Act claims in so far as so arising or so connected. They
     included the breach of fiduciary duty claims against Mr Rossi and Mr Stinson in so far as so
     arising or so connected. For the reasons I have given I do not think that any of these claims were
     within the scope of the exclusive jurisdiction clause on its true construction. But the injuncted
G    claims did not include the claims relating to the alleged milking of the trust funds nor those
     relating to the APL/NPV debt collection agreement. The Court of Appeal's refusal to extend
     the injunction so as to bar these claims is not the subject of any cross-appeal and it is accepted
     by Mr Donohue that the prosecution in New York of these claims against him and the other
     defendants will continue.

H        73. So the injunction as granted by the Court of Appeal has left the alleged secret agreement
     to be litigated both in the New York courts and in England. The possibility of inconsistent
     conclusions on the facts is plain. The injunction has barred the prosecution in New York of a
     part of the RICO Act claim. The claim cannot be litigated in England and it follows that the part
     of the RICO Act claim that arises out of or in connection with the 'management buy-out'
     cannot be litigated anywhere. The injunction has required Armco, an American company, to
     prosecute in England a claim against its officers, Mr Rossi and Mr Stinson, for breach of the
     fiduciary duty that they owe under Armco's domestic law.

**462**      Donohue v Armco Inc      [2002] CLC
(Lord *Scott*)

A

74. Many of the claims made in the New York proceedings, including the RICO Act claims and the breach of fiduciary claims in so far as they do not arise out of or in connection with the management buy-out as well as all the trust fund claims and the debt-collection agreement claims, will be proceedings in New York in any event. The common sense in all the claims based on the alleged secret agreement being dealt with in the same court and at the same time seems to me overwhelming. There are undoubted disadvantages to Mr Donohue in being sued in New York instead of in England. These have been referred to by Lord Bingham. And the prosecution in New York of the claims, not only against Mr Donohue but against Mr Rossi and Mr Stinson as well, that fall within the exclusive jurisdiction clause constitutes a breach of a contractual term that Mr Donohue is prima facie entitled to require to be observed. It is relevant to take into account, however, that the New York claims that do fall within the exclusive jurisdiction clause on its true construction are somewhat peripheral, if measured against the sort of contractual and tortious claims that the parties might reasonably be supposed to have had in mind when agreeing to that clause. The conspiracy constituted by the alleged secret agreement was aimed at extracting money from the Armco group by using, or misusing, the authority of two of Armco's own officers who had become co-conspirators. It is one thing to conclude that those claims based upon the conspiracy that arise out of or in connection with the management buy-out are caught by the exclusive jurisdiction clause properly construed; it is quite another to suppose that the parties would have had claims of that sort in mind when agreeing to the clause.

B

C

D

75. In my opinion, however, it is the evident absurdity of requiring some claims resulting from the alleged secret agreement to be litigated in England notwithstanding that the rest will be litigated in New York that is the overriding factor. There are, in my estimation, very strong reasons indeed for the normal injunctive protection that the exclusive jurisdiction clause would warrant to be withheld in this case. I would have come to this conclusion in any event but the undertaking offered by Armco to which Lord Bingham has referred confirms it. If it should transpire that Mr Donohue is successful in the New York proceedings but is unable to recover his costs, being costs that he would have expected to have been awarded if he had successfully defended in England, I can see no reason in principle why he should not recover, as damages for breach of the exclusive jurisdiction clause, such part of those costs as he incurred in his successful defence of the claims that fall within that clause.

E

76. For these reasons I would allow the appeal and make the orders that Lord Bingham has suggested. As I have endeavoured to explain, I regard the exclusive jurisdiction clause, correctly construed, to the benefit of which Mr Donohue is but Mr Rossi and Mr Stinson are not contractually entitled, as covering some of the claims made against Mr Rossi and Mr Stinson whether or not Mr Donohue is a co-defendant and as not covering any of the RICO Act claims. Subject to that, I am in respectful and complete agreement with the reasons given by Lord Bingham for allowing the appeal.

F

*(Appeal allowed)*

G

H

© 2002 Sweet and Maxwell Ltd
bcom2002 case   52 Mp   462   —bcom4100