# EXHIBIT LC4
# Part II of IV

Status: ■ Negative Judicial Treatment

## *1090 Donohue v Armco Inc & Ors.

Court of Appeal (Civil Division)

29 March 2000

### [2000] C.L.C. 1090

Stuart-Smith, Brooke and Sedley L JJ

Judgment delivered 29 March 2000

*Anti-suit injunction—Conflict of laws—Service out of jurisdiction—Defendants took proceedings in US against claimant and others alleging fraudulent conspiracy and other fraudulent conduct in relation to management buy-out and share purchase agreements—Claimant sought anti-suit injunction on basis of exclusive English jurisdiction clauses in agreements—Which parties and claims were within jurisdiction clauses—Whether defendants had shown strong reason why jurisdiction clauses should not be enforced—Materiality of forum considerations and comity—Whether defendants to US proceedings should be joined as claimants in anti-suit proceedings.*

This was an appeal by the claimant from a judgment of Aikens J (*[1999] CLC 1748*) refusing to grant an anti-suit injunction.

The defendants, Armco, were companies in the Armco group, a US based conglomerate of which the first defendant, Armco Inc, was the parent company. Armco owned a British insurance group, 'BNIG'. BNIG's assets were owned by Armco subsidiaries, 'AFSIL' and 'AFSEL'. BNIG was in run-off. Armco negotiated to sell BNIG to its management, which included the claimant, 'D', and 'A'. Two US employees of Armco, 'R' and 'S', were involved in the negotiations on behalf of Armco. The management buy-out ('MBO') was effected by AFSIL and AFSEL transferring their BNIG assets, and other assets, to a Channel Islands company, 'CISHL', which was then sold to a Jersey company, Wingfield, owned by D and A, under a sale and purchase agreement ('SPA'). The transfer agreements and SPA contained exclusive English jurisdiction clauses ('EJCs'). After the MBO took place A told Armco that he had been part of a conspiracy with D, R and S to defraud Armco. Armco brought proceedings in New York against D, R and S, relying on A's allegations of conspiracy and claiming that the four conspirators had fraudulently induced Armco to inject US$42.5m in cash and securities into BNIG before the MBO, and to agree to the EJCs in the SPA. Armco also obtained Mareva relief in various jurisdictions against D, who lived and worked in Singapore. Those other proceedings were all stayed pending the outcome of the New York proceedings. Other plaintiffs in the US proceedings, 'APL' and 'NNIC', made allegations of fraud against the conspirators relating to an agreement for NPV, a company in which the conspirators were interested, to collect debts on behalf of APL, and to the alleged fraudulent removal by the conspirators of some US$16m from trust funds set up to give financial protection to NNIC.

D sought an anti-suit injunction to restrain Armco from suing him anywhere but in England. R and S, and companies owned by them, and CISHL and Wingfield applied to be joined as co-claimants in D's anti-suit injunction action. Aikens J dismissed the applications (*[1999] CLC 1748*). He rejected the allegation that the EJCs were inserted in the transfer agreements and SPA as part of the fraudulent conspiracy. The EJCs were valid as against the second and third defendant Armco companies but did not bind Armco Inc which was not a party to the transfer agreements and SPA. Further the EJCs covered disputes arising out of or in connection with the agreements and the claims in the US proceedings were based on the pre-existing conspiracy and did not arise out of the agreements. Since only some of the parties and claims were within the EJCs there was no good reason for an anti-suit injunction nor for joining the potential co-claimants ('PCCs'). The judge also set aside service of the anti-suit proceedings on APL and NNIC out of the jurisdiction. D and the PCCs appealed.

*Held*, allowing the appeal by a majority (Brooke LJ dissenting):

*1091

1 Contrary to the judge's holding, the EJCs did bind Armco Inc. Its only claim in any of the

*Schiffahrtsgesellschaft Detlef von Appen v Voest Alpine Intertrading GmbH [1997] CLC 993*

*Sennar, The (No. 2) [1985] 1 WLR 490*

*South Carolina Insurance Co v Assurantie Maatshappij 'de Zeven Provincien' NV [1987] AC 24*

*Ultisol Transport Contractors Ltd v Bouygues Offshore SA [1998] CLC 1526*

## Representation

Peter Leaver QC, Robert Howe and Camilla Bingham (instructed by Simmons & Simmons) for the appellant.

Anthony Grabiner QC and Daniel Toledano (instructed by Freshfields) for the respondent.

## JUDGMENT

Stuart-Smith LJ:

### Introduction

1 This is an appeal from a judgment of Aikens J reported at *[1999] CLC 1748 given on 15 July 1999* whereby he dismissed the claimant's (Mr Donohue's) application for an anti-suit injunction to restrain the defendants from suing him in any forum other than England for claims said to arise out of the circumstances surrounding the sales of a UK based insurance business and a debt collecting business. He also dismissed an application by two individuals and four corporations, the potential co-claimants ('PCCs'), that wish to be joined as co-claimants in Mr Donohue's anti-suit injunction action. The PCCs are, like Mr Donohue, all defendants in proceedings which the defendants have brought in the District Court of the Southern District of New York, NY, USA ('the NY proceedings'). There was a third application considered by the judge which was made by the fourth and fifth defendants in the anti-suit proceedings (respectively 'APL' and 'NNIC'). They applied to set aside the proceedings against them and to discharge the permission given to serve these proceedings on them out of the jurisdiction. The judge acceded to this application. Mr Donohue and the PCCs appeal with the leave of the judge against all three of his orders. In an annex to this judgment I set out the dramatis personae and the abbreviations adopted.

### Summary of the dispute between the parties

2 I gratefully adopt in this and the following five paragraphs the judge's summary of the dispute between the parties.

*1093

3 The defendants (collectively 'Armco') are all companies in the Armco group, which is a US

based conglomerate. Armco Inc, the first defendant, is the parent company. Armco Inc owned, via two subsidiaries, a group of three insurance companies, known as the British National Insurance Group ('BNIG'). The assets of the insurance group were owned by the third defendant, 'AFSIL', and Armco Financial Services Europe Ltd ('AFSEL'), which has since been dissolved. The insurance group went into 'run-off' in 1984. In the late 1980s Armco wished to rationalise its businesses. It decided to sell off the insurance group. From 1990 Armco investigated selling the group to Armco managers in a management buy-out ('MBO'). In early 1991 negotiations began with two managers. They were Mr Donohue, who had been managing director but was then the chairman of the insurance group, and Mr David Atkins, who had become the managing director in succession to Mr Donohue. On the Armco side the negotiations for the MBO were conducted by two executives in particular. They were Mr Patrick Rossi and Mr Larry Stinson, the two individual PCCs.

4 Armco alleges that it has been the victim of a scheme to defraud the Armco group that was devised by Mr Donohue, Mr Rossi and Mr Stinson in late 1990 or early 1991 and which Mr Atkins joined in about April 1991. The fraudulent scheme is said to be based on the MBO. The allegations are made principally as a result of statements made by Mr Atkins in April and June 1997 and September 1998, after the insurance group had been bought and then gone into liquidation.

5 Because the insurance group was in 'run-off' and had many potential liabilities, it needed a large injection of cash to make it attractive to a purchaser. Armco's allegation is that the secret plan of the group of four was that Armco would be fraudulently induced to inject an extra large sum into the insurance group, totalling US$42.5m. Armco say that the plan of the group of four was then to buy the insurance group through a Jersey (Channel Islands) company they owned, called Wingfield. Armco say that the four conspirators implemented this plan. Armco asserts that, as part of the plan, the conspirators fraudulently induced Armco to agree to English exclusive jurisdiction clauses ('EJCs') in three key contracts for the sale of the shares of the insurance group companies to Wingfield. This inducement was done, it is said, during negotiations for the contracts for the transfer and sale of the insurance group in January to April 1991. Armco further alleges that the group of four has subsequently removed much of the US$42.5m that was injected into the insurance group and the four have used it for their own ends. The US$42.5m is made up of a US$30m injection of cash plus US$2.5m interest and transfer of securities owned by AFSEL valued at US$10m.

6 Armco also contends that, as part of the secret plan, the group of four fraudulently induced Armco to agree to debt collection contracts with a Nevis company owned by them called NPV (Nevis). Armco says that the conditions of the collection agreement were very favourable to that company and it has been used as the vehicle of the four to take exorbitant fees for themselves from the insurance group.

7 Lastly, Armco alleges that the group of four has fraudulently obtained funds from two trust funds set up to give financial protection to the fifth defendant, NNIC, against claims by policyholders insured by the predecessor of NNIC, Bellefonte Insurance Co ('Bellefonte'). Bellefonte's book of business was sold on to the BNIG, but it was possible that NNIC might remain liable under the policies. The two trust funds were set up to protect BNIG against those potential liabilities. But withdrawals from the trust funds could be made if the BNIG certified that the potential claims to which NNIC was exposed were less than the market value of the trust funds. Armco say that the group of four fraudulently depleted the trust funds by about US$16m after the MBO.

8 The NY proceedings are brought by Armco to recover the damages that the group claims to have suffered as a result of the alleged fraud. Armco also claims punitive and *1094 triple damages under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 USC 1962 (c) ('the RICO statute'). It will be necessary to describe in more detail below the claims made in the amended complaint in those proceedings.

