# EXHIBIT LC4
# Part III of IV

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

148 F.3d 1285
United States Court of Appeals,
Eleventh Circuit.

Irmgard LIPCON; Mitchell Lipcon; Charles R.
Lipcon; Barbara Lipcon, Plaintiffs–Appellants,
v.
UNDERWRITERS AT LLOYD'S, LONDON, a.k.a.
Corporation of Lloyd's, a.k.a. Society of Lloyd's,
a.k.a. Lloyd's of London, Defendants–Appellees.

No. 97–5144.   |   Aug. 5, 1998.

Domestic investors in foreign underwriting exchange, and investors' spouses, sued exchange under Securities Act of 1933, Securities Exchange Act of 1934, Racketeer Influenced and Corrupt Organizations Act (RICO), and Florida law. The United States District Court for the Southern District of Florida, No. 96–1137– CV–FAM, Federico A. Moreno, J., dismissed complaint based on choice-of-law and choice-of-forum clauses in parties' agreements. The Court of Appeals, Kravitch, Senior Circuit Judge, held that: (1) motions to dismiss based upon forum selection clauses are not premised on lack of subject matter jurisdiction, but on improper venue; (2) anti-waiver provisions of United States securities law did not preclude enforcement of forum selection clauses found in general undertaking agreements between investors and underwriting exchange, providing for application of English law in English courts; (3) investors did not meet rigorous standard for pleading fraud, as necessary to invalidate choice clauses based on fraud and overreaching; (4) remedies provided by English law were adequate; (5) choice clauses were not rendered unenforceable as in contravention of strong public policy, expressed in United States securities laws, that substantive remedies be available for securities violations; and (6) spouses, who signed letters of credit to provide collateral for investors but did not sign general undertaking, were bound by choice clauses.

Affirmed.

West Headnotes (15)

[1]     **Federal Courts**
        ➡ Objections, Proceedings, and Determination

Motions to dismiss based upon choice-of-forum and choice-of-law clauses ordinarily are not properly brought as motions to dismiss for lack of subject matter jurisdiction, but, instead, are properly brought as motions to dismiss for improper venue; basis upon which defendants seek dismissal, namely, that parties' agreement prohibits plaintiff from bringing suit in particular forum, is unrelated to actual basis of federal subject matter jurisdiction, either federal question jurisdiction or diversity of citizenship. Fed.Rules Civ.Proc.Rule 12(b)(1, 3), 28 U.S.C.A.

75 Cases that cite this headnote

[2]     **Federal Courts**
        ➡ What law governs and choice of law in general
        **Federal Courts**
        ➡ Venue

Enforceability of forum-selection and choice-of-law provisions in international agreements are questions of law that Court of Appeals will review de novo. Fed.Rules Civ.Proc.Rule 12(b)(3), 28 U.S.C.A.

8 Cases that cite this headnote

[3]     **Contracts**
        ➡ Agreement as to place of bringing suit; forum selection clauses
        **Contracts**
        ➡ Agreements relating to actions and other proceedings in general

Anti-waiver provisions of United States securities law did not preclude enforcement of choice-of-law and choice-of-forum clauses found in general undertaking agreements between foreign underwriting exchange and American investors, providing for application of English law in English courts. Securities Act of 1933, § 14, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, § 29(a), 15 U.S.C.A. § 78cc(a).

2 Cases that cite this headnote

*Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (1998)

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

[4]　**Contracts**
　　🖙 Agreement as to place of bringing suit; forum selection clauses

　　**Contracts**
　　🖙 Agreements relating to actions and other proceedings in general

Enforceability of choice-of-law and choice-of-forum clauses found in general undertaking agreements between foreign underwriting exchange and American investors, providing for application of English law in English courts, was controlled by *Bremen* test, under which forum-selection clauses in international agreements are prima facie valid and should be enforced unless enforcement is shown by resisting party to be unreasonable under the circumstances.

18 Cases that cite this headnote

[5]　**Contracts**
　　🖙 Agreement as to place of bringing suit; forum selection clauses

　　**Contracts**
　　🖙 Agreements relating to actions and other proceedings in general

Court will invalidate forum selection or choice-of-law clause in international agreement when enforcement would contravene strong public policy of the forum in which suit is brought.

52 Cases that cite this headnote

[6]　**Contracts**
　　🖙 Presumptions and burden of proof

　　**Contracts**
　　🖙 Weight and sufficiency

Forum-selection and choice-of-law clauses are presumptively valid where underlying transaction is fundamentally international in character, but this presumption of validity may be overcome by clear showing that clauses are unreasonable under the circumstances.

14 Cases that cite this headnote

[7]　**Contracts**

　　🖙 Agreement as to place of bringing suit; forum selection clauses

　　**Contracts**
　　🖙 Agreements relating to actions and other proceedings in general

Forum-selection and choice-of-law clauses in international agreements will be found unreasonable under the circumstances, and thus unenforceable, only when: (1) their formation was induced by fraud or overreaching; (2) plaintiff effectively would be deprived of its day in court because of inconvenience or unfairness of chosen forum; (3) fundamental unfairness of chosen law would deprive plaintiff of remedy; or (4) enforcement of such provisions would contravene strong public policy.

75 Cases that cite this headnote

[8]　**Federal Civil Procedure**
　　🖙 Fraud, mistake and condition of mind

Domestic investors in foreign underwriting exchange did not meet rigorous standard for pleading fraud, as necessary to invalidate choice-of-law and choice-of-forum clauses found in general undertaking agreements between exchange and investors, based on investors' allegations that exchange tricked and fraudulently induced investors to sign forum selection clause by stating that purpose was to bring agreements into line with new legislation governing the exchange, since statement accurately referred to substantive contract provisions requiring compliance with such legislation.

2 Cases that cite this headnote

[9]　**Federal Civil Procedure**
　　🖙 Fraud, mistake and condition of mind

Domestic investors in foreign underwriting exchange did not meet rigorous standard for pleading fraud, as necessary to invalidate choice-of-law and choice-of-forum clauses found in general undertaking agreements between exchange and investors, based on investors' allegations that exchange tricked and fraudulently induced investors to sign forum

**Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)**

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

selection clause by stating that new premiums trust deed would incorporate new provisions which were mainly of technical nature, and would not affect investors greatly on day to day basis, since choice clauses were contained in wholly separate agreement from premiums trust deed.

1 Cases that cite this headnote

[10]    **Contracts**
        ☛ Agreement as to place of bringing suit; forum selection clauses

        **Contracts**
        ☛ Agreements relating to actions and other proceedings in general

        Court will invalidate choice-of-law or choice-of-forum clause in international agreement, on basis of fraud, only if inclusion of that clause in contract was product of fraud or coercion.

        6 Cases that cite this headnote

[11]    **Contracts**
        ☛ Agreement as to place of bringing suit; forum selection clauses

        **Contracts**
        ☛ Agreements relating to actions and other proceedings in general

        English law provided remedies adequate to address complaints of aggrieved American investors in British underwriting exchange, alleging various securities registration violations by exchange, and, thus, inadequacy of remedies did not provide basis for invalidating choice-of-law and choice-of-forum clauses found in parties' general undertaking agreements; while United States securities laws would provide investors with greater variety of defendants and greater chance of success due to lighter scienter and causation requirements, English law was not fundamentally unfair. Securities Act of 1933, §§ 5, 12, 15, 15 U.S.C.A. §§ 77e, 77l, 77o; Securities Exchange Act of 1934, §§ 10(b), 20, 15 U.S.C.A. §§ 78j(b), 78t.

        1 Cases that cite this headnote

[12]    **Contracts**
        ☛ Agreement as to place of bringing suit; forum selection clauses

        **Contracts**
        ☛ Agreements relating to actions and other proceedings in general

        Courts will not invalidate choice-of-law and choice-of-forum clauses in international agreements simply because remedies available in contractually chosen forum are less favorable than those available in courts of the United States, but, rather, courts will declare choice clauses unenforceable only when remedies available in chosen forum are so inadequate that enforcement would be fundamentally unfair.

        16 Cases that cite this headnote

[13]    **Contracts**
        ☛ Ousting Jurisdiction or Limiting Powers of Court

        **Contracts**
        ☛ Agreement not to sue or to withdraw from suit

        Choice-of-law and choice-of-forum clauses found in general undertaking agreements between foreign underwriting exchange and American investors, providing for application of English law in English courts, were not rendered unenforceable as in contravention of strong public policy, expressed in anti-waiver provisions of United States securities laws, that substantive remedies be available for securities violations, since English law provided adequate remedies to vindicate policies underlying U.S. securities law. Securities Act of 1933, § 14, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, § 29(a), 15 U.S.C.A. § 78cc(a).

        2 Cases that cite this headnote

[14]    **Contracts**
        ☛ Legal remedies and proceedings

        Spouses of American investors in foreign underwriting exchange were bound by choice-of-law and choice-of-forum clauses found in general undertaking agreements

between exchange and investors, providing for application of English law in English courts, since interests of the spouses, who signed letters of credit to provide collateral for investors but did not sign general undertaking, were completely derivative of those of the investors, and thus were directly related to, if not predicated upon, investors' interests.

15 Cases that cite this headnote

**[15]** **Contracts**
  👉 Legal remedies and proceedings

To bind non-party to forum selection clause, party must be closely related to the dispute such that it becomes foreseeable that it will be bound.

69 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1287** Sharon L. Wolfe, Cooper & Wolfe, Miami, FL, for Plaintiffs–Appellants.

Jon W. Zeder, Adorno & Zeder, P.A., Miami, FL, Harvey L. Pitt, Debra Torres, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendants–Appellees.

Eric Summergrad, Leslie Smith, Washington, DC, for Amicus Curiae Securities & Exchange Commission.

Appeal from the United States District Court for the Southern District of Florida.

Before HATCHETT, Chief Judge, BLACK, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

**Opinion**

KRAVITCH, Senior Circuit Judge:

In this appeal, we are confronted with the important question of whether the anti-waiver provisions of the United States securities laws preclude enforcement of certain choice-of-law and forum-selection clauses ("choice clauses") in international agreements. Although we recognize that it is a close question, we follow the weight of circuit authority and conclude that the choice clauses are enforceable despite the anti-waiver provisions. In addition, we conclude that

the agreements in this case satisfy scrutiny for fundamental fairness and do not contravene public policy. Finally, we conclude that Irmgard, Mitchell, Charles, and Barbara Lipcon (collectively, "appellants" or "the Lipcons") are all bound by their agreement with Underwriters at Lloyd's London ("Lloyd's"). Accordingly, we **\*1288** affirm the district court's decision to dismiss the Lipcons' complaint against Lloyd's.

## I.

Lloyd's is a large insurance market in which more than three hundred Underwriting Agencies compete for underwriting business. Pursuant to the British Lloyd's Acts of 1871 and 1982, Lloyd's oversees and regulates the competition for underwriting business in the insurance market; according to the *amicus curiae* brief of the British Government, Lloyd's "has statutory powers granted by Parliament to regulate the affairs of the international insurance market in London...."[1] Lloyd's itself, however, does not accept premiums or insure risks. Instead, Underwriting Agencies, which act as syndicates, compete for the insurance business. Each Underwriting Agency is controlled by a Managing Agent, who is responsible for the financial status of its agency. The Managing Agent must attract not only underwriting business from brokers but also the capital with which to insure the risks that are underwritten.

