# EXHIBIT LC4
# Part IV of IV

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

996 F.2d 1353
United States Court of Appeals,
Second Circuit.

John S. ROBY; Susan B. Bolin; Amanda A. Bryan; Anne L. Bryan; Florence E. Bryan; John M. Bryan; Suzanne E. Bryan; Robert S. Clarke; Patrick J. Collins; Daniel F. Coughlin; Robert L. Cox; John D. Diver; Albert W. Dugan; Lee R. Ellenburg; Jules I. Epstein; Tillman R. Fesperman; Martha H. Fogelman; Robert F. Fogelman; Robert S. Forman; Leonard Friedman; Marvin Goodson; Andrew Grossman; Kathryn B. Hampton; Alton B. Harris; Michael C. Hartley; Carol M. Hathaway; Jerome E. Hickey; Alan J. Hunken; Dale A. Jenkins; Robert B. King; Richard J. Kissel; Raymond C. Lee; Janis L. MaeMillam; J. Steven Marks; Mary L. Marks; James L. McCormick; Norman N. Mintz; Charles E. Morris; Alvin B. Moss; William B. Murray; Margaret W. Nichol; Rosemary H. Pasek; Joseph N. Pattison; Charles F. Robinson; John N. Robinson; Joe R. Roby; Herbert A. Rubin; Jacob A. Rubin; Robert W. Ruder; Constantine Salonites; Arthur Schechner; Charles Schnaid; Louis B. Schoen; K. Dino Sirakides; Joel M. Spiro; Gilchrist B. Stockton, Jr.; William N. Stout; Kenneth M. Taylor; Marvel Wilson, Jr.; Henri L. Wedell; Charles I. Wellborn; William T. Zanoni; Roger Anderson; Charles G. Bentzin; Peter A. Benz; Thorton Cooke; Donald D. Decenso; Marco DiLaurenti; Lydia P. Dugan; Robert E. Eakin; Karole E. Glaser; Oliver R. Grace, Sr.; Jack D. Gray; A. Cary Harrison, III; Sidney Kahn; Audrey W. Katz; Robert P. Keith; Alan W. Kral; James E. Krause; Nancy Kurz; Paul W. McMullan; Henry A. Mitchell, Jr.; Katherine S. Nordhaus; Charles W. Olson; James J. O'Sullivan, Jr.; Libby B. Pohoryles; Anthony B. Soskin; Herman G. Sturman; Alyson Warner; Earl D. Whittemore; Herbert N. Zack; John H. Abeles; Albert B. Crutcher, Jr.; James S. Deely; Stephen E. Delaszlo; David Dolgenos; Linda Tufts Hebbler; Roger W. House; Charles A. Janda; Jeanne Long; Charles A. Malkemus; Andrew H. Marks; Allison Mercer; Martha Long Navarro; Gregory J. Salko; Robert G. Sims; Frederick E. Smithline; James D. Tufts, II; James D. Tufts, III; Shirley R. Zaid; Wilson M. Zildjian, Plaintiffs–Appellants,

v.

CORPORATION OF LLOYD'S, also known as Society & Council of Lloyd's, doing business as Lloyd's of London; Council of Lloyd's; Committee of Lloyd's; Simon Arnold; Michael Cockell; David Coleridge; Peter Daniels; Henry Dobinson; John Greig; Richard Hazell; Anthony Hines; Gordon Hutton; Alan Jackson; Bryan Kellett; Murray Lawrence; Alan Lord; Stephen Merrett; Peter Miller; Colin Murray; Alan Parry; David Rowland; Michael Wade; Bankside Members Agency Ltd.; D.E. Biggs; BPC Members Agency Ltd.; C.L. Jackson; Fenchurch Underwriting Agencies Ltd.; C.A.G. Keeling; Gardner Mountain & Capel Cure Agencies Ltd.; J.G. Hogg; Gooda & Partners Ltd.; A.W. Gooda; Jardine Ltd.; D.R. Walker; J.H. Davies Underwriting Agency Ltd.; J.H. Davies; London Wall Members Agency Ltd.; Nelson Hurst & Marsh Agencies Ltd.; B.P. Marsh; Octavian Underwriting Ltd.; J.R.T. Church; PW Kininmonth Ltd.; R.W. Sturge Ltd.; C.E. Parnell; Secretan Underwriting Agencies Ltd.; A.D. Pilcher; Sedgewick Lloyd's Underwriting Agencies Ltd.; J.M. Gordon; Thos R. Miller & Son Underwriting Agents Ltd.; Peter Miller; Willis, Faber & Duman, Agencies Ltd.; J.N.W. Wooderson; Anton Managing Agency Ltd.; S.R. Merrett; AJ Archer & Co. Ltd.; A.J. Archer; Bankside Syndicates Ltd.; E.E. Patrick; Barder & Marsh; J.H. Barder; BCP Underwriting Agencies Ltd.; C.L. Jackson; Cater Allen Underwriting Agency Ltd.; B.F. Caudle Agencies Ltd.; B.F. Caudle; Charnam Underwriting Agencies Ltd.; J.R. Charnam; H.G. Chester & Co. Ltd.; R.J. Martin; Christopherson Heath Ltd.; R.E. Heath; Claremount Underwriting Agency Ltd.; J.W. Oakes; Cox, Newman & Harman Ltd.; D.E. Harman; Cuthbert, Heath Underwriting Ltd.; J.W. Pryke; JH Davies Underwriting Agency Ltd.; J.H. Davies; Devonshire Underwriting Agency Ltd.; P.W.G. Suttle; NT Evennett & Partners Ltd.; N.T. Evennett; Feltrim UA Ltd.; P.F. Fagan; Gooda Walker Ltd.; A.W. Gooda; Gresham UA Ltd.; T.G. Green; Johnson Greene Ltd., Marine/Aviation Syndicates Div.; G.R.P.N. Valentine; J.R.L. Youell;

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)
61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

