# Exhibit 4

L.Q.R. 2005, 121(Oct), 535-540 Page 1

**(Cite as: )**

L.Q.R. 2005, 121(Oct), 535-540

Law Quarterly Review

2005

The death of Harrods: forum non conveniens and the European Court

Adrian Briggs

© 2014 Sweet & Maxwell and its Contributors

**Subject:** Conflict of laws. **Other Related Subject:** Civil procedure

**Keywords:** Allocation of jurisdiction; EC law; Forum non conveniens; Personal injury claims; Stay of proceedings

**Legislation cited:** Brussels Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters 1968 Art.2, Art.4

**Case cited:** Owusu v Jackson (t/a Villa Holidays Bal Inn Villas) (C-281/02) [2005] E.C.R. I-1383 (ECJ)

**\*535** EVEN those who praise its contribution to the promotion of free trade within the European Union must sometimes wonder about the contribution the European Court makes to private law. In 15 months the court has struck three blows against international commercial litigation in the United Kingdom and beyond. First, in *Erich Gasser GmbH v MISAT Srl* (Case C-116/02) [2005] Q.B. 1 it refused to allow that a court, given jurisdiction by a valid and binding contractual agreement between the parties, was entitled to exercise that jurisdiction where one of the parties had brought proceedings, jurisdictionally unfounded but liable to be extremely slow and costly to see off, in the courts of another Member State. The wrecking tactic ironically known as the "Italian torpedo" was allowed to defeat the enforcement of contractual agreements on jurisdiction. Then in *Turner v Grovit* (Case C-159/02) [2005] 1 A.C. 101 it denied that a court may defend the integrity of its proceedings, under collateral attack from proceedings brought *mala fide* before the courts of another Member State, by the granting of an anti-suit injunction against a wrongdoer. These cases have already been lamented in these pages: (2004) 120 L.Q.R. 357 and 529. And now the court has ruled that though an English court has been satisfied, clearly and distinctly, that a court in a non-Contracting State is more appropriate for the trial of the action, and has further determined that no injustice would be done to the claimant if the English proceedings were stayed, a defendant domiciled in the United Kingdom may not seek, and a court may not grant, a stay on the ground of *forum non conveniens*. The reference in *Owusu v Jackson* (Case C-281/02) [2005] 2 W.L.R. 942 arose from personal injuries sustained in a holiday swimming accident at a beach resort in Jamaica. The claimant issued proceedings against six defendants, five Jamaican and one English, Mr Jackson. Jackson applied for a stay of **\*536** proceedings on the basis that the claim belonged in Jamaica: a submission which did not seem at all far fetched. On a reference from the Court of Appeal, and reported at [2002] I.L.Pr. 813, the European Court stated that, where jurisdiction over the English defendant was conferred by Art.2 of the Brussels Convention, it was "mandatory in nature and … according to its terms, there can be no derogation from the principle it lays down except in the cases expressly provided for by the Convention" (at [37]). It followed, according to the ruling, that the English doctrine of *forum non conveni-*

**(Cite as: )**

*ens* was inapplicable "even if the jurisdiction of no other Contracting State is in issue or the proceedings have no connecting factors to any other Contracting State". *Re Harrods (Buenos Aires) Ltd* [1992] Ch. 72 has therefore been overruled, and an issue which had been discussed and debated for a generation was despatched by barely a page of conclusory assertion.

The real, if collateral, victims of the ruling were the five Jamaican defendants, who knew that a claim against the English defendant would exercise a strong gravitational pull on those raised against them. They had no connection with any Member State, but found that Art.2 would be likely to drag them to England to defend themselves. This was no laughing matter for defendants of limited means who had done all they ever did in Jamaica. But the court was airily dismissive of their predicament. Having recited the real and substantial grounds on which the defendants were aggrieved (at [44]), it continued "In that regard, genuine as those difficulties may be, suffice it to observe that such considerations, which are precisely those which may be taken into account when *forum non conveniens* is considered, are not such as call into question the mandatory nature of the fundamental rule of jurisdiction contained in Article 2 …" (at [45]). And that was that.

