# Exhibit 6

K
12.
L6

060316

# LLOYD'S MARITIME AND COMMERCIAL LAW QUARTERLY 2005

GENERAL EDITOR
F. D. Rose, M.A., B.C.L., Ph.D., M.A.



**|L|L|P|**

LONDON  SINGAPORE
2005

# Forum non conveniens and European ideals

### Edwin Peel*

*This article considers the circumstances in which the English courts may stay proceedings commenced in England pursuant to the jurisdictional rules in Title II of the Brussels Convention (now the Brussels Regulation) in favour of proceedings in the courts of a non-Member State. It takes as its starting point the recent decision of the European Court of Justice in Owusu v. Jackson. After considering the impact of that decision on the practice of the English courts it seeks to assess what discretion, if any, may be left to the English courts, based on the reasoning employed by the European Court.*

Ever since it was handed down, the decision of the Court of Appeal in *Re Harrods (Buenos Aires) Ltd*[1] has had the appearance of being on borrowed time. In it, the Court of Appeal held that proceedings commenced in the English courts pursuant to Art 2 of the Brussels Convention[2] might be stayed, on the grounds of *forum non conveniens*, in favour of proceedings in the courts of a non-Contracting State. A quick, but never painless, death might have ensued if a reference on this point to the European Court of Justice in *Re Harrods* itself[3] had made it that far, but the case was settled. When, subsequently, an opportunity presented itself to the House of Lords to make a further reference it was declined since, having decided no stay would be awarded in any event, it was unnecessary to refer the question of whether the English courts continued to enjoy the power to so order.[4] The bell really began to toll when a claim form was served out of the Sheffield District Registry of the High Court on 6 October 2000 in *Owusu v. Jackson*.

On this occasion, a reference from the Court of Appeal[5] did make it to the European Court with all too predictable an outcome. The court has ruled[6] that a court of a

---

* Fellow of Keble College, Oxford. This article is dedicated to the memory of Angus Johnson.

1. [1992] Ch 72.
2. Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, signed on 27 September 1968 by the original members of the European Community. It came into force in 1973 and has been amended on several occasions on the accession of new Member States. See: [1972] OJ L299/32; [1978] OJ L304/1; [1982] OJ L388/1; [1989] OJ L285/1; [1997] OJ C15/1. For a consolidated text, see: [1998] OJ C27/1. The version currently in force in the United Kingdom (on the accession of Austria, Finland and Sweden) may be found in SI 2000/1824, which came into force on 1 January 2001. For proceedings commenced on or after 1 March 2002, it has been superseded by Council Regulation (EC) 44/2001 (save in Denmark).
3. *Ladenimor v. Intercomfinanz (Case C–314/92)*.
4. *Lubbe v. Cape Plc* [2000] 1 WLR 1545, in which Lord Bingham of Cornhill (at 1562B) did not consider the "answer to that question to be clear".
5. *Owusu v. Jackson (t/a Villa Holidays Bal-Inn Villas) and others* [2003] PIQR 186.
6. *Owusu v. Jackson (t/a Villa Holidays Bal-Inn Villas) and others (Case C–281/02)* [2005] 2 WLR 942.

Contracting State[7] is precluded from declining to exercise the jurisdiction conferred on it by Art 2 on the ground that a court of a non-Contracting State would be a more appropriate forum. This article will assess the basis for that decision and its impact on the practice of the English courts. So far as the latter is concerned, it will consider what room there may be left for the operation of any discretion whether to exercise jurisdiction conferred on the courts by Title II of the Brussels Convention and its successor, Chapter II of Council Regulation (EC) 44/2001.

## The decision in *Owusu*

Andrew Owusu was the victim of a very serious accident while on holiday in Jamaica, in 1997. When diving into the sea, he struck his head on a submerged sand bank and was rendered a tetraplegic as a result. In 2000 he commenced proceedings in England against six defendants. The first defendant, who was domiciled in the United Kingdom, had rented to the claimant the villa in which he was staying. The contract included access to a private beach and it was the claimant's case that it included an implied term that the beach would be reasonably safe or free from hidden dangers. The English court had jurisdiction over the claim against the first defendant under Art 2 of the Brussels Convention on the basis of his domicile. Permission to serve out of the jurisdiction was obtained for the claims against the other five defendants;[8] but service was only effected against three of them, all of whom were Jamaican companies said to bear some responsibility for the safety of the beach and the adjacent sea.[9]

Of the various applications made to the court by the defendants, the most significant was made by the first defendant. He applied for a stay of the proceedings on the basis that Jamaica was clearly and distinctly a more appropriate forum. Judge Bentley QC agreed that Jamaica was more appropriate.[10] He did not order a stay because, quite erroneously,[11] he held[12] that he had no power to do so after the decision of the European Court in *Universal General Insurance Co* v. *Group Josi Reinsurance Co SA*.[13] Had this been correct, there would have been no need for a reference to the European Court. As it was, the Court of Appeal referred the following questions for a preliminary ruling:

1. Is it inconsistent with the Brussels Convention . . . where a claimant contends that jurisdiction is founded on Article 2, for a court of a Contracting State to exercise a discretionary power, available

---

7. And in this case that really means an English or Irish court.

8. Under CPR, r 6.20(3), as "necessary and proper" parties to the claim against the first defendant.

9. The claims against the other defendants were in tort. It appears that a similar accident had occurred two years previously with the same tragic consequences. Quite what the high profile reporting of this regrettable state of affairs will do for tourism in this part of Jamaica is not too hard to imagine.

10. And the Court of Appeal would not have intervened on this aspect.

11. And in company with one or two others.

12. 19 October 2001.

