# Exhibit 7

K
12.
L6

# LLOYD'S MARITIME AND COMMERCIAL LAW QUARTERLY 2005

GENERAL EDITOR
F. D. Rose, M.A., B.C.L., Ph.D., M.A.



**|L|L|P|**

LONDON  SINGAPORE
2005

# *Forum non conveniens* and ideal Europeans

## *Adrian Briggs**

*This article deals with and develops the final point made in the previous article by Mr Peel, who considers whether and when an English court retains a discretion to decline to adjudicate claims brought against a defendant who is subject to the allegedly mandatory jurisdiction of the English courts under Art 2 of the Judgments Regulation. Its conclusion is that the discretion does survive in the cases identified by Mr Peel, but that a parallel justification for this is to be found in the doctrine of French writers. This should make it clear that an English court should not fear the criticism that a decision to stay proceedings in these instances would be inconsistent with* Owusu v. Jackson, *or that it would be a misguided attempt to resuscitate a common law principle which had been held to be wholly inconsistent with the Judgments Regulation. On the view taken here, the exercise of a carefully tailored jurisdictional discretion would be wholly consistent with the views of influential civilian jurists.*

In his analysis of the decision of the European Court in *Owusu* v. *Jackson*,[1] Mr Peel[2] advances the highly satisfactory argument that an English court should conclude that it has power to decline to hear a case, brought against a defendant domiciled in England but involving a connection with a non-Member State which, were it with a Member State, would have fallen within what is now Art 22, or 23 or 27 of the Judgments Regulation.[3] This note is intended to lend weight to that suggestion, and to give further support to the submission that the way for an English court to do this is by the application of the doctrine of *forum non conveniens* within the space left for it after the decision in *Owusu*. The contention of this postscript to Mr Peel is that a distinct line of argument, emanating from French writers, complements and reinforces the approach which he proposes. It would be unfortunate if anyone were to conclude that this mainly gallic analysis is an alternative to what Mr Peel proposes, and it would be mistaken too for anyone to conclude that the two views were opposed to each other.

Mr Droz set the scene for the debate.[4] If, he said, by reason of what is now Art 22 of

---

* Professor of Private International Law, University of Oxford; Fellow and Tutor in Law, St Edmund Hall; Barrister.

1. (*Case C–281/02*) (forthcoming); [2005] 2 WLR 942. For other aspects of the decision, see the writer's note at (2005) 121 LQR (forthcoming).
2. E Peel, "*Forum non conveniens* and European Ideals" [2005] LMCLQ 363.
3. Council Regulation (EC) 44/2001.
4. "Si un juge français est radicalement incompétent pour juger d'un immeuble ou d'un brevet allemand, en raison de la spécificité, et de la particularité, du droit réel ou droit des brevets allemands, on ne voit pas pourquoi il serait mieux armé pour juger d'un bail rural argentin ou de la validité d'un brevet japonais!": [1990] *Revue critique de droit international privé* 1, 14.

378

the Judgments Regulation, a French court is utterly without jurisdiction to adjudicate German land or a German patent, one cannot see why it would be better equipped to adjudicate on an agricultural lease in Argentina or the validity of a Japanese patent.[5] He suggested that a court might justify its refusing to hear such a claim brought against a local defendant by applying the logic of Art 22 by analogy: in the idiom which he coined in 1972, to give that provision a "reflexive effect". Or, to be more precise, to recognize *l'effet réflexive des compétences exclusifs*.[6] His proposal, which was not echoed in the Jenard Report on the Brussels Convention,[7] may suggest that a court should take the current wording of the Article, insert the word "non-" before the word "Contracting" or "Member", and proceed from there. That done, we would appear to have a rule by which the court would be obliged to declare that it had no jurisdiction in circumstances falling precisely within the framework of Art 22, and likewise for Art 23, where it would be obliged to give effect to a jurisdiction clause for a non-Member State which complied with the formal requirements of Art 23. But it would have no such power, never mind a duty, to decline jurisdiction in cases falling outside the parameters of those provisions.[8] So interpreted, a principle of reflexive effect would not be an attractive proposition: too rigid in the cases in which it might apply, and unable to help in others where help is needed.[9]

