**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

October 30, 2014

Honorable Andrew J. Peck
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:     *Rio Tinto v. Vale et al*, Civil Action No. 14-cv-3042 (RMB) (S.D.N.Y.)

Dear Judge Peck:

      We write on behalf of Plaintiff Rio Tinto plc ("Rio Tinto") in the above-captioned matter to respectfully request, pursuant to Local Civil Rule 37.2, a pre-motion conference concerning differences that have arisen between Rio Tinto and Defendants BSGR and Steinmetz ("Defendants") over Rio Tinto's jurisdictional discovery requests.

      Defendants have not, to date, produced a single document in response to Rio Tinto's jurisdictional discovery requests that this Court specifically ordered on July 29, 2014 and that Rio Tinto served on August 5, 2014.  Rio Tinto has met and conferred with Defendants multiple times in an attempt to resolve these differences, as well as to offer a number of alternatives to move jurisdictional discovery forward.  But despite Rio Tinto's good-faith efforts, Defendants refuse to produce any documents, including documents they admit are discoverable.  For example, they will not agree to even begin producing a subset of plainly responsive corporate, jurisdictional documents (***to which they have no objection***) reflecting  Defendants' assets, bank accounts, real estate, *etc*., and for which search terms are unnecessary.  Nor will they produce (i) documents reflecting actions and contacts of Defendants' agents and co-conspirators, which are plainly relevant and discoverable under New York's long-arm statute, 18 U.S.C. §1965(a), and Fed. R. Civ. P. 4(k)(2); and (ii) documents reflecting contacts, by Defendants and/or their agents and co-conspirators, in the United States, which are (again) plainly relevant and discoverable under New York's long-arm statute and Fed. R. Civ. P. 4(k)(2).  Defendants also refuse to provide Rio Tinto with a core list of custodians that they believe will have responsive jurisdictional documents.  And they will not engage in a

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH |
SYDNEY | HONG KONG | BRUSSELS

parallel (and necessarily iterative) discussion over jurisdictional search terms that will serve to benefit the parties by short-circuiting future discussions.[1]

Defendants' unwillingness to cooperate with discovery (any part of it – partial productions, search terms, custodians, *etc*.) has unfortunately left Rio Tinto little choice but to seek relief from the Court. We need Defendants to comply with this Court's July 29, 2014 Order so that Defendants' contention that the Court lacks jurisdiction over them can be resolved sooner rather than later.

## I.     Defendants Have Not Complied With This Court's July 29, 2104 Order

In its opposition to Defendants' motion to stay all discovery, Rio Tinto provided a detailed account of this Court's July 29, 2014 hearing in which Defendants first raised their objection to proceeding with broad-based merits discovery before the Court had reached a decision on whether it had jurisdiction over them. *See* Dkt. No. 106 at 6, 15-16. In brief, Your Honor ordered Rio Tinto to serve a separate set of jurisdictional discovery requests in light of a future motion by Defendants contesting jurisdiction (which remains unfiled) and "recognize[ed] there will be some overlap" between merits and jurisdictional discovery.[2] *See* 7/29/2014 Hr'g Tr. at 16:7-18. Rio Tinto did so three months ago. Yet it still awaits a first wave of jurisdictional documents from Defendants.

Most disconcerting is that Defendants have not begun producing documents ***that they have agreed to produce***. Rio Tinto propounded approximately two dozen document requests on each Defendant. In response, each Defendant responded by saying that it "will produce non-privileged documents, if any, that are responsive to this Request, and which are in its possession, custody, or control" to roughly half those requests. *See* BSGR Resps. to Request Nos. 1, 2, 4, 8, 12 – 15, 20, 21, and 23, and Steinmetz Resps. to Request Nos. 1, 2, 3, 7, 11 – 14, 19, 20, and 22. It is now October 30, 2014 and Rio Tinto still awaits the production of those documents.

To be clear, Rio Tinto has not demanded, nor does it expect, that Defendants would have completed their production of jurisdictional documents by today. We recognize, for example, that Defendants have to navigate some data-protection laws in certain countries. But this Court has recommended that the parties produce in "stages of discovery," *see* 10/7/14 Hr'g Tr. 5:7-11, and there are most assuredly a subset of documents that Defendants could be producing now. A prime example is Defendant Steinmetz withholding documents related to past and current properties in New York, at least one of which Defendant Steinmetz seemingly admits to maintaining in New York at some point. *See* Dkt. No. 100 at 22 – 23 ( "In addition, he did not maintain a residence at

---

[1] The discovery currently at issue with Defendants relates exclusively to the jurisdictional discovery this Court ordered to proceed before Defendants' file a motion to dismiss based on personal jurisdiction. Custodians and search terms for jurisdictional discovery are separate and apart from any discussion over custodians and search terms/predictive coding for merits discovery that is currently addressed in the parties' October 30, 2014 joint letter. Indeed, Defendants have not responded to or participated in meet and confers relative to merits discovery.

