**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC • PARIS • BRUSSELS • LONDON • MOSCOW
FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG
BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
FILIP MOERMAN
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ

CARMEN A. CORRALES
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU

ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
CAROLINE F. HAYDAY
JOHN V. HARRISON
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

October 30, 2014

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re: <u>Rio Tinto plc v. Vale S.A., et al.</u>, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

      We write jointly on behalf of all appearing defendants ("Defendants") in the above-captioned case in advance of the status conference scheduled for November 3, 2014, at 9:30 am.[1] This letter describes the status of discovery generally. It then identifies on behalf of each defendant separately, who has been served with discovery or served discovery, the discovery issues upon which we have reached an impasse or those that require further discussion with Plaintiff. As indicated below, and in our motion for a stay, while Defendants address the

---

[1] We recognize that Your Honor has indicated that the parties should identify issues for the Court to resolve by submitting "a hopefully joint agenda letter two business days in advance . . . with your disputes," which should "skip the attachments," and contain "just enough so I know what you are doing," and "keep the thickness to a minimum." Sept. 8, 2014 Tr. 13:3-9. Your Honor asked the parties to pursue the same process with respect to this conference. *See* Oct. 7, 2014 Tr. 6:15-16. We had hoped to submit a joint status letter on behalf of all parties, but in light of Plaintiff's unilateral decision not to follow that process, we are unable to do so. Specifically, yesterday afternoon after having sent all Defendants a draft letter which would have had both sides identify the disputes, Plaintiff suddenly and without notice or identifying the reason for a change, sent a revised draft that purported to incorporate by reference Plaintiff's 37.2 submissions that were not sent to Defendants. After Defendants wrote to suggest that that the parties follow Your Honor's process and identify to each other the items in dispute (so as to avoid unfairness to any party) and to inquire when 37.2 letters might be filed, Plaintiff then unilaterally filed its first purported 37.2 letter (with respect to defendant Thiam), only thereafter responding and asserting that the letter "was in the process of being filed" and that other letters "will be filed shortly" and that "[s]ince we've already started down this path it makes more sense to just follow through." That plainly was not true. The Thiam letter was filed <u>after</u> defendants' email and the letters regarding the other defendants were not filed until nearly (or in Vale's case, more than) 24 hours later.

discovery issues relevant to them and consistent with Your Honor's directives and Individual Practices, all Defendants join in the position that discovery should be stayed in this case and that the Court need not, and at this stage should not, address these discovery issues but rather wait until Judge Berman has ruled—which ruling may moot these issues.

### I.     Status of Discovery

The parties first held a Rule 26(f) conference on July 9, 2014, after the Court directed Plaintiff to participate in such a conference. Plaintiff's discovery requests on Vale and Mr. Thiam were deemed served on July 10, 2014, and both Vale and Mr. Thiam responded on a timely basis as agreed on September 3, 2014. The Court directed that Plaintiff serve limited, jurisdictional requests with respect to BSGR and Steinmetz, and Plaintiff served purported jurisdictional discovery requests on those parties on August 5, 2014. BSGR and Steinmetz timely responded less than one month later on September 3, 2014. The same day, Vale served discovery requests on Plaintiff. Vale agreed to Plaintiff's request for an extension until October 13, 2014, and Plaintiff served its responses on that date.

The parties last appeared before Your Honor on October 7, 2014. At that time, Rio Tinto represented—accurately, in our view—that the parties had engaged in good-faith meet-and-confers to narrow the areas of dispute. (Dk. 95.) Plaintiff then identified the following steps remaining to be taken: (1) continue to meet and confer on Rio Tinto's requests; (2) meet and confer on Vale's requests; (3) after conferring on scope, confer on custodians; (4) begin to discuss culling methodology, including predictive coding, search terms, and date filters; and (5) attempt to reach a mutually agreed upon document production schedule. (*Id.*) Vale requested a meet-and-confer with Plaintiff the night it received Plaintiff's Responses and Objections. Those meet and confers were held on October 16 and 22, 2014. As indicated below, Plaintiff also scheduled certain meet-and-confers with Defendants on its requests and—prior to its submissions last night and today—indicated it believed it was making progress. Rio Tinto has agreed to amend its interrogatory responses to conform with the Rules, but it has yet to do so. To date, Plaintiff has not produced a single document. Plaintiff has requested that the parties continue to meet and confer with respect to certain requests.

