EB3PRIOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RIO TINTO PLC,

                    Plaintiff,

          v.                              14 CV 3042 (RMB)(AJP)

VALE, S.A., ET AL.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          November 3, 2014
                                          9:37 a.m.

Before:

                    HON. ANDREW J. PECK,

                                          Magistrate Judge


                         APPEARANCES


QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiff
BY:  MICHAEL J. LYLE
     ERIC C. LYTTLE


CLEARY GOTTLIEB STEEN & HAMILTON LLP
     Attorneys for Defendant Vale, S.A.
BY:  LEWIS J. LIMAN
     MATTHEW M. KARLAN


MISHCON DE REYA NEW YORK, LLP
     Attorneys for Defendants BSG RESOURCES LIMITED AND
BENJAMIN STEINMETZ
BY:  VINCENT FILARDO, JR.
     ELIZABETH M. ROTENBERG-SCHWARTZ
     KAVITHA S. SIVASHANKER

EB3PRIOC

                              APPEARANCES (Continued)


LAW OFFICES OF MARTIN J. AUERBACH, ESQ.
     Attorney for Defendant BSGR Resources Guinee SARL
BY:  MARTIN J. AUERBACH


SULLIVAN & WORCESTER, LLP
     Attorneys for Defendant Mahmoud Thiam
BY:  PAUL E. SUMMIT
     KAREN E. ABRAVANEL

EB3PRIOC

```
 1              (In open court)
 2              THE COURT:  Be seated.  Okay.  We have a ton of
 3     discovery disputes to deal with today.  I must say, I'm not
 4     happy that things are going so slowly, and to a certain extent,
 5     the fact that you are going so slowly encourages me to sit on
 6     the motion for a stay for a longer period to let you get done
 7     what I think you should get done.
 8              In any event, let's deal first with the dispute as to
 9     Thiam, or however I should be pronouncing that.
10              MR. SUMMIT:  Good morning, your Honor.  Paul Summit
11     for Thiam.
12              MR. LYLE:  Good morning, your Honor.  Michael Lyle for
13     Rio Tinto.
14              THE COURT:  Proceed.
15              MR. LYLE:  Your Honor, Mr. Lyttle will be handling the
16     argument for Mr. Thiam.
17              THE COURT:  Okay.
18              MR. LYTTLE:  Good morning, your Honor.  Your Honor, I
19     think this is a pretty simple dispute.  Defendant Thiam has
20     asserted a number of hypothetical privileges arising out of
21     Guinean law, potential confidentiality agreements.  All we're
22     asking for in our premotion letter is leave to file a motion to
23     compel by which defendant Thiam can identify what exactly these
24     Guinean laws are.
25              THE COURT:  As you know by now, we try to avoid
```

EB3PRIOC

| 1 | motions; so, in a sense, this is the motion.  And unless there
| 2 | is an actual privilege, or at least a disputed privilege, then
| 3 | you're going to have to produce.  So let me turn it over to
| 4 | Mr. Summit.
| 5 |      MR. SUMMIT:  Thank you, Judge.  This lawsuit pertains
| 6 | to Mr. Thiam's role as a government minister, as you know.  We
| 7 | do have an indication of authority that some of the documents
| 8 | which we presume they are seeking -- let me return to that in a
| 9 | moment -- that some of those documents may be precluded from
| 10 | disclosure by Guinean law.
| 11 |      Now, let me back up a second.  We have been asking
| 12 | plaintiff for a search-term methodology so that we can winnow
| 13 | down the documents that are responsive and, thus, identify a
| 14 | subset that may be protected from disclosure by Guinean law,
| 15 | and they have declined to enter into such discussions.  They
| 16 | have declined, in other words, to give us a way to cull, out of
| 17 | approximately 200,000 e-mails and attached documents, to cull
| 18 | down to what may be responsive and, thus, to know the scope of
| 19 | the problem to begin with.  That's No. 1.
| 20 |      No. 2.  As to the Guinean law issue, there is a tiny
| 21 | community, as you can imagine, of Guinean lawyers and Guinean
| 22 | law experts.  We have endeavored, and we are continuing to
| 23 | endeavor, to find a disinterested Guinean law expert.
| 24 |      THE COURT:  But the requests were served in June.
| 25 | We're now four to six months later.  Enough is enough.

EB3PRIOC

|      |                                                               |
| ---- | ------------------------------------------------------------- |
| 1    | MR. SUMMIT:  But the last time we heard from the              |
| 2    | plaintiffs was October 15th.  They said, please make          |
| 3    | expeditious progress.  There was no deadline.  They have not, |
| 4    | indeed, responded on the critical question of search terms.   |
| 5    | THE COURT:  Now, then that's simple.  Do what you             |
| 6    | think gets them what they're entitled to under their requests.|
| 7    | On the one hand, I'm a big believer in the Sedona Conference  |
| 8    | Cooperation Proclamation, but it also applies that Sedona     |
| 9    | Principle 6 says that the producing parties are in the best   |
| 10   | position to describe how to search its documents.             |
| 11   | So you come up with a protocol, give it to them, and          |
| 12   | if they don't have a legitimate response, you'll use your     |
| 13   | protocol.  But let's get it done.  No more, I'm waiting for a  |
| 14   | good person on privilege.  If you can't find someone, there is|
| 15   | no privilege.  In addition, I think I've given you all a 502D  |
| 16   | order, have I not?  Somebody help me out here.                |
| 17   | MR. LYTTLE:  Yes, your Honor.                                 |
| 18   | MR. LYLE:  Yes.                                               |
| 19   | MR. SUMMIT:  Yes.                                             |
| 20   | THE COURT:  So you'll at least have that protection.          |
| 21   | MR. SUMMIT:  Yes, indeed.                                     |
| 22   | THE COURT:  But I have given you all, on the grounds          |
| 23   | that this is a big case and that you're all big boys and girls,|
| 24   | that you're going to work it out.  I think it may be time for  |
| 25   | me to put deadlines on all of you.                            |

EB3PRIOC

```
1              Plaintiff, from some of the time lines in some of
2    these requests is not getting back to defendants as promptly as
3    I would think a plaintiff should.  Defendants, I think, are
4    dragging their feet in the hope that there will either be a
5    stay or that Judge Berman will send you off to somewhere else.
6              Until there is a stay, and you can assume you're not
7    going to get one, you may get one, but assume you're not, let's
8    get going.  How soon can you make production?
9              MR. SUMMIT:  Well, if we are going to select the
10   search terms, which I think is --
11             THE COURT:  In good faith.
12             MR. SUMMIT:  Of course.  But in my experience, that's
13   unusual, given that it's their burden of proof and it's their
14   amended complaint, but --
15             THE COURT:  Not for search terms.
16             MR. SUMMIT:  All right.
17             THE COURT:  They have --
18             MR. SUMMIT:  Then --
19             THE COURT:  Stop.  They have given you discovery
20   requests.  Now, let's go back to the good old paper days.  They
21   didn't say which paralegals you should use and how you should
22   instruct them.  You, as the responding lawyer, said, you know,
23   this is relevant to that request or this isn't relevant to that
24   request.
25             I would like to see cooperation, and I may give
```

EB3PRIOC

1     Mr. Lyttle a chance to respond to here as to why they're not

2     doing anything, if that's the case, but you know the data.

3     Your client knows the data.  If they came up with the search

4     terms, it is, as I have stated I think in the Silver Moore

5     and/or William A. Gross, and certainly in conferences, it's

6     like the game of Go Fish.  You know, kids' game.  You got any

7     tens?  No, go fish.  You got anything hitting this key word?

8     Yes, no.  Go fish.

9          So you propose what you want to them.  They will have

10    a very short opportunity to key in and say that's too narrow or

11    too broad or whatever else they're going to say.  If they don't

12    make any comment at that point, I'm not going to listen very

13    much at the end that what you did was improper.

14         How soon can you make production, including any

15    privilege log for whatever you're going to say is privileged?

16         MR. SUMMIT:  We have about a 200,000 e-mails.

17         THE COURT:  So next week?

18         MR. SUMMIT:  No.  Respectfully, no.

19         THE COURT:  I was being facetious when I said next

20    week, but I would be careful.  If you tell me some ridiculously

21    long period to go through them, six months after the discovery

22    request --

23         MR. SUMMIT:  No, I do -- I get the sense that we don't

24    have a great deal of time this morning; so I won't go into this

25    in detail.  But we could demonstrate to your Honor that a

EB3PRIOC

1    tremendous amount of the time passage here rests on plaintiff.

