**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

December 3, 2014

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   <u>Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (S.D.N.Y.)</u>

Dear Judge Peck:

   Pursuant to Your Honor's November 3, 2014 Order ("Order"), Plaintiff Rio Tinto plc
("Plaintiff") and Defendants Vale S.A. ("Vale") and Mahmoud Thiam write jointly to update the
Court on the status of various discovery issues in advance of our December 9, 2014 hearing.[1]

   Since the November 3, 2014 hearing before Your Honor ("Hearing"), the parties have
been meeting and conferring on a regular basis, both through telephonic meet and confers and
written correspondence.  While the parties have made some progress, there are a number of
issues that require the Court's assistance.  Below is a proposed agenda for the status conference,
with a short explanation from the relevant parties on each dispute.

---

   [1]   BSG Resources Ltd. ("BSGR") and Benjamin Steinmetz informed Plaintiff that they
did not want to participate in a joint letter and preferred to file their own letter.  Accordingly, Rio
Tinto will file a separate letter addressing discovery issues regarding those two defendants.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS |
MUNICH | SYDNEY | HONG KONG | BRUSSELS

## I.      DISCOVERY FROM DEFENDANT THIAM

### A.      Search Terms and Production Deadline

Plaintiff and Defendant Thiam have exchanged written correspondence and several telephonic meet and confers.  For the time being, the parties have resolved all outstanding issues with respect to search terms, and Defendant Thiam will comply with the Court's document production deadline of December 12, 2014.

### B.      Rio Tinto's Right to Revisit Search Terms after Initial Production

***Plaintiff's Summary***: During negotiations over the appropriate set of search terms to apply to Defendant Thiam's documents, Plaintiff made a number of compromises in the spirit of keeping the discovery process moving.  Later in the process, having made several compromises on search terms, Defendant Thiam's counsel informed us that Rio Tinto's original counter-proposal for search terms only brought back approximately 50,000 documents for review (out of what we understand is a total of 200,000 documents, *see* Nov. 3, 2014 Hr'g Tr. at 7:16).  Despite this significantly narrowed universe of documents, Defendant Thiam sought to further narrow that universe on the grounds that the search terms were still too broad and the number of documents to review was burdensome.  As a result of the search term negotiations, counsel for Defendant Thiam told Rio Tinto that they will ultimately be reviewing approximately 36,000 documents.  Understandably, Rio Tinto is concerned that this extremely low search term hit rate (less than 20%) means that responsive documents might not be captured by the current set of search terms.  Accordingly, Rio Tinto reserved its rights to revisit the issue of search terms upon inspection of Mr. Thiam's initial production due on December 12, 2014.  Defendant Thiam has taken the position that Rio Tinto's reservation of rights is baseless.  Rio Tinto respectfully requests that the Court confirm that to the extent it becomes clear (during Rio Tinto's review of documents or during depositions) that a particular search term should have been applied to Defendant Thiam's documents but was not, that Rio Tinto be permitted to revisit the issue of search terms with Defendant Thiam.  Indeed, this is completely standard in modern e-discovery, as Your Honor has previously acknowledged.  *See Gross v. American Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 135 n.2 (S.D.N.Y. 2009) (acknowledging that the Court's creation of a search term methodology was "less than perfect" and that there was a "risk that as information later comes out at depositions … another search may have to be done.").

***Defendant Thiam's Summary:***  Consistent with the Court's instruction at the November 3, 2014 hearing, on November 10, 2014, counsel for Mr. Thiam sent counsel for Rio Tinto a list of 27 proposed search terms for the review of Mr. Thiam's documents.  In response, on November 12, 2014, counsel for Rio Tinto sent back a list of 21 additional proposed search terms.  In order to meet the Court's December 12, 2014 production deadline, however, counsel for Mr. Thiam had to cut short the meet and confer process and thus agreed to use many of Rio Tinto's proposed search terms, even though we believe that many of Rio Tinto's terms are onerous and require us to review a substantial number of irrelevant documents.

Applying the parties' agreed list of search terms to Mr. Thiam's documents results in a set of approximately 36,000 documents, which we are working diligently to review in preparation for the Court's production deadline.  As we have explained to counsel for Rio Tinto, these documents have been retrieved from a larger database that includes, among other things,

the entire unfiltered  content of Mr. Thiam's personal and business email accounts, which contain his email communications for the time period January 1, 2005 to the present.  Since Mr. Thiam's service as Guinea's Minister of Mines lasted for only two of the nearly ten years covered by the document requests, it is to be expected that the total number of Mr. Thiam's email communications responsive to Rio Tinto's document requests would be proportional to Mr. Thiam's limited involvement in the events alleged in the Amended Complaint.  We therefore object to Rio Tinto's reservation of rights to "revisit" the parties' agreed list of search terms to the extent it relies solely on Rio Tinto's baseless and self-serving speculation that our review set should include a greater number of documents.

### C.    Privilege Log & Experts

With respect to Defendant Thiam's claim that certain documents cannot be produced to Rio Tinto on the basis of a privilege under Guinean law, this Court ordered Defendant Thiam to produce a privilege log and submit a brief "on what the Guinean privilege is."  11/3 Hr'g Tr. at 8:14-16.  Defendant Thiam recently disclosed to Plaintiff that he has retained an expert, and having discussed Defendant Thiam's intent to file a pre-motion letter for a protective order on this topic, Plaintiff requested and the parties have agreed, subject to the Court's approval, to the following schedule for that process:  (1) Defendant Thiam will provide a privilege log to Plaintiff on January 20, 2015, and will file a pre-motion letter for a protective order on or before January 21, 2015; (2) Rio Tinto will file its opposition to Thiam's letter by February 4, 2015; and (3) Defendant Thiam will file any reply by February 11, 2015.

## II.    DISCOVERY FROM DEFENDANT VALE

Plaintiff and Defendant Vale have exchanged correspondence and conducted several telephonic meet and confers.  The parties have also exchanged document productions in accordance with the Court's November 3, 2014 order.  On Monday, November 17, 2014, Defendant Vale produced a set of documents responsive to the production of documents ordered by this Court on November 3, 2014.  The parties continue to discuss the potential use of predictive coding as a culling mechanism for discovery.  While progress has been made toward resolving the remaining outstanding discovery disputes, the parties do require the Court's assistance on the issues identified below.

### A.    Vale Document Production

***Plaintiff's Summary:***  Vale has taken the unequivocal position that – pending further direction from Your Honor – its current discovery obligations in this case are satisfied with its production of the hypothetical grand jury documents on November 17, 2014.  This is untenable for the reasons set out below and Plaintiff therefore requests that Your Honor order Vale to continue its production of responsive documents.  As the Court contemplated at our last hearing, Vale's November 17th production was just a "start," it is time to go back to "[Rio Tinto's] original requests" and continue with document production responsive to those requests. 11/03/2014 Hr'g at 20:7-10.

