UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

RIO TINTO PLC,

              Plaintiff,

     -against-

VALE S.A., BENJAMIN STEINMETZ,
BSG RESOURCES LIMITED,
BSG RESOURCES (GUINEA) LTD.,
BSGR GUINEA LTD. BVI,
BSG RESOURCES GUINÉE SARL,
FREDERIC CILINS, MAMADIE TOURÉ,
and MAHMOUD THIAM,

              Defendants.

-----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED: 12/17/14**

## DECISION & ORDER

14 Civ. 3042 (RMB)(AJP)

## I.  Introduction

On August 15, 2014, Rio Tinto plc ("Plaintiff" or "Rio Tinto") filed an Amended Class

Action Complaint ("Complaint") against Vale S.A. ("Vale"), Benjamin Steinmetz ("Steinmetz"),

BSG Resources Limited and related entities ("BSGR"), Mahmoud Thiam ("Thiam"), Frederic

Cilins ("Cilins"), and Mamadie Touré ("Touré").  Rio Tinto, which is a leading multinational

mining company, alleges that Vale, its principal competitor, entered into a conspiracy with

Steinmetz and BSGR to misappropriate Rio Tinto's mining rights in the Simandou region of

southeast Guinea.  (Am. Compl., filed Aug. 15, 2014 ("Compl.") ¶¶ 1, 3.)[1]

---

[1] Rio Tinto, headquartered in the United Kingdom, does business in over forty countries,
including the United States.  Vale, headquartered in Brazil, does business in more than thirty
countries, including the United States.

1

According to the Complaint, Vale "secretly join[ed] forces with BSGR to form an enterprise, defraud Rio Tinto, and steal the rights to Blocks 1 and 2 of the Simandou Concession," in violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.   (Id. ¶ 83.)  Plaintiff also asserts common law claims of fraud, conspiracy to commit fraud, aiding and abetting fraud, and fraudulent inducement.  (Id. ¶¶ 59, 61–63.)

On September 3, 2014, Vale filed a motion to dismiss Rio Tinto's Complaint, asserting that Rio Tinto's claims against Vale should have been brought in England.  Vale contends that a September 2, 2008 confidentiality agreement ("Confidentiality Deed" or "Confidentiality Agreement") entered into by Rio Tinto and Vale just prior to their negotiations over Rio Tinto's mining rights, includes a mandatory forum selection clause ("Clause 20") which requires that litigation be brought in England—notwithstanding the fact that Clause 20 includes the term "non-exclusive jurisdiction." (Letter Brief in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem."), at 3–4.) [2]

---

[2] Clause 20 was drafted by Vale's counsel in this litigation, Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), and Rio Tinto's counsel, Linklaters.  Its relevant provisions state:

**20. Governing law and jurisdiction**

(a) This Deed shall be governed by and construed in accordance with English law.

(b) Each of the parties agrees that the courts of England are to have **non-exclusive** jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that accordingly any proceedings arising out of or in connection with this Deed shall be brought in such courts. In connection with any disputes which may arise out of or in connection with this Deed, each of the parties irrevocably submits to the jurisdiction of such courts and waives any objections to proceedings in any such court on the grounds of venue or on the ground that the proceedings have been brought in an inconvenient forum.

(c) Notwithstanding the provisions of sub-Clause (b) of this Clause 20, the parties recognize that the Brazilian courts may be the appropriate forum for the enforcement of some of the provisions of this Deed (including in relation to the obligations set out in sub-

In support of its forum selection clause arguments, Vale submitted the expert declaration (and supplemental declaration) of Lord Collins of Mapesbury, dated July 29, 2014. Lord Collins, who is a former member of the United Kingdom Court of Appeal and the Appellate Committee of the United Kingdom's House of Lords and is currently a Professor of Law at University College London and Acting Justice of the Supreme Court of the United Kingdom, opines that the term "non-exclusive jurisdiction," which is used twice in Clause 20, was "a result of careless drafting" and that its use was "in error." (Decl. of Lord Collins of Mapesbury, dated July 29, 2014 (Ex. C to Defs.' Mem.) ("Collins Decl."), ¶¶ 22, 62, 94.) He also opines that the forum selection clause should "be construed as an exclusive jurisdiction agreement . . . notwithstanding the use of the phrase 'non-exclusive [jurisdiction],'" and notwithstanding the fact that Clause 20 also provides for litigation in Brazil. (Id. ¶ 68.) Lord Collins says that the term "shall" in Clause 20(b) has a "mandatory nature." (Id. ¶ 63.) ²

Defendants also contend that the Complaint should be dismissed on the grounds of forum non conveniens. They argue that "[a]s a United Kingdom corporation with its principal place of business in London . . . Rio Tinto's choice of [S.D.N.Y.] forum merits little deference"; that "the English courts are not only an adequate, but in fact are a superior, forum for adjudication of this

---

Clause 5 (Share Acquisitions), not least where injunctions are required. Where this is the case, each of the parties agrees irrevocably and unconditionally to submit to the **non-exclusive** jurisdiction of the Central Courts (Foro Central) of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

(Conf. Deed, dated Sep. 2, 2008 (Ex. A to Defs.' Mem.), at cl. 20 (emphasis added).)

² The parties agree that the interpretation of Clause 20 is governed by English law. (Defs. Mem. at 4 n.3 ("The English choice of law provision of the Deed governs the interpretation of Clause 20."); Pl. Opp'n. at 3 ("The question of whether Clause 20 is mandatory or permissive is governed by the law selected in the Deed, i.e. English law.").) See Martinez v. Bloomberg LP, 740 F.3d 211, 217-18 (2d Cir. 2014).

foreign dispute"; and that the forum non conveniens factors "overwhelmingly favor dismissal." (Defs.' Mem. at 15, 17, 19, 22.)

On September 17, 2014, Rio Tinto filed its opposition to Defendants' motion to dismiss. With respect to forum selection, Rio Tinto argues that "Clause 20 unambiguously states that the courts of England have non-exclusive jurisdiction" and that "the term 'shall' does not support the conclusion that use of 'nonexclusive' in Clause 20 was in error." (Letter Brief in Opp'n to Defs.' Mot. to Dismiss ("Pl. Opp'n."), at 3, 7.) Rio Tinto also argues that even if Clause 20 were read as exclusive, "Rio Tinto's claims do not arise out of or in connection with the Confidentiality Deed." (Pl. Opp'n. at 11.)

In support of its opposition, Rio Tinto submitted the expert declaration and supplemental declaration of Lord Hoffman, who is a former member of the United Kingdom Court of Appeal and the Appellate Committee of the House of Lords, and is currently a non-permanent member of the Court of Final Appeal for Hong Kong. Lord Hoffman reaches the **opposite** conclusion from Lord Collins. He opines that the "[t]he jurisdiction conferred by these two clauses [(Clauses 20(b) and 20(c) of the Confidentiality Agreement)] upon the courts of England and Brazil respectively is expressed to be non-exclusive, a well known technical term which denotes submission to the jurisdiction of the courts in question without prejudice to the right to bring proceedings in any other court willing to take jurisdiction." (Decl. of Lord Hoffman, dated Sept. 10, 2014 (Ex. B to Pl. Opp'n.) ("Hoffman Decl."), ¶ 7.) And, Lord Hoffman concludes that the word "shall," by contrast, is "notoriously ambiguous" and that "[i]f 'shall is construed to mean that the English courts are to have exclusive jurisdiction . . . [i]t would be subscribing to a contradiction of Alice in Wonderland proportions." (Hoffman Decl. ¶¶ 20–21.)

