Ec9rrioc                                                                        1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   RIO TINTO PLC,

 4                    Plaintiff,

 5            v.                        14 Civ. 3042 (RMB)

 6   VALE, S.A., et al.,
                                        Conference
 7            Defendants.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      December 9, 2014
                                        9:55 a.m.
10   Before:

11          HON. ANDREW J. PECK

12                                      Magistrate Judge

13

14          APPEARANCES

15
     QUINN EMANUEL URQUHART & SULLIVAN LLP
16        Attorneys for Plaintiff
     BY:  ERIC C. LYTTLE
17        KEITH FORST
          MICHAEL J. LYLE
18        MEGHAN A. MCCAFFREY

19   CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Vale, S.A.
20   BY:  LEWIS J. LIMAN
          JONATHAN I. BLACKMAN
21
     MISHCON DE REYA LLP
22        Attorneys for Defendant BSG Resources Limited
     BY:  VINCENT FILARDO
23
     SULLIVAN & WORCESTER LLP
24        Attorneys for Defendant Mahmoud Thiam
     BY:  PAUL E. SUMMIT
25        KAREN E. ABRAVANEL
```

```
 1              (Case called)

 2              THE COURT:  The first thing we need to deal with is

 3    the letter system.  We required your suggestion previously that

 4    letters come in a week before the conference to give the other

 5    side a chance to deal with it and not feel sandbagged.  The

 6    result is roughly, I don't know, what would you say this is,

 7    two, three inches worth of papers with everybody writing and

 8    responding and replying.  It just doesn't work.

 9              We are either going to do a we will keep the week but

10    it is a week for response and that's it or whatever you all

11    suggest.  But you have to do an agenda better than dumping all

12    of this paper on me.  Does anyone have suggestions?

13              MR. LYTTLE:  Your Honor, a week response would be

14    fine.  If we can talk with Mr. Liman and defendants, we can set

15    a deadline for responses three, four days before the hearing.

16              THE COURT:  The only other problem I see with the week

17    is at least one of the letters that came in, the first letter

18    was we are still working on some of this, which means I wind up

19    reading things that, if you are all doing your job right, are

20    then moot by the time you get here.  I would be more inclined

21    to have the papers come in closer.  Mr. Liman, what is your

22    thought?

23              MR. LIMAN:  Your Honor, I think that is our thought.

24    Having conferences every four or five weeks, the parties

25    usually start pretty soon after the conference meeting and
```

1    conferring.  But it takes time to go back to our clients.  Our

2    suggestion would be several days before a conference and then

3    the opposition.  Then we would think a time for a short reply

4    after that.

5         THE COURT:  Particularly because you are all

6    submitting different letters as to different parties, etc., I

7    recognize it is a big case and there are a lot of parties and

8    all the defendants do not have the same issues.  But this is

9    not briefing on a motion.  There is supposed to be enough for

10   me to understand what the issues are that you are going to be

11   addressing with the Court.

12        Let's do three business days before and opposition --

13   let's go four and two, four business days before and then two

14   business days.

15        MR. LYTTLE:  Your Honor, if we are filing three, four

16   days before the conference, the parties are pretty clear what

17   the issues are.  Actually, at our meet-and-confers, everybody

18   states their position pretty well.  I don't know that we need

19   additional briefing in opposition.  I think your initial

20   submission three, four days prior to the conference could

21   adequately address both your position and your response to

22   plaintiff and other parties.

23        THE COURT:  What I might do to you all is say we will

24   do it three or four days before but we are going to do it then

25   as a joint letter and none of this I don't want to be in the

```
 1   joint letter or it's too hard to coordinate or whatever.  Be

 2   careful what you wish for.  It may be more on the defense side.

 3              But it means there will be a paragraph, as there is in

 4   at least the first Quinn Emanuel letter, document number 118

 5   here:  Here is plaintiff's position, here is defendants', and

 6   we are done.  That works a lot better for me.  So that is going

 7   to be what we are doing.  Three days before.  It is plaintiff's

 8   responsibility to coordinate it all, but it is defendants'

 9   responsibility to cooperate on that and not say no, I don't

10   want a joint letter.

11              MR. LYTTLE:  Your Honor, if I could make one quick

12   suggestion?  I'm in favor of the joint letter process.

13   Unfortunately, the defendants don't want to exchange

14   substantive positions beforehand.  We are kind of ships passing

15   in the night a little bit.

16              THE COURT:  It is going to be the same thing if I took

17   your suggestion, which is everybody putting their positions in

18   on the same day without knowing what the others' position is.

19   Look, I'm not spending more time on this.  Exchange your

20   position a day before the letter is due, and the letter comes

21   in three days before the conference, period.

