```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   RIO TINTO PLC,

 4                   Plaintiff,

 5            v.                          14 Civ. 3042 (RMB)

 6   VALE, S.A., et al.,
                                          Conference
 7                Defendants.

 8   ------------------------------x
                                          New York, N.Y.
 9                                        January 13, 2015
                                          2:00 p.m.
10   Before:
              HON. ANDREW J. PECK
11                                        Magistrate Judge

12
              APPEARANCES
13
     QUINN EMANUEL URQUHART & SULLIVAN LLP
14        Attorneys for Plaintiff
     BY:  ERIC C. LYTTLE
15        MICHAEL J. LYLE

16   CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Vale, S.A.
17   BY:  LEWIS J. LIMAN
          JONATHAN I. BLACKMAN
18        SCOTT B. REENTS
          MATTHEW KARLAN
19
     MISHCON DE REYA LLP
20        Attorneys for Defendant BSG Resources Limited
     BY:  VINCENT FILARDO
21        ELIZABETH ROTENBERG-SCHWARTZ
          KAVITHA SIVASHANKER
22
     SULLIVAN & WORCESTER LLP
23        Attorneys for Defendant Mahmoud Thiam
     BY:  PAUL E. SUMMIT
24
     MARTIN J. AUERBACH
25        Attorney for BSG Resources defendants
```

2

Flxr19C

1          (Case called)

2          THE COURT:  I have your status letter.  With respect

3    to the proposed discovery schedule, I am going to grant what

4    you have asked for, meaning fact discovery cutoff December 31

5    of this year, expert completion by March 31 of next year.

6    Judge Berman, when he sees you in a few days or a week, may cut

7    that back.  The one thing I will tell you is that by not

8    suggesting we cut it back a few months, consider that as having

9    gotten all your extra extensions built in, meaning it will take

10   somewhat of a catastrophe or exceptional circumstance, not I

11   suggested to them X and they took a week to get back to me with

12   Y and.  It's time to get moving completely.

13          As to the trigger dates for other things, expert

14   disclosures, etc., I will approve what you have done here.  Why

15   don't you folks put it into a form of order that I can sign and

16   submit it to me.  I guess, Mr. Lyle, that would be for you guys

17   as the plaintiff.

18          MR. LYLE:  Will do, your Honor.

19          THE COURT:  When we talk about certain of the briefing

20   schedules, about defendant Thiam, if I'm not mispronouncing it

21   too badly, I'm not sure why we have to wait until the end of

22   February for that.  But we will get to it in order.

23          That takes care of item I(B).

24          As to I(A), I suggest you deal with all of that when

25   you see Judge Berman, as to the briefing schedule and the

3

F1drJ19C

 1    briefs.  I suspect Judge Berman is not going to be thrilled by

 2    60 pages, but I'm going to let him make that decision.  You

 3    might decide to ask for less than that in the hope that then

 4    you will get it as opposed to being left with 25.

 5            Have you made further progress, now on Roman numeral

 6    II, on the predictive coding issue?

 7            MR. LYLE:  Your Honor, we have received a position

 8    from Vale.  There really are two issues with the coding issue.

 9    Number one is, is Vale committed to doing it?  I think this has

10    overarching impact as we discuss discovery and scope of

11    discovery throughout today.  We have asked them several times,

12    but they have not been able to affirmatively answer or say no,

13    they are not going to do it.  We would like that answer.

14            Secondly, the only real debate on the proposal that is

15    on the table is whether we are going to be doing issue coding

16    or simple binary responsive/nonresponsive when it comes to seed

17    sets and testing.

18            THE COURT:  All right.  Mr. Liman.

19            MR. LIMAN:  Your Honor, Scott Reents of my firm has

20    been integrally involved in case and discovery on this issue.

21            MR. REENTS:  Your Honor, I want to note for the

22    record, my application for admission to the Court is pending.

23            THE COURT:  For full admission or pro hac?

24            MR. REENTS:  For full admission.

25            THE COURT:  How long has it been pending?

1              MR. REENTS:  I'll be sworn in next Tuesday.

2              THE COURT:  Perfect.  Welcome board.

3              MR. REENTS:  On predictive coding, we have been

4    engaged in discussions with plaintiffs and we have resolved a

5    lot of the issues.  We have a pretty good protocol.  With

6    respect to the two questions raised by counsel, I think it is

7    premature for us to decide whether we are committed to it.  I

8    think it is sort of artificial.  We haven't decide whether we

9    are committed to it.

10             THE COURT:  When are you going to decide that?  If you

11   mean are you committed to it, you are going to try it, and if

12   it fails, you will do something else, that is one thing.  If

13   you are not going to try it at all, it seems to me that is a

14   decision that needs to be made sooner rather than later or the

15   schedule is going to wind up blown apart.  And it is not going

16   to be blown apart.

17             MR. REENTS:  It is not an all-or-nothing decision from

18   our perspective.  There are a couple of discrete issues where

19   we think predictive coding may not be an appropriate

20   methodology.

21             THE COURT:  That's fine.  Are you prepared to use it

22   for everything else?  If not, when could you make that

23   decision?

24             MR. REENTS:  I would say that it is likely we will be

25   using it for many of the issues at stake.  We haven't made a

1   firm decision on that.  I would expect we would be able to make

2   one shortly.

3            THE COURT:  How shortly is shortly?

4            MR. REENTS:  Within the next two or three weeks, I

5   would imagine.

6            THE COURT:  So, in two or three weeks you are going to

7   decide whether you are going to use it, when you are going to

8   use it, and produce the documents.  Quite frankly, and I think

9   we have a date for the document production in the proposed

10  schedule here, it is time to move.

11           MR. REENTS:  That's right, your Honor.  The dates

12  contemplated in the schedule are substantial completion by the

13  end of June for document production and rolling production is

14  after that.  We have started document review.  We anticipate

15  making rolling production.

16           THE COURT:  I may have asked this before and my memory

17  is not perfect.  Who is their vendor?

18           MR. LYTTLE:  Our vendor is Equivio, your Honor.

19           MR. REENTS:  We are using Deloitte.

20           THE COURT:  Have you had your respective vendors get

21  together?

22           MR. LYTTLE:  We have.  We have had a phonecall, your

23  Honor, with the vendors on the phone to hash out the logistics

24  and details of the protocol.

25           MR. REENTS:  For the record, our vendor was not on

6

1    that call.  I was on that call.  But we can involve the vendors

2    when we need to.

3         THE COURT:  The sooner you all make sure that the

4    people talking about this know what they are talking about,

5    with no disrespect to counsel, the more likely it is that you

6    will make a good decision and an even better implementation.

7    Do you think it useful to have an expert in the field of

8    predictive coding to be a special master/assister?  It may not

9    be somebody who will make the decisions for you subject to

10   review by me, subject to review by Judge Berman, but somebody

11   who can help you narrow whatever gaps remain.

12        MR. LYTTLE:  From the plaintiff's perspective, your

13   Honor, we do believe a special master would assist in this.  We

14   have provided some suggestions to defendants and have asked for

15   their response.  If they have any initial suggestions, would

16   they like to be on initial reachout calls where there are

17   conflicts?  We were told they want to discuss it with their

18   client, and we haven't heard back from them.

19        MR. LIMAN:  Your Honor, we have now discussed it with

20   our clients.  From Vale's perspective, we are prepared to

21   consider the option of a master.  We think it is premature at

22   this point to appoint one, but what we would like to do is

23   spend the next couple of weeks interviewing people.  If we

24   don't make progress, then I think at the next conference we

25   would be prepared to present something.

```
1            THE COURT:  Let me put it to you this way.  I am loath
2    to order special masters because I recognize it costs the
3    parties money, and I am free to you.  On the other hand, every
4    time we have one of these conferences, we are dealing with
5    innumerable issues, and instead of the more typical monthly
6    half-hour conference, it is the two-, three-hour conference.
7    You have used up your allotment of court time.  You are now in
8    overtime.  If things don't start going more smoothly, you are
9    not going to have a choice.
10           If I were to appoint a general discovery special
11   master with full special master powers, that might be different
12   than somebody who is a frequent co-speaker with me on
13   predictive coding, a technology assistant, and maybe available,
14   might be conflicted, or might not have any desire to do this,
15   or whoever else you have all come up with, merely to help on
16   the predictive coding side of things.
17           For example, what method of TAR are you contemplating,
18   are either of you contemplating:  Continuous active learning,
19   simple active learning, simple passive learning, etc., all of
20   which result in different work flows?
21           MR. LIMAN:  Your Honor, I think we have come close to
22   an agreement.  Frankly, if we are not able to in the next
23   couple of days, I think we should have a special master with
24   respect to the predictive coding.
25           THE COURT:  All right.
```

1              MR. LIMAN:  We do think, agree, that discovery in this

2      case may have been made unduly complicated.  We have with

3      respect to the request made of Vale a proposal that Mr. Reents

4      is going to put in front of you.  Mr. Blackman is here with

5      respect to the requests we have made of Rio Tinto, which have

6      not been complied with.

