# Exhibit D

# Response to BSGR Guinea press speculation

**9 May 2013**

**BSG Resources Limited** ("BSGR" or "the Group")
**Response to press speculation**
9 May 2013

Further to recent media speculation, the Board of BSGR wishes to clarify its position in relation to recent events, in light of commentary, driven largely by both official and unofficial representatives of the Government of Guinea, and organisations involved with it.

BSGR has always, and will continue to act to the highest standards of Corporate Governance in all 12 countries in which it operates. In all of these countries BSGR operates in a fully transparent manner, working in partnership with host governments at both national and local level. Good governance is intrinsic to its Group mission of balancing business success with its responsibilities to the communities in which it operates and the environment that supports them.

BSGR is confident that its activities and position in Guinea will be fully vindicated.

**Guinea**

Allegations that there was anything improper about the manner in which BSGR obtained its mining rights in Guinea are entirely baseless and motivated by an ongoing campaign to seize the assets of BSGR.

The granting of exploration permits to BSGR by the Government of Guinea ("GoG") in February 2006 was conducted in a fully transparent manner, and as part of a competitive process during which BSGR had to consistently prove that it had the technical and financial capability to carry out exploration, feasibility studies and project development. Having further demonstrated to the GoG that BSGR operated across Africa to the highest international standards, it was awarded its permits because it was prepared to act decisively and take quick decisions. Unlike most major mining companies, BSGR did not view Simandou as a strategic asset to be used to increase the value of its reserves.

BSGR was rightly proud to have been awarded these permits, and the signing ceremony was conducted as part of a high-profile event, now free to view on the internet, and done so with the full regalia, knowledge and understanding of Parliament, the President, and the Minister of Mining of the Republic of Guinea.

Lacking a permanent presence in Guinea, BSGR sought to work with Michael Noy, Avraham Lev Ran and Frederic Cilins, who had extensive business operations in Guinea, which they subsequently established as Pentler Holdings. Thus, Pentler took a participation of 17.65 per cent equity stake in BSGR Guinea Ltd BVI in March 2006. This arrangement ended when BSGR re-acquired the entire equity from Pentler Holdings in March 2008.

Between 2006 and 2009, BSGR achieved considerable success with part of its drilling programme, resulting in the completion of its feasibility study for Zogota in November 2009, submitted to the Ministry of Mines, and concluding the existence of a commercially operational deposit at Simandou South, while the Simandou North and Bauxite licenses were relinquished to the government according to the Mining Code. The completion of the feasibility study within only three years of the exploration permits being issued was the first accomplishment of its type in the history of Guinea. This was achieved despite the passing of President Lansana Conté in December 2008, which plunged Guinea into a period of political instability marked by military coups and transitional governments. BSGR continued to negotiate permit renewals with the relevant government departments using its own employees. The original leases and contracts were reviewed by the Guinean Interim Government in 2009. It should be noted that neither Pentler Holdings nor Mamadie Toure had any involvement in this process.

In December 2009, BSGR concluded a Basic Agreement with the Republic of Guinea, which provided the framework to a two-phased project of Zogota and Simandou Blocks 1 and 2. The Basic Agreement followed the three-year exploration programme in which BSGR had invested over $165 million with no guarantee of success. Further commitments to the GoG included the construction of a $1 billion passenger railway of 660km, across Guinea, only for the purpose and the benefit of the populations and isolated communities from Conakry to Kankan and Kerouane for light haul and passengers only (not for iron ore).

In April 2010, following phased discussions with two other potential partners, Vale of Brazil approached BSGR,

following which the Board of BSGR approved a strategic sale of 51 per cent of the Guernsey holding company to Vale SA for $2.5 billion of which $500 million has been disbursed to date. Remaining payments are only due on completion of agreed project milestones. The creation of such joint ventures is common practice worldwide in mineral resources development as an effective method of risk sharing. Indeed, the creation of the joint venture, known as VBG, received public support from the acting President and Prime Minister of Guinea, the Minister of Finance and current Guinean Minister of Mines, and the Guinean Transport Minister (all serving in the current administration), as well as the Guinean Ambassador to Brazil, as a means of facilitating and expediting the most ambitious iron ore project in West Africa. During the course of 2010, the joint venture, known as VBG, was successful in obtaining the necessary authorisations and orders to commence work at Zogota in accordance with the agreed timetable as well as making progress with its feasibility study in respect of Simandou Blocks 1 and 2.

Against the background of the exceptional commercial success of BSGR in Guinea and the subsequent media exposure surrounding the deal, BSGR became the victim of numerous extortion attempts by individuals who were seeking economic gains. The modus operandi of these attempts involved at times the use of forged documentation, blackmail and harassment.

**Alpha Condé**

BSGR and VBG welcomed Guinea's first democratic elections in November 2010. Alpha Condé took office in December 2010, with a pledge under the Ouagadougou agreement to hold legislative elections within the first six months. To date, no such election has taken place, which has put the mandate of the current transitional legislative body into a constitutional impasse. Many questions have been raised and reported in the international press regarding the voter registration system used during the 2010 Presidential elections. The same concerns remain a significant factor in the current civil unrest in Guinea, discussed at the UN Security Council as recently as 29 April.

