# Exhibit J1

**CONFORMED COPY**

BSG RESOURCES LIMITED

and

VALE S.A.

---

JOINT VENTURE FRAMEWORK AGREEMENT

---

Dated: 30 April 2010

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**TABLE OF CONTENTS**

Page

Section 1.   Definitions; Interpretation........................................................................................2

1.1   Definitions...........................................................................................................2
1.2   Sections and Schedules........................................................................................2
1.3   Headings ..............................................................................................................2
1.4   Other Provisions Relative to Terms ....................................................................2
1.5   Agreed Form ........................................................................................................2
1.6   BSGR Warranties Exchange Rate .......................................................................2
1.7   BSGR Limitations Exchange Rate.......................................................................3
1.8   BSGR Awareness.................................................................................................3

Section 2.   Sale and Purchase of the Sale Shares......................................................................3

2.1   Sale and Purchase ................................................................................................3
2.2   Designation ..........................................................................................................3

Section 3.   Purchase Price..........................................................................................................4

Section 4.   Completion...............................................................................................................5

4.1   Completion...........................................................................................................5
4.2   Completion Deliveries .........................................................................................5
4.3   Intentionally omitted............................................................................................8
4.4   Intentionally omitted............................................................................................8
4.5   Intentionally omitted............................................................................................8
4.6   Creation of Deferred Shares.................................................................................8
4.7   Bank Mandates/Other Officers ...........................................................................8
4.8   Change of Name ..................................................................................................8

Section 5.   Post Completion Undertakings ...............................................................................8

5.1   Feasibility Study ..................................................................................................8
5.2   Feasibility Study Interruption Circumstances.....................................................9
5.3   Feasibility Study Interruption Notices...............................................................10
5.4   Failure to Complete or Approve the Feasibility Study ......................................10
5.5   Liberian Transport Solution...............................................................................11
5.6   Technical Services Agreement ...........................................................................12
5.7   Development of Liberia ProjectCo .....................................................................12
5.8   Off-take of Minerals ..........................................................................................13
5.9   Tax and Corporate Restructuring.......................................................................13

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                              VALE-RT_00000685

5.10            Off-take Agreement ................................................................................13
5.11            Compliance with Ancillary Agreements...............................................14
5.12            FCPA Provisions....................................................................................14

Section 6.      Funding ...................................................................................................14

6.1             Funding of Feasibility Study..................................................................14
6.2             Project Financing ...................................................................................15
6.3             Vale Loan................................................................................................15
6.4             Repayments of Vale Loan......................................................................15

Section 7.      Conduct of Business ..............................................................................16

Section 8.      Warranties ...............................................................................................16

8.1             BSGR Warranties....................................................................................16
8.2             Vale Warranties ......................................................................................17
8.3             Non-pursuit of Claims.............................................................................17
8.4             Guernsey Loan Indemnity.......................................................................17

Section 9.      Tax Covenant ..........................................................................................17

Section 10.     Vale's Remedies .....................................................................................18

10.1            Basis of Claims for Breach of Indemnity Warranties............................18
10.2            Set-off of Claims....................................................................................18

Section 11.     Third Party Claims .................................................................................19

Section 12.     Payments .................................................................................................20

12.1            Payments to BSGR .................................................................................20
12.2            Payments to BSGR Guinea.....................................................................20
12.3            Payment to Vale......................................................................................21
12.4            Method of Payment.................................................................................21
12.5            Interest.....................................................................................................21
12.6            Force Majeure .........................................................................................21
12.7            Gross-up on Payments ............................................................................24

Section 13.     Non Solicitation and Non Competition...................................................24

13.1            Non Solicitation Covenant......................................................................24
13.2            Non Competition Covenant and Referral of Opportunities ...................25
13.3            Pursuit of New Business Opportunities ..................................................25
13.4            Exceptions to Non Competition Covenant. ............................................25

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                              VALE-RT_00000686

13.5          Acknowledgement Relating to Restrictions...........................................................26

Section 14.   Announcements.......................................................................................................26

Section 15.   Confidentiality .......................................................................................................26

15.1          Confidentiality Obligation ....................................................................................26
15.2          Exceptions..............................................................................................................27
15.3          Disclosure to Representatives ................................................................................28
15.4          Effect on Termination ............................................................................................28
15.5          Confidentiality Agreement.....................................................................................28

Section 16.   Miscellaneous .........................................................................................................28

16.1          Costs.......................................................................................................................28
16.2          Notices ...................................................................................................................28
16.3          Entire Agreement ...................................................................................................30
16.4          Assignment .............................................................................................................30
16.5          Waiver of Rights ....................................................................................................31
16.6          Amendments ...........................................................................................................31
16.7          Invalidity ................................................................................................................31
16.8          No Partnership or Agency ......................................................................................31
16.9          Conflict With Constitutional Documents...............................................................32
16.10         Governing Law; Arbitration. .................................................................................32
16.11         Further Assurances.................................................................................................34
16.12         Contracts (Rights of Third Parties) Act 1999 .......................................................34
16.13         Remedies.................................................................................................................34
16.14         Effect of Completion...............................................................................................35
16.15         Counterparts............................................................................................................35

Schedule 1 - Defined Terms
Schedule 2 - Form of Off-take Term Sheet
Schedule 3 - Form of Vale Loan Term Sheet
Schedule 4 - BSGR Warranties
Schedule 5 - Limitations on Liability
Schedule 6 - Vale Warranties
Schedule 7 - BSGR Guinea Group
Schedule 8 - Liberian Transport Solution
Schedule 9 - Feasibility Study
Schedule 10 - Tax Covenant

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000687

## JOINT VENTURE FRAMEWORK AGREEMENT

THIS JOINT VENTURE FRAMEWORK AGREEMENT (this "**Agreement**") is made on 30 April 2010

BETWEEN:

(1)     BSG RESOURCES LIMITED, a company registered under the laws of Guernsey with registered number 46565, with its principal office in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX ("**BSGR**"); and

(2)     VALE S.A., a company registered under the laws of Brazil, with its principal office in Av. Graça Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brasil ("**Vale**" and, together with BSGR, the "**Parties**").

## RECITALS

(A)     BSGR owns directly 100% of the issued share capital of BSG Resources (Guinea) Limited, a company registered under the laws of Guernsey ("**BSGR Guinea**"), which in turn owns directly 100% of the issued share capital of each of BSG Resources (Guinea) S.à r.l., a company registered under the laws of the Republic of Guinea ("**ProjectCo**"), and BSG Resources (Liberia) Limited, a company registered under the laws of the British Virgin Islands ("**Liberia HoldCo**"). Liberia HoldCo in turn owns directly 100% of the issued share capital of BSGR (Liberia) Limited, a company registered under the laws of the Republic of Liberia ("**Liberia ProjectCo**").  Further details regarding BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo are contained in Schedule 7.

(B)     ProjectCo and Liberia ProjectCo, as applicable, hold the Exploration Permits and the Mining Concession and ProjectCo is engaged in the development of the Project.

(C)     On the terms and subject to the conditions of this Agreement (i) BSGR will sell and Vale will purchase in consideration for the Purchase Price ordinary shares representing 51% of BSGR Guinea's issued share capital; and (ii) the Parties will cooperate to develop the Project and provide the funds necessary for such purpose.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein, the Parties agree as follows:

UK-2421081-v8                                             - 1 -                                          95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                   VALE-RT_00000688

## Section 1.        Definitions; Interpretation

1.1      <u>Definitions</u>. Capitalized terms not otherwise defined in this Agreement shall have the meaning set forth in Schedule 1.

1.2      <u>Sections and Schedules</u>. Except where the context otherwise requires, references to Sections and Schedules are to Sections of, or Schedules to, this Agreement. The Schedules form part of this Agreement.

1.3      <u>Headings</u>. Headings are inserted for convenience only and shall not affect the construction of this Agreement or the Schedules hereto.

1.4      <u>Other Provisions Relative to Terms</u>. In this Agreement, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class or examples of acts, matters or things. Words importing the singular shall include the plural and vice versa and words importing any gender shall include all other genders and references to persons shall include individuals, firms, corporations, other bodies corporate, partnerships, unincorporated associations, employee representative bodies, governments, states and agencies of a state. A reference to any other document in this Agreement (other than a document referred to in the Disclosure Letter) is a reference to that other document as amended, varied or supplemented (other than in breach of this Agreement) at any time. References in this Agreement to statutory provisions shall be construed as references to those provisions as respectively amended, consolidated, extended or re-enacted from time to time and any orders, regulations, instruments or other subordinate legislation made from time to time under the statute concerned.  References to a "day" shall mean a period of 24 hours running from midnight to midnight.  References to a liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument.  Reference to a party being liable to another party, or to liability, includes, but is not limited to, any liability in equity, contract or tort (including negligence).  References to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall in respect of any jurisdiction other than England be deemed to mean what most nearly approximates in that jurisdiction to the English legal term and to any English statute shall be construed so as to mean equivalent or analogous laws of any other jurisdiction.

1.5      <u>Agreed Form</u>. A reference in this Agreement to a document in the **"agreed form"** is a reference to a document in a form approved and, for the purposes of identification, initialed by or on behalf of Vale and BSGR.

1.6      <u>BSGR Warranties Exchange Rate</u>. Any monetary sum to be taken into account for the purposes of any BSGR Warranty where that sum is expressed in a currency other than dollars

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                   VALE-RT_00000689

shall be translated into dollars at the Exchange Rate on the day immediately prior to the date of this Agreement (or, if such date is not a Business Day, on the Business Day immediately preceding such day).

1.7     <u>BSGR Limitations Exchange Rate</u>. Where it is necessary to determine whether a monetary limit or threshold referred to in Schedule 5 has been reached or exceeded and the value of the Claim is expressed in a currency other than dollars, the value of that Claim shall be translated into dollars at the Exchange Rate on the date of receipt by BSGR of written notification from or on behalf of Vale in accordance with the provisions of this Agreement of the existence of such Claim (or, if such day is not a Business Day, on the Business Day immediately preceding such day).  The amount of any sum payable by BSGR in discharge or settlement of such Claim shall be converted into dollars (where such amount is expressed in a currency other than dollars) at the Exchange Rate on the date of such amount being agreed or finally determined (**"Settlement Date"**), provided always that any such sum shall continue to be payable even if after conversion into dollars the relevant sum at the Settlement Date would be below a relevant monetary limit or threshold referred to in Schedule 5.

1.8     <u>BSGR Awareness</u>. A reference in this Agreement to "*so far as BSGR is aware*", "*so far as any BSGR Guinea Group Company is aware*" or "*to the knowledge of any BSGR Guinea Group Company*" or any similar reference shall be construed as the actual knowledge as at the date of this Agreement of Yossie Tchelet, Marc Struik, Asher Avidan and David Clark of BSGR, David Barnett (in his capacity as an external advisor) and Benjamin Steinmetz (in his capacity as an external advisor to BSGR/the Balda Foundation) (the **"BSGR Principals"**), together with such knowledge as the BSGR Principals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement.

**Section 2.     Sale and Purchase of the Sale Shares**

2.1     <u>Sale and Purchase</u>. On the terms and subject to the conditions of this Agreement, at Completion BSGR shall sell and transfer and Vale shall purchase, or procure that a wholly-owned subsidiary of Vale shall purchase, for the Purchase Price, all of the Sale Shares free and clear of all Encumbrances. Full title to, and legal and beneficial ownership of, all of the Sale Shares, together with all rights and benefits attaching to them, shall pass to Vale or its nominated subsidiary upon Completion.

2.2     <u>Designation</u>. Vale shall have the right to designate a wholly-owned subsidiary to purchase the Sale Shares as set out in Section 2.1 by written notice to BSGR to be received no later than the Completion Date, provided that Vale shall remain responsible for its obligations hereunder and shall procure that such wholly-owned subsidiary complies with the provisions of this Agreement, as applicable.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                        VALE-RT_00000690

**Section 3.    Purchase Price**

The consideration for the Sale Shares shall be the Initial Consideration and, to the extent that they become due and payable in accordance with the terms of this Section 3, the First Deferred Consideration and the Second Deferred Consideration (together, the "**Purchase Price**"), which Vale shall pay to BSGR in the manner prescribed by Section 12 as follows:

(a)    the "**Initial Consideration**" shall be $500,000,000 and shall be paid at Completion;

(b)    the "**First Deferred Consideration**" shall be $500,000,000 and shall be payable in the event that the Liberian Transport Solution Effective Date occurs prior to the Second Deferred Consideration Trigger Date, such amount to be paid on the date (if any) that is 10 Business Days following the later of (1) the Liberian Transport Solution Effective Date and (2) 1 January 2011, provided that the Liberian Transport Solution Effective Date shall have occurred prior to 1 January 2011 and provided always that Vale's obligation to pay the First Deferred Consideration to BSGR shall automatically terminate on the BSGR Subscription Trigger Date (if any); and

(c)    the "**Second Deferred Consideration**" shall be either (1) $1,500,000,000 if the First Deferred Consideration has been paid prior to the payment of the Second Deferred Consideration (or, if the Second Deferred Consideration is paid in more than one installment, prior to the payment of the final installment of such Second Deferred Consideration) or (2) $2,000,000,000 if the First Deferred Consideration has not been paid prior to the payment of the Second Deferred Consideration (or, if the Second Deferred Consideration is paid in more than one installment, prior to the payment of the final installment of such Second Deferred Consideration), and, to the extent it becomes payable in accordance with the terms of this Agreement, shall be paid according to the following timetable:

(i)    **if the Simandou Construction Date occurs before (I) the Second Deferred Consideration Trigger Date and (II) the BSGR Subscription Trigger Date**: (A) $1,000,000,000 on the date that is 10 Business Days following the Simandou Construction Date (the "**Simandou Construction Second Deferred Consideration**"), and (B) (x) $500,000,000 if the First Deferred Consideration has previously been paid or (y) $1,000,000,000 if the First Deferred Consideration has not previously been paid, in either case, as applicable, on the date (if any) that is 10 Business Days following the Second Deferred Consideration Trigger Date provided always that if the BSGR Subscription Trigger Date has occurred prior to the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000691

Simandou Construction Date, none of the amounts referred to in this Section 3(c)(i) shall become payable; or

(ii) **if the Simandou Construction Date has not occurred prior to the Second Deferred Consideration Trigger Date**: an amount equal to the Second Deferred Consideration (whichever the amount of the Second Deferred Consideration as determined above) on the date (if any) that is 10 Business Days following the Second Deferred Consideration Trigger Date,

provided that, if each of the First Deferred Consideration and the Second Deferred Consideration becomes due and payable in accordance with the terms of this Section 3, the total Purchase Price shall be equal to $2,500,000,000.

The Parties also agree that, to the extent it becomes due and payable in accordance with the terms of this paragraph, Vale shall pay to BSGR in the manner prescribed by Section 12, $180,000,000 on the date that is 10 Business Days following 27 December 2012 provided that on 27 December 2012 any member or members of the BSGR Guinea Group are the only companies with rights of passage from Guinea to Liberia for the export of iron ore from the coast of Liberia (the "**Additional Consideration**"), provided always that Vale's obligation to pay the Additional Consideration shall automatically terminate with immediate effect if the BSGR Subscription Trigger Date has occurred prior to 27 December 2012.

**Section 4.    Completion**

4.1    <u>Completion</u>. Completion of the sale and purchase of the Sale Shares ("**Completion**") shall take place immediately following the execution of this Agreement, such date being the Completion Date (the "**Completion Date**").

4.2    <u>Completion Deliveries</u>. Completion shall not be deemed to have taken place unless and until all of the actions and deliveries set forth below shall have been taken or delivered:

(a) *Sale and Purchase*.  At Completion:

(i) Vale shall pay to BSGR the Initial Consideration; and

(ii) BSGR shall deliver to Vale certificates for the Sale Shares, together with a share transfer form, duly and validly executed by BSGR and sufficient to vest in Vale (or such member of its Group as it has designated pursuant to Section 2.2) full and valid title to the Sale Shares, free and clear of all Encumbrances.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                VALE-RT_00000692

(b)     *Ancillary Agreements (BSGR)*. At or by Completion, BSGR shall enter into and cause that BSGR Guinea shall enter into, or, as applicable, initial as an agreed form document the following:

    (i)     the Shareholders' Agreement relating to BSGR Guinea of even date herewith and made between BSGR, Vale and BSGR Guinea (the "**Shareholders' Agreement**");

    (ii)    the Off-take term sheet in the form attached as Schedule 2 (the "**Off-take Term Sheet**"); and

    (iii)   the Vale Loan Term Sheet.

