# Exhibit J2

Loan Agreement, (ii) any necessary consents (of any governmental, judicial or public body or authority in its jurisdiction of incorporation) relating to such accession and the performance of its obligations under the Loan Agreement having been obtained by the Additional Borrower and (iii) the enforceability of the Loan Agreement against such Additional Borrower upon its accession.   The Lender will be entitled to reimbursement of its reasonable legal costs in relation to any such accession.

(c)   **Funding/Tax Structure**: The Loan Parties shall use commercially reasonable efforts with a view to establishing the optimal tax structure for the implementation and funding of the Vale Loan.

(d)   **Joint and Several Liability:** The Borrower and each Additional Borrower shall be jointly and severally liable for the performance of its respective obligations under the Loan Agreement, unless such joint and several liability would result in a breach of any laws or regulations of any applicable jurisdiction.

(e)   **Type of Facility:**      Term loan facility.

(f)   **Security**:      None.

(g)   **Purpose:**      To provide the funds necessary to permit the Borrower  and any Additional Borrower to comply with the Business Plan, provided that this obligation shall be reduced (dollar for dollar) to the extent of any Project Financing.

(h)   **Loans**:      The Lender shall make Loans available in accordance with the terms and conditions of the Loan Agreement.

(i)   **Amount**:      Up to the Project costs in accordance with the Business Plan, less the (dollar for dollar) amount of any Project Financing.

(j)   **Conditions Precedent[7]:**      The following conditions precedent shall apply and shall be the only conditions precedent to the disbursement of

---

[7]      Subject to the Loan Parties' local counsel confirmation/approval.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                      VALE-RT_00000752

each of the Loans (except for item (iii) that shall only be provided as a condition precedent to the first disbursement in respect of the Borrower and each Additional Borrower):

(i)     Borrower (and each Additional Borrower) have obtained any registration or other requirements under the laws of the Republic of Guinea that are required to permit:

  (1)     each of them to enter into the Loan Agreement and the enforceability of all of their respective rights and obligations under the Loan Agreement;

  (2)     the disbursement in question to be made to the Borrower (and/or any Additional Borrower); and

  (3)     any disbursement and any interest (including capitalized interest) to be paid by the Borrower (and each Additional Borrower) to the Lender in US Dollars in accordance with the terms of the Loan Agreement.

(ii)    Borrower (and each Additional Borrower) has opened and maintains in effect a bank account in the Republic of Guinea (or the Republic of Liberia in the case of any Additional Borrower registered in Liberia) into which the Loans will be paid and in which the Borrower (and any Additional Borrower) will hold the loan funds disbursed to it until they are required to meet Project costs[8]. At the Lender's option to the extent that it is possible (and would not result in a breach of any laws or regulations of any applicable jurisdiction) for the Borrower and any Additional Borrower to hold the proceeds of the Loan Agreement offshore in US Dollars they shall do so; to the extent that they are unable to do so, but are able to hold the proceeds of the Loan Agreement onshore in US Dollars until such time as they are needed to pay Project costs (and so doing would not result in a breach of any laws or regulations of any applicable jurisdiction), again they shall do so.

---

[8] Loan Parties' Local counsel to confirm whether US Dollar account can be held by Borrower onshore and, if not, most effective account structure to reduce exposure to local currency fluctuation against US Dollar.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                     VALE-RT_00000753

(iii)    The Lender has received in form and substance satisfactory to it a legal opinion from counsel to the Lender with respect to (a) the Loan Agreement being valid, binding and enforceable and (b) the capacity and authority of the Borrower (and each Additional Borrower) to enter into and perform its obligations under the Loan Agreement.

(iv)    No obligation to make disbursements in circumstances where such obligation to disburse is suspended in accordance with the JVFA or Shareholders' Agreement for so long as such suspension of the obligation to disburse is continuing under the JVFA or Shareholders' Agreement or the JVFA or Shareholders' Agreement is terminated.

(v)    No default is continuing under the Loan Agreement or would result from the proposed Loan. All representations under the Loan Agreement are true (or for any disbursement other than the first, all repeating representations under the Loan Agreement are true in all material respects).

(vi)    A disbursement request specifying the requested loan amount and the requested utilization date has been received by the Lender in the form and with the notice period specified in the Loan Agreement.

(vii)    No Insolvency Event (see paragraph (p) below) has occurred and is continuing in relation to the Borrower or any Additional Borrower.

(viii)    No Force Majeure Event is reasonably determined by Vale too have occurred in accordance with Section 12.6 of the JVFA.

(ix)    No Material Adverse Event has occurred and is continuing.

For the purposes of the Loan Agreement "**Material Adverse Event**" shall mean an event or circumstance (or combination thereof) which has or could reasonably be expected to have a material adverse effect on:

- the ability of the Borrower and any Additional Borrower to continue to perform its obligations under the Loan Agreement; or

- the validity or enforceability of the Loan Agreement or the rights or remedies of the Lender under the Loan Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL        VALE-RT_00000754

Such conditions precedent shall be satisfied to the satisfaction of the Lender acting reasonably.

(k) **Automatic Termination of funding obligation:**   The obligation of the Lender to lend under the Loan Agreement will automatically terminate (i) in the circumstances provided in Section 9.1 (e) of the Shareholders' Agreement (ii) to the extent envisaged by Section 7.3 of the Shareholders' Agreement (iii) if the Shareholders' Agreement terminates for any reason.

(l) **Automatic Suspension of funding obligation:**   The obligation of the Lender to lend under the Loan Agreement will automatically be suspended if a Force Majeure Event is reasonably determined by Vale to have occurred and is continuing in accordance with Section 12.6 of the JVFA. The suspension will continue until Vale reasonably and in good faith determines that such Force Majeure Event is no longer continuing.

(m) **Currency**:   U.S. Dollars, or, at the option of the Lender in the currency in which the Project costs to be funded by a given loan are to be incurred.

(n) **Representations and Warranties**:  The Loan Agreement will contain customary representations and warranties for an arm's length loan agreement of the nature envisaged by the JVFA and in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement.

(o) **Ranking**:   Without prejudice to Section 9.1 (h) and 9.2 of the Shareholders' Agreement, the Loans under the Loan Agreement will rank senior to all of the Borrower's and each Additional Borrower's other financial indebtedness at any time.

(p) **Negative Pledge:**  The Loan will include a customary negative pledge provision subject only to exceptions agreed between the Loan Parties**.**

(q) **Other Positive and Negative Covenants:** The Loan Agreement will contain other customary positive and negative covenants for an arm's length loan agreement of the nature envisaged by the JVFA and, in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                VALE-RT_00000755

(r)     **Dividends and share redemption:** Except as provided for in, or is consistent with the terms of, the JVFA, the Loan Agreement shall not include any restriction on the ability of any member of the Group (as defined below) to:

    (a)     declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid divided, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

    (b)     repay or distribute any dividend or share premium reserve;

    (c)     pay or allow any member of the Group to pay any fee to or to the order of any of the shareholders of the BSGR Guinea; or

    (d)     redeem, repurchase, decease, or retire or repay any of its share capital or resolve to do so.

(s)     **Insolvency Event:** Upon the occurrence of an Insolvency Event relating to the Borrower and/or an Additional Borrower the obligation of the Lender to make further Loans shall be terminated and the outstanding amount of the Loans shall be immediately due and payable. For the purposes of the Loan Agreement "**Insolvency Event**" will be defined to cover the normal range of insolvency triggers in an arm's length loan agreement of the nature envisaged by the JVFA and, in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement and will be subject to review by local counsel in each jurisdiction in which the Loan Parties (other than the Lenders) are incorporated Guinea and Liberia to confirm that it captures all customary insolvency events at default in relation to those jurisdictions.

(t)     **Repayment:** There shall be no scheduled repayment date for the Loans made under the Loan Agreement, provided that Borrower/Additional Borrowers shall repay the interest and principal due under the Loan Agreement as provided in Section 6.4 of the JVFA as modified by Section 9.1(f) of the Shareholders' Agreement. Any repayment of Loans under the Loan Agreement shall reduce the aggregate outstanding principal amount of the Loans in the order that they were disbursed (i.e. oldest first).

(u)     **Optional Repayment from certain Borrower/Additional Borrower funds:** Lender shall have the right to require the Borrower/Additional Borrower to repay the Loans under the Loan Agreement from and to extent that they receive funds from the following sources:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000756

(i)     Insurance proceeds (net of any Tax payable by the Borrower or any Additional Borrower on such proceeds),unless these are in respect of a liability to a third party and are paid to such third party (less reasonable costs and expenses) unless applied in reinstatements of the relevant loss within a time period to be agreed by the Loan Parties;

(ii)     Damages (liquidated or otherwise) for delay or breach of contract by third parties and proceeds of claims against third parties (net of any Tax payable by the Borrower or any Additional Borrower on such damages) unless applied in amelioration of the loss resulting directly from the delay or breach of contract by the relevant third party within a time period to be agreed by the Loan Parties; and

(iii)     Proceeds of sale, lease or transfer of any asset of the Borrower or any Additional Borrower (net of any Tax payable by the Borrower or any Additional Borrower on such proceeds) less any costs and expenses incurred in respect of such sale, lease or transfer, as the case may be,

in each case subject to certain exceptions and de minimis threshold (to be agreed).

(v)     **Voluntary Prepayment and cancellation**:  The Borrower and any Additional Borrower may prepay all or any part of the Loans and cancel the whole or any part of any available Loan, in each case, at any time and without any prepayment fee, cost or premia.  Furthermore, the Loans may be cancelled (without any prepayment fee, cost or premia) in the event of any increased cost/tax gross-up owing to any Lender, provided that such cancellation does not give rise to any cost or liability of Vale under the JVFA or the Shareholders' Agreement.

(w)     **Mandatory Repayment in case of certain Shareholder events:** In case of each of the following events, the Loans shall be repaid by the Borrower and any Additional Borrowers (if and to the extent that any proceeds of such events are received at the level of the Borrower/Additional Borrowers) and/or by BSGR Guinea (if and to the extent that any proceeds of such events are received at the level of BSGR Guinea) from, and in an amount equal to, the sources of funds and to the extent identified in each case below:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL          VALE-RT_00000757

(1)  Upon the events as defined in Section 7.3 of the Shareholders' Agreement; and

(2)  Promptly following receipt of any financial compensation from a Government Entity or insurer in relation to any seizure, expropriation or intervention by such Government Entity of all or any part of the  Borrower and/or any Additional Borrower, or any cancellation or material amendment or de facto nationalization (as the case may be) of all or any material part of the Project or the rights relating thereto, in each case, to the extent of, and in an amount equal to, the compensation received by them (less any reasonable costs associated therewith).

(x)   **Interest Period:**   semi-annual.

(y)   **Interest Payment Date:**  The last day of an Interest Period.

(z)   **Interest**: Subject to paragraphs (aa) and (bb) below, Interest shall be paid in arrears, on each Interest Payment Date and shall accrue on the outstanding principal amount of the Loans.  Interest shall accrue from the disbursement of each Loan until the next Interest Payment and on each Interest Payment date thereafter.  The applicable interest rate shall be 16% per annum.

(aa)  **Capitalisation of Interest prior to Date of First Commercial Production:**  During the period prior to the receipt of first revenues from production/sales of iron ore by the Borrower or any Additional Borrower, interest on each Loan due and payable in accordance with the Loan Agreement, shall not be paid in cash and on each Interest Payment Date shall be capitalised and added to the principal amount of the Loan.

