F269TINC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RIO TINTO PLC,

                  Plaintiff,

            v.                        14 Civ. 3042 (RMB) (AJP)

VALE, S.A., et al.,
                                      Conference
                  Defendants.

------------------------------x
                                      New York, N.Y.
                                      February 6, 2015
                                      2:00 p.m.
Before:
            HON. ANDREW J. PECK

                                      Magistrate Judge


            APPEARANCES

QUINN EMANUEL URQUHART & SULLIVAN LLP
      Attorneys for Plaintiff
BY:  ERIC C. LYTTLE
      MICHAEL J. LYLE
      KEITH H. FORST

CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Attorneys for Defendant Vale, S.A.
BY:  JONATHAN I. BLACKMAN
      SCOTT B. REENTS

MISHCON DE REYA LLP
      Attorneys for Defendant BSG Resources Limited
BY:  VINCENT FILARDO

SULLIVAN & WORCESTER LLP
      Attorneys for Defendant Mahmoud Thiam
BY:  NITA N. KUMARASWAMI
            ANDREW T. SOLOMON

MARTIN J. AUERBACH
      Attorney for BSG Resources defendants

F269TINC

1            (In open court; case called)

2            THE COURT:  Good to see the usual cast of thousands

3     here.  For any client who reads the bill, and there aren't full

4     appearances, I'm exaggerating quite a lot, but it's a large

5     number of people.

6            With respect, first of all, to the BSG and related

7     issue about a stay of discovery, the answer is Judge Berman has

8     ruled and so if you want to make a motion for him to reconsider

9     it, that would be an application that goes to Judge Berman, not

10    to me.

11           MR. FILARDO:  Your Honor, could I be heard briefly on

12    this.

13           Your Honor's rulings have been consistent to this

14    point, that until the Court has determined personal

15    jurisdiction over BSGR and Mr. Steinmetz, that merits discovery

16    wouldn't go forward against them.  I don't think that Judge

17    Berman's scheduling order is necessarily inconsistent with your

18    Honor's rulings.

19           THE COURT:  It is because he ruled at the last

20    conference that everything would go forward.  And to make sure

21    there wasn't a miscommunication, I have spoken to him.  And so

22    you are getting this both from me and, through me, from him

23    that if you want relief from that you need to make the

24    appropriate application to him.  I'm out of it.

25           MR. FILARDO:  Understood, your Honor, but if I could

F269TINC

1    just point out for the record that Judge Berman's order, how it

2    differed from the order that -- the proposed scheduling order

3    that the parties had agreed to and submitted to your Honor, at

4    least in relevant part how it differs, is in paragraph three

5    where it states:  Item No. 7 is not contingent upon any pending

6    or impending personal jurisdiction motions.

7            And when you look at item No. 7 of that order, and of

8    course this is the January 16, 2015 scheduling order of Judge

9    Berman, No. 7 says discovery deadlines include any Hague

10   Convention discovery not vice versa.

11           I think, as your Honor knows, we've been participating

12   in discovery.  It's been limited jurisdictional discovery up to

13   this point, of course, not merits.  We've complied with your

14   Honor's rulings.  We've produced the Steinmetz declaration

15   which refutes all of these specific allegations of general

16   jurisdiction and minimum contacts that were made against my

17   client.  And we've also responded to plaintiffs' jurisdictional

18   discovery requests in accordance with your Honor's orders and

19   the scope of that discovery.  And there were no documents that

20   were produced that tend to show any jurisdiction over my

21   client.

22           As your Honor pointed out the last time we were before

23   you, that given the deadlines, and that given that Judge Berman

24   would likely not extend them -- and I think that's what was

25   clear in this order, that he didn't want to extend them despite

F269TINC

```
 1    any jurisdiction --

 2              THE COURT:  Not only was he not extending the

 3    deadlines, he was dialing them back at least a little bit.

 4              MR. FILARDO:  Correct.

 5         And your Honor had pointed out, as you anticipated

 6    that he wouldn't do that, that the parties should start

 7    thinking about how to conduct either nonparty discovery,

 8    whether it's under the Hague or whether it's under letters

 9    rogatory through the federal rules.

10         What Judge Berman didn't rule upon was -- although he

11    stated at the end of the conference, and he stated that he

12    thought that it would include merits discovery, what he stated

13    here in his scheduling order, in paragraph No. 3 -- what he

14    didn't rule on was how that would -- how merits discovery would

15    be participated in by my clients.  Would it be that they had to

16    object pursuant to the federal rules?  Or would it be that they

17    would object and say that the Hague Convention should apply?

18         Your Honor had suggested was that the parties discuss

19    looking at this as a nonparty discovery under the Hague or

20    under appropriate rules that would apply.  And I think that

21    that certainly wasn't ruled upon by Judge Berman.

22              THE COURT:  That's not the application that was made

23    in your letter to me.

24              MR. FILARDO:  The application that was made was in

25    light -- because we feel that, although we don't believe Judge
```

F269TINC

1    Berman intended it, we feel that --

2              THE COURT:  Let me be clear.  Judge Berman intended

3    it.  And obviously you can --

4              MR. FILARDO:  I don't think Judge Berman intended to

5    prejudice us by putting these deadlines in the order.

