# EXHIBIT A



Between

**THE REPUBLIC OF GUINEA**

**and**

**SIMFER S.A.**

**(A Rio Tinto group company)**

**and**

**RIO TINTO MINING & EXPLORATION LIMITED**

**(A Rio Tinto group company)**

---

**SETTLEMENT AGREEMENT**

---

**22 April 2011**

1

**SETTLEMENT AGREEMENT**

**Between**

**The Republic of Guinea,** represented by its Minister of Mines, duly authorised for the purpose hereof;

Hereinafter, the "**State**"

**and**

**Simfer S.A.**, a Rio Tinto Group company having its seat at Cité Chemin de Fer - Immeuble Kankan BP 848, Conakry, Republic of Guinea, incorporated with the RCCM of Conakry, under the number RCCM/GCKRY/0867A/2003, represented by Mr. Alan Davies, duly authorised for the purpose hereof,

Hereinafter "**Simfer**"

**and**

**Rio Tinto Mining & Exploration Limited**, a Rio Tinto Group company incorporated in England and having its registered office at 2 Eastbourne Terrace, London W2 6LG, represented by Mr Alan Davies, duly authorised for the purpose hereof,

Hereinafter "**RTME**"

The State and Simfer being hereinafter individually referred to as "**Party**" and collectively as "**Parties**"

**RECITALS:**

From 1997, the State, RTME and, once it was incorporated, Simfer began negotiations for a mining convention, which they initialled on 21 May 2002 and signed on 26 November 2002.

Pursuant to Articles 84 and 85 of the Guinean Mining Code (the ″**Mining Code**″), this Mining Convention (the "**Convention**") sets out the conditions under which the iron ore contained in the Simandou deposit can be explored, exploited, transported and exported (the "**Project**").

The Convention was ratified by a Law dated 3 February 2003 pursuant to Article 11 of the Mining Code, and provides that the four exploration permits granted in 1997 for Blocks I, II, III and IV over Mount Simandou, which were renewed in May 2000 and in October 2002 (the "**Exploration Permits**"), would be replaced by a mining concession to be granted to Simfer, with no relinquishment of area.

This mining concession (the "**Concession**") was granted by presidential decree on 30 March 2006 (the "**Decree**") over a surface area of 738 km² (the "**Mining Perimeter**"), pursuant to the Convention.

A presidential decree was issued on 28 July 2008 and notified to Simfer on 30 July 2008, ordering the withdrawal of the Concession (the "**Withdrawal Decree**") and stating that Simfer retained the rights of an exploration permit holder and would be granted a mining concession to mine iron ore at Simandou pursuant to the Mining Code.

The State, Simfer and RTME have been in disagreement leading up to and since that time. Numerous communications have been exchanged and exploration rights have been granted to RTME/Simfer and to third parties for sections of the Mining Perimeter.

These disagreements include disagreement over the following points:

o   Simfer and the State disagree over the legality of the manner in which the Concession was granted to Simfer in 2006, and the legality of its withdrawal in July 2008: (i) Simfer considers that it is entitled to the Concession to undertake exploration and mining activities within the entire Mining Perimeter, while (ii) the State considers that the Concession should be reduced by half its size, namely that it should cover slightly more than the area of Blocks III and IV, excluding most of the area of Blocks I and II.

o   On 19 March 2010, the Rio Tinto group made public the signature of an agreement between Rio Tinto Plc, Rio Tinto Iron Ore Atlantic Limited and Aluminium Corporation of China Limited ("**Chalco**") for the joint development of the Simandou Project and, accordingly, the progressive investment over time of Chalco in a joint venture with the Rio Tinto group to which the ninety-five per cent (95%) of Simfer's share capital currently held by the Rio Tinto group is to be transferred. The State considers that this agreement should have been approved in advance pursuant to Article 62 of the Mining Code whereas Simfer, given the agreement was a share transfer and not a transfer of mining titles and concerned non-Guinean companies, considers that Article 62 does not apply to the transaction.

o   In August 2010, the State expressed its intention to exercise its purchase option for a twenty per cent (20%) stake in the share capital of Simfer pursuant to Article 19 of the Convention. Further communications were then exchanged, particularly in December 2010,however, the State and Simfer were not able to agree on the price of the shares to be transferred.

o  On 4 August 2010, the Minister of Mines wrote to Simfer, stating that he would only allow Simfer teams access to the land located within the proposed railway route and port areas (the "**Corridor**") under certain conditions and that rights had been granted to third parties over the Corridor. Simfer considers that, pursuant to the Convention, it holds priority rights to all land located within the Corridor. The State and Simfer disagree over the granting of exclusive rights within the Corridor to third parties where these prevent Simfer from carrying out work necessary for construction and operation of the infrastructure required to transport and export iron ore from the Project.

o  On 29 December 2008, Simfer submitted a feasibility study to the State subject to the confirmation of its rights and to additional studies to be carried out. On 19 August 2010, Simfer submitted an addendum to the feasibility study of December 2008, in which, subject to the final confirmation of the mining rights, it concluded that the Project was feasible. Further communications were then exchanged between the State and Simfer, confirming their disagreement over a number of points relating, in particular, to the nature of the feasibility study and addendum lodged, contractual deadlines applicable to the Project and which party should bear responsibility for any delays affecting those deadlines.

It follows from the above that significant disagreements remain between the State and Simfer, which, if they were to continue, would be irreparably prejudicial to the Project and to the interests of the State the Rio Tinto group and the Guinean people.

For this reason, meetings have recently been held between representatives of the Parties, in which both Parties have expressed a wish to continue working together to bring the Project to completion within the scope of the Convention and with the common goal of promoting the economic and social development of Guinea and improving the quality of life of the Guinean population as a whole.

Therefore the Parties have decided to come together to sign this Settlement Agreement and thereby definitively settle all existing disputes between them, and all disputes which may arise between them in the future, related to events that occurred before the signature of this Settlement Agreement, relating to any of (i) the Convention; (ii) any mining title now or previously held by RTME or Simfer; or (iii) the Mining Code.  To accomplish this, the Parties therefore agree to the reciprocal concessions outlined below.

