# EXHIBIT C

                                                                      1
       F2rdrioc

  1    UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
  2    ------------------------------x

  3    RIO TINTO PLC,

  4                    Plaintiff,

  5             v.                        14 Civ. 3042(RMB)(AJP)

  6    VALE, S.A., et al.,
                                          Conference
  7                    Defendants.

  8    ------------------------------x
                                          New York, N.Y.
  9                                       February 27, 2015
                                          2:05 p.m.
 10    Before:

 11            HON. ANDREW J. PECK
                                          Magistrate Judge
 12
                       APPEARANCES
 13
       QUINN EMANUEL URQUHART & SULLIVAN LLP
 14            Attorneys for Plaintiff
       BY:  ERIC C. LYTTLE
 15            MICHAEL J. LYLE
               MEGHAN A. McCAFFREY
 16
       CLEARY GOTTLIEB STEEN & HAMILTON LLP
 17            Attorneys for Defendant Vale, S.A.
       BY:  JONATHAN I. BLACKMAN
 18            LEWIS J. LIMAN

 19    MISHCON DE REYA LLP
               Attorneys for Defendant BSG Resources Limited
 20    BY:  VINCENT FILARDO
               TIM McCARTHY
 21            DAN MANDELL

 22    SULLIVAN & WORCESTER LLP
               Attorneys for Defendant Mahmoud Thiam
 23    BY:  NITA N. KUMARASWAMI

 24    MARTIN J. AUERBACH
               Attorney for BSG Resources defendants

 25


                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

F2rdrioc

1                    (In open court; case called)

2                    THE COURT:  Be seated.

3                    OK.  First, what is it that we have to keep reminding

4     you all?  One letter with both sides' position, not six or

5     seven letters.  So, accordingly, I am going to start with the

6     joint letter and rule on issues in that order and get to the

7     other things, if there is time, as we go forward.

8                    If you think it will help you in the future to move

9     that letter to two days in front of the conference instead of

10    three, I'm fine with that.  You know, that still gives me a day

11    to read it.  I see the heads shaking yes, so that will be the

12    protocol.

13                   MR. LIMAN:  Your Honor, if I can report?

14                   We met with counsel for the plaintiff just before

15    court today, and we managed to work out many -- really, all of

16    the issues but one between Vale and --

17                   THE COURT:  Good.  Always glad to hear that.

18                   MR. LYTTLE:  That is correct, your Honor.

19                   THE COURT:  You two at least due to your clients get

20    brownie points.

21                   So with respect to defendant Thiam, have we heard

22    anything further from the Guinean government?

23                   MS. KUMARASWAMI:  Your Honor, Nita Kumaraswami for the

24    defendant Thiam.

25                   We've heard back from DLA, your Honor, that they have

3

F2rdrioc

1    reviewed the documents that we provided on February 13th.  I'm

2    told by plaintiff's counsel that a substantial portion of them

3    they have agreed to produce, which we will do so in short

4    order, and there is apparently a few that they will be holding

5    back to consider further.

6            THE COURT:  All right.  Let's put a definite date on

7    the you will be producing them soon.  So what do you need?

8            MS. KUMARASWAMI:  Your Honor, we actually haven't

9    heard directly from DLA.  This was communicated to plaintiff's

10   counsel.  So as far as I am concerned, whenever they get back

11   to us, we can turn that production around within a week.

12           MR. LYTTLE:  Your Honor, Mr. Horton, counsel for the

13   Guinean government, did contact me this morning.  He expects to

14   have a letter out releasing the documents sometime next week.

15           We would just ask that defendant Thiam turn them over

16   to us shortly after that, a week sometime period after that.

17           THE COURT:  All right.  No later than a week after

18   that letter, sooner if possible.

19           MS. KUMARASWAMI:  That is fine.

20           THE COURT:  As to the ones that they are still

21   considering, as soon as they finish considering them, if you

22   need a privilege log or following the privilege protocol that

23   you have all agreed to, talk to DLA about that.  And,

24   otherwise, unless you tell me there is a problem, I am going to

25   assume things are going well on that.

4

F2rdrioc

1              MR. LYTTLE:  Thank you, your Honor.

2              Just to round that out, it only handles documents

3     Mr. Horton indicated he believed the Guinean government

4     ultimately will agree to turn those over as well given their

5     interest in transparency here.

6              THE COURT:  Excellent.

7              MS. KUMARASWAMI:  Your Honor, it may be a nonissue,

8     but to the extent they do assert their privilege, I'm not sure

9     that defendant Thiam would be logging that privilege.  It may

10    be that they would need to appear in this proceeding and move

11    for a protective order.

12             THE COURT:  All right.  You all can work that out with

13    them.  They seem to be cooperating.  So I'm sure if they want

14    to protect the privilege, they will either instruct you

15    accordingly or avoid the middleman and come in directly.

16             MS. KUMARASWAMI:  Thank you.

17             THE COURT:  OK.  Now we get to the BSGR and Steinmetz

18    issue, which I think also called one of the other letters fact

19    insufficient, which is the February 26 letter from Mr. Filardo.

20             All right.  With respect to that -- well, let me ask

21    each of the interested parties to address that first.  I've

22    then got some questions.  So why don't we start with plaintiff.

23             MR. LYLE:  Thank you, your Honor.  Michael Lyle on

24    behalf of Rio Tinto, the plaintiff.

25             Your Honor, we have highlighted to you in our

5

F2rdrioc

1   correspondence of February 23rd, which I think is the letter

2   that started this all off, and Mr. Filardo has responded with

3   his correspondence that you just mentioned.  We are seeking

4   merits discovery pursuant to the federal rules, and all federal

5   rules, not just simply Rule 28, which is the rule under which,

6   you know, the letters rogatory procedures that Mr. Steinmetz

7   and BSGR defendants are seeking to impose.

8          We've cited to you the case law in our correspondence.

9   The one that we think is particularly relevant is the Chevron

10   case, which took up this issue in the context of Rule 34

11   document requests.  And in that case the Court -- there was

12   objection to producing documents in accordance with Rule 34.

13   The Court found a finding that there were mixed issues of

14   jurisdictional discovery and merits discovery; ordered that

15   discovery proceed on all fronts under the applicable rules.

16          THE COURT:  That raises one of my questions, which is

17   both for you and Mr. Filardo and anyone else who wants to jump

18   in.  On the one hand, we're done with what I'll call pure

19   jurisdictional discovery; the motion has been made.  On the

20   other hand, I took a narrow approach to that in order to not

21   get bogged down in months and months of that discovery before

22   the other defendants had made the 12(b) motion.

