**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

April 6, 2015

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   **Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (S.D.N.Y.)**

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), Vale S.A. ("Vale"), and Mahmoud Thiam write jointly to update the Court on the status of various discovery issues in advance of our April 8, 2015 hearing.

Since the March 17, 2015 hearing before Your Honor ("Hearing"), the parties have been meeting and conferring on a regular basis, both through telephonic meet and confers and written correspondence.  While the parties have made some progress, there are a number of disputes that require the Court's assistance.  Below is a proposed agenda for the April 8, 2015 status conference.

**I.      DISCOVERY FROM DEFENDANT THIAM**

As explained in prior correspondence to the Court, Defendant Thiam provided all responsive, otherwise non-privileged documents previously withheld as privileged to counsel for the Government of Guinea on February 13, 2015.  On April 2, 2015 counsel for the Guinean Government confirmed that the matter has been submitted to the Secretary-General in the Presidency for final review in accordance with Guinean law and that they are awaiting his ruling. Counsel for the Government of Guinea has confirmed that the documents will be released immediately after the Secretary-General reaches a decision.  Mr. Thiam confirms that he will be

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

able to produce the documents to Rio Tinto within a week of their release.  The parties will continue to keep the Court apprised of any developments on this issue and remain hopeful that it will be resolved soon.

## II.      DISCOVERY FROM DEFENDANTS BSGR AND STEINMETZ

### A.      Plaintiff's Position

***Production from BSGR and Steinmetz's "Non-Responsive" Cilins Documents.***  On Friday, April 3, 2015, Defendants BSGR and Steinmetz produced certain documents that were returned as a result of the search term "Cilin\*" and previously withheld as non-responsive.  Rio Tinto is in the process of reviewing those documents and will update the Court on its findings.

***BSGR And Steinmetz's Privilege Log.***  On March 6, 2015, BSGR and Steinmetz produced revised privilege logs for the documents they withheld when responding to jurisdictional discovery.  Both logs are still deficient.  Based on the information provided, Rio Tinto cannot assess the validity of either defendant's privilege claims.

Both defendants appear to have withheld communications that were circulated between BSGR, Steinmetz, their attorneys, and Powerscourt Group ("Powerscourt"), a London-based corporate communications agency with more than sixty clients.  BSGR and Steinmetz claim these documents are protected from disclosure under the attorney-client privilege, even though they were disclosed to Powerscourt, an independent third-party.  Ordinarily privilege is waived when a client discloses communications to a third-party that would otherwise be protected by the attorney-client privilege.  To get around this well-established rule, BSGR and Steinmetz claim that Powerscourt is their agent, functioning as BSGR's in-house public relations department. As such, they argue, Powerscourt is protected by the same privileges that may be asserted by BSGR or Mr. Steinmetz to shield their own communications with counsel.

Rio Tinto cannot test the merits of this position.  Rio Tinto has no way to determine whether Powerscourt was the functional equivalent of a BSGR employee at the time of the communications in question.  Neither party has provided any information regarding the nature of its relationship with Powerscourt or the scope of Powerscourt's duties.  Rio Tinto has requested this information and expected to receive it no later than today.  As of the time of this filing, we have not heard from BSGR or Steinmetz.  Rio Tinto reserves the right to seek appropriate relief from the Court if, after a full analysis of the underlying facts, it determines that BSGR and Steinmetz have improperly withheld communications involving Powerscourt.

### B.      Defendants' Position

On February 17, 2015, BSGR and Mr. Steinmetz produced their privilege log for the documents they withheld when responding to jurisdictional discovery.  The privilege log reflects that both defendants withheld communications that were circulated between BSGR, Mr. Steinmetz, their attorneys, and Powerscourt Group ("Powerscourt"), a London-based public relations firm.  BSGR and Mr. Steinmetz claim on the privilege log that these documents are protected from disclosure under the attorney-client privilege.

In response to complaints from Rio Tinto unrelated to the issue it now raises, on March 6, 2015, BSGR and Steinmetz produced revised privilege logs.  More than three weeks later, on March 30, 2015, Rio Tinto requested that BSGR and Mr. Steinmetz provide "the Index number, Date, Custodian, Author/Sender, Recipient, CC/BCC and privilege claim for each individual document involving Powerscourt that does not have an attorney in the author/sender field, recipient, or cc/bcc field."  On March 31, 2015, BSGR and Mr. Steinmetz responded to Rio Tinto's request, informing it that there is only a single document for which an attorney is not an author/sender, recipient, or a CC/BCC.  On April 1, 2015, Rio Tinto asked for "a revised privilege log with categories that provide more clarity as to what the legal advice being rendered related to and the role that Powerscourt played in rendering that advice."  BSGR and Mr. Steinmetz replied on April 2, 2015, stating that the revised privilege logs it served already provided the information now sought, but that they were willing to have a call to discuss the issue.

The parties had an initial meet-and-confer session on April 3, 2015, during which BSGR and Mr. Steinmetz explained that, as listed on the privilege logs, Powerscourt was and is functionally equivalent to an employee of BSGR, acting as an in-house public relations department.  Rio Tinto complained that it could not test the merits of this position, and posed a series of specific questions concerning Powerscourt's relationship with BSGR and Mr. Steinmetz.  Counsel for BSGR and Mr. Steinmetz stated that they did not believe many of the questions were relevant, but would endeavor to answer some of them, after conferring with BSGR and Mr. Steinmetz, by Monday, April 6, 2015.  However, counsel for BSGR and Mr. Steinmetz explained, due to the holidays it might not be possible to get in contact with BSGR and Mr. Steinmetz, so they may not have answers to all of Rio Tinto's new (irrelevant) questions by then.  Counsel to BSGR and Mr. Steinmetz agreed to provide an update by the end of Monday, April 6, and it was agreed that the parties would then continue to meet and confer.

As agreed, counsel to BSGR and Mr. Steinmetz did provide an update on April 6, providing the relevant additional information Rio Tinto had requested.  Counsel to BSGR and Mr. Steinmetz also informed Rio Tinto that, due to the holidays, they had not yet been able to discuss Rio Tinto's new, irrelevant questions with their clients, but that they would keep Rio Tinto apprised of their progress in this regard.

## III.    DISCOVERY FROM VBG DEFENDANTS

Counsel for VBG has informed Rio Tinto that there are 77 boxes in Guinea that were not seized by the Guinean Government.  The contents of those boxes include the following:  one box of legal files; seven boxes with bank statements, pay slips, bank reconciliation statements, cash vouchers, and health forms dated from 2006 to 2010; and 69 boxes of invoices from suppliers and services providers, property purchase invoices, orders of payments of invoices, list of contracts, payroll statements, and taxes and duties payment receipts.  Counsel for Rio Tinto and VBG will continue meeting and conferring to discuss this issue and VBG's outstanding request to the Guinean courts for the documents seized by the Government of Guinea and will update the Court accordingly.

## IV.    DISCOVERY FROM DEFENDANT VALE

Plaintiff and Defendant Vale have exchanged correspondence and conducted several telephonic meet and confers.  There are several outstanding disputes that require the Court's resolution.

