F48PRIOC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RIO TINTO PLC,

                Plaintiff,

          v.                        14 CV 3042 (RMB)(AJP)

VALE, S.A., ET AL.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    April 8, 2015
                                    2:02 p.m.

Before:

                  HON. ANDREW J. PECK,

                                    Magistrate Judge


                        APPEARANCES


QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiff
BY:  MICHAEL J. LYLE
     ERIC C. LYTTLE


CLEARY GOTTLIEB STEEN & HAMILTON LLP
     Attorneys for Defendant Vale, S.A.
BY:  LEWIS J. LIMAN
     JONATHAN I. BLACKMAN
     SCOTT B. REENTS


MISHCON DE REYA NEW YORK, LLP
     Attorneys for Defendants BSG Resources Limited and
Benjamin Steinmetz
BY:  VINCENT FILARDO, JR.
     DAN MANDELL
```

F48PRIOC

1                              APPEARANCES (Continued)

2

3    LAW OFFICES OF MARTIN J. AUERBACH, ESQ.
          Attorney for Defendant BSG defendants
     BY:  MARTIN J. AUERBACH

4

5    SULLIVAN & WORCESTER, LLP
          Attorneys for Defendant Mahmoud Thiam
6    BY:  PAUL E. SUMMIT

7

     ALSO PRESENT:  KINNY CHAN, Managing Director, eDiscovery
8                             Precision Discovery

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F48PRIOC

```
 1              (In open court)

 2              THE COURT:  Be seated.  Okay.  Seems like the first

 3      issue you needed me to rule on starts with the Roman numeral

 4      IV, discovery from Vale on Page 4 and beyond, correct?

 5              MR. LYLE:  Michael Lyle for Rio Tinto.  Yes, your

 6      Honor, that's our perspective.

 7              THE COURT:  And I saw shaking heads in the correct

 8      direction.  Okay.  So let's try to take these in the order of

 9      point to put them.  The documents from certain custodians, is

10      there anything you want me to do with this at the moment?

11              MR. LYLE:  Yes, your Honor.  Michael Lyle for Rio

12      Tinto.  Given that we now have learned that we have eight key

13      custodians who have no documents at all because Vale has

14      destroyed those documents, we'd like to get eight replacement

15      custodians.

16              As your Honor knows, we've requested in our letter

17      already two of the custodians we'd like added.  We have two

18      others that we can also identify, but we'd like to get leave to

19      have eight additional custodians that we've designated, plus

20      additional custodians that Vale designates that can tell us who

21      will have documents as close to what has been destroyed by Vale

22      purportedly pursuant to their documents retention policies.

23              We'd also like, your Honor, to examine what it is

24      exactly that happened in connection with those documents that

25      were destroyed.  We've asked in our correspondence that we be
```

F48PRIOC

```
 1   entitled to receive the document retention policies, as well as
 2   the notices that litigation holds that went out in connection
 3   with their --
 4          THE COURT:  All right.  I thought they've already
 5   agreed to give you some of that, am I misremembering?
 6          MR. LYLE:  They took it under advisement, your Honor.
 7   We haven't heard a response from them.
 8          THE COURT:  All right.  Mr. Liman?
 9          MR. LIMAN:  Yes, your Honor.  I'm prepared to address
10   this, and if there's a motion, we would be prepared to address
11   it in writing and seek sanctions from Rio Tinto from this
12   allegation.  It's false.  It's spurious.  We resent the
13   accusation of misconduct by me.
14          THE COURT:  I'll take note at your outrage.  Now,
15   let's move onto the merits.
16          MR. LIMAN:  They talk about eight custodians.  All of
17   those custodians left well over a year before this lawsuit was
18   filed, before there was ever any reasonable anticipation of
19   this notice.  Their documents were not retained pursuant to the
20   policies of Vale, which I'm happy to disclose to you and to the
21   other side.  Which is, that when an employee leaves, unless
22   there is a document holds in place, and there wasn't for these
23   employees, their hard drive is taken and the hard drive is then
24   overwritten and no longer exists.  E-mails, remain on backup
25   tapes for one year, and then after a year, those backup tapes
```

F48PRIOC

1    are overwritten.  The fact is --

2            THE COURT:  Have you checked to see whether any of the

3    backup tapes on which these employees' material may have been

4    stored, may exist because of other reasons that the backup

5    tapes might have been kept?

6            MR. LIMAN:  We did, your Honor, and that ties into the

7    timing of this.  We checked, and we learned from our vendor in

8    mid-January that there were no documents retained for these

9    eight individuals.

10           I would add, your Honor, with respect to the request

11   for additional custodians, I think that should stand on its

12   own.  We have objections with respect to the other two

13   custodians.

14           THE COURT:  I understand the first two that were in

15   the letter are objected to.  I guess I would ask this.  Are

16   there other likely sources of the potentially relevant e-mails

17   of the eight former employees?

18           MR. LIMAN:  Yes.  The other custodians, who they

19   identified and whose e-mails are being searched.  So we

20   believe, and I can give you statistics, that a large number of

21   the documents with respect to these employees will turn up in

22   the custodians whose documents are already being searched.

23           I should mention, we're already well advanced, and

24   further advanced than Rio Tinto, with respect to the predictive

25   coding and --

F48PRIOC

```
1        THE COURT:  Subject to a very big issue, which we'll

2   get to.  All right.  Are you prepared to give redacted or

3   indeed unredacted copies of your litigation hold memos,

4   e-mails, whatever it may be, to the plaintiff's counsel?

5        MR. LIMAN:  Not without reviewing them for privilege

6   and without there being an understanding, mutuality.  These

7   employees did not get the document holds because, again, they

8   were gone long before there was litigation anticipated.

9        THE COURT:  Understood.  I will direct the production

10  of both sides of litigation hold material with whatever

11  redactions for privilege are appropriate.  Hopefully, nobody

12  will be taking the position that the entire litigation hold

13  memo itself, regardless of content, is privileged or work

14  product.  I will deal with that, if I have to.

