**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

May 6, 2015

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:     <u>Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (S.D.N.Y.)</u>

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), Vale S.A. ("Vale"), and Mahmoud Thiam write jointly to update the Court on the status of various discovery issues in advance of our May 8, 2015 hearing.

Since the April 8, 2015 hearing before Your Honor ("Hearing"), the parties have been meeting and conferring on a regular basis, both through telephonic meet and confers and written correspondence.  While the parties have made some progress, there are a number of disputes that require the Court's assistance particularly with respect to Defendant Vale and Plaintiff Rio Tinto.  Below is a proposed agenda for the May 8, 2015 status conference.

**I.      DISCOVERY FROM DEFENDANT THIAM**

On April 29, 2015, the Secretary General of the Presidency of the Republic of Guinea released all of Mr. Thiam's documents previously withheld as privileged, with the exception of nine documents that the Government of Guinea determined should be withheld on the basis of diplomatic communications with foreign governments.  In accordance with the Guinean Government's decision, Mr. Thiam produced all remaining documents previously withheld as privileged on May 6, 2015.  Additionally, Mr. Thiam served his First Request for Production of Documents to Defendant Vale and his Second Request for Production of Documents to Plaintiff

Rio Tinto on April 24, 2015.  Responses and objections to those requests are due Tuesday, May 26, 2015.

## II.     DISCOVERY FROM DEFENDANTS BSGR AND STEINMETZ

Plaintiff Rio Tinto and Defendants BSGR and Steinmetz have no outstanding disputes that require the Court's attention at this time.

***BSGR Letter of Request.***  Vale has taken the necessary steps to enforce the Joint Letter of Request to BSGR under the Hague Convention by submitting it to the Senior Master of the High Court.  The English court clerk has confirmed that the Orders have been approved and are awaiting the Senior Master's seal, after which they will be served.  At Vale's request, BSGR has confirmed that it is in the process of collecting and reviewing its documents in the UK responsive to the Letter of Request and that it intends to make a timely production after the Senior Master so orders.

## III.     DISCOVERY FROM VBG DEFENDANTS

### A.     Plaintiff's Position

Plaintiff has no outstanding disputes that require the Court's resolution at this time.

### B.     Defendant's Position

## IV.     DISCOVERY FROM DEFENDANT VALE

Plaintiff and Defendant Vale have exchanged correspondence and conducted several telephonic meet and confers.  There are outstanding disputes that require the Court's resolution.

### A.     Plaintiff's Position

***Vales Refuses to Produce the Nardello Report.***  Vale continues to improperly withhold a due diligence report prepared on its behalf by Nardello & Co. (the "Nardello Report").  Vale, through its counsel Clifford Chance, commissioned the Nardello Report as part of a fact-gathering mission to obtain information about BSGR's and Steinmetz's activities, particularly those in Guinea, before entering into the Vale-BSGR transaction in April 2010.  Tellingly, Vale does not argue that the Nardello Report itself constituted legal advice and is therefore protected by the attorney-client privilege.  Rather, the Nardello Report should not be produced, Vale's theory goes, because it was *used by* Clifford Chance to generate a *separate and distinct* legal memorandum that was provided to Vale.  But that argument has been rejected, resoundingly, by courts in this jurisdiction:[1]

---

[1]   We are further compelled to note that we have turned over, at Vale's insistence, Rio Tinto's investigative reports that are conceptually the same in form and substance as the Nardello Report.

> [The] fact-acquisition process in the course of a business transaction is no more
> protected by privilege when conducted by an attorney than if conducted by an
> accountant, engineer or head of a business unit. ***The factual information
> presented is not privileged merely by the use of an attorney as a conduit for the
> information.*** *See Federal Housing Finance Agency v. UBS Americas Inc.,* 2013
> WL 1700923, at *2 (S.D.N.Y. Apr. 16, 2013) ("[Factual material] is not rendered
> privileged simply because it was contained in a memorandum prepared by an
> attorney or because that memorandum was relayed to [a party] by its attorney.").

*Vector Capital Corp. v. Ness Technologies, Inc.*, 2014 WL 171160, at *2 (S.D.N.Y. Jan. 9, 2014)
(emphasis added); *see also see also Upjohn v. United States*, 449 U.S. 383, 395 (1981) (attorney-
client privilege "only protects disclosure of communications; it does not protect disclosure of the
underlying facts by those who communicated with the attorney"); *Astra Aktiebolag v. Andrx
Pharm., Inc.*, 208 F.R.D. 92, 103 (S.D.N.Y. 2002) (holding that documents are not privileged
merely because they are attached to a communication with an attorney).  The same result should
obtain here, and Vale should produce the Nardello Report immediately.

Even assuming *arguendo* that the Nardello Report contains privileged information in
some form or fashion[2] (although, we remain at a loss as to what information that could be), any
such privilege has been waived, as Vale voluntarily permitted a representative from the
Government of Guinea, who was then adverse to and investigating VBG (in which Vale was a
51% shareholder and over which Vale had complete day-to-day control), to review the Nardello
Report in April 2013.  As relayed to us by the Government of Guinea's counsel, Mr. Scott
Horton, in April 2013 Vale's General Counsel, Clovis Torres, invited a representative from the
Government of Guinea to review the Nardello Report at Vale's offices in Rio De Janeiro, further
permitting that representative to take notes.  That voluntary disclosure to an adverse party (the
Government of Guinea ultimately stripped VBG of its rights to Simandou Blocks 1 and 2 in
April 2014) amounts to an unequivocal waiver of any privilege claim per settled, black-letter,
New York law.  *See In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973); *Gruss v. Zwirn*, 2013 WL
3481350, at *12 (S.D.N.Y. July 10, 2013) ("As a general matter, when a party selectively
discloses attorney-client communications to an adverse government entity, the privilege is
waived not only as to the materials provided, but also as to the underlying source materials");
*Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 174–75 (S.D.N.Y. 2002) (a party's
presentation to the government waived work product protection for "the actual facts revealed to
the government or the underlying documents upon which the presentation was based").

Moreover, the Nardello Report is indisputably relevant.  Vale has again and again said
that it had no idea of BSGR and Mr. Steinmetz's conduct, and pointed specifically at the
Nardello Report as a purported defense to Rio Tinto's allegations.  Vale cannot, however, use the
purportedly "privileged" Nardello Report to slash at Rio Tinto's claims yet at the same time

---

[2]   Including, for example, as work product, which Vale asserted for the first time in a
May 4, 2015 letter.  As discussed below, Vale's claim of work-product privilege is based on its
belief that by partnering with BSGR "it would subject itself to investigation by the U.S.
government."

attempt to shield it from production.  *See, e.g., Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK, 2013 WL 6182744, at *2 (S.D.N.Y. Nov. 21, 2013) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes") (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991)).

