UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rio Tinto plc,

                Plaintiff,

    -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

                Defendants.



14 Civ. 3042 (RMB)(AJP)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 5/12/15

## APPLICATION FOR THE ISSUANCE OF
## INTERNATIONAL LETTER OF REQUEST (LETTER ROGATORY) & ORDER

Defendant Vale S.A. ("Vale" or the "Applicant"), respectfully petitions this Court

pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence

Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781

(the "Hague Evidence Convention"), for the issuance of a Letter of Request in the form annexed

hereto as Exhibit B, Director General of the Department of Justice and Constitutional

Development acting as the Competent Judicial Authority of South Africa, requesting that the

Director General cause the Letter of Request to be served upon the designated recipients, who

are representatives of Executive Research Associates. In support thereof, the Applicant

respectfully represents as follows:

### BACKGROUND

1.      On April 30, 2014, Rio Tinto plc ("Plaintiff" or "Rio Tinto") filed a complaint in

this Court against Vale, BSG Resources Ltd. ("BSGR"), and the other named defendants

(together, "Defendants") asserting claims under the Racketeer Influenced Corrupt Organizations Act ("RICO") and alleging, *inter alia*, that Vale and BSGR had conspired to take for themselves Rio Tinto's iron ore mining rights to Blocks 1 and 2 in the Simandou area of the Republic of Guinea ("Guinea"). (Dkt. No. 2.) Rio Tinto alleged that the defendants obtained the rights to Simandou Blocks 1 and 2 in December 2008. Rio Tinto filed an amended complaint ("AC") with substantially similar allegations on August 15, 2014. (Dkt. No. 83.) Rio Tinto alleges that one of its competitors, BSGR, engaged in bribery to obtain Rio Tinto's rights to Blocks 1 and 2 in Simandou for itself in December 2008 and that another of its competitors, Vale, conspired with BSGR and assisted it in obtaining those rights in December 2008 by misappropriating confidential information from Rio Tinto and providing it to BSGR. (AC ¶¶ 154, 174-180.) Vale denies the allegations against it.

2.      The statute of limitations for RICO claims is four years running from the date of injury. *Rotella v. Wood*, 528 U.S. 549, 553, 555, 559 (2000). RICO does not have a discovery rule. *Id.* at 553. Rather, because of its prophylactic purposes and in light of the treble-damages remedy it provides, Congress required parties purporting to assert RICO claims "diligently to investigate" as "the expected benefit of suppressing racketeering activity [is] an object pursued the sooner the better": RICO is "aimed at rewarding the swift who undertake litigation in the public good." *Id.* at 558-59 (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987)).

3.      Under the law in this Circuit, there is a narrow exception to RICO's strict four-year statute of limitations which imposes substantial burdens of proof on a plaintiff bringing an out-of-time claim. *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006) ("*NGC*"). If the plaintiff can establish each of the following

2

elements by a preponderance of the evidence, the court will toll the statute of limitations during the period of concealment and due diligence: "(1) wrongful concealment by the defendant (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *Id.* at 265 (citing *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)). If the plaintiff fails as to any of these elements, the claim of equitable tolling due to fraudulent concealment also fails.

       4.     In order to satisfy that burden, the Amended Complaint claims that, "[u]pon learning" of Vale's joint venture with BSGR on April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise," that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until . . . April 2013" (AC ¶¶ 146-147), when Defendant Frédéric Cilins was arrested by the Federal Bureau of Investigation. With respect to Vale, the Amended Complaint makes a single allegation of fraudulent concealment which Vale contends is insufficient: Vale "continued negotiations with Rio Tinto during the first half of 2009, despite its discussions with Steinmetz and BSGR to develop a joint venture." (AC ¶ 144(a).) Vale denies those allegations. It is Vale's contention that Rio Tinto possessed all the operative material facts upon which it based its complaint prior to April 2013, that Rio Tinto failed to investigate continuously from April 2010 to the filing of the complaint, that no fraudulent conduct of Vale thwarted Rio Tinto's pursuit of its claim, and that the timing of Rio Tinto's lawsuit was due to extrinsic factors, including developments in Guinea and Rio Tinto's strategic decision to capitalize on them to belatedly attempt to regain rights to Simandou.

