F584rioc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  RIO TINTO PLC,

4              Plaintiff,

5        v.                        14 CV 3042 (RMB-AJP)

6

   VALE, S.A.,
7
             Defendants.
8
   ------------------------------x
9                                  New York, N.Y.
                                   May 8, 2015
10                                 2:00 p.m.

11 Before:

12                  HON. ANDREW J. PECK,

13                                 Magistrate Judge

14                       APPEARANCES

15 QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for RIO TINTO PLC
16 BY:  KEITH H. FORST
        ERIC LYTTLE
17      MICHAEL J. LYTE

18

   CLEARY GOTTLIEB STEEN & HAMILTON LLP
19      Attorneys for VALE, S.A.
   BY:  LEWIS J. LIMAN
20      SCOTT B. REENTS

21

        MISHCON de REYA NEW YORK, LLP
22      Attorneys for BSG RESOURCES LIMITED
   BY:  VINCENT FILARDO

23

24

25

1          (In open court)

2          THE COURT:  Welcome back.

3          It looks like the first issue that is not just

4   informational is the Nardello report issue, starting on page 2.

5   Is there anything before that?

6          MR. LYTTLE:  Your Honor, there is the issue before

7   that of the letters of request and the arbitration materials.

8   I don't know which order you want to take that up, but it

9   actually appears in two places.

10         THE COURT:  The letters of request, all I see is that

11  you've --

12         MR. LYTTLE:  I apologize, your Honor.

13         THE COURT:  I see, as requested, defendants have

14  produced the Nardello report for me to look at.

15         Mr. Liman or one of your colleagues, why don't you

16  help me out.  I have two pieces of page, four pages, engagement

17  letter for Nardello, and then I have the Clifford Chance

18  report.  I don't seem to have a Nardello report itself unless

19  that is a piece --

20         MR. LIMAN:  It is a piece, your Honor.  We tried to

21  put a tab next to where the Nardello report begins.  It is

22  behind tab 7.  There is a color flag that marks the beginning.

23         THE COURT:  I got it.

24         Perhaps one way to deal with this is what is the

25  evidence that plaintiffs have about the waiver, alleged waiver,

F584rioc

1    because if there is a waiver, I don't need to worry about the

2    other issues?

3              MR. LYTTLE:  Good afternoon, your Honor.

4              In April of 2013, we have learned from counsel for the

5    Guinean government, Mr. Scott Horton, that the general counsel

6    of Vale, Mr. Clovis Torres, invited a representative of the

7    Guinean government to review the Nardello report.  At the time,

8    it was not attached to that Clifford Chance memorandum.  It was

9    a stand-alone document.  Mr. Torres, the general counsel,

10   initiated the meeting, hosted the meeting, and participated and

11   sat in the meeting.  Mr. Horton, I had asked for an email -- he

12   is traveling, I haven't been able to get written confirmation

13   of that -- but we do believe that is what happened.

14             At the time, the government of Guinea was actively

15   investigating corruption and bribery at Simandou and was

16   actively adverse to at least VBG, which was the joint venture

17   which Vale had 51 percent share of and managed the day-to-day

18   operations of.  So we believe that it is absolutely a full

19   waiver, a knowing waiver.  Any selective waiver in the Second

20   Circuit is pretty much a dead letter.  The facts here certainly

21   wouldn't support it, either.

22             THE COURT:  Mr. Liman, is this the first you know that

23   it was Vale's general counsel, or were you told that before --

24             MR. LIMAN:  Your Honor, a couple of days ago, we were

25   given the information that was just relayed to your Honor.  We,

1    too, tried to reach out to Mr. Horton this morning, and did get

2    a response back.  I would note, just even from the proffer that

3    has been made to you, there are a couple of deficiencies and a

4    couple of things we think are inaccurate.  In April of 2013,

5    Vale was not under investigation by the Guinean government.  It

6    would have had a common interest with the Guinean government

7    with respect to potential claims against BSGR, which as you

8    know, have been made.  But we're prepared to investigate this,

9    as we indicated to counsel for Rio Tinto, and to present the

10   case to your Honor with a full set of facts and issues with

11   respect to waiver.  Frankly, both U.S. law and U.K. law would

12   apply here.  The engagement letter -- the relationship with

13   Clifford Chance was a relationship that was run basically out

14   of the U.K.  As your Honor can see, the engagement of Nardello

15   was done with the Nardello firm in the U.K., to be paid in

16   pounds with a choice of law under U.K. law to be resolved in

17   courts --

18            THE COURT:  That may be in terms of the relationship

19   between Clifford Chance and Nardello.  As to U.S. privilege in

20   this litigation, I'm somewhat dubious that one can

21   contractually get more protection for something by contracting

22   under U.K. law.

23            MR. LIMAN:  Your Honor, that is not obviously the

24   extent of our argument.  There is no evidence of any ties to

25   the United States with respect to what you just heard from

F584rioc

 1   counsel.

