**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
mikelyle@quinnemanuel.com

May 26, 2015

Hon. Andrew J. Peck
United States Magistrate Judge,
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   *Rio Tinto plc v. Vale S.A., et al*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

We write regarding Vale's failure to substantiate the privilege claims it has asserted to shield the investigative report prepared by Nardello & Co. (the "Nardello Report" or "Report") from discovery.  Vale has made clear from its first appearance in Court that it intends to rely on its purported due diligence to demonstrate that it did not know of the criminal genesis of its rights in Simandou.  *See* 6/9/2014 Hr'g Tr. 8:16–20 (Counsel for Vale: "[BSGR] misrepresented to us through reps, warranties, personal certifications and the like that they had engaged in no such activity, the standard FCPA diligence.  That's why Vale entered into the joint venture.")  The Nardello Report, which contains confidential source and other non-public factual information, thus sits at the heart of this case because it will show what Vale knew about BSGR and Mr. Steinmetz's activities related to Simandou.  Importantly, there may be no other way to recreate Vale's knowledge of this subject, given that Vale has destroyed the custodial files of all the key players that negotiated the deal with BSGR and Mr. Steinmetz.  Just like the facts developed during Rio Tinto's investigation (over which the Court has ordered broad discovery), the facts about what Vale knew about BSGR's and Mr. Steinmetz's criminal activities related to Simandou are highly relevant.

As explained herein, the Nardello Report was not privileged in the first instance, Vale has failed to substantiate its privilege claim despite this Court's order that it do so, and Vale subsequently waived any privileges that may have once applied.  The time has come for Vale to stop hiding (and hiding behind) the Nardello Report.  This long-standing issue is ripe, and we respectfully request that the Court order Vale to produce the Nardello Report immediately.

**I.   Vale Has Refused to Provide Any Facts that Support Its Privilege Assertion**

It is Vale's burden to establish that the Nardello Report is privileged and that the privilege has not been waived.  *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002) ("The party asserting the protection afforded by the work product doctrine has the burden of showing both that the protection exists and that it has not been waived."); *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988) ("[T]he party seeking to

invoke a privilege has the burden of establishing non-waiver of the privilege."). At the May 8, 2015 status conference, the Court ordered Vale to investigate the circumstances surrounding its disclosure of the Nardello Report to the Guinean Government. *See* 5/8/2015 Hr'g Tr. 6:1–7:5. Vale agreed to conduct an investigation and share the results with Rio Tinto. *Id.* 6:19–20 ("[W]e will consult with [Vale's General Counsel] and consult with Rio Tinto.").

On May 14, 2015, pursuant to the Court's order and Vale's representations, Rio Tinto wrote Vale to ask if its investigation had developed any grounds to justify Vale's assertion of privilege over the Nardello Report or to rebut Rio Tinto's claim that any such privilege has been waived. Contrary to its representations in court that it "would consult with Rio Tinto," however, Vale refused to discuss the matter at all, summarily declining to substantiate its position and simply reiterating its vague claim of privilege. Indeed, Vale refused to confirm or deny even basic facts surrounding its disclosure of the Nardello Report to the Guinean Government, such as whether it had executed a common interest agreement or whether Vale has ever disclosed the Report to any other third parties. Vale refused to even confirm that the meeting where it permitted the representative of the Government of Guinea to review the Report had in fact occurred. Rather than engage in a productive discussion, Vale told Rio Tinto to just "make its motion." Vale's approach left Rio Tinto no choice but to do so.

