CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY

MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO

JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
JOHN V. HARRISON
CAROLINE F. HAYDAY
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

Writer's Direct Dial: +1 (212) 225-2550
E-Mail: lliman@cgsh.com

May 28, 2015

VIA ECF

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:  *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

We write on behalf of Defendant Vale S.A. ("Vale"), jointly with Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), and Mahmoud Thiam, to update the Court on the status of discovery in advance of the status conference scheduled for June 1, 2015 at 2 p.m.

As set forth in the proposed conference agenda below, there are a number of discovery disputes that require the Court's assistance.

**I.    Discovery From Plaintiff Rio Tinto**

   **a.   Rio Tinto's Training of Its Predictive Coding System**

      *i.   Vale's Position*

Rio Tinto has violated the Predictive Coding Protocol (Dk. 207) by using a method to train its documents that is not reasonably designed to identify documents responsive to all of

Hon. Andrew J. Peck, p. 2

Vale's document requests.[1]  In particular, Rio Tinto has failed to train its model to identify documents responsive to a number of Vale requests critical to Vale's defense in this litigation. Vale discovered this flaw after Rio Tinto completed its training process and produced its "Training Set" on May 12.  Only through careful review of the Training Set did Vale discover what Rio Tinto had sought to conceal – that Rio Tinto had ended what was supposed to have been an iterative, multi-round training process to create a helpful Training Set prematurely without a sufficient and sufficiently diverse set of responsive documents to train an effective predictive coding model.  Vale undertook a re-examination of the training documents produced to Vale to confirm and quantify the extent of the problem, and conferred with appropriate experts at Deloitte to understand its impact and importance.  Vale completed its investigation on May 21 and raised this objection with Rio Tinto on May 26, and Rio Tinto has thus far refused to modify its training approach in response to Vale's concerns.

Because of the significance of this issue to the integrity of the entire case, Vale has obtained and attaches a declaration from Ali Hadjarian, a text categorization expert at Deloitte Transactions and Business Analytics LLP, who has consulted with Vale on its use of predictive coding in this matter.

Rio Tinto has used a total of 284 responsive documents, out of a total of 3,676 documents produced as its Seed and Training Sets, to train its predictive coding model to identify responsive documents in the Document Universe.[2]  These responsive documents overwhelmingly relate to Rio Tinto's management and operations of its Simandou concession and there is a near absence of documents responsive to Vale's other document requests, which Rio Tinto is required to find and produce to Vale.  For example, of the 284 responsive documents, only nine documents in total relate to the following critical topics:

- Three documents concerning Rio Tinto's response to the Government of Guinea's revocation of Rio Tinto's rights to Simandou Blocks 1 and 2 in 2008.  (*See, e.g.*, Requests 13, 40, 45.)

- Three documents concerning BSGR's operations in Guinea prior to December 2008, including documents concerning its alleged reputation, any rumors concerning its operations, and Rio Tinto's assessment of those rumors.  (*See, e.g.*, Requests 15, 31.)

- One document concerning Rio Tinto's response to the announcement that those Blocks were awarded to BSGR in December 2008.  (*See, e.g.*, Requests 41, 42.)

- Two documents concerning Rio Tinto's response to the April 30, 2010 announcement of the Vale-BSGR joint venture.  (*See, e.g.*, Requests 39, 41, 42, 45.)

---

[1] *See* Section 4(d) (requiring Responding Party to use a "reasonable method" to train the Predictive Coding Software).

[2] This includes documents Rio Tinto has acknowledged are not responsive but which it has included "for training purposes only."  This does not include documents Rio Tinto withheld as privileged, since Rio Tinto did not disclose to us the number of such documents.

Hon. Andrew J. Peck, p. 3

These topics go to the heart of a number of critical issues, such as the reasons for the Government of Guinea's revocation of Rio Tinto's rights, Rio Tinto's awareness of its potential claims, and the adequacy of the steps Rio Tinto took to investigate potential claims.[3]  Assuming Rio Tinto retained them, it is inconceivable that there would not be numerous documents on each of these subjects.  Rio Tinto alleges that the mine it lost was "one of the most valuable iron ore deposits in the world, estimated to be worth billions of dollars" (AC ¶ 1); it alleges that it "was genuinely shocked" when Vale and BSGR announced the joint venture in April 2010 (AC ¶ 146).  The custodians include those executives who were identified by Rio Tinto as being knowledgeable about these events; there is no way they were silent and did not respond.  Indeed, based on the results of Rio Tinto's randomly generated Control and Seed Sets, we conclude that documents relating to the above topics do exist, though they occur with relatively low prevalence relative to the vast majority of the other (largely irrelevant or inconsequential) documents selected by Rio Tinto.  Rio Tinto's failure to adequately search for and produce these documents would seriously prejudice Vale in its defense of this litigation.  The fact that Rio Tinto has not adequately trained its model to identify such documents is a grave deficiency that has just been discovered and needs to be addressed.

This deficiency is a result of Rio Tinto's flawed approach to training its predictive coding model.  The vast majority of the documents used to train the model have been selected at random.  This means that documents relating to high-prevalence topics – such as the operations of Simandou – will be selected in a far greater number than documents relating to low-prevalence topics, such as those identified above.  As a consequence, documents relating to relatively low-prevalence topics (such as particular events as opposed to regular operations) are not meaningfully represented in the training set.  Rio Tinto took no steps to try to incorporate documents responsive to relatively low-prevalence topics in its Seed or Training Sets.

It is important for documents used for training a predictive coding model to provide coverage of all topics of relevance.  Hadjarian Decl. ¶ 6.  Neglecting to do so risks training a model that will fail to identify documents relevant to the excluded topics.  *Id.*  There are simple steps that can be taken to ensure adequate coverage of all topics of relevance, such as using targeted searches in place of random selection for one's seed or training sets, or by feeding in identified exemplar documents.  *Id.* ¶ 7.  Such steps are particularly important where, as here, the relevant topics are not very prevalent in the overall population, because in such cases, non-targeted means, such as random selection, are relatively unlikely to identify an adequate set of documents relevant to low-prevalence issues.  *Id.* ¶¶ 7-8.  The shortcomings of over-reliance on random selection of training documents has been corroborated by recent research.  *See* M.R. Grossman and G.V. Cormack, *Evaluation of Machine-Learning Protocols for Technology-*

---

[3] *Completely* absent from Plaintiff's Seed and Training Set productions are documents that substantiate the core allegations of its Amended Complaint against Vale, including that Vale knew or should have known that BSGR was bribing the Government of Guinea (Request 30); that Vale and BSGR met in December 2008 to discuss Simandou and present information stolen from Rio Tinto to the Government of Guinea (Requests 29, 32); that Vale and BSGR met again in January 2009 to "discuss the progress of the conspiracy" to steal Simandou from Rio Tinto (Request 33); that Vale or BSGR utilized information stolen from Rio Tinto to develop Simandou (Request 36); and critically, that "Rio Tinto exercised due diligence" and "conducted a lengthy investigation" of the facts (Request 39).  Vale concludes that such documents are absent because they do not exist, but if Rio Tinto contends otherwise, Vale demands that Rio Tinto include representative examples of such documents in its Training Set to train its predictive coding model.

Hon. Andrew J. Peck, p. 4

*Assisted Review in Electronic Discovery*, SIGIR 2014 at 160 (2014) (finding that a keyword search "almost always yields a more effective seed set than random selection").

      The inadequacies of Rio Tinto's training methods are particularly concerning in light of the fact that Rio Tinto has chosen to use a simple passive learning ("SPL") technology for its predictive coding. *See* Feb. 6, 2015 Tr. 16:8. In SPL, the "review phase is separate and distinct from the training phase," and "the learning algorithm plays no role in the selection of training examples." M.R. Grossman and G.V. Cormack, *Comments on "The Implications of Rule 26(g) on the Use of Technology Assisted Review,"* 7 Fed. Cts. L. Rev. 285, 291 (2014). As a consequence, "the size and composition of the training set play a *critical* role in SPL; once these choices are made and the training set is coded, the review set is fixed, and the quality of the review is *largely predetermined*." *Id.* at 291-92 (emphasis added). It is therefore crucial that Rio Tinto augment its training process to include sufficient documents responsive to the topics identified above and to all of Vale's document requests.

      It is no answer that Rio Tinto estimates relatively high levels of recall overall. Rio Tinto elected to report a single recall estimate for general "responsiveness," rather than provide specific recall estimates for distinct topics or issues. Rio Tinto's failure to train for low-prevalence topics would not likely be reflected in this overall recall estimate, because a high level of recall can be achieved by identifying only or predominanlty documents relevant to high-prevalance topics. Hadjarian Decl. ¶ 11. In such an instance, recall does not measure the success of the text categorization process in identifying low-prevalence documents. *Id.* Instead, the effectiveness of the text categorization process in identifying high-prevalence documents would mask the ineffectiveness of the process in identifying low-prevalence documents. *Id.* Here, Rio Tinto's recall likely reflects an estimate of the model's effectiveness at identifying documents relevant to the high-prevalence issues it has trained on (*i.e.*, documents related to Rio Tinto's Simandou operations) and not any measure of its effectiveness with respect to the low-prevalence issues it has not trained on (*i.e.*, everything else).

      We anticipate that Rio Tinto will argue that Vale's objection to their training process comes too late, and that Vale should have made this objection after Rio Tinto produced its initial Seed Set. But that argument is fatuous and would reward the wrongdoer for his own wrongdoing. Production of Rio Tinto's Seed Set was supposed to be just the first step in a multi-step, iterative process in which Rio Tinto would refine and revise its predictive coding model through further training rounds. The Predictive Coding Protocol explicitly provides for the review of additional "Training Sets," after which the Responding Party is to disclose the "results of the training" to the Requesting Party. Predictive Coding Protocol ¶ 4(d). Rio Tinto itself described its process to Vale and the Court as an iterative one with multiple "rounds," involving the selection of training documents through "random sampling, keyword searching, and/or conceptual ranking." *See* Feb. 13, 2015 Letter to Court (Dk. # 181).[4] It now appears that

---

[4] Multiple training rounds involving the selection of additional training documents is a standard feature of the SPL method employed by Rio Tinto. *See* 7 Fed. Cts. L. Rev. at 292 ("SPL methods typically employ an iterative training phase in which a candidate training set is constructed and used by the learning algorithm to create a candidate review set. If sampling indicates that the review set is "adequate," the training phase is complete; otherwise, the training set is revised (typically by adding more examples), a new canditde review set is created, and sampling is repeated until stabilization is achieved."

