# CLEARY GOTTLIEB STEEN & HAMILTON LLP

WASHINGTON, DC
PARIS
BRUSSELS
LONDON
FRANKFURT
COLOGNE
MOSCOW

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

ROME
MILAN
HONG KONG
BEIJING
BUENOS AIRES
SÃO PAULO
ABU DHABI
SEOUL

June 1, 2015

VIA ECF

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:  *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

On behalf of Vale S.A. ("Vale"), we move pursuant to Fed. R. Civ. P. 37 to compel Plaintiff Rio Tinto plc ("Rio Tinto") to produce documents and information in the possession of investigative firms engaged by Rio Tinto as part of its purported "lengthy investigation" of its claims (Dk. 83, "AC" ¶ 146), which are within Rio Tinto's custody or control and which are responsive to Vale's First Set of Interrogatories to Plaintiff and Vale's First Request for Production of Documents.  The Court ordered Rio Tinto to send letters to its investigators asking for names of confidential sources and to produce any responses (May 8, 2015 Tr. 25:17-22, 26:14-19), and the responses received to date decline to produce documents and information to Rio Tinto for transmittal to Vale – just as the Court anticipated, "the investigators are still going to say, sorry, Charlie, you can't have it" (*id.* at 24:4-6).  The response is not surprising, as Rio Tinto engineered it, and it follows repeated signals from Rio Tinto and its investigators over more than nine months that they will not provide this information.  The Court indicated that after the investigators responded, Vale could "make[] another motion for me to interpret [the] contracts" between Rio Tinto and its investigative firms.  (*Id.* at 26:20-21.)  Vale's motion is now ripe.

## BACKGROUND

### A. The Discovery Requests Relevant To Vale's Statute Of Limitations Defense

This motion seeks documents and information in the custody and control of Rio Tinto critical to defendants' statute of limitations defense.  As the Court is aware, the Amended Complaint ("AC") alleges a RICO conspiracy to deprive Plaintiff Rio Tinto of its mining rights

to Simandou Blocks 1 and 2. (AC ¶¶ 1, 12.) The AC alleges that the conspiracy "b[ore] fruit" when the Government of Guinea rescinded Rio Tinto's interest in Simandou Blocks 1 and 2 in December 2008 (AC ¶ 12), and that the "result" of the alleged scheme "was a June 2009 official statement … that confirmed the mining rights for Simandou Blocks 1 and 2, previously held by Rio Tinto, were now BSGR and Steinmetz's." (AC ¶ 13.) Plaintiff's complaint was first filed in April 2014, long outside the statute of limitations for RICO claims, which is four years *from the date of injury*.

Defendants have therefore asserted that the claim is time-barred on its face. To avoid the effect of the statute of limitations, Rio Tinto alleged equitable tolling (AC ¶¶ 146-47 ) – which requires proof *by Rio Tinto* not just of wrongful concealment by each defendant but also that Rio Tinto exercised due diligence in investigating its potential claim throughout the period beginning with its injury and that the alleged wrongful concealment prevented plaintiff's discovery of the nature of the claim within the limitations period. *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265, 268 (S.D.N.Y. 2006) ("*NGC*") (citing *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)). Moreover, Rio Tinto must show that wrongful conduct of each individual defendant sought to be sued prevented it from discovering its claim and suing earlier. *See, e.g.*, *Matter of Mediators, Inc.*, 190 B.R. 515, 525 (S.D.N.Y. 1995), *aff'd*, 105 F.3d 822 (2d Cir. 1997). To rebut that claim, Vale propounded discovery, which seeks information about when Rio Tinto retained its investigators, the nature of the engagement, the hours billed, the activities conducted, as well as what it instructed the firms to investigate, including whether it referred to allegations of bribery in those instructions and what it shared with the investigators with regards to the sources of its suspicions, and what the firms reported back on those issues.

Indeed, as early as September 3, 2014, immediately after the initial conference, Vale propounded discovery on Rio Tinto regarding its purported due diligence and investigation. The interrogatory request asked Rio Tinto to

> [i]dentify each Person who has knowledge or information of any facts (including knowledge or information regarding the location and description of any Documents) that evidence, reflect, or support Your allegation in Paragraph 146 of the Amended Complaint that "[u]pon learning of Vale's involvement with Blocks 1 and 2 of Simandou, Rio Tinto exercised due diligence in pursuing discovery of the claims asserted" in the Amended Complaint and that "Rio Tinto conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou. But Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise."

(Ex. A, Vale's First Set of Interrogatories to Plaintiff, Interrogatory No. 22.)

Vale's initial document requests asked for "[a]ll Documents supporting, providing a basis for, evidencing, or otherwise concerning the statements in Paragraph 146 of the Amended Complaint that 'Rio Tinto was genuinely shocked that Vale and BSGR were doing business together' and that 'Rio Tinto exercised due diligence' and 'conducted a lengthy investigation' of the facts." (Ex. B, Vale's First Request for Production, Request No. 39.)

Hon. Andrew J. Peck, p. 3

Defendants also obtained International Letters of Request seeking discovery from investigative firms engaged by Rio Tinto to conduct its purported investigation. The Letters of Request seek: (1) proposals, pitch books and presentations prepared for Rio Tinto reflected in the firm's reports; (2) engagement and disengagement letters; (3) bills, invoices and bank statements of the investigative firms showing payments by Rio Tinto relating to work done; (4) documents shared with Rio Tinto in connection with the reports; (5) drafts of the reports, including research for, preparation of, and analyses and discussions regarding the reports; (6) interview memoranda and attendance notes underlying the conclusions of the reports; (7) all other documents reviewed, received or prepared in connection with the reports; and (8) specific documents the firms had relied on for specific findings in their reports. (*See* Ex. I-K, Dk. 225, 226, 227.)[1]

Vale propounded additional discovery requests on Rio Tinto in February concerning its investigation, seeking "proposals, pitch books, or presentations" and "engagement letters" (Request Nos. 48-49), "disengagement letters" (Request No. 50), "documents containing, describing, summarizing or characterizing the scope" of the engagements (Request No. 51), "bills or invoices, and time sheets and records of activities performed" (Request. No. 52), "records of payments" (Request No. 53), "[d]ocuments and correspondence between Rio Tinto and any Investigative Firm relating to Rio Tinto's retention of any Investigative Firms services" (Request No. 54), documents supporting specific findings concerning potential arrangements between BSGR and other potential partners other than Vale (Request Nos. 55-56), and all other documents concerning any investigative reports, including "drafts," "research for, preparation of, and analyses and discussions regarding any Investigative Reports" (Request No. 57). (Ex. C, Rio Tinto's Obj. and Resp. to Vale's Second Request for Production.)[2]

But Vale's efforts to obtain this discovery have been thwarted. Rio Tinto's strategy is now apparent. Having filed an untimely complaint, Rio Tinto seeks to prevent Vale from obtaining discovery regarding its alleged investigation – which it claims excuses it from having timely filed its complaint – by hiding behind the artifice that such information is not within Rio Tinto's possession. Vale has a due process right to put on its statute of limitations defense, including obtaining documents and information in Rio Tinto's possession, custody and control relevant to such a defense and relevant to the exercise of due diligence and whether Plaintiff was aware of red flags putting it on notice of its claim. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972). Such discovery – and an early decision on this issue – could substantially streamline any subsequent trial and lead to an early resolution of this matter.

