# EXHIBIT I

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _____3/31/15_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rio Tinto plc,

            Plaintiff,

    -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

            Defendants.

14 Civ. 3042 (RMB)(AJP)

## ORDER GRANTING APPLICATION FOR
## ISSUANCE OF INTERNATIONAL LETTER OF REQUEST (LETTER ROGATORY)

       Upon the Application for the Issuance of an International Letter of Request (Letter

Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the

issuance of an international letter of request (the "Letter of Request") pursuant to the provisions

of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or

Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague

Evidence Convention"); and upon the record of the above-captioned matter;

     **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

       The Application is **GRANTED**.

This Court shall sign the Letter of Request attached to the Application as Exhibit B and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request.

The Clerk of the District Court is directed to return the original, signed Letter of Request to counsel for Vale so that said Letter of Request may be issued to the Ministère de la Justice acting as the Competent Judicial Authority of the Republic of France.

Vale is directed to transmit the original, signed Letter of Request to the Competent Judicial Authority of the Republic of France.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____3|3||5_____, 2015
        New York, New York


_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

**BY ECF**

11

# EXHIBIT B

# (LETTER OF REQUEST TO AENEAS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc, <br><br>              Plaintiff, <br><br>   -against- <br><br> Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG-Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam, <br><br>          Defendants. | 14 Civ. 3042 (RMB)(AJP) |

### REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Southern District of New York presents its compliments to the Minister of Justice of the Republic of France, "*Garde des Sceaux*," and has the honor of submitting the following request for assistance in obtaining documents requested in the above-captioned action on behalf of Defendant Vale S.A. ("Vale" or the "Applicant"), all of which documents are located in France. This request is made pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague Evidence Convention").

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck <br> United States District Court <br> Southern District of New York <br> 500 Pearl Street, Courtroom 20D |

New York, New York 10007

| | | |
|---|---|---|
| **2.** | **Central Authority of the Requested State** | Ministère de la Justice<br>Direction des Affaires Civiles et du Sceau<br>Bureau de l'entraide civile et commerciale internationale (D3)<br>13, Place Vendôme<br>75042 Paris Cedex 01<br>France |
| **3.** | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

**4.**   **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

| | |
|---|---|
| **Date** | Examinations to occur no later than November 30 2015.  Document productions to occur as the parties may agree, but no later than June 30, 2015. |
| **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), document productions must be substantially complete by June 30, 2015 and pretrial examination of fact witnesses must be complete by November 30, 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

| | | |
|---|---|---|
| **5.** | ***a*** **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B<br>New York, New York 10007 |
| | ***b*** **To the competent authority of (Article 3,a)** | The Republic of France |

**6.**   **Names and addresses of the Parties and their representatives (including**

14

**representatives in the
requested State) (Article 3,b)**

| | | |
|---|---|---|
| *a* | **Plaintiff** | **Rio Tinto plc** |

     **Representatives**     William A. Burck
Michael J. Lyle
Eric C. Lyttle
Quinn Emanuel Urquhart & Sullivan, LLP
777 6th Street NW, 11th Floor
Washington, DC 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

| | | |
|---|---|---|
| *b* | **Defendants** | **Vale, S.A.** |

     **Representatives**     Jonathan I. Blackman
Lewis J. Liman
Boaz S. Morag
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225 2000
Facsimile: (212) 225 3999

**BSG Resources Limited**

     **Representatives**     Robert Gold
Vincent Filardo, Jr.
Elizabeth M. Rotenberg-Schwartz
Mishcon de Reya New York, LLP
750 Seventh Avenue
New York, New York 10019
Telephone: (212) 612 3270
Facsimile: (212) 612-3297

**Benjamin Steinmetz**

     **Representatives**     Robert Gold
Vincent Filardo, Jr.
Elizabeth M. Rotenberg-Schwartz
Mishcon de Reya New York, LLP
750 Seventh Avenue
New York, New York 10019

15

Telephone: (212) 612 3270
Facsimile: (212) 612-3297

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

Representatives                   Martin Joel Auerbach
                                  Law Offices of Martin J. Auerbach, Esq
                                  1185 Avenue of the Americas, 31st Floor
                                  New York, New York 10036
                                  Telephone: (212) 704 4347
                                  Facsimile: (212) 3040175

**Mahmoud Thiam**

Representatives                   Paul Eliot Summit
                                  Sullivan & Worcester LLP (MA)
                                  One Post Office Square
                                  Boston, MA 02109
                                  Telephone: (617) 210 8437
                                  Facsimile: (617) 338 2880

**7.      Nature of the proceedings and summary of claims (Article 3,c)**

7.1     This action, captioned Rio Tinto v. Vale, S.A., et al., Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam. All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea. In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates. The term

"Representative" is used to refer to directors (or shadow directors), officers, employees,

representatives, agents, intermediaries and consultants. The Relevant Period referred to below is

January 1, 2004 to April 30, 2014. Although not named as defendants, Rio Tinto's complaint

16

has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2     Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3     Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4     BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production.  The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family.  BSG Resources Limited maintains an office in London.

7.5     In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world.  Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining rights to four "Blocks" or areas of Simandou:  Blocks 1, 2, 3, and 4.  Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to

17

transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through Guinea or through the neighboring country of Liberia.

