# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc, | USDC SDNY |
| Plaintiff, | DOCUMENT |
| | ELECTRONICALLY FILED |
| -against- | DOC# _____ |
| | DATE FILED: 3/31/15 |
| Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG-Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam, | 14 Civ. 3042 (RMB)(AJP) |
| Defendants. | |

## ORDER GRANTING APPLICATION FOR
## ISSUANCE OF INTERNATION LETTERS OF REQUEST (LETTERS ROGATORY)

Upon the Application for the Issuance of an International Letter of Request (Letter

Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the

issuance of an international letters of request (the "Letters of Request") pursuant to the

provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in

Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague

Evidence Convention"); and upon the record of the above-captioned matter;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Application is **GRANTED**.

This Court shall sign the Letters of Request attached to the Application as Exhibits B through D and affix the seal of the United States District Court for the Southern District of New York over said signature in each of the Letters of Request.

The Clerk of the District Court is directed to return the original, signed Letters of Request to counsel for Vale so that said Letters of Request may be issued to the Senior Master of the High Court (Queen's Bench Division) acting as the Competent Judicial Authority of the United Kingdom.

Vale is directed to transmit the original, signed Letters of Request to the Competent Judicial Authority of the United Kingdom.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____3/31/15_____, 2015
       New York, New York

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

COPIES ECF: All Counsel
Jopi Brun

**BY ECF**

11

# EXHIBIT B

# (LETTER OF REQUEST TO AFRICA RISK CONSULTING)

**Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of the Requested State** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL |
| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

4.    **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

> **Date**                    Examinations to occur as the parties may agree, but no later than November 30, 2015.  Document productions to occur as the parties may agree, but no later than June 30, 2015.

> **Reason for urgency**      Under the Court's Scheduling Order (Dkt. Nos. 161, 163), document productions must be substantially complete by June 30, 2015 and pretrial examination of fact witnesses must be complete by November 30, 2015.

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

5.  *a*  **Requesting judicial authority (Article 3,a)**          The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B

13

|   |   | New York, New York 10007 |
|---|---|---|
| **b** | **To the competent authority of (Article 3,a)** | United Kingdom of Great Britain and Northern Ireland |

6. **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)**

| **a** | **Plaintiff** | **Rio Tinto plc** |
|---|---|---|
|   | **Representatives** | William A. Burck<br>Michael J. Lyle<br>Eric C. Lyttle<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW, 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100 |
| **b** | **Defendants** | **Vale, S.A.** |
|   | **Representatives** | Jonathan I. Blackman<br>Lewis J. Liman<br>Boaz S. Morag<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225 2000<br>Facsimile: (212) 225 3999 |
|   |   | **BSG Resources Limited** |
|   | **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
|   |   | **Benjamin Steinmetz** |

14

| **Representatives** | Robert Gold |
| | Vincent Filardo, Jr. |
| | Elizabeth M. Rotenberg-Schwartz |
| | Mishcon de Reya New York, LLP |
| | 750 Seventh Avenue |
| | New York, New York 10019 |
| | Telephone: (212) 612 3270 |
| | Facsimile: (212) 612-3297 |

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

| **Representatives** | Martin Joel Auerbach |
| | Law Offices of Martin J. Auerbach, Esq |
| | 1185 Avenue of the Americas, 31st Floor |
| | New York, New York 10036 |
| | Telephone: (212) 704 4347 |
| | Facsimile: (212) 3040175 |

**Mahmoud Thiam**

| **Representatives** | Paul Eliot Summit |
| | Sullivan & Worcester LLP (MA) |
| | One Post Office Square |
| | Boston, MA 02109 |
| | Telephone: (617) 210 8437 |
| | Facsimile: (617) 338 2880 |

7.    **Nature of the proceedings and summary of claims (Article 3,c)**

7.1    This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

15

"Representative" is used to refer to directors (or shadow directors), officers, employees, representatives, agents, intermediaries and consultants. The Relevant Period referred to below is January 1, 2004 to April 30, 2014. Although not named as defendants, Rio Tinto's complaint has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2    Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3    Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4    BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG Resources Limited maintains an office in London.

7.5    In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining

16

rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room so that Vale could review certain of Rio Tinto's documents related to the assets under discussion. After the Confidentiality Deed was signed and the data room opened, the two parties ultimately discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks 1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began negotiating a joint venture. The negotiations culminated in the signing of a Framework Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both included broad and detailed anti-bribery representations and warranties, on which Vale relied.

17

The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou. The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release. Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding. The Technical Committee found that Vale had no involvement in this bribery

18

scheme. Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008. Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2. An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008. Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou. Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2. Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea. The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home. The Guernsey Financial Investigations United and the United Kingdom's

Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2

Notices on BSGR's current and past London counsel as well as Onyx. BSGR has filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division

of the English High Court of Justice.

 7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR,

any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of

trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with

BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2,

after December 2008 sought other mining companies as partners with respect to these rights, and

did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized

above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether

BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights

in which Vale subsequently invested by those means, and whether Vale had anything to do with

these activities, which it denies.

 7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the

four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after

April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into

the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the

concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to

discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-

147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations.

Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms retained

to conduct competitive intelligence. Among other things, those reports bear on the validity of

Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April 2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008. It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct any investigation after December 1, 2010, at the latest.

7.18   The evidence sought from the investigative firm identified below, which includes evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint venture agreement with Vale in April 2010, and evidence of potential bribery by BSGR and Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of limitations defense, including on the timing of Rio Tinto's claim and whether its investigation was sufficient, as well as the merits of Rio Tinto's claim of a conspiracy between BSGR and Vale and its claim of bribery by BSGR.

## 8.     Evidence to be obtained or other judicial act to be performed (Article 3,d)

8.1     Rio Tinto's claims rest fundamentally on (1) BSGR's alleged bribery and corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008 shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008. Documents reviewed by the Applicant, including reports produced and clarification provided by Rio Tinto, identify Tara O'Connor as among those Representatives of Africa Risk Consulting who were involved in drafting the investigative firm reports during the relevant time period and have knowledge of facts that bear on the issues of this case.

8.2    It is accordingly requested that for the purpose of justice and for due

determination of the matters in dispute between the parties you direct Tara O'Connor to provide

oral testimony for use at trial (if appropriate) to counsel for applicant subject to any applicable

privileges that may apply under the rules and procedures of the Requesting Court or the courts of

England and Wales. The Witnesses' unique importance to the claims and defenses is described

both above and in the subject matters as to which each Witness is to be examined, detailed in

Section 10 below.  Absent voluntary cooperation, evidence from Tara O'Connor is available

only by an order of the High Court.

| | | |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Article 3,e)** | Tara O'Connor<br>+ 44 (0) 207 0784080 |

10.    **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that each Witness be questioned according to the procedure set out below

in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may

apply under the rules and procedures of the Requesting Court or the courts of England and

Wales, on:

Africa Risk Consulting's investigation resulting in the reports entitled:  (a) "Interim

Draft: Project Isiro Profiles," dated 18 May 2009; (b) "Report:  Project Isiro," dated 26 June

2009; (c) "Report:  Project Isiro, Section II: Corruption Risk Enquiry, Draft Report" dated 1 July

2009; (d) "Corruption Risk Enquiry, Draft Report" dated 1 July 2009; (e) "Economic

Indicators," dated 6 July 2009; (f) "Guinea Briefing" and "Chronology," dated 11 August 2009;

(g) "Project Isiro II, Draft Report," dated 12 August 2009; (h) "Memo Project Isiro," dated 8

September 2009; (i) "Guinea Briefing," dated 23 October 2009; (i) "Poisoning stirs

Peulh-Malinké tensions," dated 1 November 2010; and (j) "Key Findings," dated 7 November

2010, for Rio Tinto, including the scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings and conclusions.

