## CLEARY GOTTLIEB STEEN & HAMILTON LLP

| | | |
|---|---|---|
| WASHINGTON, DC<br>PARIS<br>BRUSSELS<br>LONDON<br>FRANKFURT<br>COLOGNE<br>MOSCOW | ONE LIBERTY PLAZA<br>NEW YORK, NY 10006-1470<br>(212) 225-2000<br>FACSIMILE (212) 225-3999<br>WWW.CLEARYGOTTLIEB.COM | ROME<br>MILAN<br>HONG KONG<br>BEIJING<br>BUENOS AIRES<br>SÃO PAULO<br>ABU DHABI<br>SEOUL |

June 5, 2015

<u>VIA ECF</u>

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re: <u>*Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)</u>

Dear Judge Peck:

We submit this letter on behalf of Defendant Vale S.A. ("**Vale**") in opposition to the May 26, 2015 letter motion (the "**Letter**") of Plaintiff Rio Tinto plc ("**Rio Tinto**") for an order compelling Vale to produce a report (the "**Nardello Report**" or the "**Report**") prepared at the direction of Vale's counsel, Clifford Chance, by the investigative firm Nardello & Co. ("**Nardello**"), that is protected by the attorney-client and work product privileges. We first address the choice-of-law question. Then, at the Court's suggestion, Vale addresses the question of whether attorney-client privilege or attorney work product protection has been waived by showing a copy of the Report to a representative of the Government of Guinea ("**GoG**"). *See* May 8, 2015 Tr. 5:21-25 ("Clearly, looking at the retention in the engagement letter, it clearly shows that Clifford Chance hired Nardello for its investigative services in connection with its legal advice to Vale. So, at a minimum, it may well be work product if not privileged."). Finally, we show that under both English and U.S. law, the Report is privileged and protected by the attorney work product doctrine.

### BACKGROUND

Vale's opposition is supported by the attached declarations of Scott Horton, counsel for the GoG, and Clovis Torres, Vale General Counsel. Those declarations establish that Vale showed a copy of the Nardello Report to the GoG at a time when both Vale and the GoG believed they had a common interest in sharing information and under conditions of strictest confidentiality. In particular, as established by both declarations, "at the time, Vale had a common interest with the GoG in uncovering any corrupt conduct by [BSG Resources Limited ("**BSGR**")], given that it could pursue certain remedies for breach of contract and fraudulent

misrepresentation based on representations BSGR made in connection with its contracts with Vale." Declaration of Scott Horton, dated June 4, 2015 ("**Horton Decl.**") ¶ 5; Declaration of Clovis Torres, dated June 5, 2015 ("**Torres Decl.**") ¶ 8.

At the time the GoG asked to see the Nardello Report and Vale agreed to show it to the GoG, Frédéric Cilins had just been arrested by the United States Department of Justice on charges of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, destruction of documents in violation of 18 U.S.C. § 1519, and tampering with a witness or informant in violation of 18 U.S.C. § 1512(c)(2). Horton Decl. ¶¶ 3-4; Torres Decl. ¶ 7. The GoG had an interest in uncovering any potential corruption by BSGR in the award of Simandou and Vale had a similar interest in understanding whether representations to it by BSGR had been breached. Horton Decl. ¶ 5; Torres Decl. ¶ 8. Vale had potential remedies against BSGR and had an interest in exploring them. *Id.* (Before the present meritless lawsuit by Rio Tinto was ever anticipated by Vale, Vale had pursued such remedies against BSGR in international arbitration under the parties's contract. Torres Decl. ¶ 8.) And, Vale had been specifically assured not only that it had not been involved in any wrongdoing, but that the GoG considered Vale to be a victim – just like the GoG was a victim. Horton Decl. ¶ 3; Torres Decl. ¶¶ 4, 7-8.

Moreover, the Report was shared under conditions of strictest confidence. Vale did not give a copy of the Report to the GoG. It did not permit the GoG to make a copy of the Report. It received assurances of confidentiality. It did not permit the GoG to look at the Report at the GoG's own offices or outside the view of Vale's watchful eye. It made sure that the Report was viewed at Vale's offices. And, it placed a chaperone with the GoG to assure that the GoG did not photograph or otherwise try to make a copy of the Report – just in case it was requested by a third party. *See* Horton Decl. ¶¶ 6-7; Torres Decl. ¶¶ 7-10.

Indeed, even before Vale agreed to show the Report to the GoG, the GoG agreed to show (and did show Vale) on a confidential basis information that the GoG had gathered regarding its investigation of BSGR. Horton Decl. ¶ 3; Torres Decl. ¶¶ 3-6. The GoG expressed that it did not believe Vale to have been involved in the conduct under investigation but to be a victim. Horton Decl. ¶ 3; Torres Decl. ¶ 4. Thus, the decision to let the GoG read the Nardello Report was made against a background of Vale and the GoG mutually sharing information with each other on a confidential basis and in pursuit of their mutual common interests. Horton Decl. ¶ 3; Torres Decl. ¶¶ 7-9.

