UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>      Plaintiff,<br><br>    -against-<br><br>Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam,<br><br>      Defendants. | 14 Civ. 3042 (RMB) |

### DECLARATION OF CLOVIS TORRES

CLOVIS TORRES declares as follows pursuant to 28 U.S.C. § 1746:

1.    I am the General Counsel and Chief Compliance Officer of Vale, S.A ("Vale"). I joined Vale in this position in July 2011. By making this declaration, I do not intend to waive any applicable privilege. Information in this declaration is based on my personal knowledge unless otherwise indicated.

2.    In late March or early April 2013, Vale was contacted by Scott Horton of DLA Piper LLP, counsel to the Government of Guinea. Mr. Horton informed Vale that BSG Resources Ltd. ("BSGR") (and not Vale) was being investigated for corruption in connection with Simandou by the Department of Justice and the Government of Guinea.

3.    Mr. Horton then invited Vale to DLA Piper's offices in Paris so that Vale could review materials obtained by the Government of Guinea in the course of its investigation of BSGR. On April 12, 2013, I visited DLA Piper's offices, accompanied by my counsel from Cleary Gottlieb Steen & Hamilton LLP.

4.      At the beginning of the meeting, Mr. Horton emphasized the strict confidentiality surrounding the discussions and materials being discussed with us. Mr. Horton stated that the meeting and the Government of Guinea's willingness to share the information in question reflected the high level of confidence the Government of Guinea had in Vale, and in Vale's integrity and candor in its dealings with the Government. Mr. Horton emphasized that the Government of Guinea's position was that Vale had never been linked to or involved in the corruption under investigation, but was a victim of that corruption.

5.      We were introduced by Mr. Horton to Steven Fox of Veracity Worldwide, and were told that Mr. Fox had been retained as the Government of Guinea's investigator. Mr. Fox then gave us a presentation on the evidence obtained by the Government of Guinea as a result of its investigation of BSGR. Following the presentation, Mr. Horton proposed that Vale and the Government of Guinea enter into a joint strategy to defend and protect our common legal position against BSGR.

6.      I understood that the evidence shared with me during the April 12, 2013 meeting was confidential and that Vale had agreed that it would not disclose any information it received at the meeting without explicit authorization from the Government of Guinea to do so. Given this desire to maintain confidentiality, neither I nor the other Vale representatives were given copies of the evidence that we were shown by Mr. Fox, nor were we permitted to make copies of the evidence.

7.      A few days after this meeting, on April 15, 2013, the United States Department of Justice announced the arrest of Frédéric Cilins. After the announcement of the arrest, Vale was again contacted by Mr. Horton who reiterated to Vale that Vale was not under investigation and that the Government of Guinea considered Vale to be a victim of BSGR's conduct. He then

2

asked that Vale permit the Government of Guinea to review materials regarding the due diligence by Vale's attorneys and their agents on BSGR in order to assist the Government of Guinea with respect to its investigation, just as the Government of Guinea had permitted Vale to review evidence of BSGR's wrongdoing uncovered by its investigation at the Paris meeting. In particular, Mr. Horton requested that Mr. Fox, acting as a representative of the Government of Guinea, be permitted to review certain of Vale's due diligence materials on a confidential basis. On this basis, Mr. Fox visited Vale's offices in Brazil on April 19, 2013, one week after my meeting with him in Paris on April 12, 2013.

8.     I permitted Mr. Fox, acting as a representative of the Government of Guinea, to look at the report prepared by Nardello & Co. ("the Report"). I did so because I considered Vale to be a victim and was informed that Vale was a victim of BSGR's conduct, and because I considered that Vale had a reciprocal obligation to permit the Government of Guinea to review its documents concerning BSGR's conduct on an understanding of confidentiality, and believed that Vale had a common interest with the Government of Guinea in uncovering any corrupt conduct by BSGR. Given the representations BSGR had made to Vale in their joint venture negotiation, and the remedies that existed in the contracts between Vale and BSGR,[1] any evidence that BSGR had engaged in corrupt activities in connection with the award to it of mining rights at Simandou Blocks 1 and 2 would also support a claim by Vale that it was a victim of fraudulent misrepresentation and be entitled to remedies of damages and rescission. Thus, Vale's interest was aligned with that of the Government of Guinea – evidence of corruption by BSGR, both the evidence that Mr. Fox had already presented to Vale as well as

---

[1] Based on the representations and warranties in the Framework Agreement (Section 8.1; Schedule 4, Part B, Sections 2.1, 3.1, 3.2, 3.5, 3.6, 4.2) and Shareholders' Agreement (Sections 16.1, 16.2; Schedule 3), Vale has claims for fraudulent misrepresentations, breach of warranties, and frustration under English law. Under English law, such claims entitle Vale to contractual damages as well as rescission of the Agreements.

3

any further evidence obtained by the Government of Guinea, would assist Vale in claiming its remedies under the Framework Agreement and Shareholders' Agreement. In addition, given Vale's positive relationship with the Government of Guinea, and the fact that the Government of Guinea had already displayed a willingness to assist Vale in its claim against BSGR, I wanted to assist the Government of Guinea with its investigation in good faith.

9.      At the same time, and as the Government of Guinea had done at our meeting on April 12, 2013, I insisted that the Government of Guinea maintain the information given to it by Vale in confidence and received assurances that it would keep the information in confidence.

10.      In particular, when Mr. Fox visited Vale's offices in Brazil on April 19, 2013, I informed Mr. Fox that the materials being shared with him were confidential. Mr. Fox expressly agreed to maintain that confidentiality. I permitted Mr. Fox only to review the Report, and did not give him a copy or permit him to make copies because I wanted to preserve the confidentiality of the Report. In fact, I instructed Mariangela Bartz, Vale's Deputy General Counsel, to stay in the conference room while Mr. Fox reviewed the Report to ensure that no copies or photographs could be made and to protect the confidentiality of the Report. The Government of Guinea agreed to those conditions. No other person was permitted to review the Report and no copies of the Report have been given to anyone outside Vale, Cleary Gottlieb, Clifford Chance, or Nardello.

11.      Ultimately, after Mr. Fox reviewed the Report, Vale instituted legal action against BSGR through the contractually prescribed arbitration procedure seeking damages and rescission because BSGR deceived it with respect to Simandou. That legal action was instituted before Vale was sued by Rio Tinto or reasonably anticipated any lawsuit by Rio Tinto – the allegations of which Vale denies.

4

I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct.

Executed:      São Paulo, Brazil
               June 5, 2015

                                              _____
                                              Clovis Torres

5