F61NRIOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   RIO TINTO PLC,

4                  Plaintiff,

5            v.                         14 CV 3042 (RMB)(AJP)

6   VALE, S.A., ET AL.,

7                  Defendants.

8   ------------------------------x
                                        New York, N.Y.
9                                       June 1, 2015
                                        2:00 p.m.
10
    Before:
11
12                        HON. ANDREW J. PECK,

13
                                        Magistrate Judge
14

15                        APPEARANCES

16
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
17        Attorneys for Plaintiff
    BY:  MICHAEL J. LYLE
18        ERIC C. LYTTLE
          MEGHAN A. McCAFFREY
19

20  CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Vale, S.A.
21  BY:  LEWIS J. LIMAN
          MATTHEW M. KARLAN
22        SCOTT B. REENTS

23
    MISHCON DE REYA NEW YORK, LLP
24        Attorneys for Defendants BSG Resources Limited and
    Benjamin Steinmetz
25  BY:  VINCENT FILARDO, JR.
          TIM McCARTHY

F61NRIOC

```
 1

 2
                              APPEARANCES (Continued)
 3

 4
    SULLIVAN & WORCESTER, LLP
 5        Attorneys for Defendant Mahmoud Thiam
    BY:  PAUL E. SUMMIT
 6

 7  LAW OFFICES OF LAURA E. NEISH
          Attorneys for BBG
 8  BY:  LAURA E. NEISH

 9  ALSO PRESENT:  KINNY CHAN, Managing Director, eDiscovery
                   Precision Discovery
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

F61NRIOC

1          (In open court)

2          THE COURT:  Welcome on this nice rainy day.  The idea

3     of you giving me a joint letter is great, but it falls apart

4     when there are then six other supplemental letters.  So I am

5     going to work off of the joint letter first, and then work our

6     way around to the other letters.

7          Do you all have your E-discovery experts/consultants

8     here?  With respect to the training documents the Rio Tinto

9     training Vale's motion on this, the argument seems to be that

10    if there are only a small number of training documents on a

11    particular subtopic that that is not going to be sufficient.

12    And I am not sure that that is correct.

13          So, Mr. Reents, it is your application.  Proceed.

14          MR. REENTS:  Your Honor, I don't know that I would say

15    that there is a particular number that has to be to be in

16    there, but there does need to be a critical mass, and they do

17    need to be appropriate training documents.

18          THE COURT:  The question is, what is a critical mass?

19          MR. REENTS:  Yes.

20          THE COURT:  In other words, if the richness of the

21    corpus is such that it is 10 percent rich on subject A and only

22    1 percent rich on subject B, as long as there are positive

23    training documents for both A and B, does it matter how many of

24    them there are or whatever constitutes your sufficient corpus?

25    In other words, is one enough, for example?

F61NRIOC

1          MR. REENTS:  I don't think it is, your Honor.

2     Moreover --

3          THE COURT:  Now I need somebody with Ph.D. or computer

4     scientist after their name to tell me more about it, because I

5     am not sure you're right.

6          MR. REENTS:  I think the declaration addressed this

7     issue, from Mr. Hajarian.  He states that if you don't have

8     sufficient examples from the different categories of documents

9     you are not --

10         THE COURT:  What is sufficient is the question.

11         MR. REENTS:  Yes.  I think that Mr. Hajarian would say

12    there is not a bright line that you can draw for this number.

13         THE COURT:  I guess I'm saying how many more documents

14    would you like them to train on, on the subjects that are of

15    the lesser number of training documents?

16         MR. REENTS:  Your Honor, I think we are looking at

17    somewhere in the ballpark of 15 to 20, which is sort of the low

18    end of the number of documents that we've trained on all of the

19    issues that they have asked us to look for in our universe.

20         THE COURT:  Do you have examples of such additional

21    documents to use as training documents, or do they have to

22    search blindly to find 14 more if they've got one or whatever?

23         MR. REENTS:  We don't, because we don't have the

24    appropriate documents from them.  But we just e-mailed them a

25    short time ago to offer to meet and confer with them to propose

F61NRIOC

1    search terms that they can use.

2          THE COURT:  It's getting kind of late in the day for

3    much more meeting and conferring.

4          Who am I going to hear from?

5          MS. McCAFFREY:  Your Honor, Meghan McCaffrey for Rio

6    Tinto.  Respectfully, your Honor, I think you have hit the nail

7    on the head.

8          I also would offer, if you would like to see it, I

9    have compiled a chart that does detail the documents that we do

10   believe are responsive to the various requests that Mr. Reents'

11   letter has outlined.  We actually do believe there are more

12   than sufficient documents that are responsive to, for example,

13   requests 13, 40 and 45, for example, the first bullet point.

14         We have including -- for example, nonprivileged

15   documents, we show at least 39 documents as being responsive to

16   those requests.  When you include privileged documents, that

17   goes up to 70 documents.  Our total universe of documents that

18   we are training the system on includes 400 documents.  Those

19   are nonprivileged and privileged documents.

20         Like I said, we are more than willing to continue to

21   work with Vale to continue to address their concerns with this,

22   but we do believe that the system is more than adequately

23   trained.

24         We are training it on concepts.  We are getting a

25   comprehensive data universe to produce our documents here.

F61NRIOC

1    More importantly, we also over the weekend did do a

2    statistically relevant sample of our documents that were coded

3    as nonresponsive by the system.  Our allusion rate is showing a

4    2.5 percent response rate.  We truly do believe that we are

5    getting the responsive documents and will be producing those to

6    the defendants.

7          MR. REENTS:  Your Honor, I think it is not just a

8    question of the numbers, although this is the first that I am

9    hearing of the additional documents that they think are

10    responsive, although we alerted them to this issue a week ago.

11          But it is also the quality.  If you look at the nine

12    documents that we believe are responsive to these requests, we

13    are talking about the critical issues in the case here from our

14    perspective.

15          It's the response to the announcement that they've

16    lost the concession.  It's the announcement that BSGR has

17    gained the concession.  For those topics we have not seen any

18    internal e-mails, the kinds of e-mails where they are talking

19    about why did this happen, what do we do next, as they allege

20    was Vale involved in this.

21          THE COURT:  Do you have any reason to believe that

22    they are an e-mail heavy user?

23          MR. REENTS:  Well, we know that they have some two or

24    three million e-mails in their collection.  It is a very

25    substantial e-mail collection.

F61NRIOC

| | |
|---|---|
| 1 | THE COURT:  All right.  Here's the problem.  You both |
| 2 | have used -- and I warned you about it at the time -- a very |
| 3 | generic protocol for your respective predictive coding |
| 4 | approaches.  It is not necessarily the approach that is the |
| 5 | best in the world, frankly, on either of you.  And you know, |
| 6 | you are giving me the, it's bigger than a breadbox or it's not |
| 7 | bigger than a breadbox. |
| 8 | I agree there needs to be an appropriate number of |
| 9 | training document for each subset.  You are saying there aren't |
| 10 | enough; maybe 14 more would suffice.  They are saying there are |
| 11 | enough and that in fact they have not used 9 documents, but 39. |
| 12 | I've offered you all previously a special master |
| 13 | expert in the use of TAR.  You all said you didn't need it. |
| 14 | I am in no position to rule on this at this stage. |
| 15 | Obviously, you have in the protocol that there will be |
| 16 | statistical sampling and quality control of the null set, the |
| 17 | documents not shown as responsive. |
| 18 | If it really is that there was nothing in the garbage |
| 19 | file that should have been produced, then maybe these documents |
| 20 | didn't exist, and you will find that out when you depose people |
| 21 | or you'll find out the converse, that there were lots and lots |
| 22 | of e-mails on this subject and that plaintiff didn't |
| 23 | sufficiently find them. |
| 24 | The only other suggestion I would make, if you both |
| 25 | want to do it, there is a recent article in prepublication form |

F61NRIOC

1  from people I believe to be expert in this area that say one

2  can create a synthetic document, which is essentially taking

3  the language of the document requests, removing words like "all

4  documents relating to" and putting just the gist of the

5  requests into a Word document.

