**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

June 10, 2015

Hon. Andrew J. Peck
United States Magistrate Judge,
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   *Rio Tinto plc v. Vale S.A., et al*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

We write in response to Vale's June 5, 2015 letter, Dkt. No. 263 ("Opposition" or "Opp.") opposing Rio Tinto's motion, Dkt. No. 256 ("Motion" or "Mot.") for an order compelling disclosure of the investigative report prepared by Nardello & Co. (the "Nardello Report" or "Report").  Vale's Opposition and the Declarations of Scott Horton and Clovis Torres demonstrate that Rio Tinto has been right all along: the Nardello Report was never privileged and, even if it once was, Vale long ago waived it.  As the Court intuited, Vale's disclosure of the Nardello Report is "ballgame over," June 1, 2015 Hr'g Tr. 33:16, and nothing in Vale's Opposition changes that.

At the outset, Vale's request that the Court defer ruling on this issue, *see* Dkt. No. 264, should be denied.  Rio Tinto's motion is ripe for determination, and Vale's request is simply a continuation of its strategy to delay discovery in this case at every turn.[1]  Moreover, even if Vale had agreed to produce the Report, which it has not, that would not dispose of the issue.  As explained in Rio Tinto's Motion, Vale's disclosure of the Report not only waived any applicable privilege as to the Report itself, but also as to the underlying materials used to generate the Report.  *See* Mot. at 3 (citing *Gruss v. Zwirn*, 09-cv-6441 (PGG), 2013 WL 3481350 (S.D.N.Y. July 10, 2013) (applying waiver to source materials underlying attorney-client communications and work product)).  Rio Tinto is entitled to those documents too and has subpoenaed Nardello to get them, but Nardello has refused to produce them until the Court decides the issues raised in Rio Tinto's motion.  Vale should not be permitted to forestall the resolution of these issues through an illusory promise that it might change its mind after Judge Berman denies its motion to dismiss.

---

[1] To date, Vale has produced approximately one *twentieth* the number of documents that Rio Tinto has produced.

I.      **Vale Concedes The Selective Waiver Doctrine Does Not Apply.**

Vale's Opposition has no response whatsoever to Rio Tinto's argument that the selective waiver doctrine does not shield the Nardello Report from discovery.  *See* Mot. at 3–4.  As a result, Vale concedes that the Nardello Report may not be withheld on that basis.  *See BNP Paribas Mortgage Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012).

II.     **Vale's Has Put Its Due Diligence At Issue And Effectively Concedes The Point.**

Vale does not dispute that it has trumpeted its due diligence again and again to suggest that it partnered with BSGR and Mr. Steinmetz in good faith and committed no crimes in doing so.  Indeed, it admits it made this argument in its *very first appearance* in this case.  Opp. at 8.  Vale's sole response is to argue that it has not formally asserted its due diligence as a "defense" in a responsive pleading.[2]  That does not mean that Vale has not put its due diligence at issue, and Vale cites to no authority suggesting that at-issue waiver requires such formalism.  To the contrary, Vale's claim of good faith puts its subjective beliefs and the advice that informed those beliefs squarely at issue.  In the Second Circuit, "if (1) a defendant claims the defense of good faith, and (2) that claim can only be scrutinized by examining the disputed communications, then that defendant has waived the privilege."  *Scott v. Chipotle Mexican Grill, Inc.*, __ F. Supp. 3d __, 2014 WL 7236907, at *3 (S.D.N.Y. 2014); *see also In re Cnty. of Erie*, 546 F.3d 222, 228–29 (2d Cir. 2008) ("[T]he assertion of a good-faith defense involves an inquiry into state of mind, which typically calls forth the possibility of implied waiver of the attorney-client privilege.").  Vale's primary, if not only, merits defense in this case is that, despite its due diligence, it had no idea that Blocks 1 and 2 were obtained through fraud and bribery.  Rio Tinto cannot test that contention without discovering what Vale knew and what its due diligence showed.  Under *Erie* and its progeny, Vale's claim that it relied upon the legal advice from its advisors to green light the joint venture with BSGR places at issue the Nardello Report and any other due diligence materials it received in considering whether to partner with BSGR.

