**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

June 18, 2015

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

**Re:** **Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)**

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), Vale S.A. ("Vale"), and Mahmoud Thiam write jointly to update the Court on the status of various discovery issues in advance of our June 22, 2015 hearing.

Although the parties have been meeting and conferring on a regular basis, both through telephonic meet and confers and written correspondence, there are a number of disputes that require the Court's assistance.  Below is a proposed agenda for the June 22, 2015 status conference.  In light of the various issues raised by both sides regarding predictive coding however, Vale and Rio Tinto have agreed to meet and confer with their experts at the courthouse prior to the conference to try to resolve those issues prior to discussing them with Your Honor.

I. **Discovery From Defendant Vale**

   a. **Production of the Nardello Report**

      i. *Rio Tinto's Position*

Rio Tinto's motion to compel the Nardello Report is fully briefed.  Rio Tinto will be prepared to discuss it with the Court at Monday's hearing.

**quinn emanuel urquhart & sullivan, llp**
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

### ii. *Vale's Position*

On June 10, Rio Tinto filed a reply in support of its motion to compel production of the privileged Nardello Report (Dk. 268) in which it asserted that the statements of Vale and the Government of Guinea amount to mere "after-the-fact" "subjective views of the parties" and not "objective reality of the relationship at the time." (Dk. 268 at 3.) Vale has therefore provided the Court with contemporaneous documentary evidence to the contrary. (Dk. 276-1). In light of the evidence submitted by Vale, and for all the reasons stated in Vale's opposition, the Court should reject Rio Tinto's claim of waiver and deny its motion to compel the Report prepared for and at the request of Vale's counsel.

### b. **Production of Vale's Litigation Hold Materials**

#### i. *Rio Tinto's Position*

***Vale's refusal to produce its litigation hold material.*** Your Honor previously "direct[ed] the production of both sides of litigation hold material with whatever redactions for privilege are appropriate." *See* 4/8/15 Tr. 6:9-11. In response to this order, Rio Tinto produced all of its litigation hold material, as ordered, including its cover correspondence that was sent along with Rio Tinto's underlying litigation hold memoranda. Vale has not followed suit. Vale acknowledges having sent cover correspondence in connection with its litigation hold memoranda but refuses, without explanation or justification, to produce it.

Production of the cover correspondence is especially relevant given Vale's shifting story on when its custodians received its litigation hold notice. Rio Tinto recently learned – through the parties' discussions over adding additional custodians – that Vale's May 12, 2015 letter to Rio Tinto, which purports to set forth who received Vale's document retention notices and when they did so, is inaccurate. For example, Mr. Bruno Abreu, an individual listed by Vale in its May 12, 2015 letter as having received Vale's May 16, 2014 preservation notice, did not in fact receive that notice until December 2014. And just today Vale amended that May 12 letter again to add new dates. Rio Tinto needs the cover correspondence to get to the bottom of when the Vale employees actually received the litigation hold rather than continuing to wait for Vale to change its story again. We therefore respectfully ask the Court to reiterate its previous order and compel Vale to produce all of its litigation hold material, including any cover correspondence.

#### ii. *Vale's Position*

On June 10, two months after Vale had produced its litigation holds, Plaintiff demand for the first time that Vale produce "any cover email or transmissive correspondence that was sent atop Vale's document retention notices" – i.e., not the holds themselves but other communications with counsel. (June 6, 2015 Email from K. Forst to M. Karlan.) The request is both belated and pointless and appears to be part of a continuing effort to increase the costs and burden of this litigation on Vale.

In accordance with the Court's April 8 direction, Vale produced, on April 17, its "litigation hold material with whatever redactions for privilege are appropriate," including "[a]ny lit hold for civil or criminal matters arising out of the Simandou situation." (April 8, 2015 Tr. 6:9-11, 7:6-7.) In fact, unlike Rio Tinto, Vale produced its holds in the first instance without any redactions. Vale has further accommodated Rio Tinto's request for information concerning the

2

precise timing of its holds, disclosing the dates on which each recipient was sent each hold.

Discovery about discovery must come to an end. No additional information relevant to preservation can be gleaned from the transmittals, as Vale has already produced the unredacted holds themselves, the dates they were sent, and to whom. The only result of honoring Rio Tinto's request would be to produce more documents, at a greater cost.

Rio Tinto's continuing inquiry into spoliation is not only baseless but pretextual. The Court should be aware that after virtually every conference before the Court where Rio Tinto raised frivolous claims of document destruction, the press reported those allegations. See Vale Destroyed Crucial Documents, Rio Tinto Alleges, Main Justice, Apr. 10, 2015 (reporting allegations that "Brazilian mining giant Vale SA has destroyed email and other documents that could shed light on an allegedly corrupt mining deal in Guinea"); Marcus Leroux, Rival Miner Wiped Out Key Emails, Claims Rio, The Times (London), June 8, 2015, at 35 ("Rio Tinto has accused one of its largest rivals of destroying evidence, including wiping the emails of a former chief executive, in a battle over the world's largest untapped mass of iron ore"). The Court will also recall that when, at the very first conference during which Plaintiff raised issues of "document destruction," the Court proposed that the parties agree to a gag order, all of the defendants agreed – but Rio Tinto did not. (See April 8, 2015 Tr. at 33:14-34:4 ("THE COURT: All right. Everybody willing to agree, on behalf of their clients, to a gag order? Anybody have a problem with that? MR. BLACKMAN: No, your Honor. MR. FILARDO: No, your Honor. MR. AUERBACH: No, your Honor. MR. SUMMIT: No, your Honor. THE COURT: Mr. Lyttle? MR. LYTTLE: I will speak with my client, your Honor. THE COURT: Well, that's interesting.").)

The Court cannot in these circumstances restrict Rio Tinto's free speech rights (and we do not ask it to do so). Nor does Vale have a thin skin. But the Court certainly can draw inferences whether Rio Tinto is engaged in an attempt to discover the truth of its allegations (for which no support yet has been found) or instead to multiply Vale's litigation costs and besmear its reputation during a continuing contest for mining rights between two competitors.

   c. **Vale Documents and Employees Associated with the VBG Simandou Operations**

      i. *Rio Tinto's Position*

***VBG and Vale's failure to collect documents from former VBG employees.*** As this Court knows, Rio Tinto has served discovery requests on Defendant VBG seeking documents related to the claims and defenses that have been raised in this case. In response to that discovery, counsel for VBG has told Rio Tinto and the Court that "to the extent that [relevant documents] exist and are pertinent here, Vale has all that material because that is what is on Vale's server," *see* 2/27/2015 Hr'g 30:22-24, that "virtually all of the substantive staff working at VBG [ ] were from overseas and largely Vale employees at that point," *id.* at 28:20-22; and that "when [the Vale-VBG employees] left, they took their materials with them." *Id.* at 29:2-3.

