2015 WL 1514539
United States District Court,
S.D. New York.

7 WEST 57TH STREET REALTY
COMPANY, LLC, Plaintiff,

v.

CITIGROUP, INC.; Citibank, N.A.; Bank of America
Corp.; Bank of America N.A.; Barclays Bank Plc;
UBS AG; Jpmorgan Chase & Co.; JPMorgan Chase
Bank, National Association; Credit Suisse Group AG;
Bank of Tokyo–Mitsubishi UFJ Ltd.; Coöperatieve
Centrale Raiffeisen–Boerenleenbank B.A.; HSBC
Holdings Plc; HSBC Bank Plc; HBOS Plc; Lloyds
Banking Group Plc; Royal Bank of Canada; the
Norinchukin Bank; Royal Bank of Scotland Group,
Plc; Westlb AG; Westdeutsche Immobilienbank
AG; Deutsche Bank AG, Defendants.

No. 13 Civ. 981(PGG). | Signed March 31, 2015.

*MEMORANDUM OPINION & ORDER*

PAUL G. GARDEPHE, District Judge.

**\*1** On February 13, 2013, Plaintiff 7 West 57th Street Realty
Company, LLC—the assignee of Sheldon H. Solow—filed
this action against Defendants Citigroup, Inc.; Citibank, N.A.;
Bank of America Corp.; Bank of America N.A.; Barclays
Bank Plc; UBS AG; JPMorgan Chase & Co.; JPMorgan
Chase Bank, National Association; Credit Suisse Group
AG; Bank of Tokyo–Mitsubishi UFJ Ltd.; Coöperatieve
Centrale Raiffeisen–Boerenleenbank B.A.; HSBC Holdings
Plc; HSBC Bank Plc; HBOS Plc; Lloyds Banking Group
Plc; Royal Bank of Canada; The Norinchukin Bank; Royal
Bank of Scotland Group, Plc; WestLB AG; Westdeutsche
Immobilienbank AG; and Deutsche Bank AG, alleging that
Defendants colluded to manipulate the London InterBank
Offered Rate for the U.S. dollar ("USD–LIBOR") in 2008.
(Am.Cmplt.(Dkt. No. 95)) Plaintiff claims that Defendants—
who are members of the British Bankers Association (the
"BBA"), and who were responsible for submitting interest
rates that the BBA used to calculate USD–LIBOR in 2008
—violated Section 1 of the Sherman Act, 15 U.S.C. § 1; the
Clayton Act, 15 U.S.C. § 12 *et seq.;* the Racketeer Influenced
and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961

*et seq.;* and New York's Donnelly Act, N.Y. Gen. Bus. Law
§ 340. (Am.Cmplt.(Dkt. No. 95) ¶ 1)

Defendants have moved to dismiss the Amended Complaint.
(Dkt.Nos .114, 139) For the reasons stated below, Defendants'
motions to dismiss will be granted.

## BACKGROUND [1]

### I. *FACTUAL BACKGROUND*

#### A. *THE LIBOR–FIXING SCHEME*
The London InterBank Offered Rate ("LIBOR") is set daily
by the BBA, a non-regulatory body governed by a board
composed of members of various banks. (Am.Cmplt.(Dkt.
No. 95) ¶¶ 39, 40) LIBOR functions as a pricing mechanism
and benchmark for determining, *inter alia,* interest rates for
trillions of dollars in financial instruments worldwide. (*Id.* ¶¶
5, 50–55)

Each day, the BBA calculates and publishes LIBOR for
ten currencies, including the U.S. dollar. (*Id.* ¶ 41) Each of
these currencies is overseen by a separate BBA "Contributor
Panel." (*Id.*) A Contributor Panel consists of various banks
that—as described below—provide submissions to the BBA
that are used to calculate the daily LIBOR for that panel's
particular currency. *See id.*

Defendants are or were members of the Contributor Panel
for the U .S. dollar. (*Id.* ¶ 39) Defendants are also
horizontal competitors across a range of financing activities,
including transactions that expressly incorporate LIBOR as a
benchmark. (*Id* . ¶ 36)

USD–LIBOR is set daily through a process orchestrated by
the BBA. (*Id.* ¶ 43) Each day, the BBA asks the sixteen banks
on the Contributor Panel for USD–LIBOR (the "contributing
banks") "[a]t what rate [of interest] [they] could ... borrow
funds, were [they] to do so by asking for and then accepting
inter-bank offers in a reasonable market size just prior to 11
am[.]" (*Id.*) Under BBA rules, each bank's answer—referred
to as its "contribution" or "submission"—is meant to reflect
the interest rate at which members of the bank's staff who
are primarily responsible for management of the bank's cash
believe that the bank could borrow unsecured interbank funds
in the London money market. (*Id.* ¶ 44) Under BBA rules,
each contributing bank's submission must be based on its own
independent good faith judgment, taking into account market

conditions and the bank's posture as a borrower in the market for interbank loan funds. (*Id.* ¶ 45) The contributing banks' daily submissions to the BBA reflect their costs of borrowing funds at three maturity dates—one-month, three-months, and six-months. (*Id.* ¶ 43)

**\*2** Thomson Reuters—an independent entity—collects the contributing banks' submissions on the BBA's behalf. (*Id.* ¶¶ 47, 49) Using the contributing banks' submissions, Thomson Reuters calculates USD–LIBOR through an "inter-quartile" methodology, in which it discards the four highest and the four lowest submissions, and then averages the remaining eight submissions to arrive at the USD–LIBOR for a given day. (*Id.* ¶ 43)

The BBA requires each contributing bank to arrive at its own daily submission without referring to the submissions of other banks on the Contributor Panel. (*Id.* ¶¶ 44, 46) Each bank is further required to keep its submission confidential until after Thomson Reuters publishes the daily USD–LIBOR. (*Id.* ¶¶ 46, 49) When USD–LIBOR is published, the rates submitted by each individual contributor bank are published as well, so that it is clear how USD–LIBOR was calculated. (*Id.* ¶¶ 46, 47)

The BBA also prohibits banks from submitting contributions based on the pricing of any derivative financial instruments tied to LIBOR. (*Id.* ¶ 44) This prohibition is intended to prevent contributing banks from making submissions based on a motive to maximize profits or minimize losses in connection with such derivative transactions. (*Id.*)

By 2008, however, Defendants were not complying with the BBA's rules governing their submissions. *See id.* ¶ 5. Instead, "Defendants ... manipulate[d] USD–LIBOR by falsely reporting to the BBA the ... interest rates at which the Defendant banks expected they could borrow funds ... on a daily basis." (*Id.* ¶¶ 6, 68, 73) Traders at the contributing banks asked their colleagues who were responsible for submitting rates to the BBA (the "LIBOR submitters") to submit rates that would benefit the bank's own trading positions, as opposed to rates that reflected the bank's good faith judgment of its true cost of borrowing that day. *See, e.g., id.* Traders also requested that other contributing banks do the same. *See, e.g., id.* The traders made these requests through electronic messages, telephone calls, and in-person conversations. *See, e.g., id.* ¶ 61. The LIBOR submitters frequently agreed to accommodate these requests. *See id.* Through their traders' requests—and the LIBOR

submitters' acquiescence—Defendants caused rates to be submitted to the BBA that served Defendants' own financial interests, rather than complying with BBA standards. (*Id.* ¶¶ 5, 6) As a result, USD–LIBOR calculated on the basis of these rates was "artificial" and did not reflect the contributing banks' true costs of borrowing under actual market conditions. (*Id.*)

### B. *SOLOW'S LOANS AND 2008 DEFAULT*

Solow—who assigned his claims related to this action to Plaintiff—pledged a portfolio of more than $450 million in high-grade municipal bonds as collateral for LIBOR-denominated loans in or about 2003. *See id.* ¶¶ 9, 148. Several of these loans were issued by Defendant Citibank, N.A. (*Id.* ¶¶ 9, 15) The interest rate for these loans was determined by reference to USD–LIBOR. *See id.* ¶ 9. For approximately five years, the interest rate on Solow's loans was LIBOR 0.75%. (*Id.* ¶ 148) In March 2008, however, Citibank increased the interest rate on the loans to LIBOR 1.25%. (*Id.* ¶ 148)

**\*3** Statistical analysis indicates that—at certain times between August 31, 2007 and October 22, 2008—there was a negative correlation coefficient relationship between one-month USD–LIBOR rates and Standard & Poor's ("S & P") New York AMT–Free Municipal Bond Index (the "S & P bond index"), which is an index that measures the performance of bonds similar to those in Solow's portfolio. (*Id.* ¶ 156) This analysis suggests that an increase in one-month USD–LIBOR during those periods was, on average, associated with a decline in the value of the bonds listed in the S & P bond index. (*Id.*)

Between September 12, 2008 and October 10, 2008, Defendants' submissions to the BBA for the calculation of USD–LIBOR were higher than their true costs of borrowing, which resulted in the artificial inflation of USD–LIBOR throughout that period. (*Id.* ¶¶ 151, 153–54, 157)

On September 24, 2008, Citibank notified Solow that on five consecutive days between September 17 and September 23, 2008, the value of his bond portfolio had dropped below the value required as collateral for his loans. (*Id.* ¶ 152) Solow was then current on his loans, but Citibank nonetheless declared a technical default and seized Solow's bond portfolio. (*Id.* ¶¶ 9, 149, 152, 158)

On November 3, 2008, Solow's portfolio—which had been worth $450 million when pledged as collateral—sold for

approximately $415 million, net of commissions. (*Id.* ¶ 159) Defendants Citibank, JPMorgan, Bank of America, Barclays, and Deutsche Bank were "direct and indirect" participants in the liquidation of the portfolio, with Citibank purchasing a substantial portion of the portfolio in the first instance. (*Id.* ¶ 158) Because there was still a deficiency in the amount Solow owed following this sale, Citibank seized the portfolio's earned interest of more than $15,000 as well. (*Id.* ¶ 159)

Between October 6 and November 13, 2008, Citibank seized more than $4.2 million in cash from accounts held by Solow. (*Id.*) Citibank claimed that at least $2.1 million of the cash seized was for interest that Solow owed on the loans after default. (*Id.*) In calculating interest, Citibank applied a "default" interest rate, which was LIBOR-denominated and higher than the interest rate that had applied prior to Citibank's declaration of default. (*Id.*)

After these transactions, Citibank still claimed a $67 million deficiency, and demanded immediate payment of the deficiency and an additional $18.5 million in cash collateral. (*Id.* ¶¶ 159, 160) On December 16, 2008, Citibank filed suit against Solow in New York Supreme Court seeking the $67 million deficiency, interest at the default interest rate, $18.5 million in cash collateral and fees, unspecified management fees, expenses, costs, and attorneys' fees. (*Id.* ¶ 161)

On March 24, 2011, Citibank obtained a judgment against Solow in New York Supreme Court for more than $100 million. (*Id.* ¶ 162; Ruffino Decl. (Dkt. No. 118) Ex. D) On February 23, 2012, the lower court's judgment was affirmed by the First Department. *See Citibank, N.A. v. Solow,* 92 A.D.3d 569, 570 (1st Dep't), *leave to appeal denied,* 19 N.Y.3d 807 (N.Y.2012). Solow paid the judgment in full on May 23, 2012. (Am.Cmplt.(Dkt. No. 95) ¶ 162)

## II. *PROCEDURAL HISTORY*

 **\*4**  After satisfying the state court judgment, Solow assigned claims arising out of the events described above to Plaintiff 7 West 57th Street Realty Company. *See id.* ¶ 1. Plaintiff commenced this action on February 13, 2013. (Cmplt.(Dkt. No. 1)) The Amended Complaint was filed on June 11, 2013. (Am.Cmplt. (Dkt. No. 95)) Plaintiff claims that—but for Defendants' conduct—USD-LIBOR would not have been artificially inflated in September 2008, the value of Solow's bond portfolio would not have dropped beneath the value necessary to collateralize Solow's loans with Citibank, and no default on the loans would have been declared. *See id.* Plaintiff further claims that the seizure of Solow's portfolio

and cash, the low prices realized from the sale of the portfolio, the high default interest rates Solow was forced to pay, and the judgment in the state court action all resulted from Defendants' manipulation of USD-LIBOR. *See id.* ¶ 163.

