F6MARIOAps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  RIO TINTO PLC,

4              Plaintiff,

5         v.                        14-cv-3042 (RMB)(AJP)

6  VALE, S.A., et al.,

7              Defendants.

8  ------------------------------x

9                                   New York, N.Y.
                                     June 22, 2015
10                                   3:00 p.m.

11 Before:

12              HON. ANDREW J. PECK

13                                   Magistrate Judge

14
                       APPEARANCES
15
   QUINN EMANUEL URQUHART & SULLIVAN, LLP
16      Attorneys for Plaintiff Rio Tinto PLC
   BY: MICHAEL J. LYLE, ESQ.
17      ERIC C. LYTTLE, ESQ.
        MEGHAN A. MCCAFFREY, ESQ.
18
   CLEARY GOTTLIEB STEEN & HAMILTON LLP
19      Attorneys for Defendant Vale, S.A.
   BY: LEWIS J. LIMAN, ESQ.
20      SCOTT B. REENTS, ESQ.

21 MARTIN J. AUERBACH, ESQ.
        Attorney for BSG Resources (Guinea) Ltd.
22
   MISHCON DE REYA NEW YORK LLP
23      Attorneys for Defendant Benjamin Steinmetz
   BY: VINCENT FILARDO, ESQ.
24
   SULLIVAN & WORCESTER LLP
25      Attorneys for Defendant Mahmoud Thiam
   BY: PAUL E. SUMMIT

F6MARIOAps

Also Present:    Donald Monson
                 Senior Manager
                 Analytics, Economic & Statistical Consulting
                 Deloitte LLP

                 Kinny Chan
                 Managing Director
                 eDiscovery

                 (In open court)

                 THE COURT:  All right.  I have seen you've shared the

translation with plaintiff's counsel, Mr. Liman?

                 MR. LIMAN:  We have, your Honor.

                 THE COURT:  OK.  The new letters rogatory is with

respect to whom?

                 MR. LIMAN:  It's with respect to the investigative

firm BTG.  We have previously identified one witness from BTG.

We've been informed by BTG that that's not the right person.

It's given us the identity to two other people who are not with

BTG.

                 There are only two minor changes in the letter of

request.  I have informed opposing counsel of both of them.  I

am happy to inform your Honor.

                 THE COURT:  All right.  Why don't you tell me who they

are.

                 MR. LIMAN:  Absolutely.  On page 4 of the application,

in paragraph 6 at the bottom, there is an update with respect

to reports having been produced in this litigation.  On page 20

of the letter of request, paragraph 7.15 -- it's the carryover,

1   the last clause there, which refers to the fact that the

2   English High Court of Justice denied the application for

3   judicial review of the SFO Section 2 notices.  That has been

4   added.

5           THE COURT:  All right.  Anyone have any objection to

6   me signing this letter of request?

7           Hearing none, I will review it when I get back to

8   chambers and rule.

9           OK.  Let's deal with your joint status letter in the

10  first instance.  As to the Nardello report, I am inclined to

11  order it produced, but I have not yet reached a definitive

12  decision on that.  And that will have to wait.  So at some

13  point you will hear from me on that.

14          However, in light of the amount of judicial resources

15  that the parties have used here, which is well beyond your

16  quota, and in light of the Vale position that once the motion

17  to dismiss were denied it would be inclined to waive the

18  privilege, if it is a privilege, and produce it, I would invite

19  you over the next two weeks, while I'm not going to be thinking

20  about Nardello, to reconsider your position and perhaps bargain

21  it against something else or whatever, but if not at some point

22  in July I will rule.

23          All right.  With respect to the Vale litigation hold

24  material, do any of the e-mails that are in dispute show who

25  received the litigation holds?  In other words, are the e-mails

1  a sort of cover e-mail that says, you know, the following 52

2  people got this litigation hold?

3      MR. LIMAN:  Your Honor, they don't.  We've given over

4  the information about when different individuals received the

5  litigation hold.  And I think that should be sufficient.

6      THE COURT:  All right.  And if that is the case, the

7  Court --

8      MR. LYLE:  Your Honor, may I may be heard?

9      THE COURT:  Well, I thought that's the purpose of the

10  letter.  And because you're all taking forever in these

11  conferences, I've read the letter on both sides.  I have

12  certain questions, but otherwise I am prepared to rule.  So you

13  have something to say that you didn't say in the letter?

