# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC • PARIS • BRUSSELS • LONDON • MOSCOW
FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG
BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY

MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO

JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
JOHN V. HARRISON
CAROLINE F. HAYDAY
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

Writer's Direct Dial:  +1 (212) 225-2550
E-Mail: lliman@cgsh.com

July 24, 2015

<u>VIA ECF</u>

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:  *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

We write on behalf of Defendant Vale S.A. ("Vale"), jointly with Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), and Mahmoud Thiam, to update the Court on the status of discovery in advance of the status conference scheduled for July 28, 2015 at 2 p.m.

As set forth in the proposed conference agenda below, there are a number of discovery disputes that require the Court's assistance.

## I.      Discovery from Plaintiff Rio Tinto

### a.   Rio Tinto's Production of Documents from Its Auditors

#### i.   *Vale's Position*

***Rio Tinto Should Be Required To Produce Responsive Documents In The Possession Of Its Auditors, As Vale Has Agreed To Do.***  Rio Tinto served a subpoena on Ernst & Young LLP, in the U.S., dated June 2, 2015.  In response, Ernst and Young LLP stated that it did not have any documents responsive to that subpoena.  Rio Tinto then wrote Vale to request that it "contact each of the Ernst & Young member-firms that supported its diligence efforts and

Hon. Andrew J. Peck, p. 2

demand that they produce any materials in their possession that are responsive to Rio Tinto's subpoena," on the ground that Vale had the right to obtain those documents and that they were therefore under its "control."  July 22, 2015 Letter to E. Lyttle to L. Liman at 2.  Without hesitation, Vale agreed to contact the relevant offices.  In fact, Vale has already made those requests to the relevant Ernst & Young offices.  In return, Vale asked that Rio Tinto reciprocally request documents responsive to Vale's requests from its auditors, including but not limited to PricewaterhouseCoopers LLC and Grant Thornton International Ltd. Inexplicably, the day before this letter was due, Rio Tinto refused.

Rio Tinto's outside auditors undoubtedly possess relevant documents responsive to Vale's requests.  For example, Rio Tinto has agreed to requests seeking, *inter alia*, documents concerning Rio Tinto's alleged "invest[ment of] its resources, time, and finances into the exploration and development of the iron ore mining operations at Simandou" (Request 3), documents concerning Rio Tinto's valuations of Simandou "including but not limited to all Documents provided to Rio Tinto's outside auditors (PricewaterhouseCoopers) or received from such auditors" (Request 43), documents concerning communications with investors about the expenses, projected costs revenues and profits, or good will associated with Simandou (Request 44), and documents exchanged with any Third Party concerning the April 22, 2011 Settlement Agreement, including but not limited "any and all correspondence with any of Rio Tinto's internal or external auditors regarding the April 22, 2011 Settlement Agreement" (Request 62).

These documents are plainly relevant.  They are also within Rio Tinto's control, by its own argument with respect to the Ernst & Young documents it has demanded from Vale, and should be produced.

## ii.  *Rio Tinto's Position*

Rio Tinto already has undertaken a reasonable search of its files and produced materials responsive to Vale's document requests concerning third-party audits.[1]  All Rio Tinto is refusing to do is undertake an unnecessarily duplicative search of its auditors' files.  Notably, Vale's requests themselves are limited to the materials *in Rio Tinto's files* only – *i.e.*, documents either sent to or received from its auditors.  *See* Vale RFP No. 43 (seeking documents Rio Tinto provided to its outside auditors); Vale RFP No. 62 (seeking correspondence between Rio Tinto and its outside auditors).  There is no reason for Rio Tinto to undertake a burdensome and unnecessarily duplicative search for the versions of the same documents held by its auditors.

Vale's new and belated request for third-party audit files (raised for the first time yesterday) is an unwarranted retaliation for Rio Tinto's reasonable request that Vale seek due diligence materials from Ernst & Young after Ernst & Young's U.S. office refused to provide them in response to Rio Tinto's subpoena.  Vale's tit-for-tat request rests on a false equivalence between due diligence regarding the specific Vale-BSGR deal at the heart of this case and routine, independent third-party audits of marginal relevance.  Indeed, Rio Tinto sought discovery from Ernst & Young based on the firm's role as one of Vale's diligence counselors for

---

[1]  Vale's third-party audit requests came in its second request for production, which was not subject to the June 30 substantial completion deadline.  Rio Tinto will produce additional audit-related materials, if any, identified during its ongoing document review.

the BSGR transaction—not its role as Vale's auditor.[2]  Vale itself has identified Ernst & Young as an entity likely to have highly relevant information in its interrogatory responses.

Because many of Vale's files from the relevant time period have been destroyed, the only way Rio Tinto may obtain complete discovery of information related to Vale's due diligence efforts is by seeking such discovery from third parties, like Ernst & Young, that participated in the due diligence (of course, because Rio Tinto has not wholesale destroyed documents from key custodians, the same is not true for Vale's requests to Rio Tinto regarding its auditors).  Even then, Rio Tinto served a subpoena on Ernst & Young (in contrast to Vale, which has not subpoenaed Rio Tinto's auditors), and only requested that Vale get this information from Ernst & Young when Ernst & Young claimed all the documents were held by foreign Ernst & Young offices (thus necessitating Hague requests or letters rotatory).  Vale has acknowledged that it has control of the documents held by Ernst & Young but has sought to unreasonably and unnecessarily leverage that control over Ernst & Young's documents into a new (and unrelated) demand that Rio Tinto now collect and produce from its third-party auditors.  The need for Rio Tinto in the first place to go to third parties for due diligence materials is a problem of Vale's own making (specifically, its document destruction).  Vale should not be able to further benefit from the situation its document destruction has created by insisting that Rio Tinto now go to third parties for duplicative and unnecessary document collection.

**b.  Rio Tinto's Redactions of Investigator Communications**

    *iii.  Vale's Position*

**Rio Tinto Has Improperly Redacted (And Possibly Withheld) Its Communications With The Third-Party Investigative Firms.**  Vale's initial review of Rio Tinto's June 30 production indicates that there are a number of documents in the production with redactions that are legally unjustified, including most notably communications between Rio Tinto and its third-party investigative firms.[3]  Specifically, Rio Tinto's production contains improperly redacted

---

[2]  Vale's attempts to obfuscate this issue went so far as to refuse to change the heading in the latter section of this joint letter to accurately reflect that Rio Tinto is seeking documents from Ernst & Young in its capacity as a due diligence counselor for the Vale-BSGR transaction rather than as an auditor.

[3]  Without waiving any rights as to other documents, Vale objects to the redactions in the following documents: RT0429725, RT0480296; RT0676855; RT0676988; RT0676991; RT0677142; RT0677144; RT0677146; RT0677149; RT0677171; RT0677173; RT0677175.

Vale's review of the investigator materials is ongoing, and has been impeded by Rio Tinto's violation of the Court's orders.  Prior to June 30, Vale requested that the Court "order[] that Rio Tinto produce the invoices and other documents with respect to the investigators separate from the production Rio Tinto was already under an obligation to make on June 30" or alternatively "identify such documents by bates number when they are produced."  Dk. 285 at 3.  Rio Tinto responded that "Rio Tinto *already* has agreed to identify its investigator invoices and related materials by bates number when they are produced on June 30, as requested by Vale in its latest letter."  Dk. 286 at 1.  Rio Tinto's June 30 production cover letter also purports to attach an "appendix detailing the production bates numbers for documents responsive to those requests" in Vale's Second Request for production (which concerns the investigative firms).  June 30, 2015 Cover Letter at 1.  As Vale pointed out to Rio Tinto on  July 7, that statement is demonstrably false, as there are documents responsive to Vale's investigator requests that are in the production but which Rio Tinto has not identified.  Subsequently, Rio Tinto admitted this.  In its July 17 letter to Vale, Rio Tinto concedes that it has only "identified investigative materials that fall within the scope of Vale's Request for Production Nos. 48, 49, 50, 52 and 53" (July 17, 2015 Letter at 1), failing to identify documents

Hon. Andrew J. Peck, p. 4

communications between Rio Tinto and three of its investigative firms (two of which should have been, but were not, previously identified by Rio Tinto): (1) Aeneas, one of the investigative firms it previously identified as contributing to its alleged investigation; (2) Garda World, which prepared at least two reports for Rio Tinto, including a comprehensive 122-page report on Beny Steinmetz; and (3) Africa Practice, which prepared at least three reports for Rio Tinto, including a 65-page report concerning both BSGR and Vale.

The Court has repeatedly held that Vale is entitled to discovery concerning Rio Tinto's purported investigation and that those facts are not privileged. Rio Tinto is relying on that investigation in order to prosecute what would otherwise be stale claims under the RICO statute of limitations. In considering Vale's motion for a ruling that Rio Tinto has waived privilege by putting its due diligence at issue through its claims of equitable tolling, Am. Compl. ¶¶ 142-148 (which remains pending, *see* Dk. 119), the Court ordered Rio Tinto to "[p]roduce the factual information from any privileged document that is relevant to the investigation and diligence issue." Dec. 9, 2014 Tr. 20:23-25. *See also id.* at 27:15-23 (ordering Rio Tinto to identify investigative firms); *id.* at 28:3-6 ("Precomplaint, if there was an investigative firm of any sort, whether working with the lawyers or not, I don't find that to be privileged."); Jan. 13, 2015 Tr. 52:12-21 (ordering expedited production of the reports); Feb. 6, 2015 Tr. 27:6-17, 29:1-12 (ordering Rio Tinto to identify the firms and persons with knowledge of the investigation). Rio Tinto has conceded that its investigative materials, including the final reports, drafts thereof, and its communications with the firms, are not privileged, producing at least some of each type of document. *See* Nov. 3, 2014 Tr. 44:9-17 (conceding Rio Tinto must show conduct that is "diligent as an investigation" and offering to "turn[] over the facts of that investigation"). Discovery to date has already unearthed documents showing that Rio Tinto did not exercise the requisite due diligence throughout the period sought to be tolled, supporting Vale's arguments, and that in fact it had red flags with respect to the claims it brought and that nothing Vale did impeded any investigation of those red flags by Rio Tinto.

