Neutral Citation Number: [2015] EWHC 1865 (QB)
Case No: IHQ/15/0337
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 29/06/2015

**Before** :

**MRS JUSTICE ANDREWS DBE**

- - - - - - - - - - - - - - - - - - - - -

**Between** :

| | |
|---|---|
| **RIO TINTO PLC** | **Claimant** |
| - and - | |
| **VALE S.A. AND OTHERS** | **Defendants** |

And Between:

| | |
|---|---|
| **VALE S.A.** | **Applicant** |
| - and - | |
| **(1) LIVINGSTONE AND COMPANY LTD**<br>**(2) AFRICA RISK CONSULTING LTD**<br>**(3) BEGBIES TRAYNOR (INVESTIGATIONS) LTD** | **Respondents** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Sara Cockerill QC** (instructed by **Cleary Gottlieb Steen & Hamilton LLP**) for the
**Defendants and Applicants**

**Andrew George QC and David Hirst** (instructed by **Farrers LLP**) for the **First Respondents,**
**(**by **Sheridans)** for the **Second Respondents** and (by **DWF LLP**) for the **Third Respondents**

Hearing date: 25 June 2015
- - - - - - - - - - - - - - - - - - - - -
# Judgment

**Mrs Justice Andrews:**

1. On 28 April 2015 Master Eastman made orders against each of the three Respondents under CPR Part 34 ("the Orders") in response to a Letter of Request dated 31 March 2015 issued by the Honourable Judge Andrew J Peck in the US District Court for the Southern District of New York at the request of one of the Defendants to civil proceedings before that Court, Vale SA ("Vale"). Each Order requires the relevant Respondent to produce documents falling into individual requests set out in Schedule A, and requires a named employee to be examined as a witness on the matters set out in Schedule B.

2. The substantive US Proceedings are for alleged fraudulent conspiracy and corruption under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). They relate to the withdrawal from the Claimant, Rio Tinto Plc ("Rio Tinto") in December 2008 of certain iron ore concessions in the Simandou region of Guinea, which the Government of Guinea then granted to one of the other Defendants to those proceedings, a company to which I shall refer as "BSGR". It is alleged that BSGR obtained the concessions in consequence of bribery and other dishonest behaviour.

3. Vale, like Rio Tinto, is one of the world's leading mining companies. Vale entered into a joint venture with BSGR in April 2010. Rio Tinto alleges that the loss of its concessions was brought about by a fraudulent conspiracy between Vale and BSGR, which Vale vigorously denies. Vale says that it came upon the scene well after BSGR obtained the revoked concessions.

4. Vale also alleges that Rio Tinto's lawsuit, which was commenced on 30 April 2014, is time-barred. The relevant limitation period is four years from the date on which the injury was suffered. Rio Tinto contends that its claim is not time-barred. It has accused Vale of taking steps to improperly conceal matters that would have led it to discover that it had a claim, and relies upon the defence of "equitable tolling". This appears to be broadly similar in effect to s.32 of the Limitation Act 1980, in that the limitation period is postponed until the injured party, by investigating the matter with reasonable diligence, could have discovered that he had a claim, or until he was put on notice that he had a claim. The merits of the equitable tolling defence therefore turn upon whether Rio Tinto's investigations were or were not sufficiently diligent, whether Rio Tinto was aware of so-called "red flags" putting it on notice of its potential claim, and whether or not there was any deliberate (and effective) cover-up by Vale.

5. The Respondents, to whom I shall refer respectively as Livingstone, ARC and BTG, are firms or corporations based in this jurisdiction specialising in corporate investigations. Each firm was commissioned by Rio Tinto in either 2009 or 2010 (i.e. after the loss of the mining concessions) to produce business intelligence reports concerning the contemporary political and commercial situation in Guinea, focusing in particular on the activities of BSGR. 18 of the 19 reports were produced after 30 April 2010. On the evidence before this court, Livingstone and BTG are to be taken to have contracted with Rio Tinto on the latter's standard terms of business, which are expressly governed by English law. By contrast, ARC contracted with Rio Tinto on its own standard terms of business, which are also governed by English law.

