```
F6NPRIOC
```

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------x
4  RIO TINTO PLC,
5              Plaintiff,
6        v.                          14 CV 3042 (RMB)(AJP)
7  VALE, S.A., ET AL.,
8              Defendants.
   ------------------------------x
9                                    New York, N.Y.
                                     June 23, 2015
10                                   10:29 a.m.
11 Before:
12                  HON. RICHARD M. BERMAN,
13                                    District Judge
14                          APPEARANCES
15
16 QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Plaintiff
17 BY:  MICHAEL J. LYLE
        ERIC C. LYTTLE
18
19 CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Attorneys for Defendant Vale, S.A.
20 BY:  LEWIS J. LIMAN
        JOAQUIN P. TERCENO III
21
22 MISHCON DE REYA NEW YORK, LLP
        Attorneys for Defendants BSG Resources Limited and
23 Benjamin Steinmetz
   BY:  VINCENT FILARDO, JR.
24      TIM McCARTHY
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

APPEARANCES (Continued)


LAW OFFICES OF MARTIN J. AUERBACH, ESQ.
     Attorney for Defendant BSG defendants
BY:  MARTIN J. AUERBACH


SULLIVAN & WORCESTER, LLP
     Attorneys for Defendant Mahmoud Thiam
BY:  PAUL E. SUMMIT

1                (In open court)
2                THE COURT:  Please be seated.  So I'd like to cover a
3     couple of topics, which I'll tell you what they are, and you
4     may well have your own issues that you want to present.  So
5     what I would like to do is start with the order issued on
6     June 18.
7                In response to the letters regarding a stay, I wrote
8     that the parties are aware that no stay of discovery is
9     currently in effect, notwithstanding prior applications for a
10    stay by defendants, and none is anticipated before the proposed
11    stay motion and/or the pending motion to dismiss are decided.
12    The parties should meet an confer prior to June 23 and
13    determine if they can jointly agree to a stay and its terms.
14               Then I went on to say that the Court requests that the
15    parties be prepared to discuss at the Tuesday conference, which
16    is this conference, in addition to the proposed stay motion,
17    the issue of alleged document destruction and the status of any
18    settlement discussions.
19               So from my point of view, it would be useful to
20    discuss/hear what you want to say further about stay or stay
21    motion, and then talk about this alleged document destruction,
22    and the status of any settlement discussions.  Actually,
23    preliminarily, even this other one, I would like to hear your
24    take on what the status of the case is at the moment.  So maybe
25    I'll start with plaintiff.

            MR. LYLE:  Good morning, your Honor.  Michael Lyle for
Rio Tinto.  With respect to the stay issue, the parties did,
pursuant to your order, meet and confer yesterday afternoon,
and we have come to an agreement, we think, and have a proposal
that we would like to present to your Honor.  And please
correct me if I get this wrong, counsel of record.

            The agreement would be that we would agree to a stay
of deposition discovery and expert discovery until
September 30th, unless your Honor rules on the motion to
dismiss prior to such time.  In which case, deposition and
expert discovery would begin 30 days after your Honor's ruling
on the motion.

            All written discovery would continue, document
production would continue, and any of the letters rogatory that
have been issued and any of the documents being produced
through that process or any depositions that may be taken in
connection with those of non-parties would proceed.

            THE COURT:  Is that a fair statement?

            MR. LIMAN:  Your Honor, the only thing that I would
add is that all subsequent deadlines would be moved by the
respective amounts of time; so that the time period for sort of
motions for summary judgment or trial or depositions would be
moved out an equal amount of time.

            THE COURT: So that's a reasonable idea, but let's
reserve on that for now and see where we are at those

particular milestones.  So, for example, if you need an extra 30 days, let's see what unfolds, but I think that it's, generally speaking, an acceptable idea.

          MR. LYLE:  And we agree with that, your Honor, as well.

          THE COURT:  Okay.  Could you jointly submit a very short order --

          MR. LYLE:  Yes.

          THE COURT:  -- just reflecting that you've reached that agreement?  That's very helpful.

          MR. LYLE:  We would be happy to do that, your Honor.

          THE COURT:  Okay.  So I do have a couple of questions.  So why don't we turn, though, to this issue of alleged document destruction.  Is that a real issue, or what does it mean, and who's alleged to have done it, and how do you know, et cetera, et cetera?

          MR. LYLE:  Thank you, your Honor.  Michael Lyle again for Rio Tinto.  The issue of the document destruction has just turned up during the course of the written discovery, and it is in connection with Vale's documents.  We learned in April of this year that, with respect to eight of the key former Vale employees --

          THE COURT:  Key what?

