```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
 3
     RIO TINTO PLC,
 4
                    Plaintiff,
 5
            v.                        14 CV 3042 (RMB-AJP)
 6

 7   VALE, S.A.,

 8                   Defendants.

 9   ------------------------------x
                                     New York, N.Y.
10                                   July 28, 2015
                                     2:10 p.m.
11   Before:
                     HON. ANDREW J. PECK,
12
                                     Magistrate Judge
13
                         APPEARANCES
14
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
15        Attorneys for RIO TINTO PLC
     BY:  KEITH H. FORST
16        ERIC LYTTLE
          MICHAEL J. LYLE
17        MEGHAN A. McCAFFREY

18   CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for VALE, S.A.
19   BY:  LEWIS J. LIMAN
          SCOTT B. REENTS
20        MATTHEW M. KARLAN

21        MISHCON de REYA NEW YORK, LLP
          Attorneys for BSG RESOURCES LIMITED
22   BY:  VINCENT FILARDO
          SHAUNEIDA C. DePEIZA SALDENHA
23        DAN MANDELL

24   SULLIVAN & WORCESTER LLP
          Attorneys for Mahmoud Thiam
25   BY:  PAUL E. SUMMIT
```

1              (In open court)

2              THE COURT:  I'm going to use the July 24 joint status

3      letter.

4              With respect to the first item, the auditor

5      information, I'm going to deny the request at this point,

6      without prejudice to Vale renewing it after it sees the full

7      extent of the July 30th production, the balance of Rio Tinto's

8      production, to see if you get from Rio Tinto the sort of

9      material that you think was exchanged between Rio Tinto and its

10     auditors.

11             I know that is different than what you agreed to do,

12     but since you agreed to do it, you're still stuck doing it, Mr.

13     Liman, but that doesn't necessarily get a quid pro quo.

14             MR. LIMAN:  Just a clarification for the record, our

15     document requests are not limited to what was exchanged between

16     Rio Tinto and its auditors, but we understand your Honor's

17     order.  I just wanted to clarify that for the record.

18             THE COURT:  Next, the redaction with respect to the

19     later Rio Tinto investigation, any chance you brought a copy of

20     the material?

21             MR. LIMAN:  Yes, your Honor.

22             THE COURT:  Hand it up, although I'm probably going to

23     need the unredacted copy from Rio Tinto to be able to make any

24     sense out of it.

25             MR. LYTTLE:  We have that, your Honor, as well.

1          THE COURT:  Good.

2          MR. LIMAN:  Your Honor, I should add that with respect

3     to the, quote/unquote, legal investigation, when we were last

4     before your Honor on this issue in December, you ordered, let's

5     see the privileged log, after we see the privileged log, try to

6     work it out, make your motions.  I think that applies to the

7     legal investigation.  There are a number of documents that

8     don't pertain to the legal investigation that I have handed up.

9          THE COURT:  I'm not sure what you're saying, but I

10    don't need to resolve this?

11         MR. LIMAN:  What I'm saying is that for the documents

12    I handed up, I think you do need to resolve them.  There is one

13    document that I handed up that is with Aeneas and I think it is

14    also with outside counsel, with Mr. Lytlle, Mr. Lyle.  I think

15    that document you don't yet need to resolve.  That will be the

16    subject of further briefing, further motion practice.  The

17    remainder of the documents do not pertain to Aeneas and you do

18    need to resolve.

19         MR. LYTTLE:  I'm just a little confused.  The Aeneas

20    document and communications with --

21         THE COURT:  You're not the only one, so let's do it

22    this way:  Give me the documents.  These seem to be starting

23    with Rio Tinto Bates Number RT 0676855 through 57, and then

24    76988 through 90, 91 through it looks like 97 or 98 and beyond.

25    So, hopefully, you have the unredacted set that matches the

1    redacted set that Mr. Liman gave me.

2              MR. LYTTLE:  May I make a suggestion?  May I see what

3    Mr. Liman showed you so I can match them up and make it easier?

4              THE COURT:  That makes perfect sense.

5              MR. LIMAN:  Why don't I put them in date order, also,

6    and I will exclude the ones which I think you don't need to

7    resolve.

8              THE COURT:  Why don't the two of you work on that.

9              MR. LYTTLE:  Just so the record is clear, these

10   additional documents were not ones they raised with us prior to

11   the joint letter.  So we reviewed these after.  They may

12   require explanation.  I point out that we didn't address these

13   in the joint letter because we didn't know they intended to

14   raise them.  The only one we are aware of is Mr. Toure, which

15   apparently now we're not dealing with today, and Mr. Aeneas.

16             THE COURT:  Okay.  You all want to put a pin in this,

17   and I will deal with the other issues and come back to this

18   since I'm not sure that you all can walk and chew gum or, in

19   less facetious terms, talk and also put documents in order,

20   give it to one of your minions.  Remind me to come back to

21   this.

22             With respect to the attorneys' eyes only

23   designation -- I'm now at the bottom of page 6 through

24   page 8 -- it seems to me the burden is on Rio Tinto here.  So

25   my question is:  What do you want to do to fix this at this

1    point?

2            MS. McCAFFREY:  Your Honor, as a personal matter, I do

3    think we have pretty much resolved this.  We sent revised

4    confidentiality designations with metadata overlays.  To the

5    extent that that does not adequately address Vale's concerns,

6    we're happy to receive a list of documents from them.  We can

7    go back and look at it.

8            THE COURT:  That's what I'm telling you we're not

9    doing.

10           MS. McCAFFREY:  I guess my only point, your Honor, is

11   there are processes in place.  We do have a protective order in

12   place entered by the Court that requires the opposing party, to

13   the extent that there is a challenge to a confidentiality

14   designation, to notify us of that, to then conduct a

15   meet-and-confer.  There may be -- I can't say it is perfect.

