CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC • PARIS • BRUSSELS • LONDON • MOSCOW
FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG
BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT H. BINDER
MEYER H. FEDIDA
JOHN V. HARRISON
CAROLINE F. HAYDAY
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

Writer's Direct Dial: +1 (212) 225-2550
E-Mail: lliman@cgsh.com

August 10, 2015

VIA ECF

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:  *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

     We write on behalf of defendant Vale to advise the Court of repeated false representations and violations of Court orders by plaintiff Rio Tinto. The false representations and violations of Court orders go to a core issue in this case: whether Rio Tinto can prove that the statute of limitations for its facially stale RICO claim was equitably tolled because what Rio Tinto alleges to have been a thorough investigation of potential legal claims following its RICO injury in 2008 was thwarted by Vale's fraudulent concealment. *See* Amended Complaint (Dk. 83) ¶¶ 146-48.

     As the Court is aware, Vale has been trying for more than 11 months to obtain discovery to test those "diligent investigation" allegations of the Amended Complaint. *See* June 1, 2015 Letter from L. Liman to Judge Peck (Dk. 261), at 1-9. The Court has repeatedly inquired of Rio Tinto and ordered Rio Tinto to turn over information responsive to Vale's discovery requests with respect to those issues. *See* Dec. 9, 2014 Tr. 20:22-21:3, 27:11-28:5 (ordering Rio Tinto to disclose the names of persons with knowledge of Rio Tinto's alleged investigation, including its third-party investigators, and to produce non-privileged documents concerning its purported investigation and investigative reports of firms hired by Rio Tinto); Jan. 13, 2015 Tr. 52:12-21 (ordering expedited production of the reports); Feb. 6, 2015 Tr. 27:6-17, 29:1-12 (ordering Rio Tinto to identify the firms responsible for the reports and all persons with knowledge concerning

its alleged investigation); Apr. 8, 2015 Tr. 31:3-10 (ordering Rio Tinto to disclose its contracts with its investigative firms); May 8, 2015 Tr. 25:17-22, 26:14-19 (ordering Rio Tinto to send letters to its investigators asking for names of confidential sources and to produce any responses). Among the discovery the Court has ordered are all the documents "relevant to the investigation and diligence issue." Dec. 9, 2014 Tr. 20:23-21:2. And among the central questions the Court (and Vale) have raised is Rio Tinto's relationship with the investigative firms that conducted any investigation on behalf of Rio Tinto following its loss of Simandou in 2008.[1] As the Court is aware, Rio Tinto claimed repeatedly and aggressively that it had no current relationship with any of the investigators who conducted the investigation on Rio Tinto's behalf, and no possession, custody or control over their documents. It now turns out that those representations were false: by its own admission (made only after Vale discovered Rio Tinto's deceit), Rio Tinto currently enjoys a relationship with at least one (and maybe more) of the investigators who conducted the investigation and whose documents are directly responsive with respect to this core issue.

As Your Honor knows, over the past 11 months, Vale has been engaged in discovery about Rio Tinto's investigations, including a lengthy and costly process of obtaining discovery from all of Rio Tinto's investigators through Letters of Request after Rio Tinto claimed not to have access itself to certain of their information. That process commenced with Vale's service of interrogatory requests on Rio Tinto on September 3, 2014 asking for the names and identities of each person with knowledge or information of any facts that support its claim that "Rio Tinto exercised due diligence in pursuing discovery of the claims asserted" and "conducted a lengthy investigation." *See* Vale's First Set of Interrogatories to Plaintiff, Interrogatory No. 22. After 3 months of filibustering, on December 19, 2014, Rio Tinto answered the interrogatories, identifying five firms, including BTG Intelligence, now called Begbies Traynor ("Begbies").[2] After Rio Tinto claimed it did not have, and had no access to, various documents in the possession of its investigators, including Begbies, Vale was forced to serve Letters of Request pursuant to the Hague Convention, which it did on the investigative firms identified in Rio Tinto's interrogatories. The Court directed Rio Tinto to identify the appropriate individuals from each firm to be examined in relation to the investigations. Feb. 6, 2015 Tr. 27:6-17, 29:1-12. Rio Tinto, ostensibly following the directions of this Court, identified John Humphrey as the appropriate individual with respect to Begbies' investigation. It did not identify any other individual. Vale then embarked on a six-month process of drafting Letters of Request, serving them on Begbies in England, and litigating Begbies' objections to them during a half-day High Court hearing with counsel. All this was premised on Rio Tinto's claim that this was the only

