**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

August 17, 2015

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   **Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)**

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Rio Tinto") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), Vale S.A. ("Vale"), and Mahmoud Thiam write jointly to update the Court on the status of various discovery issues in advance of our August 19, 2015 status conference.  Below is a proposed agenda for the conference.

I.   **Discovery From Defendant Vale**

a.   **Production of documents from Ernst and Young**

i.   *Rio Tinto's Position*

***Vale's Improper Attempt To Shield E&Y Reports From Discovery.***  On August 14, Rio Tinto learned for the first time that Vale is withholding a 2010 report prepared by E&Y's U.K. office concerning BSGR's books and records, and the adequacy of BSGR's financial controls. Among other items, the engagement letter governing that project indicates that E&Y was asked to assess whether BSGR's record-keeping practices created an increased risk of bribery or other acts of corruption.  Vale has asserted that this report is privileged and refused to produce it. This is yet another factual report prepared during the course of Vale's due diligence efforts on BSGR that Vale has improperly withheld (the other being the Nardello Report that Your Honor is considering).  Vale has affirmatively stated that it had no idea BSGR was engaged in corrupt practices, including bribing government officials.  These reports are critical to Rio Tinto's efforts

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

to rebut that assertion.

There is no reason to believe the subject matter of the E&Y report—facts relating to the state of BSGR's books and records at the time of Vale's joint venture negotiations with BSGR—is privileged.  Indeed, E&Y limited its engagement to analyses of data, expressly disavowed that it was providing any legal opinion or advice, and asked Vale to draw its own conclusions.[1]  This is because Vale retained E&Y to perform accounting services, and in this Circuit it is well-established that materials related to such services are not privileged.  *See United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.  If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists."); *see also United States v. Hatfield*, No. 06-CR-0550 (JS), 2010 WL 183522, at *1 (E.D.N.Y. Jan. 8, 2010) ("But the Second Circuit did not bless all attorney-accountant relationships as privileged. Instead, it distinguished between accountants hired to aid attorneys in understanding accounting concepts, and those hired to perform only accounting service.") (quotations omitted).  Vale was seeking E&Y's insight regarding the state of BSGR's books and records (*i.e.*, "accounting services") – not assistance "as a translator or interpreter of client communications," *United States v. Ackert*, 169 F.3d 136, 140 (2d Cir. 1999).  Accordingly, Vale cannot shield E&Y's work from discovery under a claim of privilege.[2]

Nor does it matter that Clifford Chance was involved in this E&Y engagement.  *See United States v. Rosenthal*, 142 F.R.D. 389, 392 (S.D.N.Y. 1992) (retention of an accounting firm by counsel does not automatically establish that the accounting firm was engaged to assist in the provision of legal advice).  As noted above, despite Clifford Chance's involvement, E&Y made clear it was providing only accounting services; not legal advice or opinions.  Moreover, Vale (not Clifford Chance) engaged E&Y, and the E&Y member-firms that performed work relating to Simandou did so as an agent of Vale, working under Vale's direction.  Indeed, three of the four engagement letters produced by Vale concerning the diligence work E&Y performed for Vale during its joint venture negotiations with BSGR *do not contain a single reference* to Clifford Chance.  And other documents produced by Vale provide a window into the true nature of E&Y's work and confirm the principal-agent relationship.  Indeed, email correspondence produced by Vale indicates that E&Y altered some of its preliminary conclusions regarding the

---

[1]  Vale has designated this E&Y engagement letter as "Confidential," which precludes Rio Tinto from filing them with the Court.  VALE-RT_00024658.  Rio Tinto will have a copy available for Your Honor at the hearing.

[2]  Nor is E&Y's work protected by the attorney work product doctrine, as there is no indication that the report was commissioned "because of" litigation.  *See United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998); *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 553 (S.D.N.Y. 2013) ("While legal risks may ripen into litigation, not all risk management qualifies as anticipation of litigation. Generalized steps to avoid non-specific litigation are not accorded work product protection.").

risk of bribery and corruption associated with BSGR in response to prodding from Vale.  *See* VALE-RT_00075302.[3]

***E&Y Materials Held By Vale.***  Vale's pattern of withholding factual information it obtained during due diligence—both with respect to the Nardello Report and the report prepared by E&Y—is consistent with a company that wants to hide both what it knew about BSGR's efforts to gain a toehold in Guinea through bribery and deceit, and when Vale acquired that knowledge.  Without access to the documents from key Vale custodians—which have been destroyed—Rio Tinto's only hope to obtain discovery concerning Vale's diligence efforts may be materials prepared by third parties.  And Vale's efforts to stonewall discovery of those materials has prevented Rio Tinto from propounding follow-up discovery requests on third parties, including, if necessary, requests issued through the Hague Convention.  Accordingly, Rio Tinto respectfully requests that the Court order Vale to produce any reports or other working papers, including drafts or final versions of any report prepared by E&Y, in its possession that were created by E&Y during the course of its work concerning Simandou.

***E&Y Materials Held by E&Y Affiliates.***  There also is a broader set of relevant materials held by a variety of E&Y affiliates.[4]  Vale's efforts to obtain these from E&Y have been half-hearted at best.[5]  Even though Vale itself has identified E&Y as one of its diligence counselors that is likely to have highly relevant information, Vale's request to each E&Y member firm neither confirmed that Vale had in fact retained E&Y to perform work related to Simandou, nor did it reference the engagement letter governing the relationship between Vale and each E&Y entity.  In fact, it was only after being pressed by Rio Tinto for more information concerning both its communications with the relevant firms and the underlying engagements, that Vale finally located and produced five E&Y engagement letters concerning Simandou.  To ensure Vale vigorously pursues such discovery from E&Y, Rio Tinto respectfully asks the Court to order Vale to contact each E&Y member-firm again to reiterate its request for the relevant documents.  This time, Rio Tinto requests an order from the Court requiring each letter to (1) include references the Vale's underlying engagement letters with each of the relevant entities; and (2) request that any responsive documents be provided.

***E&Y U.K.***  Unsurprisingly, in response to Vale's tepid initial request, E&Y's U.K. affiliate has indicated that it will not produce any responsive materials in its possession absent an order from a U.K. Court.  To counter any further efforts by E&Y's U.K. member-firm to avoid

---

[3]  Vale has designated this document "Attorneys' Eyes Only" under the Protective Order. Rio Tinto will have a copy available for Your Honor at the hearing.

[4]  Based on information obtained through discovery, Rio Tinto currently believes that Vale retained E&Y entities in Brazil, Gabon, Guinea, and the U.K. to support its diligence efforts concerning Simandou.

[5]  During the July 28 hearing, Vale committed that it would ask each of the E&Y member-firms it retained to produce all documents within their control that are responsive to Rio Tinto's discovery requests.

discovery in response to Vale's request, Rio Tinto plans to concurrently pursue discovery under the Hague Convention. Rio Tinto is preparing a letter of request for the Court's consideration and plans to present it to the Court during the upcoming conference. To provide the requisite degree of specificity in its requests under the Hague Convention, Rio Tinto will be asking Vale to waive certain confidentiality designations it has asserted with respect to the relevant E&Y engagement letters. If the parties are unable to reach agreement on those issues, Rio Tinto will bring any outstanding disputes to the Court's attention during the upcoming hearing.

