## quinn emanuel trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

August 20, 2015

Hon. Andrew J. Peck
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:   **Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)**

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Rio Tinto") respectfully submits the enclosed (and narrowed) Letter of Request to obtain discovery from Ernst & Young LLP's U.K. affiliate (hereinafter, "Ernst & Young").[1]  Defendant Vale S.A. ("Vale") retained Ernst & Young at various points in 2010 to perform due diligence concerning its 2010 joint venture with BSGR.  The information sought by Rio Tinto in its Letter of Request is uniquely within Ernst & Young's possession and will shine valuable light in connection with this lawsuit.  As stated yesterday at the parties' conference, Vale does not object in concept to Rio Tinto's pursuit of this information; indeed, Vale itself identified Ernst & Young in its discovery responses as having relevant information and has asked Ernst & Young for this information, to no avail.[2]

---

[1] Rio Tinto has tied its Letter of Request directly to Vale's three engagements of Ernst & Young in 2010, specifically limiting it to requests for (i) communications concerning those engagements, (ii) Ernst & Young's draft, revised, and final reports, and (iii) what source material was provided to or considered by Ernst & Young in connection with its engagements.  Upon advice of its U.K. counsel, Rio Tinto also has refined the presentation of the relevant facts in its application to underscore the significance and relevance of information it seeks from Ernst & Young, and included an introductory section in its application.

[2] As the Court ordered, Rio Tinto provided Vale with an advance copy of the revised letter of request topics that were the subject of Vale's previous objections.  Notably, Vale did not previously share the bodies of its letters of requests to Rio Tinto's investigators prior to presenting them to the Court.  Rio Tinto nevertheless shared the body of its letter with Vale shortly before it was ready for filing.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

Vale's objection, if any, is to the temporal scope of Rio Tinto's Letter of Request—specifically, that it seeks documents after April 30, 2010, the date Vale announced its joint venture with BSGR.[3] But, as explained at the August 19 conference, Vale's deal with BSGR was a multi-stage transaction, under which Vale paid a $500 million down payment with the remaining $2 billion contingent upon conditioned on BSGR's fulfillment of certain critical objectives, one of which was the resolution of any legal claims or uncertainties surrounding BSGR's acquisition of Blocks 1 and 2. Only one aspect of this transaction, therefore, was even arguably completed by April 30, 2010. Indeed, Vale engaged Ernst & Young to perform a substantial and significant portion of Vale's due diligence throughout 2010. Pursuant to three separate engagements in 2010 (only one of which predates the announcement of the joint venture on April 30, 2010), Vale asked Ernst & Young to carefully scrutinize BSGR—its books, its records, its board minutes, its off-balance sheet conditions, its agreements with third-parties, *etc*. Indeed, Ernst & Young was specifically asked to "report back on matters which we consider may increase bribery and corruption risk."[4] VALE-RT_00024660, at -660.[5] Of course, that specific instruction by Vale to Ernst & Young suggests that Vale knew *something* about BSGR's reputation and was concerned enough about *that something* (or its involvement in *that something*) that it asked Ernst & Young to "report back" on BSGR's "bribery and corruption." Ernst & Young's analyses therefore strike at the heart of this case, and will shine light on, *e.g.*, what Vale knew about BSGR going into the deal; what it knew about BSGR immediately after the deal; what it continued to investigate about BSGR, and why; why it instructed Ernst & Young to make changes to its analyses;[6] and whether Vale made any internal or external changes in response to that information. This information, particularly information showing that Ernst & Young informed Vale that BSGR had engaged in illegal and corrupt practices, is directly

---

[3] It bears noting that Vale is not the subject of this discovery; rather, Ernst & Young, an independent third-party, is. Vale too sought discovery from Rio Tinto's foreign investigators that went beyond the scope of discovery as agreed to between Rio Tinto and Vale, to which Rio Tinto did not object. In any event, as explained at the August 19 conference, the "agreement" Vale seeks to impose was based on a representation that diligence about the Vale-BSGR ended on April 30, 2010, which we now know is clearly not correct. This is an issue for Vale's own production of responsive materials, which we will separately take up with Your Honor if necessary after meeting and conferring with Vale.

[4] Ernst & Young explicitly disclaimed in its engagement letter, however, that it was in any way providing "legal opinion or advice." VALE-RT_00024658 at 661.

[5] The later two Ernst & Young engagements in 2010 both relate to due diligence. Vale asked Ernst & Young to provide information that could assist Vale "in negotiating the terms of the transaction or mitigate the *key risks identified*, including matters requiring further action following completion of the transaction." See VALE-RT_001605921, at 594. These engagements occurred at a time when Vale was "contemplating the acquisition of BSG Resources (Guinea) Ltd by means of a joint venture with BSG Resources Ltd . . ." – further evidence that the transaction was not complete in April 2010. *See id*. at 592.

