F8J5rioC                        conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RIO TINTO PLC,

                Plaintiff,

          v.                              14 Civ. 3042 (RMB)
                                          (AJP)

VALE, S.A., *et al.*,

                Defendants.

------------------------------x
                                          New York, N.Y.
                                          August 19, 2015
                                          2:35 p.m.

Before:

                    HON. ANDREW J. PECK,

                                          Magistrate Judge

F8J5rioC                        conference

1                                    APPEARANCES

2

3    QUINN EMANUEL
          Attorneys for Plaintiff
     BY:  KEITH H. FORST
4         MICHAEL J. LYLE
          ERIC C. LYTTLE
5         MEGHAN A. McCAFFREY

6    CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP
          Attorneys for Defendant Vale S.A.
7    BY:  JONATHAN I. BLACKMAN
          LEWIS J. LIMAN
8         MATTHEW M. KARLAN

9    MISHCON DE REYA NEW YORK LLP
          Attorneys for Defendant BSG Resources Ltd.
10   BY:  TIM McCARTHY
          SHAUNEIDA C. DePEIZA SALDENHA
11
     SHER TREMONTE, LLP
12        Attorneys for Defendant VBG
     BY:  MICHAEL TREMONTE
13
     SULLIVAN & WORCESTER, LLP
14        Attorneys for Defendant Thiam
     BY:  ANDREW T. SOLOMON
15        NITA N. KUMARASWAMI

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  All right.  Some documents were just

3    handed to me but we can wait until the appropriate point in our

4    outline to get to that.

5          Based on late last night's letter from Rio Tinto

6    withdrawing the E&Y issues from discussion we can turn and

7    start at page 6 of the joint letter, correct?

8          MR. LYTTLE:  Your Honor, there is one E&Y issue

9    remaining.  We would like to hand up a Hague letter request.

10          THE COURT:  Okay.

11          MR. BLACKMAN:  And, your Honor, we, on behalf of Vale,

12   have no objection in concept to the letter of request but we do

13   think that the time period covered by it is overbroad in terms

14   of the parties' previous agreement going back to January on the

15   scope of discovery on this particular due diligence subject and

16   we have an alternative formulation which I would like to hand

17   up, if I might.

18          THE COURT:  Have you all talked about this?

19          MR. BLACKMAN:  We have, and I am afraid we are at a

20   bit of an impasse on that.  The issue, very briefly, your

21   Honor, is that after the initial discovery requests were served

22   back a year ago and responded to, the parties of course

23   negotiated and agreed, ultimately, that the scope of the

24   diligence request to Vale from Rio Tinto would be January 1,

25   2010 through April 30, 2010 -- April 30, 2010 being the date of

1   the joint venture with BSGR and E&Y was retained by Clifford

2   Chance to assist Clifford Chance in the diligence process.  We

3   have no objection to Rio Tinto seeking, through letters of

4   request, to get information from E&Y affiliates that are not

5   subject to subpoena in the United States but we don't think the

6   scope, time-wise, should be any different than the scope of

7   ending April 30, 2010 that has been followed throughout since

8   the issue was first essentially agreed in January of this year.

9            THE COURT:  Well, since none of you --

10           MR. BLACKMAN:  I have the text.

11           THE COURT:  You can hand it up also.  What page of the

12  existing letter are we talking about?  It would have been nice

13  if Rio Tinto has submitted this ahead of time.

14           MR. LYTTLE:  Your Honor, we were negotiating.

15           MR. BLACKMAN:  We just got them ourselves which is why

16  they weren't part of the joint letter writing process.

17           MR. LYTTLE:  Your Honor, we were attempting to

18  negotiate these up to the last minute with counsel.

19           THE COURT:  Are you definitely at an impasse?

20           MR. LYTTLE:  We are, your Honor.

21           The date that they're seeking to impose of April 30th,

22  2010, the due diligence, it is not clear it had begun at that

23  point let alone finished.

24           I am looking at the engagement letter which, your

25  Honor, is not even dated until the 7th of April, 2010, it is

1    not signed by Vale until May 12, 2010.  The focus of the work,

2    your Honor, is FCPA-related analysis looking at bribery and

3    corruption risks and the reports generated from that don't even

4    come until late May.  Then we have subsequent engagements with

5    E&Y that come May 12 also looking at risks associated with the

6    transaction, and another one in settlement of 2010, all looking

7    at risks associated with the transaction with BSGR.

8         So, your Honor, the issue hear is more than just this

9    letter of request.  We agreed to, in the discovery responses

10   with Vale, our cutoff of April 30th upon the representation

11   that the due diligence was completed at that point.  And your

12   Honor, that is clear that is not the case.  In fact it is

13   continuing on and it is clear the deal is not even consummated

14   on April 30th, 2010.  Not only is it not proper to cut off the

15   subpoena, the discovery from Vale is going to have to expand.

16   We just have seen these documents in discovery.

17        MR. BLACKMAN:  Your Honor, first of all, Rio Tinto has

18   had, since the very first documents were produced in this case,

19   eight, nine months ago, the agreement with BSGR which has a

20   completion date, i.e. a closing date, of April 30, 2010.  So,

21   the idea that there wasn't a closed transaction is completely

22   fanciful and due diligence, by definition, was done in

23   connection with signing that document which was a legally

24   enforceable contract.

25        We don't deny that work was done by E&Y afterwards but

1      it wasn't due diligence on the deal.  This is a bit reminiscent

2      of the discussion we had some months ago of a fictional

3      lookback that supposedly occurred on the diligence years after

4      the transaction closed.  Whatever these documents are about,

5      they're not diligence for a closed transaction.

6              MR. LYTTLE:  Your Honor, I am happy to show you the

7      engagement letter but we also know --

8              THE COURT:  Hand it up.  But, if indeed the Vale BSGR

9      transaction closed at the end of April 2010, what's the

10     relevance of what happened afterwards?

11             MR. LYTTLE:  Well, the relevance, your Honor, is that

12     these firms are continuing to do due diligence on the

13     corruption and bribery risk associated with that transaction.

