**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC • PARIS • BRUSSELS • LONDON • MOSCOW
FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG
BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY

MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO

JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
JOHN V. HARRISON
CAROLINE F. HAYDAY
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

Writer's Direct Dial: +1 (212) 225-2550
E-Mail: lliman@cgsh.com

September 10, 2015

VIA ECF

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re: *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

      On behalf of Defendant Vale, we write to raise an issue with respect to the question of privilege in connection with the examinations of Rio Tinto's UK investigators, which, pursuant to this Court's Letters of Request and the ensuing Sealed Orders issued by the English High Court, are scheduled to take place in London on September 28-30 and October 1-2 (the "UK Examinations").

      Specifically, Vale seeks an order confirming that Rio Tinto may not seek to raise in the UK Examinations any objection or argument that the testimony called for by the Sealed Orders is privileged or otherwise protected from disclosure, nor may Rio Tinto purport to instruct any witness in the UK Examinations not to answer on that basis any question within the scope of the examination authorized by the Sealed Orders. Vale also seeks an order compelling Rio Tinto to produce, in advance of the UK Examinations, any communications between it and the third-party investigators subject to the Sealed Orders that it has not yet produced. Rio Tinto has refused to agree to the above, despite the fact that it has told this Court unequivocally that it "has asserted no privilege or protection" with respect to these investigators' prior work for it.

      In the first instance, the Letters of Request issued by this Court and enforced by the English High Court do not call for privileged information. Vale seeks disclosure regarding, in the case of each firm, "the scope and timing of its engagement, who it interviewed, what

documents it reviewed, its findings and conclusions," and its communications with Rio Tinto (and its lawyers) regarding the same.

Rio Tinto itself has made it clear that the relationship between it and the third-party investigative firms is such that no communication between them (and within the scope of the Sealed Orders) could be privileged or protected. Rio Tinto has represented, again and again, that the firms are "independent, third party, foreign investigative firms" not controlled by Rio Tinto or its outside counsel. March 23, 2015 Letter from E. Lyttle to Judge Peck at 1 ("Rio Tinto does not control these investigative firms"); *see, e.g.*, Dk. 246 at 13 ("Rio Tinto does not have . . . any right to obtain, the names of sources in the investigator reports compiled by its investigators."); Dk. 277 at 6 ("All of the investigators have declined Rio Tinto's multiple requests for source names"); Dk. 318 at 6 ("The investigators are not agents of Rio Tinto"). Rio Tinto has also repeatedly represented that the investigative firms were not retained or directed by counsel. It claimed to have "identified . . . the two fact witnesses, *who are not lawyers*, who oversaw the investigation" and "agreed to pull their files." Dec. 9, 2015 Tr. 23:11-14 (emphasis added). It represented that its "investigation was by investigative firms hired that went out to talk with sources and generated the reports. The law firms did not run that. They were independent people." Jan. 13, 2015 51:11-15 ("We, your Honor, are not planning to search Quinn Emanuel or Weil Gotshal files."). Most recently, and dispositive of this question (in seeking to explain its failure to disclose its current retention of one of the investigators), Rio Tinto stated without qualification that it "has no objection to any investigator turning over materials responsive to Vale's requests" and that it "*has asserted no privilege or protection that would prevent the investigators from talking about their prior work for Rio Tinto*." Dk. 318 at 4-6 (emphasis added). Moreover, the investigative firms themselves have made clear, in the English proceedings under this Court's Letters of Request, that they were not retained for the purpose of litigation, foreclosing any suggestion of work product protection. *See* Tr. 149:17-151:2 ("Rio Tinto did not retain ARC for litigation but to provide investigative reports. . . . ARC was asked to produce business intelligence for . . . for Rio Tinto, not to gather evidence for use in litigation which is a distinct activity. . . . Livingstone was not told that it was investigating potential claims against Vale and at no point did it occur to Mr. Huband that the sources of information might be potential trial witnesses.").[1]

Second, and independently, the requested information is critical to the fair and accurate disposition of this case and it has been put directly at issue by Rio Tinto.[2] The Court has held, repeatedly, that Vale is entitled to discovery concerning Rio Tinto's investigation. Without ruling on Vale's pending at-issue waiver motion (*see* Dk. 119), the Court ordered Rio Tinto to "[p]roduce the factual information from any privileged document that is relevant to the

---

[1] Accordingly, Rio Tinto has no basis to argue, for instance, any exception under *Kovel* (or otherwise), because the investigative firms (unlike Vale's engagement of Nardello and Ernst & Young) were not retained by counsel or for the purpose of assisting the provision of legal advice; nor were they retained, they say themselves, in anticipation of litigation. *See, e.g.*, *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2014 WL 7238354, at *4 (S.D.N.Y. Dec. 19, 2014) (third-party marketing firm broke privilege because firm did not serve interpretive function necessary to providing legal advice and was not a functional employee).

