UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG-Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam,<br><br>　　　　　　　　Defendants. | 14 Civ. 3042 (RMB)(AJP) |

### APPLICATION FOR THE ISSUANCE OF
### <u>INTERNATIONAL LETTERS OF REQUEST (LETTERS ROGATORY)</u>

Defendant Vale S.A. ("Vale" or the "Applicant"), respectfully petitions this Court

pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence

Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781

(the "Hague Evidence Convention"), for the issuance of a Letter of Request in the form annexed

hereto as Exhibit B, addressed to the Senior Master of the High Court (Queen's Bench Division)

acting as the Competent Judicial Authority of the United Kingdom, requesting that the Senior

Master cause the Letter of Request to be served upon the designated recipients, who are former

employees and consultants of BTG Intelligence.  In support thereof, the Applicant respectfully

represents as follows:

### BACKGROUND

1.　　　On April 30, 2014, Rio Tinto plc ("Plaintiff" or "Rio Tinto") filed a complaint in

this Court against Vale, BSG Resources Ltd. ("BSGR"), and the other named defendants

(together, "Defendants") asserting claims under the Racketeer Influenced Corrupt Organizations Act ("RICO") and alleging, *inter alia*, that Vale and BSGR had conspired to take for themselves Rio Tinto's iron ore mining rights to Blocks 1 and 2 in the Simandou area of the Republic of Guinea ("Guinea").  (Dkt. No. 2.)  Rio Tinto alleged that the defendants obtained the rights to Simandou Blocks 1 and 2 in December 2008.  Rio Tinto filed an amended complaint ("AC") with substantially similar allegations on August 15, 2014.  (Dkt. No. 83.)  Rio Tinto alleges that one of its competitors, BSGR, engaged in bribery to obtain Rio Tinto's rights to Blocks 1 and 2 in Simandou for itself in December 2008 and that another of its competitors, Vale, conspired with BSGR and assisted it in obtaining those rights in December 2008 by misappropriating confidential information from Rio Tinto and providing it to BSGR.  (AC ¶¶ 154, 174-180.)  Vale denies the allegations against it.

2.     The statute of limitations for RICO claims is four years running from the date of injury.  *Rotella v. Wood*, 528 U.S. 549, 553, 555, 559 (2000).  RICO does not have a discovery rule.  *Id.* at 553.  Rather, because of its prophylactic purposes and in light of the treble-damages remedy it provides, Congress required parties purporting to assert RICO claims "diligently to investigate" as "the expected benefit of suppressing racketeering activity [is] an object pursued the sooner the better":  RICO is "aimed at rewarding the swift who undertake litigation in the public good."  *Id.* at 558-59 (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987)).

3.     Under the law in this Circuit, there is a narrow exception to RICO's strict four-year statute of limitations which imposes substantial burdens of proof on a plaintiff bringing an out-of-time claim.  *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006) ("*NGC*").  If the plaintiff can establish each of the following

elements by a preponderance of the evidence, the court will toll the statute of limitations during the period of concealment and due diligence:  "(1) wrongful concealment by the defendant (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim."  *Id.* at 265 (citing *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)).  If the plaintiff fails as to any of these elements, the claim of equitable tolling due to fraudulent concealment also fails.

4.      In order to satisfy that burden, the Amended Complaint claims that, "[u]pon learning" of Vale's joint venture with BSGR on April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the concealed and intricate nature of the RICO enterprise," that "Rio Tinto was unable to discover the conduct that underlies its RICO and other claims until . . . April 2013" (AC ¶¶ 146-147), when Defendant Frédéric Cilins was arrested by the Federal Bureau of Investigation.  With respect to Vale, the Amended Complaint makes a single allegation of fraudulent concealment which Vale contends is insufficient:  Vale "continued negotiations with Rio Tinto during the first half of 2009, despite its discussions with Steinmetz and BSGR to develop a joint venture."  (AC ¶ 144(a).)  Vale denies those allegations.  It is Vale's contention that Rio Tinto possessed all the operative material facts upon which it based its complaint prior to April 2013, that Rio Tinto failed to investigate continuously from April 2010 to the filing of the complaint, that no fraudulent conduct of Vale thwarted Rio Tinto's pursuit of its claim, and that the timing of Rio Tinto's lawsuit was due to extrinsic factors, including developments in Guinea and Rio Tinto's strategic decision to capitalize on them to belatedly attempt to regain rights to Simandou.

