# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY

MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO

JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
JOHN V. HARRISON
CAROLINE F. HAYDAY
RESIDENT COUNSEL

LOUISE P. PARENT
OF COUNSEL

Writer's Direct Dial:  +1 (212) 225-2550
E-Mail: lliman@cgsh.com

September 21, 2015

<u>VIA ECF</u>

Hon. Andrew J. Peck, U.S.M.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:  *Rio Tinto plc v. Vale S.A., et al.*, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)

Dear Judge Peck:

We write on behalf of Defendant Vale S.A. ("Vale"), jointly with Plaintiff Rio Tinto plc ("Plaintiff") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), and Mahmoud Thiam, to update the Court on the status of discovery in advance of the status conference scheduled for September 24, 2015 at 2:30 p.m.

As set forth in the proposed conference agenda below, there are a number of discovery disputes that require the Court's assistance.

## I.    Discovery From Plaintiff Rio Tinto

### a.    Vale's Renewed Motion For A Finding Of At-Issue-Waiver

#### i.    *Vale's Position*

**Discovery To Date Supports Vale's At-Issue Waiver Motion.**  As set forth at length by Vale in its motion for a finding of at-issue waiver (Dks. 119, 122, 135), by filing this lawsuit after the four-year statute of limitations had expired, Rio Tinto has put directly at issue its claim that it may bring the stale suit because, due to defendants' alleged concealment and despite its alleged diligence, it "did not know of or discover, and could not have known or discovered in the

Hon. Andrew J. Peck, p. 2

exercise of reasonable diligence, the unlawful conduct and resulting injury alleged herein . . . until . . . April 2013." (Am. Compl. ¶ 143 (emphasis added)).[1]  The Court deferred ruling on Vale's waiver motion pending service of Rio Tinto's privilege log, ordering that in the interim all factual information be produced and any purportedly privileged information be logged to allow for challenge by Vale.  (Dec. 9, 2014 Tr. 21:22-23:3.)  It noted that "[a]t that point I will determine further whether there indeed has been a waiver or not."  (*Id.* at 21:1-3.)

As Vale noted before the last conference, Rio Tinto's log, served July 30, confirms that it has withheld thousands of documents directly relevant to its equitable tolling claim that it has put at issue – including documents concerning its factual investigation that it was ordered, and agreed, to produce.  Rio Tinto's "supplemental log" (served after the conference on September 11, and which identifies the documents purportedly related to Rio Tinto's investigation on a document-by-document, rather than categorical, basis[2]), further confirms that documents have improperly been withheld.  In addition to facially non-privileged communications with investigators and other third parties (which, as discussed *infra*, are non-privileged irrespective of waiver), Rio Tinto has withheld hundreds of documents which – discovery to date and the log suggest – support Vale's claim that Rio Tinto was aware of a bribery-based claim for its loss of Simandou in 2009 (indeed, the Court will recall that a document it ruled was not privileged indicates Rio Tinto retained counsel to bring suit in the spring of 2009)[3] but made a strategic decision at the highest levels of the company not to pursue that claim or any further investigation at the time – because, among other reasons, it would tarnish Rio Tinto's relationship with the Government and a damages claim would not help Rio Tinto obtain mining rights – and instead pursue a conciliatory approach to government relations in the hopes of regaining the rights to Blocks 1 and 2.

In particular, discovery obtained by Vale to date supports Vale's theory that, as early as the summer of 2008 – when the Government of Guinea announced its intention to rescind Rio Tinto's rights to Blocks 1 and 2 of Simandou – Rio Tinto had information that BSGR was attempting to obtain those Blocks through improper contacts in Guinea, including by seeking to influence President Conté through his fourth wife Mamadie Touré – i.e. the precise allegation of impropriety on which this case is based (compare Am. Compl. ¶¶ 43, 44, 48, 49[4]); and that, as early as spring 2009, Rio Tinto believed it had a cause of action for Rio Tinto's December 2008 loss of Simandou and the award of those rights to BSGR, and had decided to bring suit. Specifically, Rio Tinto's investigators indicated that BSGR obtained the rights to Blocks 1 and 2 through bribery of Guinean Government officials.  The evidence also supports, however, that Rio

---

[1] The following paragraphs of the Amended Complaint are relevant to the fraudulent concealment/equitable tolling claim, among others:  Am. Compl. ¶¶ 12, 76-77, 80, 92-94, 98-100, 142-148.

[2] As discussed *infra*, even the supplemental log remains deficient.

[3] *See* August 19, 2015 Tr. 15:5-11 ("[B]ack in 2009 . . . Rio Tinto was aware of the injury, and . . . they were suing for something or intended to sue for something, instructed to sue for something.").

[4] Rio Tinto alleges, for example, that BSGR's agent "began distributing gifts to various contacts in Guinea" but "soon learned . . . that the only person who mattered in the country was President Conté, and that the way to Conté was through his four wives – particularly through his fourth and youngest wife, Defendant Mamadie Touré" (Am. Compl. ¶ 43); so "[t]o gain access to Defendant Touré, Cilins hired her brother, Ibrahima Soury Touré, to help promote BSGR's interests in Guinea," after which BSGR was able to secure meetings with the President and the Minister of Mines at which each was presented with gifts.  (*Id.* ¶ 44.)

Hon. Andrew J. Peck, p. 3

Tinto made a strategic decision in August 2009 to forego legal action (for the time) against BSGR because such an action (1) could not obtain for Rio Tinto the remedy it really sought – the return of Simandou; and (2) worse yet, risked antagonizing the Government of Guinea by having Rio Tinto sue the Government's current business partners. Instead, it made the decision to cease investigating and not to pursue a claim but instead to pursue reconciliation with the Government of Guinea – an approach that (unlike a lawsuit) offered the prospect of regaining Blocks 1 and 2, not just damages. It also appears that Rio Tinto then ceased investigating for a period of at least 8 months. It appears that it did not conduct investigation of a claim again until well after BSGR and Vale announced their joint venture on April 30, 2010 – despite that the evidence also shows Rio Tinto (contrary to its allegations) in fact knew of JV discussions between Vale and BSGR before they were publicly announced on April 30, 2010. Thus, Rio Tinto's argument that equitable tolling is unnecessary – despite its affirmatively pleading it in the Amended Complaint – because it sued within four years of notice of the JV talks fails. It is predicated on a misrepresentation of Rio Tinto's own knowledge, laid bare by its own documents. There is no question that Rio Tinto's claim is time-barred absent sufficient tolling.[5] And Rio Tinto did not sue until even later, in April 2014, after the Government of Guinea announced that it no longer wanted to do business with BSGR or the joint venture entity VBG, thus opening up the prospect that if Rio Tinto sued it might be able to regain Simandou.[6]

Such a claim by Vale – if we prove it to the satisfaction of a jury – will defeat Rio Tinto's claim for RICO injury for the loss of Simandou and its lawsuit. Among other things, a plaintiff's conscious (and strategic) choice not to bring (or not to investigate) a claim of which it is aware means it cannot satisfy the second requirement of equitable tolling that "*the concealment*" – not plaintiff's own strategic choice – "*prevented* plaintiff's discovery of the nature of the claim within the limitations period." *Madison 92nd St. Associates, LLC v. Courtyard Mgmt. Corp.*, No. 14-2947-CV, 2015 WL 5332093, at *1 (2d Cir. Sept. 15, 2015) (citation omitted). And of course, a failure to investigate would also be dispositive of the third requirement, that "[e]quitable tolling requires a party to pass with reasonable diligence *through the period it seeks to have tolled.*" *Id.* at 4-5 n.1.[7]

---

[5] Rio Tinto chose to file this action exactly *four years to the day* after the Vale-BSGR joint venture was announced on April 30, 2010, and it claims, on that basis, to have filed within four years of notice of its injury. Vale disagrees with that (Rio Tinto knew of its injury by December 2008), but even by Rio Tinto's own argument, if it had notice of the joint venture even *one day* before April 30, 2010, then it sued too late as the four-year statute of limitations had expired that many days prior to its filing (even if by only one day). By the same token, if Rio Tinto failed to investigate for even *one day* of the period it needs to toll to bring a timely suit (including, at a minimum, December 9, 2008 – April 30, 2010), then its equitable tolling claim fails and its suit is untimely.

[6] Because it has designated the few produced documents that support Vale's theory as Confidential or Highly Confidential under the Protective Order, Vale has, simultaneously with this letter, hand delivered a factual submission to the Court outlining the results of discovery to date. Vale asks that the letter be made part of the record on its renewed motion, and that it be permitted to file it publicly.

[7] Vale expects that Rio Tinto will claim that equitable tolling is satisfied when some reasonable plaintiff (and not the actual plaintiff) could not have discovered its cause of action and that the claim it discovered was a claim against BSGR and not a claim against Vale. That argument is directly contrary to the law and would read the second two elements out of the test for equitable tolling. A plaintiff such as Rio Tinto who discovers the existence of a claim cannot sit on its hand and wait to bring suit because a hypothetical reasonable plaintiff would not have discovered the claim and, in addition Rio Tinto alleges it was discovery of BSGR's alleged bribery – and not any other event – that alerted it to its claim but that discovery occurred as early as 2008/2009. And, as to Rio Tinto's argument that it

Hon. Andrew J. Peck, p. 4

Despite having put its investigation and the timing of its discovery of a claim at issue, Rio Tinto has not produced the vast wealth of documents with respect to these discoveries or any of the documents underlying either its initial decision to bring suit or its later change of heart (both within the limitations period). Its arguments to support those limitations are ill-founded. There is a factual basis for Vale's discovery requests as laid out above and in Vale's supplemtnal submission. It is not just the facts found by the investigators but the analysis of the legal consequences of those facts that are relevant (after all, if Rio Tinto's lawyers advised it that it had a claim but it nonetheless decided not to pursue it and not to investigate that would defeat equitable tolling). *See, e.g.*, *Bohack Corp. v. Iowa Beef Processors, Inc.*, 31 Fed. R. Serv. 2d 1205 (E.D.N.Y. 1981) (invoking fraudulent concealment waived privilege as to letter from Simpson Thacher to its client Bohack containing "an opinion by Simpson, Thacher & Bartlett with respect to the merits of a possible action by Bohack against Iowa Beef," which "may reveal that Bohack was aware of a possible claim prior to May 1974 or that Bohack had failed to exercise due diligence in investigating the possible claim").[8] Further, the intertwined business and legal reasons for Rio Tinto's decision to stop investigating (and the very fact that it did stop investigating) are put at issue by the claim that it was Vale's alleged concealment that prevented the discovery of a claim. Finally, while Rio Tinto has claimed that it has already produced a number of documents on these issues, the rules of discovery do not permit it to pick and choose. Vale is entitled to obtain the documents it has requested with respect to these decisions and not just those self-selected by Rio Tinto because those are the documents Rio Tinto would like to disclose.[9]

Vale therefore renews its waiver motion, which seeks a ruling a waiver for the entire time period up to the filing of the complaint. As an initial step, however, Vale requests an order finding a waiver at least with respect to the categories of documents set forth in Attachment A, all of which Vale has asked Rio Tinto to bring to the conference and all of which concern Rio Tinto's decision to bring or not bring suit before the statute of limitations expired in December 2012.

All of these communications are called for by Vale's document requests; all concern Rio Tinto's consideration of, and purported investigation of, a potential lawsuit within the four-year limitations period following its injury; all are put directly at issue by Rio Tinto's claim that it *could not* bring a claim during that period due to Vale's fraudulent concealment. Vale is entitled to test that claim.

---

knew only of the claim against BSGR that fails for two additional reasons. First, the statute of limitations runs from discovery of the claim (not discovery of all of the defendants). *Rotella v. Wood*, 528 U.S. 549, 553, 555, 559 (2000). Second, if Rio Tinto knew of a claim but decided to stop investigating for extrinsic reasons that would demonstrate (a) it did not diligently investigate through the time period sought to be tolled; and (b) no act of Vale's prevented it from investigating.

[8] *Bohack* (and others cited in Vale's motion) are directly on point, and Rio Tinto has never cited any equitable tolling case to the contrary.

[9] Rio Tinto has never made a claim of burden.

Hon. Andrew J. Peck, p. 5

    ii. *Rio Tinto's Position*

   There has been no "renewed" motion for at-issue waiver.  After the parties extensively briefed the issue back in November and December (*See* Dkt Nos. 115, 119, 121, 122), the Court ruled "We are going to take this in baby steps.  Produce the nonprivileged documents on this issue.  Produce the factual information from any privileged document that is relevant to the investigation and diligence issue, and log everything else. At that point I will determine further whether there indeed has been a waiver or not."  Dec. 9, 2014 Hr'g Tr. 20:22–21:2.  That is the status quo and that is what Rio Tinto has done.  Indeed, the latest round in Vale's cause celebre shows just how narrowly Rio Tinto has construed privilege to ensure it has produced all non-privileged factual information:  in addition to the actual investigative reports Rio Tinto long ago produced, Rio Tinto has produced hundreds of communications with its investigators, including communications between its investigators and its lawyers (because they contained non-privileged factual information); not withheld *any* pre-April 2010 communications with investigators on the basis of privilege; and withheld only a small handful of documents as privileged, all of which were within the statute of limitations period and all of which were with counsel in preparation of this lawsuit.

   Vale's at-issue waiver claims also fail on the law.  *In re County of Erie*, 546 F.3d 222 (2d Cir. 2008) requires that "a party must *rely* on privileged advice from his counsel to make his claim or defense" in order to invoke "at issue" waiver. *Erie*, 546 F.3d at 229 (emphasis in original).   Rio Tinto's equitable tolling claim does not make an issue of its good faith or its reliance on advice of counsel.  The RICO statute of limitations test is objective and is determined with reference to what facts Rio Tinto learned and when it learned them. *See De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 296 (S.D.N.Y. 2013) ("whether a plaintiff is placed on inquiry notice is analyzed under an objective standard").  Advice of counsel is immaterial to an equitable tolling claim. *Erie*, 546 F.3d at 229 (holding that because a test was objective, "reliance upon advice of counsel" could not be used to support it).  What Rio Tinto's counsel thought about those facts, or any legal advice it provided in light of them, therefore is not relevant (and not "at issue") to the objective determination of when the statute began to run.  At bottom, Rio Tinto is not relying on any privileged legal advice, nor any claims of good faith or state of mind, in order to support its fraudulent concealment arguments. Under *Erie* and its progeny, the "at issue" waiver inquiry ends there. Vale cites no post-*Erie* Second Circuit cases – and indeed there are no post-*Erie* Second Circuit cases period – that stand for the proposition that, by merely asserting fraudulent concealment or equitable tolling, Rio Tinto has put its good faith or state of mind at issue sufficient to waive the privilege.

