UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Rio Tinto plc,

        Plaintiff,

    -against-

Vale S.A., Benjamin Steinmetz, BSG
Resources Limited, VBG-Vale BSGR Limited
aka BSG Resources (Guinea) Ltd. aka BSG
Resources Guinée Ltd, BSG Resources Guinée
SARL aka BSG Resources (Guinea) SARL aka
VBG-Vale BSGR, Frederic Cilins, Mamadie
Touré, and Mahmoud Thiam,

        Defendants.

14 Civ. 3042 (RMB)(AJP)

## ORDER GRANTING APPLICATION FOR
## ISSUANCE OF INTERNATION LETTERS OF REQUEST (LETTERS ROGATORY)

Upon the Application for the Issuance of an International Letter of Request (Letter

Rogatory) (the "Application") filed by Vale, S.A. ("Vale" or the "Applicant"), requesting the

issuance of an international letters of request (the "Letter of Request") pursuant to the provisions

of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or

Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. § 1781 (the "Hague

Evidence Convention"); and upon the record of the above-captioned matter;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Application is **GRANTED**.

This Court shall sign the Letter of Request attached to the Application as Exhibit B and affix the seal of the United States District Court for the Southern District of New York over said signature in the Letter of Request.

The Clerk of the District Court is directed to return the original, signed Letter of Request to counsel for Vale so that said Letter of Request may be issued to the Senior Master of the High Court (Queen's Bench Division) acting as the Competent Judicial Authority of the United Kingdom.

Vale is directed to transmit the original, signed Letter of Request to the Competent Judicial Authority of the United Kingdom.

The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order.

Dated: _____9/22_____, 2015
New York, New York

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

COPY EGF:

BY ECF

11

# EXHIBIT B

# (LETTER OF REQUEST TO NIGEL BROWN AND ALEC LEIGHTON)

**Request for International Judicial Assistance Pursuant to the Hague Convention of 18
March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

| | | |
|---|---|---|
| 1. | **Sender** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |
| 2. | **Central Authority of the Requested State** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL |
| 3. | **Person to whom the executed request is to be returned** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 20D<br>New York, New York 10007 |

4.   **Specification of the date by which the requesting authority requires receipt
of the response to the Letter of Request**

| | |
|---|---|
| **Date** | Examinations currently scheduled to occur on 1-2 October 2015, pursuant to Order of Master Leslie dated 7 August 2015, but no later than November 30, 2015. |
| **Reason for urgency** | Under the Court's Scheduling Order (Dkt. Nos. 161, 163), pretrial examination of fact witnesses must be complete by November 30, 2015.  Examinations currently scheduled to occur on 1-2 October 2015, pursuant to Order of Master Leslie dated 7 August 2015. |

IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE
UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING
REQUEST:

| | | |
|---|---|---|
| 5. | *a* **Requesting judicial authority (Article 3,a)** | The Honorable Andrew J. Peck<br>United States District Court<br>Southern District of New York<br>500 Pearl Street, Courtroom 17B<br>New York, New York 10007 |

|   |   |   |
|---|---|---|
| *b* | **To the competent authority of (Article 3,a)** | United Kingdom of Great Britain and Northern Ireland |
| 6. | **Names and addresses of the Parties and their representatives (including representatives in the requested State) (Article 3,b)** | |
| *a* | **Plaintiff** | **Rio Tinto plc** |
|   | **Representatives** | William A. Burck<br>Michael J. Lyle<br>Eric C. Lyttle<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW, 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100 |
| *b* | **Defendants** | **Vale, S.A.** |
|   | **Representatives** | Jonathan I. Blackman<br>Lewis J. Liman<br>Boaz S. Morag<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225 2000<br>Facsimile: (212) 225 3999 |
|   |   | **BSG Resources Limited** |
|   | **Representatives** | Robert Gold<br>Vincent Filardo, Jr.<br>Elizabeth M. Rotenberg-Schwartz<br>Mishcon de Reya New York, LLP<br>750 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 612 3270<br>Facsimile: (212) 612-3297 |
|   |   | **Benjamin Steinmetz** |
|   | **Representatives** | Robert Gold |

