1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   RIO TINTO, PLC,

4                  Plaintiff,

5            v.                          14 Civ. 3042 RMB AJP

6   VALE, S.A., et al.,

7                  Defendants.

8   ------------------------------x

9

10

11                                       September 24, 2015
                                         2:30 p.m.
12

13

14

15  Before:

16                  HON. ANDREW J. PECK,

17                                       U.S. Magistrate Judge

18

19

20

21

22

23

24

25

1          (In open court)

2          (Case called)

3          THE COURT:  Be seated.

4          I must say I think you've set a new record for the

5     length of your joint letter, not to mention all the other

6     things that came along with it including the supplemental

7     letter, the letter motion to strike the supplemental letter.

8          Come on, guys, give me a break!!

9          You should be coming to the end of the paper discovery

10    and not looking for ways to make the fights go longer and

11    longer and more expensive and more expensive.

12         So using the letter as the agenda, knowing that you

13    knocked one or two of them off, the Vale application for

14    ad-issue waiver, here is what I have decided to do.  To me that

15    issue, even though it is in some way a discovery issue, is

16    extraordinarily substantive and seems to be the argument for

17    motions to strike letters and all of that.  So I am going to

18    reverse delegate.  You can make that motion whenever you want.

19    It is going to Judge Berman directly.

20         Now, you can wait because I don't think he's going to

21    want you to heap supplement, keep supplementing every three

22    days as you get another document or learn something else.  He

23    has got some serious substantive motions, procedural motions,

24    jurisdictional motions which have not yet been ruled upon.  If

25    you want to make the pile bigger in the hope that he won't rule

1  on it because of the size of the pile, make your motion now.

2  If you want to wait, it won't be constituting a waiver.  That

3  is my ruling on that issue.

4          The clawback letters, does someone want to hand up the

5  4-30-15 document which seems to be the only one still in

6  dispute?

7          MR. LIMAN:  Yes, your Honor.

8          MR. LYTTLE:  Your Honor, if you want any background, I

9  am happy to address that.

10          THE COURT:  Is anybody on this letter a lawyer?

11          MR. LYTTLE:  Yes, your Honor.

12          THE COURT:  Who?

13          MR. LYTTLE:  Mr. Edmonds at the top was the lead

14  lawyer for Rio Tinto on Cynaview's response and everyone copies

15  Rio Tinto's employee.

16          THE COURT:  Mr. Edmonds was in-house counsel?

17          MR. LYTTLE:  Yes, your Honor, in-house counsel.  The

18  date of this is also relevant.  It is May 2, right after the

19  announcement of the Vale-BSG joint venture.

20          (Pause)

21          THE COURT:  Let me hear two points.  One, I believe

22  there is a reporter in the audience.  Two, I am not sealing the

23  transcript or this conference, but both sides knowing those

24  issues, tell me why this is not at a minimum a mixture of

25  business and legal advice which would require redacting not the

1   whole thing in total, and then similarly for Mr. Liman, tell me

2   why this letter from a lawyer that contains at least in part

3   legal analysis is not privileged at least in part?

4          MR. LYTTLE:  Your Honor, first under the Gruss case,

5   Magistrate Judge Dolinger, under the first Geary decision from

6   the Second Circuit, what you're to look at is obviously there

7   is a gap between business and legal advice.  Is it

8   predominantly legal.  It is our position the document and

9   e-mail from Mr. Edmond, which is evaluating on legal options,

10  providing legal advice --

11         THE COURT:  It certainly looks like it is evaluating

12  business options as well as it is evaluating legal options.

13  Under that test, you probably lose the whole document.

14         MR. LYTTLE:  We are happy to look at the redactions if

15  that is what you prefer.

16         THE COURT:  I prefer you not bring these disputes to

17  the court and work them out.  On privilege, putting aside the

18  ad-issue waiver that I just passed the buck to my friend Judge

19  Berman, you're each arguing in essence the same thing against

20  the other side, and then when they turn around and say but we

21  want your similar material, you're saying no, no, no, no, and

22  you have used up more than your fair share of the court's time

23  collectively.  So I am not asking anything.  You are looking

24  for a ruling.  You said look at Judge Dolinger's analysis.  I

25  told you under that I think you lose.  Is there anything else

1    you want to argue?

2              MR. LYTTLE:  We are happy to work out some redactions,

3    your Honor.

4              THE COURT:  The document is not clawed-back.

5              As to the logging, I am now on Page 8, Paragraph C,

6    logging of investigator communications, since you all have

7    unlimited budgets, whatever anyone wants the other side to log

8    individually, go right ahead and waste your time.

9              So now Vale wants Rio Tinto to log certain things

10   document-by-document, that is what you're going to do.  I think

11   I am going to get the same issue the going the other way and,

12   you know, so that is the ruling.  No discussion.  Move on.

13             Logging of communications with third parties, Page 12.

14   There is no way I can rule on this without seeing some of the

15   documents.

16             MR. LYLE:  Your Honor, do you want to go through these

17   documents or the ones you wanted us to bring there?  We have

18   two sets.  We can start with the --

19             THE COURT:  I don't care.

20             MR. LYLE:  So I've got groupings which I think will

21   make it easier to follow because they're e-mail chains.

