**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8166**

WRITER'S INTERNET ADDRESS
**mikelyle@quinnemanuel.com**

November 12, 2015

Hon. Andrew J. Peck
United States Magistrate Judge, Southern
District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20D
New York, New York 10007

Re:    <u>Rio Tinto v. Vale et al, Civil Action No. 14-cv-3042 (RMB) (AJP) (S.D.N.Y.)</u>

Dear Judge Peck:

Plaintiff Rio Tinto plc ("Rio Tinto") and Defendants VBG–Vale BSGR Limited aka BSG Resources (Guinea) Ltd. aka BSG Resources Guinée Ltd, and BSG Resources Guinée SARL aka BSG Resources (Guinea) SARL aka VBG-Vale BSGR (together, "VBG Defendants"), Benjamin Steinmetz, BSG Resources Limited ("BSGR"), Vale S.A. ("Vale"), and Mahmoud Thiam write jointly to update the Court on the status of various discovery issues in advance of our November 17, 2015 status conference. Below is a proposed agenda for the conference.

## I.    <u>Discovery From Defendant Vale</u>

### a.    <u>Production of Documents from Ernst and Young Between 30 April and 31 May, 2010</u>

#### i.    <u>*Rio Tinto's Position*</u>

Through the Rule 502(d) negotiations Your Honor directed Vale and Rio Tinto to undertake with regard to materials prepared by Ernst & Young ("E&Y"), Rio Tinto narrowed its focus to E&Y's work concerning evidence of potential BSGR bribery or corruption.  Based on documents produced in discovery, it appears that the relevant E&Y work culminated in the preparation of two reports, one of which was finalized on May 27, 2010.  Vale claims that materials related to the May 27, 2010 report (included all drafts thereof) are privileged because, even though E&Y was retained by Vale, Vale's counsel, Clifford Chance, directed E&Y's activities.  For now, Rio Tinto has only asked Vale to produce or individually log all versions of

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS |
MUNICH | SYDNEY | HONG KONG | BRUSSELS

the May 27, 2010 report, along with any associated communications sent between April 30, 2010 and May 31, 2010, which Vale has refused to do.

As it stands now, documents Vale produced in discovery indicate that Clifford Chance played little, if any, role in E&Y's independent bribery and corruption investigation. Rather, it appears E&Y's work was done at Vale's direction, with E&Y going so far as to modify – at Vale's request – its conclusion in a near-final draft of the report that BSGR's operations posed a high risk of bribery or corruption. VALE-RT_00075302, at -305. Nor does Vale's privilege log support its argument that Clifford Chance oversaw E&Y's work. Vale's log contains only three individual entries for the entire month of May 2010, and none of those entries identify a single communication involving E&Y or Clifford Chance. And Vale does not appear to have individually logged even the final version of the May 27 report, let alone any of the intermediate drafts. The foregoing suggests that Clifford Chance did not in fact direct E&Y's activities and that none of the materials at issue are privileged.[1]

Nevertheless, to better evaluate Vale's privilege claim and narrow the scope of this dispute before deciding whether to seek relief from this Court, Rio Tinto asked Vale to produce or log a limited set of documents in a narrow time window (i.e., those created *before May 31, 2010*) that are related to E&Y's work regarding evidence of bribery or corruption associated with BSGR, and in particular the May 27, 2010 report. Consistent with the Court's order,[2] Rio Tinto asked Vale to individually log (even using categorical descriptions that would still allow Rio Tinto to see the to/from and cc lines for each document) any such documents that Vale claims to be privileged. Individual log entries are critical here because Rio Tinto needs to assess what role, if any, Clifford Chance played in the work performed by E&Y.

Vale, however, has refused to produce or individually log those documents. Vale's basis for doing so appears to be that these documents were created after the Vale-BSGR joint venture was publicly announced on April 30, 2010. Its position has no merit.

*First*, Your Honor already has said that discovery through May 2010 regarding Vale's due diligence work is proper as long as such discovery requests are tied to the subject matter of BSGR bribery or corruption. Hr'g Tr. 9:10-12 (August 19, 2015) ("But, to the extent it is

---

[1]  In any event, even if Vale's log did reflect communications with Clifford Chance, evidence of emails copying Clifford Chance on communications between E&Y and Vale would not somehow cloak all of E&Y's accounting work in privilege pursuant to *Kovel* and its progeny. A careful, fact-specific analysis would be necessary to test any such superficial claims of privilege.

[2]  *See* Hr'g Tr. 5:5-12 (September 24, 2015) ("As to the logging, I am now on Page 8, Paragraph C, logging of investigator communications, since you all have unlimited budgets, whatever anyone wants the other side to log individually, go right ahead and waste your time. So now Vale wants Rio Tinto to log certain things document-by-document, that is what you're going to do. I think I am going to get the same issue the going the other way and, you know, so that is the ruling. No discussion. Move on.").

dealing with specific reports and subjects of bribery and corruption in and around April/May 2010, it doesn't bother me that we are in May."). Rio Tinto's requests are so limited, and Vale's position is completely at odds with that directive.

     *Second*, Vale's refusal to produce or log these documents is based on an agreement between Vale and Rio Tinto that was based on an incorrect premise in the early stages of discovery. Vale previously represented that its due diligence concerning BSGR's operations was complete no later than April 30, 2010, the date VBG was formed. Based on that representation, Rio Tinto agreed to limit the scope of certain discovery requests to documents created before that date. As the timeline below illustrates, however, that agreement was based on a premise that has now been shown to be demonstrably false. Vale's diligence work concerning BSGR's accounting controls and whether BSGR's Guinean operations posed a risk of bribery and corruption (including work performed by E&Y) continued until at least May 27, 2010. That work may have begun shortly before the formation of VBG (Vale retained E&Y to perform this work on April 27, 2010, only three days before the announcement of the Vale-BSGR joint venture), but it was far from complete on April 30, 2010. Indeed, Your Honor was right to allow discovery to proceed into May 2010 since we know all of the following events occurred in May 2010, and Vale is refusing to produce or individually log documents related to them.

### TIMELINE OF VALE'S CORRUPTION INVESTIGATION CONCERNING BSGR'S BOOKS AND RECORDS

| 4/30/2010 | Vale and BSGR announce the formation of VBG. | |
|---|---|---|
| 5/5/2010 | E&Y's fraud investigation team travels to Guinea to continue its assessment of BSGR's books and records.<br><br>Vale had asked E&Y, in the month prior to the formation of VBG, to understand a change in KPMG's audit opinion for BSGR's 2009 financial statements that reflected the addition of a "books and records" certification mirroring the language of the U.S. Foreign Corrupt Practices Act. The audit opinion from the prior year did not include similar language.<br><br>While in Guinea, E&Y investigators ask probing questions of BSGR personnel regarding whether BSGR has ever bribed any government officials. | VALE-RT_00147539; VALE-RT_00188043<br><br>*See also* VALE-RT_00076141, at -144, -143; VALE-RT_00146974<br><br><br><br>VALE-RT_00190141, ¶90 |
| 5/7/2010 | E&Y finally meets with KPMG in Conakry to discuss the addition of the FCPA "books and records" certification in BSGR's 2009 audit opinion. KPMG indicates that the "books and records" certification was only added because it was requested by BSGR. | Vale-Audit_00005902 |

| 5/14/2010 | E&Y's fraud team provides a draft version of its report to Vale for review. | VALE-RT_00075302, at -309 |
| 5/24/2010 | Vale directs E&Y to modify its draft report by removing the conclusion that BSGR's Guinean operations pose a high risk of bribery and corruption. | VALE-RT_00075302, at -307 |
| 5/27/2010 | Vale authorizes E&Y to finalize its report, but only after E&Y agrees to remove the reference to the high risk of bribery and corruption associated with BSGR. | VALE-RT_00075302, at -305 |

*Finally*, without regard to the date limitation concerning Rio Tinto's due diligence requests, these materials are clearly responsive to separate document requests regarding bribery and corruption that are not subject to such a limitation. *See* RFP No. 17 ("All Documents and Communications discussing information, statements, allegations or rumors of bribery and/or corruption by BSGR and/or Steinmetz."). In a case where nearly every issue has been contested, even Vale should agree that any evidence of BSGR bribery or corruption is relevant and must be produced, regardless of whether it relates to due diligence or not.

Rio Tinto's prior efforts to work in good faith to limit the burdens of Vale's document production should not now be used to curtail discovery into some of the most critical issues in this case. Given the subject matter of E&Y's work in May 2010 (evidence of potential BSGR bribery and corruption), there can be no doubt that those materials are highly relevant to Rio Tinto's case and must be produced, either pursuant to Rio Tinto's diligence requests or the more general requests related to fraud, bribery, and corruption that do not contain the date limitation Vale asserts.

