FARLRIOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
RIO TINTO,

                    Plaintiff,

          v.                            14 CV 3042 (RMB)

VALE, S.A., et al.,

                    Defendants.
------------------------------x
                                    New York, N.Y.
                                    October 27, 2015
                                    10:38 a.m.

Before:

                    HON. RICHARD M. BERMAN,

                                        District Judge

                         APPEARANCES

QUINN EMMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiff
BY:  MICHAEL J. LYLE
     ERIC C. LYTTLE
     DANIEL KOFFMANN

CLEARY GOTTLIEB STEEN & HAMILTON LLP
     Attorneys for Defendant Vale
BY:  LEWIS J. LIMAN
     JONATHAN I. BLACKMAN
     KATHERINE ELLIS

MISHCON DE REYA
     Attorneys for Defendant BSG Resources Limited
BY:  VINCENT FILARDO
     TIM McCARTHY
     SHAUNEIDA C. DEPEIZA SALDENHA

SULLIVAN & WORCESTER
     Attorneys for Defendant Thiam
BY:  PAUL E. SUMMIT
     CAITLIN C. FAHEY

MARTIN J. AUERBACH
     Attorney for Defendant VBG

FARLRIOC

1    THE COURT:  I thought notwithstanding that the motion

2    is defendants' motion that I might start with plaintiff because

3    I'm going to refer to the complaint in some respects, so maybe

4    do that early on and then we'll hear from the defense after you

5    all.  Is that okay?  Great.

6        So I have a preliminary question for everybody, I

7    guess, but I'll ask the plaintiffs first.  There are two

8    letters that come up obviously throughout the complaint and the

9    motion papers and they are those from the Guinean government,

10   one I think dated on or about December 8, 2008, and the other

11   dated on or about June 29, 2009.  And I don't know if you

12   intended to or did -- I didn't see them as part of the record

13   of this motion, and I'd like to know what your feeling is if it

14   belongs in the motion.  It seems to be integral.  The bottom

15   line is if all that is true, I don't have copies of them.  If

16   you do, I would appreciate that.

17       MR. LYLE:  Your Honor, Michael Lyle for plaintiff Rio

18   Tinto.  We'd be happy to provide both of those letters to your

19   Honor.  We can have them sent over later this afternoon.

20       THE COURT:  Okay.  That would be great.  Do you agree

21   that they're really part and parcel of the motion?

22       MR. LYLE:  Yes.  We've alleged them in the complaint,

23   and I do believe that they do come up as part of the motion.

24       THE COURT:  Defense, is that agreeable to you as well?

25       MR. LIMAN:  Yes, your Honor.

1      THE COURT:  Okay.  So I'm happy to start with the

2   plaintiff.  I have a couple of questions.  You may have some

3   points you want to make independently.  Why don't you do that

4   first and then I'll pose some questions I might have.

5      MR. LYLE:  Certainly, your Honor.

6      THE COURT:  You're welcome to use the podium if you

7   like.

8      MR. LYLE:  If the Court doesn't mind, I'm set up here.

9      THE COURT:  That's great.  Sure.

10      MR. LYLE:  As long as you can hear me okay.

11      THE COURT:  I can.  No problem.

12      MR. LYLE:  With respect to the motion to dismiss, it's

13   clear that there are three main areas where the defendants have

14   filed their motion to dismiss -- one having to do with statute

15   of limitations; the other with the 12(b)(6) merits pleading the

16   RICO violations; and, lastly, the personal jurisdiction issues

17   which are raised only by some of the defendants, particularly

18   BSGR and Steinmetz.

19      Your Honor, with respect to the statute of limitations

20   aspects of the motion to dismiss, they're without merit.  Under

21   whatever analysis as applicable to the facts, I would want to

22   highlight to the Court a decision that we cited in our

23   opposition papers, that's the decision by Judge Preska in the

24   *Forde* case, the *New York District Council of Carpenters Pension*

25   *Fund v. Forde* case, 939 F.Supp.2d 268.  We did cite it in our

FARLRIOC

1   case.  We didn't spend a great deal of time discussing it given

2   the space limations and the number of arguments we had.  We

3   think this one is worthwhile to highlight to the Court as it

4   tracks the allegations in our complaint as it relates to

5   fraudulent concealment and as it relates to the RICO

6   allegations, particularly with respect to the requirements of

7   pleading a conspiracy under 1962(d).

8           And in this case, the motion to dismiss, as we

9   understand the statute of limitations arguments, they are

10  arguing that the injury that is the RICO injury occurred in

11  December of 2008.

12          THE COURT:  Right.

13          MR. LYLE:  That is not a RICO injury.

14          THE COURT:  It's not one generically or it's not one

15  that you're asserting?

16          MR. LYLE:  It's not one generically and it's not one

17  we're asserting, because there were no predicate acts committed

18  prior to that in December of 2008.  And that's the

19  correspondence that your Honor just asked about and it's the

20  allegations in the complaint relating to the purported action

21  by the government of Guinea to reduce Rio Tinto's rights to

22  blocks 1 and 2 and purportedly to convey those to defendant

23  BSGR as it relates to Simandou and, ultimately, to Vale and

24  their coconspirator Vale and VBG, which became the entity

25  through which BSGR and Vale acted.

1          The 2008 action is not the result of any predicate

2     acts.  The predicate acts that we allege and that form the

3     basis of the injury occurred beginning in 2009 through multiple

4     acts on the part of Vale in taking and using our confidential

5     information to thwart our efforts, Rio Tinto's efforts, to

6     secure its rights to blocks 1 and 2.  The action that the

7     government --

8          THE COURT:  Say that again.  Taking the information?

9          MR. LYLE:  Taking and using that information to thwart

10    Rio Tinto's efforts to get back its rights to blocks 1 and 2.

11    In the time that the government of Guinea acted, Rio Tinto

12    challenged that conduct.  It consistently challenged that from

13    2008 all the way up and through until April of 2011, which is

14    when Rio Tinto was ultimately forced at the hands of the

15    conspiracy to give up its claims against the government of

16    Guinea as it relates to blocks 1 and 2 of Simandou.

17         THE COURT:  When did you start challenging in 2008?

18         MR. LYLE:  We challenged it immediately, your Honor,

19    and consistently throughout that time period, as alleged in the

20    complaint.

21         THE COURT:  I'm saying a date, a month.  After you got

22    the letter?

23         MR. LYLE:  Right.  After the letter and at various

24    times throughout 2009, Rio Tinto asserted its rights and

25    challenged that action in the government of Guinea as we

1    alleged.  So the injuries that we're talking about are the

2    first set of RICO injuries that we're alleging occurred

3    beginning in 2009 as a result, as I described, of Vale's

4    conduct.

5              THE COURT:  And those injuries again are what?

6              MR. LYLE:  During that time period, Vale repeatedly

7    and through predicate acts took our confidential information

8    under the guise of a legitimate negotiator for part of the

9    rights to Simandou, which we were negotiating with them at that

10   time period as you may remember from the forum non conveniens

11   arguments.  At that time in 2009, Rio Tinto and Vale were

12   negotiating for a joint venture as it relates to Simandou.  At

13   that time, little did we know that they were in a conspiracy

14   with BSGR to take our rights to Simandou.

15             THE COURT:  Right.  You're confusing me because I'm

16   having trouble separating the rights to one and two to just

17   stealing your information.  Is the RICO conspiracy just that

18   they stole information from you?

19             MR. LYLE:  No, that they stole information and used it

20   to keep us from retaking our rights to blocks 1 and 2 of

21   Simandou.  So in 2008, the government of Guinea --

22             THE COURT:  That's odd, a little bit odd to me.  It

23   would seem to me that you were concerned about them taking it

24   in the first place, not retaking it.  I thought in your

25   complaint, in fact, in your complaint you said, among other

1  things, you said this is a case about theft --

2          MR. LYLE:  Yes.

3          THE COURT:  -- of Rio Tinto's valuable mining rights.

4          That's the way I've always understood your complaint,

5  literally, the document, and also your complaints here in

6  court.

7          MR. LYLE:  Yes.

8          THE COURT:  And logically that's what one would think.

9  You had rights to one and two.  You lost them, and that's

10  what's brought this all about.

11          MR. LYLE:  That's right, your Honor.  The question is

12  when did we learn.

13          THE COURT:  I know, but that's sort of technical a

14  little bit.  I'm confused with stealing your information versus

15  stealing one and two.

16          MR. LYLE:  Understood.

17          THE COURT:  Isn't that really what you're saying, they

18  took one and two from us?

19          MR. LYLE:  They took one and two from us, yes.

20          THE COURT:  That's the real gravamen of your injury,

21  right?

22          MR. LYLE:  That is one aspect of our injury.  And that

23  that was achieved, that taking of one and two --

24          THE COURT:  We're going to dispute, I guess everybody

25  is disputing when that was achieved --

FARLRIOC

1        MR. LYLE:  That's right.

2        THE COURT:  -- for RICO purposes, etc.

3        MR. LYLE:  That's right.

4        THE COURT:  So just say it again to me --

5        MR. LYLE:  I'll clarify.

6        THE COURT:  -- what is the gravamen of your complaint?

7        MR. LYLE:  Our RICO claim, there are two injuries that

8   we claim under our RICO, under our RICO allegations.  And we

9   have other allegations in our complaint which are common law

10   fraud and conspiracy to commit fraud, etc.

