Fbhdrioc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    RIO TINTO PLC,

4                  Plaintiff,

5          v.                              14 Civ. 3042(RMB)(AJP)

6    VALE, S.A., et al.,
                                           Conference
7             Defendants.

8    ------------------------------x

9                                          New York, N.Y.
                                           November 17, 2015
10                                         10:33 a.m.
     Before:
11
             HON. ANDREW J. PECK,
12                                         Magistrate Judge

13                    APPEARANCES

14   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Plaintiff
15   BY:  ERIC C. LYTTLE
          MICHAEL J. LYLE
16        JAIME KAPLAN

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Vale, S.A.
18   BY:  JONATHAN I. BLACKMAN
          LEWIS J. LIMAN
19
     MISHCON DE REYA LLP
20        Attorneys for Defendant BSG Resources Limited
     BY:  VINCENT FILARDO
21        SHAUNEIDA C. DePEIZA SALDENHA

22   SULLIVAN & WORCESTER LLP
          Attorneys for Defendant Mahmoud Thiam
23   BY:  ANDREW T. SOLOMON
          CAITLIN C. FAHEY

24

25

Fbhdrioc

APPEARANCES CONTINUED

MARTIN J. AUERBACH
    Attorney for BSG Resources defendants


DLA PIPER LLP (US)
    Attorneys for DLA Piper LLP
BY:  JEFFREY D. ROTENBERG

                                oOo

            THE COURT:  Be seated.

            All right.  Why don't we deal with the DLA Piper issue

first even though it is near the end of the joint letter so

that DLA can leave after their issue is resolved.

            My first question for Thiam's counsel is do you have

the DLA report that doesn't seem to be here?

            MR. SOLOMON:  Yes.

            THE COURT:  You have the DLA report.  Where did it

come from.

            MR. SOLOMON:  We received it as part of our joint

defense arrangement with the lawyers from BSGR.

            THE COURT:  All right.  And do we know where BSGR got

it from?

            MR. FILARDO:  Your Honor, good morning.  Vincent

Filardo, from Mishcon de Reya.

            No, your Honor, I don't have a clear answer to that.

I have been trying to get one but I do not have one.

            THE COURT:  All right.  Well, OK.  Having read your

piece of the letter, Mr. Solomon, and having read the letters

1    from DLA, the subpoena to DLA certainly is overbroad in many,

2    many ways even if there was no sovereign immunity, or whatever,

3    based on them having the protection of the government of

4    Guinee.

5            Secondly, was the DLA work done out of DLA New York?

6    DLA -- you know, you guys are a small intimate firm also known

7    as a verein with a few million people all over the world.

8            MR. ROTENBERG:  It makes my life more interesting,

9    your Honor.  Jeffrey Rotenberg of DLA.

10           The engagement was out of DLA in the U.K.  Almost the

11   entire team was located in France.  There was one lawyer who at

12   the time was located in New York who was part of the team.  He

13   is now located in London, but principally I believe a European

14   operation.

15           THE COURT:  Then, I guess, Mr. Solomon we've got about

16   12 problems here, one of which is why are you coming to me for

17   this?  Do you want DLA in France?  I'm not sure anybody wants

18   to travel there now but --

19           MR. SOLOMON:  I mean, the short answer to that, your

20   Honor, is -- and we haven't even -- the personal jurisdiction

21   issue over DLA and whether DLA having a New York office and

22   what their arrangement is with their French office, I haven't

23   even looked at that issue, although I think that DLA is here

24   and they are subject to your jurisdiction.  Mr. Thiam is a

25   defendant in this case so this is the only place we would be

Fbhdrioc

1  getting that information.

2          THE COURT:  No.  That hasn't stopped other people from

3  doing whatever.