9 Mr Donohue, Mr Rossi and Mr Stinson all strenuously deny the conspiracy. They say that the allegations of secret meetings and a conspiracy to defraud Armco are the result of a fevered imagination of Mr Atkins. They have some justification in saying so. Mr Atkins made no less than three statements over a period of 18 months. The first was dated 15 April 1997. It contained no suggestion of a secret agreement and the account of the negotiation for the sale accords substantially with Mr Donohue's own. In a second statement, dated 26 June 1997, Mr Atkins

stated that in April or July 1991 Mr Donohue proposed to him that Mr Rossi and Mr Stinson should later join the purchasing company the following year. This proposal was made in the bar of the Waldorf Astoria Hotel. The reason given for this proposal was that it would be advantageous for Mr Rossi and Mr Stinson to deal with clients in the USA rather than sending people out from England. At this meeting Mr Atkins says he was asked to sign an agreement that all four men would be equal owners of the purchaser company; he did so sign it, but was not provided with a copy. It was not until the third statement, signed on 7 September 1998, that Mr Atkins gave an account of a meeting attended by all four alleged conspirators at the Waldorf Astoria Hotel just prior to 10 April when the arrangement for Mr Rossi and Mr Stinson to join the purchasing company was made. This last statement was signed on the same day as proceedings against Mr Atkins in the NY proceedings were settled. The settlement was subsequently renegotiated on more favourable terms on 10 November 1998 and approved by the court in the form of a consent judgment. Under that settlement judgment was entered against Mr Atkins for US$2m, to be satisfied as to £95,000 paid forthwith, the transfer of his home and a percentage of his earnings in future. He agreed to co-operate with Armco. It was a term of the settlement that if it was found that the third statement of 7 September 1998 contained any material misstatement or omission, Armco should have the right to terminate the settlement agreement and pursue Mr Atkins to the full extent permitted by law.

10 Moreover, in ancillary proceedings in Hong Kong in pursuit of Mareva relief against Mr Donohue, Armco's own counsel described Mr Atkins as an 'habitual liar'. Mr Leaver QC, on behalf of Mr Donohue, also points to some remarkable features of the MBO in that the agreement of the sum of US$30m as the sum payable was actually agreed with Mr Askins, the chief financial officer of the Armco Financial Group; it was calculated according to a formula apparently approved by accountants on both sides; moreover, the board of Armco appear to have approved a draft of the sale and purchase agreement ('SPA') which, although it referred in the body of the SPA to the transfer of AFSEL's assets described in a schedule, the schedule was said to have been left blank at the time of approval; whereas when the SPA was signed the schedule included US$10m worth of securities. As Mr Leaver points out, those responsible in Armco, their accountants and legal advisers, would seem to have some explaining to do, if these matters were really achieved through a fraudulent conspiracy. I have referred to these matters in some detail because, while clearly the court cannot determine the merits of the case at this stage, Mr Leaver submitted that the judge hardly did credit in para. 8 of his judgment to the strength of the criticisms of Mr Atkins' evidence. I think there is a good deal of force in Mr Leaver's criticism. And it is on Mr Atkins' evidence of the secret agreement that the whole edifice of Armco's case in respect of the MBO is built.

11 On the other hand, Lord Grabiner QC, who appears for Armco, submits that there is no other explanation of Mr Atkins' confession and submission to judgment, unless it results from a crisis of conscience; that also is a powerful submission. There are also two pieces of evidence relating to payment of sums of money and the existence of shareholders in Wingfield, other than Mr Donohue and Mr Atkins, which Lord Grabiner *1095 says can be taken as some corroboration of Mr Atkins' account. In the circumstances the court cannot in my view take any prima facie view as to the strength of the case one way or the other at this stage.

## The parties: the claimant and potential co-claimants

12 Mr Donohue is a British subject who lives and works in Singapore. He worked for the first defendant (Armco Inc) as a banker from 1982 to 1989. He was then appointed managing director of BNIG. The main company in that group was British National Insurance Company Ltd ('BNIC'). Mr Donohue was also a director of the fourth defendant, APL, from 1983 to 1998. It is common ground that Mr Donohue and Mr Atkins led the bid for the MBO of BNIG in early 1991. One of the principal issues in the dispute is whether Mr Rossi and Mr Stinson were also secretly involved. Mr Donohue is a defendant in the NY proceedings. He was a party to the SPA which is the main agreement whereby the MBO was effected.

13 The potential co-claimants are individuals and companies. The individuals are Mr Rossi and Mr Stinson. Mr Rossi is a US citizen resident in the state of Ohio. He was employed by Armco between 1968 and 20 May 1992 when he joined Wingfield. In 1991 he was vice president and chief financial officer of Armco Financial Services Group (the Armco division responsible for Armco's insurance and finance leasing subsidiaries). He was not a party to the SPA or transfer

agreement; he is a defendant in the NY proceedings.

14 Mr Stinson was employed by Armco from 1972 to January 1992. At the time of the MBO he was the chief assistant to Mr Rossi and was involved on behalf of Armco in the negotiations for the MBO. He also lives in Ohio. He is not a party to the SPA or transfer agreements; he is a defendant in the NY proceedings.

15 The other potential co-claimants are companies and are defendants in the NY proceedings. They are as follows:

> (1) *CI Services Holdings Ltd ('CISHL')* . The shares in the BNIG were originally owned by the third defendants ('AFSIL') and Armco Financial Services Europe Ltd ('AFSEL'). (The latter company has been dissolved and its assets have been 'transferred' to Armco Inc, a point which itself gives rise to a dispute in these proceedings.) To effect the sale and transfer of the shares in the BNIG, Armco incorporated CISHL, a Channel Islands company. Then the second defendant ('AFSC') injected US$32.5m in cash and securities into CISHL. Securities to a value of US$10m were transferred from AFSEL to CISHL. On 3 September 1991 AFSIL and AFSEL each executed an agreement ('the transfer agreements') transferring all their assets in the BNIG into CISHL. The transfer agreements were expressly governed by English law and each had an English EJC. On the same day Wingfield acquired all the shares in CISHL under the SPA dated 3 September 1991, in which Wingfield was named as the purchaser. The SPA was also subject to English law and contained an English EJC. After the sale the BNIG was renamed as the North Atlantic Insurance Group and the leading company was called the North Atlantic Insurance Co Ltd ('NAIG' and 'NAIC' respectively). In 1997 the directors of NAIG (Mr Donohue, Mr Rossi and Mr Stinson) took advice on whether NAIC was able to meet its debts as they fell due. Their accountants' advice was that it could not. The directors decided to put all the NAIG companies into liquidation and a winding-up petition was presented to the High Court on 6 March 1997. Provisional liquidators have been appointed but no scheme of arrangement has yet been proposed. *1096*

> (2) *Wingfield Ltd* . This is a Jersey company that was bought as a 'shell' by Mr Donohue and Mr Atkins for the purpose of obtaining the BNIG assets, in the manner described.

> (3) *International Run-off Services Inc ('IROS')* . This is an Ohio corporation. Its shares are owned by Mr Stinson. Armco alleges that the company was used to receive commission fraudulently obtained from the fourth defendant ('APL') through the debt collection agreements made between APL and NPV (Nevis), then via another company set up by Mr Donohue, NPV (British Virgin Islands).

> (4) *International Trustee and Receivership Ltd* or *International Trustee and Receivership Services Inc ('ITRL')* . This is an Ohio company owned by Mr Rossi.

**The defendants**

16 The defendants in these proceedings are all companies in the Armco group; they are the plaintiffs in the NY proceedings. The third defendant AFSIL was a party to one of the transfer agreements by which its assets in BNIG were transferred to CISHL; it was also a party to the SPA. The second defendant AFSC was a party to the SPA. Although Armco Inc is described as the successor to AFSEL having acquired its assets, it was not an original party to any of the agreements. AFSEL was a party to the SPA and one of the transfer agreements. There is an important dispute whether as successor to AFSEL Armco Inc is bound by the EJC contained in

the SPA and transfer agreement.

## The foreign proceedings

17 The most important of these are the NY proceedings which began on 5 August 1998. I shall have to deal with these more fully later in this judgment. But other proceedings were started in other jurisdictions. First in Hong Kong on 6 August 1998 against NPV Nevis, to which Mr Donohue was joined on 27 August. On 7 August 1998 proceedings were started in Singapore against Mr Donohue and on the same day in Jersey; on 19 August 1998 proceedings were taken in Guernsey. In all these jurisdictions the Armco plaintiffs obtained Mareva injunctions against Mr Donohue. They have all been stayed pending the determination of the NY proceedings. But the proceedings in Hong Kong and Singapore have involved a number of applications to the court and the generation of vast quantities of paper. It is part of Mr Donohue's case that this is a pattern of oppressive litigation which he as an individual, albeit a wealthy one, has had to face in different time zones and against opponents with seemingly inexhaustible resources.

## Proceedings in New York

18 There have been two sets of proceedings in New York. In the US Bankruptcy Court for the Southern District of New York the liquidators of NAIC brought proceedings against NNIC relating to two trust funds. These proceedings have been settled subject to the approval of the High Court. The settlement is without prejudice to the right of NNIC to continue to claim against Mr Donohue and the individual PCCs in the NY proceedings.

19 As previously stated, the plaintiffs in the NY proceedings are the five defendants in the present proceedings. In addition, Mr Atkins was a defendant, but the proceedings against him were settled as explained in para. 9. NAIC was also a defendant; but the settlement referred to in the previous paragraph appears to have embraced this action too. All the defendants in those proceedings other than Mr Donohue (who until recently has taken no part so far in the NY proceedings), that is to say the PCCs, applied by motion to dismiss the NY proceedings on the grounds of want of jurisdiction and forum non conveniens. That motion was dismissed on 19 November 1999 by Judge Schwartz. *1097 This has occurred since Aikens J's judgment and it is a matter upon which Lord Grabiner places great reliance.