Managing Agents recruit "Names" to provide the underwriting capital. A Name becomes a Member of the Society of Lloyd's through a series of agreements, proof of financial means, and the deposit of an irrevocable letter of credit in favor of Lloyd's. By becoming a Member, a Name obtains the right to participate in the Lloyd's Underwriting Agencies. The Names, however, do not deal directly with Lloyd's or with the Managing Agents. Instead, the Names are represented by Members' Agents, who, pursuant to agreement, act as fiduciaries for the Names. Upon becoming a Name, an individual selects the underwriting agencies in which he wishes to participate. The Names generally join more than one underwriting agency in order to spread their risks across different types of insurance. In large part because of the experience of the Members' Agents, Names generally rely on the advice of their Members' Agents in deciding which syndicates to invest. Selecting well is of the utmost financial importance because a Name is responsible for his share of an agency's losses.

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

In addition to providing the indicia of financial security mentioned above, to become a Name one must travel to England to acknowledge the attendant risks of participating in a syndicate by signing a standard-form "General Undertaking." The General Undertaking is a two-page document containing the choice clauses that form the basis for this dispute. The choice clauses provide:

The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.

Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/ or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding ... arising out of or relating to such matters shall be brought in such courts.... [2]

Irmgard and Mitchell Lipcon are Names who entered into underwriting agreements, and Charles and Barbara Lipcon, who signed letters of credit to provide collateral for the Names, are their spouses. Irmgard and Mitchell first became Names in 1983 and 1984, respectively, and in 1986 signed a revised General Undertaking that contains the choice clauses set out above.

After it became clear that the Names would be responsible for massive losses for asbestos and pollution claims, appellants brought suit in United States District Court for the Southern District of Florida alleging that: (1) Lloyd's actively sought investors from the United States to fill an urgent need to build up capital; (2) concealed information regarding the possible consequences of the risks undertaken; and (3) deliberately and disproportionately exposed the Names to massive liabilities for which sufficient underwriting **1289 capital or reinsurance was not available. The Lipcons stated claims under the Securities Act of 1933, §§ 5, 12(1), & 15, 15 U.S.C. §§ 77e, 77l, & 77o; the Securities Exchange Act of 1934, §§ 10(b) & 20, 15 U.S.C. §§ 78j & 78t; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; and various provisions of Florida law. The district court granted the motion to dismiss brought by Lloyd's, finding that the choice clauses are enforceable and preclude litigation arising out of the Lipcons' agreement

with Lloyd's in United States courts. In addition, the district court concluded that Charles and Barbara Lipcon, who signed letters of credit in favor of Lloyd's but never entered into any agreement with Lloyd's, are bound by the choice clauses.

As in numerous similar cases in the courts of appeals involving these choice clauses, "[t]his appeal does not address the merits of the underlying claims. It addresses only the Names' contention that their disputes with Lloyd's should be litigated in the United States despite contract clauses binding the parties to proceed in England under English law." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998).

## II.

As a preliminary matter, we note that some uncertainty exists as to both the appropriate vehicle for motions to dismiss on the basis of forum-selection clauses and the proper standard of review for district court decisions granting such motions to dismiss. *See Haynsworth v. Lloyd's of London,* 121 F.3d 956, 961 & n.8 (5th Cir.1997) (citing cases); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 (2d ed. Supp. 1998). In the case before us, Lloyd's styled its motion as a Rule 12(b)(3) motion to dismiss for improper venue. *See* Fed.R.Civ.P. 12(b)(3).

The Ninth Circuit has treated such motions as motions brought pursuant to Fed.R.Civ.P. 12(b)(3) to dismiss for lack of venue, *see Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998); *cf. Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 207 (7th Cir.1993) (affirming district court's grant of defendant's Rule 12(b)(3) motion to dismiss for improper venue in case involving forum-selection clause); *Commerce Consultants Int'l v. Vetrerie Riunite,* 867 F.2d 697, 698 (D.C.Cir.1989) (same), and has reviewed district court decisions to enforce forum-selection and choice-of-law clauses for abuse of discretion, *see id.; accord Sun World Lines, Ltd. v. March Shipping Corp.,* 801 F.2d 1066, 1068 & n.3 (8th Cir.1986). The Second Circuit, on the other hand, has treated such motions as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See AVC Nederland B.V. v. Atrium Inv. Partnership,* 740 F.2d 148, 153 & n.8 (2d Cir.1984). Finally, several circuits have avoided resolving the issue of the appropriate form of pleading for a motion to dismiss based upon choice clauses and instead have held simply that "the enforceability of a forum selection clause is a question of law reviewable *de novo.*" *Haynsworth,* 121

Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

F.3d at 961;*see id.* (electing not to reach "the considerably more enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under Fed.R.Civ.P. 12(b)(1), 12(b)(3), or 12(b)(6), or 28 U.S.C. § 1406(a)"); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1229 (6th Cir.1995); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.1992) (noting that "[a] motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3)," but failing to resolve issue).

**[1]**   In our view, motions to dismiss based upon forum-selection clauses ordinarily are not properly brought pursuant to Rule 12(b)(1), which permits motions to dismiss for lack of subject matter jurisdiction, because the basis upon which the defendants seek dismissal—namely, that the agreement of the parties prohibits the plaintiff from bringing suit in the particular forum—is unrelated to the actual basis of federal subject matter jurisdiction—namely, federal question jurisdiction or diversity of citizenship, as the case may be. In the case before us, appellants stated claims under, *inter alia,* the federal securities laws, a sufficient basis for federal subject matter jurisdiction that is not affected **\*1290** by the parties' agreement to litigate elsewhere. *See, e.g., Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Blue Cross & Blue Shield of Ala. v. Sanders,* 138 F.3d 1347, 1352 (11th Cir.1998) (noting that under *Bell,* "a federal court may dismiss a federal question claim for lack of subject matter jurisdiction only if: (1) 'the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'; or (2) 'such a claim is wholly insubstantial and frivolous' ") (quoting *Bell,* 327 U.S. at 682–83, 66 S.Ct. at 776) (emphasis omitted); *Central Contracting Co. v. Maryland Cas. Co.,* 367 F.2d 341, 345 (3d Cir.1966) (stating that a forum-selection clause "does not oust the jurisdiction of the courts; in effect it merely constitutes a stipulation in which the parties join in asking the court to give effect to their agreement by declining to exercise its jurisdiction"). Instead, we hold that motions to dismiss upon the basis of choice-of-forum and choice-of-law clauses are properly brought pursuant to Fed.R.Civ.P. 12(b)(3) as motions to dismiss for improper venue.

We are aware that the First Circuit has treated motions to dismiss upon the basis of forum selection clauses as Rule 12(b)(6) motions urging dismissal for failure to state a claim upon which relief can be granted. *See Lambert v. Kysar,* 983 F.2d 1110, 1112 n.1 (1st Cir.1993); *LFC Lessors, Inc. v Pacific Sewer Maintenance,* 739 F.2d 4, 6–7 (1st Cir.1984). Although we perceive no significant doctrinal error in that approach, we consider Rule 12(b)(3) a more appropriate vehicle through which to assert the motion to dismiss. We find support for this conclusion in the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 2245, 101 L.Ed.2d 22 (1988), in which the Court held that 28 U.S.C. § 1404(a), which vests in the district court discretion to transfer a civil action to "any other district or division where it might have been brought," controls the request of a party in a diversity suit to give effect to a contractual forum-selection clause by transferring the action. Although the Supreme Court did not decide the precise question presented in the case before us, the Court's conclusion that the federal transfer-of-*venue* statute governs district court decisions in enforcing forum-selection clauses provides support for our view that motions to dismiss based upon forum-selection clauses are cognizable as motions to dismiss for improper venue. *See* 487 U.S. at 29–30, 108 S.Ct. at 2244 ("The flexible and individualized analysis Congress prescribed in § 1404(a) thus encompasses consideration of the parties' private expression of their *venue* preferences.") (emphasis added); *see also* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (2d ed. 1986 & Supp. 1998) (discussing forum-selection clauses as "Contractual Modification" of venue).[3]

**[2]**   Although ordinarily we review "the dismissal of a lawsuit for improper venue under the standard of abuse of discretion," *Home Ins. Co. v. Thomas Indus., Inc.,* 896 F.2d 1352, 1355 (11th Cir.1990), we conclude that there is good reason to treat district court decisions regarding the enforceability of forum-selection and choice-of-law provisions in international agreements as decisions of law reviewable *de novo.* Not only do such decisions at times require interpretation of the provisions of a contract— determinations that we review *de novo, see, e.g., Zaklama v. Mt. Sinai Med. Center,* 906 F.2d 650, 652 (11th Cir.1990)—but such decisions also, at least in the context of international agreements, require a complex analysis of fundamental fairness and public policy, *see infra,* section III —determinations that are quintessentially legal. We therefore hold that the enforceability of forum-selection and choice- **\*1291** of-law provisions in international agreements are questions of law that we review *de novo.*

Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

## A.

We note at the outset that although this circuit has not yet ruled on the validity of the Lloyd's choice clauses at issue in this case, we do not write on a clean slate. Thus far, the Second,[4] Fourth,[5] Fifth,[6] Sixth,[7] Seventh,[8] Ninth,[9] and Tenth[10] Circuits have addressed the enforceability of the precise choice clauses that we confront today, and although the reasoning of those courts has not been uniform, all seven courts of appeals have concluded that the clauses are valid and enforceable. *See generally* D. Hall, Note, *No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Laws in International Transactions,* 97 Colum. L.Rev. 57, 68 (1997).

## B.

**[3]**   Appellants' first argument is that the choice clauses, which make United States law inapplicable to disputes arising between them and Lloyd's, are unenforceable under the anti-waiver provisions of the United States securities laws. The Securities Act of 1933 provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. § 77n. The Securities Exchange Act of 1934 contains a similar provision. *See* 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."). According to the Securities and Exchange Commission ("SEC"), which filed an *amicus curiae* brief, "These provisions are essential to the enforcement of the securities laws in that they prevent persons from avoiding their obligations under those laws through the simple expedient of requiring investors to waive their rights under those laws as a condition to engaging in securities transactions."[11]

The district court rejected appellants' and the SEC's argument that the anti-waiver provisions categorically render unenforceable the choice clauses in the Lipcons' contract. Instead, the district court reviewed the clauses under the framework for evaluating choice provisions in international agreements first announced in *M.S Bremen v. Zapata Off Shore Co..* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513

(1972). In *Bremen,* an admiralty case that did not involve the securities laws, the Court enforced a choice-of-forum clause that required litigation in the courts of London. Because "[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts," *id.* at 9, 92 S.Ct. at 1913, the Court concluded that forum-selection clauses in international agreements "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances," *id.* at 10, 92 S.Ct. at 1913;*see id.* at 15. 92 S.Ct. at 1916 ("[I]n the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside."). Although the contract at issue in *Bremen* provided for a forum in **\*1292** which to litigate, as opposed to the substantive law that would apply to, any dispute, the Court noted that the choice-of-forum clause likely would have the effect of a choice-of-law clause:

> [I]t is the general rule in English courts that the parties are assumed, absent contrary indications, to have designated the forum with the view that it should apply its own law.... It is therefore reasonable to conclude that the forum choice clause was also an effort to obtain certainty as to the applicable substantive law.