Hexad Partnership; Marquees of Downshire; G.W. Hutton & Co. Ltd.; G.W. Hutton; BPD Kellett & Co. Ltd.; BPD Kellett; London Wall Managing Agencies; R.H. Warrender; London River Underwriting Management Ltd.; J.M. Poland; Merrett Syndicates Ltd.; J.R. Robson; Murray Lawrence & Partners Ltd.; W.N.M. Lawrence; D.M. Holman; Octavian Syndicate Management Ltd.; D.E. Coleridge; R.M. Pateman; R.M. Pateman Underwriting Agencies Ltd.; Peter Pepper Ltd.; P.L. Pepper; John Poland Ltd.; T.M. Bradley; RD Underwriting Agencies Ltd.; J.M. Donner; C.W. Rome Underwriting Agencies Ltd.; C.W. Rome; Rose, Thompson, Young Ltd.; L.R. Sawyer Ltd.; FLP Secretan & Co. Ltd.; A.D. Pilcher; Street Ltd.; C.K. Murray; Sturge Marine Syndicate Management Ltd.; B.E. Beagley; Wellington Underwriting Agencies Ltd.; J.O. Prentice; Wendover Underwriting Agency Ltd.; A.D. Shead; Alexander Howden & Beck Ltd.; P.M. Graham; D.T. Carey; Cater Allen Members Agency; D.J. White; Chiltren Underwriting Agencies Ltd.; N.A. Lewis; Harrison Brothers (U/A) Ltd.; D.B.K. Harrison; Jardine (Lloyd's Underwriting Agents) 1990 Ltd.; Kingsley Underwriting Agencies Ltd.; R.C. Kingsley; R.C. Hallam; Lime Street Underwriting Agencies Ltd.; RAF MacMillan & Co.; M.A. Brecknell; RAF MacMillan; Mocatta Dashwood Members Agents Ltd.; F. Dashwood; Murray Lawrence Members Agency; W.N.M. Lawrence; P.W. Kinimonth; Rose Thomson Young (Underwriting) Ltd.; D.H.H. Meacock; Scott Underwriting Agencies Ltd.; G.W. Scott; Vanguard Underwriting Agencies, Ltd.; T.J. Pepper; KC Webb (Underwriting) Ltd.; J.G. Hogg; Aragorn Agencies Ltd.; A.J.W.F. Wallace; Austin Caudle (U/A) Ltd.; B.F. Caudle; Guest Barnes (Underwriting Agencies) Ltd.; Birrell Smith Underwriting Agencies Ltd.; Cater Allen Syndicate Management Ltd.; Edward & Payne (Underwriting Agencies) Ltd.; C.H.A. Skey; Janson Green Ltd.; Wetherell Non–Marine Division; G.R.P.N. Valentine; J.M.W.P. Wetherell; B.P.D. Kellett; RJ Kiln & Co. Ltd.; KPH Underwriting Agencies Ltd.; D.G. King; Mark Loveday Underwriting Agencies Ltd.; Merrett Underwriting Agency Management Ltd.; Newgreen Underwriting Agencies Ltd.; J.R.T. Church; Oxford Syndicate Management Ltd.; Roberts & Hiscox Ltd.; R.R.S. Hiscox; RD Robertson Underwriting Agency Ltd.; L.R. Sawyer; Three Quays Underwriting Management Ltd.; Robert Keville; Philip Wroughton; J.B. Marshall; Cuthbert Heath Members Agency Ltd.; D. Hazelwood; Donner Underwriting Agencies Ltd.; J.G. Curtis; Kiln Members Agency Ltd.; D.L. Dann; W.S. Strathalmond; Scott Caudle Hilsum Ltd.; J.D. Scott; Cassidy Davis Underwriting Ltd.; D.A. Pease; Cutler Underwriting Agencies Ltd.; D.E. Dowlen; Gravell & Tilling (Underwriting Agencies) Ltd.; M.A. Gravett; Holmes Hayday (Underwriting Agencies) Ltd.; T.J. Hayday; Knightstone (Managing Agency) Ltd.; G. Cooper; Mander Thomas & Cooper (Underwriting Agents) Ltd.; C.J. Mander; MFK Underwriting Agency Ltd.; M.C. Watkins; MIS Underwriting Agency Ltd.; RHM Outhwaite (Underwriting Agencies) Ltd.; Lord Havers; Stewart & Hughman Ltd.; D.C. Craig; Venton Underwriting Agencies Ltd.; R.N. Alwen; Wren Syndicate Management Ltd.; N.C. Haydon; Syndicates–2, 10, 15, 17, 28, 31, 33, 37, 40, 47, 48, 51, 52, 53, 62, 65, 79, 80, 97, 102, 103, 104, 105, 108, 109, 112, 122, 123, 138, 144, 153, 156, 162, 164, 179, 182, 183, 185, 190, 197, 203, 204, 205, 206, 207, 209, 210, 212, 216, 218, 219, 225, 227, 228, 229, 234, 235, 253, 254, 255, 256, 257, 264, 270, 271, 272, 282, 288, 290, 293, 295, 296, 298, 299, 304, 305, 309, 310, 314, 317, 318, 319, 321, 322, 323, 329, 330, 331, 332, 340, 342, 349, 350, 362, 363, 366, 370, 375, 376, 397, 382, 384, 386, 387, 388, 396, 397, 401, 404, 406, 417, 418, 421, 428, 435, 437, 439, 445, 448, 454, 456, 457, 463, 469, 471, 483, 484, 488, 490, 498, 500, 503, 505, 506, 508, 509, 510, 512, 527, 529, 530, 535, 536, 540, 542, 544, 545, 546, 552, 554, 557, 560, 561, 566, 570, 573, 575, 577, 582, 584, 588, 601, 602, 603, 604, 609, 613, 623, 625, 633, 635, 636, 648, 657, 658, 660, 661, 662, 674, 685, 694, 697, 702, 711, 718, 724, 726, 727, 732, 733, 735, 740, 741, 744, 745, 760, 764, 780, 782, 785, 787, 794, 799, 800, 803, 807, 808, 816, 820, 824, 831, 833, 836, 839, 843, 847, 850, 851, 860, 861, 866, 868, 872, 877, 887, 892, 896, 901, 904, 907, 913, 919, 920, 923, 925, 926, 929, 932, 939, 942, 947, 950, 955, 957, 958, 959, 960, 963, 965, 979, 980, 982, 989, 994, 998, 1001, 1002, 1003, 1005, 1006, 1007, 1009, 1011, 1014, 1019, 1021, 1023, 1025, 1027, 1028, 1034, 1035, 1036, 1038, 1041, 1046, 1048, 1049, 1052, 1058, 1066, 1067, 1068, 1069, 1079, 1083, 1084, 1085, 1086, 1087, 1091, 1093, 1095, 1096, 1097, 1098, 1101, 1102,

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

1104, 1105, 1112, 1114, 1117, 1118, 1122, 1125, 1129, 1137, 1139, 1141, 1143, 1144, 1145, 1148, 1151, 1152, 1153, 1156, 1158, 1162, 1163, 1171, 1173, 1176, 1179, 1181, 1182, 1184, at Lloyd's of London, Defendants–Appellees.

No. 870, Docket 92–9032.   |   Argued Feb. 5, 1993.   |   Decided June 2, 1993.

Investors in English insurance syndicates brought securities and RICO action against syndicates and agents associated with the syndicates. The United States District Court for the Southern District of New York, Morris E. Lasker, J., dismissed action, 796 F.Supp. 103, 824 F.Supp. 336, and investors appealed. The Court of Appeals, Meskill, Chief Judge, held that: (1) forum selection and arbitration clauses in agreements executed by the investors applied to defendants, and (2) public policy codified in antiwaiver provisions of the securities laws did not render forum selection and arbitration clauses unenforceable.

Affirmed.

**Attorneys and Law Firms**

*1356 Dale A. Schreiber, New York City (Minna Schrag, Steven B. Feigenbaum, Adrienne B. Koch, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for appellants.

Taylor R. Briggs, New York City (Sheila H. Marshall, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for appellees The Society, Corp., Committee and Council of Lloyd's and their individual Internal Members.

Jonathan C. Thau, New York City (Thomas W. Wilson, Nicholas J. Conca, Fred N. Knopf, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, of counsel), for appellees The Members' Agents.

William A. Meehan, New York City (Daniel M. Bianca, Leo W. Fraser, III, Jeff Imeri, Karen Wallace, Mendes & Mount, New York City, of counsel), for appellees The" Managing Agent Defendants".

Charles A. Gilman, New York City (Robert A. Alessi, Marcy A. Siskind, Cahill Gordon & Reindel, New York City, of counsel), for appellees The So–Called" Syndicate Defendants".

Before: MESKILL, Chief Judge, FEINBERG and WINTER, Circuit Judges.

**Opinion**

MESKILL, Chief Judge:

Appellants, all American citizens or residents, are more than one hundred "Names" in the Corporation of Lloyd's (Lloyd's). Loosely speaking, Names are investors in Lloyd's syndicates, the entities that nominally underwrite insurance risk. For convenience we will refer to the syndicates as entities; although this is a disputed issue on appeal, we affirm on a different basis and therefore need not resolve this issue. Appellant Names (Roby Names) alleged in their consolidated complaint that they have suffered severe financial loss as a result of appellees' violations of the Securities Act of 1933, 15 U.S.C. §§ 77a–77bbbb (the Securities Act), the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78ll (the Securities Exchange Act), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (RICO). This opinion, however, addresses only the Roby Names' contention on appeal that their disputes with *1357 Lloyd's and Lloyd's entities should be litigated in the United States despite a host of contract clauses that appear to bind them to arbitrate in England under English law. The district court held that those contract clauses must be enforced and therefore dismissed the Roby Names' complaint for improper venue. The Roby Names contend that the district court erred because (1) the clauses by their very terms do not protect certain defendants and do not cover the substance of appellants' complaints, and (2) the clauses are unenforceable because they effectively waive compliance with the United States securities laws, contrary to the antiwaiver provisions of those laws and the public policy reflected by them. To understand why we disagree with the Roby Names' arguments it is necessary to understand the structure and operations of Lloyd's, which we discuss in some detail.

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

## BACKGROUND

Lloyd's is not a company; it is a market somewhat analogous to the New York Stock Exchange. Lloyd's' governing bodies, the Council and Committee of Lloyd's, promulgate regulations and enforce compliance therewith. There are over 300 syndicates competing within Lloyd's for underwriting business, each managed by an entity called a Managing Agent. Each Managing Agent is responsible for its own syndicate's financial well-being; it tries to attract capital and underwriting business. Managing Agents owe a contractual duty to Names to manage their syndicates with reasonable care and skill. Capital comes from Names, who are represented in their dealings with Lloyd's by Members' Agents (also entities). Members' Agents are obliged to act in the sole interest of their principal Names. By agreement, the Members' Agents stand in a fiduciary relationship to their Names. Lloyd's brokers broker underwriting risk to the syndicates by negotiating with the syndicates' Active Underwriters, individuals appointed by the syndicates' Managing Agents. Brokers, Managing Agents, and Members' Agents all compete with their peers in their respective areas.