The doctrine of *forum non conveniens* causes the most palpable sense of unease where a corporate defendant raises it against an individual claimant who has sustained personal injury, and most of all if the claimant is a local. All doctrinal analysis aside, this may be the real explanation for its repudiation by the High Court of Australia in *Oceanic Sun Line Special Shipping Co Inc v Fay* (1988) 165 C.L.R. 197, where an Australian holidaymaker sued a Greek ship operator, and in *Zhang v Régie Nationale des Usines Renault SA* (2003) 210 C.L.R. 491, where a would-be-Australian claimant sued a French car manufacturer. In England, personal injury claims have been where the court has been most willing to accept that it may be unjust to consign the claimant to the courts of the natural forum. In *Connelly v RTZ Corp (No.2)* [1998] A.C. 854, where an employee sustained injury from working in a corporation's mines, and in *Lubbe v Cape Plc* [2000] 1 W.L.R. 1545, where widows and orphans had been injured and bereaved by asbestos exposure, it was held to be unjust to expect the claimants to hazard their meagre resources on a trial in the **\*537** natural forum in southern Africa, and a stay was refused. In such cases the abstract attraction of trial in the natural forum quickly becomes overshadowed by these more individual concerns. But the doctrine is perfectly well able to deal with such cases, as *Connelly* and *Lubbe* showed. And in any event, this was not the explanation for the European Court's decision, which betrayed (especially at [42]) an utter inability to accept that English judges operate the doctrine to produce an outcome which is predictable, proportional, rational, and just. Some may find it curious that the court, whose principal judicial expertise is in promoting and enhancing free trade and fair competition within the internal market, can be so blind to the competition between legal services which arises from national laws on jurisdiction and judgments. But in this area, a stalinist monoculture prevails.

Tears and spilt milk, one may say: better to look forward than to look back. But the view is not alluring. To begin with, taking *Owusu* on its own terms, a jurisdiction agreement for the courts of Jamaica would have to be refused legal effect; and if a claim will require a court to adjudicate upon title to land in Jamaica, this foreign connection will be irrelevant as well. Neither the Convention nor the Judgments Regulation makes any express provision for points of contact with non-Contracting or non-Member States. Yet if the court really means that only express provisions are able to overcome the mandatory nature of Art.2 of the Convention or Regulation, this contradicts what it said in Case C-387/98 *Coreck Maritime GmbH v Handelsveem BV* [2000] E.C.R. I-9337. There (at [19]) it had accepted that a court may give effect to a jurisdiction agreement for a non-Contracting State in accordance with its own national law, notwithstanding the textual silence of the Convention. It is hard to believe that the court has both applied and changed its mind, but the language used in *Owusu* will give needless aid and comfort to those who cast around for means to defeat agreements on jurisdiction. The Advocate General in *Owusu,* in a de-

© 2014 Thomson Reuters.

tailed Opinion which did face up to the arguments, had suggested that such cases might be dealt with by according a "reflexive effect" to the provisions now found in Arts 22, 23, and possibly 27, of the Judgments Regulation.But*Coreck Maritime*is no authority for a principle of "reflexive effect".If the validity of a jurisdiction agreement for Jamaica is to depend on an analogy drawn from Art.23, it would presumably have to meet the formal and other limitations imposed by Art.23 for agreements which nominate the courts of Member States.That is not the same as a simple*renvoi*to national law, where such restrictions do not appear.Likewise, to give a "reflexive effect" to Art.22 of the Judgments Regulation will not have the effect of reproducing the common law rule in *British South Africa Co v Companhia de Moçambique*[1893] A.C. 602.Article 22 of the Regulation applies to proceedings which "have as their object rights*in rem*" in land in a Member State, whereas the common law denies an English court jurisdiction to***538** determine title to foreign land.No doubt the two categories will overlap, but they are certainly not congruent.And even if*Owusu*does not mean what it said, the critical detail of the law on jurisdiction agreements for non-Member States, etc. remains in doubt.For even though this broad issue formed the basis for the second question referred by the Court of Appeal, the European Court went out of its way to criticise the Court of Appeal for having had the temerity to ask it.It is to the shame of the European Court that, when the Court of Appeal saw the possible answer to the first question and asked for guidance in the second, there was so total a lack of judicial solidarity.