13. *(Case C–412/98)* [2000] I ECR 5925. The decision in *Group Josi* merely confirmed that the Convention rules for *establishing* jurisdiction (as opposed to national law) must be applied where the defendant is domiciled in a Contracting State, regardless of the domicile of the claimant. In cases like *Owusu*, the real question is whether the courts are bound to *exercise* such jurisdiction. It might be argued that the ruling in *Group Josi* affirms the mandatory application of Title II when the conditions for its application are satisfied, ie, when the defendant is domiciled in a Contracting State, and that this *implies* that such jurisdiction *must* be exercised. It cannot be put any higher than that. See R Fentiman, "Stays and the European Conventions—End-Game?" [2001] CLJ 10.

under its national law, to decline to hear proceedings brought against a person domiciled in that State in favour of the courts of a non-Contracting State:

    (a) if the jurisdiction of no other Contracting State under the 1968 Convention is in issue;

    (b) if the proceedings have no connecting factors to any other Contracting State?

2. If the answer to question 1(a) or (b) is yes, is it inconsistent in all circumstances or only in some and if so which?

Even by the standards of the European Court, its ruling in *Owusu* is thinly reasoned on the issue which was of central importance. Some of the ruling is devoted to the question of whether Art 2 applied in the first instance. The argument that it might not is that, since both claimant and first defendant were domiciled in the UK and all other connections were with a non-Contracting State, a necessary intra-Community element was missing. The view of the court that Art 2 did apply because the necessary conflict of international jurisdiction need not also be an intra-community conflict may have wider constitutional implications,[14] but they are not the principal focus of this article.

The question with which this article is principally concerned is whether, in circumstances such as those in *Owusu*, the English courts may decline to exercise the jurisdiction which they do have on the basis of Art 2.[15] This is a question to which the answer is far from obvious, but the court seemed to entertain even less doubt about how it should be answered: no. A summary[16] of the reasoning in the nine paragraphs which are devoted to this issue is as follows: (1) no exception on the basis of *forum non conveniens* was provided for on the accession of the UK in 1978; (2) the operation of the Convention would be rendered too uncertain; in particular, both defendants *and claimants* should be able to predict with reasonable certainty where the case between them may be heard; (3) the legal protection of persons established in the Community would be undermined, and (4) since the doctrine of *forum non conveniens* is recognized only in a limited number of Contracting States, to allow it to operate in cases like *Owusu* would affect the uniform application of the rules of jurisdiction contained therein.

In fairness to the court, none of these reasons betrays any outright hostility to the doctrine of *forum non conveniens* itself.[17] The only hint of that comes in the observation of the court that, in so far as (3) is concerned, it is the claimant who has the burden of proving that he will "not be able to obtain justice before that foreign court".[18] Indeed, the court acknowledged that there may be "genuine difficulties" if *forum non conveniens* is

---

14. A Briggs, "The Death of *Harrods: Forum Non Conveniens* and The European Court" (2005) 121 LQR (forthcoming).

15. The question of whether Art 2 applied, and the question of whether it applied *to the exclusion of any provisions of national law*, probably amount to the same thing. They both turn on a determination as to the proper scope of the Convention.

16. Not that a lot of summarizing is needed.

17. Unlike some who have sought to argue against the exercise of any discretion, but have also appeared fairly hostile to the very idea of *forum non conveniens*: see, eg, D Tebbens, "The English Court of Appeal in *Re Harrods*: An Unwelcome Interpretation of the Brussels Convention", in M Sumampouw (ed), *Essays on National and International Procedural Law* (1992).

18. At [42]. One can forgive the omission of any reference to the burden which is first placed on the defendant to show that the foreign court is more appropriate, issues of substantial justice apart.

no longer to be available in the circumstances of cases like *Owusu*.[19] Nonetheless, this was not sufficient to outweigh the reasons summarized above for regarding Art 2 as mandatory in nature. Those reasons involve a mixture of the textual and the teleological and are analysed more closely below. Before that, two preliminary observations may be made.

First, the ruling in *Owusu* is, of course, a ruling on the operation of the Brussels Convention. For proceedings commenced on or after 1 March 2002, the Brussels Convention has been replaced by Council Regulation (EC) 44/2001 ("the Regulation")[20] and it is in the context of that instrument that this issue is likely to recur in the English courts in the future. The changes introduced at the time of the switch from Convention to Regulation are very unlikely to herald any change in approach to this issue. If anything, some of the Recitals to the Regulation imply even more strongly than does the Preamble to the Convention that the jurisdiction of the Member States under Chapter II is mandatory.[21] Ultimately, however, they are just as inconclusive since they do not address the crucial issue: the scope of the Regulation. For most of this article references are made to the Convention and to its relevant provisions, but on the basis that there should be no difference in approach when the same issues arise under the Regulation.

Secondly, the full ruling in *Owusu* is that the Convention precludes a court from declining the jurisdiction conferred on it by Art 2 on the ground that a court of a non-Contracting State would be more appropriate "even if the jurisdiction of no other Contracting State is in issue or the proceedings have no connecting factors to any other Contracting State". This is no surprise since those were the terms of the reference to the court brought about by the circumstances of the case in *Owusu*. There are echoes here of the approach in *Re Harrods*[22] of Dillon LJ, who concluded that a power to stay was available "in a case in which no other contracting state is in any way concerned".[23] In fact, in subsequent cases the English courts had extended the reach of *Re Harrods* so as to include cases where their jurisdiction was dependent on rules in Title II of the Convention other than Art 2 and where it could not be said that there were *no* connecting factors to any other Contracting State. All that seems to have been required is a choice between the English courts and the courts of a non-Contracting State.[24] Since *Re Harrods* is the foundational case upon which these subsequent decisions were based and it has,

---

19. Against that, it has been observed that the facts and circumstances of *Owusu* may not have been the most propitious for a reference to the European Court, at least for those hoping to maintain a role for *forum non conveniens*. The prospect of the tetraplegic Mr Owusu being sent to Jamaica eight years after he was first injured may have exerted some influence over the court. Perhaps, if the ruling had been that a discretion was available, the Court of Appeal might have been inclined not to stay this particular case on the basis that the additional delay represented a change of circumstance which would make it unjust to do so: see Briggs (2005) 121 LQR (forthcoming), where further consideration is given to the question whether the context of individual cases may have had a profound influence on the development of common law doctrine in England and Australia.