But this, it is suggested, is not quite right. It is instead necessary to separate the material scope of those areas in which jurisdiction may be declined, from the actual rule which will be relied upon to do it. Only the former need be defined, reflexively, by reference to Arts 22 and 23. Such an interpretation of the principle of reflexive effect would allow that where an issue would, apart from its geography, have fallen within the material scope of Art 22, an English court may apply its traditional rules of private international law to decide whether it will exercise jurisdiction. The same would apply to Art 23: where the parties have entered into an agreement for the court or courts of a non-Member State, an English court would apply the principles established in case law from *The Eleftheria*[10] to *Donohue* v. *Armco Inc*[11] to determine whether to stay the proceedings. It would not be

---

5. He was provoked to make this point by an observation in their report on the San Sebastián Convention, by which instrument Spain and Portugal adhered to the Brussels Convention, where Messrs Almeida Cruz, Desantes Real and Jenard expressed the view that if a court has jurisdiction under Art 2, and the proceedings have as their object land in a non-Contracting State, the court will simply have to hear the case, as what was then Art 16 will be inapplicable: 1990 OJ C.189/35, 47. One has to say that this is simply unacceptable, even if the observation was copied from the Jenard & Moller Report on the Lugano Convention: 1990 OJ C.189/57, [54].

6. In this sense, it may appear to be limited to cases of exclusive jurisdiction regardless of domicile (now in Art 22 of the Judgments Regulation), and capable of extension to jurisdiction agreements (Art 23). But for extension to Arts 27 and 28, see below. The view and terminology of Droz was first advanced in his *Compétence judiciaire et effets des jugements dans le marché commun* (1972), paras 164–169 (exclusive jurisdiction regardless of domicile) and para 204 (jurisdiction clauses). It is supported in particular by Gaudemet-Tallon, *Compétence et exécution des jugements en Europe*, 3rd edn (2002). Loussouarn, Bourel & Vareilles-Sommières, *Droit international privé*, 8th edn (2004), para 485–1 also agrees with the general conclusion, but does not adopt the terminology of reflexive effect, preferring simply to say that in such a case jurisdiction may not be founded on Art 2.

7. [1979] OJ C/59./1.

8. Including Arts 27 and 28 (*lis alibi pendens*).

9. This is the gist of Mr Peel's criticism of it.

10. [1970] P 94.

11. [2002] 1 Lloyd's Rep 425.

necessary to go further, to show that the detailed requirements of Art 23, as to form, etc, had been complied with.

Some confirmation of the validity of this approach is available from Professor Gaudemet-Tallon, who expresses the view that it is sufficient that the clause complies with the requirements of the national rules of the conflict of laws, adding that it is not necessary that it fulfil the requirements for validity set out in Art 23.[12] She reserves her position, and so should we, in the case in which a jurisdiction agreement would otherwise have been invalidated by the provisions of the Regulation dealing with exclusive jurisdiction regardless of domicile,[13] and those which would have been invalidated by the rules on insurance, consumer and employment contracts,[14] though it is reasonable to suppose that, where the Regulation would give jurisdiction in such a case to the English courts, and would prohibit giving effect to a jurisdiction agreement for a French court, it would be surprising if a clause for a non-Member State could be given any greater effect. The point is otherwise a sound one. Within the territory of the Member States, Art 23 is a provision which provides for both prorogation and derogation of jurisdiction: it has a double edge, performing two functions. When used as the template for the law on jurisdiction clauses for *non*-Member States, Art 23 is not being used to confer or impose jurisdiction on the courts of a non-Member State: nothing in the Judgments Regulation can do that. There is therefore no need to transpose these formalities, which circumscribe the rule which defines a Member State's duty to take jurisdiction, to determine the limited question whether and when a jurisdiction may be declined in favour of a non-Member State's court.

Mr Droz wrote of the reflexive effect of exclusive jurisdictions. It is not obvious that he envisaged its relevance in a situation of *lis pendens* which is not,[15] within the scheme of the Convention or Regulation, something defined in terms of exclusive jurisdiction. On the other hand, a court seised first does, by virtue of its seisin, enjoy exclusive jurisdiction over proceedings involving the same parties and the same cause of action. In that sense a court first seised has, when seised, a jurisdiction which falls within the spirit of the rule. Accordingly, where there are proceedings before the courts of a non-Member State, which was seised before the English court was, it should be possible to respond to a situation of *lis alibi pendens* by the application of English law as established by authority deriving

---

12. "Il suffit que la clause soit régulière au regard de droit international commun: il n'est pas nécessaire qu'elle remplisse les conditions de validité prévues par les art. 17(C) ou 23(R)": Gaudemet-Tallon, *Compétence et exécution des jugements en Europe*, 3rd edn (2002), para 131, basing herself on Droz, *Compétence judiciaire et effets des jugements dans le marché commun* (1972), paras 216 *et seq*; Gothot & Holleaux, *Le Convention de Bruxelles du 27 September 1968* (1985), para 166. As to the proper interpretation of the principle of reflexive effect, it is simply a hypothesis, and not a statute. It is open to us to interpret it, within the limit of what is possible, in the way which best serves the interests of justice.