[2] Even in their Reply in support of their motion to stay discovery, Defendants complain that Rio Tinto's jurisdictional requests overlap with merits discovery. *See* Dkt. No. 108 at 6. But that limited overlap should not come with the sting of surprise, nor serve as a reason to forestall discovery, given this Court's express recognition of it in the July 29, 2014 Order. Moreover, Rio Tinto crafted its jurisdictional requests to make sure it did not overreach; indeed, Rio Tinto initially propounded 40-plus discovery requests in connection with merits discovery but dropped 20 of them in revising its requests to focus on jurisdictional issues only.

Apartment 701 at 781 Fifth Avenue *at the time of the wrongful acts complained of in the Complaint*.") (emphasis added).  Moreover, Defendant Steinmetz' carefully-worded explanation of "maintaining" only a particular property (as opposed to other properties) during only a particular time period (as opposed to other time periods) suggests that he may have owned other properties Rio Tinto is not aware of.  Discovery of information about these, and other, properties falls squarely within the scope of relevant, potentially dispositive jurisdictional discovery.  *See e.g., Motorola Credit Corp. v. Uzan*, No. 02 CIV.666 (JSR), 2002 WL 31319932, at *1 (S.D.N.Y. Oct. 16, 2002) (exercising personal jurisdiction over RICO defendants based in part on those defendants having residences in New York).  At minimum, however, Defendant Steinmetz should not hesitate to produce documents that "would readily [] establish" Rio Tinto's allegations of Defendant Steinmetz' connections to New York to be "untrue," as he stated he would indeed be doing.  *Id.*

Likewise, Defendants could be producing – now, not later – other straightforward jurisdictional documents reflecting Defendants' assets in New York, ownership interests in New York, payments, gifts, and wire transfers connected to New York, other real estate in New York, and so on.  But no such documents have come, which is particularly worrying since these documents do not require the application of custodian or search term restrictions.  Defendant BSGR, for example, refuses to produce even a simple organizational chart showing related entities that may operate here in the U.S.  Indeed, these documents, if produced, could very well put an early end to Rio Tinto's inquiry into jurisdictional discovery if they were to show that Defendants are subject to jurisdiction in this Court.

Accordingly, Rio Tinto respectfully requests that the Court order Defendants to comply with its July 29, 2014 Order, make an initial production of jurisdictional documents on or before November 14, 2014, to complete their production by November 28, 2014 – giving Defendants four months to comply with the Court's July 29, 2014 Order.

## II.   Defendants Have Not Proposed An Initial List Of Custodians Or Search Terms for Jurisdictional Discovery

As alluded to above, Rio Tinto has (repeatedly) asked Defendants to propose an initial list of core custodians and search terms that the parties can discuss in parallel with their larger discussions over the scope of particular jurisdictional discovery requests.[3]  By letter dated October 1, 2014, Rio Tinto asked counsel for Defendants "take an initial cut at those proposed custodians and search terms since (presumably) you have the ability to confer with your client, have access to relevant documentation, and are aware of the principal custodians that are likely to have relevant documents." Defendants have refused that request.  But there is absolutely no downside to kicking off this discussion now.  It will allow the parties to discuss their respective views on the most critical custodians for jurisdictional purposes.  It will allow the parties to exchange, discuss, and revise potential search terms that will most efficiently and accurately identify jurisdictional documents. And it will, as Rio Tinto has explained and counsel for Defendants has agreed, further serve to help the parties define the appropriate scope of some of Rio Tinto's jurisdictional requests.  At the very

---

[3]  To reiterate, reaching agreement on custodians and search terms should not stand in the way of Defendants rolling out productions in response to certain discovery requests.

least, the parties ought to be able to agree on a core set of custodians and search terms *now* if only to save time later.  On the one hand, Defendants agree that a discussion over search terms would assist in resolving differences, yet on the other hand, they refuse to partake in that discussion.