### II.    Rio Tinto's Rule 37.2 Letter Regarding Defendants BSGR and Steinmetz

As explained above, defendants BSGR and Steinmetz have timely complied with all of their discovery obligations to date in this action. On August 5, 2014, Rio Tinto served jurisdictional discovery requests on BSGR and Steinmetz pursuant to the Court's July 29, 2014 Order ("Requests").[2] (*See* July 29 Order at 27:10-22.) In accordance with the July 29 Order, on September 3, 2014, BSGR and Steinmetz served their Responses and Objections to these Requests a few days prior to the date that they would have been due under Federal Rule of Civil Procedure 34. (*See id.*) Rio Tinto's counsel did not contact counsel for BSGR and Steinmetz until September 16, 2014 – nearly two weeks later – to schedule an initial meet and confer discussion. Two days later, BSGR and Steinmetz conducted a preliminary call with Rio Tinto regarding the meet and confer process on September 18, 2014, and then held full telephonic meet

---

[2]  In accordance with the July 29 Order, Steinmetz and BSGR did not respond to Plaintiff's first set of discovery requests served on June 30, 2014, because they were superseded by Plaintiff's Requests.

and confer sessions on September 23, 2014 and October 20, 2014. The parties also have exchanged correspondence regarding their respective positions concerning the Requests.

After the last meet and confer session on October 20, 2014, BSGR and Steinmetz invited Rio Tinto to provide a proposal for narrowing its Requests, but it has yet to do so. Instead, Plaintiff filed a letter with the Court this evening (Dkt. No. 111) – which BSGR and Steinmetz are still in the process of reviewing – requesting a pre-motion conference to compel BSGR and Steinmetz to produce documents responsive to its Requests. BSGR and Steinmetz believe jurisdictional discovery should be appropriately limited to relevant information concerning the Court's jurisdiction over them in New York. Plaintiff does not agree with this position, and has refused to narrow *any* of its Requests to BSGR and Steinmetz. Without agreement on the appropriate scope of jurisdictional discovery, BSGR and Steinmetz believe that discussion of potential custodian lists and the methodology for culling such documents is premature. As stated in the Joint Letter to the Court (*see supra* Section I), the parties agreed on the appropriate process for discovery. However, Plaintiff is now attempting to bypass this agreement and its own representations to this Court and request the production of documents responsive to its Requests before the parties have even agreed on the appropriate scope and methodology of the jurisdictional discovery. This is inefficient and unduly burdensome.

Accordingly, BSGR and Steinmetz respectfully submit that should the Court grant Plaintiff's request to file its motion to compel, they reserve their right to oppose that motion in accordance with any briefing schedule set by the Court.

### III. Vale's Identification Of Discovery Issues

#### a. Rio Tinto Should Be Required To Identify With Reasonable Particularity The Purportedly Confidential Information It Contends Vale Misappropriated (Rio Tinto Document Requests 12, 33, 44-50; Vale Document Requests 20, 23)

Plaintiff's document requests call for all documents concerning "the materials, information, documents, and other data [Vale] reviewed in the Rio Tinto Data Room" (Request 12) and all documents "shared with BSGR, Steinmetz, or both, <u>taken from, based on, derived from, or relating</u> to any Document in the Rio Tinto Data Room" (Request 33) (emphasis added). Plaintiff justifies these Requests as being relevant to its allegation that Vale "misappropriated Rio Tinto's confidential information through the U.S.-based Data Room" (Am. Compl. ¶ 161), which allegedly contained "Rio Tinto's confidential trade secrets and other proprietary information" (*id.* ¶ 64), "known only to a small number of Rio Tinto's employees" (*id.* ¶ 57). Vale's Request 23 calls for documents "relating to the 'highly confidential and proprietary information regarding the Simandou Concession' that Rio Tinto allegedly shared with Vale as described in Paragraph 56 of the Amended Complaint, or supporting the allegation that such information was 'highly confidential and proprietary,' . . . ." Vale's Request 20 calls for documents relating to "information shared by [Rio Tinto] with any Third Party other than Vale or its representatives . . . from February 1997 to April 2010 relating to railway or port options for exporting iron ore from Simandou or to geological data regarding Simandou." It is Vale's position, among other things, that it did not misappropriate information from Rio Tinto, that the information it received was not confidential and that Rio Tinto did not institute safeguards to

keep it confidential, and that the information did not have independent value with respect to the Vale-BSGR joint venture.