2    I mean, there is no question about that from the record.

3            THE COURT:  Okay.  But at this point, even taking that

4    into account, I'd like to get this done.

5            MR. SUMMIT:  I appreciate that.  I get that message

6    loud and clear, Judge.

7            THE COURT:  When?

8            MR. SUMMIT:  I would say a month.

9            THE COURT:  Any objection?

10           MR. LYTTLE:  No objection, your Honor.

11           THE COURT:  Okay.  A month from today, which I assume

12   is December 3; so --

13           MR. SUMMIT:  And, your Honor?

14           THE COURT:  Yes.  And if you are claiming privilege, I

15   want a privilege log and, you know, a brief on what the Guinean

16   privilege is.

17           MR. SUMMIT:  I would also just want to say one other

18   thing for the record here.  We are in a case -- "we" being

19   Thiam -- we are in a case of corporate defendants.  Thiam is an

20   individual.  Regardless of what we regard as the reckless and

21   baseless allegations, and shifting allegations I might add,

22   shifting dramatically from the original complaint to the

23   amended complaint.

24           Regardless of those allegations as to Thiam, we are

25   dealing with an individual defendant with very limited

EB3PRIOC

 1    resources, and I do think that has to be taken into account in

 2    connection with Thiam's resources to handle this discovery

 3    burden.  And it's one of the reasons that the motion to stay is

 4    especially important, I think, to this individual defendant.

 5              THE COURT:  Understood.

 6              MR. SUMMIT:  All right?  All right.  Thank you, Judge.

 7              THE COURT:  You asked for a month.  I gave you the

 8    month.

 9              MR. LYTTLE:  Your Honor, may I be heard on the search

10    terms?

11              THE COURT:  Yes.

12              MR. LYTTLE:  I think your view of the Sedona

13    Principles is exactly one that we have shared.  We have asked

14    defendants multiple times, provide us a list.  Let us come.

15    Let's kick off discussions.  They repeatedly said no.  It's

16    your burden.  Get us search terms.

17              They know their data.  We haven't heard this 200,000

18    number until today.  We'll be happy to comment quickly on

19    search terms and come to agreement with them hopefully on the

20    scope that search.

21              THE COURT:  Okay.  I expect cooperation, but one way

22    or the other, December 3 is the deadline, and the odds of me

23    extending that are not good.

24              Okay.  Next issue, and I'm sort of taking these in the

25    way the letters came in.

EB3PRIOC

1          MR. LIMAN:  Your Honor, may I be heard just briefly

2     with respect to the issue of defendant's delay?  Because, your

3     Honor, I think I can understand how you might have that

4     perception, but I want to lay out the facts and the chronology

5     just to set the record straight.

6          Your Honor, we last appeared before you approximately

7     one month ago.  Two weeks ago today, the plaintiffs filed a

8     brief before your Honor, made a statement to all of the

9     defendants here, in which they said that discovery would

10    present no additional burden on the defendants, and all that

11    they were seeking, all we should have to do, would be to

12    produce whatever went to the grand jury.

13         In that two-week time period, from when we appeared in

14    front of your Honor until when that brief was filed, there was

15    very little contact from the plaintiffs whatsoever.  And we're

16    entitled, I think, your Honor, to take that representation to

17    be true.

18         One week after at that time, your Honor, we filed our

19    reply brief.  Last Thursday for the -- we received letters,

20    each of us, with extraordinary requests.  In the case of Vale

21    with the statement that the whole Vale-BSGR relationship was a

22    product of fraud and corruption and, therefore, the plaintiffs

23    were compelled to ask for everything.

24         Your Honor might ask, and I think your Honor has

25    asked, what happened in the interim, in that two-week time

EB3PRIOC

period.  The answer, your Honor, and I think this is telling in

terms of the issues before your Honor, is one week after the

statement was made by the plaintiffs to us, none of us heard

anything from the plaintiffs about this.

With respect to Vale, it was not until after we had

the -- we filed our reply brief that the plaintiffs first said,

well, no, they're not seeking just what was produced to the

government.  They're seeking something far more expansive.

With respect to Thiam, Thiam didn't hear anything

whatsoever in that time period from when the opposition brief

was filed until last Thursday.

And with respect to BSGR, they heard something on the

20th before that opposition brief was filed.  They made a

request to the plaintiffs and a suggestion.  They heard on the

23rd that the plaintiffs were considering it, and then they, my

understanding is, that the first time they heard that a

consideration, that Rio Tinto was not only considering it but

teeing up the issue before your Honor, was last Thursday late

in the day.

Your Honor, you know, fundamentally, it's fine for

parties to tee up legal issues in advance of a hearing before

the Court and for the parties to be prepared to address those

issues and to argue them.  That's what we understood the

process was to be.  Your Honor, the process has been perverted,

and that has been a substantial prejudice to all of the

EB3PRIOC

1    defendants here.

2           Getting a letter at 10:30 at night on a Thursday

3    teeing up legal issues that where the other side has said they

4    still want to talk, that's not fair.  It's just fundamentally

5    not fair.  And your Honor might request briefing from us, your

6    Honor might request argument from us with respect to those

7    issues, but on behalf of all the defendants -- we don't agree

8    on very much.  We're fighting with each other on most of the

9    issues on this case.

10          The one thing that we do agree on and feel very

11   strongly about, is that the way that the plaintiffs have

12   conducted this case has worked to our substantial prejudice,

13   and we'd like opportunities to address issues in orderly ways.

14   Sending letters late on Thursdays, after saying for a long

15   period of time discovery presents no burden, is not the way

16   that we would expect litigants before your Honor to act.

17          THE COURT:  All right.  Let's set a procedure.

18          MR. LYTTLE:  May I be heard briefly, your Honor?

19          THE COURT:  Very briefly.

20          MR. LYTTLE:  Very briefly.  It is really stunning that

21   Mr. Liman would articulate this position when we wrote

22   explicitly a letter and said:  Hi, there are issues we'd like

23   to bring up with Judge Peck.  You asked us to move things

24   forward.  These are issues that we feel we are at an impasse

25   at.  Please let us know if you agree or disagree.  That is

EB3PRIOC

1    enlightening.

2          Everything that Mr. Liman said can be contradicted if

3    we wanted to show your Honor tit for tat.  We don't think it's

4    in your Honor's interest or in this court's interest.

5    Everything that we have filed on, we said we believe we're at

6    an impasse.  If you disagree, let us know.  They wrote back and

7    said we agree, we are at an impasse.

8          We then proceeded, as your Honor requested.

9    Mr. Steinmetz -- Mr. Steinmetz has refused -- the meet and

10   confer lasted for about half an hour and he says, you're not

11   getting anything because you don't get agents and you don't

12   get --

13         THE COURT:  Okay.  I understand that.  Let's set a new

14   rule that the agenda letters come in a week in advance unless,

15   by mutual agreement, you cut that deadline back, but that way,

16   if you're doing unilateral letters, a week in advance, and then

17   three days after that, the other side can submit their papers.

18   If that means you have to be more prepared for whatever the

19   conference is, so be it.

20         Now, one other question, and I know there was this

21   dancing about whether there was a grand jury or any of that,

22   but I guess one question is, do you want to take them up on the

23   proposal they made?  Which is to say, phrasing it in whatever

24   hypothetical to preserve grand jury secrecy, here's

25   hypothetically what we gave the government.  Leave me alone for

EB3PRIOC

1   anything else, at least for now.  Is that anything any

2   defendant wants to do?

3           MR. LIMAN:  Let me confer.

4           (Pause)

5           MR. LYLE:  Your Honor, if we could just clarify what

6   we were discussing with respect to the grand jury materials and

7   the materials for the government, before we get too far down

8   the path.  What we were suggesting --

9           THE COURT:  Let me ask you to wait a minute so that

10  Mr. Liman can hear you.

11          MR. LYLE:  Yes, your Honor.

12          (Pause)

13          MR. LIMAN:  Your Honor, we would be prepared to

14  produce -- hypothetically assuming that there is a grand jury

15  investigation, we would all be prepared to produce what has

16  been produced to the grand jury.

17          MR. LYLE:  Your Honor, the point that we were making

18  with respect to the materials that were -- we were asking for

19  and the discussion we were having with respect to the documents

20  that the defendants are turning over to the U.S. Attorney for

21  the Southern District of New York, was to point out that there

22  would be no prejudice for them to begin collecting documents

23  and producing documents to us.