As an initial matter, Vale's production to date – consisting of approximately 840 documents – is deficient on its face.  Vale previously represented to this Court in seeking a stay

of discovery that it has "1.7 million emails, files, and other documents, comprising 1.3 terabytes of data from seven offices in four countries" and that Rio Tinto's document requests "would substantially increase these volumes."  Dkt. No. 100 at 9-10.  But the approximately 840 documents Vale has produced to date represents only 0.0001% of a terabyte of data.  Vale cannot have it both ways:  it cannot on the one hand claim that it has overwhelming amounts of data responsive to Rio Tinto's requests and on the other say that it has met its current discovery obligations in this case by producing less than 0.0001% of those documents.

Vale's production to date is also deficient in substance.  Indeed, this small production contains a handful of documents responsive to only a few of Rio Tinto's document requests.  The vast majority of Rio Tinto's document requests – including ones Vale has agreed to produce documents in response to – find no responsive documents in the production.  For example, while the production contains some (but clearly not all) documents relating to Vale's formal joint venture negotiations with BSGR in 2010 and its due diligence in connection with those negotiations, the production is otherwise completely deficient with respect to many other requests and key allegations in the Amended Complaint, including Vale's other communications with its co-conspirators, Vale's negotiations with Rio Tinto over Simandou, how Vale used Rio Tinto's information to advance the RICO conspiracy, what information Vale wrongfully disclosed to its co-conspirators, its contacts and negotiations with Defendants prior to the formal joint venture negotiations, and Vale's early and ongoing efforts to acquire mining rights at Simandou independent of its negotiations with Rio Tinto, among others.

This Court has ordered that discovery should proceed and Judge Berman just this past Monday instructed the parties to "[k]eep going with discovery in the meantime."  12/1/2014 Hr'g Tr. 31:21-22.  To that end, Rio Tinto also respectfully refers the Court to its October 30, 2014 letter (Dkt. No. 112) outlining Vale's refusal to produce (1) documents and communications with its co-defendants after December 2008; (2) documents relating to transfers of money, gifts, or other consideration to BSGR, VBG, and the Beny Steinmetz Group; (3) documents concerning the materials it reviewed in the Rio Tinto data room; (4) documents relating to Vale and BSGR's efforts to develop Simandou independent of the information it stole from Rio Tinto; and (5) documents related to its motives for and efforts at acquiring Simandou.

***Defendant Vale's Summary***:  At the November 3, 2014 conference, Your Honor ordered that Vale "produce what it hypothetically produced to the government" pursuant to a Grand Jury investigation regarding Simandou, noting that "we will see how much more [Plaintiff] need[s] after that, which may have an impact on the Courts ruling on the stay," and that a request for much more at this time would be "a very good argument for a stay."  (Nov. 3, 2014 Tr. 19:2-3, 20: 3-11.)  Without objection or request for any greater expedition from Plaintiff, Vale proposed that it would produce the Grand Jury materials two weeks from the date of the court conference.  On that date, in accordance with that order, Vale produced over 8,000 pages of documents to Rio Tinto.  These documents are at the core of the issues in the case.  They include documents in the categories listed in Vale's Appendix A hereto.  Notably, the produced documents undermine Rio Tinto's claim against Vale here.  They include various certifications provided by defendants BSGR and Steinmetz that neither made any corrupt payments in connection with Simandou.

4

Plaintiff previously represented: "The information sought by the outstanding discovery requests is the same type of information the Defendants likely already have collected and produced, or will produce, to U.S. and other authorities. There is absolutely no additional burden associated with providing discovery Defendants likely already have started. All Defendants have to do is turn over what they have collected in response to the various governmental investigations." (Dk. 106 at 10-11.) To date, Plaintiff has not identified why the production of these materials should be considered to be insufficient or what more it requires in response to its requests. Indeed, Plaintiff has shown no eagerness to review and digest this material. Although Plaintiff received Vale's production on Monday, November 17, it did not contact Vale regarding a problem it was having loading the data for review until mid-day on Wednesday, November 19. Given Vale's significant production of core materials, which Plaintiff represented in its opposition to Defendants' stay motion would suffice, and given Plaintiff's failure to identify any respects in which the production is insufficient, it is Vale's position that no further production from it is appropriate at this time. Oral argument has now been heard on Defendants' *forum non conveniens* motion, and discovery from Vale should be stayed pending a ruling on that motion. In the alternative, Vale respectfully suggests that the appropriate course of action is that Plaintiff should review the documents that have already been produced and identify any respect in which the document production is insufficient.

Regarding the parameters of Vale's Grand Jury production, Plaintiff's request would require Vale to indicate the documents requested by the Grand Jury and thus reveal the course of an ongoing Grand Jury investigation. This is different from a circumstance where a regulatory investigation is already complete and charges have been brought. Here, the Grand Jury investigation is ongoing, and the court has an independent interest in preserving the sanctity and privacy of the proceedings of a Grand Jury sitting in this District. Thus, Rio Tinto is not entitled to peer into "the direction of the grand jury's investigation and the names of persons involved." *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986). To the contrary, "the case law recognizes that the identification and production of materials supplied to the grand jury may permit discerning attorneys to learn 'not only the information contained in specific documents, but the pattern of the grand jury's entire investigation'" *In re Sulfuric Acid Antitrust Litig.*, No. 1536, 2004 WL 769376, at *1-3 (N.D. Ill. Apr. 9, 2004) (citation omitted). *See, e.g.*, *In re Milk Products Antitrust Litig.*, 84 F. Supp. 2d 1016, 1026-27 (D. Minn. 1997) (denying motion to compel grand jury materials because, *inter alia*, disclosure would reveal the direction of the grand jury investigation, even if completed), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

Finally, should the Court decide that discovery from Vale should proceed at this time, we respectfully recommend that the parties proceed with staged discovery as Your Honor previously suggested. (Oct. 7, 2014 Tr. 5:8-14). Your Honor has already ruled on Vale's requests for documents regarding the alternatives to the Confidentiality Deed that Rio Tinto considered while it was responding to the BHP Billiton hostile offer. There is no reason why discovery cannot proceed with respect to that issue. In addition, the parties have agreed on certain requests regarding communications between BSGR and Vale prior to June 2009 and between Vale and Rio Tinto in connection with the Confidentiality Deed. Vale believes these materials will put the lie in Plaintiff's claim that Vale and BSGR met and conspired in December 2008, and that Vale fraudulently induced Plaintiff to enter into the Confidentiality Deed. (Am. Compl. ¶¶ 55, 86, 87.) Therefore, Vale proposes that, should discovery from it proceed while the Court considers the disputed requests that impose extraordinary burdens on Vale, the next

phase consist of the production set forth above.  If it turns out that there is no evidence to support the claim that Vale illegally assisted BSGR in obtaining the rights to Simandou, most of Plaintiff's other requests can be substantially narrowed or eliminated.  *See, e.g.*, *Wood v. Capital One Servs., LLC*, No. 09-CV-1445  NPM/DEP, 2011 WL 2154279, at *3, 13 (N.D.N.Y. Apr. 15, 2011) (applying the "rule of proportionality").[2]