4

With respect to Defendants' contention that this case should be dismissed on forum non conveniens grounds, Rio Tinto argues that "a plaintiff's choice of forum is entitled to deference"; that "England is not an adequate alternative forum because some Defendants are not amenable to process in England"; and that "private and public interests weigh[] in favor of Rio Tinto's chosen [S.D.N.Y.] forum." (Pl. Opp'n. at 14–15, 20.)

On September 24, 2014, Defendants filed a reply and supplemental Declaration of Lord Collins. (See Letter Brief in Further Supp. of Defs.' Mot. to Dismiss, dated Sept. 24, 2014 ("Defs.' Reply"); Third Declaration of Lord Collins of Mapesbury, dated Sept. 24, 2014 (Ex. A to Defs.' Reply) ("Collins Reply Decl.").) In a footnote to its reply brief, Vale states that Rio Tinto's assertion that Vale is relying on a theory of mistake is "**not true**." (Defs.' Reply at 2 n.2 (emphasis added).) This (reply brief) argument appears to be at odds with the position of Vale's own English law expert, Lord Collins, who, as noted, concludes that the term "non-exclusive" "has been inserted in, or left in, the Confidentiality Deed as a result of careless drafting," and was "inserted . . . in error." (Collins Decl. ¶¶ 62, 94.) Vale also contends in its reply brief that use of the phrase "non-exclusive jurisdiction" in Clause 20 "clearly reflects" that "England and Brazil are non-exclusive as to each other while being exclusive as to other forums." (Defs.' Reply at 2 n.2; see also discussion infra at 21.)

On October 3, 2014, Plaintiff filed a sur-reply and Second Declaration of Lord Hoffman. (See Letter from M. Lyle to Hon. Richard M. Berman, dated Oct. 3, 2014.) In his Second Declaration, Lord Hoffman expresses the opinion that Lord Collins "has [not shown] that designating a non-exclusive jurisdiction, as the parties did here, was commercially pointless and therefore must have been a mistake." (Second Declaration of Lord Hoffman, dated Oct. 3, 2012 (Ex. A to Pl. Sur-reply), ¶ 4.)

5

Oral argument was held on December 1, 2014. (See Hr'g Tr., dated Dec. 1, 2014 ("12/1/14 Tr.").)

**For the reasons stated below, Defendants' motion to dismiss is denied.[3]**

## II. Background

For the purposes of this motion, the Court accepts the following allegations in the Complaint as true. See, e.g., Aguas Lenders Recovery Grp. LLC v. Suez, S.A., 585 F.3d 696, 697 (2d Cir. 2009).

### Rio Tinto's Simandou Mining Rights

At the core of this financial dispute is the right to exploit iron ore in the Simandou region in the Republic of Guineau. Simandou contains one of the largest iron ore deposits in the world, capable of yielding as much as 200 million tons per year. (Compl. ¶ 36.) On February 25, 1997, the Guinean Ministry of Natural Resources and Energy awarded four exploration permits to Rio Tinto for mining at Simandou and, on March 20, 2006, the President of Guinea, Lansana Conté, awarded Rio Tinto the Simandou Concession, which consisted of four "blocks" spanning an area of 738 km (squared). (Id. ¶ 37.) As of August 2008, Rio Tinto had invested hundreds of millions of dollars in exploring and developing the Simandou Concession. (Id. ¶ 40.)

### The Alleged RICO Conspiracy

The Complaint alleges that in 2008, "Vale made the strategic decision to gain control of Simandou [for purposes of mining iron ore] at any cost." (Id. ¶ 53.) A "key part" of Vale's strategy was to "dupe Rio Tinto into revealing its confidential and proprietary information about Simandou that it had spent many years and hundreds of millions of dollars developing." (Id. ¶

---

[3] **Any issues raised by the parties not specifically addressed herein were considered by the Court and rejected.**

54.) To accomplish this, Vale "feigned interest" in negotiating with Rio Tinto to purchase the
Simandou Concession, "while actively concealing from Rio Tinto the material facts that (1) it
was also in discussions with the Government of Guinea for Rio Tinto's Simandou Concession,
and (2) it was evaluating and considering Defendants Steinmetz and BSGR as possible partners."
(Id. ¶ 4.)

Relying upon Vale's alleged "material omissions and misrepresentations," Rio Tinto
commenced negotiations with Vale and, at a November 24, 2008 meeting in New York City at
the headquarters of Vale's legal counsel, Cleary Gottlieb, Rio Tinto provided Vale with
confidential information regarding Simandou. The information included geological data
gathered by Rio Tinto and port and rail transport plans developed by Rio Tinto. (Id. ¶¶ 68–83.)
During the November 24, 2008 meeting at Cleary Gottlieb, Rio Tinto also provided Vale
employees with access to Rio Tinto's "Data Room," which housed additional confidential
information. (Id. ¶¶ 64–67.)

The Complaint alleges that, shortly after obtaining Rio Tinto's confidential information at
the November 24, 2008 meeting, Vale "resolved to work with Steinmetz, BSGR, and the other
defendants to acquire Rio Tinto's Simandou Concession." (Id. ¶ 86.) On information and belief,
a meeting among Vale, Steinmetz and BSGR occurred in early December 2008. (Id.) During
this meeting, Vale, Steinmetz and BSGR allegedly conspired to work together to "steal Rio
Tinto's mining rights at Simandou," and Vale "improperly divulged the confidential information
it had obtained from Rio Tinto at the November 24, 2008 meeting and from the [Rio Tinto] Data
Room regarding the technical and geological information necessary for any development at
Simandou." (Id. ¶ 87) Soon after the meeting among Vale, BSGR and Steinmetz, Vale and
BSGR held another meeting (also in December 2008) with Guinean officials, during which Vale

7

and BSGR secretly proposed a BSGR-Vale joint venture to develop Blocks 1 and 2 of Simandou, the rights to which were held by Rio Tinto, and allegedly disclosed some of Rio Tinto's confidential information. (Id. ¶ 91.)

According to the Complaint, BSGR, Steinmetz, and Vale agreed among themselves that, in order to continue obtaining Rio Tinto's confidential information regarding Simandou, Vale "would continue its ruse of negotiating in good faith with Rio Tinto, never once disclosing its scheme with Steinmetz and BSGR to steal Rio Tinto's Simandou Concession." (Id. 90) And, Vale continued to negotiate with Rio Tinto for approximately seven months (between December 2008 and June 2009), during which it continued to misrepresent its true intentions about Simandou. (Id. ¶¶ 96, 105–106.) The Complaint alleges that, as a result of misrepresentations and omissions during Vale's negotiations with Rio Tinto, "the [RICO] enterprise gained access to highly confidential information from Rio Tinto, which the Defendants then used for their own development of Simandou." (Id. ¶ 90.)