22              MR. LYTTLE:  Thank you, your Honor.

23              THE COURT:  Now let's go on to substance.  I'm more or

24   less going to take it in the order the letters came in and

25   we'll see how that works.
```

1          Scope of discovery.  I'm working off of the juris-

2     dictional issue.  My question on this is how many times do I

3     have to rule on the same issue?  I said last time it was

4     limited to Mr. Cilins in terms of being an agent of BSGR.  I'm

5     not advancing it to all these others, particularly where, at

6     least as of now, you seem to be confusing merits discovery with

7     jurisdictional.  Any further discussion needed on that?

8          MR. LYTTLE:  Your Honor, my colleague Keith Forst will

9     address that.  He has been the one directly negotiating with

10    Mr. Steinmetz.

11         THE COURT:  I think you are the one with the pro hac

12    motion that I approved this morning.  You will be getting it

13    back on the ECF system today.

14         MR. FORST:  Excellent.  I appreciate that, your Honor.

15         At the last hearing, on November 3rd, your Honor, we

16    specifically identified defendant Cilins as somebody that we

17    need to pursue discovery on.  As to the other agents, I want to

18    be clear, because there is a little mix-up I think in the

19    letters.  We are not asking them to collect documents with

20    respect to any other individuals.

21         Our sole request, which is tied to our allegations in

22    the complaint with respect to Michael Noy, Pentner Holdings,

23    was simply that on information and belief based on some

24    publicly available materials as well as what is in our

25    complaint, these other people were actively involved in Mr.

1    Cilins's activities here in the United States, and specifically

2    coming to Florida and having phonecalls in New York.

3          All we ask with respect to those agents, your Honor,

4    is simply that they run search terms against their custodians,

5    just to hit some documents with those names.  Again, based on

6    their contention that they aren't agents, they weren't

7    involved, we expect very little documents to come back, if any.

8    Yet to date, with respect to those agents, they have flatly

9    refused to even run those terms.  That is all we are asking

10   with respect to those agents.

11         THE COURT:  If you find a document that refers to a

12   Michael Noy, what does that prove?

13         MR. FORST:  What we think it will prove, based on the

14   allegations, and it is set forth in our complaint, is that when

15   Cilins was here in Florida, again on information and belief in

16   our allegations, interacting with Mamadie Toure to destroy

17   evidence, there was in fact a phonecall that took place between

18   Michael Noy, Avraham Lev Ran, and Mamadie Toure regarding

19   activities to cover up the scheme and the bribery that went

20   down in the United States.

21         We are not trying to get at the larger interaction,

22   what Michael Noy did in Guinea per se or anything else or what

23   happened in New York, but simply focusing on the things that

24   took place in the United States which are relevant to the

25   jurisdictional inquiry under 4(k)(2), under the long-arm

1   statute, etc.  That's what we are trying to target.

2          We understand that this is iterative.  We are not

3   saying you have to review all the documents.  If they run a

4   term, your Honor, and it comes back with 100,000, we are happy

5   to revisit it.  We are simply asking can you run the term and

6   see what the hits are.

7          THE COURT:  The request is still denied.

8          Time period for jurisdictional discovery.

9          MR. FORST:  Right.

10          THE COURT:  Are you really arguing that there is a

11   general jurisdiction argument, or is it New York long-arm

12   specific jurisdiction?

13          MR. FORST:  Right now, you're right, in our complaint

14   we don't plead general jurisdiction applies, we plead specific

15   jurisdiction.  Also, 4(k)(2) talks about when you don't have

16   general jurisdiction in any particular state, you can look at

17   the broader United States.  These labels of general

18   jurisdiction versus specific, again, all we have asked is when

19   we are looking at the United States, New York, Manhattan, to

20   run those terms over --

21          THE COURT:  That's the question.  What is the time

22   period?

23          MR. FORST:  What we have proposed is not defendants

24   come in and ask for a single day, we will run it on the day of

25   the complaint.  We have said I don't know how that works

1    because documents can be created and emails can be sent.  We

2    have looked at the case law, and we sought to suggest can you

3    pool a dataset of just six months leading up to the complaint,

4    we will take a look at the hits, if there are too many, again

5    we will revisit it.

6              We went back and forth.  They have come back now with

7    a two-week window.  We think simply that that two-week window

8    overlooks potentially real estate documents, emails,

9    communications that could be coming up a little bit before that

10   that relate to the time period of the complaint.

11             We are kind of having this discussion in a vacuum,

12   your Honor.  I think defendants haven't collected those

13   documents yet and run any search terms, so we don't know really

14   what the universe of documents are.  We are at that stage where

15   we have simply requested if you pool those custodians, and

16   again there is an issue on that, and run those search terms --

17   "United States," "Manhattan," "New York" -- or particular terms

18   that defendants' counsel suggested last time we were here on

19   November 3rd -- again, we are open.  We want this to be

20   iterative.  We are suggesting search terms.  But without hits,

21   we just don't know.

22             THE COURT:  I understand that.  But without a theory

23   of what the general jurisdiction is, you are going blindly.

24   Frankly, it does not sound like there is really a general

25   jurisdiction argument being advanced as opposed to what we

1    usually call a fishing expedition.

2         MR. FORST:  There is one, your Honor, in the

3    complaint, where it is specific to defendant Steinmetz.  We

4    identified two properties that he has, one in New York at the

5    time of the complaint and a second one that we think he owned

6    or maintained or operated earlier specifically during the

7    conduct alleged in the complaint.

8         THE COURT:  But for general jurisdiction, it matters

9    at the time of the complaint, not at the time of the prior

10   conduct.

11        MR. FORST:  I credit that.  All we are saying is we

12   need a window of time to gather documents that will reflect the

13   conduct around that.

14        THE COURT:  We are talking at cross-purposes.  If you

15   say the only thing you really know as to general jurisdiction

16   is that Mr. Steinmetz owns one property now and owned another

17   one previously, I might give you discovery as to whether indeed

18   he owned something in New York around the time of the

19   complaint.  That would seem to be it for general jurisdiction.

20   Why don't we stick with that.

21        As to Steinmetz, who is responding?

22        MR. FILARDO:  Your Honor, we have no problem searching

23   around the time of the complaint for any property that is

24   alleged to have been or is owned by Steinmetz.

25        THE COURT:  Frankly, do you need a search?

```
1              MR. FILARDO:  Your Honor, we don't really need search

2    terms.  We need to search for those documents.  To our

3    knowledge, he doesn't own it.  He may have owned something or

4    owns an entity that may have owned it ten years ago.  I really

5    don't know.  We are happy to test it.

6              THE COURT:  How about an affidavit from Mr. Steinmetz

7    that within six months around the filing of the complaint in

8    both directions he did not own any property in New York?

9              MR. FILARDO:  Or an affidavit from a trust or

10   something that may have owned that he was the beneficiary of,

11   someone with personal knowledge.

12             THE COURT:  Someone with personal knowledge.  That way

13   we don't have to search.

14             MR. FILARDO:  We had also suggested to plaintiff that

15   they actually go to the building were they claim the apartment

16   was.  We did.  They were prepared to give an affidavit or

17   testimony, but only on subpoena.  They wouldn't just hand it

18   over to us.  They alleged the Sherry-Netherlands was the place

19   that Mr. Steinmetz owned the apartment.  We went, we spoke.

20             THE COURT:  Rather than involving co-op boards or

21   whatever, just an affidavit from Mr. Steinmetz or somebody with

22   knowledge on his behalf that he doesn't own the apartment.

23             MR. FILARDO:  We can do that, your Honor.

24             THE COURT:  That takes care of that.

25             As to the specific jurisdiction, let's deal with those
```

E68z14ec

```
 1    time frames.
 2              MR. FORST:  Your Honor, just one point of
 3    clarification.  Is it an affidavit that he doesn't own any
 4    apartments in and around the six-month period?
 5              THE COURT:  Yes, any real estate, any property of any
 6    sort in New York.  It is just in New York, not all U.S., right?
 7              MR. FILARDO:  That's correct, your Honor.
 8              MR. FORST:  Our allegation in our complaint is New
 9    York.
10              THE COURT:  Then that's what we are dealing with.
11              Specific jurisdiction.  There seems to be disputes as
12    to the time period.
13              MR. FORST:  Thanks, your Honor.  Again, these are
14    allegations that connect to Mr. Cilins that we previously spoke
15    about.  We have laid out, I don't want to revisit them, the
16    allegations in March and April 2012, a similar time period in
17    2013, where again we believe he traveled to the United States.
18    In fact, we have an investigation going on in the SDNY in which
19    he has been indicted and jailed for those activities.
20              THE COURT:  What specifically are you looking for?
21              MR. FORST:  We are looking for documents reflecting
22    that.  The defendants have contested he is not our agent, he
23    wasn't here at the behest of defendant Steinmetz or BSGR in the
24    United States doing these things.  We think there are public
25    documents that suggest otherwise.
```

 1          We have simply asked that they run terms over the

 2    period of 2012 and 2013 to identify email communications, other

 3    documents reflecting those activities that took place in the

 4    United States.  We are focused on that because we recognize it

 5    is only jurisdictional discovery.

 6          The defendants have come back and said that window is

 7    too broad.  They point to 10,000 documents coming back or

 8    really 9,000, 9,228, that hit on Fred Cilins over that two-year

 9    window of time.  We respectfully submit that that is not an

10    unreasonable number of documents to look at for such a central

11    player in the scheme of the bribery.

12          THE COURT:  Do you want to pay for half of it?

13          MR. FORST:  I guess we haven't heard what the amount

14    would be, but I think we would entertain that, assuming it's a

15    reasonable amount.

16          MR. FILARDO:  Your Honor, we are arguing that the

17    scope of this inquiry should be for the period that is alleged

18    in the complaint.  It is a period of April 27, 2012, to May 8,

19    2012, and March 1, 2013, to April 14, 2013.

20          THE COURT:  In order to make sure nothing is being

21    missed, I would give some appropriate period of time before and

22    after each of those periods to catch the email sent a month

23    after he was back saying pay my airfare or whatever.

24          MR. FILARDO:  Perhaps a month, your Honor, before and

25    after.  But plaintiff is seeking a two-year period, a full two-

1   year period, without any basis for it.  There are no

2   allegations in the complaint that go that far.

3         THE COURT:  There are 9,000 and change documents hit

4   by it, is that correct?

5         MR. FORST:  That's correct, over the two-year period

6   of time.

7         MR. FILARDO:  Let me take a look.

8         THE COURT:  Have you looked at any of them to see how

9   you would winnow them down?

10        MR. FILARDO:  No, your Honor.  All the hit reports

11  come from our IT consultants.  They run the searches on the

12  date ranges and the custodians.

13        THE COURT:  It is a deduped number?

14        MR. FILARDO:  Yes.

15        THE COURT:  If one search term hits the document and

16  then another search term hits the document, is that counted

17  twice or once?

18        MR. FILARDO:  What we did, I believe we ran "Cilins."

19  So that's broad.  Even if you tried to break it down broader

20  still, that is the broadest amount of hits we brought back.

21        MR. FORST:  The defendants have told us they can't run

22  unique hit reports.  In fact, we suspect that number to be

23  perhaps larger than it would turn out to be for your documents

24  to review.

25        THE COURT:  If the hit report is on "Cilins."

E6Gnrize                                                                    14