7              THE COURT:  I think it is time to keep your feet to

8      the fire.  By a week from Friday you are going to make a

9      decision on the Vale side as to whether you are using

10     predictive coding for anything or not and have further

11     discussions between and amongst the parties as to the method to

12     be used, etc.  Hopefully, that will result in a cost-free

13     resolution and you don't need a special master limited to the

14     TAR field.  But we have really got to move.

15             I think there was a second question plaintiff raised.

16             MR. LYTTLE:  The other issue was issue coding for seed

17     sets.  My proposal, strictly out of efficiency, would simply be

18     to set the code documents, inspect the test sets, responsive or

19     nonresponsive, and not get an issue coding where the parties

20     will only argue further about how it should be coded for what

21     issue and what issue not to.  It is simply an efficiency thing.

22     We are still talking about that with them, but that is our

23     position.

24             MR. REENTS:  I don't know that we are at impasse on

25     this issue, at least as far as I was aware.  Our concern is

1    just transparency.  You can train the computer software either

2    with a binary decision, responsive/not responsive, or you can

3    train it using multiple issues.  Our proposal is just that if

4    they are training it using multiple issues, that they disclose

5    what those issues are to us so we have some visibility on how

6    they are training it.

7              THE COURT:  Sounds like you all need to talk about it

8    further, since I heard an "if" in that.  If both sides are

9    using comparable methodology, if it is only a yes-or-no coding,

10   relevant/nonrelevant, sounds like you are in agreement on that.

11   It's just if they are doing it some other way, Mr. Reents, you

12   want to know that and want input into it.

13             MR. REENTS:  That's right.

14             MR. LYTTLE:  That's accurate, your Honor.  We are

15   planning binary, responsive/nonresponsive.

16             THE COURT:  Sound like you have agreement on that.

17             MR. REENTS:  We weren't aware of that.  But if that's

18   what they are doing, that's fine.

19             THE DEFENDANT:  OK.  Item IV.  On Thiam, whoever is

20   the movant, why do you need until February 20th to make the

21   motion?  My general principle, as set forth in my chambers

22   rules, is opposition two weeks, reply one week.  This seems to

23   be taking a three-week and ten-day approach.  But I'm most

24   concerned about the starting date.

25             MR. SUMMIT:  Paul Summit for defendant Thiam.

1  Plaintiff had requested that we complete the privilege log

2  before motion practice.  We are briefing motions to dismiss

3  this month.  We have already completed a very substantial

4  document review and document production under this Court's

5  order.  What is left are the government privilege documents.

6          THE COURT:  What is the scope of that, approximately,

7  volumewise?

8          MR. SUMMIT:  A little over 10,000 documents to review.

9          THE COURT:  10,000 are on the privilege log?

10          MR. SUMMIT:  No.  10,000 are left now for review.

11          THE COURT:  Of what you have reviewed, how many

12  privileged documents are in issue based on this Thiam

13  privilege?

14          MR. SUMMIT:  I don't have a precise amount.  These are

15  the documents that were received or generated during his couple

16  of years.  We suspect that there will be a substantial number

17  privileged under the government privilege.

18          THE COURT:  He is no longer a government official, is

19  that correct?

20          MR. SUMMIT:  That's correct.

21          THE COURT:  He still has the material?

22          MR. SUMMIT:  That's correct.

23          THE COURT:  I'm not sure there is a privilege there

24  other than one that the government may want to assert.  Has the

25  government been notified?

 1          MR. SUMMIT:  The government has not been, but they

 2     will be.

 3          THE COURT:  Why don't you notify the government

 4     immediately, unless other parties think that we are just

 5     opening a hornets nest.  My view would be he has the documents,

 6     he is no longer a government official, if the government

 7     doesn't move for a protective order or whatever, no privilege,

 8     let's just produce it.

 9          MR. SUMMIT:  We have absolutely no problem or

10     objection to notifying the government.  We will do so

11     forthwith.  Our understanding from our expert, and we will file

12     these papers, is that unless the government says otherwise,

13     there are substantial sanctions that could be levied against

14     Mr. Thiam.

15          THE COURT:  Even when the government has had a chance

16     to protect its interest and has failed?

17          MR. SUMMIT:  Governments are governments.  Your Honor,

18     we would like to see these documents, frankly, released,

19     because they are exculpatory to us.  But we can't put our

20     client into a position in which he is subject to sanctions.

21     And there may be, for all I know, legitimate governmental

22     confidentiality issues.

23          THE COURT:  Who is going to make that decision?

24          MR. SUMMIT:  You.

25          THE COURT:  No, I'm not.

 1             MR. SUMMIT:  Let me put it this way.  There is a body

 2    of case law that gives U.S. judges a set of factors to consider

 3    in connection with confidentiality asserted by another

 4    government.

 5             THE COURT:  You just said the magic words, asserted by

 6    another government.  Mr. Thiam is not another government

 7    anymore.  And you know the solution under U.S. law merely on

 8    confidentiality, which is produce it under a confidentiality

 9    order.  Unless there is a governmental privilege different from

10    confidentiality --

11             Frankly, on all of this we are now dealing with

12    foreign law, foreign government confidentiality concerns.  How

13    am I going to make that decision?  Even if you have an expert,

14    that may be an expert on the Ghanaian law of privilege.  It is

15    not going to be an expert on what is confidential or sensitive

16    to the government, is it?

17             MR. SUMMIT:  Actually, he will be an expert on the

18    statutory scheme of Ghanaian law which governs release of such

19    documents.

20             THE COURT:  It is a sort of like saying, if this were

21    on the other shoe, that somebody would opine as an expert on

22    FOIA, Freedom of Information Act, as to how you can get certain

23    documents from the government.  That is a different standard

24    than what has to be produced in civil discovery from a

25    nongovernment actor who happens to have nonstolen government

 1    documents.

 2            MR. SUMMIT:  May I suggest the following.  We will

 3    notify the government forthwith by the fastest means we know

 4    of.  We may get clarity.  They might say, we could care less.

 5    They might say, we'll prosecute you if you release these.  I

 6    really have no idea what they are going to say.  Let me do

 7    that, and we will crystallize the issue then.

 8            THE COURT:  Does anyone with better knowledge than me

 9    of the Ghanaian situation think that we are just making things

10    worse instead of better?

11            MR. LYTTLE:  Your Honor, if I may, briefly.  I think

12    we may be able to short circuit this.  The government of the

13    Guinea is represented by a U.S. law firm, DLA Piper.  We are

14    happy to provide that contact to Mr. Summit and see if we can

15    short circuit this and have American lawyers representing the

16    Ghanaian government weigh in.

17            THE COURT:  The other thing I will tell you all now,

18    if it's a question of what does the foreign law say as a matter

19    of law, I would deal with that, subject of course to review by

20    Judge Berman.  If it is applying that document by document to

21    more than 10 or 20 documents, you are going to a special

22    master.

23            MR. SUMMIT:  Nobody anticipates such an exercise by

24    your Honor.

25            THE COURT:  All right.  Then I will leave that

14

1   briefing schedule where you have set it in the hope that by

2   February 20th it will be moot.

3           MR. SUMMIT:  Very good.

4           THE COURT:  Next, paragraph V, BSGR and Steinmetz.

5   Where are we on jurisdictional discovery production?

6           MR. FILARDO:  Good afternoon, your Honor.  Vincent

7   Filardo for BSGR and Mr. Steinmetz.  We are substantially

8   complete, nearing completion of both our collection and review.