Notably, following the election of Alpha Condé, a targeted campaign against BSGR emerged, which caused work at Simandou to gradually grind to a complete standstill. Many uncertainties were introduced through the announcement of a new Guinean Mining Code advised by George Soros and his supported institutions, and subsequent government decisions to review all mining contracts signed by previous governments through the establishment of an ad hoc entity, the Comité Technique de Revue des Titres et Conventions Miniers (CTRTCM). Additional interference in BSGR's mining project became apparent through numerous scandals which erupted in Guinea, the most notable one being the loan-for-asset deal concluded with Palladino Capital 2 by the entourage of the President.

Furthermore, both the review and the CTRTCM, appeared contrary to the Guinean Constitution and the Mining Code. The New Mining Code also recommended substantial fiscal changes including nationalisation of 15 per cent free carry and an acquisition right of a further 20 per cent, combined with material increases in royalties and import duties. The government then announced abruptly to BSGR, a change in policy regarding the iron ore export corridor, which materially altered the fundamentals of the project and more than doubled costs when compared to the initially authorized passage through Liberia. Whilst BSGR supports fully the need for indigenous governments to receive fair returns for the development of its natural resources, the fiscal conditions must also allow mining companies to generate project returns that are attractive to its shareholders. Without such a balance, long-term mining projects will stall, as is the case in Guinea at present. Furthermore, it is unusual for the technical and economic fundamentals of such a significant project to be materially challenged and continuously uncertain.

For reasons that have never been clearly communicated to BSGR, the CTRTCM, managed by representatives of George Soros, began an investigation into the existing mining agreements. At all times, BSGR and VBG have attempted to cooperate with the CTRTCM, but the Committee's actions have defied all notions of due process. At the same time, the government of Guinea announced it would be open to mediate a solution, yet it appeared that this measure was just another form of hidden harassment against the company. Thus, rather than look for solutions, the representatives of the Guinean administration chose to issue public statements, employing high profile international mouthpieces to do so, that questioned the validity of the concluded agreements. In addition, the government banned inexplicably the President of BSGR from entering the country. Since then, the Government and its agents have consistently and deliberately looked for opportunities to attack and smear the reputation of BSGR. All of their claims remain unsubstantiated and motivated by the desire to seize or expropriate the assets of BSGR in Guinea.

The web of relationships that exist between the GoG, the CTRTCM, George Soros, the various international non-government organisations and their numerous professional advisers, including Global Witness, law firm DLA Piper, and business intelligence firm Veracity, has resulted in a coordinated but crude smear campaign against BSGR. Their relationships with high-profile journalists, involving the leaking of privileged and confidential information to them, has resulted in these journalists becoming part of the story and calling into question their respective abilities to report with any impartiality.

BSGR's attempts to uncover this misuse of confidential information, and other potentially illegal activities against it, by requesting information held about the Company through the use of the Data Protection Act 1998, have been consistently hampered by Veracity and Global Witness. This potentially collusive and unlawful behaviour, by many connected parties, forms important context in BSGR being forced to issue and serve legal proceedings, in the UK High Court against FTI Consulting LLP and Lord Mark Malloch-Brown.

Furthermore, the GoG is now attempting to use the on-going investigation into Frederic Cilins, to illegally detain, on unsubstantiated grounds, two employees of BSGR in Guinea. This is a further example of the GoG resorting to harassment of BSGR and its officials. In light of the media reports on human rights and justice system abuses in Guinea by the current administration, BSGR remains concerned for the safety of its employees and expects their rights under Guinean and international law to be observed.

BSGR can only conclude that the ultimate aim of the GoG and CTRTCM, assisted by the many third parties that are advising them, remains the expropriation of the interests of BSGR and VBG in Guinea. It would appear that, under increasing pressure from the international community to run free and fair legislative elections, key individuals within the current administration are attempting to use BSGR and VBG to divert attention away from their alleged roles in the many scandals, widely reported in the international press, that have plagued the Guinean mining industry since the current administration took office.

ENDS

**Contact details**
*Media Enquiries Re: BSG Resources*
*Powerscourt +44(0) 20 7250 1446*
*Rory Godson / Ian Middleton / Conal Walsh*
*bsg@powerscourt-group.com*

Back

About Us  |  Mining & Metals  |  Energy  |  Community & Environment  |  Media  |  Contact

Legal Notice  |  Disclaimer  |  Cookies  |  ©2013 BSG Resources Limited

Privacy and Cookies Policy The attention of users is drawn to BSGR's Privacy & Cookies Policy which includes details on the use of performance, identification and targeting cookies (both our own and third parties) to enhance the functionality of the web-site, to enable the Group to monitor usage and to assist with future communications. By continuing to use this site users will be deemed to have accepted this policy and the use of cookies for these limited purposes only.

While every attempt has been made to ensure the accuracy of all statements at the time of writing, it must be born in mind that BSGR is constantly changing and developing in line with strategy and the markets in which it operates. We regularly check website content but cannot accept responsibility for actions or decisions based on information contained on this website. All questions regarding BSGR's most current status should be checked. Contact details can be found below.