(c)     *Ancillary Agreements (Vale)*.  At Completion, Vale shall enter into, or, as applicable, initial as an agreed form document the following:

    (i)     the Shareholders' Agreement;

    (ii)    the Off-take Term Sheet; and

    (iii)   the Vale Loan Term Sheet.

(d)     *Corporate Approvals (BSGR)*.  At Completion, BSGR shall procure that a general meeting of BSGR Guinea and the Board shall approve such resolutions and take such other actions as are necessary to ensure that:

    (i)     the agreed form constitutional documents for BSGR Guinea are adopted, reflecting certain matters set out in the Shareholders' Agreement (the "**Constitutional Documents**");

    (ii)    new share certificates in relation to the Sale Shares are issued in the name of Vale or its nominated subsidiary;

    (iii)   the transfer of the Sale Shares from BSGR to Vale (or such member of its Group as it has designated pursuant to Section 2.2) is approved and Vale's name (or the name of such member of its Group as it has designated pursuant to Section 2.2) is entered in the members' register of BSGR Guinea in respect of the Sale Shares;

    (iv)    with effect from Completion, Sandra Merloni-Horemans, Asher Avidan and Marcus Struik resign from the Board;

    (v)     with effect on and from Completion, Lucio Cavalli, Eduardo Etchart and José André de Castro Alves are appointed as general managers (*gérant*) of ProjectCo;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                          VALE-RT_00000693

(vi) with effect on and from Completion, Lucio Cavalli, Eduardo Etchart and José André de Castro Alves are appointed to the Board and designated as Vale Directors (as defined in the Shareholders' Agreement) and Dag Cramer is appointed to the Board and designated as a BSGR Director (as defined in the Shareholders' Agreement); and

(vii) with effect from Completion, David Clark is re-designated as a BSGR Director (as defined in the Shareholders' Agreement).

(e) *Corporate Documents (BSGR)*. At Completion BSGR shall deliver or cause the delivery to Vale of:

(i) as evidence of the authority of each person executing a document referred to in this Section 4 on behalf of BSGR or a BSGR Guinea Group Company:

(A) a copy of an extract from the minutes of duly held meetings of the directors of BSGR and each relevant BSGR Guinea Group Company (or a duly constituted committee thereof) authorizing the execution by BSGR or the relevant BSGR Guinea Group Company (as applicable) of the relevant document(s) and, where such execution is authorized by a committee of the board of directors of BSGR or the relevant BSGR Guinea Group Company (as applicable), a copy of the minutes of a duly held meeting of the directors constituting such committee or the relevant extract thereof; or

(B) a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the secretary of BSGR or the relevant BSGR Guinea Group Company (as applicable);

(ii) as evidence of full legal title in the Sale Shares passing to Vale or its nominated subsidiary, a certified copy of an updated register of members of BSGR Guinea that reflects Vale's or its nominated subsidiary's ownership of the Sale Shares; and

(iii) duly executed resignation letters from Sandra Merloni-Horemans, Asher Avidan and Marcus Struik resigning their positions as directors of BSGR Guinea in the agreed form expressed to take effect from Completion.

(f) *Corporate Documents (Vale)*. At Completion Vale shall deliver or cause the delivery to BSGR of, as evidence of the authority of each

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                          VALE-RT_00000694

person executing a document referred to in this Section 4 on behalf of Vale or Vale International S.A. or the relevant member of the Vale Group a copy of a confirmation from a senior officer of Vale that the board of directors of Vale (or a duly constituted committee of the board) has authorized the execution of the relevant documents by Vale and/or other relevant members of the Vale Group.

4.3     Intentionally omitted.

4.4     Intentionally omitted.

4.5     Intentionally omitted.

4.6     Creation of Deferred Shares. On or as soon as is reasonably practicable after Completion, each Party shall procure that BSGR Guinea shall take all necessary steps to create a class of Deferred Shares, having the rights as set out in the agreed form Deferred Share rights document, and to make such changes to its Articles as may be reasonably necessary or appropriate to reflect the creation of the Deferred Shares.

4.7     Bank Mandates/Other Officers.  The Parties agree to use all reasonable efforts to cause or to procure that on or as soon as is reasonably practicable after Completion, BSGR Guinea and any other relevant member of the BSGR Guinea Group replaces, removes and/or appoints such officers (including, without limitation, directors, *gérants*, general managers or company secretaries), officials and auditors and makes such amendments to the bank mandates of BSGR Guinea and/or such member of the BSGR Guinea Group as Vale may reasonably require.

4.8     Change of Name.  The Parties agree to use all reasonable efforts to procure that the name of BSGR Guinea shall be changed to VBG – Vale BSGR Limited, the name of ProjectCo shall be changed to VBG – Vale BSGR Guinea Limited, the name of Liberia HoldCo shall be changed to VBG – Vale BSGR BVI Limited and the name of Liberia ProjectCo shall be changed to VBG – Vale BSGR Liberia Limited as soon as is reasonably practicable following Completion.

**Section 5.     Post Completion Undertakings**

5.1     Feasibility Study. The Parties acknowledge that it is necessary to conduct and complete the Feasibility Study to assess the viability of the Project as follows:

(a)     each Party shall use its reasonable efforts, including in its capacity as a shareholder of BSGR Guinea, so far as it lawfully can, to ensure compliance by ProjectCo with its obligations under the Basic Agreement;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                 VALE-RT_00000695

(b)      each Party shall procure that ProjectCo shall appoint Vale to undertake the Feasibility Study on its behalf within the Feasibility Study Period and that ProjectCo shall provide quarterly updates on the status and progress of the Feasibility Study to the Board of BSGR Guinea and to BSGR;

(c)      within 10 Business Days of the date of completion of the Feasibility Study, Vale shall deliver an irrevocable notice to BSGR Guinea and BSGR confirming that the Feasibility Study has been completed and the date on which the Feasibility Study was completed (such date being, the "**Feasibility Study Completion Date**"); and

(d)      by no later than 60 days after the Feasibility Study Completion Date (the "**Feasibility Study Approval Date**"), Vale shall confirm to BSGR Guinea and BSGR whether or not the Feasibility Study has been approved by Vale, such approval to be at its sole discretion.

5.2    <u>Feasibility Study Interruption Circumstances</u>. If, at any time during the Feasibility Study Period:

(a)      a Force Majeure Event occurs or factors which are not within the sole control of Vale prevent Vale from continuing to undertake and complete the Feasibility Study by the Feasibility Study Period Expiry Date (any such event or factors comprising "**Feasibility Study Interruption Circumstances**"), Vale shall deliver a notice to BSGR and BSGR Guinea within 10 Business Days of Vale having reasonably determined that such an event has occurred or is occurring or such factors have arisen (a "**Feasibility Study Interruption Notice**") advising them of the nature of such event or factors and the date upon which such event or factors first occurred (the "**Feasibility Study Interruption Date**");

(b)      following the service of a Feasibility Study Interruption Notice, the Feasibility Study Period shall be suspended with effect on and from the Feasibility Study Interruption Date identified in such Feasibility Study Interruption Notice and the Parties shall meet promptly and in good faith with a view to finding a mutually acceptable solution to enable Vale to recommence work on the Feasibility Study in such a manner as would enable Vale to complete the Feasibility Study prior to the Feasibility Study Period Expiry Date (a "**Feasibility Study Interruption Solution**");

(c)      within 10 Business Days of the earlier of (i) the date on which the Feasibility Study Interruption Circumstances in relation to which a Feasibility Study Interruption Notice has previously been delivered under

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                           VALE-RT_00000696

Section 5.2(a) cease to exist or apply; and (ii) the date (if any) on which the Parties agree a Feasibility Study Interruption Solution to the Feasibility Study Interruption Circumstances in relation to which a Feasibility Study Interruption Notice has previously been delivered under Section 5.2(a), and provided that, in either such case, no other intervening or supervening Feasibility Study Interruption Circumstances have arisen and are continuing at such time, Vale shall deliver a notice to BSGR and BSGR Guinea advising them of the earliest practicable date (consistent with the relevant Feasibility Study Interruption Solution, if any) on which work to complete the Feasibility Study can recommence (or, if work to complete the Feasibility Study has already recommenced, the date on which such work recommenced) (such date of recommencement being, the "**Feasibility Study Continuation Date**"); and

(d)     the Feasibility Study Period shall recommence with effect from the Feasibility Study Continuation Date and, accordingly, the Feasibility Study Period Expiry Date shall be extended by the number of days elapsed from and including the Feasibility Study Interruption Date to but excluding the Feasibility Study Continuation Date and the notice specifying the Feasibility Study Continuation Date shall also specify the date of the Feasibility Study Period Expiry Date as so extended.

5.3     <u>Feasibility Study Interruption Notices</u>. Vale shall be permitted to serve a Feasibility Study Interruption Notice in accordance with Section 5.2 on more than one occasion during the Feasibility Study Period (whether in respect of different or a repetition of the same Feasibility Study Interruption Circumstances) and on each such occasion the Feasibility Study Period shall be suspended and, subject to determination of a Feasibility Study Continuation Date, the Feasibility Study Period Expiry Date extended accordingly.

5.4     <u>Failure to Complete or Approve the Feasibility Study</u>. Subject to the provisions of Section 12.6, if: (i) the Feasibility Study is not completed on or prior to the Feasibility Study Period Expiry Date due to factors within the sole control of Vale; or (ii) in circumstances where the Feasibility Study is completed on or prior to the Feasibility Study Period Expiry Date, Vale does not confirm approval of the Feasibility Study on or prior to the Feasibility Study Approval Date then:

(a)     BSGR shall subscribe to such additional Ordinary Shares of BSGR Guinea at a price per share equal to their par value, such that upon completion of such subscription, Vale shall hold Ordinary Shares comprising the Acquired Ownership Interest (the "**BSGR Subscription**");

(b)     BSGR shall undertake the BSGR Subscription at any time within the period commencing on the BSGR Subscription Trigger Date and ending

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                           VALE-RT_00000697

on the date falling 10 Business Days thereafter, by delivering an irrevocable notice in writing to Vale and BSGR Guinea, provided that the BSGR Subscription may only be exercised once and in whole;

(c)    the BSGR Subscription shall be completed on the Business Day next following the date on which a notice is served by BSGR under paragraph (b) above; on completion, BSGR shall pay to BSGR Guinea the subscription price of the Ordinary Shares it shall have subscribed for and BSGR Guinea shall issue and allot to BSGR such Ordinary Shares, free and clear of all Encumbrances, and thereupon deliver to BSGR executed share certificates in respect of such Ordinary Shares; and

(d)    BSGR Guinea shall have the right, without any liability or penalty (except for accrued liabilities), to terminate the Off-take Agreement and/or any technical services agreement(s) which may have been entered into as contemplated in Section 5.6 by serving notice on Vale or any of Vale's Affiliates which is a party to any such agreement within 30 Business Days of completion of the BSGR Subscription,

provided, further, that Vale undertakes to take all action and execute all documents and/or instruments as is reasonably necessary or appropriate for the BSGR Subscription to be completed in accordance with this Section 5.4.

For the purposes of this Agreement, the "**BSGR Subscription Trigger Date**" shall mean:

(a)    in the event that the Feasibility Study is not completed on or prior to the Feasibility Study Period Expiry Date due to factors within the sole control of Vale, the first Business Day next following the Feasibility Study Period Expiry Date; or

(b)    in the event that the Feasibility Study is completed on or prior to the Feasibility Study Period Expiry Date and Vale does not confirm approval of the Feasibility Study on or prior to the Feasibility Study Approval Date, the first Business Day next following the Feasibility Study Approval Date (or such earlier date (if any) on which Vale confirms to BSGR Guinea and BSGR that the Feasibility Study has not been approved by Vale).

5.5    <u>Liberian Transport Solution</u>. The Parties acknowledge that the Project would benefit from an agreement regarding an economically, technically and legally viable logistic solution for the transportation of iron ore from the relevant Concession Areas through Liberia to the loading point for shipping (or other form of dispatch), as well as for the construction of all necessary

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000698

facilities (including railway and port facilities) required in connection on such a solution (together the "**Liberian Transport Solution**").

The "**Liberian Transport Solution Effective Date**" shall be the earlier of the date on which (i) the Parties confirm in writing that they have reached an agreement on the Liberian Transport Solution for the purposes of this Section 5.5; (ii) BSGR Guinea and/or ProjectCo (and/or any other member of the BSGR Guinea Group) enters into legally binding agreements (each such agreement, a "**Relevant Liberian Agreement**") with such of the Liberian Government; the Liberian railway concessionaire; the Buchanan port concessionaire; and any other relevant Government Entities in Liberia as are sufficient to Vale's satisfaction to permit the export of at least 15,000,000 metric tonnes per annum of iron ore produced at the Zogota mine through Liberia to the Buchanan port facilities and to export such iron ore from the Buchanan port facilities; (iii) the BSGR Guinea Group has the *de facto* ability to export at least 15,000,000 metric tonnes per annum of iron ore produced at the Zogota mine through Liberia by rail to the Buchanan port facilities and from such port facilities; or (iv) the Liberian Transport Solution Construction Works commence.

Vale shall be entitled to reach its decision regarding whether it agrees that a given potential Liberian Transport Solution is consistent with the Business Plan and is economically, technically and legally viable in its sole discretion. In reaching its decision, Vale shall be entitled to look not just to the feasibility and anticipated cost of that solution, but shall, *inter alia*, be entitled to determine whether the solution is satisfactory from the perspective of Vale's corporate values and policies, including in relation to the environment, and the key issues identified in Schedule 8. BSGR agrees that discussions with each of the Liberian railway concessionaire, the Buchanan port concessionaire and relevant Governmental Entities in relation to the definition and confirmation of the Liberian Transport Solution will be conducted with the full involvement of and consent of Vale. To this end, BSGR shall procure that Vale receives reasonable advance notice of any meetings being held with such parties and has the right to attend such meetings. BSGR shall procure that Vale receives copies of all correspondence from such parties in relation to the Liberian Transport Solution and discussions relating thereto received by any member of the BSGR Group. Vale shall have a prior right of approval (acting reasonably) in relation to any proposals to be submitted, issues to be discussed, or agreements to be reached with third parties (including Government Entities where applicable) in relation to the Liberian Transport Solution.

5.6     Technical Services Agreement. Following Completion, the Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing appropriate technical services agreements with BSGR Guinea or any of its subsidiaries in respect of the Project.

5.7     Development of Liberia ProjectCo. The Parties shall agree in good faith the actions, if any, they shall, in their capacity as shareholders of BSGR Guinea, cause Liberia ProjectCo to undertake in relation to the Liberia Exploration Permits and how those actions shall be funded and otherwise supported and directed by each of them and/or BSGR Guinea. The Parties acknowledge that any such funding may be based on a different arrangement to the funding of the Feasibility Study and/or the Project. The Parties acknowledge that the potential opportunities

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000699

presented by the Liberia Exploration Permits must not materially distract either of them from their respective obligations in respect of the Project, even if this entails ultimately surrendering the Liberia Exploration Permits or transferring them to another company.