(bb)  **Payment of interest post Date of First Commercial Production:** Following the date of the receipt of first revenues from production/sales of iron ore by the Borrower or any Additional Borrower  interest is to be paid on each Interest Payment Date. To the extent that there are insufficient funds to repay such interest as it falls due, on each Interest Payment Date interest on each Loan shall be capitalised and added to the principal amount of the Loan to which it relates as it accrues.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                          VALE-RT_00000758

(cc)  **Costs and Expenses**: Each of the Loan Parties shall pay its own costs and expenses in relation to the preparation, negotiation and signing of the Vale Loan.

(dd)  **Governing Law**: The Loan Agreement and any non-contractual obligations in connection with it shall be governed by English Law with the courts of England having exclusive jurisdiction to settle and dispute arising out of or in connection with the Loan Agreement.

(ee)  **Miscellaneous:** The Loan Agreement shall contain such other provisions as are customary for an arm's length loan agreement of the nature envisaged by the JVFA and also any provisions that are required from the perspective of Guinean and Liberian law to give full force and effect to the Loan Agreement, in each case, as agreed between the Loan Parties.  The Loan Parties agree to negotiate the Loan Agreement in good faith and in the spirit of the JVFA and the Shareholders' Agreement.

(ff)  **Assignments and Transfers:**  Lender may only transfer intra-group (subject to no adverse tax consequences for the Borrowers / Additional Borrowers and provided that the Lender shall procure that the intra-group transferee complies with its obligations under the Loan Agreement in accordance with the JVFA and the Shareholders' Agreement). No assignment, transfer of other disposal by Borrower and/or Additional Borrowers other than as permitted under the JVFA or the Shareholders' Agreement.

(gg)  **Amendments, waivers, consents:**  The Loan Agreement may not be amended, waived or varied in any other way unless approved in writing by the Parties to the JVFA.

(hh)  **Fees:**  There shall be no upfront, ongoing or other financing fees, cost and expenses (other than those expressly referred to in these Key Terms and Conditions) payable to the Lenders (or any other party) under or in connection with the Loan Agreement and/or the Loans.

(ii)  **Borrower's/Additional Borrower's Counsel:**  The Borrowers/Additional Borrowers will be represented by independent, internationally recognised counsel (with financing expertise), in relation to the preparation, negotiation, execution and administration of the Loan Agreement and all matters relating thereto.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                          VALE-RT_00000759

## SCHEDULE 4

## BSGR WARRANTIES

**Part A**

**Section 1.      Group Structure and Corporate Matters**

1.1      Each of BSGR, BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation and has full power and authority required under its constitutional documents to enter into this Agreement and, where applicable, each of the Ancillary Agreements to which it is a party and to conduct its business as conducted at the date of this Agreement.

1.2      BSGR is the sole shareholder of BSGR Guinea and holds full and valid legal and beneficial title to the shares of BSGR Guinea, free from Encumbrances. BSGR Guinea is the sole shareholder of ProjectCo and Liberia HoldCo and holds full and valid legal and, where such concept is recognized under applicable law, beneficial title to the shares of ProjectCo and Liberia HoldCo, free from Encumbrances. Liberia HoldCo is the sole shareholder of Liberia ProjectCo and holds full and valid legal title and, where such concept is recognized under applicable law, beneficial title to the shares of Liberia ProjectCo, free from Encumbrances.

1.3      The shares held by BSGR in BSGR Guinea, by BSGR Guinea in ProjectCo and Liberia HoldCo and by Liberia HoldCo in Liberia ProjectCo have been validly issued and allotted in accordance with Applicable Law, are fully paid up and each of these shareholdings represents all of the shares in issue for each respective company.

1.4      There is no agreement or commitment outstanding, which calls for the allotment, issue or transfer of, or accords to any person the right to call for the allotment, issue or transfer of, any shares or certificates or debentures in or securities of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo.

1.5      The information relating to each member of the BSGR Guinea Group set out in Schedule 7 is true, accurate and complete as to the category of information referred to therein.

1.6      There are no outstanding (i) securities of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo convertible into or exchangeable for shares of capital stock or voting securities or ownership interests in BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively, (ii) options, warrants, rights or other agreements or commitments to acquire from BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo or obligations of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo to issue, any capital stock, voting securities or other ownership interests in (or securities convertible into or exchangeable for capital stock or voting securities or other ownership interests in) BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively, or (iii) obligations of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to the issuance of any

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                    VALE-RT_00000760

capital stock, voting securities or other ownership interests in BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively.

1.7     There are no subsidiaries of BSGR Guinea (direct or indirect) other than ProjectCo, Liberia HoldCo and Liberia ProjectCo.

1.8     BSGR and each BSGR Guinea Group Company has obtained all corporate authorizations and all other governmental, statutory, regulatory or other consents and authorizations required to empower it to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party where failure to obtain them would adversely affect its ability to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party and such agreements constitute valid and binding obligations of each such party.

1.9     Entry into and performance by BSGR and each BSGR Guinea Group Company of this Agreement and/or any Ancillary Agreement to which it is a party will not (i) breach any provision of its memorandum and articles of association, by-laws or equivalent constitutional documents or (ii) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any Governmental Entity, where any such breach would materially adversely affect its ability to enter into or perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

1.10     Neither BSGR nor any BSGR Guinea Group Company is insolvent or bankrupt under the laws of its jurisdiction of incorporation, unable to pay its debts as they fall due or has proposed or is liable to any arrangement (whether by court process or otherwise) under which its creditors (or any group of them) would receive less than the amounts due to them.  There are no proceedings in relation to any compromise or arrangement with creditors or any winding up, bankruptcy, désastre or insolvency proceedings concerning BSGR or any BSGR Guinea Group Company and no events have occurred which would justify such proceedings.  No steps have been taken to enforce any security over any assets of any BSGR or any BSGR Guinea Group Company and no event has occurred to give the right to enforce such security. BSGR and BSGR Guinea each satisfy the solvency test under Guernsey Law at the date of this Agreement and will not become unable to satisfy such solvency test as a result of entering into this Agreement.

1.11     The BSGR Accounts provided a true and fair view as at 31 December 2008 of the state of affairs of BSGR and its assets and liabilities as at 31 December 2008.

1.12     If consolidated accounts were to be prepared for BSGR showing the state of affairs of BSGR and its assets and liabilities as at the date of this Agreement on a basis consistent with the preparation of the BSGR Accounts, the net assets of BSGR which are not subject to any Encumbrance would exceed $700,000,000.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000761

**Part B**

**Section 2.      Information**

2.1      So far as BSGR is aware, the information set out in this Agreement, the Disclosure Bundle and the Disclosure Letter is accurate in all material respects and is not misleading.  The documents contained in the Disclosure Bundle were collected in good faith for the purpose of providing a description of the material areas of the BSGR Guinea Group's business as at the date of this Agreement.  So far as BSGR is aware, no document or other information, which would otherwise have been material to the business of the members of the BSGR Guinea Group and is in the possession or under the control of the BSGR Group has been knowingly withheld or fraudulently concealed from the Disclosure Bundle.

2.2      The Zogota Feasibility Study has been diligently prepared in accordance with the scope of work and on the basis of the assumptions referred to therein and reflects the expectations of BSGR and the directors of BSGR Guinea as to the matters referred to therein and such expectations are honestly and reasonably held provided that no warranty is given as to the ultimate outcome.

**Section 3.      Regulatory Matters**

3.1      The businesses of each BSGR Guinea Group Company have been carried on and are being carried on in compliance with all Applicable Law and in compliance with all constitutional documents of such BSGR Guinea Group Company and there has been and there is at the date of this Agreement no investigation or enquiry by, or order, decree or judgment of, any Governmental Entity outstanding or, to the knowledge of any BSGR Guinea Group Company, threatened against any BSGR Guinea Group Company, nor any notice or other communication from any Governmental Entity with respect to any alleged violation and/or failure to comply with any such Applicable Law that would prevent any BSGR Guinea Group Company from performing its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

3.2      Each BSGR Guinea Group Company has all necessary permissions, consents and approvals to carry on the activities that it is currently carrying on (each a **"Relevant Permit"**). Liberia ProjectCo holds the Liberia Exploration Permits and ProjectCo holds the Guinea Exploration Permits and the Mining Concession, which are valid and enforceable as at the date of this Agreement according to their respective terms.  ProjectCo is a party to the Basic Agreement which is valid and enforceable as at the date of this Agreement according to its terms. As of the date of this Agreement, no notice has been received by a BSGR Guinea Group Company from any Governmental Entity that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is to be revoked or restricted or amended in such a manner which is prejudicial to the interests of a BSGR Guinea Group Company. As of the date of this Agreement, no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is likely to be revoked or restricted or amended in such a manner which is materially prejudicial to the interests of a BSGR Guinea Group Company.   True and complete copies of the Exploration Permits, the Mining

UK-2421081-v8                                                              - 75 -                                                              95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Concession and the Basic Agreement are attached to the Disclosure Letter at Section 3 and no other amendments, modifications, waivers or supplements (in whole or in part) have been made to any of the Exploration Permits or the Mining Concession at any time.

3.3     Each BSGR Guinea Group Company has at all times complied in all material respects with all applicable laws and regulations regulating data protection, privacy or the recording, monitoring or interception of communications in any jurisdiction in which data is managed or processed.

3.4     Each BSGR Guinea Group Company and each BSGR Advisory Company has since the date of its incorporation been and is in compliance with any applicable export control and economic sanctions laws and regulations of the US and other jurisdictions in which it operates or to which it is subject ("**Applicable Sanctions Laws**"), including without limitation the US Export Administration Regulations and the US International Traffic in Arms Regulations, the US Department of Treasury and the Office of Foreign Asset Control's economic sanctions regulations.

3.5     In regard to the operations of the BSGR Guinea Group and all matters governed by this Agreement, none of BSGR nor any BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their respective agents have paid, offered, promised, or authorised the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(a)     corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(b)     securing an improper advantage;

(c)     corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(d)     providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.

3.6     In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, no BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their agents:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000763

(a)     has taken any action, directly or indirectly, that has resulted or would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "**OECD Convention**") or any similar laws or regulations to which any BSGR Guinea Group Company, any BSGR Advisory Company or any of their respective agents is subject; or

(b)     have paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(i)     corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(ii)    securing an improper advantage;

(iii)   corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(iv)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.

3.7     For the purposes of this paragraph 3 only:

(a)     "**agents**" means with respect to an entity its directors, officers and employees; persons for whose acts it may be vicariously liable; and anyone acting on its behalf; and

(b)     "**Government Official**" means: (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of a Government Entity; (ii) a legislative, administrative or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000764

who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organisation (including, without limitation, World Bank, United Nations, International Monetary Fund and OECD).

3.8     Save as disclosed under Section 3 of the Disclosure Letter, consent under the Control of Borrowing (Bailiwick of Guernsey) Ordinance 1959, as amended, was obtained for all Indebtedness incurred and each guarantee given by BSGR Guinea at any time, or the incurring of such Indebtedness or the giving of such guarantee did not require such consent by virtue of falling within an exception or exemption under that ordinance.

**Section 4.     Litigation**

4.1     Neither any BSGR Guinea Group Company nor any of their respective directors or officers is a claimant or defendant in or otherwise a party to any litigation, arbitration or administrative proceedings that are in progress. So far as BSGR is aware, no employee of any BSGR Guinea Group Company is a claimant or defendant in or otherwise a party to any litigation, arbitration or administrative proceedings that are in progress and which is expected to be material (individually or collectively) to the business of any member of the BSGR Guinea Group.