6              The reason of our application was because, if we were

7    to keep our objections and we were to not participate in

8    affirmative discovery and argue to your Honor, as we think is

9    appropriate, that discovery against us should proceed either as

10   nonparty or party under the Hague, that there could be a

11   possibility of prejudice here given the deadline.

12             THE COURT:  Mr. Filardo, let me be clear.

13             If you're asking for a stay, that has to go to Judge

14   Berman.  If to the extent that he has already ruled against a

15   stay or future rules against a stay, that puts you between a

16   rock and a hard place.  If I said you have my sympathies that

17   doesn't resolve anything.  My hands are tied.  And you then

18   have to make the decision of whether you want to object to any

19   discovery under U.S. discovery rules and say you're going to

20   roll the dice and hope that you are correct that there is no

21   jurisdiction against you here and you're going to get knocked

22   out of the case; and if not, you're not going to have any

23   defensive discovery for you except what you get through the

24   requests made by other defendants that may enure to your

25   benefit.  Or you're going to work things out appropriately with

F269TINC

the plaintiffs and anyone else -- other defendants who may take

discovery against you to make it as convenient as possible in

terms of occurring elsewhere.

         Right now we are still at the point where we're

talking about documents.  Obviously, if we're talking about a

deposition and the place of a deposition, that is something

that may not get -- we may not ever get to that point before

the motion is decided upon.

         MR. FILARDO:  That's where I was going, your Honor.  I

understand fully that if we're going to make -- we understand

your Honor's ruling, that if we have to make this stay motion

that we must do it before Judge Berman.  But that's exactly

where I was going with this, is that the scheduling order, nor

does the commentary at the end of the conference before Judge

Berman make a ruling as to how we're supposed to proceed as to

merits discovery.  It doesn't say we have to proceed under Rule

30, Rule 33, Rule 34.

         THE COURT:  Are you ready to make an application or

not?  You seemed to be indicating at the start of this that --

         MR. FILARDO:  Essentially what I don't want to be in a

position is that -- plaintiffs had already served both document

requests and interrogatories on us.  As you know, the only

statement my client ever made in court is that the court

doesn't have jurisdiction over us.  And the interrogatories are

particularly troublesome.  So we're at a point now if we're

F269TINC

1  going to object --

2         THE COURT:  Stop.  Stop.  Stop.

3         I appreciate you've got to make a decision.  I'm not a

4  big fan of interrogatories.  I will give you that little

5  freebie right now.  So, if you have documents, and there was at

6  least a comment in one of plaintiff's letters that at least as

7  to certain documents you already have them all together, or

8  some such -- parties always think the other side is more ready

9  than perhaps they are.  But you can produce documents because

10  documents, many of which -- well, this is old enough, it may be

11  paper.  But even so, it is something that can be moved easily

12  from one place to another, whether in bits and bytes or on

13  pieces of paper.  You'll have to make that decision as to what

14  road you want to go down.  And whether it's today or the next

15  conference, if you want to object to all their discovery and

16  say it's your position that they must go via the Hague

17  Convention, and you letter brief it, I'll deal with it.  I'm

18  not going to take much more time now until you're ready to tell

19  me that you have gotten your client's instructions and you are

20  prepared to do X or Y and you want a ruling.

21         MR. FILARDO:  Thank you, your Honor.  I'll just do

22  it -- then let me reserve our rights to make those objections

23  that this discovery, if it was to proceed, would proceed under

24  the Hague Convention.  And if we would make that application

25  we'll do it in writing.

F269TINC

1          THE COURT:  Do it sooner rather than later.  Don't

2     wait until the 30th day.  I don't remember when they served

3     you.  But in fairness -- although I have already indicated to

4     the plaintiffs they too might want to consider immediately

5     going to the Hague, but I would not consider it fair play to

6     wait until the 30th day or indeed get an extension of that 30th

7     day and then just say:  General objection to everything you've

8     asked, we think we're not subject and, therefore, you've got to

9     go Hague.  I'm not going to look upon that kindly.

10          MR. FILARDO:  I will do it much sooner than later,

11     your Honor.

12          THE COURT:  One last point just to be sure if there is

13     any doubt Judge Berman asked me to clarify with you that your

14     motion for lack of personal jurisdiction has to be incorporated

15     within the master motion to dismiss that Judge Berman has

16     scheduled and given page limits on.

17          MR. FILARDO:  There is no doubt, and it has been.  It

18     will be submitted, fully submitted.

19          THE COURT:  Very good.

20          MR. LYLE:  Your Honor, Michael Lyle for Rio Tinto.

21          THE COURT:  You can snatch defeat from the jaws of

22     victory but, yes.