**THE PARTIES HAVE AGREED AS FOLLOWS**:

**1.     SIMFER'S CONCESSIONS**

**1.1    Perimeter of the Concession**

Subject to article 2.1, Simfer accepts, for the purposes of this Settlement Agreement, the reduction, pursuant to the wishes of the State, of the perimeter of the concession (the "**Perimeter of the Modified Concession**", as it is identified in the map appended hereto as Annexure 1) such that its new geographical coordinates are as follows.

| POINTS | NORTH LATITUDE | WEST LONGITUDE |
|--------|---------------|----------------|
| A | 8° 54'40" | 8° 57'00" |
| B | 8° 54'40" | 8° 52'00" |
| C | 8° 51'00" | 8° 52'00" |
| D | 8° 51'00" | 8° 51'00" |
| E | 8° 49'00" | 8° 51'00" |
| F | 8° 49'00" | 8° 50'00" |
| G | 8° 39'00" | 8° 50'00" |
| H | 8° 39'00" | 8° 52'00" |
| I | 8° 30'00" | 8° 52'00" |
| J | 8° 30'00" | 8° 51'00" |
| K | 8° 25'00" | 8° 51'00" |
| L | 8° 25'00" | 8° 55'00" |
| M | 8° 30'00" | 8° 55'00" |
| N | 8° 30'00" | 8° 56'00" |
| O | 8° 33'00" | 8° 56'00" |
| P | 8° 33'00" | 8° 58'00" |
| Q | 8° 35'00" | 8° 58'00" |
| R | 8° 35'00" | 8° 55'00" |
| S | 8° 41'00" | 8° 55'00" |
| T | 8° 41'00" | 8° 53'00" |
| U | 8° 49'00" | 8° 53'00" |
| V | 8° 49'00" | 8° 54'00" |
| W | 8° 50'00" | 8° 54'00" |
| X | 8° 50'00" | 8° 55'00" |

| Y | 8° 54'00" | 8° 55'00" |
| Z | 8° 54'00" | 8° 57'00" |

**1.2**   **First Commercial Production Date, Technical Studies and Investment Decision**

Simfer undertakes on each of the dates referred to below to submit additional information and studies to the State in such detail and form as, in Simfer' opinion, will allow it to achieve the Date of First Commercial Production referred to below:

- Within 30 days of the execution of this Settlement Agreement, and on the basis of Article 8.3 of the Convention, (i) additional geological, geophysical and drilling information to allow the State to better comprehend the reported reserves within the Perimeter of the Modified Concession; and (ii) a business plan indicating proposed development of that Perimeter of the Modified Concession, which has a draft implementation schedule/chronology of the different proposed development activities on the Perimeter of the Modified Concession, and development milestones ("**Additional Materials**");

- By 30 November 2011 additional technical information for the mine indicating progress achieved against the business plan referred to above and updating the Additional Materials; and

- By 30 September 2012, additional technical information for the principal infrastructure (rail and port) indicating progress achieved against the business plan referred to above and updating the Additional Materials. Early works commencement and long lead items for the principal infrastructure will proceed prior to this date where practical. Submission by this due date of technical studies in relation to principal infrastructure will remain dependant on the State providing unfettered access to the Corridor immediately upon signing of this Settlement Agreement, and in any event no later than 1 May 2011.

Simfer undertakes that the Date of First Commercial Production, as this term is defined in the Convention, shall occur before 30 June 2015. Simfer will make every reasonable effort to deliver initial mine production prior to 31 December 2014.

All dates in this Article 1.2 are subject to extension entitlements under the Convention, and to force majeure events and government action and failure to act having an evident impact on these dates, and will automatically extend by any period provided pursuant to those extension entitlements or by which those events and actions or failures to act delay achievement of these dates.

If Simfer fails to achieve the Date of First Commercial Production (as that date may be extended pursuant to the provisions of this Settlement Agreement) the Parties agree that the State's remedy will be to take termination action under Article 41.1.5 of the Convention (after formal notice has been given under that Article, and provided the default has not been cured within the relevant notice period in that notice) with the exclusion of the entitlement of the State to damages under Article 41.2.3 of the Convention.

In light of the provisions of this Article 1.2, Simfer will not be under any formal obligation

to make an Investment Decision under the Convention, but instead must make such investment decisions, within such times, as permit it to comply with the Date of First Commercial Production provisions of this Article 1.2.

**1.3**     **Railway and port for exporting the ore**

In accordance with Articles 17 and 35.1 of the Convention, Simfer agrees that the route of the railway shall be located entirely within Guinean territory, unless the State should confirm the availability of other options. Simfer will engage in extensive discussions with the State regarding the route with the full support and participation of the Rio Tinto Group, and of Chalco as a co-joint venturer.

**1.4**     **Participation of the State in the share capital of Simfer (and potential separation of mine and infrastructure)**

In order to settle the dispute existing between the Parties concerning the participation of the State in the Project, the Parties agree that the State shall have the right, by exercising the options referred to below, to acquire a participation interest in Simfer of up to 35%.

The State in acquiring its participation interest will be able to acquire the following types of shares in Simfer:

- (a) non-contributing shares, being shares carrying rights to dividends but to which no obligation to contribute to Simfer Costs (as defined below) attaches ("**Non-Contributing Shares**"); and

- (b) contributing shares, being ordinary shares carrying a right to dividends but also an obligation to contribute to Simfer Costs ("**Ordinary Contributing Shares**").

The Parties agree, for the avoidance of doubt that, whilst the State's participation by way of Ordinary Contributing Shares will be dilutable in the case of non contribution to Simfer Costs in accordance with the same dilution principles referred to below, the State's participation by way of Non-Contributing Shares will not be dilutable in any circumstance during the life of the Project.

Construction, maintenance and operation activities of the Project's rail and port infrastructure (the "**Infrastructure Activities**") shall be carried out by a special purpose vehicle (the "**SPV**") to be incorporated in Guinea following execution of this Settlement Agreement and held by the same shareholders as Simfer (save that current shareholders in Simfer that belong to the Rio Tinto Group may nominate another company or companies in the Rio Tinto group to be the foundation shareholders in this new company in their stead and in the proportions they nominate). The SPV shall carry out the Infrastructure Activities through an operator as referred to elsewhere in this Settlement Agreement, being initially Simfer and subsequently an operator appointed after international tender as referred to in clause 2.4.

Simfer shall following incorporation of the SPV carry out all the Project activities other than the Infrastructure Activities, namely the exploration, mining, production and related activities relating to Simandou iron ore location, identification, assessment and production (the "**Mining Activities**") in addition to acting as operator in relation to the Infrastructure Activities.