23          Isn't there overlap here, or is or isn't there overlap

24   here between the merits discovery and the jurisdictional

25   discovery?  Well, let me hear from your point of view on that.

6

F2rdrioc

1    Then I'll hear from Mr. Filardo.

2            MR. LYLE:  Yes, your Honor.

3            In our view there is overlap.  I think even you

4    yourself have recognized that earlier, when you were narrowly

5    tailoring the discovery that you did allow with respect to

6    settling the personal jurisdictional question as it related to

7    Mr. Cilins and a specific time period.  There are many

8    allegations in the complaint that both go to the merits,

9    inclusion allegations in terms of the conspiracy, Vale's

10   conduct, the conduct of Mr. Cilins beyond the time period that

11   you mentioned, Mr. Thiam.  All of those factors relate to both

12   the merits of our case and the specific jurisdiction questions,

13   which are going to be litigated and many of which are the basis

14   of their current motion.  So there is an overlap.

15           THE COURT:  Be more specific.

16           MR. LYLE:  Well, I mean, we have -- well, they have

17   made their motion for personal jurisdiction.  We believe that

18   there is jurisdiction under Rule 404(k), under the New York

19   Long-Arm Statute and under the RICO Statute.  And the

20   allegations that we're focused on and activities that

21   Mr. Steinmetz and BSGR are engaged in -- running money through

22   banks in the United States, bribery to individuals within the

23   United States, Vale's activities and negotiations which are

24   attributable to the BSGR defendants as co-conspirators under

25   the applicable law, which we've cited to your Honor -- those

F2rdrioc

1   are some of the examples that we are referring to.  All of that

2   information overlaps both in terms of merits and jurisdictional

3   issues, which brings Chevron directly into play.

4           THE COURT:  The court reporter does not have the

5   advantage of hearing you as many times as I have nor of your

6   premotion/preconference letters so you have to slow down.

7           MR. LYLE:  I apologize and I will do that.

8           THE COURT:  All right.  Mr. Filardo.

9           MR. FILARDO:  Good afternoon, your Honor.

10          Chevron, of course, was Judge Kaplan's decision, and

11  Judge Kaplan put it very concisely that what he looked at was

12  the jurisdictional prerequisite followed by the comity

13  analysis.  Of course, in Chevron, it was a situation regarding

14  jurisdictional discovery.  It was a foreign defendant.  The

15  Court determined, as it must, that it had jurisdiction to

16  determine jurisdiction.  That was a controversial proposition

17  by Judge Kaplan.

18          Then the question was that on the comity analysis, the

19  Court had the discretion to choose either to proceed under the

20  federal rules, all of the federal rules, or proceed under the

21  Hague, or the provisions with respect to letters rogatory.  The

22  Court decided to proceed under the federal rules, and defendant

23  did not comply with that order and then there was a sanction

24  motion that was up before Judge Kaplan.

25          THE COURT:  All right.  Let's --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

F2rdrioc

1          MR. FILARDO:  Judge Kaplan ruled ultimately that when

2     he looked at the issues of what this was about, it was about

3     jurisdiction in the U.S.  That was the concept of the

4     jurisdictional discovery, and the question was an agent -- the

5     purported agent or employee that allegedly acted in the U.S.,

6     either alone or through an attorney, and the discovery that was

7     sought with respect to that individual.

8          Your Honor, we were here, I would say, almost six

9     months ago where your Honor had just this issue that you had to

10    decide -- the allegations with respect to the only alleged

11    agent and/or employee against my client or with respect to

12    Mr. Cilins.  Your Honor ruled on that --

13         THE COURT:  What about the conspiracy argument?

14         MR. FILARDO:  The conspiracy with respect to the only

15    other party that I can think of that acted in the U.S. --

16    allegedly acted in the U.S., which would be defendant Vale,

17    those allegations of defendant Vale's communications and

18    presence in the U.S. actually by the allegations the complaint

19    predates the conspiracy -- the alleged start of the conspiracy.

20    And the conspiracy itself was alleged to have started outside

21    the U.S. --

22         THE COURT:  That is the subject of the motions to

23    dismiss or whatever.

24         What I am looking at -- and let me put the question a

25    little more bluntly.  If the conspiracy, the RICO claim --

F2rdrioc

1    well, let me break it down.

2            Will you agree in general that a foreign defendant

3    with no other contacts with the United States is subject to

4    U.S. jurisdiction if it is proved they are a co-conspirator

5    with somebody who lives within the jurisdiction?

6            MR. FILARDO:  Your Honor, I would not agree with that

7    statement.  You still have to have minimal Constitutional

8    minimal contacts in the U.S.

9            THE COURT:  Well, how does that square with all of the

10   cases I see, some of which I'll probably be seeing next week,

11   the criminal cases where some person sitting in Colombia who

12   has never set foot in the United States but is an alleged

13   co-conspirator with somebody within the Southern District of

14   New York is criminally prosecuted successfully, if they are

15   indeed guilty, in the Southern District of New York?  And

16   perhaps Mr. Liman, who is a former A.U.S.A., might have

17   something to add to that, but I will let you go first,

18   Mr. Filardo.

19           MR. FILARDO:  Your Honor, I think in those cases there

20   has to be at least a prima facie showing of the connections

21   between those co-conspirator and the activities that they had

22   that were directed toward the U.S.  I think at a minimum that

23   has to be shown.  That certainly wasn't shown in this

24   complaint, not even on a prima facie level.

25           THE COURT:  That's a motion to dismiss for addition.

F2rdrioc

```
 1              For discovery purposes, assuming the prima facie case
 2      was made and all of that -- and Judge Berman has your motions
 3      to dismiss -- what I'm trying to deal with is if the allegation
 4      is that your clients were co-conspirators with Vale, etc., and
 5      there is no issue as to the jurisdiction over Vale, is the
 6      issue of proof of that conspiracy a jurisdictional as well as a
 7      merits discovery issue?
 8              MR. FILARDO:  I think really to separate -- I think it
 9      is a jurisdictional discovery issue, and the separation of the
10      two is a dichotomy that even -- you know, it's something that
11      the Court doesn't really need to focus on, because the issue
12      still comes down to do you have jurisdiction to require that
13      jurisdictional discovery, which they clearly do.
14              THE COURT:  I guess what I'm saying is did I make a
15      mistake when I limited the initial jurisdictional discovery
16      purely to the alleged contacts with the United States as
17      opposed to the question of whether there was evidence of a
18      conspiracy with a United States participant, Vale or others,
19      and BSGR Steinmetz, etc.?
20              MR. FILARDO:  Your Honor, I don't think you did.  I
21      think you properly allowed the jurisdictional discovery with
22      respect to Mr. Cilins.  Those were the specific allegations in
23      the complaint.
24              THE COURT:  Always glad to hear that I'm correct,
25      but --
```

F2rdrioc

1        MR. FILARDO:  With respect to Vale --

2        THE COURT:  -- the conspiracy.

3        MR. FILARDO:  With respect to Vale and the conspiracy,

4    the allegations in the complaint don't even support the

5    proposition that Vale was sent to the U.S. on behest of

6    Steinmetz or BSGR.  It is not even on the same timeline.  Vale

7    was here in connection with a deal that is laid out in timing.