### A.    Plaintiff's Position

***Vale Has Destroyed Documents from Key Custodians Like Roger Agnelli, Fabio Barbosa, and Eduardo Ledsham.***  For the first time on Friday April 3, Vale informed Rio Tinto that it had destroyed documents from <u>eight</u> key custodians, several of which Vale proposed, and that the parties had previously agreed upon:  Roger Agnelli (former CEO), Fabio Barbosa (former CFO), Eduardo Ledsham (former head of exploration), Jose Andre de Castro Alves (General Manager , Iron Ore 2009-2010 and General Manager, Simandou 2010-August 2012), Keith Martin (represented Vale in the November 2008 Rio Tinto negotiations), Marco Monteiro (Vale Country Manager for Guinea, 2006-2009), Bruno Perrotta (accessed the Rio Tinto data room), and Paul Antaki (senior manager for business development, Africa, Middle East and West Asia, 2004 to 2012).

These custodians undoubtedly are among the most central to the allegations in this case. Roger Agnelli and Eduardo Ledsham led the dealings with Steinmetz/BSGR and Rio Tinto. Fabio Barbosa (Vale's CFO at the time) reportedly refused to sign the joint venture with BSGR and resigned in protest.  Jose Andre de Castro Alves also was one of the key negotiators on the Vale-BSGR transaction and would go on to be the general manager for the Simandou project during a time period critical to Rio Tinto's allegations, including Mahmoud Thiam's tenure as Minister of Mines.  And Bruno Perotta was one of the last Vale employees to access the Rio Tinto data  room, specifically accessing data related to Rio Tinto's rail and port plans.  Among other things, materials from these custodians are critical to understanding the nature of Vale's and BSGR's discussions prior to entry of the joint venture, as well as to test Vale's representations that it had no idea that Steinmetz/BSGR were engaged in bribery to obtain Simandou.  Conveniently for Vale, these documents all have apparently been destroyed.  The prejudice to Rio Tinto from Vale having destroyed these documents is incalculable.

Vale fully recognizes these are critical custodians since Vale itself first proposed several of them back in December.  Vale apparently did nothing at that time to ascertain whether it actually had documents for them.  When exactly Vale destroyed documents from these custodians remains to be seen, but Vale's lawyers have represented that they have known for "at least the past month or two" that Vale had no documents for these custodians.  Instead of promptly notifying the Court, Rio Tinto or any other party in this case of that fact, Vale's counsel said nothing for at least a month or more while the parties negotiated about the production of documents that didn't even exist because Vale had destroyed them.  Indeed, Rio Tinto spent months negotiating in good faith with Vale's counsel regarding the scope of discovery, and repeatedly asked about the status of Vale's document collection efforts from its custodians.  Never once did Vale's counsel even suggest that Vale had destroyed documents for eight crucial custodians until this past Friday.  Vale cannot possibly have acted in good faith during discovery when it concealed the destruction of critical documents for months, and have had Rio Tinto's document requests since June 2014.

Rio Tinto has asked Vale to immediately produce its corporate retention policies and Vale's counsel has taken our request under advisement.  We ask that the Court order Vale to produce its corporate retention policies by Friday, April 10, 2015.  Moreover, Rio Tinto may seek a Rule 30(b)(6) deposition regarding, *inter alia*, Vale's corporate retention policies, the circumstances surrounding the destruction of the documents, and the reasons for their destruction.  Vale lists its ADRs on the New York Stock Exchange, and reports to the SEC and other regulatory bodies around the world.  It defies logic that Vale would have corporate retention policies authorizing the destruction of documents from its CEO and CFO, among other senior officers.  Moreover, Vale was made aware that activities related to Simandou were being investigated by the Guinean Government in 2011 and the U.S. Department of Justice in 2013.  How Vale allowed the documents of some of its key custodians (including its CEO who left in 2011 and was key to the Simandou negotiations), among others, to be destroyed warrants further examination and explanation.

Rio Tinto intends to get to the bottom of what happened, and reserves its rights to seek appropriate relief with the Court.

**Vale's Proposed Use of Search Terms to Cull the Document Universe is Inappropriate.** On April 1, Vale informed Rio Tinto that it had unilaterally decided to apply search terms to its Document Universe (a Document Universe that, as explained above, is already woefully flawed because it includes documents from only 14 of the 22 agreed-upon custodians).  Vale used its search terms to eliminate 1,427,030 documents, almost 75% of the documents in its Document Universe.

Your Honor already has weighed in on the inappropriateness of using search terms to cull the Document Universe.  As the Court unequivocally stated during the parties December hearing, "there is really no debate" as to whether it is appropriate to run search terms prior to predictive coding.  12/09/2014 Hr'g 33:18.  Your Honor went on to explain, "Search terms to find your seed set are great.  Search terms to limit the universe that you are running your population against means that everything you didn't get with the search terms will never be found by the predictive coding engine, which usually skews the results."  Id. at 33:21-25.

As the Court is well aware, Vale's use of search terms to unnecessarily cull the Document Universe introduces the risk of low recall.  Such a risk is unnecessary when predictive coding, without the interference of search terms or keywords, performs significantly better than search terms in responsive document recall.  In fact, studies have shown that keywords provide well below 50% recall of responsive documents from a document population to more than 80% with predictive coding alone.  *See e.g.*, David Grossman, *The Impact of Judgmental Sampling on Assisted Review*, at 9 (finding that keyword queries resulted in less than 10% recall for most queries and that even after a second round of keywords were applied, recall "remained well below 50 percent"); *Da Silva Moore v. Publicis Groupe*, 2012 WL 607412 (S.D.N.Y. Feb. 24, 2012), aff'd 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012) (Judge Peck) ("Moreover, keyword searches usually are not very effective. In 1985, scholars David Blair and M. Maron collected 40,000 documents from a Bay Area Rapid Transit accident, and instructed experienced attorney and paralegal searchers to use keywords and other review techniques to retrieve at least 75% of the documents relevant to 51 document requests. David L. Blair & M. E. Maron, An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval System, 28 Comm. ACM 289

(1985). Searchers believed they met the goals, but their average recall was just 20%. *Id*. This result has been replicated in the TREC Legal Track studies over the past few years.")

Vale's use of search terms to unnecessarily cull the Document Universe compounds the other problem with its Document Universe – namely that it only contains documents from 14 out of the 22 (63%) of the agreed-upon custodians. As the Court knows, the parties worked hard – and spent a great deal of resources on – negotiating the Predictive Coding Protocol (Dkt No. 206). Moreover, this Court spent time evaluating that Protocol and eventually wrote an opinion that has been the subject of extensive press in the greater ESI community. It would be a shame if Vale were permitted to apply the Predictive Coding Protocol in a manner that would distort the results and distract from the ultimate goals of the entire predictive coding process.

Vale's search terms are also deficient on their face. They only contain a handful of terms in Portuguese, the language that Vale's employees speak and use, and exactly one term in French, the language used in Guinea and used to communicate with the Guinean government. They also run the risk of eliminating key concepts critical to this case. As the Court observed at our January hearing, it's unlikely that entities participating in bribery and corruption actually used words like "brib*" and "corrupt*" to discuss those activities, even though Vale proposes using such terms to cull down its Document Universe here. 1/13/2015 Hr'g 39: 2-6 (The Court asking "Is the word 'fraud' or 'RICO' in the list? I'm being facetious," in response to Vale's prior search term proposals which included terms like "steal" and "misappropriate").