15        As to the replacement custodians, the Court will take

16  that on a custodian-by-custodian basis on the representation

17  that Mr. Liman has made that the e-mails of the departed

18  custodians is likely, or would largely be picked up by existing

19  custodians who are being searched.

20        What else, Mr. Lyle, on this issue?

21        MR. LYLE:  Your Honor, if we could just get

22  clarification.  In the correspondence to your Honor, Vale

23  indicates in a footnote in their insert --

24        THE COURT:  What page?

25        MR. LYLE:  On Pages 17 to 18, that they had no
```

F48PRIOC

```
 1    reasonable anticipation of civil litigation.  They did know of

 2    the investigation for the government of Guinea, and we would

 3    request, your Honor, that in addition to the lit hold in

 4    connection with this litigation, that they produce the lit hold

 5    for 2011 identified here.

 6             THE COURT:  Any lit hold for civil or criminal matters

 7    arising out of the Simandou situation should be produced.

 8             MR. LYLE:  Thank you.

 9             MR. LIMAN:  Your Honor, I assume that that is

10    reciprocal?

11             THE COURT:  Correct.

12             MR. LIMAN:  And includes the litigation holds that --

13    since they anticipate litigation against Guinea back to '09 --

14             THE COURT:  What's good for the goose is good for the

15    gander.

16             Okay.  So now the next items are the search terms.  Is

17    this going to be Mr. Liman, Mr. Blackman?

18             MR. LIMAN:  Your Honor, with respect to the predictive

19    coding, I think that that is Mr. Reents.

20             THE COURT:  All right, Mr. Reents.  Mr. Reents, let's

21    take this in baby steps.  Have you produce the keyword lists

22    that you used to the other side?

23             MR. REENTS:  We have, your Honor.

24             THE COURT:  Yes?

25             MR. REENTS:  Yes.
```

F48PRIOC

1          THE COURT:  All right.  Are there additional keywords,

2      Mr. Lyle, or whoever on your side will be arguing, Mr. Lyttle,

3      that you would want run?  Neither of you have given me the

4      keywords.  Other than perhaps an anecdotal in here, it doesn't

5      particularly help me.

6          MR. LYTTLE:  Your Honor, if we're going to be going

7      down the keyword path, yes, absolutely.  For example, the very

8      term that they use to identify the joint venture we don't

9      believe are included.  There are only a handful of Portuguese

10     terms, which is the language their witnesses speak in.  So if

11     we're going to be using search terms, and we have a threshold

12     issue with that -- if we're going to be using these search

13     terms, and we're going to dig into these, we're absolutely

14     going to have feedback on those search terms.

15         MR. REENTS:  Your Honor, if I could just respond

16     quickly?

17         THE COURT:  Yes.

18         MR. REENTS:  I don't agree with counsel's

19     characterization of the search terms, but putting that aside,

20     we're very open to the search term suggestions.  We're not

21     looking for a fight on search terms.  This is purely a

22     pragmatic decision that we had to make in order to give

23     ourselves a reasonable universe to deal with for

24     methodological --

25         THE COURT:  I guess the question I would ask is in