Finally, Vale has recently asserted that the Nardello Report is, alternatively, protected from disclosure pursuant to the work-product doctrine because Vale purportedly anticipated litigation in 2010.  Notably, however, Vale does not contest that it commissioned the Nardello Report as part of expected and routine due diligence before entering into a joint venture—*i.e.*, as part of its ordinary course of business.  As such, Vale cannot properly withhold the Nardello Report on the basis of work product.  *See United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (holding work product doctrine inapplicable to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation"); *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 107-09 (S.D.N.Y. 2007) (denying work product protection to investigation conducted by attorney where public statements had been made in connection with investigation and there were business reasons for internal investigation).  But again assuming *arguendo* that Vale commissioned the Nardello Report with an eye towards litigation, Rio Tinto may nonetheless compel its production upon a showing of "substantial need" and the inability to obtain its "substantial equivalent by other means.'"  *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 221057, at *10 (S.D.N.Y. Jan. 15, 2015) (quoting Fed.R.Civ.P. 26(b)(3)(ii)).  Here, there can be no question that Rio Tinto has a substantial need for the Nardello Report; Rio Tinto cannot, today, recreate a factual investigation that took place over five years ago, particularly where, as here, Vale has otherwise destroyed thousands of documents from the principal custodians that participated in that deal.  *See Pine Top Ins. Co., v. Alexander & Alexander Servs., Inc.*, 1991 WL 221061, at *2-3 (S.D.N.Y. Oct. 7, 1991) (civil RICO case holding that the plaintiff was entitled to discovery of audit reports protected by work-product doctrine because the underlying investigation was conducted seven years prior to litigation and it would have been "virtually impossible" to reconstruct the facts presented in the report through depositions or other discovery).  Rio Tinto's substantial need for the Nardello Report and inability to get information about what Vale knew about Mr. Steinmetz and BSGR from other sources is all the more evident when one considers that tens of thousands of emails from Vale's principal custodians that interacted with BSGR and Steinmetz have gone missing.

***Rio Tinto is Entitled to Discovery Regarding Vale's Destruction of Documents from Key Custodians as it is Highly Relevant to Rio Tinto's Claims.***  Rio Tinto just learned last month that Vale has destroyed documents from eight key custodians, including Roger Agnelli (former CEO), Eduardo Ledsham (former head of exploration), Jose Andre de Castro Alves (General Manager for Simandou), and Fabio Barbosa (former CFO), among others.  These custodians include the masterminds of Vale's entry into Simandou and the key intermediaries with Mr. Steinmetz and BSGR.

Vale's document destruction strikes at the heart of this case.  Rio Tinto has alleged that the Defendants engaged in a cover up and ongoing conspiracy to conceal their illicit activities.

We already know that document destruction is part and parcel of this conspiracy:  Defendant Frederic Cilins, a member of the conspiracy, pled guilty in the U.S. criminal investigation to destroying documents.  It is crucial to understand whether Vale's destruction of documents from these key custodians (*e.g.*, its CEO and CFO) likewise is part of that conspiracy.  Indeed, just yesterday, Vale disclosed that it does *not* have a formal, written, document retention policy in place. Vale instead does its best to follow a "general practice," administered in part by an outside IT vendor, whereby (i) it purportedly erases an employee's hard drive on the day an employee departs, and (ii) it then deletes that same employee's emails one year later.  This raises legitimate questions over whether this "general practice" was followed by Vale's outside vendor, whether it was followed for each custodian, and why it was followed, and under whose direction, despite Vale's anticipation of litigation in 2010 (see below).  In sum, the specifics on how, when and why these documents were destroyed therefore is central to this case.

Rio Tinto has attempted to engage and cooperatively work with Vale to resolve this without Court intervention.  On April 10, 2015, for example, we sent Vale a letter asking that it answer a routine set of questions aimed at helping us understand exactly what happened to the "missing" documents, when it happened, and whether there was a replacement set of custodians that could offset, even if just partially, the gaping hole that exists.  We asked, *e.g.*, (i) when employees departed Vale, (ii) when their documents were destroyed, (iii) whether destruction included both hard and soft copies, (iv) when Vale first learned of the destruction, and (v), in effect, what other Vale employees could serve as replacement custodians.   (*See* Exhibit A).  By and large, Vale has sidestepped these questions and refused to answer them in writing.

Vale's story about its document destruction simply does not add up and is constantly changing.  First, Vale represented that it issued a litigation hold in response to the Government of Guinea's investigation, which began in 2011 (*see* R. 234, Apr. 6, 2015 Joint Letter, at 17 n. 5 ("Although Vale had no reasonable anticipation of civil litigation in the U.S. or anywhere else related to Simandou before this action was filed, it in any case issued a hold on relevant documents years earlier after becoming aware of the Government of Guinea's investigation of Simandou."), but that now turns out to be false.  And now Vale says in a letter dated May 4, 2015 that  "there existed a risk that if Vale entered into an agreement [**in 2010**] with BSGR with regards to a property in Guinea*, it would subject itself to investigation by the U.S. government* with respect to that transaction and any activities of its JV partner."  Vale made this assertion in an attempt to justify its withholding of the Nardello Report on grounds of work product (discussed *supra*).  But the pertinent questions here center on how Vale allowed documents (again from the key players in the BSGR and Steinmetz deal) to be destroyed long after it knew of a risk of a U.S. investigation before it entered into the joint venture in 2010, after it became aware of a Simandou bribery and corruption investigation by the Government of Guinea (which began in 2011), and after it became aware of a U.S. criminal investigation in 2013.  *See e.g., Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."); *Anderson v. Sotheby's Inc. Severance Plan*, 2005 WL 2583715, at *4 (S.D.N.Y. Oct. 11, 2005) (date of document as to which party claims work-product privilege establishes date as of which party had duty to preserve documents); Am. Bar Assoc., Criminal Justice Section, The State of

5

Criminal Justice at 149 (2013) ("The duty to preserve potentially relevant information arises when a government investigation is contemplated, threatened, pending or can be reasonably anticipated.").  The timeline below demonstrates the need for more information about and answers to these questions.



⸱ Vale no longer claims it issued a litigation hold, despite previously representing one was sent years earlier in response to the Government of Guinea's investigation.

There is simply no excuse and no time for Vale to continue to stall (and change its story) in this fashion.  Vale should have to come clean now with the substantive specifics we have asked for.  Accordingly, we respectfully request that the Court order Vale to respond, in writing, to each question posed in our April 10, 2015 Letter and to thereafter make a 30(b)(6) witness available for deposition concerning, *e.g.*, Vale's policies, practices, and procedures, whether written or unwritten, formal or informal, with respect to the retention of documents, including but not limited to, the preservation of documents related to Simandou, and whether those policies, practices, and procedures were followed for the agreed-upon custodians in this case.

***Production of Documents From Vale-BSGR Arbitration***.  Rio Tinto's Request No. 66 for documents produced or received by Vale in its LCIA arbitration with BSGR remains pending.  Vale has informed Rio Tinto that the Tribunal has issued a decision regarding Vale's production of these documents.  In effect, the Tribunal has ruled that, upon receiving an order from this Court, it will authorize Vale's production.  The Tribunal ruled that "Vale cannot invoke the legality exceptions [to general confidentiality obligations under LCIA Rules, the Framework and Shareholders' Agreement, and the Tribunal's procedural order on this issue] because it cannot point to ***any actually existing legal requirement*** that it produce the documents at issue. . . . Short of a concrete ruling from the U.S. court — i.e., a legal requirement — this Tribunal is unwilling itself to set aside the various confidentiality arrangements contemplated and put into place by both Parties."  (Tribunal Decision ¶ 23 (emphasis original)).  The Tribunal also noted the "vital importance of obtaining a ruling from the U.S. court — a ruling which presumably will resolve the issue of whether Vale has a true 'legal obligation.'" (*Id.* ¶ 24.)  Accordingly, Rio Tinto respectfully requests an order from this Court clearing the way for Vale to produce documents called for by Request No. 66.  Vale does not oppose this request.

Rio Tinto understands that Defendants BSGR and Steinmetz plan on objecting to Vale's production of documents in response to Request No. 66.  To date, however, BSGR and Steinmetz have not shared the bases for that objection.  Rio Tinto, therefore, reserves the right to respond at the upcoming conference to any such objection raised by BSGR and Steinmetz.