5. In light of Rio Tinto's claim that it conducted a lengthy investigation beginning in April 2010 and continuing through the filing of the complaint, Vale's Interrogatory No. 22 to Rio Tinto requested that Rio Tinto identify persons with knowledge concerning Rio Tinto's purported investigation beginning on April 30, 2010. (*See* Vale's First Set of Interrogatories to Plaintiff, Interrogatory No. 22.) In its amended interrogatory responses and subsequent correspondence with Vale, Rio Tinto identified six firms as having been involved in its alleged investigation from April 30, 2010 to April 30, 2014: (1) Executive Research Associates, (2) Aeneas, (3) Livingstone and Company, (4) Weil, Gotshal and Manges LLP, (5) Quinn Emanuel Urquhart & Sullivan, and (6) Amsterdam & Partners LLP.[1]  Rio Tinto identified the following as having been involved with its alleged investigation after December 2008 but concluding by April 29, 2010: (1) BTG Intelligence and (2) Africa Risk Consulting.

6. In response to this Court's Order, Rio Tinto produced what it claims to be the complete set of reports authored by any of the firms it hired to pursue an investigation. Those reports included reports by the two firms – BTG Intelligence and Africa Risk Consulting – that did not investigate after the date on which Rio Tinto claims the investigation began. Their reports are relevant to the issue of whether Rio Tinto had knowledge or red flags regarding its claim, but not the question of whether Rio Tinto exercised due diligence after April 2010. Rio Tinto also produced reports of two of the firms that it claims investigated after April 2010 – Executive Research Associates and Livingstone and Company. None of those reports post-date December 2010: the reports from Livingstone and Company authored after April 2010 are all dated between May and August 2010 and the only reports from Executive Research Associates that directly concern Vale are dated August 13, 2010 and December 1, 2010. Rio Tinto has not

---

[1] Rio Tinto's identification of lawyers from its current firm as having been involved in its investigation is inconsistent with its prior representation to this Court that none of its lawyers had any "first-hand percipient knowledge of the investigation." (Jan. 13, 2014 Hr'g Tr. 50:5-10).

4

produced any reports by Aeneas, Weil or Quinn – notwithstanding the Court's direction that the factual portions of documents prepared by counsel be produced. (Dec. 9, 2014 Hr'g Tr. 20:22-21:3.) The plain inference is that there were no such reports. From the face of the reports, all are devoted to competitive intelligence and, at most, to the questions of how BSGR obtained its interest in Simandou or how Rio Tinto could regain an interest in Simandou Blocks 1 and 2 if the Guinean government made that opportunity available, and in two cases, the two Project Vaal reports by Executive Research Associates dated August 13, 2010 and December 1, 2010, the chronology of Vale's contacts with BSGR and eventual joint venture with it on April 30, 2010. None appear to investigate the question of how Rio Tinto lost its concession. (It is Vale's position that Rio Tinto lost its rights because it failed to exploit Simandou, as the Guinean government stated.) Moreover, many of the reports contain the type of facts that are in the Amended Complaint regarding the conduct of BSGR, Thiam, and Steinmetz and contain red flags regarding that conduct.

7.      The information requested is highly relevant to Rio Tinto's claims that it conducted due diligence and that fraudulent concealment serves to toll the otherwise expired statute of limitations, and to Vale's argument that Rio Tinto has not established any of the elements of those claims. Information requested regarding the statements in the reports will demonstrate that Rio Tinto was well aware of any red flags with respect to BSGR's purported acts of bribery well before April 2010. It will also demonstrate that Vale did not in any way thwart Rio Tinto's investigation. Information regarding the nature of the engagement, the hours billed, the activities conducted, and the time spent on the investigation will demonstrate that Rio Tinto, despite these red flags, was not in fact conducting a lengthy investigation of its claims regarding the loss of its concession (especially from December 2010 to 2013) and was not

5

thwarted by Vale. The reports also demonstrate that Rio Tinto did not hire these firms to conduct an investigation of its claim, but largely to gather competitive intelligence.

8.     Further, the information requested also goes to Rio Tinto's claim of conspiracy against Vale. The reports show that BSGR was engaged in negotiations with *other* Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008. (The Amended Complaint alleges that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, and that the formation of the joint venture in April 2010 constitutes the documentation of an agreement already reached. (AC ¶¶ 92, 146, 159.))