 2            THE COURT:  I understand that.

 3            MR. LIMAN:  I am prepared, your Honor, to address the

 4   question with respect to whether the Nardello report is

 5   privileged.  We've read the cases cited by Rio Tinto.  The

 6   thrust of them seems to be the unexceptional proposition that

 7   when you have a document that is not independently privileged,

 8   you can't cloak it with privilege by having it sent to the

 9   client by a lawyer.  Our position, just so it is clear, is that

10   the Nardello report is independently privileged, both under the

11   Kovel doctrine for attorney-client privilege and with respect

12   to attorney work product.  It is not analogous to a newspaper

13   article that you might transmit or a business document.  It was

14   generated only because Nardello was retained by Clifford Chance

15   from Vale's perspective.  Vale would have been content, it

16   would have been sufficient to have Clifford Chance's advice.

17   The fact that Clifford Chance, in the exercise of its

18   professional judgment, chose to hire Nardello does not make

19   that work by Clifford Chance and the report delivered to it any

20   less than privileged.

21            THE COURT:  Clearly, looking at the retention in the

22   engagement letter, it clearly shows that Clifford Chance hired

23   Nardello for its investigative services in connection with its

24   legal advice to Vale.  So, at a minimum, it may well be work

25   product if not privileged.  So I think it makes more sense to

F584rioc

1    give Vale a little bit of time to talk to its general counsel,

2    Mr. Howard, who was involved, and find out what are the facts

3    and deal with it first from the waiver.

4         The other point I would note is -- and stop me,

5    Mr. Liman, if I say anything that itself violates the

6    privilege.  But in the methodology description, it seems that a

7    lot of what they did was research from public records/open

8    sources --

9         MR. LIMAN:  Your Honor, at this point, I think

10   actually what they did and who directed them probably does

11   intrude into the privilege --

12        THE COURT:  I guess what I'm suggesting is, to the

13   extent that the information that found its way into the

14   Nardello report is and was public record, it's probably

15   something that Rio Tinto can hire its own Nardello or do its

16   own research on.

17        MR. LIMAN:  That's precisely our point.  They can take

18   the depositions of the witnesses.  The general counsel's name

19   is Clovis Torres, and we will consult with him and consult with

20   Rio Tinto.

21        How would you like the parties to bring this issue

22   back before you if, as I suspect, we're not able to reach

23   agreement but we might --

24        THE COURT:  Suppose affidavits, letter briefs, or

25   formal motions, as you all may wish.  I don't mind it being

F584rioc

1  informal.  I think, for the factual basis, I will need the

2  affidavit from Mr. Torres, and the Guinean counsel's

3  information, which seems to have come from Mr. Horton.  Whether

4  Mr. Horton was the person involved in the alleged review or was

5  just telling what he now knows, I don't know.

6          MR. LIMAN:  Fine, your Honor.

7          THE COURT:  Anything further from the plaintiff on

8  this?

9          MR. LYTTLE:  No, your Honor.

10          THE COURT:  Okay.  And I guess I will hold onto this

11  material for now.

12          Okay.  Next --

13          MR. LIMAN:  Your Honor, if I can maybe short-circuit

14  things a little bit and tell you how we have organized things

15  on our end.  With respect to the issues about document

16  retention and document production, as well as Chinalco and BHP,

17  my colleague, Mr. Reents is going to be addressing them.  With

18  respect to Chinalco, we had a conversation with plaintiff's

19  lawyers just before your Honor came on the bench, where they

20  made a proposal to us which would involve the production of

21  some of the Chinalco documents.  Subject to your Honor's

22  agreement, I think what we would propose is that after the

23  conference we go in the back room to see if we can come to an

24  agreement.  If we can, our hope would be to present it to your

25  Honor; if we cannot, unfortunately we need to address it with

F584rioc

1    your Honor.

2           THE COURT:  Let me go in the order of the letter,

3    though, or I will never keep track of all of this.

4           So the eight key custodian destruction issue, which

5    seems to tie into the issue of how much information Rio Tinto

6    is entitled to with respect to this as opposed to the questions

7    that have been asked, which I don't think I have a copy of --

8           MR. LYLE:  The questions are attached as Exhibit A to

9    the joint letter.  It was not included in yours, I can give you

10   a copy.

11          THE COURT:  It was not included in mine.

12          All right.  Mr. Liman or colleague, which of the -- I

13   guess it is 17 questions, although somewhere in the cover

14   letter to me it was described I think as 25 -- in any event,

15   which of these are you willing to answer and which are you not?

16          MR. REENTS:  Your Honor, I would say we have answered,

17   in fact, most of these either explicitly or in sum and

18   substance.

19          THE COURT:  Then, I guess the question is:  Why can't

20   you do a cut and paste and take their questions and the answers

21   you have already given them and be done with it rather than

22   asking me to rule as to whether you have or haven't or whether

23   they should have all of this or shouldn't, but you're telling

24   me they did --

25          MR. REENTS:  Your Honor, we made an effort to try to

F584rioc

1  narrow the issue with them at our meet-and-confer.  They

2  weren't interested in going question-by-question.  They wanted

3  to present it all-or-nothing to you.  We were sort of forced

4  into this position.  Nevertheless, we could do that copy-and-

5  paste job.  They have the letters.  A lot of these questions

6  were answered on the record.  That said, there are certainly

7  questions here that we don't feel are appropriate and are not

8  willing to answer.

9          THE COURT:  Let's go with the "I will assume you will

10  answer all 17 except for the ones you tell me now that you

11  don't want to answer," then I will rule on them.