## II. Vale Waived Any Privileges It May Have Had Over the Nardello Report[1]

Notwithstanding Vale's failure to meet its burden, Rio Tinto encloses a declaration from Steven Fox proving that Vale waived any privilege and must produce the Nardello Report. Mr. Fox formerly served as the lead investigator on behalf of the Government of Guinea during its official inquiry into allegations of corruption surrounding Simandou. *See* Ex. 1 ("Fox Decl.") ¶ 3. During that investigation, Vale invited Mr. Fox to review the Nardello Report. Mr. Fox's statement makes clear that, even if the Nardello Report was once covered by attorney-client or work product privilege, Vale waived that privilege long ago. Vale gave Mr. Fox unfettered access to the Report in the midst of his investigation, and as a result of that investigation, the Guinean Government stripped Vale of its mining rights to Blocks 1 and 2.[2]

In late April 2013, Vale's General Counsel, Clovis Torres, invited Mr. Fox to review the 62-page Report in a conference room at Vale's headquarters in Rio de Janeiro. Fox Decl. ¶ 6. At the time, Mr. Fox was acting as a representative of the Government of Guinea. *Id.* ¶¶ 4, 6. Over the course of the approximately ninety minutes that he reviewed the report, and at Vale's invitation, Mr. Fox took detailed notes on the contents of the Report. *Id.* ¶ 8. When Vale made the Report available to Mr. Fox, it was a standalone document not attached to any legal memorandum. *Id.* ¶ 7. Vale placed no restrictions on Mr. Fox's ability to review the document: there were no redactions, no sections appeared to be missing, and he was permitted to read the entire Report at his leisure. *Id.* ¶ 8. Vale's Mr. Torres invited Mr. Fox to examine the report in connection with Mr. Fox's role as the lead investigator for the Government of Guinea's inquiry

---

[1] We address waiver first as the Court indicated that it wished to consider those issues before getting to the underlying privilege claim. But as discussed herein (*infra* Section III), it is clear that the Nardello Report is not privileged to begin with.

[2] Vale held these mining rights through its subsidiary, VBG. Vale was the majority shareholder and controlled the day-to-day operations of VBG.

into the provenance of Vale's and BSGR's rights to Simandou Blocks 1 and 2 (which were held via their subsidiary, VBG, which Vale controlled). *Id.* ¶¶ 4, 6. Neither Vale nor its counsel informed Mr. Fox that the Report was privileged. *Id.* ¶ 7 ("[T]here was no discussion of privilege whatsoever.").

### A. Voluntary Disclosure Waives Attorney-Client And Work Product Privileges

Vale's decision to voluntarily reveal the entire Report to the lead investigator for the Government of Guinea waived all available claims of attorney-client privilege. It is black-letter law that the attorney-client privilege is waived when a party discloses an otherwise privileged communication to a third party. *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973). Such a waiver extends to the materials that are directly disclosed and to any underlying source materials. *Gruss v. Zwirn*, No. 09-cv-6441 (PGG), 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013) ("As a general matter, when a party selectively discloses attorney-client communications to an adverse government entity, the privilege is waived not only as to the materials provided, but also as to the underlying source materials.").

Vale's voluntary disclosure of the Nardello Report to Mr. Fox likewise waives any claimed work product privilege that could apply. Work product dissolves when a party discloses otherwise protected materials to a third party in a way that substantially increases the likelihood that a potential adversary may obtain the information. *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 279 F.R.D. 140, 147 (S.D.N.Y. 2011) ("Work product protection is waived by the disclosure of documents to third parties, however, only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information." (internal quotations omitted)). Vale's disclosure of the Report to the Government of Guinea, in the midst of Guinea's investigation which resulted in the stripping of Vale's mining rights, waived any protections that may otherwise have been available under the work product doctrine.

### B. The Selective Waiver Doctrine Is All But Dead In This Circuit and Does Not Apply

Vale cannot shield the Nardello Report from disclosure through the selective waiver doctrine as it "has been uniformly rejected by the Courts of Appeal, including by the Second Circuit in *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir. 1993)." *Gruss v. Zwirn*, No. 09-cv-6441 (PGG), 2013 WL 3481350, at *6 (S.D.N.Y. July 10, 2013) (sustaining objection under Rule 72(a) and reversing order premised on applicability of selective waiver doctrine); *Steinhardt*, 9 F.3d at 235 ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties."). Here, Vale's voluntary disclosure of the Report to a representative of the Government of Guinea constitutes a complete, knowing, and voluntary waiver.