Hon. Andrew J. Peck, p. 5

was a misrepresentation. But at the time there was no reason to suspect that Rio Tinto would not refine and revise its predictive coding model through appropriate methods. To the contrary, the Predictive Coding Protocol required Rio Tinto to use a "reasonable method" to develop the Training Sets that would train its predictive coding model. Predictive Coding Protocol ¶ 4(d). But Rio Tinto delayed and then, when it produced its Training Set on May 12, it included just 13 responsive documents, none of which addressed the critical topics described above, and which were apparently selected to address certain technical gaps in the scoring of its predictive coding model. It was then that Vale realized the trivial nature of Rio Tinto's subsequent "rounds" of training and determined, through substantial additional diligence and expense, that Rio Tinto's training process as a whole was a farce.

Vale therefore requests an order requiring that Rio Tinto take immediate steps to correct these deficiencies by identifying sufficient numbers of documents responsive to all Vale document requests, including those identified above, and using such documents to train its predictive coding model.[5]

*ii.   Rio Tinto's Position*

**Rio Tinto Appropriately and Properly Trained its Predictive Coding System.**  Vale's complaints with respect to Rio Tinto's training of its predictive coding system ultimately boil down to one issue: that Rio Tinto should have trained its system the same way that Vale trained its system. But that is not what the parties agreed to at the outset of this process, that is not what the Predictive Coding Process calls for, and contrary to Vale's allegations, Rio Tinto's training of its Predictive Coding System is entirely reasonable, appropriate, and proper.

Almost three months ago, the Court entered the parties' negotiated and agreed upon Predictive Coding Protocol, which states that, with respect to Seed Sets, "The Responding Party may use any reasonable method, including, *but not limited to*, search terms, to identify a set of documents to be used initially to train the Predictive Coding software." Rio Tinto, in consultation with its predictive coding expert, opted to utilize both a random sampling and judgmental sampling (where the documents were sampled across clusters of documents grouped by conceptual content) to arrive at a seed set of 3504 documents. With respect to the Training Set, the Predictive Coding Protocol states that, "The Responding Party may use *any reasonable method* to train the Predictive Coding Software." Again, in consultation with its experts, Rio Tinto's approach was reasonable, this time opting to draw its random Training Set of 755 documents from the pool of documents where the predictive coding system required more training. Thus, Rio Tinto has – in full compliance with the parties' agreed upon process and procedures – trained the predictive coding system reasonably and appropriately. Indeed, Rio Tinto's training numbers confirm that its approach was reasonable. As we disclosed to Vale, Rio Tinto's numbers show that our training is returning an estimated 80.67% Recall rate and an estimated 62.75% Precision rate within the Control Set (which was created with a 95% Confidence +/- 2% margin of error).

---

[5] Vale has also raised with Rio Tinto several deficiencies with respect to its predictive coding disclosures required by the Protocol, including (1) its reporting of a Recall rate with a level of confidence that require review of more responsive documents than it has disclosed producing; (2) its failure to disclose the total number of responsive documents in its Control Set, as required by Section 4(b) of the Protocol; and (3) the unexplained inconsistency in the responsiveness rates in the randomly drawn samples in Rio Tinto's Control Set (4.3%) and Seed Set (9.1%).

Hon. Andrew J. Peck, p. 6

Vale would now have this Court believe that Rio Tinto should use search terms to conduct a targeted search to train the system on specific requests. But Vale's approach is not reasonable, is untimely, and is not required by the Predictive Coding Protocol. If Vale thought the parties should use search terms and train the system on specific document requests (the latter of which Vale itself is not even doing), then Vale should have insisted that those be included in the protocol. Vale did not. And Rio Tinto is not required to abide by Vale's post hoc attempts to manufacture a dispute over what it views as "appropriate" for training the system. This is particularly true in light of the reasonableness of Rio Tinto's own approach to training the system, which fully comports with the parties agreed upon procedures.

Moreover, Vale's complaints with respect to Rio Tinto's training of its system comes far too late in this process. Rio Tinto produced its Seed Set on April 17, 2015. Any of Vale's objections with respect to that Seed Set (which comprise 82% of the documents that Vale is now belatedly disputing) and how Rio Tinto utilized its Seed Set to train the predictive coding system were due no later than April 24, 2015. Vale is now raising stale claims and cloaking them in the guise of issues with Rio Tinto's "training" of the predictive coding system. The Court should not be fooled. Vale's complaints are late in the game and should they be entertained, will significantly hamper Rio Tinto's ability to comply with the Court ordered 95% substantial completion date of June 30, 2015 (an order that Vale advanced and strongly advocated for). This is nothing more than a manufactured dispute to both prejudice Rio Tinto's ability to comply with that order and distract from Vale's failure to make any progress with respect to its own document production in this case.

While Rio Tinto has and will continue to meet and confer with Vale in an effort to resolve their concerns regarding the predictive coding training process, including by making its own expert available to Vale, Vale's ongoing attempts to hamstring Rio Tinto's good faith efforts to meet the discovery deadlines in this case must come to an end. Rio Tinto has and will continue to comply with the spirit and letter of the parties' ESI protocol, discovery requests, and the Predictive Coding Protocol. But Vale must be held to the same standard and it should not be allowed to conjure false distractions that take away from Rio Tinto's ability to meet the Court ordered deadlines in this case.

### b. **Vale's Third Document Requests**

#### i. *Vale's Position*

Rio Tinto has stonewalled in response to Vale's Third Request for Documents. That Request is directed to Rio Tinto's new theory of injury articulated for the first time in March 2015 – one year after this lawsuit was first filed. In short, in response to Defendants' statute of limitations argument on its motion to dismiss, Rio Tinto abandoned the claim in its Amended Complaint that it suffered RICO injury when the Guinean Government took Simandou from it in 2008 and awarded Simandou to BSGR. It admitted that its 2008 loss of Simandou was *not* caused by a pattern of racketeering since "not even one predicate act . . . occurred before December 2008." (Dk. 209 at 5.) Instead, it argued for the first time a theory that was not in its Amended Complaint that it suffered an independent injury when "in April 2011 . . . [Rio Tinto] .

Hon. Andrew J. Peck, p. 7

. . relinquish[ed] its claims to Blocks 1 and 2 as part of a settlement with the Guinean Government." (*Id.* at 1-2.)

Vale's Third Requests, served April 9, 2015, seek relevant discovery on this new theory of injury. Vale contends that Rio Tinto's attempt to rewrite its complaint is in vain. But, unless and until Defendants' motion is granted, Vale must assume that it will have to go to trial on Plaintiff's new theory that "Rio Tinto's April 2011 Settlement with the Government of Guinea Was an Independent Injury That Resulted from a Separate Set of Predicate Acts" apart from Rio Tinto's 2008 loss of Blocks 1 and 2. (Dk. 209 at 12.) The requested documents are critical to Vale's defense of showing, *inter alia*: (1) that the Settlement Agreement did not harm Rio Tinto, but in fact benefited Rio Tinto, and (2) that no predicate act by Vale caused Rio Tinto to enter into the Settlement Agreement.

Rio Tinto's only objections are to relevance. It cannot claim burden. And, given Rio Tinto's bait-and-switch, it does not claim the Third Request is served too late.[6] In any event, here is what the Amended Complaint says about the 2008 and early 2009 loss of Simandou (the time-barred RICO injury), and the new alleged 2011 Settlement Agreement injury:

<u>2008 and Early 2009 Loss of Simandou:</u>

- "This is a case about the theft of Rio Tinto's valuable mining rights by the Defendants." AC ¶ 1.

- "The result of Defendants' scheme was a June 2009 official statement from Thiam, on behalf of the Government of Guinea, that confirmed the mining rights for Simandou Blocks 1 and 2, previously held by Rio Tinto, were now BSGR and Steinmetz's." AC ¶ 13.

- "[O]n July 28, 2008, Guinea had issued a decree purporting to change Rio Tinto's property rights to those of an exploration permit holder." AC ¶ 77.

- "On December 9, 2008, the Guinean Government sent a letter to Rio Tinto indicating that it was rescinding Rio Tinto's rights to Simandou's Blocks 1 and 2. On December 11, 2008, it was publicly announced that the Guinean Government was awarding exploration licenses for those same blocks to BSGR Guinea." AC ¶ 92.

- "In an attempt to legitimize the award of Blocks 1 and 2 to BSGR, Defendant Thiam as the Minister of Mines sent Rio Tinto a letter on February 29, 2009 purporting to officially rescind Rio Tinto's rights to Blocks 1 and 2." AC ¶ 98.

- "The Government of Guinea officially rescinded Rio Tinto's rights to Blocks 1 and 2 in 2009." AC ¶ 148.

---

[6] As noted in the parties' last joint letter, "[o]n May 1, 2015, Rio Tinto responded to Vale's Third Request for the Production of Documents, objecting to several of the requests. The parties . . . agreed to meet and confer based on Rio Tinto's agreement that it will not argue that it has suffered prejudice as a result of Vale's not raising at this conference issues regarding Rio Tinto's failure to produce pursuant to that request." (Dk. 246 at 19 n.12.)

Hon. Andrew J. Peck, p. 8

New Alleged Settlement Agreement Injury:

- Nothing

The relevance is manifest. Vale must conduct discovery on the assumption that the motion to dismiss will be denied and that Rio Tinto will be free to follow the theories in its opposition. In the opposition to the motion to dismiss, Rio Tinto argued that it was forced to enter into the 2011 Settlement Agreement and to release its claim for damages against Guinea based on a purported "campaign of bribery and threats to Rio Tinto's remaining mining rights to Simandou Blocks 3 and 4" by Thiam, which "left Rio Tinto with no alternative but to relinquish its claims to Blocks 1 and 2 as part of a settlement with the Guinean Government." (Dk. 209 at 2; *see, e.g., id.* at 4 ("Thiam, in exchange for bribes, took to the media to conceal the existence of the RICO Enterprise and to threaten Rio Tinto with the loss of its remaining rights if Rio Tinto continued to assert its rights to Blocks 1 and 2.").) In fact, Rio Tinto paid $700 million to the Government and agreed to release any claim for damages against Guinea not because of statements from Thiam but because it lost little in the Settlement Agreement and it gained much. Rio Tinto lost its Concession to all of Simandou (Blocks 1-4) in July 2008 as a result of its failure to develop the Concession and pursuant to the July 2008 decree referenced in the Settlement Agreement. Settlement Agreement (Dk. 210-1) at 3 ("A presidential decree was issued on 28 July 2008 and notified to Simfer [Rio Tinto] on 30 July 2008, ordering the withdrawal of the Concession (the 'Withdrawal Decree') and stating that Simfer retained the rights of an exploration permit holder and would be granted a mining concession to mine iron ore at Simandou pursuant to the Mining Code.") Thus, it did not give up anything of value when it released Guinea in connection with Simandou – the value already had been lost and Rio Tinto would have had no claim against Guinea. Not only did Rio Tinto not lose anything – it gained. The 2008 actions of the Guinean Government stripped Rio Tinto of all of its rights to Simandou – both Blocks 1 and 2 and Blocks 3 and 4. The Settlement Agreement provided a benefit to Rio Tinto by giving it Simandou Blocks 3 and 4 and providing it with a new Concession Decree "granting to Simfer a mining concession [covering Blocks 3 and 4] (the "Modified Concession") for the exploration and exploitation of iron ore within the Perimeter of the Modified Concession" and "confirm[ing] that the Modified Concession . . . restores to Simfer all mining rights as set out in the Convention and Articles 84 and 85 of the Mining Code." Settlement Agreement § 2.1.