B. **Rio Tinto Stonewalls The Requests**

1. Rio Tinto Delays Identifying The Investigative Firms For Over Five Months

It took Rio Tinto five months from the date of Vale's interrogatories even to provide Vale

---

[1] For the Court's convenience, Vale encloses a table reflecting both common and specific requests made to the investigative firms as Appendix 1.
[2] Rio Tinto has objected to these requests to the extent they "seek[] documents that are not within its possession, custody, or control." (*See* Ex. C, Rio Tinto's Obj. and Resp. to Vale's Second Request for Production.) But Rio Tinto has neither confirmed or denied that it has some of these documents within its possession, begging the question as to what documents are not within its possession but within its control.

the names of the investigating firms it intended to rely on to satisfy its due diligence obligation, because Rio Tinto improperly sought to cloak those names and the firms' reports in some unspecified privilege, and then simply delayed providing them. First, Rio Tinto refused to identify in response to Vale's interrogatory the firms that were involved in its investigation or to produce investigative reports prepared by those firms, withholding the very names of the firms on the purported grounds of "privilege." Vale objected to the claim of privilege over names. It also argued in an October 2014 submission (with further briefing in November 2014) that Rio Tinto had waived any possible privilege with respect to its alleged investigation by placing that investigation at issue through its equitable tolling claim (*see* Dk. 114 at 6-7; Dk.119; Dk. 122).[3] The Court rejected Rio Tinto's efforts to conceal the names of the investigating firms, whose identity is critical to the due diligence question. On December 9, 2014, over *six* months ago, the Court ordered Rio Tinto to disclose the names of persons with knowledge of Rio Tinto's alleged investigation, including its third-party investigators, and to produce non-privileged documents concerning its purported investigation of its claim and investigative reports of firms hired by Rio Tinto (not counsel). (Dec. 9, 2014 Tr. 20:22-21:3, 27:11-28:5.)

Second, even after the December Court order (already more than three months after the discovery was served), Rio Tinto delayed producing the names of its investigators. The Court had to revisit this issue twice more before Vale got their names. (*See* Jan. 13, 2015 Tr. 52:12-21 (ordering expedited production of the reports); Feb. 6, 2015 Tr. 27:6-17, 29:1-12 (ordering Rio Tinto to identify the firms responsible for the reports and all persons with knowledge concerning its alleged investigation).)

Rio Tinto finally amended its interrogatory responses to add the requested names (identifying Livingstone & Company, BTG Intelligence Limited, Africa Risk Confidential, Aeneas, and Executive Research and Associates) and produced some of its (redacted) investigative reports on February 17, 2015, more than *five* months after Vale had initially requested the information. (Even then, Rio Tinto flouted the Court's orders. It was not until March 2, 2015, that Rio Tinto belatedly produced a report it claimed it had "inadvertently omitted from [its] prior production" (*see* Dk. 208 at 2), which appears to be the source of many of the allegations it has made against Vale. And, it was not until *five days ago* – and only after Vale, having obtained the information from a third party, called Rio Tinto to task – that Rio Tinto produced a report from Kroll, the investigative firm the Court back in December correctly surmised was one Rio Tinto had hired. *See* Dec. 9, 2014 Tr. 20:23-25 ("Produce the factual information from any privileged document that is relevant to the investigation *and diligence issue*") (emphasis added); *id.* at 27:15-23 (ordering Rio Tinto to identify investigative firms, "[m]eaning if they hired Kroll or somebody like that"); *id.* at 28:3-6 ("Precomplaint, if there was an investigative firm *of any sort*, whether working with the lawyers or not, I don't find that to be privileged.") (emphasis added).[4]).

---

[3] Rio Tinto is now seeking disclosure of the Nardello Report, in part by claiming that Vale has put its own due diligence at issue by raising it as a defense. This is patently false. The Court expressly ordered Vale to file a protective answer to identify Vale's defenses; none of Vale's defenses involve its due diligence.
[4] Rio Tinto is still improperly holding back on producing two additional Kroll reports.

Hon. Andrew J. Peck, p. 5

   2. <u>Rio Tinto's Confidentiality Designations Delay The Letters Of Request For Over A Month</u>

After Rio Tinto took over five months to identify the names of its investigative firms, Rio Tinto then forestalled Vale's ability to serve International Letters of Request on the investigative firms for well over another month.

First, when it finally produced the investigative reports on February 17, 2015 – more than five months late – Rio Tinto designated the entirety of its reports, without exception, "Highly Confidential – Attorneys' Eyes Only," disabling Vale from providing the necessary specificity to satisfy the requirements for Letters of Request. Then, when Vale raised the issue, Rio Tinto further delayed. In compliance with the Protective Order, Your Honor's rules, and the Local Rules, Vale sought the Court's guidance on February 24, 2015 as to whether to file its Letters under seal in light of Rio Tinto's AEO designations. (Dk. 196 at 15-16.) Vale provided the language of its intended requests to Rio Tinto on March 4, 2015 promptly after the Court ordered the parties to meet and confer about de-designating the portions of the reports referenced in the Letters of Request. (Feb. 27, 2015 Tr. 38:7-13.) Even though Rio Tinto did not identify any sensitive material in the limited quotations from the reports excerpted in the draft Letters of Request, Rio Tinto refused to de-designate *any* excerpted portions of its investigative reports. Vale was forced to seek leave from the Court to file the Applications under seal (Dk. 212).

After Rio Tinto reiterated its blanket opposition to the Letters of Request based on confidentiality concerns (Dk. 217 at 11-12), the Court suggested that Rio Tinto could avoid public disclosure by bypassing the Hague Convention altogether and asking the investigative firms to voluntarily produce documents. (Mar. 17, 2015 Tr. 6:9-18, 8:18-9:10.) For weeks thereafter, Rio Tinto continued to delay, reporting that the firms were "considering their options" and that Rio Tinto would "follow up" with the firms. (*See* Dk. 228; *see also* Dk. 229 (reporting that the firms still "cannot provide a definite answer at this time").)

Given these continuing delays in trying to obtain voluntary disclosure from the firms, the Court issued Vale's Letters of Request on March 31, 2015, more than a month after Vale had initially raised the issue. (Ex. I-K, Dk. 225, 226, 227.) By then, *seven* months had passed since Rio Tinto had been asked to identify the names of its investigative firms so that Vale could seek discovery from them.