      7.6    In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room so that Vale could review certain of Rio Tinto's documents related to the assets under discussion. After the Confidentiality Deed was signed and the data room opened, the two parties ultimately discussed the sale of Rio Tinto's rights to Simandou.

      7.7    On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio Tinto in June 2009.

      7.8    On December 9, 2008, BSGR was granted a research permit for Simandou Blocks 1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those Blocks on December 4, 2008.

      7.9    Over a year later, in February 2010, BSGR approached Vale about the possibility of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began negotiating a joint venture. The negotiations culminated in the signing of a Framework Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both included broad and detailed anti-bribery representations and warranties, on which Vale relied. The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou.  The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release.  Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding.  The Technical Committee found that Vale had no involvement in this bribery scheme.  Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008. Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2. An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008. Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou. Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2. Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea. The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home. The Guernsey Financial Investigations United and the United Kingdom's Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2 Notices on BSGR's current and past London counsel as well as Onyx. BSGR has filed an

20

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division of the English High Court of Justice.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR, any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2, after December 2008 sought other mining companies as partners with respect to these rights, and did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights in which Vale subsequently invested by those means, and whether Vale had anything to do with these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations. Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms retained to conduct competitive intelligence. Among other things, those reports bear on the validity of Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

21

2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008. It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct any investigation after December 1, 2010, at the latest.

7.18    The evidence sought from the investigative firm identified below, which includes evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint venture agreement with Vale in April 2010, and evidence of potential bribery by BSGR and Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of limitations defense, including on the timing of Rio Tinto's claim and whether its investigation was sufficient, as well as the merits of Rio Tinto's claim of a conspiracy between BSGR and Vale and its claim of bribery by BSGR.

**8.    Evidence to be obtained or other judicial act to be performed (Article 3,d)**

8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged  bribery and corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008 shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008. Documents reviewed by the Applicant, including clarification provided by Rio Tinto, identify Tidiane Toure as among those Representatives of Aeneas who were involved in Aeneas' investigation for Rio Tinto during the relevant time period and have knowledge of facts that bear on the issues of this case.

8.2    It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct Tidiane Toure to provide

22

oral testimony for use at trial (if appropriate) to counsel for applicant subject to any applicable privileges that may apply under the rules and procedures of the Requesting Court or the courts of the Republic of France.  The Witness' unique importance to the claims and defenses is described both above and in the subject matters as to which the Witness is to be examined, detailed in Section 10 below.  Absent voluntary cooperation, evidence from Tidian Toure is available only by an order issued by a French Court.

|   |   |   |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Article 3,e)** | Tidiane Toure<br>Aeneas<br>333 Bld Saint Denis<br>92400 Courbevoie<br>France |

10.  **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that the Witness be questioned according to the procedure set out below in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may apply under the rules and procedures of the Requesting Court and in accordance with whatever procedure French law provides for in these matters, on:

Aeneas's investigation for Rio Tinto, including the scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings and conclusions.

11.  **Documents or other property to be inspected (Article 3,g)**

It is requested that Aeneas be required to produce the specified documents described herein as are believed to exist in its power, possession or control.  Such documents are necessary for the purposes of justice and for the due determination of the matters in dispute between the parties.

23

a.  The proposals, pitch books, presentations Aeneas provided to or prepared for Rio
    Tinto which concern Simandou, Guinea, BSGR, Steinmetz, and/or Vale between
    April 30, 2010 and April 30, 2014.

b.  The engagement letters and disengagement letters between Aeneas and Rio Tinto for
    Rio Tinto's retention of Aeneas' services concerning Simandou, Guinea, BSGR,
    Steinmetz, and/or Vale between April 30, 2010 and April 30, 2014.

c.  The bills or invoices, including the time sheets or records of activities performed by
    Aeneas in connection with Rio Tinto's retention of Aeneas' services concerning
    Simandou, Guinea, BSGR, Steinmetz, and/or Vale between April 30, 2010 and April
    30, 2014.

d.  The bank statements showing payment by Rio Tinto to Aeneas in connection with
    Rio Tinto's retention of Aeneas' services concerning Simandou, Guinea, BSGR,
    Steinmetz, and/or Vale between April 30, 2010 and April 30, 2014.

e.  The documents shared with Rio Tinto in connection with Aeneas' services
    concerning Simandou, Guinea, BSGR, Steinmetz, and/or Vale [between April 30,
    2010 and April 30, 2014.

f.  The correspondence between (a) Aeneas and Rio Tinto and/or (b) Aeneas and Quinn
    Emanuel Urquhart & Sullivan LLP regarding the results of Aeneas' investigation
    concerning Simandou, Guinea, BSGR, Steinmetz, and/or Vale between April 30,
    2010 and April 30, 2014.

g.  The documents reviewed, received, or prepared in connection with Aeneas' services
    concerning Simandou, Guinea, BSGR, Steinmetz, and/or Vale, including the

24

documents summarizing or characterizing conversations or information received by

contacts, sources, and/or informants between April 30, 2010 and April 30, 2014.

12.   **Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3,h)**

The Requesting Court requests that in the interest of justice you cause, by your proper

and usual process, the Witness to appear to be examined under oath or affirmation before a

French court.