11. **Documents or other property to be inspected (Article 3,g)**

It is requested that Africa Risk Consulting be required to produce the specified documents described herein as are believed to exist in its power, possession or control. Such documents are necessary for the purposes of justice and for the due determination of the matters in dispute between the parties.

a. The proposals, pitch books, presentations You provided to or prepared for Rio Tinto as reflected in the reports entitled:  (a) "Interim Draft:  Project Isiro Profiles," dated 18 May 2009; (b) "Report:  Project Isiro," dated 26 June 2009; (c) "Report: Project Isiro, Section II: Corruption Risk Enquiry, Draft Report" dated 1 July 2009; (d) "Corruption Risk Enquiry, Draft Report" dated 1 July 2009; (e) "Economic Indicators," dated 6 July 2009; (f) "Guinea Briefing" and "Chronology," dated 11 August 2009; (g) "Project Isiro II, Draft Report," dated 12 August 2009; (h) "Memo Project Isiro," dated 8 September 2009; (i) "Guinea Briefing," dated 23 October 2009; (i) "Poisoning stirs Peulh-Malinké tensions," dated 1 November 2010; and (j) "Key Findings," dated 7 November 2010, which concern Simandou, Guinea, BSGR, Steinmetz, and/or Vale (the "Reports").

b. The engagement letters and disengagement letters between You and Rio Tinto for Rio Tinto's retention of Your services in connection with the Reports.

c. The bills or invoices, including the time sheets or records of activities performed by You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

23

d.  The bank statements showing payment by Rio Tinto to You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

e.  The documents shared with Rio Tinto in connection with the Reports.

f.  The drafts of the Reports, including the research for, preparation of, and analyses and discussions regarding the Reports for Rio Tinto, whether relied upon or not in any version of the a Report for Rio Tinto.

g.  The documents, including interview memoranda, which You relied on for Your finding that "[t]he minister of mines [Thiam] told a confidential ARC source that he has a good relations with Benny Steinmetz who has made a point of making himself known to Thiam," as referenced on page 15 of Your report entitled "Project Isiro," dated 26 June 2009.

h.  The documents which You relied on for Your findings on page 1 of Your report entitled "Key Findings," dated 7 November 2010, referring to Minister of Mines Mahmoud Thiam's ("Thiam") "[f]requent travel on the private jet of Beny Steinmetz . . . to numerous jurisdictions" and "Thiam and Beny Steinmetz tog[e]ther making frequent private flights to numerous jursidictions," including the flight records and confidential source inquiries supporting the itineraries listed on page 22 of that report.

i.  The documents which You relied on for Your finding that "Steinmetz and Thiam attend[ed] a family wedding in Israel," as referenced on page 1 of Your report entitled "Key Findings," dated 7 November 2010, including (for example) the wedding invitation, passport details, flight information, or correspondence related to the visit.

j.  Any other documents, providing a basis for, or concerning Your findings as set forth in Your report entitled "Key Findings," dated 7 November 2010, concerning the relationship between Thiam and Steinmetz.

k.  The documents, including interview memoranda, which You relied on for Your finding that Thiam "is very close to former economy and finance minister Ibrahima Kassory Fofana, who supported his appointment for his current position in the new military government," as referenced on page 22 of Your report entitled "Interim Draft: Project Isiro Profiles," dated 18 May 2009, and pages 3 and 13 of Your report entitled "Key Findings," dated 7 November 2010, including interview memoranda with the source quoted on page 13 of that report as saying, "When he was in government, Kassory Fofana often asked Thiam's advice."

l.  The documents, including interview memoranda summarizing or characterizing Your discussion with a "well-informed source," which You relied on for Your finding that "Thiam returned to Guinea on this specific mission:  to support the Kassory [Fofana] agenda," as referenced on page 20 of Your report entitled "Interim Draft: Project Isiro Profiles," dated 18 May 2009.

m.  The documents, including interview memoranda or media articles, which You relied on for Your finding that "Guinea commentators suggest Fofana was behind the 2008 award of the Simandou iron ore concession to BSGR Guinea" and that "[i]t is thought Fofana's influence secured the decision by the new Mines Minister [Thiam] . . . not to overturn the award to BSGR.  Steinmetz is known to have met personally with the new Mines Minister," as referenced on page 4 of Your report entitled "Corruption Risk Enquiry: Draft Report," dated 1 July 2009.

n.  The documents, including interview memoranda and other "reports [that] indicate that Kassory [Fofana] did not avoid a direct confrontation with Prime Minister Ahmed Tidiane Souaré on 10 November 2008, when he gave Souaré a talking to in private," as referenced on page 25 of Your report entitled "Interim Draft: Project Isiro Profiles," dated 18 May 2009.

o.  The documents which You relied on for Your finding of Thiam's purchase of properties located at 771 Duell Road in Dutchess County, New York, 170 East End Avenue in New York, New York, including (for example) the deed of purchase, land registry, or land value appraisal.

p.  The documents which You relied on for Your finding on page 1 of Your report entitled "Key Findings," dated 7 November 2010, of Thiam's "[s]uspicious purchase of $1.5 million new development apartment in New York with no mortgage several days after the conclusion of a loan agreement between CIF and Alex Stewart International," including the deed of purchase, land registry, land value appraisal, and the loan agreement.

q.  The documents concerning or relating to any other real estate owned directly or indirectly by Thiam.

r.  The documents which You relied on for Your finding that Rio Tinto was "already well-informed about Beny Steinmetz, his interests and activities," as referenced on page 12 of Your report entitled "Project Isiro, Section II: Corruption Risk Enquiry, Draft Report," dated 1 July 2009 and on page 18 of Your report entitled "Project Isiro II, Draft report," dated 12 August 2009.

s. The documents which You relied on for Your findings as set forth in Your report entitled "Key Findings," dated 7 November 2010, concerning bribes paid by BSGR to the Government of Guinea, including the finding on page 15 that "[President] Conté's fourth wife ([Mamadie Touré] cited above [on page 12]) who actually has interests in BSGR Guinea, received kickbacks to help establish the company in the country," including interview memoranda from sources referring to "£7 million and much more from the start" and the *Jeune Afrique* report from 2008 cited for the proposition that "Steinmetz paid $7 million to those close to Conté on the eve of the signing over of the rights to Simandou."

t. The documents which You relied on for Your finding that "Ibrahima Sory Touré, in charge of external relations for BSGR Guinea, is one of the brothers of Mamadie Touré Conté, the 4th wife of the late president," as referenced on page 15 of Your report entitled "Project Isiro, Section II: Corruption Risk Enquiry, Draft Report," dated 1 July 2009, including the *Africa Mining Intelligence* report, dated 7 January 2009, which is cited as the source supporting that statement.

u. The documents which You relied on for Your finding that "Ibrahima Sory Touré was the intermediary of his sister, who used her influence on Conté to achieve her goals," as referenced on page 12 of Your report entitled "Key Findings," dated 7 November 2010, including the interview memoranda of the conversations with Ibrahima Sory Touré, as quoted on pages 12-13 of that report.

v. The interview memoranda with a "senior ARC source who knows Touré well," who is referenced on pages 18-20 of Your report entitled "Project Isiro II, Draft report," dated 12 August 2009, as having confirmed Touré's relationship with

Steinmetz, stating that Touré "opened many doors to Steinmetz and has many relationships," characterizing the award of mining rights to BSGR as "a beautiful coup," and reporting that Touré was appointed to his BSGR position for his "services rendered."

w.  The documents which You relied on to evidence the roles of Ibrahima Sory Touré and Kassory Fofana, as referenced on page 5 of Your report entitled "Project Isiro II, Draft report," dated 12 August 2009.

x.  The sources which You relied on to support the statement that "[t]here are perceived/suspected links between Steinmetz and Kassory Fofana in Guinean news/commentary websites," including articles attributed to Moussa Diop about the influence of Mamadie Touré Conté in the grant of the Simandou concession, as referenced on pages 15-16 of Your report entitled "Project Isiro, Section II: Corruption Risk Enquiry, Draft Report," dated 1 July 2009, and on page 20 of Your report entitled "Project Isiro II, Draft report," dated 12 August 2009, which adds that "Diop claims that a US source asserted that Thiam had financial management links with some of Conté's wives in addition to financial management role for Fofana."

y.  Any other documents reviewed, received, or prepared in connection with the Reports, including the documents summarizing or characterizing conversations or information received by contacts, sources, and/or informants cited in Your Reports for Rio Tinto.

12.    **Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3,h)**

The Requesting Court requests that in the interest of justice you cause, by your proper and usual process, each Witness to appear to be examined under oath or affirmation at the office of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London EC2V 5EH, or such other place as the parties may agree.