## ARGUMENT

### A. Under English Law, The Nardello Report Is Privileged And Privilege Was Not Waived

#### 1. Under "Touch Base" Analysis, English Privilege Law Governs

Rio Tinto's argument that Vale waived the privilege enjoyed by the Nardello Report fails not least because Rio Tinto does not even *address* English privilege law, which is applicable here under the Second Circuit's "touch base" analysis. *See, e.g., Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 520 (S.D.N.Y. 1992). In this analysis, the court "defers to the law of the country that has the predominant or the most direct and compelling interest in whether those

Hon. Andrew J. Peck, p. 3

communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002) (internal quotation omitted). Here, as Vale previously argued, England has the most direct and compelling interest in whether the Report should remain confidential. Even though this issue was raised at the May 8 hearing, Rio Tinto ignores it.

There should be no dispute that Clifford Chance's engagement of Nardello, and the resulting report, are governed by U.K. law. Vale engaged Clifford Chance, a U.K. firm, to review and negotiate transaction documents governed by English law. The negotiations with BSGR, a Guernsey-based company with a London office, principally took place in April 2010 during face-to-face meetings in London. Clifford Chance retained Nardello pursuant to an engagement letter with Nardello's U.K. affiliate, with its place of business in London, and agreed to pay Nardello for its services in pounds. *See* Ex. A, Engagement Letter between Nardello & Co. LLP and Clifford Chance LLP. The engagement letter itself not only expressly provides that Clifford Chance's engagement of Nardello is to be governed by English law, but also that the parties agree to submit to the exclusive jurisdiction of the English courts and may submit to the English Court any dispute not otherwise resolved by arbitration. *Id.*

All of the factors outlined in *Golden Trade* and *Astra* demonstrate that England has "the predominant" and "most direct and compelling interest" in applying its law of privilege: (1) at the time of the communication, "the place in which [the allegedly privileged] relationship was centered" was England, since Nardello's London office prepared the Report for a firm based in the U.K.; (2) the substance of the communication related to compliance with anti-bribery laws (including *but not limited* to the FCPA) in the context of advice related to an English-law transaction negotiated in London; (3) other than Vale, all of the parties here have ties to the United Kingdom, and even Vale is a foreign party; and (4) recognizing the privilege here would not violate U.S. public policy given the similarities between U.S. and English privilege law. *See generally Golden Trade*, 143 F.R.D. at 520-523; *Astra*, 208 F.R.D. at 98. Indeed, the only factors relating to the United States are that the advice concerned, in part, U.S. law, but that is not sufficient to ground the attorney-client relationship in the United States. *Veleron Holding, B.V. v. BNP Paribas SA*, No. 12-CV-5966 (CM)(RLE), 2015 WL 4184806, at *5 (S.D.N.Y. Aug. 22, 2014); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 67 (S.D.N.Y. 2010). Most significantly, there is no evidence of *any* direct ties to the United States that would militate in favor of the application of U.S. law and displace England's compelling interest.

Ultimately, however, the Court need not engage in a choice-of-law analysis: whether U.K. or U.S. law applies is not determinative because, under the laws of *both* countries, it is clear that the Nardello Report is privileged and that Vale did not waive that privilege by allowing the GoG to review the Report. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 982 F. Supp. 2d 260, 263-64 (S.D.N.Y. 2013) ("There is no need to resolve th[e] question of whether [the] communications touch base with the United States or the Netherlands because the same result obtains whether the communications 'touch base' here or in the Netherlands.") (internal citation omitted). As a result, regardless of which law applies, the Court should find that Rio Tinto's arguments are meritless.

## 2. Under English Law, Communications With Third Parties Are Privileged And English Courts Are Reluctant To Find Waiver

Under English law, any communication between a lawyer and a third party, which is then passed on to the client, is considered privileged. Paul Matthews & Hodge M. Malek, *Disclosure* § 11.15 (4th ed. 2012) ("Communications between a *lawyer* and third party from whom he obtains information which he passes on to his client in privileged communications are also privileged, not because the third party is his or the client's agent, but because there is no basis for separating the parts of the lawyer/client communications dealing with that information from the parts not so dealing.") (emphasis original). This extends to all communications that are related to the legal advice provided in connection with the same transaction. *See Carpmael v Powis* [1846] ("It is impossible, however, to split the duties in that manner without getting into inextricable confusion. I consider them all parts of one transaction – the sale of an estate ... That being the case, I consider that all communications which may have taken place between the witness and his client in reference to that transaction are privileged."); *see also Balabel v. Air India* [1988] 1 Ch. 317 ("Once solicitors are embarked on a conveyancing transaction they are employed to ensure that the client steers clear of legal difficulties, and communications passing in the handling of that transaction are privileged (if their aim is the obtaining of appropriate legal advice) since the whole handling is experience and legal skill in action and a document uttered during the transaction does not have to incorporate a specific piece of legal advice to obtain that privilege."). Accordingly, any information that Clifford Chance received from Nardello as part of its advice with respect to the joint venture transaction, and which it then passed on to Vale, is privileged under English law.