6       If you are both willing to do that, then maybe that is

7  an easy solution, and retrain and see what else, if anything,

8  bubbles up accordingly.  That would mean you would have to do

9  it on your side with their requests, and they would do it with

10  your requests.  Maybe that would show that something is missing

11  now, maybe it wouldn't.

12       I offer that as a suggestion.  I offered the special

13  master as a suggestion, and it could be on a help you basis as

14  opposed to necessarily rule.

15       MR. REENTS:  Your Honor, we would be in favor of both

16  of those, a special master and discussion --

17       THE COURT:  Where were you two months ago when this

18  issue first came up?

19       You've got a June 30 substantial completion date.

20  Even if the person I am thinking of to appoint as your special

21  master is instantly available, it is a little late.

22       MR. REENTS:  Your Honor, my understanding was that

23  both parties were in favor of a special master, but we

24  reconsidered based on --

25       THE COURT:  Certainly nobody told me you wanted a

special master, whether it's you both did want to go that

route, but nobody told me, or one of you did and one of you

didn't or everybody's positions are changing.

You want a special master, too?  Yes?  No?  I mean

obviously you are paying big firm rates.  Did I mention the

name of the person I was thinking of last time?

MR. REENTS:  You did.

THE COURT:  OK.  You are paying for a senior counsel

level at Wachtell, which I'm sure ain't cheap.

MS. McCAFFREY:  Yes, your Honor.  We certainly are not

opposed to it.  I think we need to discuss it with our client.

I think, frankly, part of the reason the parties had backed off

of it is that Judge Berman I think had very specifically --

there was an order in place where Judge Berman had told us

that -- had basically said no, no special masters.  So I think

that was why we had backed off of it, frankly.

THE COURT:  OK.

MS. McCAFFREY:  He said we had the best.

THE COURT:  Lucky me.  We will put a pin in that.

If you both tell me you want it, then obviously you

will have to clear conflicts and you will have to work out the

financial arrangements.

It may be because Ms. Grossman uses continuous active

learning, I think neither of your systems are continuous active

learning systems, so we certainly do not have time to start

F61NRIOC

```
 1  │  from scratch.  Nevertheless, consult with your clients, get
 2  │  back to me promptly.
 3  │        You will still, however, be on the current schedule,
 4  │  so you may have waited too long or gotten mixed signals from me
 5  │  and Judge Berman.
 6  │        In any event, the one thing we can immediately do, how
 7  │  do you both feel about running a Word document created off of
 8  │  the document requests as an additional training document?
 9  │        MS. McCAFFREY:  Excuse me.  I'm just consulting with
10  │  my expert.
11  │        THE COURT:  Your expert is free to speak directly if
12  │  he tells me who he is.
13  │        MR. CHN:
14  │        MR. CHAN:  Judge, I am Kinny Chan from Precision
15  │  Discovery.  There's no technical limitation on adding that
16  │  document into the system and every running categorization.
17  │        THE COURT:  So that is a yes?
18  │        MS. McCAFFREY:  I think we are fine with it, yes, as
19  │  long as obviously it's mutual from both sides, we would be
20  │  running the same.
21  │        THE COURT:  You would be running the flip?
22  │        MS. McCAFFREY:  Yes, sir.  I'm sorry.  Excuse me.
23  │  Yes, sir.
24  │        MR. REENTS:  Pending confirmation with our vendor that
25  │  that is there are no technical issues, which I wouldn't expect
```

F61NRIOC

1    there to be, we would like to do that as well.

2              THE COURT:  Good.  OK.

3         MR. REENTS:  Your Honor, I would like to say that the

4    training exercise wouldn't necessarily need to be limited to

5    that composite document.  I think there are other documents in

6    the universe.  We would like the opportunity to identify those

7    documents and Rio Tinto's document collection for feeding it as

8    well.

9              THE COURT:  Here's the problem, as I understand it,

10   and I'll let our expert here tell me otherwise.  Since you are

11   not doing continuous active learning on either side, at some

12   point they will be done or partially done, and if you then say,

13   well, you have now produced ten additional documents, we would

14   like you retrain on them, I am not sure what that does if we're

15   too late into the game.

16             Mr. Chan?

17        MR. CHAN:  Your Honor, it shouldn't make a difference

18   if it's continuous active learning, simple passive learning.

19   It is all a matter of validation, that final validation step

20   that we've written into the protocol.

21             THE COURT:  They are not talking about doing it at the

22   validation stage.  They are all talking about, you are all

23   doing rolling productions.  As I understand Mr. Reents, it is

24   that if in your first rolling production they find other 20

25   documents, 25 documents, whatever, that they think would be

F61NRIOC

1    better training documents or additional training documents,

2    they would like you to retrain and restabilize the system.  If

3    you are telling me you can do that --

4              MR. CHAN:  Right, any system should be able to do

5    that.

6              THE COURT:  OK.

7              MS. McCAFFREY:  Judge, frankly my concern becomes now,

8    it is June 1 now.  We are 29 days out from when we are supposed

9    to have substantial document production complete.  This ongoing

10   process, at some point we need to have the system stabilized

11   and this is an ongoing process.

12             THE COURT:  The only way that this is going to work,

13   and maybe I'm missing this, is when you stabilize the system

14   you start producing, and we've talked about not producing

15   everything on June 30 --

16             MS. McCAFFREY:  Agreed.

17             THE COURT:  -- in bulk, but in waves, so that if in a

18   week you give them the first wave of production and they look

19   at it and say there are some really great documents on subject

20   A, B, and C here that we thought were underrepresented in the

21   training set, please use the following 25 documents, retrain or

22   supplement train, and then keep producing more relevant

23   documents.  Does that work or not?

24             MS. McCAFFREY:  Yes, it can work.  But I guess my

25   point is we've already had 400 documents that we are using to

F61NRIOC

1    train the system.  As I said before, we have numerous documents

2    that are being used to train these specific requests.

3             THE COURT:  If your training was sufficient, the new

4    documents shouldn't turn up much, if anything, new.  Let's see

5    what happens.  I am not ruling on it per se other than the

6    synthetic document that you have both agreed to.  We will go

7    from there and see what happens as the production continues.

8

9             MR. REENTS:  Your Honor, could we have a date when the

10   parties will report back to you on what their plan is with

11   respect to both the special master and this additional

12   training.

13            THE COURT:  The special master, if you don't get back

14   to me tomorrow or the next day, the ship which may already have

15   long since passed, will certainly have passed, particularly

16   because Ms. Grossman is going to have to get a conflict check

17   and all the usual stuff at a big firm to make sure she is able

18   to do it even if you all want her.

19            So the faster you all decide, yes, that you're willing

20   to split her fee 50/50 and that she will help you all with this

21   sort of nitty gritty stuff, because she talks the talk and

22   walks the walk, so be it.

23            I am not setting an absolute deadline other than

24   whoever wants it better say yes first and put pressure on the

25   other side if that's the way it goes.

F61NRIOC

1           OK.  Next issue.  This is the two big parties, if that

2     is the issue you are going to raise.

3           MR. SUMMIT:  Your Honor, if I may be heard just

4     briefly, Paul Summit for defendant Thiam.  You haven't heard

5     much from us lately with regard to that synthetic document that

6     these parties are talking about creating.

7           There are a number of document requests we served a

8     couple of months ago, a month and a half ago, and a tremendous

9     amount of those document requests are embraced already in the

10    ongoing dialogue between these parties.  There are a few issues

11    that we believe are not --

12          THE COURT:  Just get with them and add it to the list.

13          MR. SUMMIT:  Perfect.  Thank you.

14          THE COURT:  OK.  Vale's third document request.

15          I am not sure where you are in agreement or

16    disagreement here, despite the letter.

17          MR. LIMAN:  Your Honor, Lewis Liman for Vale.  Let me

18    say first that this doesn't have to do with the June 30

19    deadline.  This is the subsequent set of document requests

20    which are not under the same time pressure.  I believe that our

21    disagreement is confined to request 62 and request 63.

22          We have laid out in 62 by category the types of

23    documents we're looking for.  There is a little bit of a

24    strawman on the other side, where they say that our request

25    could call for every single press release.