III.    **Vale Distorts The Common Interest Doctrine Beyond Recognition.**

Vale's only serious attempt to rebut Rio Tinto's waiver arguments is to claim a common interest with the Government of Guinea.  But Vale's diluted theory of common interest not only misstates the law, it seeks to rewrite history and fabricate a common interest through mere *ipse dixit*.  The fact remains that when Vale permitted Mr. Fox to review the Nardello Report, it stood to lose its stake in a $5 billion asset, and that is exactly what happened as a result of the Government of Guinea's investigation.  Whether Vale was at risk of criminal prosecution cannot transform it from adversary to ally, especially when its legal rights and commercial interests in Blocks 1 and 2 were directly at stake in the Guinean investigation.

---

[2] Vale also claims the Piauí article cited in the Motion "has already been discredited," Opp. at 8, but does not cite to anything in the record that actually discredits the article.  That is because Vale has never put forth any evidence that calls into question whether its former General Counsel made the claims quoted in the article or any other contentions made by the author of the article.  Vale has neither disputed the article outside this litigation nor sought its retraction.  This is not surprising since Vale's *current* General Counsel (Mr. Torres who submitted the declaration here) sat with Vale's *current* CEO while he was interviewed for and quoted extensively in the article.  Nowhere in his declaration does Mr. Torres remotely suggest that the article is inaccurate in any way.

### A. Mere Incantation Of "Common Interest" Does Not Make It So.

Vale's evidence that it shared a common interest with the Government of Guinea consists of after-the-fact statements that the parties had a "common" or "aligned" interest in uncovering wrongdoing by BSGR. Horton Decl. ¶ 5; Torres Dec. ¶ 8. But the subjective views of the parties to an ostensible common interest agreement articulated years later cannot overcome the objective reality of the relationship at the time. "[T]he mere assertion of a common legal interest in a written agreement cannot create such an interest. What matters is whether there exists in actuality a common legal interest between the contracting parties." *Schaeffler v. United States*, 22 F. Supp. 3d 319, 334 (S.D.N.Y. 2014); *see also In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 465–66 (S.D.N.Y. 2008) ("Credit Suisse contends that the Memoranda were produced to the SEC pursuant to an agreement that stated the entities had common interests. However, such an agreement cannot manufacture a common interest *ipse dixit*.").

Vale's theory of "common interest" would turn a narrow exception to waiver into a shibboleth to be uttered by parties colluding to shield documents from discovery. That is not the law. To establish a common interest, a party must demonstrate (1) identical or nearly identical legal interests with the party to whom it disclosed the privileged information and (2) that the disclosure was in the course of formulating a joint legal strategy. *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995); *Egiazaryan v. Zalmayev,* 290 F.R.D. 421, 434 (S.D.N.Y. 2013); *Schaeffler*, 22 F. Supp. 3d at 330–31. Here, Vale points to nothing more than an oral agreement to maintain confidentiality and *post hoc* rationalizations informed by subsequent developments between Vale and BSGR. As explained below, Mr. Torres's self-serving claim of a "joint strategy" proposed by Mr. Horton is wholly unsupported by Mr. Horton's declaration. *Compare* Torres Decl. ¶ 5 *with* Horton Decl. ¶¶ 3–6.

### B. At The Time Vale Disclosed The Nardello Report, It Was At Risk Of Losing Its Rights In Simandou.

As Rio Tinto demonstrated in its Motion, at the time Vale disclosed the Nardello Report, it was at risk of losing its rights to Blocks 1 and 2, a risk that materialized a year later and deprived Vale of its share of a $5 billion asset and the hundreds of millions of dollars already spent to acquire and develop it. Mot. at 5. Vale's only response is that it was not under investigation. *See, e.g.*, Opp. at 5 ("At the time of . . . Vale's disclosure, it was understood . . . that Vale was not the subject of [the Government's] investigation"); *id.* at 6 ("Vale did not have to engender any goodwill by sharing the Nardello Report because it never understood that it could have any potential criminal liability."). Vale even claims that the Government of Guinea "considered Vale to be a *victim*." *Id.* (emphasis in original).