Since VBG's counsel gave this explanation, Rio Tinto has been diligently seeking from Vale information concerning which current Vale employees were previously seconded to VBG

3

during the relevant period of time such that they may have relevant, discoverable information and to confirm that Vale, working with VBG, will produce relevant documents. Rather than provide that information, however, Vale has flatly refused—even though Vale admits that it has access to these employees and access to their information. Accordingly, Rio Tinto has no choice but to enlist the Court's assistance. We therefore respectfully request that Vale provide Rio Tinto with (i) the names of principal Vale employees and contractors who worked on the VBG Simandou operations, (ii) confirm that it has retained documents for those custodians, and (iii) that it will produce them. To the extent Vale needs assistance from VBG's counsel to provide Rio Tinto with this information, those parties should be ordered to work together rather than frustrate Rio Tinto's ability to obtain relevant discovery.

### ii. *Vale's Position*

Vale met and conferred with Rio Tinto concerning sources of potentially relevant ESI. In that context, Vale agreed to investigate the data systems used by the joint venture (VBG) to the extent within Vale's knowledge. Vale has provided Rio Tinto with information it has been able to obtain concerning VBG's IT infrastructure, including the issuance of computers (which are not in Vale's possession, custody, or control) and the use by some VBG personnel of Vale.com email addresses. VBG is not controlled by Vale, was separately sued, and has its own counsel. Cleary Gottlieb does not now, and never did, represent VBG in connection with this litigation. The information was provided a courtesy, without prejudice, and without requiring Rio Tinto to serve formal discovery. Vale informed Rio Tinto it did not speak for VBG and that Rio Tinto should confirm all information with counsel for VBG.

Rio Tinto's complaint appears to be that Vale has not complied with its requests that it "identify by name all of the VBG employees associated with Vale" and confirm that Vale is preserving materials taken by "Vale-VBG employees." The requests are improper for a number of reasons, including that they are vague and undefined. (There is no definition, for example, of "VBG employees associated with Vale," or "Vale-VBG employees") Moreover, with respect to Vale employees, Rio Tinto is well aware of the steps Vale has taken to preserve potentially relevant documents based on the numerous disclosures we have made. With respect to VBG employees, of which Vale understands there to have been more than two thousand, Rio Tinto should inquire of VBG regarding which employees or former employees, if any, may have information potentially relevant to this litigation or to the document requests served on VBG. Vale does not have this information.

## II. Update Regarding Rio Tinto's Investigators

### i. *Rio Tinto's Position*

At the May 8 status conference, Your Honor ordered Rio Tinto to follow up on its oral requests by sending the investigators a letter asking them to turn over materials responsive to Vale's requests. Those letters, which Rio Tinto allowed Vale to effectively author since they related to Vale's requests, were sent to all the investigators on May 20. The investigators have

now responded to those letters (all responses have been provided to Vale) as follows:[1]

- Aeneas – On June 1, Mr. Tidian Toure again provided all documents he had that were responsive to Vale's requests (he had previously provided them in response to our prior requests, and we in turn had previously provided them to Vale).

- Livingstone & Co. – English lawyers for Livingstone recently responded on June 17. Confirming that Rio Tinto had, in fact, asked for this material before, they wrote that they were "surprise[d]" at the content of our May 20 letter because "[o]ur client had understood that its position with regard to the provision of the underlying material had been made clear to your client from previous contact and that this was one reason why the learned Judge in the New York litigation had determined to proceed by way of Letters of Request under the Hague Convention." They continued that they are "willing to disclose the documents properly sought by the Letters of Request," and that they have "invited Cleary Gottlieb to propose amendments to the Letter of Request which will allow the matter to proceed without a hearing." The letter closes with "[f]or the avoidance of doubt, it is our client's position that it was and is entitled to decline a request from your client to identify the sources of the information contained in its reports." It then attaches two witness statements filed in the English proceedings that detail its concerns with revealing source names.

- Begbies Traynor Group (BTG) – Counsel for BTG wrote on May 22 that it "continues to maintain the view that it cannot supply the information you have requested, a view previously expressed by my letter dated 8 April 2015," and that "[i]t follows that your client has no rights (legal or otherwise) or control in relation to the names of the sources requested and the Company cannot supply the information requested."

- Executive Research Associates (ERA) – South African counsel for ERA wrote on May 25 that "it ha[s] no intention of dealing with this matter informally or outside the ambit of the formal process [*i.e.*, the Hague letters of request] which, as stated above, has not yet commenced."

- Africa Risk Consulting (ARC) – ARC has not responded to our May 20 letter. But just late last night, Vale finally produced (after weeks of delay) its correspondence with the investigators related to the Hague Requests. We are still reviewing that material, but it appears from an initial glance that ARC is taking a position similar to that of Livingstone and BTG.

In sum, we have one investigator (Aeneas) that has now (twice) turned over everything he has. And we have another investigator (Livingstone) that is willing to turn documents over if Vale will narrow its requests and allow Livingstone to redact out source names (we believe the

---

[1] Rio Tinto will have copies of this correspondence at the status conference on Monday should Your Honor wish to see it.

5

other investigators in the UK may have taken a position on Vale's Hague requests that is similar to Livingstone's, but have not yet had a chance to confirm through a review of the materials we just received from Vale). All of the investigators have declined Rio Tinto's multiple requests for source names, and denied any contractual or practical ability for Rio Tinto to force them to turn it over. And the investigators have taken the exact same positions in the Hague request proceedings that they have taken with Rio Tinto and this Court. Collectively, all of this, of course, is exactly what Rio Tinto has repeatedly told Vale and this Court, and refutes any notion that Rio Tinto has interfered with the investigators' responses to Vale's requests. Indeed, as Rio Tinto said at the last hearing, Rio Tinto has no objection to the investigators providing source names if they so choose. But Rio Tinto is in no position to force them to do so.