On December 13, 2013, all Defendants moved to dismiss the Amended Complaint. (Dkt. No. 114) Defendants argue that (1) Plaintiff's claims are barred by the applicable statutes of limitations; (2) Plaintiff has failed to state an antitrust claim; (3) Plaintiff has failed to state a RICO claim; (4) Plaintiff's claims are barred by *res judicata* in light of the state court proceedings; and (5) Plaintiff lacks standing to assert Solow's claims. *See* Dkt. Nos. 115, 117.

On October 23, 2014, the foreign bank Defendants requested leave to file a second motion to dismiss—for lack of personal jurisdiction—based on developments in the law of personal jurisdiction since the original motion to dismiss was filed. (Dkt. No. 133) This Court granted Defendants' application, and on December 10, 2014, the foreign bank Defendants filed a motion to dismiss for lack of personal jurisdiction. (Dkt. No. 139)

## *DISCUSSION*

## I. *LEGAL STANDARD FOR MOTION TO DISMISS*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," *Kassner,* 496 F.3d at 237 (citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 87 (2d Cir.2002)), and must "draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s] devoid of 'further factual enhancement,' " *Iqbal* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) (citing *Twombly,* 550 U.S. at 555). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco,* 622 F.3d at 111 (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 54 (2d Cir.1999)).

## II. *PERSONAL JURISDICTION*

**\*5** The Bank of Tokyo–Mitsubishi UFJ, Ltd., Barclays Pank PLC, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc, HSBC Bank plc, Lloyds Banking Group plc, Coöperatieve Centrale Raiffeisen–Boerenleenbank B.A., HBOS plc, the Norinchukin Bank, the Royal Bank of Canada, the Royal Bank of Scotland plc, Portigon AG (f/k/a WestLB AG), and Westdeutsche ImmobilienBank AG (together, the "Foreign Banks") claim that this Court lacks personal jurisdiction over them. (Def. Br. on Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 140) at 1) "Jurisdiction to resolve cases on the merits requires ... authority ... over the parties (personal jurisdiction), so that the court's decision will bind them ." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577 (1999). Accordingly, this Court will address the Foreign Banks' objection to this Court's exercise of personal jurisdiction over them before addressing the arguments brought by all Defendants that Plaintiff has failed to state a claim.

## A. *The Foreign Banks Have Not Waived Their Personal Jurisdiction Objection*

Plaintiff argues that the Foreign Banks have waived their objections as to personal jurisdiction by not raising them in their original motion to dismiss under Rule 12(b). (Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 17) Generally, a party waives any objection to personal jurisdiction by not raising it on a motion to dismiss under Rule 12(b). *See* Fed.R.Civ.P. 12(h)(1)(A) ("A party waives any defense listed in Rule 12(b)(2)-(5) by ... omitting it from a motion described in Rule 12(g)(2) [providing that a party who makes a motion under Rule 12(b) must not make another motion under Rule 12(b) raising a new defense or objection that was available in their earlier motion]"). However, Rule 12(g)(2) provides that only where "a defense or objection ... was available to the party" does its omission from an earlier Rule 12(b) motion constitute waiver. Fed.R.Civ.P. 12(g)(2); *see Hawknet, Ltd. v. Overseas Shipping Agencies,* 590 F.3d 87, 92 (2d Cir.2009) (" '[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could

first have been made.' " (quoting *Holzsager v. Valley Hosp.,* 646 F.2d 792, 796 (2d Cir.1981))).

Plaintiff argues that an objection as to personal jurisdiction was available to the Foreign Banks when they filed their original motion to dismiss in December 2013. (Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 18–19) In *Gucci America, Inc. v. Weixling Li,* 768 F.3d 122 (2d Cir.2014), however, the Second Circuit ruled that a foreign bank similarly situated to the Foreign Banks in this case had not waived its objection to personal jurisdiction, even though the bank had not raised a personal jurisdiction objection in the district court:

> In *Daimler[AG v. Bauman,* 134 S.Ct. 746 (2014) ], the Supreme Court for the first time addressed the question whether, consistent with due process, "a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary." 134 S.Ct. at 759. Assuming without deciding that such contacts may in some circumstances be imputed to the foreign parent, the Court held that a corporation may nonetheless be subject to general jurisdiction in a state only where its contacts are so "continuous and systematic," judged against the corporation's national and global activities, that it is "essentially at home" in that state. *Id.* at 761–62. Aside from "an exceptional case," the Court explained, a corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business. *Id.* at 761 & n. 19. In so holding, the Court expressly cast doubt on previous Supreme Court and New York Court of Appeals cases that permitted general jurisdiction on the basis that a foreign corporation was doing business through a local branch office in the forum. *See id.* at 735 n. 18 (citing *Barrow S.S. Co. v. Kane,* 170 U.S. 100 (1898)[;] *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259 (1917)) ....

**\*6** We conclude that applying the Court's recent decision in *Daimler,* the district court may not properly exercise general personal jurisdiction over the Bank. Just like the defendant in *Daimler,* the nonparty Bank here has branch offices in the forum, but is incorporated and headquartered elsewhere. Further, this is clearly not "an exceptional case" where the Bank's contacts are "so continuous and systematic as to render [it] essentially at home in the forum." *Daimler,* 134 S.Ct. at 761 & n. 19 (alteration in original) (quoting *Goodyear* [*Dunlop Tires Operations, S.A. v. Brown* ], 131 S.Ct. [2846,] 2851 [ (2011) ] )....

Although the Bank appeared in the district court and did not argue there that the court lacked personal jurisdiction, we also conclude that its objection to the exercise of general jurisdiction has not been waived. While arguments not made in the district court are generally waived, *see Datskow v. Teledyne, Inc., Cont'l Prods. Div.,* 899 F.2d 1298, 1303 (2d Cir.1990), "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made," *Hawknet,* 590 F.3d [at] 92 (citation omitted). Accordingly, we have held that a defendant does not waive a personal jurisdiction argument—even if he does not make it in the district court—if the "argument that the court lacked jurisdiction over [the] defendant would have been directly contrary to controlling precedent in this Circuit." *Id.* Prior to *Daimler,* controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York *was* properly subject to general personal jurisdiction here.... Under prior controlling precedent of this Circuit, the Bank was subject to general jurisdiction because through the activity of its New York branch, it engaged in a "continuous and systematic course of doing business in New York." *Hoffritz [for Cutlery, Inc. v. Amajac, Ltd.],* 763 F.2d [55,] 58 [ (2d Cir.1985) ]. Therefore, we conclude that the Bank did not waive its personal jurisdiction objection.

*Gucci Am.,* 768 F.3d at 134–36.

Plaintiff argues that the test applied in *Daimler* was, in fact, established three years earlier in *Goodyear,* 131 S.Ct. at 2851 (2011). *See Daimler,* 134 S.Ct. at 751 ("In *Goodyear* ... we addressed the distinction between general or all-purpose jurisdiction, and specific or conduct-linked jurisdiction. As to the former, we held that a court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.' ... Instructed by *Goodyear,* we conclude that Daimler is not 'at home' in California[.]" (quoting *Goodyear,* 131 S.Ct. at 2851)). Moreover, that same test was applied by the Second Circuit itself prior to *Daimler. See In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 674 (2d Cir.2013) ( "The Supreme Court recently noted that '[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.' " (alteration in original) (quoting *Goodyear,* 131 S.Ct. at 2853–54)).

**\*7** *Gucci America* unequivocally holds, however, that *Daimler* effected a change in the law, providing defendants such as the Foreign Banks with a personal jurisdiction defense that was previously unavailable to them. *Gucci Am.,* 768 F.3d at 135–36. This Court is, of course, bound by *Gucci America.* Accordingly, the Foreign Banks have not waived their personal jurisdiction objection.

### B. *Specific Personal Jurisdiction*

"In litigation arising under federal statutes that do not contain their own jurisdictional provisions, ... federal courts are to apply the personal jurisdiction rules of the forum state, provided that those rules are consistent with the requirements of Due Process." [2] *Penguin Grp.,* 609 F.3d at 35 (internal citation omitted).

"[C]ontacts with [a] forum may confer two types of jurisdiction-specific and general." *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 449, 453 (S.D.N.Y.2005) (footnote omitted). Plaintiff does not contend that there is any basis for the exercise of general jurisdiction here. *See* Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 10–14 (arguing only that "[e]xercising [s]pecific [j]urisdiction [o]ver Defendants is [p]roper"); Oct. 24, 2014 Pltf. Ltr. (Dkt. No. 134) at 1 ("General personal jurisdiction is irrelevant here ...."). "Specific jurisdiction exists when a forum 'exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.' " *Id.* (quoting *Metro. Life Ins. Co.,* 84 F.3d at 567–68 (internal quotation marks and citation omitted)).

### 1. *Specific Personal Jurisdiction Under New York Law*

New York's long-arm statute provides, in relevant part, that a court may exercise specific personal jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state," where plaintiff's claim arises out of that transaction of business or contract. N.Y. C.P.L.R. § 302(a)(1). To establish personal jurisdiction under this section, plaintiff must show that "(1) defendant purposefully availed himself of the privilege of doing business in the forum state such that the defendant could foresee being brought into court there; and (2) plaintiff's claim arises out of or is related to the defendant's contacts with the forum state." *Aqua Prods., Inc. v. Smartpool, Inc.,* No. 04 Civ. 5492(GBD), 2005 WL 1994013, at \*5 (S.D.N.Y. Aug. 18, 2005) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 508, 414

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

(1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980); *Chew v. Dietrich,* 143 F.3d 24, 28 (2d Cir.1998)).

"A court will have personal jurisdiction over a defendant, pursuant to § 302(a)(2), if the defendant 'commits a tortious act within the state.' " *Virgin Enters. Ltd. v. Virgin Eyes LAC,* No. 08 Civ. 8564(LAP), 2009 WL 3241529, at *4 (S.D.N.Y. Sept. 30, 2009) (quoting N.Y. C.P.L.R. § 302(a) (2)). "[T]he New York Court of Appeals has interpreted [this] subsection to reach only tortious acts performed by a defendant who was physically present in New York when he committed the act." *Id.* (citing *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 460 (1965) ("Any possible doubt on this score is dispelled by the fact that the draftsmen of section 302 pointedly announced that their purpose was to confer on the court 'personal jurisdiction' over a non-domiciliary whose act in the state gives rise to a cause of action or, stated somewhat differently, 'to subject non-residents to personal jurisdiction when they commit acts within the state.' ") (citations omitted)). "[I]n *Bensusan Restaurant Corp. v. King,* the [Second Circuit] declined to deviate from the New York Court of Appeals' decision in *Longines–Wittnauer ....*" *Id.* (citing *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 29 (2d Cir.1997)).

 **\*8** Section 302(a)(3) allows for "a nondomiciliary who 'commits a tortious act without the state causing injury ... within the state' [to] be brought before a New York court to answer for his conduct if he has had sufficient economic contact with the State or an active interest in interstate or international commerce coupled with a reasonable expectation that the tortious conduct in question could have consequences within the State." *McGowan v. Smith,* 52 N.Y.2d 268, 273 (1981) (quoting N.Y. CPLR § 302(a)(3)). Under Section 302(a)(3), any non-domiciliary who in person or through an agent " 'commits a tortious act without the state causing injury to person or property within the state' " may be subject to personal jurisdiction if he

> "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives

substantial revenue from interstate or international commerce ...."

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 790–91 (2d Cir.1999) (quoting N.Y. CPLR § 302(a) (3)).