14      MR. LYLE:  Just to expand, your Honor, on the

15  information relative to the witness that we referred to,

16  Mr. Bruno Abreu, who is the now ninth custodian of documents to

17  documents which have been destroyed, which makes the issues

18  surrounding when they said and what they said in their cover

19  correspondence all the more relevant.  We now have nine

20  witnesses.

21      THE COURT:  The request is denied.

22      Next.  Subparagraph C, Vale documents associated with

23  VBG.  The request seems overbroad on its face.  My question is,

24  to the extent it might be limited, would it make sense to look

25  at those former VBG employees who had a Vale.com e-mail

F6MARIOAps

1    address?  Mr. Reents?

2            MR. REENTS:  Your Honor, first I would just note that

3    with respect to the review --

4            THE COURT:  No, first answer my question.  Then you

5    can ask about something else.

6            MR. REENTS:  That conceivably could make sense,

7    although it would seem to me to make more sense if they

8    identify which individuals they are looking for, and we can

9    look to see what materials, that they in consultation with VBG,

10   identify the individuals that are relevant and we can look for

11   documents at the request of VBG for those individuals.

12           MR. LYLE:  Your Honor, we don't know who the witnesses

13   are.  We've asked VBG to give us information.  They sent us the

14   Vale.  Vale seemed to be sending us back to VBG.  We would like

15   Vale and VBG to sort it out and tell us who they are.  We have

16   two parties that are pointing at each other.  And so we're at a

17   loss.  We can't identify them.  We don't know.

18           MR. REENTS:  Your Honor --

19           THE COURT:  If you sit down the lawyer behind you can

20   perhaps shed on light on this.

21           MR. AUERBACH:  Good afternoon, your Honor.  Martin

22   Auerbach for VBG.

23           In our answers to the interrogatories we have

24   identified the individuals, we have already identified those

25   who might have relevant information.  To the extent that those

F6MARIOAps

1  people might have Vale e-mail addresses, we're happy to work

2  with Vale on identifying those.

3          Beyond that, I think the universe of people who might

4  have had, or did have certain individual Vale e-mail addresses

5  at VBG, I think the vast majority of those operational people

6  as far as I can tell have absolutely no connection to any

7  matter in this case.  And so I agree with your observation that

8  it seems overbroad.  I'm happy to work with everyone with

9  regard to the universe of people.

10          THE COURT:  Does that satisfy the plaintiff?

11          MR. LYLE:  Yes, your Honor.  We would be satisfied, as

12  long as Vale will participate.

13          THE COURT:  Mr. Reents?

14          MR. REENTS:  Yes.

15          THE COURT:  OK.  I am not inclined to go beyond the

16  subset with the Vale.com e-mail address.  So it's sort of

17  taking the people Mr. Auerbach previously identified, seeing

18  that plaintiffs are interested in all of them, seeing that they

19  had at the relevant time a Vale.com e-mail address, and if

20  that's not overly broad, etc., producing from them.

21          MR. REENTS:  Your Honor, could I clarify something,

22  though.  At this point, as I understand it, there's no request

23  to produce for these individuals, or no request that's been

24  negotiated between VBG and the individuals.

25          THE COURT:  Correct.  I think that's correct.  Yes?

F6MARIOAps

1    MR. LYLE:  Yes.  There are document requests that were

2    served, so there are formal requests in place.

3            THE COURT:  Requests that went to VBG?

4            MR. LYLE:  Yes, your Honor.

5            THE COURT:  All right.  So you'll need to all

6    coordinate that so you know what it means.  And that's what

7    Vale, sort of on behalf of VBG or in cooperation, will do.

8            MR. REENTS:  I just want to clarify right now there

9    isn't a set of individuals.  There's been no agreement to

10   produce all documents from individuals with Vale.com.

11           THE COURT:  You'll work it all out.

12           MR. LYLE:  Your Honor, we would just like

13   clarification, we would also like it that Vale be able to

14   describe to us just in a general sense just who these

15   individuals are.