Rio Tinto's communications with these third-parties are not privileged, either on grounds of attorney-client privilege, which is the stated basis for most of the redactions, or work product. Rio Tinto has already, and repeatedly, represented to the Court, in resisting discovery of Rio Tinto's lawyers, that the investigative firms, unlike counsel, were not retained or directed by counsel. It claimed to have "identified . . . the two fact witnesses, *who are not lawyers*, who oversaw the investigation" and "agreed to pull their files." Dec. 9, 2015 Tr. 23:11-14 (emphasis added). It further represented that its "investigation was by investigative firms hired that went out to talk with sources and generated the reports. The law firms did not run that. They were independent people." Jan. 13, 2015 51:11-15 ("We, your Honor, are not planning to search Quinn Emanuel or Weil Gotshal files."). Moreover, the investigative firms themselves have denied, in the English proceedings under this Court's Letters of Request, that they were retained the purpose of litigation. *See* Tr. 149:17-151:2 ("Rio Tinto did not retain ARC for litigation but to provide investigative reports. . . . ARC was asked to produce business intelligence for . . . for Rio Tinto, not to gather evidence for use in litigation which is a distinct activity. . . . Livingstone

---

responsive to the remainder of the Vale's investigator requests (i.e. Nos. 39, 51, 54, 55, 56, and 57). Rio Tinto's intentional comingling of these documents with the remainder of its June 30 production has prejudiced Vale, which reserves the right to make an application to the Court for those costs at the appropriate time.

Hon. Andrew J. Peck, p. 5

was not told that it was investigating potential claims against Vale and at no point did it occur to Mr. Huband that the sources of information might be potential trial witnesses.").

Rio Tinto has also represented, again and again, that the firms are "independent, third party, foreign investigative firms" not controlled by Rio Tinto or its outside counsel.  March 23, 2015 Letter from E. Lyttle to Judge Peck at 1 ("Rio Tinto does not control these investigative firms"); *see, e.g.*, May 6, 2015 Joint Letter (Dk. 246) at 13 ("Rio Tinto does not have, nor does it have any right to obtain, the names of sources in the investigator reports compiled by its investigators."); June 18, 2015 Joint Letter (Dk. 277) at 6 ("All of the investigators have declined Rio Tinto's multiple requests for source names, and denied any contractual or practical ability for Rio Tinto to force them to turn it over.").

Rio Tinto therefore cannot conceivably invoke any exception to the rule that, "[g]enerally, communications made between a [party] and counsel in the known presence of a third party are not privileged." *People v. Osorio*, 75 N.Y.2d 80, 84 (1989).  It has no basis to argue any potential exception to waiver, under *Kovel* or otherwise, because the investigative firms (unlike Vale's engagement of Nardello) were not retained by counsel or for the purpose of assisting the provision of legal advice; nor were they retained, they say themselves, in anticipation of litigation.  *See, e.g., Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2014 WL 7238354, at *4 (S.D.N.Y. Dec. 19, 2014) (concluding communications with third-party marketing firm waived privilege as firm did not serve interpretive function necessary to providing legal advice and was not a functional employee).

The ESI Protocol (Dk. 82) states that while "[r]edacted documents need not be logged, . . . any redactions applied to documents shall contain text indicating the basis for redaction (e.g., 'A/C Privilege')" and "[u]pon reasonable request and for good cause, a Producing Party shall provide additional information sufficient to allow the Receiving Party to evaluate the claim of privilege over the information redacted."  ESI Protocol at F.3.  Rio Tinto's June 30 production did not indicate the basis for any redactions.  Vale objected to those redactions on July 9.  Having received no response, it followed up by email on July 20.  On July 20, without responding to Vale's objections, Rio Tinto produced new images for certain documents in the June 30 production.  Vale's initial review indicates that many of the offending redactions remain.

Vale has raised valid objections to Rio Tinto's redactions.  Vale therefore asks that Rio Tinto be ordered to comply with Section F.3 of the ESI Protocol by providing "additional information sufficient to allow the Receiving Party to evaluate the claim of privilege over the information redacted" no later than July 30, 2015, the date on which its privilege log is also due.  If it fails to do so, Rio Tinto should be deemed to have waived any otherwise applicable privilege.

     *iv.*   <u>Rio Tinto's Position</u>

As this Court knows, Rio Tinto performed two "investigations" in connection with this case.  First, Rio Tinto performed a factual investigation, which consisted of the various investigator reports that have been produced to the Defendants.  This factual investigation lasted from approximately May 2009 through December 2010.  Second, Rio Tinto performed a legal

Hon. Andrew J. Peck, p. 6

investigation, via outside counsel, that looked at possible litigation and legal claims *arising from* the factual investigation and providing related legal advice. This legal investigation lasted from approximately August/September 2010 to January 2011.

The particular redactions Vale is complaining about fall squarely within Rio Tinto's second, legal investigation.[4] As part of this legal investigation, Rio Tinto's outside counsel consulted with Mr. Tidian Touré (a former Rio Tinto security employee who had left to start his own investigative firm) on factual questions tailored to a potential lawsuit. These consultations with Mr. Touré – including the document at issue here – were a critical and necessary component of the legal advice that Rio Tinto's outside lawyers were providing at that time.[5] They are therefore protected both by the attorney-client privilege and work-product doctrine. *See In re Grand Jury Subpoena Dated Mar. 20, 2013,* No. 13-MC- 189, 2014 WL 2998527, at *8 (S.D.N.Y. July 2, 2014) ("Private investigators also fit within this category of necessary aides to the provision of legal services."); *see generally United States v. Kovel,* 296 F.2d 918 (2d Cir. 1961); *see also See Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010) ("[C]ourts have frequently extended the attorney-client privilege to communications made to investigators who have provided necessary assistance to attorneys" (collecting cases)); *id.* at 74 ("[Work product] doctrine has been held to protect work performed by those 'enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparation for litigation.' (quoting *Costabile v. Westchester, New York,* 254 F.R.D. 160, 164 (S.D.N.Y. 2008)). It bears noting that Defendants already have Rio Tinto's factual investigative reports. They are not, however, entitled to legal reports as conducted by Rio Tinto's outside counsel as part of developing a potential legal strategy and providing legal advice.[6]

Nor do these communications have any bearing on Vale's statute of limitations defense or purported at-issue waiver argument. These communications are all *after* April 2010, and thus fall within the applicable four-year statute of limitations (the case was filed in April 2014). In other words, whatever Rio Tinto (or its lawyers) learned after April 2010 is not relevant to the statute of limitations defense because Rio Tinto acted within four years of learning it.

### c.  Rio Tinto's "Attorneys' Eyes Only" Designations

#### v.  *Vale's Position*

***Rio Tinto Violated The Protective Order By Indiscriminately Designating Over 90% Of Its Production As Attorneys' Eyes Only.*** It is apparent that Rio Tinto has violated the Protective Order (Dk. 81) by attempting to apply blanket "Attorneys' Eyes Only" protection to over 90% of its June 30 production. Section IV.1 of the Protective Order (Exercise of Restraint and Care in

---

[4]   To the extent Vale is complaining about redacted communications between Rio Tinto and its investigator ARC, Rio Tinto removed those redactions and produced revised versions of those documents to Vale on July 20.

[5]   This fact distinguishes these communications from the Nardello Report, which was not privileged in the first instance because it was prepared in the ordinary course of business as part of evaluating a joint venture (and in any event, any such privilege was later waived when Vale voluntarily showed it to the Government of Guinea). *See* Dkt. Nos. 256, 268.

[6]   Rio Tinto subsequently and separately engaged Mr. Touré for political and background monitoring in January 2011. Mr. Touré's reports and materials from this separate work have been produced by Rio Tinto and Mr. Touré himself (Mr. Touré voluntarily produced these materials rather than forcing Vale to proceed through the Hague Convention in response to Rio Tinto's requests that he do so).

Hon. Andrew J. Peck, p. 7

Designating Material for Protection) requires that the designating party "take care to limit any such designation to specific material that qualifies under the appropriate standards," including, "[t]o the extent it is practical to do so," by designating "only those parts of material, documents, items, or oral or written communications that qualify, so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order."[7]   Rio Tinto cannot credibly claim that, prior to June 30, it reviewed each of the nearly 45,000 documents in the production marked as AEO and made a good-faith determination that each qualified as "extremely sensitive 'CONFIDENTIAL' information disclosure of which to another Party or Non-Party would create a substantial risk of serious harm (including, but not limited to, trade secrets, financial data, personal information, or competitively-sensitive information about future business plans and strategies) that could not be avoided by less restrictive means."  Protective Order § I.9.  To the contrary, saw fit to indiscriminately designate the great bulk of its Production as AEO, including for example news coverage, public legislation, travel logistics, and other trivial correspondence that could not conceivably warrant that treatment.

This violation makes clear that Rio Tinto did not in fact meet the June 30 deadline for substantial completion because it did not conduct the required document-by-document evaluation of confidentiality required by the Protective Order, instead taking the shortcut of blanket designation, perhaps in the hope of shifting the work to Vale, or perhaps simply to buy time. Regardless, the violation prejudiced Vale.