6. Vale, not without difficulty, managed to obtain copies of the business intelligence reports from Rio Tinto, which were eventually disclosed pursuant to an order of the New York Court and are currently the subject of a Protective Order in that jurisdiction which precludes anyone from seeing them other than the parties' attorneys. I have therefore not seen the reports.

7. Rio Tinto has refused to produce any information other than that which was in its physical possession, and has taken the position that if Vale wanted other information from Livingstone, ARC and BTG themselves, it would have to make an application under the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial matters. That is what led to the application for, and issue of, the Letters of Request, and in due course to the Orders of Master Eastman.

8. The application for the Orders was supported by a short witness statement of Mr Kelly of Cleary Gottlieb, Vale's solicitors. In paragraph 9 of that statement he refers to section 7 of the Letter of Request and states that the evidence sought "*bears on Vale's statute of limitations defence, including on the timing of Rio Tinto's claim … whether it was on notice of red flags… and whether its purported investigation of its claim was sufficient to toll the statute of limitations during a period of fraudulent concealment and due diligence.*" Mr Kelly then goes on to say that the evidence also has a bearing on the merits of the conspiracy claim because the reports contain evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained the mining rights in question, and before the joint venture agreement was signed with Vale.

9. As each of the orders was obtained without notice on the papers, the Master made express provision for an application to be made within 14 days of service for the order to be varied or set aside. Each Respondent has made such an application, raising essentially the same or same types of objections. Some of these (including well-founded objections as to the width of the descriptions of some of the classes of documents and information sought) have been resolved by agreement, but one matter in particular has remained contentious and falls to me to determine, namely, whether the Respondents should be required to identify the individuals from whom they obtained the information they used to compile the reports ("the sources").

10. Each Respondent has asked the Court to vary the requirement for it to produce documents or for any witness to give evidence so as to protect the identities of its confidential sources. The Respondents do not object to the disclosure of the documents or information in itself on the basis that it is confidential (though it plainly is), but merely seek an order permitting such redactions to be made to the documents and limits placed on the information to be provided by the witnesses under examination, as will protect the identities of those sources.

11. The powers of the English court to make orders to enable evidence to be taken for foreign proceedings are limited by the terms of the Evidence (Proceedings in Other Jurisdictions) Act 1975 ("The Act"). The principle of comity ensures that the court starts from the basis that it is obliged to give effect to the request unless there is a good reason not to. It will generally rely on the judgment of the foreign court as to what evidence is relevant: see <u>Rio Tinto Zinc</u> v <u>Westinghouse Electric</u> [1978] AC 547 at 654. As a general principle the English court will give effect to a request from a foreign court for assistance in obtaining evidence for the purpose of proceedings in

that court so far as is proper and practicable and to the extent that is permissible under English law.

12. As a matter of English public policy, applications under the Act may not be used for the purpose of obtaining pre-trial discovery in accordance with US civil procedure: Section 2(3) of the Act, and see Westinghouse Electric (above) per Lord Diplock at 634G-H. Evidence may be taken only for the purpose of proving (or disproving) a case at trial. Moreover the documents must be "particular documents specified in the order"; the documents can be compendiously described, but only so long as the description clearly identifies the exact documents to be produced. If it is too widely couched, the English court will try to give effect to the Letter of Request to the extent that it can. It is entitled to apply the metaphorical "blue pencil" to edit a Letter of Request by deleting aspects of it that are objectionable, but it cannot substitute a different request: Refco Capital Markets v Credit Suisse (First Boston) Ltd [2001] EWCA Civ 1733 at [30]-[32].

13. A relevant consideration for the court is whether a respondent to the request will be required to breach a confidence in giving evidence or providing documents. However, confidentiality in and of itself is unlikely to be a sufficient reason for refusing to accede to a request. The court must undertake a balancing exercise, weighing on the one hand the public interest in preserving the confidentiality, and on the other hand the public interest in the English court assisting the foreign court in obtaining evidence in this jurisdiction and enabling the fair resolution of court proceedings: see e.g. In re Norway's Application (Nos 1 & 2) [1990] AC 723 per Lord Goff at 810G.