          MR. LYLE:  -- former Vale employees, including the CEO, Roger Agnelli of Vale; his right-hand man, Mr. Ledsham;

1    Mr. Ledsham right-hand man, Mr. Alves; all of the people who
2    had critical evidence with respect to our allegations in the
3    complaint.  They had firsthand dealings in connection with the
4    transaction between the defendant BSGR, and Vale.  They are the
5    masterminds of the transaction and the activities that took
6    place, and are central to our allegations as it relates to the
7    RICO conspiracy.
8            Those e-mails for those eight witnesses were destroyed
9    by Vale.  That, of course, is of extreme relevance in this case
10   because we have allegations in this case of destruction of
11   evidence, or attempted destruction of evidence.  In fact,
12   Mr. Cilins, one of the co-defendants in this case, was arrested
13   for attempting to bribe another co-defendant to destroy
14   documents in evidence.
15           THE COURT:  He's currently incarcerated, right?
16           MR. LYLE:  He was incarcerated, has since been
17   released and has been deported from the country, your Honor.
18   And Mr. Cilins was arrested as a co-conspirator, as you know,
19   in connection with his efforts, and he's a co-defendant in this
20   case.
21           So learning of that, you know, we confronted Vale with
22   this issue, and according to Vale, they destroyed those e-mails
23   and documents pursuant to their document destruction policy,
24   which is that, in the absence of a litigation hold, documents
25   are wiped from the hard drive for a former employee's computer,

1    and then the e-mails are put on backup tapes and destroyed
2    after one year.
3             The problem is is that when you look at what happened,
4    their explanation doesn't add up.  Their story has become
5    inconsistent and doesn't make any sense.  When you look at
6    three of the former employees, including Mr. Alves, Mr. Antaki
7    and Mr. Perrotta given the dates that they left and given their
8    stated policy of, you know, retaining backup tapes for one
9    year, they should have backup tapes for each of those three
10   individuals based upon their departure dates and then the one
11   year retention on the backup tapes for e-mails.
12            THE COURT:  And they don't?
13            MR. LYLE:  And they don't.  They also had issued a
14   litigation hold in connection with general litigation.  Five
15   days after Mr. Cilins was arrested, Vale issued a document
16   retention, a litigation hold, on April 19th; so five days --
17   April 19th of 2013, five days after Mr. Cilins was arrested.
18            It is a very broad litigation hold, and it refers to
19   reasonable anticipation of arbitration or other legal
20   proceedings related to the Simandou project, which is, of
21   course, the mine at issue in this case, and other issues
22   stemming from the project, including transactions and dealings
23   between Vale and BSGR, which are at the heart of this case as
24   well.
25            So the litigation hold had been issued, according to

1   Vale, on April 19th, 2013.  When you look at the dates of
2   departure and their e-mail destruction policy, they should have
3   documents, because they issued a hold, for these three
4   witnesses and they don't.
5            The issue gets -- the story gets more complicated and
6   has more twists to it.  Vale, when we confronted them about the
7   issue, submitted a letter to Judge Peck, after we had included
8   the information in the letter to -- joint letter to Judge Peck
9   advising him of the document destruction issue and our desire
10  to take discovery surrounding it.
11           In that letter, Vale stated, in a footnote, that says:
12  Although Vale had no reasonable anticipation of civil
13  litigation in the U.S. or anywhere else related to Simandou
14  before this action was filed, in any case, issued a lit hold on
15  relevant documents years earlier, after becoming aware of the
16  government of Guinea's investigation of Simandou.
17           Well, that turns out to be a false statement for two
18  reasons.  First of all, they did anticipate civil litigation in
19  the U.S. or elsewhere related to Simandou prior to the
20  litigation that we instituted.  We filed our complaint in April
21  of 2014.  We have from them the litigation notice that they
22  sent out a year before, in April of 2013.
23           On top of that, they have then since retracted their
24  statement, and now say that they never issued a litigation hold
25  after becoming aware of the government of Guinea's

1    investigation.

2             If you accept their first version, that they did issue
3    a litigation hold, that implicates, based on their dates of
4    departure and e-mails destruction policy, the e-mails for
5    Mr. Agnelli and Mr. Ledsham, who are central to our case.