16   There may be problems.

17           THE COURT:  I understand, and I do understand that the

18   good ol' day procedures that worked fine don't work nearly as

19   well when there are 150,000 documents.  The fact that as of at

20   least two days ago -- because of the weekend, four days ago --

21   when this letter came in, there were still 49,000 documents --

22           MS. McCAFFREY:  That's not correct, your Honor.

23   That's incorrect.  We have approximately the same percentage of

24   documents designated as AEO as Vale does.  The amount of

25   documents that we had, I agree, when it first came in, we had a

1    mess-up on our part.  That's been corrected.  The attorneys'

2    eyes only designation for that production, we have reduced the

3    designations down from over 34,000 of our documents.  So at

4    this point there is a subset.

5              THE COURT:  It is now 34,000?

6              MS. McCAFFREY:  No, your Honor, it is less than that.

7    In terms of our entire production, we have 117,000 documents

8    that we have produced in this matter.  This is a small portion

9    of those materials.

10             MR. LIMAN:  Your Honor, the number 14,000 in the

11   footnote to our letter indicates even a brief review reflects

12   that it includes tons of things like newspaper articles and the

13   like, which either nobody looked at these documents or whoever

14   looked at these documents had no idea what they were doing.

15             MS. McCAFFREY:  That's incorrect, your Honor.  We have

16   certainly had attorneys review these materials, and I don't

17   appreciate -- we corrected that.

18             THE COURT:  You have two choices.  You're all going to

19   follow the protocol a few steps, but despite the bulk of the

20   documents, you know, it is one thing to say almost everything

21   is confidential because other than when you have to file it

22   with the Court should this case ever get to a factual

23   determination whether on summary judgment or trial, it does

24   matter.  The fact that it is attorneys' eyes only, which keeps

25   Vale and other defendants from showing it to their clients,

bothers me; and at some point, I will give you one more shot at

it, but I don't think that you can put the burden on Vale to

say, we over designated, we've now fixed it a lot, but, you

know, whether the number is 14,000 or whatever it is should not

be on them to review them one by one.

I'm going to let you all work this out, but the burden

remains on the designator, in this case, Rio Tinto.  The issue

may come back to haunt Vale later, it may not.  So if you live

by the sword, you die by the sword later.

MS. McCAFFREY:  Your Honor --

THE COURT:  Let me just finish.

If after another round with some cooperation but not

switching the burden it comes back to me and there are more

than a handful of so clearly misdesignated documents -- and I

have lived through tender-offer litigation where blank

pages were marked either confidential or attorneys' eyes only,

I know these things happen when there is a massive production

and not enough time -- but I'm not shifting the burden to Vale.

And if I find there is abuse -- and this will go to any other

party producing documents later -- after one to two efforts to

fix it, after that, the baby goes with the bath water, and

there will be no attorneys' eyes only designations for

Rio Tinto.

Got it?  So make another review.  Do what you've got

to do within economic reasonableness, work with Mr. Liman and

his colleagues, but don't say that if they don't call it to
your attention you don't have to re-review it.  If the issue
comes back, I'm going to expect, I guess, Vale to bring samples
of documents still classified incorrectly in their view, and if
there are more than a few, that's the end of it.

MS. McCAFFREY:  Understood, your Honor.  I just want
to make sure it is reciprocal here, because the amount that we
designated is similar to the amount that Vale has designated.

THE COURT:  It will be reciprocal.  Look, something
that is a close call, is this really business sensitive, so it
is clearly confidential, is it attorneys' eyes only, that's one
thing.  When I hear that newspaper articles and the like are
designated as attorneys' eyes only, there's something wrong
with the process.

MS. McCAFFREY:  Yes, your Honor.  Completely
understood.  I will note that some of these materials are
investigator materials.  That may be also where some of the
confusion is.

THE COURT:  The investigator's material is public
record.  It is not attorneys' eyes only just because an
investigator wrote about it.

MS. McCAFFREY:  Understood.  Thank you, your Honor.

THE COURT:  Next issue, update on the investigators.
I see that my counterpart in the UK has given you certain
rulings, and I don't think there is anything that you're asking

1    me to do in connection with that.

2        MR. LIMAN:  Your Honor, not at this moment.  We would

3    note the finding with respect to document destruction --

4        THE COURT:  I did read that.

5        MR. LYTTLE:  Your Honor, may I address that briefly?

6        THE COURT:  That depends.  Are you asking me to rule

7    on it?

8        MR. LYTTLE:  I'm not.

9        THE COURT:  Then, why do I want to listen to something

10   that I may or may not remember when the issue comes up again if

11   it comes up again?

12       MR. LYTTLE:  That's fine, your Honor.  There is one

13   point I would like to add.

14       THE COURT:  Go ahead.

15       MR. LYTTLE:  There was an additional witness statement

16   that was served by Vale's counsel which we believe

17   mischaracterizes some of the facts in the record, as well as to

18   the positions that we have taken and this Court has taken.  We

19   would just ask that Vale, as they have done in the past and

20   promised to do, continue to keep us up to date and to serve us

21   when things are served simultaneously in their Hague

22   proceeding, to notify us when depositions are scheduled, and to

23   provide us documents quickly when they are provided by the

24   investigator.

25       THE COURT:  Any problem with that?

1    MR. LIMAN:  Your Honor, we have already provided them

2    everything that has been produced.

3    MR. LYTTLE:  Your Honor, we don't have the second

4    witness statement from Mr. Kelly.

5    MR. LIMAN:  I will look into it.  That's the first I

6    have heard about it.

7    THE COURT:  Get it to them quickly.

8    Roman numeral III, Rio's application, discovery with

9    respect to Vale, the Nardello report.  I'm not prepared to rule

10   on it at this time.  The auditors' material, which is item (b)

11   -- I'm now on page 11 -- Vale's agreed to request documents

12   from E&Y.  It seems that's the end of it.

13   MR. LIMAN:  Your Honor, I can update you on that.  We

14   have written to the various E&Y affiliates.  We haven't

15   received responses yet.  When we do receive responses, we will

16   let Rio Tinto know, and let them know the position with respect

17   to control.  I don't know what position they will take.  We

18   haven't stipulated as to anything.

19   MR. LYTTLE:  Your Honor, just as we were asked and

20   ordered to provide our communications with the investigators,

21   we would ask to see their communications with Ernst & Young to

22   make sure they're asking for the right materials, as well as to

23   see any responses.