---

[1] In order to establish equitable tolling, Rio Tinto will have to prove: (a) continuous investigation during period of time sought to be tolled; (b) that it did not know of or have red flags with respect to its claim during the limitations period; and (c) that it was prevented from discovering its claim by the defendant against whom the statute is sought to be tolled. *See, e.g., Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006); *Matter of Mediators, Inc.*, 190 B.R. 515, 524 (S.D.N.Y. 1995), *aff'd sub nom. In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997). Thus, information regarding what the investigative firms did and what they learned and what they failed to do is critical to the issue of equitable tolling.

[2] Although the interrogatories called for the names of natural persons, Rio Tinto did not identify any at the investigative firms.

Hon. Andrew J. Peck, p. 3

way to get the missing information about Begbies' investigation, because Rio Tinto had no control over this information.[3]

It now turns out that Rio Tinto's answers in response to the Court's direction were a deception and that the High Court Letters of Request and litigation over them would have been unnecessary had Rio Tinto told the truth. In challenging the scope of the Letter of Request before the English High Court, Mr. Humphrey testified that he had *nothing to do with* the Rio Tinto investigation and had *no documents* relevant to the requests. For the first time, he identified two former employees of Begbies, Nigel Brown and Alec Leighton, whose names had never been mentioned by Rio Tinto, and who Mr. Humphrey testified had conducted the investigation.[4] He also testified that they and/or Begbies had destroyed the documents at Rio Tinto's request. Rio Tinto said nothing.

On June 22, 2015, Vale therefore returned to Your Honor and sought yet another Letter of Request, this time naming Mr. Brown and Mr. Leighton. Vale explained: "We have previously identified one witness from BTG. We've been informed by BTG that that's not the right person. It's given us the identity to two other people who are not with BTG." June 22, 2015 Tr. 2:13-16. Still, Rio Tinto said nothing. Vale then had to spend many more weeks and many thousands of dollars to submit this Letter of Request to the English High Court and to serve it on those two individuals. On July 31, 2015, Senior Master Fontaine of the Queen's Bench Division in the High Court of Justice issued orders (the "Orders") requiring the examination of Mr. Brown and Mr. Leighton pursuant to the Letters of Request.

Finally, in the middle of last week, for the first time and quite by accident, Vale learned that Rio Tinto knew full well who Mr. Brown was because he was working for them (and for Quinn Emanuel) at all relevant times – and still is – and that the documents and information Vale had been seeking were in Rio Tinto's custody and control this entire time. Vale did not learn this from Rio Tinto, which had still said nothing about its relationship with Mr. Brown. Rather, following service of the Orders on Mr. Brown and Mr. Leighton, on Wednesday, August 5, a lawyer from Cleary Gottlieb Steen & Hamilton LLP's London office telephoned Mr. Brown, who was abroad, on his cell phone to confirm Mr. Brown's address for service and to organize mutually convenient dates for the witness examinations to take place. Mr. Brown asked what the examination regarded. When told that it related to the report he prepared for Rio Tinto on Beny Steinmetz and BSGR, he told Cleary Gottlieb for the first time that he was currently engaged by Rio Tinto and Rio Tinto's lawyers here (Quinn Emanuel) on a retainer related to that very issue. He further stated that he would not provide any evidence that might breach his confidentiality obligations under that contract.[5] When asked to confirm his address, Mr. Brown refused, said

---

[3] At the same time, as discussed above, the Court had already ordered Rio Tinto to produce all documents "relevant to the investigation and diligence issue." Dec. 9, 2014 Tr. 20:23-21:2.

[4] Both investigators also apparently conducted investigations for Rio Tinto on the matters at issue here when they were employed by another investigative firm, GardaWorld.