### ii.  *Vale's Position*

***Vale Has Requested That The EY Member Firms Provide It With Any Responsive Documents.*** The morning this letter was due, Rio Tinto indicated for the first time that it would be raising "the E&Y issues" in the joint letter. Vale is at loss what those could be, as it has complied with each Plaintiff's demands and has received no response to its August 14 correspondence to Rio Tinto on this subject in which it provided additional information and documents.

As discussed at the last conference, Rio Tinto served a subpoena on Ernst & Young LLP, in the U.S., dated June 2, 2015. Ernst & Young LLP responded that it did not have any responsive documents. On July 16, Rio Tinto requested that Vale obtain and produce documents in the possession of Ernst & Young's affiliate offices in Brazil, Gabon, or the United Kingdom related to Simandou. Vale promptly wrote to each office on July 24 to "request that [each firm] send copies of the documents in your possession, custody, or control that are responsive to the requests in the Rio Tinto Subpoena." (*See* VALE-RT_00160574 - VALE-RT_00160579.)[6]

After Vale provided this correspondence to Rio Tinto, Plaintiff then demanded on August 7 that Vale produce its engagement letters with the EY firms. Vale pointed out that it had already produced the only engagement letter of which it was then aware (VALE-RT_00024658) but undertook to confirm whether there were any others, producing four additional letters on

---

[6] Vale did not, and does not, concede that it has control over those EY firms. *See* July 28, 2015 Tr. 10:13-18 ("MR. LIMAN: Your Honor, I can update you on that. We have written to the various E&Y affiliates. We haven't  received responses yet. When we do receive responses, we will let Rio Tinto know, and let them know the position with respect to control. I don't know what position they will take. We haven't stipulated as to anything."); Aug. 4, 2015 Letter from L. Liman to E. Lyttle ("we have not stipulated or agreed that any documents are under Vale's custody or control").

Moreover, as Rio Tinto is aware, one of the EY engagements, in relation to the 2010 BSGR/Vale joint venture agreement, is an engagement of EY UK by Vale's outside counsel, Clifford Chance, to assist that law firm in providing legal advice to Vale – implicating important privilege issues similar to those regarding the Nardello report, as to which Your Honor has deferred ruling. Vale has withheld as privileged documents created by EY pursuant to Clifford Chance's direction, and has produced others, not made pursuant to that engagement with outside counsel, which are not privileged.

August 14 (VALE-RT_00160607; VALE-RT_00160625; VALE-RT_00160582; VALE-RT_00160592).  Vale also offered, in response to Plaintiff's request, to reference any particular engagement letter in further correspondence with the firms if Rio Tinto requested and further to consider removing the confidentiality designations from portions of the engagement letters to facilitate Rio Tinto's application for Letters of Request, if Rio Tinto deemed it necessary to make such an application (and once Rio Tinto identified the portions of the letters it wished for Vale to de-designate).  (*See* Aug. 14, 2015 Email from M. Karlan to M. Bonanno.)  To date, Vale has received no response.  In fact, the first it heard there were "E&Y issues" outstanding was when Rio Tinto announced this morning that it would be including them in the letter.  Rio Tinto's "litigation by ambush" tactic is fundamentally unfair as it fails to identify any issue and therefore provides no opportunity for Vale to respond.

In any case, the only response Vale has so far received from the foreign EY firms is from the UK firm, which responded to Vale's inquiry on August 6 to confirm receipt of Vale's letter and to state that "notwithstanding consent of Vale, we are unable to provide you with copies of documents without first receiving an order of the English Courts for production" (the EY representative further stated she would be out of the office until August 27 but available thereafter).  (VALE-RT_00160580.)  Vale will keep Rio Tinto and the Court apprised of any new developments.[7]

---

[7] At the last conference, Vale pointed out that, by its own argument about Ernst & Young, Rio Tinto was in control of documents held by its auditors that are responsive to Vale's requests and that it should collect and produce those documents to Vale.  (Dk. 304 at 1-2.)  The Court denied Vale's request "without prejudice to Vale renewing it after it sees . . . the balance of Rio Tinto's production."  (July 28, 2015 Tr. 2:4-10.)  Vale's review of Rio Tinto's production to date confirms that Rio Tinto has not produced substantial auditor materials, nor has Vale received additional auditor documents from Rio Tinto since the conference.  Vale awaits the balance of Rio Tinto's production by August 28 and reserves its rights upon review of that production to request further relief, as permitted by the Court.

Vale also objected to Rio Tito's over-designation of more than 90% of in its June 30 production as AEO, and the Court ordered that Rio Tinto "make another review" and re-designate the documents properly.  (July 28, 2015 Tr. 4, 7.)  Late last week, Rio Tinto re-designated several thousand documents formerly marked AEO.  Vale is reviewing those re-designations and reserves its rights to challenge additional AEO designations in the revised production.

## II.  Discovery from Plaintiff Rio Tinto

### a.  Rio Tinto's Claw Back of its Privileged Document and its Response to Vale Interrogatory No. 22

#### i.  *Vale's Position*

The heading to this section inserted by Rio Tinto over Vale's objection is misleading and improperly presumes the answer to the question before the court.

***Rio Tinto Must Amend Its Response To Interrogatory 22 To Identify Foreign Counsel.*** To prevail in its claim for the loss of Simandou, Rio Tinto must prove two critical facts, one of which is that the four-year statute of limitations which otherwise would bar a 2014 claim for its 2008 loss of Simandou was tolled by fraudulent concealment by each of the defendants.[8]  Rio Tinto argues that it can bring a 2014 lawsuit for a 2008 loss notwithstanding RICO's four-year statute of limitations because of equitable tolling, alleging that the statute of limitations was suspended until April 2013 because Rio Tinto allegedly conducted a thorough investigation during that period, did not discover the existence of a claim based on its 2008 loss, and was prevented from discovering the claim because of the alleged deceptive conduct of Vale.  *See, e.g.*, Am. Compl. ¶ 146 ("Upon learning of Vale's involvement with Blocks 1 and 2 of Simandou, Rio Tinto exercised due diligence in pursuing discovery of the claims asserted herein. Rio Tinto conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou.  But Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise.").  To test that proposition, in September 2014 Vale served Interrogatory No. 22 asking Rio Tinto to identify "each Person" who had knowledge or information with respect to this allegation of a diligent investigation.  For months, Rio Tinto refused to identify counsel in response to the Interrogatory.  In December 2014, in response to Vale's request, Your Honor ordered Rio Tinto to identify the lawyers involved.  Dec. 9, 2014 Tr. 27:11-17 ("THE COURT:  Now you can identify the law firms.  MR. LYTTLE:  All right.  THE COURT:  Who else didn't you identify?  MR. LYTTLE:  We did not identify the internal lawyer.  THE COURT:  You will identify external and internal lawyers by the end of this week. MR. LYTTLE:  Yes, your Honor.").

In purported compliance with that order, Rio Tinto amended its response on December 19, 2014 to identify internal counsel as well its U.S. external counsel Weil Gotshal and Quinn Emanuel, and Amsterdam & Partners.