[6] Ernst & Young committed to providing a Vale a preview of its findings before finalizing its reports, to ensure that matters therein were addressed to Vale's "satisfaction." *See* VALE-RT_00160607, at 613; VALE-RT_001605921, at 596. Documents produced by Vale appear to demonstrate that Vale used that review process to pressure Ernst & Young to alter its initial conclusion that BSGR's business practices posed a high risk of corruption.

relevant to Rio Tinto's allegations regarding the conspiracy involving Vale and BSGR, and its ongoing nature and concealment, because Vale did nothing to pull out of the deal or put a stop to it until after the conspiracy was publically uncovered in 2013.

Moreover, in mounting its defense to Rio Tinto's lawsuit, Vale has vigorously denied that it had any knowledge (or involvement) whatsoever of BSGR's corrupt and illegal practices in connection with BSGR's procurement of rights in Simandou. *See, e.g.,* Hr'g Tr. 8:16-20 (June 9, 2014) ("[BSGR] misrepresented to us through reps, warranties, personal certifications and the like that they had engaged in no such activity, the standard FCPA diligence. That's why Vale entered into the joint venture."). More specifically, Vale has relied on its 2010 due diligence surrounding its joint venture with BSGR to argue that it conducted a thorough assessment of BSGR and that its due diligence turned up no indication of wrongful conduct.[7] Thus, information from Ernst & Young sits at the heart of Rio Tinto's efforts to develop both a rebuttal to this defense and, more generally, what Vale knew about BSGR and Mr. Steinmetz's activities related to Simandou as it decided to enter into and continue in the conspiracy.[8]

Ernst & Young's analyses (if produced) also could tell a very different story than the story Vale tells, as Rio Tinto suspects it might: Vale's enlistment of Ernst & Young could have been another, more elaborate attempt to further cover up and sanitize its conspiracy with BSGR. For starters, Vale appears to have engaged Ernst & Young for the first time just *four days* before it announced its joint venture with BSGR on April 30, 2010. There is simply no way, therefore, that Ernst & Young could have completed its due diligence (nor did it, as Ernst & Young's engagement included a deliverable date of May 14, 2010) before Vale announced its joint venture. That timing raises serious questions over whether Vale in fact conducted due diligence "to the greatest possible extent," as it has repeatedly stated, before doing its deal. The purported substance of Ernst & Young's analyses (*i.e.*, that they turned up no instances of corruption and bribery) is also vitally important to this case. That "substance" appears, at first blush, to contradict other pre-2010 evidence available and known to Vale. Why it contradicts that evidence remains an open question, and perhaps suggestive that Vale never intended for, nor instructed, Ernst & Young to conduct a thoroughgoing, independent assessment of BSGR's business practices. All Vale wanted instead was to apply the veneer of post-hoc "due diligence"

---

[7] *See, e.g.*, Consuelo Dieguez, *Risk Contract: How Vale Signed a Deal to bear All the Costs of an Obscure Multi-billion-dollar Mining Project in Guinea*, Piauí, Mar. 2014 (Christopher Peterson trans.) (quoting former Vale General Counsel Fabio Spina, "Before we closed the deal, we did our due diligence. Vale hired two international law firms, Cleary Gottlieb and Clifford Chance, to proceed with an independent investigation into the concession. Neither of them turned up anything suspicious' . . . . In his opinion, due diligence was performed 'to the greatest possible extent that a purchaser is able."), *available at* http://revistapiaui.estadao.com.br/edicao-90/business-in-africa-ii/risk-contract.

[8] This conspiracy did not end with the public announcement of the Vale-BSGR joint venture on April 30, 2010. As alleged in the Amended Complaint, the conspiracy stymied Rio Tinto's efforts to regain its rights to Blocks 1 and 2 through a campaign of bribery, intimidation, and threats to Rio Tinto's remaining mining rights to Blocks 3 and 4 – much of which occurred after April 30, 2010. Indeed, specific bribes are alleged to have been paid by the conspiracy after April 30, 2010, and Defendant Cilins was not even arrested until 2013 for his efforts on behalf of the conspiracy.

to its joint venture in order to continue its cover up and in the event that Vale's and BSGR's deal went south, as it did.

In sum, Ernst & Young's analyses (including drafts, commentary, and communications regarding the same) are critical to this case—they stand to inform, if not undermine, Vale's principal defense to Rio Tinto's allegations. They also stand to partially fill the gap of missing documents from Vale's missing custodians who interfaced with Ernst & Young and conducted Vale's purported due diligence. Accordingly, Rio Tinto respectfully requests that the Court grant its application for a Letter of Request seeking discovery from Ernst & Young through the Hague Convention.

Very truly yours,

/s/Michael Lyle
Michael Lyle

cc:     Counsel of Record (via ECF)