14             THE COURT:  But there is a contract at that point,

15     April 30th.  Either there was or wasn't any knowledge, and when

16     one entered into it as to BSGR misconduct what difference does

17     it make if they learned of it a year later or five years later

18     or whatever else?

19             MR. BLACKMAN:  Or today where we agree that it

20     occurred and we learned many years later.

21             MR. LYTTLE:  Your Honor, this was an ongoing

22     conspiracy that continued well past the close of this deal.  In

23     fact that deal, your Honor, only -- it was a $2.5 billion deal,

24     they only paid $500 million up front.  They withheld --

25             THE COURT:  Only and $500 million in the same

F8J5rioC                        conference

1    sentence.

2              MR. LYTTLE:  Fair enough.  They withheld $2 billion on

3    confirming that BSGR had proper title.  Your Honor, I think it

4    is imminently apparent that the advisor was advising them that

5    Mr. Steinmetz was engaged in corruption.  We have seen an

6    e-mail where E&Y produces a due diligence report after the deal

7    which tells them --

8              THE COURT:  Let me finish you for one reason and cut

9    you off.  Whatever I rule, yes, you'll have a transcript you

10   can show to my counterpart in the UK, but if you don't have an

11   agreement with Vale whether that is based on compromises, they

12   want April 2010, you want today, you compromise wherever; then

13   whatever happens here, they're going to have the rights as

14   certainly E&Y UK will have rights to argue otherwise in the

15   High Court in London.  You are much better off having an

16   agreement.

17             MR. LYTTLE:  Your Honor, when it is clear that due

18   diligence is advising them of bribery and corruption risks that

19   is extending well past April 30th, 2010, we can't agree not to

20   seek that.  That is the most relevant evidence in our case.

21             THE COURT:  What paragraphs are we looking at here?

22             MR. LYTTLE:  Can I come up and hand the engagement

23   letter to your Honor?

24             THE COURT:  Skip that.

25             MR. LYTTLE:  Okay.

1          THE COURT:  Let me try to read what you are asking to

2     be produced in the UK.  So, it is the letter of request and --

3          MR. LYTTLE:  I apologize.  The actual topics begin on

4     page 20 and what we are gunning this off of is the engagement

5     letter because they have withheld the report as privileged.

6     That's the only issue we have tabled for further discussion

7     with Vale.  So, we have provided specificity, we are keying off

8     the engagement letter and the very clear definition of the

9     engagement letter of the scope of the work which again extended

10    well past April 30th, 2010.

11         MR. BLACKMAN:  And the issue, just in terms of

12    formality, is really the first paragraph of what I handed up to

13    your Honor setting forth the relevant time period.  But, if I

14    could speak to the broader question for a moment, and I know

15    you admonished us not to argue the merits here, but if you just

16    think about it for a moment, we entered into a binding contract

17    under which we paid half a billion dollars and were

18    contractually obligated to pay additional amounts totaling

19    another $2 billion or so when various contractual milestones

20    were met.  The idea that there is a "ongoing conspiracy," I

21    don't know what that means in this context.  We were

22    contractually bound.

23         THE COURT:  It means this isn't the summary judgment

24    motion on trial.

25         MR. BLACKMAN:  Exactly.  That's why I prefaced it with

1   a disclaimer but I am just saying it makes no sense what he

2   said.

3           THE COURT:  Next time not only preface it but bite

4   your tongue.

5           MR. BLACKMAN:  Okay, your Honor.

6           THE COURT:  Frankly, this looks like it is much ado

7   about nothing because the requests A through O all seem to gear

8   to reports.  I mean, some of this may be overly broad and, you

9   know, I don't know whether I should restrict it or say have fun

10  in London.  But, to the extent it is dealing with specific

11  reports and subjects of bribery and corruption in and around

12  April/May 2010, it doesn't bother me that we are in May.

13          I am concerned if there was a different report

14  prepared by E&Y UK or any other E&Y entity that is going to be

15  in the E&Y UK files that will get picked up by this.

16          H.  I'm not exactly sure what that is and why it,

17  under U.S. discovery, let alone the Hague convention in the UK,

18  is not a fishing expedition.  Certainly, as I understand the

19  way the UK deals with it when you are looking for specifics,

20  that's fine.  The report, the things immediately leading up to

21  it, drafts of the report.  Okay, I think you can probably get

22  that in the UK.  When you are talking about e-mails, letters,

23  documents, communications, I don't even know what all of this

24  is.

25          MR. LYTTLE:  Your Honor, what we are trying to do is

1    get after -- we are doing the best we can based on the

2    engagement letter.  Many of these documents are being withheld

3    and privilege has not otherwise been provided to us but, given

4    the schedule, we want to get this request out.  We tried to

5    subpoena the E&Y U.S. which is the entity Vale identified and

6    they told us to take a hike, told us to go to the UK.  We are

7    trying to do that now.

8              THE COURT:  To a certain extent you made your bed and

9    now you are lying in it, and by that I mean I am not sure that

10   Vale has any more sway over E&Y in foreign countries than you

11   do over the, you know, various people who did your

12   investigation and you have made them jump through all sorts of

13   hoops, or at least they have had to jump through all sorts of

14   hoops perhaps because of the way Rio Tinto dealt with this so

15   now you are going to do the same thing.

16             How soon, you know, the Court in the UK will deal with

17   this?  I am not inclined to limit it but I am not inclined to

18   prevent Vale from going into court in the UK and moving to

19   intervene or using the E&Y lawyers as their proxy behind the

20   scenes and objecting to the time period and the scope of this.

21             Meanwhile, needless to say since I have not seen this

22   before two seconds ago, I am in no position to sign it without

23   looking at it later.  So, that's where it is going to go.  I am

24   not insisting that they put in your limitation paragraph of

25   limiting it to the period through April 30.  I am not sure,

1   since it is tied to a retainer of E&Y shortly thereafter that

2   it is going to make any difference in the real world and you

3   can do whatever you want to do in the UK.

4            MR. BLACKMAN:  Thank you, your Honor.

5            THE COURT:  And/or, within the next day you can

6   consider, before this gets sent through the bureaucracy to the

7   UK, whether there is any way you all can spend a little more

8   time and try to come to an agreement either as to the date or

9   as to the paragraphs which, frankly, don't even seem to have

10  been rewritten by Vale that go beyond the reports and the bases

11  for the reports to any and all communications which seem overly

12  broad.  And I may well strike it out on my own as I read

13  through it.  You will have to wait for that.