[2] Rio Tinto concedes that, to the extent it seeks to recover for a December 2008 injury (and a December 2008 claim) – which its Amended Complaint clearly does – equitable tolling "would be required [for the period] prior to April 30, 2010" and Vale would be "entitled to documents related to Rio Tinto's investigation from December 2008 to April 29, 2010 (*i.e.*, four years prior to Rio Tinto commencing suit)." (Dk. 121 at 8.)

Hon. Andrew J. Peck, p. 3

investigation and diligence issue." Dec. 9, 2014 Tr. 20:23-25. *See also id.* at 27:15-23 (ordering Rio Tinto to identify investigative firms); *id.* at 28:3-6 ("Precomplaint, if there was an investigative firm of any sort, whether working with the lawyers or not, I don't find that to be privileged."); Jan. 13, 2015 Tr. 52:12-21 (ordering expedited production of the reports); June 1, 2015 Tr. 47:14-16 ("Produce whatever you have that you haven't produced with respect to the investigators."). Rio Tinto, for its part, has conceded it must show conduct that is "diligent as an investigation" and must, at a minimum, "turn[] over the facts of that investigation." Nov. 3, 2014 Tr. 44:9-17.

The point is by now as familiar as it is clear: Rio Tinto alleges it suffered the loss of Simandou by December 2008, that it knew of the injury when it happened (Am. Compl. ¶¶ 77, 92) and that it conducted a "lengthy investigation" (*id.* ¶ 146), but that the investigation was stymied by Vale's alleged fraudulent concealment, such that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until after the criminal proceedings involving Cilins became public in April 2013" (*id.* ¶ 147). Vale has already discovered substantial evidence that puts the lie to that accusation and should defeat this untimely lawsuit on limitation grounds. The evidence already obtained in discovery shows that Rio Tinto obtained information as early as 2008 that BSGR was making payments to Guinean officials for the rights to Simandou (the very allegation it makes in the Amended Complaint here), that it initially decided to bring suit against BSGR *in 2009* for the loss of Simandou, and that it ultimately decided not to do so and not to continue to investigate a legal claim – not because it lacked the information to do so – but because it recognized that (prior to the Justice Department action) bringing a lawsuit might gain it damages but would not help it recover Simandou. Whatever the wisdom of that strategic decision, Rio Tinto made it with eyes wide open, and it must accept the consequences of that decision in terms of the statute of limitations.

The work done by the three firms and the communications with them have been put directly at issue by Rio Tinto's allegations on this subject. In response to Vale's Interrogatory 22 and the Court's order, Rio Tinto identified the three firms subject to the UK Examinations (Livingstone and Company, BTG Intelligence, and Africa Risk Consulting) as "Persons that . . . may have knowledge related to Rio Tinto's investigation between December 2008 and the filing of the complaint" on April 30, 2014. If, consistent with these allegations, but contrary to the evidence developed by Vale to date, those firms were diligently investigating a potential claim but were stymied, Vale is entitled to that information now. If, on the other hand, those firms, having been hired by Rio Tinto, either knew of the potential claim and that Rio Tinto had decided not to pursue it, or were not instructed by Rio Tinto to investigate a potential claim at all, Vale is also entitled to that information. Such evidence from third-party witnesses would directly undermine Rio Tinto's claim of equitable tolling, including its allegation of a "stymied" investigation. So too would evidence that any investigation was not stymied.[3] *See, e.g.*, *Bohack*

---

[3] Rio Tinto will assert that the test for equitable tolling is "objective," but that is just wrong. There is not a single case that says a plaintiff who has discovered his cause of action or who has not diligently investigated can sit on its hands and avoid the statute of limitations on the theory that some hypothetical reasonable plaintiff would not have discovered its claim. Indeed, although Rio Tinto does not come out and admit it, its argument would eliminate the first and second elements that a plaintiff must prove to show equitable tolling: (1) diligent investigation through the period sought to be tolled and (2) that the plaintiff's discovery of a claim was stymied by the alleged wrongful concealment.