5.      In light of Rio Tinto's claim that it conducted a lengthy investigation beginning in April 2010 and continuing through the filing of the complaint, Vale's Interrogatory No. 22 to Rio Tinto requested that Rio Tinto identify persons with knowledge concerning Rio Tinto's purported investigation beginning on April 30, 2010.  (*See* Vale's First Set of Interrogatories to Plaintiff, Interrogatory No. 22.)  In its amended interrogatory responses and subsequent correspondence with Vale, Rio Tinto identified six firms as having been involved in its alleged investigation from April 30, 2010 to April 30, 2014:  (1) Executive Research Associates, (2) Aeneas, (3) Livingstone and Company, (4) Weil, Gotshal and Manges LLP, (5) Quinn Emanuel Urquhart & Sullivan, and (6) Amsterdam & Partners LLP.[1]  Rio Tinto identified the following as having been involved with its alleged investigation after December 2008 but concluding by April 29, 2010:  (1) BTG Intelligence and (2) Africa Risk Consulting.

6.      In response to this Court's Order, Rio Tinto produced what it claims to be the complete set of reports authored by any of the firms it hired to pursue an investigation.  Those reports included reports by the two firms – BTG Intelligence and Africa Risk Consulting – that did not investigate after the date on which Rio Tinto claims the investigation began.  Their reports are relevant to the issue of whether Rio Tinto had knowledge or red flags regarding its claim, but not the question of whether Rio Tinto exercised due diligence after April 2010.  Rio Tinto also produced reports of three of the firms that it claims investigated after April 2010 – Executive Research Associates, Livingstone and Company, and Aeneas.  None of those reports post-date December 2010:  the reports from Livingstone and Company authored after April 2010 are all dated between May and August 2010, the only reports from Executive Research Associates that directly concern Vale are dated August 13, 2010 and December 1, 2010, and the

---

[1] Rio Tinto's identification of lawyers from its current firm as having been involved in its investigation is inconsistent with its prior representation to this Court that none of its lawyers had any "first-hand percipient knowledge of the investigation."  (Jan. 13, 2014 Hr'g Tr. 50:5-10).

Aeneas reports are nothing more than eight weekly intelligence briefings that do not directly concern Vale.

7.      From the face of the reports, all are devoted to competitive intelligence and, at most, to the questions of how BSGR obtained its interest in Simandou or how Rio Tinto could regain an interest in Simandou Blocks 1 and 2 if the Guinean government made that opportunity available, and in two cases, the two Project Vaal reports by Executive Research Associates dated August 13, 2010 and December 1, 2010, the chronology of Vale's contacts with BSGR and eventual joint venture with it on April 30, 2010.  None appear to investigate the question of how Rio Tinto lost its concession.  (It is Vale's position that Rio Tinto lost its rights because it failed to exploit Simandou, as the Guinean government stated.)  Moreover, many of the reports contain the type of facts that are in the Amended Complaint regarding the conduct of BSGR, Thiam, and Steinmetz and contain red flags regarding that conduct.