  **b.  Rio Tinto's Clawback Letters**

    i. *Vale's Position*

   ***Rio Tinto Has Yet Again Attempted to Claw Back Non-Privileged Documents.***  By letters dated August 20 and Sept. 16, 2015, Rio Tinto purported to claw back over 170 purportedly privileged documents.  Its reviewers were right the first time – the documents are not privileged.  Notably, this is not the first time the Court has been burdened with reviewing Rio Tinto's spurious privilege claims.  At the last conference, the Court addressed Rio Tinto's

Hon. Andrew J. Peck, p. 6

attempt to claw back a document containing factual information ("the fact of an instruction to counsel . . . which is a factual matter that may or may not be relevant to the statute of limitations issue," Aug. 18, 2015 Tr. at 18: 5-9), which was moreover intended for disclosure to third parties, ruling it was not privileged.  The result was the same the conference before, in July, when the Court was burdened with reviewing purported privilege redactions by Rio Tinto which, in reality, included only the unprivileged fact of "setting up a meeting."  July 27, 2015 Tr. 38:2-3.  Rio Tinto's latest efforts are no different.

In light of this, and cognizant of the burden on the Court of reviewing all of Rio Tinto's many clawbacks, Vale requests *in camera* review of only three documents purportedly clawed back by Rio Tinto, in the hopes that rulings from the Court on these will guide future discussions among the parties with an eye towards resolving the remainder.  (All three documents are also described more fully in Vale's supplemental submission delivered by hand.)  Vale will bring these to the conference.

- *RT_TAR_0034384*:  May 19, 2009 engagement letter between Rio Tinto and the Guernsey firm Ozannes regarding work related to Simandou.  It does not disclose any of counsel's advice or analysis and only suggests the general nature of the engagement.  Those facts are not privileged; it is well settled that "[t]he compensation and terms of engagement of a lawyer are not protected by the attorney-client privilege." *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 1815461, at *2 (S.D.N.Y. June 25, 2007) (Kaplan, J.).  Indeed, neither the "the date and general nature of the legal services performed" by a law firm, nor the "the identity of a client" are privileged, "*even though the fact of having retained counsel may be used as evidence against the client.*"  *Colton v. United States*, 306 F.2d 633, 636-377 (2d Cir. 1962).[10]

- *RT0517563*:  November 9, 2009 email from Steven Din, Rio Tinto's Guinea country manager, addressed to Sam Walsh (Iron Ore CEO) and Tom Albanese (Rio Tinto CEO), GC Debra Valentine also in the "To" line but not participating in the chain, regarding "Simandou – update."  The entire first two pages have been redacted completely (and, in violation of the Protective Order, without any indication of the basis for the redaction).  On the third page is an outline by Din regarding the status of Rio Tinto's rights and obligations with respect to Simandou.  Din, who is not a lawyer, opines on, among other things, the extent to which Rio Tinto has met (or failed to meet) all of its obligations to the Government of Guinea, including in regards to developing geological information and rail and port plans – i.e. the allegedly "confidential and proprietary information about the Simandou Concession that it had spent many years and hundreds of millions of dollars developing"  (Am. Compl. ¶ 4) and that Vale had supposedly stolen earlier that year.  Though perhaps embarrassing to Rio Tinto (and certainly contrary to its allegations)

---

[10] The same goes for bills and time records.  *See, e.g.*, *DiBella v. Hopkins*, 403 F.3d 102, 120 (2d Cir. 2005) (applying N.Y. law) ("attorney time records and billing statements are not privileged when they do not contain detailed accounts of the legal services rendered"); *Renner v. Chase Manhattan Bank*, No. 98 CIV. 926 (CSH), 2001 WL 1356192, at *8 (S.D.N.Y. Nov. 2, 2001) (bills and invoices "are generally discoverable, unless production will necessarily reveal client confidences").  When time records do contain privileged information, the practice is of course to redact the privileged portions only.  Moreover, all of these documents have also been put at issue.

Hon. Andrew J. Peck, p. 7

Din's assessment is not privileged. It is also relevant to, among other things, causation (the reason Rio Tinto lost its concession) and damages. The email also recounts the other non-privileged matters, including the history of the Government of Guinea's revocation of Rio Tinto's rights, the award to BSGR, and Rio Tinto's subsequent entry into a MoU with the Government as part of its strategy to maintain its claim to Blocks 3 and 4 (in preference to attempting to retain Blocks 1 and 2).

- *RT_TAR_0043035*: May 1, 2010 email from Rio Tinto's Andy Munro (Rio Tinto Iron Ore General Manager of Communications & External Relations) to Sam Walsh (CEO of Iron Ore), Phil Edmands (in-house attorney), and Gervase Greene (Media Manager), attaching several documents discussed that day on the phone, including multiple Simandou update documents, an update from the prior day's Executive Committee meeting, and a media Q&A sheet. Edmands discusses the strategic value of legal options versus other avenues for obtaining and/or maintaining rights at Simandou – referencing in particular work related to a possible suit against BSGR and Vale performed prior to the JV announcement on April 30, 2010. Even were it privileged in the first instance (which is questionable given that the attorney is giving strategic rather than legal advice), the communication is put directly at issue by – and is directly inconsistent with – Rio Tinto's allegation that it did not know of a possible claim against BSGR and Vale prior to April 30, 2010.

Vale requests a ruling that none of the three documents above is privileged, and respectfully reserves it rights with respect to the remainder of Rio Tinto's roughly 170 clawbacks.

## ii. *Rio Tinto's Position*

Rio Tinto has now sent two separate clawback letters — the first on August 20 and the second on September 16 — informing all Defendants of the inadvertent production of certain privileged or protected documents, and requesting that counsel promptly return or destroy the produced material in accordance with the requirement of the Stipulated Protective Order (Dkt. No. 81). All the Defendants, except for Vale, have honored Rio Tinto's clawback requests.

Instead of complying with those clawback requests or alternatively, notifying Rio Tinto that it contested Rio Tinto's claim of privilege, Vale lay in wait for the parties' joint letter process, waiting until *today* to inform Rio Tinto that it intended to challenge *all* of Rio Tinto's clawback documents.[11] As a result, Vale and Rio Tinto have not met and conferred over these clawback issues, and Rio Tinto is at a loss as to the basis for Vale's challenge(s) to them. Instead of granting Vale's request, this Court should require Vale to meet and confer as the Protective Order requires. Without the benefits of a meet and confer in which Vale has explained the bases for its challenges, Rio Tinto cannot offer an individualized response to any one document. Nevertheless, to give the Court an overview of the issues, Rio Tinto offers the following general categories into which its clawbacks fall:

---

[11]   Indeed, absent one August 26 email from Vale seeking Rio Tinto's privilege basis for ten claw back documents, Vale has been radio silent on this issue, all the while continuing to maintain and further examine Rio Tinto's inadvertently produced privileged material, in direct contravention of the parties' Protective Order.

Hon. Andrew J. Peck, p. 8

- **Work Product Material dated after the discovery cutoff**.  Rio Tinto learned that four copies of a 36-member family were inadvertently and partially produced, despite that the date of the parent email is well beyond the April 30, 2014 agreed-upon production cut-off deadline.  Moreover, a cursory review of the parent email confirms that these documents should have been withheld on work product grounds.  As Rio Tinto has already confirmed to Vale, to the extent any of the individual non-privileged attachments originally produced as part of these families are not privileged when standing alone, they have already been produced elsewhere in Rio Tinto's production.  Accordingly, Vale has access to these documents in a non-privileged context.

- **TAR Training Documents**.  These documents were produced in the process of training the predictive coding system, and thus were reviewed within the four corners of the document.  It was only upon re-review of the entire family that we were able to confirm that these should have been withheld as privileged.  These documents include such things as strategy regarding legal rights to Simandou, advice regarding timetable commitments, briefing to the Investment Committee, and draft letters to the Guinean government, among others.  Where appropriate, Rio Tinto intends to re-produce certain documents in redacted form.  Notably, when Vale had similar issues with discovering that TAR Training documents were privileged upon review of the entire family, Rio Tinto complied with Vale's clawback request.

- **Other Inadvertently Produced Privileged Documents.**  Unfortunately, a few privileged documents were inadvertently produced by Rio Tinto in the course of reviewing and producing hundreds of thousands of documents.   These documents were partially produced and partially withheld on privilege grounds, or in some cases produced in full, despite reflecting and containing legal advice from attorneys.  Again, where appropriate, Rio Tinto will re-produce the documents in redacted form.[12]

Rio Tinto therefore respectfully requests that the Court deny Vale's challenge and issue clear instructions that, going forward, Vale is required to comply with the challenge procedures as outlined in the parties' Protective Order rather than wasting the Court's time and resources.

### c.  Rio Tinto's Logging Of Investigator Communications

#### i.  *Vale's Position*

***Rio Tinto Has Withheld Communications With Its Investigators, In Violation Of The Court's Order.***  Rio Tinto's Supplemental Privilege Log,[13] dated Sept. 11, 2015, violates the Court's Sept. 10, 2015 order that "Rio Tinto has no privilege with respect to . . . the investigation and resulting reports produced by each respective firm" subject to the UK Sealed Orders,

---

[12]  Notably, this category also includes one document – RT_TAR_0026596 – that Rio Tinto clawed back and later re-produced in accordance with the Court's August 19 Order.  *See* Hr'g Tr. At 18:5–16.  Despite multiple requests from Rio Tinto, Vale continues to refuse to confirm that it has destroyed the document as required by the parties Protective Order.

[13]  Rio Tinto has designated the log itself as "Confidential" under the Protective Order.  Vale will have a copy available for the Court at the conference.

Hon. Andrew J. Peck, p. 9

including as to "communications with Rio Tinto (including its agents) and/or Rio Tinto's counsel regarding the same," and must "produce all communications between Rio Tinto (or its counsel) and each of the firms and witnesses subject to the Sealed Orders that is responsive to Vale's document requests to Rio Tinto (regardless of custodian), without withholding or redacting any such document on the basis of any purported privilege or protection from disclosure." (Dk. 345 at 6.) Despite this clear order, Rio Tinto has purported to withhold communications between it (and its counsel) and the investigative firm Livingstone, which is subject to the Sealed Orders. *See* SUPP1868; SUPP1869; SUPP1876; SUPP1877; SUPP1878; SUPP1879; SUPP1880; SUPP1881; SUPP1882; SUPP1884; SUPP1885; SUPP1886; SUPP1887. Even after Vale brought this to Rio Tinto's attention, it refused to produce the documents (or even respond).

Rio Tinto is not relieved of the obligation to comply with the Court's order simply because it disagrees, has asked for reconsideration, or has asked for a stay. *See generally United States v. United Mine Workers*, 330 U.S. 258, 293-94 (1947) ("an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings"; "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal."). Vale requests an order that the documents be produced forthwith.[14]

In addition, the supplemental log indicates that Rio Tinto has withheld seven emails between Rio Tinto and the investigative firm Aeneas, which, though not the subject of the proceedings in the UK, is also subject to a letter of request ordered by this Court. *See* SUPP1; SUPP2; SUPP3; SUPP6; SUPP804; SUPP980; SUPP1251. There is no substantive distinction with respect to these communications with Aeneas. As set out in Vale's September 10 letter, which the Court endorsed (*see* Dk. 345), Rio Tinto's representations with respect to *all* of its investigators leave no room to claim any privilege from disclosure, since, according to Rio Tinto, the firms were not retained, nor was their investigation directed, by Rio Tinto. Vale requests an order that these documents be produced immediately as well.

***Rio Tinto's Refusal to Individually Log Documents Related to Its Equitable Tolling Claim.*** Rio Tinto recently sought an order from the Court directing Vale to individually log documents relating to certain categories on its categorical privilege log. *See* September 18, 2015 Letter from Eric Lyttle to Judge Peck. What Rio Tinto failed to disclose in that request is that Rio Tinto is itself refusing to individually log documents of central relevance to its claim for equitable tolling, that it was this refusal that lay behind the parties inability to reach an agreement regarding logging of additional categories of documents, and that Rio Tinto shut down the meet-and-confer process rather than seek a reasonable resolution of Vale's request. Rio Tinto should not be rewarded for circumventing the relief meet and confer process (not to mention the joint letter process) by running to the Court for relief, and should be ordered to provide Vale with the additional information Vale had sought in exchange for agreeing to the additional requests that Rio Tinto made, and that this Court has now ordered Vale to provide.

In particular, during the meet and confer process over what documents each side would agree to individually log, Vale sought from Rio Tinto an agreement that it would individually log

---

[14] We note that an award of sanctions for violation of this Court's order would be appropriate.

Hon. Andrew J. Peck, p. 10

all documents that "concerning Rio Tinto's response to the loss (or threatened loss) of Simandou Blocks 1 and 2," from 2008 to the filing of the complaint, including:

> (1) the facts surrounding the loss or threatened loss, (2) whether and/or how to investigate the facts surround[ing] the loss or threatened loss, (3) retention of, or consultation with, counsel in response to the loss or threatened loss (including any instructions given to counsel related to the loss or threatened loss), (4) consideration of whether to investigate and/or bring a claim against any party related to the loss or threatened loss, or whether Rio Tinto had a potential or actual claim against any party related to the loss or threatened loss, and (5) consideration of the timing of any legal action related to the loss or threatened loss.

August 21, 2015 Email from M. Karlan to J. Kaplan.