14

Vincent Filardo, Jr.
Elizabeth M. Rotenberg-Schwartz
Mishcon de Reya New York, LLP
750 Seventh Avenue
New York, New York 10019
Telephone: (212) 612 3270
Facsimile: (212) 612-3297

**BSG Resources Guinee SARL**
*also known as*
VBG-Vale BSGR Guinea

**Representatives**
Martin Joel Auerbach
Law Offices of Martin J. Auerbach, Esq
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Telephone: (212) 704 4347
Facsimile: (212) 3040175

**Mahmoud Thiam**

**Representatives**
Paul Eliot Summit
Sullivan & Worcester LLP (MA)
One Post Office Square
Boston, MA 02109
Telephone: (617) 210 8437
Facsimile: (617) 338 2880

7.    **Nature of the proceedings and summary of claims (Article 3,c)**

7.1    This action, captioned <u>Rio Tinto v. Vale, S.A., et al.</u>, Case No. 14 Civ. 3042

(RMB)(AJP) (the "Action"), is a civil litigation proceeding pending before the Requesting Court

asserting, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") by Vale, BSG Resources Limited, VBG – Vale BSGR Limited and BSG Resources

Guinée SARL, Frédéric Cilins, Mamadie Touré, and Mahmoud Thiam.  All of the defendants are

alleged to have been co-conspirators in a scheme to steal Rio Tinto's mining rights to Blocks 1

and 2 in the Simandou region of Guinea.  In this application, the term "BSGR" is used to refer to

BSG Resources Limited as well as any of its subsidiaries, or its affiliates.  The term

"Representative" is used to refer to directors (or shadow directors), officers, employees, representatives, agents, intermediaries and consultants. The Relevant Period referred to below is January 1, 2004 to April 30, 2014. Although not named as defendants, Rio Tinto's complaint has identified Avraham Lev Ran and Michael Noy as Representatives of BSGR, who are alleged to have been co-conspirators with the defendants.

7.2    Rio Tinto, headquartered in the United Kingdom, is one of the three largest mining companies in the world, operating globally and mining a wide variety of metals and minerals, including iron ore.

7.3    Vale, a Brazilian corporation, is another of the world's three largest mining companies and also mines iron ore among numerous other metals and minerals.

7.4    BSG Resources Limited is a Guernsey corporation that is principally engaged in mining operations in Africa and eastern Europe, but which also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Benjamin ("Beny") Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family. BSG Resources Limited maintains an office in London.

7.5    In February 1997, the government of the West African nation of Guinea (the "Government of Guinea") awarded permits to Rio Tinto to explore an area of Guinea called Simandou, which is known to be one of the most significant untapped iron ore deposits in the world. Rio Tinto alleges that it spent the next nine years exploring and developing Simandou. In 2006, the Government of Guinea awarded Rio Tinto a "Concession" that consisted of mining

16

rights to four "Blocks" or areas of Simandou: Blocks 1, 2, 3, and 4. Rio Tinto claims to have

continued developing and investing in Simandou, including developing railway and port plans to

transport iron ore from Simandou by rail to the coast of the Atlantic Ocean, either through

Guinea or through the neighboring country of Liberia.

      7.6     In 2008, Rio Tinto approached Vale to discuss the possible sale of assets from Rio

Tinto to Vale or a possible joint venture between the companies. In September 2008, Vale and

Rio Tinto executed a Confidentiality Deed and in November 2008 Rio Tinto opened a data room

so that Vale could review certain of Rio Tinto's documents related to the assets under discussion.

After the Confidentiality Deed was signed and the data room opened, the two parties ultimately

discussed the sale of Rio Tinto's rights to Simandou.

      7.7     On December 4, 2008, the Government of Guinea withdrew half of the Rio Tinto

Concession, which covered Blocks 1 and 2 of Simandou. Notwithstanding this revocation, Rio

Tinto and Vale continued to explore possible transactions. Vale ultimately purchased iron and

potash assets from Rio Tinto, but negotiations regarding Simandou were terminated by Rio

Tinto in June 2009.

      7.8     On December 9, 2008, BSGR was granted a research permit for Simandou Blocks

1 and 2 following the Government of Guinea's withdrawal of Rio Tinto's Concession to those

Blocks on December 4, 2008.