22             THE COURT:  Hand them up and tell Mr. Liman what it

23   is.

24             MR. LIMAN:  Your Honor, there are I think it is four

25   documents that we are taking off of the agenda.  Those are the

1    documents related to Mr. Toray, when Mr. Toray apparently was

2    an employee of Rio Tinto.  That representation has been made to

3    us.  On the basis of that representation, basis of the

4    representation made to us by Rio Tinto, and on the basis of

5    that representation, we withdraw the request as to the

6    documents with Mr. Toray when Mr. Toray was an employee of Rio

7    Tinto.

8             MR. LYLE:  I don't know if you want me to address this

9    from here or hand them up and do a sidebar?

10             THE COURT:  The sidebar will have to be on the record.

11   I don't think you want to stand closer so that we're looking at

12   documents together.  In any event, bring the documents.

13             MR. LYLE:  If I can approach?

14             THE COURT:  Slow down.  All right.

15             At least on some of these you are either the sender or

16   primary recipient, but these all seem to be with non-parties,

17   third parties.  How do you still have a privilege?

18             MR. LYLE:  These are all of those on the "to" line,

19   those are the investigators who assisted --

20             THE COURT:  Why is that privileged?

21             MR. LYLE:  Because there are two reasons why that is

22   privileged.  First of all, it is the work-product privilege

23   applies as does attorney-client under Cavel, and as your

24   Honor's acknowledged under your holding in the Gross case,

25   communications with third-party investigators who are assisting

F9OJRIOC                    Conference

1    attorneys in the litigation --

2               THE COURT:  What litigation?

3               MR. LYLE:  This is in anticipation of litigation, your

4    Honor.

5               THE COURT:  Okay.  So you're admitting that as of

6    November 2010 you anticipated litigation?

7               MR. LYLE:  Yes, your Honor.  This is subsequent to the

8    announcement of the joint venture between Vale and BSGR.  If

9    you can see in there, the purpose of those individuals that are

10   being talked to is for the purposes of aiding the attorneys,

11   and everyone on the CC line, every single one of those

12   individuals are attorneys, and they're outside counsel with the

13   exception of Mr. Edmonds, who you now know is in-house as in

14   Mr. Searles, who is also in-house at Rio Tinto.

15              THE COURT:  Mr. Liman.

16              MR. LIMAN:  Your Honor, there are two allegations of

17   the complaint that are inconsistent with representations just

18   made to you.  Our objection is to Rio Tinto seeking to have it

19   both ways.  If they were to withdraw --

20              THE COURT:  Why should they be different from you?

21              Everybody is trying to have it all different ways from

22   Sunday.

23              MR. LIMAN:  If we have tried to do that, we apologize.

24              Our point with respect to this is a central issue in

25   the case is what is reflected in Paragraph 143 of the

F9OJRIOC                    Conference

1    complaint.

2         THE COURT:  Which I got memorized, but my memory is

3    slipping today.  What does it say?

4         MR. LIMAN:  It says as a result of such wrongful

5    concealment, referring to the allegations of fraudulent

6    concealment, Rio Tinto did not know of or discover and could

7    not have known or discovered, in the exercise of reasonable

8    diligence, the unlawful conduct and resulting injury -- I am

9    now skipping some words -- until after criminal proceedings

10   against various defendants, as set forth below, were publicly

11   disclosed beginning in April 2013.

12        THE COURT:  Let me ask you a question.

13        Is anything important, other than in the content of

14   these documents, other than that they are claiming a work

15   product protection of investigating a possible lawsuit against

16   Vale, Steinmetz, BSGR, et cetera, in November of 2010, in which

17   case if you have that fact as a stipulation, do you need the

18   documents?

19        MR. LIMAN:  Your Honor, without knowing what is in the

20   documents, I can't answer precisely except to say that the

21   contents of it are potentially very relevant because --

22        THE COURT:  Let's perhaps see in the old approach of

23   you each can help each other, and I note in just a quick look,

24   various documents in an e-mail chain are withheld or

25   clawed-back or whatever we are fighting about here separately,

1    and it is really all the same information, but, in any event,

2    you both want to say for the purposes of this case, and under a

3    502 (d) non-waiver order, your whose-is-what's-its report on

4    the Vale side that you're fighting over, whether that was a

5    waiver or not and all of this stuff and all the EY stuff on the

6    Vale side and all the communications with the investigators on

7    the Rio Tinto side, which are borderline privileged, and to the

8    extent they're privileged, you all want to agree, you know, you

9    have a 502 (d) protection for no use and no waiver outside of

10   this case, you'll accept their material, they'll get your

11   material, you can stop taking up the court's time on

12   conflicting arguments.

13              MR. LIMAN:  We would accept that.

14              MR. LYLE:  We would -- we are happy to talk with Mr.

15   Liman and work that out.

16              THE COURT:  Come on, guys, I don't want to exaggerate.

17   I have a 39-page letter plus attachments.  Make a decision.

18              MR. LYLE:  In order for us to waive, to do that we

19   need to contact our clients.  The only thing we are asking

20   for --

21              THE COURT:  Are you recommending to them a mutual

22   waiver?