Rio Tinto therefore respectfully requests that the Court order Vale to produce (or individually log) any documents created between April 30, 2010 and May 31, 2010 that are responsive to Rio Tinto RFP Nos. 2, 11, 17, 20 – 25, including all drafts of the report that E&Y finalized and transmitted to Vale on May 27, 2010 and any other documents related to evidence of BSGR bribery and corruption.

       *ii.*    <u>*Vale's Position*</u>

**Vale Has Produced Or Logged Responsive EY Documents From May 2010.** The day before this letter was due (and in the context of informing Vale that it would not agree to the Court's proposed 502(d) exchange of materials as to which the parties have made privilege claims), Rio Tinto indicated to Vale that it intended to "seek an order from Judge Peck requiring Vale to either produce or log documents and communications created between April 30, 2010 and May 31, 2010 that are responsive to Rio Tinto's RFP Nos. 2, 11, 17, 20 – 25 (including

4

documents related to E&Y's work).["]3  That request is puzzling, to say the least, since Vale long ago complied.

Vale and Rio Tinto agreed near the outset of this litigation that Vale would conduct a search for documents related to "due diligence" regarding its joint venture with BSGR up until April 30, 2010.  This cut-off date made eminent sense since that is the date that the transaction with BSGR closed, and it would be nonsensical to search for documents related to "due diligence" for a closed deal.[4]  This was an agreement reached by the parties, back in January 2014, to resolve the substantive scope of Rio Tinto's document requests, including the requests it now cites (Requests 2, 11, 17, and 20-25), which generally concern "due diligence."  Vale did *not* refuse to produce documents (from EY or otherwise) after April 30, 2010.  Notably, Vale agreed from the start that to the extent there are documents, of whatever type, dated after April 30, 2010 (or before) that arguably relate to alleged "bribery or corruption" by BSGR or Steinmetz, Vale would consider those documents responsive and either produce or log them, as appropriate.

Vale has done just that.  It has produced the non-privileged documents concerning EY's pre-closing due diligence work for Vale.  *See, e.g.*, VALE-RT_00146236 (April 12, 2010 draft engagement letter for "due diligence services"); VALE-RT_00025314 (April 1, 2010 EY report); VALE-RT_00024609 (April 16, 2010 EY "due diligence report," stating that "we have performed the work set out in our draft engagement dated 12 April 2010").  Rio Tinto makes no complaint concerning Vale's production of pre-closing due diligence materials, nor could it.

Vale has also logged responsive, privileged communications with EY, as it was required to do.  In particular, Vale has logged privileged documents concerning work performed by EY that, while not due diligence, arguably relates to "bribery or corruption" by BSGR, and is therefore responsive Rio Tinto's requests, liberally construed.  Those documents relate to a separate engagement of EY by Vale, apart from the due diligence engagement, to perform *other*

---

[3] Rio Tinto expressly stated: "we do not intend to raise Vale's privilege claims with respect to E&Y's work at the next discovery conference. "  Nov. 11, 2015 Email from M. Bonnano to J. Terceno.  In the event that Rio Tinto reneges on this commitment, Vale reserves the right to make a full response by separate letter.  Despite Rio Tinto's current position, Vale remains open to the idea of a 502(d) exchange that would moot this issue in whole or in part.

[4] The Vale-BSGR deal closed on April 30, 2010.  *See, e.g.*, Vale acquires Simandou iron ore assets (April 30, 2010), http://www.vale.com/EN/investors/home-press-releases/Press-Releases/Pages/vale-adquire-simandou.aspx.  The operative legal agreements (Framework Agreement and Shareholders' Agreement), both dated April 30, 2010, have been produced to Rio Tinto.  *See* VALE-RT_00032944 (Framework Agreement); VALE-RT_00154739 (Shareholders' Agreement).  The April 30, 2010 closing date ("completion date" in the English law terminology of the agreement) is also confirmed by the contemporaneous correspondence produced to Rio Tinto.  *See, e.g.*, VALE-RT_00073884 (April 30, 2010: "Please accept my compliments to all team involved in this landmark transaction for Vale."); VALE-RT_00075585 (April 30, 2010: "Mazal Tov"); VALE-RT_00008168 (April 30, 2010 funds transfer).

services, not due diligence, for the Vale-BSGR transaction, pursuant to a separate engagement letter (VALE-RT_0002465) that, unlike the diligence engagement, does not mention due diligence and that – also unlike the due diligence engagement – specifies that the work was done at the direction of counsel.  EY was retained in this context to perform work "under day to day instructions from Clifford Chance LLP"; specifically, to "[p]rovide a description of the current status of these entities' books and records, noting weaknesses seen in the course of our work; and [p]rovide recommendations on how identified weaknesses can be fixed, including with respect to the imposition of internal controls."  VALE-RT_00024658.  This post-closing work was a forward-looking analysis prepared at the request of Vale's counsel to assist outside counsel in providing legal advice to Vale concerning the operations of the newly formed joint venture; Vale has appropriately logged these documents as privileged.  *See generally United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961); *see, e.g.*, Vale's Oct. 7, 2015 Amd. Priv. Log, Part 1, Index Nos. 2,006 - 2,011 (log of post-closing communications with EY); Vale's Oct. 16, 2015 Amd. Priv. Log, Part 2, Index Nos. 1047, 1049, 1065, 1068, 1075, 1083, 1086, 1094, 1099, 1118, 1132, 1133 (additional communications with EY regarding books and records review).[5]

In short, Vale has not only complied with the agreements it and Rio Tinto made long ago, but has undertaken to produce or log all "specific reports" concerning "bribery and corruption in and around April/May 2010," as Your Honor indicated it should.  Aug. 19, 2015 Tr. 9:10-12.[6]

## II.   Discovery from Plaintiff Rio Tinto

### a.   Rio Tinto's Logging of Communications with Third Parties

#### i.   *Vale's Position*

***Rio Tinto Has Improperly Withheld Communications With Non-Counsel Third Parties That Are Not Privileged.***  Vale is cognizant of Your Honor's preference that the parties "not bring these disputes to the court and work them out."  Sept. 24, 2015 Tr. 4:16-17.  We have attempted to do so with Rio Tinto, including offering to agree to the 502(d) trade suggested by Your Honor in which each side would produce the challenged third-party communications without waiver.  *Id.* at 9; *see* Vale's first fn., *supra*.  Rio Tinto has refused, and Vale therefore has no choice but to seek a ruling from the Court.  Vale requests a ruling that the withheld

---

[5] While Vale has agreed to treat the books-and-records work performed by EY as responsive for the purposes of discovery since it deals, indirectly, with forward-looking FCPA compliance risks, Vale by no means concedes that the work is relevant.  To the contrary, the work performed by EY in May 2010 has no bearing on whether Vale and BSGR harmed Rio Tinto by entering into criminal conspiracy in December 2008, as Rio Tinto alleges (Am. Compl. ¶ 86).  This is true notwithstanding Rio Tinto's attempts to mischaracterize EY's work as a "bribery investigation," when, as the engagement letter makes clear, "bribery and corruption risk" was "not the focus of [EY's] work."  VALE-RT_00024658 at -660.

[6] The day before this letter was due, Rio Tinto raised, for the first time, a concern that a specific draft report (of which it was aware and which in part forms the basis of the parties' privilege dispute as to EY), was not represented on Vale's privilege log.  Vale will investigate that issue and add the document if it is missing.

documents discussed below are not privileged and asks that Rio Tinto make them available at the conference for the Court's *in camera* review, if necessary.[7]

**Livingstone**.  Rio Tinto has withheld at least 16 communications[8] between it (and its counsel) and the investigative firm Livingstone.  As noted at the last conference, Rio Tinto's failure to produce these documents violated the Court's Sept. 10, 2015 order that "Rio Tinto has no privilege with respect to . . . the investigation and resulting reports produced by each respective firm" subject to the UK Sealed Orders, which included Livingstone, and must produce those documents "regardless of custodian."  Dk. 345 at 6.  The only relief from that Order was granted by Your Honor on September 21, in an order stating that "[r]econsideration . . . is denied (and no stay is granted), except that Rio Tinto shall bring the allegedly privileged documents to the next conf. for judicial review."  Dk. 362.  At the September 24 conference, Your Honor declined to review the documents at that time, instead directing the parties to attempt a 502(d) compromise, which, as noted, has not been successful.