11        Our allegations are there are two RICO injuries that

12   stem from the defendants' conduct.  The first one, to get right

13   to the point of blocks 1 and 2, that occurred in April of 2011.

14        THE COURT:  Well, let's forget when it occurred, but

15   it's the taking of one and two is one injury, right?

16        MR. LYLE:  Yes.  That injury, we would say, so, yes,

17   that is our taking of one and two.

18        THE COURT:  And the other?

19        MR. LYLE:  And the other is at a time when the

20   government had purported to act, okay, in 2008, the government

21   did one thing.  It reduced our rights to blocks 1 and 2 to

22   exploration rights, and then it purported to transfer

23   exploration rights to BSGR.

24        THE COURT:  Right, December 2008.

25        MR. LYLE:  2008.  This action is not a RICO injury.

1    That is not a RICO injury because it wasn't achieved through

2    predicate acts.  The RICO injury that we're alleging in

3    addition to the taking of one and two is that after that took

4    place, beginning in 2009 through the RICO conspiracy, Vale and

5    BSGR thwarted Rio Tinto's rights to take on the action that was

6    taking place by the government of Guinea in trying to reduce

7    our rights to blocks 1 and 2.  And what they did --

8              THE COURT:  It's not very clear to me still.

9              MR. LYLE:  The way I think of it, Judge, is sort of

10   like if you're a fighter, if I'm taking the knock out blow of

11   taking blocks 1 and 2, that's April of 2011.

12             THE COURT:  Well, whenever it is, we're going to get

13   to that in a minute.

14             MR. LYLE:  That's our position, 2011, as we lay out in

15   our papers.  They have a different view, but 2011.  Along the

16   way we are struggling to challenge and take back what the

17   government had tried to do because it was improper, it was

18   illegal.  We challenged it.

19             THE COURT:  But it wasn't a RICO act.

20             MR. LYLE:  It was not a RICO act in 2008, that's

21   correct.  But the interference with our ability to take back

22   those rights through the acts of the conspiracy and at the same

23   time through Vale's conduct, taking our information and using

24   it in that effort to thwart our taking back, our challenge of

25   the rights that the government sought to reduce in 2008, those

1    are the predicate acts that form the second injury of the RICO.

2         So there were two distinct.  One is the body blows

3    along the way where they repeatedly took our information, used

4    it to convince the government through multiple government

5    changes.  The government of Guinea changed over time between

6    2008 through 2011.  There was a junta that took over.  So you

7    have multiple times.

8         THE COURT:  It's a mouthful, the second one is a

9    mouthful.  I'm not sure I'm understanding.  Maybe you can point

10   me to a paragraph in the complaint that says just what you

11   said.

12        MR. LYLE:  In terms of the injuries?

13        THE COURT:  Yeah.

14        MR. LYLE:  So the predicate acts that I'm referring to

15   where they're interfering with our negotiations or they're

16   taking our information are if you look at paragraph 167 of the

17   complaint, that lays out the predicate acts that we're

18   referring to.

19        THE COURT:  Paragraph 167 describes what the second

20   predicate act is just as you described it here?

21        MR. LYLE:  The series of predicate acts that began in

22   January of 2009 moving forward.  And also paragraphs --

23        THE COURT:  Give me a sentence or two that captures

24   what you just said.

25        MR. LYLE:  Also paragraphs 86 to 106.  And let me grab

1   my complaint so I can do that for you.  I'm looking for one of

2   the best ones to give you.

3           THE COURT:  I want to have one that's the same as your

4   oral comment.

5           MR. LYLE:  Paragraph 94, your Honor.

6           THE COURT:  And it says?

7           MR. LYLE:  It says, Rio Tinto did not accept that its

8   rights to blocks 1 and 2 were actually rescinded.  Instead, Rio

9   Tinto made every effort to convince the government of Guinea

10  that the recession was invalid and inconsistent with Guinean

11  law.  As discussed in more detail below, Rio Tinto's efforts on

12  this front were consistently stymied by the enterprise,

13  particularly defendant Thiam, who as the minister of mines was

14  vested with the power to review and award mining permits in

15  Guinea.

16          And then we go through and allege in a number of

17  paragraphs, 95, beginning of 95, the acts of Thiam as the

18  minister of mines in intimidating Rio Tinto, taking steps to

19  further secure BSGR's and Vale's grasp on blocks 1 and 2.

20  Because Thiam was the minister of mines, he was a critical part

21  of that requirement that the minister of mines needs to take

22  action in order to provide the rights to BSGR and Vale.

23          And then we go on to further allege that this

24  intimidation took place in a variety of ways, not just through

25  official acts, but also as a result of bribery, but also acts

1    where Thiam publicly and through the airways and on appearances

2    on CNBC and so on was making threats against Rio Tinto's

3    remaining rights that were not subject to any issues, blocks 3

4    and 4. So by threatening blocks --

5          THE COURT: This is not a lawsuit about blocks 3 and

6    4.

7          MR. LYLE: No. It's just that that was used as

8    leverage to force us to ultimately give up our fight for blocks

9    1 and 2.

10         THE COURT: Okay. I hear what you're saying, but I go

11    back to the complaint. The complaint also says that the U.S.

12    based enterprise's ultimate target was Rio Tinto's mining

13    concessions in the Simandou region of southeast Guinea.

14         You agree with that?

15         MR. LYLE: Yes.

16         THE COURT: And then you say in your complaint, the

17    defendants' conspiracy quickly began to bear fruit. So if it's

18    bearing fruit, it means it's already in place, right? The RICO

19    conspiracy can't bear fruit -- you're shaking your head. It's

20    not?

21         MR. LYLE: No.

22         THE COURT: How can it bear fruit if it doesn't exist?

23         MR. LYLE: It's a conspiracy. It's not a RICO

24    conspiracy at that stage. It can't be.

25         THE COURT: Oh, it's just a conspiracy, but it doesn't

1    become a RICO conspiracy.

2            MR. LYLE:  Yes, your Honor.

3            THE COURT:  Because it says, that quickly began to

4    bear fruit when officials in the Guinean government announced

5    in December 2008 that the government had rescinded half of Rio

6    Tinto's Simandou concessions --

7            MR. LYLE:  Correct.

8            THE COURT:  -- blocks 1 and 2, and intended to assign

9    that interest to BSGR.

10           MR. LYLE:  That's correct.

11           THE COURT:  So that's not a RICO problem.

12           MR. LYLE:  It can't be because that wasn't achieved by

13   RICO predicate acts.  The only way that that could be a RICO

14   conspiracy is if it was achieved through predicate acts.  The

15   predicate acts didn't begin until January of 2009.

16           THE COURT:  How do you think that came about, it was

17   dropped down from the Guinean government from the sky?  Nobody

18   did anything to cause that to happen?

19           MR. LYLE:  We do believe that was part and parcel of

20   bribery and improper conduct on the part --

21           THE COURT:  You call it a conspiracy.

22           MR. LYLE:  Yes, but it's not a RICO conspiracy.  It is

23   a common law conspiracy.  It would be a common law fraud

24   conspiracy.

25           THE COURT:  You charge common law conspiracy in your

1  complaint?

2           MR. LYLE:  Yes, we have common law fraud count.

3           THE COURT:  Common law conspiracy.

4           MR. LYLE:  Common law conspiracy to commit fraud

5  count.

6           THE COURT:  You have that.

7           MR. LYLE:  Yes.

8           In any event, even if we didn't have an allegation,

9  Judge, it isn't the RICO conspiracy, right.  You can have a

10 conspiracy, you can commit acts.  There's no question that what

11 happened in 2008 was a harm.  We're not disputing that.

12          THE COURT:  Not only was it a harm, but it's the harm.

13          MR. LYLE:  No.

14          THE COURT:  Oh, no, okay.

15          MR. LYLE:  It's not because it wasn't, that didn't

16 happen.  We didn't lose.

17          THE COURT:  You're not saying it's not a harm because

18 it falls outside the statute of limitations, are you?

19          MR. LYLE:  No, we're saying it's a harm.  It is not a

20 harm that is the result of a RICO conspiracy.  It's not a RICO

21 injury.  What we're saying is that while that took place, while

22 that was a harm as a result of collaboration among the

23 defendants, there's no question about that, it can't be a RICO

24 injury because no predicate acts were committed.

25          THE COURT:  I understand it can't be a RICO

1    conspiracy, a RICO problem, because it's beyond four-year

2    statute of limitations.  I understand that.  But I'm not sure I

3    understand why it couldn't be a RICO harm.

4            MR. LYLE:  It can't be a RICO harm because in order

5    for there to be a RICO injury, it has to be an injury that

6    results from predicate acts.

7            THE COURT:  Okay.  So what acts bore this fruit?

8            MR. LYLE:  The 2008?

9            THE COURT:  Yeah.

10            MR. LYLE:  We would say Beny Steinmetz's and BSGR's

11    bribery of government officials resulted in that activity.