4          I'm not sure and perhaps Mr. Rotenberg can help.  I

5  know some little bit about DLA.  Is the London and/or Paris

6  office separate; that is to say, while it goes under the DLA

7  name, because it is a verein it is not the same as if this were

8  Cleary New York and Cleary U.K. or some such?

9          MR. ROTENBERG:  I believe that the U.S. operation and

10  the European operation are separate partnerships.  They are

11  obviously related and they are part of the verein, as you said.

12          Your Honor, I would want to note, though, that we

13  objected on foreign law ground and all of that in our

14  objections and responses, and the only I guess complaint we

15  received from Mr. Thiam's counsel was with respect to our

16  assertion of immunity.  So our numerous other objections which

17  we levied were never flagged for Mr. Thiam as an issue, and

18  really the only point they made back in July was with regard to

19  immunity and really with respect to that when we asked him

20  whether or not we had to produce a privilege log because we

21  were asserting immunity.

22          THE COURT:  I was looking at getting at this from

23  several different angles.

24          Mr. Solomon, it seems to me you slept on your rights

25  on this.  And, in any event, what's the point of a privilege

1    log where the issue here is not, you know, did a particular

2    memo go to, you know, Joe Blow but rather whether there is a

3    sovereign privilege here?

4              MR. SOLOMON:  Well, if they were correct, if DLA were

5    correct that they can say, hey, we worked for a sovereign

6    country and we are not subject to U.S. jurisdiction based on

7    sovereign immunity and therefore we're not responding, if that

8    were the correct position, then they're probably right.  Why

9    waste your tame with a privilege log?  Although, I mean, in

10   their opposition to our original subpoena, they listed all

11   kinds of privileges without any kind of articulation or

12   specification as to how they pertain.  But they're wrong about

13   sovereign immunity and I can show that very easily.  So I

14   mean --

15             THE COURT:  Then you are either going to make a formal

16   motion on sovereign immunity doesn't apply and deal with all

17   the other myriad issues, but to the extent your letter here

18   seems to say all you're asking the Court to rule on now is

19   whether they need to do a privilege log.

20             MR. SOLOMON:  Well, no, I want to pierce -- we have to

21   dispense with the sovereign immunity issue, which I think it

22   can be done -- the burden is theirs, but I think that the

23   sovereign immunity issue can be resolved very quickly.

24             THE COURT:  The other question is where have you been

25   all these months?  And I may just deny your request on the

Fbhdrioc

1   ground that it's too broad a subpoena and you slept on your

2   rights for well over a month and discovery ended, in theory,

3   for paper discovery August 28th, and this was not raised with

4   the Court in any way, shape or form before then and based on

5   DLA's letter it wasn't raised with them for a very lengthy

6   time, from sometime in July until the beginning of this month.

7            MR. SOLOMON:  I think that part of the finishing

8   sentence on "slept on your rights" is prejudice and I don't

9   think that DLA has any prejudice.  And I also don't think --

10           THE COURT:  Let's deal with the sleeping on the rights

11  half of it first.

12           MR. SOLOMON:  All right.  So we waited four months or

13  three months, but there are a lot of things that are still

14  going on.  I am not disputing that --

15           THE COURT:  Your request is denied.

16           MR. SOLOMON:  Your Honor, just to be clear, you are

17  not allowing us to make a motion to compel?