20 I must try and analyse the claims made in the amended complaint in the NY proceedings. To an English lawyer the pleading is confusing and lacking in particularity. Not least of the problems is that no attempt is made to differentiate between the different plaintiffs or to identify which has a cause of action in relation to which factual situations; they are all collectively referred to as the plaintiffs. The factual basis set out in the amended complaint is that which I have summarised in para. 3–8 above. There are 17 counts, which appear to be the equivalent of causes of action which are said to arise on the pleaded facts. They can be considered under the following heads:

(1) The secret plan to buy NAIG and induce Armco to inject excessive funds into CISHL. Counts 1 and 2 are based upon the fraudulent misrepresentations that only Mr Donohue and Mr Atkins were concerned in Wingfield and the fraudulent concealment of the participation of Mr Rossi and Mr Stinson in Wingfield pursuant to the secret agreement between the four conspirators. Count 8 alleged a conspiracy to defraud; in English law we would regard this as a conspiracy by unlawful means, namely the fraud and concealment alleged in counts 1 and 2. Count 13 alleges breach of fiduciary duty on the part of Mr Rossi and Mr Stinson in connection with the MBO. Count 14 alleges aiding and abetting by Mr Donohue of the breach of fiduciary duty by the other two. In addition count 17 (constructive trust) seems to arise out of these matters. The plaintiffs who would appear to have causes of action in respect of these matters are AFSC, AFSIL and Armco Inc. The latter's claim could arise as successors to AFSEL or possibly, though this is by no means clear, on its own account if it, rather than its subsidiaries AFSC and AFSIL, suffered loss. Neither APL nor NNIC appear to have any claim in relation to this aspect of the case. The defendants to these claims would appear to be Mr Donohue, Mr Rossi, Mr Stinson, Wingfield, CISHL and possibly Mr Rossi's and Mr Stinson's companies ITRS and IROS.

(2) The fraudulent collection agreement between APL and NPV. The allegation is that the terms of this agreement were exceptionally favourable to NPV at the expense of APL, excessive proportions of the collections being allotted to NPV and in some cases even what was due not being accounted for. This was brought about by fraudulent misrepresentation that only Mr Donohue was interested in NPV (count 3) and fraudulent concealment of the fact that Mr Rossi, who signed the agreement on behalf of APL and Mr Stinson, were beneficially interested in NPV (count 4). Breach of fiduciary duty on the part of Mr Rossi in this respect and aiding and abetting it on the part of Mr Donohue and Mr Stinson again form part of the allegations in counts 13 and 14 respectively. The only Armco plaintiff which has a cause of action in relation to the collection agreement appears to be APL; the relevant defendants are Mr Rossi, Mr Donohue, Mr Stinson and NPV which is in liquidation. This also forms part of the RICO counts.

(3) Allegations of the trust fund withdrawals. I do not think it is necessary to set this out in more detail than I have done in para. 7. This is because the Armco plaintiff who has a claim under the head is NNIC, and the proceedings against NAIC, which obtained the funds in respect of which NNIC was the beneficiary, have been effectively settled. It is possible that the liquidators of NAIC may have a claim against the four alleged conspirators, but that is nothing to the point. Mr Leaver asserts that there is no evidence at all that the certificates against which the trust funds were released were fraudulent; certainly the evidence to the effect that they were seems very tenuous. These matters are the subject of counts 5, 6, and 7. There *1098 is potentially a claim against Mr Donohue, Mr Rossi and Mr Stinson which has been preserved in the settlement agreement with NAIC's liquidators.

(4) The diversion of funds from NAIG to CISHL. Armco alleged that following the sale of NAIG to the four conspirators in the MBO, Messrs Donohue, Rossi, Stinson and Atkins stripped NAIG of funds via CISHL and the NPV companies. This was done by charging fees, commissions and dividends that were not justified. It is said US$16m was diverted in this way. This is the subject of counts 1, 2, 13 and 14, and the RICO counts. There are additionally counts 15 (conversion) and count 16 (money had and received) which appear to relate to this matter. On the face of it improper abstraction of NAIG's funds to the benefit of the four conspirators would appear primarily to be a matter for the liquidators of NAIG.

(5) The RICO statute counts. The racketeering is mail fraud and wire fraud. Essentially this involves in this case alleged fraudulent misrepresentations or money transfers effected through the mail and telephone or telegraphic transfer, and is the subject of counts 9–12.

21 The issues which fall to be determined in this appeal are as follows:

(1) Which of the Armco plaintiffs in the NY proceedings is bound by the EJCs; in particular is Armco Inc so bound?

(2) What is the scope of the EJCs? In particular to which counts of the amended complaint in the NY proceedings do they apply, if any?

(3) What are the relevant principles of law if the EJCs bind some but not all of the Armco plaintiffs in the NY proceedings and cannot be relied upon by some of the PCCs?

(4) On the basis that even if the EJCs are binding on some of the NY plaintiffs, on what principles should the discretion to grant or refuse an anti-suit injunction be exercised? In particular:

(a) Should some or all of the PCCs be joined in this action?

(b) What is the effect of Judge Schwartz's judgment?

(c) Should service of the proceedings on the fourth and fifth defendants, APL and NNIC, be set aside?

(5) Did Aikens J correctly exercise his discretion? If not, what should this court do?

### Which of the Armco plaintiffs are bound by the EJCs?

22 The clause itself is cl. 18(a) of the SPA and is in these terms:

'The parties … irrevocably submit themselves to the exclusive jurisdiction of the English courts to settle any dispute which may arise out of or in connection with the [agreement].'

There are similar provisions in cl. 15 of each of the two transfer agreements. Before the judge Armco mounted a wholesale attack on the validity of these clauses; it was said that they were inserted as part of the fraudulent conspiracy to do so. Aikens J rejected this attack. He held that at the time Armco had good reasons for agreeing to such clauses. Nor is it surprising that such a clause should have been inserted in an agreement which involved the sale of predominantly a British insurance business to a Jersey company, Wingfield, which was controlled by two British subjects. Accordingly, Lord Grabiner now accepts that the clauses are valid and that Mr Donohue at least, can take advantage of it so far as the second and third defendants, AFSC and AFSIL, are concerned.

*1099

### But are Armco Inc bound by it?

23 I regard this question as of very great importance. The judge held that they were not. Unfortunately the judge seems to have misunderstood Mr Leaver's argument on this point. He recorded in para. 28 that Mr Leaver had conceded that there was no question of statutory succession and that therefore the only way in which Armco Inc could become a party was by novation. In fact Mr Leaver's argument went further than this, as Lord Grabiner accepts; I think also it may have been further developed in this court. Mr Leaver made the following submissions which he submitted resulted in Armco Inc being bound:

(1) Armco themselves in the Singapore and Hong Kong proceedings maintained that they sued as successors to AFSEL.

(2) It was only consistent with their being so that they accepted service on Nabarro

Nathanson pursuant to the provisions of the SPA. No attempt has been made by Armco Inc to set aside service.

(3) Armco Inc had no independent cause of action other than one derived from AFSEL in the Far Eastern proceedings or in the NY proceedings, except perhaps the RICO counts.

(4) AFSEL's assets were at the time of its dissolution transferred to Armco Inc. These assets would include any chose in action owned by AFSEL. It is alleged that in the MBO US$10m worth of AFSEL's securities were wrongly transferred to Wingfield. If so, it would be AFSEL who would have the right to sue. Armco have declined to produce any documentation relating to the transfer of assets to Armco Inc.

(5) Clause 10 of the SPA provided that the 'Agreement should be binding upon and enure for the benefit of each party's successors and assigns without written consent of the vendor'. Even though there is no statutory succession in Delaware law, there is no reason why there should not have been some other transaction by way of succession or assignment to justify and support Armco's claim that they were successors of AFSEL.

24 As to the first points, in the statement of claim in Singapore, para. 19 reads as follows:

'The sale was concluded in a sale and purchase agreement, dated the 3rd day of September, 1991 ... The material points of the Sale and Purchase Agreement are, inter alia, as follows:

(a) Three members of AFSG were parties to the Sale and Purchase Agreement. These were ... AFSEL, the 2nd Plaintiff and 3rd Plaintiff (the 1st Plaintiff is the successor company to AFSEL, which has now been dissolved). It is for this reason that AFSEL is not a Plaintiff to this action."

In his affidavit in support of the Mareva relief, Mr Cooper, who is a solicitor of the Supreme Court, made the matter even clearer. At para. 12 he said that:

'On November 9, 1994 AFSEL was dissolved and its assets were transferred to Armco.'

And at para. 35(i) after referring to AFSEL being a party to the SPA he said:

'Armco [which must be a reference to Armco Inc] is the successor company to AFSEL, which has now been dissolved. It is for this reason that Armco is Plaintiff rather than AFSEL.'

The same statements appear in the documents in the Hong Kong proceedings. With characteristic frankness Lord Grabiner said that he could not explain why these claims were made.

*1100

25 I cannot see that Armco Inc have any independent claim, as opposed to one derived through AFSEL in the Far Eastern proceedings and Lord Grabiner did not suggest any. As for the NY proceedings there is no evidence before this court that in New York law a parent company can sue in respect of a subsidiary's cause of action or damage. We must assume therefore that the New York law is the same as English law in this respect. Apart therefore from the RICO claims,

which may enable such claims to be brought (and although there is no evidence on the point, I am prepared to assume so), it seems to me that all Armco Inc's claims in the NY proceedings are also derivative.

26 In my judgment it is not acceptable that Armco Inc should be able to claim and their solicitor swear in an affidavit something in one jurisdiction and seek to say in this that it is wrong without any explanation, without producing the documents relating to the transfer of assets and when in my judgment there is a perfectly feasible way in which Armco Inc could become the successor of AFSEL. Armco had to give undertakings in damages in the Far Eastern proceedings. The undertakings were no doubt acceptable because according to Mr Cooper's affidavit the Armco Group was listed on the New York Stock Exchange and had assets in excess of US$1,800m. I do not know whether the undertaking would have been acceptable in the absence of the parent company of the group.

27 If, as I would hold, at any rate for the purpose of these applications, Armco Inc is the successor to AFSEL, then it seems to me that Armco Inc is bound by the EJC in the SPA. It is a case of not being able to take the plums without the duff (see also *Schiffahrtsgesellschaft Detlef von Appen GmbH v Voest Alpine Intertrading GmbH [1997] CLC 993*).