*Id* at 14 n.15, 92 S.Ct. at 1915 n.15.

In giving content to *Bremen* 's "strong showing" standard for invalidating international choice-of-forum clauses, courts have announced that those provisions will be found "unreasonable under the circumstances," *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotations omitted), and thus unenforceable only when: (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provisions would contravene a strong public policy. *See Carnival Cruise Lines. Inc. v. Shute,* 499 U.S. 585, 594–95, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Bremen,* 407 U.S. at 15 -18, 92 S.Ct. at 1916–17;*Roby v. Corporation of Lloyd's,* 996 F.2d 1353. 1363 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). Applying this test (hereinafter "the

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

*Bremen* test"), the district court concluded that the choice clauses in this case are enforceable.

Appellants and the SEC contend that the *Bremen* test is inapplicable when Congress has spoken directly as to whether it is permissible to waive United States statutory remedies. They argue that to apply the *Bremen* test—which requires courts to assess public policy, *see Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision.")—is tantamount to treating "the anti-waiver provisions [of the securities laws] as merely reflecting a Congressional direction to the courts to decide whether 'the public policies incorporated into' the securities laws would be undermined." [12] This approach is incorrect, the SEC argues, because "[t]he anti-waiver provisions ... are not simply an expression of public policy that favors the United States securities laws unless other comparable laws are available. Rather, they are an express and unequivocal directive that the rights and obligations under the securities laws cannot be waived." [13] *See also Richards v. Lloyd's of London,* 135 F.3d 1289, 1297–98 (9th Cir.1998) (Thomas, J., dissenting).

**[4]**   Although appellants' argument finds strong support in the plain language of the anti-waiver provisions, which facially admit of no exceptions, precedent and policy considerations compel us to conclude that *Bremen* 's framework for evaluating choice clauses in international agreements governs this case. We turn first to an examination of Supreme Court precedent.

### 1.

In *Scherk v. Alberto-Culver Co*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), "the Supreme Court explicitly relied on *Bremen* in a case involving a securities transaction." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1293 (9th Cir.1998). *Scherk* involved an international transaction to sell a company, where that transaction was based upon a contract that included arbitration and choice-of-law clauses that provided for the application of Illinois law by an arbitrator in France. When the deal soured, one of the parties challenged the enforceability of the arbitration provision. In enforcing the provisions, the Court relied in large part upon the nature of international agreements:

[I]n the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, **\*1293** concerning the law applicable to the resolution of disputes arising out of the contract. Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction.

*Scherk*. 417 U.S. at 516, 94 S.Ct. at 2455;*see id.* at 516–17, 94 S.Ct. at 2456 ("A parochial refusal by the courts of one country to enforce an international arbitration agreement would ... invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.").

We recognize that *Scherk* differed from the case before us in that the choice clause before the Court in *Scherk* provided, by designating Illinois law as the governing law, for the application of United States securities law, *see id.* at 519 n.13, 94 S.Ct. at 2457 n.13 ("Under some circumstances, the designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction. In this case, however, 'the laws of the State of Illinois' were explicitly made applicable to the arbitration agreement."), and thus that the Court in *Scherk* had no opportunity to decide if an international choice-of-law provision is enforceable if it conflicts with the anti-waiver provisions of the United States securities laws. Nevertheless, the Court's statement in *Scherk* that a choice-of-forum clause is "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction," 417 U.S. at 516, 94 S.Ct. at 2455, combined with the Court's observation that a forum-selection clause "might also be viewed as implicitly selecting the law of that place to apply to that transaction," *id.* at 519 n.13, 94 S.Ct. at 2457 n.13;*see also Bremen,* 407 U.S. at 13 n.15, 92 S.Ct. at 1915 n.15 (noting that in light of English law, it is "reasonable to conclude that the forum clause was also

an effort to obtain certainty as to the applicable substantive law"), indicates that international agreements—even those that render United States securities law inapplicable—are *sui generis.* [14]

Appellants nevertheless point our attention to a line of Supreme Court cases that they contend indicate the Court's disapproval of choice provisions that waive the substantive protections of United States law. Supreme Court precedent, however, does not resolve the precise issue presented in this case: namely, whether an *international* agreement may, through the interaction of choice-of-*forum* and choice-of-*law* clauses, prospectively waive the protections of the United States securities laws.

Appellants claim that the Court in *Mitsubishi Motors Corp. v Soler Chrysler -Plymouth,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), indicated its unwillingness to permit choice provisions to eliminate United States statutory remedies. In *Mitsubishi,* the Court held that the Sherman Act did not render unenforceable a forum-selection provision in an international agreement, because "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the *substantive* rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 628, 105 S.Ct. at 3354 (emphasis added); *see id.* at 637, 105 S.Ct. at 3359 ("[S]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."). Appellants rely in particular on the Court's statement that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue the statutory remedy for antitrust violations, we would have little hesitation in condemning the agreement as **\*1294** against public policy." *Id.* at 637 n.19, 105 S.Ct. at 3359 n.19. In *Mitsubishi,* however, the Court was not confronted with the scope of the anti-waiver provisions of the United States securities laws. *See id.* at 616, 105 S.Ct. at 3348 ("The principal question presented by these cases is the arbitrability, pursuant to the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of claims arising under the Sherman Act and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.") (internal citations omitted). More important, the Court in *Mitsubishi* recognized and affirmed *Scherk* 's policy of treating international commercial agreements as *sui generis. See Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355

("As in *Scherk*..., we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in the domestic context.").

Appellants rely as well upon *Shearson/American Express, Inc., v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), in which the Court held that the anti-waiver provision of the Securities Exchange Act of 1934 did not render an arbitration agreement unenforceable, because "[b]y its terms, [section 78cc(a)] only prohibits waiver of the *substantive* obligations imposed by the Exchange Act." *Id.* at 288, 107 S.Ct. at 2338 (emphasis added); *see also Rodriguez de Quijas v. Shearson/American Express, Inc.* 490 U.S. 477, 485–86, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989) (holding that arbitration clause was not invalid under anti-waiver provisions of Securities Act; stating that "[o]ur conclusion is reinforced by our assessment that resort to the arbitration process does not inherently undermine any of the *substantive* rights afforded to petitioners under the Securities Act") (emphasis added). *McMahon,* however, involved the enforceability of an arbitration clause in a *domestic* securities agreement. Although appellants contend that *McMahon* makes clear the Court's categorical unwillingness to permit waiver of the substantive remedies of the securities laws, we do not think that *McMahon* controls the case before us. As stated above, the Court consistently has treated "truly international agreements," *Scherk,* 417 U.S. at 515, 94 S.Ct. at 2455, differently than domestic transactions, which indisputably are subject to the anti-waiver provisions of the securities laws, *see McMahon,* 482 U.S. at 230, 107 S.Ct. at 2339.

Supreme Court precedent thus suggests that the enforceability of choice clauses in international agreements should be determined by a framework designed specifically for the international commercial context. Because the Supreme Court has not ruled on whether the anti-waiver provisions of the United States securities laws categorically render unenforceable choice-of-law clauses in international agreements, however, we turn to policy considerations.

**2.**

Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

Underlying the Supreme Court's conclusions in *Bremen* and *Scherk* were two main concerns: (1) ensuring "the orderliness and predictability [that are] essential to any international business transaction," *Scherk,* 417 U.S. at 516, 94 S.Ct. at 2455;*see Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 (stating importance of "present-day commercial realities and expanding international trade"), and (2) furthering international comity, *see Scherk,* 417 U.S. at 516, 94 S.Ct. at 2456 (condemning "parochial refusal[s] by the courts of one country to enforce ... international agreement[s]"); *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1913 ("We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."). *See also Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355 (relying on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes....").

To conclude that the anti-waiver provisions of the United States securities laws categorically **\*1295** preclude sophisticated parties from entering into international agreements—agreements that by definition involve parties and subject matter that would be subject to the laws of more than one nation if the parties did not contract *ex ante* for provisions governing choice of forum and choice of law—would undermine both policies upon which *Bremen* and *Scherk* were based. As the Ninth Circuit has observed, appellants' assertion that the statutory anti-waiver provisions categorically invalidate the choice clauses in the agreement with Lloyd's would, if correct, expand the reach of United States securities law to "any and all such transactions, no matter how remote from the United States." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1293 (9th Cir.1998); *see also Allen v. Lloyd's of London,* 94 F.3d 923, 929 (4th Cir.1996) ("[W]e do not believe that Congress intended that the disclosure requirements of the United States securities law be exported and imposed as governing principles on markets conducted entirely in other countries simply because membership in such markets is solicited in the United States.").

[5]   We also find in the content of the *Bremen* test itself support for our conclusion that the anti-waiver provisions of the United States securities laws do not preclude application of the *Bremen* test to determine the validity of the choice clauses. A court will invalidate a choice clause in an international agreement when "enforcement would contravene a strong public policy of the forum in which the suit is brought...." *Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916;*see infra* section III.C; *Richards,* 135 F.3d at 1293;*Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993). Thus, "[i]n *Bremen* itself, the Supreme Court contemplated that a forum selection clause may conflict with relevant statutes." *Richards,* 135 F.3d at 1293.

Although we do not deny that there is some force to appellants' argument that the anti-waiver provisions preclude application of the *Bremen* test, we believe that to invalidate the choice provisions for that reason in effect would be to conclude that "the reach of the United States securities laws [is] unbounded," *Richards,* 135 F.3d at 1293, and to ignore the Supreme Court's caveat that "[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts," *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1913. Because we are unwilling so to conclude, we hold that the anti-waiver provisions of the United States securities laws do not categorically render unenforceable the Lloyd's choice clauses, and we join the seven other courts of appeals that have addressed the issue in holding that the *Bremen* test controls our resolution of the enforceability of the Lloyd's choice clauses. *See Richards,* 135 F.3d at 1292–94;*Haynsworth v. The Corporation, a/k/a Lloyd's of London,* 121 F.3d 956, 962 (5th Cir.1997); *Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir.1996); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1229–30 (6th Cir.1995); *Bonny v. Society of Lloyd's,* 3 F.3d 156, 159 (7th Cir.1993), *cert. denied,*510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1362–63 (2d Cir.), *cert. denied,*510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 957 (10th Cir.), *cert. denied,*506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

### III.

Appellants contend on appeal that even if the anti-waiver provisions of the United States securities laws do not *per se* invalidate the choice clauses, the district court erred in concluding that the *Bremen* test was satisfied and that the choice clauses in this case are enforceable. We disagree and conclude that the district court correctly applied the *Bremen* test.