While eighty percent of Lloyd's 26,000 Names are English, about 2,500, representing more than $1 billion in capital, are American. The Roby Names were solicited in the United States by various Lloyd's entities and representatives. Except for a brief meeting in London—a mandatory formality—the entire process by which the Roby Names became Names took place in the United States. In order to become a Name, an individual had to pass a "means test." The Roby Names assert that in 1988, by which time they had all become Names, this test required prospective Names to maintain a net worth of approximately $170,000. By contrast, Lloyd's claims that Names were required to demonstrate that they were "accredited investors" under Regulation D, 17 C.F.R. § 230.501(a) (1992), so that any sale of securities to them would be exempt from the registration requirements of the Securities Act. See 15 U.S.C. § 77d(2); 17 C.F.R. § 230.506(b) (1992). While there is evidence that this requirement was established after 1988, Lloyd's has not pointed to any proof that the requirement was in effect prior to 1988. Nevertheless, the Securities and Exchange Commission (SEC) has never insisted that Lloyd's or Lloyd's entities register securities.

Upon becoming a Name, an individual selects from a list of syndicates—with the aid of only very limited financial information—and decides how much he wishes to invest in each one. In making these decisions, Names rely to a great extent on the advice of their Members' Agents. The profits that Names earn are in proportion to their capital contributions, and Names bear unlimited liability for their proportionate losses in each syndicate they join. Their liability is several, not joint; no Name is ever responsible for the losses of those fellow Names who comprise the syndicate.

Names are required to enter directly into two agreements and indirectly into two others.[1] The "General Undertaking" is between a Name and the Lloyd's' governing bodies  *1358  and contains choice of forum (England) and choice of law (English) clauses. This undertaking does not contain an arbitration clause. The "Members' Agent's Agreement" is between a Name and his Members' Agent and also contains choice of forum (England), arbitration and choice of law (English) clauses. The Members' Agent's Agreements specifically authorize the Members' Agents to enter into a third agreement on behalf of the Names, called the "Managing Agent's Agreement." This agreement, not signed by the Names themselves, and apparently often not even signed by the Managing Agents, defines the rights and obligations of the Managing Agent of a syndicate and that syndicate's Names, and also contains choice of forum (England), arbitration and choice of law (English) clauses. In turn, the Managing Agent's Agreement authorizes the Managing Agents to enter, on behalf of themselves, the Names and the Members' Agents, into a "Syndicate and Arbitration Agreement" which requires disputes related to the affairs of the particular syndicate to be arbitrated in London.

[1]   A slightly different structure existed prior to 1990, but the differences are irrelevant for purposes of this appeal and affect at most only five of the 109 appellants.

In their consolidated complaint, the Roby Names allege violations of sections 12(1) and 12(2) of the Securities Act, 15 U.S.C. § 77l(1), (2), and section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). In addition, they allege "controlling person"

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)
61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

liability under section 15 of the Securities Act, 15 U.S.C. § 77o, and section 20 of the Securities Exchange Act, 15 U.S.C. § 78t. Finally, using these securities law violations as predicate acts, the Roby Names allege several violations of RICO. Each cause of action names as defendants a different combination of the following parties: Lloyd's, Lloyd's' governing bodies, certain Managing and Members' Agents, certain individual members of these entities (the Chairs), and certain syndicates.

By order dated June 12, 1992, Judge Lasker dismissed the complaint against the "syndicate defendants," finding that they had no separate existence and therefore could not be sued as entities. 796 F.Supp. 103. By subsequent order dated August 18, 1992, the judge found that the interlocking set of agreements bound the Roby Names to arbitrate or litigate their disputes in London and dismissed the complaint in its entirety for improper venue. A judgment dated August 25, 1992 was entered to this effect. The Roby Names appeal from the June 12th order and the August 25th judgment.

## DISCUSSION

The Roby Names maintain that their investments in Lloyd's syndicates constitute "securities" under the securities laws. We decline to rule on this question today, noting only that we have received little guidance from the SEC on this issue. Instead, we will assume for purposes of this appeal that the Roby Names' consolidated complaint states cognizable claims under the securities laws. For the sake of precision, we note that the assumed sale of a security occurs not when an individual *becomes* a Name, but instead when a Name *pledges capital* to a syndicate. Nevertheless, we understand the Roby Names to argue that the *solicitation* of individuals to become Names is in fact part of the overall process of soliciting them to pledge capital (*i.e.*, to buy "securities").

The Roby Names present us with two basic arguments as to why these suits should be litigated in the United States: (1) the contract clauses, by their terms, apply neither to the substance of their claims nor to certain defendants; and (2) the clauses are unenforceable due to the public policy codified in the securities laws. We find neither of these arguments persuasive.

### I. *Scope of the Contract Clauses*

#### A. *Parties Covered*
We believe every defendant in this action, in the words of Judge Lasker, is either "protected directly by the [contract] clauses or [is an] intended beneficiar[y] entitled to enforce them." *Roby v. The Corporation of Lloyd's*, 824 F.Supp. 336, 342 (S.D.N.Y.1992, as amended). We reject, therefore, the Roby Names' arguments that neither the syndicates, the Managing Agents nor the individual Chairs of the Managing and Members' Agents may assert the protection of these clauses.

### *1359 1. *Syndicates*

[1]   Judge Lasker dismissed the Roby Names' action against the syndicates on the ground that they had no entity existence. Although the Roby Names dispute this legal determination, we need not decide the issue because we may of course affirm the judgment of the district court on any basis that has support in the record. See *L. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991). Consequently, even if we assume the syndicates do have entity existence, we would affirm the dismissal of the Roby Names' complaint on the basis of improper venue.

Paragraph 2.2 of the General Undertaking states, in pertinent part:

> Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the [Name's] membership of, and/or underwriting of insurance business at, Lloyd's.

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)
61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

Paragraph 2.1 is equally broad and provides for the application of English law. The syndicates are third-party beneficiaries of this agreement. As Professor Corbin has said, a third party will have an enforceable right "if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract." 4 Arthur L. Corbin, *Corbin on Contracts* § 776, at 18 (3d ed. 1967). Here, the syndicates have a pecuniary interest in the certainty and consistency of litigating in one nation's courts under one nation's laws. The extremely broad language of the General Undertaking should make it clear that Lloyd's' intent was to benefit all Lloyd's entities, particularly because potential actions against Lloyd's itself are limited in nature and the broad language of paragraphs 2.1 and 2.2 otherwise would be sorely *over* broad. Moreover, paragraph 1, which is the only other substantive provision in the General Undertaking, requires Names to abide by the provisions of any other contract authorized by the Council (including, *e.g.,* the Members' Agent's Agreement). We believe this indicates that the General Undertaking was meant to govern the Names' general obligations within the entire Lloyd's community.

As a fallback position, the Roby Names rightly observe that Judge Lasker refused to issue an order confirming that his decision dismissing the action against the other defendants for improper venue applied equally to the syndicate defendants. However, the judge offered no explanation for his refusal and we believe he was simply exercising cautious restraint rather than definitively ruling that the improper venue decision did not apply to the syndicates. Because we believe the reasoning of the venue decision is equally applicable to the syndicate defendants, we hold that the syndicates, if they are entities, are also entitled to the benefits of the forum selection and choice of law clauses.

The General Undertaking contains no arbitration clause, and therefore we do not decide today whether the Roby Names are bound to arbitrate with the syndicates. Whether the Syndicate and Arbitration Agreement or some other agreement may be interpreted to require the Roby Names to arbitrate is a question that should be decided under English law in an English court pursuant to the General Undertaking.

### 2. *Managing Agents*

[2]   The Roby Names contend that they are not bound by the Managing Agent's Agreements because neither they nor the Managing Agents ever signed them. However, the parties clearly assented to be bound by the Managing Agent's Agreements. First, the Roby Names signed the Members' Agent's Agreements which authorize their Members' Agents to enter into Managing Agent's Agreements on their behalf. Second, they signed the General Undertaking which requires them to abide by all of Lloyd's bylaws. Bylaw 8 prohibits any Name from underwriting insurance at Lloyd's other than pursuant to the standard agreements. By underwriting insurance, the Roby Names have demonstrated their intent to be bound by the Managing Agent's Agreements. Similarly, the Managing Agents, by acting in their capacity in accordance with the web of standard agreements, clearly have *1360  demonstrated their intent to abide by the provisions of the Managing Agent's Agreements.

### 3. *Individual Chairs*

[3]   The Roby Names next contend that the individual Chairs of the Members' and Managing Agents are neither signatories to nor third-party beneficiaries of any agreement with the Roby Names and therefore that they must litigate in federal court. We agree with the district court, however, that the individual Chairs are entitled to rely on the contract clauses incorporated into their employers' agreements.

[4]   Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement. *See, e.g., Nesslage v. York Securities, Inc.,* 823 F.2d 231, 233–34 (8th Cir.1987); *Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 216–17 (S.D.N.Y.1989); *Brener v. Becker Paribas, Inc.,* 628 F.Supp. 442, 451 (S.D.N.Y.1985). The Roby Names argue that, unlike those cases, the complaints against the individual Chairs are

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

distinct from those against their employers. They contend that the Chairs have not been sued for acts carried out on behalf of the Members' and Managing Agents (Agents) or in violation of the Agents' contractual obligations to the Roby Names. Instead, they have been sued as "controlling persons" under the securities laws.