But when one stands back from the immediate decision, two larger and far more disconcerting issues can be seen.First, Art.2 was interpreted as a rule which was mandatory in its effect: in providing that a defendant "shall be sued" where he is domiciled, it left no room for the operation of a judicial or jurisdictional discretion.Hitherto, Art.2 had been understood as a provision which conferred on a defendant a strong right to defend at home.Numberless decisions which gave a restrictive interpretation to Articles which would have derogated from this were motivated by the need to protect the defendant's general right to defend at home.But a right given to a defendant may, presumably, be given up (the judgment at [42] plainly misunderstands this); and if Mr Jackson wished to forgo the privilege of defending in England, one may have supposed that the decision to give up home advantage was his alone.Instead, the court interpreted Art.2 as though it gave rights to a claimant rather than the defendant, inverting the usual understanding.Article 2 now appears to mean that a claimant may avail himself of the general jurisdictional rule.This in turn raises the question whether Art.4 must now be interpreted in the same way.Article 4(1) deals with jurisdiction over defendants who do not have a domicile in any Member State, by providing that jurisdiction in such cases is a matter for the national law of the court to be seised.On the face of it, if national law provides for the exercise of a jurisdictional discretion, Art.4(1) allows it to be exercised.But Art.4(2) is rather different.It says that a claimant domiciled in a Member State "may, whatever his nationality, avail himself in that State of the rules of jurisdiction there in force, and in particular those specified" in Art.3 of the Convention or Annex I of the Regulation.Now the list of rules so specified includes one "which enables jurisdiction to be founded on the document instituting proceedings having been served on the defendant during his temporary presence in the United Kingdom".If Art.4(2) says that a claimant may avail himself of that rule, the corollary is that the defendant is liable to be sued on the basis of that rule if a qualifying claimant chooses to invoke it.And if that is so, a court, seised under Art.4 with jurisdiction over a defendant who has been served within the jurisdiction, would have no more right than did the court in*Owusu,*seised on the basis of Art.2, to find that the natural forum lay elsewhere and***539** stay the proceedings.It may seem odd that this could be so, but Art.4(2) does say that a claimant may avail himself of a particular jurisdictional rule.The difference between this and Art.2 is one of geography but is not, now, one of structure.

Secondly, though, the question whether the doctrine of*forum non conveniens*was consistent with the Brussels Convention presupposed that the latter applied at all.This was the biggest issue of all, and it drew a more direct

© 2014 Thomson Reuters.

attack from Jackson and the United Kingdom.They pointed out that the issue in*Owusu*had nothing to do with relations between Contracting States, and deduced that the Treaty of Rome did not therefore authorise a Convention to lay down the law for a case which was so irrelevant to the internal market.But the court saw perfectly clearly the nature of the iceberg being floated towards it, and pressed the nuclear button.It refused to accept that this made the Brussels Convention inapplicable, using language which meant that it was*never*inapplicable.Its astounding reasoning (at [33] and [34]) may be reformulated into five propositions.The court (i) observed that the EC Treaty was designed to facilitate the working of the internal market, (ii) asserted in unconditional terms that the functioning of the internal market risked being obstructed by disparities which existed between national laws on jurisdiction and judgments, (iii) averred that the Convention was intended to eliminate obstacles to the functioning of the internal market, (iv) deduced that the Convention, whenever it applied, would inevitably contribute to the elimination of obstacles to the functioning of the internal market, and by saying so, (v) ensured that the uniform rules in the Convention were therefore not confined to those individual cases which exhibited a real and sufficient link with the working of the internal market.If this hardens into law, it will mean that it will*never* be admissible to argue that an absence of actual connection to the internal market means that the Convention is inapplicable.This marking out of territory by the court was deadly serious.It was intended to warn off those who might advance similar arguments about lack of connection to the internal market to trim or undermine the scope of the Judgments Regulation.It will also serve to prevent those who may advance similar arguments to cast doubt on the treaty basis of Regulations, present and to come, governing choice of law in contract, tort and unjust enrichment, family law, etc.Disparities in any of these areas of national law may, just as speciously, be said to obstruct the internal market.Careful and precise legal arguments about the legal basis for such legislation will be impotent against a boilerplate paragraph, bolted into every judgment, which will say that*any*disparities between national legislation will impede the functioning of the internal market, and that legislation to eradicate such disparities is therefore within the competence of the organs of the European Union.Left unchallenged, this appalling claim removes every limitation on the extent to which English private international law may be dismantled**\*540** by European legislation.It was in this, rather than in its treatment of the doctrine of*forum non conveniens,*that the court revealed its sense of its mission.Set against that, Mr Jackson's preference for defending himself in the natural forum simply did not register on the scale.

ADRIAN BRIGGS.[1]

---

[1]. St Edmund Hall, Oxford.

END OF DOCUMENT

© 2014 Thomson Reuters.