20. In all Member States save Denmark.

21. See, especially, Recitals 8 and 11.

22. Based, to some extent, on the views expressed in L Collins, "*Forum Non Conveniens* and the Brussels Convention" (1990) 106 LQR 535.

23. [1992] Ch 72, 97H.

24. See, eg, *Eli Lilly & Co* v. *Novo Nordisk A/S* [2000] 1 ILPr 73 (Brussels Convention); *Ace Insurance Co* v. *Zurich Insurance Co* [2001] 1 Lloyd's Rep 618 (Lugano Convention); *Anton Durbeck GmbH* v. *Den Norske Bank ASA* [2003] QB 1160 (Lugano Convention); *DSM Anti-Infectives BV* v. *SmithKline Beecham Plc* [2004] EWCA Civ 1199 (Regulation, though the decision of the European Court in *Owusu* was pending and the Court of Appeal had no need to resolve for itself whether *Re Harrods* applied because it was not inclined to interfere with the judge's decision not to order a stay in any event).

effectively, been overruled by the European Court, there is no scope to argue that they offer features which allow the ruling in *Owusu* to be distinguished.

## Text and teleology

In this part, the reasoning of the European Court in *Owusu* is subjected to closer analysis. It is, perhaps, a somewhat fruitless exercise to do so merely to conclude that the court may have reached the wrong conclusion, since a change of heart (or even the opportunity for a change of heart) is very unlikely. The aim therefore is also to provide the background against which to consider the question which was left unanswered by the court; namely, whether there is room for a more limited power in the courts to decline to exercise Convention jurisdiction in circumstances where there are proceedings, or the prospect of proceedings, in the courts of a non-Contracting State.

No hard and fast distinction is drawn between text and teleology since the latter is very largely to be derived from the former, but any textual analysis must begin with Art 220 of the EC Treaty (now EC, Art 293), which is referred to in the Preamble to the Convention in the following terms:

... Desiring to implement the provisions of Article 220 of that Treaty by virtue of which they undertook to secure the simplification of formalities governing the reciprocal recognition and enforcement of judgments of courts or tribunals;

Anxious to strengthen in the Community the legal protection of persons therein established;

Considering that it is necessary for this purpose to determine the international jurisdiction[25] of their courts, to facilitate recognition and to introduce an expeditious procedure for securing the enforcement of judgments, authentic instruments and court settlements ...

Under Art 220 the Member States agreed to enter into negotiations with each other, so far as necessary, with a view to securing for the benefit of their nationals the simplification of formalities governing the reciprocal recognition and enforcement of judgments of courts or tribunals.[26] According to Dillon LJ in *Re Harrods* it is clear from the Preamble and the reference therein to Art 220 of the EC Treaty that the main object was to secure the simplification of *the recognition and enforcement of judgments* "between the member states of the Community".[27] It is all too easy to lose sight of this and to believe that the Convention is primarily a "jurisdiction" Convention, given the greater emphasis on rules of jurisdiction in Title II. It is not. It is a "judgments" Convention in which rules on jurisdiction are included purely to facilitate the recognition and enforcement of judgments. It was this emphasis on the primary objective of the Convention which enabled Dillon LJ to reach the following conclusion:[28]

25. It may be argued that the reference to "international jurisdiction" undermines the *Re Harrods* decision since it is capable of extending to conflicts of jurisdiction with the courts of non-Contracting States. However, as seems to be made clear by the Jenard Report ([1979] OJ C59/1, 8) the reference to international jurisdiction in this context is merely designed to distinguish between cases with an international element and purely domestic cases. It is, like the rest of this passage, inconclusive when it comes to what is meant by "international" and whether it is limited to intra-Community conflicts of jurisdiction.

26. And of arbitration awards; but "arbitration" is excluded from the Convention, and the Regulation.

27. [1992] Ch 72, 96C.

28. *Ibid*, 97A–B.

For the English court to refuse jurisdiction, in a case against a person domiciled in England, on the ground that the court of some non-contracting state is the more appropriate court to decide the matters in issue does not in any way impair the object of the Convention of establishing an expeditious, harmonious, and, I would add, certain procedure for securing the enforcement of judgments, since *ex hypothesi* if the English court refuses jurisdiction there will be no judgment of the English court to be enforced in the other contracting states. Equally and for the same reason such a refusal of jurisdiction would not impair the object of the Convention that there should, subject to the very large exception of article 4, be a uniform international jurisdiction for obtaining the judgments which are to be so enforced.

This passage puts the rules on jurisdiction in Title II of the Convention into their proper context. Subject to the exception of Art 4, which is concerned with defendants domiciled in non-Contracting States, Title II lays down minimum uniform jurisdictional standards which must be followed by the courts of the Contracting States. It is on the basis that such minimum standards have been adhered to that there are very few jurisdictional challenges which may be made to a judgment from a Contracting State at the stage of recognition and enforcement in another Contracting State.[29] The courts of Contracting States must not exercise any jurisdiction which they *do not have*, thereby creating the risk of the recognition of a judgment which does not conform to the minimum jurisdictional standards of the Convention. There is nothing in this scheme, however, which requires them to *exercise* any jurisdiction which they *do have*. It is, in this sense, that one should understand the argument put forward by Sir Lawrence Collins and accepted in *Re Harrods* that the Convention is "intended to regulate jurisdiction as between the Contracting States".[30]

There is nothing in the reasoning of the court in *Owusu* which appears directly to challenge this interpretation of the primary objective of the Convention. Rather, the approach seems to be that there is a fatal absence of any express reservation of the power to stay proceedings and that the Convention seeks to fulfil other objectives which would be undermined if such a power were available. The supposedly fatal absence of any express reservation is evident in the observation of the court[31] that: "It is common ground that no exception on the basis of the *forum non conveniens* doctrine was provided for by the authors of the Convention, although the question was discussed when the Convention . . . on the Accession of Denmark, Ireland and the United Kingdom was drawn up, as is apparent from the report on that Convention by Professor Schlosser."[32]

The key paragraph in the Schlosser Report is para 78, which states as follows:

According to the views of the delegations from the Continental Member States of the Community such possibilities [i.e. exercises in discretion] are not open to the courts of those States when, under the 1968 Convention, they have jurisdiction and are asked to adjudicate.