13. See Art 23.5 of the Judgments Regulation. These cases will indeed be more difficult, for it must be admitted that the jurisdictional rule which gives exclusive or enhanced jurisdiction to the English court (found in Sections 3, 4, 5, and 6 of Chapter II of the Regulation) is in some sense more mandatory than that in Art 2, which confers general jurisdiction only. Indeed, the question once referred in *Re Harrods (Buenos Aires) Ltd* [1992] Ch 72 (question referred by the House of Lords as reference C–314/92 *Ladenimor* v. *Intercomfinanz*: withdrawn without a ruling) did ask about the compatibility of a stay with jurisdiction based on what is now Art 22.2.

14. Respectively, Arts 13, 17 and 21: see Art 23.5.

15. Art 29 apart.

ultimately from *The Atlantic Star*[16] the doctrine of *forum non conveniens*. In other words, an English court would have a discretion to stay proceedings. This is what it would mean to give a reflexive effect to Art 27 of the Regulation: if there is a case in which Art 27 would have applied the proceedings been in another Member State, a court will apply its own law to deal with the clash of jurisdiction and the risk of irreconcilable judgments where the court first seised is in a non-Member State. There will, of course, be no *obligation* to stay or dismiss the proceedings: beyond the single legal space defined by the Regulation and Lugano Convention an absolute obligation to cede jurisdiction to the court first seised would be indefensible.

This would also reflect developments in French law. The Cour de cassation has latterly committed itself to the view that a defendant may raise a defence of *litispendence*[17] in relation to proceedings before the French courts, even though this is not provided for in the New Code of Civil Procedure,[18] subject to conditions which include that the foreign proceedings will give a judgment which will comply with the requirements of French law for the recognition of foreign judgments.[19] French private international law therefore allows[20] a court, properly seised, to give way in favour of the proceedings in the foreign court which was seised earlier in time; and there is therefore no need to worry that according a reflexive effect to Art 27 will result in an inappropriate solution[21] or will be seen as a piece of chicanery.[22] So far as concerns the remedy—to stay or to dismiss—French writers suggest that the court should be pragmatic: dismissing the local action where it is clear that the foreign judgment will be recognized, but staying the proceedings where there is room for doubt about it.[23] They also note that what is true for cases within the material scope of Art 27 (*litispendence*) will apply also to instances of

---

16. [1974] AC 436. Of course, it may also be possible to respond to it by anti-suit injunction, free of the shackles of *Turner* v. *Grovit* (*C–159/02*) [2005] 1 AC 101.

17. A plea that the existence of an action pending elsewhere is a defence to the assertion of jurisdiction by the claimant.

18. Art 100 of which simply provides for a defence of *litispendence* elsewhere within France.

19. *Soc Miniera di Fragne* v. *Cie européenne d'équipment industrielle* (Cass 1re civ, 26 November 1974), *Rev. crit.* 1975, 491, note Holleaux, who expressed the view that the court's change of heart from an earlier refusal to take notice of international *litispendence* was "a little disconcerting". But Meyer, *Droit international privé*, 6th edn (1998), para 443, says that the court's more recent liberal position is to be approved; and it is hard to find any recent dissent from this more optimistic view of the recent jurisprudence. By way of comparison, as an English court will not stay its proceedings unless the foreign court is available and the defendant will submit to its jurisdiction, a stay of English proceedings will be very likely to result in a judgment which will be recognized and enforceable in England.

20. Rather than obliges; and whether relief will be granted depends on the primary judge's prediction about the enforceability of the foreign judgment. To put it another way, there are conditions on the admissibility of the defence.

21. A duty to dismiss proceedings, with no discretion to do otherwise.

22. "Il valait mieux tuer dans l'oeuf cette source de chicane" was the notably sour assessment of the common law doctrine of *forum non conveniens* offered by Mr Droz in *Compétence judiciaire* (*supra*, fn 12, para 206). Writing in 1972, when there was no trace of the doctrine in English law either, he must have been fearful of the spread of American ideas, or in possession of a remarkably powerful crystal ball. But by 1990 (*supra*, fn 4) Mr Droz had had second thoughts, having noticed the similarity between his own proposal and the doctrine of *forum non conveniens*, and eschewing the opportunity to repeat his earlier criticism of the latter: at p 15.