Given the course of Defendants' conduct to date (*e.g.*, appearing not to have diligently started navigating data-protection laws to collect documents from core custodians; refusing to produce *any* documents including plainly responsive documents for which search terms are unnecessary; refusing to propose even a first cut of custodians and/or search terms related to jurisdictional discovery so that the parties can simply start the iterative discussion that needs to take place over those items; overstating the volume of data that it must process just to respond to our jurisdictional requests),[4] we do not see a way forward absent intervention by Your Honor.  Accordingly, Rio Tinto additionally requests that the Court order Defendants to provide an initial list of custodians and search terms related to Rio Tinto's outstanding jurisdictional discovery requests, or provide predictive coding proposals, by November 7, 2014.

## III.   Jurisdictional Discovery Here Properly Encompasses the Acts of Agents and Co-Conspirators, and Broader Contacts with the United States

Rio Tinto served two-dozen jurisdictional requests on Defendants seeking targeted information that will specifically negate Defendants' unsubstantiated contention that they are not subject to personal jurisdiction in this forum.  In response, Defendants have lodged two threshold objections to the scope of certain requests.  Specifically, Defendants have objected to producing (i) documents reflecting contacts of their agents and co-conspirators, and (ii) documents reflecting contacts, by Defendants and/or their co-conspirators and agents, in the U.S., not just New York.  In other words, Defendants are only willing to produce – though they have not done so – documents reflecting *their direct contacts with this forum*.  But Defendants' objections are baseless.  Settled law authorizes this Court to consider contacts by Defendants' agents and co-conspirators, as well as U.S.-based contacts, in order to reach a decision on whether to exercise personal jurisdiction over Defendants.  Thus, Rio Tinto is entitled to the jurisdictional discovery it seeks.

*Acts of Agents and Co-Conspirators:*  Rio Tinto has propounded a number of jurisdictional requests that seek documents reflecting Defendants involvement in and/or knowledge of acts carried out by its agents, other Defendants, and co-conspirators.  In response, Defendants object that such requests are overbroad and irrelevant to any jurisdictional inquiry.  Instead,  Defendants argue that it is only their *direct* contacts that can bear upon this Court's ability to exercise jurisdiction over them.  Defendants are wrong.

---

[4] Defendants have repeatedly represented to this Court that they must process 20.6 *terabytes* of data just to respond to 24 jurisdictional discovery requests.  That contention, however, jumps out as wildly high.  Rio Tinto has no reason to doubt that Defendants may have a total of 20.6 terabytes of electronic information stored on their company-wide systems, but it has every reason to doubt that Defendants would need to process all of that data (which would roughly translate to over 150 million documents) in order to respond to 24 jurisdictional requests.  Indeed, Defendants confirmed they have done nothing to reduce that volume of data by, for example, pulling PST files or electronic documents for relevant custodians only (which is all we ask) or applying appropriate date restrictions on the backend of their systems to further reduce the data set (again, all we ask).  If they did, as parties routinely do in every case, they would have a far more manageable data set, reduced by orders of magnitude.  Defendants will also cull the resulting data set by de-duplicating globally and applying search terms before reviewing and producing documents.

New York's long-arm statute, on its face, expressly permits this Court to "exercise personal jurisdiction over any non-domiciliary" who "in person or through an *agent*" commits or performs certain enumerated acts. N.Y. CPLR §302(a). For example, N.Y. CPLR §302(a)(2) permits a court to exercise personal jurisdiction over a defendant who *through an agent* "commits a tortious act within the State." Furthermore, the term "agent" has customarily been interpreted broadly, *see Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981), and has been held to include *co-conspirators*. In *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991), the Court explained:

> CPLR 302(a)(2) permits the exercise of jurisdiction over an out-of-state defendant who commits a tortious act within New York either in person or through an agent. Courts have defined "agent" broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators. It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2).

(Citations omitted.) *See also Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-cv-488 (BSJ) (HBP), 2012 WL 3594288, at *1 (S.D.N.Y. Aug. 16, 2012).