The information that Rio Tinto claims Vale misappropriated is identified in the Amended Complaint only in broad terms such as "geological data acquisition," "exploration data," "rail transport and port options," and "the status of its Simandou Concession." (*Id.* ¶¶ 68, 69, 71, 76.) During the parties' meet-and-confers, Vale highlighted this problem, explaining that the Requests left it guessing what specific information Rio Tinto claimed Vale misappropriated. (Vale denies it misappropriated any information). Vale also pointed out that the index of documents contained in the Data Room, dated March 2009 and which Rio Tinto stated may be incomplete, contained hundreds of entries and thus provided no particularity with respect to the data that Rio Tinto claims was misappropriated or that Vale was to search for in its documents regarding Simandou. The Court has been provided a copy of that Index. (Dk. 99 Exs. X, Z.) Rio Tinto acknowledged that it has not told Vale what it believes Vale stole but did not provide an answer to Vale's question. By letter of October 21, 2014 letter (the "Letter," Dk. 109 Ex. C), it offered to "exclude" from its document requests 19 "categories of VDR documents" from the index, many of which—such as "Accounting Policies and Procedures," "Company Officer Details," and "Simfer Corporate Structure"—are irrelevant on their face (Letter at 4). Because the 19 "categories" actually include subcategories already excluded, the proposal would eliminate, by Vale's count, roughly 40 documents. It would leave hundreds in the index.[3] It would also not identify what data contained within each of the hundreds of documents in the index Plaintiff has evidence (sufficient to satisfy Rule 11) that Vale stole. Vale has told Plaintiff it does not believe it has any of the documents in the Data Room—they are marked as "read only." Plaintiff first responded to Vale's notice that it did not believe it had any of the documents from which to identify the data by stating "Thank you also for confirming that you don't have any documents from the VDR in your possession. Please advise what happened to them." It later responded to counsel by threatening Vale "very well knows which specific documents within those categories it shared with its co-conspirators" and should "advise what happened to them." It still has not provided the documents or the requested information Rio Tinto claims was misappropriated.

It is now six months after Rio Tinto first filed this lawsuit and it has yet to identify any specific information it claims Vale misappropriated. Its requests literally would require Vale both (1) to identify all of the data or information regarding the broad categories related to Simandou contained in all of the documents in the Rio Tinto Data Room regarding Simandou (excluding the roughly 40 documents Plaintiff has identified) and then to sift through all of the documents in its possession, custody or control to see whether those documents contained any of that information. That request would be impossible to satisfy and the law does not require Vale to try to satisfy it. Nor does it permit Rio Tinto to hide its allegations.

---

[3] Plaintiff stated during the parties' meet-and-confer that it had not analyzed the implications of its proposal and did not know how many documents—much less what specific data—it would exclude or leave at issue. Similarly, Plaintiff's purported offer to limit these Requests—to "geology, mining, transport, modeling and mapping, resource estimates, exploration data, suitable mining methods, drilling operations, processing, logistics, the Transguinean Railway, any Guinean passenger rail, and the usage of railways and ports in Liberia" (Letter at 8)—when what is at issue is a mining operation that involves exploration and transportation leaves Vale at a loss as to what exactly it is Rio Tinto is claiming.

It is well established that "[t]he burden . . . is on the plaintiff to define or identify in detail the trade secret or proprietary information it alleges has been misappropriated by defendants." *Julie Research Labs., Inc. v. Select Photographic Eng'g, Inc.*, 810 F. Supp. 513, 519 (S.D.N.Y. 1992), *aff'd in part, vacated in part*, 998 F.2d 65 (2d Cir. 1993). Accordingly, "[s]everal courts have held that a party alleging a claim for misappropriation of trade secrets is required to identify its alleged trade secrets with reasonable particularity before it will be allowed to compel discovery of its adversary's trade secrets." *Switch Commc'ns Grp. v. Ballard*, 2:11-CV-00285-KJD, 2012 WL 2342929, at *4, 6 (D. Nev. June 19, 2012); *see, e.g.*, *MSCI Inc. v. Jacob*, 36 Misc. 3d 211, 213-15 (N.Y. Sup. Ct. 2012) (because "the law requires that a trade secret plaintiff identify trade secrets with reasonable particularity early in the case" and plaintiff may not "shift[] the burden to defendants to clarify plaintiffs' claim," "plaintiffs are precluded from seeking further discovery from defendants until they . . . identify to defendants . . . the trade secret components of their source code").