24          Our point was, is that they produced documents in some

25  form or fashion to the government, and we would be receptive to

EB3PRIOC

 1    receiving those.  What our proposal or our discussion about was

 2    never intended to mean that if our requests are broader than

 3    what the government has received, that we were foregoing our

 4    other requests.  That was never what we were suggesting in any

 5    of our discussions or in any of our papers.

 6              So while it's true that if the defendants are, and we

 7    believe they are, producing documents to the government, that

 8    they can at least begin turning those materials over to us

 9    right now.

10              The remainder of our requests, the ones that we've

11    been writing to your Honor about to get assistance from, remain

12    pending.  And we don't want to suggest that we were somehow

13    trying to limit that what we want and what we need for our case

14    is necessarily just what they produced to the government.

15              THE COURT:  Well, then, you're not giving them

16    anything for going that route, and I think Mr. Liman is about

17    to point out to me the exact phrase you used in your briefing

18    on the stay.

19              So, Mr. Liman, since I don't have my stay briefs in

20    front of me and you have Post-its and highlighting on yours,

21    that's about all I can see from this distance, but yes, go

22    ahead, read it.

23              MR. LIMAN:  The information -- this is, your Honor,

24    from Page 10 to 11 of their brief:

25              The information sought by the outstanding discovery

EB3PRIOC

1   requests is the same type of information the defendants likely

2   already have collected and produced or will produce to the U.S.

3   and other authorities.  There is absolutely no additional

4   burden associated with the providing of discovery defendants

5   likely already have started.  All defendants have to do is to

6   turn over what they have collected in response to the various

7   governmental investigations.  The ease of replicating these

8   productions weighs against defendants' request for a stay.

9           There are other statements to the same effect in their

10  papers.

11          MR. FILARDO:  Good morning, your Honor.  If I may be

12  heard.  Vincent Filardo for the defendants BSGR and Benjamin

13  Steinmetz.  Just to be clear, to my knowledge, your Honor, the

14  U.S. government has not asked my client for documents or issued

15  us a subpoena.

16          What we did initially, very early on, was undertake a

17  document preservation exercise, and that's the 20.6 terabytes

18  or 20.7 terabytes that we've written about, and the issue for

19  us is processing that data.  As your Honor well knows, that's

20  where the cost is, and it depends upon the actual tool that you

21  use.  And the tool that's appropriate to use is determined by

22  whether or not you have flexibility with the custodians that

23  you're going to look at and whether or not you have an

24  agreement on search terms and the actual scope.

25          We're talking a tremendous amount of data.  It could

EB3PRIOC

1    be far in excess of 3 million bridge pounds to process that

2    kind of data, and that's really where our impasse has been.

3    Let's focus on if we're going to have an agreement on the

4    broadness of what jurisdictional discovery is required for here

5    in New York, their view is that it's not much different than

6    substantive discovery.

7              And, certainly, we're not going to agree to that

8    without judicial intervention and review.  And if we're unable

9    to agree with that, we're going to be taking a shot at doing

10   some kind of document processing that may well be with the tool

11   that's not going to be as efficient as another may be if that

12   scope changes.  That's really what our argument is.

13             If we we're going to sit down and say what search

14   terms, I'd say New York, Manhattan, but even that would get a

15   whole huge universe of documents that we would then have to

16   review.  So that's, in a nutshell, where we are with them, and

17   where we haven't been able to make any progress.

18             THE COURT:  All right.  Mr. Summit?

19             MR. SUMMIT:  Your Honor, we have not produced anything

20   to this hypothetical grand jury, and so we're not in this

21   issue.

22             I do want to just suggest to your Honor that I need a

23   few more minutes of your Honor's time on this month deadline,

24   as I've been talking -- thinking about it and conferring with

25   Ms. Abravanel.  Maybe now is the moment or sometime later.

EB3PRIOC

1          THE COURT:  I'll hold that for a moment.

2          MR. SUMMIT:  Thank you, your Honor.

3          MR. LIMAN:  Your Honor, in response to that

4    hypothetical grand jury, we would have documents to produce.

5          THE COURT:  All right.  Any reason, Mr. Liman, why you

6    shouldn't produce those, and then the Court can see whether

7    that is enough for all purposes, enough in the interim,

8    et cetera?  I mean, since they don't know what the government

9    is asking for and what you have produced, despite what they've

10   said in their brief, I'm not inclined to say they can never ask

11   you for anything else, but, you know, if they don't want a stay

12   in the interim, they said that's pretty good for the short

13   term.

14         MR. LIMAN:  Your Honor, if it would resolve for the

15   moment the issues with respect to their request to us, well, we

16   think we do have a valid objection.  We would not stand on that

17   objection.

18         MR. LYLE:  Your Honor, Michael Lyle for the plaintiff.

19   Your Honor, the idea, then, that we've already heard from two

20   of the defendants, that they haven't produced anything --

21         THE COURT:  Limit yourself to the one defendant who

22   hypothetically said they did.

23         MR. LYLE:  What we said in our papers, your Honor, is

24   that the information that we were requesting is the same type

25   of information, not that it is identical, that it is limited to

EB3PRIOC

1    the same scope.

2              THE COURT:  You're making a very good argument for a

3    stay.

4              MR. LYLE:  We don't -- your Honor, but what we're

5    suggesting is is that we know that they've already gone to

6    their documents, begun identifying for the government, who has

7    an investigation going on about the identical issues in our

8    case.  We don't know what they've given to the government.  We

9    don't know what the government's asked them for because we're

10   not privy to that information.  So we can't say that our

11   materials are identical that we're asking for.

12             What we can say is we know that they've already given

13   something, and Mr. Liman has now confirmed that they've given

14   something, and we're certainly happy to take that information.

15   What we were suggesting is, there's no burden there because

16   they've already done it.  To the extent that they've held back

17   information that they've looked at and collected that is

18   responsive to our requests, that they haven't turned over to

19   the government, we would be entitled to that.

20             Our point was there's no burden on them because

21   they've already initiated some kind of process relative to many

22   of the issues.

23             THE COURT:  There is a big burden in going from, you

24   know, let's see what's there and/or let's produce what the U.S.

25   Attorney's Office has demanded, and let's now answer all of

EB3PRIOC

 1   your discovery requests, to the extent that they're different.

 2   So you can't have it both ways.

 3           I will require Mr. Liman's client to produce what it

 4   hypothetically produced to the government, in short order.

 5   Mr. Liman, you tell me what short order is, and we will see how

 6   much more you need after that, which may have an impact on the

 7   Court's ruling on the stay.  If it's very little, then what you

 8   said originally holds.  If it's, this is a nice start and we

 9   got all these goodies that we didn't even ask for, so now we're

10   going back to our original requests, et cetera.  So how soon

11   can you produce, Mr. Liman?

12           MR. LIMAN:  Your Honor, two weeks.

13           THE COURT:  Okay.

14           MR. LIMAN:  I may have made a colleague unhappy, but I

15   think two weeks will do it.

16           THE COURT:  Good.  All right.  Let me go back to

17   Mr. Summit.

18           MR. SUMMIT:  Thank you.

19           THE COURT:  Who's going to plead for a little more

20   time.

21           MR. SUMMIT:  I think I made my colleague over there

22   very unhappy.  Thinking about the month and what we're going to

23   get done and what we can get done within that month, your

24   Honor, we need to agree on search terms with plaintiff, and we

25   will propose search terms.  We will attempt to conduct the

EB3PRIOC

1    search, and thereby have a corpus of documents.

2           We don't know -- I don't know as I stand here today

3    whether that will mean a thousand documents or 50,000 documents

4    or 150,000 documents.  I do know that many, many, many of them

5    will be in French.  I do know that they have to be reviewed for

6    privilege and all the rest.

7           So what I would ask, your Honor, is that we continue

8    to meet and confer.  If I may just --

9           THE COURT:  That, I'm not allowing because that seems

10   to get us nowhere.

11          MR. SUMMIT:  In a month, we will commit to your Honor

12   that we will have proposed search terms, and we will have

13   identified a Guinean authority, and we will begin --

14          THE COURT:  The month deadline sticks.

15          MR. SUMMIT:  Your Honor.

16          THE COURT:  And, one, you know, other than privilege

17   and at least the attorney-client privilege review can largely

18   be done by keyword search, for the names of lawyers and

19   extensions.

20          Now, I don't know what the governmental privilege are.

21   You've had six months to come up with a lawyer who can advise

22   on that, and even if you have to hold stuff back as this may be

23   privileged, it may not, we're not sure, the only way to get

24   through the 200,000 e-mails, however you do it, is to have a

25   deadline.  So how soon can -- Let's maybe even break it down

EB3PRIOC

1   into baby steps.