### B. Custodian List

*Plaintiff's Summary*: On December 1, 2014 – almost five months after Rio Tinto first served its discovery requests, and two weeks after Rio Tinto provided its proposed custodian list for the Vale discovery requests – Vale finally provided Rio Tinto with a proposed custodian list.[3] Their proposal is woefully inadequate.  Having provided Rio Tinto with a proposed custodian list of more than 16 people for the BHP requests *alone* (see *infra* Section III.C), and having suggested adding an additional 11 people to Rio Tinto's proposed custodian list (bringing that total to 31), Vale suggests a mere seven custodians for its *entire* production in this action.  Vale's proposed custodian list fails to even include three quarters of the people Vale itself identified as persons with "discoverable information" in its Initial Disclosures, let alone the 29 people it identified in response to Rio Tinto Interrogatories Nos. 1 and 4.  *See* Dkt. No. 100 at 10.

The parties have scheduled a meet and confer for Thursday, December 4, 2014 to discuss proposed custodian lists, at which time Rio Tinto will propose additional custodians commensurate with its document requests to Vale and the scope of discovery in this case.  Rio Tinto remains hopeful that the parties will be able to reach resolution on this issue, but will update the Court with the results of the anticipated meet and confer at the December 9, 2014 hearing.

*Defendant Vale's Summary:* Without prejudice to its position that no further discovery is due from it at this time, and in the event that a further production becomes appropriate, Vale has provided Plaintiff with an initial list of seven custodians and proposed to start any additional production with those custodians, without prejudice to Plaintiff's right to add custodians should the need arise.  Vale understands that each of these seven custodians was involved in both Vale's negotiations with Rio Tinto regarding Simandou and Vale's negotiations with BSGR regarding Simandou.[4]

---

[2] For the same reasons, Plaintiff should be required to produce up front documents concerning its alleged investigation of its claims.  If there is no evidence to support the claim that a defendant's acts stymied Rio Tinto from discovering its claim then there would be no basis for pursuing this stale lawsuit against that defendant.

[3]  The ESI order in this case contemplated a mutual exchange and discussion of proposed custodian lists.  Vale was not willing to do that so Rio Tinto went ahead and provided its proposed custodian list to try to move things along.

[4] Vale's proposed initial custodians are: Roger Agnelli (CEO), Eduardo Ledsham (Director, Global Exploration Team), José Carlos Martins (Director, Ferrous Metals and Strategy), Jose Andre de Castro Alves (Iron Ore Technical Coordinator), Lucio Cavalli (Director of Long-Term (footnote continued)

### C.       Identification of Allegedly Misappropriated Information

*Plaintiff's Summary*: As required by the Court's November 3, 2014 order, Rio Tinto identified nine key documents from the Rio Tinto data room containing the information that Vale's "individual employees access[ed] and, therefore, stole from those documents." 11/03/2014 Hr'g at 41:20-22.  Rio Tinto took this Court's order seriously and engaged in significant efforts to identify those key nine documents.  By doing so, it successfully winnowed down the relevant universe of documents in the data room from over 200 to a mere nine.  Vale therefore cannot now be heard to complain that this fails to provide a "limited set" of documents as ordered by this Court.  *Id.*

Vale's position that it is now entitled to even more specificity than what the Court previously ordered is wrong:

- First, Vale is not operating in the dark here.  Vale knows better than anyone what key documents it stole from Rio Tinto.  Indeed, the access logs produced by Rio Tinto confirm that these key documents were the ones Vale employees consistently and repeatedly accessed throughout the negotiations.

- Second, as Rio Tinto has consistently maintained since day one of this case, the misappropriated information in these documents all relate to three discrete topics – geology, ports, and railways.  *See* Am. Compl. ¶¶ 68-75.

- Third, Vale's position rests on the fundamental misapprehension that this is a misappropriation or trade secrets case.  It is not.  Despite Vale's attempts to frame it otherwise, this is a RICO case in which Vale engaged in numerous illegal acts as part of an ongoing RICO conspiracy to steal Rio Tinto's mining rights at Simandou – including fraud, corruption, obstruction of justice, and destroying evidence – not just misappropriation.  *See* Am. Compl. ¶¶ 8, 10, 12, 15-16.

- Fourth, Vale would not have had *any* of Rio Tinto's confidential information but for its negotiations with Rio Tinto, had no right to use *any* of that information outside the context of its negotiations with Rio Tinto and similarly had no right to share *any* information with its co-conspirators that it learned in the course of its negotiations with Rio Tinto.  Rio Tinto is therefore entitled to know about the defendants' use of *any* of its information to further the conspiracy.  Indeed, Rio Tinto's discovery requests are not and need not be targeted at identifying the specific information Vale stole from Rio Tinto, but rather at discovering how Vale used that information in order to advance the RICO conspiracy.  *See e.g. Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 440, 443 (E.D.N.Y. 2007) ( "Plaintiffs will be entitled to seek discovery about the money-laundering scheme, including communications that occurred through mail and wires and Defendants' understanding of such communications."); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F.

---

Planning of Ferrous Ore), Eduardo Etchart (General Manager for Exploration in Africa), and Pedro Rodrigues (Global Director of M&A).

Supp. 2d 141, 156–57 (E.D.N.Y. 2005) (ordering discovery on civil RICO claim of, among other things, all communications among all named defendants).  And Rio Tinto's discovery requests are appropriately tailored towards obtaining that information.