Rio Tinto alleges that BSGR and Steinmetz's role in the alleged conspiracy included bribing persons with influence in the Guinean Government and, in particular, Mahmoud Thiam, who served as the Guinean Minister of Mines (during the presidency of Captain Moussa Dadis Camara) from December 24, 2008 until 2010.[4] (Id. ¶¶ 51–52, 97.) The Complaint alleges that, in 2009 and 2010, Thiam "received more than one hundred million dollars in bribes, portions of which he doled out to a broad array of government officials to further the interests of the conspiracy, and misused his authority and power to ensure the success of the conspiracy." (Id. ¶¶

---

[4] Camara seized power in a coup d'état on December 24, 2008, two days after the death of former President Lansana Conté. (See "Guinea Officials Surrender as Junta Chief Claims Presidency," PBS Newshour (Dec. 25, 2008) http://www.pbs.org/ newshour/updates/africa-july-dec08-guinea_12-25/.)

2, 115.) According to the Complaint, Vale "knew or should have known" that BSGR and Steinmetz were bribing Guinean officials. (Id. ¶ 90.) [5]

The Complaint alleges that, as a result of the unlawful efforts of Vale, BSGR, Steinmetz, and others, the Government of Guinea issued a series of letters in late-2008 and 2009 rescinding Rio Tinto's rights to Blocks 1 and 2 of the Simandou Concession and transferring those rights to BSGR. (Id. ¶¶ 90, 95–101.) The first such letter was sent on behalf of then-President Conté on December 9, 2008, shortly after Vale, BSGR and Steinmetz met and conspired to misappropriate Rio Tinto's rights to Simandou—and also shortly after Vale and BSGR met with Guinean officials. (Id. ¶¶ 12, 91.) On February 29, 2009, Thiam, President Camara's Minister of Mines, who allegedly was receiving bribes from BSGR and Steinmetz, sent another letter to Rio Tinto "purporting to officially rescind Rio Tinto's rights to Blocks 1 and 2 [of Simandou]." (Id. ¶ 98.) On June 26, 2009, Thiam sent another letter to Rio Tinto in which he allegedly "chastised Rio Tinto for questioning the validity of BSGR's rights to Blocks 1 and 2, and maintain[ing] that the decision 'complies with Guinean laws.'" (Id. ¶ 100.) Rio Tinto alleges that Thiam's February 29, 2009 and June 26, 2009 letters "legitimize[d] the award of Blocks 1 and 2 to BSGR" and "thwart[ed] Rio Tinto's efforts to contest the [December 9, 2008] award of Blocks 1 and 2 to . . . BSGR." (Id. ¶¶ 97-98.)

On April 30, 2010, Vale publicly announced that it had negotiated a joint venture with BSGR for Blocks 1 and 2 of Simandou, and that it had acquired a majority stake in BSGR's Guinea subsidiary for $2.5 billion. (Id. ¶ 108.) The Complaint alleges that, from 2010 through

---

[5] To be sure, the Complaint also alleges that other individuals were involved in the alleged conspiracy. Defendant Touré allegedly "received some of the bribes from BSGR and Steinmetz" (Compl. ¶ 2) and Defendant Cilins, as "an agent and/or employee of Steinmetz and BSGR," traveled to the United States to "conceal and/or destroy evidence of the enterprise's illegal activity related to Simandou." (Id. ¶ 16.)

9

2013, BSGR, Steinmetz, and Vale continued to rely upon Rio Tinto's confidential information to develop Simandou, and that BSGR and Steinmetz, in furtherance of their alleged conspiracy with Vale and others, continued to bribe Thiam to "bolster the legitimacy of BSGR's title to Simandou Blocks 1 and 2 and put an end to any attempts to question the legality of BSGR's rights." (Id. ¶¶ 111, 115, 119-120.)

### Related Proceedings

In January 2013, the United States Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation commenced a criminal investigation of possible violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq., and anti-money laundering statutes relating to "the laundering into and through the United States of potential bribe payments to Guinean officials for the purpose of obtaining Rio Tinto's rights to Simandou." (Id. ¶¶ 16, 121.) A parallel investigation was started at about the same time by the Guinean Government. (Id. ¶ 121.) The Complaint alleges that, soon after the commencement of the U.S. Attorney's investigation, BSGR, Steinmetz and Vale sent Defendant Cilins, an employee of BSGR and Steinmetz, to the United Stated to "conceal and/or destroy evidence [located in the United States] of the enterprise's illegal activity related to Simandou." (Id. ¶ 16.) This plan allegedly backfired when, in April 2013, U.S. federal authorities arrested Cilins in Florida and charged him with "obstruction of a grand jury investigation, destruction of evidence, and witness tampering." (Id.) In March 2014, Cilins entered a guilty plea to "obstruction." (Id.)

The criminal investigation commenced in the Southern District of New York is ongoing. (Id.) On April 9, 2014, the Guinean Government announced that Steinmetz and BSGR had obtained the mining rights to Blocks 1 and 2 of Simandou through bribery and corruption and, as

10

a result, the Government of Guinea revoked the rights of BSGR and Vale to Blocks 1 and 2.

(Id.)

## III.    Legal Standard

Courts employ a four-part analysis to determine whether to dismiss on the basis of a

forum selection clause. Phillips v. Audio Active Ltd., 494 F.3d 378, 383–84 (2d Cir. 2007). The

Court must determine: (1) whether the clause was "reasonably communicated" to the party

resisting enforcement, (2) whether the clause is mandatory or permissive, and (3) whether the

claims and parties involved in the suit are subject to the clause. Id. at 383. "If the forum clause

was communicated to the resisting party, has mandatory force and covers the claims and parties

involved in the dispute, it is presumptively enforceable," and the Court must then determine (4)

"whether the resisting party has rebutted the presumption of enforceability by showing that

enforcement of the forum selection clause would be unreasonable or unjust, or that the clause is

otherwise invalid for reasons such as fraud or overreaching." Id. at 383–84 (internal quotation

marks and citations omitted).

Under English law, "[w]here the parties have used unambiguous language, the court must

apply it." Rainy Sky SA v Kookmin Bank, [2011] UKSC 50, [23] (quoting Society of Lloyd's v.

Robinson, [1999] WLR 756, 763).

Courts utilize a "three-step process" to determine whether claims should be dismissed on

forum non conveniens grounds. Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153

(2d Cir. 2005). "At step one, a court determines the degree of deference properly accorded the

plaintiff's choice of forum." Id. "At step two, it considers whether the alternative forum

proposed by the defendants is adequate to adjudicate the parties' dispute." Id. "Finally, at step

three, a court balances the private and public interests implicated in the choice of forum." Id.