```
 1              MR. FORST:  "Fred" and/or "Cilins."  It is running
 2    those two terms.
 3              THE COURT:  You are really running "Fred"?
 4              MR. FILARDO:  That's what they want, your Honor.
 5              MR. FORST:  It's his name, yes.
 6              THE COURT:  I know it is his name.  How many Freds are
 7    there in this case?  All right, I will give you March 1 to July
 8    1, 2012, and for the 2013 period February 1 through June 1.
 9              MR. FORST:  Thank you, your Honor.
10              THE COURT:  That takes care of that.
11              Custodians, have you worked that out?
12              MR. FORST:  Your Honor, I think we are closer to that.
13    Some of these letters have provided clarity on that.  Respect
14    to specific jurisdiction, we went back and forth.  We proposed
15    a set.  They came back and let us know that there were certain
16    operators only in Guinea.  Some people were never employees.
17    Of course, if they don't have PSD files pulled for certain
18    custodians, we can't insist.  So we are OK there.
19              General jurisdiction.  There are a few high-level
20    executives that we have asked to take a look at, and they are
21    identified.
22              THE COURT:  The general jurisdiction we just limited
23    to the real estate.
24              MR. FORST:  That's right.
25              THE COURT:  So that's moot.
```

E629r14c

```
 1              MR. FORST:  Forgive me.  Then as to custodians, I
 2    think we are agreed.
 3              MR. FILARDO:  Your Honor, if I could for the record to
 4    make it clear, I think on specific jurisdiction we have 12
 5    custodians, I will read them into the record, that we have
 6    agreed upon:  Asher Avidan, Benjamin Steinmetz, Dag Cramer,
 7    David Clark, David Trafford, Francis "Frank" Eagar, Gerard
 8    "Gerry" Wilson, Iwan Williams, Mark Struik, Peter Driver,
 9    Sandra Merloni-Horemans, and Yossie Tchelet.
10              THE COURT:  The next section is search terms and
11    metrics.  What is the dispute on that, if any?
12              MR. FORST:  I think the dispute on that is simply
13    again we are still working through some of the other search
14    terms that we have initially proposed.  For example, we have a
15    set of terms talking about, tied to allegations in our
16    complaint, attestation and declaration, where we have proposed
17    that these terms be run in front of a window.  Again, this
18    boils down to conduct that Cilins participated in here in the
19    United States that documents were signed and otherwise
20    destroyed.
21              THE COURT:  What is it you want me to rule on?  What
22    is the dispute?
23              MR. FORST:  I think we identified our period of time,
24    3,000-plus documents to review on those terms.  We would submit
25    that is a reasonable number that tie directly to the
```

1    allegations in our complaint that they can review.  Again, they

2    are attempting to limit the windows directly to the weeks that

3    are specific in our allegations.  We are asking simply for a

4    little bit broader than that.

5            THE COURT:  I have already ruled on the time period.

6            MR. FORST:  That's correct.  But that was specific to

7    the terms "Fred" and "Cilins," as I understood it.

8            THE COURT:  It is for everything.  That is your

9    specific allegation period with enough buffer zone before and

10   after, right?

11           MR. FORST:  Specific to that term.  For example, we

12   have allegations in our complaint that tie to payments made in

13   2010 and cash payments in Wells Fargo.  We have terms that we

14   have asked they run for 2010 and 2013.  The windows vary

15   depending on the particular term that we are asking for.

16           THE COURT:  Tell me exactly what you want now.

17           MR. FORST:  In our letter, your Honor, we are looking

18   at page 4, we are asking for what we talked about, the first

19   full paragraph, which starts "Accordingly."  We have search

20   terms.  The first part we have dealt with Cilins' conduct.  The

21   second part, we have term names of wire transfers tied to the

22   amended complaint.  We are asking for the years 2010.

23           THE COURT:  When were the wire transfers?

24           MR. FORST:  In 2010.  Are you asking specifically?

25           THE COURT:  The entire year or were there months?

1              MR. FORST:  They were specific weeks within that year,

2      as far as we know.  Again, some of this is on information and

3      belief of what we know.

4              THE COURT:  There is a limit to what I can give you

5      here, particularly when we are talking jurisdiction, not the

6      merits.  If you get jurisdiction over these folks, a lot of

7      this may have to be redone.  Obviously, the Steinmetz-BSGR

8      folks should consider that.  You cut it narrowly here, which

9      you have every right to do.  I'm not going to look favorably

10     upon an argument later that says we did this already and now

11     they want it for more.  That's going to be tough.

12             MR. FORST:  Understood, your Honor.  At page 41 of our

13     amended complaint, paragraph 40 in particular, we lay out the

14     various cash payments and wire transfers.

15             THE COURT:  You have to hand things up.  The file is

16     now too big that I am not searching in the file for anything

17     previous.

18             MR. FORST:  The bottom line, I would submit, taking

19     your guidance on Cilins, we have months in here, July-August

20     2010, that we can go back and work out with defendants on a

21     window that is narrower in 2010 but covers and gives us some

22     cushion on the back end.

23             THE COURT:  And 2013?

24             MR. FORST:  Same.

25             THE COURT:  What are the months there?

E2e9r14c

1        MR. FORST:  July is the month.  I need to confirm

2   that.  Your Honor, I don't have my finger on it right here.  In

3   my mind is sticking out April or July 2013.  In any event,

4   taking your guidance, which I fully understand --

5        THE COURT:  It would appear to be March 1 through

6   April 14, 2013, at least based on the defendant's paragraph.

7        MR. FORST:  On Cilins?

8        THE COURT:  Is that the wire transfers?

9        MR. FORST:  Yes.

10        THE COURT:  OK.

11        MR. FILARDO:  Your Honor, the allegations of the wire

12   transfers have to be with Cilins's conduct, not my client's

13   conduct.

14        THE COURT:  Then presumably you don't have any

15   documents.

16        MR. FILARDO:  Your Honor, yes, this goes to the

17   merits.  Whenever we are speaking about the conduct of an

18   alleged agent or co-conspirator, it is going to the merits.  It

19   is not the relationship between my clients, defendants BSGR and

20   Mr. Steinmetz, and Mr. Cilins to try to determine what, if any,

21   relationship exists between them.

22        THE COURT:  That was their proposal.

23        MR. FILARDO:  Yes.  That's why we proposed just

24   "Fred" -- they proposed "Fred," we proposed Cilins.  We will

25   run "Fred" and "Cilins" over the period that your Honor has

E6anri4c

 1    already ruled upon.  We think that should be broad enough to

 2    capture anything that they have alleged with respect to

 3    jurisdiction, specific jurisdiction, as a result of an alleged

 4    agency relationship.

 5         THE COURT:  It doesn't seem to overlap, at least in

 6    2013.  As to 2010, run Mr. Cilins' name for July and August

 7    2010.  Add that to your "Cilins" search, and that should cover

 8    it.

 9         MR. FORST:  Your Honor, while we are there, I want to

10    be contrary.  We have asked for their particular bank accounts,

11    Wells Fargo and other things, that tie to these wire transfers

12    and cash payments over those periods.  We would ask that those

13    terms be included for those limited windows.  Again, we are

14    willing to narrow it down.

15         THE COURT:  Either Cilins did it, in which case you

16    may pick it up through that -- specifically, what words are you

17    asking to be searched for July and August 2010?

18         MR. FORST:  What we are asking for for July and August

19    2010 is "Wells Fargo."  Just one term we are asking for to that

20    specific allegation in our complaint.

21         THE COURT:  All right, run "Wells Fargo."  But if it

22    is not related to what Mr. Cilins was doing and it is something

23    else about Wells Fargo, they do not have to produce it.

24         MR. FORST:  The only other two terms, your Honor, are

25    "attestation" and "declaration."