9   We will be prepared to meet our obligations by the 16th, this

10  Friday.  We also will have the declaration that your Honor

11  asked for from Mr. Steinmetz, we will have that ready to be

12  produced.

13          We have reviewed several thousand documents that came

14  up through hits.  It is actually, when you consider documents

15  and document families, probably less than 7,000 but on that

16  magnitude so far.  We will alert the Court and plaintiff's

17  counsel that we have yet to find a responsive document in that

18  group.

19          If there is nothing to produce, we will let

20  plaintiff's counsel know in a cover letter at our deadline on

21  Friday.  If there is something to produce, we will produce

22  that.  If there are any privileged responsive documents, which

23  there are none of so far, we will produce a privilege log, too.

24          Your Honor, we have also been served with discovery

25  requests as provided in the letter to your Honor from defendant

1   Vale.  I believe we have come to an agreement that we will not

2   need to respond to those substantive requests.  They are not

3   jurisdictional discovery requests.  We have not put in a

4   written response or objection to that thus far.  We could

5   simply put in a letter objecting generally and asserting the

6   basis of our jurisdiction argument.  I leave that up to your

7   Honor how you would prefer us to do that, if at all.

8           THE COURT:  Mr. Liman.

9           MR. LIMAN:  Your Honor, we did serve a discovery

10  request because we believed that ultimately, if jurisdiction is

11  found, the documents will be both relevant and exculpatory of

12  our client.

13          With respect to the issue of whether responses and

14  objections need to be filed now, we are prepared to do whatever

15  your Honor deems best.  Plainly, we are not seeking merits

16  discovery, but discovery has been made so far as to

17  jurisdiction.

18          THE COURT:  I don't see a need for more formal

19  response to preserve the records being transferred.  However, I

20  am not planning to extend discovery past the end of this year.

21  I don't know when your motion is going to be decided and

22  therefore when you can impose on BSGR and Steinmetz for merits

23  discovery.  Does it pay to, for at least document discovery

24  purposes, after X period of time goes by and there is no

25  decision, deal with it as a rule 45 subpoena or Hague

1    Convention or whatever?

2          MR. LIMAN:  This is one of those instances where we

3    are on this side of the table and not on that side of the

4    table.  From Vale's perspective, and I believe from Rio Tinto's

5    perspective, we would like the documents, and we think it

6    should be dealt with as a rule 45 subpoena in that

7    circumstance.

8          THE COURT:  But where are BSGR and Steinmetz for that

9    purpose?

10         MR. FILARDO:  Your Honor, we have document custodians

11   that are literally in multiple foreign jurisdictions.  I guess

12   it would depend upon if we stuck to those same custodians, of

13   which there were a vast cross-section.  I think there were six

14   different custodians that we have checked at least for

15   jurisdictional documents.

16         For argument's sake, assume it was that same amount.

17   That would cover five or six different foreign jurisdictions,

18   one or two of which may have more stringent rules than others,

19   two or three maybe would have more stringent rules than others.

20   At that point, if we were going to be looking at nonparty

21   subpoenas under rule 45, I think we would have to follow

22   whatever rules are going to be applicable in those

23   jurisdictions, whether Hague would work; if not, if federal

24   rules are acceptable.  We have to meet and confer with the

25   other parties and see what exactly is available.

 1          MR. LYTTLE:  I would have to talk with Mr. Filardo

 2     more.  I do have some concerns.  I think rule 45 subpoenas

 3     could introduce some complexities that aren't otherwise there.

 4     We not a party, obviously.  Quite frankly, perhaps I can talk

 5     about it with Mr. Liman and Mr. Blackman as well as Mr. Filardo

 6     and think about it a little more.  I think this is a complex

 7     issue.

 8          MR. BLACKMAN:  I was going to say, your Honor, it

 9     would be great if these documents were subpoena-able.  Indeed

10     if they were subpoena-able from third parties, we might already

11     be doing it, because that would not necessarily involve the

12     jurisdictional issue that's been raised.  I fear, knowing what

13     I know about Mr. Filardo's client, that we may have to resort

14     to the Hague or similar mechanisms if his client does not

15     remain a party to this case.

16          THE COURT:  The only question I invite you all to

17     discuss is whether it makes sense to start the Hague route now,

18     knowing how difficult it is and how long it takes, and hope,

19     from your points of view but not from Mr. Filardo's point of

20     view, that it becomes moot because the jurisdictional motion is

21     denied and they are in as a party.

22          MR. BLACKMAN:  I think that is a sensible suggestion

23     that we can talk about amongst ourselves and at least prepare

24     requests.

25          THE COURT:  Do it with as much cooperation, including

 1   Mr. Filardo and his clients through him, as possible.  See

 2   where it goes.  If the decision is not made for a while and the

 3   motion hasn't been made yet -- right?

 4           MR. FILARDO:  It has not.

 5           THE COURT:  We are talking two to three months at a

 6   minimum for the motion to finally be made once jurisdictional

 7   discovery is over, responded to, etc., and then decided.  You

 8   may not get an answer until after June 30th, when you hope to

 9   have all the documents.  If you wait until then to go Hague

10   Convention, you may have problems.

11           It may be that money talks.  Under rule 45 there are

12   different obligations for costs.  Maybe if you are willing to

13   gamble your money either on a refundable or nonrefundable

14   basis, they might, or might not, make certain productions

15   through a more civil procedure route than a Hague route.  Keep

16   talking about this.  I will ask you to report back at the next

17   conference.

18           MR. BLACKMAN:  Thank you.  I think it is a sensible

19   suggestion.  Sooner rather than later I think is the watch

20   word.

21           THE COURT:  Paragraph VI, the VBG defendants,

22   something was due last Friday.  Where does all that stand?

23           MR. AUERBACH:  Martin Auerbach for the VBG defense.

24   We did serve our responses to the discovery demands, both

25   document and interrogatories, last Friday.

 1          THE COURT:  Did that include the documents or just the

 2     formal responses?

 3          MR. AUERBACH:  I thought I would take a minute to

 4     bring your Honor up to date.  Our discovery requests, as you

 5     may be aware of or not, came much later than everybody else's.

 6     We got ours just before Thanksgiving.  We have had a very

 7     constructive dialogue with plaintiff's counsel with respect to

 8     the state of the documents and state of the witnesses.

 9          The key to that entire picture is the fact that in May

10     of 2013 the Ghanaian government came and executed the Ghanaian

11     equivalent of a search warrant and took all records through the

12     end of 2010.  Prior to that point in time, in October 2012, the

13     Ghanaian government put this project on hold.  It froze the

14     project.

15          Ultimately, when that happened, what happened on the

16     operational side is that the process went from being an

17     operating business to being essentially an asset.  They had

18     about 3,000 people on the payroll.  They were technical people

19     who had come in from overseas.  They left.  The mining experts

20     who were left, they left.  The people on the ground who now

21     remain are a skeleton crew and security guards, their assets,

22     their cars.

23          That has in some ways made my life easier, because the

24     documents that they are most interested in are not in their

25     hands, they are in the Ghanaian government hand.  I am happy to

1   announce today that the Ghanaian government has counsel in the

2   U.S.  If they get production of those documents, perhaps we

3   will get to see them, too.

4        With respect to electronic communications, because

5   Ghanaian infrastructure, unlike some Third World countries, is

6   not that advanced, VBG has never had its own electronic

7   service.  All of that has been hosted, certainly post-joint

8   venture by Vale, part of the joint venture I believe by BSGR,

9   though I am uncertain as to that.

10       I have undertaken to endeavor to determine who

11  potential custodians before the people who are now responsible

12  for the joint venture were.  It is complicated a bit by the

13  health situation, which has resulted in all of the senior

14  management, of whom there are now only two, leaving the

15  country.  They are afraid.  I speak to them.

16       This past week as we were trying to sort through the

17  issues.  The very terrible communication in France precluded my

18  communicating with them because they still communicate through

19  cell phones that operate out of Africa, and clearly the French

20  government decided they didn't need any African communications.

21  I have been able to reconnect this week, and we continue to

22  discuss where the documents are.