5.8    Off-take of Minerals. If either (i) the opportunities under any or all of the Liberia Exploration Permits are pursued and Liberia ProjectCo or another Affiliate of BSGR Guinea undertakes commercial production of iron ore or other mineral products from the areas to which the Liberia Exploration Permits relate; and/or (ii) commercial production of any mineral other than iron ore is undertaken by any member of the BSGR Group or any Affiliate of BSGR Guinea in relation to any of the Concession Areas, Vale shall, directly or through one of its Affiliates, have the right, in relation to each mineral product separately and each country of production separately (such right exercisable at Vale's sole discretion by written notice to BSGR Guinea delivered at any time prior to the date which is 6 months before the date on which BSGR Guinea determines that commercial production of such mineral in such country will commence), to purchase and off-take 100 per cent. of the output of such mineral from such country FOB (Incoterms 2000) at a nominated port in the Republic of Liberia (or such other location as Vale may agree) for a period of up to the full duration of commercial production of such mineral in such country. Unless the Parties agree otherwise, any such off-take shall be concluded on arm's length commercial terms based on international market practice for the sale and purchase of the relevant mineral products. In the event that the BSGR Subscription Trigger Date shall occur, BSGR Guinea shall have the right, without any liability or penalty (except for accrued liabilities), to terminate any agreements entered into as contemplated in this Section 5.8.

5.9    Tax and Corporate Restructuring. The Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing the optimal tax structure for the Liberian Transport Solution and the future development of the Project and an appropriate corporate/corporate governance structure (consistent with the Shareholders' Agreement) for the BSGR Guinea Group Companies (including, without limitation, the conversion of ProjectCo from an S.à r.l. to an S.A.) and shall procure that any corporate restructurings required to achieve such optimal tax and/or appropriate corporate/corporate governance structure as may be agreed between the Parties are implemented by or in respect of the relevant member of the BSGR Guinea Group at the appropriate time.

5.10    Off-take Agreement. Following Completion, the Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing the form of the Off-take Agreement. The Parties agree that the final form of the Off-take Agreement (i) shall be consistent with the provisions of the Off-take Term Sheet, including as to risk allocation and pricing and the size of the "Marketing Cost Adjustment" (as that term is used in the Off-take Term Sheet); (ii) shall follow the form of Vale's contracts for arm's length (non-short term) sales of iron ore to third parties if the Parties are unable to agree a position between themselves; and (iii) shall be designed so as to ensure that, in case of default by a party to the Off-take Agreement, reasonable (taking into account the extent and impact of the breach and the relationship between the parties thereto) cure periods must have expired and senior managers of the shareholders of BSGR Guinea must have consulted concerning the breach and how it should be cured prior to

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                   VALE-RT_00000700

any right to terminate arising thereunder (regardless of which party to the Off-take Agreement is in breach).  This Section 5.10 reflects the Parties mutual intention that the Off-take Agreement is intended to be capable of remaining in full force and effect throughout the entire period of commercial production of the iron ore mines in the Concession Areas subject to Section 5.4(d).

5.11   <u>Compliance with Ancillary Agreements</u>.  Where any member of the Vale Group (other than Vale or any member of the BSGR Guinea Group) has entered into any of the Off-take Agreement, the Vale Loan or any agreement or agreements as contemplated in Section 5.6 of this Agreement, Vale shall be responsible for such member of the Vale Group's compliance with all the provisions of the agreement into which such member has entered.

5.12   <u>FCPA Provisions</u>.  The Parties agree to give effect to the provisions of Schedule 4 to the Shareholders' Agreement in accordance with its terms.

**Section 6.      Funding**

6.1   <u>Funding of Feasibility Study</u>. Vale shall provide (or shall procure that one of its Affiliates provides) funding for the Feasibility Study, such funding to be provided in such amounts and at such times as determined by Vale in its sole discretion consistent with the Business Plan, provided that under no circumstances will BSGR be required to fund any of the costs and/or expenses required to carry out the Feasibility Study. Vale (or one of its Affiliates) shall provide such funding from time to time by subscribing for Deferred Shares in accordance with the following provisions:

  (a)   the Parties shall procure that BSGR Guinea delivers notices to Vale from time to time in the period between the Completion Date and the date on which the Feasibility Study is completed which shall each specify (each such notice, a **"Subscription Notice"**):

    (i)   the amount then required to fund the Feasibility Study (the **"Funding Amount"**);

    (ii)   the number of Deferred Shares to be subscribed for by Vale corresponding to the Funding Amount, assuming a subscription price per Deferred Share of $1,000; and

    (iii)   the date on which such subscription of Deferred Shares is to occur (which shall be at least 10 Business Days, but not more than 30 Business Days, from and including the date of delivery of such Subscription Notice); and

  (b)   on the date referred to in (a)(iii) above as specified in any Subscription Notice, BSGR Guinea shall issue and allot to Vale (or its Affiliate), and Vale (or its Affiliate) shall subscribe in consideration for the Funding

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                VALE-RT_00000701

Amount specified in such Subscription Notice, the number of Deferred Shares then to be issued as specified in such Subscription Notice, free and clear of all Encumbrances, and thereupon BSGR Guinea shall enter Vale (or its Affiliate) in the register of members of BSGR Guinea and deliver to Vale (or its Affiliate) executed certificates for such Deferred Shares.

6.2    Project Financing. Each Party agrees to use its reasonable efforts, including in its capacity as a shareholder of BSGR Guinea, so far as it lawfully can, to cause that financing for the Project from third party providers, consistent with the Business Plan, is obtained on commercially viable terms at market rates, as determined by the Board acting reasonably (the "**Project Financing**").  In the period between the Completion Date and the date on which all amounts outstanding under the Vale Loan have been repaid, the Board shall, consistent with its fiduciary duties, undertake on an annual basis a review of the availability of Project Financing (including, if applicable, to refinance the Vale Loan), provided always that nothing in this Section shall require any member of the BSGR Guinea Group to incur any material expenditure in connection with undertaking any such annual review.

6.3    Vale Loan. Unless and until Project Financing has been secured as contemplated in Section 6.2 (including (if applicable) to refinance the Vale Loan) or if the Project Financing is not obtained in time for BSGR Guinea to ensure material compliance with actions to be taken pursuant to the Business Plan or is obtained in an amount lower than that required for the purposes of implementing the actions to be taken pursuant to the Business Plan, Vale shall (or shall procure that a member of its Group shall) lend to ProjectCo (or another BSGR Guinea Group Company) the amounts necessary to comply with the Business Plan pursuant to the Vale Loan.

6.4    Repayments of Vale Loan. Without prejudice to the provisions contained in the Shareholders' Agreement under Sections 7 (Share Transfers) and 9 (Consequences of Transfers) respectively, each of the Parties (so far as it is legally able as a shareholder of BSGR Guinea) will, and will take all necessary steps to ensure that BSGR Guinea will, procure that, in the period commencing on the Date of First Commercial Production and ending on the date on which no amounts of principal (including capitalized interest) remain outstanding under the Vale Loan:

(a)    prior to declaring any dividend or other distribution, ProjectCo (and any other borrower from time to time under the Vale Loan) will first ensure that any accrued but unpaid interest on the Vale Loan (if any) is paid in full and, subject to such payment having been made, the maximum amount of the dividends or other distributions which ProjectCo and each other member of the BSGR Guinea Group (other than Liberia Holdco and Liberia ProjectCo) would be permitted to declare at such time out of their respective distributable profits and in accordance with Applicable Law (but, for the avoidance of doubt, not including any amount constituting part of the capital of ProjectCo or such other member of the BSGR Guinea Group (other than Liberia Holdco and Liberia ProjectCo)) shall be

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                    VALE-RT_00000702

determined (the aggregate of such maximum amounts being the "**Permissible Dividend Amount**"); and

(b)     subject always to having complied with their obligations under section 6.4(a), ProjectCo and each other borrower from time to time under the Vale Loan shall together apply in aggregate an amount equal to the Loan Repayment Amount in or towards repayment of the aggregate principal amount (including capitalized interest) then outstanding under the Vale Loan such repayments to be made at least once in any calendar year, provided that an amount equal to but not more than the Loan Repayment Amount (excluding for this purpose any Liberian Dividends) shall be treated as available to support and finance, at the same time as any such repayment in respect of the Vale Loan, the payment by BSGR Guinea of a dividend in an amount equal to the BSGR Dividend Amount.  The Parties agree to (i) use all commercially reasonable efforts with a view to establishing the optimal structure and arrangements to enable BSGR Guinea to pay any such dividends in a manner that minimizes or avoids any withholding tax cost to any member of the BSGR Guinea Group on any dividend or other distribution paid or any interest on any loan made in order to create a distributable profit or to ensure there is sufficient cash within BSGR Guinea for the purpose of paying the BSGR Dividend Amount and (ii) permit the payment of dividends by BSGR Guinea for this purpose out of any distributable profits or, where so required for the purposes of paragraph (i), reserves whether or not the same constitute part of the capital of BSGR Guinea and (iii) cause such dividends to be declared apportioned and paid to the holders of Ordinary Shares pro rata according to the amounts paid up on such shares.

## Section 7.     Conduct of Business

As of the Completion Date, each of BSGR and Vale agrees to promote the best interests of BSGR Guinea and pursue the development of the Project in accordance with the principles set forth in the Business Plan with the aim of maximizing production on an economically viable basis, profits and distributions to shareholders consistent with the Business Plan and the requirement under Section 3.3 of the Shareholders' Agreement to take account of the Dividend Reserve Amount. Each of BSGR and Vale shall, and shall procure that its Affiliates shall, co-operate in good faith to promote the success of BSGR Guinea and develop the Project in the most efficient and expeditious manner possible, provided that nothing in this Section shall require any Party or any member of its Group to breach any contract to which it is currently a party or do anything that would make any such Party or any member of that Party's Group breach any Applicable Law or incur any liability (including in tort).

## Section 8.     Warranties

8.1     <u>BSGR Warranties</u>. BSGR warrants to Vale as at the date of this Agreement that the warranties contained in Schedule 4 (the "**BSGR Warranties**") are true, accurate and not

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000703

misleading. The BSGR Warranties are given subject to the limitations set out in Schedule 5 but only to the extent provided in Schedule 5. Unless expressly provided in this Agreement, the BSGR Warranties shall be separate and independent and shall not be limited by reference to any other section or anything in this Agreement.

8.2     Vale Warranties. Vale warrants to BSGR as at the date of this Agreement that the warranties contained in Schedule 6 (the "**Vale Warranties**") are true, accurate and not misleading. Unless expressly provided in this Agreement, the Vale Warranties shall be separate and independent and shall not be limited by reference to any other section or anything in this Agreement.

8.3     Non-pursuit of Claims. BSGR undertakes to Vale and to each person referred to in this Section 8.3 that, except in the case of fraud, it will not make any claim against any BSGR Guinea Group Company or any of their respective directors, officers, employees or agents or any adviser of any BSGR Guinea Group Company (in such capacity), on whom BSGR may have relied in agreeing to any term of this Agreement and/or any of the Ancillary Agreements, which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by any such person for the purpose of assisting BSGR to make a representation, give a BSGR Warranty or prepare the Disclosure Letter.  Each BSGR Guinea Group Company and any such director, officer, employee, agent or adviser of any BSGR Guinea Group Company may enforce the terms of this Section 8.3 subject to and in accordance with the provisions of the Contracts (Rights of Third Parties) Act 1999.

8.4     Guernsey Loan Indemnity. BSGR hereby undertakes to indemnify and hold harmless Vale (for itself and as agent or trustee for each member of the Vale Group) or, if Vale so elects as contemplated in Section 10.1 (*mutatis mutandis*), the relevant member of the BSGR Guinea Group against any and all Losses suffered or incurred by Vale (or any member of its Group including, without limitation, the BSGR Guinea Group) in connection with the failure by any member of the BSGR Group to obtain consent from the Guernsey Financial Services Commission, in accordance with the Control of Borrowing (Bailiwick of Guernsey) Ordinances, 1959, as amended, in respect of any and all amounts borrowed prior to the date of this Agreement by any relevant member of the BSGR Guinea Group and which are the subject of the exchange of letters dated 6 and 7 April 2010 respectively between Carey Olsen and the Guernsey Financial Services Commission (copies of which are contained in the Disclosure Bundle at Section 7 (tab 41)).

**Section 9.     Tax Covenant**

In consideration of the Purchase Price and the mutual rights and obligations in this Agreement the Parties agree that the Tax Covenant in Schedule 10 shall apply from Completion.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                     VALE-RT_00000704

**Section 10.     Vale's Remedies**

10.1     <u>Basis of Claims for Breach of Indemnity Warranties</u>. In the event there is an Indemnity Warranty Claim, BSGR shall pay on demand (at Vale's election) either:

>    (a)     to Vale, the amount of the relevant Loss to Vale, including the aggregate reduction caused in the value of the Sale Shares; or
>
>    (b)     to the relevant member(s) of the BSGR Guinea Group, the amount of the relevant Loss to the BSGR Guinea Group, including the reduction caused in the value of any asset of the BSGR Guinea Group or, as the case may be, the amount of any new or increased liability (in the latter case limited to the increase) of the BSGR Guinea Group,

provided, however, that the limitations set out in Schedule 5 shall apply to a Claim for breach of an Indemnity Warranty to the extent expressly stated therein; provided, further, that, where Vale has elected that payment shall be made to a member of the BSGR Guinea Group, Vale shall have the right to enforce on behalf of the relevant member of the BSGR Guinea Group the provisions of this Agreement which relate to Indemnity Warranty Claims.

10.2     <u>Set-off of Claims</u>. If, at the time at which Vale is required pursuant to Section 3 to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration and/or the time at which BSGR Guinea would declare a dividend in accordance with Section 3.3 of the Shareholders' Agreement, BSGR is liable to pay any amount or amounts to Vale (or, if Vale has so elected in accordance with Section 10.1, to a member of the BSGR Guinea Group) under or pursuant to a Substantiated Claim (an "**Unpaid Amount**") then, without prejudice to Vale exercising its general rights of enforcement available at law, Vale may, in full satisfaction of or, as applicable, in reducing such Unpaid Amount, (at Vale's election and upon notice to BSGR (copied to BSGR Guinea)) deduct (and, where Vale has elected in accordance with Section 10.1 that payment shall be made to a member of the BSGR Guinea Group, shall pay to such member of the BSGR Guinea Group) such Unpaid Amount (only once with respect to the amount thereof) from:

>    (a)     the amount payable in respect of the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and, to the extent that the amount of the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) exceeds the Unpaid Amount, payment by Vale to BSGR of the net amount shall constitute a full and sufficient discharge of the obligation to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and, to the extent that the amount of the Unpaid Amount exceeds the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be), such deduction shall constitute a full and sufficient discharge of Vale's

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                            VALE-RT_00000705

obligation to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and a pro-tanto reduction in the Unpaid Amount; and/or

(b)    the amount of any dividend (or other distribution) which would otherwise be payable by BSGR Guinea to BSGR (from time to time) and BSGR hereby irrevocably agrees to waive its entitlement to such dividend or other distribution in such circumstances to the extent of the Unpaid Amount and undertakes to irrevocably instruct and direct BSGR Guinea to pay to Vale such amounts out of such dividend or distribution entitlement as are necessary to satisfy or reduce the amount of such Unpaid Amount,

**Section 11.    Third Party Claims**

If Vale becomes aware, following Completion, of any claim by a third party (a "**Third Party Claim**"), or of any other matter or circumstance, which will or is reasonably likely to result in a Guernsey Loan Indemnity Claim, Warranty Claim or an Indemnity Warranty Claim other than a Tax Claim being made, subject always to the general obligations to mitigate provided for by Section 3.4 of Schedule 5, Vale shall and, where applicable, shall procure that any member of the Vale Group shall:

(a)    promptly (and in any event within 15 Business Days of becoming aware of it) give notice of the Third Party Claim or other matter or circumstance to BSGR;

(b)    upon reasonable prior notice and to the extent that BSGR does not already have such access as a shareholder in BSGR Guinea and/or through its BSGR Directors, provide to BSGR and its representatives reasonable access to premises and personnel and to relevant assets, documents and records within the power or control of BSGR Guinea or any member of the BSGR Guinea Group, in each case, to the extent that such is reasonably necessary for the purposes of investigating the matter, provided in each case that:

(i)    to do so would not be materially prejudicial or detrimental to the promotion of the best interests of BSGR Guinea and the development of the Project or the business undertaken by any member of the Vale Group; and

(ii)    any such documents and records (i) do not constitute internal memoranda of a member of the Vale Group relating to the merits or conduct of such matter or claim (rather than the factual circumstances underlying such matter or claim); (ii) are not subject to legal privilege; (iii) do not constitute commercially sensitive or confidential information of Vale

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000706

(rather than the BSGR Guinea Group); and (iv) are not subject to any other confidentiality restrictions;

(c)     not admit liability or make any agreement or compromise in relation to the Third Party Claim unless either (i) such admission, agreement or compromise results in no liability on BSGR (whether to the Third Party or otherwise); or (ii) BSGR gives its prior written consent (such consent not to be unreasonably withheld or delayed) to such admission, agreement or compromise; and

(d)     (subject to Vale (for itself and as agent or trustee for each BSGR Guinea Group Company and each other member of the Vale Group) being indemnified by BSGR on demand against all costs reasonably incurred by Vale, any BSGR Guinea Group Company or any other member of the Vale Group in respect of that Third Party Claim) ensure that it shall:

  (i)     not enter into any settlement in respect of any such Third Party Claim unless either (i) such settlement results in no liability on BSGR (whether to the third party or otherwise); or (ii) BSGR gives its prior written consent (such consent not to be unreasonably withheld or delayed) to such settlement; and

  (ii)     provide such information and assistance as BSGR may reasonably require in connection with the preparation for and conduct of any proceedings and/or negotiations relating to the Third Party Claim,

provided, in each case, that to do so would not be materially prejudicial or detrimental to the promotion of the best interests of Vale, BSGR Guinea or the other members of the BSGR Guinea Group (as the case may be) and the development of the Project or the business undertaken by any member of the Vale Group or the BSGR Guinea Group.