4.2     No litigation, arbitration or administrative proceedings are threatened or pending by or against any BSGR Guinea Group Company where, in each case, or in aggregate, the negative resolution of which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under this Agreement and/or any Ancillary Agreement and/or the Basic Agreement to which it is a party and to the knowledge of BSGR no fact or circumstance exists which may give rise to any such litigation, arbitration or proceedings.

4.3     There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity in Guernsey or the British Virgin Islands against any member of the BSGR Guinea Group or any of their respective directors or officers.  So far as BSGR is aware, there is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity in any jurisdiction against any member of the BSGR Guinea Group, any of their respective directors or officers or, to the extent that such judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity is material in the context of the business of the relevant member of the BSGR Guinea Group, any employee of any BSGR Guinea Group Company.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000765

## Section 5.      Investigations

No BSGR Guinea Group Company has received any material written notice or order from any Governmental Entity, and no material administrative or judicial action, suit, investigation, demand, directive, claim, lien, judgment or proceeding has been asserted by any Governmental Entity or, to the knowledge of any BSGR Guinea Group Company is threatened, against any BSGR Guinea Group Company that alleges a violation of, or liability under, any Applicable Law.

## Section 6.      Insurance

Section 6 of the Disclosure Letter contains a list of each current insurance and indemnity policy in respect of which any of the BSGR Guinea Group Companies has an interest (including any active historic policies which provide cover on a losses occurring basis) and each such policy is a full force and effect as at the date of this Agreement.  No claims have been made or threatened against any BSGR Guinea Group Company under any such policies in the last three years and so far as BSGR is aware no fact or circumstance exists which might give rise to a claim under any such policies.

## Section 7.      Financial matters

7.1      Save for Indebtedness under the loan agreement between BSGR Guinea (as lender) and ProjectCo (as borrower) referred to in Section 7.3 of the Disclosure Letter, no BSGR Guinea Group Company has any outstanding Indebtedness.

7.2      The BSGR Guinea Accounts provide a true and fair view, on an aggregate basis, of the state of affairs of the BSGR Guinea Group and its assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with the principles set out therein which the board of directors of BSGR Guinea deemed appropriate at the time of preparation and, where relevant, in a manner consistent with the consolidated financial statements of BSGR and reviewed by Ernst & Young under "agreed upon procedures" determined in accordance with the International Standard on Related Services 4400.

7.3      The ProjectCo Accounts provide a true and fair view of the state of affairs of ProjectCo and its assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with the principles set out therein which the board of directors of ProjectCo deemed appropriate at the time of preparation and, where relevant, in a manner consistent with the consolidated financial statements of BSGR and.

7.4      The Liberia HoldCo Accounts provide a true and fair view of the state of affairs of Liberia HoldCo and Liberia ProjectCo on an aggregate basis and their respective assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with principles and in a manner, in each case, consistent with the consolidated financial statements of BSGR.

7.5      No accounts showing the state of affairs of Liberia ProjectCo on a stand-alone basis have been prepared.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                              VALE-RT_00000766

7.6    No change in accounting policies has been made in preparing the BSGR Guinea Accounts, the Liberia HoldCo Accounts and/or the ProjectCo Accounts for each of the three financial years of the BSGR Guinea Group ended on the BSGR Guinea Accounts Date, except as stated in the respective accounts for the relevant member of the BSGR Guinea Group for those years.

7.7    As at the BSGR Guinea Accounts Date, no BSGR Guinea Group Company had any liability (whether actual, contingent, unquantified or disputed), including any liability in respect of Taxation, or outstanding capital commitment which was not disclosed or provided for in the BSGR Guinea Accounts, the ProjectCo Accounts or the Liberia HoldCo Accounts (as applicable) to the extent that such disclosure or provision should properly have been made in such accounts in accordance with Applicable Laws and applicable accounting standards.

7.8    No BSGR Guinea Group Company has given or received the benefit of any guarantee of another person's or its obligations (as applicable) which remains undischarged (other than guarantees of the obligations of another BSGR Guinea Group Company).

7.9    Save as specified in Section 7 of the Disclosure Letter, since the BSGR Guinea Accounts Date:

(a)    each BSGR Guinea Group Company has carried on business in the ordinary course without any material interruption or material alteration in its nature, scope and manner;

(b)    no BSGR Guinea Group Company has declared, authorized, paid or made any dividend or other distribution;

(c)    no BSGR Guinea Group Company has issued or agreed to issue any share or loan capital or any other security constituting or giving rise to a right over or convertible into its capital;

(d)    no BSGR Guinea Group Company has repaid any Indebtedness in an amount in excess of $50,000 in advance of its stated maturity;

(e)    no material adverse change in the financial or trading position or prospects of a BSGR Guinea Group Company has occurred;

(f)    no material adverse change has occurred in the assets or liabilities of a BSGR Guinea Group Company, and there has been no material reduction in the value of the net tangible assets of a BSGR Guinea Group Company;

(g)    no BSGR Guinea Group Company has, other than in the usual course of its business:

(1)    assumed or incurred, or agreed to assume or incur, a liability, obligation or expense (actual or contingent);

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000767

(2)     acquired or disposed of, or agreed to acquire or dispose of, an asset;

(3)     entered into any capital commitment; or

(4)     entered into any agreements otherwise than on arm's length commercial terms;

(h)     no BSGR Guinea Group Company has changed its accounting reference period; and

(i)     each BSGR Guinea Group Company's accounting records are up to date, in its possession or under its control and are and have at all times been kept in accordance with the applicable standards.

7.10    The Management Accounts have been properly prepared on a basis consistent with the BSGR Guinea Accounts and provide a fair and accurate view, on an aggregate basis, as at 31 March 2010 of the state of affairs of the BSGR Guinea Group and its assets and liabilities.

**Section 8.    Statutory Books**

8.1    The statutory books and other records of each BSGR Guinea Group Company required to be kept by Applicable Law in all relevant jurisdictions are up-to-date and have been maintained in accordance with all such Applicable Law and comprise complete records of all information required to be recorded, in each case in all material respects.

8.2    All such statutory books and other records, together with all documents of title which are necessary for the proper conduct of the business of any BSGR Guinea Group Company are in the possession or under the control of a BSGR Guinea Group Company, as applicable.

8.3    All such statutory books and other records and books of account accurately and fairly reflect the transactions and dispositions by each such BSGR Guinea Group Company of its assets, and each BSGR Guinea Group Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that:

(a)     transactions are executed in accordance with management's general or specific authorization and are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and/or International Accounting Standards to maintain accountability of such assets;

(b)     access to assets is permitted only in accordance with management's general or specific authorization; and

(c)     the recorded accountability for assets is compared with existing assets at reasonable levels and appropriate action is taken with respect to any differences.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                        VALE-RT_00000768

**Section 9.    Arrangements between the BSGR Group and the BSGR Guinea Group Companies**

9.1    Save as specified in Section 9 and Section 13 of the Disclosure Letter: (i) no contract or arrangement or other commitment is outstanding between any BSGR Guinea Group Company and any member of the BSGR Group (where such member of the BSGR Group is not a BSGR Guinea Group Company); and (ii) no other agreements or arrangements or other commitments exist between any BSGR Guinea Group Company and any member of the BSGR Group (other than a BSGR Guinea Group Company).

9.2    No BSGR Guinea Group Company has agreed to guarantee or provide any security or indemnity in relation to any debt or obligation of any other member of the BSGR Group.

**Section 10.    Assets**

10.1    Each asset included in the BSGR Guinea Accounts, the ProjectCo Accounts, the Liberia HoldCo Accounts or the Liberia ProjectCo Accounts or acquired by any BSGR Guinea Group Company since the BSGR Guinea Accounts Date (other than stock disposed of in the ordinary course of business) and each asset used by the relevant BSGR Guinea Group Company or which is in the reputed ownership of the relevant BSGR Guinea Group Company is:

(a)    legally and beneficially owned solely by the relevant BSGR Guinea Group Company free from any Encumbrance; and

(b)    where capable of possession, in the possession or under the control of the relevant BSGR Guinea Group Company.

10.2    Each BSGR Guinea Group Company owns or has the right to use each of the assets necessary for the effective operation of its business as currently carried on.

**Section 11.    Property**

11.1    Section 11 of the Disclosure Letter contains a complete and accurate list of all Properties, including address and destination, which are occupied and/or used by any BSGR Guinea Group Company, and accurately states the title under which each such Property is so owned, occupied or used (as applicable) and, in respect of Properties occupied under verbal arrangements, all material terms of such occupation.

11.2    All leases or similar agreements relating to the Properties are valid and enforceable according to their respective terms.

11.3    The Properties are held under leases or similar arrangements.  No member of the BSGR Guinea Group owns any property.

11.4    BSGR have provided in the Disclosure Bundle true and complete copies of all written lease agreements in respect of, and other relevant written documents relating to, the right of any member of the BSGR Guinea Group to use the Properties mentioned therein.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                VALE-RT_00000769

**Section 12.      Environmental matters**

12.1    For the purposes of this Section 12, the following definitions will apply:

(a)    **Environment** means:

(i)    land, including, without limitation, surface land, sub surface strata, sea bed and river bed under water (as defined in paragraph (ii) below) and natural and manmade structures;

(ii)    water, including, without limitation, coastal and inland waters, surface waters, ground waters and water in drains and sewers;

(iii)    air, including, without limitation, air inside buildings and in other natural and manmade structures above or below ground; and

(iv)    any and all living organisms or systems supported by those media, including, without limitation, humans;

(b)    **Environmental Investigation** means a governmental investigation or inspection relating to Environmental Matters;

(c)    **Environmental Laws** means all or any international, European, national or local, civil, administrative or criminal law, common law, statutes, statutory instruments, regulations, directives, treaties, statutory guidance, orders, decrees, injunctions, or judgments of a parliamentary government, quasi government, supranational, federal, state or local government, statutory, administrative or regulatory body, court or agency in any part of the world, which relate to Environmental Matters (except in relation to town and country planning or zoning) and which have the force of law and are legally binding on any BSGR Guinea Group Company on or before the date of this Agreement;

(d)    **Environmental Matters** means:

(i)    pollution or contamination of the Environment;

(ii)    the generation, manufacture, processing, handling, storage, distribution, use, treatment, removal, transport, disposal, release, spillage, deposit or discharge of hazardous substance and/or waste;

(iii)    the exposure of any person or other living organism to hazardous substance and/or waste; or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                VALE-RT_00000770

(iv)   the creation of any noise, vibration, radiation, common law or statutory nuisance or other damage to, or material adverse impact on, the Environment;

(e)   **Environmental Permits** means any permit, licence, authorisation, permission, approval, consent or registration, issued or granted to, or required by, any BSGR Guinea Group Company on or before the date of this Agreement pursuant to Environmental Laws; and

(f)   **Hazardous Substance** means a natural or artificial substance, organism, preparation or article which (alone or combined with another substance, preparation or article) is capable of causing significant harm to the Environment, or which is prohibited or restricted under Environmental Law (including, without limitation, any waste).

12.2   So far as BSGR is aware, there have not been over the past 3 years and there are not now any releases or emissions by any BSGR Group Company into the Environment of any Hazardous Substance from or at any of the Properties or resulting from any activities undertaken by any BSGR Guinea Group Company in and around any of the Concession Areas or any land relating to the Liberia Exploration Permits, which releases or emissions constituted or constitute a breach of Environmental Laws or Environmental Permits.  So far as BSGR is aware, no BSGR Guinea Group Company has disposed of, stored or kept any Hazardous Substance in or under any of the Properties or in and around any of the Concession Areas or any land relating to the Liberia Exploration Permits in a manner which constituted or constitutes a breach of Environmental Laws or Environmental Permits.