23          MR. LYLE:  All I'm asking your Honor is that with

24     respect to the six thousand documents that BSG defendants have

25     acknowledged that they have and reviewed, that if we could have

F269TINC

```
 1    a date for them to begin production of at least those

 2    documents.

 3              THE COURT:  They haven't decided yet whether they are

 4    going to do that or not.

 5              MR. LYLE:  That's why I'm suggesting if we get a date,

 6    your Honor, so that they can then make a decision one way or

 7    the other.

 8              THE COURT:  Let's do it a different way.

 9              Mr. Filardo, when will you be prepared to have gotten

10    the advice of your client and perhaps taken a run at Judge

11    Berman.

12              MR. FILARDO:  Within a week, your Honor.

13              THE COURT:  Excuse me?

14              MR. FILARDO:  By a week from today.

15              Let me clear something up for plaintiff's counsel on

16    the 6,000 documents.  Your Honor, as you know, the limited

17    jurisdictional discovery that we were engaging in was also

18    under very broad search terms, including the term Fred and

19    Florida.  The only reason why we even came up with six thousand

20    documents was because of those broad terms.  These things are

21    completely irrelevant.  The only hits that we did get in the

22    things that we produced were when the actual name Fred Cilins

23    came up in a news article.

24              THE COURT:  All of this -- we've now taken 20 minutes

25    on an issue that I thought would take three to say, "Not me,
```

F269TINC

1  Berman."  So a week from today you will tell them what you're

2  doing not only on those six thousand documents, if there are

3  six thousand documents, but whether you are engaging in paper

4  discovery, and by that I mean nondeposition, under U.S. rules,

5  or Hague Convention, or any other variation.  Can we now move

6  on to the agenda item.

7            MR. LYLE:  Thank you, your Honor.

8            MR. FILARDO:  Thank you, your Honor.

9            THE COURT:  Okay.  As to the discovery request from

10  defendant Thiam, whose name I'm sure I'm mispronouncing, how

11  soon can you get the documents to the government of Guinea?

12            MS. KUMARASWAMI:  Nita Kumaraswami for defendant

13  Thiam, your Honor.

14            We are nearing completion of our review, and it is our

15  hope to get them to the Government of Guinea on or around the

16  13th, which would allow them a week to get back to us, which

17  they represented would be ample time to review these documents.

18            THE COURT:  I take it that is acceptable to the

19  plaintiffs?

20            MR. LYTTLE:  Yes, your Honor.

21            THE COURT:  So ordered.

22            MS. KUMARASWAMI:  Thank you, your Honor.

23            THE COURT:  We've already dealt with II, which is the

24  BSGR Steinmetz.

25            III. VBG.

F269TINC

1            Is VBG prepared to go to the government to do I guess

2      what is the equivalent of a FOIA application and get back

3      copies of your documents.

4            MR. AUERBACH:  Good afternoon, Judge Peck.

5            Martin Auerbach.

6            Plaintiff's counsel has been kind enough to identify

7      for me U.S. counsel representing the government of Guinea.  I

8      am in the process of connecting with him.  Once I've connected

9      with him, I will go back to my clients in Guinea and explain to

10     them what this process is.  I assume I'll get direction from

11     them to go ahead and make that request.

12            THE COURT:  How soon will you be in a position either

13     to make the request or inform plaintiffs and the Court that

14     your clients will not for some reason.

15            MR. AUERBACH:  I don't think I'll be speaking to U.S.

16     counsel for the Guinean government today.  I assume that this

17     will carry over until early next week.  As soon as I have

18     spoken with them, I will reach out to the clients.

19            Plaintiff's counsel understands, and they've been very

20     understanding about the fact, that it's been extraordinarily

21     difficult to communicate with my clients.  The management of

22     the Guinean company is currently in Paris.  After the terrible

23     events in Paris, I couldn't get through to them.  Hopefully, I

24     can get through to them now much more readily.  And so by the

25     end of next week I should certainly have an answer.  And if the

F269TINC

```
 1    answer is that this is a fairly simple and straightforward

 2    process, which I'm hoping it will be, I assume your Honor would

 3    encourage me to encourage them to go forward in that respect.

 4              THE COURT:  That's for sure.  So status report by next

 5    Friday to the plaintiffs.

 6              MR. AUERBACH:  Sure.

 7              THE COURT:  You don't need to copy me on that.  If

 8    that creates a problem between you and them, one or the other

 9    of you will let me know.

10              MR. FORST:  Your Honor, if I may.  Just one thing on

11    that point.

12              THE COURT:  Just remind me of who you are.

13              MR. FORST:  Keith Forst with Quinn Emanuel on behalf

14    of Rio Tinto.

15              I just wanted to relay, and I relayed this to counsel

16    for VBG, that Scott Forman, counsel for the Guinean government,

17    conveyed to us, which we conveyed to him, that any request by

18    VBG to the Guinean government would be, in his expectation,

19    acted on promptly and responded to right away.  So we've

20    communicated that too.  So they're aware of it and that it's

21    coming and ready to act on it.

22              THE COURT:  Good.  Excellent.  And the other part of

23    the letter is that Rio Tinto is awaiting answers to certain

24    questions.

25              MR. AUERBACH:  And Mr. Forst and I have been talking
```