The options of the State to acquire shares in Simfer by way of participation interest as referred to above are as follows (exercisable by written notice to Simfer):

(i)     Upon and from the promulgation of the Concession Decree (as defined in Article 2.1) and the Consent Decree (as defined in Article 2.5), to acquire a 7.5% State participation interest in Simfer by way of Non-Contributing Shares, to be acquired for free;

(ii)    Upon and from the promulgation of the Concession Decree (as defined in Article 2.1) and the Consent Decree (as defined in Article 2.5), to acquire a further 10% State participation interest in Simfer by way of Ordinary Contributing Shares to be acquired at Historical Mining Cost (as defined below);

(iii)   Upon and from the fifth anniversary of the promulgation of the Concession Decree (as defined in Article 2.1), and the Consent Decree (as defined in Article 2.5) to acquire a further 7.5% State participation interest in Simfer by way of Non-Contributing Shares, to be acquired for free;

(iv)    At a time as agreed between the Parties, but not before the 15th anniversary of the promulgation of the Concession Decree (as defined in Article 2.1) and the Consent Decree (as defined in Article 2.5), to acquire a further 5% State participation interest in Simfer by way of Ordinary Contributing Shares to be acquired at market value as determined by an independent expert experienced in valuation of mining assets; and

(v)     At a time as agreed between the Parties but not before the 20th anniversary of the promulgation of the Concession Decree (as defined in Article 2.1) and the Consent Decree (as defined in Article 2.5), to acquire a further 5% State participation interest in Simfer by way of Ordinary Contributing Shares to be acquired at market value as determined by an independent expert experienced in valuation of mining assets.

The following provisions will apply to the participation interest of the shareholders in the SPV:

- The participation interest will be acquired by acquiring ordinary shares in the SPV carrying a right to dividends but also an obligation to contribute to the SPV Costs (as defined below) ("**SPV Ordinary Contributing Shares**");

- The SPV Ordinary Contributing Shares will be acquired at Historical Infrastructure Cost (as defined below);

- Each shareholder shall contribute its participation interest percentage of the costs of the SPV and will be entitled to its participation interest percentage of any dividends paid by the SPV;

- The State's participation interest in the SPV will vest on payment by the State its share of the Historical Infrastructure Costs;

- If a shareholder in the SPV does not contribute its share of SPV costs within 60 days of demand by the Infrastructure Operator (as defined below) then the other SPV shareholders will be entitled to contribute those costs pro rata in place of the non-contributing shareholder by subscribing for ordinary fully paid shares in the SPV and consequently diluting the participation interest of the non-contributing shareholder in the SPV.  To ensure dilution at the appropriate rate, the Parties agree that all shares issued at any time in the SPV will be ordinary shares of like nominal value and fully paid.  Each Party agrees and hereby commits to procure that any shareholder in the SPV under the control of that Party (and, in the case of the State, any holding company referred to below to which the State has transferred SPV shares) votes in favour of any increase in the capital of the SPV contemplated in this paragraph, and hereby waives, it rights to subscribe for shares in the context of any such increase.

- Where a shareholder has failed to contribute to costs of the SPV and has been notified of dilution on account of that non-contribution by Simfer or the SPV, it shall lose the ability to contribute those costs and consequently lose the ability to redeem participation interest lost as a consequence of dilution;

- Where dilution of a shareholding has occurred, the participation interest percentage of such shareholder from time to time will constitute the percentage of costs of the SPV to which such shareholder must contribute and the percentage of any dividends of the SPV to which such shareholder will be entitled;

- The State may within three months of the date of the Election introduce other parties ,agreed to by Simfer, to hold nominated portions of its participation interest in the SPV in place of the State and upon that agreement the State will establish a holding company, transfer its SPV Ordinary Contributing Shares to that holding company, and have those nominated parties ("**Introduced SPV Shareholders**") hold their interest by holding shares in that holding company;

- For the purposes of this Article 1.4, the holding company will be treated as the State, such that the provisions of this Article 1.4 relevantly applying to the State will apply to that holding company and the non-contribution to costs of the SPV will result in dilution of that holding company's interest in the SPV in accordance with the provisions of this Article 1.4;and

- For the period until transfer of the infrastructure to the State under Article 2.4, and thereafter if reappointed following international tender as referred to in that article ,Simfer or its nominee or nominees within the Rio Tinto Group (collectively the "**Infrastructure Operator**") will manage all the Infrastructure Activities and operate the Project Infrastructure (as defined in Article 2.4), and accordingly manage all the activities of the SPV, on terms consistent with international standards as notified by the Infrastructure Operator to the Parties.

All shares in Simfer or the SPV acquired by the State under the separate entitlements of the State in relation to each of Simfer and the SPV under this Article 1.4, shall, in all respects other than as provided for in this Article 1.4, carry the same rights and obligations as the ordinary shares of Simfer or the SPV.  For the purposes of calculating

the number of shares to be acquired by the State pursuant to the separate entitlements of the State in relation to each of Simfer and the SPV under this Article 1.4, all shares of Simfer or the SPV shall be treated as if of the same class so that any percentage participation interest of the State referred to in this Article 1.4 shall equate to that number of shares as gives the State like percentage of all the issued share capital of Simfer or the SPV.

Compliance with its obligations under this Article 1.4 will constitute Simfer's and the SPV's compliance in full with any current or subsequent requirement in relation to State participation in the Project, whether any such requirement is contained in any new Mining Code or any amendments to the current Mining Code or arises in any other way.

The Parties agree that this State participation will additionally occur on the following bases:

- Where acquisition of shares at "**Historical Mining Cost**" means at the proportionate percentage of all costs of and investments made by Simfer and/or any other entity of the Rio Tinto Group, to the point of acquisition by the State of relevant shares in Simfer, relating to any Mining Activities and the resource base within Blocks III and IV (and any additional area now to be included within the Perimeter of the Modified Concession referred to in Article 1.1). For this purpose "proportionate percentage" means the percentage the relevant shares constitute of all the issued share capital of Simfer other than Non-Contributing Shares;

- Where acquisition of shares at "**Historical Infrastructure Cost**" means at the proportionate percentage of all costs of and investments made by Simfer, and/or any other entity of the Rio Tinto Group, to the point of acquisition by the State of relevant shares in SPV, relating to any Infrastructure Activities within or relevant to Blocks III and IV (and any additional area now to be included within the Perimeter of the Modified Concession referred to in Article 1.1) or transport and export of production therefrom.  For this purpose "proportionate percentage" means the percentage the relevant shares constitute of all the issued share capital of the SPV;

- The direct or indirect transfer of any State participation in Simfer or in the SPV is subject to the following provisions relative to pre-emption rights and must in any case result from a decision by the State to list all or a part of its mining assets on a recognized stock market.