8    I believe they started their discussions in June or July of

9    2008.  Then --

10        THE COURT:  That portion of the complaint isn't before

11    me.  The complaint alleges -- correct me if I am wrong -- the

12    complaint alleges a RICO conspiracy in which your clients were

13    a participant.  Yes?

14        MR. FILARDO:  It does.

15        THE COURT:  Then why isn't the proof or lack of proof

16    timeline, etc., of whether that conspiracy exists something

17    that is both jurisdictional and merits.

18        MR. FILARDO:  Because jurisdictional positions in the

19    complaint are what is required there along with the allegations

20    of the conspiracy.

21        So plaintiff has a long-arm argument and they are

22    under New York law, plaintiff has arguments under the RICO

23    statute with respect to jurisdiction.  They don't apply here

24    clearly.  We analyzed that in premotion letters to your Honor.

25    If your Honor recalls, I think it is 1960(a) and (b).  Bottom

12

F2rdrioc

1    line is you had to have at least a presence in the U.S. and

2    service in the U.S. in order to take advantage of the

3    jurisdictional provisions of RICO, even the conspiracy

4    jurisdictions of RICO.  That they haven't shown or proved.

5         So when we're talking about whether or not there is

6    jurisdiction here and the discovery that should be taken on

7    that, it has to go along with what actually is alleged in the

8    complaint.  And none of those things are alleged properly in

9    the complaint for purposes of jurisdiction -- not the merits.

10   And now, at this point, plaintiff is seeking merits discovery.

11   It is quite different than the jurisdictional discovery

12   where --

13        THE COURT:  Well, it is unless the merits and the

14   jurisdictional issues so overlap that they should be considered

15   together.

16        MR. FILARDO:  But, Judge --

17        THE COURT:  Let me hear briefly from Mr. Liman and

18   then I am going to go back to Mr. Lyle, the last word, whoever

19   else wants to participate.

20        MR. BLACKMAN:  Jonathan Blackman, your Honor.  We

21   don't necessarily have a horse in this race as long as we get

22   discovery.

23        THE COURT:  Well, you have a horse in the race at

24   least indirectly since you have asked me -- well, originally

25   asked Judge Berman.

F2rdrioc

```
 1              MR. BLACKMAN:  Exactly.  That is where I was coming
 2      to.
 3              We have and we would like you to sign today the
 4      letters of request.
 5              THE COURT:  Hold that issue.  Do you have anything
 6      else to say on the --
 7              MR. BLACKMAN:  No.  Our point simply is we want the
 8      information.  If it comes under the federal rules, that's
 9      great.  If it comes under letters of request, that's fine.  I
10      have heard Mr. Filardo say in his letters to the Court that he
11      did not oppose the letters of request, and I would like him to
12      say that again so that there is no dispute when we get to the
13      High Court on that.
14              THE COURT:  You are missing the point about --
15              MR. BLACKMAN:  But as far as --
16              THE COURT:  -- not letters of request.
17              MR. BLACKMAN:  -- my point.  We would like the
18      discovery --
19              THE COURT:  All right.  That is not helping me.  Thank
20      you.
21              MR. BLACKMAN:  No.  Your Honor, in all fairness, I
22      don't know how this dispute plays out in part because we don't
23      think the allegations of conspiracy are valid; we think they
24      are bogus.  We agree with the timeline argument.
25              Our client negotiated --
```

F2rdrioc

1                  THE COURT:  Let me stop you there.  I understand that

2        you are in the middle position of on the merits there is no

3        conspiracy but you want discovery from BSGR somehow.  So you

4        are --

5                  MR. BLACKMAN:  Yes.  And the difference between us and

6        the plaintiff.

7                  THE COURT:  -- a battling horse.

8                  MR. BLACKMAN:  The difference between us and the

9        plaintiffs is they are kind of propounding these allegations

10       and saying that they are mixed.  We're not.  They're not --

11                 THE COURT:  Thank you.

12                 Mr. Lyle, anything further you want to say here?

13                 MR. LYLE:  Yes, your Honor.  Just briefly.

14                 First of all, in the Chevron case --

15                 THE COURT:  All right, please.  Judge Kaplan and I

16       have known each other for 40 years, but I think we can move on

17       to a different case.

18                 MR. LYLE:  I only wanted to correct one error, which

19       is that in the Chevron case they were talking about both

20       jurisdictional and merits discovery.  Well, it strikes me as

21       slightly different.  So Mr. Filardo is incorrect in that

22       description of the case.

23                 Secondly, your Honor, we've laid out, although they

24       dispute our allegations -- which we understand, that's what

25       they have said.  We've made those allegations.  They are in the

F2rdrioc

1    complaint.  They are there to stay.  We have and therefore are

2    entitled to discovery in connection with the overlapping issues

3    of both jurisdiction and merits.

4          And we're not just talking about Mr. Cilins.  They

5    keep on talking about just him.  Those are not our allegations.

6    Your Honor limited it to a discrete set as an initial position,

7    an initial starting point, but, you know, when you said that, I

8    think that you were also indicating to us that that was where

9    you were beginning and now here we are months later.

10         THE COURT:  It is always dangerous to tell a judge

11   what he was thinking.

12         MR. LYLE:  Well, I think you indicated that, though.

13   That is my memory of what you had said.

14         But here we are now.  We have allegations involving

15   codefendants, as I articulated earlier, Vale, Thiam, Toure, all

16   of those defendants that we've alleged that we're entitled to

17   discovery to prove our case against them both in terms of the

18   jurisdiction and the overlapping merits that must go with that

19   conduct as it relates to specific jurisdiction.

20         That's all I have, your Honor.

21         MR. FILARDO:  Your Honor, if I could just add one

22   thing?