Vale wrongly claims that this culling criteria is permitted by Section 4 of the Predictive Coding Protocol (Dkt No. 206). Vale fails to account for the fact that Section 4 also requires that the application of such culling criteria "be reasonable and appropriate." Vale's application of search terms to cull a Document Universe (of less than 2 million documents and containing documents from only 63% of its agreed-upon custodians) by almost 75% is neither reasonable nor appropriate for the reasons discussed above. Moreover, the provision contemplating the use of search terms – only when reasonable and appropriate – was a courtesy based on the very remote chance that, as Vale and the other Defendants indicated in their representations to the Court when seeking a stay of discovery, there were indeed "terabytes of data" responsive to Rio Tinto's requests. Dkt No. 100 at 10. Vale's current Document Universe of 1.9 million documents comes nowhere close to those numbers. Vale's approach does nothing but skew the results of its predictive coding process by eliminating almost 75% of its Document Universe at the outset.

Unlike *In re Biomet*, Vale is not facing a scenario of running an unreasonably high volume of documents through predictive coding and it should not be permitted to manipulate the predictive coding process by applying search terms to cull the Document Universe.[1] Rio Tinto therefore respectfully requests an order from the Court requiring that Vale submit its entire Document Universe to predictive coding.

### Because Vale intends to rely on its due diligence as a defense, it must produce its

---

[1] By way of comparison, Rio Tinto's Document Universe is approximately 3,000,000 and it does not intend to use any search terms to cull the Document Universe.

***diligence reports and add two key custodians involved in evaluating that diligence.*** It is clear that Vale intends to heavily rely on the due diligence it conducted in conjunction with the Vale-BSGR transaction as a key part of its defense in this case. For example, Vale's former General Counsel explained to the Brazilian magazine *Piauí*, "Before we closed the deal, we did our due diligence. Vale hired two international law firms, Cleary Gottlieb and Clifford Chance, to proceed with an independent investigation with the concession…the company also hired the American firm Nardello & Co. to examine the transaction." The same theme was echoed by Mr. Blackman at the parties first hearing before Judge Berman ("In fact, our arbitration claim is that they misrepresented to us through reps, warranties, personal certifications and the like that they had engaged in no such activity, the standard FCPA diligence. That's why Vale entered into the joint venture." 6/9/2014 Hr'g 8:16-20) and has been echoed by Vale in numerous public statements.

Since the beginning of discovery – over nine months ago – Rio Tinto has tried to explore this claim, requesting that Vale produce documents related to its due diligence efforts, in particular the due diligence reports prepared in connection with the Vale-BSGR transaction by Nardello,[2] Cleary Gottlieb and Clifford Chance, among others. In fact, these documents were requested in the very first set of document requests that Rio Tinto served back in June 2014. Like Rio Tinto's investigative reports that Rio Tinto worked hard to identify and expedite for production, these diligence materials are a discrete and readily identifiable set of documents, the likes of which Vale has represented to Rio Tinto that it does not intend to submit to the predictive coding process. There is no burden associated with producing these due diligence reports. Even if there were, it is undoubtedly outweighed by Rio Tinto's need for these reports, which are crucial to evaluating the due diligence Vale relies upon and are likely to inform any additional third-party discovery that may be necessary, including through foreign channels or third party subpoenas. It also will inform the role Cleary Gottlieb lawyers played in this due diligence that Vale has clearly put at issue.[3] We are quickly running out of time and Vale cannot continue to delay production of case critical documents.

Vale also performed an internal re-evaluation of its due diligence on the BSGR transaction in 2011. That effort was overseen by Murilo Ferreira and Ricardo Flores, both of whom played key roles in evaluating the adequacy of Vale's earlier due diligence as well as the propriety of the Vale-BSGR transaction more generally. Indeed, it was Mr. Flores who "asked to see the contract with Steinmetz. After analyzing it, he concluded that it was contrary to the company's interest. He questioned it clause by clause. He was furious to learn that Vale had paid 500 million dollars without any guarantee, that it would bear all the financial liability for [Simandou], and that it had formally waived its right to prosecute [BSGR]." *Piauí* at 11. Soon after Flores' review of the Vale-BSGR contract, Roger Agnelli was fired as Vale's CEO. He was replaced by Ferreira, who in May 2011 flew to Guinea to meet with Guinean President Alpha Conde and was told "that Guinea wanted no business with Steinmetz [and if] Vale wanted

---

[2]  Rio Tinto has served a subpoena on Nardello for the materials underlying its due diligence work on BSGR and Steinmetz.

[3]  To date, Rio Tinto has not served a subpoena on Cleary Gottlieb or Clifford Chance in light of Your Honor's order that subpoenas should not be served on law firms until the parties first see what is produced (or logged) from the client's files. Rio Tinto reserves its rights to do so in the future, should circumstances warrant.

to stay in Simandou, the company would have to get rid of its partner." *Id.* at 12.  Ferreira would immediately return to Brazil, undertake a formal review of the Vale-BSGR contract, claim force majeure, and suspend enforcement of all contractual clauses with BSGR.  Ferreira also later met with the Guinean President in February 2014 to ask that the Guinean technical committee tasked with reviewing BSGR's rights to Blocks 1 and 2 at Simandou postpone the release of its finding for sixty days.  The results of the technical committee's findings that Mr. Ferreira sought to have delayed?  That Vale's partner BSGR had won the mining rights to Blocks 1 and 2 of Simandou through bribery and corruption.  There can be little doubt, therefore, that both Ferreira and Flores are custodians of relevant documents in this case and should be added to Vale's custodian list immediately.

When Rio Tinto asked that they be added, Vale refused.  This request to add *two* custodians is particularly baseless in light of the fact Vale then just a day later announced that it had destroyed documents from *eight* of its custodians (including Agnelli), leaving it with only fourteen custodians total.  In contrast, Rio Tinto is collecting and producing from 25 custodians, including its current and former CEO.  Vale adding a couple of custodians who undeniably possess highly relevant documents when it already has destroyed documents from four times that many custodians is more than reasonable and fair.  Rio Tinto therefore requests an order from this Court that Vale add Murilo Ferreira and Ricardo Flores as custodians.

***Vale Refuses to Agree to Predictive Coding Disclosure Dates.***  On March 27, 2015 Rio Tinto sent Vale a proposed schedule for mutual exchange of date required under the parties agreed upon Predictive Coding Protocol.  The idea was to kick off a discussion about dates that would work for both parties to move the ball forward.  Vale, however, refused to even engage in discussions on deadlines, instead replying that it did "not think further specification of the schedule for predictive coding disclosures is necessary."  Vale then informed Rio Tinto – the very next day – that it intended to use predictive coding to cull the Document Universe.  Rio Tinto objected to the use of search terms and the parties scheduled a meet and confer for April 6, 2015 but were unable to resolve their dispute.  During that call, however, counsel for Vale also informed Rio Tinto that it would be producing its Control Set (which starts Rio Tinto's five business days for review under the terms of the Predictive Coding Protocol), despite the parties ongoing disagreement over the appropriateness of Vale's proposed culling criteria.  This dispute clearly impacts the Document Universe and, consequently, the Control Set derived from that universe.