```
 1   some of the other cases, such as Biomet, that use these twin
 2   approach of keywords, followed by predictive coding on balance,
 3   it was because Biomet, they needed to reduce 19-and-a-half
 4   million ESI documents to a more cost-manageable percentage.
 5           Starting with a million on a case this big does not
 6   strike me as a break-the-bank proposition.  According to the
 7   letter, you did it because of a very low prevalence and you, or
 8   whoever else you've got here with you, explained why the low
 9   prevalence requires this sort of keyword string.
10           MR. REENTS:  Right.  So I mean, when you get to that
11   very low prevalence, you need a much larger control set in
12   order to be able to validate the results of the model.
13           THE COURT:  How much larger?
14           MR. REENTS:  Significantly larger.  So if we, for
15   example --
16           THE COURT:  If it's bigger than a breadbox, can you
17   put numbers on it?
18           MR. REENTS:  Sure.  For example, if you want to be
19   able to estimate recall, plus or minus five percent error with
20   a 95 percent confidence, and with the control set of about
21   20,000 or more than 20,000 terms.  It's not just a matter of --
22   as your Honor knows, it's not just a matter of we need to
23   review those 20,000, but it needs to be an expert reviewer
24   because this decision is very important that you get it right.
25           In this case, because of the protocol, you have to
```

F48PRIOC

1    produce the 20,000 to the other side, and it opens up a lot of

2    potential for ancillary disputes over, you know, how those

3    documents are coded.  So I think it would be opening up a huge

4    can of worms to try to go down that path.

5            THE COURT:  Prior to even running the keywords, did

6    you do the deduping, delisting, getting rid of, you know,

7    @ESPN.com and all the things to weed out the junk?

8            MR. REENTS:  Yes, we did the deduping.  It's a global

9    dedupe and did the delisting.  We haven't, at this point, done

10   a culling out of the bulk terms, but at least in a systematic

11   way.  But our experience has been that that usually takes out

12   five percent or so.  It's not going to make a material

13   difference.

14           THE COURT:  Mr. Lyttle?

15           MR. LYTTLE:  You Honor, I think we need to take a step

16   back.  This document universe is fundamentally flawed already.

17   It's missing eight of the key custodians and the low prevalence

18   that we're seeing --

19           THE COURT:  It may or may not, but the universe is the

20   universe.  You may or may not, down the road, when you've

21   completed discovery, be able to show that they should have

22   preserved and whether under the current version of 37, or the

23   presumptively effective December 1, 2015, version of 37(e),

24   that they did, with intent to deprive, and all of that jazz.

25           But keywords doesn't effect that.  So I would like to

1  get this conference over in less than our traditional hour or

2  two hour or whatever.  Let's focus on the issue, which is the

3  keyword screening or other methods of using predictive coding

4  in a cost effective manner.

5        MR. LYTTLE:  Your Honor, if I may.  If we're stuck

6  with this document universe, we've told Vale that we're willing

7  to work with these keyword search terms, but the problem here,

8  your Honor, is they've known since mid-January they were going

9  to have eight custodians.  Mr. Liman just admitted that.

10       THE COURT:  Counsel, counsel, counsel.  I'm going to

11  start enforcing a rule of brevity and that when you go off

12  topic, you're done.  So are you done on this issue, or would

13  you like to stay on the topic?  You are not my only case.  I am

14  seeing you regularly with 20-page, single-spaced letters of

15  disputes that either want a ruling or not.  I'm fed up with

16  lawyers who don't take instruction.  You're the one getting hit

17  with it at the moment.

18       MR. LYTTLE:  Understood, your Honor.  We'll, work them

19  on the keyword search terms.  If I may, reserve the right to

20  contend that this document universe is not appropriate and that

21  later --

22       THE COURT:  You always have the right, you know,

23  Sedona Principle 6 and 7.

24       MR. LYTTLE:  Thank you, your Honor.

25       THE COURT:  The producing party is in the best

F48PRIOC

 1   position, in general, to decide the method to be used.

 2   Principle Seven, the burden is on the other side, but it's not

 3   a irrebuttable, or it's not something that once they've decided

 4   as the producing party, that's the end of the universe.

 5           You all have entered into a protocol that, in

 6   retrospect, you might have wanted to make better than it is.

 7   You're all somewhat stuck with what you've agreed to, and that

 8   included some keyword searching to narrow down the universe.

 9   The fact that it's much greater than you anticipated, you know,

10   so be it.

11           All right.  Next.  The due diligence material, is

12   there any reason, at this point, that it needs to be done

13   immediately, based on the response?

14           The other thing, before you answer that and before I

15   forget, I am directing the defendants to file what I'll call a

16   protective-and-without-prejudice answer to the complaint so we

17   will know what affirmative defenses, if any, are being raised.

18   Otherwise, there is the danger that we will finish ESI

19   discovery, if not all discovery, before Judge Berman is able to

20   rule on the motion, and then you will suddenly throw in some

21   affirmative defense that changes the scope of discovery.

22           So I guess my questions are, one, any problem with

23   that?  And, two, how soon can you do it?  Mr. Liman?

24           MR. LIMAN:  Your Honor, we would like 30 days to do

25   it.  We hadn't begun work on the answer in this case.

F48PRIOC

1            THE COURT:  That doesn't --

2            MR. LIMAN:  And that's what the rules would give us.

3            THE COURT:  No, I think the rules would give you

4    either ten or 21 days from the Court's decision.  Be that as it

5    may, two weeks.

6            MR. SUMMIT:  Can we get 21 days?

7            MR. LIMAN:  Can we get -- There are various of us that

8    have travel schedules --

9            THE COURT:  Okay.  April 29th will give you 21 days.

10            MR. FILARDO:  As you know, BSGR and Mr. Steinmetz

11    have --

12            THE COURT:  That's why I said it's without prejudice

13    to your rights.

14            MR. FILARDO:  Okay.  We'll have that as one of our

15    affirmative defenses, as well.

16            THE COURT:  Understood.

17            MR. FILARDO:  That's just a concern because the answer

18    is typically --

19            THE COURT:  I understand.  You know, you can put a

20    footnote after the word "answer" that says, you know, you

21    reserve all rights, you were ordered to do this, it's without

22    prejudice, you know, blah, blah, blah, et cetera.

23            MR. FILARDO:  Thank you, your Honor.

24            MR. LIMAN:  And we can -- I assume we can also amend

25    based on the decision, as we need to amend?

F48PRIOC

1          THE COURT:  Correct.  Okay.  So with that, I guess the

2     question is, particularly after the sentence that the requested

3     material are largely privileged or non-existent, other than,

4     you know, they got your investigation material early,

5     particularly since you already have your subpoena out, why is

6     this crucial?

7          MR. LYTTLE:  Your Honor, I think for the same reasons

8     they argued.  We have a subpoena out to one investigative firm.

9     There are other due diligence parties that were involved here,

10    many of which are going to require foreign discovery either

11    through letters rogatory or the Hague and we'd just like to get

12    started on that.

13         THE COURT:  So get started on your Hague requests.

14         MR. LYTTLE:  Your Honor, without seeing the report,

15    it's very hard, under Hague, to say please give us all of your

16    due diligence.  We'd like to see reports and --

17         THE COURT:  Who are you talking about?  Cleary

18    Gottlieb and Clifford Chance are pretty local.

19         MR. LYTTLE:  Your Honor, I don't have their

20    interrogatory responses in front of me, but there's a number of

21    other --

22         THE COURT:  Your letter refers to Nardello and then

23    drops a footnote saying you served a subpoena on Nardello,

24    Cleary Gottlieb and Clifford Chance, "among others."

25         MR. LYTTLE:  Your Honor, I don't have the memo at my

F48PRIOC

```
 1   fingertips.  There are a number of other firms.  We've actually

 2   asked Vale to help clarify their role in this.  Again, trying

 3   to tailor any third-party discovery, we have not served a

 4   subpoena on Cleary Gottlieb because we didn't think your Honor

 5   would want that.

 6        THE COURT:  Correct.  And they told you they didn't

 7   represent Vale in this.

 8        MR. LYTTLE:  They didn't represent Vale in 2010.

 9   There was a full re-evaluation at Vale of that due diligence.

10   Were they involved then?  We don't know that.  And defendant's

11   statements --

12        THE COURT:  Here is the Court's ruling.  Try

13   cooperating with each other.  Give a little informal discovery

14   on what was done, et cetera, and then treat the reports in the

15   normal course of your discovery.  But, on the other hand, if

16   they're sitting in your office, Mr. Liman, Mr. Blackman,

17   whatever, you know, in a nice, neat little file, et cetera,

18   don't play games.