### B.    Defendants' Position

Vale continues to make rolling document productions, including most recently on May 3.  In accordance with the Predictive Coding Protocol, Vale also disclosed its Revised Control Set on May 1.  Since the last conference on April 8, Vale has followed up on a number of items at the Court's request.  The bullet points below describe those items that do not require a ruling and should be considered resolved:

- ***Search Terms***.  At the last conference, Your Honor allowed Rio Tinto to suggest "reasonable" additional search terms to limit the Document Universe for purposes of the Predictive Coding Protocol, after Rio Tinto objected that the search terms selected by Vale were too limited.  (Apr. 8, 2015 Tr. 17:17.)  Rio Tinto argued the Court should reject Vale's statistical proof that its use of search terms did not unreasonably exclude relevant documents.  Following the conference, Rio Tinto asked Vale to add more than 120 search terms, which more than doubled the volume of documents.  Vale agreed to nearly all of Rio Tinto's terms.  Vale's statistical sampling indicates that the addition of those search terms did not add new responsive documents to the Document Universe, which now includes over 800,000 documents.  While this detour delayed the review and production of emails by nearly a month, Vale is still on schedule to complete its document production on time.

- ***"Look-Back" Diligence***.  At the last conference, Rio Tinto argued, in support of its document requests and its effort to belatedly add as custodians Vale's current CEO and former Chairman, that Vale "performed an internal re-evaluation of its due diligence on the BSGR transaction in 2011."  (Dk. 234 at 7.)  The question was apparently generated from a news article from a untrustworthy source, *Piauí*, that Vale has repudiated.  We have followed the Court's instruction "to verify that the article [cited by Plaintiff] that talked about a look-back in 2011 [about the diligence for the Vale-BSGR transaction], there was no such look-back" (Apr. 8, 2015 Tr. 19:20-22), including by interviewing our client and reviewing board materials (some privileged) from 2010 through 2012.  We have confirmed to Rio Tinto that there was no "look-back" diligence conducted in 2011 (or at any other time), and that this seems to be an invention by a careless or misinformed journalist.

- ***Murilo Ferreira & Ricardo Flores***.  Relatedly, we have confirmed that Murilo Ferreira (Vale's current CEO) and Ricardo Flores (Vale's former Chairman), whom Rio Tinto had requested be added as custodians because they were purportedly involved in this "look-back diligence," "had nothing to do" with the matters alleged in the Amended Complaint, *i.e.* "the alleged conspiracy with BSGR, the negotiation of the [JV], the prior abortive discussions with Rio Tinto, et cetera" (Apt. 8, 2015 Tr. 20:16, 20:23-25), including the activities of Frédéric Cilins, his arrest, and any other alleged obstruction by him or any

other person (c*f. id.* at 21:12-19).  Indeed, both Ferriera's and Flores's tenure at Vale post-dates the April 2010 JV, and, as noted, there is no indication that the purported "look back," in which Rio Tinto argued they were involved, in fact occurred.

- ***2011 Meetings***.  With respect to Rio Tinto's Requests No. 56 and 63, concerning meetings held in 2011 between Vale and President Condé, Your Honor ordered them "limit[ed] . . . to the information about the bribery, the conspiracy" or any other "funny business," "as opposed to just the general operations of Simandou" or "normal business."  (Apr. 8, 2015 Tr. 23:11-15, 24:15-19, 25:1-6.)  We searched for and reviewed documents related to both the February 2011 meeting between Roger Agnelli, Alpha Condé, and Luiz Inácio Lula da Silva and the purported May 2011 meeting between Murilo Ferreira and Alpha Condé.  We informed Rio Tinto that the documents reviewed concerning the February 2011 meeting contained no discussion of the bribery, fraud, misappropriation of information, or obstruction of justice alleged in the Amended Complaint.  Vale's review of documents, as well as interviews of witnesses, revealed that the February 2011 meeting concerned the groundbreaking ceremony for the trans-Guinea railway.  We found no indication of any meeting in May 2011.

***Vale's Document Collection***.  At the last conference, Vale reported that under its document retention policies, in the absence of a litigation hold, an employee's hard drive is overwritten upon their departure and backup tapes are overwritten after 12 months.  (Apr. 8, 2015 Tr. 4:16-5:9.)  As a result of those policies, Vale had not retained electronic custodian documents for custodians who had departed Vale over a year before Rio Tinto filed suit.  Vale agreed to conduct diligence into whether there were other sources for documents of these individuals and to report to Plaintiff "whether there is anyone else whose documents should be searched" in addition to the 22 Vale custodians agreed upon.  (*Id.* at 26:16-18.)  Vale conducted extensive diligence, including reaching out to the former employees (with the exception of Mr. Barbosa, who is gravely ill, and Mr. Monteiro, who is Rio Tinto's employee) to interview them as well as their former Vale assistants who could be reached.  Based on those interviews, the only Vale employees who might have additional relevant documents from these custodians are already custodians.[3]  Only one assistant, to Keith Martin, had documents created or received by any of the custodians at issue, and provided those few documents, which have been added to Vale's Document Universe.  Vale also analyzed the documents it has collected and the results of

---

[3] The one exception is Ricardo Saad, whom Eduardo Ledsham identified among seven correspondents, the other six of whom are already custodians.  Adding Saad as a custodian would not be appropriate for several reasons, many of which we already discussed with Plaintiff last winter.  Since joining Vale in 2003, Saad has worked exclusively in project implementation and had no involvement in the Rio Tinto or BSGR negotiations concerning Simandou.  Until he was appointed director of VBG in July 2010 (*after* the formation of the JV), he worked on unrelated projects.  Saad would only possess documents related to VBG's operations at Simandou, which are not relevant to Plaintiff's claims.  Saad is not an appropriate "replacement" (were a replacement needed) for Ledsham, whose role as a member of the Global Exploration Team was to evaluate potential ventures, and who was selected as a custodian precisely because of his involvement in both sets of negotiations at issue here, neither of which involved Saad.

that analysis corroborate the interviews.  Vale determined that approximately 140,000 of the former employees' documents, including communications with each of the 8 former employees, are preserved and have been collected through the other custodians and are included in the Document Universe subject to predictive coding.  Vale has no reason to believe that there exist better sources of these individuals' responsive documents than the other custodians already collected.

On April 10, Rio Tinto sent Vale a letter setting forth 17 questions concerning Vale's preservation and collection process.  Vale used the question in the letter, where relevant, to inform its investigation.  As noted, based on that investigation, there is no reason to believe any additional documents need to be collected.  Other of Rio Tinto's questions go far beyond what is required to address whether there are other locations that should be searched for the custodians' documents.  The Court directed that Vale "verif[y] with your client whether there is anybody else whose documents . . . should be searched," and "send [a] letter to Mr. Lyttle confirming whether there is anyone else whose documents should be searched."  (Apr. 8, 2015 Tr. 26:8-18.)  Vale has done that.  Vale has also, in its April 23 letter to Plaintiff and in a subsequent meet-and-confer, elaborated on the steps it took in order to reach that conclusion.  Vale further offered during that meet-and-confer to go through each of the 17 questions individually, explain how Vale had already answered many of those questions, provide further explanation if it could, and explain why it viewed further responses as unduly burdensome and beyond the scope of discovery.  Rio Tinto declined that offer, demanding instead that Vale provide a written response to every question posed as written in the letter (including, for example, "[f]or each person identified in Vale's Second Amended Interrogatory Responses," of which there are nearly 100, "an explanation of their role(s) in connection with each of the following: Simandou, Rio Tinto, BSGR, Steinmetz, VBG and/or the Vale-BSGR Transaction").  Rio Tinto's demand should be rejected.  "Discovery on discovery" is wholly unjustified where there is absolutely no showing that Vale's preservation or discovery efforts have been deficient in any manner.  *See  Orillaneda v. French Culinary Inst*., No. 07 Civ 3206, 2011 U.S. Dist. LEXIS 105793, at *27 (S.D.N.Y. Sept. 19, 2011) (Pitman, M.J.) (finding plaintiff was not entitled to conduct discovery into the manner in which defendant maintained and searched for documents without first showing "specific reasons for believing that defendant's production is deficient").