9.     The information requested thus will bear substantially on Vale's position that Rio Tinto's claims are not timely, as well as the merits of Rio Tinto's allegations that Vale entered into a conspiracy with BSGR in December 2008. Vale accordingly submits this Letter of Request to test Rio Tinto's affirmative claim that it should be excused from the requirement to timely file under RICO, based on equitable tolling by fraudulent concealment, as well as the merits of its underlying claim.[2]

## RELIEF REQUESTED

1.     Vale therefore requests that this Court issue an Order in the form attached hereto as Exhibit A:

(a)     Providing for this Court to sign the Letter of Request and affix the seal of the United States District Court for the Southern District of New York over said signature;

---

[2] Rio Tinto has designated the reports it produced from the investigative firms as "Highly Confidential – Attorneys' Eyes Only." Vale does not believe these documents are Confidential, let alone Highly Confidential. Accordingly, it has challenged Rio Tinto's designations.

(b)     Requiring that the Clerk of the District Court return the original, signed Letter of
Request to Vale, so that said Letter of Request may be delivered to the Director
General of the Department of Justice and Constitutional Development acting as
the Competent Judicial Authority of South Africa, which is the domicile of the
designated recipients from whom evidence is sought; and

(c)     Directing counsel for Vale to transmit the original, signed Letter of Request to the
Competent Judicial Authority of South Africa;

so that Vale may obtain for use at trial potential evidence material to the claims and defenses at
issue in the above-captioned litigation.

2.     The person from whom evidence is sought by the Letter of Request is an
individual, who Rio Tinto has identified as responsible for the reports of Executive Research
Associates. Executive Research Associates and its representatives have knowledge of facts
bearing on the central issues of this case, and the documents and testimony sought are material to
Vale's defenses.

3.     Vale has considered the requirements of the Courts of South Africa in respect of
letters of request, including the form in which the Letter of Request should be presented to the
South African Court and its permissible content. It believes that this Letter of Request is
consistent with these requirements and the Hague Evidence Convention. This Court is requested
to issue this Letter of Request on this basis.

4.     Vale requests that after this Court has signed the Letter of Request, it be returned
to Vale for forwarding to the Director General of the Department of Justice and Constitutional
Development acting as the Competent Judicial Authority of South Africa.

7

WHEREFORE, Vale respectfully requests that the Court enter the attached form of order (i) providing for this Court to sign the Letter of Request and affix the seal of the United States District Court for the Southern District of New York over said signature; (ii) directing that the Clerk of the District Court return the original, signed Letter of Request to counsel for Vale, so that said Letter of Request may be issued to the Competent Judicial Authority of South Africa; (iii) directing counsel for Vale to transmit the original, signed Letter of Request to the Competent Judicial Authority of South Africa; and (iv) granting such other relief as the Court deems just and proper.

Dated: New York, New York

March 23, 2015

CLEARY GOTTLIEB STEEN & HAMILTON LLP

_____

Jonathan I. Blackman
Lewis J. Liman
Boaz S. Morag
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225 2000
Facsimile: (212) 225 3999

*Counsel for Vale, S.A.*

8

# EXHIBIT A

# (DRAFT ORDER)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc, <br><br>         Plaintiff, <br><br>    -against- <br><br> Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG-Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam, <br><br>         Defendants. | 14 Civ. 3042 (RMB)(AJP) |

### ORDER GRANTING APPLICATION FOR
### ISSUANCE OF INTERNATIONAL LETTER OF REQUEST (LETTER ROGATORY)

Upon the Application for the Issuance of an International Letter of Request (Letter Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the issuance of an international letter of request (the "Letter of Request") pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague Evidence Convention"); and upon the record of the above-captioned matter;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Application is **GRANTED**.

10

This Court shall sign the Letter of Request attached to the Application as Exhibit B and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request.

The Clerk of the District Court is directed to return the original, signed Letter of Request to counsel for Vale so that said Letter of Request may be issued to the Director General of the Department of Justice and Constitutional Development acting as the Competent Judicial Authority of South Africa.