12          MR. REENTS:  Okay.  So just going through these --

13          THE COURT:  Both to save your money on the transcript

14  and to save my patience, think without talking out loud, and

15  just say question number X is a problem.  Don't tell me 1 is

16  good, 2 is good.  Get to the ones you don't like.

17          MR. REENTS:  Okay.  Question 9, they have asked for

18  the identity of every one of the eight custodians most

19  frequently --

20          THE COURT:  I agree, the objection is sustained.

21          What else?

22          MR. REENTS:  Question 10, we --

23          THE COURT:  Is there an org chart that would give them

24  this information?

25          MR. REENTS:  There is not an org chart that we have

F584rioc

1    been able to locate.  We did ask this question of the eight

2    custodians we were able to reach, and we were able to confirm

3    whether any of those supervisors or directs reports had any

4    involvement in the relevant event here, and the answer

5    overlapped with the custodian we had already identified.

6              THE COURT:  Put that answer in your answer 10, and

7    that will suffice.

8              What else?

9              MR. REENTS:  Question 11.  Again, we have conducted

10   this diligence.  We talked to the secretaries that we could

11   identify.  We don't think that it is necessary to actually list

12   them out and provide effectively an interrogatory response on

13   who their secretaries are.

14             THE COURT:  Subject to hearing anything from

15   plaintiff's counsel, 11 is out.

16             12 is out because it is similar to 9.

17             What else?

18             MR. REENTS:  14.  There are over 100 individuals

19   listed --

20             THE COURT:  14 is out.

21             What else?

22             MR. REENTS:  15.

23             THE COURT:  15 is out.

24             What else?

25             MR. REENTS:  16 we have already answered on the

1    record, your Honor, at the last conference.

2              THE COURT:  So then you will just paste it in.

3              Is that it?

4              MR. REENTS:  Just a moment.  Let me confer.

5              And 17.

6              THE COURT:  That doesn't seem problematic.  Either

7    there is a date you learned of it or you didn't learn of it.

8    To the best of your client's ability to answer that.  So that

9    is still in.

10             Okay.

11             MR. LYLE:  Your Honor, if I may be heard?

12             THE COURT:  Yes.

13             MR. LYLE:  On the questions that we addressed in 9,

14   12, what we're trying to achieve is to figure out how best to

15   gather the information that Vale has, that they would have had,

16   had they not destroyed the documents.  That's what we're trying

17   to achieve with those.

18             THE COURT:  It appears that so are they, but this is

19   not a very good way to get it.  Either you trust that they

20   have, indeed, done what they say they have, which is gone to

21   others in the company who might have had communications or

22   whatever.  This seems a lot more like discovery about discovery

23   and/or make-work.

24             MR. LYTTLE:  With respect to paragraph 14, question

25   number 14, that's the custodians they have identified in

F584rioc

1    response to the interrogatory referred to in that question.

2    Other custodians, they're quite right, there are about a

3    hundred of them, but they don't give us any sense of what it is

4    that their information is.  What we would propose is, with

5    respect to that one, if we could have them take us through so

6    that we can approximate and try to determine if, of that pool,

7    there are custodians that we should substitute in response.

8               THE COURT:  How many people are on your 26(a) list?

9               MR. LYLE:  On our 26(a) list?

10              THE COURT:  Do you really want to do that for every

11   one on your list, as well?

12              MR. LYLE:  Your Honor, we don't have any witnesses

13   whose documents are missing.

14              THE COURT:  It is going to come up for other

15   deposition issues and the like.  If one side has to do that,

16   what is the role, and it is not likely to be particularly

17   useful --

18              MR. LYLE:  Understood.

19              THE COURT:  -- I'm not inclined to go there, and if I

20   were convinced, I would probably be convinced to do it equally.

21              MR. LYLE:  Point taken, your Honor.

22              Perhaps, then, what we could do is have them go

23   through and tell us, of that pool, who would be the people who

24   would be the closest, so that we can at least, when we start

25   getting documents from them, look at those particular

F584rioc

1   individuals with that eye.

2           THE COURT:  Mr. Reents.

3           MR. REENTS:  We have effectively done that.  We have

4   gone back and talked to, we've reached out to the eight

5   custodians, those that we could reach out.  I asked them who

6   they were communicating with about these issues, who else would

7   have been involved.  We have done that investigation, but

8   people that they identified are a subset of the people

9   identified in the interrogatories --

10          THE COURT:  Is there anyone they identified who is not

11  already one of the custodians whose material is being searched?

12          MR. REENTS:  Yes, there is one individual which we

13  alerted them to by letter, a Mr. Ricardo Saad, who was one of

14  the custodians that they sought when we were negotiating over

15  custodians back in December and January.  They agreed not to

16  seek that custodian, not because of any burden argument, but

17  because they agreed with us that his documents were not

18  relevant to the litigation because he wasn't involved in any of

19  the negotiations with BSGR and Rio Tinto.  He was purely an

20  operations person.

21          THE COURT:  All right.  Mr. Lyle, Mr. Lyttle, whoever.

22          MR. LYLE:  I'm being told that we agreed to that when

23  we thought we had the other eight custodians.  If they give it

24  to us in writing, we will take whatever he is saying.  We have

25  no idea --

F584rioc

1          THE COURT:  But what he is saying is the people who

2     are the likely contacts are the people whose files are being

3     searched with one exception.  This is becoming discovery about

4     discovery.  What is the gentleman's name?  Saad?