At the time Mr. Fox reviewed the Report, the Government of Guinea was investigating the same series of events surrounding Simandou that are at issue in this case, and it was developing evidence of bribery and corruption by actors who are Defendants in this case. *See* Fox Decl. ¶ 3. VBG and Vale (as VBG's controlling member) were squarely in the cross-hairs of that investigation. Facing potential liability for its actions in Guinea, including the loss of its rights in Simandou (which, in fact, later came to pass), Vale's relationship with the Guinean

3

government was clearly adversarial. *See Steinhardt*, 9 F.3d at 234 (holding that "the presence of an adversarial relationship does not depend on the existence of litigation" or "formal enforcement proceedings," and "the fact that [a party] cooperated voluntarily does not transform the relationship from adversarial to friendly"). Notwithstanding its potential liability, Vale elected to disclose the work of its private investigators to the Government of Guinea. Through that decision, Vale forfeited all privilege claims with respect to not only the Government of Guinea, but any other potentially adverse party, including Rio Tito. *Id.* at 235 ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to *other parties*." (emphasis added)).

The result is the same whether or not Vale expected the Nardello Report to remain confidential. Although the Second Circuit in *Steinhardt* commented in *dicta* that a confidentiality agreement with a government agency could affect the waiver analysis, *see* 9 F.3d at 236, recent authority makes clear that subjective expectations regarding confidentiality are irrelevant. Judge Gardephe's authoritative exposition of the selective waiver doctrine in *Gruss* demonstrates not only that the weight of circuit authority is against recognizing the selective waiver doctrine in these circumstances, but the *better reasoned* authority is against it, as well. 2013 WL 3481350, at *11 ("*Steinhardt* is now nearly twenty years old, and more recent circuit court decisions have not permitted parties who produce documents to an adverse government agency to assert attorney-client privilege and work product protection as to those same documents when demanded by a third party in an unrelated litigation."). Accordingly, whatever Vale may have believed when it invited Mr. Fox to review the Nardello Report, standing alone, is insufficient to sustain the privilege. As Judge Gardephe explained, courts must scrutinize closely any supposed confidentiality agreements to ascertain their objective limitations. *See* 2013 WL 3481350, at *8 (analyzing confidentiality agreement at issue and concluding it was "illusory" based on the protections the agreement gave to the disclosing party). Here, Vale's expectation of confidentiality was so illusory that it has not even alluded to the existence of a written confidentiality agreement, and certainly not any kind of confidentiality agreement that could be subjected to the kind of scrutiny by this Court sufficient to permit a finding of selective waiver.

### C. Vale's Claim Of Common Interest Is Without Merit

Neither can Vale withhold the Nardello Report under the common interest doctrine.[3] That doctrine protects a communication to an attorney for a party with an identical or nearly identical legal interest for the purpose of seeking legal advice or forming a joint legal strategy. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) ("In theory, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. In practice, they must have demonstrated cooperation in formulating a common legal strategy."); *see also Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002) (accord); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 434 (S.D.N.Y. 2013) (even if *identity* of interests not required, parties must have common legal purpose).

---

[3] *See* 5/8/2015 Hr'g Tr. 4:4–8 (Counsel for Vale: "In April of 2013, Vale . . . would have had a common interest with the Guinean Government . . . .").

4

Vale cannot meet this standard. There is no basis to believe that Vale and the Government of Guinea had identical (or even similar) legal interests, or that Vale disclosed the Nardello Report to further a joint legal strategy with the Government of Guinea. There is no evidence that Vale and the Government of Guinea signed a common interest agreement at the time of the disclosure or that either party expected that Mr. Fox's review of the Nardello Report would facilitate a *joint* legal strategy. *Bank of Am.*, 211 F. Supp. 2d at 498 ("[T]he two entities did not enter into the ['Common Interest/Joint Prosecution and Defense Agreement'] until April 24, 2000. Thus, there was no joint defense effort or strategy in place in 1999 when the Disputed Documents were created." (quotation marks and citations removed)).