Moreover, not only did Rio Tinto obtain the rights to Simandou Blocks 3 and 4 through the Settlement Agreement, it also obtained a release from the Government of Guinea to any challenge that the Government of Guinea would make to a joint venture Rio Tinto had signed with the Chinese mining company (Chinalco) regarding Simandou Blocks 3 and 4. *See* Settlement Agreement at 3, 16, 18. The value of this release is difficult to underestimate – and impossible to calculate without evidence.

The relationship between Rio Tinto and Chinalco, its largest shareholder, had been troubled. In response to the BHP takeover, Chinalco purchased a 9% stake in Rio Tinto for $14 billion, becoming Rio Tinto's biggest single shareholder.[7] It was contemplated that Chinalco would later double its investment, but a few months later in June 2009 (after Rio Tinto moved toward a friendly deal with BHP), Rio Tinto terminated negotiations with Chinalco and paid a

---

[7] Dexter Roberts and Chi-Chu Tschang, *Why Chinalco's Buying Into Rio Tinto*, Bloomberg Business, Feb. 5, 2008.

Hon. Andrew J. Peck, p. 9

$195 million breakup fee.[8]  The next month, four Rio Tinto employees were detained in China on allegations of stealing state secrets (a capital offense); in August they were formally charged with obtaining trade secrets and commercial bribery.[9]  In March 2010, Rio Tinto moved to repair its relationship with its largest shareholder by entering into negotiations with Chinalco for a Simandou joint venture.[10]  The joint venture was of critical importance.

The Settlement Agreement recites that "[t]he State considers that this agreement [between Rio Tinto and Chalco] should have been approved in advance pursuant to Article 62 of the Mining Code" (Settlement Agreement  at 3), which required that "[a]ny contract or agreement" for the transfer of "all or some of the rights and obligations arising out of a mining title, must receive prior approval from the Minister of Mines" and "[s]uch authorization is issued by decree when concessions are involved."  (1995 Mining Code, Art. 62 (translated).)  In exchange for Rio Tinto's "Concessions" under the Settlement, the Government "expressly approve[d] all terms and conditions of the agreements signed by Rio Tinto and Chalco" (*id.* § 2.5) and "[c]ure[d] all defaults as may exist as of the date of its signature of Simfer or of any Rio Tinto or Chalco group company in relation to the Convention and/or the Mining Code."  (*Id.* § 6.)

Indeed, Chalco claimed in an SEC filing that it "Chalco's participation in the cooperative development, [and] the special political and economic influence of China in West Africa ***brought about*** the conclusion of the Settlement Agreement dated 22 April 2011 between the Republic of Guinea and Rio Tinto plc" in which "[t]he president of Guinea officially signed a government decree to grant the mining rights of Simandou Blocks 3 & 4 to Simfer Jersey of Rio Tinto plc."[11]

Thus, the requested documents are highly relevant.  Not only do they go to core issues in the case (RICO injury and damages), but there is every reason to believe that – if Rio Tinto complies with its discovery obligations – the requested documents will be exculpatory.  No wonder Rio Tinto is resisting so much.

**Request 62: All Documents exchanged with any Third Party concerning the April 22, 2011 Settlement Agreement, including but not limited to any and all correspondence with any insurers regarding the April 22, 2011 Settlement Agreement and any and all correspondence with any of Rio Tinto's internal or external auditors regarding the April 22, 2011 Settlement Agreement.**

---

[8] David Barboza and Michael Wines, *Mining Giant Scraps China Deal*, New York Times, June 4, 2009; Terry Macalister, *Rio's deal with Chinalco Collapses*, The Guardian, June 4, 2009; Dana Cimilluca, Shai Oster, Amy Or, *Rio Tinto Scuttles Its Deal with Chinalco*, The Wall Street Journal, June 5, 2009.

[9] Jamil Anderlini, *China official arrests Rio employees*, Financial Times, August 12, 2009.

[10] Lyndal McFarland, Ian McDonald, and Chuin-Wei Yap, *Rio Tinto, Chinalco in Iro-Ore Venture*, The Wall Street Journal, March 19, 2010; Rio Tinto March 19, 2010 Press Release, *available at* http://www.riotinto.com/media/media-releases-237_1455.aspx.

[11] SEC Form 6-K, Aluminum Corporation of China Limited., Nov. 16, 2010 (emphasis added).  The filing details some of the considerations involved in the decision to enter into the Settlement, including that "the mining rights of Blocks 3 & 4 owned by Rio Tinto plc would expire on 24 February 2011 and there was risk with the extension of mining rights of Rio Tinto plc."  *Id.*

Hon. Andrew J. Peck, p. 10

Rio Tinto has expressly stated, twice, that its objection to this request is not based on burden, but on relevance. Vale offered to limit this request to limited categories of third parties, but Rio Tinto rebuffed that attempt at compromise. It rejected Vale's proposed limiting and refused to indicate what third parties, if any, it believed would render this request either overbroad or burdensome. It also rejected Vale's proposal to limit the time period.

The request is directed to several categories of third parties. First is communications with Rio Tinto's joint venture partners – Chinalco, Chalco, and IFC. Rio Tinto's negotiations with Chinalco, for example, began prior to the Settlement Agreement (the Memorandum of Understanding was announced in 2010) but were not completed until the joint venture was finalized in 2012, after the April 2011 Settlement Agreement. One of the key benefits Rio Tinto negotiated in the Settlement Agreement was that Guinea would release any challenges to the Rio Tinto-Chalco joint venture based on the fact that it did not receive prior approval from that government. Communications between Rio Tinto and Chinalco (or Chalco) regarding the Settlement thus would be relevant to the decision of Rio Tinto to enter the Settlement Agreement (whether it was because, as Rio Tinto claims, Thiam made threats to Simandou Blocks 1 and 2), the value Rio Tinto received from the Settlement Agreement, and the damages, if any, it suffered.

The next category is communications with Rio Tinto's internal and external auditors. A Settlement Agreement is an asset. Before it is signed, the prospective counterparties must engage in an accounting analysis to see whether there is an expense or revenue that is estimable and probable and must record that expense or revenue. And the internal and external auditors would inquire about that gain or loss. And, after the Agreement was signed, it would have fallen to the finance staff at Rio Tinto and to the internal and external auditors to measure whether there was an expense or revenue from the Agreement itself and how to account for it. Given that damages is an issue and that the Settlement Agreement is the principal RICO injury asserted by Rio Tinto, such communications clearly are relevant.

The third category are communications with any insurer for Rio Tinto regarding the Settlement Agreement. Vale does not know whether there were any such communications. But, from the Settlement Agreement itself, it is apparent that the Guinean Government believed it had a claim against Rio Tinto and Rio Tinto may have believed it had a claim against Guinea. If insurance even arguably covered those claims and there were communications with the insurers about the claims, such documents would be relevant to measuring damages and to determining the issue of causation.

The final category is Rio Tinto's consultants and advisors. These communications are again relevant to understanding why Rio Tinto decided to enter into the Settlement Agreement and how it understood the costs and benefits of doing so. Communications with advisors Rio Tinto's financial, political, and business advisors and consultants on the merits and effect of the proposed agreement should be produced.

**Request 63:** **All Documents provided by Simfer to the Government of Guinea pursuant to Section 1.2 of the April 22, 2011 Settlement Agreement, including but not limited to the additional geological, geophysical and drilling information to allow the Government of Guinea to better understand the reserves reported within the Modified**

Hon. Andrew J. Peck, p. 11

**Concession Area, the business plan describing the proposed development of the Modified Concession Area, the draft timetable for completion of the different development activities proposed within the Modified Concession Area, the additional technical information concerning the mining operations indicating the progress made as of November 30, 2011, and the additional technical information concerning the main infrastructures (railway and port) indicating the progress made as of September 30, 2012.**

Vale claims, and the investigative reports provided by Rio Tinto support, that Rio Tinto lost the rights to Simandou because Guinea believed Rio Tinto failed to meet its obligations to develop those blocks, and not because of any conduct by Vale. That position is supported by the Settlement Agreement itself, which references a discrete set of relevant documents further evidencing the point. If that is so, it would be a defense to the claim that the alleged racketeering conspiracy caused Rio Tinto to lose Simandou (whether in 2008 or 2011) and to the claim that Rio Tinto lost value by entering into the Settlement Agreement or was caused to enter into the Settlement Agreement by the defendants.

The recitals to the Settlement Agreement make this pellucid. They recite, for example, that:

> On 29 December 2008, Simfer [Rio Tinto] submitted a feasibility study to the State subject to the confirmation of its rights and to additional studies to be carried out. On 19 August 2010, Simfer submitted an addendum to the feasibility study of December 2008, in which, subject to the final confirmation of the mining rights, it concluded that the Project was feasible. Further communications were then exchanged between the State and Simfer, confirming their disagreement over a number of points relating, in particular, to the nature of the feasibility study and addendum lodged, contractual deadlines applicable to the Project and which party should bear responsibility for any delays affecting those deadlines.

Settlement Agreement at 4.

Accordingly, Section 1.2 of the Settlement Agreement states that Rio Tinto's "Concessions" – i.e. its consideration in exchange for the Government's agreement – will include the submission of "additional information and studies to the State in such detail and form as, in Simfer' opinion, will allow it to achieve the Date of First Commercial Production" of June 30, 2015 and further to Rio Tinto's commitment to "make every reasonable effort to deliver initial mine production prior to 31 December 2014." Settlement Agreement § 1.2.

The relevance of these materials is to show that the Settlement Agreement was caused by, and sought to remedy, Rio Tinto's failure to meet its obligations to develop Simandou. It was not caused by any predicate act of Vale. These documents are also relevant to showing the importance Rio Tinto place on obtaining rights to Blocks 3 and 4 and demonstrating that the Settlement Agreement constituted a net gain, not a loss, to Rio Tinto.