   3. <u>Obtaining Discovery Through Letters Of Request Is Proving Impractical And Is Insufficient To Protect Vale's Due Process Rights</u>

The delay in obtaining documents from the investigative firms did not end there. After the Court approved Vale's Letters of Request, Vale promptly submitted them to the Competent Judicial Authorities of the United Kingdom, South Africa, and France (*see* Dk. 246 at 21-22). Since then, the investigative firms – Rio Tinto's agents – have employed every device to forestall Vale from obtaining that information directly from them. Each one of them "lawyered up" (presumably at Rio Tinto's expense) to resist discovery of documents that Rio Tinto – their significant client – ostensibly wanted them to produce. (It is apparent that Rio Tinto in fact does *not* want them to produce material that could only aid Vale.) Vale's efforts to obtain discovery pursuant to the Hague Convention have only proven that the information and documents Vale is

seeking cannot practically be obtained from foreign sources (and that Rio Tinto will not allow the information to be obtained from those sources). Indeed, *two* months have passed since the Court issued the Letters of Request and Vale still does not have *any* of the information it has requested. Vale has faced repeated obstruction in its efforts on all fronts:

The **United Kingdom**'s Senior Master is the *only* judicial authority to have So-Ordered the Letters of Request, which were made available to counsel for Vale on May 13, 2015. Vale served the Letters of Request on the three investigative firms located in the United Kingdom on that same day, after which two of those firms made requests for extensions to comply with those Requests: counsel to Livingstone wrote to Vale on May 19 and May 22 requesting an extension, claiming that its client "has been out of the country on business since service of the Order" and that the "Order raises several serious issues on which our client reasonably requires advice," while counsel to Africa Risk Confidential wrote to Vale on May 18 and May 22, pointing to a two-week delay between the date when the Order was sealed and when it was made available to Vale (by no fault of Vale's) as having "a great impact on the time available for our client to consider the appropriate response to the order," claiming that "the principal of our client is currently abroad," and indicating that it would be "seek[ing] a variation of the Order and in particular those documents referred to in Schedule A of the Order." On May 27, two weeks after being served with the order, BTG's counsel also wrote, noting that the date for its compliance had elapsed, that it was "currently in the process of obtaining our clients' instructions," and that it would therefore "not be in a position to provide the documents requested until the outcome of any [application to set aside or vary the Order] has been determined."

Tellingly, although Vale proposed granting the extension if the firms agreed to voluntarily produce the materials responsive to Vale's Letters of Request, none accepted that offer. And while each of these three firms corresponded with Vale's counsel after their receipt of the letter from Rio Tinto requesting disclosure of confidential sources (*see infra* at 8-9), not one of them referenced it. In what appears to be a concerted effort, within days of each other, one firm made an applications to modify the Order and timing for compliance, while the other two firms indicated their intention to do so. Vale is now forced to oppose these requests so as not the disturb the U.S. discovery schedule. These extensions and excuses for noncompliance are unwarranted, since – based on Rio Tinto's representations – each of the firms presumably has been on notice of these requests since mid-March (*see supra* at 5). In fact, Livingstone's counsel admitted that "it is the case that our client has been aware of Vale's intention to request information for some time." Indeed, it is inconceivable, and would be cause for substantial concern, had Rio Tinto not advised the firms of the Letters of Request and asked them to do what they could to cooperate so that discovery would not be delayed.

In **South Africa**, Vale's counsel liaised with the South African Department of Justice to commence the formal process of arranging for service of the Letter of Request. On April 10, Vale's counsel confirmed by phone that the South African Department of Justice was familiar with the procedure to execute the Letters of Request; on April 24, Vale's counsel was directed to an individual responsible for these matters; on April 28, the South African Department of Justice accepted receipt of the Letter. In parallel, Vale effected informal service on the representatives of Executive Research Associates on April 20. (Again, Rio Tinto should have made these representatives well aware of the Letters of Requests a month earlier.) However, on May 7, the South African Department of Justice, contrary to information it had previously provided,

informed Vale's counsel for the first time that the Letter of Request would need to be transmitted to South African authorities through consular means (*i.e.* from the U.S. Department of State to the U.S. Embassy in Pretoria to the South African Department of Justice), which we are advised will likely take many more months.

In **France**, after a lengthy and costly process of providing sworn translations to the French Ministry of Justice, we have been advised that obtaining the documents will take at least six months (since the Letter of Request must be transmitted to the Court of Appeals of Versailles, which will then transfer it to the General Prosecutor of that Court, who will then pass it on to the "*Procureur de la République*" of the Nanterre Tribunal, who will file it with the President of the Nanterre Tribunal in charge of serving the order on Aeneas). Relatedly, the individual that Rio Tinto had identified as the proper contact person at Aeneas France for the Request has since left Aeneas France to work for Aeneas Ivory Coast (a separate legal entity); although Vale asked Rio Tinto on May 4, 2015 to "identify any and all other current employees or principals of Aeneas with knowledge of the work it conducted on Rio Tinto's behalf in connection with Simandou, Guinea, BSGR, Steinmetz, and/or Vale," its counsel replied only on May 21, 2015 to state that the former employee was the *only* point of contact at Aeneas. France does not have the equivalent of a 30(b)(6) deposition and a Letter of Request to the Ivory Coast, which is not a party to the Hague Convention, is likely not to be honored, leaving Vale with no recourse.

    4.   Rio Tinto's Obfuscation Regarding Its Interrogatory Responses And Confidential Source Names

When Rio Tinto produced its investigative reports in February, it redacted the names of confidential sources who have personal knowledge of the allegations in the Complaint. Rio Tinto claimed that its redactions "were made in order to protect the identity of confidential sources." (Dk. 217 at 3.) Vale asked Rio Tinto to produce un-redacted versions of its reports and to amend its interrogatory responses. After Rio Tinto refused, Vale sought an order from this Court in March. (*See* Dk. 217 at 7-8.) The Court agreed with Vale that it was entitled to "know the names" of confidential sources in the reports and ordered Rio Tinto to produce un-redacted reports. (Mar. 17, 2015 Tr. 14:10-12, 15:22, 16:7-8.)

On March 23, 2015 (nearly *four* months after it was first ordered to produce investigative reports), Rio Tinto finally produced un-redacted copies of its investigative reports. Contrary to its representations to the Court, much of the material that Rio Tinto had redacted did not contain any names whatsoever. Instead, the reports referred to the sources for some of the most pertinent allegations only by general title or description. In short, Rio Tinto misrepresented the information that it tried so hard to withhold. For example, the Project Vaal II report, which seems to be the source of many of the allegations directed at Vale, relies on "[t]wo sources from BSGR now working in South Africa," "[o]ne top source in Vale," and "[a] former consultant working for Vale." (RT0310616.) Rio Tinto has continued to withhold from its responses to Vale's interrogatories the names of these and other sources, which were relied on in these reports, despite the fact that it has access to this information and that the information is plainly requested by the interrogatories served nearly *nine* months ago. These sources clearly have information relevant to allegations in the AC and are responsive to Vale's interrogatories dealing with those allegations.