13.   **Special methods or procedure to be followed (Articles 3,i and 9)**

13.1   Pursuant to Article 9 of the Convention, it is requested that the Witness be placed

under oath or solemn affirmation in accordance with whatever procedure French law provides

for in these matters and in particular Article 211 of the French New Code of Civil Procedure

before answering the oral questions and cross-questions.

13.3   In accordance with Article 740 of the French Civil Procedure Code, the

Requesting Court requests that the legal representatives of the parties be authorized by the

French magistrate presiding over the deposition to put questions to the Witness concerning the

topics listed above.  The legal representatives of the parties be permitted to conduct the

examination of the witness in France on the subjects identified.  The questions would be asked

either in French or in English and translated to the Witness into French by a certified interpreter.

The Witness would answer the questions in French and the certified interpreter would then

translate the answers into English.

13.4   The Requesting Court believes that the procedure of having these attorneys

participate in the taking of the testimony is appropriate and necessary.  These attorneys are

familiar with the relevant events and transactions in this complex matter.  Accordingly, they will

be able to elicit the relevant testimony in a manner as efficient and expeditious as possible.  If the

25

questioning were to be done by someone not familiar with the relevant facts, there is a strong possibility that complete and accurate testimony would not be obtained.

13.5    Vale expects that the taking of the Witness testimony will take one day.

13.6    The Requesting Court also respectfully requests that the questions and the responses of the Witness be recorded verbatim in both French and English and that the Witness sign the verbatim transcript. The verbatim transcript of the Witness' responses to questions under oath taken pursuant to the Letter of Request issued or endorsed by the Courts will be admissible at trial in certain circumstances to be agreed among the parties (or, failing agreement, as directed by the Requesting Court), except to the extent that the content of such transcript of the examination would, for reasons other than the fact that it was obtained in an out-of-court examination, otherwise be inadmissible under the Federal Rules of Evidence if the Witness were present at trial in the relevant jurisdiction.

13.7    In accordance with Articles 3(i) and 9 of the Hague Convention, the Requesting Court respectfully requests that the examination be executed in compliance with American proceedings rules. The Witness would be posed questions in accordance with United States Federal Rules of Civil Procedure, specifically F.R.C.P. 30. In accordance with F.R.C.P. 30(b)(l), attorneys for all parties must be provided notice of the examination and an opportunity to be present. The party seeking the testimony is obligated under U.S. law to notify the attorneys for any other party to the case of the time and place of the examination. Pursuant to F.R.C.P. 30(b)(3), it is requested that the testimony of each witness be recorded by both stenographic and video means. When a party or parties desire that testimony be recorded by stenographic and video means, they are obligated under U.S. law to provide for the presence of the stenographer (court reporter) and videographer and to bear the costs associated with their work. The

26

Applicants would bear the costs of the recordings as well as the costs associated with providing a certified interpreter. The Witness would be entitled to be represented by an attorney present during the examination.

13.8    The Requesting Court also respectfully requests that you cause the testimony of the Witness and all of the documents produced at her examination as a result of the Letter of Request to be duly marked for authentication, and that you further authenticate the examination by the seal of your Court or in such other way in accordance with your procedure and return the written evidence and documents produced or identified to Jean-Yves Garaud of Cleary Gottlieb Steen & Hamilton LLP, 12, rue de Tilsitt, 75008 Paris, under cover duly sealed, and the Requesting Court shall be ready and willing to do the same for you in a similar case when required.

13.9    In the event the evidence cannot be taken in the manner requested above, the Requesting Court respectfully requests that the evidence be taken in the manner provided by the applicable law of the Republic of France.

13.10  The appearance of the Witness for his or her testimony is voluntary and no criminal prosecution in the United States will result from a failure to appear. However, the Requesting Court respectfully requests that, if necessary, appropriate compulsion be exercised to compel the Witness to give evidence in response to this Letter of Request if the Witness is uncooperative.

27

14.   **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[3]**

Jean-Yves Garaud
Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris

15.   **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

16.   **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

The Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or France, or would disclose a privileged communication.

17.   **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of the Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale. The payment of any such fees and costs is without prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

---

[3] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of the Republic of France, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in Republic of France.

DATE OF REQUEST

Mar 31, 2015
.............................................

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

.............................................

HON. ANDREW J. PECK
United States Magistrate Ju
Southern District of New York

29

# EXHIBIT J

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: ___3/31/15___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Rio Tinto plc,

              Plaintiff,

    -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

              Defendants.

14 Civ. 3042 (RMB)(AJP)

---

## ORDER GRANTING APPLICATION FOR
## ISSUANCE OF INTERNATIONAL LETTER OF REQUEST (LETTER ROGATORY)

Upon the Application for the Issuance of an International Letter of Request (Letter

Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the

issuance of an international letter of request (the "Letter of Request") pursuant to the provisions

of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or

Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague

Evidence Convention"); and upon the record of the above-captioned matter;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Application is **GRANTED**.

10

This Court shall sign the Letter of Request attached to the Application as Exhibit B and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request.

The Clerk of the District Court is directed to return the original, signed Letter of Request to counsel for Vale so that said Letter of Request may be issued to the Director General of the Department of Justice and Constitutional Development acting as the Competent Judicial Authority of South Africa.