13.    **Special methods or procedure to be followed (Articles 3,i and 9)**

13.1    The Requesting Court further requests that Jonathan Blackman, Lewis Liman, and Jonathan Kelly, who are representatives of Vale, or such other persons later designated by Vale, be appointed as Commissioners pursuant to Article 17 of the Convention, and be authorized to question the Witnesses on the subjects identified above and elicit their sworn testimony.

13.2    Pursuant to Article 9 of the Convention, it is requested that the legal representatives of Vale be permitted to conduct the examination of each Witness in England before an impartial Barrister of the Bar of England and Wales (the "Examiner"), to be nominated by the Applicants, who, subject to approval by you, shall act as referee. It is requested that the Witnesses be placed under oath or solemn affirmation in accordance with whatever procedure English law provides for in these matters before answering the oral questions and cross-questions on the subjects identified above which are put to them by the legal representatives referred to above.

13.3    The Requesting Court believes that the procedure of having these attorneys appointed to take the testimony is appropriate and necessary. These attorneys are familiar with the relevant events and transactions in this complex matter. Accordingly, they will be able to elicit the relevant testimony in a manner as efficient and expeditious as possible. If the

questioning were to be done by someone not familiar with the relevant facts, there is a strong possibility that complete and accurate testimony would not be obtained.

13.4   The Requesting Court respectfully requests that the representatives of Vale be allotted a total of five hours for each of their examinations. Counsel for these parties will consult with each Witness' legal representatives in order to determine a mutually convenient date to conduct the examination on or before November 30, 2015, as approved by you.

13.5   The Requesting Court also respectfully requests that the questions and the responses of each Witness be recorded verbatim and that each Witness sign the verbatim transcript. The verbatim transcript of each Witness' responses to questions under oath taken pursuant to the Letter of Request issued or endorsed by the Courts will be admissible at trial in certain circumstances to be agreed among the parties (or, failing agreement, as directed by the Requesting Court), except to the extent that the content of such transcript of the examination would, for reasons other than the fact that it was obtained in an out-of-court examination, otherwise be inadmissible under the Federal Rules of Evidence if the Witness were present at trial in the relevant jurisdiction. The Requesting Court also respectfully requests that you cause the testimony of each Witness to be duly marked for authentication, and that you further authenticate the examination by the seal of your Court or in such other way in accordance with your procedure and return the written evidence and documents produced or identified to Jonathan Kelly of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London EC2V 5EH, under cover duly sealed, and the Requesting Court shall be ready and willing to do the same for you in a similar case when required.

13.6    In the event the evidence cannot be taken in the manner requested above, the Requesting Court respectfully requests that the evidence be taken in the manner provided by the applicable law of England and Wales.

13.7    The appearance of each Witness for his or her testimony is voluntary and no criminal prosecution in the United States will result from a failure to appear.  However, the Requesting Court respectfully requests that, if necessary, appropriate compulsion be exercised to compel each Witness to give evidence in response to this Letter of Request if the Witness is uncooperative.

14.    **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[3]**

Jonathan Kelly
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

15.    **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

16.    **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

Each Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or the United Kingdom, or would disclose a privileged communication.

---

[3] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of England and Wales, nor is *Cleary Gottlieb Steen & Hamilton LLP* instructed by the Applicant to accept service of any proceedings in England and Wales.

31

17.   **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale.  The payment of any such fees and costs is without prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.


DATE OF REQUEST                          _Mar 3/ 2015_____


SIGNATURE AND SEAL OF                    _Andy J. Peck_____
THE REQUESTING AUTHORITY
                                         HON. ANDREW J. PECK
                                         United States Magistrate Judge
                                         Southern District of New York


32

# EXHIBIT C

# (LETTER OF REQUEST TO LIVINGSTONE AND COMPANY)

**Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of the Requested State** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL |
| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

4. **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

| | |
|---|---|
| **Date** | Examinations to occur as the parties may agree, but no later than November 30, 2015.  Document productions to occur as the parties may agree, but no later than June 30, 2015. |
| **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), document productions must be substantially complete by June 30, 2015 and pretrial examination of fact witnesses must be complete by November 30, 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

| | | |
|---|---|---|
| 5. *a* | **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B<br>New York, New York 10007 |

| | | |
|---|---|---|
| *b* | **To the competent authority of (Article 3,a)** | United Kingdom of Great Britain and Northern Ireland |

6. **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)**

| | | |
|---|---|---|
| *a* | **Plaintiff** | **Rio Tinto plc** |
| | **Representatives** | William A. Burck<br>Michael J. Lyle<br>Eric C. Lyttle<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW, 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100 |
| *b* | **Defendants** | **Vale, S.A.** |
| | **Representatives** | Jonathan I. Blackman<br>Lewis J. Liman<br>Boaz S. Morag<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225 2000<br>Facsimile: (212) 225 3999 |
| | | **BSG Resources Limited** |
| | **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
| | | **Benjamin Steinmetz** |
| | **Representatives** | Robert Gold |

Vincent Filardo, Jr.
Elizabeth M. Rotenberg-Schwartz
Mishcon· de Reya New York, LLP
750 Seventh Avenue
New York, New York 10019
Telephone: (212) 612 3270
Facsimile: (212) 612-3297

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

**Representatives**              Martin Joel Auerbach
                                 Law Offices of Martin J. Auerbach, Esq
                                 1185 Avenue of the Americas, 31st Floor
                                 New York, New York 10036
                                 Telephone: (212) 704 4347
                                 Facsimile: (212) 3040175

**Mahmoud Thiam**

**Representatives**              Paul Eliot Summit
                                 Sullivan & Worcester LLP (MA)
                                 One Post Office Square
                                 Boston, MA 02109
                                 Telephone: (617) 210 8437
                                 Facsimile: (617) 338 2880

## 7.    Nature of the proceedings and summary of claims (Article 3,c)

7.1    This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia,* violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

36

"Representative" is used to refer to directors (or shadow directors), officers, employees, representatives, agents, intermediaries and consultants. The Relevant Period referred to below is January 1, 2004 to April 30, 2014. Although not named as defendants, Rio Tinto's complaint has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

  7.2  Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

  7.3  Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

  7.4  BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG Resources Limited maintains an office in London.

  7.5  In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining

rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room so that Vale could review certain of Rio Tinto's documents related to the assets under discussion. After the Confidentiality Deed was signed and the data room opened, the two parties ultimately discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks 1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began negotiating a joint venture. The negotiations culminated in the signing of a Framework Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both included broad and detailed anti-bribery representations and warranties, on which Vale relied.

38

The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou. The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release. Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding. The Technical Committee found that Vale had no involvement in this bribery

39

scheme. Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

    7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008. Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2. An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

    7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008. Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou. Rio Tinto alleges that



Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2.

Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

    7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea. The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home. The Guernsey Financial Investigations United and the United Kingdom's

Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2

Notices on BSGR's current and past London counsel as well as Onyx. BSGR has filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division

of the English High Court of Justice.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR,

any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of

trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with

BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2,

after December 2008 sought other mining companies as partners with respect to these rights, and

did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized

above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether

BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights

in which Vale subsequently invested by those means, and whether Vale had anything to do with

these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the

four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after

April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into

the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the

concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to

discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-

147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations.

Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms retained

to conduct competitive intelligence. Among other things, those reports bear on the validity of

Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio

Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other

Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008.

It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before

April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct

any investigation after December 1, 2010, at the latest.

     7.18    The evidence sought from the investigative firm identified below, which includes

evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained

the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint

venture agreement with Vale in April 2010 and evidence of potential bribery by BSGR and

Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of

limitations defense, including on the timing of Rio Tinto's claim and whether its investigation

was sufficient, as well as whether Vale was in any way aware of BSGR's wrongdoing.

     **8.**    **Evidence to be obtained or other judicial act to be performed (Article 3,d)**

     8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged  bribery and

corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008

shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008.

Documents reviewed by the Applicant, including reports produced and clarification provided by

Rio Tinto, identify Mark Huband as among those Representatives of Livingstone and Company

who were involved in drafting the investigative firm reports during the relevant time period and

have knowledge of facts that bear on the issues of this case.