A common interest privilege applies in English law where one party voluntarily discloses a document which is privileged in its hands to another party who has, at the time of such sharing, a common interest in the subject matter of the communication. Bakim Thanki, *The Law of Privilege* § 6.16 (2d ed. 2011); *see also Svenska Handelsbanken v Sun Alliance and London Insurance Plc* [1995] 2 Lloyd's Rep 84.

English law goes even further: even absent a common interest, English courts are generally reluctant to find that there has been a waiver of confidentiality, and accordingly privilege, simply because privileged material has been made available to a third party. Colin Passmore, *Privilege* § 7-037. Generally, if the confidential basis upon which the material was communicated was sufficiently well expressed, as it was here, the disclosure may not involve a loss of privilege against the world or even against the persons to whom it is disclosed.[1] *Id.* In short, English law recognizes selective waiver. Thus, under English law, privilege over the Nardello Report was not waived when the Report was shared with the GoG.

---

[1] Even when confidentiality has not been expressed, to the extent English courts find that there has been a waiver at all, the privilege is lost only as to the third party to whom disclosure has been made (here, the GoG), and not more generally to others (*i.e.*, privilege would not be waived as to Rio Tinto). *Id.* § 7-038.

Hon. Andrew J. Peck, p. 5

### B. Even Under U.S. Law, Vale Did Not Waive The Attorney-Client Privilege Or Work Product Protection Enjoyed By The Nardello Report

The Court need go no further. However, in the event the Court finds that U.S. law governs, the result would be the same.

1. Vale Did Not Waive Privilege By Sharing The Nardello Report With The Government of Guinea – With Whom It Shared A Common Interest – Subject To A Confidentiality Agreement

As under English law, under U.S. law, where a party furnishes its privileged materials to persons with whom it shares a common interest, the attorney client privilege and work product protection is retained. *See, e.g., Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03 CIV. 5560(RMB)(HBP), 2008 WL 4452134, at *7 (S.D.N.Y. Oct. 2, 2008) (explaining that the common interest rule is now a well-recognized "limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party outside the attorney-client relationship"). Thus, contrary to the suggestion of Rio Tinto, even under U.S. law Vale did not waive privilege by disclosing the Nardello Report to the GoG, which it did on the basis of a mutual understanding of its shared interest with the GoG and subject to an explicit understanding with respect to confidentiality. Horton Decl. ¶ 5; Torres Decl. ¶ 8.

This result is consistent with *Salomon Brothers Treasury Litigation v. Steinhardt Partners, L.P. (In re Steinhardt Partners, L.P.)*, 9 F.3d 230 (2d Cir. 1993), which states that where the disclosing party and the government "share a common interest in developing legal theories and analyzing information" or where the disclosing party furnished information with the understanding that the government will maintain its confidentiality, privilege may be maintained. *Id.* at 236 (explaining that "[c]rafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis" and expressly rejecting the establishment of a "rigid rule") (internal citations omitted). The situation here is precisely of the type contemplated in *Steinhardt*.

a. *Vale and the Government of Guinea Had a Common Interest*

At the time it showed the GoG the Report, Vale shared a common interest with the GoG in uncovering corrupt conduct by BSGR and mutually shared evidence in that regard. Vale shared the Report with the GoG one week after the GoG made its own presentation to Vale regarding the evidence it had obtained as a result of its two-year investigation of BSGR. Horton Decl. ¶ 3; Torres Decl. ¶ 7. At the time of both this initial meeting and of Vale's disclosure, it was understood not only that Vale was not the subject of its investigation,[2] but also that the GoG

---

[2] While Rio Tinto misleadingly suggests that that the GoG's investigation uncovered wrongdoing by Vale, *see* Letter at 3 (Vale's "disclosure of the Report to the GoG, in the midst of Guinea's investigation which resulted in the stripping of Vale's mining rights . . ."), the wrongdoing that was the basis for the GoG's withdrawal decision was found to have been solely *BSGR*'s. Horton Decl. ¶ 2; *see also Comité Technique de Revue des Titres et Conventions Minières* (Technical Committee for the Review of Licenses and Mining Agreements), Report and Recommendation of the *Comité Technique de Revue des Titres et Conventions Minières*, ¶ 139 (Mar. 21, 2014) (indicating that Vale had not participated in any of the corrupt activities it described, all of which predated Vale's investment in VBG

*(continued)*

Hon. Andrew J. Peck, p. 6

did not consider Vale to have been in any way involved in the conduct under investigation and considered Vale to be a *victim* of BSGR's conduct. Horton Decl. ¶ 3; Torres Decl. ¶¶ 4, 7-8. Thus, they "share[d] a common interest in developing legal theories and analyzing information," as contemplated by *Steinhardt*. 9 F.3d at 236.