F61NRIOC

1          That's not what's intended.  So I think, for the

2    Court's benefit, it's really on page 10, the four categories of

3    documents with respect to 62 and then 63 there is also

4    disagreement.

5          THE COURT:  All right.  Who am I hearing from?

6          MR. LYTTLE:  Good afternoon, your Honor, Eric Lyttle

7    for Rio Tinto.

8          A little background.  These are document requests

9    related to the April 2011 settlement agreement in which Rio

10   Tinto gave up its fight essentially for blocks one and two in

11   order to secure its rights to blocks 3 and 4.

12         Vale has already served extremely broad discovery

13   related to the April 2011 settlement, including in their very

14   first set of requests, which had a request for all

15   communications with the Guinean government about the April 2011

16   settlement agreement.

17         We have agreed to produce in response to that, in

18   fact, we count ten requests focused only on --

19         THE COURT:  That's what I thought.

20         So let me be clear.  Whether specifically responding

21   to new request No. 62 or responding via the prior requests, are

22   you producing all documents relating to that settlement

23   agreement as encompassed by the categories on page 10 of the

24   joint letter?

25         Yes or no?

F61NRIOC

1          MR. LYTTLE:  No, your Honor.

2          THE COURT:  OK.  Go ahead.

3          MR. LYTTLE:  The problem, your Honor, is that 62 talks

4     about third parties.  It's completely unmoored in any way shape

5     or form.

6          THE COURT:  But it's now moored by page 10.  So the

7     third parties are Chinalco, Chalco, IFC, internal and external

8     auditors, insurers, consultants and advisers.

9          MR. LYTTLE:  I appreciate that, your Honor.  That is

10    news to us.  We learned that just sitting here now.

11          That's nice.  The request as drafted was included but

12    not limited to -- and in the meet-and-confers they were

13    specifically not willing to limit to it those.

14          THE COURT:  I assume when you send thee letters you

15    actually read the other side's position.

16          MR. LYTTLE:  I think that is a flaw in this process,

17    your Honor.  We are ships passing in the night.  We exchange

18    topics.  We do not get to see, nor do they get to see, the

19    substantive insert.  It is a flaw in the process.  I would like

20    that.

21          THE COURT:  You have seen the final letter which came

22    out on May 28.  So that letter told you what they were limiting

23    this to, to the extent that it was too broad to begin with.

24          Let's cut to the chase.

25          MR. LYTTLE:  The cut to the chase, your Honor.  It is

F61NRIOC

1    still not limited in subject matter.  We would be willing to

2    look for documents for these third parties, but it is any

3    communication related to the April 2011 settlement agreement.

4    It is not in any way related to the decision to enter into

5    that, the status of our rights, or even the cost benefit, which

6    are the areas of relevance they have identified.

7           If we can limit 62 to these parties --

8           THE COURT:  What is this that you want to limit out.

9    That's what I am trying to understand here.

10          MR. LYTTLE:  Right now this request is worded for any

11   piece of correspondence or communication that mentions the

12   April 2011 settlement agreement.

13          THE COURT:  How many documents are we talking about?

14          MR. LYTTLE:  We are talking likely under that a

15   massive amount of documents.  This was a big deal for this

16   company.

17          THE COURT:  That mentions the settlement agreement?

18          MR. LYTTLE:  That just says April 2011 settlement

19   agreement.  What we are trying to do is confine -- they have

20   confined the third parties.  We would like would --

21          THE COURT:  I think you are going to have a further

22   meet-and-confer on this, because there are so many letters.

23   I've got a 3:30 conference call on another case.  So you all

24   figure out how to use your remaining hour and -- I have to get

25   downstairs for that, so now an hour and five minutes.

F61NRIOC

1          Do you want to do that right now?  Do you want to have

2     me send you and Mr. Liman into the back when we're done with

3     everything else?

4          It sounds like there hasn't been a full

5     meet-and-confer on this.  So tell me how you want to use your

6     time, Mr. Lyttle

7          MR. LYTTLE:  I'm happy to discuss it more with

8     Mr. Liman.  I think it is a lot to get through today.  I would

9     suggest that we do that afterwards, like we did last time.

10          THE COURT:  Mr. Liman, any problem with that?

11          MR. LIMAN:  Yes, your Honor.  Let me try to keep it

12     quick.

13          THE COURT:  Just to be clear, I am not going to send

14     you home.  It just means hopefully we'll get everything done by

15     3, but if not, we will go until 3:30, I will take my other

16     conference call -- that should take 15 minutes to half an

17     hour -- you will use that period to talk, which you should have

18     been doing beforehand.  Maybe you have and maybe you haven't.

19          Go ahead.

20          MR. LIMAN:  Your Honor, we have.

21          My issue is twofold.

22          One, I think we need a decision on this issue.

23          THE COURT:  You are going to get a decision.  The

24     question is whether you would like it without further

25     meet-and-confer where you might work this out, or whether you

1    want it just based on what's in the letter here.

2            MR. LIMAN:  Second, your Honor, I have an urgent

3    criminal matter in the Eastern District of New York at 4

4    o'clock.  Maybe I should have started off with that.

5            THE COURT:  Yes, maybe.

6            The problem is going to be, you and your colleagues

7    who have not only this 29-page joint letter but then, you know,

8    two or three inches of supplemental letters are going to run

9    out of time.  I don't care.

10           MR. LIMAN:  We're happy for your Honor to decide this

11   on the papers.  We are also happy to do a telephone conference,

12   come back tomorrow --

13           THE COURT:  That's a possibility.  But let's just deal

14   with this.

15           How would you suggest limiting this?

16           MR. LYTTLE:  I would suggest a limitation to the

17   parties they have identified, which we have first seen in this

18   letter, as well as a limitation to documents that relate to Rio

19   Tinto's decision to enter into the settlement agreement and to

20   credit their cost/benefit discussion, the documents with third

21   parties that relate to the cost benefit, and the parties have

22   agreed to a definition of what that means because it comes up

23   in other requests.

24           What I'm not willing to agree to is a broad any

25   document mentioning the settlement agreement.

F61NRIOC

1          THE COURT:  OK.  Mr. Liman, does that work?

2          MR. LIMAN:  Your Honor, I think in addition to the

3     categories that were mentioned, we think it should encompass --

4     and it's not going to be a huge volume -- all of the

5     correspondence with the third parties, external correspondence

6     that referenced the settlement agreement.

7          So if there is correspondence with Chalco or with IRC

8     that references the settlement agreement that can be searchable

9     by the address --

10          THE COURT:  By correspondence you are including

11     e-mail, which gets us back into the huge volume?

12          MR. LIMAN:  I don't think it does, your Honor, because

13     we understand internal e-mails with respect to this subjects

14     that were mentioned, and then we are looking for -- it probably

15     should cover similar categories -- any external e-mails on the

16     subject of the settlement.

17          THE COURT:  Mr. Lyttle, limited to external, is that

18     acceptable?

19          MR. LYTTLE:  Your Honor, we can make that acceptable.

20          THE COURT:  Good.

21          Does that apply to 63 as well, or do we have different

22     issues on 63?

23          MR. LYTTLE:  Unfortunately 63 presents a different

24     issue.

25          THE COURT:  OK.  What is it from your point of view?

F61NRIOC

1              MR. LYTTLE:  The April to 11 settlement agreement

2       created a new project over blocks three and four.  It set a

3       number of milestones, production milestones, development

4       milestones.  All of those milestones, they now want extensive

5       discovery into how those milestones were being met or not met.

6       Our position, your Honor, is that that is all post-settlement

7       work.

8              Let's credit their theory just for purposes of

9       argument.  If we weren't meeting those milestones, it presented

10      no threats to our rights to blocks one and two.  It would only

11      present a threat to our rights to blocks three and four.

12             There's been extensive development work on 3 and 4,

13      extensive, that we don't think is relevant.  It is not called

14      for.  This request is again completely unmoored to the concept

15      of the why did you enter into the settlement agreement.