But these contentions find no support in Mr. Horton's declaration. Indeed, Mr. Horton *never* states in his declaration that Vale was not a target or potential target of the Government of Guinea's investigation. To the contrary, Mr. Horton identifies "the transfer by BSGR of an interest in [Blocks 1 and 2] to Vale S.A. in 2010" as one of the matters under investigation, Horton Decl. ¶ 2, and makes equally clear that at the time Vale disclosed the Nardello Report, the Government of Guinea had not reached any conclusion regarding Vale:

> I advised Vale's representatives that specific information was being sought relating to Vale's dealings with BSGR and its agents and representatives in connection with the Simandou inquiry. I also noted that the inquiry had not, *up to that point*, revealed any evidence, whether testimonial or documentary, linking Vale to corrupt acts, and that it therefore appeared *on the present state of the evidence* that Vale *may* itself have been a victim.

*Id.* ¶ 3 (emphases added). Notwithstanding Vale's ambiguous assertion that "it was understood" that Vale was not under investigation, Opp. at 5, the Horton Declaration dispels any notion that the Government of Guinea had that understanding.

However, even if the Government of Guinea had already exonerated Vale at the time Vale disclosed the Nardello Report (which Vale's own submission demonstrates was *not* the case), that does not change the fact that their interests were adverse. The Government's investigation into "the grant of rights to [BSGR] beginning in 2008, and the transfer by BSGR of an interest in those rights to Vale S.A. in 2010," Horton Decl. ¶ 2, indisputably threatened Vale's rights to Blocks 1 and 2, whether or not Vale faced criminal liability as a result. By that point, Vale was the controlling shareholder of VBG, the entity that held legal title to Blocks 1 and 2; it directed VBG's response to the investigation; and when the Government of Guinea stripped VBG of the rights to Blocks 1 and 2, Vale lost its share of a $5 billion asset. Indeed, just as it did then, even now Vale continues to answer for VBG—literally. *See, e.g.*, Vale Protective Answer ¶¶ 1, 2, 14, 16, 17, 21, 48, 52, 93–95, 101, 113, 115, 118, 121, 123, 142–46, 153, 160, 168, 169, ("Denies the allegations . . . as to Vale *and VBG*" (emphasis added)), Dkt. No. 242. Under such circumstances, Vale has no claim that its interests were not adverse to the Government of Guinea.

        C.      An "Interest In Common" Is Not A "Common Interest" Under The Law.

At bottom, Vale's argument is that the Government of Guinea sought incriminating evidence against BSGR that would be helpful to Vale if Vale later chose to bring a claim against BSGR. But a common enemy does not create a joint legal strategy, as required for the common interest doctrine to apply. *See Bank Brussels*, 160 F.R.D. at 447. Vale can point to nothing more than its growing discontent with BSGR as a "common interest" with the Government of Guinea, but that theory of the common interest doctrine has been rejected again and again. *See, e.g.*, *In re Initial Pub. Offering*, 249 at 466 ("[I]f the SEC, USAO, and Credit Suisse had any common interest, it was in the disclosure of the Memoranda (Credit Suisse to placate the authorities, and the SEC and USAO to further their investigations). Notwithstanding this common interest, an adversarial relationship continued to exist among Credit Suisse and the investigative agencies."); *In re Vitamin C Antitrust Litig.*, No. 06-md-1738, 2011 WL 197583, at *5 (E.D.N.Y. Jan. 20, 2011) ("There may be any number of reasons—relating to economic or foreign policy, ideological considerations, or simple home-team favoritism—that might cause the [People's Republic of China] and its various agencies to have an interest in seeing this lawsuit end on terms favorable to the defendants that coincide with [defendant's] legal interests in the litigation. But none of those reasons arises from the possibility that the outcome of this litigation will have any legal consequences for those agencies."); *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) ("Although Shamis and BankBoston would both benefit from a