Finally, Your Honor asked at our last hearing whether any of these investigators are under any sort of current relationship or contract with Rio Tinto. We can confirm that we are not aware of any current commercial relationship between Rio Tinto and any of the investigators, other than a subscription (open to subscribers other than Rio Tinto) to an online service provided by ARC for media and socio-political updates on Africa.

### ii. *Vale's Position*

Rio Tinto's investigative firms continue to stonewall, as discussed infra, Section III(a)(i). We expect Rio Tinto will report receiving correspondence from the firms again declining to provide the information requested for Vale's use. That correspondence follows Rio Tinto's public pronouncements in these proceedings that the request came from Vale and that it did not initially want to provide the information (the Court will recall the lengths to which Rio Tinto resisted producing the investigative reports, and then resisted producing un-redacted reports). Tellingly, none of the firms go so far as to state that they would not turn over the information to Rio Tinto if it helped Rio Tinto and was requested by Rio Tinto.

In addition, Rio Tinto granted itself an extension of this Court's order that, by Friday June 4, it "produce whatever the prior e-mails or correspondence, whether from your firm or Rio Tinto to the investigators during the course of his attempt to find out the sources and backup information." (June 1, 2015 Tr. 52: 14-17.) On June 8, it made a production. Notwithstanding that the production consists largely of communications with litigation counsel and not with Rio Tinto itself, Rio Tinto has made the representation that it has made a thorough search of its client's files, that the production includes all correspondence and emails with the investigative firms including correspondence with Rio Tinto alone that does not copy litigation counsel, and that nothing has been withheld. We also understand that Rio Tinto will update this production with any later-dated correspondence with the firms. While we are still studying the material, one communication is of particular note: A March 24, 2015 email from Executive Research Associates to Rio Tinto inquires of Rio Tinto, "Could you advise if the client is going to fund the costs associated with legal opinions and possible litigation in South Africa"? (RT0405628.) Plaintiff responded that "Nick [Sceales of Rio Tinto] will be in touch regarding your question on funding." (Id.) We ask the Court to inquire whether when Rio Tinto answered that Rio Tinto had not paid the attorneys' fees for any of the investigative agencies (June 1, 2015 Tr. 48:7-14), it also meant to include in that answer that it had not agreed to pay the attorneys' fees for the

6

investigative agencies and no one had paid or agreed to pay the investigative firms on Rio Tinto's behalf.[2]

### III. Discovery from Plaintiff Rio Tinto

#### a. Rio Tinto's Production of Documents Concerning its Investigators

##### i. *Vale's Position*

**Rio Tinto's Violation of the Court's Order Regarding Evidence of Equitable Tolling and Request for Sanctions.** Rio Tinto continues to stonewall defendants' discovery of evidence necessary to test Rio Tinto's claim of equitable tolling. It has violated this Court's orders with respect to investigative materials.

In its motion paper served prior to the June 1 Order, Vale wrote that "Rio Tinto has neither confirmed or denied that it has some of these documents within its possession, begging the question as to what documents are not within its possession but within its control." (Dk. 261 at 3 n.2.) The Court stated: "[T]hey are saying you have neither confirmed or denied that you don't have any of the investigator-related documents. I would like a confirmation that you don't have any of them." (June 1, 2015 Tr. 47:1-5.) The Court then ordered: "Produce the invoices. Produce whatever you have that you haven't produced with respect to the investigators. Clear?" (*Id.* at 47:14-17.) Rio Tinto made clear it understood the Order: "MR. LYTTLE: Yes, your Honor. THE COURT: Good." (*Id.* at 47:18-19.)

The Court did not give an extension to Rio Tinto to comply with that Order, nor did Rio Tinto request one. The Court ordered Rio Tinto to make the production.

Rio Tinto has violated the Court's Order. It has now been 17 days since the Court Order, and nearly four months since Vale first requested this basic information from Rio Tinto, and Rio Tinto has failed to produce any of the invoices or the other documents the Court ordered. Moreover, the documents, for the most part, should not be difficult to produce. They include:

- Proposals, pitch books, or presentations (Requests 48 and 49);
- Engagement and disengagement letters (Requests 48, 49, 50);
- Bills or invoices, and time sheets (Request 52); and
- Records of payment by Rio Tinto to any Investigative Firm (Request 53).

Rio Tinto has known of the relevance (and not disputed it) for four months; it is directly relevant to its affirmative claim of equitable tolling. It is inexcusable that Rio Tinto has failed to comply. We request sanctions in the amount of $2,000 for violation of the Court order, which constitutes

---

[2] Indeed, from the documents Rio Tinto has produced, it is apparent that Rio Tinto owes indemnity obligations to the firms. *See, e.g.*, RT0362639, Africa Risk Consulting Proposal for Rio Tinto ("Rio Tinto Plc must agree to indemnify and hold harmless ARC against any damages or claims resulting from unauthorized use [of information received from ARC]"); RT362605, Aeneas Proposal for Rio Tinto Global Security ("Rio Tinto must agree to indemnify and hold harmless Aeneas against any damages or claims resulting from such unauthorized use.")

a small portion of the attorneys' fees expended in seeking discovery on Plaintiff's affirmative claim of tolling.

Before this conference, in response to Vale's request, Rio Tinto wrote that not only was it not producing the invoices and other documents with respect to the investigators as written, but it would not produce them until the time due for production of documents under Vale's second set of document requests. (June 11, 2015 Email from K. Forst to M. Karlan.) *I.e.*, Rio Tinto is treating the Court's order as a nullity. The Court did not engage in a meaningless gesture. It did not order Rio Tinto to produce documents it was already under an obligation to produce – on a timetable that would extend out months. Nor was *Vale* or the Court required to impose a deadline. When a Court speaks, the parties should respond and do as told.[3]

Vale also continues to be stonewalled by the investigative firms. To date, not a single document has been produced in the foreign proceedings. In what can only be a concerted effort, within days of each other, the three United Kingdom based firms made applications to modify the Letters of Request So-Ordered by the Senior Master of the English court, using similar – and in many instances identical – wording in the applications and witness statements (in violation of the U.K. rule that a witness use his or her own words).[4] The firms raise two objections, both baseless. First, they argue that Vale is not entitled to the identities of confidential sources, yet offer no reason to withhold the names of critical witnesses. As Your Honor has already ruled, at

---

[3] Indeed, what Rio Tinto has produced – the communications Rio Tinto's counsel has had with the investigative firms, dating back to March – demonstrate that Rio Tinto has communicated to the firms – whether expressly or with a wink and nod – that it need not comply with Vale's letters of request. (*Compare* Dk. 208 at 2 (writing to Your honor on March 23, 2015 that "in accordance with the Court's request, Rio Tinto has made a concerted effort to speak with the investigative firms about cooperating with discovery in this case"), *with* RT0405272 - RT0405276, RT0405285- RT0405288, RT0405625- RT0405630 (writing to its contacts at BTG Intelligence Limited, Livingstone & Company, Africa Risk Confidential, and Executive Research Associates on March 24, 2015 that, "[a]s we said previously, we do think a letter from your firm to Judge Peck outlining your concerns would be extremely helpful here")).