### 2. *Due Process Limits on the Exercise of Specific Personal Jurisdiction*

To satisfy the Due Process Clause, "the nonresident generally must have 'certain minimum contacts ... such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Walden v. Fiore,* 134 S .Ct. 1115, 1121 (2014) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940))). "The inquiry [with respect to specific, personal jurisdiction] ... 'focuses on "the relationship among the defendant, the forum, and the litigation.' ' " *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977))). Accordingly, for this Court "to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum state." *Id.*

Moreover, "the relationship [between the defendant's suit-related conduct and the forum] must arise out of contacts that the 'defendant *himself*' creates with the forum ...." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985)) (emphasis in original). And the " 'minimum contacts' analysis looks to the defendant's contacts with the forum ... itself, not the defendant's contacts with persons who reside there." *Id.* While "a defendant's contacts with the forum ... may be intertwined with his transactions or interactions with the plaintiff or other parties," these relationships, "standing alone, [are] an insufficient basis for jurisdiction." *Id.* at 1123. "Due process requires that a defendant be haled into court in a forum ... based on his own affiliation with the [forum], not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [forum]." *Id.* (quoting *Burger King,* 471 U.S. at 475). In this regard, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 1125.

 **\*9** A defendant need not have committed a physical act within the forum state, however, for his contacts with the

forum to be sufficient; the test may also be satisfied where "an act performed elsewhere[ ] causes an effect in the [forum]." *Eskofot A/S v. E.I. Du Pont De Nemours & Co.,* 872 F.Supp. 81, 87 (S.D.N.Y.1995) (citing *SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir.1990)) (applying minimum contacts analysis in context of Fed.R.Civ.P. Rule 4(k)(2)). Indeed, in *Walden,* the Supreme Court discussed at length how the effects of a defendant's conduct can tie the defendant sufficiently to a forum to permit the exercise of personal jurisdiction. Justice Thomas explained that

> [t]he crux of *Calder* [—a case finding specific personal jurisdiction in California where a Florida-based paper published a defamatory article about a California actress—] was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons .... Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, ... the defendants' intentional tort actually occurred in California.... In this way, the "effects" caused by the defendants' article—*i.e.,* the injury to the plaintiff's reputation in the estimation of the California public —connected the defendants' conduct to *California,* not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Walden,* 134 S.Ct. at 1123–24 (emphasis in original) (footnote omitted).

In this Circuit, "where 'the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff,' " a court is to employ "an 'effects test,' by which 'the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.' " *Tarsavage v. Citic Trust Co., Ltd.,* 3 F.Supp.3d 137, 145 (S.D.N.Y.2014) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 173 (2d Cir.2013) (citing *Calder,* 465 U.S. at 789)). It is not sufficient that conduct incidentally had an effect in the forum, or even that effects in the forum were foreseeable. *See id.* (citing *In re Terrorist Attacks,* 714 F.3d at 674) Instead, the defendant must have intentionally caused—*i.e.,* expressly aimed to cause—an effect in the forum through his conduct elsewhere. *See id.* (citing *In re Terrorist Attacks on Sept. 11, 2001,* 538 F.3d 71, 95 (2d Cir.2008), *abrogated on other grounds by Samantar v. Yousuf,* 560 U.S. 305 (2010)).

### 3. *Analysis*

**\*10** Plaintiff alleges that "[t]his Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this District." (Am.Cmplt.(Dkt. No. 95) ¶ 12) Plaintiff must demonstrate that the Foreign Banks' *suit-related* conduct creates minimum contacts with New York, however, not simply that the Foreign Banks have a presence here or conduct business activities here in general. *Walden,* 134 S.Ct. at 1121. General contacts with New York are not sufficient to establish specific personal jurisdiction. There is precious little in the Amended Complaint demonstrating a connection between the Foreign Banks' alleged suit-related conduct and New York, and there are no allegations demonstrating that any such relationship arose out of contacts that the Foreign Banks created with New York. *See id.* at 1122–23.

Only two paragraphs in the 72–page Amended Complaint (*see* Am. Cmplt. (Dkt. No. 95) ¶¶ 64–65) even hint at a connection between New York and the Foreign Banks' suit-related conduct. In those paragraphs, Plaintiff quotes from a June 6, 2013 *Wall Street Journal* article reporting that " 'several former Barclays derivatives traders and other employees who worked in the bank's New York office' " are under investigation by the U.S. Department of Justice, and that " 'Barclays has fired several employees ... for their alleged roles in attempted Libor manipulation.' " (*Id.* ¶ 64) The *Journal* article goes on to state that the two Barclays

employees who were fired " 'engaged in communications involving inappropriate requests relating to Libor.' " *See id.* ¶ 65. As to the Foreign Banks other than Barclays, nothing of this sort is pled. As to Barclays, these allegations are not sufficient to demonstrate the necessary connection between its alleged suit-related conduct and New York, much less that any relationship between this conduct and New York arose out of contacts that Barclays created with New York. *See Walden,* 134 S.Ct. at 1121–23. Indeed, Plaintiff has not pled facts suggesting that the conduct of the two Barclays employees has any connection with the injury suffered by Solow, or that the misconduct alluded to in the article took place within the relevant time period—September 12, 2008 to October 10, 2008, according to Paragraphs 151, 153–54, 157 of the Amended Complaint.

Accepting the Amended Complaint's allegations that Solow resided in New York and was injured here, due process requires more for the exercise of personal jurisdiction. The Foreign Banks' suit-related conduct must tie them to New York *itself,* not just to a plaintiff who happens to reside in New York. *Walden,* 134 S.Ct. at 1121–22.

The Amended Complaint likewise does not satisfy the "effects test," which requires factual allegations demonstrating that the Foreign Banks' suit-related conduct was " 'expressly aimed' " at New York, in addition to having an effect here. *Tarsavage,* 3 F.Supp.3d at 145 (quoting *Licci,* 732 F.3d at 173). Plaintiff alleges that "[t]he municipal bonds in the Solow portfolio were issued by New York governmental entities," and conducts a statistical analysis of LIBOR's relationship to a New York bond index that is "an index of bonds similar to those in the Solow portfolio." (Am.Cmplt.(Dkt. No. 95) ¶ 156) Plaintiff further alleges that the Foreign Banks' LIBOR manipulations caused the value of Solow's bond portfolio-which contained New York municipal bonds—to fall below the minimum required threshold for his loans' collateral. (*Id.* ¶ 163 ("The purported impairment of Plaintiff's bond portfolio, seizure of the portfolio and cash, the low prices realized in the collateral sale and inflated LIBOR-denominated contract and 'default' interest rates and imposition of fees and expenses *were the result of Defendants' collective manipulations of LIBOR."* ) (emphasis added))

**\*11** Assuming *arguendo* that these allegations are sufficient to demonstrate an effect in New York, Plaintiff has not alleged facts demonstrating that the Foreign Banks " 'expressly aimed' " their conduct at New York or its

municipal bond markets. *See Tarsavage,* 3 F.Supp.3d at 145 (quoting *Licci,* 732 F.3d at 173). Accepting that (1) the artificial inflation of LIBOR caused interest rates to increase; (2) the increase in interest rates caused the value of Solow's bond portfolio to fall below the required threshold; and (3) the negative effect on Solow's portfolio was a foreseeable result of the Foreign Banks' alleged LIBOR manipulation, "the fact that harm in the forum is foreseeable ... is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks,* 714 F.3d at 674. Because the Amended Complaint does not plead facts demonstrating that the LIBOR manipulation was done with the express aim of causing an effect in New York, the "effects test" is not satisfied. *See TarsavaRe,* 3 F.Supp.3d at 145.

This Court does not have specific personal jurisdiction over the Foreign Banks.

### C. *Consent to Personal Jurisdiction*

Plaintiff argues that some of the Foreign Banks have consented to general personal jurisdiction in New York by virtue of their registration with the New York Department of Financial Services and designation of an agent for service of process in New York. (Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 4–10) Plaintiff cites a number of cases for the proposition that such registration and designation amounts to consent to general personal jurisdiction in New York. *See id.* None of these cases are on point, however, because they address registration under provisions of New York law different from those under which the Foreign Banks are registered.

The Foreign Banks are registered under New York Banking Law § 200, which provides that foreign banks operating in New York must "appoint]] the superintendent and his or her successors as its true and lawful attorney, upon whom all process in any action or proceeding against it on a cause of action *arising out of a transaction with its New York agency or agencies or branch or branches,* may be served ...." N.Y. Banking Law § 200(3) (emphasis added). The plain language of this provision limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction. *See Gliklad v. Bank Hapoalim B.M.,* No. 115/95/2014 2014 N.Y. Slip Op 32117(U), at \*5 (Sup.Ct.N.Y.Cnty. Aug. 4, 2014) (Section 200 "provid[es] for the exercise of specific jurisdiction, not general.").

The cases cited by Plaintiff address different registration and licensing provisions, which do not contain the same language

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

limiting claims arising out of the activities of a New York branch or agency. *See, e.g., The Rockefeller Univ. v. Ligand Pharms.,* 581 F.Supp.2d 461, 464–66 (S.D.N.Y.2008) (registration under N.Y. Business Corporation Law § 1304(6) constitutes consent to general jurisdiction). Under the plain language of New York Banking Law § 200 and the holding in *Gliklad*—the only case cited that addresses Section 200—this Court concludes that the Foreign Banks have not consented to general personal jurisdiction in New York.

**D. *Jurisdiction Premised on Co–Conspirators' Acts***

**\*12** Plaintiff also argues that "[t]he Court may ... exercise personal jurisdiction over the [Foreign Banks] based on the acts committed by their co-conspirators." (Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 16) To establish that personal jurisdiction based on the acts of a co-conspirator is appropriate, a plaintiff must demonstrate that " '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant.' " *Maersk, Inc. v. Neewra, Inc.,* 554 F.Supp.2d 424, 442–43 (S.D.N.Y.2008) (quoting *In re Terrorist Attacks on Sept. 11, 2001,* 349 F.Supp.2d 765, 805 (S.D.N.Y.2005) (citations and internal quotation marks omitted)).

The Amended Complaint does not plead sufficient facts to satisfy these requirements. Although Plaintiff repeatedly asserts that the Defendants conspired to injure Solow (*see, e.g.,* Am. Cmplt. (Dkt. No. 95) ¶¶ 33–35, 175–177, 192, 202–204), these allegations are conclusory, and the Court cannot "credit 'mere conclusory statements' or '[t]hreadbare recitals of the elements of a cause of action.' " *Tarsavage,* 3 F.Supp.3d at 144 (quoting *Iqbal,* 556 U.S. at 678).

Plaintiff attempts to support its conclusory allegations by citing guilty pleas, settlements, and accompanying admissions, along with "econometric evidence" of Defendants' LIBOR manipulation. *See* Pltf. Opp. to Motion to Dismiss (Dkt. No. 119) at 35; Am. Cmplt. (Dkt. No. 95) ¶¶ 56–157. Plaintiff has not shown, however, how the banks' guilty pleas, settlements, or admissions demonstrate a conspiracy to cause injury to Solow.

As to Plaintiff's "econometric evidence," Plaintiff's theory appears to be that the LIBOR rates reported during the relevant time period were higher than they would have been

absent a conspiracy among the banks to inflate their LIBOR submissions. However, Plaintiff concedes that the studies on which it relies concluded that (1) " '[i]f banks were truthfully quoting their costs, ... we would expect [their] distributions to be similar' " (*id.* ¶ 143 (quoting Connan Snider and Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* (April 2, 2010)), and (2) the unexpected pattern of divergence between LIBOR quotes and certain other economic indicators " 'cannot establish the presence of a conspiracy or a manipulation of the LIBOR rate, [although] certain patterns do "flag" such a possibility.' " (*Id.* ¶ 144 (quoting Rosa M. Abrantes–Metz, Michael Kraten, Albert D. Metz, and Gim S. Seow, *LIBOR Manipulation?,* 36 Journal of Banking & Finance 136, 149 (2012)) Analysis that "flags the possibility" of a conspiracy is not sufficient to meet the plausibility test under *Iqbal. See Iqbal,* 556 U.S. at 678 (claim for relief must be "plausible on its face").