16           THE COURT:  I'm not sure that they know.

17           MR. LYLE:  To the extent they do.

18           THE COURT:  You're all going to sit down and work it

19   out.

20           MR. LYLE:  Thanks.

21           THE COURT:  Next.  With respect to the investigators,

22   and looking at the very bottom of page 6, has Rio Tinto, even

23   if it hasn't paid any legal fees yet to its investigators, has

24   it agreed to pay any such?

25           MR. LYTTLE:  They have not, your Honor.

F6MARIOAps

1    THE COURT:  And are they in any way considering it, or

2    as far as Rio Tinto is concerned it's the investigative nickel?

3    MR. LYTTLE:  As far as Rio Tinto is concerned, it's

4    the cost of doing business.

5    THE COURT:  With that in mind, I think the

6    investigator approach is going forward through letters rogatory

7    and the like, and the Court is not inclined to take any further

8    action with respect to it.

9    MR. LIMAN:  Your Honor, there is a hearing on June

10   25th, and we'll report to you if anything comes of that.

11   THE COURT:  All right.  Nevertheless, while this is

12   not a definitive ruling, the odds of getting further relief on

13   this issue from this Court absent new facts is not one that you

14   should put heavy bets on.

15   MR. LIMAN:  If we come before your Honor we'll give

16   you that.

17   THE COURT:  All right.  With respect to Rio Tinto's

18   production about its investigators, no sanction will be

19   imposed.  Produce the material within seven days from today,

20   period.

21   Next, Rio Tinto's commercial relationship with its

22   investigators, this all seems to be moot.  Anything further on

23   that?

24   MR. LIMAN:  Your Honor, the language that is used is

25   fairly carefully guarded language.  I don't know whether that

1    was intentional or not.  But if your Honor could just inquire

2    whether Rio Tinto has any commercial or other relationship with

3    an investigative firm, that would satisfy us.

4         MR. LYTTLE:  Your Honor, we do not.  We describe the

5    exact relationship.  The only one is an online description for

6    a service on African developments.  That is the only current

7    working relationship.

8         THE COURT:  OK.

9         Rio Tinto's response to Vale interrogatory 24, let's

10   be clear.  Anyone you didn't identify in that interrogatory

11   response, Rule 26(a) is self-enforcing.  You cannot use them

12   affirmatively in any way.  Is that understood?

13        MR. LYTTLE:  That's understood, your Honor.

14        THE COURT:  That's the only relief the Court is going

15   to grant on that at this time.

16        MR. LIMAN:  Your Honor, if we could make that without

17   prejudice, we may want to take depositions of other

18   individuals.  We don't want to be limited to key individuals

19   with respect to it.  So it had to do with our affirmative

20   effort.

21        THE COURT:  Anyone you want to depose within the

22   limits of the federal rules, etc., you can depose.  If they are

23   identified in some other way and deposed, then obviously that

24   does not prevent Rio Tinto from using them affirmatively.

25        MR. LIMAN:  Is it correct to understand that the five

F6MARIOAps

1   individuals who are identified are the individuals who would

2   have knowledge with respect to the decision to answer and not

3   just the qualifications that this is who they considered to be

4   key?

5           MR. LYTTLE:  That's correct, your Honor.

6           THE COURT:  Next, item number IV, discovery from BSGR

7   and Steinmetz, it doesn't seem like there's anything that you

8   all need me to do on this.  Correct?

9           MR. FILARDO:  Good afternoon, your Honor.  I think

10  that's correct.

11          MR. LYTTLE:  I just think we need an answer on the SFO

12  3.

13          MR. FILARDO:  SFO materials were specifically

14  requested in the letters of request.  To the extent that we

15  have responsive documents that aren't privileged they will be

16  produced, your Honor, on a ruling basis or by June 30.

17          THE COURT:  There's not going to be much rolling

18  between now and June 30, so I assume June 30.

19          MR. FILARDO:  We will have something today, so I

20  assume a rolling production.

21          THE COURT:  Next.

22          MR. LYTTLE:  Your Honor, briefly, the order on the

23  production of the invoices, a lot of that, your Honor, is not

24  in a discrete set.  It's in our materials that have been

25  identified in the discovery process.  I have identified the

1    invoices on a separate server, but seven days, your Honor, can

2    be very difficult to meet.