Vale objected to this blanket designation on July 9.  Rio Tinto did not deny the violation. On July 23, as this letter was being prepared, Rio Tinto produced a supplement indicating that the designations had been adjusted so as to match, not coincidentally, the percentage of AEO documents in Vale's production (approximately 30%).  Not surprisingly, given that this appears to have been a mechanical re-designation, Vale's initial review indicates that many improper designations remain.[8]

Accordingly, Vale requests that the Court inquire of Rio Tinto whether, prior to June 30, it subjected each of the nearly 45,000 documents marked as AEO to review by an attorney who concluded that such treatment was warranted, and further whether, as concerns the revised

---

[7] Section IV.1 also states that "[i]f it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation."  The deficiencies in Rio Tinto's designations have now been brought to Rio Tito's attention, and Vale expects that it will act appropriately in accordance with Section IV.1 to remedy those deficiencies without attempting to impose additional unnecessary costs on Vale.

[8] *See, e.g.*, RT0431426 (Sept. 2010 news coverage of election); RT0435406 (Sept. 2013 election media monitoring); RT0448552 (Oct. 2011 Simandou news digest); RT0452031 (June 2011 Simandou daily news); RT0500910 (attaching translation of Sept. 2011 news article); RT0535271 (March 2010 Citi company profile on Rio Tinto); RT0539779 (digest of Rio Tinto media coverage); RT0543303 (same); RT0585534 (same); RT0585540 (same); RT0609926 (same); RT0611872 (same); RT0612006 (same); RT0621850; RT0544909 (2008 Australian media summary); RT0607264 (same); RT0606618 (Liberum Capital report on Rio Tinto half year results); RT0607938 (Alcan media monitoring); RT0607948 (July 2007 Globe and Mail article); RT0614891 (Oct. 2010 Citi Equities report on Vale); RT0651799 (compilation of Xtsrata news coverage); RT0662054 (news article re Vale); RT0662669 (West Africa Newsletter).

Hon. Andrew J. Peck, p. 8

designations, each of the roughly 14,000 documents still marked as AEO has been so designated following review by an attorney.  If the answer is "no," Rio Tinto should be ordered to do so immediately, and by no later than July 30, 2015.

### *vi.  Rio Tinto's Position*

This is a non-issue because it has been rectified by Rio Tinto.  With Rio Tinto's June 30 production of almost 49,000 documents, Rio Tinto learned that the vast majority of the production was inadvertently designated as AEO by our vendor.  Rio Tinto immediately initiated a fix of this issue by downgrading the designation of approximately 34,000 documents and provided the Defendants with these revised designations on July 20.  Rio Tinto believes that these revised designations are correct and proper under the terms of the Court-ordered Protective Order in this case, Dkt. No. 81.

Nonetheless, if Vale still wishes to dispute any of Rio Tinto's AEO designations, the process dictated by the Court's order is clear – Vale is required to provide written notice for each designation it is challenging, the basis for its challenge, and then meet and confer with Rio Tinto in good faith to resolve those challenges.  Dkt No. 81 at 10.  Vale has done none of this.  And although Rio Tinto is more than willing to meet and confer with Vale and re-evaluate any challenged designations, it can only do so if and when Vale actually follows those same procedures.

## II.    Update Regarding Rio Tinto's Investigators

### *i.  Vale's Position*

After all three of Rio Tinto's investigative firms based in the United Kingdom made applications to modify the Letters of Request So-Ordered by a Master of the English court, an English High Court judge, Mrs. Justice Andrews, heard the joint application during a hearing held on June 25, 2015, issuing a judgment and order on 29 June, both of which are enclosed for Your Honor's convenience.  In brief, the High Court rejected the argument that the firms' documents were not in Rio Tinto's control, found that they were, ordered that documents be produced, and concluded that Rio Tinto had been "extremely naughty" in directing the destruction of certain of these documents.

Two of the firms, Africa Risk Confidential ("ARC") and Livingstone & Company, were ordered to make productions, subject to minor modifications to Vale's requests, Judgment ¶ 44; Order ¶¶ 9-15, and produced certain documents on June 14, 2015.[9]  BTI (formerly BTG), by contrast, told the English court, to Justice Andrews' dismay ("Rio Tinto have been extremely naughty," Tr. 109:9-15[10]) that it had been instructed by Rio Tinto to destroy documents that would have fallen within the ambit of the Letter of Request, contrary to company

---

[9] Vale is in the process of reviewing those documents and reserves the right to raise any deficiencies in the production.  Vale is similarly in receipt of, and in the process of reviewing, BSGR's production in response to the Letter of Request to it, and Vale similarly reserves its rights to object to any deficiencies identified in that production.

[10] The characteristic understatement should deceive no one about the seriousness of Rio Tinto's conduct.

Hon. Andrew J. Peck, p. 9

policy.  Judgment ¶ 21.  BTI claimed to have nonetheless undertaken "reasonable" efforts to search its records for the documents but produced to the English Court only the report and one email chain referring to the report's creation.  Justice Andrews found that BTI's search for documents had been inadequate, instructed BTI to conduct further searches based on keywords to be agreed by BTI and Vale, and ordered BTI's witness to provide deposition testimony concerning the search.  Order ¶ ¶ 16-18.  BTI is in the process of conducting such searches.

With respect to Vale's request for the identities of confidential sources, Justice Andrews found that, under English law, the provisions of Rio Tinto's Terms and Conditions relied upon by the investigative firms would not have entitled the firms to refuse a request from Rio Tinto to provide the information, including the name of confidential sources – that is, under English law, this information is in Rio Tinto's control.  Judgment ¶¶ 30-31; *see also* Tr. 22:24-23:21, 30:23-34:12, 149:9-22.  Nevertheless, Justice Andrews declined to order disclosure of those sources to Vale on the basis of English public policy concerns.  Judgment ¶¶  34, 48.

This English court process has, at great expense to Vale, confirmed Rio Tinto's stonewalling tactics, including its instructions to destroy documents prepared by the investigators on which it relies for its equitable tolling claim, as found by Justice Andrews.  Vale continues to review the information that has been and will be produced by the investigative firms (and still awaits service of its Letters of Request in South Africa and France), and the parties are discussing a mutually convenient time to conduct depositions of the UK firms before a Senior Master, most likely in early October.  Vale reserves the right to make a further application for relief from this Court, including costs, at the appropriate time.

### ii.   *BSGR's Position*

BSGR would like to bring to the Court's attention the English High Court's June 29, 2015 ruling resolving the challenges of three of Rio Tinto's investigators (Livingstone and Company Ltd., Africa Risk Consulting Ltd., and Begbies Traynor (Investigations) Ltd.) to Vale's Letters of Request.  A copy of the ruling is attached to this letter.  As Your Honor can see, the English High Court addressed the issues fully and held that while the three investigative agencies would be required to produce documents and sit for depositions, they would not be required to reveal the identities of their individual sources.

### iii.   *Rio Tinto's Position*

We write to briefly update the Court on the results of Vale's June 25th hearing before the London Special Master regarding its letters of requests to Rio Tinto's investigators, in particular its efforts to compel those investigators to reveal the identity of their sources and obtain other source-related material.  The English court ruled that the source information is of "marginal relevance," is entitled to protection, is and should remain confidential, and that neither Vale nor Rio Tinto is entitled to it.  *Vale S.A. v. Livingstone and Company, Africa Risk Consulting Ltd., and Begbies Traynor (Investigations) Ltd.*, [2015] EWHC 1865 (WB) at ¶48.  The English court stated that "it would be disproportionate and unfair to make the [investigators] reveal those identities in the circumstances of this case, bearing in mind the very real risks that could arise for the sources themselves and (although this is of far less weight) the impact that such enforced disclosure might have on the Respondents' businesses and business reputations."  *Id.* at ¶ 47.  As

Hon. Andrew J. Peck, p. 10

to Rio Tinto's ability to get this information, the English court confirmed that "Rio Tinto was not entitled to be told the identities of ARC's sources . . . [and] [t]herefore even if Rio Tinto had tried to obtain that information it is unlikely to have succeeded" *Id.* at ¶ 25.  As to Rio Tinto's rights to source-identifying information from its other UK investigators, BTG and Livingstone, the Court reasoned that even if "Rio Tinto sought the names of [their] sources, it is far from certain that an English court would make an order in its favour." *Id.* at 31.  And even in the unlikely event an English court were to rule in Rio Tinto's favor, the court noted that "Rio Tinto would be bound by the same obligation of confidentiality as [BTG and Livingstone]." *Id.* at 32.

Notably, all of this is in line with what Rio Tinto has consistently represented to Vale and this Court.

### III.   Discovery from Defendant Vale

#### a.   Vale's Nardello Report

##### i.   *Rio Tinto's Position*

Counsel for Vale persists in its refusal to produce the Nardello Report because, according to counsel, the Nardello Report is privileged and they have not otherwise been authorized by Vale to waive that privilege.  Just recently, however, *Main Justice* reported that Vale has in fact authorized its counsel to produce the Nardello Report:

> "Vale has issued contradictory statements on the matter.  In court, Vale has argued that it has no obligation to release the report because it is protected by attorney-client privilege.  But a spokeswoman at the firm's corporate headquarters told Just Anti-Corruption that Vale has authorized release of the report."