14. In Science Research Council v Nasse [1980] AC 1028 (a case in which, in a domestic context, the question arose whether the court should order discovery of documents in breach of a duty of confidentiality owed to non-parties). Lord Wilberforce described how the court should set about the balancing exercise:

    *"...here, the process is to consider fairly the strength and value of the interest in preserving confidentiality and the damage which may be caused by breaking it; then to consider whether the objective – to dispose fairly of the case – can be achieved without doing so, and only in a last resort to order discovery, subject if need be to protective measures. This is a more complex process than merely using the scales; it is an exercise in judicial judgment."*

15. The evidence from the Respondents is to the effect that each source provided the information on the strict condition that their identity as the source of that information would remain confidential and not be disclosed. The most specific evidence in this regard is from Mr Huband of Livingstone. Mr Huband explains that Livingstone researches business intelligence information by engaging in-country research associates ("Associates") who are not on Livingstone's payroll and who will have their own human sources of information, depending on the area of interest involved. Associates are remunerated by Livingstone, but are strictly forbidden from paying sources for information. Some, but not all, of the Associates are journalists.

16. Mr Huband goes on to describe how the requirement that the sources will not be identified lies at the heart of their relationship with Livingstone's Associates, and that requirement is essential to the disclosure of information. He points out that there may be considerable risks in passing information which may well involve or imply the

exposure of official corruption. The sources are forthcoming in their provision of information because there is no risk of exposure, and all information is passed on by Livingstone to the client. Livingstone does not insist that an Associate identify the sources to them beyond a description of their position, although the confidentiality setting for the work may mean that the Associate is willing to share that information with Livingstone. Mr Huband says that "at the very least a description of their position will act as an endorsement for the reliability of the information they provide."

17. Mr Huband goes on to say that the Associates are only willing to carry out the research for Livingstone on the basis that their identities will not be revealed, and that this is a common, universally understood position in the business intelligence sector. However, unlike the sources, he does not explain why there is any specific reason for the identities of Associates to remain confidential.

18. Mr Huband has made specific enquiries regarding the sources identified in the documents falling in paragraphs a to nn of Schedule A. He gives a description of the position of each of those sources (Sources A to I) and explains what kinds of risks (for example, risks of recrimination) they might face if their identity is made known. The nature and seriousness of the perceived risks varies, as one might expect, from source to source. Mr George told the court, on instructions, that two of the "sources" were also Associates.

19. Ms Tara O'Connor, of ARC, explains how her firm operates in several countries or regions where its work threatens established corrupt networks in politics and business. Some of those are geographical areas with a high risk of political volatility, regime change and state-sponsored violence. She gives a graphic description of what has happened in the past to her colleagues when ARC's involvement in anti-corruption projects and investigations has become known, and she describes the specific risks for journalistic and business intelligence sources – as well as journalists themselves - in Guinea.

20. Ms O'Connor confirms that each source that ARC used for the business intelligence reports received an assurance that their identity would not be disclosed in any circumstances when they began working for ARC and that if they were to be identified, they were highly likely to be put in a position whereby they would fear for their safety or wellbeing, or at the least adversely affected in their employment or career. She states that it is realistic to believe that disclosure could have potentially threatening repercussions, including deadly repercussions, not only for them but for their families. She says in respect of two sources in particular, sources B and J, disclosure is likely to place their immediate families at risk.

21. BTG is in a slightly different position to the other two Respondents, because Mr Humphrey, their company secretary, has explained in his first statement that the two individuals who were involved in the compilation of the report for Rio Tinto, Mr Brown and Mr Leighton, have now left the company. It would appear that they destroyed documents that would otherwise have fallen within the ambit of the Letter of Request at the behest of Rio Tinto, contrary to company policy and without his knowledge. Whilst this information, if true, is to the discredit of Rio Tinto, it appears that there is little that Vale can do about the situation save to pursue Mr Brown and Mr Leighton. Mr Humphrey is therefore in no position to give any evidence that would shed any light on any of the matters included in the Letters of Request, and it is

only in the (somewhat unlikely) event that further documents come to light in consequence of further searches by BTG that the risk of identification of sources would even arise. There is no reason to believe that Mr Humphrey is aware of their identities.