6             We have another aspect to this, your Honor.  We have
7    another witness that we've asked for, a witness by the name of
8    Bruno Abreu, who is also a former Vale employee, and we got a
9    correspondence from counsel for Vale in May of this year
10   telling us that a litigation hold for this case, for this
11   litigation, had been issued in May of 2014 and that it was
12   issued in connection with Mr. Abreu's e-mails, which would have
13   been on the backup tapes.

14            When we asked them for the e-mails for Mr. Abreu, they
15   changed their story and told us, no, no, we didn't issue the
16   lit hold in May of 2014 for Mr. Abreu's e-mails.  We did it
17   after his documents and his e-mails had been destroyed on the
18   backup tapes.

19            So we have here, your Honor, multiple instances of
20   litigation hold notices not being complied with, changing
21   stories in connection with the documents.  And what we want,
22   and what we've done, is asked Judge Peck for discovery into
23   what happened.  We certainly want to get to the bottom of it.
24   As it currently stands, Judge Peck has asked that we review the
25   documents, look and see what we have, and then come back to

1   pursue the discovery into this issue.
2           It's clearly important and a central issue in the
3   litigation because it's completely consistent with our case as
4   it relates to the RICO conspiracy and destruction of evidence,
5   the coverup of evidence.  And as your Honor knows full well
6   from our motion to dismiss the fraudulent concealment issues.
7           THE COURT:  And so are you saying that Judge Peck
8   wants you to zero in on what discovery you are asking for with
9   respect to the alleged document destruction?
10          MR. LYLE:  That is our understanding, your Honor.
11  We've raised these issues in numerous letters with Judge Peck.
12  At the hearing before the last hearing, he ordered that we look
13  at the materials that we get, because we're going to be having
14  the document production June 30th, substantial document
15  production will be coming from Vale, and so we'll have a chance
16  to look at that information.
17          The thing that's going to be missing from that, and
18  the big hole that we're going to have, is that any
19  communications among those individuals, who are central to the
20  case, those will be lost.  The only thing that we're going to
21  have is communications with them with other people.  So it may
22  help us try to focus our discovery somewhat, but we certainly
23  believe and expect that we're going to get to the bottom of
24  this, and we'll have that discovery taking place with Judge
25  Peck.

1           THE COURT:  Okay.  Mr. Liman?

2           MR. LIMAN:  Your Honor, it would not be surprising to

3  know that we disagree with a lot of what Rio Tinto said.

4           THE COURT:  Not only would I not be surprised, but I

5  would hope that you disagree with what they said.

6           MR. LIMAN:  Let me make a couple of points, and then

7  respond to a couple of points, and then any questions your

8  Honor has, I'd be prepared to address.

9           The first couple of points are that any issue with

10  respect to document preservation, documents that are gone, is

11  entirely premature because since we have noted to plaintiffs,

12  and as Judge Peck has recognized, there is no evidence that any

13  document is missing in this case.

14           After the issue was raised by the plaintiffs, Vale, on

15  its own, did a thorough investigation to make sure that there

16  were alternative sources of documents for the plaintiffs.  We

17  agreed on alternative sources of documents to give the

18  plaintiffs, and as the record now stands, there is no evidence

19  that any documents are missing.

20           The second point, your Honor, that I make is that this

21  has been the subject at numerous conferences in front of Judge

22  Peck.  I would disagree very much with what Rio Tinto just said

23  the status is in front of Judge Peck.  The status in front of

24  Judge Peck is that Judge Peck gave Rio Tinto the opportunity to

25  push for discovery with respect to document retention, alleged

1    document destruction at the last conference and obtain ruling

2    on it, or wait to see if there was evidence of any documents

3    being missing, and Rio Tinto elected to wait.

4            The third point that I would make --

5            THE COURT:  So when you say to wait, is that in

6    reference to the June 30 discovery or --

7            MR. LIMAN:  Yes, your Honor.  What I expect will

8    happen after June 30th is that both sides are going to take a

9    look at each other's productions.  There are issues on both

10   sides with respect to document preservation and document

11   destruction.

12           The other thing I would say is that we have

13   substantial issues with respect to document destruction by Rio

14   Tinto.  We've elected not to bring them because, frankly, my

15   view of litigation is you bring the claim when you've got all

16   of the pieces in place and not prematurely.

17           I do think, though, that there's an important point

18   that is highlighted by what Rio Tinto said and that I do want

19   to take the opportunity, if your Honor will indulge me, to

20   make, which is that the facts that they laid out actually

21   highlight the wisdom of statutes of limitations and the evil

22   that comes when parties sit on their rights.