24   THE COURT:  Any problem with that, Mr. Liman?

25   MR. LIMAN:  None whatsoever.

1          THE COURT:  Okay, next.  Vale's objections to Rio

2     Tinto's second interrogatories and third document requests.

3     Except where Vale has agreed to produce certain documents, the

4     objections are all sustained.

5          If you desperately need to make argument on this, on

6     Rio Tinto's side, I will listen, but the odds of me changing my

7     mind are slim.  Discovery has to end at some point.

8          MS. McCAFFREY:  Your Honor, to be clear, it's your

9     ruling with respect to the interrogatories or also --

10          THE COURT:  Both.  Interrogatories and document

11     requests.

12          MS. McCAFFREY:  Then, your Honor, I believe we need to

13     make a record.

14          THE COURT:  Make a record.

15          MS. McCAFFREY:  With respect to interrogatory

16     number 12, which calls for Vale to identify every person who

17     has knowledge and/or that may possess information regarding

18     Vale's response to Rio Tinto's November 2008 briefing, that

19     briefing was a critical briefing related to notification to

20     Vale of BSGR's --

21          THE COURT:  Let me interrupt you to help on one thing.

22     We are supposedly -- "we," meaning, you -- about to start

23     taking depositions.  The fact that I'm not making them answer

24     interrogatories asking for every person, which is clearly

25     overbroad, you are free to depose whoever the designee is,

whether it is a name or a 30(b)(6), on some of these issues and
ask them who else may be knowledgeable and what they know.
That's a much more appropriate and convenient, under our local
rules, way of getting this information at this stage in the
case than doing it this way.

          MS. McCAFFREY:  To that, your Honor, I recognize that,
I understand that.  I think the point there is that we are on a
very expedited discovery schedule.  The deposition schedule is
fast.

          THE COURT:  No, you are not.  If you hadn't taken
three times longer than you should have with all the
documents -- and you're still fighting over that -- things
would have moved much more quickly.  So, you know, get the
information through depositions.  If that means somebody else
will have to be deposed, we will figure out a way to get that
to happen.

          Anything else you want to make a record on?

          MS. McCAFFREY:  I do, your Honor.

          With the document requests in particular, I am now on
request number 78, which requests documents concerning one of
Vale's agents.  In particular, I want to notify you in the
course of going through the Vale production, we have found
evidence that supports our belief that Mr. Keira was acting on
behalf of Vale as an agent; more specifically, in 2008, which
is a critical time period in this case, was liaising as Vale's

1  agent with the Guinean president and other officials within the

2  Minister of Mines, and that was in connection with trying to

3  acquire rights at Simandou.

4         We believe that this is particularly relevant given

5  the allegations in this case.

6         THE COURT:  Objection sustained.

7         MS. McCAFFREY:  Request number 79 regarding Vale's

8  discussions with third parties, again we believe this is highly

9  relevant in terms of, in particular, it goes to use and

10  dissemination of Rio Tinto's information; in particular, the

11  extent to which Vale then used that information and put it off

12  as its own in order to try to entice another joint venture

13  partner to join its efforts at Simandou.  We believe it will

14  also shed light in terms of any information Vale may have

15  provided with respect to questions or issues raised by the

16  Guinean government in connection with the legality of their

17  rights to Simandou.

18         Finally, your Honor, this frankly is very similar in

19  scope to the same request that Vale served on Rio Tinto with

20  respect to Shan Alto (phonetic) and BHP, which we have already

21  produced documents in response to.

22         THE COURT:  My ruling stands.

23         If you're really going to take objections to Judge

24  Berman, which is probably a very good way to get him to rule on

25  the motion to dismiss, to let him see firsthand what I'm going

1    through with all of you, make your record.  But you submitted

2    letters in advance.  I have read them.  I have read each side's

3    views on this.  This is not the first round of document

4    production.  If you get these materials 30 days from now,

5    you're never going to take depositions.  It is time to move

6    this case to its final stage.

7            MS. McCAFFREY:  Understood, your Honor.

8            I guess a question for you:  May our submissions in

9    the joint letter stand as our record?

10           THE COURT:  Absolutely.

11           MS. McCAFFREY:  Otherwise, I won't take the Court's

12   time.

13           THE COURT:  Next.  This jumps us all the way over to

14   page 20.  Let me first deal with footnote 18.  Is Trojan Horse

15   a code name for the BSGR deal, Mr. Liman?

16           MR. KARLAN:  The short answer, your Honor, is that as

17   they know because we produced documents so indicating, it is

18   used sometimes seemingly interchangeably with that deal,

19   although it does not appear until about the same time as the

20   transaction itself, which is April 2010.  It also appears later

21   in contexts which suggests to me, as the reader, that it is

22   used more generally to refer to Simandou.  I don't think it is

23   necessarily synonymous with the deal.

24           MS. McCAFFREY:  Your Honor, based on our review of the

25   documents, it does not appear that it was used simultaneously

with Simandou from the documents that we have seen.  It has also raised concerns on our part that the deal was not closed on April 30th and that the documents, the limited amount that we have seen on Trojan Horse, do indicate it is very specific to the BSGR deal.

THE COURT:  Since you're doing a mixed key word and predictive coding system here, on anything already not produced, if you had to run the term Trojan Horse, how much material -- I don't know which of you is going to answer this -- how much material would it turn up so that we are sure that this is covered?

MR. REENTS:  Your Honor, I don't know the answer to that.  I do know that we've produced a number of documents that contain the term.

THE COURT:  "A number" is not all.

MR. REENTS:  It is conceivable there are other documents, although we did go through the process as specified by the protocol wherein we sampled documents that were excluded by the search terms, and we didn't find any responsive documents --

THE COURT:  Of the excluded documents, how many refer to Trojan Horse?

MR. REENTS:  I can tell you that from the sample that we reviewed there were zero responsive documents.