[5] Rio Tinto plainly cannot obtain a privilege for documents that are not privileged by the expedient of hiring the investigators <u>after</u> their investigation was injected by Rio Tinto as a fact issue into the case. To the contrary, Rio Tinto's retention of the very same witnesses whose testimony is relevant to a claim of equitable tolling waives the privilege with respect to all communications relating to the claims against Vale and BSGR regardless of date. *See, e.g.*, *In re Buspirone Patent Litig.*, 210 F.R.D. 43, 53 (S.D.N.Y. 2002) (Koeltl, J.).

Hon. Andrew J. Peck, p. 4

that he was out of the country and Cleary Gottlieb would have to "do what they had to do" to serve him, and hung up.

      That call took place at about 7 a.m. New York time. Not more than a few hours later, before noon New York time, Quinn Emanuel – obviously having now been alerted to the fact that the cat was out of the bag – attempted to walk back Mr. Brown's story. Quinn Emanuel emailed Cleary Gottlieb and stated that Mr. Brown's statement that he had been retained in relation to the subject of Vale's discovery requests was, in fact, "not correct." Quinn Emanuel now claimed – contrary to the statement of its own investigator just a few hours earlier – that Mr. Brown had been retained (by whom it is not clear) "after filing the complaint in this action in connection with separate potential investigative work into issues that had arisen in the litigation" and that "Mr. Brown was not retained by Quinn Emanuel (or Weil) for his work at GardaWorld or BTG" (a point that was either obvious or meaningless because Mr. Brown had since left Garda World and BTG). *See* Ex. A., Aug. 5, 2015 email from Meghan McCaffrey to Lewis Liman et al. Astoundingly (because it turns out the documents were always in Rio Tinto's custody and control), Rio Tinto stated that it "had requested on Vale's behalf that Mr. Brown and his colleague Mr. Leighton collect any responsive documents" – but only documents responsive to the Letters of Request and not to Vale's broader Rule 34 document requests, and only as "a courtesy for Vale to try to move things along," not because they were required to have produced such documents months ago. *Id.* Even then, Quinn Emanuel added that neither investigator had agreed to actually produce documents, or even to provide the documents to Quinn Emanuel so it could produce them to Vale.

      It was not long before Rio Tinto told a third story – this time through the mouth of Mr. Brown's colleague (also a subject of the Letter of Request). On the night of August 5 (hours after Quinn's email), Alec Leighton[6] emailed a partner in Cleary Gottlieb's London office who is handling the U.K. aspects of this matter, ostensibly offering cooperation but in fact creating the potential for more delay and obstruction. After making the self-serving observation that "neither Nigel [Brown] nor I are hostile witnesses," and claiming that Mr. Brown had not hung up on the earlier call, but simply – and with fortuitous timing – had been disconnected, he made another meaningless and astounding offer: "Nigel and I are willing to assist in any way we are able. … *Nigel is on holiday* but he will have to take a few days out from his holiday to attend some meetings next week or the week after in Cyprus. *I am sure that if Nigel was being compensated for his time and travel etc., he would return to London to meet with you as I would.*"[7] *See* Aug. 5, 2015 email from Alec Leighton to Jonathan Kelly et al. Neither Rio Tinto nor the investigators explained why any such meeting would be at Vale's expense or how it would cure Rio Tinto's failure to have complied with the Federal Rules. The response with respect to documents was no more promising. Mr. Leighton admitted that he was likely in possession of

---

[6] Mr. Brown and Mr. Leighton appear to continue to work together to this day, though Vale has as yet been unable to determine whether Mr. Leighton is also currently in Rio Tinto's employ. Quinn Emanuel has informed Vale that it forwarded the sealed orders from the English High Court not only to Mr. Brown, but also to Mr. Leighton, suggesting there is an undisclosed relationship there as well. *See* Ex. A., Aug. 5, 2015 email from Meghan McCaffrey to Lewis Liman et al.