Eight months later – and nearly a year after the Interrogatory was served – other discovery has revealed that the amended Interrogatory answer was both incorrect and substantially incomplete.  In response to the Interrogatory, Rio Tinto identified a series of investigative firms that it contended exercised due diligence on behalf of Rio Tinto (and knew of

---

[8] The other fact is that Vale was complicit in BSGR's alleged bribery and that such bribery caused Rio Tinto's loss.  Vale denies that it was complicit in any bribery by BSGR or that it caused Rio Tinto's loss.

Rio Tinto's due diligence) in pursuing discovery of a claim based on the loss of Simandou. But, in the proceedings in the U.K. under this Court's Letters of Request, three of those firms (the only to date who have been the subject of a hearing) denied conducting any investigation into the existence of a claim. Rather, they conducted political intelligence regarding how Rio Tinto could reclaim Simandou and into the conduct of Rio Tinto's competitors and did not conduct any legal due diligence whatsoever. *See, e.g.*, Firms' Skeleton Argument in the High Court ¶ 3 ("Each of the Respondents was commissioned in either 2009 or 2010 by Rio Tinto to produce business intelligence reports concerning the contemporary political and commercial situation in Guinea . . . ."); Parkhouse Second Witness Statement ¶ 10 ("Livingstone was not told that it was investigating potential claims against Vale and at no point did it occur to Mr. Huband that the sources of the information might be potential trial witnesses."). The interrogatory response omitted the names of those who *did* conduct a legal investigation and who – as other discovery now reveals – had in fact been instructed to bring a claim before the alleged tolling period even began. Specifically, the Interrogatory answer omitted the names of lawyers or law firms in three jurisdictions (Israel, Guernsey, and France) who had been instructed by Rio Tinto in March 2009 (three months after the 2008 loss of Simandou, and well within the statute of limitations) to bring suit for tortious interference with Rio Tinto's loss of Simandou (i.e., a claim for exactly the same loss alleged here). The fact that Rio Tinto sat on any claim for the loss of Simandou until April 2014, under these circumstances, is damning evidence against its equitable tolling claim.

Despite the fact that their identities are clearly responsive to this interrogatory, none of these law firms have been identified by Rio Tinto. All should be identified immediately (and prior to the scheduled end of document discovery on August 28).[9] Rule 33 obviously does not limit the answering party to producing information that supports its allegation but also requires disclosure of persons with information that relates to the allegations but does not support them – and information that Rio Tinto knew it had a claim as early as March 2009 plainly does not support its equitable tolling / fraudulent concealment allegation. *See, e.g.*, *J.S. v. Attica Cent. Sch.*, No. 00-CV-513S(F), 2008 WL 2986388, at *4 (W.D.N.Y. July 31, 2008) ("Conversely, if after Plaintiffs' painstaking review of the files, Plaintiffs have not determined the factual basis for their allegations or evidence of the alleged violations, the function of an interrogatory pursuant to Rule 33(a) is that Defendant be informed of this circumstance as well."). Even assuming the law firms were engaged to investigate and/or prosecute only certain legal theories (e.g. tortious interference) or against only certain defendants (e.g. BSGR) arising out of Rio Tinto's loss of Simandou, that fact is plainly relevant – indeed, potentially dispositive – with respect to Rio Tinto's equitable tolling claim: the law is clear that there can be no equitable tolling, even where there is concealment – there was none here by Vale – if plaintiff knew of the existence of a potential claim. *See, e.g.*, *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Technologies Inc.*, 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006) (no equitable tolling where, even assuming allegations pleaded wrongful concealment, plaintiff possessed information "sufficient to challenge the alleged misconduct in Saudi tribunals"). By withholding these names, Rio Tinto has obstructed the progress of discovery.

---

[9] Based on other documents Rio Tinto has produced, Vale suspects, but does not know for certain, that the relevant Guerseny counsel was Ozannes. (*See* RT_TAR_0034384.)

When Vale brought the defect in Rio Tinto's interrogatory response to its attention, Rio Tinto responded by stating that the requested information is somehow "neither relevant to Vale's purported statute of limitations defense nor responsive to Interrogatory No. 22." (Aug. 10, 2015 Letter from E. Lyttle to L. Liman at 2.)[10]  But Rio Tinto put it directly at issue by alleging "Rio Tinto did not know of or discover, and could not have known or discovered in the exercise of reasonable diligence, the unlawful conduct *and resulting injury alleged herein* that underlies the RICO claims and the other wrongs alleged herein until after the criminal proceedings against various Defendants . . . were publicly disclosed beginning in April 2013." (Am. Compl. ¶ 143 (emphasis added)).  Indeed, discovery that *has* been provided reveals that:

- As early as the summer of 2008 – when the Government of Guinea announced its intention to rescind Rio Tinto's rights to Blocks 1 and 2 of Simandou – Rio Tinto believed that BSGR was attempting to obtain those Blocks through its contacts in Guinea, including by seeking to influence President Conté, through his fourth wife Mamadie Touré – i.e. the precise allegation of impropriety on which this case is based.

- As early as October 2008 (again, before its concession was revoked in December 2008), Rio Tinto considered the voluntary relinquishment of the northern portion of its concession – i.e. the portion for which it now claims damages – to the Government of Guinea in order to secure its rights to the remainder and improve relations with the Government.

- And most important, documents that Rio Tinto has produced (discussed in the next section) show conclusively that as early as spring 2009, Rio Tinto was considering legal action against BSGR for its December 2008 loss of Simandou and the award of those rights to BSGR, and was aware that BSGR was alleged to have obtained the rights to Blocks 1 and 2 through bribery of Guinean Government officials.

Vale thus seeks an order directing Rio Tinto to amend its response to Interrogatory 22 to identify, at last, the foreign law firms and individual counsel, and those who worked with them, as well as any other counsel and any other persons who investigated potential or actual claims related to Rio Tinto's loss of Simandou Blocks 1 and 2.  Those names are indisputably relevant,

---

[10] Rio Tinto later recanted to the limited extent of stating that "we do not know whether these firms have knowledge of Rio Tinto's investigation" but will "confirm this with our client and amend Interrogatory No. 22 if needed." (Aug. 14, 2015 Letter from E. Lyttle to L. Liman at 1.) This stall tactic should be rejected.  The Interrogatory has been pending for nearly a year and Rio Tinto was ordered to identify the lawyers eight months ago, in December 2014.  Rio Tinto should have made the required inquiry then, at the latest.  Moreover, as discussed in the next section, other discovery establishes that the firms in question have relevant knowledge; all that remains is for Rio Tinto to identify them.

discoverable, and known to Rio Tinto.[11]  They are also long past due and urgently needed before the close of fact discovery.

***Rio Tinto Has Attempted to Claw Back A Document That Is Not Privileged.***  After Vale raised the issue of Rio Tinto's incomplete response to Interrogatory 22 and identified the document which demonstrates that such response was incomplete, Rio Tinto sought to recall the document, a May 25, 2009 email regarding disclosure of material claims or litigation – on a meritless claim of privilege.  (RT_TAR_0026596.)