14           MR. LYTTLE:  Thank you, your Honor.

15           MR. BLACKMAN:  Thank you.

16           THE COURT:  Okay.  So, page 6, the clawback and the

17  interrogatory 22.

18           As to interrogatory 22, it seems to me -- you can sit

19  down, Mr. Liman -- that Rio Tinto should identify the law firms

20  which seems now to be known and the lawyers at the law firms

21  who were involved and what their knowledge is or whatever will

22  be played out down the road.

23           MR. BLACKMAN:  Thank you, your Honor.

24           MR. LYTTLE:  Your Honor, we are happy to identify

25  these firms.  I can do it now.  They're not, as we understand

F8J5rioC                          conference

```
1   it, responsive to interrogatory no. 22.  And, your Honor, the

2   way that interrogatory no. 22 has been, in our view, used and

3   abused in this process it would be wrong, in our current

4   understanding, to identify them.  We are not contending these

5   names are privileged --

6            THE COURT:  Here is what you are going to do.  Then do

7   it as an interrogatory of your own or an affidavit.  Just get

8   them in a formal way, not on the record now, the names of the

9   law firms and the lawyers or other staff at the law firms who

10  are involved.  How soon can you get that done?  Monday?

11           MR. LYTTLE:  We can do that by Monday, your Honor.

12           THE COURT:  So Ordered.

13           The other issue with respect to this paragraph is

14  clawback of a certain document.  Obviously there is a 502(d)

15  order in place so the only question is not the fact that you

16  have it, Mr. Liman, but whether the document itself is

17  privileged or not.  Why don't you hand the document up?

18           MR. LIMAN:  Your Honor, that is what you have in front

19  of you.

20           THE COURT:  Ah.

21           MR. LIMAN:  You have three documents in front of you;

22  the first document is the document at issue, it is Bates

23  labeled RTTAR 26596 and, just to be clear, we are not seeking

24  the entire document, we are seeking only portions of it.  We

25  accept a claim of privilege and relevance with respect to some
```

1    of it.  What we are seeking is the initial e-mail from an

2    Eileen Lerum, L-E-R-U-M, that is dated May 22nd, and then the

3    Trudy Stedman e-mail that is the last in the sequence but there

4    we are seeking the first two paragraphs and then the item

5    marked no. 2.  We are not seeking the item marked no. 1 which

6    does appear to contain privileged information.

7            If I could just be clear, also, about the other

8    documents we passed up?  They belong together.  There is an

9    e-mail dated June 3rd, 2009 Bates stamped RT 652172 to 73 and

10   then the attachment which is Bates stamped 2174.  Those are the

11   due diligence notes for the offering.  And on page 2184 there

12   is a reference to the preparation of a lawsuit with respect to

13   Simandou against BSGR.  That information tracks the information

14   that is in the document at issue.

15           One last thing to note, you will see that there is a

16   threshold of $350 million that is referred to in the document

17   at issue.  That number happens to correspond to about 5 percent

18   of Rio Tinto's operating income which, given the initial

19   e-mail, is not accidental, this is a document about accounting

20   prepared for accounting purposes consistent with the relevant

21   accounting literature to report loss and gain contingencies to

22   the --

23           THE COURT:  All right.  Now let's go back.  I don't

24   see where on page 2184 what you are talking about so without

25   reading into a public record anything that is attorney's eyes

1    only or whatever, just try to clue me in.

2              MR. LIMAN:  Your Honor, if you look at 21083, item,

3    the heading is 7 which asks for an update on the situation.

4              THE COURT:  Okay.  Got it.  Okay.

5              MR. LIMAN:  And then, actually, if you follow down the

6    bullet points on 2183 and 2184 --

7              THE COURT:  Am I correct that there is no claim of

8    clawing back either of these two documents, the 652172 or the

9    652174, et al?

10             MR. LYTTLE:  That's correct.

11             THE COURT:  Okay.  With that, I guess let's take it in

12   pieces.

13             Is there any objection to producing the Eileen Lerum

14   e-mail?

15             MR. LYTTLE:  No.

16             THE COURT:  Okay, so you will do that or reproduce it

17   in such a way that it is not attached to material that may or

18   may not be clawed back.

19             Now, with respect to the e-mail from Trudy Stedman, I

20   guess if you have the information otherwise -- and this sort of

21   goes to both sides, if you have the information why do you need

22   the e-mail unless it gets you a slightly different date?  And

23   conversely, to Rio Tinto, if that same information is in a

24   document that isn't privileged and Mr. Liman is willing to have

25   redaction of other information from the Trudy Stedman e-mail,

F8J5rioC                        conference

1    why are you all fighting in front of me on this?

2             MR. LIMAN:  Your Honor, maybe I will go first in terms

3    of why we want the document and it has to do with evidence.

4             This document, to us, is frankly one of the best

5    pieces of evidence in the case that establishes that back in

6    2009 two things; no one, Rio Tinto was aware of the injury, and

7    no. 2 -- and that, your Honor, is a contested question on

8    motion to dismiss, one of the things that Rio Tinto says is the

9    injury occurred later on.  This makes it clear they were suing

10   for something or intended to sue for something, instructed to

11   sue for something.

12            Second, your Honor, what this document shows is that

13   the very lawsuit that they're bringing now with the exception

14   of the allegations about Cilins, all of which goes back to

15   things about corruption, are things that they could have

16   brought in 2009.

17            Now, there will be argument, no doubt, by Rio Tinto,

18   that this document doesn't disprove their claim of equitable

19   tolling but it clearly is highly relevant to the subject of

20   equitable tolling when you have an instruction bringing a

21   lawsuit against BSGR in the jurisdictions as to which BSGR is

22   subject to personal jurisdiction.

23            MR. LYTTLE:  Your Honor, I think what is nice is we

24   don't actually have to debate this.