*Corp. v. Iowa Beef Processors, Inc.*, 31 Fed. R. Serv. 2d 1205 (E.D.N.Y. 1981) (plaintiff "may not take advantage of the assertion of fraudulent concealment . . . and at the same time preclude its adversary's discovery of the very evidence which pertains to the application of the doctrine"); *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 CIV. 4911 (HB), 2003 WL 1990262, at *3 (S.D.N.Y. Apr. 29, 2003) (plaintiffs who invoked equitable tolling "impliedly waived the privilege by making a claim that in fairness requires an examination of the purported privileged material"); *WLIG-TV, Inc. v. Cablevision Sys. Corp.*, 879 F. Supp. 229, 235 (E.D.N.Y. 1994) ("WLIG put otherwise protected information at issue by raising equitable doctrines to overcome a limitations bar."). Rio Tinto has not cited, and cannot cite, any equitable tolling case from this District or the Second Circuit to the contrary.

In addition to testimony, Vale seeks the documents necessary to use in the UK Examinations. On December 9, 2014 (and again in January 2015 and June 2015), this Court ordered all investigative materials to be produced.[4] Despite all this, Rio Tinto's privilege log indicates it continues to withhold communications with each of the three UK investigative firms due to be examined, on a purported claim of privilege. *See, e.g.*, Index Ranges 7074-7198 (communications with ARC between March 2006 and April 2014 re: "Rio Tinto's investigation into the loss of Blocks 1 & 2"); 20194-20221 (communications with BTG between August 2007 and August 2010 re: "public relations issues regarding development of Simandou"); 9280-9418 (communications with Livingstone between December 2006 and March 2014 "related to potential litigation over mining rights in Simandou"); 7026-7057 (communications with Livingstone between November 2008 and August 2011 re: "investigative reports regarding Rio Tinto's investigations into the loss of Blocks 1 & 2"). When, during the parties' privilege log meet-and-confer on August 21, Vale inquired on what basis Rio Tinto purported to withhold those documents, Rio Tinto's response was simply that it would be re-examining the claims of privilege in preparing its revised, document-by-document long – which, three weeks later, Vale still has yet to receive. And when, on September 4, Vale asked Rio Tinto to produce these documents in advance of the UK Examinations, and to confirm – consistent with its prior statements – that it would not seek to interpose any privilege objection during those examinations, Rio Tinto inexplicably refused.

\*\*\*

---

[4] For months, Rio Tinto flouted those court orders – and continues to do so. Vale served its first discovery requests seeking information about Rio Tinto's alleged investigation on September 3, 2014. Rio Tinto stonewalled. First, it refused to identify the investigative firms or to produce their reports, withholding the very names of the firms on the purported grounds of "privilege." Next, even after the Court's December 2014 order, Rio Tinto delayed producing the names and the Court had to revisit this issue twice more (in January and February 2014). Rio Tinto finally identified Livingstone, BTI, and ARC, among others, and produced some of their (redacted) investigative reports on February 17, 2015, more than five months after Vale's requests. (It was not until March 2, 2015 that Rio Tinto belatedly produced a report it claimed to have "inadvertently omitted," and which appears to be the source of many of the allegations against Vale.) And, it was not until May 27, 2015 – and only after Vale called Rio Tinto to task – that Rio Tinto produced a report from Kroll – which to this day Rio Tinto has not identified in its interrogatory response. The August 2008 Kroll report leaves no doubt that Rio Tinto believed at the time it lost Simandou that the loss was caused by BSGR's improper contacts with President Conte's fourth wife, Mamadie Toure. Among other things, Rio Tinto's antics caused Vale to expend considerable time and resources pursuing discovery under the Hague Convention even though, as the English High Court found, Rio Tinto all along had control over the documents in question but refused to produce them.

Hon. Andrew J. Peck, p. 5

      Accordingly, Vale seeks an order in connection with the UK Examinations:

      (1) Ruling that Rio Tinto has no privilege with respect to any question or testimony regarding the investigation and resulting reports produced by each respective firm (as enumerated in the Sealed Orders), including, in the case of each firm, "the scope and timing of its engagement, who it interviewed, what documents it reviewed, its findings and conclusions," or to questions or testimony regarding communications with Rio Tinto (including its agents) and/or Rio Tinto's counsel regarding the same.

      (2) Ordering Rio Tinto to produce all communications between Rio Tinto (or its counsel) and each of the firms and witnesses subject to the Sealed Orders that is responsive to Vale's document requests to Rio Tinto (regardless of custodian), without withholding or redacting any such document on the basis of any purported privilege or protection from disclosure, and to do so no later than September 18, 2015.

      (3) Ordering Rio Tinto to produce any operative engagement letter or agreement between Rio Tinto and Mr. Nigel Brown (a witness for the UK Examinations with whom Rio Tinto now admits to having a current engagement) or Mr. Alec Leighton (whom Rio Tinto says it has not retained, but who it acknowledges is Mr. Brown's associate).

      Respectfully submitted,

      /s/ Lewis J. Liman
      Lewis J. Liman

cc:    All counsel of record