8.      The information requested is highly relevant to Rio Tinto's claims that it conducted due diligence and that fraudulent concealment serves to toll the otherwise expired statute of limitations, and to Vale's argument that Rio Tinto has not established any of the elements of those claims.  Information requested regarding the statements in the reports will demonstrate that Rio Tinto was well aware of any red flags with respect to BSGR's purported acts of bribery well before April 2010.  It will also demonstrate that Vale did not in any way thwart Rio Tinto's investigation.  Information regarding the nature of the engagement, the hours billed, the activities conducted, and the time spent on the investigation will demonstrate that Rio Tinto, despite these red flags, was not in fact conducting a lengthy investigation of its claims regarding the loss of its concession (especially from December 2010 to 2013) and was not

thwarted by Vale.  The reports also demonstrate that Rio Tinto did not hire these firms to conduct an investigation of its claim, but largely to gather competitive intelligence.

9.      Further, the information requested also goes to Rio Tinto's claim of conspiracy against Vale.  The reports show that BSGR was engaged in negotiations with *other* Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008.  (The Amended Complaint alleges that Vale entered into a conspiracy with BSGR in December 2008, before Rio Tinto lost its concession for Simandou Blocks 1 and 2, and that the formation of the joint venture in April 2010 constitutes the documentation of an agreement already reached. (AC ¶¶ 92, 146, 159.))

10.     The information requested thus will bear substantially on Vale's position that Rio Tinto's claims are not timely, as well as the merits of Rio Tinto's allegations that Vale entered into a conspiracy with BSGR in December 2008.  Vale accordingly submits these Letters of Request to test Rio Tinto's affirmative claim that it should be excused from the requirement to timely file under RICO, based on equitable tolling by fraudulent concealment, as well as the merits of its underlying claim.[2]

### RELIEF REQUESTED

1.      Vale therefore requests that this Court issue an Order in the form attached hereto as Exhibit A:

(a)      Providing for this Court to sign the Letters of Request and affix the seal of the United States District Court for the Southern District of New York over said signature in each of Letters of Request;

---

[2] Rio Tinto has designated the reports it produced from the investigative firms as "Highly Confidential – Attorneys' Eyes Only."  Vale does not believe these documents are Confidential, let alone Highly Confidential.  Accordingly, it has challenged Rio Tinto's designations.

(b)     Requiring that the Clerk of the District Court return the original, signed Letters of Request to Vale, so that said Letters of Request may be delivered to the Senior Master of the High Court (Queen's Bench Division) acting as the Competent Judicial Authority of the United Kingdom, which is the domicile of the designated recipients from whom evidence is sought; and

(c)     Directing counsel for Vale to transmit the original, signed Letters of Request to the Competent Judicial Authority of the United Kingdom;

so that Vale may obtain for use at trial potential evidence material to the claims and defenses at issue in the above-captioned litigation.

2.      The persons from whom evidence is sought by the Letters of Request are individuals, who have been identified by the investigative firm BTG Intelligence as responsible for the reports of that firm.  BTG Intelligence and their representatives have knowledge of facts bearing on the central issues of this case, and the documents and testimony sought are material to Vale's defenses.

3.      Vale has considered the requirements of the Courts of England and Wales in respect of letters of request, including the form in which the Letter of Request should be presented to the English Court and its permissible content.  It believes that this Letter of Request is consistent with these requirements, as contained in the UK Evidence (Proceedings in Other Jurisdictions) Act 1975 and Part 34 of the Civil Procedure Rules.  This Court is requested to issue the Letter of Request on this basis.

4.      Vale requests that after this Court has signed the Letter of Request, it be returned to Vale for forwarding to the Senior Master of the High Court (Queen's Bench Division) acting as the Competent Judicial Authority of the United Kingdom, Royal Courts of Justice, Strand

London WC2A 2LL, United Kingdom (for the attention of the Foreign Process Section, Room E16).

WHEREFORE, Vale respectfully requests that the Court enter the attached form of order (i) providing for this Court to sign the Letter of Request and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request; (ii) directing that the Clerk of the District Court return the original, signed Letter of Request to counsel for Vale, so that said Letter of Request may be issued to the Competent Judicial Authority of the United Kingdom; (iii) directing counsel for Vale to transmit the original, signed Letter of Request to the Competent Judicial Authority of the United Kingdom; and (iv) granting such other relief as the Court deems just and proper.