As discussed above, it has become clear that Rio Tinto made a decision not to pursue potential legal claims arising from the loss of Simandou and not to continue to investigate for strategic reasons and not because of any act of fraudulent concealment. The reasons why Rio Tinto declined to pursue its potential claims is obviously critical to evaluating Rio Tinto's claim of equitable tolling of the statute of limitations period. Rio Tinto's decision to individually log documents relating only to its "investigation" (as it defines it) of potential claims related to Simandou is inadequate, because it would not cover communications that relate to factors other than the investigation that influenced its decision. For example, an email among Rio Tinto executives about how to best respond to the loss of Blocks 1 and 2, including whether it should take a confrontational or conciliatory approach with respect to the Government of Guinea, would presumably not fall within the scope of Rio Tinto's logging agreement if it did not mention "investigations" into potential claims.[15] The context around Rio Tinto's response to the loss of Blocks 1 and 2 is important to understanding its decision not to pursue a claim in 2008 and 2009, and a log limited only to documents related strictly to its "investigation" would miss that context (and conceal what else is withheld).

Rio Tinto summarily refused Vale's request , and stated that it would proceed unilaterally with the logging of communications related only to its "investigations" (as it defined them) because Vale had not yet agreed to Rio Tinto's requests for additional logging, stating that it would raise the issues at the next conference.[16]

Your Honor did not have the benefit of the above facts because Rio Tinto chose not to include them in its September 18 letter, nor simply to wait one business day for this joint letter. Vale will not burden the Court now with the arguments it would have made regarding Rio Tinto's requests (although it believes them to be unreasonably overbroad), had it been given that opportunity, and will meet and confer with Rio Tinto on a reasonable way to provide the

---

[15] Such a communication ought not be considered privileged at all, but based on Rio Tinto's attempts to claw back communications relating to such strategic business considerations, it is clear that Rio Tinto has a broader (and incorrect) view of what constitutes a privileged communication.

[16] Rio Tinto also waited to send its letter until just one day before the joint letter was due (belying any argument that a separate letter was needed due to impending deadlines), and just minutes before a multi-hour meet and confer with Vale on other issues, foreclosing any possibility of an immediate response from Vale.

Hon. Andrew J. Peck, p. 11

additional information Rio Tinto seeks.  However, since Rio Tinto is getting the benefit of its requests on Vale, Vale should likewise get the benefit of the request it made on Rio Tinto, and which Rio Tinto rejected.  Rio Tinto should not be able to limit its individual logging of communications only to those that concern strictly its "investigation," when it has become clear that the merits of Rio Tinto's "investigations" were not the real reason behind its decision to delay pursuing claims related to Blocks 1 and 2.  Accordingly, Vale respectfully requests that Rio Tinto be ordered to undertake the logging Vale had earlier requested, as set out in the block quote above.

> ii.  _Rio Tinto's Position_

Rio Tinto believes the Court's ruling this morning mooted this matter as it currently stands before Your Honor.  _See_  No. 362.  In compliance with that Order, Rio Tinto will bring copies of the documents to the conference for judicial review.

***Vale's Request Regarding Rio Tinto's Privilege Log***.  In addition to Rio Tinto's categorical privilege log (which is being revised and will be served on September 28), Rio Tinto's supplemental privilege log, delivered to Vale on September 11, contained almost _2,000_ individually-described document families.  Vale now wants even more, well beyond what they initially requested and what Rio Tinto agreed to do and has in fact already done.

By way of background, on August 13, Vale lodged various objections regarding Rio Tinto's privilege log, complaining about 2,500 withheld documents that "explicitly reference Rio Tinto's alleged investigation."  The parties held a meet and confer the following week, and Rio Tinto agreed to individually log the documents identified on the initial privilege log as having to do with Rio Tinto's investigation.

Vale's new demand, after Rio Tinto agreed to do (and did) what Vale originally asked, would eviscerate any benefit or efficiency obtained through providing categorical privilege logs. Moreover, Rio Tinto already has provided much of what Vale is seeking via its supplemental log.  In short, Vale's protests to the Court about Rio Tinto's privilege log are manufactured and premature.  Rio Tinto respectfully submits that upon receipt of the final privilege logs on September 28 (and once Rio Tinto is reassured that Vale will in fact provide additional detail in accordance with the Court's Order embodied in Docket Number 355), Rio Tinto is – as it always has been – willing to meet and confer about reasonable, proportional and mutual requests for additional granularity in the final privilege logs.

### d.  Rio Tinto's Logging Of Communications With Other Third Parties

#### i.  *Vale's Position*

**Rio Tinto Has Improperly Withheld Its Communications With Non-Lawyer Third Parties.**  In addition to those improperly withheld documents the Court already addressed via its September 10 order, Rio Tinto has withheld and logged additional communications with third parties that are not privileged.

The log indicates that Rio Tinto has withheld at least 17 communications with non-lawyer third parties in which it apparently disclosed to those third parties, in 2010, its intention to sue Vale and/or BSGR.  *See* SUPP416; SUPP488; SUPP491; SUPP 493; SUPP550; SUPP551; SUPP552; SUPP558; SUPP619; SUPP620; SUPP622; SUPP632; SUPP1500; SUPP1502; SUPP1505; SUPP1648; SUPP1789.  Each of these communications was shared with Georges Landau, a political and public relations advisor and former professor of economics – who is neither an attorney nor a Rio Tinto employee.  Four of these documents (SUPP550, SUPP551, SUPP552, and SUPP558) were also shared with Marco Antonio Fujihara, a sustainability consultant – who is also neither an attorney nor a Rio Tinto employee.

On the face of the log, these communications are not privileged.  Vale asked that Rio Tinto either produce the documents or substantiate the factual basis for the claim of privilege by providing, among other things, copies of any engagement and/or confidentiality agreements with Messrs. Landau and Fujihara, and stating the functions those individuals performed with respect to the purported request or provision of legal advice.   Vale made that request on September 18.

On September 21, only a few hours before this letter was filed, Rio Tinto responded that one of the third parties, Mr. Landau, "was considered by Rio Tinto's outside counsel, Amsterdam & Peroff, as a consultant for a *possible government relations strategy*," and that "Messrs. Fujihara and Landau were later engaged by Rio Tinto's outside counsel, Weil Gotshal, to advise and educate them on *operations, business practices, and industry standards for mining companies in Brazil*."  (Sept. 21, 2015 Email from J. Kaplan to M. Karlan.)  A few hours later, it produced a "consulting agreement" with each of the third parties.  Each was retained as an independent contractor in October 2010 as a consultant regarding mining operations in Brazil.  Neither engagement makes any mention of privilege or work product production, nor any legal purpose to the engagement whatsoever.  In other words, there is no support for the notion that either non-lawyer third party was retained for the purpose of assisting with the provision of legal advice, and thus no basis for Rio Tinto to argue any exception to third party waiver.  *See, e.g.*, *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2014 WL 7238354, at *4 (S.D.N.Y. Dec. 19, 2014) (third-party marketing firm broke privilege because firm did not serve interpretive function necessary to providing legal advice and was not a functional employee).  To the contrary, each was apparently retained to do precisely what they normally do, which the non-legal task of providing consulting services related to operations in Brazil and assisting with PR.  As courts have recognized, while "[i]t may be that the modern client comes to court as prepared to massage the media as to persuade the judge," that fact does not mean that "the clients' communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status.  *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).  Rio Tinto's outside counsel is undoubtedly familiar with these

Hon. Andrew J. Peck, p. 13

legal standards, and knows how to draft an engagement letter for the retention of services necessary for providing legal advice – when that is the case. Tellingly, the letters here do not retain the consultants for the purpose of rending legal advice.

Moreover, eight of the logged documents (SUPP488; SUPP1505; SUPP1648; SUPP416; SUPP491; SUPP1502; SUPP493; SUPP1500) occurred in July and August 2010, *before* either non-lawyer third party was engaged in October 2010, and thus on their face they are not privileged. *See Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 513 (S.D.N.Y. 2003) (even as to attorneys, pre-engagement communications between an attorney and future client are not privileged absent indicia the party "intended to retain [the lawyer] in a legal capacity at the time the communications were made").

Rio Tinto's last minute production of conclusory statements and form contracts does not satisfy the requirement of supplying facts necessary to support the claim of privilege. It has therefore waived the claim of privilege.[17] *See S.E.C. v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 157 (S.D.N.Y. 2014).

In the alternative, Vale requests a ruling that they are in any case not privileged, either on the basis of the limited information provided in the log or else on the basis of the Court's in camera review.

>            ii.   *Rio Tinto's Position*

Vale asserts that Rio Tinto has improperly logged communications with other third parties. This issue, which relates to very few documents, can be best summarized as follows:

- **Communications with Messrs. Landau and Fujihara**, **Consulting Experts Retained by Outside Counsel in Connection with a Potential Legal Action Against Vale, BSGR and Steinmetz** - Vale is challenging the privilege designations of documents[18] with Messrs. Landau and Fujihara, consulting experts retained by Rio Tinto's outside counsel, Weil Gotshal, to advise and educate them on operations, business practices, and industry standards for mining companies in Brazil in connection with rendering legal advice to Rio Tinto regarding a potential legal action against Vale, BSGR, and Steinmetz.[19] Rio Tinto already has produced the relevant engagement letters to Vale that demonstrate their retention as consulting experts. Mr. Landau is a Brazilian lawyer who specializes in government relations for foreign companies operating in Brazil,

---

[17] Based on Rio Tinto's past practice, Vale suspects that Rio Tinto will attempt to offer some substantiation after the parties exchange their submissions to this letter. If it does not do so, the court should order immediate production of the documents. If it does do so, Vale would request an opportunity – if it deems necessary – to review the substantiation.

[18] *See* SUPP416; SUPP488; SUPP 491; SUPP 493; SUPP550; SUPP551; SUPP552; SUPP558; SUPP619; SUPP620; SUPP622; SUPP632; SUPP1500; SUPP1502; SUPP1505; SUPP1648; and SUPP1789.

[19] Mr. Landau also was considered by Rio Tinto's outside counsel, Amsterdam & Peroff, as a consultant for a possible government relations strategy that was being considered as part of the legal strategy in response to the loss of Simandou. These communications are privileged too. *Vacco v. Harrah's Operating Co.*, Case No. 107-0663, 2008 WL 4793719, at *7-8 (N.D.N.Y. Oct. 29, 2008) (communications between lobbyist firm and defendant and its counsel privileged because the communications were "predominately legal").

Hon. Andrew J. Peck, p. 14

particularly in the energy sectors, including mining.  Mr. Fujihara is a natural resources advisor, with particular expertise in the energy and mining sectors.  These consulting experts were necessary because Rio Tinto's outside counsel were unschooled in the ways of Brazilian mining companies specifically and the mining industry generally.  Pursuant to Rule 26(b)(4)(D), the information contained in the documents is not discoverable.  *See William A. Gross Const., Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354, 361 (S.D.N.Y. 2009) (J. Peck) (recognizing that under Fed.R.Civ.P. 26(b)(4)(D) work product protection extends to "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.").

In addition to the protections afforded by Rule 26(b)(4)(D), this information is not discoverable under the attorney-client privilege and work product protections.  *See Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 437 (S.D.N.Y. 2013) (attorney work product protects confidential communications in anticipation of litigation with third party consultants); *see also Gucci Am., Inc. v. Guess?, Inc.*, 71 F.R.D. 58, 71 (S.D.N.Y. 2010) (extending attorney-client privileged under *Kovel* "to include individuals who assist attorneys in providing legal services, such as 'secretaries and law clerks,' 'investigators, interviewers, technical experts, accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences'") (internal citations omitted).

- **Outside counsel's communications with Livingstone, a UK investigator, concerning Rio Tinto's evaluation of a possible lawsuit against Vale and its coconspirators**[20] – The issues with the UK investigators, including Livingstone, have been extensively briefed.  We will not burden the Court with further argument here.  Pursuant to Your Honor's most recent Order in Dkt. No. 362, Rio Tinto will bring copies of the documents to the conference for judicial review.

- **Outside counsel's communications with Aeneas, a non-UK investigator, concerning Rio Tinto's evaluation of a possible lawsuit against Vale and its coconspirators** – Vale similarly complains about four logged documents that involve correspondence between Rio Tinto's lawyers at Weil Gotshal & Manges and investigation firm Aenas.[21] Vale's challenge to these documents is nothing more than an attempt to rehash issues addressed by this Court months ago.  As Rio Tinto already advised the Court and Vale in July, *see* Dkt. No. 304 at p. 6, as part of its investigation into possible litigation and legal claims, Rio Tinto's outside counsel, Weil Gotshal, consulted with Aeneas on factual questions tailored to a potential lawsuit.  Those consultations – which are the very documents Vale is challenging – were critical and necessary to the advice being rendered by Rio Tinto's outside counsel at that time.  Indeed, each of the documents that Vale is challenging involve communications by, among, and between Weil Gotshal attorneys and Aeneas, making it abundantly clear that each communication is appropriately withheld as both attorney-client communications and attorney work product.

---

[20]  *See* SUPP1868; SUPP1869; SUPP1876; SUPP1877; SUPP1878; SUPP1879; SUPP1880; SUPP1881; SUPP1882; SUPP1884; SUPP1885; SUPP1886; SUPP1887.

[21]  *See* SUPP1; SUPP2; SUPP3; SUPP6.

Hon. Andrew J. Peck, p. 15

- **Communications with Tidian Toure, when he was a Rio Tinto security employee, not a third party** - Vale also complains about communications with Tidiane Toure from when he was an employee at Rio Tinto with a Rio Tinto email address (before he left the company to work for Aenas).[22] Mr. Toure was not, therefore, a "third party" at the time these communications occurred, but rather a Rio Tinto employee copied on privileged communications by and between Rio Tinto's attorneys in connection with rendering legal advice. These emails are clearly privileged. Despite being aware of this for one week, Vale has yet to withdraw its demand that Rio Tinto immediately produce these privileged documents.