      7.9     Over a year later, in February 2010, BSGR approached Vale about the possibility

of partnering to develop its mining area in Blocks 1 and 2 of Simandou and the two parties began

negotiating a joint venture. The negotiations culminated in the signing of a Framework

Agreement and Shareholders' Agreement, both dated April 30, 2010. The Agreements both

included broad and detailed anti-bribery representations and warranties, on which Vale relied.

The joint venture was called "VBG." Vale paid BSGR $500 million as an initial payment of the $2.5 billion purchase price for its 51% stake in the venture.

7.10    On October 30, 2012, VBG Guinea received notice that a Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea (the "Technical Committee") had begun investigating how BSGR had obtained its mining rights to Simandou.

7.11    On information and belief, in or about January 2013, a U.S. federal Grand Jury began a criminal investigation into allegations that BSGR violated the Foreign Corrupt Practices Act ("FCPA") relating to BSGR's suspected bribes of Guinean officials in connection with obtaining rights to Simandou. The Federal Bureau of Investigation ("FBI") arrested BSGR's alleged agent Frédéric Cilins on April 14, 2013 after recording several conversations between him and a confidential informant, Mamadie Touré (the fourth wife of former Guinean President Conté and a co-defendant in this action), that implicated him in offering bribes and attempting to destroy documentary evidence of bribes paid by BSGR to obtain its mining rights in Guinea. The U.S. Department of Justice ("DOJ") filed criminal charges against Cilins the next day. Cilins pleaded guilty in 2014 to obstruction of justice and was sentenced to 24 months in prison with three years of supervised release. Cilins was released from prison on January 9, 2015.

7.12    In April 2014, after concluding its investigation, the Government of Guinea revoked VBG's rights to Simandou, having determined that BSGR had obtained its rights to Blocks 1 and 2 of Simandou through corrupt acts, including bribery of Mamadie Touré and efforts by Cilins to destroy evidence of such bribery by, *inter alia*, Cilins and Michael Noy seeking to induce Mamadie Touré to execute a false declaration in the U.S. Grand Jury proceeding. The Technical Committee found that Vale had no involvement in this bribery

18

scheme.  Vale instituted an arbitration proceeding against BSGR alleging, in part, that it was

defrauded by BSGR.

7.13    Thereafter, on April 30, 2014, Rio Tinto filed a complaint against Vale, BSGR,

and a number of other parties alleging, *inter alia*, that it lost its rights to Simandou Blocks 1 and

2 because of a conspiracy by Vale and BSGR in December 2008.  Rio Tinto alleged that, as a

result of BSGR's alleged bribery and Vale's alleged disclosure of Rio Tinto's trade secrets to

BSGR, BSGR was able to obtain Rio Tinto's rights to Simandou Blocks 1 and 2.  An Amended

Complaint with substantially similar allegations was filed on August 15, 2014.

7.14    Rio Tinto claims that Vale used access to Rio Tinto's data room (*see supra* ¶ 7.6)

to steal confidential information about Simandou and gave that information to BSGR for BSGR

to use in obtaining Rio Tinto's rights, which BSGR obtained in December 2008.  Rio Tinto

further claims that Vale met with Steinmetz, BSGR, and Mahmoud Thiam, then-Minister of

Mines for Guinea and a co-defendant in this action, multiple times from January 2009 to June

2009 in furtherance of the conspiracy to obtain rights to Simandou.  Rio Tinto alleges that

Steinmetz and BSGR paid bribes to Thiam to confirm their interest in Simandou Blocks 1 and 2.

Rio Tinto alleges that BSGR and Vale formed a joint venture agreement with respect to

Simandou Blocks 1 and 2 in April 2010.