23              MR. LYLE:  We will recommend that is what we do.  I

24   think there may be ways for us to -- it is very clear you're

25   irritated and you're admonishing us to work it out.

1        THE COURT:  I have a concession from lawyers on the

2    defense side who have the courage or authority to make a

3    decision.  If you really can't make a decision --

4        MR. LYLE:  We will recommend.

5        THE COURT:  That is the court's order.

6        Hopefully that works all of that out.  Take your

7    documents back, and your deadline -- today is Thursday.  Today

8    is Thursday.  Monday you will advise Vale and I guess the court

9    because that also means they'll be giving you -- I am sorry.  I

10    am blanking on the name.  What is the name of the investigator

11    report or whatever that is I am holding up ruling on on your

12    side?

13        MR. LYTTLE:  Nardello, your Honor.

14        THE COURT:  Thank you.  That is the one.  Next I am

15    now over to Paragraph E, Confidentiality designations.  I want

16    to see if a sentence here on Page 18 is a workable way out for

17    you.

18        MR. LYLE:  I am sorry to interrupt the flow.  We

19    understand your ruling on Livingston and Aranus, the

20    investigators.  We have separately the issues as it relates to

21    Georges Landau and Fijihara, who are consulting experts that

22    were retained by attorneys.

23        THE COURT:  Why isn't that the same thing?

24        MR. LYLE:  These documents are a different set and a

25    completely different --

F9OJRIOC                    Conference

 1            THE COURT:  That isn't the question.  The idea is

 2     you're each going to get a non-waiver waiver so we can get by

 3     all of this.

 4            MR. LYLE:  We are talking about with respect to the

 5     investigators that you were just referring to --

 6            THE COURT:  Stop.  Are these people -- when were these

 7     people hired?

 8            MR. LYLE:  They were retained by Weil Gotshal under

 9     separate, outside counsel for Rio Tinto in October of 2010.

10            THE COURT:  It is the same time period.

11            MR. LYLE:  I am sorry.  I apologize.  They are

12     separate circumstances.  These are consulting experts, not

13     investigators.

14            THE COURT:  The same.

15            MR. LYLE:  All they were used for is to educate the

16     attorneys, not to investigate.  There is a big difference there

17     under all the cases, your Honor.  That is why I am separating

18     them out from --

19            THE COURT:  You're going to work that out with Mr.

20     Liman.  I am past that.

21            If you don't, I think we are going to start, and I

22     threatened this once before, you know, your firms, your clients

23     have unlimited resources, the court does not.  There will be

24     Rule 37 sanctions payable to the Clerk of Court on an

25     item-by-item basis depending on who wins and who losses.

F9OJRIOC                    Conference

1       Confidentiality designations.  Rio Tinto on Page 18

2   says, "Acquiescent to Vale's request for B designation would

3   serve no purpose other than to allow Vale's counsel to share

4   confidential commercially sensitive business information with

5   unknown entities and parties outside this litigation."

6       So what if the designations of confidential or

7   attorney's eyes only confidential were removed for the limited

8   purpose that anything that needed in good faith to be filed

9   with the court, could be filed without causing redactions or

10  non-filings?  Does that satisfy you all?

11      MR. LIMAN:  That satisfies us, your Honor.

12      MS. McCAFFREY:  Your Honor, I think we would be

13  willing to work with the defendants on that.  I think in terms

14  of a blanket agreement, these documents do vary in terms of

15  substance and what is contained.  I think if it was a mutually

16  agreeable solution for both parties, Rio Tinto will obviously

17  work with Vale to see if we can arrive at a solution.

18      THE COURT:  You don't seem to have worked very well

19  because I have six pages of a letter on all of this.  I am not

20  particularly happy, I am Mickey Mouse.  You're going to work it

21  out.  If I hear it again, somebody pays.  If I have to look at

22  documents, it may well be that you get sent not to Ms.

23  Grossman, but a litigation special master who will charge you

24  $800.00 an hour or whatever to look at on a

25  document-by-document basis on whether the designations have

1    been abused or not.

2              MS. McCAFFREY:  Understood.  Just to be clear, that

3    applies to Vale's designations of confidential and highly

4    confidential as well, correct?

5              THE COURT:  Yes.

6              MR. LIMAN:  The one thing we can't agree on is with

7    respect to the feasibility study for two reasons.

8              THE COURT:  I understand.  Everything else, try to

9    work it out.

10             MS. McCAFFREY:  May I be heard on the feasibility?

11             THE COURT:  Do you want me to rule now on anything?

12             MS. McCAFFREY:  No.

13             THE COURT:  Thank you.

14             Rio Tinto's collection of documents from the foreign

15   law firms which probably goes somewhere along with EY

16   documents.  What do you want me to order since there seems to

17   be on the one hand cooperation, on the other as a just in case,

18   they don't cooperate, take convention requests.  Tell me what

19   you want.

20             MR. LIMAN:  We are trying to come up with a workable

21   solution to avoid costs.  What we would like is for you to

22   order that the non-privileged documents be produced and that

23   before we go to the expense and the burdening of foreign

24   officials to get the letters requested, we understand what is

25   being logged as privileged.