As detailed in Vale's September 10 letter (Dk. 341), which the Court subsequently endorsed (Dk. 345), these documents are not privileged.  Rio Tinto has represented, again and again, that the firms are "independent, third party, foreign investigative firms" not controlled by Rio Tinto or its outside counsel.  March 23, 2015 Letter from E. Lyttle to Judge Peck at 1 ("Rio Tinto does not control these investigative firms"); *see, e.g.*, Dk. 318 at 6 ("The investigators are not agents of Rio Tinto").  Rio Tinto has also repeatedly represented that the investigative firms were not retained or directed by counsel.  It claimed to have "identified  . . . the two fact witnesses, *who are not lawyers*, who oversaw the investigation" and "agreed to pull their files." Dec. 9, 2015 Tr. 23:11-14 (emphasis added).  It represented that its "investigation was by investigative firms hired that went out to talk with sources and generated the reports.  The law firms did not run that.  They were independent people."  Jan. 13, 2015 51:11-15 ("We, your Honor, are not planning to search Quinn Emanuel or Weil Gotshal files.").  In the context of the UK examinations pursuant to this Court's Letters of Request, Rio Tinto stated without qualification that it "has no objection to any investigator turning over materials responsive to Vale's requests" and that it "has asserted no privilege or protection that would prevent the investigators from talking about their prior work for Rio Tinto."  Dk. 318 at 4-6.

---

[7] Rio Tinto's failure to distinguish between privileged and non-privileged documents is now well documented.  In July the Court was burdened with reviewing purported privilege redactions by Rio Tinto that, in reality, included only the unprivileged fact of "setting up a meeting."  July 28, 2015 Tr. 38:2-3.  In August, the Court addressed Rio Tinto's attempt to claw back a document containing factual information ("the fact of an instruction to counsel . . . which is a factual matter"), ruling again it was not privileged.  Aug. 19, 2015 Tr. 18: 5-9.  In September, after Rio Tinto purported to claw back over 170 documents – and then recanted as to all but one on the day of the conference – Your Honor ruled the remaining document was not clawed back.  Sept. 24, 2015 Tr. 5:4.

[8] *See* SUPP1868; SUPP1869; SUPP1918; SUPP1919; SUPP1920; SUPP1876; SUPP1884; SUPP1877; SUPP1878; SUPP1879; SUPP1880; SUPP1885; SUPP1881; SUPP1886; SUPP1882; SUPP1887.

Moreover, the investigative firms themselves have made clear, in the English proceedings under this Court's Letters of Request, that they were not retained for the purpose of litigation, foreclosing any suggestion of work product protection.  *See* June 25, 2015 Hr'g Tr. 149:17-151:2 ("Rio Tinto did not retain ARC for litigation but to provide investigative reports. . . . ARC was asked to produce business intelligence for . . . for Rio Tinto, not to gather evidence for use in litigation which is a distinct activity. . . . Livingstone was not told that it was investigating potential claims against Vale and at no point did it occur to Mr. Huband that the sources of information might be potential trial witnesses."); Sept. 28-29, 2015 Exam. of T. O'Connor (ARC) at 10:16-18 ("This was not litigation support services."); Sept. 30, 2015 Exam. of M. Huband (Livingstone) at 18:2-24 ("[W]e were not part of a legal process, and we are not asked to . . . look into issues and to provide . . . evidence or information to evidential standards."); Oct. 1-2, 2015 Exam. of N. Brown (BTG) at 100:4 ("we didn't know about the legal strategy").

***Aeneas***.  Rio Tinto has also withheld at least four emails[9] between Rio Tinto and the French investigative firm Aeneas.  There is no substantive distinction between its communications with Aeneas and with Livingstone.  As set out in Vale's September 10 letter endorsed by the Court, Rio Tinto's representations with respect to *all* of its investigators leave no room to claim any privilege from disclosure, since, according to Rio Tinto, the firms were not retained, nor was their investigation directed, by counsel.

***Landau & Fujihara***.  Finally, the log indicates that Rio Tinto has withheld at least 19 communications[10] with two additional non-lawyer, third-party "consultants."  Each of these communications was shared with a "government relations" consultant (Mr. Landau) and, in some cases, a second "natural resources advisor" (Mr. Fujihara).  Dk. 364 at 14.  Both consultants were retained via an October 2010 "Consulting Agreement," neither of which makes any mention of privilege or work product production, nor any legal purpose to the engagement whatsoever.  To the contrary, each was apparently retained to do precisely what they normally do, which is the non-legal task of providing consulting services related to operations in Brazil and assisting with PR.

Rio Tinto has offered no support that either third party provided legal advice or was retained for the purpose of assisting with providing legal advice, and thus there is no basis for any exception to third-party waiver of attorney-client privilege.  *See, e.g.*, *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2014 WL 7238354, at *4 (S.D.N.Y. Dec. 19, 2014) (communications with third-party marketing firm were not privileged because firm did not serve interpretive function necessary to providing legal advice and was not a functional employee).  Even if the consultants were retained in connection with Rio Tinto's

---

[9] *See* SUPP6; SUPP1; SUPP2; SUPP3.

[10] *See* SUPP488; SUPP1505; SUPP1648; SUPP416; SUPP491; SUPP1502; SUPP493; SUPP1500; SUPP550; SUPP551; SUPP552; SUPP558; SUPP619; SUPP620; SUPP622; SUPP632; SUPP1789; SUPP1917; *see also* Log Part B Index No. 10774.

decision whether to bring a lawsuit, a consultant's "advice in determining the benefits of taking legal action" is not privileged. *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013).[11]

Rio Tinto's work product argument is equally meritless and, indeed, contradicted by its own pleading. It affirmatively alleges that at the time of these communications, in 2010, it did not anticipate litigation: "Rio Tinto did not know of or discover . . . the unlawful conduct and resulting injury alleged herein that underlies the RICO claims . . . until after . . . April 2013." Am. Compl. ¶ 143. Even if it did consider the possibility of legal action, and even if its communications with the consultants concerned whether it should pursue a legal strategy, that would not cloak them in work product protection simply because Rio Tinto brought a lawsuit four years later. "[I]t is not enough to show merely that the material was prepared at the behest of a lawyer or was provided to a lawyer. Rather, the materials must result from the conduct of investigative or analytical tasks to *aid counsel in preparing for litigation*"; "'the purpose of the rule is to provide a zone of privacy for strategizing about *the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.*'" *Egiazaryan*, 290 F.R.D. at 435 (emphasis added) (citations omitted). Correspondence concerning "efforts to lobby" the government, "gathering facts about [the client's] situation," "a proposed public relations strategy," or "efforts to bolster [the client's] image" are not protected. *Id.* at 436. Indeed, no paragraph of the Complaint or Amended Complaint has anything to do with "the ways of Brazilian mining companies" about which the consultants were supposedly experts (Dk. 364 at 14). The advice was plainly not "because of" this litigation (filed four years later), even if it may have been provided in connection with Rio Tinto's consideration of strategic options (including litigation), which are not privileged.[12]

  *ii.*  <u>Rio Tinto's Position</u>

### A. Communications with Consulting Experts

Vale continues to improperly challenge Rio Tinto's logging of communications with consulting experts retained by outside counsel representing Rio Tinto *in this litigation* for purposes of providing legal advice related to and evaluating *this litigation*. These consulting experts are subject to the protections of Rule 26(b)(4)(D). Indeed, even the identities of Landau, Fujihara and Aeneas/Toure are protected and Rio Tinto only logged out of an abundance of

---

[11] Rio Tinto's outside counsel is undoubtedly familiar with these legal standards, and knows how to draft an engagement letter for the retention of services necessary for providing legal advice – when that is the case. Tellingly, the letters here do not retain the consultants for the purpose of rending legal advice.

[12] Moreover, eight of the withheld documents are dated in July and August 2010, *before* either consultant was engaged in October 2010, and thus on their face they are not privileged. *See Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 513 (S.D.N.Y. 2003) (even as to attorneys, pre-engagement communications between an attorney and future client are not privileged absent indicia the party "intended to retain [the lawyer] in a legal capacity at the time the communications were made").

caution to comply with Your Honor's prior orders. *See Williams v. Bridgeport Music, Inc.*, 300 F.R.D. 120 (S.D.N.Y 2014) ("Rule 26 protects the identities of retained consulting experts as privileged unless they are designated to testify . . . .").

Moreover, none of these communications relate to Rio Tinto's pre-April 2010 consideration of whether to bring a lawsuit and all of them occurred within the four year statute of limitations period. So Vale's purported "at issue" waiver arguments are inapplicable, and would be before Judge Berman anyways.

- **Messrs. Landau and Fujihara Were Consulting Experts Retained by Weil Gotshal in Connection with a Potential Legal Action Against Vale, BSGR and Steinmetz** – As discussed previously, Messrs. Landau and Fujihara were consulting experts retained by Rio Tinto's outside counsel, Weil Gotshal (now Quinn Emanuel),[13] to advise and educate them on operations, business practices, and industry standards for mining companies in Brazil in connection with rendering legal advice to Rio Tinto regarding a potential legal action against Vale, BSGR, and Steinmetz. Mr. Landau is a Brazilian lawyer who specializes in government relations for foreign companies operating in Brazil, particularly in the energy sectors, including mining. Mr. Fujihara is a natural resources advisor, with particular expertise in the energy and mining sectors. These consulting experts were necessary because Rio Tinto's outside counsel were unschooled in the ways of Brazilian mining companies specifically and the mining industry generally.