12    That, however, is not a RICO predicate act.

13            THE COURT:  And why not?

14            MR. LYLE:  Because it doesn't satisfy any of the

15    predicate acts under the statute.  In order for that to have

16    occurred, in order for Beny Steinmetz's activities to subject

17    him as a non-U.S. entity, right, he would have to have engaged

18    in an FCPA violation for bribery, but in order for that to

19    happen, Mr. Steinmetz and BSGR at that time would have to have

20    a nexus to the United States, but they don't, so it's not a

21    FCPA violation.  It's not a predicate act.  The predicate acts

22    of corruption and FCPA violations under RICO extend as a result

23    of the Travel Act.  That's not applicable to Mr. Steinmetz and

24    BSGR at that time.

25            So the injuries, that particular injury, Judge, at

1  that time placing our rights under siege, that's our harm, and

2  then ultimately at the end -- and this is where we diverge from

3  them, from the defendants.  April of 2011, when we are forced

4  into the settlement at the hands of the conspiracy because of

5  all the intimidation and threats against our remaining rights,

6  Rio Tinto is forced to relinquish its challenge to one and two

7  which it had consistently.

8           THE COURT:  So that's ultimately 2011.  But you say in

9  the complaint also, the result of defendants' scheme -- not

10  qualified in any way, I'm quoting you -- was a June 2009

11  official statement from Thiam on behalf of the government of

12  Guinea that confirmed the mining rights for Simandou blocks 1

13  and 2 previously held by Rio Tinto were now BSGR and

14  Steinmetz's.

15          MR. LYLE:  Yes.

16          THE COURT:  Sounds like the end to me.

17          MR. LYLE:  It is not the end, your Honor, because that

18  doesn't take place.  Because even then, if you think about the

19  two different injuries, that step in June of 2009, after all of

20  the things that had occurred in January of 2009 while

21  Mr. Steinmetz is bribing officials and Vale is taking our

22  information and providing that to the conspiracy to convince

23  the government and give them cover and comfort that they can

24  continue to keep the rights that they were purporting to

25  transfer in 2008, in 2009 that's culminating in another action

FARLRIOC

1  by the government of Guinea, which is a step along the way.

2  But we continue even after that because we continue to protest,

3  as we've alleged in the complaint.

4  THE COURT:  You call it the result of defendants'

5  scheme in June 2009.  You didn't say a step along the way to

6  2011 happened in June 2009.  You said, the result of

7  defendants' scheme was a June 2009 official statement from

8  Thiam on behalf of the government of Guinea that confirmed the

9  mining rights for Simandou blocks 1 and 2 previously held by

10  Rio Tinto were now BSGR and Steinmetz's.

11  You don't call that a step in the direction of 2011.

12  MR. LYLE:  Yes, your Honor.

13  THE COURT:  It sounds pretty definitive is what I'm

14  trying to say.

15  MR. LYLE:  Yes, but it's not meant to be.  And we

16  alleged the conduct continued.

17  THE COURT:  Would you agree with me that it does sound

18  pretty definitively as a statement?  I'm just quoting your

19  sentence.

20  MR. LYLE:  It's not meant to be at all, Judge, that

21  that's the final step because we allege that there's continuing

22  conduct on the part of the defendants where they continued to

23  threaten blocks 3 and 4 after that date.

24  THE COURT:  I know, but we've already agreed that

25  three and four is really not the subject of your grievance

1    here.

2         MR. LYLE:  Yes, but what I'm saying is that the

3    threats against three and four were used to get us to back off

4    of our challenge as it relates to blocks 1 and 2, which we

5    ultimately do in April of 2011.

6         THE COURT:  Yeah.  As you know, big disagreement about

7    that.

8         MR. LYLE:  There is.  When you look at --

9         THE COURT:  I'm just looking at the statements and

10   they seem so definitive to me that it almost sounds like at one

11   time in drafting the complaint you were focusing on 2008, 2009.

12        MR. LYLE:  2009 though is not -- we have, if we read

13   the complaint in its totality and we give effect to the rest of

14   the allegations, it's clear that the story doesn't end then

15   because we have continued conduct on the part of the defendants

16   for a period well into 2010 and 2011.  And, in fact, it

17   continues through 2013 up until the arrest of Mr. Cilins.

18        THE COURT:  The story doesn't end, but blocks 1 and 2

19   are gone in 2009.

20        MR. LYLE:  No, your Honor, they're not gone because if

21   they were gone, there would be no reason for continued threats

22   and intimidation to get us to give up our rights.  And there

23   would be no need to have an agreement whereby we in 2011 gave

24   up our claim as to those rights to blocks 1 and 2 with the

25   government of Guinea.

1        THE COURT:  Except that's not what you say in the

2   complaint.  You say that his letter, the June 2009 letter

3   confirmed the mining rights for Simandou blocks 1 and 2

4   previously held by Rio Tinto -- that's your client -- were now

5   BSGR and Steinmetz's.  That doesn't say they're gone.

6        MR. LYLE:  No.  It can't say that they're gone

7   because --

8        THE COURT:  What does it say?  It says they were yours

9   and now they're somebody else's.  That's not gone?

10       MR. LYLE:  At that time, government of Guinea is

11  purporting to --

12       THE COURT:  You didn't say he wrote a letter

13  purporting to do anything.  You said he wrote a letter

14  confirming --

15       MR. LYLE:  They did, the government did.

16       THE COURT:  -- what some people could say happened

17  already in 2008 in December.

18       MR. LYLE:  That's right.

19       THE COURT:  So now he's confirming that the rights are

20  gone.  They are not Rio Tinto's.  How many letters does he have

21  to write?

22       MR. LYLE:  Because even if he writes that letter, even

23  if that was his final decision, it didn't end the dispute

24  because Rio Tinto continued to assert the illegality of that

25  action, and, as we made multiple allegations beyond that date

FARLRIOC

1  talking about continued conduct which culminates in April of

2  2011 when we have to, when we relinquish our rights.  Only then

3  is it done.

4        Your Honor, if I could refer you to footnote 4 of our

5  brief on page 10.

6        THE COURT:  I have to take a look at it.  I'm always

7  suspicious of footnotes.  I tell my clerks all the time if it's

8  important, don't put it in a footnote, put it in the text.  But

9  I'm not suggesting your footnote 4 is not important.

10        MR. LYLE:  Footnote 4 talks about how the

11  government -- I apologize we didn't include it in the text, but

12  it's an important footnote on this particular issue -- and it

13  talks about Rio Tinto being asked by defendant Thiam, we have

14  asked in vain for Rio Tinto to give us written confirmation

15  they have given up half of Simandou in accordance with the

16  mining code.

17        THE COURT:  Please start that again.  I'm not

18  following.  I don't have it in front of me.  Unless you have an

19  extra copy.

20        MR. LYLE:  I do.  I can bring it up to you.  If I may

21  approach, your Honor.

22        THE COURT:  Sure.

23        MR. LYLE:  I don't have any notes.  I don't think

24  there are any notes, but I should probably take it back.

25        THE COURT:  This is footnote 4.  I just want to follow

FARLRIOC

1  along.  I see it.  It's in really small type also.  But,

2  anyway, I can make it out.

3         MR. LYLE:  So we have a parenthetical.

4         THE COURT:  So you're saying -- do you want me to look

5  at the whole?

6         MR. LYLE:  If you want, what I'm trying to get to --

7         THE COURT:  You can read it.  Yep.

8         MR. LYLE:  I apologize.  I'm looking in the

9  parenthetical.

10        THE COURT:  Within footnote 4.

11        MR. LYLE:  It says we have asked -- do you see that?

12        THE COURT:  I do.

13        MR. LYLE:  "We have asked in vain for Rio Tinto to

14  give us written confirmation that they have given up half of

15  Simandou in accordance with the mining code, Mines Minister

16  Mahmoud Thiam told Reuters in an interview late on Friday.  If

17  this isn't done by February 2011, Rio risks losing the other

18  two blocks under its control and could definitely lose its

19  rights to the zone, he said."

20        THE COURT:  Okay.  And what does this prove?

21        MR. LYLE:  What this is consistent with is that the

22  issue is not final in June of 2009.  Even defendant Thiam,

23  who's minister of mines, recognizes that it wasn't a finality

24  because he's talking about this and asking for confirmation

25  that we've given up our rights, which we didn't do.  That

1    didn't happen, as I said.

2            THE COURT:  It's a little metaphysical.  In some

3    senses, nothing is ever done, but I get it.  You're saying this

4    supports your contention that even the mining rights in one and

5    two are not gone?

6            MR. LYLE:  They are not gone as of that time, not

7    until 2011.

8            THE COURT:  I get it.  They're not gone until what,

9    you entered the settlement agreement and gave them up?

10           MR. LYLE:  Yes, under threats and intimidation against

11   our other remaining blocks.  But for that, we wouldn't have

12   given up our rights.  That's what we've alleged.

13           THE COURT:  I get it.

14           MR. LYLE:  Your Honor, the issue as it relates to the

15   statute of limitations is a question of when Rio Tinto knew or

16   should have known that it had suffered a RICO injury.  The

17   first question is when.  But the issue as it relates to the

18   statute of limitations is under the discovery rule and the

19   applicable law, it's when did Rio Tinto know or when was it

20   that it should have known that it had suffered a RICO injury.