18           THE COURT:  Correct.

19           MR. SOLOMON:  Because we waited?

20           THE COURT:  A, you waited.  B, you shouldn't be here

21  in the first place.  You know, you want to think about a letter

22  rogatory to my friends in the U.K. or the folks in France, I'll

23  consider it.  This is a backdoor attempt, and while in other

24  situations I might say DLA holds itself out as one entity and,

25  you know, if it has any documents here, it's stuck, but not at

Fbhdrioc

```
 1   this point in the case.  We are getting to the point that

 2   enough is enough.

 3            So the subpoena is quashed as to DLA.

 4            MR. SOLOMON:  Thank you, your Honor.

 5            MR. ROTENBERG:  Thank you, your Honor.

 6            THE COURT:  All right.  So now we can go back to the

 7   letter and go in order.

 8            MR. LYTTLE:  Your Honor, I think we can one issue off

 9   the table.  Eric Lyttle -- good morning, your Honor -- for Rio

10   Tinto.

11            The first issue for Rio Tinto and in fact the only

12   issue that we raised, your Honor, against Vale was E&Y issue.

13   They have agreed --

14            THE COURT:  Remember, you guys are here all the time.

15   I know your shorthand.  The reporter doesn't.

16            MR. LYTTLE:  Sure.  I apologize.

17            They have agreed to produce a log, as we've requested,

18   so we will wait for that and evaluate privilege based on that

19   information and come back to your Honor if necessary.  They

20   have agreed under 502(d) to produce a final copy of the May 27,

21   2010 Ernst & Young report.  I just want on the record that they

22   will be providing that under 502(d).

23            We likewise, your Honor, were filing yesterday under

24   502(d) and have agreed to produce the communications with the

25   Investigator Livingstone.
```

Fbhdrioc

```
 1              THE COURT:  Good.  So that means we can go to page 8
 2      it looks like where we've got the related parties Aeneas,
 3      however it is pronounced, A-e-n-e-a-s, and then Landau and
 4      Fujihara.  And to finally resolve this issue, it seems to me
 5      the best way to deal with it is for you to hand up a few sample
 6      documents so I can look at them and see if I can determine
 7      based on that whether they are privileged or not.  So there are
 8      apparently four emails between Rio Tinto and Aeneas.
 9              MR. LYLE:  Yes, your Honor.  Michael Lyle for Rio
10      Tinto, your Honor.  I have the Landau/Fujihara one right now.
11      Let's start with that one.
12              THE COURT:  That's fine.
13              MR. LYLE:  Here is a sample.  Do you also want to see
14      the engagement letters?
15              THE COURT:  No, at least not yet.
16              MR. LYLE:  What you are looking at, your Honor, is an
17      email and --
18              THE COURT:  Hold on.  I can read.
19              (Pause)
20              All right.  So this is October 23, 2010, and which
21      privilege are you claiming?
22              MR. LYLE:  We are asserting Rule 26(b)(4)(D) work
23      product privilege as well as the attorney-client privilege.
24              THE COURT:  OK.  Which one?
25              MR. LYLE:  Both.
```

Fbhdrioc

```
1            THE COURT:  All right.  Generally "both" means we

2       can't figure it out, you figure it out, Judge, and hopefully it

3       is one of them.  I don't see this as attorney-client

4       communications.  So that's out.

5            So, work product.  Four years before this litigation

6       began?

7            MR. LYLE:  Yes, your Honor.

8            THE COURT:  What was the litigation that was being

9       contemplated?

10           MR. LYLE:  This litigation was the litigation that was

11      being contemplated.  This is post the April 2010 announcement

12      of the joint venture between Vale and BSGR, which prompted the

13      inquiry and the retention of the consulting experts that that

14      email is with.  If you will look, those consultants, all of the

15      individuals on there are either the consulting experts or

16      attorneys, both the internal counsel and external counsel for

17      Rio Tinto.

18           THE COURT:  Now, other than perhaps the sentence below

19      the first bullet under "Recommendations," other than perhaps

20      that sentence, it seems to me there is nothing here that is not

21      more business related than legal.

22           MR. LYLE:  Well, your Honor, the retention was

23      specifically with respect to, as the engagement letter lays

24      out, it does provide information as it relates to mining

25      operations, which was the purpose of the retention as the
```

Fbhdrioc

1    consultants.  And 26(b)(4)(D) indicates that it is facts known

2    or opinions held by the consulting experts.  So all --

3                 THE COURT:  These were not consulting experts.

4                 No privilege.  Produce it.

5                 Any others you would like me to look at, or are they

6    all going to be the same for the Landau group?

7                 MR. LYLE:  They are all similar, your Honor.

8                 THE COURT:  OK.  Then that's the Court's ruling.

9                 Do you want to give me a sample on Aeneas, or do you

10   want to just produce it?