*What is the scope of the EJCs?*

28 The judge dealt with this matter at para. 41 and 42 (p. 1760) of his judgment. He held that the claims raised in the NY proceedings based on a pre-existing conspiracy to defraud Armco were not claims that 'arose out of' either the SPA or the transfer agreements; they arose out of the conspiracy. He also held that the collection agreement and trust fund claims did not do so either. In the last sentences of para. 42 he said, 'Thus at least the issues raised in counts 1–8 and 9–12 are not within the EJCs'.

29 Mr Leaver criticises the judge's conclusion on two bases. First he submits that the judge has concentrated only on the phrase 'arise out of' and ignored the words 'or in connection with'. These words in combination are given wide scope (see *Mustill and Boyd: The Law and Practice of Commercial Arbitration* (2nd edn) pp. 119–120; *Ashville Investments Ltd v Elmer Contractors Ltd [1989] QB 488*; *Mackender v Feldia AG [1967] 2 QB 590* and *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd [1993] QB 701*). In the *Ashville* case Bingham LJ said at p. 517E in relation to the arbitration clause in that case:

> 'I would be very slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings.'

30 The judge was in error in saying that counts 1–8 were not within the scope of the EJCs. It was common ground that once the judge had decided that the EJCs had not been fraudulently introduced into the contracts and they were therefore valid, that they covered counts 1 and 2. Brooke LJ makes the point that count 2 alleges fraudulent concealment by Mr Rossi and Mr Stinson and is not caught by the EJC. While that appears to be so, the concealment is simply the opposite side of the coin of the misrepresentations in count 1. Furthermore the claim for damages in para. 82 of the amended complaint is against all the defendants. I do not think it would be right now to go behind the concession clearly made by Armco's counsel. Moreover, in my judgment the conspiracy claim in count 8 is also within the EJC. The alleged conspiracy was in *\*1101* connection with the SPA. It is no answer to say that these claims arose out of the conspiracy. The conspiracy itself was simply an agreement to use the unlawful means of the secret agreement of April 1991, the misrepresentations and concealments in respect of it and the breaches of fiduciary duty alleged in counts 13 and 14 in so far as they related to the SPA. It should be noted that where there are allegations of fraud inducing a contract, there may be a difference between the scope of an arbitration clause and an exclusive jurisdiction clause. In the former the arbitrator cannot determine his own jurisdiction; but the court has no such inhibition.

31 In the course of the argument I had thought that the judge might have intended to refer to counts 3–8 and 9–12 in para. 42 (p. 1760). But on reflection I do not think this is so, because the conspiracy to which he refers is I think the secret agreement which is the foundation of counts 1 and 2. If the EJCs are valid, binding and enforceable against the first three defendants, it is not in dispute that they cannot pursue the RICO claims based upon the same material as is within the

scope of the EJCs.

32 In my judgment the judge's error in holding that Armco Inc was not bound by the EJC and as to the scope of the clause, means that the exercise of his discretion is flawed. This court must therefore address the question afresh. It is therefore necessary to consider the relevant principles. Although as in all cases involving the grant of an injunction the final question of whether it should go is a matter of discretion, there is a clear distinction in the authorities between those cases where there is an EJC and those where there is not and the court is simply considering the question of alternative forum or forum non conveniens. It is an important part of Mr Leaver's submissions that the judge confuses the two and treated the case as an alternative forum case (see para. 63(3) (pp. 1765–1766) and the first reason given in para. 66 (p. 1768) of his judgment). I do not find it necessary to consider the matter further because, for the reasons I have given, we must in my view approach the matter afresh.

33 Where there is a valid EJC the court will give effect to it by granting an anti-suit injunction or stay of domestic proceedings unless 'strong cause' or 'strong reasons' are shown why it should not be. These expressions are used interchangeably in the cases. In The Fehmarn [1957] 1 LI Rep 511, a case in which Lord Brandon of Oakbrook, as he later became, appeared as counsel, Willmer J said (at p. 514):

> 'Clearly it requires a strong case to satisfy the court that the agreement [an express agreement to submit to a foreign tribunal] should be overridden.'

In The Chaparral [1968] 2 LI Rep 158 Diplock LJ, citing *Mackender v Feldia* used the expression 'very strong reasons' and Widgery LJ at p. 164 said it required 'strong grounds'. In Aratra Potato Co Ltd v Egyptian Navigation Co ('The El Amria') [1981] 2 LI Rep 119 at p. 123, Brandon LJ, citing his own decision in *The Eleftheria [1970] P 94* at p. 99, said:

> 'This discretion should be exercised by granting a stay unless strong cause for not doing so is shown.'

In *The Sennar (No. 2) [1985] 1 WLR 490* at p. 500 Lord Brandon affirmed in the House of Lords this statement of law.

34 In Aggeliki Charis Compania Maritima SA v Pagnan SpA ('The Angelic Grace') [1995] 1 LI Rep 87 in a much quoted passage Millett LJ at p. 96 said:

> 'In my judgment, the time has come to lay aside the ritual incantation that this is a jurisdiction which should only be exercised sparingly and with great caution. There have been many statements of great authority warning of the danger of giving an appearance of undue interference with the proceedings of a foreign Court. Such sensitivity to the feelings of a foreign Court has much to commend it where the injunction is sought on the ground of forum non conveniens or on the general *1102 ground that the foreign proceedings are vexatious or oppressive but where no breach or contract is involved. In the former case, great care may be needed to avoid casting doubt on the fairness or adequacy of the procedures of the foreign Court. In the latter case, the question whether proceedings are vexatious or oppressive is primarily a matter for the Court before which they are pending. But in my judgment there is no good reason for diffidence in granting an injunction to restrain foreign proceedings on the clear and simple ground that the defendant has promised not to bring them.'

and

> 'I cannot accept the proposition that any Court would be offended by the grant of an injunction to restrain a party from invoking a jurisdiction which he had promised not to invoke and which it was its own duty to decline.'

and

'The justification for the grant of the injunction in either case is that without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy. The jurisdiction is, of course, discretionary and is not exercised as a matter of course, but good reason needs to be shown why it should not be exercised in any given case.'

In the latter passage Millett LJ uses the expression 'good reason'. I doubt whether he intended to water down what had been said in the earlier authorities which I have referred to, which do not seem to have been cited in that case. In my view we should adhere to the expressions 'strong cause' or 'strong reason'.

35 One must, I think, therefore start from the position that Mr Donohue is entitled to the grant of an injunction against the first three defendants, unless strong reasons are shown why he should not be. It follows that I do not accept Lord Grabiner's submissions that the whole question is simply one of discretion in deciding where the action should most conveniently be tried and that the EJC is simply one factor, albeit a weighty one, in the exercise of that discretion.

*Are strong reasons shown here? The burden upon Armco*

36 We have been referred to a number of cases where different factors have been considered. I do not think one can derive much assistance from them since they tend to turn on their own particular facts. But some principles can be discovered. First, many factors which may have an important bearing on an alternative forum case will be of little or no weight, because they are either irrelevant or the parties must be deemed to have taken them into account where they have deliberately chosen a forum. Thus little or no weight should be paid to the convenience or availability of witnesses (except possibly in an extreme case like The El Amria where one of the considerations was the presence of all the experts on both sides), the availability of documents, the fact that the party sought to be restrained may have a juridical advantage in the other jurisdiction, for example the RICO claims and more extensive discovery in New York, the nationality or residence of the parties. Accordingly I do not consider that the matters relied upon by Aikens J in para. 63(3) (pp. 1765–1766) are of much, if any, weight as showing strong cause. I should add in parenthesis that the sixth reason there stated, that Mr Atkins has agreed to give evidence in New York but not elsewhere, is wrong. Under the settlement agreement referred to in para. 9 he is clearly obliged to give evidence wherever he is required to. Furthermore, I think there is some force in Mr Leaver's criticism that although there may be considerable discovery connection with the USA, there is little with the state of New York other than the fact that the secret agreement is said to have been made in the Waldorf Astoria Hotel. But because I do not regard the factors set out in para. 63(3) *1103 (pp. 1765–1766) of the judge's judgment as of much importance in relation to the question of strong reason, in the same way I do not attach much importance to this criticism.

37 Likewise I do not think that the factors which the judge relied upon in para. 63(4) (p. 1766) as showing that the connection with England was slim should carry much, if any, weight. Here too I think the judge has perhaps understated the connection with England. The MBO was concerned with the sale of a British business, the BNIG based in the UK, to a Jersey company (Wingfield) controlled by two British citizens, albeit Mr Donohue's main connection is with Singapore. The winding up of the business is taking place here and the bulk of the documents would appear to be likely to be here.

38 In para. 63(5) (p. 1767) the judge considered whether the NY proceedings were vexatious and oppressive to Mr Donohue. If this was an alternative forum case then, subject to one matter, I would not necessarily disagree with the judge. But in an EJC case it is prima facie oppressive and vexatious to litigate elsewhere than in the agreed forum. And that seems to me to be particularly so where the forum which has been deliberately rejected by the parties exposes one of them to the risk of triple damages, the trial of an immensely complex action involving many documents, to the process of jury selection and jury trial, and where, even if successful, Mr Donohue is unlikely to recover his costs. The one matter where the judge was wrong in this paragraph is in saying that there was no evidence that the NY proceedings would be more costly overall than comparable proceedings in London. The evidence of Mr Passmore in his first affidavit at para. 93.5 that it would be, was not contradicted.