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

[6]   [7]   As noted *supra,* section II.B, forum-selection and choice-of-law clauses "are presumptively valid where the underlying transaction is fundamentally international in character." *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1362 (2d Cir.) (citing *Bremen,* 407 U.S. at 15, 92 S. Ct. at 1916),*cert. denied,*510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). "This presumption of validity may be overcome, however, by a clear showing that the clauses are 'unreasonable under the circumstances.' " *Roby,* 996 F.2d at 1363 (quoting *1296 *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotation omitted)). Choice clauses will be found "unreasonable under the circumstances," *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotations omitted), and thus unenforceable only when: (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 594–95, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Bremen,* 407 U.S. at 15–18, 92 S.Ct. at 1916–17;*Roby,* 996 F.2d at 1363. Appellants contend that the choice clauses in this case are unreasonable under the first, third, and fourth *Bremen* factors.

### A.

Appellants first contend that the choice clauses were the product of fraud and overreaching. The only specific allegation in the complaint of fraud is that Lloyd's "tricked and fraudulently induced [the Lipcons] to sign on or about Nov. 5, 1986 a forum selection clause" by making "fraudulent statements" that included the following:

> The purpose, in both instances, is to bring the agreements into line with ... the new Lloyd's legislation.

* * * * * *

> The new Premiums Trust Deed will incorporate some new provisions which are mainly of a technical nature, and will not affect you greatly on a day to day basis.[15]

Appellants contend that allegation of these statements is sufficient to invalidate the choice clauses.

In *Scherk,* the Court stated:

In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud...." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.

417 U.S. at 519 n.14, 94 S.Ct. at 2457 n.14 (emphasis in original) (internal citations omitted). By requiring the plaintiff specifically to allege that the choice clause itself was included in the contract due to fraud in order to succeed in a claim that the choice clause is unenforceable, courts may ensure that more general claims of fraud will be litigated *in the chosen forum,* in accordance with the contractual expectations of the parties.

[8]   We conclude that the allegations in the Lipcons' complaint are insufficient to satisfy *Scherk* 's rigorous standard for pleading fraud. The first alleged statement by Lloyd's (or, presumably, by an agent of Lloyd's)—that "[t]he purpose, in both instances, is to bring the agreements into line with ... the new Lloyd's legislation"[16]—is in no way fraudulent or misleading. Indeed, the General Undertaking, which the Lipcons signed on the day that Lloyd's allegedly made this statement, specifically provides that "[t]hroughout the period of his membership of Lloyd's the Member shall comply with the provisions of Lloyd's acts 1871– 1982 [and] any subordinate legislation made or to be made thereunder...."[17] An allegation that the defendant made a statement that accurately brings to the attention of the plaintiff the substantive provisions of the contract is insufficient to support a claim that the choice clauses were included in the contract as a result of fraud.

[9]   [10]   The second allegedly fraudulent statement—that "[t]he new Premiums Trust *1297 Deed will incorporate some new provisions which are mainly of a technical nature, and will not affect you greatly on a day to day basis"— likewise fails to satisfy *Scherk* 's standard. Appellants contend that the insertion of the choice clauses in the General Undertaking was a change of more than simply "a technical nature" and that the statement thus was misleading and fraudulent. According to the original agreement, which was signed in October 1984 by Mitchell Lipcon and Lloyd's, the Premiums Trust Deed governs the disposition of "[a]ll

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

premiums and other moneys collected on behalf of the Name" and provides that all such funds "shall be held upon the trusts declared in the Trust Deed."[18] An allegation that the Lipcons were induced—even fraudulently induced—to make changes in the Premiums Trust Deed is insufficient to support a claim that the choice clauses, which are contained in a *separate* agreement (the General Undertaking), were induced by fraud. As stated above, this court will invalidate a choice clause only if "the *inclusion of that clause in the contract* was the product of fraud or coercion." *Scherk,* 417 U.S. at 519 n.14, 94 S.Ct. at 2457 n.14 (emphasis in original). Appellants have not satisfied this standard.

## B.

**[11]** Appellants also contend that the remedies provided by English law are inadequate. They argue that no cause of action exists under the laws of England analogous to an action under Section 12(1) of the Securities Act of 1933 for securities registration violations. *See Bonny v. Society of Lloyd's,* 3 F.3d 156, 162 (7th Cir.1993), *cert. denied,*510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994). Appellants also contend that their remedies under English law for misrepresentations made in connection with the sale of a security are inferior to those available under Section 12(2) of the Securities Act of 1933 because Section 14 of the Lloyd's Act of 1982 immunizes Lloyd's from any claims under the English Misrepresentations Act, absent a showing of bad faith. Finally, appellants assert that Lloyd's is immune from liability under England's Financial Services Act of 1986, which provides private remedies for fraud in connection with securities transactions, and that unlike United States securities law, *see*15 U.S.C. § 77o, English law does not recognize controlling person liability.

**[12]** We have little doubt that "the United States securities laws would provide [appellants] with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements...." *Roby,* 996 F.2d at 1366. We will not invalidate choice clauses, however, simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States. Instead, we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair. *See Carnival Cruise Lines, Inc v Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Roby,* 996 F.2d at 1360–61 ("In the absence of

other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."); *Riley v. Kingsley Underwriting Agencies, Ltd,* 969 F.2d 953, 958 (10th Cir.), *cert. denied,*506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992) ("The fact that an international transaction may be subject to laws and remedies different and less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair.").

Like the seven other courts of appeals that have addressed this issue, we hold that English law provides remedies adequate to address the complaints of the aggrieved Names. Although Section 14 of the Lloyd's Act of 1982 exempts Lloyd's, its officers, and its employees from liability under the English Misrepresentations Act, no other entities within Lloyd's—such as the Members' Agents and Managing Agents, both of whom owe a fiduciary duty to the Names—are exempt. **\*1298** *See Roby,* 996 F.2d at 1365; *Richards,* 135 F.3d at 1296 ("The Names have recourse against both the Member and Managing Agents for fraud, breach of fiduciary duty, or negligent misrepresentation.") (citing *Arubuthnott v. Fagan and Feltrim Underwriting Agencies, Ltd.,* 3 Re LR 145 (H.L.1994)); *Shell v. R.W Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995) (noting that "England's highest appellate court recently upheld a lower court's ruling that Members' Agents can be contractually liable for negligent underwriting by the Managing Agents who run the insurance syndicates at Lloyd's") (citing *Deeny v. Gooda Walker Ltd.,* slip op. (Q.B. Div'l Ct. Apr. 12, 1994), *appeal dismissed,* slip op. (H.L. July 25, 1994)). In addition, even Lloyd's itself is not immune from liability if appellants can make a credible showing of bad faith. We therefore conclude that the contractually chosen law is not fundamentally unfair and thus does not provide a basis upon which to deny enforcement of the choice clauses.

## C.

**[13]** Appellants argue that enforcement of the choice clauses would contravene a strong public policy, namely the policy expressed in the anti-waiver provisions of the United States securities laws that substantive remedies be available for securities violations. We already have rejected appellants' argument that the anti-waiver provisions categorically render invalid the choice clauses. *See supra* section II.B. We now must decide whether enforcement of the choice clauses,

Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

which would require appellants to litigate in England under English remedies, would undermine the public policies more generally expressed in the United States securities laws. In so doing, we are mindful that at least one commentator has criticized the decisions of some other courts of appeals on the ground that the public policy inquiry "necessitates an exploration of foreign legal regimes about which U.S. courts are likely to know little or nothing" and requires courts to "determine which of two incommensurables is greater." *See* D. Hall, Note, *No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Laws in International Transactions,* 97 Colum. L.Rev. 57, 83 (1997). Nevertheless, we cannot avoid our duty to ensure, by determining whether enforcement of the choice clauses would contravene public policy, that enforcement of the choice clauses is not "unreasonable under the circumstances." *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913 (internal quotation omitted).

Although we share the concern of the Second and Seventh Circuits that "the contract clauses may operate 'in tandem' as a prospective waiver of the statutory remedies for securities violations," *Roby,* 996 F.2d at 1364 (quoting *Mitsubishi Motors Corp v. Soler Chrysler -Plymouth,* 473 U.S. 614, 637 n.19, 105 S.Ct. 3346, 3359 n.19, 87 L.Ed.2d 444 (1985)); *accord Bonny,* 3 F.3d at 160–61, we agree with those courts and the other five circuits that have addressed the issue that enforcement of the Lloyd's choice clauses does not contravene public policy. We reach this conclusion in part for the reasons stated by the other courts of appeals and in part for the reasons stated in section III.B—that English remedies are adequate to provide redress for the alleged actions that gave rise to appellants' United States securities claims.

In *Roby* and *Bonny,* the Second and Seventh Circuits, respectively, concluded that "[t]he framers of the securities laws were concerned principally with reversing the common law rule favoring 'caveat emptor,' " *Roby,* 996 F.2d at 1364 (citing *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1025 n.51 (D.C.Cir.1978)), and accordingly that the United States securities laws embody the policies of "insuring full and fair disclosure by issuers and deterring the exploitation of United States investors," *Bonny,* 3 F.3d at 161. Appellants and the SEC do not disagree that the securities laws were intended to ensure disclosure and deter exploitation, but they argue that the Second and Seventh Circuits, as well as the district court in this case, ignored the compensatory function of private actions under the securities laws.

We agree with the SEC that private actions under the securities laws "serve as an important means of providing recompense to investors who have been harmed by wrongdoers." ***1299** [19] We are more confident than the SEC, however, that the compensatory policy underlying United States securities law will be vindicated by litigation in English courts under English law; this is especially so given our conclusion that English law provides adequate remedies to appellants in this case. *See supra,* section III.B. Because we conclude that "the available remedies and potential damage recoveries suffice to deter deception of American investors[,] to induce the disclosure of material information to investors," *Bonny,* 3 F.3d at 162, and to provide redress to aggrieved Names, we hold that the choice clauses satisfy the public-policy prong of the *Bremen* test. We thus conclude that the district court did not err in finding that the choice clauses are enforceable. [20]

## IV.

**[14]**   Finally, appellants argue that the district court erred in concluding that Charles and Barbara Lipcon, who signed letters of credit to provide collateral for their spouses but did not sign the General Undertaking, are so closely related to the dispute that they are bound by the choice clauses. We hold that the district court did not err and that the spouses must litigate their claims in English courts under English law, in accordance with the choice clauses.

**[15]**   "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993) (quoting *Manetti Farrow, Inc. v. Gucci Am.,* Inc., 858 F.2d 509, 514 n.5 (9th Cir.1988)); *see also Manetti- Farrow.* 858 F.2d at 514 n. 5 ("[A] range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses."). In *Hugel,* which involved a suit brought by a Name against Lloyd's, the Seventh Circuit affirmed the district court's finding that two non-signatory corporations were bound by the Name's assent to the Lloyd's choice clauses. *See*999 F.2d at 209–10. The district court based its finding upon the fact that the Name owned 99% of one corporation, which owned 100% of the other. *See id.* The court of appeals noted that "[w]hile it may be true that third-party beneficiaries to a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, a third-party beneficiary status is not required." *Id.* at 209-10

n.7;*cf. Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1297 (3d Cir.1996) (holding that a sister corporation that did not sign an arbitration agreement could not be bound by the agreement, but noting that if the "corporation's interests were directly related to, if not predicated upon, the [signatory's] conduct," the corporation would have been subject to agreement).