We believe that this is a distinction without a legal difference. The complaints against the individual Chairs are completely dependent on the complaints against the Agents. Whether the individual Chairs are disclosed agents or controlling persons, their liability arises out of the same misconduct charged against the Agents. If the scope of the Agents' agreements includes the Agents' misconduct, it necessarily includes the Chairs' derivative misconduct. Moreover, we believe that the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements. If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.

## B. *Disputes Covered*

"[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). The Roby Names contend essentially that the forum selection and arbitration clauses apply only to disputes arising from the conduct of the defendants as managers, representatives or regulators. Because this conduct can occur only *after* the "securities" have been sold, the Roby Names claim that they did not agree to arbitration of, or English jurisdiction over, complaints pertaining to the sale of those "securities." They present two basic arguments: (1) because the choice of law clauses require the application of English law, the Roby Names' United States statutory claims cannot possibly be covered under the agreements, and (2) resolution of their claims does not require the construction of the agreements because the Roby Names have not alleged any breach of contract, and the language of the arbitration and forum selection clauses is not broad enough to cover their claims. We reject both arguments.

### 1. *Application of English Law*

[5]  It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement. A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading. *See Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983). In the absence of other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts *1361 must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum.

### 2. *Scope of the Agreements*

[6]  Of course, the Roby Names are quite right that if the *substance* of their claims, stripped of their labels, does not fall within the scope of the clauses, the clauses cannot apply. However, they must make this argument in the face of strong public policy in favor of forum selection and arbitration clauses. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). Indeed, an order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

There is ample precedent that the scope of clauses similar to those at issue here is not restricted to pure breaches of the contracts containing the clauses. The Managing and Members' Agent's Agreements speak, with respect to the arbitration clauses, in terms of "dispute[s], difference[s], question[s] or claim[s] *relating to*" the agreements and, with respect to the forum selection clauses, in terms of submission for "all purposes of and *in connection with*" the agreements (emphasis added). In *Bense v. Interstate Battery System of America*, 683 F.2d 718, 720 (2d Cir.1982), we held that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust actions. Similarly, the Supreme Court in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, reh'g denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974), held that controversies and claims "arising out of" a contract for the sale of a business covered securities violations related to that sale. *Id.* 417 U.S. at 519–20, 94 S.Ct. at 2457. We find no substantive difference in the present context between the phrases "relating to," "in connection with" or "arising from." We therefore reject the Roby Names' contention that only allegations of contractual violations fall within the scope of the clauses.

In the instant case the conduct surrounding the underwriting activities at Lloyd's is integrally related to the sale of Lloyd's "securities" because the "security" is essentially equivalent to the underwriting of risk or the pledging of capital. In order to underwrite risk, a Name is required by Lloyd's bylaws to enter into the Managing and Members' Agent's Agreements. He may not underwrite risk otherwise; that is, he may not "buy the security" otherwise. Misconduct with respect to the sale of these "securities" necessarily "relates to" these required agreements.

It is perhaps even more persuasive that the agreements are in fact not limited to the conduct of business but also cover the raising of capital. Thus, for instance, the agreements contain certain disclosure requirements. In addition, they establish certain duties of the Agents with respect to the Name and because the agreements are entered into *prior* to the underwriting of risk, these duties are owed with respect to the raising of capital. We believe the agreements are clearly intended to, and in fact do, govern the relationships between Agents and Names with respect to the purchase and sale of Lloyd's "securities." Because the gist of the Roby Names' allegations relates to the sale of those "securities," we hold that their claims "relate to" the Agent's Agreements.

Similarly, and even more forcefully, the broad language of the forum selection clause of the General Undertaking covers the Roby Names' claims at least against Lloyd's' governing bodies. Those claims are undoubtedly related to the Roby Names' "membership of, and/or underwriting of insurance business at, Lloyd's."

## II. *Application of the Securities Laws*

[7]   The Roby Names argue that the public policy codified in the antiwaiver provisions of the securities laws renders unenforceable any agreement that effectively eliminates **\*1362** compliance with those laws. The Securities Act provides that "[a]ny ... stipulation ... binding any person acquiring any security to waive compliance with any provision of this subchapter ... shall be void." 15 U.S.C. § 77n. Similarly, the Securities Exchange Act states, "[a]ny ... stipulation ... binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder ... shall be void." 15 U.S.C. § 78cc(a). According to the undisputed testimony of a British attorney, neither an English court nor an English arbitrator would apply the United States securities laws, because English conflict of law rules do not permit recognition of foreign tort or statutory law. From this, the Roby Names conclude that the contract clauses work to waive compliance with the securities laws and therefore are void.

We note at the outset that *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), has been squarely overruled. *See Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989); *see also Shearson/American Express v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185, reh'g denied, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987) (asserting that the assumptions underlying *Wilko* are no longer valid). *Wilko* held that an agreement to arbitrate future controversies was void under the antiwaiver provision of the Securities Act. We do not doubt that judicial hostility to arbitration has receded dramatically since 1953 and that the arbitral forum is perfectly competent to protect litigants' substantive rights. In the words of the *Mitsubishi* Court, quoted by both the *Rodriguez* and *McMahon* Courts, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." 473 U.S. at 628, 105 S.Ct. at 3354. If the Roby Names objected

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

merely to the choice of an arbitral rather than a judicial forum, we would reject their claim immediately, citing *Rodriguez* and *McMahon*. However, the Roby Names argue that they have been forced to forgo the *substantive* protections afforded by the securities laws, not simply the judicial forum. We therefore do not believe that *Rodriguez* and *McMahon* are controlling and must look elsewhere to determine whether parties may contract away their substantive rights under the securities laws.

The Tenth Circuit recently addressed this exact issue in a similar context in *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir.), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). Relying primarily on four Supreme Court precedents, *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Mitsubishi*, 473 U.S. 614, 105 S.Ct. 3346; *Scherk*, 417 U.S. 506, 94 S.Ct. 2449; *The Bremen*, 407 U.S. 1, 92 S.Ct. 1907, the *Riley* Court concluded that "[w]hen an agreement is truly international, as here, and reflects numerous contacts with the foreign forum, the Supreme Court has quite clearly held that the parties' choice of law and forum selection provisions will be given effect." 969 F.2d at 957; *see also Bonny v. Society of Lloyd's*, 784 F.Supp. 1350, 1353 (N.D.Ill.1992) (drawing the same conclusion). While we agree with the ultimate result in *Riley*, we are reluctant to interpret the Supreme Court's precedent quite so broadly.

### A. *Presumption of Validity*

The Supreme Court certainly has indicated that forum selection and choice of law clauses are presumptively valid where the underlying transaction is fundamentally international in character. *See, e.g., The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916.[2] In *The Bremen*, the **\*1363** Court explained that American parochialism would hinder the expansion of American business and trade, and more generally, interfere with the smooth functioning and growth of global commerce. *Id.* at 9, 92 S.Ct. at 1912. Forum selection and choice of law clauses eliminate uncertainty in international commerce and insure that the parties are not unexpectedly subjected to hostile forums and laws. Moreover, international comity dictates that American courts enforce these sorts of clauses out of respect for the integrity and competence of foreign tribunals. *See Mitsubishi*, 473 U.S. at 629, 105 S.Ct. at 3355. In addition to these rationales for the presumptive validity of forum selection and choice of law clauses, the Court has noted that contracts entered into freely generally should be enforced because the financial effect of forum selection and choice of law clauses likely will be reflected in the value of the contract as a whole. *Carnival Cruise Lines*, 499 U.S. at ——, 111 S.Ct. at 1527.

2    The analysis is no different for the arbitration clauses. Indeed, an arbitration clause is merely a specialized type of forum selection clause. *See Scherk*, 417 U.S. at 519, 94 S.Ct. at 2457. We might have referred to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517 (United States entered on December 29, 1970), *reprinted in* 9 U.S.C. §§ 201–08 (the Treaty), for further support with respect to the arbitration clauses; however, because we are not entirely persuaded that the Treaty applies in the securities context, we prefer to rest our decision on different grounds. Because we understand the Roby Names to complain primarily that the United States securities laws will not be applied and not that the arbitration forum is particularly inappropriate in their case, we do not believe a detailed analysis of the Treaty is necessary.