Article 21[33] expressly prohibits a court from disregarding the fact that proceedings are already pending abroad. For the rest the view was expressed that under the 1968 Convention the Contracting

---

29. Only those allowed in Art 28 (now Art 35 of the Regulation) which are limited to breach of the rules for the protection of consumers and insured parties, and breach of the rules of exclusive jurisdiction in Art 16 (now 22).
30. Collins (1990) 106 LQR 535, 538.
31. At [32].
32. [1979] OJ C59/71, paras 77 & 78.
33. Now Art 27 of the Regulation.

States are not only entitled to exercise jurisdiction in accordance with the provisions laid down in Title 2; they are also obliged to do so. A plaintiff must be sure which court has jurisdiction. He should not have to waste his time and money risking that the court concerned may consider itself less competent than another. In particular, in accordance with the general spirit of the 1968 Convention, the fact that foreign law has to be applied, either generally or in a particular case, should not constitute a sufficient reason for a court to decline jurisdiction. *Where the courts of several states have jurisdiction*,[34] the plaintiff has deliberately been given a right of choice, which should not be weakened by application of the doctrine of *forum conveniens*. The plaintiff may have chosen another apparently "inappropriate" court from among the competent courts in order to obtain a judgment in the state in which he also wishes to enforce it. Furthermore, the risk of a negative conflict of jurisdiction should not be disregarded: despite the UK court's decision, the judge on the Continent could likewise decline jurisdiction. The practical reasons in favour of the doctrine of *forum conveniens* will lose considerably in significance, as soon as the 1968 Convention becomes applicable in the UK and Ireland. The implementing legislation will necessitate not inconsiderable changes in the laws of those states, both in respect of the definition of domicile . . . and on account of jurisdictional competence based merely on service of a writ within the area of the court . . . To correct rules of jurisdiction in a particular case by means of the concept of *forum conveniens* will then be largely unnecessary. After considering these arguments the UK and Irish delegations did not press for a formal adjustment of the 1968 Convention on this point.[35]

The obvious comment to be made about this passage is that it is inconclusive, precisely because it does not address the real issue in *Re Harrods*, ie, *the scope* of the Convention. Nothing in the *Re Harrods* decision, or its later extension in subsequent cases, required the English courts to apply *forum (non) conveniens* to the question whether proceedings commenced pursuant to the rules in Title II should be heard in England, *or in the courts of another Contracting State*. Yet it seems reasonably clear from this passage that this is the question with which it is concerned. For example, when Schlosser states:[36] "where the courts of several States have jurisdiction . . . ", it is clear that he is referring to the courts of Contracting States and the choice which that gives to the claimant. The decision in *Re Harrods* did not detract from this choice.[37] The problem of the "negative conflict of jurisdiction" referred to by Schlosser is one which can really only arise if the English courts were seeking to stay their proceedings in favour of the courts of another Contracting State.[38]

One could labour this point, and others which may be made on the basis of the wording in the Convention and the Official Reports, but they all come down to the same thing; they

---

34. Italics added.

35. [1979] OJ C59/71, 98, [78].

36. See the italicized words.

37. Unless the effect of a stay is to send the claimant away from all of the Contracting States because the English courts would remain seised for the purposes of Art 21(27). In *Haji-Ioannou v. Frangos* [1999] 2 Lloyd's Rep 337 (an Art 4 case), while Bingham LJ accepted that a decision to stay proceedings does not ordinarily have the same effect as a dismissal or discontinuance of them (*Rofa Sport Management AG v. DHL International (UK) Ltd* [1989] 1 WLR 902), he observed that the English court could "effectively disseise" itself by an appropriate order, liberty to apply for which could be granted as a condition of any stay, so as to deal with the possibility of any later objection in the courts of another Contracting State based on Art 21(27).

38. This can, of course, happen in an Art 4 situation, but, as the Court of Appeal has indicated in *Haji-Ioannou v. Frangos, supra* fn 37, this can be overcome by making the order to stay conditional on the court involved accepting and exercising its own jurisdiction.

are entirely inconclusive about the intended scope of the Convention.[39] Indeed, one is left with the distinct impression that the issues raised in *Owusu* were not given any thought until they began to arise in the practice of the English courts.[40] On this basis, the fourth of the reasons advanced by the court merely serves to beg the question: a uniform application of the rules of jurisdiction contained in the Convention is an appropriate goal only *if* one has already decided that the circumstances of *Owusu* should fall within the exclusive scope of the Convention. It might also be noted that the European Court has itself acknowledged that the Convention does not seek to harmonize rules of procedure.[41]

If the issue raised in *Owusu* is one to which there was no pre-determined answer, greater weight should perhaps be placed on the other reasons relied upon by the court, both for the assessment of its decision and for considering the scope of any more limited discretion. Those remaining reasons are certainty and the protection of persons established in the Community. To some extent they come down to the same thing—both defendants and claimants are entitled to know that, if the jurisdiction of a court of a Contracting State is invoked it will be exercised, subject only to the exceptions or restrictions laid down in the Convention itself. If it is necessary, there is a textual basis for this in the Preamble, which refers to the "legal protection of persons therein established" and in the EC Treaty, Art 220 (now EC, Art 293), which refers to the benefits to be secured by the Member States for "the benefit of their nationals".