23. Loussouarn, Bourel & Vareilles-Sommières (*supra*, fn 6), para 490–8, proposes that a dismissal should be ordered if the judge has no doubt that the foreign judgment will qualify for recognition in France, and a stay if he is less sure. They accept that the condition that the foreign proceedings will lead to a judgment recognizable under French private international law is justified but is also problematic: *ibid*, para 490–7.

related actions (*connexité*) within the scope of Art 28 of the Regulation.[24] There is therefore little reason to disparage the principle of reflexive effect, and every reason to suppose that it supports, and defines the scope of, the principle that an English court may use its traditional principles of law. These are expressed in *British South Africa Co* v. *Companhia de Moçambique*,[25] and by the doctrine of *forum non conveniens*, operating within the territory delineated by Arts 22, 23, 27 and 28. It appears that this approach will be supported by courts and colleagues in at least one influential civilian jurisdiction.

So far as the jurisprudence of the European Court is concerned, the right of an English court to apply its own law to validate and enforce a jurisdiction clause for a non-Member State is supported by *Coreck Maritime GmbH* v. *Handelsveem BV*.[26] This stands alone as authority, as the European Court in *Owusu* turned its nose up at the second question referred by the Court of Appeal. In its refusal, it left open the questions raised here; and there is no need to consider that their answer is implicit in what it said in relation to the first. The Advocate-General went out of his way to express no opinion on the application of a doctrine of reflexive effect to allow an exception to the operation of Art 2.[27] One of these days, no doubt, the court will be asked for a second time to answer the question it disdained to answer the first. Until then, an English court should be prepared to find that the principle of reflexive effect supported by French jurists, the "limited discretion" proposed by Mr Peel, and common sense, all point to the same conclusion. An English court: may and must follow its own law to refuse to adjudicate a claim which has as its object title to land in a non-Member State; may follow its own law to stay proceedings brought in England in violation of a valid and binding jurisdiction agreement for the courts of a non-Member State; may follow its own law to stay proceedings if a foreign court was seised before it was of proceedings between the same parties in respect of the same cause of action; and may follow its own law to stay its proceedings if these are related to an action already pending in the courts of a non-Member State. And, where it *may* do these things, it should guide itself by the principle of *forum non conveniens*, because, in applying the relevant rules of its own law, it will be doing precisely what a rational civilian jurist would expect it to do.

---

24. Meyer (*supra*, fn 19), para 442, notes that the decision of the Cour de cassation in *Cressot* v. *Cozma* (Cass 1re civ, 20 October 1987), *Clunet* 1988, 446 (note Huet), "implicitly" allowed the principle of connexity with proceedings in a foreign court as a defence to proceedings before the French courts, parallel to that of *litispendence*. Loussouarn *et al* (*supra*, fn 6), para 490–10, makes the same assessment of this authority, but adds that the implicit acceptance was confirmed and made explicit by the same court in *Soc Maurigarments Trading and Marketing Ltd* v. *Benichout* (Cass 1re civ, 22 June 1999), *Rev. crit.* 2000, 42 (note Cuniberti, who observes, at para 8 of his note, that the French doctrine may be considered to resemble a particular and gallic form of *forum conveniens*). In neither case was there any reference to the Brussels Convention. The former concerned matrimonial causes, and the court first seised was in Lebanon. The latter was a loan and guarantee dispute where the court first seised was in Mauritius; it was not clear where the defendant to the French proceedings was domiciled, and therefore unclear whether the case *directly* raised the issue which is under discussion here.

25. [1893] AC 602.

26. (*Case C–387/98*) [2000] I ECR 9337, judgment [19].

27. Opinion of Mr Leger, at [70–71], [80–81]. At [254] he gave a hypothetical case in which there were related proceedings pending before the courts in Jamaica, and observed that what is now Art 28 of the Regulation would be inapplicable to them. But he does not appear to have founded any conclusion on this hypothesis, and certainly did not say that a national court could not use its doctrine of *litispendence* or *connexité* to deal with it. He simply seems to have used it as an opportunity to disparage the doctrine of *forum non conveniens*, which is rather disappointing.