Likewise, civil RICO claims against any person "may be instituted in the district court of the United States for any district in which such person resides, is found, *has an agent*, or transacts his affairs." 18 U.S.C. § 1965(a) (emphasis added). On its face, therefore, this provision also permits the Court to exercise jurisdiction over Defendants provided they had an agent and/or co-conspirator operating on their behalf in New York when Rio Tinto initiated this lawsuit. *See Am. Trade Partners, L.P. v. A-1 Int'l Importing Enterprises, Ltd.*, 755 F. Supp. 1292, 1304 (E.D. Pa. 1990) ("Section 1965(a) provides that venue may be found in the district where the defendant 'has an agent.' The co-conspirator theory is bottomed on agency theory. It is said that each co-conspirator acts as the agent for the others and any co-conspirator's act in a district is attributable to the other co-conspirators."). In this case, Defendants' agents and/or co-conspirators, specifically Defendants Thiam and Cilins, were in New York when Rio Tinto initiated this lawsuit. Defendant Thiam, for example, resided in New York on April 30, 2014 when the complaint was filed and continues to reside there. And Defendant Cilins was also in New York when Rio Tinto initiated this lawsuit. *See* Dkt. No. 37 (Aff. of Serv. on Cilins). Accordingly, 1965(a) provides additional, alternate grounds for seeking documents related Defendants' agents and co-conspirators.

Still further, Fed. R. Civ. P. 4(k)(2) provides separate grounds for Rio Tinto's requests regarding Defendants' agents. That rule provides an alternate basis to exercise personal jurisdiction in federal courts over alien defendants. Notably, contacts under that rule may be established by the conduct of the defendant *and of its agents. See Peterson v. Islamic Republic of Iran*, No. 10-cv-4518 KBF, 2013 WL 1155576, at *18 (S.D.N.Y. Mar. 13, 2013). And although there seems to be a split, not yet addressed by the Second Circuit, over whether acts of a defendant's co-conspirator can also serve to establish jurisdiction under Rule 4(k)(2), *see Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 764 (S.D.N.Y. 2004), that does not need to be confronted here because, in this case, Defendants' agents and co-conspirators are one and the same.

Accordingly, Rio Tinto's jurisdictional requests properly seek information concerning the acts of Defendants' agents and co-conspirators. And there can be no dispute that Rio Tinto has good-faith bases for believing that Defendants did in fact conduct their conspiracy and commit wrongdoing through a number of agents and co-conspirators. For example, Defendants (i) entered into a behind-the-scenes agreement with Defendant Vale, their co-conspirator and agent, to meet with Plaintiff in New York to obtain rights to the Simandou Concession (Am. Compl. ¶¶ 102-04), (ii) illegally obtained, pursuant to their agreement with Defendant Vale, geological, technical, and logistical data provided by Plaintiff during the meetings *that took place in New York* (*id.* ¶¶ 87, 89-90); (iii) engaged, paid, and sent their co-conspirator, employee and agent, Defendant Frederic Cilins,[5] to the United States to conceal and/or destroy evidence (*id.* ¶¶ 16, 32, 124-31, 135-39), and (iv) further engaged and paid Defendant Cilins to wire money bribes to an account *in Florida* for Defendant Mamadie Touré (*id.* ¶¶ 25, 124-31, 140-41). Additionally, other credible sources identify Ibrahima Kassory Fofana, based in Maryland, as "BSGR's consultant via his firm, IF Global" (attached hereto as Ex. B).

**Broader Contacts With United States:** Rio Tinto has also propounded a number of jurisdictional requests that seek documents and communications reflecting Defendants' and their agents' and co-conspirators' contacts with the United States, not just New York. U.S.-based contacts are plainly relevant to this Court's jurisdictional inquiry. As mentioned above, this Court may exercise jurisdiction over Defendants pursuant to Rule 4(k)(2), which was enacted to permit the exercise of personal jurisdiction in federal courts over alien defendants having contacts with the ***nation as a whole***, but whose contacts are so scattered among states that none of them would have general jurisdiction over those defendants. In fact, Rule 4(k)(2) is designed to "fill a gap in the enforcement of federal law" for courts to exercise personal jurisdiction over defendants "having sufficient contacts with the United States to justify the application of United States law . . . but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." *See United States v. Int'l Brotherhood of Teamsters,* 945 F. Supp. 609, 616–17 (S.D.N.Y. 1996) (quoting Fed. R. Civ. P. 4(k)(2), advisory committee's note (1993)). Moreover, N.Y. CPLR §302(a)(3) is another hook to obtaining contacts outside of New York – it permits a court to exercise of jurisdiction over a foreign defendant who commits a tortious act *outside of the state*, which causes injury within the state.