Courts have identified at least four policies supporting this requirement, all of which apply with equal force regardless of whether a plaintiff chooses to couch its allegations as misappropriation of trade secrets, breach of a non-disclosure agreement, a RICO claim, or otherwise. First, early identification avoids "fishing expeditions to discover trade secrets of a competitor." *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 680 (N.D. Ga. 2007) (quotation marks omitted). Second, "until the trade secret plaintiff has identified the secrets at issue with some specificity, there is no way to know whether the information sought is relevant." *Id.* Third, "it is difficult, if not impossible, for the defendant to mount a defense until it has some indication of the trade secrets allegedly misappropriated." *Id.* at 681. And fourth, "requiring the plaintiff to state its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives." *Id.*

"At the very least, a defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are." *Xerox Corp. v. Int'l Bus. Machs. Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974). Until the "confidential information alleged to have been misappropriated" is identified by Rio Tinto "in detail," "neither the court nor the parties can know, with any degree of certainty, whether discovery is relevant or not." *Id.* Thus, as in *Xerox*, the Court should require Plaintiff to:

> (1) identify in detail all trade secrets and confidential information alleged to have been misappropriated by [Vale];
>
> (2) list all documents which contain, refer to, or incorporate by reference [Rio Tinto's] trade secrets or confidential information; and
>
> (3) key all documents or portions thereof to the specific trade secrets and confidential information alleged to have been misappropriated by [Vale].

*Id.* at 372.

Such an order is well founded in the law and would serve the salutary purpose of focusing discovery on relevant matters and reducing the burden on all parties. Indeed, a contrary, "Dance of the Seven Veils approach" to Plaintiff's misappropriation allegations would

be "manifestly prejudicial to [Vale], and taxing on the Court."  *TNS Media Research, LLC v. TRA Global, Inc.*, 977 F. Supp. 2d 281, 313-14 (S.D.N.Y. 2013) (quotation marks omitted).[4]

The same problem plagues Rio Tinto's Requests 44-50, which seek all documents concerning Simandou and regarding "geological data, studies, analyses, [or] plans"; "mining data and studies"; "rail transportation"; "port data and studies"; "the Transguinean Railway or data, studies, and plans for a Transguinean railway"; "a passenger railway or data, studies, and plans for a passenger railway"; or "data, studies, and plans regarding using ports in Liberia."  As Rio Tinto has explained, each of these Requests seeks all documents "Vale received from BSGR or information that Vale itself independently created or developed itself, or that was prepared for Vale by a third party."  (Letter at 10.)  Vale does not object in theory to a Request that would call for it to produce evidence that it independently received the specific data that Rio Tinto claims Vale misappropriated from Plaintiff.  It is intolerable, however, and far outside the bounds of what is relevant to any claim or defense for Rio Tinto to require Vale to produce all documents regarding Simandou when what is at issue is whether Vale misappropriated specific information and whether that information was confidential or obtained from other sources.

### b. Rio Tinto Has Waived Privilege With Respect To Its Alleged Investigation Of Its Claims, Which It Put At Issue By Seeking To Invoke Equitable Tolling (Vale Interrogatory 22 and Document Request 42)

Vale's Interrogatory 22 seeks the identity of persons with knowledge of Rio Tinto's alleged investigation (*see* Am. Compl. ¶ 146).  Its Document Request 42 further seeks documents "relating to any threats by Rio Tinto to sue or otherwise bring legal action" or "any consideration by Rio Tinto whether to bring any legal action" regarding Simandou, including "communications with counsel or regarding counsel."  Rio Tinto has refused to produce either names or documents on the basis of the attorney-client privilege and/or the work product doctrine.  The objection is not well founded.[5]

Rio Tinto alleges that the four-year statute of limitations that would otherwise bar its RICO claims was equitably tolled because although "[u]pon learning of Vale's involvement with Blocks 1 and 2 of Simandou, Rio Tinto exercised due diligence in pursuing discovery" of its claims and although it "conducted a lengthy investigation involving substantial resources into the

---

[4] *See also Ferguson v. Ferrante*, No. 13 Civ. 4468(VEC), 2014 WL 1327968, at *2 (S.D.N.Y. Apr. 3, 2014) (compelling identification of allegedly misappropriated information, noting that complaint did not "clarify 'with particularity the specific 'trade secrets and confidential business information' . . . allegedly appropriated'"); *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12 Civ. 220(WWE), 2012 WL 3113162, at *2 (D. Conn. July 31, 2012) (finding "good reason," for "fairness and efficiency," "to require plaintiff to describe with reasonable specificity the trade secrets that form the basis of its claim" and ordering "that defendants are entitled to an explanation of plaintiff's theory of the case before plaintiff gets the benefit of defendants' discovery").