2            MR. SUMMIT:  Good.

3            THE COURT:  How soon can you propose keywords to the

4   plaintiffs?

5            MR. SUMMIT:  I think in a week.

6            THE COURT:  Because of testing or because -- you know,

7   look, if you're just picking the key words out of thin air,

8   which isn't the way to do it, then do it today.  If you're

9   actually going to test the keywords -- which you should read

10  the William A. Gross decision, if nothing else, and it's cited,

11  I believe, at the back of my chambers procedures.

12           If you're actually going to test the keywords and see

13  what they hit and things like that, then, yes, you need a

14  little more time.  But, you know, if you take three weeks to

15  make a keywords proposal to them and they take equally long to

16  get back with much less information, we're nowhere.

17           MR. SUMMIT:  Well, I suggested a week.

18           THE COURT:  Okay.  So if you get them the keywords by

19  November 10th, your proposal, how soon can you respond?

20           MR. LYTTLE:  Two days, your Honor.

21           THE COURT:  Good.  So that's November 12th.  You then

22  have the choice of agreeing to their suggestions or taking your

23  chances.  I'm not going to hold your hands on all of this.  So

24  if you've got your keywords in hand roughly by the 12th or the

25  14th, that still gives you three weeks, albeit one of them is a

EB3PRIOC

1    short week because of Thanksgiving.

2              MR. SUMMIT:  But, your Honor, what if these keywords

3    yield 100,000 documents, 90,000 of which are in French?

4              THE COURT:  Then, you know, the answer, and you

5    probably should be arranging this upfront, is to get a team of

6    contract attorneys, whether from a vendor or from a staffing

7    agency, who speak French.

8              MR. SUMMIT:  Your Honor, I don't want to come back

9    here in a month with a lot of excuses and failure, and I want

10   to be realistic with you today.

11             THE COURT:  So what's your realistic, now, knowing

12   that it's French and, frankly, unless the e-mails are highly

13   responsive to the richness of 50 percent, you really shouldn't

14   have 100,000 e-mails to look at, but --

15             MR. SUMMIT:  Well, the discovery requests, as defined

16   still by plaintiff, are extraordinarily broad.

17             THE COURT:  You're also claiming poverty, and to a

18   certain extent, other than privilege, produce it all.  You

19   know, do what you need to do.  Tell me what it is that you

20   think is a realistic deadline.

21             MR. SUMMIT:  What I would like to suggest, to your

22   Honor --

23             THE COURT:  No, a completion deadline.

24             MR. SUMMIT:  By completion deadline, you mean complete

25   production of all documents?

EB3PRIOC

1          THE COURT:  Of whichever of the 200,000 are

2     responsive.

3          MR. SUMMIT:  I would have to ask then for three months

4     because we haven't --

5          THE COURT:  Okay.  Then your credibility is gone, and

6     it's December 12th and that's it.  So you bought yourself nine

7     days.  Get it done.

8          MR. SUMMIT:  Your Honor.

9          THE COURT:  No, no, no.  Stop.  Three months for

10     200,000 e-mails is absurd, even if they're in French.  Hire a

11     good vendor who understands French.  Do what you have to do.

12     You're not getting three months.  December 12th is the

13     deadline.

14          Now, okay, so we've taken care of Vale, I think at

15     least for the moment.  So now we're back to BSGR and Steinmetz.

16          MR. LYTTLE:  Your Honor, one point on Vale.  If this

17     hypothetical government production, it would be very helpful

18     for us in evaluating it, if Mr. Liman could provide us with the

19     custodians they searched, the dates that they searched.  I

20     understand he can't provide us the government request, but I

21     think that information would not be subject to grand jury

22     secrecy.  That would help give us a sense of what this data is

23     and where it came from.

24          THE COURT:  Any problem with that?

25          MR. LIMAN:  I'm not sure what I'm being asked, your

EB3PRIOC

1    Honor.  I think if the question is to provide information right

2    now, I don't know the answer to that.

3            THE COURT:  No, no.  When you make your production,

4    what was the date range parameter of the search, and what were

5    the custodians whose files were searched?

6            MR. LYTTLE:  And the search terms.

7            MR. LIMAN:  Your Honor, I do think there is

8    potentially an issue with respect to that.  One of the things

9    that the parties have agreed upon is not to produce the actual

10   government request that led to the production of documents

11   because that would intrude into the secrecy of the grand jury

12   and the U.S. Attorney's Office processes.

13           I would be hesitant to make that commitment in front

14   of your Honor without having some sense as to whether it would

15   implicate those issues.  I think it does.

16           THE COURT:  All right.  Well, we'll leave it for now

17   as something that you and plaintiff's counsel can discuss and

18   see where that all works out.  Okay.  BSGR and Steinmetz.

19           MR. LYLE:  Your Honor, Michael Lyle for plaintiff.

20   Your Honor, the issues with respect to Mr. Steinmetz are really

21   focused on three areas.  First, there are documents that

22   Mr. Steinmetz and BSGR agreed are responsive and that they

23   would have no objection to producing, but they haven't produced

24   them.  And we'd like to have --

25           THE COURT:  All right.  Let's get a date for that,

EB3PRIOC

1    assuming that's true.  I just saw a head shake.

2                MR. FILARDO:  No, your Honor, it's not true.  What

3    Mr. Lyle is referring to is our responses to discovery requests

4    whereby we responded subject to general objections, which

5    included our scope objections, and maybe others.

6                In fact, it said if they weren't privileged and they

7    exist, we would produce them.  And that was in accordance with

8    the prior procedure that we agreed with plaintiff was that we

9    will agree upon the scope of discovery and only then would we

10   then discuss the appropriate custodians and search terms.

11               So it's not like we agreed, and we just failed to

12   produce, as it seems to be being suggested to the Court.  It's

13   not that at all.

14               THE COURT:  All right.  So let's deal with scope.

15               MR. LYLE:  The issues, your Honor, that Steinmetz has

16   asserted are twofold, and the real impasse relates to what it

17   is that we're entitled to receive from them.  We are seeking

18   contacts, your Honor, more broadly than Steinmetz and BSGR are

19   agreeing to.

20               They are trying to suggest that we are only limited to

21   contacts with New York in order to establish the personal

22   jurisdiction.  Our requests are targeted in two areas, agents

23   and co-conspirators, which provide for information in discovery

24   relative to --

25               THE COURT:  What are we talking about as to agents and

EB3PRIOC

1   co-conspirators?

2            MR. LYLE:  So we're talking about all of the other

3   co-defendants.

4            THE COURT:  Now, that's proving your case through the

5   back door.

6            MR. LYLE:  Well, your Honor --

7            THE COURT:  You may get it later.  You're not getting

8   it now.

9            MR. LYLE:  Well, the contacts with respect to the

10  co-conspirators go directly to the questions of the long-arm

11  jurisdiction, which we have asserted in the complaint and which

12  is also allowed under federal rule 4K2.  And so our contacts

13  with respect to them is focused on those personal jurisdiction

14  issues.

15           THE COURT:  That is basically the merits; is it not?

16           MR. LYLE:  But, your Honor, we recognized when you

17  were with us last time and you picked up on this point, that

18  there may be some limited overlap.

19           THE COURT:  There's a difference between limited

20  overlap and every substantive document that BSGR and Steinmetz

21  have because, in your view, it shows what they and/or the

22  co-conspirators did.

23           So I understand lines have to be drawn, and it may not

24  be perfect, but at the moment, let's take a very classic

25  jurisdiction and let's focus on that first.

EB3PRIOC

 1          What actions, if any, did BSGR, Steinmetz and any

 2     direct employees or direct agents, which probably aren't any,

 3     what contact did they have with New York or the United States.

 4          MR. LYLE:  Well, your Honor, with respect to agents,

 5     we have alleged that Mr. Cilins is an agent of BSGR and so --

 6          THE COURT:  Who's Mr. Cilins?

 7          MR. LYLE:  Mr. Cilins is one of the co-defendants in

 8     the case, who is the one that's in prison right now in

 9     connection with his crimes that are the subject of this lawsuit

10     and also the government's investigation.

11          So we would ask that we have at least the opportunity

12     to have discovery with respect to Mr. Cilins, who is

13     specifically alleged as an agent of BSGR.