- ▪ Fifth, even if this case were a misappropriation of trade secrets case, Rio Tinto has fully met its burden to identify the information stolen from the data room.  As Judges Karas and Smith held in *Medtech Prods. Inc. v. Ranir, LLC*, a plaintiff asserting misappropriation of trade secrets is entitled to discovery prior to being required to identify the particular trade secrets.  596 F. Supp. 2d 778, 790 (S.D.N.Y. 2008).  Vale asks this Court to issue what the court ordered in *Xerox Corp. Inc. v. Int'l Bus. Machs. Corp.*, but Vale entirely neglects to mention that this order was issued only after almost a year of discovery.  64 F.R.D. 367, 371 (S.D.N.Y. 1974); *see* Dkt. No. 112, at 5 (asking the Court to issue order from *Xerox*).  Similarly, in *TNS Media Research, LLC v. TRA Global, Inc.*, Judge Scheindlin rejected the plaintiff's "Dance of the Seven Veils approach" at the summary judgment stage after discovery was completed.  977 F. Supp. 2d 281, 283 (S.D.N.Y. 2013) ("Discovery is complete.").  Indeed, even where courts have required plaintiffs to identify the trade secrets allegedly misappropriated, they have been careful to balance competing concerns about, among other things, plaintiffs' broad right to discovery under the Federal Rules and plaintiffs' inability to know exactly what has been misappropriated until they receive discovery on how the defendant operates its business.  *See DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 680–82 (N.D. Ga. 2007).  These courts therefore recognize that the determination is fact-dependent and must be made on a case-by-case basis.  *Id.*  Thus, even according to trade secrets misappropriation doctrine, Rio Tinto has more than adequately identified the trade secrets Vale misappropriated for present purposes, and it would be premature and inappropriate for the Court to issue Vale's requested order.  *See Medtech Prods.*, 596 F. Supp. 2d at 789–90.

Finally, Vale's purported concerns about the burden associated with Rio Tinto's discovery requests on these issues are similarly overstated.  Any purported burden associated with Rio Tinto's requests on these issues are best addressed through the use of custodians and other culling criteria.  As noted above, the custodian discussion is ongoing.  And, in an effort to advance this discussion and avoid burdening the Court with needless discovery disputes, Rio Tinto has also agreed to provide Vale with proposed search terms for this specific issue by Friday, December 5, 2014.  Rio Tinto therefore respectfully requests that the Court order Vale to produce documents in response to Rio Tinto request Nos. 12, 33, and 44-50.

**Defendant Vale's Summary:**  To date, Plaintiff has failed to give Vale any guidance as to what information, if any, Rio Tinto alleges Vale stole and provided to BSGR.  Plaintiff's document requests purport to require Vale to produce all documents concerning "the materials, information, documents, and other data [Vale] reviewed in the Rio Tinto Data Room" (Request 12) and all documents "shared with BSGR, Steinmetz, or both, taken from, based on, derived from, or relating to any Document in the Rio Tinto Data Room" (Request 33), as well as all documents concerning Vale's independent efforts to develop similar information (Requests 44-50).  In an effort to cabin these sweeping requests, Vale asked Rio Tinto to identify the data

that it believes was misappropriated; in the absence of such identification, there is no way for Vale to identify and produce the documents "derived" from the information in the Data Room or documents "related to" the data reviewed in the Data Room (*see* Dk. 114 at 3-6), and Plaintiff's requests would subject Vale to the burden of having to produce everything that relates to the Simandou project without regard to whether that information was allegedly misappropriated or not.

          In response to this request by Vale, and the Court's order, Plaintiff's letter dated November 24, 2014 purported to identify nine documents "as the limited set of key documents from the Rio Tinto data room" containing the information Rio Tinto alleges Vale misappropriated.  However, that purported identification was the opposite of "limited" and fails to identify with reasonable particularity the specific data Plaintiff contends was misappropriated, leaving Vale no guidance with respect to Plaintiff's document requests Request 12, 33, and 44-50.  The nine documents Plaintiff has identified comprise over 270 pages and contain a countless number of facts and data.  As Vale informed Rio Tinto, the documents contain statements regarding:

- Simandou's location and the surrounding area (RT0000379-380);
- Rio Tinto's initial reconnaissance work in 1996, after being invited to Guinea by the Minister of Mines, Fassine Fofana (RT0000382);
- Rio Tinto's receipt of four exploration licenses for iron ore at Simandou in 1997 (RT0000382);
- The mining Convention that took effect in 2003 (RT0000382);
- The Concession Rio Tinto was granted by the President in 2006 (RT0000382);
- Rio Tinto's Simandou mining concession targets and the fact that they included Ballagbeni, Damaro, Captain Hook, Kerkour South, Diodio, Pic de Tibe, Oueleba, Pic de Fon, and Signal de Fokko (RT0000403);
- Rio Tinto's focus within Simandou on the Pic de Fon and Ouelebra areas (RT0000384);
- The estimated total tonnage for Pic de Fon (RT0000385);
- The amount of unclassified resources of Pic de Fon (RT0000414);
- The estimated total tonnage for Oueleba (RT0000385);
- The quality of the typical Simandou ore blend (RT0000386);
- The concentration of minor components at Simandou (RT0000386);
- The base case nominal capacity at Pic de Fon and Ouelba and possible further expansion (RT0000387):
- The envisioned mine operations by conventional truck and shovel equipment (RT0000387);
- Correspondence between the Guinean Government and Rio Tinto in Sept. – Nov. 2008, in which the Government proposed that Rio Tinto relinquish half of its concession (RT0000399);
- The number of exploration drill rigs operating onsite in Simandou (RT0000400);
- The focus for the development of the Simandou iron ore project, until July 2008, on a trans-Guinean option with a railway and port within Guinea (RT00003958);
- The design criteria for a Guinean railway (RT0004945);
- The length and number of curves of the possible Guinean railway (RT0004999);

- The number of berths at the export wharf for a port on Guinea's coast and what it would be expandable to (RT0005015);
- Visibility at the contemplated Guinean port (RT0005037);
- The length of rail transport through Liberia (RT0000392); and
- Port Buchanan's capacity (RT0000394).

There are numerous other examples. To search for the documents concerning the data set forth in these documents or derived from that data in essence would require Vale to search for and produce virtually every document related to the geology, transport, finances, and operations of Simandou – one of the largest iron ore deposits in the world, which has been under development since at least 1997 in an undertaking Plaintiff describes as of "historic scope" (Am. Compl. ¶ 39), and where geology and transport are virtually the only issues concerning the mine. Thus, Plaintiff would have Vale produce documents not to prove or disprove a claim, but rather for Plaintiff to search for a claim. Plaintiff's counsel has admitted they "don't know what defendant Vale shared with its co-conspirators" (Nov. 3, 2014 Tr. 37:2-3) and "have identified, as best we can, what it is we believe they stole" (*id.* at 39:12-13).

In the parties' correspondence, Vale laid out the information set forth above and asked Rio Tinto to identify for it what information Rio Tinto claimed was misappropriated. Rio Tinto refused and declined to exclude any of the categories set forth above. Its response was peremptory:

> Because this is not a misappropriation case, your cases are inapposite and we are not required to provide any further detail regarding the specific information that was stolen. Your client certainly would not have had any such information but for its negotiations with Rio Tinto, had no right to use that information outside the context of its negotiations with Rio Tinto and similarly had no right to share any information with its co-conspirators that it learned in the course of its negotiations with Rio Tinto.