11

"[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

## IV.   Analysis

### A.   Clause 20

Rio Tinto and Vale dispute the second and third prongs of the above-mentioned four-part forum selection analysis, i.e., whether Clause 20 is mandatory, and, if so, whether it encompasses Rio Tinto's claims against Vale.[6]  The Court concludes that, under English law, Clause 20's use of the words "non-exclusive jurisdiction" means that jurisdiction in England is permissive, not mandatory, and that the claims presented here do not "arise out of or in connection with" the Confidentiality Agreement.

### (i)      The forum selection clause is permissive, not mandatory

Interestingly, Clause 20 was drafted by two of the most sophisticated law firms in the world, Cleary Gottlieb and Linklaters. In this litigation, Vale puts forth two separate (but unpersuasive) explanations of the phrase "non-exclusive jurisdiction," which is used twice in Clause 20. First, Vale's expert, Lord Collins, opines that the use of the phrase "non-exclusive jurisdiction" in Clause 20(b) was the result of "careless drafting" and "error" and really means "exclusive jurisdiction." (Collins Decl. ¶¶ 62, 68.) When asked at oral argument about whether there had been a mistake, Vale's counsel said "no." (See 12/1/14 Tr. at 7:19–22 ("THE COURT: I thought your expert actually said it was a mistake the way it was written. MR. LIMAN: No, your Honor. I think both of the experts say that this could have been expressed better."); see also

---

[6] Rio Tinto does not appear to dispute the first and fourth prongs of the analysis, i.e., whether Clause 20 was "reasonably communicated" to it, and whether, if the first three prongs are met, it could successfully rebut the presumption of enforceability.

Defs.' Reply at 2 n.2 ("Rio Tinto asserts that Vale is relying on a theory of 'mistake' in this drafting . . . This is not true.").) Second, in its reply brief, Vale offers a different interpretation than that given by its expert, and (for the first time) contends that the phrase "non-exclusive jurisdiction," as used in Clauses 20(b), does in fact mean "non-exclusive jurisdiction," with the limitation that English jurisdiction is non-exclusive only as to Brazil. (Defs.' Reply at 2.)

Rio Tinto and its expert, Lord Hoffman, argue (persuasively) that the phrase "non-exclusive jurisdiction" should be given its time-honored meaning in both Clauses 20(b) and 20(c), i.e., that the parties "submi[t] to the jurisdiction of the courts in question (in England and Brazil) without prejudice to the right to bring proceedings in any other court willing to take jurisdiction," such as the Southern District of New York. (Hoffmann Decl. ¶ 7.)

### "Non-exclusive jurisdiction" means permissive jurisdiction

The Court concludes that Clause 20 is permissive and does not require dismissal of Rio Tinto's litigation against Vale in New York. For one thing, under English law, "[l]oyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation . . . Words ought therefore to be interpreted in the way in which a reasonable commercial person would construe them." Rainy Sky SA v Kookmin Bank, [2011] UKSC 50, [25] (quoting Society of Lloyd's v. Robinson, [1999] WLR 756, 763). Vale's own English law expert, Lord Collins, states that "[t]he starting point" for interpreting a contractual provision under English law "is the natural and ordinary meaning of the words of the contract, and in the vast majority of cases that is the ending point also." (Collins Decl. ¶ 21.)

"Where the parties have used unambiguous language, the court must apply it." Rainy Sky SA, [2011] UKSC 50, [23].[7]

The term "non-exclusive jurisdiction" is unambiguous and means permissive rather than mandatory jurisdiction. See Deutsche Bank AG v. Highland Crusader Offshore Partners LP, [2009] EWCA (Civ) 725, [107] ("An exclusive jurisdiction clause creates a contractual right not to be sued elsewhere . . . In the case of a non-exclusive clause, either party is prima facie entitled to bring proceedings in a court of competent jurisdiction."); Virgin Atlantic Airways Limited v. K.I. Holdings Co. Ltd, Mitsubishi Corporation International (Europe) plc, [2014] EWHC 1671 (Comm), [16] (where the agreement stated that "the parties hereby submit to the non-exclusive jurisdiction of the English courts," the court found a "non-exclusive jurisdiction clause."). Lord Collins concludes that "a non-exclusive jurisdiction clause gives or confirms an option for proceedings to be brought in the nominated court." (Collins Decl. ¶ 37.) "[T]he ordinary meaning of an express reference to the non-exclusive character of jurisdiction would normally be determinative" and "the use of the expression 'non-exclusive' would normally be a conclusive pointer against the exclusivity of the clause." (Id. ¶¶ 59, 62.) And, Lord Hoffman concludes that "non-exclusive jurisdiction" is "a well known technical term which denotes submission to the jurisdiction of the courts in question without prejudice to the right to bring proceedings in any other court willing to take jurisdiction." (Hoffmann Decl. ¶ 7.) The Court finds that "the forum selection clause in [Clause 20] permits claims like those in this case to be brought outside

---

[7] "Where the literal, in the sense of ordinary or primary construction, would lead to an absurd result and the words used are capable of being interpreted so as to avoid this result, the literal construction will be abandoned." See Grovewood (LE) v Lundy Properties, (1995) 69 P. & C.R. 507, 513.

14

England and Brazil, including in the United States District Court for the Southern District of New York." (Id. ¶ 30.)

Courts in this Circuit, applying English law, have consistently interpreted the term "non-exclusive jurisdiction" as a dispositive indicator that a forum selection clause is permissive rather than mandatory. See RLS Associates, LLC. v. United Bank of Kuwait PLC., No. 01 Civ. 1290, 2002 WL 122927, at *4 (S.D.N.Y. Jan. 29, 2002) (rejecting the argument that "the contractual term 'non-exclusive' actually means 'exclusive' under English law"); Telemedia Partners Worldwide Ltd. v. Hamelin Ltd., No. 95 Civ. 2452, 1996 WL 41818, at *7 (S.D.N.Y. Feb. 2, 1996) ("[T]he Agreement's forum selection clause is explicitly permissive as to jurisdiction, designating the English courts' jurisdiction as 'non-exclusive.'").[8]  Vale has not identified a case under English law that construes "non-exclusive jurisdiction" to mean anything other than permissive jurisdiction.  Given the unambiguous meaning of "non-exclusive jurisdiction," the Court "must apply" that language, and, accordingly, concludes that English jurisdiction under Clause 20 is permissive. Rainy Sky SA, [2011] UKSC 50, [23].[9]

---

[8] In a letter submitted following oral argument, Vale offered one case from the Southern District of New York and two cases from outside the Second Circuit. (See Letter from Lewis J. Liman to Hon. Richard M. Berman, dated Dec. 3, 2014.)  These cases did not involve the application of English law.

[9] Vale's opening brief virtually ignores discussion of Clause 20's "non-exclusive jurisdiction" language.  Similarly, at oral argument on December 1, 2014, Vale's counsel did not mention the term "non-exclusive jurisdiction" until prompted to do so by the Court. (See 12/1/14 Tr. at 11:1–6 ("THE COURT: The only word, which is the elephant in the room, that you haven't mentioned is the word 'nonexclusive.'  How could you make an oral argument and not deal with that unless I have asked about it?"  MR. LIMAN: Your Honor, I was prepared to address that and I will. I think the answer to that is simple respectfully.").)