```
 1              THE COURT:  No, that's too broad.  Enough.  What else?
 2    Are we up to page 6, 7, what?  This is the first letter.  We
 3    have a lot of work to do, and I have other cases.
 4              MR. FORST:  I understand.
 5              THE COURT:  You all are getting at risk that if you
 6    can't work together better, you may go the special master route
 7    and be paying by the hour for it.
 8              MR. FILARDO:  Your Honor, I think we are done.  I
 9    think you covered it all by just getting to the heart of it.
10              THE COURT:  That's what I need to make sure of.
11              MR. FORST:  Your Honor, with respect to Steinmetz and
12    BSGR, I think that covers it.
13              THE COURT:  Is this letter now done?
14              MR. FORST:  Which letter, I'm sorry?
15              THE COURT:  Your letter of November 17th.
16              MR. FORST:  Yes, that letter is done.
17              THE COURT:  Good.  Next.  On the Rio Tinto
18    investigation issue and the privilege waiver, do we have a
19    privilege log at this point or no?
20              MR. LIMAN:  No, your Honor, we have not.
21              MR. LYTTLE:  We do not.
22              THE COURT:  We are going to take this in baby steps.
23    Produce the nonprivileged documents on this issue.  Produce the
24    factual information from any privileged document that is
25    relevant to the investigation and diligence issue, and log
```

```
 1    everything else.  At that point I will determine further
 2    whether there indeed has been a waiver or not.  It may not even
 3    be necessary to go there.
 4            MR. LYTTLE:  Your Honor, thank you for that.  There
 5    are two time frames at issue here.  If I could briefly address
 6    that, because I think that would help us know what is relevant.
 7            THE COURT:  You are raising a question, which is how
 8    much privileged material is there, allegedly privileged,
 9    outside of the time period.  If the answer is not very much,
10    since in theory there could be a memo the day before the
11    lawsuit, that's all lovely.
12            I can see lines, I can see two colors.  I can't see a
13    single word on there.
14            MR. LYTTLE:  May I approach, your Honor?  And I have a
15    copy for counsel.
16            THE COURT:  Yes.  What works for a jury only works
17    with a judge if it is large enough type for those of us whose
18    eyes aren't what they used to be.
19            MR. LYTTLE:  I was impressed we had a poster board,
20    your Honor, and I wasn't trying to set up a PowerPoint.  May I
21    approach?
22            THE COURT:  Yes.  If you want to give me the poster
23    board so you don't feel like it was a waste, that's fine.  But
24    holding it down there doesn't help me.
25            MR. LYTTLE:  Your Honor, as I indicated, we are
```

1    seeking a little guidance on the privilege issue and what time

2    periods are relevant.  The time period that you look for is you

3    look back four years from when the plaintiffs filed, which

4    takes us back to April 2010.  What they challenged is our due

5    diligence for equitable tolling and fraudulent concealment.

6         Your Honor, the only period for which equitable

7    tolling and fraudulent concealment is relevant, if they are

8    correct that they run from December 2008, and we dispute that,

9    but let's assume arguendo for now that they are correct, the

10   only period for which our due diligence, our investigation, is

11   relevant, i.e., the only period for which we should be looking

12   for privileged documents, is December 2008 to April 2010.

13        Anything within April 2010, the reports, any

14   investigative reports done by counsel, those are work product.

15   Any legal advice deriving from those are work product.  Under

16   Hickman and Upjohn, even the facts in those, your Honor, they

17   have to show substantial hardship and undue burden.

18        Your Honor, they are free to do their own

19   investigation.  This is not a David-and-Goliath situation.  We

20   know they have their own investigators.  We are happy to log

21   the privileged communications between December '08 and April

22   2010, but up to April 2010, up to the filing, they are not

23   relevant.

24        THE COURT:  The general rule, putting aside any and

25   all arguments, is that privileged documents up to the date of

1    the lawsuit are logged, then people fight about their relevance

2    or not.  If you are telling me, in this world of emails and all

3    of that, that that itself is an extraordinary burden, I might

4    consider --

5         They are arguing there is no relevance to it, you are

6    arguing it is not.  I can deal with the issue and the waiver

7    and all of that, or we can take this and say if there are only

8    five documents to log, let's log them and we will worry about

9    it then.  They might decide they don't want them or whatever.

10   What is the volume we are talking about?

11        MR. LYTTLE:  I think it depends, your Honor, on what

12   custodians we are able to agree on.  We have identified to them

13   the two fact witnesses, who are not lawyers, who oversaw the

14   investigation.  We have agreed to pull their files.

15        THE COURT:  Hold on.  Was it your firm or someone else

16   who has been advising them as outside counsel?

17        MR. LYTTLE:  Our firm became involved in the fall of

18   2010, your Honor.  It was actually our prior firm, but the same

19   lawyers.

20        THE COURT:  How much email communication?  Whether we

21   search it out of your files or your clients', I don't really

22   care.  Not your internal documents.  How much went to the

23   client?

24        MR. LYTTLE:  Quite a bit, your Honor.  There's a lot

25   of factual scenarios in this time period.