23       As I say, the electronic communications, to the extent

24  they exist, are best sought from Vale because we don't have

25  them.  Our records are gone, so I can't tell them who was

Eldridge

1  running the show back in 2008, '09, '10.  I believe that the

2  parents, if you will -- at different points in time it was

3  different entities -- can answer those questions.  I'm working

4  with them to encourage that sort of undertaking.  Hence, my

5  inability to currently produce anything.

6          Rather than given the timetable, I didn't want to

7  simply assert that I was not going to respond.  We have

8  responded.

9          The one form of discovery that we have not had, and I

10  will explain my understanding as to why, is jurisdictional

11  discovery.  Your Honor knows that since July 18th, 17th, 18th,

12  we have advised the plaintiffs and the Court that we do not

13  believe that there is any jurisdiction with respect to the VBG

14  entities.

15          VBG Guernsey is simply a corporate secretary holding

16  the ownership of the Guinean entity.  VBG Guinea, as I will

17  refer to it, is a company that does not now and never has and

18  certainly at the time the suit was brought did not have

19  operations or a presence in the United States, so no general

20  jurisdiction.  Nor are there any general jurisdictional

21  allegations in the complaint.

22          With respect to specific jurisdiction, again, no

23  jurisdictional pleadings other than that there is a conspiracy

24  here and that everyone in the conspiracy is everyone else's

25  agent, and therefore, if you have jurisdiction over the

 1    co-conspirators, you have jurisdiction over us.

 2         I don't believe, based on my research, that that is an

 3    accurate reading of the law.  But in terms of factual

 4    predicate, there is nothing in the complaint to suggest any

 5    specific action by VBG in the United States, which makes their

 6    decision not to serve jurisdictional discovery perfectly

 7    sensible.

 8         I don't want to find myself in front of Judge Berman

 9    saying -- I'll probably take the least of the brief in any

10    event, because I'm the smallest player -- saying that

11    essentially if you look at the face of the complaint, there is

12    a theory of co-conspirator liability, so in essence

13    jurisdictional discovery is largely irrelevant based on the

14    pleadings.  I just wanted to fill you in.

15         THE COURT:  I appreciate that.  Plaintiff?

16         MR. LYTTLE:  Your Honor, quickly, we have had very

17    good private discussions with Mr. Auerbach about where the

18    documents are.

19         THE COURT:  Let's start with the jurisdictional

20    discovery related or not discovery issue.  I have assumed that

21    the only people we were dealing with on that is what we have

22    been going through with Mr. Filardo.

23         MR. LYTTLE:  Your Honor, the discovery against VBG,

24    the discovery we served, Mr. Auerbach is charactering it as

25    merits discovery, but it was merits and jurisdictional

Eldric4ac

1  discovery.  As we have dealt with often with Mr. Filardo, there

2  is quite a bit of overlap there.  Our view is that the

3  discovery we served is responsive to both merits and

4  jurisdictional.

5          THE COURT:  If you are not getting any of that, what

6  is that going to do to the jurisdictional issue?

7          MR. LYTTLE:  As Mr. Auerbach said, we have a number of

8  bases of jurisdiction, whether it is Federal Rule 4(k)(2),

9  whether it is the New York long-arm statute, whether it is the

10 RICO statute itself.  We would like to get documents.  It

11 doesn't sound like we are going to get very much.  We are still

12 talking about that with him.

13         THE COURT:  The motion is going to get made as soon as

14 Judge Berman clears you to make it and as soon as Mr. Filardo's

15 client has completed its jurisdictional production, which

16 sounds like it will be Friday.  When you see Judge Berman next

17 week, you are all asking for a briefing schedule, right?

18         MR. FILARDO:  That's correct.

19         THE COURT:  OK.  Keep talking with respect to figuring

20 out where any documents are, whether it is jurisdictional or

21 merits or otherwise.

22         MR. AUERBACH:  Absolutely, your Honor.  The only thing

23 I would say in terms of guidance as to the jurisdictional

24 allegations specific jurisdictional, I can get a declaration

25 from people saying we have no presence.  But in terms of

1    specific jurisdiction, I don't see anything in the complaint

2    that gives you guidance on what I would be looking for,

3    frankly, if I had documents to look at.  That's why I raise

4    this with you, your Honor.

5         I want clarity because I don't want to go to Judge

6    Berman and say we believe there is no jurisdictional basis here

7    because none is alleged and then have the plaintiff say sure it

8    is alleged.  It may be that 4(k)(2) and 1956 are essentially

9    it.  In terms of long-arm jurisdiction, I believe that the

10   theory is, as I said, that co-conspirator liability creates

11   jurisdiction rather than anything specific that VBG, either the

12   Guernsey or Guinean entities, which operate exclusively in

13   foreign jurisdictions, has done here.  That's all.

14        MR. LYTTLE:  Your Honor, I like Mr. Auerbach a lot,

15   but I think he is mischaracterizing our allegations a little

16   bit.  I do think our discovery was directed at finding what

17   activities and what knowledge they had of the co-conspirator

18   activities.  That is really what our focus is on jurisdiction

19   here.

20        THE COURT:  Assuming they did nothing in New York, you

21   are, I take it, relying upon the fact that they are allegedly

22   in a conspiracy with other folks, etc., not that there is some

23   other transaction that somehow or some other theory under the

24   C.P.L.R. somehow gets you jurisdiction over them?

25        MR. LYTTLE:  That's correct, your Honor, with the

1    caveat that our discovery was designed to find out are there

2    other things like that, if you do anything affirmatively in New

3    York that we don't know about, anything independent of your

4    co-conspirators.  If they don't have anything because they

5    don't have the documents, that's fine.  But what I do dispute

6    is that we haven't sought that information.  They may not have

7    anything, but we have sought it.

8              THE COURT:  I understand each of your positions.

9    There is nothing further to do on it now.

10             Now we can get to the bigger gun, which is Vale.

11   Let's take the issues one at a time here, which I think is the

12   custodian issue.  Are you resolved on that or not?

13             MR. LYTTLE:  Your Honor, it is our position that we

14   are resolved, Rio Tinto custodians have resolved those.  We

15   believe we have reached agreement with Vale.  I will let them

16   speak to this.  They have reserved some rights for this vague

17   idea of let's agree on scope first.  But our view is we've got

18   custodians, let's move forward, let's stop doing this

19   piecemeal.

20             THE COURT:  Who am I going to hear from on the Vale

21   side?

22             MR. LIMAN:  Your Honor, we have agreed, as the letters

23   indicate we would, on the custodians who will have relevant

24   documents.  Those are the custodians that we have discussed

25   with them.  What we have reserved is that if it is determined

1   that the requests based upon the search terms or the predictive

2   coding that we use yields too many documents, we would have the

3   right to go back to them, and they would have the right to go

4   back to us and say we should drop this from the search.

5        THE COURT:  That sounds acceptable.  The letter is

6   sort of all over the board, so why don't you raise an issue,

7   tell me where in the letter you have raised it, where in the

8   letter they respond to it, and we will try to get through this

9   before the next conference shows up in 45 minutes.

10       MR. LYTTLE:  Your Honor, I think we can kind of cut

11  through the morass here.  I think there really are two

12  overarching issues with respect to our disputes on Vale's

13  production and responsiveness.  I think that we can get a

14  resolution and guidance from the court.  It will trickle down

15  and resolve a number of other small issues.

16       A little quick background.  We did serve discovery

17  over six months ago.  You have all that.

18       THE COURT:  I don't want that background.  I got that.

19       MR. LYTTLE:  Here are the two overarching issues I

20  would like to cut through with.  Number one, Vale is trying to

21  cut discovery off at either June 2009, which is when the

22  negotiations with Rio Tinto formally ended, or April 2010,

23  which is when the joint venture with BSGR was announced.

24       Your Honor, this conspiracy was an ongoing conspiracy.

25  This conspiracy didn't end in 2009, when the negotiations

1    ended.  And this conspiracy didn't end in April 2010, when the

2    joint venture was entered.  We have alleged and know of

3    numerous acts this conspiracy undertook after April 2010, after

4    the joint venture.

5         We have numerous meetings in 2009 and 2010 between

6    Vale and representatives of BSGR.  We have bribes in June of

7    2010.  We know that in 2008 and 2011 Mr. Thiam was working with

8    the conspiracy to exert pressure on Rio Tinto to relinquish its

9    rights to plots 1 and 2.  And we know from 2010 to 2013 the

10   conspiracy was actively using Rio Tinto's information for the

11   joint benefit of that joint venture between Vale and BSGR.