## Section 12.     Payments

12.1     Payments to BSGR. Any payment to be made to BSGR pursuant to this Agreement by Vale shall be made to BSGR's Bank Account (or to such other bank account as may be notified in writing by BSGR to Vale not less than 10 Business Days prior to the date on which the relevant payment is due to be made).

12.2     Payments to BSGR Guinea.  Any payment to be made to BSGR Guinea pursuant to this Agreement by Vale shall be made to BSGR Guinea's Bank Account (or to such other bank account as may be notified in writing by BSGR Guinea to the Parties not less than 10 Business Days prior to the date on which the relevant payment is due to be made).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                           VALE-RT_00000707

12.3   <u>Payment to Vale</u>. Any payment to be made to Vale pursuant to this Agreement by either BSGR or BSGR Guinea shall be made to the bank account Vale shall have notified to BSGR or BSGR Guinea from time to time for the purpose of the relevant payment.

12.4   <u>Method of Payment</u>. Payments under Section 12.1, 12.2 and 12.3 shall be made in immediately available cleared funds in $ by electronic transfer of funds for value on the due date for payment. Receipt of the amount due shall be an effective discharge of the relevant payment obligation.

12.5   <u>Interest</u>. If any sum due for payment in accordance with this Agreement is not paid on the due date for payment, the person in default shall pay Default Interest on that sum from but excluding the due date to and including the date of actual payment calculated and accrued on a daily basis save that Default Interest shall not be payable where the Initial Consideration is received on the Business Day next following the Completion Date.

12.6   <u>Force Majeure</u>.

> (a)   Without prejudice to the operation of Section 5.2, if, during the time in which this Agreement is in force, the circumstances under which it was concluded are fundamentally changed such as to have a material adverse impact on the Project as a result of events or circumstances as specified in Section 12.6(b) below which are outside of the control of Vale (a "**Force Majeure Event**"), either Party may propose appropriate revisions to this Agreement, and both Parties will endeavor to find a mutually acceptable solution.  Each Party acknowledges that a spirit of mutual co-operation and long term goodwill underlies this Agreement and agrees that in the event that unforeseen hardships arise affecting either Party, the Parties shall meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship.

> (b)   A Force Majeure Event shall be:

>> (i)   (A) a natural catastrophe or cataclysm; (B) revolution, military or political coup, regime change, civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act; (C) an act of God, natural disasters such as lightning, flood, fire, storm, earthquakes and lack of water arising from environmental problems or weather; (D) chemical contamination; (E) an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas to the extent required or to export iron ore from any of the Concession Areas to any other

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                         VALE-RT_00000708

area within or outside of Guinea or Liberia, including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution; (F) unforeseeable geological, environmental or ground (including ground water) conditions affecting the construction of all or some of the works relating to the Project; and/or (G) breakdown, inoperability, failure or partial failure of any part of the energy source required to run any key component of the Project,

in each case, such that the development, exploitation or continued operation of the Project is not reasonably practicable or commercially viable;

(ii)   a major financial and/or economic crisis, either worldwide or in major market(s) that could reasonably be expected to materially and adversely affect or alter the iron ore demand from customers and downstream industries and/or inventory levels;

(iii)   the price for the target guaranteed specification of iron ore calculated in accordance with the Off-take Term Sheet (or the Off-take Agreement) being less than $27 per metric tonne on an ex-works mine basis for a continuous period of not less than 60 days;

(iv)   the revocation, annulment or materially adverse restriction of the Basic Agreement, the Mining Concession or any of the Guinea Exploration Permits for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be; or

(v)   the implementation of any action, without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000709

(c)    Without prejudice to the operation of Section 5.2, in the event that Vale reasonably determines that a Force Majeure Event has occurred then:

    (i)    Vale shall notify BSGR and BSGR Guinea of its determination of the occurrence of a Force Majeure Event within 10 Business Days of such determination;

    (ii)    Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement (including, without limitation, Vale's obligations to pay the First Deferred Consideration, the Second Deferred Consideration and/or the Additional Consideration pursuant to Section 3; Vale's obligation to fund the Feasibility Study; and any obligations of the lender under the Vale Loan to provide funding pursuant to the terms of the Vale Loan, as applicable) and the Parties agree and shall, to the fullest extent they are able to do so, procure that BSGR Guinea and its subsidiaries shall not make payments of dividends or other distributions without the prior approval of Vale, so that such payments and/or obligations shall be suspended, in all such cases, for such period as Vale reasonably and in good faith determines that a Force Majeure Event is continuing;

    (iii)    the Parties will continue to cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event; and

    (iv)    if the Force Majeure Event is of a type as contemplated in section 12.6(b)(ii) or (iii) above, it is the current intention of Vale that, in determining the course of action (if any) to be adopted in respect of the Project in response to such Force Majeure Event, it would make its assessment by reference to criteria which are not materially more onerous than those applicable to other comparable projects of Vale and its Affiliates and after having regard to all applicable factors and circumstances (including, without limitation, the quality and quantity of the iron ore produced or expected to be produced by the Project) and the prevailing and anticipated market conditions at that time.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000710

12.7   <u>Gross-up on Payments</u>. In the event that, in relation to any payment due by BSGR to Vale or any member of its Group in respect of a Claim under this Agreement: (i) BSGR (or any member of its Group) is required by Applicable Law to make a deduction, retention or withholding from such payment; or (ii) Vale or any member of its Group will be or has been subject to Tax in respect of such payment, then the sum due by BSGR shall be increased to the extent necessary to ensure that Vale (or the relevant member of its Group) receives and retains a net sum equal to the sum it would have received had no such deduction, retention or withholding been made and/or the payment had not been subject to Tax.

## Section 13.    Non Solicitation and Non Competition

13.1   <u>Non Solicitation Covenant</u>. Each Party covenants with the other (for itself and as agent or trustee for each member of its Group) that neither it nor any member of its Group shall, directly or indirectly, in the period commencing on the date of this Agreement and ending on the date falling 24 months after the date on which one of the Parties or any of its Affiliates ceases to be a shareholder in BSGR Guinea:

    (a)    employ or offer to employ, or enter into a contract for the services of, any individual who is or was, at any time during the preceding 6 months, an employee holding an executive or managerial position with, or an officer of, any BSGR Guinea Group Company or any company in the other Party's Group (the "**Key Employees**") or entice, solicit or procure any such person to leave the employment within the BSGR Guinea Group or such other Party's Group (or attempt to do so) whether or not that person would commit any breach of contract in leaving such employment; or

    (b)    procure or facilitate the making of any such offer or attempt by any other person,

provided, however, that the following shall not constitute a breach of this Section 13.1:

    (i)    the placing of an advertisement of a post available to a member of the public generally and the recruitment of a person through an employment agency and, in each case, the subsequent employment of such person, provided that no company in either Party's Group, or any of their respective officers and employees, encourages or advises such agency to approach any Key Employee; and/or

    (ii)    the employment by any member of either Party's Group of a Key Employee who was an employee of a BSGR Guinea Group Company and, prior to such employment, had been employed by a member of such Party's Group.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000711

13.2    Non Competition Covenant and Referral of Opportunities. Each Party covenants with the other (for itself and as agent or trustee for each member of its Group) that, subject to Section 13.4, in the period commencing on the date of this Agreement and ending on the date on which one of the Parties and/or one of its Affiliates cease to be shareholder(s) in BSGR Guinea:

   (a)   it shall, and shall ensure that each member of its Group shall, abstain from undertaking any action in Guinea or Liberia in connection with the mining of iron ore, which is in direct competition with any of the activities that form part of the Project and may cause damage or hindrance to the Project; and

   (b)   BSGR Guinea shall be its respective Group's exclusive vehicle for the pursuit of business opportunities in connection with the mining of iron ore within the Republic of Guinea and Liberia (**"Relevant Business Opportunities"**) and accordingly, (to the extent not prohibited by confidentiality obligations), each Party will refer any Relevant Business Opportunity to the Board and, to the extent available to it (or any member of its Group) on a basis which permits such disclosure, provide to the Board all information and data reasonably necessary to assess the viability of the proposition.

13.3    Pursuit of New Business Opportunities. To the extent that the Board decides to pursue any Relevant Business Opportunity, such Relevant Business Opportunity will be pursued based on the principles set forth in this Agreement and the Ancillary Agreements.

13.4    Exceptions to Non Competition Covenant. The restrictions contained in Section 13.2 shall not restrict or prohibit either of the Parties or member of their respective Groups from:

   (a)   acquiring in a single transaction or series of related transactions or entering into a joint venture or equivalent transaction with any one or more companies and/or businesses whose activities include carrying on or being engaged in a business which is in direct competition with any of the activities that form part of the Project and may cause damage or hindrance to the Project (a **"Competing Business"**), provided that the principal purpose of such acquisition is not the acquisition of control over a Competing Business; or

   (b)   pursuing a Relevant Business Opportunity which has previously been referred to the Board pursuant to Section 13.2(b) by such party and in relation to which the Board has not notified the relevant Party within 20 Business Days of such referral that it intends to pursue such Relevant Business Opportunity provided that, in the case of a Relevant Business Opportunity referred to the Board by Vale, Vale may not pursue any such Business Opportunity unless at least one of the BSGR Directors, acting in

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                      VALE-RT_00000712

a commercially reasonable manner consistent with his/her fiduciary duties in determining whether or not BSGR Guinea has the capability (including, without limitation, in terms of financing and resources) to pursue such opportunity in the near term, has voted in favor of a resolution of the Board not to pursue such Relevant Business Opportunity.

13.5    Acknowledgement Relating to Restrictions. Each of the Parties acknowledges that the duration, extent and application of the restrictions in this Section 13 are no greater than is reasonable and necessary for the protection of the interests of the BSGR Guinea Group and the other Party's Group but that, if any such restriction shall be adjudged by any court or authority of competent jurisdiction to be void or unenforceable but would be valid if part of the wording thereof were to be deleted and/or the period thereof were to be reduced and/or the area dealt with thereby were to be reduced, such restriction shall apply within the jurisdiction of that court or authority with such modifications as are necessary to make it valid and effective.

## Section 14.    Announcements

Neither Party (nor any of their respective Affiliates) shall make any reference to, announcement of or issue any circular or other communication in connection with the existence or subject matter of this Agreement (or any other agreement contemplated herein) without the prior written approval of the other Party (such approval not to be unreasonably withheld or delayed). This restriction shall not apply to the extent that such announcement or other communication is required by Applicable Law, including by any stock exchange with competent jurisdiction. If this exception applies, to the extent practicable not prohibited by Applicable Law, the Party making the announcement or other communication shall use its reasonable efforts to consult with the other Party in advance as to its form, content and timing.   If it is not practicable to consult in advance of making such announcement or issuing such communication (or such consultation would have been prohibited), the Party making the announcement or other communication shall notify the other Party as soon as practicable after having made the announcement or other communication.

## Section 15.    Confidentiality

15.1    Confidentiality Obligation.  For the purposes of this Section 15:

(a)    **"Confidential Information"** means:

(i)    (in relation to the obligations of Vale) any information received or held by Vale (or any of its Representatives) relating to BSGR or the BSGR Group; or

(ii)    (in relation to the obligations of BSGR) any information received or held by BSGR (or any of its Representatives) relating to Vale or the Vale Group; and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                    VALE-RT_00000713

       (iii)       information relating to the provisions of, negotiations leading to, and any claim or potential claim under this Agreement and the other agreements contemplated herein,

and includes written information and information transferred or obtained orally, visually, electronically or by any other means; and

       (b)       **"Representatives"** means: (i) in relation to BSGR, to the extent that they are involved in the transaction contemplated by this Agreement, its respective Affiliates and the directors, officers, employees, agents, advisers, lending banks, accountants and consultants of BSGR and/or of its respective Affiliates; (ii) in relation to Vale, to the extent that they are involved in the transaction contemplated herein, directors, officers, employees, agents, consultants, contractors, advisers (including, without limitation, attorneys, accountants, consultants, bankers and financial advisers), potential providers of finance (whether equity or debt), Affiliates and persons who hold the aforementioned roles in relation to Affiliates.

Each Party shall (and shall ensure that each of its Representatives shall) maintain Confidential Information in confidence and not disclose Confidential Information to any person except (i) as permitted under Section 15.2 or (ii) as the other Party approves in writing.

15.2   <u>Exceptions</u>. Section 15.1 shall not prevent disclosure by a Party or its Representatives to the extent such Party can demonstrate that such:

       (a)       disclosure is required by law, or by the rules, regulations or requirements of any stock exchange or any regulatory or other supervisory body or Governmental Entity or authority (including tax authority) having applicable jurisdiction (provided that, to the extent practicable not prohibited by Applicable Law, the disclosing Party shall first inform the other Party of its intention to disclose such information and take into account the reasonable comments of the other Party);

       (b)       subject to Applicable Law, disclosure is of Confidential Information which was lawfully in the possession of that Party or any of its Representatives (in either case as evidenced by written records) without any obligation of secrecy prior to its being received or held;

       (c)       subject to Applicable Law, disclosure is of Confidential Information which has previously become publicly available other than through that Party's action (or that of its Representatives) in breach of this Agreement; or

       (d)       subject to Applicable Law, disclosure is required for the purpose of any arbitral, judicial or regulatory proceedings arising out of this Agreement (or any other Ancillary Agreement).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                          VALE-RT_00000714

15.3    Disclosure to Representatives. Each Party may disclose Confidential Information to its Representatives, and undertakes that it (and its Affiliates) shall only disclose Confidential Information to its Representatives if: (i) it is reasonably required for purposes connected with this Agreement or the Project and only if its Representatives are informed of the confidential nature of the Confidential Information; or (ii) these Representatives agree to comply with the confidentiality obligations contained in this Section 15 as if a party hereto.

15.4    Effect on Termination. If this Agreement is terminated, either Party shall as soon as practicable on request by the other Party:

(a)    return all written documents and other materials relating to the other Party's Group or this Agreement (including any Confidential Information), without keeping any copies thereof;

(b)    destroy all information or other documents derived from such Confidential Information; and

(c)    so far as it is practicable to do so, expunge such Confidential Information from any computer, word processor or other device,

provided that a Party shall be permitted to retain copies of Confidential Information that is contained in the archived computer system back-up in accordance with its security and/or disaster recovery procedures and may retain such copies (in whatever form) as are required to be retained for the purpose of compliance with, and only for so long as required by, any Applicable Law or Governmental Entity, or for legal and compliance purposes in accordance with its document retention policies in effect from time to time.

15.5    Confidentiality Agreement. The Confidentiality Agreement is hereby terminated immediately following the execution of this Agreement.