12.3   So far as BSGR is aware, each BSGR Guinea Group Company has obtained, and complied in all material respects with the terms and conditions of, each Environmental Permit.

12.4   Each BSGR Guinea Group Company complies and has complied since their respective dates of incorporation with all applicable Environmental Laws in all material respects, and no BSGR Guinea Group Company has received over the past 12 months any written notification under Environmental Law requiring it, or which is likely to result in a requirement for it, to take or omit to take any action (including, but not limited to, to make good, re-instate, remediate or clean up any land or other waterways).

12.5   There is and has, during the period of two years prior to the date of this Agreement, been no Environmental Investigation concerning any BSGR Guinea Group Company and, so far as BSGR is aware, none is pending or threatened.

## Section 13.   Material contracts

13.1   True and complete copies of all contracts material to each BSGR Guinea Group Company and/or their respective businesses are attached to the Disclosure Letter at Section 13 (the "**Material Contracts**").   No Material Contract has been otherwise amended, modified, waived or supplemented (in whole or in part) at any time.  Each Material Contract is valid, enforceable and binding in accordance with its terms at the date of this Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000771

13.2    No BSGR Guinea Group Company is in material default under any Material Contract and, to the knowledge of each BSGR Guinea Group Company, there are no circumstances likely to give rise to such a default.

13.3    No party with whom any BSGR Guinea Group Company has entered into any Material Contract is in material default under it and, to the knowledge of each BSGR Guinea Group Company, there are no circumstances likely to give rise to such a default.

13.4    Entry into and performance by any BSGR Guinea Group Company of this Agreement and/or any Ancillary Agreement to which it is a party will not result in a material breach of any provision of any Material Contract to which it is a party.

13.5    No BSGR Guinea Group Company is party to any contract which is or creates:

(a)    an agreement, arrangement or obligation entered into other than in the usual course of its business;

(b)    an agreement, arrangement or obligation entered into other than by way of a bargain at arm's length and on commercial terms, having regard to the jurisdiction of incorporation of such BSGR Guinea Group Company; or

(c)    an agreement, arrangement or obligation restricting such BSGR Guinea Group Company's freedom to operate the whole or part of its business or to use or exploit any of its assets.

13.6    No BSGR Guinea Group Company is party to any Material Contract nor has entered into any agreement, option, right of first refusal, right of pre emption, third party right or interest which relates to the sale or distribution of iron ore or any other mineral or similar substance.

13.7    Each document entered into by any BSGR Guinea Group Company relating to the Liberia Group Transfer constitutes valid, binding obligations on the parties thereto in accordance with their terms.

13.8    Other than the Royalties Agreement, no BSGR Guinea Group Company has entered into any royalty, technical services or consultancy agreements under which any BSGR Guinea Group Company has any outstanding obligations.   A true and complete copy of the Royalties Agreement is contained in Section 13 of the Disclosure Letter and no amendments, modifications, waivers or supplements (in whole or in part) to the Royalties Agreement have taken place since its date of execution or effect.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000772

## Section 14.    Employees

14.1    Section 14 of the Disclosure Letter includes a complete, up to date and accurate list of all employees of each of the BSGR Guinea Group Companies and correctly states for each employee in an anonymized form the department, function/position, date of birth, start of employment, fixed monthly gross salary and applicable Employee Benefits and there are no other material terms applicable to their employment.

14.2    No BSGR Guinea Group Company is aware of any proposal to terminate or circumstances which may lead to the termination of the employment arrangements relating to any employee.

14.3    Each BSGR Guinea Group Company has no outstanding liability for breach or termination of any employment contract or consultancy agreement or any breach of any statutory or regulatory obligations relevant to the relations between it and its current or former directors, employees, workers or consultants.

14.4    No formal trade union, works council or other employee representative body is recognized by any BSGR Guinea Group Company for any purpose whatsoever.

14.5    No BSGR Guinea Group Company has any outstanding pension liabilities nor are there any pension arrangements in place with respect to any employee or director in any BSGR Guinea Group Company.

## Section 15.    Intellectual Property Rights

There are no intellectual property rights which are material to the operation of the business of any member of the BSGR Guinea Group.

## Section 16.    Powers of Attorney

No BSGR Guinea Group Company has given a power of attorney or other authority by which a person may enter into an agreement, arrangement or obligation on such BSGR Guinea Group Company's behalf (other than an authority for a director, other officer or employee to enter into an agreement in the usual course of that person's duties a copy of which is set out at Section 16 of the Disclosure Letter).

## Section 17.    Tax

17.1    Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has paid all material Tax for which it has been or is liable.

17.2    Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has made and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                      VALE-RT_00000773

accounted to the relevant Tax Authority for any deductions, withholdings or retentions of Tax which it has been or is required by law to make.

17.3     Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has properly and punctually made all material returns, claims, disclaimers, elections, given all material notices and consents, maintained all material records and supplied all other material information in relation to Tax which it has been or is required to make, give, maintain or supply or which were assumed to have been made or submitted in the BSGR Guinea Accounts and all such returns, notices, records and information were complete and accurate in all material respects.

17.4     There is no material dispute and there has not at any time within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, been any material dispute between any BSGR Guinea Group Company and any Tax Authority and none of them is, or has within the last three years or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company been, the subject of an investigation by any Tax Authority.

17.5     Each BSGR Guinea Group Company has at all times been resident for any Tax purpose in its country of incorporation and has not at any time been resident for any Tax purpose in any other country.

17.6     Apart from the tax provisions in the Basic Agreement to which this warranty 17.6 does not apply, no Taxation Authority has agreed to operate any special arrangement (being an arrangement which is not based on a strict and detailed application of the relevant legislation) in relation to the affairs of any BSGR Guinea Group Company.

17.7     Under Guernsey's current tax regime, BSGR Guinea is liable to income tax in Guernsey at the company standard rate of zero per cent.

17.8     Each BSGR Guinea Group Company has sufficient records to determine the Tax consequences that would arise on a disposal or realisation of each asset owned by it.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000774

# SCHEDULE 5

# LIMITATIONS ON LIABILITY

**Section 1.      Time Limits and Notices Applicable to Claims**

1.1      BSGR shall not be liable for any Claim unless it receives from Vale written notice, within 60 days of becoming aware of such Claim, containing reasonably specific details of the Claim, including its nature, a short summary of the relevant facts and Vale's estimate, to the extent estimable (on a without prejudice basis), of the amount of the Claim:

> (a)      in the case of a Warranty Claim (other than a Claim for breach of the provisions of Section 8.1 as a result of a breach of a Tax Warranty) or a Claim for breach of the provisions of Section 8.1 as a result of a breach of an Indemnity Warranty, prior to the date which is 24 months from the Completion Date; and

> (b)      in the case of a Tax Claim, by the date which falls three months after the expiry of the period specified by Applicable Law during which an assessment of that liability to Tax may be issued by the relevant Tax Authority or, if there is no such period, on or before the date which falls seven years after the Completion Date,

provided that there shall be no time limit in case of a Claim for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty, the Title Warranty or the Guernsey Loan Indemnity Claim.

It is agreed and acknowledged that none of the provisions in this Schedule 5 save for those relating to the giving of notice shall apply to, or limit, a Claim for breach of the Debt Free Warranty or the Title Warranty or a Guernsey Loan Indemnity Claim.

1.2      The purpose of Section 1.1 above is to provide for notification to BSGR that it is facing a Claim. It is not intended to permit it to rely on technical defenses to such Claims on the grounds of insufficiency of notice. Accordingly, no defect in the form of the notice will invalidate the notice or permit BSGR to allege that Vale has not complied with Section 1.1 of this Schedule 5 except as expressly set out below.

> (a)      If BSGR believes that a notice that has been given is defective in that it does not comply with Section 1.1 above, it may give notice thereof to Vale within 28 days of the service of such notice and Vale shall have an additional 28 days (whether or not the period specified in Section 1.1 of this Schedule has expired or would expire during such 28 days) to remedy any defects so identified. If no request for any additional information is made, the notification of such Claim pursuant to Section 1.1 shall be deemed to have been properly served for all purposes in this Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                          VALE-RT_00000775

(b)   A notice given under Section 1.1. of this Schedule, as supplemented by a response made under Section 1.2(a) of this Schedule, shall only be regarded as being insufficient and therefore not properly given if BSGR can satisfy the arbitrator that it could not reasonably have been expected to understand the general nature of the allegation made, provided that a notice shall not be regarded as being insufficient if the form of the notice reasonably reflects the material which was reasonably available to Vale at the time of the notice.

(c)   For the avoidance of doubt, the failure by Vale to reply to a notice under Section 1.2(a) shall not itself invalidate a Claim made hereunder, unless the original notice given by it under Section 1.1 of this Schedule would not itself have been regarded as properly given by reason of Section 1.2(b).

## Section 2.   Financial Limitations Applicable to certain Claims

2.1   BSGR shall not have any liability towards Vale for any Claim (other than a Claim under or for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty, the Title Warranty or a Guernsey Loan Indemnity Claim):

(a)   unless the amount (or the aggregate amount in respect of two or more claims arising out of the same Event that would otherwise be recoverable from BSGR but for this section 2.1(a) in respect of that claim or those claims) of the liability pursuant to such Claim (but for this Section 2.1 of Schedule 5) exceeds $30,000; and

(b)   unless the aggregate amount of the liability for such Claims, when aggregated with the liability of BSGR in respect all Claims not excluded by Section 2.1(a), exceeds $30,000,000,

in which event Vale shall be entitled to claim the whole amount of such Claims and not merely the excess.

2.2   The aggregate amount of the liability of BSGR for all Claims (other than Tax Claims under Schedule 10, Claims under or for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty or the Title Warranty or a Guernsey Loan Indemnity Claim) shall not exceed $500,000,000.

## Section 3.   Other Limitations

3.1   Any Claim shall (if it has not been previously satisfied, settled or withdrawn) be deemed to have been withdrawn 12 months after the notice is given pursuant to Section 1 of this Schedule or, in the case of a Claim that is based upon a contingent liability, 12 months after that liability becomes an actual liability, unless, in each case, arbitration in respect of such Claim has been commenced by being referred to arbitration in accordance with Section 16.10. No new

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                      VALE-RT_00000776

Claim may be made in respect of the same facts, matters, events or circumstances giving rise to any such withdrawn Claim.

3.2     BSGR shall not be liable for any Claim (other than a Warranty Claim in respect of a breach of the Title Warranty, the Debt Free Warranty, a Tax Claim under Schedule 10 or a Guernsey Loan Indemnity Claim) if and to the extent that the fact, matter, event or circumstance giving rise to such Claim is fairly disclosed in the Disclosure Letter or any document included in the Disclosure Bundle.

3.3     Save as regards a Tax Claim, if any Claim is based upon a liability which is contingent only, BSGR shall not be liable to pay unless and until such contingent liability gives rise to an obligation to make a payment, provided that this paragraph shall not operate to avoid a claim in respect of such a contingent liability where notice of such claim is given prior to the expiry of the relevant period specified in Section 1.1 above even if such liability shall only become an actual liability after the expiry of such period.

3.4     Nothing in this Schedule 5 or Section 11 restricts or limits the general obligations of Vale or the relevant member of the BSGR Guinea Group at law to mitigate any loss or damage which Vale or the relevant member of the BSGR Guinea Group may suffer in consequence of any breach of the terms of this Agreement or any fact, matter, event or circumstance which can be foreseen to be likely on the balance of probabilities to give rise to a Warranty Claim and it is agreed and acknowledged that this Section 3.4 shall apply *mutatis mutandis* to any Indemnity Warranty Claim.