F269TINC

```
 1   about that, and talking about ways to try to find answers to
 2   interrogatory questions.  It principally has to do with first
 3   what the universe --
 4             THE COURT:  Let me stop you.  In an effort to keep all
 5   this short.  Is there any dispute, or you're comfortably
 6   working together?
 7             MR. FORST:  We're comfortably work, your Honor.
 8   However I asked Mr. Auerbach if we could get a date certain by
 9   which he would amend those interrogatories.  I proposed by the
10   end of next week.
11             MR. AUERBACH:  I think realistically two weeks for
12   that.  And since it's looking forward to people to depose, and
13   that's not going to happen until July, I think --
14             THE COURT:  But it's also looking for documents and
15   where the computers went.
16             MR. AUERBACH:  Judge, I've already told them that.
17             THE COURT:  Is two weeks from today acceptable?
18             MR. FORST:  We'll take it.
19             THE COURT:  So ordered.  Move on.
20             MR. FORST:  I'm sorry.  The very last thing is counsel
21   for VBG also helpfully pointed out that there are 20 boxes of
22   hard copy documents left in their offices in Guinea that have
23   since been abandoned.  So we've asked him to look into getting
24   access to those documents, to get them shipped.  We also have
25   identified, through our client, that there are people there in
```

F269TINC

1     Guinea who can assist in that effort to get those documents.

2     Those weren't seized by the government but remain on the

3     premises.  So we would request that those documents be scooped

4     up first chance and at least shipped back to him for review and

5     production.

6             MR. AUERBACH:  I am trying to coordinate with the

7     clients on the status of those.  And I will have the status on

8     that by the end of next week as well -- two weeks.

9             THE COURT:  Well let's get the documents -- unless

10    there is a reason the documents can't leave the country, let's

11    get them shipped to you immediately so that they're here by the

12    two weeks from today, and then you can fight over content and

13    you could even talk about who is going to split the shipping

14    cost or whatever.  But let's try to get this moving.

15            MR. AUERBACH:  Fine, your Honor.  The health situation

16    in Guinea continues to be a really serious obstacle, and I'm

17    working around it.

18            THE COURT:  Two weeks is the deadline.  And if there

19    is a problem you'll need to get relief from the plaintiff; and

20    if not from the plaintiff, from the Court.

21            MR. AUERBACH:  Thank you.

22            MR. FORST:  Thank you, your Honor.

23            THE COURT:  I guess now is the time for the predictive

24    coding protocol.  And could the e-discovery gurus on each side

25    stand up and tell me who they are and where they're from.

F269TINC

```
 1              Start with the plaintiff.

 2              MR. CHAN:  Kinny Chan from Precision Discovery.

 3              MR. LAND:  Jonathan Land from Quinn Emanuel.

 4              THE COURT:  Okay.

 5              MR. REENTS:  Scott Reents from Cleary Gottlieb.

 6              MR. SIKORSKI:  David Sikorski from Deloitte.

 7              THE COURT:  Okay.  So let me ask you this.  Have you

 8    decided at this point, on each side, which vendor or which

 9    TAR -- I'm using TAR and predictive coding synonymously --

10    whose product you're using.

11              I'll start with the defense.  I know Deloitte doesn't

12    have a product of its own per se, at least I think that's

13    correct.  You, as a service provider, use the tools from

14    others.

15              MR. SIKORSKI:  Correct we use open source algorithms.

16              THE COURT:  Which means what?

17              MR. SIKORSKI:  They're publicly available algorithms

18    that are usually behind these other products.

19              MR. REENTS:  If you're looking for a name, they brand

20    it under Deloitte Dynamic Review.

21              THE COURT:  I was wrong.  It is essentially your own.

22              Is it an SPL, SAL or CAL as those acronyms are now

23    used.  If you need me to translate, by all means.

24              MR. SIKORSKI:  It approaches CAL.

25              THE COURT:  On the plaintiff's side.
```

F269TINC

 1          MR. CHAN:  From Precision Discovery, we use Relativity

 2     Assisted Review by kCura.

 3          THE COURT:  Is that continuous active learning or

 4     something else?

 5          MR. CHAN:  It's not continuous active learning.  It's

 6     simple learning.

 7          THE COURT:  Simple passive or simple active?

 8          MR. CHAN:  Simple passive learning.

 9          THE COURT:  The problem I see, among others, and this

10     could be the first time you've all agreed on something and I

11     hate to be a problem where there is agreement but the protocol,

12     perhaps because it had to cover two different types of

13     products, does not necessarily make sense to me.  If you all

14     want to give me any background and address that in any way;

15     otherwise, I can tell you like one or two of the specifics I

16     see as being problematic.  And if you all want to tell me I

17     should mind my own business, you've agreed and leave you alone,

18     I'm happy to do that as long as the understanding then is that

19     I'm not going to get all sorts of motions as you go through

20     this as to they miscoded 35 of the 50 documents in this seed or

21     whatever.