- Simfer's shareholders other than the State ("**Non-State Simfer Shareholders**") will retain a pre-emptive right, in accordance with the following principles: (i) the State will be entitled to transfer, any shares or interest it holds in Simfer to a wholly State owned entity that agrees to be bound (in a way that is enforceable by the Non-State Simfer Shareholders) by these pre-emptive provisions without any right of pre-emption by the Non-State Simfer Shareholders; (ii) if the State as direct or indirect holder of the shares in Simfer wishes to directly or indirectly transfer them, or any interest in them to a third party (other than by way of public float or by trading them on a recognised stock exchange) and the proposed transferee is not wholly owned by the State, the State must first give the Non-State Simfer Shareholders the right to acquire those shares on equivalent terms to the terms proposed to apply to the transfer to the third party and the State may only transfer those shares or that interest to the third party in the event that the Non-State Simfer Shareholders do not

elect to take transfer of those shares or that interest themselves; (iii) the State as direct or indirect holder of the shares may transfer the shares or an interest therein, directly or indirectly, by way of public float, but only if it has first offered those shares or that interest to the Non-State Simfer Shareholders at market value as determined by an appropriately qualified independent expert and the Non-State Simfer Shareholders have elected not to take transfer of those shares or that interest themselves; and (iv) the State as direct or indirect holder of the shares in Simfer may transfer those shares or an interest therein ,directly or indirectly, by trading them or the shares of a direct or indirect holding company on a recognised stock exchange, but only if it has first offered those shares or that interest to the Non-State Simfer Shareholders at market value as determined by an appropriately qualified independent expert and the Non-State Simfer Shareholders have elected not to take transfer of those shares or that interest themselves;

- SPV's shareholders other than the State and the Introduced SPV Shareholders ("**Non-State SPV Shareholders**") will retain a pre-emptive right, in accordance with the following principles:(i) for the purposes of this provision introduction of the Introduced SPV Shareholders will not attract pre-emption rights but any direct or indirect transfer by the Introduced SPV Shareholders of their (indirect) interest in the SPV will require prior approval of Simfer (not to be unreasonably withheld or delayed) and if that consent is given will be treated as a transfer by the State attracting the pre-emptive provisions of this clause; (ii) the State must procure that the Introduced SPV Shareholders agree to the restrictions in this provision in a way that is enforceable by the Non-State SPV Shareholders; (iii) the State will be entitled to transfer, any shares or interest it directly or indirectly holds in SPV to a wholly State owned entity that agrees (in a way that is enforceable by the Non-State SPV Shareholders) to be bound by these pre-emptive provisions without any right of pre-emption by the Non-State SPV Shareholders; (iv) if the State as direct or indirect holder of the shares in SPV wishes to directly or indirectly transfer them, or any interest in them to a third party (other than by way of public float or by trading them on a recognised stock exchange) and the proposed transferee is not wholly owned by the State, the State must first give to the Non-State SPV Shareholders the right to acquire those shares on equivalent terms to the terms proposed to apply to the transfer to the third party and the State may only transfer those shares or that interest to the third party in the event that the Non-State SPV Shareholders to not elect to take transfer of those shares or that interest themselves; (v) the State as direct or indirect holder of the shares in SPV may transfer the shares or an interest therein, directly or indirectly, by way of public float, but only if it has first offered those shares or that interest to the Non-State SPV Shareholders at market value as determined by an appropriately qualified independent expert and the Non-State SPV Shareholders have elected not to take transfer of those shares or that interest themselves; and (vi) the State as direct or indirect holder of the shares in SPV may transfer those shares or an interest therein, directly or indirectly, by trading them or trading the shares of a direct or indirect holding company on a recognised stock exchange, but only if it has first offered those shares or that interest to the Non-State SPV Shareholders at market value as determined by an appropriately qualified independent expert and the Non-State SPV Shareholders have elected not to take transfer of those shares or that interest; All director appointments to the boards of either Simfer of the SPV appointed at the instance of or to represent the State or any assignees or ultimate holders of interest that once was the State's shall be filled by

individuals who are and continue to serve as State officials unless otherwise agreed between the Parties;

- Where if participation interest is by way of Ordinary Contributing Shares those shares will carry liability for the State for the proportion of Simfer's costs the number of those shares bears to all shares of Simfer on issue other than Non-Contributing Shares. For this purpose Simfer costs are all costs of Simfer being all costs relating to the Mining Activities incurred or accruing following acquisition ("**Simfer Costs**"); and

- Where if participation interest is by way of SPV Ordinary Contributing Shares, those shares will carry liability for the State for the proportion of SPV's costs the number of those shares bears to all shares of SPV on issue. For this purpose "SPV costs" are all costs of SPV being all costs relating to Infrastructure Activities incurred or accruing following acquisition ("**SPV Costs**").

The Parties agree that (a) the options set forth above shall supersede and replace the State's option pursuant to Article 19 of the Convention, to acquire a 20% interest in the share capital of Simfer; (b) the State will accordingly be entitled to exercise the options set forth above in place of any nominated or actual exercise by it historically of its original option to acquire a 20% interest in the share capital of Simfer; and (c) Article 19 of the Convention will be amended so that it is consistent with the provisions of this Article 1.4.]

The State or the State Mining Company shall be entitled to buy and market a quantity of iron ore up to its participation in the share capital of Simfer at FOB market price for delivery FOB, Simfer having a right of pre-emption over any on-sale to any third party at the same conditions.

### 1.5    Settlement Sum

Simfer hereby agrees to pay to the State a  final settlement sum in an amount of seven hundred million US Dollars (US$700,000,000) (inclusive of all fees, duties, taxes and other charges of any kind applicable in the State to payment of that sum) (the "**Settlement Sum**").

It is understood that the State, as a shareholder of Simfer, will not contribute to the payment of the Settlements Sum.

The State agrees that any funding required by Simfer (equity or debt funding) to pay the Settlement Sum will be fully free of any fee, duty, taxes and other charges of any kind.

This Settlement Sum shall be paid to the account of the Guinean Public Treasury by payment by wire transfer to a certified account number of seven hundred million US Dollars (US$700,000,000) within three (3) business days of the date by which both the Concession Decree (as defined below in Article 2.1) and the Consent Decree (as defined below in Article 2.5) have been promulgated.

The Parties hereby agree that the Settlement Sum will be tax deductible even though it will be capitalised in the accounts of Simfer on the basis that it, amongst other things, is paid on account of confirmation of exclusive rights to mine.