23         We have two sets of discovery requests from plaintiff.

24   We have let's call them the merits discovery request that was

25   served very early on that your Honor did not require my clients

16

F2rdrioc

1   to respond to given the jurisdictional objections, and we have

2   the jurisdictional discovery requests.  And the jurisdictional

3   discovery requests weren't limited to any particular theory,

4   just all their theories of jurisdiction.  Then we had our

5   arguments before your Honor as to how the corpus of documents

6   would be limited for review and to find responsive documents

7   for those jurisdictional requests.

8        Right now what's before your Honor in plaintiff's

9   application is for my clients to respond to the merits

10   discovery requests, which are much broader and well beyond any

11   allegations of jurisdiction.  So, for example, to the extent

12   that there is a mixed question of jurisdiction and merits

13   discovery with respect to Vale's conduct or any other

14   co-conspirators, those merits discovery requests far exceed

15   that.  Frankly, the jurisdictional discovery requests that were

16   served onus, that we responded in accordance with your Honor's

17   order, those would cover that if it was just a little bit

18   broader with respect to, say, Vale's conduct.  But certainly

19   what they're asking the Court to do is to order us to actually

20   respond to merits discovery that is not limited to

21   jurisdiction.

22        THE COURT:  Let me now go where Mr. Blackman was

23   trying to lead me.  What is your position with respect to the

24   Hague Convention request that is on the table?  And when you

25   have indicated that you think that's the proper way to go,

F2rdrioc

1     etc., do you mean that either the current version or something

2     that you will have some time to sit down with him but not, you

3     know, months but days and winnow it down a little is something

4     that you will represent, or your solicitor barrister

5     counterpart, is acceptable to your clients, as opposed to

6     saying let's go the Hague Convention route and then telling the

7     Senior Master in London that the document requests are horribly

8     overbroad and that England is not the U.S. and that they should

9     not approve the letters rogatory?

10          MR. FILARDO:  Thank you, your Honor.  I think you have

11     identified the issues that we have been struggling with.

12          Obviously, we believe the letters request and under

13     the Hague is the proper way to go forward.  We have not had an

14     opportunity to meet and confer with defendant Vale on the

15     scope.  We do think the scope is extraordinarily overbroad and

16     it may even be --

17          THE COURT:  The other question is is it overbroad in

18     a, you know, if this were a law school class it is overbroad

19     or, you know, is it going to be similar to the response on the

20     discovery about the Cilins and the like, you know, oh, it

21     starts as overly broad and then when the Court says produce

22     there are six packets that were produced?

23          MR. FILARDO:  Again, I am not an English solicitor, as

24     I am fully aware of what is allowable in that central authority

25     but --

F2rdrioc

```
 1              THE COURT:  Let me put it this way.  I'll consent to
 2      probably anything.
 3              MR. FILARDO:  So consensually some of the things that
 4      have been identified to me in conversations that I have had
 5      with my colleagues in London is that it appears that some of
 6      these requests may be directed towards the LCIA arbitration
 7      allegations that were made that's currently going on in London
 8      now and so it is not relevant to these proceedings.  We don't
 9      have crossclaims against each other in this proceeding, for
10      example.  So that appears to be something that is a little
11      bit -- that is broad and perhaps irrelevant.  And then there
12      are other issues that are similar to just when you look at any
13      given document request and you try to analyze whether or not it
14      is within the scope of the allegations, and the defense --
15              THE COURT:  Analyze it also in the context of what
16      does your client have.  Because I don't want there to be a big
17      fight about, you know, should it be three years or two years or
18      six months, and then the response at the end of the day is
19      regardless of what time period is used, we never, you know,
20      conspired, we never did anything, etc., etc.
21              Here is where I think -- Mr. Blackman.
22              MR. BLACKMAN:  I was listening with great care here.
23      We have these letters of request drafted in conjunction with
24      our English colleagues, and we think that they are proper
25      letters of request under English law.
```

F2rdrioc

1           We certainly do not want to be in the sort of, you

2    know, situation of a shell game where he says today they're OK

3    and then says to the Special Master and the High Court Judge

4    no, they are not, they are overbroad, or they only relate to

5    the arbitration.  Everything in the letters of request goes to

6    allegations or issues in this case.

7           The arbitration, just so the Court is clear, involves

8    claims by Vale against BSGR for falsely representing that it

9    did not engage in bribery or other corrupt activities.  Those

10   are --

11          THE COURT:  Let me put it to you this way.

12          MR. BLACKMAN:  So there is an overlap with this case.

13          THE COURT:  There may be an overlap, but when you make

14   requests that say give me everything from the arbitration --

15          MR. BLACKMAN:  No, that's --

16          THE COURT:  -- that may not quite be what he said, but

17   I did look at the letter of request and when you tie it to

18   another proceeding, it raises concerns that if you just tied it

19   to an allegation, you know, that would be a different story.

20          Here's what I --

21          MR. BLACKMAN:  Can I just respond to that one point?

22          THE COURT:  No.  Here's what I will suggest.  I am

23   going to hold in abeyance, for a very short period, the

24   question of whether to have this done via letters rogatory, the

25   Hague Convention, or whether the Court will say there is

F2rdrioc

1     sufficient overlap between merits and jurisdictional discovery

2     that we're going to go ahead.  That will be determined, or at

3     least an important factor, Mr. Filardo, is whether you can

4     reach agreement with Vale with respect to their letters of

5     request and with the plaintiffs as to their document requests

6     that would be turned into a Hague Convention request so that

7     they can put, for my signature, that your clients are agreeing

8     that the Senior Master in London can enforce, execute, whatever

9     the appropriate legal term is, approve the letters of request

10    because you are not objecting.

11            To the extent that can't be done -- and I expect good

12    faith on all of the three or more parties in interest -- I will

13    then see you in a weak or so and deal with -- and it may be

14    belt and suspenders.  It may be that I will sign whatever

15    letters of requests there are so that, you know, that process

16    can start.  But I also may well order federal rules, non-Hage

17    discovery, and then you will be in the position of taking

18    objections to Judge Berman -- and I think you know how he feels

19    about discovery going forward without delaying it -- and/or

20    complying or failing to comply and having your client held in

21    contempt or whatever.  We've been through your options before.

22            MR. BLACKMAN:  Your Honor, if I may have just one

23    moment on that?