Given Vale's attempts to game the discovery process and that the parties are now within three months of the Court-ordered deadline for the substantial completion of written discovery, Rio Tinto believes that Court-ordered deadlines are absolutely critical for Vale to substantively participate in discovery.  Rio Tinto therefore proposes that the Court enter the following dates for predictive coding disclosure:

**Control Set Disclosure:**  April 10, 2015

**Objections to Control Set:**  April 17, 2015

**Seed Set Disclosures:**  April 17, 2015

**Objections to Seed Set Disclosures:**  April 24, 2015

**Training Set Production:**  To be determined based on training process

**Objections to Training Set Production:**  10 business days after Training Set production

**Disclosure of Uncategorized Documents:**  To be determined

**Validation Set:**  Prior to first production

*Vale refuses to produce documents in response to several of Rio Tinto's requests in its Second Request for Documents.*  Each of Rio Tinto's second set of document requests seek specific, targeted information relevant to the claims at issue in this case.  Rio Tinto's requests seek documents related to Vale's monitoring of the Guinean Presidential election and its expected or potential impact on Vale's mining rights at Simandou, two specific meetings between Vale's CEO and the President of Guinea relating to Simandou, and documents related to Vale's evaluation of its earlier due diligence on BSGR deal.  Vale refuses to produce documents in response to these requests except to the extent that they refer to "the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the Amended Complaint."  Their proposal is insufficient (and dependent on terms like "bribery" and "misappropriation" that this Court has recognized are not likely to be in the documents).  Rio Tinto therefore respectfully requests that the Court order Vale to produce documents in response to the following requests:

- Request No. 53:  All Documents and communications concerning the November 2010 Guinean Presidential election and its potential or expected impact on Vale's mining rights in Simandou in whole or part, and in particular, what impact, if any, the election of presidential candidate Alpha Condé may have on those rights.

- Request No. 56:  All Documents and communications concerning the purpose, agenda items, topics for discussion, actual content and substance, post-meeting discussions and reporting, and any other follow-up from Roger Agnelli's meeting with Alpha Condé and Luiz Inácio Lula da Silva in February 2011.

- Request No. 62:  All Documents and Communications relating to internal discussions about the legality and/or propriety, including any perceived or actual legal risk or exposure, of Vale's joint venture with BSGR, including Vale's decision to conduct an audit of the negotiation and execution of the agreement with BSGR after Ricardo Flores became chairman of Vale's board of directors.

- Request No. 63:  All Documents and Communications concerning the purpose, agenda items, topics for discussion, actual content and substance, post-meeting discussions and reporting, and any other follow-up from Murilo Ferreira's visit to Guinea in May 2011 and meeting with President Alpha Conde.

- Request No. 64:  All Documents and Communications concerning any meetings of Vale's board of directors in which board members discussed and/or conferred regarding BSGR, Vale's joint venture with BSGR, VBG, Simandou, or mining iron

ore in Guinea, including but not limited to Dan Conrado's presentation to the Vale board of directors of his views on Vale's joint venture with BSGR, and all minutes, attendance records, presentations, board papers, slides and/or summaries of such meetings.

▪ Request No. 65:  All Documents and Communications concerning Vale's decision to declare a material adverse change and/or force majeure with respect to its joint venture agreement with BSGR.  Again, Vale refuses to produce documents in response to this request except to the extent that they refer to "the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the Amended Complaint."

## B.    Defendants' Position

Vale continues to make rolling document productions, including most recently on April 2.  In accordance with the Predictive Coding Protocol, Vale also disclosed its Control Set on April 6.  Notably, none of the documents produced by Vale, or produced by Rio Tinto, support the key allegation in the Amended Complaint that there was an agreement between Vale and BSGR in 2008, or provide any evidence that Vale played any role in the loss of Rio Tinto's concession or its award to BSGR by the Government of Guinea at that time.  Predictably, unable to support its allegations with any evidence, Rio Tinto unjustifiably raises six issues with respect to discovery from Vale, although three of them have been raised only since last Thursday, April 2, or even more recently:

(1) Plaintiff's unjustified and belated demand for additional custodians,

(2) Plaintiff's demand that Vale make an expedited and special production of due diligence materials, including those that may be privileged and will be logged in due course pursuant to the ESI Protocol and Your Honor's instruction,

(3) Plaintiff's demand in its Second Document Requests for irrelevant business materials created long after the formation of the April 30, 2010 JV with BSGR,

(4) Plaintiff's objection to Vale's use of Culling Criteria in accordance with the Predictive Coding Protocol,

(5) Plaintiff's insistence on a disclosure schedule not provided for in the Predictive Coding Protocol (Vale has already disclosed its Control Set, unlike Plaintiff), and

(6)  Plaintiff's unwarranted complaints regarding Vale's document collection.

The first two issues, in particular, are not timely raised by Rio Tinto at this late date in discovery and the predictive coding process.  Indeed, after months of silence on these issues, Rio Tinto manufactured a dispute on the first two points on April 2 – the day before Good Friday and Passover – by sending an email that first raised the issues (without any prior notice) and by demanding response the following day – a shortened holiday day.  The final point is even more recent – Rio Tinto raised it only a few hours before this joint letter was due.   The Court should

not allow these manufactured claims to distract attention from Rio Tinto's discovery failures or its failure to produce documents supporting any of its claims – now months into discovery.

**Rio Tinto's Request for Additional Custodians Is Unwarranted**.  Last Thursday, April 2, nearly three months after it first agreed on the parties' list of custodians in January 2014, Rio Tinto for the first time demanded that Vale add two additional custodians to its document collection and review, Murilo Ferreira (Vale's current CEO) and Ricardo Flores, in addition to the 22 custodians agreed months ago, and demanded a response by close-of-business the following day.  Ferreira became CEO in May 2011 and Flores was Vale's Chairman for a period in 2010-2012.  The demand is improper.

Rio Tinto represented to the Court back in January that the custodian issue was "resolved" and that "our view is we've got custodians, let's move forward, let's stop doing this piecemeal."  (Jan. 13, 2015 Tr. 25:13-19.)  At the time, the identity of these two individuals and their roles at Vale were well known, yet Rio Tinto agreed to proceed without them among the custodians.  Plaintiff did not even mention their names at the time of the discussions regarding custodians.  Indeed, Plaintiff only begrudgingly acquiesced to Vale's reservation of rights to revisit the list if culling yielded "*too many* documents." (*Id.* at 26:2 (emphasis added).)  Nothing has changed since January to justify additional custodians, and indeed the advanced stage of discovery and the predictive coding process counsels against a change.

Plaintiff attempts to justify this new demand by stating that the custodians are "relevant to our second set of document requests" and specifically that "Vale intends to heavily rely" on a "due diligence" defense.  This is a red herring.  There is no "due diligence" defense as such; this is not a securities class action and Vale has no duty to show due diligence.  Rio Tinto alone has the heavy burden of showing that Vale was involved in or agreed to bribery – an allegation that has been rejected by everyone (including every regulator) who has looked at it and that is frivolous on its face.  In any event, this supposed justification is bizarre, given that both Ferreira and Flores joined Vale only *after* the JV was consummated, and thus played no role either in Vale's alleged decision to join forces with BSGR in December 2008 when Rio Tinto lost the concession (for which there is no evidence whatsoever) or in its decision to sign a joint venture contract with BSGR in April 2010, 14 months after BSGR obtained the rights from the Government of Guinea.  Rio Tinto also has made no showing that the already agreed custodians – who include the key players in the JV negotiations – do not possess the relevant documents to assess Vale's "due diligence."