19        MR. BLACKMAN:  Your Honor, if I could just briefly

20   speak to that.  That's, obviously, a sensible direction.  This

21   whole issue seems to be a part around a magazine article that

22   they cite at length in their letter.  That article was issued,

23   was written, was published in March 2014, before they brought

24   this lawsuit, and they knew about it because, in fact, they

25   mentioned it to us last fall during a meet and confer.
```

F48PRIOC

1           So this is not new news, and I just would say for the

2      record that that article, in many respects, is completely

3      wrong.  I will represent to the Court that Cleary Gottlieb had

4      nothing whatever to do with due diligence for Vale at the time

5      of the joint venture, and that this re-due diligence that

6      they're talking about is, as far as we know, completely

7      fiction.

8           THE COURT:  All right.

9           MR. BLACKMAN:  Most of this stuff is privileged but --

10          THE COURT:  This is the sort of discussion that if the

11     two of you had before you got to court, you might have saved

12     several single-spaced pages of letters on both sides of the

13     letter issue.  Discuss it.  If you have to come back to me on

14     it, you'll come back to me.

15          MR. LYTTLE:  Thank you, your Honor.

16          THE COURT:  Next, the predictive coding disclosure

17     dates.  Vale has already given you its control set disclosure.

18     Why do we need seed set disclosure dates and all these other

19     things, some of which, at least as of today, is going to be in

20     serious flux because of the need to run additional keywords and

21     work the results into the document review?  I suspect,

22     therefore, this is something you all should work out a little

23     further down the road.

24          MR. LYTTLE:  That was our goal, your Honor.  We kicked

25     some dates out to them.  We said, hey, what do you think?  We'd

F48PRIOC

1   like to put some dates around this, try to work towards the

2   June 30th deadline for substantial completion.  That was

3   rejected outright.  They then dropped their control set, with

4   no notice on us, while we were reviewing ours.

5        I think the control set should be reviewed because

6   we're going to have to rerun more search terms.  We just would

7   like, your Honor -- Vale to date has produced about 2,500

8   documents and we've produced about 60,000, and we just want to

9   try and get some dates on the calendar that everybody is

10  working towards and that the Court has ordered.

11       THE COURT:  My concern is that the dates may be

12  counterproductive, considering what you are all doing,

13  particularly -- and I will say that the control set disclosure

14  by Vale will not be triggering objections at this stage because

15  of the need to refine the control set potentially after

16  additional documents are developed using whatever additional

17  keywords the plaintiff suggests that are reasonable.

18  Obviously, a suggestion of a keyword that adds over a million

19  documents back into the set is not going to be well received by

20  Vale or the Court.  So no dates at this point, but try to work

21  together.

22       Okay.  Specific document requests.  Although I think I

23  may have missed the issue of the two additional witnesses

24  because of where it was stuck --

25       MR. REENTS:  Your Honor?

F48PRIOC

1             THE COURT:  Yes.

2             MR. REENTS:  Before we move on, could we just ask that

3     you give us a date by which Rio Tinto would make its search

4     terms, in order to keep this process moving?

5             THE COURT:  Mr. Lyttle?

6             MR. LYTTLE:  I think we could have search terms early

7     next week, Monday or Tuesday.

8             THE COURT:  Tuesday.

9             MR. REENTS:  Okay.

10            THE COURT:  Where in this letter are the additional

11    witnesses or the additional custodians?  Vale's response is on

12    Page 11.  I seem to have lost where your request is.

13            MR. LYTTLE:  Your Honor, it's the bottom of Page 7,

14    continuing on to the top of Page 8.

15            THE COURT:  Thank you.  Well, they say these people

16    came onboard after the fact.  Why is their material relevant?

17    You know, if all you're going to do is have them gather

18    material and then because most of your disputes, I think, are

19    scope issues, not technology issues, they're going to find

20    nothing in those documents because of the date.  What's the

21    point?

22            MR. LYLE:  Your Honor, the documents that we expect

23    that we would find relate to the look-back diligence that was

24    done, again, in 2011 that --

25            THE COURT:  Of which they said there wasn't any.

F48PRIOC

1              MR. LYLE:  And so if that is accurate and there are no

2      documents, then they can make that representation to us, we're

3      not going to have any documents about any of the 2011 due

4      diligence.

5              But setting that aside, your Honor, they've asserted

6      that, in defense to our allegations, that they looked back and

7      that they found absolutely nothing.  Mr. Blackman has told this

8      Court and Judge Berman, we've scoured all of our documents and

9      we've seen nothing, they indicate, that any of the allegations

10     that we have, including our allegation that there was a;

11     concealment of the conspiracy all the way up through 2013.

12             These individuals were present in Vale.  They were

13     senior people who both have information, or should have

14     information, about their dealings with BSGR and the other

15     members of the conspiracy.  Again, if they come forward with

16     evidence to show, and they make a search and they find nothing,

17     then that's what they can tell us.

18             THE COURT:  If they make a search, that's going to

19     change the whole dynamics of the predictive coding process.

20     So, Mr. Blackman, what do you need to do to verify that the

21     article that talked about a look-back in 2011, there was no

22     such look-back?

23             MR. BLACKMAN:  We don't believe there was, and we're

24     happy to talk to them and, hopefully, give them the proof.

25     That's proving a negative, but we can certainly do that.

F48PRIOC

1           I just would like to say to the Court that besides

2    these people having not been employed at the relevant time,

3    they are so unrelated to this, that they are not even listed in

4    Rio Tinto's interrogatory answers, where they list tens of Vale

5    employees as having knowledge.  They don't list these people.

6           THE COURT:  Are they listed in your 26(a) --