***Rio Tinto's Demand for Production of the Privileged Nardello Due Diligence Report Should Be Denied***.  Rio Tinto has challenged Vale's assertion of privilege with respect to a memorandum provided by Vale's counsel, Clifford Chance, to Vale as part of Clifford Chance's legal advice regarding Vale's contemplated joint venture with BSGR.  The memorandum incorporates and attaches a report prepared by the investigative firm Nardello & Co. (the "Nardello Report" or the "Report").  Nardello was retained by Vale's lawyer, Clifford Chance, to assist it in providing privileged legal advice to Clifford Chance's client, Vale.  Vale had no separate relationship with Nardello.  Clifford Chance was retained by Vale and Nardello was retained by Clifford Chance *before* Vale entered into any kind of agreement with BSGR with respect to Simandou.  At the time Vale retained Clifford Chance and Clifford Chance retained Nardello, there existed a risk that if Vale entered into an agreement with BSGR with regards to a property in Guinea, it might subject itself to investigation or regulatory action by the U.S. government with respect to that transaction and any activities of its JV partner.  When Clifford Chance concluded the representation, that risk no longer existed and Vale agreed to enter the

9

transaction with BSGR.  As it turns out, Vale is *not* the subject of any governmental investigation.

Rio Tinto claims that the Nardello Report is not privileged because it is not "legal advice" and also asserts (without substantiation) that any privilege was waived because the report was shown to a representative of the Guinean Government.

The Court's consideration  of this issue would be premature.  Only yesterday, Rio Tinto provided Vale with preliminary factual information about the purported waiver.  Vale informed Rio Tinto that it did not consider this issue ripe for decision, asked Rio Tinto that it be given the opportunity to investigate the facts concerning that claim, and proposed that the parties continue to meet-and-confer on this issue before raising it with Your Honor, if necessary, on a full factual record at the next status conference.  Rio Tinto refused this request.  Moreover, while Rio Tinto has asserted *only* two grounds on which it is challenging Vale's claim of privilege, it has purported to "reserve all rights to challenge any privilege claimed by Vale with respect to both the Report itself and any representations by third-parties contained therein."  Vale should have to litigate this issue only once.  If Rio Tinto has objections to Vale's claims of privilege, it should make all those objections now.  It has no right to make only certain objections, holding others in reserve – thus requiring Vale and the Court to duplicate efforts.

In any event, should the Court desire to reach them, Rio Tinto's arguments are meritless. It is hornbook law in the United States that privilege extends not only to "legal advice" but to any confidential attorney-client communication made for the purpose of seeking or providing legal advice.  *See* Restatement (Third) of the Law Governing Lawyers § 68 (2000).  Moreover, the privilege may include communications with or by third parties when those third parties are "necessary, or at least highly useful," to an attorney in providing legal advice to his or her client. *In re Grand Jury Subpoena Dated Mar. 20, 2013*, No. 13-MC-189, 2014 WL 2998527, at *8 (S.D.N.Y. July 2, 2014) ("Private investigators also fit within this category of necessary aides to the provision of legal services."); *see generally U.S. v. Kovel*, 296 F.2d 918 (2d Cir. 1961).  That is precisely the situation here.  Nardello was retained by Clifford Chance (again, Vale had no separate relationship with Nardello) to assist Clifford Chance in providing advice to Vale.

The same result obtains under English law, which governs the scope of Vale's privilege with Clifford Chance, a U.K. firm, hired to represent Vale in a transaction governed by English law with BSGR, a Guernsey-based company.[4]  "Communications between a *lawyer* and third party from whom he obtains information which he passes on to his client in privileged communications are also privileged, not because the third party is his or the client's agent, but because there is no basis for separating the parts of the lawyer/client communications dealing with that information from the parts not so dealing."  Malek, *Disclosure* ¶ 11.15 (2012) (emphasis original); *see also Carpmael v Powis* [1846] ("It is impossible, however, to split the duties in that manner without getting into inextricable confusion.  I see them as all parts of one transaction … the sale of an estate … That being the case, I consider that all communications

---

[4] In addition, Nardello is an English investigative firm, and its engagement by Clifford Chance was governed by English law.

which may have taken place between the witness and his client in reference to that transaction are privileged.").[5]

Moreover, the Nardello report is protected attorney work product under U.S. law. Work product protection attaches to documents prepared in reasonable anticipation of litigation. *See Kayata v. Foote, Cone & Belding Worldwide, L.L.C.*, 2000 WL 502859, at *2-3 (S.D.N.Y. Apr. 26, 2000) (holding that documents prepared during the course of an investigation at the direction of counsel and because of the prospect of litigation were protected by the work-product doctrine). Work product protection extends to documents created prior to the specific event giving rise to litigation. *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995). The Nardello Report is work product because at the time it was prepared, there existed a risk of investigation or regulatory action by the U.S. government with respect to the joint venture transaction and any activities of its JV partner.

Finally, Rio Tinto alleges – without any supporting proof – that Vale waived privilege because it purportedly allowed a representative of the Guinean Government to review the Nardello Report. We offered to investigate the information Rio Tinto provided. That request was rejected. Rio Tinto has made its own bed. If it insists on a ruling now, the claim of waiver should be rejected for lack of any competent or admissible evidence of waiver. *See, e.g.*, *McKean v. City of New York*, No. 03 Civ. 7790(RWS)(MHD), 2005 WL 1812987, at *1 (S.D.N.Y. Aug. 2, 2005) (noting that "Defendants are free to make an appropriate motion demonstrating, with competent evidence, the factual and legal basis for their waiver claim" but that "[w]e fail to see, based on the letter from defendants' attorney, the basis for defendants' contention that plaintiff has waived the attorney-client privilege" where there has been "no evidentiary showing by defendants" as to waiver).[6]

### C.    BSGR's Position With Respect To LCIA Documents

---

[5] *See also Balabel* [1988] Ch. 317 ("Once solicitors are embarked on a conveyancing transaction they are employed to ensure that the client steers clear of legal difficulties, and communications passing in the handling of that transaction are privileged (if their aim is the obtaining of appropriate legal advice) since the whole handling is experience and legal skill in action and a document uttered during the transaction does not have to incorporate a specific piece of legal advice to obtain that privilege.").

[6] A claim that evidence was shared with a government representative would raise complicated questions under either U.S. or English law. *See, e.g.*, *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993) (recognizing that there may be "situations in which the disclosing party and the government [in its investigation] may share a common interest in developing legal theories and analyzing information"); 8 Wright & Miller, *Federal Practice & Procedure* § 2024 ("disclosure of a document to third persons does not waive the work product immunity unless it has substantially increased the opportunities for potential adversaries to obtain the information."); *see also* Thanki, *The Law of Privilege* ¶ 6.16 (2nd Ed.) (principle is similar under U.K. law); Passmore, *Privilege* ¶¶ 7-037 (3rd Ed. 2013) (even absent common interest, English courts generally reluctant to find privilege lost simply because material is made available to a third party in confidence).

As Your Honor will recall, at the last conference the parties raised an issue with Document Request No. 66 in Rio Tinto's Second Request for the Production of Documents to Vale. The Request makes a categorical demand for all documents "produced by Vale or received by Vale from other parties in connection with its Simandou arbitration in the London Court of International Arbitration." Because of the absolute breadth of this request, it encompasses all of the documents BSGR has produced and might produce to Vale in the LCIA arbitration, including witness statements, statements of the case, and supporting evidence. Notwithstanding the confidentiality provisions governing the LCIA arbitration, Vale agreed to produce documents in response to this request and informed the LCIA Panel of its intent to do so. BSGR objected to Vale's request to the LCIA Panel, citing the confidentiality of the LCIA arbitration and the documents' uncertain relevance to this Action.