Vale is directed to transmit the original, signed Letter of Request to the Competent Judicial Authority of South Africa.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____, 2015
New York, New York

THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

**BY ECF**

11

# EXHIBIT B

# (LETTER OF REQUEST TO EXECUTIVE RESEARCH ASSOCIATES)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rio Tinto plc,

        Plaintiff,

    -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

        Defendants.

14 Civ. 3042 (RMB)(AJP)

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON
## THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

        The United States District Court for the Southern District of New York presents its
compliments to the Director General of the Department of Justice and Constitutional
Development acting as the Competent Judicial Authority of South Africa and has the honor of
submitting the following request for assistance in obtaining documents requested in the above-
captioned action on behalf of Defendant Vale S.A. ("Vale" or the "Applicant"), all of which
documents are located in South Africa. This request is made pursuant to the provisions of the
Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial
Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague Evidence
Convention").

| | | |
|---|---|---|
| **1.** | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| **2.** | **Central Authority of**<br>**the Requested State** | Director General<br>Department of Justice and<br>Constitutional Development<br>Postal Address : Private Bag X81<br>Pretoria, 0001 |

South Africa
Street Address :  Momentum Centre
329 Pretorius Street
(c/o Pretorius and Prinsloo Streets)
Pretoria
South Africa

**3.**     **Person to whom the**     The Honorable Andrew J. Peck
      **executed request is**     United States District Court
      **to be returned**     Southern District of New York
                     500 Pearl Street, Courtroom 20D
                     New York, New York 10007

**4.**     **Specification of the date by which the requesting authority requires receipt
of the response to the Letter of Request**

      **Date**                  Examinations to occur as the parties may agree,
                             but no later than November 30, 2015.  Document
                             productions to occur as the parties may agree, but
                             no later than June 30, 2015.

      **Reason for urgency**     Under the Court's Scheduling Order (Dkt. Nos. 161,
                             163), document productions must be substantially
                             complete by June 30, 2015 and pretrial examination
                             of fact witnesses must be complete by November
                             30, 2015.

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE
UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING
REQUEST:

**5.**   *a*   **Requesting judicial**     The Honorable Andrew J. Peck
         **authority (Article 3,a)**     United States District Court
                        Southern District of New York
                        500 Pearl Street, Courtroom 17B
                        New York, New York 10007

     *b*   **To the competent**     South Africa
         **authority of (Article 3,a)**

**6.**     **Names and addresses of the
Parties and their
representatives (including
representatives in the
requested State) (Article 3,b)**

14

*a*  **Plaintiff**                    **Rio Tinto plc**

   **Representatives**            William A. Burck
                                  Michael J. Lyle
                                  Eric C. Lyttle
                                  Quinn Emanuel Urquhart & Sullivan, LLP
                                  777 6th Street NW, 11th Floor
                                  Washington, DC 20001
                                  Telephone: (202) 538-8000
                                  Facsimile: (202) 538-8100


*b*  **Defendants**                   **Vale, S.A.**

   **Representatives**            Jonathan I. Blackman
                                  Lewis J. Liman
                                  Boaz S. Morag
                                  Cleary Gottlieb Steen & Hamilton LLP
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone: (212) 225 2000
                                  Facsimile: (212) 225 3999

                                  **BSG Resources Limited**

   **Representatives**            Robert Gold
                                  Vincent Filardo, Jr.
                                  Elizabeth M. Rotenberg-Schwartz
                                  Mishcon de Reya New York, LLP
                                  750 Seventh Avenue
                                  New York, New York 10019
                                  Telephone: (212) 612 3270
                                  Facsimile: (212) 612-3297

                                  **Benjamin Steinmetz**

   **Representatives**            Robert Gold
                                  Vincent Filardo, Jr.
                                  Elizabeth M. Rotenberg-Schwartz
                                  Mishcon de Reya New York, LLP
                                  750 Seventh Avenue
                                  New York, New York 10019
                                  Telephone: (212) 612 3270
                                  Facsimile: (212) 612-3297

                                  15

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

Representatives

Martin Joel Auerbach
Law Offices of Martin J. Auerbach, Esq
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Telephone: (212) 704 4347
Facsimile: (212) 3040175

**Mahmoud Thiam**

Representatives

Paul Eliot Summit
Sullivan & Worcester LLP (MA)
One Post Office Square
Boston, MA 02109
Telephone: (617) 210 8437
Facsimile: (617) 338 2880

7.      **Nature of the proceedings and summary of claims (Article 3,c)**

7.1      This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

"Representative" is used to refer to directors (or shadow directors), officers, employees,

representatives, agents, intermediaries and consultants.  The Relevant Period referred to below is

January 1, 2004 to April 30, 2014.  Although not named as defendants, Rio Tinto's complaint

has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2 Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3 Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4 BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG Resources Limited maintains an office in London.