5          MR. REENTS:  Ricardo Saad.

6          THE COURT:  Put him in the custodian search file.  Add

7     him back in.

8          Next issue.

9          MR. LYLE:  Your Honor, can we also ask, in 13, Mr.

10     Guto Quintella and Fabio Spina be added.

11          MR. REENTS:  Your Honor, they're not suitable

12     replacements, but beyond that, Mr. Spina left Vale in 2011, and

13     Quintella left Vale in 2010.  We haven't investigated whether

14     there may be documents.  It's extremely unlikely.

15          THE COURT:  Based on that representation, we will

16     leave them out for now.  If the other production shows that

17     they had involvement and that any of the material still exists

18     at Vale, we can revisit the issue.

19          Okay, next.  The arbitration issue where you two are

20     in agreement, and with BSGR, a little differently, it strikes

21     me that the solution here, although it will create a little

22     more work for Vale, is not to produce everything received from

23     BSGR in the arbitration but only such information as is

24     otherwise called for by the discovery requests or the Hague

25     convention requests in this case.

1          Does that's work for BSGI?

2          MR. FILARDO:  Good afternoon, your Honor.  I don't

3     think it was clear in the papers -- and I certainly didn't make

4     it clear to your Honor the last time I was before you --

5     Redfern schedules and document requests haven't even been

6     issued in the LCIA and won't be issued until I would say the

7     end of July.

8          THE COURT:  That wasn't my question.

9          MR. FILARDO:  Understood, your Honor.  We would have

10    had our production in response to the letters of request as

11    scheduled in the Court's scheduling order at the end of June,

12    and I think any documents that would have been relevant to this

13    matter and obviously requested would be produced by then.  At

14    that point, if there was anything that was left out for any

15    reason, there could be additional requests made and

16    applications to your Honor.

17         THE COURT:  On the one hand, that seems to make sense.

18    As I understand it, we are still waiting for my counterpart,

19    the senior master in London, to actually approve the letters of

20    request.

21         Has there been any change in that in the two days

22    since I got your letter?

23         MR. FILARDO:  No, your Honor, there hasn't, but we

24    have been undertaking it.  As we told your Honor before, we

25    have done a collection.  We have continued that collection.

F584rioc

1    And we are doing our review in preparation to be able to have a

2    production, a timely production.

3        THE COURT:  Any reason this shouldn't be tabled in

4    that case until the production under the letters of request?

5        MR. FORST:  Just so I'm clear, the way that would work

6    is they'll produce, in response to the Hague, Vale will

7    otherwise produce if there is anything going on in the

8    arbitration in the meantime to us, too.

9        THE COURT:  Come on.  Either pay attention --

10       MR. FORST:  I'm doing my best.  I'm trying --

11       THE COURT:  It sounded an awful lot like trying to

12   reverse the order that Mr. Filardo was suggesting.  What he is

13   saying is no, there is no need -- look, the only reason to have

14   the production out of the arbitration is in the event that for

15   some reason the letters of request in the U.K. were not honored

16   or to get the material a little faster here.  It seems to me

17   that having heard from Mr. Filardo that they are indeed

18   assuming that the letters of request are going to be approved

19   in the U.K. because they agreed to them here and that they're

20   already reviewing their documents for production there, this

21   seems to me as an issue that the Court need not deal with.

22       MR. FORST:  I understand that.  Thank you for that

23   clarification.

24       The request also includes other positions of what's

25   been produced in the arbitration, which I understand we're

F584rioc

1   tabling, witness statements, other submissions to the panel.

2   I'm not sure if that has happened or not yet.

3          MR. FILARDO:  To the extent that there were pleadings

4   filed in the arbitration, there were.  There was a demand

5   filed.  There was a response to that demand.  I'm not sure of

6   any of the specific pleadings.  I'm not sure of the relevance

7   of those pleadings here in this action.  Certainly, we found no

8   authority that would provide a basis to have a wholesale

9   evisceration of a confidentiality agreement at an arbitration

10  unless there was first an analysis of relevance.

11         THE COURT:  Has BSGR produced any affidavits or

12  witness statements?

13         MR. FILARDO:  Not yet, your Honor.

14         THE COURT:  Inform Rio Tinto when you do, and I will

15  deal with the issue then.  That doesn't mean I'll grant them

16  access to it, it doesn't mean I'll deny it.  This isn't law

17  school.  I don't have to deal with hypotheticals.

18         Next issue.

19         MR. FORST:   Judge, just to be clear, that applies to

20  Vale, as well, in the arbitration.  I don't think they have an

21  objection to that.

22         MR. LIMAN:  Your Honor, with apologies, that wasn't

23  raised in the letter by Rio Tinto.  Mr. Blackman was handling

24  that, and I'm not prepared to address it.  We can get on the

25  phone with them.

F584rioc

1           THE COURT:  Okay.  Talk about it.  I assume that as

2      with BSGR, there are no statements yet.

3           MR. LIMAN:  Your Honor, I apologize.  I can't make a

4      representation.

5           THE COURT:  Talk to Mr. Blackman, and we will go from

6      there.

7           Okay.  I think we now go to the issues on discovery

8      from the defendants to Rio Tinto starting on page 13 in the

9      letter.  Is there anything prior to page 13 that you were

10     seeking a ruling on that we haven't covered?