At best, Vale *hoped* that its cooperation would engender goodwill with the Government of Guinea and insulate Vale from the consequences of the criminal conduct that obtained for VBG (and through it, Vale) the rights to Blocks 1 and 2. That is not enough to invoke the common interest doctrine. As the court in *In re Tyco Intern., Inc. Multidistrict Litig.* explained, a common interest cannot exist between a private party and a government agency where the conduct at issue could expose the private party to liability in adversarial proceedings involving the government agency:

> Tyco is not engaged in a joint action with either the SEC or the district attorney. Instead, it has merely supplied documents that both agencies require for their own investigations. Further, while Tyco may share an interest with the SEC and the district attorney in seeing that [former Tyco General Counsel] is held to account for any wrongdoing, both agencies are acting pursuant to a broader mandate to protect the public that may well put them in an adversarial relationship with Tyco at some point in the future.

02-mdl-1355-B, 2004 WL 556715, at *2 (D.N.H. Mar. 19, 2004); *see also Steinhardt*, 9 F.3d at 234 ("[T]he fact that [a party] cooperated voluntarily does not transform the relationship from adversarial to friendly.").

These same principles apply here. At the time Mr. Torres invited Mr. Fox to review the Nardello Report, Vale was attempting to protect itself from potential action by the Government of Guinea—not working in concert with it against BSGR, as the common interest doctrine requires. Indeed, Vale's conduct only demonstrates its recognition that the investigation created a grave risk that Vale could lose its rights in Simandou (which, of course, is exactly what happened). Whatever Vale professes it now believes about BSGR and the manner in which VBG came to hold the rights to Simandou Blocks 1 and 2, at the time it disclosed the Nardello Report it was *aligned* with BSGR in seeking to protect its interests in Guinea. Vale's desire to assist in the investigation and thereby bolster its chances of avoiding Government action does not qualify as a common interest under the law. *Bank Brussels*, 160 F.R.D. at 447; *Bank of Am.*, 211 F. Supp. 2d at 498; *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC,* 01-cv-9291 (JSM), 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002).[4]

---

[4] Moreover, the common interest doctrine does not apply because the Nardello Report itself is not protected by the attorney-client or attorney work product privileges. *See infra* Section III; *Sokol v. Wyeth, Inc.*, No. 07-cv-8442 (SHS), 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) ("If a communication is not protected by the
(footnote continued)

5

### D. Vale Has Put The Substance Of The Nardello Report At Issue In This Case

Vale has made clear from its first appearance in court that it intends to rely on its purported due diligence to demonstrate that it was unaware of the criminal genesis of VBG's rights in Simandou. *See* 6/9/2014 Hr'g Tr. 8:16–20 (Counsel for Vale: "[BSGR] misrepresented to us through reps, warranties, personal certifications and the like that they had engaged in no such activity, the standard FCPA diligence. That's why Vale entered into the joint venture."); *see also* Consuelo Dieguez, *Risk Contract: How Vale Signed a Deal to bear All the Costs of an Obscure Multi-billion-dollar Mining Project in Guinea*, Piauí, Mar. 2014 (Christopher Peterson trans.) (quoting former Vale General Counsel Fabio Spina, "'Before we closed the deal, we did our due diligence. Vale hired two international law firms, Cleary Gottlieb and Clifford Chance, to proceed with an independent investigation into the concession. Neither of them turned up anything suspicious,' he explains. The company also hired the American firm Nardello & Co to examine the transaction. According to Spina, all the legal precautions were taken before sealing the joint venture with BSGR. . . . In his opinion, due diligence was performed 'to the greatest possible extent that a purchaser is able.'"), *available at* http://revistapiaui.estadao.com.br/edicao-90/business-in-africa-ii/risk-contract. These assertions place Vale's claimed due diligence at issue. Vale cannot use the supposedly privileged Nardello Report to slash at Rio Tinto's claims and at the same time attempt to shield it from production. *See, e.g., Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2013 WL 6182744, at *2 (S.D.N.Y. Nov. 21, 2013) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes" (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991))).

Because Vale has placed its diligence at issue, even if Rio Tinto had the practical ability to contact every confidential source that Nardello consulted in the preparation of the Report (which it does not) it still would be entitled to review the Report. The precise contours of what Vale knew, or recklessly ignored, at the time it decided to publicize its partnership and form a joint venture with BSGR is a critical component of Vale's defense. That information is memorialized in the Nardello Report and has independent significance because it is the only direct evidence of what Vale knew at the time VBG was created. Rio Tinto must have an opportunity to review the Report in order to address Vale's arguments and pursue other relevant discovery.