Rio Tinto has outright refused to consider producing documents in response to this request, claiming that it relates to Blocks 3 and 4, not the Blocks allegedly stolen by Vale. This misses the point. Rio Tinto has put the Settlement squarely at issue. If that Settlement concerns

Hon. Andrew J. Peck, p. 12

Blocks 3 and 4, then Rio Tinto has by its own argument made Blocks 3 and 4 relevant. Rio Tinto cannot have it both ways: it cannot rely on the Settlement Agreement for its theory of RICO injury and for damages and then seek to excise from discovery all documents relating to a key feature of that Settlement Agreement.

> ii.   _Rio Tinto's Position_

**_Rio Tinto Already has Agreed to Produce the Documents Vale Needs Related to the April 2011 Settlement Agreement with the Guinean Government._** In April 2011, after Defendants' extensive campaign of bribery and threats to Rio Tinto's remaining mining rights to Simandou Blocks 3 and 4 left Rio Tinto with no alternative, Rio Tinto relinquished its claims to Blocks 1 and 2 as part of a settlement with the Guinean Government.

Rio Tinto agrees that Vale is entitled to test that allegation, in particular Rio Tinto's motivations for entering into the settlement agreement. So Rio Tinto has agreed to produce documents in response to eight of the (at least) ten requests Vale has served related to the April 2011 settlement agreement. This includes broad requests that call for "All Documents relating to Rio Tinto's negotiations with the Government of Guinea regarding Simandou…[and] Rio Tinto's settlement with the Government of Guinea," [Request No. 40] "All Documents referring or relating to the determination or calculation of the settlement amount…including all documents concerning the basis for Rio Tinto making a payment to the Government of Guinea as part of the April 22, 2011 Settlement Agreement," [Request No. 64] and "All Documents concerning the benefit and/or cost to Rio Tinto of entering into the April 22, 2011 Settlement Agreement" [Request No. 61]. As these requests demonstrate, Vale will receive the documents it needs to both explore Rio Tinto's motivations for entering into the April 2011 Settlement Agreement and Rio Tinto's damages theory to the extent it relates to the settlement agreement.

Vale's additional requests on the settlement agreement are irrelevant and unduly burdensome. Vale Request No. 62 seeks "All Documents exchanged with any Third Party concerning the April 22, 2011 Settlement Agreement." Read literally, this would call for every media release, every email, and every document exchanged with any third party (including auditors, advisors, attorneys, and joint venture partners) that mention, refer or speak to the April 22, 2011 Settlement Agreement. Similarly, Vale Request No. 63 calls for documents that don't even touch on Rio Tinto's motivations for entering into the settlement agreement or the status of rights to Blocks 1 and 2. Instead, it seeks documents related only to operational and commercial aspects of Blocks 3 and 4, including Rio Tinto's commercial production date, planned development, technical studies, and investment decisions with respect to Blocks 3 and 4. None of this is relevant to what this case is about, namely the theft of Rio Tinto's Blocks 1 and 2. To the extent Rio Tinto was, as Vale claims, stripped of its rights to Blocks 1 and 2 because of an alleged failure to develop those blocks – an allegation that Rio Tinto disputes – it is hard to see how documents detailing Rio Tinto's development plans for Blocks 3 and 4 (years after the taking of Blocks 1 and 2) speak to that claim. Indeed, any failures of Rio Tinto to comply with the terms of the settlement agreement would affect only its rights to Blocks 3 and 4, _not_ Blocks 1 and 2 that are the subject of this litigation. In addition, Vale and Rio Tinto long ago agreed that their document requests did not cover day-to-day business operations. Requests 62 and 63 violate that long-standing agreement. Finally, Requests 62 and 63 must be considered in light of Vale's numerous other requests related to the April 2011 settlement, not to mention Vale's

Hon. Andrew J. Peck, p. 13

requests related to Rio Tinto's valuation of Simandou all of which already speak to Rio Tinto's damages in this case. Rio Tinto therefore respectfully requests that the Court strike Vale Request No. 62 as irrelevant and overbroad.

### c.  **Rio Tinto's Custodians for Vale's Third Document Requests**

#### i.  *Vale's Position*

Rio Tinto and Vale reached agreement on custodians in January 2015, prior to Rio Tinto's new theory of injury in March 2015. In addition to serving appropriate document requests, Vale responded to Rio Tinto's new damages theory by serving an interrogatory on April 9, 2015 seeking the identifies of persons "with knowledge regarding Rio Tinto's negotiation of, or decision to enter into, the April 22, 2011 Settlement Agreement." (Vale's Interrogatory No. 24.) Plaintiff responded by purporting to identify "the key individuals involved with negotiating and deciding to enter into the April 22, 2011 Settlement Agreement: 1. Alan Davies 2. Warrick Ranson 3. Phil Edmands 4. Benoit Palmer 5. Herbert Smith (Stephan Brabant)." Two of these witnesses, Alan Davies and Phil Edmands, were included in the January 2015 list of custodians. Two – Warrick Ranson (CCO & VP International Operations; GM Expansion Studies) and Benoit Palmer (Senior Corporate Counsel, Simandou Project) – were not, because Rio Tinto had not articulated its new theory of injury and they were not identified in any interrogatory responses. Vale seeks two forms of relief.

*First*, Vale has asked that Rio Tinto search the files of two of these key custodians, Warrick Ranson and Benoit Palmer, for documents responsive to Vale's Third Requests, in addition to its previously agreed custodians. This is appropriate given Rio Tinto's bait-and-switch: it concealed its new theory of injury until after the parties agreed on the list of custodians. Moreover, the burden is slight: Rio Tinto's interrogatory response indicates that there are only five "key individuals" on this topic, one of whom is a third party.

The only objection Rio Tinto has articulated is that it will produce documents from Alan Davies and Phil Edmands, and those individuals were superiors to the requested custodians. Discovery should not work that way – Rio Tinto claims it lost "billions of dollars" in this lawsuit. It is not much to ask that it produce documents from more than two custodians on its exclusive theory of injury. And, Rio Tinto should not be able unilaterally to select the custodians. (Indeed, there is reason to be suspect about Rio Tinto's selection. Back in December, Rio Tinto represented to Vale that two custodians were among the "core" team members involved in the BHP takeover defense (Peter Cunningham and Rowena Albones), but they have proved to be marginal at best: of the roughly 60,000 purportedly responsive BHP documents Plaintiff has produced to date, less than 4% (not 40%) are communications to or from either of the two custodians Plaintiff represented were central to this issue, *see* Dk. 246 at 21, a shortcoming that was not, contrary to Rio Tinto's counsel's statement, due to "deduping" (May 8, 2015 Tr. 32:15).[12]) Assuming Rio Tinto's interrogatory response concerning "key" witnesses

---

[12] The statistics provided are based on the number of parent email communications to and from the custodians, not the custodian metadata field, which could be affected by de-duping.

Hon. Andrew J. Peck, p. 14

was made in good faith, these employees played a key role and will have unique documents not in the possession of their superiors.[13]

*Second*, Plaintiff should be ordered to serve a proper response to Vale's Interrogatory 24 that is not limited to purportedly "key individuals." Plaintiff's objection to the request for "all Persons with knowledge" is not well taken, given that its own interrogatories to Vale call for it to identify "every Person," in response to which Vale has identified nearly 100 individuals in response to a single interrogatory. Moreover – and particularly in light of past experience – Vale should not be forced to rely on Plaintiff's representations as to which potential witnesses are "key" or "core."

## ii. Rio Tinto's Position

**Vale Does Not Need, Nor is it Entitled to, Add Two Additional Rio Tinto Custodians.** The Court should deny Vale's request to add two more custodians to Rio Tinto's custodian group, which already consists of 25 custodians. The custodians Vale seeks to add relate only to the April 2011 settlement agreement and are cumulative of other custodians from which Rio Tinto already has collected. Specifically, Rio Tinto has already collected documents from Messrs. Davies and Edmands, both of whom were directly involved in the company's negotiations surrounding the April 2011 Settlement Agreement. The two additional custodians that Vale seeks to add here will not have any material information that is not duplicative of that already being produced from the files of Messrs. Davies and Edmands under the parties' existing agreement. Vale's request is therefore unnecessarily cumulative, and it would impose an undue burden on Rio Tinto.

Vale's request to add these two custodians also runs afoul of a prior agreement of the parties on this issue. When Vale and Rio Tinto reached agreement with respect to the 25 Rio Tinto custodians, Vale had already served – and Rio Tinto had already agreed to produce documents in response to – request No. 40, which calls for "All Documents relating to Rio Tinto's negotiations with the Government of Guinea from December 2008 to April 17, 2014 regarding Simandou, including but not limited to…Rio Tinto's settlement with the Government of Guinea on April 22, 2011 that allowed it to retain Simandou Blocks 3 and 4." Thus, the parties reached an agreement with respect to the appropriate number of custodians with this request in mind. Vale should not now be permitted to renegotiate the terms of that agreement merely by serving additional discovery requests related to the April 2011 settlement agreement (the vast majority of which are duplicative of Request No. 40 anyway).

Finally, Vale's request that Rio Tinto add custodians is particularly inappropriate in light of the fact that Vale recently revealed it does not have documents from eight (almost 40%) of its agreed-upon custodians. To ask Rio Tinto to *add* custodians at a time when Vale unilaterally *subtracted* eight of its custodians through its document destruction is unseemly, to say the least. Mere fairness and proportionally dictate that Vale's request must be rejected.

---

[13] To the extent Rio Tinto objects on the basis of burden, Vale has offered to limit the search and review of these custodians' two files to documents responsive to Vale's Third Requests only, and would agree to the use of any reasonable means, including but not limited to predictive coding or key terms, to identify those documents.

Hon. Andrew J. Peck, p. 15

### d. Rio Tinto's Oral Litigation Hold

#### i. *Vale's Position*

At the April 8 conference, at Plaintiff's urging (April 8, 2015 Tr. 4:2), the Court ordered a reciprocal production "of both sides of litigation hold material" for "[a]ny lit hold for civil or criminal matters arising out of the Simandou situation" (*id.* at 6:10, 7:6-7). The parties agreed to mutually exchange notices on April 17. But when Vale received Rio Tinto's production, it was facially deficient. Rio Tinto improperly redacted virtually all of the relevant text from the litigation holds it produced, including its description of the Action, the notice's definition of "documents," and the categories of documents to be preserved. Moreover, Plaintiff admitted that Rio Tinto's purported document retention efforts had consisted in large part of "orally advis[ing]" unspecified employees on unspecified dates that documents should be retained, and conducting a vague "collect[ion]" of unspecified "relevant documents" on an unknown date. (April 29, 2015 Letter from E. Lyttle to L. Liman at 2-3.) As Vale informed Plaintiff, that information is highly relevant (and troubling) both with respect to Rio Tinto's document retention efforts and with respect to the critical question in this case of when Rio Tinto first anticipated litigation. *See, e.g.*, *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03 Civ. 5560(RMB)(HBP), 2006 WL 1520227, at *1 (S.D.N.Y. June 1, 2006) ("[I]f plaintiff's document retention notices are patently deficient or inadequate in some other respect, they might support a negative inference concerning the merits of plaintiff's claims.").