Hon. Andrew J. Peck, p. 8

Rio Tinto has rebuffed Vale's request that the sources be identified *by name*, claiming that these general descriptions provide sufficient detail and identifying information to evaluate the reliability of the sources. (*See* Dk. 234 at 20-21; Dk. 246 at 13.) But this misses the point; Rio Tinto is required to produce this information under Fed. R. Civ. P. 33 because it is within its control and to identify any individuals with knowledge of its claims or who are responsive to the interrogatories, not simply describe those individuals in a manner Rio Tinto deems sufficient to support their reliability. Rio Tinto cannot limit its disclosure only to those persons it believes will *support* its claims; it is required to provide the names of *all* persons with knowledge of the allegations, including those who will not support Rio Tinto.

Accordingly, as far back as February 23, Vale asked for Rio Tinto's engagement letters, in part in order to determine the extent of Rio Tinto's control over this information. Rio Tinto refused to provide them, and on April 8, the Court ordered Rio Tinto to disclose its contracts with its investigative firms in order to determine whether Rio Tinto in fact has a right to the withheld information. (Apr. 8, 2015 Tr. 31:3-10.) On April 17, Rio Tinto produced *some* of the engagement letters, but Vale had to seek clarification from Rio Tinto about certain contracts that appeared to be missing, and Rio Tinto delayed responding to Vale's questions and producing the missing information until April 29.

Rio Tinto then claimed that it did not know the names of confidential sources, but that it had "asked the investigators if they are willing to provide source names" and that they "universally refused" to do so. (Dk. 246 at 13). But – in further violation of Court order (Apr. 8, 2015 Tr. 31:3-4) – Rio Tinto has not produced all of its written correspondence with these firms to refute the notion that there is any "winking going on" with them (Apr. 8, 2015 Tr. 31:8), claiming that the "vast majority" of correspondence with the firms to date are "emails asking us to set up a call in which we discussed the issues with them." (May 8, 2015 Tr. 25:14-16.) As another delay tactic, Rio Tinto also has asserted – without any foundation in law or in fact given what has transpired – that "[i]f Vale desires more information than that already provided in the [investigative] reports," such a request "be directed at the foreign courts and foreign parties from whom Vale is seeking discovery [pursuant to Hague discovery requests], not this Court and not Rio Tinto." (Dk. 246 at 13-14.)

> 5. <u>Rio Tinto's May 20 Letters To The Investigative Firms Expose The Pretense That It Is Genuinely Demanding The Information</u>

At the May 8 conference, as an alternative to Vale's request that Your Honor interpret the contracts with the investigative firms and rule as a matter of law that Rio Tinto had control of the work it hired the firms to perform for it, Your Honor ordered Rio Tinto to write "a clean letter" to the investigative firms to formally request that they disclose the names of their confidential sources and to share its written requests and any responses thereto with Vale. (May 8, 2015 Tr. 25:17-22, 26:10-19.) Presumably, if Rio Tinto made a genuine demand on the firms that *it* wanted the documents and information for *its* use and employed the leverage that it possessed with those firms, the issue would go away. The sample draft of that letter – shared with Vale – made unmistakably clear that Rio Tinto does not want the investigative firms to turn over documents and information. The message was that it is asking for the information only for the use of Rio Tinto's adversary – Vale – and only because the Court required it to ask.

In the first draft, Rio Tinto proposed to write to the firms that "Rio Tinto does not have and has never had" "the names of confidential sources in [the firm's] investigative reports" and that "[a]ccordingly," the Court "has ordered Rio Tinto to again request from you the names of the confidential sources in your investigative reports." The draft added that this request "follows our previous request, at Judge Peck's direction, that you consider voluntarily turning this information over in lieu of Vale publicly filing requests under the Hague Convention. You refused to voluntarily turn over this information and Judge Peck entered Vale's Hague Requests." (Email from K. Forst, dated May 15, 2015.) In short, as Vale noted, the letter was precisely the "wink and a nod" that Your Honor expressly prohibited – a message that Rio Tinto is making a *pro forma* request for the information but really has no interest in obtaining it and wishes its agents to take the position it is not entitled to it. (*See* May 8, 2015 Tr. 23:18, 26:5-25; Email from M. Karlan, dated May 18, 2015.) It conveyed that Rio Tinto did not have the information – and presumably never wanted it (the information was being sought for Vale); and that the investigative firms had a good argument for not turning it over. It reminded the investigative firms of Rio Tinto's previous requests and that the turnover be "voluntary" (*i.e.* thus conveying the view that Rio Tinto did not have and would not assert a right to obtain the information). And it also conveyed that the request was not even coming from Rio Tinto (and presumably there would be no business ramifications from failing to honor the request, but that there might be such ramifications if the request *were* honored), but instead came from Your Honor and was only being made because Rio Tinto had no choice: the Court had ordered it.

After Vale pointed out that the letter would send these messages, Rio Tinto's second draft made clear that that was exactly its intent – Rio Tinto did not really want the firms to turn over the information; it was not saying to the firms that the information was critical for Rio Tinto to obtain. It added back in language to which Vale had objected: that Rio Tinto was "ordered by Magistrate Judge Peck" to make this request, once again signaling that the request did not come from Rio Tinto and was being made only because Rio Tinto had no other option. And it would have once again reminded the investigative firms that "Rio Tinto does not have, and has never had, that information." (Email from K. Forst, dated May 19, 2015.)

Only when Vale threatened to bring the issue to the attention of the Court did Rio Tinto draft a letter that purported to be a good faith request from Rio Tinto – but by then Rio Tinto had already signaled its true intent. The letter it sent was the product of more than six months of interaction that have made clear that neither Rio Tinto nor its investigators want to produce the requested information.

## ARGUMENT

### A. The Court Should Order Rio Tinto To Produce Documents And Information In The Possession Of Investigative Firms But In Rio Tinto's Custody and Control

If Rio Tinto has either the practical ability or legal right to obtain the documents requested in the Letters of Request or the information necessary to make its interrogatory responses complete, then the Court has the authority and responsibility under the Federal Rules of Civil Procedure to order Rio Tinto to produce those documents and that information. Both under Rule 33 and Rule 34, a party is required to provide the responsive information to the extent it is within its custody or control – *i.e.* within its practical ability or legal right to obtain,

including through legal recourse if necessary.  *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 196 F.R.D. 444, 445, 447 (S.D.N.Y. 2000) (Kaplan, J.) (ordering party to answer all interrogatories, including in its response information known to [a non-party], explaining that "[a] party served with interrogatories is obliged to respond . . . not only by providing the information it has, but also the information within its control or otherwise obtainable by it"); *Sompo Japan Ins. Co. of Am. v. M/V TAMPA*, No. 04 CIV. 4156(LAP)DF, 2005 WL 4012818, at *1 (S.D.N.Y. Nov. 10, 2005) (ordering production of documents within responding party's custody or control).  "'Control' has been construed broadly by the courts as the legal right, authority or practical ability to obtain the materials sought upon demand."  *See, e.g.*, *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (Peck, M.J.) (internal quotation omitted).[5]