Vale is directed to transmit the original, signed Letter of Request to the Competent Judicial Authority of South Africa.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____7/31/15_____, 2015
      New York, New York

THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

BY ECF

11

# EXHIBIT B

# (LETTER OF REQUEST TO EXECUTIVE RESEARCH ASSOCIATES)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rio Tinto plc,

                    Plaintiff,

        -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

                    Defendants.

14 Civ. 3042 (RMB)(AJP)

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON
## THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

        The United States District Court for the Southern District of New York presents its
compliments to the Director General of the Department of Justice and Constitutional
Development acting as the Competent Judicial Authority of South Africa and has the honor of
submitting the following request for assistance in obtaining documents requested in the above-
captioned action on behalf of Defendant Vale S.A. ("Vale" or the "Applicant"), all of which
documents are located in South Africa.  This request is made pursuant to the provisions of the
Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial
Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague Evidence
Convention").

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of<br>the Requested State** | Director General<br>Department of Justice and<br>Constitutional Development<br>Postal Address :  Private Bag X81<br>Pretoria, 0001 |

13

|  |  | South Africa |
|---|---|---|
|  |  | Street Address :  Momentum Centre |
|  |  | 329 Pretorius Street |
|  |  | (c/o Pretorius and Prinsloo Streets) |
|  |  | Pretoria |
|  |  | South Africa |

| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck United States District Court Southern District of New York 500 Pearl Street, Courtroom 20D New York, New York 10007 |
|---|---|---|

4. **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

| | **Date** | Examinations to occur as the parties may agree, but no later than November 30, 2015.  Document productions to occur as the parties may agree, but no later than June 30, 2015. |
|---|---|---|
| | **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), document productions must be substantially complete by June 30, 2015 and pretrial examination of fact witnesses must be complete by November 30, 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

| 5. | *a* **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck United States District Court Southern District of New York 500 Pearl Street, Courtroom 17B New York, New York 10007 |
|---|---|---|
| | *b* **To the competent authority of (Article 3,a)** | South Africa |

6. **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)**

*a*   **Plaintiff**                        **Rio Tinto plc**

    **Representatives**            William A. Burck
                                        Michael J. Lyle
                                        Eric C. Lyttle
                                        Quinn Emanuel Urquhart & Sullivan, LLP
                                        777 6th Street NW, 11th Floor
                                        Washington, DC 20001
                                        Telephone: (202) 538-8000
                                        Facsimile: (202) 538-8100


*b*   **Defendants**                       **Vale, S.A.**

    **Representatives**            Jonathan I. Blackman
                                        Lewis J. Liman
                                        Boaz S. Morag
                                        Cleary Gottlieb Steen & Hamilton LLP
                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone: (212) 225 2000
                                        Facsimile: (212) 225 3999

                                        **BSG Resources Limited**

    **Representatives**            Robert Gold
                                        Vincent Filardo, Jr.
                                        Elizabeth M. Rotenberg-Schwartz
                                        Mishcon de Reya New York, LLP
                                        750 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 612 3270
                                        Facsimile: (212) 612-3297

                                        **Benjamin Steinmetz**

    **Representatives**            Robert Gold
                                        Vincent Filardo, Jr.
                                        Elizabeth M. Rotenberg-Schwartz
                                        Mishcon de Reya New York, LLP
                                        750 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 612 3270
                                        Facsimile: (212) 612-3297

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

**Representatives**          Martin Joel Auerbach
                            Law Offices of Martin J. Auerbach, Esq
                            1185 Avenue of the Americas, 31st Floor
                            New York, New York 10036
                            Telephone: (212) 704 4347
                            Facsimile: (212) 3040175

**Mahmoud Thiam**

**Representatives**          Paul Eliot Summit
                            Sullivan & Worcester LLP (MA)
                            One Post Office Square
                            Boston, MA 02109
                            Telephone: (617) 210 8437
                            Facsimile: (617) 338 2880

7.    **Nature of the proceedings and summary of claims (Article 3,c)**

7.1    This action, captioned Rio Tinto v. Vale, S.A., et al., Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

"Representative" is used to refer to directors (or shadow directors), officers, employees,

representatives, agents, intermediaries and consultants.  The Relevant Period referred to below is

January 1, 2004 to April 30, 2014.  Although not named as defendants, Rio Tinto's complaint

has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2    Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3    Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4    BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG Resources Limited maintains an office in London.

7.5    In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to

transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through

Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio

Tinto to Vale or a possible joint venture between the companies.  In September 2008, Vale and

Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room

so that Vale could review certain of Rio Tinto's documents related to the assets under discussion.

After the Confidentiality Deed was signed and the data room opened, the two parties ultimately

discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto

Concession, which covered Blocks 1 and 2 of Simandou.  Notwithstanding this revocation, Rio

Tinto and Vale continued to explore possible transactions.  Vale ultimately purchased iron and

potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by  Rio

Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks

1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those

Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility

of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began

negotiating a joint venture.  The negotiations culminated in the signing of a Framework

Agreement and Shareholders' Agreement, both dated April 30, 2010.  The Agreements both

included broad and detailed anti-bribery representations and warranties, on which Vale relied.

The joint venture was called "VBG."  Vale paid BSGR $500 million as an initial payment of the

$2.5 billion purchase price for its 51% stake in the venture.