8.2     It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct Mark Huband to provide oral testimony for use at trial (if appropriate) to counsel for applicant subject to any applicable privileges that may apply under the rules and procedures of the Requesting Court or the courts of England and Wales.  The Witnesses' unique importance to the claims and defenses is described both above and in the subject matters as to which each is to be examined, detailed in Section 10 below.  Absent voluntary cooperation, evidence from Mark Huband is available only by an order of the High Court.

| 9. | **Identity and address of any person to be examined (Article 3,e)** | Mark Huband Livingstone and Company 10 Dover Street London W1S 4LQ United Kingdom |

10.     **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that each Witness be questioned according to the procedure set out below in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may apply under the rules and procedures of the Requesting Court or the courts of England and Wales, on:

Livingstone and Company's investigation resulting in the reports entitled (a) "Guinea – Political Economic and Security Monitor (Report One)," dated 10 February 2010; (b) "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010; (c) "Abu Dhabi – Abdul Rahman Al Muhairi," dated 11 May 2010; (d) "Guinea (Report One – Preliminary)," dated 1 June 2010; (e) "Guinea (Report One – Final)," dated 4 June 2010; (f) "Guinea (Report Two)," dated 11 June 2010; (g) "Guinea (Report Three)," dated 18 June 2010; (h) "The Political Landscape in Guinea," dated 18 June 2010; (i) "Guinea (Report Four)," dated 25 June 2010; (j) "Guinea

43

(Report Four – Supplementary 2)," dated 27 June 2010; (k) "Guinea (Report Four –

Supplementary 3)," dated 28 June 2010; (l) "Guinea (Report Five)," dated 2 July 2010; (m)

"Guinea (Report Six)," dated 9 July 2010; (n) "Guinea (Report Seven)," dated 16 July 2010; (o)

"Guinea (Report Eight)," dated 23 July 2010; (p) "Guinea (Report Nine)," dated 30 July 2010;

(q) "Guinea (Report Ten)," dated 6 August 2010; (r) "Guinea (Report Eleven)," dated 11 August

2010; and (s) "Guinea (Report Twelve)," dated 13 August 2010, for Rio Tinto, including the

scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings

and conclusions.

11.    **Documents or other property to be inspected (Article 3,g)**

It is requested that Livingstone and Company be required to produce the specified

documents described herein as are believed to exist in its power, possession or control.  Such

documents are necessary for the purposes of justice and for the due determination of the matters

in dispute between the parties.

      a.    The proposals, pitch books, presentations You provided to or prepared for Rio

Tinto as reflected in the reports entitled:  (a) "Guinea – Political Economic and

Security Monitor (Report One)," dated 10 February 2010; (b) "Guinea/Liberia –

Beny Steinmetz," dated 7 May 2010; (c) "Abu Dhabi – Abdul Rahman Al

Muhairi," dated 11 May 2010; (d) "Guinea (Report One – Preliminary)," dated 1

June 2010; (e) "Guinea (Report One – Final)," dated 4 June 2010; (f) "Guinea

(Report Two)," dated 11 June 2010; (g) "Guinea (Report Three)," dated 18 June

2010; (h) "The Political Landscape in Guinea," dated 18 June 2010; (i) "Guinea

(Report Four)," dated 25 June 2010; (j) "Guinea (Report Four – Supplementary

2)," dated 27 June 2010; (k) "Guinea (Report Four – Supplementary 3)," dated 28

44

June 2010; (l) "Guinea (Report Five)," dated 2 July 2010; (m) "Guinea (Report Six)," dated 9 July 2010; (n) "Guinea (Report Seven)," dated 16 July 2010; (o) "Guinea (Report Eight)," dated 23 July 2010; (p) "Guinea (Report Nine)," dated 30 July 2010; (q) "Guinea (Report Ten)," dated 6 August 2010; (r) "Guinea (Report Eleven)," dated 11 August 2010; and (s) "Guinea (Report Twelve)," dated 13 August 2010, which concern Simandou, Guinea, BSGR, Steinmetz, and/or Vale (the "Reports").

b. The engagement letters and disengagement letters between You and Rio Tinto for Rio Tinto's retention of Your services in connection with the Reports.

c. The bills or invoices, including the time sheets or records of activities performed by You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

d. The bank statements showing payment by Rio Tinto to You in connection with Rio Tinto's retention of Your services as reflected in the Reports.

e. The documents shared with Rio Tinto in connection with the Reports.

f. The drafts of the Reports, including the research for, preparation of, and analyses and discussions regarding the Reports for Rio Tinto, whether relied upon or not in any version of the a Report for Rio Tinto.

g. The interview memoranda with Your source who is quoted on pages 1 and 3 of Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010, as stating that BSGR was discussing infrastructure "with [Arcelor]Mittal – specifically the issue of the railway that will go from Mifergui to Buchanan."

h.  The documents, including interview memoranda, which You relied on for the finding of "[o]ne of [Y]our associates" in Monrovia that "BSGR is in partnership with 'a number' of strategic partners in the context of its Liberian operations, implying that the arrangement goes beyond the cooperation with Vale," including interview memoranda summarizing conversations with "a senior Liberian official" who is noted as stating that "one of the companies involved is an infrastructure company," as referenced on page 5 of Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010.

i.  The documents, including interview memoranda, which You relied on for Your findings on page 5 of Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010, that "Steinmetz had already signed a separate MoU whereby agreement was to be reached before 1 June 2010 for the development of Yekepa-Buchanan railway operated by Mittal," and that "[w]hile BHP Billiton's interest in having access to the railway is widely known, more directly linked to Steinmetz' strategy are the intentions of the Israeli company Elenilto owned by Jacob Engel, which is the current operator of the Western Cluster," including documents evidencing Your findings concerning Elenilto and Jacob Engel.

j.  The documents, including interview memoranda, which You relied on for Your finding on page 6 of Your report entitled "Guinea (Report Six)," dated 9 July 2010, that "Beny Steinmetz originally approached Chinalco about the Blocks 1 & 2 project, but Chinalco refused to enter into a JV and finance BSRG [*sic*]."

k.  The documents, including interview memoranda, which You relied on for Your findings concerning the importance of Steinmetz's "close ties" to "Ibrahim [*sic*]

Sory II Touré, a brother-in-law of [President] Conté and currently the chief

external relations officer of Steinmetz' BSG Resources (Guinea) Ltd (BSGR)," 

including Your finding that Asher "Avidan worked closely with Ibrahim [*sic*]

Sory II Touré, prior to the death of Conté, using his access to seize Rio Tinto's

assets immediately following the 9 December 2008 government announcement

that control of half the concession had been rescinded," as referenced on page 2 of

Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010.

l.   The documents, including interview memoranda, which You relied on for Your

findings on pages 1 and 2 of Your report entitled "Guinea (Report Three)," dated

18 June 2010 concerning "the lengths it appears Steinmetz allegedly went to in

order to secure control of the Simandou Blocks," including:

    i.   The interview memoranda with Your source quoted on page 2 of that

      report as stating:

> Beny knew that securing the concessions would cost him
> money, but in the long run it would be worth it . . . . He
> also knew that the Guinean government wouldn't get
> anything out of a multinational playing by the rules, so it
> was a simple case of persuading corrupt government
> officials to obtain the deposits by confiscating them from
> Rio, and then agreeing on the fee.  This is how he operates
> – the suitcase that [Steinmetz' business partner] Victor
> Kenan was spotted with outside the president's office
> contained $10 million.

    ii.  The interview memoranda with Your source quoted on page 1 of that

      report as stating that the "$10 million [that BSGR] paid to officials in

      2008 was 'a sweetner.'"

    iii. The interview memoranda with Your source described on pages 1 and 2 of

      that report as "well-known" to You and quoted as stating that "[a]fter

asking him this question, [Minister of Mines Mahmoud] Thiam

[("Thiam")] replied that he was 'asking for my $200 million.'"

m.    The interview memoranda of Your source quoted on page 4 of Your report

entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010 as stating that

Steinmetz "has been offering bribes to most of the key people in Guinea for the

past several years."

n.    The interview memoranda of the "officer" quoted on page 4 of Your report

entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010 as stating that

"Steinmetz puts a lot of effort into looking for influence, and has tried repeatedly

to influence President Konaté," including by "sending him a gift of a white cow –

a gift which was returned because it was 'unwanted.'"

o.    The interview memoranda with a source described as having knowledge of "Beny

Steinmetz' 'inner circle,'" who is referenced on pages 1 and 3 of Your report

entitled "Guinea (Report Ten)," dated 6 August 2010, who "related to one of

[Your] associates in Tel Aviv how it appears [BSGR] has sought to gain influence

in several African countries, and specifically in Guinea," explaining that

"[Avraham] Levran [sic] had told him that he is responsible for what he himself

called 'special payments to officials and leaders in countries of interest in

Africa,'" and that "'Avi [Lev Ran] receives the money in cash, and delivers it to

others. He told me that he personally delivered to the head of a certain country in

Africa a suitcase with cash, and that on his way to the office also delivered

envelopes of $10k and up to $40k to helpers, subordinates and aides of that

leader.'"