Whether their interests were "identical or nearly identical" is irrelevant. Letter at 4. Courts in this Circuit have been clear that parties need not share "identical" interests for the common interest doctrine to apply. *Eugenia VI Venture Holdings, Ltd. v. Chabra*, No. 05 Civ. 5277 DAB DFE, 2006 WL 1096825, at *2 (S.D.N.Y. Apr. 25, 2006); *In re Velo Holdings Inc.*, 473 B.R. 509, 515 (Bankr. S.D.N.Y. June 12, 2012). Indeed, parties with a common legal interest that is adverse to a third party may share their otherwise privileged documents without waiving that protection. *Eugenia*, 2006 WL 1096825, at *1-2 (noting that this conclusion is not altered "even where a later law-suit is foreseeable between [those parties]"). Far from Vale being "*aligned* with BSGR in seeking to protect its interests in Guinea," Letter at 5, as soon as Vale received a notification from the GoG of potential wrongdoing by BSGR in having obtained the mining rights on October 30, 2012 and again after Cilins was arrested, Vale repeatedly asked BSGR to respond to the allegations that were being made against it and reserved its rights to institute a legal action against BSGR, which it eventually did.

It is black letter law in this circuit that privilege protection will *only* be waived when work product is disclosed to someone who is "reasonably viewed as a conduit to a potential adversary." *See, e.g., Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 448 (S.D.N.Y. 1995). Rio Tinto's argument that Vale did not share a common interest with the GoG is predicated on Rio Tinto's mischaracterization of Vale's relationship with the GoG as "adversarial." *See* Letter at 3-5. Rio Tinto claims that "[a]t best, Vale *hoped* that its cooperation would engender goodwill with the GoG and insulate Vale from the consequences of the criminal conduct that obtained for VBG (and through it, Vale) the rights to Blocks 1 and 2," *see* Letter at 5 (emphasis in original), but to the contrary the GoG repeatedly reassured Vale that it was not the target of its investigation but rather the victim of BSGR's wrongdoing, *before* the GoG shared information *with Vale*, and *again* before Vale shared the Nardello Report. Horton Decl. ¶ 3; Torres Decl. ¶¶ 4, 7-8. Unlike in the cases that Rio Tinto cites, Vale did not have to engender any goodwill by sharing the Nardello Report because it never understood that it could face any potential criminal liability. *See Steinhardt*, 9 F.3d at 234 ("The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the memorandum was sought as part of this investigation."); *Gruss v. Zwirn*, No. 09 Civ. 6441(PGG)(MHD), 2013 WL 3481350, at *8 (S.D.N.Y. July 10, 2013) (holding that what rendered the relationship adversarial was that the defendants "self-reported financial irregularities to the SEC in order to escape or limit liability."); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F.R.D. 166, 172 (S.D.N.Y. 2002) (the presentation made to the government was made "to forestall any investigation . . . that might have occurred" or "to obtain lenient treatment," which rendered them "potential" adversaries); *In re Tyco Int'l, Inc. Multidistrict Litig.*, No. MDL 02-13555-B, 2004 WL 556715, at *2 (D. N.H. Mar. 19, 2004) (finding that the government agency could institute adversarial proceedings in the future).

---

Guinea), *available at* http://www.contratsminiersguinee.org/blog/publication-report-recommendation-VBG.html (Guinea) (in French).

Hon. Andrew J. Peck, p. 7

> b. *Vale and the Government of Guinea Shared Information Based on an Oral and Reciprocal Confidentiality Agreement*

As contemplated by *Steinhardt*, both Vale and the GoG understood that their reciprocal disclosures were made confidentially. Horton Decl. ¶¶ 6-7; Torres Decl. ¶¶ 7-10. Vale did not provide a copy of the report to the GoG or permit the GoG to make a copy of the Report. Horton Decl. ¶ 7; Torres Decl. ¶ 10. It showed the Report to the GoG only after receiving assurances of confidentiality. Horton Decl. ¶ 6; Torres Decl. ¶ 9. And, indeed, to protect confidentiality it permitted the GoG to read the Report only in a room controlled by Vale and chaperoned by a Vale representative who made sure no copy was made. Torres Decl. ¶ 10.

It is sufficient here that Vale and the GoG had an "oral understanding" that they would maintain confidentiality over the mutual sharing of evidence they each gathered with respect to BSGR's wrongdoing. *Permian Corp. v. United States*, 665 F.2d 1214, 1217, 1222 (D.C. Cir. 1981) (holding that documents voluntarily given to SEC did not lose work product protection where there was an "oral understanding" that they would be kept confidential). In any event, Vale's shared interest with the GoG is enough to keep the work product protection intact: once a party has determined that it shares a common interest with a government entity, it may share documents without waiving protection, even in the absence of a confidentiality agreement. *See In re Cardinal Health, Inc. Sec. Litig.*, No. C2 04 575 ALM, 2007 WL 495150, at *9 (S.D.N.Y. Jan. 26, 2007) (preserving privilege despite defendant's disclosure of documents to the government because the defendant had determined that it shared a common interest with the SEC and the USAO, even though it had not entered into a confidentiality agreement with the USAO); *Steinhardt*, 9 F.3d at 236.