16             THE COURT:  I got your point.

17             Mr. Liman?

18             MR. LIMAN:  Your Honor, first I think, just to be

19      clear, what we're looking for in 63 is documents provided by

20      Sinfer, that's Rio Tinto, to the government of Guinea.  So we

21      are not looking for everything that references.

22             Second, to make it --

23             THE COURT:  Stop for a minute.  Provided when?

24      Presettlement agreement or post or both?

25             MR. LIMAN:  Both, but limited to the categories that

F61NRIOC

1   follow the word "including."

2            And, your Honor, if I could address the relevance

3   briefly.  The relevance is that our theory of the case is that

4   the settlement agreement was a positive for Rio Tinto.  All of

5   these documents will demonstrate that this was a deal not to

6   give up Simandou one and two, but to get Simandou three and

7   four that made money for Rio Tinto.

8            That's the relevance.

9            The burden, since it's described in the documents that

10  are required to be produced pursuant to the agreement and just

11  external, should be nonexistent.

12           MR. LYTTLE:  Your Honor, we have agreed in response to

13  numerous other requests to give them all correspondence with

14  the Guinean government about why to enter into the settlement

15  agreement.  If you look at what that their request is, it is

16  calling --

17           THE COURT:  This is postsettlement agreement.

18           MR. LYTTLE:  Postsettlement agreement.

19           -- for geological drilling data, business plans --

20           THE COURT:  How much data did you have give the

21  government?

22           MR. LYTTLE:  Your Honor, it is not exactly clear to

23  me.  We are trying to find that out.  There was a lot

24  developed -- I'm sorry.  I don't have an answer for your Honor,

25  is the short answer.

F61NRIOC

```
 1          THE COURT:  It is hard to say that the burden is great
 2     if you don't know what it is.  Presumably you are going to do
 3     this based on either e-mail or other cover correspondence
 4     saying, "dear government, attached is . . ." or you are going
 5     to rely on your client saying this is what we gave the
 6     government to the best of our recollection.
 7          So at this point, I will enforce request 63.  If you
 8     tell me that when you do that search either you can't figure it
 9     out at all, in which case is answer is probably you don't have
10     to produce anything, or you know there are a billion documents
11     we'll revisit the issue.
12          MR. LYTTLE:  May I briefly clarify, your Honor?
13          THE COURT:  Very briefly.
14          MR. LYTTLE:  Just to be clear, that is what was sent
15     to the Guinean government only as Mr. Liman represented?
16          THE COURT:  Correct.
17          MR. LYTTLE:  Thank you.
18          THE COURT:  All documents provided to the government.
19          MR. LYTTLE:  Thank you, your Honor.
20          THE COURT:  Next we go over to page 13, Rio Tinto's
21     custodians, and you want to add two more people.
22          Their response, of course, is in part that means they
23     should get people added on your custodian list, and there is
24     some fairness to that suggestion.
25          So why are these two so important that if you get it
```

F61NRIOC

 1    you may wind up having to add people to your custodian list?

 2              MR. LIMAN:  Your Honor, they are so important because

 3    the sole theory of RICO injury that remains in this case is the

 4    settlement agreement.

 5              We have two custodians that have been identified by

 6    them.  We are asking for two more custodians in a case where

 7    billions of dollars is being sought in damages.  This is

 8    critical information for us.

 9              THE COURT:  Didn't you have this information from the

10    beginning?

11              MR. LIMAN:  We did not, your Honor.  We absolutely did

12    not.

13              If your Honor would look at page 7 and 8 of the joint

14    letter, those lay out what we had and what we didn't have.

15    What we had was a theory of the case that depended on 2008 and

16    2009.

17              THE COURT:  Your argument is they changed their

18    argument.

19              All right.  I'm inclined to give them these two

20    additional custodians, Mr. Lyttle.  And the quid pro quo may

21    well be when you are arguing that you get more custodians that

22    you do, but tell me why I shouldn't.

23              MR. LYTTLE:  Your Honor, just very briefly, these

24    custodians we believe are cumulative.  One of them is another

25    in-house counsel.

F61NRIOC

1            THE COURT:  If it's cumulative that is going to make

2      it pretty easy, because you are going to dedupe.

3            MR. LYTTLE:  Still the collection and the processing,

4      your Honor.  Fair enough.

5            Last but not least, I won't belabor it, but it really

6      to us is shocking that they would basically not have documents

7      or custodians we have lost and now they want to add more.

8            THE COURT:  I understand.

9            MR. LYTTLE:  All right.

10           THE COURT:  All right.  Add the two new custodians,

11     Laura Granson and Benoit Palmer.

12           MR. LYTTLE:  Your Honor, those two custodians are

13     limited to these requests?

14           THE COURT:  Yes.  Third requests.  That's what the

15     request is.  That's what they get.

16           MR. LYTTLE:  Thank you, your Honor.

17           THE COURT:  OK.  Next.

18           Rio Tinto's oral litigation hold.

19           MR. LIMAN:  I'm just confirming something with

20     Mr. Lyttle.

21           THE COURT:  I understand.

22           MR. LIMAN:  Just to clarify for the record, what we

23     just discussed is that with respect to the two additional

24     custodians.  It will be everything in the third request?  Not

25     just 62 and 63, but everything in the third request?

F61NRIOC

1              THE COURT:  Correct.

2              MR. LIMAN:  Thank you, your Honor.

3              THE COURT:  OK.

4         I am not a big fan of discovery about discovery.  I've

5    got two supplemental letters, maybe it's one supplemental

6    letter, two copies of it adding to the pile on this issue.  It

7    seems there is a lot of information here.

8              What else do you want, Mr. Liman?

9              MR. LIMAN:  Your Honor, I think if you look at our

10   letter of June 1, we lay out on page 2 in a series of bullet

11   points --

12             THE COURT:  Hang on while I find your June 1 letter.

13             You don't mean the joint letter?

14             MR. LIMAN:  I don't, your Honor.

15             THE COURT:  You mean the supplemental?

16        OK.  Got it.  I think.  This is the one that says the

17   discovery requests relevant to the statute of limitations?

18             MR. LIMAN:  No, your Honor, it's not.

19             THE COURT:  I've got a gazillion letters from all of

20   you.  Why don't you hand me what it is.

21        OK.  So is it mostly getting from fall of 2010 to an

22   exact date?

23             MR. LIMAN:  Fall of 2010 to an exact date, and then

24   whether the oral hold covered the bullet points that are on the

25   bottom of page 2 and 3 and whether it didn't.

F61NRIOC

 1              THE COURT:  OK.  Mr. Lyle.

 2              This all seems much ado about nothing on both sides.

 3              MR. LYLE:  Yes, your Honor.

 4              The fact is our oral hold, as we've told them and

 5    advised them -- and in fact we told them as early as March of

 6    this year that it encompasses Simandou, which encompasses

 7    everything that they have put in their letter.

 8              THE COURT:  How about a date?

 9              MR. LYLE:  We can give them dates, your Honor.

10              THE COURT:  Good.

11              What else, Mr. Liman, on that issue?

12              MR. LIMAN:  Can we have a deadline of some type for

13    when we'll get it?

14              THE COURT:  Wednesday.

15              Mr. Lyle?

16              MR. LYLE:  Can we make it by the end of the week, your

17    Honor.

18              THE COURT:  Sure.

19              MR. LYLE:  Thank you.

20              THE COURT:  OK.

21              Next, status of Rio Tinto's document production.

22              I think there is nothing you want me to rule on that.

23    That is informational, is that correct?

24              MR. LIMAN:  That's correct, your Honor.

25              THE COURT:  All right.  We are going to hold off on

F61NRIOC

1     the investigator issue and now go to the discovery from Vale.

2              I am not inclined --

3              MR. LIMAN:  Your Honor, Mr. Reents will be handling

4     that.

5              THE COURT:  It seems to be an issue of additional

6     custodians and a 30(b)(6) witness.  I'm disinclined to give the

7     30(b)(6) witness.  I may be inclined to give the additional

8     witnesses.