judgment in favor of the plaintiff, they do not share identical legal interests. Indeed, sharing a desire to succeed in an action does not create a 'common interest.'").[3] Aside from Mr. Torres's self-serving claim to a "joint strategy," uncorroborated by Mr. Horton, Vale puts forth no evidence aside from the disclosure of information to show it had a joint legal strategy with the Government of Guinea. But as the authorities above and in the margin demonstrate, the disclosure itself cannot prove a common legal strategy, and neither can the existence of a common foe. That is particularly true where Vale was in jeopardy of losing—and did, in fact, lose—billions of dollars as a result of the Government's investigation.

Even if a common enemy were enough to create a common interest agreement, Vale overstates its adversity to BSGR at the time it disclosed the Nardello Report. Mr. Torres notes that "ultimately" Vale instituted legal action against BSGR, but he neglects to mention that it did not do so until a year later, *after* the Government of Guinea had stripped VBG—and by extension, Vale—of its rights to Blocks 1 and 2. Neither does he mention that it was not until nearly two years later that Vale renounced its right to 51% of VBG and thereby ended its joint venture with BSGR. *See* Paul Kiernan, *Vale Transfers Guinea Mining Stake to BSG Resources*, Wall St. J., Mar. 13, 2015. Indeed, the most Vale can say is that at the time it disclosed the Nardello Report, it "repeatedly asked BSGR to respond to the allegations [of wrongdoing] . . . and reserved its rights to institute a legal action against BSGR." Opp. at 6. Vale's belated and self-serving attempt to distance itself from BSGR cannot change the fact that in April 2013 it had every incentive to see BSGR exonerated by the Government of Guinea, thereby removing the cloud of uncertainty hanging over their joint venture and VBG's concessions for Blocks 1 and 2.

**IV.   The Nardello Report Was Never Privileged In The First Place.**

    **A.   United States Law Governs The Privilege Inquiry.**

Vale's discussion of whether the law of the United States or England should guide the Court's analysis of Vale's privilege claims rests on a false premise. When presenting the framework for the "touch base" analysis in its letter, Vale omitted a foundational component from the holding in *Astra Aktiebolag v. Andrx Pharm., Inc.*:

> ***Where, as here, alleged privileged communications took place in a foreign country or involved foreign attorneys or proceedings***, this court defers to the law of the country that has the predominant or the most direct and compelling interest in whether those

---

[3] Similar decisions abound. *See Schaeffler*, 22 F. Supp. 3d at 332 ("[a] shared desire to succeed in an action does not . . . rise to the level of a common legal interest." (quotation marks omitted)); *In re Tyco Int'l, Inc. Multidistrict Litig.*, No. 02-1357-B, 2004 WL 556715, at *2 (D.N.H. Mar. 19, 2004) (rejecting common interest because "while Tyco may share an interest with the SEC and the district attorney in seeing that [its former general counsel] is held to account for any wrongdoing, both agencies are acting pursuant to a broader mandate to protect the public that may well put them in an adversarial relationship with Tyco at some point in the future."); *United States v. Bergonzi*, 216 F.R.D. 487, 496 (N.D. Cal. 2003) (rejecting common interest theory where the disclosing party "may have had a 'common interest' in the investigation of the alleged securities fraud committed by its officers, [but] the 'common interest' alleged is not like the interest shared by allied lawyers and clients who are working together in prosecuting or defending a lawsuit.").

>communications should remain confidential, unless that foreign law is contrary to the public policy of this forum.

208 F.R.D. 92, 98 (S.D.N.Y. 2002) (emphasis added and internal quotations omitted).

Vale was careful to exclude this part of the holding from its letter. *Cf.* Opp. at 2–3. Contrary to Vale's tortured reading of the law, "The principles of *Astra* and *Golden Trade* instruct that communications relating to legal proceedings in the United States, or that reflect the provision of advice regarding American law, 'touch base' with the United States and, therefore, are governed by American law . . . ." *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 65 (S.D.N.Y. 2010). The "predominant interest" analysis described in Vale's letter only applies where the communications at issue were exclusively related to foreign proceedings. *Cf. Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (holding that foreign law governed any privilege that could have attached to communications between an Italian corporation and foreign patent agents concerning the prosecution of foreign patents).