[4] Consider, as one of many examples, the following instances of blatant collaboration:

**Livingstone:** "[T]here is no justification expressed in the Letter of Request or in Mr Kelly's statement as to why Vale require identities of sources. Names of sources is not information which will throw light on the primary chronology/limitation points relied upon in support of the application for the Order." First Witness Statement of Adrian Parkhouse ¶ 13.

**RC:** "[T]here is no justification expressed in the Letter of Request or in Mr Kelly's statement as to why Vale requires identities of sources to be disclosed. Names of sources is not information which will throw light on the primary chronology/limitation points relied upon in support of the application for the Order." Second Witness Statement of Jane Hardy ¶18.

**BTI:** "There is no justification expressed in the Letter of Request or in Mr Kelly's statement as to why Vale require identities of sources. Names of sources is not information which will throw light on the chronology/limitation points relied upon in support of the application for the Order." First Witness Statement of John Ashton Humphrey ¶ 21.

the very least, there is no basis for withholding this information from counsel. Second, the firms object to certain of the terms of the Orders as too broad. On that front Vale is working to accommodate any such concerns. A hearing concerning all three firms' objections to the Orders implementing the Letters of Request is scheduled to take place on June 25, 2015.

Among other things, the firms have objected to a number of requests including the request for documents transmitted to Rio Tinto. Vale believes the objections are baseless. Nonetheless, in order to resolve the disputes and not to burden the U.K. courts, we have proposed to forego the request that such firms produce pursuant to the U.K. proceeding the documents that they transmitted to Rio Tinto on the understanding that those firms will immediately resend to Rio Tinto all documents which were originally sent to Rio Tinto in connection with the Reports and that Rio Tinto agrees that it will then immediately produce those documents to Vale. We have asked Rio Tinto to agree to this compromise. Specifically, we have asked that Rio Tinto confirm that it (1) will promptly produce to Vale the documents transmitted to it from the firms pursuant to this agreement, and (2) will not argue that Vale's failure to press for the a full and direct production from the firms before the U.K. court prejudices in any way Vale's right to obtain those documents from Rio Tinto in the U.S. litigation. As of this writing, we have not heard back.

All told, these tactics have imposed significant costs on Vale. Forced to litigate Rio Tinto's claims in the U.S., while critical evidence concerning Plaintiff's affirmative tolling claim resides abroad, and without assistance from Rio Tinto in obtaining those materials, Vale has expended considerable resources in pursuing the Letters of Request, as to which it reserves its rights to make an application at the appropriate time.[5]

### ii. *Rio Tinto's Position*[6]

On June 8, 2015, Rio Tinto produced documents in accordance with this Court's June 1 order. As noted at the last status conference and further reiterated to Vale, Rio Tinto will produce invoices, pitch books and other materials from Rio Tinto's investigators in due course,

---

[5] In the interests of transparency, and so that all parties and the Court can see this stonewalling for themselves, Vale has produced its correspondence with the investigative firms, as well as its submissions abroad before the relevant judicial authorities.

[6] As Rio Tinto explained to Your Honor at the last hearing, we do not have the benefit of seeing Vale's substantive inserts before the joint letter is filed. Instead, the parties exchange topics they intend to raise with the Court generally based on the meet and confers that the parties have been having since the last status conference. In preparing this joint letter, the parties exchanged topics that each were planning to raise with the Court on Wednesday. On Thursday, Rio Tinto and Vale had a number of phone calls to discuss and try to narrow or resolve some issues without burdening the Court. At no point in time did Vale advise that it would attempt to move for sanctions on anything. Instead, Vale mentioned sanctions for the first time at 5:49 pm on the day the joint letter was due. Rio Tinto has no idea what possibly could be "sanctionable," but has no choice but to reserve its rights to respond if necessary to Vale's position once it has the chance to see it.

as they are responsive to Vale's second set of document requests, served at the end of February and to which Rio Tinto responded at the end of March (Rio Tinto has already produced the engagement letters with the investigators).

### b. Rio Tinto's Current Commercial Relationship with its Investigators

#### i. *Vale's Position*

**Rio Tinto's Violation with Respect to Current Engagements with Any of the Investigative Firms.** Rio Tinto is in violation of another court order with respect to the evidence of equitable tolling. The Court instructed Rio Tinto to answer the question "Are any of these investigators under any sort of current relationship or contract with Rio Tinto?" (June 1, 2005 Tr. 51:22-25.) Rio Tinto agreed to abide by that instruction: "MR. LYTTLE: I thought about it on the way in, your Honor. I need to check on that. I am not in a position to confirm that. I will do so." (Id. at 52:1-3.) It has now been over two weeks and Rio Tinto has still not provided an answer to this critical question which goes directly to the question of custody or control. The Court did not order Rio Tinto to answer only if and when Rio Tinto got around to it. Rio Tinto should be expected to provide the answer for each of the five investigative firms at issue at the court conference on Monday.

#### ii. *Rio Tinto's Position*

As noted earlier (*see* Section II(i)), we can confirm that we are not aware of any current commercial relationship between Rio Tinto and any of the investigators, other than a subscription (open to subscribers other than Rio Tinto) to an online service provided by ARC for media and socio-political updates on Africa.