**\*13** In any event, Plaintiff has not explained how its allegations are sufficient to satisfy the necessary elements for co-conspirator personal jurisdiction set forth above. *See* Pltf. Opp. to Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 157) at 16. This Court concludes that personal jurisdiction over the Foreign Banks cannot be predicated on this theory.

**E. *Personal Jurisdiction Under Fed.R.Civ.P. 4(k)(2)***

Fed.R.Civ.P. 4(k)(2) provides a basis for "the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and laws.' " *Porina v. Marward Shipping Co.,* 521 F.3d 122, 127 (2d. Cir.2008) (quoting Fed.R.Civ.P. 4(k)(2)). Rule 4(k)(2) "fill[s] a gap in the enforcement of federal law for courts to exercise personal jurisdiction over defendants with sufficient contacts with the United States generally, but insufficient contacts with any one state in particular." *In re Terrorist Attacks,* 349 F.Supp.2d at 807 (citations and internal quotation marks omitted).

Here, Plaintiff has alleged claims under three federal statutes: the Sherman Act, the Clayton Act, and the RICO Act. (Am.Cmplt.(Dkt. No. 95) ¶ 1).

"As to the second element, although the Court has already found that Defendants are not subject to personal jurisdiction in New York, Plaintiffs have not certified that Defendants

are not subject to jurisdiction in any other state." *Tamam v. Fransabank Sal,* 677 F.Supp.2d 720, 731 (S.D.N.Y.2010). Accordingly, the second prerequisite for application of Rule 4(k)(2) has not been met. *See id.* A contrary holding would encourage similarly-situated plaintiffs—those suing foreign corporations under federal law—to omit any allegations tying defendants to a specific state, in hopes of engaging the broader minimum contacts analysis of Rule 4(k)(2), which only requires contacts with the United States as a whole. *See Porina,* 521 F.3d at 127. Because Plaintiff has not alleged all of the elements required for the exercise of personal jurisdiction under Rule 4(k)(2), this Court declines to apply that provision here.

* * * *

Because this Court does not have personal jurisdiction over the Foreign Banks, Plaintiffs' claims against them will be dismissed. [3]

### III. *ANTITRUST CLAIM*

Plaintiff alleges that the Defendants violated Section 1 of the Sherman Act by conspiring to "fix[ ], maintain[ ] or ma[ke] artificial prices for LIBOR-based financial instruments, including [Solow's] loans and bond portfolio." (Am.Cmplt. (Dkt. No. 95) ¶ 176) All Defendants have moved to dismiss this claim, arguing, *inter alia,* that Plaintiff has failed to allege an antitrust injury. (Def.Br.(Dkt. No. 115) at 24–29)

#### A. *Antitrust Injury*

**\*14** Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The private right of action to enforce this provision is set forth in Section 4 of the Clayton Act. *See* 15 U.S.C. § 15.

In order for "[a] private plaintiff ... [to] recover damages under § 4 of the Clayton Act[,] ... [the] plaintiff must prove the existence of ,*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O– Mat, Inc.,* 429 U.S. 477, 489 (1977)) (emphasis in original).

"[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny ...." *Id.* "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Id.* at 344 (emphasis omitted). Accordingly, a plaintiff must demonstrate not only an injury resulting from the defendant's conduct, but also that the injury " 'is the type of injury contemplated by the [antitrust] statute.' " *Nichols v. Mahoney,* 608 F.Supp.2d 526, 544 (S.D.N.Y.2009) (quoting *Arista Records LLC v. Lime Grp. LLC,* 532 F.Supp.2d 556, 568 (S.D.N.Y.2007)).

"[P]roof of a per se violation [of the Sherman Act] and of antitrust injury are distinct matters that must be shown independently." *Atl. Richfield,* 495 U.S. at 344 (quotation omitted). Accordingly, "even in cases involving per se violations [of the Sherman Act], the right of action under § 4 of the Clayton Act is available only to those private plaintiffs who have suffered antitrust injury." *Id.*

The Second Circuit "employ[s] a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,* 711 F.3d 68, 76 (2d Cir .2013).

First, the party asserting that it has been injured by an illegal anticompetitive practice must "identify[ ] the practice complained of and the reasons such a practice is or might be anticompetitive." [*Port Dock & Stone Corp. v. Oldcastle Ne., Inc .,* 507 F.3d 117, 122 (2d Cir.2007).] Next, [courts] identify the "actual injury the plaintiff alleges." *Id.* This requires [courts] to look to the ways in which the plaintiff claims it is in a "worse position" as a consequence of the defendant's conduct. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 486 (1977). Finally, [courts] "compar [e]" the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges." *Port Dock,* 507 F.3d at 122. It is not enough for the actual injury to be "causally linked" to the asserted violation. *Brunswick,* 429 U.S. at 489. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." [*Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 438 (2d Cir.2005) ] (internal quotation marks omitted).

**\*15** *Gatt Commc'ns, Inc.,* 711 F.3d at 76.

**B. _In re LIBOR–Based Financial Instruments Antitrust Litigation_**

In _In re LIBOR–Based Fin. Instruments Antitrust Litig._, 935 F.Supp.2d 666, 686, _reconsideration denied_, 962 F.Supp.2d 606 (S.D.N.Y.2013), _appeal dismissed,_ Nos. 13–3565(L); 13–3636(Con), 2013 WL 9557843 (2d Cir. Oct. 30, 2013), _rev'd and remanded sub nom. Gelboim v. Bank of Am. Corp.,_ 135 S.Ct. 897 (2015) (the "MDL"), a court in this District addressed the question of whether plaintiffs sufficiently pled an "antitrust injury" resulting from Contributor Panel banks' manipulation of USD–LIBOR. [4] The MDL consists of "private lawsuits by persons who allegedly suffered harm as a result of the suppression of LIBOR." _In re LIBORBased Fin. Instruments Antitrust Litig._, 935 F.Supp.2d at 676. Plaintiffs in the MDL fall into four categories: (1) plaintiffs who "purchased in the United States, directly from a[d]efendant, a financial instrument that paid interest indexed to LIBOR ... [and allegedly] received lower payments from defendants [due to the suppression of LIBOR]"; (2) "[plaintiffs] who owned ... U.S. dollar-denominated debt securit[ies] ... on which interest was payable ... at a rate expressly linked to the U.S. Dollar Libor rate ... [and allegedly] 'receiv[ed] manipulated and artificially depressed amounts of interest' [due to the suppression of LIBOR]"; (3) plaintiffs who purchased Eurodollar contracts at "supracompetitive prices" because "defendants' suppression of LIBOR caused Eurodollar contracts to trade and settle at artificially high prices"; and (4) plaintiffs who held or purchased LIBOR-based financial instruments that paid a rate of return "directly based on LIBOR," or who purchased fixed-rate based instruments that they "decided to purchase by comparing the instruments' fixed rate of return with LIBOR...." _See id._ at 681–84.

In the MDL, "plaintiffs ... alleged that defendants violated the Sherman Act through a horizontal price-fixing conspiracy .... which [was] ... unlawful ... [in] its effect of restraining competition." _Id._ at 686 n. 7. In particular, plaintiffs claimed that "defendants violated the antitrust laws by conspiring to set LIBOR at an artificial level." _Id._ at 688.

As to antitrust injury, plaintiffs alleged that

> Defendants' anticompetitive conduct had severe adverse consequences on competition in that [plaintiffs] who traded in LIBOR–Based [financial instruments] during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct. As a consequence thereof, [plaintiffs] suffered financial losses and were, therefore, injured in their business or property.

_Id._ at 688 (alterations in original) (citation and quotation marks omitted).

After conducting an exhaustive analysis of the facts concerning LIBOR-setting and the case law surrounding antitrust injury, Judge Buchwald concluded in a March 29, 2013 opinion that "plaintiffs' allegations d[id] not make out a plausible argument that they suffered an antitrust injury ....“ _Id._ at 695. "Plaintiffs, therefore, d[id] not have standing to bring claims pursuant to the Clayton Act." _Id._ "Accordingly, plaintiffs' antitrust claims [were] dismissed." _Id._

 **\*16**  In reaching this conclusion, Judge Buchwald found that

> [a]lthough [plaintiffs'] allegations might suggest that defendants fixed prices and thereby harmed plaintiffs, they do not suggest that the harm plaintiffs suffered resulted from any anticompetitive aspect of defendants' conduct. As plaintiffs rightly acknowledged at oral argument, the process of setting LIBOR was never intended to be competitive. Rather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index. Thus, even if we were to credit plaintiffs' allegations that defendants subverted this cooperative process by conspiring to submit artificial estimates instead of estimates made in good faith, it would not follow that plaintiffs have suffered _antitrust injury._ Plaintiffs' injury would have resulted from defendants' misrepresentation, not from harm to competition.

*Id.* at 688 (emphasis added) (internal citations omitted).

In addition to finding that the LIBOR-setting process was a cooperative and not a competitive exercise, Judge Buchwald concluded that the LIBOR manipulation that Defendants allegedly engaged in was not anti-competitive in its effects:

> [W]ith regard to the market for LIBOR-based financial instruments, plaintiffs have not alleged that defendants' alleged fixing of LIBOR caused any harm to competition between sellers of those instruments or between buyers of those instruments. Plaintiffs' allegation that the prices of LIBOR-based financial instruments "were affected by Defendants' unlawful behavior," such that "Plaintiffs paid more or received less than they would have in a market free from Defendants' collusion," might support an allegation of price fixing but does not indicate that plaintiffs' injury resulted from an anticompetitive aspect of defendants' conduct. In other words, it is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have. Yet here, undoubtedly as distinguished from most antitrust scenarios, the alleged collusion occurred in an arena in which defendants never did and never were intended to compete.
>
> ...
>
> [T]here was similarly no harm to competition in the interbank loan market. As discussed above, LIBOR is an index intended to convey information about the interest rates prevailing in the London interbank loan market, but it does not necessarily correspond to the interest rate charged for any actual interbank loan. Plaintiffs have not alleged that defendants fixed prices or otherwise restrained competition in the interbank loan market, and likewise have not alleged that any such restraint on competition caused them injury. Plaintiff's theory is that defendants competed normally in the interbank loan market and then agreed to lie about the interest rates they were paying in that market when they were called upon to truthfully report their expected borrowing costs to the BBA. This theory is one of misrepresentation, and possibly of fraud, but not of failure to compete.

**\*17** *Id.* at 688–89 (footnote and citation omitted). [5]

In the absence of a "loss stem[ming] from a competition-reducing aspect or effect of the defendant[s'] behavior," *Atl. Richfield,* 495 U.S. at 344 (emphasis omitted), Judge Buchwald concluded that plaintiffs "d[id] not make out a plausible argument that they suffered an antitrust injury." *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 695. Accordingly, she dismissed Plaintiffs' antitrust claims. *Id.*

At least one other court in this District has likewise concluded in a LIBOR-fixing case that plaintiff had failed to plausibly allege antitrust injury. In *Laydon v. Mizuho Bank, Ltd.,* No. 12 Civ. 3419(GBD), 2014 WL 1280464, at \*8 (S.D.N.Y. Mar. 28, 2014), the plaintiff alleged "that he initiated short positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR futures prices proximately caused by Defendants' unlawful manipulation and restraint of trade." *Id.* (internal citations and quotation marks omitted). Judge Daniels ruled that "[p]laintiff fail[ed] to plead an antitrust injury," because he "fail[ed] to plead facts sufficient to establish that this [conduct] 'is or might be anticompetitive.' " *Id.* (quoting *Gatt Commc'ns, Inc.,* 711 F.3d at 76). "At most, Plaintiff allege[d] that prices were distorted." *Id.* Judge Daniels found, however, that "the setting of the USD LIBOR benchmark rate is not competitive; rather it is a cooperative effort wherein otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate index." *Id.* Accordingly, the plaintiff's antitrust claim was dismissed. *Id.* at \*10.