3              THE COURT:  You were ordered a month ago to produce

4    it.

5              MR. LYTTLE:  Your Honor, with all due respect, we were

6    not ordered.  That's a mischaracterization of the record.  At

7    that conference I explained that these documents were not

8    requested until their February request, which we responded to

9    in March.  I explained that.  Your Honor said, good,

10   understood.

11             THE COURT:  And I further said, "Produce the invoices.

12   Produce whatever you have that you haven't produced with

13   respect to the investigators.  Clear?"  And you responded,

14   "Yes."

15             MR. LYTTLE:  At which point -- I have a transcript,

16   you can probably see -- I explained they were part of the

17   second request, which weren't even technically due by June 30.

18   We will do our best to get that, your Honor.  But seven days in

19   the midst of trying to meet this deadline is very, very

20   difficult.

21             THE COURT:  95 percent of the documents are supposed

22   to be produced by June 30.  I will give you eight days.  And

23   that gets you to June 30.

24             MR. LYTTLE:  Your Honor, June 30 for the first set of

25   requests.  That's our point.  This was not the subject of the

1    first set of requests.  This was in the second set of requests.

2              THE COURT:  When do you propose to produce it?

3              MR. LYTTLE:  I think we'll be able to get it out in

4    the June 30 production.

5              THE COURT:  Good.  So produce it by June 30.  That's

6    what I said.

7              MR. LYTTLE:  OK.  Thank you.

8              THE COURT:  OK.  Next.  V, discovery from VBG.  I

9    don't know if there is any dispute.  Anything I'm supposed to

10   be dealing with on this, counsel?

11             Mr. Lyle, Mr. Lyttle?

12             MR. LYLE:  Nothing, your Honor.

13             THE COURT:  OK.  Next, VI, the biggy -- predictive

14   coding.  I hope you took the opportunity to use the jury room

15   and that you worked out all or most of this.  Correct?

16             MR. REENTS:  We did, your Honor.  You'll be

17   disappointed that there is only one issue that remains, but we

18   wanted to just get on the record the resolution that we've

19   reached.

20             THE COURT:  OK.

21             MR. REENTS:  And this will resolve all issues that

22   have been raised by the parties to date with respect to the

23   sufficiency of these items: training process.  We're going to

24   engage in supplemental training that will be comprised of a

25   hundred additional documents from each side, selected from each

F6MARIOAps

1   side's forthcoming production on June 30.

2        In addition, each side will be able to define a search

3   that the other side will need to run, that will identify up to

4   2,000 documents, which will be reviewed, disclosed to the other

5   side, and the responsive documents from that supplemental

6   training set will be used in the training process.

7        The parties will exchange methodologies for that

8   search by July 3rd.  They will exchange training sets and the

9   hundred additional documents by July 31st.  And they will

10  produce all documents identified from the supplemental training

11  by August 28th.

12       THE COURT:  Ms. McCaffrey, is that what the agreement

13  is?

14       MS. McCAFFREY:  I believe all documents identified are

15  responsive.

16       MR. LIMAN:  Right.  That will be used in the training

17  process.  But the full 2,000 documents will be disclosed.

18       MS. McCAFFREY:  Yes.  Your Honor, yes.

19       THE COURT:  OK.  I'm a little concerned that the

20  further out you keep pushing any sort of document production,

21  the harder it's going to be for you to finish all your

22  deposition by November 30.  But I don't think you're going to

23  get an extension of the November 30 date from Judge Berman, so

24  if you've agreed to this, terrific.

25       OK.  So what's the issue that you haven't agreed on,

1    and where in the letter is it?

2              MR. REENTS:  Yes.  So this is the issue raised in the

3    letter on page 17, bottom of page 17 and 18.  It's footnote 12,

4    which has to do with the disclosure around their recall and the

5    validation set that Rio Tinto reviewed.  And the concern, as

6    we've expressed it in the letter we brought, Mr. Donald Monson

7    from Deloitte Consulting can speak to the statistics, but the

8    concern we have is that the recall estimate that they have

9    disclosed to us suggests one number of responsive documents

10   have been excluded from the review process.  Their validation

11   set review implies a number that is one fifth that size.  So a

12   5X difference between those two estimates.