*See* Josh Kovensky, *Nardello Report Privilege Battle Reveals Splits in Guinea Bribery Investigation*, Main Justice Just Anti-Corruption, July 20, 2015, *available at* http://www.mainjustice.com/justanticorruption/2015/07/20/nardello-reportprivilege-battle-reveals-splits-in-guinea-bribery-investigation/.  Vale's counsel should therefore immediately produce the Nardello Report, as authorized by its client.

To be fair, Main Justice further quotes Vale's spokeswoman as saying that Nardello "is [the party that is] blocking release to protect its sources."  But a third-party's desire to protect its confidential sources cannot properly stand in the way of producing investigative reports, as Vale has argued time and time again.  As this Court well knows, Vale has attempted to compel Rio Tinto to turn over its investigative reports ***as well as the confidential sources connected to those reports***, saying that they are within the proper scope of discovery and can be adequately protected by appropriate confidentiality designations.  The Nardello Report is no different.  Vale's counsel has it.  Vale has authorized its release.  And Nardello's concerns can be adequately addressed with proper confidentiality designations.

Rio Tinto therefore reiterates its request for an order compelling Vale to produce the Nardello Report.

Hon. Andrew J. Peck, p. 11

> ### ii.   *Vale's Position*

   ***The Court Should Defer Ruling On The Nardello Report.***   Vale's position remains that the Nardello Report is privileged and that, in any event, Rio Tinto's motion is premature before any decision that the Amended Complaint states a claim or any answer that would put privileged information at issue.   There is much at stake.   Rio Tinto claims to be seeking not just production of the Nardello Report, but instead an at-issue waiver with respect to Vale's *entire* due diligence related to the transaction.   (Dk. 298; *see also* Dk. 256 at 6.)   Not only has Vale never put its own due diligence at issue by raising it as a defense in any of its pleadings – unlike what Rio Tinto has done by affirmatively pleading its alleged due diligence as an essential prerequisite to its equitable tolling claim – but there is also no need for the Court to get into the morass of at-issue waiver at this time.   In addition to the pending motion to dismiss, Your Honor has noted upon in camera review of the report that "it seems that a lot of what they did was research from public records/open sources" and that "to the extent that the information that found its way into the Nardello report is and was public record, it's probably something that Rio Tinto can hire its own Nardello or do its own research on."   May 8, 2015 Tr. 6:4-16.   In contrast, there is the risk of extraordinary prejudice to Vale in addressing Rio Tinto's motion before there has been any determination that Rio Tinto has stated a claim or any decision by Vale with respect to the hypothetical question (affected by the scope of any ruling on the motion to dismiss) whether – if Rio Tinto did state a claim – Vale would rely on such information as a defense.

   If the Court were nonetheless to find a waiver with respect to the Nardello Report, which it should not, Vale respectfully requests that compliance with any such order be stayed during the pendency of any appeal of such order to Judge Berman.

### b.   Vale's Production of Documents from Its Auditors

> ### i.   *Rio Tinto's Position*

   Based on representations made by Vale on July 23, 2015, Rio Tinto understands that Vale will produce all documents from the Ernst & Young member-firms it retained to perform work relating to Simandou that are responsive to Rio Tinto's outstanding document requests to Vale. Email from M. Karlan to M. McCaffrey (July 23, 2015).   Rio Tinto requests that the Court order Vale to produce these materials by August 30.

> ### ii.   *Vale's Position*

   ***Vale Has Already Agreed To Request Relevant Documents From Ernst & Young.***   As discussed above, there is no dispute as it concerns production by Vale (as opposed to Rio Tinto). In response to Rio Tinto's request, Vale promptly agreed to contact the relevant Ernst & Young offices.[11]   Vale asks that, in turn, Rio Tinto reciprocally request documents responsive to Vale's

---

[11] The scope of Vale's discovery obligations is defined not by the subpoena (which is overbroad) but by the scope of Rio Tinto's document requests to Vale, as narrowed in the parties' many meet-and-confers and the Court's rulings. Vale never agreed, nor would it, to such broad requests as are set out in the subpoena, including for example "[a]ll Communications between You and any Person concerning Rio Tinto, Simandou, Vale's discussions with Rio Tinto, the Vale-BSGR Transaction, and/or any Defendant."

Hon. Andrew J. Peck, p. 12

document requests to Rio Tinto from its auditors.  As discussed above, Rio Tinto has refused to do this.

      **c.**  **Vale's Objections to Rio Tinto's Second Interrogatories and Third Document Requests**

         *i.*  *Rio Tinto's Position*

Vale wrongfully refuses to respond to numerous interrogatories and document requests as propounded by Rio Tinto.

- **Interrogatory No. 12**:  Interrogatory No. 12 asks Vale to "[i]dentify every Person" who has "knowledge and/or that may possess information regarding [Vale's] response to Rio Tinto's November 24, 2008 confidential briefing," including "any investigation, research, review, or analysis" of the information shared by Rio Tinto on November 24, 2008.  In response, Vale has only listed the individuals who ***attended*** Rio Tinto's briefing.  That, of course, does not answer the interrogatory as propounded and, instead, simply provides Rio Tinto with information that it already has.  Vale's response needs to identify the individuals who have knowledge or information concerning, for example, any post-briefing analysis, follow-up, or discussion regarding Rio Tinto's briefing.  It is *these* individuals who will have relevant information to the claims and defenses in this case.

- **Interrogatory No. 14**:  This interrogatory asks Vale to "[i]dentify every Person" who has "knowledge and/or that may possess information regarding [Vale's] response following notice from the Government of Guinea that it was conducting a review of the Simandou rights held by BSGR Guinea, Vale and/or VBG."  Vale has refused to answer this interrogatory, without basis or justification.  But Vale has asserted by letter that it "first learned of the Government of Guinea's inquiry concerning suspicions of misconduct by BSGR when it was notified of that inquiry by the Government of Guinea in October 2012."  Of course, the Government of Guinea's investigation into Vale's and BSGR's mining rights at Simandou strikes at the heart of this case.  At a minimum, therefore, Vale should identify individuals with knowledge or information concerning this particular notice.  Additionally, Rio Tinto has identified for Vale at least four additional events that potentially put Vale on notice that the Government of Guinea "was conducting a review of the Simandou rights."[12]  Yet Vale refuses to identify which individuals within Vale have knowledge of these events and the steps Vale took in response thereto.

---

[12]   Vale received notice that the Government of Guinea "was conducting a review of the Simandou rights" on (i) March 3, 2011, when government officials made such an announcement at the Global Conference of the Extractive Industries Transparency Initiative, *see* William MacNamara & Christopher Thompson, *Guinea to Review Mining Licenses*, Fin. Times, Mar. 4, 2011; (ii) October 4, 2011, when the Minister of Mines made a demand for documents to VBG, *see* Comité Technique de Revue des Titres et Conventions Miniers, Recommendation Concerning the Minting Titles and Mining Convention Held By VBG ¶ 46; (iii) November 17, 2011, when the Minister of Mines made another request for information to VBG, including a detailed questionnaire, *id.* ¶ 47; (iv) and December 13, 2011, when the Minister of Mines made another such demand, *id.*

Hon. Andrew J. Peck, p. 13

- **Interrogatory Nos. 16–17**:  These interrogatories seek the identification of "every Person" with knowledge or information concerning (i) "Vale's analysis of its April 30, 2010 Joint Venture Agreement with BSGR," including "any audit or review of the Vale-BSGR Transaction" and "any review, analysis, conclusion, or determination regarding whether the Joint Venture Agreement was contrary to Vale's interest"; and (ii) "Vale's consideration, evaluation, discussion, and/or eventual decision [and any follow-up] to declare force majeure with respect to its Joint Venture Agreement with BSGR."  Vale refuses to respond to this Interrogatory on the basis that it is potentially duplicative of Rio Tinto's Interrogatory No. 4.  It is not.  Request No. 4 asked for individuals who had communications with other Defendants "regarding Simandou, the Zogota Project, and/or the Vale-BSGR Transaction."  It did not request the identification of people with knowledge of Vale's decision to review its partnership with BSGR and, ultimately, declare *force majeure*.  Vale should therefore be compelled to answer this interrogatory.

- **Document Request No. 78:**  This request seeks documents concerning Fode Mamadou Keira.  Mr. Keira acted on Vale's behalf in Guinea as a political liaison and go-between with the Government of Guinea and to otherwise make certain payments to the Government of Guinea on Vale's behalf.  Vale has not denied that characterization.  Thus, Mr. Keira appears to have been Vale's consultant in Guinea and liaison to the Guinean Government.  Documents and communications concerning Mr. Keira would therefore likely lead to relevant information in connection with Rio Tinto's allegations, for example, that payments were made to Guinean officials in connection with an ongoing scheme of bribery and corruption in Guinea.  Moreover, Mr. Keira may have played a role in Vale's manipulation of the Government of Guinea to overlook any wrongdoing on Vale's part in connection with obtaining rights to Simandou.

-  **Document Request No. 79**:  This request seeks documents concerning Vale's discussions with third parties regarding a potential or actual transaction involving Simandou and/or Vale's rights in Simandou.  These documents are highly relevant.  First, they relate to Vale's potential use and dissemination of information obtained from Rio Tinto (*e.g.*, the sharing of technical information that traces back to Rio Tinto's data room) and what, if anything, Vale told to these potential JV partners regarding the status of its rights at Simandou.   Second, they relate to damages (*e.g.*, how Vale valued Simandou as a whole, its specific rights there, forecasts on expected revenues and profits).  Indeed, Vale has advanced some of these same arguments with respect to Rio Tinto's third-party negotiations concerning Simandou and obtained discovery into those negotiations.  Rio Tinto's request is no different.  Nor is Rio Tinto's request a shot in the dark.  Vale contemplated one such potential venture over Simandou with Mitsui.  Vale must therefore produce relevant documents regarding this transaction and any other similar transactions.