22. Mr Brown has confirmed to Mr Humphrey that to the extent sources were not identified in the report, specific undertakings were given to them not to disclose their identities under any circumstances. Mr Humphrey either assumes from his conversations with Mr Brown or speculates that similar assurances would have been given to sources who engaged directly with Mr Leighton, given that he was under the ultimate direction of Mr Brown.

23. Mr Brown appears to have given no information to Mr Humphrey about any specific or generic risks that his or Mr Leighton's sources might face if their identities became known. However in the light of the fact that all three Respondents were working on similar projects for Rio Tinto in respect of Guinea, I believe that I can safely draw the inference that the risks to BTG's sources are likely to be of the same type as those described by Mr Huband and Ms O'Connor in respect of their firms' sources.

24. Finally, all three Respondents contend that their reputations and businesses could be damaged if it came out that they had been forced by the court to disgorge the identities of their sources of information, even into a confidentiality ring. They say that there is a real risk that they would no longer be able to recruit or engage individuals to give them the information upon which they depend. Whilst I do not regard that risk as fanciful, I would not be minded to refuse disclosure if that were the sole ground of objection. The risks that the breaches of confidence pose to the individuals concerned are of far more importance and carry far more weight with the court in this context.

25. It is well settled that an obligation of confidentiality may arise even in the absence of a contractual relationship, provided that the circumstances in which information is imparted make it plain that the information concerned is to be kept confidential. In the case of ARC, Ms O'Connor's evidence is that it contracted with Rio Tinto on the express basis of ARC's terms and conditions, which are governed by English law. Those conditions imposed an obligation of confidentiality upon the information supplied to Rio Tinto. Rio Tinto was not entitled to be told the identities of ARC's sources. Therefore, even if Rio Tinto had tried to obtain that information it is unlikely to have succeeded.

26. Livingstone and BTG contracted on Rio Tinto's standard terms which contain express obligations of confidentiality, which survive the termination of the contract, but only in favour of information supplied by Rio Tinto to the business intelligence firm, and not vice versa. Those terms and conditions include a choice of law clause in favour of English law (Clause 49).

27. Mr George QC, on behalf of the Respondents, submitted that Clause 3, which contains certain representations made by the business intelligence firm (described in the contract as "the Consultant") to Rio Tinto as at the date of the contract, is a contractual restriction upon the provision to Rio Tinto of information imparted to the Consultant in confidence, including the names of its sources. The representation is that "the execution of the Contract and the performance of the Consultancy Services

do not and will not result in the breach of … any agreement or undertaking (whether verbal or written) to which the Consultant may be affected or bound." Mr George submitted that provision of the information would result in the breach of express or implied undertakings of confidentiality.

28. On the other hand, Clause 16.1 obliges the Consultant to provide Rio Tinto with "any information requested by them in relation to the provision of the Consultancy Services". The nature of the information concerned is not restricted, and although the rest of Clause 16 relates to the keeping of records and accounts, in context it is plain that the remaining clauses are not to be read as restricting the obligation in 16.1, and that Clause 16.1 is not confined to matters of record-keeping as Mr George submitted. Clause 16.1, on the face of it, appears to entitle Rio Tinto to require the Consultant to identify a source if, for example, Rio Tinto felt they needed to know that information in order to evaluate the reliability of the evidence that is said to have emanated from that source. The sense of that, as a matter of business efficacy, seems to me to be self-evident.

29. Clause 3, on the other hand, is a clause for the benefit of Rio Tinto, in that the person whose services it is engaging is <u>warranting</u> to it that the services that it is providing will not involve it in breaching any contractual or other legal obligation to third parties. The object of Clause 3 seems to me to be to protect Rio Tinto from a possible suit at the hands of such third parties, and the representation provides an assurance that the Consultant will go about its duties lawfully.