23           Let me explain to your Honor why I think that that is

24   important and why this issue is one that Vale may, at the

25   appropriate time, be bringing to your Honor's attention.  At

1    the moment, there's no evidence that any documents are missing.
2    We believe that the documents of these eight individuals will
3    be substantially exculpatory to Vale.
4             THE COURT:  That they exist and they will be
5    exculpatory to Vale?
6             MR. LIMAN:  If they exist, and we believe that they do
7    exist, we think that they will be exculpatory.  They will
8    show -- a point that we have made all along -- that there was
9    no conspiracy going back to 2008.  There was no evidence that
10   Vale knew of any bribery.  There was no theft of trade secrets.
11   This is a fight between two behemoths in the mining industry
12   over the rights to a mine that took place over the course of
13   about a year or so.
14            Now, why do I think that this is something that we may
15   bring to your Honor's attention?  Well, what you didn't hear
16   from Rio Tinto was that all of these eight custodians are
17   former employees who departed Vale more than a year before Rio
18   Tinto brought suit or before litigation was reasonably
19   anticipated.  Some of them as early as 2009, with one
20   exception, the latest in 2002.  And they do include Vale's
21   former CEO and CFO.  We disagree maybe about the importance of
22   those individuals, but we don't disagree about who the
23   individuals were.
24            It is also the case that, as we disclosed, and we
25   disclosed early and on our own initiative, that Vale had long

1  had a consistent and uniform document retention policy similar
2  to those of many other companies, which says that in the
3  absence of a litigation hold applicable to somebody, which
4  comes in place when litigation is reasonably anticipated, an
5  employee's hard drive is given to somebody else and is
6  overwritten upon their departure and e-mail backup tapes exist
7  for 12 months and then those too are overwritten.
8          So we don't believe that there's any evidence yet that
9  any documents were lost or not retained.  If it develops that
10 evidence, we'll have a discussion, I'm sure, before Judge Peck
11 about what those documents are and whether they are exculpatory
12 or not.  There's no reason to believe that there's any
13 documents that would be helpful to Rio Tinto and, frankly,
14 there's no document destruction at all because what this was
15 was the routine application of Vale's policies.
16         I will say that we take document retention very
17 seriously, and I hope that Rio Tinto does as well.  This may be
18 something we can bring back in front of your Honor at the
19 appropriate time, if the complaint is not dismissed.
20         THE COURT:  Okay.  So, Mr. Lyle, when you said pretty
21 emphatically that these documents of these eight people will be
22 exculpatory, do you know that, or are you saying that you
23 expect that they'll be exculpatory?
24         MR. LIMAN:  Your Honor, based upon not only our
25 expectation but also statements that we have from others who

1    investigated, we have ample reason to believe that they will be
2    exculpatory.
3              In the record in this case is a statement, for
4    example, from the government of Guinea that was made when the
5    Cilins arrest was announced, stating the government of Guinea
6    stating that they believed that Vale was not involved in the
7    underlying activity at all; it was a victim.  That's in the
8    record that's before Judge Peck, and so for that reason, and
9    numerous other reasons.
10             There's no evidence.  There's, frankly, no allegation
11   that Vale was tied to the Cilins' document destruction.
12   There's, frankly, no affirmative allegation that Vale knew of
13   any bribery by BSGR, and as your Honor knows, we're suing BSGR
14   over that.
15             THE COURT:  Yes.
16             MR. LYLE:  Your Honor, if I may?
17             THE COURT:  Yes, just briefly.
18             MR. LYLE:  Briefly, yes, your Honor.  There can't --
19   if Vale's assertions are true, which is, is that they did
20   destroy the backup tapes for these eight individuals, there's
21   no way that they have the communications among those eight
22   individuals.
23             What Mr. Liman is referring to, I believe -- this is
24   what I mentioned earlier -- is that they may have
25   communications from one of the eight with other people that we

1    might be able to understand what they were saying with other
2    people at Vale or outside of Vale.
3              THE COURT:  I get it.
4              MR. LYLE:  The second thing is, with respect to Rio
5    Tinto, we have over three million documents in our production,
6    or in our universe of documents that are going to be searched
7    through predictive coding, which I won't even try to explain,
8    but we have our documents, your Honor.  They're there.  Rio
9    Tinto has a document preservation policy.  So thank you, your
10   Honor, for your time.
11             THE COURT:  Okay.  So I think I've heard enough on
12   that.  These issues will, I'm sure, be sorted out, at least in
13   the first instance, before Judge Peck.  That is to say, about
14   documents and these discovery matters.
15             Then I wanted to ask, what about settlement?  Any
16   steps in that direction?  Can the Court be of any help to you
17   or have you thought about -- or Judge Peck, for that matter, or
18   third parties, or is that not in the cards here?
19             MR. LYLE:  Your Honor, Michael Lyle for Rio Tinto.  We
20   did have some preliminary discussions that you had asked us to
21   have.  We're very far apart at this juncture.  Perhaps after we
22   start having a sense of -- the parties start seeing what the
23   record begins to look like, there may be an opportunity to
24   start.  That may jump start some things, but at this time, it
25   looks like we're very far apart.  It may be a time in the