THE COURT:  This is easy enough.  It doesn't take

1    fancy predictive coding, tar.  Run a key word search on the

2    documents that never made it into the predictive coding system

3    and unless there are a huge number -- and you're, I think,

4    suggesting there wouldn't be because of the sampling -- but

5    anything you find with Trojan Horse produce.  That's the

6    Court's ruling.

7         MS. McCAFFREY:  Your Honor, Trojan horse was never a

8    search term that was used.  Thank you in terms of any of the

9    documents that were excluded, but can it also be run against

10   the document universe of 800,000, the winnowed-down universe,

11   to make sure that they're getting a full set?

12        MR. REENTS:  Your Honor, we have a process in place

13   for deciding whether those documents are responsive that

14   involve the use of predictive coding, training sets --

15        THE COURT:  Either throw this over to Ms. Grossman and

16   you can pay 800 and whatever it was, 850 or 875 an hour, or I

17   can tell you that regardless of whether we are mucking up the

18   system more than it already is by mixing and matching, it would

19   seem to me that unless you're telling me there are a huge

20   number of non-produced documents that have the term Trojan

21   Horse in it that rather than have 12 lawyers sitting here

22   billing $50,000 an hour, whatever your collective billing rate

23   is, that you do a key word search, throw out everything not

24   produced for Trojan horse.  If you come back to me and say that

25   turns up a million documents or whatever number is the number

1  that you think is so excessive that it has to be winnowed down

2  in some other way, just produce it.

3        That's the Court's ruling, period.

4        Now, I guess my question on the rest --

5        MR. REENTS:  Your Honor, just one point on that.  I

6  didn't understand your ruling to be that we could not review

7  for relevance --

8        THE COURT:  Review for relevance and privilege, but

9  you're probably going to get questioned.  If Trojan Horse,

10  somebody is also talking about their Greek mythology days,

11  etc., fine.  If it is a close call, you're going to work with

12  the folks across the aisle from you so I don't have to deal

13  with it.

14        MS. McCAFFREY:  Your Honor, can we get an order that

15  they disclose the number of documents that are returned by the

16  search?

17        THE COURT:  Yes.  So ordered.

18        All right.  Now, as to Vale's document production and

19  the gaps that you see, you know, this seems to be a possible

20  crossover between scope definitions, which is in front of me,

21  and tar protocols and the like, which is in front of the

22  special master, Ms. Grossman.

23        What do you all suggest?

24        MR. LYLE:  Your Honor, with respect to the issues we

25  have raised in correspondence, we think these fit within your

purview.  There are major holes in the production.  In addition
to the examples we have listed here --

THE COURT:  Let me just look at what seems to be your
conclusion paragraph, and you want, as a first step, the hit
report for the search terms that ran to narrow the document
universe?

MR. LYLE:  Yes, your Honor, that's what we're asking
for.

THE COURT:  Mr. Reents, any problem with that?  That's
just numbers, right?

MR. REENTS:  Yeah, we do.  They note this is just a
first step, presumably with a greater number of steps.  But the
principle, your Honor, is that we agreed to a protocol for the
exchange of documents and an incredibly amount of transparency
into our review process.  We have produced to them almost 8,000
documents during the predictive coding training process that
they not only looked at but sat down with us and coded and had
an attempt to object to, and they haven't brought a single
document to your Honor's attention.  The reason is because we
have reached agreement on all those documents.  We have a very
good understanding about what the scope of these document
requests are.  To allow them to come at the very end of the
process and suggest additional steps that we need to go through
in order to provide even more transparency than the protocol
allows would not be fair to Vale.  I worry that it invites

1    further delay and further unnecessary burden --

2            THE COURT:  My concern is this:  They have a list of

3    about a dozen areas that they think you haven't produced enough

4    information about.  Now, you know, there are at least two, if

5    not more, possibilities.  One is there are no documents about

6    it because their view of the case and what happened is

7    erroneous and there is no conspiracy and no bad acts, etc.,

8    etc.  The other possibility, of course, is that through defects

9    in the document production process, whether in terms of how you

10   viewed the scope or how you did the prescreening leading to the

11   tar process, etc., that things got left out.

12           How do I deal with this?

13           MR. REENTS:  I have a suggestion.  First, in terms of

14   the specific issues that they raise, there are a couple of

15   other possibilities.  One is that we have, in fact, produced

16   quite a number of documents in response to many of these

17   issues.  Second possibility, which is also true for a couple of

18   these, is that these are not requests that are validly before

19   us.  They withdrew them or your Honor limited them.

20           THE COURT:  With all due respect --

21           MR. REENTS:  But --

22           THE COURT:  -- that was a discussion that I would have

23   liked to see you all have had before today.  If what you're

24   suggesting is that we once again defer or that you all, if you

25   think you can do it here, after we finish everything else in

1   this letter, go to the jury room and try to make some progress.

2   But it's difficult for me.  You agreed to a protocol.  I told

3   you at the time I had some questions about it, but you agreed

4   to changes.  I approved it.  You're both going to have to live

5   with that.  However, I have not reread the protocol in

6   preparation for today, but I am relatively confident that it

7   did not say that at the end of the day -- I'm not sure if we're

8   at the end of the day or just at sunset as opposed to

9   midnight -- that there could be a challenge if the document

10  production for whatever reason was insufficient.

11          MR. REENTS:  Your Honor, with respect to that, two

12  points:  One is, of course, sufficiency is not merely measured

13  by the number of documents you produce.  We're obligated to

14  undertake a reasonable search.  We have provided extensive

15  disclosures to them and transparency about the nature of that

16  search; and moreover -- this is sort of the punch line-- there

17  is a way to validate the completeness of our production, which

18  is that we produced to them at the very beginning of this

19  process back in April a control set randomly selected from our

20  entire document universe, and that gives them a very good idea,

21  4,000 documents of what's in our document universe.  Not only

22  that, but through statistical extrapolation, you can calculate

23  how many responsive documents you should expect to find in that

24  document universe and how many documents you should expect that

25  we would produce.  It turns out that those numbers line up very

1    closely with what we have in fact produced.  There is a

2    methodological point here.  I'm not expecting your Honor that

3    we go into the details of that.  But we set up a

4    meet-and-confer with them later in the week.  We're happy to

5    take them through those calculations and those numbers if

6    they're willing to do the same thing with respect to their

7    production, and to the extent that there are concerns about

8    statistical extrapolation or the methodology, we have

9    Ms. Grossman, and we can raise those issues before her.

10            MR. LYLE:  Your Honor, it is interesting that Vale has

11   taken this position.  With respect to the documents that they

12   used for training the system, we had a review of those

13   documents.  Two hundred of those documents have not been

14   produced in their production.  That is 25 percent of the

15   documents that they used to train their system hasn't been

16   produced in production.  The documents we saw, reviewed, 200 of

17   them are already missing.  That is one hole, your Honor.  They

18   agreed that those documents were responsive in that process,

19   and we don't have those documents.