[7] Mr. Leighton went on to criticize his former Begbies colleague Mr. Humphrey as unprofessional, essentially accusing him of lying to the English High Court when Mr. Humphrey said that Mr. Brown and Mr. Leighton had been instructed by Rio Tinto to destroy documents.

documents relating to the work he and Mr. Brown had done "when we were both at BTG Global Risk Partners and prior to that when we were at GardaWorld" (i.e., documents responsive to the Rule 34 Request that Rio Tinto was ordered to produce in December 2014), but also said that he had done nothing to comply with Vale's requests, and failed to recognize the fact that the obligation rested on Rio Tinto: "I would need to search through old files, computers, laptops etc to see what I still have in the way of working files, reports etc., but I do not see any issues with providing the information to you." *Id*.  In the next breath, however, Mr. Leighton stated that: "I know that Nigel still has some dealings with Rio Tinto so I have asked him to make contact with them to ensure that we are not encroaching into 'legal privilege' territory" – work that, if even necessary, should have been done months ago and that, Vale will show, is unnecessary, for by hiring Mr. Brown for this litigation in the face of the knowledge that he was a critical fact witness, Rio Tinto has waived any applicable privilege.

This morning, Mr. Brown confirmed that he was likely to have responsive documents and information but that he (and Mr. Leighton) had not yet even begun the process of collecting that data:

> Alec Leighton and I worked on the Rio Tinto/Beny Steinmetz case whilst we were at GardaWorld and again when we were at Begbies Traynor so we would need to research old laptops, files in storage, hard drives etc.  The fact is that we would need to spend a considerable time trawling through our old files, computers, hard drives etc., if you requite access to that information.  This could be quite an arduous task.  We would also need to make contact with former colleagues at both Begbies Traynor and GardaWold to be able to access some of the information that should still be available on secure Intranet drives.[8]

Aug. 10, 2015 Email from N. Brown to J. Turner et al.

These recent events are the latest in a long line of obfuscation and misrepresentation by Rio Tinto and Quinn Emanuel designed to prevent Vale from obtaining discovery that would doom Rio Tinto's untimely complaint.  Despite knowing for more than a year that Mr. Brown and Mr. Leighton had conducted one of the investigations for Rio Tinto and in fact having an ongoing relationship with at least one, if not both, of them, Rio Tinto failed to identify these individuals in response to Vale's interrogatories and instead, when later ordered to do so, erroneously identified Mr. Humphrey as the person at Begbies with knowledge of its investigation.  Rio Tinto then engaged in a long line of actions designed to delay disclosing information about the purported investigations, including by refusing to even identify the investigative firms for more than five months despite being ordered by the Court three separate times to do so, heavily redacting the reports it finally did produce and fighting for months not to disclose "names" of sources that it turned out were not even contained in those reports, sending requests to the investigative firms that made clear to them that Rio Tinto in fact did *not* want them to produce documents, "inadvertently omit[ing]" a key report of which it had obviously

---

[8] Mr. Brown demanded that he be paid for his time obtaining the information at a rate of £2,000 per day for his time and £1,750 for Mr. Leighton's time, estimating that the total cost would be £11,250 plus travel costs and expenses.  He also asked that he and Mr. Leighton be reimbursed for the time that they spend being examined as witnesses.  We have asked Rio Tinto whether it would pay those costs.  We have not received a response.

Hon. Andrew J. Peck, p. 6

been aware from the initial production ordered by the Court, and withholding certain other investigator reports until its June 30 production despite having been ordered by the Court to produce everything months prior. *See* June 1, 2015 Letter from L. Liman to Judge Peck (Dk. 261), at 3-9.

But these machinations pale in comparison to plaintiff's false statements to the Court.[9] In its June 1, 2015 letter regarding Rio Tinto's stonewalling discovery from its investigators, Vale stated in a footnote that Rio Tinto had neither confirmed nor denied that the documents were in its control. *See* June 1, 2015 Letter from L. Liman to Judge Peck (Dk. 261), at 3 n.2. Your Honor was quick to pick up on the importance of this question, demanding that Rio Tinto answer it during the June 1 conference:

> THE COURT: Now, I want to prove you I read footnotes so let me raise one footnote-related question to the June 1 letter. Mr. Lyle and Mr. Lyttle, where it says footnote 2, page 3, Rio Tinto has neither confirmed nor denied whether it has any of these documents, do you want to confirm that you don't have any of the documents that we're fighting about? … It's dealing with the investigator material, and they are saying you have neither confirmed or denied that you don't have any of the investigator-related documents. I would like a confirmation that you don't have any of them.
>
> MR. LYTTLE: Your Honor, we do not have any of the materials they are seeking beyond the reports themselves, invoices, and engagement letters, all of which have been produced, except for the invoices. We don't have what they are seeking in our possession.