Vale will bring the document to Court on August 19 and asks for a ruling rejecting Rio Tinto's claim of privilege (and that the document should not be treated as confidential).  The document, as set forth above, shows that Rio Tinto could have brought a lawsuit in March 2009. It did not do so because it made the strategic choice to attempt reconciliation with the Government of Guinea – a strategy that ultimately culminated in the 2011 Settlement Agreement between Rio Tinto and the Government in which Rio Tinto relinquished any claim to Blocks 1 and 2.

The document plainly is not privileged and if it were privileged Rio Tinto has waived the privilege by putting at issue the question of what it knew about a potential claim for the loss of Simandou and when it knew it.  On its face it neither requests nor provides legal advice (and Rio Tinto has not argued otherwise).  To the contrary, on its face the email concerns a collection of documents and factual information for a "due diligence effort," i.e. an effort to provide information to third parties.  "If a client communicates material to his attorney with an understanding that it will be communicated to others, the communication as well as related details will not be considered privileged because the requisite confidentiality has not existed from the outset."  *United States v. Rosenthal*, 142 F.R.D. 389, 391-92 (S.D.N.Y. 1992) (information collected for SEC submission not privileged) (citing *United States v. Tellier*, 255 F.2d 441, 447-48 (2d Cir. 1958) (no privilege for confidential communication between attorney and client regarding propriety of securities sale where it was understood that substance of discussion would be embodied in a letter to third parties, even assuming letter used different words and even assuming it was never actually sent to those third parties)).  Moreover, the information reported in the email reflects a fact – an instruction to bring litigation – and not any of the legal advice underlying that instruction.  *See generally Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.").  Finally the document was for the express purpose of providing information to third parties to facilitate a new equity issuance.  That fact alone dooms any privilege claim.  *See, e.g.*, *Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 511-12 (S.D.N.Y. 2003) (holding

---

[11] Rio Tinto's response to this interrogatory is also deficient in other respects, including its failure to identify all of its investigative firms, some of which Vale only learned about through its June 30 production.

documents were not privileged because the documents "were prepared for the purpose of marketing [a] tax plan—not for the purpose of seeking legal advice").[12]

Indeed, other documents Rio Tinto has produced show that the relevant information from the May 25, 2009 document regarding material litigation was shared with third parties as part of the due diligence exercise for Rio Tinto's fully underwritten $15 billion rights issue announced in June 2009. *See, e.g.*, RT0652172 (June 3, 2009 email attaching briefing notes for due diligence calls) and RT0652174 at 84 (attached Due Diligence Questions, noting Rio Tinto is preparing a tortious interference action against BSGR). Among others, the information was intended to be shared with the underwriters for the rights issue, including Credit Suisse, JP Morgan, Macquarie Capital Advisers, RBS, Deutsche Bank, Morgan Stanley, and Societe Generale, as part of the disclosure of material litigation.[13] Thus, because "confidential communications that are intended to be disclosed to third parties or that are disclosed are not protected by the privilege," the document in question and information contained therein are not privileged (even if the document otherwise qualified, which it does not). *Fisher v. United States*, No. 86 Civ. 1890 (JFK), 1986 WL 7545, at *2 (S.D.N.Y. June 30, 1986) (holding materials "prepared and supplied . . . with the intent that they be furnished to others—the Government—or that the information contained therein be disclosed to others . . . do not fall within the ambit of the attorney-client privilege"); *see, e.g.*, *Diversified*, 304 F. Supp. at 511-12 (documents were not privileged because "the advice provided . . . was intended to be disclosed to third parties").

Moreover, even had it been privileged when written (it was not), Rio Tinto waived any privilege with respect to the document on April 30, 2014 when it filed a stale RICO claim against Vale and the other defendants, purporting to rely upon defendants' alleged fraudulent concealment, Rio Tinto's allegedly diligent investigation, and Rio Tinto's alleged inability to discover a claim within four years of December 2008 to toll the statute of limitations. As argued at length by Vale in its motion for a finding of at-issue waiver (Dks. 119, 122, 135), doing so put directly at issue its claim that it may bring the stale lawsuit because, due to defendants' alleged concealment and despite its alleged diligence, it "did not know of or discover, and could not have known or discovered in the exercise of reasonable diligence, the unlawful conduct and resulting injury alleged herein . . . until . . . April 2013." (Am. Compl. ¶ 143 (emphasis added)). The law is clear that those allegations waive any claim of privilege over a document showing that Rio Tinto in fact *knew* of a potential claim within the statute of limitations but declined to pursue it. *See, e.g.*, *Bohack Corp. v. Iowa Beef Processors, Inc.*, 31 Fed. R. Serv. 2d 1205 (E.D.N.Y. 1981) (invoking fraudulent concealment waived privilege as to letter from Simpson Thacher to its client Bohack containing "an opinion by Simpson, Thacher & Bartlett with respect to the merits

---

[12] Of course, the act of labeling a document "privileged" does not make it so. *See, e.g.*, *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 564 (S.D.N.Y. 2008) ("The fact that the e-mails contain a warning indicating they contain 'PRIVILEGED AND CONFIDENTIAL INFORMATION,' does not transform them from non-privileged communications into privileged communications.").

[13] *See* Rio Tinto Rights Issuances – Australian Offer Document (June 16, 2009), *available at* http://www.asx.com.au/asxpdf/20090616/pdf/31j3017whmwyh8.pdf.

of a possible action by Bohack against Iowa Beef," which "may reveal that Bohack was aware of a possible claim prior to May 1974 or that Bohack had failed to exercise due diligence in investigating the possible claim"). *Bohack* (and others) are directly on point.

The Court deferred ruling on Vale's waiver motion pending service of Rio Tinto's privilege log, ordering that in the interim all factual information be produced and any purportedly privileged information be logged to allow for challenge by Vale. (Dec. 9, 2014 Tr. 21:22-23:3.) Rio Tinto's log, served July 30, confirms that it has withheld thousands of documents directly relevant to its equitable tolling claim that it has put at issue – including documents concerning its factual investigation that it was ordered, and agreed, to produce. Although the categorical descriptions in Rio Tinto's log are vague and overlapping, at least 112 categories – representing approximately 2,500 withheld documents – explicitly reference Rio Tinto's alleged investigation. *See, e.g.*, Index Ranges 628-636, 7026-7057, 8766-8769. Moreover, even though it has known from the start that the log would be scrutinized with particular emphasis on Rio Tinto's investigation and whether documents relevant to the equitable tolling claim had been withheld, including analysis of the time periods and subjects of such documents and the parties to which they were sent, the log makes such scrutiny nearly impossible by lumping together documents with vague descriptions and overlapping date ranges. *See, e.g.,* Index Range 7987-8072 (spanning the entire period from July 3, 2008 to April 30, 2014 and concerning broadly legal advice related to Rio Tinto's investigations into the loss of Blocks 1 & 2). Among other things, the defects in the log obscure whether Rio Tinto has in fact withheld other similar evidence that it knew of a potential claim in 2009. Rio Tinto and Vale have agreed to meet and confer on Vale's objections to the log (including Vale's request for a document-by-document log of the investigation-related communications) before bringing the issue before Your Honor for a ruling, including as to at-issue waiver. The facts regarding the March 25, 2009 document, however, as outlined above, make clear that as to it the Court need not even reach the issue of waiver, since the document was not privileged in the first place.