25            Mr. Liman, there is another document he can share with

F8J5rioC                        conference

1   you which I would like it pass up which if I may approach, your

2   Honor?

3           THE COURT:  Yes.

4           MR. LYTTLE:  Which indicates that this contemplated

5   lawsuit in 2009 had nothing to do with bribery or corruption or

6   fraud.  The time period is critical there.  Rio Tinto was still

7   mining and still has its equipments on blocks 1 and 2 and

8   Mr. Steinmetz is moving in.

9           THE COURT:  Isn't all of that the issue that Judge

10  Berman or the jury is going to have to decide?  And what I have

11  got to decide for discovery purposes is is this privileged, do

12  you care because you are going to say it had nothing to do with

13  this anyway.  Under 502(a), particularly if you are ordered to

14  produce it over at least a weak objection you have not got a

15  waiver of subject matter.  So, you know, why do you care?  What

16  do I care?

17          MR. LYTTLE:  I appreciate that, your Honor, because it

18  is clearly being misconstrued.  It is not relevant to the

19  equitable tolling and weighs into the privilege.

20          THE COURT:  Excuse me.  That I can't decide.

21          MR. LYTTLE:  But you can, your Honor.  You have a

22  letter sent to Mr. Steinmetz and Mr. Avidan which is the exact

23  legal proceedings contemplated there and it just says, Get your

24  equipment off our blocks, you are interfering with our rights.

25  It doesn't say we are suing you for bribery.  Nothing indicates

F8J5rioC                        conference

1    that they are looking at Vale, nothing in that document that we

2    are clawing back indicates they're looking at a RICO

3    conspiracy.  Nothing even indicates they're looking at fraud.

4            THE COURT:  I agree with you.  The document says what

5    it says.

6            MR. LYTTLE:  Your Honor, on the privilege issue I

7    think your point is well taken.  They have this clearly in

8    other sources and it is in a different form.  This is all

9    attorneys talking about this and it is talking about the value

10   and the damages none of which is included in this document they

11   have.  So, there clearly was a change.  They've got the

12   official non-privileged version.  We didn't withhold it, all we

13   withheld was a privilege discussion among lawyers and only

14   lawyers about legal strategy and the legal status of cases.

15           MR. LIMAN:  Your Honor, obviously with respect to

16   privilege, the fact that lawyers are on it is not the question

17   that is a dispositive of question of privilege.  The underlying

18   questioning is is this a communication that either reflects

19   legal advice or is made for the purpose of obtaining legal

20   advice.  The document, on its face, reflects an instruction.

21   The only conceivable claim with respect to reflecting legal

22   advice is what my colleague just said with respect to damages

23   but even that is not a good argument because the threshold is

24   an accounting threshold, it doesn't say this is the value of

25   the lawsuit.  It just says it exceeds that.

F8J5rioC                            conference

1          But, with respect to an instruction to bring a

2    lawsuit --

3          THE COURT:  So, let's see if we can refine this

4    further.

5          If the paragraph about damages is redacted is the fact

6    of an instruction to counsel in the paragraph immediately above

7    that which is a factual matter that may or may not be relevant

8    to the statute of limitations issue, anything that you care to

9    fight about?

10         MR. LYTTLE:  Your Honor, I think with that and I think

11   with the other redactions Mr. Liman discussed in particular

12   paragraph 1, I am not sure I agree with you.  I am not sure

13   this is worth fighting over anymore.

14         THE COURT:  In that case, make all of those redactions

15   and produce a copy in redacted form by Friday that can be

16   utilized and that does not have the clawback aspects of it.

17         MR. LYTTLE:  Thank you, your Honor.

18         THE COURT:  In order to not have quasi-privileged

19   material floating around in my already overflowing files I am

20   giving you all back your various documents.

21         So, now we jump all the way over to page 13 to which

22   you promised me an update that I don't really need or want at

23   this point so let's skip that and go over, that's why the

24   Special Master is here, so I don't have to delve into it and by

25   here, yes, I have noticed she is in the courtroom but I meant

F8J5rioC                          conference

1    that she has been appointed so that I don't have to deal with

2    the tar-related problems unless you don't agree with any of her

3    recommendations and she writes a report and somebody objects

4    and I deal with it.

5           So, now we go to page 14, IV, BSGR and Steinmetz.  My

6    first question to all of you is:  Why me?  Which is to say this

7    is discovery, at least for now under the auspices of the Court

8    in the UK.  What authority -- I will rephrase -- not what

9    authority -- I have the authority to convert all of this back

10   into federal rules of discovery which is something that we all

11   have been trying to avoid until Judge Berman rules on the BSGR

12   Steinmetz motions for lack of jurisdiction, etc.

13          So, this may be an issue that if you all could work

14   out I would be happy to help you, perhaps, but otherwise, what

15   is my authority?

16          MR. FORST:  Your Honor, Keith Forst on behalf of Rio

17   Tinto.

18          So, I think your Honor hit the nail on the head on

19   what we are concerned about which is that we are waiting for

20   Judge Berman's decision which could very well mean that as we

21   think it is going to be is that BSGR is subject to personal

22   jurisdiction here and subject to the Federal Rules of Evidence

23   for purposes of discovery.  I know, your Honor, we jockeyed

24   over that issue months ago and we went to the UK, again on

25   promises of BSGR that we would make a production and make a

F8J5rioC                        conference

1      comprehensive production again somewhere in the middle between

2      UK and U.S. proceedings.  Where we think your Honor can give

3      some guidance is one we would respectfully submit, if we think

4      now is the time that quite hasn't worked out the way we hoped

5      and we are in a position of if Judge Berman rules, we are going

6      to be behind months threatening depositions.

7              THE COURT:  First of all, you all seem to be falling

8      behind on your own without any help from the Court as we have

9      already pushed back the document production schedule and all of

10     that stuff.  You know, it would be nice if Judge Berman rules.

11             MR. FORST:  Sure.

12             THE COURT:  It would be nice if there weren't a

13     million satellite trucks outside and they're not for you,

14     they're for another case in front of Judge Berman.  Life is

15     short.  If and when Judge Berman says they're here, then we can

16     revisit any discovery issues and convert the Hague Convention

17     requests to good old normal Federal Rules of Civil Procedure.