Dated: New York, New York
September 18, 2015

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Lewis J. Liman
Lewis J. Liman
Jonathan I. Blackman
Boaz S. Morag
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225 2000
Facsimile: (212) 225 3999

*Counsel for Vale, S.A.*

# EXHIBIT A

# (DRAFT ORDER)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rio Tinto plc,<br><br>              Plaintiff,<br><br>     -against-<br><br>Vale S.A., Benjamin Steinmetz, BSG Resources Limited, VBG-Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR, Frederic Cilins, Mamadie Touré, and Mahmoud Thiam,<br><br>             Defendants. | 14 Civ. 3042 (RMB)(AJP) |

## ORDER GRANTING APPLICATION FOR
## ISSUANCE OF INTERNATION LETTERS OF REQUEST (LETTERS ROGATORY)

     Upon the Application for the Issuance of an International Letter of Request (Letter Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the issuance of an international letters of request (the "Letter of Request") pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague Evidence Convention"); and upon the record of the above-captioned matter;

     **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

     The Application is **GRANTED**.

This Court shall sign the Letter of Request attached to the Application as Exhibit B and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request.

The Clerk of the District Court is directed to return the original, signed Letter of Request to counsel for Vale so that said Letter of Request may be issued to the Senior Master of the High Court (Queen's Bench Division) acting as the Competent Judicial Authority of the United Kingdom.

Vale is directed to transmit the original, signed Letter of Request to the Competent Judicial Authority of the United Kingdom.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____, 2015
          New York, New York

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

11

# EXHIBIT B

# (LETTER OF REQUEST TO
# NIGEL BROWN AND ALEC LEIGHTON)

**Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of the Requested State** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL |
| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

4. **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request**

| | |
|---|---|
| **Date** | Examinations currently scheduled to occur on 1-2 October 2015, pursuant to Order of Master Leslie dated 7 August 2015, but no later than November 30, 2015. |
| **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), pretrial examination of fact witnesses must be complete by November 30, 2015.  Examinations currently scheduled to occur on 1-2 October 2015, pursuant to Order of Master Leslie dated 7 August 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:

| | | |
|---|---|---|
| 5. | *a* **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B<br>New York, New York 10007 |

| | | |
|---|---|---|
| *b* | **To the competent authority of (Article 3,a)** | United Kingdom of Great Britain and Northern Ireland |
| 6. | **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)** | |
| *a* | **Plaintiff** | **Rio Tinto plc** |
| | **Representatives** | William A. Burck<br>Michael J. Lyle<br>Eric C. Lyttle<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW, 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100 |
| *b* | **Defendants** | **Vale, S.A.** |
| | **Representatives** | Jonathan I. Blackman<br>Lewis J. Liman<br>Boaz S. Morag<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225 2000<br>Facsimile: (212) 225 3999 |
| | | **BSG Resources Limited** |
| | **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
| | | **Benjamin Steinmetz** |
| | **Representatives** | Robert Gold |

Vincent Filardo, Jr.
Elizabeth M. Rotenberg-Schwartz
Mishcon de Reya New York, LLP
750 Seventh Avenue
New York, New York 10019
Telephone: (212) 612 3270
Facsimile: (212) 612-3297

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

Representatives

Martin Joel Auerbach
Law Offices of Martin J. Auerbach, Esq
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Telephone: (212) 704 4347
Facsimile: (212) 3040175

**Mahmoud Thiam**

Representatives

Paul Eliot Summit
Sullivan & Worcester LLP (MA)
One Post Office Square
Boston, MA 02109
Telephone: (617) 210 8437
Facsimile: (617) 338 2880

7.      **Nature of the proceedings and summary of claims (Article 3,c)**

7.1      This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

"Representative" is used to refer to directors (or shadow directors), officers, employees, representatives, agents, intermediaries and consultants.  The Relevant Period referred to below is January 1, 2004 to April 30, 2014.  Although not named as defendants, Rio Tinto's complaint has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2     Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3     Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4     BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production.  The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family.  BSG Resources Limited maintains an office in London.