  ### e. <u>Rio Tinto's Confidentiality Designations</u>

  ### i. *Vale's Position*

***Rio Tinto Has Improperly Designated Documents As Confidential.*** Rio Tinto has refused to remove confidentiality designations from approximately fifty documents, identified by Vale in a letter dated September 11, 2015 that are improperly designated as either "Confidential" or "Highly Confidential – Attorneys' Eyes Only." According to Section IV.2 of the Protective Order (Dkt. 81), the parties "must take care to limit any such designation to specific material that qualifies under the appropriate standards." However, the documents identified by Vale do not include information that qualifies as "trade secret or other confidential research, development, or commercial information" (*id.* § I.2) or as "extremely sensitive 'CONFIDENTIAL' information disclosure of which to another Party or Non-Party would create a substantial risk of serious harm" (*id.* § I.9). To the contrary, Rio Tinto has applied these confidentiality designations to prevent the disclosure of information that is neither confidential nor commercially valuable. It has marked as Confidential or Highly Confidential documents in the following categories, among others:

- *Contemplation of a Claim:* Rio Tinto has designated as confidential documents that relate to its consideration of a potential claim with respect to its loss of Simandou.[23] The documents are of obvious relevance to, among other things, Rio Tinto's equitable tolling/fraudulent concealment claim. They have been, and will be, the subject of considerable argument and submissions to the Court, and, as evidenced by Vale's hand-delivered supplemental submission today, Rio Tinto's improper designation of these documents impedes Vale's ability to make those arguments. Aside from the documents' relevance, the confidentiality designations are clearly unnecessary. Indeed, this lawsuit was filed more than a year ago. There is nothing confidential or commercially sensitive about the fact that Rio Tinto considered a claim (now filed) or that it did so as early as 2009 – as has now been discussed on the record, including at the last conference. *See* August 19, 2015 Tr. 15:5-11 ("[B]ack in 2009 . . . Rio Tinto was aware of the injury, and

---

[22]   *See* SUPP804; SUPP980; SUPP1251.

[23]   E.g. RT0431088; RT0320067; RT0144259; RT0318433; RT_TAR_0033520; RT0752714; RT_TAR_0032649; RT0516198; RT_TAR_0034384; RT0414020; RT0652288; RT0599036; RT0511819; RT0511818; RT_TAR_0043035; RT0613278; RT0433480; RT0429725; RT0728323; RT0944168; RT0726508; RT0704661; RT0704671; RT0601011; RT0419253; RT0468298; RT0602411.

. . . they were suing for something or intended to sue for something, instructed to sue for something."). Nor is it any secret that Rio Tinto ultimately decided not to sue until April 2014. These facts are not trade secrets.[24] The mere fact that Rio Tinto investigated a possible claim is not confidential and any facts uncovered in that investigation are presumably the facts eventually alleged in the public Complaint and Amended Complaint (albeit in considerable distorted, if not fictional form as regards Vale). The documents do not contain trade secrets or confidential research, as required by the Protective Order, and therefore should not have been designated "Protected Material."

- *Relationship with the Government of Guinea:*  Rio Tinto has also designated as confidential documents dated June 2008 through March 2011 related to its relationship with the Government of Guinea.[25]  Among other things, these documents track Rio Tinto's internal assessment of the company's status in Guinea, including for example the degree to which it had not satisfied its obligations to the Government of Guinea (or did not intend to do so) with respect to the pace of its development of Simandou, and are relevant to the reasons Rio Tinto lost half of its concession in December 2008 and why it entered into the Settlement Agreement with the Government of Guinea in April 2011 (which agreement Rio Tinto has belatedly put forward as its new, un-pleaded theory of damages and RICO injury).  Again, these documents should not have been designated as "Protected Material" because the information is neither confidential or commercially sensitive.  The April 2011 Settlement Agreement is now public record (*see* Dk. 210-1).  It recounts the history of the Rio Tinto-Guinean relationship, the disputes that arose, and the agreements reached with respect to those disputes.  Those topics are not confidential.

- *Chinalco Joint Venture:*  Rio Tinto has designated as confidential documents dated 2008 to 2010 related to its joint venture with Chinalco, including how the joint venture affected relations with the Government of Guinea.[26]  Once again, the details of this joint venture are hardly secret, having been widely reported in the press at the time, and are now public.  It is public knowledge, for example, that in March 2010 (before Vale's joint venture with BSGR), Rio Tinto announced a MoU for a contemplated Simandou JV with Chinalco, in which Chinalco would pay $1.35 billion for 44.65% of the project[27]; that the Government of Guinea initially deemed the Chinalco JV invalid[28]; that on July 29, 2010 Rio Tinto nonetheless announced a binding agreement for the Chinalco JV[29]; that the

---

[24] For the avoidance of doubt, Vale is not seeking to reveal any source names included in these documents.  Those names are, in any case, redacted and those redactions would not be affected by a change in designation.

[25] E.g. RT0605184; RT0483495; RT0143086; RT0143051; RT0602889; RT0595537; RT0452529; RT0652966; RT0614547; RT0731432; RT0697251; RT0731725; RT0942833; RT0731444; RT0841782; RT0942959.

[26] E.g. RT0480095; RT0144095; RT0415067; RT0547155.

[27] Rio Tinto March 19, 2010 Press Release, *available at* http://www.riotinto.com/media/media-releases-237_1455.aspx.

[28] John Helmer, *Chinalco, Rio Tinto and Russal are Fighting Over Mining Rights and Power in Guinea*, Business Insider, July 29, 2010.

[29] Rio Tinto July 29, 2010 Press Release, *available at* http://www.riotinto.com/media/media-releases-237_1397.aspx.

Hon. Andrew J. Peck, p. 17

Government continued to oppose the Chinalco venture as of September 2010[30]; that on April 22, 2011, Rio Tinto and the Government entered into a Settlement Agreement resolving disputes as to the Chinalco joint venture in exchange for Rio Tinto's payment of $700 million[31]; and that on April 25, 2012, Rio Tinto and Chinalco announced that they had completed the formation of their JV, following the completion of all Chinese regulatory approvals.[32]  None of this is confidential, nor is it of commercial significance following completion of the Settlement and the JV.

Vale will have the documents available for Your Honor's inspection at the conference and respectfully requests a ruling that they are not confidential.

### ii.  *Rio Tinto's Position*

Vale has not articulated and cannot justify a compelling reason why Rio Tinto should be required to drop all confidentiality designations over approximately 50 documents, all of which reflect and contain information appropriately designated as Confidential or Attorneys' Eyes Only ("AEO") pursuant to the parties' Protective Order (Dkt No. 81).  While Rio Tinto was and remains willing to re-designate certain AEO documents as Confidential, Vale's request for a wholesale and complete de-designation of all the challenged documents (including those already designated as Confidential) is improper and unnecessary.  Vale rejected Rio Tinto's suggested targeted approach, and instead insisted on bringing this issue to the Court.

As an initial matter, Vale's request must be viewed in light of the light of the fact that absent two discrete categories of documents – publicly available documents and Vale's third party communications with Rio Tinto's investigators in this case – Vale itself has attached a confidential or AEO designations to *all* of the documents it has produced to date.  Those include similar categories of information that Vale is asking Rio Tinto to de-designate, including documents evidencing Vale's knowledge of BSGR and Steinmetz's illicit activities in 2008, communications and discussions between Vale and BSGR well before any "official" joint venture negotiations, and other key materials.

Putting aside Vale's double standard, Vale's request boils down to a claim that the challenged documents are now old and contain stale information not worthy of protection.  Not so.  Rio Tinto still has active commercial operations at Simandou, and Simandou is the subject of *current and ongoing* litigation here, governmental investigations both in the United States and elsewhere, and even the defendants' Simandou-related arbitrations abroad.  Thus, the content of these documents – ranging from Rio Tinto's consideration of various strategic responses and contemplated legal action in connection with Simandou to anticipated Simandou joint venture partners, including its current partner Chinalco – implicate contemporaneous and ongoing commercial and legal concerns.

---

[30] John Helmer, *Guinea leader rebukes 'tardy' Rio Tinto*, Business Day (South Africa), Sept. 16, 2010.

[31] Settlement Agreement between Republic of Guinea and Rio Tinto, Exhibit A to Dkt. No. 210, Lyttle Declaration in Support of Rio Tinto's Opposition to Defendants' Motion to Dismiss the Amended Complaint.

[32] Rio Tinto April 25, 2012 Press Release, *available at* http://www.riotinto.com/media/media-releases-237_6237.aspx.

Hon. Andrew J. Peck, p. 18

While Rio Tinto potentially faces significant harm should the Court grant Vale's request, Vale faces none. The Court's Protective Order has sufficient processes in place that will permit Vale to use these documents as appropriate in this litigation, including at depositions and filings before the Court. Acquiescing to Vale's request for de-designation would serve no purpose other than to allow Vale's counsel to share confidential, commercially-sensitive business information with unknown entities and parties outside this litigation.

Rio Tinto therefore respectfully requests that the Court deny Vale's request to de-designate the following documents (we have grouped these to attempt the lessen the burden on the Court):

- **Communications with and regarding Chinalco, Rio Tinto's *current* Simandou Joint Venture partner.** This includes documents related to Rio Tinto's strategic communications and internal analysis related to its potential joint venture partners, including Rio Tinto's current partner at Simandou, Chinalco. Rio Tinto's communications with and about its *current* joint venture partner are undoubtedly entitled to protection as they constitue business and commercially sensitive information related to the evaluation and execution of the joint venture, including such sensitive information as profits and losses, pricing structures, future strategies, revenue earned, costs of production, client lists, rates charged by contractors or other information relevant to licensing applications, etc. How and why Rio Tinto chose to partner with Chincalo remains commercially sensitive today.

- **Potential Legal Claims Against BSGR.** These are not documents just discussing the fact that Rio Tinto was considering a non-RICO suit against BSGR. They discuss Rio Tinto's contemplated legal strategy in response to its purported loss of blocks 1 and 2 to BSGR, strategic discussions (informed by counsel) regarding communications and public relations strategies surrounding potential claims against BSGR; and commercially sensitive internal strategies regarding how to manage the company's relationship with BSGR and others. Indeed some of these documents include presentations to Rio Tinto's Executive Committee, comprised of personnel operating at - the highest levels within Rio Tinto. So while it is true that Rio Tinto has disclosed its contemplation of a potential legal action against Defendants BSGR and Steinmetz, Rio Tinto's decision as to whether, how and why such action should or should not be taken, and what other strategic responses could be taken in lieu of such action, remain highly sensitive to this day. Indeed, given the ongoing disputes with BSGR, this remains commercially sensitive today.

- **Rio Tinto's Response to Attempts to Rescind its Rights at Simandou.** This includes documents related to Rio Tinto's strategic response to the Guinean government's stripping of its mining rights, including public relations and communications decisions, and further development plans. These documents and communications are sensitive because they reflect Rio Tinto's business relationship with the Guinean Government (a relationship that continues *to this day*), and Rio Tinto's sensitive internal decisions with regard to how to respond to the rescission attempts, including discussions of financial

Hon. Andrew J. Peck, p. 19

impacts and assessments of the government's attempted retrocession, contain sensitive and confidential business and commercial information, the public disclosure of which could harm and undermine Rio Tinto's current relations and work at Simandou. Rio Tinto's response to the attempts to rescind its rights continues to this day, as evidenced, in part, by this very lawsuit.

- **Rio Tinto's Settlement with the Guinean Government.** This includes documents related to Rio Tinto's strategy with regard to the settlement agreement with the Guinean government, including the scope of that settlement and the Guinean Government's negotiations with Rio Tinto regarding the same. Again, Rio Tinto's business relationship with the Guinean Government (which continues *to this day*), as well as internal discussions regarding its approach to the settlement negotiations, are clearly sensitive. Such documents also may reflect commercially sensitive information such as anticipated profits and losses, and operating and financial information – all of commercial interest even to this day.

### f. Rio Tinto's Collection Of Documents From Its Foreign Law Firms

#### i. *Vale's Position*

As the Court is aware, it was not until Rio Tinto's fourth amended interrogatory responses were served on August, 24, 2015 – nearly a year after Vale served its interrogatories, and four days before the scheduled document production deadline – that Rio Tinto let slip the identities of law firms it hired in 2009 to bring a claim against BSGR for encroaching on its Simandou territory.[33] Upon finally receiving that information, Vale promptly made applications to this Court for Letters of Request to preserve its rights and to minimize the prejudice it suffered from Rio Tinto's delay. Vale made its application on August 31[34] and the Court issued the Letters of Request on September 9, with the caveat that they sought the requested documents "unless such documents are privileged." (*E.g.* Dk. 342.)

Upon learning the firms' identities, Vale also requested that Rio Tinto produce all materials with respect to those firms called for by Vale's document requests. *See* Dec. 9, 2014 Tr. 20:22-3 ("THE COURT: . . . Produce the nonprivileged documents on this issue. Produce the factual information from any privileged document that is relevant to the investigation and diligence issue, and log everything else. At that point I will determine further whether there indeed has been a waiver or not."); June 1, 2015 Tr. 47:14-15 ("Produce whatever you have that you haven't produced with respect to the investigators."). Rio Tinto's response (on the last day for document production) was to say that Rio Tinto had produced "a number" of documents

---

[33] Rio Tinto's Fourth Amended Interrogatory Responses identify four law firms as having knowledge of "Rio Tinto's investigation into potential claims against Defendants BSGR, Steinmetz, and/or the Government of Guinea between December 2008 and the filing of the complaint: 1. Amsterdam & Partners LLP (Bob Amsterdam, Dean Peroff) 2. Balter, Guth, Aloni & Co (Moshe Balter, Inbal Elkayam, Sue Kiali, Meir Rosenne, Raanan Bar Zohar) 3. Herbert Smith (Stephane Brabant, Emmanuelle Cabrol, James Clark, Laurence Eranc-Menget, Bruno Gay, and former Herbert Smith attorney Charles Kaplan) 4. Mourant Ozannes (Robert Shepherd)."

[34] Vale's application was delayed by Rio Tinto's refusal to provide its engagement letters with the firms – as Vale had agreed to do at Rio Tinto's request with respect to Ernst & Young – which Vale requested the day the firms were identified.

Hon. Andrew J. Peck, p. 20

concerning the law firms and had logged "even more," and "will otherwise be producing any remaining responsive documents today [August 28] subject to our ongoing privilege quality control process."  (Aug. 28, 2015 Email from K. Forst to M. Karlan.)  After the deadline had passed, Vale asked for confirmation that Rio Tinto has now produced all documents in its possession, custody, or control (not limited to the Rio Tinto custodians agreed to months before Rio Tinto's belated revelation) concerning these law firms (and its investigators) and "Rio Tinto's investigation into potential claims against Defendants BSGR, Steinmetz, and/or the Government of Guinea between December 2008 and the filing of the complaint" (as stated in the interrogatory response).  Vale also sought confirmation that, pending the Court's decision on Vale's pending at-issue waiver motion, Rio Tinto is retaining and preserving any documents within its possession, custody or control (again, irrespective of custodian or source) that concern these law firms (and its investigators if any) and their work for Rio Tinto related to Simandou that Rio Tinto claims are privileged.  Rio Tinto never responded to those requests.