7.15    In addition to the DOJ's and Technical Committee's investigations, BSGR is also

under investigation by law enforcement agencies in Switzerland, France, and the United

Kingdom in relation to its illicit activities in Guinea.  The Swiss authorities have received a

Letter of Request from the Conakry Court of First Instance, pursuant to which they have seized

documents at BSGR's management company, Onyx Financial Advisors Ltd. ("Onyx"), and

Steinmetz's home.  The Guernsey Financial Investigations United and the United Kingdom's

Serious Fraud Office (the "SFO") have also opened inquiries, including in serving Section 2

Notices on BSGR's current and past London counsel as well as Onyx. BSGR filed an

application for judicial review of the SFO Section 2 Notices in the Administrative Court Division

of the English High Court of Justice, which the English High Court of Justice denied on May 7,

2015.

7.16    Vale denies each of the allegations made against it, any conspiracy with BSGR,

any involvement in BSGR's and Steinmetz's corrupt activities, and any misappropriation of

trade secrets. In particular, Vale denies that it did or could have entered into a conspiracy with

BSGR in December 2008 when BSGR alone enjoyed the rights to Simandou Blocks 1 and 2,

after December 2008 sought other mining companies as partners with respect to these rights, and

did not agree to a joint venture with Vale until April 2010. Rio Tinto's claims, as summarized

above, put at issue whether BSGR and Steinmetz engaged in a conspiracy with Vale, whether

BSGR and Steinmetz engaged in corruption or bribery, whether they obtained the mining rights

in which Vale subsequently invested by those means, and whether Vale had anything to do with

these activities, which it denies.

7.17    Vale and other defendants also assert that Rio Tinto's lawsuit is barred by the

four-year statute of limitations to bring RICO claims. Rio Tinto claims that, beginning after

April 30, 2010, Rio Tinto "conducted a lengthy investigation involving substantial resources into

the activities of Vale and BSGR at Simandou," that "Rio Tinto's efforts were stymied due to the

concealed and intricate nature of the RICO enterprise," and that "Rio Tinto was unable to

discover the conduct that underlies its RICO and other claims until . . . April 2013." (AC ¶¶ 146-

147.) Rio Tinto thereby invokes fraudulent concealment to toll the statute of limitations.

Pursuant to the order of this Court, Rio Tinto produced reports from investigative firms  retained

to conduct competitive intelligence. Among other things, those reports bear on the validity of

Rio Tinto's case – that Vale entered into a conspiracy with BSGR in December 2008, before Rio

Tinto lost its concession for Simandou Blocks 1 and 2, that was only "documented" in April

2010: it is Vale's case that the reports show that BSGR was engaged in negotiations with other

Rio Tinto competitors, but *not* with Vale, after BSGR obtained these rights in December 2008.

It is also Vale's case that the reports indicate that Rio Tinto began its investigation well before

April 2013, when it claims it finally uncovered the conspiracy, and apparently did not conduct

any investigation after December 1, 2010, at the latest.

      7.18    The evidence sought from the individuals identified below, which includes

evidence of BSGR's discussions with mining companies other than Vale after BSGR obtained

the rights to Simandou Blocks 1 and 2 in December 2008 and before BSGR signed the joint

venture agreement with Vale in April 2010 and evidence of potential bribery by BSGR and

Steinmetz, is material to the resolution of these disputes. The evidence bears on Vale's statute of

limitations defense, including on the timing of Rio Tinto's claim and whether its investigation

was sufficient, as well as whether Vale was in any way aware of BSGR's wrongdoing.

      **8.**      **Evidence to be obtained or other judicial act to be performed (Article 3,d)**

      8.1    Rio Tinto's claims rest fundamentally on (1) BSGR's alleged bribery and

corruption and (2) the allegation that BSGR formed a conspiracy with Vale in December 2008

shortly before BSGR obtained the rights to Simandou Blocks 1 and 2 in December 2008. BTG

Intelligence has identified Nigel Brown and Alec Leighton as the persons with responsibility for

the relationship with Rio Tinto and the preparation of the Reports, and who have knowledge of

facts that bear on the issues of this case. By e-mail dated 17 September 2005, Mr. Brown

informed counsel for Rio Tinto plc, which in turn forwarded the correspondence to Applicant,

that "[w]e have now completed the three days of the document review and are in a position to

provide what we have discovered" concerning Messrs. Brown and Leighton's prior investigative

work for Rio Tinto, i.e. "the relevant data as it pertains to the litigation, RTZ-Vale et al.," but

were unwilling to provide those documents "without further direction from the High Court."