1          If everything is being logged as privileged, then the

2     only issue is going to be the, the main issue will be for the

3     U.S. Court in terms of resolving those issues.  If there are

4     going to be a lot of documents produced that are not

5     privileged, then the issue may be isolated and we can deal with

6     it.

7          One way or another, these are documents as to which

8     the lawyers have a responsibility to the clients, and I can

9     make that proffer as an officer of the court, I have now

10    checked with courtesy counsel and French counsel, the same

11    types of duties apply as New York law, not in haec verba.

12         MR. LYTTLE:  That is a little different than what we

13    have.  We have reached out to foreign counsel.  We asked them

14    to provide us the non-privileged information.  It is not clear

15    they're telling us.  Their looking at it.  I don't have a

16    definitive answer.  It is not clear necessarily they have to

17    turn over the work.

18         We are going to continue to push for that.  The law on

19    privilege is going to be the law of that jurisdiction.  They

20    are not willing to provide us the privileged information, your

21    Honor, when you sent over the request and that is what they

22    were looking at when they said there is no privileged

23    information.  So we will ask them to turn over non-privileged

24    stuff, but to do a log and have them do a log, I am not sure

25    they'll provide it to us.  They're saying we don't have to do a

F9OJRIOC                    Conference

1    log because the Hague --

2            THE COURT:  Whatever the burden may be, and you can

3    move for cost shifting at the appropriate time because I don't

4    want us to be in a position in another month or two where we

5    have the same arguments that you all put with respect to the

6    investigators, was Rio Tinto while in black and white saying

7    please cooperate and produce stuff, were they winking and

8    saying no, we don't, the letters of request are out there.  I

9    have signed them.  We'll see what the results are.

10           MR. LIMAN:  We seek the court's guidance on an issue.

11           Based upon what Rio Tinto has said, I anticipate that

12   a significant issue will be whether the documents have been put

13   at issue pursuant to this Court's ruling.

14           THE COURT:  At issue is Judge Berman's baby.

15           MR. LIMAN:  That is correct, that is where I want to

16   tee it up.  I am seeking guidance.

17           THE COURT:  I have no guidance for you.  That is why

18   you're paid a thousand or whatever it is an hour.  We are

19   moving on.

20           MR. LIMAN:  If I can't get a privilege log out --

21           THE COURT:  You can't get --

22           (Multiple voices)

23           MR. LIMAN:  How do I know if what there are --

24           THE COURT:  To the extent it is in response to the

25   letters of request, that is up to the court in the U.K. or

1    wherever else the letters of request are going as to how they

2    handle those sort of things.  I can't tell them how to do their

3    business.

4           What I was saying is, and if this helps, you know, I

5    was not, by signing the letters of request, requiring or asking

6    the counterpart courts to require the parties at issue under

7    those letters to produce privileged material if there is really

8    a privilege.  Whether the U.K. courts or Israel or wherever

9    else the letters of request went require privilege logs or how

10   they handle that, that is up to them.

11          MR. LIMAN:  Fair enough.  Thank you.

12          THE COURT:  Paragraph G, Page 21, BSGR's challenge.

13   That is moot.  Is that correct?

14          MS. McCAFFREY:  Correct, your Honor.

15          THE COURT:  Next, Roman Numeral II, starting on 23,

16   the so-called Trojan horse documents.

17          If the documents are not relevant, why should they be

18   produced whether it is 471 or whatever it is?  Is this an area

19   where you would be prepared to show a small sample to Rio Tinto

20   to prove that when you say they're not relevant, you're using

21   the same scope of relevance that they would be using?

22          MR. REENTS:  Your Honor, I think in principle we

23   would.  That was, in fact, the agreement that we had reached

24   that you so ordered on September 2nd, allowing each side the

25   right to inspect the other side's production, have run

1  searches, responsive and nonresponsive documents.

2          Rio Tinto did not include this search in their request

3  to us.  We talked to them this week about providing a small

4  sample from the Trojan horse hits in order to demonstrate that.

5  They rejected that offer.

6          THE COURT:  Mr. Lyle.

7          MR. LYLE:  Your Honor, in your order, your Honor, when

8  we were in court, you ordered that they go back and search for

9  a Trojan horse, and --

10         THE COURT:  I know what I said last time.  What is --

11  excuse me.  I am not done -- what is the authority to order

12  them to produce nonresponsive documents under the federal

13  rules?

14         MR. LYLE:  We are not suggesting they would produce

15  nonresponsive documents.  They identified the documents using

16  the search term you ordered.  They identified less than a

17  million --

18         THE COURT:  You're not answering my question.

19         MR. LYLE:  We are not seeking nonresponsive documents.

20         THE COURT:  You are not responding.  What sample size

21  did you offer out of these 417?

22         MR. REENTS:  It is complicated.  They had 161

23  documents remaining --

24         THE COURT:  Forget everything else on the special

25  master's protocol.  How many documents would you show them out

1   of the 417 to show them that their really not relevant?

2                   MR. REENTS:  50.

3                   THE COURT:  Does that work?

4                   (Off-the-record discussion)

5                   THE COURT:  Hearing no answer, the --

6                   MR. LYLE:  I was conferring with Mr. Lyttle to get

7   input on this.  The issue that we're having is that they have

8   identified them the way they already searched them.  They are

9   relevant.