  Pursuant to Rule 26(b)(4)(D), the information contained in the documents is not discoverable. *See William A. Gross Const., Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354, 361 (S.D.N.Y. 2009) (J. Peck) (recognizing that under Fed.R.Civ.P. 26(b)(4)(D) work product protection extends to "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."). Likewise, privileged communications with Weil Gotshal's consulting experts are not discoverable under the attorney-client privilege and work product protections. *See Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 437 (S.D.N.Y. 2013) (attorney work product protects confidential communications in anticipation of litigation with third party consultants); *see also Gucci Am., Inc. v. Guess?, Inc.*, 71 F.R.D. 58, 71 (S.D.N.Y. 2010) (extending attorney-client privileged under *Kovel* "to include individuals who assist attorneys in providing legal services, such as 'secretaries and law clerks,' 'investigators, interviewers, technical experts, accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences'") (internal citations omitted).

  Vale's only real challenge to the privilege that attaches to these types of consulting experts is that their engagement letters (produced to Vale months ago) do not

---

[13]   The lawyers at Quinn Emanuel that represent Rio Tinto in this case formerly worked at Weil Gotshal.

specifically state they were retained for litigation purposes.  But such form over substance is not required for Rule 26.  Indeed, an engagement letter need not explicitly state that an expert was retained specifically for litigation purposes for the protections of Rule 26 to apply.  *See Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 521 (N.D. Ill. 2005) ("There is no requirement that a consulting expert's engagement letter explicitly state that the expert is being retained in anticipation of litigation or for trial preparation" for that material to be protected under R.26(b)(4)(D)); *see also U.S. Inspection Servs., Inc. v. NL Engineered Solutions, LLC*, 268 F.R.D. 614, 622 (N.D. Cal. 2010) ("The engagement letter need not have stated explicitly that Exponent was retained for litigation purposes.").  Instead, courts routinely look to the circumstances surrounding the consulting expert's engagement to determine privilege.

Here, every metric confirms that Rule 26 protections apply:  both Messers Landau and Fujihara were retained by Weil Gotshal in connection with rendering legal advice regarding a potential lawsuit against the Defendants; they were engaged on subject matters relevant to that litigation; they are not expected to testify at trial; during the consulting term (and for two years thereafter), both were prohibited from consulting adversely to Rio Tinto "in any litigation or other proceeding;" and all work performed by Messers Landau and Fujihara in connection with Weil Gotshal's engagement are subject to strict confidentiality requirements.  And every communication Vale challenges contains only Rio Tinto's outside counsel and lawyers within Rio Tinto.  For all these reasons, Rio Tinto has properly withheld and logged documents with these consulting experts.

- **Weil Gotshal's communications with Aeneas/Toure concerning Rio Tinto's evaluation of a possible lawsuit against Vale and its coconspirators –** As Rio Tinto already advised the Court and Vale in July, *see* Dkt. No. 304 at p. 6, as part of its investigation into possible litigation and legal claims, Rio Tinto's outside counsel, Weil Gothsal, consulted with Aeneas/Toure on factual questions tailored to a potential lawsuit.[14]  Aeneas/Toure was a consulting expert subject to the protections of Rule 26(b)(4)(D), which protects both the facts known and opinions held by him that were developed during his work for outside counsel in developing this lawsuit.  Indeed, each of the documents that Vale is challenging involve communications between Aeneas and Weil attorneys, making clear that each communication is appropriately withheld as both attorney-client communications and attorney work product.  Vale's attempts to rehash these issues that were addressed months ago should be rejected.

Notably, as Vale and the Court knows, Dkt No. 304 at 6, Rio Tinto (not Weil Gotshal) separately retained Aeneas/Toure for political and background work in January 2011.  Rio Tinto is not claiming privilege over this separate retention, and has produced

---

[14]   The Aeneas/Toure engagement letter contains privileged descriptions of the work contemplated.  Rio Tinto will have a copy of it at the hearing should Your Honor wish to review it *in camera*.

responsive documents both from its files and collected them directly from Aeneas/Toure at Vale's request.  *see e.g.* RT_AENEAS_0000001 – RT_AENEAS_0000096.

## B.  Communications with Investigators

Rio Tinto already produced hundreds of non-privileged documents and communications with and relating to Livingstone and its investigation for Rio Tinto.  What Rio Tinto properly withholds here are thirteen privileged documents between Rio Tinto's external lawyers at Weil Gotshal and Livingstone in connection with Rio Tinto's evaluation of a potential legal action against Vale, BSGR and Steinmetz.  It is wholly unsurprising that Rio Tinto's lawyers and external counsel communicated with Livingstone about its numerous reports on the Defendants' theft of Simandou in evaluating and preparing its suit, and it is similarly unremarkable that those communications are privileged and work product – and therefore properly withheld.  *See* In re Grand .Jury Subpoena Dated Mar. 20, 2013, No. 13-MC- 189, 2014 WL 2998527, at *8 (S.D.N.Y. July 2, 2014) (holding that attorney-client privilege applies to private investigators because they "fit within this category of necessary aides to the provision of legal services.").

### b.  Rio Tinto's Document Production in Response to the Court's September 10, 2015, Order

#### i.  Vale's Position

***Rio Tinto's Has Violated The Court's Orders.***  On September 10, 2015, Your Honor issued an order confirming that Rio Tinto must produce the documents concerning its investigation irrespective of where they reside:  "produce all communications between Rio Tinto (or its counsel) and each of the firms and witnesses subject to the Sealed Orders [issued in the UK pursuant to this Court's Letters of Request] that [are] responsive to Vale's document requests to Rio Tinto (*regardless of custodian*), without withholding or redacting any such document on the basis of any purported privilege or protection from disclosure, and do so no later than September 18, 2015" Dk. 345 at 6 (emphasis added).[15]

Rio Tinto twice sought reconsideration (or a stay) of the Order to collect "regardless of custodian," calling the Court's order "unfair and unreasonable."  *See* Dks. 346, 354.  It argued

---

[15] The Court has been clear from the start that Rio Tinto is obligated to produce these documents from wherever they might reside.  *See, e.g.*, Dec. 9, 2014 Tr. 20:23-25 ("Produce the factual information *from any privileged document* that is relevant to the investigation and diligence issue."  (emphasis added)); Jan 13, 2015 Tr. 52:18-19 ("Let's expedite the production of those reports.  Presumably, *your client knows where to find those* very quickly." (emphasis added)); June 1, 2015 Tr. 47:1-5 ("Produce *whatever you have* that you haven't produced with respect to the investigators" (emphasis added)); June 22, 2015 Tr. 11:1 (ordering production of investigator invoices kept "on a separate server").  *See also* Dk. 285 (Vale letter noting that "the Court ordered Rio Tinto to produce all investigative documents – regardless whether they were generated from predictive coding" of custodial documents); Dk. 286 (Rio Tinto response that Vale raised a "non-issue" because "Rio Tinto *already* has agreed" to Vale's request).

the Order constituted "an improper effort to expand the scope of discovery into Rio Tinto's investigation beyond the agreed-upon custodians," Dk. 346 at 3, erecting the straw man that compliance with the Court's Order would "[f]orc[e] Rio Tinto to search the files of every single employee, past or present," which would be "unreasonably burdensome." Dk. 348 at 2. It complained that Vale had produced documents from fewer custodians than Rio Tinto. Dk. 346 at 4. It argued that "the relevant Rio Tinto custodians were identified on November 13, 2014, . . . in response to the relevant Vale interrogatory," Dk. 348 at 2, and that "the custodians Rio Tinto collected from were the right ones," Dk. 346 at 4. It went so far as to provide the Court with a proposed revised order, which would strike the words "regardless of custodian," among others. Dk. 346 at 5. Having heard all of these arguments, Your Honor twice denied reconsideration or a stay. Dks. 362, 363. That Order was correct and critically important.