21           THE COURT:  That is definitely the issue.

22           MR. LYLE:  That is the issue.  As we've laid out, your

23   Honor, the time that that happened is April of 2010.

24           THE COURT:  And why is it April of 2010?

25           MR. LYLE:  Because April of 2010 is the time when Vale

1    and BSGR announce the joint venture for Simandou, and, in the

2    course of making that announcement, reveal that they are using

3    our proprietary confidential information that we had conveyed

4    to Vale at a time when we believed that they were a legitimate

5    purchaser when they were not.  They announced at that time

6    period that they were working together in a joint venture, and,

7    in the course of the announcement, revealed that they were

8    using our confidential information in advancement of that joint

9    venture.  That's the first time that we were on inquiry notice

10   of that connection and that use of our confidential information

11   that we had provided to Vale.

12          THE COURT:  You started providing confidential

13   information in December of 2008.

14          MR. LYLE:  Starting providing in December of 2008.

15   Beginning in January of 2009, they became predicate acts

16   because --

17          THE COURT:  You had no inquiry notice at that time.

18          MR. LYLE:  None whatsoever.  That's the first time.

19   That's a critical fact.  There's two components to it, that

20   Vale and BSGR were working together as part of a joint venture

21   and that they were using our information that we had provided

22   to Vale to advance their efforts with respect to Simandou in

23   securing blocks 1 and 2 and then using that to their benefit as

24   a conspiracy.  That's the first time.  We filed our complaint

25   within four years of that date.

FARLRIOC

1          THE COURT:  Four years of April 2010.

2          MR. LYLE:  Yes.

3          THE COURT:  Well, I know.

4          MR. LYLE:  And not only did we file in that time

5     period, under the law, as is laid out in -- as a result of

6     *Rotella v. Wood* and its progeny in the *Koch* case we've cited to

7     your Honor in the papers, we also at that time launched an

8     investigation.  The fact that under the law, the *Koch* case, if

9     you launch an investigation at the time that you knew or should

10    have known, right, in April of 2010 in our case, the statute of

11    limitations is tolled for a period until such time as a

12    reasonable diligent investigation would reveal the RICO injury.

13    And in this case, so the fact is we filed in April of 2010, but

14    we had some time period even after that, Judge, in order to

15    file our complaint.  So we complied with the statute of

16    limitations and the discovery rule in that regard.

17          The second point is -- that's the case that I started

18    off with which is Judge Preska's decision in the *Forde* case.

19    We also allege fraudulent concealment of the RICO conspiracy.

20    And what Judge Preska decided in the *Forde* case is that, and

21    *Rotella* recognizes it as an exception, fraudulent concealment

22    is an exception to the injury discovery rule of *Rotella v.*

23    *Wood*.  What it says is that if there's fraudulent concealment

24    in the face of that, the statute of limitations is tolled for a

25    period of time until such time as a diligent investigation

1  reveals the claim, the underlying conduct, the RICO conduct,

2  not the injury, but the conduct.

3       And so what happened in the *Forde* case is Judge Preska

4  was confronted with a situation where allegations had been made

5  involving an ERISA fund that was available to the carpenters.

6       THE COURT:  He was president of the carpenters union.

7  I know the case very well.

8       MR. LYLE:  A lawsuit was filed in 2006 in that case

9  against certain of the defendants.  Subsequently, in 2009 --

10  and in that case it was embezzlement of funds that were part of

11  the plan.  That conduct, the breach of fiduciary duty, all of

12  the conduct, all of the causes of action, the injury was the

13  embezzlement of the funds.

14       In 2009, a complaint, an indictment is released and a

15  new defendant appears, materializes for the first time, against

16  whom allegations of a RICO claim are brought.  The claim was

17  brought two years later in 2011.  The defendant said no, no,

18  no.  You knew about all of the injury as it relates to the

19  conduct here back in 2006 because you filed a lawsuit.  You're

20  barred by the statute of limitations.

21       Judge Preska says no, that's not right because of the

22  fraudulent concealment that the defendant engaged in in that

23  case, the statute of limitations was tolled until that time,

24  that is, in 2009, when the indictment against the defendant was

25  unsealed, and then the lawsuit was brought two years later.  So

1  in the face of a known injury, which was the RICO injury, the

2  embezzlement of the funds, the statute of limitations was

3  tolled.

4         In our case, the equivalent of the unveiling is the

5  arrest of Frederic Cilins in 2013, when the information and the

6  government's indictment of him as a defendant reveals all of

7  the conduct as it relates to the conspiracy.  There were

8  agreements, bribery, all of that information became available

9  then.

10         THE COURT:  So that's when the statute started to run?

11         MR. LYLE:  That's when the statute starts to run under

12  fraudulent concealment.  Yes, your Honor.

13         THE COURT:  So your complaint is not late, it's early,

14  right?

15         MR. LYLE:  We filed our complaint --

16         THE COURT:  Well, right after that.

17         MR. LYLE:  We filed our complaint a year later in

18  April of 2014.

19         THE COURT:  I get it.

20         MR. LYLE:  So it was timely under that analysis, your

21  Honor.

22         THE COURT:  So you did not have to file until

23  April 2013.

24         MR. LYLE:  2014.

25         THE COURT:  Four years.

1          MR. LYLE:  2014.  At the earliest, under the discovery

2     rule, right, April 2014 at the earliest.  Under fraudulent

3     concealment we had time.

4          THE COURT:  So you're back to 2017.  That's your

5     theory.

6          MR. LYLE:  Yes, under fraudulent concealment, which is

7     what we've alleged, your Honor.

8          THE COURT:  That's why I was joking that it was early.

9     You have another year or two.

10          MR. LYLE:  I understand, yes.

11          THE COURT:  Okay.  I got it.

12          MR. LYLE:  And so that, by the way, your Honor, that

13     investigation continues, but we've alleged that and we talk

14     about the government investigation and ongoing investigations

15     of the federal government, the United States government,

16     following Cilins arrest, the government of Guinea's

17     investigation, as I mentioned, the DOJ and Southern District of

18     New York's investigation.  In fact, we just received a subpoena

19     from the grand jury in this case seeking the documents in this

20     case and so that investigation is alive and well.

21          THE COURT:  Well, yeah, I don't know.  Forgive me, but

22     some people might start investigating them when they get a

23     letter from the government that says in December 2008, whoops,

24     we're taking your mining rights away, and then in June 2009

25     says, yeah, we're serious.  Not only are we taking them, but we

1    gave them to so and so.  So some reasonable people might say I

2    better start looking into this.

3              MR. LYLE:  We actually did, your Honor.

4              THE COURT:  Yeah, and what did you find?

5              MR. LYLE:  We didn't find any indication -- we found

6    no indication of Vale's involvement.

7              THE COURT:  So you did an investigation starting when?

8              MR. LYLE:  Right after December of 2008, through 2009

9    and 2010.  In fact, our investigation efforts went into

10   through -- we just sat for depositions.  We had four

11   investigative firms and five witnesses that were just deposed

12   in connection with this case, your Honor, four different

13   investigation firms that were retained, plus Rio Tinto's own

14   investigative efforts which began in 2008 and continued well

15   into the -- actively through 2010 and beyond.  And the

16   defendants have had -- we just sat for depositions of our

17   private investigators on that front.  So that investigation did

18   begin, as you would expect.

19             THE COURT:  So what prompted that investigation?

20             MR. LYLE:  Exactly what happened, the government's

21   change in its attitude toward Rio Tinto and the steps that it

22   was taking.

23             THE COURT:  Right.

24             MR. LYLE:  And so we wanted to understand what was

25   happening and why, and so that's why the investigations were

1    launched.

2            THE COURT:  And then so these investigations that come

3    after Cilins's arrest, those are new investigations?

4            MR. LYLE:  After Cilins's arrest, those investigations

5    are government investigations.  Those five different

6    governments are investigating.

7            THE COURT:  No, yours.

8            MR. LYLE:  Well, ours are in connection with our

9    claim, yes.

10           THE COURT:  Having to do with the loss --

11           MR. LYLE:  Yes, exactly.

12           THE COURT:  So it's a continuation?

13           MR. LYLE:  Absolutely.

14           THE COURT:  So your investigation starts in 2008 and

15   continues to this day, I suppose.

16           MR. LYLE:  Well, I think that's fair.

17           THE COURT:  Okay.  I get it.  All right.

18           MR. LYLE:  Were there any other --

19           THE COURT:  Let me just look at my notes.

20           MR. LYLE:  Based on your questioning, I thought

21   statute of limitations was the focus.  But if there are other

22   issues, I'm certainly happy to address.

23           THE COURT:  Well, I'm not necessarily saying it's the

24   focus, but you have to get over that, so to speak, to get to

25   anything else.  I'm having trouble getting over the hurdle.  So

FARLRIOC

1     hold on.

2          So when you say in your complaint, you say beginning

3     in 2008, Vale entered into discussions with Rio Tinto to

4     purchase the Simandou concession while actively concealing from

5     Rio Tinto the material facts that, one, it was also in

6     discussions with the government of Guinea for some or all of

7     Rio Tinto's Simandou concession, and, two, it was evaluating

8     and considering defendants Steinmetz and BSGR as possible

9     partners to pursue Rio Tinto's Simandou concession.