11                MR. LYLE:  (Handing to the Court)

12                THE COURT:  This one is a letter -- email from

13   Jonathan Carr at Weil, Gotshal.  So that one would seem to be

14   privileged at least under a work product argument.

15                Any argument you want to make on that, Mr. Blackman?

16                MR. BLACKMAN:  Yes.

17                THE COURT:  I know you haven't seen it.

18                MR. BLACKMAN:  Yes.  Aeneas is a kind of curious

19   animal, leaving aside the original Trojan hero.  But the Aeneas

20   we are dealing with here today was identified by Rio Tinto

21   pursuant to the Court's order back in December of 2014, when we

22   had the first debate about the investigators, and they in fact

23   produced various Aeneas' reports, and the communication with

24   Aeneas that they are now withholding sounds to me like it is of

25   the same substance as communications with the other

Fbhdrioc

1    investigators that you ordered to be produced --

2              THE COURT:  Well, it may be.

3              MR. BLACKMAN:  -- in the same period.

4              THE COURT:  It may be the information given by

5    Aeneas -- and there are several other emails.  I will look at

6    one more.  This one is from a Rio Tinto lawyer clearly

7    contemplating a lawsuit against Vale, Steinmetz, BSGR, etc.  So

8    to the extent that the fact that a lawsuit was being

9    contemplated in November 2010 supports your statute of

10   limitations argument, that fact is now of record.

11             But the document itself very clearly is Mr. Carr's

12   thoughts about such a lawsuit and what information he would

13   like Mr. Toure at Aeneas to develop in accordance with that.

14   So this one on its face is very clearly attorney --

15             MR. BLACKMAN:  May I just add one other fact here?

16             The Court directed Rio Tinto some time ago to produce

17   its engagement letters with these investigators, and they did

18   produce an engagement letter with Aeneas, and we've learned

19   quite recently that there was this, quote, second engagement

20   which they say these four documents relate to.  I would ask

21   that at a minimum that they at least produce the engagement

22   letter so we can see what makes this different --

23             THE COURT:  Mr. Lyle, any problem with producing the

24   engagement letter?

25             MR. LYLE:  Yes, your Honor, I can show you the

Fbhdrioc

1   engagement letter.  It reflects much of that information that

2   you are looking at.

3           THE COURT:  All right.  Let me see it.

4           (Pause)

5           I'll also note, Mr. Blackman, that if you all had

6   reached an agreement relating to EY, etc., you might well have

7   gotten all of this.

8           MR. BLACKMAN:  We tried.

9           THE COURT:  Well, I understand --

10          MR. BLACKMAN:  And we brought back -- as counsel

11  indicated, we are the only ones who are making a 502(d)

12  production in this round.

13          THE COURT:  There are other items that you are not.

14          MR. LYLE:  To be clear, your Honor, we have also made

15  502(d) production.

16          THE COURT:  All right.  This was clearly a work

17  product engagement.  So, assuming all the other Aeneas

18  documents are in the same band, privileged.

19          You can take your documents back.

20          MR. BLACKMAN:  Can I make a last stab?  I think I know

21  what the Court will say.  But my friends at Rio Tinto did say

22  in the amended complaint, at paragraph 143, "Rio Tinto did not

23  know of or discover the unlawful conduct and resulting injury

24  alleged herein that underlies the RICO claims until after

25  April 2013."  I think we all think that may be --

Fbhdrioc

1            THE COURT:  You've got your argument merely based on

2    the dates and that they are claiming work product privilege.

3    So you've got this transcript.  You've got the privilege log.

4    If the fact that in October/November 2010 they were

5    investigating you guys, if that means they lost the statute of

6    limitations protection, so be it.

7            MR. BLACKMAN:  Just one other thing --

8            THE COURT:  That doesn't give you the facts of that

9    investigation.