Court of Appeal                                                                A

# Fiona Trust and Holding Corpn and others *v* Privalov and others

## [2007] EWCA Civ 20

2006  Dec 19, 20;                              Tuckey, Arden and Longmore LJJ      B
2007  Jan 24

*Arbitration — Arbitrator — Jurisdiction — Arbitration clause referring to "dispute
arising under" and "out of" charterparty — Owners bringing tort proceedings
against charterers and purporting to rescind charterparties for bribery —
Charterers appointing arbitrator pursuant to arbitration clause — Whether
dispute as to whether charterparties properly rescinded within scope of      C
arbitration clause — Whether arbitration clause impeached by allegations of
bribery — Whether arbitrator having jurisdiction to determine whether
charterparties procured by bribery — Whether arbitration or tort proceedings to
be stayed — Arbitration Act 1996 (c 23), ss 7, 9, 72*

Eight companies within a Russian group of companies entered into charterparties
as owners with three chartering companies.  Each of the charterparties contained a      D
clause[1] providing for "any dispute arising under this charter" to be decided in
England and conferred on either party the right to elect to have any such dispute
referred to arbitration.  The owners, among others, brought proceedings against the
charterers for the torts of conspiracy, bribery and breach of fiduciary duty, claiming,
inter alia, that each of the eight charterparties had been induced by bribery.  The
charterers sought to enforce their rights under the charterparties in arbitration and
appointed a sole arbitrator.  The owners applied pursuant to section 72(1) of the      E
Arbitration Act 1996[2] for an order restraining the arbitration proceedings on the
basis that they had rescinded both the charterparties and the arbitration agreements
contained in them for bribery and that there was therefore no valid arbitration
agreement.  The charterers applied pursuant to section 9 of the 1996 Act for the
owners' rescission claims to be stayed.  The judge held that the dispute as to whether
the charterparties had been rescinded for bribery did not come within the scope of the
arbitration clause and accordingly declined the charterers' application for a stay and      F
granted interlocutory injunctions restraining the arbitration proceedings pending the
trial of the owners' action.

On the charterers' appeal—

*Held*, (1) that any jurisdiction or arbitration clause in an international
commercial contract should be liberally construed; that the words "any dispute
arising out of the contract" should cover every dispute except a dispute as to whether
there was ever a contract at all and the words "arising under the contract" should no      G
longer be given a narrower meaning; and that, therefore, a dispute as to whether the
contract could be set aside or rescinded for alleged bribery did fall within the
arbitration clause as it was different from a dispute as to whether there was ever a
contract at all ( post, paras 17–18, 21).

(2) That section 7 of the 1996 Act codified the principle that an allegation that a
contract was invalid did not prevent the invalidity question being determined by an
arbitration tribunal pursuant to an arbitration agreement or clause that was
contained within the contract, which was to be treated as a separate agreement; that      H
it was only if the arbitration agreement was itself directly impeached for some specific

---

[1] Arbitration clause: see post, para 5.
[2] Arbitration Act 1996, s 7: see post, para 22.
Ss 9, 72: see post, para 32.

A   reason that the tribunal would be prevented from deciding the disputes that related to the main contract; and that since there was no special reason for saying that the bribery alleged by the owners impeached the arbitration clause in particular, as opposed to impeaching the whole contract, the judge had been wrong to hold that the arbitrator did not have jurisdiction to decide whether the charterparties had been procured by bribery ( post, paras 23, 25, 29).

B   (3) Allowing the appeal, that it was contemplated by the 1996 Act that it would, in general, be right for the arbitrators to be the first tribunal to consider whether they had jurisdiction to determine a dispute; that, therefore, although it was contemplated by section 72(1)(a) of the Act that a party who took no part in arbitration proceedings should be entitled in court to question whether there was a valid arbitration agreement, the court should, in the light of the general principles in section 1(c) of the Act, be very cautious about agreeing that its process should be so utilised; that proceedings could not be launched under section 72(1)(a) at all if there was a valid arbitration agreement, which included the situation where the arbitration

C   agreement was wide enough to comprise the relevant dispute and the arbitration clause, being a severable agreement, was not directly impeached by whatever ground was used to attack the validity of the contract in which the arbitration clause was contained; that, further, if the party who denied the existence of a valid arbitration agreement had himself instituted court proceedings and the party who relied on the arbitration clause had applied for a stay under section 9 of the Act, the application

D   for a stay was the primary matter which needed to be decided and the question whether there was a valid arbitration agreement would have to be decided under that section; and that, accordingly, since the arbitration clause was a separate and unrescinded agreement unimpeached by the claim to set aside the charterparties and wide enough to determine whether the charterparties could indeed be set aside, the owners' claim to rescind the charterparties should be stayed under section 9 and the charterers' application under section 72 should be dismissed ( post, paras 34–37, 40–41, 45).

E   Decision of Morison J [2006] EWHC 2583 (Comm); [2007] 1 All ER (Comm) 81 reversed.

The following cases are referred to in the judgment of the court:

*Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87, CA

F   *Al-Naimi (trading as Buildmaster Construction Services) v Islamic Press Agency Inc* [2000] 1 Lloyd's Rep 522, CA

*Antonis P Lemos, The* [1985] AC 711; [1985] 2 WLR 468; [1985] 1 All ER 695; [1985] 1 Lloyd's Rep 283, HL(E)

*Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488; [1988] 3 WLR 867; [1988] 2 All ER 577, CA

*Benincasa v Dentalkit Srl (Case C-269/95)* [1997] ECR I-3767, ECJ

*Birse Construction Ltd v St David Ltd* [1999] BLR 194

G   *Chinimport plc v G d'Alesio SAS (The Paola d'Alesio)* [1994] 2 Lloyd's Rep 366

*Credit Suisse First Boston (Europe) Ltd v Seagate Trading Co Ltd* [1999] 1 Lloyd's Rep 784

*Delos (Owners of cargo lately laden on board) v Delos Shipping Ltd* [2001] 1 All ER (Comm) 763; [2001] 1 Lloyd's Rep 703

*Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The Playa Larga)* [1983] 2 Lloyd's Rep 171, CA

H   *Ethiopian Oilseeds & Pulses Export Corpn v Rio del Mar Foods Inc* [1990] 1 Lloyd's Rep 86

*Fillite (Runcorn) Ltd v Aqua-Lift* (1989) 26 Con LR 66; 45 BLR 27, CA

*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1992] 1 Lloyd's Rep 81; [1993] QB 701; [1993] 3 WLR 42; [1993] 3 All ER 897; [1993] 1 Lloyd's Rep 455, CA

A    24 January 2007.    LONGMORE LJ handed down the following judgment of the court.

   1   This is the judgment of the court.

*Introduction*

   2   This appeal raises, apparently for the first time, the question whether,
B   if there is a plausible argument that contracts have been induced by bribery and have been rescinded on discovery of the bribery, that constitutes a dispute which can (and should be) determined by arbitration in the context of a common form of arbitration clause.

   3   The relevant contracts are eight charterparties made by eight one-ship companies in the Russian Sovcomflot group of companies as owners, with three separate chartering companies between February 2001 and September
C   2003 on the Shelltime 4 Form. It is, however, important to appreciate that these eight charter disputes form a small part only of an overall dispute between Sovcomflot and its numerous subsidiaries or sub-subsidiaries on the one hand and a Mr Nikitin who is alleged to have successfully bribed one or more directors or employees of Sovcomflot and their associated companies. It is said that the charterparties with which this appeal is concerned and
D   numerous other contracts were procured by this bribery and contained terms highly favourable to the charterers. But it is also said, inter alia, that (1) vast sums were paid by way of commission to companies nominated by Mr Nikitin on ship purchases and both new and existing shipbuilding business, (2) Sovcomflot interests were deceived into making an enormous payment to acquire a debt owed to a Russian bank, (3) uncommercial sale and leaseback transactions were made for the benefit of Mr Nikitin's
E   companies, (4) shipbuilding options and shares in Sovcomflot companies were traded at a gross undervalue and (5) a fictitious service contract was entered into designed to injure owners' financial and commercial interests.

   4   An intricate and complex action has therefore been instituted in England by a large number of claimants seeking damages for the tort of conspiracy and making claims by way of damages or restitution as a result of
F   the payment of bribes and a claim for compensation or an account of profits in respect of what is said to be a breach of fiduciary duty by those who have entered into the charterparties. There is also a claim that the eight charterparties which are the subject matter of these proceedings have been validly rescinded and that restitution of benefits should be made.

   5   Each of the charterparties contains what is called a "law and litigation" clause which provides for any dispute under the charter to be
G   decided in England and confers on either party the right to elect to have any such dispute referred to arbitration in accordance with rules of the London Maritime Arbitrators Association. That clause is in the following terms:

      "41(a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

      "(b) Any dispute arising under this charter shall be decided by the
H   English courts to whose jurisdiction the parties hereby agree.

      "(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred . . . to arbitration in London, one

**1,372**                                                    [2001] CLC

## National Westminster Bank plc v Utrecht-America Finance Co.

Court of Appeal (Civil Division).
Aldous, Clarke and Laws L JJ.
Judgment delivered 10 May 2001.

*Conflict of laws – Anti-suit injunction – Loan acquisition agreement between banks governed by English law and containing non-exclusive English jurisdiction clause – Agreement provided that parties were under no obligation to disclose material information and would not sue for non-disclosure – Buyer took proceedings in California alleging fraudulent concealment by seller – Seller took English proceedings for declaratory relief and sought summary judgment and anti-suit injunction – Whether English proceedings should be stayed – Whether seller entitled to summary judgment on claim that buyer's Californian claims were in breach of promise not to sue for non-disclosure and anti-suit injunction.*

This was an appeal by a US finance company, 'Utrecht', from a deputy judge's judgment ([2001] CLC 442) refusing to stay English proceedings by National Westminster Bank plc ('NWB') against Utrecht and restraining proceedings in California by Utrecht against NWB on the basis that the Californian proceedings were in breach of an agreement between the parties (the 'TOA').