Because, as the district court found, the interests of the spouses in this dispute are completely derivative of those of the Name plaintiffs—and thus "directly related to, if not predicated upon" the interests of the Name plaintiffs, *see Dayhoff,* 86 F.3d at 1297—we affirm the district court's conclusion that the spouses are bound by the choice clauses.

**V.**

Our conclusion that the Lipcons are bound by the choice clauses does not in any way reflect our view of the merits of their substantive claims. We hold simply that the Lipcons must "honor [their] bargains," *Mitsubishi,* 473 U.S. at 640, 105 S.Ct. at 3361 (quoting *Alberto Culver Co. v Scherk,* 484 F.2d 611, 620 (7th Cir.1973) (Stevens, J., dissenting), *rev'd,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)), and attempt to vindicate their claims in the English courts under English law.

The judgment of the district court is AFFIRMED.

**Parallel Citations**

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

**Footnotes**

1   British Government Br. *Amicus Curiae* at 3.
2   R:1–8, Ex. B.
3   Unlike in *Stewart,* however, the federal statutory provisions governing transfer of venue from one United States District Court to another, *see* 28 U.S.C. § 1404(a) (providing that district court "may transfer any civil action to *any other district or division* where it might have been brought") (emphasis added); 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to *any district or division* in which it could have been brought.") (emphasis added), do not apply in cases that involve a forum-selection clause that requires litigation in another *country.*
4   *See Roby v. Corporation of Lloyd's,* 996 F.2d 1353 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).
5   *See Allen v. Lloyd's of London.* 94 F.3d 923 (4th Cir.1996).
6   *See Haynsworth v. The Corporation. a/k/a Lloyd's of London,* 121 F.3d 956 (5th Cir.1997).
7   *See Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995) (upholding choice clauses as basis for dismissing claims under Ohio securities laws).
8   *See Bonny v. Society of Lloyd's.* 3 F.3d 156 (7th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994).
9   *See Richards v. Lloyd's of London.* 135 F.3d 1289, 1292 (9th Cir.1998).
10  *See Riley v Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.), *cert. denied,* 506 U.S. 1021. 113 S.Ct. 658. 121 L.Ed.2d 584 (1992).
11  SEC Br. *Amicus Curiae* (hereinafter "SEC Br.") at 2.
12  SEC Br. at 14.
13  SEC Br. at 14.
14  We think it clear that the agreement in this case is "truly international," *Scherk,* 417 U.S. at 515. 94 S.Ct. at 2455, as that term was used in *Scherk.* In this case, the parties to the agreement are from different countries, the negotiations leading up to the agreement took place in the United States whereas the closing took place in England, and the subject matter of the transaction concerned investment in an international insurance market.
15  Second Am. Compl. at 3–4, ¶ 4.
16  It is not clear what the phrase "in both instances" refers to, but we assume *arguendo* that the phrase refers at least in part to the General Undertaking, as well as to the choice clauses specifically.
17  R:1–8, Ex. B.
18  R:1–8, Ex. C.
19  SEC Br. at 24.

**Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (1998)**

Fed. Sec. L. Rep. P 90,257, 11 Fla. L. Weekly Fed. C 1670

20  Our conclusion is not affected by appellants' pleading of a cause of action under RICO. *See Richards,* 135 F.3d at 1296 ("The addition of RICO claims does not alter our conclusion."); *Roby,* 996 F.2d at 1366 ("Although the remedies [in England] and disincentives [to deter English issuers from exploiting American investors] might be magnified by application of RICO, we cannot say that application of English law would subvert the policies underlying that statute.").

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

135 F.3d 1289
United States Court of Appeals,
Ninth Circuit.

Alan RICHARDS, et al., Plaintiffs–Appellants,
v.
LLOYD'S OF LONDON, an unincorporated
association, et al., Defendants–Appellees.
John R. NORTON, III; Doris S. Norton; Diane B.
Allison; Charles G. Bentzin; F.M. Binkley; Delmar
A. Brady; Samme Jo Brady; George Maning Close;
Russell M. Collins; Peter Dwares; Robert Flesvig;
Donald P. Gallop; Charles A. Gerlach, Jr.; Robert
W. Gerwig; Richard C. Henry; Michael C. Hirsh;
R. William Johnston; James H. Kayian; Joanne
S. Kayian–Olooney; Suzanne Kayian; Lowell
Conrad Lundell; Judith M. Ott; H.E. Rainbolt;
David L. Rosenblatt; Ray Morse Sanderson; Claire
Tillman; Warren G. Vander Voort; Peter Beck;
Harold Franz Ilg; John C. Griffin; Ted Kosloff;
Francis J. Milon; Glen R. Mogan; Melanie M.
Norton; Joseph F. Weller, Plaintiffs–Appellants,
v.
LLOYD'S OF LONDON, an unincorporated
association; CORPORATION OF LLOYD'S,
aka Society of Lloyd's, aka The Society and
Council of Lloyd's, Defendants–Appellees.

Nos. 95–55747, 95–56467.    |    Argued and
Submitted Oct. 23, 1997.    |    Decided Feb. 3, 1998.

American "External Names" in Lloyd's of London brought suit against Lloyd's of London and related entities alleging securities fraud, Racketeer Influenced and Corrupt Organizations Act (RICO), state blue sky law, breach of fiduciary duty, and common-law fraud causes of action. The United States District Court for the Southern District of California, Irma E. Gonzalez, J., dismissed claims on basis of forum selection and choice of law clauses contained in "general undertaking" between parties. Names appealed. The Court of Appeals ruled that forum selection and choice of law clauses were invalid, and rehearing en banc was granted. The Court of Appeals, Goodwin, Circuit Judge, held that: (1) antiwaiver provisions of federal securities statutes did not void choice of forum and choice of law provisions; (2) Public policy embodied in federal and state securities law and RICO did not invalidate provisions; (3) English law provided

adequate recourse to the Names; and (4) Names' general allegations of fraud did not void the provisions.

Affirmed.

Thomas, Circuit Judge, filed dissenting opinion in which Pregerson and Hawkins, Circuit Judges, joined.

West Headnotes (9)

[1]    **Federal Courts**
    🔑 Venue
    Court of Appeals reviews district court's decision to enforce choice clauses for abuse of discretion.

    1 Cases that cite this headnote

[2]    **Federal Courts**
    🔑 Securities regulation
    Whether federal securities laws void choice clauses is question of law that Court of Appeals reviews de novo.

    1 Cases that cite this headnote

[3]    **Securities Regulation**
    🔑 Contracts in violation of regulations
    Antiwaiver provisions of federal securities statutes did not void choice of forum and choice of law provisions calling for application of English law in international "general undertaking" agreements governing investment of American "Names" in Lloyd's syndicates. Securities Act of 1933, § 15, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, § 29(a), 15 U.S.C.A. § 78cc(a).

    2 Cases that cite this headnote

[4]    **Contracts**
    🔑 Agreement as to place of bringing suit; forum selection clauses
    **Contracts**
    🔑 Agreements relating to actions and other proceedings in general

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

Supreme Court's decision in *Bremen*, regarding enforceability of choice of law and choice of forum clauses, governs international contracts specifying forum and applicable law.

61 Cases that cite this headnote

**[5]**    **Contracts**
&#128073; Agreement as to place of bringing suit; forum selection clauses

**Contracts**
&#128073; Agreements relating to actions and other proceedings in general

"General undertaking" contracts between Lloyd's and American "Names," governing investment in a Lloyd's syndicates, were international transactions, in determining enforceability of choice of forum and choice of law clauses calling for application of English law; although the Names were solicited in the United States, they signed a contract with English entities to participate in an English insurance market and flew to England to consummate the transaction.

17 Cases that cite this headnote

**[6]**    **Contracts**
&#128073; Agreement as to place of bringing suit; forum selection clauses

**Contracts**
&#128073; Agreements relating to actions and other proceedings in general

Public policy embodied in federal and state securities law and Racketeer Influenced and Corrupt Organizations Act (RICO) did not invalidate choice of forum and choice of law provisions calling for application of English law in international "general undertaking" agreements governing investment of American "Names" in Lloyd's syndicates. Securities Act of 1933, § 15, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, § 29(a), 15 U.S.C.A. § 78cc(a); 18 U.S.C.A. § 1961 et seq.

6 Cases that cite this headnote

**[7]**    **Contracts**

&#128073; Agreement as to place of bringing suit; forum selection clauses

**Contracts**
&#128073; Agreements relating to actions and other proceedings in general

English law provided adequate recourse to American "Names" who claimed they were fraudulently induced into investing in Lloyd's syndicates, in determining whether choice of forum and choice of law provisions in their "general undertaking" agreements were enforceable; although Lloyd's Act immunized Lloyd's from many actions possible under United States securities laws, and remedy under Racketeer Influenced and Corrupt Organizations Act (RICO) was unavailable, Lloyd's was not immune from consequences of actions committed in bad faith, including fraud. Securities Act of 1933, § 15, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, § 29(a), 15 U.S.C.A. § 78cc(a); 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[8]**    **Contracts**
&#128073; Agreement as to place of bringing suit; forum selection clauses

**Contracts**
&#128073; Agreements relating to actions and other proceedings in general

Allegations of American "Names" that they were fraudulently induced into investing in Lloyd's syndicates were insufficient to void choice of forum and choice of law provisions in their "general undertaking" agreements, absent allegations that Lloyd's misled them as to legal effect of the choice clauses or that Lloyd's fraudulently inserted the clauses without their knowledge.

2 Cases that cite this headnote

**[9]**    **Federal Civil Procedure**
&#128073; Determination

District court was not required to adjudicate allegations of fraud of American "Names" who claimed that they were fraudulently induced into investing in Lloyd's syndicates before

**Richards v. Lloyd's of London, 135 F.3d 1289 (1998)**

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

dismissing action on basis of choice of forum and choice of law provisions in Names' underwriting agreements.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1291** Stephen A. Kroft, McDermott, Will & Emery, Los Angeles, California; Eugene I. Goldman, Robert E. Kohn, McDermott, Will & Emery, Washington, DC; Arlington Ray Robbins, Michael V. Pundeff, John H. Stephens, Robbins & Keehn, San Diego, California, for plaintiffs-appellants.

Phillip K. Fife, Seal Beach, California, for plaintiff-appellant E. Pomeroy Williams.

Harvey L. Pitt, Fried, Frank, Harris, Shriver & Jacobson, New York City; Dean Hansell, LeBoeuf, Lamb, Green & MacRae, Los Angeles, California; Taylor R. Briggs, Sheila H. Marshall, Mary L.B. Betts, Stephen H. Orel, LeBoeuf, Lamb, Greene & MacRae, New York City, for defendants-appellees The Corporation of Lloyd's, the Society of Lloyd's, and The Council of Lloyd's.

Richard H. Walker, Jacob H. Stillman, Eric Summergrad, John W. Avery, Securities and Exchange Commission, Washington, DC, as amicus curiae.