This presumption of validity may be overcome, however, by a clear showing that the clauses are " 'unreasonable' under the circumstances." *The Bremen*, 407 U.S. at 10, 92 S.Ct. at 1913. The Supreme Court has construed this exception narrowly: forum selection and choice of law clauses are "unreasonable" (1) if their incorporation into the agreement was the result of fraud or overreaching, 499 U.S. at ——, 111 S.Ct. at 1528; 407 U.S. at 12–13, 92 S.Ct. at 1914; (2) if the complaining party "will for all practical purposes be deprived of his day in court," due to the grave inconvenience or unfairness of the selected forum, 407 U.S. at 18, 92 S.Ct. at 1917; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy, 499 U.S. at ——, 111 S.Ct. at 1528; or (4) if the clauses contravene a strong public policy of the forum state, 407 U.S. at 15, 92 S.Ct. at 1916.

In this case, we can easily dispose of the first two factors. The Roby Names do not contend that they were fraudulently induced into agreeing to the forum selection, choice of law or arbitration clauses. Nor do we believe it gravely inconvenient for the Roby Names to litigate in London; they found it convenient enough to travel there for their mandatory interviews, and, in any event, many of them presently are prosecuting actions there. Moreover, nothing in the record suggests that the English courts would be biased or otherwise unfair, and United States courts consistently have found them to be neutral and just forums. *See,*

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

*e.g., Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d 821, 829 (5th Cir.1986). Finally, the Roby Names have not presented any convincing evidence that the chosen arbitral forum would be biased in any way.

As to the third factor, we note that it is not enough that the foreign law or procedure merely be different or less favorable than that of the United States. *See, e.g., Mitsubishi*, 473 U.S. at 629, 105 S.Ct. at 3355; *Medoil v. Citicorp*, 729 F.Supp. 1456, 1460 (S.D.N.Y.1990). Instead, the question is whether the application of the foreign law presents a danger that the Roby Names "will be deprived of *any* remedy or treated unfairly." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254–55, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981), *reh'g denied*, 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982) (emphasis added) (in *forum non conveniens* context). As we explain below in section C, we believe the Roby Names have ample remedies under English law.

### B. *Public Policy*

We depart somewhat from the *Riley* Court with respect to the fourth factor. We believe that there is a serious question whether United States public policy has been subverted by the Lloyd's clauses. In this section we explain our concerns; in section C below we resolve those concerns. Ultimately, we hold that the presumption of validity has not been overcome.

The Supreme Court in *The Bremen* wrote, "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum *1364 in which suit is brought." 407 U.S. at 15, 92 S.Ct. at 1916. By including antiwaiver provisions in the securities laws, Congress made clear its intention that the public policies incorporated into those laws should not be thwarted.

The framers of the securities laws were concerned principally with reversing the common law rule favoring "caveat emptor." *See, e.g., SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1025 n. 51 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). To this end, the securities laws are aimed at prospectively protecting American investors from injury by demanding "full and fair disclosure" from issuers. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 727–28, 95 S.Ct. 1917, 1921, 44 L.Ed.2d 539, *reh'g denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Private actions exist under the securities laws not because Congress had an overwhelming desire to shift losses after the fact, but rather because private actions provide a potent means of deterring the exploitation of American investors. *See, e.g., Randall v. Loftsgaarden*, 478 U.S. 647, 664, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986); *Abrahamson v. Fleschner*, 568 F.2d 862, 872 (2d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). We believe therefore that the public policies of the securities laws would be contravened if the applicable foreign law failed adequately to deter issuers from exploiting American investors.

In this sense, the securities laws somewhat resemble the antitrust laws at issue in *Mitsubishi*. The *Mitsubishi* Court enforced a clause providing that all disputes arising under a contract between a Puerto Rican corporation and a Japanese corporation be submitted for arbitration by the Japan Commercial Arbitration Association. The Court recognized that private actions under the Sherman Act, 15 U.S.C. § 1 *et seq.*, play a "central role" in promoting the national interest in a competitive economy, 473 U.S. at 634–35, 105 S.Ct. at 3357–58. Like private actions in the securities context, private actions under the Sherman Act serve primarily a deterrent purpose. *Id.* at 635, 105 S.Ct. at 3358. Nevertheless, the *Mitsubishi* Court held that a Japanese arbitration panel, *applying United States antitrust law*, adequately served the deterrent purpose of the Sherman Act, despite the panel's lack of allegiance to United States' interests. *Id.* at 636–37, 105 S.Ct. at 3358–59. The Court indicated quite clearly in dicta, however, that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. at 3359 n. 19. [3]

---

[3]   *Scherk*, decided eleven years before *Mitsubishi*, is not to the contrary. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, *reh'g denied*, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). Although the *Scherk* Court enforced an arbitration clause which contained a choice of law provision (Illinois law), the focus of the opinion is almost exclusively on the validity of the *arbitration* provision. Nowhere in the opinion is it suggested that a choice of law clause invariably trumps the public policies underlying the securities laws. In any event, Illinois law is certainly adequate to protect the substantive rights of Alberto–Culver,

> the American company that allegedly was defrauded in its purchase of Scherk, a German company. Indeed, viewed practically, the complaint was essentially a breach of contract action masquerading as a statutory misrepresentation claim. The Court could confidently rely on Illinois law to protect any public policy of the United States implicated in that action.

We are concerned in the present case that the Roby Names' contract clauses may operate "in tandem" as a prospective waiver of the statutory remedies for securities violations, thereby circumventing the strong and expansive public policy in deterring such violations. We are cognizant of the important reasons for enforcing such clauses in Lloyd's' agreements. Lloyd's is a British concern which raises capital in over 80 nations. Its operations are clearly international in scope. There can be no doubt that the contract clauses mitigate the uncertainty regarding choice of law and forum inherent in the multinational affairs of Lloyd's. Comity also weighs in favor of enforcing the clauses. Yet we do not believe that a United States court can in good conscience enforce clauses that subvert a strong national policy, particularly one that for over fifty years has served as **\*1365** the foundation for the United States financial markets and business community. In this case, the victims of Lloyd's' alleged securities violations are hundreds of individual American investors, most of whom were actively solicited in the United States by Lloyd's representatives. We believe that if the Roby Names were able to show that available remedies in England are insufficient to deter British issuers from exploiting American investors through fraud, misrepresentation or inadequate disclosure, we would not hesitate to condemn the choice of law, forum selection and arbitration clauses as against public policy. For the reasons set forth in section C below, however, we conclude that the Roby Names have failed to make such a showing.

### C. Availability of Adequate Remedies

We are satisfied not only that the Roby Names have several adequate remedies in England to vindicate their substantive rights, but also that in *this* case the policies of ensuring full and fair disclosure and deterring the exploitation of United States investors have not been subverted. We address the fraud and misrepresentation claims first.

#### 1. Fraud and Misrepresentation

English common law provides remedies for knowing or reckless deceit, negligent misrepresentation, and even innocent misrepresentation. Moreover, the Misrepresentation Act of 1967 provides some additional statutory remedies. *Id.* While the Roby Names might have been able to sue "controlling persons" under the United States securities laws and establish liability without proving reliance, it certainly is not unfair for English law to require proof of actual misconduct and reliance. Furthermore we are skeptical that "controlling person" liability could be established against many of the defendants here. For instance, we question whether the Lloyd's' governing bodies have "control" over other Lloyd's entities in the sense intended under the securities laws. *See, e.g.,* 17 C.F.R. § 230.405 (1992) (defining "control"); *Harrison v. Dean Witter Reynolds*, 974 F.2d 873, 881 (7th Cir.1992).

In any event, the available remedies are adequate and the potential recoveries substantial. This is particularly true given the low scienter requirements under English misrepresentation law (*e.g.,* negligence, "innocence"). Moreover, together with the contractual obligations imposing certain fiduciary and similar duties on Members' and Managing Agents, we believe that the available remedies and potential damages recoveries suffice to deter deception of American investors.

In this context we also note that many of the so-called "misrepresentations" the Roby Names allege are really complaints about the conduct of Lloyd's' affairs rather than complaints about fraudulent reporting. Thus, for instance, while it may be true that the defendants kept insufficient reserves and permitted "questionable accounting practices," failure to convey this information to the Roby Names is more a violation of the letter of the securities laws than their spirit, because the complaints really address Lloyd's' misconduct *after* securities are sold. We do not believe that these complaints implicate the public policy of the securities laws.

Finally, although, as the Roby Names observe, section 14 of the Lloyd's Act of 1982 exempts the Corporation of Lloyd's (and its officers and employees) from liability, no other entity within Lloyd's is exempt. Moreover, even the Corporation of Lloyd's is not exempt for acts "done in bad faith." Furthermore, as a self-regulating organization, we cannot say that Lloyd's' own bylaws

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

will not insure the honesty and forthrightness that American investors deserve and expect. We conclude that the Roby Names have adequate remedies in England to vindicate their statutory fraud and misrepresentation claims.