There seems to be a widespread acceptance that the expectations of claimants provides a justification for the decision in *Owusu*, but it may be called into doubt. In the context of the Convention, the "persons" who are most obviously in mind for legal protection are those who find themselves in the position of defendant. One of the main objectives of Title II is to ensure the appropriate protection of the defendant, who is only to be sued in the courts of his own domicile, subject to the exceptions laid out in Title II itself. It is entirely consistent with this protection of the defendant to allow for a power to stay in the circumstances of *Re Harrods* and *Owusu*. It is only if the defendant applies for a stay that it will be considered by the court and, if applied for, it can hardly be thought to be unfair or somehow to undermine the protection of the defendant to accede to his own request. Indeed, in a curious inversion of the normal order of priority, the ruling in *Owusu* can be seen almost to prefer the interests of EC claimants over those of EC defendants. If a defendant domiciled in a Contracting State is no longer able to apply for a stay in favour of the courts of a non-Contracting State, he is disadvantaged when compared to a defendant domiciled in a non-Contracting State. In proceedings commenced against the latter under Art 4, the English courts undoubtedly have the power to stay their

---

39. In *Re Harrods* neither Dillon LJ nor Bingham LJ thought that much weight should be given to the Jenard and Schlosser Reports, because: "I do not think that Mr Jenard or Professor Schlosser had that question (ie, the *Harrods/Owusu* question) in contemplation" (Dillon LJ, [1992] Ch 72, 96B); "the present question was never squarely addressed" (Bingham LJ, *ibid*, 101F).

40. The Civil Jurisdiction and Judgments Act 1982, s 49 leaves room for them to arise but without itself offering any solution when it states: "Nothing in this Act (which gives effect to the Convention) shall prevent any court in the United Kingdom from staying, sisting, striking out or dismissing any proceedings before it, on the ground of *forum non conveniens* or otherwise, where to do so is not consistent with the 1968 Convention."

41. *Hagen v. Zeehaghe BV (Case C–365/88)* [1990] I ECR 1845.

proceedings.[42] Should not the aim of protecting defendants domiciled in Contracting States be sufficient to enable them to argue that they are being sued in one forum when another is quite clearly more appropriate? To deny the English courts (and any others which may wish to do similar) such a power is to sanction the risk of forum shopping against EC-domiciled defendants.[43]

If there is any concern in the Convention for the protection of the claimant, it is only in circumstances where the claimant may be thought to occupy a vulnerable position such that additional jurisdictional options are made available.[44] There is nothing in the *Re Harrods* decision which seeks to undermine this special protection, since such additional optional bases of initial jurisdiction are still available and, if invoked, they may be taken into account in determining whether or not to exercise the power to stay proceedings.[45] Beyond these categories of the potentially vulnerable, the Convention exhibits no obvious concern with the plight of the claimant.[46]

While there are now a number of cases in which the European Court has emphasized the need for certainty from the claimant's point of view, none of them were decided in the context of *Re Harrods*.[47] They may be said to be concerned more with the issue of certainty *within the operation of the Convention* itself and, of course, one comes back to the point that *Re Harrods* is, as much as anything, a decision about the scope of the Convention. If there is any basis for strengthening the legal protection of claimants established in the EC, this can be taken into account in the exercise *of* the power to stay proceedings, rather than in denying its existence altogether. There are several illustrations of how this might operate in practice.

First, it is already clear that the burden of showing that a non-Contracting State is more appropriate falls on the defendant who has made the application.[48] That burden might be added to, to reflect the "assumed suitability"[49] of the Convention jurisdiction and the claimant's expectation that the court would exercise it, but not to the point of eliminating

---

42. Though for an argument that the ruling in *Owusu* might imply that it should be lost even here, see A Briggs & P Rees, *Civil Jurisdiction and Judgments*, 3rd edn (LLP, 2002), 227.

43. There is perhaps an assumed suitability of the jurisdiction of the courts where the defendant is domiciled such that not only are any exceptions in the Convention to be narrowly construed, but the defendant is not to be heard to say that anywhere else might be more suitable. This hardly stands up to close scrutiny: see *infra*, text to fn 64.

44. Eg, such as those granted to a consumer or an insured.

45. See *infra*, text to fn 49.

46. The *Re Harrods* decision has been castigated on the basis that the Convention "also takes the legitimate interests of the plaintiff into consideration . . . (and) guarantee(s) the plaintiff's right to seek justice by recourse to the courts": Geimer, "The Right of Access to the Courts under the Brussels Convention", in H D Tebbens, C Kohler & T Kennedy (eds), *Civil Jurisdiction & Judgments in Europe* (1992), 39. There is no textual basis or policy consideration advanced in support of this.

47. See *Effer SpA* v. *Kantner* (*Case 38/81*) [1982] ECR 825, para 6; *Mulox IBC Ltd* v. *Geels* (*Case C–125/92*) [1993] I ECR 4075, para 11; *Benincasa* v. *Dentalkit Srl* (*Case C–269/95*) [1997] I ECR 3767, para 26; *Fonderie Officine Meccaniche Tacconi SpA* v. *Heinrich Wagner Sinto Maschinenfabrik GmbH* (*HWS*) (*Case C–334/00*) [2002] I ECR 7357, para 20; *DFDS Torline* (*Case C–18/02*) (15 February 2004), para 36.

48. In this sense proceedings commenced pursuant to Title II of the Convention are equated with proceedings commenced as of right on the basis of the defendant's presence, in cases where Title II does not apply (ie, in claims against defendants domiciled in non-Contracting States (Art 4), or in non-civil and commercial matters (Art 1)).