Defendants have conceded, as they must, that Rule 4(k)(2) permits inquiry into broader, U.S.-based contacts. The law could not be more open and shut on the point. In refusing to provide the requested discovery, therefore, Defendants have resorted to attacking the sufficiency of the allegations in Rio Tinto's Amended Complaint, specifically that Rio Tinto "has not pleaded [Rule 4(k)(2)] or its 'requisite elements' as a basis for jurisdiction over either BSGR or Steinmetz." *See* Dkt. No. 108 at 4. Because of that alleged deficiency, Defendants say they do not have to produce documents reflecting broader U.S.-based contacts.

Defendants are grasping at imaginary straws. Rio Tinto has indeed pleaded the requisite elements of Rule 4(k)(2) – assuming *arguendo* that pleading the application of a federal rule in a

---

[5] Both Defendants and Defendant Frederic Cilins have each acknowledged their agency relationship regarding Simandou (attached hereto as Ex. A).

federal case is even necessary.   Rule 4(k)(2) permits a federal court's exercise of personal jurisdiction where: "(1) plaintiff's claim arises under federal law; (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction over the defendant does not offend the Constitution or other federal law."  *Smit v. Isiklar Holding A.S.*, 354 F. Supp. 2d 260,  264 (S.D.N.Y. 2005).   Elements (1) and (3) are easily satisfied in Rio Tinto's Amended Complaint.   This case, a RICO case, arises under federal law, and the Amended Complaint richly supplies instances (some referenced above) where Defendants, their agents (Vale, Cilins, Thiam, Fofana), and co-conspirators (same) operated throughout the United States (New York, Florida, Maryland, and potentially other places) to defraud and injure Rio Tinto, then cover it up, such that subjecting them to jurisdiction here comports with due process.   For element (2), Rio Tinto has *not* alleged that Defendants *are* subject to the general jurisdiction of any state court, including New York.   Indeed, Defendants themselves  hold the same position – that they are *not* subject to the general jurisdiction of any state court.   To the extent Defendants contend that Rio Tinto had to do more – to walk through, for example, every state to somehow prove the negative that Defendants are not subject to the general jurisdiction of any state court – courts have rejected such a requirement.   *See United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 40 (1st Cir. 1999) ("prov[ing] a negative fifty times over [is] an epistemological quandary which is compounded by the fact that the defendant typically controls much of the information needed to determine the existence and/or magnitude of its contacts with any given jurisdiction."); *see also Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *43-44 (E.D.N.Y. Jan. 4, 2011) (plaintiff need only make out a *prima facie* case for Rule 4(k)(2) and then "the burden [] shifts to the defendant to produce evidence that it is subject to jurisdiction in one or more states or that its contacts with the United States generally are insufficient.").

Finally, Rio Tinto is in any event permitted to seek discovery beyond the precise contours of its pleading.   The Supreme Court itself wrote "discovery is not limited to the issues raised in the pleadings, for discovery itself is designed to help and clarify the issues."  *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).   The issue here crying out for clarity, given Defendants' unsubstantiated contention, is whether Defendants are subject to jurisdiction in this Court.

\* \* \* \*

Based on well-settled law, it is abundantly clear that Rio Tinto is entitled to the jurisdictional discovery it seeks.   Of course, the Court need not reach a decision at this juncture on whether Defendants are *in fact* subject to jurisdiction in this forum.   That decision can come later assuming Defendants file their "anticipated" motion to dismiss.   Right now, however, this Court should reject Defendants' flimsy objections over documents reflecting (i) their agents and co-conspirators, and (ii) broader U.S.-based contacts, and Your Honor should instruct Defendants (once again) to produce jurisdictional discovery as sought by Rio Tinto on or before November 28, 2014.

Respectfully submitted,

/s/ Michael J. Lyle
Michael J. Lyle

# EXHIBIT A

# Bloomberg

---

# FBI Transcripts Link Steinmetz to Alleged Guinea Payments

By Jesse Riseborough and Franz Wild - Apr 14, 2014

(Corrects headline to reflect payments are disputed and location of company headquarters in third paragraph.)

Billionaire Beny Steinmetz approved millions of dollars in payments to a wife of the former president of Guinea as he fought to keep part of the world's largest iron-ore deposit, a suspect in a U.S. graft investigation said in conversations secretly taped by the FBI.