[5] As this letter was being prepared, Plaintiff sent Vale an email asking for Vale's research on the subject of "at-issue" waiver and suggesting that Plaintiff might be receptive to producing documents and information in response to this request.  Vale is mindful of this Court's directive that Your Honor runs a "rocket docket" and expects parties to bring "[d]iscovery disputes . . .  to the Court's attention promptly" or run the risk that the application will be "denied as untimely."  Individual Rule 4.A.  Moreover, as Vale previously has informed Plaintiff, it has no obligation to conduct research for it.  As this letter demonstrates, however, the law clearly supports Vale's request.

activities of Vale and BSGR at Simandou," it was "stymied due to the concealed and intricate nature of the RICO enterprise" (Am. Compl. ¶ 146) and due to the alleged fraudulent concealment of non-appearing defendant Cilins. (Am. Compl. ¶ 144(d)-(e); Dk. 106 at 21); *see In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (equitable tolling requires that Plaintiff plead and prove, *inter alia*, Plaintiff's "due diligence in pursuing the discovery of the claim"). (By its own acknowledgment, Rio Tinto was aware of the injury it suffered and aware of rumors upon which it now relies that BSGR and Steinmetz were involved in bribery well before the statute of limitations expired.) It is Vale's position that Rio Tinto knew all the material facts upon which it now relies well before it filed its lawsuit (and within the limitations period) and, further, that nothing that Vale did frustrated that investigation. (Indeed, even today, Rio Tinto refuses to identify any misappropriated information.)

Plaintiff cannot have it both ways. It "may not take advantage of the assertion of fraudulent concealment . . . and at the same time preclude its adversary's discovery of the very evidence which pertains to the application of the doctrine." *Bohack Corp. v. Iowa Beef Processors, Inc.*, No. 77 Civ. 1673, 1981 WL 2018, at *2 (E.D.N.Y. Jan. 13, 1981). *See, e.g.*, *WLIG-TV, Inc. v. Cablevision Sys. Corp.*, 879 F. Supp. 229, 233-34 (E.D.N.Y. 1994) (privilege waived where plaintiff invoked fraudulent concealment, as plaintiff who invokes fraudulent concealment "must prove that it relied on the defendant's bad faith representations and that because of such representations, plaintiff did not bring a timely suit"); *Seaman v. Sedgwick LLP*, No. SACV11-664 DOC (RNBx), 2014 WL 3738049, at *9 (C.D. Cal. June 13, 2014) ("[upholding privilege] would mean that Plaintiff is allowed to allege equitable tolling and then use the privileges as a shield against any testing of those allegations"); *Connell v. Bernstein-Macaulay, Inc.*, 407 F. Supp. 420, 423 (S.D.N.Y. 1976) ("Where a litigant seeks to avoid a statutory protection which has been established for the benefit of his adversary (e.g. a statute of limitations), by a claim that his adversary is estopped to assert such protection; and where it appears that there is a good faith basis for believing that invasion of the attorney-client privilege would shed light on the validity of such claim of estoppel; the party making such assertion must be deemed to have waived the privilege"). By its own admission, Rio Tinto conducted a "lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou." (Am. Compl. ¶ 146.) If Vale is to have to defend against a stale claim based on the assertion that the investigation was frustrated, it is entitled to evidence with respect to that investigation.

       c.  **Vale's Requests Related To The BHP Billiton Hostile Takeover Attempt Of Rio Tinto Are Directly Relevant To Plaintiff's Fraudulent Inducement Claim (Vale Document Requests 5-8, 10-12)**