14          MR. FILARDO:  Your Honor, I would say, why doesn't the

15     plaintiff take discovery of Mr. Cilins?  I mean, it's our

16     position he's not our agent.  I think that will come out if the

17     merits of this case are ever tried or adjudicated.  Take

18     Mr. Cilins' discovery.  They've had that opportunity for many,

19     many months now.  I mean, he's not going anywhere, at least

20     until January when I understand he'll be released, and at that

21     point, he'll probably go back to his home country.

22          THE COURT:  How many of the however many million

23     gigabytes, I'm exaggerating, but how much do you have about

24     Cilins and contacts with New York or anywhere in the U.S.

25          MR. FILARDO:  Your Honor, I can't respond with respect

EB3PRIOC

| | |
|---|---|
| 1 | to the 20.6 terabytes, but based on discussions with my client, |
| 2 | I doubt -- we have very little, if much, contact with New York |
| 3 | and the U.S. |
| 4 | The whole Cilins thing, I'm not sure.  We would need |
| 5 | to process some key custodians, then test some search terms, as |
| 6 | your Honor suggested earlier, and then we can determine.  But I |
| 7 | really would think that it's the actual processing and then the |
| 8 | testing that's takes the time, and then the review, obviously, |
| 9 | after that.  If we chose the right search terms, maybe the |
| 10 | review won't be as long. |
| 11 | THE COURT:  Right.  Well, keep Mr. Cilins in for now. |
| 12 | MR. LYLE:  Your Honor, the second issue is relative to |
| 13 | the contacts with the United States as a whole, that BSGR and |
| 14 | Mr. Steinmetz have.  They, again, seem to limit it only to |
| 15 | New York.  Under Federal Rule 4K2, we're entitled to discovery |
| 16 | with respect to contacts with the United States or abroad. |
| 17 | MR. FILARDO:  Your Honor, they didn't plea 4K2 in |
| 18 | their complaint nor -- and Judge Wood in a recent decision has |
| 19 | really said that that's just not a proper way to go about |
| 20 | trying to get jurisdiction over a defendant in the U.S. by |
| 21 | looking at the activities of co-conspirators everywhere. |
| 22 | THE COURT:  We have the co-conspirators.  What's BSGR |
| 23 | and Steinmetz's contacts with the rest of the United States? |
| 24 | MR. FILARDO:  Very little, if any, your Honor. |
| 25 | THE COURT:  Good.  Then it shouldn't be a burden to |

EB3PRIOC

1     produce.

2               MR. FILARDO:  Production is not the burden, your

3     Honor.

4               THE COURT:  I understand.

5               MR. FILARDO:  It's the review and the process.

6               THE COURT:  You're going to have to figure out how to

7     review it and that's, frankly, the same whether it's New York

8     or the entire United States.

9               MR. FILARDO:  Yes.  And, your Honor, one way, and I

10    think it's the appropriate way, too, which the plaintiff has

11    not moved on as well, it's not just the substance of the

12    request that we're now discussing here, but the timing.

13              So, for example, when they're pleading general

14    jurisdiction against Mr. Steinmetz or BSGR, that timing is on

15    or about the day that the complaint is filed.  When they're

16    pleading specific jurisdiction under New York alone, it's keyed

17    to the actual specific allegations that give rise to the claims

18    that are in the complaint, and those are all delineated in very

19    specific time periods, not very long, your Honor.

20              But instead, they want it through -- going back to

21    January 2008.  It increases the amount of data tremendously.

22              THE COURT:  Mr. Lyle?

23              MR. LYLE:  Our allegations in the complaint, your

24    Honor, go to 2008 through to the present, your Honor.

25              THE COURT:  I know, but isn't the test for personal

1    jurisdiction at the time of the complaint?

2              MR. LYLE:  Yes.

3              THE COURT:  In other words, you know, somebody could

4    live in New York at the time -- I mean, obviously, at the time

5    they committed the tort, that gets into another part of the

6    statute but, you know, the issue is, is it fair to bring them

7    into court at the time of the suit?

8              MR. LYLE:  Your Honor, the contacts are if you engage

9    in conduct, as you're pointing out, so in some instances it

10   does focus on the time of the complaint, but with respect to

11   the commission of the tort through an agent, you look at the

12   context at the time of the action, not at the time of the

13   lawsuit.  And so under the long-arm statute, you must look at

14   time of the allegations in the complaint.

15             THE COURT:  All right.  But if we're talking long arm,

16   it's got to be context in connection with the allegations of

17   the complaint.

18             MR. LYLE:  Yes.

19             THE COURT:  Not, you know, did they do business in

20   New York sporadically, you know, that would allow someone else

21   to have 302 long-arm statute.  So what is it you are saying

22   that they did in New York or the U.S. in connection with the

23   RICO, et cetera, claims?

24             MR. LYLE:  Your Honor, with respect --

25             THE COURT:  Directly, not through an agent, other than

EB3PRIOC

1    Cilins.

2            MR. LYLE:  With respect to Steinmetz and BSGR, your

3    Honor, our allegations are that -- that his conduct through --

4    we have to remember, we have him funneling money through the

5    United States, in banks located in the United States and in

6    New York, those are allegations.

7            We have allegations that Mr. Steinmetz sent his agent,

8    Mr. Cilins, to the United States to continue the coverup of the

9    conspiracy through the use of bribery to defendant Thiam -- to

10   defendant Toure, rather.

11           Mr. Steinmetz, we have allegations -- and let me be

12   clear, your Honor.  With respect to defendant Toure, Mr. Cilins

13   came to the United States, and for these actions he was

14   arrested and is in prison for it.  The bribery that he was

15   engaged in was at the direction and control of BSGR, and it

16   with was for the purpose of covering up the bribes that were

17   given to Toure in connection with the RICO conspiracy.  Bribes

18   which are documented, your Honor, through written agreements of

19   all things.

20           THE COURT:  What do you need more discovery for?

21           MR. LYLE:  Because, your Honor, Mr. Steinmetz has told

22   us he's contesting personal jurisdiction, and so we need to get

23   discovery to show that -- we don't know what other contacts are

24   that he has, but that's an example.  The time periods we're

25   talking about, your Honor, are laid out in our complaint, but

EB3PRIOC

1    what I'm suggesting is perhaps what we can do is, we have two

2    agents, we have Mr. Cilins, who I mentioned.  We also have

3    Mr. Furfano, who is another agent of Mr. Steinmetz's, who is

4    also part and parcel sell of the ability to -- is part of the

5    RICO conspiracy, helping funnel money and in connection with

6    the contacts that BSGR had with defendant Thiam, who is here in

7    New York.

8         What I'm suggesting is perhaps what we can do is work

9    out a way for us, with Mr. Filardo, to talk about Mr. Cilins

10   and Furfano and propose date ranges for him to search because

11   he has this vast database that he's talking about that he's

12   concerned about.

13        I think if we can come to him with dates, names and

14   search terms, and see what he comes out by also running some

15   deduping against that, because I suspect that some of that, if

16   we run search terms and dates against the data and dedupe it,

17   we're going to reduce the volume of documents that they have.

18        And I think if we can do that, your Honor, we can

19   prepare something within the next couple of days to give to

20   BSGR and Steinmetz, and then see if that reduces his vast scope

21   of material.

22        THE COURT:  Mr. Filardo, does that work?

23        MR. FILARDO:  First, Mr. Furfano is not alleged in the

24   complaint.  I really don't know who he is.  I object.  My

25   client has no idea what plaintiff is referring to.  Obviously,

EB3PRIOC

1   the allegations of bringing money through the United States, if

2   they even exist in the amended complaint, they're very, very

3   conclusory.

4          Second, the activities of Mr. Cilins, as you point

5   out, your Honor, they are alleged in some detail in the

6   complaint.  Those activities occurred allegedly in Florida.

7   There's no allegation of a harm occurring in New York.  They

8   don't even fit under New York's long-arm statute.

9          They also occur in a short period of time, I think

10  it's three or four months, in 2013.  I'm really -- you know,

11  I'm kind of at a loss to say, other than this just seems like a

12  classic fishing expedition to me with respect to this

13  particular defendant and this other individual that they're

14  raising now.

15         Frankly, if we had the opportunity to have this kind

16  of a discussion prior to coming into court, we may have been

17  able to work something out that wouldn't have us in front of

18  your Honor right now.  But here we are, and we have -- if this

19  is an opportunity where it's an appropriate review of

20  discovery, this is something we may be able to work out.  But,

21  you know, I'll leave it at that.

22         THE COURT:  All right.  You know, it really would have

23  been nice if this had occurred before.  The whole thrust of

24  your letter is defendants wouldn't give you anything.  Now,

25  you're giving stuff to them, which is fine.  I don't care which

EB3PRIOC

1    way it goes.  Let's get this done.  How soon can you give them

2    your search list and times?