Plaintiff is wrong. Vale just wants to know what information Rio Tinto alleges was stolen so Vale can search for that information and formulate its defenses. The case law does not permit Plaintiff to "shift[] the burden to defendants to clarify plaintiffs' claim," *MSCI Inc. v. Jacob*, 36 Misc. 3d 211, 213-15 (N.Y. Sup. Ct. 2012), and thus does not require Vale to review hundreds of pages of documents "to discern which material constitutes Plaintiffs' trade secrets and further, which of those are the subject of Plaintiffs claim for misappropriation." *Switch Commc'ns Grp. v. Ballard*, No. 2:11-CV-00285-KJD, 2012 WL 2342929, at *5 (D. Nev. June 19, 2012) (citation and quotation marks omitted).[5] It is not sufficient to provide, as Plaintiff has done here,

---

[5] Rio Tinto cited two cases to Vale, *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 440, 443 (E.D.N.Y. 2007), and *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 156-57 (E.D.N.Y. 2005), attempting to argue that it need not specify with reasonable particularity the information allegedly misappropriated. Neither case involved a claim of misappropriation. *Republic of Colombia* discusses whether a plaintiff needs to identify a defendant's fraudulent statements in each mailing in order to satisfy Rule 9(b). *State Farm* (footnote continued)

information that "at most, identified the categories of [Plaitniff's] alleged trade secrets, but did not describe the trade secrets themselves" and "left open the possibility that [Plaintiff] had not listed all categories of trade secrets that it accuses [Vale] of having misappropriated or intending to misappropriate." *Id.* at *2.

    Moreover, it is no answer to say, as Plaintiff has done here, that Vale's "purported burden concerns are best addressed through the use of custodians and other culling criteria."  No doubt an important function of the "reasonable particularity" requirement is that "requiring the plaintiff to sufficiently identify its trade secrets prior to allowing discovery on the defendant's trade secrets helps the court to determine the outer permissible bounds of discovery," which reduces the burdens of discovery.  *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 680-81 (N.D. Ga. 2007).  But burden is only one of many reasons.  Another is that "it is difficult, if not impossible, for the defendant to mount a defense until it has some indication of the trade secrets allegedly misappropriated," as "[u]ntil the defendant knows what information is at issue, it cannot attempt to rebut the plaintiff's charges of misappropriation."  *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 681 (N.D. Ga. 2007).  The requirement also helps prevent "'fishing expeditions' to discover the trade secrets of a competitor" *id.* at 680, a particularly salient consideration here, where Plaintiff and Vale are direct competitors, and "ensures that [the plaintiff] will not mold its cause of action around the discovery it receives," *id.* at 681.

    Finally, principles of reasonableness and proportionality weigh in favor of requiring Plaintiff to identify the allegedly misappropriated information with reasonable particularity before requiring that Vale sift through, and produce, a mass of documents that are irrelevant or of marginal relevance at considerable and unnecessary expense.  *See, e.g.*, *Wood*, 2011 WL 2154279, at *3, 13 (applying the "rule of proportionality," which "serves to protect a party against having to produce voluminous documents of questionable relevance" to "deny the bulk of plaintiff's requests" where "the marginal relevance associated with plaintiff's requests is far outweighed by the burden of responding").

    Plaintiff should have already identified the specific data that it has evidence Vale misappropriated.  (And, Vale does not believe Plaintiff has any such evidence.)  Discovery is not for the purpose of determining what data, if any, was stolen.  If Plaintiff cannot identify specific data that was stolen, then it should not have brought this lawsuit.  And if it can identify such data, it should not be playing hide-and-seek with Vale, and with the Court.  Indeed, despite Your Honor's ruling at the November 3, 2014 conference that Rio Tinto's production "will limit the scope of [its] claims accordingly and discovery to match with it" (Nov. 3, 2014 Tr. 42:11-12), Plaintiff has disclaimed any intention to be so constrained, refusing to confirm that the information allegedly misappropriated is limited to that which is contained in the nine documents it points to, and claiming "the right to amend, modify, or supplement this list as discovery in the case proceeds."  In other words, it has not agreed to confine its misappropriation claim – or discovery – at all.

---

permitted discovery of defendants' phone records and email addresses in order to establish the relationships among them.  Neither is remotely on point.

As Vale has explained to Plaintiff, Vale is prepared to give Plaintiff further additional time to identify the data that was allegedly misappropriated if that time is reasonable and in the interest of pursuing orderly discovery on this issue. But if Plaintiff would like Vale to produce documents responsive to Requests 12, 33, and 44-50, then it should identify the specific data from within the nine documents that it has provided that it contends was misappropriated.

## III.   DISCOVERY FROM PLAINTIFF RIO TINTO

On Monday, November 24, 2014, Rio Tinto produced a set of documents responsive to the production of documents ordered by this Court at the November 3, 2014 hearing. The parties also have submitted letter briefing regarding whether Plaintiff has waived privilege with respect to its alleged investigation of its claims. Additionally, the parties require the Court's assistance in resolving the outstanding issues identified below.

### A.   Rio Tinto Document Production

*Plaintiff's Summary:*  Rio Tinto has fully complied with the Court's November 3, 2014 order on production. On November 24, 2014, Rio Tinto produced all of the Simandou documents available to Vale in the Rio Tinto data room, all access logs showing the Vale employees with access to the data room, what documents those employees accessed in the data room and when those documents were accessed, from November 2008 through June 2009, and also identified the nine key documents containing the information that Vale's employees stole from the Rio Tinto data room. As is routine at this stage of the case, Rio Tinto reserved its right to amend, modify, or supplement the list of nine key documents as discovery progresses. Rio Tinto respectfully refers the Court to section II (C), *supra*, for discussion related to Vale's meritless claims that Rio Tinto be required to further detail the information that Vale stole at this point in time. As is evidenced by the above, there can be no doubt that Rio Tinto has met its discovery obligations as ordered by the Court.

*Defendant Vale's Summary*:  Rio Tinto's document production has been a tale of delay. Vale served discovery requests on Plaintiff on September 3, 2014. To date, the only documents Rio Tinto has produced are the ones the Court ordered it to produce. Plaintiff did not serve its responses when originally due, but rather requested a week's extension until October 13, 2014, which Vale granted. Vale requested a meet-and-confer with Plaintiff the night it received Plaintiff's Responses and Objections. Meet-and-confers were held on October 16 and 22, 2014. Vale wrote Plaintiff on October 18 and 24 with detailed accounts of each meet-and-confer, setting forth the parties' positions, and attempting to "finalize the parties' discussion of Vale's discovery requests to Rio Tinto in advance of the joint letter to Judge Peck due on October 30, 2014." Vale separately wrote Plaintiff on October 24 to identify three areas where the parties had reached an impasse and required the Court's assistance: (1) Plaintiff's waiver of privilege with respect to its investigation, (2) Vale's document requests related to the BHP takeover attempt of Rio Tinto, and (3) Plaintiff's failure to identify the allegedly misappropriate information with reasonable particularity. Plaintiff responded by accusing Vale of "attempt[ing] to short circuit the meet and confer process," stating "[i]t is far too early to conclude that we are at an impasse with respect to Vale's discovery requests." To date, Plaintiff still has not produced documents in response to Vale's requests. It continues to resist production of documents related to its investigation that it put at issue, it continues to resist production of documents from key

custodians related to the BHP bid and during the full relevant time period, and it still has not identified the allegedly misappropriated information with reasonable particularity.  In addition, on November 10, Rio Tinto indicated that it would shortly produce a proposal for predictive coding.  Rio Tinto has not produced that proposal.  Vale continues to be interested in exploring predictive coding, but not if it will delay Rio Tinto's production.