15

**The word "shall" does not render Clause 20 a mandatory jurisdiction clause**

Vale's expert, Lord Collins, concedes that "in contracts it may be possible for the natural meaning of 'shall' to be displaced to mean 'may.'" (Collins Reply Decl. ¶ 36). That "shall" is not necessarily mandatory is confirmed in English (and American) case law. See Gateway Plaza Limited v John David White, Kathryn Peace, [2014] EWCA (Civ) 555, [51] ("Properly construed, the words 'shall exchange' meant 'may exchange.'"); Re Zebra Industrial Projects Limited (In Liquidation), [2004] EWHC 549 (Ch), [22] ("Although 15.2(a) appears to provide that, on a failure, the supervisor is to issue a certificate of non-compliance (the word 'shall' being used), I accept that it is at least possible that that is to be construed as merely being permissive and not as obliging the supervisor necessarily to issue a certificate of non-compliance.").[10]

The Court cannot conclude, on the basis of Clause 20(b)'s use of the word "shall," that Clause 20(b) is a mandatory forum selection clause. To do so would be to ignore the time-honored, unambiguous meaning of "non-exclusive jurisdiction" in favor of the less certain meaning of the word "shall." See Ing Bank NV v. Ros Roca, [2011] EWCA (Civ) 353, [80] (where it was "impossible . . . to ignore and rewrite, or delete, the reference to EBITDA 2006, or to turn it into a reference to a current and different EBITDA"). The preferable approach, under English law, is to interpret "shall" so as to avoid the "absurd" result of two contradictory descriptions of English jurisdiction in Clause 20. See Grovewood (LE) v Lundy Properties, (1995) 69 P. & C.R. 507, 513 ("Where the literal, in the sense of ordinary or primary construction, would lead to an absurd result and the words used [("shall")] are capable of being

---

[10] Compare, Hartford Fire Ins. Co. v. Novocargo USA Inc., 156 F. Supp. 2d 372, 375 (S.D.N.Y. 2001) ("The forum selection clause invoked by Senator is not mandatory, as the use of the word 'shall' only confers jurisdiction in the courts of Bremen, Germany without excluding jurisdiction elsewhere.").

interpreted so as to avoid this result, the literal construction will be abandoned."). The Court agrees with Lord Hoffman that "shall," in this context, should be interpreted in a permissive, "temporal" manner. (Hoffman Decl. ¶ 22.) That is, the phrase "and accordingly any proceedings arising out of or in connection with this Deed shall be brought in such [English] courts" relates to Clause 20's "concentration upon the duty of a defendant to accept litigation in England." It reflects "the parties' expression that they foresee instances where a party elects in the future (temporal) to bring claims in the courts of England to take advantage of the mandatory acceptance of English jurisdiction **if suit is filed there.**" (Id. (emphasis added).) Read this way, the first sentence of Clause 20(b) means that Rio Tinto and Vale each accept the "non-exclusive jurisdiction" of English courts over disputes arising out of the Confidentiality Agreement and, "accordingly," in the event that a party chooses to bring proceedings in England, such proceedings must remain in the English courts.

Even assuming, arguendo, that the Court were persuaded that "shall" is mandatory, it would still not construe Clause 20 as a permissive forum selection clause. That is, even if the use of allegedly contradictory descriptions of jurisdiction (i.e., in this hypothetical, "non-exclusive" versus "shall") implied that "something must have gone wrong with the language," Chartbrook Ltd v. Persimmon Homes Ltd, [2009] UKHL 38, [15], the Court would be unable to form a conclusive opinion as to **what** precisely had gone wrong. Chartbrook, [2009] UKHL 38, [22] ("[I]t must be clear what correction ought to be made in order to cure the mistake." (quoting East v Pantiles (Plant Hire) Ltd, (1981) 263 EG 61)). Which allegedly unambiguous term— "non-exclusive jurisdiction" or "shall"—should be corrected ("cured")?  Absent an application for "rectification" under English law, (see infra at 18–19 & n.12), the Court would be unable to reconcile two seemingly contradictory phrases and would have little choice but to hold that the

17

forum selection clause is "void for uncertainty." See Sulamerica Cia Nacional de Seguros SA v

Enesa Engenharia SA, [2012] EWCA (Civ) 638, [36] ("[T]he content of even such a limited

obligation is so uncertain as to render it impossible of enforcement . . . ."); Sonatrach Petroleum

Corp (BVI) v Ferrell International Ltd, [2002] 1 All E.R. (Comm) 627, [30] ("[I]t is essential that

the forum selection mechanism is defined with sufficient certainty to enable the court to enforce

it."); Lobb Partnership Ltd v Aintree Racecourse Co Ltd, [2000] C.L.C. 431, 433 ("[I]f the

clause were wholly or partly ambiguous, to that extent this court would decline to enforce it.

That is what happened in relation to the remarkable clause before the court in E J R Lovelock

Ltd v. Exportles, [1968] 1 Lloyd's Rep. 163 where one part of the clause provided for any

dispute to be referred to arbitration in London and another part of the clause provided for any

other dispute to be referred to arbitration in Moscow."); Chitty on Contracts, 31st ed. (2012), at

paragraph 2-146 ("[W]here an arbitration clause provided for arbitration of 'any dispute' in

London and for 'any other dispute' in Moscow, the court disregarded the clause and determined

the dispute itself." (citing E J R Lovelock, [1968] 1 Lloyd's Rep. 163)).[11]

### Use of the phrase "non-exclusive jurisdiction" is not a mistake

Under English law, there are two mechanisms by which a court may correct a linguistic

error or mistake in a contract. One method is a petition for rectification.[12] The second method is

---

[11] The Court need not invoke the "void for uncertainty" doctrine here because it is persuaded that "non-exclusive jurisdiction" is unambiguous and that "shall" has a permissive meaning.

[12] Rectification is "a form of relief which involves correcting a written instrument which, by a mistake in verbal expression, does not accurately reflect the parties' true agreement." Marley v Rawlings, [2014] UKSC 2, [27]. (quoting Agip SpA v Navigazione v Alta Italia (The Nai Genova and The Nai Superba), [1984] 1 Lloyd's Rep 353, 359). The purpose of rectification is to give the contract "a different meaning from that which it appears to have on its face." Marley v Rawlings, [2014] UKSC 2, [40]. Vale does not assert a claim for rectification, which would require proof of, among other things, the parties' "common continuing intention," and an "outward expression of accord." (Collins Decl. ¶ 32.)

referred to as "correction of mistakes by construction," which seems to be what Vale's expert (but not its counsel) is relying upon. Marley v Rawlings, [2014] UKSC 2, [38].