```
 1              THE COURT:  10,000 emails?  What are we talking about

 2     when you say a lot?

 3              MR. LYTTLE:  I don't want to represent to the Court.

 4     I don't have an exact number.

 5              THE COURT:  As of now you are going to log them all.

 6              MR. LYTTLE:  Your Honor, one more thing.  On a

 7     custodian basis, they are going to after this hearing ask for

 8     our general counsel.  That is a huge burden, to pull our entire

 9     general counsel's files to identify a few documents that may be

10     relevant to this investigation.

11              THE COURT:  Then come up with search terms.

12              MR. LYTTLE:  OK.  There were other lawyers involved

13     that we are happy to pull their files and run the terms through

14     those.  We just ask, your Honor, that we don't have to pull our

15     general counsel's files and run search terms through even

16     those, because the burden could be extraordinary.

17              THE COURT:  Lawyers telling me the burden could be

18     extraordinary means they haven't done enough investigation to

19     figure out either how to do it or what the volume and cost is

20     not to.  A minute ago your colleague said 10,000 emails here

21     and 5,000 emails there is not a burden.  I cannot imagine that

22     that is going to be the quantity even over a four-year period

23     or a six-year period in general counsel.

24              The answer is you're going to work it out with the

25     defendants.  I hope I do not have to hear this logging issue
```

E C 8 R r 1 4 C

 1    again.  Are you saying the general counsel essentially wasn't

 2    involved and that somebody else in counsel's os was involved?

 3            MR. LYTTLE:  The general counsel had some role, but

 4    there were other lawyers that played a more day-to-day role.

 5            THE COURT:  Would they have likely everything the GC

 6    has?

 7            MR. LYTTLE:  Yes, absolutely.

 8            THE COURT:  Then without waiver, are defendants

 9    willing to accept the search from the other lawyers and go back

10    to the general counsel if it starts appearing he's gotten

11    emails?

12            MR. LIMAN:  Your Honor, we are operating in a complete

13    vacuum.  What we just heard about the role of their firm, that

14    is the first time we heard it.  What we would be prepared to do

15    is meet and confer with them with respect to burden with

16    respect to different witnesses.  We think search terms should

17    be run through the general counsel.  That doesn't interfere

18    with the general counsel's operations.

19            THE COURT:  It depends on what the search term is.

20            MR. LIMAN:  That's right.

21            THE COURT:  If the general counsel had a lot of issues

22    unrelated to this case, using a search term -- read all of you

23    the Facciola and Redgrave law review article in the Federal

24    Courts Law Review on bucketing privileged material and meet and

25    confer.  As of now the Court's ruling is there isn't a waiver

1    of the privilege.  I'm not saying there isn't or is, I just am

2    not ruling.  Let me be clear on that.  But you are going to

3    produce the factual information certainly between 2008 and

4    2010, you will do whatever you think appropriate after 2010,

5    and you will log all the allegedly privileged documents.

6            MR. LIMAN:  Your Honor, with respect to the factual

7    information after 2010, I didn't hear any objection with

8    respect to relevance with respect to that.

9            THE COURT:  Factual and not in lawyer's material.

10   They are saying it's work product if it was in the lawyer's

11   files.

12           MR. LIMAN:  Your Honor, if I could hand up the

13   complaint.

14           THE COURT:  No.  I've read enough letters on this.  As

15   of now, since we are still slogging very slowly through it, the

16   factual information other than what you are calling privileged

17   throughout the entire time period, with primary emphasis in

18   terms of priority on 2008 to April of 2010, but I'm not cutting

19   it off there.  You will come up with a protocol for search

20   terms and how to log the privileged material as a result of

21   that, and then you will see if you can further resolve this.

22   If not, it will be back on my doorstep.

23           MR. LYTTLE:  Your Honor, one last point.  After April

24   2010 what we have here is a relevance argument.  The Erie case

25   makes clear that it is not relevant.

```
 1              THE COURT:  Counsel, this issue is done.

 2              I think the last thing in the 11/17 letter from Mr.

 3    Liman, docket number 119, are plaintiffs' interrogatory

 4    responses.  The names of the people with knowledge, to wit, the

 5    investigative information people, has that been resolved or

 6    not?

 7              MR. LYTTLE:  Your Honor, we have identified the

 8    percipient facts.  The investigating firms and the internal

 9    employees oversaw the investigation.  We have not identified

10    any law firms and we have not identified --

11              THE COURT:  Now you can identify the law firms.

12              MR. LYTTLE:  All right.

13              THE COURT:  Who else didn't you identify?

14              MR. LYTTLE:  We did not identify the internal lawyer.

15              THE COURT:  You will identify external and internal

16    lawyers by the end of this week.

17              MR. LYTTLE:  Yes, your Honor.

18              MR. LIMAN:  Your Honor, would that include the

19    investigative firms working with the outside lawyers?  I think

20    that is called for.

21              THE COURT:  Meaning if they hired Kroll or somebody

22    like that?

23              MR. LIMAN:  Correct.

24              MR. LYTTLE:  We are happy to.  I think Mr. Liman has

25    one investigative firm in his mind that was hired after the
```

1   complaint was filed.  There is no way that that should be

2   identified.

3          THE COURT:  Precomplaint, if there was an

4   investigative firm of any sort, whether working with the

5   lawyers or not, I don't find that to be privileged.  That takes

6   care of that letter.

7          Docket 120 was the response on privilege, so that

8   takes care of that.

9          121 somehow is the same letter as 120.  Let's hear it

10  for the ECF system.

11         122 is further briefing on this, as is 128.

12         123 is more on search terms and the like that I have

13  already dealt with.

14         133 I believe we have taken care of.

15         The next letter seems to be docket number 131, Quinn

16  Emanuel's letter of December 3.  Yes, there can be a revisiting

17  of search terms after the initial production.  Everything is

18  being done without prejudice.

19         The next issue you seem to have worked out, the dates

20  for the privilege log with respect to the Guinean privilege.

21  Those dates are acceptable.

22         Discovery with respect to Vale.  In general, it should

23  be going forward.

24         Now we go to custodians.  Have you worked out your

25  custodian issue?