12        So, our discovery is necessarily broad to get at what

13   information they were using, when they were using it, how they

14   were using it.  This particular joint venture, a little

15   context, and I think Mr. Auerbach touched on it, this joint

16   venture itself was a product of and tainted by this conspiracy.

17   This joint venture had its rights stripped by the government of

18   Guinea in 2012 and its documents are all taken.

19        THE COURT:  I understand the argument.  Let me hear

20   from Mr. Liman.

21        MR. LIMAN:  Your Honor, it is not true that we are

22   seeking to cut off discovery on any of those particular dates.

23   Let me tell you what is correct.  The allegations here in the

24   claim center on the claim that Rio Tinto wrongfully lost its

25   concession and that the defendants stole the concession.  That

1    event took place, according to the complaint, in December of

2    '08, when the government of Guinea announced it was taking the

3    concession from them.  They allege that it was confirmed in

4    June of '11.

5        That is the RICO allegation, the fraudulent

6    concealment allegation, fraudulent inducement.  Roughly

7    parallel, the claim there is that Vale was in discussions with

8    Rio Tinto up until June of '09, and while we were doing all of

9    these allegedly nasty things, we didn't tell Rio Tinto.

10       What we have proposed, and we would like to have Mr.

11   Reents address the details if your Honor has them, is a staged

12   production, which we have already started, that would expedite

13   the production of documents and help us get through all of this

14   under the deadlines provided by the Court.

15       The staged production would have us, and this is where

16   we have already started, look at every communication from the

17   custodians to BSGR in the period up until June of 2009, every

18   communication of those custodians reflecting that there had

19   been communications with BSGR up until that time period.  That

20   is the way to figure out whether there was in fact confidential

21   information conveyed.

22       We are taking their allegations on their face, as we

23   are required to do.  Contrary to has been told to us by the

24   client, we are assuming that there was confidential

25   information.  If that is the case, we will learn that from the

1    production that we have already started to do.

2         What we have done is we have looked for the nine

3    custodians.  So far we have determined that there are no

4    documents among those nine custodians that reflect

5    communications to BSGR during that time period.  Not a surprise

6    to us, because the negotiations over the joint venture began

7    later than that.  And there are no communications reflecting

8    communications.  We have also suggested some search terms.

9    What we have told the plaintiffs is that we expect by the end

10   of February we will be done with that work for all of the

11   custodians designated by the plaintiffs.

12        We have also proposed and we have shared with your

13   Honor some additional search terms.  Your Honor will recall you

14   ordered the plaintiffs to designate the documents that they

15   allege were misappropriated.  They did it.  They designated

16   those documents.  We have taken their production numbers on

17   those documents, essentially similar to Bates numbers, and we

18   have agreed to run those through our database to see if there

19   is any information.

20        Then what we would do, and I think this largely moots

21   the issue, is we will have a discussion.  If there are

22   documents that were misappropriated or data that was

23   misappropriated, we will have far better tools.

24        THE COURT:  This isn't working.  To a certain extent

25   I'm loath to dive in on this.  It may ultimately be you will be

 1    right, you will win, and this will be a tremendous cost to Vale

 2    for no benefit.  But what I am hearing is, using your approach,

 3    there are no responsive documents.

 4              MR. LIMAN:  That is not correct, your Honor.

 5              THE COURT:  Then what did I miss?  You said for the

 6    first nine custodians you didn't find anything.

 7              MR. LIMAN:  That is correct for the first nine.  My

 8    expectation is, if their allegations are correct, we should

 9    find documents.

10              THE COURT:  But you are not going to convince them to

11    drop the case because when you finish the 22 custodians, the

12    other 13 to get to 22, there are still no documents that match

13    the search approach you are taking.

14              MR. LIMAN:  You're right, your Honor.  I'm not seeking

15    to convince them to drop the case.  What I am seeking to do is

16    to prevent a duplicative or wasteful search later on.  What we

17    are proposing would have us within a month essentially gather

18    the information that you would use for putting together seed

19    sets for predictive coding.  If there are documents and data

20    that was taken -- they have said they don't know, they can't

21    identify what the documents are.

22              THE COURT:  This, I take it, is broader than the issue

23    of did you use the documents, let alone did you use the

24    information in the documents, and it is not really helping me.

25    The use of the information or the information from the war

31

1   room, the data room, is, I think everybody would agree,

2   extensive and overlapping or duplicative of normal business

3   operations, and neither side seems able to cut through the

4   morass.

5          So, whether it is going to be through the predictive

6   coding, whether it is going to be through a cost cap -- my

7   friend Judge Grim in Maryland in certain cases says ask for

8   whatever you want, but after the responding party has spent X,

9   we're done.

10          MR. LIMAN:  Your Honor, if I could have my colleague

11   address predictive coding.  We have actually spent a fair

12   amount of time thinking about that as an approach to this.

13          THE COURT:  I thought we were done with the predictive

14   coding issue because you all are nearing agreement, etc., and

15   you want a little more time, but that there is a major issue on

16   the time period cutoff that is not resolved.

17          MR. LIMAN:  Your Honor, that is not true.  There is no

18   issue with respect to the time period cutoff.  What there is is

19   an issue with respect to the methodology and the scope.

20          THE COURT:  Are you saying that if we went with your

21   tiered approach, that when you hit predictive coding sometime

22   in late February or early March, that we are not worrying about

23   a June '09 or April 2010 cutoff but we are going all the way

24   through sometime in 2013?  Mr. Reents?

25          MR. REENTS:  There are a number of different requests.

Eldridge

1    Of course, there are other requests where there isn't a dispute

2    and we have reached agreement with plaintiffs and we can use

3    predictive coding for those requests.

4            With respect to these requests, I think the predictive

5    coding is a bit of not a red herring exactly, but it is not a

6    complete solution, because the problem isn't just our search

7    methodology.  The problem is that we disagree on the

8    substantive scope of this request.  According to plaintiffs,

9    the scope of this request is basically anything having to do

10   with geology, transport, or ports around Simandou, which amount

11   to the whole ball of wax.  Predictive coding doesn't address

12   that.

13           THE COURT:  I'm not sure that your proposal addresses

14   it, either, other than in a very narrow sense.

15           MR. LYTTLE:  Your Honor, if I may, I think you put

16   your fingers on the issue.  Their proposal is not satisfactory.

17   I will get into the reasons why.  It is going to take time to

18   do this piecemeal approach, and we are going to be back where

19   we started.

20           THE COURT:  Tell me what you would like them to do on

21   this.

22           MR. LYTTLE:  What I would like to do is what we are

23   going to do.  We have identified a custodian.  We actually have

24   collected documents from all of our custodians.  Let's get the

25   set together, let's run our search.

Eldnriac

```
 1              THE COURT:  Here is my question.  Have you talked to
 2    your folks at Equivio, and ultimately you will need to talk to
 3    Deloitte -- I'm separating whatever you have to do to produce.
 4    For Vale's production, how is the predictive coding engine
 5    going to separate or output in Simandou in the regular course
 6    of the joint venture business from the ore output or other
 7    issues that were in some of the documents in what I am calling
 8    the war room that you say was misused by them?  I don't see,
 9    frankly, how predictive coding is going to figure that out.
10              MR. LYTTLE:  I think you are correct, your Honor.  But
11    I think that doesn't need to come out.  What we would like to
12    see and what we are entitled to see in discovery --
13              THE COURT:  The question is going to be volume and
14    expense.  Are you prepared to pay any of the expense of
15    attorney review time and/or vendor time?
16              MR. LYTTLE:  We could certainly discuss that if the
17    burden is extensive.  But let's get on with the coding, let's
18    do the seed set, see what it looks like, and address that.
19    That is what we propose to do.
20              THE COURT:  Have you talked to your vendor about that?
21              MR. LYTTLE:  About what?  I'm sorry, your Honor.
22              THE COURT:  About whether that is realistic.  If you
23    put a million documents in or whatever the number is and they
24    all have to do with the operation of this Simandou mine, I'm
25    not sure that the predictive coding system is going to do
```

1    anything other than mark all of that as relevant.