**Section 16.    Miscellaneous**

16.1    Costs.

Each of the Parties shall pay its own costs and expenses in relation to the preparation and signing of this Agreement and to the implementation of the transactions contemplated by this Agreement.

16.2    Notices.

(a)    *Address of notices.*   Any notice or other communication to be given hereunder shall refer to this Agreement and shall either be delivered by hand or sent by first class post, airmail or facsimile transmission (provided that, in the case of facsimile transmission, confirmation of its error-free transmission has been received by the sender's facsimile machine) as follows:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000715

if to **BSGR**:

| | |
|---|---|
| Address: | West Wing, Frances House, Sir William Place, St Peter Port, Guernsey (GY1 1GX) |
| Fax No: | +44.1481.812020 |

Addressed for the attention of:  David Clark

<u>With a copy to</u>:

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**

| | |
|---|---|
| Address: | 40 Bank Street, Canary Wharf, London (E14 5DS) |
| Fax No: | +44.20.7072.7070 |

Addressed for the attention of:  Michael Hatchard and Michal Berkner

if to **Vale**:

| | |
|---|---|
| Address: | Rua Sapucaí, 383 – 7th Floor Belo Horizonte, MG 30150-904 |
| Fax No: | +55.31.3279.5598 |

Addressed for the attention of: Eduardo Ledsham

<u>With a copy to</u>:

**Vale**

| | |
|---|---|
| Address: | Av. Graça Aranha, 26-15th Floor, Rio de Janeiro, RJ, Brazil 20030-900 |
| Fax No: | +55.21.3814.9921 |

Addressed for the attention of:  General Counsel

<u>With a copy to</u>:

**Clifford Chance LLP**

| | |
|---|---|
| Address: | 10 Upper Bank Street, London E14 5JJ |
| Fax No: | +44.20.7006.5555 |

Addressed for the attention of: Anthony Oldfield and David Pudge

(b)  *Deemed served*.  All notices given in accordance with this Section 16.2 shall be deemed to have been served as follows:

   (i)  if delivered by hand, when left at the address listed at 16.2(a) (as applicable);

   (ii)  if sent by air mail, six (6) Business Days after it was posted; and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                          VALE-RT_00000716

<table>
<tr><td>(iii)</td><td>if communicated by facsimile when confirmation of its error-free transmission has been recorded, by the sender's facsimile machine;</td></tr>
</table>

provided, however, that where, in the case of delivery by hand or transmission by facsimile, such delivery occurs after 6 p.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, and for notices to BSGR, shall be by reference to Guernsey time) on a Business Day or at any time on a day which is not a Business Day, service shall be deemed to occur at 9 a.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, and for notices to BSGR, shall be by reference to Guernsey time) on the next following Business Day.

16.3   Entire Agreement.

(a)     This Agreement and the Ancillary Agreements, from the date that each of the Ancillary Agreements shall have been executed, constitute the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of any other Party which is not expressly set out herein or therein provided that this Section 16.3(a) shall not exclude any liability for fraudulent misrepresentation.

(b)     This Agreement and the Ancillary Agreements supersede any or all prior agreements, understandings, arrangements, promises, representations, warranties and/or contracts of any form or nature whatsoever, whether oral or in writing and whether explicit or implicit, which may have been entered into prior to the date hereof between the Parties or on their behalf as to the subject matter of this Agreement and the Ancillary Agreements including, without limitation, the Memorandum of Understanding dated 19 March 2010.

16.4   Assignment.

(a)     This Agreement shall be binding on and inure to the benefit of the Parties and their successors and permitted assigns.  Except as expressly provided in this Agreement and as set out below in sub-clause (b), neither Party may assign or transfer all or any part of its rights or obligations under this Agreement nor any benefit arising under or out of this Agreement without the prior written consent of the other Party (which shall not be unreasonably denied or withheld); provided that each Party shall remain liable for its obligations under this Agreement notwithstanding any such assignment and, save to the extent that such assignee is a wholly-owned subsidiary of Vale designated by Vale pursuant to Section 2.2, any such assignee shall be required to sign a deed of adherence to the Shareholders' Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                              VALE-RT_00000717

(b)     Vale or any other member of the Vale Group may, without the consent of BSGR, assign or transfer to any other member of the Vale Group all or any part of its rights or obligations or any benefit arising under or out of this Agreement provided always that Vale shall procure that any such other member of the Vale Group which is a direct or indirect assignee or transferee of all or any part of Vale's rights or obligations or benefits hereunder complies with such rights and obligations under this Agreement, as applicable.

16.5   <u>Waiver of Rights</u>. No waiver by a Party of a delay or failure or failures by the other Party to perform any provision of this Agreement shall operate or be construed as a waiver in respect of any other or further failure whether of a like or different character.  No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy under this Agreement or at law.

16.6   <u>Amendments</u>. This Agreement may be amended only by an instrument in writing signed by duly authorized representatives of each of the Parties.

16.7   <u>Invalidity</u>. If any of the provisions of this Agreement is or becomes invalid, illegal or unenforceable under the laws of any jurisdiction:

(a)     the validity, legality or enforceability of the remaining provisions of this Agreement in that jurisdiction shall not in any way be affected or impaired; and

(b)     the validity, legality or enforceability of such provision or the remaining provisions of this Agreement under the laws of any other jurisdiction shall not in any way be affected or impaired.  Notwithstanding the foregoing, the Parties shall thereupon negotiate in good faith in order to agree the terms of a mutually satisfactory provision, achieving so nearly as possible the same commercial effect, to be substituted for the provision so found to be void or unenforceable.

16.8   <u>No Partnership or Agency</u>. Nothing in this Agreement (or any of the arrangements contemplated hereby) shall be deemed to constitute a partnership between the Parties nor, save as may be expressly set out herein, constitute any Party as the agent of the other Party for any purpose.  In addition, no Party shall enter into contracts with third parties as agent for any BSGR Guinea Group Company or for the other Party nor shall any Party describe itself as agent as aforesaid or in any way hold itself out as being an agent as aforesaid.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                           VALE-RT_00000718

16.9    Conflict With Constitutional Documents. If there is any conflict or inconsistency between the provisions of this Agreement and the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group Company, subject to Applicable Law, this Agreement shall prevail as between the Parties *inter se* and between each Party and the relevant BSGR Guinea Group Company and be applied in priority.  The Parties shall exercise all voting and other rights and powers available to them so as to give effect to the provisions of this Agreement.  If requested to do so by any Party, the other Party shall procure that the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group Company are amended or the relevant provisions of such are waived, suspended or disqualified so as to accord with and give effect to the provisions of this Agreement, subject to Applicable Law.

16.10   Governing Law; Arbitration.

   (a)   This Agreement is governed by English law.  The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.

   (b)   Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the **"LCIA Rules"**), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party-nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court.  The seat or place of arbitration shall be London, England.  The language to be used in the arbitral proceedings shall be English.  The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction.  Any request for arbitration shall be served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

   (c)   In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000719

proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceedings sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

(d)     By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

(e)     The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

(f)     To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

(g)     Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000720

agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

(h)     BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 16.10(b) above.  If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

16.11   Further Assurances. Upon request, each Party shall from time to time take such actions and execute such further documents as may be deemed reasonably necessary by any Party to carry out, evidence and confirm their rights and the intended purpose of this Agreement. Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by any Party, subject to Applicable Laws and the requirement to comply with any fiduciary duties applicable to the directors (or equivalent officers) of such other person, such obligation shall be construed as requiring the Party concerned to exercise all rights and powers of control over the affairs of any other person which that Party is able to exercise (whether directly or indirectly) in order to procure performance of that obligation.  Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by the Board or any individual member of the Board, subject to Applicable Laws and the requirement to comply with any fiduciary duties applicable to such member(s) of the Board, such obligation shall be construed as requiring the Parties or (as the case may be) the Party that designated the relevant member of the Board to take all necessary steps in order to procure performance of such obligation.

16.12   Contracts (Rights of Third Parties) Act 1999. Save where specifically provided herein, the Contracts (Rights of Third Parties) Act 1999 shall not apply to this Agreement and no person other than the Parties to this Agreement shall have any rights under it nor shall it be enforceable by any person other than the Parties to it.  Where, pursuant to the terms of this Agreement, a third party has been expressly granted rights under the Contracts (Rights of Third Parties) Act 1999, the consent of such third party shall not be required for the variation of this Agreement or the waiver of any provision in it.

16.13   Remedies. Unless otherwise stated in this Agreement or the Shareholders' Agreement, each Party's only remedy in respect of a breach of any provision of this Agreement or any misrepresentation (other than fraudulent misrepresentation) in connection with the subject matter of this Agreement is in damages or a claim for injunctive or equitable relief.  Accordingly, neither Party shall have any right to terminate or rescind this Agreement in the event of a breach of this Agreement or negligent or innocent misrepresentation by the other Party, provided that this Section 16.13 shall not exclude any liability for fraudulent misrepresentation.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                   VALE-RT_00000721

16.14   <u>Effect of Completion.</u> Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

16.15   <u>Counterparts.</u> This Agreement may be entered into in any number of counterparts and by the Parties on separate counterparts, each of which when so executed and delivered shall be an original, but all counterparts shall together constitute one and the same instrument.

*[The remainder of this page is intentionally left blank]*

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                      VALE-RT_00000722

**AS WITNESS** this Agreement has been signed by the duly authorized representatives of the Parties the day and year first before written.

**BSG RESOURCES LIMITED**

By: David Clark

_____
      Name: David Clark
      Title: Director

**VALE S.A.**

By: Roger Agnelli

_____
      Name: Roger Agnelli
      Title: CEO of Vale S.A.

By:  Carlos Martins

_____
      Name: Carlos Martins
      Title: Executive Director

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                        VALE-RT_00000723

## SCHEDULE 1

**DEFINED TERMS**

**Acquired Ownership Interest** means the number of shares in the issued share capital of BSGR Guinea as corresponds to the portion of the Sale Shares that reflects the proportion which the aggregate amount of the Initial Consideration, the First Deferred Consideration and the Second Deferred Consideration paid by Vale pursuant to Section 3 prior to the relevant date for determining the Acquired Ownership Interest bears to $2,500,000,000, and in the event that such calculation results in an entitlement to a holding of a fraction of a share, such fraction shall be rounded to the nearest whole number. Column (2) of the below table sets out the Acquired Ownership Interest which Vale would hold as a result of paying the relevant elements of the Purchase Price as shown in column (1).

| (1)<br>Amount of Purchase Price paid | (2)<br>Acquired Ownership Interest (Ordinary Shares representing the proportion of BSGR Guinea's total issued share capital set out below) |
|---|---|
| Initial Consideration | 10.2% |
| Initial Consideration plus First Deferred Consideration | 20.4% |
| Initial Consideration plus Simandou Construction Second Deferred Consideration | 30.6% |
| Initial Consideration plus First Deferred Consideration plus Simandou Construction Second Deferred Consideration | 40.8% |

**Additional Consideration** has the meaning given in Section 3.

**Affiliate** means, in relation to a specified person, any family relation of such person, any person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with the specified person and shall also include any person who is a director or officer of the specified person or beneficial owner of at least 50% (fifty per cent.) of any class of the then issued share capital of the specified person, and in the case of either Party shall include their respective subsidiaries.

**agents** has the meaning given in Section 3.7(a) of Schedule 4, Part B.

**agreed form** has the meaning given in Section 1.5.

**Agreement** has the meaning given in the Preamble.

**Ancillary Agreements** means the Shareholders' Agreement, the Off-take Term Sheet, the Off-take Agreement, the Vale Loan and the Vale Loan Term Sheet and any technical services agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.6 and any agreement entered into by any member of

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                 VALE-RT_00000724

the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.8, or any of them.

**Anti-Bribery Laws** has the meaning given in the Shareholders' Agreement.

**Applicable Law** means, in relation to any person, property, transaction or event, (i) all applicable provisions of laws, statutes, ordinances, rules, regulations, directives, guidelines and orders of any Governmental Entity; and (ii) the terms of all judgments, orders, awards and decrees issued by any Governmental Entity, in each case, by which such person is bound or submits or having application to the property, transaction or event in question.

**Applicable Sanctions Laws** has the meaning given in Section 3.4 of Schedule 4, Part B.

**Articles** means the Articles of Incorporation of BSGR Guinea, as amended from time to time.

**Basic Agreement** means the Basic Agreement entered into amongst the Republic of Guinea, BSGR Guinea and ProjectCo, dated 16 December 2009, as ratified by Ordonnance No. 003/PRG/CNDD/SGG/2010, dated 19 March 2010.

**Board** means the board of directors of BSGR Guinea.

**BSGR** has the meaning given in the Preamble.

**BSGR Accounts** means BSGR's annual accounts for the financial year ended on 31 December 2008 which are included in the Disclosure Bundle at Section 1X (tab 6).

**BSGR Advisory Company** means any and each of BSGR Treasury Services Limited, Resources Advisory Services Limited and Onyx Financial Advisors Limited.

**BSGR's Bank Account** means an account held at JPMorgan Chase Bank, N.A. New York (CHASUS33) under direct SWIFT advice to JPMorgan Chase Bank, N.A., CHASGB2L for the account of JPMorgan Chase Bank, N.A. (CHASGB2L) with account number 0010962009 for further credit to the Ultimate Beneficiary BSG Resources Limited with the account number being 40867501 and the IBAN being GB76CHAS60924240867501.

**BSGR Directors** has the meaning given in the Shareholders' Agreement.

**BSGR Dividend Amount** means an amount equal to (but not exceeding) the Loan Repayment Amount subject only to the reduction of such amount by the amount of (i) any tax that is required to be withheld in respect of any dividend or other distribution paid or (ii) any interest on any loan made, in either case, by ProjectCo or any other member of the BSGR Guinea Group (other than Liberia HoldCo or Liberia ProjectCo) in order to create a distributable profit or to ensure there is sufficient cash within BSGR Guinea for the purpose of paying the dividend contemplated in Section 6.4.

**BSGR Group** means BSGR and its Affiliates from time to time but, for the avoidance of doubt, excluding with effect from Completion any BSGR Guinea Group Company.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000725

**BSGR Guinea** has the meaning given in Recital (A).

**BSGR Guinea Accounts** means the "Statements of Financial Affairs" of BSGR Guinea as of 31 December 2009 which are included in the Disclosure Bundle at Section 1F (tab 1).

**BSGR Guinea Accounts Date** means 31 December 2009.

**BSGR Guinea Group** means BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo and **BSGR Guinea Group Company** means any and each of these companies.

**BSGR Guinea's Bank Account** means the bank account of BSGR Guinea notified, from time to time, for the purpose of a payment to BSGR Guinea under this Agreement.

**BSGR Principals** has the meaning given in Section 1.8.

**BSGR Subscription** has the meaning given in Section 5.4(a).

**BSGR Subscription Trigger Date** has the meaning given in Section 5.4.

**BSGR Warranties** has the meaning given in Section 8.1.

**Business Day** means a day other than a Saturday or Sunday or public holiday in England and Wales, the United States or Brazil on which banks are open in London, New York and Rio de Janeiro for general commercial business.

**Business Plan** has the meaning given in the Shareholders' Agreement.

**Claim** means a Warranty Claim, Indemnity Warranty Claim, Tax Claim or Guernsey Loan Indemnity Claim.

**Competing Business** has the meaning given in Section 13.4(a).

**Completion** has the meaning given in Section 4.1.

**Completion Date** has the meaning given in Section 4.1.

**Concession Areas** means:

      (a)    the area that is the subject of the Mining Concession (the "**Zogota Concession Area**");

      (b)    the area which is the subject of the mineral exploration permit granted under decree no. A 2008/I-4980/MMG/SGG, dated 9 December 2008 and registered in the Centre de Promotion et de Développement Miniers under number A 2008/132/DIGM/CPDM (the "**Simandou Concession Area**"); and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL            VALE-RT_00000726

      (c)      the area which is the subject of the mineral exploration permit granted under decree no. A 2009/1327/PR/MMEH/SGG, dated 10 June 2009 and registered in the Centre de Promotion et de Développement Miniers under number A 2009/124/DIGM/CPDM.