3.5     BSGR shall not be liable in respect of the amount of any Claim that has been recovered under a policy of insurance (net of any costs of recovery).

3.6     Other than in respect of a Tax Claim, where Vale or any of its Affiliates is entitled to recover (whether by insurance, payment, discount, credit, relief or otherwise) from a third party (other than a member of the BSGR Guinea Group) a sum which indemnifies or compensates them (in whole or in part) in respect of the Loss which is the subject of a Claim, prior to BSGR making any payment hereunder, Vale shall take all reasonable steps or proceedings as BSGR may require (provided that Vale may only be required to appeal against a decision if an opinion has been obtained from a member of Counsel of at least five years call (on which Vale can rely) to the effect that on the balance of probabilities such appeal is likely to be successful) to enforce such right subject to being indemnified to its satisfaction in respect of the costs and expenses in relation to any such actions, and such actions not being prejudicial or detrimental to the promotion of the best interests of the BSGR Guinea Group and the development of the Project or, without prejudice to Section 3.4 above, the business undertaken by any member of the Vale Group.

3.7     Where BSGR has made a payment to Vale or any of its Affiliates in relation to any Claim and Vale or such Affiliate has recovered (whether by insurance, payment, discount, credit, relief or otherwise) from a third party (other than a member of the BSGR Guinea Group) a sum which indemnifies or compensates Vale or such Affiliate to the extent required by this Agreement in respect of the Loss which was the subject of such Claim, Vale shall pay to or cause such Affiliate to pay to BSGR as soon as practicable after receipt of such amount from a third party an amount

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                              VALE-RT_00000777

equal to the lower of (i) the amount BSGR paid to Vale or such Affiliate or (ii) the amount recovered from the third party by Vale or such Affiliate (in each case such amount being net of Taxation and less any reasonable costs of recovery).

3.8    BSGR shall not be liable to make any payment to Vale or any of its Affiliates for a Claim to the extent of any corresponding saving by or net quantifiable financial benefit to Vale or such Affiliate arising directly from the matter(s) giving rise to such Claim, including the amount (if any) by which any Tax for which Vale or such Affiliate would otherwise have been accountable or liable to be assessed is actually reduced or extinguished as a direct result of the matter(s) giving rise to the Claim, provided that the foregoing shall not (i) interfere with the right of any party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit; or (ii) oblige any party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim.

3.9    BSGR shall not be liable for any Claim if and to the extent it is attributable to, or the amount of such Claim is increased as a result of, any (i) change of Applicable Law (or any change in interpretation of Applicable Law) after the date of this Agreement, (ii) change after the date of this Agreement in the rates of Taxation in force at the date of this Agreement or (ii) change in circumstances (including a Force Majeure Event) after the date hereof, save to the extent that such change in circumstances arises from an act or omission by BSGR or any member of the BSGR Group other than an act or omission required by Applicable Law provided that this Section 3.9 shall not apply to Tax Claims.

3.10    There shall be no entitlement to recover from BSGR damages or obtain payment, reimbursement, restitution or indemnity more than once with respect to the total amount of an individual Loss which Vale is entitled to recover from BSGR in accordance with the provisions of this Agreement.

3.11    With regard to any Claim, BSGR shall have no liability for any loss other than a Loss.

3.12    If a breach of any BSGR Warranty or Indemnity Warranty (other than the Title Warranty or any of the FCPA Warranties) is capable of remedy, there shall be entitlement to compensation in respect of such breach if it is not remedied within 120 days after the date on which notice of such breach is served on BSGR. Without prejudice to its duty to mitigate any Loss, and subject to Vale (for itself and as agent or trustee for each BSGR Guinea Group Company and each member of the Vale Group) being indemnified and held harmless by BSGR on demand against all costs reasonably incurred by Vale, any BSGR Guinea Group Company or any member of the Vale Group in connection with the provision of such assistance, Vale shall provide all reasonable assistance to BSGR to remedy any such breach.

3.13    BSGR shall not be liable for any Claim (other than a Tax Claim under Schedule 10) if and to the extent that, at the date of this Agreement, Daniela Chimisso dos Santos or Alexandre Monteiro Barbosa da Silva:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000778

(a)     was actually aware of the fact, matter or circumstance giving rise to such Claim and should reasonably have appreciated that such fact, matter or circumstance would give rise to such Claim; and

(b)     the nature of the Losses which result from such Claim should have been reasonably foreseeable by such person.

3.14    BSGR shall not be liable for any Claim (other than a Tax Claim under Schedule 10) if and to the extent that Eduardo Ledsham or, solely in respect of environmental or technical mining matters, Jose Andre Alves was actually aware as at the date of this Agreement of any fact, matter or circumstance which would entitle Vale to bring a Claim immediately following Completion.

3.15    Nothing in this Schedule 5 shall have the effect of limiting or restricting any liability of BSGR in respect of a Claim arising as a result of any fraud or willful concealment on the part of BSGR.

## Section 4.      Limitations exclusive to Environmental Claims

4.1     For the purposes of this Section 4:

(a)     **Binding Order** means a requirement, notification, decree, order or summons issued by a Governmental Entity in accordance with applicable Environmental Laws and which gives rise to an obligation to take action in respect of the clean-up or remediation of Environmental Matters and to comply with Environmental Laws, a failure to comply with which is likely (on the balance of probabilities) to lead to the relevant Governmental Entity taking enforcement action and/or which may result directly or indirectly in the suspension, withdrawal or foreclosure of the Basic Agreement, the Exploration Permits, the Mining Concession or an Environmental Permit or the full or partial shutdown of activities;

(b)     **Emergency** means, as a result of Environmental Matters, any imminent or immediate risk of, or actual, significant damage or harm to the Environment;

(c)     **Environmental Contamination** means (i) the presence of any Hazardous Substance in any soil, surface water and/or groundwater at any of the Properties, any Concession Area or any areas covered by the Liberia Exploration Permits at any time before or on the Completion Date ("**Past Contamination**"); and/or (ii) the migration of Past Contamination from any of the Properties, any Concession Area or any areas covered by the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                      VALE-RT_00000779

Liberia Exploration Permits before or after the Completion Date, and which, in all cases, is capable of causing pollution, harm or damage to the Environment and/or damage to any buildings or other man-made structures or fixtures on, in or below the land; and

(d)   **Reasonable Operator** means a person acting in good faith and exercising a reasonable level of skill and diligence as would reasonably and ordinarily be expected from a major operator engaged in the same type of business under the same or similar circumstances and conditions as contemplated by this Agreement, and any reference to the standard of a Reasonable Operator herein shall be a reference to such degree of skill and diligence as aforesaid,

provided that capitalized terms not defined in this Section 4 shall have the same meaning as attributed to them in Section 12 of Schedule 4.

4.2   BSGR shall only be liable for Losses which arise in connection with Environmental Matters ("**Environmental Losses**") to the extent that the cause of such Environmental Losses (i) arises from the action or omission of a member of the BSGR Group, or the BSGR Guinea Group prior to Completion within the period commencing on 1 April 2006, in relation to Environmental Losses which were caused in Guinea, and 1 April 2008, in relation to Environmental Losses which were caused in Liberia, in each case, ending on Completion, or (ii) existed prior to 1 April 2006, in relation to Environmental Losses which were caused in Guinea, and 1 April 2008, in relation to Environmental Losses which were caused in Liberia, but came to the knowledge of a member of the BSGR Group or the BSGR Guinea Group prior to Completion and which company failed to take such steps as a Reasonable Operator would have done having regard to applicable Environmental Laws.

4.3   BSGR shall have no liability under this Agreement in respect of a Claim for Environmental Losses to the extent that such Environmental Losses have arisen, been increased, or caused as a result of:

(a)   the introduction of any pathway or receptor after Completion which results in Environmental Matters and/or any other Hazardous Substance migrating or causing harm or damage to human health or the Environment in circumstances where it was reasonably foreseeable that such actions would give rise to the Loss in question and Vale or any of its Affiliates was not acting as a Reasonable Operator; and/or

(b)   the carrying-out of any investigation or audit after Completion which is not required to be undertaken (i) under any applicable Environmental

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                       VALE-RT_00000780

Laws, (ii) under formal requirement of a Governmental Entity, (iii) pursuant to any Binding Order, and/or (iv) in an Emergency (unless BSGR has agreed, in writing in advance, to such investigation or audit being carried out (such consent not to be unreasonably withheld or delayed)); and/or

(c)     any, amendment, variation or voluntary replacement of any Environmental Permit after Completion; and/or

(d)     information (in whatever form) voluntarily given after Completion by Vale or any of its Affiliates to a Governmental Entity or third party in circumstances other than: (i) where Vale or any of its Affiliates reasonably believes that there is a reporting requirement under Applicable Laws or any Environmental Permit; (ii) where Vale or any of its Affiliates believes it is prudent to do so to prevent a Loss other than where Vale or such Affiliate was not acting as a Reasonable Operator; (iii) where the information is given as part of a remediation program approved and/or imposed by or under the supervision of a Governmental Entity; (iii) in an Emergency; (iv) where BSGR has previously approved this course of action in writing (such approval not to be unreasonably withheld or delayed); (v) where such information is required to be submitted (or it would be prudent to submit, acting reasonably and with the need to mitigate any actual or potential Losses relating to Environmental Matters) in order to obtain, or procure the amendment, variation, surrender or renewal of, any Environmental Permit; or (vi) where the information has already become publicly available through no fault of Vale or any of its Affiliates.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                          VALE-RT_00000781

**SCHEDULE 6**

**VALE WARRANTIES**

1.  Vale is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation and has full power and authority required under its constitutional documents to enter into this Agreement and, where applicable, each of the Ancillary Agreements to which it is a party and to conduct its business as conducted at the date of this Agreement.

2.  Vale has obtained all corporate authorizations and all other governmental, statutory, regulatory or other consents and authorizations required to empower it to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party where failure to obtain them would adversely affect its ability to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party and such agreements constitute valid and binding obligations of each such party.

3.  Entry into and performance by Vale of this Agreement and/or any Ancillary Agreement to which it is a party will not (i) breach any provision of its memorandum and articles of association, by-laws or equivalent constitutional documents or (ii) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any Governmental Entity, where any such breach would adversely affect its ability to enter into or perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

4.  Vale is not insolvent or bankrupt under the laws of its jurisdiction of incorporation, unable to pay its debts as they fall due or has proposed or is liable to any arrangement (whether by court process or otherwise) under which its creditors (or any group of them) would receive less than the amounts due to them.  There are no proceedings in relation to any compromise or arrangement with creditors or any winding up, bankruptcy or insolvency proceedings concerning Vale and no events have occurred which would justify such proceedings.  No steps have been taken to enforce any security over any assets of Vale and no event has occurred to give the right to enforce such security.