22          MR. REENTS:  Your Honor, I think I can give you

23     background on the protocol and our thinking.  You're right.  We

24     wanted to design a protocol that was, as much as possible,

25     agnostic as to platform so the parties could use a different

F269TINC

1    platform, and didn't micromanage the process that was used.  I

2    think those two things go together.  At the same time we felt

3    it was very important for each side to make adequate

4    disclosures so that each side could evaluate the reasonableness

5    of the other side's process.

6              THE COURT:  Would it make sense, now that you all

7    know -- maybe you knew it before I asked you to stand up and

8    tell me, maybe you didn't -- would it now make sense to go back

9    and very quickly do a protocol that says plaintiff is using

10   kCura's Relativity platform and therefore, as to it, the

11   following procedures apply; while Vale is using Deloitte's

12   Continuous Active Learning tool and, therefore, this slightly

13   different protocol applies.

14             MR. REENTS:  My view, your Honor, is that that's not

15   necessary.  We've confirmed with our vendors that nothing set

16   forth in the protocol is inconsistent with the way that their

17   process works.  And in any -- in any review process, in

18   particular with predictive coding TAR, you need some

19   flexibility because you can't set forth with certainty at the

20   start exactly how it's going to progress.  So that's also sort

21   of an important feature, I would say, not a bug of the way we

22   designed the protocol but a deliberate feature.

23             MR. LYTTLE:  I agree with Mr. Reents' description of

24   how the protocol came to be.  We did want it to be agnostic.

25   Our goal was to have a very opaque and sharing, open process

F269TINC

with how decisions were being made.  I do think now that we
have decided exactly which technologies are going to be used, I
do think there's some detail could be added.  I'd ask Mr. Chan
to weigh in on the detail that we might propose to add, which I
think is what your Honor is after.

THE COURT:  At this point TAR, as I think you all
know, is something that I'm very interested in.  On the other
hand, if there are things you haven't negotiated that now you
think you could and should, I'd rather not do that in open
court, both as a matter of taking up my time and as a matter of
fairness to all of you.  You did a very good job of coming to
an agreement, even if it's an agreement that I think may be
somewhat problematic.

Let me just tell you as I understand it and I don't
know -- I know very little about each specific tool under a
brand name or under Deloitte's name.  I know about it in the
simple versus continuous and all of that.

As I understand it, in a Continuous Active Learning
tool, they're really after the training set.  And here you seem
to have a seed set and a training set and etc.  And for, as I
understand it, for Continuous Active Learning you train and,
therefore, may be important to see what the documents of the
training set are but thereafter it bubbles up to the top the
most responsive documents and those are continuously marked as
either relevant or not relevant.  And even the ones that are

1    marked not relevant will come back again in subsequent rounds

2    if the computer algorithm, as it's retrained, thinks that you

3    made a mistake.  Is that about right and is that the way

4    Deloitte's version of CAL works?

5              MR. SIKORSKI:  That's essentially, yes.

6              THE COURT:  While a Simple Passive Learning tool has

7    much more of a -- seed sets are much more important.

8              MR. CHAN:  If I may, Simple Passive Learning, you can

9    use some of the technology or some of the functions that you

10   see in Active Learning.  So one thing with Simple Passive

11   Learning, you do see ranking of relevancy.  So it's all about

12   how you select the seed sets.  So I think some of these are the

13   details that counsel is talking about that we want to work

14   through.  So there is some commonality here that we can work

15   with in terms of the protocol.

16             THE COURT:  It's just some of the statistically valid

17   sample arguments here, or whatever, sound like the sort of

18   thing that you could better document.

19             I mean either you're using the usual sample generator,

20   so it's 2,399 documents, or whatever the other variant along

21   those numbers that the tool spits out, which is really somewhat

22   different than a 95 percent confidence level, plus or minus two

23   percent.  I mean there are just certain of the ways things are

24   described here.  And it may be that you all know what you're

25   talking about and probably, I hope, know what you're talking

F269TINC

1   about, at least the vendor folks or consultant folks better

2   than I do.  However, I'm not sure that some of the things

3   you've described here necessarily make sense.  In other words,

4   I'm having some trouble figuring out whether you've got a

5   control set and then a seed set or you're talking about two

6   different seed sets and --

7          MR. REENTS:  Your Honor, would you like us to explain

8   the difference?

9          THE COURT:  Sure.

10          MR. REENTS:  The sample set, to start, serves two

11   purposes; one is to understand the prevalence of various

12   issues, responsive issues within the document population; and

13   the second is to serve as a control set, to measure the

14   training process.  This is, at least, as I understand that

15   dynamic.