If any of the following actions ("**Actions**") occur, the Settlement Sum will become immediately repayable in full (without prejudice to any other rights of Simfer):

- In the case of expropriation in whole or part, or government action having the substantive effect of an expropriation in whole or in part;

- In the case of annulment of the Concession Decree or the Consent Decree, or the Convention as amended by this Settlement Agreement, or a measure equivalent to such annulment, or failure by the State to comply with its undertaking in Article 5 to procure relevant amendments to the Convention and ratification of those amendments or its undertaking to procure relevant compliance with additional requirements of Guinean law under Article 11.2, or its failure to give full effect to, or to continue to give full effect to, any material term of any of the Concession Decree or the Consent Decree or the Convention as amended by this Settlement Agreement; and

- In the case of any State action that materially alters the economic balance of the Project established by the Convention and this Settlement Deed to the prejudice of Simfer or the SPV, or fails to recognise provisions of either and doing so results in material detriment to Simfer or the SPV.

However, the Settlement Sum shall not be repayable where the Actions referred to above are pursuant to and in full conformity with the provisions of the Convention relating to default and the rights and entitlements of the State and Simfer thereunder in the circumstances of such default.  Except where it is expressly entitled under the Convention to do so as a consequence of default by Simfer, the State undertakes not to take any of the above Actions, nor to permit them to occur.

## 2.    THE STATE'S CONCESSIONS

### 2.1    The Concession Decree and the Perimeter of the Concession

The State accepts the Perimeter of the Modified Concession without further formality, report or other action of Simfer.

The reduction of the perimeter of the concession shall be effective on the date of the enactment of the decree (the "**Concession Decree**") granting to Simfer a mining concession (the "**Modified Concession**") for the exploration and exploitation of iron ore within the Perimeter of the Modified Concession.

The State hereby undertakes to procure promulgation of the Concession Decree promptly following signature of this Settlement Agreement.  The State confirms that the Modified Concession granted under the Concession Decree replaces the mining concession described in Article 4 of the Convention and restores to Simfer all mining rights as set out in the Convention and Articles 84 and 85 of the Mining Code.

The Parties may agree to include further area within the area originally described in Article 4 of the Convention, or an interest therein, within the Modified Concession, or that it otherwise constitute an interest additional to the Modified Concession.  In that event this further area or interest will, in the absence of agreement to the contrary, be governed by the Convention on the same basis as the Modified Concession.

The State further confirms that the Perimeter of the Modified Concession shall (subject to expansion by agreement as referred to above) correspond to the southern part of Mount Simandou situated in the Prefectures of Beyla, Macenta and Kérouané, over a distance of fifty five kilometres (55 km) and having a total surface area of three hundred and sixty nine square kilometres (369 km$^2$).

The State, in the interests of the Parties and to avoid any breach of the mining rights granted to Simfer, agrees to extend Simfer's existing rights as confirmed by the letter of the Minister of Mines dated 23 February 2011 until the date of enactment of the Concession Decree, including by not determining the application referred to in that letter before enactment of the Concession Decree.

**2.2     Feasibility Report**

Following the concession application lodged by Simfer on 22 February 2011 and additional meetings, explanations and information given by Simfer to the State at the latter's request since that time, the State notes that Simfer has performed exploration works of sufficient importance to prove (i) the existence of commercially exploitable deposits located within the perimeter of the exploration permits over Blocks III and IV of Mount Simandou as provided for by Articles 8 of the Convention and 43 of the Mining Code and (ii) that the exploitation of these deposits requires works and investments of very significant importance. Accordingly, on this basis and in reference to both the provisions of the Mining Code and of the Convention, the Minister of Mines has recommended the delivery of the Modified Concession to be granted by the Concession Decree.

In addition, all the documents and other information mentioned in the previous paragraph are deemed to constitute the Feasibility Report referred to in Articles 5.3 and 8.3 of the Convention.

**2.3     Railway and port for export of mineral ore**

Pursuant to Articles 17 and 35.1 of the Convention, the State agrees that the lands intended for the railway and port shall be situated within the Corridor identified by Simfer as operator, taking into consideration the discussions mentioned in Article 1.3 (the "**Infrastructure Corridor Proposal**"), and approved in writing by the State within 60 days of the date of the submission of the proposal by Simfer as operator and shall be reserved to the SPV for the realization and the exploitation of the infrastructures.   For the avoidance of doubt, the Parties hereby acknowledge and agree that the State will approve the Infrastructure Corridor Proposal but may require, as a condition for approval, amendments to it, consistent with this Settlement Agreement and the Convention, that do not substantially affect the Corridor and Port location and that are capable of being promptly accommodated at reasonable cost.   In the event of any delay to the State approval of the Infrastructure Corridor Proposal submitted by Simfer as operator, or any delay not caused by Simfer as operator, in relocation of persons for the purposes of infrastructure realisation and exploitation, the Date of First Commercial Production shall, without prejudice to any of the other provisions of Article 1.2 relating to extension of time, be extended by at least the same number of days as the delay in provision of State approval or delay in relocation.

Pursuant to Articles 2.3, 17 and 35.1 of the Convention, the State undertakes to ensure Simfer as operator, free access to and the right to occupy and use all lands necessary for

Simfer, for the rapid finalisation of its studies with a view to the development of the railway and port, along Simfer's chosen rail alignment and at Simfer's chosen port site, and including by doing all things necessary to confirm and facilitate construction and operation at and along Simfer's chosen port site and rail alignment.

In particular, the State agrees that Simfer's, as operator, technical teams shall be authorized, from the signature of this Settlement Agreement and in any event no later than 1 May 2011, to have unfettered access to all of the lands that could be used or necessary for the purpose of the planning, construction or exploitation of the infrastructure sites. The State further undertakes to mobilize all local government departments and authorities to facilitate the completion by Simfer, as operator, in conformity with applicable regulations, of its studies and the reception of its teams and to expedite consideration and grant of all permits and approvals necessary for rail and port study                                   and                                   development.