24            THE COURT:  Yes.

25            MR. BLACKMAN:  We would like to actually have a date

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2rdrioc

```
 1   certain set of like in a week, if that works for the Court, to
 2   come back so we can know how this gets resolved.
 3            THE COURT:  At the end of this, you are going to get a
 4   date.  It is going to be sooner rather than later.  Whether it
 5   is a week or two weeks, I don't know, but it certainly isn't
 6   going to be longer than that, and that certainly means that you
 7   and Mr. Filardo are going to have to return each other's calls
 8   or emails promptly.  I'm not saying any of you aren't.
 9   Certainly, from the number of letters I get from all of you,
10   you are in constant communication.  But it is not going to do
11   me good if I say come back in a week and, you know, you come
12   back and Mr. Filardo says, you know, I have had a week
13   corresponding with my solicitor and it is a five-hour or
14   six-hour time difference and you didn't get enough progress
15   between our solicitor and Mr. Blackman's solicitor operating
16   through their American counterparts.  So I understand that it
17   is not going to be forever.
18            And full warning to Mr. Filardo:  If there isn't
19   cooperation on your part, double bang, I will approve their
20   letters rogatory, unless my friends in Britain take care of
21   whatever the fights are, and may well order U.S. discovery,
22   and, conversely, if I find that the person who is taking the
23   hard line and won't agree on anything, it is not in your
24   interest, Mr. Blackman -- and the same from the view of the
25   plaintiffs -- because if I sign -- you know, if there is no
```

F2rdrioc

1    agreement because it is your fault, so to speak, and I say, OK,

2    I'm going to sign your letters of request but they're free to

3    argue whatever they want in London, that's probably going to

4    significantly delay the execution of any letters of request.

5            MR. BLACKMAN:  We appreciate that.

6            The only point I wanted to make on that was in order

7    to meet the specificity requirements of English law, we have in

8    fact identified certain documents with reference to things that

9    were filed in the arbitration, because there is a lot more

10   chapter and verse there than there is in this complaint.

11           THE COURT:  I understand that --

12           MR. BLACKMAN:  The irrelevance of this complaint.

13           THE COURT:  The one thing you need to recognize is

14   that some of that didn't make any sense to me, and I've lived

15   with all of you for however many months it is now.  My

16   colleague in London will not have known you from Adam and, you

17   know, sometimes the optics are more important than the

18   substance.

19           MR. BLACKMAN:  That's why we put some footnotes in,

20   but I take your point and we will probably have to put many

21   more.

22           THE COURT:  The reading of footnotes, sometimes they

23   are not read.

24           MR. BLACKMAN:  This is true, too.  Thank you.

25           THE COURT:  Now, Mr. Lyle, any reason that you can't

F2rdrioc

1   turn your document requests into a draft letter rogatory to my

2   friends in London and negotiate scope as much as possible, just

3   as I have been saying to Mr. Blackman with Mr. Filardo?

4           MR. LYLE:  No, your Honor.

5           THE COURT:  OK.  Good.  Do it as soon as possible so

6   that you can be on the same track as the Vale requests.

7           And I am reserving on the issue of whether we go

8   federal rules both in terms of, in the first instance, whether

9   we are going to go for the Hague Convention other than a CYA in

10  the event that Judge Berman rules more quickly than you've even

11  finished briefing.  So that is not going to happen, but, you

12  know, rules in such a way that your clients are actually

13  dismissed and have to be treated as nonparty witnesses.  The

14  other factors, if we go that route, and either because of

15  positions taken by BSGR and Steinmetz, or just because of the

16  docket of the Senior Master in London, you know, we don't get

17  any progress for a very long time, the Court is going to

18  revisit the issue again in any event.

19          OK.  So now I'm back to the joint letter.

20          Are there any other issues before I get to the

21  BSGR/Steinmetz privilege log issue on page 3?  Any other issues

22  on page 2 or the top of page 3 from the plaintiffs?

23          (Pause)

24          MR. LYTTLE:  Yes, your Honor.  The good news is the

25  privilege log issue, counsel have said they will be providing

F2rdrioc

1   updated privilege logs.  I think we should table that, look and

2   see what they provide, and then bring that back to your Honor

3   if necessary.

4           THE COURT:  Good.

5           MR. LYTTLE:  Before the privilege log issue, though,

6   there is the issue of the jurisdictional discovery document

7   production that has been made.  Quite frankly, we can't get a

8   good handle on the exact number but it appears in the thousands

9   of documents that hit on the search time "Cilins," just hit on

10  that search term.  As your Honor noted earlier, we've gotten

11  nine of those documents and, actually, only two documents

12  because the others are all duplicates.  We've asked them to

13  give us a little more information on how they determined

14  responsiveness, because, your Honor, they can't on one hand

15  deny these very agents and they have no relationship --

16          THE COURT:  I thought their response is that a great

17  deal of those documents were about news reports and other

18  things.

19          MR. LYTTLE:  So what doesn't make sense, your Honor,

20  is the only two documents they have produced are news reports.

21  So what made those news reports not responsive?  Are they

22  literally thousands of other copies of the same two news

23  reports?  We don't have much insight here, and it seems strange

24  us, quite frankly, that they say we have no connection, no

25  relationship with him at all, and they've got thousands of hits

F2rdrioc

1    and then say those aren't responsive.

2            Any document, your Honor, referencing Cilins could

3    shed light on their relationship with him, which we believe is

4    required for both merits and courts jurisdictional --

5            MR. FILARDO:  Your Honor, it is actually approximately

6    660 documents.  That is the documents with a family group of

7    attachments, and that is what brought it up.  Many of those, if

8    not all of those, have some stuff that reference him.  But, in

9    essence, what we did is we have these news reports and

10   sometimes they were just forwarded.  So they are not responsive

11   to plaintiff's discovery request, but the only thing they

12   evidence is our knowledge of the news reports.  In the

13   circumstances where we actually made a comment as we were

14   interofficely forwarding them around, perhaps sought legal

15   advice with respect to how to respond or how to respond to

16   inquiries that were made to them, those were either responsive

17   or responsive and privileged.  I think there is about 90-plus

18   documents in the privilege log that are encompassed in the

19   categorical privilege log, three different categories.

20           And then these are, of course, documents that are

21   going over 12 different custodians --

22           THE COURT:  Let me ask you this, Mr. Filardo.  Without

23   waiver of any of your rights, privileges and immunities, if

24   this is such junk, any reason you can't let plaintiff's counsel

25   look at it in your office and determine whether they care

F2rdrioc

1   enough to bring the issue back to me, or do you care on

2   particular documents that they say they would really like

3   produced on nonprivileged?  On privileged, that is a different

4   character.

5           MR. FILARDO:  On nonprivileged, your Honor, other than

6   the fact that it creates this particular situation directed at

7   my clients that is not applicable to any other defendant here

8   in discovery, which is, hey, what's the universe of documents?