**Rio Tinto's Demand for Immediate Production of Privileged Due Diligence Materials Should Be Denied**.  Also on April 2, Rio Tinto demanded that Vale "produce the reports prepared in connection with the due diligence associated with the Vale-BSGR transaction, including those prepared by third parties such as Nardello, Cleary Gottlieb and Clifford Chance, among others," demanding once again a response by the following day.  Cleary Gottlieb had no role in the Vale-BSGR transaction.  Clifford Chance was counsel to Vale.  Nardello is among the persons hired by Clifford Chance lawyers to assist that firm in providing legal advice to Vale.  Nardello was not hired by Vale; it did not communicate with Vale; and it has no relationship whatsoever to Vale.  The demand is similarly improper, and many of the materials may in any event be privileged.

*First*, Rio Tinto's position is utterly at odds with what it has previously argued.  Plaintiff has successfully urged on the Court that productions proceed on a rolling basis determined by the producing party, and not "piecemeal." (Jan. 13, 2015 Tr. 25:19; *id.* at 46:2-3 ("Again, we don't want to do this piecemeal.  It is not efficient.  That is our view.").)  The Court accepted Rio Tinto's argument when Rio Tinto made it to support its refusal to produce documents to Vale; indeed, at the last conference, at Rio Tinto's urging, the Court explicitly denied Vale's similar request for expedited production of certain documents, even though constituting a discrete set, on the theory that there should be no piecemeal productions and that the parties should focus their attention (as Vale has been) on the production pursuant to the Predictive Coding Protocol.  (Mar. 17, 2105 Tr. 19:9-11 (denying request to expedite production of bills "sitting in a file").)  Now that it is expedient for Rio Tinto and it is not seeking to withhold documents but to obtain them, it has reversed its position 180 degrees.  The law does not permit such gamesmanship.  *See, e.g.*, *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 364 (S.D.N.Y. 2011) (plaintiff could not opportunistically change position between motion to dismiss and summary judgment), *aff'd*, 484 F. App'x 616 (2d Cir. 2012).  Indeed, just today, Plaintiff apparently changed its position again, asserting that "[w]ith respect to [Vale's] request for Rio Tinto's contracts and engagement letters" with its investigators – which Vale had sought to assess Rio Tinto's claim that it does not have a right to obtain materials collected or created in the course of those engagements – it "will produce those in response to Vale's discovery requests as part of the ordinary course of discovery in this matter" and "will not be producing them on an expedited basis."  Rio Tinto can't have it both ways.

*Second*, Plaintiff argues "[t]he urgency of receiving these materials is now paramount since it will help inform discussions with Nardello over the scope of the subpoena we have served."  Piecemeal discovery does not become more efficient or appropriate just because Plaintiff hopes to make some use of the documents in the short-term; were that the case, every party could request immediate production of all its adversary's documents related to the many third parties they have subpoenaed or plan to subpoena.  If that is Rio Tinto's explanation, it is manufactured.  Vale received notice of a subpoena on Nardello on March 31, 2015, and received this request two days later.  We spoke with the lawyer who expects to be counsel for Nardello on this matter on Good Friday who said that Rio Tinto has not even contacted him or Nardello regarding the subpoena.  Counsel is in the process of being retained and has not yet arrived at a position regarding the documents.  Indeed, Nardello's response to Plaintiff's non-party subpoena is not due until April 30.

*Third*, unlike Rio Tinto, which necessarily collected its investigative materials prior to filing suit and had them readily available for production, Vale has not served an Answer yet in the case because of the pending motion to dismiss, has not therefore asserted any affirmative defenses (much less an inapplicable "due diligence defense"), and thus has not collected these documents as a discrete set.  To the extent Vale has responsive documents, they are interspersed with the other materials Vale will need to review to respond to Plaintiff's many requests.

*Finally*, regardless of the timing of production, the requested materials are largely privileged or non-existent.  As noted, Cleary Gottlieb did not represent Vale in the BSGR negotiations, and Clifford Chance's communications with Vale are likely to be privileged, and of course will be logged as such.  And Nardello was not hired by Vale and did not communicate with Vale.  Vale will produce any responsive, non-privileged documents in due course, and a

privilege log at the completion of document production, as contemplated by the ESI Protocol. Indeed, when the shoe was on the other foot, Plaintiff insisted on the provisions of the ESI Protocol, which does not require a privilege log until the completion of document production, and Your Honor agreed that provision controlled.  (Mar. 17, 2015 Tr. 18:24-19:3-4  ("THE COURT:  Be careful what you agree to.  If that's what the order says, that's what it says.").)  What Rio Tinto successfully argued previously at the last conference applies equally here.

***Rio Tinto's Second Document Requests Seek Irrelevant Information***.  On January 29, 2015, seven months after its first request for documents, Rio Tinto served a second set of document requests on Vale.  Vale served its Responses and Objections on March 2, agreeing to produce documents in response to several of the new requests, including new requests for documents concerning communications with the Government of Guinea and/or BSGR prior to the JV and documents concerning other alleged co-conspirators and government officials such as Toure, Thiam, and Fofana.  The parties met and conferred on March 12 and 27, exchanging written proposals in the interim.  As a result of compromises made by Vale during those meets and confers, Vale has agreed to produce documents in response many of the objected-to requests, limited to a relevant scope.  Plaintiff has insisted, however, on the original scope of its requests, which seek a wide array of documents concerning post-JV business or political matters between Vale and its JV partner or the Government of Guinea that plainly have no relevance to this matter but do have relevance to the potential bidding for the Simandou site and to the competition between these two rivals.  To the extent that the requested documents reference matters that are relevant to this case, Vale will produce them.  In particular, Vale has agreed to produce documents relating to the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the Amended Complaint (the "AC") (as well as any other categories Plaintiff can identify that would be relevant).  Plaintiff has rejected this compromise, instead insisting on overbroad requests that constitute a classic fishing expedition into the files of a competitor.  These document requests do not come as a result of any documents produced by Vale or by Rio Tinto – no evidence has been produced so far of any bribery on the part of Vale or any knowledge on the part of Vale of bribery by others.  It appears to be motivated by *Rio Tinto*'s failure to comply to produce relevant documents and its other failures – as set forth below.

As outlined below, Plaintiff's requests should be limited to documents "relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).

- **RFP 53.**  "All documents and communications concerning the November 2010 Guinean Presidential election and its potential or expected impact on Vale's mining rights in Simandou in whole or part, and in particular, what impact, if any, the election of presidential candidate Alpha Condé may have on those rights."

    o  The November 2010 Guinean Presidential election is not once mentioned in the AC; until this request, it was never mentioned by any of the parties to this litigation and Rio Tinto has failed to articulate how it is now relevant or what it has to do with mining rights allegedly stolen in 2008, and where the alleged theft was confirmed in 2009.  To the extent that documents concerning the election refer to the bribery or other wrongdoing alleged in the AC, Vale will produce them.  Other documents concerning the election, such as general political or

competitive intelligence, may be of interest to Vale's competitor, but they have no bearing on the outcome of this action.