7           MR. BLACKMAN:  No, because, again, this is like apex

8    discovery.  The current CEO --

9           THE COURT:  I understand.

10          MR. BLACKMAN:  Well, the current CEO doesn't know

11   anything about what happened before --

12          THE COURT:  That there is a difference between apex

13   deposition discovery and document review.  Do what you need to

14   do without, obviously, pulling every form of ESI and running it

15   through the system to verify with Mr. Ferrara and Mr. Flores

16   that they had nothing to do with anything related to this case.

17   Make that representation in writing to the plaintiffs, and if

18   that's the situation, we're done.

19          If you can't make that representation, then you and

20   they should talk about what should be done, if anything, to

21   review documents.

22          MR. BLACKMAN:  That's fine.  Just to be clear, this

23   case means the alleged conspiracy with BSGR, the negotiation of

24   the JAB, the prior abortive discussions with Rio Tinto,

25   et cetera, not, obviously, the defense of this lawsuit, which

F48PRIOC

1    of course they know about.

2            THE COURT:  Obviously.  Okay.  Come on.  You all know

3    what the scope of the case is.  I'm not --

4            MR. LYLE:  But --

5            THE COURT:  No, no.  We're moving on.

6            MR. LYLE:  Your Honor, if I may just be heard.  They

7    consistently try to narrow what they think the scope of the

8    case is.  That's what their defense is.  Okay?  We dispute that

9    vigorously.  The case involves a longer time period than they

10   want to say.  They want to try to use those dates to cabin us

11   in on the discovery.  That's wrong.

12           The allegations are and the proof is, we have arrests

13   that were made in 2013.  The conspiracy and the acts associated

14   with it took place over a much longer period of time than what

15   Vale wants to accept.  That's the what the fact is.  Our

16   complaint makes those allegations crystal clear.

17           So we're entitled to test his arguments, the arguments

18   that he's making and see if, in fact, there's any evidence that

19   shows that Vale knew what was happening with BSGR.  The article

20   indicates --

21           THE COURT:  That I understand is what they are

22   searching for, correct?

23           MR. BLACKMAN:  That's correct, and if he's --

24           THE COURT:  Stop.  Stop with "that's correct."

25           MR. BLACKMAN:  That's correct.

F48PRIOC

1              THE COURT:  We're moving on.  The various requests at

2     issue.  Starting with request 53, the Guinean election of 2010

3     in its broadest sense?

4              MR. LYTTLE:  Your Honor, the Guinean election of 2010

5     brought in a new administration in Guinea that did just what

6     these defendants were afraid of.  They initiated review of the

7     mining contract.  They found fraud.  They found bribery, and

8     they ripped it up.

9              Your Honor, what we'd like to know is what was this

10    conspiracy talking about when they were worried about the

11    election of 2010 and Mr. Thiam, who was the Guinean minister at

12    the time, losing his administration and his ability to further

13    the conspiracy inside Guinea.

14             THE COURT:  Is Thiam one of the concepts being

15    searched for, whether using the keywords and/or predictive

16    coding?

17             MR. BLACKMAN:  Absolutely, yes, your Honor.

18             THE COURT:  Okay.  Stop.  Thank you.  Learn to answer.

19    You don't even need absolutes.  The word "yes" or "no" will

20    often suffice.

21             Okay.  Other than what comes up by Thiam, this is much

22    too broad; so I'm not rewriting the requests.

23             56 and 63, what's the relevance of the alleged

24    meeting?

25             MR. LYTTLE:  I think it's exactly, your Honor, what

F48PRIOC

we've been talking about.  This is part of when the Conde

administration came to power in 2011 and started investigating

what happened at Simandou.  We would like to know what exactly

Vale was doing to understand what that investigation meant with

further deals with BSGR.  Does it show that they knew when they

entered the deal in 2010 that BSGR paid bribes to receive the

rights to box one and two?  That's what we're trying to get at,

the exact same thing.  This is a second round of due diligence

with a new --

          THE COURT:  All right.  Is there a way, considering

the way you're all doing these searches, to limit it to the

information about the bribery, the conspiracy, the potential

loss of rights because of a new administration, as opposed to

just the general operations of Simandou and how that might have

been affected by a meeting with the president?

          MR. BLACKMAN:  Yes.  And our problem with this, again,

is that we've already agreed to produce, and the searches will

pick up, anything having to do with the allegations of bribery,

corruption, et cetera, as well as the misappropriation, which

we haven't heard about yet today.

          But, again, this request is overbroad because when the

president of Brazil and the president of Guinea and the

president of Vale get together at a meeting, they're going to

be discussing other things, including things of competitive

interests to --

F48PRIOC

1          THE COURT:  Let me ask you a question.

2          MR. BLACKMAN:  -- our competitor.

3          THE COURT:  This seems like the sort of request where

4    you may be right, and if we weren't doing predictive coding,

5    you know, this is the sort of thing where you would look and

6    see if there is a file or a re line saying "meeting with Conde,

7    meeting with da Silva," whatever.

8          Obviously, I've said this before, and the plaintiffs

9    seemed to help with quoting it back, if you're just searching

10   for the word "bribe" or "bribery" or any of its variants,

11   "conspiracy," you know, "bad acts," et cetera, et cetera,

12   you're never going to find anything.  So the question is, is

13   there a way, without changing the whole search protocol, to

14   come up with whatever information there may have been about

15   these alleged -- it's a very narrow topic, a meeting, and then

16   once you find whatever there is about the meeting, you can

17   determine, and, if necessary, a special master can determine,

18   whether it was normal business or funny business, for lack of a

19   better term.

20         MR. BLACKMAN:  I think, in theory, one could add to

21   the search terms references to these meetings, and I think

22   that, subject to being told that that would be a vast

23   additional expense, we have no conceptual problem with that.

24   We do have a problem with then producing any document having to

25   do with the meeting.

F48PRIOC