On April 30, 2015, the LCIA Panel issued its ruling, concluding that in the absence of a court order, the parties' agreed-to confidentiality provisions, Paragraph 15 of the Tribunal's Procedural Order No. 2 of 5 November 2014, and Article 30(1) of the LCIA Rules all precluded Vale from disclosing information it received in the arbitration. Accordingly, the Panel prohibited Vale from disclosing any documents received from BSGR, including BSGR's written briefs, fact witness statements, and fact exhibits, as well as any materials generated or produced by BSGR in the LCIA arbitration, and any materials generated and submitted by Vale to the Panel. The LCIA Panel further directed the parties to bring any decision from Your Honor on this issue to its attention.

We have not been informed of any attempt by Rio and Vale to narrow Request No. 66, nor has Rio or Vale sought to meet-and-confer with BSGR concerning this issue. We were notified by counsel to Rio Tinto prior to the submission of this joint letter that Rio Tinto would be seeking an order compelling Vale to produce documents responsive to Request No. 66.

Such an Order would be entirely unwarranted, because Request No. 66 is wholly inappropriate. First, neither Rio Tinto nor Vale has identified any authority supporting the proposition that this Court can order the wholesale disclosure of a confidential arbitral record prior to determining that the documents are relevant to the action. Rather, in instances where courts have required the production of confidential arbitral materials, the question of relevance was already established. See Gotham Holdings, LP v. Health Grades, Inc., 580 F.3d 664, 666 (7th Cir. 2009) (litigating party relied upon arbitral award and supporting papers in the court case, conceding the documents' relevance; court also notes that no party objected to the subpoena requesting the materials, signifying the parties' concession of relevance); Contship Containerlines, Ltd. v. PPG Indus., Inc., 00 Civ. 0194 (RCC)(HBP), 99 Civ. 10545 (RCC) (HBP), 2003 U.S. Dist. LEXIS 6857, at *6 (S.D.N.Y Apr. 17, 2003) (court finds that arbitral documents sought "are undeniably relevant" and are "necessary for disposing of this matter fairly and inexpensively"); United States v. Panhandle E. Corp., 118 F.R.D. 346, 349 (D. Del. 1988) (court implicitly rejected argument that arbitral documents were not relevant). Thus, before any order compelling production of any LCIA materials is made, Rio and/or Vale must show the documents are relevant.

Second, to the extent that some LCIA documents are relevant to this Action and are not otherwise in Vale's custody, possession, or control, it is incumbent on Rio Tinto to issue

appropriately tailored document requests to Vale and Letters of Request to BSGR.  As the LCIA Panel re-confirmed in its decision, Vale may produce any of its own material that is relevant to this Action notwithstanding its inclusion in the LCIA arbitral record.  BSGR does not contest this ability.  However, a document request to Vale seeking all materials that Vale might obtain from BSGR in the LCIA arbitration (and an order enforcing such a request) would enable Rio Tinto (and, by acquiescence, Vale) to make an end-run around Your Honor's prior ruling that merits discovery from BSGR should proceed through Letters of Request.  Additionally, Your Honor should be aware that Vale is currently attempting to introduce into the LCIA arbitration evidence from a confidential ICSID arbitration between BSGR and the Republic of Guinea.  Compelling Vale to produce BSGR's material would permit Vale to produce this confidential ICSID material as well.  As a result, BSGR, over which this Court has yet to establish jurisdiction, would have its confidential materials from two separate arbitrations brought into this jurisdiction.  Such a result would be patently unfair to BSGR.

## V.      DISCOVERY FROM PLAINTIFF RIO TINTO

Plaintiff and Defendant Vale have exchanged correspondence and conducted several telephonic meet and confers.

### A.      Plaintiff's Position

***Rio Tinto does not have, nor is it entitled to, the names of its investigators' confidential sources.***  As we have now repeatedly explained to Vale, Rio Tinto does not have, nor does it have any right to obtain, the names of sources in the investigator reports compiled by its investigators.  The reports themselves provide more than enough identifying information about the sources to evaluate the accuracy and reliability of statements and views attributed to them, without knowing specific names.

In response to Vale's requests, Rio Tinto has asked the investigators if they are willing to provide source names.  They have universally refused, citing the fact that providing names would not only be fatal to the very source networks their work relies upon, but also put their sources at risk of personal harm and retribution.

There is nothing more Rio Tinto can do.  Vale's citation to Clause 16.1 in the Rio Tinto Terms and Conditions (which only apply to two of the five investigators) does not give Rio Tinto the right to obtain the names of sources. The investigators believe that clause 16.1, which is in the accounts and records section, does not apply to the names of their sources. And while Vale is free to argue its view of Clause 3(e)(i) (which prevents the investigators from breaching other contracts and agreements with third parties – *i.e.*, sources) to the foreign courts evaluating its Hague Requests, the investigators have universally adopted the position that this clause, where applicable, supports their position.  At bottom, the investigators have all taken the position that Rio Tinto is not entitled to – and has no right to obtain – the names of the sources.

As much as Vale may wish it otherwise, neither Rio Tinto nor the investigators (the actual parties to the agreements) shares Vale's view that Rio Tinto has a right to the names of the sources.  Indeed, both parties intended that Rio Tinto would have no rights to the identity of specific sources.  Finally, these contracts are governed by the laws of England and Wales, not the

United States, making the Court's decision to send Vale's arguments to courts in that jurisdiction all the more appropriate.

If Vale desires more information than that already provided in the reports, Vale  has already sought relief – and the Court has already granted it – in the form of Hague discovery requests.  Any arguments with respect to Vale's rights as to discovery of the confidential sources need to be directed at the foreign courts and foreign parties from whom Vale is seeking discovery, not this Court and not Rio Tinto.

***Rio Tinto's Document Production.***  Vale's claims as to Rio Tinto's delay are belied by the facts, which show that Rio Tinto's production numbers substantially dwarf those of any defendant in this case.  Indeed, to date, Rio Tinto has produced over 66,000 documents, twenty-three times the under 3,000 documents produced by Vale to date.  Numbers do not lie and Vale's allegations of delay are nothing more than false accusations and manufactured disputes meant to detract from the glaring deficiencies in Vale's own discovery and production.

Moreover, Rio Tinto is well placed (and well ahead of Vale) to proceed with predictive coding and continue rolling out document productions from there.  Consistent with the predictive coding disclosures required by the Parties' agreed upon Predictive Coding Protocol, Rio Tinto produced its Control Set on April 10, 2015 and its Seed Set on April 17, 2015.  The parties met and conferred to resolve disputes regarding those requests and Rio Tinto intends to produce its Training Set before the end of this week.  If there has been any delay, it has been caused by Vale, not Rio Tinto.  It was Vale who unilaterally decided to apply search terms to its Document Universe without first consulting with Rio Tinto, which this Court recognized was improper.  And far from delaying in response to those actions, Rio Tinto provided its proposed additions to Vale's search terms one day ahead of the Court ordered deadline.  Those search terms undeniably returned documents relevant to the claims at issue in this case, notwithstanding Vale's claims with respect to its "responsiveness" coding of those documents (which Rio Tinto expects to object to in due course and in accordance with the Predictive Coding Protocol).