7.5 In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to

transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room so that Vale could review certain of Rio Tinto's documents related to the assets under discussion. After the Confidentiality Deed was signed and the data room opened, the two parties ultimately discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks 1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began negotiating a joint venture. The negotiations culminated in the signing of a Framework Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both included broad and detailed anti-bribery representations and warranties, on which Vale relied. The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou.    The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release.    Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding. The Technical Committee found that Vale had no involvement in this bribery scheme. Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

7.13 Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008. Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2. An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14 Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008. Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou. Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2. Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15 In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea. The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home. The Guernsey Financial Investigations United and the United Kingdom's Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2 Notices on BSGR's current and past London counsel as well as Onyx. BSGR has filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division of the English High Court of Justice.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR, any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2, after December 2008 sought other mining companies as partners with respect to these rights, and did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights in which Vale subsequently invested by those means, and whether Vale had anything to do with these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations. Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms retained to conduct competitive intelligence. Among other things, those reports bear on the validity of Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

21

2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008. It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct any investigation after December 1, 2010, at the latest.

7.18    The evidence sought from the investigative firm identified below, which includes evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint venture agreement with Vale in April 2010, and evidence of potential bribery by BSGR and Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of limitations defense, including on the timing of Rio Tinto's claim and whether its investigation was sufficient, as well as the merits of Rio Tinto's claim of a conspiracy between BSGR and Vale and its claim of bribery by BSGR.

## 8.    Evidence to be obtained or other judicial act to be performed (Article 3,d)

8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged bribery and corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008 shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008. Documents reviewed by the Applicant, including reports produced and clarification provided by Rio Tinto, identify David Robertze and Warrick Davis-Webb as among those Representatives of Executive Research Associates who were involved in drafting the investigative firm reports during the relevant time period and have knowledge of facts that bear on the issues of this case.

8.2    It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct David Robertze and

22

Warrick Davis-Webb to provide oral testimony for use at trial (if appropriate) to counsel for applicant subject to any applicable privileges that may apply under the rules and procedures of the Requesting Court or the courts of South Africa. The Witnesses' unique importance to the claims and defenses is described both above and in the subject matters as to which each Witness is to be examined, detailed in Section 10 below. Absent voluntary cooperation, evidence from David Robertze and Warrick Davis-Webb is available only by an order issued by a South African Court.

| | | |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Article 3,e)** | David Robertze and Warrick Davis-Webb Executive Research Associates PO Box 413222 Craighall 2024 South Africa |

10. **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that each Witness be questioned according to the procedure set out below in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may apply under the rules and procedures of the Requesting Court and in accordance with whatever procedure South African law provides for in these matters, on:

Executive Research Associates' investigation resulting in the reports entitled "Project VAAL," dated 13 August 2010, and "Project VAAL – timeline assessment of meetings and events which took place between BSGR, Vale and the Conakry Ggovernment [*sic*] leading up to the April 2010 MOU," dated 1 December 2010, for Rio Tinto, including the scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings and conclusions.

11. **Documents or other property to be inspected (Article 3,g)**

It is requested that Executive Research Associates be required to produce the specified documents described herein as are believed to exist in its power, possession or control. Such

23

documents are necessary for the purposes of justice and for the due determination of the matters in dispute between the parties.

a. The proposals, pitch books, presentations You provided to or prepared for Rio Tinto as reflected in the reports entitled "Project VAAL," dated 13 August 2010, and "Project VAAL – timeline assessment of meetings and events which took place between BSGR, Vale and the Conakry Ggovernment [*sic*] leading up to the April 2010 MOU," dated 1 December 2010 (hereinafter, "Project VAAL II"), which concern Simandou, Guinea, BSGR, Steinmetz, and/or Vale (collectively, the "Reports").