11          MR. LIMAN:  No, your Honor, I think we have covered

12     that.

13          MR. LYTTLE:  Your Honor, there is one thing on page 7,

14     which was news to us in this letter, on the look-back

15     diligence.

16          THE COURT:  Yes.

17          MR. LYTTLE:  Vale, for the first time in this letter,

18     has described in more detail their efforts on this look-back

19     diligence issue, and they have made a couple of representations

20     on this Piaui article.  Quick context on that article.  Your

21     Honor, that is an article that Vale general's counsel and the

22     certain CEO sat for and gave an interview for.

23          THE COURT:  And the press, having listened to

24     interviews, have never gotten anything wrong, in your

25     experience?

F584rioc

1          MR. LYTTLE:  No.  Fair point, your Honor.  What we

2    have asked for, though, is they reference talking to a number

3    of people at their client, about this, as well as reviewing

4    board --

5          THE COURT:  Is the CEO who sat for the interview on

6    the witness list?

7          MR. LYTTLE:  No, your Honor.

8          THE COURT:  On the deposition list, rather?

9          MR. LYTTLE:  We would like to collect his documents

10   first and then consider whether the deposition is necessary.

11   What we are asking for is who did they talk to and any

12   non-privileged board materials they reviewed in connection with

13   this.

14         THE COURT:  Who is the "they"?  The counsel?

15         MR. LYTTLE:  Correct.  I don't think who they talked

16   to is privileged.  And then we just asked to see any

17   non-privileged board materials that support these

18   representations.

19         THE COURT:  Mr. Liman.

20         MR. LIMAN:  Your Honor, it's our position that who we

21   talked to in the investigation we did is work product.

22         THE COURT:  Okay.  And on the board materials, are

23   there any non-privileged ones?

24         MR. LIMAN:  Your Honor, if there are non-privileged

25   ones and if they're responsive, they will be produced.  I

F584rioc

1   haven't reviewed them.

2          THE COURT:  They may be responsive only in the sense

3   of showing a negative, which isn't particularly helpful.

4          Is there anything you can give Mr. Lyttle to give him

5   a little more comfort other than you and your colleagues are

6   officers of the court?

7          MR. LIMAN:  We are officers of the court, and they're

8   going to be taking depositions.  We take the representations

9   seriously, your Honor.

10         THE COURT:  Okay.  At this point, develop information

11  either from the existing depositions that you're going to be

12  taking or give me something more than a newspaper article as

13  proof that there was something that went on.

14         MR. LYTTLE:  Fair enough.

15         Do I hear correctly, though, that he will be producing

16  non-privileged board materials?

17         THE COURT:  Only if they say something positive as

18  opposed to they looked at all the board minutes for two years

19  and that they don't give any indication that there ever was a

20  look-back.  That would mean they are either going to give you

21  blank board minutes and redact everything, which doesn't help

22  anybody, or they're going to be giving you totally irrelevant

23  and possibly business-sensitive information merely to show that

24  there was no information at that board meeting about a

25  look-back.

F584rioc

1          MR. LIMAN:  The only thing I would say, if we are

2     getting into board minutes that go until the time of the

3     investigations and the lawsuit, we have also requested board

4     minutes from Rio Tinto, and we assume they'll be producing

5     those, as well.

6          MR. LYTTLE:  Is that a yes --

7          THE COURT:  That's a yes if you're producing yours.

8     It seems like this is one of those that what's sauce for the

9     goose is sauce for the gander.

10         MR. LYTTLE:  We have produced and agreed to produce

11    relevant board materials.  I don't think there will be any

12    debate about that.

13         MR. LIMAN:  We will live by the same rules.

14         MR. LYTTLE:  Including for this same time period --

15         MR. LIMAN:  Your Honor, it's reciprocal.

16         THE COURT:  Reciprocally.

17         MR. LYTTLE:  Yes, thank you.

18         THE COURT:  Very good.

19         Confidential source names.  I'm doing this by starting

20    on page 16 since the defendant is moving.  It seems to me we

21    have been over this ad nauseum, and you're asking them to

22    produce information that they don't have that they have tried

23    to get, so they at least have acted in good faith and been

24    told, apparently, to shove it by the investigators.  Whatever

25    you may argue down the road as to the contractual right between

F584rioc

1  Rio Tinto and its investigators, I don't see that there is

2  anything that I can order here.

3         MR. LIMAN:  Your Honor, I respectfully disagree.  I

4  guess what I would do is direct your Honor first -- not to our

5  argument -- but to their argument on page 13.

6         THE COURT:  How about the sentence that says there is

7  nothing more Rio Tinto can do?

8         MR. LIMAN:  I, actually, went below that, because I

9  think the sentence that is most telling is the sentence that

10 begins the following paragraph:  "As much as Vale may wish it

11 otherwise, neither Rio Tinto nor the investigators (the actual

12 parties to the agreements) shares Vale's view that Rio Tinto

13 has the right to the names of the sources."