Just as Vale argued at length regarding Rio Tinto's investigator reports, Vale cannot have it both ways. It cannot maintain that it acted in good faith as evidenced by its due diligence and at the same time obstruct Rio Tinto's efforts to demonstrate such a defense lacks merit. *See* Dkt. No. 119, at 4. Like Vale, Rio Tinto "is entitled to test that allegation by discovery into, *inter alia*, whether [Vale], in fact, had such a lengthy investigation, whether it involved substantial resources, . . . what leads the investigation pursued . . ., [and] whether it discovered any of the conduct that []underlies [Rio Tinto's allegations]." Dkt. No. 122, at 2. "Unless [Vale] is prepared to abandon these assertions concerning its purported[] investigation, [Rio Tinto] is entitled to discovery to disprove them." Dkt. No. 119, at 4.

---

attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." (citing *In re Comm. Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 536 (N.D. Ohio 2008)).

6

### III. The Nardello Report is Not Privileged

#### A. The Nardello Report Is Not Attorney-Client Privileged

The Nardello Report it not protected by the attorney-client privilege because it does not constitute legal advice. The Nardello Report was part of a *fact*-gathering mission to obtain information about BSGR's and Mr. Steinmetz's activities in Guinea before Vale entered into the Vale-BSGR transaction in April 2010. *Cf.* Fox Decl. ¶ 7. Vale nonetheless maintains that the Nardello Report should not be produced because it was *used by* Clifford Chance to generate a *separate and distinct* legal memorandum that was provided to Vale. But that argument has been rejected, resoundingly, by courts in this jurisdiction:

> [The] fact-acquisition process in the course of a business transaction is no more protected by privilege when conducted by an attorney than if conducted by an accountant, engineer or head of a business unit. *The factual information presented is not privileged merely by the use of an attorney as a conduit for the information.*

*Vector Capital Corp. v. Ness Techs., Inc.*, No 11-cv-6259 (PKC), 2014 WL 171160, at *2 (S.D.N.Y. Jan. 9, 2014) (emphasis added); *see also see also Upjohn v. United States*, 449 U.S. 383, 395 (1981) (attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney"); *Federal Housing Finance Agency v. UBS Americas Inc.*, 2013 WL 1700923, at *2 (S.D.N.Y. Apr. 16, 2013) ("[Factual material] is not rendered privileged simply because it was contained in a memorandum prepared by an attorney or because that memorandum was relayed to [a party] by its attorney."); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 103 (S.D.N.Y. 2002) (holding that documents are not privileged merely because they are attached to a communication with an attorney). Vale thus cannot cloak the Report in the privilege that may protect another distinct memorandum prepared by the company's counsel.

Vale also has claimed that the Nardello Report is protected from disclosure because the Report constitutes a communication that was "necessary" to the provision of legal advice. Dkt. No. 246, at 10 (citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)). That view of the law distorts the proper scope of attorney-client privilege beyond recognition. Contrary to Vale's interpretation of the *Kovel* doctrine, courts in the Second Circuit have rarely extended the privilege to protect communications involving third parties, and they have only done so if the third party is present to improve the comprehension of legal advice. *See United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("[*Kovel*] recognized that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client."). Here, Nardello independently gathered facts related to BSGR's and Mr. Steinmetz's activities in Guinea. Nardello's work was not necessary to translate or interpret those facts for Vale or its counsel. The *Kovel* doctrine thus has no application on these facts. *See Ackert*, 169 F.3d at 139–40 (reversing magistrate judge's reliance on *Kovel* where an attorney "was not relying on [a third party] to translate or interpret information given to [the attorney] by his client" but instead "sought out [the third party] for information [the client] did not have about the proposed transaction"); *see also Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-08333 (ALC),

2015 WL 1424009, at *7 (S.D.N.Y. Mar. 27, 2015) (a third party's work "consolidating employee interviews and delivering a factual analysis" is not protected from disclosure under the attorney client privilege).