Prior to the last status conference, Vale raised with Rio Tinto the need to disclose the recipients, timing, and content of its purported oral hold. As we told Plaintiff: "We do not intend to raise the litigation hold issue, on the understanding that both sides will be producing, this week complete, recipient lists for their holds, including Rio Tinto's oral hold, and that Rio Tinto will also be providing the content of its oral hold this week." (May 6, 2015 Email from M. Karlan to K. Forst.) Plaintiff agreed, and Vale therefore did not raise the issue.

When the time came to exchange that information, however, Plaintiff's response was yet again deficient: Rio Tinto stated only that "in connection with its 2010 investigation, Rio Tinto identified and advised the following [16] key employees involved with Simandou and the Vale-Rio Tinto negotiations of the need to continue retaining documents related to Simandou." (May 12, 2015 Letter from E. Lyttle to L. Liman.) But this case involves far more than Simandou. Among other things, this response fails to identify the date of the purported oral hold and the scope of documents subject to that instruction. It does not disclose, for example, whether documents relevant to several key topics in this litigation, including the BHP takeover attempt, Rio Tinto's relationship with Chinalco, Chalco, and IFC, not to mention Vale and BSGR, were retained.[14]

---

[14] For example, Rio Tinto's 2014 hold instructed recipients to preserve documents concerning, *inter alia*, "(d) information shared between Rio Tinto and Vale in the course of their negotiations over Simandou . . . (f) attempts by BSGR to acquire mining rights or exploration permits to Simandou or surrounding lands; . . . (k) the International Finance Corporation's *(IFC)* ownership interest in Simler, S.A. and any involvement by the IFC in developing Simandou mining operations; (l) the Aluminium Corporation of China *(China/co)* and Aluminium Corporation of China Limited *(Chalco)* ownership interests in various Rio Tinto entities involved in the Simandou project and any involvement by Chinalco or Chalco in developing Simandou mining operations; (m) Vale's acquisition of a majority

Hon. Andrew J. Peck, p. 16

Rio Tinto should be ordered to immediately disclose the full contents and timing of its purported oral hold. If Rio Tinto cannot provide this information, Vale reserves its right to argue that it has failed to preserve relevant evidence and that sanctions, including for example an adverse inference, would be warranted.[15]

### ii.   *Rio Tinto's Position*

***Vale is Not Entitled to Additional Information Regarding Rio Tinto's 2010 Verbal Preservation Notice.*** Vale's allegations regarding Rio Tinto's 2010 verbal preservation notice are nothing more than blatant retaliation for Rio Tinto raising valid concerns about Vale's document destruction in this case. Unlike Vale, Rio Tinto has its documents. The issue ends there. Indeed, Vale failed to raise any issues with Rio Tinto regarding the form and content of its 2010 verbal preservation disclosures (exchanged more than two weeks ago) until *after* Rio Tinto confirmed to Vale that it would be updating the Court on Vale's own document destruction problems. It was only then that Vale claimed that Rio Tinto's disclosures regarding its 2010 verbal preservation notices were inadequate. The Court should not allow this contrived dispute to distract it from Vale's own very real and very significant wholesale document destruction in this case.

In any event, Vale's claims are meritless. In accordance with the parties' agreement, Rio Tinto disclosed both the content of its verbal preservation notice (noting that all recipients were told to "continue retaining documents related to Simandou") and the sixteen people who received that notice. Vale is entitled to nothing more. Indeed, the case law is clear that absent a showing of spoliation – which Vale has not and cannot show – Vale is only entitled to these non-privileged facts regarding Rio Tinto's document preservation efforts. *See In re eBay Seller Antitrust Litig.*, No. C 07-01882 JF (RS), 2007 WL 2852364, at *2 (N.D. Cal. Oct. 2, 2007) (where there was no showing of spoliation, plaintiffs "should not inquire specifically into how the [Document Retention Notices] were worded"); *Cannata v. Wyndham Worldwide Corp.*, No. 2:10-CV-00068-PMP, 2011 WL 3495987, at *2 (D. Nev. Aug. 10, 2011) ("In general, unless spoliation is at issue, a litigation hold letter is not discoverable, particularly where it is shown that the letter includes material protected by the attorney-client privilege or the work product doctrine."); *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) ("Although in general hold letters are privileged, the prevailing view, which the Court adopts, is that when spoliation occurs the letters are discoverable."). Rio Tinto therefore respectfully requests the Court deny Vale's request for additional information regarding Rio Tinto's 2010 verbal preservation notice.

### e.   **Status of Rio Tinto's Document Production**

### i.   *Vale's Position*

---

stake in BSG Resources (Guinea) Limited; (n) Rio Tinto's settlement agreement with the Guinean government." (RT0362613.)

[15] Vale similarly reserves it rights with respect to the purported "collection" of documents Rio Tinto claims to have undertaken in connection with a potential "conciliation" or "dispute" with the Government of Guinea, which it says was not done pursuant to a litigation hold. (See April 29, 2015 Letter from E. Lyttle to L. Liman.)

Hon. Andrew J. Peck, p. 17

Rio Tinto informed Vale today that it intended to include an update on the status of its document production. For the reasons discussed above, Vale has serious concerns about the adequacy of the search leading to that production and has requested that Rio Tinto be ordered to take appropriate steps to ensure a valid search process.

### ii. *Rio Tinto's Position*

Rio Tinto's productions to date dwarf those made by Vale or any other defendant, with Rio Tinto having produced more than 69,000 documents to date (almost 12 times the total number of documents produced by all the other defendants combined). In fact, Rio Tinto made another rolling production yesterday. That *one production alone* included more documents than Vale has produced *to date*.

## II.    Rio Tinto's Letters to Its Investigators

### i. *Vale's Position*

Shortly before this letter was filed on May 28, and only because Vale asked for it, Rio Tinto produced two responses it received to letters sent to investigative firms, dated May 22 and May 25. The remainder of the responses are due according to Rio Tinto's unilaterally set deadline on June 1. In the two letters, the firms decline to produce documents and information to Rio Tinto for transmittal to Vale.

The response is not surprising. Rio Tinto engineered it. After Your Honor ordered Rio Tinto to write "a clean letter" to the investigative firms to formally request that they disclose the names of their confidential sources and before it sent its final letter, Rio Tinto shared two drafts with Vale. The Court's intention was that, if Rio Tinto made a genuine demand on the firms that it wanted the documents and information for its use and employed the leverage that it possessed with those firms, the issue would go away. Rio Tinto's intention was the opposite as we will show in our papers.

Rio Tinto already has taken the public position that it is not entitled to the documents and information and does not intend to seek it. In light of the communication Rio Tinto's counsel has had with the investigative firms dating back to March, it is clear that the firms do not believe Rio Tinto wants their compliance. A manufactured answer cannot substitute for judicial decision. Vale's motion is now ripe (May 8, 2015 Tr. 26:20-21 (directing Rio Tinto to "provide [the letter] and any responses to Mr. Liman," after which Vale could "make[] another motion for me to interpret [the] contracts.") and accordingly, and because of the numerous prejudicial delays caused by Rio Tinto, Vale intends to move early next week for an order compelling Rio Tinto to produce the documents and information in its possession, custody or control.

### ii. *Rio Tinto's Position*

Rio Tinto and Vale jointly prepared a form letter to request the names of confidential sources that complied with this Court's May 8, 2015 order. At Vale's request, Rio Tinto expanded that letter to include a request for materials responsive to Vale's pending Hague Convention requests. Rio Tinto requested that all investigators provide a written response no later than Monday, June 1, 2015. To date, Rio Tinto has received responses from two firms, BTG and

Hon. Andrew J. Peck, p. 18

ERA, copies of which have been provided to Vale.  Rio Tinto will bring copies of those responses, and any additional responses it receives, to Monday's status conference.

Rio Tinto is also pleased to report that one of its investigators, Mr. Tidiane Touré from Aeneas, made what he believes to be a complete production of documents in response to Vale's requests.

### III.    Discovery from Defendant Vale

#### a.    Vale's Document Destruction

##### i.    *Rio Tinto's Position*

At the May 8, 2015 status conference, the Court ordered Vale to provide written responses to Questions 1-8, 10, 13, 16, and 17 in Rio Tinto's April 20, 2015 letter, which was aimed at uncovering more information about whether, when, and why Vale destroyed key custodians' documents despite having an obligation to preserve them.  *See* 5/8/15 Hr'g Tr. 9:9-11:9.  Although still lacking in meaningful specifics, Vale's written responses to Rio Tinto's questions have now substantiated Rio Tinto's concerns:  Vale had *both* the obligation *and* the opportunity to preserve documents from at least three principal custodians —including Jose Andre de Castro Alves who engineered, oversaw, and managed Vale's Simandou Project—*yet chose to destroy those documents instead*.  Specifically, we now know that Vale imposed a litigation hold on April 19, 2013 in response to an SDNY and U.S. DOJ criminal investigation that concerned the same set of events and issues (*e.g.*, instructing employees to retain documents concerning Vale's relationship with BSGR, due diligence done by VBG in Guinea, communications with BSGR or the Government of Guinea, and payments made to the Government of Guinea or in connection with the Simandou project) that underlie this lawsuit—and did so *before* destroying backup tapes containing documents from custodians Paul Antaki, Jose Andre de Castro Alves, and Bruno Perrotta.[16]

It is well-settled in this jurisdiction that, once a litigation hold is in place, an employer has an affirmative duty to preserve backup tapes to "eliminate[] the possibility that such tapes will be inadvertently recycled."  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432-34 (S.D.N.Y. 2004); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of 'key players' to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available.  This exception applies to *all* backup tapes.").  Where that duty is breached, a party is entitled to additional depositions for the "purpose of inquiring into issues raised by the destruction of evidence."  *Zubulake*, 220 F.R.D. at 222 ("[T]here is no question that emails that UBS should have produced to Zubulake were destroyed by UBS.  That being so, UBS must bear Zubulake's costs for re-deposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence and any newly discovered e-mails.").

---

[16]  Paul Antaki left Vale in July 2012, Jose Andre de Castro Alves left Vale in August 2012, and Bruno Perrotta left Vale in March 2013.  Accordingly, per Vale's reported policy, their backup tapes would have been destroyed in July 2013, August 2013, and March 2014, respectively.