Courts often find that a party has the "practical ability" or "legal right" to obtain information in the possession of its service providers, including its prior counsel, an accounting firm, and other consultants that provided services to that party.  *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.*, No. 90 CIV. 7811 (AGS), 1994 WL 510043 (S.D.N.Y. Sept. 16, 1994); *see also Raimey v. Wright Nat'l Flood Ins. Co.*, Nos. 14-CV-00461 (JFB)(SIL)(GRB), 2014 WL 7399179, at *14 (E.D.N.Y. Dec. 31, 2014) (finding defendant had the "practical ability" to obtain draft reports from its engineers and observing that it was "hard to countenance . . . that, as part of the standard relationship between an insurance company and its engineering consultant, documents are not shared as a matter of course at the company's request"); *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus*, 233 F.R.D. 209, 212 (D.D.C. 2006) (explaining that "[b]ecause a client has the right, and the ready ability, to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control").  Here, Rio Tinto can and has a right to obtain the information gathered by its investigators, which it hired and paid for a specific service and work product.  Indeed, at least one court has found that these principles apply with equal force to documents and information available from "investigators employed by him or on his behalf."  *Miller v. Doctor's Gen. Hosp.*, 76 F.R.D. 136, 140 (W.D. Okla. 1977).

There is no doubt that virtually all of the documents requested by Vale of the investigative firms are in the custody or control of Rio Tinto; indeed, it is likely that such information is in the possession of Rio Tinto.  These are the documents requested in all of the Letters of Request (*see* Table, App. 1) – which are also requested in the Second Request for Production (*see supra* 2-3).  It includes documents that (regardless of whether Rio Tinto now possesses them) would have either been shared with Rio Tinto or been readily available to it: proposals, pitch books, presentations, engagement and disengagement letters, bills and invoices, documents shared with it in connection with the reports, research, drafts and discussions

---

[5] The principle is the same under English procedural law, were it applicable (Rio Tinto claims it governs some of its contracts with the investigative firms, Dk. 246 at 13-14).  Under English law, a party has a duty to disclose documents which are in its "control":  any documents in its physical possession, to which it has right to possession or which it has a right to inspect or take copies of.  UK Civil Procedure Rule 31.8(2).  "Right" in this context is to be interpreted as a "presently enforceable legal right."  *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627 HL.  English law holds that a *contractual* right to information creates a "presently enforceable legal right" that constitutes "control."  *Cf*. Paul Matthews & Hodge M. Malek, *Disclosure* § 5.56 (4th ed. 2012) ("Plainly, a right of inspection of documents, pursuant to a contract, satisfies the test in the CPR"); Charles Hollander, *Documentary Evidence* 7-37 (12th ed. 2015) ("Now if a party has or had a right either to inspect or take copies, the obligation to disclose arises.  That will cover cases where the right is contractual or statutory."); *The White Book Service* § 31.8.4 (2015) ("A right of inspection of documents may arise from contract, in which case the relevant documents would be disclosable.").

concerning the reports (*id.*). Rio Tinto should be ordered to produced this material forthwith.

The remainder of the requested materials are the support, interview memos, and information supporting specific findings in the investigative report or necessary for Rio Tinto to serve complete interrogatory requests. The investigative firms no doubt would provide such data and information to Rio Tinto if Rio Tinto really wanted it and pleaded with the firms that the information was necessary for Rio Tinto to pursue its claim. "Control" is not an on-off switch that can be shut down when the information is unhelpful to Rio Tinto and would establish the defense of its litigation adversary: if Rio Tinto would have access to the information for its own purposes, it also has access to it (and control) when necessary to satisfy Rio Tinto's discovery obligations to others.

1. Rio Tinto Has The "Practical Ability" To Obtain Information In The Investigators' Possession

A party is obligated to produce documents where it has the "practical ability" or means to obtain them from another source on demand, irrespective of legal entitlement. *Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co. Ltd.*, 233 F.R.D. 338, 342 (S.D.N.Y. 2005) (the fact that plaintiff secured a former employee's appearance at deposition "suggests that it has the practical means to obtain the relevant portions of his journal from him"). Here, it is clear that Rio Tinto would have the ability to obtain the information if it made a good faith request for it.

It is apparent that Rio Tinto relied on information obtained from its investigators in its Amended Complaint, which shows it had and continues to have access to information gathered by the firms. The existence of its continued right of access is supported, as a practical matter, by the fact that Rio Tinto is an international behemoth with an annual revenue of $47.7 billion, total assets of $107.8 billion, and around 60,000 employees worldwide.[6] It engages in business in all the high-risk jurisdictions where the hiring of investigative firms to seek country intelligence is a fact of life. Indeed, these firms pride themselves in working on investigations related to mining assets in Africa.[7] It is inconceivable that, given its power and how valuable its business is to these firms, Rio Tinto would not have the practical ability to demand from its service providers documents – and that the investigative firms would not produce them – if Rio Tinto wanted those documents for its own purposes in this litigation. The same should be true if Rio Tinto needs them not to prove its case, but to comply with discovery requests the Court has already held relevant and ordered Rio Tinto to honor. Rio Tinto cannot hide behind the position that it lacks control when the documents and information are requested not to support the claims but to refute them.

2. Rio Tinto Has A "Legal Right" To The Information In The Investigators' Possession

In any event, Rio Tinto has a "legal right" to the requested information and documents

---

[6] *See* Rio Tinto, *2014 Rio Tinto Annual Report*, *available at* http://www.riotinto.com/documents/RT_Annual_report_2014.pdf.
[7] *See, e.g.*, Africa Risk Consulting, *Corporate Case Studies*, *available at* http://www.africariskconsulting.com/corporate-case-studies.htm; Livingstone & Company, *Sub-Saharan Africa*, *available at* http://www.livingstoneandcompany.com/sub-saharan-africa.

including the requested documents that are common to each of the Letters of Request and the witnesses to the events reflected in the reports and the documents underlying the reports of its investigative firms. Courts have held that a litigant has a "legal right" to obtain documents from a non-party based on document sharing provisions in agreements between the litigant and a non-party like those contained in Rio Tinto's contracts with the investigators. *In re NTL*, 244 F.R.D. at 196; *Sompo Japan v. M/V TAMPA*, 2005 WL 4012818, at *1. For example, in *In re NTL*, Your Honor found that defendant had the legal right to obtain documents from a non-party under an agreement providing that:

> each party shall . . . allow the other party and its personnel to have access to . . . and . . . take copies of all documents, records or other materials containing any information which that party or any of its Group Companies or affiliated joint ventures *might reasonably require* to be able to comply with their respective legal, regulatory, accounting or filing obligations . . . .