18

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee

for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea

(the "Technical Committee") had begun investigating how BSGR had obtained its mining rights

to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury

began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices

Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with

obtaining rights to Simandou.  The Federal Bureau of Investigation ("FBI") arrested BSGR's

alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between

him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President

Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to

destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea.

The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day.

Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison

with three years of supervised release.  Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea

revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to

Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and

efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy

seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury

proceeding.  The Technical Committee found that Vale had no involvement in this bribery

scheme.  Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was

defrauded by BSGR.

19

7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008.  Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2.  An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008.  Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou.  Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2.  Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea.  The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home.  The Guernsey Financial Investigations United and the United Kingdom's Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2 Notices on BSGR's current and past London counsel as well as Onyx.  BSGR has filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division of the English High Court of Justice.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR, any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of trade secrets.  In particular, Vale denies that it did or could have entered into a conspiracy with BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2, after December 2008 sought other mining companies as partners with respect to these rights, and did not agree to a joint venture with Vale until April 2010.  Rio Tinto's claims, as summarized above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights in which Vale subsequently invested by those means, and whether Vale had anything to do with these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the four-year statute of limitations to bring RICO claims.  Rio Tinto claims that, beginning after April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until . . . April 2013."  (AC ¶¶ 146-147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations. Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms retained to conduct competitive intelligence.  Among other things, those reports bear on the validity of Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008. It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct any investigation after December 1, 2010, at the latest.

7.18    The evidence sought from the investigative firm identified below, which includes evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint venture agreement with Vale in April 2010, and evidence of potential bribery by BSGR and Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of limitations defense, including on the timing of Rio Tinto's claim and whether its investigation was sufficient, as well as the merits of Rio Tinto's claim of a conspiracy between BSGR and Vale and its claim of bribery by BSGR.

**8.    Evidence to be obtained or other judicial act to be performed (Article 3,d)**

8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged bribery and corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008 shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008. Documents reviewed by the Applicant, including reports produced and clarification provided by Rio Tinto, identify David Robertze and Warrick Davis-Webb as among those Representatives of Executive Research Associates who were involved in drafting the investigative firm reports during the relevant time period and have knowledge of facts that bear on the issues of this case.

8.2    It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct David Robertze and

Warrick Davis-Webb to provide oral testimony for use at trial (if appropriate) to counsel for

applicant subject to any applicable privileges that may apply under the rules and procedures of

the Requesting Court or the courts of South Africa.  The Witnesses' unique importance to the

claims and defenses is described both above and in the subject matters as to which each Witness

is to be examined, detailed in Section 10 below.  Absent voluntary cooperation, evidence from

David Robertze and Warrick Davis-Webb is available only by an order issued by a South

African Court.

| 9. | **Identity and address of any person to be examined (Article 3,e)** | David Robertze and Warrick Davis-Webb<br>Executive Research Associates<br>PO Box 413222<br>Craighall<br>2024<br>South Africa |
|----|----|----|

10.    **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that each Witness be questioned according to the procedure set out below

in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may

apply under the rules and procedures of the Requesting Court and in accordance with whatever

procedure South African law provides for in these matters, on:

Executive Research Associates' investigation resulting in the reports entitled "Project

VAAL," dated 13 August 2010, and "Project VAAL – timeline assessment of meetings and

events which took place between BSGR, Vale and the Conakry Ggovernment [*sic*] leading up to

the April 2010 MOU," dated 1 December 2010, for Rio Tinto, including the scope and timing of

its engagement, who it interviewed, what documents it reviewed, its findings and conclusions.

11.    **Documents or other property to be inspected (Article 3,g)**

It is requested that Executive Research Associates be required to produce the specified

documents described herein as are believed to exist in its power, possession or control.  Such

23

documents are necessary for the purposes of justice and for the due determination of the matters in dispute between the parties.

    a. The proposals, pitch books, presentations You provided to or prepared for Rio Tinto as reflected in the reports entitled "Project VAAL," dated 13 August 2010, and "Project VAAL – timeline assessment of meetings and events which took place between BSGR, Vale and the Conakry Ggovernment [*sic*] leading up to the April 2010 MOU," dated 1 December 2010 (hereinafter, "Project VAAL II"), which concern Simandou, Guinea, BSGR, Steinmetz, and/or Vale (collectively, the "Reports").

    b. The engagement letters and disengagement letters between You and Rio Tinto for Rio Tinto's retention of Your services in connection with the Reports.

    c. The bills or invoices, including the time sheets or records of activities performed by You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

    d. The bank statements showing payment by Rio Tinto to You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

    e. The documents shared with Rio Tinto in connection with the Reports.

    f. The drafts of the Reports, including the research for, preparation of, and analyses and discussions regarding the Reports for Rio Tinto, whether relied upon or not in any version of the Reports for Rio Tinto.

    g. The documents, including interview memoranda, which You relied on for Your findings set forth on page 16 of the "Project VAAL" report that "several companies were approached simultaneously [by BSGR] including [Arcelor]Mittal" concerning a

potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou, including the names of the "several companies" other than ArcelorMittal and interview memoranda summarizing or characterizing conversations with members of BSGR and/or members of the "several companies" related to such a potential joint venture.