48

p.   The interview memoranda with Your source who "told [You]: '[Steinmetz] considers [Ehud] Olmert to be his Number One 'door opener' in Africa. Olmert plans to increase his activities in Africa,'" as referenced on page 2 of Your report entitled "Guinea (Report Nine)," dated 30 July 2010.

q.   The documents, including interview memoranda, which You relied on for Your findings concerning Beny Steinmetz's relationship with Ibrahima Kassory Fofana ("Fofana"), including Your finding that Fofana is "considered by some to be Beny Steinmetz' 'godfather' in Guinea," as referenced on page 5 of Your report entitled "Guinea (Report Eleven)," dated 11 August 2010, and interview memoranda with Your source who is referenced on page 8 of Your report entitled "Guinea (Report Four)," dated 25 June 2010, who stated that Fofana was "a consultant to Beny Steinmetz."

r.   The documents, including interview memoranda, evidencing Your discussion with "several of [Y]our sources in Conakry" who "have been told that [Prime Minister Cellou Dalein] Diallo's election campaign may have received funds from Beny Steinmetz," and that Diallo is "'under pressure' to support a review of contracts," including interview memoranda with "a political figure close to [Alpha] Condé [who] explained to [You] that the 'Rio-Tinto-Steinmetz-Vale affair' is in the electoral spotlight," stating that "'there are suspicions – all of them unproven . . . that Diallo is supporting Steinmetz, perhaps because of campaign contributions,'" as referenced on pages 1 and 3 of Your report entitled "Guinea (Report One – Preliminary)," dated 1 June 2010, on pages 1 and 4 of Your report

49

entitled "Guinea (Report One – Final)," dated 4 June 2010, and on page 11 of

Your report entitled "The Political Landscape in Guinea," dated 18 June 2010.

s.   The documents, including interview memoranda, evidencing reports from Your

"associates in Monrovia," which characterized Steinmetz's relationship with

Liberia's Minister of Lands, Mines and Energy, Eugene Shannon as "strong . . .

allow[ing] Steinmetz to acquire considerable iron ore concessions that lie close to

the Nimba-Buchanan railway line," and explained that "[b]y contrast, BHP

billiton . . . has recently been frustrated by Shannon, who has instructed his

negotiators to stall discussions with the company," as referenced  on pages 4-5 of

Your report entitled "Guinea (Report Two)," dated 11 June 2010.

t.   The documents, including interview memoranda, which You relied on for Your

finding on page 6 of Your report entitled "Guinea (Report Six)," dated 9 July

2010, that "BSRG [*sic*] is doing a good job of muzzling the press with handsome

payoffs."

u.   The interview memoranda summarizing or characterizing Your conversation on

17 June 2010 with Your source who is referenced on page 3 of Your report

entitled "Guinea (Report Three)," dated 18 June 2010 who "told [You]: 'Beny is

saying that if Rio goes after him, Thiam will threaten to confiscate their remaining

concessions in Guinea.'"

v.   The interview memoranda summarizing or characterizing Your conversation with

a source described as a "mining sector insider who is well-known to us" who is

referenced on page 2 of Your report entitled "Guinea (Report Seven)," dated 16

July 2010, who "explained: 'Thiam, along with the *Secrétaire-général du*

50

*minister* Aboubacar Koly Kourouma has been pressuring President Sékouba Konaté and [Prime Minister] Jean-Marie Doré to make further ultimatums to Rio Tinto with regard to the relinquishment of their claim to Blocks 1 and 2, in return for guaranteeing their retention of title to Blocks 3 and 4.'"

w.   The interview memoranda summarizing or characterizing Your conversation with a source described as a "very well-placed official" who "explained: 'Thiam's principle political role is as paymaster to both the top officials in government and to potential opponents of the deals that have been cemented over the last year with BSRG [*sic*] and China International Fund. Thiam has been instrumental in paying of Dadis's supporters,'" as referenced on pages 4 and 13 of Your report entitled "The Political Landscape in Guinea," dated 18 June 2010.

x.   The interview memoranda summarizing or characterizing Your conversation with a source "in Conakry [who] told [You]: 'Thiam is positioning himself as the gatekeeper, so that he and his network of business associates will have legal and contractual rights to Guinean assets after the elections, and will be able to offer these up to the 'super-majors' for buyouts – in the same way that Steinmetz attracted Vale,'" as referenced on pages 4 and 13 of Your report entitled "The Political Landscape in Guinea," dated 18 June 2010.

y.   The interview memoranda summarizing or characterizing Your discussion with an official who is referenced on page 3 of Your report entitled "Guinea (Report Four)," dated 25 June 2010, concerning correspondence from Thiam "[m]aking reference to the Vale-BSRG [*sic*] deal [that] read: 'I have been monitoring the

51

deal for months, next comes Rio-Chinalco, then Bellzone and X. Then I can go home.'"

z.   The interview memoranda summarizing or characterizing Your conversation with a source described as "familiar with Mines Ministry opinion on the Rio Tinto issue," who is referenced on pages 2-3 of Your report entitled "Guinea (Report Eight)," dated 23 July 2010, who stated "'Remember, there is very much a 'party line' within the Ministry, and this party line has been promoted by Thiam and [Prime Minister] Doré, both of whom stand to gain enormously if the Blocks 1 and 2 issue can be definitely resolved in favour of Beny Steinmetz and Vale."

aa.  The documents, including interview memoranda, which You relied on for Your finding on pages 1 and 3 of Your report entitled "Guinea (Report Five)," dated 2 July 2010 that "Mahmoud Thiam has privately shared his concerns about the prospect of a legal challenge regarding the revocation of Simandou Blocks 1 and 2 and their reallocation to BSRG [sic], including interview memoranda with a source who is quoted on pages 1 and 3 of that report as stating:

   i.   "[I]t's clear that 'unofficial' signature bonuses have been paid in order to push the deal through. I think that if Rio Tinto were to present a strong case before an international arbitration court they would have a good chance of winning. This is what is really worrying Thiam."

   ii.  Thiam "is conscious that Rio Tinto is almost certainly planning a major legal challenge. He is of the view that this will not only be against Steinmetz – perhaps in multiple jurisdictions – but possibly also against the Government of Guinea . . . everyone knows that the whole process of

revocation and reallocation of the Simandou Blocks is full of legal problems."

bb.  The documents, including interview memoranda, which You relied on for Your findings on pages 1 and 2 of Your report entitled "Guinea (Report Nine)," dated 30 July 2010 that "BSRG [*sic*] has been anticipating that Rio Tinto will take legal action regarding control of Simandou Blocks 1 & 2" and concerning the suggestion that Steinmetz "probably has a source or sources in that company (Rio Tinto), who are feeding him with information" and that BSGR "may have more than one informer within Rio."

cc.  The documents summarizing or characterizing Your conversations with sources "regarding the demand made on 21 June 2010 by the Ministre Secrétaire-général at the Presidency Tibou Kamara for Rio Tinto to provide the Government with the geological studies of Simandou Blocks 1 & 2, and the demand made on 25 June 2010 by Prime Minister Doré that Rio Tinto provide the feasibility studies and schedule for exploitation of the concessions with 60 days, that is by 17 August [2010]," as referenced on pages 1 and 4 of Your report entitled "Guinea (Report Eleven)," dated 11 August 2010.

dd.  The documents which You relied on for Your "examin[ation] [of] the legal basis upon which Rio Tinto's Zagota [*sic*] and Simandou North Blocks One and Two were transferred to BSGR," as referenced on pages 1 and 3 of Your report entitled "Guinea (Report Three)," dated 18 June 2010, and on pages 4, 15, & 16 of Your report entitled "The Political Landscape in Guinea," dated 18 June 2010 including:

53

i. The interview memoranda or documents summarizing or characterizing Your associate's "preliminary discussions with a Guinean lawyer who specializes in mining issues," who Your associate stated was "firmly of the belief that the confiscation of the Rio blocks and their subsequent reassignment to BSGR . . . may have been done illegally," and that "Rio Tinto has a case which should be made before the International Court of Arbitration," as referenced on pages 1 and 3 of Your report entitled "Guinea (Report Three)," dated 18 June 2010.

ii. The interview memoranda or documents summarizing or characterizing Your associates in Conakry's "discreet discussions with Ministry officials" in which "concerns regarding the award of Simandou 1 & 2 to BSRG [*sic*] are being voiced by officials," as referenced on pages 4, 15, and 16 of Your report entitled "The Political Landscape in Guinea," dated 18 June 2010.

iii. The documents which You relied on for Your finding that "it would seem appropriate to await the result of inquiries into . . . the legality of the seizure of Simandou 1and 2, with the purpose of drawing up a sound legal case on the basis of which an action can then be launched once the election is over and the new government is in place, as referenced on pages 4, 15, and 16 of Your report entitled "The Political Landscape in Guinea," dated 18 June 2010.

ee. The documents, including interview memoranda, summarizing or characterizing Your discussion with a source described as "an insider in the Brazilian mining

54

sector" and in "personal contact with Vale's senior management," who was asked "why he thought Rio Tinto had not yet contested the Guinea deal in court" and "explained: 'The fact that Rio has not gone to court or to dispute resolution means they may believe they can talk the situation through and reach a compromise with Vale," as referenced on page 4 of Your report entitled "Guinea (Report Seven)," dated 16 July 2010.

ff.   The interview memoranda summarizing or characterizing Your discussions with Your source described as an "Ex-Vale director," who was asked "whether he thought that Vale's access to Simandou Blocks 1 and 2 might lead to a legal challenged by Rio Tinto," as referenced on page 5 of Your report entitled "Guinea (Report Seven)," dated 16 July 2010.

gg.   The interview memoranda summarizing or characterizing Your discussions with Your source quoted as stating that Steinmetz "believes that he is in the clear as far as the Rio blocks are concerned . . . He is sure that the title over the concessions that he holds is legitimate – and let's face it, Vale would not have signed off on the deal if their lawyers thought that there might be a problem," as referenced on page 6 of Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May 2010.

hh.   The interview memoranda summarizing or characterizing Your discussions with Your source quoted as stating that Steinmetz "clearly sold the Simandou deal to Vale on [the] understanding" that he would "broker a bilateral agreement between Guinea and Liberia for the export of iron ore through Buchanan," as referenced on

page 5 of Your report entitled "Guinea/Liberia – Beny Steinmetz," dated 7 May
2010.                                                                      •

ii.    The interview memoranda summarizing or characterizing Your discussions with
"a director of Vale" who is referenced on pages 1, 2, and 9 of Your report entitled
"Guinea (Report Four)," dated 25 June 2010, and quoted as stating "that the
development of [Simandou Blocks 1 and 2] will start soon . . . It is important to
remember that Rio Tinto lost the contract because they did not develop it in a
timely manner. This is what we have learned and we do not want to repeat the
mistakes of Rio Tinto."

jj.    The documents, including interview memoranda, which You relied on for Your
finding on pages 1 and 2 of Your report entitled "Guinea (Report Six)," dated 9
July 2010, that Alpha Condé "has followed the Rio Tinto case with interest and is
aware of the way that BSRG [*sic*] 'negotiated' the concessions."

kk.    The interview memoranda summarizing or characterizing Your discussions with a
source who is referenced on pages 1 and 2 of Your report entitled "Guinea
(Report Eight)," dated 23 July 2010, who stated that "Prime Minister Doré is very
annoyed that Rio Tinto officials circumvented the Prime Minister's Office and
contacted Interim President Sékouba Konaté directly to discuss their claim to
Blocks 1 and 2."

ll.    The interview memoranda summarizing or characterizing Your discussions with a
source who is referenced on page 3 of Your report entitled "Guinea (Report
Four)," dated 25 June 2010, who "told [You]: 'People believe that Rio has done a
deal with the Government formally abandoning its claim to Zagota [*sic*] and

56

13.2     Pursuant to Article 9 of the Convention, it is requested that the legal representatives of Vale be permitted to conduct the examination of each Witness in England before an impartial Barrister of the Bar of England and Wales (the "Examiner"), to be nominated by the Applicants, who, subject to approval by you, shall act as referee.  It is requested that the Witnesses be placed under oath or solemn affirmation in accordance with whatever procedure English law provides for in these matters before answering the oral questions and cross-questions on the subjects identified above which are put to them by the legal representatives referred to above.

13.3     The Requesting Court believes that the procedure of having these attorneys appointed to take the testimony is appropriate and necessary.  These attorneys are familiar with the relevant events and transactions in this complex matter.  Accordingly, they will be able to elicit the relevant testimony in a manner as efficient and expeditious as possible.  If the questioning were to be done by someone not familiar with the relevant facts, there is a strong possibility that complete and accurate testimony would not be obtained.

13.4     The Requesting Court respectfully requests that the representatives of Vale be allotted a total of five hours for each of their examinations.  Counsel for these parties will consult with each Witness' legal representatives in order to determine a mutually convenient date to conduct the examination on or before November 30, 2015, as approved by you.

13.5     The Requesting Court also respectfully requests that the questions and the responses of each Witness be recorded verbatim and that each Witness sign the verbatim transcript.  The verbatim transcript of each Witness' responses to questions under oath taken pursuant to the Letter of Request issued or endorsed by the Courts will be admissible at trial in certain circumstances to be agreed among the parties (or, failing agreement, as directed by the

58

Blocks One and Two in order to secure title over its remaining properties and push ahead with the Chinalco JV.'"

mm.  The documents, including interview memoranda, which You relied on for Your finding that "[t]he suggestion that RioTinto [*sic*] has also provided campaign finance to [Presidential Candidate] Sidya Touré has also been quite widely discussed," as referenced on page 2 of Your report entitled "Guinea (Report Four – Supplementary 3)," dated 28 June 2010.

nn.  The report entitled "Political and Business Issues Regarding Control of Simandou Blocks 1 & 2," referenced on page 10 of Your Report entitled "Guinea (Report Twelve)," dated 13 August 2010. Any other documents reviewed, received, or prepared in connection with the Reports, including the documents summarizing or characterizing conversations or information received by contacts, sources, and/or informants cited in Your Reports for Rio Tinto.

12.  **Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3,h)**

The Requesting Court requests that in the interest of justice you cause, by your proper and usual process, each Witness to appear to be examined under oath or affirmation at the office of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London EC2V 5EH, or such other place as the parties may agree.

13.  **Special methods or procedure to be followed (Articles 3,i and 9)**

13.1  The Requesting Court further requests that Jonathan Blackman, Lewis Liman, and Jonathan Kelly, who are representatives of Vale, or such other persons later designated by Vale, be appointed as Commissioners pursuant to Article 17 of the Convention, and be authorized to question the Witnesses on the subjects identified above and elicit their sworn testimony.

57

Requesting Court), except to the extent that the content of such transcript of the examination would, for reasons other than the fact that it was obtained in an out-of-court examination, otherwise be inadmissible under the Federal Rules of Evidence if the Witness were present at trial in the relevant jurisdiction. The Requesting Court also respectfully requests that you cause the testimony of each Witness to be duly marked for authentication, and that you further authenticate the examination by the seal of your Court or in such other way in accordance with your procedure and return the written evidence and documents produced or identified to Jonathan Kelly of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London EC2V 5EH, under cover duly sealed, and the Requesting Court shall be ready and willing to do the same for you in a similar case when required.

13.6    In the event the evidence cannot be taken in the manner requested above, the Requesting Court respectfully requests that the evidence be taken in the manner provided by the applicable law of England and Wales.

13.7    The appearance of each Witness for his or her testimony is voluntary and no criminal prosecution in the United States will result from a failure to appear. However, the Requesting Court respectfully requests that, if necessary, appropriate compulsion be exercised to compel each Witness to give evidence in response to this Letter of Request if the Witness is uncooperative.