Rio Tinto argues that under *Gruss v. Zwirn*, No. 09-cv-6441 (PGG), 2013 WL 3481350 (S.D.N.Y. July 10, 2013), the confidentiality-based exception articulated in *Steinhardt* is no longer applicable. *See* Letter at 4. However, in *Gruss*, the court found that *Steinhardt*'s exception would not apply to the "illusory [confidentiality] agreement *of the sort at issue here*," which granted the government the unilateral right to discharge its duty of nondisclosure in its discretion. *Gruss*, 2013 WL 3481350, at *8 (emphasis added). Here, by contrast, the GoG not only agreed to, but has gone to great lengths to, preserve the confidentiality of the information in the Nardello Report. Horton Decl. ¶¶ 6-7; Torres Decl. ¶¶ 9-10. Far from Vale "plac[ing] no restrictions on Mr. Fox's ability to review the document," Letter at 2, Vale's Deputy General Counsel stayed in the conference room while Mr. Fox reviewed the Report to ensure that no copies or photographs could be made and to protect the confidentiality of the Report, and he was not permitted to make any copies. Horton Decl. ¶ 7; Torres Decl. ¶ 10. And while Rio Tinto claims that Mr. Fox was not informed that the Report was privileged, Letter at 3, the Report on its face has the legend "Privileged and Confidential – Subject to Attorney-Client Privilege and Attorney-Work Product Doctrine: Prepared at the Direction of Counsel," Mr. Fox was told that the materials being shared with him were confidential, he expressly agreed to maintain confidentiality, and the GoG understood that Mr. Fox was bound to keep the Report confidential. Horton Decl. ¶¶ 7-8; Torres Decl. ¶¶ 9-10. In short, the confidentiality agreement here was far from "illusory." Nor did Vale have a "subjective expectation[] regarding confidentiality," Letter at 4 – its expectation was based on a mutual understanding.

Hon. Andrew J. Peck, p. 8

### 2. Vale Has Not Put The Substance Of The Nardello Report "At Issue" In This Case

Rio Tinto also bizarrely asserts that Vale waived privilege by putting its own due diligence at issue by supposedly raising it as a "defense." *See* Letter at 6. As support for this assertion, Rio Tinto can only cite to the preliminary conference before Judge Berman at the very beginning of this case where Vale simply (and correctly) stated that it had conducted extensive due diligence before entering into its joint venture with BSGR, without making any legal argument, much less suggesting that this was a "defense" to Rio Tinto's claim, as well as a news article, *id.*, that has already been discredited for its factual inaccuracies in these proceedings, as grounds for Vale's purported "due diligence defense."

Furthermore, for the reasons discussed below, it strains both law and logic to suggest that the Nardello Report, created pursuant to Vale's counsel's engagement of Nardello for its investigative services in connection with its legal advice to Vale and in anticipation of litigation, should be treated equivalent to the reports generated by Rio Tinto's investigative firms – reports which contain no legal analysis and which were commissioned by Rio Tinto, not its counsel. This claim fundamentally misunderstands the work product privilege.

Rio Tinto compares apples and oranges by relying on the fact that Vale got discovery of Rio Tinto's investigative reports. *See* Letter at 6, 8-9. Rio Tinto put at issue its investigative reports in its Amended Complaint through its equitable tolling claim to save an otherwise untimely claim, while Vale has not once relied on its due diligence in any of its operative pleadings. Rio Tinto does not need discovery to "rebut a defense" that has not been asserted and Vale does not need to "abandon . . . assertions concerning its purported[] investigation" that it never made. *Id.* at 6, 9.

### C. The Nardello Report Is Privileged Under U.S. Law

### 1. The Nardello Report Is Attorney Work Product

The Court was right to understand that the Nardello Report is entitled to work product protection. The Report was prepared by Nardello, an investigative firm with whom Vale had no independent relationship but that was retained by Vale's counsel, Clifford Chance, one of the U.K.'s leading law firms, to assist it in providing privileged legal advice to Clifford Chance's client, Vale. *See* Ex. A, Engagement Letter between Nardello & Co. LLP and Clifford Chance LLP. As expressly set forth in the engagement letter between Clifford Chance and Nardello, Clifford Chance decided to hire Nardello for the purpose of assisting Clifford Chance in formulating its legal strategy and advising Clifford Chance's client, Vale. *Id.* To that end, the engagement letter further provided that the information provided or obtained in the course of Nardello's services would be protected by the attorney-client and work product privileges. *Id.* The Report itself was attached to, considered and integrated into, a memorandum (the "**Memorandum**") provided by Clifford Chance to Vale, both of which are labeled Privileged and Confidential and Confidential Attorney Work Product. This Memorandum was drafted by one of the premiere lawyers in this field.