9              So, Mr. Reents, why don't you perhaps respond.

10             MR. REENTS:  Your Honor, the main thing, the main

11    issue here is just that -- this is the same issue that they

12    presented at the last conference.  There's no new information

13    that they have received since that conference that should cause

14    you to reconsider your decision then, which is that you allowed

15    one additional custodian, Mr. Ricardo Saad, and denied their

16    request for additional custodians beyond that.

17             They have had all the information they needed at that

18    conference to request additional custodians.  They didn't.

19    There are no issues here.

20             THE COURT:  Mr. Lyle?

21             MR. LYLE:  Your Honor, just for clarity, are we simply

22    arguing about the custodians at the moment.  I would like to

23    address the 30(b)(6) deposition as well.

24             THE COURT:  First of all.  The custodians I think I

25    did rule on.  Why should I revisit that?

1          MR. LYLE:  Your Honor, because we have demonstrated to

2     you, which is something that we did not dig into at that time

3     of the last hearing, that these witnesses are witnesses that

4     Vale has identified as having relevant information.  As you

5     will recall, there are eight custodians for whom --

6          THE COURT:  Identified in what way?

7          MR. LYLE:  In responses to their -- in the discovery

8     requests, your Honor, they have identified as having the

9     information responsive to the allegations in complaint.

10          THE COURT:  How is that different than what we

11     discussed last time, where they said they spoke to all the

12     administrative assistants and surviving people and blah blah

13     blah, and that nobody else was likely to have relevant

14     information.

15          It may be you have made a better argument here than

16     you did last time, but I'm inclined to deny it, unless you're

17     telling me this information you are now giving me is

18     information you didn't have at the May 8 conference, in which

19     case I don't like doing these things in pieces.

20          MR. LYLE:  We also received the fact that these

21     witnesses are identified in their lit. hold.

22          THE COURT:  So what?

23          MR. LYLE:  Because those are individuals who are in

24     the custodians that they've self-identified as having

25     information that should be --

F61NRIOC

1          THE COURT:  People usually overdo.  If they didn't put

2     everybody and their mother on the lit. hold, you would be

3     arguing spoliation, etc.

4          The mere fact that they put someone on a lit. hold is

5     not sufficient that they have documents that are not peripheral

6     or duplicative, etc.  Preservation is much broader than

7     production.

8          MR. LYLE:  Understood, your Honor.

9          But we have now the identification of them by Vale as

10    responsive.  We've lost eight custodians because they destroyed

11    their documents.  We are looking --

12         THE COURT:  Seven in the sense that I gave you one

13    extra custodian last time.

14         Here's what we are going to do.

15         MR. LYLE:  We are requesting the quid pro quo that we

16    talked about, your Honor.

17         THE COURT:  The quid pro quo you are going to get.

18    You get one more custodian, so that the one I gave you last

19    time and the one I give you this time equals the two they're

20    getting from you.  It's silly, but so be it.  Tell me who you

21    want of the ones you look at here, or are you can tell them

22    later.

23         Your choice.

24         MR. LYLE:  We will identify one later.

25         THE COURT:  That is fine.

F61NRIOC

1          On the 30(b)(6) witness, at this stage I am denying

2     the request.  If, after seeing their document production, you

3     can point to holes or missing evidence or the like, I will

4     consider it at that point.

5          MR. LYLE:  Your Honor, if I may be heard.

6          they have identified three custodians for whom a

7     litigation hold was in place and for whom documents were not

8     maintained in the form of e-mails on the backup tapes.

9          That is new information that we have learned since the

10    last hearing, when you directed them to answer all of the

11    questions that we've submitted.

12         Under the *Zubulake* decisions we are entitled to pursue

13    this issue, to understand why it is that those documents are

14    missing.  Because we are entitled to --

15         THE COURT:  At the moment we don't know the documents

16    are missing.  We know that certain material was not held.

17         It may be, because there are usually two parties to an

18    e-mail, that you are getting all the information.

19         So I will give you a choice.  If you push it, I will

20    make a ruling now.  You may win, you may lose.  But I won't

21    revisit it at the end.

22         Or you can wait and we'll see what the document

23    production is.  The 30(b)(6) witness isn't going away.  That is

24    an issue as to what happened in the past that they will have to

25    deal with, and I'll worry about ruling on it at the time when

F61NRIOC

1  you have a complete record so I'm not doing this in pieces.

2          What is your choice?  If I rule on it now, you may

3  win, you may lose, but I am not going to do it again.

4          MR. LYLE:  Your Honor, if I could just give you a

5  clarification on a fact.  What we don't have is the

6  communications among the eight custodians.  All of the tapes

7  have been destroyed, including the hard drives.

8          THE COURT:  What's the 30(b)(6) witness going to tell

9  you?

10          MR. LYLE:  The 30(b)(6) witness is going to explain to

11  us, we are going to focus the discovery on why the backup tapes

12  were not maintained.

13          THE COURT:  Again, do you want me to rule on the

14  current record with no revisiting win, lose or draw, or do you

15  wish to hold it until you see the full production and have a

16  better argument that indeed internal communications were not

17  produced amongst the eight, etc., etc.?  Your choice.

18          MR. LYLE:  So you are giving us a chance to look at

19  the production, determine what may or may not be missing, and

20  then come back to you with a fuller record?

21          THE COURT:  That's right.

22          MR. LYLE:  On this exact issue?

23          THE COURT:  That's right.

24          MR. LYLE:  We will defer, your Honor.

25          THE COURT:  All right.  Nardello report.  When are we

F61NRIOC

1    going to get an answer?

2              MR. LIMAN:  Your Honor, the deadline is June 9.  If

3    your Honor wants it earlier --

4              THE COURT:  Why is it June 9.

5              MR. LIMAN:  Under your Honor's rules, we have looked

6    at the two weeks.

7              THE COURT:  It is a discovery issue, not a formal

8    motion.  That means it's like three days or five days, whatever

9    the local rules say.

10             MR. LIMAN:  We will put in something by the end of the

11   week.

12             THE COURT:  OK.  I will tell you now that, for

13   whatever it's worth, my inclination is they've got an affidavit

14   saying that either somebody who is a neutral or is, at least

15   for them, one of their consultants, employees, saw the

16   information.  That, seems to me, is ballgame over unless you've

17   got a counter affidavit that says we never saw this guy, he is

18   a total liar, and then I don't know what I do with those

19   conflicting affidavits.

20             MR. LIMAN:  We are not going to put in an affidavit

21   that says that, but we will put in an affidavit or affidavits

22   that establish that under the applicable law there is no waiver

23   of the privilege here.

24             Your Honor, we are also, frankly, considering the

25   question of whether, if we could confine the scope of it to

F61NRIOC

1    just produce the Nardello report, given the contents of it and

2    the points that it makes.  That's one of the things that's

3    under consideration.

4              THE COURT:  I will certainly allow you to produce the

5    Nardello report without waiver under the equivalent of 502(a),

6    that it's not a subject matter waiver, or at least that you

7    will both be arguing how much further they can go into it, and

8    whether they want to make it a cause celebre as you guys are

9    doing with their investigator reports.  But I would suggest

10   that you seriously consider producing it.

11             MR. LIMAN:  Thank you, your Honor.

12             THE COURT:  OK.  Now I think we're up to Rio Tinto's

13   second request to Vale.

14             MR. LIMAN:  Mr. Karlan will address any questions that

15   your Honor has.

16             THE COURT:  OK.

17             Other than they are narrowing prior requests, other

18   than serving new requests, if the narrow request is one you are

19   willing to abide by, I'm not sure why we have to stand on

20   formality.

21             I said I'm not rewriting their requests, but, you

22   know, does it really matter whether that constitutes a new

23   request or not outside time limit?  It just means they'll get

24   the documents 30 days later or whatever.

25             So, with that.

F61NRIOC

1          MR. KARLAN:  Your Honor, Matthew Karlan for Vale.  I

2     think the issue is more substantive than that.