Indeed, the very origin of the label "touch base" eviscerates Vale's view of the law. As the court explained in *Golden Trade, S.r.L v. Lee Apparel Co.*: "The working standard in these cases has been summarized in general terms as follows: any communications touching base with the United States will be governed by the federal discovery rules while any communications related to matters *solely* involving a foreign country will be governed by the applicable foreign statute." 143 F.R.D. 514, 520 (S.D.N.Y. 1992) (quotation marks omitted and emphasis added). Vale's selective application of the appropriate legal standard must be rejected.

Here, the Nardello Report and any related communications clearly "touch base" with the United States. Any argument to the contrary defies credulity. According to Vale's own account, the Nardello Report was prepared at the behest of a United States lawyer to assess Vale's exposure to potential liability under United States law. The Report clearly was not a matter "solely involving a foreign country." The Court must therefore evaluate any possible privilege that could have attached to the Report under United States law.

To reach a contrary conclusion, Vale's analysis glosses over three critical facts:

1. Nardello's retention letter is both addressed to and signed by David DiBari, the managing partner of Clifford Chance's Washington, D.C. office. Opp., Ex. A.

2. Mr. DiBari is the head of Clifford Chance's United States Litigation and Dispute Resolution Practice, and he specializes in matters related to the United States Foreign Corrupt Practices Act.[4]

---

[4] *See* David DiBari Biography, *available at* http://www.cliffordchance.com/people_and_places/people/partners/us/david_dibari.html. It is noteworthy that Vale does not identify the attorney who drafted the Clifford Chance memorandum, who is "one of the premiere lawyers in this field." Opp. at 8. If Mr. DiBari drafted the memorandum, his involvement lends additional support to the obvious conclusion that United States law governs here. Moreover, as this letter's Exhibit A demonstrates, the Clifford Chance lawyers who sent the memorandum to Vale were David DiBari and George Kleinfeld, another U.S. lawyer based in Clifford Chance's Washington, D.C. Office.

      3.      Clifford Chance prepared a memorandum addressing Vale's potential liability for its involvement in the Vale-BSGR transaction under United States law, which memorandum apparently attached the Nardello Report as an appendix.[5]

These three facts, standing alone, are sufficient to rebut Vale's contentions in their entirety.

      Vale's own contention that the Report later formed the factual predicate for advice regarding potential liability under U.S. law is outcome determinative. *See Anwar v. Fairfield Greenwich Ltd.*, __ F.R.D. __, 2013 WL 3369084, at *1 (S.D.N.Y. July 8, 2013) ("Thus, American law typically applies to communications concerning legal proceedings in the United States or advice regarding American law, while communications relating to foreign legal proceedings or foreign law are generally governed by foreign privilege law." (quotation marks omitted)). Applying the appropriate legal framework, other courts have concluded that documents with much more tangential connections to the United States still "touch base" with the United States. *See Astra Aktiebolag*, 208 F.R.D. at 99 (applying United States law to a communication involving the plaintiff's Korean counsel because it related to a single U.S. patent); *In re Philip Servs. Corp. Sec. Litig.*, No. 98-cv-0835, 2005 WL 2482494, at *2 (S.D.N.Y. Oct. 7, 2005) (opinion letters regarding a U.S. securities offering authored by both U.S. and Canadian attorneys touch base with the United States). Accordingly, United States law clearly governs the privilege inquiry here.