### c. Rio Tinto's Response to Vale Interrogatory No. 24

#### i. *Vale's Position*

**Rio Tinto's Failure to Give a Proper Response to Vale Interrogatory No. 24 Regarding the Settlement Agreement.** Vale's Interrogatory 24 seeks the identities of persons "with knowledge regarding Rio Tinto's negotiation of, or decision to enter into, the April 22, 2011 Settlement Agreement." It was served on April 9, 2015. In its response on May 1, 2015, Rio Tinto provided the cagey response that "the following are the key individuals involved with negotiating and deciding to enter into the April 22, 2011 Settlement Agreement." Vale demanded a full response prior to the last conference. It has yet to receive one.[7]

---

[7] Vale requested two forms of relief with respect to Rio Tinto's response: (1) an order that Rio Tinto add the two new custodians identified in its response, and (2) an order that Rio Tinto serve a full and proper response to the interrogatory, which Rio Tinto purported to limit to five "key individuals." (*See* Dk. 258 at 13.) The Court granted the first request but did not reach the second. (*See* June 1, 2015 Tr. 25: 10-11.)

Vale is entitled to an answer. Interrogatory 24 calls for "all Persons with knowledge." An answer that is limited to "key individuals" is meaningless. The interrogatory is not limited to those who actually entered into the Settlement Agreement but extends to all those who have knowledge of the decision to do so. Indeed, the Settlement Agreement is Plaintiff's only remaining theory of RICO injury. Rio Tinto is hardly positioned to object to an interrogatory calling for "all Persons with knowledge." Not only is that language permitted by Rule 33 but Rio Tinto's own interrogatories to Vale call for it to identify "every Person," in response to which Vale has identified nearly 100 individuals in response to a single interrogatory.

### ii. *Rio Tinto's Position*

Rio Tinto has fully answered Vale Interrogatory No. 24 and need not amend that answer further. The parties have extensively negotiated on the scope of what is relevant with respect to the April 22, 2011 Settlement, and the Court has similarly weighed in. *See* 6/1/15 Hr'g Tr. 15:9–23:19. With the Court's guidance, the parties agreed to a scope that would be limited in subject-matter to "documents that relate to Rio Tinto's decision to enter into the settlement agreement," "their cost-benefit discussion," and certain external correspondence. *Id*. at 19:16–20:19. Rio Tinto's response to Interrogatory No. 24 identifies the persons with relevant knowledge on those topics. They are, indeed, the persons with the most relevant information regarding Rio Tinto's negotiation of and decision to enter in the April 22, 2011 Settlement Agreement. We believe any additional individuals would be at best tangentially related to the issues relevant to the Settlement Agreement, and any information they could provide would be duplicative of the information held by those Rio Tinto has already identified. Such cumulative discovery is unnecessary.

Moreover, Vale's interrogatory uses such overbroad and unduly burdensome language as "all Persons with knowledge," "negotiation of," and "decision to enter into." Since the beginning, Rio Tinto has objected to that language, and there those terms are not tailored to capture the agreed-upon scope of discovery regarding the April settlement agreement. In sum, Rio Tinto's answer to Interrogatory No. 24 provides Vale with all of the relevant persons and information it seeks, and their request that Rio Tinto amend its response should be denied.

### IV. **Discovery from Defendants BSGR and Steinmetz**

### i. *Vale's Position*

BSGR has committed to "make a timely production after the Senior Master So Orders" (Letter from V. Filardo, dated April 30, 2015; see also May 8, 2015 Tr. 15:24-16:2). The Special Master has so ordered by Orders provided to BSGR on May 13. Vale has requested that BSGR and Onyx agree to produce documents on a rolling basis, and they have proposed to do so beginning June 22, with full production to be complete on or before June 30. Vale has also asked BSGR to confirm that BSGR's and Onyx's production would include "[t]he letters and other documents and communications produced by BSGR to: . . . the United Kingdom's Serious Fraud Office between September 1, 2013 through the date of production," which the English High Court has ordered BSGR to produce in response to the Serious Fraud Office's Section 2 Notices. (Dk. 222, Section 8(n)(ii).) Vale has received no response on that point.

### ii. *BSGR/Steinmetz's Position*

On May 26, 2015, BSGR filed a motion in the English High Court seeking to conform Master Eastman's orders to the June 30, 2015 production deadline that the parties had previously agreed upon with respect to the Vale/Rio joint Letters of Request to BSGR and Onyx.

Master Eastman initially set a hearing on BSGR's motion for June 12, 2015. On June 5, 2015, the English High Court notified BSGR's UK counsel that Master Eastman had adjourned the June 12, 2015 hearing date, and referred BSGR's motion to a judge of the English High Court. We understand that this action was taken to consolidate BSGR's motion with the applications of Livingstone & Co., Africa Risk Consulting, and Begbies Traynor in relation to the orders for production that each of them had received as a result of Vale's Letters of Request. A hearing on BSGR's motion, as well as the applications of Livingstone & Co., Africa Risk Consulting, and Begbies Traynor, has now been re-set for June 25, 2015.

Notwithstanding the foregoing, BSGR expects to make rolling productions beginning Monday, June 19, 2015, and will complete its production by June 30, 2015.

## V. Discovery from Defendant VBG

### i. *Rio Tinto's Position*

Rio Tinto respectfully refers the Court to its prior discussion regarding discovery from VBG and Vale on VBG's Simandou operations, Section I(c).

### ii. *VBG's Position*

## VI. Predictive Coding Training

### i. *Issues with Vale's Predictive Coding*

#### 1. *Rio Tinto's Position*

Rio Tinto continues to have significant concerns regarding the adequacy of Vale's predictive coding training. As we previously notified the Court (Dkt No. 285 at 27), Vale is using an extremely restrictive methodology to train its predictive coding system that is potentially excluding large swaths of relevant documents by training its system purely within the four corners of Rio Tinto's document requests, including date ranges. Thus, if a document contains concepts responsive to Rio Tinto's requests but falls outside the date range, Vale excludes those documents as non-responsive. Rio Tinto expressed concern that Vale's approach would excluded relevant documents and unfortunately, it appears that our concerns were valid. To date, we have identified at least twelve topics, and even more Requests, that are missing from Vale's training documents. These include such critical topics as:

1. Allegations of bribery, corruption, or obstruction of justice by Vale and/or its co-defendants. *See*, *e.g.*, Requests 2, 17, 43.