## C. Analysis

Although Plaintiff claims that "the decision in the *LIBOR* MDL has no bearing on the instant case" (Pltf.Br.(Dkt. No. 119) at 32), the theory of antitrust injury in the MDL and in the instant case is essentially the same. In both actions, plaintiffs claim that defendants manipulated USD–LIBOR in such a way as to cause plaintiffs to suffer financial losses. The allegations regarding the manner in which defendants allegedly manipulated LIBOR—through the submission of artificial rates from Contributor Panel banks to the BBA—are the same in both actions. *Compare In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 678–81, *with* (Am.Cmplt.(Dkt. No. 95) ¶¶ 5–9, 39, 50–137).

Plaintiff attempts to dodge the effect of Judge Buchwald's reasoning and determinations by alleging in the Amended Complaint that the LIBOR-setting process is competitive.

*See, e.g.,* Am. Cmplt. (Dkt. No. 95) ¶¶ 39, 44, 38, 39. Plaintiff asserts that the "[MDL] plaintiffs neglected to allege that the LIBOR setting process was competitive, and in fact conceded that it was not during oral argument." (Pltf.Br. (Dkt. No. 119) at 24) Plaintiff argues that—by contrast—it has "specifically allege[d] that LIBOR is a competitively-set rate, [and] that Defendants participate in a daily contest in the marketplace, and [Plaintiff] devotes entire sections of the [Amended Complaint] to explaining the competitive nature of the industry." (*Id.*)

**\*18** In the Amended Complaint, Plaintiff alleges that Defendants "set LIBOR in a process that produces competitively determined daily USD–LIBOR rates and establishes a daily contest between the Defendants to, among other things, signal their relative strength in terms of prestige, credit risk, access to funding, and liquidity." (Am.Cmplt. (Dkt. No. 95) ¶ 39) In support of its claim, Plaintiff alleges that (1) contributor banks are required under BBA rules to independently exercise their own good faith judgment in determining their individual submissions, which reflect their daily competitive postures; (2) banks are further required under BBA rules to keep their submissions confidential before the BBA publishes the daily rate; and (3) the BBA—through Thomson Reuters—publishes the individual banks' daily submissions in announcing USD–LIBOR. (*Id.* ¶¶ 45–48) Plaintiff claims that "[t]he[s]e three key [aspects of the LIBOR-setting process] were designed to ensure that LIBOR would be based on day-to-day competition in the interbank funding markets and elsewhere.... LIBOR could not reflect and move day-to-day based on actual competitive conditions if it was not based upon independent, good faith submissions of the individual panel banks." (*Id.* ¶ 48)

Judge Buchwald correctly rejected this theory of antitrust injury and portrait of the LIBOR-setting process as entirely implausible, however, when plaintiffs in the MDL action moved for leave to amend their antitrust claims after dismissal. *See In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 962 F.Supp.2d at 627. In denying leave to amend, Judge Buchwald noted that "Plaintiffs' allegations [in their proposed second amended complaints] include new ways of packaging previously known facts, such as arguing that the LIBOR-setting rules themselves give rise to competition, and new theories for how defendants compete, such as that they compete over their creditworthiness, that they compete to offer customers the best interest rate benchmark on financial instruments, or that they compete by 'keeping other banks honest' and reporting any improper conduct

by them." *Id.* Judge Buchwald concluded, however, that plaintiffs' new allegations were not plausible and therefore did not sufficiently allege antitrust injury:

> [R]egardless of the creativity they display, none of plaintiffs' allegations make plausible that there was an arena in which competition occurred, that defendants' conduct harmed such competition, and that plaintiffs suffered injury as a result. Even where plaintiffs have identified a market in which defendants are, in fact, competitors, they have not plausibly alleged that each defendant failed to act in its independent individual self-interest. In other words, even if we grant that plaintiffs have alleged a vertical effect—that they suffered harm as a result of defendants' conduct —they have not plausibly alleged a horizontal effect—that the process of competition was harmed because defendants failed to compete with each other or otherwise interacted in a manner outside the bounds of legitimate competition.

**\*19** *Id.* at 627–28.

Similarly here, Plaintiffs allegations that the LIBOR-setting process is "competitive" are not plausible on their face. Indeed, it is obvious that the LIBOR-setting process is a cooperative and not a competitive exercise. *See Laydon,* 2014 WL 1280464, at *8 ("the setting of the USD LIBOR benchmark rate is not competitive; rather it is a cooperative effort wherein otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate index"). Under the BBA rules, each bank was required to use its own "good faith judgment about the interest rate that [the bank] would be required to pay"—not to submit rates that were competitive with those submitted by other banks. (Am.Cmplt.(Dkt. No. 95) ¶ 45) Moreover, as the Amended Complaint acknowledges, "a Contributor Panel bank's LIBOR submissions [were] not [to] be influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR." (*Id.* ¶ 44 (citation and quotation marks omitted)) This allegation supports the notion that, in setting LIBOR, the banks were not competing with one another, but instead were participating in a collective

exercise aimed at generating an objective, "good faith" benchmark, based on which there would be competition. The fact that the benchmark set as a result of the LIBOR-setting process would be a basis for competition does not mean that the cooperative process of collecting submissions used to set LIBOR was a competitive exercise. It was not.

Plaintiff argues, however, that "several other aspects of the LIBOR setting process ... demonstrate that LIBOR setting is a competitive process," including that (1) Thomson Reuters —an agency independent of the BBA—collects, calculates, and publishes the daily LIBOR; (2) any bank that trades in the London market can apply to be on a Contributor Panel; and (3) the interquartile averaging method prevents individual or small groups of banks from influencing LIBOR with false submissions. (*Id.* ¶ 49)

None of these allegations have anything to do with the issue of whether the submission process is competitive. The fact that an outside agency performs the ministerial tasks of collecting, calculating, and publishing the rates says nothing about whether the process is competitive. Likewise, the fact that other banks can apply to join a Contributor Panel does not demonstrate that rates were being competitively submitted. Similarly, the use of the interquartile averaging method suggests a collaborative process, rather than a competitive one. To the extent banks submitted particularly "competitive" rates, those rates would be eliminated as outliers under the interquartile methodology. The process of averaging the eight rates that were closest in value suggests an effort to arrive at an appropriate rate through collaboration and consensus, and not through competition.

The Amended Complaint's allegations that (1) Defendants are "horizontal competitors across a wide range of financing activities" (*id.* ¶ 36); (2) "LIBOR-denominated interest rates [are used] as a threshold or beginning point for competition among themselves in the market for loans to their customers and others" (*id.* ¶ 52); and (3) "LIBOR is also instrumental in establishing market prices for many types of interest-bearing debt securities, including financial instruments that are not specifically LIBOR-denominated" (*id.*¶ 53), add nothing to the analysis. The fact that Defendants compete in the financial markets, and that LIBOR may be the starting point for much of that competition, does not demonstrate that the process of setting LIBOR is a competitive exercise. *See In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 688 ("It is of no avail to plaintiffs that defendants were competitors outside the BBA."). Moreover, nothing in

the Amended Complaint suggests that—as a result of the manipulation of LIBOR—Defendants ceased to compete with one another in the financial markets.

**\*20**  To the extent that Plaintiff argues that the LIBOR-setting process is competitive because it is "designed to ensure that LIBOR would be based on competition in the interbank funding markets" (Am .Cmplt.(Dkt. No. 95) ¶ 48), that argument is also without merit. Plaintiff's allegations do not demonstrate that manipulation of LIBOR had any effect on competition in those markets. As Judge Buchwald stated, "[i]f LIBOR no longer painted an accurate picture of the interbank lending market, the injury plaintiffs suffered derived from misrepresentation, not from harm to competition." *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 692. [6]

Because Plaintiff has not plausibly alleged an antitrust injury, Defendants' motion to dismiss Plaintiff's antitrust claim will be granted. [7]

## IV. *RICO CLAIMS*

Plaintiff also asserts RICO claims, under 18 U.S.C. §§ 1962(c) and (d). (Am.Cmplt.(Dkt. No. 95) ¶¶ 181–82) Plaintiff alleges that "Defendants' collective association, including their participation together as members of the BBA's USD–LIBOR panel, constitutes a RICO enterprise-in-fact," and that "[e]very member of the enterprise participated in the process of misrepresenting its costs of borrowing to the BBA." (*Id.* ¶ 192)

Defendants have moved to dismiss Plaintiff's RICO claims, arguing that (1) the claims are time-barred; (2) Plaintiff seek an improper extraterritorial application of RICO; (3) Plaintiff has not alleged a sufficiently direct relationship between the claim and Solow's injury; (4) Plaintiff has not adequately plead predicate acts of racketeering; (5) the Amended Complaint fails to state a RICO conspiracy claim; (6) Plaintiff's claims are barred by *res* judicata; and (7) Plaintiff lacks standing to assert claims on Solow's behalf. *See* Def. Br. (Dkt. No. 115) at 13–58; Def. Br. (Dkt. No. 117). As discussed below, this Court concludes that Plaintiff's RICO claims are barred by the statute of limitations and by *res judicata,* and does not reach Defendants' remaining arguments.

## A. *Plaintiff's RICO Claims are Time–Barred* [8]

"RICO claims are subject to a four-year statute of limitations." *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 148 (2d Cir.2012) (citations omitted). " 'Federal courts ... generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is ....' " *Id.* (quoting *Rotella v. Wood,* 528 U.S. 549, 555 (2000)). Accordingly, "a RICO claim accrues upon the discovery of the injury alone." *Id.* at 150.

"Under Second Circuit precedent, courts apply an 'inquiry notice' analysis to determine when a plaintiff has discovered his injury[.]" *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 698.

> "Inquiry notice—often called 'storm warnings' in the securities context—gives rise to a duty of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.' In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) '[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose'; and (ii) if some inquiry is made, 'we will impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.' "

**\*21** *Id.* (quoting *Koch,* 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 168 (2d Cir.2005))).

Here, Plaintiff alleges that it was Defendants' manipulations of LIBOR that caused Solow's injury. (Am.Cmplt.(Dkt. No. 95) ¶ 163 ("The purported impairment of [Solow's] bond portfolio, seizure of the portfolio and cash, the low prices realized in the collateral sale and inflated LIBOR-denominated contract and 'default' interest rates and imposition of fees and expenses were the result of Defendants' collective manipulations of LIBOR....") As Plaintiff recognizes, however, a May 29, 2008 *Wall Street Journal* article "detailed" the "divergence between [credit-default spreads ('CDS') ] and LIBOR." (*Id.* ¶ 131; *see id.* ¶¶ 135–36; Shioleno Decl. (Dkt. No. 116) Ex. A) The article-Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate—WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor,* Wall. St. J., May 29, 2008, at A1—states that

Major banks are contributing to the erratic behavior of a crucial global lending benchmark, a Wall Street Journal analysis shows.

The Journal analysis indicates that Citigroup Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for the London interbank offered rate, or Libor, than what another market measure suggests they should be. Those five banks are members of a 16–bank panel that reports rates used to calculate Libor in dollars.

That has led Libor, which is supposed to reflect the average rate at which banks lend to each other, to act as if the banking system was doing better than it was at critical junctures in the financial crisis. The reliability of Libor is crucial to consumers and businesses around the world, because the benchmark is used by lenders to set interest rates on everything from home mortgages to corporate loans.