13             Rio Tinto in our discussion said, well, this could be

14   a result of family members or could be a result of

15   uncategorizable documents.  And we have asked that they

16   disclose information sufficient to document that.  We are

17   willing to disclose the same information.  And they have

18   refused to do that.  They said they will only do that at the

19   end of August when the whole process has run.

20             And our concern with that is just that, you know,

21   first of all it shouldn't be burdensome for them to do this

22   now.  And if there is a problem with the way that they're

23   measuring their results or if there's a problem with the way

24   that they conducted the validation set review, we need to know

25   that now so we can address it now.

F6MARIOAps

1          THE COURT:  Ms. McCaffrey?

2          MS. McCAFFREY:  Your Honor, we've already agreed to do

3     the additional training.  The additional training in our

4     opinion may change those numbers, so our opinion is that we

5     wait until we do the additional training.  All of the systems

6     are fully trained on where they need to be.  We can make the

7     disclosures at the time and the parties can sit down and talk

8     about it if further training is required.

9          MR. REENTS:  We would be happy to get updated

10    disclosure when they've done the supplemental training.  But

11    the discrepancy exists right now.

12         THE COURT:  If the whole point of additional training

13    is to get more documents produced, are any of the numbers now

14    significant?  Or even relevant?

15         MR. REENTS:  I believe they are relevant, because it

16    doesn't go to their actual -- the accuracy of -- it doesn't go

17    to how many documents they have identified.  It's the

18    discrepancy, which shows a methodological problem.

19         THE COURT:  Then we're going to have to turn to

20    Deloitte to translate this into English, in a way that I can

21    understand it.

22         MR. REENTS:  So Donald Monson, who is senior manager

23    in Deloitte's economic and statistic practice.

24         THE COURT:  I assume nobody is going to require -- do

25    you want me to swear in Mr. Monson, or can we take it that

F6MARIOAps

1    that's not necessary?

2              MS. McCAFFREY:  Not necessary, your Honor.  Thank you.

3              THE COURT:  I've been burned by that issue.

4              Go ahead, Mr. Monson.  Assume I know nothing, would be

5    an easy way to start.  May not be true, but better than

6    assuming I know more than I know.

7              MR. MONSON:  Fair enough.  So there's a control set

8    and a validation set.  The control set of data indicates,

9    plaintiffs took a random sample from the population of all

10   documents, and that sample of around 2400 documents, about 5

11   percent were responsive that.  Indicates that around 150,000

12   documents in Rio Tinto's population are responsive.

13             And from the information they disclosed that said

14   we're going to target 80 percent of those, will be in the set

15   that we produce, and they have produced a validation set, which

16   has another sample of 2400, about 6 of which were responsive.

17   And so that's around 6,000 documents in that remaining set.

18             So the universe that we're looking at, or, sorry, the

19   set of responsive documents was 150,000.  They're saying we're

20   going to give you 80 percent, or we anticipate we're going to

21   give you 80 percent.  That's 120,000.  That leaves 30,000.  And

22   they're saying, well, they said we're not going to review.

23   That has 6,000 in there.  So that leaves around 24,000

24   documents that are responsive and don't seem to show up

25   anywhere.  So that was the discrepancy.

F6MARIOAps

1          THE COURT:  I'm not sure I still understand that, but

2     Ms. McCaffrey, you or your expert want to take a shot at it?

3          MS. McCAFFREY:  I would like to allow Mr. Chan to

4     stand up because I'm not sure I understand the numbers.  I

5     don't think they add up.

6          THE COURT:  All right.  Mr. Chan.

7          MR. CHAN:  Good afternoon, your Honor.  So the numbers

8     that Deloitte just mentioned, it is a difference, but it does

9     not take into account family members, doesn't take into account

10    documents that can't be categorized.  The validation set that

11    we're talking about really deals with the set that's being

12    discarded.  So the set that's being discarded should have very

13    few documents that are responsive, if the model is working

14    correctly.  And so the issue here is that we're not finding 20

15    percent, because we're getting about 8 percent recalled in our

16    control set.  We're getting about .25 percent.  And these are

17    nominally responsive documents in our data set.  And we're

18    getting .25 percent of that.  And so the issue is, it doesn't

19    equate.  20 percent does not equate to .25 percent.