- **Document Request No. 82**:  This request seeks documents "relating to the legality of Vale and BSGR entering into the Vale-BSGR Transaction" and, more specifically, documents concerning criticism or challenge to the Vale-BSGR Transaction by the Guinean government, the Guinean opposition, government experts or others suggesting that BSGR and/or Vale did not have valid or transferable ownership rights in Simandou.  In response, Vale attempted to limit the definition of "legality" to mean

documents or communications concerning any perceived or actual legal risk or exposure in connection with the joint venture, a definition the parties used in negotiating the scope of an entirely different document request, Request No. 62. That same limitation does not work here. This particular request (i) relates to whether Vale and BSGR had the legal right to enter into the Vale-BSGR Transaction, not whether the Vale-BSGR Transaction created legal risk for Vale and (ii) relates in part to third-party communications and commentary (*i.e.*, the Guinean Government's perception of BSGR's and Vale's rights to Simandou), not Vale's internal communications and audit of the Vale-BSGR Transaction. Vale should be compelled to produce these documents.

- **Document Request No. 83**: This request seeks documents "with any official, director, employee, agent, or representative of the Government of Guinea" while excluding certain documents concerning Vale's re-tender of Blocks 1 and 2 and Vale's Guinean bauxite operations. Vale objected to this Request on grounds that it is duplicative of other requests and overbroad in light of the limitations this Court placed on the scope of discovery regarding Vale's communications with the Government of Guinea. However, Vale has since ***recently and repeatedly*** represented to the Court that it shares a common interest with the Government of Guinea through the introduction of a declaration from a representative of the Government of Guinea purporting to establish that common interest. By making that claim, Vale has opened the door to a broader category of communications with the Government of Guinea. Now that Vale has placed its communications with the Government of Guinea squarely at issue, Rio Tinto is entitled to test the veracity of Vale's representations, which includes obtaining documents that shed light on the nature of Vale's relationship with the Government of Guinea, whether it manipulated that relationship to induce the Government of Guinea to overlook any wrongdoing on Vale's part, and the extent to which Vale deflected attention from its own conduct by pointing the finger at its codefendants. Vale should be compelled to produce these documents.

   ii. *Vale's Position*

   ***Rio Tinto's Third Document Requests And Second Interrogatories Seek Irrelevant Discovery That The Court Has Already Rejected.*** As a preliminary matter, Vale objects that these requests – many of which attempt impermissibly to expand the scope of discovery well beyond the parties' agreements and the Court's orders on the same subject matter – are coming at the tail-end of document discovery. Vale's Responses and Objections to these requests were served on June 19. Rio Tinto did not raise them (or reserve its rights[13]) at the last conference on June 22. Moreover, document production in response to the parties first requests was due to be substantially complete by June 30, all document production must be complete by August 28, and depositions may begin September 30. That schedule leaves no time for overbroad and irrelevant discovery demands to be made at the eleventh hour. Rio Tinto has offered no justification for these belated attempts to expand discovery (none is based on any new development or revelation in the case), nor for attempting to reargue the Court's rulings. Its overbroad requests seeking, for

---

[13] Rio Tinto was on notice that "Judge Peck runs a 'rocket docket'" and that "[d]iscovery disputes should be brought to the Court's attention promptly; in the Court's discretion, belated applications to compel discovery may be denied as untimely." Individual Practices of Magistrate Judge Andrew J. Peck at 4.A.

Hon. Andrew J. Peck, p. 15

instance, virtually all communications with the Government of Guinea, documents concerning negotiations with any third party for Simandou, and documents concerning the "legality" of Vale's JV with BSGR, are so broad precisely because they are unmoored from any fact or development in the case – they could have been asked on day one (and if they had, would have been rejected as overbroad and irrelevant).  Furthermore, answers to Rio Tinto's interrogatories, to the extent relevant, would be better covered through the documents Vale has and will produce, and via deposition if the case survives to that stage.

"Discovery is not an end in itself," and under Rule 26's balancing test, even where discovery "might be relevant, in the capacious sense of Federal Rules of Evidence 401 and Civil Procedure 26(b)(1)" – which Rio Tinto's requests are not – the court must not permit such discovery where "sufficiently unimportant to resolution of the issues at hand."  *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, No. 12 MD 2335 LAK, 2014 WL 5392465, at *1, 3 (S.D.N.Y. Oct. 9, 2014) (Kaplan, J.); Fed. R. Civ. P. 26(b)(2)(C).  As set out below, the requests are irrelevant, burdensome, and belated, and should be quashed.

**Document Request No. 78:**  This request seeks all documents "concerning any meetings or Communications between [Vale] and Fode Mamadou Keira."  This request falls far outside of the  permitted scope of discovery under Rule 26 and also runs afoul of the balancing test.  Mr. Keira was a consultant in Guinea whom Vale hired around 2005 – three years before Rio tinto claims any conspiracy between Vale and BSGR was formed.[14]  His name appears nowhere in the 65-page Amended Complaint.  When pressed, Rio Tinto did not identify a paragraph of the Amended Complaint to which he related but could state only that "on information and belief, Mr. Keira acted on Vale's behalf in Guinea as a political liaison / go-between with the Government of Guinea and to otherwise make certain payments to the Government of Guinea on Vale's behalf."  June 30, 2015 Email from K. Forst to M. Karlan.  The Amended Complaint does not allege that Vale made any improper payments to the Government of Guinea.  (Indeed, it does not affirmatively allege that Vale was aware of any improper payments allegedly paid by BSGR years before the Vale-BSGR joint venture.)  Even then, when Vale asked Rio Tinto for the oral statement (not in any pleading) regarding Mr. Keira – to provide the "information" behind its belief – it did not do so.  *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (information-and-belief allegation "must be accompanied by a statement of the facts upon which the belief is based"); *G-I Holdings, Inc. v. Baron & Budd*, No. 01-CIV-0216 (RWS), 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) ("[T]he sources of the information and belief should be sufficiently identified so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein." (citation and quotation marks omitted)).  This request should be rejected as irrelevant and overbroad.

**Document Request No. 79**:  This request seeks all documents "relating to Vale's negotiations with any Third Party regarding any transaction that would include or involve Simandou (or any of Vale's rights with respect to Simandou) from April 30, 2010 to the present."  The request is overbroad on its face and is a pure fishing expedition.  Rio Tinto is one of Vale's two major competitors; it is not entitled to information regarding Vale's negotiations with third parties regarding interests it lawfully owned.  Rio Tinto is entitled only to relevant

---

[14] That is, until it dropped that allegation in response to the pending motion to dismiss.

Hon. Andrew J. Peck, p. 16

documents and, at this stage, only to documents that it did not request earlier and could not have requested earlier.  Neither of the justifications Rio Tinto has proffered to Vale supports this request.  When asked to explain its relevance, Rio Tinto said it might capture documents concerning  damages.  But, as to damages, Vale agreed to produce in response to Request 1, any internal or external valuations (whether formal or informal) concerning Simandou up to April 22, 2011.  Over four months ago, Your Honor limited Rio Tinto to the April 2011 date – over Rio Tinto's objection – on the rationale that documents after that date were not relevant, *see* Feb. 27, 2015 Tr. 36:14-15, and, to the extent that Rio Tinto seeks documents about negotiations that do not concern valuations (formal or informal), such documents would not be relevant to damages (and come too late in any event).  Rio Tinto has also suggested that such documents might show "Vale's sharing of information that was taken from Rio Tinto."  But, there is not a single allegation in the Amended Complaint that Vale shared information with third parties other than BSGR.  Finally, to the extent relevant to the Amended Complaint, the topic is already well covered by Rio Tinto's many prior requests.  The parties spent countless hours negotiating the scope of Rio Tinto's Requests 12, 33, and 44-50, all of which are purportedly designed to capture documents concerning the information Vale allegedly misappropriated, and all of which would capture those documents regardless of whether they were created in the context of any negotiations between Vale and any third party, or any other context.  Nothing has changed to re-open the extensively negotiated scope of those requests.

**Document Request No. 82**:  This request seeks all documents "relating to the legality of Vale and BSGR entering into the Vale-BSGR Transaction."  If the request sounds familiar, it is because the parties have already briefed and then resolved a nearly identical request:  Request 62 sought, *inter alia*, all documents "relating to internal discussions about the legality . . . of Vale's joint venture with BSGR."  Specifically, after argument at the June 1 conference, and extensive negotiations, the parties agreed on June 13 that Request 62 would be limited in relevant part to documents relating to internal discussions about the legality of Vale's joint venture with BSGR, where (i) "legality" means Documents or Communications concerning any perceived or actual legal risk or exposure in connection with the joint venture.[15]  The only relevant difference between the requests is that Request 62 was limited to internal communications, which Request 82 is not.  The request for external communications comes too late, but to resolve the dispute Vale already offered to expand the agreed scope to include external communications.  No more (not even that) is required.