30. It is a little difficult to see how a warranty, or representation of that nature, given at the date of the contract, can be interpreted as giving rise to a contractual entitlement on the part of the Consultant to refuse to provide information in accordance with a request made under Clause 16. If the provision of the information involves a breach of an undertaking, the consequence may be to put the Consultant in breach of the warranty in Clause 3 but it does not follow that the Consultant is entitled to use Clause 3 as an excuse for non-compliance. Plainly Clause 3 is not intended to cover the provision by the Consultant to Rio Tinto of information imparted to it in confidence, because the very nature of the services it is providing will involve the provision of such information to them.

31. Thus I am not persuaded that Clause 3 would entitle the Consultant to refuse to impart confidential information to Rio Tinto. The Consultant would probably have to argue that in the light of Clause 3, Clause 16 should be given a more narrow construction than the literal reading, on the basis that it cannot have been the parties' objective intentions that the Consultant should be forced to do something which would put it in breach of an obligation of confidentiality to a third party, and possibly in breach of Clause 3 too. Fortunately I do not need to resolve that issue for the purposes of disposing of this application. Suffice it to say that if Rio Tinto sought to obtain the names of the Consultant's sources, it is far from certain that an English court would make an order in its favour, even if I am right about the construction of Clause 16. There are public policy reasons why mandatory injunctive relief might well be refused.

32. One thing is clear. If Rio Tinto did call upon the Consultant to name a source, and even if the Consultant was compelled to reveal that information to it, Rio Tinto would

be bound by the same obligation of confidentiality as the Consultant, in the same way as it is in respect of the contents of the business intelligence reports.

33. The question whether Rio Tinto would be entitled to call upon Livingstone and BTG to identify the sources is academic in the present case for two reasons. First, on the evidence that I have seen (including the transcripts of the applications to the New York Court) it is plain that Rio Tinto takes the view that it cannot compel the Respondents to reveal the identities of their sources to it. Secondly, it is clear that the identities of the sources have not in fact been revealed to Rio Tinto, as Mr George confirmed in the course of argument. So Vale is seeking to obtain information from the Respondents that Rio Tinto does not have and has never sought, and in some cases the Respondents themselves may not know, because on Mr Huband's evidence that information may only be known to an Associate of Livingstone who has the connection with the source.

34. Whatever may be the contractual position as between Rio Tinto and the individual Respondents, I am satisfied on the evidence before me that the sources in question have all been given assurances or undertakings that their identities will be kept confidential and that their co-operation with the Respondents and their representatives and imparting of the information was premised upon that understanding. Their identities are subject to a duty of confidentiality, and would continue to be subject to such a duty if they had been imparted to Rio Tinto whether voluntarily or compulsorily. That duty is an important and serious one; those individuals are entitled to assume that their identities are not going to be made known to anyone without their permission. The public policy in maintaining confidentiality in those circumstances is strong.

35. Miss Cockerill QC, on behalf of Vale, accepted that in an appropriate case, an established obligation of confidentiality may be a ground for ordering the redaction of information or even for a refusal to order the provision of documents or information. However she submitted that in the present case, if the information was provided it would be subject to the Protective Order, and that was more than sufficient to outweigh the concerns expressed in the witness statements. Miss Cockerill criticized the evidence of risk as being far too general and vague for the Court to reach the conclusion that people's lives or livelihoods or even their employment relationships were truly likely to be under threat. She pointed out that much of Ms O'Connor's evidence related to historic risks, and that the court is concerned with the current situation in Guinea.

36. Miss Cockerill submitted that the court should avoid falling into the trap of relying upon any stereotypical assumptions about the state of affairs in other countries or the respect (or lack of it) that is paid to the rule of law. There is force in Miss Cockerill's admonition in this regard. If this court is faced with arguments by an individual that enforced return to a certain country would expose him to the risk of inhuman or degrading treatment, or risk to life and limb so as to engage Articles 2 and 3 of the European Convention of Human Rights, the evidence required to make out such a claim has to be specific and cogent. In many cases, specific country guidance has been expressly developed to address such situations. The court is often supplied with reports compiled by reputable international organizations which address the risks on the ground, which may change from year to year or even from month to month.