1  future when we may take your Honor up on its offer of
2  assistance, but I think, at this time, it would be premature.
3  I don't know if other parties have a different view.
4          THE COURT:  Mr. Liman, is that your sense too?
5          MR. LIMAN:  My sense, your Honor, is that the parties
6  are very far apart, and I think for reasons not having anything
7  to do with the substance of the litigation but the industry, I
8  don't think it's likely that settlement discussions would be
9  promising.
10         THE COURT:  Okay.  Anything else that you all wanted
11 to raise today that we haven't talked about?
12         Sounds like you've made good progress.  I did have one
13 question that has come up in my mind.  This will be a question
14 for plaintiff.  In the amended complaint you say:  Upon
15 information and belief, a meeting between Vale and BSGR started
16 in December 2008.  Is there any more, as a result of your
17 pursuit of discovery or any other reason, any more specific
18 date for such a meeting, or is that still your position, on
19 information and belief?
20         MR. LYLE:  Yes, your Honor.  We have not, as of yet,
21 received any further documents.  Well, we've received a handful
22 of documents or a few.  How many documents we've received?
23 Under 10,000 documents.  We understand there are tens of
24 thousands coming our way, and so we'll have a chance to see.
25         THE COURT: Okay.  All right.  Oh, yes.

1          MR. LIMAN:  Your Honor, with respect to that
2     allegation in particular, I think there is evidence now in the
3     record that Rio Tinto put in through its investigative reports
4     that its investigators don't believe that there was any such
5     agreement in 2008.
6          THE COURT:  I'm sorry, I didn't ask that.  Was there
7     such a meeting?
8          MR. LIMAN:  No, there was not.
9          THE COURT:  There was no meeting?
10          MR. LIMAN:  Correct.
11          MR. LYLE:  Your Honor, that's not accurate.  That's
12     not what --
13          THE COURT:  It's disputed.
14          MR. LYLE:  Yes.  If that's his position, it's
15     vigorously disputed by the plaintiff.
16          MR. LIMAN:  Your Honor, if that becomes a disputed
17     issue, I think we can have a deposition or something to show
18     what the information is --
19          THE COURT:  Well, I think all disputes can be
20     resolved.  I'm just asking if there's any -- Do you have a
21     document that says there was no meeting in December?
22          MR. LIMAN:  I've got their documents, and there is no
23     evidence that I've got from any of our documents.  In fact, the
24     joint venture, as your Honor knows, was formed much later and
25     then for a period of time in 2009 BSGR, according to their

1  documents and our documents, was negotiating with the third
2  parties. We know that mostly from the Rio Tinto's documents
3  because we wouldn't know what --
4           THE COURT: Well, it's a pretty narrow question, and I
5  take it it's disputed as to whether or not there was, at this
6  stage, a meeting.
7           MR. LYLE: Yes.
8           THE COURT: All right. Well, this is very helpful, as
9  far as I'm concerned. When do you think it would be fruitful
10 for us to have another, I guess, status conference?
11          MR. LIMAN: Your Honor, I would think either if your
12 Honor wants argument on the motion to dismiss or sometime after
13 the motion to dismiss is issued, if it denies the motion to
14 dismiss. Obviously, if you grant it, it's over.
15          MR. LYLE: We're scheduled to be here, your Honor, for
16 your information, the last week in July, if it makes sense for
17 us to appear before you then.
18          THE COURT: That's currently on the calendar?
19          MR. LYLE: Yes, with Judge Peck.
20          THE COURT: No, you pursue that with Judge Peck. I
21 think I won't then set another date for us to get together. If
22 you all need something, just let me know and I'll put you on
23 the calendar.
24          MR. LYLE: Thank you, your Honor.
25          THE COURT: Nice to see you all.

F6NPRIOC

1          MR. LIMAN:  Thank you, your Honor.
2          THE COURT:  Yes.
3          (Adjourned)