20            The second point, your Honor, is with respect to the

21   process that we utilized, what we're looking for here, going

22   forward in terms of suggestion, is we've asked simply that as a

23   stepping off point that they give us the search term hit report

24   for the search terms Vale ran to narrow its document universe,

25   so that we can engage in a meaningful --

1      THE COURT:  Let me back up half a step.  Do you know

2  the search terms that were used and you just need the hits, or

3  you don't even know the search terms?

4      MS. McCAFFREY:  Your Honor, if I may be heard.  We do

5  know the search terms.  We would like to see the hits.  We

6  believe this would be a first step.

7      THE COURT:  Okay.  Then, I'm going to ask you --

8      MR. REENTS:  Your Honor --

9      THE COURT:  Hang on.  Breathe in between a sentence

10  without losing the floor.

11      The question, I guess, is:  You knew the search terms,

12  and the time to object to all of that has not only passed but

13  we had a conference on it, subject to the final review stage.

14  What is the hit report going to do to add to that, and to take

15  Mr. Reents' fear of slippery slopes, which is not unjustified,

16  let's say that a term that they used to screen out documents

17  had a very high hit number or a very low number, where do we go

18  from there unless, of course, they used as a screen-out as

19  opposed a screen-in a term that is clearly relevant and you've

20  had the terms?  Where would we go with this?

21      MR. LYLE:  It will give us a sense, your Honor, it's

22  another metric that will allow us to assess the responsiveness

23  of what they have given to us, because they have only produced

24  17,000 documents out of a universe that they describe as having

25  1.3 terabytes --

1    THE COURT:  I have all that as to how big the universe

2    was.

3    MR. LYLE:  If we are able to look at how responsive

4    they are, we can also look at what they have given us, and we

5    can see how large these gaps truly are.

6    THE COURT:  You have convinced me of two things.

7    MR. LYLE:  Your Honor, I wanted to address the other

8    point that you made before you make a determination.

9    THE COURT:  Go ahead.

10   MR. LYLE:  The other possibility that you articulated

11   was that there are documents that Vale has taken the position,

12   they're saying our complaints about their production are that

13   there is nothing in the production that supports our case.  We

14   have, your Honor, a couple of examples that I can hand up to

15   you that show that we've seen some glimpses into some documents

16   that are responsive and supportive of our allegations.  For

17   example, our amended complaint is full of allegations about the

18   use of Liberia to transport iron ore out of Guinea through

19   Liberia, and there is a document that they produced, we only

20   have the document, a draft mineral development agreement that

21   refers to the use of Liberia for the exportation of iron ore

22   from Guinea, and it is an agreement involving BSGR and Vale

23   that's dated four months after the deal, the negotiations

24   between Rio Tinto and Vale Crater.  That's exactly what we're

25   alleging in our case.  What we don't have are emails related to

1  this document beforehand, correspondence related to that

2  document.  We don't have prior versions of this.  So there are

3  ample examples.

4         THE COURT:  Okay.  On this one, you are going to take

5  a twofold approach:  One, you're going to sit down and have

6  this sort of specific discussion, which at least based on both

7  the letter and at least what Mr. Reents is saying -- I'm not

8  sure, Mr. Lyle, if you have shared those specifics with him --

9  but it is clear to me that you all need to sit down and further

10 discuss this.  To the extent that you want the hit report, I am

11 not ordering it, and I'm not denying it.  To the extent that

12 that is part, albeit -- well, it is an approach leading to your

13 tar process, and therefore, in the first instance, it is for

14 you all to sit down and see if Ms. Grossman can either help you

15 compromise it, or if not, she will rule on whatever you ask her

16 to rule on, subject to my review of her rulings and Judge

17 Berman reviewing my rulings.  It seems to me that, on the one

18 hand, principle number six, the producing part is in the best

19 position to determine how and what to produce, but that does

20 not give them free range not to produce responsive documents,

21 etc.  It may be that using the various documents where you say

22 you have seen a glimpse, Mr. Lyle, but not anything else that

23 they can focus on that and find more material as a supplement

24 to the key word/tar production methodology.

25         MR. REENTS:  Your Honor, on that, I would just note

that, in fact, the parties already did agree to a supplemental

training process.  If these documents that they contend are so

case breaking, they are entitled to include those in a

supplemental seed set that we will use for further training on

the predictive coding universe.

THE COURT:  You have heard my ruling.  You all need to

cooperate with each other, and that will save you money.  It is

the usual thing about do you want the nine strangers in the

jury box determining your fate or do you want to settle a case

and work it out.  Similarly, you can work as much of this out

as possible or trigger an application to Ms. Grossman, and we

will go from there.  If it is a true scope issue, meaning you

define X on the plaintiff's side as in the case and defendant's

have defined it out of the document discovery, that's an issue

that I will be ruling on, but this does not seem to be a scope

issue as such.  That's the Court's ruling.

MR. LYLE:  If I understand your Honor, if after we

have met and conferred we continue to believe that this is a

scope issue, we should pursue it with your Honor rather than --

THE COURT:  Only in the sense of if you say -- and I

will use one of your bullet points -- that drill location from

blocks one and two and how those locations were chosen is

relevant to the lawsuit and not outside of discovery under the

operational exception to production, and they say, no, no, no,

that is purely operational, that comes to me.  If the issue is,

we agree, we look for this sort of information but this is all
we found and Vale will say, take a look at document with Bates
stamp -- or its electronic equivalent -- such-and-such, we
think you've got some there, that's all we've found, then it's
a process of how you're going to find more or why more wasn't
found, that goes to Ms. Grossman.