June 1, 2015 Tr. 46:6-47:10. The Court then went on to inquire as to whether "any of these investigators [are] under any sort of current relationship or contract with Rio Tinto," a question critical to the issue of Rio Tinto's possession, custody or control of the documents at issue. Quinn Emanuel replied that they had "thought about it on the way in" and "need to check on that" because they were "not in a position to confirm that." June 1, 2015 Tr. 51:22-52:3. That purported confirmation came in the June 18 Joint Letter to Your Honor when – after we now know it had been working with Mr. Brown for more than a year – Rio Tinto represented to the Court that it was "*not aware of any current commercial relationship between Rio Tinto and any of the investigators*, other than a subscription (open to subscribers other than Rio Tinto) to an online service provided by ARC for media and socio-political updates on Africa." Dk. 276 at 6 (emphasis added). At the subsequent status conference, Vale sought clarification of this "carefully guarded" statement. Taking note of that concern, Your Honor asked Rio Tinto

---

[9] For months, Rio Tinto has been insisting to this Court and to Vale that it had *no* current relationship with any of the investigators who purportedly investigated its alleged claims, and that its counsel was never involved in supervising those investigators. For example, during the January 13, 2015 conference before Your Honor, Rio Tinto stated: "The investigation was by investigative firms hired that went out to talk with sources and generated the reports. The law firms did not run that. They were independent people. We, your Honor, are not planning to search Quinn Emanuel or Weil Gotshal files." Jan. 13, 2015 Tr. 51:11-15. Similarly, in the March 13, 2015 joint letter to the Court, plaintiff's counsel wrote that "neither Quinn nor Weil lawyers were fact gatherers in connection with the investigator reports. We did not supervise the investigators; we didn't even select or hire them." Dk. 217 at 9. The message was clear: Rio Tinto's lawyers had no relationship with any of the investigators.

Hon. Andrew J. Peck, p. 7

directly "whether Rio Tinto has any commercial or other relationship with an investigative firm." June 22, 2015 Tr. 8:25-9:3.  Quinn Emanuel responded:  "Your Honor, we do not.  We describe the exact relationship.  The only one is an online description [*sic*] for a service on African developments.  *That is the only current working relationship.*"  *Id.* at 9:4-7 (emphasis added).[10]  It made no mention of the relationship Quinn Emanuel itself had (and had had for months) with one of Rio Tinto's principal investigators.

The time for evasiveness, false statements, violation of court orders, and playing games has ended.  As a result of Rio Tinto's misconduct, Vale has lost many months during which it would have discovered additional evidence to doom Rio Tinto's false and stale claim here.  It has also been forced to expend tens of thousands of pounds, using lawyers both in the United States and the United Kingdom.  At the August 19 conference, Vale will be seeking orders from the Court that all the responsive documents in Mr. Brown's and Mr. Leighton's possession be collected by Rio Tinto and produced immediately pursuant to Rule 34, and in no event later than the August 28 deadline for completing document production; that Rio Tinto's interrogatory responses be amended to identify information in the possession of Mr. Brown and Mr. Leighton; that the Court order that at the appropriate time Rio Tinto make Mr. Brown and Mr. Leighton available for deposition in the United States; and that Vale be awarded sanctions.

These recent revelations also, of course, go to the underlying issue of Rio Tinto's waiver of privilege regarding its purported investigation of its claims, which is key to its equitable tolling/fraudulent concealment argument for avoiding the statute of limitations.  Vale will address that issue separately in the parties' joint letter to the Court in advance of the August 19 conference.

Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman

Encl.
cc:    All counsel of record (via ECF)

---

[10] Nor can Rio Tinto say that it was not required to disclose post-complaint investigations.  The point is that it failed to disclose, and then deliberately misrepresented, the fact that it currently was using the same investigator that it had used pre-suit, and therefore had full access to his pre-suit materials at all times.  Instead, it knowingly sent Vale off on a wild goose chase to get these materials from Begbies under a Letter of Request in England, when it should have produced them from Mr. Brown months ago under Rule 34.