### *ii. Rio Tinto's Position*

Rio Tinto's document RT_TAR_0026596 is privileged. All of the recipients of the document were and are attorneys for Rio Tinto, including the sender of the document whose signature identifies her as Senior Corporate Counsel at Rio Tinto; the subject of the document is titled "URGENT – Due Diligence – Privileged and Confidential;" and the document itself contains a discussion between lawyers – and only lawyers – about the legal status of and legal strategies being employed in certain matters. And all of this was provided *in response to a request from external counsel*. Rio Tinto's clawback was and is appropriate.[14]

Vale should have stopped its substantive review of the document (just as Rio Tinto did when Vale inadvertently produced privileged documents) let alone seek its production and

---

[14]  Rio Tinto will bring a copy of the document to the August 19 conference in the event Your Honor wishes to perform an *in camera* review.

further discovery based on that review.[15]  Specifically, Vale's review of this privileged document has led it to request that Rio Tinto amend its response to Interrogatory No. 22 (which asks for the identities of those knowledgeable about Rio Tinto's investigation) to identify the law firms mentioned in this privileged document.  Interrogatory No. 22 is specifically limited to those with knowledge of "facts" related to the claims in the Amended Complaint, specifically Rio Tinto's assertions that "upon learning of Vale's involvement with Blocks 1 and 2 of Simandou, Rio Tinto exercised due diligence in pursuing discovery of the claims asserted," and that "Rio Tinto conducted a lengthy investigation into the activities of Vale and BSGR at Simandou."  Rio Tinto has, in fact, already identified 36 people and entities, including law firms, with knowledge relevant to this Interrogatory.  In preparing prior responses to Interrogatory No. 22, none of the law firms mentioned in this document were entities that Rio Tinto understood had knowledge of the investigation.  Moreover, nothing in this document suggests these law firms were knowledgeable of the investigation that led to the Amended Complaint (the email is from March 2009, over a year before Vale's conspiracy with BSGR came to light with the April 2010 JV announcement), and nothing in it suggests they were looking at anything to do with Vale or the RICO conspiracy that is alleged in the Amended Complaint.[16]

Nevertheless, Rio Tinto told Vale that Rio Tinto has agreed to go back and confirm whether any of these law firms have knowledge of the investigation and amend Interrogatory No. 22 if needed.  Preliminary indications remain that they do not, but Rio Tinto is taking further steps to be sure.   In agreeing to do so, Rio Tinto will assume that Vale asked this question in good faith rather than in reliance upon the fruit of the poisonous tree caused by its substantive review of a privileged document.[17]  Rio Tinto believes this resolves the issue.[18]

----

[15]  On other occasions, Rio Tinto has ceased review of potentially privileged documents Vale had produced and notified Vale of their possible inadvertent production.  Vale ultimately asserted privilege over almost all of those documents.  When the shoe was on the other foot, however, Vale gave no such quarter.  Vale's review and use of the privileged document is also troubling in light of New York case law, which requires that Vale immediately cease its review and use of such material and notify Rio Tinto of the documents inadvertent production.  *See, e.g., United States v. Rigas*, 281 F. Supp. 2d 733, 741-42 (S.D.N.Y. 2003) (citing to the Am. Bar Ass'n Standing Comm. on Ethics and Prof. Resp., Formal Op. 92–368 (1992)) (holding that "[a]ttorneys, of course, bear responsibility for acting in accordance with ethical norms of the legal profession…a lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.").Vale did none of that here.

[16]  The fact that Rio Tinto ultimately answered Interrogatory No. 22 back to 2008 (rather than April 2010) does not change this result.  Factually, nothing in this email suggests these law firms have any knowledge of the investigation.

[17]  The Court's Rule 502(d) Order on this point is clear: "the production of privileged or work-product protected documents…whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case[.]"  Dkt No. 61.

III.   **Update Regarding the Predictive Coding Special Master**

i.   *Rio Tinto's Position*

Rio Tinto and Vale have a meeting scheduled with Special Master Grossman prior to the parties' status conference and will update the Court on the outcome of that meeting at the hearing.  In preparation for that meeting, the parties submitted a joint dispute letter and Rio Tinto has, at Special Master Grossman's request, also completed a TAR-specific questionnaire.  Rio Tinto's response confirms what it has represented all along:  Rio Tinto's broad approach to training its predictive coding system is reasonable and appropriate, and Vale has and will receive all responsive documents to which it is entitled.  Indeed, Rio Tinto's response to Special Master Grossman also confirmed that, despite Vale's complaints to the contrary, Rio Tinto's production of responsive documents was and is well within the range of responsive documents Vale should have expected to receive.  The appropriateness of Rio Tinto's training and review is only further supported by Rio Tinto's low 0.25% Elusion Rate.  That, combined with Rio Tinto's agreement to conduct additional training, including search terms and further training on 100 documents, all identified by Vale, makes this a non-issue.

Rio Tinto remains concerned, however, about the adequacy of Vale's production.  Vale has refused to provide an explanation for a number of production deficiencies identified nearly a month ago, despite having delayed its response to Rio Tinto on these issues by almost three weeks.  Only further compounding those concerns are Vale's use of search terms to cull its document universe (but neglecting to include key terms such as "Trojan Horse" among others), its narrow approach to training, and its refusal to code documents as responsive for training purposes simply because they did not correspond to the time frame of a particular request.  Now Rio Tinto has discovered that Vale artificially inflated its production numbers with documents such as nearly 300 low resolution images, 160 attachment documents that are either entirely blank or contain garbled and incomprehensive text, and more than 1,000 publicly available media reports (the vast majority of which provide little to no internal commentary).  Although Rio Tinto has requested that Vale provide, as Rio Tinto has, its total number of responsive documents (excluding family members) produced from TAR, Vale has to date refused that request, raising questions as to whether Vale's numbers do, in fact, line up as well as they claim.  These and other issues are among the topics we expect to discuss with Special Master Grossman on Wednesday.

---

[18]  Vale's request that Rio Tinto amend its interrogatory response is no different than Rio Tinto's similar requests at the parties' last hearing for Vale to amend a number of its deficient responses.  Your Honor denied each of Rio Tinto's requests.

ii. *Vale's Position*

The parties have been working diligently with the special master to resolve various disputes between the parties regarding their use of predictive coding. On July 29, Vale and Rio Tinto submitted to a joint letter to the special master setting forth their dispute with regard to the sufficiency of Rio Tinto's predictive coding disclosures. Based on that submission, on August 3, the special master directed Rio Tinto to complete a "TAR Worksheet" to provide her with more detail to aid in her assessment of its disclosures. On August 4, Vale reported to the special master that the parties had reached an impasse on the related issue of the discrepancy between the 60,000 documents Rio Tinto had produced to Vale as a result of the Predictive Coding Process, and the 150,000 responsive documents that would have been expected based on the prevalence of responsive documents in its Control Set. On August 5, Rio Tinto asked the special master for a conference call to discuss certain alleged deficiencies in Vale's production, including "11 critical substantive areas" missing from Vale's production, though it acknowledged that Vale and Rio Tinto were still meeting and conferring on Rio Tinto's concerns. Rio Tinto submitted its TAR Worksheet on August 10, and thereafter the special master asked the parties for an in-person meeting with her on August 19, the day of the conference before Your Honor. The agenda for that meeting consists of: (a) resolution of the disputes raised by Vale regarding Rio Tinto's disclosures and production discrepancy; (b) a proposal for addressing the parties' mutual concerns regarding each other's productions; (c) a status update on the other issues raised by Rio Tinto regarding Vale's production; and (d) a path forward for resolving any outstanding issues.