18     Having gone the route of going to the Hague by consent, it

19     seems a little unseemly to say nothing has changed in terms of

20     whether or not BSGR-Steinmetz are subject to U.S. discovery and

21     U.S. jurisdiction because Judge Berman has taken too long in

22     your view to rule but you would like, you know, a second bite

23     at the apple here and I am not inclined to do that now.

24             I agree with you that if you don't work it out with

25     BSGR they will be in the position and under a very tight time

1    frame so I'm telling you that now, under the BSGR side, that if

2    Judge Berman says you are here and the document production out

3    of the UK is not sufficient because of the different standards

4    or because they don't have a process like this where the

5    parties can come in and complain that you didn't fully comply

6    with with the Hague Convention requests, you are not going to

7    get 30 days, you are going to get a week or something to redo

8    what you have to redo.  So.

9             MR. FORST:  Your Honor, if I may?

10            I do think the one thing that we are asking -- and I

11   can go through the list in a minute, but with search terms --

12   is, again, what we are trying to do, from Rio Tinto's

13   perspective, is a discussion.  We had a productive meet and

14   confer where we sent search terms and we simply asked can you

15   run these?  Or even some of these and give us some hits and we

16   can take a look at that and further the discussion.  We got

17   blank across the board.  The response that came back that said

18   we will not run an additional term.  And so, really our request

19   to you, your Honor, with those search terms which is what we

20   discussed at the last conference, was can we just run these and

21   we think there are some gaps and admittedly a production of

22   1,500 documents as compared to the tens and tens of thousands

23   that are coming from the other parties and BSGR is just as

24   involved, suggests that it was far too narrow and that's what's

25   been born out.  So, we asked for terms and they've been flatly

1    refused without any real justification.

2                    THE COURT:  Who am I going to hear from from BSGR?

3                    MR. McCARTHY:  Your Honor, Tim McCarthy for BSGR.

4                    There is a threshold issue here.  At the last

5    conference my colleague Mr. Filardo agreed to provide the

6    search terms in culling the universe of documents in response

7    to an inquiry from the Court and that inquiry from the Court,

8    in turn, was based on representations from counsel to Rio Tinto

9    about putative deficiencies in our production.  That matters

10   because these requests for additional search terms can't be

11   merely speculative.  As the Court knows, there has to be some

12   indicia of deficiencies before that can be done.  We agreed

13   consensually to do it in the meet and confers.  After that it

14   turns out those representations about the supposed deficiencies

15   in our production were wrong.  For instance, Rio Tinto, in the

16   July 24 joint letter and in the July 28th hearing, represented

17   that there was a 2009 programming budget that had not been

18   produced and that related documents had not been produced.  In

19   fact, it was and related documents had been produced.

20                   There was a particular letter in response to request F

21   of the letter of request that was identified later in meets and

22   confers as something that was supposedly missing.  It was

23   produced.

24                   I have a list of things as well.  Bottom line is that

25   to this day there has yet to be an identification of an actual

1   deficiency anywhere in the production that would have justified

2   the --

3            THE COURT:  That may now be true, however it would

4   appear that the search terms that were used do not comport with

5   the case law on crafting of search terms.  I mean, to only use

6   Mr. Cilins' last name without a variant on his first name and

7   belated issues as pointed out here, you know, that you very

8   specifically searched for the term "land cruiser" but not other

9   variants on that, that does strike me, under Judge Facciola's

10  decision about where angels fear to tread and the need for

11  expertise in crafting search terms, as well as my William A.

12  Gross warning to the bar that these search terms certainly

13  could have been better.

14           So, the question is, having in for a penny you want to

15  be in for a nickel here, what is the harm in running the extra

16  search terms they suggest and just seeing how many hits there

17  are and then discussing that with them and then seeing whether

18  there is not going to be anything there?  You know the problem

19  in proving a negative on the other side has conspiracy all over

20  the place is that if there is no conspiracy there aren't going

21  to be any documents.

22           But, I would say despite Sedona principle 6, your

23  search terms left something to be desired.

24           MR. McCARTHY:  And we would argue, your Honor, that

25  both the problem with that and the answer to that is that the

F8J5rioC                         conference

1   case law here doesn't apply.  This is governed by the principal

2   of proportionality under English law.

3          THE COURT:  Guess what?  Our principle of

4   proportionality is the same as theirs.

5          MR. McCARTHY:  That's right, and the "land cruiser"

6   example is a good one.  That request, in particular, calls for

7   "the receipt or the invoice for the land cruiser."  It doesn't

8   call for any and all documents pertaining to "land cruisers."

9   It doesn't call for any and all documents --

10         THE COURT:  Did you produce the receipt for the land

11  cruiser?

12         MR. McCARTHY:  I do not know whether we produced the

13  receipt, your Honor.  I am filling in.  If I may turn to my

14  associate for a moment?

15         THE COURT:  Yes.

16         (Counsel conferring)

17         MR. McCARTHY:  It turns out that nothing turned up,

18  your Honor.

19         THE COURT:  That's the problem.

20         MR. McCARTHY:  That is the problem.

21         THE COURT:  Is it because a land cruiser was not

22  gifted to somebody?  Or is it because the search term "land

23  cruiser" may not be the way the invoice for the car was printed

24  up?  You know, however it may be.  So, I am not saying you need

25  to search for all documents about the land cruiser but if you

F8J5rioC                        conference

1    didn't find it and the only thing you did was to search for the

2    term, in quotes "land space cruiser" which might have been

3    spelled differently, which might have been done as one word

4    without a space and this wouldn't pick that up, other

5    deficiencies, again, I'm not ordering you to do anything other

6    than to consider what is going to happen either.  You are going

7    to get out of this case on jurisdictional grounds or you are

8    likely going to be running these very search terms and many

9    others down the road.  The more you get out of the way now by

10   working somewhat collegially under the Sedona cooperation

11   proclamation principles with Rio Tinto, you know, most likely

12   the revised search term around the land cruiser is either going

13   to turn up one document or nothing.  Or, since you couldn't

14   find the invoice which is what was called for but you find an

15   e-mail saying we decided against giving him a land cruiser or

16   whatever, you know, you might voluntarily produce that.