7.5     In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world.  Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining

rights to four "Blocks" or areas of Simandou:  Blocks 1, 2, 3, and 4.  Rio Tinto claims to have

continued developing and investing in Simandou, including developing railway and port plans to

transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through

Guinea or through the neighboring country of Liberia.

7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio

Tinto to Vale or a possible joint venture between the companies.  In September 2008, Vale and

Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room

so that Vale could review certain of Rio Tinto's documents related to the assets under discussion.

After the Confidentiality Deed was signed and the data room opened, the two parties ultimately

discussed the sale of Rio Tinto's rights to Simandou.

7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto

Concession, which covered Blocks 1 and 2 of Simandou.  Notwithstanding this revocation, Rio

Tinto and Vale continued to explore possible transactions.  Vale ultimately purchased iron and

potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by  Rio

Tinto in June 2009.

7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks

1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those

Blocks on December 4, 2008.

7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility

of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began

negotiating a joint venture.  The negotiations culminated in the signing of a Framework

Agreement and Shareholders' Agreement, both dated April 30, 2010.  The Agreements both

included broad and detailed anti-bribery representations and warranties, on which Vale relied.

The joint venture was called "VBG."  Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou.  The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release.  Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding.  The Technical Committee found that Vale had no involvement in this bribery

scheme.  Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was defrauded by BSGR.

7.13     Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR, and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and 2 because of a conspiracy by Vale and BSGR in December 2008.  Rio Tinto alleged that, as a result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2.  An Amended Complaint with substantially similar allegations was filed on August 15, 2014.

7.14     Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6) to steal confidential information about Simandou and gave that information to BSGR for BSGR to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008.  Rio Tinto further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June 2009 in furtherance of the conspiracy to obtain rights to Simandou.  Rio Tinto alleges that Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2.  Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to Simandou Blocks 1 and 2 in April 2010.

7.15     In addition to the DOJ's and Technical Committee's investigations, BSGR is also under investigation by law enforcement agencies in Switzerland, France, and the United Kingdom in relation to its illicit activities in Guinea.  The Swiss authorities have received a Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and Steinmetz's home.  The Guernsey Financial Investigations United and the United Kingdom's

Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2

Notices on BSGR's current and past London counsel as well as Onyx.  BSGR filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division

of the English High Court of Justice, which the English High Court of Justice denied on May 7,

2015.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR,

any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of

trade secrets.  In particular, Vale denies that it did or could have entered into a conspiracy with

BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2,

after December 2008 sought other mining companies as partners with respect to these rights, and

did not agree to a joint venture with Vale until April 2010.  Rio Tinto's claims, as summarized

above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether

BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights

in which Vale subsequently invested by those means, and whether Vale had anything to do with

these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the

four-year statute of limitations to bring RICO claims.  Rio Tinto claims that, beginning after

April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into

the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the

concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to

discover the conduct that underlies its RICO and other claims until . . . April 2013."  (AC ¶¶ 146-

147.)  Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations.

Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms  retained

to conduct competitive intelligence.  Among other things, those reports bear on the validity of

Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio

Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

2010:  it is Vale's case that the reports show that BSGR was engaged in negotiations with other

Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008.

It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before

April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct

any investigation after December 1, 2010, at the latest.

7.18    The evidence sought from the individuals identified below, which includes

evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained

the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint

venture agreement with Vale in April 2010 and evidence of potential bribery by BSGR and

Steinmetz, is material to the resolution of these disputes.  The evidence bears on Vale's statute of

limitations defense, including on the timing of Rio Tinto's claim and whether its investigation

was sufficient, as well as whether Vale was in any way aware of BSGR's wrongdoing.