After the Court issued its Letters of Request, Vale reiterated its request that Rio Tinto instead collect now all documents from the law firms concerning their work for Rio Tinto related to Simandou, asking that it produce counsel's documents now and log any it believes are privileged absent a waiver, without requiring the parties go through the lengthy, costly and unnecessary process of proceeding under the Hague Convention for documents as to which Rio Tinto had custody or control.[35]   Rio Tinto's response was that only "as a matter of courtesy" it would ask the firms to provide it with documents that Rio Tinto considered non-privileged.  It refused to recognize its obligation to produce the requested documents and declined entirely to log (in any form whatsoever) the documents over which it claimed privilege.

Obviously this does not satisfy Vale's request or serve the ends of judicial (or even party) economy.  Vale cannot forego the Hague process on the promise that Rio Tinto will "as a matter of courtesy" but not as a matter of right produce any documents it wants to produce without indicating what it is withholding and the reasons why.  And, there is no question as a matter of basic legal ethics and the rules of professional responsibility that the lawyers hired by Rio Tinto have the obligation to turn over to Rio Tinto the client file and all correspondence with the client (Rio Tinto) if Rio Tinto so requests.  Nor is there question that these documents fall squarely within the document request.  Accordingly, Vale requests an order that Rio Tinto produce by October 1, 2015 all documents held by its counsel concerning their work related to Simandou save those as to which it claims a privilege and that it serve a privilege log with respect to the remainder.  It is only after Rio Tinto has produced any documents and a log has been served that Vale and Rio Tinto will be able to meet and confer regarding whether any privilege exists and as to which documents and the parties will be able to determine whether to go forward with the Hague process to obtain the relevant testimony.  Any other process guarantees delay, waste, and repeat examinations.  Notably, Rio Tinto has never offered any reason why it has rejected Vale's request (and any reason it offers only in this letter should be considered belated and rejected for that reason alone).

---

[35] Vale also offered to work with Rio Tinto on a reasonable and non-burdensome format for logging those documents from the firms that it considered privileged.

Hon. Andrew J. Peck, p. 21

### ii.   *Rio Tinto's Position*

Vale does not identify any valid basis for this Court to revisit its decision to prevent Vale from obtaining privileged communications from Rio Tinto's foreign law firms.  Late last month, Vale moved this Court to issue Letters of Request to three foreign law firms that previously represented Rio Tinto concerning a host of legal issues.  *See* Dkt. Nos. 333-35.  In so moving, Vale argued that it should be entitled to a production of documents from these firms without regard to privilege concerns or protections.  Specifically, Vale noted that its "Letters of Request also seek communications between the law firms and Rio Tinto" and argued in support thereof that "any privilege as to such material has been waived."  Dkt. No. 335.  This Court correctly rejected that argument, appropriately narrowing Vale's Letters of Request to encompass non-privileged documents only.  *See* Dkt. Nos. 342-44.  But Vale refuses to accept "No" for an answer.

Rio Tinto has voluntarily agreed to reach out to each of these foreign law firms to collect and produce non-privileged documents regarding Simandou as a way to cut through the Hague process.  On September 17, 2015, however, Vale sent Rio Tinto an email asking it to collect the privileged documents that this Court said it could not have.  Vale's purported justification for having Rio Tinto collect these privileged documents is that it "will save both sides the time and expense of proceeding through the Hague upon a ruling [in its favor] on at-issue waiver."  Sept. 17, 2015 E-mail from M. Karlan to K. Forst.  But Vale's argument is predicated on an incorrect assumption—specifically, Vale incorrectly assumes that US law governs whether foreign law firms need to turn over their privileged communications with foreign clients.  Nor is it correct for Vale to assume that the claim of privilege over these documents is held by Rio Tinto, and Rio Tinto alone.  That, too, likely varies pursuant to the law of each foreign jurisdiction.  By no means do we purport to be experts on these issues as they are weighed and adjudicated by foreign courts, and that is exactly why Rio Tinto cannot agree to do exactly as Vale has asked.

### g.   **BSGR's Challenge To Rio Tinto's Designation Of Its Investigative Reports As AEO**

### iii.   *BSGR's Position*

During the course of its preparation for the witness examinations of Tara O'Connor (Africa Risk Consulting), John Humphrey (BTG Intelligence), Mark Huband (Livingstone and Company), and Nigel Brown and Alec Leighton (formerly of BTG Intelligence), BSGR's counsel has determined that it will need the assistance of its clients in order to fully and properly prepare to cross-examine these witnesses.  Since the subject matter of the examinations is entirely centered on the investigative reports produced by Africa Risk Consulting, BTG Intelligence, and Livingstone and Company, any such assistance will be futile unless BSGR can review those reports with its counsel.  Currently, all of the relevant investigative reports produced by Rio are designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY".  Rio argued for that designation because it believed the security of its investigators' confidential sources would be at risk if their identities were revealed.  *See* Mar. 17, 2015 Hr'g Tr. at 14:19-25.  However, as we have come to learn, the investigative reports do not contain the names of confidential informants, thus, any sensitive information that "would create a substantial risk of

Hon. Andrew J. Peck, p. 22

serious harm," as described in the Protective Order, is moot.  *See* Dkt. No. 81 at ¶9.  To the extent that Rio Tinto continues to argue that there is a substantial risk of serious harm, a "less restrictive" solution would be to redact the information that would create such a risk, and produce the reports with redactions.  *See id.*  Of course, Rio redacted all such information from the investigative reports when it initially produced them, so there should be no additional effort required for it to re-produce the reports in that form if the Court so-orders it.  Accordingly, BSGR respectfully requests that the Court order that the investigative reports identified on Ex. A hereto be de-designated from "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to "CONFIDENTIAL" so that BSGR's personnel can review them and assist its counsel in preparation for the upcoming witness examinations in London.

Counsel for BSGR and Rio have discussed the issue of de-designation.  Rio has requested that BSGR provide a list of the at-issue reports so that it can evaluate BSGR's request.  BSGR has provided Rio with the list attached here (Ex. A) and awaits its response.

### iv.  *Rio Tinto's Position*

BSGR's request for the de-designation of Rio Tinto's investigator reports should be denied.  The parties' ESI Protocol is clear:  where a party wishes to challenge the producing party's confidentiality designation, they are required to provide "written notice of each designation it is challenging and describ[e] with particularity the basis for the challenge."  Dkt No. 81 at 10.  BSGR is then required to meet and confer with Rio Tinto in good faith "to attempt to resolve each challenge," at which time BSGR "must explain the basis for its belief that the confidentiality designation was not proper" and give Rio Tinto "an opportunity to review the designated material, to reconsider the circumstances…and explain the basis for the chosen designation."  *Id*.  Only then is BSGR entitled to raise its challenge with the Court.

BSGR has done none of this.  Instead of following the agreed-upon process, BSGR has notified Rio Tinto for the first time *today* that it intends to challenge the investigator report designations.  BSGR's challenge is not ripe, and Rio Tinto respectfully requests that the Court order BSGR to abide by the meet and confer process that it agreed to in the first instance.

Moreover, BSGR cannot possibly claim that it is entitled to challenge these documents outside those processes merely because of the upcoming investigator depositions in London.  Rio Tinto produced its investigator reports *over six months ago* and the orders for the depositions related to those reports were entered by both this Court and the English Master *over four months ago*.  BSGR has had plenty of time to raise its challenges to the designation of Rio Tinto's investigator reports but opted not to do so, presumably because it has steadfastly refused to participate in U.S. discovery in this case (and confirmed that position as recently as last night).  A party that refuses to participate in the discovery process here should not be heard to speak on the document confidentiality designations of those who are participating, and certainly should not be rewarded in its tardy attempts to raise those challenges by being permitted to circumvent the parties agreed-upon processes as ordered by the Court.

In any event, Rio Tinto understands that BSGR's sole basis for challenging the AEO designation is that counsel for BSGR "wants to share the reports with [their] client to prepare for the upcoming depositions."  This is nonsense.  The upcoming UK depositions are subject to strict

Hon. Andrew J. Peck, p. 23

limitations on scope, specifically the scope and timing of their engagements, who they interviewed, what documents they reviewed, and their findings and conclusions.  There is nothing in that narrow and defined scope about what the investigators did that requires input from Mr. Steinmetz or BSGR's other non lawyers.  The reports themselves are appropriately designated as AEO because they contain "extremely sensitive confidential information disclosure of which to another Party…would create a substantial risk of serious harm."  *Id.* at 5.  That information includes but is not limited to business intelligence information on various parties in this action, source identifying information, and other highly sensitive information related to the Defendants' actions at Simandou.  Notably, the investigators also consider the information reflected in these reports extremely sensitive and have gone to great lengths in the UK to protect that information from disclosure (including securing an order from the English court confirming their right to redact source-related information).  BSGR's counsel has the reports – and has had them for some time – and should be able to adequately prepare for the upcoming depositions without requiring the Court to create a "substantial risk of serious harm" to these investigators by ordering their de-designation here.

## II.     Discovery from Defendant Vale

### a.     Vale's Production Of "Trojan Horse" Documents

#### i.    *Rio Tinto's Position*

Vale has failed to comply with Your Honor's July 28, 2015 order that it promptly search for and produce all responsive, non-privileged documents containing the term "Trojan Horse" – a code name used by Vale to describe the BSGR-Vale joint venture.  *See* July 28, 2015 Hr'g. Trans. 16:1–18:17.  To date, despite acknowledging the existence of 913 documents hitting on the term "Trojan Horse," Vale is refusing to produce 417 of those documents.

At the July 28, 2015 hearing, Your Honor expressly ordered Vale to "[r]un a key word search" for the term "Trojan Horse" in both Vale's document universe and the documents excluded from Vale's document universe.  *Id.*  Your Honor further ordered Vale to produce "anything [it found] with Trojan Horse," (except for clearly irrelevant documents such as "somebody is also talking about their Greek mythology days") unless Vale can demonstrate that there is a "huge number" of documents (for example, "a million documents").  *Id.*  To be clear, Vale has not demonstrated that there were a "huge number" of documents that hit on "Trojan Horse"; to the contrary, Vale identified only 913 documents.  Yet, of these 913 documents, Vale has only produced 285 documents and withheld another 211 more for privilege.  That leaves 417 remaining documents that Vale has not yet produced.

Vale refuses to produce documents that (i) use "Trojan Horse" in a metaphorical sense; (ii) refer to the Simandou project *after* the close of the Vale-BSGR joint venture in April 2010; and (iii)  refer to the Simandou project generally.  But any use of "Trojan Horse" in these contexts, at any point in time, would fit directly with Rio Tinto's allegations in the Amended Complaint, which detail a classic "Trojan Horse story":  Vale purported to negotiate in good faith with Rio Tinto while in actuality using those negotiations to gain access to Rio Tinto's confidential information and in furtherance of the RICO conspiracy.  This is especially true where the Amended Complaint alleges a separate RICO injury in 2011 to steal Rio Tinto's rights

Hon. Andrew J. Peck, p. 24

to Simandou – a year after the joint venture transaction closed – and a conspiracy that continued and concealed itself up through at least the Cilins arrest in 2013.  Arbitrary date cut-offs are neither consistent with the Amended Complaint or the Court's order to produce "anything [it found] with Trojan Horse," except for clearly irrelevant documents.[36]  Rio Tinto also notes that nowhere in Vale's privilege log is there a reference to "Trojan Horse."  Rio Tinto is therefore unable to confirm which of the 211 "Trojan Horse" documents Vale is actually purporting to withhold as privileged.

Accordingly, Rio Tinto respectfully requests that the Court order Vale to comply with Your Honor's previous order by requiring Vale to (1) produce the remaining 417 responsive documents containing the term "Trojan Horse"; and (2) individually log the 211 purportedly privileged documents in Vale's privilege log.

  ii.  *Vale's Position*

***Vale Has Complied With The Court's Order Regarding "Trojan Horse" Documents.***
At the July 28, 2015 conference, Rio Tinto raised concerns about the search terms that Vale had used, pursuant to the Predictive Coding Protocol agreed to by the parties, to define the universe of documents on which to apply its predictive coding process.[37]  Rio Tinto complained that Vale had not included the term "trojan horse," which was used in some instances to refer to Vale's negotiations with BSGR regarding Simandou.  Accordingly, this Court ordered that Vale run the search for "trojan horse," report the number of hits, "[r]eview for relevance and privilege," and produce the responsive, non-privileged documents hitting on that term that had not already been produced (unless doing so would be too burdensome).  (July 28, 2015 Tr. 17.)

Vale complied with that Order.  On August 4, 2015, Vale reported the number of documents that hit on this term, and told Rio Tinto it would review any remaining documents not already slated for production, and produce any that were responsive and not privileged.  *See* August 4, 2015 Email from S. Reents to M. McCaffrey.  Vale did that by the August 28, 2015 document discovery deadline.  Rio Tinto now complains that Vale must produce not only the responsive, non-privileged documents that hit on this term, as the Court ordered, but also all of the *non*-responsive documents.

As an threshold matter, this issue is more appropriately addressed by the Special Master, who has been given the mandate to address "disputes that may arise in relation to the use of technology assisted review (aka, predictive coding)" by the parties, including disputes such as this that arise directly from the parties' Predictive Coding Protocol.  July 15, 2015 Order Appointing Special Master (Dk. 300).  Indeed, the issue has already been resolved by the parties' agreement before her, so-ordered by Your Honor, that established a protocol for resolving the

---

[36]  Vale already has produced several documents that were created after the joint venture closed in which the term "Trojan Horse" was used to describe the Simandou project generally.  *See* VALE-RT_00016233; *see also* VALE-RT_00049004.

[37]  As Your Honor recalls from earlier arguments regarding Vale's search terms, the terms used by Vale were deliberately very broad, and included dozens of terms demanded by Rio Tinto itself.  In compliance with the Predictive Coding Protocol, Vale had undertaken extensive sampling of the documents excluded by its search terms, and had disclosed the results of that sampling to Rio Tinto.