     8.2     It is accordingly requested that for the purpose of justice and for due

determination of the matters in dispute between the parties you direct Nigel Brown and Alec

Leighton to provide the documents detailed in Section 10 below.  Absent voluntary cooperation,

evidence from Nigel Brown and Alec Leighton is available only by an order of the High Court.

| | | |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Article 3,e)** | Nigel Brown and Alec Leighton<br>Nigel Brown<br>Winnington House<br>(2nd Floor)<br>2 Woodberry Grove<br>London N12 0DR<br>UK<br><br>Alec Leighton<br>147 Elgar Avenue<br>Berrylands<br>Surbiton<br>Surrey KT5 9JX<br>UK |

10.   **Documents or other property to be inspected (Article 3,g)[3]**

   a.   The proposals, pitch books, presentations You provided to or prepared for Rio
        Tinto as reflected in the reports entitled "Project Raven" and "Project Raven –
        Part 2," each dated 19 July 2010 and "compiled as a result of the research
        conducted pursuant to Rio Tinto's request for background enquiries and other
        investigations into the activities of Mr. Beny Steinmetz and Mr. Ehud Olmert any
        potential business relationships that they may have with Chinese businesses that
        are operating in Guinea or have invested in projects in Guinea" (the "Reports").

   b.   The engagement letters and disengagement letters between You and Rio Tinto for
        Rio Tinto's retention of Your services in connection with the Reports.

   c.   The bills or invoices submitted by You in connection with Rio Tinto's retention
        of Your services as reflected in the Reports including the time sheets or other
        records of the activities leading to the charges set out in those bills or invoices.

   d.   Correspondence between You and Rio Tinto concerning Your work done up to
        and following the Reports, correspondence relating to queries raised by Rio Tinto
        and documents provided to them (whether or not at their request) relevant to the
        work done or to be done.

---

[3] Messrs. Brown and Leighton shall be permitted to redact from the copies any information which may infringe any duty of confidentiality owed by them to any source of information regarding disclosure of the identity of the source. Where a redaction is made, Messrs. Brown and Leighton shall replace the name of the confidential source with an anonymised reference and a separate schedule shall provide information analogous to that provided at para 24 of Mr Huband's Witness Statement of 12 June 2015, including a description of the role and relevant employment of the source, and the reason why their evidence is considered reliable for each source.

e.   The documents from Your "enquiries" which You relied on for Your finding that "Steinmetz has also invested a considerable amount of time and effort in forging a good working relationship with Mahmoud Thiam, the Guinean Minister of Mines and that they meet on a regular basis," as referenced on page 6 of the report entitled "Project Raven Report," dated 19 July 2010.

f.   The documents, news reports, and other sources cited on pages 12-18 of Your report entitled "Project Raven Report," dated 19 July 2010, concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and potential partners, including but not limited to China International Fund ("CIFL"), Aluminum Corporation of China Limited ("Chalco"), and/or Aluminum Corporation of China ("Chinalco").

g.   Any other documents which You relied on for Your findings as set forth on pages 12-13 of Your report entitled "Project Raven" concerning a potential joint venture, partnership, investment agreement, or other arrangement regarding Simandou between BSGR and potential partners, including but not limited to China International Fund ("CIFL"), Aluminum Corporation of China Limited ("Chalco"), and/or Aluminum Corporation of China ("Chinalco"), including, if obtained in the course of Your enquiries:

i.   The interview memoranda summarizing conversations with members of BSGR, CIFLT, Chalco, or Chinalco related to such a potential joint venture.