10                  THE COURT:  Thank you.  They don't have to produce

11  anything.  That is the court's order.  You just snatched defeat

12  from the jaws of victory.  Welcome!

13                  Next, Page 26.  Vale, the draft final Ernst & Young

14  reports.  That is already resolved by the prior agreement that

15  you're now going to work out the fine-tuning of, but that is

16  probably going to be a mutual non-waiver of production.

17                  Next?

18                  MR. BONANNO:  If I may, Mike Bonanno, on behalf of Rio

19  Tinto.  Before I address the court on this issue, I want to

20  alert the court I have not filed my application to appear pro

21  hac yet.

22                  THE COURT:  A, that means you can't talk.

23                  B, this is an issue that you're going to get the

24  documents, assuming the client follows the recommendation of

25  counsel.  That is what we discussed in the very beginning of

F9OJRIOC                    Conference

 1   this conference.

 2           MR. BONANNO:  Yes, your Honor.

 3           THE COURT:  You may sit down.  No.  I have ruled.  We

 4   are moving on.

 5           The extra month of due diligence documents, I'm not

 6   sure I understand either party's position.  This is on Page 29

 7   to the top of 31.

 8           MR. BONANNO:  Your Honor, Mike Bonanno on behalf of

 9   Rio Tinto.

10           THE COURT:  I hate to do this to you, but you're not

11   admitted.

12           MR. BONANNO:  I ask the court for pro hac --

13           THE COURT:  No.  Fill out the papers.  You guys can

14   write 50-page letters to the court not following the gist.

15           Yes, you followed the letter of the law that you got

16   this 40 page letter two days before.  I think several if not

17   all of you knew I wasn't going to be here yesterday.  I have

18   made no secret of what my religion is, so I spent a lot of time

19   fast-reading late Tuesday and today.  I am really not in the

20   mood for lawyers who can't get their paperwork in.  If you want

21   to defer this to the next conference when you're admitted, we

22   can do that.

23           MR. LYTTLE:  We can address it now.  The reason we

24   couldn't get it in, the Pope was in DC and we couldn't get -- I

25   apologize for -- (Inaudible) -- I apologize.

1          I am going through to May 30th, 2010.  What we are

2     asking here, after here is available a commissioned report, to

3     prepare a report exactly on fraud and bribery BSG may be

4     subject to.  That report itself was not prepared by its own

5     terms and is expected not expected to be prepared until

6     mid-May.

7          THE COURT:  You are getting EY documents.

8          MR. LYTTLE:  We are looking for correspondance between

9     Vale and E&Y up through --

10          THE COURT:  The EY discussion you're going to

11     separately have because if your clients agreed on the waiver,

12     you're going to get EY-related production.  So we are putting a

13     pin on that.

14          Next.  I guess we are back to the Symondel feasibility

15     study.

16          MR. BLACKMAN:  Yes, your Honor.  If I could speak to

17     that.  I think we can cut this short, which is the court's

18     desire.

19          We were in touch with the Government of Guinea as

20     recently as today.  The tender process has not begun.  The

21     Government of Guinea has intended to charge bidders a great

22     deal of money, I believe in the seven figures or more to have

23     access to this feasibility study.  Until such time as that

24     process has happened, the government is strongly opposed -- and

25     has told us so -- to giving it to anybody, least of all a

1    likely potential bidder, and from our perspective, a

2    significant competitor.  That is the issue.  It is quite

3    simple.  That is why, as Mr. Liman was saying, this AEO

4    different is from --

5          MS. McCAFFREY:  Your Honor, we have now explained this

6    to Vale multiple times.  Rio Tinto has stated publicly it is

7    not participating in the public process for Class I and II,

8    which is the feasibility study this is referring to and also

9    that tender process.  We are fine it with it being designated

10   as confidential, with a confidential designation.  It doesn't

11   go anywhere else and can't be used for any other purpose than

12   this litigation.

13         THE COURT:  Why is it you need your client to --

14         MS. McCAFFREY:  Your Honor, it goes to the fact we

15   have accused Vale of using information from Rio Tinto's data

16   room in order to develop and continue the work on Symondel.

17   The individuals at Rio Tinto that worked on the Symondel

18   project and have that basis of knowledge are in the best

19   position to be able to take a look at that document to be able

20   to see and trace that information.

21         THE COURT:  From the very beginning of this case we

22   have had the difficulty that the two of you, two sides can't

23   agree on what was the information that was allegedly used by

24   Vale.  So I am not prepared to take it out of the attorney's

25   eyes only classification.

1           You can figure out a way, you know, and perhaps try to

2     work with Mr. Blackman and Mr. Liman, et al, on whether one

3     person should get to see it, nobody, whether you can excerpt a

4     line or two you think might be your information and show that

5     to somebody in-house.  At the moment the request to be

6     designated is denied.

7           MS. McCAFFREY:  I may I ask one question on that.

8           Rio Tinto has proposed potential of use of a small

9     team, and we would disclose --

10          THE COURT:  You said one person, and I said in part

11    and you would have to negotiate it.

12          MR. BLACKMAN:  If I can speak to that?

13          THE COURT:  You can snatch defeat from the jaws of

14    victory!