Having failed to modify the Court's Orders, Rio Tinto has proceeded to violate it; it has done precisely what it would have done were its motion for reconsideration granted instead of denied. It has repeatedly made clear that its production is limited – in violation of the Orders – to the prior custodians and limited servers. *See, e.g.*, Dk. 346 at 2-3 ("Rio Tinto understands [the Court's order] to mean that Rio Tinto will produce responsive documents regarding the investigation from any of the agreed-upon custodians."); Sept. 18, 2015 Dk. 354 at 1 ("Rio Tinto has produced all non-privileged, responsive documents from the agreed-upon custodians, as well as from relevant Rio Tinto corporate files and electronic document repositories."). But the Court's Orders on this critical issue were explicitly not limited to the custodians for general document discovery. Vale therefore asked that Rio Tinto confirm, pursuant to Fed. R. Civ. P. 26(g), that it had conducted a reasonable investigation of *all* the sources of documents responsive to the Court's Orders, and had produced or logged all such documents.[16]

Vale also identified for Rio Tinto several Rio Tinto employees who, discovery to date suggests, would have responsive documents concerning Rio Tinto's investigation. Among others, Vale identified the following, none of whom were identified in response to Vale's Interrogatory 22 concerning Rio Tinto's alleged investigation and due diligence:

- **Mike Hitchcock** (Rio Tinto's Chief Global Security Advisor) and **Tidiane Touré** (Principal Security Advisor for EMEA), both of whom had direct contact with Rio Tinto's investigators. *See, e.g.*, RT0431088 (Oct. 1, 2008 email to Hitchcock from investigator ARC concerning Steinmetz); RT0432740 (April 22, 2010 email chain among investigator ARC, Tidiane Touré, Robert Court and others regarding possibility of formal threat letter to Vale); RT0431396 (May 17, 2010 email from ARC to Tidiane Toure regarding possible Rio Tinto legal action against BSGR).

---

[16] Vale suggested that the parties meet and confer on this topic, and reserved the issue to be raised at a future conference. *See* Sept. 24, 2015 Tr. 29:3-10 ("MR. LIMAN: . . . we do have a disagreement with Rio Tinto with respect to the compliance with your Honor's September 10 order. We don't think that is ripe. The question is whether a proper 26 (g) review was done. We have asked them if we can raise it in subsequent conferences."). The parties have been unable to reach agreement.

- **Bangaly Maty** (CFO for Rio Tinto's Simandou subsidiary, Simfer), who was integral to the decision in 2009 to forego legal action against BSGR, preparing materials for a April 2009 Executive Committee meeting regarding legal options against BSGR (RT0944166), and then again for an August 2009 Steering Committee meeting where it appears the decision to hold off on legal action was taken (RT0599035). The minutes of that meeting indicate that Maty was to meet with counsel regarding the company's legal options against BSGR (RT0731444).

- **Andy Munro** (Iron Ore General Manager of Communications & External Relations) and **Robert Court** (Global Head of External Affairs). The Court ruled at the last conference that a document addressed to Munro from Rio Tinto's in-house counsel discussing the possibility for suit against BSGR and/or Vale was not privileged. Sept. 24, 2015 Tr. 5. The document attaches a note by Robert Court on the subject, and Munro promises to follow up with "a note penned 12 months ago, about the last time we had visible trouble from BSGR." RT_TAR_0043035. In-house counsel responds to Munro with comments on the attachments – which Vale has never seen produced or logged – including providing comments on the "options canvassed in the note that Robert Court put together," including litigation. *Id.*

Rio Tinto has still refused to comply with the Order. It does not deny that these individuals (and likely others) have responsive documents concerning its investigation. Instead, it attempts to avoid the obligation to produce these documents on the grounds that they are "duplicative" or "cumulative" of those already produced. The Order makes no such allowance for purportedly duplicative documents; responsive documents must be produced. But even if it did, Rio Tinto's argument that the responsive documents are duplicative is not credible, cannot be tested, and is not an excuse. *First*, given the roles played by these individuals it is not plausible that they do not possess responsive documents (and Rio Tinto does not contest this). *Second*, Rio Tinto has not taken the steps necessary to know what unproduced documents these individuals possess. It has not collected, searched, reviewed, or even sampled their documents. It concedes that it has not even spoken to these individuals "directly." Nov. 11, 2015 Email from M. McCaffrey to M. Karlan.[17] *Third*, even if it had spoken to them, Rio Tinto's obligation is to produce the documents regardless of whether the custodians have said in interviews that the custodians do not believe the documents are incremental; it must produce the documents unless it knows those very same documents have been produced. *Fourth*, and finally, its claims cannot practically be tested by Vale. While we in theory could inquire in depositions – should this action proceed past the now-argued motion to dismiss – whether the deponents or other individuals had communications concerning Rio Tinto's investigation and then ask for those

---

[17] After ignoring this issue since September, Rio Tinto sent an email at 8:30pm yesterday, the night before this letter was due, offering to speak with the individuals Vale had identified as possible additional sources of documents, but made no commitment to either produce or log responsive documents they have. For the reasons noted above, that eleventh-hour offer simply to speak with those individuals does not satisfy Rio Tinto's obligation to determine all of the relevant sources of documents and produce those documents.

documents, it is obviously impracticable to ask whether they had communications *beyond* those already produced (without introducing at the deposition every document that *has* been produced), which in any case would likely elicit the response that they do not recall whether they have anything else in their files.  Either Rio Tinto has collected these documents and run a search and confirmed that all documents are duplicative of what has already been produced – in which case it is no burden for Rio Tinto to hand over those documents – or else Rio Tinto has not even taken that step with respect to these key individuals, in which case it is in violation of the Court's Orders.

Moreover, it appears that whatever inquiry Rio Tinto has undertaken has been limited to purportedly identifying those individuals who were in direct contact with the third-party investigative firms.  It has argued that the Court's Orders are limited to such direct consultation with the investigators, and exclude internal communications at Rio Tinto.  But the relevance is not so limited.  Discovery to date suggests that the decision not to bring suit against BSGR in 2009 (before the statute of limitations expired) was made not in communications with the investigators (who, indeed, did not believe they had been retained for litigation), but rather in internal Rio Tinto documents discussing the strategic potential of litigation vs. a conciliatory approach to relations with the Government of Guinea.  And discovery also suggests that several of the individuals identified by Vale to Rio Tinto – whose documents Rio Tinto has not searched – likely played key roles with respect to Rio Tinto's decision not to bring suit, despite having minimal, if any, direct contact with the outside investigators (*e.g.*, Simfer CEO Bangaly Maty, Global Head of External Affairs Robert Court).

To the extent Rio Tinto has not conducted a reasonable investigation under the Federal Rules and in response to the Court's Orders, Vale requests that Rio Tinto be ordered to do so.  And to the extent that investigation indicates that there are additional documents concerning Rio Tinto's investigation of its purported claims and decision to bring suit that have not yet been produced, Vale requests an order that they be produced, or logged so that any claim of privileged over them can be determined.

### ii.  Rio Tinto's Position

Vale is again rushing prematurely to the Court for resolution of an "issue" that, at best, is not ripe for resolution by the Court and at worst, an attempt to manufacture a dispute where none exists.  Following an earlier request from Vale that Rio Tinto confirm it had complied with the Court's Orders (a request Rio Tinto honored and did so confirm), Vale informed Rio Tinto on Monday that it now wanted more.  This time (and for the first time) Vale seeks assurances from Rio Tinto that it had conducted a "Rule 26(g) investigation" of all potential sources of documents broadly concerning Rio Tinto's investigation and decision to bring suit, including speaking with and reviewing documents from at least eleven additional custodians.  Vale claims to do so under the guise of the Court's September 10 and June 22 Orders, but, as explained below, Vale's allegations rest on a tortured interpretation of those Orders.  Nevertheless, two days after Vale made its demand, Rio Tinto offered to speak with the eleven custodians identified by Vale to determine if they were likely to have any unique and non-cumulative documents relating to Rio Tinto's investigation and potential suit, but Vale rejected that offer.

Because Vale rejected its offer to inquire about additional sources, Rio Tinto is left with no choice but to address the (lack of) merits in Vale's position. And unfortunately that effort requires a lengthier submission than we might otherwise like in order to set the record straight and put Vale's request in its proper context. As we understand it, Vale's position is based on Your Honor's September 10 and June 22 Orders. Neither supports the breathtaking scope of discovery Vale now seeks. The September 10 Order did not require Rio Tinto to produce *all* documents from *all* custodians in the *whole* company relating broadly to Rio Tinto's investigation or decision to bring suit. Rather, Your Honor's September 10 Order required Rio Tinto to produce all communications between Rio Tinto and the firms and witnesses subject to the Sealed Orders, the "UK Investigators," only. *See* Dkt No. 341 at 6. Nor did Vale seek this in any of its filings or correspondence both leading up to and after the Court's September 10 Order. S*ee .e.g.* Dkt No. 341 at 3 (limiting Vale's request to UK investigator communications only); Dkt No. 347 (stating that the Court's September 10 Order was limited to the upcoming UK examinations); September 22, 2015 email from M. Karlan to M. McCaffrey confirming that the September 10 Order was limited to UK Investigators only.