10          You say that, right?

11          MR. LYLE:  Yes, your Honor.

12          THE COURT:  And that, I take it, is a true statement,

13    right?

14          MR. LYLE:  Yes.

15          THE COURT:  And so the investigation that you started

16    in December of 2008 came up blank with respect to these

17    allegations?

18          MR. LYLE:  Yes, your Honor.  We did not know that --

19          THE COURT:  You were investigating, but you didn't

20    find this out.

21          MR. LYLE:  No, no.  We did not find out any of the

22    underlying conduct as a result of our investigations that would

23    shed light on Vale's involvement.

24          THE COURT:  And then you also say at the November 24,

25    2008 meeting, Rio Tinto provided Vale with a confidential

FARLRIOC

1    briefing about the status of its Simandou concession and the

2    attempts of Steinmetz and BSGR to steal it.

3              MR. LYLE:  Yes.

4              THE COURT:  So how did you know that?

5              MR. LYLE:  That information was information that we

6    had, as it relates to BSGR --

7              THE COURT:  I get it.  Just on its face, right.

8              MR. LYLE:  It's an important distinction for purposes

9    of the RICO conspiracy, yes.  So we had information as relates

10   to BSGR's conduct which we conveyed to Vale, which then gives

11   them the idea to go team up with BSGR.  It's the teaming up

12   part we didn't have an inkling about, not until April of 2010

13   when we had inquiry notice.

14             THE COURT:  And also at that same meeting in New York,

15   this is the meeting in New York on November 24, 2008, Rio Tinto

16   discussed and confirmed for Vale that BSGR was now specifically

17   targeting Rio Tinto's Simandou concession.

18             MR. LYLE:  Yes.  These are all allegations as they

19   relate, your Honor, to BSGR.  It's the teaming up with Vale

20   which leads to the RICO component, which we didn't learn of

21   until April of 2010 when we had inquiry notice.

22             THE COURT:  And you also informed Vale that BSGR

23   Guinea had obtained written assurances from the minister of

24   mines on November 3, 2008, that the government -- Guinea, I

25   guess.

FARLRIOC

1          MR. LYLE:  Yes.

2          THE COURT:  -- would withdraw Rio Tinto's Simandou

3    concession.  That's right too?

4          MR. LYLE:  Yes.

5          THE COURT:  Okay.  I get it.  I don't have any more

6    questions on this subject.

7          Did you want to say something else on your other

8    issues?

9          MR. LYLE:  I'm happy to do that now if there are

10   issues that your Honor has as it relates to any other ones.

11   Otherwise, I'm happy to respond to whatever the defendants say

12   if that makes sense.

13         THE COURT:  That does.  Sure.  Let's hear from them.

14         MR. LIMAN:  Thank you, your Honor.  Before I get

15   started, I wanted to, having sat through the beginning portion

16   of your Honor's session this morning where you introduced the

17   members and admitted the members of the bar, just it was a

18   reminder what a special privilege I think it is for all of us

19   to appear in the mother court and to appear in front of your

20   Honor and I wanted to thank your Honor for that and to note how

21   meaningful the words were, not just for the people being

22   admitted, but for I think everybody in the courtroom.

23         I'm Lewis Liman.  I'm prepared to speak on behalf of

24   all of the defendants with respect to the common issues and

25   with respect to Vale.  If there are questions with respect to

FARLRIOC

1  personal jurisdiction, those will be addressed by Mr. Filardo

2  on behalf of BSGR and Steinmetz, as well as perhaps

3  Mr. Auerbach.  I was told before court today that Mr. Summit on

4  behalf of defendant Thiam might have a word or two, want a

5  minute or two to address any issues.

6           THE COURT:  Okay.

7           MR. LIMAN:  I do have some responses and things I want

8  to highlight.

9           THE COURT:  That was going to be my first question to

10  you.  What do you think about what you just heard?

11          MR. LIMAN:  I think it ends the case, frankly, your

12  Honor, and I'll tell you a couple of reasons why.  Your Honor

13  asked twice questions about when it was that Rio Tinto first

14  began investigating or complaining.  That was a question that

15  your Honor asked early on.  It was a question that you asked

16  towards the end.  And the answer was we started to complain

17  right away in December of '08 and in '09.

18          And I think that answer was telling and, again,

19  dispositive because what was Rio Tinto complaining about.  They

20  were complaining about the very thing that's alleged in the

21  complaint which is what they claim to have been the theft of

22  Simandou, precisely as your Honor pointed to paragraph 1 of the

23  amended complaint, exactly what they say the injury is in this

24  case, the loss of the mining rights.

25          Your Honor then asked about injury and where the

1    claims were made about injury that are now being made in the

2    opposition brief and that you heard.  And it was a surprise to

3    us when we got the opposition brief.  We thought this case was

4    an entirely different case.  What we're hearing is entirely

5    different from what we've been litigating.  It was telling that

6    the answer that you got was not a reference to a paragraph in

7    the complaint that referred to injury.  It was a paragraph,

8    paragraph 167, that referred to predicate acts.

9         And as your Honor pointed out and knows, there has to

10   be both injury and predicate acts and the two of them have to

11   be linked, there have to be predicate acts that then lead to

12   the injury.  If there's an injury and there are no predicate

13   acts, which is what they admitted to your Honor, then there is

14   no recovery under RICO.

15        They then pushed a little bit about where it appears

16   in the amended complaint and they referred your Honor to

17   paragraph 94, which we would note says nothing whatsoever about

18   a settlement agreement in 2011.  That doesn't appear anywhere

19   in the complaint.  And as your Honor has known for a long time,

20   you can't amend a complaint in opposition briefs.  I would cite

21   back to your Honor your Honor's opinion in the *Cadbury*

22   *Schweppes* case where you made precisely that point and for all

23   of the right reasons.

24        But what was telling to us is that not only does

25   paragraph 94 not refer to any separate injury, but if you read

1    on just one sentence beyond what they cited, the next heading

2    on page 29 -- so they cited you to paragraph 94 on page 28.  If

3    you look to page 29 -- I can pass it up, your Honor.

4               THE COURT:  If you have.

5               MR. LIMAN:  The heading with respect to on page 29,

6    the very next sentence, if you can give me a moment, your

7    Honor, is the enterprise continued to defraud and intimidate

8    Rio Tinto to ensure that the award to BSGR was finalized.

9               Now, we dispute and Mr. Summit can address the issues

10   with respect to intimidation.  They're not intimidation

11   whatsoever.  They don't support a predicate act.  But the

12   significant thing is that that section, the section about the

13   award to BSGR being finalized, ends on paragraph 100 with a

14   sentence very similar to the sentence that your Honor read and

15   this is at the end of paragraph 100.  Thiam's June 29, 2009

16   letter on behalf of the Guinean government made the initial

17   December 2008 award of Simandou blocks 1 and 2 to BSGR official

18   until the Guinean government recently revoked BSGR and Vale's

19   rights to Simandou blocks 1 and 2.  That's what they claim is

20   the finalization of the loss that occurred earlier.

21              Now, why do we say that this is important, why is this

22   action critically important?  It's important for at least two

23   separate reasons.  One is the statute of limitations.  I'm

24   happy to address Judge Preska's opinion or any of the other

25   issues with respect to that.  The other is the question of

1    whether there was a pattern of racketeering.  And the third is

2    whether there was June of 2011 has any relationship.  We

3    believe that the loss occurred in December of '08.  That's

4    what's pled in the complaint.  That's what happened.

5            THE COURT:  And what flows from that if you're right?

6            MR. LIMAN:  What flows from that is that the statute

7    of limitations begins to run in December of '08 because they

8    knew they lost the money.  It also means that they cannot

9    recover for that loss, for any damages incurred by the loss of

10   Simandou blocks 1 and 2 because, as they admitted and we argued

11   in the beginning of our brief, there's no pattern of

12   racketeering that causes that loss.  That, to our minds, also

13   ends the case because December of '08 is in fact the only loss

14   that's alleged.

15           THE COURT:  Ends the RICO claim?

16           MR. LIMAN:  It ends the RICO claim.  The other claims,

17   the only basis for jurisdiction is supplemental jurisdiction.

18           THE COURT:  Right.

19           MR. LIMAN:  It ends the RICO claim.

20           THE COURT:  So it ends.  And what about this, as I

21   think counsel was saying, Mr. Lyle was saying it's the theft of

22   information that is really the problem here, not the loss of --

23   well, I'm overstating it, but what about that?

24           MR. LIMAN:  I don't think you're overstating their

25   argument today.  I think it is misstating what the complaint

 1 | alleges.

 2 | THE COURT:  It does seem to be somewhat at odds with

 3 | what the complaint states.

 4 | MR. LIMAN:  Right.  What the complaint alleges, if I

 5 | could grab my copy of the complaint back, your Honor.  It's got

 6 | my little post-it with the paragraph I wanted to bring to your

 7 | attention.  One of many paragraphs that I would draw your

 8 | Honor's attention to is paragraph 159.

 9 | THE COURT:  What page is that?

10 | MR. LIMAN:  That is on page 46, your Honor.

11 | THE COURT:  Got it.

12 | MR. LIMAN:  This is the paragraph that talks about the

13 | RICO enterprise's common purpose.