10           MR. BLACKMAN:  I understand.

11           Did the Fujihara or Landau documents that you told

12    them to produce include the other one Fujihara or Landau

13    because there were two --

14           THE COURT:  That's what I assumed I was ruling on.

15    So, yes.

16           MR. LYLE:  Your Honor, with respect to the Fujihara

17    and Landau, I have the consulting agreement which indicates --

18           THE COURT:  I don't care.  I've ruled.  I've moved on.

19    We're done.

20           OK.  I think the next issue is the Rio Tinto document

21    production issue on page 15.  It looks like Rio Tinto has

22    offered to speak to its 11 disputed custodians.  Why don't that

23    resolve the issue?

24           MR. LIMAN:  Your Honor, I think I can simplify this in

25    terms of what we're asking for in answering your Honor's

Fbhdrioc

1     question at the same time.

2              We're not asking for the production of documents that

3     are duplicative.  There are five custodians who are listed in

4     our letter.  Those are custodians who we know from evidence

5     would have had communications with the investigators.  What

6     we're asking them to do is take the documents from those

7     persons, run them against the database that they have of

8     communications to investigators.  If the documents have already

9     been reviewed, then they don't need to review that document

10    again.

11             If they're right that all of the documents that these

12    individuals have with the investigators relevant to the

13    investigation have been produced or reviewed, they don't have

14    to do a single bit of work; they don't need to put a human eye

15    on it.  But if they're wrong, then with respect to that

16    remainder of documents, your Honor's orders, because you

17    ordered three times, require them to produce the custodians.

18             I can go through those arguments again, your Honor,

19    every single one of their arguments --

20             THE COURT:  No.  The advantage of all of these letters

21    is there is enough.  So, you know, if -- I guess my question is

22    this.  While you've said you're willing to go to the

23    custodians, how much documentation, particularly if it is now

24    limited to it looks like four custodians -- Maty, Munro, Court,

25    and Hitchcock -- why --

Fbhdrioc

1          MR. LIMAN:  Your Honor, there is also Toure.

2          THE COURT:  Toure is not a Rio Tinto person but an

3     outside consultant?

4          MR. LIMAN:  She was a Rio Tinto consultant.

5          THE COURT:  OK.  All right.  So those five, how much

6     would it cost to do whether keywords or whatever you've got to

7     do, sampling, whatever, to see if they have produced everything

8     and it looks like we are in a limited time period of 2010, but

9     maybe not?

10          MR. LYTTLE:  Your Honor, this is news to us.  But if

11    this is limited to a time period, 2010, and this is limited to

12    these five custodians and their communications with the

13    investigators only, we can do that.

14          THE COURT:  All right.  Mr. Liman, did I get the date

15    right?

16          MR. LIMAN:  Your Honor, the communications begin in

17    October of 2008 and run through 2010.  It shouldn't make much

18    of a difference.

19          THE COURT:  Let's limit it to 2010.  That seems to be

20    where you are having the big dispute on the statute of

21    limitations.

22          MR. LIMAN:  Your Honor, I think, actually, most of the

23    investigation began in 2008 and 2009.  If you will recall from

24    our letter, there was a decision by Rio Tinto to suspend the

25    investigation because of reasons --

Fbhdrioc

1          THE COURT:  All right.  Let's see if we go from the

2     second half, from July 1, 2008 to the end of 2010 for those

3     five people.  If it turns out there is a horrendous volume, you

4     will let Vale know and we'll work something out.  Otherwise,

5     you can double-check for more investigator communications.

6          OK.  Page 19, I've signed both of your proposed

7     orders.

8          As to the additional search terms from the time, other

9     than "Amer," which might have a technical problem, any reason

10    to search those four terms?

11         MR. SOLOMON:  Your Honor, Andrew Solomon for Thiam.

12         We are prepared to run searches but what we're

13    resisting is just plugging in "Aquil" and then getting all the

14    documents without any date or subject matter restriction and

15    then having 3 or 4,000 documents to review.