Utrecht was an indirect subsidiary of a Dutch bank, Rabobank. Utrecht's principal place of business was in New York In 1996 NWB and Rabobank agreed to provide a credit facility of some $100m to a company, 'YFG', and its subsidiaries in England and the US. In 1997 under a take-out agreement (TOA) Utrecht acquired NWB's 50 per cent interest in the credit agreement at a discount. The credit agreement and TOA were governed by English law and contained non-exclusive English jurisdiction clauses and a waiver of any objection to English jurisdiction on forum or other grounds. By cl. 8 of the TOA both parties agreed that neither would be under any obligation to disclose any material non-public information relating to the 'transfer assets' which might affect the purchase price, that neither would have any liability in relation to the non-disclosure of such information and that neither would bring any action in relation to such non-disclosure. In 1999 Utrecht issued proceedings in California complaining of fraudulent concealment of information relating to the financial position of the YFG group by NWB, under Californian law, negligent failure to disclose information and breach of good faith or fair dealing in failing to disclose such information. In each case it was alleged that NWB had a duty to disclose such information to Utrecht before entry into the TOA because it affected the collectability of the loans. Utrecht sought rescission of the TOA. NWB did not challenge the jurisdiction of the Californian court but issued English proceedings seeking summary judgment and an injunction to restrain the Californian claims which were being pursued in breach of cl. 8 of the TOA, and. Utrecht applied to stay the English proceedings until after the conclusion of the Californian proceedings. The deputy judge granted summary judgment to NWB, declared that causes of action pleaded by Utrecht in the Californian proceedings were in breach of the TOA and granted an injunction ordering Utrecht to withdraw those causes of action as against NWB. Utrecht's application for a stay was refused. Utrecht appealed.

*Held*, dismissing the appeal:

1. The judge was right that there should be no stay of the English proceedings on forum grounds because that would be inconsistent with the English jurisdiction clause and waiver of objection to English jurisdiction on forum grounds in the TOA.

2. The judge was also right that although the court had an inherent jurisdiction to order a stay, the terms of the TOA pointed overwhelmingly against the grant of a stay.

National Westminster Bank plc v Utrecht-America Finance Co.   **1,373**
(Aldous LJ)

A   Even though the jurisdiction clause was non-exclusive, a stay so as to await the outcome of and effectively grant precedence to the Californian proceedings would not reflect the parties' agreement.

3. There was no reason of comity not to entertain the summary judgment application. NWB sought a permanent injunction after a judgment on the merits of its claim that the Californian proceedings were in breach of the TOA and the grant of an injunction to

B   restrain foreign proceedings which were in clear breach of contract would not offend against comity. Although the TOA did not contain an exclusive jurisdiction clause, if it was once held that Utrecht was in breach of the TOA in commencing and continuing the Californian proceedings, the same principles applied. It was vexatious and oppressive to maintain proceedings in breach of an agreement not to do so. It did not matter that the Californian court had jurisdiction to determine the issues raised and was capable of doing so, nor that the action in California was already on foot, nor whether the

C   Californian court would or would not decline jurisdiction. Although it might have been inappropriate to grant an interlocutory anti-suit injunction on the basis that it was only arguable that the Californian proceedings were in breach of the TOA, once the judge held that Utrecht was in breach of the TOA he was right to grant a permanent injunction given the terms of the TOA.

4. Applying English law in accordance with the terms of the TOA, cl. 8 was not a clause

D   which purported to exclude liability for non-disclosure and accordingly was not subject to the tests laid down in Canada Steamship Lines Ltd v The King [1952] AC 192.

5. The parties were sophisticated international banks who plainly agreed that there could be no question of the other acting fraudulently or negligently or in breach of a duty of good faith, as alleged in the Californian proceedings. The agreement was clear and unambiguous and protected both banks from liability for non-disclosure however much

E   each might be liable for negligence or fraud under Californian law if there was such a duty of disclosure. If there was no duty to disclose neither bank could be liable for breach whatever its intentions and wherever the action was brought. The position would be different if it were alleged that NWB made a material misrepresentation which induced the contract, whether innocent, negligent or fraudulent. In that event cl. 8.2(d) would not be relevant because it was concerned only with non-disclosure. However, since each of

F   Utrecht's allegations in California against NWB alleged not misrepresentation but non-disclosure, albeit with a different mental element in each case, in bringing and pursuing the Californian action, Utrecht was in breach of the clause. It did not matter that Utrecht sought rescission of the TOA under Californian law. (HIH Casualty and General Insurance Ltd v Chase Manhattan Bank [2001] CLC 48 considered.)

6. The judge was correct that cl. 8 satisfied the test of reasonableness under s. 11 of the Unfair Contract Terms Act 1977 and s. 3 of the Misrepresentation Act 1967, if they applied.

G   7. The judge was also correct that the information which it was alleged in California that NWB failed to disclose was information 'relating to the transfer assets'. Information relevant to the prospects of the borrowers repaying the loans was information which related to the transfer assets within the definition in the TOA.

8. Accordingly the judge was right that Utrecht was in breach of the TOA in bringing the Californian claims. It followed that NWB was entitled to summary judgment and the

H   declarations granted by the judge and a permanent injunction.

The following cases were referred to in the judgment of Clarke LJ:

Airbus Industrie GIE v Patel [1998] CLC 702; [1999] 1 AC 119.
Amchem Products Inc v British Columbia (Workers Compensation Board) [1993] 1 SCR 897.
Angelic Grace, The [1995] 1 Ll Rep 87.
Barclays Bank plc v Homan [1993] BCC 757.

A

*Canada Steamship Lines Ltd v King* [1952] AC 192.
*Continental Bank NA v Aeakos Compania Naviera SA* [1994] 1 WLR 588; [1994] 1 Ll Rep 505.
*de Dampierre v de Dampierre* [1988] 1 AC 92.
*Donohue v Armco Inc* [2000] CLC 1090.
*Grimstead (E A) & Son Ltd v McGarrigan* (unreported, 27 October 1999, CA).
*HIH Casualty and General Insurance Ltd v Chase Manhattan Bank* [2001] CLC 48.
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1997] CLC 1243; [1998] 1 WLR 896.

B

*Phillips Products Ltd v Hyland* [1987] 1 WLR 659.
*Reichhold Norway ASA v Goldman Sachs International* [2000] CLC 11.
*Smith v Bush* [1990] 1 AC 831.
*Smith v South Wales Switchgear* [1978] 1 WLR 165.
*Societe Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] 1 AC 871.

C

*Stewart Gill Ltd v Horatio Myer & Co Ltd* [1992] 1 QB 600.
*Thomas Witter v TBP Industries Ltd* [1996] 2 All ER 573.

Michael Brindle QC and Bankim Thanki (instructed by Herbert Smith) for Utrecht-America Finance Co.

Lord Grabiner QC and Robin Dicker QC (instructed by Allen & Overy) for National Westminster Bank.

D

## JUDGMENT

**Clarke LJ: Introduction**

1. This is an appeal by Utrecht-America Finance Co ('Utrecht') against an order dated 27 November 2000 made by Mr Peter Gross QC sitting as a deputy judge of the High Court. The appeal is brought with the permission of the judge. The action arises out of an agreement known as a take out agreement ('TOA') between Utrecht, National Westminster Bank plc ('NWB') and others dated 15 October 1997 under which Utrecht bought NWB's interest in a credit agreement dated 21 March 1996 (as subsequently amended). Utrecht brought proceedings in California in order inter alia to obtain rescission of the TOA. NWB commenced this action in order to obtain declarations that the Californian proceedings were begun in breach of the TOA and sought a permanent injunction to restrain Utrecht from continuing them against NWB in so far as they are in breach of the TOA.

E

F

2. NWB did not seek an interlocutory injunction against Utrecht but issued an application for summary judgment. Utrecht contended that the judge should not entertain the application for summary judgment, that (if he did) he should not give summary judgment and that, in any event, he should not grant an injunction restraining Utrecht from pursuing any part of the proceedings in California. The judge rejected all those submissions, gave summary judgment and granted an injunction (see [2001] CLC 442).

G

3. The judge made declarations that the ninth, tenth and twelfth causes of action pleaded in the Californian proceedings were brought by Utrecht in breach of the TOA and that Utrecht is liable to indemnify NWB in respect of all costs and expenses (except for the costs of this action) incurred and to be incurred in defence of the ninth, tenth and twelfth causes of action. He also granted an injunction restraining Utrecht from pursuing those causes of action against NWB in California or from taking any further steps in relation to them except as provided in para. 4 of his order. Paragraph 4 ordered Utrecht forthwith to withdraw those causes of action as against NWB. The judge further ordered Utrecht to pay damages to NWB in respect of the loss and damage suffered by reason of the commencement and pursuit by Utrecht of the same causes of action together with interest and costs. Utrecht's application for a stay of the action was refused. Utrecht appeals against that order and essentially advances the same arguments as it did before the judge.

H

45-10-01
CA            National Westminster Bank plc v Utrecht-America Finance Co.        **1,375**
                                                *(Clarke* LJ)

A    **Background**

         4.  The underlying facts are not in dispute. I take them largely from the judgment. Utrecht is
     a company incorporated under the laws of Delaware with its principal place of business in New
     York. It is indirectly a wholly owned subsidiary of a Dutch bank called Rabobank Nederland
     ('Rabobank'). By a written agreement dated 21st March 1996 ('the credit agreement') NWB
     and Rabobank agreed to provide Yorkshire Food Group plc ('YFG') and certain subsidiary
B    companies of YFG with a credit facility of up to US$100m, of which NWB and Rabobank each
     agreed to provide up to US$50m. The subsidiaries were incorporated either in England or in the
     US. The total sum of US$100m was subsequently increased by a further US$19m in the form
     of US$9.5m from each of NWB and Rabobank.