Eugene R. Anderson, Seth B. Schafler, Anderson Kill Olick & Oshinsky, New York City; Amy R. Bach, San Francisco, California, for amicus curiae United Policy holders.

Leonard D. Venger, Ronald B. Turovsky, Donald R. Brown, Manatt, Phelps & Phillips, LLP, Los Angeles, California; William W. Palmer, California Department of Insurance, San Francisco, California, for amicus curiae California Commissioner of Insurance.

Appeals from the United States District Court for the Southern District of California; Irma E. Gonzalez, District Judge, Presiding. D.C. Nos. CV–94–01211–IEG, CV–95–00952–IEG.

Before: HUG, Chief Judge, GOODWIN, PREGERSON, KOZINSKI, TROTT, FERNANDEZ, RYMER, KLEINFELD, HAWKINS, TASHIMA, and THOMAS, Circuit Judges.

**Opinion**

Opinion by Judge Goodwin; Dissent by Judge Thomas.

GOODWIN, Circuit Judge:

The primary question this case presents is whether the antiwaiver provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 void choice of law and choice of forum clauses in an international transaction. The district court found that they do not. The appeal has been argued twice. Upon reconsideration en banc, the opinion published at 107 F.3d 1422 (9th Cir.1997) is withdrawn and we affirm the district court.

**Background**

Appellants, all citizens or residents of the United States, are more than 600 "Names" who entered into underwriting agreements. The Names sued four defendants: the Corporation of Lloyd's, the Society of Lloyd's, the Council of Lloyd's, (collectively, "Lloyd's") and Lloyd's of London, (the "unincorporated association").

Lloyd's is a market in which more than three hundred Underwriting Agencies compete for underwriting business. Pursuant to the Lloyd's Act of 1871–1982, Lloyd's oversees and regulates the competition for underwriting business in the Lloyd's market. The market does not accept premiums or insure risks. Rather, Underwriting Agencies, or syndicates, compete for the insurance business. Each Underwriting Agency is controlled by a Managing Agent who is responsible for the financial status of its agency. The Managing Agent must attract not only **\*1292** underwriting business from brokers but also the capital with which to insure the risks underwritten.

The Names provide the underwriting capital. The Names become Members of the Society of Lloyd's through a series of agreements, proof of financial means, and the deposit of an irrevocable letter of credit in favor of Lloyd's. To become a Name, one must travel to England to acknowledge the attendant risks of participating in a syndicate and sign a General Undertaking. The General Undertaking is a two page document containing choice of forum and choice of law clauses (collectively the "choice clauses"), which form the basis for this dispute. The choice clauses read:

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)
Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

2.1 The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.

2.2 Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's....

By becoming a Member, the Names obtain the right to participate in the Lloyd's Underwriting Agencies. The Names, however, do not deal directly with Lloyd's or with the Managing Agents. Instead, the Names are represented by Members' Agents who, pursuant to agreement, stand in a fiduciary relationship with their Names. Upon becoming a Name, an individual selects the syndicates in which he wishes to participate. In making this decision, the individual must rely to a great extent on the advice of his Members' Agent. The Names generally join more than one underwriting agency in order to spread their risks across different types of insurance. When a Name undertakes an underwriting obligation, that Name is responsible only for his share of an agency's losses; however, his liability is unlimited for that share.

In this case, the risk of heavy losses has materialized and the Names now seek shelter under United States securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The Names claim that Lloyd's actively sought the investment of United States residents to fill an urgent need to build up capital. According to the Names, Lloyd's concealed information regarding the possible consequences of the risks undertaken and deliberately and disproportionately exposed the Names to massive liabilities for which sufficient underwriting capital or reinsurance was unavailable.

This appeal does not address the merits of the underlying claims. It addresses only the Names' contention that their disputes with Lloyd's should be litigated in the United States despite contract clauses binding the parties to proceed in England under English law. It also addresses whether default should have been entered against the unincorporated association.

**Standard of Review**

**[1]**    We review the district court's decision to enforce the choice clauses for abuse of discretion. *Argueta v Banco Mexicano, S.A.,* 87 F.3d 320, 323 (9th Cir.1996). As we are reviewing a Rule 12(b)(3) motion decision, we need not accept the pleadings as true. *Id.* at 324.

**[2]**    Whether the securities laws void the choice clauses is a question of law that we review de novo. *Pinal Creek Group v Newmont Mining Corp.,* 118 F.3d 1298, 1300 (9th Cir.1997).

**Discussion**

The Names make three arguments for repudiating the choice clauses. They contend (1) that the antiwaiver provisions of the federal securities laws void such clauses, (2) that the choice clauses are invalid because they offend the strong public policy of preserving an investor's remedies under federal and state securities law and RICO and (3) that the choice clauses were obtained by fraud. We will address each of these in turn.

**I**

We analyze the validity of the choice clause under *The* **\*1293** *Bremen v. Zapata Off Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), where the Supreme Court stated that courts should enforce choice of law and choice of forum clauses in cases of "freely negotiated private international agreement [s]." *Bremen,* 407 U.S. at 12–13, 92 S.Ct. at 1914. [1]

**A**

**[3]**    The Names dispute the application of *Bremen* to this case. They contend that *Bremen* does not apply to cases where Congress has spoken directly to the immediate issue—as they claim the antiwaiver provisions do here.

The Securities Act of 1933 (the " '33 Act") provides that:

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n. The 1934 Securities Exchange Act (the " '34 Act") contains a substantially similar provision. 15 U.S.C. § 78cc(a). The Names seize on these provisions and claim that they void the choice clauses in their agreement with Lloyd's.

Certainly the antiwaiver provisions are worded broadly enough to reach this case. They cover "*any* condition, stipulation, or provision binding *any* person acquiring *any* security to waive compliance with *any* provision of this subchapter...." Indeed, this language is broad enough to reach any offer or sale of anything that could be alleged to be a security, no matter where the transaction occurs.

Nevertheless, this attempt to distinguish *Bremen* fails. In *Bremen* itself, the Supreme Court contemplated that a forum selection clause may conflict with relevant statutes. *Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared *by statute* or by judicial decision.") (emphasis added).

Moreover, in *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), the Supreme Court explicitly relied on *Bremen* in a case involving a securities transaction.[2] Echoing the language of *Bremen,* the Court found that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Id.* at 516, 94 S.Ct. at 2455. *See Bremen,* 407 U.S. at 13–14, 92 S.Ct. at 1914–16 ("[A]greeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting."). This passage should leave little doubt as to the applicability of *Bremen* to the case at hand.[3]

Indeed, were we to find that *Bremen* did not apply, the reach of United States securities laws would be unbounded. The Names simply prove too much when they assert that "*Bremen 's* judicially-created policy analysis under federal common law is *not* controlling when Congress has expressed its will in a statute." This assertion, if true, expands the reach of federal securities law to any and all such transactions, no matter how remote from the United States. We agree with the Fifth

Circuit that "we must tread cautiously before expanding the operation of U.S. securities **\*1294** law in the international arena." *Haynsworth v. The Corporation,* 121 F.3d 956, 966 (5th Cir.1997).

**B**

[4]    [5]    Having determined that *Bremen* governs international contracts specifying forum and applicable law, we turn to the question whether the contract between Lloyd's and the Names is international. Not surprisingly, the Names contend that these were purely domestic securities sales. They claim that Lloyd's solicited the Names in the United States and that the trip the Names made to England was a mere ritual without legal significance.

We disagree. The Names signed a contract with English entities to participate in an English insurance market and flew to England to consummate the transaction. That the Names received solicitations in the United States does not somehow erase these facts. Moreover, Lloyd's insistence that individuals travel to England to become a Name does not strike us as mere ritual. Lloyd's likely requires this precisely so that those who choose to be the Names understand that English law governs the transaction. Entering into the Lloyd's market in the manner described is plainly an international transaction.

**II**

We now apply *Bremen* to this case. *Bremen* emphasized that "in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside." *Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916. The Court reasoned that "[t]he elimination of all [ ] uncertainties [regarding the forum] by agreeing in advance ... is an indispensable element in international trade, commerce, and contracting." *Id.* at 13–14, 92 S.Ct. at 1915. Thus, "absent some compelling and countervailing reason [a forum selection clause] should be honored by the parties and enforced by the courts." *Id.* at 12, 92 S.Ct. at 1914. The party seeking to avoid the forum selection clause bears "a heavy burden of proof." *Id.* at 17, 92 S.Ct. at 1917.

The Supreme Court has identified three grounds for repudiating a forum selection clause: first, if the inclusion

Case 1:14-cv-03042-RMB-AJP   Document 89-4   Filed 09/24/14   Page 22 of 28

**Richards v. Lloyd's of London, 135 F.3d 1289 (1998)**

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

of the clause in the agreement be the product of fraud or overreaching; second, if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; and third, "if enforcement would contravene a strong public policy of the forum in which suit is brought." *Id.* at 12–13, 15, 18, 92 S.Ct. at 1914–18. The Names contend that the first and third grounds apply in this case.

### A

**[6]** The Names' strongest argument for escaping their agreement to litigate their claims in England is that the choice clauses contravene a strong public policy embodied in federal and state securities law and RICO. *See Bonny v Society of Lloyd's,* 3 F.3d 156, 160–61 (7th Cir.1993) (expressing "serious concerns" that the choice clauses offend public policy but ultimately ruling in Lloyd's favor), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Roby v Corporation of Lloyd's,* 996 F.2d 1353, 1364–66 (2nd Cir.) (substantially the same), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).

We follow our six sister circuits that have ruled to enforce the choice clauses. *See Haynsworth,* 121 F.3d 956; *Allen v. Lloyd's of London.* 94 F.3d 923 (4th Cir.1996); *Shell v. R W. Sturge, Ltd.,* 55 F.3d 1227 (6th Cir.1995); *Bonny,* 3 F.3d 156; *Roby,* 996 F.2d 1353; and *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). We do so because we apply *Scherk* and because English law provides the Names with sufficient protection.

In *Scherk,* the Supreme Court was confronted with a contract that specified that all disputes would be resolved in arbitration before the International Chamber of Commerce in Paris, France. *Scherk,* 417 U.S. at 508, 94 S.Ct. at 2451–52. The arbitrator was to apply the law of the state of Illinois. *Id.* The Court enforced the forum selection clause despite then hostile precedent.[4] **\*1295** *Id.* at 520–21, 94 S.Ct. at 2457–58. *See Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled by Rodriguez de Quijas v Shearson/ American Express, Inc.,* 490 U.S. 477, 485, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989).

The Court's treatment of *Wilko* leaves little doubt that the choice clauses in this case are enforceable. In *Wilko,* the Supreme Court ruled that "the right to select the judicial forum is the kind of 'provision' that cannot be waived under § 14 of the Securities Act." *Wilko,* 346 U.S. at 435, 74 S.Ct. at 186. In *Scherk,* the Court had before it a case where both the District Court and the Seventh Circuit found a forum selection clause invalid on the strength of *Wilko. Scherk,* 417 U.S. at 510, 94 S.Ct. at 2452–53.