### 2. *Disclosure*

We turn now to address whether adequate remedies are available to deter issuers from issuing securities without disclosing sufficient information to permit investors to make informed decisions. We believe that this policy concern is somewhat diluted in this case because the SEC consistently has exempted Lloyd's from the registration requirements of the securities laws. Apparently the SEC has **\*1366** decided that Lloyd's/s' means test meets the requirements of Regulation D. We are extremely reluctant to dispute the SEC's apparent judgment that the Roby Names are sophisticated enough that they do not need the disclosure protections of the securities laws.

In any event, English law in this case provides Lloyd's entities with an adequate inducement to disclose material information to American investors: failure to do so gives rise to liability for breach of contract. For instance, the Members' Agent's Agreement requires each Members' Agent "promptly" to provide Names with a host of information, and to

> disclose ... in good time *any information* in its possession relating to any of the Contracted Syndicates, or to any syndicate which the Agent has advised the Name to join ... *which could reasonably be expected to influence the Name* in deciding whether to become or remain a member of, or to increase or reduce his participation in, any such syndicate, and *use its reasonable endeavours to obtain any such information.*

(emphasis added). Similarly, paragraph 4.2(i) of the Managing Agent's Agreement requires Managing Agents to disclose "in good time" relevant information to the Name or his Members' Agent. The Roby Names, therefore, certainly can allege breach of contract claims under English law. In addition, under their contract Members' Agents owe certain fiduciary duties to Names which provide a further basis for suit.

While we do not doubt that the United States securities laws would provide the Roby Names with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements, we are convinced that there are ample and just remedies under English law. Moreover, we cannot say that the policies underlying our securities laws will be offended by the application of English law. In this case, the Roby Names have entered into contracts that require substantial disclosure by both the Members' and Managing Agents. The specter of liability for breach of contract should act as an adequate deterrent to the exploitation of American investors. The well developed English law of fraud and misrepresentation likewise adequately requires that the disclosure be "fair."

### III. *Application of RICO*

**[8]**   That RICO provides treble damages and seeks to deter persistent misconduct does not dissuade us from our view that the Roby Names' contract clauses must be enforced. As we have explained, the Roby Names have adequate potential remedies in England and there are significant disincentives to deter English issuers from unfairly exploiting American investors. Although the remedies and disincentives might be magnified by the application of RICO, we cannot say that application of English law would subvert the policies underlying that statute.

### CONCLUSION

For the foregoing reasons we hold that the Roby Names' contract clauses cover the scope of, and the parties named in, the complaint and that the Roby Names have remedies under English law adequate not only to vindicate their substantive rights but also to protect the public policies established by the United States securities laws.

Roby v. Corporation of Lloyd's, 996 F.2d 1353 (1993)
61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

The judgment and order of the district court are affirmed.

**Parallel Citations**

61 USLW 2796, Fed. Sec. L. Rep. P 97,458, RICO Bus.Disp.Guide 8307

End of Document · 2014 Thomson Reuters. No claim to original U S Government Works

# AGREEMENTS ON JURISDICTION AND CHOICE OF LAW

### ADRIAN BRIGGS

*Professor of Private International Law, Oxford University*
*Fellow and Tutor in Law, St Edmund Hall, Oxford*
*Barrister, Blackstone Chambers, Temple*



OXFORD
UNIVERSITY PRESS

Case 1:14-cv-03042-RMB-AJP Document 89-5 Filed 09/24/14 Page 16 of 23

238 *Chapter 7: Jurisdiction Agreements: Brussels I Regulation*

thereby honouring the principle of party autonomy. Whereas many commentators praise party autonomy as the primary tool for the parties to 'fine tune' their jurisdictional interests to a degree the inevitably abstracting other grounds of jurisdiction could never achieve, neither the systematic structure of the Judgments Regulation nor its interpretation by the ECJ appear to attribute any particular dignity to the agreement of the parties as a head of jurisdiction. On the other hand, the practical relevance of international choice of forum agreements, in particular underlined by the national report of the UK, can hardly be disputed, given that the Hague Conference on Private International Law ultimately brought itself, despite the many difficulties faced, to agree upon the Hague Convention on Choice of Court Agreements of 30 June 2005, the Preamble of which underlines the State Parties' desire 'to promote international trade and investment' by providing 'certainty', and ensuring 'the effectiveness of exclusive choice of court agreements between parties to commercial transactions'. It is this 'certainty' and 'effectiveness' that commercial players perceive as being jeopardised by subjecting the choice of court agreement to the strict rule of priority under Article 27 [of the Regulation].

One need hardly say that such a candid understanding of the shortcomings in the European legislative scheme, coming from such a source, gives ground for optimism that the approach of the common law may yet contribute to the improvement of private international law within Europe.

## I. THE CONTEXT IN WHICH ARTICLE 23 IS TO OPERATE

**7.02** The Brussels I Regulation, following closely the pattern set by the Brussels Convention, makes detailed provision for the validity and effectiveness of jurisdiction agreements which prorogate the courts of Member States. The general scheme is that an agreement on such jurisdiction is binding and must[2] be given effect by the court chosen (prorogation) and by all other courts which would have had, but by reason of the agreement do not have, jurisdiction (derogation). There are certain circumstances in which, according to the Regulation, the agreement will not be effective to produce this result. Where a court in a Member State has exclusive jurisdiction regardless of domicile,[3] an agreement on jurisdiction may not contradict it.[4]

---

[2] Where jurisdiction is conferred on a court by the rules of the Brussels Convention or Regulation, there is, in principle, no discretion to decline to exercise it: C-281/02 *Owusu v Jackson* [2005] ECR I-1383.

[3] Article 22.

[4] Article 23(5).

Case 1:14-cv-03042-RMB-AJP Document 89-5 Filed 09/24/14 Page 17 of 23

Where the defendant is willing to appear before a court to which he has been summoned by the claimant, that court has jurisdiction and the agreement is disregarded.[5] Where the agreement is made in the context of an insurance contract, a consumer contract or an employment contract, it will have to satisfy further conditions to be effective.[6] And where the same cause of action, between the same parties, is already pending before the court of another Member State, the agreement will not confer jurisdiction.[7] Otherwise the jurisdiction agreement must be given effect, even if a court called upon to do so sees real disadvantages in doing so. No judicial discretion is permitted to modify the statutory mechanism for enforcement or non-enforcement of jurisdiction agreements.[8]

Assuming that none of these exceptions applies, the principle is that what has been agreed to by or between the parties must be given effect. It ought to follow that mechanisms for ensuring that the agreement of the parties was real are robust, but no more complicated than is warranted to secure the ends they serve. This is because there is, as said, no room for judicial discretion in enforcing the rights and duties created by the agreement: the alleged agreement either operates or it does not. But it is also because the law on the recognition and enforcement of judgments[9] does not allow the losing party to point out, as an objection to recognition of the judgment, that the adjudicating court erred in relation to Article 23.[10] If the court considered that it was prorogated by an agreement on jurisdiction, and took jurisdiction accordingly, its decision on the point is unchallengeable.[11] If it concluded that its jurisdiction was not derogated from, and took jurisdiction accordingly, its decision on the point is final and unchallengeable. The validity of the agreement on jurisdiction is examined and resolved once and for all by the court before which proceedings are brought, which means by the first court seised if proceedings are brought before two courts in respect of the same cause of action.[12] It is therefore to be expected that the decision-taking process will be clear and transparent.

**7.03**

---

[5] Article 24, as so interpreted in 150/80 *Elefanten Schuh GmbH v Jacqmain* [1981] ECR 1671.

[6] Set out in Articles 13 (insurance), 17 (certain consumer contracts), and 21 (individual contracts of employment).

[7] C-116/02 *Erich Gasser GmbH v Misat srl* [2003] ECR I-14693.

[8] *Hough v P&O Containers* [1999] QB 834.

[9] Chapter III of the Regulation.

[10] Article 35 of the Regulation.

[11] Leaving aside Article 35(1) of the Regulation.

[12] C-116/02 *Erich Gasser GmbH v Misat srl* [2003] ECR I-14693.

# DICEY, MORRIS AND COLLINS

## ON

# THE CONFLICT OF LAWS

### FIFTEENTH EDITION

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY
P.C., LL.D., LL.M., F.B.A.