49. P Kaye, "The EEC Judgments Convention and the Outer World: Goodbye to *Forum Non Conveniens*" [1991] JBL 47.

altogether the power to stay which allows the court to police the worst forms of tactical forum shopping.[50]

Secondly, it is clear that the claimant does not enjoy a guaranteed choice of forum from those which are available under the Convention. For example, in *The Tatry*[51] the European Court could find nothing wrong in a party's commencing proceedings for a declaration of non-liability so as to ensure that the "defendant's" preferred forum was first seised for the purposes of Art 21.[52] In this sense, it may be more accurate to say that what the claimant may be entitled to expect is that, if the courts of one or other of the Contracting States has jurisdiction, he will not be sent away from the EC altogether. This is, ultimately, an argument that he should not lose the benefit of a Convention judgment. A judgment from a non-Contracting State court falls outside the enforcement regime in the Convention,[53] and can only be enforced under the national law of the Contracting States. It is an observable fact that it is easier to enforce a judgment under Title III of the Convention than it is under the national law of the Contracting States. Judicial support for the argument that this could be seen as a relevant factor[54] in the exercise *of* the court's discretion (rather than a basis for *its elimination*) is provided by the decision of the Court of Appeal to see it as precisely this in *International Credit and Investment Co (Overseas) Ltd* v. *Adham*[55] in the context of an Art 4 case.[56]

It is too late, however, now to argue that the doctrine of *forum non conveniens* is tailor-made to deal with arguments based on the interests of the parties, including the claimant. In cases like *Owusu* it is simply no longer available. Attention must turn to what this may mean for the practice of the English courts and whether there are any circumstances in which jurisdiction may be declined in favour of the courts of a non-Contracting State.

### Impact on the practice of the English courts

For the most part, the impact of the ruling in *Owusu* on the practice of the English courts is self-evident; a valuable tool against the worst excesses of forum shopping is no longer available. There may also be some unwelcome side-effects which are amply demonstrated by the circumstances in *Owusu*. In addition to the English defendant, there were five Jamaican defendants[57] and, while some may have been joined for the sake of complete-ness, the claims against them were not without foundation. Whether they were justified or not, the fact remains that the English proceedings against them are also now likely to continue. This is not to suggest that there is anything in the ruling in *Owusu* which impacts on the power of the English courts to continue to stay proceedings commenced against

---

50. R Fentiman, "Jurisdiction, Discretion and the Brussels Convention" (1993) 26 Cornell Int LJ 59, 66–67.
51. (Case C–406/92) [1994] I ECR 5439; [1999] QB 515; *sub nom The Maciej Rataj* [1995] 1 Lloyd's Rep 302.
52. Now Art 27 of the Regulation.
53. And stays outside, notwithstanding any subsequent recognition by the court of a Contracting State under its national law: *Owens Bank* v. *Bracco* (Case C–129/92) [1994] I ECR 117.
54. Even this may be said to go too far for assuming what it sets out to prove: since the issue is whether the proceedings should be heard in England in the first place, the loss of the benefit of an English judgment may be criticized as an attempt by the claimant to pull himself up by his own bootstraps.
55. [1999] ILPr 302.
56. Ie, proceedings in England against a defendant domiciled in a non-Contracting State.
57. Although service had been effected on only three.

defendants domiciled in non-Contracting States, notwithstanding that jurisdiction is derived from the Convention by virtue of Art 4.[58] Rather, it is because, if the claim against the first defendant in *Owusu* cannot be stayed, the same sense of the sound and efficient administration of justice which underpins *forum non conveniens* is likely to lead an English judge to the view that it would be better not to fragment the litigation.[59] It is perhaps this sort of scenario that has led some to conclude in the past that, without the power to stay: "countries outside Europe with whom the Community must nevertheless deal could hardly then be expected to look favourably on the Community, if its courts were to apply what would certainly come to be regarded as blatantly chauvinistic jurisdictional practices against the rest of the world".[60]

The absence of any power to stay may also expose a problem which existed under the Convention and which has not been removed altogether by changes introduced by the Regulation. The "assumed suitability"[61] of Convention jurisdiction may not always be borne out,[62] particularly where the domicile of a corporate defendant is concerned. It has been noted that a "major reason" why the Court of Appeal in *Re Harrods* considered that Argentina was a more appropriate forum than England was the fact that all the business of the defendant company was done in Argentina, and Argentina was also the place of its effective management.[63] The defendant was nonetheless domiciled in England because it had been incorporated there.[64] The definition of the domicile of a company may no longer be left to the private international law of the Member States as it is under the Convention,[65] but this has hardly served to remove the problem that domicile may sometimes represent a tenuous connection for a company. Under Art 60 of the Regulation, a company is domiciled where it has its statutory seat, or its central administration, or principal place of business. For the purpose of the UK, "statutory seat" means the registered office or, where there is no such office anywhere, the place of incorporation or, where there is no such place anywhere, the place under the law of which the formation took place.

There are two schools of thought on the prospect that an "English company" might now be sued in England under Art 2 with no prospect of staying proceedings in favour of the courts of a non-Contracting State which is clearly more appropriate. On the one hand, "if the promoters and owners of the company fail to move the place of incorporation to the country in which the real seat of management exists, the courts should not do this for them".[66] Against this is the rather powerful argument of Lord Hoffmann in his dissenting speech in *Connelly* v. *R.T.Z. Corporation Plc*:[67]

---

58. "If the defendant is not domiciled in a Contracting State, the jurisdiction of the courts of each Contracting State shall, subject to the provisions of Article 16, be determined by the law of that State." The "law" in England includes a discretion whether to exercise jurisdiction.

59. That was the view taken by Judge Bentley QC in *Owusu*.

60. Kaye [1991] JBL 47, 50.

61. *Ibid*, 74–75.

62. A point openly acknowledged by the European Court in *Custom Made Commercial Ltd* v. *Stawa Metallbau GmbH* (Case C–288/92) [1994] I ECR 2913.

63. W Kennett, "*Forum Non Conveniens* in Europe" [1995] CLJ 552, 566.

64. Civil Jurisdiction and Judgments Act 1982, s 42.

65. Art 53.

66. P Muchlinski, "Corporations in International Litigation: Problems of Jurisdiction and the United Kingdom Asbestos Cases" (2001) 50 ICLQ 1, 13.

67. [1998] AC 854, 876.