The 109 pages of transcripts were among a cache of evidence posted on a Guinean government website April 9. The transcripts were introduced in the course of an investigation by the West African nation into whether bribery was used to obtain rights to the Simandou deposit. The Federal Bureau of Investigation shared evidence with the Guinean government from its own probe into the circumstances surrounding the award of the licenses, according to the Guinean release.

Both Steinmetz and his company BSG Resources Ltd. have denied any wrongdoing by the Guernsey-based company or its employees. BSGR said April 10 it would prove all allegations of bribery and corruption are false.

At stake is an ore-laden mountain in southern Guinea that's coveted by mining companies from Beijing to London and Rio de Janeiro. The Guinean government's committee handling the probe last week recommended BSGR be stripped of the asset. Guinean President Alpha Conde will make a final ruling on the dispute, potentially putting one of the world's most-prized mineral assets back onto the market.

"BSGR will prove the allegations raised in Guinea's rigged and illegitimate process are false," the company said in an e-mailed statement. "President Alpha Conde's determination to steal our mining rights and transfer them to political allies is nothing new."

## Secret Recording

Steinmetz, Israel's richest man, is worth $6.3 billion, according to the Bloomberg Billionaires Index. He amassed his fortune initially in the diamond trade.

The director of Conde's press office, Moussa Cisse, and Alkhaly Bangoura, his adviser on mining matters, declined to comment when contacted on their mobile phones.

A federal grand jury in the Southern District of New York has been carrying out an investigation since January 2013 into potential violations of the Foreign Corrupt Practices Act involving transfers of money into the U.S. as part of a plan to obtain the Simandou concession.

The transcripts from the U.S. investigation cover telephone and face-to-face conversations last year between late President Lansana Conte's fourth wife, Mamadie Toure, and Frederic Cilins, whom BSGR has acknowledged was once its agent in Guinea. Toure, then a resident of Jacksonville, Florida, wore a wire during the meetings after agreeing to cooperate with a grand jury investigation, U.S. federal prosecutors said in court filings.

Paul Bresson, an FBI spokesman, didn't respond to messages left on his phone.

## Chicken Sandwiches

Cilins was indicted last April, accused of offering to pay a grand jury witness to hand over documents for him to destroy. Last month he pleaded guilty to a single count of interfering with a grand jury. His plea agreement doesn't require him to cooperate with the government's investigation.

According to the transcripts, Cilins said Steinmetz ordered him to destroy documents held by Toure.

"Everything that I tell you is directly from Beny," Cilins whispered to Toure in French in a meeting at the airport in Jacksonville a year ago, according to the transcript, translated by Bloomberg News. The document recounts how, over a meal of chicken sandwiches and fries, the 51-year-old Frenchman went on to promise Toure as much as $11 million in payments that he said were authorized by Steinmetz.

Cilins told Toure that Steinmetz told him: "I want you to destroy those documents. Do what you want, but I want you to tell me, 'I've seen Mamadie and the documents. It's over. There are no more documents.'"

Cilins was arrested four days later.

## Extortion Claim

BSGR has said it sought to work with Cilins in 2006 because the company lacked a "permanent presence in Guinea." It says it cut ties with him two years later. Cilins has said in court filings he worked for BSGR in 2005 to 2006.

Steinmetz's Geneva-based lawyer Marc Bonnant didn't respond to phone calls and an e-mail seeking comment. Cilins's lawyer William J. Schwartz declined to comment.

Guinea ranked 150th out of 177 countries in Transparency International's 2013 Corruption Perceptions Index.

The U.S has widened its investigation into Guinea's extractive industries. The Justice Department and the Securities and Exchange Commission opened a investigation into Houston-based Hyperdynamics Corp. in September over whether it violated the Foreign Corrupt Practices Act and money-laundering laws in obtaining oil-exploration rights in Guinea.

## Checks, Contracts

"We are fully cooperating with the government and we're responding to all their requests for information," Jack Lascar, an outside spokesman for Hyperdynamics, said April 11 by phone. "We are unable to predict when the investigation will be completed."

As well as the FBI transcripts, Guinea posted facsimiles of checks and contracts it says show payments to Toure along with her signed affidavit from the U.S. proceedings.

Cilins said in Manhattan federal court during his prosecution that the contracts were fakes and that he was trying to get hold of them to stop Toure from extorting money from him and BSGR.

Toure's lawyer Mary Mulligan declined to comment in an e-mailed response to questions.

BSGR denies allegations made by Toure in her affidavit that she received gifts from the company including two SUVs and a white gold chain studded with diamonds. She also said BSGR President Asher Avidan once invited her to the company's Conakry office and gave her $1 million in cash that had been laid out on a bed.