Vale's Document Requests 5-8 and 10-12 relate to "the proposal first made by BHP Billiton to Rio Tinto on or about November 1, 2007, and reiterated on or about December 12, 2007 ('BHP Billiton Proposal')" and "the offer made by BHP Billiton to the shareholders of Rio Tinto on or about February 6, 2008 for all of the shares in Rio Tinto Limited and Rio Tinto plc ('BHP Billiton Exchange Offer')." In its Responses and Objections, Rio Tinto objected to these Requests on the grounds that they "seek[] documents that are not relevant," arguing that the BHP

Billiton Proposal and Exchange Offer "did not relate to an acquisition of Simandou or the allegations in this case." (Plaintiff's Responses & Objections at 9-14.)[6]

Vale's requests are directly relevant to Rio Tinto's allegation that, in 2008, it was fraudulently induced to enter into negotiations with Vale, that "had it known that Vale was in discussions with the Government of Guinea for the Simandou Concession or that Vale was considering and evaluating Defendants Steinmetz and BSGR as potential partners, it never would have entered into negotiations, signed the confidentiality agreement, or provided its confidential and proprietary information to Vale" (Am. Compl. ¶ 56), and that a "key part of Vale's strategy was to dupe Rio Tinto" into revealing its confidential information" (*id.* ¶ 54).[7]

Rio Tinto asked Vale in 2008 to enter into negotiations for the sale of assets and to sign the Confidentiality Deed in response to a hostile offer from a competitor, BHP Billiton, first made in November 2007, for all of the stock of Rio Tinto. Rio Tinto's objective in initiating discussions with Vale was to explore a transaction relating to "a material or substantial interest . . . in . . . the Rio Tinto Group" (Confidentiality Deed at 4) that would enable Rio Tinto's management to defend against Rio Tinto's hostile bid.[8] Indeed, Vale's obligations under key provisions of the agreement expire at the end of a Restricted Period, the expiration of which is triggered by the ultimate defeat or success of BHP Billiton's takeover bid. In addition, the principal assets that were part of the "material or substantial interest . . . in . . . the Rio Tinto Group" that Rio Tinto had in mind for the Proposed Transaction when it proposed and negotiated the Confidentiality Deed related to non-iron ore resources assets, and not Simandou.[9] It is Vale's theory that, at the time Plaintiff signed the Confidentiality Deed, it was indifferent to whether Vale had an independent interest in Simandou.[10] Rio Tinto had an anti-takeover strategy, which included creating an alternative transaction with a strategic buyer that might be more attractive than the BHP Billiton offer and that might make it more difficult for BHP Billiton to consummate its proposed transaction. Rio Tinto was confronted with a grave threat to its corporate existence, Vale was one of the few companies that it could approach as part of that strategy, and the Vale strategy was preferable to alternative strategies that it was also considering. It would have signed the Deed whether or not Vale was in discussions with Guinea or in discussions with BSGR**.**

---

[6] As this letter was being prepared Plaintiff suggested it wanted to discuss these requests further. Vale has no objection to doing so but brings this issue to the Court because Rio Tinto has indicated no flexibility previously and pursuant to this Court's Individual Rules requiring that discovery disputes be brought to the Court's attention promptly or else risk being denied as untimely. Individual Rule 4.A.

[7] Vale denies that it made any false representations or omissions.

[8] Melanie Burton, *BHP Billiton To Focus On Rio Proposal On Table*, Dow Jones Asian Equities Report, Nov. 12, 2007.

[9] In response to the hostile offer, Rio Tinto's chief iron ore executive claimed Simandou's "significance [was] not built into analysts' valuations." *Rio Tinto plc Investor Seminar – Conference Call – Final*, FD (Fair Disclosure) Wire, Nov. 26, 2007, at 5. Rio Tinto also "used a marathon investor seminar" to urge the market to ascribe greater value to its assets, including Simandou. Barry FitzGerald, *Rio urges market valuers to notice more of its up and coming developments*, The Age (Melbourne, Australia), May 30, 2008, at 3.

[10] It is also Vale's theory that Rio Tinto understood Vale would be independently interested in Simandou, one of the largest iron ore repositories in the world.

"[A] party claiming fraudulent inducement asserts that he would not have entered into the contract on the stated terms *but for* the fraud of the defendant." *Burstyn v. Horl,* No. 84 Civ. 3064(RLC), 1985 WL 260, at *1 (S.D.N.Y. Feb. 8, 1985) (emphasis added). Thus, "[a] conclusive test for whether misrepresentations were the inducement to a contract is whether the representee would have refused his or her consent to it if the representations had not been made or if he or she had known the truth concerning them." 60A N.Y. Jur. 2d Fraud and Deceit § 149. In addition, Vale is entitled to test Rio Tinto's allegation that "[a]s of August 2008, Rio Tinto had invested hundreds of millions of dollars in developing the Simandou Concession" (Am. Compl. ¶ 40), and that Rio Tinto preserved the confidentiality of its information, by exploring what it said to others with respect to Simandou and what it did to protect that information.