3            MR. LYLE:  Your Honor, we can have them to them by

4    this Friday.

5            THE COURT:  Okay.

6            MR. FILARDO:  Once I get that search list, your Honor,

7    if I get it on Friday, it's the end of the week, I'd need some

8    time to talk with our electronic discovery vendor, select the

9    appropriate -- what I think would be the appropriate custodians

10   to do some testing.  We can come to agreement on the search

11   terms, and then see if that will work.  You know, at that

12   point, I can probably get that done in another week, your

13   Honor.

14           THE COURT:  All right.  So why don't we get a report

15   from all of you by Monday, the 17th, preferably a joint report,

16   preferably one that says we've worked it all out; we don't need

17   to bother you, judge.  But, more likely, two separate reports,

18   and at some point before Thanksgiving I'll deal with all of

19   you.

20           MR. LYLE:  Thank you, your Honor.

21           MR. FILARDO:  Thank you, your Honor.  All right.  What

22   else?

23           MR. LIMAN:  Your Honor, Vale has a number of requests

24   with respect to our discovery as to Rio Tinto.  I can address

25   each of those, if you'd like, your Honor.

EB3PRIOC

1           THE COURT:  Okay.

2           MR. LIMAN:  The first, your Honor, is briefed at pages

3    3 to 6 of the joint letter to your Honor on Thursday.  They

4    pertain to Vale document requests 20 and 23.

5           THE COURT:  Okay.

6           MR. LIMAN:  Request No. 20 calls for documents

7    relating to any information shared by Rio Tinto with any third

8    party, other than Vale or its representatives, including but

9    not limited to the government of Guinea or its representatives

10   from February '97 to April 2010, relating to, and then it lists

11   the items as to which the plaintiff claim that Vale

12   misappropriated the information.

13          Request No. 23, your Honor, calls for all documents

14   relating to the highly confidential and proprietary information

15   regarding the Simandou Concession that Rio Tinto allegedly

16   shared with Vale, as described in paragraph 56 and 57.

17          THE COURT:  Let me cut to the chase.  Why can't the

18   plaintiff do a better job of identifying what the trade secrets

19   are here?

20          MR. LYTTLE:  Your Honor, this is -- we have identified

21   this in two-ways.  This is a data room that contains categories

22   of information.  We've told them very specifically the types of

23   information we believe were taken, and we've also told them the

24   things we're willing to exclude.  But each category has a

25   number of documents that contain different pieces of

EB3PRIOC

1   information.

2           We don't know what defendant Vale shared with its

3   co-conspirators.  We can't point to a single document and say

4   that's it.  That's the one you shared, but we can't --

5           THE COURT:  My problem seems to be that what was in

6   the data room, at least according to Mr. Liman's letter, was so

7   broad and the exclusions are so minor, that it's basically

8   anything and everything about everything.

9           MR. LYTTLE:  That's just not correct.  We focused in

10  on geological data, rail and transport plans, and mining data.

11  That's what we focused in.  Each of those categories --

12          THE COURT:  Isn't this a mining company?  So isn't

13  that like saying anything about the business?

14          MR. LYTTLE:  No, because it's mining data about

15  Simandou.  They have not done any work on Simandou.  So any

16  work in their files relating to mines made on Simandou

17  necessarily came from us.  And to the extent they did work

18  after they did the joint venture, we're entitled to see how

19  that independent work they supposedly did reflects our data.

20          MR. LIMAN:  Your Honor?

21          THE COURT:  Mr. Liman.

22          MR. LIMAN:  If I might pass up, we put together the

23  information from the plaintiffs with respect to the data room.

24          Your Honor, this is an excerpt from the index to the

25  data room provided to us by the plaintiffs, limited to the

EB3PRIOC

1   documents with respect to Simandou.

2            Those items that are in orange on the left side, are

3   the items that have been excluded by the plaintiffs.  The items

4   on the -- that are in white have not been excluded by the

5   plaintiffs.  There are well over a hundred documents.  If you

6   look at the fourth column, that refers to the number of pages.

7            The documents refer to information regarding

8   financials, information regarding geology, information

9   regarding ports, information regarding the quality of the iron

10  ore.

11           Contrary to what plaintiffs just told you, there was

12  extensive information in the public domain about Simandou.

13  Simandou was publicly considered to be one of the most

14  promising sources of high-content iron ore.  That was publicly

15  known.  That was told to the world by the plaintiffs and by

16  others.  Most mining companies in the world looked at Simandou.

17           And, your Honor, I would just note we cite cases in

18  our letter that are directly on point.  Referring to the

19  magistrate judge's opinion in the Switch case, which we cite,

20  the same argument was made there that the plaintiffs make here.

21  The plaintiff there said that they identified the categories of

22  alleged trade secrets and that was sufficient.  The Court says

23  this answered most identified categories of trade secrets, but

24  did not describe the trade secrets themselves.  And that was

25  considered to be insufficient.

EB3PRIOC

1          And another instance in that case, the Court pointed

2     out the disclosure does not specify any trade secrets at all

3     but, rather, reveals the end results of the trade secrets.

4          As we've informed the plaintiffs, we, as lawyers, have

5     not been able to identify any of these documents that are

6     listed.  The request calls for us to look for the data that is

7     contained within hundreds and hundreds of pages of documents.

8          We've been sued.  The complaint has been outstanding

9     for months.  These are serious allegations of misappropriation.

10    It should -- they should have done the investigation.  We're

11    entitled to know what it is they say we stole.

12          MR. LYTTLE:  Your Honor, we have identified, as best

13    we can, what it is we believe they stole.  This is not a case

14    where we can point to a piece of source code, which is all the

15    cases they have cited, where we can say, that's it, that's what

16    they took.  Go search for that source code.  This is subject

17    information and while Simandou was probably the main areas, the

18    level of information, the detail of information, the

19    confidentiality of information that Vale was exposed to is not

20    in the public domain.

21          THE COURT:  I guess what I'm trying to figure out is

22    when you've got a broad category like this, or categories, how

23    it is that you expect Mr. Liman, who presumably is not a mining

24    engineer, to figure out what it is to produce.

25          MR. LYTTLE:  I think one option we might have is we

EB3PRIOC

1   have uncovered data logs, which show which Vale employees

2   accessed what, how many times they accessed, what they

3   accessed.  Perhaps what we could do to address Mr. Liman's

4   concerns is come back and say, okay, it's these documents and

5   these custodians.

6           THE COURT:  Well, certainly limiting the custodians

7   limits things and limits the search.  You know, if you've got

8   that John Watson looked at one document, that it's about, you

9   know, the categories of iron ore, or something, that might give

10  a specific enough item for searching.  If it's, on the other

11  hand, a 50-page report and then there are 50 of those, it

12  becomes unmanageable.

13          So why don't you identify that the way you've

14  described it, what custodians, what documents, what time

15  period.  I assume we're talking a very limited time period

16  thereafter.  And see if that's a manageable search approach.

17  If it is, it is.  If it isn't, it isn't.  When we get to the

18  merits, there may be more of a requirement for identification

19  of the trade secret.  At the moment --

20          MR. LYTTLE:  On the time period, your Honor, I think

21  while they may have accessed it for a limited time period, we

22  would be entitled to know how they used that after they

23  accessed it.

24          THE COURT:  For a limited time period.  After that, if

25  they were involved in the joint venture, et cetera, they would

EB3PRIOC

```
 1   have been getting information from other sources, and it gets
 2   very complicated.  Keep it limited, to begin with, and we'll
 3   see.
 4            MR. LIMAN:  So, your Honor, we're talking about the
 5   documents that Rio Tinto is going to produce to us, which I
 6   understand is the logs.  We would also ask that they produce to
 7   us copies of the documents from which they contend trade
 8   secrets were taken.  Right now -- I think, your Honor, we and
 9   you are at a handicap, frankly, in judging our motion
10   because --
11            THE COURT:  So you're going to have --
12            MR. LIMAN:  We don't know what these documents are.
13   We do know that there are hundreds of pages of documents from
14   descriptions --
15            THE COURT:  All right.  I got the point.  Do you have
16   these documents?
17            MR. LYTTLE:  We have the documents.
18            THE COURT:  Any problem with producing --
19            MR. LYTTLE:  No.
20            THE COURT:  -- whatever limited set you're going to be
21   using to claim that they -- individual employees accessed and,
22   therefore, stole from those documents?
23            MR. LYTTLE:  There's no issue with that.  I think the
24   problem is going to be -- I don't think we should be forced --
25   if the documents contain similar information, to guess which
```

EB3PRIOC

1    one is appropriate and the limited part is the part that I'm

2    struggling with.  And I'd appreciate your Honor's guidance with

3    that.  We can't say if two documents contain the same

4    information, we shouldn't be forced to guess Valle

5    misappropriated out of this one, and it turns out they

6    misappropriated --

7              THE COURT:  If you're talking two documents that are

8    the same.  That's one thing.  If you're going and saying it

9    could be anything that was in the data room, that's much too

10   broad for anyone to get a handle on.  Limit it, as best you

11   can, and that will limit the scope of your claims accordingly

12   and discovery to match with it.