Plaintiff has produced, in response to this Court's November 3 order, approximately 310 documents related to Simandou from the Rio Tinto Data Room, as well as access logs purportedly showing who viewed those documents.  All of these materials it presumably had on hand before it filed suit.  Of those documents, Rio Tinto purports to identify nine from which it claims Vale misappropriated its confidential information (although as set forth in Section II.C, *supra*, that purported "identification" is essentially meaningless).  The remaining 301 documents are of marginal relevance, if any, and are not responsive to the vast majority of Vale's 47 requests.  Plaintiff should be compelled to respond to Vale's requests without delay, beginning with Vale's BHP-related requests, discussed further below (*see infra* Section III.C).

As indicated above, Vale believes that staged document production should begin with Rio Tinto producing at least documents in response to Vale's requests related to BHP Billiton (Requests 5-8, 10-12), as well as its correspondence with Vale regarding the Confidentiality Deed.

## B.    Custodian List

*Plaintiff's Summary*:  Unlike Vale, Rio Tinto undertook a good faith effort to identify a proposed custodian list reflecting those persons most likely to have documents relevant to Vale's discovery requests.  To that end, Rio Tinto provided Vale with a proposed custodian list on November 17, 2014 identifying 20 key Rio Tinto custodians.  On November 24, 2014, Vale countered with a proposal to add an additional 11 custodians to that list, bringing the proposed Rio Tinto custodian list to 31 (five times greater than Vale's own proposed custodian list).  Rio Tinto is in the process of reviewing Vale's proposal, but even a cursory review of Vale's list indicates that their proposed custodians include numerous individuals unlikely to have relevant documents.  As discussed above, the parties have scheduled a meet and confer for Thursday, December 4, 2014 to discuss proposed custodian lists.  Rio Tinto will update the Court with the results of the anticipated meet and confer at the December 9, 2014 hearing.

*Defendant Vale's Summary:*  Plaintiff first provided its proposed list of 20 custodians for Vale's document requests to Rio Tinto on November 17, 2014.  Vale responded one week later on November 24 with a proposal to add 11 custodians to that list.  The parties met and conferred on November 25 and Plaintiff agreed to confer with its client and get back to Vale on its proposal.  The parties are scheduled to confer further on December 4.

## C.    BHP-Related Requests

*Plaintiff's Summary*:  At the November 3, 2014 status conference, the Court ordered the parties to meet and confer to work out "the exact details" of production from "a very small group" and a "small" time period in response to Vale's discovery requests regarding the BHP

13

takeover attempt.  11/3/2014 Hr'g at 52:19-21.  Counsel for Rio Tinto immediately worked with its client to identify five core people with knowledge of the BHP takeover defense.  Vale was not satisfied with this effort and demanded that Rio Tinto also provide it with the "insider lists" for the BHP takeover attempt.  Rio Tinto complied with Vale's request.  Vale then countered with a list of custodians *just for the BHP requests* that *more than tripled* the five custodians Rio Tinto had worked to identify.  Vale would apparently have this Court believe that a list of more than 16 custodians for a discrete issue somehow constitutes a "very small group."  Rio Tinto believes Vale's position is unreasonable, especially in light of the fact that (1) Vale has proposed only <u>seven</u> custodians for its *entire* production, and (ii) this is – at best – a tangential issue that rests on the implausible proposition that Rio Tinto would have negotiated with Vale even if it knew Vale was going to enter into a RICO conspiracy to steal its mining rights.

This Court also ordered production on the BHP requests for a "small" time period.  Vale responded to this Court's order for a "small" time period by actually *expanding* the time period for which it sought responsive documents.  Indeed, although its document requests to Rio Tinto limit its BHP requests from November 2007 to November 2008, which Vale itself stated "constitutes the period of time during which BHP Biliton was pursuing the BHP Biliton Proposal and BHP Biliton Exchange Offer," Dkt. No. 99-18 at 23, Vale now has told this Court that it seeks documents from November 2007 through June 2009.  In any event, Vale's stated reason for seeking documents after November 2008 is completely illogical and amounts to nothing more than a fishing expedition.  Vale cannot argue on the one hand that it is entitled to documents related to the BHP takeover because that takeover *induced* Rio Tinto to enter negotiations with Vale while on the other claim that documents *after* the BHP takeover ended are also related to that same inducement.  If Vale persists in its argument related to the BHP takeover, any discovery on the BHP takeover must be limited to the actual time period of the BHP takeover – November 2007 to November 2008 – and no more.

Rio Tinto of course will comply with the Court's order and produce documents responsive to the BHP requests as part of Rio Tinto's larger collection and production of documents responsive to Vale's requests, which first requires agreement on custodians and culling criteria that the parties are diligently working towards.

***Defendant Vale's Summary:*** At the November 3 conference, Plaintiff resisted producing documents in response to Vale's Requests 5-8 and 10-12, concerning the BHP Billiton takeover attempt of Rio Tinto that prompted Rio Tinto's approach to Vale in 2008, arguing that the requests implicated "very high-level CFOs, CEOs."  (Nov. 3, 2014 Tr. 52:1.)  The Court rejected this argument, as well as Plaintiff's relevance arguments that "the fraudulent inducement claim is about what Vale said to us in entering into the deed and what they didn't say[;] [i]t's not about the reason why we approached Vale" (*id.* at 50:22-25), and that Vale is "not entitled to know every potential asset we looked to sell, every potential suit[o]r we looked at, or assets completely unrelated to Simandou" (*id.* at 47:17-19).  Observing that "[p]eople do strange things in takeover defenses" (*id.* at 51:21-22), Your Honor "order[ed] production in this area with the exact details to be further worked out by the parties" (*id.* at 52:21-22).

14

On November 6, Plaintiff proposed five relatively low-level employees as custodians for these requests, and proposed a date range of November 1, 2007 through November 25, 2008.[6]  Vale has agreed to Plaintiff's proposed start date for these requests, but does not believe Plaintiff's proposed end date or custodians are appropriate.  Vale has proposed additional custodians (*see* Vale's Appendix B) and an end date of June 30, 2009.  The parties met and conferred on November 25, 2014, but Rio Tinto has not yet agreed to Vale's proposed date range or custodians.  Vale also provided Plaintiff with proposed search terms for these requests on November 19, to which Plaintiff has not yet responded.