"Correction of mistakes by construction" is a "controversial" doctrine which was advanced by Lord Hoffman in Investors Compensation Scheme Ltd v West Bromwich Building Society, [1998] 1 W.L.R. 896. Under this doctrine, the parties may request the Court to conclude that "the literal meaning of the words would be absurd and [to determine] it is clear what is meant." (Collins Decl. ¶ 33.) [13] It "require[s] a strong case to persuade the court that something must have gone wrong with the language," (id. ¶ 86 (citing Chartbrook Ltd v. Persimmon Homes Ltd, [2009] UKHL 38, [15])), and is, accordingly, limited to situations, not present here, in which a literal interpretation would "attribute to the parties an intention which they plainly could not have had." (Id. ¶ 31 (quoting Investors Compensation Scheme Ltd v. West Bromwich Building Society, [1998] 1 W.L.R. 896, 913)).

Under the doctrine of "correction of mistakes by construction," two conditions must be satisfied: "first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake." Chartbrook, [2009] UKHL 38, [22] (quoting East v Pantiles (Plant Hire) Ltd, (1981) 263 EG 61). Neither condition is satisfied here.

Vale's counsel, Cleary Gottlieb, does not agree that a mistake has been made. (Defs.' Reply at 2 n.2 ("Rio Tinto asserts that Vale is relying on a theory of 'mistake' in this drafting . . . **This is not true.**" (emphasis added)).) Vale's expert, Lord Collins, offers two unpersuasive

---

[13] In Marley v Rawlings, [2014] UKSC 2, [37], [39], the U.K. Supreme Court described the doctrine of correction of mistakes by construction as "controversial," and cited a 2010 law review article which stated that "Lord Hoffmann's approach to interpretation . . . is inconsistent with previously established principles."

"linguistic" arguments supporting his view that a mistake was made.[14]  First, he contends that the

term "shall" in Clause 20(b) is mandatory and should prevail over the Clause's description of

English jurisdiction as "non-exclusive." (Collins Decl. ¶ 22.)  However, as noted above, the

word "shall" is not necessarily mandatory, and the Court cannot (consistent with English law)

conclude that "shall" overrides the unambiguous meaning of "non-exclusive jurisdiction." (See

supra at 15–18.)

    Second, Lord Collins contends that use of the phrase "[n]otwithstanding the provisions of

sub-Clause (b) of this Clause 20" in the first sentence of Clause 20(c) would be "wholly

redundant if sub-clause 20(b) is a non-exclusive jurisdiction clause." (Collins Decl. ¶ 65.)  But

this argument does not persuade because it is quite plausible that the phrase "[n]otwithstanding

the provisions of sub-Clause (b) of this Clause 20" refers primarily to the **second** sentence of

Clause 20(b), in which the parties agree to waive any objection to proceeding in an English court

---

[14] Lord Collins also offers three "commercial common sense" considerations that he claims
support a finding of mistake. First, he states that "it makes no commercial sense for the parties
to have agreed that every court in the world which would take jurisdiction might exercise it over
the parties." (Collins Decl. ¶ 69.). This argument is a "general condemnation of non-exclusive
jurisdiction clauses, which happen to be extremely common." (Hoffman Decl. ¶26.) And, since
personal jurisdiction is always a requirement, the number of potential forums is limited. Second,
Lord Collins states that because the Confidentiality Agreement is governed by English law, "it
makes commercial sense for disputes to be centred in England." (Collins Decl. ¶ 70.) Lord
Collins does not provide any authority for the proposition that the choice of (English) law is
dispositive in determining whether a forum selection clause is mandatory or permissive. There
are numerous cases (in this Circuit) holding that a forum selection clause is permissive
notwithstanding a valid English choice of law provision. See, e.g., Blanco v. Banco Indus. de
Venezuela, S.A., 997 F.2d 974, 979 (2d Cir. 1993); Telemedia, 1996 WL 41818, at *7. Third,
Lord Collins states that "if sub-clause 20(b) is construed as non-exclusive it has achieved very
little . . . because without sub-clause 20(b) the English court would have jurisdiction in any
event" based upon the combination of Clauses 20(a) and 22(a) of the Confidentiality Deed.
(Collins Decl. ¶ 70.)  But there is another commercially reasonable justification for Clause
20(b), i.e., "to exclude so far as possible any argument that England was not a forum
conveniens." (Hoffman Decl. ¶ 14.)

on the ground that the proceedings were brought in an inconvenient forum. (Conf. Deed Cl. 20(b).) While Clause 20(b) prohibits a party from objecting to English jurisdiction on grounds of forum non conveniens, Clause 20(c) "allows him to do so if he considers that Brazil is the appropriate forum." (Hoffman Decl. ¶ 18.)

In sum, it seems clear to this Court that if the purpose of Clause 20(c) were to provide for jurisdiction in Brazil as an exception to the "exclusive" jurisdiction of English courts, the parties would have delineated the circumstances of that exception with great detail as, for example, by stating that English jurisdiction is "exclusive" except for certain enumerated categories of disputes which may (or must) be litigated in Brazil. As Lord Hoffman points out, it "would be remarkable if (c) was intended to create an exceptional right to sue in Brazil in such indistinct terms." (Id. ¶ 18).

## Vale's Reply Brief

Vale's reply brief interpretation of "non-exclusive"—i.e., to mean "non-exclusive as to Brazil but exclusive as to every other jurisdiction"—conflicts with the plain, unambiguous meaning of "non-exclusive jurisdiction." (See supra at 13–15.) See Anders & Kern UK Ltd v. CGU Insurance Plc, [2007] EWCA (Civ) 1481 [19] ("you cannot imply a term which contradicts an expressed term, because the parties cannot have intended that"). It also conflicts with Vale's principal brief, dated September 3, 2014, in which Vale relies upon the argument that "shall" is mandatory. (Defs.' Mem. at 4.) If, as Vale contends in its principal brief, "shall" means "must," Vale's reply brief interpretation of the word "non-exclusive" to mean "exclusive" (except for Brazil) would render meaningless the first sentence of Clause 20(b), which states: "Each of the parties agrees that the courts of England are to have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that accordingly any

21

proceedings arising out of or in connection with this Deed shall be brought in such courts."
(Conf. Deed cl. 20(b).) Vale's eleventh hour interpretation of "non-exclusive jurisdiction"
creates two irreconcilable directives within the first sentence of Clause 20(b), namely (1) that
claims that may arise out of the Confidentiality Agreement may be brought either in England or
Brazil; but (2) that such claims must be brought in England. The Court finds there is no basis to
attribute this contradictory (and counter-intuitive) meaning to Clause 20.

**(ii)    Plaintiff's claims do not "arise out of or in connection with" the**
**Confidentiality Agreement**

Even assuming, arguendo, that the forum selection clause were mandatory (which it is
not), the Court would likely find that Rio Tinto's RICO and fraud claims against Vale do not
"arise out of or in connection with" the Confidentiality Agreement. (Conf. Deed Cl. 20(b).)

While English courts have on occasion concluded that statutory and tort claims fall
within a contract's forum selection clause, such a result appears to be limited to situations, not
present here, in which a party's statutory or tort claim depends upon "the validity or
enforceability of the contract." Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd., [2007]
UKHL 40, [13]; see also, Skype Techs. SA v. Joltid Ltd., [2009] EWHC (Ch) 2783, [18]) ("if . . .
the License Agreement remains in force . . . then Joltid's claims against Skype Technologies in
the US proceedings will fail.").