```
 1              MR. LYTTLE:  Your Honor, if I may ask one question?
 2     Discovery should be going forward, we agree.  They have taken
 3     the position nothing more until their review of this hypo-
 4     thetical production.  We have reviewed it.  It's about 840
 5     documents.  It is responsive to about 20 percent of our
 6     document requests.
 7              THE COURT:  I think I just said yes, there will be
 8     discovery.  You are arguing with something I just ruled in your
 9     favor on, which is never a good thing.
10              MR. LYTTLE:  Thank you.
11              THE COURT:  Custodian list.
12              MR. LYTTLE:  Your Honor, we have provided Vale with a
13     proposed custodian list.  They have come back with some
14     comments.  We have met and conferred.  We have made counter-
15     proposals.  We are waiting to hear more.
16              THE COURT:  So it is not ripe for resolution, you are
17     all working it out?
18              MR. LYTTLE:  With one exception, for the BHP request,
19     I think we are still negotiating our broader custodian list.
20              THE COURT:  You said with one exception.  I'm sorry.
21              MR. LYTTLE:  Yes, the BHP request.  At the last
22     hearing your Honor ordered production on the BHP takeover
23     attempt from, quote, a very limited set of custodians for a
24     limited time frame.  We came back, talked to our client, and
25     said who are the five core people that handled all aspects of
```

30

 1     the BHP takeover, looked at what was being offered, looked at

 2     the different options.  We proposed that to them.  They have

 3     flat-out rejected that.  In document 134 they say we proposed

 4     low-level custodians and this is not who they need discovery

 5     from.

 6             Your Honor, we have said fine, we will give you five

 7     more.  They came back with 16-plus custodians, more than triple

 8     what we had offered to provide, 16-plus custodians for the BHP

 9     requests alone.  Instead of limiting the time frame, they

10     actually expanded it beyond our actual document request.

11             Your Honor, we are happy to produce in response to the

12     BHP request.  We think five custodians on that issue is more

13     than enough.  If they don't like the five we have, we have

14     offered them an alternative five, but it is one of those two.

15     You don't get 16-plus custodians on what your Honor recognized

16     was a tangential issue to this case.

17             THE COURT:  Mr. Liman.

18             MR. LIMAN:  Your Honor, if you are becoming confused,

19     it is because this issue pertains to our discovery with respect

20     to Rio Tinto, not Rio Tinto's discovery with respect to us.

21             THE COURT:  Yes.

22             MR. LIMAN:  With respect to Rio Tinto's discovery of

23     us, I think we are working on the custodians and still meeting

24     and conferring.

25             On the BHP custodians and the BHP document production,

 1    basically nothing has happened from the plaintiffs since the

 2    last conference we had before your Honor.  They proposed to us

 3    five custodians.  We listed, and it is listed on page 20 of the

 4    letter, the 11 custodians who from our investigation are the

 5    custodians who could have relevant documents with respect to

 6    this request.  We have listed their titles.  We have listed the

 7    basis for our belief that those are the relevant custodians.

 8    Those are the custodians we would be satisfied with.

 9         MR. LYTTLE:  Your Honor, 16-plus custodians is not a

10    very limited set.

11         MR. LIMAN:  I listed 11.

12         THE COURT:  If you have offered five that they don't

13    want, then we are down to 11.  What's wrong with their 11 or at

14    least some of their 11?

15         MR. LYTTLE:  Your Honor, for their entire production

16    they have offered seven custodians.  They want 11 on a limited

17    issue.  That is beyond the pale.  They've got the five people

18    that they want.  We have agreed, we have offered them a

19    different set of five.  Our point is it is five on this issue,

20    it is not 11, it is not 16.

21         THE COURT:  We will start with 5.  You can convince

22    Mr. Liman that that he should take some of the ones on your

23    list because they are likely to have the most documents;

24    otherwise, I will let defendant choose.  However, if you don't

25    take any of theirs, Mr. Liman, on the assumption that they know

 1   who was most involved, and you pick five as a starter from your

 2   list and then are shocked that they don't have the material, I

 3   may not give you any more.  If you take the five that Rio Tinto

 4   has proposed and it turns out to be insufficient, then you are

 5   likely to get all 11 of yours or at least a large number.

 6          So you are on both sides going to have to make some

 7   decisions.  All discovery that is limited at this point is open

 8   for further expansion in the event that while following

 9   proportionality, rules it turns out that the information is

10   insufficient.

11          Do you want some of their five and some of yours for a

12   total of five, Mr. Liman?  I'll let you and your team talk to

13   plaintiff's counsel and figure out who you want.

14          MR. LIMAN:  Your Honor, we have proposed search terms

15   to get the BHP documents.  We would ask that those search terms

16   be run and that the production start.  We didn't hear any

17   response back to the search terms other than that we had

18   discussed predictive coding weeks and weeks ago.  Plaintiffs

19   said they would get us a proposal.  They never did until

20   recently.  There is no reason to delay with respect to these.

21          MR. LYTTLE:  Your Honor, on the phonecall that we had,

22   we discussed BHP custodians and search terms.  Mr. Liman

23   actually left the call.  He hasn't participated in a call

24   since.  But if he was there, he would know that his colleague

25   Mr. Karlan said let's not discuss these search terms today,

33

```
 1    let's do it at another date, which we agreed to at their

 2    request.

 3              We are happy to discuss search terms, but we think

 4    this is a great case for predictive coding.  We have provided

 5    them a predictive coding proposal.  But I think your Honor

 6    knows better than the I do, because I haven't done predictive

 7    coding yet.

 8              THE COURT:  Are you talking predictive coding just on

 9    the BHP Billiton?

10              MR. LYTTLE:  No, your Honor.  We need to poll the

11    entire dataset, create our seed set from that, which would

12    include custodians, would include marking the seed set, and run

13    running the coding that way.  You can do predictive coding, and

14    I have talked to our experts, subject matter by subject matter,

15    but it is not ideal.  It is also not ideal to run search terms

16    prior to predictive coding.  I know there is some debate in the

17    community about that.

18              THE COURT:  No, there is really no debate.

19              MR. LYTTLE:  What is your view, your Honor, if I could

20    ask?

21              THE COURT:  Search terms to find your seed set are

22    great.  Search terms to limit the universe that you are running

23    your population against means that everything you didn't get

24    with the search terms will never be found by the predictive

25    coding engine, which usually skews the results.
```

E2HcriaC

 1          There is usually a cost factor.  I am hearing that

 2     vendors are changing their pricing models, but that in the big

 3     cases like BioMed, where predictive coding was run only after a

 4     key word search, it was because the vendor would have charged

 5     more than BioMed thought it could afford to put 19½ million

 6     electronic documents through the predictive coding engine as

 7     opposed to winnowing it down with search terms to 2½ million.

 8     So, it depends.

 9          My question is this.  We are probably by early next

10     year going to actually put this case on a schedule and not keep

11     slogging along slowly, once Judge Berman decides the exclusive/

12     nonexclusive jurisdiction issue.  I know he had oral argument

13     on that, and I think an opinion should be forthcoming shortly.

14     That will either get the case out of here or set you up for the

15     next set of motions or whatever.  But at some point we are

16     going to be going much more quickly.

17          In the meantime, since you want all of this stuff from

18     then, how long is it going to take you to get your predictive

19     coding scenario with all document requests up, running, tested,

20     QC'd, etc.?

21          MR. LYTTLE:  Again, your Honor, I must be completely

22     honest.  I'm operating a little bit in the dark.  I haven't

23     done predictive coding.  I don't think Mr. Liman has, either.

24     We have talked about it.  With my vendor, I think to get the

25     full dataset pulled, to get seed sets pulled, to mark those, I