2         MR. LYTTLE:  Your Honor, we have given them search

3    terms on this issue.  It came back with only 250,000 documents.

4         THE COURT:  Are you satisfied that they will have met

5    their production obligations if they produce the 250,000 hits?

6    That's got nothing to do with predictive coding, which is why

7    I'm a little frustrated that you are both all over the place.

8         MR. LYTTLE:  We are frustrated, too, your Honor.  My

9    point is we gave those search terms to gain an understanding of

10   this overall burden when we look at implicating these day-to-

11   day business operations or whatever.  My point is these search

12   terms only capture 250,000 documents from nine custodians.

13   Even if you double that, and it is not clear these next set of

14   nine custodians would have the same number of documents, you

15   are still talking about 500,000 documents to review, which your

16   Honor in a case this size and with these allegations.

17        The problem with their search terms and their proposal

18   is that it doesn't capture when they pull information out of

19   the document and they stick it into a PowerPoint or they email

20   and talk about it.  There is no way to capture that.

21        MR. REENTS:  Your Honor, could I address this?

22        THE COURT:  Why don't you first address why, if it is

23   250,000 documents, although there is a suggestion that their

24   number is off, why that is a big deal in the grand scheme of

25   things in a case like this, where there are 15 lawyers sitting

1    in front of me, four of whom I think are from your firm, maybe

2    more.

3              MR. REENTS:  A few points, your Honor.  The first is

4    of course, as counsel noted, the collection isn't complete yet

5    so there is more to come.  That is not the sum total.  That is

6    just the emails.  Also, this is just one issue among many

7    issues in this case.  As Mr. Liman was pointing out, not even

8    the most important issue, not by far.

9              The critical issues here are the formation --

10             THE COURT:  Folks, either you all have to reach

11   agreement on your own, which requires compromise, or you risk

12   either a special master who can become expert on mining, etc.

13   Yes, this is only one issue, but your approach seems to be

14   turning up nothing.  Their approach on the issue that I am

15   trying to get my hands on is 250,000 documents, which in the

16   grand scheme of things, even if this is just one issue in a

17   multiissue case, is not the end of the world.

18             MR. REENTS:  Your Honor, I guess we have a different

19   view.  Perhaps most distressing is that we have reached the

20   point where 500,000 documents is a pittance.

21             THE COURT:  That is the world we are in.

22             MR. REENTS:  The burden is not just the amount but the

23   breadth.

24             THE COURT:  Have you shown through analyzing the hit

25   reports what the overbreadth is?  Somewhere in these

Eldrige

 1   discussions there is a discussion of PDF versus the Adobe use

 2   of the same term.

 3          MR. REENTS:  I think that is a red herring.  That is

 4   not the term we focused on, although it did get a lot of hits.

 5   Some of the terms they proposed, like "BSGR," our partner in

 6   this venture, returned 25,000 documents.  The word cap "X

 7   demand" with "Simandou," among other terms, these are the sorts

 8   of terms that they really are trying to capture, essentially

 9   all of the operations of this mine.  It becomes a fishing

10   expedition where they can look for the evidence that they are

11   looking for.

12          THE COURT:  There are two things you can do.  You can

13   either use those terms and perhaps an even broader set to load

14   all those documents, then do predictive coding, and come up

15   with a way for the predictive coding system to do further

16   winnowing, knowing that it is not how many times a particular

17   hit occurs if you are not then accumulating; if the same

18   document has five different terms, that is only one document.

19          They say it is roughly 250,000 documents.

20          MR. REENTS:  That's what our hit report shows

21   cumulatively for the terms for the nine custodians.

22          To take a step back, your Honor, if I may --

23          THE COURT:  Have you analyzed those documents as

24   opposed to the hits on a sample basis?  Right now I'm hearing

25   it's way overbroad, it's just because BSGR is our joint

1    venturer, and your approach is extraordinarily narrow, their

2    approach is broad, perhaps too broad, perhaps not.

3          What is the Court supposed to do with this amount of

4    information or lack of information?  I've got to tell you, it's

5    a sad shape that we're in where I can say a quarter of

6    a million documents is not a big deal on a case this size.  But

7    you are billing, I don't know, $5,000 an hour for you and Mr.

8    Liman and Mr. Blackman and one or two other people there your

9    firm to be here.

10         I'm inclined to say review the 250,000 documents.

11   Review and produce them.  That will give all of us a better

12   feel.  I can just say that or you all can decide with this as a

13   strong push to have further productive discussions.  It seems

14   like every conference we are going through this same issue in a

15   different form or another because of, yes, the vagueness of

16   what was in the war room and the fact that that overlaps with

17   normal business decisions.

18         MR. LYTTLE:  Your Honor, if I may?

19         THE COURT:  You could snatch defeat from the jaws of

20   victory.

21         MR. LIMAN:  Your Honor, unfortunately, my guess is

22   that this is an issue that is going to continue in the case.

23   Let me tell you the reason why I think that.  If there is no

24   definition put on what it is that we allegedly gave prior to it

25   being taken, then we have defenses we are entitled to assert,

1    including asking them who else did you share information with

2    Simandou about.

3        THE COURT:  If they wind up causing themselves

4    burden --

5        MR. LIMAN:  But they persist in that.

6        THE COURT:  Let me put it this way, Mr. Liman.  I have

7    tried once to get a better feel from you for what was in the

8    war room that they are complaining about.  That hasn't really

9    helped you.  I understand that.

10       MR. LIMAN:  I think it did help us, your Honor.

11       THE COURT:  Good.  How does that help me?

12       MR. LIMAN:  I think it defines the universe of

13   documents.  What we have done is take your Honor's orders

14   seriously.  We have started from the nine documents.  We have

15   proposed to them search terms from those nine documents.  We

16   proposed codes from those nine documents.

17       We have indicated we would be open to other terms from

18   those nine documents.  We are not saying that we are limiting

19   things.  That is the whole notion of adding the search terms

20   that we have proposed.  We are not saying that we are limiting

21   things to the communications with BSGR.  We do think it is

22   highly probative that there was no back-and-forth.

23       THE COURT:  Mr. Liman, stop.  Thank you.

24       What was the response to their key words?

25       MR. LYTTLE:  Your Honor, first of all, we just got

 1    them this morning -- excuse me -- late last night.  It is

 2    laughable, your Honor.  It is terms like "Simandou and steal"

 3    or "misappropriate"?  It completely ignores how they would use

 4    the data.

 5          THE COURT:  Is the word "fraud" or "RICO" in the list?

 6    I'm being facetious.

 7          OK.  You have two choices.  The best I can do with all

 8    of this is say review and produce from the 250,000 documents.

 9    If you would rather have a special master try to spend weeks

10    and weeks -- and this one may be at your expense, not split --

11    dealing with this, I'm happy to have you do that.  But I can't

12    micromanage this discovery.  That is not the purpose of the

13    Federal Rules of Civil Procedure.

14          You seem to be having the same problem every single

15    conference.  I was not as upset with the slowness that you were

16    operating under while the first motion to transfer venue or to

17    dismiss in favor of England was briefed.  I thought that there

18    was perhaps mutual agreement to go slowly while that was going

19    on.

20          You are here.  Yes, maybe Mr. Filardo's client will be

21    dismissed, maybe there are other motions to dismiss coming, but

22    it is now full speed ahead.  You have less than a year to

23    complete this.  If we keep going in circles, you are not going

24    to do it and somebody is going to be very aggrieved when on

25    December 31 I say I don't care who has been deposed or who

Eldoriac

1    hasn't, we are done.

2            MR. BLACKMAN:  Your Honor, why would it not make sense

3    if we produce the 250, which I think will probably be a lot of

4    chaff and very little wheat, that they pay if it is determined

5    that in fact the number of pieces of wheat to the number of

6    pieces of chaff is such that this turns out to not be --

7            THE COURT:  Pay what?

8            MR. BLACKMAN:  They pay some portion of the cost of

9    doing this.  The problem we have is this.  We were thinking of

10   stages.  I know it is something your Honor has talked about in

11   the past as a sensible way to go.  The claim is that we helped

12   BSGR steal their concession.  Well, their concession was stolen

13   on December 2008 or at the latest, according to them, June '09.