**Confidential Information** has the meaning given in Section 15.1(a).

**Confidentiality Agreement** means the agreement relating to certain confidential information between BSGR and Vale South Africa (PTY) Ltd dated 22 February 2010.

**Constitutional Documents** has the meaning given in Section 4.2(d)(i).

**Control** means in respect of an entity, the capacity (other than through the exercise of minority rights under the Shareholders' Agreement) to direct or cause the direction of the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by agreement, as trustee or executor, or otherwise, and the terms **Controlling** and **Controlled by** shall be construed accordingly.

**Date of First Commercial Production** means the date on which first commercial production occurs as determined in accordance with the Basic Agreement.

**Debt Free Warranty** means the statement set out in Section 7.1 of Schedule 4, Part B.

**Default Interest** means interest at LIBOR plus 3 per cent.

**Deferred Shares** has the meaning given in the Shareholders' Agreement.

**Disclosure Bundle** means the disclosure bundle prepared by BSGR for Project Hills and annexed to the Disclosure Letter.

**Disclosure Letter** means the letter from BSGR to Vale executed and delivered immediately before the signing of this Agreement.

**Disputed Tax Claim** shall have the meaning given in Section 3.3(a) of Schedule 10.

**Dividend Reserve Amount** has the meaning given in the Shareholders' Agreement.

**Employee Benefits** means all agreements and other commitments, whether of an individual or collective nature and including commitments based on works custom, regarding employee benefits such as anniversary, holiday or jubilee payments, bonus, profit participation or other variable remuneration elements, and stock options, stock appreciation rights or similar rights, other than pensions, granted by any member of the BSGR Guinea Group.

**Encumbrance** means any mortgage, security interest, charge, pledge, lien, right of pre-emption, right of first refusal, third party right, option or other encumbrance whatsoever (including, without limitation, a title transfer or retention arrangement) having similar effect.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL          VALE-RT_00000727

**Event** means an event, act, transaction or omission, including, without limitation, a receipt or accrual of income or gains, distribution, failure to distribute, acquisition, disposal, transfer, payment, loan or advance.

**Exchange Rate** means, with respect to any particular currency or currencies for a particular day, the closing midpoint spot rate of exchange in New York City, New York for such currency into dollars on such date as reported in The Wall Street Journal which is first published thereafter or, where no such rate is so reported in respect of that currency for such date, at the rate quoted by Citibank, N.A. (or its successor) in New York City, New York as at the close of business in New York City, New York on such date.

**Exploration Permits** means (i) the Guinea Exploration Permits and (ii) the Liberia Exploration Permits.

**FCPA Warranties** means the statements set out in Part B, Sections 3.4 to 3.7 (inclusive) and 8.3 (but only to the extent that a Claim thereunder relates to a breach of Anti-Bribery Laws) of Schedule 4.

**Feasibility Study** means the feasibility study in respect of the Zogota Concession Area and Blocks 1 and 2 of the Simandou Concession Area and the Project to be conducted and completed by ProjectCo based on the parameters and standards set out in Schedule 9.

**Feasibility Study Approval Date** has the meaning given in Section 5.1(d).

**Feasibility Study Completion Date** has the meaning given in Section 5.1(c).

**Feasibility Study Continuation Date** has the meaning given in Section 5.2(c).

**Feasibility Study Interruption Circumstances** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Date** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Notice** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Solution** has the meaning given in Section 5.2(b).

**Feasibility Study Period** means, subject to Sections 5.2 and 5.3, the period of two years commencing on the Completion Date or, if, prior to the expiry of such period, Vale in its sole discretion serves a notice in writing on BSGR electing to extend such period (an "**Extension Notice**"), the period of three years commencing on the Completion Date. For the avoidance of doubt, the service of any Feasibility Study Interruption Notice or notification of a Feasibility Study Continuation Date, in each case, pursuant to and in accordance with the terms of Section 5.2 shall not constitute an Extension Notice.

**Feasibility Study Period Expiry Date** means the final date of the Feasibility Study Period, as such date may be extended from time to time by an Extension Notice or in accordance with Sections 5.2 and 5.3.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

**First Deferred Consideration** has the meaning given in Section 3(b).

**Force Majeure Event** has the meaning given in Section 12.6.

**Funding Amount** has the meaning given in Section 6.1(a)(i).

**Governmental Entity** means (i) a national government, political subdivision thereof, or local jurisdiction therein; (ii) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above or with jurisdiction in the same legal jurisdiction of any of the above, however constituted; or (iii) a government-owned/government-controlled association, organization, business or enterprise.

**Government Official** has the meaning given in Section 3.7(b) of Schedule 4, Part B.

**Group** means in respect of an entity that entity and its Affiliates from time to time.

**Guernsey Loan Indemnity Claim** means a claim under Section 8.4.

**Guinea Exploration Permits** means (i) the mineral exploration permit granted under decree no. A 2008/I-4980/MMG/SGG, dated 9 December 2008 and registered in the Centre de Promotion et de Développement Miniers under number A 2008/132/DIGM/CPDM and (ii) the mineral exploration permit granted under decree no. A 2009/1327/PR/MMEH/SGG, dated 10 June 2009 and registered in the Centre de Promotion et de Développement Miniers under number A 2009/124/DIGM/CPDM.

**Indebtedness** means with respect to any person (i) all indebtedness of such person for borrowed money, (ii) all obligations of such person evidenced by notes, bonds or similar instruments, (iii) all indebtedness created under any conditional sale or other title retention agreement, (iv) all obligations of such person as lessee under leases that have been or should be recorded as capital leases, (v) all obligations of such person under acceptance, letter of credit or similar facilities, (vi) all obligations of such person to purchase, redeem, retire or otherwise acquire for value any equity interests of such person, (vii) all obligations of such person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of business), (viii) all obligations of such person in respect of interest rate swaps, caps or collar agreements or similar arrangements, and (ix) all indebtedness of others referred to in clauses (i) through (viii) above guaranteed directly or indirectly in any manner by such person or secured by any Encumbrance on the property of such person.

**Indemnity Warranty** means a statement contained in Sections 3.2, 3.4 to 3.7 (inclusive), 7.1, 8.3 (but only to the extent that a Claim thereunder relates to a breach of Anti-Bribery Laws) or 12 of Schedule 4.

**Indemnity Warranty Claim** means a claim by Vale for breach of an Indemnity Warranty.

**Initial Consideration** has the meaning given in Section 3(a).

**issued share capital** or any equivalent expression means with respect to BSGR Guinea the aggregate number of Ordinary Shares outstanding from time to time, excluding Deferred Shares.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                VALE-RT_00000729

**Key Employees** has the meaning given in Section 13.1(a).

**LCIA Rules** has the meaning given in Section 16.10(b).

**Liberia Exploration Permits** means the following mining exploration licenses in the territory of Liberia: (i) MEL 12006 (known as Zezia Range) issued on 10 September 2008 by the Government of Liberia, (ii) MEL 12007 (known as St John's River South) issued on 28 November 2008 by the Government of Liberia, and (iii) MEL 12008 (known as St John's River East) issued on 28 November 2008 by the Government of Liberia.

**Liberia Group Transfer** means the transaction whereby Liberia Holdco became a direct subsidiary and Liberia ProjectCo became an indirect subsidiary of BSGR Guinea.

**Liberia HoldCo** has the meaning given in Recital (A).

**Liberia HoldCo Accounts** means the annual accounts of Liberia HoldCo for the financial year ending on 31 December 2009 which are included in the Disclosure Bundle at Section 7 (tab 38).

**Liberia ProjectCo** has the meaning given in Recital (A).

**Liberian Dividends** means any dividend or other distribution representing distributable profits derived from Liberia ProjectCo or Liberia HoldCo with respect to the exploitation of the Liberia Exploration Permits.

**Liberian Transport Solution** has the meaning given in Section 5.5.

**Liberian Transport Solution Construction Works** means the construction or installation by or on behalf of any member of the BSGR Guinea Group of port facilities in Liberia (other than at Buchanan) for the export of at least 50 million metric tonnes per annum of iron ore or rail facilities in Liberia (other than in relation to any rail facilities in existence as at the date of this Agreement) for the transportation of at least 50 million metric tonnes per annum of iron ore.

**Liberian Transport Solution Effective Date** has the meaning given in Section 5.5.

**LIBOR** means the display rate per annum of the offered quotation for deposits in $ for a period of one month which appears on the appropriate page of the Reuters Screen (or such other page as the parties may agree) at or about 11.00 a.m. London time on the date on which payment of the sum under this Agreement or any Ancillary Agreement was due but not paid.

**Loan Repayment Amount** means the lesser of:

(a)     the amount which is equal to 50 per cent. of the amount which is calculated by deducting the Dividend Reserve Amount from the Permissible Dividend Amount; and

(b)     the amount which is equal to the sum of the principal amount and any capitalised interest then outstanding under the Vale Loan.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                    VALE-RT_00000730

**Losses** means any and all losses, liabilities, costs (including legal costs), claims, demands, expenses (including Tax) and/or damages (but excluding any such amounts if and to the extent that they would comprise a claim for any punitive, special, indirect or consequential loss, loss of profit or loss of revenue (save where such loss of revenue relates to a contract entered into by any member of the BSGR Guinea Group prior to Completion and in respect of only loss of revenue prior to Completion) or incidental damage or for any loss of goodwill or possible business before or after Completion, whether actual or prospective (**"Excluded Losses"**)); provided that no Excluded Loss shall have the effect of limiting or excluding the ability to recover in respect of any other head of Loss other than Excluded Losses in respect of any relevant claim or breach and **Loss** shall be construed accordingly.

**Management Accounts** means the "Statement of Financial Affairs" of the BSGR Guinea Group as of 31 March 2010 which are included in the Disclosure Bundle at Section 7 (tab 33).

**Mining Concession** means the mining concession granted to ProjectCo by decree no. D2010/024/PRG/CNDD/SGG, dated 19 March 2010, following the Basic Agreement.

**OECD Convention** has the meaning given in Section 3.6 of Schedule 4, Part B.

**Off-take Agreement** means the agreement in the form to be finalized and executed pursuant to Section 5.10 of this Agreement between ProjectCo and Vale International S.A. in respect of the sale and purchase of the entire output of iron ore of the mines in the Concession Areas.

**Off-take Term Sheet** has the meaning given in Section 4.2(b)(ii).

**Ordinary Shares** means ordinary shares of $1.00 each in the capital of BSGR Guinea.

**Parties** has the meaning given in the Preamble.

**Permissible Dividend Amount** has the meaning given in Section 6.4(a).

**Project** means the (i) designing, financing, development and operation by ProjectCo of (i) iron ore mines within the Concession Areas (any such iron ore mine having an intended annual production of 50 million dry metric tonnes of iron ore product per calendar year),   (ii) transportation and export of these minerals by railway or otherwise; and (iii) related infrastructure, facilities and activities.

**ProjectCo** has the meaning given in Recital (A).

**ProjectCo Accounts** means the annual accounts of ProjectCo for the financial year ending on 31 December 2009 which are included in the Disclosure Bundle at Section 7 (tab 34).

**Project Financing** has the meaning given in Section 6.2.

**Properties** means the immovable property referred to in Section 7 (tab 25) of the Disclosure Letter.

**Purchase Price** has the meaning given in Section 3.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000731

**Relevant Business Opportunities** has the meaning given in Section 13.2(b).

**Relevant Ownership Percentage** means the percentage amount which the issued share capital of BSGR Guinea held by Vale (or any of its Affiliates) at such time bears to the total issued share capital of BSGR Guinea at such time.

**Representatives** has the meaning given in Section 15.1(b).

**Royalties Agreement** means the Royalty and Technical Advisory Agreement in respect of the Project between ProjectCo and BSGR.

**Sale Shares** means 51 Ordinary Shares.

**Second Deferred Consideration** has the meaning given in Section 3(c).

**Second Deferred Consideration Trigger Date** means the date (if any) on which Vale confirms to BSGR pursuant to Section 5.1(d) that the Feasibility Study has been approved.

**Shareholders' Agreement** has the meaning given in Section 4.2(b)(i).

**Simandou Construction Date** means the date (if any) on which any construction or installation works by or on behalf of any member of the BSGR Guinea Group commence for the purpose of mining or processing activities in the Simandou Concession Area, including the construction or installation of rail facilities, in relation to an industrial scale project for the production of at least 25,000,000 metric tonnes of iron ore per annum (**"Simandou Construction Works"**) provided that:

> (a)   the undertaking of investigations, surveys or tests to determine the viability of the mine or any such project; and

> (b)   the construction or installation of roads or other elements of infrastructure which are intended to support or which are ancillary to any Simandou Construction Works,

shall, in each case, not comprise Simandou Construction Works.

**Simandou Construction Second Deferred Consideration** has the meaning given in Section 3(c).

**Subscription Notice** has the meaning given in Section 6.1(a).

**Substantiated Claim** means a Claim for which BSGR is liable under this Agreement and in respect of which (i) liability for such Claim has been accepted or admitted in writing by BSGR; or (ii) the Claim has been determined in favor of Vale pursuant to Section 16.10 or otherwise.

---

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                 VALE-RT_00000732

**Tax** or **Taxation** means all governmental, state, community, local, municipal or regional taxes, levies, imposts, duties, charges, deductions, withholdings and social security contributions of any kind arising in any part of the world including, without limitation:

> (a)   corporation tax, income tax, capital or chargeable gains tax, inheritance tax, value added tax, national insurance contributions, social security contributions, capital duty, tax on real property, dwellings profits tax, stamp duty, stamp duty reserve tax, stamp duty land tax, document duty, transfer taxes, insurance premium tax, landfill tax, climate change levy, aggregates levy, withholdings, retentions and deductions in respect of tax, duties of customs and excise and all taxes on gross and net income, profits or gains, receipts, sales, use, occupation, franchise, added value, personal property or net worth; and

> (b)   all penalties, charges, costs and interest included in or relating to any tax,

in all cases, wherever and whenever imposed and regardless of whether such taxes, penalties, charges, costs and interest are directly or primarily chargeable against or attributable to any party and regardless of whether any such party has or may have any right of reimbursement against any other person.

**Tax Authority** means any revenue, customs or fiscal governmental, state, local, community, municipal or regional authority, body or person anywhere in the world competent to impose or collect Tax.

**Tax Claim** means any claim by Vale:

> (a)   under or for breach of the provisions of Section 8.1 as a result of a breach of a Tax Warranty; or

> (b)   under Schedule 10.

**Tax Warranty** means a statement contained in Section 17 of Schedule 4, Part B.

**Third Party Claim** has the meaning given in Section 11.

**Title Warranty** means the statement set out in Part A, Section 1.2 of Schedule 4.

**United States or US** means the contiguous United States of America, including the District of Columbia, the states of Alaska and Hawaii, and all off-shore U.S. territories and possessions, such as Puerto Rico.

**Unpaid Amount** has the meaning given in Section 10.2.

**USD or $** means the currency of the United States.

**Vale** has the meaning given in the Preamble.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                     VALE-RT_00000733

**Vale Loan** means the loan or loans to be made by Vale (or any member of its Group) to ProjectCo (or any other member of the BSGR Guinea Group), in each case, reflecting the terms of the Vale Loan Term Sheet.

**Vale Loan Term Sheet** means the loan term sheet attached as Schedule 3.

**Vale Warranties** has the meaning given in Section 8.2.

**Warranty Claim** means a claim by Vale under or for breach of the provisions of Section 8.1 as a result of a breach of a BSGR Warranty other than the BSGR Warranties under Sections 3.2, 3.4 to 3.7 (inclusive), 7.1, 8.3 (to the extent that a relevant Claim thereunder is for breach of Anti-Bribery Laws) or 12 of Schedule 4.