5.  In connection with this Agreement, and any Ancillary Agreements, and its obligations thereunder:

5.1  Vale has been and is in compliance with any Applicable Sanctions Laws, including without limitation the US Export Administration Regulations, the US International Traffic in Arms Regulations, the US Department of Treasury and the Office of Foreign Asset Control's economic sanctions regulations;

5.2  with regard to the operations of Vale and all matters governed by this Agreement, neither Vale nor any of its respective directors, officers, employees, persons for whose acts it is vicariously liable or anyone acting on its behalf have paid, offered, promised or authorized the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                  VALE-RT_00000782

payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(a)   corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist Vale or any other person in obtaining or retaining business, or directing business to any third party;

(b)   securing an improper advantage;

(c)   corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist Vale or any other person in obtaining or retaining business, or directing business to any third party; or

(d)   providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no such person has done or procured or induced any person to do any of the foregoing; and

5.3   Vale has not taken any action, directly or indirectly, that has resulted in a violation of the FCPA, the OECD Convention or any similar laws or regulations, to which Vale or any of its respective directors, officers, employees, persons for whose acts it is vicariously liable or anyone acting on its behalf is subject.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000783

## SCHEDULE 7

## BSGR GUINEA GROUP

## BSG RESOURCES (GUINEA) LIMITED

| | | |
|---|---|---|
| 1. | Registered number: | 50001 |
| 2. | Place of incorporation: | Guernsey |
| 3. | Address of registered office: | West Wing, Frances House<br>Sir William Place<br>St Peter Port   Guernsey<br>GY11GX |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Issued share capital: | 100 ordinary shares of USD 1 each held by BSGR |
| 6. | Directors: | David Clark, Asher Avidan, Sandra Merloni-Horemans, Marcus Struik |
| 7. | Secretary: | Perla Limited |
| 8. | Accounting reference date: | 31 December |
| 9. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                VALE-RT_00000784

**BSGR (LIBERIA) LIMITED**

| | | |
|---|---|---|
| 1. | Registered number: | AL – 59-60-TIN-411625001 |
| 2. | Place of incorporation: | Republic of Liberia |
| 3. | Address of registered office: | PO Box 10-2198<br>Warren Street<br>1000 Monrovia 10<br>Republic of Liberia |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | USD 75,000 |
| 6. | Issued share capital: | 100 ordinary shares representing a total capital of USD 75,000 each held by Liberia HoldCo |
| 7. | Directors: | Iwan Williams |
| 8. | Secretary: | Iwan Williams |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                          VALE-RT_00000785

## BSG RESOURCES (GUINEA) S.À R.L.

| | | |
|---|---|---|
| 1. | Registered number: | RCCM/GC-KAL-M2/024.524/2009 (previously RCCM/GC-KAL/013.755A/2006) |
| 2. | Place of incorporation: | Republic of Guinea |
| 3. | Address of registered office: | Villa André, Coléah Corniche, C/Matam-Conakry, Republic of Guinea |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | GNF 5,000,000 |
| 6. | Issued share capital: | 500 ordinary shares of 10,000 GNF each held by BSGR Guinea |
| 7. | Directors: | Marcus Struik<br>Asher Avidan |
| 8. | Secretary: | Sandra Merloni - Horemans |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000786

# BSG RESOURCES (LIBERIA) LIMITED

| 1. | Registered number: | 1429525 |
|----|-------------------|---------|
| 2. | Place of incorporation: | British Virgin Islands |
| 3. | Address of registered office: | Akara Building, 24 de Castro Street<br>Wickhams Cay I, Road Town, Tortola<br>British Virgin Islands |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | USD 50,000 |
| 6. | Issued share capital: | 50,000 ordinary shares of USD 1 each held by BSGR Guinea |
| 7. | Directors: | Marcus Struik<br>Margali Management Corp |
| 8. | Secretary: | Sandra Merloni – Horemans |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL   VALE-RT_00000787

**SCHEDULE 8**

**LIBERIAN TRANSPORT SOLUTION**

1.      **Route/Destination** – the Liberian Transport Solution must permit the export by rail of iron ore from the Concession Areas to (i) initially, the port of Buchanan and (ii) subsequently the new port at Didia or any other port agreed by the Parties (collectively (i) and (ii), the **"Designated Ports"**).

2.      **Scope of Port Works** – the scope of the works required to upgrade/construct the Designated Ports must have been identified in outline – including extent of dredging and construction of new channels, berths and jetties.

3.      **Quantity** – the Liberian Transport Solution must be capable of permitting the export of iron ore from the Designated Ports in at least the following annual quantities: (i) between 2 and 15 million dry metric tonnes of iron ore per calendar year via the port of Buchanan and (ii) 50 million dry metric tonnes of iron ore per calendar year via Didia port or any other port agreed by the Parties, with scope for increasing this volume without significant additional consent/planning/land requirements up to 80 million dry metric tonnes of iron ore per calendar year.

4.      **Zogota** – acceptable agreements must be reached between the ProjectCo and/or Liberia ProjectCo and each of (i) the Liberian Government, (ii) trans-Liberian railway concessionaire, (iii) the Buchanan Port concessionaire and (iv) the relevant Government Entities in Liberia to ensure that ProjectCo and/or Liberia ProjectCo (as necessary) have the right **to** transport the output of the Zogota mine up to 15 million metric tons per annum of iron ore to the Buchanan Port facilities using the Liberian Corridor (trans-Liberian concession), which includes the existing railway, and to export such iron ore from the Buchanan Port facilities.  These agreements should be in place and capable of implementation before the first output from the Zogota mine and be sufficient to enable the export of the tonnage referred to above throughout the period 2012 to 2016, with an option to continue to use such facilities at the discretion of ProjectCo and Liberia ProjectCo for transportation and export of iron ore post 2016.

5.      **Treaties/Conventions/Legislation** – each of the anticipated agreements and/or treaties, conventions, concessions and/or pieces of legislation required to be granted or entered into or otherwise agreed by or between the Republic of Liberia, the Republic of Guinea (and any regional or local Government Entities) must have been identified.  An indication of the process, timing and scope of such items must have been provided to Vale with sufficient notice to permit Vale to evaluate and take a decision regarding the corporate structure that will be needed to implement the Liberian Transport Solution, together with copies of any communications relating thereto between relevant parties that any member of the BSGR Guinea Group has access to.  Vale will have the right to determine whether the content or proposed content of such agreements and/or treaties, conventions, concessions and/or pieces of legislation will be adequate to support the implementation of

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL             VALE-RT_00000788

the proposed solution for the duration of the life of the relevant mines in the Concession Areas without imposing unacceptable risks on the Project.

6.   **Consents** – the principal consents and authorisations required to implement the Liberian Transport Solution must have been identified along with the granting party, and any critical path timing requirements associated with applying for such consents and authorisations.

7.   **Timetable** – the timetable for implementing the Liberian Transport Solution must have been identified, including critical path items to the extent that this can be constructed from current information. The Buchanan port component of the Liberian Transport Solution will need to be available to the Project within a timescale that enables compliance with the requirements of the Basic Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000789

## SCHEDULE 9

## FEASIBILITY STUDY

The Feasibility Study will be carried out in relation to Blocks 1 and 2 of the Simandou Concession Area (see figure 1).

The Feasibility Study will be developed following the principles described by the Front End Loading (FEL) Methodology and will follow the schedule presented in the figure 2.

As the period of time expressed in the Base Agreement for the conclusion of the aforementioned Feasibility Study is very restrictive (December 2011), it was agreed between Vale and BSGR that for Blocks 1 and 2 a FEL1 study will be carried out. Following this strategy will allow ProjectCo to satisfy the Guinea Government's expectations without infringing the deadline specified in the Base Agreement.

However Vale, as agreed with BSGR, will be also conducting a FEL3 study for the area called "The Gaff" which is located in the center-southern portion of Blocks 1 and 2.

FEL is the process by which Vale achieves a detailed definition of a given project during the planning phase, with the purpose of minimizing the risks and maximizing the investor's return. It is an efficient instrument for executive decision driving predictability, accountability, transparency and competitiveness to projects.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                      VALE-RT_00000790

## FRONT - END LOADING DEVELOPMENT

In the FEL1 phase a clear set of deliverables is associated (Attachment 1).

## FEL 1  MAIN ACTIVITIES

This stage aims at identifying, developing and evaluating investment opportunities by means of business attractiveness analysis.

Main FEL 01 activities are:

- Value creation through the identification of business opportunities in planning, commercial, operations, safety and environment areas, among others.

- Selection of technology and, in mining projects, campaigns to point out resources /reserves and determine acceptable product specifications.

- The business plan (also called business case) is done by exploiting to the fullest the identification and characterization of technical alternatives for the project.

- Preliminary selection of related alternatives in order to eliminate those that do not objectively impart sustainability to the project  or that introduce fatal risks, volume of pointed resources /reserves, technological, social-environmental and political aspects, among others.

Attachment 1 highlights FEL 1 deliverables, for each project management area, as well as, the activity flow chart.

## FEL 3  MAIN ACTIVITIES

The main FEL 03 activities are:

- Basic engineering development supported by real geology investigations and surveying, geotechnics, hydrogeology, hydrology, topography data, and so on. The objective is to deepen scope detailing level and definition, cost, implementation planning and scheduling as preparation for the project execution phase.

- Conclusion of the project executive report.

- The execution plan.

- The procurement plan.

Attachment 2 highlights FEL 3 deliverables, for each project management area, and their respective minimum number of items to be checked, as well as, the activity flow chart.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                 VALE-RT_00000791



**Figure 1 – Block 1 and 2 areas**

| Project Blocks Feasibility Study | Activities | Start Date | End Date | 2010 | | | | 2011 | | | | 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1 T | 2 T | 3 T | 4 T | 1 T | 2 T | 3 T | 4 T | 1 T | 2 T | 3 T | 4 T |
| | Geology | 01/06/10 | 01/12/10 | | | | | | | | | | | | |
| | Resource Estimation | 01/08/10 | 01/02/11 | | | | | | | | | | | | |
| | Mining Planning | 01/02/11 | 01/04/11 | | | | | | | | | | | | |
| | Processing | 01/10/10 | 01/05/11 | | | | | | | | | | | | |
| | Enginnering & Infrastructure | 01/09/10 | 01/11/11 | | | | | | | | | | | | |
| | Environmental Management | 01/06/10 | 01/11/11 | | | | | | | | | | | | |
| | Economic Evaluation | 01/11/11 | 01/01/12 | | | | | | | | | | | | |
| | Final report | 01/01/12 | 16/02/12 | | | | | | | | | | | | |
| | Guinea Government Protocol | 16/02/12 | 16/03/12 | | | | | | | | | | | | |

**Figure 2 – Feasibility Study Preliminary Schedule - FEL 1**

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL    VALE-RT_00000792

**ATTACHMENT 1 – FEL 1 Deliverables**

**1.  Planning and Control**

1.1.  Project definition
1.1.1.   Business objective's and project objective´s formal statement.
1.1.2.   Executive report.

1.2.  WBS (Work Breakdown Structure)
1.2.1.   Preliminary scope for several project areas (e.g. mining, logistics, process, etc.).

1.3.  Schedule
1.3.1.   Main milestones.

1.4.  CAPEX
1.4.1.   Preliminary CAPEX definition.
1.4.2.   Contingency/allowance estimatives considering historical data for similar projects.

**2.  Engineering**

2.1.  Site conditions
2.1.1.   Preliminary soil characterization - geotechnical drilling/hydrogeologic, topography, bathymetric evaluation.
2.1.2.   Environmental conditions preliminary survey - pluviometry, winds, temperature, tides and stream.

2.2.  Resources and reserves
2.2.1.   Geological model assumed based on regional and local geology, geophysical and hole drilling interpretation and comparison with similar deposits.
2.2.2.   Geotechnical evaluation.
2.2.3.   Hydrogeological study.
2.2.4.   Hydrological model.
2.2.5.   Preliminary mineralogical and technological characterization.