16          MR. SIKORSKI:  Correct.

17          THE COURT:  That's different than the seed set?

18          MR. REENTS:  The seed sets which are used in the

19   training process are an attempt to find responsive documents in

20   order to train the system.  And then the model is developed

21   through that process.  And the model is constantly tested

22   against that sample set that you've done in the beginning.

23          MR. CHAN:  Your Honor, that's the same methodology

24   that we apply using Simple Passive Learning through our

25   process.

F269TINC

1          MR. LYTTLE:  Your Honor, maybe there's a middle ground

2     here where we don't blow the protocol up, so to speak, where we

3     can exchange letter or something giving this level of detail

4     around how this protocol specifically will be implemented among

5     the various review platforms.

6          THE COURT:  I'm happy to do whatever you all think.

7     One possibility is for me not to sign this and for you all to

8     keep working -- you each sign it and -- because I'm both

9     worried about what you're all doing and also, frankly, there

10    are so few -- there are enough cases out there on predictive

11    coding, but there are not too many protocols.  And certain

12    protocols then wind up taking on a greater life.  And I know

13    you're only interested or largely interested in your case, not

14    the development of the law on TAR, but there are certain things

15    that I would have some concern about signing.

16          The other thing that I'll raise with you right now is

17    unless you have a very good common understanding of scope there

18    can be problems from -- I'm glad you've agreed, let me try to

19    phrase this positively as opposed to only negatively -- I'm

20    glad you've agreed on a protocol.  I'm glad you've agreed on a

21    fairly high degree of transparency and certainly a very high

22    degree of cooperation.  All of those are wonderful.  What I

23    don't want to have coming to me is in each round or in even the

24    first seed set round of the 2,399, or whatever your number

25    generator gives you for your sample in that ilk, I don't want

F269TINC

1    five hundred of those documents brought to me for a long

2    conference with the plaintiff saying we've marked these as

3    nonresponsive and the defendant saying 90 percent of them

4    should be marked responsive or vice versa here.

5         If you all are confident that this all is going to

6    work and you understand the scope of what's in discovery and

7    what's not in discovery so that the transparency and review of

8    nonresponsive nonprivileged documents is merely to give you

9    confidence in the process and that no one is trying to game the

10   system, I'm okay with that.  I'm not okay with having to

11   referee disputes on that to much degree.

12         MR. LYTTLE:  Understood, your Honor.  I think we both

13   have expressed those concerns, as well, in discussing how we

14   implement this transparency.  In conjunction with this

15   predictive coding protocol, both parties have put the source

16   down a little bit.  We're pretty close to finalizing everything

17   but a few outstanding issues on scope.  Both parties have

18   exchanged proposals.  And we think we're going to reach

19   agreement on that.

20         So we've been operating in parallel on the scope and

21   the predictive coding.  I can't promise you there won't be

22   disputes.  I'm hopeful we all start coming to an understanding

23   on the proper scope in parallel with this and that will limit

24   those disputes that you've just noted.

25         As far as the protocol, I do think as long as these

F269TINC

```
 1      concepts of transparency and openness stay in the protocol, I
 2      think we can go back and think about adding some of these
 3      details in to get a protocol that provides the level of
 4      specificity that you're after.
 5           If you could help us though -- you've mentioned a
 6      couple times now you've got a couple concerns.  I think you've
 7      mentioned one of them.  Are there any others that we could
 8      focus on so that what we present to you next time is more in
 9      line with what you're after?
10           THE COURT:  I'll go through some of the other details.
11      Your definition of precision talks about responsive by the
12      software.  Are you really talking about measuring precision at
13      that point or after the attorney review of the responsive
14      documents?
15           I don't need answers to these as we stand here.  That
16      was a concern.
17           Instead of defining statistically valid sample, if
18      you're agreeing that a sample for whatever purpose is 2399 or
19      2405 or whatever the magic numbers the various vendors throw
20      out at the conferences about TAR all the time.  Just do it.  If
21      it is not something that is just the random number generator
22      but is a percentage of the corpus or something that you won't
23      know it now, then that's a different story.  But that's
24      generally not the way the sample goes for validation and other
25      purposes including above the control and seed set.
```

F269TINC

1            On Paragraph 4(a) I'm not exactly sure what you meant

2     by sampling of the excluded documents.  Because that's prior to

3     sample set review.  Does that mean you're reviewing documents

4     that -- you're sampling documents that weren't collected?

5     You're sampling documents that were collected but are

6     eliminated from predictive coding review by deduping or

7     exclusion of everything that comes up as at ESPN.com, at

8     EBAY.com or whatever are the other junk extensions.  I just

9     didn't understand that.

10            There's some of the stuff on page four, paragraph (d)

11     training where you're talking about disagreeing with

12     categorization and things like that.  And I'm not sure whether

13     that is based on a hard yes or no, it's relevant or it's not

14     relevant versus how that works with a TAR method that ranks the

15     documents from a hundred percent likely to be relevant to zero

16     percent.