**2.4**    **Use and transfer arrangements in relation to infrastructure**

The Parties acknowledge and agree that:

- the rail and port infrastructure developed for the purposes of the Project (the "**Project Infrastructure**") must be transferred to the State free of charge once the costs of the Project Infrastructure have been fully amortised ;

- the amortisation period shall be at least 25 years but shall not exceed 30 years;

- Simfer must within 30 days of completion of its studies following obtaining Corridor access provide to the State a schedule estimating the total cost of the Project Infrastructure and indicating its best estimate of amortisation of the cost of the Project infrastructure and when the cost thereof will amortise to zero. The Parties agree that amortisation will be according to a schedule that amortises cost over at least 25 years and in accordance with the requirements of financiers;

- Simfer will be operator of the Project Infrastructure (and conduct the Infrastructure Activities) whilst they are held by the SPV. On transfer of the Project Infrastructure to the State, the State will be entitled to tender internationally for management of the Infrastructure Activities with a view to appointing a party to manage those in place of Simfer. In that case only companies of international repute in managing like infrastructure will be invited to tender, Simfer will be one of the parties invited to tender and if the most suitable tenderer will be reappointed to manage the Infrastructure Activities. The choice of the operator and the conditions of the management of the infrastructure shall be in conformity with generally accepted international principles ;

- the rail infrastructure must be multi-user in that it must be available for a dedicated passenger  service and it may be made available to third party minerals producers (each a "**Producer**") in accordance with the provisions of Annexure 2;

- An SPV will be created between the State holding 51% and the other shareholders in Simfer holding 49%, it being understood  that each of the parties shall pay its proportionate share in the capital; and

- The SPV will decide upon the award of construction contracts. The SPV will request that Simfer develop the specifications for the tenders awarding the construction contracts. And the SPV will hold free, open and extended tenders in accordance with Simfer's specifications with a view to meeting the Date of First Commercial Production.

The Parties hereby agree that the following principles shall apply to the SPV:

- That the Infrastructure Activities and Mining Activities will henceforth be separated with Simfer undertaking the Mining Activities and the SPV undertaking the Infrastructure Activities (through an operator as referred to above);

- That no impost, levy, tax, duty, excise of other payment of any kind will be imposed on incorporation of the SPV (other than usual nominal costs of incorporation of a company in Guinea) or in respect of the Infrastructure Activities being transferred to the SPV;

- That it will co-operate in giving effect to the creation of the SPV in a cost effective manner;

- That all relevant provisions of Annexure 2 will apply to the SPV and to Infrastructure Activities generally;

- That the benefit of the relevant provisions of the Convention (as amended by this Settlement Agreement) is and shall be extended to the SPV as if it was a party to the Convention; and

- That the State will promptly take all steps that may be necessary to give full effect to these provisions including all steps necessary to formally amend the Convention to reflect these provisions and to have that amendment ratified so that it is of equal force to the other provisions of the Convention.

It is acknowledged that Article 2.4 and Annexure 2 will additionally apply to the SPV (to the exclusion of the provisions of Article 1.4 where and to the extent inconsistent with those provisions.).

In addition, the State agrees and as needed, that Article 62 of Mining Code only has application to mining titles and the rights and obligations arising out of those and has no application to other matters such as infrastructure. However the parties will keep each other informed of any proposed changes to the partnership prior to proceeding with such a transaction.

**2.5    Transfer of shares to Chalco**

The Minister of Mines expressly approves all terms and conditions of the agreements signed by Rio Tinto and Chalco and, as a result, the transfer to Simfer Jersey Limited of shares in Simfer held currently by the entities of the Rio Tinto Group, as well as participation by Chalco in the capital of Simfer Jersey Limited.

This consent shall be confirmed by decree as referred to in Article 62 of the Mining Code (the "**Consent Decree**"), which the State hereby undertakes to procure is promulgated promptly after signature of this Settlement Agreement.

The State confirms that transfer to Simfer Jersey Limited of shares held by the entities of the Rio Tinto Group, and transfer of historic funding of Simfer to Simfer Jersey Limited, as well as all future participation by Chalco in the capital of Simfer Jersey Limited, will be fully free of any fees, duties, taxes and other charges of any kind.

**2.6     Tax and Accounting Annex to the Convention**

The State hereby approves as the Tax portion of the Tax and Accounting Annex to the Convention, the document annexed to this Settlement Agreement as Annexure 3.

The tax and customs provisions as currently set out in the Convention and in the attached Tax and Accounting Annex, as varied by this Settlement Agreement where applicable, are hereby confirmed and stabilised as provided for in the Convention.

The following provisions are agreed:

- Maintenance of the "impôt minimum forfaitaire" exemption and income tax holiday period of 8 years as from the first year of taxable profit ;

- Tax and withholding tax exemption on dividends and on any other income distributed to shareholders;

- Other than customs duty on imported equipment/goods necessary for mining operations, VAT and customs duty exemption (for the avoidance of doubt, the State agreeing that imports for infrastructure construction and maintenance are exempt from VAT and from customs duty); and

- A royalty/mining tax rate of 3.5% on FOB price for all exported ore (or such lower rate as legislated by applicable laws).

The State also agrees to incorporate a general rate of income tax for Simfer of 30 percent (or such lower rate legislated by general Guinean income tax laws) following the cessation of the tax holiday period.

**3.     NEW MINING CODE**

Simfer notes the preparation by the State of a new Mining Code, and notes that the provisions of the Convention, in particular articles 9, 30, 33 and 44 thereof, establish the latter's priority over other Guinean laws, which the State recognizes.

However, Simfer agrees to meet with the State to explore the insertion of some of the provisions of the new Mining Code regarding Human Rights and Environment, the Parties nonetheless hereby agreeing that the provisions of the Convention as amended by this Settlement Agreement are fixed (including for clarity as those relate to State participation and fiscal matters) absent further agreement between the Parties, and absent that agreement will remain unaffected by future inconsistent amendments to the Mining Code, or inconsistent replacement mining provisions, or other inconsistent current or future laws.

4.     **CONFIDENTIALITY**

The Parties agree, in their respective interests, that the terms of this Settlement Agreement shall remain strictly confidential (subject to legal and stock market disclosure obligations).

5.     **AMENDMENT TO THE CONVENTION AND STABILISATION**

In the event of any inconsistency between the terms of the Convention and the terms of this Settlement Agreement, the terms of this Settlement Agreement shall prevail to the extent                              of                         the                              inconsistency.

Where this Settlement Agreement provides expressly or impliedly for, or expressly or impliedly assumes, that amendment to the Convention will be necessary, and where in order for that amendment to be effective it is necessary to have the Convention formally amended and the amendment ratified, this Settlement Agreement will be deemed an undertaking by the State to promptly procure that formal amendment and ratification.

In accordance with Article 46 of the Convention, the Parties agree to promptly negotiate and conclude any necessary amendment to the Convention resulting from this Settlement Agreement.  The State confirms that during the parliamentary recess, such amendment may be validly ratified by Guinean institutions that are competent pursuant to the Guinean Constitution.