9   If it happens to have a hit term on it, produce it or show it,

10  and that's confidential --

11          THE COURT:  I know, but it's without prejudice -- you

12  know, when somebody tells me they really want a fight about,

13  you know, 600 pages, or whatever it comes down to, of emails,

14  circulated news reports that have no comments, I am little

15  troubled --

16          MR. FILARDO:  Your Honor, it is only in that respect,

17  in the procedural action in the fact that it creates this

18  precedent that we are being treated differently.  But if that

19  is the Court's desire --

20          THE COURT:  It is not a precedent.

21          MR. FILARDO:  We can do that.  It is 660 documents

22  that they can look at, approximately.  I'm not saying it is

23  exactly.  But if they want to come over and take a look at some

24  of these things and see what they are, so be it.

25          THE COURT:  OK.  Good.  Sold.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2rdrioc

1           Next issue.  Anything else on the BSGR?  Steinmetz?

2           MR. LYTTLE:  I believe that is it.  Yes, your Honor,

3    on Mr. Steinmetz, your Honor.

4           THE COURT:  OK.  That gets us over to VBG on page 6.

5           Mr. Auerbach.

6           MR. AUERBACH:  Good afternoon, your Honor.  I wanted

7    to give the Court --

8           THE COURT:  It is getting bad.  Now I am starting to

9    recognize names with faces of people other than Mr. Liman, who

10   I have known for years.  That means you are all coming here too

11   often.

12          Proceed.

13          MR. AUERBACH:  I couldn't agree more, though it is

14   always a pleasure to see your Honor.

15          I wanted to give your Honor a report, which I have

16   shared with counsel for the plaintiff, about the results of the

17   process that I have been going through.

18          First, let me take a second issue, which is the

19   request for the Guinean government for the return of the seized

20   documents, for copies of the seized documents.  As I indicated

21   to the Court and have advised them, after conferring with

22   counsel for the Guinean government, not only did we write the

23   letter to the Court asking Judge Coumbassa to direct them to

24   return those materials but we went and visited him.  And we

25   went and visited with Judge Coumbassa, and he agreed that he

F2rdrioc

```
 1   would, in the first instance, speak to the police, because he

 2   knows them because they interact frequently, and ask them to

 3   return the materials, and if they failed to do that, then he

 4   would issue an order.

 5           Unlike your Honor, who is here every day, Judge

 6   Coumbassa is not in his chambers every day.  And so when they

 7   went back to try to inquire as to the status of that, he was

 8   not there and available.  But I have been keeping plaintiff's

 9   counsel apprised.  I provided them a copy of the letter we sent

10   to him, and as soon as we have a response on that, they will

11   know it.

12           With respect to the documents that were still in VBG's

13   possession, custody and control, I can report this.  Having

14   enlisted the aid of counsel in Guinea and an accountant in

15   Guinea, we were able to determine the full scope of what

16   remains.

17           And it may be helpful just to remind your Honor of

18   something that I've shared with plaintiff's counsel, which is

19   that in 2012, the Simandou project was halted by the

20   government.  When that happened, virtually all of the

21   substantive staff working at VBG who were from overseas and

22   largely Vale employees at that point, left.  So all the

23   technical people left.  The environmental people left.  The

24   geological people left.  The procurement people.

25           THE COURT:  I got the point.
```

F2rdrioc

1           MR. AUERBACH:  You got the point.

2           And when they left they took their materials with

3      them.  What was left of any substance the Guinean government

4      came in and helped themselves to in 2013.  So what is left in

5      the now I count 77 -- not 20 but 77 cartons sitting in a

6      storage locker are, with the exception of one file marked

7      "legal," which I will be exploring further in terms of its

8      potential relevance and probatory or not, is the mundane daily

9      account records, payroll records, bank statements, bank record

10     reconciliations, all the sorts of day-to-day stuff which I do

11     not believe is the substance of this litigation.  And it is

12     truly, according to my Guinean counsel, irrelevant.  But as I

13     told plaintiff's counsel, I'm going to Europe next week to meet

14     with the principals who currently have responsibility of VBG to

15     make sure that we get on the phone with Guinean counsel, walk

16     through this, and satisfy me, so that I can satisfy them and

17     the Court, that if there is nothing there, there is truly

18     nothing there.

19           THE COURT:  OK.  And with respect to the -- well,

20     first, is all that satisfactory, Mr. Lyttle?

21           MR. LYTTLE:  It is, your Honor.  Yes.

22           THE COURT:  And in the interrogatories -- before you

23     get to that, my view on it is in light of the lack of

24     employees, whatever has been done, subject to supplementation,

25     as documents get released from the police or anything else,

F2rdrioc

1    with the further, you know, club over VBG's head that if you

2    don't say somebody is a person with knowledge here because

3    nobody could tell you that, you're not going to be able to drag

4    them in when you are trying to avoid summary judgment or a

5    trial, I would think we can just live with, you know, you are

6    doing the best you can for now.

7            Does that work for both sides?

8            MR. LYTTLE:  Two points, if I may, your Honor, on

9    that?  I believe that this time now he indicated, Mr. Auerbach,

10   that he is planning to meet with the principals of the company.

11   We would ask that if more information comes from that meeting

12   identifying --

13           THE COURT:  Obviously.

14           MR. LYTTLE:  Obviously we would supplement and talk to

15   him more about that.  As well, it would be helpful for us if he

16   could identify the best he can the Vale people who he is

17   talking about that left and took materials with them.

18           MR. AUERBACH:  And the difficulty, your Honor -- and

19   that leads me to another point which I wanted to share with the

20   Court which I have shared with plaintiff's counsel -- VBG did

21   not have a server.  No one lived with the pain of large volumes

22   of email traffic.  To the extent that they exist and are

23   pertinent here, Vale has all that material because that is what

24   is on Vale's server.  And I believe that there was at one time

25   a VBG email domain name, which I will provide as soon as I have

31

F2rdrioc

1   that.  But to the extent that there is responsive material,

2   Vale would be the place to look for it.

3          The current management of VBG came in January 2013.

4   The people who worked on the project were gone by

5   December 2012.  So, again, I believe the Vale people are the

6   ones most knowledgeable about who was actually there on the

7   ground and has pertinent facts.  But to the extent that we

8   learn them, either from Vale or from my clients or from the

9   documents, I have an obvious ongoing obligation to produce

10  those.  And if that is acceptable, we'll proceed that way.