- **RFP 56 & 63.** These requests seek all documents concerning "Roger Agnelli's [then Vale's CEO] meeting with Alpha Condé [the President of Guinea] and Luiz Inácio Lula da Silva [then the President of Brazil] in February 2011" (RFP 56) and "Murilo Ferreira's [Vale's current CEO] visit to Guinea in May 2011 and meeting with President Alpha Condé" (RFP 63).

    o   Once again, these meetings are not mentioned in the AC (indeed, none of the participants is even mentioned there) and have never been mentioned until this request by the parties to this litigation.  Of course, given that Vale operated the Simandou mining concession in Guinea for more than two years and also had bauxite operations there, it undoubtedly had many communications with the Government of Guinea.  But those communications are not relevant to Rio Tinto's claims.  They appeal only to Rio Tinto's interest as a competitor in Vale's operations in Guinea.  Communications between Vale and the Government of Guinea are only relevant to Rio Tinto's claims if they involve the claims of bribery or other wrongdoing alleged in the AC and, if they do, they will be produced.

- **RFP 57**.  "All Documents and Communications regarding the departures of (a) Fabio Spina, (b) Eduardo Ledsham, (c) Ivo Fouto, and (d) Aristides Corbellini from Vale to the extent they relate to or reference Simandou."

    o   These individuals all departed from Vale beginning in May 2011, well after Plaintiff lost its rights in 2008 and the JV was formed in 2010.  There is no evidence that their departures related to any of the allegations in the AC.  With the exception of Ledsham (who is alleged to have attended meetings with Rio Tinto in 2008), they are not mentioned by name or title in the AC.  Plaintiff previously made the identical request regarding other former Vale executives, but then acknowledged that it was not entitled to explanations for former employees' departures from Vale unless it had evidence that those departures were connected to alleged wrongdoing and withdrew the requests in their entirety.  The same result should follow here.  Vale has agreed to produce documents that discuss these departures to the extent those documents indicate the departures were related to the wrongdoing alleged in the AC.  To the extent that documents do not reference the wrongdoing alleged in the AC, the continued request for such documents concerning these departures is both irrelevant and highly intrusive into the privacy of the these individuals – who are not defendants and who are not alleged to have done anything to subject themselves to Rio Tinto's prying.

- **RFP 62**.  "All documents and communications relating to internal discussions about the legality and/or propriety, including any perceived or actual legal risk or exposure, of Vale's joint venture with BSGR, including Vale's decision to conduct an audit of the

14

negotiation and execution of the agreement with BSGR after Ricardo Flores became chairman of Vale's board of directors" in November 2010, after the April 2010 JV.

> o   The term "propriety" is overbroad and vague, and could extend to any number of irrelevant matters, such as the relative merits of business decisions or strategic judgments.  Moreover, Vale's assessment of the 2010 JV after the fact does not shed light on the supposed existence of a criminal conspiracy in 2008 and theft from Rio Tinto in 2008 as alleged by Rio Tinto in the AC (or indeed at any other time before the JV was formed).  Vale has agreed to produce documents, dated between January 1, 2005 and April 30, 2014, relating to internal discussions that occurred before April 30, 2010 about the legality and/or propriety of Vale's joint venture with BSGR, to the extent that the "legality and/or propriety" refers to the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the AC.  Moreover, given that Vale has already agreed to produce documents referring to the bribery and corruption alleged in the AC, Plaintiff will receive any non-privileged documents on those topics, including documents discussing how BSGR obtained the concession and Vale's decision to enter into the JV.

- **RFP 64.**  "All Documents and Communications concerning any meeting of Vale's board of directors in which board members discussed and/or conferred regarding BSGR, Vale's joint venture with BSGR, VBG, Simandou, or mining iron ore in Guinea, including but not limited to Dan Conrado's presentation to the Vale board of directors of his views on Vale's joint venture with BSGR, and all minutes, attendance records, presentations, board papers, slides and/or summaries of such meetings."

> o   This request is overbroad.  As Rio Tinto has previously acknowledged, this lawsuit does not involve the operations of Simandou after Rio Tinto lost that concession.  It involves the alleged theft of Simandou from Rio Tinto and the value of Simandou at the time of that theft.  Thus, the mere fact that BSGR, the JV, Simandou, or iron ore in Guinea were discussed at a board meeting does not make such documents relevant to the claims made in this action.  The request would require Vale to turn over to one of its prime competitors any number of competitively sensitive discussions by Vale's board concerning matters wholly divorced from this case.  This would be a particular imposition given Rio Tinto's position that irrelevant (and competitively sensitive) information cannot be redacted from documents containing any responsive information.  In any event, to the best of Vale's knowledge, there was no presentation to the Vale board by Dan Conrado regarding the JV.  Vale has agreed to produce board materials relating to the wrongdoing alleged in the AC in connection with Simandou.

- **RFP 65**.  "All Documents and Communications concerning Vale's decision to declare a material adverse change and/or force majeure with respect to its joint venture agreement with BSGR."

o Notwithstanding that this topic has no connection to Rio Tinto's claims, Vale has already produced to Rio Tinto, as part of the "Grand Jury" production, documents concerning the force majeure notice Vale sent to BSGR in 2012, including the notice itself, which cites "deterioration in the international economic environment" and "the decision of the Government of Guinea . . . that iron ore extracted from Simandou Blocks 1 and 2 must be transported via a railway line and port situated in Guinea." (VALE-RT_00001661.) The notice (and the reasons for it) relate to a business dispute between Vale and BSGR (and indirectly the Government of Guinea) that does not relate to the claims or defenses in this action.

o That said, Vale has agreed to produce documents, between April 30, 2010 and November 14, 2012, concerning Vale's decision to declare force majeure to the extent such documents indicate that decision related to the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the AC.[4]

***Vale's Use of Search Terms to Narrow the Document Universe***. Section 4(a) of the Predictive Coding Protocol in this case provides that, upon notice to the requesting party, "[i]f the Responding Party determines it to be reasonable and appropriate, the Responding Party may use search terms and other criteria (the 'Culling Criteria') to reduce the volume of the Document Universe." (Dk. 206.) After thorough testing and sampling, and in consultation with Vale's vendor, Deloitte, Vale determined that it was "reasonable and appropriate" to use search terms prior to predictive coding in light of the low prevalence of responsive documents found in the Document Universe of nearly 2 million documents. This low prevalence risked undermining and burdening the process of assessing the accuracy of the predictive coding process and leading to review of a disproportionately large number of documents in relation to the number of responsive documents in the Document Universe. Accordingly, in the middle of last week, on April 1, Vale made the required disclosures to Rio Tinto, including that it had applied a set of over 150 search terms and had reviewed a Statistically Valid Sample of 2,398 documents excluded by the Culling Criteria and found it to contain no responsive documents.

Plaintiff's response was quick and peremptory – sent the next day on April 2: "Vale should not have used search terms to cull its Document Universe, [and] Rio Tinto will not agree to Vale's use of search terms to cull the Document Universe." Inexplicably, but consistent with its changing its tune wherever it sees fit to do so, Rio Tinto asserted that the provision of the

---

[4] In addition to the requests discussed above, Rio Tinto's Request 66, for documents produced or received by Vale in its LCIA arbitration with BSGR, remains pending. Consistent with its Responses & Objections, Vale has notified BSGR of the request and sought its consent to produce these documents, which it is explicitly forbidden to disclose without consent by the confidentiality provisions of Article 30.1 of the LCIA rules. BSGR has refused to give this consent. Vale has therefore informed the Arbitration Tribunal of the request and BSGR's refusal, explaining the situation and seeking the Tribunal's position regarding production in response to this request. That request is pending.