```
 1              THE COURT:  Search it, and then one can determine
 2    whether anything exists so this is not a law school
 3    hypothetical and it's something real, and then you can have
 4    discussions with plaintiff's counsel, yes, we found four
 5    documents but they deal with normal business, et cetera, and if
 6    necessary, a special master will make that determination.
 7              MR. BLACKMAN:  Okay.
 8              THE COURT:  Okay.
 9              MR. LYTTLE:  Your Honor, may I be briefly heard?
10              THE COURT:  Sure.  You can snatch defeat from the jaws
11    of victory.
12              MR. LYTTLE:  That's not my intent.  My concern is we
13    don't know if we have the right custodians anymore and --
14              THE COURT:  What would you like me to do about that,
15    counsel?  Invent the eight people's files?
16              MR. LYTTLE:  May I, your Honor?
17              THE COURT:  Yes.
18              MR. LYTTLE:  I think there is a solution here.  They
19    have a duty, just like we did, to go ask their client who are
20    the right custodians.  They have not told us they've done that,
21    and they need to do that and propose additional custodians that
22    would have documents or may have documents responsive to these
23    requests.
24              THE COURT:  Mr. Liman, very briefly, you've talked to
25    your clients?
```

F48PRIOC

1              MR. LIMAN:  We take seriously our obligations with

2    respect to the interrogatories.  We have answered the

3    interrogatory questions accurately.  We take seriously our

4    obligations under Rule 26, including our obligations to update,

5    if there's a need to do it, and we will do it.  We don't

6    believe there's any need, and we've talked to the client.

7    We've done our investigation.

8              THE COURT:  Let's put it this way.  Now that you know

9    that eight custodians who were on the list of people whose

10   documents were going to be gathered don't have any, have you

11   verified with your client whether there is anybody else whose

12   documents -- and by that I always mean ESI as well -- should be

13   searched?

14             MR. LIMAN:  If we haven't, your Honor, we will.  We

15   have looked at our interrogatories.

16             THE COURT:  All right.  So you will send the letter to

17   Mr. Lyttle confirming whether there is anyone else whose

18   documents should be searched?

19             MR. LIMAN:  Correct.

20             THE COURT:  And you will do that within a week.

21             Next, what is it about the departure requests, 57, of

22   these people?

23             MR. LYTTLE:  I'm sorry, your Honor, I don't see --

24             THE COURT:  Okay.  You're right.  Somehow that was on

25   Page 14.  I thought it was following that; so if that's not --

F48PRIOC

1              MR. LYTTLE:  The good news, your Honor, I think that's

2      one of the effects of sealing that we agreed not to push.

3              THE COURT:  Okay.  62.

4              MR. LYTTLE:  Your Honor, it's the same.  I don't think

5      we need to belabor the Court's time.  It's the same issue

6      there.

7              THE COURT:  What's the next one that you want to

8      belabor my time on?

9              MR. LYTTLE:  Your Honor, I believe they all relate to

10     that second round of analyzing the BSGR deal that we believe

11     we're entitled to, as before.

12             THE COURT:  When did this so-called second round

13     occur?

14             MR. LYTTLE:  2011 is our understanding, based on the

15     article, as well as the investigative reports that they now

16     have and have seen.

17             THE COURT:  Take a look at the last bullet point at

18     the top of Page 16.  That's a little more narrow.

19             Look, is there any issue?  Mr. Blackman, are you

20     searching in the 2011 period of the so-called look-back, or

21     whatever the newspaper article called it, for any material that

22     would in any way relate to Vale's discovery or development or

23     whatever at that point of any information about what may have

24     gone on previously with respect to bribery, conspiracy,

25     et cetera, et cetera, without limiting it to the bad buzz

F48PRIOC

1    words?

2                MR. BLACKMAN:  Yes.

3                THE COURT:  Good.  That takes care of that.

4                Okay.  I think we are now over to the discovery that

5    Vale wants from the plaintiff.  On privilege logs, I'll give

6    you your choice.  You can all work this out, and it sounds like

7    on some of this you're the outside ER person and whether

8    they're the equivalent of an inside you're still discussing it.

9    Has that been resolved?

10                MR. LYTTLE:  Correct, that is with defendants BSGR and

11    Steinmetz.

12                THE COURT:  Yes?

13                MR. FILARDO:  Yes.

14                THE COURT:  Okay.  Has that been resolved?

15                MR. FILARDO:  It has not been resolved.  We are

16    discussing it with our information.

17                THE COURT:  Nobody wants me to rule at this point,

18    right?

19                MR. LYTTLE:  That is correct, your Honor.

20                THE COURT:  Okay.  Inadvertently produced privileged

21    documents.  I'm now at Page 20.  If I've missed anything before

22    then, somebody tell me.  502(d) means they need to be returned,

23    or if you desperately need them for another potential motion

24    that they are otherwise not privileged, they need to be sealed

25    up and cabined off, whatever the right term is.  I won't

F48PRIOC

require that you give it back, per say, but it really can't be used for anything other than a potential motion in front of me. Is everyone clear on that?

MR. BLACKMAN:  Yes, your Honor.

MR. LYTTLE:  Yes, your Honor.

THE COURT:  Okay.  Are we done?

MR. BLACKMAN:  We have the issue which seems to be, unfortunately, a recurring one about having Rio Tinto amend its interrogatory answers to give us just the names of the unidentified sources in the investigative reports because we had a big discussion about this, and it's a little hard to know what they were fighting so hard about because, in many cases when we did get the unredacted reports, it referred generically to five or six officials at Guinea, BSGR executives --

THE COURT:  Stop, stop.  Does Rio Tinto have the underlying information.

MR. LYTTLE:  We do not, your Honor, and there's no reason we would.

MR. BLACKMAN:  Your Honor, they have represented to the Court that Rio Tinto, not its counsel, Rio Tinto hired these firms.  They haven't given us -- we asked them -- the engagement letters, but it seems to us that, as the people who hired them, they may well be entitled to ask to get this information.  And we have seen no showing from them that they are not in a position to do that.

F48PRIOC

1              MR. LYTTLE:  Your Honor, may I approach?

2              THE COURT:  Sure.