***Vale is backing out of a deal the Parties previously struck on Vale Request 21 regarding the Chinalco/Chalco Documents.***  The parties already have reached agreement on this issue and Vale should be held to that agreement.  Rio Tinto's joint venture with Chinalco's subsidiary, Chalco, for Simandou Blocks 3 and 4 (which are not the subject of this litigation), and is an entirely separate deal from the joint venture contemplated between Rio Tinto and Vale.  Nor were Rio Tinto's negotiations with Chalco tied or related to Rio Tinto's rights with respect to Blocks 1 and 2.  Moreover, Chalco is Rio Tinto's *current* joint venture partner at Simandou.  A request for all documents exchanged between Rio Tinto and its joint venture partner at Simandou – which is what Vale originally sought and is now trying to seek again here – thus calls for an enormous amount of highly sensitive and incredibly competitive material that is completely irrelevant and wholly outside the bounds of this case.

Thus, Rio Tinto proposed, and on February 27, 2015 Vale accepted, a narrowed proposal with respect to Vale's Request on this topic.  In exchange for removing the issue from the Court's agenda that day, Rio Tinto and Vale reached an agreement with respect to the modified scope of the agreement whereby Rio Tinto agreed to produce documents in response to this request related to BHP, the Vale deal, and Chinalco up to June 2009 and that this production

"would include transactions involving any or all of Simandou, and would not be limited only to transactions involving all of Simandou." Related specifically to the Chalco joint venture (the subject of this dispute), Rio Tinto agreed – and Vale accepted – to produce the confidentiality agreement and documents from a data room that was established as part of joint venture negotiations between Rio Tinto and Chalco. This agreement provides Vale everything it needs related to the Chalco deal. It shows them what Rio Tinto information and data was shared with Chalco, and the protections in place to keep it confidential. The details of those negotiations (price paid, how the deal was structured, financing, etc.) or Rio Tinto's work with its current joint venture partner on Blocks 3 and 4 is irrelevant to Vale's claims.

Vale's position now is the very same position it advocated for in February. And it is the same one that Rio Tinto rejected both our earlier letter to the Court and in meetings with Vale's counsel in the months beforehand. Rio Tinto did not accept Vale's overly broad request then, it did not accept it on February 27th before entering the Courtroom, and in fact, it was only by reaching the agreement described above that Rio Tinto agreed to take the issue off the parties' hearing agenda that day. Vale's alleged "support" for its interpretation of the parties' agreement mischaracterizes the scope of the parties' agreement and quotes the parties' correspondence outside the context in which the agreement was negotiated. What is clear is this – if Vale's view of events were true, Rio Tinto never would have agreed to have taken this issue off the parties' February agenda. Instead, it would have been taken to the Court for resolution. Rio Tinto respectfully requests, therefore, that the Court hold Vale to terms of the deal the parties negotiated months ago and limit Vale Request No. 21 to documents related to BHP, the Vale deal, and Chinalco up to June 2009, the Chinalco confidentiality deed and data room documents, and nothing more. Not only is this the deal Vale struck, it gives Vale everything relevant to their defenses.

***Rio Tinto's BHP Production is Complete.*** Vale for the first time indicates that it intends to raise an issue with the Court regarding Rio Tinto's BHP production. Unfortunately, Rio Tinto does not have any insight into what Vale's alleged issues may be, as Vale did not previously notify or even explain to Rio Tinto what, if any, alleged deficiencies it believes exist with respect to the BHP production. Regardless, Rio Tinto's production in response to Vale's BHP requests is complete – and has been so for a long time. Rio Tinto produced over 58,000 documents in response to Vale's requests, which included requests for "All Documents concerning or referring to the proposal first made by BHP Billiton to Rio Tinto…involving a proposed acquisition of Rio Tinto" and "All Documents concerning the decision by Rio Tinto's Board of Directors to reject the BHP Billiton Proposal in or around November 2007 or otherwise considered in determining Rio Tinto's strategy in responding to the BHP Billiton Proposal or BHP Billiton Exchange offer." To say that Vale's requests were broad would be an understatement. Rio Tinto did, however, produce all documents responsive to these requests from all five agreed upon custodians (which include Rio Tinto's former CEO and Head of Mergers and Acquisitions). Vale is not entitled to more and has shown no need for more. Indeed, to grant Vale even more discovery on this issue would significantly prejudice Rio Tinto by requiring it to train the predictive coding tool on the BHP issues and then re-review the potentially tens (if not hundreds) of thousands of documents that may return from the predictive coding process. Vale wanted to expedite this production by taking it out of the predictive coding process and using search terms. It should not now be allowed to force this issue back into the predictive coding process.

While not wanting to train the predictive coding process to re-do the BHP request, Rio Tinto has, however, agreed to produce any documents responsive to the BHP requests to the extent any such documents otherwise come up in the course of its merits review.  That should be more than sufficient to resolve any concerns Vale may have on this issue.

### B.    Defendant's Position

*Confidential Source Names*.  Vale requests the Court issue an order requiring Rio Tinto to amend its interrogatory responses with the names of the sources referred to in its investigative reports.  When we were last before Your Honor, Vale pointed out that – while Rio Tinto previously had withheld the information on the grounds that disclosure of names would compromise the security of individuals – Rio Tinto's investigative reports were littered with references to unnamed sources for many of the most critical allegations in the Amended Complaint.  We also noted that a party cannot hide behind vendors it hires to withhold information it plainly has a duty to disclose.  Your Honor ordered Rio Tinto to disclose its contracts with its investigative firms in order to determine whether Rio Tinto in fact had a right to the withheld information.  (Apr. 8, 2015 Tr. 31:3-10.)  Rio Tinto has now produced some of the contracts, which confirm that it is entitled to that information.[7]  It is elementary that interrogatories under Fed. R. Civ. P. 33 require a party to produce all information in their "control or otherwise obtainable by it" and therefore it is incumbent on the Court when a party claims that certain information is not in its control and the party opponent claims that the information is in the other side's control to resolve the dispute.  *In re Auction Houses Antitrust Litig.*, 196 F.R.D. 444, 445, 447 (S.D.N.Y. 2000) (ordering party to answer all interrogatories, including in its response information known to [non-party], explaining that "[a] party served with interrogatories is obliged to respond . . . not only by providing the information it has, but also the information within its control or otherwise obtainable by it").[8]

This Court should rule that, under its contracts with the investigators, Rio Tinto has a "legal right" to the names of its investigators' confidential sources, as well as any documents underlying the reports of its investigative firms, and therefore this information is within Rio Tinto's control and this Court should order that they be produced.  *See, e.g.*, *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, (S.D.N.Y. 2007) (Peck, M.J.) ("'Control' has been construed broadly by

---

[7] As a preliminary matter, to the extent Rio Tinto has received correspondence from its investigators since the last conference, it has not been produced to Vale, and Rio Tinto is therefore in violation of Your Honor's order that "to the extent you get letters like this, give them to defense counsel."  (Apr. 8, 2015 Tr. 31:3-4.)

[8] *See also Sompo Japan Ins. Co. of Am. v. M/V TAMPA*, No. 04 CIV. 4156(LAP)DF, 2005 WL 4012818, at *2 (S.D.N.Y. Nov. 10, 2005) (same); *Miller v. Doctor's General Hosp.*, 76 F.R.D. 136, 140 (W.D. Okla. 1977) (in responding to interrogatories "[t]he answering party cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control . . . If an appropriate interrogatory is propounded, answering party is required to give the information available to him, if any, through his attorney, *investigators* employed by him or on his behalf, or other agents or representatives, whether personally known to the answering party or not") (emphasis added).

the courts as the legal right, authority or practical ability to obtain the materials sought upon demand.") (internal quotation omitted).  Courts have held that a litigant has a "legal right" to obtain documents from a non-party based on document sharing provisions in agreements between the litigant and non-party like those contained in Rio Tinto's contracts with the investigators.  *Id.* at 196; *Sompo Japan Ins. Co. of Am. v. M/V TAMPA*, No. 04 CIV. 4156(LAP)DF, 2005 WL 4012818, at *1 (S.D.N.Y. Nov. 10, 2005).  For example, in *In re NTL*, Your Honor found that defendant had the legal right to obtain documents from a non-party under an agreement providing that:

> each party shall . . . allow the other party and its personnel to have access to . . . and . . . take copies of all documents, records or other materials containing any information which that party or any of its Group Companies or affiliated joint ventures *might reasonably require* to be able to comply with their respective legal, regulatory, accounting or filing obligations . . . .