b. The engagement letters and disengagement letters between You and Rio Tinto for Rio Tinto's retention of Your services in connection with the Reports.

c. The bills or invoices, including the time sheets or records of activities performed by You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

d. The bank statements showing payment by Rio Tinto to You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

e. The documents shared with Rio Tinto in connection with the Reports.

f. The drafts of the Reports, including the research for, preparation of, and analyses and discussions regarding the Reports for Rio Tinto, whether relied upon or not in any version of the Reports for Rio Tinto.

g. The documents, including interview memoranda, which You relied on for Your findings set forth on page 16 of the "Project VAAL" report that "several companies were approached simultaneously [by BSGR] including [Arcelor]Mittal" concerning a

24

potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou, including the names of the "several companies" other than ArcelorMittal and interview memoranda summarizing or characterizing conversations with members of BSGR and/or members of the "several companies" related to such a potential joint venture.

h. The documents which You relied on for Your finding that BSGR "spoke to Mittal, BHP-Billiton and Kumba before it spoke to Vale," as referenced on page 9 of the "Project VAAL II" report, including interview memoranda reflecting discussions between Dag Cramer and a source during a meeting in Europe on 7 November 2008, during which Cramer told the source that Mittal may be "'interested' in collaborating with BSGR in a JV," as referenced on page 10 of the "Project VAAL II" report.

i. The documents which You relied on for Your finding on page 12 of the "Project VAAL II" report that, as of February 2009, "[n]egotiations had started between BSGR and Chinalco," as well as Your finding on page 14 of that report of a meeting between a "Chinalco delegation" and "BSGR elements" on 22-24 November 2009.

j. The documents, including interview memoranda from "multiple sources," which You relied on for Your findings as set forth on page 6 of the "Project VAAL" report concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and ArcelorMittal, including to interview memoranda from "multiple sources" evidencing that "discussions between ArcelorMittal and BSGR broke down during the latter half of [2009]," including:

      i.  The interview memoranda summarizing or characterizing conversations with members of BSGR and/or ArcelorMittal related to such a potential joint venture.

     ii.  The emails to or from a BSGR email address with ArcelorMittal and their attachments.

   iii.  The term sheets agreed between BSGR and ArcelorMittal.

   iv.  The contents of any data room between BSGR and ArcelorMittal.

k.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 6 of the "Project VAAL" report that "[m]ultiple sources have indicated that Vale only entered into serious negotiations with BSGR in December 2009."

l.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 6 of the "Project VAAL" report that "the December 2009 talks [between BSGR and Vale] had been preceded by earlier discussions of a preliminary nature between both parties, the first having taken place in late 2008 following by a second round of discussions in July 2009."

m.  The interview memoranda reflecting discussions with a "Guinean source" who was told by a Vale delegation that "the only prior contacts Vale had had with BSGR people working in Simandou-Zogota, was on a social or in an un-official capacity – but that no 'official discussions or agreement' had been reached at this time between both sides" and the interview memoranda with other "[k]ey sources . . . of the view that official meetings only took place between Vale and BSGR <u>after</u> Vale's early

December meeting with the [Guinean] officials," as referenced on page 10 of the "Project VAAL II" report.

n.  The documents, including interview memoranda, which You relied on for Your findings related to the meetings, referenced in the "Project VAAL II" report, between BSGR and Vale, and Your finding that "the first such recorded meeting between both sides only took place on 1 March 2009," including in reference to the following meetings:

   i.  The meeting in Dakar, Senegal between BSGR's Mark Struik and "Mr. Martins" from Vale on 1 March 2009.

   ii.  The meeting between Minister Thiam and Vale "engineers" on 4 March 2009.

   iii.  The meeting between Issa Camara, Avidan, and a Vale representative at Simandou on 7 March 2009.

   iv.  The bilateral meetings between Vale and BSGR officials in Conakry on 19 March 2009.

   v.  The meeting between Vale's legal team, officials from Vale's local office, and legal representatives from BSGR and Bateman on 25 March 2009.

   vi.  The meeting between Vale CEO Roger Agnelli and members of BSGR Guinea's team around 10 April 2009.

   vii.  The meeting between Minister Thiam and top Vale and BSGR officials in Paris on 15 April 2009.

   viii.  The visit by Avidan and Cramer to Brazil to meet a host of Vale's directors in January 2010.