14        Your Honor, what I would do and the way I think about

15 it is to direct your Honor's attention to Judge Kaplan's

16 opinion in the Auction House Securities case, where he drew the

17 analogy between requests like this, which ask for the Court to

18 make a legal determination about what's in a party's control

19 and custody to they request the Court receives all the time it

20 has here with respect to blocking statutes.  We're in the

21 position, frankly, if we don't get an order from your Honor

22 with respect to this one way or the other, there is not going

23 to be an order.  Let me illustrate to you the reason why.

24        THE COURT:  I think you're asking me to interpret the

25 contract Rio Tinto has with parties who are not here.  Is that

1  what you're asking me to do?

2          MR. LIMAN:  It is exactly, and I tell you why --

3          THE COURT:  I will cut you off unless you need to make

4  a record for objections before Judge Berman.  I'm not doing

5  that.

6          MR. LIMAN:  I think I might, your Honor, so if I could

7  be heard.

8          THE COURT:  Go ahead.

9          MR. LIMAN:  The approach that Judge Kaplan and other

10 courts have taken is to say that with respect to the objections

11 of third parties, that may go to the ultimate consequence of a

12 failure to produce.  Your Honor, to preserve the integrity of

13 the rules of procedure, has the authority and in fact has the

14 responsibility to give us a ruling:  Is this either within

15 their custody and control or is it not?  And that, in this

16 circumstance, requires an interpretation --

17         THE COURT:  Let me suggest this:  On the assumption

18 that there has not been a wink and a nod when Rio Tinto asked

19 the investigators -- and you may have the right to

20 cross-examine them on this, to a certain extent, the same way

21 they are trying to cross-examine you folks on the eight

22 custodians and all that -- but they have represented to the

23 Court that they have asked the investigators for these sources,

24 and the investigators have said no.  For me to rule, other than

25 setting up a spoliation issue or an international comity issue,

F584rioc

1    for me to rule that the contract entitles them to this right

2    and, therefore, they have to tell the investigators that they

3    are asserting their rights under clause 16.1 or whichever other

4    clause it is and they are demanding the names of the sources,

5    which presumably the investigators are still going to say,

6    sorry, Charlie, you can't have it, what does that accomplish?

7         MR. LIMAN:  First of all, the clause that they point

8    to is not a clause that contains a future representation that

9    they are not going to breach any agreements.  What the clause

10   has is a representation, which is standard in these agreements,

11   that at the time of signing, the investigators have not

12   breached any laws or obligations.

13        Second, your Honor, just to illustrate the importance

14   of this request and the reason why we would ask for your Honor

15   to rule on the issue of control, just to take one of the

16   investigative reports as an example, the one from Executive

17   Research Associates, which is called Project --

18        THE COURT:  Let me stop you.  I'm not sealing the

19   transcript.  I don't know if you people --

20        MR. LIMAN:  I'm not going to go into anything that is

21   confidential except to say that the report contains a statement

22   from a confidential source that Vale did not have any

23   discussions with BSGR prior to December of 2008 --

24        MR. LYTTLE:  With all due respect, we are going into

25   the substance --

F584rioc

1          THE COURT:  Mr. Liman, stay away from contents.

2          MR. LIMAN:  That goes essentially to --

3          THE COURT:  Let me step back a minute.  When you

4    communicated with the investigators, was any of it done in

5    writing?

6          MR. LYTTLE:  We provided a letter from one of the

7    investigators.

8          THE COURT:  No, no.  Your letter to the investigators

9    or your communication to the investigators, was it done --

10         MR. LYTTLE:  With some of them and others --

11         THE COURT:  Do you have any problem producing, for

12   those that are in writing, the letters or emails or whatever

13   form of paper or digital record there is?

14         MR. LYTTLE:  Yeah, I think the vast majority would be

15   emails asking us to set up a call in which we discussed the

16   issues with them.

17         THE COURT:  All right.  Then, I am going to direct

18   you, for each of these investigators, to say that you are

19   directing, ordering, requesting, whatever word you think is

20   most appropriate under the contract, for them to reveal the

21   names of their sources to you, and that you want a written

22   response, and we will see where it goes from there.

23         MR. LYTTLE:  Your Honor, I'm happy to do that with one

24   exception.  I think that Rio Tinto does not believe that the

25   contract -- first of all, the contract, Mr. Liman, it only

1    applies to two investigators.  We do not believe that we have a

2    right under the contract to source names.  We have asked them

3    if they're willing to voluntarily provide it.  They have said

4    no.

5              THE COURT:  I have no authority over the non-parties.

6    The question is your obligation under the Second Circuit's

7    possession, custody, or control practical ability test.  It

8    seems to me that under that test, regardless of the contract,

9    that you or at least your client has or had a relationship with

10   these investigators that allows you to ask for this information

11   because it is being asked for in a lawsuit.  And to do that

12   without any negative in there, whether that is a wink or a

13   legitimate "We don't think the contract entitles us to it, but

14   we want it anyway," I want a very clean letter sent out by the

15   appropriate relationship person at Rio Tinto or you saying you

16   are acting at the request of Rio Tinto, the former contracting

17   party, with the investigators, asking them to disclose the

18   confidential sources.  You will then provide that and any

19   response to Mr. Liman.  That will suffice for now.  If

20   Mr. Liman makes another motion for me to interpret contracts or

21   whatever, I may or may not.  If I do, I will give the

22   investigators, through you, notice that if they want to come in

23   and argue without subjecting themselves otherwise to the

24   Court's jurisdiction, they can, but it's not at least in terms

25   of the possession, custody, or control issue I will possibly be

F584rioc

1    interpreting their contracts.