### B.     The Nardello Report Is Not Attorney Work Product

Vale's assertion that the Nardello Report is protected under the work product doctrine is similarly misguided.  As an initial matter, that position flies in the face of the arguments Vale has put forth in its pursuit of Rio Tinto's investigator reports and this Court's evaluation of the applicability of the work product doctrine to such reports.  *See* 12/9/2014 Hr'g Tr. 28:3–5 (The Court: "Precomplaint, if there was an investigative firm of any sort, whether working with the lawyers or not, I don't find that to be privileged.").  Vale's assertion of work product privilege over the Nardello Report, the same type of report it has argued for months is *not* privileged, demonstrates the thinness of its arguments.

The basis of Vale's work product claim is that it anticipated a U.S. Government investigation in 2010 as a result of its joint venture with BSGR.  Dkt. No. 246, at 9.  Notably, however, Vale does not contest that it commissioned the Nardello Report as part of routine due diligence before entering into a joint venture—*i.e.*, as part of its ordinary course of business and not in anticipation of litigation.  As a result, Vale cannot properly withhold the Nardello Report as work product notwithstanding its view that publicizing its partnership with BSGR could invite an investigation by the Department of Justice.  *See United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (work product doctrine inapplicable to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation"); *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 107–09 (S.D.N.Y. 2007) (denying work product protection to investigation conducted by attorney where public statements had been made in connection with investigation and there were business reasons for internal investigation).

Even assuming for the sake of argument that Vale commissioned the Nardello Report with an eye towards litigation, Rio Tinto may nonetheless compel its production upon a showing of substantial need and the inability to obtain its substantial equivalent by other means.  Fed. R. Civ. P. 26(b)(3); *Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2013 WL 1087236, at *25–*27 (S.D.N.Y. Mar. 15, 2013).  Here, there can be no question that Rio Tinto has a substantial need to obtain the Nardello Report.  Rio Tinto cannot, today, recreate a factual investigation of confidential sources that took place over five years ago.  *See* Fox Decl. ¶ 8 (Nardello Report based on confidential sources); *Pine Top Ins. Co., v. Alexander & Alexander Servs., Inc.*, No. 85-cv-9860 (PNL), 1991 WL 221061, at *2–*3 (S.D.N.Y. Oct. 7, 1991) (civil RICO case holding that the plaintiff was entitled to discovery of audit reports protected by work product doctrine because the underlying investigation was conducted seven years prior to litigation and it would have been "virtually impossible" to reconstruct facts presented in the report through depositions or other discovery).  Rio Tinto does not know who Nardello contacted, and for many sources of information located in other countries, it has no practical ability to compel their cooperation.  Moreover, enough time has passed since Nardello prepared the Report to dull witness memories and render any information Rio Tinto could obtain today much less reliable than statements in the Report.

In light of Vale's persistence in seeking Rio Tinto's investigator reports and underlying

material, it cannot dispute the relevance and importance of the information in the Nardello Report.  If Rio Tinto "is to [rebut a defense] based on the assertion that [Vale's] investigation" did not reveal evidence of BSGR's wrongdoing, "it is entitled to evidence with respect to that investigation."  Dkt. No. 114, at 7.  And where this Court has already dismissed claims of work product privilege over investigator reports, *see* 12/9/2014 Hr'g Tr. 28:3–5, it can easily dispense with Vale's assertion of that privilege over its own investigator reports.

\*   \*   \*

This Court has already ruled that investigator reports are not privileged.  12/9/2014 Hr'g Tr. 28:3–5.  But even if the Court were to revisit its ruling and determine that the Nardello Report was privileged, Vale waived that privilege when it gave Mr. Fox unfettered access to the Nardello Report in the midst of his investigation that resulted in the Government of Guinea stripping Vale's rights to Blocks 1 and 2.  Vale therefore cannot continue to shield the Report from discovery.  We request that the Court order Vale to produce the Report immediately.

Respectfully submitted,


/s/ Michael J. Lyle
Michael J. Lyle

9