Hon. Andrew J. Peck, p. 19

There can be no dispute that Messrs. Antaki, de Castro Alves, and Perrotta played critical roles in the events underlying this case and the SDNY/DOJ investigation, and consequently, had relevant custodial documents, at least before those documents were destroyed.  Vale itself has identified each custodian in its interrogatory responses as having knowledge and information critical to this case.[17]  Mr. de Castro Alves has additionally self-described his role at Vale, while employed there as General Manager of Geology, Mine, and Economic Evaluation, to be Vale's "representative in the JV between Vale and BSGR to develop the Simandou project in Guine[a]."[18]  It does not matter that Messrs. Antaki, de Castro Alves, and Perrotta had departed Vale before Vale issued its April 19, 2013 litigation hold.  All that matters, per settled law in this jurisdiction, is that Vale still had live backup tapes, containing documents from these individuals, intact and in its possession in April 2013, yet did not pull and preserve those tapes.  *See Zubulake*, 220 F.R.D. at 218.

These revelations may only be the tip of the iceberg when it comes to Vale's destruction of relevant documents, and raise important questions about that destruction:  for example, *who* in particular overwrote the relevant backup tapes after the litigation hold was in place; *why* were those tapes overwritten despite repeated notice to Vale that litigation was reasonably imminent; and *what* rationale could Vale offer for preserving *some* custodians' documents (like those belonging to Daniela Chimisso) and destroying others' (like those belonging to CEO Roger Agnelli, who masterminded the deal with BSGR).  Moreover, in light of the fact that Vale was on notice as of October 2011 that the Government of Guinea had launched an investigation into Vale's and BSGR's mining rights to Simandou[19] (held via their subsidiary, VBG, which Vale controlled), the apparent lack of an earlier litigation hold raises a host of questions in and of itself: *why* did Vale represent to Rio Tinto and the Court that it put a litigation hold in place "years earlier," *see* Dk. 234 at 17-18 n. 5, yet later retract that statement without reason or explanation;[20] and, taking Vale at its word, *how* can it explain *not* imposing a litigation hold as a result of the pending investigation and allowing documents belonging to key custodians like Roger Agnelli and Eduardo Ledsham (both of whom led the negotiations with BSGR/Steinmetz) to be destroyed in the immediately following months.  Vale's evolving answers and/or flat refusal to answer these questions give rise to grave concerns regarding the nature of its document destruction.

Because Vale appears to have breached its duty to preserve, Rio Tinto respectfully requests that the Court order Vale to make a 30(b)(6) witness available for deposition concerning, *e.g.*, Vale's policies, practices, and procedures, whether written or unwritten, formal or informal, with

---

[17]  For example, Vale identified Mr. de Castro Alves as a person (1) who had "oral or written communications with Rio Tinto regarding Simandou," (Interrog. No. 1); (2) "with knowledge relating to the matters alleged in the Complaint," (Interrog. No. 2); (3) "who had access to, accessed, received, or was provided with documents from the Rio Tinto Data Room or any Data Room Materials," (Interrog. No. 3); and (4) who had "oral or written communications or other interactions with" other Defendants regarding "Simandou, the Zogota Project, and/or the Vale-BSGR Transaction," (Interrog No. 4).

[18]  LinkedIn.com, https://www.linkedin.com/pub/jos%C3%A9-andr%C3%A9-de-castro-alves/4/528/b96 (last visited May 28, 2015).

[19]  *See e.g. Recommendation Concerning the Mining Titles and Mining Agreement Held by VBG*, Technical Committee for the Review of Mining Titles and Agreements (2014).

[20]  Indeed, Vale flatly refused to provide any information about its retraction this week during the parties' meet and confers.

Hon. Andrew J. Peck, p. 20

respect to the retention of documents, including but not limited to, the preservation of documents related to Simandou, and whether those policies, practices, and procedures were followed for the agreed-upon custodians in this case. *See Zubulake*, 220 F.R.D. at 222. In addition, in light of these missing documents, and the looming June 30 document production deadline, Rio Tinto has identified a partial replacement set of custodians as a first step in addressing the missing documents. *See* 5/8/15 Hr'g Tr. 14:16-18 ("If the other production shows that [potential alternates] had involvement and that any of the material still exists at Vale, we can revisit the issue."). Per the Court's instruction, these individuals had involvement (as evidenced by the fact that Vale itself identified them in its interrogatory responses and/or by sending them litigation hold notices) and are likely to have material still at Vale:

- Bruno Abreu: Administrative and Finance Manager (2006 to 2012). Mr. Abreu received Vale's 2014 litigation hold notice.

- Pedro Gutemberg: Director of Technology and Technical Assistance. Mr. Gutemberg received Vale's 2014 litigation hold notice and was identified in Vale's responses to Interrogatories Nos. 2 and 3.[21]

- Eduardo Pfiffer: General Manager of Market Intelligence. Mr. Pfiffer received Vale's 2014 litigation hold notice and was identified in Vale's responses to Interrogatories Nos. 2 and 3.

- Marcio Senne: Policy and Political Analysis Manager. Mr. Senne received Vale's 2013 and 2014 litigation hold notices and was identified in Vale's responses to Interrogatories Nos. 2 and 3.

Accordingly, Rio Tinto respectfully requests that the Court order Vale (i) to make a 30(b)(6) witness available for deposition concerning the above issues and (ii) to collect and produce documents from the above-listed custodians.

ii. *Vale's Position*

**Discovery on Discovery**. Rio Tinto's continued pursuit of this issue amounts to vexatious discovery about discovery that should come to an end. This is a non-issue – as Vale explained months ago.

At the April 8 conference, Vale explained that under its document retention policies, in the absence of a litigation hold, an employee's hard drive is overwritten upon their departure and backup tapes are overwritten after 12 months. (Apr. 8, 2015 Tr. 4:16-5:9.) As a result of those policies, Vale had not retained electronic custodian documents for custodians who had departed Vale over a year before Rio Tinto filed suit. There was no spoliation or intentional document destruction. Going further, Vale agreed to conduct diligence into whether there were other sources for documents of these individuals and to report to Plaintiff "whether there is anyone

---

[21] Interrogatory No. 2 asked Vale to "[i]dentify every Person . . . with knowledge relating to the matters alleged in the Complaint," and Interrogatory No. 3 asked Vale to "[i]dentify every Person . . . who had access to, accessed, received, or was provided with documents from the Rio Tinto Data Room or any Data Room Materials, and from whom they were provided."

Hon. Andrew J. Peck, p. 21

else whose documents should be searched" in addition to the 22 Vale custodians agreed upon. (*Id.* at 26:16-18.) Vale conducted extensive diligence, including reaching out to former employees and former Vale assistants. Based on those interviews, the only plausible additional custodian was Ricardo Saad, who worked exclusively in project implementation and had no involvement in the Rio Tinto or BSGR negotiations concerning Simandou until after the formation of the JV. Rio Tinto never requested his documents. Nonetheless, at the Court's behest and without objection, Vale added him as a custodian. As previously noted, Vale also analyzed the documents it has collected and the results of that analysis corroborate the interviews: approximately 140,000 of the former employees' documents, including communications with each of the 8 former employees, are preserved and have been collected through the other custodians and are included in the Document Universe.

On April 10, Rio Tinto sent Vale a letter setting forth 17 questions concerning Vale's preservation and collection process. As we informed Rio Tinto, Vale used the questions in the letter, where relevant, to inform its investigation. On April 15, Vale sent Rio Tinto a letter with the results of its investigation. It followed up with additional details in a separate letter on April 23. It then met and conferred with Plaintiff on May 5 and elaborated on the steps it took in order to reach that conclusion. Vale further offered during that meet-and-confer to go through each of the 17 questions individually, explain how Vale had already answered many of those questions, provide further explanation if it could, and explain why it viewed further responses as unduly burdensome and beyond the scope of discovery. Rio Tinto declined that offer, which would have disposed of the issue. Instead, it chose to complain to Your Honor that Vale refused to discuss questions Vale had agreed to discuss.

At the May 8 conference, Your Honor reviewed the questions in detail. The Court ruled Vale need only respond to the following questions posed in Plaintiff's April 10 letter: Questions 1-8, 10 (to the extent Vale has this information available from its custodian interviews), 13, 16 (to the extent already answered on the record), and 17, and stated that where Vale had already answered the questions – the vast majority of which it had answered – it could refer to its earlier answers. (*See* May 8, 2015 Tr. 8-11.) On May 21, Vale provided the required responses, for the most part repeating information it had already provided as it stated it would.

Rio Tinto's harassment campaign must end. Tellingly, when the Court stated that if it permitted Rio Tinto discovery into Vale's discovery, it would also permit Vale discovery into Rio Tinto's discovery, Rio Tinto sat silent. What does it have to hide?

"Discovery on discovery" is wholly unjustified where there is absolutely no showing that Vale's preservation or discovery efforts have been deficient in any manner. *See Orillaneda v. French Culinary Inst.*, No. 07 Civ 3206, 2011 U.S. Dist. LEXIS 105793, at *27 (S.D.N.Y. Sept. 19, 2011) (Pitman, M.J.) (finding plaintiff was not entitled to conduct discovery into the manner in which defendant maintained and searched for documents without first showing "specific reasons for believing that defendant's production is deficient"). If Rio Tinto persists, Vale asks that the Court award Vale its costs and fees incurred in responding to Rio Tinto's questions, which have vexatious multiplied these proceeding, 28 U.S.C. § 1927, and its inherent power. *See, e.g., Rotblut v. Thaler*, No. 96 Civ. 5762 (JSM)(MH), 1998 WL 846124, at *7 (S.D.N.Y. Dec. 3, 1998) (awarding sanctions in the form of reasonable attorney's fees on the grounds that "plaintiffs have engaged in consistent and extended misconduct in discovery, including meritless

resistance to proper discovery demands, repeated groundless motion practice and complaints about defendants' behavior in discovery, numerous efforts to reargue issues long since decided by the court, and deliberate footdragging in scheduling discovery (including their own)"), *aff'd*, 1999 WL 58362 (S.D.N.Y. Feb. 5, 1999).

**Custodians**.  During a meet-and-confer the day before this letter was due (and concerning different topics) Plaintiff requested for the first time that Vale add four new custodians:  Bruno Abreu (Director of Administration and Finance), Pedro Gutemberg (Director of Technology and Technical Assistance), Eduardo Pfiffer (Global Director of Marketing and Sales, Ferrous Division), and Marcio Senne (External Affairs Director).  The request is belated and unfounded and should be rejected.