244 F.R.D. at 181-82, 196.[8]

As outlined below, the language contained in Rio Tinto's contracts with its investigative firms provides Rio Tinto with an unfettered right to "any" and "all" information requested from the investigative firms in connection with the engagement. This constitutes a "legal right" under both New York and English law. The time has come for the Court to "interpret [the] contracts." (May 8, 2015 Tr. 26:20.)

Rio Tinto's engagements of both **Livingstone & Company** and **BTG Intelligence Limited** are governed by Rio Tinto's General Conditions for Consultancy Services. Clause 16.1 states: "The Consultant *must* provide Rio Tinto or the Relevant Company with *any information requested* by either of them in relation to the provision of the *Consultancy Services*." (Ex. D, RT0362685 at 22; Ex. E, RT0362647) (emphasis ours). On its face, this clause provides Rio Tinto the express right to obtain the name of confidential sources as well as the other requested information. Regardless of the fact that those engagement letters are governed by English law, both English and U.S. law require a contract be read according to its plain and ordinary meaning. *Excell Consumer Prods. Ltd. v. Smart Candle LLC*, No. 11 C 7220(MEA), 2013 WL 4828581, at *14 (S.D.N.Y. Sept. 10, 2013), *opinion supplemented on denial of reconsideration*, No. 11 C 7220(MEA), 2014 WL 1796657 (S.D.N.Y. May 5, 2014) (English law requires that words "be given their natural and ordinary meaning"); *Envtl. Energy Servs., Inc. v. Cylenchar Ltd.*, Civil Action No. 3:11-CV-0039 (JCH), 2011 WL 4829851, at *3 (D. Conn. Oct. 12, 2011) (applying common law principles to interpret a contract because "principles of contract interpretation under English law [do not] differ from those principles under common law"). Here, "must" entails an imperative. *See Natt v Osman* [2014] EWCA Civ 1520 ("[T]he words 'shall' and 'must' are both synonymous as denoting something which is required to be done as opposed to something

---

[8] *See also Sompo Japan*, 2005 WL 4012818, at *1 (holding that subrogation agreement under which non-party agreed to assist plaintiff in litigation "translates to an obligation by [a non-party] to provide at least certain types of documents to [plaintiff] upon demand"); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992 (holding that non-party licensee's agreement to use "'its best efforts . . . to give [plaintiff sub-licensor] . . . all reasonably requested assistance and information necessary to proceed with [a] suit for infringement' . . . adequately demonstrates that such cooperation has been forthcoming and encompasses production of documents and other assistance in conducting discovery" (internal quotation omitted)).

which is intended to be merely optional."). "Any information" is extremely broad, since "any" means "every," "all," or "unmeasured or unlimited in amount, number, time, or extent." *See, e.g.*, *Webster's Third New International Dictionary of the English Language* 97 (1971). "Consultancy Services" is defined as "the provision of the Consultant's knowledge, skills, experience, deductive and intuitive intellectual capabilities, inventiveness, physical work and other services identified in Schedule A." (Ex. D at 14.) Schedule A describes the duties to monitor political and business issues and provide intelligence reports regarding Simandou Blocks 1 and 2. The plain meaning of Clause 16.1 thus clearly obligates any Consultant to provide Rio Tinto with *any* information in relation to its investigation of Simandou Blocks 1 and 2, including the names of confidential sources and any documents the investigative firms may have in their possession in connection with that investigation.

Moreover, pursuant to Clause 34.1(b), the investigative firm "grants to Rio Tinto . . . a non-exclusive, transferable, royalty free, irrevocable, perpetual, world wide licence to use all [investigative firm's] IP for the purposes of or in connection with their business." (Ex. D at 31.) Under Clause 34.6(c), the investigative firm also has an obligation to "provide all reasonable assistance Rio Tinto . . . may request to protect, perfect, enforce, defend or assert its interests in and right to use and exploit the [firm's] IP. . . . The [investigative firm] must also ensure that its employees provide all reasonable assistance to Rio Tinto." (*Id.*) Taken together, these provisions confirm that Rio Tinto has the legal right to any of the information the investigative firm may develop during the course of its investigation, including underlying documents and confidential source names.

Rio Tinto's only response is misrepresentation. Rio Tinto previously asserted that its investigators contend that Clause 3(e)(i) prevents them from "breaching other contracts and agreements with third parties – *i.e.*, sources." (Dk. 246 at 13.) But it misquotes the contract. Clause 3(e)(i) is contained in a section entitled "Consultant's representations" and contains Livingstone's and BTG's representations "as at the date of the Contract" as to a variety of matters including that the provision of services to Rio Tinto would not violate any other agreement or undertaking to which it was subject. It is not contained in the section regarding "Consultant's information, accounts and records" and does not purport to limit the service provider's obligation to provide access to records and information contained in that section. Thus, on its face and in context, Clause 3(e)(i) assumes and makes clear that the service provider has the legal right and ability to satisfy the other terms of the agreement, including the requirement that it provide access to information and document. It does not restrict that right.

**Africa Risk Confidential**'s proposal states that "*[a]ll* information received from ARC must remain solely for Rio Tinto PLC's private and *exclusive* use." (Ex. F, RT0362643) (emphasis added.) Thus, here too Rio Tinto has a "legal right," in fact an exclusive one, to the information it has been ordered to produce. The language "solely" and "exclusive use" makes clear that Rio Tinto has a right to access and use information gathered and prepared by Africa Risk Confidential on Rio Tinto's behalf. Further, under English law, Rio Tinto has been granted a contractual right in the form of an implied license to use all information received from Africa Risk Confidential. *See Ray v Classic FM* [1998] FSR 622 (holding that it was necessary to imply, in a contract of commission, the grant of a license by the contractor to the commissioner to use the commissioned work in order to give purpose and effect to the agreement). The grant

of a licence means that all information received from Africa Risk Confidential is in the control of Rio Tinto for the purposes of English disclosure rules.

The engagement letter with **Aeneas** similarly states that "*[a]ll* information [was] reported to Rio Tinto" and "*[a]ll* information received from Aeneas [would] remain solely for Rio Tinto's private and *exclusive* use." (Ex. G, RT_AENEAS_0000006.) (emphasis added.)[9] Although the Aeneas proposal is governed by French law (*id.*), the same principles of contract interpretation would apply, with a plain reading clearly demonstrating Rio Tinto's exclusive legal right to that information.