h.  The documents which You relied on for Your finding that BSGR "spoke to Mittal, BHP-Billiton and Kumba before it spoke to Vale," as referenced on page 9 of the "Project VAAL II" report, including interview memoranda reflecting discussions between Dag Cramer and a source during a meeting in Europe on 7 November 2008, during which Cramer told the source that Mittal may be "'interested' in collaborating with BSGR in a JV," as referenced on page 10 of the "Project VAAL II" report.

i.  The documents which You relied on for Your finding on page 12 of the "Project VAAL II" report that, as of February 2009, "[n]egotiations had started between BSGR and Chinalco," as well as Your finding on page 14 of that report of a meeting between a "Chinalco delegation" and "BSGR elements" on 22-24 November 2009.

j.  The documents, including interview memoranda from "multiple sources," which You relied on for Your findings as set forth on page 6 of the "Project VAAL" report concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and ArcelorMittal, including to interview memoranda from "multiple sources" evidencing that "discussions between ArcelorMittal and BSGR broke down during the latter half of [2009]," including:

25

      i. The interview memoranda summarizing or characterizing conversations with members of BSGR and/or ArcelorMittal related to such a potential joint venture.

      ii. The emails to or from a BSGR email address with ArcelorMittal and their attachments.

      iii. The term sheets agreed between BSGR and ArcelorMittal.

      iv. The contents of any data room between BSGR and ArcelorMittal.

k. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 6 of the "Project VAAL" report that "[m]ultiple sources have indicated that Vale only entered into serious negotiations with BSGR in December 2009."

l. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 6 of the "Project VAAL" report that "the December 2009 talks [between BSGR and Vale] had been preceded by earlier discussions of a preliminary nature between both parties, the first having taken place in late 2008 following by a second round of discussions in July 2009."

m. The interview memoranda reflecting discussions with a "Guinean source" who was told by a Vale delegation that "the only prior contacts Vale had had with BSGR people working in Simandou-Zogota, was on a social or in an un-official capacity – but that no 'official discussions or agreement' had been reached at this time between both sides" and the interview memoranda with other "[k]ey sources . . . of the view that official meetings only took place between Vale and BSGR after Vale's early

December meeting with the [Guinean] officials," as referenced on page 10 of the "Project VAAL II" report.

n.  The documents, including interview memoranda, which You relied on for Your findings related to the meetings, referenced in the "Project VAAL II" report, between BSGR and Vale, and Your finding that "the first such recorded meeting between both sides only took place on 1 March 2009," including in reference to the following meetings:

    i.  The meeting in Dakar, Senegal between BSGR's Mark Struik and "Mr. Martins" from Vale on 1 March 2009.

    ii.  The meeting between Minister Thiam and Vale "engineers" on 4 March 2009.

    iii.  The meeting between Issa Camara, Avidan, and a Vale representative at Simandou on 7 March 2009.

    iv.  The bilateral meetings between Vale and BSGR officials in Conakry on 19 March 2009.

    v.  The meeting between Vale's legal team, officials from Vale's local office, and legal representatives from BSGR and Bateman on 25 March 2009.

    vi.  The meeting between Vale CEO Roger Agnelli and members of BSGR Guinea's team around 10 April 2009.

    vii.  The  meeting between Minister Thiam and top Vale and BSGR officials in Paris on 15 April 2009.

    viii.  The visit by Avidan and Cramer to Brazil to meet a host of Vale's directors in January 2010.

      ix.  The meeting between BSGR people and Vale in Conakry on 13-14 February 2010.

      x.  The ongoing meetings between BSGR and Vale team leaders at Simandou in February 2010.

      xi.  The additional meetings in April 2010, as referenced on page 16 of the "Project VAAL II" report, including final negotiations to have taken place in Brazil on 20-30 April 2010.

o.  The documents, including interview memoranda, gathered from "human intelligence" and sources referenced on page 5 of the "Project VAAL II" report, including:

      i.  Two sources [redacted];

      ii.  One top source [redacted];

      iii.  A source in ArcelorMittal's head-office in Europe, including with respect to "discussions at one point" between "BSGR and Mittal";

      iv.  Roughly 5 to 6 sources working at different levels in Guinea Conakry.

p.  The "memo written by [Marco] Monteiro in May 2006, [according to which] an iron ore project was already being planned for Simandou," as referenced on page 7 of the "Project VAAL II" report.

q.  The documents, including interview memoranda, which You relied on for Your findings as set forth on page 8 of the "Project VAAL" report that the Government of Guinea "played a crucial role, specifically in assuring Vale (and the Brazilian government) that the Simandou investment would be safe."

r.  The documents, including interview memoranda, which You relied on for Your findings as set forth on page 8 of the "Project VAAL" report that Mahmoud Thiam

("Thiam") "has been behind attempts to undermine Rio Tinto's claim to the Simandou concessions, wanting rather several mining groups to work the area," including "RT-Chinalco and Vale-BSGR . . . an Angolan-Chinese-conglomeration CIF Sonangol in a JV known as ADC . . . Bellzone . . . [and] of course, ArcelorMittal and BHP-Billiton."

s.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 9 of the "Project VAAL" report that Jean Marie Doré ("Doré") "work[ed] closely with Mining Minister Thiam in getting several large mining companies to develop Simandou, believing that no single firm or coalition of companies can deal with the huge area single-handedly."