14.   **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[4]**

Jonathan Kelly
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

15.   **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

16.   **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

Each Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or the United Kingdom, or would disclose a privileged communication.

17.   **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale. The payment of any such fees and costs is without prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

---

[4] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of England and Wales, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in England and Wales.

DATE OF REQUEST

Mar~ 31, 2015

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

# EXHIBIT D

# (LETTER OF REQUEST TO BTG INTELLIGENCE)

**Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of the Requested State** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL |
| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

4. **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

| | |
|---|---|
| **Date** | Examinations to occur as the parties may agree, but no later than November 30, 2015. Document productions to occur as the parties may agree, but no later than June 30, 2015. |
| **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), document productions must be substantially complete by June 30, 2015 and pretrial examination of fact witnesses must be complete by November 30, 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

| | | |
|---|---|---|
| 5. | *a* **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B<br>New York, New York 10007 |

| | | |
|---|---|---|
| *b* | **To the competent authority of (Article 3,a)** | United Kingdom of Great Britain and Northern Ireland |

6. **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)**

| | | |
|---|---|---|
| *a* | **Plaintiff** | **Rio Tinto plc** |
| | **Representatives** | William A. Burck<br>Michael J. Lyle<br>Eric C. Lyttle<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW, 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100 |
| *b* | **Defendants** | **Vale, S.A.** |
| | **Representatives** | Jonathan I. Blackman<br>Lewis J. Liman<br>Boaz S. Morag<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225 2000<br>Facsimile: (212) 225 3999 |
| | | **BSG Resources Limited** |
| | **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
| | | **Benjamin Steinmetz** |

64

| | |
|---|---|
| **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
| | **BSG Resources Guinee SARL**<br>*also known as*<br>VBG-Vale BSGR Guinea |
| **Representatives** | Martin Joel Auerbach<br>Law Offices of Martin J. Auerbach, Esq<br>1185 Avenue of the Americas, 31st Floor<br>New York, New York 10036<br>Telephone: (212) 704 4347<br>Facsimile: (212) 3040175 |
| | **Mahmoud Thiam** |
| **Representatives** | Paul Eliot Summit<br>Sullivan & Worcester LLP (MA)<br>One Post Office Square<br>Boston, MA 02109<br>Telephone: (617) 210 8437<br>Facsimile: (617) 338 2880 |

## 7.    Nature of the proceedings and summary of claims (Article 3,c)

7.1    This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates. The term

"Representative" is used to refer to directors (or shadow directors), officers, employees,

representatives, agents, intermediaries and consultants. The Relevant Period referred to below is

January 1, 2004 to April 30, 2014. Although not named as defendants, Rio Tinto's complaint

has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged

to have been co-conspirators with the defendants.

      7.2     Rio Tinto, headquartered in the United Kingdom, is one of the three largest

mining companies in the world, operating globally and mining a wide variety of metals and

minerals, including iron ore.

      7.3     Vale, a Brazilian corporation, is another of the world's three largest mining

companies and also mines iron ore among numerous other metals and minerals.

      7.4     BSG Resources Limited is a Guernsey corporation that is principally engaged in

mining operations in Africa and eastern Europe, but which also engages in power generation and

oil and gas exploration and production. The company is wholly owned by Nysco Management

Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn

wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of

Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman

domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG

Resources Limited maintains an office in London.

      7.5     In February 1997, the government of the West African nation of Guinea (the

"Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called

Simandou, which is known to be one of the most significant untapped iron ore deposits in the

world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou.

In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have continued developing and investing in Simandou, including developing railway and port plans to transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room so that Vale could review certain of Rio Tinto's documents related to the assets under discussion. After the Confidentiality Deed was signed and the data room opened, the two parties ultimately discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks 1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began negotiating a joint venture. The negotiations culminated in the signing of a Framework Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both

67

included broad and detailed anti-bribery representations and warranties, on which Vale relied. The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou. The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release. Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury

proceeding. The Technical Committee found that Vale had no involvement in this bribery scheme. Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008. Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2. An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008. Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou. Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2. Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea. The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and

Steinmetz's home. The Guernsey Financial Investigations United and the United Kingdom's

Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2

Notices on BSGR's current and past London counsel as well as Onyx. BSGR has filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division

of the English High Court of Justice.

  7.16 Vale denies each of the allegations made against it, any conspiracy with BSGR,

any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of

trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with

BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2,

after December 2008 sought other mining companies as partners with respect to these rights, and

did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized

above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether

BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights

in which Vale subsequently invested by those means, and whether Vale had anything to do with

these activities, which it denies.

  7.17 Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the

four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after

April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into

the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the

concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to

discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-

147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations.

Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms  retained

to conduct competitive intelligence. Among other things, those reports bear on the validity of
Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio
Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April
2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other
Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008.
It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before
April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct
any investigation after December 1, 2010, at the latest.

      7.18    The evidence sought from the investigative firm identified below, which includes
evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained
the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint
venture agreement with Vale in April 2010 and evidence of potential bribery by BSGR and
Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of
limitations defense, including on the timing of Rio Tinto's claim and whether its investigation
was sufficient, as well as whether Vale was in any way aware of BSGR's wrongdoing.

      **8.**      **Evidence to be obtained or other judicial act to be performed (Article 3,d)**

      8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged  bribery and
corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008
shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008.
Documents reviewed by the Applicant, including reports produced and clarification provided by
Rio Tinto, identify John Humphrey as among those Representatives of BTG Intelligence who
were involved in drafting the investigative firm reports during the relevant time period and have
knowledge of facts that bear on the issues of this case.

8.2     It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct John Humphrey to provide oral testimony for use at trial (if appropriate) to counsel for applicant subject to any applicable privileges that may apply under the rules and procedures of the Requesting Court or the courts of England and Wales. The Witnesses' unique importance to the claims and defenses is described both above and in the subject matters as to which each is to be examined, detailed in Section 10 below. Absent voluntary cooperation, evidence from John Humphrey is available only by an order of the High Court.

| 9. | **Identity and address of any person to be examined (Article 3,e)** | John Humphrey BTG Intelligence Begbies Traynor Group PLC 340 Deansgate Manchester M3 4LY United Kingdom |
|----|------|------|

10.     **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3,f)**

It is requested that each Witness be questioned according to the procedure set out below in Section 13 under oath or solemn affirmation, and subject to any applicable privileges as may apply under the rules and procedures of the Requesting Court or the courts of England and Wales, on:

BTG Intelligence's investigation resulting in the reports entitled "Project Raven" and "Project Raven – Part 2," each dated 19 July 2010 for Rio Tinto, including the scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings and conclusions.

11.     **Documents or other property to be inspected (Article 3,g)**

It is requested that BTG Intelligence be required to produce the specified documents described herein as are believed to exist in its power, possession or control. Such documents are

necessary for the purposes of justice and for the due determination of the matters in dispute
between the parties.

   a.   The proposals, pitch books, presentations You provided to or prepared for Rio
        Tinto as reflected in the reports entitled "Project Raven" and "Project Raven –
        Part 2," each dated 19 July 2010 and "compiled as a result of the research
        conducted pursuant to Rio Tinto's request for background enquiries and other
        investigations into the activities of Mr. Beny Steinmetz and Mr. Ehud Olmert any
        potential business relationships that they may have with Chinese businesses that
        are operating in Guinea or have invested in projects in Guinea" (the "Reports").

   b.   The engagement letters and disengagement letters between You and Rio Tinto for
        Rio Tinto's retention of Your services in connection with the Reports.

   c.   The bills or invoices, including the time sheets or records of activities performed
        by You in connection with Rio Tinto's retention of Your services as reflected in
        the Reports.

   d.   The bank statements showing payment by Rio Tinto to You in connection with
        Rio Tinto's retention of Your services as reflected in the Reports.

   e.   The documents shared with Rio Tinto in connection with the Reports.

   f.   The drafts of the Reports, including the research for, preparation of, and analyses
        and discussions regarding the Reports for Rio Tinto, whether relied upon or not in
        any version of the a Report for Rio Tinto.

   g.   The documents from Your "enquiries" which You relied on for Your finding that
        "Steinmetz has also invested a considerable amount of time and effort in forging a
        good working relationship with Mahmoud Thiam, the Guinean Minister of Mines

and that they meet on a regular basis," as referenced on page 6 of the report
entitled "Project Raven Report," dated 19 July 2010.