Work product protection applies regardless of the fact that the advice predated any *actual* investigation or litigation. *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995) ("[T]here

is no rule that bars application of work product protection to documents created prior to the event giving rise to litigation."); *United States v. Veolia Env't N. Am. Operations, Inc.*, Civ. No. 13-mc-03-LPS, 2013 WL 5779653, at *4-5 (D. Del. Oct. 25, 2013) (finding the litigation was reasonably anticipated despite the fact that the documents in question were sought and created for planning purposes in advance of a contemplated tax write-off and that litigation by the IRS would arise only if the action was taken). Even though Vale did not have any facts or evidence suggesting a possible litigation, it undertook anti-corruption due diligence because there is always a risk of litigation in these types of transactions.

The very case upon which Rio Tinto purports to rely, *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998), makes clear that the Nardello Report is unquestionably work product. The gravamen of Rio Tinto's argument is that the Nardello Report is not protected work product because it was prepared as part of Vale's diligence before entering into the joint venture with BSGR. *See* Letter at 8. But that argument is squarely rejected by *Adlman*, which explicitly refused to adopt a definition of work product under which documents would only be entitled to work-product privilege if they are prepared "primarily or exclusively to assist in litigation." *Adlman*, 134 F.3d at 1198 (internal quotation omitted). Rather, the Second Circuit in *Adlman* held that analyses of potential litigation performed in connection with a business transaction are entitled to full work product protection "*despite the fact that their purpose is not to 'assist in' litigation.*" *Id.* (emphasis added). Indeed, the work product memorandum at issue in *Adlman* was not prepared to assist in litigation, but, as here, to analyze potential litigation so that business decision-makers could decide whether to undertake a corporate transaction that could potentially involve such litigation. *Id.* Moreover, unlike in *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96 (S.D.N.Y. 2007), there is no indication that Nardello "would have prepared the Report, along with the materials used to generate it, simply because of its business-related purpose." 240 F.R.D. at 107 (internal quotation omitted).[3]

Finally, Rio Tinto has failed to make the necessary showing of "substantial need" for the Report. Fed. R. Civ. P. 26(b)(3) (protection of the work product doctrine may be overcome upon a showing that the party seeking discovery "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain the substantial equivalent by other means"). *Pine Top Ins. Co. v. Alexander & Alexander Servs., Inc.*, No. 85-cv-9860 (PNL), 1991 WL 221061 (S.D.N.Y. Oct. 7, 1991), cited by Rio Tinto, Letter at 8, sets a high bar: "The work-product privilege is ordinarily not overcome where the information can be obtained by deposing witnesses." *Id.* at *2; *see also In re Woolworth Corp. Sec. Class Action Litig.*, No. 94 CIV. 2217 (RO), 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (no showing that information contained in notes of employee interviews was unavailable when party had access to depositions and transcripts of testimony of same employees). The court in *Pine Top* found substantial need

---

[3] *Allied* is not applicable here because the factual circumstances of this case and *Allied* are diametrically opposed. In *Allied*, the court found that plaintiff would have commissioned the report at issue solely because of its business-related purposes, noting that the investigation was announced in the press demonstrating the "critical public accountability concerns" motivating its production, there was no mention of litigation in the engagement letter commissioning the report, and the report was used for corporate management purposes. 240 F.R.D. at 107-08. The facts here could not be more different. Vale's investigation was not publicized, the engagement letter specifically refers to Nardello's assistance with Clifford Chance's legal strategy, Ex. A, Engagement Letter between Nardello & Co. LLP and Clifford Chance LLP, and the report was not used for routine business purposes.

because "only the reports themselves" would reveal what the auditors learned previously and because reconstructing facts via depositions would be "virtually impossible." 1991 WL 221061, at *3. But, here, as the Court noted the vast majority of the information in the Nardello Report is public, the Court has already held that Rio Tinto has not established any relevant documents are missing, and unlike in *Pine Top*, Rio Tinto not only will receive hundreds of thousands of pages through ongoing document production, but will also be able to take depositions.