3          Taking the first request as an example, they purported

4     to limit it.  I think it's still essentially a request for

5     competitive intelligence about local conditions in Guinea.  I

6     think that is, as your Honor ruled last time, far broader than

7     would be relevant.

8          I would also note some ambiguity in what the request

9     says.  Certainly the first part is very broad.  It is

10    essentially limiting it to one of two primary candidates.  I

11    don't think that's any less broad than saying all candidates.

12         There is a suggestion in the letter also that we have

13    agreed in the predictive coding process to mark similar

14    documents as responsive.  I think for us that is an odd

15    complaint.

16         They are also complaining in the letter that we are

17    being too narrow.  I am not sure how to reconcile those.  I

18    think the point is that, with respect to that specific

19    document, we agreed that it would be responsive.  I don't know

20    why that forms a basis for expanding the scope of the request.

21         THE COURT:  Let's limit it to Vale's perception of how

22    Mr. Condé's candidacy, or I guess really his election would

23    impact your mining rights.

24         Is there really a tremendous amount of documentation

25    on that subject?

F61NRIOC

1           MR. KARLAN:  Respectfully, your Honor, we don't know

2    for sure until we look.  I would suggest that the more relevant

3    scope would be slightly narrower than that.  They have

4    suggested the reason it is relevant is that he was coming to

5    power on a platform of reform.

6           If there are documents indicating that, as they are

7    suggesting, that Vale was concerned about that because they

8    were aware that there was prior bribery by the joint venture

9    partner that would be potentially discovered, I think we never

10   disagreed that would be discoverable.

11          THE COURT:  Except you are already obligated to

12   produce all information about possible misconduct by other

13   defendants.  So that's saying they can have ice cubes in a

14   snowstorm or whatever.

15          MR. KARLAN:  Our point, your Honor, is that would be

16   the relevant scope if there's nothing other than that.

17          THE COURT:  I am not sure how else his candidacy might

18   have affected your rights.

19          Why don't you see what's there.  In other words,

20   search for it, and if you determine either that there is so

21   much or that there isn't very much but it's not really on point

22   we can revisit the issue.

23          As of now, your arguments seem to be too much

24   hypothetical.  So that's for that one.

25          Now, 56 and 63, are you searching for documents about

F61NRIOC

1    this February and/or May meeting?  I know you say the May

2    meeting doesn't exist.

3          MR. KARLAN:  I think that the issue is similar.  It's

4    not an issue as to whether meetings occurred.  Your Honor said

5    we are not going to stand on the formality of a new request,

6    but we did look into those specific meetings reported back to

7    your Honor at the last conference.

8          I think as we have set out in the letter, we actually

9    believed all of these had been resolved as of the last

10   conference.  We disagree with the statement in the letter that

11   we agreed to hold them in abeyance.  That is not correct in our

12   view.

13         But we did due diligence on these issues.  We reported

14   back both to Rio Tinto and to the Court to that.  As we have

15   previously reported, we don't believe that those meetings are

16   relevant to the issues in the case.

17         I think the concern beyond that -- I mean, it is not

18   just a burden concern -- the issue is that we are competitors.

19   These are meetings with the government.  There is a tender

20   coming imminently apparently.

21         While there might be documents in there that are

22   responsive to the agreed-upon scope of the request that we

23   would have to produce, for instance, discussing the topics we

24   have just mentioned in terms of bribery, if there are others

25   that go to sensitive commercial topics, there's no reason to

F61NRIOC

1   produce them.

2              THE COURT:  All right.  I agree with that.  But again

3   your search for these has to be concepts, not bad buzzwords.

4              So they are not entitled to what was discussed if it's

5   not related to the allegations here of fraud, etc., etc., but

6   it's not limited to looking for bad buzzwords.

7              MR. KARLAN:  I understand that, your Honor.

8              I would point out before Mr. Lyttle speaks that we

9   have resolved all of the disagreements we have had in terms of

10  the coding, the disclosures we have made with predictive coding

11  so far.  I think that is the protection that is there for them

12  on that front.

13             They have objected to documents they felt were coded

14  incorrectly, and we resolved those.  So I think that's a

15  correct way to go about it.

16             MR. LYTTLE:  Your Honor, real quick.  We could make

17  sure that 56 would also encompass -- the timing of this is very

18  important.  This meeting with their CEO is right after

19  President Condé, who has been ushered in on a platform of

20  reform, this is that first meeting.  We would like to know if

21  President Condé is saying:  We are going to be investigating

22  you.  We are going to be investigating this.

23             THE COURT:  Investigation counts.  That is similar to,

24  you know, there's fraud or there may be fraud.

25             MR. LYTTLE:  Right.

1          THE COURT:  We love the fact that you are earning us

2      billions of dollars or whatever, that we want you to mine

3      deeper, faster, that is off the table.

4          OK.  Let's move on.  We are running out of time.

5          62 and 65 I am not sure I understand what you are all

6      fighting about here.

7          MR. LYTTLE:  Your Honor, we skipped 63, if I may.  All

8      we are asking for is there --

9          THE COURT:  It is the same issue.

10         MR. LYTTLE:  We are asking them to tell us -- they

11     have said there's no May 2011 meeting between their CEO, but

12     they alluded that there were other meetings.  We just want to

13     confirm when there are meetings with the Guinean government,

14     they will look for these types of documents.

15         MR. KARLAN:  That's correct.

16         THE COURT:  Good.

17         62.  Internal discussions, legal risks of the joint

18     venture.

19         What is the fight here?

20         MR. LYTTLE:  Your Honor, the fight is they are saying

21     this is look-back diligence.  We have told you that doesn't

22     apply.

23         It is broader than that.  We are looking for documents

24     that evaluated the proprietary, the risks of entering into a

25     joint venture with the company like BSGR and Mr. Steinmetz.

F61NRIOC

1          MR. KARLAN:  Your Honor, I think the issue is to the

2    word propriety.  If there are documents reflecting due

3    diligence, which we have agreed to produce by the way,

4    nonprivileged documents concerning due diligence, that reflect

5    the legal risks, for instance, FCPA risks, those, if they are

6    not privileged, are going to be produced.

7          Propriety is a word that can means lots of things,

8    including risks that are not of the type that relate to this

9    case.

10         THE COURT:  You two can't figure out a definition of

11   propriety that you both can live with that I have to rule?

12         MR. KARLAN:  Frankly, your Honor.

13         THE COURT:  At this stage of the case?  Really?

14         MR. KARLAN:  I think that the correct definition would

15   be some version of legality.  If we need to expand upon what

16   that means, we would be happy to do that.

17         But I don't see that propriety adds that would be

18   within the scope.

19         MR. LYTTLE:  We will talk to them, your Honor, as long

20   as we have -- it would help us to get a ruling from you that

21   information looking into how, however we define it,

22   proprietary, legality, risk, Vale is looking at doing this

23   venture not just from a legal perspective from a reputational

24   perspective is relevant.  Then we will work on the words.

25         THE COURT:  Does that work?

F61NRIOC

1          MR. KARLAN:  I am happy to talk further, your Honor.

2          THE COURT:  All right.

3          Anything having to do with when you lie down with dogs

4     you get fleas, to be colorful about it, that is what we are

5     talking about.

6          OK.  Whatever words you want to use define it, fine.

7          The force majeure with BSGR, 65.  What is this all

8     about?

9          MR. LYTTLE:  They declared force majeure.  They ended

10    the contract and we want to know why.

11         MR. KARLAN:  Your Honor, they have documents

12    concerning that that have already been produced because they

13    are in the DOJ production.

14         I don't believe any of those documents indicate that

15    the reason for that relates to the bribery, corruption, etc.

16    If that were the case, we agree those documents would be

17    relevant, responsive and would be produced

18         if they don't, they are not relevant and they should

19    not be.

20         MR. LYTTLE:  Your Honor, relevance in this case is not

21    limited to bribery or corruption and it's not limited to

22    documents that they hand selected to produce.  Our request in

23    our discovery is broader than that.  We want to know why.