      **B.    The Nardello Report Is Not Privileged Under United States Law Because It Is Not Legal Advice And Was Not Prepared In Anticipation Of Litigation.**

      **1.    The *Kovel* Doctrine Does Not Apply.**

      Vale's attempt to invoke *Kovel* and its progeny to shield the Nardello Report from discovery is misguided. Vale's argument rests entirely on the naked and self-serving proclamation that "Nardello served a critical function and its participation was necessary to Clifford Chance's provision of legal advice." Opp. at 10. The Court is left to guess what was so "critical" about Nardello's role that it was akin to an accountant interpreting "a complicated tax story," *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961), or a translator who enables a client and attorney who speak different languages to communicate, *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). All Vale puts forth is its conclusory assertion that "Nardello did not merely consolidate employee interviews and deliver a factual analysis." Opp. at 10 (quotation marks omitted). But that assertion, unsupported by either declaration Vale submitted, is nothing more than the defendant's *ipse dixit*. It is a far cry from what Vale must do to meet its burden.[6]

---

      [5] *See* Dkt. No. 246, at 9 ("At the time Vale retained Clifford Chance and Clifford Chance retained Nardello, there existed a risk that if Vale entered into an agreement with BSGR with regards to a property in Guinea, it might subject itself to investigation or regulatory action by the U.S. government with respect to that transaction and any activities of its JV partner.").

      [6] Rio Tinto does not concede that the Nardello Report was, in fact, incorporated into (as opposed to merely attached to) any Clifford Chance memorandum or other legal advice. Moreover, the Clifford Chance memorandum itself is dated April 30, 2010, the same day Vale and BSGR signed the joint venture agreement and made public (footnote continued)

Vale's interpretation of the *Kovel* doctrine is flatly inconsistent with the law. The Nardello Report, which summarized the results of a factual investigation, *see* Fox Decl. ¶¶ 7–8, clearly was not necessary to improve Vale's comprehension of subsequent legal advice provided by Clifford Chance. *See Ackert*, 169 F.3d at 139. The *Kovel* exception, therefore, does not apply, and because a fact-gathering exercise is never privileged—even if it is conducted directly by an attorney—the Report itself is not privileged. *Vector Capital Corp. v. Ness Techs., Inc.*, No. 11-cv-6259, 2014 WL 171160, at *2 (S.D.N.Y. Jan. 9, 2014); *see also J. P. Foley & Co. v. Vanderbilt*, 65 F.R.D. 523, 526 (S.D.N.Y. 1974) ("However, it does not cover an attorney's communications—whether they are in the form of information or advice—which are based upon conversations with third parties.").

### 2. The Nardello Report Is Not Protected Work Product.

The exact point in time at which Vale anticipated litigation related to Simandou tacks back and forth depending on the context in which the question is presented. When confronted with its admitted destruction of documents for key custodians, Vale maintains that there was no way it could have anticipated litigation related to Simandou in the United States. *See, e.g.* Dkt. No. 234, at 17–18 n.5 ("Vale had no reasonable anticipation of civil litigation in the U.S. or anywhere else related to Simandou before this action was filed . . . ."). Then, when justifying its work product claims with respect to the Nardello Report, Vale insists that it believed at the time of its discussions with BSGR back in 2010 there was a real risk that litigation against the U.S. Government could arise from those discussions. *See, e.g.*, Dkt. No. 246, at 11 ("The Nardello Report is work product because at the time it was prepared, there existed a risk of investigation or regulatory action by the U.S. government with respect to the joint venture transaction and any activities of its JV partner."). Vale cannot have it both ways.

The work product doctrine only shields documents from disclosure that were prepared "because of" litigation. *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998). "While legal risks may ripen into litigation, not all risk management qualifies as anticipation of litigation. Generalized steps to avoid non-specific litigation are not accorded work product protection." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 553 (S.D.N.Y. 2013). Accordingly, to satisfy its burden, Vale must do more than claim that "there is always a risk of litigation in these types of transactions." Opp. at 9. If the law did not require more, an abstract chance of litigation arising from a mundane transaction would cloak all due diligence communications in work product protection, without regard to the underlying context. Contrary to its view, Vale cannot establish a valid work product claim unless it identifies a specific risk of litigation that was, in fact, the reason that the Nardello Report was prepared. *In re Grand Jury Proceedings*, No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) ("[A] generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement"). Vale's evidentiary submission fails to meet that burden here. Like Rio Tinto's investigator reports that Vale has made into a cause célèbre, the Nardello Report was a fact-gathering mission—what Vale itself calls "standard FCPA diligence," June 9, 2014 Hr'g Tr. 8:19—in service of commercial interests.