2. Documents related to key individuals or entities involved in the bribery, corruption and cover up, including Frederic Cilins, Mamadie Touré, Pentler Holdings, Mahmoud Thiam, Ibrahima Touré, Ibrahima Kassory Fofana, Guinean Presidents Camara and Conte, Nysco

Management Corporation, Onyx Financial Advisors, Matinda Co., Michael Noy, and Avraham Lev Ran. *See*, *e.g.*, Requests 17, 43, 54, 55, 67.

       3. Vale's consideration of a potential deal with Rio Tinto regarding Simandou, including internal communications regarding the deal, Rio Tinto's concession, the legality of Rio Tinto's concession, or communications with co-defendants about Rio Tinto's Concession. *See*, *e.g.*, Requests 5–9, 11.

       4. Information or rumors that Steinmetz and/or BSGR were looking for a partner to invest in and help develop Blocks 1 and 2, and the October 18, 2010 Vale Day presentation Vale made regarding Simandou. *See*, *e.g.*, Requests 19, 40.

       5. Vale's anti-corruption policies that related to Simandou, and Vale's decision to share, or consideration of whether to share, Rio Tinto's Simandou documents with BSGR. *See*, *e.g.*, Requests 26, 34–35.

       6. Meetings between Vale and BSGR, or Vale and Rio Tinto relating to Simandou. *See*, *e.g.*, Requests 31, 32

       7. Documents concerning Fabio Barbosa and Roger Agnelli's involvement with Simandou, including their departures from Vale. *See*, *e.g.*, Requests 37, 38.

       8. Communications with and documents provided to the Government of Guinea, BSGR, or Steinmetz regarding BSGR's rights to Simandou or Vale's ability to develop Simandou. *See*, *e.g.*, Requests 51, 52

       9. Roger Agnelli's and Murilo Ferreira's 2011 meetings with Alpha Condé. *See*, *e.g.*, Requests 56, 63.

       10. Vale's decision to declare a material adverse change and/or force majeure with respect to the joint venture agreement, and Vale's agreement not to bring suit against BSGR and/or Steinmetz regarding Simandou. *See*, *e.g.*, Requests 60, 65.

       11. Documents related to Vale's involvement in operating VBG, including discussions about whether private expenses incurred by Steinmetz should be included in VBG operational costs, and Vale's board of directs meetings regarding BSGR, VBG, or Simandou. *See*, *e.g.*, Requests 61, 64.

       12. Documents related to the port of Didia, and documents such as notes, memoranda, communications, business plans, and other Vale records concerning the acquisition of an interest in Simandou. *See*, *e.g.*, Requests 1, 12, 33, 44–50.

       Rio Tinto provided these topics to Vale in an effort to help Vale supplement its training set and further narrow the topics that will require additional follow up. Vale finally produced its Training Set to Rio Tinto late Monday evening, which we are in the course of reviewing to determine whether, and to what extent, Vale has remedied this problem. Should these key topics continue to be noticeably absent from Vale's training documents, Rio Tinto intends to seek further training from Vale to remedy the issue.

       Not only is Vale missing documents regarding a significant number of issues critical to this case, but Vale also has used a surprising number of low text documents to train it system and has obstinately refused to make its expert available to Rio Tinto to address these concerns.

Specifically, there are now 31 documents in Vale's Control Set that are low text and our experts have advised that the predictive coding system is likely unable to process such low text documents and as a result, that they should not have been included in Vale's Control Set (or any training set). This includes one document containing only a single sentence. In addition, Vale has also used hundreds of documents – comprising 14.1% of its Control and Seed Sets – that are suspect filetypes such as Excel spreadsheets and pictures, again raising questions about whether Vale's system can appropriately categorize those documents. Needless to say, this raises serious concerns regarding the adequacy of Vale's training, including whether its system has a sufficient number of useable documents (and concepts) from which to learn and appropriately return responsive documents. Indeed, the combination of these factors may explain why there are so many critical topics that are not adequately addressed in Vale's predictive coding documents. And yet, despite multiple requests that Vale make its expert available to discuss our concerns, Vale has refused to do so. This is in stark contrast to Rio Tinto, who has made its experts available to Vale on numerous occasions and allowed unfettered questioning on technical issues like this. It was not until today, with the filing of the Joint Letter, that Vale agreed to a meeting with the parties' respective experts prior to Monday's hearing. Although we hope to resolve all issues in that meeting, we will update the Court on the result of that meeting during our conference.

### 2. *Vale's Position*

**Timeliness of Vale's Training Process.** Rio Tinto complains that Vale somehow delayed in producing its Training Set (which was produced last Monday, June 15). The accusation is flatly untrue. As both Rio Tinto and the Court know, the training process is an iterative one that does not lend itself to fixed timeframes.[8] That said, Vale conducted its training process in a diligent and expeditious manner, running numerous training iterations and constructing numerous models in order to attain the most effective model to identify responsive documents for production to Rio Tinto. Vale completed its training less than one month from the time it produced its Seed Set on May 18 – almost exactly the same amount of time Rio Tinto took to complete its training process (from April 17 to May 14).

The only reason Rio Tinto was able to complete its training process before Vale is because of the dispute Rio Tinto improperly and intentionally manufactured over Vale's use of search terms to pre-cull the Document Universe. Vale actually started its predictive coding process before Rio Tinto, producing its Control Set on April 6, 2015, but Rio Tinto then sought to delay discovery so it could catch up, raising a baseless objection to Vale's use of broad search terms – a procedure explicitly provided for in the parties' stipulated Predictive Coding Protocol, so-ordered by the Court (Dk. 206). That gamesmanship cost Vale time and money (as to which Vale reserves it rights) and produced no benefit to any party: On May 1, 2015, nearly a month after Vale produced its original Control Set, it was forced to produce a Revised Control Set from the set of more than 300,000 documents added by Rio Tinto's patently overbroad search terms,

---

[8] Rio Tinto misleads when it claims it sought fixed deadlines with regard to the parties' training process; in fact, its own proposal, which the Court rejected, called for the Training Set Production deadline to "be determined based on training process." April 6, 2015 Joint Letter (Dk. 234) at 9.

14

which contained zero additional responsive documents (and only one document that Vale agreed – as a matter of compromise and to avoid litigation – to code as responsive).