(Shioleno Decl. (Dkt. No. 116), Ex. A)

Given this article, by at least May 29, 2008, Plaintiff was on inquiry notice of the fact that LIBOR rates may have been manipulated. *See In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 708, 710 ("Here, not only were LIBOR and each bank's LIBOR submission publicly available on a daily basis, but benchmarks of general interest rates and each bank's financial health were also publicly available .... [T]he *Wall Street Journal* analysis [by Mollenkamp and Whitehouse] compared the LIBOR fixes and quotes to these benchmarks to conclude that LIBOR was likely artificial. In other words, by May 29, 2008, plaintiffs' investigative work had already been done for them and had been published in the pages of the *Wall Street Journal....* [P]laintiff's were on inquiry notice of their injury by May 29, 2008 ...."); *see also BPP Ill, LLC v. Royal Bank of Scot. Grp., PLC,* No. 13 Civ. 0638(JMF), 2013 WL 6003701, at \*8 (S.D.N.Y. Nov. 13, 2013) ("By May 29, 2008, ... there were at least seven articles in major publications [including the May 29, 2008 *Wall Street Journal* article] reporting that there was substantial evidence to support the conclusion that LIBOR was artificially low and had been so for some time. Those articles were sufficient 'storm warnings' to 'awaken inquiry' into the possibility that U.S. Dollar LIBOR was not, as Defendants allegedly represented to the BPP Plaintiffs to induce them into the swap agreement, 'a legitimate and reliable market-based interest rate.' ").

**\*22** Plaintiff alleges no facts suggesting that Solow undertook an inquiry into the cause of his injury—the Defendants' alleged LIBOR manipulation—over the next four years. Accordingly, Solow "[is] deemed to have knowledge of [his] injury at the point at which the duty to inquire arose, and the period of limitations starts to run on that date." *In re LIBOR–Based FinInstruments Antitrust Litig.,* 935 F.Supp.2d at 698.

Plaintiff argues, however, that the statute of limitations should be tolled, because Defendants subsequently provided reassurances that LIBOR was not being manipulated, and because they fraudulently concealed their manipulation of LIBOR. (Pltf.Br.(Dkt. No. 119) at 20–28) Because (1) the LIBOR manipulation scheme had been made public, and (2) Defendants' "reassurances" that no manipulation had occurred would have been entirely self-serving, Plaintiff's tolling argument fails. *See In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 710–11 ("Here, plaintiffs have not adequately alleged fraudulent concealment. For one, they did not 'remain[ ] unaware of [defendants'] violation during the limitations period,' as they were on notice no later than May 29, 2008, that they had likely been injured. Moreover, because of this, they could not have reasonably relied on defendants' and the BBA's reassurances that LIBOR was accurate. For the same reason, defendants' alleged manipulation [of LIBOR] was not self-concealing.... Here, ... Thomson Reuters published daily both the final LIBOR fix and the quotes from each of the panel banks. A person of ordinary intelligence could have reviewed the submitted quotes along with numerous articles analyzing these quotes and explaining why they were likely artificial. Under these circumstances, plaintiffs have not adequately alleged fraudulent concealment."); *see also BPP Ill., LLC,* 2013 WL 6003701, at \*8–9 ("Plaintiffs' arguments [regarding the statute of limitations] ... are unpersuasive. First, Plaintiffs point to the fact that the BBA itself defended the integrity of LIBOR in some of the very articles highlighting LIBOR's potential unreliability. Affirmative public denials of wrongdoing can, in some circumstances, weigh against a finding of inquiry notice. But a plaintiff may rely on such reassuring representations only if it is reasonable to do so. Here, given the BBA's 'strong incentive to maintain market confidence in LIBOR's integrity,' and the fact that its public denials flew in the face of the data marshaled by the newspaper articles discussed above, a reasonable person would have at least inquired further before accepting the BBA's representations.... Plaintiffs' fraudulent concealment

argument ... fails for the same reason that they cannot rely on the discovery rule: However reasonable it may have been to rely on Defendants' statements about the reliability of LIBOR in early 2008, it was no longer reasonable to do so by late May 2008 in the face of substantial reports to the contrary.") (internal citations omitted).

**\*23** Because Solow was on inquiry notice as of May 29, 2008, and no inquiry was pursued, RICO claims had to be brought by May 29, 2012. Plaintiff's RICO claims were not filed until February 13, 2013, however. (Cmplt.(Dkt. No. 1)) Accordingly, those claims are time-barred.

**B. *Plaintiff's RICO Claims Are Also Barred By Res Judicata***

Even if Plaintiff's RICO claims were not barred by the statute of limitations, they would be barred by *res judicata,* given the judgment in the state court action brought by Citibank against Solow .[9] (Def.Br.(Dkt. No. 117) at 8–18)

The doctrine of *res judicata* provides that

> "a valid, final judgment, rendered on the merits, constitutes an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand. It operates to bind the parties both as to issues actually litigated and determined in the first suit, and as to those grounds or issues which might have been, but were not, actually raised and decided in that action. The first judgment, when final and on the merits, thus puts an end to the whole cause of action."

*Epperson v. Entm't Express, Inc.,* 242 F.3d 100, 108–09 (2d Cir.2001) (quoting *Saylor v. Lindsley,* 391 F.2d 965, 968 (2d Cir.1968) (citations omitted)).[10] "The policies underlying res *ludicata* reflect the sensible goal that where possible all related claims be resolved in one proceeding ...." (*Id.* at 109).

"Whether a claim is precluded depends on " 'whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." ' " *Blue Ridge Invs., LLC v. Republic of Arg.,* 902 F.Supp.2d 367, 382 (S.D.N.Y.2012) (quoting

*Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *N.L.R.B. v. United Techs. Corp.,* 706 F.2d 1254, 1260 (2d Cir.1983))); *see TechnoMarine SA,* 758 F .3d at 499 ("Whether a claim that was not raised in the previous action could have been raised therein depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." (internal quotation marks omitted)). "[W]hatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of *res judicata." Berlitz Schs. of Languages of Am., Inc. v. Everest House,* 619 F.2d 211, 215 (2d Cir.1980).

### 1. *Final Judgment on the Merits*

Here, there is no question that there has been a final judgment on the merits. On March 24, 2011, Citibank obtained a judgment against Solow in New York Supreme Court requiring him to pay more than $100 million in damages to Citibank. (Am.Cmplt.(Dkt. No. 95) ¶ 162; Ruffmo Decl. (Dkt. No. 118), Ex. D) The judgment was affirmed by the First Department on February 23, 2012. *See Citibank, N.A. v. Solow,* 92 A.D.3d 569, 570 (1st Dep't), *leave to appeal denied,* 19 N.Y.3d 807 (2012). Solow paid the judgment in full on May 23, 2012. (Am.Cmplt.(Dkt. No. 95) ¶¶ 162–63)

### 2. *Same Transaction or Occurrence*

**\*24** The prior proceeding also arose out of the same transactions and occurrences alleged here. In that proceeding, Citibank claimed that

> [t]h[e] case [arose] out of Solow's failure to repay in full loans from Citibank and to provide cash collateral for letters of credit issued by Citibank. The loans were made and the letters of credit were issued or continued in existence under two lines of credit (one for $490,000,000 and one for $13,000,000) and were secured by securities in custodial accounts held by Citibank. Citibank has liquidated its collateral and has set off against cash on deposit in Solow's accounts at Citibank, all as allowed under the governing documents and applicable law. The $13,000,000 line of credit has now been repaid, but more than $67,000,000 in loans and over $18,500,000 in letters of credit remain outstanding under the $490,000,000 line of credit.

Citibank determined that, as of September 23, 2008, the market value of the Pledged Collateral had fallen below $463,000,000 for five consecutive business days.

[ ] By letter dated September 24, 2008, Citibank provided notice of a Margin Call to Solow demanding that Solow deposit within two business days collateral acceptable to Citibank with a market value of not less than $11,319,494....

[ ] By letter dated September 26, 2008, Citibank informed Solow that the market value of additional Pledged Collateral required to satisfy the Margin Call had increased to $13,561,794 and stated that if Solow did not furnish by the close of business on September 26, 2008 additional Pledged Collateral in an amount sufficient to cause the market value of all Pledged Collateral in Citibank's possession to equal or exceed $463,000,000, Citibank might begin to sell any or all of the Pledged Collateral.

[ ] By letter dated September 30, 2008, Citibank demanded the immediate payment of all amounts outstanding under the $13,000,000 Note and stated that Solow's obligations thereunder that were not paid by October 2, 2008 would bear interest at the overdue rate set forth in the $13,000,000 Note. Citibank informed Solow that it might begin to sell any or all of the Pledged Collateral at any time to satisfy Solow's obligations under the $13,000,000 Note.

[ ] By a second letter dated September 30, 2008, Citibank demanded the immediate payment of all amounts outstanding under the $490,000,000 Note and indicated that Solow's obligations thereunder that were not paid by September 30, 2008 would bear interest at the overdue rate set forth in the $490,000,000 Note. Citibank informed Solow that it might begin to sell any or all of the Pledged Collateral at any time to satisfy Solow's obligations under the $490,000,000 Note.

[ ] Between October 7 and November 3, 2008, Citibank sold all saleable assets from the Pledged Accounts on the open market for a total, net of any commissions and fees, of $415,120,803.10, and applied this amount to Solow's loan obligations.

[ ] On October 9 and October 13, 2008, interest in the aggregate amount of $15,261.46 was earned on account of the Pledged Collateral, and Citibank applied this amount to Solow's loan obligations.

**\*25** [ ] On October 6, November 3, and November 13, 2008, Citibank set off a total of $4,247,786.23 against cash on deposit in accounts maintained by Solow at Citibank. Of this amount, Citibank applied $2,099,802.93 to Solow's outstanding principal loan obligations and $2,147,983.30 to Solow's accrued interest obligations.

[ ] Following these applications, the $13,000,000 Note was paid in full and the outstanding principal balance due under the $490,000,000 Note was reduced to $67,094,168.56 (the "Loan Shortfall").

[ ] By letter to Solow dated November 18, 2008, Citibank demanded immediate payment of the Loan Shortfall and all other obligations due under the 2008 Loan Documents. With respect to the Letters of Credit, Citibank demanded, without limitation, that Solow deposit cash collateral in the amount of $18,582,168.49 to secure his reimbursement obligations under the Letters of Credit, replace the Letters of Credit with letters of credit from another financial institution, or cause the Letters of Credit to be cancelled with the consent of the beneficiaries.

[ ] To date, Solow has failed to pay the Loan Shortfall and his other obligations and has failed to collateralize, replace, or cause to be cancelled the outstanding Letters of Credit.

(Ruffino Decl. (Dkt. No. 118) Ex. L ("Cmplt.") ¶¶ 6, 48–58)

This same series of "transactions and occurrences" gives rise to Plaintiff's claims here. *See* Am. Cmplt. (Dkt. No. 95) ¶¶ 9, 147–49, 159–60. Moreover, in the state court action, Solow litigated Citibank's declaration of default, sale of collateral, and imposition of default interest rates, arguing—*inter alia*—that the value of the collateral had been determined in bad faith. *See Citibank, N.A.,* 92 A.D.3d at 569–70; Aug. 28, 2013 Rufino Decl. (Dkt. No. 118) Ex. A ("Mar. 26, 2010 State Court Decision") at 6–13; *id.* Ex. B ("Solow Answer") ¶¶ 79–87. The state court rejected Solow's arguments on the merits. (Mar. 26, 2010 State Court Decision (Dkt. No. 118) at 13) Although Plaintiff now asserts a new legal theory—that the declaration of default, low sale price of the collateral, and default interest rates are all related to Citibank's and the other Defendants' manipulation of LIBOR—alternate legal theories are not sufficient to avoid the *res judicata* effect of a prior judgment. *See Berlitz Schs.,* 619 F.2d at 215.

### 3. *Same Parties or Their Privies*

The next issue is whether this action involves the same parties or their privies. "[C]ourts of [New York] have found that the concept of privity 'requires a flexible analysis of the facts and circumstances of the actual relationship between the party and nonparty in the prior litigation [.]' " *Syncora Guar. Inc. v. J.P. Morgan Sec. LLC,* 110 A.D.3d 87, 93 (1st Dep't 2013) (quoting *Evergreen Bank v. Dashnaw,* 246 A.D.2d 814, 816 (3d Dep't 1998)); *see also Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir.1987) ("The doctrine of privity, which extends the *res judicata* effect of a prior judgment to nonparties who are in privity with the parties to the first action, is to be applied with flexibility.") (citation omitted).