20         But that's a bad comparison.  We are using predictive

21    coding to cull nonresponsive documents out of the set.

22         THE COURT:  All right.  Let me stop because I think I

23    see where this is going.  The validation set is what some

24    others would call quality control, the null set?

25         MR. CHAN:  That's correct.

F6MARIOAps

1          THE COURT:  The nonresponsives?

2          MR. CHAN:  That's correct.

3          MR. REENTS:  Not the unresponsives but the unreviewed

4    population.  Sorry.

5          MR. CHAN:  The nonresponsive.

6          MS. McCAFFREY:  They're nonresponsive.

7          MR. CHAN:  The validation set is nonresponsive

8    documents.

9          THE COURT:  So I guess I'm not clear why that's a

10   problem if there is an incredibly low .25 percent of documents

11   that would arguably be responsive but are in the 20 percent

12   non-review set.  That sounds like a good thing.

13         MR. REENTS:  Yes, right.  The problem, your Honor, is

14   the discrepancy between the estimate that's based on the

15   validation set, which shows that there would be about 6,000

16   responsive documents in the junk pile, if you will, in the null

17   set, and the evidence that they have told us, which is that

18   they're getting 80 percent recall.  80 percent recall on 150

19   documents, responsive documents, which is what they're saying

20   it would indicate, leaves 30 percent missed responsive

21   documents.  So they've got inconsistent estimates.  And we have

22   asked for disclosure that would reconcile that.  And that's

23   what they're refusing to provide at this point.

24         THE COURT:  All right.  So let's try this again.

25   Control set 20 percent nonresponsive assumes that there would

F6MARIOAps

1  be 30,000 nonresponsive documents.  How many nonresponsive, or

2  non-produced, are there in the validation set?

3          MR. REENTS:  According to their sampling, 6,000.  The

4  difference of 24,000 --

5          MR. CHAN:  6 documents in the validation set were

6  responsive.  That equates to .25 percent.

7          MR. REENTS:  Right.  And if you take -- and -- sorry

8  for jumping in, your Honor.  This is all, by the way, the math

9  is all in footnote 12 of the joint letter, if I can follow

10 along.  But if you take .25 percent -- this is page 18, your

11 Honor, at the very bottom.

12         THE COURT:  Yes.

13         MR. REENTS:  And it's the last sentence.  So this

14 would imply there are just 5,975 responsive documents.  The

15 math here is .25, their number, times approximately 2.4

16 million, which are the number of documents that are in the null

17 set.  So if .25 percent of the null set is responsive, that

18 equates to 6,000 responsive documents in that set.

19         MR. CHAN:  Your Honor, there are a couple issues here.

20 First is the issue of non-categorized documents and of family

21 members.  We are having human beings review any documents

22 predictively coded as responsive plus the family members.  So

23 those will not be included in this calculation.  There are also

24 documents that cannot be categorized because of various issues.

25 Those files are also not being included in this calculation.

F6MARIOAps

1    So some of that can make up for this.

2         Also, another issue here is, we're using 95 percent

3    confidence.  This is not a 100 percent confidence.  That can

4    account for some of the issues here as well.

5         THE COURT:  All right.  You all are either going to

6    work this out or I offered you an expert.  You haven't taken me

7    up on it.  I've got to tell you, I don't see a problem here

8    yet.  And I'm willing to wait, knowing the risk of redos and

9    expense and all of that, that you're doing significant

10   retraining, at which point perhaps the statistics can be broken

11   down so that whatever happens because of family members and

12   nonresponsive, non-reviewable by the predictive coding system,

13   you'll be able to get all those statistics and see if things

14   match better.  I don't see a big-enough problem here to take

15   any more of the Court's time on it, at this time.  So to the

16   extent that Mr. Monson and Mr. Chan may want to sit down

17   further and try to work this out, that's fine.  Otherwise I am

18   perfectly prepared to stick with Sedona principle 6.  You're

19   each doing it the way you agreed to via the protocol.  That's

20   not necessarily the best of all worlds, certainly not the worst

21   of all worlds.  We'll see what the results and what the gaps

22   are at the end, absent further cooperation among the parties to

23   try to straighten this out.