**Document Request No. 83**:  This request seeks all documents with "the Government of Guinea (and the CTRTCM) . . .  from April 30, 2010 to April 30, 2014, excluding any documents

---

[15] The full agreement for Request 62 is as follows: All Documents and Communications relating to internal discussions about the legality and/or propriety of Vale's joint venture with BSGR, where (i) "legality" means Documents or Communications concerning any perceived or actual legal risk or exposure in connection with the joint venture, and (ii) "propriety" means Documents or Communications relating to (1) Steinmetz's and/or BSGR's improper, illegal, immoral, and/or corrupt conduct; (2) Steinmetz's and/or BSGR's reputation for improper, illegal, immoral, and/or corrupt conduct; and/or (3) the sentiment that associating with Steinmetz and/or BSGR may be unwise, inadvisable, inappropriate, unsuitable, or imprudent because of Vale's prior negotiations with Rio Tinto regarding Simandou.  This request also includes any Document or Communication concerning any decision by Vale to conduct an audit of the negotiation and execution of the agreement with BSGR after Ricardo Flores became chairman of Vale's board of directors to the extent such audit concerned the "legality" and/or "propriety" of the joint venture, as those terms are defined above.

Hon. Andrew J. Peck, p. 17

and communications relating exclusively to the Government of Guinea's re-tender of Blocks 1 and 2 of Simandou or Vale's Guinean bauxite mining operations."  This amounts to a request for virtually all communications between Vale and the Government of Guinea (including all operational communications concerning Simandou).  It makes transparent Rio Tinto's real motive in this lawsuit – to try to freeze Vale out of the rebidding for Simandou and, failing that, to obtain a competitive advantage in the bidding for that concession.

Your Honor has repeatedly rejected Rio Tinto's overbroad approach and the fact that this request comes at the end of document discovery (and not at the beginning) is not an opportunity for Rio Tinto to avoid (or relitigate) those fights it has already lost.  For example, with respect to Requests 56 and 63, which sought all documents concerning certain 2011 meetings between Vale's CEO and the President of Guinea, Alpha Condé, Your Honor found the requests were overbroad and limited them "to the information about the bribery, the conspiracy" or any other "funny business," "as opposed to just the general operations of Simandou" or "normal business." Apr. 8, 2015 Tr. 23:11-15, 24:15-19, 25:1-6.  Again at the June 1 conference, Your Honor instructed that Rio Tinto is "not entitled to what was discussed if it's not related to the allegations here of fraud, etc."  June 1, 2015 Tr. 38:2-6, 38:23-39:3 ("We love the fact that you are earning us billions of dollars or whatever, that we want you to mine deeper, faster, that is off the table.").  To the extent it is limited to the relevant claims and defenses of this lawsuit, the request is cumulative and duplicative of the scope of Request Nos. 41 & 42 (communications with the Government in its role as investigator), 58 & 59 (government communications concerning Liberian transport route), and 56 & 63 (certain meetings with the President).

When asked the basis for this new and expansive and belated request, Rio Tinto stated the request is "aimed at testing Vale's in-court representations that the Government of Guinea objectively absolved Vale of any wrongdoing" and that "Rio Tinto is entitled to test the veracity of that representation, which would include obtaining documents that shed light on the nature of Vale's relationship with the Government of Guinea, whether it manipulated that relationship to induce the Government of Guinea to overlook any wrongdoing on Vale's part, and the extent to which Vale played a role in pointing the finger at Co-Defendants."  June 30, 2015 Email from K. Forst to M. Karlan.  Rio Tinto's novel theory appears nowhere in the Amended Complaint (nor is it suggested by any discovery to date).  Vale too would love to obtain Rio Tinto's communications with the Government of Guinea (and other governments) to show that Rio Tinto was not able to show those governments any evidence that would support the allegations against Vale.  But this case should be litigated on the underlying facts (or absence of facts) and not on communications with the relevant governments.[16]

In short, the request is a fishing expedition as Rio Tinto scrambles for a new theory of the case, after essentially conceding that the one in the Amended Complaint does not hold water. Twelve months ago, Judge Berman ruled that no further amendment of the complaint would be permitted.  July 28, 2014 Tr. 9:8-12.

---

[16] Rio Tinto's rationale that it is entitled to test the "veracity" of Vale's statements is a patent makeweight; on that theory, which is essentially one of impeachment, Vale would be able to ask Rio Tinto for any communication it had with anybody regarding Simandou in order to "test the veracity" of all of Rio Tinto's allegations regarding Simandou.  (It has yet to be able to convince anyone of them.)  The rationale is particularly flimsy given that there has been no showing that Vale plans to offer the Government of Guinea as a witness in this action.

Hon. Andrew J. Peck, p. 18

**Interrogatory No. 12:**  This interrogatory seeks "every Person . . . with knowledge and/or that may possess information regarding [Vale's] response to Rio Tinto's November 24, 2008 confidential briefing about the status of its Simandou Concession and BSGR's and Steinmetz's efforts to obtain Blocks 1 and 2, including any investigation, research, review, or analysis You undertook in response to the same."  This interrogatory violates Rule 33 and Local Rule 33.3.  It assumes multiple factual premises that are false and for which Rio Tinto has not provided support, including that Rio Tinto gave Vale a "confidential briefing about the status of its Simandou Concession and BSGR's and Steinmetz's efforts to obtain Blocks 1 and 2" and that Vale had a "response" thereto.  It is also vague.  To the extent it seeks confirmation or denial of those factual assertions, it is a contention interrogatory served in violation of Local Rule 33.3.

That said, to the extent the interrogatory is not objectionable – i.e. to the extent it seeks the identities of witnesses who would have knowledge of *any* briefing provided at the November 24, 2008 meeting and Vale's reaction, if any, to such briefing – Vale has appropriately responded by identifying the relevant witnesses, who are the six Vale representatives who attended that meeting.  Having the names of the relevant witnesses, Rio Tinto is free to take up the substance of that November 2008 meeting with those witnesses at depositions.

**Interrogatory No. 14**:  This interrogatory seeks "every Person . . . with knowledge and/or that may possess information regarding [Vale's] response following notice from the Government of Guinea that it was conducting a review of the Simandou rights held by BSGR Guinea, Vale and/or VBG, including any investigation, research, review, or analysis You undertook in response to the same."  Again, to the extent not objectionable, Vale's has agreed to answer.

As originally drafted, the interrogatory sought witnesses with knowledge of Vale's unidentified "response" to an unidentified "notice" from the Government of Guinea.  Vale inquired of Rio Tinto what specifically was being asked and in response Rio Tinto identified no fewer than five separate events and dates, spanning 20 months: (i) March 3, 2011, "when government officials made such an announcement at the Global Conference of the Extractive Industries Transparency Initiative," (ii) October 4, 2011, "when the Minister of Mines made a demand for documents to VBG," (iii) November 17, 2011, "when the Minister of Mines made another request for information to VBG, including a detailed questionnaire," (iv) December 13, 2011, "when the Minister of Mines made another such demand," and (v) October 2012, when Vale "first learned of the Government of Guinea's inquiry concerning suspicions of misconduct by BSGR."  Rio Tinto refused to choose which of these discrete subparts (not specified in the interrogatory as served) it wanted answered.  Regardless, to the extent relevant, Vale has agreed to respond by identifying, in response to a separate interrogatory (Interrogatory 15), individuals with knowledge of either Vale's receipt of the October 30, 2012 letter from the Technical Committee – the only one of Rio Tinto's five "notices" that involved Vale learning of suspicions by the Government of Guinea of misconduct by BSGR[17] – or Vale's response thereto, if any.

---

[17] The other "notices" belatedly referenced by Rio Tinto related to a mining industry-wide review of contracts by the Government of Guinea, involving all companies in the mining sector, including presumably Rio Tinto.  *See, e.g.*, William MacNamara and Christopher, *Guinea to review mining licences*, Financial Times (March 4, 2011) ("Guinea is planning a comprehensive review of its mining licences that could disrupt a $1.35bn iron ore agreement between

Hon. Andrew J. Peck, p. 19

**Interrogatory Nos. 16**:  This interrogatory seeks every person with knowledge "regarding Vale's analysis of its April 30, 2010 Joint Venture Agreement with BSGR, including but not limited to any audit or review of the Vale-BSGR Transaction; any review, analysis, conclusion, or determination regarding whether the Joint Venture Agreement was contrary to Vale's interest."  This request is not addressed to any allegation of the Amended Complaint and, in any event, is too late.  It could have been served earlier.  And there was no such "analysis of the April 30, 2010 Joint Venture Agreement" to which Rio Tinto is referring.  Your Honor will recall you have already ruled with respect to discovery concerning a purported "look back" at the joint venture.  Rio Tinto previously argued, in support of its discovery and based on an unreliable magazine article, that Vale "performed an internal re-evaluation of its due diligence on the BSGR transaction in 2011."  Dk. 234 at 7.  At the Court's direction, Vale followed up "to verify that the article [cited by Plaintiff] that talked about a look-back in 2011 [about the diligence for the Vale-BSGR transaction], there was no such look-back."  Apr. 8, 2015 Tr. 19:20-22.  As reported to the Court, Vale did so, confirming the article was not accurate.  Dk. 246 at 7.  Vale cannot provide the names of people with knowledge of an "audit" that its investigation to date indicates did not occur.

Vale has already produced any relevant information in response to Interrogatory 4, in response to which Vale identified 29 individuals and entities employed or retained by Vale who were involved in the BSGR negotiations, and therefore would have been the people to "analyze" the joint venture decision.  To the extent Rio Tinto requests that Vale identify individuals with knowledge of analysis of the joint venture, Vale has done so in response to Interrogatory 4.