37. Nevertheless, it seems to me that in this rather different context, the court may take judicial cognizance of the truism that even in a democratic society such as this jurisdiction or the United States, whistleblowers may be castigated for speaking out and suffer prejudice to themselves or their families, whether or not they act within the four corners of the law and whether or not they are exposing wrongdoing. Human nature is such that those who engage in corruption, particularly if they are in positions of power, do not take kindly to their wrongdoing being exposed. There are many corners of the globe where journalists are targeted and even imprisoned for fair and impartial reporting, or accused of being spies. This jurisdiction expressly recognizes the importance of keeping confidential the identity of journalists' sources (indeed there is legislation to protect them) and I accept Mr George's submissions that there is a degree of public policy overlap between that situation and this, especially in the light of the evidence that some of the sources concerned are sources of information provided to journalists, who may themselves be Associates of Livingstone.

38. There is no reason to suppose that any of the sources in this case have acted unlawfully, but that does not mean that they have nothing to fear if their identities come to light. I am persuaded that much of what is said by Mr Huband and Ms O'Connor rings true, although some of the sources may face more serious risks than others. It is in the public interest that they should not be discouraged from speaking out or from providing intelligence of this nature.

39. In my judgment, one of the most critical factors in the complex balancing exercise which I have to carry out is the importance and degree of relevance of the confidential information that is being sought. Banks have regularly been required to disgorge confidential information about their clients when that information is of central importance to the issues in the underlying case, for example, where it is necessary to have that information in order to trace the proceeds of a fraud.

40. If the information sought to be withheld or redacted was of crucial importance to the case in the United States, then bearing in mind the fact that the burden of proof is on the Respondents to justify the variation that is sought, the Court might have required far more particularity about the alleged risks and dangers to which each individual source would be exposed, in order to be able to gauge whether those risks were so serious as to justify withholding the information.

41. However, in the present case, whilst I entirely understand why Vale is so eager to find them out, the identities of the sources appear to me to be of peripheral relevance to the matters in issue in the US proceedings, and the court in that jurisdiction will not be materially impeded or disadvantaged in determining the issues between the parties if that information is not provided. In my judgment it is not necessary for the fair resolution of those issues for Vale or its legal representatives to know who the sources are, and the serious nature of the proposed breaches of confidence coupled with the potential risks to the informants outweigh any justification for disclosure.

42. The principal justification given by Mr Kelly for the Letter of Request, set out in paragraph 8 above, and paragraph 9 of his original witness statement, is that the information sought is relevant to the limitation and equitable tolling issues - which largely depend on Rio Tinto's state of knowledge and the nature of its investigations. Miss Cockerill informed me on instructions that for the purposes of these legal

arguments, the knowledge of the Respondents would be imputed to Rio Tinto as a matter of New York law.

43. The limitation defence (and the answers to it) will therefore depend on what Rio Tinto knew (or is imputed to have known) and how it behaved at the material time. As proceedings were commenced on 30 April 2014, it is my understanding that the key issue for the New York Court to determine will be whether the starting point for the commencement of the limitation period was "tolled" from December 2008 until 30 April 2010. As Mr George pointed out, the majority of the business information reports were commissioned after that date. Miss Cockerill said that the post-2010 reports were relevant to whether Rio Tinto had exercised due diligence and whether its investigations were frustrated by fraudulent concealment. It might be argued, for example, that information revealed in a later business information report could have been discovered sooner if Rio Tinto had asked for it or commissioned the report earlier. The nature of the supporting information might have some bearing on that issue.

44. There was agreement between Rio Tinto and Vale that the underlying information and documentation sought in the Letter of Request was relevant for trial; and the Respondents do not resist its production in principle. I understand why it might be said that the information in the business reports (or in the materials used to compile those reports) might be used to support an argument that there was one or more "red flag (s)" or that Rio Tinto, in failing to respond or follow up that information, failed to use due diligence, or that Rio Tinto could have found out the same information if they had asked the same questions two years earlier.