Everyone clear?

MS. McCAFFREY:  One clarification point:  I believe
Mr. Reents had said that the parties were in full agreement in
terms of the predictive training coding.  That's not true.

THE COURT:  I don't think you're in full agreement
with them on anything.

MS. McCAFFREY:  That's a fair point.

There are still some outstanding agreements on Vale's
training set.  I just want a clarification.  It is with respect
to certain coding --

THE COURT:  Obviously, anything that is tar related
goes to Ms. Grossman.

MS. McCAFFREY:  Thank you for the clarification.

THE COURT:  Roman numeral IV, page 23, discovery from
BSGR and Steinmetz, frankly, I have the feeling that BSGR and
Steinmetz are going particularly slowly.  But proceed.

MR. FORST:  Your Honor, I know you have read our
letter closely and detailed the issues with BSGR's production
here, but truth be told, a few months ago we had assurances

from Mr. Filardo and BSGR that through the Hague Convention,
they would make a full production in connection with the scope
of our request.  What we have gotten in return is a number of
documents just on its face that look absurdly low relative to
the rest of the defendants.  You can do some quick metrics
there and compare emails that are being produced from Vale
compared to what is coming from BSGR.  There are hundreds and
hundreds missing.  We have specific presentations that were
authored by BSGR, and there is not a single document draft
presentation discussion about it, an email about it, a
follow-up, even that presentation itself hasn't come.  As you
go through the list and you look at this production, there is
just gap and gap and gap.

What we have done and all we have suggested is say,
Mr. Filardo, let's get some transparency into the process.
What did you do, what custodians, what search terms.  Maybe we
can work together to figure this out.  And yet all we have
gotten in return is, in fact, Mr. Filardo has apparently
referred us to his colleagues in London, and they said, no
dice, you don't get it.  I'm sorry.  You're not entitled to
look into that stuff.

Again, we're willing to be cooperative about it, but
if you look at the production on its face, the obvious holes,
we want to see a little bit more.

THE COURT:  Mr. Filardo.

1          MR. FILARDO:  A lot of what was stated to the Court is

2     just simply inaccurate.  First of all, to begin with, these are

3     requests that are propounded pursuant to the Hague, letters of

4     request that were carefully negotiated by the parties.  They

5     needed to be narrow sufficiently to pass muster, and they were,

6     and the parties agreed to.  What Rio is looking for now are

7     broad-based responses that would not be responsive to these

8     letters of request and requests made of them.  They're

9     comparing them to Vale's responses under federal rules,

10    broad-based federal rules --

11         THE COURT:  Let me ask you this:  If for no other

12    reason than to satisfy Rio and possibly Vale, who is sitting at

13    the same table as you but is not necessarily always your

14    friend, is there any reason why you shouldn't identify, for

15    example, which custodian's data was searched?

16         MR. FILARDO:  Your Honor, we have not refused to do

17    that, nor have I punted it over to my London colleagues, even

18    though my London colleagues are the attorneys who reviewed

19    these documents, and in an effort to comply with the UK High

20    Court order.  They take that responsibility very, very

21    seriously.  We have not.  We put in a written response by the

22    people, the attorneys with personal knowledge about the review

23    and production and actually offered to have a meet-and-confer

24    if Rio wanted to have it after they read our letter.  I think

25    we have resolved a number of the issues that they have raised

1    in their letter, some that I feel confident telling your Honor

2    about, but I think they're in our actual part of the joint

3    letter.

4          But do I think there is an impediment to actually

5    providing who the custodians were?  No, I do not think that.

6    I'm not sure that is required under the rules, but in the

7    context of our meet-and-confer process, I don't think there

8    will be an objection to that.

9          THE COURT:  Take a look at page 24, the last Rio Tinto

10   paragraph before your position statement.  Is there anything --

11   putting aside (i), which is substantive production, but as to

12   little (ii), the information they want, custodians, search

13   terms, date restrictions used to cull, size of the collection

14   before culling, and a search term hit report.

15         MR. FILARDO:  I think to the extent that we have that

16   information, we can provide it.  The reason I say that is

17   because I know there were certain -- I've been told, this is

18   anecdotal, your Honor -- that certain search terms were run and

19   there may be hit reports, but then there may have been

20   additional follow-up searches that were done that they may not

21   have hit reports for, and I'm not exactly clear how that was --

22         THE COURT:  The Court is ordering you on consent to

23   produce, to the extent available, the information called for by

24   (ii) and to meet and confer with the Rio Tinto folks and anyone

25   else who has an interest and, if necessary, with an open phone

line or Skype to London and try to resolve that. Anything that
is left after that, you can either go back to my counterpart
across the pond, or I will deal with it if it is within my
current view of my agreement with you on sending it to London
instead of doing it as federal rules discovery. Obviously, if
and when Judge Berman rules on the BSGR/Steinmetz motion, if
you're still in the case, and Rio Tinto is not satisfied with
what it has gotten from you because of restrictions under the
Hague, you might have to do something --

MR. LIMAN: Your Honor, as you have anticipated, we
would like to be part of that meet-and-confer process and like
to have the same rights that your Honor granted Rio Tinto.

THE COURT: Okay. If necessary, you'll come back to
me.

On VBG, I know your client is not existing and its
poverty stricken and all of that, but it seems to me that it's
time for the documents from Guinea to make their way over here.

MR. TREMONTE: Your Honor, I think on prior occasions
you have heard from Mr. Auerbach.

With respect to the two categories of documents that I
understand are located in Guinea, there is the hard copy
documents that are in some form of storage and also the
documents that were seized by the Guinean government, I know
that Mr. Auerbach has been making efforts to determine whether
or not we can gain access to those documents. We do not

1    currently have access.  I last spoke to him on Friday.  I know

2    that those efforts have not been successful, and I don't know

3    if they will be, but that's the status of what I know.