## IV.   **Discovery from Defendants BSGR and Steinmetz**

i. *Rio Tinto's Position*

BSGR's document collection and production remains deficient. After our last conference, the parties engaged in a meet and confer, as ordered, to discuss the particulars of BSGR's document production. BSGR provided Rio Tinto with the custodians from which BSGR collected documents, the search terms and date restrictions BSGR used to cull the collected documents, and a search-term hit report. As expected, BSGR took a far too narrow approach in applying search terms (in addition to overlooking two key custodians) that has in part led to its deficient production. Rio Tinto has since asked BSGR to (i) include as custodians Ibrahima Sory Touré, a vice president of BSGR in Guinea, and Issaga Bangoura, a BSGR security official, both of whom were arrested by Guinean officials as part of its investigation into whether bribes were paid by BSGR in order to win mining licenses covering the Simandou deposit; and (ii) run a supplemental, non-duplicative list of search terms (attached as Exhibit A) against its document universe for purposes of further discussion. BSGR flatly refuses to do either. Additionally, BSGR refuses to produce a number of other documents, including those from its arbitration with Vale, that are plainly relevant to this case. We outline these issues below and conclude with specific requests for relief from Your Honor.

***Custodians***. Last November, Rio Tinto asked that BSGR include Ibrahima Sory Touré and Issaga Bangoura as custodians for purposes of BSGR's production of jurisdictional documents. BSGR acknowledged at that time that these individuals were employed by BSGR

and worked for BSGR in Guinea but otherwise refused to include them as custodians because they "worked solely on the ground in Guinea [and] could not possibly have information regarding BSGR's purported contacts with the United States." Just today, however, BSGR changed its story and stated for the first time that it has "no records or devices belonging to either Ibrahima Sory Touré or Issaga Bangoura" and that it has "no documents belonging to Ibrahima Sory Touré or Issaga Bangoura on our client's servers." This recent statement, compared to BSGR's statement from last November, raises serious concerns over BSGR's document collection processes, including why, when, and how BSGR lost track of Messrs. Touré's and Bangoura's documents. Rio Tinto plans on further discussing this revelation with BSGR to obtain more information about it.

***Search terms***. Rio Tinto has, repeatedly, expressed concern and has long suspected that BSGR's deficient production stems directly from a deficient set of search terms. That concern has now been borne out. On August 4, 2015, BSGR provided Rio Tinto with a list of the search terms it used to search for responsive documents. Those terms, by any objective measure, are far too narrow. Below are a few examples.

- Letter of Request (g) seeks "[t]he letters, emails and attachments sent between Mamadie Touré and Frédéric Cilins exchanging versions of a declaration between 27 April 2012 and 5 May 2012." In response to this Request, BSGR ran, and only ran, the connected terms "Toure and Cilins." BSGR did not run, as it should have (Mamadie OR Touré OR Toure) **AND** (Frédéric OR Fred* OR Cilins). Of course, it is entirely conceivable that there are emails and documents that include only first names, not solely last names. Nor is there any indication that BSGR even searched for Touré's and/or Cilins' respective e-mail accounts.

- Letter of Request (h) similarly seeks "[t]he letters, emails and attachments from Michael Noy to Frédéric Cilins with edits to the draft of proposed attestation by Mamadie Touré generated in or around March- April 2013." Here, again, BSGR limited its search to only the connector "Noy AND Cilins." BSGR did not use first names, such as (Michael OR Mike) **AND** (Frédéric OR Fred*), nor is there any indication that BSGR even searched for Noy's and/or Cilins' respective e-mail accounts.

- Letter of Request (i)(v) seeks "[t]he invoice and the receipt relating to the gift of two Land Cruisers allegedly made to Mamadie Touré by Asher Avidan and Beny Steinmetz as described in Mamadie Touré Decl. ¶ 26." In response, BSGR limited its search to only those documents that included the terms "Land Cruiser" AND (Toure or Mamadie) or "Land Cruiser." It did not, for example, run the obvious and key terms like (Cruiser* OR toyota*) **AND** (Mamadie OR Touré OR Toure OR Asher OR Avidan OR Ben* OR Steinmetz OR gift* OR present*).

Examples of BSGR's deficient terms go on and on. Attached hereto, as Exhibit A, is a chart of BSGR's original search terms and Rio Tinto's supplemental terms that it has asked BSGR to run. All Rio Tinto requests is that BSGR run these supplemental terms and provide a hit report. BSGR refuses, and continues to stall. To be clear, Rio Tinto selected its supplemental

terms with English law's proportionality concept in mind so as to be sure they would not pose an undue burden on BSGR and requests that the Court compel BSGR to run them.

**Missing documents**.  BSGR's production is further missing specific responsive documents that Rio Tinto has identified to BSGR.  Namely, Rio Tinto has learned, through documents produced by Defendant Thiam, that BSGR, has a set of "fundamental" files concerning its activities at Simandou, as reflected and pictured in Mr. Asher Avidan's February 3, 2012 correspondence to Ms. Nina Mitz.  Accordingly, Rio Tinto has asked that BSGR produce this discrete collection of "fundamental" documents.  Similarly, Rio Tinto has learned, through VBG's production of documents, that BSGR submitted a discrete set of documents to the Guinean Government in connection with the Government's 2011 investigation of BSGR.  Rio Tinto has asked for these documents as well.  BSGR, however, refuses to produce them, without justification.  BSGR has similarly refused to produce the documents it used to develop and create its January 2009 presentation on Simandou.  Lastly, BSGR refuses to produce its submissions in connection with the LCIA arbitration against Vale, including memorials and witness statements.  As this Court knows, the LCIA arbitration panel has cleared the way for Vale and BSGR to produce documents, even if confidential, from its arbitration.

**BSGR's Serious Fraud Office file and documents**.  BSGR further contends that it is not under a continuing obligation to produce documents responsive to Rio Tinto's and Vale's Serious Fraud Office ("SFO") Requests, including the production of any subsequent letters and other documents and communications between BSGR and the SFO, as well as the File of Correspondence provided to the court in the claim of *BSG Resources Limited v. The Director of the Serious Fraud Office and the Secretary of State for the Home Department*.  BSGR's position is that Rio Tinto must propound new letters of request through the Hague Convention each and every time BSGR submits additional documents to the SFO.  Rio Tinto disagrees.  BSGR should have to supplement its productions as additional responsive materials become available throughout the pendency of this action.  These documents, again, are plainly relevant to the issues being litigated in this case and should be produced.