17          All in all, I am strongly suggesting you work with Rio

18   Tinto on the search terms as shown by the examples on page 15

19   of the letter but I'm not ordering it.

20          MR. FORST:  Okay, your Honor.

21          THE MARSHAL:  Understood, your Honor.

22          MR. FORST:  To be clear, we, in drafting the search

23   terms which I did myself, we were sensitive to their concerns

24   of proportionality.  I wanted to put in the term "car" which of

25   course would have brought back things maybe we would run in the

F8J5rioC                        conference

1    U.S., but we purposefully tried to trim them back to make sure

2    they were on point in connection with these requests.

3            So, I appreciate that and we will endeavor to work

4    together.

5            THE COURT:  We are heading towards an hour, can we

6    move on to something I have jurisdiction over?

7            MR. FORST:  Sure.  I do have, I do want to point out

8    the custodian issue quickly, though, that is only with respect

9    to these two individuals that we note in our submission where

10   we had the understanding last fall --

11           THE COURT:  This is Mr. Toure and Mr. Bangoura?

12           MR. FORST:  Correct; that BSGR had documents for these

13   people.

14           THE COURT:  They don't.  So now what?

15           MR. FORST:  They don't but what is troubling to us,

16   your Honor, is if you remember the reason for that now is the

17   Guinean government apparently seized them some time ago.  We

18   didn't know that until now but if you remember, based on

19   discussions with VBG, there are procedures whereby the parties

20   whose documents are seized can go to the Guinean government and

21   request them.  What shocks us is we are now almost a year later

22   and maybe counsel will correct me, but there is no indication

23   that there has been any attempts on BSGR to go request from the

24   Guinean government these documents for people who were seized

25   because of bribery, the very allegations in the case.

1          THE COURT:  Do these people still work for BSGR?

2          MR. McCARTHY:  No, your Honor.

3          MR. FORST:  But they have a right to the documents

4   taken related to their employment.

5          THE COURT:  I understand.  What is BSGR's incentive,

6   not to mention legal issue other than being more forthcoming if

7   they knew this longer ago than now, and I suspect some of this

8   is BSGR, unlike its counsel, is having as little involvement in

9   this case as possible.

10          In any event, yes, it is unfortunate.  Contact

11   Mr. Toure and Mr. Bangoura, they're no longer within the BSGR

12   ambit if they're ex-employees.  If you want to ask them to ask

13   the government for their documents, be my guest.

14          MR. FORST:  Your Honor, you did require VBG to make

15   that formal request of the Guinean government because these

16   documents do belong to BSGR.  These two individuals were BSGR

17   employees and these are their documents that they have a right

18   to.

19          THE COURT:  Who is, under the law, the Guinean law --

20          MR. FORST:  Right.

21          THE COURT:   -- is it the person or the corporation?

22          MR. FORST:  The corporation, as we understand it,

23   through Guinean counsel working with VBG.  VBG had the right to

24   request the documents taken from their employees from their

25   facilities, from everything.

F8J5rioC                          conference

 1          THE COURT:  Mr. McCarthy?

 2          MR. McCARTHY:  Your Honor, as I think you have alluded

 3    to, the only disclosure obligation that we are under at this

 4    point -- we fully take on board your admonition about the

 5    timeline -- but the only discovery obligation that we have is

 6    letter of request, the High Court's order on the letter of

 7    request.  The letter of request is specifically directed

 8    towards servers, documents, materials within the UK.  We in

 9    fact have gone above and beyond and included in our production

10    in response to that letter of request materials from Guernsey,

11    from Israel, and from South Africa.  Materials within the

12    possession, custody and control of the government of Guinea

13    because they were seized several years ago are not covered by

14    that letter of request.

15          THE COURT:  That is true.  The question is sort of do

16    you want to make that request now which will probably be

17    ignored anyway but then you could say you were a good corporate

18    citizen in my court, and then if and when you get any documents

19    from the government of guinea you will decide what you want to

20    do with them.  Or you can say I have taken the position so far

21    which, if you know me enough, I might reconsider, of not

22    putting you through U.S. discovery.

23          THE MARSHAL:  Understood, your Honor.

24          THE COURT:  What is the harm of writing a letter to

25    the government of Guinea saying we have learned that documents

1   of your employees were seized, I would like copies.

2                  MR. McCARTHY:  There may be none and we will take it

3   under advisement, discuss it with counsel of Rio Tinto and have

4   a look at what VBG was ordered to do.  Standing here today I am

5   not conversant to that and can't consent to it.

6                  MR. FORST:  Let me respectfully point out that we

7   didn't include things in the letter of request that we didn't

8   know about.  Again, last November we had the understanding that

9   they had the documents.

10                 THE COURT:  Had you known I sincerely doubt that my

11  colleague in the UK has any more authority to order the

12  government of Guinea to do something, nor would it normally be

13  a discovery obligation in the UK to go get documents seized by

14  another government.

15                 MR. FORST:  Well, maybe not, but we would have been

16  given the opportunity to go make that argument there and pursue

17  it for sure.  Now, instead --

18                 THE COURT:  You may be going back there if some of the

19  issues that I am not getting involved in are not worked out by

20  agreement.

21                 MR. FORST:  Okay.

22                 THE COURT:  I suppose they have motions to reconsider

23  or, you know, help.  Whatever.

24                 MR. FORST:  Sure.

25                 THE COURT:  I'm not ordering them to do anything.  I

1    again am suggesting cooperation.  If not, if and when they are

2    subject to the U.S. jurisdiction we will deal with it and, you

3    know, the inability to produce the material may or may not,

4    under the December 1st version of 37(e) impose any further

5    obligations or penalties on BSGR.  For today we are moving on.

6          MR. FORST:  Your Honor, I only want to make clear that

7    relates to the rest of the things in our letter that we are

8    skirmishing about.  You are encouraging us to go work it out.

9          THE COURT:  I always encourage parties to cooperate

10   about everything.  So far my success rate in this case is not a

11   hundred percent.  We will put it at that.

12         As to discovery from Defendant Thiam, I don't think

13   there is really anything you are asking me to rule on.  It

14   looks like everybody is cooperating?  Anything further on that?