8.    **Evidence to be obtained or other judicial act to be performed (Article 3,d)**

8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged  bribery and

corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008

shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008.  BTG

Intelligence has identified Nigel Brown and Alec Leighton as the persons with responsibility for

the relationship with Rio Tinto and the preparation of the Reports, and who have knowledge of

facts that bear on the issues of this case.  By e-mail dated 17 September 2005, Mr. Brown

informed counsel for Rio Tinto plc, which in turn forwarded the correspondence to Applicant,

that "[w]e have now completed the three days of the document review and are in a position to provide what we have discovered" concerning Messrs. Brown and Leighton's prior investigative work for Rio Tinto, i.e. "the relevant data as it pertains to the litigation, RTZ-Vale et al.," but were unwilling to provide those documents "without further direction from the High Court."

8.2     It is accordingly requested that for the purpose of justice and for due determination of the matters in dispute between the parties you direct Nigel Brown and Alec Leighton to provide the documents detailed in Section 10 below.  Absent voluntary cooperation, evidence from Nigel Brown and Alec Leighton is available only by an order of the High Court.

| | | |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Article 3,e)** | Nigel Brown and Alec Leighton<br>Nigel Brown<br>Winnington House<br>(2nd Floor)<br>2 Woodberry Grove<br>London N12 0DR<br>UK<br><br>Alec Leighton<br>147 Elgar Avenue<br>Berrylands<br>Surbiton<br>Surrey KT5 9JX<br>UK |

10. **Documents or other property to be inspected (Article 3,g)**[3]

    a.  The proposals, pitch books, presentations You provided to or prepared for Rio Tinto as reflected in the reports entitled "Project Raven" and "Project Raven – Part 2," each dated 19 July 2010 and "compiled as a result of the research conducted pursuant to Rio Tinto's request for background enquiries and other investigations into the activities of Mr. Beny Steinmetz and Mr. Ehud Olmert any potential business relationships that they may have with Chinese businesses that are operating in Guinea or have invested in projects in Guinea" (the "Reports").

    b.  The engagement letters and disengagement letters between You and Rio Tinto for Rio Tinto's retention of Your services in connection with the Reports.

    c.  The bills or invoices submitted by You in connection with Rio Tinto's retention of Your services as reflected in the Reports including the time sheets or other records of the activities leading to the charges set out in those bills or invoices.

    d.  Correspondence between You and Rio Tinto concerning Your work done up to and following the Reports, correspondence relating to queries raised by Rio Tinto and documents provided to them (whether or not at their request) relevant to the work done or to be done.

---

[3] Messrs. Brown and Leighton shall be permitted to redact from the copies any information which may infringe any duty of confidentiality owed by them to any source of information regarding disclosure of the identity of the source. Where a redaction is made, Messrs. Brown and Leighton shall replace the name of the confidential source with an anonymised reference and a separate schedule shall provide information analogous to that provided at para 24 of Mr Huband's Witness Statement of 12 June 2015, including a description of the role and relevant employment of the source, and the reason why their evidence is considered reliable for each source.

e.   The documents from Your "enquiries" which You relied on for Your finding that "Steinmetz has also invested a considerable amount of time and effort in forging a good working relationship with Mahmoud Thiam, the Guinean Minister of Mines and that they meet on a regular basis," as referenced on page 6 of the report entitled "Project Raven Report," dated 19 July 2010.

f.   The documents, news reports, and other sources cited on pages 12-18 of Your report entitled "Project Raven Report," dated 19 July 2010, concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and potential partners, including but not limited to China International Fund ("CIFL"), Aluminum Corporation of China Limited ("Chalco"), and/or Aluminum Corporation of China ("Chinalco").

g.   Any other documents which You relied on for Your findings as set forth on pages 12-13 of Your report entitled "Project Raven" concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and potential partners, including but not limited to China International Fund ("CIFL"), Aluminum Corporation of China Limited ("Chalco"), and/or Aluminum Corporation of China ("Chinalco"), including, if obtained in the course of Your enquiries:

   i.   The interview memoranda summarizing conversations with members of BSGR, CIFLT, Chalco, or Chinalco related to such a potential joint venture.