Hon. Andrew J. Peck, p. 25

parties' disputes with respect to each other's predictive coding processes.  *See* Stipulation and Order Re: Revised Validation and Audit Protocols for the Use of Predictive Coding in Discovery (Dk. 338) (the "Audit Protocol").  That protocol, which Rio Tinto agreed to on September 2, 2015,  "resolve[d] all disputes between the Parties concerning the Predictive Coding Processes and the productions pursuant to the Predictive Coding Processes" (except for those addressed by the protocol itself) that had been raised to that point, which would include Rio Tinto's complaints regarding the "trojan horse" search term.  *Id.* ¶ 6.  Moreover, under the terms of the Audit Protocol, Rio Tinto was entitled to request that Vale undertake any search of Rio Tinto's choosing, and to produce both responsive and non-responsive documents that hit on that search. Rio Tinto chose not to request that Vale do so with respect to documents that hit on "trojan horse," and it should not be permitted to back away from its agreement under the Audit Protocol by seeking relief from Your Honor now that it chose not to seek when it should have.

In any event, Rio Tinto is not entitled to the non-responsive documents that happen to hit on the term "trojan horse."  As is self-evident, Vale has no obligation to produce documents that are not responsive to any of Rio Tinto's document requests (as agreed upon by the parties).  *See generally* Fed. R. Civ. P. 34 (describing obligation to respond to document requests); *In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, 2013 WL 6405156, at *2 (N.D. Ind. Aug. 21, 2013) (holding that a request that a party be ordered to produce non-responsive documents "reaches well beyond the scope of any permissible discovery").  As Vale explained to Rio Tinto, documents that hit on "trojan horse" that were not produced were either non-responsive, privileged, or duplicates of produced documents.  *See* September 17, 2015 Email from S. Reents to M. McCaffrey.  To give Rio Tinto comfort that Vale was not withholding responsive documents, Vale further described the kinds of non-responsive documents that happened to hit on the term, including documents using the term "trojan horse" in a metaphorical sense; in the context of "trojan horse" computer viruses (e.g., in boilerplate warnings, or notices); and to refer to the Simandou project after the close of the transaction with BSGR (after which such documents are responsive only if they relate to specific topics Vale and Rio Tinto agreed Vale would – and which Vale did – produce).[38]  *Id.*  The scope of Rio Tinto's document requests on Vale were extensively and meticulously negotiated by the parties, and Rio Tinto should not be allowed to make an end-run around those agreements just because it does not believe (without basis) that Vale has produced all the responsive, non-privileged documents to it that have hit on the "trojan horse" term.  It has been settled since the start of document discovery that "Simandou" alone is far too broad a category for either party, and "trojan horse" as no more than a synonym for it has the same overbreadth.  Accordingly, Rio Tinto's request for further relief on this issue should be denied.

---

[38] As Rio Tinto knows from the documents Vale has produced, the term "trojan horse" was often used after the April 30, 2010 close of that transaction to refer to the Simandou project generally, and not exclusively to the contemplated transaction with BSGR prior to its close.  *See, e.g.*, Vale-RT_00079609 (November 2011 email using "Projeto Trojan Horse" to refer to the Simandou project generally); Vale-RT_00167473 (June 2010 presentation  using "Simandou" and "Trojan Horse" interchangeably).

### b.  Vale's Production Of Final And Draft Reports From Ernst And Young

#### i.  *Rio Tinto's Position*

Rio Tinto has narrowed its document requests concerning the reports Ernst & Young ("E&Y") prepared for Vale regarding BSGR's financial records and operations in Guinea.  Rio Tinto's requests now mirror the scope of discovery the Court approved when it granted Rio Tinto's application to pursue discovery from E&Y under the Hague Convention, *see* Dkt. No. 327.  Vale, however, has refused to respond to these modified requests, claiming E&Y's reports are privileged.[39]

Vale's position has no merit.  E&Y's engagement letters expressly disclaim that its work was related to the provision of legal advice or opinion.  *See* VALE-RT_00024658, at -661 (none of the services or any reports will constitute any legal opinion or advice); VALE-RT_00160607, at -611 (same); VALE-RT_001605921, at -594 (same).  Instead, Vale retained E&Y to perform accounting services, VALE-RT_00024658, at -660, and due diligence services concerning Vale's joint venture with BSGR, VALE-RT_00160592, at -592.  It is black letter law that the attorney client privilege does not attach to materials prepared during such routine accounting work.[40]  *See United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists."); *see also United States v. Hatfield*, No. 06-CR-0550 (JS), 2010 WL 183522, at *1 (E.D.N.Y. Jan. 8, 2010) ("But the Second Circuit did not bless all attorney-accountant relationships as privileged.  Instead, it distinguished between accountants hired to aid attorneys in understanding accounting concepts, and those hired to perform only accounting service.") (quotations omitted).  Likewise, due diligence documents like these may not be privileged at all.  *See Vector Capital Corp. v. Ness Techs., Inc.*, 2014 WL 171160, at *2 (S.D.N.Y. Jan. 9, 2014) ("[The] fact-acquisition process in the course of a business transaction is no more protected by privilege when conducted by an attorney than if conducted by an accountant, engineer or head of a business unit.  *The factual information presented is not privileged merely by the use of an attorney as a conduit for the information.*") (emphasis added); *see also Federal Housing Fin. Agency v. UBS Am. Inc.*, 2013 WL 1700923, at *2 (S.D.N.Y. Apr. 16, 2013).

There is no reason to deviate from the established rule here.[41]  Vale—not its law firm (Clifford Chance)—retained E&Y to perform a fact-based analysis of BSGR's books, records, and financial controls.  And, consistent with the terms of its engagement letters, E&Y performed

---

[39]  Vale also has withheld emails and other documents related to E&Y's work under a claim of privilege.  Rio Tinto reserves the right to review Vale's amended privilege log, which is forthcoming in response to the Court's recent order, before seeking to compel the production of these other documents at a later date.  *See* Dkt. No. 355.

[40]  E&Y's reports also are not protected by the attorney work product doctrine; there is no indication that any of E&Y's work was commissioned "because of" litigation. *Cf. Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 553 (S.D.N.Y. 2013) ("Generalized steps to avoid non-specific litigation are not accorded work product protection.").

[41]  Vale did not retain E&Y to act "as a translator or interpreter of client communications" to assist Vale's counsel in providing legal analysis. *United States v. Ackert*, 169 F.3d 136, 140 (2d Cir. 1999).  The *Kovel* exception and its progeny therefore have no application here.

Hon. Andrew J. Peck, p. 27

its work under Vale's direction and supervision.  For example, after E&Y's Fraud Investigation and Dispute Services Team furnished its draft report to Vale on May 14, 2010, Vale (not its lawyers at Clifford Chance) directed E&Y to alter its conclusion that BSGR's financial controls posed a high risk of bribery and corruption.  Tellingly, Vale did not permit E&Y to finalize that report until the firm agreed to align its conclusions with Vale's views.

Discovery concerning E&Y's diligence work is absolutely critical to Rio Tinto's case. Since the outset of this litigation, Vale has represented to the Court that it conducted "standard FCPA diligence" and received various "reps, warranties, personal certifications and the like that [BSGR and Steinmetz] had engaged in no such [illegal] activity," and "[t]hat's why Vale entered into the joint venture." Dkt. No. 38, (6/9/14 Hr'g Tr.) at 8:16-21. Vale also has represented that it was not until "years later" that it learned of any illegal conduct, when it was discovered by the Government of Guinea. *Id.*

Vale's limited production to date, however, supports Rio Tinto's allegations and contradicts Vale's representations.  The Amended Complaint alleges that one purpose of the BSGR/Vale joint venture was to provide the Defendants' illicit partnership with a façade of legitimacy that they used to continue concealing their conspiracy for years.  *See* Am. Compl. ¶¶ 15, 108-109.  Vale's efforts to force E&Y to change its conclusion that BSGR presented a high risk of bribery and corruption is one example of the defendants using E&Y to help conceal their RICO conspiracy.  This evidence shows that Vale was actively covering up BSGR's corruption in aid of the conspiracy as alleged in the Amended Complaint.  *See id.*  Rio Tinto is entitled to see if E&Y's ongoing diligence for the joint venture into at least late May 2010 included similar reports of corruption, bribery or other misdeeds by BSGR that Vale also sought to cover up.

Moreover, Vale was well aware that BSGR posed a high risk for corruption and bribery. Rio Tinto told Vale as much during the parties' joint venture negotiations, *see* Dkt No. 83 at ¶ 78, and Vale itself had reports by October 2008 that BSGR was acting improperly in trying to gain rights at Simandou.  That impropriety was later substantiated in December 2008 when Vale's in-country manager reported to Vale's Eduardo Ledsham, the Vale head of exploration who played an integral role in the BSGR joint venture negotiations (and a key custodian whose documents have been destroyed), that Steinmetz was seen flying into Guinea with bags and envelopes likely containing cash.  Whether that information was provided to E&Y, as one of Vale's diligence counselors, and whether E&Y's diligence work revealed further evidence of bribery or other misconduct by BSGR, are critical areas of inquiry that have not yet been fully explored in discovery.  Indeed, the scope of E&Y's inquiry, Vale's reactions to the outcome of that work, and any steps Vale took to paper over evidence of prior bad acts by BSGR, are all topics that are highly relevant to both Rio Tinto's affirmative claims and the "good faith" defense that has been proffered by Vale.

Additionally, these same documents suggest that Vale's good faith defense is an after-the-fact contrivance.  This is significant because even if Vale's claim that it had no contact with BSGR until 2009 were true (it is not, as Vale's own document production, *inter alia*, demonstrates), these materials show that Vale knew full well it was entering a criminal conspiracy and is therefore liable for all crimes committed in furtherance of the conspiracy, irrespective of when they occurred.  *See, e.g.*, *United States v. Bengis*, 783 F.3d 407, 413 (2d Cir.

Hon. Andrew J. Peck, p. 28

2015) ("In general, one who joins an existing conspiracy takes it as it is, and is therefore held accountable for the prior conduct of co-conspirators.") (citation and quotation marks removed). What Vale knew and when is thus critical to rebutting its fabricated good faith defense.

Rio Tinto therefore respectfully seeks an order from the Court requiring Vale to immediately produce the E&Y reports in response to Rio Tinto's modified document requests, as follows:

1. All versions of the report, including drafts, E&Y prepared for Vale pursuant to its April 27, 2010 engagement letter, which explicitly called for E&Y to "report back" on issues concerning BSGR bribery or corruption, *see* VALE-RT_00024658, at -660; and

2. All versions of other reports, including drafts, E&Y prepared for Vale concerning Simandou that reference BSGR bribery, corruption, or other misconduct.[42]

  *ii. Vale's Position*

  ***Rio Tinto Is Not Entitled To The EY Report (And Drafts Thereof) Prepared At The Direction Of Vale's Counsel After The Joint Venture Closed.***  Prior to entering into the Vale-BSGR joint venture, Vale retained, among others, Ernst & Young ("EY") to perform certain due diligence functions in connection with the transaction, which closed April 30, 2010.  *See, e.g.*, VALE-RT_00146236 (April 12, 2010 draft engagement letter for "due diligence services").  As is the nature of due diligence, EY conducted its diligence work prior to the closing, pursuant to an engagement for that specific purpose.  Those non-privileged due diligence documents have been produced to Rio Tinto.  *See, e.g.*, VALE-RT_00025314 (April 1, 2010 EY report); VALE-RT_00024609 (April 16, 2010 EY "due diligence report," stating that "we have performed the work set out in our draft engagement dated 12 April 2010").[43]

  As the JV closed on April 30, 2010, Vale separately retained EY to perform *other* services, not due diligence for the Vale-BSGR transaction, pursuant to a different engagement letter (VALE-RT_0002465) that does not mention due diligence and that – unlike the due diligence engagement – specified that the work was done at the direction of counsel.  It is this post-closing, non-diligence work that Rio Tinto seeks, and which is both privileged and irrelevant.

  As to the post-closing engagement, EY was retained to perform work "under day to day instructions from Clifford Chance LLP"; specifically, to "[p]rovide a description of the current status of these entities' books and records, noting weaknesses seen in the course of our work; and [p]rovide recommendations on how identified weaknesses can be fixed, including with respect to the imposition of internal controls."  (*See* EY Engagement Letter, dated April 27, 2010 and

---

[42] Rio Tinto has agreed that Vale may excise the parts of these reports pertaining to matters that are not related to bribery or misconduct (such as tax planning advice).  Of course, Rio Tinto expects Vale to produce all responsive documents—not just those containing the obvious buzzwords, such as "bribe."

[43] The fact that, as is not unusual, EY's formal engagement letter for this due diligence was executed after the closing does not alter the fact the work was performed prior to the closing.

Hon. Andrew J. Peck, p. 29

executed May 12, 2010, VALE-RT_00024658.)  This is self-evidently not "due diligence" work intended to evaluate the potential transaction, but post-closing work intended to aid in the implementation of the joint venture.  Moreover, because the resulting report was prepared at the direction of counsel for the purposes of formulating advice regarding governance of the joint venture, it is privileged.[44]  *See generally United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961).

Equally important, the report is utterly irrelevant.  As Rio Tinto has acknowledged in meet-and-confers, both the engagement and the report were completed *after* Vale acquired a 51% interest in VBG pursuant to the Framework and Shareholders' Agreements, both dated April 30, 2010, of which Rio Tinto is in receipt (*see* VALE-RT_00032944 (Framework Agreement); VALE-RT_00154739 (Shareholders' Agreement)).  EY's work under the post-closing engagement was forward looking, not "due diligence" for the transaction.  Whatever Vale did or did not learn as a result of EY's work performed *after* entering into those agreements has zero bearing on whether, as Rio Tinto alleges, Vale knowingly entered into a criminal conspiracy with BSGR in December 2008 (surely Vale did not "discover," in the course of work performed after the joint venture, that it had entered into a conspiracy years earlier). *See* Am. Compl. ¶ 87 (alleging that in December 2008 "Steinmetz, BSGR, and Vale formed an agreement to work together – in conjunction with the other Defendants and co-conspirators – to steal Rio Tinto's mining rights at Simandou, and the U.S.-based illegal enterprise was born").