24

    ii. The emails to or from a BSGR email address with CIFL, Chalco, and/or Chinalco and their attachments.

    iii. The term sheets agreed between BSGR and CIFL, Chalco, and/or Chinalco.

    iv. The contents of any data room between BSGR and CIFL, Chalco, and/or Chinalco.

h.  The reports compiled as a result of information obtained relating to the
    "Suggested Lines of Enquiry" identified on pages 19-20 of the report entitled
    "Project Raven Report," dated 19 July 2010.

i.  The interview memoranda and those documents (i) referenced in the interview
    memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or
    identified by the source summarizing or characterizing Your discussion with a
    source described as "a very close personal and business associate of Steinmetz"
    who "informed [You] that Beny Steinmetz has already paid nearly $10m to the
    military regime in Guinea some time ago and that having secured additional
    mining concessions in Simandou he has been seeking assistance from Beijing to
    support his growing company infrastructure in Guinea and that he is also courting
    assistance from an influential entrepreneur in Monaco to maintain his business
    momentum," as referenced on page 19 of the report entitled "Project Raven
    Report," dated 19 July 2010.

j.  The interview memoranda and those documents (i) referenced in the interview
    memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or
    identified by the source which You relied on for "earlier information from a gold
    mining contact in Guinea that Steinmetz is very close to the Guinean Minister of
    Mines," as referenced on page 19 of the report entitled "Project Raven Report,"
    dated 19 July 2010.

26

k.  The documents which You relied on for Your finding that "the Guinean Government's Minister of Mines, Mahmoud Thiam, had wholly supported and encouraged Steinmetz's business flirations with the Chinese.  There were suggestions that Thiam himself had even offered Chinalco, the Chinese Aluminum Company that part of the Simandou project that had been removed from Rio Tinto and 'handed' to Steinmetz," as referenced on page 5 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

l.  The documents which You relied on for "the rumor that CIFL did withdraw its offer" for a potential joint venture with BSGR, as referenced on page 6 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

m.  The documents which You relied on for Your finding that "Chinalco, CIFL and other Chinese companies [were] 'circling' around the lucrative iron ore and other mining contracts in Guinea," as referenced on page 7 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

n.  The spreadsheet "that summarises the sequence of events" and which was presumably attached to "Project Raven Report – Part 2," as referenced on page 8 of that report.

o.  "The reference documents, from which the database has been created, [which] have also been scanned, indexed and incorporated into another searchable database by our researchers" and are also maintained in "hard-copy," as referenced on pages 9 and 10 of the report entitled "Project Raven Report – Part 2," dated 19 July 2010.

p.  The documents evidencing Your "awareness" "that in August 2009 the former

Prime Minister of Israel, Ehud Olmert, who is also a personal friend of Beny

Steinmetz, visited MCC Limited in Beijing together with Steinmetz," as

referenced on page 21 of the report entitled "Project Raven Report – Part 2,"

dated 19 July 2010.

q.  The interview memoranda and those documents (i) referenced in the interview

memoranda, (ii) provided to or discussed with the source, and/or (iii) provided or

identified by the source evidencing Your discussion with a source who "stated

that he and Steinmetz were still heavily engaged interacting with the Chinese in

Guinea and in other locations," as referenced on page 21 of the report entitled

"Project Raven Report – Part 2," dated 19 July 2010.

r.  The documents collected by Messrs. Brown and Leighton through "the three days

of the document review" they conducted, as stated in Mr. Brown's e-mail to

Michael Lyle (counsel for Rio Tinto) dated 17 September 2005, as to which they

"are in a position to provide what we have discovered."

11.  **Request for notification of the time and place for the execution of the request and identity and address of any person to be notified (Article 7)[4]**

Jonathan Kelly
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

---

[4] For the avoidance of doubt, nothing in this Letter of Request should be construed as a submission by Vale to the jurisdiction of the courts of England and Wales, nor is Cleary Gottlieb Steen & Hamilton LLP instructed by the Applicant to accept service of any proceedings in England and Wales.

12.     **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the letter of request (Article 8)**

None.

13.     **The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

The fees and costs incurred which may be reimbursable under the second paragraph of

Article 14 of the Convention and the fees and costs occasioned by the use of the special

procedure requested in Article 26 of the Convention, being the fees and costs in connection with

the execution of this Letter of Request, for the service of process necessary to secure the

appearance of each Witness, the costs of the Examiner and the costs of the transcript of the

evidence will be initially borne by Vale.  The payment of any such fees and costs is without

prejudice to the Applicants' right to make subsequent requests for reimbursement of those fees

and costs from other parties to the proceedings before the Requesting Court.

DATE OF REQUEST

Sept 22, 2015

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

29