15          MR. BLACKMAN:  No.  I am hopefully being helpful here.

16          What happens in trade secrets all the time is that one

17    person is the expert, not an insider, but an expert, and they

18    are free under the existing AEO order to show this to an expert

19    who can compare what they claim is confidential to what is in

20    the --.

21          THE COURT:  The order at the moment is I am not

22    removing the designation.  You all keep talking to each other.

23          THE COURT:  ESG BSGR Steinmetz, what I would like to

24    do is hear from counsel from --

25          MR. FILARDO:  Good afternoon.  We laid out in the

F9OJRIOC                    Conference

1    letter our position.  We are in the process of considering --

2              THE COURT:  All right.  With all due respect, stalling

3    in the hope that one of these years Judge Berman will rule and

4    you'll be out of the case doesn't work.  So you're going to

5    have to tell me where you're in the process will be done and

6    which should be very soon or otherwise, I am going to rule and

7    you may not like the ruling.

8              MR. FILARDO:  Your Honor, before we came to the

9    opportunity to discuss our proposals to Rio Tinto, we were

10   notified there was this application filed in the high court for

11   essentially a motion to compel was filed on September 18th.

12             That is --

13   THE COURT:  We have been going parallel on many

14   things.  You were, I believe, unavailable last time, one of

15   your colleagues was here when I said in no uncertain terms that

16   the way the keywords were done by BSGR and Steinmetz, albeit

17   via the U.K., was pretty pathetic based on clear U.S. law with

18   respect to keyword searching.

19             Your colleague, as I recall, said that she would take

20   under advisement, you know, improving that and working with Rio

21   Tinto, et cetera.  So either be candid and say you're just

22   going to await the high court ruling and I've got no

23   jurisdiction over you, et cetera, or tell me you're doing it,

24   and if so, by when regardless of what the high court rules.

25             MR. FILARDO:  Your Honor, at this point given the

1    motion, we'll wait for the high court ruling.

2              THE COURT:  Okay.  Remember that the other warning I

3    gave is when it is determined, if it is determined that the

4    court has jurisdiction over you then, and I have no idea which

5    way Judge Berman is going on that, but if you are subject to

6    jurisdiction here, when you tell me we can't possibly do this

7    in less than 60 days, et cetera, don't be surprised when you're

8    told you have a week to make production and that there will be

9    a sanction of a thousand dollars a day, five thousand dollars a

10   day, whatever seems appropriate at the time for every day you

11   miss your deadline.  If you want to wait, I can't do much about

12   it at this point.

13             I may change my position on that.  I am not prepared

14   to go there now, but you are using up any hope you have in the

15   future for getting anything other than the shortest deadline

16   humanly possible.

17             MR. FILARDO:  I understand, your Honor.

18             THE COURT:  Okay.  I am going to Page 35, Paragraph 2.

19   Let me hear from their counsel.  It looks like you don't really

20   have a problem with being ordered to produce the material that

21   came out of the LCA and ICSID proceedings, but you just need

22   the protection of the court order, correct?

23             MR. SOLOMON:  Yes.

24             THE COURT:  So ordered.  Produce it.

25             As to the other material, what else is there?  The

F9OJRIOC                    Conference

1   other category is the technical committee investigation?

2              MS. McCAFFREY:  Yes, sir.  The correspondence between

3   Mr. Thiam and the people from the Guinean Technical Committee

4   Investigation, we respectfully request an order require that

5   production.

6              THE COURT:  Any objection?

7              MR. SOLOMON:  Hold on one second.

8              THE COURT:  It is Paragraph 1 on page --

9              MR. SOLOMON:  I am a little new to some of this, I

10  confess.

11             THE COURT:  It is ordered to be produced.

12             MR. SOLOMON:  Your Honor, I just -- I didn't write a

13  39-page letter.  I have a paragraph here.  There is information

14  that we received that was part of this confidential proceeding.

15             THE COURT:  By ordering you to produce it, you are

16  relieved of any violation of that order.

17             MR. SOLOMON:  Okay.

18             THE COURT:  Okay.  BSG, Page 36.

19             MR. AUERBACH:  Good afternoon, Martin Auerbach for BSG

20  defendants.  I apologize for the prior recent conferences.

21             Before I proceed, I would draw to your Honor's

22  attention a fascinating book called When the Elephants Dance, a

23  Philippine saying when the elephants dance, the chickens have

24  to watch out.  My client does not have an infinite budget.  In

25  fact, my client's budget comes out of me, and so consistent

F9OJRIOC                    Conference

1    with what your Honor directed last time --

2            THE COURT:  Your client has the ability to withdraw

3    its answer, and if it can't afford counsel, it can --

4            MR. AUERBACH:  I understand.

5            THE COURT:  -- take its chances.

6            MR. AUERBACH:  I understand.  In light of my view of

7    my role as an Officer of the Court, I have taken it on myself

8    to do what your Honor has directed.  The issue that brings me

9    before you at the moment has to do with the e-mail search

10   protocol your Honor directed has been conducted with respect to

11   the first of multiple custodians.