Rio Tinto fully complied with the September 10 Order. On September 15, Rio Tinto informed the Court and Vale that it understood the Court's Order to mean production of documents from the agreed upon custodians, which Rio Tinto had already done. Dkt No. 346 at 4. Three days later, Rio Tinto further confirmed it had complied with the September 10 Order by producing documents relating to its communications with the UK Investigators from all 27 of its agreed upon custodians as well as all relevant corporate files and electronic document repositories. Dkt Nos. 354 and 362. That production included 645 documents (not including families and in addition to the investigator reports themselves) reflecting communications with the UK Investigators alone. Dkt No. 361. Vale knew all of this, but said nothing. If Vale thought that Rio Tinto's production did not comply with the Court's Order, the time to raise it was in response to those filings or at the latest during the parties' September 27 hearing. They did not.

Vale also misstates the record by relying on the Court's June 22 Order that Rio Tinto "produce whatever you have that you haven't produced with respect to the investigators," June 22, 2015 Tr. 11:11-13. That was not an order to produce all documents from all custodians, but rather an order that Rio Tinto produce all invoices and other documents in response to Vale's "second set of requests" by June 30. *Id.* at 11:15-12:6. That of course was limited to the custodians who Rio Tinto agreed to produce from (*i.e.*, "whatever you have" collected) in response to Vale's requests (as were all of Rio Tinto's agreements to produce documents to Vale, and vice versa). Again, Rio Tinto complied, having produced its investigator related documents – including reports, communications by, between and about the investigations, and invoices – by the parties' June 30 substantial completion deadline.

More importantly, Vale is suffering no prejudice or missing any custodians with unique documents. To date, Rio Tinto has now produced or logged over 200,000 documents in response to Vale's requests (Vale has produced or logged less than 25,000 documents), including *more than 6,000 documents* relating to Rio Tinto's investigation and contemplated legal action alone.

Apparently unsatisfied, Vale is now effectively seeking the addition of *eleven* custodians – a forty percent increase – under the guise of a request for a "Rule 26(g) investigation." Vale's request is beyond the pale. Rio Tinto first proposed custodians to Vale in November 2014. That proposal included *three attorneys* involved in the Simandou project and the key personnel involved in Rio Tinto's investigation of the Defendants' theft of Simandou.[18] The parties then negotiated over that custodian list for more than two months, finally reaching agreement on the final list of 27 Rio Tinto custodians in January of this year. Each side negotiated hard, and gave up custodians it otherwise wanted in exchange for an agreement.[19]

The idea that Vale did not know when it agreed to these custodians that Rio Tinto had previously considered legal action arising out of Simandou defies common sense (it was the loss of one of Rio Tinto's largest assets) and the facts of this case. Indeed, Vale knew about Rio Tinto's investigation from the beginning of this case (*see* Dkt. No. 82 at ¶146). And Vale's own documents show that Rio Tinto told Vale *in 2009* that it was contemplating legal action against BSGR and Steinmetz regarding Simandou, and that even when Vale was entering into the Vale-BSGR Transaction it was worried about a lawsuit by Rio Tinto. *See, e.g.,* Vale-Training_RTSupp_00006139 (May 28, 2009 email summarizing a meeting between Vale and Rio Tinto where Rio Tinto disclosed that it was considering legal again against BSGR in relation to Simandou); Vale-Training_00005740 (again noting Rio Tinto's statements to Vale about potential legal action against BSGR); Vale-RT_00169394 (April 2010 "Trojan Horse" presentation with a slide regarding potential legal action by Rio Tinto in connection with the Defendants' theft of blocks 1 and 2).

Courts in this District require a showing that additional custodians (let alone eleven additional custodians) actually would provide *unique* relevant information – a burden Vale cannot, and has not even attempted to, carry. *See Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12 CIV. 1579 HB JCF, 2013 WL 1195545, at *3 (S.D.N.Y. Mar. 25, 2013) (placing the burden on the requesting party to demonstrate why the proposed new custodians "would be likely to have non-cumulative relevant documents," and noting that in another case granting a motion to compel additional custodians, the party seeking discovery submitted "extensive exhibits to establish that the proposed custodians possessed additional relevant documents" (quotation omitted)); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) (noting that the requesting party bears the of

---

[18]   In addition, Rio Tinto agreed to and has collected and produced from all relevant Rio Tinto corporate files and electronic document repositories, including shared drives, hard copy repositories, and other electronic document storage systems utilized by Rio Tinto. Dkt No. 354. Rio Tinto also has collected and produced from two additional custodians in connection with Vale's April 22, 2011 settlement-related requests in accordance with the Court's Order.

[19]   For example, it is not surprising that Rio Tinto's General Counsel may have documents responsive to Vale's requests on potential litigation. In fact, Vale initially sought to add her as a custodian but subsequently dropped that request on a reciprocal agreement from Rio Tinto to drop its request for Vale's General Counsel. Rio Tinto still agreed to produce and collect from the three key Simandou lawyers.

"demonstrat[ing] that the additional requested custodians would provide *unique* relevant information not already obtained").

The voluminous documents Rio Tinto has produced, and the efforts it has undertaken to locate and produce them, demonstrate that Vale cannot meet that burden, and bear out that Rio Tinto provided, and Vale already has, the right custodians.  *First,* the UK investigators reaffirmed as much during Vale's examinations in London, all unanimously citing two custodians as their routine points of contact at Rio Tinto – both of whom Rio Tinto originally identified as custodians and long ago collected and produced from.  *Second,* so too did our client, whom even more recently, *and at Vale's request*, went back to confirm that the eleven additional individuals requested by Vale would not be expected to have any additional, responsive, non-duplicative, non-cumulative documents beyond those already produced by Rio Tinto and its UK investigators.  *See* November 6, 2015 Letter from E. Lyttle to L. Liman at 4.

Finally, proportionality requires that Vale's request to *add* 11 custodians must be balanced against the fact that Vale *subtracted* (by failing to retain and therefore producing no documents from) eight custodians (40% of its custodial pool) that it previously agreed to produce from.[20]  *See e.g. Moore v. Publicis Groupe*, 287 F.R.D. 182, 188 (S.D.N.Y. 2012) (Peck, J.) (holding that Rule 26(g) "does not call for certification that the discovery response is 'complete,' but rather incorporates the Rule 26(b)(2)(C) proportionality principle"); *Stinson v. City of New York*, No. 10-cv-4228, 2015 WL 4610422, at *4 (S.D.N.Y. July 23, 2015) (ordering number of custodians to be searched to be limited to a reasonable number of relevant individuals); *In re Morgan Stanley Mortgate Pass-Through Certificates Litig.*, No. 09-CV-02137 LTS SN, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013) *on reconsideration in part*, No. 09-CV-02137 LTS SN, 2013 WL 5745938 (S.D.N.Y. Oct. 23, 2013) ("Plaintiffs do not need, and are not entitled under the rules of proportionality, to every single document related to the loans and originators involved in the Offerings. Accordingly, plaintiffs have not made a sufficient showing that the burden of review—including the burden of reviewing false search hits—would justify expanding the search to include these dozens of additional custodians."); *Nat'l Day Laborer Organizing Network v. U.S. Immigration and Customs Enforcement Agency,* 877 F. Supp. 2d 87, 112–13 (S.D.N.Y. 2012) (accord).

As the above illustrates, Rio Tinto has conducted a reasonable and appropriate Rule 26(g) investigation, Vale has the relevant and responsive documents to which it is entitled, and Rio Tinto has fully complied with the Court's September 10 and June 22 Orders.  To the extent Vale (wrongly) believes that it is still missing documents in response to the Court's Orders, it can – and in fact, appears to have – make use of the parties' predictive coding Audit Protocol, which is the right place to address any remaining concerns Vale may have.

---

[20]  Rio Tinto – who has preserved, collected and produced from all of its agreed-upon custodians as well as other sources – has produced more than 175,000 documents.  Vale, on the other hand, has produced 20,000.

### III.     Discovery from Defendant Thiam

#### a.     Proposed 502(d) Order Regarding Thiam-Guidepost Communications

Over the course of discovery, Defendant Thiam produced, and then clawed back, wholly or in part, a series of communications with Guidepost Communications ("Guidepost"). Defendant Thiam maintains that Guidepost was retained by Skadden Arps, and that Skadden Arps represented Defendants Steinmetz and BSGR.  Defendant Thiam has asserted that certain communications involving Guidepost are shielded from disclosure on the basis of a common interest privilege shared between himself, Defendant Steinmetz, and Defendant BSGR.  Rio Tinto disagrees that any such common interest privilege between Defendants Thiam, Steinmetz and BSGR exist, and disputes its purported application to communications with Guidepost. After some negotiations to resolve this dispute, Rio Tinto and Thiam have agreed to a Stipulated Rule 502(d) Order, which is attached as Exhibit A.  Rio Tinto and Thiam respectfully request that the Court enter the Proposed Order, after which Defendant Thiam will promptly produce the Thiam-Guidepost communications at issue.