14 | THE COURT:  Yeah.

15 | MR. LIMAN:  And it talks about the fact that the

16 | allegation is that there was a meeting in 2008 to discuss the

17 | proprietary information Vale learned from Rio Tinto -- in 2008,

18 | notably, before there was any predicate act committed.  The

19 | predicate acts against us are only in January and February of

20 | 2009 -- and obtained confidential information in a bid to

21 | wrongfully acquire Rio Tinto's Simandou concession.

22 | I would also point your Honor to a number of other

23 | paragraphs.  Paragraph 1, this is a case about the theft of Rio

24 | Tinto's valuable mining rights.  Paragraph 10, Vale armed

25 | Steinmetz and BSGR with Rio Tinto's research and development to

1    persuade officials in the Guinean government to accept their

2    bribes and go along with the illegal scheme.  Paragraph 14,

3    RICO enterprise's ultimate target was the mining concession

4    which was taken by June of 2009.  Paragraph 87, 89,

5    paragraph 166, all for the same point.

6         The point, your Honor, is that the information that

7    was allegedly taken was not information that they allege had

8    independent value to Vale or BSGR with respect to mining

9    generally out there in the world.  Their claim is that

10   information was taken because it was of use in obtaining the

11   Simandou blocks 1 and 2.

12        THE COURT:  Right.

13        MR. LIMAN:  That's why it's a loss.

14        THE COURT:  And if that's so, then what?

15        MR. LIMAN:  If that's so, your Honor, first of all, it

16   would have occurred in November and December of '08.  So for

17   purposes of statute of limitations, that's when the loss

18   occurs.  Also, for purposes of statute of limitations, it means

19   that the loss is the loss of the mine.  They knew the loss of

20   the mine.  They were on inquiry notice of their loss.  What

21   they're talking about with you is notice of the claim, exactly

22   what *Rotella* said is not required, what *Rotella* rejected.  So

23   statute of limitations clock begins running.

24        It also means that there's no pattern and no pattern

25   that caused the loss because for two reasons -- one, only two

1  predicate acts alleged against any defendants with any

2  specificity up until June of 2009.  Those two are alleged

3  against Vale.  They're the only things alleged against Vale in

4  terms of predicate acts after February of '09, they end.  Those

5  two acts are alleged to have taken place in a one-week period,

6  January 29, February 4.  We've argued in our briefs why neither

7  of them satisfy 9(b).  But under *Linens of Europe*, other cases,

8  those are considered to be one predicate act.

9         More importantly or just as importantly, those don't

10  make out a RICO pattern.  They don't satisfy closed-end

11  continuity.  They don't satisfy open-ended continuity.  It all

12  began and ends within a short period of time.  That's the

13  reason why it's so critical that the allegation here is that

14  the information is used for the purpose of obtaining blocks 1

15  and 2.  It's not that it's got independent value out there in

16  the world.

17         There is, it does seem like their argument, and is it

18  another reason why I think that colloquy that I just heard

19  should end the case, much of what your Honor heard was claims

20  that what the wrong here was that we disputed the theft of our

21  property.  We were trying to get the theft of our property back

22  and these fellows, the defendants, interfered with our attempts

23  to get that property back.

24         And I think just as your Honor's question with respect

25  to statute of limitations, not presuming it's a point, but your

FARLRIOC

1  Honor's question about the statute of limitations sort of

2  proved the sort of the limiting principle, and there is no

3  limiting principle to their argument.  So too here their theory

4  about interference with attempt to get property back really has

5  no limiting principle, finds no support in the law.

6  It means, in essence, that if I were to steal

7  Mr. Blackman's property and Mr. Blackman was to say to me I

8  want that property back and I was to continue to hold on to it,

9  he could bring a RICO claim whenever, as long as he was able to

10 establish the predicate acts.  There are two separate

11 independent elements -- one is injury and one is the pattern.

12 And under that theory, you would essentially have no statute of

13 limitations.  It's a point the Second Circuit has made.

14 I think, your Honor, those are the points that I

15 wanted to highlight.  A lot of other points are addressed in

16 the brief.  We've cited a lot of other cases.  I know your

17 Honor has studied the papers.  I'm happy to respond to any

18 questions.

19 THE COURT:  So between 2008 and June 2009, which do

20 you think is the operative date?  I mean I think I know what

21 you think.

22 MR. LIMAN:  Your Honor, I think the critical date is

23 December of 2008 because in order for something to have been

24 finalized, something had to have happened to have been

25 finalized.

FARLRIOC

1      THE COURT:  Got it.  Okay.  All right.

2      So now did you want to talk about, you said at the

3  outset that there are three principal parts of your

4  presentation.  I don't have questions beyond that at the

5  moment.  I don't want to preclude you from saying anything else

6  that you wanted to say.

7      MR. LYLE:  Thank you, your Honor.  Do you want me to,

8  should I address what Mr. Liman has?

9      THE COURT:  Whatever you like.  I'm not suggesting

10  that you need to summarize what's in your papers.  But if you

11  wanted to make any further points about other issues and/or

12  Mr. Liman's comments, this is the opportunity to do that.

13      MR. LYLE:  Thank you, your Honor.

14      The allegations that Mr. Liman focused on and the

15  questions that you had, in follow up to the questions you had

16  been asking, in order for there to be a RICO injury, it has to

17  be the result of predicate acts.  And with respect to the

18  conspiracy that we've also alleged under 1962(d), there has to

19  be an agreement to conspire to violate RICO.  And in a civil

20  case, which is what we have here, there has to be a predicate

21  act and that's the Supreme Court's decision in the *Beck v.*

22  *Prupis* case, which is 529 U.S. 494.

23      And in this case, the only way then that there can be

24  a RICO injury giving rise to our claim, a RICO injury, there

25  had to be a predicate act and there are no predicate acts

1   alleged until 2009.

2        THE COURT:  I think Mr. Liman would thoroughly agree

3   with you and say there is no RICO claim.  It doesn't have to be

4   a RICO claim.

5        MR. LYLE:  I'm saying as it relates to the date of

6   2008, because their argument is we suffered our injury in 2008.

7        THE COURT:  That's precisely his point -- it's over at

8   that time and it's not a RICO violation.  Whatever happened,

9   whatever it is, maybe you had a lawsuit about it or maybe you

10   didn't.  It probably wasn't a RICO lawsuit, maybe some other

11   kind of lawsuit.  But you brought a RICO lawsuit.

12        MR. LYLE:  We did, your Honor.  And we've alleged

13   under the case law that we've cited, those actions are RICO

14   injuries.  And, ultimately, we have two categories of injuries

15   that we're talking about.  The first one is as a result of the

16   predicate acts that occurred in 2009 going forward.  And then

17   the ultimate -- separate and distinct injury is not just all of

18   the efforts in beating back our attempts to get one and two

19   back through multiple governments, but the ultimate injury in

20   April of 2011.

21        THE COURT:  What does multiple governments mean, does

22   the clock start when there's a new election?

23        MR. LYLE:  Each government that took over --

24        THE COURT:  You start all over again?

25        MR. LYLE:  Each new incoming administration refocused

1     on their --

2            THE COURT:  I know that.  But new four years at every

3     election or something like that?

4            MR. LYLE:  Yes, your Honor.  There are ongoing actions

5     to assess and reassess one and two, right.  And they looked at

6     all mining, but specifically Rio Tinto in blocks 1 and 2.  And,

7     in fact, we have allegations that defendant Thiam stayed on as

8     minister of mines from one administration to the next, he did,

9     and he was constantly being paid by BSGR, as a result,

10    continued his siege against our rights on one and two.  That is

11    a RICO injury.

12           A separate injury, separate and distinct from that, is

13    April 2011, when we're forced to relinquish our rights because

14    of the ongoing intimidation by Thiam which continued well past

15    the June 2009 date that you're talking about.  In fact, we've

16    got an allegation in paragraph 116 which I neglected to mention

17    to you earlier which I want to draw your attention to where it

18    says on October 4, 2010, Minister Thiam, the defendant,

19    publicly stated that Rio Tinto had until February 2011 to

20    formally waive its rights to blocks 1 and 2.  Thiam further

21    stated that if Rio Tinto did not waive its rights to one and

22    two, it risked losing its rights to blocks 3 and 4.

23           That's the ongoing siege against our rights that I was

24    referring to.  And we have other allegations in the complaint

25    along those lines.  Every effort we had to try to secure the

1  rights to one and two, the defendants jumped on and interfered

2  with it.  They stopped us from being able to get what was

3  rightfully ours.

4       The RICO aspects can only occur after, right, December

5  of 2008.  It can't beforehand.  And in setting aside that, your

6  Honor, the question that we have to ask is when did Rio Tinto

7  know or when should it have known, which we already talked

8  about.

9       Mr. Liman didn't address the *Koch* case.  And he didn't

10 refute anything I said about fraudulent concealment, which is

11 what we've alleged in the case under Judge Preska's decision in

12 the *Forde* case, which indicates that if defendants are engaged

13 in a course of concealment, which we've alleged by the nature

14 of their acts and affirmative actions that they took, they

15 prevented Rio Tinto from discovering the basis of its RICO

16 claim separate and distinct from the injury.  Even if you know

17 you've been injured, even if you know you've sustained an

18 injury under the Preska decision in the *Forde* case, in the face

19 of fraudulent concealment, the statute of limitations is

20 tolled.  You didn't hear anything from the defense on that

21 argument, your Honor.