16         THE COURT:  Stop.  What is the likely volume?

17         MR. SOLOMON:  It is over 4,000 documents.

18         THE COURT:  First of all, big deal.

19         Secondly, what suggestion would you make for limiting

20    it

21         MR. SOLOMON:  Well, with Aquil, since the relevance of

22    Aquil was the house purchase in Dutchess County, we suggested

23    four, five terms that could be used to limit it to the house

24    transaction.  We made similar suggestions with respect to some

25    of the other folks but we haven't received anything back.  It

Fbhdrioc

1    is just you need to go back and run these search terms again.

2    Frankly, 4,000 documents, 3,000 document, I don't know the what

3    the exact number is, it is a lot of work and our client is an

4    individual.

5            THE COURT:  Well, 26-page single-spaced letters from

6    the parties to the Court at least once a month is a lot of work

7    also.  I'm not overly sympathetic but if you and I assume you

8    are Ms. Kaplan?

9            MS. KAPLAN:  I am.  Good morning, your Honor.

10           THE COURT:  Can figure out a way to limit it, that's

11   fine.  Otherwise, you guys got, you know, Mr. Thiam has had a

12   back seat.  Time to do a little more work.

13           Any suggestions on them, since it is limited to the

14   real estate issue?

15           MS. KAPLAN:  The search terms that were proposed --

16   the narrowing search terms that Mr. Thiam proposed were not

17   acceptable because they didn't even hit on the documents that

18   they had already produced relevant to these terms, but are open

19   to discussing a time period limitation with respect to when the

20   transaction was occurring.

21           THE COURT:  All right.  So if you limit it to 2011,

22   which seems to be --

23           MS. KAPLAN:  It is probably mid-2010 to mid-2012.

24           THE COURT:  All right.  What will that do to the

25   search number of hits?

Fbhdrioc

1          MR. SOLOMON:  It will reduce it.  I don't know the

2     exact number; we haven't run that.

3          THE COURT:  All right.  For the other three,

4     "Alabbar," "MAA" and "Amer" -- and I'm going to come back to

5     Amer in a minute to make sure you are not going to pick up

6     "American" and any other thing where Amer is the root -- other

7     than that, what is your suggestion on limiting it?

8          MR. SOLOMON:  Again, if we could limit it to a

9     timeframe?

10         THE COURT:  OK.  What is the proposed timeframe?

11         MS. KAPLAN:  Mid-2010 to mid-2012.

12         THE COURT:  All right.  Does that work?

13         MR. SOLOMON:  I think that will help, your Honor.

14         THE COURT:  And work with your experts so that you are

15    getting Amer as a standalone word, not --

16         MS. KAPLAN:  We are not looking for the wildcards,

17    your Honor.

18         THE COURT:  OK.  That takes care of all of that.  Get

19    it done promptly.

20         Roman numeral four on page 23 you are not asking me to

21    do anything.

22         MR. AUERBACH:  Judge, may I have just one moment?

23         THE COURT:  Yes.

24         MR. AUERBACH:  Martin Auerbach for the BSG defendants.

25         We have had a very productive, instructive dialogue,

Fbhdrioc

1    your Honor.  There are just two terms -- because I was asked to

2    run a new report and have run a new report, and there are only

3    two terms that seem to be outliers that have produced thousands

4    of hits without any clear relevance.  I thought this might be a

5    convenient way to deal with those two terms.

6              THE COURT:  Have you talked to your adversaries?

7              MR. AUERBACH:  We talked about one of them.

8              THE COURT:  So let's start with that one.

9              MR. AUERBACH:  Let's start with that one.  Thank you,

10   Judge.  The term is "Zogota," which is a separate mining

11   concession, the name of which appears once in the complaint, in

12   the amended complaint, as a passing reference to a concession

13   adjacent to the Simandou concession.  As far as I can tell,

14   there is no relevance, it is not part of this case, and it

15   produces over 5,000 hits, which in this context are

16   significant.