         5.  The parties to the TOA were NWB, Utrecht, Rabobank, YFG and a Delaware subsidiary
     of YFG called Yorkshire Dried Fruit & Nuts Inc. As already stated, the essential purpose of the
C    TOA was to effect a novation under which Utrecht took out or purchased NWB's interest in the
     credit agreement. At the time of the TOA the sums advanced under the various facilities in the
     credit agreement were already due and were unpaid. The price which Utrecht paid NWB to
     purchase its interest in the credit agreement was at a discount to the outstanding amounts of the
     loans. In accordance with a pricing letter dated 14 October 1997 Utrecht paid the sum of
     US$39,525,386.30 which was calculated in such a way as to ensure that the overall discount
     did not exceed £11.3m. Whether that discount represented good business for Utrecht or not
D    depended of course upon what the judge called the quality of the debt.


     **The Californian proceedings**

         6.  The Californian proceedings were commenced on 28 October 1999 by Rabobank and
     Utrecht against NWB and various individual directors and officers of certain subsidiaries of
     YFG based in California. The case against NWB originally comprised the ninth, tenth, twelfth
E    and fourteenth causes of action pleaded in the complaint. The fourteenth cause of action has
     recently been abandoned so that we are concerned only with the ninth, tenth and twelfth causes
     of action. I shall return to them in a little more detail below, but they essentially allege
     fraudulent concealment of information, negligent failure to disclose information and a breach
     of good faith or fair dealing in failing to disclose such information. In each case it is alleged that
     NWB was under a duty to disclose the information to Utrecht.

F        7.  On 30 December 1999 the solicitors for NWB wrote a letter before action alleging that
     the commencement and pursuit of the Californian proceedings by Utrecht against NWB were a
     breach of the TOA on the ground that by cl. 8.2(d) Utrecht had agreed to bring no action against
     NWB in respect of non-disclosure of the classes of information alleged in the complaint. The
     letter asked for an undertaking from Utrecht that it would withdraw the relevant parts of the
     proceedings, failing which NWB would commence proceedings in England for appropriate
G    relief. No such undertaking was or has been given and the whole purpose of this appeal is to
     enable Utrecht to continue to advance the ninth, tenth and twelfth causes of action in California
     against NWB.

         8.  On 3 January 2000 NWB filed an answer and cross-complaint in California. However, it
     did so under cover of a letter from its Californian attorneys indicating in effect that it was doing
     so without prejudice to its position in the English proceedings which it intended to commence.
H    In short the letter asserted that NWB was advancing certain causes of action in order to
     preserve its right to assert them under the Californian procedural code and without prejudice to
     its right to commence proceedings in England and that it would pursue its cross-claims in
     California only to the extent necessary to preserve its rights to those claims. It is not now in
     dispute that NWB had to take those steps to preserve its position in California and that it did not
     make an irrevocable election by doing so. It is right to add that there is no suggestion that the
     courts of California do not have jurisdiction to determine either the claims or cross-claims in
     those proceedings.

**1,376**   National Westminster Bank plc v Utrecht-America Finance Co.   **[2001] CLC**
(*Clarke* LJ)

9. On 18 January 2000 NWB commenced this action in England and on 9 February it issued its application for summary judgment seeking the declarations and the injunction which the judge subsequently granted. It is important to note (as I have said already) that NWB did not seek an interlocutory injunction prior to the determination of its summary judgment application. Indeed, as I understand it, if summary judgment is refused, NWB intends to obtain directions for the trial of the action in England and does not intend to seek an interlocutory injunction in the meantime. On 1 August 2000 Utrecht served an application for an order staying this action until after the conclusion of the proceedings in California.

**The TOA**

10. The terms of the TOA are central to the issues in this appeal as they were before the judge. It provides, so far as relevant, as follows:

'1. INTERPRETATION

1.1 *Definitions*

...

"Collateral"

means any property... in which or over which an Encumbrance has been... granted to or for the benefit of the Banks under any Security Document.

...

"Purchaser Warranties"

means the warranties, representations and indemnities made by, and the covenants and agreements of, the Purchaser in this Deed.

"Seller Warranties"

means the warranties, representations and indemnities made by, and the covenants and agreements of, the Seller in this Deed.

...

"Transfer Assets"

means all rights, title and interests... of the Seller under the Credit Agreement, the UK Facility Agreement, the Security Documents and any Collateral:

(a) in, under and to:

(i) the Advances;

(ii)... all interests, fees, costs, expenses and other amounts in relation to the Advances and the Commitments..

(iii) the Credit Agreement, the UK Facility Agreement, the Security Documents and any Collateral;

(b) to or in respect of any and all other claims, rights or causes of action against persons arising from or otherwise in relation to or in connection with the rights, title and interests described in paragraph (a)...

2. AGREEMENT TO NOVATE

2.1 *Agreement to novate*

In consideration of the mutual covenants and agreements contained in this Deed and subject to the terms and conditions of this Deed the Parties... agree as follows:

(a) that the Seller with full title guarantee, subject to payment of the Purchase Price to the Seller... will novate... in favour of the Purchaser... the Transfer Assets and the Novated Obligations...

7. REPRESENTATIONS AND WARRANTIES

**A**

7.1 *Representations and warranties of the Seller*

The Seller hereby represents and warrants to the Purchaser that, at the Completion Date:

...

(f) ... the Seller will be the sole beneficial owner of, with good title to, the Transfer Assets free and clear of any Encumbrance...

**B**

7.2 *Representations and warranties of the Purchaser*

...

(e) the Purchaser is a sophisticated buyer with respect to the Transfer Assets (who has made its own enquiries into, and who has adequate information concerning, the business and financial condition (including without limitation, the creditworthiness) of the Obligors, the value of any Collateral, the perfection, validity and priority of any Security Interest forming part of the Transfer Assets, and the status of, and its rights with respect to the Transfer Assets in, any relevant Insolvency Proceedings or proposed Insolvency Proceedings), the Credit Agreement and the UK Facility to make an informed decision regarding the Novation of the Transfer Assets and the Novated Obligations and has independently and without reliance upon the Seller, and based on such information as the Purchaser has deemed appropriate, made its own analysis and decision to enter into each of the Transfer Documents, except that the Purchaser has relied upon the Seller Warranties:

**C**

**D**

8. ACKNOWLEDGEMENTS

8.1 *Acknowledgements by the Seller*

...

(c) the Purchaser may be in possession of material non-public information relating to the Transfer Assets and which may affect the Purchase Price which the Purchaser shall be under no obligation to disclose to the Seller and the Seller hereby acknowledges and agrees that the Purchaser shall have no liability to the Seller, and the Seller shall bring no action against the Purchaser in relation to the non-disclosure of such information, provided that nothing in this sub-clause (c) shall affect the right of the Seller in relation to the Purchaser's Warranties;...

**E**

**F**

8.2 *Acknowledgements by the Purchaser*

The purchaser acknowledges that:

(a) the Seller has not made and does not make any representation or warranty, whether express or implied, of any kind or character except as expressly set forth in the Transfer Documents:

(b) the novation of the Transfer Assets and Novated Obligations is irrevocable and without recourse to the Seller, except with respect to breaches of, or pursuant to, the Seller Warranties and is in any event subject to (e) below;

**G**

(c) save for the Seller's Warranties, the Seller makes no representation or warranty, nor assumes any liability for, the due execution, legality, validity, effectiveness, adequacy or enforceability of the Credit Agreement, the UK Facility Agreement, the Security Documents or the collectability or value of the Transfer Assets;

**H**

(d) the Seller may be in possession of material non-public information relating to the Transfer Assets and which may affect the Purchase Price which the Seller shall be under no obligation to disclose to the Purchaser and the Purchaser hereby acknowledges and agrees that the Seller shall have no liability to the Purchaser, and the Purchaser shall bring no action against the Seller in relation to the non-disclosure of such information, provided that nothing in this sub-clause (d) shall affect the rights of the Purchaser in relation to the Seller Warranties:

**1,378**   National Westminster Bank plc v Utrecht-America Finance Co.   [2001] Cl.C
(*Clarke* LJ)

(e) the Seller shall be under no obligation to disclose any documents or correspondence   A
between it and any member of the Group in relation to:

(i) the terms of the Credit Agreement...; or

(ii) the conduct of the parties in relation to the Credit Agreement (whether in relation to
those terms or otherwise),

and that the Purchaser has received all the documents or correspondence (whether from   B
the Seller, Rabobank.. or any other person) which it requires in respect of (i) and (ii)
above for the purposes of the transactions envisaged by the Transfer Documents;

**9. INDEMNITIES AND RELEASE**

...

**9.2** *Indemnity by the Purchaser*

The Purchaser shall indemnify and keep indemnified, and shall defend and hold the   C
Seller... harmless from and against any liability, claim, cost, loss, damage or expense
(including, without limitation, reasonable legal fees and disbursements) or judgments
which they (or any of them) incur or suffer as a result of:

(a) the breach of any of the Purchaser Warranties by the Purchaser;...

**18. ENTIRE AGREEMENT**

The Transfer Documents constitute the entire agreement of the Parties about its subject   D
matter and any previous agreements, understandings and negotiations on that subject
cease to have any effect...

**22. JURISDICTION AND SERVICE OF PROCESS**

**22.1** *Submission*

Each party agrees for the benefit of the other Party, that the courts of England shall have   E
jurisdiction to settle any disputes in connection with this Deed and accordingly, submits
to the jurisdiction of the English courts.

**22.2** *Service of process*

The Purchaser irrevocably appoints Rabobank, London Branch... as agent with full
authority to receive, accept and acknowledge... for the appointor and on the appointor's
behalf, service of all process issued out of or relating to any proceedings in England,
and... the Purchaser... agrees that service on the relevant agent shall be deemed due   F
service for the purposes of proceedings in those courts without prejudice to any other
mode of service.

**22.3** *Forum convenience and enforcement abroad*

Each Party:

(a) waives objection to the English courts on grounds of inconvenient forum or   G
otherwise as regards proceedings in connection with this Deed; and

(b) agrees that a judgment or order of an English court in connection with this deed is
conclusive and binding on it and may be enforced against it in the courts of any other
jurisdiction.