In distinguishing *Wilko,* the Supreme Court stated that there were "significant and, we find, crucial differences between the agreement involved in *Wilko* and the one signed by the parties here." *Scherk,* 417 U.S. at 515, 94 S.Ct. at 2455. The first and primary difference that the Court relied upon was that "Alberto-Culver's contract ... was a truly international agreement." *Id.* The Court reasoned that such a contract needs, as "an almost indispensable precondition," a "provision specifying in advance the forum in which disputes shall be litigated *and the law to be applied.*" *Id.* at 516, 94 S.Ct. at 2455 (emphasis added).

Moreover, the Supreme Court has explained that, in the context of an international agreement, there is "no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere." *Id.* at 517 n. 11, 94 S.Ct. at 2456 n. 11. To require that " 'American standards of fairness' must ... govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries." *Id.*

These passages from *Scherk,* we think, resolve the question whether public policy reasons allow the Names to escape their "solemn agreement" to adjudicate their claims in England under English law. *Scherk* involved a securities transaction. *Id.* at 514 n. 8, 94 S.Ct. at 2455 n. 8. The Court rejected *Wilko 's* holding that the antiwaiver provision of the '34 Act prohibited choice clauses. *Id.* at 515–16, 94 S.Ct. at 2455–56. It also recognized that enforcing the forum selection clause would, in some cases, have the same effect as choosing foreign law to apply. *Id* at 516, 517 n. 11, 94 S.Ct. at 2455, 2456 n. 11. Yet the Court did not hesitate to enforce the forum selection clauses. It believed that to rule otherwise would "reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts.' " *Id.* at 519, 94 S.Ct. at 2457 (quoting *Bremen.* 407 U.S. at 9, 92 S.Ct. at 1912). As the Supreme Court has explained, " '[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

resolved in our courts.' " *Id.* (quoting *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1912).

Relying on *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 634, 105 S.Ct. 3346, 3357–58, 87 L.Ed.2d 444 (1985), the Names argue that federal and state securities laws are of "fundamental importance to American democratic capitalism." They claim that enforcement of the choice clauses will deprive them of important remedies provided by our securities laws. The Supreme Court disapproved of such an outcome, the Names contend, when it stated that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. at 3359 n. 19.

Without question this case would be easier to decide if this footnote in *Mitsubishi* had not been inserted. Nevertheless, we do not believe dictum in a footnote regarding antitrust law outweighs the extended discussion and holding in *Scherk* on the validity of clauses specifying the forum and applicable law. The Supreme Court repeatedly recognized in *Scherk* that parties to an international securities transaction may choose law other than that of the United States, **\*1296** *Scherk,* 417 at 516, 517 n. 11, 519 n. 13, 2455–56, 2456, 2457 n. 13, yet it never suggested that this affected the validity of a forum selection clause. *See also Bremen,* 407 U.S. at 13 n. 15, 92 S.Ct. at 1915 n. 15 (recognizing that a forum selection clause also acts to select applicable law); *Milanovich v. Costa Crociere, S.p.A.,* 954 F.2d 763, 767 n. 7 (D.C.Cir.1992) ("*The Bremen* involved a choice-of-forum clause, but the Supreme Court recognized that enforcing the provision would have the effect of subjecting the contract to foreign law."). [5]

### B

[7]   Of course, were English law so deficient that the Names would be deprived of any reasonable recourse, we would have to subject the choice clauses to another level of scrutiny. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991) ("It bears emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness."). In this case, however, there is no such danger. *See Haynsworth,* 121 F.3d at 969 ("English law provides a variety of protections for fraud and misrepresentations in securities transactions."). *Cf. British Midland Airways Ltd v International Travel, Inc.,* 497 F.2d 869, 871 (9th Cir.1974) (This court is "hardly in a position to call the Queen's Bench a kangaroo court.").

We disagree with the dramatic assertion that "[t]he available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law." *Richards v. Lloyd's of London,* 107 F.3d 1422, 1430 (9th Cir.1997). The Names have recourse against both the Member and Managing Agents for fraud, breach of fiduciary duty, or negligent misrepresentation. Indeed, English courts have already awarded substantial judgments to some of the other Names. *See Arubuthnott v. Fagan and Feltrim Underwritings Agencies Ltd.,* 3 Re LR 145 (H.L.1994); *Deeny v. Gooda Walker Ltd.,* Queen's Bench Division (Commercial Court), The Times 7 October 1994. [6]

While it is true that the Lloyd's Act immunizes Lloyd's from many actions possible under our securities laws, Lloyd's is not immune from the consequences of actions committed in bad faith, including fraud. Lloyd's Act of 1982, Ch. 14(3)(e) (i). The Names contend that entities using the Lloyd's trade name willfully and fraudulently concealed massive long tail liabilities in order to induce them to join syndicates. If so, we have been cited to no authority that Lloyd's partial immunity would bar recovery.

### C

The addition of RICO claims does not alter our conclusion. This court has already held that the loss of RICO claims does not suffice to bar dismissal for forum non conveniens. *Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768–69 (9th Cir.1991). We agree with our sister circuit that has considered this issue and extend the logic of *Lockman* to this case. *Roby,* 996 F.2d at 1366.

### D

[8]   The Names also argue that the choice clauses were the product of fraud. They claim that at the time of signing the General Undertaking, Lloyd's knew that the Names were effectively sacrificing valid claims under U.S. law by signing the choice clauses and concealed this fact from the Names. Had the Names known this fact, they contend, **\*1297** they never would have agreed to the choice clauses. The Names

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)
Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

never allege, however, that Lloyd's misled them as to the legal effect of the choice clauses. Nor do they allege that Lloyd's fraudulently inserted the clauses without their knowledge. Accordingly, we view the allegations made by the Names as going only to the contract as a whole, with no allegations as to the inclusion of the choice clauses themselves.

Absent such allegations, these claims of fraud fail. The Supreme Court has noted that simply alleging that one was duped into signing the contract is not enough. *Scherk,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (The fraud exception in *Bremen* "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud ... the clause is unenforceable."). For a party to escape a forum selection clause on the grounds of fraud, it must show that "the *inclusion of that clause in the contract* was the product of fraud or coercion." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)) (emphasis in original). *See also Prima Paint,* 388 U.S. at 404, 87 S.Ct. at 1806 ("[T]he statutory language [of the United States Arbitration Act] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").

### E

**[9]**   The Names object that *Moseley v. Electronic & Missile Facilities, Inc.,* 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963), requires the district court to adjudicate the claims of fraud before dismissal. In *Moseley,* the Supreme Court found that "it seems clear that the issue of fraud should first be adjudicated before the rights of the parties under the [contracts] can be determined." *Id.* at 171, 83 S.Ct. at 1817–18. Taken out of context, this statement would seem to support the Names' position.

When viewed in context, however, it becomes clear that this statement in fact provides no aid to the Names. The Supreme Court required an initial adjudication of the fraud claim after noting that "no request has been made here for the enforcement of the arbitration agreement included within the [contracts.]" *Id.* at 170, 83 S.Ct. at 1817. It was only "[w]ith the pleadings in this posture" that the Supreme Court required a trial on the fraud claims. *Id.* at 171, 83 S.Ct. at 1817. Here Lloyd's has clearly and vigorously called for the enforcement of the choice clauses. Accordingly, *Moseley* does not apply to the instant case and the Names are not entitled to a trial on their claims of fraud.

### III

Because we decide that the district court correctly ruled to enforce the choice clauses, the request to enter default against the unincorporated association is moot.

AFFIRMED.

THOMAS, Circuit Judge, with whom Judge PREGERSON and Judge HAWKINS join, dissenting.

The majority espouses a reasonable foreign policy, but one which emanates from the wrong branch of government. Congress has already explicitly resolved the question at hand. In the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Acts"), Congress expressly provided that investors cannot contractually agree to disregard United States securities law. Thus, in applying the "reasonableness" policy-weighing approach of *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the majority displaces Congress' specific statutory directive. Furthermore, even assuming that the *Bremen* analysis applies here, the circumstances surrounding this dispute compel the conclusion that enforcement of the choice clauses would be unreasonable. Accordingly, I respectfully dissent.

### I.

Unlike the conflict the *Bremen* Court envisioned between statutes and forum selection clauses, the Acts do not merely declare "a strong public policy" against the waiver of compliance with United States securities laws. Rather, the Acts explicitly and unconditionally prohibit such a waiver. The language of the Securites Act of 1933 is clear and unambiguous:

> Any condition, stipulation, or provision binding any person acquiring any security **\*1298** to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n. The Securities Exchange Act of 1934 contains a similar restriction. *See* 15 U.S.C. § 78cc(a).

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

Absent these antiwaiver provisions, courts could appropriately examine choice-of-forum clauses in investment contracts under a *Bremen* analysis to determine whether they violated the strong public policy of the United States as embodied in our securities law. However, the Acts' antiwaiver provisions decisively alter this inquiry. With adoption of those sections, Congress announced a per se rule that American laws cannot be ignored in this context. Courts should not employ amorphous public policy to emasculate plain statutory language. "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). Rather, "[o]nly when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied." *Id.* Because Congress quite reasonably intended that our securities laws be enforced even when a salesperson managed to obtain an investor's waiver, we "have no license to depart from the plain language" of the Acts. *Id.*

The majority turns this analysis inside out, by holding that underlying antiwaiver public policy eviscerates specific antiwaiver statutory provisions. Disregarding this express prohibition to assess whether enforcement of the choice clauses contravenes the underlying policy against waiver is akin to overlooking the plain language of a statute to consider its legislative history, a clearly disfavored method of statutory interpretation. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.... It would be dangerous in the extreme to infer ... that a case for which the words of an instrument expressly provide, shall be exempted from its operation.") (citations and internal quotation marks omitted). As the majority concedes, the explicit language of the Acts bars the waiver that the choice clauses would effectuate here. Thus, the "unadorned words" of the Acts' antiwaiver provisions should not be limited by the antiwaiver public policy they impliedly express, *see Germain,* 503 U.S. at 254, 112 S.Ct. at 1149–50.

The majority's fears notwithstanding, it is unnecessary to displace Congress' reasoned judgment in order to contract

the "boundless" reach of United States securities laws. First, because plaintiffs alleging securities fraud will at some point have to establish that the disputed transactions involved "securities," as defined under United States law, plaintiffs cannot gain unfettered access to the protection of the securities laws simply by alleging that they have purchased securities. Second, the plaintiffs here do not seek to invoke the Acts' substantive remedies in the context of transactions that enjoy only an incidental nexus with the United States. Lloyd's recruited the plaintiffs, residents of the United States, in the United States, often using United States brokerage firms and recruiters, and availed itself of the United States mails to disseminate information about becoming a Name. In short, Lloyd's purposefully devoted considerable time and resources to recruiting American investors through specifically American media. To penalize the plaintiffs in this case based upon a hypothetical scenario that differs dramatically from the circumstances at issue here would work an unjust deprivation of the plaintiffs' rights under the Acts.