WITH

### SPECIALIST EDITORS

## VOLUME 1

SWEET & MAXWELL  THOMSON REUTERS

which confer jurisdiction on the courts of a particular part of the United Kingdom. It is designed for cases in which the defendant is domiciled in another part of the United Kingdom. It differs in certain respects from Art.23 of the Regulation, in the light of which it was drafted. It imposes no formal requirements for the agreement to be valid; and there is no reason to suppose that it is not subject other rules of English law which might override its effectiveness. The clause confers jurisdiction, as opposed to exclusive jurisdiction, on the chosen court and consequently the chosen court may decline jurisdiction, and a court other than the chosen court may, if it otherwise has jurisdiction, override the clause in accordance with clause (2) of Rule 39.[632]

**Discretion.** Where Art.23 applies, the chosen court has no discretion to decline jurisdiction, and other courts have no power to override the jurisdiction agreement.[633] But where it does not apply, the exercise of jurisdiction under clause (1) of Rule 39 is in theory subject to the discretion of the court, although (as will be seen) it is only infrequently that the court would be likely refuse to exercise it by staying an action or refusing permission to serve out of the jurisdiction.[634] The court has a discretion under clause (2) of Rule 39 to override the choice of a foreign court.

12–145

**Clause (1) of the Rule.** At common law the mere agreement of the parties that the High Court would have jurisdiction to determine disputes arising out of a contract between them was insufficient by itself to give the court jurisdiction, because the defendant could not effectively be served with a writ if he were outside England.[635] But if one party nominated an agent resident in England to accept service of process on his behalf, he was deemed to submit to the jurisdiction, and service could be effected on the agent in accordance with the contract.[636] Part 6 of the Civil Procedure Rules[637] provides that where a contract contains a term providing that, in the event of a claim being issued in relation[638] to the contract the claim form may be served by a method

12–146

---

[632] *cf. British Steel Corp v Allivane International Ltd*, 1989 S.L.T. (Sh Ct) 57 (Scots court may override English jurisdiction clause if no real dispute). This decision was misunderstood in *Jenic Properties Ltd v Andy Thornton Architectural Antiques*, 1992 S.L.T. (Sh Ct) 5. See also *McCarthy v Abowall (Trading) Ltd*, 1993 S.L.T. (Sh Ct) 65; *Morrison v Panic Link Ltd*, 1993 S.C. 631 (English jurisdiction clause held non-exclusive).

[633] A point which appears to have been overlooked in *OT Africa Line Ltd v Magic Sportswear Corp* [2005] EWCA Civ 710, [2005] 2 Lloyd's Rep. 170, and in *Dubai Islamic Bank PJSC v PSI Energy Holding Co BSC* [2011] EWHC 1019 (Comm.) (though the domicile of the parties to the jurisdiction agreement was not examined in detail, so the application of Art.23 may not be wholly clear). *cf. Microsoft Ireland Operations Ltd v EIM International Electronics Ltd* [2010] IEHC 228.

[634] Though see *Bouygues Offshore SA v Caspian Shipping Co (Nos 1, 3, 4, 5)* [1998] 2 Lloyd's Rep. 461 (CA).

[635] See *British Wagon Co v Gray* [1896] 1 Q.B. 35 (CA).

[636] *Tharsis Sulphur Co v Société des Métaux* (1889) 58 L.J.Q.B. 435; *Montgomery, Jones & Co v Liebenthal Co* [1898] 1 Q.B. 487 (CA); *Reversionary Interest Society Ltd v Locking* [1928] W.N. 227.

[637] CPR, r.6.11.

[638] CPR, r.6.11 applies only to actions "in respect of a contract" and there is no jurisdiction to allow service out of the jurisdiction where the parties have agreed to submit in respect of a tort: *The Anna L* [1994] 2 Lloyd's Rep. 379, 382.

specified in the contract, the claim form is deemed to be served on the defendant if it is served by a method specified in the contract. If the place of service specified is within the jurisdiction, permission of the court for issue and service of process is not necessary. But (except where the case comes within Art.23 of the Brussels I Regulation or of the Lugano Convention or of Sch.4 to the 1982 Act[639]) if the contract provides for service outside the jurisdiction, or contains no provision for service and the defendant is outside the jurisdiction, permission to serve outside the jurisdiction is required. Permission can be obtained under what is now CPR, PD6B, para.3.1(6)(d), the effect of which is that service outside the jurisdiction is permissible where the claim is brought in respect of a contract which contains a term to the effect that the High Court shall have jurisdiction to hear and determine any action in respect of the contract.

12–147    The provision which is now found in CPR, PD6B, para.3.1(6)(d), had its origin in 1920,[640] when it was introduced to allow service out of the jurisdiction in cases where there was a contractual submission but where no other head of what was then RSC Order 11, r.1(1) was applicable. Today cases will be rare in which CPR, PD6B, para.3.1(6)(d), would be the only available head of jurisdiction, especially since, in the absence of an express choice of some other law, it will normally be inferred from the jurisdiction clause that English law is the governing law of the contract.[641] Although permission to serve outside the jurisdiction may be required in cases outside the scope of Art.23 of the Regulation or the Convention, where the parties have agreed to an English forum it would require strong grounds for one of the parties to resist the exercise of jurisdiction by the English court.[642]

12–148    Where there is an agreement within the scope of Art.23 of the Brussels I Regulation or of the Lugano Convention or of Sch.4 to the 1982 Act conferring jurisdiction on the English court, permission to serve process out of the jurisdiction is not necessary, and, in the case of such an agreement, no question of the exercise of a discretion arises.

12–149    **Clause (2) of the Rule.** "Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign court, and the defendants apply for a stay, the English court, assuming the claim to be otherwise within its jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not."[643] The court will exercise its discretion to grant a stay unless the

---

[639] In which event service is permitted without permission under CPR, rr. 6.32 and 6.33.

[640] Ord.11, r.2(a).

[641] See below, para.32–061.

[642] *The Chaparral* [1968] 2 Lloyd's Rep. 158, 163–164 (CA); *Attock Cement Co Ltd v Romanian Bank for Foreign Trade* [1989] 1 W.L.R. 1147, 1161 (CA); *Gulf Bank KSC v Mitsubishi Heavy Industries Ltd* [1994] 1 Lloyd's Rep. 323; *Egon Oldendorff v Libera Corp* [1995] 2 Lloyd's Rep. 64; *BAS Capital Funding Corp v Medfinco Ltd* [2003] EWHC 1798 (Ch), [2004] 1 Lloyd's Rep 652. On the power to stay proceedings brought in England as the contractual forum, see *UBS AG v Omni Holding AG* [2000] 1 W.L.R. 916; *Marubeni Hong Kong & South China Ltd v Mongolian Government* [2002] 2 All E.R. (Comm.) 873. On the power of the court to restrain foreign proceedings brought in breach of a jurisdiction agreement see clause (4) of the Rule, below, para.12–159.

[643] *The El Amria* [1981] 2 Lloyd's Rep. 119, 123 (CA) approving *The Eleftheria* [1970] P. 94, 99; applied in *The Pioneer Container* [1994] 2 A.C. 324, 347 (PC); also *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425.

claimant shows strong reasons, certainly requiring more than that he show England to be the *forum conveniens*, why the English proceedings should not be stayed. This is because the underlying principle is that the court makes people abide by their contracts. There is an even heavier burden on a claimant who applies to serve a foreign defendant out of the jurisdiction than on a claimant who institutes proceedings in England against a defendant present in England.[644] In this respect, the approach of the court to jurisdiction agreements does not draw significant distinctions according to whether they relate to the English court or to a foreign court:[645] a strong case will be required to justify the grant of relief which has the effect of allowing a party to a contract to resile from its terms. Where the defendant is present in England, or a ship is arrested in England in an action *in rem*, and the action is brought in breach of a jurisdiction agreement, the application by the defendant is to stay proceedings, and not to have them set aside.[646]

Clause (2) of Rule 39 is subject to the effect of Art.23 of the Brussels I Regulation and of the Lugano Convention under clause (3). Rule 12 of Sch.4 to the 1982 Act, which deals with jurisdiction agreements in intra-United Kingdom cases, does not give conclusive effect to an exclusive jurisdiction clause and therefore falls within the general principle of clause (2). **12–150**

English law as the *lex fori* determines the effect which will be given to the jurisdiction clause, and, in particular, the circumstances in which the court has a discretion to override it.[647] A stay will be refused if the choice of jurisdiction is contrary to a statutory rule against ousting the jurisdiction of the court[648] or against referring a dispute to the courts and law of a foreign country. Thus in *The Hollandia*[649] it was held that the effect of the Hague-Visby Rules, scheduled to the Carriage of Goods by Sea Act 1971, was to prohibit the submission of a dispute to the courts of a foreign country which would give effect to a limitation of the liability of the carrier under the original Hague Rules. On the other hand, the fact that, under the law of another country, an agreement providing for the jurisdiction of the English courts would be denied effect furnishes no ground for the English court to refrain from giving the **12–151**

---

[644] *Evans Marshall & Co Ltd v Bertola SA* [1973] 1 W.L.R. 349, 362. For other cases of service out of the jurisdiction involving foreign jurisdiction clauses see *Hoerter v Hanover, etc. Works* (1893) 10 T.L.R. 103 (CA); *Re Schintz* [1926] Ch. 710 (CA); *Ellinger v Guinness Mahon & Co* [1939] 4 All E.R. 16; *Mackender v Feldia* [1967] 2 Q.B. 590 (CA); *YTC Universal Ltd v Trans Europa SA* [1973] 1 Lloyd's Rep. 480n. (CA); *Standard Steamship Owners' Protection and Indemnity Assn (Bermuda) Ltd v Gann* [1992] 2 Lloyd's Rep. 528; *Citi-March Ltd v Neptune Orient Lines* [1996] 1 W.L.R. 1367; *Northern Sales Co Ltd v Government Trading Corp of Iran* (1991) 81 D.L.R. (4th) 316 (BCCA); *Ash v Corporation of Lloyd's* (1992) 94 D.L.R. (4th.) 378 (Ont CA); *Lewis Construction Co Ltd v M. Tichauer SA* (1966) V.R. 341.