The defendant is a multinational company, present almost everywhere and certainly present and ready to be sued in Namibia. I would therefore regard the presence of the defendants in the jurisdiction as a neutral factor. If the presence of the defendants as parent company and local subsidiary of a multinational can enable them to be sued here, any multinational with its parent company in England will be liable to be sued here in respect of its activities anywhere in the world.

This was, of course, a dissenting speech and the idea of a "neutral factor" may have to be amended to give additional weight to the fact that jurisdiction is in fact based on domicile in accordance with Title II of the Convention. It is noticeable that, in the subsequent case of *Lubbe* v. *Cape Plc*,[68] where another English parent company was sued largely on the basis of the activities of its subsidiaries in South Africa, the House of Lords did not need to resolve the *Re Harrods* issue because it found that a stay was not appropriate. The point made by Lord Hoffmann does become rather acute when one contemplates the prospect that the courts now have no discretion to stay proceedings which may quite inappropriately have been commenced in England.

## The unanswered question—a limited discretion?

There was a second question in the reference to the European Court in *Owusu*: is it inconsistent with the Convention to decline jurisdiction in favour of the courts of a non-Contracting State in all circumstances, or only in some; and, if so, which? Consistent with its practice to date, the court declined to answer this question on the basis that it was unnecessary to resolve the dispute in *Owusu*.[69] That in itself indicates of course that, whatever are the circumstances in which a discretion may exist, they were not present in *Owusu* itself. There are, perhaps, two forms which a more limited discretion may take.

The first would depend on the identity of the claimant. In *Owusu* the claimant was domiciled in England and this is very much the context in which the ruling of the court must be understood. The emphasis is on the intention of the Convention to "strengthen in the Community the legal protection of *persons therein established*".[70] Any expectation that Convention jurisdiction, if available, will be exercised and that, if successful, the claimant will obtain the benefit of a Convention judgment seems to be confined to "local claimants". It has to be said that, in some ways, this is not an attractive argument. If the aim of the Convention is to bolster the working of the internal market by ensuring the free movement of judgments, one might have thought that this would also be offered to non-EC parties to encourage inward investment. It has also been observed[71] that:

Such a preference for a "local" plaintiff, however, is merely a matter of degree where the identity of the *forum conveniens* is concerned. It does not involve giving such persons an unfettered right to sue, while insisting that "foreign" plaintiffs should face the risk that their actions might be stayed.

---

68. [2000] 1 WLR 1545.
69. *Djabali* v. *Caisse d'Allocations Familiales de l'Essonne* (Case C–314/96) [1998] I ECR 1149, para 19; *Barcadi-Martini and Cellier des Dauphins* (Case C–318/00) [2003] I ECR 905, para 42; and *Azienda Agricola Ettore Ribaldi and others* (Joined Cases C–480/00 to C–482/00, C–484/00, C–489/00 to C–491/00 and C–497/00 to C–499/00) (25 March 2004), para 72.
70. Preamble to the Convention (emphasis added). See the court's judgment at [39].
71. Fentiman (1993) 26 Cornell Int LJ 59, 93.

It would be alarmingly Euro-centric if such a position were accepted as correct and, if a rights-based argument is to be mounted at all, it must surely extend to all plaintiffs.

Unattractive and Euro-centric though it may be, it is of course now too late to rely on an unwarranted distinction between local and foreign claimants so as to retain the doctrine of *forum non conveniens* in full and it may be preferable to retain it at least as far as the latter are concerned. For example, it would allow the English courts to retain their discretion to stay proceedings in the circumstances which caused concern to Lord Hoffmann in *Connelly*, if, not only was a non-Contracting State more appropriate, but the claimants were also domiciled in the non-Contracting State in question.[72] Barring an unlikely amendment to the definition of the domicile of a company, the English courts will also not be enthusiastic about the prospect of entertaining proceedings between two essentially foreign companies without any prospect of ordering a stay, merely because one of them happens to use the offices of their London lawyers as their registered office.

The second form in which a limited discretion might be available would not depend upon the identity of the claimant and might therefore be invoked even as against a local claimant. It has been canvassed for some time now and has attracted considerable support.[73] It is alluded to in the judgment of the court when it notes[74] that the: "second question was asked in connection with cases where there were identical or related proceedings pending before a court of a non-Contracting State, a convention[75] granting jurisdiction to such a court or a connection with that State of the same type as those referred to in Article 16[76] of the Brussels Convention." In short, and updating this idea to the context of the Regulation, a discretion would be available where rules equivalent to those in Art 22 (exclusive jurisdiction), Art 23 (choice of court agreements) and Art 27 (*lis alibi pendens*) pointed to the courts of a non-Member State.

It is important to emphasize that what is advocated here is a *discretion*. This must be distinguished from a similar idea, sometimes referred to as "reflexive effect", under which it is the rules contained in Arts 22, 23 and 27 themselves which would be applied notwithstanding their limitation to proceedings in the courts of Member States.[77] On this basis, the courts of a Member State would be *obliged* to decline jurisdiction if there was an Art 22 connection with a non-Member State,[78] if the parties had agreed to the exclusive jurisdiction of the courts of a non-Member State, or if proceedings had already been commenced in the courts of a non-Member State between the same parties and in the same

---

72. As they were in *Lubbe* v. *Cape Plc* [2000] 1 WLR 1545 (South Africa), but not in *Connelly* (where the claimant was domiciled in Scotland). It does not follow that the courts will stay their proceedings (as the House of Lords declined so to do in *Lubbe* because of the lack of any funding in South Africa for what would be a complex group action), but merely that they should at least have this option.

73. Briggs & Rees (*supra*, fn 42), 221–231; A Layton & H Mercer (eds), *European Civil Practice*, 2nd edn (2003), §§13.019–13.024.

74. At [48].

75. Here, it seems clear that the court is referring to an agreement of the parties.

76. Now Art 22 of the Regulation.

77. The terminology of "reflexive effect" was first employed by G Droz, *Compétence judiciaire et effets des jugements dans le marché commun* (Paris, 1972), paras 164–169. The text herein assesses the impact of a rigid adherence to such an effect. In fact it may take other forms much closer to the "limited discretion" advocated herein: see A Briggs [2005] LMCLQ 378.