## 'Entirely Concocted'

"Our client does not accept there is any truth whatsoever in the evidence put forward in the Toure attestation," London-based lawyers for BSGR from Skadden, Arps, Slate, Meagher & Flom U.K. LLP wrote in a Dec. 8 letter to Nava Toure (no relation of Mamadie), who is heading Guinea's review into the country's mining licenses, and which was seen by Bloomberg News.

"Our client considers this to be an entirely concocted self-serving statement by a witness who has previously (unsuccessfully) sought to extort money from BSGR," the lawyers said.

The law firm wasn't immediately able to answer questions when contacted by phone and e-mail on

April 11.

# Rio Stripped

BSGR had planned to spend $10 billion building an iron-ore rail, port and mine complex supported by the Simandou deposit. It sold a 51 percent stake to Vale SA (VALE5), the world's biggest iron ore exporter, for as much as $2.5 billion in 2010.

Vale declined to comment, referring to its March 27 filing to the U.S. Securities and Exchange Commission, where it said that the company may lose its investment in Simandou if Guinea accepts the committee's recommendation.

The committee said the evidence indicated Vale wasn't involved in corruption.

BSGR got rights to the iron-ore concessions in December 2008 after the government stripped Rio Tinto Group of its title.

President Conte gave the order for the rights to be taken from Rio and given to BSGR during two meetings with BSGR's Avidan and Toure, according to her affidavit. She says she arranged the meetings, according to the document.

Conte's instruction came after BSGR had signed three contracts with Toure, giving her a 5 percent stake in the company's local unit and promising her a $2 million commission if it was awarded ground at Simandou, she said in the affidavit.

"None of the supposed evidence has been produced and the person making the allegations has never been questioned about her claims," BSGR said in a statement yesterday. "BSGR looks forward to international arbitration, where the allegations will be exposed for the first time to a fair and transparent legal process and the witness will face cross-examination that establishes the truth."

To contact the reporters on this story: Jesse Riseborough in London at jriseborough@bloomberg.net; Franz Wild in Johannesburg at fwild@bloomberg.net

To contact the editors responsible for this story: John Viljoen at jviljoen@bloomberg.net Randall Hackley

®2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT B



Nº 220  10/02/2010

**GUINEA**

# City Bank and Chinalco Partner BSGR in Guine

**City Bank** and **China Aluminium Company** (Chinalco) were designated at the end of January as BSGR's partners to fund mining at the *Zogota* iron ore deposit in Guinea. The partners undertook to plough in USD 1 billion each out of an estimated total investment of USD 2.42 billion. The convention governing the partnership is expected to be ratified by decree. The lawyer who was key to drafting the document, **Momo Sacko**, is the Guinean presidency's advisor on natural resources and sustainable development and is close to the former economy and finance minister, **Ibrahima Kassory Fofana**, who is BSGR's consultant via his firm, **IF Global**.

## A Clarification from BSGR

Following our article in the February 8 issue of Africa Mining Intelligence, BSGR wishes to state that to its knowledge, to date, *"the interim government of Guinea has no intention "of targeting"* BSGR or *"unvalidating"* the convention. *"Everything within this convention is in the Mining Code and the law of the Republic of Guinea and follows the best international standards and practice"*.

It adds: *"As far as City Bank and Chinalco are concerned, neither companies are or plan to be investors in our project. BSGR Guinée owns 100% of BSGR Guinea. All investments are fully funded by BSGR's own resources. BSGR will provide relevant information in due course."*

BSGR also states that it has *"no business relationships with Mr Ibrahima Kassory Fofana's firm"*. Secondly, *"Mr Momo Sacko, as a representative of the presidency and the finance ministry, was merely one of the members of the 20 Government representatives cross-ministerial Commission formed by the Guinean Government for the first time in history to study the feasibility study submitted by BSGR"*.

*We take due note of this. However, according to our information, Momo Sacko was not a member of this commission as a representative of the finance ministry but solely in his role at the Guinean presidency. In the absence of Aboubakar Koly Kourouma, it was Momo Sacko who led the Evaluation Commission's work on the feasibility study for BSGR to mine the Zogota deposit.*



© Copyright 1982- Indigo Publications.43783051 Reproduction and dissemination prohibited (photocopy, Intranet, web, etc.) without written permission of the editor.43783051