Vale has attempted to address any potential burden by limiting these Requests to key Rio Tinto custodians whom Rio Tinto can easily identify including persons on the "Restricted List" for the proposed transaction, i.e. those authorized to receive non-public information regarding the BHP Billiton Proposal and/or Exchange Offer,[11] and would be prepared to discuss with Rio other ways to limit any burden of these Requests by search terms or predictive coding. To date, however, Rio Tinto has claimed that the Requests do not call for relevant evidence and has refused to produce any documents in response to them.[12]

### IV.   Rio Tinto's Rule 37.2 Letter Regarding Defendant Thiam

Last night, Rio Tinto filed a five-page, single-spaced letter requesting leave to file a motion to compel against Mr. Thiam. This letter came as a complete surprise to Mr. Thiam. Prior to filing the letter, Rio Tinto gave no indication that it believed the parties had reached an "impasse" with respect to any of the issues in dispute.

Indeed, to the contrary, following the parties' first meet and confer, Rio Tinto reported in its October 3, 2014 letter to the Court that it "believe[d] we are making progress," and stated that the parties would continue to meet and confer to discuss and resolve certain outstanding issues. *See* dkt. no. 95. The single set of actions that Rio Tinto took following the last conference (prior to the submission of the letter last night) was to schedule a single meet and confer session, which was held that week after that conference (on October 10, 2014), and which lasted less than thirty minutes and to send a letter to Mr. Thiam the following week, on October 15, 2014, which summarized counsel's discussion regarding certain areas in dispute, proposed possible amendments to Rio Tinto's discovery requests, and which closed by stating that Rio Tinto "remain[ed] hopeful that we can resolve any outstanding areas of disagreement." *See* dkt. no. 110 at Ex. 2, p. 4. Mr. Thiam heard nothing further from Rio Tinto until last night, when Rio Tinto filed its letter out of the blue.

Mr. Thiam respectfully submits that Rio Tinto's letter manufactures disputes for the Court to address, when the parties are still working to resolve these very same disputes through the meet and confer process. Significantly, however, Rio Tinto has taken almost no action to

---

[11] This is a list that Rio Tinto—as a U.K. company—is required to maintain under these circumstances.

[12] After 10:00 pm tonight, Vale finally received ECF notice of the filing of a 37.2 letter with respect to Vale discovery issues. Counsel has not had a chance to review that letter as this letter is being finalized. Vale respectfully reserves the right to respond to that letter.

9

address these disputes. For example, in its October 3, 2014 letter to the Court, Rio Tinto highlighted certain "unresolved" issues that it committed to address through the meet and confer process, including the "culling criteria" for searching and identifying responsive documents, and proposing a schedule for document production. In the month since that letter was filed, however, Rio Tinto has refused to propose search terms or any other method for culling the more than 200,000 e-mails and electronic documents in Mr. Thiam's possession (many or most of which are utterly irrelevant to this lawsuit), and has never set forth a requested production schedule. It is irrational and illogical to expect Mr. Thiam to review and somehow produce e-mails and documents before Rio Tinto has even proposed search terms. Further, contrary to Rio Tinto's assertions, Mr. Thiam has never sought to avoid production of *all* documents based on the terms of Guinean law, confidentiality agreements or other governmental secrecy rules and privileges, but has only objected to disclosure "to the extent" that it would violate such laws, rules and privileges. *See* dkt. no. 110 at p. 2.

Mr. Thiam therefore respectfully submits that the appropriate response to Rio Tinto's letter would be for the Court to direct the parties to continue to engage in the meet and confer process, and to establish a deadline for the completion of that process. After that date, any remaining issues in dispute can be brought before the Court for resolution. Should the Court determine, however, that the issues raised in Rio Tinto's October 29 letter are ripe for consideration now, then Mr. Thiam respectfully reserves his right to submit a substantive response.

Respectfully submitted,

/s/ Lewis J. Liman

Lewis J. Liman

cc: All Counsel of Record (by email)