13             MR. LYTTLE:  Will do.  Thank you, your Honor.

14             MR. LIMAN:  Your Honor, with respect to that, can we

15   have a deadline for when we're going to get the documents?

16             THE COURT:  Yes.

17             MR. LYTTLE:  The actual production of the documents?

18   We need time to look at them ourselves and attempt to narrow

19   our terms.

20             THE COURT:  Give me a date.

21             MR. LYTTLE:  A month, three weeks?

22             THE COURT:  What's the least you can do it in?

23   Because, you know, you want speed except when you have to do

24   something.

25             MR. LYTTLE:  No, understood, your Honor.  I think we

EB3PRIOC

```
 1    want to be very careful in doing this and looking at them very
 2    carefully.
 3             THE COURT:  All right.  Three weeks.
 4             MR. LYTTLE:  Thank you.
 5             THE COURT:  Which is the Monday before Thanksgiving.
 6    Okay.  Next?
 7             MR. LIMAN:  The next issue, your Honor, is addressed
 8    at pages 7 to 9 of our letter.  Maybe I can cut through this a
 9    little bit.  This pertains to --
10             THE COURT:  Are we dealing with the privilege, or did
11    you skip over that?
12             MR. LIMAN:  Your Honor, I think that is right.  I did
13    not intend to skip over that.  That's Pages 6 to 7 and, your
14    Honor, we passed up a letter this morning correcting a
15    miscitation in our letter filed on ECF.  I think we've laid out
16    the grounds in our letter that pertains to the interrogatory
17    that asks for the names and identities, and it seeks
18    information regarding the alleged extensive investigation that
19    was allegedly done.
20             THE COURT:  Mr. Lyttle.
21             MR. LYTTLE:  Your Honor, as an initial matter, this
22    matter is not ripe.  We repeatedly spoke with Mr. Liman and
23    Vale about ways to narrow this request.  Putting that issue
24    aside, this complaint was filed in April of 2014.  Anything in
25    any investigation between April 10 and April 2014 is not
```

EB3PRIOC

```
 1    relevant because we filed within the statute of limitations.

 2             The only period with which, if defendants are correct

 3    about when the RICO injury occurred, and we don't believe as a

 4    threshold matter that they are correct about when the RICO

 5    injury occurred, but if they are, and it occurred in December

 6    of 2008, the only time period that we need to toll is

 7    December 2008 up through April 2010; i.e. four years before the

 8    complaint was filed.

 9             We're happy to talk with them about turning over the

10    facts of that investigation.  All we need to allege is that it

11    was diligent as an investigation.  The legal advice is not an

12    issue.  So there are two issues are here, what investigation,

13    what time period, and is it just the facts showing the

14    diligence, or are they also entitled, which they are not, to

15    the legal advice stemming from that due diligence and that

16    investigation.  These were issues we hoped to continue to

17    discuss.  This issue, in our view, is not ripe now.

18             THE COURT:  When is it going to be ripe, since

19    everyone likes to kick things down the road?

20             MR. LIMAN:  Your Honor, we're prepared to have the

21    conversation with them in the next two days and to bring it in

22    front of your Honor by the end of this week.

23             THE COURT:  Just what I wanted, more letters.  All

24    right.  Promptly work it out, and if you can't, get back to me

25    on it.  Right now, I don't think you have any dispute, per se,
```

EB3PRIOC

1  since the interrogatories for identity of knowledgeable people,

2  that doesn't negate the privilege, even if there is one.  Then

3  the document scope issue, you know --

4          MR. LYTTLE:  On the interrogatory issue, we've already

5  identified over 20 people with knowledge of the investigation.

6          THE COURT:  Well, you need to say what their knowledge

7  is and not use that as feather bedding; so work it out within a

8  week.

9          MR. LIMAN:  Your Honor, while counsel may say they've

10 identified people, that presumably means they've identified

11 conversations within the Quinn firm, but have not told us

12 anything other than, go take a hike.  Can we have a deadline as

13 to when we're going to get the interrogatory answer?  Maybe by

14 the end of this week?

15         THE COURT:  Okay.  Did you or didn't you answer that

16 interrogatory?  I thought you were saying you did.

17         MR. LYTTLE:  I thought, I believe we did, your Honor.

18 I need to double-check I believe we identified people with

19 knowledge.  If we've not done that, we can do that with

20 Mr. Liman.

21         THE COURT:  Mr. Liman?

22         MR. LIMAN:  Your Honor, apparently, they've identified

23 some people.  They're withholding others on the grounds of

24 privilege.  That's the nature of the dispute.

25         MR. LYTTLE:  Thank you.

EB3PRIOC

1          MR. LIMAN:  Names are not privileged.  They're names

2     of people.

3          THE COURT:  Identify all the people.  I don't see a

4     privilege in that, and then work out with Mr. Liman how else

5     you're going to handle the rest of this.  If you are going to

6     be withholding documents on the basis of privilege, you're

7     going to have to do a privilege log.

8          So let's put it as a two-week.  You'll get back to me

9     all in two weeks.  So two weeks from today you'll tell me that

10     either this is resolved, I don't really care how, or that it's

11     not and here is where you all are on it.

12          MR. LIMAN:  Should we -- if we have reached an

13     impasse, and hopefully we won't, would your Honor's preference

14     be that we would each put in simultaneous short letters?  We

15     can keep them very short, whatever length you want.

16          THE COURT:  Even a joint letter perhaps, but that

17     hasn't work so well in the past.  Short letter briefing on it,

18     and we'll go from there.  Okay.

19          (Discussion off the record)

20          MR. LIMAN:  Your Honor, now we're on pages 7 to 9.  As

21     indicated in our letter, the plaintiffs have also written us

22     that they believe that this request is no longer -- is not

23     ripe.  We believe it is ripe.  We think we've gone through

24     discussions and reached an impasse, as we did with respect to

25     the preceding request.

EB3PRIOC

1                 The plaintiffs have said, in the spirit of compromise,

2       they would be prepared to produce documents about Rio Tinto's

3       decision to approach Vale.  We would welcome, frankly, any

4       documents from the plaintiff in this case.  They are, after

5       all, the plaintiff.  But we think that that request does not --

6       that that answer does not satisfy the request.  I can argue it,

7       your Honor.  I'm cognizant of the hour and the position they're

8       likely to take, which is it's not ripe; so whatever your

9       Honor's pleasure is.

10                THE COURT:  Let me hear from them as to why it is not

11      ripe.

12                MR. LYTTLE:  I believe this one may be ripe, your

13      Honor.  The BHP takeover attempt of our client, there were a

14      number of scenarios looked at in defense of that takeover

15      attempt.  The vast majority of those scenarios did not relate

16      in any way, shape or form to Vale; did not relate in any way,

17      shape or form to Simandou.  They are not entitled to know every

18      potential asset we looked to sell, every potential suiter we

19      looked at, or assets completely unrelated to Simandou.

20                We have offered to them that we will give you

21      documents that go to why we decided to approach Mr. Liman's

22      client, Vale, about an asset deal.

23                Now, there's one other point on the BHP takeover

24      attempt.  If this is really what's driving those

25      investigations, as Vale, that's the position they've taken, I

EB3PRIOC

1    have a Wall Street Journal article here.  The headline is:

2    Death of a Mega Deal, BHP Ends Its Pursuit Of Rio.  That's my

3    client, Rio Tinto.  That's dated November 26th, 2008.

4             Your Honor, the BHP deal was off the table the day

5    after we opened the data room to them.  It is absurd to contend

6    that the BHP deal drove those accusations, and it is equally

7    absurd for the defendants to say that when we continued to

8    negotiate for six to nine months after the BHP deal was off the

9    table.  The BHP deal had nothing to do with this.  We will give

10   them the reasons behind it.  That's relevant.  That's

11   discoverable.  But we don't need a fishing expedition into all

12   the business opportunities our client looked at completely

13   unrelated to Vale and completely unrelated to Simandou.