Vale's proposed custodians are appropriate to the nature of these document requests, which – as Plaintiff acknowledges – implicate high-level corporate decision makers.  In December 2007, it was reported that:

> RIO Tinto has beefed up its brains trust in the face of BHP Billiton's predatory pursuit, appointing former Australian coal boss **Doug Ritchie** as its Australian-based managing director of strategy.  Mr Ritchie, 51, joins London-based strategy boss **Phil Mitchell**, 47.  Rio's strategy is now being driven by two veterans of its takeover binge of 2000, when it acquired iron ore maker North and diamond miner Ashton.  Both men report to chief executive **Tom Albanese** and chief financial officer **Guy Elliot**, who are spearheading the defence against BHP's proposed $US150 billion ($174 billion) three-for-one merger.[7]

Remarkably, none of the bolded names is among Plaintiff's proposed custodians, as Vale has proposed they should be, even though both Guy Elliot and Philip Mitchell are signatories to the Confidentiality Deed Plaintiff claims it was fraudulently induced to sign.  Vale has also proposed adding Rio Tinto's Chairman, Paul Skinner, and its top iron ore executive, Sam Walsh, both of who made contemporaneous public statements suggesting their involvement with the takeover defense,[8] as well as Rio Tinto's top legal executives, who would ordinarily be integral to a takeover defense (and Rio Tinto has not claimed otherwise).  (*See* Vale's Appendix B.)

---

[6] Plaintiff's proposed custodians are: Tim Renwick (General Manager, Business Development), Daniel Larsen (Controller), Peter Cunningham (Managing Director, Energy and Climate Sector), Rowena Albones (General Manager, Business Improvement), and Simon Trott (Business Development Executive).

[7] Andrew Trounson, *Putting heads together in defence*, The Australian (December 18, 2007) (emphasis added).

[8] Skinner, Rio Tinto's Chairman, opened an investor seminar with the following statements: "All of you know that we recently received an unsolicited and conditional acquisition proposal from BHP, which our Board fully considered and rejected on the basis that it significantly undervalued Rio Tinto's assets and prospects. . . .  I believe that [this seminar] will give you a very clear understanding of why we rejected the ideas that were put to us."  *Rio Tinto plc Investor Seminar – Conference Call – Final, FD (Fair Disclosure) Wire*, November 26, 2007.  During the same presentation, Sam Walsh highlighted Rio Tinto's iron ore assets, asserting they were undervalued in BHP's offer: "Rio Tinto Iron Ore has clearly assumed the lead in this industry.  One could (footnote continued)

Plaintiff alleges that in 2008 it was fraudulently induced to enter into negotiations with Vale and sign the Confidentiality Deed by Vale's misrepresentations concerning its discussions with the Guinean Government and its interest in partnering with BSGR.  (Am. Compl. ¶ 56).  Vale believes the evidence will show that Rio Tinto would have signed the Deed whether or not Vale was in discussions with Guinea or in discussions with BSGR**,** because Rio Tinto had an anti-takeover strategy that included creating an alternative transaction with a strategic buyer that might be more attractive than the BHP offer and that might make it more difficult for BHP to consummate its proposed transaction, Vale was one of the few companies that it could approach as part of that strategy, and the Vale strategy was preferable to alternative strategies that it was also considering.  In order to demonstrate this, Vale needs discovery, not from low-level Rio into employees who worked on the takeover defense, but from Rio Tinto's strategic decision makers – those authorized to enter agreements and transactions, including the Confidentiality Deed, that were critical to the takeover defense.

Regarding the appropriate date range, Plaintiff argues that the formal BHP bid ended in November 2008.  But as early as February 2009, it was reported that BHP was weighing a fresh approach for Rio Tinto after hearing from investors who were upset by a potential deal in which Rio Tinto would sell a stake to the Chinese aluminum producer Chinalco.  One paper reported: "BHP is expected to approach the Rio board to make a counter-offer for some of the mine stakes that have been offered to the Chinese.  If the board rejects BHP's approach, the company is understood to be willing to approach shareholders directly."[9] In March 2009, it was reported that "[r]enewed market interest in a merger emerged . . . after Rio Tinto softened its tone on a proposed $19.5 billion investment from . . . Chinalco.  [Rio Tinto's] Chief Financial Officer Guy Elliott said Rio has a 'plan B' in place if the Chinalco investment faltered.  The company also has a new chairman-elect, Jan du Plessis, sparking hope that the board could revisit the BHP deal."[10]  In April 2009, Rio Tinto's top iron ore executive, Sam Walsh, was quoted as saying that Rio still had potential iron ore synergies with BHP.[11]  That month, Citigroup released a 25-page report entitled BHP Billiton & Rio Tinto: Consolidation

---

contend that much of the BHP pitch is an effort to get access to this leadership position and to attempt to offset the increasing challenges that they are facing in expanding their production.  In simple terms, we believe that they're playing catch-up.  And we believe that their iron ore business may need us, but we certainly don't need them.  We have demonstrated our capability to deliver superior growth.  Over the past eight years, we have delivered a compound annual growth rate of close to 15% in the Pilbara.  And this should be directly compared with BHP Billiton, which, in 1999, had a larger iron ore business than we did."  *Id.*

[9] David Robertson & Helen Power, *BHP Billiton looks likely to gatecrash Chinalco's $19bn Rio Tinto bailout*, Times (London), February 12, 2009, (Business), at 42.

[10] Jeffrey Sparshott, *Rio Tinto Shrs Buoyed by BHP Billiton Speculation*, Dow Jones International News, March 27, 2009.

[11] Elisabeth Behrmann, *Rio Tinto: BHP, Rio Still Have Potential Iron Ore Synergies*, Dow Jones Factiva, April 20, 2009.

Time," which canvassed the pros and cons of a deal.[12]  Finally, in June 2009, the same month Rio Tinto broke off negotiations with Vale, Rio Tinto and BHP announced a planned iron ore joint venture in Australia.

Vale believes it is no coincidence that Rio Tinto chose to terminate negotiations with Vale (which it initiated in response to the BHP bid) at the same time it made peace with BHP and announced a friendly deal.  Indeed, the evidence strongly suggests that, far from Plaintiff's allegation that Vale engaged in a "ruse" of negotiations (Am. Compl. ¶ 90), it was Rio Tinto that was stringing Vale along for its own purposes.

Finally, there is also no excuse for Plaintiff's failure to respond to Vale's proposed search terms.  Plaintiff should begin producing documents using those search terms without delay.