Rio Tinto's RICO and fraud claims against Vale do not "arise out of" the
Confidentiality Deed because these causes of action do not depend upon the validity or
enforceability of the Confidentiality Deed. Rather, the duties and obligations imposed upon Rio
Tinto and Vale under the Confidentiality Deed are subsidiary (or irrelevant) to Rio Tinto's
causes of action. The gravamen of Rio Tinto's claims against Vale is an alleged conspiracy

22

unlawfully to deprive Rio Tinto of its rights to the Simandou Concession. To prevail in its RICO

claims, Rio Tinto will need to prove, among other things, (1) that Vale and the other Defendants

formed an "enterprise," i.e., "an ongoing organization, formal or informal" in which "the various

associates function as a continuing unit," United States v. Turkette, 452 U.S. 576, 583 (1981);

(2) that, in furtherance of the enterprise, Defendants engaged in a "pattern of racketeering

activity," including a "scheme to defraud," Anctil v. Ally Financial, Inc., 998 F. Supp. 2d 127,

141 (S.D.N.Y. 2014); and (3) the existence of "a meaningful connection between [Defendants']

racketeering acts and the affairs of the enterprise." Rosenson v. Mordowitz, No. 11 Civ.

6145(JPO), 2012 WL 3631308, at *5 (S.D.N.Y. Aug. 23, 2012.). None of these elements relate

in a meaningful way to the terms, validity, or enforceability of the Confidentiality Deed. While

Vale's alleged use of Rio Tinto's confidential information may have breached the terms of the

Confidentiality Deed, such overlap is incidental to the pursuit of Rio Tinto's fraud and RICO

claims. And, the Court need not determine the contractual issue to resolve the fraud and RICO

claims.

The recent decision of the U.K. Court of Appeal in Ryanair Ltd v. Esso Italiana Srl,

[2013] EWCA (Civ) 1450, which involved the question of whether a forum selection clause in a

contract for the sale of jet fuel encompassed an airline's claim against its fuel supplier for

participating in a cartel in breach of a European Union anti-competition statute, is applicable

here. In Ryanair, the Court of Appeal held that the forum selection clause did not encompass the

statutory claim, stating, in relevant part:

23

> [R]ational businessmen would be surprised to be told that a non-exclusive jurisdiction clause bound or entitled the parties to that sale to litigate in a contractually agreed forum an entirely non-contractual claim for breach of statutory duty pursuant to article 101, the essence of which depended on proof of unlawful arrangements between the seller and third parties with whom the buyer had no relationship whatsoever. . .
>
> I see nothing in the Fiona Trust doctrine of a presumption in favour of one-stop adjudication to justify a conclusion that the parties to this supply contract should reasonably be regarded as intending that a purely tortious claim which lies against a cartel of Italian suppliers of fuel oil at Italian airports for breach of EU and/or Italian law should fall within the jurisdiction provisions of an English law contract . . . .

Ryanair, [2013] EWCA (Civ) 1450 [46], [49]

Here, Rio Tinto's RICO claims depend upon proof of unlawful arrangements among Vale

and third parties with whom Rio Tinto had no relationship whatsoever. They include claims

brought against a group of alleged co-conspirators for breach of U.S. anti-racketeering laws and,

as such, do not "arise out of" the Confidentiality Deed.

Moreover, because none of the five Defendants (apart from Vale) is subject to the forum

selection clause, if the Court were to interpret the clause to encompass the fraud and RICO

claims against Vale, it would create a very undesirable result, i.e., Rio Tinto's claims against

Vale could be brought in England, while claims based upon substantially the same set of facts

could continue simultaneously to be litigated in this district against the other Defendants. Such

an outcome might result in duplicative discovery and litigation and the prospect of inconsistent

judgments.[15]

---

[15] This would also be contrary to the English law presumption that parties to contractual forum selection clauses intend for "one-stop adjudication of their . . . disputes." Ryanair, [2013] EWCA (Civ) 1450, [48].

24

## B. The Southern District of New York is a convenient forum

### Rio Tinto's choice of forum is entitled to deference

With respect to the level of deference given to Rio Tinto's choice of forum, the guiding

principle is as follows: the more that a plaintiff, even a foreign plaintiff such as Rio Tinto,

chooses to sue in a United States court for "legitimate reasons, the more deference must be given

to that choice." Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006) (quoting Iragorri v.

United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001) (en banc)). The Court concludes that Rio

Tinto has brought suit in New York for legitimate reasons.

For one thing, the Southern District of New York appears to be the forum where it is

possible for Rio Tinto to obtain jurisdiction over all of the Defendants.[16]  It is less likely that Rio

Tinto would be able to obtain jurisdiction in England over two Defendants, namely Defendant

Touré, who is a U.S. resident currently residing in Florida, and Defendant Cilins, who is

currently incarcerated in federal prison in Pennsylvania.  Neither has consented to jurisdiction in

England.

Rio Tinto also offers other legitimate reasons for filing suit in New York, including: (1)

Vale's alleged conduct in furtherance of the RICO conspiracy (including relevant meetings

between Vale and Rio Tinto) occurred in New York, and (2) the pendency of a federal criminal

---

[16] Rio Tinto and Vale are multinational corporations headquartered in England and Brazil, respectively; BSGR is a privately-held corporation with its head office in Guernsey, Channel Islands (Compl. ¶ 21); Benjamin Steinmetz is an Israeli citizen who maintains a business address in New York (id. ¶ 20); Defendant Thiam is a U.S. citizen and a resident of New York City (id. ¶ 24); Defendant Cilins is a citizen of France who is currently incarcerated in federal prison in Pennsylvania (id. ¶ 22; Pl. Opp'n. at 17 n.7); and Defendant Touré is a citizen of Guinea who resides in Florida. (Id. ¶ 23.)

investigation in this district relating to BSGR's obtaining Rio Tinto's mining rights to Blocks 1 and 2 of Simandou. (Pl. Opp'n. at 15.) [17]

Accordingly, the Court finds that Rio Tinto's choice of forum is entitled to "considerable" deference. Bigio, 448 F.3d at 179; see Iragorri, 274 F.3d at 73 ("legitimate reasons" include "the ability of a [plaintiff] to obtain jurisdiction over the defendant.")

## England is not an adequate alternative forum [18]

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003). The Court finds that England is not, in this instance, an adequate alternative forum to New York because, as noted, Defendants Cilins and Touré, who reside in the United States, may not be amenable to service of process by English courts.