```
 1   think, honestly, you're looking at at least a month, with the
 2   holidays.
 3           THE COURT:  You are probably talking way more than
 4   that.
 5           MR. LYTTLE:  I think so.  Two months?
 6           THE COURT:  Let's do the BHP documents the old-
 7   fashioned way for now.  Finish with Mr. Liman or one of his
 8   colleagues the search term discussion quickly, and let's get
 9   that done with an aim that you will be producing it before New
10   Year's.  Negotiate fast, folks, on that.  Whether that gets
11   revisited and expanded if we go to predictive coding for
12   everything else, I'm certainly in favor of using predictive
13   coding as a general matter.
14           MR. LIMAN:  Your Honor, the last issue I think is the
15   date range.  The plaintiff proposed a date range of November 1,
16   2007, through November 25, 2008.  We proposed a date range that
17   would extend to June 30th of 2009.  Up until June 30, 2009,
18   there were discussions with respect to BHP Billiton.  June of
19   2009 is the same month that Rio Tinto broke off negotiations
20   with Vale, our issue in this case.  Rio Tinto and BHP Billiton
21   announced their plans for an iron ore joint venture in
22   Australia.  To our mind, that is the appropriate cutoff.
23           THE COURT:  Which is an extra seven months.
24           MR. LYTTLE:  Your Honor, at the last hearing you
25   limited the time frame from November 2007 to November 2008.
```

Ec8qriec

1    That is exactly the time frame they asked for in the document

2    request.  They expanded that now after your Honor ordered a

3    very limited time frame.  That correlates exactly with when the

4    BHP takeover attempt was first made and when it was off the

5    table.  The subsequent joint venture that they now want to

6    extend to is a completely different deal.  It was cooperative

7    deal.  It was not a takeover attempt.  So, the idea that you

8    can find things in takeover defenses simply doesn't apply to

9    that.

10          THE COURT:  Now we are going to limit it from November

11   '07 to the end of November '08 period.

12          MR. LIMAN:  Your Honor, I'm informed that that is not

13   correct.  What I would like to do is reserve the opportunity,

14   after we get the documents up to November of '08, to come back

15   to your Honor and make that showing.

16          THE COURT:  All right.  That doesn't mean you're going

17   to have an easy task at that point.

18          MR. LIMAN:  I have to trust.

19          THE COURT:  What else?

20          MR. LYTTLE:  Two points, if I may, on the production

21   of BHP.  There is the holidays.  If we could have until the

22   middle of January.  Secondly, if we are going to tier some

23   productions, which we are happy to do, and we have told

24   defendants we are happy to do that, then defendants need to

25   start producing the misappropriation documents which we

 1     likewise provided them custodians and search terms for.

 2              THE COURT:  You are both fighting over that, I think.

 3     Any objection to extending the BHP production until January

 4     9th?

 5              MR. LIMAN:  No, your Honor.

 6              MR. LYTTLE:  Your Honor, if we could also get a date

 7     for Mr. Steinmetz and BSGR, we would appreciate that.

 8              THE COURT:  Mr. Filardo?

 9              MR. FILARDO:  Your Honor, there are a number of

10     custodians, one or two, in South Africa, and another one in

11     Paris that we have to get on line.  That is going to take us

12     some time.  We have actually been working on that issue over

13     the past few weeks.  Given the holidays, could we have until

14     the end of January or mid January?

15              THE COURT:  You all have to start moving faster.

16              MR. FILARDO:  If we can, we will do it on a rolling

17     basis.

18              THE COURT:  January 16th.  Get it done.

19              MR. FILARDO:  Thank you, your Honor.

20              THE COURT:  Everybody should be operating on a rolling

21     basis to the extent possible.

22              You each seem to be fighting over the alleged

23     misappropriation information issue.  Vale wants more specifics.

24     You at Rio Tinto want the information.  I'm not quite sure how

25     to deal with this.

```
 1              MR. LYTTLE:  Your Honor, if I may.  After the last
 2    conference, we took your order very seriously.  The data room
 3    had over 200-plus documents in it.  We have successfully
 4    winnowed that down to nine documents.  These are the nine
 5    documents that the Vale employees repeatedly, consistently
 6    accessed throughout the negotiations.  These nine documents
 7    contain the key information that we have always alleged, which
 8    relates to the geological data, the rail and transport options,
 9    both through Guinea and through Liberia, and the port.
10              THE COURT:  I'm looking at Mr. Liman's analysis or
11    summary of the categories.  I'm looking at page 9 --
12              MR. LYTTLE:  Yes, your Honor.
13              THE COURT:  -- and 10 of your joint letter, which
14    seems like a very broad base of information.
15              MR. LYTTLE:  It does and it doesn't, your Honor.  They
16    were able to identify with this level of specificity just by
17    going through it.  Your Honor, with search terms and custodians
18    is how we are going to deal with this.  That is exactly what we
19    have provided them.
20              This is a RICO case.  This is not a misappropriation
21    case.  It is not a trade secrets case.  All of their case law
22    talks about misappropriation and trade secrets cases.  We have
23    case law from the Southern District that says, and even their
24    cases say, you get some discovery, you try to figure out
25    exactly what it is, and then you winnow that you down.  It is a
```

1    filter approach.

2            THE COURT:  If we limit it to these nine documents,

3    and I'm not saying that that alone is sufficient or isn't

4    sufficient, where are you all on appropriate key words,

5    custodians, whatever, so that this isn't going to be a million

6    documents?

7            MR. LIMAN:  Your Honor, we received a list of search

8    terms from the plaintiffs.  Those search terms are tantamount

9    to asking us to search for documents regarding Liberian ports

10   and regarding the geology of Simandou.

11           I would remind your Honor, and I sort of get the

12   feeling of Groundhog Day with respect to this issue, of the

13   dialogue when we last discussed this.  When we last discussed

14   this, the plaintiff made the argument that they are making now,

15   which said, we focused in on geological data, rail and

16   transport plans, and mining data, that's what we focused in on.

17   Your Honor responded, isn't this a mining company, so isn't

18   that like saying just give me anything about the business?  It

19   is Groundhog Day because that is where we were last time and it

20   is where we still are.

21           The problem with respect to the nine documents is that

22   the nine documents contain pieces of data and information that

23   touch on everything with respect to Simandou.  So this is not

24   just a matter of anything relevant to the claims.  This is a

25   matter of the plaintiffs asking your Honor to permit them

40

1   discovery in search of a claim.  It's the definition of a

2   fishing expedition.

3       It actually also exactly reads on point to our Swift

4   Communications case, which is precisely the issue in Swift

5   Communications, same stage as this stage here.  That was a

6   misappropriation claim, Vale 9 in isolation.  Here

7   misappropriation is one element.

8       The court there, it is 2012 WL 2342929, said that you

9   are not permitted to do discovery in search of a claim.

10      THE COURT:  A shocking statement.  All I mean is in

11  the abstract that doesn't help.

12      MR. LIMAN:  What we are asking for, your Honor, is we

13  provided a list of the types of data that we were able to

14  discern from these documents.  What we would ask is that the

15  plaintiff tell us which of these pieces of data their complaint

16  is about.  If it is not these particular pieces of data, then

17  identify what other pieces of data it is.

18      From that, we can come up with a list of search terms

19  that is something other than a Liberian port.  It shouldn't be

20  that difficult.  It should be something that they can do in the

21  next week.  And it would be without prejudice.

22      MR. LYTTLE:  Your Honor, it is important to set the

23  context here.  Vale may be a mining company, but Vale is not a

24  mining company that ever had to deal with Simandou, so we gave

25  them access to our data room.  The confidentiality agreement

1    they signed precluded their use of any information they saw for

2    any purpose whatsoever.

3         Our discovery is not targeted at getting at what

4    exactly did you take.  Our discovery is what did you do with

5    our information, how did you use it to further the conspiracy,

6    how did you use it in violation of the deed?  It is not

7    targeted at identifying you stole this exact thing.  It is not

8    a case of source code.

9         THE COURT:  I understand all that.  But assuming that

10   this is an accurate summary of some of the data in the nine

11   documents, are you saying that you really want every one of

12   these topics?

13        MR. LYTTLE:  No, your Honor.  And the search terms

14   don't touch on them.

15        THE COURT:  What are your search terms?  Do I have

16   that in one of the innumerable letters in front of me?

17        MR. LYTTLE:  No, your Honor.  We provided it to them

18   on Friday.  We are happy to pass that up, if you would like.

19        THE COURT:  My question, Mr. Liman, is, putting aside

20   all the arguments on both sides, if the search terms work or if

21   your counter to their search terms are workable, then that is

22   an easy way to go about it.  Have you looked at their search

23   terms to see what they would hit?

24        MR. LIMAN:  We have not run hit terms.  Let me give

25   you an example of their search terms.  Search term number 1 is

 1  port and, open parentheses, Simandou or Guinea or Liberia.  We

 2  are talking about a port for iron ore coming out of Simandou,

 3  which is located in Guinea and where the nearest country is

 4  Liberia and where everybody who was talking about Simandou was

 5  talking about ports in Liberia.  They list Liberia with an

 6  asterisk point.  That is another one of their search terms.

 7        THE COURT:  Aside from saying that their search terms

 8  don't work, how about the two of you and your experts sit down

 9  and try to come up with search terms that work or other

10  approaches that work.

11        MR. LIMAN:  Your Honor, we would be happy to do that.

12  I think the only way in which we are going to end up making

13  progress is if they implicitly or explicitly tell us what it is

14  that they think was misappropriated, because it can't be

15  everything.

16        THE COURT:  We are going in circles, and that really

17  is the Groundhog Day.  They are basically saying it's

18  everything, and you are saying that can't be.  There is merit

19  to both of your positions.  Whether it is predictive coding on

20  this issue or search terms or limiting it to a much smaller

21  list of custodians, whatever it is, you all are going to figure

22  out a way to make this work.  There is really no way for the

23  Court to rule in the abstract.

24        I think the statute of limitations you say ran before

25  the case was brought.  In any event, to the extent that you

1    claim they are fishing, I am not likely to allow an amendment

2    to the complaint based on information from broad discovery.

3    Whatever is covered by the complaint is covered by it.  If they

4    discover you did some allegedly other horrible thing, they are

5    out of luck.

6          Maybe I'm just doing what you all are doing, kicking

7    this down the road until Judge Berman decides whether the case

8    is here or not here, but I don't find that you all have given

9    me enough to rule on this area.  When you come back in January,

10   it may be one of these where I look at one party's search terms

11   plus custodian list and the other's and do what is a horrible

12   way to resolve this, but if that is the only choice you give

13   me, it's sort of going to be baseball arbitration.  That is to

14   say, whichever of those lists sounds more reasonable under the

15   circumstances, you may get stuck with that.  So go out and be

16   reasonable.

17         MR. LYTTLE:  Your Honor, my fear with that is now we

18   are not going to agree on search terms.  From past experience,

19   we are not going to agree on search terms until we come back to

20   see you.  Rio will have made another production, yet Vale, who

21   have had discovery requests pending for five months, two months

22   later than Rio, will not have made production.

23         THE COURT:  Don't worry about it.  We are not closing

24   discovery until you have all had a fair shake at discovery.  In

25   addition, you are the plaintiff.  You should know your