14           We said a good first stage would be to see what, if

15   anything, we gave BSGR during that period.  The answer is

16   probably nothing.  The answer is probably that we didn't even

17   have discussions of any kind with BSGR except passing hellos

18   during that period.  That is one thing.  If that's not enough,

19   the other thing is bribery and corruption.  That's what this

20   case is about.  We are prepared to say we will look for bribery

21   corruption payment type documents.

22           Then we have the third issue, which is what we are

23   talking about here, where they have essentially said that

24   everything this joint venture did is potentially criminal.  You

25   have agreed that that doesn't make sense, because digging ore

1    out of the ground is not criminal, paying a worker, putting

2    stuff in a cart, etc.

3         Since we are now in that third and vastly larger and

4    least relevant bucket, why shouldn't they have to at least pay

5    part of the cost of our getting into that bucket in terms of

6    proportionality and benefit versus cost?  It seems to me that

7    is consistent with the law under rule 34, and it would make it

8    at least a little fairer if we have to go through this

9    exercise.

10        THE COURT:  Merely as a parade of horribles, perhaps

11   realistically Mr. Liman is saying you are going to ask for

12   something equally broad of them.

13        MR. BLACKMAN:  They are resisting discovery.  I'm

14   going to get to that when you get to that in the letter.  That

15   is another issue, sauce for the goose.

16        THE COURT:  What is the plaintiff's view on cost

17   sharing for that 250,000?  Of course your answer first is no,

18   so give me your second answer.

19        MR. LYTTLE:  Our answer is no because, your Honor,

20   that discovery is perfectly appropriate for this size case.

21        THE COURT:  It depends on what the result is.

22        MR. LYTTLE:  Understood.

23        THE COURT:  If the result is that it is all garbage, I

24   guess I'm asking you this.  You can buy a pig in a poke or you

25   can have the Sword of Damocles hanging over your head.  I can

                Eldrige4c

1    cost shift after the fact, but then you are not being able to

2    make a decision of do you really want this method of getting to

3    the 250,000 documents if you are paying for a decent chunk of

4    it, or would you do something else, or you could decide to cut

5    a deal that you will pay X percent now and then, it is a

6    percent of what.

7              MR. LYTTLE:  Your Honor, to answer your question

8    shortly and distinctly, I'll take the Sword of Damocles.  I'm

9    confident on search terms, I'm confident on our allegations.

10             THE COURT:  People have to learn short answers, not

11   essays.  Produce the 250,000 hits and I'll reserve and you can

12   make a motion for cost sharing.  Make sure you have kept good

13   cost records, both at the vendor level and at the law firm

14   level, as to what you are doing and what the costs are.

15             MR. LYTTLE:  Your Honor, could we also ask that they

16   run the search terms against the remaining custodians?

17             THE COURT:  Let's see the result quickly for the first

18   nine custodians.  If it turns out it is garbage -- let's put it

19   this way.  Run it over the remaining custodians so we have a

20   hit total to compare.  Maybe the custodians are not equal and

21   there will be fewer hits in the remaining 13 than there were in

22   the first nine or maybe it will be three times the number of

23   hits.  But you don't have to actually produce that until we get

24   a feel for what the production of the first 250 is.

25             What else?  We are running out of time, and in

 1    fairness I have to deal with their document requests to you.

 2         MR. LYTTLE:  Your Honor, on the search term point, we

 3    are still in discussions about predictive coding.  We still

 4    believe predictive coding is a productive way to do this.

 5         THE COURT:  For a lot of this, I agree.  For certain

 6    other things I think it won't work.

 7         MR. LYTTLE:  I was asking if you could also order that

 8    they gather all 22 custodians and run it.  Let's do this the

 9    right way instead of continuing to tier this out.

10         THE COURT:  This is something you are all going to

11    have to work on together by yourselves or with a special

12    master.  I really find the way you are all doing this, with

13    nobody giving much on anything and everything being we are

14    almost in agreement, we are still working on agreement . . .

15         What else do you need a ruling on from plaintiff's

16    side today?  I would like to see, and I'm obviously going to

17    bring you back shortly, where you are on the predictive coding

18    issue.

19         MR. LYTTLE:  Your Honor, the other issue that I wanted

20    to cut through, the second one, we kind of touched on it, we do

21    not need to further specify or identify.  I think we resolved

22    that.

23         THE COURT:  That is correct.  You have done as good a

24    job as you are going to do on that.  You will win or lose down

25    the road accordingly.

1      Defendants' issues to the plaintiff.

2           MR. BLACKMAN:  Thank you, your Honor.  The fact of the

3  matter is that other than what we received literally on Friday,

4  we haven't received any documents.  What we received on Friday

5  were some, but, they submit, not all of the documents which BHP

6  Billiton has run at them, which is the basis on which the Court

7  knows they invited us in as a potential white knight.

8           You ordered them on December 9 to produce the

9  documents dealing with their investigation of this supposed

10  conspiracy and bribery, etc., which are critical documents

11  because they are the basis on which they claim that their

12  lawsuit against Vale is --

13           THE COURT:  Stop.

14           MR. BLACKMAN:  We haven't gotten a single document

15  yet.

16           THE COURT:  When is it going to be produced?

17           MR. LYTTLE:  I'm sorry.  What were you asking for?  I

18  apologize.

19           THE COURT:  The BHP material.

20           MR. BLACKMAN:  BHP I left.  I was going on to the next

21  one.  Tell me when you are going to have the BHP by all means.

22           MR. LYTTLE:  We are pulling documents from various

23  enterprise vaults and archives.  We pulled the documents over

24  the holidays.  We did the best we could --

25           THE COURT:  Come on.  Give me an answer.

45

```
 1              MR. LYTTLE:  I knew you were going to ask.  I do my
 2    best with my vendor.  Two, three weeks.
 3              THE COURT:  Two weeks, period.  Get it done.  Have
 4    them do overtime if need be.  Get it done.  Two weeks from
 5    today.
 6              What is the next issue?
 7              MR. BLACKMAN:  The next thing which I transitioned
 8    into, perhaps not clearly, was the fact that the Court ordered
 9    them to produce on December 9 the documents that were not
10    privileged, fact documents, dealing with their investigation,
11    and ordered them to produce a privilege log of what they claim
12    to be privileged, which of course we challenge on waiver.
13              Your first step, which you were very clear and
14    unequivocal about, was produce the nonprivileged documents and
15    give me a log.  We haven't seen hide nor hair of either a
16    document or a log.  We would like the same date you just
17    imposed on them as the outside date that we get that, because
18    that is critical to the limitations issues and it may indeed
19    form the basis for an early summary judgment motion on that.
20              THE COURT:  There are no early summary judgment
21    motions.
22              MR. BLACKMAN:  In any event, it is critical and you
23    ordered them to do it.
24              THE COURT:  When?
25              MR. LYTTLE:  Your Honor, we were collecting the
```

1   documents as part of the larger productive set.  Again, we

2   don't want to do this piecemeal.  It is not efficient.  That is

3   our view.

4          THE COURT:  I got you.  Here is what we are going to

5   do.  You are all going to come back very shortly, you are going

6   to bring the folks from Equivio and Deloitte, and you are going

7   to produce to the Court a complete, hopefully agreed upon,

8   protocol.  Frankly, if you don't have an agreed-upon protocol

9   on both sides for everything, whether for all predictive

10  coding, predictive coding for this issue, key words for

11  another, I don't care how you do it, I want to know how we are

12  getting all this done and when and who you want as your special

13  master, unless that protocol is completely agreed upon.  Enough

14  is enough.

15         MR. BLACKMAN:  Your Honor, I haven't heard that this

16  is a predictive coding issue.  They were ordered to do this.

17  They knew what their investigation produced.

18         THE COURT:  What they are saying is it makes sense to

19  do it as part of the bigger predictive coding that they are

20  going to run on all of their data.

21         MR. LYTTLE:  Correct.

22         THE COURT:  I'm taking them at their word and

23  modifying my prior order to allow them to do it once, except

24  for the BHP, which they have two weeks to finish.  How soon

25  will you be ready on both sides to have your predictive coding

1   protocol and any other protocols that will have what you are

2   doing, when it is being done, all the steps, and that your

3   vendors have talked to you about it, that it is actually going

4   to work?  Tell me when you want to come back.