**Zogota Feasibility Study** means the existing feasibility study for the Zogota Concession Area integrated by the Basic Agreement included in the Disclosure Bundle at Section 2A (tab 1).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                         VALE-RT_00000734

VALE-RT_00000735

## SCHEDULE 2

> *Please note that the terms set out in this summary term sheet (including the attached schedules) do not constitute a contract but rather indicate the basic terms upon which a detailed sale and purchase agreement will be drawn up by Vale to be entered into by the Parties. The term sheet includes only key terms in summary form. For the avoidance of doubt Schedule 1 and Schedule 2 form part of this term sheet.*

### TERM SHEET FOR THE PROPOSED PROJECT HILLS

### GUINEA IRON ORE SALE AND PURCHASE AGREEMENT

### (the "Sale and Purchase Agreement")

1. **Purpose** – the Sale and Purchase Agreement will set out the full terms and conditions upon which the Seller shall sell and deliver and the Buyer shall take delivery and purchase iron ore produced from the Concession Areas[1] by the Buyer.

2. **Parties**

   a. **"Buyer"** – Vale International S.A.; and

   b. **"Seller"** – BSG Resources (Guinea) S.à.r.l.,

   Each a **"Party"** and together the **"Parties"**.

3. **Effectiveness and Term** – unless the Parties agree otherwise, the Sale and Purchase Agreement will be effective from the date of signature by both of the Parties. The Sale and Purchase Agreement shall continue in full force and effect for the duration of commercial production of iron ore from the Concession Areas.

4. **Product** – the Sale and Purchase Agreement relates to the entire iron ore output of the mines in the Concession Areas (the **"Product"**). For the avoidance of doubt, the Sale and Purchase Agreement does not deal with any by-products of iron ore production.

---

[1] **"Concession Areas"** shall have the meaning given to that term in the Joint Venture Framework Agreement between BSG Resources Limited and Vale S.A. (the **"Framework Agreement"**).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

5. **Quality** – the Sale and Purchase Agreement will provide for a detailed specification for the Product, including a target specification and an acceptable range of quality for Product from each mine to be delivered by the Seller to the Buyer. The final specification for each mine can only be produced following the detailed feasibility study for such mine. As such, the Sale and Purchase Agreement will initially set out the procedure by which the specification shall be determined for each mine (or where applicable based on a blend of output from more than one mine). The Sale and Purchase Agreement will set out detailed procedures for determining quality and for resolving any disputes regarding quality of a given shipment, which will be subject to binding determination by an expert.

6. **Sale and Purchase Obligation** – the Seller agrees to sell the Product to the Buyer and to deliver it to the identified delivery point (which will be at the port of Buchanan and/or at the port of Didia when this has been built and commissioned, or such other delivery point as the Parties may agree from time to time) and the Buyer agrees to buy and take delivery of the Product - in each case, subject to detailed provisions relating to quantities, scheduling of deliveries and quality of Product. For a summary of the risk allocation that will apply in relation to these matters see Schedule 1 to this term sheet.

7. **Delivery** – shipments of Product will be delivered on an FOB basis at the relevant delivery point in accordance with INCOTERMS 2000. Title and risk of loss with respect to any shipment of Product will pass at the ship's rail at the loading port in accordance with INCOTERMS 2000. The Sale and Purchase Agreement will contain detailed provisions for scheduling shipments in each contract year and for coordinating delivery dates and vessel timings.

8. **Failure of Seller to supply/failure of Buyer to take delivery** – for a summary of the consequences of a failure by the Seller or the Buyer to perform their respective obligations in relation to the supply, sale, delivery and purchase of Product whether by reason of Force Majeure or default see Schedule 1 to this term sheet. For the avoidance of doubt, the only rights that the Seller shall have to sell any of the Product to a third party during the term of the Sale and Purchase Agreement are those rights identified in Schedule 1 to this term sheet.

9. **Consequences of delays in supply/taking delivery** – for a summary of the consequences of delay by either the Seller or the Buyer in relation to a given shipment see Schedule 1 to this term sheet.

10. **Price** – the Sale and Purchase Agreement will contain detailed provisions for determining the price of each shipment, including the price adjustment for quality of supply that is below the target specification. The Sale and Purchase Agreement will contain a detailed provision explaining how to determine price if any relevant reference price necessary for the purposes of calculating the Actual Contract Price (as defined in Schedule 2) disappears or is otherwise unavailable, or the calculation of such reference price materially changes over time. Schedule 2 to this term sheet sets out the detailed mechanism for calculation of the Actual Contract Price.

11. **Payment** – the Sale and Purchase Agreement will contain standard payment terms for an agreement such as this. Schedule 1 to this term sheet sets out details of the consequences of payment defaults and the resolution of payment disputes. All payments will be in US$ unless the Sale and Purchase Agreement specifies otherwise.

12. **Exclusive Marketing** - the Sale and Purchase Agreement makes the Buyer solely and exclusively responsible for marketing and selling the Product to end customers. Except when necessary to enable the Seller to exercise its right to sell any part of the Product to third parties, which

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000736

CONFIDENTIAL

right arises solely in the circumstances expressly provided in this term sheet, the Seller shall not market the Product or discuss pricing, quantities or other sale terms of the Product with any third party without first obtaining the prior written consent of the Buyer and the Buyer shall be entitled to attend all such discussions.  The Seller shall promptly refer all bids, offers and enquiries received by it or any its Affiliates from prospective purchasers to the Buyer.

13. **Taxes** – the Sale and Purchase Agreement will provide for a clear allocation of responsibility for payment of taxes, levies, duties, imposts and like charges (**"Taxes"**) – for further details see Schedule 1 to this term sheet.

14. **Consents** – each Party will be responsible for obtaining and maintaining in force the consents, licences, authorisations and permissions (**"Consents"**) that it requires to perform its obligations under the Sale and Purchase Agreement – for further details see Schedule 1 to this term sheet. The Seller will, at the request of the Buyer, use reasonable endeavours to assist the Buyer to identify, obtain and maintain and Consents it may require in the Republic of Guinea or the Republic of Liberia.

15. **Force Majeure** – the Sale and Purchase Agreement will contain standard provisions relating to Force Majeure – for further details of certain consequences of Force Majeure see Schedule 1 to this term sheet.

16. **Disputes** – the Sale and Purchase Agreement will provide for resolution of disputes by expert or by arbitration depending upon the nature of the dispute in question.

17. **Changes in Circumstances** – the Sale and Purchase Agreement is expected to be in force for several decades and therefore it is appropriate for either Party to be able to raise and require discussion by the Parties of how to take into account material changes in circumstances – for further details see Schedule 1 to this term sheet.

18. **Governing Law** – the Sale and Purchase Agreement and any dispute or claim (including any non-contractual dispute or claim) arising out of or in connection with it or its subject matter shall be governed by, and construed in accordance with, English law.

19. **Limitations of Liability and Exclusive Remedies** – the Sale and Purchase Agreement will contain standard provisions relating to limitations of liability of each of the Parties arising under and/or in connection with the Sale and Purchase Agreement and in respect of the exclusive remedies available to the Parties in case of defaults. See Schedule 1 for more details of limitations of liability.

20. **Liability for Contractors and Agents** – each Party shall be liable for the actions and omissions of any person to whom it sub-contracts any part of its obligations under the Sale and Purchase Agreement or who it uses to provide a service (e.g. operation of a mine or railway) in relation to the performance of this Sale and Purchase Agreement as if the act and omissions of such person were the acts and omissions of the Party in question.

21. **Indemnities** – the Sale and Purchase Agreement will contain the indemnities identified in Schedule 1 to this term sheet.  In addition, depending upon the nature and scope insurances intended to be taken out by each Party it may be appropriate to include mutual hold harmless indemnities in relation to damage to property and personal injuries that one Party causes to another.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000738

22. **Warranties** – the Sale and Purchase Agreement will contain standard warranties from each Party in relation to due authorisation, etc. The Seller will give a warranty of good and marketable title to the Products sold and that the Products are free of liens, but there will be no implied or express warranties in relation to the fitness for purpose or other characteristics of the Products.

23. **Miscellaneous/General** – the Sale and Purchase Agreement will contain typical "boilerplate" provisions for an agreement of this nature (for example, but without limitation:  no partnership created by the Agreement; exclusion of third party contractual rights; assignment provisions; and further assurance)

24. **Exclusion of Uniform Law on Sales, etc**. - the Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967, the United Nations Convention on International Sales of Goods of 1980 and the United Nations Convention on Prescription (Limitation) in the International Sales of Goods of 1974 and the amending Protocol of 1980 shall not apply to this Contract

UK-2421081-v8         - 51 -         95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000739

**SCHEDULE 1**

**Guinea Iron Ore Sale and Purchase Agreement – Risk Matrix[2]**

| No. | Risk/issue | Solution |
|---|---|---|
| **Commissioning Output and Commencement of Commercial Output** | | |
| 1. | What to do with Commissioning output? | Commissioning output should be stockpiled, and then blended with iron ore produced during commercial production for sale to final customers. As such, there will be no iron ore purchase prior to the commencement of commercial production. |
| 2. | What if commercial production is behind schedule/ahead of schedule? | No liability for Seller for late commencement of commercial production, equally no bonus for early commencement of commercial production.<br><br>Buyer will offtake output once commercial production commences and Seller is able to make deliveries at the designated delivery point, regardless of whether early or late, with Seller to provide a period of notice of start date. |
| **How to deal with multiple mines/iron ore specifications and Quality Issues Generally** | | |
| 3. | Iron ore is being developed in relation to a number of different mines in Guinea with different product specifications and different development timelines – will they be covered by one contract or multiple contracts? | A single contract covering all iron ore production from the Guinea mines is proposed.<br><br>The product specification for each mine will be drawn up separately taking into account the characteristics of the mine, but the same pricing formula will apply to output from all resources (i.e. the single pricing formulation will be capable of applying to a range of iron ore product specifications).<br><br>In due course, there may be blending of product across mines to produce a single blended product specification. |

---

[2] Note this table does not attempt to identify and allocate every risk that will be addressed in the arm's length sale and purchase agreement – but it does attenmpt to identify some of the key risks that were highlighted during the discussions between Vale International and BSGR

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000740

| No. | Risk/issue | Solution |
|---|---|---|
| 4. | What is Seller's obligation re-specification of product? | For each mine there will be a target specification.  This may need to be varied over time to reflect the exploitation of different parts of the resource at each site.<br><br>Seller will be obliged to use reasonable endeavours to achieve target product specification, and in any case to supply within a stated acceptable range of specification.<br><br>If a given shipment is outside of the target specification but within acceptable specification range, then the Buyer must take delivery and automatic price adjustment for quality applies.<br><br>If a given shipment is outside of acceptable range of specification, then the Buyer will have a right to reject and Seller will indemnify Buyer for any Buyer out of pocket costs, including in relation to vessels (whether Vale or non Vale) and any penalties/charges under Buyer's third party contracts. Indemnity is capped at value of shipment (based on price of target specification). Seller's risk is mitigated by Seller checking specification at the mine.<br><br>If Buyer knowingly accepts out of  specification shipment the only impact is a price adjustment based on the pricing formula. |
| 5. | How to deal with variation of ore specification over time? | Contracts will permit adjustment of target specification to take account of different ore bodies being developed over time and any differences between feasibility study results and actual ore body results in commercial production. |
| 6. | Resolution of disputes as to quality of any shipment. | Resolved by expert determination to allow rapid resolution of invoicing and liability issues. |
| 7. | Are there any warranties as to quality? | No express or implied warranties as to merchantability or fitness for a particular purpose.<br><br>There will be an express warranty that deliveries are made free from liens |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000741

| No. | Risk/issue | Solution |
|---|---|---|
| | | and that Product is sold with good title. |
| **Quantity Issues Generally including impact of FM and default** | | |
| 8. | Defining the annual contract quantity. | The annual contract quantity for a given contract year shall be determined in advance of the start of that contract year, based on the anticipated production schedule, which shall reflect the level of anticipated market demand agreed by the Buyer and the Seller for each separate specification of Product and any physical constraints at the mines. The agreement will set out the detailed procedure for determining the annual contract quantity. |
| 9. | Buyer's ability to vary shipment size within each contract year. | The agreement will provide for a target number of shipments per calendar year to achieve the annual contract quantity and, subject to meeting the annual contract quantity, Buyer will have the ability to modulate shipment size within defined parameters to help it to match supply to demand within the contract year. <br><br> Individual shipments will have a tolerance of +/- 10% for vessel trimming. |
| 10. | Not Used | Not Used |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000742

| No. | Risk/issue | Solution |
|---|---|---|
| **11.** | Shipments are interrupted due to Seller FM of Buyer FM. | Sale and Purchase Agreement will contain market standard FM definition and structure for claiming FM by either party.<br><br>If a claim of FM < 3 months, then each party has a reasonable endeavours obligation to try to catch up the volume not delivered/purchased due to such FM in same contract year (or the same and the following contract year if cannot be fully accommodated within same contract year).<br><br>If a claim of FM > 3 months, then the party not claiming FM may cancel the volume; if not cancelled, parties have reasonable endeavours obligation to try to catch up the volume not delivered/purchased due to such FM in same contract year (or the same and the following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity is adjusted to take account of FM and any applicable catch-up.<br><br>Note: wherever such a volume catch-up structure applies in the agreement, the reasonable endeavours obligation for the Buyer entails finding additional customers/markets or increased volume demand from existing customers, it does not require Buyer to substitute project output for output from its other mines or to reduce the sale price in order to sell additional volumes at the expense of its sale margins.  Also, any quantities that are caught up (whether following default or FM are paid for at the price applicable at the date of actual delivery not the date that a shipment was originally due).<br><br>Neither party has a right to terminate due to extended FM.<br><br>Each party bears its own costs/losses due to FM.<br><br>Seller has the right to sell to third parties in case a Buyer claim of FM lasts more than 3 months. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000743

| No. | Risk/issue | Solution |
|-----|------------|----------|
| 12. | Shipments are interrupted due to Seller default. | In case where caused by Seller default, Seller will indemnify Buyer for any Buyer out of pocket costs arising due to shipment interruption, including in relation to vessels (whether Vale or non Vale) and any penalties/charges under Buyer's third party contracts.<br><br>Indemnity is capped at value of shipment (based on price as at proposed delivery date of target specification or, if known, actual specification).<br><br>No right of termination provided that indemnity is paid.<br><br>At Buyer's option, each party has a reasonable endeavours obligation to try to catch up the volume lost due to Seller default in same contract year (or same and following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity shall be adjusted to take account of default and any applicable catch-up. |
| 13. | Buyer fails to take shipments due to Buyer default. | In case where caused by Buyer default, Buyer will indemnify Seller for any Seller out of pocket costs arising due to shipment interruption, including in relation to port and storage costs.<br><br>Indemnity is capped at value of shipment (based on price as at proposed delivery date of target specification or, if known, actual specification).<br><br>No right of termination provided that indemnity is paid.<br><br>Seller has the right to sell to third parties in case of Buyer failing to take shipments due to Buyer default in excess of 3 months duration.<br><br>At Seller's option, each party has an reasonable endeavours obligation to try to catch up the volume lost due to Buyer default in same contract year (or same and following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity shall be adjusted to take account of default and any applicable catch-up. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000744

| No. | Risk/issue | Solution |
|---|---|---|
| **Delay Costs – delays in delivery of shipments** | | |
| 14. | How are deliveries scheduled. | Sale and Purchase Agreement will include a standard administrative procedure for identifying the scheduled date for each shipment, so as to enable determination of delays and allocate responsibility accordingly. |
| 15. | If Seller is late in delivering a shipment other than due to FM. | Seller pays demurrage costs incurred by the Buyer and Buyer's out of pocket costs (e.g. any demurrage charges that are payable by Buyer to a third party where the relevant vessel is a third party vessel) resulting from such delay. |
| 16. | If Buyer is late in taking delivery of a shipment other than due to FM. | Buyer pays Seller any additional storage and port costs resulting from such delay. |
| **Changing Circumstances** | | |
| 17. | Circumstances at some point in the future are fundamentally and materially different from those at the time that the Parties entered the contract. | The Sale and Purchase Agreement will provide for a right for either Party to request that the Parties meet to discuss and attempt to agree any necessary or appropriate changes where circumstances relating to the obligations and benefits of the Parties have fundamentally and materially altered since the date of the Sale and Purchase Agreement. Neither Party shall be under any obligation to agree to such changes. |
| **Payment/Non-Payment** | | |
| 18. | Obligation to pay/effect of non-payment. | The Parties are to agree the payment terms that will be included in the Sale and Purchase Agreement, provided that the period within which payment is to be made shall follow Buyer's practice with their clients but shall be no longer than 45 days from delivery.. Each invoice to be accompanied by appropriate level of supporting data/documentation (noting that confidentiality may apply to Buyer's third party contracts preventing full disclosure). Right to withhold payment in relation to disputed amounts.  Non-disputed amounts to be paid even if part of invoice is disputed. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000745