2.3.  Mining plan
2.3.1.   Choice of possible scenario for the mining plan (mining method, geotechnical and technological parameters assumed based on similar operations, preliminary layout with the location of waste stockpiles, preliminary LOM, equipment and infra-structure fleet based on similar operations Mine geometry, sequence of exploitation and preliminary mathematical pit.

2.4.  Engeneering
2.4.1.   Identification and pre-selection of technology and process rules available.
2.4.2.   Process, utilities and tailings block diagram.
2.4.3.   Demand estimate and verification of the availability of energy.
2.4.4.   Preliminary plot plan and general layout.
2.4.5.   Main equipment´s preliminary list.

**3.  Economic Evaluation and Market**

3.1.  OPEX
3.1.1.   Total operating cost based on index or analogies.

3.2.  Market analysis
3.2.1.1.      Product description.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000793

**ATTACHMENT 1 – FEL 1 Deliverables**

    3.3. Economic evaluation and project feasibility
        3.3.1.   NPV sensitivity´s preliminary analysis (price, cost, taxes, ore grades, logistics, etc).
        3.3.2.   Definition of main feasibility indicators for the business plan (Discounted Pay Back, NPV, IVP, NPV/IVP and IRR), considering the options of scalability and flexibility.

**4.   Risk Management**

    4.1. Risk analysis

**5.   Communication Management**

    5.1. External communication
        5.1.1.   Matrix of external stakeholders including: roles, impacts, extent, perception, main interests, etc.
        5.1.2.   Institutional positioning and key messages.
        5.1.3.   Speech alignment with the field team ("speak the same language"), script (speech) update with main Q&A (Questions and Answers).
        5.1.4.   Define communication team´s structure.
        5.1.5.   Definition and execution of social communication program.

    5.2. Internal communication
        5.2.1.   Project internal communication plan.

**6.   Health, Safety, Environment and Community**

    6.1. Health and safety legal requirements
        6.1.1.   Identification and analysis of health and safety legal requirements.

    6.2. Environmental studies and permitting process
        6.2.1.   Definition of the permitting strategy (including political and institutional actions).
        6.2.2.   Socio-environmental characterization and preliminary environmental assessment.

**7.   Land Management**

    7.1. Right of use of land
        7.1.1.   Preliminary land´s survey required for the project.
        7.1.2.   Mineral research rights.

**8.   Team and Organizational**

    8.1. Project organizational chart.

UK-2421081-v8                                                                                                 95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000794

VALE-RT_00000795

**ATTACHMENT 1 – Activity Flowchart**



This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

**ATTACHMENT 1 – Activity Flowchart**

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000796

CONFIDENTIAL

**ATTACHMENT 1 – Activity Flowchart**

Model to be run on a project basis and should generate project sensitivity analysis for variations in model variables including capital cost and schedule

```
  ┌───┐     ┌──────────────────┐     ┌──────────────────┐     ┌──────────────────────────┐
  │ E │ ──→ │ Consolidate      │ ──→ │ Run economic     │ ──→ │ Submit the approval      │
  └───┘     │ inputs for       │     │ models (includes │     │ request to the board     │
            │ economic model   │     │ decision and risk│     │                          │
            │ and analysis     │     │ analysis)        │     │                          │
            └──────────────────┘     └──────────────────┘     └──────────────────────────┘
                     ↑
                 ┌───────┐
                 │ Data  │
                 └───────┘
                     ↑
            ┌──────────────────┐
            │ Input from       │
            │ Logistic, Port,  │
            │ Energy, Utilities│
            │ Infrastructure   │
            └──────────────────┘
```

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_00000797

CONFIDENTIAL

**ATTACHMENT 2 – FEL 3 Deliverables**

## 1. Planning and Control

1.1. Project definition

    1.1.1.   Formal update (if applicable) of business objectives and project objectives - with sponsor agreement.

    1.1.2.   Issue the executive report.

1.2. WBS (Work Breakdown Structure)

    1.2.1.   Complete WBS (Work Breakdown Structure) covering the whole project scope, detailed to the 3rd level minimum (physical areas, sub-areas and assets).

1.3. Schedule

    1.3.1.   Complete set of milestones, including permits, major procurement activities, construction, and startup, detailed activities for execution (sufficient to assure the level of control expected).

    1.3.2.   Detailed tie-ins schedule - with operations and maintenance agreement.

    1.3.3.   Resource-loaded schedule with: activities relationship, main activities loaded with real quantities and resources (from basic engineering), activities duration according to productivity indices, procurement activities based on bidding quotes.

    1.3.4.   Critical path review and schedule baseline.

1.4. CAPEX

    1.4.1.   Project accounting plan.

    1.4.2.   References and exchange rates applied royalties and taxes estimate.

    1.4.3.   Cost of equipment based on quotation, cost estimate for each package, including detailed engineering, civil works, erection and assembling, commissioning and startup.

    1.4.4.   Investment definition such as: safety, environmental issues, workforce development, operational and maintenance training, and logistics.

    1.4.5.   Definite estimate for infrastructure (permanent and temporary): access, fueling, workshops, power supply, water supply, IT, telecom, etc.

    1.4.6.   Confidence level used for CAPEX definition based on risk analysis results.

    1.4.7.   Contingency/allowance for final CAPEX.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL VALE-RT_00000798

**ATTACHMENT 2 – FEL 3 Deliverables**

1.5. Physical, economical and financial control structure

    1.5.1.  Baseline of the physical-economic schedule, procedures for review and control, budget and contingency work out.

    1.5.2.  Structure of the economic-financial control system integrated with the physical schedule, follow up reports and responsibilities.

1.6. Project execution plan (PEP)

    1.6.1.  Definite PEP.

1.7. Change management plan

    1.7.1.  Change management plan for construction phase.

1.8. Project validation

    1.8.1.  Report on project compliance issued by the decision support team.

**2.  Engineering**

2.1. Site conditions

    2.1.1.  Geotechnical data sufficient for definition of earthmoving quantities, foundations and drainage system.

2.2. Resources and reserves

    2.2.1.  Geological model shall be enough to support mine plan, incorporated all data with lateral and depth extension of deposit defined. This model shall include complete drilling data interpretation, mineralogical and metallurgical test work data, mineralization control factor and geological plan defined.

    2.2.2.  Final geotechnical model based on detailed discontinuity mapping, geological modeling, considerations about the effect of detonations and the presence of water in discontinuities. Parameters proved by tests on non deformed samples and samples obtained from holes from geotechnical drilling (including geotechnical logging). Strains and stability analysis with adequate degree of definition to subside

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                    VALE-RT_00000799

**ATTACHMENT 2 – FEL 3 Deliverables**

the mining. And sequencing plan, including risk analysis, structural and rock strain model in 3D, virgin strains determined by geotechnical tests.

2.2.3.  Final hydrogeological model with flow parameters and underground water characterization obtained from wells and monitoring, groundwater level determined from piezometers, water flow analysis and distribution of poro pressure using an appropriate empiric model, clear definition of groundwater flow, including all aquiferous, water levels, porosity, permeability and poro pressure, integration of information from geotechnical model and mining plan. Hydrogeological Monitoring Plan and tests completed.

2.2.4.  Final hydrological model with detailed definition of the area drainage, including differential soil permeability, vegetation, bay shape and inclination, water courses and main effluents, soil conditions during raining periods, concentration period, etc, definition of best alternative for water impounding and treated tailings dam, weathering and alteration regimes, rain precipitation rate and fluviometric data obtained from weather, pluviometrical  stations installed on site, with final statistical analysis of the data obtained, integration of information with geology, geotechnical parameters, mine planning and environment, risk analysis.

2.2.5.  Whole ore for cash flow period classified as, at least, resource measured and indicated, audit on reserves by a third party.

2.2.6.  Execution phase plan, including drilling, sampling, tests, QA/QC and logging.

2.2.7.  Definite mineralogical and technological characterization, including pilot plant and industrial test.

2.3. Mining plan

2.3.1.  Mine plan including: final layout, detailed schedule, environment management plan, mining sequence, monthly plan for the first year, six-months plan for the next four years and a five year plan for the rest of the LOM, closure plan, blasting plan, equipment maintenance strategy, mine drainage plan and safety plan.

2.4. Engineering

2.4.1.  Design criteria for basic design.

2.4.2.  Process detailed description.

2.4.3.  Heat and mass balance, utilities balance and final process flow diagrams.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000800

**ATTACHMENT 2 – FEL 3 Deliverables**

2.4.4. Utility systems and equipment complete specifications, estimate of concrete and/or steel structures, loading and anchoring plan.

2.4.5. Load and demand studies, short circuit and load flow studies, one-line diagram (general and for each area), ensure power demand compliance.

2.4.6. Definite drawings and design, plot plan, general layout, mechanical layout including: location of industrial facilities, temporary installations, access, roads, railways, transmission line route, piping routes, IT, automation and telecom networks.

2.4.7. Piping and instrumentation diagrams (P&ID's).

2.4.8. List of mechanical, electrical, industrial automation and telecom equipment.

2.4.9. List of material (piping, mechanical, electrical, industrial automation, telecom), instruments, line and cable list and other special material.

2.4.10. Definite configuration diagrams for control, supervision and telecom systems, including control logic and I/O list.

2.4.11. Final take-off worksheets for each discipline.

2.4.12. Technical request for equipment supply, material, systems, civil works and services, including general specs, technical specs, data sheets, typical details, standards and engineering symbology.

2.4.13. Basic design review by maintenance, operation, construction and safety teams.

2.4.14. Definition of operational cycles, validated by the operation team; definite nameplate capacity and operational performance goals, validated by the operation and maintenance teams.

2.4.15. Scalability and flexibility attributes of the basic design, revised and approved by operation and maintenance teams.

2.4.16. Basic design.

2.5. Maintenance strategy

2.5.1. Definition of maintenance strategy and spare parts, both validated by the maintenance team.

## 3. Economic Evaluation and Market

3.1. OPEX

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

ATTACHMENT 2 – FEL 3 Deliverables

    3.1.1.   Definition of complete cost framework. Estimate basis, data sources, exchange and commodities variation handling.

    3.1.2.   Operating costs definition based on the complete cost structure, given by calculation spreadsheets (process flowchart,), maintenance cost of main equipment.

    3.1.3.   Review the logistic costs and taxes concerning the selected alternative.

    3.1.4.   Survey the effects of nominal capacity and availability of the alternative selected on operating costs.

  3.2. Market analysis and strategic alignment

    3.2.1.   Update market risk analysis.

    3.2.2.   Update marketing strategy.

    3.2.3.   Update product description.

  3.3. Economic evaluation and project feasibility

    3.3.1.   Update sensitivity's analysis of NPV.

    3.3.2.   Complete feasibility analysis, including ultimate indicators, variation analysis, NPV probability and sensitivity analysis, considering scalability and flexibility options.

## 4.  Procurement

  4.1. RFQ´s

    4.1.1.   RTs of main equipment and services, main RFQs.

  4.2. Procurement plan

    4.2.1.   Procurement plan, according the procurement planning handbook, including: project risk management plan, communication plan for bidders, suppliers, contractors (added to project communication plan), package summary, procurement and contracting strategy, criteria for previous qualifying, vendor-list.

## 5.  Risk Management

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                              VALE-RT_00000802

**ATTACHMENT 2 – FEL 3 Deliverables**

5.1. Risk analysis

    5.1.1.   Evaluation of project risks.

    5.1.2.   Critical analysis of the risk evaluation.

5.2. Risk management plan

    5.2.1.   Detailed risk management plan for the project life cycle, resulting in an effective elimination of fatal flaws.

5.3. HazOp

    5.3.1.   HazOp.

    5.3.2.   Review standards and operational procedures for basic/detailed design.

    5.3.3.   Structure for operational risks control and monitoring: team, roles and responsibilities, procedures, audits, type of reports, etc.