17            You're doing a lot of things with producing

18     nonresponsive material, but not the responsive, which makes

19     sense in one sense, because you're going to get all the

20     responsive documents from the training set, seed set, and later

21     sets as part of a big production, but it's not necessarily

22     helping you all decide whether the system was adequately

23     trained.  Again, you may be okay on that.  You may not.

24            Page five.  Paragraph 4(e).  When you say

25     uncategorized documents, are you meaning things that were

F269TINC

1    exceptions that don't work in TAR at all like pictures,

2    architectural drawings, mine shaft drawings, whatever would be

3    the appropriate analogy here?  Or are you talking about

4    documents that the predictive coding software said:  Beats the

5    heck out of us, we can't tell whether this is responsive or

6    nonresponsive because we haven't been trained enough.

7                That and what I've already talked about, about

8    differences between control sets, seed sets and the like, I

9    think covers most of the issues I had here.  So what I would

10   suggest, unless you all want to do it differently, is that you

11   take one more crack at this, disclose as part of this in the

12   preamble or whatever what system you're each using and how you

13   would characterize it as simple, active, passive, continuous,

14   etc.; fix the other issues to the extent you think it needs

15   fixing or at least clarification, and then submit it for me

16   and, as I say, I will probably accept it if you're in

17   agreement.  I just hope that we're not just creating problems

18   down the road.

19               Anyone have any different thoughts?

20               MR. LYTTLE:  That makes sense to us, your Honor.

21               MR. REENTS:  Yes, makes sense to us.

22               THE COURT:  A week from today.  Does that give you

23   enough time?  A little less, a little more?  What's your

24   pleasure?

25               MR. LYTTLE:  I think it would keep us moving.

F269TINC

1          MR. REENTS:  That would be fine.

2          THE COURT:  A week from today I'll expect a new

3    protocol with a cover, you know, probably better if you explain

4    it all, anything you're answering my question on without

5    necessarily changing things in the protocol itself by a

6    footnote or something, but if you want a cover letter that's an

7    agreed cover letter explaining things, that's fine too.

8          I think with that we have covered everything in your

9    letter.  Maybe.  Tell me if I've skipped anything there.

10          MR. BLACKMAN:  The only thing left, and it's not

11    something we need to linger on here, is in the portion of the

12    letter, Roman V, deals with Vale's request for discovery from

13    Rio Tinto.  They now have produced the investigative reports.

14    We've noted, and we've already informed them that some of those

15    reports don't have dates which is significant, given the reason

16    they're being ordered to be produced.  And at least one doesn't

17    indicate who prepared it.  And we've asked them to give us that

18    information.  I can't imagine there's an objection.  But just

19    for the sake of good order I'd like to have it agreed on the

20    record, or otherwise directed by the Court, that they do that

21    in a week.

22          MR. LYTTLE:  Yes, your Honor.  They did send a letter

23    Wednesday or Thursday.  I hoped to talk about it before the

24    conference.  Unfortunately because of traffic I didn't make it.

25    Long story short.  Yes, we will give that.  We propose to treat

F269TINC

1    that as an interrogatory.  We won't take the full 30 days.  We

2    won't make them to serve it as an interrogatory.  We will get

3    back to them as soon as we can but we do need to run some traps

4    with our clients about identifying the names of particular

5    contacts at investigators.

6              THE COURT:  Well that's a different story, I thought.

7    I thought there -- there may be two parts.  There's the

8    redaction question.  But just the dates and who prepared and by

9    who?  Do you mean Mr. Holmes or do you mean the Pinkerton

10   Investigative Agency, when you say who prepared the report that

11   doesn't show who prepared.

12             MR. BLACKMAN:  I'd like to know both, but I'll start

13   with just the entity.  At least one of these reports just

14   doesn't indicate whether it's from --

15             THE COURT:  Any reason you can't get that all squared

16   away within a week?

17             MR. LYTTLE:  No.  We can do that, your Honor.

18             MR. BLACKMAN:  Then you moved on to the question of

19   the redactions.  We're going through those.  Frankly, we don't

20   necessarily accept the redactions particularly since some of

21   these people may turn out to be fact witnesses.  And without

22   some more clarity about vague concerns about security and so

23   on, I don't think it's fair for them just to redact sources of

24   discoverable information.

25             THE COURT:  Let's take that in two pieces.

F269TINC

1          Are any of the confidential informants people who are

2     likely to be testifying for either side or at least be deposed

3     by either side?

4          MR. LYTTLE:  Not at this time, your Honor, no.

5          THE COURT:  Are they likely to be picked up not

6     because you are using them affirmatively but because they are a

7     fact witness who is likely to have been mentioned by one side

8     or the other as a likely deponent?

9          MR. LYTTLE:  They have not shown up on any initial

10    disclosures.  No.  They're not people we're in contact with.

11    They're not people we think will speak to us.  We have no

12    reason to believe that any of the people we've redacted will be

13    fact witnesses.