The Parties further agree that the provisions of this Settlement Agreement together with the Convention as amended by this Settlement Agreement (and including the stabilisation provisions within the Convention) are fixed and will not be diminished, amplified, abrogated or otherwise varied by any term of the Concession Decree or otherwise, and further that there will be no requirement within the terms of the Concession Decree nor otherwise that requires renegotiation of the terms of this Settlement Agreement or of the Convention as amended by this Settlement Agreement.

6.     **FINAL SETTLEMENT**

This Settlement Agreement, as of the date of its signature, but in the case of any right against the State subject to continued good faith implementation by the State of its undertaking in Article 5 to procure relevant amendments to the Convention and their ratification, and to its undertaking to procure compliance with any other requirement of Guinean law for the efficacy of this Settlement Agreement as referred to in Article 11.2:

- Resolves all disputes that have arisen between the Parties or that may arise between them related to events that occurred before signature with respect to the Convention and/or the Mining Code; and

- Cures all defaults as may exist as of the date of its signature of Simfer or of any Rio Tinto or Chalco group company in relation to the Convention and/or the Mining Code or as relate to the Modified Concession or any predecessor title of Simfer or RTME (such that those defaults will no longer exist and no fine, impost, tax, penalty or other payment of any kind will be imposed on account of any such

defaults, and no action of any kind will be taken relating in any way to any such defaults).

## 7.   APPLICABLE LAW AND DISPUTE RESOLUTION

The law applicable to the present Settlement Agreement is that set out in Article 42.3 of the Convention, subject to its conformity with the principles of international law which principles shall apply in cases of inconsistency.

The Parties hereby agree that any dispute arising out of or relating to this Settlement Agreement will be finally settled by arbitration as provided for in Annexure 4.

The Parties hereby agree that Article 42.2 of the Convention is replaced with the provisions provided for in Annexure 4 (adapted as necessary for context) and that Annexure 4 (adapted as necessary for context) will also govern the resolution of all disputes between the Parties arising under or in connection with the Convention.

## 8.   RES JUDICATA AUTHORITY

This Settlement Agreement has, pursuant to Article 1085 of the Guinean Civil Code, the authority of *res judicata* as between the Parties.

## 9.   CAPACITY OF RTME

Without diminishing the rights of Simfer to enforce the provisions of this Settlement Agreement, RTME will be additionally entitled to enforce this Settlement Agreement for and on behalf of Simfer or in order to protect the interests of Simfer's direct or indirect shareholders, or in a case where any shares in Simfer are expropriated, the interests of the former shareholders of those expropriated shares (the State hereby agreeing that it will not expropriate any of the shares in Simfer, nor take any action that has like effect to expropriation of shares in Simfer).

## 10.   PROJECT STANDARDS

The Parties affirm their desire that the Project be developed in accordance with international best practice in commercial governance, ethical conduct in business, and transparency, and agree to comply with all applicable international and local laws in relation to these matters as well as the principles incorporated in the below:

- Rio Tinto's general policy document, 'The Way We Work';

- the '"Equator Principles"';

- IFC's 'Performance Standards on Social & Environmental Sustainability';

- 'The "Voluntary Principles on Security & Human Rights"';

- the World Economic Forum 'Partnering Against Corruption Principles for Countering Bribery'; and

- Transparency International's 'Business Principles for Countering Bribery'.

In addition, the State represents and warrants, in connection with the transactions contemplated by this Settlement Agreement, that neither it nor any of its officials, agents, representatives, affiliates or any other person acting on its behalf shall take any action, directly or indirectly, that would constitute a violation of any anti-bribery or anti-corruption law, convention or regulation of the Republic of Guinea, and that no portion of any consideration received pursuant to this Settlement Agreement from Simfer and/or RTME, including but not limited to Simfer's concessions set forth in subsections 1.3, 1.4, and 1.5, shall be transferred to or for or converted in any manner for the direct or indirect benefit of any government official of the Republic of Guinea. The State further represents and warrants that, in connection with the transactions contemplated in this Settlement Agreement, it will uphold and implement in all respects the Principles and Criteria of the Extractive Industries Transparency Initiative (EITI), including but not limited to submission of any consideration received pursuant to this Settlement Agreement from Simfer and/or RTME, including but not limited to Simfer's concessions set forth in subsections 1.3, 1.4, and 1.5, to a credible, independent audit, applying international auditing standards, and reconciliation of payments and revenues by a credible, independent administrator, applying international auditing standards and with publication of the administrator's opinion regarding that reconciliation including discrepancies, should any be identified.

The Rio Tinto Group and the Chalco Group support maintenance of the highest safety standards in their operations, treating all their employees and contractors, as well as the communities within which they operate, with dignity and respect; and taking measures to promote the health, education and welfare of their employees. More broadly both those groups are committed to acting in a socially responsible manner as developer of a nationally significant project of great importance to the welfare of the Guinean people.

## 11.    DECLARATIONS AND GUARANTEES

### 11.1    Simfer's and RTME's Declarations and Guarantees

Simfer and RTME represent and warrant that they have the capacity necessary to conclude this Settlement Agreement and agree on its content and have received to this end all required authorizations and agreements required by the internal rules of the Rio Tinto Group.
Simfer represents and warrants that it has at its disposal all human and financial resources necessary for the execution of this Settlement Agreement.

### 11.2    The State's Declarations and Guarantees

The State, through the Minister of Mines, represents and warrants that the Minister of Mines has the necessary authority to conclude this Settlement Agreement in the name and on behalf of the State; and that this Settlement Agreement conforms to applicable Guinean law, in particular as it authorizes legal entities under public law, including the State, to agree and compromise regarding the subject matter of this Settlement Agreement. If there are any additional requirements of Guinean law for any term of this Settlement Agreement to have full effect, such as without limitation a requirement for an order of the Minister of Finance in order to confirm fiscal provisions in this Settlement Agreement, the State undertakes to promptly procure that those requirements are satisfied.

**11.3    Effective Date**

This Settlement Agreement is legally binding on the State, Simfer and RTME immediately upon and from its execution.

Done in Conakry, on 22 April 2011 in three original copies.

| **For The Republic of Guinea** | **For** SIMFER S.A. | **For Rio Tinto Mining & Exploration Limited** |
|---|---|---|
| His Excellency Mohamed Lamine Fofana, Minister of Mines | Alan Davies | Alan Davies |
| Read and approved by:<br><br>His Excellency Mohamed DIARÉ<br><br>Minister Delegate of the Budget | | |

**Annexure 1**

[Map of Perimeter of Modified Concession]

**Annexure 2**

Further to Articles 1.4 and 2.4 the basis upon which the Project Infrastructure shall be used, operated and transferred by the SPV is set out below, including but not limited to where Simfer has elected to implement one or more BOT arrangement(s):

- Funding prior to transfer of the Project Infrastructure to the State following amortisation will be by debt and equity in the percentages determined by Simfer and, in the case of a BOT arrangement,  the Project Infrastructure will be financed, constructed, and maintained through the SPV.  Following transfer to the State funding will be as determined by the State and will be the sole liability of the State.