11         MR. LYTTLE:  That sounds fine with us.  Thank you.

12         MR. AUERBACH:  One last caveat, your Honor.  As you

13  know, our view, we have certainly made a motion to dismiss on

14  jurisdictional grounds, and we think that we are further

15  removed from any of the other parties.  And I think it is

16  clear -- and I agree with plaintiff's counsel -- that none of

17  our approach to discovery here is in any way a waiver of our

18  jurisdictional approach, and rather than go through the much

19  more complex and for us burdensome process of insisting on the

20  Hague Convention, we're proceeding this way without waiving.

21         Thank you.

22         MR. LYTTLE:  Agreed.

23         THE COURT:  It sounds not only like a good idea but

24  something other people might learn from you.  OK.  Thank you.

25         All right.  I will now go on to the plaintiff's

F2rdrioc

1    discovery against Vale.  Which of those issues as to the

2    documents from the Data Room are still alive or not?

3         MR. LYTTLE:  So the good news is, your Honor, as

4    Mr. Liman indicated at the beginning of the conference, we had

5    a productive meeting ahead of time and we had resolved these

6    issues as they currently stand except for one and it is on page

7    8.  It is the valuations of Simandou internal and external

8    beyond able 2011.

9         Your Honor, we've asked for those.  We believe they

10   are relevant to damages models.  We believe these data points

11   and reference points will be used by both sides' experts in

12   interpreting the damages.  And, more specifically, their

13   proposal is to cut it off at April 2011.  Well, that is not a

14   date picked out of thin air.  April 2011 is when Rio Tinto

15   agreed not to pursue any legal rights against the government of

16   Guinea for the loss of Simandou.  So we want to see did the

17   value internally at Vale go up when this uncertainty was

18   removed.

19        Likewise, when Frederic Cilins' arrest is made public

20   in April 2013, what did that do to their valuation?  Did it go

21   down because now there is criminal uncertainty?  And last, but

22   not least, in April 2014 the government of Guinea strips their

23   rights, and we would like to know what are they saying the

24   value of Simandou is now that that has happened.

25        The last point, your Honor, we likewise have agreed to

33

F2rdrioc

1     produce documents up through the filing of the complaint and

2     would ask that they do the same.

3            THE COURT:  Mr. Liman.

4            MR. LIMAN:  Thank you, your Honor.  Your Honor, there

5     is a backdrop here that your Honor may not be aware of but I

6     think it is highly relevant to the resolution of this dispute.

7            As Mr. Auerbach indicated in 2012, the Simandou

8     Project was abandoned, essentially abandoned.  The government

9     of Guinea has been considering what to do with the project, and

10    it has put up Simandou for tender.  There are only a few

11    companies that are potentially interested in Simandou.  There

12    aren't that many companies in this industry.  One of them is

13    Rio Tinto.  Another potential bidder is Vale.

14           The documents -- so there are two considerations at

15    issue.  One consideration at issue is the use of discovery for

16    purposes other than the resolution of the dispute.

17           THE COURT:  You do have the ability to mark it for

18    attorneys' and experts' eyes only, right?

19           MR. LIMAN:  We do, your Honor, but this is information

20    that obviously is highly relevant to the tender.  The other --

21           THE COURT:  What is the theory of that?  In other

22    words, if you start it -- and by "you" I mean your client --

23    has started figuring out how much Simandou is worth, you know,

24    as of January 1, 2015, that may go to the current bid

25    competition while something that went on in 2012, '13 or some

F2rdrioc

1      of 2014 may be sufficiently old that it is not relevant.

2              MR. LIMAN:  Your Honor, I think even information from

3      2012 and 2013 would be relevant.

4              Let me address the second point that I wanted to

5      address with your Honor, which is the relevant timeframes for

6      this case.  The complaint alleges that it was in July 2008 that

7      Rio Tinto's rights to Simandou were first started to be taken

8      away.  In December of '08, Simandou was given to BSGR.  In

9      April of 2010, the joint venture was formed.

10             At that point -- frankly, even before then, in

11     December of '08 on, there was work done with respect to

12     Simandou, which had been essentially inactive.  The Rio Tinto

13     had not been developing the project even prior to it being

14     taken away from them.  That is the reason it was taken away.

15             And after December of '08, first BSGR and then VBG

16     started to pour resources into the project.  The law, as your

17     Honor knows, is that the measure of damages for RICO is

18     measured at the time of the theft of the property at issue.

19     That date here is December of '08.

20             What we've agreed to do -- and I think it is beyond

21     what relevance but should capture everything they are

22     interested in -- is to go up to the April of 2011 time period,

23     because that's when Rio Tinto voluntarily relinquished any

24     claim to the properties in Simandou at issue.  With respect to

25     relevance, with respect to the proportionality requirement, you

F2rdrioc

1    know --

2            THE COURT:  I'm not sure there is any proportionality

3    in this case.

4            MR. LIMAN:  Well, you know, we -- I don't think that's

5    fair.

6            THE COURT:  That is not entirely true, I understand.

7    But I am looking at, and let me do a quick count, 3, 5, 8, 11,

8    14 lawyers or relateds sitting here.

9            MR. LIMAN:  And I can assure your Honor that from

10   every party here there are other lawyers back at the office.

11   But that doesn't mean that Rule 26 doesn't apply to them just

12   likes it applies to every other party.

13           THE COURT:  I agree.  Move on.

14           MR. LIMAN:  So, you know, April 2011 gives them

15   everything that they would want in terms of measuring the value

16   of the time --

17           THE COURT:  Stop.

18           Mr. Lyttle.

19           MR. LYTTLE:  Your Honor, the tender that Mr. Liman is

20   articulating, the earliest dates that we are aware of that

21   Guinea went on tender is May 2014, which makes sense because

22   the Guinean government stripped the rights from the VBG entity

23   in April of 2014.

24           THE COURT:  All right.  Isn't the damage under RICO

25   the same as it is under the securities laws or anything else,

F2rdrioc

1     which is what is the damage when you lost the rights to

2     Simandou regardless of -- I know there are statute of

3     limitations arguments you are all making as to anything else,

4     but you lost it then.  It is the value then that matters, is it

5     not?

6            MR. LYTTLE:  I don't know if I completely agree with

7     that.  But I would still argue that the valuations by the

8     company inform that, because this is an imperfect side of how

9     you are going to value that --

10           THE COURT:  That may be but I have the feeling -- I

11    don't know much about the mining industry, but that a party's

12    valuation of oil reserves today is a lot different than it was

13    a year ago, at least based on what I'm paying at the pump.