Predictive Coding Protocol explicitly allowing the use of search terms was meant only as a "courtesy" based on the "very remote chance" that it would be reasonable under the circumstances.  As Plaintiff well knows, there are no such qualifications in that provision, nor were they discussed.  Indeed, we recall no objection or concerns expressed by Rio Tinto about the inclusion of the provision permitting the use of search terms.

Moreover, the search terms selected are extremely broad, and reasonably designed to include any documents that even remotely touch on Rio Tinto, BSGR, Simandou and the issues in this case.  As Plaintiff is aware, Vale's statistical sampling found <u>zero</u> responsive documents excluded by the search terms – hardly suggestive of a process that will unreasonably exclude potentially responsive documents.  Nonetheless, Vale has offered to accommodate any reasonable suggestion for additional search terms to ensure that no responsive documents are excluded.  Plaintiff has offered none.  In fact, Plaintiff has indicated it has no interest in pursuing any accommodations offered by Vale at this time and will instead seek a *per se* ruling from the Court that the use of search terms as provided for in the parties' so-ordered agreement is not permitted here.

In short, Vale's approach is not only one explicitly agreed to by the parties, but it is also clearly designed to satisfy the "reasonable inquiry" required by the rules.

***Plaintiff's Insistence on a Predictive Coding Disclosure Schedule.***  On March 27, Plaintiff proposed a schedule for certain disclosures under the Predictive Coding Protocol, such as control and seed sets, that specified certain dates through April.  The Predictive Coding Protocol sets certain time periods, such as the time to raise objections after a disclosure, but does not mandate disclosures on specific dates.  Vale does not believe it is necessary to do so.  Indeed, Vale (unlike Plaintiff) has already disclosed its Control Set and, pursuant to Section 4 of the Predictive Coding Protocol, any objections by Plaintiff are therefore due by April 13.

***Vale's Document Collection.***  Finally, earlier today, and only several hours before this joint letter (and during a call scheduled to discuss predictive coding issues), Plaintiff raised for the first time its purported dissatisfaction that the custodians it had agreed to months earlier include several former employees who departed Vale well before (in each case more than a year or longer) Rio Tinto initiated this suit (and before Vale had any reason to anticipate it would), and for whom Vale has not been able, after a good-faith effort, to identify any documents still in Vale's possession.  Plaintiff's insinuation that the inability of Vale to locate documents for these former employees results from anything other than the long passage of time since the events in question, the regular operation of Vale's document retention policies, and the fact that these employees left Vale well before Plaintiff filed suit, is simply wrong.  Plaintiff's suggestion of a 30(b)(6) deposition on this issue at this time is both premature – the Court's scheduling order states depositions may only begin July 1, 2015, unless "the parties agree" to schedule them sooner (Dks. 161, 163) – and unproductive.  This is a transparent attempt effort pick a fight where there is no reason for one.[5]

---

[5] Although Vale had no reasonable anticipation of civil litigation in the U.S. or anywhere else related to Simandou before this action was filed, it in any case issued a hold on relevant (footnote continued)

## V.     DISCOVERY FROM PLAINTIFF RIO TINTO

Plaintiff and Defendant Vale have exchanged correspondence and conducted several telephonic meet and confers.  Vale served its Second Request for Production of Documents from Rio Tinto on February 23, 2015.  Rio Tinto's responses to those requests are due on March 25, 2015.

### A.     Plaintiff's Position

Consistent with the predictive coding deadlines proposed above, Rio Tinto intends to make its Control Set disclosures on April 10, 2015 and will continue to move forward with the predictive coding process.

***Rio Tinto's Privilege Log for the BHP Production.***  As a preliminary matter, Rio Tinto is at a loss as to why Vale feels the need to raise the issue of Rio Tinto's privilege log in this joint letter.  Upon receiving Vale's various complaints about the BHP privilege log and Rio Tinto's identification of inadvertently produced documents on March 27, 2015, Rio Tinto offered to have a meet and confer on the next business day.  Rio Tinto then notified Vale that it is currently re-reviewing each and every one of the more than 6,900 privileged documents contained on the categorical privilege log and will deliver a revised categorical privilege log no later than May 4, 2015 – just as Vale had requested.  Despite Rio Tinto's more than reasonable willingness to compromise on these issues, Vale notified Rio Tinto on April 6, 2015 that it still intends on raising these issues with the Court.  Rio Tinto therefore has no choice but to provide the Court with the applicable history here.

In late 2014, the Court ordered Rio Tinto to produce documents from five custodians in response to Vale's document requests related to BHP Billiton's takeover attempt.  In response, Rio Tinto produced over 60,000 documents by February 16, 2015.[6]  Not surprisingly, there is a large volume of privileged documents as Rio Tinto was in constant contact with its attorneys on issues related to the takeover defense for a period of approximately one year.  Upon completing the BHP production, Rio Tinto endeavored to create a privilege log for the more than 6,900 responsive but privileged documents in the five custodian's files.  This privilege log technically was not due until after the parties completed production, but Rio Tinto nonetheless undertook the effort to provide it to Vale early as a courtesy.

The ESI Order in this case (Dkt. No. 82) allows for categorical privilege logs.  As of the time Rio Tinto began preparing its log, the only parties in this case to provide a categorical

---

documents years earlier after becoming aware of the Government of Guinea's investigation of Simandou.

[6]  Although it complied with this Court's Order,  Rio Tinto maintains its original position with respect to the BHP document requests;  with the exception of documents related to a potential deal with Vale, these documents have nothing to do with this litigation.

privilege log were Defendants BSGR and Steinmetz.  On March 6, 2015, Defendants BSGR and Steinmetz provided a three-page log that asserted privilege over 91 documents (including many communications that included a third party, Powerscourt Group), all of which were logged within a total of five rows and only three categories.  Because Vale had proposed the categorical privilege log language contained in the ESI Order, Rio Tinto reached out to Vale to ask whether it thought the BSGR/Steinmetz privilege log was adequate under the ESI Order.  During a March 12, 2015 phone call, Vale said that it believed the Steinmetz/BSGR privilege log complied with the ESI protocol (the parties also discussed other aspects of the privilege log).  In addition, on March 16, 2015, Vale also made clear that although not required by the Federal Rules or the ESI protocol, it felt a privilege log legend identifying the affiliation of every person on any privileged document, was necessary.

On March 18, 2015, Rio Tinto produced a categorical privilege log relying on the representations Vale made about what it believed was acceptable under the ESI order.  Although all of the documents produced related to a single category – the BHP takeover defense – Rio Tinto worked hard to break out the privilege log into a total of ten categories.  In addition, Rio Tinto provided a privilege log legend, which it had put together in the less than two days that passed after Vale announced a privilege log legend was necessary to evaluate claims of privilege.  In short, Rio Tinto checked with Vale first, and then committed significant resources to put together a privilege log that complied with the ESI protocol and Vale's stated expectations, despite the fact that most parties in this litigation – and Vale in particular – have yet to do so.