3              MR. LIMAN:  Do you have one for us?

4              MR. LYTTLE:  There is.

5         Your Honor, despite Vale prematurely pulling the

6    ripcord on the investigator materials we gave following the

7    Hague, we happened to discuss with the investigators, we have

8    requested from all of them the material Vale requested.  They

9    uniformly have rejected that request.  We are continuing to

10   discuss with them, including gathering the political contracts,

11   and when they're found, we will provide them.  But this is a

12   first example of the positions that they're taking.  This is a

13   letter from --

14             THE COURT:  All right.

15             MR. LYTTLE:  -- Begbies Traynor, which is one of the

16   investigative firms known as BTG.  We have advised the Court

17   that they might be coming.  They are coming down.  We have made

18   every effort that we can to get this information.  We are not

19   entitled to it.  They will not provide it, and Vale has decided

20   to go to the Hague, and that's where they need to go.

21             THE COURT:  Why don't you produce the umbrella

22   supplier contract that was, obviously, an attachment to this

23   letter and, therefore, one can assume it's very readily

24   available.

25             MR. LYTTLE:  It actually does say that.  It wasn't

F48PRIOC

 1    attached.  This came in right before the hearing.  We're going

 2    to write --

 3              THE COURT:  So to the extent you get letters like

 4    this, give them to defense counsel.  If you provide copies of

 5    the contracts with these folks that will presumably support

 6    your position or, in any event, even if it doesn't support your

 7    position, if the supplier is refusing to turn it over, and

 8    assuming there's no winking going on and I certainly assume

 9    that and believe that, you'll have to pursue it through the

10    Hague.

11              MR. BLACKMAN:  That's fine.  If we could just, for the

12    agreements, the umbrella agreement and the comparable

13    agreements with the other investigators --

14              THE COURT:  If they are readily at hand, they will be

15    produced.

16              MR. BLACKMAN:  In a week or so?

17              THE COURT:  Probably simultaneously with your

18    producing whatever those reports were that they wanted

19    urgently, immediately, that I told you to produce if they are

20    at hand; so quid pro quo, goose and gander, all that good

21    stuff.  So that's the end of that.

22              So, yes, basically a week, but presumably you're

23    complying as well.

24              MR. BLACKMAN:  Right.

25              MR. LYTTLE:  Thank you, your Honor.  May I approach

F48PRIOC

 1   with one more documents?

 2              THE COURT:  Yes.  Is this another letter?

 3              MR. LYTTLE:  No.  It's a news article that appeared

 4   this morning, and I think it's probably a little bit of what we

 5   were afraid of with the investigators.  We're not sure how this

 6   got to the media, but with names made public, just as we

 7   feared, others are out there indicating these investigators and

 8   their sources are going to be called to this courtroom to

 9   testify, which we've repeatedly said we don't anticipate

10   happening.  We're --

11              THE COURT:  First of all --

12              MR. BLACKMAN:  Your Honor, this is --

13              THE COURT:  First of all, you know, I'm not exactly

14   sure what this means, but that British private investigators

15   will be called to testify before the Southern District in

16   New York.  You know, the journalist thinks my power goes a lot

17   further than the Constitution and the Hague Convention do.

18              MR. LYTTLE:  Understood, your Honor.  There's not

19   anything I'm asking you to do.  We're just bringing this to the

20   Court's attention that this is the exact -- you may know that,

21   and we as lawyers may know that, but these investigators --

22              THE COURT:  They suspect --

23              MR. LYTTLE:  -- with their source networks don't know

24   that.

25              THE COURT:  I'm sorry, who doesn't know it?

F48PRIOC

1              MR. LYTTLE:  The investigators.

2              THE COURT:  Oh, come on.  Seriously?  Seriously?  You

3    know, unless they just started their company yesterday, and

4    clearly they didn't, I would be very surprised if investigators

5    don't know that they may be in the witness stand.  I am

6    assuming, Mr. Blackman and all other counsel, that this did not

7    come from your clients.  Is that correct?

8              MR. BLACKMAN:  It certainly did not, and the article,

9    and I have no idea whether there's any truth to this says, at

10   the request of businessman Benny Steinmetz's company --

11             THE COURT:  That's not --

12             MR. BLACKMAN:  So I don't know.  This is certainly not

13   coming from us.

14             THE COURT:  All right.  Everybody willing to agree, on

15   behalf of their clients, to a gag order?  Anybody have a

16   problem with that?

17             MR. BLACKMAN:  No, your Honor.

18             MR. FILARDO:  No, your Honor.

19             MR. AUERBACH:  No, your Honor.

20             MR. SUMMIT:  No, your Honor.

21             THE COURT:  Mr. Lyttle?

22             MR. LYTTLE:  I will speak with my client, your Honor.

23             THE COURT:  Well, that's interesting.  There is no gag

24   order until you all stipulate to one.  So the defendants are

25   willing, if they don't change their mind, but it's, you know,

F48PRIOC

1    interesting that you're upset about there being press articles

2    about certain things that are essentially public, maybe below

3    the radar but, you know, there are Hague Convention requests,

4    they're signed in on the docket here.

5            This sounds more like somebody got it from the docket

6    in the UK, if there is indeed such a docket, or that it got it

7    from somebody.  To the extent you don't want to tie your

8    client's hands, that's fine, but don't complain to me, absent

9    party agreement and subject to the codes of ethics that apply

10   to lawyers but not their clients, that they can do what they

11   want except, obviously, anything that's under a confidentiality

12   awe agreement.  That overrides everything else.

13           MR. LYTTLE:  Understood, your Honor.

14           THE COURT:  Anything else for today, other than our

15   next conference date?

16           MR. LYTTLE:  One small point I think we skipped in the

17   letter, your Honor.

18           THE COURT:  Okay.

19           MR. LYTTLE:  There's a footnote.

20           THE COURT:  Page?

21           MR. LYTTLE:  I'm looking, your Honor.  I'm sorry.

22   It's a lengthy letter.

23           THE COURT:  Really?  I hadn't noticed.

24           MR. LYTTLE:  Footnote 4 on Page 16.  We had, as this

25   Court is aware, there's a parallel arbitration going on between

F48PRIOC