244 F.R.D. at 181-82, 196.[9]

The language contained in Rio Tinto's contracts with its investigative firms goes even further, providing Rio Tinto with an unfettered right to "any" and "all" information received from the investigative firms in connection with the engagement.[10]  For example, Rio Tinto's engagements of both Livingstone & Company and BTG Intelligence Limited are governed by Rio Tinto's General Conditions for Consultancy Services.  Clause 16.1 states: "The Consultant *must* provide Rio Tinto or the Relevant Company with *any information requested* by either of them in relation to the provision of the *Consultancy Services*."  (RT0362685; RT0362647) (emphasis ours).  On its face, this clause provides Rio Tinto the express right to obtain the name of confidential sources.  Both English and U.S. law require a contract be read according to its plain and ordinary meaning.  Here, "must" entails an imperative.  *See Natt v Osman* [2014] EWCA Civ 1520 ("[T]he words 'shall' and 'must' are both synonymous as denoting something which is required to be done as opposed to something which is intended to be merely optional.").  "Any information" is extremely broad, since "any" means "every," "all," or "unmeasured or unlimited in amount, number, or extent."  *See, e.g.*, Merriam-Webster Dictionary.  "Consultancy Services" is defined as "the provision of the Consultant's knowledge, skills, experience, deductive and intuitive intellectual capabilities, inventiveness, physical work and other services

---

[9] *See also Sompo Japan*, 2005 WL 4012818, at *1(holding that subrogation agreement under which non-party agreed to assist plaintiff in litigation "translates to an obligation by [non-party] to provide at least certain types of documents to [plaintiff] upon demand"); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992 (holding that non-party licensee's agreement to use "'its best efforts . . . to give [plaintiff sub-licensor] . . . all reasonably requested assistance and information necessary to proceed with [a] suit for infringement' . . . adequately demonstrates that such cooperation has been forthcoming and encompasses production of documents and other assistance in conducting discovery").

[10] The proposal from Executive Research and Associates ("ERA") does not address this issue. (RT0362765).

17

identified in Schedule A." Schedule A describes the duties to monitor political and business issues and provide intelligence reports regarding Simandou Blocks 1 and 2.

The plain meaning of Clause 16.1 thus clearly obligates any Consultant to provide Rio Tinto with *any* information in relation to its investigation of Simandou Blocks 1 and 2, including the names of confidential sources and any documents the investigative firms may have in their possession in connection with that investigation.[11]

***Plaintiff's Document Production***. Rio Tinto has been dilatory in its production of documents in this case and has taken steps to avoid timely production. Vale's first document request was served on September 3, 2014. Since that date, Rio Tinto's production has been limited to about 200 documents from its data room – 9 of which are purportedly relevant – and a similar discrete set of Chinalco data room documents; BHP documents (produced belatedly) which go to one of Vale's defenses – but not to establishing Rio Tinto's affirmative claim – and which include a significant "dump" of thousands of irrelevant documents; and a handful of investigative reports – which undermine its claim.

Rio Tinto has not produced any documents going to the central allegations in this case. Instead, it has delayed. Vale produced its Control Set on April 6, which should have triggered Rio Tinto's five business days to respond. Instead, Rio Tinto launched the parties on a detour regarding search terms, the transparent purpose and effect of which was to delay the service of Rio Tinto's objections beyond the five days from the date of Vale's set required under the Protocol, and to distract from Plaintiff's failure to produce its own set. Rio Tinto did not serve its Control Set until April 10, 2015, and even then this contained a substantial number of documents (about 10% of those marked responsive) that Rio Tinto agreed upon meeting and conferring were improperly marked as responsive by its reviewers. The problem only worsened in Plaintiff's Seed Set, produced April 17, in which 66 documents – about 25% of those marked responsive – were improperly marked as responsive.

The Court's Scheduling Order in this case provides that "[r]olling document productions must be substantially complete" by June 30, 2015. The only exception this Court permitted was for "any pending personal jurisdiction or discovery motions." As to those, "all [d]ocument production must be complete: August 28, 2015." (Dk. 161.) Judge Berman amended the Order to provide that the June 30 deadline "is not contingent upon any pending or impending personal jurisdiction motion(s)," thus leaving in place as the only exception to the June 30 date pending discovery motions. (Dk. 163 (emphasis original).) Depositions are scheduled to begin July 1.

---

[11] Rio Tinto claims that its Terms and Conditions were not sent to Aeneas, contrary to the handwritten notation on the Aeneas engagement letter that "RT will send you our 'Terms and Conditions' in 5 working days" (RT_AENEAS_0000006). If that is indeed the case, then the terms and conditions stated in the engagement letter remained in effect, and "*[a]ll* information [was] reported to Rio Tinto" and "*[a]ll* information received from Aeneas [would] remain solely for Rio Tinto's private and *exclusive* use." (*Id.*) (emphasis added). Africa Risk Confidential's proposal similarly states that "[a]ll information received from ARC must remain solely for Rio Tinto PLC's private and *exclusive* use." (RT0362643) (emphasis added). Thus, here too Rio Tinto has possession, custody or control of the information it was ordered to produce.

The time between June 30 and August 28 was intended for discovery motion practice (including as to documents withheld for privilege), which obviously cannot begin unless document production is complete by June 30 and a privilege log served in compliance with the Order. Vale is on schedule to meet the June 30 deadline. It would be unfair for it to be alone in meeting that cutoff, particularly when Rio Tinto is the Plaintiff. Accordingly, Vale requests an order that Rio Tinto complete production in response to Vale's current document requests by June 30, 2015.[12]

**Vale Request 21: Chinalco Documents**. Rio Tinto is attempting to backpedal out of the parties' months-old written agreement concerning the production of documents related to its joint venture with Chinalco for Blocks 3 and 4 of Simandou. The parties previously had reported that this issue was resolved. (Feb. 27, 2015 Tr. 37:6-14, 39:13-40:2.) Unhappy with the agreement it reached, Rio Tinto is now attempting to rescind it.

Vale's Request 21 calls for "[a]ll Documents relating to Rio Tinto's negotiations with any Third Party regarding any transaction that would include or involve Simandou (or any of Rio Tinto's rights with respect to Simandou) from 2006 to the present, including but not limited to negotiations with . . . Chinalco." On March 2, after the parties met and conferred, Vale wrote to Plaintiff to memorialize the agreement the parties had reached:

> You clarified and agreed that your search for documents responsive to this request . . . would include transactions involving any or all of Simandou, and would not be limited only to transactions involving all of Simandou.

(March 2, 2015 Email from S. Reents.) Rio Tinto responded on March 4, confirming that agreement as well as its agreement to produce responsive data room documents (a discrete set) by a date certain: "Agreed and as confirmed at the hearing, we will produce the Chinalco data room and confidentiality agreement by Friday, March 6." (March 4, 2015 Email from M. McCaffrey.) At the conference on February 27, we reported that the dispute concerning this request, which had been raised in the joint letter, was resolved. (Feb. 27, 2015 Tr. 37:6-14, 39:13-40:2.)