27

    ix.  The meeting between BSGR people and Vale in Conakry on 13-14
February 2010.

    x.  The ongoing meetings between BSGR and Vale team leaders at Simandou
in February 2010.

    xi.  The additional meetings in April 2010, as referenced on page 16 of the
"Project VAAL II" report, including final negotiations to have taken place
in Brazil on 20-30 April 2010.

o.  The documents, including interview memoranda, gathered from "human intelligence"
and sources referenced on page 5 of the "Project VAAL II" report, including:

    i.  Two sources [redacted];

    ii.  One top source [redacted];

    iii.  A source in ArcelorMittal's head-office in Europe, including with respect
to "discussions at one point" between "BSGR and Mittal";

    iv.  Roughly 5 to 6 sources working at different levels in Guinea Conakry.

p.  The "memo written by [Marco] Monteiro in May 2006, [according to which] an iron
ore project was already being planned for Simandou," as referened on page 7 of the
"Project VAAL II" report.

q.  The documents, including interview memoranda, which You relied on for Your
findings as set forth on page 8 of the "Project VAAL" report that the Government of
Guinea "played a crucial role, specifically in assuring Vale (and the Brazilian
government) that the Simandou investment would be safe."

r.  The documents, including interview memoranda, which You relied on for Your
findings as set forth on page 8 of the "Project VAAL" report that Mahmoud Thiam

("Thiam") "has been behind attempts to undermine Rio Tinto's claim to the Simandou concessions, wanting rather several mining groups to work the area," including "RT-Chinalco and Vale-BSGR . . . an Angolan-Chinese-conglomeration CIF Sonangol in a JV known as ADC . . . Bellzone . . . [and] of course, ArcelorMittal and BHP-Billiton."

s.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 9 of the "Project VAAL" report that Jean Marie Doré ("Doré") "work[ed] closely with Mining Minister Thiam in getting several large mining companies to develop Simandou, believing that no single firm or coalition of companies can deal with the huge area single-handedly."

t.  The sources which You relied on for Your finding that "[w]ith regard to the [Guinea Conakry ("GC")] Mining Ministry, there is widespread acknowledgement that it is the purveyor of widespread corruption" and that the ministry "has become the personal fiefdom of Minister Thiam," as referenced on page 20 of the "Project VAAL" report.

u.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 8-9 of the "Project VAAL" report that the "powerful fourth wife of the late President Conté, Mamadie Touré has been known to have been a long-time supporter of Benny Steinmetz," including interview memoranda with Your source(s) for the "rumour" that Mamadie Touré's brother, "BSGR's [then] Vice-President of its Guinea operations Ibrahima Soury [*sic*] Touré . . . convinced her to convince the ailing general [President] Conté to intercede on Steinmetz's behalf . . . in securing the Simandou concessions," and interview memoranda with Your

source(s) for Your finding that "Mamadie Touré was a critical supporter of mining contracts secured by BSGR in December 2007" in the Forécariah mining region, including by "overrul[ing] cabinet decisions on the allocation of mining concessions in favour of Steinmetz and also reportedly secur[ing] a top government building for BSGR to use as its [headquarters] in Guinea."

v.  The documents, including interview memoranda, which You relied on for Your finding of "rumours that Steinmetz paid GBP 7 million to elicit favours from the presidential wife," as referenced on page 8 of the "Project VAAL II" report.

w.  The documents, including interview memoranda, which You relied on for Your findings as set forth on page 9 of the "Project VAAL" report that Colonel Bouréma Condé, although originally "skeptical of the BSGR-Vale deal, having been close to the Rio Tinto dispensation . . . seemed to change his mind after BSGR initiated several 'social programmes' in destitute areas under his control and direction."

x.  The documents, including interview memoranda, which You relied on for Your finding that Vale "[i]s willing to take some risks, if the outcome looks promising," as referenced on page 11 of the "Project VAAL" report including interview memoranda with the "Vale source" quoted on page 11 of that report as saying, "'[w]e don't have a problem in going into troubled areas: if you want to hunt elephants, you have to go where elephants are. There are no elephants on 5th St, NYC.'"

y.  The documents which You relied on for Your finding set forth on pages 3 and 11 of the "Project VAAL" report that "[t]he decision to enter into talks with BSGR was taken by a strategy 'crisis group' headed by Vale's CEO Roger Agnelli" (as also referenced on page 12 of the "Project VAAL II" report).