2            MR. LYTTLE:  Just so I'm clear, your Honor, you would

3    like us to write a letter to the investigators asking them in

4    writing what we have already asked orally, which is whether

5    they are willing to turn over information regarding sources and

6    produce that letter and any responses --

7            THE COURT:  And that it is Vale's position that they

8    are required to, without regard to what your position is or

9    isn't or what their position should be.

10           MR. LYTTLE:  It is Vale's position that they're

11   required to --

12           THE COURT:  Correct.  And that you are required to

13   give it to Vale.

14           MR. LYTTLE:  We are required to give the

15   information --

16           THE COURT:  It is Vale's position that you have the

17   practical ability to get this information from the

18   investigators and to produce it in this lawsuit, and if you

19   don't, there will be repercussions.

20           MR. LYTTLE:  I don't mean to be obtuse.  What would be

21   the repercussions?

22           THE COURT:  If the Court were to find down the road on

23   a full-blown motion that Rio Tinto had the practical ability to

24   get this information and did not get it, there could be some

25   sort of spoliation repercussion with respect to it.  That's

1    three steps down the road.  Right now, in an effort to avoid

2    interpreting a contract with one of the parties absent, I think

3    that the more forceful request in writing should suffice for

4    now.  If it doesn't, it doesn't.

5         Okay.  We're moving on.  With respect to the document

6    production issues at page 18, and I'm quite sure other than

7    when we get to Chinalco, on page 19, what is it that you want

8    from me?

9         MR. LIMAN:  Your Honor, all we want, which I take it

10   is not disputed, is an order that both sides are to be

11   complete -- not substantially complete -- but be complete with

12   respect to their documentation production by June 30th.

13        THE COURT:  That's what Judge Berman said.

14        MR. LYTTLE:  Your Honor, with all due respect, that's

15   not what Judge Berman said.  It is substantially complete, and

16   we are very much on track, as Vale has represented, that it is,

17   as well.  Substantially complete was built in and heavily

18   negotiated and entered by this Court.  A full document

19   completion has never been contemplated by June 30th.

20        THE COURT:  When is it contemplated by?  Because,

21   otherwise, you can't take depositions --

22        MR. LYTTLE:  We built this date in exactly for that

23   reason, so you weren't dumping large numbers of documents.

24   They just served requests on us --

25        THE COURT:  New requests is a different story.  The

1    stuff that has been on the table since day one, where in the

2    normal case it would have been 30 days, obviously it is well

3    beyond that for good reasons and for reasons that may or may

4    not be as good.  The issue is, again, parity on both sides,

5    so --

6              MR. LYTTLE:  Your Honor --

7              THE COURT:  Let's put it this way:  You know you've

8    got a November 30th -- I don't have my file in front of me --

9    cut-off, and you all have lots and lots of depositions you're

10   going to want to take.  The parties also have to be able to not

11   only see the documents but analyze them.  If substantially

12   complete means 99 percent, that's one thing.  If substantially

13   complete means we're still going to be producing documents

14   other than your requests in July, August, September, we have a

15   problem.  And you're all going to have that problem because I

16   don't think Judge Berman, who has the ultimate control over

17   that November date, is going to give you any more time.

18             MR. LYTTLE:  We absolutely are working towards, and we

19   hope Vale is doing the same, an absolute God faith substantial

20   completion.

21             THE COURT:  What does substantial mean?

22             MR. LYTTLE:  I am happy to discuss metrics around that

23   with Mr. Liman.  We tried to discuss that initially and Vale

24   did not want to put a number on it.  We initially said 80

25   percent.  We can go higher than that.  That's fine, too.  But

F584rioc

1  it was Vale's demand --

2  THE COURT: 95 percent, and we're moving on. That's

3  the Court's order.

4  Chinalco, you'll go talk about in the back.

5  MR. LIMAN: Your Honor, with respect to the remaining

6  5 percent --

7  THE COURT: Let's see where we are. Unfortunately, I

8  will be seeing you several times before June 30th.

9  Okay. Chinalco, you're going to try to work through

10 that.

11 The BHP documents, it sounds like the solution

12 implicitly suggested by both sides is that as Rio Tinto sees

13 BHP-related documents in going through the TAR process, it will

14 mark them as nonresponsive but produce the ones it sees. That,

15 I take it, is what you're suggesting --

16 MR. LYTTLE: That is our suggestion, your Honor.

17 THE COURT: Why doesn't that work?

18 MR. REENTS: The reason that doesn't work, your Honor,

19 is because if you look back at what they have produced to us

20 from the BHP production, you remember that there were five

21 custodians that your Honor allowed --

22 THE COURT: The problem is -- and I think they're

23 right -- you wanted that done faster, quicker, up front, and

24 they did it.

25 MR. REENTS: Right.

F584rioc

1          THE COURT:  So it probably will confuse the predictive

2     coding system to start marking that as relevant when it has

3     nothing to do with everything else that's going on.  You can't

4     have it both ways.

5          MR. REENTS:  They haven't made that representation,

6     and I'm not sure that that is true.  The documents came --

7          THE COURT:  Whether it confuses the system or not, I

8     guess my question is:  Having asked for it to be done in a

9     certain way up front, why do you get another crack at it now?