The Court made clear the process by which any additional proposed custodians would be considered:  "As to the replacement custodians, the Court will take that on a custodian-by-custodian basis on the representation that Mr. Liman has made that the e-mails of the departed custodians is likely, or would largely be picked up by existing custodians who are being searched."  (April 8, 2015 Tr. 6:15-19; *id.* at 5:16-17 ("Are there other likely sources of the potentially relevant e-mails of the eight former employees" beyond the documents already collected.").)  Vale followed that process, and none of the work it has done suggests that any of these four individuals should be added as custodians.  The only arguably appropriate new custodian who has been identified through Vale's diligence is Ricardo Saad.  At the Court's behest, Vale has already added him without objection.  None of the four custodians now requested were identified by the 8 former employees has likely to have relevant documents.  Indeed, none of Vale's responses to Plaintiff's onerous 17 questions points towards these individuals in any way.

It was only after Vale stated that it wanted Rio Tinto to produce documents from the two custodians who are key to Plaintiff's secret RICO injury claim (*see supra* Section I.b) and after the Court (over Rio Tinto's objection) ordered discovery to be 95% complete in response to First Requests that Rio Tinto raised this issue.  But Rio Tinto's tit-for-tat does not work.  Unlike with Vale's requests, the only reasons Plaintiff has offered are (1) that these individuals are identified in response to Vale's responses to Rio Tinto's Interrogatories 2 and 3, and (2) that they received a litigation hold.  The first reason does not apply to Bruno Abreu, who is not identified in any of Vale's interrogatory responses.  As to the other three proposed custodians, they were identified back in September 2014 – months before the custodians were selected and only in response to Plaintiff's Interrogatory 3 (among 69 total names) because they had "access" to the Rio Tinto Data Room, and in response to Plaintiff's Interrogatory 2 (among 96 total names), which concerns "matters alleged in the Complaint" for the same reason – because the Data Room is a matter alleged in the Complaint.  There was good reason Rio Tinto did not select them then.  None of these individuals is identified in response to Interrogatory 1 (concerning the Vale-Rio Tinto negotiations) or Interrogatory 4 (concerning the Vale-BSGR negotiations), and Vale has no reason to believe they played a significant role in those negotiations or any other relevant matter.

The Court should see through Rio Tinto's transparent ploy.  Vale cannot defend itself against a RICO injury claim that was omitted from the Amended Complaint without discovery from the key witnesses to that alleged RICO injury.  Rio Tinto cannot conceal the RICO injury

claim and then use Vale's pursuit of that discovery to permit it to reopen a custodian list to add names it knew of since September and knowingly chose not to include.

In short, nothing changed between the last conference and today that would make these new proposed custodians appropriate. Rio Tinto had all of the relevant facts concerning these individuals as of the last conference (and indeed at the prior conference, and in December 2014), and did not request that they be added.

### b. Rio Tinto's Motion Regarding the Nardello Report

#### i. *Rio Tinto's Position*

Rio Tinto respectfully refers the Court to its request for the immediate production of the Nardello Report, fully briefed at Dkt No. 256.

#### ii. *Vale's Position*

Vale has received Rio Tinto's motion seeking to compel production of the Nardello Report, filed May 26. (Dk. 256.) Rio Tinto gave Vale no notice that it was intending to file the motion, nor did it tell Vale that its new affiant would be not Mr. Horton (the representative of the Government of Guinea) but a Mr. Fox who works for Rio Tinto. Vale disagrees with Rio Tinto's contention that the Nardello Report is not privileged or that Vale waived that privilege. Vale will submit its response to Rio Tinto's motion within the time permitted by Your Honor's rules.

### c. Rio Tinto's Second RFPs to Vale

#### i. *Rio Tinto's Position*

***Vale Continues To Refuse Any Reasonable Compromise To Rio Tinto's Second Set of Document Requests.*** Since the April 8, 2015 conference, the parties have not been able to reach agreement on a number of Rio Tinto's second set of document requests. Rio Tinto did not raise these issues at our last conference, upon agreement with Vale, as the parties had hoped to independently resolve their differences over the intervening weeks.

**Request No. 53**: With Your Honor's ruling in mind that Request No. 53 as initially propounded was too broad, *see* 4/8/15 Hr'g Tr. 22:21–22, Rio Tinto has since revised and narrowed its requests to seek: **All documents and communications concerning Alpha Condé's candidacy in connection with the November 2010 Guinean Presidential election, and what impact his election may have on Vale's mining rights in Simandou**. Rio Tinto pared back this request so that it no longer seeks any and all documents, concerning any candidate, related the November 2010 Guinean Presidential election. This request, therefore, is now limited to one issue: Vale's perception or analysis of Mr. Condé's presidential candidacy, and only his candidacy, and how that may impact its mining rights. Indeed, discovery to date indicates that Vale was interested in the November 2010 election, monitored it closely, and was potentially concerned about the outcome of that election, particularly Mr. Condé's election, on its mining rights. This is not surprising, since one of the platform's for Mr. Condé's election was a planned review of all mining contracts entered into under the previous regime, including the Vale-BSGR deal at Simandou. Thus it was Mr. Condé's election to the Presidency that led to the Guinean

Hon. Andrew J. Peck, p. 24

Government's investigation and ultimate decision to strip Vale of its rights to Simandou, undoubtedly making documents responsive to this request relevant to the claims at issue here. In fact, Vale has *agreed* to code certain documents (*e.g.*, VALE-Seed_00000952) as responsive for predictive coding purposes *because it discusses Mr. Condé's candidacy*. As such, there is no reason for Vale to refuse to produce similar documents that fall squarely within the scope of Request No. 53 as revised above.

**Request Nos. 56 and 63**: These requests seek "all documents and communications concerning the purpose, agenda items, topics for discussion, actual content and substance, post-meeting discussions and reporting, and any other follow-up from":

- [Request No. 56] "Roger Agnelli's meeting with Alpha Condé and Luiz Inácio Lula da Silva in February 2011"; and

- [Request No. 63] "Murilo Ferreira's visit to Guinea in May 2011 and meeting with President Alpha Condé."

Vale has acknowledged that a meeting in fact took place in February 2011 between Roger Agnelli, Alpha Condé, and Luiz Inácio Lula da Silva. Yet Vale is withholding any and all documents concerning that meeting because they do not *on their face* "contain[] discussion of the bribery, fraud, misappropriation of information, or obstruction of justice alleged in the Amended Complaint." This Court has rejected Vale's application of such "bad buzz words" as the defining metric for determining whether documents are responsive to Rio Tinto's requests. Indeed, conspicuously absent from Vale's description of these documents is what they *do* concern, which we can only infer means they relate to Simandou, Vale, VBG's and BSGR's mining rights, how President Condé and Guinea viewed those rights, what the parties planned to do about them, *etc*. In any event, Vale should have no objection to producing this finite collection of documents, concerning this specific meeting, if, as it says, they are immaterial and irrelevant.

Vale, in contrast, has stated that a meeting did not take place in May 2011 between Murilo Ferreira and Alpha Condé. Yet Vale's statement suggests that a meeting may have taken place between Mr. Ferreira and Mr. Condé during a *different* month or during *different* year. We have thus asked Vale, and Vale has refused, to inquire into whether that is in fact the case. We respectfully request that the Court order Vale to make the appropriate inquiry.

**Request Nos. 62, 64, and 65**: The parties have reached an agreement on Request No. 64[22] but continue to disagree regarding Requests 62 and 65. Vale incorrectly asserts that these two requests go *solely* to the issue of the "look-back due diligence" — an issue that we are prepared to explore further through depositions as directed by Your Honor at our last hearing. But these requests go beyond any "look-back due diligence" and additionally concern critical and highly-relevant documents that relate to whether, when, and to what extent Vale learned about BSGR's alleged misconduct. The operative requests read as follows:

- Request No. 62: All Documents and Communications relating to *internal discussions*

---

[22]  We include Request No. 64 simply because the parties have discussed these requests as a group and to further memorialize the parties' agreement that both sides will produce board materials to the extent they include responsive information to either side's document requests. *See* 5/8/15 Hr'g Tr. 19:24–25.

Hon. Andrew J. Peck, p. 25

> *about the legality and/or propriety*, including any perceived or *actual legal risk or exposure*, of Vale's joint venture with BSGR, including Vale's decision to conduct an audit of the negotiation and execution of the agreement with BSGR after Ricardo Flores became chairman of Vale's board of directors.

- Request No. 65: All Documents and Communications concerning Vale's decision to declare a material adverse change and/or force majeure with respect to its joint venture agreement with BSGR. Vale refuses to produce documents in response to this request except to the extent that they refer to the bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the Amended Complaint.

Far from being limited to the look-back due diligence, these Requests go to the broader circumstances surrounding Vale's decision to enter into a deal with BSGR in the first place, any analysis of risk stemming from BSGR's reputation or BSGR's limited rights, and the ultimate decision to change the terms, or terminate the terms, of the joint venture agreement in response to BSGR's misconduct. These issues strike at the heart of Rio Tinto's allegations that Vale *knew* about BSGR's reputation for participating in bribery and partnered up with BSGR in order to carry out its overall RICO scheme. Rio Tinto, therefore, respectfully requests that Vale be ordered to produce any responsive documents to these requests.

**Request Nos. 58 and 59**: These requests seek documents and communications concerning assurances given to Vale from the Government of Guinea and Steinmetz or BSGR regarding the position of the Government of Guinea regarding the transport of iron ore extracted from Simandou to a port in Liberia. Vale does not contest the relevance of these requests, nor their scope. Weeks ago, however, Vale had indicated that the Government of Guinea may be lodging an objection, due to confidentiality concerns, to Vale's production of responsive documents. Based on recent meet and confers with Vale, we understand that Vale will be producing documents in response to these requests notwithstanding any such objection by the Government of Guinea, "although it might have some bearing on whether responsive documents are marked as AEO." Accordingly, we respectfully request that this agreement between the parties be reflected and ordered at our upcoming conference.

### ii. *Vale's Position*

Vale was disappointed, if not surprised, to learn that Rio Tinto will once again be raising issues with respect to its Second Request for Production to Vale, which were addressed by the Court at the April 8 conference (*see* Dk. 234 at 9, 13) and again at the May 8 conference (*see* Dk. 246 at 7) and on which the Court has definitively ruled. The joint letter before the last conference informed the Court that these matters were resolved: "Since the last conference on April 8, Vale has followed up on a number of items at the Court's request. The bullet points below describe those items that do not require a ruling and should be considered resolved," including purported "look-back" diligence concerning the JV, the relevance of Murilo Ferreira & Ricardo Flores, and the relevance of certain alleged 2011 meetings with the Government. (Dk. 246 at 7-8.) As set forth in the letter, counsel had, as directed by the Court, taken steps to investigate the purported factual basis for Rio Tinto's discovery requests and relevance arguments, including interviewing its client and reviewing documents, and confirmed that they were without merit. (*See id.*) That statement was accurate. In addition, Plaintiff had its chance

Hon. Andrew J. Peck, p. 26

and did not speak up.  (May 8, 2015 Tr. 32:24 ("Any other issues?").)  Nothing else has transpired in the interim.  In short, the time to reargue has expired.[23]

  **Request No. 53.**  Two months ago, Your Honor ruled that this Request for documents related to the November 2010 Guinean Presidential election "is much too broad" and that You would not rewrite it. (Apr. 8, 2015 Tr. 22:21-22.)  Rio Tinto did not serve a new request.  In any event, Your Honor went one step further and already ruled that any relevant documents would be produced in response to requests concerning Mahmoud Thiam.  (*Id.* at 22:21-22) (THE COURT: "*Other than what comes up by Thiam*, this is much too broad.") (emphasis added).    That ruling was correct.  Once again, the time to reargue has expired.