Finally, the proposal from **Executive Research and Associates** ("ERA") does not address this issue (Ex. H, RT0362765), but the result is the same as for the other investigative firms. ERA was a service provider, providing to Rio Tinto its research and investigation services in exchange for consideration and pursuant to a highly-specific proposal governing the scope of its work related to the Vale-BSGR transaction, including when discussions started between Vale and BSGR, who initiated those discussions, who was involved in the decision-making, who expressed concerns about the deal, and Vale's relationship with the Government of Guinea. (*Id.*) Its methodology was also specified, requiring a scan of open sources, review of databases and specialist publications, and interviews of witnesses. Under English law, which is similar to South African law, a legal right to obtain inspection or production of documents, and therefore 'control' of documents for the purposes of disclosure, flows from the right of a principal to see his agent's documents prepared by the agent in the course of its work for the principal, as set out in *Yasuda Fire & Marine Insurance Co. of Europe Ltd v Orion Marine Insurance Underwriting Agency Ltd* [1995] QB 174 and *Equitas v Horace Holman & Co Ltd* [2007] EWHC 903 (Comm). Indeed, when lawyers provide a service to their clients, the client is entitled to the work product prepared by the lawyer on their behalf, which it can request and obtain at any time, and thus that work product is in the client's control. *See generally* Rest. of Law Governing Lawyers § 46(2) (2000) ("on request, a lawyer must allow a client or former client to inspect and copy any document possessed by the lawyer relating to the representation, unless substantial grounds exist to refuse it"); *see also Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn*, 91 N.Y.2d 30, 34-35 (1997) (abandoning the distinction "between documents representing the 'end product' of an attorney's services, which belong to the client, and the attorney's 'work product' leading to the creation of those end product documents, which remains the property of the attorney," and holding instead that client is entitled "full access to the attorney's file"); *Martin v. Valley Nat'l Bank of Ariz.*, 140 F.R.D. 291, 320 (S.D.N.Y. 1991) ("Having been hired to serve the client, the attorney cannot fairly be authorized to subvert the client's interests by denying to the client those work papers to which the client deems it necessary to have access."). The same principle applies here.

### B. The Two Responses From Investigative Firms Confirm That Vale Should Receive Documents Directly From Rio Tinto

As this motion was being prepared, Rio Tinto wrote the Court that it had received

---

[9] Although there is a handwritten notation on the Aeneas engagement letter that says that "RT will send you our 'Terms and Conditions' in 5 working days" (Ex. G, RT_AENEAS_0000006), *i.e.* the same terms and conditions applicable to Livingstone and BTG, Rio Tinto claims that its Terms and Conditions were not in fact sent to Aeneas.

responses to its letter from two of the investigative firms. (*See* Dk. 258 at 17-18). Those letters only further support Vale's application.

First, Rio Tinto misrepresents that it "expanded the letter to include a request for materials responsive to Vale's pending Hague Convention requests." (Dk. 258 at 17.) In fact, Vale did ask that Rio Tinto include in its letter a request for documents responsive to the Letters of Request (and by extension, responsive to Vale's Second RFPs), but Rio Tinto refused to make that request. Therefore, the letter and the responses to it cannot form the basis for Rio Tinto's objecting to turning over the responsive documents – all of which would have been shared with Rio Tinto in the ordinary course. Rio Tinto never asked the firms to turn over that information.

Second, and as important, the content of the firms' responses confirms that Vale is entitled to the requested information. ERA (the author of the reports that purport to substantiate Rio Tinto's allegations against Vale) does not assert that it has a legal right or basis to withhold documents from Rio Tinto or dispute that it would readily provide them to Rio Tinto if Rio Tinto requested all of the documents and information for its own purposes. As laid out above, as ERA's client – who paid it substantial sums for its work – Rio Tinto has the right to all of that information. Rather, ERA objects only to producing the documents and information to Vale. It asserts that until it "receive[s] formal service of the letters of request, [it is] not obliged in law to react thereto" and that therefore it "will not respond to the information sought in [Rio Tinto's] correspondence under reply, which [Executive Research and Associates] understand[s] forms the subject matter of the letter of request, until such time as it is obliged to do so." (Dk. 258-3.) But the issue here is not whether ERA is required to respond to the Letters of Request prior to the formal service of the Letters of Request – plainly, it is not required to do so. The issue here is whether Vale is required to go through the Letter of Request process at all because the documents and information are in the custody and control of Rio Tinto and can be obtained by Rio Tinto to respond to requests validly served and enforceable against Rio Tinto (the plaintiff) under the Federal Rules of Civil Procedure. On that issue, ERA is entirely silent. It does not assert – because it cannot assert – that it has the legal right and privilege to withhold the information from Rio Tinto. Rio Tinto therefore should be compelled to produce the requested information and documents with respect to ERA.

BTG's response is no more compelling. In carefully phrased language, it claims that it need not produce the names to Rio Tinto for ultimate production to Vale because "if supplying such information breaches the Company's agreements and undertakings with its suppliers then such information cannot form part of the services supplied to your client." (Dk. 258-2.) (It does not dispute that Rio Tinto has the legal right to the documents.) But there are two responses to that claim. First, as noted, the source for BTG's claim – Clause 3(e)(i) of the Terms and Conditions – does not support its argument on the Clause's face. As noted, Clause 3(e)(i) is the service provider's representation that there are no agreements or undertakings to third parties that would prevent BTG from satisfying its obligations, including the obligation to provide access set forth in the other provisions of the contract. It does not limit BTG's obligation to provide access. Second, even if it could be read to limit BTG's obligation to provide access when there are conflicting agreements and undertakings (which it does not do), BTG cannot and does not identify a single undertaking or agreement with a third party that would be violated by its discharge of its duties under the General Conditions. Thus, Rio Tinto should be compelled to produce this requested information and documents as well.

What is now clear is that both ERA and BTG have been given their opportunity to have a voice in this proceeding.  So too has Rio Tinto.  The Court has their arguments.  And given how gossamer thin those arguments are, the Court should order Rio Tinto to produce the requested information and documents.

Finally, Rio Tinto claims that it believes Aeneas has made a "complete production of documents in response to Vale's requests" to Aeneas (Dk. 258 at 18).  As Vale informed Rio Tinto in a letter on May 4, the production of nine documents cannot represent the sum total of all the materials in Aeneas's possession.  The production of eight weekly intelligence briefings, spanning only two months (January and February 2011), along with Aeneas's work proposal, does not come close to satisfying Vale's requests for "disengagement letters," "bills or invoices," "bank statements," "documents shared with Rio Tinto," "correspondence" with Rio Tinto and your firm, and "documents reviewed, received, or prepared," all in connection with Aeneas's work concerning Simandou, Guinea, BSGR, Steinmetz, and/or Vale.  (Ex. I, Dk. 225.)

### C. Rio Tinto's Responses Are Meritless

1. Vale Is Not Required To Seek The Documents And Information From Foreign Courts When Rio Tinto Has Control Of Them

Rio Tinto responded to Vale's argument by stating – publicly – that it agreed with the investigative firms that it did not have the right to obtain information from them (thus demonstrating its true intent) and by asking for more delay.  It has suggested that "[i]f Vale desires more information than that already provided in the [investigative] reports," such a request "be directed at the foreign courts and foreign parties from whom Vale is seeking discovery [pursuant to Hague discovery requests], not this Court and not Rio Tinto."  (Dk. 246 at 13-14.)