t.  The sources which You relied on for Your finding that "[w]ith regard to the [Guinea Conakry ("GC")] Mining Ministry, there is widespread acknowledgement that it is the purveyor of widespread·corruption" and that the ministry "has become the personal fiefdom of Minister Thiam," as referenced on page 20 of the "Project VAAL" report.

u.  The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 8-9 of the "Project VAAL" report that the "powerful fourth wife of the late President Conté, Mamadie Touré has been known to have been a long-time supporter of Benny Steinmetz," including interview memoranda with Your source(s) for the "rumour" that Mamadie Touré's brother, "BSGR's [then] Vice-President of its Guinea operations Ibrahima Soury [*sic*] Touré . . . convinced her to convince the ailing general [President] Conté to intercede on Steinmetz's behalf . . . in securing the Simandou concessions," and interview memoranda with Your

29

source(s) for Your finding that "Mamadie Touré was a critical supporter of mining contracts secured by BSGR in December 2007" in the Forécariah mining region, including by "overrul[ing] cabinet decisions on the allocation of mining concessions in favour of Steinmetz and also reportedly secur[ing] a top government building for BSGR to use as its [headquarters] in Guinea."

v. The documents, including interview memoranda, which You relied on for Your finding of "rumours that Steinmetz paid GBP 7 million to elicit favours from the presidential wife," as referenced on page 8 of the "Project VAAL II" report.

w. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 9 of the "Project VAAL" report that Colonel Bouréma Condé, although originally "skeptical of the BSGR-Vale deal, having been close to the Rio Tinto dispensation . . . seemed to change his mind after BSGR initiated several 'social programmes' in destitute areas under his control and direction."

x. The documents, including interview memoranda, which You relied on for Your finding that Vale "[i]s willing to take some risks, if the outcome looks promising," as referenced on page 11 of the "Project VAAL" report including interview memoranda with the "Vale source" quoted on page 11 of that report as saying, "'[w]e don't have a problem in going into troubled areas: if you want to hunt elephants, you have to go where elephants are.  There are no elephants on 5th St, NYC.'"

y. The documents which You relied on for Your finding set forth on pages 3 and 11 of the "Project VAAL" report that "[t]he decision to enter into talks with BSGR was taken by a strategy 'crisis group' headed by Vale's CEO Roger Agnelli" (as also referenced on page 12 of the "Project VAAL II" report).

30

z. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3 and 12 of the "Project VAAL" report that "[o]nce the decision to link up with Steinmetz was taken" an "operational oriented [group] was constituted [at Vale] to hold direct talks with BSGR" which "worked during late 2009 in intense contacts with" BSGR (as also referenced on page 12 of the "Project VAAL II" report).

aa. The "classified briefing made to the three Vale teams dealing with BSGR and selected shareholders" made by José Carlos Martins, as referenced on pages 12-13 of the "Project VAAL" report.

bb. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 15 of the "Project VAAL" report that "Vale used several entities to ensure that all legal aspects of the deal [with BSGR over Simandou] was secure, notwithstanding the challenges posed by Rio Tinto," and that Vale "did its homework before making the investment," including any documents summarizing conversations with José Martins who is quoted on page 15 of that report as saying "'[w]e took all precautions.'"

cc. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 3, 15, and 16 of the "Project VAAL" report that "[a]vailable information suggests that there was very little internal opposition to Vale partnering [with] BSGR in Guinea" and that "[h]ad there been significant opposition to the Simandou deal within Vale, it would not have gone through, especially with government concerns that were lurking in the background."

31

dd. The documents, including interview memoranda, which You relied on for Your findings as set forth on pages 16 of the "Project VAAL" report that "if there was one major exception [to the lack of opposition to the Simandou deal within Vale], it came from Fabio Barbosa," including interview memoranda with the sources cited on page 16 of that report stating that in mid-2008 Fabio Barbosa "voiced concerns over Simandou with regard to environmental and other ethical issues, but that the exact reasons are not known."

ee. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 16 of the "Project VAAL" report that "BSGR was frightened by the prospect of having to develop [a Trans-Guinean Rail link] alone, when it took possession of the Simandou concessions, and therefore had made it a priority to find a willing partner to share the burden of infrastructure costs," including:

    i. The interview memoranda summarizing or characterizing conversations with members of BSGR related to finding, and/or negotiations with, such a willing partner to share the burden of infrastructure such a potential joint venture.

    ii. The emails to or from a BSGR email address with potential partners discussing infrastructure and their attachments.

ff. The documents, including interview memoranda, which You relied on for Your findings that Vale "was [BSGR's] first prospective partner willing to work on infrastructure" as set forth on page 16 of the "Project VAAL" report.

gg. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 16 of the "Project VAAL" report that Vale was willing to work with BSGR on infrastructure "although on a revised and downscaled version of the original grand project," including:

   i. The documents, including emails to or from a BSGR email address with potential partners and interview memoranda summarizing conversations with members of BSGR related to or discussing the "original grand project."

   ii. The term sheets relating to the "original grand project."

   iii. The documents, including emails to or from a BSGR email address and interview memoranda summarizing conversations with members of BSGR related to or discussing the "revised and downscaled version of the original grand project."

   iv. The term sheets relating to the "revised and downscaled version of the original grand project."

hh. The interview memoranda with "one contact in GC," who was reported as stating that using the Liberian corridor to transport iron ore from Simandou "was part of Rio Tinto's initial plan of action (from around 2006)" but that "the significant political instability within Liberia had thrown a question mark over the viability of such a line" and that "efforts had been undertaken to pursue the alternate rail route through Liberia, but the lack of security prevented even preliminary efforts," as referenced on page 17 of the "Project VAAL" report.