h.    The documents, news reports, and other sources cited on pages 12-18 of Your
report entitled "Project Raven Report," dated 19 July 2010, concerning a potential
joint venture, partnership, investment agreement, or other arrangement regarding
Simandou between BSGR and potential partners, including but not limited to
China International Fund ("CIFL"), Aluminum Corporation of China Limited
("Chalco"), and/or Aluminum Corporation of China ("Chinalco").

i.    Any other documents which You relied on for Your findings as set forth on pages
12-13 of Your report entitled "Project Raven" concerning a potential joint
venture, partnership, investment agreement, or other arrangement regarding
Simandou between BSGR and potential partners, including but not limited to
China International Fund ("CIFL"), Aluminum Corporation of China Limited
("Chalco"), and/or Aluminum Corporation of China ("Chinalco"), including, if
obtained in the course of Your enquiries:

   i.    The interview memoranda summarizing conversations with members of
BSGR, CIFLT, Chalco, or Chinalco related to such a potential joint
venture.

   ii.   The emails to or from a BSGR email address with CIFL, Chalco, and/or
Chinalco and their attachments.

   iii.  The term sheets agreed between BSGR and CIFL, Chalco, and/or
Chinalco.

74

iv.   The contents of any data room between BSGR and CIFL, Chalco, and/or
Chinalco.

j.   The reports compiled as a result of information obtained relating to the
"Suggested Lines of Enquiry" identified on pages 19-20 of the report entitled
"Project Raven Report," dated 19 July 2010.

k.   The documents, including interview memoranda, summarizing or characterizing
Your discussion with a source described as "a very close personal and business
associate of Steinmetz" who "informed [You] that Beny Steinmetz has already
paid nearly $10m to the military regime in Guinea some time ago and that having
secured additional mining concessions in Simandou he has been seeking
assistance from Beijing to support his growing company infrastructure in Guinea
and that he is also courting assistance from an influential entrepreneur in Monaco
to maintain his business momentum," as referenced on page 19 of the report
entitled "Project Raven Report," dated 19 July 2010.

l.   The documents, including interview memoranda, which You relied on for "earlier
information from a gold mining contact in Guinea that Steinmetz is very close to
the Guinean Minister of Mines," as referenced on page 19 of the report entitled
"Project Raven Report," dated 19 July 2010.

m.   The documents which You relied on for Your finding that "the Guinean
Government's Minister of Mines, Mahmoud Thiam, had wholly supported and
encouraged Steinmetz's business flirations with the Chinese.  There were
suggestions that Thiam himself had even offered Chinalco, the Chinese
Aluminum Company that part of the Simandou project that had been removed

75

from Rio Tinto and 'handed' to Steinmetz," as referenced on page 5 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

n.   The documents which You relied on for "the rumor that CIFL did withdraw its offer" for a potential joint venture with BSGR, as referenced on page 6 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

o.   The documents which You relied on for Your finding that "Chinalco, CIFL and other Chinese companies [were] 'circling' around the lucrative iron ore and other mining contracts in Guinea," as referenced on page 7 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

p.   The spreadsheet "that summarises the sequence of events" and which was presumably attached to "Project Raven Report – Part 2," as referenced on page 8 of that report.

q.   "The reference documents, from which the database has been created, [which] have also been scanned, indexed and incorporated into another searchable database by our researchers" and are also maintained in "hard-copy," as referenced on pages 9 and 10 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

r.   The documents evidencing Your "awareness" "that in August 2009 the former Prime Minister of Israel, Ehud Olmert, who is also a personal friend of Beny Steinmetz, visited MCC Limited in Beijing together with Steinmetz," as referenced on page 21 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

s.   The documents, including interview memoranda, evidencing Your discussion
with a source who "stated that he and Steinmetz were still heavily engaged
interacting with the Chinese in Guinea and in other locations," as referenced on
page 21 of the report entitled "Project Raven Report – Part 2," dated 19 July
2010.

t.   Any other documents reviewed, received, or prepared in connection with the
Reports, including the documents summarizing or characterizing conversations or
information received by contacts, sources, and/or informants cited in Your
Reports for Rio Tinto.

12.   **Any requirement that the evidence be given on oath or affirmation and any
special form to be used (Article 3,h)**

The Requesting Court requests that in the interest of justice you cause, by your proper
and usual process, each Witness to appear to be examined under oath or affirmation at the office
of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London
EC2V 5EH, or such other place as the parties may agree.

13.   **Special methods or procedure to be followed (Articles 3,i and 9)**

13.1   The Requesting Court further requests that Jonathan Blackman, Lewis Liman, and
Jonathan Kelly, who are representatives of Vale, or such other persons later designated by Vale,
be appointed as Commissioners pursuant to Article 17 of the Convention, and be authorized to
question the Witnesses on the subjects identified above and elicit their sworn testimony.

13.2   Pursuant to Article 9 of the Convention, it is requested that the legal
representatives of Vale be permitted to conduct the examination of each Witness in England
before an impartial Barrister of the Bar of England and Wales (the "Examiner"), to be nominated
by the Applicants, who, subject to approval by you, shall act as referee.  It is requested that the

77

Witnesses be placed under oath or solemn affirmation in accordance with whatever procedure English law provides for in these matters before answering the oral questions and cross-questions on the subjects identified above which are put to them by the legal representatives referred to above.

13.3    The Requesting Court believes that the procedure of having these attorneys appointed to take the testimony is appropriate and necessary. These attorneys are familiar with the relevant events and transactions in this complex matter. Accordingly, they will be able to elicit the relevant testimony in a manner as efficient and expeditious as possible. If the questioning were to be done by someone not familiar with the relevant facts, there is a strong possibility that complete and accurate testimony would not be obtained.

13.4    The Requesting Court respectfully requests that the representatives of Vale be allotted a total of five hours for each of their examinations. Counsel for these parties will consult with each Witness' legal representatives in order to determine a mutually convenient date to conduct the examination on or before November 30, 2015, as approved by you.

13.5    The Requesting Court also respectfully requests that the questions and the responses of each Witness be recorded verbatim and that each Witness sign the verbatim transcript. The verbatim transcript of each Witness' responses to questions under oath taken pursuant to the Letter of Request issued or endorsed by the Courts will be admissible at trial in certain circumstances to be agreed among the parties (or, failing agreement, as directed by the Requesting Court), except to the extent that the content of such transcript of the examination would, for reasons other than the fact that it was obtained in an out-of-court examination, otherwise be inadmissible under the Federal Rules of Evidence if the Witness were present at trial in the relevant jurisdiction. The Requesting Court also respectfully requests that you cause

the testimony of each Witness to be duly marked for authentication, and that you further
authenticate the examination by the seal of your Court or in such other way in accordance with
your procedure and return the written evidence and documents produced or identified to
Jonathan Kelly of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall
Street, London EC2V 5EH, under cover duly sealed, and the Requesting Court shall be ready and
willing to do the same for you in a similar case when required.

13.6    In the event the evidence cannot be taken in the manner requested above, the
Requesting Court respectfully requests that the evidence be taken in the manner provided by the
applicable law of England and Wales.

13.7    The appearance of each Witness for his or her testimony is voluntary and no
criminal prosecution in the United States will result from a failure to appear. However, the
Requesting Court respectfully requests that, if necessary, appropriate compulsion be exercised to
compel each Witness to give evidence in response to this Letter of Request if the Witness is
uncooperative.

14.    **Request for notification of the time and place for the execution of the request
and identity and address of any person to be notified (Article 7)[5]**

Jonathan Kelly
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

15.    **Request for attendance or participation of judicial personnel of the
requesting authority at the execution of the letter of request (Article 8)**

None.

---

[5] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the
jurisdiction of the courts of England and Wales, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the
Applicant to accept service of any proceedings in England and Wales.

16.     **Specification of privilege or duty to refuse to give evidence under the law of the state of origin (Article 11,b)**

Each Witness may refuse to answer any question asked during the examination if such answer would subject the Witness to a real and appreciable danger of criminal liability in the United States or the United Kingdom, or would disclose a privileged communication.

17.     **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale.  The payment of any such fees and costs is without prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

DATE OF REQUEST                     *Mar 31, 2015*

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

80