### 2. The Nardello Report Is Attorney-Client Privileged

The Court should likewise reject Rio Tinto's argument that the Nardello Report is not protected by the attorney-client privilege because it does not constitute "legal advice." Letter at 7-8. Under U.S. law, the Report and Nardello's work is independently privileged because Nardello was hired by Clifford Chance to assist it in the provision of legal advice. It is hornbook law in the United States that privilege extends not only to "legal advice" (as Rio Tinto would have it) but to any confidential attorney-client *communication* made for the purpose of seeking or providing legal advice. *See* Rest. (3d) of Law Governing Lawyers § 68 (2000). Indeed, the attorney-client privilege applies to communications with or by third parties, when those third parties are "necessary, or at least highly useful," to an attorney in providing legal advice to his or her client, including where, as here, those third parties are investigators. *In re Grand Jury Subpoena Dated Mar. 20, 2013*, No. 13-MC-189, 2014 WL 2998527, at *8 (S.D.N.Y. July 2, 2014) ("Private investigators also fit within this category of necessary aides to the provision of legal services."); *see generally United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). That is precisely the situation here.

While Rio Tinto attempts to circumscribe *Kovel* and its progeny, the precedents on which it relies are inapposite. In *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999), the court rejected the magistrate's wholesale application of *Kovel* to simple advice obtained merely so that the lawyer could "gain information and . . . better advise his client." *Id.* at 139. Here, by contrast, Nardello's role was more akin to *Kovel* and *In re Grand Jury* than *Ackert*, in that Nardello served a critical function and its participation was necessary to Clifford Chance's provision of legal advice. *See Sunnyside Manor, Inc. v. Twp. of Wall*, Civil Action No. 02-2902 (MLC), 2005 WL 6569572, at *4 (D.N.J. Dec. 22, 2005). And, unlike in *Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-08333 (ALC)(SN), 2015 WL 1424009 (S.D.N.Y. Mar. 27, 2015), Letter at 7-8, Nardello did not merely "consolidate[] employee interviews and deliver[] a factual analysis," *Scott*, 2015 WL 1424009, at *7.

The other cases cited by Rio Tinto are irrelevant. This is not a case of taking a document not subject to privilege and cloaking it in privilege through a lawyer's transmittal letter. Rio Tinto's reliance on such cases is also misplaced because it is predicated on Rio Tinto's mischaracterization of the Nardello Report as merely consisting of factual information obtained as "part of a *fact*-gathering mission." Letter at 7 (emphasis in original). *Astra Aktiebolag v. Andrx Pharm. Inc.*, 208 F.R.D. 92, 103 (S.D.N.Y. 2002), cited by Rio Tinto, also supports Vale's position. Judge Jones stated that "attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with an attorney" and then – applying that principle – held that scientific reports – attached to legal memos – *were privileged* because they were prepared in response to requests by lawyers to conduct scientific investigations. *Id.*

Hon. Andrew J. Peck, p. 11

\* \* \* \* \*

  For the foregoing reasons, Vale requests that the Court deny Rio Tinto's motion for an order compelling Vale to produce the Nardello Report.

Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman

cc: All counsel of record (via ECF)

# EXHIBIT A



**NARDELLO & Co**
LONDON • NEW YORK • WASHINGTON • MILAN

Nardello & Co. LLP
13 Harley Street
London W1G 9QG
T: +44 (0)20 7079 5900
F: +44 (0)20 7079 5919

David D. DiBari, Esq.
Clifford Chance LLP
2001 K Street, N.W.
Washington, DC 20006-1001

25 March 2010

Dear Mr. DiBari,

I am pleased that Clifford Chance LLP ("Clifford Chance") on behalf of Companhia Vale do Rio Doce ("the Client") has engaged Nardello & Co. LLP ("Nardello") to provide investigative services in connection with Clifford Chance's legal advice to the Client. This letter will set forth certain matters with respect to our engagement.

1. <u>Scope of Engagement</u>. As described to us, we will provide investigative and consulting services relating to a mining project in Guinea, West Africa with effect from 25 March 2010, in order to assist you in formulating your legal strategy and advising the Client.

2. <u>Fees and Payment Terms</u>. Fees for our investigative services will be charged on an hourly basis. Our hourly fees range from £100 to £500 depending on the personnel assigned. In addition to our fees, our statements will cover office charges and expenses in connection with our services, including, without limitation, travel, telephone, database, messenger, duplicating and similar charges. Long distance, cellular telephone, facsimile and other communication charges will be estimated based on the fees incurred. Statements will be rendered monthly and at the end of the investigation and will be sent to the Client; we will also send a copy to Clifford Chance unless you instruct otherwise. The Client agrees to process Nardello's invoices promptly and the Client agrees to remit payment within thirty (30) days of the date of the invoice. If any invoice remains outstanding for thirty (30) days after it is due, Nardello may give the Client seven (7) days' notice to terminate this engagement. Unless the invoice has been paid before the expiration of such notice, this engagement will terminate and Nardello's obligations shall cease without prejudice to any outstanding liabilities of the Client. If Nardello seeks legal recourse to collect payments that have been overdue for more than sixty (60) days the Client agrees to reimburse Nardello for all reasonable legal fees and costs incurred. Interest will accrue from the due date until date of payment at the prevailing interest rate set by the National Westminster Bank. Nardello understands that the Client, and not Clifford Chance, will be solely responsible for the payment of our professional fees and expenses.