24         THE COURT:  I understand.  But if they decided to get

25    out of the with BSGR because they were losing money or

F61NRIOC

1   whatever, you are not entitled to that.  Only if they get out

2   of it because they discovered that something bad was happening

3   or had happened with BSGR.

4            MR. LYTTLE:  If they are losing money because it is

5   under investigation by six foreign countries, if they are

6   losing investigation --

7            THE COURT:  If they say it's because there are

8   investigations, you get it.

9            I think my ruling is clear.  We are moving on.

10           Vale's training of its predictive coding system.  I

11   think we have already taken care of that.

12           MR. KARLAN:  Your Honor, if I could lay a marker with

13   respect to request No. 64.

14           THE COURT:  I thought you all agreed on 64.

15           MR. KARLAN:  That's what I wanted to raise, your

16   Honor.  There is a footnote in the letter.  It is on page 24.

17   It's footnote 22.

18           It could be read to mean that we have agreed to the

19   request as written.  That is not correct.  It refers to a

20   conversation we had on the record at the last conference where

21   we discussed possibly the mutual exchange of board minutes.

22   That would not indicate that we agreed to the scope of the

23   request as written, which is their --

24           THE COURT:  OK.  I got you.

25           The predictive coding system is that all resolved by

F61NRIOC

1       my ruling on synthetic documents?

2                MR. REENTS:  I think that was an FYI point raised by

3       Rio Tinto.

4                THE COURT:  If it's FYI, I am not dealing with it.

5                OK.  The London High Court issue, also informational

6       on page 28.  Yes?

7                MR. FILARDO:  Yes, your Honor, it is.  Good afternoon.

8                Just one quick update.  We learned on Friday that

9       Master Eastman of the London High Court did issue an interim

10      ruling whereby he set down that application for hearing on June

11      12 and then stayed all responses given that ruling.

12               THE COURT:  OK.  Is that because of the extension

13      request?

14               MR. FILARDO:  It is because of the extension request,

15      your Honor.  Essentially it was a modification of the order

16      that was issued which didn't comply with the parties' agreement

17      to produce all documents by June 30.

18               THE COURT:  All right.  And Onyx --

19               MR. FILARDO:  That's the same for the Onyx

20      application, your Honor.

21               THE COURT:  OK.

22               BBG documents --

23               MR. LYTTLE:  Your Honor, before we --

24               THE COURT:  Yes.

25               MR. LYTTLE:  On the BSGR and Steinmetz, Vale has been

F61NRIOC

1   very good about forwarding information about how that's going

2   with us.

3          We did cooperative work on those.  I would ask that

4   Mr. Steinmetz of BSGR also forward correspondence and

5   communications and correspondence about how they are

6   progressing to us.

7          THE COURT:  So ordered on consent.

8          MR. FILARDO:  Your Honor, I will pass these to counsel

9   right now.  He's received it today.

10          THE COURT:  BBG documents.

11          MS. NEISH:  Your Honor, Laura Neish for BBG.  There

12   was a delay earlier this year with respect to the documents in

13   storage.  That was caused by the fact that ownership of BBG

14   changed hands, and there was some confusion as to who on the

15   ground over at Guinea was handling that process.  We resolved

16   that now, and the production is moving forward and we

17   anticipate being able to make the discovery deadline.

18          THE COURT:  Of June 30?

19          MS. NEISH:  Correct.

20          THE COURT:  OK.  Good.

21          the documents that you are waiting for from the

22   Guinean government?

23          MS. NEISH:  No further progress on that.  We don't

24   have any objection to producing them if and when the Court

25   releases them.

F61NRIOC

         1            MR. LYTTLE:  We would just ask -- we understand they

         2     are working hard and we appreciate that.  If we could ask for

         3     relief from the June 30 for that discrete -- because those were

         4     subject to the original request.

         5            THE COURT:  If they can do it by then, great.  If they

         6     can't, nobody is going to be able to say I couldn't do it by

         7     June 30 so I don't have to do it once you are freed by the

         8     Guinean government.

         9            MR. LYTTLE:  Thank you, your Honor.

        10            THE COURT:  Now, supplemental letters.

        11            Let's see what we have here.  We are putting a pin in

        12     Nardello.

        13            I don't know what that leaves, Mr. Liman.

        14            MR. LIMAN:  I think that leaves the motion with

        15     respect to the investigative firms.

        16            I think we need two things with respect to that.  One

        17     is a date for the opposition from Rio Tinto.

        18            The second is Rio Tinto raised with us just before we

        19     came into court today that some of the attachments on the

        20     motion, the agreements with the investigative firms that

        21     they've designated as highly confidential.  We fail to see how

        22     they would qualify for that.

        23            But, in any event, we will take it up however your

        24     Honor wants to, either get the exhibits filed under seal or to

        25     raise with the Court.

F61NRIOC

1            THE COURT:  Go through the ECF help desk, pull the

2    letter, file it.  The letter without seal, with the attachments

3    under seal.  If you need an order to be able to do that, the

4    two of you jointly submit something for my signature.

5            MR. LIMAN:  Thank you, your Honor.

6            THE COURT:  Now, I want to prove you I read footnotes

7    so let me raise one footnote-related question to the June 1

8    letter.

9            Mr. Lyle and Mr. Lyttle, where it says footnote 2,

10   page 3, Rio Tinto has neither confirmed nor denied whether it

11   has any of these documents, do you want to confirm that you

12   don't have any of the documents that we're fighting about?

13           MR. LYTTLE:  Your Honor, I'm sorry we had planes,

14   trains, and automobiles to get here this morning with the

15   weather.  I haven't had a chance to read this carefully.

16           THE COURT:  Just read footnote 2 to start.

17           MR. LYTTLE:  I'm sorry.  I don't see a footnote 2 on

18   the June 1 letter.  Mr. Liman handed us a copy when we came in

19   the door.  It's probably their huge one they filed.  They got

20   that one in the taxicab.

21           We haven't seen it, your Honor.  I'm happy to read it.

22           THE COURT:  Does one of you have a copy to give him.

23           There we go.

24           MR. LYTTLE:  Oh, all right.

25           THE COURT:  It's dealing with the investigator

F61NRIOC

1    material, and they are saying you have neither confirmed or

2    denied that you don't have any of the investigator-related

3    documents.

4          I would like a confirmation that you don't have any of

5    them.

6          MR. LYTTLE:  Your Honor, we do not have any of the

7    materials they are seeking beyond the reports themselves,

8    invoices, and engagement letters, all of which have been

9    produced, except for the invoices.  We don't have what they are

10   seeking in our possession.

11         MR. LIMAN:  Your Honor, we don't have any of the

12   invoices.  If they are saying they've got the invoices, that is

13   part of what the motion is addressed to.

14         THE COURT:  OK.  Produce the invoices.

15         Produce whatever you have that you haven't produced

16   with respect to the investigators.

17         Clear?

18         MR. LYTTLE:  Yes, your Honor.

19         THE COURT:  Good.

20         If you have produced the invoices and Mr. Liman

21   doesn't remember seeing them, just tell him the Bates numbers

22   or how to find them.

23         MR. LYTTLE:  Just for the record, the request for the

24   invoices was served under the second set of requests in March,

25   so we are actually in the process of collecting those, and we

F61NRIOC

1    will absolutely be providing those.

2            THE COURT:  Rio Tinto does not have any other

3    documents about the investigator reports, is that correct?

4            MR. LYTTLE:  We do not, your Honor.

5            THE COURT:  OK.

6            Next, flipping over to page 5.

7            A presumption or assumption is that you are paying the

8    investigator firms' legal or other expenses.  It is at the very

9    bottom paragraph, it looks like the fifth line, where it says,

10   "Each one of them lawyered up, (presumably at Rio Tinto's

11   expense)."

12           MR. LYTTLE:  Your Honor, we are neither indemnifying

13   nor paying any of their expenses.