---

their partnership. *See* Ex. A. That calls into question the role that both the Nardello Report and Clifford Chance's legal advice played in Vale's claimed due diligence.

Neither does Vale's claim that "the Report on its face has the legend 'Privileged and Confidential – Subject to Attorney-Client Privilege and Attorney-Work Product Doctrine: Prepared at the Direction of Counsel,'" Opp. at 7, 8, change the outcome. Vale has submitted no evidence whatsoever that controverts Mr. Fox's testimony that the Nardello Report was unattached from the Clifford Chance memo and contained no indication that it was privileged. Fox Decl. ¶ 7. The court should ignore counsel's unsworn assertions to the contrary.[7]

Moreover, even if the Court concludes that the Nardello Report is protected work product, Vale's contention that Rio Tinto cannot meet its burden to show it has a "substantial need" for the information in the Report is wrong. Vale's argument on this point, in essence, is that Rio Tinto cannot overcome the lower protection afforded to "fact" work product because it could depose the witnesses who were interviewed by Nardello more than five years ago. *See* Opp. at 9–10. This view of the law is without merit.

As a threshold matter, Vale's argument ignores a number of significant impediments that stand in the way of those depositions. Most significantly, Rio Tinto does not know the identities of the witnesses it would need to depose in order to reconstruct the Nardello Report. Vale has refused to provide them. But even if Rio Tinto did have that information, it may not have the practical ability to compel testimony from foreign witnesses during discovery. Where similar obstructions have prevented the collection of relevant facts, courts have found that a party is entitled to discovery of fact work product. *See Pine Top Ins. Co. v. Alexander & Alexander Servs., Inc.*, No. 85-cv-9860 (PNL), 1991 WL 221061, at *2–*3 (S.D.N.Y. Oct. 7, 1991).

Vale's argument also overlooks the fact that the contents of the Report have independent significance in this case—beyond the truth or falsity of the information contained therein. Vale has defended itself in this case by playing the part of the victim and feigning ignorance of the criminal activities of its partners BSGR and Mr. Steinmetz. Accordingly, Vale has placed its diligence efforts preceding the Vale-BSGR transaction squarely at issue. *See supra*, Section II.

Precisely what Vale knew about BSGR's and Mr. Steinmetz's activities in Guinea, and when Vale obtained that information, is highly relevant to Vale's defenses. The only available evidence bearing on either of those points—because Vale has destroyed all the relevant custodial documents held by its former high-level employees who dealt directly with BSGR—is the Nardello Report. Without access to the Report, Rio Tinto cannot test the validity of Vale's principal defense. Thus, Rio Tinto has a substantial need to obtain the information in the Report. *Cf. In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982) ("Quite apart from the truth of the matters asserted therein, which is clearly pertinent, the statements may be relevant simply for the fact they were made because they may tend to prove what Doe Corp. knew and when it knew it. On that issue, the notes may be the only available evidence . . . . [T]he government has met its burden of showing a substantial need.").

---

[7] Even if the Clifford Chance memorandum to which the Nardello Report apparently was attached included such a legend, it would further demonstrate that the memorandum was prepared by U.S. lawyers pursuant to U.S. law. Otherwise, had it been prepared by English lawyers analyzing English law, one would expect it to use English legal terminology such as "litigation privilege" and "legal advice privilege" instead of U.S. terminology such as "attorney work product" and "attorney-client privilege." *See supra*, Section IV.A.; *see also infra*, Section IV.C. (discussing differences between U.S. and English terminology).