Notwithstanding Rio Tinto's attempts to set back Vale's production, Vale has made substantial progress on its document discovery, including a production on Friday June 19 of nearly 5,000 emails and documents. It is on schedule to comply with the June 30 production deadline ordered by the Court (and we ask the Court to reaffirm that deadline for all parties). Vale produced the most critical documents in this litigation months ago, including a re-production of Vale's production in response to a grand jury inquiry into the events that form the core of Rio Tinto's complaint and tens of thousands of pages of technical documents showing the geological, rail, and port plans that Vale developed for Simandou, which Rio Tinto claims were misappropriated from its data room (but which show no such thing). (None of those documents support Rio Tinto's claims.) By contrast, Rio Tinto has delayed producing any documents supporting its claim until the last days of the discovery period, with nearly 90% of the documents it has produced thus far pertaining exclusively to the BHP Billiton takeover attempt, which go to Vale's defense, not Rio Tinto's claim, and the overwhelming majority of which are at best marginally responsive.[9]

**Rio Tinto's Untimely Objections.** Rio Tinto has very recently raised untimely and meritless objections to certain documents in Vale's Control and Seed Sets, although these productions were made weeks and even months ago, in a transparent attempt to delay Vale's discovery process further. Notably, and in keeping with a pattern, these concerns were raised only after, and in apparent retaliation for, concerns Vale raised at the last conference with respect to the adequacy of Rio Tinto's training process. The Predictive Coding Protocol requires parties to raise disputes with respect to the Control and Seed Sets within 5 or 10 days (depending on volume) of their production. Sections 4(b), (c). That rule is important, as it allows the predictive coding process to move forward, and not get bogged down in endless disputes about training documents. Once again, Rio Tinto has flouted the Protocol when it serves its purposes, raising objections on June 5, nearly three weeks after the production of Vale's Seed Set (on May 18), and over one month after the production of Vale's Revised Control Set (on May 1).[10] As a courtesy, despite the untimeliness of Rio Tinto's objections, Vale provided explanations for the documents in the Control and Seed Sets, but Rio Tinto met this courtesy with demands for additional meet and confers and the involvement of the parties' experts. Vale has no problem making its expert available to discuss questions from Rio Tinto about live issues or questions; it

---

[9] To the extent Rio Tinto objects to coding of documents in Vale's Training Set, and to the extent there are coding changes that result in changes to Vale's predictive coding model, and those changes result in additional documents requiring review, Vale can review and produce those as part of the 5% of documents permitted to be produced following the June 30 cut-off.

[10] Vale also produced a Supplemental Control Set on May 29, which contained additional documents that resulted from the addition of Ricardo Saad as a custodian, per the Court's order. Rio Tinto has objected to only one document from this production, to which Vale has provided a response, and to which Rio Tinto has not in turn responded.

15

has done so at least as often as Rio Tinto has, and it was Vale that proposed to bring experts to the upcoming conference for the omnibus meet and confer on all predictive coding issues. But Vale is not obligated to make its experts available, and absorb the costs of doing so, for untimely objections intended to harass and delay. The process must move forward and Rio Tinto should be ordered to withdraw its untimely objections to Vale's Control and Seed Sets.

**Rio Tinto's Refusal to Return or Destroy Training Documents.** Even more distressingly, it has come to light that Rio Tinto violated the strict requirement of the Predictive Coding Protocol to "promptly return[] or destroy[]" all non-responsive documents included in Control Set and Seed Set productions following the resolution of all disputes regarding those documents. This provision was included to protect the confidentiality of documents that are, by definition, unrelated to this lawsuit and therefore outside the ordinary limits of discoverability. The parties resolved all disputes with respect to Vale's Seed Set on June 3. Rio demonstrated it had ignored this rule when, in an email to Vale on June 12, it referenced three non-responsive Excel spreadsheets from Vale's Seed Set containing potentially sensitive financial information and forecasts. Vale immediately demanded that Rio Tinto destroy these documents, and provide confirmation that it had destroyed all documents in its Control and Seed Sets. Rio Tinto refused to do so.

Accordingly, Vale respectfully requests that the Court order that Rio Tinto: (a) withdraw its untimely objections to documents in Vale's Control and Seed Sets, and (b) immediately return or destroy all non-responsive documents from Vale's Control and Seed Sets.

    ii. *Issues with Rio Tinto's Predictive Coding*

     1. *Vale's Position*

Rio Tinto's run to the Court last week was another attempt to distract from the serious methodological concerns that Vale has raised concerning Rio Tinto's predictive coding process. At the last conference, Vale objected to Rio Tinto's failure to train its predictive coding system on four issues of critical importance to Vale's defense in this litigation, specifically:

- Rio Tinto's response to the Government of Guinea's revocation of Rio Tinto's rights to Simandou Blocks 1 and 2 in 2008.

- Rio Tinto's response to the announcement that those Blocks were awarded to BSGR in December 2008.

- Rio Tinto's knowledge about BSGR's operations in Guinea prior to December 2008, including documents concerning its alleged reputation, any rumors concerning its operations, and Rio Tinto's assessment of those rumors.

- Rio Tinto's response to the April 30, 2010 announcement of the Vale-BSGR joint venture.

These topics go to the heart of a number of critical issues, such as the reasons for the Government of Guinea's revocation of Rio Tinto's rights, the allegations of bribery, Rio Tinto's damages, Rio Tinto's awareness of its potential claims, and the adequacy of the steps Rio Tinto

16

took to investigate potential claims. Unfortunately, the 284 responsive documents Rio Tinto used to train its predictive coding system relate overwhelmingly to Rio Tinto's ordinary management and operations of its Simandou concession, with only 11 documents relating to any of the four issues identified above.[11]

Your Honor "agree[d] there needs to be an appropriate number of training document[s] for each subset" of issues, May 28, 2015 Tr. 7:8-9, and you ordered that the parties exchange "synthetic document[s]" to supplement the training undertaken to that point, id. 13:5-7. Vale has provided Rio Tinto with its synthetic documents and is awaiting delivery of Rio Tinto's synthetic documents. We still do not have them. Your Honor explicitly left open the possibility of "additional training documents" used to "retrain and restabilize the system" if the inclusion of synthetic documents did not solve the problem. Id. at 12:1-2; see also id. at 13 ("We will go from there and see what happens as the production continues."). Both Rio Tinto's counsel and their predictive coding expert agreed that additional training would work. Id. at 12:4-5 ("Mr. Chan: Right, any system should be able to do that."); id. at 12:24 ("Ms. McCaffrey: Yes, it can work.").