**\*26** There is no question that Defendant Citibank, N.A., was a party to the state court action. *See Citibank, N.A.,* 92 A.D.3d at 570. As to Solow, Plaintiff claims that it is the assignee of Solow's claims for injuries arising out of Citibank's declaration of default on his loans in September 2008. *See* Am. Cmplt. (Dkt. No. 95) ¶ 1. Plaintiff is therefore in privity with Solow for *res judicata* purposes. *See Savini v. Sheriff of Nassau Cnty.,* 209 F.Supp. 946, 952 (E.D.N.Y.1962) ("[I]t is abundantly clear that the defense of *res judicata* applies against an assignee as it does against his assignor.") (citations omitted); *In re Slocum ex rel. Nathan A. v. Joseph B.,* 183 A.D.2d 102, 103 (3d Dep't 1992) ("Under current New York law, privity of a nonparty to a prior litigation with a party to that litigation [for *res judicata* purposes] refers to 'a relationship with [the] party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation.' ") (alteration in *In re Slocum* ) (quoting *D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 76 N.Y.2d 659, 664 (1990)). Accordingly, Plaintiff's RICO claims against Citibank are barred by *res judicata.*

The other Defendants were not named in the prior state court action, but may properly be considered in privity with Citibank for *res judicata* purposes. Plaintiff's theory is that Citibank and its co-defendants conspired to manipulate LIBOR and, in doing so, caused Plaintiff's injuries. With respect to its RICO claims, Plaintiff alleges that "Defendants, in concert and with the assistance of brokers and co-conspirators, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to suit their needs of the moment." (Am.Cmplt.(Dkt. No. 95) ¶ 193; *see also id.* ¶ 5 ("This case arises from the collusion to manipulate and manipulation of LIBOR for the U.S. dollar ...."); *id.* ¶ 6 ("Defendants conspired to, and did,

manipulate USD–LIBOR by falsely reporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow funds—*i.e* ., their true costs of borrowing—on a daily basis.... By acting together and in concert to knowingly falsely report borrowing costs, Defendants colluded to manipulate and manipulated USD–LIBOR ...."); *id.* ¶ 9 ("Notwithstanding the fact that Solow was at all times current on [his] loans, at a time when Defendants' collusion and manipulations caused LIBOR to be artificially inflated, Citibank declared Solow's bond portfolio collateral to be inadequate for having dropped below the required minimum value, declared a technical default, seized the bond portfolio and sold it off including to itself and on information and belief to other defendants, at prices that were artificially low as a result of their collusion and manipulation of USD–LIBOR, and further imposed a LIBOR-denominated 'default' interest rate rather than the LIBOR-denominated contract rate."); *id.* ¶ 33 ("Various other persons, firms and corporations, unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.")) Plaintiff further alleges that "[e]ach of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein." (*Id.* ¶ 34)

**\*27** Accordingly, "[a]lthough [Citibank's co-defendants] w[ere] not named ... in [the prior] suit ..., the pleadings are sufficient to support a finding of privity—*i.e.,* the legal conclusion that the relationship between the parties is sufficiently close to warrant claim preclusion. Courts have held that alleged co-conspirators are 'in privity' with one another for *res judicata* purposes." *Discon Inc. v. NYNEX Corp.,* 86 F.Supp.2d 154, 166 (W.D.N.Y.2000) (internal citation omitted); *see also In re Teltronics Servs., Inc.,* 762 F.2d 185, 192 (2d Cir.1985) ("LM Ericsson TeleComm, Inc., was alleged to be a co-conspirator in the second Southern District action filed by Teltronics against the Ericsson defendants, and is entitled to the *res judicata* effect of that decision."); *Fonseca v. Columbia Gas Sys., Inc.,* 37 F.Supp.2d 214, 228 (W.D.N.Y.1998) ("I find that a sufficiently close relationship existed between the alleged coconspirators to preclude plaintiff from proceeding against any of them in this subsequent, separate action."); *Somerville House Mgmt., Ltd. v. Arts & Entm't Television Network,* 92 Civ. 4705(LJF), 1993 WL 138736, at \*2 (S.D.N.Y. Apr. 28, 1993) ("[N]ewly-added defendants may assert a *res judicata* defense as long as the 'newly-added defendants have a sufficiently close relationship to the original defendant.' ...

[A] number of courts have found that alleged coconspirators can be considered 'in privity' with one another for *res judicata* purposes ....") (quoting *Official Publ'n, Inc. v. Kable News Co.,* 811 F.Supp. 143, 147 (S.D.N.Y.1993)) (citations omitted); *McLaughlin v. Bradlee,* 599 F.Supp. 839, 847 (D.D.C.1984) ("The defendants here may defensively assert claim preclusion against McLaughlin even though none of the prior suits named all six of them as defendants.... [T]he defendants in the present suit are closely related to those named in the 1981 complaints[ ] ... [and] there is only one alleged conspiracy."), *aff'd,* 803 F.2d 1197 (D.C.Cir.1986).

"*Res judicata* operates to preclude claims, rather than particular configurations of parties; Plaintiff's addition of new defendants, in the context of allegations of their involvement in the series of alleged deprivations, does not entitle [it] to revive the previously-[decided] claims," *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003), or to litigate claims "which might have been, but were not, actually raised and decided in [the earlier] action." *Epperson,* 242 F.3d at 108 (citation and quotation marks omitted); *cf. Official Publ'ns, Inc.,* 811 F.Supp. at 147 ("The doctrine of *res judicata* also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant.... Where the 'new' defendants are sufficiently related to one or more of the defendants in the previous action which arises from the same transaction all defendants may invoke *res judicata*") (citations omitted).

### 4. *Plaintiff's RICO Claims Could Have Been Asserted in the Prior Action*

**\*28** Plaintiff argues, however, that its RICO claims are not barred by *res judicata,* because they could not have been asserted as counterclaims in the state court action. *See* Pltf. Br. (Dkt. No. 120) at 8. Plaintiff is mistaken. Solow could have asserted—as counterclaims in the state court action—the same RICO claims that Plaintiff asserts here. *See Tafflin v. Levitt,* 493 U.S. 455, 458, 467 (1990) ("[S]tate courts have concurrent jurisdiction over civil RICO claims."). In bringing RICO counterclaims, Solow could also have joined Citibank's co-defendants as parties. *See* N.Y. C.P.L.R. § 3019(a) ("A counterclaim may be any cause of action in favor of ... [a] defendant [ ] ... against ... a plaintiff and other persons alleged to be liable."). "While New York does not have a compulsory counterclaim rule, a party is not free to remain silent in an action in which he is the defendant and then bring a second

action seeking relief inconsistent with the judgment in the first action by asserting that it is simply a new legal theory." *Henry Modell & Co. v. Minister, Elders & Deacons of Reformed Protestant Dutch Church of City of N.Y.,* 68 N.Y.2d 456, 461 (N.Y.1986) (internal citation omitted); *Santiago v. Lalani,* 256 A.D.2d 397, 399 (2d Dep't 1998)* (same); *Se Dae Yang v. Korea First Bank,* 247 A.D.2d 237, 237–38 (1st Dep't 1998) (same). Because Plaintiff's RICO claims arise out of the same transactions and occurrences as those at issue in the state court action, those claims could have and should have been pursued in that action. *Cf. Bin Saud v. Bank of N.Y.,* 734 F.Supp. 628, 633 (S.D.N.Y.1990), *aff'd sub nom. Saud v. Bank of N.Y.,* 929 F.2d 916 (2d Cir.1991)* ("[W]hen a party fails to raise the defense of fraud in an initial action, a subsequent collateral challenge to an adverse judgment rendered in that initial action under the guise of a fraud based RICO claim may be barred by *res judicata."* ).

Plaintiff also argues that Solow could not have raised claims related to LIBOR manipulation in the earlier state court action because he "had no knowledge of any of the instant claims prior to or even while the earlier lawsuit was pending." (Pltf.Br.(Dkt. No. 120) at 8) "As a general rule, newly discovered evidence does not preclude the application of *res judicata,"* however. *Saud,* 929 F.2d at 920 (citing *Guerrero v. Katzen,* 774 F.2d 506, 508 (D . C.Cir.1985)). "Exceptions to this rule exist when the evidence was either fraudulently concealed or when it could not have been discovered with due diligence." *Id.*

Here—as the Amended Complaint acknowledges, and as this Court recounted in finding Plaintiff's RICO claims time-barred—the *Wall Street Journal* reported on May 29, 2008—several years before the state trial court entered judgment against Solow—that Defendants had been "reporting significantly lower borrowing costs for the London interbank offered rate, or Libor, than what another market measure suggests they should be," and that as a result, LIBOR was artificially low. (Shioleno Decl. (Dkt. No. 116), Ex. A; *see also BPP Ill., LLC,* 2013 WL 6003701, at *8 ("By May 29, 2008, ... there were at least seven articles in major publications [including the May 29, 2008 *Wall Street Journal* article] reporting that there was substantial evidence to support the conclusion that LIBOR was artificially low and had been so for some time.").

 **\*29** According to the Amended Complaint, press reports concerning Defendants' possible manipulation of the LIBOR rate continued in subsequent years. Another flurry of media

reports concerning this issue appeared in mid-March 2011 —also before the state trial court had entered judgment against Solow. According to Plaintiff, a "public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011," when Defendant UBS disclosed in an SEC filing that it had received subpoenas from the SEC, the CFTC, and the U.S. Department of Justice "in connection with investigations regarding submissions to the BBA ." (*Id.* ¶ 81 (citation, quotations marks, and brackets omitted)) UBS disclosed that "the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." (*Id.* (citation, quotations marks, and brackets omitted))

On March 16, 2011, the Financial Times reported that

> UBS, Bank of America, Citigroup, and Barclays had received subpoenas from U.S. law enforcement agencies "probing the setting of" LIBOR "between 2006 and 2008." The Financial Times further noted that investigators had "demanded information from" WestLB, and that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar LIBOR rate during 2006–08 received informal requests for information."

(*Id.* ¶ 82) Plaintiff asserts that on March 17, 2011, Bloomberg reported that "Barclays, Citigroup and Bank of America had received subpoenas from U.S. authorities investigating whether some firms manipulated the setting of LIBOR and Defendants WestLB and Lloyds had been contacted by the authorities." (*Id.* ¶ 83 (citation, quotations marks, and brackets omitted)) According to Plaintiff, on March 23, 2011, Bloomberg reported that Defendants Citigroup, Deutsche Bank, Bank of America, and JPMorgan had been asked by U.S. authorities "to make employees available to testify as witnesses in a probe of potential interest-rate manipulation in connection with the ongoing LIBOR investigation." (*Id.* ¶ 84 (citation and quotation marks omitted)) All of these articles were published prior to the state trial court's entry of judgment against Solow, and put Solow on notice of the LIBOR-manipulation scheme that Plaintiff alleges here.

Even accepting Plaintiff's allegation that Solow did not know that the media reports concerning Defendants' LIBOR manipulation were true, these news reports put Solow on inquiry notice. With the exercise of due diligence, he could have learned the details of the LIBOR manipulation and asserted his claims accordingly. Because Solow "had sufficient information to create a duty of further

investigation," Plaintiff may not avoid the effects of *res judicata. See Saud,* 929 F.2d at 921 (holding that RICO claims were barred by *res judicata;* "[E]ven if Saud did not know the full extent of the Bank's alleged fraud at the time the Guaranty Action was commenced, his pleadings in that suit demonstrated that he had sufficient information to create a duty of further investigation.... Indeed, given the substantial amount of money at stake in the Guaranty Action, Saud had a strong incentive to actively litigate his defense and further uncover evidence of fraud. Having failed to undertake that inquiry, Saud is chargeable with full knowledge of the fraud.") (citing *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) ("The test as to when fraud should with reasonable diligence have been discovered is an objective one.... '[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.' " (citing *Higgins v. Crouse,* 147 N.Y. 411, 416 (1895))).