24        MR. REENTS:  Your Honor, I just wanted to note that we

25   have reached out to Ms. Grossman to check to check whether she

1    has any conflicts.  Rio Tinto has not agreed to engage her.

2    But we see issues like this, particularly in light of the

3    supplemental training.  We still see potential value from a

4    special master.

5          THE COURT:  So do I.  The problem is, if there isn't

6    mutual agreement, I am loath to order a party to pay for it if

7    they don't want it.  If you want to pay for a hundred percent

8    subject to application for a change in cost if you win most of

9    your issues in front of Ms. Grossman, that's all fine and

10   dandy.  I'm telling you that there gets to a point where a

11   court is spending hours and hours with you, is willing to say

12   enough, and I'll take my chances that there won't have to be a

13   massive redo at the end.

14         So is Rio Tinto any more amenable to getting

15   professional help, or do you want to take your chances that

16   whatever I'm skipping over now will indeed be explained better

17   to my way of understanding it at the end after you've done the

18   retraining and taken out the groups and family members and

19   fixed the statistics accordingly, you know, and maybe you'll be

20   ordered to do a massive retraining at great expense at the end.

21         MR. LYTTLE:  Your Honor, we'll take our chance on

22   that.  We feel very good about our training.

23         THE COURT:  OK.  Penny wise and pound foolish perhaps.

24   But so be it.

25         So Mr. Reents, the floor is yours on that.  If you

F6MARIOAps

want to pay a hundred percent subject to the possibility that

the results will be so clear that Ms. Grossman recommends to me

shifting some of those costs against Rio Tinto, that's fine.

Otherwise I suspect I'm not going to order them at this point,

in light of the protocol, to pay for half of it.

MR. REENTS:  We'll let the Court know.  We will

consider that.

THE COURT:  As far as I'm concerned, if that's what

you want -- particularly since, while I will be getting

messages from my staff, I'm going to be out for the next two

weeks.  If you want to consider that, I will approve

Ms. Grossman as a special master if she decides she's

interested and not conflicted, at your sole expense with the

possibility of cost shifting, and we'll enter an appropriate

order when I get back.

MR. REENTS:  Thank you, your Honor.

MR. LYTTLE:  We may have some concern with

Ms. Grossman.  I don't think it's worth wasting the Court's

time unless they make a request, at which point we would weigh

in if necessary.

THE COURT:  OK.  You're all going to do a very good

job of making sure that if she comes on board there will be so

little time for her to do anything useful.  So be it.

All right.  Any other issues?  I believe all the other

letters have been taken care of, other than the Nardello report

F6MARIOAps

1    issue that is being put off.

2            Good.

3            MR. LIMAN:  Just the date of the next conference.

4            THE COURT:  Yes.  OK.  What's your request?  I know we

5    can't go more than a few weeks without you all coming in.

6            MR. LIMAN:  Your Honor, the last week of July?

7            THE COURT:  All right.  By that you mean the week

8    starting Monday the 27th of July, I assume?

9            MR. LIMAN:  Yes.

10           THE COURT:  All right.  How about Tuesday, the 28th,

11   at 2 o'clock?  Does that work for everyone?

12           MR. LYLE:  At 2 o'clock, your Honor?

13           THE COURT:  Yes.  And if you wish to use the jury room

14   from 1 to 2, feel free, but I would rather not push the

15   conference back.

16           MR. LIMAN:  We appreciate Court making the jury room

17   available today.

18           THE COURT:  Just wait till you all get the rent bill.

19           MR. LYLE:  That's a default letter, your Honor.

20           THE COURT:  Based on what GSA charges us for rent here

21   at the court, etc.

22           All right.  Usual drill.  The transcript is the

23   Court's rulings.  And the usual drill about purchasing the

24   transcript, whoever's turn it is to pay or whatever.  And if

25   anything interesting happens in front of Judge Berman tomorrow,

F6MARIOAps

1    while I suspect he will tell me, you're all free to send me a

2    joint synopsis report as well.

3            MR. LIMAN:  Thanks, your Honor.

4            MR. LYLE:  Thank you, your Honor.

5            MR. REENTS:  Thank you, your Honor.

6                            o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25