**Interrogatory Nos. 17**:  Finally, this interrogatory seeks all persons with knowledge "regarding Vale's consideration, evaluation, discussion, and/or eventual decision to declare force majeure with respect to its Joint Venture Agreement with BSGR, and any follow-up thereto.  Again, the Court has considered and rejected discovery in this area.  Rio Tinto's Request 65 sought "[a]ll Documents and Communications concerning Vale's decision to declare a material adverse change and/or *force majeure* with respect to its joint venture agreement with BSGR."  At the June 1 Conference, Your Honor ruled: "[I]f they decided to get out of the with BSGR because they were losing money or whatever, you are not entitled to that.  Only if they get out of it because they discovered that something bad was happening or had happened with BSGR. . . . If they say it's because there are investigations, you get it."  June 1, 2015 Tr. 41:24-42:9.  Vale has therefore agreed to produce non-privileged documents concerning its decision to declare force majeure to the extent such documents indicate that decision related to the alleged bribery, fraud, misappropriation of confidential information, or obstruction of justice alleged in the Amended Complaint.  Despite the substantial completion of document production, Rio Tinto has come forward with no evidence that the decision to declare force majeure was based on allegations of bribery or corruption against BSGR, as indeed, it was not.  It has therefore made no showing that the subject matter of this interrogatory is relevant and within the scope of Rule 26.

---

China's Chinalco and Rio Tinto, a $2.5bn iron ore acquisition by Brazil's Vale, and a slew of smaller mining deals in the mineral-rich west African state.").  According to the Government, the review meant that "[a]ll contracts [would] be reviewed and reworked."  *Id.*  Any suggestion by Rio Tinto that these other notices related to an "investigation" of VBG or Vale (or even of BSGR) would be a complete fabrication.

Hon. Andrew J. Peck, p. 20

### d.  **Vale's Document Production**

#### i.  *Rio Tinto's Position*

Vale's document production is deficient in several critical respects.  To date, Vale has produced less than 17,000 documents, approximately 1/7th the amount that Rio Tinto has produced or more than *100,000 fewer* documents.  This paltry number is startlingly low in light of Vale's previous assertions that Rio Tinto's document requests implicated 1.3 terabytes of data.  *See* Dkt. No. 100 at 9–10.  Moreover, Vale's production of just 17,000 documents is an order of magnitude less than the 140,000 documents it claimed to have involving the eight missing custodians alone.  Indeed, as to documents from those eight missing custodians, Vale produced less than ***2,000 documents*** in total, which does not include a ***single*** email sent by Roger Agnelli, its former CEO who led Vale's efforts with respect to Simandou.

Vale's production is also glaringly deficient due to the absence of documents responsive to many of Rio Tinto's document requests.  For example, Vale's production includes a negligible amount of documents and communications regarding:

- Vale's interest in acquiring Blocks 1 and 2;

- Pre-2010 contacts between BSGR and Vale;

- The dates and locations of Vale's meetings with BSGR and Rio Tinto regarding negotiations over Simandou;

- Drill locations for Blocks 1 and 2 and how those locations were chosen;

- Vale's anti-corruption policies and efforts;

- The October 28, 2010 Vale Day presentation, including drafts, supporting documentation, and transcripts;

- Fabio Barbosa's and Roger Agnelli's involvement in Simandou and their subsequent departures from Vale;

- Roger Agnelli's and Murilo Ferreira's February 2011 meetings with Alpha Condé;

- Rio Tinto's settlement with the Government of Guinea regarding Blocks 1 and 2;

- Vale's consideration, evaluation, and discussions regarding the Trans Guinean Railway; and

- The studies, plans, and analyses underlying VBG's October 2011 Feasibility Study.

This non-exhaustive list of gaps in Vale's production reveals that Vale has not produced thousands of documents that go to the heart of this case.  There are a few potential reasons for these gaps.

*First*, as explained above, Vale is missing swaths of documents from critical custodians.

*Second*, Vale has taken an unjustifiably narrow view of responsiveness in determining what documents should be produced. For example, Vale produced only 238 documents reflecting communications by, between, and among Rio Tinto and Vale relating to the parties' Simandou negotiations. Rio Tinto, in contrast, has produced four times that number—meaning, of course, that Vale has marked communications between it and Rio Tinto as "non-responsive" when they clearly are not.

*Third*, Vale has taken an unjustifiably narrow view when it comes to training its predictive coding system. For example, Rio Tinto has already identified over 100 documents that Vale improperly coded as non-responsive during training. Indeed, Rio Tinto continues to dispute Vale's coding of certain documents in Vale's training set. This means that Vale's system (almost a month after the substantial completion deadline) is still not properly trained. As another example, Vale has improperly excluded documents related to exporting ore from Simandou via the Trans Guinean railway—a key issue in this case that falls squarely within the scope of Rio Tinto's document request as agreed by the parties. Indeed, Vale conceded during a recent meet and confer that it had forgotten that documents concerning the Trans Guinean railway fell within the scope of the parties' agreement. Despite that concession, Vale has otherwise argued that these documents should not be produced because they relate to mundane, day-to-day business operations so as to attempt to exclude them. But that argument is plainly wrong. The parties' carve-out (*i.e.*, that Vale does not need to produce documents concerning day-to-day business operations) was meant to cover only routine business operations like ordering rock crushers or processing payroll. It was not meant to exclude documents discussing Vale's plans for a Trans Guinean railway. Indeed, that railway never "operated" and so it cannot relate to day-to-day business "operations." Moreover, Vale's plans to develop a Trans Guinean railway trace directly back to Rio Tinto's same plans as presented to Vale and included in its data room. Documents about this are undoubtedly highly relevant.

These deficiencies warrant immediate attention and correction, and the agreed-upon additional predictive coding training will not correct them. That additional training was meant to identify and further train the system on low prevalence documents in the parties' training document universe (indeed, it is why the parties exchanged search terms a mere three days after the substantial production deadline).[18] The categories of missing documents, however, likely are not of "low prevalence" in Vale's system, but rather are missing because of Vale's narrow approach to responsiveness, as explained above. Further training cannot and will not fix this issue. Only a change in Vale's approach to responsiveness can.

Accordingly, Rio Tinto respectfully seeks, as a first step, an order that Vale produce a search term hit report for the search terms it ran to narrow its document universe. Having that search-term report will clarify the general subject matter of Vale's document universe and whether Vale has documents related to the gaps in its production. From there, Rio Tinto can meet and confer with Vale to develop a reasonable approach to rectify the issue, including by re-

---

[18]   Vale also refuses to confirm whether Trojan Horse was a code name for its deal with BSGR. There are documents suggesting that it was. If so, Vale should include the term "Trojan Horse" as a search term to locate additional, responsive documents.

Hon. Andrew J. Peck, p. 22

reviewing documents related to key missing terms and adding additional search terms that Vale should have included in the first instance (and that Rio Tinto could not have known to add absent review of Vale's production).

> ii. *Vale's Position*

**Vale Continues To Meet Its Production Obligations.**  Rio Tinto informed Vale yesterday that it planned to raise issues regarding unspecified "deficiencies" in Vale's document production.  Rio Tinto's elevation of this issue to Your Honor's attention is premature since Vale only this week received complaints from Rio Tinto about Vale's productions (three weeks after Vale substantially completed them), Vale is still investigating the issues raised, and therefore the parties have not had an opportunity to meet and confer about them.

In any case, Rio Tinto complaint that Vale's production is not voluminous enough is baseless.  Vale's obligation is to conduct a reasonable search for documents responsive to Rio Tinto's requests, not to produce any particular volume of documents, whether overall or with respect to specific issues.  That Vale's search has been reasonable should be apparent to Rio Tinto, since it has had the opportunity to inspect and participate in Vale's predictive coding process throughout, including by reviewing every single non-privileged document that was used to train Vale's predictive coding model, and by receiving extensive disclosures about the accuracy and completeness of Vale's review through its Control Set, Training Set, and Validation Set disclosures.  Those disclosures prove that Vale has fulfilled its obligation to identify and produce non-privileged documents responsive to Rio Tinto's document requests, which Vale will shortly demonstrate to Rio Tinto.

By contrast, the equivalent disclosures from Rio Tinto raise serious questions about the completeness of its productions, and its good faith search for documents responsive to Vale's document requests.  Specifically, Rio Tinto's Control Set disclosures established that approximately five percent of the 3 million documents in Rio Tinto's Document Universe, or 150,000 documents in total (not including family members of responsive documents), were responsive to Vale's requests, and yet it produced fewer than 60,000 documents (including family members of responsive documents) from that universe.  Vale will seek an explanation from Rio Tinto about the source of this enormous discrepancy and, if Rio Tinto cannot provide an adequate explanation, Vale will take the issue up with the Special Master newly appointed in this case.[19]

At bottom, Rio Tinto's real complaint seems to be that the documents Vale has produced do not support Rio Tinto's theory of the case.  For example, Rio Tinto complains that Vale has not produced documents establishing pre-2010 contacts between Vale and BSGR regarding Simandou, including the dates and locations of meetings between the two parties.  The absence of such documents only establishes what Vale has been saying all along: that there was no conspiracy formed between Vale and BSGR, and that Rio Tinto lost its rights to Simandou in late-2008 because it was not complying with its obligations under Guinean mining law to exploit the concession.  Negotiations between Vale and BSGR over an investment by Vale in Simandou

---

[19] By letter dated July 22, 2015, Special Master Maura Grossman has requested a joint submission from the parties on disputes related to the use of predictive coding in this case, which the parties are assembling.

Hon. Andrew J. Peck, p. 23

with BSGR did not take place until 2010, long after Rio Tinto lost its concession, after BSGR had started developing the project, and after BSGR had tried and failed to negotiate a joint venture agreement with parties other than Vale.