45. However, I cannot see how the identities of those providing the information would materially advance either party's arguments, particularly since the evidence suggests that the Respondents themselves (save possibly Livingstone, in some cases) may not have known who the sources were. Miss Cockerill submitted that knowledge of the identities of the sources would enable an evaluation to be made of the reliability of the information and the credibility of the sources. That is a criticism that could be made of Rio Tinto for not asking for their identities to be revealed to them, though no doubt Rio Tinto would respond that they reasonably believed they were not entitled to that information or that they would not have got it if they had asked for it.  It is <u>not</u> a reason for finding that the identification of the sources is material or necessary to the determination of the limitation argument, or of Vale's defence to the claim of fraudulent concealment or to the equitable tolling point.

46. I do not accept any of the arguments put forward by Mr Kelly in paragraphs 52-54 of his second witness statement as ex post facto justification for seeking that information. I note that that justification appears nowhere on the face of the Letter of Request itself, and indeed that the various requests adumbrated in the Letter of Request appear to be aimed squarely at the information contained in the documents (such as memoranda evidencing particular discussions with a source), rather than the identity of the source, which is precisely what I would expect given the nature of the legal issues. There is nothing in the transcript to lead me to believe that Judge Peck considered that the identification of the sources was of vital significance to the issues in the New York proceedings.

47. The identity of the sources is, at best, of marginal relevance. In my judgment the fair and just resolution of the underlying litigation in New York can be achieved without requiring the very serious breaches of undertakings of confidentiality that revealing those identities would entail. It would be disproportionate and unfair to make the Respondents reveal those identities in the circumstances of this case, bearing in mind the very real risks that could arise for the sources themselves and (although this is of far less weight) the impact that such enforced disclosure might have on the Respondents' businesses and business reputations. I do not consider that it is a sufficient answer that the information would be subject to the Protective Order. It is only if the breach of confidence can be justified and disclosure should be ordered in principle, that the Court goes on to consider whether the information or documents should be disclosed to a limited class of people.

48. For those reasons, the balancing exercise clearly comes down in favour of acceding to the Respondents' applications. The Orders are to be varied so as to make it clear that the Respondents are under no obligation to reveal any information that would identify the individual sources. For the avoidance of doubt, my ruling does not include those of Livingstone's Associates who are not also sources, as the evidence does not demonstrate that they are subject to the same risks; but the particular sources identified in Mr Huband's witness statement, (whether or not they are also Associates) and any sources that have provided information to the Associates are not to be identified. The documents that are to be disclosed may be redacted in order to remove any references within them that would lead to such identification. When they are examined, Mr Huband and Ms O'Connor may refuse to identify the sources or to provide information that would lead to their identities being revealed. I need not make such an order in respect of Mr Humphrey, because he is not going to be examined about the contents of the documents, even if he finds any. The scope of any examination of Mr Humphrey is to be confined to the searches that he has made and the explanation for the inability to produce the documents and information requested (i.e. the alleged destruction of the documents by Mr Brown).

49. Livingstone claims it was able to make an assessment of reliability of information provided to it, based upon more general information about the sources of the type deposed to by Mr Huband in paragraph 24 of his witness statement. Miss Cockerill submitted that the descriptions of the sources in that paragraph are too vague to serve any useful purpose. I disagree. If the relevant Respondents were to attribute the information they provided pursuant to the Orders to a suitably anonymised source (e.g. "Source A") and if that source were to be described in terms such as the descriptions in paragraph 24 of Mr Huband's statement, I consider that would be sufficient information to enable a fair view to be taken as to the reliability of the information provided for the purposes of the limitation and allied arguments.

50. Given that the task of this Court is to give effect to the Letter of Request to the extent that it is possible to do so, bearing in mind the competing public policy considerations, I consider that it would be appropriate for me to direct that Livingstone and ARC shall carry out an exercise of the nature I have described above. Although Vale's lawyers will not know the identities of the individual sources, they will have descriptions of them and they will know which aspects of the information in the business intelligence reports were provided by which source. That is enough to create a fair balance between the competing public interests in this case and possibly

gives Vale more than what they would be strictly entitled to. I do not consider that this would go beyond what is legitimate use of the blue pencil because it is directing where the boundaries of the directed disclosure lie. Mr George did not argue against my taking that course. Subject to that condition, the application for a variation of the Orders is allowed.