4            THE COURT:  Whatever the government has, there's

5    basically only begging.  What's in storage, it may cost money,

6    but unless you're telling me that VBG does not have the right

7    to get those documents out of storage, if it is only a question

8    of the storage company has a lien on it and somebody has got to

9    pay, your client has got the choice of somehow coming up with

10   the money and paying and producing the relevant documents from

11   that or potentially being defaulted for discovery violations

12   and if you can't pay the cost of the storage company, it

13   probably doesn't matter whether a default judgment is entered

14   against you if there are no assets.  But I have been hearing

15   this, we're working on it, we're working on it for much too

16   long.

17           What is the reason that you can't get the files that

18   are in storage?

19           MR. TREMONTE:  Your Honor, I am at something of a

20   disadvantage.  I don't know the precise details of the

21   back-and-forth.  I think it may be somewhat more complicated

22   than simply a matter of we owe somebody money that hasn't been

23   paid.  I would request an opportunity to confer with

24   Mr. Auerbach and then confer, in turn, with Rio Tinto by the

25   end of the week on this issue.

1          THE COURT:  So ordered, but at some point, the

2     kindness that everybody has been showing to Mr. Auerbach and

3     VBG is coming to an end, and my patience at this stage is

4     certainly enough excuses.  I'm either going to need actual

5     proof, an affidavit or whatever, as to what the impediment is

6     as to the files in storage or something more than we're working

7     on it but it is complicated.

8          MR. TREMONTE:  Understood, your Honor.

9          MR. FORST:  With respect to those documents, the one

10    thing that we have requested from Mr. Auerbach and we have yet

11    to receive -- and as you know, there's been a lot of, we're

12    trying, we're trying -- I have specifically asked him, can you

13    copy us on the letters or give us letters that you're sending

14    or inform us who you are reaching out to, because we have

15    offered, Rio Tinto can get people there and work with people.

16    We have offered to assist in that effort, but again, we have

17    only been met with we're trying.  To the extent we're going to

18    get an update on Friday, I would appreciate getting all the

19    correspondence that they have and maybe some specifics so maybe

20    we can pitch in because we want the documents.

21         THE COURT:  Any problem with that?

22         MR. TREMONTE:  Your Honor, again, my understanding is

23    that Mr. Auerbach is making diligent efforts.  I don't know if

24    he has been doing that in letters or on the phone or some other

25    form of communication.  I may well have a problem with it.  I

1    just don't know.  If we can do the meet-and-confer --

2              THE COURT:  Do the meet-and-confer.  If there are

3    letters, produce them, unless you have a very good reason,

4    which you'll tell me by letter on Friday why you're not

5    producing.  By letter, I mean email, text, any other method of

6    modern communication that leaves a track record beyond a phone

7    call.  We're about to go into the deposition period in

8    September, I think, or whenever it is that Judge Berman has let

9    the clock start running again.  I think it is somewhere in

10   September.  Enough is enough.

11             MR. TREMONTE:  Understood, your Honor.  Thank you.

12             THE COURT:  What else?

13             MR. FORST:  For VBG, in addition to the documents,

14   either hard copy or seized from the government, we have since

15   we filed the letter earlier this week been working with VBG to

16   identify additional custodians.  All we ask here, since we're

17   having a meet-and-confer Friday, maybe we get an order that we

18   get that list by this Friday, so we can continue to move

19   forward, electronic documents that VBG may have on Vale's

20   servers from previous --

21             THE COURT:  It is going to be very simple.  This is

22   taking too long, and if VBG doesn't cooperate, then I will

23   order that whatever Vale identifies as a potential VBG email

24   account, they're going to produce it, and they're going to lose

25   any input on it.  So, by Friday, you all better get that worked

1    out.

2         MR. LIMAN:  Your Honor, with respect to the issue of

3    the privileged documents, I've got a suggestion for your

4    Honor --

5         THE COURT:  Okay.

6         MR. LIMAN:  -- if I might.  The specific request we

7    make, which is at page 5 of the letter, the third full

8    paragraph, is with respect to the ESI protocol and the

9    requirement that producing party -- which in this case would be

10   Rio Tinto -- shall provide additional information sufficient to

11   allow the receiving party to evaluate the claim of privilege

12   over the information received.  With respect to a number of the

13   documents, until we saw the insert from Rio Tinto, which made

14   reference to Aeneas, we had not been provided that information

15   with respect to the communications with Aeneas.  We still have

16   not been provided that information with respect to the other

17   documents that Mr. Lytlle referenced.

18        What we would ask for is either that in court now or

19   by the end of this week, pursuant to an order from your Honor,

20   we be provided that additional information so that we can

21   evaluate it, we can confer, and if there is an issue, bring it

22   to your Honor, if there's not, try to work it out.

23        THE COURT:  Any objection to that?

24        MR. LYTTLE:  We are happy to.  Again, these documents

25   are new to us.  We will take a look at them and provide

1   additional information.  That is not necessarily required.

2   We're happy to do it.  I ask that it be reciprocal.  We have

3   yet to see a priv log from Vale.

4           THE COURT:  I'm not dealing with reciprocal requests.

5   Each request is standalone.  If you want to give me, we'll take

6   a shot at one -- because I'm still missing the plaintiff for

7   the 3:00 conference -- you want to give me one of the redacted

8   and unredacted, I will take a look and see if anything jumps

9   out to me as clearly privileged --

10          MR. LIMAN:  Your Honor, given the magnitude of this

11  issue I think for both sides, frankly, for the defendants, the

12  issue of equitable tolling is one of our main defenses, and I

13  don't underestimate the significance of the issue --

14          THE COURT:  With all due respect, Mr. Liman, if I read

15  this and it says, you know, the lawyers at Quinn Emmanuel said

16  X, then I have a pretty good idea that the claim of

17  attorney-client privilege is well founded unless there was a

18  waiver.  That's similar to what I've deferred on ruling on

19  Nardello as to whether there is a privilege there or not.  If,

20  on the other hand, there is something that is marked as

21  attorney-client privilege that could not in a million years

22  satisfy the standards for privilege, then I can easily look at

23  that and give you all some advice going forward to look at the

24  remainder of the documents.  Now, if it is more complicated

25  than that, I may or may not want briefing from you.  I

1   certainly will give you the opportunity to meet and confer

2   further, but let me see one document or two documents, one by

3   you and one by Mr. Lytlle --

4               MR. LIMAN:  Let me hand up exhibit, it is Bates RT

5   7171.