**Redactions**.  Finally, BSGR has heavily redacted documents based on its view of what is and what is not relevant in this case.  There is no question that redacting for relevance alone is not permitted, neither as part of discovery in the United States nor in the United Kingdom.  *See* Exhibit B (Charles Hollander, Documentary Evidence, ¶¶ 10-19 (recognizing that redactions for relevance are only potentially permitted for information that is *both* irrelevant *and* confidential)); *see also* (*Myers v. Elman*, [1940] A.C. 282).  BSGR has nevertheless improperly and heavily redacted non-confidential information from produced documents.  For example, BSGR has extensively redacted flight logs and expense reports, both of which include information that is necessarily public, and that, contrary to BSGR's assertions, are relevant and may connect to other documents that definitively discuss various flights made by BSGR personnel to Guinea.  Indeed, as we have previously reported to the Court, Vale's in-country manager in Guinea reported in 2008 to Vale's Eduardo Ledsham that Beny Steinmetz flew into Guinea with bags and envelopes likely containing cash.  We further note that BSGR agreed to a Protective Order in this case under which these same flight logs and expense reports, as well as additional information in BSGR's production, *would not be confidential*.  As such, we ask that BSGR be

16

compelled to reproduce its documents in proper form and otherwise provide a redaction log for any redactions that remain.

*        *        *

Accordingly, Rio Tinto requests that the Court order BSGR to do as follows:

- Run Rio Tinto's proposed set of supplemental search terms and provide a hit report;

- Produce its (i) "fundamental" file concerning its activities at Simandou; (ii) discrete set of documents as sent to the Guinean Government in connection with the Government's 2011 investigation of BSGR; (iii) the documents and communications that were used to develop the January 21, 2009 "BSGR Guinea Simandou Blocks 1 and 2 Exploration Programme and Budget;" and (iv) submissions in connection with the LCIA arbitration;

- Supplement its production of documents as additional documents are produced to the SFO; and

- Remove all redactions made for relevance.

### ii. *BSGR/Steinmetz's Position*

When the parties were last before your Honor on July 28, 2015 ("July 28th hearing"), Rio Tinto asserted to the court that they had identified deficiencies in BSGR's production. BSGR's position at that hearing was that Rio Tinto visibly had not conducted a proper review of their production and that it was therefore premature for them to raise an issue with the completeness of our production. Since July 28th hearing, it has become even clearer that Rio Tinto has failed to complete even a cursory review of our production and has no basis for asserting that BSGR's production is deficient in any way.

In the July 24, 2015 joint letter ("July 24th joint letter"), Rio Tinto pointed to a Vale-produced January 21, 2009 presentation titled "BSGR Guinea Simandou Blocks 1 and 2 Exploration Programme and Budget," created by Graham Greenway, Iwan Williams, and Iain Bryson, as a representative instance of BSGR's production's supposed deficiencies. July 24, 2015 Joint Letter, at 23. During the July 28th hearing, counsel to Rio Tinto went further, stating that "[w]e have specific presentations that were authored by BSGR, and there is not a single document draft presentation discussion about it, an email about it, a follow-up, even that presentation itself hasn't come." July 28th Hearing Tr. at 27:8-11. In fact, BSGR *had* timely produced this very document to Rio Tinto over a month before, on June 22, 2015. LOR_0007472.

Furthermore, in the July 28th hearing, counsel for Rio Tinto stated that their review of BSGR's document production revealed "gap and gap and gap." July 28th Hearing Tr. at 27:11-13. Again, BSGR has come to learn through our communications with counsel that many of the

gaps they identified simply do not exist.  For example, Rio Tinto asserts in its August 6, 2015 letter ("August 6th letter") that BSGR has not produced documents responsive to requests (f) and (t).  However, again, BSGR has produced LOR_0018080 in response to Request (f) and LOR_0017718 in response to Request (t).  Thus, again, counsel to Rio Tinto made these representations to the Court without having conducted a review sufficient to support them (to say the very least).

Rio Tinto's statements to the Court at the July 28th hearing became the foundation for further inquiries into BSGR's document review and production.  During the July 28th hearing, in good faith, and based on Rio Tinto's representations to the Court and to us that they had identified specific deficiencies in BSGR's production,  consented to providing Rio Tinto with (a) the custodians from whom BSGR collected documents, (b) the search terms and date restrictions used to cull the collected documents, (c) the total size of the collection, both before and after it was culled for review, and (d) a search-term hit report.  On August 4, one week later, BSGR provided Rio Tinto with all the information your Honor ordered it to provide.

Now Rio Tinto has requested in their August 6th letter that BSGR run additional searches and review additional documents.  While BSGR objected to the review of additional documents until Rio Tinto provides the documents that they relied upon as a basis for seeking information regarding our document collection and production process, BSGR did examine the proposed search terms Rio Tinto suggested.  Many of these terms are wholly unnecessary and are not proportional, as is required by English law.

For example, Rio Tinto requested that BSGR run additional search terms for Request (d), which calls for a single document: BSGR's "Overview of BSGR's Iron Ore Investment in Guinea: Chronicle of Events 2006-2012," and the annexes thereto, which BSGR submitted to the Technical Committee in February 2012. Dkt. 221-2, Request (d).  BSGR has already produced this document, satisfying the request in its entirety.  Yet Rio Tinto now demands that BSGR search and review additional documents for some further responsiveness to this clearly-defined request.  Similarly, Rio Tinto proposed that BSGR run additional searches for Request (f), which calls for "[t]he letter from Aboubacar Bah to BSGR demanding payment under the Memorandum of Understanding signed by Aboubacar Bah, Ibrahima Sory Touré, Pentler Holdings, Ltd., dated 20 February 2006." *Id*. at Request (f).  Yet again, BSGR has already produced this document, LOR_0018080, and thus it is antithetical to the notion of proportionality, under English law, to demand additional searches to again find this single, already-identified and already-produced document.

The only documents Rio Tinto has identified as ostensibly missing from BSGR's production are, in fact, not missing.  The three categories of "missing" documents sought by Rio Tinto's August 6th letter are categorically unresponsive to the Letters of Request, and therefore were not produced.  Rio Tinto has not advanced an argument as to how these documents are supposedly responsive to the Letters of Request.  The individual requests, which were agreed to by counsel and ordered by this Court and the High Court, limited the scope and period of documents that are responsive.  For example, request (n)(ii) of the Letters of Request specifically calls for "letters and other documents and communications produced by BSGR to … the United Kingdom's Serious Fraud Office between **September 1, 2013 through the date of production**."

(Docket No. 221-2, at Request (n)(ii)) (emphasis added).  By the parties' extensively-negotiated and agreed terms, the date of production for the Letters of Request was June 30, 2015. (*See* Docket No. 221-2, at 2.)  Therefore, these documents do not evidence any deficiencies in BSGR's document production whatsoever.  Instead, Rio Tinto's request for these documents is an improper, *post hoc* attempt to expand the scope of the negotiated, agreed, and ordered Letters of Request.