15         MS. McCAFFREY:  No, your Honor.

16         THE COURT:  Good.

17         Next the discovery from VBG, particularly with respect

18   to the documents of Mr. Rezende.  So, is he a Vale employee or

19   a VBG employee?  Both?

20         MR. FORST:  Your Honor, let me just --

21         THE COURT:  Well, Mr. Blackman has more information.

22         MR. BLACKMAN:  Yes.

23         He is somebody who certainly was a Vale employee.  He

24   may still be a Vale employee.  Like others, he was secunded to

25   VBG in the period after the creation of the joint venture.

1          THE COURT:  So why are his e-mails not being searched?

2          MR. BLACKMAN:  His e-mails in fact have been produced

3     in many respects.  He was not sought as a custodian.  However,

4     my understanding is that we actually have produced or are

5     producing about 120 e-mails in which he was either a "to" or a

6     "from" as part of our production of documents.

7          THE COURT:  Coming from somebody else's files?

8          MR. BLACKMAN:  Yes, exactly.  So, it is not like --

9          THE COURT:  What would the burden be -- and I don't

10    know if the cost is yours or VBG's but since he has two hats, a

11    Vale hat and VBG hat, why aren't you going to search his files

12    at least for his VBG-related role?

13         MR. LIMAN:  Your Honor, I spoke to him this morning.

14    I got questions also.  I gave the questions we were going to

15    ask him to counsel for VBG.  The answer is about $150,000 to

16    get his custodial e-mails, to search them and to review them.

17         There is also a more fundamental point with respect to

18    Mr. Rezende.  Mr. Rezende began working at VBG in April of

19    2011.  He ceased working there in December of 2012.  Prior to

20    April 2011 he had no involvement with the Simandou project.

21    While he was at VBG he had no responsibility with respect to

22    any of the alleged trade secrets, that is, with respect to the

23    port and the rail options.  Those were already in place as of

24    April 2011, he had nothing to do with them.  As to drilling

25    site selection for Simandou I and II and resource estimates,

 1    again, that was largely done before he arrived.  He had nothing

 2    to do with them.

 3          We asked about the technical committee because that's

 4    been an issue.  He did not prepare, was not involved in the

 5    preparation of the responses for the technical committee.

 6          Now, a long time ago when we were in front of your

 7    Honor with respect to trade secrets back in November, the issue

 8    came up of what about the utilization of information allegedly

 9    taken.  Your Honor said back then that the utilization of

10    alleged information was not particularly relevant except for a

11    limited time period after it was allegedly taken which would be

12    2009.  After that, if they were involved in the joint venture,

13    etc., it would have been getting information from other sources

14    and it gets very complicated, keep it limited to begin with.

15          So, that's the reason why we think Rezende has really

16    nothing to do with this case.

17          MR. FORST:  Your Honor, this is admittedly, and maybe

18    we will take that time period for which he worked for VBG which

19    is a different entity, we have different discovery requests for

20    VBG and have agreed to different search terms and that is

21    happening in parallel with VBG.  VBG has said, and I think

22    VBG's counsel is here and can speak, that they have requested

23    Mr. Rezende' e-mails for the time period that he worked for VBG

24    and I will note, your Honor, we have a original chart where he

25    was second in command over all these technical areas including

1    railways.

2              THE COURT:  So, let me hear from VBG counsel.  Just

3    remind me who you are.

4              MR. TREMONTE:  Michael Tremonte, your Honor.

5              I would like to follow up on Mr. Liman's remarks

6    because what is true with respect to Mr. Rezende is in fact

7    true with respect to each and every one of the VBG custodians

8    whose e-mail accounts were hosted by Vale.

9              THE COURT:  Okay, but that ship has sailed.  You had

10   an argument on that.  You agreed or a ruled.  Sobeit.  The only

11   problem seems to be with Rezende because you want the e-mails

12   so that you can go through them and do what you have to do and

13   Mr. Liman, according to the letters or his counterpart, said

14   no.  So --

15             MR. TREMONTE:  Well, with respect to Mr. Rezende our

16   position is set forth in the letter and it is even clearer

17   after today that he was a Vale employee and he is therefore not

18   a custodian --

19             THE COURT:  April 2011 through December 2012 he was

20   secunded to you.  That makes him your employee for that

21   purpose.

22             MR. TREMONTE:  I'm not sure that that is right.  I

23   think the fact that he was on premises or at the site is one

24   thing but I don't know that he was --

25             THE COURT:  Was he the no. 2 to whoever the no. 1 was?

1            MR. FORST:  In the original chart, your Honor, the

2    no. 1 says vacant so he is the no. 2 with the name there.

3            THE COURT:  All right.

4            MR. TREMONTE:  I have to go back and confirm his

5    precise position but I don't believe there is a legal argument

6    that he was an employee of VBG.

7            THE COURT:  The legal argument seems to me somebody

8    has to do something between you and Vale and the question may

9    be who is paying for it, what the extent of the search is and

10   how much, if any, Rio Tinto wants to kick in.  Are you telling

11   me, Mr. Liman, that the $150,000 estimate you had is for the

12   year, less than a year and a half period of April 2011 to

13   December 2012?  Or is it for his entire period for which Vale

14   has files?

15           MR. LIMAN:  Your Honor, I believe it is for the

16   relevant time period.  It is a very rough estimate but that is

17   the --

18           THE COURT:  Is that for the cost of search or what,

19   exactly?

20           MR. LIMAN:  It is the search, it is review, it is

21   designation as ADO, privilege review and the like.

22           I can answer your Honor's question with respect to his

23   role.  He was one of three people who were recorded during the

24   time period that he was there, to the person who ran VBG.  His

25   responsibilities were largely operational ones.  There were

F8J5rioC                          conference

1    people who preceded him who were involved with respect to the

2    issues of site selection and the ports and the like.  Those

3    people's e-mails, my understanding is, are being produced.

4              MR. TREMONTE:  And if I may, your Honor, all of the

5    remaining custodians that are still being discussed -- I think

6    there is 10 -- fall into this category and if, at $100,000-plus

7    each we are going to spend a million dollars reviewing e-mails

8    when we know in advance, almost to a certainty, that there is

9    nothing relevant.