24

ii.   The emails to or from a BSGR email address with CIFL, Chalco, and/or Chinalco and their attachments.

iii.   The term sheets agreed between BSGR and CIFL, Chalco, and/or Chinalco.

iv.   The contents of any data room between BSGR and CIFL, Chalco, and/or Chinalco.

h.   The reports compiled as a result of information obtained relating to the
"Suggested Lines of Enquiry" identified on pages 19-20 of the report entitled
"Project Raven Report," dated 19 July 2010.

i.   The interview memoranda and those documents (i) referenced in the interview
memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or
identified by the source summarizing or characterizing Your discussion with a
source described as "a very close personal and business associate of Steinmetz"
who "informed [You] that Beny Steinmetz has already paid nearly $10m to the
military regime in Guinea some time ago and that having secured additional
mining concessions in Simandou he has been seeking assistance from Beijing to
support his growing company infrastructure in Guinea and that he is also courting
assistance from an influential entrepreneur in Monaco to maintain his business
momentum," as referenced on page 19 of the report entitled "Project Raven
Report," dated 19 July 2010.

j.   The interview memoranda and those documents (i) referenced in the interview
memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or
identified by the source which You relied on for "earlier information from a gold
mining contact in Guinea that Steinmetz is very close to the Guinean Minister of
Mines," as referenced on page 19 of the report entitled "Project Raven Report,"
dated 19 July 2010.

k.  The documents which You relied on for Your finding that "the Guinean Government's Minister of Mines, Mahmoud Thiam, had wholly supported and encouraged Steinmetz's business flirations with the Chinese.  There were suggestions that Thiam himself had even offered Chinalco, the Chinese Aluminum Company that part of the Simandou project that had been removed from Rio Tinto and 'handed' to Steinmetz," as referenced on page 5 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

l.  The documents which You relied on for "the rumor that CIFL did withdraw its offer" for a potential joint venture with BSGR, as referenced on page 6 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

m.  The documents which You relied on for Your finding that "Chinalco, CIFL and other Chinese companies [were] 'circling' around the lucrative iron ore and other mining contracts in Guinea," as referenced on page 7 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

n.  The spreadsheet "that summarises the sequence of events" and which was presumably attached to "Project Raven Report – Part 2," as referenced on page 8 of that report.

o.  "The reference documents, from which the database has been created, [which] have also been scanned, indexed and incorporated into another searchable database by our researchers" and are also maintained in "hard-copy," as referenced on pages 9 and 10 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

p.   The documents evidencing Your "awareness" "that in August 2009 the former Prime Minister of Israel, Ehud Olmert, who is also a personal friend of Beny Steinmetz, visited MCC Limited in Beijing together with Steinmetz," as referenced on page 21 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

q.   The interview memoranda and those documents (i) referenced in the interview memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or identified by the source evidencing Your discussion with a source who "stated that he and Steinmetz were still heavily engaged interacting with the Chinese in Guinea and in other locations," as referenced on page 21 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

r.   The documents collected by Messrs. Brown and Leighton through "the three days of the document review" they conducted, as stated in Mr. Brown's e-mail to Michael Lyle (counsel for Rio Tinto) dated 17 September 2005, as to which they "are in a position to provide what we have discovered."

11.   **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[4]**

Jonathan Kelly
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

---

[4] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of England and Wales, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in England and Wales.

12. **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

13. **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of Article 14 of the Convention and the fees and costs occasioned by the use of the special procedure requested in Article 26 of the Convention, being the fees and costs in connection with the execution of this Letter of Request, for the service of process necessary to secure the appearance of each Witness, the costs of the Examiner and the costs of the transcript of the evidence will be initially borne by Vale.  The payment of any such fees and costs is without prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.


DATE OF REQUEST                   …………………………………….


SIGNATURE AND SEAL OF          …………………………………….
THE REQUESTING AUTHORITY