Vale has produced its non-privileged due diligence materials, and Rio Tinto is not entitled to more.

### a.  Vale's Production Of Due Diligence Documents Through May 30, 2010

#### iii.  *Rio Tinto's Position*

During early meet-and-confer discussions surrounding Rio Tinto's document requests regarding Vale's diligence efforts, *see* RFP Nos. 2, 11, 17, 20 – 25, Vale represented that its diligence work concerning BSGR's operations in Guinea ended prior to the formation of VBG on April 30, 2010.  Based on that representation, Rio Tinto agreed that Vale could limit its search for responsive documents to those that were created or received on or before that date.  Whether by design or negligence, however, Vale's representation was incorrect.  Documents produced by Vale have since revealed that Vale's diligence efforts continued through at least the end of May 2010.  As a result, the Court already has recognized, when considering Rio Tinto's application to seek discovery from E&Y, that Rio Tinto is entitled to discovery of diligence documents dated up until at least the end of May 2010.  *See* 8/19/15 Hr'g Tr. 9:10-12 ("But, to the extent it is dealing with specific reports and subjects of bribery and corruption in and around April/May 2010, it doesn't bother me that we are in May.").

Because the parties' earlier agreement to limit such discovery was based on a false premise, Rio Tinto has asked Vale to produce responsive documents dated up through May 31, 2010.  Vale has refused to produce those documents.  Vale maintains that materials created after

---

[44] As a compromise, Vale offered to produce the final post-closing EY report under a 502(d), if that would resolve the matter.  Rio Tinto rejected that offer, insisting that Vale produce all drafts and related correspondence, including with Clifford Chance.

Hon. Andrew J. Peck, p. 30

April 30, 2010 are not related to "due diligence" and therefore are not responsive to Rio Tinto's outstanding document requests. At bottom, Vale's objections are rooted in a dispute over semantics.

Indeed, it is now clear that Vale's proposal to terminate diligence-related discovery on April 30, 2010 is, and always was, a red herring. The creation of the VBG joint venture was the first step in a multi-stage, multi-billion dollar transaction. Vale fully expected that its efforts to shore up BSGR's operations and construct a façade of legitimacy to shield BSGR's conduct in Guinea from scrutiny would continue long after the initial formation of VBG. Vale retained E&Y's Fraud Investigation and Dispute Services Team on April 27, 2010 to conduct further diligence regarding the risk of bribery or corruption posed by BSGR's operations and financial controls—just *three days* before the formation of VBG and only *after* E&Y's financial diligence team had identified a suspicious modification to an audit opinion concerning BSGR's 2009 financial statements. By its express terms, E&Y's April 27, 2010 engagement letter did not even contemplate that E&Y's Fraud Investigation Team would submit its final report to Vale until May 14, 2010, and documents produced by Vale indicate that the report was not actually finalized until May 27, 2010.

Accordingly, Rio Tinto requests that the Court order Vale to produce (1) all documents created or received on or before May 31, 2010 that are responsive to Rio Tinto's outstanding diligence requests (RFP Nos. 2, 11, 17, 20 – 25); and (2) for diligence materials created after May 31, 2010, all documents responsive to Rio Tinto's diligence requests that are related to BSGR bribery, corruption, or misconduct.

### iv.   *Vale's Position*

**There Are No "Due Diligence" Documents Dated After The BSGR-Vale JV Closed On April 30, 2010.** Vale and Rio Tinto agreed long ago that Vale would conduct a search for documents related to "due diligence" regarding the joint venture up until April 30, 2010. This cut-off date made eminent sense since that is the date that the transaction with BSGR closed, and it would be nonsensical to search for documents related to "due diligence" after the transaction has closed. Now, Rio Tinto contends that Vale misled Rio Tinto as to the closing date of the transaction, and that negotiations and diligence on the deal continued well past April 30, 2010, and seeks therefore to extend the cut-off date to May 30, 2010.

This is simply false. It is a matter of public record that the Vale-BSGR deal closed April 30, 2010. *See, e.g.*, Vale acquires Simandou iron ore assets (April 30, 2010), http://www.vale.com/EN/investors/home-press-releases/Press-Releases/Pages/vale-adquire-simandou.aspx. The operative legal agreements (Framework Agreement and Shareholders' Agreement), both dated April 30, 2010, have been produced to Rio Tinto. *See* VALE-RT_00032944 (Framework Agreement); VALE-RT_00154739 (Shareholders' Agreement). The April 30, 2010 closing date ("completion date" in the English law terminology of the agreement) is also confirmed by the contemporaneous correspondence produced to Rio Tinto. *See, e.g.*, VALE-RT_00073884 (April 30, 2010: "Please accept my compliments to all team involved in this landmark transaction for Vale."); VALE-RT_00075585 (April 30, 2010: "Mazal Tov"); VALE-RT_00008168 (April 30, 2010 funds transfer).

Hon. Andrew J. Peck, p. 31

Other than the post-closing EY work and engagement letter already discussed (which, for the reasons discussed above also do not concern "due diligence"), Rio Tinto has cited only a single document, VALE-Training_0000719, in support of its contention that "due diligence" continued after the close of the transaction. That document, a June 2010 internal email chain, does not discuss due diligence on a potential transaction with BSGR but instead the "absorption of BSG companies" following the close of the transaction, and reflects nothing more than the post-closing implementation of the previously negotiated joint venture.[45]

### b. Vale's Confidentiality Designations

#### v. Rio Tinto's Position

Vale's refusal to de-designate its Simandou feasibility study from AEO to confidential is inappropriate and must stop.[46] Rio Tinto's Amended Complaint is replete with allegations that Vale used Rio Tinto's proprietary and confidential information to develop and hold on to Blocks 1 and 2 of Simandou. But Vale's ongoing refusal to drop the confidentiality designation of its feasibility study to confidential means that Rio Tinto is prohibited from showing that study to the very Rio Tinto personnel who spent years developing the confidential information that was ultimately disclosed to and used by Vale; personnel whose intimate knowledge of Rio Tinto's development of Simandou are best positioned to know what information in the Vale feasibility reflects the information Vale stole from Rio Tinto and how Vale went on to use that information.[47]

While Rio Tinto understands the Guinean Government's concerns regarding the dissemination of the Vale feasibility study, a few important facts alleviate that concern. First, all Rio Tinto is seeking is that the feasibility study be designated "confidential," rather than "attorneys' eyes only." Designating these documents "confidential" does not mean that the information contained therein will become publicly available. Indeed, confidential information produced in this litigation may only be used for "prosecuting, defending or attempting to settle this Litigation between the Parties[.]" Dkt No. 81 at 11.

Second, the Guinean Government's concern was driven at the time by the re-tender process it was engaging in for Blocks 1 and 2. As we understand it, both Rio Tinto and Vale have made clear that neither of them are participating in the re-tender process.[48] So it cannot be the case that designating the study as confidential would force Vale to disclose "competitively

---

[45] Rio Tinto may point to entries in Vale's initial privilege log that are dated after the closing and reference "due diligence." These do not indicate that the due diligence continued after the closing date, but, at most, that reference to that earlier work may have been made at a later date.

[46] Vale's refusal to re-designate its feasibility study extends to far more than the feasibility study itself. Indeed Vale is refusing to re-designate nearly 100 documents as confidential on the basis that they relate to or are similar to the information contained in its feasibility study.

[47] In an effort to resolve this without the Court's intervention, Rio Tinto proposed limiting disclosure of the feasibility study to a potential "clean team" of Rio Tinto personnel. Vale summarily rejected that proposal.

[48] See e.g. "Rio Tinto Says Will Hang Back From North Simandou Iron Tender," available at http://uk.reuters.com/article/2014/08/07/rio-tinto-iron-guinea-idUKL6N0QD5NW20140807.

Hon. Andrew J. Peck, p. 32

sensitive" information to a competitor for Simandou; Vale and Rio Tinto are not competing for *anything* at Simandou.

Third, when Vale provided its feasibility study to the Guinean Government, it does not appear to have done so under any guise of confidentiality.  The document bears no confidentiality designation (other than that added in the production in this case) and Vale to date has not produced a cover letter or any other material indicating that the study was produced as confidential to the Guinean Government back in 2011.[49]

Ultimately, Vale's claims of support for its AEO designation appear to be nothing more than a post hac attempt to claim confidentiality where none exists in an effort to prejudice Rio Tinto's review and use of the study in this case.  Rio Tinto therefore respectfully requests that the Court order Vale to de-designate and reproduce its Simandou feasibility study as confidential by Friday.

### vi.  *Vale's Position*

**VBG's Feasibility Study Is Appropriately Designated AEO.**  The Feasibility Study is an exhaustive, 8-volume, 1,300-page document detailing the work done to evaluate Simandou Blocks 1 and 2 and setting forth the plan for its future development.  It was submitted to the Government of Guinea after monumental effort and great expense by Vale, three years after Rio Tinto, Vale's direct competitor, lost its rights to Blocks 1 and 2.  Among other things, it documents Vale's geological work, its logistical port and railway planning, and, importantly, what the concession is worth.  It also provides the roadmap for developing that concession.  Consequently, it is precisely the type of "competitively-sensitive information" (Dk. 81) the Protective Order allows to be designated as AEO.  This is particularly true in light of the tender process that the Government of Guinea is presently organizing to auction off the rights to develop Blocks 1 and 2 that it subsequently revoked because of BSGR's – not Vale's – misconduct.  Allowing Rio Tinto access to the Feasibility Study – which the Government of Guinea has explained will only be made available to serious bidders who make a significant financial commitment to the auction – would provide Rio Tinto with an unfair advantage over potential competitors, including Vale, with respect to the tender process.  Indeed, on multiple occasions, the Government of Guinea has made clear that it considers the Feasibility Study and other technical information related to Simandou to be its highly confidential property that is not to be disclosed to any third party pending the tender.  After Rio Tinto raised the confidentiality of the feasibility yet again, Vale asked the Government of Guinea its position on the confidentiality of that study.  At the end of last week, the Government informed vale that Rio Tinto's position that the Simandou tender process is under way is false.  The Government insisted that Vale designate the study as AEO for any other designation would give Rio Tinto an unfair advantage in the bidding process.

It was in part for these reasons that Vale initially resisted producing the Feasibility Study in its entirety, and instead proposed to produce only those portions of it relevant to Rio Tinto's claims (i.e. those portions reflecting any information that Rio Tinto alleges Vale

---

[49]  This is in stark contrast to Rio Tinto, who produced its 2008 feasibility study to the Guinean Government bearing a confidential designation.

Hon. Andrew J. Peck, p. 33

misappropriated, were Rio Tinto ever able to identify such information with sufficient particularity, which to date it has not). Rio Tinto vigorously protested, and in moving to compel its production, assured Vale and the Court that Vale would be "free to designate" sensitive portions of the report as "Highly Confidential – Attorneys' Eyes Only," under the terms of the Protective Order. *See* February 18 Letter from Michael Lyle to Judge Peck, at 3. The Court likewise suggested that Vale could produce the Feasibility Study and address any concerns about its competitive sensitivity through "the ability to mark it for attorneys' and experts' eyes only" (Feb. 27 Tr. 33:17-18).

Now Rio Tinto is walking back from those earlier assurances that encouraged Vale to voluntarily produce the Feasibility Study in its entirety. It has cited no justification. It has not identified any need to de-designate the document now, in advance of the tender, and indeed, there is none.[50] Rio Tinto is free, in accordance with the Protective Order and Your Honor's suggestion, to share the report with an appropriate outside expert if necessary. It is not free to distribute at will to Rio Tinto business people the most up-to-date and sensitive information on the asset in question prepared by its primary competitor, on the eve of an auction for that asset.[51]

### III.    Discovery from Defendants BSGR and Steinmetz

#### i. *Rio Tinto's Position*

BSGR's production remains deficient.   What is worse, BSGR continues to flatly refuse to take any steps, if only as a courtesy to Your Honor's strong suggestion that it indeed take steps, to correct that deficiency.

Rio Tinto has identified serious gaps in BSGR's production that are in part due to BSGR's use of extremely narrow, restrictive, and misspelled search terms and date ranges. At our last conference, this Court agreed that BSGR's "search terms that [it] used do not comport with the case law on crafting of search terms," (*see* Aug. 19, 2015 Hr'g. Trans. 23:3-5), and admonished BSGR for, e.g., its narrow approach in using only first names as part of its search terms and not last names:  "only us[ing] Mr. Cilins' last name without a variant on his first name" and not [using] other variants on th[e] [term 'land cruiser']" were not compliant with the law. *Id*. at 23:5-13. Further still, this Court warned BSGR that, absent cooperation, it would likely have to "run[] these very search terms and many others down the road," (*see id*. at 25:6-9)

---

[50] In a September 11, 2015 email to Vale, Rio Tinto's counsel stated that "the tender process for blocks 1 & 2 . . . is now sufficiently underway to assure Vale, via publicly available information, that Rio Tinto is not bidding on those blocks." This is not true. Even were the commercial sensitivity of the Feasibility Study limited to the bid for Blocks 1 and 2, that tender process has not been completed (or even launched officially) and Vale is not aware of any binding commitment by Rio Tinto not to participate, directly or indirectly, in a bid for those blocks at any time in the future. Among other things, its current joint venture partner, Chinalco, is not a party to this lawsuit and has made no such commitment.

[51] Rio Tinto has alternatively suggested in meet-and-confers "developing a potential 'clean team' of Rio Tinto personnel who could be permitted to review the feasibility studies" (Sept. 11, 2015 Rio Tinto email). For the reasons stated, there is no need to distribute the study internally at Rio Tinto at this time, and thus no need for a "clean team," which proposal in any case would not adequately address the concerns of Vale or the Government of Guinea regarding the disclosure of this competitively sensitive information to Rio Tinto business people, especially considering that Rio Tinto suggested that the as-yet undetermined list would include as many as ten Rio Tinto employees.

Hon. Andrew J. Peck, p. 34

(emphasis added), and that "[BSGR] [is] not going to get 30 days" and instead only "a week or something" to fix its production. *Id*. at 20:45-25:8.