12           What I wanted to report to your Honor and get the

13   court's guidance on is the fact there is absolutely nothing in

14   the selection that I have reviewed personally because I was

15   busy reading hard late at night so I can meet my other

16   obligations.  The closest we get to responsive is the happy

17   news from the current minister of mines, that he does not

18   believe Benny Steinmetz is sending bats to invade Guinea, and

19   that comes out of a popular rumor in Guinea the reason they

20   have Ebola is because the Titanic data between Mr. Soros and

21   Mr. Steinmetz led them to get Ebola.

22           Out of the e-mails that were gathered for Mr. Kuchu,

23   there were approximately 6,000 hits because we applied all of

24   the Rios search terms.  I reviewed every one of the sample of

25   250 of those, and there is nothing responsive beyond newspaper

1    articles about the fact Mr. Steinmetz isn't sending bats.  The

2    fact is Mr. Steinmetz would be willing to compromise with the

3    government.  I am reading e-mails about travel reservations,

4    about terminating leases for apartments.

5         THE COURT:  The question, it may be you are arguing to

6    be relieved or your client to be relieved from examining any

7    more of this, but as a first step in that, any reason since

8    you're basically saying it is all junk, that you shouldn't show

9    the hits results to the --

10        MR. AUERBACH:  I am happy to read those 250 I got from

11   Vale.  Out of those hits, I am happy to read the 250.

12        MR. LYTTLE:  The issue --

13        MR. AUERBACH:  -- I just want to finish because the

14   next person in line is Mr. DeDoka, and one of the things you

15   will see when you look through the e-mails Mr. Dedoka's e-mail.

16   He was responsible for environmental health and safety.  He

17   came in 2011 and is one of the people who we have Vale-based

18   e-mail for.  I have regard for Mr. Dedoka and Kuchu, but they

19   were the last men standing.

20        That is what Vale has produced for us in terms of

21   e-mail, and rather than continue, I think it is a pointless

22   exercise, and under the kind of timetable they want, I prefer

23   that they look perhaps at defined search terms, perhaps have a

24   better protocol, but to waste everyone's time is pointless.

25        MR. LYTTLE:  Two points.  One, we have searched on

1   BSG.  They haven't responded and haven't had extensive

2   meet-and-confers.  They are not relevance parameters they're

3   applying to this and making relevance determinations.

4               THE COURT:  Why don't you look at the 250-something

5   documents and then take Mr. Auerbach back up on the suggestion

6   of discussing this further, quickly, mind you, and seeing

7   whether it pays for a revision of the search terms or, you

8   know, running the rest of this and other than doing a very

9   quick privilege review search, you're still protected with or

10  without the 502 order in general effect in this case.

11              If it is all junk, produce it without further review

12  and let the plaintiff spend the money dealing with it or work

13  out something else, but do it quickly.

14              MR. AUERBACH:  Absolutely.

15              MR. LYTTLE:  That would apply to Mr. Dedoka as well

16  because we believe he is a substantive witness.

17              THE COURT:  All of the people from the --

18              MR. LYTTLE:  One other point.  We agree on custodians

19  with Mr. Auerbach.

20              THE COURT:  I know some of them don't exist.

21              MR. LYTTLE:  We are going to be working with him to

22  find a place for custodians, I want your Honor to know.

23              THE COURT:  The paragraph Roman VI, Page 37, is moot.

24  Roman numeral 7, no issues is always good news.

25              At the risk of not wanting to hear the answer, but

1    anything that is a dispute ripe for court resolution today that

2    didn't make it into the 39 pages?

3         MR. LIMAN:  Not one we think is ripe for resolution,

4    but we do have a disagreement with Rio Tinto with respect to

5    the compliance with your Honor's September 10th order.  We

6    don't think that it is ripe.  The question is whether a proper

7    26 (g) review was done.  We have asked them if we can raise it

8    in subsequent conferences.

9         THE COURT:  If I is not ripe, we'll let it go.

10         Anything else?

11         MR. BLACKMAN:  One other thing just quite recently,

12    like in the last day or so, we have had a request from Rio

13    Tinto for the documents that both we and BSGR submitted in the

14    arbitration in London, and we have told the court, the arbitral

15    tribunal which we approached on this issue said we could not

16    produce either their documents or our documents unless ordered

17    to by this Court, and we need to take that order to the

18    tribunal unless BSGR does not object, which they do, so I am

19    presenting it to the court.  We will abide the court's order.

20         THE COURT:  So these are documents you have because

21    they came from BSGR?

22         MR. BLACKMAN:  They're actually the briefs and witness

23    statements actually submitted to the tribunal.  That is what

24    they have asked for, both ours as claimant and theirs as

25    respondent, and we can't do, produce either of them unless the

F9OJRIOC                    Conference

1    tribunal lets us or they consent.

2              THE COURT:  I am ordering its production.

3              MR. FILARDO:  We have provided the witness statements

4    and all exhibits that are attached.  Some of the confusion is

5    coming in because even though that is a significant amount of

6    information, also produced documents that are responsive to the

7    letters of request that were also produced in the LCIA, it is

8    not every document that was produced in the LCIA.

9              THE COURT:  So now every document that you have

10   produced in the London arbitration will be produced via Vale.

11   That is the court's order subject to you have --

12             MR. BLACKMAN:  We have to take your order to the

13   tribunal, which we will do promptly.