#### b.     Google Subpoena and Proposed Order

As previously explained to the Court (Dkt. No. 364 at pp. 34-35), Defendant Thiam maintains that all of his Google emails pre-dating May 2009 were inadvertently deleted at some point in 2009 or 2010.  As a result, Rio Tinto has, with the consent of Thiam, subpoenaed Google in an attempt to recover any emails from this time period that may still exist.  Google has informed Rio Tinto that in order to produce any documents it may have, it requires a Court Order and subsequently, a consent email from Defendant Thiam.  Rio Tinto and Defendant Thiam have conferred, and jointly move the Court to enter the attached Proposed Order (Exhibit B).  Upon signature, we will provide Google with a copy of the Order and Defendant Thiam will provide the requisite consent email.

#### c.     Rio Tinto's Request that Thiam Review and Produce Documents Hitting on 4 Additional Search Terms

##### i.     *Rio Tinto's Position*

This Court ordered Defendant Thiam to respond to Rio Tinto's first set of discovery requests by December 12, 2014.  *See* 11/3/2014 Hr'g Tr. at 24 (THE COURT: "Okay.  Then your credibility is gone, and it's December 12th and that's it.  So you bought yourself nine days. Get it done.").  Defendant Thiam then proceeded to produce responsive documents identified by an agreed-upon set of search terms (which Rio Tinto reserved the right to re-visit after reviewing Thiam's production).  By early 2015, Rio Tinto believed Thiam had provided all documents in

his control that were responsive to its first set of discovery requests, as required by the Court's order. We now know that was not the case.[21]

On August 28, 2015, almost *nine months* after the Court-ordered deadline for Defendant Thiam to complete his document production, Thiam made a subsequent production that, to Rio Tinto's surprise, consisted of documents responsive to Rio Tinto's first set of document requests.[22] Upon review of the new information presented in these this production, Rio Tinto realized the originally agreed-upon list of search terms omitted a small number of key terms. On September 18, 2015, Rio Tinto asked Thiam to run 12 additional search terms, review the results, and produce any documents responsive to Rio Tinto's discovery requests.

Thiam applied these twelve search terms to his files and provided a hit report to Rio Tinto. After meet-and-confer discussions in which Rio Tinto agreed to withdraw several of its proposed terms, Thiam agreed to review some, but not all, of the documents that hit on the remaining search terms proposed by Rio Tinto. Specifically, Thiam agreed to review the documents that hit on four search terms that captured a total of 230 documents with families (presumably, Defendant Thiam agreed to do so because these were the search terms that brought back the lowest number of documents for him to review). On October 21, 2015, Defendant Thiam made a supplemental production of responsive documents consisting of 287 documents. In other words, it appears that essentially *all* of the documents (it is unclear why they agreed to search 230 but produced 287) hitting on the four search terms Rio Tinto proposed were responsive. This alone is proof that Rio Tinto's modest request for Defendant Thiam to run additional search terms was justified.

The parties, however, remain at an impasse with respect to four remaining search terms. The search terms at issue and the reason they are reasonably likely to return responsive documents are summarized below:

**Aquil.** Rio Tinto alleges that after receiving bribes from Defendant Steinmetz, in 2011, Thiam bought an estate in Duchess County, New York using cash. *See* Am. Compl. ¶ 115. Discovery has revealed that in reality, a Mozambican soap company ("Sociedad Saboeira De Nacala") purchased the company using cash, on behalf of Defendant Thiam. The soap company then appointed Defendant Thiam and his wife as agents of the property, who treated the house as their own, making significant renovations and purchasing numerous fixtures. One of the

---

[21]   Indeed, Thiam has indicated that in the coming weeks, he will be producing responsive text messages and other files that were not even identified or searched for until the past few months.

[22]   A large number of these documents are responsive to RFP No. 16, which states: "All Documents and Communications related to any real estate you own, lease, rent, or otherwise use or used in the past in the United States, including your properties at 170 East End Avenue, New York, New York and 771 Duell Road, Middlebrook, New York, along with All Documents and Communications related to the source of the funds used to purchase any real estate in the United States."

individuals that represented the soap company in this transaction was Momade Aquil Rajahussen.

To date, Thiam has produced many responsive documents that hit on the term "Aquil," but given that Mr. Thiam waited until August 28, 2015 to produce these documents, we are concerned that Mr. Thiam possesses additional responsive correspondence involving Aquil that has not yet been produced.  If there were any doubt about the relevance of documents involving Aquil to Rio Tinto's case, it appears that at some point in 2011, Defendant Thiam and Aquil had a disagreement about the Duchess County transaction, and Aquil demanded that Defendant Thiam repay the loan they provided to buy the house.[23]  In response, Defendant Thiam referred to a series of agreements/payments from an individual he refers to as "B," which appears to be, based on other documents produced by Thiam, a reference to Defendant Beny Steinmetz.

Rio Tinto is therefore entitled to some assurances that Thiam has produced all the responsive documents on this topic, and "Aquil" appears to be a common thread across the responsive documents produced so far.[24]

**Alabbar, MAA, and Amer**.  Mr. Mohamed Alabbar is an individual that appears throughout Defendant Thiam's document production.  He is sometimes referred to as "MAA" (his initials), and in Thiam's documents appears to be associated with a company that sometimes called "Amer."

Rio Tinto alleges that Defendant Thiam accepted a series of bribes from Defendant Steinmetz, including an installment he received in June 2010.  *See* Am. Compl. ¶ 115.  On August 1, 2010, Mr. Alabbar emailed Defendant Thiam and asked how Benny was treating him.[25]  This is undoubtedly a reference to Defendant Steinmetz.  Thiam responded that he had just left Beny, and that everything was on track.  Based on other documents produced by Thiam, it appears that he received regular payments from Mr. Alabbar, including ten six figure payments in 2011 from Africa Middle East Resources, also known as "AMER" (hence the search term, "Amer"), a company we understand to be affiliated with Mr. Alabbar,[26] and later in 2011, an additional large wire transfer from Mr. Alabbar.[27]  The following year, Defendant Thiam emailed Mr. Alabbar about an idea he had regarding a potential deal relating to Simandou, again referring

---

[23]   *See* MT017815.  As this document was marked by Defendant Thiam as Confidential, it cannot be filed on the public docket, but Rio Tinto will bring copies to the conference.

[24]   Defendant Thiam has represented to us that there 992 unique hits on "Aquil" (1,613 with families).

[25]   *See* MT013881.  As this document was marked by Defendant Thiam as Confidential, it cannot be filed on the public docket, but Rio Tinto will bring copies to the conference.

[26]   *See* MT019541.  As this document was marked by Defendant Thiam as Confidential, it cannot be filed on the public docket, but Rio Tinto will bring copies to the conference.

[27]   *Id.*

21

to an individual name "B" who retained shares of Simandou and Zogota.  Given the description, it seems obvious that "B" is another  reference to Defendant Benjamin Steinmetz.

The financial relationship between Mr. Alabbar and Defendant Thiam, coupled with the correspondence they exchanged regarding Simandou and Defendant Steinmetz, conclusively show that Rio Tinto's proposed search term will lead to discovery of documents relevant to this case.[28]

Thiam refuses to review the documents returned by these four search terms because he unilaterally concluded, after reviewing a sample set of 30 documents for each search term, that the document sets would too burdensome to review in light of their likely probative value (even where the sampling turned up responsive documents).[29]  Given the limited number of documents at issue, his position defies credulity.  We are asking Thiam to review only 2,942 documents (4,814 with families).  This is not unreasonable or burdensome, particularly in light of the highly responsive nature of the documents produced that hit on these terms to date.

When pressed in recent days to produce these documents, Thiam invoked another, separate objection, now refusing  to review these additional documents, because, according to him, document discovery is over.  This position is untenable.  If Defendant Thiam produced these documents in December 2014, as ordered by the Court, Rio Tinto would have realized the need to add the additional search terms well before the close of document discovery.  Rio Tinto should not be barred from obtaining reasonable and legitimate discovery because of an error by Defendant Thiam (and similarly, Defendant Thiam should not be rewarded for producing documents late).

---

[28]   Defendant Thiam has represented to us that there are 377 hits on "Alabbar" (570 with families); 1,239 hits on "Amer" (2,044 with families); and 334 on Aquil (587 with families).

[29]   Rio Tinto has no idea why or how Defendant Thiam determined that reviewing 30 documents is an adequate or reliable way to test a search term.  Additionally, Defendant Thiam offered to run narrowed versions of these search terms, however the search terms are so narrow and ineffective that they would not even bring back the majority of documents Defendant Thiam has already produced that hit on these search terms.  To provide some examples, according to Defendant Thiam, the "narrowed" search terms he ran including the word "Alabbar" yielded 0 responsive documents.  Yet, Defendant Thiam has already produced 8 responsive documents that hit on the term "Alabbar," and only *3* of those documents (37.5%) would have hit on the narrowed terms selected by Defendant Thiam.  Thus, it appears that the limiting terms are not effective search terms (as opposed to there being a lack of responsive documents).  Similarly, Thiam has produced 55 documents that hit on "Aquil," but the narrowing terms proposed by Defendant Thiam would only capture 27 of those documents (49%) 55 documents.  Given these statistics, it is clear is that the limiting search terms are not workable, and that in order to ensure Rio Tinto receives responsive documents it is entitled to, that the four search terms should be run without limiting criteria.