22      THE COURT:  I should ask him about it.  I will.

23      MR. LYLE:  Thank you.

24      THE COURT:  Hold on.

25      So what about it, Mr. Liman?  He's saying, I think as

1    to your client in particular, that your client was more than

2    silent, but that your client lied during negotiations with his

3    client and concealed, consequently.

4         MR. LIMAN:  I think that's the kind of allegation that

5    both the *Forde* case and every other case in this district and

6    in this circuit needs to be supported by well-pleaded

7    allegations and not just by conclusory statements.  Not only is

8    it not supported by well-pleaded allegations, but the evidence

9    before your Honor, the pleadings, the documents incorporated in

10   it, make it perfectly clear that my client had the absolute

11   right to enter into a joint venture with BSGR in April of 2010.

12        There's no allegation that we lied to them.  There's

13   still been no specification for any lies that we told to them

14   or any act of concealment.  All they're alleging is that in

15   January of 2009, we said that we would be interested in

16   Simandou.  We were interested in Simandou.  When they lost it,

17   we ended up engaging in a joint venture with BSGR; and the

18   January of '09 agreement said we can do that.  And in February,

19   a couple days later, we said we're still interested in the

20   agreement to get Simandou.

21        I don't think there's anything fraudulent with respect

22   to that.  If those kinds of allegations are accepted, this

23   courthouse is going to be flooded with cases that are ancient.

24        THE COURT:  All right.  Those are the issues that were

25   on my mind.  There were others that wanted to be heard back

FARLRIOC

1    there.

2          MR. SUMMIT:  It's almost good afternoon, your Honor.

3    Paul Summit for Thiam.  Thank you for your time, and I

4    represent defendant Thiam.  I'm not going to get into the

5    statute of limitation argument, which has been ably

6    represented.  I want to focus on a number of Thiam specific

7    points briefly.

8          The predicate acts simply disappear upon scrutiny.

9    Let's start with the alleged bribes.  First of all, the

10   allegation of bribery is incredibly sparse and does not pass

11   9(b) scrutiny and that's in two respects.  No. 1, they barely

12   allege a $100 million bribe in installments to Thiam.  But

13   also, No. 2, and perhaps more to the point for the Foreign

14   Corrupt Practice Act issue, they then say that defendant Thiam

15   distributed those bribes to other government officials.

16         Now, they had to add that redistribute allegation.  It

17   wasn't in the first complaint.  They added it in the amended

18   complaint.  They don't name a single other official.  They

19   don't name a single time or place.  They don't name a single

20   amount.  They say nothing but the rote assertion in numerous

21   places, he distributed to others.  The reason they added that,

22   that they felt they had to add that, was that it is completely

23   clear under the case law that Thiam, as a foreign official,

24   cannot be prosecuted under the Foreign Corrupt Practices Act,

25   even if he did get this barely alleged bribe.

1          So the FCPA predicate act falls out.  Rio Tinto

2    doesn't challenge that.  Rio Tinto concedes *sub silentio* that

3    there can be no FCPA again Thiam, there can be no FCPA for an

4    alleged receipt of bribe.  So they allege the redistribution in

5    rote, which is utterly inadequate under 9(b).  And they cite no

6    case law in any event that the redistribution would have

7    constituted an FCPA violation anyway.  So that predicate act

8    disappears.

9          The money laundering, which is a second predicate act,

10   is supposed to be based upon a purchase of a property in

11   Westchester in 2011.  There's absolutely no showing that either

12   that any bribe money was used, assuming it existed, for the

13   purchase of that property or that it in any way perpetuated a

14   scheme.

15         And, finally, the mail and wire fraud allegations are

16   all alleged post April 2010.  They are anodyne, truthful

17   statements.  You can find them at paragraphs 111 to 116 of the

18   amended complaint.  They are simply statements to the media

19   about a public dispute that was already ongoing as Rio Tinto

20   alleged that its rights had somehow been taken from it

21   improperly back in December of 2008.  So there's absolutely no

22   reliance.  There can be absolutely no showing of reliance, and

23   they are completely silent on the question of reliance.

24         So defendant Thiam stands behind the arguments that

25   have been made ably as to statute of limitation.  But there are

1    a whole independent set of reasons that are set forth I think

2    amply in the papers as to why there are no predicate acts

3    anyway as to him.

4           And also, by the way, fraudulent concealment for

5    purposes of statute of limitation, as your Honor is well aware,

6    has to be proved defendant by defendant; and there's absolutely

7    no showing that Thiam or, for that matter, any of the other

8    defendants fraudulently concealed the injury.

9           THE COURT:  Anybody else at that table want to be

10   heard?

11          MR. FILARDO:  Good morning, your Honor, Vincent

12   Filardo from Mishcon on behalf of defendants BSG Resource and

13   Mr. Steinmetz.  I'd like to be heard briefly on the personal

14   jurisdiction issues.

15          Your Honor, I just want to start by saying that

16   defendants BSGR and Steinmetz agree with the representations

17   made by plaintiff this morning that BSGR and Mr. Steinmetz do

18   not have a nexus to the United States.  And, indeed, at

19   plaintiff's request, there was jurisdictional discovery taken

20   in this case on precisely that issue, meaning on general

21   jurisdiction over Mr. Steinmetz and BSGR, their minimum

22   contacts with the United States, not just New York, and their

23   relationship with any alleged agents here in the U.S. and the

24   activities of those agents here in the U.S.  And, of course, in

25   the complaint, the only agent that's alleged is Mr. Cilins.

1     And in Judge Peck's deliberations on the scope of

2     jurisdictional discovery, he asked plaintiff's counsel to name

3     the agents that they believed they needed discovery from and

4     they only identified Mr. Cilins, and that was in the

5     November 3, 2014 hearing transcript before Judge Peck, for the

6     record, on page 28, lines 4 to 5.

7     After having had that discovery, there was absolutely

8     no evidence of any connection, jurisdictional connection

9     between Steinmetz and BSGR to the U.S. or to New York.  There

10    was no evidence provided that shows an agency relationship

11    between my clients and Mr. Cilins, and no evidence certainly

12    that we directed any of Mr. Cilins's activities here.

13    Having had that level of jurisdictional discovery, it

14    was plaintiff's burden and they failed that burden to prove

15    that jurisdictional connection on those bases.  And, indeed,

16    the only specific allegation they had with respect to

17    jurisdiction over my clients was that with respect to

18    Mr. Steinmetz allegedly having owned or used property here in

19    Manhattan.  There was no discovery that came up that proved

20    that.  And at Judge Peck's request, Mr. Steinmetz submitted a

21    sworn declaration refuting those allegations.  In fact, he did

22    it on two separate occasions, as your Honor knows based upon

23    the briefing.

24    Given that, plaintiffs shift, it appears, in their

25    opposition to really focus on the activities of coconspirators

1    here in the U.S.  But, at the outset, it's important to

2    recognize, and we put this in our brief, that minimum contacts,

3    federal constitutional minimum contacts, are going to play out

4    across any theory other than general jurisdiction of

5    jurisdiction in this case.  And, again, there was minimum

6    contact jurisdictional discovery taken.  Nothing was shown to

7    establish those minimum contacts.

8        And, in fact, plaintiffs had even asked for nationwide

9    contacts in light of 4(k)(2).  They received that expressly

10   from Judge Peck and, again, there was nothing shown to

11   establish those minimum contacts on a nationwide or New York

12   basis.  And certainly what's required under due process is an

13   intentional effort to direct activities at the forum state and

14   that there be a harm that either exists in the forum state or

15   is developed in the forum state.

16       And the complaint, the amended complaint and the

17   original complaint don't allege a harm in New York, and I'm

18   happy to discuss why that is the case.  But, certainly, we have

19   an Anglic Australian company that's headquartered in the U.K.

20   and they have alleged a harm to their Guinean mining interests

21   and no harm has been alleged in New York or even the U.S.

22       So instead what remains is has there been a prima

23   facie standard met with respect to any kind of activities of

24   coconspirators and clearly there hasn't.  There's a single

25   specific statement of conspiracy between BSGR and Vale about a

1     conspiracy to have taken place in Guinea.  That's not enough

2     for jurisdictional purposes.  For jurisdictional purposes,

3     there needs to be allegations that are made that are akin to

4     agency allegations that BSGR directed the activities of its

5     coconspirators, that they did it on behalf of BSGR, that those

6     activities were for the benefit of the conspirator, and, again,

7     that there was an awareness, that BSGR would have had an

8     awareness of an effect in New York.  None of those allegations

9     appear in this complaint, nor really can they given the balance

10    of allegations.

11         So at that point what is left really is, is there any

12    other jurisdiction under New York law.  And, again, without

13    having properly alleged that connection, it's akin to an agency

14    connection.  There can be no direct, whether it's under

15    302(a)(2) or (a)(3), jurisdiction in New York over BSGR.  And,

16    again, I'll address that just quickly here.