17             THE COURT:  Mr. Lyttle.

18             MR. LYTTLE:  Your Honor, this is news to me.  We have

19   worked cooperatively.  I suggest that we get a chance to look

20   at this and talk with Mr. Auerbach a bit more.

21             Zogota is a separate concession, right around

22   Simandou, held by BSGR.  Our view is, as alleged in the

23   complaint, that BSGR was using information derived at Zogota,

24   but I think there may be ways to limit this with connectors and

25   boolean modifiers.

Fbhdrioc

```
 1              THE COURT:  I will let the two of you work it out but
 2      get it done quickly.
 3              MR. AUERBACH:  Great.  And Camara was the other term.
 4      We will do the same on that.
 5              THE COURT:  All right.  Number Roman Numeral five,
 6      update on predictive coding.  I don't need those updates.  I
 7      don't want those updates until there is something that either
 8      you or the Special Master bring to my attention needing my
 9      work.  Enough is enough.
10              All right.  Roman VI, which was third-party discovery
11      of DLA we've dealt with.  I don't know what Veracity is.  Is
12      that part of the DLA issue?  But since no one is here from
13      Veracity there is nothing I can do about it.
14              MR. SOLOMON:  Logically, your ruling as to DLA should
15      apply to Veracity.
16              THE COURT:  All right.  Fine.  Good.
17              OK.  It seems to me that if I don't give you a new
18      cutoff life will go on indefinitely and you would be finding
19      something to pick at the other side about.  Can it be
20      November 30th?  December 15th?  What's your pleasure to get all
21      of this done, etc.?
22              MR. LYTTLE:  Your Honor, with the Thanksgiving
23      holiday, we need a little past November 30.
24              THE COURT:  Give me a date.  If there is agreement, I
25      am probably going to agree with all of you.
```

Fbhdrioc

1          MR. LYTTLE:  I think we certainly could make

2     December 15th work.

3          I think we have agreement on December 15th, your

4     Honor.

5          THE COURT:  All right.  That's it.  And that means

6     nothing new.  Just finish up the stuff that has been lurking,

7     etc.  Work with Ms. Grossman on the predictive coding par side

8     of life.  Get it all done.

9          And your stay of depositions expires December 1,

10    December 15?

11         MR. LIMAN:  I think, December 2.

12         THE COURT:  I assume you are going to make another

13    application to Judge Berman?

14         MR. LIMAN:  You know, we'll see what happens with

15    respect to the motion, and if we need to we will make another

16    application next week or so.

17         THE COURT:  All right.  We'll see where that goes.

18    You might consider whether there are any depositions on which

19    BSGR has so little interest that certain things can go forward

20    with BSGR getting the transcript and preserving its rights, or

21    not.  You know, if you don't do that and if Judge Berman gives

22    you a further stay, at some point the stay is going to be

23    lifted and for all the nice long period you have had to get

24    your document discovery way out of proportion to the merits,

25    perhaps you are going to wind up finding you have a lot less

Fbhdrioc

1    time and will perhaps be multi-tracking whatever on the

2    depositions.  So if there is anything that can go forward while

3    we are in a period that we're still waiting for the go and

4    Judge Berman --

5              MR. LIMAN:  I can inform your Honor that from our

6    perspective there are no U.S. witnesses.  So, you know.

7              THE COURT:  Which means what going forward?

8              MR. LIMAN:  Which means that depositions will either

9    have to be scheduled abroad or with respect to people who are

10   potentially relevant, the plaintiffs will have to figure out

11   what kind of methods exist to obtain that testimony.

12             THE COURT:  All right.  Well, you know, any people who

13   are party witnesses I suspect, you know, whether you decide on

14   some cost sharing to bring them here or whether you decide to

15   shlep around the world, but either you are going to be able to

16   control them and have them appear for a deposition somewhere or

17   you're not, but in which case they are not going to be trial

18   witnesses either.  So you all should start working that out and

19   thinking about it.