**22.4** *Non-exclusivity*

Nothing in this clause 22 limits the right of any Party to bring proceedings in connection   H
with this Deed:

(a) in any other court of competent jurisdiction; or

(b) concurrently in more than one jurisdiction.

**23.** *Governing Law*

This Deed is governed by English law.'

A  **Issues on the appeal**

11. It is clear from Utrecht's skeleton argument and indeed from Mr Brindle's oral submissions that the principal object of this appeal is to remove the injunction in order to enable Utrecht to continue its proceedings against NWB in California. The judge considered first Utrecht's application for a stay of this action before considering whether he should give summary judgment for NWB. He was in my judgment right to do so because, if it were

B  appropriate to grant a stay, it would be wrong to consider the application for summary judgment since no question of giving judgment for NWB (whether summary or otherwise) would then arise. As already stated, the judge refused a stay. I do not understand Utrecht to be formally challenging that refusal on this appeal, but since the purpose of the appeal is to allow the Californian proceedings to continue to judgment ahead of the English action, it seems to me that logically the first question for consideration is indeed whether a stay should be granted or whether the English action should be allowed to proceed to judgment.

C  12. If the judge was right to refuse a stay, the next question for consideration is whether he was justified in embarking on the NWB's application for summary judgment, if so, whether he was right on the merits and, if so, whether he was right to grant the declarations and/or the injunctions which he did. I shall therefore consider the issues in that order, but before doing so it is I think important to set out in a little more detail the reasons why Utrecht wishes to proceed in California and not in England, which involves some further consideration both of the

D  differences between Californian and English law and of the content of the two sets of proceedings.

**The law of California and England compared**

13. In England a contract like the TOA is not a contract uberrimae fidei and neither party owes a duty to disclose material facts to the other. The only bases upon which a party can seek

E  damages from the other or seek rescission of such a contract is by relying upon a misrepresentation, whether innocent, negligent or fraudulent. The law of California is different.

14. I am not sure to what extent the principles of the law of California are in dispute, but for present purposes it is appropriate to assume that the law is as asserted by Utrecht (as may indeed be the case). As already stated, the relevant assertions can be seen from the ninth, tenth

F  and twelfth causes of action alleged in the complaint. As I read them, each of the causes of action alleges a duty to disclose material facts and the difference between them is that the ninth cause of action alleges fraudulent concealment of those facts, the tenth alleges negligent failure to disclose them and the twelfth alleges that the failure to disclose them was in breach of a duty of good faith or fair dealing. As I read the twelfth cause of action, it does not depend upon fraud or negligence but simply on a failure to disclose facts in circumstances where the facts are material such that it would be a breach of the duty of good faith or fair dealing not to disclose

G  them.

**The proceedings compared**

15. In support of the ninth, tenth and twelfth causes of action Utrecht relies upon non-disclosure of facts in circumstances which the judge correctly identified from the following quotation from Utrecht's skeleton argument:

H      '... the individual directors or officers of YFI and its subsidiaries who are sued are alleged to have acted in breach of fiduciary duties owed to the lending banks and negligently misrepresented the financial position of their companies to the banks over a period of time. Some of these individuals caused their companies to transfer property and funds for no consideration to three other companies, Almond Farms I, Almond Farms II and White Rose Farming. These transfers were made at a when YFI and Treehouse were insolvent and were not properly reflected in the accounting records of

**1,380**   National Westminster Bank plc v Utrecht-America Finance Co.   [2001] CLC
*(Clarke LJ)*

the companies. They also committed YFI to enter into long term leases with Almond Farm I and II. These liabilities (which exceeded US$20m) were also not reflected in the companies' accounting records.

Rabobank and Utrecht's case is that NatWest was fully aware of these activities and that it provided additional funds for the Almond Bank ventures... Rabobank and Utrecht claim that NatWest induced them to enter into the TOA. Had NatWest disclosed its knowledge and its involvement in these transactions Utrecht and Rabobank would not have entered into the TOA.'

16. In short Utrecht's case in California is that NWB failed to disclose material information of the kind set out in that extract. The ninth, tenth and twelfth causes of action all rely upon the same non-disclosure. The difference between them is the mental element. The ninth cause of action alleges fraudulent concealment, which as I understand it involves saying that an honest bank would have disclosed the information, whereas NWB did not and thus acted dishonestly. The tenth cause of action alleges a negligent failure to disclose the information and the twelfth cause of action does not allege dishonesty or negligence but simply a failure disclose contrary to a duty of good faith or fair dealing.

17. As already stated, none of those allegations could be made in an action based on English law because they all depend upon there being a duty to disclose the relevant facts and there is no such duty in English law. Under English law it would be necessary to allege a misrepresentation, which Utrecht has not done, either in California or in England. As I understand it, Utrecht's claim in the Californian proceedings depends entirely on the proposition that NWB owed it a duty to disclose certain facts.

18. As I said earlier, NWB has brought this action in England in order to obtain a declaration that the Californian proceedings are a breach of the TOA. In para. 5 of its defence Utrecht has admitted the novation contained in the TOA, but,

'without prejudice to Utrecht's and Rabobank's contentions set out in the Complaint that they were induced to enter into the TOA by fraud on the part of NWB which, if proved, would avoid the TOA in its entirety.'

19. Utrecht was asked for further information and clarification of para. 5 of the defence under CPR, Pt. 18. In particular it was asked to clarify whether para. 5 was intended to contain an allegation of fraud against NWB and, if not, what, if any reliance it was intended to be placed on the matters alleged in para. 5. Utrecht's answer was that it is not intended to establish in these proceedings that NWB has been guilty of fraud, but that that allegation, having been made in the Californian action, ought properly to be determined in that action. Utrecht further asserted that the relevant matter alleged in para. 5 is that fraud 'in the form of fraudulent concealment of material information' has been 'alleged' (the pleader's emphasis) in California. Utrecht concluded its clarification in this way:

'The relevance of the allegation of fraudulent inducement having been made in the Californian action is apparent from the matters contained in paragraphs 6 and 10(iii)(3) and (4) of the Defence, in summary: since Utrecht has made such an allegation in the Californian action it is an issue in these proceedings whether or not NWB can, by the means it has adopted and relied upon in the Particulars of Claim, exclude its liability for its own fraud if proved and can, therefore, prevent the matter being tried out in the Californian action or elsewhere.'

20. It is important to note that (as stated above), although the pleading refers to fraudulent inducement, the pleading itself defines fraudulent inducement as being in the form of fraudulent concealment of material information and not in the form of misrepresentation. It is for that reason that, save for its submissions relating to the TOA itself, Utrecht does not seek to rely upon any principle of English substantive law to avoid liability. Nor does it seek to rely upon any rule of English conflicts of laws in order to assert a right to rely upon the law of California in England.

A    21.  As to the paragraphs of the defence referred to in the information quoted above, para. 6 simply alleges that NWB's claim is premature and contrary to the principles of comity by reason of its direct interference with the Californian proceedings. Paragraph 10(iii) makes a number of points on the true construction of the TOA and asserts that cl. 8.2(d) is unreasonable and of no effect pursuant to s. 3 of the *Misrepresentation Act* 1967. I shall return to those points below because they are relevant to the question whether the judge should have given summary judgment for NWB.

B

**Should the action in England be stayed?**

22.  The judge considered this question first and held that the action should not be stayed. There were two alternative bases upon which the action could in theory have been stayed. The first was based on principles of forum non conveniens and the second was based on principles of case management.

C

23.  The judge said that Mr Brindle did not press Utrecht's application for a stay on the ground of forum non conveniens because he recognised the force of the argument based on cl. 22.1–22.3 of the TOA. Mr Brindle did not seek a stay on that ground in this court either. He was in my judgment right not to do so because those clauses are fatal to any such case. Their effect is that each party submitted to the jurisdiction of the English courts, waived any objection it might otherwise have to the English courts on the ground of forum non conveniens

D   or otherwise and agreed that any judgment or order of the English court in connection with the TOA would be conclusive and binding on it. Those clauses make any application for a stay on the ground of forum non conveniens unarguable.

24.  Faced with that difficulty, Mr Brindle submitted to the judge that the English action should be stayed under its inherent power to control its proceedings and under its powers of case management and relied upon the decision of this court in *Reichhold Norway ASA v*

E   *Goldman Sachs International* [2000] CLC 11. The judge accepted that there was jurisdiction to grant a stay on that basis but rejected the submission that the action should be stayed, essentially because of the express terms of cl. 22 of the TOA. He said that, looked at overall, the scheme of cl. 22 tells overwhelmingly against a stay of the English proceedings so as to await the outcome of and effectively to grant precedence to proceedings elsewhere. In short, he said, such a stay would not reflect the bargain made by the parties.

25.  I entirely agree with the conclusions of the judge in this regard and it was no doubt

F   because of their undoubted force that Mr Brindle did not submit before us that the judge should have stayed the action. Instead he sought to achieve the same result by a somewhat different route. He did so by submitting that the judge was wrong to approach the applications in the order in which he did and that he should not have entertained the application for summary judgment.

G   **Should the judge have entertained the application for summary judgment?**

26.  The reasons given in Utrecht's skeleton argument in support of the submission that the answer to that question is no were these:

(a) It would have been consistent with comity to consider the validity of NWB's entitlement to an anti-suit injunction first, before entertaining argument on and deciding issues (raised in the summary judgment application) which the judge accepted were already before the

H       Californian court. This was imperative given that the judge rightly held that California was a natural forum for the resolution of the dispute and that England was not *the* natural forum.

(b) Utrecht's application for a stay was made simply to ensure that the appropriate remedy was before the court if it declined to grant NWB the anti-suit injunction sought. In such circumstances the judge should have decided to stay the application after or at the same time as deciding NWB's application for an anti-suit injunction.

**Commercial Law Cases**