The majority argues that the Supreme Court's reliance on *Bremen* in *Scherk v. Alberto Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), should control here. However, the majority overlooks the crucial differences between the instant dispute and the facts underlying *Scherk.* *Scherk* involved a contract that contained an agreement to arbitrate any disputes arising out of the contract in Paris, France. This contract specified that "[t]he laws of the State of Illinois, **1299** U.S.A. shall apply to and govern this agreement, its interpretation and performance." *Scherk,* 417 U.S. at 508, 94 S.Ct. at 2451–52. In contrast, the choice clauses here not only select the forum—the courts of England—but mandate that English law shall govern any controversy. Thus, the reasoning and conclusions of *Scherk* should not extend to this case. To the extent that the *Scherk* Court approved a hypothetical choice-of-law clause that prescribed the application of foreign law, such approval was dicta and cannot bind the parties here.

Furthermore, the Lloyd's underwriting agreements had substantial connections with the United States, in contrast with the sparse contacts between the United States and the contract in *Scherk.* In *Scherk,* an American company made an initial contact with Scherk, a German citizen, in Germany, pursued negotiations with Scherk in both Europe and the United States, and finally executed a contract in Vienna, Austria, providing for the transfer of the ownership of Scherk's enterprises. The closing of this transaction occurred in Geneva, Switzerland. In comparison, the sole component

Case 1:14-cv-03042-RMB-AJP   Document 89-4   Filed 09/24/14   Page 26 of 28

Richards v. Lloyd's of London, 135 F.3d 1289 (1998)

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

of Lloyd's campaign to recruit American Names that took place in England was the committee meeting that new Names attended in London. Otherwise, every aspect of the solicitation occurred in the United States. To characterize this extensive and multifaceted recruitment campaign as the mere receipt of "solicitations," as does the majority, is to understate the impact of Lloyd's activities in the United States.

The *Scherk* majority itself recognized that a contract with "insignificant or attenuated" contacts with foreign countries might well prompt a refusal to enforce a forum selection clause, let alone a clause choosing foreign law. *Scherk,* 417 U.S. at 517 n. 11, 94 S.Ct. at 2456 n. 11. The Court observed: "Judicial response to such situations can and should await future litigation in concrete cases." *Id.* The instant case offers just such a concrete opportunity to assess the enforceability of the choice clauses independently of the *Scherk* methodology and holding—an opportunity this court should use to effectuate Congress' explicit statutory directive.

Unfortunately, the majority has chosen to contravene an unequivocal Congressional mandate, founded on an interpretation of underlying public policy. However reasonable that policy, it cannot supplant clear, unambiguous statutory language.

## II.

In addition to violating the Acts' express antiwaiver provisions, the choice clauses are unenforceable because they are " 'unreasonable' under the circumstances." *Bremen,* 407 U.S. at 10, 92 S.Ct. at 1913. Initially, the Supreme Court has twice stated that the type of clauses at issue here are invalid when they prospectively disable parties from pursuing statutory remedies. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19, 87 L.Ed.2d 444 (1985), *quoted in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 540, 115 S.Ct. 2322, 2329–30, 132 L.Ed.2d 462 (1995). Indeed, in *Vimar,* the Court went so far as to declare that "[t]he relevant question" was "whether the substantive law to be applied [would] reduce the carrier's obligations to the cargo owner below what [the Carriage of Goods by Sea Act] requires." *Vimar,* 515 U.S. at 539, 115 S.Ct. at 2329. In other words, the Court implicitly rejected the argument that a forum selection clause must be enforced even if some of the claims that could have been brought in the forum of the lawsuit must be forfeited.

As applied here, the logic of *Mitsubishi* and *Vimar* militates against enforcing the choice clauses. Not only do the choice clauses preclude the plaintiffs from seeking the substantive remedies the Acts offer, but the protections they provide under English law are markedly inferior to the Acts'. For instance, English law recognizes no remedy for the failure to register securities as required by section 12(1) of the Securities Act of 1933. Nor is there any English remedy against Lloyd's for negligent misrepresentation as provided by section 12(2) of the Securities Act of 1933, because the 1982 Lloyd's Act expressly immunizes Lloyd's from any claim for "negligence or other tort" unless bad faith was involved.[1] Third, no "controlling *1300 person" liability exists in England, whereas section 15 of the Securities Act of 1933 and section 20(a) of the 1934 Securities Exchange Act impose such liability. Thus, the choice clauses should not be enforced, because they afford a level of protection far lower than the remedies the Acts provide.

The stark differences between American and English securities laws in turn reveal additional public policy reasons for invalidating the choice clauses. Enforcing the choice clauses gravely disadvantages American businesses, because foreign businesses, like Lloyd's, can recruit investors without expending the time and money involved in fulfilling the requirements of the Acts—a burden that American businesses cannot legally evade. Invalidating the choice clauses therefore eliminates any artificial advantage that Lloyd's may have enjoyed in competing in the American insurance market. In addition, the Acts furnish a necessary regulatory check upon an otherwise virtually autonomous organization. As the British government itself concedes, Lloyd's is a self-governing body charged with regulatory functions. Hence, a refusal to enforce the choice clauses would not reflect a lack of deference to English law and courts, but would simply arise from the realization that externally imposed restraints may sometimes be appropriate to control the behavior of a self-regulating organization.

The majority rejects the applicability of *Mitsubishi* and *Vimar* to the choice clauses on two bases. First, the majority assails footnote 19 in *Mitsubishi* as mere dictum which cannot "outweig[h] the extended discussion and holding in *Scherk* on the validity of clauses specifying the forum and applicable law." Second, the majority objects to the extension of *Vimar* to the instant case, because *Vimar* involved the Carriage of Goods by Sea Act ("COGSA"), a statute attempting to ensure uniformity in international transactions.

**Richards v. Lloyd's of London, 135 F.3d 1289 (1998)**

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

This reasoning stands on tenuous ground. Initially, while footnote 19 in *Mitsubishi* was not incorporated into the Court's actual holding, the Court left no doubt about its position on this issue by reiterating it in the entirely different setting of *Vimar*. Hence, the Court implicitly indicated that its concerns about a potential deprivation of plaintiffs' access to statutory remedies were limited to neither the antitrust nor the COGSA context. Moreover, as explained above, to the extent that the *Scherk* Court speculated about the enforceability of a contractual provision selecting foreign law, such a discussion was dictum. As such, it warrants no greater deference than footnote 19 of *Mitsubishi*.

Finally, the majority errs in characterizing the Acts as purely domestic, as opposed to the internationally-oriented COGSA. Congress intended the Securities Act of 1933 to bring the United States into line with the protections other nations gave the security-buying public, by protecting American investors against fraud and misrepresentation in the sale of securities in interstate and foreign commerce alike. In fact, Congress observed that the necessity for such legislation arose from "the fact that billions of dollars [had] been invested in practically worthless securities, both foreign and domestic, including those of foreign governments, by the American public through incomplete, careless, or false representations." The consequence, Congress concluded, was "dire national distress." S.Rep. No. 47, at 2 (1933). Not only does this legislative history establish the international, as well as domestic, perspective of the Securities Act of 1933, but it drives home the necessity for invalidating the choice clauses here. Allegations of Lloyd's "incomplete, careless, or false representations" about the plaintiffs' participation in the English insurance market are precisely the issue in this case. Most importantly, given the hundreds of millions of dollars that American Names have invested in Lloyd's underwriting agreements, the "dire national distress" that originally prompted Congress to adopt securities regulation legislation may well make an unwanted reappearance.

**\*1301 III.**

Increasing access to international capital markets is a laudable goal, but one need not trample on United States securities laws to achieve it. Indeed, securitization of insurance risk is increasing, with some public offerings involving Lloyd's exposures. However, these insurance risk-backed securitized investments are marketed in conformance with securities law, with full disclosure to the investor. Indeed, the facts alleged in this case make a powerful argument for vigorous application of American securities laws. A company, whether foreign or domestic, should not be able to mislead American investors with impunity into assuming unlimited liability for known losses with no possibility of financial gain.

When Congress voided waiver clauses, it meant what it said. The antiwaiver provisions of the Acts, whether as clear statutory directives or as embodiments of public policy, render the choice clauses unenforceable. The district court's dismissal of the plaintiffs' claims under the Acts should be reversed. Hence, I respectfully dissent.

**Parallel Citations**

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907, 98 Daily Journal D.A.R. 1207

**Footnotes**

1  While the contract in *Bremen* did not contain a choice of law clause, the Supreme Court explicitly recognized that the forum selection clause also acted as a choice of law clause. *Id.* at 13 n. 15, 92 S.Ct. at 1915 n. 15 ("[W]hile the contract here did not specifically provide that the substantive law of England should be applied, it is the general rule in English courts that the parties are assumed, absent a contrary indication, to have designated the forum with the view that it should apply its own law.... It is therefore reasonable to conclude that the forum clause was also an effort to obtain certainty as to the applicable substantive law.").

2  In *Scherk* the Supreme Court assumed without so ruling that the transaction involved securities. *Scherk*, 417 U.S. at 514 n  8, 94 S.Ct. at 2455 n. 8. Because it is not altogether clear whether the investments here were securities, we too assume without deciding that the Names invested in securities.

3  The Names also cite *Stewart Organization, Inc  v. Ricoh Corp*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) in support of their position. *Stewart* does not aid the Names. It is true that *Stewart* held that before engaging in a *Bremen* analysis, "the first question [is] whether [28 U.S.C.] § 1404(a) itself controls respondent's request to give effect to the parties' contractual choice of venue." *Stewart*, 487 U.S. at 29, 108 S.Ct. at 2243–44. That case, however, involved a federal court sitting in diversity confronted with a purely domestic transaction. Thus it does not address this situation.

**Richards v. Lloyd's of London, 135 F.3d 1289 (1998)**

Fed. Sec. L. Rep. P 90,134, RICO Bus.Disp.Guide 9495, 98 Cal. Daily Op. Serv. 907...

4      The Court recognized that an agreement to arbitrate "is, in effect, a specialized kind of forum-selection clause." *Scherk,* 417 U.S. at 519, 94 S.Ct. at 2457.

5      The Names also point to *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), as support for their position. In *Vimar,* the Supreme Court expressed concern that a forum selection clause combined with a choice of law clause would deprive a party of remedies under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 et seq. *Id.* at 539, 115 S.Ct. at 2329. The Court's reasoning in *Vimar,* however, does not extend to the instant case as *Vimar* involved COGSA, a statute designed to address international transactions. *Id.* at 537, 115 S.Ct. at 2328 ("COGSA is the culmination of a multilateral effort to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade.") (internal quotations and citation omitted).

6      The Names complain that the Member and Managing Agents are insolvent. If so, this is truly unfortunate. It does not, however, affect our analysis of the adequacy of English law.

1      While the plaintiffs may sue Members' and Managing Agents, who are not exempt from the 1982 Lloyd's Act, the Members' and Managing Agents are insolvent. The majority regards this insolvency, if true, as "truly unfortunate," but deems it irrelevant to the "analysis of the adequacy of English law." *See supra* note 6. However, it is equally reasonable to find English law all the more inadequate to address the plaintiffs' grievances, because the insolvency of one class of potential defendants so materially damages the plaintiffs' chances for recovery.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---