[645] *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425.

[646] *The Fehmarn* [1958] 1 W.L.R. 159 (CA); *The Eleftheria* [1970] P. 94; *The Pia Vesta* [1984] 1 Lloyd's Rep. 169.

[647] See Kahn-Freund (1977) 26 I.C.L.Q. 825, 833–836.

[648] See, e.g. Consumer Credit Act 1974, s.141(1); Employment Rights Act 1996, s.203(1).

[649] [1983] 1 A.C. 565, distinguished in *The Benarty (No.2)* [1985] Q.B. 325 (CA). The actual decision would now be different under Art.23, because the conventions which enact the Hague and Hague-Visby Rules are not within Art.71. See also *Messageries Maritimes v Wilson* (1954) 94 C.L.R. 577; *Kim Meller Imports Pty Ltd v Eurolevant SpA* (1986) 7 N.S.W.L.R. 269; *Akai Pty Ltd v People's Insurance Co Ltd* (1997) 188 C.L.R. 418.

jurisdiction agreement its full effect, which may also mean enforcement by anti-suit injunction.[650]

**12–152**  In exercising its discretion whether to grant a stay, the court considers all the circumstances of the case, and the following formulation[651] of the particular factors to be taken into account has been much relied upon: (1) in which country the evidence is available, and the effect of that on the relative convenience and expense of a trial in England or abroad; (2) whether the contract is governed by the law of the foreign country in question, and if so, whether it differs from English law in any material respect; (3) with what country either party is connected, and how closely; (4) whether the defendants genuinely desire trial in a foreign country, or are only seeking procedural advantages; (5) whether the claimants would be prejudiced by having to sue in the foreign court because they would be deprived of security for their claim,[652] or be unable to enforce the judgment in their favour, or be faced with a time-bar not applicable in England, or for political, racial, religious or other reasons be unlikely to get a fair trial.[653] Until recently it could be confidently stated that if the making of an order to give effect to a jurisdiction clause— whether a stay of local proceedings, or permission to serve out of the jurisdiction, or even an anti-suit injunction—would have the effect that there would be concurrent legal proceedings, with different parties, that factor will cause the court to exercise its discretion against the making of the order; and subject to what is said below, that approach is still sound. In *The El Amria*,[654] a stay of English proceedings in favour of the chosen court would have meant that the claim for damages for spoiling of a cargo would be tried partly in Alexandria against the sea carrier, and partly in England against the Mersey Docks and Harbour Board. The risk of irreconcilable judgments, and the duplication of time and expense, justified the decision not to stay the English proceedings. In *Donohue v Armco Inc*[655] the House of Lords declined to enforce an English jurisdiction clause, by refusing to restrain parties who were bringing proceedings in the United States courts in breach of their promise, because there were other claimants in the United States proceedings who were under no contractual obligation to sue in England, and whose actions against

---

[650] *Akai Pty Ltd v The People's Insurance Co Ltd* [1998] 1 Lloyd's Rep. 90; *OT Africa Line Ltd v Magic Sportswear Corp* [2005] EWCA Civ 710, [2005] 2 Lloyd's Rep. 170.

[651] *The Eleftheria* [1970] P. 94, 100, *per* Brandon J., approved in the *The El Amria* [1981] 2 Lloyd's Rep. 119, 123–124, *per* Brandon L.J. (CA); *The Sennar (No.2)* [1985] 1 W.L.R. 490, 500, *per* Lord Brandon (HL).

[652] Where the claimant would be entitled to security in England, but not in the foreign court, the stay may be made conditional on the claimant retaining the security: *The Eleftheria*, above; Civil Jurisdiction and Judgments Act 1982, s.26. *cf. The Sylt* [1991] 1 Lloyd's Rep. 240; above, para.8–036.

[653] On the effect of delay in the chosen forum see *Evans Marshall & Co Ltd v Bertola* [1973] 1 W.L.R. 349 (CA); *The Vishva Prabha* [1979] 2 Lloyd's Rep. 286; *The El Amria*, above; *The Nile Rhapsody* [1994] 1 Lloyd's Rep. 382 (CA).

[654] [1981] 2 Lloyd's Rep. 119. See also *Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 W.L.R. 1367; *The MC Pearl* [1997] 1 Lloyd's Rep. 566; *Soc Nat Ind Aérospatiale v Lee Kui Jak* [1987] A.C. 871 (not a jurisdiction clause case).

[655] [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425. See also *Bouygues Offshore SA v Caspian Shipping Co (Nos 1, 3, 4, 5)* [1998] 2 Lloyd's Rep. 461 (CA).

the claimants were not open to criticism.[656] The general principle is that a court, while it will give great weight to a jurisdiction agreement, will not allow the parties to a contract to insist on the strict enforcement of their contractual agreement at the cost of damage being done to the orderly and efficient resolution of complex disputes or of the resolution of the controversy by "a single tribunal which is best fitted to make a reliable, comprehensive judgment on all matters in issue",[657] especially where this would risk exposing non-parties to serious prejudice.

Where the parties, however, have agreed to the jurisdiction of the English court, they are to be taken to be aware that the Brussels I Regulation removes any judicial discretion to not give effect to that agreement, and that a concentration of jurisdiction by declining to exercise English jurisdiction may therefore be impossible to achieve. In those circumstances, the court may be more willing to enforce the jurisdiction agreement according to its terms, including by anti-suit injunction if appropriate.[658] Likewise, if the parties have made an agreement on jurisdiction which was incomplete, or have entered into a series of contracts which contain a number of jurisdiction clauses[659] and which, if all enforced according to their terms, would result in the fragmentation of proceedings, it will not lie in the mouth of one of them to ask the court to withhold effect from one or another of the clauses on the ground that to give it effect will be to risk the fragmentation of a complex dispute. Where a party may be said to have subscribed to jurisdiction clauses which now show it to have brought its jurisdictional misfortune upon itself,[660] it may face an uphill struggle to persuade the court to exercise its discretion to allow it to depart from the terms of an agreement.[661] It will certainly need to do a good deal more than to assert that there is an abstract risk, as opposed to a real and present danger, of fragmentation.

*Effect of time bar.* Where a claimant sues in England in breach of a foreign jurisdiction clause it frequently happens that, by the time the defendant's application for a stay comes before the court, any action in the contractually-chosen forum is time-barred. If the existence of a time bar is taken into account in favour of the claimant in refusing a stay, it would deprive the defendant of an accrued defence in the chosen forum; if it is taken into

12–153

12–154

---

[656] *cf. Horn Linie GmbH v Panamericana Formas e Impresos SA* [2006] EWHC 373 (Comm.), [2006] 2 Lloyd's Rep. 44; *Starlight Shipping Co v Tai Ping Insurance Co Ltd* [2007] EWHC 1893 (Comm.), [2008] 1 Lloyd's Rep. 230.

[657] *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 Lloyd's Rep. 425, [34].

[658] Though there is certainly no requirement that an injunction be granted; it remains a matter for the discretion of the court: *Skype Technologies SA v Joltid Ltd* [2009] EWHC 2783 (Ch), [2011] I.L.Pr. 103; *Bank of New York Mellon v GV Films Ltd* [2009] EWHC 2328 (Comm.).

[659] Or clauses which envisage the bringing of parallel claims in different courts.

[660] That could not be said of the claimant in *The El Amria*, who had had no reason to make a jurisdiction agreement with anyone other than the sea carrier. However, if the risk of being deprived of a fair trial in the designated court is significant, it would not be right to blindly enforce the jurisdiction agreement and blame the parties for their own predicament: see above, para.12–040.

[661] *Konkola Copper Mines Plc v Coromin Ltd (No.2)* [2006] EWHC 1093 (Comm.), [2006] 2 Lloyd's Rep. 446; *Deutsche Bank AG v Highland Crusader Offshore LP* [2009] EWCA Civ 725, [2010] 1 W.L.R. 1023.