78. Eg, a dispute over title to land situated in the non-Member State (Art 22(1)).

cause of action. There are two principal reasons why a discretionary approach is to be preferred.[79]

First, relying on the outward projection of these provisions as the springboard for a discretionary approach has already been embarked upon, or endorsed, even by the European Court. In *Coreck Maritime GmbH* v. *Handelsveem BV*[80] one of the issues before the court was the validity and effect of a choice of court agreement entered into in circumstances where it may have resulted in the choice of the courts of a non-Contracting State.[81] The court ruled as follows:[82]

As to the second condition, Article 17 of the Convention [Article 23 of the Regulation] does not apply to clauses designating a court in a third country [i.e. a non-Contracting State]. A court situated in a Contracting State must, if it is seised notwithstanding such a jurisdiction clause, assess the validity of the clause according to the applicable law, including conflict of laws rules, where it sits (Report by Professor Schlosser on the Convention of 9 October 1978 on the Accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland to the Convention on Jurisdiction and the enforcement of judgments in Civil and Commercial matters and to the Protocol on its interpretation by the Court of Justice, OJ 1979 C 59, p. 71, paragraph 176).

This endorsement of the view put forward by Schlosser is significant in that it seems to[83] admit of at least one basis upon which the courts of a Member State may decline to exercise jurisdiction in favour of the courts of a non-Member State. In England, of course, the relevant national law is in the form of a discretion to stay proceedings brought in breach of an agreement to sue in a foreign court.[84] In the aftermath of *Re Harrods*, the English courts formed the view that a discretion was available to them not to exercise Convention jurisdiction when the proceedings were in breach of the parties' agreement to sue in a non-Contracting State.[85] There is every reason to believe that this will continue to be the case, even after *Owusu*.[86]

The second reason for preferring a limited discretionary approach over any literal reflexive effect is that it offers a superior product. This may be illustrated in the context of a *lis alibi pendens* in the courts of a non-Member State. The reflexive effect of Art 27 would require the courts of a Member State to decline jurisdiction whenever the courts of a non-Member State are first seised. There are at least two reasons why this would not be appropriate. First, the rather crude "first come first served" rule in Art 27 can only be justified as between the courts of the Member States. Each of the Member States have

---

79. In the context of Art 22 it is doubtful whether there would be any difference between "reflexive effect" and "limited discretion", since it is in the nature of the connections in Art 22 that jurisdiction will always be declined.

80. (*Case C–387/98*) [2000] I ECR 9337.

81. One can only say "may" because of the formulaic wording of the agreement.

82. [2000] I ECR 9337, [19].

83. One perhaps has to say "seems to" since the court refers to the *validity* of the agreement, as does the relevant paragraph in Schlosser's Report which is endorsed. Nevertheless, it is difficult to see how, if according to the applicable law such an agreement is regarded as valid, the courts can do anything other than give effect to it in accordance with their national law.

84. *The Eleftheria* [1970] P 74; *The El Amria* [1981] 2 Lloyd's Rep 119; *The Sennar (No. 2)* [1985] 1 WLR 490; [1985] 1 Lloyd's Rep 521 (HL).

85. *The Nile Rhapsody* [1992] 2 Lloyd's Rep 399; *aff'd* [1994] 1 Lloyd's Rep 382.

86. See *Konkola Copper Mines Inc* v. *Coramin* [2005] EWHC 898 (Comm) (Colman J).

placed their trust and confidence in the jurisdictional rules[87] and general standards of civil trial in the other Member States.[88] The same is simply not true of the courts in the rest of the world. Secondly, if proceedings are commenced in the courts of a non-Member State just after the commencement of proceedings in the English courts, no reflexive effect[89] will oblige the non-Member State court to decline jurisdiction; but, if the reverse is true, the English courts would be so obliged, however inappropriate the proceedings in the courts of the non-Member State. This cannot make sense and it is far better that there should be a balanced consideration of whether it is more appropriate for the two sets of proceedings to continue or for the proceedings in the English courts to be stayed.

One cannot help but observe that these arguments in favour of a limited discretion serve only to highlight the very flexibility and sophistication of the doctrine of *forum non conveniens*. If available generally, it could accommodate not only the special circumstances of Arts 22, 23 and 27 connections with the courts of non-Member States but also deal with all other cases where the circumstances would lead one to believe that the courts of a non-Member State offered a more appropriate forum. That option may have gone with the ruling in *Owusu*, but it may be hoped that there is still room for the limited form of discretion advocated here.

## Conclusion

Some cherished aspects of English civil procedure have taken a bit of a battering in the European Court of late. Shortly before *Owusu*, the so-called "anti-suit injunction" had been outlawed within the scheme of the Regulation[90] and the sanctity of the parties' agreement on choice of court held to be no protection against the race to court encouraged by Art 27.[91] The ingenuity of English civil procedure and those who ply their trade therein means that ways may yet be found to get round some of the worst of the implications of these developments.[92] It is to be hoped that some of the suggestions made herein for limiting the effect of the ruling in *Owusu* might find favour with the English courts[93] and perhaps even the European Court itself.

---

87. Whether those in Chapter II, or the rules of national law applicable under Art 4.
88. As the European Court was at pains to emphasize in *Turner v. Grovit (Case C–159/02)* [2005] 1 AC 101; [2004] 2 Lloyd's Rep 169.
89. Or limited discretionary approach, for that matter.
90. *Turner v. Grovit (Case C–159/02) ibid.*
91. *Erich Gasser GmbH (Case C–116/02)* [2005] 1 QB 1; [2004] 1 Lloyd's Rep 222.
92. For example, an action for damages for breach of a choice of court agreement: see A Briggs (2004) "Anti-suit injunctions and Utopian ideals" 120 LQR 529.
93. To the extent that they have not already done so: see fn 84.