14            THE COURT:  Mr. Liman.

15            MR. LIMAN:  We, obviously, disagree with the statement

16   of facts as counsel addressed them, but let me be more precise

17   in my answer.  The claim in this case against Vale is that we

18   fraudulently induced Rio Tinto to sign a confidentiality

19   agreement.

20            That deed is dated -- one moment -- is dated September

21   of 2008.  It is explicitly geared to the BHP doing the deal.  I

22   can hand up a copy to your Honor, but the critical provisions

23   are of it is that it established a restricted period of time

24   during which Vale could not talk to anybody else regarding the

25   Billiton.  There were timetables tied to the Billiton deal.

EB3PRIOC

1          In essence, the theory of the confidential deed was

2      that Rio Tinto was the subject of a hostile takeover offered by

3      BHP.  Vale was one of the other few competitors in the area of

4      strategic buyer -- a strategic buyer potentially for some of

5      Rio Tinto's assets or BHP Billiton's assets that would have to

6      be divested if there was a takeover of Rio Tinto by BHP

7      Billiton.

8          And the proposed transaction, as it was described to

9      Vale, when Rio Tinto first approached Vale, had nothing to do

10     with Simandou.  Simandou only came about later on.  So the

11     legal question is, were we fraudulent -- did we fraudulently

12     induce Rio Tinto to sign this document in September of '08?

13         Our theory, your Honor, is that Simandou had nothing

14     to do with the plaintiff's decision to sign the confidentiality

15     deed, that it was part of their defensive tactics with respect

16     to a transaction that would have ended Rio Tinto's life as a

17     corporation.  And it was a critical -- one of their critical

18     strategies.

19         And why is all of this relevant?  I think, your Honor,

20     first, it does entitle us to the strategic discussions with

21     respect to the decision to approach Vale.  But, your Honor, I

22     don't think it is limited to that under the case law in this

23     district and elsewhere.  When you have a fraudulent

24     concealment -- I'm sorry, fraudulent inducement claim, the

25     question is, would the plaintiff have done something different

EB3PRIOC

1    if the information had been disclosed to the plaintiff?

2           And if that is correct, and it undoubtedly is correct,

3    it entitles us to demonstrate that the alternatives that they

4    had to Vale would not have -- were not sufficient to address

5    the threat to their corporate life.  So that's the relevance.

6           Let me address the burden issue.  We, in our document

7    request, we did something that I don't think we've done very

8    often in document requests, and I don't think plaintiffs do.  I

9    don't think parties ordinarily do.  We limited our request to

10   specify a group of people who are on the UK counterparts

11   restricted list.  That is, the people who would know about

12   these deals.  It's a limited group of people.  And then we left

13   it open to say, and anybody else that we would agree to with

14   the plaintiffs.

15          We think this is a request that with respect to burden

16   could be easily addressed because, as your Honor knows, when

17   you have takeover transactions, the group of people in the know

18   is a relatively limited group of people.  It's not an antitrust

19   case, where we're asking for tons of documents, and certainly

20   not the kind of requests that they've made to us with respect

21   to everything having to do with geology, but that's somewhat --

22          MR. LYTTLE:  Your Honor, the fraudulent inducement

23   claim is about what Vale said to us in entering into the deed

24   and what they didn't say.  It's not about the reason why we

25   approached Vale.  We can even discuss the stipulation.  We

EB3PRIOC

1    approached you because we wanted to raise cash.  That doesn't

2    permit you to steal our information and enter into a RICO

3    conspiracy.  But why we approached Vale is okay, and we can get

4    that.

5            But it's a pure fishing expedition to look at

6    completely unrelated transactions with completely unrelated

7    parties.  And we've been very consistent about this.  The data

8    room, as Mr. Liman pointed out earlier, contains information on

9    Simandou, another asset called potash and another asset called

10   calumba.  We told them potash and calumba is off the table.

11   We're really focused on Simandou and we're focused on Vale.

12           THE COURT:  Mr. Liman says that if you would have

13   entered into this transaction anyway, then there can't be a

14   fraudulent inducement.

15           MR. LYTTLE:  Understood, your Honor.  I would posit

16   that's an absurd proposition, that our client would literally

17   say, you know what, we know you're going to enter a deal with

18   Mr. Steinmetz and BSGR, we know you're going to steal our

19   mining rights, but we'll open -- we'll talk to you anyway,

20   we'll go open kimono and show -- that's absurd.

21           THE COURT:  People do strange things in takeover

22   defenses, but what are we talking about in terms of volume or

23   burden?

24           MR. LYTTLE:  Significant volume.  I'm not even sure

25   that there is a restricted list with significant volume, more

EB3PRIOC

1    importantly, with very high-level CFOs, CEOs.  This is a

2    significant burden, and we've got to look at every possible

3    transaction that we looked at.  I'm not even sure, is an e-mail

4    that says:  We should reach out to Estrada in London?  Is that

5    relevant if we never did it?  I don't know where you cabin

6    this.  It's just not relevant.  They got Simandou and they got

7    why we're talking to them, and that's all we need.

8                THE COURT:  All right.  Well --

9                MR. LIMAN:  Your Honor, the restricted list is a

10   requirement of UK law.  If they didn't have it, they were in

11   violation of UK law.  This is a sophisticated company.  They

12   plainly have that list.

13               MR. LYTTLE:  I don't think the restricted list --

14   we're still trying to figure this out, in all honesty, your

15   Honor, but I don't think the restricted list in this case was

16   necessarily required.  Mr. Liman is actually correct.  If it

17   was required, we had one.  The initial information is we do not

18   have one.

19               THE COURT:  I'm sure between the two of you, you can

20   limit this to a very small group.  The time period also seems

21   to be a small one.  I'm ordering production in this area with

22   the exact details to be further worked out by the parties.  So

23   that gives you a little bit of wiggle room, but --

24               MR. LYTTLE:  Thank you, your Honor.

25               THE COURT:  All right.  I think that finishes

EB3PRIOC

```
 1  everybody's letters.  Other than picking a date for our next
 2  marathon, any other issues for today?  Okay.
 3            MR. LYLE:  Nothing from the plaintiff, your Honor.
 4            MR. LIMAN:  Nothing from Vale.
 5            MR. FILARDO:  Nothing from us, your Honor.
 6            MR. SUMMIT:  And I think nothing further from Thiam;
 7  although, with some hesitation, your Honor.
 8            THE COURT:  Understood.  All right.  When do you all
 9  want to come back?  Right before Thanksgiving?  Right after
10  Thanksgiving?
11            MR. LYLE:  Right after Thanksgiving I think would be
12  okay.
13            MR. FILARDO:  Your Honor, I think you've ordered that
14  there be a joint letter or individual letters by November 17th,
15  and the new protocol is that should be at least a week ahead of
16  our next conference; so I think that would put us after
17  Thanksgiving.
18            MR. LYLE:  After Thanksgiving.
19            THE COURT:  Okay.  The week of December 1st.  Anyone
20  have preferences?
21            MR. LIMAN:  Your Honor, is there -- I hesitate to ask
22  this, but I'm scheduled to be in a Hong Kong that week.  I
23  could, I think, appear on December 1st, if that's the Monday.
24  The rest of the week I'm out.
25            THE COURT:  All right.  Well, I mean, December 1st is
```

EB3PRIOC

1    right immediately after Thanksgiving, the Monday after

2    Thanksgiving.  I'm not sure I want to impose that on all of

3    you.  Indeed, for anyone traveling, that would be pretty

4    miserable.  Do you want to kick it another week?  So the week

5    of December 8th?

6              MR. LYLE:  I think we all are in agreement, your

7    Honor, that that would probably be better, and we appreciate

8    that your Honor would not push us to come up on the weekend.

9              THE COURT:  Anyone have a preference?  Earlier in the

10   week sounds better than later in the week, but....

11             MR. SUMMIT:  Earlier in the week is better for us, if

12   it works for the Court.

13             MR. LIMAN:  Your Honor, I'm being told from the back

14   that if your Honor has time on December 9th, that we'd be --

15             THE COURT:  Okay.  December 9th at 10:00.  Okay.  See

16   you all then.  Usual drill.  Transcript pertains to the Court's

17   order, and you're all required to buy the transcript.

18             MR. LIMAN:  Thank you.

19             (Adjourned)

20

21

22

23

24

25