*       *       *

The parties will continue to keep the Court informed of their progress as the meet and confer process advances.

Very truly yours,


/s/Michael Lyle
Michael Lyle

---

[12] Felicity Williams, *BHP looking to buy – Rumors of renewed Rio Tinto bid surface*, The Courier Mail (Australia), April 23, 2009, (Finance), at 65.

**Vale's Appendix A**
**Categories of Documents Produced to Rio Tinto**

1. Contracts between BSGR and Vale regarding Vale's 2010 acquisition of an interest in the Guinean subsidiary of BSGR.

2. Wire transfer information regarding the payments from Vale to BSGR in connection with the 2010 acquisition.

3. Organizational charts for BSGR-Guiana and any other corporate entity involved in the Simandou mining project, including a Project Hills Corporate Structure and a BSGR Corporate Structure Chart.

4. Business plans relating to the Simandou mining project, including a Business Plan Summary (dated April 2010) as well as a Business Plan (dated September 2011) that was submitted to the Government of Guinea.

5. Documents relating to the Joint Venture Framework Agreement's force majeure provisions, including correspondence between Vale and BSGR from November-December 2012 relating to the declaration by Vale that a force majeure event had occurred.

6. Documents relating to any feasibility study conducted or contemplated in connection with the Simandou mining project or any other mining project in Guinea, including a Feasibility Study that was completed by BSGR prior to Vale's involvement in the Joint Venture, which relates to the Zogota project, as well as non-privileged correspondence concerning all such Feasibility Studies, including an extension of the deadline for the submission of a final Feasibility Study relating to Simandou Blocks 1 and 2 to October 2013.

7. Documents relating to the Joint Venture Framework Agreement's provisions governing the payment of additional consideration, including correspondence between Vale and BSGR from December 2012 and January 2013.

8. Documents relating to the Liberian Transport Solution, as defined in the Joint Venture Framework Agreement, including correspondence between Vale and BSGR, as well as documents that were provided to or correspondence with the Governments of Liberia and Guinea in the context of negotiations of the Liberian Transport Solution.

9. Documents relating to the designation of bank accounts by BSGR and Vale in connection with the Joint Venture Framework Agreement, the Simandou mining project and any joint venture to which BSGR is or was a party.

10. A list of bank account numbers that Vale S.A. was currently using to make payments in relation to the Simandou project.

11. Correspondence or communications between BSGR and Vale relating to the Simandou mining project, specifically correspondence and communications between BSGR and

Vale in the context of negotiations of the Joint Venture Framework Agreement, including correspondence related to anti-corruption and the FCPA.

12. Documents relating to the 'corporate documents' or 'authorities' referenced on page 7 of the Joint Venture Framework Agreement, including minutes of meetings of board of directors of BSGR, a copy of a power of attorney conferring authority, register of members of BSGR Guinea or BSGR Guernsey, and resignation letters of several individuals from the BSGR Guinea board of directors.

13. Executed signature pages relating to the Joint Venture Framework Agreement and Shareholder's Agreements, such as an undertaking and a resignation signed by Asher Avidan.

14. Documents relating to factual or legal representations made by BSGR in connection with the Simandou mining project, including documents relating to the legality of its mining concessions in Guinea (including, for example, the Guinean subsidiary's compliance regime and its mining permits).

15. Documents relating to the Technical Committee in Guinea, specifically submissions that were made by Vale or BSGR to the Technical Committee or the Government of Guinea regarding the Technical Committee, or correspondence between Vale and BSGR regarding the Technical Committee.

16. Correspondence between BSGR and Vale related to any confidentiality agreement between BSGR and Vale, specifically post-closing correspondence between Vale and BSGR regarding the application of the confidentiality provision of the Framework Agreement in making submissions to the Technical Committee or the Government of Guinea as well as correspondence made in the context of responding to this Subpoena.

17. Documents produced by BSGR in connection with Vale's bribery-related, FCPA-related, UK Bribery Act-related, or OECD-related due diligence, including a Compliance Due Diligence Questionnaire, a Supplemental Compliance Due Diligence Questionnaires, the Webber Wentzel Due Diligence Questionnaire, an Anti-Bribery Certification signed by Benjamin Steinmetz, an Anti-Bribery Certification signed by David Clark on behalf of BSGR, an Outline of Proposed Anti-Bribery Compliance Policy for BSGR, BSGR's Anti-Bribery Compliance Program, and a document reflecting the ABL Solution.

**Vale's Appendix B**
**Additional Proposed Custodians for Vale's BHP-Related Requests**

| Tom Albanese | CEO May 2007-2013 |
|---|---|
| | On Plaintiff's insider list for BHP Billiton takeover defense |
| | Named in the press as "spearheading" Rio Tinto's defense against BHP Billiton |
| Guy Elliott | CFO 2002-2013 |
| | On Plaintiff's insider list for BHP Billiton takeover defense |
| | Signed the Confidentiality Deed |
| | Named in the press as "spearheading" Rio Tinto's defense against BHP Billiton |
| Sam Walsh | Chief Executive of Iron Ore 2004-2013 |
| | Public statements about Rio Tinto's reasons for rejecting BHP Billiton's offer |
| Phil Mitchell | Head of Business Development 2007-2014 |
| | On Plaintiff's insider list for BHP Billiton takeover defense |
| | Signed the Confidentiality Deed |
| | London head of strategy and reportedly involved in BHP Billiton takeover defense |
| Paul Skinner | Chairman 2003-2009 |
| | On Plaintiff's insider list for the BHP Billiton takeover defense |
| | Public statements about Rio Tinto's reasons for rejecting BHP Billiton's offer |
| Stephen Creese | General Counsel 1995-February 2008 |
| | On Plaintiff's insider list for BHP Billiton takeover defense |
| Debra Valentine | Global Head of Legal January 2008-2009 |
| | On Plaintiff's insider list of BHP Billiton takeover defense |
| Doug Ritchie | Managing Director of Strategy, Australia December 2007-present |
| | On Plaintiff's insider list of BHP Billiton takeover defense |
| | Received appointment in response to the BHP Billiton offer |
| Tim Lane | Senior Corporate Counsel 2005-2010 |
| | On Plaintiff's proposed list of general custodians |
| | Identified in Plaintiff's interrogatory response related to fraudulent inducement |
| Mike Harris | Managing Director of Iron Ore Atlantic 2008-present |
| | On Plaintiff's insider list for BHP Billiton takeover defense |
| | On Plaintiff's proposed list of general custodians |
| | Identified in Plaintiff's interrogatory response related to fraudulent inducement |
| Ken Haddow | Mineral Industrial Business Development Director 1983-2011 |
| | On Plaintiff's proposed list of general custodians |
| | Identified in Plaintiff's interrogatory response related to fraudulent inducement |