Defendants' argument that "the court need not seek consent of non-appearing parties to dismiss on the grounds of forum non conveniens" is unpersuasive. (Defs.' Mem. at 18.) The Second Circuit has held that, in order to grant a motion to dismiss for forum non conveniens, "a court must satisfy itself that the litigation may be conducted elsewhere against all defendants." PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 73 (2d Cir. 1998); see

---

[17] Defendants' argument that Rio Tinto's choice of this district was motivated by the possibility of obtaining treble damages under RICO, (Defs.' Mem. at 16), is speculative. Defendants' reliance on this Court's decision in In re Herald, Primeo, & Thema Sec. Litig., is completely misplaced. See In re Herald, Primeo, & Thema Sec. Litig., No. 09-civ-289, 2011 WL 5928952, at *12 (S.D.N.Y. Nov. 29, 2011). The Court's finding in that case was based upon the plaintiffs' statements regarding their motivations for filing suit in New York, which included seeking "to take advantage of the [U.S.] class action device," to "avoid costly fee shifting," and "to pursue claims under RICO." Id.

[18] The word "adequate" is used herein as a term of art only.

26

also, National Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C., No. 03 Civ.

0200(GEL), 2003 WL 21180421, at *4 (S.D.N.Y. May 20, 2003).

Accordingly, the Court finds that England is not an adequate alternative forum.

### The private and public interest factors do not "strongly favor" dismissal

Defendants have failed to satisfy their burden "to demonstrate that both the private and

public interest factors strongly favor dismissal." Cortec Corp. v. Erste Bank Ber

Oesterreichischen Sparkassen AG, 535 F. Supp. 2d 403, 407 (S.D.N.Y. 2008) (internal quotation

marks omitted). In reviewing the forum non conveniens factors, the Court should dismiss an

action "if the chosen forum is shown to be genuinely inconvenient and the selected forum

significantly preferable." Iragorri, 274 F.3d at 74–75. That is not the case here.

#### Private Factors

The private factors primarily concern the convenience of the litigants and include "the

relative ease of access to sources of proof; availability of compulsory process for attendance of

unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of

premises, if view would be appropriate to the action; and all other practical problems that make

trial of a case easy, expeditious and inexpensive." Iragorri, 274 F.3d at 73–74 (quoting Gulf Oil

Corp. v. Gilbert, 330 U.S. 501, 508 (1947). Defendants raise the first two of these factors in

their motion, i.e., "the relative ease of access to sources of proof" and "the availability of

compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing,

witnesses." (Defs.' Mem. at 19–22.)

#### Ease of access to sources of proof

As Defendants acknowledge in their principal brief, documents and witnesses relevant to

this dispute are located in no less than ten separate countries, and are not concentrated in

27

England. (Defs.' Mem. at 19–20.) See Constellation Energy Commodities Group Inc. v. Transfield ER Cape Ltd., 801 F. Supp. 2d 211, 220 (S.D.N.Y. 2011) (private interest factors "at most, weakly favor" transfer where "[a]lthough the sources of proof . . . may be located abroad, they are not concentrated in either of the two adequate alternative forums."). By contrast, Rio Tinto has identified at least three potential trial witnesses who are located in the United States: Defendant Thiam, who resides in New York, and Defendants Cilins and Touré, who are located in Pennsylvania and Florida, respectively.

The majority of the documents and witnesses located in England appear to be within the possession or control of Rio Tinto. (See Defs.' Mem. at 19–20.). Thus, any inconvenience imposed by transporting such witnesses and documents to this district will not be borne by Defendants. See Manela v. Garantia Banking Ltd., 940 F. Supp. 584, 592 n.12 (S.D.N.Y. 1996) ("[D]efendants cannot rely on any inconvenience to plaintiff and witnesses whose expenses plaintiff will bear.").[19]

**Obtaining attendance of witnesses**

Defendants argue that "witnesses outside of the parties' control, such as former Rio Tinto employees who reside in England, could be compelled to testify by an English court," but not by this Court. In fact, there appears to be one such former Rio Tinto employee, Tom Albanese, whom the parties have identified in their Federal Rule of Civil Procedure 26(A)(1) disclosures. (See Defs.' Steinmetz and BSG Resources Ltd's Amended Initial Disclosures, dated Sept. 3, 2014 (Ex. F to Defs.' Mem.), at 11 (describing Tom Albanese as the "former Chief Executive Officer of Rio Tinto").) Mr. Albanese is located in London. The inconvenience associated with

---

[19] Defendants' argument that producing documents from Switzerland "could involve potential criminal penalties," (Defs.' Mem. at 22), is unpersuasive, as they fail to explain how such penalties would be obviated by locating this action in England.

the absence of compulsory process for a single witness is mitigated by the ability to conduct videotaped depositions of that witness. DiRienzo v. Phillip Services Corp., 294 F.3d 21, 30 (2d Cir. 2002) ("While demeanor evidence is important when trying a fraud case before a jury. . . videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess the credibility of these Canadian witnesses.")

Defendants' concern over the relative costs of traveling from Africa or Europe to New York versus London, (Defs.' Mem. at 21), only minimally, **if at all**, favors an English forum. Vale is a multinational corporation with over $48 billion in revenue in 2013, and Defendant Steinmetz appears to have a net worth of approximately $2 billion. (See http://www.forbes. com/profile/beny-steinmetz/.) Thus, any travel cost differential would appear to have a de minimis impact. See Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc., 725 F. Supp. 2d 438, 443 (S.D.N.Y. 2010) ("[T]he difficulties of discovery are mitigated by instant communication and rapid transport, especially for sophisticated corporate entities such as the parties in this case, thus diminishing any supposed inconvenience that litigating the case in this [S.D.N.Y.] forum might impose.").

### Public Interest Factors

The U.S. Supreme Court has outlined four factors to be weighed: "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the "local interest in having localized controversies decided at home;" and (4) avoiding difficult problems in conflict of laws and the application of foreign law." DiRienzo, 294 F.3d at 31 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. at 508–09). Defendants appear to focus their attention upon the second factor, i.e., that "the

29

Amended Complaint alleges no material connection between [the alleged] scheme and New York." (Defs.' Mem. at 23.)  The Court disagrees.

The Complaint alleges at least three significant connections between Rio Tinto's claims and this district, including (1) the New York City meetings between Vale and Rio Tinto, which allegedly occurred on November 19 and 24, 2008, December 21-22, 2008, January 15-16 and 28-29, 2009 and February 4, 2009 (Compl. ¶¶ 59, 63, 96); (2) the pendency of a federal criminal investigation in this district relating to the subject matter of this action, namely BSGR's obtaining of Rio Tinto's mining rights to Blocks 1 and 2 of Simandou, (id. ¶ 121); and (3) Defendant Thiam's use of alleged bribe payments to purchase a home in Dutchess County, New York.  (Id. ¶ 115.) [20]

In sum, the Court finds that the private and public interest factors do not "strongly favor" England, and that Defendants have not shown that a trial in the United States "would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience." DiRienzo, 294 F.3d at 30.

Accordingly, the Court concludes that Plaintiff's choice of forum should not be disturbed.

## V.    Conclusion and Order

For the reasons stated herein, Defendants' joint motion to dismiss [#84] is denied.  The parties are directed to appear on January 6, 2015 at 10:30 for a status/scheduling conference.

Dated:  New York, New York
        December 17, 2014

_RMB_

**RICHARD M. BERMAN, U.S.D.J**

---

[20] The Court also notes that actions and events relevant to the Complaint occurred in Guinea and France.