```
 1   documents and what has to be produced much better at the time

 2   you start a lawsuit.  If that means you had to go faster, so be

 3   it.

 4            Having said that, I'm here all of January.  If you

 5   want to come back on January 4 or whatever is the first day

 6   after the holiday, I'll give you an early January date or a

 7   later date.  I expect you all to work appropriately.  If you

 8   don't want to kill as much of your Christmas, aim for a

 9   slightly later January date.  But I do expect you to come back

10   having made progress.

11            What date would you all like?

12            MR. LYTTLE:  Your Honor, how does the week of the 12th

13   look for you?

14            THE COURT:  Fine.  Anything other than Monday.  What

15   is your pleasure?

16            MR. LYTTLE:  The 13th in the afternoon, your Honor, so

17   we can travel up in the morning.

18            THE COURT:  The 13th at 2 o'clock.

19            MR. LYTTLE:  Thank you, your Honor.

20            THE COURT:  Usual drill.  The transcript is the

21   Court's rulings.  You are all ordered to buy the transcript.

22            MR. LYTTLE:  Your Honor, I do have one additional

23   point, if I may.  You have suggested now a couple of times a

24   special master.  We do believe that would be productive for the

25   parties.  We certainly have not had a chance to discuss it with
```

```
 1    defendants.  We will.  I did want to raise with the Court that
 2    we intend to raise that with defendants.
 3              THE COURT:  Let me note that you get the Court's
 4    services for free.  The special master is, I don't know, 500 an
 5    hour or whatever is the current billing rate.  There are some
 6    excellent former judges out there who do special master work.
 7    If you go that route, I would assume you will be splitting the
 8    cost either 50-50 or whatever else you come up with, possibly
 9    on a loser pay basis.  But it is going to have costs.
10              I think you need to decide is it a judge making
11    rulings.  In the grand scheme of things, if not you are going
12    to listen to the special master, you are just going to wind up
13    paying for the special master to rule and write a letter, which
14    you will file objections to me and then I'll rule and you will
15    file objections to Judge Berman, and all that fun stuff, that
16    really makes no sense.
17              Then the question is, do you need an e-discovery
18    special master type who can help you with predictive coding or
19    refining search terms and all of that, or do you need somebody
20    to slog through privileged documents and decide if they are
21    privileged or not, etc.?  I'm not trying to shirk work, but
22    your conferences always seem to go an hour and a quarter to an
23    hour and a half, when my usual discovery conference in cases is
24    half an hour.
25              I am in favor of special masters, other than the cost
```

1    issue.  There are only about four cards on the sign-in sheet

2    here.  I don't know how many of you have fully signed in so

3    your name is on the transcript.  We have 15 lawyers here

4    between the two sides.  Money, obviously, is not much of an

5    issue for you.  I am in favor with those caveats.  Talk to each

6    other.

7          The other thing I will tell you is because of the

8    complexity of this, you are going to get a fair amount of

9    discovery time and not a three-month discovery period, even

10   though we have now been doing discovery for umpteen months.

11   Once Judge Berman rules on the pending motion or I rule on the

12   stay of discovery motion, and the two are probably going to

13   come out pretty closely in time, it is going to be full speed

14   ahead.

15         You are going to have to learn to trade off things.

16   You feel strongly about issue one, they feel strongly about

17   issue two, you disagree.  You will compromise on your own.  You

18   will go to a special master or, instead of dealing with you

19   once a month, it might become an every Friday morning we get

20   together.  I hope we don't have to do that.  But we are going

21   to have to move faster going forward.

22         Anything else from either side?  Hearing nothing,

23   happy holidays all but.  Don't stop working, at least not

24   before the 24th.  I will see you in January.

25         (Adjourned)