5           MR. REENTS:  Do you want an answer now?

6           THE COURT:  Yes.

7           MR. LYTTLE:  The 23rd through the 29th we are not

8   available.  Other than that, we will come before or after.  We

9   will be prepared.

10           THE COURT:  If it is before the 23rd, that's nine days

11   from now.  Do you really think you will be ready?  Your

12   colleague is shaking his head no, and I think he is realistic.

13           MR. REENTS:  Your Honor, we propose that we add them

14   on in the first week of February.

15           MR. LYTTLE:  The first week of February is preferable

16   to us.

17           THE COURT:  The first week of February is Legal Tech.

18   I can get you in in the afternoon of February 6th.  2 o'clock

19   on February 6th with vendors.  I'm very serious.  Use your time

20   well because by February 6th you are then down to four months,

21   five months I think, to make the complete production.  Use your

22   time between now and then well.

23           I think that is probably going to include that you

24   agree upon a special master candidate.  If you want names, I

25   can give you names of former judges who are around.  If you

1   want to just do it on your own so I'm not putting my thumb on

2   the scale at all, that's fine.

3           MR. LYTTLE:  Your Honor, we collected some names.

4   None of them are predictive coding experts.  I'd love to have

5   some names from you.

6           THE COURT:  As to a predictive coding expert who may

7   or may not have the least bit of inclination to do this or her

8   firm may not allow her, Maura Grossman at Wachtell Lipton is

9   probably the world's leading expert on predictive coding among

10  lawyers.  She also works with Professor Gordon Cormack, a

11  computer scientist from University of Waterloo.  That would be

12  my first choice.  She and I work very closely together at

13  conferences.  You may consider that a plus or a minus.

14          Your vendors can probably come up with names of

15  lawyers with some skill in this area or vendors with some

16  skill.  But in terms of the more general discovery-related

17  issues, I think if you keep going the way you're going, you're

18  going to need a special master there, and that should probably

19  be a former federal judge.

20          MR. BLACKMAN:  Your Honor, if I could address a couple

21  of points in the time remaining.  One I need to just raise for

22  the record right now.  The Court made it clear that you are not

23  going to extend deadlines.  What we don't want to be in a

24  position of, it would be very unfair, getting on June 30 a log

25  and discovery is now over on documents and we have to now

1    litigate the issue of their at issue waiver.

2         THE COURT:  It is not going to take until June 30 to

3    get this done.  But assuming that they are using predictive

4    coding -- and you will have some say in this.  It is a

5    negotiated protocol.  If it makes sense to use the predictive

6    coding process to find the investigation documents, privileged

7    and nonprivileged, they can't do a privilege log until they

8    have done the document search and culling.

9         I understand it would be nice if they were doing it

10   sooner rather than later.  To the extent that one needs to

11   search law firm files to get to these documents, unless you are

12   going to throw your files into the predictive coding engine, it

13   might make sense to log those documents, either document by

14   document or in whatever categorization is acceptable, if any,

15   to both sides so the Court can deal with that issue, perhaps.

16        MR. BLACKMAN:  Your Honor, you read my mind on the

17   next point I was going to raise.  One of the law firm files

18   that is involved is my friend's.  They started, I believe,

19   doing this investigation years ago when they were at Weil

20   Gotshal and took it to their present firm.

21        There is a serious issue there, which I hate to raise

22   but have to because I don't want to be accused of waiving it,

23   about lawyer witnesses, if it turns out they are going to be

24   defending at a trial, if there is one, their investigation.  We

25   don't know and we won't be able to know what's there until we

1    do this discovery.  But I do want the record to be clear that

2    we are not waiving a potential lawyer witness rule

3    disqualification if that is where the evidence takes us.

4         MR. LYTTLE:  Your Honor, this is the first we have

5    heard of this.  None of the lawyers, including the in-house

6    lawyers, let alone the outside lawyers, have any first-hand

7    percipient knowledge of the investigation or the witnesses

8    spoken to in that investigation other than company witnesses

9    interviewed in the normal course.  The attorneys are not going

10   to be witnesses here.

11        In fact, your Honor, actually on the privilege log, we

12   talked about it.  We were not planning to search law firms.  We

13   have added two in-house counsel, the communications.  They were

14   the ones who led the investigation.  We added those lawyers at

15   their request.  We will search their files, and communications

16   with us as lawyers to them will be logged.

17        We did not understand your Honor to say and don't

18   think the case law requires a search of lawyer files as well,

19   because any relevant documents that need to be logged will be

20   captured in the search of the in-house lawyers.  We are not

21   going to log all of our --

22        THE COURT:  Certainly if that is true, then you don't

23   need to log something twice.  I'm not ruling on this at this

24   point.  If, for example, your firm, whether your current or

25   prior, were running this investigation -- it is not even clear

Eldnri4c

1   what the investigation is, but I know we have had discussion

2   about it -- and you were running it in such a way that it

3   didn't touch the in-house folks because they wanted to do it

4   that way, obviously we would have to look at what's in your

5   firm's files.

6           I suggest you all, again, cooperate with each other

7   more than you are already doing.  Otherwise, whoever the

8   special master is will deal with this in the first instance and

9   I'll deal with the question of whether there has been a

10  privilege waiver or not.

11          MR. LYTTLE:  Your Honor, their investigation was by

12  investigative firms hired that went out to talk with sources

13  and generated the reports.  The law firms did not run that.

14  They were independent people.  We, your Honor, are not planning

15  to search Quinn Emanuel or Weil Gotshal files.

16          THE COURT:  Understood.

17          MR. BLACKMAN:  We don't know what the documents say,

18  so we obviously are kind of in the dark on this.

19          THE COURT:  Were there reports in those outside

20  investigative firms?

21          MR. LYTTLE:  Yes, your Honor.

22          THE COURT:  Are those going to be produced?

23          MR. LYTTLE:  They are, your Honor.  Some will be

24  logged, some will be produced.

25          THE COURT:  Any reason that can't be expedited?

 1          MR. LYTTLE:  We can expedite that, your Honor.  The

 2   hesitation I have is that there is case law and we are coming

 3   to your Honor for a protective order.  These are confidential

 4   sources that face reprisal, economic, business reprisal, and

 5   potentially personal harm.

 6          I don't want to be a drama queen or create too much

 7   drama about this, but this is a very serious matter in Africa.

 8   Our confidential sources, pursuant to case law, we are going to

 9   redact those.  They can have the facts and what was relayed,

10   but the identity of those sources is something that we cannot

11   disclose.

12          THE COURT:  We will deal with that when I or the

13   special master needs to deal with it.  I think the main issue

14   is, because of the statute of limitations argument, to get them

15   the information they need so they can make the argument about

16   you knew about this at a point where you should have brought

17   the suit earlier than you did, etc.

18          Let's expedite the production of those reports.

19   Presumably, your client knows where to find those very quickly.

20   All documents about may be different.  But the reports, however

21   many it is, redact, produce.

22          I'm not saying it is appropriate to redact.  I'm

23   saying you will do it that way because that is what you want to

24   do.  They will argue to me it is inappropriate or it is

25   appropriate.  We will go from there.  If there are reports

1  similar that you are saying are totally privileged, log those

2  immediately and see if we can make some progress.

3           MR. BLACKMAN:  The last thing, your Honor, is the

4  other third parties besides Chinalco.  We have had discussion

5  with them, and they have been very reluctant.  We know they

6  talked to Chinalco, the Chinese mining company, and they may

7  well have provided that entity with the same allegedly

8  confidential material.  We also believe they talked to other

9  third parties and they have just been reluctant to do that.

10          We think it is totally fair game for discovery in

11 light of their issues about misappropriation and also as part

12 of the fact that whereas they claim we tricked them into

13 talking to us, the truth of the matter is we think they tricked

14 us into talking to them while they were talking to a whole

15 bunch of other people.

16          THE COURT:  We will worry about that at the next

17 conference.  We have run out of time.  The usual drill.  You

18 will all have to purchase the transcript.  You will get me by

19 tomorrow the proposed scheduling order as a clean document so I

20 can get that entered.

21          MR. LYTTLE:  Yes, your Honor.

22          THE COURT:  See you February 6th.

23          (Adjourned)

24

25