| No. | Risk/issue | Solution |
|---|---|---|
|  |  | Expert procedure for resolution of disputes shall apply in relation to invoiced amounts. |
|  |  | Interest to accrue on late payments and withheld disputed payments determined to be correctly payable. |
|  |  | Non-payment will be a material breach giving rise to right to terminate but only after substantial cure period and escalation of non-payment issue to senior management. |
|  |  | Non-defaulting party to have a right to suspend its obligations to deliver/purchase during period of non-payment of an undisputed sum.  Any such suspension period ends automatically upon payment. |
|  |  | Annual contract quantity will be adjusted to take account of period of suspension. |
|  |  | Seller to have right to sell to third parties during any such period of suspension once the cure period for non-payment has ended. |
| **Taxes** | | |
| 19. | Division of Responsibility for taxes. | There is a clean division of responsibility of each party for payment of taxes. |
|  |  | Seller is responsible for all taxes on its operations and taxes in country of origin (i.e. Guinea and Liberia) and Buyer is responsible for all taxes on its operations (including any Taxes on its vessels) and taxes outside of the country of origin.  There is no pass through of any such Taxes from one party to the other. |
|  |  | Each party is responsible for Taxes imposed on its revenue (i.e. corporation tax) without recourse to the other party. |
|  |  | If for any reason a party pays a tax that is for the account of the other party then the party that pays will be indemnified by the other party. |
|  |  | Changes in tax rates are at the risk of the paying party. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000746

| No. | Risk/issue | Solution |
|---|---|---|
| | | |
| **Consents/Licences** | | |
| 20. | Obligation to obtain and maintain necessary consents/licences. | Each party to obtain and maintain the Consents required by it to perform its obligations.<br><br>Seller is responsible for export licences at port of delivery to Buyer (and export from Guinea/import into Liberia in order to get product to port). |
| **Limits on Liability and Exclusive Remedies** | | |
| 21. | Exclusion of liability for consequential loss.<br><br><br><br>Are remedies expressly referred to in the agreement the exclusive ones available to the parties? | Standard exclusion of liability of either party for any special, indirect or consequential loss or loss of profit or anticipated profit, loss of sales or turnover, loss or customers, loss of or damage to reputation, loss of revenue, loss of goodwill, loss of opportunity or other special loss or damage consequential loss  shall apply, but this will not prevent recovery of categories of costs expressly set out in the Sale and Purchase Agreement and will not apply to standard exceptions for fraudulent misrepresentation or death or personal injury caused  by negligence.<br><br>The Sale and Purchase Agreement will include a standard exclusive remedies clause for a contract of this type. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

SCHEDULE 2

PRICE

## Summary of Calculation of the purchase price per dry metric ton

All sales under the Agreement will be made on an FOB basis by the Seller to the Buyer.

Consistent with Vale's overall sales strategy it is the intention that all sales by the Buyer to its customers will be made on a CFR basis by reference to a particular unloading port.

For each shipment of Product delivered FOB under the Sale and Purchase Agreement, the Seller shall invoice the Buyer based on the quantity of the shipment and the contract price per dry metric ton applicable respectively to the iron ore fines and any lump ore in that shipment – this will be calculated by reference to the actual average CFR price achieved by the Buyer in that Quarter, less a market based freight adjustment.

For the purposes of this Agreement a **Quarter** shall be a period of 3 calendar months ending on 31 March, 30 June, 30 September and 31 December.

## 1. Calculation of the Actual Contract Price (iron ore fines)

For a given Quarter, x,  the Actual Contract Price per dry metric ton of iron ore fines shall be the higher of the **Adjusted Base Purchase Price** for that period and the **Floor Price** for that period.

## 2. Calculation of the Base Purchase Price (iron ore fines)

**Base Purchase Price**, for iron ore fines means, in respect of any Quarter, x shall be calculated as follows:

(i) If that Quarter is the Quarter in which supplies are first made under this Agreement, the Base Purchase Price for that Quarter will be provisionally calculated based on the tonnage weighted average price per dry metric ton of Carajás iron ore fines supplied CFR to Vale's top 5 Chinese clients (by volume) in the previous Quarter (based on the best information available at the end of that previous Quarter[3]) adjusted for freight (as provided below) to give an FOB Liberia equivalent price. This shall provide provisional Base Purchase Price that will be used for the purpose of invoicing during the Quarter.  As soon as reasonably practicable once the relevant information is available following the end of the Quarter, the Buyer will undertake a reconciliation calculation comparing the provisional Base Purchase Price and the tonnage weighted average FOB Liberia equivalent price based on the

---

[3] Note that not all invoices in relation to the shipments in a given Quarter will have been issued by the end of that Quarter, so the provisional price will be based on the information available at the end of the Quarter not on the full complement of invoices for shipments in that Quarter.  Since it is a provisional price this does not matter because any inaccuracy will be cancelled out by the reconciliation calculation which is only undertaken once full information is available to calculate the actual Base Purchase Price.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000747

CONFIDENTIAL

VALE-RT_00000748

tonnage weighted average CFR price per dry metric ton of iron ore fines supplied by the Seller under the Seller's sale contracts[4] to customers for each unloading port[5] adjusted for freight (as provided below), which shall be the actual Base Purchase Price for that Quarter. Any difference between the provisional Base Purchase Price that was used for invoicing under this Agreement and the actual Base Purchase Price for the Quarter shall be reflected in a reconciliation payment, which shall be payable within [•] Business Days of such calculation by the Buyer to Seller or by the Seller to the Buyer as necessary.

(ii) In respect of any subsequent Quarter, the Base Purchase Price for the previous Quarter (using the provisional Base Purchase Price for that previous Quarter until such time as the actual Base Purchase Price for that previous Quarter is available) shall be used as a provisional Base Purchase Price that will be used for the purpose of invoicing during the Quarter. As soon as reasonably practicable once the relevant information is available following the end of the Quarter, the Buyer will undertake a reconciliation calculation comparing the provisional Base Purchase Price for that Quarter and the tonnage weighted average FOB Liberia equivalent price based on the tonnage weighted average CFR price per dry metric ton of iron ore fines supplied by the Seller under the Seller's sale contracts to customers for each unloading port adjusted for freight (as provided below), which shall be the actual Base Purchase Price for that Quarter. Any difference between the provisional Base Purchase Price that was used for invoicing under this Agreement and the actual Base Purchase Price for the Quarter shall be reflected in a reconciliation payment which shall be calculated as soon as reasonably practicable once the information becomes available to the Buyer and which shall be payable within [•] Business Days of such calculation by the Buyer to Seller or by the Seller to the Buyer as necessary.

In each case, the Base Purchase Price shall be calculated by an independent auditor from an internationally recognised auditing company appointed by the Buyer. The Buyer will not be required to disclose its third party contracts to the Seller (due to confidentiality restrictions) but will be required to disclose them to this independent auditor for them to calculate the relevant average price.

### 3. Calculation of the Freight Adjustment

The Buyer proposes that the freight adjustment required to adjust the tonnage weighted average CFR prices referred to in this Schedule so as produce an FOB equivalent price will calculated in respect of each unloading port on the basis of the **standard freight adjustment** defined below.

**Standard Freight Adjustment** (for Didia port) – for the first Quarter of supply, the weighted average CFR price calculated on the basis of Vale's 5 biggest Chinese clients (by volume) – see 2(i) above – will be adjusted for freight by deducting from this average price the average spot freight market price per dry metric ton for freight for the previous Quarter for freight between Liberia and the relevant unloading ports. This will create the provisional Base Purchase Price for the first Quarter.

The provisional Base Purchase Price for every subsequent Quarter will be equal to the actual Base Purchase Price from the immediately previous Quarter - no further standard freight adjustment is required since it has already been applied to produce the actual Base Purchase Price calculation.

The standard freight adjustment for the actual Base Purchase Price for the first Quarter and every subsequent Quarter will be calculated by deducting

---

[4] For the avoidance of doubt, if a customer of the Buyer takes delivery but fails to pay the full contract price under the relevant supply contract between it and the Buyer, this non-payment is the Buyer's risk and the contract price in the supply contract will continue to apply for the purposes of calculating the Base Purchase Price hereunder. If the customer fails to take delivery of a shipment then the Buyer will be forced to look for alternative customers. The sale price under the sale contract for the sale of the shipment to such an alternative customer will in these circumstances be the price that will used be for the purposes of calculating the Base Purchase Price hereunder.

[5] Note that where tonnage weighted average prices per unloading port are referred to in this Schedule these are calculated by first calculating the tonnage weighted average price for each route adjusted for freight and then calculating the average of these tonnage weighted averages to give a single figure.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000749

from the actual CFR average price calculation applicable to that Quarter the actual average spot freight market price per dry metric ton for freight between Liberia and the relevant unloading ports for that Quarter.

For Products to be delivered from Buchanan, the freight rate to be used as reference for standard freight adjustment shall be the same freight rate agreed by Vale International S.A with the owners of the vessels.

Freight to be paid shall be deemed earned on cargo as taken on board, non-returnable, vessel and/or cargo lost or not lost.

If a published market reference spot freight price per dry metric ton is available for the freight for Liberia to the relevant unloading port, then this will be used for the purposes of the above calculations. If, for whatever reason, no such price is available for the relevant Quarter, the Parties shall use an equivalent freight price based on the Tubarao to unloading port rate, calculated based on shipping parameters, for each unloading port, as follows:

*[Vale to confirm]*

In each case, the freight price per dry metric ton will be calculated using the freight price in US Dollars per metric ton divided by (1 minus % $H_2O$) where **% $H_2O$** is the moisture content of iron ore fines (or lump ore in case of lump ore shipments) in % basis.

## 4. Calculation of the Adjusted Base Purchase Price

For any Quarter, x, the **Adjusted Base Purchase Price$_x$ per dry metric ton of iron ore fines** = Base Purchase Price$_x$ minus the **Marketing Adjustment Amount$_x$** minus any **Floor Price Compensation Adjustment Amount$_x$**

## 5. Calculation of the Floor Price

From time to time the Buyer shall have the right to propose a Floor Price that would set a minimum price floor (on a per dry metric ton basis) for all iron ore fines sales under this Agreement (subject to any maximum quantity per calendar year proposed by the Buyer) for a given duration proposed by the Buyer (for example a period of one year or a period of five years). The Floor Price will be calculated based on FOB sales at a Designated Port in Liberia.

In exactly the same way as for sales of iron ore fines, the Buyer shall have the right to a Floor Price that would set a minimum price floor (on a per dry metric ton basis) for all iron ore lump under this Agreement (subject to any maximum quantity per calendar year proposed by the Buyer) for a given duration proposed by the Buyer (for example a period of one year or a period of five years). The Floor Price will be calculated based on FOB sales at a Designated Port in Liberia.

When it proposes any Floor Price (whether for iron ore fines or lump ore) the Buyer shall also specify the % risk fee that would be used to calculate the Floor Price Adjustment Amount if the Seller agrees to accept the proposed Floor Price. The % risk fee is intended to compensate the Buyer for providing the guaranteed floor price to the Seller and the risks arising from that and, as such, the higher the guaranteed Floor Price the higher the % risk fee that the Buyer will propose.

Any Floor Price proposed by the Buyer (whether for iron ore fines or lump ore) shall only apply to sales of iron ore under this Agreement if the Seller agrees to accept the Buyer's proposed Floor Price. Once agreement has been reached on a Floor Price, that Floor Price will apply for the period proposed by the Buyer to all iron ore sales under this Agreement during the proposed period subject to any maximum quantity limit.

For the avoidance of doubt, if there is no Floor Price agreed for a particular Quarter, the Floor Price for that Quarter shall be deemed to be zero.

If the Seller proposes to put in place any price hedge or price support mechanism, the Buyer shall have a right to match any such offer obtained from a third party.

## 7. Calculation of the Floor Price Compensation Adjustment Amount

For any given Quarter, x, to calculate the Adjusted Base Purchase Price, the Floor Price Compensation Adjustment Amount for that Quarter shall be equal to the product of the Base Purchase Price for that Quarter and the % risk fee that has been agreed by the Parties in relation to the proposed Floor Price for that Quarter.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

For the avoidance of doubt, if no Floor Price applies to a Quarter the Floor Price Compensation Adjustment Amount shall be zero.

If a Floor Price applies just to a part of a given Quarter, the Floor Price Compensation Amount calculated per (a) and (b) above will be pro rated to reflect the fact that it does not apply to the full Quarter.

**8. Calculation of the Marketing Adjustment Amount**

For any given Quarter, x, to calculate the Adjusted Base Purchase Price the Marketing Adjustment Amount shall be equal to the product of the Base Purchase Price for that Quarter and 4%.

**9. Calculation of the Actual Contract Price (lump ore)**

Exactly the same pricing formula as that which is used to calculate the Actual Contract Price for iron ore fines shall be used to calculate the Actual Contract Price for lump ore, the only difference being that the price per dry metric ton of lump ore will tend to be a different (and higher) price than that applicable for iron ore fines.

The invoice in respect of any given shipment will include an amount payable for the iron ore fines in that shipment and a separate amount payable for the lump ore in that shipment, in each case calculated as specified in this Schedule.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000750

CONFIDENTIAL

## SCHEDULE 3

## FORM OF VALE LOAN

## KEY TERMS AND CONDITIONS

*This is a summary of the key terms and conditions of the proposed loan agreement between the Lender ,the Borrower and BSGR Guinea to be entered into in accordance with the Joint Venture Framework Agreement ("JVFA") and the Shareholders' Agreement (the "Loan Agreement"). The Loan Parties agree to negotiate the Loan Agreement in good faith and in the spirit of the JVFA and the Shareholders' Agreement. Where this Schedule is silent, or where it refers to a position in general terms, the final form Loan Agreement will be consistent with the terms of this Schedule and otherwise in accordance with customary terms and conditions for arm's length loan agreements of the nature envisaged by the JVFA to the extent consistent with the terms of, or provisions contemplated by, the JVFA and/or the Shareholders' Agreement and in the case of any inconsistency, the terms of the JVFA and/or Shareholders' Agreement shall prevail. Vale may, at its sole option, require the borrower (and any Additional Borrower) to enter into either (a) a single loan agreement based on these key terms and conditions or (b) two identical loan agreements based on these key terms and conditions, with the loans under each agreement being proportional to the respective shareholdings of Vale and BSGR in BSGR Guinea as at the date that the Loans are entered into references to the facility below should be interpreted accordingly .Unless otherwise defined in this Schedule, defined terms shall have the meaning given in the JVFA.*

(a)   **Parties:**       (1) Vale International S.A.[6] (the "**Lender**");

(2) BSG Resources (Guinea) S.a.r.l. (the "**Borrower**"); and

(3) BSG Resources (Guinea) Limited ("**BSGR Guinea**").

(together, the "**Loan Parties**")

(b)   **Additional Borrowers**:       If Project costs are to be incurred by other subsidiaries of BSGR Guinea, these entities may accede to the Loan Agreement as Additional Borrowers, if Project revenues are earned by any subsidiaries of BSGR Guinea these subsidiaries shall accede to the Loan Agreement as Additional Borrowers unless the Lender agrees otherwise or such accession would result in a breach of any laws or regulations of any applicable jurisdiction. In each case such accession shall be by such instrument as the Loan Parties may reasonably agree and subject to provision of a legal opinion of Lenders' counsel in form and substance satisfactory to the Lender acting reasonably in respect of (i) the capacity of the Additional Borrower to accede to and perform its obligations under the

---

[6]   Or such other member of the Vale Group as Vale may nominate.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                          VALE-RT_00000751