6. **Communication Management**

6.1. External communication

    6.1.1.   Stakeholder matrix.

    6.1.2.   SWOT analysis.

    6.1.3.   Institutional positioning and key messages.

    6.1.4.   Speech alignment with the field team ("speak the same language"), update Q&A.

    6.1.5.   Update communication team structure.

    6.1.6.   Social communication program - community mobilization plan, communication program for environmental permits.

6.2. Internal communication

    6.2.1.   Stakeholder matrix.

    6.2.2.   Review the project's internal communication plan.

7. **HSEC (Health, Safety, Environment and Community)**

7.1. Health and safety legal requirements

    7.1.1.   Re-evaluation of applicable legislation.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                        VALE-RT_00000803

**ATTACHMENT 2 – FEL 3 Deliverables**

7.2. Health and safety management plan

7.2.1.  Definition of health and safety key performance indicators (KPI's) for execution and operations.

7.2.2.  Definition of the training program (execution and operations).

7.2.3.  Complete HazOp - see risk management

7.2.4.  Definition of health and safety policies for execution phase: corporate safety procedures, need for specific safety procedures for erection, requirements for contracting.

7.2.5.  Definition of the structure for controlling and monitoring operational risks (team, roles and responsibilities, audit process, reports, etc).

7.3. Environmental studies and permitting process

7.3.1.  Negotiation of compensatory actions associated with environmental permit.

7.3.2.  Development of the environmental control plan.

7.3.3.  Previous license (if applicable), application for installation license.

7.3.4.  Definition of a specific socio-economical management plan for the project.

7.3.5.  Environmental management plan for the execution phase.

8.  **Land Management**

8.1. Right of use of land

8.1.1.  Final documents for land purchase/lease/right of use.

9.  **Team and Organizational**

9.1. Project organizational chart.

9.1.1.  Project construction team selected.

9.1.2.  Roles and responsibilities' matrix for execution.

9.1.3.  Updated project organizational chart.

9.2. Defining the human resources for execution and operation

9.2.1.  Integrated human resources plan.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000804

**ATTACHMENT 2 – FEL 3 Deliverables**

## 10. General

### 10.1.        Insurance

Insurance plan including values, schedule, responsibilities and scope.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                         VALE-RT_00000805

**ATTACHMENT 2 – Activity Flowchart**

Project team should include representatives from
key functions:
- Planning and Control;
- Engineering specialists;
- Cost estimating;
- Operations;
- Maintenance;
- Construction Manager
- Representatives from business Unit (mine,
beneficiation, logistics, energy/utilities).

```
┌──────────────┐    ┌──────────────┐    ┌──────────────┐    ┌──────────────┐
│ Complement   │    │ Update roles │    │ Update       │    │ Develop      │         ⬡
│ project      │───▶│ and          │───▶│ internal     │───▶│ change       │───▶   A
│ team         │    │ responsibil- │    │ communication│    │ management   │
│              │    │ ities matrix │    │ plan         │    │ plan         │
└──────────────┘    └──────────────┘    └──────────────┘    └──────────────┘
```

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

VALE-RT_000008806

CONFIDENTIAL

VALE-RT_00000807

**ATTACHMENT 2 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000808

**ATTACHMENT 2 – Activity Flowchart**

The FEL 3 engineering study should be led by the owner team and will frequently involve outside contractors

B → VIPs implementation plan

Develop Basic Engineering study

| Develop tests and simulations | Complete site analysis (soil borings, hydrological, and geotechnical studies) | Definitive Plot Plan and layouts | Complete site review | Develop VIPs in accordance to the plan |
| Finalize process flow diagrams | Review site for contamination removal requirements (if applicable) | Develop P&IDs | Develop single line electrical drawings | Review safety and fire control systems |
| Develop definitive equipment list | Definitive material take-offs | Develop H&MB | Synergies with other project or operation | Scale up study |

Approve Basic Engineering (operational and maintenance team)

C → Resource-load Schedule

D → Monitoring and controls

E → Environmental licensing process

F → Orebody definition process

Develop interfaces management plan

Develop commissioning and start-up plan → G

Interface within other projects and current operations

→ H

→ I

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000809

**ATTACHMENT 2 – Activity Flowchart**

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

VALE-RT_00000810

**ATTACHMENT 2 – Activity Flowchart**



The following areas should take part of PEP definition:
- Business
- Strategic planning
- Construction
- Communications
- Social area
- Human resources
- Legal
- Health, Safety and Environmental
- Public Relations

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL

## SCHEDULE 10

## TAX COVENANT

**Section 1.       Covenant**

1.1      The Parties agree that BSGR shall pay, in each case, on demand (at Vale's election) either (i) to Vale, an amount equal to the Relevant Ownership Percentage of the aggregate amount of; or (ii) to the relevant BSGR Guinea Group Company, an amount equal to 100 per cent. of the aggregate amount of:

(a)      each relevant BSGR Guinea Group Company's liability for Tax, in each case, which arises:

(i)      in consequence of an Event occurring or being deemed to have occurred on or before Completion; or

(ii)      in respect of or by reference to any income, profits or gains which were, or were deemed to be, earned, accrued or received on or before Completion or in respect of a period ending on or before Completion;

(b)      Tax in respect of which Vale would have been able to make a Claim under this Agreement but which is not payable in consequence of the utilization of any relief arising to a BSGR Guinea Group Company or Vale or a member of the Vale Group after Completion; and

(c)      Tax which (on the basis of the rates prevailing on the date of this Agreement) would have been saved by the relevant BSGR Guinea Group Company but for the loss, reduction, modification or cancellation of a relief shown as an asset in, or otherwise taken into account in, the BSGR Guinea Accounts in consequence of an Event occurring on or before Completion, or the non-availability or non-existence of such a relief,

in each case whether or not such Tax is or would have been chargeable against or attributable to another person and whether or not any amount in respect thereof is recoverable from any other person.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                      VALE-RT_00000811

**Section 2.        Exclusions and Limitations**

2.1        No liability shall arise under Section 1 of this Schedule 10 or under the Tax Warranties to the extent that:

> (a)        such liability to Tax was discharged unconditionally and in full prior to Completion;

> (b)        any relief arising to a BSGR Guinea Group Company as a result of an Event before Completion was available to mitigate or relieve such liability to Tax;

> (c)        provision or reserve for such Event was made in the BSGR Guinea Accounts;

> (d)        such Tax arises or is increased as a result of:

>> (i)        a change in Tax rates or in legislation, law, directive or legislative requirement made after Completion; or

>> (ii)        change or withdrawal after Completion of any previously published practice or concession of any Tax Authority;

>> in either case with retrospective effect;

> (e)        such Tax arises as a result of the terms, conditions and provisions of the Basic Agreement in respect of Tax being breached or deemed to be breached, amended or deemed amended, revoked, invalid or void or deemed revoked, invalid or void, in each case after Completion (whether or not deemed to be before Completion) or being applied after Completion in a manner which would not on any reasonable interpretation of the Basic Agreement as at the date of this Agreement have resulted in such Tax;

> (f)        such Tax would not have arisen but for a voluntary act or transaction carried out by Vale or a BSGR Guinea Group Company after Completion (including those acts or transactions carried out pursuant to this Agreement, the Liberia Exploration Permits, the Guinea Exploration Permits, the Ancillary Agreements, the Basic Agreement, the Material Contracts, the Mining Concession and the Royalties Agreement); or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL        VALE-RT_00000812

(g)   recovery of such Tax is made under the Warranties or has already been made under this Schedule 10.

2.2    The exclusions in Section 2.1(a)-(g) of this Schedule 10 shall also operate to limit or reduce the liability of Vale in respect of claims under the Tax Warranties and in any case when the provisions of this Schedule 10 conflict with the other provisions of the Agreement which apply in respect of claims under this Schedule or under the Tax Warranties then the provisions of this Schedule 10 shall prevail.

## Section 3.    Conduct of Claims

3.1    BSGR shall be entitled, at its expense, to resist any Tax Claim under this Schedule for and on behalf and in the name of the relevant BSGR Guinea Group Company which is or could relate to Tax liability for which BSGR has agreed it will be liable under Section 1 of this Schedule 10 if the Tax Claim is not successfully defended, subject to the remaining provisions of this Schedule 10.

3.2    If Vale or a BSGR Guinea Group Company becomes aware of a Tax Claim under this schedule Vale shall give written details of the relevant matters to BSGR as soon as reasonably practicable and in any event within 15 Business Days.

3.3    Vale shall (and where relevant, shall procure that the relevant BSGR Guinea Group Company shall):

(a)   take such action as BSGR may reasonably request in writing to avoid, dispute, defend, resist, appeal or compromise any Tax Claim (a "**Disputed Tax Claim**"), subject to BSGR agreeing (to Vale's reasonable satisfaction) to indemnify Vale or the relevant BSGR Guinea Group Company against the Tax and any costs which it may reasonably and properly suffer or incur as a result of taking such action;

(b)   make available to BSGR such persons as BSGR may reasonably require and all such information as may be available and as may reasonably be requested by the BSGR for avoiding, disputing, resisting, appealing, compromising or contesting any such Tax Claim; and

(c)   not accept or pay or compromise any such Tax Claim without the BSGR's prior written consent.

3.4    BSGR shall:

(a)   keep Vale fully informed of all matters relating to the Disputed Tax Claim and deliver to Vale copies of all correspondence relating to the Disputed Tax Claim;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                    VALE-RT_00000813

    (b)    obtain Vale's prior written approval (not to be unreasonably withheld or delayed) to:

        (i)    the appointment of solicitors or other professional advisers; and

        (ii)    the content and sending to a Tax Authority of each communication (written or otherwise) relating to the Disputed Tax Claim; and

    (c)    obtain Vale's prior written approval (not to be unreasonably withheld or delayed) to:

        (i)    the settlement or compromise of the Disputed Tax Claim; and

        (ii)    the agreement of any matter which is likely to affect the amount of the Disputed Tax Claim or the future liability of Vale, BSGR Guinea or a BSGR Guinea Group Company in respect of Tax.

3.5    BSGR's rights under Section 3.1 of this Schedule 10 cease if it fails to comply with any of its obligations under Section 3.4 of this Schedule 10, or it:

    (a)    takes corporate action, or other steps are taken or legal proceedings are started for its winding up, declaration as an désastre, dissolution, administration or re-organisation or for the appointment of a receiver, administrator, trustee or similar officer of it or of any of its assets; or

    (b)    is unable to pay its debts as they fall due, starts negotiations with a creditor with a view to the general readjustment or rescheduling of its indebtedness or makes a general assignment for the benefit of, or a composition with, its creditors.

3.6    BSGR is to pay any required sum under Section 1 of this Schedule 10 on the later of the date five Business Days before the date on which the relevant BSGR Guinea Group Company will finally be liable to pay the Tax (or would have been so liable if such Tax is not payable due to the utilisation of a Relief) in respect of the relevant Tax Claim unless such Tax is required by a Tax Authority to be paid before such time (in which case BSGR shall pay such sum five Business Days before the date on which the relevant BSGR Guinea Group Company is required to pay the Tax), and the date five Business Days following the date on which written notice setting out the amount due is received by BSGR from Vale.

UK-2421081-v8                                                                                                                    95-40469850
This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

CONFIDENTIAL                                                                                                    VALE-RT_00000814