14         THE COURT:  You know who they are, right?

15         MR. LYTTLE:  I have names for some, your Honor.  Other

16    times I just have description, Senior Minister in the Ministry

17    of Mines.

18         THE COURT:  To the best you can, if it becomes clear

19    that anyone you've listed you've redacted or been vague on the

20    description in the report is somebody who is otherwise being

21    deposed make sure that you then unseal and redact that piece.

22    As to the rest I'll wait until you make some sort of analysis

23    and make whatever application to me by letter you want to make

24    and we'll see where we go.

25         MR. BLACKMAN:  That actually again segues to the last

F269TINC

1    point.  In terms of people who have been identified in

2    interrogatory responses again we've found through our own

3    research some names from their side of the case who were not

4    identified and some of them I think they've agreed to put in to

5    amend their answers.  There's at least one who they're thinking

6    about and, again, just for the sake of good order I'd like to,

7    within a week of today that they either tell us they're going

8    to amend and add things we've asked or else not so we know

9    whether we have a dispute or not.

10              THE COURT:  Agreed?

11              MR. LYTTLE:  Agreed, your Honor.  We will add the

12   names they've asked, we're looking into one of them.

13              THE COURT:  Anything else?

14              MR. BLACKMAN:  No, your Honor.

15              MR. LYTTLE:  Your Honor, I have two points if I may.

16              THE COURT:  Yes.

17              MR. LYTTLE:  Just like you asked us and required us to

18   gather the investigator reports, because they were a discrete

19   set of documents, we would ask that Vale be ordered to expedite

20   production on two sets of discrete documents.

21              THE COURT:  Have you talked to them about this yet?

22              MR. BLACKMAN:  No.

23              MR. LYTTLE:  Many times we've been asking for these,

24   the due diligence documents, particularly due diligence reports

25   which I think may inform --

F269TINC

 1          THE COURT:  Let's be fair to each other.  And if this

 2     means you come back a little sooner than you otherwise would,

 3     the purpose of these preconference letters is not only for me

 4     but it's so that you're not sandbagging the other side

 5     unintentionally or intentionally.  So unless you think it is

 6     desperate that we break that protocol let's save it for the

 7     next conference.

 8          MR. LYTTLE:  I'm glad to know that's the protocol

 9     going forward, your Honor, I'm not sure that's been followed at

10     all times, but we're happy to follow that protocol going

11     forward.

12          THE COURT:  This letter, even though we're still

13     having an hour conference, did seem to get everything to work

14     much more -- much better.  You each had your positions in the

15     same letter, not conflicting letters, etc., etc., etc.

16          MR. LYTTLE:  Your Honor, understood.

17          There is that one -- the feasibility study which I

18     think would help inform our final negotiations on scope, I

19     think it would be helpful if we could get.

20          THE COURT:  What is the feasibility --

21          MR. BLACKMAN:  Again this is sandbagging because one

22     of the things we've been negotiating about is the deal with the

23     scope issue on so-called misappropriated information by giving

24     them this feasibility study.  So that's part of a negotiation.

25     Now if you're going to order to produce it, that's not fair.

F269TINC

1          THE COURT:  When you agree to produce it, produce it

2     fast.  That's all I'll say.  If you don't agree because you

3     don't get whatever the countermaterial or promises, we'll deal

4     with it next time.

5          When do you all want to come back?

6          MR. BLACKMAN:  We've been doing this on a monthly,

7     more or less, basis.

8          THE COURT:  I'm happy to make it shorter.  I'm happy

9     to make it longer.  Obviously, I have a certain preference on

10     that but I want to make sure you're getting the judicial help

11     you need even if that help is just if you have a conference you

12     know you've got to resolve other things.

13          MR. BLACKMAN:  I would think in roughly four weeks.

14          MR. LYTTLE:  I propose three weeks, your Honor.

15     There's a lot of balls in the air.  I think as we're trying to

16     finalize the coding protocol.  And if we're not able to

17     finalize those disputes on scope with Vale, although we're

18     close, it's good to have one on the calendar.  I think it will

19     help move the parties along.

20          THE COURT:  If you like being my Friday at 2:00 in the

21     afternoon, we could do it on the 27th.  We could do it any

22     earlier day that week, which is a little less than your three

23     weeks at that point, or we can do it -- no we can't do it the

24     week of March 2.

25          MR. BLACKMAN:  I would say the 27th.

F269TINC

1    THE COURT:  All right.  27th at 2:00 work for

2 everyone?

3    MR. LYTTLE:  That's good for us, your Honor.

4    THE COURT:  Okay.  Usual drill.  Transcript purchased.

5 And I will see you in three weeks.  If for some miracle you

6 don't need the conference in three weeks I would not be

7 disappointed to get a letter the Wednesday of that week saying

8 can we push this two or three weeks, Judge, but it has to be a

9 unanimous mutual request.

10    Thank you all.  Usual drill with the purchasing of the

11 transcript.

12    (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25