- Simfer to the extent that the State holds a minority interest in the SPV and otherwise at Simfer's election will be responsible with the support of the Rio Tinto Group and Chalco as its co-joint venturer for seeking project financing and, if project financing is obtained, the Parties agree to co-operate with the relevant banks involved with a view to finalising the arrangement on terms consistent with those accepted (at that point in time) in international project financing of mega infrastructure projects.

- As the foundation customer, Simfer shall have absolute priority of use of all the Project Infrastructure for the transportation and export of its products, both before and after transfer of the Project Infrastructure to the State.

- Capacity expansions of the Project Infrastructure prior to transfer of the Project Infrastructure to the State (including as to whether those expansions occur) will be as determined by Simfer.  Following transfer of the Project Infrastructure to the State, the State will determine capacity expansions which will (as with all SPV expenses and expenses of Infrastructure Activities) be at the cost of the State but Simfer may elect if the State does not wish to proceed with such an expansion to fund that expansion itself and be entitled to return of its funding costs plus a reasonable margin by way of credit against tariff charges until those costs and margin have been fully repaid.

- Subject to Simfer's rights of priority use, and only in the event there is excess capacity in the railway comprised in the Project Infrastructure, the operator(s) (which will initially  be Simfer but subsequently will be as determined by international tender as referred to in Article 2.4) may negotiate individually with other Producers, on a case-by-case basis, for the use of that excess capacity.  Service may be on a "hook and pull" basis whereby the rail user delivers loaded ore cars to the operator for haulage on its railway.

- The operator will not be required to enter into arrangements with different Producers on the same terms and conditions.  All arrangements with other Producers shall be subject to (a) continuing capacity in excess of Simfer's needs, including where Simfer's production increases, and (b) the ability to maintain operational efficiencies and performance in the Project Infrastructure for Simfer's purposes, including by expanding the relevant infrastructure to meet Simfer's production increases on terms and conditions which are acceptable to Simfer  and any project financiers without either increasing the cost of such expansions or reducing or adversely affecting the operational capacity of the Project Infrastructure to meet, or its efficiency in meeting, Simfer's needs.

24

- Other than Simfer and any subsequent operator appointed under Article 2.4, third parties will not be allowed control or operating rights in relation to the Project Infrastructure.

- For so long as Simfer remains operator, the operator shall be entitled to levy user charges calculated to recover the amount of maintenance, operational and finance costs, as well as a return on capital as reasonably determined by Simfer in conjunction with relevant banks providing project financing recognising that the charges levied for passenger services will be different to those that may be individually negotiated with any Producers.  The benefit of such charges may be transferred to Simfer, and/or the SPV, and/or any financiers in accordance with the arrangements entered into with those parties.

- Following transfer of the Project Infrastructure to the State, Simfer will be charged user charges for access to and use of the Project Infrastructure that reflects Simfer's status as the foundation user as agreed between the Parties. In default of agreement and pending agreement, Simfer will be charged a provisional tariff that in any event cannot be higher than represents an internal rate of return of 7%.

- Any BOT arrangement will be developed in conformity with Law L/97/012/AN and the State will procure approval of all BOT contracts by Decree of the Council of Ministers and seek ratification of them by the Parliament as necessary where they are in conformity with that law.]

- The SPV and all BOT contractors as the investor pursuant to the BOT contract will automatically benefit from at least the guarantees granted by the general regime of the Investment Code (Order no. 001/PRG/87 of 3 January 1987) and may apply to benefit from one or more special regimes recognized by this Code.  As investments made in rail and port infrastructure projects are deemed to be a priority for the national economy and public interest, it will also benefit from the preferential tax and customs regime provided by article 9.6 of the Law L/97/012/AN.  In addition, the State will procure approval of the BOT contract with provisions providing full income taxes, customs duties and VAT exemptions to the investor.

- The SPV and all BOT contractors will be entitled to convention protections at least equal to those provided by the Convention, save where inconsistent with the provisions of Law L/97/012/AN, and to additional convention protections as provided for in Law L/97/012/AN, and the Parties will co-operate to procure this.

- The State will agree to all reasonable changes in structure of the SPV and in the BOT arrangements from those reflected in this Annexure 2 where Simfer or the SPV seeks to make those changes in order to conform with any of the laws referred to in this Annexure 2 or in order that relevant BOT arrangements or the SPV or Simfer qualify for benefits provided for under any of those laws.

The Parties recognise that any BOT arrangement and the other provisions of this Settlement Agreement in relation to Infrastructure Activities will require detailed contractual arrangements and the Parties agree to co-operate in finalising those contractual arrangements on reasonable commercial terms but consistent with the above provisions, Article 10 of this Settlement Agreement, and the requirements of any project financiers as promptly as possible and in any event by no later than the 1st January 2013, unless extended by the Parties.

**Annexure 3**

[Tax portion of Tax and Accounting Annex]

**Annexure 4**

- The State (for the purposes of this Annexure 4, the "**Host State**") and Simfer and RTME (for the purposes of this Annexure 4, each and together the "**Investor**") hereby consent to submit to the International Centre for Settlement of Investment Disputes (the "**Centre**") any dispute arising out of or relating to this Settlement Agreement and/or the Convention for settlement by arbitration pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**").

- It is hereby agreed that, although Simfer is a national of the Host State, it is majority controlled by nationals of other contracting States other than the Host State and shall be treated as a national of another contracting States for the purposes of the ICSID Convention.

- Hearings in an arbitration conducted pursuant to this Annexure 4 shall be in Paris.

- The language of any arbitration pursuant to this Annexure 4 shall be French.

- Without prejudice to the power of the Arbitral Tribunal constituted under the above provisions to recommend provisional measures, any Party may request any judicial or other authority to order any provisional or conservatory measure, including attachment, prior to the institution of the arbitration proceeding, or during the proceeding, for the preservation of its rights and interests.

- The Host State hereby waives any right of sovereign immunity as to it, its instrumentalities and its property in respect of the enforcement and execution of any provisional or conservatory measure ordered by any judicial or other authority and of any partial, interim or final award rendered by an Arbitral Tribunal constituted pursuant to this Annexure.