14           So I'm going to deny the request for going beyond

15    April 22, 2011 at this point.  You can revisit it later in

16    discovery if you can convince me that your experts need it and

17    are entitled to it or that the defendants' experts have started

18    using material from beyond that period.

19           MR. LYTTLE:  Thank you, your Honor.  One point of

20    clarification.  Would that order apply as well to Rio Tinto's

21    obligation to produce the valuation information?

22           MR. LIMAN:  Your Honor, we have no problem applying

23    the same cutoff dates.

24           THE COURT:  There you go.

25           MR. LYTTLE:  Thank you, your Honor.

F2rdrioc

 1          THE COURT:  All right.  So that now gets us over to --

 2     I assume we are now on page 14 since you have told me you

 3     resolved everything else, or not?

 4          MR. LIMAN:  I think with --

 5          MR. LYTTLE:  That is our position, yes.

 6          MR. LIMAN:  Just to report, your Honor, the one

 7     position that we laid out in our portion of the letter had to

 8     do with the Chinalco Data Room.  This is with respect to --

 9          THE COURT:  At this point in the conference, if you

10     have agreed that I don't need to do anything, the less reports

11     for posterity, the better.

12          MR. LIMAN:  And I think they are going to produce it

13     next week is what I am told.

14          THE COURT:  Good.  So now we are on page 14.

15          MR. LIMAN:  Your Honor, the bottom of 15, and just we

16     would appreciate your Honor's guidance with respect to the

17     third-party discovery.  We have additional applications for

18     letters of request.  As Mr. Blackman indicated, they need to

19     have some specificity under U.K. law.

20          In the letters of request we excerpt portions of the

21     investigative reports.  I think they are very narrow portions

22     and I think not things that should be objectionable.  They are

23     things like the fact that BSGR, after it obtained the rights in

24     December of '08 and before the negotiations with Vale, was

25     trying to joint venture with somebody else.

F2rdrioc

1          Essentially, what we would like is the investigative

2     reports are designated as attorneys' eyes only.  We are

3     scheduled to talk to plaintiff about whether the reports as a

4     whole should be designated.  If we could submit under seal the

5     applications to your Honor so you could have a chance to rule

6     with respect to the limited aspects that are in the letter --

7          THE COURT:  All right.  Why don't you in the first

8     instance see if they will release confidentiality on the

9     limited aspects you are quoting.  If they release it, then you

10    can quote it, and, you know, with certain limitations --

11    because my reputation goes with your letters of request, but to

12    a certain extent, you know, I will sign what you all put

13    forward at least as to nonparties.  With respect to parties, I

14    like to try to resolve the disputes here rather than in London.

15         But, obviously, as you know, if you ask for too much,

16    particularly even though the U.K. is much closer to us than the

17    rest of the European Union, if you ask for too much in the way

18    of documents, the odds are pretty good that the request is

19    going to be rejected.  And I suspect that if it is rejected,

20    they are not going to spend the hours that I do parsing

21    requests and negotiating as opposed to saying overbroad, try

22    again.  So --

23         MR. LIMAN:  Your Honor, that is precisely the reason

24    why we refer to documents that are produced --

25         THE COURT:  All right.  So quickly get your draft to

39

F2rdrioc

1    Mr. Lyttle, or anyone else who has a say in releasing

2    confidentiality or the like, and work it out, and if you can't

3    work it out, you will send it to me and, you know, I will rule

4    accordingly.

5            MR. LIMAN:  And, your Honor, I take it from Judge

6    Berman's order that it appears we should now be directing them

7    to you?

8            THE COURT:  All of the requests should have been

9    coming to me from day one.  I am not at all sure why you

10   thought you had to go to Judge Berman with the first set, but

11   all of them would come to me.

12           That has finished the, I think -- Mr. Lyttle.

13           MR. LYTTLE:  One point of clarification on the

14   Chinalco Data Room.  They had asked for March 6th.  I did tell

15   Mr. Lyle in the hallway we thought we would be able to meet

16   that.  Actually, I checked with my colleague, Ms. McCaffrey.

17   We do have a motion in opposition due next week.  We are very

18   busy.  Ms. McCaffrey is critical to both of those.  I would ask

19   if we could have to the end of the week to produce that?

20           MR. LIMAN:  That is fine, your Honor.

21           THE COURT:  OK.  Fine.

22           There is something in your letter, Mr. Blackman, about

23   is it -- no.  Different letter.

24           One of you wrote about is it Lots One through Four or

25   just One and Two, or are you all cleared up on all of that?

F2rdrioc

 1          MR. LIMAN:  We are all cleared up.  I think we will

 2    document it between us.

 3          THE COURT:  OK.  All right.  So let's figure out when

 4    you want to come back.

 5          MR. LYTTLE:  Your Honor, one other dead item is the

 6    predictive coating protocol.

 7          THE COURT:  Consider it signed.  It will officially be

 8    signed probably Monday or Tuesday.  I am doing a short opinion

 9    to go with it, frankly, more for the public than for those of

10    you here, but I thought that would be helpful for the discovery

11    community.  So it will get officially signed when that opinion

12    is ready to go, which will be Monday or Tuesday, depending on

13    how hectic Mr. Liman's former colleagues in the U.S. Attorney's

14    Office keep me next week when I've got the criminal coverage.

15          All right.  So let me look at the calendar.

16          OK.  Morning of March 10, does that work for all of

17    you?  Normally I would start at 9:30.  Are there any of you who

18    are coming from a longer distance than locally that would want

19    a slightly later start?

20          MR. LYLE:  If we could, your Honor, yes.  We are

21    coming from Washington.

22          THE COURT:  What is the earliest you can get here

23    without -- well, knowing, you know, we are still in potential

24    bad weather and all of that and that the afternoon is busy so?

25          MR. LYLE:  Then we will come up the night before, your

F2rdrioc

1    Honor.  We will go with the 9:30.

2              THE COURT:  If you want to do 10 or 11 --

3              MR. LYLE:  It won't matter.  So thank you, your Honor.

4    We don't want to risk the flight so we will come in the night

5    before.  Thank you.

6              THE COURT:  All right.  So March 10th at 9:30.

7              Usual drill.  Make your arrangements with the reporter

8    on whatever sharing agreement you have been using.  The

9    transcript is the record for objection purposes.  You know the

10   drills on that.

11             With that, happy end of February.  See you next month.

12             Two days before.  No extra letters, please.

13        MR. LYLE:  Yes, your Honor.

14        THE COURT:  OK.

15        MR. LYLE:  Thank you, your Honor.

16

17                              -  -  -

18

19

20

21

22

23

24

25