Despite Rio Tinto's good faith effort to comply with the ESI protocol, Vale notified Rio Tinto on March 27, 2015 that it considered Rio Tinto's BHP privilege log completely deficient, and demanded that Rio Tinto provide more specificity across the board (as opposed to identifying certain categories for which it seeks more granularity).  Rio Tinto expressed its surprise that Vale considered the Steinmetz/BSGR privilege log adequate yet considered Rio's BHP privilege log wholly deficient.  Rio Tinto suggested that if the categorical privilege log language in the ESI Order was going to be used as a means to force parties to expend enormous resources constantly re-logging documents on the grounds categories were not sufficiently detailed, then it would be best for all parties to either (1) amend the ESI protocol language to provide more specific requirements as to the categorical privilege log process that would apply fairly to all parties at the outset, or (2) simply produce document-by-document privilege logs.  Vale rejected both ideas.

Rio Tinto objects to being a guinea pig in the categorical privilege log process, and objects to this unnecessary and wasteful sideshow on privileged documents that are, at best, marginally relevant to this case.[7]  Rio Tinto respectfully requests that all parties in this litigation be required to provide the same level of specificity that Vale is demanding from Rio Tinto with respect to the categorical privilege log.  The best way to do that is to order Vale to enter into negotiations to amend the ESI protocol.

---

[7]   Rio Tinto reserves its right to seek the costs associated with the re-logging effort it has agreed to undertake for Vale.

***Inadvertently Produced Privileged Documents.***  Again, there is no issue here.  In compliance with this Court's Order regarding Vale's BHP document request, Rio Tinto reviewed tens of thousands of documents in a very short time frame, and produced more than 60,000 documents.  In doing so, Rio Tinto inadvertently produced a number of privileged or partially-privileged documents.  Pursuant to the 502(d) and Protective Orders in this case, Rio Tinto notified the parties of this on March 18, 2015.

On March 27, 2015, and despite Vale's obligation not to review the documents Rio Tinto identified as privileged, Vale gave Rio Tinto an ultimatum that conditioned its willingness to honor the 502(d) and Protective Order on obtaining certain concessions from Rio Tinto, including a document-by-document privilege log of the relevant documents.[8]  Despite Vale's antics – and to avoid burdening the Court with this issue – Rio Tinto agreed to produce a document-by-document log of the fully-privileged documents that Rio Tinto clawed back on March 18, 2015.[9]  Rio Tinto is thus doing exactly what Vale has asked.

***Rio Tinto's Interrogatory Responses.***  Vale asks that this Court order Rio Tinto to amend its interrogatory responses – now for a fourth time – to include sources of information in the various investigator reports Rio Tinto has produced to date.  Vale's request is improper.  As an initial matter, by their very argument Vale acknowledges that the names of several sources already are identified in the reports themselves.  Rio Tinto does not need to further identify them in the interrogatory responses.  As for the other sources in the reports, their names may be known by Rio Tinto's investigators, whom Rio Tinto already has identified for Vale.  The investigators already have provided in their reports the necessary and appropriate level of detail and identifying information to allow recipients of the report to evaluate the reliability of these sources without compromising their identities and the investigator's ability to access them in the future.  This is precisely how investigative firms routinely work to provide information while preserving their confidential and proprietary network of sources.  Vale is going down the very "slippery slope" that the Court warned it against at our last hearing and the door must now be slammed shut.  3/17/2015 Hr'g Tr. 15:19-16:3.  Vale's request should be denied.

**B.    Defendant's Position**

***Rio Tinto's Failure to Comply With The Court's Order.***  In the parties' last joint letter, Vale raised yet again the deficiencies in Rio Tinto's responses to Vale's interrogatories.  Specifically, Vale sought an order compelling Rio Tinto to amend its interrogatory responses to identify individuals relied upon as sources of information in its investigative reports, who purportedly have knowledge of allegations in the AC (and also compelling Plaintiff to remove redactions from the reports concealing this information).  *See* Dkt. 217 at 7-8.  The Court agreed that the names of the sources were discoverable and granted Vale's request.  *See* March 17, 2015

---

[8]   Rio Tinto has every intention of abiding by Section X of the Protective Order in the event a party announces that it has inadvertently produced privileged documents.  Rio Tinto remains hopeful that Vale will do the same.

[9]   Rio Tinto did not agree to log the 15 partially-privileged documents that it clawed back (but will provide replacement images for these documents) because the ESI protocol states that redacted documents do not have to be logged.  *See* Dkt. No. 82 at Section F.4.

Tr. 14:10-12 ("The request is granted[] [b]y the defense and you are to produce unredacted copies 'attorneys eyes only'."); *id.* at 16:7-8 ("[T]hat's the Court's order.  Get it done by Monday.").

On March 23, 2015, Rio Tinto produced un-redacted copies of its investigative reports. Contrary to Rio Tinto's representation to the Court that its redactions concealed "the names of confidential informants" and "were made in order to protect the identity of confidential sources" (Dk. 217 at 3), much of the material that was (improperly) redacted by Rio Tinto did not contain any names whatsoever.  They referred to the sources for some of the most important allegations by general title or description, and even then referred to many of these people as former employees of one of the companies in this lawsuit (i.e., not anyone whose life would be threatened – as Rio Tinto had claimed – by disclosure of their name on an AEO basis).  For example, the report with a purported timeline of meetings between BSGR, Vale, and the Government of Guinea included two unnamed sources from BSGR, an unnamed source at Vale, and 5-6 sources in the Government of Guinea.  Rio Tinto has continued to withhold from its responses to Vale's interrogatories the names of these and other sources, which were relied on in these reports, despite the fact that it has such information (or access to it) and that the information is plainly requested by the interrogatories.  These sources clearly have information relevant to allegations in the AC and are responsive to Vale's interrogatories dealing with those allegations.  The interrogatories were first served on September 3, 2014; it is time for Rio Tinto to answer them.

In not providing this information, Rio Tinto has violated the Court's order.  As the Court ruled, Vale is entitled to the identity of each of these sources.  Plaintiff has responded that this request (which the Court already granted) is "improper" because, it says, "the names of several sources already are identified in the reports" and the unidentified sources "may be known by Rio Tinto's investigators."  This response misses the point.  If Rio Tinto knows (or can determine upon reasonable inquiry) the identities of these sources (which it has refused to confirm or deny), then it is required to identify them in response to Vale's interrogatories.

***Rio Tinto's Clawback and Inadequate Privilege Log.***  In its letter of March 18, 2015, Rio Tinto purported to claw back 221 previously produced documents that it now claims are privileged.  While the Protective Order (Dk. 81) permits a clawback of inadvertently produced privileged documents, several of the documents Rio Tinto is attempting to claw back appear not to be privileged because they were shared with various third parties, including banks (JP Morgan, Morgan Stanley, Credit Suisse, Macquarie), PR firms (Hintons), public policy advisers (Fipra), and other advisers (Rothschild Group, Makinson Cowell).  "The law is clear in this circuit that a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof.  That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."  *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (citation omitted).  Vale asked Rio Tinto to substantiate the claim of privilege with respect to these third-party communications before it makes the decision whether to return the documents or challenge the assertion of privilege, and also raised other deficiencies in its privilege log.  In response, Plaintiff has undertaken to provide a revised log in 30 days.  Vale reserves its rights to insist on an adequate log in conformity with the ESI Protocol.

*       *       *

The parties will continue to keep the Court informed of their progress as the meet and confer process advances.

Very truly yours,


/s/Michael Lyle
Michael Lyle