```
1   Vale and BSGR in London.  We, as part of our document requests,

2   have asked for materials produced in the arbitration, as well

3   as the pleadings and filings in that.

4        I understand Vale has agreed to that, which we

5   appreciate, but we, for the first time in this footnote,

6   learned that BSGR has not agreed to that and will not agree to

7   that.  I tried to speak with Mr. Filardo before the hearing.

8   We didn't have a chance to finish, but I'm just not sure what

9   basis there is to refuse that.

10       MR. FILARDO:  Your Honor, I'm just getting my arms

11  around this issue as well, but I understand that request No. 66

12  issued by Rio Tinto to Vale, which categorically requests the

13  production of all documents in the LCIA arbitration, including

14  documents that my clients had produced and documents such as

15  witness statements and statements of the case, they're seeking

16  that categorically from Vale.

17       I understand Vale is not objecting and has, instead,

18  requested permission from the LCIA panel for the arbitration to

19  have an exception -- this is my understanding -- an exception

20  to the confidentiality provisions of that arbitration.  My

21  client has objected to that, and is opposing that before the

22  LCIA panel.

23       I don't know where that issue is at right now.  I do

24  not know if it's fully briefed.  I do not believe there's been

25  a decision.  I think -- I was going to raise it as well to the
```

F48PRIOC

1    Court today as I'm learning about this, that we do not think

2    it's appropriate that Vale not object, at least in part, to

3    that request with respect to producing --

4            THE COURT:  Since they're not producing it, the issue

5    really is what's the tribunal going to do.  At this point, and

6    with the instructions to counsel to tell their counterpart that

7    the Court would appreciate a prompt ruling from those

8    arbitrators so that I don't have to rule on it independently.

9    You know, this may be a situation where the federal rules trump

10   the LCIA provisions.  I would rather not get into that sort of

11   fight.

12           So tell the LCIA, whoever has that contact -- I guess

13   it's both Vale and BSGR's appropriate arbitration counsel --

14   that this court needs a prompt ruling.  In the absence of a

15   prompt ruling, this Court will rule on the issue as a matter of

16   U.S. discovery.  Let me put it this way.  While we are going

17   slowly with respect to BSGR and going through the Hague

18   Convention, et cetera, this technically is a request to Vale,

19   and the Court may well exercise its authority, not necessarily

20   on a blanket basis but on a relevant-to-this-litigation basis,

21   that if they have information from BSGR because of the

22   arbitration relevant to this litigation, you know, I'm not sure

23   that I can't override the tribunal.

24           But that's a gut reaction to a footnote that I'm not

25   even sure I read before this very second.  Even though I read

F48PRIOC

1   most of the letter and its other footnotes, that one slipped by

2   me.  Let's try to get a ruling out of the arbitrators promptly

3   and possibly something that the three relevant sides can work

4   on here in terms of a compromise.

5           MR. BLACKMAN:  Your Honor, the matter will be fully

6   briefed before the arbitral tribunal a week from this coming

7   Friday.  And we have told them that, ultimately, we don't want

8   to have a dispute needlessly between that tribunal and this

9   court, but that, ultimately, will be a matter for this court to

10  determine.  So they're apprised of that.

11          THE COURT:  All right.  I'm sure you'll be bringing

12  this back to me at the next conference, if it hasn't resolved

13  either by the tribunal or by BSGR agreeing with Vale and Rio

14  Tinto to the release, under the Court's protective order here,

15  confidentiality order, to certain, that is, the

16  relevant-to-this-lawsuit information that may have been

17  developed in the arbitration proceeding.

18          MR. BLACKMAN:  We would welcome that.

19          THE COURT:  All right.  That really means,

20  Mr. Filardo, it's in your client's control more than anybody

21  else.

22          MR. FILARDO:  Yes, your Honor.  We're happy to

23  consider that and discuss that.  We just have not had the

24  opportunity.

25          THE COURT:  All right.  When do you all want to come

F48PRIOC

```
 1    back?
 2                MR. BLACKMAN:  In roughly four weeks, your Honor?
 3                THE COURT:  Okay.  How about either May 7th in the
 4    afternoon or May 8th?  What's your pleasure?
 5                MR. LIMAN:  Your Honor, I have a CLE in the courthouse
 6    on May 7th.
 7                THE COURT:  Does that mean you'd like to be here
 8    because you'll be here at 5:00 anyway, or you'd rather not?
 9                MR. LIMAN:  I would rather not, unless --
10                THE COURT:  Okay.  May 8th at 2:00, that's a Friday.
11    Does that work for everybody?
12                MR. LYLE:  Your Honor, if I could just have it for the
13    Monday?
14                THE COURT:  I can't give you anything on Monday,
15    May 11th, other than 9:30 for half an hour.  I'm on criminal DE
16    that week.  So you can do it any of the 7th, the 8th.  We can
17    do it on the 6th, but it would have to be in the morning and I
18    know you guys, on the plaintiff side, like to come up the day
19    of.  I've got the week of the 4th afternoons, on the Monday the
20    4th or the 7th or the 8th, mornings on some of the other days.
21                MR. LYLE:  I'll find a way to make the 8th work, your
22    Honor.  I think that's best for everything.
23                THE COURT:  Okay.  May 8th at 2:00.  Usual drill,
24    you're all required to purchase the transcript.
25                MR. LYLE:  Thank you, your Honor.
```

F48PRIOC

```
1              THE COURT:  With that, we are adjourned.

2              MR. LIMAN:  Thank you, your Honor.

3              (Adjourned)
```