On April 24, for the first time, Rio Tinto sent Vale an email asserting "that Vale is not entitled to any documents related to Rio Tinto's joint venture with Chinalco over Blocks 3 and 4" *except* for the data room and confidentiality agreement. (April 24, 2015 Email from M. McCaffrey.) This is flatly contrary to the agreement that was reached and reported to the Court. If Rio Tinto had any remaining objections to the document request, the time has long since passed for it to raise them. Any objection is waived.

---

[12] On May 1, 2015, Rio Tinto responded to Vale's Third Request for the Production of Documents, objecting to several of the requests. The parties have agreed to meet and confer based on Rio Tinto's agreement that it will not argue that it has suffered prejudice as a result of Vale's not raising at this conference issues regarding Rio Tinto's failure to produce pursuant to that request.

In any event, were the Court to reconsider the issue and permit Rio Tinto to raise belated objections at this late hour, the relevance of these documents is manifest. The request is clearly relevant to, among other issues, the value of Simandou, what rights to Simandou Rio Tinto believed it possessed after the Government of Guinea's revocation of its rights to Blocks 1 and 2 in 2008, and what purportedly confidential information about Simandou it shared with third parties such as Chinalco. The documents have now become even more important. In its opposition to defendants' motion to dismiss, Rio Tinto surrendered any claim it had previously asserted for any loss caused by the (July and December) 2008 decision of the Government of Guinea to withdraw Rio Tinto's rights to Simandou and to award those rights to BSGR or to the June 2009 confirmation by Government Guinea of that withdrawal and the assignment of those rights to BSGR. (*See* Dk. 209 at 1.) Instead, for the first time, it makes the claim (un-alleged in the Amended Complaint) that Rio Tinto suffered "independent injury" from its decision in April 2011 to enter into a settlement agreement with Government of Guinea. (*Id.* at 12.) Vale and the other defendants have moved to dismiss this claim (and the Amended Complaint) on the theories that this alleged RICO injury is not pleaded and is not independent. But at this stage, the parties must assume that the claim is in the case and that Vale (and the other defendants) will go to trial on the theory that the RICO injury it caused (and the only RICO injury it caused) was the incremental harm Rio Tinto suffered from entering into the settlement agreement. Rio Tinto's agreement with Chinalco is at the center of the settlement agreement and is critical to the questions of why Rio Tinto entered that settlement and whether it suffered any damages as a result of doing so. The agreement recites the Government of Guinea's complaint that Rio Tinto signed the deal with Chinalco without first obtaining Government approval and contains a settlement where the Government releases any claims related to the Chinalco deal and confirms Rio Tinto's interest in the Simandou Blocks 3 and 4 rights that were the basis of Chinalco deal. (*See* Dk. 210-1 at 3-4, 12-13.)

Plaintiff should be ordered to honor its written agreement and make a full production in response to this request, which has since become even more relevant, not less so.

***BHP Documents***. Vale has discovered that Rio Tinto is marking as non-responsive documents that are responsive to Rio Tinto's requests regarding BHP. This conduct violates Rio Tinto's obligation to respond to the documents requests. Vale seeks an order compelling Rio Tinto to mark such documents responsive and produce them through its predictive coding review.

In its document requests, Vale requested documents concerning BHP's attempted hostile takeover of Rio Tinto, launched in 2007, which was the impetus for Rio Tinto approaching Vale. Rio Tinto resisted and the issue came to a head at the time defendants' *forum non conveniens* motion was pending and it was not clear where this case would be litigated. At the time, the Court ordered Rio Tinto to make a limited production of BHP documents from a select group of custodians while the District Court considered the motion. The Court's order was consistent with the other Orders it was entering at the time: it limited Vale's production to the documents produced to the Government and just as it limited Rio Tinto's production to the BHP documents. The Court has since ordered Vale to produce the documents requested by the Plaintiff's Document Requests and has not permitted Vale to limit itself to the Government production, which contains the most relevant documents – the old "goose and gander" thing. The Court did not excuse Rio Tinto from complying with the discovery requests in their entirety when it turned

to predictive coding.  To the contrary, the Court also made clear "[a]ll discovery that is limited at this point is open for further expansion in the event that while following proportionality[] rules it turns out that the information is insufficient."  (Dec. 9, 2014 Tr. 32:7-10; *see also id.* at 31:21 ("THE COURT:  We will start with 5" custodians.); *id.* at 35:6-13 ("THE COURT:  Let's do the BHP documents the old-fashioned way for now.  . . .  Whether that gets revisited and expanded if we go to predictive coding for everything else, I'm certainly in favor of using predictive coding as a general matter."); *id.* at 36:10-18 (noting Vale's reservation of rights as to time period).)[13] There is no reason that Rio Tinto should be relieved from producing BHP documents – and turn a blind eye to them – while reviewing documents to produce to defendants in response to its other document requests.  The Court never so ordered and, once again, Rio Tinto never requested such relief.

Indeed, Rio Tinto's invocation of its selected custodians at the early stage of this case goes against it.  The two custodians whom Rio Tinto represented to Vale were among the "core" team members involved in the BHP takeover defense (Peter Cunningham and Rowena Albones) have proved to be marginal at best.  Plaintiff represented to Vale that "Rowena was also a core working member of the Manchester defense team" who "would have also had knowledge/involvement in a potential iron ore demerger as well," and "Peter led the Project Venice team, including the specific asset sales to Vale after the collapse of the BHP bid" and "would have had significant involvement and responsibility with a potential iron ore demerger." (Dec. 11-12 Emails from M. McCaffrey.)  Yet, of the roughly 60,000 purportedly responsive BHP documents Plaintiff has produced to date, less than 4% (not 40%) are communications to or from either of the two custodians Plaintiff represented were central to this issue.

## VI.   THIRD PARTY DISCOVERY

***Letters of Request to Investigative Firms.***  Vale and its counsel have taken the necessary steps to enforce the Letters of Request to investigative firms pursuant to the Hague Evidence Convention by submitting them to the Competent Judicial Authorities of the United Kingdom, South Africa, and France.

---

[13] As to custodians, Vale requested eleven, and Your Honor instructed the parties to "start with 5":

> We will start with 5.  You can convince Mr. Liman that that he should take some of the ones on your list because they are likely to have the most documents; otherwise, I will let defendant choose.  However, if you don't take any of theirs, Mr. Liman, on the assumption that they know who was most involved, and you pick five as a starter from your list and then are shocked that they don't have the material, I may not give you any more.  If you take the five that Rio Tinto has proposed and it turns out to be insufficient, then you are likely to get all 11 of yours or at least a large number.

(Dec. 9, 2014 Tr. 31:21-32:5.)  Heeding Your Honor's words – and taking Rio Tinto's representations on good faith – Vale selected two custodians proposed by Rio Tinto and three of its own choosing.

With respect to the French Letter of Request concerning Aeneas, Rio Tinto previously identified Aeneas employee Tidiane Touré, who was tasked with managing this project (RT_AENEAS_0000005), as the proper contact person at Aeneas for the purpose of Vale's Letter of Request.  It has come to Vale's attention, however, that he has since left Aeneas.  While Vale has submitted its Letter or Request with respect to its request for documents, it will now be required to apply to this Court for a new Letter of Request for the deposition testimony of a knowledgeable individual from Aeneas.  Accordingly, Rio Tinto should be ordered to immediately identify any and all other current employees or principals of Aeneas with knowledge of the work it conducted on Rio Tinto's behalf in connection with Simandou, Guinea, BSGR, Steinmetz, and/or Vale.

*       *       *

The parties will continue to keep the Court informed of their progress as the meet and confer process advances.

Very truly yours,


/s/Michael Lyle
Michael Lyle