30

z.  The documents, including interview memoranda, which You relied on for Your
findings as set forth on pages 3 and 12 of the "Project VAAL" report that "[o]nce the
decision to link up with Steinmetz was taken" an "operational oriented [group] was
constituted [at Vale] to hold direct talks with BSGR" which "worked during late 2009
in intense contacts with" BSGR (as also referenced on page 12 of the "Project VAAL
II" report).

aa. The "classified briefing made to the three Vale teams dealing with BSGR and
selected shareholders" made by José Carlos Martins, as referenced on pages 12-13 of
the "Project VAAL" report.

bb. The documents, including interview memoranda, which You relied on for Your
findings as set forth on page 15 of the "Project VAAL" report that "Vale used several
entities to ensure that all legal aspects of the deal [with BSGR over Simandou] was
secure, notwithstanding the challenges posed by Rio Tinto," and that Vale "did its
homework before making the investment," including any documents summarizing
conversations with José Martins who is quoted on page 15 of that report as saying
"'[w]e took all precautions.'"

cc. The documents, including interview memoranda, which You relied on for Your
findings as set forth on pages 3, 15, and 16 of the "Project VAAL" report that
"[a]vailable information suggests that there was very little internal opposition to Vale
partnering [with] BSGR in Guinea" and that "[h]ad there been significant opposition
to the Simandou deal within Vale, it would not have gone through, especially with
government concerns that were lurking in the background."

31

dd. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 16 of the "Project VAAL" report that "if there was one major exception [to the lack of opposition to the Simandou deal within Vale], it came from Fabio Barbosa," including interview memoranda with the sources cited on page 16 of that report stating that in mid-2008 Fabio Barbosa "voiced concerns over Simandou with regard to environmental and other ethical issues, but that the exact reasons are not known."

ee. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 16 of the "Project VAAL" report that "BSGR was frightened by the prospect of having to develop [a Trans-Guinean Rail link] alone, when it took possession of the Simandou concessions, and therefore had made it a priority to find a willing partner to share the burden of infrastructure costs," including:

    i. The interview memoranda summarizing or characterizing conversations with members of BSGR related to finding, and/or negotiations with, such a willing partner to share the burden of infrastructure such a potential joint venture.

    ii. The emails to or from a BSGR email address with potential partners discussing infrastructure and their attachments.

ff. The documents, including interview memoranda, which You relied on for Your findings that Vale "was [BSGR's] first prospective partner willing to work on infrastructure" as set forth on page 16 of the "Project VAAL" report.

gg. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 16 of the "Project VAAL" report that Vale was willing to work with BSGR on infrastructure "although on a revised and downscaled version of the original grand project," including:

    i. The documents, including emails to or from a BSGR email address with potential partners and interview memoranda summarizing conversations with members of BSGR related to or discussing the "original grand project."

    ii. The term sheets relating to the "original grand project."

    iii. The documents, including emails to or from a BSGR email address and interview memoranda summarizing conversations with members of BSGR related to or discussing the "revised and downscaled version of the original grand project."

    iv. The term sheets relating to the "revised and downscaled version of the original grand project."

hh. The interview memoranda with "one contact in GC," who was reported as stating that using the Liberian corridor to transport iron ore from Simandou "was part of Rio Tinto's initial plan of action (from around 2006)" but that "the significant political instability within Liberia had thrown a question mark over the viability of such a line" and that "efforts had been undertaken to pursue the alternate rail route through Liberia, but the lack of security prevented even preliminary efforts," as referenced on page 17 of the "Project VAAL" report.

14.   **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[3]**

> Jason Smit
> Werksmans Attorneys
> 155 5th Street
> Sandton
> Johannesburg
> 2196
> South Africa

15.   **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

> None.

16.   **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

Each Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or South Africa, or would disclose a privileged communication.

17.   **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale. The payment of any such fees and costs is without

---

[3] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of South Africa, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in South Africa.

prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

DATE OF REQUEST

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

38