10         MR. REENTS:  It is not necessarily getting another

11    crack at it, your Honor.  They're coming across these documents

12    in the ordinary course of the training exercise.  The

13    incremental burden of marking documents that they have agreed

14    are relevant, that they have agreed to produce as relevant

15    during the training process, doesn't seem to us to be an

16    extraordinary approach --

17         THE COURT:  The burden is what it does to the

18    predictive coding software, and you each have to give me your

19    expert's opinions on that, so I'm not just guesstimating from

20    prior experience.

21         MR. REENTS:  Your Honor, one fact to consider --

22         THE COURT:  Another fact to consider is that it is

23    3:00 and I have another case scheduled to be here, and since I

24    saw a few more people come in recently, I suspect they're here.

25    So wrap it up.

F584rioc

1          MR. REENTS:  The two custodians that they suggested of

2     the five turned out to have 4 percent of the documents.  Your

3     Honor explicitly left open the possibility that if that

4     occurred, we would be entitled to come back and ask for more

5     discovery.  That is what has happened.  Now we have a

6     predictive coding process --

7          THE COURT:  What do you mean they have 4 percent of

8     the documents?

9          MR. REENTS:  Of the production that they have made,

10    your Honor, the BHP documents, there are five custodians.

11    Three of them were our suggestion, two of them were theirs.

12    The two that they had suggested and said that these were core

13    members of the BHP accounted for 4 percent of the documents

14    that they produced.

15          MR. LYTTLE:  Your Honor, that is because of deduping

16    and other things.  We produced over 60,000 documents on BHP

17    alone, and this came in on a very thin reed of relevance, to

18    begin with.

19          THE COURT:  As of now, if you find BHP documents,

20    produce them.  If either of you want to, before the next

21    conference, submit an affidavit or whatever from your ESI

22    experts, I will reconsider, but at the moment, I'm going with

23    Rio Tinto's proposal.

24          Any other issues?

25          MR. LIMAN:  Two very short things.

F584rioc

1          First, with respect to the letters rogatory, we were

2    informed today by the South African authorities that they were

3    not accepting the letters rogatory that were transmitted

4    through the regular South African process and wanted us to

5    follow a different process.  We have another copy of the

6    letters rogatory that your Honor signed, and we would ask if we

7    could hand that up and to have your Honor re-sign it, just to

8    speed up the process.

9          THE COURT:  It is exactly the same as before?

10         MR. LIMAN:  Exactly the same as before.

11         THE COURT:  Hand it up.

12         MR. LIMAN:  In terms of process, we have agreed with

13   Rio Tinto, subject to your Honor's agreement that in future

14   letters, we'll try to organize things better.

15         THE COURT:  That would be great, yes.

16         MR. LIMAN:  We will alternate.  The next letter the

17   defendants will go first with any issues they got and

18   plaintiff --

19         THE COURT:  Since you brought this up, it would be

20   extraordinarily helpful if we had one party's position on a

21   small issue followed immediately by the opposing party's

22   position, and whoever is the movant should be first.  Whoever

23   prepares the letter, I don't care, but if it is an issue where

24   Rio Tinto wants something from Vale, the Rio Tinto position

25   should be first, followed by the Vale position.  If it is

F584rioc

1    something that Vale wants first, then Rio Tinto is being

2    defensive in responding, then the order should be the Vale

3    position, followed by Rio Tinto.  That would make things

4    helpful, in any event.  Show, or make sure, that Mr.  Lyttle is

5    comfortable with what you're asking me to sign.  In the future,

6    isn't the easier method getting the clerk's office to do a

7    certified copy or whatever?

8            MR. LIMAN:  If it is, we will do it.

9            THE COURT:  In the meantime, hand it up so I can sign

10   it.

11           When do you all want to come back?

12           Should this come under today's date or a different

13   date?

14           MR. LIMAN:  I suppose it should come under today's

15   date because that seems right to me.  If we find out that it

16   should come under a different date, your Honor, may we submit a

17   new application to your Honor?

18           THE COURT:  Yes.  I have signed it.  Send copies to

19   the other counsel.

20           MR. LIMAN:  With respect to datum between two opposing

21   parties, one says four weeks, the other says three weeks, and

22   we can live with either three or four weeks on Vale's side.

23           THE COURT:  Okay.  Three weeks is May 28 or

24   thereabout.  Other than Memorial Day, we're pretty open the

25   week of the 25th or the week of June 1st.  What's your

F584rioc

1   pleasure?

2          MR. FILARDO:  As the Court sees fit.

3          THE COURT:  Okay.  Since you want afternoons,

4   June 1st, at 2:00.

5          MR. LIMAN:  Your Honor, we do have an issue we're

6   discussing with the plaintiffs about the appropriate

7   representative from one of the investigative firms.  My hope is

8   that we're going to be able to work it out with them.  If we're

9   not able to, may we submit a letter to your Honor?

10         THE COURT:  You know my rules.  You know where to find

11  me.

12         Why don't you pick up what I have signed for you.

13         Okay.  Usual drill.  Make your arrangements with the

14  court reporter, and I will see you on June 1st.

15         ALL:  Thank you, your Honor.

16         (Adjourned)

17

18

19

20

21

22

23

24

25