  **Requests No. 56 and 63.**  With respect to Rio Tinto's requests concerning meetings held in 2011 between Vale and President Condé, Your Honor recognized that those requests are overbroad and ordered them "limit[ed] . . . to the information about the bribery, the conspiracy" or any other "funny business," "as opposed to just the general operations of Simandou" or "normal business."  (Apr. 8, 2015 Tr. 23:11-15, 24:15-19, 25:1-6.)  Vale searched for and reviewed documents related to those meetings and interviewed witnesses, shared with Rio Tinto and the Court the results of its investigation (including that the February 2011 meeting concerned the groundbreaking ceremony for the trans-Guinean railway and that it had not found any indication of a meeting in May 2011).  The joint letter informed the Court that this issue was resolved (Dk. 246 at 7, 8).  That statement was accurate.  Once again, also, Rio Tinto did not object to the report or raise it at the conference.  We do not know why Rio Tinto is seeking to resurrect prior matters as to which the parties reached – and reported – agreement and resolution.  What we can say is that the Court was correct the first time, there is no reason for the Court to revisit its rulings, and it is too late for Rio Tinto to seek reconsideration of this issue, especially one that has no relevance on its claims.

  **Request Nos. 62, 64, 65.**  At the last conference, the joint letter also informed the Court that requests "related to that second round of analyzing the BSGR deal" (Apr. 8, 2015 Tr. 27:9-11) were resolved, since Vale's investigation (including interviewing the client and reviewing board materials) did not reveal any such "look-back" (Dk. 246 at 7).  Your Honor agreed and instructed that it was now Rio Tinto's burden to "give me something more than a newspaper article as proof that there was something that went on."  (May 8, 2015 Tr. at 20:10-13).  Rio Tinto made no such showing and this matter should be at an end.  Rio Tinto is now trying to re-open this issue once again by claiming that Vale must conduct a "broad search" of 2011 due diligence documents.  But there was no such due diligence.

  **Requests No. 58 and 59.**  On May 19, 2015, the Government of Guinea sent a letter to Vale and Rio Tinto confirming its position that it considers certain technical information developed by Vale after the Vale-BSGR joint venture in 2010 to be proprietary to it and confidential.  Vale has since informed the Government of Guinea of its position that it must

---

[23] *See* Local Rule 6.3; *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088 (RMB), 2014 WL 5809604, at *1 (S.D.N.Y. Nov. 6, 2014) ("Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources . . . [and] may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for re-litigating issues already decided by the Court." (internal citations omitted)).

Hon. Andrew J. Peck, p. 27

produce all responsive documents regardless whether the Government contends they belong to Guinea.

### d.  **Vale's Training of its Predictive Coding System**

#### i.  *Rio Tinto's Position*

***Vale is using an overly restrictive methodology to train its Predictive Coding Tool.***  Rather than training on concepts, Vale has restricted its training to documents that fit within the four corners of Rio Tinto's document requests, including date ranges.  Under Vale's approach, if a training document contains words or concepts responsive to Rio Tinto's document requests, it will still be excluded from the training process if it falls outside the agreed-upon date range for a given document request.  While Vale's approach may in theory sound reasonable, in practice it presents a very real risk of excluding responsive documents because the predictive coding system does not distinguish between dates and concepts.  Rio Tinto, in consultation with its e-discovery experts, therefore believes Vale instead should use a broader approach under which, if a document is conceptually responsive, it can be used for the purpose of training the predictive coding system, even if it falls outside the date range.  This approach ensures the tool brings in the most robust set of potentially responsive documents and then leaves it to human reviewers to exclude documents falling outside the date range.  And this approach is precisely the one Rio Tinto has taken.

Until Vale discloses its rates of Recall and Precision (Vale only just produced its Seed Set), Rio Tinto's insight into the performance of Vale's coding and system is limited at best.  Thus, Rio Tinto does not contend this issue is ripe but wanted to bring it to the Court's attention and reserve all rights under Section B.6 of the Predictive Coding Protocol to bring to the Court any disputes with respect to Vale's approach to training its Predictive Coding system.  Vale already significantly limited its Document Universe with the application of search terms and the loss of documents from 40% of its custodians; it should not be permitted to further limit discovery here by applying overly restrictive review and production criteria in training the system.

#### ii.  *Vale's Position*

In contrast to Rio Tinto, Vale has employed a reasonable and appropriate methodology to train its predictive coding model, including use of targeted search terms to ensure that documents used for training cover the issues that Rio Tinto has requested in its document requests.  Rio Tinto stated to us for the first time this morning that it intends to raise with the Court that it believes Vale is taking an overly narrow view of responsiveness with respect to the documents it is using for training the predictive coding model.  It raised this concern only after Vale indicated it would raise concerns with Rio Tinto's methodology.  The Court's rules require the parties to meet and confer and Rio Tinto has failed to do so on a timely basis.  Rio Tinto has been given ample opportunity to raise any concerns it has about Vale's coding of documents during extensive meet and confers.  All objections raised by Rio Tinto to Vale's coding have been resolved, and so Vale sees no dispute in this respect, let alone a dispute ripe for judicial resolution.

Hon. Andrew J. Peck, p. 28

Rio Tinto has also complained about the fact that Vale's Seed Set contained documents that were "near duplicates" to one another, i.e., very similar in substance.  This was a result of Vale's use of targeted search terms to identify documents likely to cover Rio Tinto's documents, which naturally hit on all similar documents that contained certain key words.  Regardless, the inclusion of near duplicates does not indicate any weakness in Vale's overall training process.  *See* Hadjarian Decl. para. 12.

## IV.    Discovery from Defendants BSGR and Steinmetz

### i.    *Vale's and Rio Tinto's Position*

BSGR's counsel in this action has previously represented that BSGR and Onyx would "make a timely production after the Senior Master So Orders" (Letter from V. Filardo, dated April 30, 2015), which was reiterated to the Court at the last conference (May 8, 2015 Tr. 15:24-16:2).  The Special Master has so ordered – by Orders provided to Vale's counsel, and then to BSGR and Onyx on May 13.  Vale consented to an extension for production as long as the first production occurred by June 1; BSGR has applied to the London High Court to make its production by June 30.  Vale hopes to receive full production on or before that date.  Vale has also asked BSGR to confirm that BSGR's and Onyx's production would include "[t]he letters and other documents and communications produced by BSGR to: ... the United Kingdom's Serious Fraud Office between September 1, 2013 through the date of production," which the English High Court has ordered BSGR to produce in response to the Serious Fraud Office's Section 2 Notices.  (Dk. 222, Section 8(n)(ii).)  Vale has received no response.

### ii.    *BSGR/Steinmetz's Position*

Master Eastman of the English High Court so-ordered the Letter of Request to BSGR on April 28, 2015, and issued a second order to Onyx Financial Advisors Limited on May 11, 2015.  Each order called for the production of documents within 28 days of the orders' respective dates.  However, neither BSGR nor Onyx were notified of either order until each was served on counsel on May 13, 2015 – more than two weeks after Master Eastman sealed and ordered the Letter of Request to BSGR, and only two weeks before production was due under the BSGR order.

On May 20, 2015, counsel for BSGR in London wrote to counsel for Vale in London to request that Vale agree to jointly seek a modification of Master Eastman's orders, conforming the deadline for production to the June 30, 2015 deadline provided in the case Scheduling Order, and in the terms of the agreed Letters of Request.  Inexplicably (and opportunistically), counsel for Vale refused to stand by its prior agreement to the June 30 deadline for production, and join BSGR's application for the proposed modification.  As a result, BSGR's London counsel was required to make a motion to the English High Court seeking a modification of the production deadline.  The motion was submitted on May 26, 2015.  As of the date of this joint letter, the English High Court has not issued a ruling on the motion.

BSGR continues to manually collect, review, and prepare its documents for production.  As counsel has represented to Vale and Your Honor previously, BSGR will be ready

Hon. Andrew J. Peck, p. 29

to make a timely production of *all* of its non-privileged responsive documents by the June 30, 2015 deadline.

## V.    **Discovery from Defendant VBG**

### i.  *Rio Tinto's Position*

#### A.  VBG's Boxes of Documents in Guinea

At the February 6, 2015 status conference, Rio Tinto flagged for the Court that VBG had boxes of hard copy documents in its Guinea office.  *See* 2/6/2015 Hr'g Tr. 13:20-14:5.  The Court ordered VBG to have those documents shipped from Guinea to the United States within two weeks of the hearing date or else to "get relief from [Rio Tinto]; and if not from [Rio Tinto], from the Court."  *Id.* 14:9-20.  In nearly four months since then, VBG has made no discernible progress in relocating these documents—in fact, we are effectively where we started.  VBG's boxes (69 of them), the contents of which appear to include at least some responsive information, still remain in Guinea, despite Rio Tinto's offers to pick them up, pay shipping costs, and bear the burden of reviewing all non-privileged documents for potentially relevant information.  As the June 30 deadline for the production of documents rapidly approaches with VBG's boxes no closer to the United States, Rio Tinto accordingly asks that the Court hold VBG to its obligation and order it to get its documents here and produced immediately.

#### B.  VBG's Request for Documents Seized by the Government of Guinea

VBG also has represented, as this Court knows, that another set of highly-relevant documents was seized by the Government of Guinea in connection with its bribery investigation.  VBG has not, however, been successful in obtaining copies of these documents as it is permitted to request under Guinea law.  VBG reports that the Judge presiding over its request is in declining health and, as a result, VBG has not received word on whether its request will be granted or when copies of its documents may be turned back over.  If these extenuating circumstances continue to frustrate VBG's efforts, Rio Tinto respectfully requests that the Court permit the production of these documents, irrespective of the upcoming document deadline, when and if VBG obtains copies of them.

### ii.  *VBG's Position*

Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman

cc:    All counsel of record (via ECF)