But that suggestion is meritless.  The Hague Convention procedures "are neither the exclusive nor even, necessarily, the first means for obtaining discovery from a foreign entity" and a discovery demand is proper when served on a party to the action "for documents within their custody or control regardless of where the documents are located."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 182 (S.D.N.Y. 2006); *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 536 (1987) (Hague Convention is a "permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad").  Indeed, if the issue were left to foreign courts, Vale would be left without a remedy.  There is no mechanism for the foreign courts to address the underlying issue of whether Rio Tinto has custody and control of the requested documents and information. It is also clear from delays Rio Tinto has procured to date that Vale will never receive the requested information within the discovery period, or in sufficient time to be able to use it.

Judge Kaplan's opinion in *In re Auction Houses* is illustrative.  Judge Kaplan drew an analogy between requests for a court to make a legal determination as to whether information is within a party's custody and control and requests for a court to make a legal determination as to whether discovery is barred by a blocking statute.  *See* 196 F.R.D. at 446.  Just like in *In re Auction Houses*, here "there is no countervailing United Kingdom governmental interest," nor would Rio Tinto "be faced with serious adverse consequences in the United Kingdom if it were to take a firm position opposite" its investigative firms, "there is genuine ground to suspect [Rio

Tinto's] good faith here," and thus Rio Tinto's "position in resisting an order to respond is considerably weaker than that of one subject to a foreign blocking statute." *Id.* Accordingly, Rio Tinto should be ordered to respond to Vale's interrogatories and produce the requested information, "including in its response information known to" the investigative firms. *Id.* at 447.

> 2. Rio Tinto Cannot Rely On The Purported Legal Rights Of The Investigative Firms To Relieve It Of Its Legal Obligations

Unable to resist production on the basis of the Federal Rules of Civil Procedure alone, Rio Tinto also seeks to rely on the purported rights of the investigative firms – third parties who did not institute this lawsuit and who do not have anything at risk in the suit. But the law does not require Vale's due process rights to discovery or the Federal Rules to bow to the unasserted conclusory claims of firms that have not even appeared in this Court to resist discovery.

First, the claim that Rio Tinto purports to assert on behalf of the investigative firms is itself risible. Rio Tinto has invoked the investigative firms' rights in protecting their networks and sources from personal harm and retribution, and purported obligations with respect to third parties arising under Clause 3(e)(i). (Dk. 246 at 13.) But that claim is expressly contradicted by the terms of the contracts. (*See supra* 13, 15.)

Second, in any event, the Court addressed that concern by inviting the firms to brief their position without subjecting themselves to the Court's jurisdiction. (May 8, 2015 Tr. 26:21-24.) Again, Judge Kaplan's guidance is instructive: although the compelled party had "professed concern for [the third party's] alleged . . . rights," Judge Kaplan found that it was not clear that there was "any real risk at all" and that it "certainly is not inappropriate to order Christie's to respond, and if it does not, then to consider later the efforts that it has made to secure [the third party's] cooperation and the reasons for any failure in determining whether the imposition of sanctions is appropriate and, if so, what those sanctions would be." *In re Auction Houses*, 196 F.R.D. at 447; *see also id.* at 446 (noting that resolving the underlying legal issue "may be more important to the question of sanctions in the event that a discovery order is disobeyed"). Rio Tinto chose to bring this lawsuit in *this* forum and subject itself to the jurisdiction of *this* Court – accordingly, Vale is entitled to a ruling from this Court as to whether the documents and information are within Rio Tinto's custody and control, so as to be able to enforce that ruling by seeking sanctions (including preclusion) as the ultimate consequence of a potential failure to produce.

And, finally, as noted, Rio Tinto has now produced the legal views of two of those firms (one of which is a party to the common language in the General Conditions) and it is clear from their submissions that Rio Tinto would have the right to the information if it was legally required to obtain it and therefore that it should be legally ordered to obtain it.

> **D. In The Alternative, The Court Should Preclude Rio Tinto From Offering Any Evidence Of Equitable Tolling**

In its Opposition to Defendants' Motion to Dismiss the Amended Complaint, Rio Tinto argued for the first time that the December 2008 loss of Simandou Blocks 1 and 2 was not caused by a pattern of racketeering (Opp., Dk. 209 at 5) but that it instead suffered "independent

injuries" when (1) "in April 2011 . . . [Rio Tinto] . . . relinquish[ed] its claims to Blocks 1 and 2 as part of a settlement with the Guinean Government" and (2) "the RICO Enterprise pilfered Rio Tinto's valuable information . . . in 2009." (*Id.* at 1-2.) Rio Tinto thus argued, entirely inconsistent with its Amended Complaint, that its injury occurred in 2011 and *not* December 2008, such that there would be no need for equitable tolling.

Rio Tinto cannot have it both ways. In the event it continues to refuse to produce the documents and information in its custody and control related to its investigation and due diligence that are relevant to defendants' statute of limitations defense, the Court should hold Rio Tinto to this position, and therefore preclude Rio Tinto from offering evidence of equitable tolling. Indeed, where a party has "fail[ed] to provide or supplement information or to identify a witness as Rule 26(a) and 26(e) require[]" – as Rio Tinto has failed to do here – the Federal Rules of Civil Procedure specifically provide that a court has authority to "prohibit[] the offending party from 'us[ing] that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Max Impact, LLC v. Sherwood Grp., Inc.*, No. 09 Civ. 902(JGK)(HBP), 2014 WL 902649, at *4 (S.D.N.Y. Mar. 7, 2014) (noting court's "wide discretion to impose [such] sanctions") (citing Fed. R. Civ. P. 37(c)(1)); *see also Sinco, Inc. v. Metro-N. Commuter R.R. Co.*, 133 F. Supp. 2d 308, 311 n.3 (S.D.N.Y. 2001) (holding that documents not produced during discovery were precluded from consideration on summary judgment); *Grace v. Corbis Sygma*, 535 F. Supp. 2d 392, 394 (S.D.N.Y. 2008) (party "cannot very well now rely on documents that he failed to produce in discovery"). Here, where the information requested is not only within Rio Tinto's custody and control, but also is directly relevant to defendants' statute of limitations defense – and thus could materially impact the resolution of this case – Rio Tinto's noncompliance is neither justified nor harmless, and preclusion would be appropriate. *See Max Impact, LLC*, 2014 WL 902649 at *4, **11-12. This is so regardless of whether Judge Berman sustains Rio Tinto's novel theory of RICO injury.

In sum, Rio Tinto should be ordered to provide discovery on its equitable tolling claim that is in its custody and control even if it is in the possession of foreign investigative firms. Its failure to do so should preclude any reliance on its position that it is entitled to equitable tolling of limitations.

\* \* \* \* \*

For the foregoing reasons, Vale requests that the Court hold that the documents responsive to the Letters of Request (Dk. 225, 226, 227, attached hereto as Exhibits I-K) directed to its investigative firms are in Rio Tinto's custody and control and order Rio Tinto to produce them (*see* Table, App. 1) and order Rio Tinto to amend its interrogatory responses to identify by name the confidential sources referenced in their reports.

Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman

cc:     All counsel of record (via ECF)