33

ii. The documents, including interview memoranda, which You relied on for Your finding as set forth on page 17 of the "Project VAAL" report that "Liberia offers a deepwater port option making the pursuance of the transport link more practical."

jj. The interview memoranda with Your "contact in GC" who is referenced on page 17 of the "Project VAAL" report and who characterized the "Liberian option [as] extremely problematic, and personally did not think it was do-able."

kk. The documents, including interview memoranda, which You relied on for Your findings as set forth on page 17 of the "Project VAAL" report that "Bateman played a significant role in leveraging the full value of [the Simandou] deposit for BSGR," and was "directly responsible for defining and managing the metallurgical test work . . . the materials handling system at a port and the entire infrastructure surrounding the mine and the plant," including the sources supporting the statement that this "ultimately led to the signing of the [joint venture] between BSGR and GC government in December 2008."

ll. Any other documents reviewed, received, or prepared in connection with the Reports, including the documents summarizing or characterizing conversations or information received by contacts, sources, and/or informants cited in the Reports.

12.    **Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3,h)**

The Requesting Court requests that in the interest of justice you cause, by your proper and usual process, each Witness to appear to be examined under oath or affirmation at the office of Cleary Gottlieb Steen & Hamilton LLP, 12, rue de Tilsitt, 75008 Paris, or such other place as the parties may agree.

13.    **Special methods or procedure to be followed (Articles 3,i and 9)**

34

13.1    The Requesting Court further requests that Jonathan Blackman and Lewis Liman, who are representatives of Vale, or such other persons later designated by Vale, be appointed as Commissioners pursuant to Article 17 of the Convention, and be authorized to question the Witnesses on the subjects identified above and elicit their sworn testimony.

13.2    Pursuant to Article 9 of the Convention, it is requested that the legal representatives of Vale be permitted to conduct the examination of each Witness in South Africa before an impartial Attorney of the Bar of South Africa (the "Examiner"), to be nominated by the Applicants, who, subject to approval by you, shall act as referee. It is requested that the Witnesses be placed under oath or solemn affirmation in accordance with whatever procedure South African law provides for in these matters before answering the oral questions and cross-questions on the subjects identified above which are put to them by the legal representatives referred to above.

13.3    The Requesting Court believes that the procedure of having these attorneys appointed to take the testimony is appropriate and necessary. These attorneys are familiar with the relevant events and transactions in this complex matter. Accordingly, they will be able to elicit the relevant testimony in a manner as efficient and expeditious as possible. If the questioning were to be done by someone not familiar with the relevant facts, there is a strong possibility that complete and accurate testimony would not be obtained.

13.4    The Requesting Court respectfully requests that the representatives of Vale be allotted a total of five hours for each of their examinations. Counsel for these parties will consult with each Witness' legal representatives in order to determine a mutually convenient date to conduct the examination on or before November 30, 2015, as approved by you.

35

13.5    The Requesting Court also respectfully requests that the questions and the responses of each Witness be recorded verbatim and that each Witness sign the verbatim transcript. The verbatim transcript of each Witness' responses to questions under oath taken pursuant to the Letter of Request issued or endorsed by the Courts will be admissible at trial in certain circumstances to be agreed among the parties (or, failing agreement, as directed by the Requesting Court), except to the extent that the content of such transcript of the examination would, for reasons other than the fact that it was obtained in an out-of-court examination, otherwise be inadmissible under the Federal Rules of Evidence if the Witness were present at trial in the relevant jurisdiction. The Requesting Court also respectfully requests that you cause the testimony of each Witness to be duly marked for authentication, and that you further authenticate the examination by the seal of your Court or in such other way in accordance with your procedure and return the written evidence and documents produced or identified to Jason Smit of Werksmans Attorneys, 155, 5th Street, Sandton, Johannesburg , 2196, South Africa, under cover duly sealed, and the Requesting Court shall be ready and willing to do the same for you in a similar case when required.

13.6    In the event the evidence cannot be taken in the manner requested above, the Requesting Court respectfully requests that the evidence be taken in the manner provided by the applicable law of the South Africa.

13.7    The appearance of each Witness for his or her testimony is voluntary and no criminal prosecution in the United States will result from a failure to appear. However, the Requesting Court respectfully requests that, if necessary, appropriate compulsion be exercised to compel each Witness to give evidence in response to this Letter of Request if the Witness is uncooperative.

36

14. **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[3]**

Jason Smit
Werksmans Attorneys
155 5th Street
Sandton
Johannesburg
2196
South Africa

15. **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

16. **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

Each Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or South Africa, or would disclose a privileged communication.

17. **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale.  The payment of any such fees and costs is without

---

[3] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of South Africa, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in South Africa.

prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees

and costs from other parties to the proceedings before the Requesting Court.


DATE OF REQUEST                             March 31, 2015


SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

38