NARDELLO & C°
LONDON • NEW YORK • WASHINGTON • MILAN

3. <u>Conflicts of Interest</u>. Nardello wishes to avoid any circumstance in which Clifford Chance or the Client would regard our performance of investigative services for another client to be inconsistent with our duties to and understandings with Clifford Chance and the Client. Clifford Chance and the Client hereby consent and waive any objection to our performing investigative services to any other client on any matters not substantially related to the investigative services performed under this agreement.

4. <u>Confidentiality</u>. In the course of our investigation for Clifford Chance and the Client, it is likely that Nardello will acquire confidential information and/or legally privileged information relating to the Client ("Confidential Information"). All Confidential Information provided to us by Clifford Chance or the Client or created by us in connection with this matter shall be deemed covered by the attorney-client privilege, attorney work product doctrine, and self-evaluative privileged and its disclosure to third parties is prohibited without the consent of Clifford Chance or the Client, Nardello will not use the Confidential Information or disclose it to any third party for any purpose other than to complete this assignment, unless compelled to disclose it by operation of law. Should any attempt be made by any party by legal process or otherwise to gain access to the Confidential Information or interrupt or interfere with Nardello's investigation, then to the extent permissible by law Nardello will notify Clifford Chance and the Client and follow the instructions of Clifford Chance. Until otherwise instructed by Clifford Chance, Nardello will assume that the Client will not waive confidentiality or legal privilege. The Client agrees to pay, reimburse, indemnify and/or hold harmless Nardello for all reasonable fees, costs, legal liabilities and disbursements as may be incurred in connection with any of the matters in this paragraph.

We agree that any written communication from us to Clifford Chance shall be marked as follows: "Privileged and Confidential – Subject to Attorney-Client Privilege and Attorney Work-Product Doctrine: Prepared at the Direction of Counsel."

5. <u>Disclaimer</u>. Nardello will take every reasonable precaution to ensure that information provided to Clifford Chance and the Client is accurate, but Nardello cannot give any guarantees or warranties as to the accuracy of such information. Nardello cannot be held responsible for any reliance placed upon information it provides. Nardello cannot give any warranties or guarantees concerning the results of the investigative services performed in this engagement. Nardello shall be under no liability to the Client with respect to any damages of any nature suffered by the Client, any consequential or indirect loss, or any loss, damage or injury or consequential or indirect loss arising from the performance of or failure by Nardello to perform any duty at Clifford Chance's or the Client's request, except to the extent finally judicially determined to have resulted from the bad faith or intentional misconduct of Nardello

6. <u>Compliance with Law:</u> In connection with the engagement, Nardello shall at all times (i) comply with all applicable laws and regulations of all relevant jurisdictions and (ii) comply with the following:

- The Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, all as amended, or any of the foreign assets control



regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, as collectively interpreted and applied by the US Government at the prevailing point in time, and

- the US Foreign Corrupt Practices Act, 15 U.S.C. §78-dd-1, et seq., as amended and any applicable anti-bribery law, anti-corruption law, conflict of interest law, or any other law, rule or regulation of similar purpose and scope.

7. Termination. Nardello looks forward to a successful relationship with Clifford Chance and the Client. Nevertheless, any of us may terminate this engagement on seven (7) days written notice to the others. Notwithstanding any such termination, the Client will remain liable to pay all reasonable fees and charges incurred up to the date of the termination.

8. Other. Clifford Chance and the Client agree that Nardello is permitted in its sole discretion to subcontract any of its obligations under this engagement. Any subcontractors shall be subject to the confidentiality provisions contained herein. The Client agrees to indemnify Nardello for any action or claim against Nardello arising out of its performance of this engagement, including the costs of defending any claims brought against it, unless and until it is finally judicially determined that Nardello's conduct was unlawful, negligent, or tortious. This engagement agreement shall be governed and construed in accordance with English law. The parties agree to submit to the exclusive jurisdiction of the English courts.

9. Arbitration. If any dispute arises out of or in connection with the engagement, the parties agree that they will seek to have the dispute resolved amicably by the use of an alternative dispute resolution procedure acceptable to all parties before commencing legal proceedings. If the dispute has not been resolved to the satisfaction of all parties within thirty (30) days of the initiation of the procedure or if any party fails or refuses to participate in or withdraws from participating in the procedure, then any party may refer the dispute to the High Court.

The provisions of this engagement agreement will apply to future engagements of Nardello by Clifford Chance for the Client unless we mutually agree otherwise.

We look forward to working with you on this matter. Please indicate your agreement with the foregoing by signing and returning the enclosed copy of this letter.

Very truly yours,
Nardello & Co. LLP

*Michael Walsh*

Michael Walsh



The above sets forth the terms of the Engagement and is agreed to on behalf of Clifford Chance and the Client, as indicated below:

Dated: 3/25/10

Clifford Chance LLP

David D. DiBari, Esq.