14           THE COURT:  That's what I thought.

15           So I guess my question to Mr. Liman is this.  Two

16   things:  One, at least in the UK, you've got a chance, probably

17   a good one, despite the objections and maybe not by June 1 or

18   June 15 or even June 30, but there is a good chance you are

19   going to get material from the letters of request at least in

20   the UK.  If I start ruling on this issue now, that may or may

21   not interfere with that.

22           Do you want to put a pin in this and let at least the

23   UK if not South Africa run its course before getting a ruling?

24           That's question number one.

25           MR. LIMAN:  The answer is yes, we would.

F61NRIOC

1          What we would suggest is that your Honor receive the

2     briefing on this issue and then --

3          THE COURT:  I don't know.  I certainly don't think I

4     need any more briefing from you.  I am not sure that I need any

5     more briefing from them.  But if you are saying I don't have to

6     do anything until after my colleague and counterpart in the UK

7     rules, I am more than happy to put it off, and you will put it

8     on the agenda for another conference.

9          MR. LIMAN:  What I would suggest is that we keep your

10    Honor informed of the process, and then at some point your

11    Honor will have the fully briefed motion.

12         We just didn't want there to be delay.  That's why we

13    brought it to you.

14         THE COURT:  I assume the plaintiffs have no objection

15    to that.

16         MR. LYTTLE:  No, your Honor.

17         MR. LIMAN:  Your Honor, we do think it would be

18    worthwhile to have the application fully briefed, however much

19    time they need, so that if the time comes when -- let me tell

20    you the concern that I've got.

21         If we report to your Honor that the process is being

22    frustrated abroad, then Rio Tinto is going to ask for

23    presumably a week or two to put in its papers.  It may take

24    some time to get the conference before your Honor.  If we could

25    just simply both agree to submit the papers, your Honor would

F61NRIOC

1  hold it in abeyance.  I think, given the tight timetables we

2  are under in front of Judge Berman, that would ensure that the

3  trains keep moving as best we can.

4          THE COURT:  You know, I think, not to get ahead of

5  ourselves, but the other request I have for you, which you can

6  think about now and maybe answer, is what good is it going to

7  do if I rule that this is in their possession, custody, or

8  control under operative Second Circuit law and their practical

9  ability when it is clear that, at least so far, the

10  investigative firms have largely said, but not entirely --

11  particularly those that are subject to UK jurisdiction as

12  opposed to other countries that don't know anything about

13  discovery -- where, some at least, of the investigative firms

14  have said the heck with you we've got our own interests and

15  we're not complying?

16          MR. LIMAN:  Your Honor, I think Judge Kaplan gave the

17  answer to that.

18          My experience is, and I think the Court's experience

19  is that when a party says I've got an order from the Court

20  saying I have to produce this material, deliver it to me, I

21  demand that you deliver it to me so that it can be produced,

22  and if not, there are enforcement mechanisms to make sure I've

23  done everything possible to get it, that has a way of

24  clarifying people's minds.

25          THE COURT:  I have the feeling that the very argument

F61NRIOC

```
 1    you have made about Rio Tinto has made in your view its
 2    position that it doesn't want this complied with, you know,
 3    known to the investigators, that the next letter they have to
 4    send if I rule in your favor that says, no kidding around now,
 5    the judge has ordered me to produce this or I'm going to face
 6    penalties, I don't know that that's going to have any better
 7    result than what I thought we were doing here, which was a
 8    letter saying the Court wants me to get this, please give it to
 9    me, and at least several of the investigators said go away
10    don't bother me.
11                 MR. LYTTLE:  Your Honor may I be briefly heard.
12                 THE COURT:  Sure.
13                 MR. LYTTLE:  Judge Kaplan's decision in *Auction Houses*
14    is not repeatedly on point there.  In that case --
15                 THE COURT:  Don't argue that issue now.
16                 MR. LYTTLE:  We have no leverage, like they had in
17    *Auction Houses*. I won't get into the details.  All Judge Kaplan
18    said was exert whatever leverage you have under a settlement
19    agreement or a separation agreement as well as a defense
20    cooperation agreement.  We have neither.  We have no leverage
21    under those agreements.
22                 THE COURT:  Am I correct that as to all of these
23    investigative firms none of them -- that may be too many
24    negatives.  Are any of these investigators under any sort of
25    current relationship or contract with Rio Tinto?
```

F61NRIOC

1          MR. LYTTLE:  I thought about it on the way in, your

2     Honor.  I need to check on that.  I am not in a position to

3     confirm that.  I will do so.

4          MR. LIMAN:  Your Honor, I think you have previously

5     ordered Rio Tinto to produce to us the correspondence with the

6     investigative firms.  We still have not received that.  We've

7     received some -- the most recent letters, but they have made

8     reference to the fact that there were e-mails and other types

9     of correspondence.

10         Your Honor ordered it.  We are just asking that your

11    Honor's order be complied with.

12         MR. LYTTLE:  You didn't order that, your Honor.

13         THE COURT:  Whether I did or didn't, any reason you

14    shouldn't produce whatever the prior e-mails or correspondence,

15    whether from your firm or Rio Tinto to the investigators during

16    the course of this attempt to find out the sources and backup

17    information?

18         MR. LYTTLE:  We can turn that over.

19         THE COURT:  Good.  Do it by the end of the week.

20         Is that doable?

21         MR. LYTTLE:  Your Honor, on the investigators,

22    literally in the car on the way here we did receive a

23    production from one of the investigators.

24         I actually had my colleague in the New York office

25    print it off so I was able to bring it.  It is a response

F61NRIOC

1  letter as well as production material.  So I think this

2  belies --

3          THE COURT:  Which investigator?

4          MR. LYTTLE:  Mr. Tiddian Torre.

5       I think this belies the position that Vale has

6  repeatedly taken that we don't want this, that we have

7  discouraged this.  That is absolutely not the case.  And here

8  is an investigator turning over what he has.

9          THE COURT:  OK.

10         MR. LYTTLE:  Your Honor, one other point.

11         THE COURT:  Yes.

12         MR. LYTTLE:  In this letter -- my French is not very

13  good -- he does make reference that there may be additional --

14  he's not sure, but there may be additional political or

15  monitoring reports.

16      Those type of political monitoring background reports

17  are the subject of a recent request that we have been

18  discussing with them.  We are going to look for them.  If we

19  have them, we will produce those.

20         THE COURT:  Good.

21         MR. LYTTLE:  Would you like a copy of that, your

22  Honor.

23         THE COURT:  Absolutely not.

24         MR. FILARDO:  I would like a copy, your Honor.

25         THE COURT:  OK.

1          I assume that that has taken care of all issues on the

2     table, corresponded about or not, correct?

3          MR. LIMAN:  Your Honor, I assume with respect to the

4     motion -- how would you like us to handle it?

5          THE COURT:  I am going to require you to brief it very

6     quickly at the time.  I don't think it's useful to have that

7     brief now.  First of all, the factual aspect of it may change

8     as some of them produce.  I assume, however, that whether it's

9     the senior master in the UK or his equivalent in other

10    countries asks Rio Tinto's position, you certainly agree that

11    that information should be produced, correct?

12         MR. LYTTLE:  If they want to produce it, we have no

13    problem with them producing it, correct.

14         THE COURT:  Good.  OK.

15         That will suffice for now.

16         You all, Mr. Liman through your British or other

17    colleagues can make that information known to the powers that

18    be over there.

19         When do you all want to come back?

20         MR. LIMAN:  A suggestion has been made of three weeks,

21    your Honor, or four weeks.

22         THE COURT:  You have the choice of up to June 23 or

23    after July 10 based on my vacation schedule.

24         MR. LIMAN:  I think, your Honor, the latest date in

25    June that you have available and that you can see us.

F61NRIOC

1              THE COURT:  Because you guys are a little long winded,

2      let's do it, rather than doing it at 4 o'clock on the 23rd,

3      let's do it the 22nd at 2:30.  If by some miracle you don't

4      need that date and you want to push it to July 11 or after, let

5      me know.

6              OK.  Usual drill, the Court's orders are what you have

7      heard.  The transcript contains the rulings, etc., etc, The

8      usual drill of the most involved parties buying the transcript.

9              With that, we are adjourned.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25