### C. The Report Is Not Privileged Under English Law Either.

Even if the Court were persuaded that English law controlled, the victory would be a Pyrrhic one for Vale, as English law takes an even narrower view of privilege than U.S. law. In order for "litigation privilege" (the English analogue of work product privilege) to apply, (1) litigation or other adversarial proceedings must have commenced or be reasonably in prospect and (2) the sole or dominant purpose of the communication must be preparing for or dealing with the litigation. *Three Rivers District Council v Governor and Company of the Bank of England*, [2004] UKHL 48. However, English law explicitly excludes investigative or other inquisitorial proceedings such as the investigation conducted by the Government of Guinea from the definition of "adversarial" proceedings. *Id.* Routine, pre-acquisition due diligence of the sort at issue here thus does not qualify.

Similarly, English "legal advice privilege" is even more circumscribed than U.S. attorney-client privilege. In *R (Prudential PLC and another) v Special Commissioner of Income Tax*, [2013] UKSC 1, the Supreme Court refused to extend the availability of legal advice privilege beyond members of the legal profession (in that case, accountants providing tax advice). In other words, the *Prudential* decision declined to adopt anything resembling the *Kovel* doctrine. Vale relies on Paul Matthews & Hodge M. Malek on Disclosure, § 11.15 (4th ed. 2012) for the proposition that a lawyer's communications with a third party that are passed on to the client are protected, but that reliance is misplaced. First, the treatise was published prior to the Supreme Court's decision in *Prudential* and thus is out of date. Second, the portion of the treatise Vale cites to concerns communications from third parties that are *incorporated into*, not simply *attached to*, legal advice. *Id.* (citing *Re Sarah C Getty Trust,* [1985] Q.B. 956).[8]

In fact, earlier this week, the England and Wales High Court (Chancery Division) refused to allow Clifford Chance to cloak otherwise non-privileged communications under the guise of legal advice. In *Property Alliance Group Limited v The Royal Bank of Scotland Plc*, [2015] EWHC 1557 (Ch), the court made clear that reports prepared by investigators, even though "external legal advisors, Clifford Chance, played a key part in [their] work . . . and [their] meetings were attended by Clifford Chance" would not be privileged if even "*part* of [the investigators'] role included the task of overseeing investigations and reporting to the" client. *Id.* (emphasis added).

The Nardello engagement letter makes clear that Vale is the client and that Nardello is providing "investigative and consulting services," not providing legal advice. *See* Opp., Ex. A, at 1 (defining Vale as "the Client," describing Nardello's services as "investigative and consulting," and providing for Nardello to invoice Vale directly). Whatever the status of the memorandum prepared by Clifford Chance, Vale has no basis to claim any communication from Nardello is privileged. *See Prudential*, [2013] UKSC 1. The Court should not permit Vale to use Clifford Chance to conceal an investigator's report under English law when an English court

---

[8] Mr. Fox's declaration makes clear that the Nardello Report Vale disclosed to him was a standalone document unattached to any legal memorandum and not incorporated into legal advice. Fox Decl. ¶ 7. As noted above, Vale has put forth nothing other than its counsel's unsworn assertion to rebut Mr. Fox's testimony.

has already rejected precisely the same gambit.

*   *   *

Vale freely disclosed the Nardello Report to the lead investigator for the government that was investigating whether to strip it of its rights to a $5 billion asset.  That eviscerates any claim of privilege.  That is particularly true here, where the Report was not privileged in the first place.  Vale cannot continue to shield the Report from discovery.  The Court should order Vale to produce the Report immediately.

Respectfully submitted,


/s/ Michael J. Lyle
Michael J. Lyle

# Exhibit A

| | Rio Tinto plc v. Vale, et al. Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.) | | | | |
|---|---|---|---|---|---|
| | Vale Privilege Log of Discrete Due Diligence Materials | | | | |
| Date | From | To | CC | Description | Basis for Privilege |
| 4/30/2010 | Clifford Chance (David Di Bari; George Kleinfeld) | Fabio Spina | Peter Brady; Daniela Chimisso dos Santos | Clifford Chance memorandum containing legal advice with respect to Vale's compliance with law in connection with the proposed joint venture with BSGR, with attachments. | ACP |