Immediately following the conference, Vale offered a proposal for addressing Rio Tinto's failure to train on four critical issues. That proposal that would have required Rio Tinto to review fewer than 2,000 additional documents. Vale's proposal sought a full and speedy resolution to Vale's objections now rather than letting this issue fester only to require more cumbersome resolution after the June 30 production deadline. But Rio Tinto rejected that proposal, and instead embarked on a campaign of prevarication and shifting positions that forced Vale to accept a delay in the resolution of its concerns until after "substantial completion" on June 30 and the start of depositions. However, as stated in our letter to the Court last week responding to Rio Tinto, we think that it could be worthwhile to try again to reach a negotiated settlement with the negotiation proceeding with ready access to the Court, we proposed that Rio Tinto, and we are pleased that Rio Tinto agreed to our proposal to meet before Monday's conference.

Recently, Rio Tinto has also revealed to Vale information it had previously withheld about its process that exposes serious flaws in the ways it has measured and validated its results. Specifically, Rio Tinto had claimed that just 0.25% of documents excluded by its predictive coding process (so-called "Purported Non-Responsive Documents") are responsive, but its purported Recall contradicts that estimate, implying a number of excluded responsive documents that is 5 times or more greater than that.[12] The dramatic discrepancy suggests significant flaws

---

[11] At the last conference, Vale identified 9 documents from Rio Tinto's Seed and Training Sets relating to these issues. Rio Tinto claimed falsely at that conference to have a "chart" that identified many more documents related to those issues. When Rio Tinto provided us that chart, we found that of the 97 it claimed as responsive, there were only 2 additional documents that pertained to those issues, with the remainder arguably responsive to Vale's document requests generally, but not with respect to the issues Vale identified.

[12] Rio Tinto's Control Set review purportedly established that approximately 5% (120/2,399) of its Document Universe was responsive. This implies that Rio Tinto's Document (footnote continued)

in either the review of Rio Tinto's Validation Set, its Recall estimates, or both. We have asked that Rio Tinto to explain these discrepancies which appear to reflect significant methodological problems with Rio Tinto's Predictive Coding Process. Rio Tinto has stonewalled Vale on providing that information.

We respectfully request that the Court order Rio Tinto to provide its synthetic document by June 29, 2015 and to provide by the time of the conference a detailed description of its methodology for selecting and reviewing its Validation Set, calculating the 0.25% elusion rate, and calculating its Recall and Precision estimates, including providing an error interval for those estimates.

2. *Rio Tinto's Position*

Yet again, Rio Tinto is forced to say what it has already proven in multiple ways: Rio Tinto appropriately and properly trained its Predictive Coding System under the parties' agreed upon Predictive Coding Protocol. Every possible metric supports that. Indeed, Rio Tinto's validation set showed an Elusion Rate of less than .25%; Rio Tinto has coded over 500 documents as responsive in its Control, Seed and Training Sets; and Rio Tinto is returning an estimated 80.67% Recall rate and an estimated 62.75% Precision rate within the Control Set (which was created with a 95% Confidence +/- 2% margin of error).

Nonetheless, in addition to running Vale's synthetic documents that this Court ordered and to avoid further burdening the Court with these issues, Rio Tinto agreed to meet and confer with Vale to again try to address their specific concerns about four topics that were allegedly missing from Rio Tinto's training materials. But even that effort again demonstrated that Rio Tinto's training had been comprehensive overall, and on the particular topics Vale was concerned about in particular. Specifically, Rio Tinto confirmed that it coded 97 documents as responsive to the relevant document requests related to Vale's allegedly "missing" topics. In addition, at Vale's request, Rio Tinto ran a series of search terms (with particular date ranges – including a period of less than two months for one issue in particular) for each of the four "missing" topics identified by Vale. Those search results found that 83 documents in Rio Tinto's Control, Seed, and Training sets hitting on Vale's proposed search terms and date ranges had already been coded in training alone. Indeed, more than 50% of the documents that were

---

Universe of 2,994,904 documents should contain 149,808 (5%*2,994,904) responsive documents. Rio Tinto claimed in letters to Vale on May 14 and June 2, 2015 an estimated Recall of about 80%, which means that about 20% of responsive documents, or about 29,962 (20%*149,808) documents, had been categorized as Purported Non-Responsive.

This estimate contradicts the purported results of Rio Tinto's Validation Set review. According to Rio Tinto's June 2 letter, that review of 2,399 documents randomly selected from the 2,388,816 Purported Non-Responsive documents contained just 6 responsive documents, 0.25% of the sample. This would imply that there are just 5,975 (0.25%*2,388,816) responsive documents in the Purported Non-Responsive population, about one-fifth of the 29,962 implied by Rio Tinto's Recall estimates

returned by Vale's search terms had already been categorized as responsive by Rio Tinto's predictive coding system as a result of Rio Tinto's training. The bottom line by any objective measure is that, to the extent Rio Tinto has documents responsive to Vale's requests, those documents will be produced to Vale as a result of Rio Tinto's broad and comprehensive training process. Vale's rehashed arguments are moot, untimely, and must come to an end.

     Vale's latest complaint appears to be that Rio Tinto calculated its numbers incorrectly. But Rio Tinto's Recall, Precision, and Validation Set results all have been provided in accordance with the parties' Predictive Coding Protocol and are being calculated exactly how Rio Tinto said it would all along: based off of Control Set measures and statistical sampling of the nonresponsive documents. (*See* Dkt No. 181 at 1-2, noting that "the Control Set…will serve as a benchmark throughout the project…" and that "a last step of validation [will be performed]…on documents coded as non-responsive). In addition, just yesterday Vale informed Rio Tinto of a new dispute relating to Rio Tinto's Validation Set disclosures. Vale's latest sideshow objection is untimely, but more importantly, their arguments are circuitous and ultimately baseless. Vale is manipulating numbers and calculations to tell a story that it wants to tell. In any event, Vale just raised this latest purported issue yesterday; we intend on having the parties' experts meet before our conference in an attempt to understand if there actually is an issue and work it out.

                                                  \*       \*       \*

     The parties will continue to keep the Court informed of their progress as the meet and confer process advances.

Very truly yours,


/s/Michael Lyle
Michael Lyle