* * * *

**\*30** Plaintiff's RICO claims will be dismissed because they are barred by the applicable statute of limitations and by *res judicata.*

## V. *STATE LAW CLAIM*

"[U]nder 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." *Schaefer v. Town of Victor,* 457 F.3d 188, 210 (2d Cir.2006) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351 (1988)). "[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice." *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 103 (2d Cir.1998) (emphasis omitted) (citing *Carnegie–Mellon Univ.,* 484 U.S. at 350). There is no reason to deviate from this rule here. Accordingly, the Court declines to exercise supplementary jurisdiction and will dismiss Plaintiff's remaining state law claim under N.Y. Gen. Bus. Law § 340.

## VI. *LEAVE TO AMEND*

Plaintiff requests leave to amend in the event that this Court grants Defendants' dismissal motion. (Pltf.Br.(Dkt. No. 119) at 55) Leave to amend should be "freely give[n] ... when justice so requires." Fed.R.Civ.P. 15(a)(2). District courts "ha[ve] broad discretion in determining whether to grant leave to amend ...." *Gurary v. Winehouse,* 235 F.3d 793, 801 (2d Cir.2000). Leave to amend may properly be denied in cases of " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " *Ruotolo v. City of N.Y .,* 514 F.3d 184, 191 (2d Cir.2008) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)); *see also Murdaugh v. City of N.Y., No.* 10 Civ. 7218(HB), 2011 WL 1991450, at \*2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile.") (citations omitted).

Given that Plaintiff's RICO claims are barred by the statute of limitations and *res judicata,* it is clear that any amendment would be futile. Accordingly, leave to amend is denied as to those claims.

As to Plaintiff's antitrust claim, it appears unlikely that Plaintiff can plead facts sufficient to cure the defects noted in this opinion. Moreover, in *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 962 F.Supp.2d at 627–28, Judge Buchwald found that the attempt to amend the antitrust claim was futile. Nevertheless, this Court will permit Plaintiff to move to amend the Amended Complaint within thirty days of this decision.

### *CONCLUSION*

For the reasons stated above, Defendants' motions to dismiss the Amended Complaint are granted. Any motion for leave to file a second amended complaint is to be filed by April 30, 2015. The Clerk of the Court is directed to terminate the motions (Dkt.Nos.114, 139).

**\*31** SO ORDERED.

### Parallel Citations

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

Footnotes

1  The following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendants' motions to dismiss. *See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir.2007).* In resolving Defendants' motions, the Court has also considered documents that are incorporated into the Amended Complaint by reference, including non-prosecution and deferred prosecution agreements that certain Defendants entered into with the United States Department of Justice, as well as certain press releases and news articles concerning the manipulation of LIBOR. *See* Am. Cmplt. (Dkt. No. 95) ¶¶ 59–126. "In assessing the legal sufficiency of [a plaintiff's] claim[s] [on a motion to dismiss,]" the court may "consider ... the complaint and any documents attached thereto or incorporated by reference and 'documents upon which the complaint "relies heavily." ' " *Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir.2012)* (quoting *In re Citigroup ERISA Litig., 662 F.3d 128, 135 (2d Cir.2011)* (quoting *DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir.2010)*)). The Court has also taken judicial notice of public filings in New York state court proceedings brought by Defendant Citibank, N.A. against Solow. *See Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir.2006)* (" '[In deciding a motion to dismiss,] [a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir.1998)*).

2  Before analyzing the forum state's rules regarding the exercise of personal jurisdiction, it is necessary to address the applicability of the nationwide personal jurisdiction provisions in the RICO statute and the Clayton Act. These federal laws provide the bases for two of Plaintiff's causes of action.

The Second Circuit has noted that the RICO statute "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found.... [A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., 138 F.3d 65, 71 (2d Cir.1998).* Additional defendants may be subject to nationwide personal jurisdiction, but "[t]his jurisdiction is not automatic[;][it] requires a showing that the 'ends of justice' so require." *Id.* The "ends of justice" requirement is satisfied where "there is no district with personal jurisdiction over all defendants." *Id.* at 71 n. 5; *see also Daly v. Castro Llanes, 30 F.Supp.2d 407, 413 (S.D.N.Y.1998)* ("The phrase 'ends of justice require' has been interpreted to mean that § 1965(b) authorizes an assertion of personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action.").

Only "if the allegations in the Complaint state[ ] a viable RICO claim, ... would [it] be proper to exercise 'ends of justice' RICO jurisdiction," however. *Elsevier Inc. v. W.H.P.R., Inc., 692 F.Supp.2d 297, 315 (S.D.N.Y.2010); see BWP Media USA Inc. v. Hollywood Fan Sites, LLC,* No. 14 Civ. 121(JPO), 2014 WL 6077247, at *4 (S.D.N.Y. Nov. 14, 2014) ("Plaintiffs 'cannot rely upon [the nationwide personal jurisdiction provisions of the RICO statute] to establish jurisdiction over each of the defendants' if the RICO claim is dismissed." (quoting *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC,* No. 11 Civ. 7801(PAE), 2012 WL 1231775, at *8 (S.D.N.Y. Apr. 12, 2012))). Here—as discussed below—Plaintiff's RICO claim is barred by the statute of limitations and by *res judicata.* Accordingly, this Court cannot apply the RICO statute's nationwide personal jurisdiction provisions.

Application of the nationwide personal jurisdiction provisions of the Clayton Act would be improper for the same reason: as discussed below, Plaintiff has failed to state an antitrust claim. Where there is no valid antitrust claim, it necessarily follows that Plaintiff cannot rely on an antitrust statute's personal jurisdiction provisions. *Cf. id.; Elsevier Inc, 692 F.Supp.2d at 315.*

Because the provisions in the Clayton Act and the RICO statute authorizing nationwide personal jurisdiction are not applicable here, this Court will "apply the personal jurisdiction rules of the forum state, provided that those rules are consistent with the requirements of Due Process. *Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 35 (2d Cir.2010)* (internal citations omitted).

3  On February 20, 2015, Plaintiff requested leave to submit a supplemental declaration in opposition to the Foreign Banks' motion to dismiss for lack of personal jurisdiction. (Dkt. No. 169) Certain of the Foreign Banks object to Plaintiff's proposed supplemental submission. (Dkt. No. 171) Leave is granted to file the supplemental declaration, but it does not alter the Court's analysis. While the supplemental declaration provides more information concerning certain Foreign Banks' general contacts with New York, it does not assist Plaintiff in demonstrating that the Foreign Banks' *suit-related* conduct ties them to this forum.

4  As discussed at length below, the district court in *In re LIBOR–Based Fin. Instruments Antitrust Litig.* dismissed plaintiffs' antitrust claim on the ground that they had not pled an antitrust injury. On reconsideration, the district court denied plaintiffs

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

leave to amend, finding that any amendment would be futile. *962 F.Supp.2d 606*. Plaintiffs appealed, but the Second Circuit "determined *sua sponte* that it lack[ed] jurisdiction over [plaintiffs'] appeal because a final order ha[d] not been issued by the district court ... and the orders appealed from did not dispose of all the claims in the consolidated action." *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 2013 WL 9557843, at *1. The Supreme Court granted *certiorari* on the jurisdiction question and reversed in *Gelboim v. Bank of Am. Corp. See Gelboim,* 135 S.Ct. at 906. The Supreme Court held that the plaintiffs whose antitrust claims were dismissed without leave to amend are entitled to an immediate appeal of the district court's decision, despite the continued pendency of certain other claims in the MDL. *See id.* at 905–06 ("The District Court's order dismissing the ... complaint for lack of antitrust injury, without leave to amend, had the hallmarks of a final decision."). Accordingly, the Court "reverse[d] the judgment of the ... Second Circuit deeming the District Court's dismissal of the ... complaint unripe for appellate review, and ... remand[ed] the case for further proceedings[.]" *Id.* at 906.

5    Contrary to Plaintiff's contention, Judge Buchwald did not "rel [y] exclusively on Defendants' conduct and not on the effects thereof .... " (Pltf.Br.(Dkt. No. 119) at 33 n. 19) Judge Buchwald considered the effects of Defendants' conduct on the relevant markets.

6    Plaintiff argues that this case "is similar to many others attacking index or benchmark price manipulation." (Pltf.Br.(Dkt. No. 119) at 29) Many of the cases that Plaintiff cites (*see id.* at 29 n. 17) are addressed in Judge Buchwald's decision. In a thorough analysis, she distinguishes the harm in those cases from the type of injury resulting from the manipulation of LIBOR. *See In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 688, 694 & n. 9, 694–95. The Court finds Judge Buchwald's analysis persuasive and adopts her conclusions here.

7    In a February 20, 2015 letter (Dkt. No. 168), Plaintiff directs this Court's attention to two recent cases: *Gelboim,* 135 S.Ct. 897, and *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* Nos. 13 Civ. 7789(LGS), 13 Civ. 7953(LGS), 14 Civ. 1364(LGS), 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) ("*FOREX* "). As noted above, in *Gelboim* the Supreme Court held that the plaintiffs whose antitrust claims were dismissed in the *LIBOR* MDL are entitled to immediately appeal Judge Buchwald's decision. *See Gelboim,* 135 S .Ct. at 905–06. Nothing in *Gelboim* casts doubt on Judge Buchwald's reasoning and conclusions. In *FOREX,* which involves allegations of collusion in fixing a foreign exchange benchmark, the court distinguished Judge Buchwald's determination that the LIBOR-setting process is cooperative and not competitive:

> LIBOR [MDL]'s conclusion that the plaintiffs in that case had not demonstrated antitrust injury was explicitly based on that court's understanding that the LIBOR-setting process was a "cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs ... to facilitate the ... calculation of an interest rate index." The Fix[—the process of setting the foreign exchange benchmark at issue in *FOREX*—] by contrast, is set by actual transactions in a market where Defendants are supposed to be perpetually competing by offering independently determined bid-ask spreads.

> *FOREX,* 2015 WL 363894, at *11 (quoting *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 935 F.Supp.2d at 688). The *FOREX* court found that because the process for setting the foreign exchange "Fix" involved actual market transactions, it differed from the cooperative LIBOR-setting process in a crucial way. This conclusion, if anything, supports Judge Buchwald's reasoning.

8    In deciding a motion to dismiss on statute of limitations grounds, "[a][d]istrict [c]ourt [may] t[ake] judicial notice of ... media reports, state court complaints, and regulatory filings" as long as "[t]he court d[oes] 'not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted.' " *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 424 (2d Cir.2008) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 460 F.Supp.2d 329, 335 (D.Conn.2006) *vacated and remanded,* 547 F.3d 406 (2d Cir.2008)); *see id.* at 425 ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice ....").

9    Defendants argue that *"[r]es judicata* applies to all of [Plaintiff's] claims, including [its] Sherman Act claim ...." *See* Def. Reply Br. (Dkt. No. 121) at 2. Defendants assert that *res judicata* bars Plaintiff's antitrust claim because Plaintiff was required to raise LIBOR manipulation as a defense in the state court action. (*Id.* at 2–4) Plaintiff argues, however, that federal courts have exclusive jurisdiction over Sherman Act claims, and that accordingly *res judicata* does not bar Plaintiff's antitrust claim. (Pltf.Br.(Dkt. No. 120) at 5) Having concluded that Plaintiff's antitrust claim must be dismissed for failure to allege an antitrust injury, this Court does not reach the question of whether Plaintiff's antitrust claim is barred by *res judicata.*

10   "A court may consider a *res judicata* defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.,* 758 F.3d 493, 498 (2d Cir.2014).

2015-1 Trade Cases P 79,127, RICO Bus.Disp.Guide 12,598

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.