## IV.    **Discovery from Defendants BSGR and Steinmetz**

### i.   *Rio Tinto's Position*

Defendants BSGR's and Steinmetz's recent production on June 30, 2015 is deficient. Rio Tinto, together with Defendant Vale, propounded 25 document requests (many with multiple subparts) on BSGR and Steinmetz via the Hague Evidence Convention. *See* Dkt. No. 221. In response to these requests, BSGR and Steinmetz committed to a comprehensive production of responsive documents. What has come from BSGR and Steinmetz, however, is far from comprehensive. Indeed, BSGR and Steinmetz produced ***less than 1,400 documents***[20] in response to requests that span more than a decade and cover a wide range of topics, including BSGR's and Steinmetz's negotiations and interactions with Vale, communications with other Co-Defendants, BSGR's technical work as performed on the ground at Simandou in Guinea, and interactions with the Guinean Government. Moreover, there are obvious and concrete gaps in BSGR's and Steinmetz's production.

- BSGR and Steinmetz have produced only a few hundred emails that were exchanged between them and Vale. By comparison, Vale has produced more than 2,000 emails that were exchanged among Vale, BSGR, and Steinmetz. Of course, even this number of emails (2,000) produced by Vale is likely only a subset of what was exchanged among Vale, BSGR, and Steinmetz in light of Vale's destruction of documents from critical custodians that interacted with BSGR and Steinmetz. For this reason, production of these communications from BSGR and Steinmetz is critical – they may be the only remaining source for them.

- BSGR and Steinmetz have not produced *any* "[d]ocuments referring to information and documents related to Simandou and received by BSGR from Vale before April 2010," as called for by Request (x) in the parties' Letter of Request. *See* Dkt. No. 221. Vale, on the other hand, has produced hundreds of such communications, despite Vale's document destruction issues noted above.

- Likewise, Vale has produced a January 21, 2009 presentation entitled "BSGR Guinea Simandou Blocks 1 and 2 Exploration Programme and Budget," created by ***BSGR employees*** Graham Greenway, Iwan Williams, and Iain Bryson. By comparison, BSGR and Steinmetz have not produced this presentation nor any of "the email[s], letters and other documents and communications held on the BSGR IT system or in other locations within the possession, custody or power of BSGR which concern or were used to develop the January 21, 2009 presentation titled 'BSGR Guinea Simandou Blocks 1 and 2 Exploration Programme and Budget,' created by Graham Greenway, Iwan Williams, and Iain Bryson." *See* Dkt. No. 221, Request (y).

---

[20]   Even Defendant Thiam, a single individual, produced three times that number.

Hon. Andrew J. Peck, p. 24

- BSGR and Steinmetz have not produced "[t]he File of Correspondence provided to the court in the claim BSG Resources Limited v. The Director of the Serious Fraud Office and The Secretary of State for the Home Department dated November 26, 2014; Claim No. CO/5477/2014," as called for by the parties' Letters of Request.  *See* Dkt. No. 221, Request (p).

These specific deficiencies are even more glaring against the backdrop of BSGR's and Steinmetz's previous representations to the Court that Rio Tinto's ***jurisdictional requests alone*** mandated the "processing of at least 20.6 terabytes of data and the review of several million records in foreign languages."  Dkt No. 100 at 10.  Moreover, BSGR and Steinmetz provided hit reports (at that time) that returned tens of thousands of potentially responsive documents, which BSGR and Steinmetz withheld at the time as relating to "merits" discovery rather than jurisdictional discovery.  Merits discovery is now well underway, yet BSGR and Steinmetz have produced a grand total of less than ***1,400 documents.***  The gaps in BSGR's and Steinmetz's production and the extremely small number of documents produced show that significant numbers of responsive documents have not produced.

Rio Tinto therefore respectfully requests the Court to order BSGR and Steinmetz to (i) produce the documents in response to Requests (x) and (y) in connection with the parties Letters of Request and (ii) to identify (a) the custodians from which they collected documents, (b) what, if any, search terms and date restrictions they used to cull the collected documents, (c) the total size of BSGR's and Steinmetz's collection, both before and after it was culled for review, and (d) a search-term hit report.  This information is necessary to ensure that BSGR's and Steinmetz's next production will be "substantially" complete, as it was supposed to be on June 30, 2015.

## ii.  *BSGR/Steinmetz's Position*

Rio Tinto is once again jumping the gun and raising issues with Your Honor before they are ripe.  The parties have not yet had the opportunity to meet-and-confer on the points Rio Tinto raised for the first time just a few days ago, in a letter in which Rio Tinto also conceded that it had not even finished its review of BSGR's document production.

On July 21, 2015, counsel for Rio Tinto sent counsel to BSGR a letter complaining about several purported deficiencies in the productions BSGR made in response to Rio Tinto's and Vale's joint Letter of Request ("July 21 Letter").  Rio Tinto conceded in the July 21 Letter that it had not yet finished its review of BSGR's productions, but nonetheless demanded a meet-and-confer for the following afternoon.  Counsel to BSGR replied by e-mail the same day to say that they were not available for a meet-and-confer session the following day, but that they were discussing the points raised in the July 21 Letter with BSGR's London counsel and would provide a written response before the end of the week.

On July 24, 2015, BSGR's London counsel sent a letter to Rio Tinto's counsel responding to the points raised in the July 21 Letter ("July 24 Response").  The July 24 Response addressed each of the July 21 Letter's complaints.  Specifically, the letter explained that:

Hon. Andrew J. Peck, p. 25

- Rio Tinto's specious comparison between the number of documents BSGR produced and the number of documents that other defendants have produced was irrelevant and had no bearing on the fact that BSGR fully complied with its obligations;

- a metadata overlay would be (and has now been) provided;

- any non-privileged documents responsive to Requests (x) and (y) of the Letter of Request have been produced;

- BSGR would review its searches to ensure that no documents were inadvertently withheld from discovery as a result of foreign language issues;

- the file called for by Request (p) of the Letter of Request was produced.  In fact, Rio Tinto knew this answer already since BSGR had responded to the same question from Vale's counsel on July 6, 2015; and

- a privilege and redaction log would be produced which would address Rio Tinto's complaints about redactions.

The July 24 Response also addressed Rio Tinto's assertion that documents that were not produced as part of BSGR's jurisdictional document production should have been produced as part of the production in response to the Letter of Request.  Specifically, the July 24 Response reminded counsel to Rio Tinto that the text of the Letter of Request was carefully negotiated and that if Rio Tinto sought the production of documents withheld during the jurisdictional discovery process, it should have insisted on the inclusion of language in the Letter of Request that would cover those documents.  BSGR cannot be criticized for failing to produce documents that were not called for.

That said, the July 24 Response confirmed that BSGR has produced all non-privileged documents responsive to the jurisdictional discovery requests, including all responsive, non-privileged documents from the categories referenced in Rio Tinto's counsel's March 23, 2015 letter.  Additionally, the July 24 Response confirmed that BSGR has produced all non-privileged documents responsive to the specific requests contained in the Letter of Request regarding Pentler Holdings Ltd.

The July 24 Response also offered to meet-and-confer with counsel to Rio Tinto at a mutually convenient time.  BSGR has not received any request for a meet-and-confer on the issues raised in the July 21 Letter.  Thus, none of the issues raised in the July 21 Letter are ripe for Your Honor's attention.

## V.    Discovery from Defendant VBG

### i.    Rio Tinto's Position

On July 17, 2015, Rio Tinto requested further assistance from this Court to compel Defendants VBG and Vale to do more to "cooperate" with Rio Tinto in collecting and producing documents from VBG custodians.  See Dkt. No. 302.  Since submitting that letter, Rio Tinto and

Hon. Andrew J. Peck, p. 26

VBG have begun making progress.  Rio Tinto understands from VBG's counsel that (i) VBG has obtained relevant documents from VBG's previous counsel and will produce those documents next week, and (ii) VBG has requested that Vale identify additional employees that previously worked for VBG and what documents Vale has for those individuals.  Rio Tinto further understands that Vale will provide VBG with a list that identifies an additional 26 individuals.  VBG has further represented that it is still attempting to obtain (i) hard copy documents that remain in Guinea and (ii) the documents that were seized by the Guinean Government.  Rio Tinto respectfully requests that VBG provide the Court with a detailed update on these efforts.

Rio Tinto also respectfully requests an order that VBG produce the documents it has received from VBG's previous counsel by July 31, 2015 and produce emails from relevant VBG custodians by August 21, 2015, simply to ensure that the parties, including Vale, continue to move forward.

## ii. *VBG's Position*

Consistent with our report to the Court in our letter dated July 20, 2015, all documents produced by VBG's former counsel ("Former Counsel") in Paris to the Technical Committee established by the Guinean government to review matters pertaining to Simandou, have been reviewed and will be produced in their entirety on Monday, July 27, 2015.   These documents represent the totality of responsive documents in the possession, custody or control of Former Counsel.

Also consistent with our report to the Court in our letter dated July 20, 2015, counsel to Vale have provided us with a list of thirty one VBG custodians whose email was at one time hosted by Vale.  We are reviewing those names and will, in consultation with counsel to Rio Tinto, determine which custodians' emails should be reviewed for potential responsiveness and production.

As a result of financial constraints in Guinea, we do not currently have access to the files stored there but are endeavoring to find a means to access those documents to permit them to be reviewed for potential responsiveness and production

## VI.   **Discovery from Defendant Thiam**

Rio Tinto and Defendant Thiam are currently in the process of meeting and conferring with respect to several issues related to Defendant Thiam's production.  The parties have been making progress and at this time, there are no issues that require the Court's intervention.  To the extent anything remains unresolved by the next status conference, we will advise the Court.

Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman

cc:     All counsel of record (via ECF)