6               THE COURT:  I need the corresponding one from

7   Mr. Lytlle.

8               MR. LIMAN:  I would like to hand up 7144.

9               THE COURT:  I thought your minions and his minions

10  were putting this all together better.  Talk to him without

11  being on the record and figure this out.

12              MR. LYTTLE:  If I can offer a quick proffer on who

13  those individuals you're seeing are, it might be helpful.

14              THE COURT:  Hang on.

15              MR. LYTTLE:  I don't have it in front of me.  I

16  believe it is from Mr. Deschends, who is a high level member of

17  Rio Tinto's internal security team.

18              THE COURT:  Are there any lawyers on this document?

19              MR. LYTTLE:  There is.  Tim Lane is a Rio Tinto

20  lawyer.

21              THE COURT:  Let me put it to you this way:  Under

22  502(a), even voluntary production of this is not a waiver.  I'm

23  not reading anything here that is either legal advice or asking

24  for legal advises as opposed to setting up a meeting.  Are you

25  really claiming that this is attorney-client privilege?

MR. LYTTLE:  May I ask for a side bar, your Honor,
just to point that concern out?

THE COURT:  This is off the record.

MR. LIMAN:  Your Honor, we would be prefer it be on
the record and just that section redacted.

(Mr. Lyttle at sidebar)

MR. LYTTLE:  It's going to be this portion, your
Honor.  This is Mr. Deschends asking Rio --

THE COURT:  That's not a waiver.

MR. LYTTLE:  Not a waiver or not privileged?

THE COURT:  Both.

MR. LYTTLE:  This is asking counsel to direct and
assist the investigator.

THE COURT:  Okay.  But as long as it is produced on a
non-waiver agreement, that doesn't mean that what advice
Mr. Lane gave to the consultant is fair game.

MR. LYTTLE:  If we produce this asking counsel for
directions but don't produce the subsequent correspondence and
the direction --

THE COURT:  Unless I look at the reminder and find
that there was still nothing privileged.

MR. LYTTLE:  Okay.

THE COURT:  All right.  Step back.

(In open court)

THE COURT:  Without revealing anything from the

redaction that would be sensitive, this is, as I think was

clear from what I said on the record before, setting up a

meeting.

Now, this is the old slippery slope fear that I

thought Rule 502(a) obviated, and so the concern that

Mr. Lytlle expressed to me at the sidebar was, if I give this,

will that mean that Vale can then ask what legal advice was

given at the subsequent meeting that was being set up, my view

under 502(a) is that that is not a waiver, it is not a subject

matter waiver, assuming all the other parties agree that

whether I'm right or wrong on my interpretation of 502(a) you

will not call it a waiver with respect to the subsequent

meeting, then we can at least deal with some of these, and

there may be others of these where there will be discussion of

what was actually said at a meeting, and then if it is legal

advice, it doesn't have to be produced, if it is not or not

requesting legal advice.

Mr. Liman, with that, what's your position?

MR. LIMAN:  Your Honor, we would not argue that the

fact of producing that is a waiver.  We're, obviously,

reserving all of our rights to argue that there already has

been a waiver.

THE COURT:  Understood.

Anyone else on the defense team that is going to take

a different position?

1          Good.  Hearing nothing.

2          How many more of these are more like this document,

3   which for the record was RT 0677144, and how many start getting

4   into substance?  Maybe if I look at one of those, I can help

5   you more, and then after that, you can try to work this out on

6   your own.

7          MR. LYTTLE:  Under your Honor's current order and the

8   ones they have identified in the joint letter, it is

9   essentially various versions of that.

10         THE COURT:  Good.  That, hopefully, will allow you to

11  go forward.

12         I am returning to each of you this material, and to

13  make the reporter's life easier, Mr. Lytlle, based on what has

14  now gone on, can that part of the transcript be public?

15         MR. LYTTLE:  Yes, your Honor.  I have no problem with

16  that.

17         THE COURT:  Very good.

18         MR. LYTTLE:  Your Honor, can I make one correction?

19  We only looked at the correspondence related to this particular

20  Tim Lane chain of emails.  There is the Mr. Aeneas, Mr. Toure

21  issue.  That is a very different issue that we have not --

22         THE COURT:  You all said you want to do some more work

23  on it --

24         MR. LYTTLE:  I don't want to leave the impression that

25  everything cited in their footnote would be produced.  That's

1    not correct.  It includes those communications.

2                THE COURT:  Understood.

3                I think that concludes this letter, and all the other

4    letters were informational of late.

5                Is there anything else we should be doing now other

6    than setting a time for our next conference?

7                As you're all consulting, let me help you.

8                MS. McCAFFREY:  Thank you, your Honor.

9                THE COURT:  Folks, you have the choice of up to and

10   including August 21 or after Labor Day.

11               MR. LIMAN:  Your Honor, it has been a complicated

12   negotiation.  If your Honor has any time on August 19th, I

13   think we will try to make that work.

14               THE COURT:  All right.  2:30, to give commuters time

15   to get here.

16               MR. LYTTLE:  Thank you, your Honor.

17               THE COURT:  Although with what's been happening with

18   Amtrak tunnels lately, you're at risk.

19               August 19, 2:30, see you then.

20               Usual drill.  Everybody, in whatever sharing you have

21   been doing, is required to buy the transcript.

22               Try to keep working as much out as possible.  And

23   while I appreciate that in order to get the letters to me

24   two days before that sometimes things are then worked out

25   between the letter, but I am trying to be well prepared for

1    these conferences so that I'm ruling as opposed to re-listening

2    to argument that's already in the letter, so if you're

3    resolving things post-letter and before the conference, that's

4    great, but try to do it before you write the letter instead of

5    in that gap period.

6            Okay.  See you on the 19th.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25