As to Rio Tinto's allegations that BSGR failed to search records and devices belonging to either Ibrahima Sory Toure or Issaga Bangoura held by our clients, BSGR has informed Rio Tinto, by letter dated August 17, 2015, that in fact no documents belonging to Ibrahima Sory Toure or Issaga Bangoura were to be found on BSGR's servers.  Ibrahima Sory Toure and Issaga Bangoura's counsel have informed counsel to BSGR that that any relevant documents and devices previously held by them were seized by the Guinean government about two years ago at the time of their arrest.

Similarly, in BSGR's August 17, 2015 letter, BSGR addressed Rio Tinto's concerns regarding the redaction of certain portions of documents.  English counsel to BSGR have confirmed that these redactions were proper, because the controlling English law routinely permits redactions for irrelevance.  *GE Capital Corporate Finance Group v Bankers Trust Co* [1995] 1 WLR 172; *Shah v HSBC Private Bank* [2011] EWCA Civ 1154.

## V.   Discovery from Defendant Thiam

### i.   *Rio Tinto's Position*

We have recently discovered that Mr. Thiam has failed to produce any documents from the first three months of his tenure as Minister of Mines (mid-January 2009 – April 2009), a crucial time period for the events alleged in the Amended Complaint.  Back in March 2015, we asked Mr. Thiam's counsel why we had not yet received any pre-2009 emails, and we were informed only that certain *pre-2009* emails were deleted, but there was no mention by Mr.

Thiam's counsel that the deletion also impacted documents dated well into 2009.  Since receiving the documents initially withheld by Mr. Thiam on the grounds of a Guinean privilege, we have determined that Mr. Thiam has produced *zero* documents dated prior to May 2009.  When Rio Tinto raised this issue with Mr. Thiam, we were informed that "There are no documents during this date range because emails from Mr. Thiam's gmail account were inadvertently deleted at some point in 2009 or 2010."  Rio Tinto is extremely concerned about this additional example of document destruction by a defendant.

Similar to when we learned that Vale no longer had information for various key custodians, we plan to  ask Mr. Thiam for additional information about the purported inadvertent deletion to understand more about how (and when) the deletion occurred, and to determine whether there is a possibility that these documents reside elsewhere.  We understand that Mr. Thiam will cooperate with Rio Tinto in this effort.  We nonetheless ask the Court for an order that Mr. Thiam cooperate.  We also are looking into whether there is a possibility that back-ups of the deleted emails reside with Google, and we may require Mr. Thiam's assistance in acquiring those emails from Google.  We will report back to the Court with additional information next month.

## ii. _Thiam's Position_

On August 10, 2015 counsel for Mr. Thiam wrote to Plaintiff's counsel to "confirm that all responsive emails dated between January 17, 2009 and May 3, 2009 have been produced. There are no documents during this date range because emails from Mr. Thiam's gmail account were inadvertently deleted at some point in 2009 or 2010." The deletion of emails was identified by Rio Tinto for inclusion in the joint letter yesterday, August 16, 2015. At 5:11 PM today, August 17, 2015, we were told the issue is being raised to inform the Court and that "[Rio Tinto will] be seeking more information to better understand the issue and determine whether the documents exist elsewhere. [Rio Tinto will] also be asking that the Court order Mr. Thiam to assist in those efforts." This is the first we have heard that Rio Tinto will be seeking a Court order. Needless to say, we are unaware of what "those efforts" entail, and are therefore unable to take a position. This issue is not ripe for resolution by Your Honor.

## VI.  **Discovery from Defendant VBG**

### i. _Rio Tinto's Position_

Following the parties last hearing, VBG has provided Rio Tinto with a list of former VBG employees. In response to receiving that list, Rio Tinto further requested that VBG provide a _brief_ written description of each custodian's responsibilities (_e.g._, VBG's operations, Simandou, and interactions with the Guinean Government) so that Rio Tinto could make an informed decision on which former VBG custodians would most likely have responsive information. VBG has refused to provide those written details as requested.[19] Rio Tinto has nonetheless requested (based on job titles and VBG's discovery responses) that VBG collect documents from at least the following custodians (i) Joao Vidoca; (ii) Teleshpore Tchatchou; (iii) Bruno Hitier; (iv) Raphael Outarra; and (v) Issiagha Bangoura. VBG has agreed to collect and produce documents from at least these five custodians.

Rio Tinto and VBG are currently discussing other potential custodians and whether Vale has documents for them. We anticipate resolving those issues over the coming days, except for one that warrants the Court's attention now. VBG has refused to collect documents from Mr. Charles Rezende, who worked at VBG as its second in command, in charge of Mining and Logistics. Even though VBG has confirmed that Vale has emails for Mr. Rezende, VBG refuses to collect those emails (or even ask for them) because Mr. Rezende used his Vale email account while working for VBG as opposed to using a dedicated VBG's account. That fact, however, should not matter. Mr. Rezende worked _for VBG_ at the relevant time, and his documents and emails from that same time period belong to VBG. Accordingly, Rio Tinto respectfully seeks an order compelling VBG to collect and produce Mr. Rezende's documents.

---

[19]   VBG has no justification to refuse to provide these specifics, which are available to VBG through discussion with its co-Defendant Vale and would only serve to streamline the parties' efforts.

ii. _VBG's Position_

In response to a request from VBG to Vale, Vale provided VBG with a list of thirty-one VBG custodians whose emails Vale had hosted. VBG provided that list to Rio Tinto and also produced documents identifying the positions occupied by those employees and others. VBG, after conferring with Vale and with two senior-most former employees of VBG to whom we have access (and whose email are being gather for production) also provided Rio Tinto with an explanation of the nature of the roles performed by the other individuals on the list of Vale-hosted VBG custodians. VBG asked to meet and confer with Rio Tinto to identify which of those custodians it would like VBG to obtain emails from. Rio Tinto demurred and instead demanded that VBG prepare written descriptions of the thirty-one VBG custodians on Vale's list.

Rio Tinto has now modified its position and identified five custodians whose emails it wants and five other custodians whose emails it may potentially seek depending on which we hosted by Vale. As Rio Tinto notes, we are discussing those other potential custodians and whether VBG has documents for them, and anticipate resolving those issues shortly. However, with respect to one individual – Mr. Charles Rezende – we appear to be at an impasse.

Contrary to Rio Tinto's assertion, VBG has not "refused to collect documents for Mr. Charles Rezende." In requesting that Vale provide emails for VBG employees whose emails Vale hosted, we inquired about Mr. Rezende's emails but were advised by Vale that Mr. Rezende was a Vale employee, not a VBG employee, and therefore not a custodian whose email we were entitled to. As we understand Vale's position, and have communicated it to Rio Tinto, in light of that fact he was not VBG's employee, we have no greater right to Mr. Rezende's email than any other third-party. Thus, we have not refused to collect Mr. Rezende's emails, nor do we object to those emails being produced. If Vale provides us with Mr. Rezende's email, we will of course review them and produce those that are responsive. We simply have no ability to compel Vale to produce those documents to us or Rio Tinto.

\*          \*          \*

The parties will continue to keep the Court informed of their progress as the meet and confer process advances.

Very truly yours,


/s/Michael Lyle
Michael Lyle