10             THE COURT:  Here is what we are going to do:  You are

11   going to do a sample in some way that you are going to work out

12   with Rio Tinto as to whether there is going to be anything

13   relevant.  So, if there are -- I think we are back in the key

14   word world for this -- come up with key words and Vale and VBG

15   and we are going to limit it to the VBG time period, you will

16   figure out which of them is footing the bill for this or how

17   they're going to do it and you will come up with something that

18   is going to cost somewhere in the neighborhood of $5,000, maybe

19   10, no more than that, and see whether there is or isn't

20   material that Mr. Rezende has in his VBG period that is not

21   being picked up by the other custodians.  And if there are

22   other custodians that are being fought about it is not in the

23   letter to me so it is not on the table for today.

24             MR. TREMONTE:  Your Honor, if I may?

25             THE COURT:  You can snatch what I think is some

1    victory for you, you know, and get into a worse position, but

2    go ahead.

3              MR. TREMONTE:  Okay.  In that case, your Honor, I just

4    want -- a little bit of housekeeping I want to clarify the

5    record.

6              Last time I was before the Court I failed to report,

7    because I didn't know at the time, that on the day before all

8    of the documents that had been in the possession of VBG's prior

9    counsel in Paris that had been produced to the technical

10   committee had in fact been produced to Rio Tinto before I

11   appeared.  I don't want the record to be inaccurate in that

12   respect.

13             THE COURT:  Good.  All right.  I am sure I am going to

14   regret this question but are there any additional issues that

15   we need to deal with today that are not in the letter in front

16   of me?

17             MR. LIMAN:  Your Honor, there is a discrepancy with

18   respect to the reservation of rights on the E&Y documents.  We

19   previously wrote to Mr. Forst to indicate the nature of the

20   reservation.  I assume we don't need to lodge that with the

21   Court?  And if it becomes an issue I --

22             THE COURT:  If it was in a letter you advised me of

23   it.  I am sure I won't remember it any more or less when it

24   becomes a live issue, whether you raise it today or just in the

25   letter.

1          One housekeeping matter.  Why doesn't Rio Tinto put

2     together for me all of the letter briefing that I have gotten

3     on the, whatever the name of your document is, Mr. Liman.

4          MR. LYTTLE:  Nardello, your Honor.

5          THE COURT:  Thank you; so that way I will have it all

6     in front of me again and I will get it?

7          MR. LYTTLE:  Would you like it in addition to filing

8     ECF or hand-delivered to you?

9          THE COURT:  Since it has all been previously filed on

10    ECF just send a set with a cover letter "over by hand" or by

11    "Fed Ex," whatever.

12         MR. LYTTLE:  Okay.  We will do that, your Honor.

13         One housekeeping matter on the E&Y letter

14    conversations taken today and your Honor's advice and thoughts

15    into it.  I think we may make some revisions so I request that

16    perhaps you hold off in reviewing that one and we will submit a

17    separate one.

18         THE COURT:  Well, here is the issue that I think I

19    have told you before:  Friday is my last day in the office for

20    two weeks.  If you get me something before Friday I can sign

21    it.  While discovery emergencies or whatever my clerks will be

22    working and can get things to me, a letter of request does not

23    work well on a Blackberry or even an iPad.  I am not going to

24    deal with it during those two weeks.  So, whatever your urgency

25    is or isn't, if you get me something know that I have got

1    Friday fairly heavily booked.  So, if you get me something

2    before Friday and I have a chance to look at it, I will sign

3    it.  If you don't, I won't.

4            So.

5            MR. LYTTLE:  We will, your Honor.

6            MR. BLACKMAN:  And on that score, your Honor, again

7    taking on board what you said, we would like to see the draft

8    and hopefully have a chance to have some input into it, so

9    maybe as our other letters of request were, this can be agreed

10   as opposed to not.

11           THE COURT:  I think, A, agreement is highly unlikely

12   and I think reading between the lines what I am hearing is that

13   some of the requests that might be perfectly fine in American

14   parlance, you know, documents, communications, e-mails, etc.,

15   they may be trying to sharpen.  Certainly if you are adding

16   anything as opposed to subtracting I expect you to let

17   Mr. Blackman have a small window of opportunity to look at it.

18   If all you are doing is narrowing if, again, you know, if the

19   two-week gap urgency is such it might be that with today's

20   discussion you can, indeed, get agreement.  Maybe that's

21   hopeless.  I leave it to all of you.

22           MR. BLACKMAN:  Thank you, your Honor.

23           THE COURT:  Date for our next session?  What is your

24   pleasure?  What do you need?

25           MR. LIMAN:  Your Honor, I don't know that we have a

F8J5rioC                        conference

1   calendar in front of us with a particular day and date of the

2   week, but if we could have a date sometime shortly before

3   September 27th?  September 27th is a day that a number of us

4   will be out of town.

5           THE COURT:  The 27th is a Sunday, we can do it the

6   afternoon of the 24th which is the day after Yom Kippur.  If

7   that works we can do it the week before so we are not near Yom

8   Kippur.  Whatever you all want.

9           MR. LIMAN:  The only thing I would ask is if we do it

10  the day after Yom Kippur, if we could set a time period for

11  submitting the letter to your Honor so that those of us who are

12  observant are able to observe the holiday.

13          THE COURT:  If we do it on Thursday the 24th you can

14  get the letter in on Monday, the 21st, or the morning of

15  Tuesday the 22nd.  Whatever your pleasure is on that.

16          MR. LIMAN:  Your Honor, I think that works for

17  everybody.  We would also ask that the letter go in on Monday

18  night that would give your Honor a chance to review it.

19          THE COURT:  Yes, since they tend to be long letters.

20  All right, September 24th, 2:30.

21          All right.  So, enjoy the rest of your summer even

22  though I know you are all working hard.  For those it applies

23  to, Happy New Year in advance since I won't see you until

24  afterwards.

25          We are adjourned.

F8J5rioC                              conference

1          Usual drill with the transcript; reading the Court's

2     rules you all have to buy it.

3                              o0o

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25