Notwithstanding this Court's warning and strong suggestion that it cooperate with Rio Tinto to fix its production, BSGR remains defiant. BSGR ignored Rio Tinto's August 28, 2015 e-mail, sent after our last conference, asking whether BSGR would cooperate and run the supplemental search terms Rio Tinto had previously provided. Nor has BSGR reached out to Rio Tinto to otherwise offer any suggested compromise to improve upon its production. As a result, BSGR has forced Rio Tinto to spend even more time and money to file the equivalent of motion to compel with the presiding UK Court, which it did on September 18, 2015, to spur BSGR into action. There is no timetable, however, for when that motion will be resolved. Consequently, BSGR appears contented to continue to do nothing and withhold critical, responsive documents that it undisputedly has.

We respectfully renew our request, therefore, that this Court order BSGR to run the supplemental search terms as proposed by Rio Tinto. If so ordered, we can accordingly advise the UK Court and avoid the soaring costs associated with compelling BSGR to follow through on its pledge to this Court that it would fully cooperate with document discovery. Waiting another month or two to obtain relevant documents from BSGR stands to interfere with Rio Tinto's ability to adequately prepare for depositions, poses the risk that depositions will need to be reopened, and almost guarantees that the remainder of this Court's schedule cannot hold.

### ii. *BSGR/Steinmetz's Position*

Counsel to BSGR and Rio had been discussing Rio's request that additional searches be run in connection with the Letters of Request sought by Vale and Rio. Before those discussions were complete, however, on September 16, 2015, Rio notified BSGR that it was filing an application for specific disclosure (the equivalent of a motion to compel) to the English High Court. BSGR's London counsel will respond to Rio's Application in the ordinary course. Given Your Honor's prior ruling on this issue, and in light of Rio's instant application, Rio's insistence on raising this issue again before Your Honor is improper and a waste of Court resources.

Moreover, Rio (and Vale) has refused to pay the fees and costs associated with BSGR's response to the Letters of Request which were ordered by the English High Court in the sealed Letters of Request. Nevertheless, Rio persists in seeking to force BSGR to incur more costs and fees by demanding additional unwarranted and overbroad searches. Until Rio pays its fair share of the BSGR's fees and costs, it should not be heard any further on this issue.

## IV.   **Discovery From Defendant Thiam**

### i. *Rio Tinto's Position*

With respect to Defendant Thiam's recent revelation that he deleted all emails that are dated before May 2009, Defendant Thiam has agreed to sign a consent form to accompany a subpoena to Google to determine whether any electronic emails are still recoverable.

Hon. Andrew J. Peck, p. 35

Regarding Defendant Thiam's document requests and other discovery responses, Rio Tinto is concerned that they remain deficient. On August 28, 2015, Defendant Thiam made a production of documents that were clearly responsive to Rio Tinto's First Set of Discovery Requests, which Mr. Thiam was ordered by the Court to respond to in December 2014. Given the extremely delayed nature of this production, Rio Tinto is seeking some assurances that all responsive documents have been produced, and has requested that Defendant Thiam apply some additional search terms in connection with those efforts. Rio Tinto is hopeful that the parties can resolve these issue without assistance of the Court, and will update the Court as appropriate at the hearing.

There are, however, two categories of documents that Defendant Thiam admits to possessing but refuses to produce:

1. Rio Tinto is aware that Defendant Thiam has correspondence stemming from the Guinean Technical Committee's investigation of Defendants BSGR and Vale. To date, Defendant Thiam refuses to produce those documents.

2. On August 28, 2015, Defendant Thiam's counsel stated that "we are in possession of certain arguably responsive documents that are protected by the confidentiality provisions of the LCIA and ICSID proceedings. Consistent with Judge Peck's ruling on May 8, 2015, we will not be producing these documents at this time. We will produce the documents if ordered by the Court; or, if the LCIA or ICSID panels eliminate the confidentiality restriction." Accordingly, we request that this Court order Defendant Thiam to produce these two categories of obviously responsive documents.

    ii.   *Thiam's Position*

Mr. Thiam submitted witness statements in the LCIA and ICSID proceedings. In order to do so, he was provided with various documents that have been deemed confidential pursuant to those proceedings. In Thiam's August 28, 2015 production cover letter, we alerted Plaintiff, and all parties, "that we are in possession of certain arguably responsive documents that are protected by the confidentiality provisions of the LCIA and ICSID proceedings. Consistent with Judge Peck's ruling on May 8, 2015, we will not be producing these documents. We will produce the documents if ordered by the Court; or, if the LCIA or ICSID panels eliminate the confidentiality restriction." Consistent with that position, we await further guidance from this Court, or the respective panels.

Plaintiffs specifically identify the October 2012 Technical Committee letter as subject to discovery. Thiam received the October 2012 letter pursuant to the same confidentiality provisions discussed above. More, importantly, this document has already been produced, and it, and any other document already in Plaintiff's possession, therefore need not be produced by Thiam. This is particularly so because when or how Thiam came into possession of such documents is not relevant.

Hon. Andrew J. Peck, p. 36

## V.     Discovery from Defendant VBG

### i.     *Rio Tinto's Position*

Rio Tinto continues to await documents from VBG.  VBG previously agreed to collect and produce documents from the following custodians:  (i) Joao Vidoca; (ii) Telesphore Tchatchou; (iii) Charles Rezende; (iv) Issiagha Bangoura; (v) Luiz Otavio Costa; (vi) Rogerio Ribeiro; and (vii) Raphael Outarra.  But as the parties' conversations have continued over the last few weeks, VBG recently informed Rio Tinto that it must backtrack from the parties' agreement, as Vale has deleted documents for *four* of these custodians (Messrs. Bangoura, Costa, Ribeiro, and Outarra), and deleted those documents *after* it was on notice of legal issues surrounding Simandou.  Perhaps most egregiously, Vale appears to have knowingly and purposely deleted documents for Mr. Issiagha Bangoura *in 2014* after he was arrested and imprisoned *in 2013* by the Guinean Government for his involvement in the scheme of bribery and corruption that led to this lawsuit.  The same holds for the other custodians:  Vale appears to have destroyed their documents when it was required, by law, to preserve them.  This is just further evidence of Vale's reckless disregard to preserve, if not a purposeful decision *not* to preserve, damning documents from its files.  And the list of custodians for which Vale has destroyed documents has now grown to double digits.

Destruction issues aside, VBG has pledged to review and produce documents for Messrs. Vidoca, Tchatchou, and Rezende.  VBG has not, however, proposed a date certain by which it will complete that review and production.  Accordingly, Rio Tinto respectfully requests that VBG produce documents by September 30, 2015.

Beyond a production by VBG for these three individuals, Rio Tinto will also be proposing additional custodians to make up for the recent revelation that Vale destroyed documents for the four other custodians listed above

### ii.     *VBG's Position*

VBG has received hard copy materials from Conakry, is in the process of preparing them for production and will make production to Rio Tinto this week.

In addition, Vale has been gathering emails and running Rio Tinto's search terms (approximately 496 terms plus six dozen variants). The first custodian whose emails have been processed are Telesphore Tchatchou's. We have been reviewing a sample of those and have thus far identified ten email strings that are responsive and that we will produce. While these documents are nominally responsive, they are so because, for example, they contain newspaper articles about the Simandou project, or reflect the status of communications with the Technical Committee reviewing the Simandou licenses, not because they are substantive communications probative of the merits of the case. This is consistent with the nature of Mr. Tchatchou's role at VBG. Once Rio Tinto has reviewed these documents, we anticipate further discussion on refining the protocol with respect to emails from VBG custodians.

Hon. Andrew J. Peck, p. 37

**VI.**     **Vale's Pending Letter Of Request Applications**

> *i.   Vale's Position*

As Your Honor is aware, Vale has requested that the Court issue, as a matter of urgency, further Letters of Request in connection with the upcoming examinations of Rio Tinto's investigators Ms. Tara O'Connor and Messrs. Humphrey, Huband, Brown and Leighton, scheduled to take place at the Royal Courts of Justice in London before Master Leslie between September 28-October 2, 2015.  (Dk. 356, 357, 358.)  Those examinations were ordered by the High Court in London pursuant to this Court's original Letters of Request dated March 31, 2015 and July 31, 2015.

The circumstances surrounding Vale's Letter of Request to Messrs. Brown and Leighton (Dk. 356) are by now familiar to the Court.  In brief, last Thursday, Rio Tinto's counsel informed Vale that it had received a communication from Mr. Brown informing them that he and Mr. Leighton had – apparently at Rio Tinto's request –  "now completed . . . three days of the document review" but that Messrs. Brown and Leighton refused to "disclose [their] findings" absent "further direction from the High Court" despite being "in a position to provide what [they had] discovered."  Vale has requested that the Court grant its application for a new Letter of Request to Messrs. Brown and Leighton that tracks the categories of the orders already issued by the High Court on the Court's previous Letters of Request to the Rio Tinto investigators seeking the production of relevant documents in their possession, but also including those documents collected by Messrs. Brown and Leighton during their document review, prior to their examinations.  As detailed in Vale's letter to Your Honor dated September 18, 2015 (Dk. 359), Messrs. Brown and Leighton are the critical witnesses in the London examinations regarding the BTG investigation and the documents in their possession may be of great importance to those examinations.  No party to this action has opposed the production of those documents, nor given their relevance could they.

Further, Vale requested that the Court issue amended Letters of Request for each of the examinations scheduled in the UK to make clear that counsel for all other parties in this action are entitled to ask questions at the examinations.  While this was always Vale's intent, UK counsel for the examinees have sought clarification.  Rio Tinto's counsel have written that they intend to pose questions to these witnesses, as they should have every right to do, as do counsel for the other parties.

> *ii.   Rio Tinto's Position*

On Friday night, Vale submitted amended Letters of Request for each of the examinations scheduled in the UK.  These had been amended to clarify that counsel for other parties in this action may also ask questions at the examinations.  Rio Tinto does not oppose these amended Letters of Request.

Separately, Vale filed another Letter of Request seeking the production of documents (not just testimony) from Messrs. Nigel Brown and Alec Leighton.  Rio Tinto does not oppose this request, and in fact has been actively facilitating the collection of responsive documents from Messrs. Brown and Leighton pursuant to this Court's order.  But to set the record straight,

Hon. Andrew J. Peck, p. 38

Vale's problems with Messrs. Brown and Leighton are entirely of its own making.  First, Vale failed to include a request for documents in its original letters of request to them.  Then Vale acted in a way that Messrs. Brown and Leighton believe was inappropriate and possibly criminal relating to the collection of personal data on them.  In light of all this, Messrs. Brown and Leighton told counsel for Rio Tinto that while it had collected responsive documents just as Rio Tinto had asked, it was not willing to provide them absent an order from the English Court.  Counsel for Rio Tinto promptly informed counsel for Vale of this turn of events.  Likewise, Vale's complaints that Rio Tinto was wrong to identify BTG, Messrs. Brown and Leighton's former employer, are demonstrably false.  Just as it did in the initial briefing on this issue, Vale fails to mention that BTG has produced over four boxes of responsive material - more than any other investigator.  BTG's substantial production, coupled with the collection Messrs. Brown and Leighton are prepared to turn over once they receive an order from the English court, belies the accusations that any materials have been "destroyed" or that Rio Tinto in any way has acted inappropriately.  Vale's accusations of "hiding the ball" or "zigzagging" are wrong.

## VII.   **Joint Update Regarding Predictive Coding**

The parties provide the following joint update regarding issues being addressed by the Special Master.  There are no issues currently requiring resolution by the Court.

Immediately prior to the last conference on August 19, Vale and Rio Tinto met with the Special Master to address issues that had been raised by the parties with respect to each other's productions.  Following that meeting, the parties agreed to a protocol that they agreed resolved all disputes between the parties with respect to their predictive coding processes and the productions made pursuant thereto (other than those that may arise as a result of the process the parties agreed to undertake in the protocol), and that protocol was submitted and so-ordered by Your Honor.  *See* Stipulation and Order Re: Revised Validation and Audit Protocols for the Use of Predictive Coding in Discovery (Dk. 338) (the "Audit Protocol").  The results of the Audit Protocol will allow the parties and, if necessary, the Special Master, to determine whether each party has satisfied its production obligations.


Respectfully submitted,

/s/ Lewis J. Liman
Lewis J. Liman


cc:     All counsel of record (via ECF)

Hon. Andrew J. Peck, p. 39

## Vale's Attachment A

- All documents concerning the Rio Tinto (and/or Simfer) Executive Committee meeting held on or about April 14, 2009, including any analysis or assessment of a claim prepared for that meeting, any discussion at that meeting, and any follow-on work on a potential claim (or investigation of a claim) following that meeting.

- All documents concerning the Rio Tinto (and/or Simfer) Steering Committee meeting held on or about August 18, 2009, including any analysis or assessment of a claim prepared for that meeting, any discussion at that meeting, and any follow-on work on a potential claim (or investigation of a claim) following that meeting.

- All documents concerning the sessions held in London by Rio Tinto with its investigators and/or counsel, in or about September or October 2010, concerning legal work and evaluation of a potential claim related to Simandou.

- All documents, dated between December 9, 2008 and December 9, 2012, concerning communications between Rio Tinto and any of the firms it has identified as having knowledge of "Rio Tinto's investigation into potential claims against Defendants BSGR, Steinmetz, and/or the Government of Guinea between December 2008 and the filing of the complaint:  1. Amsterdam & Partners LLP (Bob Amsterdam, Dean Peroff) 2. Balter, Guth, Aloni & Co (Moshe Balter, Inbal Elkayam, Sue Kiali, Meir Rosenne, Raanan Bar Zohar) 3. Herbert Smith (Stephane Brabant, Emmanuelle Cabrol, James Clark, Laurence Eranc-Menget, Bruno Gay, and former Herbert Smith attorney Charles Kaplan) 4. Mourant Ozannes (Robert Shepherd)."

- All documents, dated between December 9, 2008 and December 9, 2012, concerning communications between Rio Tinto and any of the investigative firms identified by Rio Tinto as having knowledge "related to Rio Tinto's investigation between December 2008 and the filing of the complaint: . . . 26. Executive Research Associates 27. Aeneas 28. Livingstone and Company 29. BTG Intelligence 30. Africa Risk Consulting," as well as Kroll, which Rio Tinto failed to identify but which did work for Rio Tinto during that period, and any other investigator Rio Tinto has not yet identified.