14             MR. LYTTLE:  Your Honor's order covers any documents

15   exchanged, the discovery-like mechanisms?

16             MR. BLACKMAN:  That hasn't happened yet.

17             THE COURT:  It will if and when there is discovery

18   there, and I think London arbitrators may have had more sense

19   than U.S. arbitration to allow much discovery.  We will order

20   that if and when it happens.

21             Is there anything else from any other defendant, or

22   shall turn back to plaintiff's table?

23             MR. FILARDO:  One more point.  The London examinations

24   will be taking place next week.  These are the examinations of

25   certain Rio Tinto's investigators located in London.  We have

F9OJRIOC                    Conference

1  conferred a bit on our side with defendant Vale, and TM will be

2  counsel for all, will be appearing and participating in those

3  examinations.

4        We'd like a proposal to make to Rio, as we haven't had

5  a chance to talk to them and have your Honor's ruling on it to

6  the extent you can, to have an agreement that all objections as

7  to substance, not to form, be reserved for this Court and

8  trial.  Right now the order from the special master in London

9  is that only admissible evidence will be taken into

10 consideration, which would require potentially a number of

11 hearsay objections and other substantive objections that may

12 pique the flow of those examinations.

13        MR. BLACKMAN:  Put another way, your Honor, we would

14 like -- it is ultimately up to Master Leslie to describe what

15 to put in, but we would like to have you on the record so we

16 can show him that the English examinations will be used to the

17 extent permissible.

18        THE COURT:  Any objection?

19        MR. BLACKMAN:  And follow --

20        MR. LYTTLE:  No objection.  There is a fight over

21 whether we will be permitted to question.

22        MR. BLACKMAN:  There is no objection to that on our

23 side.

24        MR. LYTTLE:  If we are not permitted an opportunity to

25 --  (Multiple voices) .

F9OJRIOC                    Conference

1          MR. LYTTLE:  It is up all up to Master Leslie.  Rio

2   Tinto cannot say no matter what we agree to the admissibility

3   of this.

4          THE COURT:  That is not even close to what I

5   understood defense counsel to be asking.

6          MR. LYTTLE:  I apologize.  I didn't understand what

7   defense counsel was asking.

8          THE COURT:  What they're basically saying is that the

9   admissibility at trial or summary judgment or other proceedings

10  here of anything that the witnesses say in those examinations

11  will be subject to U.S. admissibility rules, and there is not a

12  waiver merely because hearsay or something else was gathered in

13  that examination because of the possible different evidence

14  rules there and here.  Is that accurate?

15         MR. BLACKMAN:  That is totally accurate.

16         MR. FILARDO:  Totally.

17         MR. LYTTLE:  That makes more sense.  We agree with

18  that.

19         THE COURT:  That is approved.

20         Any issues from the plaintiff?

21         MR. LYTTLE:  No, your Honor.

22         THE COURT:  When do you all feel the need to come

23  back?  And I do suggest, tell me if you need to rework the two

24  days before letter-writing or whatever, but I think there are a

25  lot of things that you're each submitting your pieces of the

1    letter, but they're not really meeting each other, maybe less

2    of this time than the last one, but I would like to encourage

3    you to raise as few issues as possible with the court.

4               MR. LYTTLE:  We have been thinking about that as well.

5               We proposed this in the past and would like to re-up

6    it.  We are passing in the night a little bit.  If we could

7    have three days before we exchange actually not just topics,

8    but we exchange substantive inserts, and you can respond to

9    that or take things off the table and then the next day --

10              THE COURT:  You would --

11              (Multiple voices)

12              THE COURT:  Work it all out.  It is in both sides, all

13   sides' interest.  Work it out and make a proposal to me by a

14   joint letter, and most likely anything that doesn't increase my

15   burden and that may, indeed, lessen it and that will still get

16   me the letter two business days, actual days that you know I am

17   going to be here or don't know I am not going to be here, days

18   in advance.  How you get up to that point I don't care.

19   Obviously, if you start the letter-writing a week or two

20   before, you will wind up putting it together, but then ripping

21   it up.  Work it out.  When do you want to come back?

22              (Off-the-record discussion)

23              MR. LIMAN:  We have reached a compromise on the

24   suggestion, your Honor, of five weeks instead of the typical

25   four weeks.

1          THE COURT:  If I am judging your calendar agreement

2    right, we are now looking at either the week of November 2 or

3    the week of November 9?  Which?  Which do you prefer?

4          MR. LIMAN:  We would prefer the 9th, your Honor, the

5    9th.

6          THE COURT:  How about Thursday, November 12, at 2:00

7    o'clock, does that work for everybody?

8          MR. LIMAN:  It works for Vale.

9          (Off-the-record discussion)

10         THE COURT:  I know the DC folks like the afternoon,

11   but how about November 13th, at whatever time in the morning

12   works best for your trains?

13         MR. LYLE:  That is fine, your Honor, we can travel up,

14   we can come up the night before as well.

15         THE COURT:  9:30, 10:00, 10:30, 11:00?

16         MR. LYLE:  Why don't we do 10:00 o'clock?

17         THE COURT:  On the 13th, 10:00 am, all right.

18         Thank you.

19         (Court adjourned)

20

21

22

23

24

25