In light of the foregoing, Rio Tinto respectfully requests that the Court order Defendant Thiam to review the documents that hit on the search terms Alabbar, MAA, Amer, and Aquil, and produce any responsive documents by December 18, 2015.

        *ii.*    <u>*Thiam's Position*</u>

Under the Scheduling Order (Dkt. No. 161), document discovery was to conclude on August 28, 2015.  Thiam produced some documents on that last day.  Thiam is willing and has agreed to run additional search terms for responsive documents to the extent that the search terms were revealed <u>for the first time</u> in that last-day of production or in any subsequent curative production.  What Thiam is unwilling to do is to run new searches on terms that were known to Rio Tinto since Thiam's initial productions on December 19, 2014 and February 13, 2015.

Based on this position, Thiam will (and has) searched the following *new* terms: "house loan," "b payment," "Arif," [30] "American Middle East Resources," "house /w collateral," "Duell," "Dutchess," and "SSNL."[31]  But Thiam will not search "Aquil," "MAA," "Amer," and "Alabbar," which terms were known to Rio Tinto since the beginning of 2015.  Thiam's position is not based solely on the deadlines, although they are significant.  Were Thiam to accede to Rio Tinto's tardy demands, he would incur the substantial burden of reviewing 4,814 additional documents.

## IV.   **Discovery from Defendant VBG**

Rio Tinto and VBG are working together to identify responsive documents for the following four custodians:  Joao Vidoca, Telesphore Tchatchou, Charles Rezende, and Rogerio Ribeiro.  In furtherance of those efforts, Rio Tinto has proposed various search terms for VBG to run.  According to VBG, those terms have generated 39,152 total documents.  Although Rio Tinto believes that 39,152 documents for four custodians in a case of this magnitude is not unduly burdensome, it has agreed to revisit a handful of its search terms that VBG believes are overly broad.  Rio Tinto will be providing VBG with its revised terms by November 13  and hopes to resolve any lingering disputes prior to the Status Conference on Tuesday.  To the extent any disagreement remains, the parties will seek guidance from the Court .  In turn, VBG has agreed that upon Rio Tinto's narrowing of a handful of its search terms, it will immediately begin making substantial rolling productions to Rio Tinto.

---

[30] Arif was known to Rio Tinto prior to Thiam's August 28, 2015 production, but because it returned a limited number of hits, Thiam agreed to review and produce any responsive documents.

[31] The terms "house loan," "American Middle East Resources," and "house /w collateral" returned no hits.

## V. Update on Predictive Coding

### i. Rio Tinto's Position

In accordance with the Stipulation and Order Re: Revised Validation and Audit Protocols (Dkt No. 338), Rio Tinto produced a New Control Set to Vale on September 8, 2015. After a series of meet and confers to discuss coding challenges, the parties were still unable to resolve coding disputes for a handful of documents and agreed to submit a handful of disputed documents to Special Master Grossman for resolution. On November 1, 2015 Special Master Grossman rendered a decision on the disputed documents, finding that while the disputed documents may have been "'technically' responsive, on a different day, I might conclude differently" and that she had "seen nothing marked non-responsive by Rio Tinto that, were it not produced, would lead me to conclude that their production was inadequate." Accordingly, Special Master Grossman requested that Rio Tinto complete two versions of her TAR Worksheet, which Rio Tinto provided on November 6, 2015. Those worksheets indicate an recall confidence rate of 60% (and exact confidence interval of 48% to 72%) (accepting Rio Tinto's coding determinations), and 49% (with an exact confidence interval of 39% to 60%) (accepting Special Master Grossman's "technically" responsive coding determinations) for an end-to-end (*i.e.*, predictive coding through manual human review to production) process. In other words, unlike the recall calculation called for by the parties' Predictive Coding Protocol (which measures recall of the training tool), the TAR Worksheet recall evaluates the end-to-end review process as a whole, adding in the impact of human manual review. Vale has not provided a similar number to Rio Tinto for comparison purposes.

The parties have not yet discussed these submissions with the Special Master, and she has not made any findings based on them. She accordingly has indicated that she believes any arguments before Your Honor on them are premature..

In addition, the parties exchanged Audit Samples on September 22, 2015 in accordance with Section 5 of the Audit Protocol and have been meeting and conferring regarding coding dispute challenges to the Audit Samples.

A discussion of these control set reviews and audit samples is scheduled for Monday, November 16, 2015.

### ii. Vale's Position

The parties have been working diligently with the Special Master to resolve disputes regarding their use of predictive coding. Pursuant to the Stipulation and Order Re: Revised Validation and Audit Protocols for the Use of Predictive Coding in Discovery (Dk. 338) (the "Audit Protocol"), Rio Tinto was required to review and code a "New Control Set" in order to test the sufficiency of its Predictive Coding Process. On November 6, following resolution of objections raised by Vale with respect to the coding of certain documents in Rio Tinto's New Control Set (some of which required resolution by the Special Master), Rio Tinto provided a "TAR Worksheet" that disclosed the results of this validation process. That TAR Worksheet revealed that Rio Tinto's Predictive Coding Process had an overall recall of 49% (accepting the coding determinations made by the Special Master), or 60% (accepting the coding

determinations made by Rio Tinto).  Vale is considering the results of Rio Tinto's TAR Worksheet, including possible remediation steps with respect to Rio Tinto's document productions.[32]

The Audit Protocol also provided for a process by which both parties could test the other party's production through the exchange of certain "Audit Samples."  The parties exchanged mutual Audit Samples and have been meeting and conferring with respect to the coding of those Audit Samples.  Based on the results of those Audit Samples, Vale has proposed that both parties agree to undertake certain supplemental, targeted searches for responsive documents.  Rio Tinto has said it is considering that proposal.

## VI.   **Third Party Discovery**

Defendant Thiam requests permission to file a motion to compel non-parties DLA Piper LLP ("DLA") and Veracity Worldwide, LLC ("Veracity") to comply with the subpoena served upon each and, to the extent objections are raised, provide a privilege log detailing the nature of the documents both non-parties are withholding.

On May 22, 2015, Thiam served *subpoena duces tecum* on DLA (which Guinea had hired to investigate the same transactions that are at issue here) and Veracity (an investigator hired by DLA).  In response, DLA, as counsel to Guinea, invoked the Foreign Sovereign Immunities Act ("FSIA") and common law immunity as a blanket protection for withholding documents and withholding a privilege log.  Veracity refused on the same grounds.

This is not the context to litigate the viability of DLA's and Veracity's objections.  But a few points are clear.  First, they are not covered by the FSIA. *See Rep. of Argentina v. NML Capital, Ltd.*, 134 S.Ct. 2250 (2014).  Second, their status as counsel or investigator to a foreign sovereign does not cloak them with categorically immune from U.S. discovery.  *See, e.g., Mare Shipping Inc, v. Squire Sanders (US) LLP*, 574 Fed. App'x 6 (2d Cir. 2014).  And, third, in response to our attempts to resolve DLA's and Veracity's disputes amicably, neither could cite a single case that was both factually relevant and in support of their position.

But even if DLA or Veracity had an immunity or privilege to assert, a blanket refusal is improper.  As to privileges and protections, specifically, a log is required under Fed. R. Civ. P. 45 (e)(2)—even sovereigns must comply.  *See Compagnie Francaise d'Assurance Pour le*

---

[32] In the course of preparing the Joint Letter today, Rio Tinto made an appeal to the Special Master to order Vale not to include this update on the results of the New Control Set review.  That appeal was unsuccessful.  In the course of making the appeal, Rio Tinto made comments suggesting that it did not believe that the TAR Worksheet that it submitted to Vale and the Special Master provided a complete picture of the sufficiency of its production, and made reference to the possibility that documents "similar" to those it failed to produce may have been produced.  Rio Tinto has not provided Vale with any details to substantiate this suggestion, so Vale is not prepared to address it.  In any event, such arguments are appropriately before the Special Master rather than Your Honor.

*Commerce Exterieur*, 105 F.R.D. 16 (S.D.N.Y. 1984); *LNC Invs. Inc. v. Republic of Nicar.*, No. 96-cv-6360, 1997 WL 729106, at*3 (S.D.N.Y. Nov. 21, 1997) (foreign governments are not exempt from the required procedural process in order to invoke privilege).  In the hope of avoiding motion practice, we have invited counsel for DLA and Veracity to attend the joint discovery conference.


Very truly yours,


/s/Michael Lyle
Michael Lyle