17         Leaving aside the connection of coconspirator agency

18    sufficiency allegations, there has to at least have been under

19    302(a)(2) an allegation of a tort or activity occurring here in

20    New York.  And plaintiffs took some issue with us calling Vale

21    as an alleged coconspirator, their use of the confidential

22    information that they gathered when they were in New York in

23    November of 2008 as being a breach of contract.  Well,

24    regardless of how the Court wants to treat that activity,

25    whether it's a breach or whether it's a misuse of confidential

1    information, it's clear that that did not take place in New

2    York.  That access was pursuant to a lawful confidentiality

3    deed and data access agreement that was negotiated before Vale

4    was even in New York.  That access occurred in New York, but

5    then the use was alleged to have taken place somewhere outside

6    of New York.  It appears to be Guinea, but it's really not

7    clear.  But, in any event, if a breach occurred, it was outside

8    of Guinea.

9              THE COURT:  I'm sorry?

10             MR. FILARDO:  It's outside of New York, excuse me.

11   And if a misuse occurred, the misuse, the location of that

12   tort, the place of that tort would be in the place of misuse.

13   And that's the *V. Cars* case that we cite in our reply, *V. Cars*

14   *v. Israel Corp*.  So clearly 302(a)(2) doesn't apply with

15   respect to Vale.

16             And with respect to Thiam, the allegations that are

17   made against Thiam, because it's specific jurisdiction under

18   302(a)(2), none of the claims are arising out of those

19   allegations.  His appearance on the television program, the

20   statements he made while he was in New York, the claims just

21   simply don't arise out of it and it's required that they do.

22             Finally, with respect to 4(k)(2), I think I touched on

23   this again.  4(k)(2) is a limited applicability.  It needs to

24   have minimum contacts.  And once minimum contacts aren't

25   established, there's no real further inquiry that's necessary.

1  Already touched upon that.  But courts in this district have

2  found that trying to use the activities of coconspirators to

3  somehow foist jurisdiction under 4(k)(2) is not allowable.  I

4  don't think the Court even needs to go there given the fact

5  that we had jurisdictional discovery.

6          And those are the main points.  I could address

7  1965(a) and (b) if the Court would like, but I'll leave that to

8  the Court's decision.

9          MR. AUERBACH:  Good afternoon, your Honor.  Martin

10  Auerbach for the VBG defendants.  I promised my brethren I

11  would be brief and I will be.  I ask only whether the Court has

12  any doubt as to the need to dismiss my client, a foreign

13  country, companies with absolutely no alleged contact to the

14  United States.  I think there's more than ample basis to

15  dismiss the entire case.  If your Honor has any question or any

16  doubt as to the necessity of dismissing my client, I'd be happy

17  to address that.  If not, I'd be happy to sit down.

18          THE COURT:  I don't have questions for you.  It

19  doesn't mean I agree with the ultimate legal conclusion.  I

20  didn't finish the opinion yet.  But I don't have any questions.

21          MR. AUERBACH:  Thank you, your Honor.

22          THE COURT:  Anybody else from the back, so to speak,

23  the defense table?

24          So now you get the last word, Mr. Lyle, to respond to

25  what you've just heard if you wish.

FARLRIOC

1          MR. LYLE:  Thank you, your Honor.

2          With respect to BSGR's issues, as it relates to

3     counsel's arguments on personal jurisdiction, to clarify the

4     point that he first seized on where I said there was no nexus

5     to the United States, I was referring to in the time period in

6     November, December 2008.  That obviously changes going forward

7     because our arguments as it relates to what they did subsequent

8     to those dates shows that BSGR has sufficient contacts to the

9     United States and to New York.

10          THE COURT:  As of when?

11          MR. LYLE:  As certainly as of 2009, in January 2009

12     going forward.

13          And, your Honor, when you look at the issue of the

14     discovery that Mr. Filardo referred to, there has been very

15     limited discovery as it relates to jurisdiction.  There's been

16     no substantive hearing and there's been no evidentiary hearing

17     of any kind as it relates to the question of jurisdiction.

18     Judge Peck had a very narrow view as it relates to discovery.

19     There have been no depositions on this, as deposition

20     discovery, as your Honor knows, has been stayed at the request

21     of the parties.  Mr. Cilins has not been deposed.  Nobody from

22     BSGR has been deposed on these issues.

23          BSGR has steadfastly resisted discovery in the normal

24     rules of civil procedure forcing us to go through the Hague,

25     which therefore limits dramatically the type of information

1    that you're able to obtain.

2            So to suggest that somehow there's been this robust

3    discovery opportunity and an evidentiary hearing based on

4    that --

5            THE COURT:  I don't think anybody said there was an

6    evidentiary hearing.

7            MR. LYLE:  I stand correct -- that there's been robust

8    discovery, and as I've said, there was no evidentiary hearing.

9    I refer your Honor to the cases we've cited in our papers on

10   that score as it relates to the burden that we have with

11   respect to establishing jurisdiction.

12           And if you look at our allegations and we've laid out

13   in our papers there are independent bases for finding personal

14   jurisdiction under 302(a)(2), we've alleged a conspiracy and

15   acts committed in furtherance of that.  We have Vale's actions

16   that took place in New York as a result of the conspiracy which

17   BSGR is charged with under the cases we've cited in our papers.

18           The actions of Mr. Cilins and the attempted bribery of

19   defendant Toure and all of the conduct that resulted in

20   Mr. Cilins's arrest which is alleged here and effort to destroy

21   evidence, all of that is alleged to have occurred at the

22   instruction and request of BSGR and Mr. Steinmetz, sending an

23   agent of Mr. Cilins into the United States.  And Mr. Cilins was

24   incarcerated here in New York, as your Honor well knows, after

25   he was released and fled the country.  All of those actions

1   were purposeful actions taken at the behest and at the request

2   of and under the instruction of BSGR, as we've laid out.  All

3   of those things satisfy 302(a)(2).

4          As it relates to the other nexuses for purposes of

5   jurisdiction under the RICO statute, all need be alleged and

6   shown is that at the time of the complaint, there was an agent

7   who was here in New York, which was Thiam.

8          And, lastly, we've laid out in our papers and I'll

9   stand on our assertions on that as it relates to 4(k)(2).  But

10  if you look at what defendant BSGR did and what was done

11  through his association and participation in the conspiracy,

12  there is jurisdiction over him personally for all of the

13  reasons that we've laid out in our papers.

14         With respect to the other arguments by other counsel,

15  we'll rest on our papers on those points, as I don't think

16  they've done anything other than reiterate what they've said in

17  our papers and we'll stand on ours.

18         MR. FILARDO:  If I can briefly be heard on rebuttal.

19         First, jurisdictional discovery was conducted under

20  the Federal Rules of Civil Procedure pursuant to Judge Peck's

21  order.  There was a period of jurisdictional discovery that was

22  set forth both for documents and anything that plaintiff needed

23  to take.  They issued 26 document requests.  That was what they

24  issued.  They issued them broadly on general jurisdiction, on

25  specific jurisdiction, and the activities and connections of

1   BSGR and Mr. Steinmetz with any agents alleged in the

2   complaint.  They got all that, nothing came up.  Nothing came

3   up to support the allegations with respect to an agency

4   relationship between my clients and Mr. Cilins.

5            In any event, Mr. Cilins' activities took place in

6   Florida.  There is no allegation that under CPLR 302(a)(3) that

7   those out-of-state alleged tortious activities had a harmful

8   effect in New York.  Therefore, they do not fulfill the

9   requirements for the long arm.  Mr. Cilins was arrested in

10  Florida.  He was incarcerated in Florida.  He was moved to this

11  district for sentencing and for other investigative purposes

12  that are unclear.

13           But the acts that are alleged in the complaint by

14  plaintiffs do not take place in New York in any respect, nor do

15  their claims arise out of those acts.  In essence, those acts

16  were the cover-up.  They claim this happened as a cover-up,

17  presumably to help affect their issues with respect to statute

18  of limitations.

19           Your Honor, I think with respect to, again, general

20  jurisdiction, there has been nothing.  And, in fact, even Rio's

21  counsel had admitted there's no general jurisdiction claims

22  against BSGR or Mr. Steinmetz outside of the ownership of that

23  property, which now has been completely refuted.

24           And, frankly, again, with respect to, and I didn't

25  address, but I'll do it now, 1965(a), which is the so-called

FARLRIOC

1    RICO jurisdiction, that does not confer an independent basis

2    for jurisdiction.  What is required under that analysis is that

3    there are, again, minimum contacts, that the forum state's long

4    arm jurisdiction is satisfied.  And once you have that, then

5    you can look to see if there is an agent in the district at the

6    time the complaint is filed.  And the agent that now and in

7    their opposition papers Rio points to is Mr. Thiam, but

8    Mr. Thiam is not alleged to be an agent in the complaint.  And

9    certainly there are no facts that are alleged in the complaint

10   that would create an inference of agency between Mr. Thiam and

11   BSGR and Mr. Steinmetz.

12            THE COURT:  Okay.  I think this has been very helpful.

13   I will try and get to an opinion as soon as I can, probably in

14   the next couple weeks for sure.  Thank you very much.  Good to

15   see you.

16                              o0o

17

18

19

20

21

22

23

24

25