20             In certain countries, if you have to take a consent

21   deposition, it may have to be at the embassy.  That used to be

22   the rule.  And, you know, you can't necessarily get into the

23   embassy on two days' notice.  So it may be premature because

24   you can't reserve the embassy until you know when you are going

25   to start doing depositions and et cetera.  On the other hand,

Fbhdrioc

1    if you find out that, you know, a lot of witnesses are in

2    country X and there is a six-month wait for the embassy, you

3    might want to put your request in so that when Judge Berman

4    rules and you start taking depositions you will be able to have

5    your slot reserved at the embassy.

6         Start, you know -- at a minimum, I think you all are

7    in a position now to decide what witnesses you are going to be

8    asking for from each other, what nonparty witnesses you are

9    going to be going after.  And on that I can't help you at all

10   other than to sign letters rogatory, and if it is the U.K. you

11   might be in good shape but if it is elsewhere probably not but

12   you'll try.  But, you know, figure out what you're going to

13   want to do in terms of, you know, one plaintiff deposition

14   followed by one defendant deposition, a two-to-one ratio or

15   whatever you are all going to do, start thinking ahead.

16        You know, I probably would not object to you asking

17   Judge Berman, you know, for a stay to the end of the year if he

18   hasn't decided by then.  But after that at some point either

19   there will be a decision or without the decision you may have

20   to start going forward, and preplanning on that will put you in

21   much better stead because once we start and, you know, you may

22   be getting lots and lots of frequent flier miles but you are

23   going to be moving very quickly during that stage.  This case

24   has been for me, although it is a big case, around a lot longer

25   than I would like it.

Fbhdrioc

1          Do we need a December conference date?

2          MR. LIMAN:  I don't think so.

3          (Pause)

4          MR. LYLE:  I don't think we need one.  I think we are

5     all --

6          THE COURT:  You know, it is so nice to see agreement

7     between the two of you and the other people who were silently

8     nodding their head or ignoring the issue.  So we'll leave it

9     that you will contact me if there are any disputes that need

10    the Court's resolution.  Otherwise, you will get everything

11    done by December 15th and start planning for the barrage of

12    depositions once you are given the green light to go do that.

13         MR. LYTTLE:  Your Honor, may I clarify one point?

14         THE COURT:  Yes.

15         MR. LYTTLE:  The December 15th date does not apply to

16    the pending Hague request that we have?

17         THE COURT:  Correct.  Whatever is outstanding is, you

18    know, not going to be stopped on the ground that, you know, my

19    counterparts abroad are slower than I am or whatever.  But no

20    new ones without Court leave, you know, or party agreement,

21    should there be that.

22         MR. LIMAN:  Your Honor, I assume the same also applies

23    to Ms. Grossman's processes which are ongoing.

24         THE COURT:  I would like, subject to her availability,

25    etc., for that to be all wrapped up by December 15th.  But if

Fbhdrioc

1    she needs more time or she agrees with you that you all need

2    more time, you will apply to me for that.  But I'm hoping you

3    are near the end of the road with her and that you're meeting

4    with her or you met with her yesterday or you are going to --

5              MR. LIMAN:  There was a meeting with her yesterday.

6    Without going into detail, there is a pending proposal that we

7    made --

8              THE COURT:  Never mind.  I don't want to know.  Just I

9    am hopeful that December 15th applies to that.  If Ms. Grossman

10   thinks you deserve more time than that, she'll let me know or

11   you'll let me know.

12             But, you know, the idea is to be done so that if Judge

13   Berman says motions all denied, depositions go forward, that

14   you are ready to go and not, oh, OK, we still need to play with

15   the car model a little more and we're not ready and won't be

16   for another month.

17             All right.  Happy Thanksgiving all, and in the

18   unlikely event I don't see you before the end of the year,

19   happy holidays, happy new year.

20             ALL COUNSEL:  Thank you, your Honor.

21             THE COURT:  All right.

22

23                                      -  -  -

24

25